IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MONA DOBRICH, et al., | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | No. 05-cv-00120-JJF |
| | : | |
| HARVEY L. WALLS, et al., | : | |
| | : | |
| Defendants. | : | |

**COMPENDIUM OF UNREPORTED OPINIONS TO PLAINTIFFS'
ANSWERING BRIEF IN OPPOSITION TO
DEFENDANTS WALLS, ISAACS, EVANS, COHEE, HASTINGS,
BUNTING, BIRELEY, HATTIER, MCCABE, HOBBS AND
SAVAGE, AND THE INDIAN RIVER SCHOOL BOARD AND
INDIAN RIVER SCHOOL DISTRICT'S MOTION TO DISMISS ALL CLAIMS**

Thomas J. Allingham II (#476)
Robert S. Saunders (#3027)
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899
(302) 651-3000

Attorneys for Plaintiffs

Dated: May 18, 2005

415334.01-Wilmington S1A

# INDEX

CASES                                                                    TAB NO.

Carter v. Brady,
        C.A. No. 99-757-JJF, 2001 WL 34368378 (D. Del. Mar. 30, 2001) . . . . . . . 1

Doe v. Tangipahoa Parish Sch. Bd.,
        C.A. No. 03-2870, 2005 WL 517341 (E.D. La. Feb. 24, 2005),
        appeal docketed, No. 05-30294 (5th Cir. Mar. 22, 2005) . . . . . . . . . . . . . . . 2

Montanez v. Thompson,
        C.A. No. 03-6713, 2004 WL 2668582 (E.D. Pa. Nov. 19, 2004) . . . . . . . . . 3

N.A.I.F. Inc. v. Snyder,
        C.A. No. 03-506-JJF, 2005 WL 735554 (D.Del. Mar. 30, 2005) . . . . . . . . . 4

Prof'l Staff Leasing Corp. v. Unicare Life & Health Ins. Co.,
        C.A. No. 02-11-JJF, 2003 WL 21359621 (D. Del. Mar. 31, 2003) . . . . . . . . 5

Wright v. O-Hara,
        C.A. No. 00-1557, 2002 WL 1870479 (E.D. Pa. Aug. 14, 2002) . . . . . . . . . 6

# TAB 1



Not Reported in F.Supp.2d

2001 WL 34368378 (D.Del.)

**(Cite as: 2001 WL 34368378 (D.Del.))**

Page 1

**H**
Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
Sherman CARTER, Plaintiff,
v.
Attorney General M. Jane BRADY, et al.,
Defendants.
**No. Civ.A. 99-757-JJF.**

March 30, 2001.
Sherman Carter, Wilmington, Delaware, Plaintiff,
pro se.

Stuart B. Drowos, Deputy Attorney General,
Delaware Department of Justice, Wilmington,
Delaware, for Defendants.

*MEMORANDUM OPINION*

FARNAN, J.

**\*1** Presently before the Court is Defendants'
Motion to Dismiss (D.I.7), filed pursuant to Rules
12(b)(6) and 12(b)(5) of the Federal Rules of Civil
Procedure. For the reasons stated below, the Court
will grant the motion in part and will deny the
motion in part.

BACKGROUND
Plaintiff Sherman A. Carter ("Plaintiff") was
sentenced on August 4, 1994 to three years of
imprisonment at Level V minus credit for time
already served, suspended after one year to Level
IV in-patient drug treatment for two years. (D.I. 8,
Exh. A at ¶ 3). Plaintiff served one year and six
days at Level V, and on September 9, 1994, became
eligible for Level IV; however, Plaintiff remained at
Level V until November 30, 1994, which is when
space first became available at Level IV. (D.I. 8 at
¶ 4).

On December 1, 1997, Plaintiff was incarcerated
for his third probation violation. He was sentenced
by the New Castle County Superior Court on
December 16, 1997, to two years at Level V
effective on December 16, 1997, but, upon
successful completion of a drug rehabilitation
program, suspended for the remainder of the
sentence at Level III. [FN1] (D.I. 8, Exh. A at ¶
3-4). The December 16, 1997 sentencing order did
not provide Plaintiff with credit for time already
served. (D.I.8, Exh. B).

> FN1. Plaintiff never completed a drug
> rehabilitation program.

Plaintiff alleges that as early as July, 1998, he
attempted to contact the Delaware Correctional
Center's ("DCC") Records Department in order to
clarify that he should have received credit for time
already served. (D.I. 1 at 7). In August of 1998,
Plaintiff alleges that he filed a grievance with the
DCC claiming that the Records Department was
erroneously interpreting his sentence. (D.I. 1 at 8).
Plaintiff was provided a hearing in October, 1998,
and argued that he was entitled to credit for time
served pursuant to 11 *Del. C.* § 3901. [FN2] (D.I. 1
at 8). Plaintiff contends that the committee at the
hearing promised Plaintiff that they would look into
the matter, but that he did not hear back from
anyone until "some five months later." (D.I. 1 at 8).

> FN2. Section 3901(b) of the Delaware
> Code states in relevant part: "[a]ll
> sentences for criminal offenses of persons
> who at the time the sentence is imposed are
> held in custody in default of bail, or
> otherwise, shall begin to run and be
> computed from the date of incarceration
> for the offense for which said sentence
> shall be imposed."

Meanwhile, on March 4, 1999, the superior court
amended Plaintiff's December 16, 1997 sentencing

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 2

2001 WL 34368378 (D.Del.)

**(Cite as: 2001 WL 34368378 (D.Del.))**

order to specifically provide that Plaintiff was to receive "credit for time previously served." (D.I.8, Exh. C). Rebecca McBride ("Defendant McBride"), the Records Supervisor at the DCC, interpreted this amended sentencing order as affording Plaintiff credit for December 1, 1997 until December 16, 1997, the time that he was incarcerated but still awaiting sentencing on his third probation revocation. (D.I. 8, Exh. A at ¶ 5). Plaintiff, however, interpreted the March 4, 1999 amended sentencing order to mean that he was to receive credit for the extra time served at Level V on his original sentence, which included six days over the one-year sentence at Level V and the eighty-two extra days spent at Level V while waiting for space to open up at Level IV. [FN3] (D.I. 8 at ¶ 6). With credit for these eighty-eight days, Plaintiff would have been released on July 5, 1999. (D.I. 8 at ¶ 5).

> FN3. It is unclear from a reading of the Complaint and the exhibits attached to Plaintiff's brief whether this indeed was Plaintiff's contention regarding the appropriate calculation of his sentence. Some exhibits suggest that he was arguing for 16 days credit--consistent with Defendant McBride's calculation. Some exhibits suggest that he believed he should be released in January or February of 1999. Some exhibits appear to argue that he should receive credit for the extra eighty-eight days he served at Level V on his original sentence back in 1994.

**\*2** Plaintiff alleges that he repeatedly complained to the warden, the deputy warden, and the commissioner that his sentence was being misinterpreted, but that his complaints were ignored. [FN4] (D.I. 1 at 8). Plaintiff also filed numerous petitions in state court seeking his release from incarceration, but such relief was repeatedly denied.

> FN4. The Court notes that Plaintiff's Complaint is not clear as to when he attempted to contact these people--either before or after the March 4, 1999 amended sentencing order was issued.

Plaintiff alleges that he began writing to politicians in May, 1999. (D.I. 1 at 10). According to Plaintiff, he contacted the Lieutenant Governor's office on May 12, 1999, which accordingly requested that an employee in the Delaware Department of Corrections' ("DOC") Administrative Building examine Plaintiff's complaint. (D.I. 1 at 10). In early July of 1999, Plaintiff alleges that someone in the Lieutenant Governor's office contacted a family member of Plaintiff and informed said family member that Plaintiff should have been released sometime between June 1, 1999 and June 5, 1999. (D.I. 1 at 10). Upon receiving this information, Plaintiff claims that he began talking about filing a lawsuit, which caused the contact in the Lieutenant Governor's office to "recant[ ] her statement." (D.I. 1 at 11).

Soon thereafter, Plaintiff alleges that he received a letter from Mary Page Bailey, a Deputy Attorney General in the Delaware Department of Justice ("DAG Bailey"), who informed Plaintiff that she would send a letter to the superior court asking for a clarification of the March 4, 1999 amended sentencing order. (D.I. 1 at 11). DAG Bailey sent this letter on July 22, 1999. (D.I.8, Exh. D). The superior court responded by letter dated August 2, 1999, stating that: "to the extent that [Plaintiff] may have served more than one year Level V on the original sentence, the excess time should be applied to" the sentence Plaintiff received on December 16, 1997, as amended on March 4, 1999. (D.I.8, Exh. D).

Defendant McBride received a copy of the superior court's letter on August 3, 1999, and immediately recalculated Plaintiff's sentence in accordance with the letter resulting in a release date of July 5, 1999. (D.I. 8, Exh. A at ¶ 9). Plaintiff was released from the DCC that day.

Plaintiff filed the instant Complaint on November 5, 1999 against Attorney General M. Jane Brady, Commissioner Stanley Taylor, Warden Robert Snyder, and Defendant McBride (collectively "Defendants") in their personal capacities, alleging violations of 42 U.S.C. § 1983 by depriving Plaintiff of his Eighth and Fourteenth Amendment

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

2001 WL 34368378 (D.Del.)

**(Cite as: 2001 WL 34368378 (D.Del.))**

rights when they kept Plaintiff incarcerated for almost a full month after his sentence had expired. (D.I. 1 at 3). Defendants filed the instant Motion to Dismiss (D.I.7) on March 17, 2000.

STANDARD OF REVIEW

When a court analyzes a motion to dismiss brought under Rule 12(b)(6), the "factual allegations of the complaint must be accepted as true." *Dow Chem. Co. v. Exxon Corp.,* 30 F.Supp.2d 673, 693 (D.Del.1998). The Court must draw all reasonable inferences in favor of the nonmoving party. *Id.* at 694. In sum, the only way a court can grant a Rule 12(b)(6) motion to dismiss is "if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations" contained in the complaint. *Id.*

DISCUSSION

*3 In order to establish a claim under 42 U.S.C. § 1983, the plaintiff must show that the conduct complained of: (1) was committed by a person acting under color of state law; and (2) deprived the plaintiff of a right secured by the Constitution or laws of the United States. *Barna v. City of Perth Amboy,* 42 F.3d 809, 815 (3d Cir.1994) (citations omitted). Because there is no dispute that Defendants were acting under color of state law, the Court will focus solely on whether or not Plaintiff was deprived of any federally secured rights.

A. Unlawful Incarceration

Detaining a prisoner beyond the termination of his or her sentence can amount to cruel and unusual punishment in violation of the Eighth Amendment. *Sample v. Diecks,* 885 F.2d 1099, 1108 (3d Cir.1989). To state a Section 1983 claim for incarceration beyond the expiration of a prisoner's sentence, a prisoner must establish that: (1) a prison official "had knowledge of the prisoner's problem and thus of the risk that unwarranted punishment was being, or would be, inflicted"; (2) the prison official "either failed to act or took only ineffectual action under the circumstances, indicating that his response to the problem was a product of deliberate indifference to the prisoner's plight"; and (3) a causal connection exists between the prison

official's response to the problem and the unjustified detention." *Moore v. Tartler,* 986 F .2d 682, 686 (3d Cir.1993).

Defendants do not dispute that the first element is satisfied; rather, they contend that Plaintiff has failed to allege facts that could warrant a finding that Defendants acted with deliberate indifference towards Plaintiff's problem, and that there is no causal connection between Defendants' conduct and Plaintiff's unlawful incarceration because Defendants did not have the authority to amend or alter the superior court's sentencing order. (D.I. 8 at ¶ 6). The Court concludes that Defendants' contentions lack merit.

1. Causal Connection

The Court concludes that, after March 4, 1999, Defendants' conduct is sufficiently connected to Plaintiff's unlawful incarceration to survive the instant motion to dismiss. Before March 4, 1999, the sentencing order specifically required that Plaintiff be imprisoned at Level V for two years effective as of the date of sentencing, subject to suspension at Level III upon completion of a drug rehabilitation program. Prison officials do not have the authority to amend or alter a sentencing order issued by a court. Therefore, the Court concludes that Defendants' inaction prior to March 4, 1999 is not causally connected to Plaintiff's unlawful incarceration. However, the Court cannot conclude as a matter of law that Defendants' inaction after March 4, 1999, is not causally connected to Plaintiff's unlawful incarceration because Defendants did have the authority to seek clarification of ambiguities in Plaintiff's amended sentencing order.

2. Deliberate Indifference

*4 Defendants contend that Plaintiff's Complaint does not allege sufficient facts for a finding that Defendants acted with deliberate indifference to Plaintiff's problem. (D.I. 8 at ¶ 6). As evidence of this, Defendants contend that Defendant McBride understood the March 4, 1999 amended sentencing order to require that Plaintiff receive credit for his

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 4

2001 WL 34368378 (D.Del.)

**(Cite as: 2001 WL 34368378 (D.Del.))**

December 1, 1997 to December 16, 1997 incarceration. (D.I. 8 at ¶ 6). Furthermore, Defendants contend that upon receiving the amended sentencing order, Plaintiff's records were adjusted immediately to reflect credit for these 16 days. (D.I. 8 at ¶ 6).

The Court concludes that Plaintiff has sufficiently alleged deliberate indifference on the part of Defendants. Plaintiff alleges that he repeatedly complained that his release date was possibly miscalculated. The Court notes that the rationale for Plaintiff's contention, as reflected in the exhibits attached to Plaintiff's Complaint and to his brief in opposition to the instant motion, is not always consistent or comprehensible. However, Plaintiff does allege that a Deputy Attorney General admitted to Plaintiff that the March 4, 1999 amended sentencing order was ambiguous as to whether it required credit for the time served from December 1, 1997 to December 16, 1997, or whether it required that Plaintiff be afforded credit for the extra eighty-eight days he spent at Level V in 1994. (D.I. 1 at 11). Then, Plaintiff's contention received further support when the Delaware Supreme Court issued an opinion on May 12, 1999, reaffirming that when a person on probation has his or her probation revoked, the probationer should be "given Level V credit for [time] served at Level V incarceration while waiting for available space at Level IV work release" on his original sentence. *Gamble v. Delaware,* 728 A.2d 1171, 1172 (Del.1999). It appears that those responsible for the time served only started listening to Plaintiff when he began to refer to *Gamble* in his letters and pleas for help.

Defendants contend that these allegations do not allow for a conclusion of deliberate indifference because Plaintiff had requested that Defendants "recalculate his sentence in accordance with *Gamble,"* which Defendants did not have the authority to do. (D.I. 8 at ¶ 6). However, Plaintiff did not ask for a recalculation of his sentence; rather, Plaintiff asked that Defendants recalculate his release date in accordance with his interpretation of the ambiguous March 4, 1999 amended sentencing order. The fact that Defendants failed to take any timely action in response to Plaintiff's complaints leads the Court to conclude that Plaintiff does sufficiently allege deliberate indifference for purposes of surviving the instant motion to dismiss.

Defendants nonetheless contend that they "immediately" responded to the confusion over the March 4, 1999 amended sentencing order by writing a letter to the superior court requesting that the court clarify the ambiguity. (D.I. 8 at ¶ 6). However, this letter was not written until July 22, 1999 and Defendants provide no explanation for the delay. As a result of this delay, the confusion was not rectified until almost a month after Plaintiff's appropriate release date. Thus, the Court concludes that Defendants' contention does not support a motion to dismiss. *See Moore,* 986 F.2d at 687 (granting motion for summary judgment only because the defendants immediately and actively investigated the prisoner's claim of a sentence miscalculation, despite that the investigation was extremely slow and inept); *Doyle v. U.S. Dep't of Justice,* 1995 WL 412406, at *8 n. 17 (E.D.Pa. July 7, 1995)(holding that a prisoner did not establish deliberate indifference when the defendants "thoroughly investigated" the prisoner's claim of sentence miscalculation); *Campbell v. Illinois Dep't of Corr.,* 907 F.Supp. 1173, 1181 (N.D.Ill.1995) (same)(citing *Moore,* 986 F.2d at 686; *Sample,* 885 F.2d at 1108-09).

