**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **MONA DOBRICH, et al.,** | : | |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| v. | : | **C.A.No. 05-120-JJF** |
| | : | |
| | : | |
| **HARVEY L. WALLS, et al,** | : | |
| | : | |
| **Defendants.** | : | |

**DEFENDANT REGINALD L. HELMS' OPENING BRIEF IN SUPPORT OF HIS
MOTION FOR SUMMARY JUDGMENT ON THE BOARD'S
VOLUNTARY PRAYER POLICY AS WRITTEN**

**THE RUTHERFORD INSTITUTE**
**JOHN W. WHITEHEAD, ESQ.**
**DOUGLAS MCKUSICK, ESQ.**
P.O. Box 7482
Charlottesville, VA 22906
(434) 978-3888
JohnW@Rutherford.org
DouglasM@Rutherford.org

Of Counsel

**THE NEUBERGER FIRM, P.A.**
**THOMAS S. NEUBERGER, ESQ. (#243)**
**STEPHEN J. NEUBERGER, ESQ. (#4440)**
Two East Seventh Street, Suite 302
Wilmington, DE 19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com

Attorneys for Defendant Reginald L. Helms

Dated: August 5, 2005

## TABLE OF CONTENTS

NATURE AND STAGE OF THE PROCEEDINGS....................................................1

SUMMARY OF THE ARGUMENT.............................................................................1

STATEMENT OF FACTS.........................................................................................2

    A.      Adoption of the Indian River School Board's Policy on Prayer............................2

    B.      The Nature and Functions of Delaware School Boards...........................................6

ARGUMENT.............................................................................................................7

    I.      INTRODUCTION................................................................................................7

        A.      The Big Picture.....................................................................................................7

        B.      Prayer By Legislative and Deliberative Bodies is Settled Law
                Under <u>Marsh</u>...................................................................................................8

        C.      The State Cannot Dictate the Viewpoint of Legislative Prayer..................9

        D.      Standard of Review.................................................................................................11

    II.      THE POLICY GRANTING EACH BOARD MEMBER THE
          OPPORTUNITY TO OFFER AN INVOCATION ACCORDING TO
          HIS OR HER OWN RELIGIOUS VIEWPOINT COMPORTS WITH
          THE FREE SPEECH CLAUSE AND DOES NOT IMPERMISSIBLY
          DISCRIMINATE BASED ON VIEWPOINT.......................................................11

        A.      The Invocation Policy Must Be Viewpoint-Neutral Because It
                Establishes a Nonpublic Forum................................................................11

        B.      An Invocation Policy Requiring Board Members to Avoid Referring
                to One's Preferred Name for God Would Discriminate On the Basis
                of Viewpoint, Thereby Violating the Speaker's Right to Free Speech......15

        C.      No Compelling State Interest Warrants a Viewpoint Restriction..............17

            1.      A Private Speaker's Interest in Free Speech Usually
                    Outweighs the Government's Establishment Clause Concerns.....17

            2.      The First Amendment Allows the Policy's Content-Based
                    Restrictions Which Are Not Based on Viewpoint........................18

*i*

III.  BY ALLOWING PRAYER-GIVERS THE OPPORTUNITY TO PRAY
      ACCORDING TO THEIR OWN VIEWPOINTS, SECTARIAN OR
      OTHERWISE, THE POLICY AS WRITTEN AVOIDS VIOLATING THE
      ESTABLISHMENT CLAUSE UNDER <u>LEE v. WEISMAN</u> AND <u>SANTA
      FE IND. SCH. DIST. v. DOE</u>...............................................................21

IV.   A BOARD POLICY ADVOCATING ONLY NONSECTARIAN PRAYERS
      WOULD FORCE THE GOVERNMENT TO ENGAGE IN THE
      UNCONSTITUTIONAL TASK OF DEFINING A THEOLOGICAL
      FICTION..............................................................................................25

V.    <u>MARSH</u> DOES NOT PROPOSE THAT EVERY INVOCATION POLICY
      MUST EXCLUDE REFERENCES TO SECTARIAN VIEWPOINTS................26

      A.    <u>Marsh</u> Focuses on the Intended "Effect" of the Invocation Policy
            Rather Than the "Content" of the Specific Prayers to Determine
            Whether the Policy is Unconstitutional.....................................................28

      B.    A Rule that Every Legislative Prayer Must Be "Nonsectarian" Does
            Not Follow from Dicta in <u>County of Allegheny v. ACLU</u> Discussing
            <u>Marsh</u>'s Footnote About the Nebraska Chaplain's Voluntary Omission
            of Christ's Name..........................................................................................30

      C.    The Sectarian vs. Nonsectarian Distinction Cannot Survive
            Subsequent Developments in First Amendment Law.................................32

VI.   THE BOARD IS A DELIBERATIVE AND LEGISLATIVE BODY WHOSE
      PRAYERS FALL WITHIN THE SCOPE OF LEGITIMATE LEGISLATIVE
      PURPOSES.............................................................................................33

      A.    <u>Marsh</u> Governs this Case............................................................................33

      B.    Numerous Courts Have Upheld Prayer by Legislative or Other
            Deliberative Bodies.....................................................................................34

      C.    The Requirements of the <u>Marsh</u> Test........................................................34

      D.    The Board Prayer Policy Meets and Exceeds the <u>Marsh</u> Test...................35

            1.    Threshold Test: Legislative or Deliberative Body........................35

            2.    Solemnification of the Proceedings...............................................36

            3.    The Recipients Are Not Susceptible to Religious
                  Indoctrination..............................................................................36

    4.    The Prayer Is Not to be Exploited or Abused.................................37

CONCLUSION.............................................................................................................39

# TABLE OF AUTHORITIES

**Cases**                                                                                        **Page**

ACLU of N.J. v. Black Horse Pike Regional Bd. of Educ., 84 F.3d 1471 (3d Cir. 1996)...........35

Ark. Educ. Television Comm'n v. Forbes, 523 U.S. 666 (1998)..............................................12-13

Bd. of Educ. at Westside Cmty. Sch. (Dist. 66) v. Mergens,
    496 U.S. 226 (1990).....................................................................................................10

Bd. of Regents v. Southworth, 529 U.S. 217 (2000)....................................................................15

Bogen v. Doty, 598 F.2d 1110 (8th Cir. 1979)............................................................................34

Bond v. Floyd, 385 U.S. 116 (1966)......................................................................................13-14

Boos v. Berry, 485 U.S. 312 (1988)..........................................................................................16

Boyle v. County of Allegheny, Pa., 139 F.3d 386 (3d Cir. 1998)..................................................11

Capitol Square Review & Advisory Bd. v. Pinette, 515 U.S. 753 (1995)
    (plurality opinion)..............................................................................................17

City of Madison Joint Sch. Dist. v. Wis. Employment Relations Comm'n,
    429 U.S. 167 (1979)...............................................................................................12-13

Coles v. Cleveland Bd. of Educ., 171 F.3d 369 (6th Cir. 1999)..........................................8,34,37

Colo v. Treasurer and Receiver General, 392 N.E.2d 1195 (Mass. 1979)....................................34

Cornelius v. NAACP, 473 U.S. 788 (1985).........................................................................12-13,15

County of Allegheny v. ACLU, Greater Pittsburgh Chapter, 492 U.S. 573 (1989)...........30-31,35

Davey v. Locke, 299 F.3d 748 (9th Cir. 2002).............................................................................18

Dobrich v. Walls, slip op., C.A.No. 05-120-JJF (D.Del. August 2, 2005)...............1,7-9,28,33-35

Engel v. Vitale, 370 U.S. 421 (1962)........................................................................................21

Good News Club v. Milford Central Sch., 533 U.S. 98 (2001)..........................9,16-17,34, 37-38

Jones v. Wolf, 443 U.S. 595 (1979)..........................................................................................25

Lamb's Chapel v. Center Moriches Union Free Sch. Dist., 508 U.S. 384 (1993)....................16-17

Lee v. Weisman, 505 U.S. 577 (1992)...........................................1,10,21-22,24,35,37-38

Legal Services Corp. v. Velazquez, 531 U.S. 533 (2001).............................................14

Lincoln v. Page, 241 A.2d 799 (N.H. 1968).........................................................34

Lynch v. Donnelly, 465 U.S. 668 (1984)...............................................18,29,33,35-36

Marsa v. Wernik, 430 A.2d 888 (N.J. 1981).........................................................34

Marsh v. Chambers, 463 U.S. 783 (1983).......................................................passim

McCreary County v. ACLU of Ky., -- U.S. --, 125 S.Ct. 2722 (2005)...............................25-26,33

McGowan v. Maryland, 366 U.S. 420 (1961)...........................................................20

McHugh v. Bd. of Educ., 100 F. Supp. 2d 231 (D.Del. 2000)..........................................36

National Endowment for the Arts v. Finley, 524 U.S. 569 (1998).....................................13

Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37 (1983)...........................12-13

Presbyterian Church in the U.S. v. Mary Elizabeth Blue Hull Memorial
        Presbyterian Church, 393 U.S. 440 (1969).........................................................25

R.A.V. v. St. Paul, 505 U.S. 377 (1992).........................................................19

Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. 819 (1995)...........................12,14-17

Rust v. Sullivan, 500 U.S. 173 (1991)............................................................14

Santa Fe Ind. Sch. Dist. v. Doe, 530 U.S. 290 (2000)..................................1,10,21,23-24

Simpson v. Chesterfield County Bd. of Supervisors, 404 F.3d 276
        (4th Cir. 2005).................................................................26-27,32,34-36

Snyder v. Murray City Corp., 159 F.3d 1227 (10th Cir. 1998) (en banc)................26-27,30,34-36

Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly, 309 F.3d 144 (3d Cir. 2002).................17-18,38

Texas v. Johnson, 491 U.S. 397, 414 (1989).......................................................15

Van Orden v. Perry, -- U.S. --, 125 S.Ct. 2854 (2005)......................................26,34,38

<u>Va. v. Black</u>, 538 U.S. 343 (2003) (plurality opinion)....................................................19

<u>Widmar v. Vincent</u>, 454 U.S. 263  (1981)..................................................................17

<u>Wynne v. Town of Great Falls, S.C.</u>, 376 F.3d 292 (4th Cir. 2004)........................27,30-31,34-35

## **Constitutions, Statutes and Rules**

U.S. Constitution, Amendment I......................................................................<u>passim</u>

42 U.S.C. § 1983...........................................................................................36

14 Del.C. § 1043..........................................................................................7,36

14 Del.C. § 1051............................................................................................35

Fed.R.Civ.P. 56(c)..........................................................................................11

## **Other Authorities**

Delaware School Boards Association, <u>Board Member Handbook,</u> (rev. July, 2003), at
    http://www.edsba.org/handbook.html..............................................................6-7

Russo, Charles J., "Between a Rock and a Hard Place: The Emerging Questions of
    Prayer at School Board Meetings," 137 Ed. Law Rep. 423 (October 1999)...................8-9

"Sixth Circuit Holds That Opening School Board Meetings with a Prayer Is an
    Establishment of Religion," 113 Harvard L. Rev. 1240 (March 2000).............................8

Webster's Third New International Dictionary (1986)..................................................16

Wherley, Jr., James Mann, "Transforming A School Board Meeting Into a Student
    Council Meeting: Coles v. Cleveland Board of Education, 171 F.3d 369
    (1999)," 68 U.Cin.L.Rev. 1359 (Summer 2000). ...........................................9

## NATURE AND STAGE OF THE PROCEEDINGS

On August 2, 2005 the Court ruled on various motions to dismiss. (Hereinafter "Op. at __.") This is defendant Reginald L. Helms' Opening Brief in support of his Motion for Summary Judgment on the Board's voluntary prayer Policy as written. The record consists of the declaration of defendant Helms, (hereinafter "Helms ¶ __"), found at Tab A.

