**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **MONA DOBRICH, et al.,** | : | |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| v. | : | **C.A.No. 05-120-JJF** |
| | : | |
| | : | |
| **HARVEY L. WALLS, et al,** | : | |
| | : | |
| **Defendants.** | : | |

**DEFENDANT REGINALD L. HELMS' REPLY BRIEF IN SUPPORT OF HIS MOTION
FOR SUMMARY JUDGMENT ON THE BOARD'S VOLUNTARY PRAYER POLICY
AS WRITTEN AND ANSWERING BRIEF IN OPPOSITION TO PLAINTIFFS'
MOTION TO DENY OR CONTINUE DEFENDANT HELMS'
MOTION FOR SUMMARY JUDGMENT**

**THE RUTHERFORD INSTITUTE**
**JOHN W. WHITEHEAD, ESQ.**
**DOUGLAS MCKUSICK, ESQ.**
P.O. Box 7482
Charlottesville, VA 22906
(434) 978-3888
JohnW@Rutherford.org
DouglasM@Rutherford.org

Of Counsel

**THE NEUBERGER FIRM, P.A.**
**THOMAS S. NEUBERGER, ESQ. (#243)**
**STEPHEN J. NEUBERGER, ESQ. (#4440)**
Two East Seventh Street, Suite 302
Wilmington, DE 19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com

Attorneys for Defendant Reginald L. Helms

Dated: August 26, 2005

# TABLE OF CONTENTS

NATURE OF THE PROCEEDINGS............................................................................1

SUMMARY OF THE ARGUMENT.........................................................................2

COUNTER STATEMENT OF FACTS......................................................................2

ARGUMENT..............................................................................................................3

I.      PLAINTIFFS' ARGUMENTS ON MOOTNESS AND OTHER MERITS
        ISSUES FAIL AS A MATTER OF LAW.................................................3

        A.      The Case is Not Moot Since the Court Has Not Yet Decided Whether
                The Board's Voluntary Prayer Policy As Written is Constitutional......................3

        B.      *Marsh v. Chambers* Has Not Been Misread..........................................3

        C.      This Case is Not Governed by the *Lemon* Test...................................4

        D.      The *Lee* Decision is Inapplicable.......................................................4

II.     RULE 56 EXPLICITLY AUTHORIZES A DEFENDANT TO MOVE FOR
        SUMMARY JUDGMENT "AT ANY TIME" ON "ANY PART" OF A
        CLAIM BEING MADE AGAINST HIM.....................................................4

III.    SUMMARY JUDGMENT SHOULD BE GRANTED TO DEFENDANT
        HELMS BECAUSE PLAINTIFFS HAVE FAILED TO DEMONSTRATE
        THAT THERE IS A GENUINE ISSUE OF MATERIAL FACT STANDING
        IN THE WAY OF HIS MOTION ON THE BOARD'S VOLUNTARY PRAYER
        POLICY "AS WRITTEN"..........................................................................5

        A.      As Written vs. As Applied Challenges................................................5

        B.      Plaintiffs Have In Effect Conceded That There is No Genuine Issue of
                Material Fact Standing in the Way of Summary Judgment.....................7

                1.      Plaintiffs' Counsel's Rule 56(f) Affidavit Is Irrelevant To This
                        Analysis.............................................................................7

                2.      Rule 56(g) Attorneys Fees Should Be Assessed Against Plaintiffs............9

                        a.      Plaintiffs Have Acted in Bad Faith and/or Solely for the
                                Purpose of Delay..................................................9

*i*

    b. Defendant Helms is Greatly Prejudiced by Plaintiffs' Actions......11

    c. Plaintiffs' Affidavit Also Evidences Sandbagging
      and Other Indicators of Bad Faith....................................................11

     (1) Plaintiffs' Lack of Diligence....................................................11

     (2) There is No Record for the Facts Alleged...............................14

  3. Plaintiffs' Un-Notarized Affidavit is Facially Deficient...........................16

CONCLUSION.....................................................................................................................17

# TABLE OF AUTHORITIES

**Cases**                                                                              **Page**

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)....................................................7

Baum v. Gillman, 648 F.2d 1292 (10th Cir. 1981).......................................................13

Boyle v. County of Allegheny, Pa., 139 F.3d 386 (3d Cir. 1998)....................................7

Bradley v. U.S., 299 F.3d 197 (3d Cir. 2002)..........................................................7,9,16

Chambers and Co. v. Equitable Life Assurance Society of the U.S.,
    224 F.2d 338 (5th Cir. 1955)..................................................................................13

Circle Schools v. Pappert, 381 F.3d 172 (3d Cir. 2004)..............................................5

City of Houston, Tex. v. Hill, 482 U.S. 451 (1987)......................................................5

Congregation Kol Ami v. Abington Township, 309 F.3d 120 (3d Cir. 2002).................5

Dobrek v. Phelan, -- F.3d --, 2005 WL 1963036 (3d Cir. Aug. 17, 2005)....................5

Elonex I.P. Holdings, Ltd. v. Apple Computer, Inc., 145 F.Supp.2d 579
    (D.Del. 2001)........................................................................................................11

Good News Club v. Milford Central Sch., 533 U.S. 98 (2001)...................................3-4

Gostin v. Nelson, 41 F.R.D. 48 (D.Del. 1965)...........................................................13

Herbert v. Wicklund, 744 F.2d 218 (1st Cir. 1984)....................................................12

Ideal Dairy Farms, Inc. v. John Labatt, Ltd., 90 F.3d 737 (3d Cir. 1996)......................7

International Brotherhood of Boilermakers, et al. v. Kelly, 815 F.2d 912
    (3d Cir. 1987).........................................................................................................3

Klein v. Stahl GMBH & Co. Maschineff Abrik, 185 F.3d 98 (3d Cir. 1999)..............10

Lee v. Weisman, 505 U.S. 577 (1992)........................................................................4

Lemon v. Kurtzman, 403 U.S. 602 (1971)..................................................................4

Levy v. Bd. of Educ. of Cape Henlopen Sch. Dist., 1990 WL 154147
    (Del.Ch. 1990)......................................................................................................15

Marsh v. Chambers, 463 U.S. 783 (1983)...................................................................3-4

Miller v. Daimler Chrysler Corp., 219 F.R.D. 331 (D.Del. 2003)....................................7

Pastore v. Bell Telephone Co. of Pa., 84 F.3d 508 (3d Cir. 1994)................................16

Proctor v. Sagamore Big Game Club, 265 F.2d 196 (3d Cir. 1959).............................13

Radich v. Goode, 886 F.2d 1391 (3d Cir. 1989)..........................................................16

RePass v. Vreeland, 357 F.2d 801 (3d Cir. 1966).........................................................4

Robin Const. Co. v. U.S., 345 F.2d 610 (3d Cir. 1965)............................................13-14

San Remo Hotel, L.P. v. City and County of San Francisco, Cal., -- U.S. --,
    125 S.Ct. 2491 (2005)..........................................................................................5

Southern Rambler Sales, Inc. v. American Motors Corp., 375 F.2d 932
    (5th Cir. 1967)......................................................................................................14

U.S. v. Salerno, 481 U.S. 739, 745 (1987) ..................................................................6

**Constitutions, Statutes and Rules**

U.S. Constitution, Amendment I........................................................................passim

28 U.S.C. § 1746.........................................................................................................17

29 Del.C. § 10001 et seq............................................................................................15

29 Del.C. § 10004 ......................................................................................................16

Fed.R.Civ.P. 11(b)(1)..................................................................................................11

Fed.R.Civ.P. 11(b)(2)..................................................................................................10

Fed.R.Civ.P. 54............................................................................................................4

Fed.R.Civ.P. 56 ...........................................................................................2,11-12,16

Fed.R.Civ.P. 56(b)......................................................................................................4-5

Fed.R.Civ.P. 56(c).........................................................................................................7

Fed.R.Civ.P. 56(f).................................................................................................1-2,7-12,16

Fed.R.Civ.P. 56(g)...........................................................................................................9

D.Del. LR 7.1.2(a)(2).....................................................................................................10

D.Del. LR 83.6(d)(2).......................................................................................................11

Model Rule of Professional Conduct 3.2 .......................................................................11

Model Rule of Professional Conduct 3.2, comment 1.....................................................11

## Other Authorities

10B Wright, Miller & Kane, Federal Practice and Procedure § 2740 (1998)................................12

10B Wright, Miller & Kane, Federal Practice and Procedure § 2741 (1998).......................8,12-13

## NATURE OF THE PROCEEDINGS

Once all the parties in the pending mediation agreed that the issue of injunctive relief arising from the newly adopted Board Prayer policy could not be mediated, defendant Helms immediately moved for summary judgment on that new policy as written, which was a gravamen of the Complaint and which was unresolvable at mediation. (See, e.g. D.I. 1 at 38).  The Magistrate issued no Order baring filing of the summary judgment motion but did rule that she did not need further written mediation submissions during the mediation process.[1]  (See D.I. 59).  For now, the other defendants could not take a timely position on the pending summary judgment motion without the benefit of a legal Board meeting, which was not scheduled until August 23, 2005.[2]

Hopefully, other issues, (a) of claimed damages for actions arising before adoption of the newly created policies, and (b) injunctive relief arising from the recent adoption of the Clinton Justice Department guidelines on high school graduations, can be resolved in mediation without further litigation in light of the Court's previous rulings on the motions to dismiss.  (D.I. 57, 58).

Instead of filing a separate Answering Brief in response to the pending summary judgment motion and a separate motion for Rule 56(f) discovery, defendants instead chose to include their four arguments on the merits of the pending summary judgment motion in one pleading which also presented their Rule 56(f) arguments.  This is defendant Helms' Reply Brief in support of his pending summary judgment motion and

---

[1]  The contrary assertion by plaintiffs (D.I. 64 at 2) is incorrect.  All parties agreed that the Board Prayer policy was off the table and would not be resolved at mediation.

[2]  Defendant expects they will join in the Motion.

1

his Answering Brief in opposition to plaintiffs' motion to deny or continue Helms' motion for summary judgment.[3]

## SUMMARY OF ARGUMENT

As a matter of law, mootness and other arguments on the merits fail.

The plain language of Rule 56 permits the filing of the current motion.

The plaintiffs have failed to demonstrate that any genuine issue of material fact is in dispute relating to their facial, "as written" challenge to the recent Board voluntary prayer policy. Their Rule 56(f) gambit requesting "as applied" discovery also fails because their affidavit is legally deficient, has no bearing on the current "as written" motion and obviously was made for purposes of delay and in bad faith, as numerous Third Circuit cases indicate.

## COUNTER STATEMENT OF THE FACTS

Plaintiffs have asserted no facts which are genuine or material to the facial, "as written," challenge which they pose in their lawsuit regarding the recently adopted written Board Prayer policy.

As is explained later, any facts asserted only relate to an "as applied" challenge to the written Policy.

---

[3] It is not surprising that plaintiffs have sought to muddy the waters on this issue by refusing to file an Answering Brief to Helms' Motion for summary judgment and instead filing an Opening Brief in support of a separate motion to deny or continue Helms' Motion. But this is a distinction without a difference, no doubt intended to allow plaintiffs to make an improper end run around the local rules and secure the last word on the issue with a Reply Brief to which they otherwise would not be entitled on briefing under Helms' Motion. Defendant Helms notes however, that plaintiffs' motion and brief should be properly construed an Answering Brief and that any reply filed by plaintiffs on the merits will be stricken as impermissible sandbagging after an anticipated Motion to Strike.

## ARGUMENT

**I.    PLAINTIFFS' ARGUMENTS ON MOOTNESS AND OTHER MERITS ISSUES FAIL AS A MATTER OF LAW.**

Plaintiffs present four arguments on the merits in response to defendant's Opening Brief.  (See D.I. 64 at 5-6, 8-10, 8 n.5, and 8 n.6).

