**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **MONA DOBRICH, et al.,** | : | |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | **C.A.No. 05-120-JJF** |
| | : | |
| | : | |
| **HARVEY L. WALLS, et al,** | : | |
| | : | |
| **Defendants.** | : | |

**DEFENDANT HELMS' MOTION TO STRIKE PORTIONS OF PLAINTIFFS' REPLY
BRIEF (D.I. 68) AND DECLARATION (D.I. 69) FOR FAILURE
TO COMPLY WITH LOCAL RULE 7.1.3**

Defendant Helms Moves to strike portions of plaintiffs' Reply brief (D.I. 68), and

Declaration (D.I. 69), for failure to comply with Rule 7.1.3(c)(2) of the Local Rules of Civil

Practice and Procedure of the U.S. District Court for the District of Delaware.

D. Del. LR 7.1.3(c)(2) addresses the form and content of briefs in this district and states

"[t]he party filing the opening brief shall not reserve material for the reply brief which should

have been included in a full and fair opening brief."  It is well established that inserting new

arguments or evidence into a reply brief is a "tactic . . . [which] amounts to impermissible

'sandbagging'" and will not be countenanced or otherwise considered by the court.  Rockwell

Tech, LLC v. Spectra-Physics Lasers, Inc., 2002 WL 531555, * 3 (D.Del. March 26, 2002);

accord In re Student Finance Corp., 2004 WL 609329, *3 n.4 (D.Del. March 23, 2004).[1]

---

[1]  See also Jordan v. Bellinger, 2000 WL 1239956, * 5 n. 7 (D.Del. Aug. 28, 2000); Fed.
Insur. Co. v. Signatics, Inc., 1998 WL 175882, * 1-2 (D.Del. March 26, 1998); Aubrey Rogers
Agency, Inc. v. AIG Life Insur. Co., 2000 WL 135129, *1 n. 4 (D.Del. Jan. 13, 2000); Adkins v.
Bell Atlantic Corp., 2000 WL 1728368, * 11 n.13 (D.Del. Feb. 16, 2000).

Additionally, motions to strike should be considered before the substantive motions because if

stricken, the improper filings "would not weigh into the court's decision." Fed. Insur., 1998 WL

175882, at * 1.

### Introduction

In order to understand this Motion, a review of the complicated history of this case's

recent docket is necessary.

On August 5, 2005, defendant Helms moved for partial summary judgment on the

Board's voluntary prayer policy, as written. (D.I. 60). Instead of filing a separate Answering

Brief in response to the pending summary judgment motion and then a separate motion for Rule

56(f) discovery, plaintiffs instead chose to file a new Motion and Opening Brief, asking that the

court deny or continue the summary judgment Motion. (D.I. 63-64). In this Opening Brief,

plaintiffs included numerous merits arguments in opposition to the pending summary judgment

motion. In addition, plaintiffs also presented Fed.R.Civ.P. 56(f) arguments in this brief and

attempted to submit a sworn affidavit as required under that rule. (D.I. 65).

As a matter of logic, defendant Helms respectfully submits that with the exception of the

Rule 56(f) arguments, plaintiffs' Opening Brief (D.I. 64) in opposition to Helms' Motion

properly should be construed as an Answering Brief in opposition to Helms' Motion. In other

words, a new motion, asking the Court to deny an earlier motion, should simply be construed as

an Answering Brief in Opposition to the original motion. See D. Del. LR 7.1.2.

On August 26, 2005, defendant Helms filed a joint Reply Brief in support of his summary

judgment motion and an Answering Brief in opposition to plaintiffs' Rule 56(f) claims. (D.I.

67).[2]  In that Reply, defendant Helms responded to the various merits arguments raised by plaintiffs in their Opening Brief - such as mootness and other claims.  In addition, Helms pointed out that plaintiffs' Rule 56(f) affidavit was fatally deficient, for numerous reasons, under governing Third Circuit precedent.  (See e.g., D.I. 68 at 16-17).

On September 2, 2005, plaintiffs filed a Reply Brief in support of their motion to deny or continue Helms' motion.  (D.I. 68).  Defendant Helms respectfully submits that only the portions of this Reply Brief addressing the Rule 56(f) issue are proper, and that the remainder of the brief must be stricken for failure to comply with this Court's briefing rules.

## Improper Arguments

For example, Argument I of plaintiffs' Reply Brief argues mootness and should be stricken.  (D.I. 68 at 2-3).  Mootness is a merits argument in answer to defendant Helms' original Opening Brief.  Plaintiffs do not get a second bite at the apple by way of a disguised sur-reply which now inserts new material which should have been placed in their Answering Brief.  Defendant Helms Moved for summary judgment.  (D.I. 60).  Plaintiffs opposed - and this in effect was their Answering Brief.  (D.I. 64).  Helms then Replied in support of his original motion.  (D.I. 67).  The Local Rules of this Court simply do not authorize plaintiffs to file a masked sur-reply on an issue that they already addressed.  Accordingly, this Argument must be stricken.

Plaintiffs' Argument II also must be stricken.  (D.I. 68 at 3-9).  This Argument claims that summary judgment is inappropriate on the policy as written.  But again, this entire argument is

---

[2]  Helms noted therein that plaintiffs had muddied the procedural waters in an attempt to make an end-run around the local briefing rules.  (D.I. 67 at 2 n.3).

3

plainly untimely.  Helms Moved on the policy as written.  (D.I. 60).  Plaintiffs opposed - and

submitted what in effect was their Answering Brief.  In that brief, plaintiffs offered numerous

legal arguments in support of their opposition. (D.I. 64 at 5-16).  Helms then Replied in support

of his original motion.  (D.I. 67).  Now plaintiffs are inserting entirely new cases and argument.

But they do not get a second chance to make arguments that should have been made in a "full

and fair" original brief.  See D. Del. LR 7.1.3(c)(2).  Thus, this Argument also must be stricken.

Plaintiffs' tactic of filing an Answering Brief masquerading as an "Opening Brief" is an

attempt to obtain the tactical advantage of filing a Reply Brief, being able to receive the last word

on an issue and being able to raise new arguments for the first time in a Reply.  This tactic cries

out to be recognized as the very type of "impermissible sandbagging" that this Court has

repeatedly struck down in its opinions.  (See page 1 above).  For example, on pages 4-6 of their

disguised sur-reply (D.I. 68), plaintiffs cite new authority and make new arguments that they

failed to make in their earlier brief.  Then, on pages 6-7 they continue and now belatedly claim

that the prayer policy makes factual assertions - a claim they failed to make in their earlier brief.

Then on page 8, plaintiffs now claim that the policy is discretionary on its face - a claim they

failed to make in their earlier brief.  Defendant Helms could go on and on about how plaintiffs

(1) raised new arguments for the first time and (2) expanded upon arguments that they previously

raised, which the rules do not allow them to do because the non-moving party to a motion only

gets one shot - in an Answering Brief - and is not entitled to a sur-reply

All of this is improper and must be stricken for a number of reasons.  First, plaintiffs'

brief is properly construed as an Answering Brief, not an Opening.  As a result, under the rules

plaintiffs are not entitled to a sur-reply and a chance to expand upon arguments that they should

have made in their Answering Brief.  Second, in violation of Local Rules 7.1.3, plaintiffs saved

for their Reply what should have been included in a "full and fair" opening.  If plaintiffs wished

to make these arguments, they should have been included in their original brief.  But they were

not.  They have "misled [defendant] by holding back arguments until the reply brief in violation

of Local Rule 7.1.3(c)(2)."  <u>Fed. Insur.</u>, 1998 WL 175882, at *2. As a result, defendant Helms

has been deprived of the opportunity to respond to these arguments - one of the due process

concerns that the local rules were designed to address.  Such illicit "sandbagging" is improper

under the local rules.  <u>In re Student Finance Corp.</u>, 2004 WL 609329, at *3 n.4.

## Improper Evidence

Four days after filing their Reply Brief, on September 6th, plaintiffs next submitted a

declaration in support of their Motion for Rule 56(f) discovery.  (D.I. 69).  Plaintiffs have stated

that this Declaration is intended to replace their fatally deficient Rule 56(f) affidavit.  (D.I. 68 at

15 n.7).  However, this belated declaration also is improper under the Local Rules and should be

stricken.

As defendant Helms explained at length in his Reply Brief (D.I. 67 at 7-17), plaintiffs'

Rule 56(f) affidavit (D.I. 65) is fatally deficient for a large number of reasons.  By filing a

Declaration, plaintiffs now have belatedly attempted to remedy only one of their original

affidavit's many deficiencies that Helms brought to the Court's attention in his Reply Brief.  (D.I.

67 at 16-17).

It appears that plaintiffs seek to rely upon this recently filed declaration as support for

their Rule 56(f) motion.  But this also is improper under the Local Rules for the reasons

discussed at length above.  If plaintiffs wished to argue from this evidence, it should have been

properly included with their original filing. It was not. At this late date, plaintiffs do not get a second chance to correct their briefing mistakes after defendant Helms has pointed them out to the Court as grounds for denying plaintiffs' motion. All the more so in light of the Third Circuit's strict compliance standard when it comes to Rule 56(f) affidavits. <u>See</u> <u>Bradley v. U.S.</u>, 299 F.3d 197, 207 (3d Cir. 2002); <u>Radich v. Goode</u>, 886 F.2d 1391, 1394 (3d Cir. 1989); <u>Pastore v. Bell Telephone Co. of Pa.</u>, 84 F.3d 508, 511(3d Cir. 1994). This attempt at impermissible sandbagging also should be stricken.

<u>**Conclusion**</u>

In these pleadings, plaintiffs have sandbagged defendant Helms, made new arguments and included new evidence that should have been included in a full and fair original brief. Accordingly, plaintiffs' attempt to play fast and loose with the Rules should be rejected and Arguments I and II of their Reply brief, as well as their Declaration, should be stricken.

Defendant Helms waives an Opening Brief in support of this Motion.

Respectfully Submitted,

**THE NEUBERGER FIRM, P.A.**

/s/ Thomas S. Neuberger
**THOMAS S. NEUBERGER, ESQ. (#243)**
**STEPHEN J. NEUBERGER, ESQ. (#4440)**
Two East Seventh Street, Suite 302
Wilmington, DE 19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com

Attorneys for Defendant Reginald L. Helms

6

**THE RUTHERFORD INSTITUTE**
**JOHN W. WHITEHEAD, ESQ.**
**DOUGLAS MCKUSICK, ESQ.**
P.O. Box 7482
Charlottesville, VA 22906
(434) 978-3888
JohnW@Rutherford.org
DouglasM@Rutherford.org

Dated: September 8, 2005          Of Counsel

# Unreported Opinions

Not Reported in F.Supp.2d
**(Cite as: 2000 WL 1728368 (D.Del.))**

Only the Westlaw citation is currently available.

United States District Court, D. Delaware.

Linda L. ADKINS, Plaintiff,

v.

BELL ATLANTIC CORPORATION, a Delaware
corporation; Bell Atlantic Corporation,
Plan Administrator; Bell Atlantic Sickness and
Accident Disability Benefit
Plan, a welfare benefit plan; Bell Atlantic Long-Term
Disability Plan, a
welfare benefit plan; Group Life Insurance Program,
a welfare plan; and
Supplementary Group Life Insurance Plan, a welfare
plan, Defendants.

**No. 98-254 GMS.**

Feb. 16, 2000.

John M. Stull, Wilmington, Delaware, for Plaintiff.

Michael P. Kelly, Wilmington, Delaware, Lawrence B.
Fine and Gregory T. Mayes of Morgan, Lewis &
Bockius LLP, for Defendants.

*MEMORANDUM OPINION AND ORDER*

SLEET, J.

I. INTRODUCTION

 *1 On May 8, 1998, plaintiff Linda L. Adkins
("Adkins") filed a five count complaint against her
former employer, defendant Bell Atlantic Corporation
("Bell"), and four employee benefit plans maintained by
Bell. [FN1] In Counts I, III and IV, Adkins alleges that
she was wrongfully denied disability, life insurance and
medical benefits under these plans. She seeks to recover
such benefits pursuant to section 502(a)(1)(B) of the
Employee Retirement Income Security Act of 1974
("ERISA"), 29 U.S.C. § 1132(a)(1)(B). In Count II,
Adkins alleges that Bell, as Plan Administrator,
breached its fiduciary duties by failing to adequately
disclose its reasons for denying her benefit claims, in
violation of ERISA § 503, 29 U.S.C. § 1133, and
regulations promulgated thereunder. In Count V, [FN2]
Adkins alleges that Bell failed to provide a copy of
certain plan documents in violation of ERISA §

104(b)(4), 29 U.S.C. § 1024(b)(4). [FN3]

 FN1. The four plans named as defendants are:
 (1) the Bell Atlantic Sickness and Accident
 Disability Benefit Plan; (2) the Bell Atlantic
 Long-term Disability Plan; (3) the Group Life
 Insurance Program; and the Supplementary
 Group Life Insurance Plan.

 FN2. The Complaint actually has two claims
 identified as Count IV. The court will refer to
 the second such claim as "Count V."

 FN3. Count V actually asserts that the failure
 to provide these documents was in violation of
 ERISA § 502(c), 29 U.S.C. § 1132(c). In their
 motion to dismiss, Defendants have properly
 recognized Count V as an alleged violation of
 § 1024(b), for which a remedy is provided in
 § 1132(c).

 Before the court is Defendants' motion to dismiss the
complaint for failure to state a claim upon which relief
can be granted, pursuant to Rule 12(b)(6) of the Federal
Rules of Civil Procedure. Also before the court is
Adkins' motion for summary judgment. For the reasons
that follow, the court will deny both of these motions.

II. BACKGROUND

 Prior to her termination in May of 1996, Adkins was
employed by Bell for approximately 26 years. While
employed, Adkins was a participant in various
employee benefit plans sponsored by Bell. Adkins has
suffered from severe back pain since at least 1990. She
also suffers pain from a spinal fusion procedure and
from hip surgery. For some time prior to May of 1996,
Adkins was absent from work as a result of these
injuries and was receiving short term disability benefits
from the Bell Atlantic Sickness and Accident Disability
Benefit Plan ("SADBP").

 By notice dated April 26, 1996, Adkins was informed
that her disability benefits under the SADBP would
cease as of that date. Adkins did not return to work, and
her employment with Bell ended sometime during May
of 1996. The parties do not appear to agree as to
whether Adkins resigned or was involuntarily
terminated. It is clear, however, that she is no longer an

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

employee of Bell, and that she has not received benefits under any of the Plans since her employment ceased.

As discussed more fully below, resolution of the instant motions turns on the legal significance of, and legal adequacy of, the April 26th notice and the ensuing correspondence between Defendants and lawyers representing Adkins. Defendants contend that these documents establish that Adkins failed to exhaust her administrative remedies under the SADBP, thus barring her claims for wrongfully denied benefits in Counts I, III and IV of the complaint. [FN4] They also claim that these documents adequately disclose the reason Adkins' SADBP benefits were denied, thus requiring dismissal of Count II. Finally, Defendants contend that these documents establish that Adkins' request for certain plan documents was untimely and/or was improperly asserted by her attorney, thus requiring dismissal of Count V.

> FN4. Although Adkins seeks to recover various types of benefits from several different benefit plans, the parties' briefs focus entirely on the denial of short term disability benefits under the SADBP. Adkins' claims for the other types of benefits are apparently dependent upon her claim for short term disability. For example, it appears that benefit eligibility under the SADBP is a precondition to eligibility for long term disability benefits. *See* Mot. to Dismiss at Ex. I (Summary Plan Description), Section 1 ("Disability Benefits"), p. 4; Section 2 ("Sickness and Accident Disability Coverage"), p. 3; and Section 3 ("Long-Term Disability Plan"), p. 4. Further, Adkins alleges that had she not been wrongfully denied short and long term disability benefits, she would have been eligible for insurance and medical benefits. Compl. ¶¶ 33-35, 38-40.

III. DISCUSSION

A. Standard of Review on Defendants' Motion to Dismiss

**\*2** When considering a motion to dismiss for failure to state a claim, the court must accept as true "the factual allegations in a complaint and all reasonable inferences that can be drawn therefrom." *Graves v. Lowery,* 117 F.3d 723, 726 (3d Cir.1997) (citations omitted). In passing on a motion to dismiss, courts generally consider only the allegations in the complaint, exhibits attached thereto, and matters of public record. *See*

*Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.,* 998 F.2d 1192, 1196 (3d Cir.1993).

The documents alluded to above and described more fully below were not attached to Adkins' complaint. Nevertheless, the court can properly consider "undisputedly authentic document[s] that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *Id.; see also In re Rockefeller Ctr. Properties, Inc. Sec. Litig.,* 184 F.3d 280, 287 (3d Cir.1999) (court can consider documents "integral to or explicitly relied upon in the complaint").

Defendants have attached a number of documents to their motion, and claim that each of these documents falls within the rule just stated. For the most part, the court agrees. Adkins does not dispute the authenticity of any of these documents. Further, most of these documents are clearly "integral to" or "explicitly relied upon" in Adkins' complaint. [FN5] This is less clear, however, with respect to two of the documents--a May 15, 1996 letter from Bell and a "Summary Plan Description." *See* Mot. to Dismiss Exs. E and I. Although these documents are related to the exhaustion issue, it is not clear that Adkins' complaint can be said to be "based on" these documents. Even if they do not qualify under the rule, however, the court could consider these documents by treating Defendants' motion as one for summary judgment. *See* Fed.R.Civ.P. 12(b); *In re Rockefeller Ctr.,* 184 F.3d at 287. For the reasons discussed below, the court concludes that Defendants' motion should be denied whether viewed as a motion to dismiss or as a motion for summary judgment. The court, therefore, need not decide whether consideration of these two documents requires "conversion" of Defendants' motion. [FN6]

> FN5. Such documents include the SADBP Plan document, the April 26th benefit denial notice, the letters cited in the complaint as satisfying the exhaustion requirement and the letters cited in the complaint regarding Adkins' request for Plan documents. Mot. to Dismiss Exs. A, B, D, F, G, and H.

> FN6. Before *granting* a "converted" motion, it is typically necessary to provide notice to the parties of the court's intent to treat the motion as one for summary judgment. *See In re Rockefeller Ctr.,* 184 F.3d at 287-88. But where, as here, the court would *deny* the motion under either standard, the court sees no reason why notice is necessary.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

B. Defendant Bell's Claim that it Should be Dismissed as an Improper Defendant

Before reaching the arguments asserted by all the defendants, the court will address Defendant Bell's assertion that it is not a proper defendant in this action. Bell concedes that it is the SADBP's Plan Sponsor and Plan Administrator as those terms are defined by ERISA. Bell contends, however, that it delegated its responsibilities as Plan Administrator to the Bell Atlantic Corporate Employees' Benefits Committee ("the Corporate EBC"). It further claims that the Corporate EBC, in turn, delegated its claims determination and claims appeal responsibilities to the Bell Atlantic Benefits Claims Committee ("the Claims Committee") and to the Bell Atlantic Benefit Appeals Committee ("the Appeals Committee"), respectively. As such, Bell contends that it retained no fiduciary duties, and is thereby immune from liability pursuant to ERISA § 405, 29 U.S.C. § 1105(c).

*3 Section 1105(c) permits plan fiduciaries to delegate certain fiduciary responsibilities to "persons other than named fiduciaries ." § 1105(c)(1). If such delegations are made in accordance with plan provisions, then, except under circumstances specified by the statute, the originally named fiduciary is immune from liability for "an act or omission" of the designated "other person" in carrying out those fiduciary responsibilities. § 1105(c)(2).

The SADBP does appear to authorize Bell's delegation of duties to the committees noted above. Nevertheless, Bell has failed to establish whether these committees are "other" persons within the meaning of the statute. There is nothing in the record that even hints at (1) the nature of these committees; (2) the relationship between Bell and these entities; or (3) whether these committees are "entities" at all. Surely a corporate plan administrator cannot insulate itself from liability under ERISA simply by designating a "committee" of its own employees to administer the plan. But there is nothing in the record to suggest that Bell's committees are anything more than a group of its own employees. Therefore, the court will deny Bell's request to be dismissed from this lawsuit. [FN7]

FN7. Because the reason noted above precludes Bell's request, the court need not address other issues that would appear to require some attention before Bell could be dismissed from this lawsuit. For example, a named fiduciary cannot escape liability for

acts of a designee if it has knowledge of the designee's breach of duty and fails to make reasonable efforts to remedy the breach. § 1105(c)(2)(B). Several of the letters at issue in this case are on "Bell Atlantic" letterhead, and at least one of the letters is written by a lawyer representing "the Bell Atlantic companies." See, e.g., Mot. to Dismiss at Exs. E, H. Further, Bell has cited no authority to establish that § 1105 would shield it from liability that it would have incurred even if their had been no breach of fiduciary duty by any party--e.g., liability for benefit payments that it might have incurred as Plan Sponsor if Adkins did qualify for such benefits and her claim were properly approved by the committees. The court, today, expresses no opinion on these potential issues.

