# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

WENDY MILLER,                           :
                                        :
        Plaintiff,                      :
                                        :
                                        :    Civil Action No. 01-827-JJF
v.                                      :
                                        :
DAIMLER CHRYSLER CORPORATION,  :
                                        :
        Defendant.                      :

### MEMORANDUM ORDER

Presently before the Court is Defendant Daimler Chrysler Corporation's ("Daimler Chrysler") Motion for Protective Order in Connection with Plaintiff's Subpoena Duces Tecum directed to United Auto Workers Local 1183 (D.I. 56), Defendant's Motion to Extend Time to File its Reply Brief for its Motion for Protective Order (D.I. 64), Defendant's Motion for Leave to File Reply Brief Out of Time (D.I. 68) and Plaintiff Wendy Miller's Motion to Extend Time to File her Answering Brief to Defendant's Motion for Summary Judgment (D.I. 73). For the reasons discussed below, Defendant's Motion for a Protective Order will be denied (D.I. 56), Defendant's Motions to Extend Time (D.I. 64), Defendant's Motion For Leave to File a Reply Brief Out of Time (D.I. 68) and Plaintiff's Motion to Extend Time to File an Answer to Defendant's Summary Judgment Motion (D.I. 73) will be granted.

1

## BACKGROUND

This is an employment discrimination case. Effective January 5, 2000, Plaintiff was terminated from her employment at the Daimler Chrysler Plant in Newark, New Jersey. Defendant claims that Plaintiff was terminated due to her "violent outburst" in the Labor Relations Office in response to being advised by Human Resources employees that she was being indefinitely suspended pending further investigation into reports that she had threatened another coworker. Plaintiff alleges that the termination was pretextual. On December 12, 2001 Plaintiff filed a one count Complaint alleging race discrimination under 42 U.S.C. § 1981 in connection with her termination of employment. On or about August 27, 2002 Plaintiff served United Auto Workers Local 1183 with a subpoena duces tecum requesting ten categories of documents. The subpoena requests the following documents: 1) all documents relating to grievances filed anytime from January 1, 1995 to the present involving any accusation that a Union employee violated Shop Rule No. 14 and/or similar rule regarding "threatening, intimidating, coercing, harassing, retaliating or using abusive language to others," and/or violation of the Non-Violence Policy; 2) all documents regarding complaints to the Union made anytime from January 1, 1995 to the present involving an accusation that a Union employee at Daimler Chrysler violated

2

Shop Rule No. 14 and/or similar rule as described in number one;
3) all documents including computer print-outs listing grievances
filed and/or complaints made to the Union anytime from January 1,
1995 to the present involving an accusation that a Union employee
at Daimler Chrysler violated Shop Rule No. 14 and/or similar rule
as described in number one; 4) all statistical data and/or lists
compiled on computer, via typewriter, or via handwriting which
identifies by name and/or race when Union employees were
terminated or forced to resign as a result of Shop Rule No. 14
and/or similar rule as described in number one and/or violation
of the Non-Violence Policy where such incident occurred between
January 1, 1995 and the present; 5) all documents concerning the
grievances of Sonja James (Morrow), Gregory Gavins and Gary Kirby
for incidents involving the alleged violation of Shop Rule No. 14
and/or similar rule as described in number one and/or violations
of the Non-Violence Policy which led to their discharge; 6) all
documents regarding grievances in which Steve Heitzmann was
involved where discipline was imposed; 7) all documents regarding
grievances in which Michael Somrak was involved where discipline
was imposed; 8) all documents relating to Aaron Honie's
accusations that Robert Gilkey threatened him; 9) all documents
identifying the names of the Union employees at the Daimler
Chrysler Plant in Newark from January 1, 1995 to the present

including where possible, the identification of the race of the
employee; 10) all documents or memoranda where the Union, a Union
official, a Shop Steward, or a Union member alleges that racial
discrimination has taken place at the Daimler Chrysler Newark
Plant from January 1, 1995 to the present. (D.I. 63 at Ex. A).
After notice of this subpeona, Defendant filed a motion for a
Protective Order. (D.I. 56).

### DISCUSSION

Defendant, in its Motion for a protective order, contends
that Plaintiff's discovery requests from a third-party are not
relevant to any claim or defense in this case, and therefore,
violate Federal Rule of Civil procedure 26(b)(1).  Id.  Defendant
asserts that the discovery sought is unreasonable, oppressive,
overly broad, unduly burdensome and needlessly increases the cost
of this litigation.  Id.  Specifically, Defendant asserts that
Sonja James, Robert Gilkey, Gregory Gavins and Gary Kirby are not
comparators to the Defendant because they are not similarly
situated. (D.I. 68 Ex. A at 3). Additionally, Defendant
contends that requests 1-4 are irrelevant because they concern
non-minority employees and are unrelated to the reason for which
Plaintiff was discharged.  Id. at 4.  Further, Defendant contends
that the grievances filed in which Heitzmann and Somrak were
involved as well as all documents regarding racial discrimination

4

from the past seven years are unrelated to Plaintiff's termination and are undiscoverable. _Id._ [1]

In response, Plaintiff contends that the information that she seeks is discoverable because it could lead to the discovery of admissible, relevant evidence. (D.I. 63 at 11). Specifically, Plaintiff claims that she is entitled to evidence of similarly situated comparators. (_Id._ at 12). Further, Plaintiff claims that the information sought relates to conduct of "comparable seriousness." (_Id._ at 14). Additionally, Plaintiff argues that there is sufficient temporal proximity between adverse actions against comparators and Plaintiff to support a finding that the comparators are similarly situated. _Id._ at 16. Also, Plaintiff asserts that discoverable comparator evidence need not involve the same decision maker. _Id._ at 17. Lastly, Plaintiff contends that the _McDonnell Douglass_ burden shifting pretext paradigm specifically allows Plaintiff to dispute Defendant's proffered reason for terminating her, and therefore, evidence sought in the subpoena and used to show pretext is allowable under Rule 26. _Id._ at 18.

