# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

MONA DOBRICH and MARCO     :
DOBRICH, individually and as     :
parents and next friend of ALEXANDER   :
DOBRICH, SAMANTHA DOBRICH,   :
JANE DOE and JOHN DOE,     :
individually and as parents and next   :
friend of JORDAN DOE and JAMIE   :
DOE,     :
     :
     Plaintiffs,     :
     :
     v.     :   C.A. No. 05-120 (JJF)
     :
INDIAN RIVER SCHOOL DISTRICT,  :
INDIAN RIVER SCHOOL BOARD,   :
HARVEY L. WALLS, MARK A.    :
ISAACS, JOHN M. EVANS, RICHARD  :
H. COHEE, GREGORY A. HASTINGS,  :
NINA LOU BUNTING, CHARLES M.  :
BIRELEY, DONALD G. HATTIER,   :
REGINALD L. HELMS, M. ELAINE   :
McCABE, and their successors in office, :
in their official capacities as members of :
the Indian River School Board, LOIS M. :
HOBBS, and her successors in office, in :
their official capacities as District   :
Superintendent, and EARL J. SAVAGE, :
and his successors in office, in their  :
official capacities as Assistant District  :
Superintendent,     :
     :
     Defendants.     :

## PLAINTIFFS' FIRST AMENDED COMPLAINT

Plaintiffs Mona Dobrich, Marco Dobrich, Samantha Dobrich and

Alexander Dobrich (collectively, the "Dobriches") and Jane Doe, John Doe, Jordan

Doe and Jamie Doe (collectively, the "Does"), by and through their undersigned

attorneys, hereby allege upon knowledge as to themselves and upon information and

belief as to all others, as follows:

## PRELIMINARY STATEMENT

1.      The Dobriches and Does bring this action to enforce their right

under the United States Constitution and the Constitution of the State of Delaware to

be free from state-sponsored religion.

2.      School-sponsored prayer has been a longstanding tradition in

the Indian River School District (the "District"). As a matter of practice and policy,

school officials and community religious leaders have delivered prayers at events and

meetings organized by District schools. Prayers have begun (and often ended)

football practice sessions, athletic and academic banquets, school potlucks, school

baccalaureate services, graduation exercises and Indian River School Board (the

"School Board") meetings. The prayers frequently have been sectarian, Christian

prayers.

3.      The District's custom and practice of school-sponsored

Christian prayer, frequently imposed upon a captive audience that includes impres-

sionable non-Christian students, constitutes a violation of both the United States and

the Delaware Constitutions.

4.      District practices foster an environment of religious exclusion.

5.      The Dobriches and Does seek damages for past unconstitu-

2

tional practices and policies involving the orchestration and encouragement of school-sponsored prayer in the District.

6.      The Does seek declaratory and injunctive relief to prevent school-sponsored prayer in the District.

## THE PARTIES

7.      Plaintiff Mona Dobrich graduated from Sussex Central High School ("Sussex Central") in 1984. As a student, and later as a parent of students who attended District schools, she has participated in all aspects of school life in the District, including school-sponsored field trips, book fairs, class assemblies, potlucks, graduations and School Board meetings.

8.      Plaintiff Marco Dobrich is the husband of Mona Dobrich. As a taxpayer and a parent of students who attended District schools, he too has participated in many aspects of school life in the District, including attending School Board meetings. Marco works at the Sussex Academy of Arts and Sciences as a transportation coordinator.

9.      Mona and Marco were homeowners in the District. Marco remains a resident of the District.

10.     Plaintiff Alexander Dobrich is a thirteen-year old-boy who completed grades one through five at North Georgetown Elementary School. He sues through his parents, Mona and Marco Dobrich.

11.     Plaintiff Samantha Dobrich is the daughter of Mona and Marco

3

Dobrich and the sister of Alexander Dobrich. She graduated from Sussex Central on June 3, 2004, and was the only Jewish student in her graduating class. Samantha was fifth in her class at Sussex Central. She was a member of the National Honor Society, and she lettered in cross-country.

12.     The Does are residents of the District. Because of the public backlash directed against the Dobriches, which is described in detail below, the Does wish to remain anonymous to avoid retaliation by members of the community and employees of the District.

13.     Jordan Doe is the child of Jane and John Doe. Jordan attended middle school in the District and plans to attend a District high school. Jordan sues through Jordan's parents, Jane and John Doe.

14.     Jamie Doe is the child of Jane and John Doe. Jamie attends an elementary school in the District. Jamie sues through Jamie's parents, Jane and John Doe.

15.     The Defendant District is located in Southeastern Sussex County. Since its creation in 1969, the District has served the towns of Selbyville, Frankford, Dagsboro, Gumboro, Fenwick Island, Bethany Beach, Ocean View, Millsboro and Georgetown. The District consists of seven elementary schools, two middle schools, two high schools, two special schools, an arts magnet school and an outdoor education center. District schools serve more than 7,700 students and employ more than 1,000 adults. The District is organized pursuant to 14 *Del. C.* § 1068.

4

16.    The Defendant School Board is a ten-member elected body that governs the schools in the District, including Sussex Central High School and North Georgetown Elementary School. The School Board determines final policy and prescribes rules and regulations for the conduct and management of District schools, as well as the District's property and funds, pursuant to 14 *Del. C.* § 1043.

17.    Defendants Harvey L. Walls, Mark A. Isaacs, John M. Evans, Richard H. Cohee, Gregory A. Hastings, Nina Lou Bunting, Charles M. Bireley, Donald G. Hattier, Reginald L. Helms and M. Elaine McCabe were members of the School Board since at least 2002. In 2005, Donna M. Mitchell replaced McCabe on the School Board. In 2006, Randall Hughes replaced Hastings on the School Board. Each Defendant is a resident of the State of Delaware. The School Board members, and their successors in office, are sued in their official capacities.

18.    Defendant Lois M. Hobbs is and has been the District Superintendent since at least 2002. On Friday, December 17, 2004, Hobbs announced that she will resign effective in mid-2006. The School Board has chosen Susan Bunting as Hobbs's successor in office. Hobbs is a resident of the State of Delaware. She, and her successors in office, are sued in their official capacities.