B. Personal Involvement of Each Defendant

*5 Defendants next contend that Plaintiff does not adequately allege individual involvement by each Defendant in the complained of conduct. (D.I. 8 at ¶ 7). Since Defendants cannot be held liable for Section 1983 violations under the doctrine of respondeat superior, Defendants contend that the Court should grant their motion to dismiss. (D.I. 8 at ¶ 8). The Court agrees that Plaintiff must allege some personal involvement by each individual Defendant in order to maintain a claim against that Defendant, and that "not every official who is aware of a problem exhibits [deliberate] indifference by failing to resolve it." *Sample,* 885 F.2d at 1110. To determine if an individual Defendant is liable for a prisoner being incarcerated beyond the expiration of his sentence, an examination of the individual

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 5

2001 WL 34368378 (D.Del.)

**(Cite as: 2001 WL 34368378 (D.Del.))**

Defendant's "official duties and his or her role in the everyday workings of the prison" is necessary. *Campbell,* 907 F.Supp. at 1182.

1. Defendant McBride

It is apparent from Defendants' briefs that Defendant McBride, as the Records Supervisor at the DCC, had the authority to calculate Plaintiff's release date in accordance with the March 4, 1999 amended sentencing order. (D.I.8, Exh. A). In his Complaint, Plaintiff alleges that he wrote "numerous letters" to the Records Department trying to clarify his sentence miscalculation. (D.I. 1 at 2). Therefore, the Court concludes that Plaintiff sufficiently alleges personal involvement by Defendant McBride to survive the motion to dismiss. *See Sample,* 885 F.2d at 1111 (affirming Section 1983 judgment against a records supervisor for a prisoner's unlawful detention).

2. Defendant Snyder and Defendant Taylor

Plaintiff alleges that he wrote numerous letters to Defendant Snyder, as warden of the DCC, and Defendant Taylor, as commissioner of the DOC, seeking their assistance in rectifying the problem. (D.I. 1 at 2). The Court of Appeals for the Third Circuit has specifically held that policymaking officials such as the Commissioner of the Bureau of Corrections can be held liable under Section 1983 for violating a prisoner's due process rights, by keeping the prisoner incarcerated beyond the expiration of his sentence, when that policymaker "authorizes constitutionally inadequate procedures" for a prisoner to challenge the calculation of his release date. *Sample,* 885 F.2d at 1114.

The Third Circuit has also stated that, although a prison warden "does not exhibit deliberate indifference by failing to address a sentence calculation problem brought to his attention when there are procedures in place calling for others to pursue the matter," the court refused to hold that a prison warden could never be liable for sentence miscalculations when his job description requires his or her involvement in such issues. *Id.* at 1110. *See also Homoki v. Northampton County,* 86 F.3d

324, 325 (3d Cir.1996)(reversing the district court's granting of a motion for summary judgment filed by the warden when the prisoner had raised issues of material fact as to whether he was incarcerated beyond the expiration of his sentence); *Douglas v. Murphy,* 6 F.Supp.2d 430, 432 (E.D.Pa.1998) (suggesting that a warden could be held liable for a prisoner being incarcerated beyond the expiration of his sentence).

**\*6** Applying the above standards, absent any evidence regarding Defendants Snyder's and Cook's official duties, the Court cannot conclude as a matter of law that they cannot be held liable for Plaintiff's unlawful detention. *See Campbell,* 907 F.Supp. at 1182 (refusing to dismiss the defendants from plaintiff's unlawful incarceration claim because the court did not have any evidence as to each individual defendant's official duties at the prison).

3. Defendant Brady

The Court concludes that Defendant Brady should be dismissed from the case. In his Complaint, Plaintiff alleges that various employees in the Delaware Department of Justice ("DOJ") concealed his sentence miscalculation. (D.I. 1 at 12). Plaintiff alleges that Defendant Brady should be held liable because she "has altimate [sic] responsibility for actions taken by her staff which violated Plaintiff's rights," and that her acquiescence to unethical policies, customs, and practices within the DOJ subject her to liability. (D.I. 1 at 15- 17).

Courts have held that liability can extend to "non-prison officials who play a direct role in a person's unlawful incarceration." *Adams v. Costello,* 1998 WL 242600, at \*4 (E.D.Pa. May 13, 1998). Therefore, prosecutors potentially can be held liable for a prisoner's Section 1983 unlawful incarceration claim. However, in the instant case, Defendant Brady did not play a "direct role" in Plaintiff's unlawful incarceration; rather, Plaintiff merely alleges that Defendant Brady acquiesced to deficient procedures. Although a prison policymaker can be held liable for approving deficient procedures at a prison, the Court is not

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

2001 WL 34368378 (D.Del.)

**(Cite as: 2001 WL 34368378 (D.Del.))**

aware of any authority suggesting that a State Attorney General can be liable under circumstances similar to those in the instant case. Therefore, the Court concludes that Defendant Brady should be dismissed as a Defendant.

C. Defendants' Affirmative Defenses

Defendants also raise numerous affirmative defenses in their motion, including: (1) Eleventh Amendment immunity, (2) qualified immunity, (3) sovereign immunity, and (4) protection under the State Tort Claims Act. (D.I. 8 at ¶ 9-12). The Court concludes that Eleventh Amendment immunity does not apply in the instant case because Plaintiff is only suing Defendants "in their personal capasity [sic]." (D.I. 1 at 1). The claim for qualified immunity has been rendered moot by the Court's conclusion above that Plaintiff sufficiently alleges deliberate indifference. Lastly, the doctrine of sovereign immunity and the State Tort Claims Act do not apply to Section 1983 claims seeking redress for federally protected rights. Therefore, the Court concludes that none of these affirmative defenses are applicable in the instant case.

D. Service of Process

Defendants next contend that Defendants Snyder and McBride have not been served in this case, and that these Defendants should therefore be dismissed pursuant to Rule 12(b)(5) of the Federal Rules of Civil Procedure. (D.I. 8 at ¶ 13). Defendants' contentions regarding lack of service appear weak in light of the documentary evidence submitted by Plaintiff. Plaintiff claims that he mailed copies of his Complaint and two waiver forms to Defendants Snyder, Taylor, and McBride, on November 8, 1999. (D.I. 15 at ¶ 16; Exh. 24). Defendants' counsel sent a letter to Plaintiff dated December 21, 1999, in which Defendants' counsel informed Plaintiff that he had requested that his clients sign the waiver forms. (D.I.15, Exh. 25). Defendants' counsel sent Plaintiff another letter dated March 3, 2000, indicating that the waivers signed by Defendants Snyder and McBride were misfiled and that efforts were underway to locate them. (D.I.15, Exh. 26). Also in this letter, Defendants' counsel

indicated that he intended to file an Answer to Plaintiff's Complaint in the near future. (D.I.15, Exh. 26). Based on this record, the Court concludes that dismissal pursuant to Rule 12(b)(5) is not warranted.

*7 Defendants also contend that Plaintiff has failed to comply with 10 *Del. C.* § 3104(c), which requires that a plaintiff serve the Attorney General, State Solicitor, or Chief Deputy Attorney General whenever a state official is sued in connection with the performance of his or her discretionary duties. (D.I. 8 at ¶ 13). Without deciding whether or not 10 *Del. C.* § 3104 applies in the instant case, the Court concludes that dismissal is not warranted where Defendants received adequate notice of the filing of Plaintiff's pro se Complaint.

CONCLUSION

For the reasons discussed above, the Court concludes that Defendants' Motion to Dismiss (D.I.7) will be granted insofar as it seeks to dismiss Attorney General M. Jane Brady as a Defendant. The Court further concludes that Defendants' Motion to Dismiss (D.I.7) will be denied in all other respects.

An appropriate Order will be entered.

*ORDER*

At Wilmington, this *30* day of March, 2001, for the reasons set forth in the Memorandum Opinion issued on this date;

IT IS HEREBY ORDERED that:
   1. Defendants' Motion to Dismiss (D.I.7) is *GRANTED* insofar as it seeks to dismiss Attorney General M. Jane Brady as a Defendant.
   2. Defendants' Motion to Dismiss (D.I.7) is *DENIED* in all other respects.

2001 WL 34368378 (D.Del.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**TAB 2**



Slip Copy                                                                                    Page 1

2005 WL 517341 (E.D.La.)

**(Cite as: 2005 WL 517341 (E.D.La.))**

---

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
E.D. Louisiana.
John DOE, Individually and as next friend of his
minor children, James Doe, and
Jack Doe,
v.
TANGIPAHOA PARISH SCHOOL BOARD, et al
**No. Civ.A. 03-2870.**

Feb. 24, 2005.
Ronald Lawrence Wilson, Attorney at Law, New
Orleans, LA, for Plaintiff.

Albert Kirk Gasperecz, Adams & Reese, New
Orleans, LA, James A. Keith, Adams & Reese,
Jackson, MS, for Defendants.

*Opinion* [FN1]

> FN1. Laura A. Cisneros, a third year law
> student at Loyola University of New
> Orleans School of Law, assisted in the
> research and preparation of this decision.

BERRIGAN, J.

**\*1** This case involves a First Amendment
Establishment Clause challenge to the practice of
the Tangipahoa Parish School Board ("School
Board") of opening each board meeting with a
religious invocation. Plaintiff brings this action
pursuant to 42 U.S.C. § 1983 and 28 U.S.C. § 2201.
Plaintiff seeks declaratory judgment that
Defendants' action violates the Establishment
Clause of the First Amendment and injunctive relief
to enjoin Defendants from continuing the practice.

The parties ask this Court to decide which standard
applies when analyzing the constitutionality of the
School Board's practice of opening board meetings
with prayer, and whether, under that standard, such
practice violates the Establishment Clause.

This case sits between two opposing lines of
constitutional thought. The first holds that officially
endorsed prayer in the primary and secondary
public school setting is unconstitutional, while the
second holds opening a legislative session with
prayer is permissible and does not violate the
Establishment Clause. Because a school board has
features characteristic of both settings, the legal
standard to apply in this case is less than obvious.

Plaintiff contends that the analysis must be
conducted under the three-part test first articulated
by the Supreme Court in *Lemon v. Kurtzman,* 403
U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971),
which held that government action, to comply with
the Establishment Clause, must (1) have a secular
purpose; (2) have the primary effect of neither
advancing nor inhibiting religion; and (3) not foster
an excessive governmental entanglement with
religion. Conversely, the defense argues that the
School Board's practice falls under the legislative
prayer exception and should therefore be analyzed
under *Marsh v. Chambers,* 463 U.S. 783, 103 S.Ct.
3330, 77 L.Ed.2d 1019 (1983), which held that
opening prayers are constitutionally permissible at
sessions of a state legislature.

This case came before the Court for a bench trial
on the stipulations and briefs and was taken under
advisement. Having considered the record, the
stipulations, arguments of counsel, and the law for
the reasons set forth below, the Court declines
Defendants' invitation to apply the *Marsh* exception
to prayers delivered at their public school board
meetings. Without the benefit of this exception,
Defendants' practice of opening each board meeting
with a religious invocation must be assessed under

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                Page 2

2005 WL 517341 (E.D.La.)

(Cite as: 2005 WL 517341 (E.D.La.))

the three-part *Lemon* test, which it fails, resulting in a violation of the Establishment Clause of the First Amendment.

### I. FACTUAL AND PROCEDURAL BACKGROUND

The facts are not in dispute and are found in the joint stipulation filed by the parties. The School Board is a political subdivision of the state of Louisiana organized under Louisiana law. In Louisiana, school boards are deliberative bodies constituted to act in the public interest. As its name suggests, the School Board is responsible for the operation and government of the schools comprising the Tangipahoa Parish School System. In performing this role, the School Board supervises over 18,000 students each of who attend one of thirty-five elementary and secondary schools. The Plaintiff in this action is the parent of two children currently enrolled at a high school within the Tangipahoa Parish School System.

*2 The School Board meets twice a month in the boardroom of the Tangipahoa Parish School System Central Office. School Board meetings are open to the public, including students. Since at least April 3, 1973, and continuing through the present, each meeting opened with an invocation delivered by persons selected by the School Board. Such persons included the board president, other board members, the assistant superintendent, teachers, students, or ministers. On numerous occasions, the offered prayers made specific reference to "God," "Heavenly Father," and "Jesus." The following is typical of the prayers delivered at the meetings of the School Board:

Heavenly Father, we thank you for the many blessings we've received. We thank you for our health. We thank you for our strength. We thank you for our peace of mind. We thank you for allowing us to assemble here tonight, and we ask that you give this Board and our Superintendent all the wisdom and the knowledge, and the understanding they need to make the correct decisions for our students and for our parents. Also Lord, we ask that you throw your strong arm of protection around our President and his

Cabinet Members, to help him make the right decisions that will affect thousands of U.S. soldiers, airmen, and marines, at this time. We ask that you give him the same wisdom you gave Solomon in making decision [sic] that's best for our country. Also, we thank you for your greatest gift of all--your darling son Jesus Christ. For we all know that He was born, died, and rose again, so that we all may be forgiven for our sins. And Lord, as we leave this meeting tonight, we ask that you guide us safely to our various abodes. These things we ask in your darling son, Jesus Christ's name. Amen.

(R. 16 at 7-8.)

The School Board, on August 3, 2004, considered a written policy that would have permitted it to open its meetings with a brief invocation to solemnize the occasion, provided such invocations were non-sectarian and non-proselytizing. The proposed policy also would have limited presenters of the invocation to board members. However, the Board voted unanimously to reject the proposed policy.

### II. THE ESTABLISHMENT CLAUSE

For many Americans, religious faith is the core of their values and the guide to how they live their lives. The First Amendment guarantees to them the freedom to practice their faith in their hearts, their homes, their houses of worship, their neighborhood organizations and in voluntary gatherings with others of like faith. This freedom of religion also guarantees that their faith and their worship will not be interfered with by others who profess a different religion or no faith at all. While the guarantee of religious freedom allows for persons of one faith to proselytize and attempt to convert others of different faiths, it likewise guarantees that no particular religious faith can be forced upon another whose beliefs are different. All faiths, including lack of faith, are entitled to the same respect and liberty.

*3 This protection of religious liberty has historical roots, going back to the original colonists.
  A large proportion of the early settlers of this

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

country came here from Europe to escape the bondage of laws which compelled them to support and attend government favored churches. The centuries immediately before and contemporaneous with the colonization of America had been filled with turmoil, civil strife, and persecutions, generated in large part by established sects determined to maintain their absolute political and religious supremacy. With the power of government supporting them, at various times and places, Catholics had persecuted Protestants, Protestants had persecuted Catholics, Protestant sects had persecuted other Protestant sects, Catholics of one shade of belief had persecuted Catholics of another shade of belief, and all of these had from time to time persecuted Jews. In efforts to force loyalty to whatever religious group happened to be on top and in league with the government of a particular time and place, men and women had been fined, cast in jail, cruelly tortured, and killed. Among the offenses for which these punishments had been inflicted were such things as speaking disrespectfully of the views of ministers of government-established churches, nonattendance at those churches, expressions of non-belief in their doctrines, and failure to pay taxes and tithes to support them. See e.g. Macaulay, History of England (1849) I, cc. 2, 4; The Cambridge Modern History (1908) V, cc. V, IX, XI; Beard, Rise of American Civilization (1937) I, 60; Cobb, Religious Liberty in America (1902) c. II; Sweet, The Story of Religion in America (1939).
*Everson v. Board of Education,* 330 U.S. 1, 8-9, 67 S.Ct. 504, 91 L.Ed. 711 (1947).

A great irony and "unfortunate fact of history" is that the descendants of some of these same groups that fled Europe for religious freedom in the new world repeated the same practices once their own particular religion was sufficiently powerful--"writ(ing) their own prayers into law ... pass(ing) laws making their own religion the official religion of their respective colonies." *Engel v. Vitale,* 370 U.S. 421, 427, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962). Once again, "Catholics found themselves hounded and proscribed because of their

faith; Quakers who followed their conscience went to jail; Baptists were peculiarly obnoxious to certain dominant Protestant sects; men and women of varied faiths who happened to be in a minority in a particular locality were persecuted because they steadfastly persisted in worshipping God only as their own consciences dictated." *Everson,* 330 U.S. at 10.

It was against this backdrop of history that the recognition spread among the colonists that "one of the greatest dangers to the freedom of the individual to worship in his own way lay in the Government's placing its official stamp of approval upon one particular kind of prayer or one particular form of religious services." *Engel,* 370 U.S. at 429. This historical awareness led to the so-called Establishment Clause of the First Amendment which prohibits government from making any laws "respecting the establishment of religion." Government must remain neutral in matters of faith.