## SUMMARY OF THE ARGUMENT

As written, the Board's Policy of allowing prayer-givers to pray according to their own denominational idioms avoids violating the First Amendment for four reasons. First, the government abridges free speech by engaging in viewpoint discrimination when it directs a private speaker how to pray in a nonpublic forum. Second, such government action also would constitute impermissible government speech on a religious viewpoint, thereby violating the Establishment Clause as discussed in <u>Lee v. Weisman</u>, 505 U.S. 577, 588 (1992), and <u>Santa Fe Ind. Sch. Dist. v. Doe</u>, 530 U.S. 290 (2000). Third, enforcing a "nonsectarian" prayer requirement would require the State to engage in a theological inquiry, which is another prohibited government action under the Establishment Clause. Lastly, <u>Marsh v. Chambers</u>, 463 U.S. 783 (1983), sets the standard for the intended effect, not the religious viewpoint, of legislative prayer.

As already noted by the Court, the Board's practice of allowing an invocation to solemnize its meetings is constitutional because the Board is a deliberative and legislative body, which, under <u>Marsh</u>, may solemnize its meetings with prayer. Op. at 20-21. The Board's governance over the school system does not render its prayers unconstitutional because this affiliation is not the kind that would lead to indoctrination or coercion.

1

## STATEMENT OF FACTS

**A.  Adoption of the Indian River School Board's Policy on Prayer.**  For as long as anyone can remember, school boards in the Indian River area have opened their meetings with invocations.   The Board of the current Indian River School District has commenced its meetings  with prayer since its formation in 1969.  Local memory recounts that this unwritten practice was a continuation from some of the five sub-districts that existed before Indian River.  (Helms ¶¶ 3-5).

In the summer of 2004, defendant Helms asked experienced constitutional lawyers to prepare a written Board prayer policy which was in accord with constitutional requirements.  The Neuberger Firm and The Rutherford Institute prepared the attached Policy and legal opinion which was submitted to the Board on August 30, 2004.  The Board adopted the Policy in its entirety in October of 2004.  (Helms ¶ 6).

The preambular clauses, (Helms ¶ 7), explain the need for the Policy as follows:

### Policy on Prayer at Board Meetings

**Whereas**, this School Board is an elected legislative and deliberative public body composed of adults;

**Whereas**, this School Board has had a long established custom of solemnifying its proceedings by opening its meetings with a sectarian or non-sectarian prayer by one individual Board member as his or her conscience and religious tradition leads;

**Whereas**, our Country is in a War with terrorism which on September 11, 2001 took the innocent lives of thousands of our fellow citizens, united our Nation and also reminded many of us of the efficacy of prayer;

**Whereas**, in times of War our leaders have lead us in prayer.   A few examples follow:

Our first President, George Washington, as he concluded his service as the Continental Army's Commander in Chief, on June 14, 1783, wrote to all the

governors of the newly freed states urging them to join him in this prayer:

"Almighty God, We make our earnest prayer that Thou wilt keep the United States in Thy holy protection: that Thou wilt incline the hearts of the citizens to cultivate a spirit of subordination and obedience to government, and entertain a brotherly affection and love for one another and for their fellow citizens of the United States at large.

And finally that Thou wilt most graciously be pleased to dispose us all to do justice, to love mercy, and to demean ourselves with that charity, humility, and pacific temper of mind which were the characteristics of the Divine Author of our blessed religion, and without a humble imitation of whose example in these things we can never hope to be a happy nation. Grant our supplication, we beseech Thee through Jesus Christ, Our Lord, Amen."  (Emphasis added).

President Abraham Lincoln lamented during the days of the Civil War:

"We have been recipients of the choicest bounties of Heaven...but we have forgotten God.... We have forgotten the gracious hand which preserved us in peace.... Intoxicated with unbroken success, we have become too self sufficient to feel the necessity of redeeming and preserving grace, too proud to pray to the God that made us."

President Franklin D. Roosevelt, at the moment of the greatest military invasion in history, D Day (June 6, 1944), led the nation in praying:

"Almighty God, Our sons, pride of our Nation, this day have set upon a mighty endeavor, a struggle to preserve our Republic, our religion, and our civilization, and to set free a suffering humanity. Lead them straight and true; give strength to their arms, stoutness to their hearts, steadfastness in their faith."

Our current President George W. Bush, in the midst of America's war on terror, urged the Country to pray, stating:

"I ask our Nation to join me in praying for the strength to meet the challenges before us, for the wisdom to know and do what is right, for continued determination to work towards making our society a more compassionate and decent place, and for peace in the affairs of men." (A Proclamation, National Day of Prayer, May 1, 2003)

**Whereas**, a member of the American Civil Liberties Union attended one of our School Board meetings, was offended by a prayer which was said and which ended in the name of Jesus Christ, as did the above mentioned prayer by President George Washington, and the ACLU has threatened the Board and School District with a lawsuit if it does not abandon its custom;

3

**Whereas**, the School Board has obtained the legal advice of two competent and experienced constitutional attorneys, John W. Whitehead, Esquire and Thomas S. Neuberger, Esquire, that prayer to open Board meetings is constitutional in the United States Court of Appeals for the Third Circuit which includes Delaware, and legal counsel have identified the following legal authority in support of their legal opinion.

In <u>Marsh v. Chambers</u>, 463 U.S. 783 (1983), the United States Supreme Court held that prayer before sessions of legislative and other deliberative bodies does not violate the Establishment Clause of the First Amendment to the Constitution. The Court reasoned and stated that such prayer must not violate the Establishment Clause, noting that the practice pre exists the First Amendment itself.

"The opening of sessions of legislative and other deliberative public bodies with prayer is deeply embedded in the history and tradition of this country. From colonial times through the founding of the Republic and ever since, the practice of legislative prayer has coexisted with the principles of disestablishment and religious freedom."

<u>Id.</u> at 786. The Court cited the practices of the First Congress as evidence of the Framers' understanding that prayer before meetings of legislative bodies did not violate the Establishment Clause and also said:

"It can hardly be thought that in the same week Members of the First Congress voted to appoint and to pay a chaplain for each House and also voted to approve the draft of the First Amendment for submission to the states, they intended the Establishment Clause of the Amendment to forbid what they had just declared acceptable."

<u>Id.</u> at 790. Thus, it is a settled principle that legislative and other deliberative bodies do not violate the Establishment Clause of the First Amendment by opening their meetings with a brief invocation.

It is the opinion of legal counsel that since the Indian River Board of Education is a public legislative and deliberative body it has the right to open its meetings with a prayer.

In support of assertions that a School Board member's prayer is unlawful, the ACLU can only rely upon the divided Sixth Circuit's opinion in <u>Coles v. Cleveland Bd. of Educ.</u>, 171 F.3d 369 (6th Cir. 1999). However, the Sixth Circuit's 2 to 1 decision in <u>Coles</u> is, of course, not even binding precedent in Delaware, which is governed by the decisions of the Third Circuit Court of Appeals in Philadelphia. The Third Circuit has not addressed this question, and counsel are unaware of any court in the Third Circuit that has even cited to the

<u>Coles</u> decision, much less any court that has indicated that it viewed the decision favorably. Furthermore, the fractured <u>Coles</u> decision has faced considerable criticism from legal scholars because it ignores the Supreme Court decision in <u>Marsh</u>. <u>See, e.g.</u>, "Sixth Circuit Holds That Opening School Board Meetings with a Prayer Is an Establishment of Religion," [113] Harvard L. Rev. 1240 (March 2000) (majority in <u>Coles</u> "inappropriately attributed to school board meetings the same coercive context as the classroom and read too narrowly the permissible role of religious speech in solemnizing the lawmaking process"). So <u>Marsh</u> is still very good law which must be obeyed.

Contrary to the Sixth Circuit's dismissal of <u>Marsh</u> as an "historical aberration," <u>Coles</u>, 171 F.3d at 383, the Supreme Court itself has regularly recognized the continuing vitality of <u>Marsh v. Chambers</u> in the legislative arena. <u>See, e.g.</u> <u>County of Allegheny v. ACLU</u>, 492 U.S. 573, 603 (1989) (discussing the scope of <u>Marsh</u>); <u>Lee v. Weisman</u>, 505 U.S. 577, 596-97 (1992) (noting the inherent differences between the forced attendance of students at a high school graduation and the voluntary attendance of adults at legislative sessions).

Furthermore, a majority of the federal Courts of Appeals that have addressed the matter have followed the Supreme Court's command and squarely held that prayer by legislative and other deliberative bodies does not violate the Establishment Clause. For example, in <u>Snyder v. Murray City Corp.</u>, 159 F.3d 1227 (10th Cir 1998), the Tenth Circuit Court of Appeals held that invocational prayers at a city council meeting fell squarely under <u>Marsh</u> and that such "'legislative prayer' does not violate the Establishment Clause." <u>Id.</u> at 1233.

Likewise, just this past summer, the Fourth Circuit Court of Appeals held that a town council may "invoke Divine guidance for itself before engaging in public business." <u>Wynne v. Town of Great Falls, S.C.</u>, 376 F.3d 292, 298 (4th Cir. 2004). And more than a quarter century earlier, the Eighth Circuit Court of Appeals held that prayer by a clergyman before a county board meeting helps set "a solemn tone for the transaction of government business and assists towards the maintenance of order and decorum." <u>Bogen v. Doty</u>, 598 F.2d 1110, 1115 (8th Cir. 1979).

Moreover, even before the Supreme Court's decision in <u>Marsh</u>, at least three State Supreme Courts had decided that prayer by deliberative bodies did not run afoul of the Establishment Clause. <u>See</u> <u>Marsa v. Wernik</u>, 430 A.2d 888 (N.J. 1981) (prayer at borough council meetings by council members); <u>Colo v. Treasurer and Receiver General</u>, 392 N.E.2d 1195 (Mass. 1979) (prayer by chaplains in state legislature); <u>Lincoln v. Page</u>, 241 A.2d 799 (N.H. 1968) (prayer by clergy at town meetings).

So in reality it is the divided <u>Coles</u> decision which is the aberration and not these six courts of appeals. Additionally, <u>Coles</u> was decided before the recent landmark

decision by the U.S. Supreme Court in <u>Good News Club v. Milford Central School</u>, 533 U.S. 98 (2001), which laid to rest the legally incorrect notion that just because religious activity takes place upon public school grounds it is a violation of the Establishment Clause.  The Supreme Court there also criticized lower courts which take the simplistic position that mere geography determines whether voluntary prayer is constitutional.

Thus, it is the opinion of legal counsel that the Supreme Court's decision in <u>Marsh v. Chambers</u>, which unlike the <u>Coles</u> decision is binding precedent in Delaware, compels the conclusion that the Indian River School District's tradition of opening its meetings with a brief invocation is constitutionally permissible.

The Board's official Policy, (Helms ¶ 8), is as follows:

**Accordingly, the Board hereby adopts the following written policy and it Resolves that -**

1.   In order to solemnify School Board proceedings, it is the policy of the Board to open its meetings with a prayer or a moment of silence, all in accord with the freedom of conscience of the individual adult Board member.