**A.    The Case Is Not Moot Since The Court Has Not Yet Decided Whether The Board's Voluntary Prayer Policy As Written Is Constitutional.**  Defendant Helms is at a loss to explain plaintiffs' frivolous claim that the Court has already held that the Board's voluntary prayer policy as written is Constitutional.  (D.I. 64 at 5).  No where in this Court's August 2nd Opinion (D.I. 57) did the Court address the policy as written or the facial challenge plaintiffs have raised against it.  Likewise, the Court's August 2nd Order (D.I. 58), also is very clear and explicit as to what issues the Court resolved.  No where in this three page Order did the Court remove from the case plaintiff's facial challenge to the Board's voluntary prayer policy.

Accordingly, and because plaintiffs have offered no precedent or reasoned legal argument to the contrary, the issue of whether the Board's voluntary prayer policy as written is constitutional is not moot.  Instead, there is a concrete dispute between adverse parties fully capable of resolution.  See International Brotherhood of Boilermakers, et al. v. Kelly, 815 F.2d 912, 915 (3d Cir. 1987).

**B.    *Marsh v. Chambers* Has Not Been Misread.**  Next plaintiffs contend that defendant has misread Marsh v. Chambers, 463 U.S. 783 (1983), and offer their own narrow construction of that governing precedent.  (D.I. 64 at 8-10).  Defendant's Opening Brief adequately addresses this issue and especially the analysis of the effect of Good

3

News Club v. Milford Central Sch., 533 U.S. 98 (2001).  (See D.I. 61 at 35-39).  No
Reply is necessary.

      **C.  This Case Is Not Governed by the *Lemon* Test.**  Plaintiffs also wrongly
argue that the test of Lemon v. Kurtzman, 403 U.S. 602 (1971), should be applied, and
not Marsh v. Chambers, and claim defendant apparently does not dispute this contention.
(D.I. 64 at 8 n.5).  Again, defendant's Opening Brief amply explains that current free
speech and forum jurisprudence, a careful reading of establishment clause precedent and
application of the governing decision in Marsh, all indicate that a  Lemon analysis is
inappropriate.  (D.I. 61 at 7-20, 21-32).   No Reply is necessary.

      **D.  The *Lee* Decision is Inapplicable.**  Finally, plaintiffs contend that the
decision in Lee v. Weisman, 505 U.S. 577 (1992), is the undoing of defendant's facial
challenge defense.  (D.I. 64 at 9 n.6).  Again, Lee has been carefully analyzed and no
Reply is necessary.  (D.I. 61 at 10, 21-24, 36-38).

**II.    RULE 56 EXPLICITLY AUTHORIZES A DEFENDANT TO MOVE FOR
          SUMMARY JUDGMENT "AT ANY TIME" ON "ANY PART" OF A
          CLAIM BEING MADE AGAINST HIM.**

      Plaintiffs' claim that this Court cannot grant partial summary judgment also is
entirely without merit. (D.I. 64 at 15-16).   The plain text of Fed.R.Civ.P. 56(b) clearly
states that "A party against whom a claim ... is asserted ... may, at any time, move ... for a
summary judgment in the party's favor as to all or any part thereof."  (emphasis added).
Reliance on RePass v. Vreeland, 357 F.2d 801, 805 (3d Cir. 1966), is misplaced.  (D.I. 64
at 15).  Unfortunately for plaintiffs, if one actually takes the time to read this opinion, one
quickly discovers that the Third Circuit was discussing Rule 54, and not Rule 56(b),
which explicitly allows defendants to move for partial summary judgment "at any time."

It is a well-established rule that when interpreting statutes, rules or regulations, "the first step is to determine whether the language at issue has a plain and unambiguous meaning." Dobrek v. Phelan, -- F.3d --, 2005 WL 1963036, *3 (3d Cir. Aug. 17, 2005). "The inquiry ends if the statutory language is unambiguous and the statutory scheme is coherent and consistent." Id.   And here the Federal Rules are clear.  Moreover, these same Rules have provided the explicit vehicle to resolve the plain and unambiguous written Board Prayer policy at issue in our case. A defendant may move for summary judgment "at any time" on "any part" of a claim against him.  Fed.R.Civ.P. 56(b). Plaintiffs' claim to the contrary is wrong.

### III.   SUMMARY JUDGMENT SHOULD BE GRANTED TO DEFENDANT HELMS BECAUSE PLAINTIFFS HAVE FAILED TO DEMONSTRATE THAT THERE IS A GENUINE ISSUE OF MATERIAL FACT STANDING IN THE WAY OF HIS MOTION ON THE BOARD'S VOLUNTARY PRAYER POLICY "AS WRITTEN."

**A.  As Written vs. As Applied Challenges.**  The differences between "as written" (or "facial") and as "as applied" challenges are well recognized in the case law. See, e.g. San Remo Hotel, L.P. v. City and County of San Francisco, Cal., -- U.S. --, 125 S.Ct. 2491 (2005) (discussing facial and as applied challenges to an ordinance); City of Houston, Tex. v. Hill, 482 U.S. 451 (1987) (First Amendment free speech facial challenge to an ordinance); Circle Schools v. Pappert, 381 F.3d 172 (3d Cir. 2004) (facial Establishment Clause challenge); Congregation Kol Ami v. Abington Township, 309 F.3d 120 (3d Cir. 2002) (as applied Establishment Clause challenge).  This is not a novel distinction by any means.

Both plaintiffs' Complaint and Brief make it clear that they have challenged the Board's Prayer policy as applied, and also as written.  See, e.g. D.I. 1 at 38 (Request for

Relief - requesting a declaratory judgment "declaring unconstitutional the District's

policy on 'Board Prayer at Regular Board Meetings'"); D.I. 64 at 4 (claiming that "the

District's policy on School Board prayer[ ] [is] constitutionally deficient").

      Thus, again, defendant Helms is at a loss to explain why plaintiffs have devoted

nearly their entire Brief to explaining why they need "as applied" discovery to counter his

"as written" motion for summary judgment.  As the very titles of his Motion and Opening

Brief make clear, defendant Helms moved for summary judgment on the Board's

voluntary prayer policy "as written."  (See D.I. 60, 61 - Cover Pages).  Similarly,

throughout his Opening Brief, defendant Helms repeatedly explained that his Motion was

limited to the policy "as written."  For example, the Conclusion to his Opening Brief (D.I.

61 at 39) very clearly states -

        The <u>written</u> Policy is constitutional <u>as written</u>.
        Summary judgment should be granted for defendant Helms.
        <u>Any as applied challenge awaits another day</u>. (emphasis
        added).

      Thus, defendant Helms is not arguing against himself.  (D.I. 64 at 6).  Instead,

plaintiffs' own Complaint and brief make clear that they have offered a facial challenge to

the Board's written prayer policy.[4]  They claim that the Board's voluntary prayer policy is

unconstitutional as written.  As a result, in his Opening Brief, defendant Helms

approached, addressed and knocked down every possible legal argument plaintiffs could

hope to make in that regard.  And as Helms' Brief clearly demonstrates, the Board's

---

   [4]  Perhaps plaintiffs have grown timid about their facial challenge in light of the heavy
burden they must carry.  <u>See, e.g.</u> U.S. v. Salerno, 481 U.S. 739, 745 (1987) ("A facial challenge
to a legislative Act is, of course, the most difficult challenge to mount successfully, since the
challenger must establish that no set of circumstances exists under which the Act would be
valid").

prayer policy, as written, meets and exceeds Constitutional standards.

**B. Plaintiffs Have In Effect Conceded That There Is No Genuine Issue of Material Fact Standing in the Way of Summary Judgment.** It is clear that under Fed.R.Civ.P. 56(c), only genuine issues of material fact will stand in the way of summary judgment. Boyle v. County of Allegheny, Pa., 139 F.3d 386, 393 (3d Cir. 1998). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). The moving party bears the burden of proving that there is no genuine issue of material fact. Ideal Dairy Farms, Inc. v. John Labatt, Ltd., 90 F.3d 737, 743 (3d Cir. 1996). Once met, the burden shifts to the nonmoving party to "come forward with specific facts showing that there is a genuine issue for trial." Id.

Because defendant Helms has moved for summary judgment on the sole issue of whether the written prayer policy, as written, is constitutional, only facts going to the Board's written prayer policy are relevant and material. Thus, the repeated plea of plaintiffs that they need discovery on the policy "as applied" are not material to the issue presently before this Court. Defendant Helms did not move on the policy "as applied," only "as written."

**1. Plaintiffs' Counsel's Rule 56(f) Affidavit Is Irrelevant to This Analysis.** A Rule 56(f) affidavit must identify "with specificity what particular information is sought; how, if uncovered, it would preclude summary judgment; and why it has not previously been obtained." Bradley v. U.S., 299 F.3d 197, 206 (3d Cir. 2002); accord Miller v. Daimler Chrysler Corp., 219 F.R.D. 331, 332 (D.Del. 2003).

Here, plaintiffs' counsel's affidavit fails to meet Rule 56(f)'s requirements

because the information sought would not preclude summary judgment.  All of the

discovery sought goes to an "as applied" challenge.  Specifically, plaintiffs claim they

need discovery in two areas.  First, to determine if in practice the "only recipients of

School Board prayer are the adult members of the School Board" (D.I. 65 - Allingham

Aff. ¶ 6), and second, to determine if in practice "the School Board members exploit the

prayer opportunity to proselytize."  (<u>Id.</u> at ¶ 8).

But each of these two areas identified by plaintiffs go to "as applied" challenges.

The Board's prayer policy, "as written" specifically deals with and explicitly addresses

each of these two areas.  On the recipients of the prayer issue, the Board policy clearly

states that

> Such prayer is voluntary and it is just among the adult members of the Board.  No
> school employee, student in attendance or member of the community in
> attendance shall be required to participate in any such prayer or moment of
> silence.

(Policy at Item 4; Helms Aff. ¶ 8).  On the proselytization issue, the Board policy also

explicitly states that the prayer or moment of silence

> opportunity shall not [be] used or exploited to proselytize, advance or convert
> anyone or to derogate or otherwise disparage any particular faith or belief.

(Policy at Item 3; Helms Aff. ¶ 8).  The policy "as written" specifically addresses each of

the areas defendants seek to take "as applied" discovery on.  Because defendant Helms

has not moved for summary judgment on any "as applied" theory, such contentions

cannot preclude summary judgment on the policy "as written."

It is well established that a Rule 56(f) affidavit should be disregarded "if the

discovery sought appears irrelevant to the issues to be adjudicated."  10B Wright, Miller

& Kane, Federal Practice and Procedure § 2741, 438 (1998) (collecting cases).

Defendant Helms simply did not move for summary judgment on a fact intensive "as applied" issue.  Instead, he moved for summary judgment on the policy "as written" or facially.  Plaintiffs have not averred that they need discovery because they believe that the Board's voluntary prayer policy actually says something other than what is set forth in defendant Helms' affidavit.  The only material issues are the words of the policy itself.  And plaintiffs do not contend that the words of the policy are inaccurate.  Accordingly, their wish for discovery on other irrelevant matters is without merit, and their "failure to comply with Rule 56(f) is fatal to a claim of insufficient discovery."  Bradley, 299 F.3d at 207.

### 2. Rule 56(g) Attorneys Fees Should Be Assessed Against Plaintiffs.

Rule 56(g) provides that -

> Should it appear to the satisfaction of the court at any time that any of the affidavits presented pursuant to this rule are presented in bad faith or solely for the purpose of delay, the court shall forthwith order the party employing them to pay to the other party the amount of the reasonable expenses which the filing of the affidavits caused the other party to incur, including reasonable attorneys fees, and any offending party or attorney may be adjudged guilty of contempt. (emphasis added)

### a. Plaintiffs Have Acted in Bad Faith and/or Solely for the

**Purpose of Delay.**  Plaintiffs' Rule 56(f) affidavit, and their Brief which builds upon it, are nothing but a transparent attempt to gain an improper tactical advantage by gaining additional time to respond to defendant Helms' exhaustive and comprehensive summary judgment brief.