C. Defendants' Motion to Dismiss Counts I, III and IV of the Complaint

Defendants contend that Adkins' claims for wrongfully denied benefits should be dismissed because she failed to exhaust her administrative remedies under the SADBP. Actions to recover benefits due under an employee benefit plan are authorized by ERISA's civil enforcement provision, 29 U.S.C. § 1132(a)(1)(B). That provision does not expressly require a plan participant to exhaust administrative remedies available under a plan prior to initiating a lawsuit. See Thomas v. Kemper Nat'l Ins. Co., 984 F.Supp. 885, 890 (E.D.Pa.1997); see also Amato v. Bernard, 618 F.2d 559, 566 (9th Cir.1980) ( "It is true that the text of ERISA nowhere mentions the exhaustion doctrine."). Nevertheless, federal courts generally require exhaustion of such remedies prior to entertaining a suit for wrongfully denied plan benefits. See, e.g., Weldon v. Kraft, Inc., 896 F.2d 793, 800 (3d Cir.1990); Wolf v. National Shopmen Pension Fund, 728 F.2d 182, 185 (3d Cir.1984). Defendants contend that Adkins failed to follow the administrative review procedures required by the SADBP.

Under the SADBP, participants must submit claims for benefits to the Claims Committee within 60 days from the date of accident or from the first day of absence from work. See Ex. A (SADBP) §§ 3.2(e), 6.6. [FN8] If a claim for benefits is denied by the Claims Committee, the Plan permits the participant to appeal that denial to the Appeals Committee by submitting a written request for review within 60 days after receiving notice that her claim has been denied. Ex. A § 3.3(a). While these requirements seem simple enough, the process is anything but simple in practice.

FN8. All lettered exhibits referred to herein refer to the exhibits attached to Defendants' Motion to Dismiss.

**\*4** Although Adkins had been receiving disability benefits under the SADBP for some time prior to April 26, 1996, it is not clear from the complaint or the parties' briefs how (i.e., by what procedures) or when those benefits commenced. By notice from the Claims Committee dated April 26, 1996 (Ex. B), Adkins was informed that her disability benefits were denied and would cease as of that date. This notice was a standardized benefit denial form, on which a mark was placed next to the following standard reason for denial: "The medical evidence indicates that you are able to work with restrictions. Therefore you are not unable to work [citation to Plan provisions]."

1. Adkins' Position on Exhaustion

Adkins contends that she timely appealed that claim denial by letter from the attorney then representing her, William Schab, dated May 13, 1996 (Ex. D). She further contends that her appeal was denied, by letter from "Bell Atlantic Health Services" dated July 18, 1996 (Ex. F). Having thus exhausted her remedies under the Plan, Adkins contends that she was free to pursue her claim in court. Instead of immediately suing, however, Adkins' new attorney, John Stull, wrote to the Claims Committee on December 20, 1996 (Ex. G). In that letter, Stull asked the Claims Committee to reconsider its claim denial and to provide a more detailed explanation as to why the medical documentation Adkins had previously submitted was not sufficient to establish her disability. By letter dated January 23, 1997 (Ex. H), Stull's request was rejected.

2. Defendants' Position on Exhaustion

Defendants view things quite a bit differently. They contend that the April 26th notice denying Adkins' benefits was not a "claim denial" at all, but rather a "Suspension Notice." As such, Defendants argue that the proper response to this notice was not to "appeal" the benefit denial, but rather to submit a "Claim" to the Claims Committee, within 60 days. Because Adkins' May 13th letter was not addressed to the Claims Committee, it did not qualify as a "Claim." Instead, Defendants contend that Stull's December 20th letter to the Claims Committee--although purporting to be a request for reconsideration of a previously denied appeal--was actually the first correspondence qualifying as a "Claim." Because that "Claim" was submitted more than 60 days after Adkins' receipt of the April 26th

"Suspension Notice," the Claims Committee denied the "Claim" as untimely, by its letter dated January 23, 1997. Defendants, therefore, contend that Adkins failed to exhaust Plan remedies in two respects--by failing to submit a timely "Claim" to the Claims Committee, and by failing to appeal the Claim denial (presumably the January 23, 1997 Claim denial) to the Appeals Committee.

3. Defendants are Primarily to Blame for any Exhaustion Deficiencies

As will soon be clear, Mr. Schab's efforts on Adkins' behalf at complying with Defendants' administrative procedures leave something to be desired. For the reasons that follow, however, the court concludes that any defects in Adkins' exhaustion efforts were primarily the result of the confusing procedures employed by the Defendants and their failure to clarify what was, at worst, a reasonable misunderstanding on the part of Adkins and/or Schab. As will also become evident, Defendants themselves had difficulty following their own procedures.

**\*5** The problems begin with the proper characterization of the April 26th benefit denial notice. As noted above, Defendants argue that this notice was not a "claim denial" but rather a "Suspension Notice." Curiously, the form does not use that term, nor can the court locate that term in either the Plan itself or the Summary Plan Description. *See* Exs. A, I. Although the form also does not use the term "claim denial," that certainly appears to be the thrust of it. The form is titled "Notice from Assistant Secretary of Bell Atlantic Benefits Claims Committee." Ex. B. This committee, of course, is specified in the Plan itself as the one "to which is delegated the authority and responsibility ... to decide *benefit claims* of Employees." Ex. A § 2.4 (emphasis added). Near the top of the form, the "Benefit Denial Date" is noted. Ex. B. This is followed by the heading "REASON(S) FOR DENIAL OF YOUR BENEFIT." Ex. B. As noted above, a mark was placed next to the applicable reason, which included a citation to applicable Plan provisions.

These characteristics all point to one conclusion--that the Claims Committee was denying Adkins' *claim* for benefits. This conclusion is consistent with an ordinary understanding of the words "claim," "benefit" and "denial." That is, it would seem more reasonable to expect that a "benefit denial" would follow a "claim" for benefits than, as Defendants contend, a "claim" for benefits should follow a "benefit denial." As has already been noted above, by some procedure that remains unclear, Adkins was already receiving SADBP benefits for some time prior to the April 26th notice.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Indeed, prior to April 26th, Adkins had already submitted medical documentation of her disability, and had already undergone an "Independent Medical Examination" at Bell's request. *See* Compl. ¶ 14; Pl's Opp'n Br. at Ex. 1. [FN9] These steps further support Adkins' apparent belief that since her "claim" for benefits had been under review prior to April 26th, the notice of that date was a denial of her claim.

> FN9. Interestingly, the Independent Medical Examiner unequivocally concluded that "in regard to her employment with Bell Atlantic, [Adkins] is now permanently totally disabled." *See* Letter dated March 7, 1996 from Dr. Thomas Otter (included in Ex. 1 to Pl's Opp'n Br.). He further opined that "there is little hope that this patient can be rehabilitated to the point where she could actively engage in any activities of an occupational nature." *Id.*

At the bottom of the April 26th notice, however, boilerplate language advises the recipient that "if you disagree with this determination you may submit a written Claim ... to: Bell Atlantic Claims Committee [address provided]." Ex. B. The recipient is told that there is no special claim form, and that information previously submitted to "Health Services" would be forwarded to the Claims Committee. The recipient is then advised that any additional medical information should be submitted to Health Services at the address supposedly indicated on an attached letter. Curiously, the attached letter does not, in fact, provide an address for "Health Services." *See* Ex. B. Nor does it, for that matter, even refer to Health Services. Nor is Health Services referred to in either the Plan or the Summary Plan Description. The attached letter does, however, state that the Claims Committee will not consider "reinstating your benefits" unless a "written statement" (which statement is *not* referred to as a "Claim") is submitted to the Claims Committee. Finally, the letter notes that any additional medical information should be sent to "Bell Atlantic, Health and Safety Management Center" (perhaps another name for the elusive "Health Services"?) at an address that is provided.

**\*6** These instructions provide at least some support for Defendants' position that Adkins should have responded to the April 26th notice by filing a "Claim" rather than an appeal. In the court's view, however, the instructions are not clear enough to undermine Adkins' reasonable belief that the notice was itself a "claim" denial by the Claims Committee.

Clearly (and reasonably) confused by the April 26th

notice, Adkins' attorney, Mr. Schab, attempted to appeal the benefit denial by letter dated May 13, 1996. After describing the basis for his belief that Adkins did qualify for disability benefits, Schab states: "If Ms. Adkins must file an appeal of some previously made decision of Bell Atlantic, let this letter serve as that appeal." Ex. D. While the court would ordinarily frown on a participant essentially making up his own appeals procedure, Schab's statement was reasonable under the circumstances. Further, although Schab's letter was not addressed to the Appeals Committee--as might have been appropriate based on an understanding that the April 26th notice was a "claim denial"--no address had been provided for that committee in the April 26th notice or attached letter. Thus, Mr. Schab did the next best thing--he sent the letter to the attention of Barbara Kelly, the person who signed the April 26th notice. Schab addressed the letter to Bell Atlantic Health Services at the address that had been provided for the Bell Atlantic Health and Services Management Center (i.e. Schab reasonably assumed--indeed, perhaps correctly assumed--that this was the proper address for "Health Services").

Ms. Kelly apparently forwarded Schab's May 13th letter to Keith Fischler, a labor lawyer with "Bell Atlantic Network Services" who represents "the Bell Atlantic companies" and their agents. *See* Ex. E. Kelly may have done so because Schab's letter, in addition to attempting to appeal the April 26th benefits denial, also sought to address a dispute that apparently had arisen as to whether Adkins had resigned. Fischler responded to Schab by letter dated May 15, 1996. Ex. E. Although the primary focus of this response was the resignation issue, Fischler's letter also states that if Schab believed Adkins had not received all the disability benefits to which she was entitled, he should "file an ERISA claim by writing to the Claims Administrator." The letter provides the address for the Claims Committee.

One might have hoped that Schab would have reacted to Fischler's letter in some way. [FN10] On the other hand, one might also have hoped that while Ms. Kelly was forwarding Schab's May 13th letter to Mr. Fischler, she would have also forwarded a copy to the Claims Committee, thus perfecting Adkins' "Claim." *See* 29 U.S.C. § 1104 (requiring plan fiduciaries to discharge their duties "solely in the interest of the participants and beneficiaries and ... for the exclusive purpose of providing benefits to participants and their beneficiaries ...").

> FN10. It appears that Schab did not respond in any way to Fischler's letter. Although he was perhaps still reasonably confused as to why

the Claims Committee's April 26th denial of Adkins' claim needed to be appealed by filing a claim with the Claims Committee, further inquiry at this point might have revealed why in the Defendants' view the May 13th letter had not perfected an appeal. Still, for the reasons already stated, and those which follow, Schab's failure to respond to the Fischler letter does not alter the court's conclusion that Bell is primarily at fault for any deficiencies in Adkins' exhaustion efforts.

**\*7** Next in the parade of confusing correspondence is a July 18, 1996 letter from Bell Atlantic Health Services to Adkins. Ex. F. This letter advises Adkins that, subsequent to its April 26th benefit denial notice, Health Services had received "further information from you and/or your treating health professional." Without hinting at what this additional information might have been (was it, perhaps, Schab's May 13th letter?), the letter states that this additional information does not change Health Services' prior determination to deny benefits. Ever anxious to be helpful, the letter then reminds Adkins that she has only 60 days from the date of the prior notice to submit a Claim to the Claims Committee. That is, the July 18, 1996 letter reminds Adkins that she is required to submit a claim by June 26, 1996. The July 18, 1996 letter concludes with yet another helpful reminder--it advises Adkins that she "will be expected to return to work on April 26, 1996." Ex. F. This letter further demonstrates *Defendants'* inability to understand and/or effectively communicate its own deadlines under the Plan.

In sum, the court concludes that Adkins reasonably understood the April 26th Benefit Denial notice to be a claim denial. Further, Schab made a reasonable effort to perfect an appeal of that decision by his letter dated May 13, 1996, thus exhausting the administrative procedures required by the Plan. While some of Defendants' correspondence advised Adkins that she needed to file a "Claim," none of the letters expressly advised Adkins that the April 26th notice was not a "claim denial" and that Schab's May 13th letter did not perfect her appeal.

Moreover, even if Defendants are correct that Adkins first filed a "Claim" by Stull's December 20, 1996 letter, their January 23, 1997 denying that claim is inadequate. Had that letter truly been a claims denial letter, Defendants would have been required to provide Adkins written notice specifying, *inter alia,* "appropriate information as to the steps to be taken if [she] wishes to submit [her] claim for review." 29 C.F.R. § 2560.503-1(f) (setting forth required content

of notice to claimants whose claims for benefits are denied). Rather than provide Adkins with information as to how she could appeal the Claims Committee's January 23rd denial of her claim, the letter simply states: "The decision of this Committee is final." Ex. H. Remarkably, Defendants' alternative "failure to exhaust" theory appears to be that Adkins failed to appeal the January 23rd claims denial letter. *See* Def's Mem. of Law in Supp. of their Mot. to Dismiss, at 12. [FN11]

FN11. Defendants' alternative exhaustion theory might be better understood to be that even if the April 23rd notice was a claim denial, the May 13th letter does not qualify as a proper appeal of that denial because it was not addressed to the Appeals Committee. As already indicated, that argument fails because the April 23rd claim denial notice and accompanying letter failed to inform Adkins that her appeal should go to that Committee. *See* 29 C.F.R. § 2560.503-1(f). Under the circumstances, Schab's request in his May 13th letter to "let this letter serve as [any required] appeal" was a reasonable effort to perfect an appeal.

Perhaps even more remarkably, Defendants essentially attempt to argue that although the April 23, 1996 notice was *not* a claims denial letter for the purpose of Counts I, III and IV of the Complaint, it *was* a claims denial letter for the purpose of Count II of the Complaint. *See infra.* That argument only bolsters the court's conclusion that Adkins' understanding of the April 23rd notice as a claims denial letter was reasonable.

4. Conclusion as to Defendants' Motion to Dismiss Counts I, III and IV

**\*8** For these reasons, the court concludes that Adkins' efforts to exhaust administrative remedies were sufficient. To the extent these efforts were not perfect, excusing any deficiencies is, under the circumstances, wholly consistent with the purposes served by the exhaustion requirement. In *Zipf v. AT & T,* 799 F.2d 889 (3d Cir.1986), the Third Circuit described those purposes as follows:

When a plan participant claims that he or she has unjustly been denied benefits, it is appropriate to require participants to address their complaints to the fiduciaries to whom Congress, in Section 503 [29 U.S.C. § 1133], assigned the primary responsibility for evaluating claims for benefits. This ensures that the appeals procedures mandated by Congress will be

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

employed, permits officials of benefit plans to meet the responsibilities properly entrusted to them, encourages the consistent treatment of claims for benefits, minimizes the costs and delays of claim settlement in a nonadversarial setting, and creates a record of the plan's rationales for denial of the claim. *Id.* at 892 (citations omitted).

When Adkins' disability benefits were denied, she did not run to the federal courthouse. Rather, she attempted to appeal the denial to the fiduciaries Congress made responsible for benefit determinations. In response, she was met with only obstacles to a review on the merits. Even after Health Services reaffirmed its earlier decision by its letter dated July 18, 1996, Adkins once again implored the Defendants to reconsider their decision "before we proceed to a more formal review of your procedures." Ex. G. Defendants rejected that request as untimely. Defendants, therefore, had more than ample opportunity to evaluate Adkins' claims on the merits before she was forced to resort to this lawsuit.

Further, allowing Defendants to benefit from the confusing procedures they have established would be inconsistent with Congress's intent to facilitate employees' access to plan benefits. *See, e.g.,* 29 U.S.C. § 1133(1) (claim denials must be written "in a manner calculated to be understood by the participant"); 29 U.S.C. § 1133(2) (requiring plans to provide adequate notice of the reasons for claim denial and to afford a "reasonable opportunity" for a "full and fair review" of claim denials); *see also* 29 C.F.R. § 2560.503-1(b) (benefit plans must not be administered a way that "unduly inhibits or hampers the initiation or processing of plan claims").

Finally, since the Defendants twice considered and denied Adkins' claim for benefits (i.e., as indicated by their notices dated April 26, 1996 and July 18, 1996), they have presumably developed a record of their rationales for denying the claim. Such record should be adequate to facilitate this court's review of the merits of Adkins' claims. To the extent Defendants failed to properly develop a record for review, Adkins has maintained copies of relevant medical records and opinions that were submitted to the Defendants for their consideration. *See* Pl's Opp'n Br. at Ex. 1.

**\*9** Accordingly, the court will deny Defendants' motion to dismiss Counts I, III and IV of the Complaint.

D. Defendants' Motion to Dismiss Count II of the Complaint

In Count II, Adkins alleges that Bell breached its statutory duties to adequately disclose the reasons her claim for benefits was denied. *See* 29 U.S.C. § 1133(1). She also alleges that Bell failed to disclose the reasons her appeal was denied and failed to advise what information was required to meet the Plan's eligibility requirements. As alluded to above, Defendants contend that their April 26, 1996 "Suspension Notice" fully satisfies all of the requirements for claims denial letters as set forth in regulations promulgated under § 1133.

As discussed above, Defendants have vigorously contended that the April 26, 1996 benefit denial letter was *not* a claims denial letter. Indeed, they contend that Adkins did not file a "Claim" until December 20, 1996. It is quite difficult to understand how the April 26th notice could satisfy statutory disclosure requirements for claims denials, when the "Claim" was--according to Defendants--not even filed until nearly eight months after the purported claims denial notice.

Even more surreal is Defendants' explanation as to how the April 26th notice satisfies the requirement that a claims denial letter set forth information as to how a participant can appeal a denied claim. *See* 29 C.F.R. § 2560.503- 1(f)(4). Defendants assert: "[T]he Suspension Notice explained in detail Ms. Adkins' right to what would have been an appeal had the suspension of benefits been a claim denial." Def's Mem. of Law in Supp. of their Mot. to Dismiss, at 17. They then note that the Suspension Notice provided "explicit instructions for perfecting an appeal." *Id.* This is difficult to comprehend in light of (1) Defendants' earlier argument that appeals must be filed with the Appeals Committee; and (2) the fact that the Suspension Notice never even refers to the Appeals Committee.

For these reasons, the court will deny Defendants' motion to dismiss Count II of the Complaint.

E. Defendants' Motion to Dismiss Count V of the Complaint

In Count V, Adkins alleges that Bell failed to provide her with copies of the plan documents for the SADBP and the Bell Atlantic Long-Term Disability Plan, in violation of ERISA § 104(b)(4), 29 U.S .C. § 1024(b)(4). By letter to the Claims Committee dated December 20, 1996, Mr. Stull unambiguously requested copies of these two plan documents. After identifying the plans at issue, Stull stated: "As Ms. Adkins' representative, I request in her behalf copies of plan documents for each plan." Ex. G. By letter dated January 23, 1997, the Claims Committee addressed other aspects of Stull's letter (i.e., it treated his letter as a "Claim" for benefits and denied it as untimely), but

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

ignored the request for plan documents. Ex. H.

Defendants assert two independent bases for dismissal of this claim. First, they contend that they were not required to provide these documents because the request was made by Adkins' attorney, rather than by Adkins herself. Second, they claim that at the time the request was made, Adkins was no longer a plan "participant" entitled to request copies of plan documents. The court rejects both arguments.

1. Defendants Could Not Refuse Adkins' Request for Plan Documents on the Basis That the Request Was Made by Her Attorney

*10 Section 1024(b)(4) provides, in pertinent part, that:

> The administrator shall, upon written request of any participant or beneficiary, furnish a copy of the latest updated summary plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated.

Defendants contend that because Mr. Stull was not a "participant or beneficiary" of either plan, they were not obligated to provide the requested plan documents. In support of their position, Defendants principally rely on a 1982 Department of Labor Opinion Letter. In that Letter, the DOL concluded that § 1024(b)(4) does not require a plan to provide documents to third parties without a written release from a participant or beneficiary. DOL Opinion Ltr. No. 82-021A (Ex. J).

Defendants suggest that the court should defer to the DOL's interpretation of this statute. The court finds deference unnecessary because the Letter gives no indication whatsoever that the DOL would consider an attorney acting on behalf of his client to be a "third party." Instead, the Letter simply addressed the far different issue of whether certain benefit funds were required to provide various documents to an *employer* that made contributions to the funds on behalf of its employees. [FN12] Ex. J.

FN12. That is, the employer *made contributions* to the funds on behalf of the employees. There is no suggestion that the employer *requested the documents* on behalf of its employees. In fact, the Letter expressly states that none of the employees had requested any documents. Ex. J.

Defendants also rely on *Bartling v. Fruehauf Corp.,* 29

F.3d 1062, 1072 (6th Cir.1994), in which the court held that a plan administrator was not obligated to disclose plan documents to participants' attorney without the written authorization of the participants. The court finds *Bartling* unpersuasive. First, that court "acknowledged the force of [the plaintiff's] arguments," but nevertheless felt compelled to defer to the DOL Opinion Letter discussed above. As already indicated, this court finds such deference to be misplaced. Second, the court has found no other case accepting Defendants' position, and several cases rejecting it. *See, e.g., Moothart v. Bell,* 21 F.3d 1499, 1503 (10th Cir.1994); *Jandek v. AT & T Corp.,* 1996 WL 147919, at *4 (N.D.Ill.1996) (rejecting *Bartling* ); *Algie v. RCA Communications, Inc.,* 891 F.Supp. 839, 869 n. 22 (S.D.N.Y.1994), *aff'd,* 60 F.3d 956 (2d Cir.1995); *Curry v. Contract Fabricators Inc. Profit Sharing Plan,* 744 F.Supp. 1061, 1066 (M.D.Ala.1988), *aff'd,* 891 F.2d 842 (11th Cir.1990).