The scope of discovery is set forth in Federal Rule of Civil

---

[1] The Court considered Daimler Chrysler's Reply Brief in considering this motion for protective order which was attached as an exhibit to D.I. 68.

5

Procedure 26(b)(1), which, in relevant part, provides, "[p]arties
may obtain discovery regarding any matter, not privileged, that
is relevant to the claim or defense of any party...." Fed. R.
Civ. P. 26(b). Also, protective orders are governed by Rule
26(c), which, in pertinent part, provides, "[u]pon motion by a
party ... for good cause shown ... the court ... may make any
order which justice requires to protect a party or person from
annoyance, embarrassment, oppression or undue burden or
expense...." Fed. R. Civ. P. 26(c). The Court concludes that the
subpoenaed records are relevant to Plaintiff's case, and
therefore, discoverable. Specifically, Plaintiff is entitled to
gather comparator evidence and evidence to support her pretext
theory. Although Defendant contends that the evidence sought is
not comparator evidence because the information sought is not
about similarly situated individuals or of "comparable
seriousness", the Court declines to decide the merits of
Plaintiff's case in the context of a discovery dispute.

Additionally, the Court concludes that the document requests
at issue are not oppressive or unduly burdensome. Specifically,
the Court finds that the time frame of seven years in the
subpoena at issue is not overly broad or unduly burdensome for
purposes of establishing a pattern of racial discrimination at
this discovery stage. See e.g. Maull v. Division of State

6

Police, 141 F. Supp. 2d 463, 479 (D. Del. 2001) (where Court

considered seven year comparator evidence in deciding summary

judgment motion). Additionally, for purposes of discovery,

comparator evidence by different decision makers could be

reasonably calculated to lead to the discovery of admissible

evidence. See Fed R. of Civ. P. 26 (b)(1); Taylor v. Proctor &

Gamble Dover Wipes, 184 F. Supp.2d 402, 410 (declining to use

evidence by different decision makers in the summary judgment

phase to lead to an inference of discrimination). Based on this,

Defendant's Motion for a Protective Order will be denied.

Defendant has also filed a motion for Summary Judgment in

this case (D.I. 65). In response, Plaintiff has filed a Motion

to Extend Time to File an Answer Brief to Defendant's Summary

Judgment Motion (D.I. 73) until after Plaintiff has received all

discovery. Defendant opposes this motion by arguing that the

motion should be denied due to Plaintiff's failure to submit an

affidavit as required by Rule 56 (f).

Rule 56 (f), in relevant part, provides, "[s]hould it

appear from the affidavits of a party opposing the motion that a

party cannot for reasons stated present by affidavit facts

essential to justify the party's opposition the court may refuse

the application for judgment or may order a continuance to

permit...discovery to had... " Fed R. Civ. P. 56 (f). The Court

7

does not find that Rule 56(f) mandates denial of Plaintiff's

motion.   Although the Court recognizes that technical compliance

with Rule 56(f) is desirable, failure to support a motion with an

affidavit is not automatically fatal to its consideration.   See

Surin v. Virgin Island Daily News , 21 F.3d 1309, 1314 (3d Cir.

1994); Cf. Sames v. Gable, 732 F.2d 49, 52 n.3 (3d Cir. 1984)

(failure to file affidavit with Rule 56(f) motion does not compel

non-merits resolution of claim when failure to do so is not

"sufficiently egregious").   Additionally, the Court notes that

Plaintiff filed the appropriate affidavit in conjunction with her

Reply Brief for her Motion to Extend Time to Answer.   (See D.I.

79).

The purpose of a summary judgment motion is to determine if

there are any genuine issues of material fact and if the moving

party is entitled to judgment as a matter of law.   See Fed. R.

Civ. P. 56 (c).   However, since Plaintiff has not yet received

discovery regarding evidence of comparators or evidence to

support her theory of pretext it would be premature to rule on

any such motion.   Therefore, in the interest of fairness, the

Court will grant Plaintiff's Motion for extension of time.

NOW THEREFORE, IT IS HEREBY ORDERED that:

1.    Defendant's Motion for a Protective Order In

Connection with Plaintiff's Subpoena Duces Tecum

8

Directed to United Auto Workers Local 1183 (D.I. 56) is **DENIED**;

2.    Defendant's Motion to Extend Time to File its Reply Brief to Plaintiff's Answering Brief in its Motion for Protective Order (D.I. 64) is **GRANTED**;

3.    Defendant's Motion For Leave to File a Reply Brief Out of Time is **GRANTED**;

4.    United Auto Workers Local 1183 shall comply with the subpoena within thirty (30) days of this Order;

5.    Plaintiff's Motion to Extend Time to File its Answering Brief to Defendant's Motion for Summary Judgment (D.I. 73) is **GRANTED**;

6.    Plaintiff shall file its Answer Brief to Defendant's Motion for Summary Judgmen within ten (10) days after receipt of all subpoenaed documents.

12/20/02
DATE

UNITED STATES DISTRICT JUDGE

9

# EXHIBIT B

Westlaw.

Not Reported in F.Supp.2d                                                  Page 1

Not Reported in F.Supp.2d, 2002 WL 655470 (D.Del.)

**(Cite as: 2002 WL 655470 (D.Del.))**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, D. Delaware.
Anthony L. HOOD, Petitioner,
v.
Robert GEORGE, Warden, and Attorney General of
the State of Delaware,
Respondents.
**No. Civ.A. 00-538-SLR.**

April 12, 2002.
Anthony L. Hood, Sussex Correctional Institution,
Georgetown, Delaware, Petitioner, pro se.

Loren C. Meyers, Chief of Appeals Division,
Delaware Department of Justice, Wilmington,
Delaware, for Respondents.

MEMORANDUM OPINION

ROBINSON, Chief J.