19.    Defendant Earl J. Savage (together with Hobbs and the School Board members, the "Official Capacity Defendants," and together with the District and School Board, "Defendants") is and has been the Assistant District Superintendent since at least 2002. He is a resident of the State of Delaware. He, and his successors in

5

office, are sued in their official capacities.

## JURISDICTION

20.    This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a)(3) and (a)(4), 1367, and 2201, and pursuant to 42 U.S.C. § 1983.

## VENUE

21.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391. Delaware is the site of Plaintiffs' injuries, and all parties reside in the District of Delaware.

## SUBSTANTIVE ALLEGATIONS

22.    School-sponsored prayer has pervaded the lives and activities of teachers and students in District schools. School officials and community religious leaders routinely deliver prayers at events and meetings organized by the District. Prayers have begun and ended athletic and academic banquets, school potlucks, school baccalaureate services, graduation exercises and School Board meetings.

### Graduation Ceremonies

23.    For many years, the District has asked a member of the local clergy to deliver an invocation and a benediction at the annual Sussex Central High School graduation ceremony.

24.    The District continued to ask a member of the local clergy to deliver an invocation and a benediction at the annual Sussex Central High School graduation ceremony despite the United States Supreme Court's holding in *Lee v.*

6

*Weisman*, 505 U.S. 577 (1992), that school-sponsored prayer at graduation is unconstitutional.

25.    The School Board and school administrators continued to approve of the practice described in ¶¶ 23-24 above despite a complaint from a District employee that sectarian prayer at her son's graduation in 2003 was inappropriate.

26.    School officials invited Pastor Jerry Fike of Mt. Olivet Church of the Brethren in Georgetown to give the invocation and the benediction at Sussex Central's 2004 graduation exercises.

27.    Samantha Dobrich attended Sussex Central's 2004 graduation ceremony as a graduating senior. Mona, Marco and Alexander Dobrich attended as spectators and as members of Samantha's family.

28.    At the beginning of the graduation ceremony, members of the uniformed Junior Reserve Officer Training Corps color guard presented the Flags of the United States and the State of Delaware in front of the podium. Singers led the student body and the spectators in the National Anthem.

29.    Pastor Fike then stepped to the microphone and stated to the assembled students:

> Let us bow for the invocation. Our heavenly Father we thank You for a bright and beautiful day tonight, in which we can celebrate the accomplishments of these students and those who have assisted them over the years. We praise You Father for bringing them to this point. We pray that You guide them as they use their gifts and abilities and discover them during the coming days, weeks, months and years, that they can use them to serve their fellow human beings in this world and You also. So we ask for Your direction in this endeavor. I also pray for one specific student, that You be with her and guide

7

her in the path that You have for her. And we ask all these things in Jesus'
name, and for His sake. Amen.

30.    School officials then welcomed the assembled students and

spectators to the ceremonies. After the commencement addresses and the awarding of

degrees, Pastor Fike asked the audience to stand and bow their heads in prayer. Pastor

Fike then stated:

> Heavenly Father thank You for this great occasion, for the work, the effort, the
> joys and everything that led up to this point in time. Thank You for your
> guidance in this event. We pray for Your direction in the lives of each of these
> graduates. As they enter the world that they use their gifts and abilities to serve
> you and humanity. We pray that You direct them into the truth, and eventually
> the truth that comes by knowing Jesus. We also pray that You would be with
> them even as one last time the teachers surround the students with their
> presence. And we ask these things in Jesus' name. Amen.

### Bible Club

31.    The prayer at the 2004 graduation ceremony is only one

example of the pervasive presence of religion in the District.

32.    Bible Clubs have met at more than one school in the District.

33.    At Selbyville Middle School, District employees led three

different Bible Clubs -- one each for the sixth, seventh and eighth grades. A science

teacher, Ms. Truitt, led the sixth grade club; a social studies teacher, Mr. Buchler, led

the seventh grade club; and a school secretary, Mrs. Butler, led the eighth grade club.

34.    Students who attended Bible Clubs at Selbyville Middle School

received privileges not available to other students. At the start of lunch periods, a

District employee would announce that Bible Club students could get their lunches.

8

Students planning to attend Bible Club could advance to the head of the lunch line and take their lunches to the Bible Club meeting. Teachers leading the Bible Clubs would award doughnuts to participating students.

35.    Students had no reasonable alternative to the Bible Clubs during lunch period. The school approved a Book Club, but that club met only once a month. Attendance in the Book Club was limited. Students had to apply to the Book Club and there was a waiting list to join. The school frequently cancelled Book Club meetings and would not reschedule them.

36.    The Bible Clubs, on the other hand, met weekly, and whenever a scheduling conflict arose, the school found an alternate time for the Bible Clubs to meet.

37.    Jordan Doe complained to Jordan's parents that Jordan's friends would go to Bible Club and leave Jordan sitting alone at the lunch table. Jordan felt pressure to join Bible Club. When Jane Doe contacted a school official to discuss Jordan's alternatives, that official insisted that Jordan could attend Bible Club. After Jane Doe made sure that the school official fully understood that her family was not Christian and that their individual faith was important to them, the official again told Jane that her child should go to Bible Club.

9

### Schools Distributing Bibles

38.    At least one elementary school in the District distributed Bibles to students during the 2003 school year.

39.    A school official made an announcement during class, reminding students to pick up their Bibles.

40.    Teachers then dismissed students during class time to retrieve their Bibles. After getting their Bibles, the students returned to class.

41.    Jordan was a student and present in class when the District distributed Bibles at Jordan's school. Jamie also was a student and present in class when the District distributed Bibles at Jamie's school.

### Athletic Events

42.    Football practices and games are another example of school prayer in the District. Indian River High School football coach Jim Bunting explained to a local television station how he led his student athletes in prayer before football practice and games:

> When we prepare for a ball game we warm up. Obviously, we warm our muscles up. I guess my thing is with prayer – that kind of – that warms us all up. That prepares our mind for this. It's just as important a part as anything we do to prepare for a game.