*\*4 The Supreme Court applies the *Lemon* criteria in almost all Establishment Clause cases. See *Lee v. Weisman,* 505 U.S. 577, 603, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992). "[S]ince 1971, the Court has decided 31 Establishment Clause cases. In only one instance, the decision of *Marsh v. Chambers,* 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019, (1983), has the Court not rested its decision on the basic principles described in *Lemon.*" (Blackmun, Stevens, and O'Connor, JJ. concurring).

Establishment Clause cases often turn on a single fact, requiring courts to sift through the evidence presented in each individual case. *Lemon,* 403 U.S. at 614. For example, in *Lynch v. Donnelly,* 465 U.S. 668, 687, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984) the Supreme Court held that a nativity scene in a town square did not violate the Establishment Clause because it was surrounded by secular Christmas decorations, such as Santa Clause and Christmas trees, while in *County of Allegheny v. American Civil Liberties Union, Greater Pittsburgh Chapter,* 492 U.S. 573, 601-02, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989), the Supreme Court held that a nativity scene in a town square *did* violate the Establishment Clause because it stood apart from

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

2005 WL 517341 (E.D.La.)

(Cite as: 2005 WL 517341 (E.D.La.))

Page 4

the other, more secular decorations on display in the square) (emphasis added). Indeed, the Supreme Court has stated, "Establishment Clause jurisprudence remains a delicate and fact-sensitive one." *Lee,* 505 U.S. at 597. The line between permissible relationships and those barred by the Clause can be no more straight and unwavering than due process can be defined in a single stroke or phrase or test. *Lynch,* 465 U.S. at 678-79.

Despite the Supreme Court's reluctance to adopt a bright-line rule for evaluating all Establishment Clause cases, it has been unequivocal and consistent when addressing religion in the public school setting. The Establishment Clause prohibits officially endorsed prayer at many school-related functions and recognizes that "[T]here are heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools." *Lee,* 505 U.S. at 592. Religious faith is a personal matter and its transmission from parent to child is uniquely personal and private. For a public school to promote its view of prayer and faith interferes with that relationship and abrogates the promise that government will remain neutral in religious affairs. The Supreme Court was well aware of the vulnerability of young people to peer pressure and the feeling of isolation that can flow from being perceived to be different from the norm. See *Lee,* 505 U.S. at 589-599. This tension would be all the more pronounced in matters so personal as religion, where the young person's faith is likely drawn from his family. For his school to overtly or tacitly endorse a contrary faith puts the student in an untenable position of either distancing from his family faith or enduring a feeling of exclusion from his peers. The Supreme Court has held that government "may not, consistent with the Establishment Clause, place primary and secondary school children in this position." See *Lee,* 505 U.S. at 593.

**\*5** This is even more true today as our nation becomes more diverse. In colonial times, the main religions were Protestant denominations, with some Catholics and Jews. *School District of Abington Township, Pennsylvania v. Schempp,* 374 U.S. 203,

240, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963). In a census survey from 2001, [FN2] the self-described religious identification of significant populations of Americans included thirty-five separate Christian faiths, and twenty non Christian faiths, [FN3] as well as several categories of non-religion. [FN4]

> FN2. *www.census.gov/prod/2004* pubs/04statab/pop.pdf

> FN3. These included Jewish, Muslim, Buddhist, Hindu, Native American, Scientologist, Baha'i, Taoist, Eckankar, Rastafarian, Sikh, Wiccan, Druid, Santeria and Pagan.

> FN4. Atheist, agnostic, humanist, secular and "no religion."

On the other hand, the Supreme Court has acknowledged that some religious activity sponsored by government but outside the public school setting does not violate the Establishment Clause. As Justice Douglas noted, "[w]e are a religious people, whose institutions presuppose a Supreme Being." *Zorach v. Clauson,* 343 U.S. 306, 313, 72 S.Ct. 679, 96 L.Ed. 954 (1952). The activity relevant here is the practice of opening legislative sessions with prayer.

A.   *MARSH*   LEGISLATIVE   PRAYER EXCEPTION

In *Marsh,* the Supreme Court held that the Nebraska state legislature's practice of opening its session with a prayer delivered by a state-paid chaplain did not violate the Establishment Clause. *Marsh,* 463 U.S. at 793- 94. The *Marsh* court compared the Nebraska legislatures' practice with the "unique history" of the United States Congress, noting that, "the opening of sessions of legislative and other deliberative public bodies with prayer is deeply embedded in the history and tradition of this country." *Id.* at 786.

The *Marsh* court noted that three days before the First Congress adopted the language of the Establishment Clause, it authorized the appointment

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

2005 WL 517341 (E.D.La.)

**(Cite as: 2005 WL 517341 (E.D.La.))**

of paid chaplains to offer invocations at the beginning of each congressional session. *Id.* at 787-88. The Supreme Court found it untenable that the First Congress "intended the Establishment Clause of the Amendment to forbid what they had just declared acceptable." *Id.* at 790.

The holding in *Marsh* is narrow, [FN5] however, and largely limited to its unique facts, the most important of which is the long-pre-Constitutional history of beginning legislative sessions with prayer. Although repeatedly asked, federal district and circuit courts throughout the country have consistently refused to apply the *Marsh* exception outside the legislative body context.

> FN5. The Supreme Court stated, "We granted certiorari limited to the challenge to the practice of opening sessions with prayers by a state-employed clergyman, 459 U.S. 966, 103 S.Ct. 292, 74 L.Ed.2d 276 (1982)." *Marsh,* 463 U.S. at 786.

The Supreme Court in *Lee* noted that "[i]nherent differences between the public school system and a session of a state legislature distinguish [the case of prayer at graduation] from *Marsh v. Chambers." Lee,* 505 U.S. at 596. Such "inherent differences" include the difference between adult and student audiences, the differing degrees of state control, and the differing requirements for attendance. *Id.* 505 U.S. at 597. In the context of classroom instruction, the Supreme Court has likewise rejected the *Marsh* analysis. *Edwards v. Aguillard,* 482 U.S. 578, 583 n. 4, 107 S.Ct. 2573, 2577, 96 L.Ed.2d 510 (1987) ("such a historical approach is not useful in determining the proper roles of church and state in public schools, since free public education was virtually nonexistent at the time the Constitution was adopted.").

*6 Thus, the Supreme Court has established jurisprudence both respecting religious tradition in the legislative sphere on the one hand and enjoining activity tending to "establish" a religion when the underlying issue is related to public schools.

B. *Coles v. cleveland* determination of school

board as integral part of public school system

In the most analogous case to date, the Sixth Circuit in *Coles v. Cleveland Board of Education,* 171 F.3d 369 (6th Cir.1999), had to choose between these two clear strands of Establishment Clause jurisprudence: either apply the *Marsh* exception, as the defendants asked, or rely on *Lee* and thus apply the *Lemon* test to the question of prayer at local school board meetings.

In *Coles,* a former student and teacher filed an action against the Board of Education and Superintendent alleging the board's practice of opening school board meetings with prayer or a moment of silence was unconstitutional. *Id.* at 374. The Sixth Circuit analyzed the nature of the relationship between the school board and the public schools they govern, finding it is the close relationship between the school board and the school system it governs that removes a defendants' invocation from the logic of *Marsh* and places it "squarely within the history and precedent concerning the school prayer line of cases." *Id.* at 381. The Sixth Circuit found that although the meetings of the school board might be of a "different variety" than other school-related activities, the fact remained that they were part of the same "class" as those other activities in that they take place on school property, and are inextricably intertwined with the public school system. *Id.* at 377.

The Sixth Circuit noted that the Supreme Court has been very careful to prevent government from endorsing religion in the public school setting, stating, "The Supreme Court's Establishment Clause jurisprudence has been remarkably consistent in sustaining virtually every challenge to government-sponsored religious expression or involvement in the public schools." *Id.* at 377. Unlike *Marsh,* which the Sixth Circuit characterized as "an historical aberration," the Supreme Court's jurisprudence on religion in public schools is long, clear, and unwavering. *Id.* at 381-83.

In its analysis, the *Coles* court disagreed that the *Marsh* exception supported the proposition that government-sponsored prayer at all "deliberative

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

2005 WL 517341 (E.D.La.)

**(Cite as: 2005 WL 517341 (E.D.La.))**

Page 6

public bodies" is presumptively valid. *Coles,* 171 F.3d at 380-81. It questioned, "whether the Cleveland School Board is a 'deliberative public body' *as that phrase was used* in *Marsh." Id.* (emphasis added). Although the *Coles* court recognized that the school board is an elected body consisting of adults conducting public business in public meetings, it refused to stop its analysis there. *Id.* Rather, it found significant that the school board meetings addressed school-related topics and were held in a building located on school property. *Id.* The court stated, "What actually occurs at the school board's meetings is what sets it apart from the deliberative processes of other legislative bodies." *Id.* [FN6]

> FN6. The defendants argue that *Coles* determined that a school board is not a deliberative body. On the contrary, the *Coles* court recognized that it was a deliberative body but with a unique function that brought it under the long established line of school prayer caselaw.

*7 The court similarly disagreed that school board meetings were the equivalent of galleries in a legislature where spectators are incidental to the work of the public body. *Id.* at 382. It found that students were directly involved in the discussion and debate at school board meetings. *Id.* Accordingly, it held that the school board, unlike other public bodies, is an integral part of the public school system. *Id.*

Having determined that a public school board was an integral part of the public school system the *Coles* court held that the same strict protections and prohibitions that apply to public schools also apply to school boards. *Id.* at 383. Consequently, it concluded that the School Board's practice must be analyzed under the test normally used to analyze government practices challenged under the Establishment Clause, *i.e.,* the *Lemon* test. *Coles,* 171 F.3d at 383.

III. ANALYSIS

The determination that the school board,

notwithstanding its statutory definition as a political subdivision or deliberative public body, is also an integral component of the public school system is central to our analysis here. This Court cannot ignore the School Board's obvious connection to public education. A determination based solely on the technical definition of a school board as a deliberative body ignores its functional reality. [FN7] The School Board sets policy for the schools and oversees their functions. In a very real sense, the Board runs the schools, and serves as the spokesperson of the public school system. In officially promoting a religious practice at its governmental meetings, the Board is doing what its schools and teachers cannot do, favor religion over nonreligion and endorse particular religious faiths.

> FN7. Neither party proffered evidence specific to the structure and function of the School Board with respect to student participation. However, this Court reasonably infers that school boards in general function in substantially similar ways, thus, the functions attributed to the school board in *Coles,* namely, the presence of a student representative, adjudication over disciplinary hearings, and invitations to students to attend and receive awards and recognition at school board meetings are understood as substantially comparable to the functions and activities of the School Board in the instant case.

School children regularly and significantly participate in meetings of the School Board, and in direct connection with the government's educational responsibilities. They are not likely to be any less impressionable at School Board meetings than in classrooms, and may in fact be more so, due to the official nature of the business being conducted. Even without student participation, the Board's policy of opening with prayer is an endorsement of religion which undermines the promise made by the Establishment Clause to public school students of all faiths, or no faith, that their schools will remain neutral with respect to the highly personal and private matter of religious belief.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

In effect, Defendants are asking this Court to disregard the nature of the School Board's function. To do so, however, would negate many years of binding Supreme Court precedent with regard to public schools. [FN8]

> FN8. The defendants cite a number of cases where the *Marsh* exception was extended to city and town council meetings. As these bodies do not have the unique task of operating the public schools, they are distinguishable.

Defendants further contend that this Court should reject the *Coles* decision because it conflicts with the Sixth Circuit's decision in *Stein v. Plainwell Community Schools,* 822 F.2d 1406 (6th Cir.1987) (finding that an annual graduation exercise was analogous to the legislative sessions referred to in *Marsh* and should be governed by the same principles) and the Fifth Circuit's decision in *Jones v. Clear Creek Independent School District,* 977 F.2d 963 (5th Cir.1992) (*Jones II* ) (holding that a school district's resolution permitting public high school seniors to choose student volunteers to deliver non-sectarian, non-proselytizing invocations at their graduation ceremonies had the secular primary effect of solemnizing the graduation ceremonies and was unlikely to advance religion).

*8 Although the Sixth Circuit applied *Marsh* to a school function in *Stein,* it is significant that the Sixth Circuit, when later considering *Coles*--a case whose facts closely resemble those here--chose not to extend *Marsh's* application to the school board setting. The *Coles* court determined that the overwhelming line of authority protecting public school students from government-sponsored religion could not be reversed simply to extend the narrow exception of *Marsh* into new territory. This Court agrees with the *Coles* decision.

Similarly, Defendants' contention that the *Coles* decision conflicts with the Fifth Circuit's holding in *Jones II* also fails. In *Jones v. Clear Creek Independent School Dist.,* 930 F.2d 416 (5th Cir.1991) (*Jones I* ), the court applied the *Lemon* tripartite test and held that the invocations delivered

at graduation did not violate the Establishment Clause. One year later, the Supreme Court in *Lee,* held that a similar practice *did* violate the Establishment Clause under a newly fashioned analytical framework that looked at the level of government coercion. *Jones II,* 977 F.2d at 965. (emphasis added). The Supreme Court granted certiorari in *Jones I,* vacated the lower court's judgment, and remanded the issue for further consideration in light of *Lee. Id.* The Fifth Circuit in *Jones I* applied *Lemon* and in *Jones II* applied all five tests the Supreme Court used from *Lemon* to *Lee,* i.e., the three-part *Lemon* test, as well as the Endorsement and Coercion tests. *Id.* at 966. Neither *Jones I,* nor *Jones II* applied *Marsh.*

Of even greater significance is that the graduation invocations found constitutional in *Jones,* I & II, were "nonsectarian and nonproselytizing." 977 F.2d at 965. Without those restrictions, the Fifth Circuit would have struck the policy down. See *Doe v. Santa Fe Independent School District, et al,* 168 F.3d 806, 822 (5th Cir.1999). The parties in this case have stipulated that a proposal to open the School Board meetings with a "non-sectarian, non-proselytizing invocation" was unanimously voted down. Rec. Doc. 16, Stipulation No. 17. Thus, the defendant expressly rejected the twin requirements of *Jones I & II* that passed constitutional muster. [FN9]

> FN9. While not urged by the defendant here, it could be argued that the encroachment on government neutrality by these opening prayers is too minuscule to be of concern. But history has cautioned that "(t)he breach of neutrality that is today a trickling stream may all too soon become a raging torrent and, in the words of (James) Madison, 'it is proper to take alarm at the first experiment on our liberties ...' " *School District of Abington Township, Pennsylvania, et al. vs. Schempp,* et al, 374 U.S. 203, 83 S.Ct. 1560, 1573, 10 L.Ed.2d 844 (1963). Furthermore, considering that the School Board rejected a secular invocation, 7-0, indicates the issue is not insignificant to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

2005 WL 517341 (E.D.La.)

**(Cite as: 2005 WL 517341 (E.D.La.))**

them.

The Court's opinion finds further support in the numerous cases cited by Plaintiff where federal courts refused to extend the *Marsh* holding beyond its facts. In *Jaeger v. Douglas County School District*, 862 F.2d 824 (11th Cir.1989), the plaintiffs challenged the school district's practice of giving invocations prior to public high school football games. The court refused defendant's request to apply the *Marsh* exception in lieu of the *Lemon* test, stating, "Because *Marsh* was based on more than 200 years of the "unique history" of legislative invocations, it has no application to the case at bar.... Such a historical approach is not useful in determining the proper roles of church and state in public schools." *Id.* at 828-29. See also, *Mellen v. Bunting III*, 327 F.3d 355, 369 (4th Cir.2003) (holding that daily supper prayers at military colleges and universities do not share *Marsh's* unique history).