2.  On a rotating basis one individual adult Board member per meeting will be given the opportunity to offer a prayer or moment of silence.  If the member chooses not to exercise this opportunity, the next member in rotation shall have the opportunity.

3.  Such opportunity shall not [be] used or exploited to proselytize, advance or convert anyone or to derogate or otherwise disparage any particular faith or belief.

4.  Such prayer is voluntary and it is just among the adult members of the Board. No school employee, student in attendance or member of the community in attendance shall be required to participate in any such prayer or moment of silence.

5.  Any such prayers may be sectarian or non-sectarian, denominational or non-denominational, in the name of a Supreme Being, Jehovah, Jesus Christ, Buddha, Allah, or any other person or entity, all in accord with the freedom of conscience, speech and religion of the individual Board member, and his or her particular religious heritage.

**B.  The Nature and Functions of Delaware School Boards.**  Since colonial times, Delaware citizens have been gathering together as deliberative bodies to oversee their children's education.  Delaware School Boards Association, <u>Board Member</u>

6

Handbook, (rev. July, 2003), at http://www.edsba.org/handbook.html.  Communities

initially established schools through their churches.  As communities grew, municipal

authorities or town meetings created school committees to oversee the schools.  Id.   The

state legislature did not begin to fund school districts until the Free School Law of 1829,

and not until 1875 did the Legislature establish a State Board of Education to oversee the

"general administration" of the free public schools.  Id.  In 1997 Delaware reorganized its

public education system and made the Department of Education a cabinet post.  Id.

Throughout this history, Delaware school boards have maintained their status as a

public body of local representatives who exercised "the authority to determine policy and

adopt rules and regulations for the general administration and supervision of the free

public schools."  14 Del. C. § 1043 (2005); accord Op. at 16.

According to the Board Member Handbook, supra, school boards are supposed to

create policies rather than carry out administrative tasks:

> The school board member should keep in mind, under all circumstances that the
> primary function of the Board is to establish the goals and policies by which the
> schools are to be administered, but that the administration of the educational
> program and the conduct of school business shall be left to the superintendent of
> schools and the staff.

Another duty proposed by the Handbook is to "accept the principle of board unity and be

able to subordinate self-interest."  Id.

## ARGUMENT

## I.    INTRODUCTION.

**A.  The Big Picture.**   The Indian River School Board's written prayer Policy

raises two basic Constitutional issues.  The livelier debate considers whether the Board

should allow prayer-givers to pray according to their own conscience or should force

them to use "nonsectarian" language instead of their own personal ways of addressing God. But the second, and most fundamental issue is, of course, whether a school board is a legislative or deliberative body that may entertain legislative prayers in the first place. Supreme Court case law makes clear that the School Board is such a body, entitled to engage in legislative prayers. And when the totality of the free speech, public forum, viewpoint discrimination and Establishment Clause principles are analyzed, the School Board's Policy in question is constitutional because the First Amendment interests involved heavily outweigh any speculative Establishment Clause concerns.

**B.  Prayer By Legislative and Deliberative Bodies is Settled Law Under Marsh.**  As already noted by the Court, Op. at 20-22, prayer by legislative and deliberative bodies is settled law under Marsh v. Chambers, 463 U.S. 783 (1983). In Marsh, the Supreme Court recognized that deliberative and legislative bodies have the right to engage in legislative prayer and that such prayer does not violate the Establishment Clause. Ignoring that precedent-setting ruling, plaintiffs' claims are built upon a weak theory that has only been accepted by a fractured Sixth Circuit Court of Appeals panel - that the rule should not apply to all legislative or deliberative bodies, and especially should not apply to school boards, whose meetings "take place on school property and are inextricably intertwined with the public school system." Coles v. Cleveland Bd. of Educ., 171 F.3d 369, 177 (6th Cir. 1999). But the Coles opinion runs counter to the plain text of Marsh, contradicts the rulings of numerous federal Courts of Appeals and State Supreme Courts, has received significant scholarly criticism,[1] and does

---

[1] "Sixth Circuit Holds That Opening School Board Meetings with a Prayer Is an Establishment of Religion," 113 Harvard L. Rev. 1240 (March 2000); Russo, Charles J., "Between a Rock and a Hard Place: The Emerging Questions of Prayer at School Board

not survive the Supreme Court's decision in <u>Good News Club v. Milford Central Sch.</u>,

533 U.S. 98 (2001) (rejecting the constitutionally incorrect notion that the geographic

location at a school and the presence of children in the vicinity of prayer results in an

Establishment Clause violation).  As legislative and deliberative bodies, school boards are

governed by <u>Marsh</u>.  Op. at 20-21.  And as the Supreme Court has held, the mere

affiliation with a school does not invalidate otherwise permissible conduct.  <u>Good News</u>

<u>Club</u>, 533 U.S. at 115, 119.

**C.  The State Cannot Dictate the Viewpoint of Legislative Prayer.**  The Indian

River School Board adopted a policy that allows a Board member to offer an invocation

at its meetings on a rotational basis.  The policy does not restrict the prayer-giver's

religious viewpoints, but instead allows the speaker to pray a sectarian or nonsectarian

prayer according to his or her own free conscience.  The decision is left to the individual,

not the government.  The question is - is this policy as written constitutional?

The federal Courts of Appeals that have addressed the issue have ruled that prayer

by legislative and deliberative bodies is constitutional, but have differed on the types of

prayers that are permitted.  One interpretation of <u>Marsh</u> is that the prayers of a legislative

or deliberative body must be nonsectarian.  Proponents of this "nonsectarian only" rule

point to the principle that the Establishment Clause forbids the government from

affiliating itself with one particular sect.  By banning sectarian speech from legislative

prayers, the government avoids some dangers of affiliation, but such actions then raise

several other serious constitutional concerns.

Meetings," 137 Ed. Law Rep. 423 (October 1999); Wherley, Jr., James Mann, "Transforming A
School Board Meeting Into a Student Council Meeting: Coles v. Cleveland Board of Education,
171 F.3d 369 (1999)," 68 U.Cin.L.Rev. 1359 (Summer 2000).

The primary difference between an open-ended policy, such as the one used by the School Board, and a "nonsectarian only" policy, like the ones already struck down by the Supreme Court in <u>Lee v. Weisman</u>, 505 U.S. 577 (1992) and <u>Santa Fe Ind. Sch. Dist. v. Doe</u>, 530 U.S. 290 (2000), is that the former type creates a nonpublic forum for private speakers and the latter is a form of government speech. "There is a crucial difference between government speech endorsing religion, which the Establishment Clause forbids, and private speech endorsing religion, which the Free Speech and Free Exercise Clauses protect." <u>Bd. of Educ. at Westside Cmty. Sch. (Dist. 66) v. Mergens</u>, 496 U.S. 226, 250 (1990). What matters most for the Free Speech and the Religion Clauses is not so much what is said but who says it and why.

Consequently, the Court will need to identify what is the real danger when the speaker is not the government but an individual who wants to express his or her viewpoint in an approved nonpublic forum for legislative prayer. In this situation, which is what has been created by the School Board's written Policy, the fear of religious affiliation must be weighed against: (1) the speaker's right to free speech in a nonpublic forum without viewpoint restriction; (2) the Establishment Clause violations to be caused by the government dictating a particular viewpoint; (3) the Establishment Clause violations caused by the courts trying to discern the difference between sectarian and nonsectarian prayer; and (4) the actual rule in <u>Marsh</u> that focuses on the intended effect of prayer, not its content.

A close look at the Supreme Court's holdings in free speech and religion cases will demonstrate that government need not - and indeed, should not - force someone to pray according to just one particular religious viewpoint. For that reason, the Board's

Policy explicitly states that invocations do not have to be "nonsectarian." The Policy provides an open forum for the Board members, on a rotational basis, to pray according to their own religious idioms.

**D. Standard of Review.** A motion for summary judgment shall be granted if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Boyle v. County of Allegheny, Pa., 139 F.3d 386, 393 (3d Cir. 1998); Fed.R.Civ.P. 56(c).

## II. THE POLICY GRANTING EACH BOARD MEMBER THE OPPORTUNITY TO OFFER AN INVOCATION ACCORDING TO HIS OR HER OWN RELIGIOUS VIEWPOINT COMPORTS WITH THE FREE SPEECH CLAUSE AND DOES NOT IMPERMISSIBLY DISCRIMINATE BASED ON VIEWPOINT.

The open-ended nature of the Policy preserves the prayer-giver's First Amendment right to free speech. The Board grants one member at each meeting the opportunity to offer an invocation according to his or her free conscience. In doing so, the Board has established a nonpublic forum in which it would be unconstitutional to restrict the prayer-giver's viewpoint. A policy mandating that all spoken invocations consist wholly of "nonsectarian" language would place an unconstitutional prior restraint on the prayer-giver's personal viewpoint. Though a compelling interest allows prohibitions on exploitative invocations, the First Amendment requires the Board to entertain invocations from any denomination, regardless of viewpoint, as long as they are not being exploited and used for proselytizing.

### A. The Invocation Policy Must be Viewpoint-Neutral Because it Establishes a Nonpublic Forum.

The courts have adopted "forum analysis" to address free speech claims. The

standard for determining the propriety of a speech restriction in a government-controlled forum depends on whether the forum is public or nonpublic. <u>Perry Educ. Ass'n v. Perry Local Educators' Ass'n</u>, 460 U.S. 37, 45 (1983). By "forum," the Court refers to any government-controlled means of access sought by the speaker. Thus, a channel of communication, such as a meeting, as well as a physical place like a school is a forum for the purposes of the analysis. <u>Cornelius v. NAACP</u>, 473 U.S. 788, 802 (1985). To determine whether a forum is public or nonpublic, courts look at the traditional character of the forum and determine the government's original intent by examining its policy and practice when creating the forum. <u>Id.</u>

A forum is "public" if all or a portion of the population has general access for expressive activity. Traditional public fora include streets, parks and sidewalks, which have always been available to the general public for discourse. <u>Perry</u>, 460 U.S. at 45. The state also may create a public forum by intentionally allowing public access for a specific purpose or group of people. <u>Id.</u>, <u>see, e.g.</u>, <u>City of Madison Joint Sch. Dist. v. Wis. Employment Relations Comm'n</u>, 429 U.S. 167 (1979) (determining that a school board created an occasion for the general public to speak about issues relating to the school during a public participation portion of a school board meeting); <u>Rosenberger v. Rector & Visitors of Univ. of Va.</u>, 515 U.S. 819 (1995) (determining that the university established a limited public forum by subsidizing publication costs for student groups who complied with procedural requirements).

If the government does not grant the public general access to the forum, the Court considers the forum "nonpublic." <u>Cornelius</u>, 473 U.S. at 803-804. A forum is likely to be nonpublic if a speaker achieves access through a selection process. <u>Ark. Educ. Television</u>

12

Comm'n v. Forbes, 523 U.S. 666, 670 (1998). Examples of nonpublic fora include NEA grants distributed according to certain subjective criteria, National Endowment for the Arts v. Finley, 524 U.S. 569 (1998); a televised presidential debate that could not include every candidate, Forbes, 523 U.S. 666; the Combined Federal Campaign drive, which raises money only for select charities, Cornelius, 473 U.S. 788; and a school's inter-office mailing system, Perry, 460 U.S. 37. Restrictions upon speech in a nonpublic forum must be reasonably related to the purposes of the forum and viewpoint-neutral. Perry, 460 U.S. at 46.