Despite working for perhaps the largest law firm in the nation, plaintiffs' numerous counsel are apparently unwilling (or perhaps simply unable) to respond on the merits to Helms' well reasoned legal argument that the Board's voluntary prayer policy,

9

as written, meets and exceeds constitutional standards.  When they brought this lawsuit, plaintiffs should have been prepared to make their arguments.  The time to research their claims was before the suit was filed.  See Fed.R.Civ.P. 11(b)(2).  They do not get to do their research later, outside the bounds of this District's briefing schedule.  Plaintiffs should not have brought a lawsuit challenging a written policy if they were unwilling to defend themselves when called on the carpet for their allegations of unconstitutionality.

Plaintiffs now seek extensive additional time to work on and conjure up a brief, well beyond the ten days permitted by the local rules of this court.  See D.Del. LR 7.1.2(a)(2).  Presently no doubt they are frantically shopping Helms' brief to every ACLU cooperating law professor around the country who wishes to eradicate the names of Allah, Buddha, Yahweh and Jesus Christ from the public sphere.  Plaintiffs are seeking delay to gain an improper tactical advantage.  It is this very type of "disingenuous[]" behavior that the Rule was designed to guard and protect against.  Klein v. Stahl GMBH & Co. Maschineff Abrik, 185 F.3d 98, 110 (3d Cir. 1999).

If plaintiffs' affidavit was being presented for any reason other than delay or bad faith, upon the filing of Helms' summary judgment motion, plaintiffs would immediately have contacted the Court or made a Rule 56(f) motion requesting a stay of briefing and the need for discovery.  But instead, plaintiffs waited until the eleventh hour - after two weeks passed - before filing their affidavit and brief.  This telling delay reveals their true intentions.  No doubt they used the two weeks to research the law and came up lacking.  Now, they disingenuously seek to gain an improper tactical advantage and gain substantially more time than they are permitted under the Local Rules to work on a merits brief and seek help from their allies nationwide when they should have been prepared for

10

briefing when they filed their case.

**b. Defendant Helms Is Greatly Prejudiced by Plaintiffs'**
**Actions.**  Thus, it is clear that defendant Helms will suffer great prejudice as a result of

plaintiffs' actions.  The local briefing rules are designed to facilitate the just, orderly and

efficient resolution of issues submitted to the district court.  All parties are on the same

footing.  Everyone knows the rules and the playing field going in.

But plaintiffs have broken the rules as part of a bad faith attempt at delay to gain

an improper tactical advantage that they would not have had otherwise.  Now, in addition

to the two weeks that plaintiffs had under the rules to research and write their answering

brief, plaintiffs will have literally months to work on an argument with other like minded

cause attorneys from throughout the country.  The prejudice defendant Helms suffers is

self-evident.

Such abuse of the judicial process and of Rule 56 can not be tolerated.

Accordingly, because of this clear bad faith effort at delay, reasonable attorneys fees

should be awarded against plaintiffs in addition to any other actions the Court finds to be

appropriate.[5]

**c. Plaintiffs' Affidavit Also Evidences Sandbagging and Other**
**Indicators of Bad Faith.**

**(1) Plaintiffs' Lack of Diligence.**  Rule 56(f) "will not be

---

[5]  "Pursuant to Local Rule 83.6(d)(2), the District of Delaware has adopted the Model Rules of Professional Conduct."  Elonex I.P. Holdings, Ltd. v. Apple Computer, Inc., 145 F.Supp.2d 579, 581 (D.Del. 2001). Cf. MRPC 3.2 ("A lawyer shall not ... assert an issue ... unless there is a good faith basis in law and fact for doing so that is not frivolous..."); MRPC 3.2, comment 1 (noting that an advocate has "a duty not to abuse legal procedures"); see also Fed.R.Civ.P. 11(b)(1) (requiring that court filings not be presented "for any improper purpose").

liberally applied to aid parties who have been lazy or dilatory." 10B Wright, Miller &
Kane, Federal Practice and Procedure § 2740, 405 (1998); accord id. § 2741, 429 ("the
rule will not be applied to aid a party who has been lazy and dilatory"). It is clear that
"court[s] need not employ the rule to spare litigants from their own lack of diligence."
Herbert v. Wicklund, 744 F.2d 218, 222 (1st Cir. 1984). "The most obvious indication of
lack of diligence is a failure on the part of the non-movant to present affidavits" or other
evidence. Id.

At the time Rule 56(f) issues come to the forefront, a party must offer what
evidence it has on the genuine material issues as well as explain what genuine material
evidence it does not have. But the affidavit in question is woefully deficient in this regard
and even reveals an effort to sandbag the Court on appellate review. On the holding back
of evidence, in paragraph 7 of the affidavit plaintiffs indicate the following –

> Although Plaintiffs could submit minutes and agendas of School Board meetings
> that indicate student attendance at those meetings, Plaintiffs must recognize the
> possibility that this Court will find that evidence alone insufficient to create a
> genuine issue of material fact regarding whether children are recipients of School
> Board prayer.

This is plainly improper. Why did plaintiffs refuse to offer this evidence? Why have
plaintiffs refused to submit sworn affidavits attesting to what they personally observed at
the four school board meetings which they alleged they attended? (D.I. 1 at ¶¶ 54, 74, 79,
90). Why have plaintiffs refused to swear to what they earlier alleged they saw? The
time has come and gone when plaintiffs can just rely on the bare assertions in their
unverified complaint. Under Rule 56, if they contend there is a fact record which can be
disputed they cannot hold back either documentary or testimonial evidence on issues they
claim are material to the facial challenge. But they have consciously chosen not to do so

and so they fail to comply with their duties under the Rules. "An acknowledged failure to prepare within the requested time, a refusal to go forward at the hearing with facts to meet the motion, cannot serve as an excuse for a complete failure to comply with Rule 56." Baum v. Gillman, 648 F.2d 1292, 1295 (10th Cir. 1981).

Indeed, "an affidavit ... of a witness who is known and available must be taken as soon as that is feasible." 10B Wright, Miller & Kane, Federal Practice and Procedure § 2741, 437 (1998). The numerous plaintiffs are certainly known witnesses who are available to swear to evidence in their own case. Indeed, it has long been the rule in the Third Circuit that "[a] party who desires to resist a motion for summary judgment cannot hold back evidence until trial, but must bring it before the Court where the motion is heard so that it may then be judicially evaluated." Proctor v. Sagamore Big Game Club, 265 F.2d 196, 201 (3d Cir. 1959); accord Robin Const. Co. v. U.S., 345 F.2d 610, 613 (3d Cir. 1965); Gostin v. Nelson, 41 F.R.D. 48, 50 (D.Del. 1965); see Chambers and Co. v. Equitable Life Assurance Society of the U.S., 224 F.2d 338, 346 (5th Cir. 1955) ("Disclosure under summary judgment must be full and complete"). This is the general rule. "[T]he assertion that stronger evidence could have been brought forward but has been held back [will not] deter a court from ordering summary judgment." 10B Wright, Miller & Kane, Federal Practice and Procedure § 2741, 445 (1998).

But plaintiffs do not offer any affidavit indicating what evidence they do have on the question. They simply declare the Court would find it insufficient. But that is a legal question for the Court to decide and not for the plaintiffs to hold back in an improper attempt to imply prejudgment of the issues and bias by the Court. As the Third Circuit has stated,

> It is not enough to rest upon the uncertainty which broods over all human affairs or to pose philosophic doubts regarding the conclusiveness of evidentiary facts. In the world of speculation such doubts have an honored place, but in the daily affairs of mankind and the intensely practical business of litigation they are put aside as conjectural.

Robin Const. Co., 345 F.2d at 614.  In the world of litigation, one must present evidence.

And plaintiffs refuse to do so.

> **(2) There is No Record for the Facts Alleged.**  The litany

of alleged material facts in dispute on which discovery is allegedly needed also is

misleading.  Defendant has already explained that these "as applied" facts are not material

to a facial, "as written" challenge.  But if one looks more carefully at these "as applied"

issues, they also reveal either further holding back or misstatements of the record.

The histrionic claim that the opening prayer at Board meetings is, in practice,

creating a "revival meeting atmosphere" (D.I. 64 at 5), while good theater, does not

advance resolution of the legal issues underlying the Motion for summary judgment.

Plaintiffs have failed to provide any proper evidentiary support for this or any other of

their allegations - despite a clear ability to do so.  As one court has observed

> The tools and devices of discovery are more than options and opportunities.  Rule 56 expressly exacts them by negative compulsion on pain of judicial denouement - saying in effect, 'Meet these affidavit facts or judicially die.'  Diligence in opposing a motion for summary judgment is required, for such a motion with supporting logistics and gear does not lose its thrust by an opponent's complacence.

Southern Rambler Sales, Inc. v. American Motors Corp., 375 F.2d 932, 937 (5th Cir.

1967) (internal footnote omitted).  But according to their own Complaint, plaintiffs

themselves claimed to be highly offended eye witnesses to much of this alleged behavior.

However, when the rubber hits the road, where are the affidavits from the numerous

14

plaintiff eye witnesses?  (D.I. 1 at ¶¶ 54, 74, 79, 90).  Where is the affidavit from

plaintiff's own eye witness sister?  (Id. at ¶ 98).  Where is the affidavit from the local

president of the ACLU who, it was alleged, also was an eye witness to this alleged

behavior?  (Id. at ¶ 97). The silence here is deafening.

    Plaintiffs also claim they need the opportunity to prove that the Board is, in

practice, exploiting the opportunity to pray and is proselytizing and advancing a particular

religion.  (D.I. 64 at 12).  But even if plaintiffs contend that the new written policy is

being violated "as applied," where is their affidavit saying so based on personal

knowledge gained from Board meetings they attended since the policy came into effect?

Again, even under plaintiffs misplaced focus on "as applied" evidence, their contentions

fail because they still refuse to offer affidavits based on their own eyewitness knowledge.

If there was proselytizing going on, plaintiffs would have been eye witnesses to it.  This

deafening silence speaks volumes.

    Relatedly, and again in practice, they contend that the Board chooses to open its

non-public meetings without prayer, which is then somehow claimed to be proof of

proselytizing.  (D.I. 64 at 12).  In the same way, this assertion also is only material to an

"as applied" contention and has no bearing on defendant Helms' "as written" Motion.

Plaintiffs also still refuse to offer the alleged evidence in their possession.

    More importantly, under school law in Delaware there are no non-public meetings

of school boards.  Non-public meetings are illegal.  All meetings are public and subject to

sunshine laws.  See 29 Del.C. § 10001 et seq.; Levy v. Bd. of Educ. of Cape Henlopen

Sch. Dist., 1990 WL 154147 (Del.Ch. 1990) (enjoining a local school board from

discussing public business in private).  In the Indian River School District, these public

meetings open with a prayer.  Later in the meeting there may be an executive session, to

discuss pending litigation strategy, privacy protected employee matters, etc., and the

public is statutorily excluded from this portion of the meeting.  29 Del.C. § 10004.  No

prayer is offered at this time simply because this is a part of the initial board meeting,

which already began with a prayer, and which has yet not ended. This red herring

contention is probative of no issue material to the "as written" Motion.

     **3.  Plaintiffs' Un-Notarized Affidavit is Facially Deficient.**  Lastly,

plaintiffs also have failed to submit a properly notarized affidavit.  And because

plaintiffs' affidavit it not notarized, it is simply not a sworn statement. (See D.I. 65).  This

deficiency is fatal to their application.