Further, *Bartling* appears to be distinguishable because in that case, the benefit plan had actually asked the requesting attorney to provide written authorizations from his clients. *See Bartling,* 29 F.3d at 1065-66. Defendants here made no such request. Nor is their any suggestion that Defendants had any reason to believe Stull was not authorized to act on behalf of Adkins. To the contrary, the Claims Committee was more than happy to accept Stull's December 20th letter as a "Claim" by Adkins. It then summarily denied the Claim as untimely and advised Stull that the decision of the Committee was final. Indeed, the Committee did not even bother to copy Adkins on its denial letter. Ex. H.

*11 Under these circumstances, the court cannot imagine a single reason why Stull's request for these non-confidential plan documents should be deemed insufficient under § 1024(b)(4). Accordingly, the court rejects this argument as a basis for dismissing Count V of the Complaint.

2. Adkins Was Entitled to the Plan Documents Because She Had, at the Very Least, a Colorable Claim for Vested Benefits

Defendants next contend that at the time of Adkins' December 20, 1996 request for plan documents, she was no longer a "participant" entitled to such disclosures. The court disagrees.

ERISA defines the term "participant" as "any employee or former employee of an employer ... who is or may become eligible to receive a benefit of any type from an employee benefit plan." 29 U.S.C. § 1002(7). In *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101 (1989), the Supreme Court addressed the issue of how

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

this definition should be applied in the context of a former employee requesting plan documents pursuant to 29 U.S.C. § 1024(b)(4). The Court held that the term "participant" includes, *inter alia,* "former employees who have ... a colorable claim to vested benefits ." *Id.* at 117. The court further explained that to fall within the category of one who "may become eligible" for benefits, "a claimant must have a colorable claim that (1) he or she will prevail in a suit for benefits, or that (2) eligibility requirements will be fulfilled in the future." *Id.* at 117-18.

Defendants contend that by the time Adkins requested the plan documents on December 20, 1996, she no longer had a "colorable claim" for benefits because it was by then too late to file a "Claim" and, thereby, begin the process of exhausting administrative remedies. The court has already concluded, however, that Adkins has sufficiently exhausted administrative remedies. As such, it follows that her alleged failure to do so cannot support Defendants' claim that Adkins no longer had a "colorable claim" for benefits. [FN13]

> FN13. In their reply brief, Defendants presented an additional argument. They contend that because only *pension* benefits "vest," Adkins claim for *disability* benefits cannot qualify as a "colorable claim to vested benefits" as required by *Firestone.* Aside from the fact that this argument was improperly raised for the first time in a reply brief, *see* D. Del. LR 7.1.3(c)(2), this argument has no merit. First, although the *Firestone* Court first referred to a "colorable claim to vested benefits," it immediately followed that comment by stating that a claimant must have a "colorable claim that ... he or she will prevail in a suit for benefits." *Firestone,* 489 U.S. at 117. Second, the Court in no away implied that its holding was limited to pension benefits. Indeed, it appears that two of the three plans at issue in *Firestone* were not pension benefit plans. *See id.* at 105. Finally, in adopting the "colorable claim" standard, the *Firestone* Court intended to give meaning to the phrase "or may become eligible" for benefits as that phrase is used in 29 U.S.C. § 1002(7). *Firestone,* 489 U.S. at 117. But the full phrase in that section reads: "or may become eligible to receive a benefit *of any type* from an employee benefit plan." § 1002(7) (emphasis added). Defendants offer no reason why, despite this language, different standards should be applied for different types of benefits.

For these reasons, the court will deny Defendants' motion to dismiss Count V of the Complaint.

F. Adkins' Motion for Summary Judgment

To the extent that Adkins has attempted to file a motion for summary judgment, she has failed to do so with sufficient clarity. [FN14] Other than its title and a brief reference in its conclusion, Adkins' response to Defendants' motion to dismiss does little to suggest that she is seeking summary judgment in her favor. [FN15] Although the above discussion suggests that Adkins may be able to assert meritorious arguments for summary judgment, her present request did not give Defendants sufficient notice that they needed to oppose summary judgment at this time. [FN16] Accordingly, to the extent Adkins has, in fact, moved for summary judgment, the court will deny her motion.

> FN14. In response to Defendants' motion to dismiss, Adkins filed a document entitled: "Plaintiff Linda Adkins' Response in Opposition to Defendants' Motion to Dismiss Complaint Pursuant to Federal Rule of Civil Procedure 12(b)(6) Plaintiff's Motion for Summary Judgment."

> FN15. For example, the brief's introductory paragraph suggests that Adkins seeks nothing more than the denial of Defendants' motions to dismiss. The two section headings that refer to summary judgment do so cryptically, at best. *See, e.g.,* Def's Opp'n Br. at 3 ("Guidelines for Substantive Review of Claim for Benefits (Summary Judgment) in the Motion to Dismiss"). Further, the body of the brief neither cites Rule 56 of the Federal Rules of Civil Procedure nor states the standard of review on a motion for summary judgment.

> FN16. In their reply brief in support of their motion to dismiss, Defendants did not respond at all to Adkins' cursory request for summary judgment. For example, Defendants note that the medical records attached to Adkins' brief are not relevant to the resolution of their motion to dismiss. While that is true, such records would be relevant to a properly filed motion for summary judgment. In the court's view, the Defendants would have been wise to at least acknowledge the possibility that

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Adkins had moved for summary judgment. Nevertheless, it would be incongruous to reject Defendants' exhaustion arguments on the basis of undue confusion resulting from their claims administration procedures, yet grant Adkins' request for summary judgment despite undue confusion caused by the brief filed on her behalf.

IV. CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED that:

1. Defendants' Motion to Dismiss the Complaint (D.I.12) is DENIED; and

**12** 2. Plaintiff's Motion for Summary Judgment (D.I.13) is DENIED.

2000 WL 1728368 (D.Del.)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

2000 WL 135129
**(Cite as: 2000 WL 135129 (D.Del.))**

**H**

Only the Westlaw citation is currently available.


United States District Court, D. Delaware.

AUBREY ROGERS AGENCY, INC., Plaintiff,

v.

AIG LIFE INSURANCE COMPANY, Defendant.

**No. Civ.A.97-529 MMS.**

Jan. 13, 2000.

Jeffrey C. Wisler, of Connolly Bove Lodge & Hutz, L.L.P., Wilmington, Delaware, Jeffrey H. Marsh, and Michael J. Filla, of Mattingly & Marsh, L.L.P., Houston, Texas; for plaintiff, of counsel.

Stephen E. Jenkins, and Regina A. Iorii, of Ashby & Geddes, Wilmington, Delaware; for defendant.


*MEMORANDUM OPINION*

SCHWARTZ, J.

### I. INTRODUCTION

**\*1** Plaintiff Aubrey Rogers Agency, Inc. ("ARA") sold credit life insurance and disability policies underwritten by Defendant AIG Life Insurance Company ("AIG"). In February 1995, AIG unilaterally terminated its business relationship with ARA. Shortly thereafter, AIG exited the credit life insurance and disability business due to alleged heavy losses. In July, 1996, ARA filed suit against AIG in a Texas state court, alleging breach of contract, fraudulent and negligent misrepresentation, and tortious interference with contractual and business relations. AIG removed the action to the United States District Court for the Southern District of Texas, and that court later transferred the case to this Court.

ARA identified George Wise, an actuary, as an expert witness to testify on the issue of damages. Mr. Wise wrote his expert report in April 1998, and AIG took Mr. Wise's deposition on June 16, 1998. In a proposed Pretrial Order, ARA identified citations from the transcript of Mr. Wise's deposition that it intended to offer into evidence in lieu of Mr. Wise's live appearance at trial.

On November 30, 1999, AIG filed a Motion in Limine to exclude the deposition testimony of George Wise. AIG argues that Mr. Wise's deposition testimony is inadmissible hearsay. ARA counters that the deposition testimony falls under two hearsay exceptions: Rule 804 of the Federal Rules of Evidence and Rule 32 of the Federal Rules of Civil Procedure. For the reasons set forth *infra,* the Court will not permit ARA to introduce into evidence Mr. Wise's deposition testimony in lieu of his live testimony at trial.

### II. FACTS

The background facts of this case are as set forth in the Court's summary judgment opinion, *Aubrey Rogers Agency, Inc. v. AIG Life Ins., Co.* [FN1] Other pertinent facts are discussed in the body of this opinion.


FN1. 55 F.Supp.2d 309 (D.Del.1999).


### III. DISCUSSION

Statements made during deposition testimony that are offered at trial to prove the truth of the matter asserted are hearsay. [FN2] Such hearsay statements are not admissible except as specifically provided for by rule prescribed by the Supreme Court or other statutory authority. [FN3] AIG argues that Mr. Wise's deposition testimony is hearsay and that it is not admissible as a hearsay exception under either Rule 804 of the Federal Rules of Evidence or under Rule 32 of the Federal Rules of Civil Procedure. [FN4] Rule 804 of the Federal Rules of Evidence and Rule 32(a)(3)(B) of the Federal Rules of Civil Procedure provide independent methods of determining whether a deposition may be admitted into evidence as hearsay exception. [FN5] Therefore, the Court will evaluate the applicability of each Rule to Mr. Wise's deposition testimony.


FN2. *See* Fed.R.Evid. 801(c)(defining hearsay).


FN3. *See* Fed.R.Evid. 802.


FN4. AIG makes two additional exclusion arguments for the first time in its reply brief. In its answering brief, ARA asserts that Mr. Wise was hired "to review Mr. Loesch's

calculations, perform independent calculations of the same type as Mr. Loesch did, and to opine as to whether or not Mr. Loesch's methodology and conclusions were correct." Based on this statement, AIG contends that if Mr. Wise's testimony adds nothing more to the case than buttressing Mr. Loesch's opinions, then his testimony is cumulative under Fed.R.Evid. 403 and therefore should be inadmissible. Because AIG raised this argument for the first time in its reply brief and, thus, ARA has not had an opportunity to respond, this argument is not properly presented to the Court. *See* D. Del. L.R. 7.1.3(c).

AIG further maintains that Fed.R.Evid. 608 renders it inappropriate to support Mr. Loesch's credibility through Mr. Wise's deposition testimony since Rule 608 provides that a witness' credibility may be rehabilitated by "evidence in the form of opinion or reputation," subject to the limitation that the evidence may refer only to the witness' "character for truthfulness or untruthfulness." The Court finds Rule 608 is inapposite to this case. Rule 608 relates to the admissibility of evidence of character and conduct of a witness. ARA has not purported that the purpose of Mr. Wise's testimony is to rehabilitate Mr. Loesch in terms of Loesch's character for truthfulness. Moreover, since the argument was raised for the first time in reply, it is not properly before the Court. *See* D. Del. L.R. 7.1.3(c).

Furthermore, depending on the outcome of AIG's motion in limine to exclude the report and testimony of ARA's primary expert, Patrick Loesch, that is, if the Court determines that Mr. Loesch is not qualified as an expert and/or that his report is unreliable, such ruling would appear to moot AIG's argument that Mr. Wise's testimony is cumulative or an improper attempt to support Mr. Loesch's credibility.

FN5. *See United States v. Vespe,* 868 F.2d 1328, 1339 (3d Cir.1989); *In re Complaint of Bankers Trust Co.,* 752 F.2d 874, 888 n .17 (3d Cir.1984); *Polozie v. United States,* 835 F.Supp. 68, 71 (D.Conn.1993).

A. Deposition of Plaintiff ARA's Expert Mr. Wise is Inadmissible under Federal Rule of Evidence 804

Rule 804(b)(1) provides that, if the declarant is unavailable to be a witness, the former testimony of the declarant is admissible as an exception to the hearsay rule if the testimony was taken in a deposition or hearing and "if the party against whom the testimony is now offered ... had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination." [FN6] Thus in order for Mr. Wise's former testimony to be admitted as an exception to the hearsay rule (1) he must be unavailable; (2) the testimony must have been taken at a hearing or deposition, in the same or another proceeding; and (3) AIG must have had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination. [FN7] Mr. Wise testified under oath in a deposition taken in this action, so there is no dispute that the second element has been satisfied.

FN6. Fed.R.Evid. 804(b)(1).

FN7. *See Kirk v. Raymark Indus.,* 61 F.3d 147, 164 (3d Cir.1995), *cert. denied,* 516 U.S. 1145, 116 S.Ct. 1015, 134 L.Ed.2d 95 (1996).

**\*2** Regarding the first element, ARA, the proponent of the deposition testimony, has the burden of establishing that Mr. Wise is unavailable before his deposition may be admitted at trial. [FN8] The only definition of "unavailability" that appears applicable to this case is when the witness "is absent from the hearing and the proponent of a statement has been unable to procure the declarant's attendance ... by process or other reasonable means." [FN9]

FN8. *See id.* at 165.

FN9. Fed.R.Evid. 804(a)(5).

ARA must prove that it has been unable to procure Mr. Wise's attendance at trial by process or other reasonable means. [FN10] ARA has demonstrated that Mr. Wise's attendance cannot be secured by process because he resides in Texas, more than 100 miles from this Court and, therefore, beyond its subpoena power. [FN11] However, ARA has failed to prove that it has been unable to procure Mr. Wise's attendance "by other reasonable means." [FN12] ARA has failed to demonstrate that it used other "reasonable means" to ensure Mr. Wise's presence at trial. There is nothing in the record to indicate that ARA has made any effort to

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

secure Mr. Wise's attendance at trial or has even contacted Mr. Wise to "offer him his usual expert witness fee, and request his attendance at trial." [FN13]

FN10. *See id.; Kirk,* 61 F.3d at 165; *Creamer v. General Teamsters Local Union 326,* 560 F.Supp. 495, 499-500 & n. 6 (D.Del.1983) (declining to follow "the across-the board rule apparently adopted by the Court of Appeals for the Ninth Circuit in *Murray v. Toyota Distributors, Inc.,* 664 F.2d 1377, 1380 (9th Cir.1982), which equates 'by process or other reasonable means' with 'by process' " because "[i]f the words 'or other reasonable means' are to have any meaning at all, ... it is clear that they must be interpreted as meaning something other than by process."); *Polozie,* 835 F.Supp. at 71.

FN11. *See* Fed.R.Civ.P. 45(c)(3)(A)(ii).

FN12. Fed.R.Evid. 804(a)(5); *Kirk,* 61 F.3d at 165.

FN13. *Kirk,* 61 F.3d at 165 (dicta).

ARA relies on several cases from other circuits which found a witness unavailable under Rule 804 solely because the witness resided more than 100 miles from the district. [FN14] All of these cases are distinguishable in that they involved the unavailability of fact witnesses, rather than an expert, as in this case. Courts that have been asked to address the issue have distinguished between unavailability of fact witnesses and expert witnesses. Parties are expected to use other reasonable means to procure the attendance of their experts because the parties select their experts and arrange for their appearance at trial. [FN15] In *Carter-Wallace,* Judge Friendly, writing for the Court of Appeals for the Second Circuit, stated that "there is something unusual about the use of the prior testimony of an expert witness that calls for further scrutiny of his unavailability." [FN16] The Court explained:

FN14. *See Starr v. J. Hacker Co., Inc.,* 688 F.2d 78 (8th Cir.1982); *Charles v. Wade,* 665 F.2d 661 (5th Cir.1982), *cert. denied,* 460 U.S. 1036, 103 S.Ct. 1426, 75 L.Ed.2d 787 (1983); *Hartman v. United* States, 538 F.2d 1336 (8th Cir.1976); *Castilleja v. Southern*

*Pacific Co.,* 445 F.2d 183 (5th Cir.1971); *Richard v. Brooks,* 227 F.2d 490 (2d Cir.1955); *Texas & P.R. Co. v. Reagan,* 118 F. 815 (5th Cir.1902).

FN15. *See Carter Wallace, Inc. v. Otte,* 474 F.2d 529, 535-36 (2d Cir.1972), *cert. denied,* 412 U.S. 929, 93 S.Ct. 2753, 37 L.Ed.2d 156 (1973); *Myers v. Alessi,* 80 Md.App. 124, 560 A.2d 59, 66 (Md.App.), *cert. denied,* 566 A.2d 1 (Md.1989); *Thompson v. Merrell Dow Pharmaceuticals, Inc.,* 229 N.J.Super. 230, 551 A.2d 177, 189 (N.J.Super.1988). *See also Kirk,* 62 F.3d at 165 (indicating in dicta that an argument that the expert witness was beyond the court's subpoena power was insufficient to prove unavailability and that proponent of expert's deposition testimony needed to show, at a minimum, that expert was contacted and offered usual fee to attend trial).

FN16. 474 F.2d at 536 (internal citations omitted).

First, unlike the typical witness whose involvement with the case may depend on the fortuity of his observing a particular event and whose presence at trial is often involuntary, a party ordinarily has the opportunity to choose the expert whose testimony he desires and invariably arranges for his presence privately, by mutual agreement, and for a fee. Although a requirement of an attempt to secure the voluntary attendance of a witness who lives beyond the subpoena power of the court is not ordinarily imposed before prior testimony can be used in civil litigation, we think that such a requirement is particularly appropriate when dealing with the testimony of expert witnesses whose earlier attendance is almost invariably secured by such voluntary arrangements. [FN17]

FN17. *Id.*

The Second Circuit Court of Appeals went even further, stating that "even the unavailability of a particular expert witness should not without more allow the use of his prior testimony in a second action." [FN18]

FN18. *Id.* (internal citation omitted).

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

**\*3** The Court explained:

It must be recognized that the general preference of the federal rules, as expressed in F.R.Civ. P. 43(a), is for oral testimony so that there will be an opportunity for live cross-examination and observation of the demeanor of the witness. While the use of previous testimony is a well-established exception to this rule, it is an exception based on the necessity of using the prior testimony when the alternative is the loss of that testimony entirely. When the ordinary witness is unavailable, his unique knowledge of the facts will be lost unless the use of his prior testimony is allowed. But the expert witness generally has no knowledge of the facts of the case. Instead, he is called upon to express a professional opinion upon the facts as they are given to him, often expressing his opinions in the form of answers to hypothetical questions. Thus, even if one particular expert is unavailable, there is no need to use his previous testimony to prevent the loss of evidence, because there will usually be other experts available to give similar testimony orally. [FN19]

> FN19. *Id.* at 536. *See also Thompson v. Merrell Dow Pharmaceuticals, Inc.,* 551 A.2d at 189 ("We agree with the rationale of Judge Friendly in *Carter-Wallace v. Otte,* that expert witnesses are not unavailable simply because they are not subject to service of process.... If the expert is beyond the jurisdiction of the court to compel attendance at trial, it is the responsibility of the party offering the expert to ascertain the willingness and availability of the expert to appear at trial. The proponent of the expert must attempt to arrange a trial date at which the expert can appear. Since the expert is under the control of the offering litigant, due diligence must be used to secure attendance at trial."); *Myers v. Alessi,* 560 A.2d at 66 (prior testimony properly ruled inadmissible where proponent responsible for selecting out-of-state expert and decision not to pay him to attend trial).

The Court finds the reasoning of the Second Circuit Court of Appeals in *Carter-Wallace,* and those courts that have followed it, [FN20] to be persuasive and will follow that approach. ARA is responsible for selecting its own expert witnesses and presumably have control over them. ARA has proffered no explanation for Mr. Wise's unavailability other than that he lives in Texas. ARA has not indicated that it has even asked this chosen expert to appear at trial, nor that ARA has offered to pay for the expert's fee and expenses. Thus,

ARA has failed to meet its burden of establishing that Mr. Wise is unavailable within the meaning of Fed.R.Evid. 804(a)(5). [FN21]

> FN20. *See, e.g., Myers v. Alessi,* 560 A.2d at 66; *Thompson v. Merrell Dow Pharmaceuticals, Inc.,* 551 A.2d at 189.

> FN21. Because ARA had failed to make the threshold showing that Mr. Wise is unavailable within the meaning of Rule 804, *see Kirk,* 61 F.3d at 165, the court need not address whether AIG had "an opportunity and similar motive" to develop Mr. Wise's testimony at the deposition, as required by Rule 804(b)(1).

B. Deposition of ARA's Expert Mr. Wise is Inadmissible under Rule 32 of the Federal Rules of Civil Procedure

Because Fed.R.Civ.P. 32(a)(3) constitutes an independent exception to the hearsay rule, [FN22] the Court turns to the question of whether Mr. Wise's deposition may be admitted under that rule. Rule 32(a) provides in pertinent part:

> FN22. *See Vespe,* 868 F.2d at 1339; *In re Complaint of Bankers Trust Co.,* 752 F.2d at 888 n. 17.