I. INTRODUCTION

*1 Petitioner Anthony L. Hood is a former inmate
at the Sussex Correctional Institution in
Georgetown, Delaware. Currently before the court
is petitioner's document captioned "Petition for Writ
of Mandamus," (D.I.2), which the court has treated
as an application for a writ of habeas corpus
pursuant to 28 U.S.C. § 2254. Because petitioner's
application for habeas relief is moot, the court will
dismiss it without reaching the merits of his claims.

II. BACKGROUND

On August 21, 1998, the Delaware Superior Court
sentenced petitioner to five years in prison at Level
V custody for first degree robbery. (D.I. 12,

Sentencing Order.) The sentence was suspended
after two years for six months of work release at
Level IV, followed by two and one-half years of
probation at Level III. (*Id.*) The Superior Court
modified its sentencing order on January 21, 2000,
to require that petitioner be held in custody at Level
V until space was available at Level IV. (*Id.,*
Amended Sentencing Order.)

On April 5, 2000, while incarcerated at the Sussex
Correctional Institution, petitioner filed with this
court the current application for habeas relief. In his
application, petitioner alleges that the Superior
Court violated his constitutional rights by
modifying its order to hold him at Level V until
space was available at Level IV. (D.I.2.) Shortly
after filing his application, petitioner was placed on
Level IV work release.

On July 25, 2000, the Superior Court found
petitioner guilty of violating the conditions of
release, and sentenced him to three years in prison
to be suspended after six months for home
confinement followed by probation. (*Id.,* Violation
of Probation Order.) In December 2000, petitioner
was placed on home confinement. On March 9,
2001, however, the Superior Court found that
petitioner had violated the conditions of home
confinement, revoked his release, and resentenced
him.

In their answer to petitioner's application for
habeas relief, respondents ask the court to dismiss
the application as moot. (D.I.11.) As discussed
below, the court agrees with respondents, and will
dismiss the application.

III. DISCUSSION

A. Mootness

Initially, the court must determine whether
petitioner's application for habeas relief is moot.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 2

Not Reported in F.Supp.2d, 2002 WL 655470 (D.Del.)

**(Cite as: 2002 WL 655470 (D.Del.))**

Shortly after filing his federal habeas petition, petitioner was removed from Level V custody and placed in Level IV work release. At that point, the alleged unlawful execution of sentence of which he complains ceased. If this renders petitioner's application moot, the court lacks jurisdiction and must dismiss it. *Chong v. District Director, INS,* 264 F.3d 378, 383-84 (3d Cir.2001) (citing *Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83, 90 (1998)). Federal courts must resolve mootness issues, "even when not raised by the parties, before turning to the merits." *Chong,* 264 F.3d at 383.

Pursuant to Article III, the power of federal courts extends only to cases and controversies. *Id.* at 383. A litigant has standing to pursue a case or controversy in federal court only if he "has suffered, or is threatened with, an actual injury traceable to the [respondent] that is likely to be redressed by a favorable decision." *Id.* at 384. This "personal stake in the outcome" of a case must continue throughout the litigation. *Spencer v. Kemna,* 523 U.S. 1, 7 (1998).

*2 An individual who has been convicted and is incarcerated as a result of that conviction always has standing to challenge his incarceration. *Id.* If his sentence expires while the litigation is pending, he must demonstrate a "concrete and continuing injury" in order to maintain standing in federal court. *Id.* Federal courts presume that "a wrongful criminal conviction has continuing collateral consequences" sufficient to satisfy the injury requirement, even after the sentence expires. *Id.* at 8. Where a petitioner does not attack his conviction, however, the injury requirement is not presumed; rather, the petitioner must demonstrate continuing collateral consequences adequate to meet the injury requirement. *Id.* at 14; *Chong,* 264 F.3d at 384.

In the matter at hand, petitioner does not challenge his conviction in any way. His habeas petition challenges only the execution of his sentence, *i.e.,* holding him at Level V until space was available at Level IV. This alleged unlawful execution of sentence ceased once he was placed at Level IV work release. To maintain standing to challenge the

execution of his sentence, petitioner must demonstrate continuing collateral consequences sufficient to meet the injury requirement.

The court is unable to find any such continuing collateral consequences. Once petitioner was removed from Level V custody, the court cannot discern any injury that could be redressed by a favorable decision in the current matter. Absent any conceivable continuing injury, petitioner no longer has standing to maintain this action. For this reason, the court will dismiss his habeas petition as moot.

B. Certificate of Appealability

Finally, the court must determine whether a certificate of appealability should issue. *See* Third Circuit Local Appellate Rule 22.2. The court may issue a certificate of appealability only if petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

When a federal court dismisses a habeas petition on procedural grounds without reaching the underlying constitutional claims, the prisoner must demonstrate that jurists of reason would find it debatable: (1) whether the petition states a valid claim of the denial of a constitutional right; and (2) whether the court was correct in its procedural ruling. *Slack v. McDaniel,* 529 U.S. 473, 484 (2000) . "Where a plain procedural bar is present and the district court is correct to invoke it to dispose of the case, a reasonable jurist could not conclude either that the district court erred in dismissing the petition or that the petitioner should be allowed to proceed further." *Id.*

For the reasons discussed above, the court has concluded that petitioner's application for habeas relief is moot. The court is convinced that reasonable jurists would not debate otherwise. Petitioner, therefore, has failed to make a substantial showing of the denial of a constitutional right, and a certificate of appealability is not warranted.

IV. CONCLUSION

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 3

Not Reported in F.Supp.2d, 2002 WL 655470 (D.Del.)

**(Cite as: 2002 WL 655470 (D.Del.))**

**\*3** For the reasons stated, the court will dismiss petitioner's application for a writ of habeas corpus as moot, and will not issue a certificate of appealability. An appropriate order shall issue.

ORDER

At Wilmington, this 12th day of April, 2002, consistent with the memorandum opinion issued this same day;

IT IS HEREBY ORDERED that:

1. Petitioner Anthony L. Hood's petition for writ of mandamus, (D.I.2), treated as an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, is dismissed as moot.

2. The court declines to issue a certificate of appealability for failure to satisfy the standard set forth in 28 U.S.C. § 2253(c)(2).