43.    Bunting stated that any player has the right to forego the daily ritual, as long as the student remains for practice. Bunting said he stands by his daily prayers. In fact, he said the players look forward to them.

44.    The football team is not the only athletic team that has prayed at

10

the direction of a coach. The Sussex Central cross-country team has gathered for pasta dinners before cross-country meets. The cross-country coach, Patricia Anderson, had students open those dinners with prayer.

### Potlucks, Ice Cream Socials and Academic Banquets

45.     At the beginning of each academic year, schools in the District welcome parents and students with potluck dinners, ice cream socials and other events.

46.     Teachers and school administrators have begun and ended the events with prayer.

47.     For example, at the beginning of the 2003-2004 school year, Selbyville Middle School hosted a family dinner at the school to help parents and students become acquainted with teachers. Ms. Truitt opened the dinner with prayer incorporating her own religious beliefs. Throughout the meeting, she continued to make comments reflecting her zeal for religion.

48.     The District holds annual awards banquets to recognize selected students for their exemplary performance in academic and athletic pursuits. Those banquets include a keynote address and provide an opportunity for students to celebrate their achievements. The banquets have begun and ended with sectarian prayer led by Pastor Marvin Morris.

49.     The District Superintendent and School Board members, including School Board presidents, have attended the annual awards banquets. These

11

officials were present when the banquets began and ended with prayers.

50.    In each of her ninth-, tenth-, eleventh-, and twelfth-grade years, Samantha Dobrich was invited to attend these awards banquets because of her success in academic and extracurricular activities. As a twelfth grader, Samantha received a plaque for qualifying as a recipient during each of her four years at Sussex Central.

### Religion in the Curriculum

51.    Religion has become part of the District's curriculum.

52.    The District schools' sixth-grade science classes include a lesson on evolution. In at least one school – Selbyville Middle School – school officials have given students the option to attend Bible Club and do a worksheet instead of learning about evolution. The school offered special Bibles Clubs that week to ensure that all who wanted to could attend.

53.    At Selbyville Middle School, a social studies teacher, Mr. Buchler, emphasized to students that there was only one true religion. Influenced by that lecture, one student wrote a paper on Abraham and Moses. Fliers for Mr. Buchler's surfing ministry were placed on student desks.

54.    Ms. Truitt explained to sixth-grade students in her science class that she did not believe in the "big bang" theory of the creation of the universe. She made references to her religious views on creation and told her students that they would have to attend Bible Club to find out more.

55.    Students in Jordan Doe's science class also were told that they

12

could go to Bible Club instead of learning about the "big bang" theory of the creation of the universe.

56.    At least one School Board member has instructed school officials to include religious references or expressions in school-prepared materials. For example, a School Board member ordered a school official to remove inclusive references to "Winter Break" and "Spring Break" from a school calendar and replace them with Christian-specific references to "Christmas Break" and "Easter Break."

57.    Barbara Jackson, who taught honors English to Samantha Dobrich at Sussex Central, frequently referenced Christianity – and no other religions – in her classroom instruction.

### Religion At School Board Meetings

58.    The District has opened every School Board meeting with prayer.

59.    Students attend School Board meetings to receive awards, to speak about issues affecting their schools, to appear before the School Board as representatives of student government, to attend disciplinary hearings and to perform musical demonstrations for the assembled crowd. In certain cases, student attendance is mandatory. School Board members and District employees have encouraged students to attend and participate in School Board meetings to raise funds for student programs and field trips.

60.    The Does attended School Board meetings that opened with a

13

prayer in the name of Jesus.

61.    A number of schoolchildren attended the School Board meeting on November 16, 2004. The District honored one elementary school student from North Georgetown Elementary for winning the state's School Bus Safety Contest, Division II, for Grades 3 through 5.

62.    Student government representatives from Sussex Central High School also attended the School Board meeting on November 16, 2004. They read a prepared speech that detailed the accomplishments of students at Sussex Central and the projects that student groups had planned for the future.

63.    According to the agenda for the School Board meeting of November 16, 2004, eight students were scheduled for private hearings before the School Board.

64.    Defendant Hattier opened the School Board meeting of November 16, 2004, with a prayer in "the Lord's name."

65.    The SDSA Steel, a student band from the Southern Delaware School of the Arts, played music before and during the School Board meeting on December 21, 2004.

66.    At the same meeting, the District honored a faculty member for dedicated service to the Sussex Central cross-country team. One student and her family attended the meeting to receive an award for winning the state's School Bus Safety Contest, Division IV.

14

67.    According to the agenda for the School Board meeting on December 21, 2004, fourteen students were scheduled for private student hearings before the School Board.

68.    Defendant Evans opened the School Board meeting of December 21, 2004, with a prayer "in the name of Christ."

69.    Many students from Sussex Central High School attended the School Board meeting of January 26, 2005, to protest the quality of water in the new school and the conditions of the sodding of the softball field.

70.    Defendant Evans opened the School Board meeting of January 26, 2005, with a prayer to "Our Heavenly Father."

71.    School employees, including teachers, administrators and School Board members, are present at School Board meetings. The School Board uses the occasion to recognize teachers for their accomplishments. School employees speak in their official capacities about issues affecting the District.

72.    School Board members act as District employees when they begin School Board meetings with prayer.

73.    The School Board sets District-wide and individual school policies, establishes curricula, approves school choice applications, approves school trips, and approves new construction projects at School Board meetings.

74.    School Board meetings take place in District schools. The meeting of November 16, 2004, took place at North Georgetown Elementary School.

15

The meeting of December 21, 2004, took place at Frankford Elementary School. School Board meetings now alternate between Indian River High School and Sussex Central High School.

75.    Because School Board meetings are held in District schools, are attended by teachers and students, feature active participation by students, and result in the setting of District and school policies, School Board meetings are an integral component of the District's public school system. As such, the prayers that start each School Board meeting are part of the public school system.

### The Dobriches' Reaction to the Prayer at Graduation

76.    The Dobriches are Jewish. At Sussex Central's graduation ceremony on June 3, 2004, Samantha bowed her head along with the other students when Pastor Fike gave the benediction. When Pastor Fike asked God to lead the students to "the truth that comes by knowing Jesus," Samantha was startled and scanned the crowd for her mother.