\*9 Even in cases outside the public school setting, courts have been unwilling to extend *Marsh* beyond its unique historical and factual context. In *North Carolina Civil Liberties Union Legal Foundation v. Constangy*, 947 F.2d 1145, 1147 (4th Cir.1991) plaintiffs challenged a state court judge's practice of beginning sessions with a prayer. The defendants argued that prayer by a judge is analogous to legislative prayer, and under *Marsh*, does not violate the Establishment Clause. *Id.* at 1148. The Fourth Circuit rejected defendant's argument and held that the unique history supporting the *Marsh* decision was limited to the legislative context. *Id.* According to the Fourth Circuit, judicial prayer did not fall within the *Marsh* exception to the Establishment Clause's standard prohibition against state-sponsored religion. *Id.* at 1149. Consequently, it analyzed the case under the principles of *Lemon v. Kurtzman. Id.*

As shown above, the *Jaeger, Mellen,* and *Constangy,* decisions emphasized the unique fact patterns of *Marsh,* explaining that the legislative prayer at issue in that case had a long history within the Republic--a history not shared by most other legislative bodies, and certainly not by public

school boards. [FN10] For this reason, the courts in *Jaeger, Mellen,* and *Constangy* refused to extend *Marsh's* prayer exception into other public arenas. This Court sees no cause to disregard the reasoning in this line of cases.

> FN10. Public education was virtually nonexistent in the 1780's and did not take root until the 1820's and 1830's. See *Abington,* 374 U.S. at 237, fn. 5 and 239, fn. 7.

iv. The *Lemon* Test

Having determined that the School Board is an integral part of the school system such that it falls outside the scope of *Marsh's* legislative prayer exception, the Court must analyze the School Board's practice of opening each meeting with a prayer under the three-part *Lemon* test.

Under *Lemon,* a government-sponsored activity will not violate the Establishment Clause if: (1) it has a secular purpose, (2) its principal or primary effect neither advances nor inhibits religion, and (3) it does not create an excessive entanglement with religion. *Lemon,* 403 U.S. at 612-13. If the challenged practice violates any part of the three-part test, then it violates the Establishment Clause. *See Edwards,* 482 U.S. at 583; *Stone v. Graham,* 449 U.S. 39, 40-41, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980).

*1. Secular Purpose*

Under the *Lemon* standard, a court must invalidate a statute if it lacks "a secular purpose." *Lemon,* 403 U.S. at 612. In determining purpose, courts look to whether the government subjectively intended to convey a message of endorsement or disapproval of religion. *Lynch,* 465 U.S. at 690 (O'Connor, J. concurring). It is not enough for defendants to merely say that they had a secular purpose. *Edwards,* 482 U.S. at 586-87 (stating, the government's statement of secular purpose cannot be a mere "sham."). The School Board's action cannot stand if its real purpose was religious. *Wallace v. Jaffree,* 472 U.S. 38, 56, 105 S.Ct. 2479,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

86 L.Ed.2d 29 (1985) (quoting *Lynch,* 465 at 690).

*10 In determining the purpose of the opening invocation, one need look no further than the text of the invocations. The record shows for example, on September 3, 2003, one individual, Joseph Bosch, a former teacher, principal, interim superintendent, and personnel director, read a tribute to the dead in which, he frequently referenced "God" and "Jesus Christ." (R. 16 at 7.) Mr. Bosch then read a tribute to teachers entitled, "God Created the First Teacher," in which "God" was mentioned at least twelve times. (R. 16 at 7.) After this recitation, Mr. Bosch read a self-authored selection entitled "Lament for an Ancient Teacher," in which he gave thanks to "God for Jesus who came to die for all our sakes." (R. 16 at 7.)

Defendants assert that they had a secular purpose--to solemnize the occasion. But this secular purpose is overwhelmed by the strongly religious--indeed denominational--tone of the prayers. The overtly religious purpose of Defendants' invocations dominate any secular purpose the invocations might serve. The repeated references to "Jesus," "Jesus Christ," and "Jesus as the Son of God," are clearly Christian beliefs meant to venerate the Christian faith.

Furthermore, the School Board specifically refused to adopt a written policy that would provide nonsectarian and non-proselytizing prayers. Accordingly, this Court holds that the School Board's practice of opening each meeting with a prayer lacks a secular purpose.

Although not required to show a violation of the Establishment Clause, the Court considers the School Board's practice relative to parts two and three of the *Lemon* test.

### 2. *Primary Effect*

Even if a secular purpose had been shown, the School Board's practice fails the *Lemon* test. The second part of the *Lemon* test looks to whether, "irrespective of government's actual purpose, the practice under review in fact conveys a message of

endorsement or disapproval." *Lynch,* 465 U.S. at 690. This Court must make an objective determination about whether a reasonable observer would conclude that the opening invocations endorse a religious message or belief. *County of Allegheny,* 492 U.S. at 592.

The Court finds that a reasonable person attending a School Board meeting would not construe the opening invocation as merely solemnizing the democratic process. This finding is supported by the text of the prayers. Each prayer references decidedly Christian views and beliefs. They are replete with invocations to "God" and end with the affirmation "Amen." Further confusion arises when religious members of the community lead the prayers. The Court finds that the School Board's practice has the effect, to a reasonable observer, of conveying a religious message.

### 3. *Excessive Entanglement*

The last part of the *Lemon* test looks to "the character and purpose of the institutions that are benefited, the nature of the aid that the State provides, and the resulting relationship between the government and religious authority." *Lemon,* 403 U.S. at 614. The essence of this inquiry focuses on "excessive entanglement." *Id.* at 615.

*11 Here, the School Board decided to include prayer in its public meetings, chose which member from the local religious community would give those prayers, and has had the board president, board members, superintendent, and students compose and deliver the prayers to those in attendance. The Court finds that based on the stipulated facts, the School Board's practice of opening its meetings with prayer leads to excessive entanglement in religious matters and thus fails this third part of the *Lemon* test.

### V. CONCLUSION

Having considered the record, the memoranda of counsel, and the law, the Court concludes that the School Board's intimate relationship with the public school system compels stricter scrutiny of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 517341 (E.D.La.)

**(Cite as: 2005 WL 517341 (E.D.La.))**

Establishment Clause evaluation consistent with school-prayer cases. This Court holds that the *Lemon* test is the appropriate standard by which to analyze Defendants' practice of opening each School Board meeting with a religious invocation. Further, this Court concludes that Defendants' practice fails the *Lemon* test. Because Defendants' practice violates the Establishment Clause of the First Amendment, it is constitutionally prohibited.

Accordingly,

IT IS SO ORDERED that judgment is hereby entered in favor of Plaintiff declaring that the Defendants' practice of opening each Tangipahoa Parish School Board meeting with a religious invocation violates Plaintiff's rights under the Establishment Clause of the First Amendment to the United States Constitution as made applicable to the States through the Fourteenth Amendment to the United States Constitution. The Court permanently enjoins the Tangipahoa Parish School Board from opening their school board meetings with such an invocation.

2005 WL 517341 (E.D.La.)

**Motions, Pleadings and Filings (Back to top)**

• 2004 WL 2467430 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Reply Memorandum (Sep. 23, 2004)

• 2004 WL 2467425 (Trial Motion, Memorandum and Affidavit) Defendants' Reply to Plaintiffs' Pre-Trial Memorandum (Sep. 22, 2004)

• 2004 WL 2467415 (Trial Motion, Memorandum and Affidavit) Defendants' Trial Memorandum (Sep. 09, 2004)

• 2004 WL 2467421 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Pre-Trial Memorandum (Sep. 09, 2004)

• 2004 WL 2467410 (Trial Pleading) Answer to Amended Complaint (Jan. 26, 2004)

• 2003 WL 23860135 (Trial Pleading) Amended Complaint Pursuant to Rule 15(a), Fed.R.Civ.P. (Nov. 26, 2003)

• 2003 WL 23860110 (Trial Pleading) Complaint (Oct. 14, 2003)

• 2:03CV02870 (Docket)
                                    (Oct. 14, 2003)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 3



Slip Copy                                                                     Page 1

2004 WL 2668582 (E.D.Pa.)

**(Cite as: 2004 WL 2668582 (E.D.Pa.))**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
E.D. Pennsylvania.
Miguel MONTANEZ Plaintiff
v.
Pat THOMPSON, et. al. Defendants
**No. Civ.A.03-6713.**

Nov. 19, 2004.

*MEMORANDUM AND ORDER*

SANCHEZ, J.

*1 Plaintiff Miguel Montanez is suing prison officials for damages under 42 U.S.C. § 1983, alleging 311 days unlawful incarceration. Montanez claims Defendants Pat Thompson, Robert Durison, and three unnamed individuals, in their official and individual capacities, violated his Eighth and Fourteenth Amendment rights. Defendants Thompson and Durison ask this Court to dismiss Montanez's claims under a statute of limitations claim and Fed.R.Civ.P. 12(b)(1), (5), and (6). This Court denies those motions.

FACTS

On February 8, 1996, Montanez was arrested. On April 30, 1996, Judge Joseph Bruno sentenced him to a prison term of 2 1/2 --5 years. After a negotiated plea, Judge Gregory Smith reduced the sentence to 2-5 years on June 9, 1997. Montanez claims his maximum sentence ended on February 7, 2001, not on December 15, 2001, the date prison officials actually released him.

On August 14, 1996, the Pennsylvania Board of Probation and Parole ("Board") recommitted Montanez for a parole violation following his February 8th arrest. The Board, however, rescinded that recommitment on January 8, 1998. Since that rescission, Montanez frequently informed all defendants of the Board's rescission, asserting his release date is February 7, 2001. Initially, defendants ignored Montanez's argument. On December 10, 2001, Defendant Robert Durison wrote Montanez a memo acknowledging the Board's rescission, but did not change Montanez's release date. On December 15, 2001, prison officials released Montanez.

Montanez claims he was unlawfully detained an additional 311 days in prison. He argues the wrongful and excessive detention violated his Eighth Amendment right against cruel and unusual punishment, and his Fourteenth Amendment right to due process of law. Montanez claims all defendants acted under color of state law during this wrongful detention and seeks damages and attorney's fees for this deprivation of civil rights under 42 U.S.C. § 1983.

After filing Montanez's complaint, his counsel's attempt to serve the complaint failed several times. Judge Timothy Savage extended the service of process deadline from April 12, 2004 to August 6, 2004. Montanez's attorney served the complaint before the August 6th deadline.

DISCUSSION

Both Defendants Thompson and Durison move to dismiss Montanez's complaint arguing Pennsylvania's two-year statute of limitations for personal injury, which is applicable to civil rights actions, expired in 2000. They also move to dismiss pursuant to Fed.R.Civ.P. 12(b)(5) for his attorney's failure to serve opposing counsel within the 120-day limit required by Fed.R.Civ.P. 4(m).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 2

2004 WL 2668582 (E.D.Pa.)

(Cite as: 2004 WL 2668582 (E.D.Pa.))

Thompson moves to dismiss for lack of subject matter jurisdiction under Fed.R.Civ.P. 12(b)(1), claiming Eleventh Amendment immunity in her official capacity. She also argues in her official capacity that she is not a person under 42 U.S.C. § 1983. Additionally, Thompson claims she cannot be held liable as an individual because she lacked personal involvement in Montanez's complaint. Thus, she also moves to dismiss under Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted.

*2 Durison claims 53 P.S. § 16257 [FN1] prevents Montanez from suing Philadelphia Prison System ("PPS"), and thus, his claim against PPS should also be dismissed under Rule 12(b)(6). This Court finds neither Thompson nor Durison are entitled to dismissal on any of their motions for the reasons that follow.

FN1. Act of April 21, 1855, P.L. 264, § 11.

Motion to Dismiss Due to Expiration of Statute of Limitations

When deciding a motion to dismiss, the Court may look only to the facts alleged in the complaint and its attachments, and accepts as true all well-pleaded allegations. *Jordan v. Fox, Rothschild, O'Brien & Frankel,* 20 F.3d 1250, 1261 (3d Cir.1994).

Both Durison's and Thompson's motions to dismiss based on the statute of limitations fail as a matter of law because the continuing violations doctrine applies to this case. *Nicolette v. Caruso,* 315 F.Supp.2d 710, 723-24 (W.D.Pa.2003); *See also Cowell v. Palmer Tp.,* 263 F.3d 286, 291-94 (3d Cir.2001) (describing and applying continuing violations doctrine). The continuing violations doctrine "permits a civil rights plaintiff, under certain circumstances to raise civil rights claims that otherwise would be barred by the statute of limitations." *Nicollette,* 315 F.Supp.2d at 723. In the continuing violations doctrine, the *Nicolette* Court examined three prongs: 1) subject matter (whether the violations constitute the same type of discrimination, tending to connect them in a continuing violation); 2) frequency (whether the

acts are recurring or more in the nature of isolated incidents); and 3) degree of permanency (whether the act had a degree of permanence which should trigger the plaintiff's awareness of and duty to assert his/her rights and whether the consequences of the act would continue even in the absence of a continuing intent to discriminate). *Id.* at 724 (noting key consideration is degree of permanency).

Montanez met *Nicolette'* s three prong test by frequently reminding Durison, Thompson and other state correctional officers of his prolonged sentence and their continuing dismissal of those claims. Montanez satisfies the subject matter prong because his continuous and ignored requests all concerned his erroneous release date, making it a single type of discrimination. Montanez's constant attempts to correct his release date satisfy the frequency prong. Monatenez also meets the permanency prong. Degree of permanency requires plaintiff to demonstrate defendant's affirmative acts prevented him from asserting his rights. *Nicolette,* 315 F.Supp.2d at 724. On December 10, 2001, Durison sent Montanez a letter acknowledging the Board's rescission, but claiming Montanez still had to remain in prison because parole backtime and sentence time could not run concurrently. Letter from Robert Durison, Philadelphia Prison System, Philadelphia, to Miguel Montanez (May 28, 1998). This letter, combined with Montanez's detention for four more days, satisfy the permanency prong because they show the defendants' affirmative act which obscured the claims Montanez now asserts.

*3 Durison's and Thompson's motions to dismiss based on the statute of limitations also fail as a matter of law because damages attributable to an unconstitutional conviction do not accrue for purposes of the statute of limitations until the conviction or sentence has been invalidated. *Heck v. Humphrey,* 512 U.S. 477, 490 (1994). Even though Montanez does not claim his entire conviction is unconstitutional, the same reasoning applies to an unconstitutional detention claim. Like the conviction, the detention cannot accrue until the detention is invalidated, which arguably did not happen until Montanez's release on December 15, 2001. Thus, the statute of limitations did not start

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                              Page 3

2004 WL 2668582 (E.D.Pa.)

**(Cite as: 2004 WL 2668582 (E.D.Pa.))**

until December 15, 2001 and did not expire until December 15, 2003. Since Montanez filed this complaint on December 14, 2003, the two-year-statute of limitations does not bar his complaint.

Motion to Dismiss due to Insufficiency of Service of Process

When a party moves to dismiss under Fed.R.Civ.P. 12(b)(5) (insufficiency of service of process), "the party making the service has the burden of demonstrating its validity...." *Grand Entm't Group, Ltd. v. Star Media Sales, Inc.,* 988 F.2d 476, 488-89 (3d Cir.1993). Thompson and Durison's motion to dismiss Montanez's complaint under 12(b)(5) fails as a matter of law because Montanez demonstrated "excusable neglect" and/or "good cause" for his service of process beyond the 120-day limit. *MCI Telecommunications Corp. v. Teleconcepts, Inc.,* 71 F.3d 1086, 1097 (3d. Cir.1995), *cert. denied,* 519 U.S. 815 (1996). Judge Savage extended Montanez's deadline for service of process to August 6, 2004.

Judges sitting in coordinate jurisdictions should not review each other's decisions. *State Auto Ins. Ass'n v. Young Men's Republican Club of Allegheny County, Inc.,* 663 F.Supp. 1077, 1080 (1987); *Yamulla Trucking & Excavating Co., Inc. v. Justofin,* 771 A.2d 782, 784 (Pa.Super.Ct.2001). [FN2] Because Judge Savage represents a coordinate jurisdiction, this Court will not question the extension of service of process. Thus, August 6, 2004 establishes the deadline for service of process, and accordingly, Durison's and Thompson's Rule 12(b)(5) motion to dismiss is denied.

> FN2. "We note that this rule is not a matter of jurisdiction *per se.* Rather, it is a rule of sound jurisprudence based on the policy of fostering finality of pre-trial applications so that judicial economy and efficiency can be maintained." *Yamulla Trucking & Excavating Co., Inc. v. Justofin,* 771 A.2d 782, 784 (Pa.Super.Ct.2001).