Though parts of Board meetings may be open to the public, see, e.g. City of Madison Joint Sch. Dist., 429 U.S. 167, the invocation at issue is a nonpublic forum. The Board opens this forum only to the one particular board member scheduled to give the invocation for that meeting. No one else may give the invocation unless the scheduled board member gives up his or her turn, in which case the board will allow the next member on the schedule to speak. In this light, the forum is nonpublic because the School Board intended the opportunity to be "selective access" rather than "general access." See, e.g., Forbes, 523 U.S. at 670 (deciding that presidential debate was nonpublic forum because television producers selected a few from among many candidates).

But even in this nonpublic forum, the school board member who gives the invocation is still a private speaker with the First Amendment right to speak his or her viewpoint. Representative government depends upon the First Amendment's guarantee that legislators and policy makers may engage in "uninhibited, robust, and wide-open" discourse. Bond v. Floyd, 385 U.S. 116, 136 (1966). This guarantee is of paramount

13

importance when the legislator expresses a viewpoint not endorsed by the government. Id. (acknowledging freedom of speech for Vietnam War protestor elected to Georgia legislature).

The State may not restrict the viewpoints of such private speech just because the speaker is associated with the government and speaking in a nonpublic forum. In Legal Services Corp. v. Velazquez, 531 U.S. 533 (2001), the Supreme Court struck down a regulation preventing lawyers in a government-funded welfare-assistance program from criticizing the welfare laws. The Court distinguished the legal services attorneys in Velazquez from the physicians in Rust v. Sullivan, 500 U.S. 173 (1991), whose viewpoints on abortion Congress could legitimately restrict because the physicians spoke on behalf of the government and merely carried out government policy. The legal service attorneys, on the other hand, spoke for their clients and helped shape policy through legal advocacy. Velazquez, 531 U.S. at 541. The Velazquez Court affirmed the rule that viewpoint-based restrictions violate the First Amendment "when the government does not itself speak or subsidize transmittal of a message it favors but instead expends funds to encourage a diversity of views from private speakers." Id. (quoting Rosenberger, 515 U.S. at 834).

Though the case at hand does not involve a subsidy, the Board also encourages a diversity of views from private speakers. The invocation prior to the School Board meeting, like the opportunities for deliberation during the meeting, is an occasion for board members to share their own personal views, unfettered by restrictions on how they should pray. The Policy itself reveals the Board's intention that the invocation be a forum in which a Board member can provide a prayer "in accord with the freedom of

14

conscience, speech and religion of the individual Board member, and his or her particular religious heritage." (Helms ¶ 8, item 5).

Because the invocation is a limited forum, in which an individual board member may engage in private speech, any restrictions on the board member's invocation must be viewpoint neutral and reasonably related to the purpose of the forum. And the purpose of the invocation is clear - to solemnify the meeting. (Helms ¶ 8, item 1).

> **B.    An Invocation Policy Requiring Board Members to Avoid Referring to One's Preferred Name for God Would Discriminate On the Basis of Viewpoint, Thereby Violating the Speaker's Right to Free Speech.**

If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because the government does not endorse it or society finds it disagreeable. Texas v. Johnson, 491 U.S. 397, 414 (1989) (striking down law that banned Flag burning as speech). When the government targets not merely subject matter, but particular views taken by speakers on a subject, the government commits an egregious violation of the First Amendment. Rosenberger, 515 U.S. at 829. "The whole theory of viewpoint neutrality is that minority views are treated with the same respect as are the majority views." Bd. of Regents v. Southworth, 529 U.S. 217, 235 (2000). Thus, the government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction. Rosenberger, 515 U.S. at 829.

Viewpoint discrimination is the restraint on certain speech solely to suppress the point of view on an otherwise permissible subject. Cornelius, 473 U.S. at 806. For example, the Supreme Court ruled that a school district that opened school facilities to the Boy Scouts and other civic-minded youth groups could not exclude a Christian youth

group that also taught morals. Good News Club, 533 U.S. at 114 n.4 ("religion is the viewpoint from which ideas are conveyed"). A public university could not refuse to subsidize one group's publication because of its evangelical message when the university subsidized other groups' publications, some of which wrote about religion from an atheistic perspective. Rosenberger, 515 U.S. at 832. A school that usually gives permission to use its facilities to almost any group could not deny access to one just because it wanted to show a film on parenting a religious perspective. Lamb's Chapel v. Center Moriches Union Free Sch. Dist., 508 U.S. 384 (1993).

Even a prohibition against all "sectarian" prayers is viewpoint discriminatory. The general subject of the speech at issue is an invocation, so a permissible content-based restriction would have to prohibit all invocations, not just ones with sectarian language. Boos v. Berry, 485 U.S. 312, 319 (1988) (declaring that content-based regulation "extends to prohibition of public discussion of an entire topic"). A policy permitting only nonsectarian prayers favors just one viewpoint among many and thus fails First Amendment scrutiny.

The very meaning of the word "sectarian" denotes viewpoint: Webster's defines "sectarian" as "limited to narrow and partisan views, interests, or sympathies" and as "confined to the limits of one religious group, one school or one party." Webster's Third New International Dictionary 2052 (1986). A restriction on any or all viewpoints is still discrimination. As the Court states in Rosenberger, 515 U.S. at 831, it is "as objectionable to exclude both a theistic and an atheistic perspective on the debate as it is to exclude one, the other, or yet another political, economic, or social viewpoint."

**C.    No Compelling State Interest Warrants a Viewpoint Restriction.**

**1.    A Private Speaker's Interest in Free Speech Usually Outweighs the Government's Establishment Clause Concerns.**

Government institutions that have excluded religious viewpoints in the past have often argued that the obligation to avoid an Establishment Clause violation provides a compelling interest to restrict speakers' viewpoints.  Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly, 309 F.3d 144, 173 n.33 (3d Cir. 2002) (listing cases).  Indeed, Supreme Court dictum has indicated that an Establishment Clause concern might justify a content-based restriction.  Widmar v. Vincent, 454 U.S. 263, 271 (1981) (but ruling that the Establishment Clause concerns were not enough to support discrimination against a student group's religious speech).  The Court, however, has yet to hold that an Establishment concern would justify viewpoint discrimination.  Good News Club, 533 U.S. at 113.

The Court in Good News Club thought it important to note that the Supreme Court has consistently rejected the State's Establishment Clause defense.  Id.  In each case, the State feared someone would impute to it a private speaker's religion.  In both Good News Club and Lamb's Chapel, schools impermissibly prevented Christian groups from using school facilities because of the schools' belief that children would perceive endorsement and feel compelled to participate. Good News Club, 533 U.S. at 113-114; Lamb's Chapel, 508 U.S. at 395.  In Rosenberger, 515 U.S. at 839-46, a state university was wrong to think withholding student funds from an evangelical Christian paper would prevent an Establishment Clause violation.  And, according to the plurality in Capitol Square Review & Advisory Bd. v. Pinette, 515 U.S. 753, 761-63 (1995), the erection of a

17

Ku Klux Klan cross on city property alongside other groups' displays does not violate the Establishment Clause either because even the Klan had the right to free speech of a religious nature in a public forum publicly announced and open to all on equal terms.

Citing the above cases, the Third Circuit has stated that a free speech interest will trump any attempt to go beyond what the Establishment Clause requires. Tenafly, 309 F.3d at 173 (ruling that municipality violated free exercise and speech rights by selectively enforcing ordinance against Jewish group). "The state interest asserted here--in achieving greater separation of church and State than is already ensured under the Establishment Clause of the Federal Constitution--is limited by the Free Exercise Clause and in this case by the Free Speech Clause as well." Id. (quoting Davey v. Locke, 299 F.3d 748, 753-54 (9th Cir. 2002)). In other words, if the purported Establishment Clause violation is weak or nonexistent, as it is here, then the state cannot use the Establishment Clause to justify a discriminatory policy against religious speech.

### 2. The First Amendment Allows the Policy's Content-Based Restrictions Which Are Not Based on Viewpoint.

The Board narrowly construed the Policy's restrictions to accommodate the purposes of the invocations, which are "the solemnizing of public occasions, expressing confidence in the future, and encouraging the recognition of what is worthy of appreciation in society." Lynch v. Donnelly, 465 U.S. 668, 693 (1984) (O'Connor, J. concurring). An invocation policy need not forbid denominational or sectarian prayers to achieve these purposes; one can still offer a dignified, encouraging invocation in the name of Allah, Jesus, or whomever. What matters in achieving the goals of legislative prayer is not the name mentioned in the prayer but how one says the prayer.

Consequently, the Policy paraphrases the rule from <u>Marsh</u> - "[t]he content of the prayer is not of concern to judges where, as here, there is no indication that the prayer opportunity has been exploited to proselytize or advance any one, or to disparage any other, faith or belief." <u>Marsh</u>, at 794-795.  The Board's Policy recognizes that, according to <u>Marsh</u>, the primary Constitutional concern is not the invocation's sectarian content but an aggressive exploitation of the prayer opportunity either to convert or belittle listeners. Such exploitation, whether in the guise of sectarian prayer or a general monotheistic prayer, contravenes the purpose of the prayer and would likely disrupt the harmony of the ensuing meeting.  Consequently the Policy prohibits exploitation to proselytize or convert or to derogate or disparage another faith, as <u>Marsh</u> requires.  (Helms ¶ 8, item 3).

Likewise, in two cases concerning cross burning, the Supreme Court drew a similar line between an impermissible viewpoint restriction and a permissible purpose-based content regulation.  In <u>R.A.V. v. St. Paul</u>, 505 U.S. 377 (1992), the Court struck down a city ordinance banning the cross burnings because the ordinance singled out expressions of racial hatred.  A decade later, the Court this time upheld a Virginia law banning cross burnings.  <u>Va. v. Black</u>, 538 U.S. 343 (2003) (plurality opinion). The Virginia law differed from the St. Paul ordinance because it outlawed the burning of a cross "with the intent of intimidating any person." <u>Id.</u> at 348.  Thus, Virginia avoided a First Amendment violation by focusing on the legitimate interest of preventing intimidation rather than on censoring a particular message. <u>Id.</u> at 361-363.  Similarly, Indian River's invocation Policy as written does not violate free speech because its few restrictions focus on the legitimate interest of preventing exploitation of the prayer opportunity.

The unavoidable presence of a sectarian viewpoint in an invocation does not necessarily disrupt the harmony of the meeting. Deliberative bodies are meant to be fora for diverse viewpoints. Legislatures, city councils, and school boards benefit when their members feel free to share their personal viewpoints with the knowledge that even those who disagree will listen tolerably to what is said.

Moreover, Congress and the courts have recognized the traditional place of legislative prayer and its beneficial effects on the deliberative process. The Court has said that "the Founding Fathers looked at invocations as 'conduct whose effect harmonized with the tenets of some or all religions.'" Marsh, 463 U.S. at 792 (quoting McGowan v. Maryland, 366 U.S. 420, 422 (1961)). When Congress first debated whether to have legislative prayers, deist Samuel Adams stated "he was no bigot, and could hear a prayer from a gentleman of piety and virtue, who was at the same time a friend to his country." C. Adams, Familiar Letters of John Adams and his Wife, Abigail Adams, during the Revolution 37-38, reprinted in Stokes, at 449 (quoted in Marsh, 463 U.S. at 792).