     The importance of a sworn affidavit cannot be understated.  Indeed, as the Third

Circuit has discussed in the Rule 56(f) context, "[w]e cannot diminish the value of an

affidavit by permitting an attorney's unsworn statement to replace it."  Radich v. Goode,

886 F.2d 1391, 1395-96 (3d Cir. 1989).  Such an unsworn statement "is lacking both in

substance, and in any indicia of evidentiary reliability contemplated by the requirements

of Rule 56."  Id. at 1396.

     Importantly, the Third Circuit has repeatedly rejected "constructive compliance"

arguments under Rule 56(f).  See Bradley v. U.S., 299 F.3d 197, 207 (3d Cir. 2002) ("we

have generally rejected constructive compliance arguments"); Radich, 886 F.2d at 1394

(such an argument "will not withstand close scrutiny"); Pastore v. Bell Telephone Co. of

Pa., 84 F.3d 508, 511 (3d Cir. 1994) ("In the past we have rejected such arguments

because Rule 56(f) clearly requires that an affidavit be filed") (internal punctuation

omitted).

Notwithstanding the Third Circuit's repeated rejection of constructive compliance arguments, plaintiffs have nonetheless failed to even constructively comply with the rule. First, as discussed at length above, defendant Helms has moved on the policy "as written," but plaintiffs have requested "as applied" discovery in their unsworn affidavit.

Second, plaintiffs' unsworn affidavit also does not comply with 28 U.S.C. § 1746's requirements for unsworn declarations under penalty of perjury. No where in the unsworn affidavit does plaintiffs' counsel swear that "under penalty of perjury that the foregoing is true and correct." Id. No where in the unsworn affidavit is any such sworn statement found. This omission also is fatal to plaintiffs' claims.

<u>**CONCLUSION**</u>

The written Policy is constitutional as written. Summary judgment should be granted for defendant Helms. Any as applied challenge awaits another day. D.I. 63 also should be denied.

Respectfully Submitted,

**THE NEUBERGER FIRM, P.A.**

/s/ Thomas S. Neuberger
**THOMAS S. NEUBERGER, ESQ. (#243)**
**STEPHEN J. NEUBERGER, ESQ. (#4440)**
Two East Seventh Street, Suite 302
Wilmington, DE 19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com

Attorneys for Defendant Reginald L. Helms

**THE RUTHERFORD INSTITUTE**
**JOHN W. WHITEHEAD, ESQ.**
**DOUGLAS MCKUSICK, ESQ.**
P.O. Box 7482
Charlottesville, VA 22906
(434) 978-3888
JohnW@Rutherford.org
DouglasM@Rutherford.org

Dated: August 26, 2005                Of Counsel

# Unreported Opinions

Westlaw.

2005 WL 1963036                                                                                    Page 1
--- F.3d ----, 2005 WL 1963036 (3rd Cir.(N.J.))
**(Cite as: 2005 WL 1963036 (3rd Cir.(N.J.)))**

**Briefs and Other Related Documents**

Only the Westlaw citation is currently available.

United States Court of Appeals,
Third Circuit.
Thomas L. DOBREK, Appellant
v.
Donald F. PHELAN, Individually for Damages and in
His Official Capacity as
Clerk of the Superior Court of the State of New
Jersey for Prospective Relief.
**No. 04-3391.**

Argued March 31, 2005.
Aug. 17, 2005.

**Background:** Commercial bail bondsman brought action against the clerk of the Superior Court for the State of New Jersey, contending that clerk wrongfully removed his name from the bail bondsman registry following the discharge of his bail bond debts in a chapter 7 bankruptcy proceeding, in violation of the discharge injunction and the prohibition against discriminatory treatment of debtors pursuant to the bankruptcy laws. The United States District Court for the District of New Jersey, Jerome B. Simandle, J., dismissed action. Bail bondsman appealed.

**Holding:** The Court of Appeals, Fischer, Circuit Judge, in a matter of first impression, held that judgments against commercial bail bondsman, which arose from bond debts were "forfeitures," excepted from discharge in chapter 7 proceeding.
Affirmed.

**[1] Bail** ☜60

49k60 Most Cited Cases
New Jersey courts permit individuals and companies to post bail bonds for criminal defendants in return for a fee. R. 1:13-3(d).

**[2] Bail** ☜60
49k60 Most Cited Cases
Under New Jersey law, once the bondsman posts bail for a criminal defendant, it becomes the bondsman's responsibility to produce the defendant for required court proceedings. R. 1:13-3(e)(2).

**[3] Bail** ☜60
49k60 Most Cited Cases
Under New Jersey law, if a criminal defendant fails to appear for his court date following the posting of bail by a bondsman, then the bail posted is forfeited, and the bondsman becomes responsible for the amount of bail or for ensuring that the fugitive defendant is captured and brought to court. R. 1:13- 3(e)(2).

**[4] Federal Courts** ☜763.1
170Bk763.1 Most Cited Cases
The Court of Appeals should affirm the District Court's dismissal for failure to state a claim only if it appears that the plaintiff could prove no set of facts that would entitle him to relief. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[5] Statutes** ☜188
361k188 Most Cited Cases
The starting point of any statutory analysis is the language of the statute.

**[6] Statutes** ☜190
361k190 Most Cited Cases
When interpreting statutes or regulations, the first step is to determine whether the language at issue has a plain and unambiguous meaning.

**[7] Statutes** ☜190
361k190 Most Cited Cases
In interpreting a statute, the inquiry ends if the statutory language is unambiguous and the statutory scheme is coherent and consistent.

**[8] Bankruptcy** ☜3377

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

51k3377 Most Cited Cases

Judgments against commercial bail bondsman in New Jersey, which arose from failure of criminal defendants to appear in court and bondsman's nonperformance of his duty to produce those defendants, were "forfeitures," excepted from discharge in a Chapter 7 proceeding, under the discharge exception for a "fine, penalty, or forfeiture"; plain meaning of "forfeiture" was the deprivation of a right in consequence of the nonperformance of some obligation or condition, determination fit within context of the other monetary sanctions excepted from discharge, and New Jersey law also characterized the debts as forfeitures. Bankr.Code, 11 U.S.C.A. § 523(a)(7); Rule 3:26-6 of the New Jersey Rules of Court.

[9] Statutes ☞208

361k208 Most Cited Cases

In interpreting a statute, when the words and provisions are ambiguous, that is, when they are reasonably susceptible of different interpretations, a court looks at the surrounding words and provisions and also to the words in context.

[10] Bankruptcy ☞3342

51k3342 Most Cited Cases

Although the label that state law affixes to a certain type of debt cannot of itself be determinative of the debt's character for purposes of the federal bankruptcy dischargeability provisions, such state-law designations are at least helpful to courts in determining the generic nature of such debts. Bankr.Code, 11 U.S.C.A. § 523(a)(7).

On Appeal from the United States District Court for the District of New Jersey, (D.C. No. 04-cv-00313), District Judge: Honorable Jerome B. Simandle.

Joseph M. Pinto (Argued), Joseph F. Polino, P.C., Moorestown, NJ, for Appellant.

Tracy E. Richardson (Argued), Office of Attorney General of New Jersey, Division of Law, Trenton, NJ, for Appellee.

Before ALITO, SMITH, and FISHER, Circuit Judges.

OPINION OF THE COURT

FISHER, Circuit Judge.

*1 This case presents the issue of whether the debts of a commercial bail bondsman are excepted from discharge, i.e., non-dischargeable, in a Chapter 7 bankruptcy proceeding under 11 U.S.C. § 523(a)(7). Though this precise issue is one of first impression in the Circuit, in In re Gi Nam, 273 F.3d 281 (3d Cir.2001), we considered the related issue of whether the bail bond debts of an individual family member acting as a surety are excepted from discharge under § 523(a)(7). Relying on the plain meaning of the statute, the purpose and context of Pennsylvania's bail forfeiture laws, and public policy considerations, we determined in Gi Nam that such bail bond debts are non-dischargeable. Because we are persuaded by the reasoning of Gi Nam and the soundness of its expanded application to commercial bondsmen in New Jersey, we will affirm the judgment of the District Court.

I. FACTS

[1][2][3] New Jersey courts permit individuals and companies to post bail bonds for criminal defendants in return for a fee. See Capital Bonding Corp. v. N.J. Supreme Court, 127 F.Supp.2d 582, 584 (D.N.J.2001) (explaining this system). Once the bondsman posts bail for an accused, it becomes the bondsman's responsibility to produce the defendant for required court proceedings. See id. If the defendant fails to appear, then the bail posted is "forfeited," and the bondsman becomes responsible for the amount of bail or for ensuring that the fugitive defendant is captured and brought to court. Id. The bondsman's obligation to satisfy bail in this circumstance may be underwritten by insurance companies licensed to do business in New Jersey. Id.

Appellant Thomas Dobrek ("Dobrek") is an insurance representative licensed to write bail bonds in New Jersey. Prior to filing a Chapter 7 bankruptcy petition in the United States Bankruptcy Court for the District of New Jersey, Dobrek was, at different times, an authorized agent of various commercial surety companies. In connection with this work, Dobrek was listed on the New Jersey Bail Registry ("Bail Registry"), a list of insurance producers and limited

2005 WL 1963036                                                                                    Page 3
--- F.3d ----, 2005 WL 1963036 (3rd Cir.(N.J.))
**(Cite as: 2005 WL 1963036 (3rd Cir.(N.J.)))**

insurance representatives licensed to write bail bonds in New Jersey. *See Capital Bonding Corp.,* 127 F.Supp.2d at 584. Individuals who are not listed on the Bail Registry cannot engage in the business of writing bonds in that state. [FN1]

As an agent who executed bail bonds on behalf of surety companies, Dobrek, like all other such agents in New Jersey, was responsible for the contractual default of these companies in the event that a defendant failed to appear in court, at least to the extent of being precluded from writing additional bonds until the bail forfeiture judgments were satisfied. *In re Preclusion of Brice,* 366 N.J.Super. 519, 841 A.2d 927, 929 (N.J.Super.Ct.App.Div.2004). In other words, in instances where defendants failed to appear, judgment was entered against both the commercial sureties and Dobrek, as the signer of the bail bond. *See id.* As a result, Dobrek was jointly bound to pay to the court any amount of money specified in a court order setting bail where a defendant failed to appear at any required court proceedings. *See id.*

**\*2** Dobrek filed his Chapter 7 bankruptcy petition on October 29, 2002. On January 25, 2003, he received a discharge from the Bankruptcy Court, relieving him of all debts which arose before that date pursuant to 11 U.S.C. § 727. [FN2]

New Jersey Court Rule 1:13-3(e)(2) requires the removal of any bail agents, agencies, guarantors, and other persons or entities authorized to administer or manage an insurer's bail bond business from the Bail Registry for failure to satisfy a judgment. N.J. R. 1:13-3(e)(2). [FN3] Consequently, on January 29, 2003, Dobrek's name was removed from the Bail Registry due to accumulated bail forfeitures resulting from bails in which Dobrek had been the producer for corporate sureties. As a result, Dobrek could not continue to write bail bonds in New Jersey.