At the trial ... any part or all of a deposition, so far as admissible under the rules of evidence applied as though the witness were then present and testifying, may be used against any party who was present or represented at the taking of the deposition or who had reasonable notice thereof, in accordance with any of the following provisions:

...

(3) The deposition of a witness, whether or not a party, may be used by any party for any purpose if the court finds: ... (B) that the witness is at a greater distance than 100 miles from the place of trial or hearing, or is out of the United States, unless it appears that the absence of the witness was procured by the party offering the deposition[.] [FN23]

> FN23. Fed.R.Civ.P. 32(a)(3)(B).

ARA contends that, because Mr. Wise resides in

Texas, more than 100 miles from the trial, his deposition testimony is admissible under the rule. AIG counters that Mr. Wise's testimony is inadmissible because his absence from trial in this case was "procured" by ARA. The Court acknowledges that, as to fact witnesses, the typical rule applied in federal courts is that depositions are permitted to substitute for the testimony of distant witnesses. However, as to expert witnesses, authorities are split. Some courts do not distinguish between expert witnesses and fact witnesses in applying Fed.R.Civ.P. 32(a)(3)(B). [FN24] However, other courts have held that, given the proponent's latitude in selecting experts and the rules' general preference for live testimony, [FN25] judges have discretion to exclude depositions of expert witnesses where the party proponent has selected a distant expert and has not made reasonable efforts to assure the expert's presence at trial. [FN26] The Court's agrees with the latter approach for the reasons set forth in those cases and in *Caron v. General Motors Corp.* [FN27]

FN24. *See, e.g., Alfonso v. Lund,* 783 F.2d 958, 961 (10th Cir.1986) (factually distinguishable because out-of-state expert was out of the country; also parties did not raise nor did court discuss fact that expert was under the control of offering party); *Savoie v. LaFourche Boat Rentals, Inc.,* 627 F.2d 722, 724 (5th Cir.1980) (same); *Pfeiffer v. Eagle Mfg., Co.,* 137 F.R.D. 352, 354-55 (D.Kan.1991) (factually distinguishable because opposing party knew before deposition was taken that it would be a trial deposition and parties knew expert's employer had a policy of not permitting employees to testify); *State v. Long,* 344 So.2d 754, 757-59 (Ala.1977) (distinguishable because expert had informed parties he would be unavailable during trial); *Lee v. Volkswagon of America, Inc.,* 688 P.2d 1283, 1290 (Okla.1984) (stating without explanation that deposition of out-of-county expert admissible under Oklahoma rule).

FN25. *See, e.g.,* Fed.R.Civ.P. 43(a).

FN26. *See, e.g., Polys v. Trans-Colorado Airlines,* 941 F.2d 1404, 1410 (10th Cir.1991) (holding district court was not automatically required to admit the deposition testimony under Rule 32(a)(3)(B) just because the witnesses were more than 100 miles away; the

trial judge appropriately considered surprise to opposing counsel); *Hanson v. Parkside Surgery Ctr.,* 872 F.2d 745, 750 (6th Cir.), cert. denied, 493 U.S. 944, 110 S.Ct. 349, 107 L.Ed.2d 337 (1989) (holding not error to exclude expert deposition testimony under Rule 32 where expert's absence "was at least in part due to plaintiff's own lack of diligence"); *In re Air Crash Disaster at Stapleton Int'l Airport,* 720 F.Supp. 1493, 1502 (D.Colo.1989) (refusing to admit deposition testimony even though the expert witness lived outside the 100 mile radius, in part, because the jury needed to "consider and evaluate the witness's credibility"); *Myers v. Alessi,* 560 A.2d at 66; *Thompson v. Merrell Dow Pharmaceuticals, Inc.,* 551 A.2d at 189.

FN27. 37 Mass.App.Ct. 744, 643 N.E.2d 471 (Mass.App.1994), *review denied,* 419 Mass. 1107, 646 N.E.2d 1071 (Mass.1995).

**\*4** In *Caron,* as here, the defendant deposed the expert after the plaintiff has designated the witness as his expert for trial. Subsequently, the plaintiff asserted that the expert was unavailable for trial in the case because the expert lived in Arizona, outside the Commonwealth of Massachusetts. There, as in this case, the principal argument of the proponent of the deposition testimony seemed to be that he was entitled by right to present the testimony of an out-of-state witness by deposition. The Caron court determined that under Rule 32(a)(3)(B) of the Massachusetts Rules of Civil Procedure, which is virtually identical to the Federal Rule, the trial court did not err in excluding the expert's deposition testimony. [FN28] On the issue of whether a party has a duty to arrange for an expert's appearance at trial, the court looked to federal authorities and noted, "[u]nlike fact witnesses, who are determined by their personal knowledge of relevant facts, regardless of where they live or work, a party normally has broad latitude in selecting his expert witnesses." [FN29] Therefore, reasoned the court, "[b]y selecting an expert from Arizona, the plaintiff's counsel 'procured' the absence of his expert from the Commonwealth in the sense that he voluntarily created a situation in which his expert would be out of the Commonwealth unless he should make arrangements for the expert's appearance at trial." [FN30] The court found "the trial judge doubtlessly suspected that [plaintiff's] counsel may have made little real effort to obtain [the expert witness'] attendance at the trial," and properly rejected plaintiff's argument that "he was entitled by right to present the testimony of an out-of-State witness by deposition." 31

FN28. *Id.* at 474.

FN29. *Id.*

FN30. *Id.*

ARA's claim here is similar to that of the plaintiff in *Caron.* Because Mr. Wise lives in Texas, ARA maintains, it is entitled to present Mr. Wise's deposition testimony by deposition under Rule 32. However, ARA had latitude in selecting its expert. By selecting an expert in Texas, ARA "procured" that expert's absence from this Court "in the sense that [ARA] voluntarily created a situation in which [such] expert would be [*o*utside the subpoena power of this Court] unless [ARA] should make arrangements for the expert's appearance at trial." [FN32] Given the preference of this Court and the Rules for live testimony, the apparent absence of any effort by ARA to secure Mr. Wise's attendance at trial, and the importance for the jury to see and observe the expert's testimony and cross-examination on the issues to determine the expert's credibility and reliability, the Court holds that Mr. Wise's deposition testimony will not be admitted under Rule 32(a)(3)(B).

### IV. Conclusion

ARA has latitude to select its experts and is presumed to have control over such experts. Although Mr. Wise resides beyond the subpoena power of this Court, because there has been no showing ARA used reasonable means, or in fact took any action, to secure Mr. Wise presence at trial, the Court holds in its discretion that Mr. Wise is not unavailable within the meaning of Fed.R.Evid. 804 or Fed.R.Civ.P. 32(a)(3)(B) and, therefore, that his deposition will not be admitted at trial in lieu of live testimony.

FN31. *Id.* at 475.

FN32. *Caron,* 643 N.E.2d at 474.

2000 WL 135129, 2000 WL 135129 (D.Del.)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

1998 WL 175882
**(Cite as: 1998 WL 175882 (D.Del.))**

**C**

Only the Westlaw citation is currently available.

United States District Court, D. Delaware.

FEDERAL INSURANCE COMPANY, as subrogee
of Wilmington Trust Corporation, and St.
Paul Fire & Marine Insurance Company, as subrogee
of Wilmington Trust
Corporation, Plaintiffs,
v.
SIGNTACTICS, INC. and KEITH SIGN
COMPANY, Defendants.
HARTFORD INSURANCE COMPANY, as
subrogee of Limestone Valley Enterprises, L.P.
Plaintiff,
v.
SIGNTACTICS, INC. and KEITH SIGN
COMPANY, Defendants.

**No. 97-343-SLR, 97-647-SLR.**

March 26, 1998.

John D. Balaguer, Esquire of White and Williams,
Wilmington, attorney for plaintiffs Federal Insurance
Co. and St. Paul Fire & Marine Insurance Co.

Kathleen Jennings, Esquire, Oberly, Jennings &
Drexler, Wilmington, attorney for plaintiff Hartford
Insurance Co.

Mary Matterer, Esquire, Stradley, Ronon, Stevens &
Young, Wilmington, attorney for defendant Signtactics,
Inc.

MEMORANDUM OPINION

ROBINSON, District J.

I. INTRODUCTION

 **\*1** Pending before the court are motions to dismiss
filed by defendant Signtactics, Inc. ("Signtactics").
(*Federal Insurance Co., et al. v. Signtactics, Inc. et al.,*
C.A. No. 97-343-SLR("*Federal* "), D.I. 6; *Hartford
Insurance Co. v. Signtactics, Inc. et al.,* C.A. No.
97-647-SLR ("*Hartford* "), D.I. 6) Independent suits
were initiated against Signtactics by Federal Insurance
Company & St. Paul Fire & Marine Insurance Company

("Federal") and Hartford Insurance Company
("Hartford") (collectively referred to as "plaintiffs"),
alleging contract and tort claims.

 The court has jurisdiction over this matter pursuant to
28 U.S.C. § 1332. Venue properly lies in this district
pursuant to 28 U.S.C. § 1391(a).

II. FACTS AND PROCEDURAL BACKGROUND

 The underlying facts do not appear to be in dispute.  In
March 1990, Wilmington Trust Company ("Wilmington
Trust") leased space in the Lantana Plaza Shopping
Center in Hockessin from Limestone Valley Enterprises
L.P. ("Limestone L.P.") to operate a bank branch.
(*Federal,* D.I. 10, Exhibit 1A)

 On January 3, 1991, Wilmington Trust contracted with
Signtactics to "meet, survey, design, manufacture, erect,
and install" business signs at the Lantana Plaza branch.
(*Hartford,* D.I. 7, Exhibit 1A at 1) The contract called
for work to be completed by no later than the week of
February 18, 1991.  (*Id.* at 4) The sign at issue in this
case was referred to in the contract as Sign # 6, and was
to be installed on the south elevation of the bank
building. (*Id.* at 3)

 On September 23, 1996, Sign # 6 malfunctioned.  Fire
and smoke spread throughout the bank branch, causing
extensive damage to both real and personal property.
On June 23, 1997, Federal, as subrogee of Wilmington
Trust, filed a law suit against Signtactics and Keith Sign
Company,   allegedly   a   subcontractor   hired   by
Signtactics to perform the contract for the signs.
(*Federal,* D.I. 1) The suit claimed breach of contract,
negligence, and breach of warranties. On December 9,
1997, Hartford, as subrogee of Limestone L.P., filed an
action against the same defendants, based on the same
events, claiming negligence and breach of warranties.
(*Hartford,* D.I. 1)

 Signtactics has now filed motions to dismiss in both
cases, pursuant to F.R.C.P. 12(b)(6), alleging that the
six-year statute of repose provided by Delaware's
"Builders' Statute," 10 Del. C. § 8127, bars both
actions. (*Federal,* D.I. 6;  *Hartford,* D.I. 6) Briefing is
complete on the motions in both cases, and all parties
have consented to have the motions decided jointly by
the court.  (*Hartford,* D.I. 5)  [FN1] Also pending is
Signtactics' motion to strike a surreply brief filed by
Federal.  (*Federal,* D.I. 12, 13)

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

FN1. Previously, Federal requested oral argument, pursuant to Local Rule 7.1.4. (*Federal,* D.I. 9) There was no request for oral argument in *Hartford.* The court considers Federal's request now moot.

III. DISCUSSION

A. Motion to Strike

Signtactics has moved to strike Federal's surreply brief and the supplemental affidavit contained therein. (*Federal,* D.I. 12, 13) This motion should be considered before addressing the motions to dismiss because if stricken, the supplemental affidavit of Edward Huppi would not weigh into the court's decision on the motions to dismiss.

*2 Local Rule 7.1.3 addresses the form and content of briefs in this district. No subsection provides for or prohibits surreply briefs. Subsection (c) discusses the contents of opening, answering, and reply briefs. Signtactics interprets this to imply that a surreply is not allowed, at least without leave from the court. Federal did not seek permission to file a surreply.

Federal addressed two issues in its surreply. First, it believed Signtactics inaccurately implied that Sign # 6 was the only sign for the bank branch and clarified the number of signs at the branch through Huppi's supplemental affidavit. However, whether or not the affidavit is stricken is irrelevant, as there is already evidence in the record through the contract between Wilmington Trust and Signtactics, of the number of signs at the bank branch. (*See Federal,* D.I. 7, Exhibit 1A)

Second, Federal argued that *McHughs Electric Co. v. Hessler Realty & Development Co.,* Del.Supr., 129 A.2d 654 (1957), cited and relied upon in Signtactics' reply brief, is distinguishable from the instance case. In its answering brief, Federal asserted that the lease between Wilmington Trust and Limestone L.P. was evidence of the intent of both the lessor and the lessee that the signs were neither permanent additions nor enhancements to the capital value of the property. (*Federal,* D.I. 10 at 14) Signtactics then properly addressed that argument in its reply brief, citing *McHughs.* This is not a situation where one party misled the other by holding back arguments until the reply brief, in violation of Local Rule 7.1.3(c)(2).

However, Signtactics has not alleged any particular prejudice suffered, nor is any such prejudice readily apparent. Given that the surreply brief is innoxious,

the motion to strike is denied and the court will consider the surreply brief and supplemental affidavit in deciding the motions to dismiss.

B. Motions to Dismiss

Signtactics moves this court to dismiss the two complaints pursuant to F.R.C.P. 12(b)(6). [FN2] Specifically, Signtactics argues protection under the Delaware Builders' Statute and expiration of the six-year limitations period for damages resulting from deficiencies in the construction of improvements to real property prior to the filing of either complaint. The application of the Builders' Statute is an affirmative defense and as such, Signtactics bears the burden of proving its applicability in this case.

FN2. Signtactics states in its opening brief that it seeks a motion to dismiss "pursuant to F.R.C.P. 12(b)(6) for lack of subject matter jurisdiction." (*Hartford,* D.I. 7 at 1) Such a motion would be based upon F.R.C.P. 12(b)(1). As this is the only reference to subject matter jurisdiction, it is likely a typographical error. Therefore, this memorandum opinion assumes Signtactics' motion is a motion to dismiss for failure to state a claim.

1. Standard of Review

A motion to dismiss for failure to state a claim, pursuant to F.R.C.P. 12(b)(6), cannot be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief," assuming all allegations set forth in the complaint are true and drawing all inferences favorable to the plaintiff. *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). However, when matters outside the pleadings are presented, "the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56...." F.R.C.P. 12(b)(6). F.R.C.P. 56 provides that granting summary judgment is appropriate when "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." F.R.C.P. 56(c). "The appropriate inquiry is whether there is a need for a trial .... Are there any genuine factual issues that properly can be resolved in favor of either party." *Windlev v. Potts Welding & Boiler Repair Co.,* 888 F.Supp. 610, 611 (D.Del.1995).

*3 In its opening briefs, Signtactics attached a copy of the contract with Wilmington Trust. "The Court may

consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *DeWitt v. Penn-Del Directory Corp.*, 872 F.Supp. 126, 128 (D.Del.1994). The contract is such a document and, thus, Signtactics' submission of the contract does not convert the motions to dismiss to summary judgment motions.

However, both plaintiffs submitted affidavits for the court's consideration. Hartford's answering brief contained an affidavit from Cindy Bartoshesky, a limited partner of Limestone L.P. (*Hartford,* D.I. 10, Exhibit A) Federal submitted two affidavits in its answering brief; one from a Wilmington Trust executive, Eduard Huppi, and the other from Clifford Patton, a retained expert in this case. (*Federal,* D.I. 10, Exhibit 1, 2) Additionally, Federal attached a supplemental affidavit from Eduard Huppi in its surreply brief. (*Federal,* D.I. 12, Exhibit 1) These affidavits are matters outside the pleadings and, therefore, the motions to dismiss are converted to motions for summary judgment.

The court is required to provide the parties with notice of its intent to treat motions to dismiss as motions for summary judgment and give the parties an opportunity to submit material in support of their positions. *Hilfirty v. Shipman,* 91 F.3d 573, 578 (3d Cir.1996). The parties appear to have had proper notice, as both plaintiffs and Signtactics propounded in their briefs that the motions were converted. (*Federal,* D.I. 10 at 6, D.I. 11 at 1; *Hartford,* D.I. 10 at 5)

2. Delaware Builders' Statute

The basis for Signtactics' motions is that the actions are barred by the statute of repose in the Delaware Builders' Statute, 10 Del. C. § 8127. A six-year limitation period applies thereunder to actions for damages, indemnification, or contribution for property damage, real or personal or mixed, arising out of any deficiency in the construction of an improvement to real property or the design, planning,supervision, or observation of any such construction. 10 Del. C. § 8127(b)(1)(2). "The limitation period begins to run at the earliest of several designated dates, irrespective of the date of the injury." *City of Dover, et al. v. International Telephone and Telegraph Corp. et al.,* Del.Supr., 514 A.2d 1086, 1089 (1986). "The statute in question is a true statute of repose. It prevents a claim from arising, whereas a statute of limitations bars an accrued cause of action.... Thus, the passing of the six-year period deprives the injured party of a legal right to redress." *Id.* (citations omitted).

The parties agree that the relevant designated date in this case, if the Builders' Statute were to apply, is "the date of purported completion of all the work called for by the contract as provided by the contract if such date has been agreed to in the contract itself." 10 Del. C. § 8127(b)a. The contract between Wilmington Trust and Signtactics called for completion of all work by the week of February 18, 1991. Thus, under the Builders' Statute, the limitation period expired on February 18, 1997.

**\*4** Signtactics asserts it is entitled to protection under the Builders' Statute and, thus, any claim either plaintiff had against it expired approximately four months before Federal filed its complaint and approximately ten months before Hartford filed its complaint. Therefore, the complaints fail to state a claim and should be dismissed. Plaintiffs contend that Signtactics is not entitled to protection under the Builders' Statute and, since the statute of limitations for the particular actions have not expired, the complaints were timely filed.

In order for a builder to receive protection under the Builders' Statute, he or she must furnish construction of an improvement to real property. *City of Dover v. International Telephone and Telegraph Corp.,* 514 A.2d at 1089.

a. Furnish Construction

The Builders' Statute provides protection to persons performing or furnishing, or causing the performance or furnishing of, any ... construction of ... an improvement or against any person performing or furnishing, or causing the performing or furnishing of, any ... designing, planning, supervision, and/or observation of any ... construction or manner of construction of ... an improvement.

10 Del. C. § 8127(b). "Furnish" is defined as "provides for, equips, supplies, or appoints." *Becker v. Hamada, Inc.,* Del.Supr., 455 A.2d 353, 355 (1982). "Construction" is defined by the Builders' Statute to include "construction, erection, building, alteration, reconstruction,and destruction of improvements to real property." 10 Del. C. § 8127(a)(4). Like the definition of "improvement," "[the] Delaware courts apply a common sense understanding of the word construction: the act of building; erection; act of devising and forming; fabrication; or composition." *Windley,* 888 F.Supp. at 612 (citing *Becker,* 455 A.2d at 356). A party must supply more than just raw materials in order to be protected by the Builders' Statute. *Windley,* 888 F.Supp. at 612. If "the party is more than a mere supplier of the material in question in that it actually fabricates them to the specifications of the buyer, that

party furnishes construction." *Id.* Fabrication to the specifications of the buyer is the lynchpin of the "furnishing construction" issue. *Schermerhorn v. Anchor Electric Co. et al.,* Del.Super., 1992 WL 301636, 2 (1992).

In *City of Dover v. International Telephone and Telegraph Corp.,* the court held that off-site fabrication of utility poles constituted "furnishing construction," although the defendant only manufactured and delivered the poles and did not install them, because it manufactured the poles according to the specifications provided by a company involved with designing the pole system. 514 A.2d at 1089.

In *Hiab Cranes and Loaders Inc., et al. v. Service Unlimited Inc. et al.,* Del.Super., C.A. No. 82C-FE-98, Martin J. (August 16, 1983), *modified,* C.A. 82C-FE-98, Martin J. (October 4, 1983), the defendant met the "furnishing construction" requirement by manufacturing and selling an oil furnace designed to be incorporated into a building under construction, according to mechanical specifications of a co-defendant. C.A. 82C-FE-98 at 6-7.

**\*5** In *Standard Chlorine of Delaware, Inc. v. Dover Steel Co., Inc.,* Del.Super., 1988 WL 32044 (1988), the court held a liquid storage tank manufacturer, who did not install the tank, "furnished construction" where the tank was constructed according to the specifications supplied by the plaintiff. *Id.* at 1.

By contrast, in *Kirkwood Dodge v. Krapf,* Del.Super., 1989 Lexis 201 (1989), the court held that the manufacturer of a circuit breaker panel box did not meet the requirement of "furnishing construction" where the panel box was not manufactured according to any specifications, but was a generally available item. *Id.* at 7-8.

In *Schermerhorn,* the plaintiff was injured by a kilowatt hour meter and brought suit against the manufacturer of the meter pan and receptacle. As in *Kirkwood Dodge,* the item was not fabricated according to specifications provided to the manufacturer and the court held the defendant did not furnish construction, stating "[t]he public policy behind the statute of repose does not apply to items manufactured by a general supplier not designed for specific application to a particular construction project." *Schermerhorn,* 1992 WL 301636 at 2.