Not Reported in F.Supp.2d, 2002 WL 655470 (D.Del.)

**Motions, Pleadings and Filings (Back to top)**

• 1:00CV00538  (Docket)

(May. 31, 2000)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT C



Not Reported in F.Supp.                                                    Page 1

Not Reported in F.Supp., 1998 WL 175882 (D.Del.)

**(Cite as: 1998 WL 175882 (D.Del.))**

**C**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, D. Delaware.
FEDERAL INSURANCE COMPANY, as subrogee
of Wilmington Trust Corporation, and St.
Paul Fire & Marine Insurance Company, as
subrogee of Wilmington Trust
Corporation, Plaintiffs,
v.
SIGNTACTICS, INC. and KEITH SIGN
COMPANY, Defendants.
HARTFORD INSURANCE COMPANY, as
subrogee of Limestone Valley Enterprises, L.P.
Plaintiff,
v.
SIGNTACTICS, INC. and KEITH SIGN
COMPANY, Defendants.
**No. 97-343-SLR, 97-647-SLR.**

March 26, 1998.
John D. Balaguer, Esquire of White and Williams,
Wilmington, attorney for plaintiffs Federal
Insurance Co. and St. Paul Fire & Marine Insurance
Co.

Kathleen Jennings, Esquire, Oberly, Jennings &
Drexler, Wilmington, attorney for plaintiff Hartford
Insurance Co.

Mary Matterer, Esquire, Stradley, Ronon, Stevens
& Young, Wilmington, attorney for defendant
Signtactics, Inc.

MEMORANDUM OPINION

ROBINSON, District J.

I. INTRODUCTION

*1 Pending before the court are motions to dismiss
filed by defendant Signtactics, Inc. ("Signtactics"). (
*Federal Insurance Co., et al. v. Signtactics, Inc. et
al.,* C.A. No. 97-343-SLR("*Federal* "), D.I. 6;
*Hartford Insurance Co. v. Signtactics, Inc. et al.,*
C.A. No. 97-647-SLR ("*Hartford* "), D.I. 6)
Independent suits were initiated against Signtactics
by Federal Insurance Company & St. Paul Fire &
Marine Insurance Company ("Federal") and
Hartford Insurance Company ("Hartford")
(collectively referred to as "plaintiffs"), alleging
contract and tort claims.

The court has jurisdiction over this matter pursuant
to 28 U.S.C. § 1332. Venue properly lies in this
district pursuant to 28 U.S.C. § 1391(a).

II. FACTS AND PROCEDURAL BACKGROUND

The underlying facts do not appear to be in dispute.
In March 1990, Wilmington Trust Company
("Wilmington Trust") leased space in the Lantana
Plaza Shopping Center in Hockessin from
Limestone Valley Enterprises L.P. ("Limestone
L.P.") to operate a bank branch. (*Federal,* D.I. 10,
Exhibit 1A)

On January 3, 1991, Wilmington Trust contracted
with Signtactics to "meet, survey, design,
manufacture, erect, and install" business signs at the
Lantana Plaza branch. (*Hartford,* D.I. 7, Exhibit
1A at 1) The contract called for work to be
completed by no later than the week of February 18,
1991. (*Id.* at 4) The sign at issue in this case was
referred to in thecontract as Sign # 6, and was to be
installed on the south elevation of the bank
building. (*Id.* at 3)

On September 23, 1996, Sign # 6 malfunctioned.
Fire and smoke spread throughout the bank branch,
causing extensive damage to both real and personal
property. On June 23, 1997, Federal, as subrogee
of Wilmington Trust, filed a law suit against

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                            Page 2

Not Reported in F.Supp., 1998 WL 175882 (D.Del.)

**(Cite as: 1998 WL 175882 (D.Del.))**

Signtactics and Keith Sign Company, allegedly a subcontractor hired by Signtactics to perform the contract for the signs. (*Federal*, D.I. 1) The suit claimed breach of contract, negligence, and breach of warranties. On December 9, 1997, Hartford, as subrogee of Limestone L.P., filed an action against the same defendants, based on the same events, claiming negligence and breach of warranties. ( *Hartford*, D.I. 1)

Signtactics has now filed motions to dismiss in both cases, pursuant to F.R.C.P. 12(b)(6), alleging that the six-year statute of repose provided by Delaware's "Builders' Statute," 10 Del. C. § 8127, bars both actions. (*Federal*, D.I. 6; *Hartford*, D.I. 6) Briefing is complete on the motions in both cases, and all parties have consented to have the motions decided jointly by the court. (*Hartford*, D.I. 5) [FN1] Also pending is Signtactics' motion to strike a surreply brief filed by Federal. (*Federal*, D.I. 12, 13)

> FN1. Previously, Federal requested oral argument, pursuant to Local Rule 7.1.4. ( *Federal*, D.I. 9) There was no request for oral argument in *Hartford*. The court considers Federal's request now moot.

III. DISCUSSION

A. Motion to Strike

Signtactics has moved to strike Federal's surreply brief and the supplemental affidavit contained therein. (*Federal*, D.I. 12, 13) This motion should be considered before addressing the motions to dismiss because if stricken, the supplemental affidavit of Edward Huppi would not weigh into the court's decision on the motions to dismiss.

**\*2** Local Rule 7.1.3 addresses the form and content of briefs in this district. No subsection provides for or prohibits surreply briefs. Subsection (c) discusses the contents of opening, answering, and reply briefs. Signtactics interprets this to imply that a surreply is not allowed, at least without leave from the court. Federal did not seek permission to file a surreply.