77.    Samantha felt that the prayer ruined her family's enjoyment of the graduation. As the only Jewish student in her graduating class, Samantha felt isolated and excluded because of the Christian prayer.

78.    Mona Dobrich heard the same words as Samantha and saw the pained expression on her daughter's face. Immediately after the ceremony, Mona told Defendant Hobbs that the prayer had ruined Samantha's graduation.

79.    Late in the evening of June 3, 2004, Mona followed up with an

16

e-mail protesting the invocation of Jesus Christ at the official school ceremony. The following Monday, Mona telephoned Hobbs' office and left a message regarding the prayer.

80.    Mona also telephoned Defendant Walls, then President of the School Board. Walls told Mona that the use of prayer at commencement ceremonies was a matter for the entire School Board. When Mona asked how she could bring the issue to the School Board's attention, Walls told her that someone would need to put the topic on the agenda for the next meeting. Mona asked Walls to put the issue on the agenda himself, but he refused.

81.    Hobbs then returned Mona's call. Hobbs said she had slipped the school-prayer issue onto the agenda for the June 2004 School Board meeting under the innocuous title "Graduation Ceremonies." Hobbs also explained that the District's lawyer, James Griffin, was preparing a legal opinion on the issue. Hobbs told Mona that she should be prepared to present her complaint to the School Board during the public comment period.

### The June 15, 2004 School Board Meeting

82.    Defendant John Evans opened the School Board meeting of June 15, 2004, with a prayer in Jesus's name. Mona Dobrich spoke out during the public comment period. She asked that the name of Jesus not be used at school events, and she used as an example the prayer that Defendant Evans had made at the start of the School Board meeting. "No, never," Evans responded. Mona suggested that

17

prayers be made in the name of God.

83.     When it came time for Bradley Layfield, the Athletic Director of Sussex Central, to speak about field conditions at the new Sussex Central High School, he addressed the prayer issue instead. He encouraged the District to use the name of Jesus in prayer.

84.     When it came time to discuss "Graduation Ceremonies," Defendant Hobbs announced that the District's lawyer was absent from the meeting because of a death in the family. Defendant Walls previously had mentioned that no one had complained about graduation prayer before the Dobriches. At the meeting, Defendant Walls tabled further discussion of the agenda item until the next meeting.

85.     Mona left the meeting. She was followed out by Susan Towers, a reporter from The Wave, and Defendant Hattier. Hattier proposed a compromise in which the District would keep "Jesus" out of graduation prayers but would allow the use of "God." As part of the compromise, Hattier offered to provide Mona with a copy of the legal opinion provided to the School Board by the District lawyer. Hattier warned Mona against retaining a lawyer.

86.     On June 23, 2004, The Wave published a two-page article on Mona's complaints about prayer at graduation.

### The July 27, 2004 School Board Meeting

87.     A full crowd, including Mona Dobrich, attended the School Board meeting on July 27, 2004. Representatives from a number of local churches

attended. The meeting began with a prayer.

88.    Defendant Walls allowed more than twice the normally allotted

twenty minutes for public comment. Thirteen residents, including five religious

leaders, spoke, and they overwhelmingly endorsed school-sponsored prayer.

89.    Mona stated at the meeting:

Imagine what it feels like to always be an outsider. It is as if you are standing on the street looking through the window at a wonderful scene you can never be a part of. That is what it was like for me growing up as a student in the Indian River School District. There was not a day that went by that I was not painfully aware that I was different. I kept waiting for that feeling to leave. I graduated in 1984 from Sussex Central High School and stayed in Georgetown to start a family. I thought if I became more involved in the school than my parents were, I could make a difference. My husband and I jointed the PTO, went on every field trip, baked countless cookies and cakes, and worked in the library at each book fair. I felt confident that I was doing everything right and that my children would have a wonderful school experience. However, as they progressed through each grade I started to notice subtle changes. They too were beginning to feel like outsiders. We all tell our children that they should be an individual. We tell them to not just follow the crowd, be a leader. However, they only want what we all want, the feeling of acceptance.

This past June, I attended my daughter's graduation from Sussex Central High School. After 13 long years of school, countless late nights of studying, she received the honor of graduating number five in her class. I sat in the bleachers that day with my heart full as I looked down at my daughter with a feeling of such pride and happiness it is difficult to put it into words. At the close of the ceremony, the benediction began. I listened as the pastor led the crowd in prayer. He said: "We pray that you direct them into the truth, and eventually the truth that comes from knowing Jesus." I looked down to see my daughter searching for my face in the crowd. It was in her eyes and I saw it. The pain that comes from being made to feel like an outsider. Why on this day, on this occasion, with all she had worked for? It was then that I knew I could no longer allow the law to be broken. You as elected officials of this community have not only an opportunity, but an obligation to follow the law. It is your duty to develop standards for teachers, coaches, and administrators to follow. Put into place policies that will ensure that all school events, the law is upheld. Make me proud to be a graduate of the Indian River School District.

19

90.    Pastor Richard Blades of the Calvary Baptist Church spoke of a Biblical mandate for prayer in Jesus' name, adding: "Our school district has prayed in Jesus' name for many, many years." Pastor Marvin Morris received applause after suggesting that removing prayer from the schools would lead to an erosion of the community's foundations.

91.    After public comments, the School Board announced that it would meet in executive session. The crowd left the building. Defendant Hattier approached Mona Dobrich outside the executive session. He wanted to confirm that Mona had no objection to leaving "God" in the graduation prayer. Hattier mentioned that he had spoken about the issue with the Rutherford Institute, a conservative civil liberties organization. Mona expressed her desire that the District follow the law.

92.    Later that week, the School Board announced that it would form a committee to develop a policy regarding prayer at commencement ceremonies and that it would announce the policy at the next School Board meeting.

### Local Talk Radio Picks Up the Story

93.    Afterwards, WGMD 97.2 FM, "The Talk of Delmarva," began airing reports on the controversy surrounding the graduation prayer. Dan Gaffney, the host of a WGMD talk show, took calls about the issue.