Motion to Dismiss due to Official's Eleventh

Amendment Immunity

The Court may treat a Rule 12(b)(1) motion as either a facial or factual challenge to the court's subject matter jurisdiction. *See Mortensen v. First Fed. Sav. and Loan Ass'n,* 549 F.2d 884, 891 (3d Cir.1977). In reviewing a facial attack, the court considers only the allegations in the complaint and documents. *See id.; PBGC v. White,* 998 F.2d 1192, 1196 (3d Cir.1993). Defendant Thompson's 12(b)(1) motion to dismiss fails as a matter of law because "the Eleventh Amendment does not erect a barrier against suit to impose individual and personal liability on state officials under § 1983." *Hafer v. Melo,* 502 U.S. 21, 31 (1991) (internal citations omitted). In regards to Thompson's status as a person under § 1983, *Hafer* holds "state officials, sued in their individual capacities, are persons within the meaning of § 1983." *Id.* (internal citations omitted). Therefore, Thompson is a person under § 1983. This Court has jurisdiction in this case, and therefore, Thompson's 12(b)(1) motion to dismiss is denied.

Motion to Dismiss Due to Official's Lack of Personal Involvement

**\*4** A court will grant a Rule 12(b)(6) motion only when it is certain that no relief could be granted under any proven set of facts. *Ransom v. Marrazzo,* 848 F.2d 398, 401 (3d Cir.1988).

Defendant Thompson's motion to dismiss based on her lack of involvement in any civil rights violation fails as a matter of law because *Hafer* only requires individuals act under the color of state law. 502 U.S. 21, 25 (1991). "[T]o establish *personal* liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right." *Id.* (emphasis in original). In his complaint, Montanez alleges Thompson acted under color of state law. This is sufficient to satisfy the *Hafer* requirement. A plaintiff may prove personal involvement by stating time, place and persons responsible. *See Boykins v. Ambridge Area School Dist.,* 621 F.2d 75, 80 (3d Cir.1980) (deciding statement of time, place and persons responsible sufficed in demonstrating

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                          Page 4

2004 WL 2668582 (E.D.Pa.)

**(Cite as: 2004 WL 2668582 (E.D.Pa.))**

defendant's personal involvement). Montanez stated the time, place and persons responsible, satisfying the requirement of personal involvement. Accordingly, Thompson's 12(b)(6) motion to dismiss is denied.

Motion to Dismiss because Philadelphia Prison System Cannot be Sued

Durison bases his motion to dismiss on a Pennsylvania statute prohibiting suits against the Philadelphia Prison System. *Griffith v. City of Philadelphia,* No. 99-6638, 2001 WL 876804 at *1 (E.D.Pa. May 18, 2001). [FN3] His argument fails as a matter of law because Montanez is suing a superintendent and agents of PPS, not the entity. Consequently, the statute and case law do not apply. Accordingly, we enter the following:

> FN3. All claims against this entity must be made against the City of Philadelphia. *See* 53 P.S. § 16257 (2004)); *Griffith v. City of Philadelphia,* No. 99-6638, 2001 WL 876804 at *1 (E.D.Pa. May 18, 2001).

ORDER

AND NOW, this 19th day of November, 2004, it is ORDERED that Defendants' Motions to Dismiss (documents 6 and 9) are DENIED.

2004 WL 2668582 (E.D.Pa.)

**Motions, Pleadings and Filings (Back to top)**

• 2004 WL 2717314 (Trial Motion, Memorandum and Affidavit) Order (Sep. 13, 2004)

• 2004 WL 2717313 (Trial Motion, Memorandum and Affidavit) Order (Aug. 18, 2004)

• 2:03CV06713  (Docket)
                         (Dec. 14, 2003)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**TAB 4**



Slip Copy

Page 1

2005 WL 735554 (D.Del.)

**(Cite as: 2005 WL 735554 (D.Del.))**

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
N.A.I.F. INC., Friend of Abdullah T. Hameen;
Ismaa'Eel H. Hackett; and Shakirah
Hameen, Plaintiffs,
v.
Robert SNYDER, Betty Burris, Larry McGuigan,
Charles Cunningham, Ron G.
Hostermen, Frank Pennell, Stanley W. Taylor, Jr.,
Carl C. Danberg, and Paul
Howard, Defendants.
**No. Civ.A. 03-506 JJF.**

March 30, 2005.
N.A.I.F., Inc., Wilmington, Delaware, Plaintiff, pro
se.

Ismaa'eel H. Hackett, Wilmington, Delaware,
Plaintiff, pro se.

Shakirah Hameen, Philadelphia, Pennsylvania,
Plaintiff, pro se.

Stuart B. Drowos, of the Department of Justice for
the State of Delaware, Wilmington, Delaware, for
Defendants Robert Snyder, Betty Burris, Larry
McGuigan, Charles Cunningham, Ron G.
Hostermen, Frank Pennell, Stanley w. Taylor, Jr.,
Carl C. Danberg, and Paul Howard.

*MEMORANDUM OPINION*

FARNAN, J.

**\*1** Presently before the Court is the Motion To

Reconsider The Court's Order Granting Plaintiff's
Motion To Amend The Complaint (D.I.27) filed by
State Defendants Robert Snyder, Larry McGuigan,
Betty Burris, Charles Cunningham, Ron Hosterman,
Frank Pennell, Stan Taylor, Carl C. Danberg, and
Paul Howard. For the reasons discussed, the motion
will be denied.

BACKGROUND
Plaintiff Ismaa'eel Hackett is the Director and Iman
of the North American Islamic Foundation, Inc.
("NAIF"), a national not-for-profit organization
located in Wilmington, Delaware. Mr. Hackett and
NAIF filed this lawsuit pursuant to 42 U.S.C. § 1983
as next friend of Abdullah T. Hameen, a former
death row inmate who was executed in May 2001.
Mr. Hackett volunteered his services as a religious
advisor to Muslim inmates at the DCC. In their First
Amended Complaint (D.I.3), Plaintiffs Hackett and
NAIF allege that Defendants violated Mr. Hameen's
First Amendment right to freedom of religion when
they failed to allow Mr. Hackett to act as Mr.
Hameen's religious advisor at the time of his
execution.

On October 24, 2003, Defendants filed a Motion
For Summary Judgment (D.I.14). On January 27,
2004, Plaintiffs Hackett and NAIF filed a Motion
For Leave To File Second Amended Complaint
(D.I.23), in which they added Shakirah Hameen,
Mr. Hameen's widow, as a plaintiff and added a
claim pursuant to the Religious Land Use And
Institutionalized Person Act ("RLUIPA"), 42
U.S.C. § 2000cc-1. On February 9, 2004, the Court
entered an Order (D.I.26) granting the Motion For
Leave To File Second Amended Complaint. On
February 23, 2004, Defendants filed the instant
motion for reconsideration of the Court's February 9
Order.

PARTIES' CONTENTIONS
By their motion, Defendants contend that Plaintiffs'
Motion For Leave To File Second Amended

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Complaint (D.I.23) should be denied for three reasons: 1) Plaintiffs' motion is the product of undue delay; 2) Plaintiffs' amendment adding Ms. Hameen violates the applicable statute of limitations, and 3) the constitutionality of RLUIPA is questionable.

Plaintiffs respond that, because they are acting *pro se*, they did not have knowledge of RLUIPA at the times they filed the original Complaint and the First Amended Complaint. Plaintiffs further contend that RLUIPA is constitutional.

LEGAL STANDARD

"As a general rule, motions for reconsideration should be granted 'sparingly.' " *Stafford v. Noramco of Delaware, Inc.,* 2001 WL 65738 at *1 (D.Del. Jan. 10, 2001) (quoting *Karr v. Castle,* 768 F.Supp. 1087, 1090 (D.Del.1991)). The purpose of granting motions for reconsideration is to correct manifest errors of law or fact, present newly discovered evidence, or to prevent manifest injustice. *Harsco Corp. v. Zlotnicky,* 176 F.3d 669, 677 (3d Cir.1999) (citing *Keene Corp. v. Int'l Fid. Ins. Co.,* 561 F.Supp. 656, 665 (N.D.Ill.1983); *North River Ins. Co. v. CIGNA Reins.,* 52 F.3d 1194, 1218 (3d Cir.1995) (citations omitted). Parties should remain mindful that a motion for reconsideration is not merely an opportunity to "accomplish [the] repetition of arguments that were or should have been presented to the court previously." *Karr v. Castle,* 768 F.Supp. 1087, 1093 (D.Del.1991) (citing *Brambles U.S.A., Inc. v. Blocker,* 735 F.Supp. 1239, 1240-41 (D.Del.1990). However, a court should reconsider a prior decision if it overlooked facts or precedent that reasonably would have altered the result. *Id.* (citing *Weissman v. Fruchtman,* 124 F.R.D. 559, 560 (S.D.N.Y.1989) ).

DISCUSSION

\*2 For the reasons discussed, the Court concludes that State Defendants have not identified errors of law or fact, newly discovered evidence, or manifest injustice sufficient to allow the Court to grant the motion for reconsideration.

I. Whether Plaintiffs' Motion For Leave To Amend

Should Be Denied As The Product Of Undue Delay

Defendants first contend that Plaintiffs' motion is the product of undue delay. Defendants specifically contend that Mr. Hackett possessed the information he added to his Second Amended Complaint at the time he filed his First Amended Complaint and, therefore, he acted in a dilatory manner. Defendants further contend that it was only after Mr. Hackett received Defendants' Motion For Summary Judgment (D.I.27), wherein Defendants argued that Mr. Hackett lacked standing, that Mr. Hackett filed the Second Amended Complaint adding Shakeerah Hameen, Mr. Hameen's widow, as a plaintiff.

Federal Rule of Civil Procedure 15(a) declares that leave to amend "shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). In the absence of substantial or undue prejudice, denial of a motion for leave to amend a pleading "must be based on bad faith or dilatory motives, truly undue or unexplained delay, repeated failures to cure the deficiency by amendments previously allowed, or futility of amendment." *Lorenz v. CSX Corp.,* 1 F.3d 1406, 1414 (3d Cir.1993).

The Court concludes that, although the amendment was made after Defendants filed a motion for summary judgment, Defendants have not shown they are substantially or unduly prejudiced by the amendment. The Court finds that Plaintiffs have not acted in bad faith or had dilatory motives in failing to add Ms. Hameen or file the RLUIPA claim in the original Complaint. Further, the Court finds no undue or unexplained delay on the Plaintiffs' part, particularly because they are acting *pro se.*

II. Whether Plaintiffs' Motion For Leave To Amend Should Be Denied With Regard To Ms. Hameen On Statute Of Limitation Grounds

Defendants contend that Plaintiffs' amendment adding Ms. Hameen should be denied on statute of limitation grounds.

The Supreme Court has held that the state statute of limitations for personal injury actions applies to § 1983 claims. See *Owens v. Okure,* 488 U.S. 235,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                  Page 3

2005 WL 735554 (D.Del.)

**(Cite as: 2005 WL 735554 (D.Del.))**

239 (1989); *Wilson v. Garcia,* 471 U.S. 261, 269 (1985); *Smith v. City of Pittsburgh,* 764 F.2d 188, 194 (3d Cir). In Delaware, the limitations period for a personal injury claim is two years. Del.Code Ann. tit. 10, § 8119 (1974); *McDowell v. Delaware State Police,* 88 F.3d 188, 190 (3d Cir.1996).

Federal Rule of Civil Procedure 15(c) allows amendments that add a party despite the running of an applicable state statute of limitations in certain circumstances. Fed. R. Civ P. 15(c)(3). To ameliorate the running of the statute of limitations, Rule 15(c)(3) imposes three conditions, all of which must be met for a party to successfully relate back an amended complaint adding a new plaintiff. See *Singletary v. Pennsylvania Depot of Corrections,* 266 F.3d 186, 193-94 (3d Cir.2001) (describing the three elements of Rule 15(c)(3)); *see also Nelson v. County of Allegheny,* 60 F.3d 1010, 1014 n. 7 (3d Cir.1995) (noting that the relation back of amendments applies equally to amendments changing and adding plaintiffs). The three elements of Rule 15(c)(3) are whether 1) the claim arose out of the same conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, 2) whether the defendant had notice of the filing of the action within the period provided by Rule 4(m) and will not be prejudiced in maintaining a defense, and 3) the newly named plaintiffs failed to add their names to the complaint because of a mistake. Fed.R.Civ.P. 15(c)(3); *Nelson,* 60 F.3d at 1015.

**\*3** The Court finds that, in the circumstances of this case, Defendants had notice of and will not be prejudiced in maintaining a defense to the § 1983 claim. With respect to the third element, the Court finds that the facts in the instant case demonstrate that but for Mr. Hackett's mistake, Ms. Hameen would have been named in the Complaint. Fed.R.Civ.P. 15(c)(3)(B).

For these reasons, the Court concludes that under Rule 15(c)(3) Plaintiff's amendment adding Ms. Hameen as a plaintiff is entitled to relate back to the filing of the Complaint.

III. Whether Plaintiffs' Motion For Leave To Amend Should Be Denied With Regard To The RLUIPA Claim

Defendants contend that Plaintiffs' motion to amend adding a RLUIPA claim should be denied because the U.S. Supreme Court has yet to consider the constitutionality of RLUIPA.

Federal Rule of Civil Procedure 15(c)(2) allows an amendment stating a different claim than the original Complaint to relate back to the date of the original Complaint if the new claim is within the Court's jurisdiction and arises out of the conduct, transaction, or occurrence set forth in the original Complaint. Fed.R.Civ.P. 15(c)(2).

The Court concludes that the RLUIPA claim is within the Court's federal question jurisdiction and arises from the conduct set forth in the original Complaint. Thus, the Court concludes that Defendants' Motion To Reconsider (D.I.27) should be denied with respect to the addition of the RLUIPA claim.

                                CONCLUSION
In sum, the Court concludes that State Defendants have not identified errors of law or fact, newly discovered evidence, or manifest injustice sufficient to allow the Court to grant the motion for reconsideration.

An appropriate Order will be entered.

                                  *ORDER*
At Wilmington, this *30* day of March 2005, for the reasons discussed in the Memorandum Opinion issued this date;

IT IS HEREBY ORDERED that the Motion To Reconsider The Court's Order Granting Plaintiff's Motion To Amend The Complaint (D.I.27) filed by State Defendants is *DENIED.*

2005 WL 735554 (D.Del.)

**Motions, Pleadings and Filings (Back to top)**

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 735554 (D.Del.)

**(Cite as: 2005 WL 735554 (D.Del.))**

• 1:03CV00506  (Docket)

                 (May. 23, 2003)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 5



Not Reported in F.Supp.2d                                                                                    Page 1

2003 WL 21359621 (D.Del.), 30 Employee Benefits Cas. 1669

**(Cite as: 2003 WL 21359621 (D.Del.))**

United States District Court,
D. Delaware.
PROFESSIONAL STAFF LEASING CORP.,
Plaintiff
v.
UNICARE LIFE & HEALTH INSURANCE
COMPANY, Unicare Health Plans of the Midwest,
Inc., and Senior Living Properties, I, Inc.,
Defendants
**No. Civ.A. 02-11-JJF.**

March 31, 2003.
R. Stokes Nolte, of Nolte & Broadway, P.A.,
Wilmington, Delaware, for Plaintiff.

Stuart M. Brown and Jami B. Nimeroff, of
Buchanan Ingersoll, P.C., Wilmington, Delaware,
for Defendants Unicare Life & Health Insurance
Co. and Unicare Health Plans of the Midwest, Inc.

*OPINION*

FARNAN, J.

*1 Presently before the Court is Defendant Unicare
Life & Health Insurance ("Unicare Life"), and
Unicare Health Plans of the Midwest, Inc.'s
("Unicare    Midwest")    (collectively    "Unicare
Defendants") Motion to Dismiss Counts I-IV of the
Complaint (D.I.7). For the reasons discussed below,
the Unicare Defendants' Motion to Dismiss (D.I.7)
is denied.

I. Factual Background

This is an Employee Retirement Income Security
Act ("ERISA") case. The Plaintiff, Professional
Staff Leasing Corporation, ("ProLease"), is a
Maryland corporation providing payroll, tax,
employee benefit and human resources services for
its clients. (D.I. at ¶ 1). Defendant, Unicare Life is
a corporation formed under the laws of the State of
Delaware, which issues life, health care and other

types of insurance policies which provide insurance
coverage to the general public. (D.I. 1 at ¶ 2).
Defendant Unicare Midwest is a corporation formed
under the laws of the state of Illinois which
provides health benefits coverage to the general
public. Senior Living Properties L.L.C. and Senior
Living Properties I, Inc. (collectively "SLP") are a
limited liability company and corporation formed
under the laws of the state of Indiana and which
own and operate a number of nursing homes. [FN1]
(D.I. 1 at ¶¶ 4, 5).