As an instrument of conciliation that recognizes the value of sectarian speech, the Policy, as written, does not drown out any one voice or replace people's personal views with a state-composed belief. True ecumenism does not call for the lowest common denominator but instead acknowledges that each individual's faith has its own value. Likewise, the invocation Policy, which precedes the school board's secular deliberations, creates a nonpublic forum for the expression of the board members' own personal beliefs. Consequently, it is imperative that the Court maintain the open-ended invocation Policy, which does not discriminate against the personal beliefs of the speaker.

20

III.    **BY ALLOWING PRAYER-GIVERS THE OPPORTUNITY TO PRAY ACCORDING TO THEIR OWN VIEWPOINTS, SECTARIAN OR OTHERWISE, THE POLICY AS WRITTEN AVOIDS VIOLATING THE ESTABLISHMENT CLAUSE UNDER LEE v. WEISMAN AND SANTA FE IND. SCH. DIST. v. DOE.**

The Supreme Court has held that "it is a cornerstone principle of our Establishment Clause jurisprudence that 'it is no part of the business of government to compose official prayers for any group of the American people to recite as a part of a religious program carried on by government.'" Lee, 505 U.S. at 588 (quoting Engel v. Vitale, 370 U.S. 421, 425 (1962)).  When the government has asked someone giving an invocation at a school function to offer only a "nonsectarian" prayer, the Supreme Court significantly has twice held that this form of directing the content and viewpoint of prayer violates the First Amendment. See Santa Fe, 530 U.S. 290; Lee, 505 U.S. 577.  By suggesting how a speaker should pray, the government illegally establishes a "civil religion" and isolates those who do not hold to its general tenets.  In Lee, the Supreme Court struck down one school district's practice of including invocations and benedictions at graduation ceremonies.  The school principal selected a local rabbi to administer the prayer, gave the rabbi a pamphlet entitled "Guidelines for Civic Occasions," and advised him that the prayers should be nonsectarian.  Lee, 505 U.S. at 581.  The Court identified two dominant facts that control the decision: first, "State officials directed the performance of a formal religious exercise," and, second, the students' attendance at graduation ceremonies are "in a fair and real sense obligatory." Id. at 586; see id. at 636-640 (Scalia, J. dissenting) (identifying the two facts).  Though Lee may be well known for its opinion on the latter factor - that peer pressure and the formal trappings of a graduation ceremony have a coercive effect upon students - Lee's ruling concerning the

21

former fact holds particular importance on the question of whether the government should or should not forbid sectarian references.

The Court determined that, by giving the rabbi the "Guidelines for Civic Occasions," the State directed and controlled the content of the prayers. Id. at 588.  In response to the school's claim that it merely suggested the prayers be nonsectarian, the Court replied that a typical clergy person would not wish to incur the school's displeasure by disregarding the principal's advice. Id.

The school also argued that its suggestion that the prayers be nonsectarian was merely a good-faith attempt to avoid entanglement with any one denomination.  This argument raised a serious question for the Court:

> We are asked to recognize the existence of a practice of nonsectarian prayer, prayer within the embrace of what is known as the Judeo-Christian tradition, prayer which is more acceptable than one which, for example, makes explicit references to the God of Israel, or to Jesus Christ, or to a patron saint.

Id. at 589.  The Court then ultimately rejected the notion that it is more acceptable for the government to promote nonsectarian prayers over sectarian ones. Id. at 590.

The primary concern here is not so much what type of prayer the government chooses, but whether the government is entitled to make the choice in the first place.  Id. at 589.  As in Marsh, the Court in Lee did not endeavor to define specifically what would or would not constitute a nonsectarian prayer, if there were such a thing.  The Court did say, however, that if one could find such "common ground," it is not the government's place either to seek it or to authorize it. "[T]hough the First Amendment does not allow the government to stifle prayers which aspire to these ends, neither does it permit the government to undertake that task for itself." Id.   "Religious beliefs and religious

expression," the Court stated, "are too precious to be either proscribed or prescribed by the State." Id.

The Establishment Clause is blind to all religious viewpoints. "[A]ll creeds must be tolerated and none favored. " Id. at 589. The government may not choose one viewpoint for any reason. As the Lee Court concluded, "[t]he suggestion that government may establish an official or civic religion as a means of avoiding the establishment of a religion with more specific creeds strikes us as a contradiction that cannot be accepted." Id.

In other words, even if the government had discovered a "golden prayer," one expressing a perfect viewpoint that appeals to the basic tenets of all religious beliefs and offends none, the government still could not endorse it. The Establishment and Free Exercise Clauses do not just protect the dissenter from government oppression. They also serve to protect all religious institutions from the harmful effects of government intrusion. Id. Invoking the wisdom of James Madison, the Court noted that religious bodies lose "the purity and efficacy of Religion" when the State lends its support. Id. at 589.

Similarly, in Santa Fe, 530 U.S. 290, the Court held that a high school violated the Establishment Clause by providing for student-led prayers at home football games. Hoping to form a "circuit-breaker" between itself and the prayers, id., at 305, the school instituted a student referendum on whether to have an invocation at graduation and football games and subsequent vote on who would be the student council chaplain. Id. at 298. The school provided the public address system for the prayers, id. at 294, and as in Lee, strongly suggested that the statements be a nonsectarian invocation. Id. at 298 n.6. But the Court concluded that the Santa Fe policy created an impermissible entanglement

23

with religion and put school-aged children in an untenable position.  Id. at 305-306.  And again as in Lee, part of the Santa Fe holding specifically disapproves of the endorsement of only a "civic or nonsectarian" religion. Id. at 305.

Thus, the School Board's current Policy which refuses to limit itself to non-sectarian prayers, does not violate the Establishment Clause under Lee and Santa Fe, which declare the limitation of nonsectarian prayer to be unconstitutional. These cases stand for the basic First Amendment principles that the Establishment Clause (1) protects religions from the harmful effects of government intrusion, Lee, 505 U.S. at 589-590, and (2) protects religious minorities from religious viewpoints that may seem inoffensive to everyone else. Santa Fe, 530 U.S. at 305-306; Lee, 505 U.S. at 594.

Concerning the Clause's interest in protecting religion from the government, the School Board, by removing all restrictions on religious viewpoint from its Policy, does not advocate any particular creed, not even "civic religion."  It is a neutral Policy.  The Policy features none of the requirements, suggestions or inducements found in the policies in Lee and Santa Fe that contributed to their Establishment Clause violations.

The School Board's invocation Policy also addresses the Establishment Clause interest in protecting minority religious views.  The Policy accommodates as many different religious viewpoints as there are members on the Board.  The rotational Policy provides each member with an opportunity to pray according to his or her conscience, thereby ensuring that no minority viewpoint on the Board is stifled.

Granted, under the School Board's Policy, people are likely to disagree with some religious references in the invocations - disagreements are bound to occur in a free society.  But, such differences in religious viewpoint are acceptable because the parties

24

know that the government does not endorse the viewpoints they hear.  The board members have agreed to listen to one another's personal religious viewpoints during the invocation before the meeting, just as they must listen to each other's political and social viewpoints during the meeting.

## IV.   A BOARD POLICY ADVOCATING ONLY NONSECTARIAN PRAYERS WOULD FORCE THE GOVERNMENT TO ENGAGE IN THE UNCONSTITUTIONAL TASK OF DEFINING A THEOLOGICAL FICTION.

Requiring all legislative prayers to be "nonsectarian" might at first seem to avoid the perception that the government is endorsing the religion of the prayer-giver. However, taking this 'easy road' causes more problems than it solves.  Courts and other government bodies would find themselves immersed in impermissible theological discussions, only to find that "nonsectarian" prayer is an illusory goal.

The Supreme Court has predicted that a "nonsectarian-only" rule would face the courts with questions the Establishment Clause forbids them to answer. Marsh, 463 U.S. at 793-94  ("it is not for us to embark on a sensitive evaluation or to parse the content of a particular prayer").  Determining whether a certain statement belongs to a particular sect is a serious theological inquiry, id. at 818-19 (Brennan, J., dissenting), and the Establishment Clause prohibits government officials and courts undertaking such matters. See, e.g. Jones v. Wolf, 443 U.S. 595 (1979); Presbyterian Church in the U.S. v. Mary Elizabeth Blue Hull Memorial Presbyterian Church, 393 U.S. 440 (1969).

In all likelihood, however, even if a court were to "parse the content" of a putative "nonsectarian" prayer, it nonetheless would find sectarian elements.  As Justice Scalia noted in his dissent in McCreary County v. ACLU of Ky., "if religion in the public forum

25

had to be entirely nondenominational, there could be no religion in the public forum at all." -- U.S. --, 125 S.Ct. 2722, 2752 (2005) (Scalia, J., dissenting). One cannot express anything slightly religious without contradicting the beliefs of some other group of people. Id.

Justices Stevens and Brennan illustrate Justice Scalia's point. Despite the fact that in Van Orden v. Perry, -- U.S. --, 125 S.Ct. 2854 (2005), four Justices declared the Texas Capitol's Ten Commandments display to be "nonsectarian," in dissent, Stevens argued that use of the King James Version places the State in "the center of a serious sectarian dispute" because many sects do not recognize that particular version of Scripture. Id. at 2879-80 (Stevens, J., dissenting). In his Marsh dissent, Justice Brennan also listed a number of ways that even the seemingly innocuous decision to offer "nonsectarian" prayer could cause great theological division. Marsh, 463 U.S. at 819 (Brennan, J., dissenting). As these Justices demonstrate, those who would try to abide by a "nonsectarian-only" rule will find themselves searching for an impossible to attain common ground at the end of a theological rainbow.

## V.    **MARSH** DOES NOT PROPOSE THAT EVERY INVOCATION POLICY MUST EXCLUDE REFERENCES TO SECTARIAN VIEWPOINTS.

Little case law provides direct guidance on the issue of what a deliberative body may or may not allow in its invocation policy. Courts faced with the issue have had to rest their decisions on their interpretations of Marsh. See, e.g. Simpson v. Chesterfield County Bd. of Supervisors, 404 F.3d 276, 281 (4th Cir. 2005) (upholding county board's policy and decision to exclude pantheist prayer); Snyder v. Murray City Corp., 159 F.3d 1227, 1232 (10th Cir. 1998) (en banc) (upholding city council policy and decision to

exclude unfit prayer which proselytized and disparaged other religious views).

As one might expect, these circuits do not present a unified answer on whether a neutral policy can allow an individual prayer-giver to offer a formal invocation according to his or her own conscience. This question simply has not been asked or answered. The Fourth Circuit seems to advocate restrictions on sectarian prayers. "[N]onsectarian prayers, unlike sectarian prayers, do not have the effect of affiliating the government with any one specific faith or belief." Wynne v. Township of Great Falls, 376 F.3d 292, 301 n.6 (4th Cir. 2004) (disagreeing with the Snyder court).[2]   On the other hand, the Tenth Circuit takes a broader view of the Marsh holding:

> [T]he mere fact a prayer evokes a particular concept of God is not enough to run afoul of the Establishment Clause. Rather, what is prohibited by the clause is a more aggressive form of advancement, i.e., proselytization. See Marsh, 463 U.S. at 793. By using the term "proselytize," the Court indicated that the real danger in this area is effort by the government to convert citizens to particular sectarian views. See Websters Third New International Dictionary (Unabridged) 1826 (1986) (defining "proselytize" as "to convert from one religion, belief, opinion, or party to another").