On January 27, 2004, Dobrek commenced this action in the United States District Court for the District of New Jersey. The Defendant in the matter, Donald Phelan ("Phelan"), is the Clerk of the Superior Court for the State of New Jersey and is responsible for maintaining the Bail Registry. The crux of Dobrek's

Complaint is that he was wrongfully removed from the Bail Registry because his bail bond debts were discharged in bankruptcy pursuant to 11 U.S.C. § 727. Dobrek's Complaint specifically alleges that Phelan (i) willfully or otherwise violated the discharge injunction pursuant to 11 U.S.C. § 524(a) and the protections against discriminatory treatment of debtors afforded under 11 U.S.C. § 525(a) by refusing to reinstate Dobrek's name to the Bail Registry and attempting to force him to pay discharged debts; (ii) violated 42 U.S.C. § 1983 by depriving Dobrek of his rights, privileges, and immunities secured by the Constitution and Federal statutes of the United States, specifically the Supremacy Clause and the Bankruptcy Clause of the United States Constitution and 11 U.S.C. § 524(a) and 11 U.S.C. § 525(a); and (iii) intentionally or negligently inflicted emotional distress upon Dobrek.

On May 14, 2004, Phelan filed a Motion to Dismiss. Dobrek responded to that motion and filed a Cross Motion for Partial Summary Judgment on June 10, 2004. On August 4, 2004, the District Court found that Dobrek's bail bond debts were not discharged pursuant to § 523(a)(7), and accordingly, granted Phelan's Motion to Dismiss and denied Dobrek's Cross Motion for Partial Summary Judgment. Dobrek filed a timely notice of appeal on August 16, 2004. Before this Court, Dobrek alleges that the District Court erred in its determination that these debts were excepted from discharge in bankruptcy pursuant to § 523(a)(7). More generally, he argues that the indebtedness of an individual bail bondsman on a defaulted bail bond written as an agent for a corporate surety is dischargeable under Chapter 7 of the Bankruptcy Code.

## II. STANDARD OF REVIEW

[4] This Court exercises plenary review over the District Court's grant of a motion to dismiss for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6). *Alston v. Parker,* 363 F.3d 229, 232-33 (3d Cir.2004) (citing *Nami v. Fauver,* 82 F.3d 63, 65 (3d Cir.1996)). The Court must take all factual allegations and reasonable inferences as true and view them in the light most favorable to the Plaintiff. *Mariana v. Fisher,* 338 F.3d 189, 195 (3d Cir.2003), *cert. denied,* 540 U.S. 1179, 124 S.Ct. 1413, 158 L.Ed.2d 80 (2004). Thus, the Court should affirm the District Court's dismissal

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

only if it appears that the Plaintiff could prove no set of facts that would entitle him to relief. *Alston, 363 F.3d at 232-33* (citing *Nami, 82 F.3d at 65).* Furthermore, this appeal presents questions of law which this Court reviews *de novo. United States v. Hendricks, 395 F.3d 173, 176 (3d Cir.2005).*

### III. DISCUSSION

**\*3** **[5]** The starting point of any statutory analysis is the language of the statute. *Pa. Dep't of Pub. Welfare v. Davenport, 495 U.S. 552, 557-58, 110 S.Ct. 2126, 109 L.Ed.2d 588 (1990).* Under *§ 523(a)(7),* a discharge in bankruptcy does not discharge a debtor from debt "to the extent such debt is for a fine, penalty, or forfeiture payable to and for the benefit of a governmental unit, and is not compensation for actual pecuniary loss, other than a tax penalty...." *11 U.S.C. § 523(a)(7) (2004).* Thus, in order for debts to be non-dischargeable in bankruptcy under *§ 523(a)(7),* they must satisfy the three requirements of that section. Because the parties do not dispute that the bail bond debts are "payable to and for the benefit of a governmental unit" and not "compensation for actual pecuniary loss, other than a tax penalty," we address ourselves solely to the question of whether the debt at issue is a "fine, penalty, or forfeiture" within the meaning of *§ 523(a)(7).*

**[6][7][8]** When interpreting statutes or regulations, the first step is to determine whether the language at issue has a plain and unambiguous meaning. *Barnhart v. Sigmon Coal Co., 534 U.S. 438, 450, 122 S.Ct. 941, 151 L.Ed.2d 908 (2002)* (citing *Robinson v. Shell Oil Co., 519 U.S. 337, 340, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997)).* The inquiry ends if the statutory language is unambiguous and the statutory scheme is coherent and consistent. *Id.* (citing *Robinson, 519 U.S. at 340).* The plain meaning of "forfeiture" as used in *§ 523(a)(7)* is unambiguous. As we noted in *Gi Nam,* a " 'forfeiture' is defined in *Black's Law Dictionary* as 'a divestiture of specific property without compensation; ... [a] deprivation or destruction of a right in consequence of the nonperformance of some obligation or condition." ' *273 F.3d at 286* (citing BLACK'S LAW DICTIONARY 650 (6th ed.1990)). Consistent with our analysis in *Gi Nam,* Dobrek's judgments arose from the various defendants' nonperformance of their obligations to appear in court and Dobrek's and the commercial

sureties' breach of duty to produce those defendants. *Cf. id.* at 286. As such, the plain meaning of "forfeiture" appears to encompass the judgments against Dobrek.

**[9]** Nonetheless, in the event the words and provisions are "ambiguous--that is, whether they are reasonably susceptible of different interpretations," *Nat'l R.R. Passenger Corp. v. Atchison Topeka & Santa Fe Ry. Co., 470 U.S. 451, 473 n. 27, 105 S.Ct. 1441, 84 L.Ed.2d 432 (1985)--*we look next at the surrounding words and provisions and also to the words in context. *Whitman v. Am. Trucking Ass'n., 531 U.S. 457, 466, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001)* ("Words that can have more than one meaning are given content, however, by their surroundings."). Considering "forfeiture" in the context of *§ 523(a)(7),* that section excepts from discharge any debts to the extent they are for a "fine, penalty, or forfeiture." A "fine" or "penalty" are both means of inflicting monetary sanctions, traditionally by the government, against a debtor for some particular action or inaction. Thus, defining "forfeiture" to encompass Dobrek's bail bond debts would be consistent and conform with these terms. *Cf. Gi Nam, 273 F.3d at 286* (noting that the judgments "against [the family surety] arose from [the defendant's] nonperformance of his obligation to appear in court and [the family surety's] breach of his duty to produce [the defendant] for trial").

**\*4** Construing "forfeiture" in this way is also consistent with our prior determination in *Gi Nam.* In *Gi Nam,* we faced a similar question involving the bail bond debts of a non-appearing defendant's father, who acted as a bail bond surety for his son. *Id.* at 283. In that case, the defendant was charged with several crimes, including murder, robbery, and burglary. *Id.* Bail was set at $1 million, conditioned on a ten percent cash payment by the surety to assume legal responsibility for paying the full amount of bail to the Commonwealth of Pennsylvania. *Id.* The defendant's father agreed to serve as surety for the bail, and accordingly, when the defendant failed to appear in court for a pre-trial status listing in his criminal case, the court ordered the bail bond forfeited and entered judgment against the defendant's father. *Id.* at 283-84. Subsequently, the defendant's father petitioned for Chapter 7 bankruptcy and listed the City of Philadelphia as the creditor on a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1963036                                                                                    Page 5
--- F.3d ----, 2005 WL 1963036 (3rd Cir.(N.J.))
**(Cite as: 2005 WL 1963036 (3rd Cir.(N.J.)))**

claim arising from the bail bond security. *Id.* at 284. The City filed a Complaint in Adversary alleging that although the defendant's father listed the bail bond judgment as an " 'unsecured non-priority claim," ' the debt was not in fact dischargeable pursuant to § 523(a)(7). *Id.* at 284-85. The bankruptcy judge disagreed, found the debt dischargeable under § 523(a)(7), and granted the bankruptcy petitioner's motion to dismiss. *Id.* at 285. The decision was later affirmed by the District Court. *Id.* at 285. On appeal, we reversed, holding that § 523(a)(7) excepts from discharge in a Chapter 7 bankruptcy a bail bond forfeiture judgment entered against a family surety for failure to produce the defendant for trial. *Id.* at 294.

In *Gi Nam,* we first considered the plain meaning of § 523(a)(7) and in particular, the term "forfeiture." *Id.* at 286-88. As noted, *supra,* we looked to the dictionary definitions of "forfeiture" and concluded that a plain text reading of § 523(a)(7) encompassed the judgment against the defendant's father, which arose from the defendant's nonperformance of his obligation to appear in court and the father's breach of his duty to produce the defendant for trial. *Id.* Second, we considered the state law context of bail bond debts and determined that these debts were characterized as forfeitures under Pennsylvania law. *Id.* at 288-89. We also reviewed the legislative history of § 523(a)(7), which we found strongly suggests that Congress intended the sort of forfeiture entered against the defendant's father to come within the exception from dischargeability set forth in that section. *Id.* at 289.

Finally, we discussed the public policy considerations at issue with respect to discharging these debts. *Id.* at 292-94. Initially, we noted our concern with "socioeconomic fairness" *vis-a-vis* the average accused felon who is unlikely to have an economically advantaged family, versus an accused felon whose family can afford to post bail resulting in the accused's release. *Id.* at 293. We reasoned that this disparity in treatment, though inadvertent, could open the door to accusations of differential treatment between wealthy and poor accused criminals. *Id.* We also considered the possibility that finding bail bond forfeitures dischargeable here would encourage the use of federal bankruptcy laws to evade the financial consequences of noncompliance with a bail bond agreement. *Id.* Additionally, we discussed the implications of discharging these debts under federal bankruptcy laws with respect to principles of comity and federalism. *Id.* In this regard, we noted that federal bankruptcy courts should not invalidate the results of state criminal proceedings by erasing these debts through discharge in bankruptcy. *Id.* Finally, we considered the "perverse incentives" created by allowing family surety obligations to be dischargeable in bankruptcy, namely that a defendant's incentive to appear for trial would be diminished because he knows that his family would evade financial responsibility, and that a family surety would not be deterred from assisting the defendant in his flight. *Id.* at 293-94.

**\*5** Nonetheless, *in dicta* in *Gi Nam,* we addressed and rejected the applicability of some of these policy considerations to commercial bondsmen (although clearly stating we were not addressing the question of professional sureties). 273 F.3d at 294 n. 9. Indeed, there we suggested that the bail bond debts of a commercial bondsman may be dischargeable in bankruptcy. *Id.* "But in any event, this Court is bound by holdings, not language." *Alexander v. Sandoval,* 532 U.S. 275, 282, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001). As such, in spite of our earlier disavowal of the applicability of *Gi Nam's* reasoning to commercial bondsmen, upon further reflection, we conclude that many of the policy concerns of *Gi Nam* apply with equal force to commercial bondsmen. In particular, allowing commercial bondsmen to discharge bail bond debts in bankruptcy could encourage the use of federal bankruptcy laws to evade the financial consequences of noncompliance with a bail bond agreement. Indeed, while bail forfeitures are "an anticipated cost of doing business," a bail bondsman would certainly prefer to avoid these debts. *Id.* at 294 n. 9. Should a commercial bondsman be allowed to discharge these debts in bankruptcy, bankruptcy could become an attractive option over satisfying one's financial obligations to the state. Additionally, should the bail bond debts of a commercial bondsman be dischargeable in bankruptcy, the state's criminal proceedings may effectively be invalidated, triggering comity and federalism concerns. The non-appearing or fugitive defendant would be out of the state's custody and the professional bondsman

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1963036                                                                                          Page 6
--- F.3d ----, 2005 WL 1963036 (3rd Cir.(N.J.))
**(Cite as: 2005 WL 1963036 (3rd Cir.(N.J.)))**

would no longer have any incentive to produce him in court.