In the cases at bar, the contract between Wilmington Trust and Signtactics provided that Signtactics will "meet, survey, design, manufacture, erect, and install" signage, *within Wilmington Trust's specifications,* for

the bank branch in question. (*Hartford,* D.I. 7, Exhibit 1A at 1)(emphasis added). This suggests that Signtactics was more than just a supplier of a generally available item [FN3], and is entitled to the status of one who furnished construction under the Builders' Statute.

FN3. Although there may be a factual dispute as to whether Signtactics actually "constructed" Sign # 6 or "caused" the construction of Sign # 6 (*see Federal,* D.I. 10, Exhibit 1 at para. 6), the dispute is not material under the language of the statute. The Builders' Statute protects parties "performing or furnishing any construction of an improvement to real property, *as well as those causing* to perform or furnish, any design, plan, supervision of or observation of any construction of an improvement. *City of Dover v. International Telephone and Telegraph Corp.,* 151 A.2d at 1089 (emphasis added). This language indicates the courts' recognition that a party to a contract may generally delegate his or her duties under the contract and that such delegation does not relieve the original promisee of primary responsibility for performance. Therefore, whether Signtactics caused Keith Sign Company to perform or furnish Sign # 6, pursuant to Wilmington Trust's specification, or performed and furnished Sign # 6 itself, Signtactics is entitled to the status of one who furnished construction under the Builders' Statute.

b. Improvement to Real Property

The second requirement of the Builders' Statute is that the item constructed qualify as an improvement to real property. 10 Del. C. § 8127(b)(1). This is a question of law. *Windley,* 888 F.Supp. at 613. Thus, there can be no genuine issue of material fact for a jury to decide and a summary judgment review is appropriate.

The Builders' Statute defines "improvement" to include "buildings, highways, roads, streets, bridges, entrances and walkways of any type constructed thereon, and other structures affixed to and on land, as well as the land itself...." 10 Del. C. § 8127(a)(2). The Delaware Supreme Court, using the rules of statutory construction, interpreted this listing to be "exemplary, not exclusive." *City of Dover v. International Telephone and Telegraph Corp.,* 514 A.2d at 1089 (citing *Gage v. City of Wilmington,* Del.Supr., 293 A.2d 555, 557 (1972)). Thus, the case law has further

defined what constitutes an improvement.

The seminal case on this issue in Delaware is *Hiab Cranes and Loaders Inc., et al. v. Service Unlimited Inc. et al.,* Del.Super., C.A. No. 82C-FE-98, Martin J. (August 16, 1983), *modified,* C.A. 82C-FE-98, Martin J. (October 4, 1983). In that case, the court was asked to determine whether an oil furnace was an improvement to real property.    After noting that challenges to the statute's application, based on the definition of "improvement," had not previously been addressed in Delaware, the court analyzed how other jurisdictions approached the issue.    The court found that "those decisions which have interpreted the 'improvement' to real property provision of the builders' statute indicate that the term is susceptible of definition employing either of two basic approaches." *Hiab* at 3. The first is a common law fixture analysis. *Id.* In Delaware, such analysis focuses mainly on the "intention of the annexor as to whether or not a chattel was affixed to realty for a temporary or permanent purpose."    *Hiab* at 6, n. 10 (citing *Del-Tan Corporation v. Wilmington Housing Authority,* Del.Supr., 269 A.2d 209, 210 (1970)).

**\*6** The second approach is a "common sense" interpretation, defining "improvement " as

a permanent addition to or betterment of real property that enhances its capital value and that involves the expenditure of labor and money and is designed to make the property more useful or valuable as distinguished from ordinary repairs.

*Hiab* at 4.

Additionally, the *Hiab* court cited a New Jersey case, *Brown v. Central Jersey Power & Light Co., 163 N.J.Super. 179, 394 A.2d 397 (N.J.Super.1978),* where the court used a vitality test, holding that a transfer switch assembly was an improvement because it "constituted a permanent part of one of the mechanical systems necessary to the normal function of the particular improvement to real estate ... By contrast, equipment or chattels brought into a structure after it is architecturally and mechanically suitable for occupancy for the purpose intended should be exempted from the statute, e.g., furniture, production machinery, appliances, etc." *Hiab* at 5 (citing *Brown,* 394 A.2d at 405-406).

(1) Vitality Test

Ultimately, the *Hiab* court, citing *Brown,* used the vitality test and held that the heating system, with the oil furnace at issue, was an improvement because it "comprised the permanent entirety of one of the

mechanical systems vital to the normal function of the [building]. Without the heating system, the [building] would have been neither functional nor architecturally and mechanically suitable for occupancy." *Hiab* at 5.

This court applied the vitality test in *Windley,* holding that a large air preheater in a power plant was an improvement because it was "central to the plant's function." 888 F.Supp. at 613.

In the instant cases, Sign # 6 fails the vitality test.    It was not essential to one of the mechanical systems of the building, necessary for occupancy, nor central to the building's function.    The building at issue could be occupied and used without this sign.    Thus, under this approach, Sign # 6 would not meet the definition of "improvement" to real property and the Builders' Statute would not apply.

(2) Common Sense Interpretation Approach

Utilizing the common sense interpretation of "improvement," in *Davis v. Catalytic Inc.,* Del.Super., 1985 WL 189329 (1985), the court reviewed the factors constituting the common sense definition of "improvement" and held that a slurry cooler, a large free standing structure encased in steel with other significant parts cemented into the ground and bolted to it, was an improvement to real property. *Id.* at 4. The court found that the physical structure of the cooler clearly indicated a permanent addition;  the cooler enhanced the capital value of the property by enabling an increase in product production, as well as being a capitalized item on the owner's books;  its construction required an expenditure of money and labor;  and the cooler made the property more useful because it facilitated increased production. *Id.*

**\*7** In *Standard Chlorine,* a liquid storage tank was found to be an improvement. 1988 WL 32044 at 2. The decision furnished minimal analysis, simply relying on the tank weighing approximately 74,000 pounds, containing 320,000 gallons of toxic liquid, costing \$24,000 to construct, and being "attached to the realty through a system of pipes, valves, manifolds, wires, scaffolds, catwalks, and a foundation." *Id.* The court also found that the tank enhanced the value of the real property, but provided no basis for this conclusion. *Id.*

In *Kirkwood Dodge,* the court held that a circuit breaker panel box, installed when the building was originally constructed, qualified as an improvement under the common sense definition. 1989 Lexis 201 at 3-4.   Again, the court did not provide much analysis, stating only that the box was "a permanent fixture to the building which is certainly designed to make the

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

property more useful than it otherwise would be." *Id.*

Perhaps the most related case to the instant actions is *Fountain v. Colonial Chevrolet Co., et al.,* Del.Super., 1988 WL 40019 (1988). In *Fountain,* the Builders' Statute was held to apply to a pole bearing a rotating sign. Although the primary issue in *Fountain* was whether the defendant had furnished construction, application of the statute implied that the item was an improvement to real property, since both requirements must be met to fall within § 8127. However, unlike the matters under consideration, the focus of the *Fountain* court was not whether the sign was an improvement, but whether the pole was an improvement. Here, the sign is the focus of the improvement inquiry. Thus, *Fountain* is not as helpful as it appears at first glance.

Reviewing the four common sense factors as they apply to the cases at bar, Sign # 6 does not meet the common sense definition of "improvement." Clearly, there was an expenditure of money and labor, given the sign cost $10,500 and required labor to create it. (*Hartford,* D.I. 7, Exhibit 1A) Furthermore, the addition of Sign # 6 was not an ordinary repair to the building. It made the property more useful to Wilmington Trust than it otherwise would have been by announcing the exact location of the bank branch within the shopping center to both existing and potential bank customers.

However, the physical structure of Sign # 6 does not indicate that it was a permanent addition to the building. Sign # 6 is described as compromising 15 individual lightweight, portable letters, each with its own wires, that could be attached to and detached from the permanent wires in the building, without damage to the building or the sign. (Affidavit of Clifford Patton, *Federal,* D.I. 10, Exhibit 2; Wilmington Trust/Signtactics contract, *Hartford,* D.I. 7, Exhibit 1A)

Nor did Sign # 6 add any capital value to the real property, although an improvement does not necessarily *require* value enhancement to be defined as such. *City of Dover v. International Telephone and Telegraph Corp.,* 514 A.2d at 1089-90. There is no evidence that Sign # 6 increased the value of the property to Limestone L.P., the owner of the real property, or that Wilmington Trust characterized Sign # 6 as a capital expenditure, as in *Davis.* Signtactics argues that Limestone L.P. may have had difficulty securing a tenant for the property without permitting commercial signs, thus decreasing the property value if signs were excluded. While this proposition may be accurate, the court must focus on the sign at issue, not signs in general. The issue is whether Sign # 6 added capital value to the real property. Sign # 6 was a sign *located on a building.* Signtactics submitted no evidence to

support that the absence of a sign on a building would decrease the value of the property.

**\*8** Using common sense and comparing Sign # 6 to those items deemed an improvement by the Delaware courts, there is an obvious difference, as a matter of law, between a sign on the side of a building and a slurry cooler, circuit breaker panel box, liquid storage tank, or a pole. Therefore, the court finds that Sign # 6 is not an improvement to real property under the common sense interpretation approach.

(3) Common Law Fixture Analysis

Employing the common law fixture analysis approach, "the dominant inquiry in according a chattel the status of fixture is the intention of the annexor as to whether or not the chattel was affixed to realty for a temporary or permanent purpose." *Hiab* at 6, n. 10 (citing *Del-Tan Corp.,* 269 A.2d at 210). Factors that should be considered include "the nature of the chattel, the mode of its annexation to the real estate, the purpose or use for which the annexation has been made, and the relation of the person annexing the chattel to the property." *Del-Tan Corp.,* 269 A.2d at 210.

In *Hiab,* the court applied the fixture analysis, as well as the common sense interpretation, regarding whether an oil furnace was an improvement to real property. *Hiab* at 6, n. 10. The court concluded, without elaborating on its analysis, that "the oil furnace was intended as a permanent structure and that plaintiff did not contemplate its removal prior to the expiration of its useful life." *Id.*

Application of the fixture analysis to the cases at bar results in the conclusion that Sign # 6 was not a fixture. The nature of the chattel was a sign, consisting of fifteen lightweight, portable letters, that could be attached to and detached from the building's permanent electrical system without damage to the building or the sign. (Patton Affidavit, *Federal,* D.I. 10, Exhibit 2) The annexation was achieved by mounting each letter on the wall with two-inch pins. (*Hartford,* D.I. 7, Exhibit 1A at 3) Each of the fifteen individual letters had its own wires that could be attached to and detached from the permanent wires in the building. (Patton Affidavit, *Federal,* D.I. 10, Exhibit 2) The removal of the letters from the building could be accomplished with no damage to the building or the letters themselves. (*Id* ) Wilmington Trust was a lessee to the property. (*Hartford,* D.I. 10, Exhibit A)

Additionally, the lease between Wilmington Trust and Limestone L.P. evidences that Wilmington Trust intended the sign to be affixed on the building

temporarily, as Paragraph 10(d) specifically provides that

> signs or moveable trade fixtures shall not be deemed part of the [premises] and may be removed by Lessee at any time or times during the term of this lease and upon the termination of the term of this Lease.... In the event that Lessee removes signs and removable trade fixtures not deemed to be part of the [premises], Lessee must restore [the premises] to its original condition.    All improvements, except signs and removable trade fixtures, shall belong to Lessor at the termination of this Lease.

**\*9** (*Hartford,* D.I. 10, Exhibit A) Also, the affidavit by Cindy Bartoshesky confirms that the signs were not part of the premises and could be removed by Wilmington Trust at any time, that Wilmington Trust was obligated to remove the signs at the termination of the lease, and that the signs were not a permanent part of the premises "inasmuch as they were not owned by the owner of the premises." (*Hartford,* D.I. 10, Exhibit A, para. 7, 8, 9)

 Signtactics claims that the lease between Wilmington Trust and Limestone L.P. cannot preclude assertion of a statutorily created right for its benefit, citing *McHughs Electric Co. v. Hessler Realty & Development Co.,* Del.Supr., 129 A.2d 654 (1957). The plaintiff, a subcontractor, had installed lights and wiring on various buildings and when he was not paid, sought a mechanic's lien on the entire theater.    The defendant, a lessee, claimed the lights and wiring were personal property, not fixtures, because the lease provided that upon termination, removal of all installations made during the lease was allowed.    The court held that the lights and wiring were fixtures, stating the defendant could not contract away a statutory right created for the benefit of the plaintiff.

 *McHughs* is distinguishable from this case.    Here, the lease is being offered as evidence of Wilmington Trust's intent that Sign # 6 was not a permanent improvement to the building, but merely a temporary addition. Plaintiffs are not claiming that the lease, in and of itself, makes Sign # 6 a temporary addition.    Additionally, there are other factors which lead to the conclusion that Sign # 6 was temporary, such as its physical composition and the method of attachment.

 Therefore, under any of the three possible approaches to determine whether an item is an improvement under the Builders' Statute, the court concludes that Sign # 6 was not an improvement to real property as a matter of law. Therefore, Signtactics is not entitled to protection under the Builders' Statute.

 III. CONCLUSION

 For the reasons stated, defendant Signtactics' motions to dismiss/summary judgment shall be denied.

  An order shall issue.

 1998 WL 175882, 1998 WL 175882 (D.Del.)

 END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



Not Reported in F.Supp.2d                                                                                                          Page 1
Not Reported in F.Supp.2d, 2004 WL 609329 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

**C**
Not Reported in F.Supp.2d, 2004 WL 609329 (D.Del.)
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
In re: STUDENT FINANCE CORPORATION,
Debtor.
STUDENT FINANCE CORPORATION, Plaintiff,
v.
ROYAL INDEMNITY CO., Defendant.
**No. 02-11620, Civ.A. 03-507 JJF, 02-6803 LK.**

March 23, 2004.

L. Jason Cornell , of Fox Rothschild LLP , Wilmington, Delaware, Hal Baume , of Fox Rothschild LLP , Lawrenceville, New Jersey, David A. Gradwohl , Andrew W. Bonekemper , and Anthony P. DeMichele , of Fox Rothschild LLP, Lansdale, Pennsylvania, for Plaintiff/Debtor Student Finance Corporation, of counsel.
Lawrence C. Ashby , Philip Trainer, Jr. , and Gregory A. Taylor , of Ashby & Geddes , Wilmington, Delaware, Michael H. Barr , Peter D. Wolfson , and Kenneth J. Pfaehler , of Sonnenschein Nath & Rosenthal , New York, New York, Alan S. Gilbert , of Sonnenchein Nath & Rosenthal, Chicago, Illinois, for Defendant Royal Indemnity Company, of counsel.

*OPINION*

FARNAN, J.
**\*1** Presently before the Court is Defendant Royal Indemnity Company's ("Royal") Motion To Dismiss. (D.I.6.) FN1 For the reasons set forth below, the Court will grant in part and deny in part Royal's Motion.

> FN1. The docket item numbers referenced herein are the docket items in the adversary proceeding *Student Finance Corporation v. Royal Indemnity Co.,* Adversary Proceeding

Number 02-06803 LK.

BACKGROUND

This is an adversary proceeding arising from the Chapter 11 bankruptcy filing *In re Student Finance Corporation.* The parties to this adversary proceeding stipulated to the withdrawal of the reference to the bankruptcy court, which was granted by Chief Judge Robinson. The instant action was subsequently assigned to this Court.

Student Finance Corporation ("SFC") engages in the origination and purchasing of student loans, primarily for truck driving school students. FN2 SFC, along with its affiliates, obtained funds to purchase and originate student loans from warehouse lines of credit provided by the Wilmington Trust Co. and PNC Bank. Once SFC exhausted these warehouse lines of credit, SFC and its affiliates packaged loans it purchased or originated into portfolios and sold them on the secondary market (the "securitizations") to financial institutions or insurance companies. To continue selling its portfolios on the secondary market, SFC required credit risk insurance which it obtained from AIG. In 1999, AIG discontinued this line of insurance. Thereafter, SFC obtained credit risk insurance from Royal.

> FN2. As the instant motion is a motion to dismiss, the Court has taken the facts from SFC's Complaint.

Royal continued to provide SFC with credit risk insurance for its securitizations through November of 2001. In December of 2001, SFC alleges that Royal verbally agreed to issue it one more credit risk insurance policy. In February of 2002, Royal was told by its parent company to discontinue issuing credit risk insurance. Royal subsequently announced that it was exiting the credit risk insurance business; however, SFC alleges that Royal assured it that Royal would issue one last policy. SFC alleges that Royal later stated that it would only consider doing so if SFC executed two

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 2
Not Reported in F.Supp.2d, 2004 WL 609329 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

promissory notes (the "Notes") whereby SFC agreed to borrow approximately twelve million dollars from Royal that would be used to make forbearance payments to Wells Fargo, who was the trustee of the securitizations. All the proceeds of the Notes went directly to Wells Fargo.

SFC alleges that after it complied with Royal's request Royal never issued SFC the credit risk insurance policy as promised. SFC alleges that, in reliance on Royal's promises, it continued to approve and fund student loans. In its Complaint (D.I.1), SFC asserts six claims against Royal. This is Royal's Motion to Dismiss Counts I and II pursuant to Rule 9(b) and Counts I-VI pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

STANDARDS OF REVIEW

I. Rule 9(b)

Rule 9(b) requires a party alleging fraud or mistake to plead with particularity the circumstances constituting its claims. Fed.R.Civ.P. 9(b). The intent behind Rule 9(b) is to give defendants notice of the claims against them and to reduce the number of frivolous actions. In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1418 (3d Cir.1997). Rule 9(b) does not require the recitation of "every material detail of the fraud such as date, location and time[; however,] plaintiffs must use 'alternative means of injecting precision and some measure of substantiation into their allegations of fraud.' " In re Rockefeller Ctr. Prop., Inc. Sec. Litig., 311 F.3d 198, 216 (3d Cir.2002) (quoting In re Nice Sys., 135 F.Supp.2d 551, 557 (D.N.J.2001)).

II. Rule 12(b)(6)

**\*2** A motion to dismiss tests the legal sufficiency of the complaint. Conley v. Gibson, 355 U.S. 41, 45-56 (1957). In reviewing a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, courts "must accept as true the factual allegations in the [c]omplaint and all reasonable inferences that can be

drawn therefrom." Langford v. City of Atlantic City, 235 F.3d 845, 847 (3d Cir.2000). A court will grant a motion to dismiss only when it appears that a plaintiff could prove no set of facts that would entitle him or her to relief. Id.

DISCUSSION

I. Whether SFC Has Pled With Particularity Fraud And Negligent Misrepresentation

Royal contends that Counts I, negligent misrepresentation, and II, fraud, of SFC's Complaint should be dismissed because SFC has failed to plead these claims with particularity as required by Rule 9(b). Royal contends that SFC's Complaint does not identify the speaker of the alleged misrepresentations nor, with one exception, to whom the false statements were made. Royal also contends that SFC asserts only generalized and conclusory descriptions of misrepresentations made by Royal. SFC responds that the Rule 9(b) standard is generous in the Third Circuit and that its allegations of fraud and negligent misrepresentation satisfy Rule 9(b)'s requirements. In addition, SFC requests, in the event the Court agrees with Royal, that it be granted leave to amend its Complaint.

After reviewing the Complaint in light of the Rule 9(b) standards recited above, the Court concludes that SFC has failed to satisfy the pleading requirements of Rule 9(b). Nowhere in its Complaint does SFC identify the speaker of Royal's alleged misrepresentations. This is a failure to satisfy the particularity requirements of Rule 9(b). See Klein v. Gen. Nutrition Co., Inc., 186 F.3d 338, 345 (3d Cir.1999) (stating that Rule 9(b) "requires, at a minimum, that the plaintiff identify the speaker of the fraudulent statements .") Although SFC contends that, according to Brown v. SAP America, Inc., 1999 WL 803888 (D.Del. Sept. 13, 1999), a plaintiff need not identify the speaker of the alleged misrepresentation to satisfy Rule 9(b)'s requirements, to the extent Brown's holding conflicts with Klein v. General Nutrition Co., Inc., the Court declines to extend Brown to the facts in this case. See also F.D.I.C. v. Bathgate, 27 F.3d 850, 876 (3d Cir.1994) (holding

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

that a failure to identify the speaker of alleged misrepresentations amounted to a failure to satisfy Rule 9(b) ); *Liafail, Inc. v. Learning 2000, Inc.,* 2002 WL 31667861, at *4 (D.Del. Nov. 25, 2002).