Federal addressed two issues in its surreply. First, it believed Signtactics inaccurately implied that Sign # 6 was the only sign for the bank branch and clarified the number of signs at the branch through Huppi's supplemental affidavit. However, whether or not the affidavit is stricken is irrelevant, as there is already evidence in the record through the contract between Wilmington Trust and Signtactics, of the number of signs at the bank branch. (*See Federal*, D.I. 7, Exhibit 1A)

Second, Federal argued that *McHughs Electric Co. v. Hessler Realty & Development Co.*, Del.Supr., 129 A.2d 654 (1957), cited and relied upon in Signtactics' reply brief, is distinguishable from the instance case. In its answering brief, Federal asserted that the lease between Wilmington Trust and Limestone L.P. was evidence of the intent of both the lessor and the lessee that the signs were neither permanent additions nor enhancements to the capital value of the property. (*Federal*, D.I. 10 at 14) Signtactics then properly addressed that argument in its reply brief, citing *McHughs*. This is not a situation where one party misled the other by holding back arguments until the reply brief, in violation of Local Rule 7.1.3(c)(2).

However, Signtactics has not alleged any particular prejudice suffered, nor is any such prejudice readily apparent. Given that the surreply brief is innoxious, the motion to strike is denied and the court will consider the surreply brief and supplemental affidavit in deciding the motions to dismiss.

B. Motions to Dismiss

Signtactics moves this court to dismiss the two complaints pursuant to F.R.C.P. 12(b)(6). [FN2] Specifically, Signtactics argues protection under the Delaware Builders' Statute and expiration of the six-year limitations period for damages resulting from deficiencies in the construction of improvements to real property prior to the filing of either complaint. The application of the Builders' Statute is an affirmative defense and as such, Signtactics bears the burden of proving its applicability in this case.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                              Page 3

Not Reported in F.Supp., 1998 WL 175882 (D.Del.)

**(Cite as: 1998 WL 175882 (D.Del.))**

FN2. Signtactics states in its opening brief that it seeks a motion to dismiss "pursuant to F.R.C.P. 12(b)(6) for lack of subject matter jurisdiction." (*Hartford,* D.I. 7 at 1) Such a motion would be based upon F.R.C.P. 12(b)(1). As this is the only reference to subject matter jurisdiction, it is likely a typographical error. Therefore, this memorandum opinion assumes Signtactics' motion is a motion to dismiss for failure to state a claim.

1. Standard of Review

A motion to dismiss for failure to state a claim, pursuant to F.R .C.P. 12(b)(6), cannot be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief," assuming all allegations set forth in the complaint are true and drawing all inferences favorable to the plaintiff. *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). However, when matters outside the pleadings are presented, "the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56...." F.R.C.P. 12(b)(6). F.R.C.P. 56 provides that granting summary judgment is appropriate when "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." F.R.C.P. 56(c). "The appropriate inquiry is whether there is a need for a trial .... Are there any genuine factual issues that properly can be resolved in favor of either party." *Windley v. Potts Welding & Boiler Repair Co.,* 888 F.Supp. 610, 611 (D.Del.1995).

*3 In its opening briefs, Signtactics attached a copy of the contract with Wilmington Trust. "The Court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *DeWitt v. Penn-Del Directory Corp.,* 872 F.Supp. 126, 128 (D.Del.1994). The contract is such a document and, thus, Signtactics' submission of the contract does not convert the motions to dismiss to summary judgment motions.

However, both plaintiffs submitted affidavits for

the court's consideration. Hartford's answering brief contained an affidavit from Cindy Bartoshesky, a limited partner of Limestone L.P. (*Hartford,* D.I. 10, Exhibit A) Federal submitted two affidavits in its answering brief; one from a Wilmington Trust executive, Eduard Huppi, and the other from Clifford Patton, a retained expert in this case. ( *Federal,* D.I. 10, Exhibit 1, 2) Additionally, Federal attached a supplemental affidavit from Eduard Huppi in its surreply brief. (*Federal,* D.I. 12, Exhibit 1) These affidavits are matters outside the pleadings and, therefore, the motions to dismiss are converted to motions for summary judgment.

The court is required to provide the parties with notice of its intent to treat motions to dismiss as motions for summary judgment and give the parties an opportunity to submit material in support of their positions. *Hilfirty v. Shipman,* 91 F.3d 573, 578 (3d Cir.1996). The parties appear to have had proper notice, as both plaintiffs and Signtactics propounded in their briefs that the motions were converted. (*Federal,* D.I. 10 at 6, D.I. 11 at 1; *Hartford,* D.I. 10 at 5)

2. Delaware Builders' Statute

The basis for Signtactics' motions is that the actions are barred by the statute of repose in the Delaware Builders' Statute, 10 Del. C. § 8127. A six-year limitation period applies thereunder to actions for damages, indemnification, or contribution for property damage, real or personal or mixed, arising out of any deficiency in the construction of an improvement to real property or the design, planning,supervision, or observation of any such construction. 10 Del. C. § 8127(b)(1)(2). "The limitation period begins to run at the earliest of several designated dates, irrespective of the date of the injury." *City of Dover, et al. v. International Telephone and Telegraph Corp. et al.,* Del.Supr., 514 A.2d 1086, 1089 (1986). "The statute in question is a true statute of repose. It prevents a claim from arising, whereas a statute of limitations bars an accrued cause of action.... Thus, the passing of the six-year period deprives the injured party of a legal right to redress." *Id.* (citations omitted).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                 Page 4

Not Reported in F.Supp., 1998 WL 175882 (D.Del.)

(Cite as: 1998 WL 175882 (D.Del.))

The parties agree that the relevant designated date in this case, if the Builders' Statute were to apply, is "the date of purported completion of all the work called for by the contract as provided by the contract if such date has been agreed to in the contract itself." 10 Del. C. § 8127(b)a. The contract between Wilmington Trust and Signtactics called for completion of all work by the week of February 18, 1991. Thus, under the Builders' Statute, the limitation period expired on February 18, 1997.

**\*4** Signtactics asserts it is entitled to protection under the Builders' Statute and, thus, any claim either plaintiff had against it expired approximately four months before Federal filed its complaint and approximately ten months before Hartford filed its complaint. Therefore, the complaints fail to state a claim and should be dismissed. Plaintiffs contend that Signtactics is not entitled to protection under the Builders' Statute and, since the statute of limitations for the particular actions have not expired, the complaints were timely filed.