94.    Defendant Hattier, known to radio listeners as "Dr. Don" because of his frequent appearances on the air to offer medical advice, spoke on Gaffney's show about the controversy.

20

95.    WGMD offered over-the-air driving directions to callers who wished to attend the next School Board meeting. WGMD took many calls from listeners who both provided directions and noted that temporary signs had been posted directing traffic to the event.

96.    On August 23, 2004, the School Board met in executive session at Sussex Central Middle School to discuss proposed prayer policies for the District. When news reporters and citizens confronted School Board members after the meeting, the members refused to talk about the decision they had reached and encouraged interested people to attend the School Board meeting the next day.

### The August 24, 2004 School Board Meeting

97.    On August 24, 2004, hundreds of people gathered at Frankford Elementary School for the School Board meeting. An organized prayer group prayed in the parking lot as they waited for the school's doors to open.

98.    When Mona and Marco arrived with their son and daughter, they were intimidated by the crowd. They asked a Delaware state trooper whether they could sit in the school building so they would not have to wait in the parking lot. At first, the officer refused. A few minutes later, however, he returned and escorted the family into the building.

99.    By the time the school opened, the crowd was so large that it had to be divided into two rooms. The School Board met along with hundreds of spectators while others watched on closed-circuit television monitors from another

21

room.

100.    Jane Doe was in the crowd.  Because she was intimidated by a

prayer circle blocking the main entrance at Frankford Elementary School, Jane asked a

state trooper to let her enter through an alternate entrance.

101.    Defendant Walls opened the School Board meeting by stating:

"At this time I'd like to ask Dr. Hattier to lead the School Board in a word of prayer."

The crowd erupted into cheering and applause.  Defendant Hattier read the following

prayer:

> Almighty God, we make our earnest prayer that Thou wilt keep the United
> States in Thy holy protection: that Thou wilt incline the hearts of the citizens to
> cultivate a spirit of subordination and obedience to government, and entertain a
> brotherly affection and love for one another and for their fellow citizens of the
> United States at large.  And finally that Thou wilt most graciously be pleased
> to dispose us all to do justice, to love mercy, and to demean ourselves with that
> charity, humility, and pacific temper of mind which were the characteristics of
> the Divine Author of our blessed religion, and without a humble imitation of
> whose example in these things we can never hope to be a happy nation.  Grant
> our supplication, we beseech Thee.  Amen.

102.    Six days later, the Rutherford Institute issued a press release

stating that it had provided the School Board with a draft policy on prayer at School

Board meetings.  The press release triumphantly reported that the crowd had broken

into applause when Defendant Walls asked Defendant Hattier to speak, and it

published the full text of the prayer.

103.    When the public comment period began at the School Board

meeting of August 24, 2004, Defendant Walls announced that each person who had

signed up to speak would get two minutes at the microphone.  Speakers who spoke

22

against school-sponsored prayer were kept to the two-minute limit. However, the

School Board allowed those who spoke in favor of school-sponsored prayer more than

two minutes each.

104.    Mona Dobrich stood up and spoke about the prayer issue,

stating:

> I had not planned on speaking tonight. After all, what is left for me to say? This whole situation arose because of a very simple and heartfelt request. I quietly approached the superintendent of the School Board and the Board president and shared my displeasure with this year's commencement exercise at Sussex Central Senior High School. I have been accused of being an outsider, a trouble maker, and an instigator. None of which are true. My only request was that in the future they consider the diverse community in which we live when having public school events. If the Board had acted in a responsible manner, that would have been the end of it. However, they failed to do the appropriate thing, instead letting this issue ignite the community. I am forced to ask why? Are members of the Board enjoying the limelight? Are they feeling more powerful now that they are the leaders of an angry mob? Why did members of the Board contact a lawyer with the Rutherford Institute! When the District's own legal counsel had already advised Board members of the law? Why has the District let this matter overshadow the community? They and members of the community have spread hatred all under the name of religion. Hatred in the name of religion. Does that sound familiar to anyone? Do not let this misguided event turn you into someone you have a difficult time facing each morning in the mirror.

105.    Then Alexander Dobrich stood up. One of the people in the

crowd shouted at him to "take your yarmulke off!" Alexander attempted to speak, but

could not. Samantha stood up, put her arm around him, and read his prepared

statement to the School Board:

> My name is Alex Dobrich. I am in the sixth grade. I have gone to Indian River School District all of my life. I feel bad when kids in my class call me Jew boy. When grown-ups say things kids hear it and say them too. I do not want to have to move away from the house I have lived in forever. I like it here and I

23

like my neighbors. They are from Italy. They do not care that I am different. We learn a lot about each other. When they were sick my mom made them chicken soup. When they went back to Italy they brought me home Italian candy. Everyone should just try and do what we do. Just be nice to each other. It is fun to learn how different people do things. Please think about this when you plan things at school. People can pray at home and in their head. That is what I do. Please follow the law.

106.    Drewry Fennell, at attorney with the American Civil Liberties Union, spoke as well. After her allotted two minutes, Fennell was greeted with boos and catcalls. Others called out "Go back to Wilmington" and "Go back up north."

107.    Rhonda Tuman, Mona's sister, said that she felt as though she had gone back fifty years. She accused the School Board of mishandling Mona's original request. "Why do you perpetuate the mob behavior?" she asked.

108.    A large number of people from the community stood up to express the importance of invoking the name of Jesus and the importance of prayer in the schools. People shouted out "Amen" and "Praise Jesus" as others quoted scripture passages during the public comment period.

109.    State Representative Gerald W. Hocker of Ocean View told the School Board that he represented the majority and if the School Board did not support prayer, then the public would remove the School Board from office.

110.    Harold Johnson, a former School Board member, suggested that Mona might just "disappear" like Madalyn Murray O'Hair, the named plaintiff in the Supreme Court case that ended mandatory recitation of Bible verses in the public schools. O'Hair, her son and her granddaughter disappeared in 1995 and were

presumed dead. One of their killers led authorities to their dismembered bodies in 2001.