> FN1. Defendant Senior Living Properties,
> L.L.C. was dismissed from this action on
> July 12, 2002.

On or about October 24, 2000, ProLease entered
into an Administrative Services Agreement with
SLP    (the    "Agreement"),    pursuant    to    which
ProLease    agreed    to    provide    certain    payroll
processing, tax withholding, benefit administration
and    human    resources    services    to    SLP,    in
consideration    for    which    SLP    agreed    to    pay    a
periodic    administrative    service    fee    to    ProLease.
(D.I. 1 at ¶¶ 8, 10, the Agreement D.I. 1, Ex. A).
As part of the service ProLease provided to SLP
under the Agreement, ProLease remitted, on behalf
of SLP, insurance premiums to insurers providing
benefits to SLP's employees pursuant to SLP's
benefit plan (the "SLP Plan") (D .I. 1 at ¶ 11).

On or about January 1, 2001, the Unicare
Defendants    issued    policies    providing    insurance
coverage for life, health, dental, long-term disability
and    short-term    disability    for    SLP's    active
employees. (D.I. 1 at ¶ 12).

During the time period ProLease provided services
to    SLP    under    the    Agreement    (between
approximately January 1, 2001 and September 30,
2001),    the    Unicare    Defendants    periodically
transmitted    invoices    to    ProLease    itemizing
premiums owed by SLP to the Unicare Defendants

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 2

2003 WL 21359621 (D.Del.), 30 Employee Benefits Cas. 1669

**(Cite as: 2003 WL 21359621 (D.Del.))**

for insurance coverage. (D.I. 27 at 4). ProLease contends that upon receipt of these invoices, it would typically collect premium payments from SLP (which payments were comprised of contributions from SLP itself, as well as its employees), and would then forward such payments to the Unicare Defendants to pay SLP's insurance premiums. (D.I. 27 at 4). On occasion, however, ProLease contends that it failed to receive payments from SLP at the time the Unicare Defendants' premiums became due. (D.I. 27 at 24). In these instances ProLease asserts that it paid the Unicare Defendants' insurance premiums directly from its own funds, as a short term advance on behalf of the SLP Plan, in order to ensure that SLP's employees continued to receive insurance benefits from the Unicare Defendants.

\*2 Pursuant to their Agreement, ProLease contends that SLP was supposed to provide them with the names of employees who were terminated or resigned so that there would be no overpayment of insurance premiums. ProLease asserts that SLP did not do so, and as a result, ProLease overpaid Unicare Defendants approximately one million dollars. After ProLease learned of the overpayment it requested reimbursement from the Unicare Defendants; Unicare Defendants refused and ProLease filed the instant lawsuit alleging the following counts against Unicare Defendants: 1) a federal common law right of action under ERISA for equitable restitution of overpayments made due to a mistake of fact or law; 2) breach of fiduciary duty under ERISA; 3) prohibited transactions under ERISA; and 4) a state law claim for unjust enrichment.

II. Parties' Contentions

By their motion, the Unicare Defendants cite the following grounds for dismissal: 1) Counts II-III should be dismissed because Unicare Defendants are not fiduciaries under ERISA; 2) Counts II-III should be dismissed because ProLease does not have standing under ERISA to assert its claims; 3) Counts II-III should be dismissed because Unicare Defendants' alleged conduct does not subject them to ERISA liability; 4) ERISA does not authorize the

relief that ProLease seeks; 5) Count I should be dismissed because a common law claim under ERISA for equitable restitution does not exist under the facts as alleged by ProLease; and 6) if the Court dismisses Counts I-III, the Court should decline to exercise supplemental jurisdiction over Count IV.

In response, ProLease contends that: 1) it has stated claims against the Unicare Defendants for breach of fiduciary duty and for participation in prohibited transactions (Counts II and III); 2) ProLease is in fact a fiduciary under the SLP Plan and has standing to sue under § 502(a) of ERISA for breach of fiduciary duty; 3) Unicare Defendants are fiduciaries, and therefore, liable for breach of fiduciary duties; 4) the Unicare Defendants' retention of the premium overpayments made by ProLease constitutes a breach of the Unicare Defendants' duties under ERISA as well as unlawful participation in a prohibited transaction; 5) the remedies available to ProLease are not limited to restoration of money to SLP's Plan; 6) Plaintiff has stated a claim against the Unicare Defendants for equitable restitution under the federal common law of ERISA; and 7) even if Counts I-III of the complaint are dismissed, ProLease may still maintain its state law claim pursuant to diversity jurisdiction.

III. Applicable Legal Standard

Unicare Defendants move the Court to dismiss Counts I-III pursuant to Federal Rules 12(b)(1) and 12(b)(6) and Count IV pursuant to 12(b)(1). A motion to dismiss under Rule 12(b)(1) challenges the jurisdiction of the court to address the merits of the plaintiff's complaint. *See Lieberman v. Delaware, No.* CIV. A. 96-523, 2001 WL 1000936, at \*1 (D.Del. Aug.30, 2001). The motion should be granted where the asserted claim is "insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as not to involve a federal controversy." *Coxson v. Comm. of Pennsylvania*, 935 F.Supp. 624, 626 (W.D.Pa.1996) (citations omitted). Additionally, a motion to dismiss under 12(b)(1) may present either a facial or factual challenge to subject matter jurisdiction. *See Mortensen v. First Federal Savings*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 3

2003 WL 21359621 (D.Del.), 30 Employee Benefits Cas. 1669

**(Cite as: 2003 WL 21359621 (D.Del.))**

*and Loan,* 549 F.2d 884, 891 (3d Cir.1977). The instant case presents a facial challenge because Unicare Defendants do not dispute the existence of the jurisdictional facts alleged in the complaint. Therefore, the court must accept the facts alleged in the complaint as true, and draw all reasonable inferences in favor of the plaintiff. *See Zinermon v. Burch,* 494 U.S. 113, 118, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990); *Markowitz v. Northeast Land Co.,* 906 F.2d 100, 103 (3d Cir.1990).

**\*3** The purpose of a motion to dismiss pursuant to Rule 12(b)(6) is to test the legal sufficiency of a complaint. *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Strum v. Clark,* 835 F.2d 1009, 1011 (3d Cir.1987). In reviewing a motion to dismiss for failure to state a claim, "all allegations in the complaint and all reasonable inferences that can be drawn therefrom must be accepted as true and viewed in the light most favorable to the non-moving party." *Strum,* 835 F.2d at 1011; *see also Jordan v. Fox, Rothschild, O'Brien & Frankel,* 20 F.3d 1250, 1261 (3d Cir.1994). A court may dismiss a complaint for failure to state a claim only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations. *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984); *Jordan,* 20 F.3d at 1261.

IV. Discussion

A. Whether Unicare Defendants are Fiduciaries

Unicare Defendants contend that they are not fiduciaries, and therefore, cannot be liable under ERISA. On the record before it, the Court cannot conclude as a matter of law that the Unicare Defendants are not fiduciaries for purposes of ERISA. ERISA, specifically, 29 U.S.C. § 1002(21)(A) defines the term fiduciary as follows:
  Except as otherwise provided in subparagraph (B), a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or

disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan. Such term includes any person designated under section 1105(c)(1)(B) of this title.
29 U.S.C. § 1002(21)(A). The Third Circuit Court of Appeals has stated that there is a lower threshold to establish a fiduciary status under § 1002(21)(A)(iii). Specifically, the court stated:
  Discretionary authority or responsibility is required to confer fiduciary status for plan administration under subsection (iii), and "discretionary" authority or "discretionary" control is required for plan management under subsection (i). As noted earlier, however, the adjective "discretionary," so carefully selected for plan administration and management, is omitted in subsection (i) when dealing with authority or control over the management or disposition of plan "assets." 'The statute treats control over the cash differently from control over administration. That Congress established a lower threshold for fiduciary status where control of assets is at stake is not surprising, given that '[a]t common law, fiduciary duties characteristically attach to decisions about managing assets and distributing property to beneficiaries.' 'By mandating the trust form and by transposing the duty of loyalty from trust to pension law, the drafters of ERISA were able to institute a familiar fiduciary regime to protect pension funds against internal defalcation.'
**\*4** *Board of Trustees of Bricklayers and Allied Craftsman Local 6 of New Jersey Welfare Fund v. Wettlin Associates,* 237 F.3d, 274 (3d Cir.2001) (citations omitted). Based on this analysis, the Third Circuit declined to state that a party was not a fiduciary as a matter of law where the defendant had the "day to day responsibility to control, manage, hold, safeguard, and account for the Fund's assets and income." ' *Id.* at 274 (citations omitted).

In this case, ProLease contends that Unicare determined the eligibility of SLP's employees for

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 4

2003 WL 21359621 (D.Del.), 30 Employee Benefits Cas. 1669

**(Cite as: 2003 WL 21359621 (D.Del.))**

such benefits, determined the compensability of insurance claims submitted by SLP's employees and reserved the right to grant or deny claims submitted. (D.I. 27 at 4). Based on these facts, and the analysis outlined in *Wettlin*, the Court declines to dismiss the claim at this stage, because the record needs to be further developed as to this issue. Accordingly, the Court will deny Unicare's motion to dismiss.

B. Does ProLease Have Standing?

Unicare Defendants contend that ProLease lacks standing under § 502(a) of ERISA for breach of fiduciary duty. ProLease argues that it does have standing under ERISA because it is a fiduciary under 29 U.S.C. § 1002(21)(A). The civil enforcement provision of ERISA, 29 U.S.C. § 1132(a), limits parties entitled to sue thereunder to: 1) participants; 2) beneficiaries; and 3) fiduciaries. The Court has previously defined fiduciary and will not restate the definition. Additionally, the Court has noted the Third Circuit's analysis of fiduciary status designation under 29 U.S.C. § 1002(21)(A)(iii). ProLease contends that it remitted, on behalf of SLP, insurance premiums to insurers providing benefits to SLP's employees pursuant to SLP's benefit plan, and on occasion advanced sums for the payment of premiums. Applying the *Wettlin* standard to the facts pled in the Complaint, the Court cannot conclude as a matter of law that ProLease is not a fiduciary under 29 U.S.C. § 1002(21)(A)(iii). Viewing the facts in the light most favorable to ProLease, the record on this issue needs to be further developed, and therefore, dismissal at this juncture is inappropriate.

Additionally, Unicare Defendants argue that even if ProLease was a fiduciary, the tasks at issue were performed outside of that fiduciary capacity, and therefore, ProLease lacks standing. The Court cannot determine as a matter of law, at this juncture, that the tasks were performed outside of ProLease's role as a fiduciary. The Court recognizes that some courts have found that in cases of directed trustees, even if the tasks were performed outside of the fiduciary capacity, if the directed trustee intentionally or knowingly participates in a violation of ERISA than they can still be held

liable. *Firstier Bank, N.A. v. Zeller*, 16 F.3d 907, 911 (8th Cir.1994). Thus, the Court concludes that the factual record as to ProLease's fiduciary status, or whether the actions at issue fall within that status needs to be developed more thoroughly. As a result, the Court concludes that dismissal is not warranted.

C. Whether Unicare Defendants' Conduct Subject Them to Liability

*5 Unicare Defendants' contend that their conduct is not a prohibited transaction under ERISA and also contend that they cannot breach a fiduciary duty to ProLease, since ProLease, is not the SLP Plan. Section 404 of ERISA states that:

a fiduciary shall discharge his duties with respect to a plan solely in the interest of participants and beneficiaries and ... for the exclusive purpose of ... providing benefits to participants and their beneficiaries ... with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use....

29 U.S.C. § 1104(a)(1)(B). Additionally, § 406 of ERISA, forbids fiduciaries and parties in interest from engaging in transactions that are not in the best interest of the plan, including "deal[ing] with the assets of the plan on his own interest or own account." 29 U.S.C. § 1106(b)(1). In this case, as previously stated, the Court cannot conclude as a matter of law that Unicare is not a fiduciary to the SLP plan. If the Plaintiffs allegations are accepted as true, than Unicare as a fiduciary, by not returning an overpayment, has dealt with the assets of the plan for its own interest—a prohibited transaction. Also, even if Unicare Defendants are not fiduciaries they could still be held liable for prohibited transactions as "parties in interest" which is defined as a "person providing services" to an employee benefit plan. *See* 29 U.S.C. § 1002(14); 29 U.S.C. § 1106.

Additionally, Unicare Defendants seem to be arguing that the insurance overpayments are not "plan assets", and therefore, they cannot be liable for breach of fiduciary duty or be considered a prohibited transaction within the context of ERISA. ERISA does not define the term "plan assets." The

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 5

2003 WL 21359621 (D.Del.), 30 Employee Benefits Cas. 1669

**(Cite as: 2003 WL 21359621 (D.Del.))**

only Circuit Court to develop a test for determining whether a given asset is a "plan asset" is the Ninth Circuit. According to the Ninth Circuit, "[t]o determine whether a particular item constitutes [an] 'asset of the plan,' it is necessary to determine whether the item in question may be used to the benefit (financial or otherwise) of the fiduciary at the expense of plan participants or beneficiaries." *Acosta v. Pacific Enters.,* 950 F.2d 611, 620 (9th Cir.1992). Given the fact that ERISA does not define the term "plan asset" and the Third Circuit has not announced a test to determine if an asset is a plan asset, the Court cannot conclude as a matter of law that the overpayment by ProLease was not a plan asset. Although a Department of Labor Regulation provides a definition for "plan asset", the Court is reluctant to adopt such a definition in the context of a motion to dismiss.

**D. Whether the Remedies Available are Limited to Restoration of Money to SLP's Plan**

Unicare Defendants argue that the remedies available in this action are limited to restoration of money to SLP's Plan. However, § 1132(a)(3) of ERISA states that a civil action may be brought "by a participant, beneficiary or fiduciary ... to obtain other appropriate equitable relief." 29 U.S.C. § 1132(a)(3). The scope of "other appropriate equitable relief" has been addressed by the Third Circuit, which has concluded that relief is available to parties other than the plans. *See Ream v. Frey,* 107 F.3d 147, 152-153 (3d Cir.1997) (determining that a beneficiary of a benefit plan may assert a claim for individualized relief under § 1132(a)(3) because he suffered a "clear and distinct personal loss"). Given this possibility, the Court cannot conclude as a matter of law at this juncture, that ProLease's remedy is limited to restoration of money to the SLP plan.

**E. Whether a Claim for Equitable Restitution Exists**

*6 In regard to Count I, Unicare Defendants contend that it should be dismissed because a common law claim under ERISA for equitable restitution does not exist under the facts alleged by ProLease. The Third Circuit first recognized an

equitable restitution claim in *Plucinski v. I.A.M. National Pension Fund,* 875 F.2d 1052 (3d Cir.1989). In *Plucinski* the court awarded equitable restitution to employers for a mistaken overpayment, stating:

> [w]e hold that there is an equitable cause of action by employers for the recovery of contributions erroneously paid to pension funds due to a mistake of fact or law. Of course, general equitable principles govern and when it would be inequitable to so order, for example, when restitution would result in the underfunding of the plan, the court should in its sound discretion deny recovery. We believe that creating such a cause of action will fill in the interstices of ERISA and further the purposes of ERISA ... Indeed, we believe that if we did not recognize this cause of action it could lead to severely inequitable results that we do not believe were intended by Congress. A simple keypunch error could cost an employer tens of thousands of dollars or more. Perhaps more strikingly, a trustee could extort extra money from an employer by force or fraud, and the employer would have no definite means of recouping the 'contributions' from the fund.

*Plucinski,* 875 F.2d at 1058. Additionally, the Third Circuit recognized such a cause of action for restitution to a plan in *Luby v. Teamsters Health, Welfare and Pension Trust Funds,* 944 F.2d 1176 (3d Cir.1991). Although the Court understands that ProLease is neither an employer or a plan, it also understands that Unicare Defendants have not presented any authority stating that such a claim does not exist under similar circumstances. As a result, the Court will not dismiss such a claim at this stage due to the factual considerations involved in the determination to award such relief, including the balancing of equities, and whether such an action would "fill in the interstices of ERISA and further the purposes of ERISA." *Luby,* 944 F.2d at 1186. Accordingly, the Court will deny Unicare Defendants' Motion to Dismiss Count I.