Snyder, 159 F.3d at 1234 n.10. An analysis of the actual Marsh decision reveals that the Tenth Circuit is correct - Marsh only prohibits proselytizing prayer.

What Marsh does establish is that the propriety of a legislative prayer policy depends upon its intended effect rather than the content of the specific prayers. The standard is whether the state uses the policy to solemnify the body by harmonizing basic beliefs or whether it exploits the policy to force particular beliefs upon the people.

_____

[2]  In Simpson, 404 F.3d at 287, the Fourth Circuit continues to forswear "the forbidding character of sectarian invocations." But at the same time, it applauds a county board's "nonsectarian" invocation policy that allowed prayers invoking such sectarian titles as "the God of Abraham, Isaac, and Jacob." Id. at 284. Such reasoning illustrates the problem with and the inability of courts to draw lines between what is sectarian and nonsectarian.

<u>Marsh</u> does not impute enough significance to the "nonsectarian" nature of the prayers mentioned in its footnote number 14 to justify making a similar policy the rule in every case.  Consequently, the Board's Policy, which allows prayer-givers to pray according to their own religious viewpoint as long as they do not exploit the opportunity to proselytize or disparage other faiths, is constitutional under <u>Marsh</u>.

> **A.    <u>Marsh</u> Focuses on the Intended "Effect" of the Invocation Policy Rather Than the "Content" of the Specific Prayers to Determine Whether the Policy is Constitutional.**

In <u>Marsh</u>, the Supreme Court held that the Establishment Clause permits the Nebraska legislature to open and close its sessions with prayer.  The Court pointed to the history of the government's use of civil religion, the secular purpose of invocations, and the likelihood that listeners would not interpret the prayers as an endorsement of a particular religion.  The most significant factor in the decision was that the constitutional delegates who approved the Bill of Rights also voted that same week to have a Senate chaplain. <u>Id.</u> at 790.

Having decided that invocations on behalf of public, deliberative bodies are acceptable, the Court in <u>Marsh</u> went on to address the respondent's arguments that Nebraska conducted the prayers in an unconstitutional manner. <u>Id.</u> at 792.  The respondent claimed that three of Nebraska's practices in particular violated the Establishment Clause: (1) the legislature kept the same chaplain of the Presbyterian denomination for sixteen years, (2) the chaplain's pay came from public funds, and (3) the chaplain's prayers came solely from his Judeo-Christian tradition.  <u>Id.</u> at 793.

The Court rejected all three arguments.  <u>See also</u> Op. at 20.  To the first argument, the Court replied that the Chaplain's long tenure does not create a constitutional violation

28

per se and that the respondent offers no proof that Nebraska reappointed its Presbyterian chaplain out of an impermissible motive. Marsh, 463 U.S. at 793. The Court refuted the second argument by noting that the same Congress that adopted the Establishment Clause also paid their newly appointed chaplain from public funds. Id. at 794. The Court then dismissed the respondent's third argument, which implied that a court could declare an invocation to be in violation of the Establishment Clause merely because it pertains to a particular religious viewpoint. Id.

To the contrary, Marsh held that the Court should not evaluate or "parse the content" of a particular prayer. Id. at 795. The Court ruled that "the content of the prayer is not of concern to judges where, as here, there is no indication that the prayer opportunity has been exploited to proselytize or advance any one, or to disparage any other, faith or belief." Id. at 794-795.

Thus the precise viewpoint of a prayer does not cause an Establishment Clause issue. Marsh's rule against exploitation hearkens to the opinion's earlier discussion of the historical purposes of legislative prayer.

> [T]he delegates [to the first session of the Continental Congress] did not consider opening prayers as a proselytizing activity or as symbolically placing the government's official seal of approval on one religious view. Rather, the Founding Fathers looked at invocations as conduct whose effect harmonized with the tenets of some or all religions.

Id. at 792 (quotations and citations omitted). The assumption is that any invocation, regardless of viewpoint, can acknowledge the general basis of "beliefs widely held among the people of this country." Id.

Indeed, prayers from almost all sects can fulfill the secular purposes of legislative prayer identified by Justice O'Connor. See Lynch, 465 U.S. at 693 (O'Connor, J.

concurring).  Problems with the Establishment Clause arise, however, when the prayer-giver chooses to ignore these purposes and provoke the listeners.  See Snyder, 159 F.3d at 1235 (holding that proposed invocation did not fit within genre of legislative prayer because it was intended to offend and disrupt city council).

The Supreme Court in deciding Marsh certainly considered the question of whether an invocation's sectarian language by itself could violate the Establishment Clause.  The dissenting opinions of Justices Brennan and Stevens claimed that any prayer would necessarily be unconstitutional because it could not avoid offending everyone.  But the majority, by holding both that legislative prayers are constitutional and that the court should not engage in the evaluation of a prayer's content, in effect rejected their argument.

No one on the Court in Marsh, however, suggested that the Establishment Clause permits legislative prayers only on the grounds that they be "nonsectarian."  Either legislative prayers are permissible and sectarianism is not an issue, or sectarianism does matter and therefore all legislative prayers are unconstitutional.  The former rule, of course, is the holding of Marsh and is the law today.

**B.    A Rule that Every Legislative Prayer Must Be "Nonsectarian" Does Not Follow From Dicta in County of Allegheny v. ACLU Discussing Marsh's Footnote About the Nebraska Chaplain's Voluntary Omission of Christ's Name.**

Dicta in County of Allegheny v. ACLU, Greater Pittsburgh Chapter, 492 U.S. 573, 603 (1989), has led to the misunderstanding that Marsh forbids all sectarian viewpoints in legislative prayer.  For example, in Wynne, the Fourth Circuit quite reasonably held that a city council violated the Establishment Clause by insisting that all its invocations contain Christian references.  But then referring to the principle that the

30

government should not affiliate itself with a particular sect, <u>Wynne</u> suggested that the Court "only upheld the prayer in <u>Marsh</u> because the <u>Marsh</u> prayer did not violate this nonsectarian maxim - 'because the particular chaplain had removed all references to Christ.'" <u>Wynne</u>, 376 F.3d at 299 (quoting <u>Allegheny</u>, 492 U.S. at 603).  <u>Wynne</u> then proposed that sectarian prayer would necessarily violate the Establishment Clause.  <u>Id.</u> at 300.

But the quotation from <u>Allegheny</u> used in <u>Wynne</u> is merely part of the response of the <u>Allegheny</u> majority to Justice Kennedy's attempt to extend the <u>Marsh</u> holding to a crèche.  The <u>Allegheny</u> Court stated:

> [I]n <u>Marsh</u> itself, the Court recognized that not even the "unique history" of legislative prayer, 463 U.S. at 791, can justify contemporary legislative prayers that have the effect of affiliating the government with any one specific faith or belief.  <u>Id.</u> at 794-795. The legislative prayers involved in <u>Marsh</u> did not violate this principle because the particular chaplain had "removed all references to Christ."  <u>Id.</u> at 793 n.14.

<u>Allegheny</u>, 492 U.S. at 603.  "[H]owever history may affect the constitutionality of nonsectarian references to religion by the government, history cannot legitimate practices that demonstrate the government's allegiance to a particular sect or creed."  <u>Id.</u>  This dicta merely affirms principles that the <u>government</u> cannot ally itself with a religious sect and that nonsectarian references tend not to suggest such affiliations. It does not say what happens when a <u>private speaker</u> uses sectarian language, which was not the question presented in that case.

The majority in <u>Marsh</u>, furthermore, does not actually comment on the nonsectarian nature of the Nebraska prayers, nor does it impute any significance to the chaplain's voluntary decision to cease mentioning Christ.  The assessment of the prayers

as "nonsectarian," "Judeo Christian," and having "elements of the American civil religion" comes from the chaplain himself, not the Court. <u>Marsh</u>, 463 U.S. at 793 n.14. The note referring to the actual text of the prayers does not elaborate upon anything the Court itself is discussing but instead illustrates the respondent's argument that Judeo Christian legislative prayers should be unconstitutional, an argument that the Supreme Court explicitly rejected. <u>Id.</u> at 793-95.

As it is, neither <u>Allegheny</u> nor <u>Marsh</u> force deliberative bodies to ban all references to sectarian viewpoints in their invocations. <u>Marsh</u> never draws a line between "sectarian" and "nonsectarian," between Christian and Judeo Christian, or between language that is permissible on its face and language that is not. The dicta in <u>Allegheny</u>, while pointing out one example of what may avoid an Establishment Clause violation, sheds no further light on these issues.

Thus deliberative bodies need not go so far as to restrict the religious speech of their prayer-givers.[3] Under the <u>Marsh</u> holding and the <u>Allegheny</u> dicta, a government may still have a neutral policy that allows prayer-givers to pray in their own idioms, even if that means the prayer language is sectarian.

**C. The Sectarian vs. Nonsectarian Distinction Cannot Survive Subsequent Developments in First Amendment Law.** Lastly, as discussed in greater detail in Arguments **II-IV** above, any distinction drawn between sectarian and nonsectarian prayers cannot survive the Supreme Court's subsequent development of free speech, free

---

[3] The chaplain's omission of Jesus' name in <u>Marsh</u> was voluntary. <u>Cf.</u> <u>Simpson v. Chesterfield County Bd. of Supervisors</u>, 404 F.3d 276, 278-79 (4th Cir. 2005) (describing county board's current policy of directing prayer-givers to avoid referring to Jesus). The First Amendment recognizes an important difference between a self-imposed restriction and a state-imposed restriction on religious speech.

exercise, viewpoint discrimination and public forum analysis. Similarly, such a distinction cannot survive a close reading of current Establishment Clause doctrine. As a result, both the dicta in <u>Allegheny</u>, and any misinterpretation of <u>Marsh</u>, are immaterial because once the full panoply of First Amendment modes of analysis are applied, such a distinction does not survive.

## VI.    THE BOARD IS A DELIBERATIVE AND LEGISLATIVE BODY WHOSE PRAYERS FALL WITHIN THE SCOPE OF LEGITIMATE LEGISLATIVE PURPOSES.

A.  **<u>Marsh</u> Governs this Case.**  The Establishment Clause does not require complete separation of church and state. <u>Lynch</u>, 465 U.S. at 673. Though Establishment tests can be quite perplexing, <u>see</u> <u>McCreary</u>, 125 S.Ct. at 2750-2753 (Scalia, J. dissenting), in <u>Marsh</u> the Supreme Court carved out an exception for government invocations that involves applying relatively clear standards.

In <u>Marsh</u>, 463 U.S. 783, the Supreme Court held that prayer before sessions of legislative and other deliberative bodies does not violate the Establishment Clause. <u>Accord</u> Op. at 20-23. Because of a unique, two hundred year history that included the assent of the authors of the Establishment Clause and the First Amendment, the Court held that:

> To invoke Divine guidance on a public body entrusted with making the laws is not, in these circumstances, an "establishment" of religion or a step toward establishment; it is simply a tolerable acknowledgment of beliefs widely held among the people of this country.

<u>Id.</u> at 792. The Court did not view legislative prayer as a threat to the Establishment Clause in any way. In their own words:

> We conclude that legislative prayer presents no more potential for establishment than the provision of school transportation, beneficial grants for higher education

or tax exemptions for religious organizations.

Id. at 791 (internal citations omitted).