[10] A review of New Jersey's statutory treatment of these bail bond judgments also suggests that these debts are considered "forfeitures" under state law. Indeed, "[a]lthough the label that state law affixes to a certain type of debt cannot of itself be determinative of the debt's character for purposes of the federal dischargeability provisions, such state-law designations are at least helpful to courts in determining the generic nature of such debts...." *Gi Nam,* 273 F.3d at 288. Rule 3:26-6 of the New Jersey Rules of Court provides, in part:

Upon breach of a condition of a recognizance, the court on its own motion shall order forfeiture of the bail, and the finance division manager shall forthwith send notice of the forfeiture, by ordinary mail, to county counsel, the defendant, and any surety or insurer, bail agent or agency whose names appear on the bail recognizance.... The notice shall direct that judgment will be entered as to any outstanding bail absent a written objection seeking to set aside the forfeiture, which must be filed within 75 days of the date of the notice. The notice shall also advise the insurer that if it fails to satisfy a judgment entered pursuant to paragraph (c), and until satisfaction is made, it shall be removed from the Bail Registry.... In addition the bail agent or agency, guarantor or other person or entity authorized by the insurer to administer or manage its bail bond business in this State who acted in such capacity with respect to the forfeited bond will be precluded, by removal from the Bail Registry, from so acting for any other insurer until the judgment has been satisfied.

**\*6** The terms "forfeiture" or "forfeited bond" are employed several times throughout this rule and refer expressly to the same type of bail bond debts in question in *Gi Nam.* Although the state law designations are not "determinative" in this analysis, they are, as the *Gi Nam* Court stated, at least helpful in deciding the generic nature of these debts. *See Gi Nam,* 273 F.3d at 288 (examining Pennsylvania law). Accordingly, the state law context of Dobrek's debts reinforces our conclusion that they are "forfeitures" within the meaning of § 523(a)(7).

We also find this approach to be consistent with *Kelly v. Robinson,* 479 U.S. 36, 107 S.Ct. 353, 93 L.Ed.2d 216 (1986), where the Supreme Court decided the somewhat analogous issue of whether restitution obligations imposed as conditions of probation in state criminal proceedings are dischargeable under § 523(a)(7). In *Kelly,* the Supreme Court held that restitution obligations are not subject to discharge under § 523(a)(7). *Id.* at 53. In so holding, the Court opined:

On its face, [§ 523(a)(7) ] creates a broad exception for all penal sanctions, whether they be denominated fines, penalties, or forfeitures. Congress included two qualifying phrases; the fines must be both 'to and for the benefit of a governmental unit,' and 'not compensation for actual pecuniary loss.' Section 523(a)(7) protects traditional criminal fines; it codifies the judicially created exception to discharge for fines.

*Id.* at 51. Upon determining that § 523(a)(7) "protects traditional criminal fines," the Court then considered whether restitution is encompassed within this category. *Id.* at 51-53. While the Court conceded that restitution resembles a judgment 'for the benefit' of the victim, as opposed to 'for the benefit' of a governmental unit' as required by § 523(a)(7)'s language, it nonetheless determined that because criminal proceedings focus on the state's interest in rehabilitation and punishment rather than the victim's desire for compensation, restitution orders imposed in such proceedings operate "for the benefit" of the state. *Id.* at 52. Thus, the Court concluded that these obligations, also a means of inflicting monetary sanctions against a debtor for some particular action or inaction, are non-dischargeable. *Id.* at 53.

We recognize that other Circuits to have considered the nature of a commercial bondsman's bail forfeiture debts have concluded that these obligations are dischargeable in bankruptcy. *See In re Hickman,* 260 F.3d 400, 405 (5th Cir.2001); *In re Collins,* 173 F.3d 924, 932 (4th Cir.1999). These Circuits interpreted § 523(a)(7) as contemplating *only* those fines or obligations imposed because of misconduct or wrongdoing by the debtor, consistent with their interpretation of the Supreme Court's *Kelly v. Robinson* decision. *See In re Hickman,* 260 F.3d at 405 (finding bail bond debts by commercial surety not encompassed by § 523(a)(7) because their

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1963036                                                                    Page 7
--- F.3d ----, 2005 WL 1963036 (3rd Cir.(N.J.))
**(Cite as: 2005 WL 1963036 (3rd Cir.(N.J.)))**

"true nature" is contractual, not penal); *In re Collins,* *173 F.3d at 932* (finding bail bond debts by commercial surety not encompassed by *§ 523(a)(7)* because debts more akin to "triggering liquidated damages" for breach of contract than triggering a penal sanction). We have not adopted this alternative reading of *Kelly,* however. Indeed, in *Gi Nam,* we expressly rejected this interpretation, noting, "We do not interpret *Kelly* to imply that the 'fine, penalty or forfeiture' prong of *§ 523(a)(7)* is restricted in scope to except from dischargeability only obligations of a penal nature." *273 F.3d at 287*. We further distinguished *Kelly* on the basis that the Supreme Court only addressed the penal nature of restitution obligations because the plain language of *§ 523(a)(7)* fails to address restitution expressly. *Id.* Accordingly, because forfeitures are expressly addressed in *§ 523(a)(7)*, the *Gi Nam* court did not need to examine their "nature," whether penal or contractual. *Id.* Relying on the plain meaning of the statute, whether bail bond debts are of a criminal nature is irrelevant to the question of whether they are discharged.

### IV. CONCLUSION

 **\*7** Because we read the text of *§ 523(a)(7)* to encompass the type of bail bond debts at issue here, and because we are persuaded by the reasoning in *Gi Nam,* we hold that *§ 523(a)(7)* excepts from discharge bail bond forfeitures entered against a commercial bail bondsman. For the foregoing reasons, we will affirm the judgment of the District Court.

 *FN1.* In New Jersey, surety bonds for purposes of bail may be accepted only from licensed insurance producers and limited insurance representatives who are registered by the insurance company for which they are authorized to write bail with the Clerk of the Superior Court. *N.J. R. 1:13-3(d)* ("No surety bond for purposes of bail shall be accepted by any court unless the insurer has first filed with the Clerk of the Superior Court a Bail Program Registration Form in the form prescribed by Appendix XXI to these rules.").

 *FN2.* *Section 727 of the Bankruptcy Code* provides in pertinent part:
Except as provided in *section 523* of this title,

a discharge under subsection (a) of this section discharges the debtor from all debts that arose before the date of the order for relief under this chapter, and any liability on a claim that is determined under section 502 of this title as if such claim had arisen before the commencement of the case, whether or not a proof of claim based on any such debt or liability is filed under section 501 of this title, and whether or not a claim based on any such debt or liability is allowed under section 502 of this title.
*11 U.S.C. § 727(b) (2004)*. Thus, a discharge pursuant to *§ 727* does not discharge debts within the scope of *§ 523(a)(7)*.

 *FN3.* *New Jersey Court Rule 1:13-3(e)(2)* provides:
If a registered insurer fails to satisfy a judgment entered pursuant to R. 3:26-6(c) or R. 7:4-5(c), the Clerk of the Superior Court shall forthwith send the insurer a notice informing it that if it fails to satisfy the judgment within fifteen days of the notice, it shall be removed from the Bail Registry until satisfaction is made. Further, the insurer's bail agents and agencies, guarantors, and other persons or entities authorized to administer or manage its bail bond business in this State will have no further authority to act for it. Their names, as acting for the insurer, will be removed from the Bail Registry. In addition, the bail agent or agency, guarantor, or other person or entity authorized by the insurer to administer or manage its bail bond business in this State who acted in such capacity with respect to the forfeited bond will be precluded, by removal from the Bail Registry, from so acting for any other insurer until the judgment has been satisfied.
*N.J. R. 1:13-3(e)(2)*.

 --- F.3d ----, 2005 WL 1963036 (3rd Cir.(N.J.))

**Briefs and Other Related Documents** **(Back to top)**

• *04-3391* (Docket)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1963036                                                                                              Page 8
--- F.3d ----, 2005 WL 1963036 (3rd Cir.(N.J.))
**(Cite as: 2005 WL 1963036 (3rd Cir.(N.J.)))**


                    (Aug. 20, 2004)

END OF DOCUMENT


© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d
Not Reported in A.2d, 1990 WL 154147
**(Cite as: Not Reported in A.2d)**

Page 1

**C**
Not Reported in A.2d, 1990 WL 154147
Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT RULES
BEFORE CITING.
Court of Chancery of Delaware, Sussex County.
Mark H. LEVY, Petitioner,
v.
BOARD OF EDUCATION OF THE CAPE
HENLOPEN SCHOOL DISTRICT and the
individual members of said Board;  N. Dean Day;
Harry M. Isaacs, Jr.;  Susan F. Shupard;  Ted H.
Palmer;  and James T. Wilson, Executive Secretary of
the Board and Cape Henlopen School District
Superintendent, Respondents.
**Civ. A. No. 1447.**

Submitted:  Sept. 28, 1990.
Decided:  Oct. 1, 1990.

Merritt Burke, III , and James R. Chorman  of Brown,
Shiels & Chasanov, Georgetown, for petitioner.
James D. Griffin   of Griffin & Hackett, P.A.,
Georgetown, for respondents.

*MEMORANDUM OPINION*

CHANDLER, Vice Chancellor.
**\*1** This case arises from a decision by the Cape
Henlopen Board of Education (the "Board") to reassign
students in the school district's junior high schools.
That decision is challenged on the ground that it was
the result of a series of Board meetings conducted in
violation of Delaware's Freedom of Information Act
(the "Act" or "the sunshine law").  29 *Del.C.* ch. 100.
Petitioner Mark Levy ("Levy"), a resident of the school
district, seeks a preliminary injunction (1) to prevent the
Board from implementing the new student assignment
plan until a final hearing on the merits and (2) to
compel the Board to comply with the State's open
meeting law.  I have concluded that Levy is not entitled
to an injunction against the reassignment plan.

However, because the record contains overwhelming
evidence that the Board has repeatedly failed to comply
with the sunshine law, a preliminary injunction will
issue requiring compliance with the Act's open meeting
mandate.

I.

For a number of years the Cape Henlopen School Board
has considered redistricting or reorganizing the school
district.  Student population increases have caused
some of the elementary and junior high schools to suffer
from overcrowding, while other school buildings in the
district are underutilized.  In early 1989 the Board
began to seriously consider different options to relieve
the overcrowding.  On January 27, 1989, the Board
held a day-long "workshop" meeting at a local
restaurant in Dewey Beach.  It did not give notice of
the meeting, and the public was not invited to attend.
During the workshop, Board members discussed
financial requirements and personnel needs associated
with a reorganization plan.  Although no minutes were
kept of the topics discussed during the workshop, we
are told, by James L. Wilson (Superintendent and
executive secretary to the Board), that these were the
subjects discussed.  Wilson Affidavit (9/10/90) ¶ 6.
No votes or other actions, again according to Wilson,
were taken at the January 27 workshop meeting.  *Id.*
Further consideration of the reorganization issue was
deferred, ostensibly to await results of the May school
board elections.

It appears that consideration of the reorganization
question was reactivated in July.  Before its regularly
scheduled July 13, 1989, meeting, the Board met in
executive session to discuss reorganization.  This
closed meeting began at 2:30 p.m. and concluded
shortly before the regular public meeting.  Minutes of
the executive session indicate that the Board discussed
various options regarding student assignment and
reorganization, as well as personnel issues.  Petitioner's
Appendix at 36-37.  No votes were taken during the
executive session.  Notice of this closed session was

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                      Page 2
Not Reported in A.2d, 1990 WL 154147
**(Cite as: Not Reported in A.2d)**

not included on the July 13 agenda. *Id.* at 38. Nor does it appear that the Board otherwise informed the public that a five-hour closed meeting had preceded the public meeting.