The Court also concludes that SFC's allegations of material omissions fail to satisfy Rule 9(b)'s pleading requirements. SFC bases, in part, its fraud and negligent misrepresentation claims on material omissions by Royal, yet never identifies what facts withheld by Royal induced SFC to act. Moreover, although courts cannot expect plaintiffs to have access to information sufficient to satisfy a detailed application of Rule 9(b) in all cases, in the instant case, SFC does not contend that information it needs to satisfy Rule 9(b)'s particularity requirements is exclusively within Royal's control. *See F.D.I.C.,* 27 F.3d at 876. Therefore, SFC has given the Court no reason to relax "the normally rigorous particularity rule" based upon lack of knowledge or control. *Burlington,* 114 F.3d at 1418. Accordingly, to the extent Counts I and II of SFC's Complaint are based on material omissions by Royal, the Court concludes that SFC has failed to satisfy Rule 9(b). FN3

> FN3. Royal also contends that *Brug v. The Enstar Group, Inc.,* 755 F.Supp. 1247 (D.Del.1991) , and *Brown v. The Buschman Co.,* 2002 WL 389139 (D.Del.2002), compel the Court to dismiss Counts I and II of SFC's Complaint for failure to adequately plead scienter. Because the Court concludes that *Brug* and *Brown* are distinguishable from the facts in this case, the Court disagrees. The plaintiffs in *Brug* and *Brown* made only general averments, without any supporting facts, of intent or scienter. *Brug,* 755 F.Supp. at 1254-55; *Brown,* 2002 WL 389139, at *8. Therefore, the *Brug* and *Brown* courts concluded that they had no choice but to dismiss the plaintiffs' claims. In this case, however, SFC has identified facts by which the Court infers intent. In paragraphs 31 and 33 of its Complaint (D.I.1), SFC alleges that Royal indicated that it would extend additional credit risk insurance following its announcement that it was leaving the credit

risk insurance business if SFC would agree to borrow money from Royal to be used in making forbearance payments to Wells Fargo. SFC alleges that it complied with Royal's condition, but that Royal never extended additional credit risk insurance. The Court concludes that these facts are sufficient by which to infer intent or scienter.

*3 In sum, the Court concludes that Counts I and II of SFC's Complaint fail to satisfy the pleading requirements of Rule 9(b). FN4

> FN4. In its reply brief (D.I.18), Royal contends for the first time that all of SFC's claims are based on allegations of fraud, and, therefore, if the Court finds that SFC has failed to properly plead Counts I and II, then all of SFC's claims must be dismissed. Without addressing the merits of Royal's arguments, the Court concludes that Royal is not entitled to dismissal of the remaining claims of SFC's Complaint on Rule 9(b) grounds.
> Rule 7.1.3 of the Local Rules for the District of Delaware ("Local Rule 7.1.3") provides that "[t]he party filing the opening brief shall not reserve material for the reply brief which should have been included in a full and fair opening brief." D. Del. L.R. 7.1.3(c)(2). The practice of reserving arguments for reply briefs "amounts to impermissible 'sandbagging.' " *Rockwell Tech., LLC v. Spectra-Physics Lasers, Inc.,* 2002 WL 531555 (D.Del. March 26, 2002) (quoting *Jordan v. Bellinger,* 2000 U.S. Dist. LEXIS 19233, *18 (D. Del. April 28, 2000)). By waiting until its reply brief to assert that all of SFC's claims should be dismissed pursuant to Rule 9(b), Royal has violated Local Rule 7.1.3. Accordingly, the Court rejects Royal's attempt to dismiss SFC's remaining claims under Rule 9(b).

II. Whether Counts I-VI State A Claim Upon Which Relief May Be Granted

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 609329 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

A. *Counts I And II, Negligent Misrepresentation And
Fraud*

Under Delaware law, to state a claim of common law
fraud a plaintiff must plead: 1) a false representation
made by the defendant, usually one of fact; 2) the
defendant's knowledge or belief that the statement was
false; 3) an intent to induce the plaintiff to act; 4) the
plaintiff's justifiable reliance upon the representation;
and 5) damage to the plaintiff as a result. *Stephenson v.
Capano Dev., Inc., 462 A.2d 1069, 1074 (Del.1983)*.
The only difference between an action for fraud and
negligent misrepresentation is that, with a claim of
negligent misrepresentation, the plaintiff need not plead
that the defendant knew or believed that his or her
statement was false or that he or she proceeded in a
reckless disregard for the truth. *Id.* By its Motion, Royal
seeks to dismiss Counts I and II for failure to plead
elements 1, 4, and 5.

### 1. *Statement Of A Material Fact*

Royal contends that SFC has not adequately pled the
existence of a material fact because the statements SFC
alleges were false or negligent concern future
undertakings. (D.I. 7 at 8.) SFC responds that the Court
should not be persuaded by Royal's arguments because
a claim for fraud may be based upon statements of
future results.

Under Delaware law, "[o]pinions and statements as to
probable future results are not generally fraudulent even
though they relate to material matters." *Esso Standard
Oil Co. v. Cunningham, 114 A.2d 380, 383 (Del.
Ch.1955)* ; *Craft v. Bariglio, 1984 WL 8207, at *8
(Del. Ch. March 1, 1984)*. Applying this principle and
the Rule 12(b)(6) standard of review to the allegations
in SFC's Complaint, the Court concludes that it would
be premature to dismiss Counts I and II for failure to
plead a material fact.

In its Complaint, SFC alleges that after Royal made a
public announcement that it was leaving the credit risk
insurance business, "Royal continued to represent to
SFC that one more policy *would* be issued to SFC."

(D.I. 1 at ¶ 31) (emphasis added). Further, SFC alleges
that Royal contacted SFC's CEO and "told him that
Royal would consider providing credit risk insurance
for another securitization if SFC agreed to borrow
money from Royal to be used to make 'forbearance
payments' to Wells Fargo." *Id.* at ¶ 33. Taken as true,
SFC's assertions constitute more than mere "[o]pinions
and statements as to probable future results." *See Esso
Standard,* 114 A.2d at 383. Thus, the Court concludes
that the combined effect on SFC of Royal's statements
of intent to issue a new policy suffice, for the purposes
of this Motion, to plead the existence of misstatements
or negligent misrepresentations made to induce SFC to
borrow money from Royal.

### 2. *Justifiable Reliance*

**\*4** Royal contends that SFC has not pled justifiable
reliance because, in the circumstances of this case, a
reasonable person would not have relied upon a verbal
commitment that Royal would issue an additional credit
risk insurance policy. In response, SFC contends that its
reliance upon Royal's misrepresentations was justifiable
because, unlike the precedent relied upon by Royal, in
this case there was no written agreement between the
parties that made Royal's oral assurances unworthy of
SFC's reliance.

Delaware courts follow the Restatement's definition of
justifiable reliance. *See Lock v. Schreppler, 426 A.2d
856, 863 (Del.Super.1981), superceded by statute in
part on other grounds as stated in, Amato & Stella
Assoc. v. Florida North Inv ., Ltd., 678 F.Supp. 445,
448 (D.Del.1988)*. In order to plead justifiable reliance
based on a statement of intention, a plaintiff must allege
facts demonstrating that "the intention is material and
the recipient has reason to believe that it will be carried
out." Restatement (Second) of Torts § 544 (1977).
Applying these standards to SFC's Complaint, the Court
concludes that SFC has adequately pled justifiable
reliance in order to survive dismissal.

Royal directs the Court to *Debakey Corp. v. Raytheon
Service Co ., 2000 WL 1273317 (Del. Ch. Aug. 25,
2000)*, for support of its contention that SFC failed to
adequately plead justifiable reliance. FN5 In *Debakey,*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                              Page 5
Not Reported in F.Supp.2d, 2004 WL 609329 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

the plaintiff sued for fraudulent inducement because of an oral promise by defendants that they would provide funding in excess of $2 million to the parties' joint venture. 2000 WL 1273317, at *22. A subsequent written contract, however, stated that the defendants had the right to unilaterally decide not to extend funding once the $2 million limit was reached. *Id.* Once the $2 million limit was reached, the defendants declined to extend the plaintiffs additional funding. *Id.*

FN5. Royal does not contest that the statements at issue are material.

Following a bench trial, the *Debakey* court concluded that the written contract precluded the plaintiff from establishing justifiable reliance. *Id.* The court reasoned that reliance on the defendants' prior oral representations that they would provide funding in excess of $2 million when a subsequent express contract "unambiguously" permitted the defendants to terminate the joint venture "once the $2 million funding limit was reached" was unreasonable. *Id.*

The Court concludes that *Debakey* is both factually and procedurally distinguishable from the instant case. Here, unlike *Debakey,* there is no express contract that would make SFC's reliance on Royal's oral representations unjustifiable. Further, the *Debakey* court reached its conclusions after a bench trial and post-trial briefing, clearly not subject to the liberal 12(b)(6) standard of review. When reviewing SFC's Complaint under the correct standard of review, the Court concludes that SFC has adequately pled justifiable reliance. As noted above, SFC alleges that Royal made two statements to it indicating Royal's intent to issue a new credit risk insurance policy. (D.I. 1 at ¶ 31, 33.) Further, SFC alleges that Royal made these two representations following Royal's public announcement that it was exiting the credit risk insurance business (D.I. 1 at ¶ 29), thereby justifying SFC's belief that Royal would issue one more policy despite its announcement.

**\*5** Based on these allegations, the Court cannot conclude that SFC could prove no set of facts establishing justifiable reliance. *See Langford,* 235 F.3d

at 47. Accordingly, the Court will deny Royal's Motion to Dismiss Counts I and II for failure to plead justifiable reliance.

### 3. *Damages*

The Court is not persuaded by Royal's contention that SFC has failed to plead damages as a result of Royal's allegedly fraudulent and negligent misrepresentations. In paragraph 36, SFC alleges that it borrowed over $12 million from Royal "that provided no benefit to SFC." (D.I.1.) Further, in paragraph 45, SFC alleges that based on Royal's misrepresentations, Royal continued to receive pecuniary benefits that it was not entitled to from SFC's business. *Id.* Based on these allegations, the Court concludes that SFC has pled damages that are a consequence of Royal's alleged misrepresentations and false statements.

### 4. *Duty To Speak*

Royal also contends that SFC has failed to state a claim of fraud or negligent misrepresentation because, to the extent SFC bases Counts I and II on material omissions by Royal, SFC has not alleged that Royal had a duty to speak. In Delaware, a duty to speak may arise from circumstances other than a fiduciary or confidential relationship. *See Matthews Office Designs, Inc. v. Taub Inv., 647 A.2d 382 (Del.1993)* (relying on the Restatement (Second) of Torts § 551(2) (1976) for the circumstances in which a duty to speak may arise). In relevant part, the Restatement (Second) of Torts § 551 provides that a party to a business transaction has a duty to exercise reasonable care to disclose: 1) information known due to the existence of a confidential or fiduciary relationship; 2) information that if undisclosed will cause its partial statements of facts to be misleading; or 3) facts basic to the transaction "if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts." *Id.; see also Mentis v. Delaware Am. Life Ins. Co., 1999 WL 744430 (Del.Super. July 28, 1999)* (holding that a duty to speak

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 6
Not Reported in F.Supp.2d, 2004 WL 609329 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

may arise from a pre-existing relationship between the parties or from a partial disclosure of facts that requires further disclosure to prevent a misleading impression) (citations omitted).

Royal moves to dismiss Counts I and II only on the basis that SFC has not alleged the existence of a confidential or fiduciary relationship between the parties. Therefore, the Court will deny Royal's Motion because Royal has not established, under all the circumstances articulated by Section 551 of the Restatement (Second) of Torts, that SFC has failed to plead facts sufficient to establish a duty to speak.

### B. *Count III, Breach Of The Duty Of Good Faith And Fair Dealing*

Royal contends that Count III of SFC's Complaint, breach of the duty of good faith and fair dealing, should be dismissed because there was no contract by which a covenant of good faith and fair dealing may be implied. In response, SFC contends that it has alleged facts sufficient to support its breach of the duty of good faith and fair dealing claim because the case Royal relies upon implied a covenant of good faith and fair dealing before the execution of any written contract. Further, SFC contends that part of its good faith and fair dealing claim involves actions that took place after the Notes were executed.

**\*6** Delaware courts recognize an implied covenant in contracts requiring the parties to act with good faith toward the other party with respect to their contract. *Katz v. Oak Indus. Inc.,* 508 A.2d 873, 880 (Del. Ch.1986) (citing Restatement (Second) of Contracts, § 205 (1981)). A party must "act reasonably to fulfill the intent of the parties to the agreement." *Gloucester Holding Corp. v. U.S. Tape & Sticky Prod., LLC,* 832 A.2d 116, 128 (Del. Ch.2003) (quoting *Kelly v. McKesson HBOC, Inc.,* 2002 WL 88939 at *10 (Del.Super.Jan. 16, 2002)). Applying these principles to the allegations in SFC's Complaint, the Court will grant Royal's Motion to Dismiss SFC's claim for breach of the duty of good faith and fair dealing.

SFC contends that it has sufficiently alleged a claim for breach of the duty of good faith and fair dealing because it alleged in its Complaint that "at the time the parties negotiated the Notes, SFC reasonably expected Royal to issue the new policy based on Royal's misrepresentations and omissions." (D.I. 14 at 21.) SFC alleges that its reasonable expectations are based upon Royal's representations to SFC's CEO that Royal would consider providing additional credit risk insurance for another securitization if SFC executed the Notes that Royal would use to make forbearance payments to Wells Fargo. (D.I. 1 at ¶ 33.) SFC further alleges that it executed the Notes requested by Royal, but that Royal never fulfilled its promise to issue a new credit risk insurance policy. *Id.* at ¶ 59-60.

The Court concludes that SFC's allegations are complaints about Royal's bad faith in bargaining or negotiation, and therefore, do not fall within the scope of the duty of good faith and fair dealing in contracts. *See* Restatement (Second) of Contracts § 205 comment (c) (1981). "The duty of good faith is ... not imposed on parties until they have reached agreement and does not bind them during their earlier negotiations." E. Allen Farnsworth, 2 *Farnsworth on Contracts* § 7.17 (2d ed.2001). SFC's allegations involve contract invalidating claims dealing with fraudulent inducement or fraud, not breach of the duty of good faith and fair dealing. Accordingly, the Court will grant Royal's Motion to Dismiss Count III of SFC's Complaint for failure to state a claim upon which relief may be granted on grounds of breach of the duty of good faith and fair dealing.

### C. *Count IV. Unjust Enrichment*

Royal contends that Count IV, unjust enrichment, should be dismissed because payment of the loan proceeds was carried out as contemplated by the parties. Further, Royal contends that because unjust enrichment is a quasi-contract claim, it is not available when, as here, an express contract covers the same subject matter. SFC responds that it has sufficiently pled an action for unjust enrichment because actions for unjust enrichment are permitted when the validity of a contract is challenged, as in the instant case.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                              Page 7
Not Reported in F.Supp.2d, 2004 WL 609329 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

**\*7** "Unjust enrichment is 'the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience." *Total Care Physicians, P.A. v. O'Hara,* 798 A.2d 1043, 1056 (Del.Super.2001) (quoting *Fleer Corp. v. Topps Chewing Gum, Inc.,* 539 A.2d 1060, 1062 (Del.1988)). " 'The elements of unjust enrichment are: (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and the impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law." ' *Id.* (quoting *Jackson Nat'l Life Ins. Co. v. Kennedy,* 741 A.2d 377, 393 (Del. Ch.1993). Applying these principles to the facts alleged in SFC's Complaint, the Court concludes that SFC has adequately alleged facts in support of its unjust enrichment claim to survive Royal's Motion to Dismiss.

The Court is not persuaded by Royal's contention that SFC may not maintain a claim for unjust enrichment because the parties executed documents, i.e. the Notes, providing for payment to Wells Fargo. Although the Court agrees with the general contract principle cited by Royal, in this case, SFC alleges that the Notes should be rescinded because of fraudulent statements and omissions made by Royal. Therefore, accepting SFC's factual allegations, the Court concludes that SFC's unjust enrichment claim must survive the instant motion because if the Notes are rescinded due to fraudulent conduct or omissions, there is no valid contract that would preclude SFC's unjust enrichment theory.

Further, the Court rejects Royal's assertion that SFC has failed to allege that Royal received any unjust retention of a benefit. Royal contends that because the parties specifically contemplated that the proceeds from the Notes would be paid to Wells Fargo, SFC cannot now complain of any unfairness that may have resulted from that agreement. SFC is not, however, merely complaining that Wells Fargo received the benefit of the proceeds of the Notes; instead, SFC asserts that Royal was unjustly enriched because Royal induced SFC to act by making promises Royal never intended to keep. Accordingly, the Court will deny Royal's Motion to Dismiss Count IV.

D. *Counts V. Rescission, and VI, Declaratory Judgment*

Royal contends that Counts V, rescission, and VI, declaratory judgment, should be dismissed because these claims are based upon previous paragraphs in the Complaint that are defective for reasons it stated with respect to Counts I-IV. The Court disagrees.

Delaware law recognizes fraudulent inducement as one means by which a party may rescind an agreement. *Norton v. Poplos,* 443 A.2d 1, 4 (Del.1982). The elements of fraudulent inducement are 1) a false statement or misrepresentation; 2) that the defendant knew was false or made with reckless indifference to the truth; 3) the statement induced the plaintiff to enter the agreement; 4) the plaintiff's reliance was reasonable; and 5) the plaintiff was injured as a result. *Lord v. Souder,* 748 A.2d 393, 402 (Del.2000) (citing *Stephenson,* 462 A.2d at 1074.

**\*8** The Court concludes that SFC has alleged facts sufficient to support its claim for rescission due to fraudulent inducement. In its Complaint, SFC alleges that Royal knew that representations and omissions it made to SFC were false, that it acted reasonably in reliance on these representations, and that it was injured. (D.I. 1 at ¶ 30-36.) These allegations support a claim for rescission due to fraudulent inducement. FN6

> FN6. As noted above, the Court has concluded that SFC's Complaint, for the purposes of the Rule 12(b)(6) Motion, alleges a material fact, justifiable reliance, and the damages elements of an action for fraud.

The Court also concludes that SFC has alleged facts sufficient to support its declaratory judgment claim. Count VI of SFC's Complaint asserts that SFC is entitled to a declaratory judgment that the Notes are null and void because it was fraudulently induced into their execution. As the Court has concluded, SFC has alleged facts adequate to support a claim for fraudulent inducement, and therefore, the Court will deny Royal's Motion to Dismiss Count VI of SFC's Complaint.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 8
Not Reported in F.Supp.2d, 2004 WL 609329 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

CONCLUSION

For the reasons discussed, the Court concludes that Counts I and II of SFC's Complaint do not satisfy Rule 9(b)'s pleading requirements, and therefore, must be dismissed. Further, the Court concludes that Count III of SFC's Complaint must be dismissed pursuant to Rule 12(b)(6). The Court also concludes that Counts I, II, and IV-VI state a claim for which relief may be granted.

An Order consistent with this Opinion will be entered.

*ORDER*

At Wilmington, this 23rd day of March, 2004, for the reasons discussed in the Opinion issued this date;

NOW THEREFORE, IT IS HEREBY ORDERED that:
   1) Royal Indemnity Co.'s ("Royal") Motion to Dismiss (D.I.6) Counts I and II of Student Finance Corporation's ("SFC") Complaint pursuant to Rule 9(b) is *GRANTED;*
   2) Royal's Motion to Dismiss (D.I.6), pursuant to Rule 12(b)(6), with respect to:
   a) Count III of SFC's Complaint is *GRANTED;*
   b) Counts I, II, IV-VI of SFC's Complaint is *DENIED.*
   3) SFC shall file an Amended Complaint within twenty (20) days of this Order.

D.Del.,2004.
In re Student Finance Corp.
Not Reported in F.Supp.2d, 2004 WL 609329 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 1:03CV00507 (Docket) (May. 23, 2003)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2000 WL 1239956
**(Cite as: 2000 WL 1239956 (D.Del.))**

▶

Only the Westlaw citation is currently available.

United States District Court, D. Delaware.

Michael JORDAN, Plaintiff,

v.

Captain BELLINGER, et al., Defendants.

**No. Civ.A. 98-230-GMS.**

Aug. 28, 2000.

Michael Jordan, Smyrna, Delaware, Plaintiff, pro se.

Ophelia M. Waters, of the State of Delaware Department of Justice, Wilmington, Delaware, for Defendants.

*MEMORANDUM OPINION*

SLEET, J.

I. INTRODUCTION.

 *1 Michael Jordan is presently incarcerated at the Delaware Correctional Center ("DCC") which is located in Smyrna, Delaware. On May 1, 1998, he filed a complaint with this court alleging that several correctional officers at the prison violated his constitutional rights while conducting a search of his cell. *See* 42 U.S.C. § 1983 (1994). According to Jordan, these prison guards confiscated some of his legal papers. Jordan claims that these materials have not yet been returned to him. Jordan also alleges that the prison guards seized or destroyed a number of his personal possessions during the course of their search. Finally, Jordan claims that these guards acted unreasonably in conducting their search in violation of his Fourth Amendment rights. Jordan seeks compensatory damages for these alleged wrongs as well as injunctive relief to prevent similar conduct from occurring in the future. [FN1] He also seeks to recover for the common law tort of conversion.