In order for a builder to receive protection under the Builders' Statute, he or she must furnish construction of an improvement to real property. *City of Dover v. International Telephone and Telegraph Corp.,* 514 A.2d at 1089.

a. Furnish Construction

The Builders' Statute provides protection to persons
 performing or furnishing, or causing the performance or furnishing of, any ... construction of ... an improvement or against any person performing or furnishing, or causing the performing or furnishing of, any ... designing, planning, supervision, and/or observation of any ... construction or manner of construction of ... an improvement.
10 Del. C. § 8127(b). "Furnish" is defined as "provides for, equips, supplies, or appoints." *Becker v. Hamada, Inc.,* Del.Supr., 455 A.2d 353, 355 (1982). "Construction" is defined by the Builders' Statute to include "construction, erection, building, alteration, reconstruction, and destruction of improvements to real property." 10 Del. C. §

8127(a)(4). Like the definition of "improvement," "[the] Delaware courts apply a common sense understanding of the word construction: the act of building; erection; act of devising and forming; fabrication; or composition." *Windley,* 888 F.Supp. at 612 (citing *Becker,* 455 A.2d at 356). A party must supply more than just raw materials in order to be protected by the Builders' Statute. *Windley,* 888 F.Supp. at 612. If "the party is more than a mere supplier of the material in question in that it actually fabricates them to the specifications of the buyer, that party furnishes construction." *Id.* Fabrication to the specifications of the buyer is the lynchpin of the "furnishing construction" issue. *Schermerhorn v. Anchor Electric Co. et al.,* Del.Super., 1992 WL 301636, 2 (1992).

In *City of Dover v. International Telephone and Telegraph Corp.,* the court held that off-site fabrication of utility poles constituted "furnishing construction," although the defendant only manufactured and delivered the poles and did not install them, because it manufactured the poles according to the specifications provided by a company involved with designing the pole system. 514 A.2d at 1089.

In *Hiab Cranes and Loaders Inc., et al. v. Service Unlimited Inc. et al.,* Del.Super., C.A. No. 82C-FE-98, Martin J. (August 16, 1983), *modified,* C.A. 82C-FE-98, Martin J. (October 4, 1983), the defendant met the "furnishing construction" requirement by manufacturing and selling an oil furnace designed to be incorporated into a building under construction, according to mechanical specifications of a co-defendant. C.A. 82C-FE-98 at 6-7.

**\*5** In *Standard Chlorine of Delaware, Inc. v. Dover Steel Co., Inc.,* Del.Super., 1988 WL 32044 (1988), the court held a liquid storage tank manufacturer, who did not install the tank, "furnished construction" where the tank was constructed according to the specifications supplied by the plaintiff. *Id.* at 1.

By contrast, in *Kirkwood Dodge v. Krapf,* Del.Super., 1989 Lexis 201 (1989), the court held

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1998 WL 175882 (D.Del.)

**(Cite as: 1998 WL 175882 (D.Del.))**

that the manufacturer of a circuit breaker panel box did not meet the requirement of "furnishing construction" where the panel box was not manufactured according to any specifications, but was a generally available item. *Id.* at 7-8.

In *Schermerhorn,* the plaintiff was injured by a kilowatt hour meter and brought suit against the manufacturer of the meter pan and receptacle. As in *Kirkwood Dodge,* the item was not fabricated according to specifications provided to the manufacturer and the court held the defendant did not furnish construction, stating "[t]he public policy behind the statute of repose does not apply to items manufactured by a general supplier not designed for specific application to a particular construction project." *Schermerhorn,* 1992 WL301636 at 2.

In the cases at bar, the contract between Wilmington Trust and Signtactics provided that Signtactics will "meet, survey, design, manufacture, erect, and install" signage, *within Wilmington Trust's specifications,* for the bank branch in question. (*Hartford,* D.I. 7, Exhibit 1A at 1)(emphasis added). This suggests that Signtactics was more than just a supplier of a generally available item [FN3], and is entitled to the status of one who furnished construction under the Builders' Statute.

> FN3. Although there may be a factual dispute as to whether Signtactics actually "constructed" Sign # 6 or "caused" the construction of Sign # 6 (*see Federal,* D.I. 10, Exhibit 1 at para. 6), the dispute is not material under the language of the statute. The Builders' Statute protects parties "performing or furnishing any construction of an improvement to real property, *as well as those causing* to perform or furnish, any design, plan, supervision or observation of any construction of an improvement. *City of Dover v. International Telephone and Telegraph Corp.,* 151 A.2d at 1089 (emphasis added). This language indicates the courts' recognition that a party to a contract may generally delegate his or her duties under the contract and that

such delegation does not relieve the original promisee of primary responsibility for performance. Therefore, whether Signtactics caused Keith Sign Company to perform or furnish Sign # 6, pursuant to Wilmington Trust's specification, or performed and furnished Sign # 6 itself, Signtactics is entitled to the status of one who furnished construction under the Builders' Statute.

b. Improvement to Real Property
The second requirement of the Builders' Statute is that the item constructed qualify as an improvement to real property. 10 Del. C. § 8127(b)(1). This is a question of law. *Windley,* 888 F.Supp. at 613. Thus, there can be no genuine issue of material fact for a jury to decide and a summary judgment review is appropriate.

The Builders' Statute defines "improvement" to include "buildings, highways, roads, streets, bridges, entrances and walkways of any type constructed thereon, and other structures affixed to and on land, as well as the land itself...." 10 Del. C. § 8127(a)(2). The Delaware Supreme Court, using the rules of statutory construction, interpreted this listing to be "exemplary, not exclusive." *City of Dover v. International Telephone and Telegraph Corp.,* 514 A.2d at 1089 (citing *Gage v. City of Wilmington,* Del.Supr., 293 A.2d 555, 557 (1972)). Thus, the case law has further defined what constitutes an improvement.