111.    State Representatives Hocker, John Atkins of Millsboro, and Benjamin Ewing of Bridgeville gathered around the microphone. Representative Atkins read a letter co-signed by the state representatives in attendance as well as State Representatives Joe Booth of Georgetown and Clifford Lee of Laurel. The letter acknowledged the separation of church and state but added that the representatives could not "recognize the separation of God from the state." The representatives also sent copies of the letter to local newspapers that later published it.

112.    Judy Smith of Georgetown asked: "Why shouldn't we have prayer in Jesus' name in our schools? Jesus is just about the best role model I could ask for my child."

113.    During a break, Defendant Hobbs confronted Mona Dobrich about her statement and accused Mona of being ungrateful.

114.    Later that week, Defendant Walls commented that the new policy would end the District's longstanding practice of inviting a local religious leader to offer a prayer at graduation.

## The Lives of the Dobriches Since their Public
## Appearances Opposing School Prayer

115.    After Mona Dobrich first spoke in favor of a new policy regarding prayer at graduation, members of the community who opposed her views made the Dobrich family miserable. In a call to a WGMD talk show, one community

member explained that the problem would disappear if the Dobriches would just do what millions of other Jews have done: "Accept Jesus Christ as their lord and savior." Others told the Dobriches that Sussex County was a Christian community and that if they did not like it, they should just move away.

116. One man approached Samantha when she was working at Ace Hardware and gave her a tape praising the name of Jesus. Alex's schoolmates openly teased him, calling him "Jew boy." Another child told Alex, "you killed Jesus."

117. A community member called the Dobrich family residence to warn them that the Ku Klux Klan was meeting nearby.

118. Alexander became increasingly fearful. The slightest unfamiliar noise terrified him. He began to sleep in his mother's room. He insisted that the doors to the house be locked. Although he wore his yarmulke in his mother's car, he would snatch it off his head whenever he spotted a police officer for fear that the officer would see it and pull the car over.

119. Whenever the family went to the local Wal-Mart to purchase groceries, Alexander would remove the pin holding his yarmulke on his head for fear that someone would grab it and rip out some of his hair.

120. As a direct result of the policies and practices of the School Board and the District, and the environment they fostered, the Dobriches decided that they had to leave. The Dobriches refinanced their home to pay for a move, and they found an apartment in Wilmington.

26

121.    Mona Dobrich enrolled Alexander in a private school in Philadelphia. The family was forced to live apart. In order to retain his job in Sussex County, Marco continued to reside in the family home, while Mona and Alexander began to live in Wilmington.

122.    The family now pays rent for a house in Wilmington. After filing the original complaint in this action (the "Original Complaint"), the Dobriches also had to sell their home of eighteen years in Sussex County because the they were unable to make mortgage payments along with rent payments for their Wilmington residence. Mona has taken a job to help pay her family's increased expenses.

123.    Since filing the Original Complaint, Alexander has engaged in suicidal behavior and become depressed as a result of the trauma and stress he and his family have endured. Alexander is receiving medical treatment for his condition. The Dobriches are faced with having to home school Alexander for the 2006-2007 academic year, even though Mona and Marco must work full-time schedules in order to pay their increased living expenses due to the conduct of Defendants.

124.    During the 2004-2005 academic year, Samantha attended a joint program administered by the Jewish Theological Seminary and Columbia University in New York, New York. Samantha began the 2005-2006 academic year at the Jewish Theological Seminary and Columbia University, but was able to attend only the fall semester. Because the family had diverted its limited resources to pay for Mona and Alexander to move to Wilmington, Samantha and her family no longer

27

could afford tuition payments. Samantha had to withdraw from the Jewish
Theological Seminary and Columbia University.

125.    When she would visit Sussex County, Samantha received
unwanted attention and was harassed by people she met on the street.

126.    Samantha's mental and physical health deteriorated due to the
stresses from: (i) the threatening phone calls her family received; (ii) her mother and
brother's move to Wilmington; (iii) the financial burden that the move placed on the
family; and (iv) the uncertainty surrounding Samantha's ability to remain at Columbia
given the family's financial circumstances. Samantha gained upwards of sixty pounds
and has been diagnosed with and treated with medication for depression.

### The District Has Not Investigated
### Complaints Of Constitutional Violations

127.    The District has not conducted investigations into allegations of
teacher and administrator misconduct.

128.    When Jane Doe complained by letter to the District and the
Delaware Department of Education, Defendant Hobbs called and promised an
investigation.

129.    Jane Doe immediately called back to follow up, but she had to
leave a message with a secretary. Hobbs never returned the call.

130.    The District later denied that any further communications
related to Jane Doe's complaint took place.

28

### The Life Of The Doe Family Since The Litigation Began

131.    During the summer of 2004, the Does were presented with the opportunity to place Jordan Doe in a non-District school.  Because of the widespread custom and practice of promoting religion in the District and the family's fear of teacher retaliation against Jordan, the Does decided that Jordan could not remain in a District school.

132.    Jordan had difficulty adjusting to the new school.  Jordan became depressed and her grades suffered.  After the Does filed the Original Complaint, the Does had to seek medical treatment for Jordan's depression.

133.    After the Does filed the Original Complaint, Jane Doe has suffered anxiety and depression, aggravated by the shock of discovering the extent of Jordan Doe's condition.

134.    Because of the widespread custom and practice of promoting religion in the District and their fear of teacher retaliation against Jamie, the Does will not send Jamie to a District middle school.

### The District Has Refused to Distribute Its New Policies

135.    After the District's legal counsel advised the School Board of the threat of litigation, the District proposed three new policies on "School Prayer at Commencement/Graduation and Baccalaureate Ceremonies," "Board Prayer at Regular Board Meetings" and "Religion" (together, the "Policies").

136.    The School Board gave token first and second readings to the

proposed Policies, but refused to distribute copies of the Policies to interested parents and students and failed to provide a meaningful opportunity for public comment.

137.     The District failed to post the Policies on its website even though other District policies were available on the site – including policies on "Staff Conduct: Dating and Social Engagements with Students," "Staff Conduct: Sexual Harassment," "Staff Conduct: Sexual Harassment or Misconduct Toward Students," "Sexual Misconduct" and "Staff Ethics." The District finally posted copies of the Policies on its website after receiving a letter and a settlement proposal from Plaintiffs.