**F. Count IVState Law Claims**

Because the Court is not dismissing Counts I-III, consideration of whether the Court will exercise supplemental jurisdiction is moot.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

2003 WL 21359621 (D.Del.), 30 Employee Benefits Cas. 1669

**(Cite as: 2003 WL 21359621 (D.Del.))**

Page 6

V. Conclusion

In sum, the Court concludes that a further factual record needs to be developed with regard to the legal issues presented. Accordingly, the motion to dismiss will be denied.

An appropriate Order will be entered.

*ORDER*

NOW THEREFORE, for the reasons set forth in the Opinion issued this date, IT IS HEREBY ORDERED this *31st* day of March 2003 that Unicare Defendants' Motion to Dismiss Counts I-IV. (D.I.7) of the Complaint is *DENIED.*

2003 WL 21359621 (D.Del.), 30 Employee Benefits Cas. 1669

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 6



Not Reported in F.Supp.2d

2002 WL 1870479 (E.D.Pa.)

**(Cite as: 2002 WL 1870479 (E.D.Pa.))**

Page 1

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, E.D. Pennsylvania.
Kevin WRIGHT,
v.
Clifford O'HARA, et al.
**No. CIV.A. 00-1557.**

Aug. 14, 2002.

Pro se state prisoner brought § 1983 action against prison officials, guards, and healthcare workers at state prison, seeking damages for various alleged constitutional violations. Defendants moved to dismiss, and moved for more definite statement. The District Court, O'Neill, J., held that: (1) action prison nurse was not barred by two-year statute of limitations; (2) Eleventh Amendment barred action against defendants in their official capacity; (3) prisoner did not have either protected property or liberty interest in employment while in prison; (4) allegations that prison officials forced state prisoner to serve burnt food, which resulted in prisoner losing his prison kitchen job, did not state equal protection claim; (5) allegations that defendants harassed prisoner, through verbal abuse and threats, did not state constitutional claim; and (6) allegations that guard sexually assaulted prisoner, and incited other prisoners against him stated Eighth Amendment violation.

Motions granted in part, and denied in part.

West Headnotes

**[1] Limitation of Actions ☞58(1)**
241k58(1) Most Cited Cases
Pro se state prisoner's § 1983 action against prison nurse for giving him medication which caused him to suffer severe allergic reaction was not barred by two-year statute of limitations, absent evidence that incident occurred more than two years before action was filed. 42 U.S.C.A. § 1983.

**[2] Limitation of Actions ☞58(1)**
241k58(1) Most Cited Cases
Continuing violation doctrine applied to pro se state prisoner's § 1983 claim against corrections officer alleging repeated instances of sexual assault, maltreatment and threats over two year period, for statute of limitations purposes; prisoner wrote letters to prison superintendent over two-year period complaining of officer's conduct, demonstrating ongoing nature of the violations, and final letter fell within two-year limitations period for § 1983 action. 42 U.S.C.A. § 1983.

**[3] Federal Courts ☞265**
170Bk265 Most Cited Cases

**[3] Federal Courts ☞269**
170Bk269 Most Cited Cases
Eleventh Amendment barred pro se state prisoner's § 1983 action against state, and state prison officials, guards, and healthcare workers, in their official capacity. U.S.C.A. Const.Amend. 11; 42 U.S.C.A. § 1983.

**[4] Conspiracy ☞7.5(2)**
91k7.5(2) Most Cited Cases

**[4] Constitutional Law ☞272(2)**
92k272(2) Most Cited Cases

**[4] Constitutional Law ☞277(1)**
92k277(1) Most Cited Cases
State prisoner did not have either protected property or liberty interest in employment while in prison, barring prisoner's pro se § 1983 claim against various prison officials, alleging that officials conspired to deprive him of employment in

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 1870479 (E.D.Pa.)

**(Cite as: 2002 WL 1870479 (E.D.Pa.))**

violation of due process rights. U.S.C.A. Const.Amend. 14; 42 U.S.C.A. § 1983.

**[5] Constitutional Law ☜250.3(2)**
92k250.3(2) Most Cited Cases

**[5] Convicts ☜7(1)**
98k7(1) Most Cited Cases
Allegations that prison officials forced state prisoner to serve burnt food, which resulted in prisoner losing his prison kitchen job, did not state claim against prison officials for equal protection violation, for purposes of § 1983 action; prisoner did not have legally cognizable interest in prison job. U.S.C.A. Const.Amend. 14; 42 U.S.C.A. § 1983 .

**[6] Sentencing and Punishment ☜1554**
350Hk1554 Most Cited Cases
Allegations that state corrections officers harassed prisoner, through verbal abuse and threats, did not state Eighth Amendment violation, for purposes of prisoner's §1983 action. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[7] Sentencing and Punishment ☜1537**
350Hk1537 Most Cited Cases

**[7] Sentencing and Punishment ☜1548**
350Hk1548 Most Cited Cases
Allegations that state prison guard sexually assaulted prisoner and incited other prisoners against him stated Eighth Amendment violation, for purposes of prisoner's § 1983 action. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[8] Prisons ☜4(13)**
310k4(13) Most Cited Cases
Opportunity
Allegations that state prisoner was only given limited access to prison law library during time he had to prepare document for pending state court action did not state claim against prison officials for denial of access to courts, absent allegation of resulting injury.

**[9] Civil Rights ☜1395(7)**
78k1395(7) Most Cited Cases

(Formerly 78k235(7))
Allegation by pro se state prisoner that prison nurse gave him medication that almost resulted in his death did not state § 1983 claim under the Eighth Amendment for deliberate indifference to prisoner's medical needs; despite liberal pleading standard, allegation was insufficient to suggest that nurse had requisite knowledge to be deliberately indifferent. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983; Fed.Rules Civ.Proc.Rule 8(a), 28 U.S.C.A.

**[10] Civil Rights ☜1358**
78k1358 Most Cited Cases
(Formerly 78k207(2))

**[10] Sentencing and Punishment ☜1537**
350Hk1537 Most Cited Cases
Allegations that prison superintendent and other corrections supervisors did nothing to investigate state prisoner's written complaints that he was sexually assaulted by prison guard and that guard attempted to incite other prisoners against him stated claim under the Eighth Amendment, for purposes of prisoner's § 1983 supervisory liability action. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

*MEMORANDUM*

O'NEILL, J.

I. INTRODUCTION

*1 This is a civil rights action arising under 42 U.S.C. § 1983, brought against prison officials, guards, and healthcare workers at the State Correctional Institution at Graterford. Plaintiff Kevin Wright, currently a prisoner at Graterford seeks damages for injuries he has suffered while imprisoned. He alleges a number of constitutional violations. Before me is the defendants' motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. Additionally, with respect to plaintiff's claim against defendant Kelley, the motion requests in the alternative a more definite statement pursuant to Federal Rule of Civil Procedure 12(b). For the reasons stated below, I will grant defendants' motion to dismiss in-part and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

2002 WL 1870479 (E.D.Pa.)

**(Cite as: 2002 WL 1870479 (E.D.Pa.))**

Page 3

deny it in-part, and will deny the motion for a more definite statement as moot.

## II. BACKGROUND

In his handwritten amended complaint, plaintiff makes a host of claims. Plaintiff alleges that Mary Canino, a hearing examiner a Graterford unjustly took away a prison job from him on September 9, 1997. Around that same time, plaintiff contends that Robert Crawford, Levi Hosband, and Elliot Bennett, as members of a Program review Committee at Graterford conspired with Ms. Canino to take away his job. Plaintiff contends that John Henschel wrongfully denied him a new job in 1997 and conspired with Leslie Kloss to do so. He also claims that Maryann Williams, a grievance coordinator conspired with Ms. Canino to harass him in 1997.

Plaintiff avers that in 1996 Kim Ulisney, the person responsible for acceptance of mail at Graterford, delivered legal correspondence to him 10 days late and opened it. He claims that in 1996 Charles Brubach, a grievance coordinator, was made aware of a similar instance of tampering with legal mail and did nothing.

Plaintiff alleges that Corrections Officer Joseph Jamison repeatedly subjected him to physical abuse and threats from November 20, 1997 to January 29, 2000. Specifically, plaintiff asserts that Officer Jamison attempted to assault him sexually on at least one occasion, has repeatedly encouraged other inmates to attack plaintiff by calling him a "snitch," and has threatened to kill plaintiff.

Plaintiff contends that Correctional Officers Edward Fessler and Frank Singleton and Lieutenant John Kelly have subjected him to "harassment and discrimination." Plaintiff asserts that Fessler and Kelly harassed him because he is African American and that Kelly also did so because plaintiff is a Muslim. Plaintiff offers no motivation for harassment by Singleton and no time frame for when the harassment took place. In addition, he claims that Sergeant Joseph Balberchak threatened him "with continuous punishment and arrest if [he] refused DNA testing."

Plaintiff also asserts claims against various healthcare workers. Specifically, plaintiff claims that Nurse Shelly Martin [FN1] gave him medication to which he had an allergic reaction and almost died. Plaintiff provides no further details as to when [FN2] or how this incident occurred.

> FN1. In addition to Nurse Martin, plaintiff has sued Doctors Boxer and Saranoff and Nurse Joseph Carred. Nurse Martin, however, appears to be the only healthcare worker that is a party to the present motion to dismiss.

> FN2. The timing of the incident is relevant in determining whether plaintiff's claim against Martin is time-barred. Defendants' memorandum accompanying the motion to dismiss suggests that the exhibits plaintiff attached to his amended complaint show that the incident occurred in 1996.

Plaintiff contends that prison officials operating in supervisory positions failed to address and remedy his various complaints. Plaintiff alleges that he mailed four letters to Superintendent Vaughn, over the course of two years, expressing his complaints regarding his treatment by staff members at Graterford. The last of these letters, dated June 6, 1999, plaintiff has attached as an exhibit to his amended complaint. In this letter, plaintiff describes his sexual assault and other alleged instances of maltreatment and threats by Officer Jamison. The letter also complains of the prison's alleged "job discrimination" against plaintiff, detailing how prison staff wrongfully fired him from his employment in the prison's kitchen. Plaintiff claims that the letter to Vaughn was also copied to Clifford O'Hara at the Pennsylvania Department of Corrections. Plaintiff has also attached as an exhibit to his amended complaint a cover letter, dated July 11, 1999, that allegedly was sent to O'Hara with a copy of the Vaughn letter. Plaintiff also claims that he mailed a letter, dated January 23, 1998, to Robert Bitner at the Pennsylvania Department of Corrections, describing how his grievances against Officer Jamison were not properly being addressed by prison officials at Graterford and how he feared

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 4

2002 WL 1870479 (E.D.Pa.)

**(Cite as: 2002 WL 1870479 (E.D.Pa.))**

for his welfare.

**\*2** Plaintiff claims other defendants unconstitutionally denied him access to the court system. Wright contends that William Zenkal, is the person responsible for issuing prisoners passes to use Graterford's law library. Plaintiff has attached to his amended complaint a request form, dated November 11, 1999, which informed Zenkal of a deadline for an impending court filing and his need to use the law library for five days. Plaintiff claims that he sent a request slip on October 29, 1999 to William Conrad, the unit manager for plaintiff's cell block, complaining that he was not being assigned adequate library time and had only been granted five days over a two-month period. Plaintiff also claims that he made Leslie Hatcher aware of his denial to access the courts on October 25, 1999.

### III. STANDARD
A Rule 12(b)(6) motion to dismiss examines the sufficiency of the complaint. *Conley v. Gibson,* 355 U.S. 41, 45, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). In determining the sufficiency of the complaint I must accept all the plaintiff's allegations as true and draw all reasonable inferences therefrom. *Graves v. Lowery,* 117 F.3d 723, 726 (3d Cir.1997).

> The Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts upon which he bases his claim. To the contrary, all the Rules require is "a short and plain statement of the claim" that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.

*Conley,* 355 U.S. at 47. "Thus, a court should not grant a motion to dismiss 'unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *Graves,* 117 F.3d at 726, *quoting, Conley,* 355 U.S. at 45-46. Moreover, although plaintiff is now represented by counsel [FN3] when drafting the amended complaint he was acting *pro se. See Zilich v. Lucht,* 981 F.2d 694, 694 (3d Cir.1992) (noting that when a plaintiff is a *pro se* litigant, judge has a special obligation to construe his complaint liberally).

> FN3. I received a *pro se* filing by plaintiff

today, August 14, 2002, entitled "Acknowledgment of Change of Address and Report of Retaliation." I note that all future filings should be made through plaintiff's counsel.

The alternative motion, for a more definite statement, is governed by Federal Rule of Civil Procedure 12(e), which is directed to the rare case where because of the vagueness or ambiguity of the pleading the answering party will not be able to frame a responsive pleading. *See Schaedler v. Reading Eagle Publication, Inc.,* 370 F.2d 795, 798 (3d Cir.1967). Specifically, Rule 12(e) provides, in-part, the following.

> **\*3** If a pleading to which a responsive pleading is permitted is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading, the party may move for a more definite statement before interposing a responsive pleading. The motion shall point out the defects complained of and the details desired.

A court should grant a Rule 12(e) motion when the complaint does not give the defendants adequate notice of the claims against them. *See Doe v. Borough of Morrisville,* 130 F.R.D. 612, 615 (E.D.Pa.1990).

### IV. DISCUSSION
A. Claims Barred By The Statute of Limitations

Defendants assert that the majority of plaintiff's claims are barred by a two-year statute of limitations. I agree. "In actions under 42 U.S.C. § 1983, federal courts apply the state's statute of limitations for personal injury." *Sameric Corp. of Delaware, Inc. v. City of Philadelphia,* 142 F.3d 582, 599 (3d Cir.1998), *citing Wilson v. Garcia,* 471 U.S. 261, 276-78, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985). Pennsylvania's statute of limitations on personal injury actions is two years. *Reitz v. County of Bucks,* 125 F.3d 139, 143 (3d Cir.1997), *citing* 42 Pa. Cons.Stat. Ann. § 5524(2).

Many of plaintiff's claims are barred because the two-year statute of limitations ran before his original complaint was filed on March 27, 2000. A cause of action under section 1983 accrues when

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 5

the plaintiff knew or should have known of the injury upon which his claim is based. *Sameric,* 142 F.3d at 599. In the present case, all claims in the amended complaint relating to the following individuals are time-barred because they accrued well before March, 27 1998: Mary Canino, Robert Crawford, Levi Hosband, Elliot Bennett, John Henschel, Leslie Kloss, Kim Ulisney, Charles Brubach, Maryann Williams, and Robert Bitner. Therefore, as to those individuals I will grant defendants' motion to dismiss.

[1] Defendants assert that the statute of limitations also requires me to dismiss plaintiff's claims against Nurse Shelly Martin. In their memorandum supporting the motion to dismiss, defendants contend that plaintiff's allegations against Nurse Martin stem from an incident that occurred in 1996. To support this proposition, defendants generally cite to the exhibits plaintiff attached to his amended complaint without pointing to any one in particular. After reviewing the relevant exhibits, however, I see nothing to suggest that the statute of limitations has run on plaintiff's claim against Nurse Martin.

[2] Defendants' also contend that plaintiff's claims against Officer Jamison are barred by the statute. Plaintiff responds by invoking the continuing violations doctrine. The Court of Appeals for the Third Circuit has recognized this doctrine as an equitable exception to the timely filing requirement. *Cowell v. Palmer Twp.,* 263 F.3d 286, 292 (3d Cir.2001). "When a defendant's conduct is part of a continuing practice, an action is timely so long as the last act evidencing the continuing practice falls within the limitations period; in such an instance, the court will grant relief for the earlier related acts that would otherwise be time barred." *Brenner v. Local 514, United Bhd. of Carpenters and Joiners of Am.,* 927 F.2d 1283, 1295 (3d Cir.1991).

*4 To benefit from this rule, the plaintiff must demonstrate that the defendant's conduct is more than the occurrence of isolated or sporadic acts. *Cowell,* 263 F.3d at 292. In making this determination, district courts should consider at least three factors:

(1) subject matter--whether the violations

constitute the same type of [harm], tending to connect them in a continuing violation; (2) frequency-- whether the acts are recurring or more in the nature of isolated incidents; and (3) degree of permanence--whether the act had a degree of permanence which should trigger the plaintiff's awareness of and duty to assert his/her rights and whether the consequences of the act would continue even in the absence of a continuing intent to discriminate.