**B.  Numerous Courts Have Upheld Prayer by Legislative or Other Deliberative Bodies.**  In addition to this Court's recent ruling that Marsh permits school boards to open meetings with prayer, Op. at 20-21, a majority of federal Courts of Appeals and State Supreme Courts have upheld prayer by legislative and deliberative bodies over constitutional challenges, both pre and post Marsh.  See Snyder v. Murray City Corp., 159 F.3d 1227 (10th Cir 1998) (city council meetings); Wynne v. Town of Great Falls, S.C., 376 F.3d 292 (4th Cir. 2004) (town council meetings); Simpson v. Chesterfield County Bd. of Supervisors, 404 F.3d 276 (4th Cir. 2005) (county board); Bogen v. Doty, 598 F.2d 1110 (8th Cir. 1979) (county board); Marsa v. Wernik, 430 A.2d 888 (N.J. 1981) (borough council meetings); Colo v. Treasurer and Receiver General, 392 N.E.2d 1195 (Mass. 1979) (state legislature); Lincoln v. Page, 241 A.2d 799 (N.H. 1968) (town meetings).

Coles v. Cleveland Board of Educ., 171 F.3d 369 (6th Cir. 1999), should not dissuade this court from its stance on Marsh and school boards.  The Coles opinion itself states that it is a "close case that could go either way," id. at 383, and the path chosen by that fractured panel has been the subject of sharp criticism in the scholarly community. See articles cited supra, n.1.  Moreover, recent Supreme Court cases such as Good News Club, 533 U.S. at 115, and Van Orden, 125 S.Ct. at 2862, contradict Coles' assumptions that mere affiliation with a school can cause an Establishment violation, Coles, 171 F.3d at 379, and that Marsh carries little weight.  Id. at 383.

**C.  The Requirements of the Marsh Test.**  The following requirements must be

met for a prayer to be valid under <u>Marsh</u> and the Establishment Clause.

> 1. The entity must be a "legislative or other deliberative public bod[y]." <u>Marsh</u>, 463 U.S. at 786.

> 2. The prayer must be used to solemnify the proceedings. <u>See</u> <u>id.</u> at 792 (observing that the prayer was being used "to invoke Divine guidance on a public body entrusted with making the laws"); <u>Lynch</u>, 465 U.S. at 693 (O'Connor, J. concurring).

> 3. The recipients of the prayer must not be "readily susceptible to 'religious indoctrination.'" <u>Marsh</u>, 463 U.S. at 792; <u>see</u> <u>Allegheny</u>, 492 U.S. at 603 n.52 (observing that legislative prayer does not coerce the public); <u>Lee</u>, 505 U.S. at 596-97 (discussing in detail the "[i]nherent differences" between a high school graduation and a session of a state legislature); <u>ACLU of N.J. v. Black Horse Pike Regional Bd. of Educ.</u>, 84 F.3d 1471, 1480 (3d Cir. 1996) (same).

> 4. The prayer must not be used or "exploited to proselytize or advance any one or to disparage any other, faith or belief." <u>Marsh</u>, 463 U.S. at 794-95; <u>Snyder</u>, 159 F.3d at 1234; <u>Wynne</u>, 376 F.3d at 298.

If these factors are met, than the prayer must be sustained and its content is irrelevant.

<u>Marsh</u>, 463 U.S. at 794-95.

**D.  The Board Prayer Policy Meets and Exceeds the <u>Marsh</u> Test.**

**1.  Threshold Test: Legislative or Deliberative Body.**  As this Court has ruled in granting the motions to dismiss, the School Board is a deliberative body entrusted with making rules and laws. Op. at 20-21.  Like members of state legislatures, school board members are elected representatives of the people.  <u>See, e.g.</u> 14 Del.C. § 1051 ("School board members shall be elected by the qualified voters of" their school districts).  As the Board Member Handbook discusses, the primary task of the Board is to deliberate, make rules, and set policy.  Like city councils, which several courts have held

35

fall under <u>Marsh</u>, <u>see</u> <u>Simpson</u>, 404 F.3d 276; <u>Snyder</u>, 159 F.3d 1227, school boards

derive this authority to pass laws and set policy from the state legislature.  14 Del. C. §

1043.  Indeed, courts often grant school boards legislative immunity under 42 U.S.C. §

1983.  <u>See, e.g.</u>  <u>McHugh v. Bd. of Educ.</u>, 100 F.Supp.2d 231 (D.Del. 2000).

**2.  Solemnification of the Proceedings.**  Indistinguishable from the

situation approved by the Court in <u>Marsh</u> and also later identified by Justice O'Connor in

her <u>Lynch</u> concurrence, the Board Policy specifically states that the legislative prayers are

being offered "to solemnify the School Board proceedings."  (Helms ¶ 8, item 1).  The

other secular purposes Justice O'Connor mentions - "the expression of confidence in the

future and the recognition of what is worthy of appreciation in society," <u>Lynch</u>, 465 U.S.

at 693 (O'Connor, J. concurring), - are apparent in the Policy's "whereas clauses" that

speak of the need for prayer during times of war. (Helms ¶ 7).

**3.  The Recipients Are Not Susceptible to Religious Indoctrination.**

The Board's invocations are for and on behalf of the Board itself - all of whom are adults.

The Policy, (Helms ¶ 8, item 4), specifically states that the neither the public nor school

employees are invited to pray:

> Such prayer is voluntary and it is just among the adult members of the Board.  No
> school employee, student in attendance or member of the community in
> attendance shall be required to participate in any such prayer or moment of
> silence.

> Visitors remain free to temporarily remove themselves from the meeting if they

are offended by the invocation.  As the Supreme Court has observed, "[t]he atmosphere at

the opening of a session [of a legislative or deliberative body] where adults are free to

enter and leave with little comment and for any number of reasons cannot" be equated or

compared with the inherently compulsive force of a high school graduation which students are practically compelled to attend.  <u>Lee</u>, 505 U.S. at 597-98.

In light of <u>Good News Club</u>, the Court should not follow <u>Coles</u>' assertion that the presence of school children at the meetings bars the school board from opening with prayer or silence. <u>Coles</u>, 171 F.3d at 382.  In the Supreme Court's recent words, "we have never extended our Establishment Clause jurisprudence to foreclose private religious conduct during nonschool hours merely because it takes place on school premises where elementary school children may be present."  <u>Good News Club</u>, 533 U.S. at 115. Continuing -

> We cannot operate ... under the assumption that any risk that [ ] children would perceive endorsement should counsel in favor of excluding ... religious activity. We decline to employ Establishment Clause jurisprudence using a modified heckler's veto, in which a group's religious activities can be proscribed on the basis of what the youngest members of the audience might misperceive.

<u>Id.</u> at 119.

Significant to <u>Lee</u>'s analysis of the coercive effects of prayer at graduations is the assumption that children are more susceptible to indoctrination when they are removed from their parents.  <u>Lee</u>, 505 U.S. at 643; <u>cf.</u> <u>Good News Club</u>, 533 U.S. at 114 (holding that parental consent to join club minimizes coercion and endorsement concerns). Parents can and often do accompany their children to school board meetings, lessening the susceptibility of children to incidental indoctrination.

**4. The Prayer Is Not to be Exploited or Abused.**  In the same way, item 3 of the Policy is nearly identical to the <u>Marsh</u> requirement and requires that the prayer "not [be] used or exploited to proselytize, advance or convert anyone or to derogate or otherwise disparage any particular faith or belief." (Helms ¶ 8, item 3).

Putting aside for the moment that the prayers are only among the adult members of the Board, (Helms ¶ 8, item 4), additionally, there is no evidence, and the Board is in no way trying, to indoctrinate or coerce any adults or the occasional school child who happens to be present for meetings. A major part of Lee's holding is that the children, standing together while the prayer was said on their behalf at one of the most significant events of their lives, were forced to conform because they had no way to dissent without embarrassment. Lee, 505 U.S. at 593. The Board's Policy, in contrast, assumes that visitors are not praying; thus, silence does not indicate compliance.

As discussed above, the Supreme Court explained in Good News Club that the mere presence of children does not trigger an Establishment Clause violation. While the Court has weighed the coercive effects of government religion on captive children, it has not similarly embraced the concept that an Establishment violation occurs if endorsement can be perceived by just a mere child. The test for endorsement in the Third Circuit is from the viewpoint of "a reasonable informed observer, i.e. one familiar with the history and context of [the issue]." Tenafly, 309 F.3d at 174. And any question about a child perceiving endorsement must take into account the actual policy as written.

Thus, the occasional presence of children is not a determinative factor in deciding whether Marsh governs the Board's prayer. See Good News Club, 533 U.S. at 115-19. After all, school children on field trips can observe Congress, state legislatures, and city councils engaging in legislative prayers. Likewise, children in Texas may very well pass by the Ten Commandments display on the way to observe their legislature or to see the monument on the Texas Capitol lawn dedicated to school children. Van Orden, 125 S.Ct. at 2858 n.1.

Accordingly, because the Board Policy comports with the history of legislative prayer as well as with <u>Marsh</u>'s specific requirements, it is appropriate and Constitutionally permissible for the Board to open its meetings with an invocation. The Board is a deliberative and legislative body. The prayers are made on behalf of and directed at the adult members of the Board alone and are explicitly not intended to proselytize, but instead are intended to solemnize. (Helms ¶ 8). As the Supreme Court has explained at length, the Board's mere affiliation with the school district and the possibility that a child may attend a Board meeting does not violate the Establishment Clause.

## <u>CONCLUSION</u>

The written Policy is constitutional as written. Summary judgment should be granted for defendant Helms. Any as applied challenge awaits another day.

Respectfully Submitted,

**THE NEUBERGER FIRM, P.A.**

/s/ Thomas S. Neuberger
**THOMAS S. NEUBERGER, ESQ. (#243)**
**STEPHEN J. NEUBERGER, ESQ. (#4440)**
Two East Seventh Street, Suite 302
Wilmington, DE 19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com

Attorneys for Defendant Reginald L. Helms

**THE RUTHERFORD INSTITUTE**
**JOHN W. WHITEHEAD, ESQ.**
**DOUGLAS MCKUSICK, ESQ.**
P.O. Box 7482
Charlottesville, VA 22906
(434) 978-3888
JohnW@Rutherford.org
DouglasM@Rutherford.org

Dated: August 5, 2005              Of Counsel

# Tab A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **MONA DOBRICH, et al.,** | : |
| | : |
| **Plaintiffs,** | : |
| | : |
| **v.** | :     **C.A.No. 05-129-JJF** |
| | : |
| | : |
| **HARVEY L. WALLS, et al,** | : |
| | : |
| **Defendants.** | : |

## UNSWORN DECLARATION OF REGINALD L. HELMS,
## UNDER 28 U.S.C. § 1746

I, Reginald L. Helms, hereby depose and state as follows:

1.    I make this declaration on my own personal knowledge and I will testify hereto if called as a witness.

2.    I have been a member of the Indian River School Board (hereinafter "Board") for fourteen (14) years and am one of the defendants in the above titled action.  I have personal knowledge of the facts contained in this affidavit and, if called as a witness, I am competent to testify as to those facts.

3.    As a long time member of the Board, I have investigated and am otherwise familiar with the history and traditions of the Board's policy of beginning its meetings with a brief, non-proselytizing prayer.

4.    The Board has a long history and tradition of beginning its meetings by allowing one of its members to offer a brief, non-proselytizing prayer in accordance with his or her own individual convictions.

5.     This history actually predates the founding of the Indian River School District in 1969. The tradition then continues back and finds its origins in the operations of its several predecessor school districts for several decades before.