To consider various alternative plans addressing the reorganization problem, the Board, at its regular July 20 meeting, created a Reorganization Committee, consisting of three Board members, six public representatives, four administrators and four teachers. *Id.* at 62; 98. Evidently the concept of creating a committee, and who would be appointed to serve on it, had been discussed during the closed sessions held on July 13. *See id.* at 36-37. After the Reorganization Committee was organized, it met twice during August. A quorum or more of the seven member Board attended each of the Reorganization Committee's meetings. *Id.* at 61. These meetings, although not officially noticed, were open to the public, with discussions centering on long-term and short-term reorganization solutions. In addition, during the second Committee meeting, held on August 21, a straw poll was taken as to the alternative student assignment plans. This poll, in which all members of the Board who were present participated, indicated that Committee and Board members preferred, as a short-term solution, moving all district ninth grade students to the Lewes Junior High School and dividing all district seventh and eighth grade students between the Milton and Rehoboth Junior High Schools. *See id.* at 67-84. The Reorganization Committee later recommended the so-called short-term option to the Board. The Board then scheduled public hearings on the issue in each of the affected communities (Milton, Lewes and Rehoboth Beach). *Id.* at 86-87. These hearings concluded in mid October, with public opinion divided over the issue. *Id.* at 89-94.

**\*2** In early November, the Board's President asked the Reorganization Committee to reconsider its recommendation in light of the information gathered during the public hearings. *Id.* at 95. It did so on November 14, and reaffirmed its support for the short-term student reassignment option. Two days later, at its regularly scheduled November 16 meeting, the Board, in public session, voted unanimously to adopt the short-term plan of transporting all ninth grade

students to Lewes Junior High School, with all seventh and eighth grade students attending either Milton or Rehoboth Junior High. *Id.* at 57. This decision, against the background of events preceding it, gave rise to this lawsuit.

Two issues have emerged as the central points of this contest: (1) whether the Board's November 16 decision to adopt the short-term reassignment plan is voidable because it was based upon meetings and discussions assertedly held in violation of the Act, and (2) whether the Board's alleged continuing violations of the sunshine law warrant issuance of an injunction to compel compliance with the Act in the future. Most of the argument has focused on the first issue.

II.

The issues are framed, of course, by the requirements of the Act. It thus seems appropriate to begin by setting forth the relevant statutory duties which the Board, as a public body, must follow. Delaware's sunshine law, like similar laws found in every state in the nation, requires meetings of public bodies to be open to the public. *29 Del.C. § 10004(a)*. It also requires that all public records be open to inspection and copying by citizens. *Id. § 10003(a)*. These general requirements stem from a recognition that "public entities, as instruments of the government, should not have the power to decide what is good for the public to know." *Delaware Solid Waste Authority v. The News Journal Co., Del.Supr., 480 A.2d 628, 631 (1984)* citing C.S. Rhyne, *The Law of Local Government Operations,* § 9.1 at 135 (1980). The Act's open government policy is broadly stated in § 10001:

It is vital in a democratic society that public business be performed in an open and public manner so that our citizens shall have the opportunity to observe the performance of public officials and to monitor the decisions that are made by such officials in formulating and executing public policy; and further, it is vital that citizens have easy access to public records in order that the society remain free and democratic. Toward these ends, and to further the accountability of government to the citizens of this State, this chapter is adopted, and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                        Page 3
Not Reported in A.2d, 1990 WL 154147
**(Cite as: Not Reported in A.2d)**

shall be construed.

Although the Act declares the public's right to attend all meetings of public bodies, it also provides for executive sessions, closed to the public, for any of nine specific purposes.  These purposes are narrowly defined in the Act as follows:

(b) A public body may call for an executive session closed to the public pursuant to subsections (c) and (e) of this section, but *only* for the following purposes:

**\*3** (1) Discussion of individual citizen's qualifications to hold a job or pursue training unless the citizen requests that such a meeting be open;

(2) Preliminary discussions on site acquisitions for any publicly funded capital improvements;

(3) Activities of any law enforcement agency in its efforts to collect information leading to criminal apprehension;

(4) Strategy sessions, including those involving legal advice or opinion from an attorney at law, with respect to collective bargaining or pending or potential litigation, but only when an open meeting would have an adverse effect on the bargaining or litigation position of the public body;

(5) Discussions which would disclose the identity of the contributor of a bona fide and lawful charitable contribution to the public body whenever public anonymity has been requested of the public body with respect to said contribution by the contributor;

(6) Discussion of the content of documents, excluded from the definition of "public record" in § 10002 of this Title where such discussion may disclose the contents of such documents;

(7) The hearing of student disciplinary cases unless the student requests a public hearing;

(8) The hearing of employee disciplinary or dismissal cases unless the employee requests a public hearing;

(9) Personnel matters in which the names, competency and abilities of individual employees or students are discussed, unless the employee or student requests that such a meeting be open.

29 *Del.C.* § 10004(b)(1)-(9).

Furthermore, to convene in executive session, the public body must satisfy several requirements:  it must publicly announce the purpose of the closed session in advance thereof, approve holding such a session by majority vote taken at a prior public meeting, and limit the agenda of the closed session to public business that falls within one of the nine purposes allowed for such meetings.  All voting on public business must occur at a public meeting, with the results of the vote made public.   Minutes of any closed session, as well as minutes of any regular or emergency meetings, must be kept and made available as public records for public inspection.  *Id.* § 10004(c).  In addition, public notice of a regular meeting, as well as the intention to hold an executive session, must be given at least *seven days before the scheduled meeting*.  If available, an agenda must be published with the notice, although the agenda may be modified to add or delete items, including executive sessions, which arise at the time of the meeting.  *Id.* § 10004(e)(2).  However, an agenda must be added to the notice of a regular meeting *at least six hours in advance thereof, together with a statement of the reasons for the delay in posting the agenda*.  *Id.* § 10004(e)(5) (emphasis added).  An agenda is defined to include, but not be limited to, "a general *statement of the major issues expected to be discussed* at a public meeting, as well as a *statement of intent to hold an executive session and the specific ground or grounds therefor*" under § 10004(b).  *Id.* § 10002(f) (emphasis added).

**\*4**  Finally, the Act contains broad enforcement provisions.  It authorizes "any citizen" to challenge "any action" by a public body taken at a meeting in violation of the Act.  *Id.* § 10005(a).  A citizen may seek a declaratory judgment, writ of mandamus or equitable relief in the Court of Chancery.   FN*  A successful plaintiff may be awarded attorney's fees and costs.  *Id.* § 10005(d).  Citizens may also petition the Attorney General to determine whether a violation has

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 4
Not Reported in A.2d, 1990 WL 154147
**(Cite as: Not Reported in A.2d)**

occurred or is about to occur. *Id.* § 10005(e). These are the pertinent statutory requirements that govern the outcome of this case.

### III.

On the merits of his complaint, Levy has stated a powerful claim. The undisputed record, consisting of copies of agendas and minutes of Board meetings, demonstrates unequivocally that the Board misapprehended its responsibilities under the Act. Indeed, no serious effort is made to defend the Board's actions on the merits. Nor could it be made. Beginning with the January 27, 1989, executive session, the Board has repeatedly discussed and considered public business in meetings or "workshops" closed to the public. No notice was given, or minutes taken, of the January 27 workshop. Compounding this error, the Board discussed redistricting and reorganization issues, despite the fact that such public business clearly is not a permissible subject for discussion in an executive session.

The Board's performance did not improve at its July 13 meeting, when it convened in executive session without advance notice to the public and before its announced public workshop meeting. Board members, again contrary to the Act's requirements, discussed various reorganization and student assignment options. Then, in August, a quorum of Board members attended meetings of the Reorganization Committee, participated in discussions about public business and voted in a straw poll on proposed reorganization options. Although the Board halfheartedly contends that the Reorganization Committee meetings were not public meetings of a public body, this argument ignores *News-Journal Co. v. McLaughlin,* Del.Ch., 377 A.2d 358, 362 (1977), in which this Court held, shortly after enactment of the sunshine law, that a gathering of a public body, even *informally,* for the purpose of *discussing* or taking action on public business constituted a meeting within the statutory definition. *See* 29 Del.C. § 10002(e). No one denies that the August Reorganization Committee meetings were for the purpose of *discussing* public business. The failure, at least seven days in advance, to announce publicly

(and post agendas regarding) those meetings constituted a violation of the Act. The argument that the Reorganization Committee constituted a "subcommittee" of the Board not subject to the Act's requirements, *see Delaware Solid Waste Authority v. The News Journal Co., supra,* fails because the August meetings of the Committee were attended by a *quorum* of Board members who participated in discussion of public business and who voted in a straw poll on the issues discussed. The *Delaware Solid Waste Authority* case is inapposite because there the subcommittees of the Authority did not constitute a quorum of directors. That some members of the public evidently learned about the Reorganization Committee meetings in time to attend is also no answer, as it should not be incumbent upon the public to search out and discover meetings at which public business is to be considered and discussed.

**\*5** Executive sessions held on September 14 and November 9, 1989, also included discussions about redistricting and reorganization, directly contrary to the agenda limiting the executive sessions to "matters relating to personnel and negotiations." Petitioner's Appendix at 42-43; 48-49. The November 16 meeting, which in the Board's view is the focal point of this litigation, was likewise flawed, for its agenda also noticed the executive session for matters related to personnel and negotiations. *Id.* at 55. Minutes of the closed session, however, plainly show discussions related to various reorganization options, as well as consideration of "procedures for proceeding with the Reorganization Committee in making a recommendation for a long-term option." *Id.* at 56.

In the November 16 public meeting, as the Board repeatedly asserts, the vote to implement the separate ninth grade option was publicly recorded. Levy counters that the Board's unanimous vote during the public meeting was a sham, a "rubber stamping" of a secret decision that had crystallized over a period of time in a series of nonpublic meetings. The Board vigorously denies that a vote was ever taken on the reorganization issue during any of the closed meetings. Of course, that is a proposition difficult to refute, since the public was impermissibly excluded from the meetings and minutes were not always taken. It also is

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                          Page 5
Not Reported in A.2d, 1990 WL 154147
(Cite as: Not Reported in A.2d)

plainly self-serving. Additionally, it seems inconsistent with the broad policy declarations of the Act to insist that a citizen seeking relief for asserted violations of the Act's provisions must bear the burden of establishing what was actually said or done at a meeting from which he or she was excluded. *See* 29 *Del.C.* § 10005(c) (burden of proof is on public body to justify a decision to meet in executive session or any failure to comply with the Act); *News-Journal Co. v. McLaughlin, supra.*

Moreover, the matter does not end on November 16, 1989. Levy's complaint alleges, and the record seems to establish, continuing violations of the Act. At its March 15, 1990, meeting, for example, the Board convened in executive session, before the regular meeting, where it discussed "issues and concerns" raised by the Cape Henlopen Education Association. Levy contends that such discussions extended beyond "matters related to personnel," as was publicly advertised in the Board's March 15 agenda notice.

Minutes of the March 22, 1990, closed session also establish violations of the Act. During that particular closed session, the Board discussed, among other things, past and future meetings with the Cape Henlopen Education Association, expansion of the Reorganization Committee, and the schedule of future Board meetings-all despite a posted agenda that limited the Board to an "executive session for matters related to personnel." *See* Petitioner's Appendix at 11. During the April 5, 1990, meeting, the closed session again included discussions that extended beyond "personnel matters," ranging from discussions of issues raised at a recent meeting with the Cape Henlopen Education Association to discussions about acquiring additional modular buildings for the district.

**\*6** The record is littered with examples of where the Board departed from the sunshine law, departures both substantive and procedural. Not only has the Board improperly discussed matters in closed meetings when, under our law, the public was clearly entitled to be present and to be heard, but it also has failed to give appropriate, timely and adequate notice of executive sessions and has failed to enumerate specific grounds for holding such secret meetings.