>    FN1. The court presumes that Jordan is seeking monetary damages from the defendants in their personal capacity and injunctive relief against the defendants in their

official capacity. To the extent that Jordan is seeking to recover damages against the defendants in their official capacities, the court will dismiss these claims because the defendants are entitled to sovereign immunity under the Eleventh Amendment. *See, e.g., Pena v. Gardner,* 976 F.2d 469, 472-73 (9th Cir.1992) (citing, *inter alia, Edelman v. Jordan,* 415 U.S. 651, 663 (1974)); *Orum v. Haines,* 68 F.Supp.2d 726, 729 (N.D.W.Va.1999) (citing *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71 (1989)).

 On April 19, 1999, the defendants filed a motion to dismiss. [FN2] In it, they argue that Jordan has failed to show that his access to the courts was actually impeded by the confiscation of his legal papers. The defendants also contend that although a number of Jordan's possessions were seized during the search of his cell, he subsequently received a hearing on the matter. Thus, his constitutional right to due process was not violated. Jordan has opposed this motion in addition to moving to amend to assert his claims against two new defendants. He further asks this court to compel the defendants to respond to his numerous discovery requests.

>    FN2. In light of this motion, the court will deny the motion for a default judgment which Jordan filed on May 26, 1999. *See* Fed.R.Civ.P. 55(a) (1999) (noting that the party must fail to plead or otherwise defend against the lawsuit).

 While the court will grant the dispositive motion, this ruling does not dispose of all of Jordan's claims. Those alleging that the search conducted by the defendants was unreasonable and seeking to recover for the conversion of his property remain. In addition, while a large portion of Jordan's motion to amend will be denied as futile, the court will allow him to assert his due process claims against the officer who presided over his post-deprivation hearing. Finally, in light of these rulings, several of Jordan's discovery requests have become moot. Nevertheless, others seem to request relevant information which appears to be either admissible or reasonably calculated to lead to the discovery of admissible evidence. For this reason, the court will grant Jordan's motion to compel in part. The following sections explain the reasons for this decision

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

more thoroughly.

## II. STANDARD OF REVIEW.

Although the defendants filed a motion to "dismiss," they have attached materials outside of the pleadings to this submission. In opposition to this motion, Jordan has also submitted materials outside of the pleadings. He has further argued that when the record is viewed in the light most favorable to him, a reasonable jury could return a verdict in his favor. For these reasons, the court will treat the pending motion to dismiss as one for summary judgment. *See* Fed. Civ. P. 12(b) (1999) (noting that a Rule 12(b)(6) motion can be converted into a motion for summary judgment when the parties attach materials outside of the pleadings to their papers); *See also Neal v. Kelly,* 963 F.2d 453, 455-56 (D.C.Cir.1992) (emphasizing that the plaintiff must receive the opportunity to submit its own affidavits or other materials in opposition to the motion before it is converted into one for summary judgment) (citing *Lewis v. Faulkner,* 689 F.2d 100, 101 (7th Cir.1982)).

**\*2** Under Rule 56, he court can only grant summary judgment if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c) (1999). An issue is "genuine" if, given the evidence, a reasonable jury could return a verdict in favor of the non-moving party. *See, e.g., Robinson v. Klotz,* Civ. A. No. 94-1993, 1995 WL 27479, at \*1 (E.D. Pa. Jan 23, 1995) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248-49 (1986)). A fact is "material" if, under the governing law, it might affect the outcome of the case. *See id.* (citing same). On summary judgment, the court must look at the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences and resolving all reasonable doubts in favor of that party-here, Jordan. *See, e.g., Gutridge v. Chesney,* Civ. A. No. 97-3441, 1998 WL 248913, at \*1 n. 1 (E.D.Pa. May 8, 1998). With these standards in mind, the court turns to a discussion of the most relevant facts giving rise to this lawsuit.

## III. BACKGROUND.

In his complaint, Jordan alleges that three prison guards (Captain Bellinger, Lieutenant Tailor, and Lieutenant Burton) burst into his cell to conduct a search on November 11, 1997. At the time, Jordan claims, he was using the toilet. He was immediately ordered to stand. He was then handcuffed. Jordan also alleges that he was subsequently subjected to a body cavity search, possibly in front of other inmates.

According to Jordan, the correctional officers then began removing all of the items from the cell, including the light fixtures. [FN3] When they failed to find any contraband, Jordan claims, "they began confiscating legal documents, pictures, [his] socks, and ... items that [he had purchased] at the prison store." Jordan alleges that the guards were looking for "anything to make the search legitimate."

> FN3. Jordan contends that, in removing the fixtures, the defendants left several electrical wires exposed. As a result, Jordan claims, he was exposed to the possibility of electrocution in violation of his constitutional right against cruel and unusual punishment. There is no merit to this claim. In order to establish an Eighth Amendment violation, an inmate must show that prison guards or officials acted with deliberate indifference to or reckless disregard for a substantial risk of serious harm to the physical safety of an inmate. *See, e.g., Farmer v. Brennan,* 511 U.S. 825, 834 (1994). Here, Jordan only alleges that the defendants left exposed electrical wires in his cell. He has not claimed that he was actually harmed by these wires. Thus, while the situation in his cell may have been something of a nuisance, this minor inconvenience cannot serve as the basis for an Eighth Amendment claim. *See Robinson v. Detella,* Civ. A. No. 95-4067, 1996 WL 422154, at \*3 (N.D. Ill. Jul 24, 1996) (finding no cruel or unusual punishment where the plaintiff had not been seriously harmed by exposed wiring) (relying on *Morissette v. Peters,* 45 F.3d 1119, 1122 (7th Cir.1995); *Harris v. Fleming,* 839 F.2d 1232, 1235 (7th Cir.1988)).

Jordan further claims that as these officers were in the process of seizing his legal papers, he told them that he was filing a motion for a rehearing in the Third Circuit Court of Appeals. According to Jordan, Lieutenant Burton responded by telling him "I don't give a damn. You're pissing me off now. Get out of my face." Jordan further alleges that his motion for a rehearing was denied by the Third Circuit as untimely even though his delay was caused by the confiscation of his legal materials.

Jordan next claims that the officers confiscated his reading glasses, his knee and ankle braces, a mirror, a pencil sharpener, his personal letters, a list of the telephone numbers and addresses of his family members, and several magazines. Jordan also alleges that the guards broke his watch during the conduct of

their search.

According to Jordan, he filed a grievance but received no response. Later, he was apparently brought before a disciplinary committee which "found both [him and his cellmate] guilty" of possessing contraband. Jordan claims that although his cellmate's items were returned to him, he has yet to receive any of his possessions.

**\*3** Jordan contends that this conduct violated his constitutional rights of access to the courts and due process. He also appears to be claiming that the search of his cell and his person was excessive and unreasonable. Finally, he contends that the defendants committed the common law tort of conversion by seizing his personal items. Jordan seeks to recover compensatory damages for his injuries as well as injunctive relief which the "court deem[s] just and proper."

IV. DISCUSSION.

In order to recover on the majority of his claims, Jordan must show that he was deprived of a constitutional right by a person acting under the color of state law. *See* 42 U.S.C. § 1983 (1994). Here, there is no question that the defendants were acting under the color of state law at the time that the alleged conduct occurred. *See, e.g., Cespedes v. Coughlin,* 956 F.Supp. 454, 465 (S.D.N.Y.1997). Instead, the only questions raised by their dispositive motion is whether the defendants' violated any of Jordan's constitutional rights and, if so, whether he can recover against the defendants.

A. Jordan's Claim Concerning His Access To The Courts.

Jordan first claims that he was denied access to the court because the defendants confiscated his legal documents. As a result, he alleges, his motion for a rehearing was denied by the Third Circuit. The record, however, tells a different story.

After reviewing the materials which Jordan has attached to his pleadings, it is clear that the case to which he is referring is his appeal of the denial of his petition for a writ of habeas corpus as a second or successive petition. *See Jordan v. Snyder,* Civ. A. No. 97-385-SLR, slip op. at 1 (D.Del. July 1, 1997). Contrary to Jordan's allegations, the Third Circuit did not deny his motion for a rehearing in this case. Instead, the appellate court afforded him an additional thirty days to file his motion. *See Jordan v. Snyder,* Civ. A. No. 97-7458, slip op. at 1 (3d Cir. Nov. 12, 1997). While Jordan has stated that he "surely did not expect

to be granted an extension of time" because he "was just informing the court [of appeals] of what [had] happened" to his legal documents, he cannot deny that he was in fact granted an extension of time.

Furthermore, the Third Circuit ultimately reversed the ruling which Jordan was appealing, and the district court was instructed to "review the petition as if it were the first such filing." *See Jordan v. Snyder,* Civ. A. No. 97-7458, slip op. at 1 (3d Cir. Dec. 12, 1997) (relying on *Christy v. Horn,* 115 F.3d 201, 208 (3d Cir.1997)). In light of these favorable rulings, the court cannot conclude that Jordan has suffered "some actual injury, that is, an instance in which [he] was actually denied access to the courts" before the Third Circuit. *See Hudson v. Robinson,* 678 F.2d 462, 466 (3d Cir.1982); *See also Lewis v. Casey,* 518 U.S. 343, 351-52 (1996) (reaffirming the actual injury requirement). Therefore, the defendants' motion to dismiss (*i.e.,* for summary judgment) will be granted on this claim.

**\*4** Jordan also appears to claiming that he was denied access to the courts because his legal documents were seized while his "case was fully active in this court" once it was remanded by the Third Circuit. After reviewing the docket in this habeas proceeding, the court notes that Jordan's petition was dismissed. *See Jordan v. Snyder,* Civ. A. No. 97-385, 2000 WL 52152, at \*1 (D.Del. Jan. 5, 2000). However, after the respondents submitted their answer to the petition and portions of the state court record for review, nearly eighteen months passed before the court issued a final ruling on the matter. During this time, Jordan did not submit one filing to the court. For example, he did not request copies of the documents which had been filed in his case. *Cf. Johnson v. Coughlin,* Civ. A. No. 89-4237, 1990 WL 150469, at \*5 (S.D.N.Y.1990). Nor did he even ask the court for additional time to respond to the answer because his legal materials had been seized.

Moreover, in this litigation, Jordan has not pointed to any perceived point of error in the decision which dismissed his petition for a writ of habeas corpus. Nor has Jordan explained how the judge in that case might have reached a different result if the seized legal materials had been returned. In fact, the only basis for Jordan's claim that he was denied access to the courts is his contention in this lawsuit that the seizure of his legal materials prevented him from fully litigating his case.

However, this general allegation of harm cannot provide the basis for relief in this Section 1983 action, especially when Jordan has not come forward with more specific evidence that his access to the courts was actually impeded. *See, e.g., Lewis,* 518 U.S. at 351 (explaining that the plaintiff must demonstrate that his

efforts to pursue a legal claim were actually hindered); *Hudson,* 678 F.2d at 466 (emphasizing the "actual injury" requirement).

For these reasons, Jordan cannot recover on his claim that he was denied access to the courts. Consequently, the court will grant this portion of the defendants' dispositive motion.

B. Jordan's Due Process Claim.

Jordan next claims that his constitutional right to due process was violated when his property was seized without first receiving notice and an opportunity to be heard on the matter. However, as the Supreme Court has held:

[A]n unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause ... if a meaningful post-deprivation remedy for the loss is available. For intentional ... deprivations of property by state employees, the state's action is not complete until and unless it provides or refuses to provide a suitable post-deprivation remedy.

*See Hudson v. Palmer,* 468 U.S. 517, 533 (1984).

In light of *Hudson,* Jordan's claim that he was entitled to a pre- deprivation hearing before his possessions were confiscated fails as a matter of law, especially since Jordan has admitted that he was afforded a post-deprivation hearing and that he was "found ... guilty" of possessing prison contraband at this hearing.

**\*5** Nevertheless, Jordan also contends that the officer who presided over his post-deprivation hearing (Lieutenant Reynolds) withheld ruling on the confiscation of a radio until it could be determined whether this item belonged to Jordan or another inmate. [FN4] Jordan further claims that, contrary to prison regulations, he was not afforded an opportunity to send his remaining contraband home. [FN5]

FN4. Apparently, prison regulations prohibit inmates from possessing items belonging to other inmates.

FN5. While Jordan also claims that Reynolds promised to return his legal documents to him, any claim based on this alleged promise fails as a matter of law. In short, given the court's earlier ruling on Jordan's claim that he was denied access to the courts, any failure to return Jordan's legal materials to him did not cause him to suffer an actual injury. *See*

Section IV *supra.*

Even if this conduct violated Jordan's constitutional rights, there is no indication that any of the three individuals who are currently named as defendants were involved in any these post-deprivation events. While the three correctional officers may have seized Jordan's items, there is no evidence that they were involved in the hearing which upheld the seizure. Because there is no indication that any of these three defendants were the proximate cause of the conduct which Jordan now claims violated his constitutional rights, the court will grant summary judgment in their favor on the due process claim. [FN6]

FN6. In any event, as the court will discuss, Jordan has brought conversion claims against these three defendants. Because a common law action for conversion provides an adequate post-deprivation remedy for an individual who may have been deprived of his property without notice or an opportunity to be heard, Jordan's due process claims against Bellinger, Tailor, and Burton fail as a matter of law. *See Austin v. Lehman,* 893 F.Supp. 448, 454 (E.D.Pa.1995) ("[T]o the extent he has any property interest in the ... cigarettes he was denied, [the p]laintiff still has available a state court action for [this] deprivation. The existence of this remedy ... forecloses [the p]laintiff's due process claim.") (citations omitted).

C. Jordan's Conversion Claim.

Jordan also asserts a claim of conversion against Bellinger, Tailor, and Burton. Given Jordan's underlying federal claim, 42 U.S.C. § 1983, the court may exercise supplemental jurisdiction over the state law claim. *See* 28 U.S.C. § 1367 (1994). As the Third Circuit has explained, under the common law, the tort of conversion

is an act of willful interference with the dominion or control over a chattel, done without lawful justification, by which any person entitled to the chattel is deprived of its use and possession. The tort is predicated on [the] interference with dominion or control over the chattel incident to some general or special ownership rather than on damage to the physical condition of the chattel. A person not in lawful possession of a chattel may commit conversion by intentionally dispossessing the lawful possessor of the chattel ..., by disposing of a chattel

by an unauthorized sale with [the] intent to transfer a proprietary interest in it, or by refusing to surrender a chattel on demand to a person entitled to lawful possession.

The modern law remedy for conversion has emerged from the common law action of trover, which was premised on the theory that the defendant had appropriated the plaintiff's chattel for which he must pay. A plaintiff who proved conversion in a common law trover action was entitled to damages equal to the full value of the chattel at the time and place of [the] conversion.

*See* Baram v. Parugia, 606 F.2d 42, 43-44 (3d Cir.1979) (footnotes and citations omitted).

Here, Jordan contends that the three defendants intentionally interfered with his property by seizing it during their search of his cell. In their opening brief, the only relevant defense which Bellinger, Tailor, and Burton raised to Jordan's conversion claim is that they should receive immunity for their actions under the Delaware Tort Claims Act. *See* Del.Code Ann. tit. 10, § 4011 (1999). [FN7] However, this statute expressly exempts willful or intentional acts from coverage. Del.Code Ann. tit. 10, § 4011(c); *See also Farris v. Moeckel*, 664 881, 896 (D.Del.1987). As previously explained, according to Jordan, these three defendants acted intentionally when they confiscated his personal property and there is no evidence in the record to rebut this assertion. For this reason, the court cannot dismiss Jordan's conversion claim at this stage of the proceedings.

> FN7. Although the defendants also claim that the property which was seized was "in excess of what was allowable" under the prison rules and, therefore, confiscated pursuant to prison policy, this argument was not raised in the defendants' opening brief. Instead, it was included in their reply brief. However, under the Local Rules, "[t]he party filing the opening brief shall not reserve material for the reply brief which should have been included in a full and fair opening brief." *See* D. Del. L.R. 7.1.3(c)(2) (1995). Therefore, the court will not consider this argument at this time.

D. Jordan's Unreasonable Search Claim.

**\*6** Finally, Jordan claims that the excessive or unreasonable manner by which the defendants conducted their search violated his constitutional rights. The defendants have not moved to dismiss this particular claim. Instead, their motion is limited only to

Jordan's claims for denial of access to the courts and denial of due process. Furthermore, at this stage of the proceedings, the court cannot conclude that Jordan's allegations are otherwise frivolous, malicious, made in bad faith, or fail to state a claim upon which relief can be granted. *See* 28 U.S.C.A. § 1915(d) (1999).

Here, Jordan alleges that when the guards burst into his cell, they ordered him off the toilet and placed him in handcuffs. They then brought him to a common area where he was strip searched. According to Jordan, one of the officers conducted an anal cavity search.

As the Supreme Court has observed, "[a] detention facility is a unique place fraught with serious security dangers. Smuggling of money, drugs, drugs, weapons, and other contraband is all too common an occurrence." *See* Bell v. Wolfish, 441 U.S. 520, 559 (1978). For this reason, prison inmates do not retain a constitutionally-protected right of privacy in their prison cells, which can be searched at random at any time. *See Hudson*, 468 U.S. at 527-29. Nevertheless, as the *Bell* Court emphasized, "the[se] searches must [still] be conducted in a reasonable manner." 441 U.S. at 560. In *Bell*, the Court ultimately concluded that a visual body cavity search of an inmate could be conducted on less than probable cause given the legitimate security concerns of the institution. *Id.*

In this case, it is not clear whether a visual or physical inspection was conducted. Furthermore, it is not clear what cause the prison guards had to conduct their search in the first place. Because the record on these issues has not yet been developed, the court cannot rule on this claim at this stage of the litigation. *Cf.* LeVoy v. Mills, 788 F.2d 1437, 1439 (10th Cir.1986) (reversing the dismissal of a complaint under 28 U.S.C. § 1915(d) because the plaintiff might be able to prove that his body cavity search was unreasonable under the circumstances and, thus, violated his rights under the Fourth Amendment).

E. Jordan's Motion To Amend.

After briefing on the defendants' dispositive motion closed, Jordan moved to amend his complaint. Through his proposed amendment, Jordan primarily seeks to name Reynolds and Robert Snyder (the warden of DCC) as defendants to his claim that he was denied access to the courts due to the seizure of his legal documents and his claim that he was denied due process during the proceedings which followed the confiscation of his radio. [FN8]

> FN8. In this motion, Jordan also seeks to

amend the answering brief which he submitted in opposition to the motion to dismiss. Specifically, Jordan seeks to raise new legal arguments that were not presented in his earlier opposition. Even though Jordan is proceeding *pro se,* the court cannot condone the manner in which his new arguments were raised. As the court previously explained, the Local Rules provide that "[t]he party filing the opening brief shall not reserve material for the reply brief which should have been included in a full and fair opening brief." *See* D. Del. L.R. 7.1.3(c)(2). Likewise, a party should not be allowed to supplement an opposing brief by later moving to amend not only it but also the complaint. Nevertheless, because the arguments which Jordan raises in his motion to amend all fail on the merits, the court will comment on them briefly.

Jordan first argues that the defendants cannot turn his suit against them in their individual capacities to an official capacity suit in order to win a quick dismissal of his case. However, as stated at the outset of this opinion, the court has presumed that Jordan named the defendants in their individual or personal capacities for the purpose of obtaining monetary damages and in their officials capacities for the purposes of obtaining injunctive relief. *See* Note 1 *supra.* Thus, this argument raises a moot issue.

Next, Jordan contends that the defendants are not entitled to qualified immunity because they acted in "clear violation of established constitutional law." However, this argument raises a point which is not ripe for decision because the court has concluded that (1) Jordan's right of access to the courts was not violated and (2) the three named defendants were not personally involved in any of the events which occurred at Jordan's post-deprivation hearing and, thus, cannot be held liable for any due process violation which might have occurred during these proceedings. *See* Sections IV.A and IV.B *supra.*

Finally, Jordan contends "the[re] must be some merit to [his] claims" because defense counsel went so far as to consult an insurance agent before filing the motion to dismiss. The defendants, however, introduced an affidavit from the State's risk manager to show that Delaware has not insured itself against these types of actions. As a result, the State has not waived its sovereign immunity for these types of claims. *See Turnball v. Fink,* 668 A.2d 1370, 1376 (Del.1995) (explaining that 18

Del.Code § 6511 "provides for the waiver of sovereign immunity only as to risks or losses covered by the State Insurance Coverage Program").

While Jordan contends that the DCC could purchase this type of insurance coverage with the $17.5 million which the State has allocated to the prison over the last three years, the fact remains that this type of coverage has not been purchased. Consequently, Delaware has not waived its sovereign immunity against these claims.

Thus, after considering the additional arguments which Jordan has raised in his motion to amend, the court finds them to be without merit. As a result, they fail to provide a basis for successfully opposing the motion to dismiss.