The seminal case on this issue in Delaware is *Hiab Cranes and Loaders Inc., et al. v. Service Unlimited Inc. et al.,* Del.Super., C.A. No. 82C-FE-98, Martin J. (August 16, 1983), *modified,* C.A. 82C-FE-98, Martin J. (October 4, 1983). In that case, the court was asked to determine whether an oil furnace was an improvement to real property. After noting that challenges to the statute's application, based on the definition of "improvement," had not previously been addressed in Delaware, the court analyzed how other jurisdictions approached the issue. The court found that "those decisions which have interpreted the 'improvement' to real property provision of the builders' statute indicate that the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 6

Not Reported in F.Supp., 1998 WL 175882 (D.Del.)

**(Cite as: 1998 WL 175882 (D.Del.))**

term is susceptible of definition employing either of two basic approaches." *Hiab* at 3. The first is a common law fixture analysis. *Id.* In Delaware, such analysis focuses mainly on the "intention of the annexor as to whether or not a chattel was affixed to realty for a temporary or permanent purpose." *Hiab* at 6, n. 10 (citing *Del-Tan Corporation v. Wilmington Housing Authority,* Del.Supr., 269 A.2d 209, 210 (1970)).

*6 The second approach is a "common sense" interpretation, defining "improvement " as
a permanent addition to or betterment of real property that enhances its capital value and that involves the expenditure of labor and money and is designed to make the property more useful or valuable as distinguished from ordinary repairs.
*Hiab* at 4.

Additionally, the *Hiab* court cited a New Jersey case, *Brown v. Central Jersey Power & Light Co.,* 163 N.J.Super. 179, 394 A.2d 397 (N.J.Super.1978) , where the court used a vitality test, holding that a transfer switch assembly was an improvement because it "constituted a permanent part of one of the mechanical systems necessary to the normal function of the particular improvement to real estate ... By contrast, equipment or chattels brought into a structure after it is architecturally and mechanically suitable for occupancy for the purpose intended should be exempted from the statute, e.g., furniture, production machinery, appliances, etc." *Hiab* at 5 (citing *Brown,* 394 A.2d at 405-406).

(1) Vitality Test
Ultimately, the *Hiab* court, citing *Brown,* used the vitality test and held that the heating system, with the oil furnace at issue, was an improvement because it "comprised the permanent entirety of one of the mechanical systems vital to the normal function of the [building]. Without the heating system, the [building] would have been neither functional nor architecturally and mechanically suitable for occupancy." *Hiab* at 5.

This court applied the vitality test in *Windley,* holding that a large air preheater in a power plant was an improvement because it was "central to the

plant's function." 888 F.Supp. at 613.

In the instant cases, Sign # 6 fails the vitality test. It was not essential to one of the mechanical systems of the building, necessary for occupancy, nor central to the building's function. The building at issue could be occupied and used without this sign. Thus, under this approach, Sign # 6 would not meet the definition of "improvement" to real property and the Builders' Statute would not apply.

(2) Common Sense Interpretation Approach
Utilizing the common sense interpretation of "improvement," in *Davis v. Catalytic Inc.,* Del.Super., 1985 WL 189329 (1985), the court reviewed the factors constituting the common sense definition of "improvement" and held that a slurry cooler, a large free standing structure encased in steel with other significant parts cemented into the ground and bolted to it, was an improvement to real property. *Id.* at 4. The court found that the physical structure of the cooler clearly indicated a permanent addition; the cooler enhanced the capital value of the property by enabling an increase in product production, as well as being a capitalized item on the owner's books; its construction required an expenditure of money and labor; and the cooler made the property more useful because it facilitated increased production. *Id.*

*7 In *Standard Chlorine,* a liquid storage tank was found to be an improvement. 1988 WL 32044 at 2. The decision furnished minimal analysis, simply relying on the tank weighing approximately 74,000 pounds, containing 320,000 gallons of toxic liquid, costing $24,000 to construct, and being "attached to the realty through a system of pipes, valves, manifolds, wires, scaffolds, catwalks, and a foundation." *Id.* The court also found that the tank enhanced the value of the real property, but provided no basis for this conclusion. *Id.*

In *Kirkwood Dodge,* the court held that a circuit breaker panel box, installed when the building was originally constructed, qualified as an improvement under the common sense definition. 1989 Lexis 201 at 3-4. Again, the court did not provide much analysis, stating only that the box was "a permanent

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 7

Not Reported in F.Supp., 1998 WL 175882 (D.Del.)

**(Cite as: 1998 WL 175882 (D.Del.))**

fixture to the building which is certainly designed to make the property more useful than it otherwise would be." *Id.*

Perhaps the most related case to the instant actions is *Fountain v. Colonial Chevrolet Co., et al.,* Del.Super., 1988 WL 40019 (1988). In *Fountain,* the Builders' Statute was held to apply to a pole bearing a rotating sign. Although the primary issue in *Fountain* was whether the defendant had furnished construction, application of the statute implied that the item was an improvement to real property, since both requirements must be met to fall within § 8127. However, unlike the matters under consideration, the focus of the *Fountain* court was not whether the sign was an improvement, but whether the pole was an improvement. Here, the sign is the focus of the improvement inquiry. Thus, *Fountain* is not as helpful as it appears at first glance.

Reviewing the four common sense factors as they apply to the cases at bar, Sign # 6 does not meet the common sense definition of "improvement." Clearly, there was an expenditure of money and labor, given the sign cost $10,500 and required labor to create it. (*Hartford,* D.I. 7, Exhibit 1A) Furthermore, the addition of Sign # 6 was not an ordinary repair to the building. It made the property more useful to Wilmington Trust than it otherwise would have been by announcing the exact location of the bank branch within the shopping center to both existing and potential bank customers.