138.     When one interested parent called the Superintendent's office to request copies of the Policies, a District employee told the parent that she would have to submit a Freedom of Information Act request before she could obtain copies.

139.     In sum, the District deliberately kept the Policies beyond the reach of parents, employees and the general public in an effort to reduce their effectiveness.

### The District Has Failed to Implement Its Policies

140.     The District has failed to develop or implement procedures for investigating or resolving complaints alleging violations of the Policies.

141.     After the District ratified the Policies, a District official approached Defendant Hattier's wife, a member of the Dagsboro Church of God, about bringing the Church's Ministry into District middle and high schools.

142.     The School Board violated its policy on "Board Prayer at

30

Regular Meetings." The policy provides that "[o]n a rotating basis one individual adult Board member per meeting will be given the opportunity to offer a prayer or request a moment of silence." On February 22, 2005, and on a rotating basis from August 23, 2005, through February 28, 2006, Defendant Helms opened School Board meetings with prayer. Students attended many of these School Board meetings at the Defendants' invitation.

143.    For example, approximately twenty high school students attended the School Board meeting of February 22, 2005, to accept awards for their extracurricular activities. Three schoolchildren from District elementary schools also attended the meeting to accept awards for their achievements in a poster and essay contest.

144.    Defendant Helms began the School Board meeting of February 22, 2005, with a prayer:

> Heavenly Father, Lord our God. Heavenly Father, please help the Board with the problems in the School District that we are going through right now. We ask these things in Jesus' Name.

145.    The District has taken token steps to instruct teachers, administrators and employees about the Policies and their obligations under the Policies. As a result, the Policies have done nothing to abate the ongoing constitutional violations in District schools.

31

**The District Has Failed to Respond to Good-Faith
Efforts To Address Deficiencies in the Policies**

146.    On November 12, 2004, attorneys acting on behalf of the

Dobriches sent a letter to the District requesting clarification of the new Policies.  The

letter pointed out deficiencies and ambiguities in the Policies as well as the District's

failure to publicize or implement the Policies.  The District did not respond.

147.    Marco Dobrich attended the School Board meeting of

November 16, 2004.  Defendant Hattier began the meeting with a prayer.

148.    Attorneys acting on behalf of the Dobriches sent an additional

letter on December 16, 2004, asking the District to answer the previous letter or at

least to state whether the District intended to respond.

149.    Mona Dobrich and her family attended the School Board

meeting of December 21, 2004.  Defendant Evans began the School Board meeting of

December 21, 2004, with a prayer "in the name of Christ."

150.    During the public comment period, Mona Dobrich encouraged

the School Board to respond to her attorneys' letters regarding the Policies.  Mona told

the School Board of the financial and emotional burden its actions had placed on her

family.

151.    The District rejected requests for clarification of the Policies

from Mona Dobrich's attorneys.  In a letter dated January 7, 2005, the District claimed

that the Policies were "sufficiently explicit" and refused to elaborate further.

152.    On the same day, Mona Dobrich sent a letter to the District in

32

which she requested a face-to-face meeting with the School Board to discuss the
failure to publicize or implement the Policies.

153.    The District ignored Mona's letter.

## COUNT I
### The Customs and Practices of the District, School Board and Individual Defendants Have Violated the First Amendment and Created an Establishment of Religion

154.    Plaintiffs repeat, reallege and incorporate by reference the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

155.    Defendants have acted under color of law of the State of Delaware.

156.    The pervasive customs and practices, both official and unofficial, of Defendants have established a policy of promoting, endorsing and establishing prayer and other religious activities at school events, ceremonies, meetings and assemblies, including but not limited to graduation ceremonies, academic awards banquets, School Board meetings, and athletic dinners and events.

157.    The Official Capacity Defendants have known about prayer and other religious activities at school events, ceremonies, meetings and assemblies, including but not limited to graduation ceremonies, academic awards banquets, School Board meetings, and athletic dinners and events.

158.    There was no secular or educational purpose for this prayer.

159.    The customs and practices of Defendants have had the principal and primary purpose of advancing a particular religious preference.

33

160.    The customs and practices of Defendants have fostered an excessive governmental entanglement with religion.

161.    The customs and practices of Defendants have constituted an establishment of religion in violation of the First and Fourteenth Amendments to the United States Constitution, and Article One, Section One of the Constitution of the State of Delaware.

162.    The Dobriches have been injured by Defendants' conduct. Mona and Marco Dobrich have had to place Alexander Dobrich in private school. Defendants' actions have forced Mona and Alexander to leave the District and to bear an emotional and financial burden. Defendants' actions also have forced Samantha to withdraw from the Jewish Theological Seminary and Columbia University and to bear an emotional and financial burden.

163.    The Does have been injured by Defendants' conduct. The Does have had to take Jordan Doe out of a District school. The Does also have had to place Jamie Doe in a non-District middle school. Defendants' actions have forced the Does to bear a financial burden. Defendants' actions also have forced Jane and Jordan Doe to bear an additional emotional burden.

164.    The Does have suffered and will suffer irreparable injury through the unconstitutional establishment of religion as complained of herein, and they have no adequate remedy at law.

34

## COUNT II
### The Customs and Practices of the District, School Board and Individual Defendants Have Violated the First Amendment and Violated Plaintiffs' Free Exercise Rights

165.   Plaintiffs repeat, reallege and incorporate by reference the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

166.   The pervasive customs and practices of Defendants establishing religion infringed on the rights of Plaintiffs to freely exercise their religious beliefs as follows:

(a)   By interfering with the rights of Jordan, Jamie, Samantha and Alexander to be instructed in religious doctrines and spiritual matters according to their own preferences and consciences;

(b)   By interfering with the rights of John, Jane, Mona and Marco to instruct their children in religious doctrine and spiritual matters according to their own preferences and the persuasions of their consciences;

(c)   By introducing the authority of the State into the fundamentally private area of faith and doctrine;

all in violation of the First and Fourteenth Amendments of the United States Constitution, and Article One, Section One of the Constitution of the State of Delaware.