*Id.*

In the present case, it appears that plaintiff may use the continuing violation doctrine to bring his section 1983 claim against Officer Jamison. Although the continuing violations doctrine is most frequently applied in employment discrimination claims, it may also be used to bring a section 1983 claim. *See id.* (citing cases). First, all of plaintiffs allegations against Officer Jamison seem to constitute harassment in one form or another. Plaintiff claims Jamison sexually assaulted him, threatened him with death, and attempted to incite other inmates to attack him over the course of at least two years. Plaintiff's repeated written complaints to Vaughn over the course of those two years demonstrate the on-going nature of the alleged harassment. Moreover, the repeated letters to Vaughn show plaintiff's awareness of and willingness to assert his rights against Jamison. [FN4] Finally, the last of these letters complaining about Jamison's continuous harassment, dated January 29, 2000, clearly falls within the statute of limitations.

> FN4. Plaintiff's repeated letters to Vaughn demonstrate that, over the course of those two years, plaintiff attempted to remedy his problem with Officer Jamison without immediately resorting to litigation. Keeping in mind that the continuing violation doctrine is a form of equitable relief, plaintiff should not be penalized for failing to assert all of his claims within the two-year statute of limitations because he attempted to remedy his situation without involving the courts.

B. Claims Barred By Eleventh Amendment

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 6

[3] Defendants correctly assert that the Eleventh Amendment prevents plaintiff from suing them in their official capacity. [FN5] The Eleventh Amendment provides the states immunity from suit brought by individual citizens in federal court. *See Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 54, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996) ("For over a century we have reaffirmed that federal jurisdiction over suits against unconsenting States 'was not contemplated by the Constitution when establishing the judicial power of the United States.' "). However, statutes that are specifically intended by Congress to abrogate immunity and enacted pursuant to section 5 of the Fourteenth Amendment, such as in 42 U.S.C. § 1983, constitute a limited exception to the Eleventh Amendment. *See id.* at 59.

> FN5. The Supreme Court has distinguished official capacity lawsuits from personal capacity lawsuits in the following manner: Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law. Official-capacity suits, in contrast, "generally represent only another way of pleading an action against an entity of which an officer is an agent." As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. It is not a suit against the official personally, for the real party in interest is the entity. Thus, while an award of damages against an official in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself. *Kentucky v. Graham,* 473 U.S. 159, 165-66, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) (internal citations omitted).

Although plaintiff sues defendants under § 1983 in the current action, § 1983 only authorizes suits against "persons" acting under the color of state law. *See Hafer v. Melo,* 502 U.S. 21, 26, 112 S.Ct.

358, 116 L.Ed.2d 301 (1991). The Supreme Court has recognized that when a plaintiff sues a state agent in his or her official capacity for damages the suit is not against the "person" but rather against the official's office. *See id.* at 27 ("State officers sued for damages in their official capacity are not 'persons' for purposes of the suit because they assume the identity of the government that employs them."). Therefore, state officials acting in their official capacities are outside the class of persons subject to liability under § 1983. *Id.* at 22-23. To the extent plaintiff sues defendants in their official capacities, I will grant the motion to dismiss. [FN6]

> FN6. In the present case, it is unclear from the amended complaint that plaintiff is asserting any claims against defendants in their official capacities. It, however, is apparent that plaintiff intended to sue the defendants in their personal capacities. Therefore, I will not dismiss, based on Eleventh Amendment immunity, any claims asserted against defendants in their personal capacities. *See Graham,* 473 U.S. at 166-67 (noting that only personal defenses, such as qualified immunity, may be used in such instances).

C. Failure to State a Claim Under the Fourteenth Amendment

1. Prison Employment

*5 [4] Defendants correctly contend that plaintiff has no right under the Fourteenth Amendment to employment while in prison and, therefore, plaintiff's allegations against Canino, Williams, Henschel, Bennett, and Kloss do not state a claim upon which I can grant relief. [FN7]

> FN7. Plaintiff apparently concedes this point by failing to address this issue in his memorandum opposing the motion to dismiss.

Plaintiff has failed to allege a constitutional violation under the Fourteenth Amendment. The Court of Appeals for the Third Circuit has stated:

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                 Page 7

2002 WL 1870479 (E.D.Pa.)

**(Cite as: 2002 WL 1870479 (E.D.Pa.))**

"We do not believe that an inmate's expectation of keeping a particular prison job amounts either to a 'property' or 'liberty' interest entitled to protection under the due process clause." *Bryan v. Werner,* 516 F.2d 233, 240 (1975), *citing Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *see also James v. Quinlan,* 866 F.2d 627, 630 (1989) ("Traditionally, prisoners have had no entitlement to a specific job, or even to any job."). Here, plaintiff has alleged that these defendants conspired to deprive him of employment while in prison. Without more, these allegations do not rise to the level of a constitutional violation.

2. Disciplinary Procedures

Plaintiff appears to assert that two defendants, Officer Fessler and Lieutenant Kelley, violated the Equal Protection Clause of the Fourteenth Amendment. Defendants argue that plaintiff's claim against Officer Fessler does not constitute a constitutional violation under the Fourteenth Amendment. [FN8] Paragraph 18 of plaintiff's amended complaint alleges that "Respondent C/O Fessler abused his authority by harassing petitioner, because a [sic] African American C/O gave petitioner an order. *See:* Attachment (Q)." Plaintiff's "Attachment (Q)" is a request for an appeal from a hearing on September 7, 1997, where he was found guilty of misconduct. The request describes an incident where Fessler ordered plaintiff to serve burnt pizza to the prisoners in the cafeteria. After the prisoners refused to accept the burnt pizza, plaintiff was told by two different officers to put the burnt pizza aside and serve non-burnt pizza.

> FN8. Defendants attempt to characterize plaintiff's claim against Fessler as arising from a Due Process Clause violation. However, the plain language of the amended complaint appears to allege an Equal Protection Clause violation.

[5] Plaintiff's allegation against Fessler does not state a constitutional claim. [FN9] From the language of his amended complaint, it appears that plaintiff is attempting to claim an equal protection violation under the Fourteenth Amendment. [FN10]

*See Turner v. Safley,* 482 U.S. 78, 84, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987) ("[Prisoners] are protected against invidious racial discrimination by the Equal Protection Clause of the Fourteenth Amendment."), *citing Lee v. Washington,* 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968). To bring a successful claim under 42 U.S.C. § 1983 for a denial of equal protection, plaintiff must show that: 1) defendants intentionally discriminated on the basis of race; 2) plaintiff suffered a legally cognizable injury; and 3) defendants were personally involved in the alleged violation. *Simpson v. Horn,* 80 F.Supp.2d 477, 479 (E.D.Pa.2000) (Brody, J.).

> FN9. Alternatively, although defendants do not point this out, it appears that plaintiff's claim may be time-barred because that the misconduct report by Fessler in September of 1997 appears to have been the "harassment."

> FN10. Plaintiff also characterizes his claim against Fessler as arising from an Eighth Amendment violation. As I will discuss below, the allegations against Fessler do not constitute an Eighth Amendment violation.

*6 Plaintiff has not suffered a legally cognizable injury. Plaintiff seems to allege that Fessler reported him for misconduct, ultimately resulting in the loss of his prison employment, because he followed the orders of an African American corrections officer instead of Fessler. Because plaintiff has no right to prison employment, see *James,* 866 F.2d at 630, he fails to allege a legally cognizable injury.

The same appears to be true with respect to plaintiff's allegations against defendant Kelly. In his amended complaint plaintiff asserts only that "Lt. Kelly is the respondent responsible for harassing petitioner because he is an African American Muslim." This, without more, fails to state a claim for which relief can be granted.

D. Eighth Amendment Violations

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                  Page 8

2002 WL 1870479 (E.D.Pa.)

**(Cite as: 2002 WL 1870479 (E.D.Pa.))**

Defendants contend that plaintiff's allegations against defendants Fessler, Singleton, Balberchak, and Jamison do not constitute Eighth Amendment violations. I conclude that plaintiff's assertions against Fessler, Balberchak, and Singlton do not state a claim but those against Jamison do.

[6] Plaintiff claims that Fessler and Singleton harassed him by being verbally abusive and threatening to charge him with misconduct. He also alleges that Sergeant Balberchak threatened him with "punishment and arrest" if he did not submit to DNA testing. It is well-established that verbal abuse or threats alone do not state a constitutional claim. *See Maclean v. Secor,* 876 F.Supp. 695, 698 (E.D.Pa.1995) (Brody, J.) (citing cases). "This is so because '[n]ot every unpleasant experience a prisoner might endure while incarcerated constitutes cruel and unusual punishment.' " *Ramos v. Vaughn,* No. Civ. 94- 2596, 1995 WL 386573, *4 (E.D.Pa. June 27, 1995) (Dubois, J.), *quoting Ivey v. Wilson,* 832 F.2d 950, 954 (6th Cir.1987).

[7] Plaintiff's allegations against Jamison, however, suggest serious misconduct. Beyond threats and verbal abuse, plaintiff claims that Jamison sexually assaulted him and incited other inmates against him. The Supreme Court has recognized that "The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones, and it is now settled that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (internal citations and quotations omitted). Moreover, "[b]eing violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.' " *Farmer,* 511 U.S. at 834, *quoting Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). At least one Court of Appeals has held that sexual assault by a prison guard clearly violates the Eighth Amendment. *See Schwenk v. Hartford,* 204 F.3d 1187, 1197 (9th Cir.2000) ("A sexual assault on an inmate by a guard--regardless of the gender of the guard or of the prisoner--is deeply 'offensive to human dignity.'

") (determining that it is clearly established under the Eighth Amendment that prison guards cannot sexually assault prisoners). I conclude that plaintiff has stated a claim against defendant Jamison.

E. Access To The Courts

*7 Plaintiff alleges that defendants Zenkal, Hatcher, and Conrad violated his right to access the court system by denying him use of Graterford's law library. Plaintiff's allegations against the specific defendants are vague. However, my examination of the amended complaint and the attachments thereto reveals that in the Fall of 1999 plaintiff had to prepare a response to a Finley letter for a case that was pending in state court. Plaintiff asserts that from September 1999 until November of that same year he was allowed only five days of access to the law library despite numerous requests.

[8] Plaintiff has failed to state a claim that defendants denied him access to the courts. The Supreme Court has determined that plaintiffs denied access to prison law libraries must plead that a resulting injury occurred to state a claim. *See Lewis v. Casey,* 518 U.S. 343, 349, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996); *see also Oliver v. Fauver,* 118 F.3d 175, 178 (3d Cir.1997) (noting that inmate must demonstrate that the alleged shortcomings hindered his efforts to pursue a legal claim); *Jones v. Horn,* No. CIV. A. 97- 3921, 1998 WL 297636, at *4 (E.D.Pa. June 4, 1998) (Bechtle, J.) ("A plaintiff must show some injury, such as the loss of a legal claim."). For instance, the *Lewis* Court noted that to demonstrate an actual injury, an inmate could show that a complaint he prepared was dismissed for failure to satisfy some technical requirement, or that he was unable to file any complaint at all. *Lewis,* 518 U.S. at 351. Here, plaintiff does not make such an assertion. He does not claim that his response to the Finley letter was deficient in anyway or that he was barred from filing his response. I will dismiss plaintiff's claims that he was denied access to the courts.

F. Medical Eighth Amendment Claim

Plaintiff has failed to state a claim that Nurse

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Martin was deliberately indifferent to his serious medical needs. In *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), the Supreme Court recognized that deliberate indifference to the serious medical needs of prisoners constitutes unnecessary and wanton infliction of pain proscribed by the Eighth Amendment. *Id.* at 104. However, not every claim of inadequate medical care violates the Eighth Amendment. "An accident, although it may produce added anguish, is not on that basis alone to be characterized as wanton infliction of unnecessary pain." *Id.* at 105.

Deliberate indifference requires a state of mind more blameworthy than negligence. *Farmer,* 511 U.S. at 835. The *Estelle* Court determined: "In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend 'evolving standards of decency' in violation of the Eighth Amendment." *Id.* at 106. In defining the "deliberate indifference," the Supreme Court has held that "a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. For example, injecting a prisoner with penicillin despite knowing that the prisoner was allergic to such medicine and then failing to treat the allergic reaction would constitute deliberate indifference. *See Estelle,* 429 U.S. at 104 n. 10, *citing Thomas v. Pate,* 493 F.2d 151, 158 (7th Cir.1974).

[9] In the present case, plaintiff has not alleged that Nurse Martin was the deliberately indifferent to his serious medical needs. Rather, plaintiff's amended complaint states: "Nurse Shelly [Martin] is the respondent who gave petitioner allergic Medication that almost resulted in Petitioner's death." Despite the liberal standards for pleading under Rule 8(a), plaintiff's allegation is insufficient to suggest that Nurse Martin had the requisite knowledge to be deliberately indifferent to plaintiff's medical needs.

*See, e.g., Grove v. Prison Health Servs., Inc.,* Civ. A. No. 90-4955, 1990 WL 167936, *2 (E.D.Pa. Oct.29, 1990) (dismissing claim for failure to plead actions constituting deliberate indifference). Moreover, the it is indistinguishable from an allegation claiming professional negligence, which is not actionable under the Eighth Amendment. *See Farmer,* 511 U.S. at 835; *Estelle,* 429 U.S. at 106 ("Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.").

G. Supervisory Defendants

*8 [10] Plaintiff has adequately alleged that the supervisory defendants Vaughn and O'Hara were aware of and acquiesced in the unconstitutional behavior of Officer Jamison. A plaintiff may establish section 1983 supervisory liability by showing that a supervisor tolerated past or ongoing misbehavior that violates the Constitution. *Baker v. Monroe Twp.,* 50 F.3d 1186, 1191 n. 3 (3d Cir.1995); *see also Rode v. Dellarciprete,* 845 F.2d 1195, 1207 (3d Cir.1988) ("A defendant in a civil rights action must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of *respondeat superior....* Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence....").

Here, plaintiff claims that he mailed four letters to Vaughn over the course of two years, the final one dated June 6, 1999, describing how Officer Jamison had sexually assaulted him and continued to harass him and attempted to incite other inmates against him. Plaintiff also claims that he sent a copy of the Vaughn letter to O'Hara at the Pennsylvania Department of Corrections and that neither supervisor did anything to investigate the ongoing incidents or discipline Jamison. [FN11] Such inaction violates the Eighth Amendment. *See Smith v. Mensinger,* 293 F.3d 641, 651 (3d. Cir.2002) ("The restriction on cruel and unusual punishment contained in the Eighth Amendment reaches non-intervention just as readily as it reaches the more demonstrable brutality of those who

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 10

2002 WL 1870479 (E.D.Pa.)

**(Cite as: 2002 WL 1870479 (E.D.Pa.))**

unjustifiably and excessively employ fists, boots or clubs."). I will not dismiss the claims against Vaughn and O'Hara.

> FN11. Plaintiff also asserts that he mailed a letter, dated January 23, 1998, to Robert Bitner at the Pennsylvania Department of Corrections, describing how his grievances against Officer Jamison were not properly being addressed by prison officials.

*ORDER*

**\*9** AND NOW, this day of August, 2002, after considering the defendants' motion to dismiss, and the plaintiff's response thereto, and for the reasons set forth in the accompanying memorandum, it is ORDERED that:

1. The motion to dismiss is GRANTED with respect to defendants Canino, Crawford, Hosband, Bennett, Henschel, Kloss, Ulisney, Brubach, Williams, Bitner, Fessler, Singleton, Balberchak, Kelley, Hatcher, Conrad, Zenkal, and Martin. All claims against these defendants are DISMISSED;

2. The motion to dismiss is GRANTED with respect to all defendants sued in their official capacities. All such claims are DISMISSED.

3. The motion to dismiss is DENIED with respect to defendants Vaughn, O'Hara, and Jamison.

4. Defendant's motion for a more definite statement with regard to plaintiff's claim against Kelley is DENIED as moot.

2002 WL 1870479 (E.D.Pa.)

**Motions, Pleadings and Filings (Back to top)**

- 2:00CV01557  (Docket)
                                  (Mar. 27, 2000)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.