6.     In the summer of 2004, I asked experienced constitutional lawyers to prepare a Board prayer policy which was in accord with constitutional requirements. The Neuberger Firm and The Rutherford Institute then prepared a policy and legal opinion which was submitted to the Board on August 30, 2004. The policy in its entirety was adopted as written by the Board in October of 2004.

7.     The preambular clause of the policy that was submitted to the Board on August 30, 2004 stated as follows::

> **Whereas**, this School Board is an elected legislative and deliberative public body composed of adults;
>
> **Whereas**, this School Board has had a long established custom of solemnifying its proceedings by opening its meetings with a sectarian or non-sectarian prayer by one individual Board member as his or her conscience and religious tradition leads;
>
> **Whereas**, our Country is in a War with terrorism which on September 11, 2001 took the innocent lives of thousands of our fellow citizens, united our Nation and also reminded many of us of the efficacy of prayer;
>
> **Whereas**, in times of War our leaders have lead us in prayer. A few examples follow:
>
> Our first President, George Washington, as he concluded his service as the Continental Army's Commander in Chief, on June 14, 1783, wrote to all the governors of the newly freed states urging them to join him in this  prayer:

2

"Almighty God, We make our earnest prayer that Thou wilt keep the United States in Thy holy protection: that Thou wilt incline the hearts of the citizens to cultivate a spirit of subordination and obedience to government, and entertain a brotherly affection and love for one another and for their fellow citizens of the United States at large.

And finally that Thou wilt most graciously be pleased to dispose us all to do justice, to love mercy, and to demean ourselves with that charity, humility, and pacific temper of mind which were the characteristics of the Divine Author of our blessed religion, and without a humble imitation of whose example in these things we can never hope to be a happy nation. Grant our supplication, we beseech Thee through Jesus Christ, Our Lord, Amen." (Emphasis added).

President Abraham Lincoln lamented during the days of the Civil War:

"We have been recipients of the choicest bounties of Heaven...but we have forgotten God.... We have forgotten the gracious hand which preserved us in peace.... Intoxicated with unbroken success, we have become too self sufficient to feel the necessity of redeeming and preserving grace, too proud to pray to the God that made us."

President Franklin D. Roosevelt, at the moment of the greatest military invasion in history, D Day (June 6, 1944), led the nation in praying:

"Almighty God, Our sons, pride of our Nation, this day have set upon a mighty endeavor, a struggle to preserve our Republic, our religion, and our civilization, and to set free a suffering humanity. Lead them straight and true; give strength to their arms, stoutness to their hearts, steadfastness in their faith."

Our current President George W. Bush, in the midst of America's war on terror, urged the Country to pray, stating:

"I ask our Nation to join me in praying for the strength to

3

meet the challenges before us, for the wisdom to know and do what is right, for continued determination to work towards making our society a more compassionate and decent place, and for peace in the affairs of men." (A Proclamation, National Day of Prayer, May 1, 2003)

**Whereas**, a member of the American Civil Liberties Union attended one of our School Board meetings, was offended by a prayer which was said and which ended in the name of Jesus Christ, as did the above mentioned prayer by President George Washington, and the ACLU has threatened the Board and School District with a lawsuit if it does not abandon its custom;

**Whereas**, the School Board has obtained the legal advice of two competent and experienced constitutional attorneys, John W. Whitehead, Esquire and Thomas S. Neuberger, Esquire, that prayer to open Board meetings is constitutional in the United States Court of Appeals for the Third Circuit which includes Delaware, and legal counsel have identified the following legal authority in support of their legal opinion.

In <u>Marsh v. Chambers</u>, 463 U.S. 783 (1983), the United States Supreme Court held that prayer before sessions of legislative and other deliberative bodies does not violate the Establishment Clause of the First Amendment to the Constitution. The Court reasoned and stated that such prayer must not violate the Establishment Clause, noting that the practice pre exists the First Amendment itself.

"The opening of sessions of legislative and other deliberative public bodies with prayer is deeply embedded in the history and tradition of this country. From colonial times through the founding of the Republic and ever since, the practice of legislative prayer has coexisted with the principles of disestablishment and religious freedom."

<u>Id.</u> at 786. The Court cited the practices of the First Congress as evidence of the Framers' understanding that prayer before meetings of legislative bodies did not violate the Establishment Clause and also said:

4

"It can hardly be thought that in the same week Members of the First Congress voted to appoint and to pay a chaplain for each House and also voted to approve the draft of the First Amendment for submission to the states, they intended the Establishment Clause of the Amendment to forbid what they had just declared acceptable."

Id. at 790. Thus, it is a settled principle that legislative and other deliberative bodies do not violate the Establishment Clause of the First Amendment by opening their meetings with a brief invocation.

It is the opinion of legal counsel that since the Indian River Board of Education is a public legislative and deliberative body it has the right to open its meetings with a prayer.

In support of assertions that a School Board member's prayer is unlawful, the ACLU can only rely upon the divided Sixth Circuit's opinion in Coles v. Cleveland Bd. of Educ., 171 F.3d 369 (6th Cir. 1999). However, the Sixth Circuit's 2 to 1 decision in Coles is, of course, not even binding precedent in Delaware, which is governed by the decisions of the Third Circuit Court of Appeals in Philadelphia. The Third Circuit has not addressed this question, and counsel are unaware of any court in the Third Circuit that has even cited to the Coles decision, much less any court that has indicated that it viewed the decision favorably. Furthermore, the fractured Coles decision has faced considerable criticism from legal scholars because it ignores the Supreme Court decision in Marsh. See, e.g., "Sixth Circuit Holds That Opening School Board Meetings with a Prayer Is an Establishment of Religion," Harvard L. Rev. 1240 (March 2000) (majority in Coles "inappropriately attributed to school board meetings the same coercive context as the classroom and read too narrowly the permissible role of religious speech in solemnizing the lawmaking process"). So Marsh is still very good law which must be obeyed.

Contrary to the Sixth Circuit's dismissal of Marsh as an "historical aberration," Coles, 171 F.3d at 383, the Supreme Court itself has regularly recognized the continuing vitality

5

of <u>Marsh v. Chambers</u> in the legislative arena. <u>See, e.g.</u> <u>County of Allegheny v. ACLU</u>, 492 U.S. 573, 603 (1989) (discussing the scope of <u>Marsh</u>); <u>Lee v. Weisman</u>, 505 U.S. 577, 596-97 (1992) (noting the inherent differences between the forced attendance of students at a high school graduation and the voluntary attendance of adults at legislative sessions).

Furthermore, a majority of the federal Courts of Appeals that have addressed the matter have followed the Supreme Court's command and squarely held that prayer by legislative and other deliberative bodies does not violate the Establishment Clause. For example, in <u>Snyder v. Murray City Corp.</u>, 159 F.3d 1227 (10th Cir 1998), the Tenth Circuit Court of Appeals held that invocational prayers at a city council meeting fell squarely under <u>Marsh</u> and that such "'legislative prayer' does not violate the Establishment Clause." <u>Id.</u> at 1233.

Likewise, just this past summer, the Fourth Circuit Court of Appeals held that a town council may "invoke Divine guidance for itself before engaging in public business." <u>Wynne v. Town of Great Falls, S.C.</u>, 376 F.3d 292, 298 (4th Cir. 2004). And more than a quarter century earlier, the Eighth Circuit Court of Appeals held that prayer by a clergyman before a county board meeting helps set "a solemn tone for the transaction of government business and assists towards the maintenance of order and decorum." <u>Bogen v. Doty</u>, 598 F.2d 1110, 1115 (8th Cir. 1979).

Moreover, even before the Supreme Court's decision in <u>Marsh</u>, at least three State Supreme Courts had decided that prayer by deliberative bodies did not run afoul of the Establishment Clause. <u>See</u> <u>Marsa v. Wernik</u>, 430 A.2d 888 (N.J. 1981) (prayer at borough council meetings by council members); <u>Colo v. Treasurer and Receiver General</u>, 392 N.E.2d 1195 (Mass. 1979) (prayer by chaplains in state legislature); <u>Lincoln v. Page</u>, 241 A.2d 799 (N.H. 1968) (prayer by clergy at town meetings).

So in reality it is the divided <u>Coles</u> decision which is the

6

aberration and not these six courts of appeals. Additionally, <u>Coles</u> was decided before the recent landmark decision by the U.S. Supreme Court in <u>Good News Club v. Milford Central School</u>, 533 U.S. 98 (2001), which laid to rest the legally incorrect notion that just because religious activity takes place upon public school grounds it is a violation of the Establishment Clause.  The Supreme Court there also criticized lower courts which take the simplistic position that mere geography determines whether voluntary prayer is constitutional.

Thus, it is the opinion of legal counsel that the Supreme Court's decision in <u>Marsh v. Chambers</u>, which unlike the <u>Coles</u> decision is binding precedent in Delaware, compels the conclusion that the Indian River School District's tradition of opening its meetings with a brief invocation is constitutionally permissible.

8.    The Board then adopted the following policy upon the advice of its experienced

counsel:

**Accordingly, the Board hereby adopts the following written policy and it Resolves that -**

1.  In order to solemnify School Board proceedings, it is the policy of the Board to open its meetings with a prayer or a moment of silence, all in accord with the freedom of conscience of the individual adult Board member.

2.  On a rotating basis one individual adult Board member per meeting will be given the opportunity to offer a prayer or moment of silence.  If the member chooses not to exercise this opportunity, the next member in rotation shall have the opportunity.

3.  Such opportunity shall not [be] used or exploited to proselytize, advance or convert anyone or to derogate or otherwise disparage any particular faith or belief.

4.  Such prayer is voluntary and it is just among the adult members of the Board.  No school employee, student in attendance or member of the community in attendance shall

7

be required to participate in any such prayer or moment of silence.

5.  Any such prayers may be sectarian or non-sectarian, denominational or non-denominational, in the name of a Supreme Being, Jehovah, Jesus Christ, Buddha, Allah, or any other person or entity, all in accord with the freedom of conscience, speech and religion of the individual Board member, and his or her particular religious heritage.

**REGINALD L. HELMS**

I declare under penalty of perjury that the foregoing is true and correct.   Executed on August ___4___, 2005.

Helms \ Pleadings \ Helms Declaration.final

8

## CERTIFICATE OF SERVICE

I, Stephen J. Neuberger, being a member of the bar of this Court do hereby certify

that on August 5, 2005, I electronically filed this **Brief** with the Clerk of the Court using

CM/ECF which will send notification of such filing to the individuals by the means

indicated:

>Thomas J. Allingham II, Esq.
>Robert S. Saunders, Esq.
>One Rodney Square
>P.O. Box 636
>Wilmington, DE 19899
>(Via CM/ECF)
>
>John D. Balaguer, Esq.
>824 Market St., Suite 902
>P.O. Box 709
>Wilmington, DE 19899
>(Via CM/ECF)
>
>John F. Cafferky, Esq.
>William A. Porter, Esq.
>Andrea D. Gemignani, Esq.
>Blankingship & Keith
>4020 University Drive, Suite 300
>Fairfax, VA 22030
>(Via U.S. Mail)

>/s/ Stephen J. Neuberger
>**STEPHEN J. NEUBERGER, ESQ.**

cc:    Thomas S. Neuberger, Esq.
       John W. Whitehead, Esq.
       Douglas McKusick, Esq.
       Mr. Reginald L. Helms

Helms \ Briefs \ Motion for Summary Judgment OB.final

41