The Board's answer to all of this is disappointing. It admits that it failed to comply with the "technical niceties" of the Act. Respondents' Answering Brief at pp. 2-3. Waving aside the Act's "formalities," the Board invites the Court to focus on "substance" by recognizing that (1) the public (and Levy) had ample opportunity to express its views on reorganization issues during public hearings and meetings, (2) reorganization issues were thoroughly aired in the local media, and (3) the Board's vote to approve the disputed plan was both unanimous and publicly recorded. This argument, in my opinion, rings hollow in light of the plain mandate of the Act and its broad policy declarations. That an issue is sufficiently controversial to receive widespread publicity, or that public input is allowed through hearings, hardly justifies holding closed sessions to discuss public business in violation of the open meetings law. If this Board, or other school boards, believe they cannot satisfy the strict requirements of this law, or that its requirements unreasonably infringe upon their deliberative processes, such grievances must be directed to the General Assembly which has made the policy decision to enact the sunshine law in its present form.

The heart of the Board's argument (and the basis for its conclusion that Levy is not entitled to injunctive relief) is a narrow interpretation of the term "action" in § 10005(a) of the Act. That section provides:

(a) Any action taken at a meeting in violation of this chapter may be voidable by the Court of Chancery. Any citizen may challenge the validity under this chapter of any action of a public body by filing suit within 60 days of the citizens learning of such action but in no event later than six months after the date of the action.

The Board interprets "action" to mean "final action by a vote on an item of public business." *See* Respondents' answering Brief at p.8. Since allegedly no vote occurred in any of the closed meetings, and since the November 16 vote was publicly recorded, the Board reasons that no harm whatsoever has come to Levy (or to the public) and no injunction is warranted. Furthermore, even if the pre-November 16 meetings contravened the Act, says the Board, the later public

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 6
Not Reported in A.2d, 1990 WL 154147
(Cite as: Not Reported in A.2d)

vote validated the Board's ultimate decision.

No authority has been offered in support of the Board's argument and I find it unpersuasive. Under the Board's construction of the Act, there would be no remedy to deter Board members from privately meeting for discussion, investigation or deliberation about public business as long as the Board reached no formal decision at that private meeting. Such a construction ignores the statement in § 10001 that citizens have the right to monitor decisions of public officials in formulating public policy and the requirement that discussions or deliberations, as well as action, on public business shall be conducted openly. *See* 29 Del.C. § 10002(e) and § 10004(a). Other courts have noted that "action" by a public body includes fact gathering, deliberations and discussions, all of which surely influence the public entity's final decision. *See, e.g.*, *Brookwood Area Homeowners Association v. Municipality of Anchorage*, Alaska Supr., 702 P.2d 1317, 1323 (1985); *Town of Palm Beach v. Gradison*, Fla.Supr., 296 So.2d 473, 477 (1974). A more liberal interpretation of the term "action" is consistent with the Act's broad policy declarations. It also recognizes that policy decisions by public entities cannot realistically be understood as isolated instances of collective choice, but are best understood as a decisional process based on inquiry, deliberation and consensus building. Because informal gatherings or workshops are part of the decision-making process they too must be conducted openly. The Board's narrow construction of the term "action" is thus rejected. As this Court has had occasion to observe:

**\*7** One purpose of sunshine laws is to prevent at nonpublic meetings the crystallization of secret decisions to a point just short of ceremonial acceptance, [since] rarely could there be any purpose to a nonpublic pre-meeting conference except to conduct some part of the decisional process behind closed doors, and ... a sunshine statute, being for the benefit of the public, should be construed so as to frustrate all such evasive devices.

*News-Journal Co. v. McLaughlin*, 377 A.2d at 362. That admonition is especially apt in the present case.

The Board's theory that a later public vote remedies earlier technical violations of the Act is a different and more subtle argument. No authority has been offered for it either, but it is analogous, I think, to the harmless violation doctrine by which some authorities have said that a later public meeting may validate a prior private meeting, provided that the later public meeting functions as a true *de novo* consideration of the challenged action. *See* McQuillin, *Municipal Corporations*, § 13.07(b) (3rd ed. 1989 Cum.Supp.). Under the harmless violation doctrine, courts must determine whether there was a substantial reconsideration of the challenged decision and, if not, whether invalidation of the government decision is a proper remedy. *Brookwood Area Homeowners Association v. Municipality of Anchorage, supra*. Additionally, it seems appropriate for the Court to consider the nature of the infraction, *i.e.,* whether the violation was unintentional or deliberate and whether it was an isolated incident or an ongoing pattern of infractions.

There may be circumstances where this Court would legitimately conclude that a later public vote at a meeting held in compliance with the sunshine law would remedy an earlier minor violation. Such circumstances, however, do not presently exist. The undisputed record shows a pattern of violations. In addition, a reasonable inference from the record, in my opinion, is that the Board's November 16 vote was the pro forma acceptance of an informal decision reached during earlier private meetings. In the circumstances of this case, I think it would be inconsistent with the Act's underlying purpose-opening the processes of government-to say as a general matter that the November 16 public vote cured any and all violations of the Act. I thus conclude that Levy's claims in this case have a reasonable likelihood of prevailing at the final hearing.

An injunction, however, is an extraordinary remedy, a unique power of equity designed to prevent future conduct rather than to serve as a punitive measure to be imposed after a wrong is done. *Wear-Ever Aluminum, Inc. v. Townecraft Industries, Inc.*, N.J. Ch., 182 A.2d 387, 396 (1962). Even where factual situations are presented which would justify the granting of injunctive

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                              Page 7
Not Reported in A.2d, 1990 WL 154147
**(Cite as: Not Reported in A.2d)**

relief, this power should be limited to preventing or deterring a future act. An injunction is not intended to punish past wrongs, especially if to do so will threaten greater injury to third parties or to the public generally than will befall the moving party if an injunction does not issue. This is one of the traditional considerations in determining the appropriateness of issuing such a remedy. *See, e.g., Beaver Blacktop, Inc. v. Dept. of Transportation,* Del.Ch., C.A. No. 11714, Allen, C., slip op. at 6-9 (Sept. 10, 1990).

**\*8** At one level this case involves the plaintiff's objection to the Board discussing public business in private meetings. At another level, it concerns discontent over the implementation of a student reassignment plan. Clearly the Board did not abide by the "rules of the game" when it discussed reorganization, on several different occasions, in closed sessions. Nevertheless, judicial remedies aimed at undoing the wrongs which the Board has committed will have a serious effect on the operation of the school district.

A preliminary injunction in these circumstances will not preserve the status quo until the final hearing. The status quo *is* the challenged reassignment plan. Levy delayed pursuing an injunction until *after* the reassignment plan had been fully implemented. This is the fifth week of the school district's 1990-91 school year. Staff and students have already been reassigned and are presently attending their new schools and classes. To enjoin implementation of the plan now would entail undoing all that has already occurred. Teaching assignments and classes, as well as curriculum plans and lessons, would have to be changed. Bus contracts with private contractors would have to be modified. Students would probably lose certain course offerings that are available only as a result of the reassignment plan. Others would end up having different teachers grading them in later marking periods. Special education programs would have to be completely rewritten, as they are closely linked to the staff, courses and programs now offered in a particular building. Athletic teams and other extra-curricular activities are already organized based on the reassignment plan. *See* Wilson Affidavit, 9/28/90, ¶¶ 3-8. An injunction would, therefore, seriously disrupt

teachers, students and staff, diverting attention from their critical educational mission-a mission that ought to be the first order priority of everyone. Moreover, an injunction would probably threaten to impair contracts with third parties, exposing the school district to lawsuits, as well as requiring the investment of significant amounts of time and money to restore the status quo ante. *See* M. Jones Affidavit, 9/28/90, ¶ 3.

There is an alternative remedy with less draconian consequences. This Court could *provisionally* invalidate the Board's November 16 vote. That is, the vote would be invalidated if the Board failed, within 30 days, to convene a new public meeting in which it considered *de novo* the ninth grade option. One wholesome effect of that alternative would be to notify public entities that the sunshine law will be strongly enforced, consistent with its remedial purposes. On the other hand, the Board would be forced to go through the motions of reconsideration, although the result of that reconsideration seems quite predictable. It thus seems to me that provisional invalidation would accomplish little more than to punish the Board, and that is not an appropriate purpose of injunctive relief. Having weighed the serious consequences to the community and to the school should the ninth grade plan be enjoined, I have concluded that the application to enjoin the reassignment plan must be denied.

**\*9** I reach a different conclusion, however, with regard to the other aspect of relief Levy seeks. On this record it is plain that the Board misperceived its obligations under the sunshine law, both before and after the November 16 meeting. Under our law, the public has a right to be present and to be heard at all deliberations of governmental bodies when issues affecting the public are being discussed or decided. Tendencies toward secrecy in public affairs have been extensively criticized in our history as contrary to the goals of a self-governing society. To this end, an open meeting law is designed to ensure governmental accountability. The public has the right to be fully informed. School boards, and other public entities, have no monopoly on wisdom. Discussion of public business in the presence of the public is vital, for that is the method by which government officials earn the trust of the electorate. When public bodies have the power to decide what is

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

good (or necessary) for the public to know, the ideal of government accountability becomes a farce.

The undisputed record requires that a preliminary injunction issue prohibiting the Board from holding executive sessions to discuss reorganization and redistricting issues affecting the Cape Henlopen School District, as required by the sunshine law. All such public business must be discussed in meetings open to the public. If the Board believes this intrudes on their prerogatives, then the General Assembly should be petitioned to change the law. If the Board is concerned that it may not always know what is or is not a permissible topic for discussion in executive session, it has, in my judgment, two recourses. One: The Board can have its attorney on hand to advise it. Two: The Board can follow a very simple, practical principle. When in doubt, the members of any public body should follow the open meeting policy of the law, and hold the discussion in public.

An Order has been entered consistent with this Memorandum Opinion.

### ORDER

For the reasons assigned in this Court's Memorandum Opinion entered in this case on this date, it is:

ORDERED:

(1) Petitioner's application for a preliminary injunction barring the Respondents from implementing the ninth grade student reassignment plan is denied.

(2) Pursuant to the requirements of 29 *Del.C.* ch. 100, the Respondent Board of Education of the Cape Henlopen School District is preliminarily enjoined from discussing public business involving reorganization and redistricting of the Cape Henlopen School District in executive sessions or other meetings closed to the public.

(3) This Preliminary Injunction Order shall become effective upon the posting of a bond without surety by the Petitioner with the Register in Chancery in Sussex County in the amount of One Thousand Dollars ($1,000.00), and shall remain in effect until further Order of this Court.

> FN* Although the Board's answer admits jurisdiction properly lies in this Court, it argues that the relief sought is in the nature of a writ of mandamus available only in a law court. This argument misconceives the nature of the alleged wrongs, as well as the specific remedy-injunction-petitioner seeks. The Court of Chancery has subject matter jurisdiction over this controversy.

Del.Ch.,1990.
Levy v. Board of Educ. of Cape Henlopen School Dist.
Not Reported in A.2d, 1990 WL 154147

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## CERTIFICATE OF SERVICE

I, Stephen J. Neuberger, being a member of the bar of this Court do hereby certify that on August 26, 2005, I electronically filed this **Brief** with the Clerk of the Court using CM/ECF which will send notification of such filing to the following individuals:

Thomas J. Allingham II, Esq.
Robert S. Saunders, Esq.
One Rodney Square
P.O. Box 636
Wilmington, DE 19899

John D. Balaguer, Esq.
824 Market St., Suite 902
P.O. Box 709
Wilmington, DE 19899

John F. Cafferky, Esq.
William A. Porter, Esq.
Andrea D. Gemignani, Esq.
Blankingship & Keith
4020 University Drive, Suite 300
Fairfax, VA 22030

/s/ Stephen J. Neuberger
**STEPHEN J. NEUBERGER, ESQ.**

cc:    Thomas S. Neuberger, Esq.
John W. Whitehead, Esq.
Douglas McKusick, Esq.
Mr. Reginald L. Helms

Helms \ Briefs \ Motion for Summary Judgment RB.final