Under Rule 15 of the Federal Rules of Civil Procedure, this court must freely grant leave to amend. Fed.R.Civ.P. 15(a) (1999). In fact, under this liberal standard, the court can only deny a motion to amend under a limited number of circumstances. *See Foman v. Davis,* 381 U.S. 178, 182 (1962) (explaining that such a motion should only be denied in the face of undue delay, bad faith, unfair prejudice, a repeated failure to cure deficiencies in the pleadings, or futility). Given the court's previous findings, the majority of Jordan's proposed amendments are futile. [FN9] Therefore, his motion will be denied in large part. *See Jablonski v. Pan Am. World Airways, Inc.,* 863 F.2d 289, 292 (3d Cir.1988) (denying leave to amend because the proposed amendment would not survive a motion to dismiss); *Satellite Fin. Planning Corp. v. First Nat'l Bank of Wilmington,* 646 F.Supp. 118, 120 (D.Del.1986) (same).

FN9. Here, Jordan has moved to amend at a fairly early stage in these proceedings. Thus, the court cannot conclude that he has acted with undue delay. Nor can the court conclude that he has a dilatory motive since it does not appear as if he is inserting new legal theories into this case that are based on entirely different facts solely for the purpose of drawing out these proceedings. Instead, it seems that Jordan is simply seeking to assert his current claims against two new defendants. The court also cannot conclude that Jordan has acted in bad faith since his motion to amend appears to address some of the deficiencies of his earlier pleading. For all of these reasons, the court cannot conclude that

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

any of the defendants will be prejudiced to the extent that the court allows the amendment. *See Howze v. Jones & Laughlin Steel Corp., 750 F.2d 1208, 1212 (3d Cir.1984)* (noting that prejudice is the "touchstone" of this inquiry) (citing *Cornell & Co., Inc., v. Occupational Safety and Health Review Comm'n,* 573 F.2d 820, 823 (3d Cir.1978)); *Hill v. Equitable Bank, N.A.,* 109 F.R.D. 109, 112 (D.Del.1985) (same).

1. The claim alleging denial of access to the courts.

**\*7** As the court has previously explained, Jordan's claim that he was denied access to the courts as a result of the seizure of his legal materials fails as a matter of law because, given the underlying facts of this case, Jordan cannot prove that he suffered an actual injury, that is, an instance where he was actually denied access to the courts. *See* Section IV.A *supra.* Given the futility of the proposed amendment, the court will deny this portion of Jordan's motion to amend.

2. The claim alleging denial of due process.

It is does not appear that Jordan is attempting to assert his due process claim against Snyder. Instead, all of Jordan's allegations concerning Snyder involve the previous claim of denial of access to the courts. [FN10] To the extent that he is attempting to assert his due process claim against Snyder, Jordan has utterly failed to allege any facts which would indicate that the warden was personally involved in or aware the confiscation of Jordan's personal property or the events which occurred at the subsequent hearing. Because this claim would effectively be an attempt to hold Snyder liable purely on a *respondeat superior* basis, this portion of his motion to amend will be denied as futile. *See Gay v. Petsock,* 917 F.2d 768, 771 (3d Cir.1990); *Rode v. Dellarciprete,* 845 F.2d 1195, 1207 (3d Cir.1988).

FN10. For example, in the motion to amend, Jordan states that he is "hereby charg[ing] ... Snyder and ... Reynolds with violating [his] First Amendment right of access to the courts." Jordan also contends that because the warden was named as a party in the habeas action, he "was mailed a copy of every motion filed ... challenging [Jordan's] confinement." Therefore, Jordan contends, Snyder was "well aware of [his] concern[s about] his legal process" yet "did nothing to stop officials from violating" his constitutional rights.

Jordan also seeks leave to bring a due process claim against Reynolds. As previously explained, Jordan alleges that Reynolds withheld ruling on the confiscation of his radio until it could be determined whether the radio belonged to Jordan or another inmate. It is not clear whether this radio was ever returned. In any event, Jordan appears to be seeking damages for the time period during which he was deprived of his property interest in the item. Jordan has also claimed that, contrary to prison regulations, he was not afforded an opportunity to send his remaining contraband home.

However, even if the radio belonged to Jordan and even if Reynolds deprived Jordan of his property interest in this item without first affording him due process, Jordan has an adequate post-deprivation remedy. Specifically, he may bring a common law action for conversion against Reynolds. *See Austin,* 893 F.Supp. at 454 ("[T]o the extent he has any property interest in the ... cigarettes he was denied, [the p]laintiff still has available a state court action for [this] deprivation. The existence of this remedy ... forecloses [the p]laintiff's due process claim.") (citations omitted); *See also Murphy v. Collins,* 26 F.3d 541, 543-44 (5th Cir.1994) (concluding that a prison's violation of its own notice and hearing policies did not violate an inmate's right to due process because he could bring an action for conversion in state court). Therefore, his due process claim fails as a matter of law. Consequently, while the court will allow Jordan to amend his complaint to assert a claim for conversion against Reynolds, the portion of Jordan's motion to amend which seeks to assert a due process claim against this individual will be denied as futile.

3. The amended complaint.

**\*8** Finally, because the defendants have objected to the manner in which Jordan has moved to amend, the court will afford him fifteen days to file a revised amended pleading which plainly sets forth the basis for his unreasonable search and seizure claim against Bellinger, Burton, and Tailor as well as his conversion claim against these three defendants and Reynolds. *Cf.* Fed.R.Civ.P. 8(a)(2) (2000) (requiring a plaintiff to set forth a "short and plain" statement showing that he is entitled to relief). In this revised pleading, Jordan shall also set forth the specific declaratory, monetary, and injunctive relief that he is seeking in this action. *See* Fed.R.Civ.P. 8(a)(3) (explaining that the complaint must contain a demand for judgment for the relief sought). The court will afford the defendants thirty days to answer or otherwise respond to Jordan's revised pleading.

F. Jordan's Discovery Requests.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Finally, Jordan has made a number of discovery requests. Given the nature of the court's ruling, several of these requests have become moot. [FN11] Therefore, the defendants' motion for a protective order will be granted in part. Nevertheless, substantial portions of Jordan's document requests and interrogatories seem directed at relevant and admissible evidence. At a minimum, these discovery requests appear to be reasonably calculated to lead tot he discovery of admissible evidence. *See* Fed.R.Civ.P. 26(b)(1)(2000).

> FN11. For example, Jordan requests for "a copy of all of the steps that are being taken to provide [him] with the ... legal documents" that were allegedly seized during the search of his cell. He also asks why the prison guards unscrewed the light fixtures in his cell when they conducted their search. He further seeks the identity of the person who "authorized the defendants to seize [his] legal documents."

For example, Jordan asks for an official copy of the standard operating procedures which govern the conduct of correctional officers at the DCC. He has also asked for a copy of the disciplinary write up filled out by Burton and a copy of the list of items that were confiscated from his cell during the November 11, 1997 search. He further requests information concerning the radio which was seized during this search. In addition, he seeks information concerning how many boxes of personal items he is allowed to keep in his cell. Jordan has also propounded a number of interrogatories that relate to the manner in which his cell and his person were searched.

Because these discovery requests seek information which appears to be relevant and admissible or, at the very least, reasonably calculated to lead tot he discovery of admissible evidence, the court will deny this portion of the defendants' motion for a protective order. Nevertheless, given the volume of Jordan's discovery requests, the court will afford the defendants sixty days to respond.

V. CONCLUSION.

Jordan has failed to demonstrate that the seizure of his legal documents actually deprived him of his constitutional right of access to the courts. Therefore, this particular claim will be dismissed and this portion of Jordan's motion to amend will be denied. Furthermore, because Jordan was afforded a post-deprivation hearing and because he still has available to him an action for the common law tort of conversion, his due process claim against Bellinger, Burton, and Tailor fails as a matter of law. Finally, the court cannot rule on Jordan's claims of unreasonable search and seizure at this stage of the proceedings since the record on this point is not fully developed. Consequently, the court will continue to exercise jurisdiction over this claim and supplemental jurisdiction over Jordan's common law claims of conversion. The court, however, will require Jordan to file an amended complaint which plainly sets forth these claims and the relief sought so that the defendants are properly put on notice of the causes of action which have been brought against them. Likewise, the court will require the defendants to respond to Jordan's discovery requests that seek information concerning the search of his cell and the items that were seized. The court will issue an order to this effect in conjunction with this opinion.

2000 WL 1239956, 2000 WL 1239956 (D.Del.)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
**(Cite as: 2002 WL 531555 (D.Del.))**

▷

Only the Westlaw citation is currently available.

United States District Court, D. Delaware.

ROCKWELL TECHNOLOGIES, LLC, Plaintiff,
v.
SPECTRA-PHYSICS LASERS, INC. and Opto
Power Corporation, Defendants.

**No. Civ.A.00-589 GMS.**

March 26, 2002.

*MEMORANDUM AND ORDER*

SLEET, J.

I. INTRODUCTION

*1 The plaintiff, Rockwell Technologies, LLC ("Rockwell") filed the above- captioned action against Spectra-Physics Lasers, Inc. ("Spectra") and Opto Power Corporation ("Opto") on June 16, 2000. In its complaint, Rockwell alleges that Spectra and Opto are infringing U.S. Patent No. 4,368,098 ("the '098 patent").

Presently before the court is Rockwell's motion for partial summary judgment. In this motion, Rockwell asks the court to find that the '098 patent is not invalid due to alleged inequitable conduct that occurred in the prosecution of the patent application. For the reasons that follow, the court will grant this motion in part and deny it in part.

II. STANDARD OF REVIEW

The court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Boyle v. County of Allegheny, Pennsylvania,* 139 F.3d 386, 392 (3d Cir.1998). Thus, the court may grant summary judgment only if the moving party shows that there are no genuine issues of material fact that would permit a reasonable jury to find for the non-moving party. *See Boyle,* 139 F.3d at 392. A fact is material if it might

affect the outcome of the suit. *Id.* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-248 (1986)). An issue is genuine if a reasonable jury could possibly find in favor of the non-moving party with regard to that issue. *Id.* In deciding the motion, the court must construe all facts and inferences in the light most favorable to the non-moving party. *Id.; see also Assaf v. Fields,* 178 F.3d 170, 173-174 (3d Cir.1999).

With these standards in mind, the court will describe the facts and procedural history that led to the motion presently before the court.

III. BACKGROUND

A. Prosecution of the '098 Patent

The patent-in-suit relates to a process for forming "an epitaxial film of group III-V semiconductor disposed on a single crystal substrate." Dr. Harold Manasevit ("Manasevit") developed the process described in the '098 patent. On February 13, 1968, Rockwell filed a patent application with the United States Patent and Trademark Office ("PTO"). As the application contained both process and product claims, the PTO required that Rockwell choose one to proceed with first. Rockwell elected to give precedence to the product claims.

In 1978, Rockwell retained the law firm of Staas and Halsey to prosecute the Manasevit patent application with respect to the process claims. Jack Staas ("Staas") was the Staas and Halsey attorney primarily responsible for this prosecution. On April 7, 1978, Rockwell filed a divisional application seeking a patent for the process claims. This application issued as the '098 patent on January 11, 1983. It expired on January 11, 2000.

B. Alleged Prior Art

*2 In 1957, Thomas R. Scott obtained patents from Japan (the "Japanese Scott patent") and the United Kingdom (the "UK Scott patent"). Spectra and Opto allege that the UK Scott patent came to the attention of Rockwell's in-house patent attorneys while Rockwell was prosecuting the Manasevit process patent application in Great Britain. In response to that application, the UK Patent Office identified the UK Scott patent and five other prior art references. The UK Patent Office directed Rockwell's attention to those references.

Rockwell's UK patent counsel informed Rockwell's

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

in-house patent counsel Robert Rogers ("Rogers") of the UK Scott patent and the five other references on September 29, 1972. In response to the UK patent counsel's request on how to respond to that information, Rockwell employee Martin E. Gerry prepared detailed instructions for amending Rockwell's claims to avoid the cited references. The UK patent counsel subsequently informed Rogers that it was removing from the application the original prior art cited in the application because the UK Scott patent and the other references constituted "the closest prior art."

 Rockwell also applied for a Japanese patent on Manasevit's invention. On that application, Rockwell listed Frederick Hamann ("Hamann") as its representative. Hamann supervised Rockwell's in-house patent department from 1970 to 1995. As in the prosecution of the UK patent application, Scott's work was cited against the Japanese patent application.

 On June 18, 1974, the Japanese patent office issued a rejection against the pending claims in Rockwell's Japanese patent application . [FN1] Rockwell's Japanese patent counsel sent the rejection to Hamann on July 6, 1974, along with a discussion of the Japanese Scott patent. The Japanese counsel also sent Hamann a copy of this patent. Rockwell's in-house patent counsel G. Donald Weber ("Weber") responded by asking for an English abstract of the Japanese Scott patent. The Japanese patent counsel complied on August 8, 1974. Weber subsequently sent them instructions on how to amend Rockwell's Japanese claims in light of the Scott patent.

> FN1. Spectra and Opto allege that the claims in Rockwell's Japanese patent application were substantively the same as the claims in the '098 patent.

 C. Procedural History

 On August 30, 1993, Rockwell brought an action against the United States in the United States Court of Federal Claims. In May 1995, Rockwell initiated an action against Spectra in the Northern District of California. Spectra then intervened in the Court of Federal Claims action as a third-party defendant. The Northern District of California stayed its action pending a resolution of that action.

 In 1998, the United States and Rockwell settled. This settlement deprived the Claims Court of jurisdiction over the dispute between Rockwell and Spectra. Thus, on January 13, 1999, the Northern District of California

court lifted its stay and reopened the matter. On July 24, 2001, the court denied Rockwell's motion for partial summary judgment on the issue of inequitable conduct.

 Rockwell brought the present infringement action on June 16, 2000.

 IV. DISCUSSION

 *3 Spectra and Opto assert that the inventor, Dr. Harold M. Manasevit, and Rockwell's attorney Jack Staas were guilty of inequitable conduct by failing to disclose material references to the PTO. [FN2]

> FN2. Spectra and Opto deny basing their inequitable conduct claims on the Rule 132 Declaration that Manasevit filed with the PTO (the "Manasevit Declaration") Further, in their opposition papers, Spectra and Opto state that they do not oppose the portion of Rockwell's summary judgment motion directed to the Manasevit Declaration. Likewise, they deny alleging that Rockwell itself, as a corporate entity, could be liable for inequitable conduct. Accordingly, it is undisputed that only Manasevit's and counsel for Rockwell's conduct is at issue.

 As an initial matter, Rockwell argues for the first time in its reply brief that Spectra and Opto failed to plead inequitable conduct with particularity in their answer to the complaint and have thus waived their right to assert this affirmative defense. However, Rockwell's tactic of reserving new arguments for its reply brief amounts to impermissible "sandbagging." *See Jordan v. Bellinger,* 2000 U.S. Dist. LEXIS 19233, super* 18 (D. Del. April 28, 2000) (declining to address new arguments reserved for the reply brief); *see also* D. DEL. L.R. 7.1.3(c)(2) (1995). Accordingly, the court declines to address Rockwell's arguments on this issue and will turn instead to the substantive merits of the motion.

 Patent applicants and their legal representatives have a duty to prosecute applications with candor, good faith, and honesty. *See Molins PLC v. Textrom, Inc.,* 48 F.3d 1172, 1178 (Fed.Cir.1995). Breach of this duty can lead to a finding that the applicant engaged in inequitable conduct before the PTO. *See Life Tech., Inc. v. Clontech Lab., Inc., 224 F.3d 1320, 1324 (Fed.Cir.2000).* The effect of such inequitable conduct is to render the affected patent unenforceable. *See id.*

 In order to prove inequitable conduct, the defendants bear the burden of providing clear and convincing

evidence that: (1) omitted or false information was material; (2) the applicant had knowledge of the existence and material nature of the information; and (3) the applicant intended to deceive the PTO. *See Molins,* 48 F.3d at 1178. "Materiality and intent to deceive are distinct factual inquiries, and each must be shown by clear and convincing evidence." *Life Tech,* 224 F.3d at 1324. Information is considered material "when there is a substantial likelihood that a reasonable examiner would have considered the information important in deciding whether to allow the application to issue as a patent." *Molins,* 48 F.3d at 1179. The court may infer intent from the facts and circumstances surrounding the applicant's overall conduct. *See Merck & Co. v. Danbury Pharmacal, Inc.,* 873 F.2d 1418, 1422 (Fed.Cir.1989). However, in making its inferences, the court must be aware that "[a]lthough the intent element of fraud or inequitable conduct may be proven by a showing of acts the natural consequence of which were presumably intended by the actor, this requires the fact finders to evaluate all the facts and circumstances in each case. Such an evaluation is rarely enabled in summary proceedings." *KangaROOS U.S.A., Inc. v. Caldor, Inc.,* 778 F.2d 1571, 1577 (Fed.Cir.1985) (citation omitted).

In its moving papers, Rockwell declines to address the materiality of the Scott references. The Scott patents, however, were cited by foreign patent offices against Manasevit's process. This raises at least an inference that the references are material. *See Molins,* 48 F.3d at 1180. Further, Rockwell amended the claims in its foreign patents to overcome the Scott references. Accordingly the court finds that there is a triable issue of fact with regard to the materiality of the Scott patents.

*4 The court likewise concludes that granting summary judgment on the issue of intent would be improvident. Rockwell submits that Manasevit and Staas have each stated that they were unaware of the Scott patents. The Federal Circuit has stated, however, that "[f]ailure to cite to the PTO a material reference cited elsewhere in the world justifies a strong inference that the withholding was intentional." *Molins,* 48 F.3d at 1182. Moreover, the court expresses concern over Rockwell's argument that the named inventor of the '098 patent, who is also the named inventor of the British and Japanese patents that were amended in light of the Scott patents, was not aware of the Scott patents.

When faced with a similar motion for summary judgment based on inequitable conduct with regard to these patents, the District Court for the Northern District of California explicitly reserved judgment on whether the actions of Staas and his fellow Rockwell attorneys were inequitable. [FN3] *See Rockwell v. SDL, Inc.,* No. C-95-1729, at 12, n. 11 (N.D.Cal. July 24, 2000). That court further expressed a concern identical to that which the court has in the present case arising from Manasevit's failure to disclose the Scott patents to the PTO.

> FN3. Based on the California court's denial of summary judgment on a similar issue, Spectra and Opto argue that Rockwell is now collaterally estopped from further litigating this issue. The court must disagree because a determination that there remain genuine issues of material fact is not a "final decision." *See Johnson v.. Jones,* 515 U.S. 304, 313 (1995); *see also Whitford v. Boglino,* 63 F.3d 527, 530 (7th Cir.1995) (stating that the denial of summary judgment is not a final judgment, but rather an interlocutory order in the *res judicata* context.)

While mindful of the heavy burden the defendants bear, the court is persuaded that there remain substantial questions regarding Manasevit's and Staas's knowledge and intent that are better left to trial. *See Baker Oil Tools, Inc. v. Geo Vann, Inc.,* 828 F.2d 1558, 1566 (Fed.Cir.1988) (noting that, "[i]f the facts of materiality or intent are reasonably disputed the issue is not amenable to summary disposition.")

Finally, Rockwell requests leave to file a further motion for summary judgment on inequitable conduct. Rockwell contends that this is appropriate because it was waiting for Spectra's and Opto's expert reports assessing the materiality of additional prior art references that were allegedly not disclosed to the PTO. However, as Spectra and Opto argue, the references at issue are articles that Manasevit himself wrote. Manasevit's and Rockwell's own experts were surely capable of assessing the materiality of Manasevit's work. Accordingly, the court declines to grant Rockwell additional time to file a motion that could have been filed with the instant motion for summary judgment.

V. CONCLUSION

The parties do not dispute that the corporate entity Rockwell is not being accused of inequitable conduct. Nor do they dispute that the charges of inequitable conduct are not based on the Manasevit Declaration. Thus, the court will grant Rockwell's motion with regard to these issues. However, there remain genuine issues of material fact with regard to the remaining inequitable conduct allegations.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

For these reasons, IT IS HEREBY ORDERED that:

1. Rockwell's motion for partial summary judgment (D.I.149) is GRANTED in part and DENIED in part.

2. Rockwell's request to file a further motion for summary judgment on inequitable conduct (D.I.149) is DENIED.

2002 WL 531555 (D.Del.)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

## CERTIFICATE OF SERVICE

I, Stephen J. Neuberger, being a member of the bar of this Court do hereby certify that on September 8, 2005, I electronically filed this **Motion** with the Clerk of the Court using CM/ECF which will send notification of such filing to the following individuals:

Thomas J. Allingham II, Esq.
Robert S. Saunders, Esq.
One Rodney Square
P.O. Box 636
Wilmington, DE 19899

John D. Balaguer, Esq.
824 Market St., Suite 902
P.O. Box 709
Wilmington, DE 19899

John F. Cafferky, Esq.
William A. Porter, Esq.
Andrea D. Gemignani, Esq.
Blankingship & Keith
4020 University Drive, Suite 300
Fairfax, VA 22030


/s/ Stephen J. Neuberger
**STEPHEN J. NEUBERGER, ESQ.**


cc:     Thomas S. Neuberger, Esq.
        John W. Whitehead, Esq.
        Douglas McKusick, Esq.
        Mr. Reginald L. Helms


Helms \ Briefs \ Motion to Strike Affidavit.final

8