However, the physical structure of Sign # 6 does not indicate that it was a permanent addition to the building. Sign # 6 is described as compromising 15 individual lightweight, portable letters, each with its own wires, that could be attached to and detached from the permanent wires in the building, without damage to the building or the sign. (Affidavit of Clifford Patton, *Federal,* D.I. 10, Exhibit 2; Wilmington Trust/Signtactics contract, *Hartford,* D.I. 7, Exhibit 1A)

Nor did Sign # 6 add any capital value to the real property, although an improvement does not necessarily *require* value enhancement to be

defined as such. *City of Dover v. International Telephone and Telegraph Corp.,* 514 A.2d at 1089-90. There is no evidence that Sign # 6 increased the value of the property to Limestone L.P., the owner of the real property, or that Wilmington Trust characterized Sign # 6 as a capital expenditure, as in *Davis.* Signtactics argues that Limestone L.P. may have had difficulty securing a tenant for the property without permitting commercial signs, thus decreasing the property value if signs were excluded. While this proposition may be accurate, the court must focus on the sign at issue, not signs in general. The issue is whether Sign # 6 added capital value to the real property. Sign # 6 was a sign *located on a building.* Signtactics submitted no evidence to support that the absence of a sign on a building would decrease the value of the property.

**\*8** Using common sense and comparing Sign # 6 to those items deemed an improvement by the Delaware courts, there is an obvious difference, as a matter of law, between a sign on the side of a building and a slurry cooler, circuit breaker panel box, liquid storage tank, or a pole. Therefore, the court finds that Sign # 6 is not an improvement to real property under the common sense interpretation approach.

(3) Common Law Fixture Analysis
Employing the common law fixture analysis approach, "the dominant inquiry in according a chattel the status of fixture is the intention of the annexor as to whether or not the chattel was affixed to realty for a temporary or permanent purpose." *Hiab* at 6, n. 10 (citing *Del-Tan Corp.,* 269 A.2d at 210). Factors that should be considered include "the nature of the chattel, the mode of its annexation to the real estate, the purpose or use for which the annexation has been made, and the relation of the person annexing the chattel to the property." *Del-Tan Corp.,* 269 A.2d at 210.

In *Hiab,* the court applied the fixture analysis, as well as the common sense interpretation, regarding whether an oil furnace was an improvement to real property. *Hiab* at 6, n. 10. The court concluded, without elaborating on its analysis, that "the oil

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                              Page 8

Not Reported in F.Supp., 1998 WL 175882 (D.Del.)

**(Cite as: 1998 WL 175882 (D.Del.))**

furnace was intended as a permanent structure and that plaintiff did not contemplate its removal prior to the expiration of its useful life." *Id.*

Application of the fixture analysis to the cases at bar results in the conclusion that Sign # 6 was not a fixture. The nature of the chattel was a sign, consisting of fifteen lightweight, portable letters, that could be attached to and detached from the building's permanent electrical system without damage to the building or the sign. (Patton Affidavit, *Federal,* D.I. 10, Exhibit 2) The annexation was achieved by mounting each letter on the wall with two-inch pins. (*Hartford,* D.I. 7, Exhibit 1A at 3) Each of the fifteen individual letters had its own wires that could be attached to and detached from the permanent wires in the building. (Patton Affidavit, *Federal,* D.I. 10, Exhibit 2) The removal of the letters from the building could be accomplished with no damage to the building or the letters themselves. (*Id* ) Wilmington Trust was a lessee to the property. ( *Hartford,* D.I. 10, Exhibit A)

Additionally, the lease between Wilmington Trust and Limestone L.P. evidences that Wilmington Trust intended the sign to be affixed on the building temporarily, as Paragraph 10(d) specifically provides that

  signs or moveable trade fixtures shall not be deemed part of the [premises] and may be removed by Lessee at any time or times during the term of this lease and upon the termination of the term of this Lease.... In the event that Lessee removes signs and removable trade fixtures not deemed to be part of the [premises], Lessee must restore [the premises] to its original condition.
  All improvements, except signs and removable trade fixtures, shall belong to Lessor at the termination of this Lease.
**\*9** (*Hartford,* D.I. 10, Exhibit A) Also, the affidavit by Cindy Bartoshesky confirms that the signs were not part of the premises and could be removed by Wilmington Trust at any time, that Wilmington Trust was obligated to remove the signs at the termination of the lease, and that the signs were not a permanent part of the premises "inasmuch as they were not owned by the owner of

the premises." (*Hartford,* D.I. 10, Exhibit A, para. 7, 8, 9)

Signtactics claims that the lease between Wilmington Trust and Limestone L.P. cannot preclude assertion of a statutorily created right for its benefit, citing *McHughs Electric Co. v. Hessler Realty & Development Co.,* Del.Supr., 129 A.2d 654 (1957). The plaintiff, a subcontractor, had installed lights and wiring on various buildings and when he was not paid, sought a mechanic's lien on the entire theater. The defendant, a lessee, claimed the lights and wiring were personal property, not fixtures, because the lease provided that upon termination, removal of all installations made during the lease was allowed. The court held that the lights and wiring were fixtures, stating the defendant could not contract away a statutory right created for the benefit of the plaintiff.

*McHughs* is distinguishable from this case. Here, the lease is being offered as evidence of Wilmington Trust's intent that Sign # 6 was not a permanent improvement to the building, but merely a temporary addition. Plaintiffs are not claiming that the lease, in and of itself, makes Sign # 6 a temporary addition. Additionally, there are other factors which lead to the conclusion that Sign # 6 was temporary, such as its physical composition and the method of attachment.

Therefore, under any of the three possible approaches to determine whether an item is an improvement under the Builders' Statute, the court concludes that Sign # 6 was not an improvement to real property as a matter of law. Therefore, Signtactics is not entitled to protection under the Builders' Statute.

III. CONCLUSION

For the reasons stated, defendant Signtactics' motions to dismiss/summary judgment shall be denied.

An order shall issue.

Not Reported in F.Supp., 1998 WL 175882

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 9

Not Reported in F.Supp., 1998 WL 175882 (D.Del.)

**(Cite as: 1998 WL 175882 (D.Del.))**


(D.Del.)


   **Motions, Pleadings and Filings (Back to top)**

• 1:97cv00343  (Docket)
                        (Jun. 23, 1997)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.