167.   The Dobriches have been injured by Defendants' conduct. Mona and Marco Dobrich have had to place Alexander Dobrich in private school. Defendants' actions have forced Mona and Alexander to leave the District and to bear an emotional and financial burden.  Defendants' actions also have forced Samantha to withdraw from the Jewish Theological Seminary and Columbia University and to bear an emotional and financial burden.

35

168.    The Does have been injured by Defendants' conduct.  The Does have had to take Jordan Doe out of a District school.  The Does also have had to place Jamie Doe in a non-District middle school.  Defendants' actions have forced the Does to bear a financial burden.  Defendants' actions also have forced Jane and Jordan Doe to bear an additional emotional burden.

169.    The Does have suffered and will suffer irreparable injury through the infringement of their right to freely exercise their religion, as complained of herein, and they have no adequate remedy at law.

### COUNT III
**The District and School Board Have Failed to Train District Personnel to Avoid Establishing Religion Within the District and Violating the Free Exercise Rights of Students, Parents and Employees of the District**

170.    Plaintiffs repeat, reallege and incorporate by reference the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

171.    The District and School Board deliberately have failed to train administrators, officers and employees to avoid promoting, endorsing and establishing prayer and other religious activities at school events, ceremonies, meetings and assemblies, including but not limited to graduation ceremonies, academic awards banquets, School Board meetings, and athletic dinners and events, when such religious activities would have a non-secular purpose.

172.    The District and School Board deliberately have failed to train administrators, officers and employees to avoid promoting religious activities at school events when such religious activities would have the principal or primary effect

36

of advancing a particular religious preference.

173.    The District and School Board deliberately have failed to train administrators, officers and employees to avoid promoting religious activities at school events when such religious activities would foster an excessive governmental entanglement with religion.

174.    The District and School Board's deliberate failure to train administrators, officers and employees in the foregoing manner evidences a deliberate indifference to Plaintiffs' rights under the First and Fourteenth Amendments of the United States Constitution, and Article One, Section One of the Constitution of the State of Delaware.

175.    The District and School Board's failure to train its administrators, officers and employees has been the moving force behind the deprivation of Plaintiffs' rights under the First and Fourteenth Amendments of the United States Constitution, and Article One, Section One of the Constitution of the State of Delaware.

176.    The Dobriches have been injured by Defendants' conduct. Mona and Marco Dobrich have had to place Alexander Dobrich in private school. Defendants' actions have forced Mona and Alexander to leave the District and to bear an emotional and financial burden. Defendants' actions also have forced Samantha to withdraw from the Jewish Theological Seminary and Columbia University and to bear an emotional and financial burden.

37

177.    The Does have been injured by Defendants' conduct. The Does have had to take Jordan Doe out of a District school. The Does also have had to place Jamie Doe in a non-District middle school. Defendants' actions have forced the Does to bear a financial burden. Defendants' actions also have forced Jane and Jordan Doe to bear an additional emotional burden.

178.    Through the deliberate indifference of the District and School Board to train its employees to avoid the unconstitutional establishment of religion and infringement of the Does' rights to exercise their religion, the Does have suffered and will continue to suffer irreparable injury and have no adequate remedy at law.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court enter an order:

A.    Awarding compensatory or nominal damages in favor of the Dobriches, and against Defendants, for past unconstitutional practices and policies orchestrating and encouraging school-sponsored prayer in the District; for the Dobriches' resulting emotional distress; and for the pecuniary loss that the Dobriches have suffered, including without limitation: (i) the costs of Mona's and Alexander's move from Sussex County to Wilmington, Delaware; (ii) the costs of maintaining two households and ultimately selling the Dobriches' home of eighteen years; (iii) providing Alexander with a private education; (iv) providing Alexander and Samantha with needed medical treatment; and (v) Samantha's inability to remain in the universities of her choice;

B.    Awarding compensatory or nominal damages to the Does, and against Defendants, for past unconstitutional practices and policies orchestrating and encouraging school-sponsored prayer in the District; for the Does' resulting emotional distress, and for the pecuniary loss that the Does have suffered, including without limitation: (i) the costs of finding and providing for Jordan Doe to attend a non-District middle school; (ii) the costs of finding and providing for Jamie Doe to attend a non-District middle school; and (iii) providing Jane and Jordan with needed medical treatment;

39

C.    Enjoining Defendants from promoting any school-sponsored religious exercises at public school functions within the District, including but not limited to graduation ceremonies, athletic activities, holiday festivals and awards presentations;

D.    Enjoining Defendants, their agents, employees and successors in office from conducting or permitting any school-sponsored religious exercises or prayer as part of any School Board meeting;

E.    Enjoining the District from continuing any customs or practices that promote, endorse or establish religion, including: (i) identifying scheduled breaks or vacation periods that coincide with or include particular religious holidays using language that identifies that religious holiday; (ii) school-sponsored and teacher-led religious clubs; and (iii) school-sponsored distribution of religious texts;

F.    Ordering the District to establish policies for reviewing complaints of violations of its policies on "School Prayer at Commencement/Graduation and Baccalaureate Ceremonies," "Board Prayer at Regular Board Meetings" and "Religion," and to provide regular training for teachers, school officials and other District employees regarding these policies;

G.    Declaring unconstitutional the customs and practices of the District which promote, endorse and establish religious activities, prayer and instruction in District schools;

H.    Declaring unconstitutional the District's policy on "Board

40

Prayer at Regular Board Meetings";

        I.      Awarding Plaintiffs their attorneys' fees in this case under 42 U.S.C. § 1988;

        J.      Awarding Plaintiffs their costs herein; and

        K.     Awarding such other relief as the Court deems just and proper.

 

Thomas J. Allingham II (I.D. No. 476)
Robert S. Saunders (I.D. No. 3027)
Richard S. Horvath, Jr. (I.D. No. 4558)
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899
(302) 651-3000
Attorneys for Plaintiffs

DATED: June 2, 2006

449129.06-Wilmington Server 1A - MSW