# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MONA DOBRICH and MARCO DOBRICH, individually and as parents and next friend of ALEXANDER DOBRICH, SAMANTHA DOBRICH, JANE DOE and JOHN DOE, individually and as parents and next friend of JORDAN DOE and JAMIE DOE, | : : : : : : : : : |
| Plaintiffs, | : : |
| v. | : C.A. No. 05-120 (JJF) |

:

[HARVEY L. WALLS, MARK A.                       :
ISAACS, JOHN M. EVANS,                          :
RICHARD H. COHEE, GREGORY A.                    :
HASTINGS, NINA LOU BUNTING,                     :
CHARLES M. BIRELEY, DONALD G.                   :
HATTIER, REGINALD L. HELMS,                     :
M. ELAINE McCABE, individually and             :
as members of the Indian River School           :
Board, LOIS M. HOBBS, individually              :
and as District Superintendent, EARL J.         :
SAVAGE, individually and as Assistant           :
District Superintendent, THE INDIAN             :
RIVER SCHOOL BOARD and THE                      :
INDIAN RIVER SCHOOL                             :
DISTRICT]INDIAN RIVER SCHOOL                    :
DISTRICT, INDIAN RIVER SCHOOL                   :
BOARD, HARVEY L. WALLS, MARK                    :
A. ISAACS, JOHN M. EVANS,
RICHARD H. COHEE, GREGORY A.
HASTINGS, NINA LOU BUNTING,
CHARLES M. BIRELEY, DONALD G.
HATTIER, REGINALD L. HELMS, M.
ELAINE McCABE, and their successors
in office, in their official capacities as
members of the Indian River School
Board, LOIS M. HOBBS, and her
successors in office, in their official
capacities as District Superintendent, and
EARL J. SAVAGE, and his successors in
office, in their official capacities as
Assistant District Superintendent,

:

Defendants.                    :

## PLAINTIFFS' FIRST AMENDED COMPLAINT

Plaintiffs Mona Dobrich, Marco Dobrich, Samantha Dobrich and

Alexander Dobrich (collectively, the "Dobriches") and Jane Doe, John Doe, Jordan

Doe and Jamie Doe (collectively, the "Does"), by and through their undersigned

2

attorneys, hereby allege upon knowledge as to themselves and upon information and belief as to all others, as follows:

## PRELIMINARY STATEMENT

1.      The Dobriches and Does bring this action to enforce their right under the United States Constitution and under the Constitution of the State of Delaware to be free from state-sponsored religion.

2.      School-sponsored prayer has been a long[-]standing tradition in the Indian River School District (the "District").  As a matter of practice and policy, school officials and community religious leaders have delivered prayers at events and meetings organized by District schools.  Prayers have begun (and often ended) football practice sessions, athletic [banquets,]and academic banquets, school potlucks, school baccalaureate services, graduation exercises and Indian River School Board (the "School Board") meetings.  The prayers frequently have [frequently] been sectarian, Christian prayers.

3.      The District's custom and practice of school-sponsored Christian prayer, frequently imposed upon a captive audience that includes impres-sionable non-Christian students, constitutes a violation of both the [Constitution of the] United States and the [Constitution of the State of] Delaware Constitutions.

4.      District practices foster an environment of religious exclusion.

5.      The Dobriches and Does seek damages for past unconstitu-tional practices and policies [orchestrating and encouraging]involving the

3

<u>orchestration and encouragement of</u> school-sponsored prayer in the District.

6.    The Does seek declaratory and injunctive relief [preventing]<u>to</u> <u>prevent</u> school-sponsored prayer in the District.

## **THE PARTIES**

7.    Plaintiff Mona Dobrich graduated from Sussex Central High School ("Sussex Central") in 1984.  As a student, and later as a parent of students who attended District schools, she has participated in all aspects of school life in the [Indian River School] District, including school-sponsored field trips, book fairs, class assemblies, potlucks, <u>graduations and </u>School Board meetings[ and graduations].

8.    Plaintiff Marco Dobrich is the husband of Mona Dobrich.  As a taxpayer and a parent of students who attended District schools, he too has participated in many aspects of school life in the [Indian River School ]District, including attending School Board meetings.  Marco works at the Sussex Academy of Arts and Sciences as a transportation coordinator.

9.    <u>Mona and Marco were homeowners in the District.  Marco</u> <u>remains a resident of the District.</u>

[9.]<u>10.</u> Plaintiff Alexander Dobrich is a [twelve]<u>thirteen-</u>year old-boy who completed grades one through five at North Georgetown Elementary School.  He sues through his parents, Mona and Marco Dobrich.

[10.    Mona and Marco are homeowners in the District.  Mona and Marco pay District taxes.  Marco remains a resident of the District.]

4

11.    <u>Plaintiff</u> Samantha Dobrich is the daughter of Mona and Marco Dobrich and the sister of Alexander Dobrich. She graduated from Sussex Central on June 3, 2004[.]<u>, and she was the only Jewish student in her graduating class.</u> Samantha was fifth in her class at Sussex Central. She was a member of the National Honor Society, and she lettered in cross-country.

12.    The Does are residents of the District. [Given]<u>Because of the</u> public backlash directed against the Dobriches, which is described in detail below, the Does wish to remain anonymous to avoid retaliation by members of the community and employees of the District.

13.    Jordan Doe <u>is the child of Jane and John Doe. Jordan</u> attended middle school in the District and plans to attend a District high school. Jordan [Doe is the child of Jane and John Doe]<u>sues through Jordan's parents, Jane and John Doe.</u>

14.    Jamie Doe <u>is the child of Jane and John Doe. Jamie</u> attends an elementary school in the District [and plans to attend middle and high school in the District]. Jamie [Doe is the child of Jane and John Doe. ]<u>sues through Jamie's parents, Jane and John Doe.</u>

15.    The Defendant District is located in Southeastern Sussex County. Since its creation in 1969, the District has served the towns of Selbyville, Frankford, Dagsboro, Gumboro, Fenwick Island, Bethany Beach, Ocean View, Millsboro and Georgetown. The District consists of seven elementary schools, two middle schools, two high schools, two special schools, an arts magnet school and an

outdoor education center. District schools serve more than 7,700 students and employ more than 1,000 adults. The District is organized pursuant to 14 Del. C. § 1068.

16.    The Defendant School Board is a ten-member elected body that governs the schools in the District, including Sussex Central High School and North Georgetown Elementary School. The School Board determines final policy and prescribes rules and regulations for the conduct and management of District schools, as well as the District's property and funds, pursuant to 14 Del. C. § 1043.

17.    Defendants Harvey L. Walls, Mark A. Isaacs, John M. Evans, Richard H. Cohee, Gregory A. Hastings, Nina Lou Bunting, Charles M. Bireley, Donald G. Hattier, Reginald L. Helms and M. Elaine McCabe [are]were members of the School Board [and have been since at least 2002 [(collectively, the "Board Members")]since at least 2002. In 2005, Donna M. Mitchell replaced McCabe on the School Board. In 2006, Randall Hughes replaced Hastings on the School Board. Each Defendant is a resident of the State of Delaware. The School Board [M]members, and their successors in office, are sued in their official capacities.

18.    Defendant Lois M. Hobbs is and has been the District Superintendent [and has been ]since at least 2002. On Friday, December 17, 2004, [Ms.] Hobbs announced that she will resign effective in mid-2006. The School Board has chosen Susan Bunting as Hobbs's successor in office. [She]Hobbs is a resident of the State of Delaware. She, and her successors in office, [is]are sued in [her]their official [capacity]capacities.

6

19.    Defendant Earl J. Savage (together with Hobbs and the School Board members, the "Official Capacity Defendants," and together with the District and School Board, "Defendants") is and has been the Assistant District Superintendent [and has been ]since at least 2002. He is a resident of the State of Delaware. He, and his successors in office, [is]are sued in [his]their official [capacity]capacities.

### JURISDICTION

20.    This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a)(3) and (a)(4), 1367[,] and 2201, and pursuant to 42 U.S.C. § 1983.

### VENUE

21.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391. Delaware is the site of Plaintiffs' injuries, and all parties reside in the District of Delaware.

### SUBSTANTIVE ALLEGATIONS

22.    School-sponsored prayer has pervaded the [life]lives and activities of teachers and students in District schools. School officials and community religious leaders [have]routinely deliver[ed] prayers at events and meetings organized by the District. Prayers have begun and ended athletic [banquets,]and academic banquets, school potlucks, school baccalaureate services, graduation exercises and School Board meetings.

### Graduation Ceremonies

23.    For many years, the District has asked a member of the local

7

clergy to deliver an invocation and a benediction at the annual Sussex Central High School graduation ceremony.

24.    The District continued to [do so ]ask a member of the local clergy to deliver an invocation and a benediction at the annual Sussex Central High School graduation ceremony despite the United States Supreme Court's holding in _Lee v. Weisman,_ 505 U.S. 577 (1992), that school-sponsored prayer at graduation is unconstitutional.

25.    The School Board and school administrators continued to approve of the practice described in ¶¶ 23-24 above despite a complaint from a District employee that sectarian prayer at her son's graduation in 2003 was inappropriate.

26.    School officials invited Pastor Jerry Fike of Mt. Olivet Church of the Brethren in Georgetown to give the invocation and the benediction at [the]Sussex Central's 2004 graduation exercises.

27.    Samantha Dobrich attended [the]Sussex Central's 2004 graduation ceremony as a graduating senior.  Mona, Marco and Alexander Dobrich attended as spectators and [family]as members of Samantha's family.

28.    At the beginning of the graduation ceremony, members of the uniformed Junior Reserve Officer Training Corps color guard presented the Flags of the United States and the State of Delaware in front of the podium.  Singers led the student body and the spectators in the National Anthem.

29.    Pastor Fike then stepped to the microphone and stated to the

assembled students:

> Let us bow for the invocation. Our heavenly Father we thank You for a bright and beautiful day tonight, in which we can celebrate the accomplishments of these students and those who have assisted them over the years. We praise You Father for bringing them to this point. We pray that You guide them as they use their gifts and abilities and discover them during the coming days, weeks, months and years, that they can use them to serve their fellow human beings in this world and You also. So we ask for Your direction in this endeavor. I also pray for one specific student, that You be with her and guide her in the path that You have for her. And we ask all these things in Jesus' name, and for His sake. Amen.

    30.    School officials then welcomed the assembled students and

spectators to the ceremonies. After the commencement addresses and the awarding of

degrees, Pastor Fike asked the audience to stand and bow their heads for prayer.

Pastor Fike then stated:

> Heavenly Father thank You for this great occasion, for the work, the effort, the joys and everything that led up to this point in time. Thank You for your guidance in this event. We pray for Your direction in the lives of each of these graduates. As they enter the world that they use their gifts and abilities to serve you and humanity. We pray that You direct them into the truth, and eventually the truth that comes by knowing Jesus. We also pray that You would be with them even as one last time the teachers surround the students with their presence. And we ask these things in Jesus' name. Amen.

### **Bible Club**

    31.    The prayer at the 2004 graduation ceremony is only one

example of the pervasive presence of religion in the District.

    32.    Bible Clubs have met at more than one school in the District.

    [32.]33.    At Selbyville Middle School, District employees led

three different Bible Clubs – one each for the sixth, seventh and eighth grades. A

9

science teacher, Ms. Truitt, led the sixth grade club; a social studies teacher, Mr. Buchler, led the seventh grade club; and a school secretary, Mrs. Butler, led the eighth grade club.

[33.]34.   Students who attended Bible Clubs at Selbyville Middle School received privileges not available to other students. At the start of lunch periods, a [teacher]District employee would announce that Bible Club students could get their lunches. Students planning to attend Bible Club could [cut]advance to the head of the lunch line and take their lunches to the Bible Club meeting. Teachers leading the Bible Clubs would award doughnuts to [attending]participating students.

[34.]35.   Students had no reasonable alternative to the Bible Clubs during lunch period. The school approved a Book Club, but that club met only once a month. Attendance in the Book Club was limited. Students had to apply to the Book Club and there was a waiting list to join. The school frequently cancelled Book Club meetings and would not reschedule them.

[35.]36.   The Bible Clubs, on the other hand, met weekly, and whenever a scheduling conflict arose, the school found an alternate time for the Bible Clubs to meet.

[36.]37.   [At one middle school in the District, students would leave the lunchroom every Wednesday to attend Bible Club. One student]Jordan Doe complained to [her]Jordan's parents that [her]Jordan's friends would go to Bible Club and leave [her]Jordan sitting alone at the lunch table. [She]Jordan felt pressure to join

10

Bible Club.  When [one of her parents called]Jane Doe contacted a school official to

discuss [their daughter's]Jordan's alternatives, [the official insisted that student could

and should attend]that official insisted that Jordan could attend Bible Club.  After Jane

Doe made sure that the school official fully understood that her family was not

Christian and that their individual faith was important to them, the official again told

Jane that her child should go to Bible Club.

### Schools Distributing Bibles

[37.]38.        At least one elementary school in the District

distributed Bibles to students during the 2003 school year.

[38.]39.        A school official [would make]made an announcement

during class, reminding students to pick up their Bibles.

[39.]40.        Teachers [would ]then dismissed students during class

time to retrieve their Bibles.  After getting their Bibles, the students returned to class.

41.        Jordan was a student and present in class when the District

distributed Bibles at Jordan's school.  Jamie was also a student and present in class

when the District distributed Bibles at Jamie's school.

### Athletic Events

[40.]42.        Football practices and games are another example of

school prayer in the District.  Indian River High School football coach Jim Bunting ex-

plained to a local television station how he led his student athletes in prayer before

football practice and games:

11

When we prepare for a ball game we warm up. Obviously, we warm our muscles up. I guess my thing is with prayer – that kind of – that warms us all up. That prepares our mind for this. It's just as important a part as anything we do to prepare for a game.

[41.]43.    Bunting [said]stated that any player has the right to [skip out on]forego the daily ritual, as long as the student [sticks around]remains for practice. Bunting said [that] he stands by his daily prayers. In fact, he said the players look forward to them.

[42.]44.    The football team is not the only athletic team that has prayed at the direction of [their]a coach. The Sussex Central cross-country team has gathered for pasta dinners before cross-country meets. The cross-country coach, Patricia Anderson, [has opened]had students open those dinners with prayer.

### Potlucks, Ice Cream Socials and Academic Banquets

[43.]45.    At the beginning of each academic year, schools in the District welcome parents and students with potluck dinners, ice cream socials and other events.

[44.]46.    Teachers and school administrators have begun and ended the events with prayer.

[45.]47.    For example, at the beginning of the 2003-2004 school year, Selbyville Middle School hosted a family dinner at the school to help parents and students [get]become acquainted with the teachers. Ms. Truitt[, a 6th grade science teacher,] opened the dinner with prayer incorporating her own religious beliefs. Throughout the meeting, she continued to make comments reflecting her zeal for

12

religion.

[46.]48.    The District holds annual awards banquets to recognize selected students for their exemplary performance in academic and athletic pursuits. Those banquets include a keynote address and provide an opportunity for students to celebrate their achievements. The banquets have begun and ended with sectarian prayer led by Pastor Marvin Morris.

49.    The District's Superintendent and School Board members, including School Board presidents, have attended the annual awards banquets. These officials were present when the banquets began and ended with prayers.

[47.]50.    In each of her ninth-, tenth-, eleventh-, and twelfth-grade years, Samantha Dobrich was invited to attend these awards banquets because of her success in academic and extracurricular activities. As a twelfth grader, Samantha received a plaque for qualifying as a recipient during each of her four years at Sussex Central.

### Religion in the Curriculum

[48.]51.    Religion has become part of the District's curriculum.

[49.]52.    The District schools' sixth grade science classes include a lesson on evolution. In at least one school – Selbyville Middle School –[, however,] school officials have given students the option to attend Bible Club and do a worksheet instead of learning about evolution. The school offered special Bibles Clubs that week to [insure]ensure that all who wanted to could attend.

13

[50.]53.        At Selbyville Middle School, a social studies teacher,

Mr. Buchler, emphasized to students that there was only one true religion.  Influenced

by that lecture, one student wrote a paper on Abraham and Moses.  Fl[y]iers for Mr.

Buchler's surfing ministry were placed on student desks.

[51.]54.        Ms. Truitt explained to sixth grade students in her

science class that she did not believe in the "big bang" theory of the creation of the

universe. She made references to her religious views [of]on creation and [she ]told her

students that they would have to [come to]attend Bible Club to find out more.

55.      Students in Jordan's science class were also told that they could

go to Bible Club instead of learning about the "big bang" theory of the creation of the

universe.

56.      At least one School Board Member has ordered school officials

to include religious references or expressions in school prepared materials.  For

example, a School Board Member ordered a school official to remove inclusive

references of "Winter Break" and "Spring Break" in a school calendar and replace

them with Christian-specific references of "Christmas Break" and "Easter Break."

57.      Barbara Jackson, who taught honors English to Samantha

Dobrich at Sussex Central High School, frequently referenced Christianity – and no

other religions – in her classroom instruction.

### Religion At School Board Meetings

[52.]58.        The District has opened every School Board meeting

14

with prayer.

[53.]59.       Students attend School Board meetings to receive awards, to speak about issues affecting their schools, to appear before the School Board as representatives of student government, to attend disciplinary hearings and to perform musical demonstrations for the assembled crowd.  In [some of these]certain cases, student attendance is mandatory.  School Board members and District employees have encouraged students to attend and participate in School Board meetings to raise funds for student programs and field trips.

[54.]60.       The Does attended [a] School Board meetings that opened with a prayer in the name of Jesus.

[55.]61.       A number of school[ ]children attended the School Board meeting on November 16, 2004[ Board meeting].  The District honored one elementary school student from North Georgetown Elementary for winning the state's School Bus Safety Contest, Division II, for Grades 3 through 5.

[56.]62.       Student government representatives from Sussex Central High School also attended the School Board meeting on November 16, 2004[ meeting].  They read a prepared speech that detailed the accomplishments of students at Sussex Central[ High School], and the projects that student groups had planned for the future.

[57.]63.       [The]According to the agenda for the School Board meeting of November 16, 2004,[ meeting listed] eight students [as having]were

15

scheduled for private hearings [in front of]before the School Board.

[58.]64.      Defendant Hattier opened the School Board meeting of November 16, 2004, [meeting ]with a prayer in "the Lord's name."

[59.]65.      The SDSA Steel, a student band [of students ]from the Southern Delaware School of the Arts, played music before [the start of ]and during the School Board meeting on December 21, 2004.

[60.]66.      At the same meeting, the District honored a faculty member for dedicated service to the Sussex Central cross-country team. One student and her family attended the meeting to receive an award for winning the state's School Bus Safety Contest, Division IV.

[61.]67.      [The]According to the agenda for the School Board meeting on December 21, 2004, [meeting listed ]fourteen students [as having ]were scheduled for private student hearings [in front of]before the School Board.

[62.]68.      Defendant Evans opened the [December 21]School Board meeting of December 21, 2004, with a prayer "in the name of Christ."

[63.]69.      Many students from Sussex Central High School attended the School Board meeting of January 26, 2005, [School Board meeting ]to protest the quality of water in the new school and the conditions of the sodding of the softball field.

[64.]70.      Defendant Evans opened the School Board meeting of January 26, 2005, [meeting ]with a prayer to "Our Heavenly Father."

16

[65.]71.        School employees, including teachers, administrators

and School Board members, are present at School Board meetings. The School Board

uses the occasion to recognize[s] teachers for their accomplishments. School

employees speak in their official [capacity]capacities about issues affecting the

District.

[66.]72.        The School Board members act as District employees

when they begin [these ]School Board meetings with prayer.

[67.]73.        The School Board [makes]sets District-wide and

individual school policies, establishes curricula, approves school choice applications,

approves school trips and approves new construction projects at School Board

meetings.

[68.]74.        School Board meetings take place in District schools.

The meeting of November 16, 2004, [meeting ]took place at North Georgetown

Elementary School. The meeting of December 21, 2004, [meeting ]took place at

Frankford Elementary School. School Board meetings now alternate between Indian

River High School and Sussex Central High School.

[69.]75.        [Given the presence of students and teachers,

the]Because School Board meetings are held in District schools, are attended by

teachers and students, feature active participation [of]by students[ in School Board

meetings, that the School Board makes], and result in the setting of District and school

[policy at School Board meetings and that School Board meetings are held in District

17

schools]policies, School Board meetings are an integral component of the District's public school system. As such, the prayers that start each School Board meeting are part of the public school system.

### The Dobriches' Reaction to the Prayer at Graduation

[70.]76.        The Dobriches are Jewish. At [the ]Sussex Central's [Graduation Ceremony]graduation ceremony on June 3, 2004, Samantha bowed her head along with the other students when Pastor Fike gave the benediction. When Pastor Fike asked God to [direct]lead the students to "the truth that comes by knowing Jesus," [she]Samantha was startled[,] and scanned the crowd for her mother.

77.     Samantha felt that the prayer ruined her family's enjoyment of the graduation. Being the only Jewish student in her graduating class, Samantha felt isolated and excluded because of the Christian prayer.

78.     Mona Dobrich heard the same words as Samantha and saw the pained expression on her daughter's face. Immediately after the ceremony, she told Defendant Lois Hobbs that the prayer had ruined Samantha's graduation.

[71.]79.        [Mona heard the same words and saw the pained expression on her daughter's face. Immediately after the ceremony, she told Defendant Lois Hobbs that the prayer had ruined Samantha's graduation.] [Late that]Late in the evening of June 3, 2004, Mona followed up with an e-mail protesting the invocation of Jesus Christ [in]at the official school ceremony. The following Monday, [she]Mona telephoned[ called] Ms. Hobbs' office and left a message

18

regarding the prayer.

[72.]80.        Mona also telephoned Defendant Walls, then President of the School Board.  Walls told Mona that the [issue]use of prayer at commencement ceremonies was a matter for the entire School Board.  When [she]Mona asked how she could bring the issue to the School Board's attention, [he]Walls told her that someone would need to put the topic on the agenda for the next meeting.  Mona asked Walls to put the issue on the agenda himself, but he refused.

[73.]81.        [Ms. ]Hobbs then returned Mona's call.  [Ms. ]Hobbs said that she [hid]had slipped the issue of school-prayer [on]issue onto the agenda for the June 2004 School Board meeting under the innocuous title "Graduation Ceremonies."  [Ms. ]Hobbs also explained that the District's lawyer, James Griffin, was preparing a legal opinion on the issue.  [Ms. ]Hobbs told Mona that she should be prepared to [air]present her complaint to the School Board during the public comment period.

### The June 15, 2004 School Board Meeting

[74.]82.        Defendant John Evans opened the [June 15, 2004] School Board meeting of June 15, 2004 with a prayer in Jesus's name.  Mona Dobrich spoke out during the public comment period.  She asked that the name of Jesus not be used at school events, and she used as an example the prayer that Defendant Evans had made at the start of the School Board meeting.  "No, never," Evans responded.  Mona suggested that prayers be made in the name of God.

19

[75.]83.        When [time]it came time for Bradley Layfield, the Athletic Director of Sussex Central, to speak about field conditions at the [New]new Sussex Central High School, he addressed the prayer issue instead.  He encouraged the District to [pray using]use the name of Jesus in prayer.

[76.]84.        When it [was]came time to discuss "Graduation Ceremonies,"  Defendant Hobbs announced that the District's lawyer was absent from the meeting because of a death in the family.  Defendant Walls [had ]previously had mentioned that no one had complained about graduation prayer before the Dobriches.  At the meeting, Defendant Walls tabled further discussion of the agenda item until the next meeting.

[77.]85.        Mona left the meeting.  She was followed out by Susan Towers, a reporter from The Wave, and Defendant Hattier.  [Dr.] Hattier proposed a compromise in which the District would keep "Jesus" out of graduation prayers but would allow the use of "God."  As part of the compromise, [He]Hattier offered to provide Mona with a copy of the legal opinion provided to the School Board by the District lawyer[ as part of the compromise].  [He]Hattier warned Mona against retaining a lawyer.

[78.]86.        On June 23, 2004, The Wave published a two-page article on Mona's complaints about prayer at graduation.

20

### The July 27, 2004 School Board Meeting

[79.]87.        A full crowd, including Mona Dobrich, attended the

[July 27 ]School Board meeting on July 27, 2004.  Representatives from a number of

local churches attended.  The meeting began with a prayer.

[80.]88.        Defendant Walls allowed more than twice the normally

allotted twenty minutes for public comment.  Thirteen residents, including five

religious leaders, spoke, and they overwhelmingly endorsed school-sponsored prayer.

[81.]89.        Mona stated at the meeting:

> Imagine what it feels like to always be an outsider.  It is as if you are standing
> on the street looking through the window at a wonderful scene you can never
> be a part of.  That is what it was like for me growing up as a student in the
> Indian River School District.  There was not a day that went by that I was not
> painfully aware that I was different.  I kept waiting for that feeling to leave.  I
> graduated in 1984 from Sussex Central High School and stayed in Georgetown
> to start a family.  I thought if I became more involved in the school than my
> parents were, I could make a difference.  My husband and I jointed the PTO,
> went on every field trip, baked countless cookies and cakes, and worked in the
> library at each book fair.  I felt confident that I was doing everything right and
> that my children would have a wonderful school experience.  However, as they
> progressed through each grade I started to notice subtle changes.  They too
> were beginning to feel like outsiders.  We all tell our children that they should
> be an individual.  We tell them to not just follow the crowd, be a leader.
> However, they only want what we all want, the feeling of acceptance.
>
> This past June, I attended my daughter's graduation from Sussex Central High
> School.  After 13 long years of school, countless late nights of studying, she
> received the honor of graduating number five in her class.  I sat in the bleachers
> that day with my heart full as I looked down at my daughter with a feeling
> of such pride and happiness it is difficult to put it into words.  At the close of the
> ceremony, the benediction began.  I listened as the pastor led the crowd in
> prayer.  He said: "We pray that you direct them into the truth, and eventually
> the truth that comes from knowing Jesus."  I looked down to see my daughter
> searching for my face in the crowd.  It was in her eyes and I saw it.  The pain
> that comes from being made to feel like an outsider.  Why on this day, on this

occasion, with all she had worked for?  It was then that I knew I could no longer allow the law to be broken.  You as elected officials of this community have not only an opportunity, but an obligation to follow the law.  It is your duty to develop standards for teachers, coaches, and administrators to follow. Put into place policies that will ensure that all school events, the law is upheld. Make me proud to be a graduate of the Indian River School District.

[82.]90.       Pastor Richard Blades of the Calvary Baptist Church spoke of a Biblical mandate for prayer in Jesus' name, adding[,]: "[o]Our school district has prayed in Jesus' name for many, many years."  Pastor Marvin Morris received applause after suggesting that [doing away with]removing prayer [in] from the schools would lead to an erosion of the community's foundations.

[83.]91.       After public comments, the School Board announced that it would meet in executive session.  The crowd left the building.  [Dr.]Defendant Hattier approached Mona Dobrich outside of the executive session.  He wanted to confirm that [he and ]Mona [both agreed that]had no objection to leaving "God" in the graduation prayer[ was appropriate].  [Dr.]Hattier mentioned that he had spoken about the issue [to]with the Rutherford Institute,[ –] a conservative civil liberties organization.  Mona expressed her desire that the District follow the law.

[84.]92.       Later that week, the School Board announced that it would form a committee to develop a policy regarding prayer at commencement ceremonies and that it would announce the policy at the next School Board meeting.

### Local Talk Radio Picks Up the Story

[85.]93.       Afterwards, WGMD - 97.2 FM, "The Talk of Delmarva," [picked up]began airing reports on the controversy surrounding the

22

graduation prayer.  Dan Gaffney, the host of a WGMD talk show, took calls about the issue.

[86.]93.     Defendant [Donald ]Hattier, known to [the]radio listeners [audience ]as "Dr. Don" because of his frequent appearances on the air [offering]to offer medical advice, spoke on Gaffney's show about the controversy.

[87.]95.     WGMD offered over the air driving directions to callers who [were going]wished to attend the next School Board meeting.  WGMD took many calls from listeners who both provided directions and noted that temporary signs [were]had been posted directing traffic to the event.

[88.]96.     On August 23, 2004, the School Board met in executive session at Sussex Central Middle School to discuss proposed prayer policies for the District.  When news reporters and citizens confronted [them]School Board members after the meeting, [Board]the members refused to talk about the decision they had reached and encouraged interested people to attend the School Board meeting the next day.

### The August 24, 2004 School Board Meeting

[89.]97.     [On the day of the School Board meeting]On August 24, 2004, hundreds of people [collected]gathered at Frankford Elementary School for the School Board meeting.  An organized prayer group prayed in the parking lot as they waited for the [doors of the ]school's doors to open.

[90.]98.     When Mona and Marco arrived with their son and

23

daughter, they were intimidated by the crowd. They asked a Delaware [S]state [T]trooper [if]whether they could sit in the school building so they would not have to wait in the parking lot. At first, the officer refused. A few minutes later, however, he returned and escorted the family into the building.

[91.]99.    By the time the school opened, the crowd was so large that it had to be divided into two rooms. The School Board met along with hundreds of spectators while others watched on closed-circuit television monitors from another room. [Jane Doe was among the crowd.]

100.    Jane Doe was among the crowd. Because she was intimidated by a prayer circle blocking the main entrance at Frankford Elementary School, Jane asked a state trooper to let her enter through an alternate entrance.

[92.]101.    Defendant Walls opened the School Board meeting by stating: "At this time I'd like to ask Dr. Hattier to lead the School Board in a word of prayer." The crowd erupted into cheering and applause. Defendant Hattier read [a]the following prayer[.]:

> Almighty God, we make our earnest prayer that Thou wilt keep the United States in Thy holy protection: that Thou wilt incline the hearts of the citizens to cultivate a spirit of subordination and obedience to government, and entertain a brotherly affection and love for one another and for their fellow citizens of the United States at large. And finally that Thou wilt most graciously be pleased to dispose us all to do justice, to love mercy, and to demean ourselves with that charity, humility, and pacific temper of mind which were the characteristics of the Divine Author of our blessed religion, and without a humble imitation of whose example in these things we can never hope to be a happy nation. Grant our supplication, we beseech Thee. Amen.

[93.]102.    Six days later, the Rutherford Institute issued a press

24

release [explaining]stating that it had provided the School Board with a draft policy on prayer at School Board meetings. The press release triumphantly reported that the crowd had broken into applause when Defendant Walls asked Defendant Hattier to speak, and it published the full text of the prayer.

[94.]103.      [At the opening of]When the public comment period began at the [August 24 ]School Board meeting of August 24, 2004, Defendant Walls [told those]announced that each person who had signed up to speak [that they ]would [each] get two minutes at the microphone. Speakers who spoke against school-sponsored prayer were kept to the two-minute limit. However, the School Board would allow speakers in favor of school-sponsored prayer more than two minutes each.

[95.]104.      Mona Dobrich stood up and spoke about the prayer issue, stating:[.]

> I had not planned on speaking tonight. After all, what is left for me to say? This whole situation arose because of a very simple and heartfelt request. I quietly approached the superintendent of the School Board and the Board president and shared my displeasure with this year's commencement exercise at Sussex Central Senior High School. I have been accused of being an outsider, a trouble maker, and an instigator. None of which are true. My only request was that in the future they consider the diverse community in which we live when having public school events. If the Board had acted in a responsible manner, that would have been the end of it. However, they failed to do the appropriate thing, instead letting this issue ignite the community. I am forced to ask why? Are members of the Board enjoying the limelight? Are they feeling more powerful now that they are the leaders of an angry mob? Why did members of the Board contact a lawyer with the Rutherford Institute! When the District's own legal counsel had already advised Board members of the law? Why has the District let this matter overshadow the community? They and members of the community have spread hatred all under the name of religion.

25

Hatred in the name of religion. Does that sound familiar to anyone? Do not let this misguided event turn you into someone you have a difficult time facing each morning in the mirror.

[96.]105.    Then [Alex] Alexander Dobrich stood up. One of the people in the crowd shouted at him[,] to "take your yarmulke off!" [He]Alexander attempted to speak, but could not. Samantha stood up, put her arm around him, and read his prepared statement to the School Board[.]:

My name is Alex Dobrich. I am in the sixth grade. I have gone to Indian River School District all of my life. I feel bad when kids in my class call me Jew boy. When grown-ups say things kids hear it and say them too. I do not want to have to move away from the house I have lived in forever. I like it here and I like my neighbors. They are from Italy. They do not care that I am different. We learn a lot about each other. When they were sick my mom made them chicken soup. When they went back to Italy they brought me home Italian candy. Everyone should just try and do what we do. Just be nice to each other. It is fun to learn how different people do things. Please think about this when you plan things at school. People can pray at home and in their head. That is what I do. Please follow the law.

[97.]106.    Drewry Fennell, an attorney with [from ]the American Civil Liberties Union, spoke as well. After her allotted two minutes, [she]Fennell was greeted with boos and catcalls. Others called out "Go back to Wilmington," and "Go back up [N]north."

[98.]107.    Rhonda Tuman, Mona's sister, said that she felt [like]as though she had gone back fifty years. She accused the School Board of mishandling Mona's original request. "Why do you perpetuate the mob behavior?" she asked.

[99.]108.    A large number of people from the community stood up to express the importance of invoking the name of Jesus and the importance of prayer

26

in the schools. People shouted out "Amen" and "Praise Jesus" as others quoted scripture passages during the public comment period.

[100.]109.    State Representative Gerald W. Hocker of Ocean View told the School Board that he represented the majority and if the School Board did not support prayer, then the public would remove the School Board from office[, not the ACLU].

[101.]110.    Harold Johnson, a former School Board member, suggested that Mona might just "disappear" like Madalyn Murray O'Hair, the named plaintiff in the Supreme Court case that ended mandatory recitation of Bible verses in the public schools. [Ms. ]O'Hair, her son and her granddaughter disappeared in 1995 and were presumed dead. One of their killers led authorities to their dismembered bodies in 2001.

[102.]111.    State Representatives Hocker, John Atkins of Millsboro[,] and Benjamin Ewing of Bridgeville[ and Gerald Hocker of Ocean View] gathered around the microphone. Representative Atkins read a letter [on behalf of the Representatives present,]co-signed by the state representatives in attendance as well as[ and also] State Representatives Joe Booth of Georgetown and Clifford Lee of Laurel[, who had signed the letter,]. The letter [acknowledging]acknowledged the separation of church and state but [explaining]added that the Representatives could not "recognize the separation of God from the state." The [R]representatives also sent copies of the letter to local newspapers that later published it.

27

[103.]112.     Judy Smith of Georgetown asked[,]: "Why shouldn't we have prayer in Jesus' name in our schools? Jesus is just about the best role model I could ask for my child."

[104.]113.     During a break, Defendant Hobbs confronted Mona Dobrich about her statement and accused Mona of being ungrateful.

[105.]114.     Later that week, Defendant Walls commented that the new policy would end the District's long[-]standing practice of inviting a local religious leader to offer a prayer at graduation.

### The Life of the Dobriches Since their Public
### Appearances Opposing School Prayer

[106.]115.     After Mona Dobrich first spoke in favor of a new policy regarding prayer at graduation, members of the community who opposed her views made the Dobrich family miserable. In a call to a WGMD talk show, one community member explained that the problem would disappear if the Dobriches would just do what millions of other Jews have done[,]: "[a]Accept Jesus Christ as their lord and savior." Others told the Dobriches that Sussex County was a Christian community and that if they did not like it, they should just move away.

[107.]116.     One man approached Samantha when she was working at Ace Hardware and gave her a tape praising the name of Jesus. Alex's schoolmates openly teased him, calling him "Jew boy." Another child told Alex, "you killed Jesus."

[108.]117.     A community member called the Dobrich family

28

residence to warn them that the [Klu]Ku Klux Klan was meeting nearby.

[109.]118.     [Alex]Alexander became increasingly fearful. The slightest unfamiliar noise terrified him. He began to sleep in his mother's room. He insisted that the doors to the house be locked. Although he wore his yarmulke in his mother's car, he would snatch it off his head whenever he spotted a police officer for fear that the officer would see it and pull the car over.

[110.]119.     Whenever the family went to the local Wal-Mart to [get]purchase groceries, [Alex]Alexander would remove the pin holding his yarmulke [to]on his head for fear that someone would grab it and rip out some of his hair.

[111.]120.     As a direct result of the policies and practices of the School Board and the District, and the environment they fostered, the Dobriches decided that they had to leave. [They]The Dobriches refinanced their home to pay for a move, and they found an apartment in Wilmington.

[112.]121.     Mona Dobrich enrolled [Alex]Alexander in a private school in Philadelphia. The family was forced to live apart. In order to retain his job in Sussex County, Marco continued to reside in the family home, while Mona and [Alex]Alexander began to live in Wilmington.

[113.]122.     The family now pays rent for [an apartment in Wilmington and a mortgage for their house in Sussex County] a house in Wilmington. After filing the original complaint in this action (the "Original Complaint"), the Dobriches also had to sell their home of eighteen years in Sussex County because the

29

they were unable to make mortgage payments along with rent payments for their Wilmington residence. Mona has taken a job to help pay for [their]her family's increased expenses.

123. Since filing the Original Complaint, Alexander has engaged in suicidal behavior and become depressed as a result of the trauma and stress he and his family have endured. Alexander is receiving medical treatment for his condition. The Dobriches are faced with having to home school Alexander for the 2006-2007 academic year, even though Mona and Marco must work full-time schedules in order to pay for their increased expenses due to the conduct of Defendants.

124. During the academic year of 2004-2005, Samantha attended a joint program between the Jewish Theological Seminary and Columbia University in New York, New York. Samantha then started the 2005-2006 academic year at the Jewish Theological Seminary and Columbia University, but Samantha could only attend the fall semester. Because her family had diverted its limited resources to pay for Mona and Alexander to move to Wilmington, Samantha and her family could no longer afford tuition payments. Samantha had to withdraw from the Jewish Theological Seminary and Columbia University.

125. When she would visit Sussex County, Samantha received unwanted attention and was harassed by people she met on the street.

126. Samantha's mental and physical health deteriorated due to the stresses from: (i) the threatening phone calls her family received; (ii) her mother and

30

brother's move; (iii) the financial burden that move placed on her family; and (iv) the

uncertainty surrounding Samantha's ability to remain at Columbia given the family's

financial circumstances.  Samantha gained upwards of sixty-one pounds and has been

diagnosed with and treated with medication for depression.

### The District Has Not Investigated
### Complaints[Demonstrating] of Constitutional Violations

[114.]127.     The District has not conducted investigations into

allegations of teacher and administrator misconduct.

[115.]128.     When [one parent]Jane Doe complained by letter to the

District and the Delaware Department of Education [over a school official's

harassment regarding their religious beliefs], Defendant Hobbs [returned the ]called

and promised an investigation.

[116.]129.     [The parent]Jane Doe immediately called back to

follow up, but she had to leave a message with a secretary.  [Defendant ]Hobbs never

returned the call.

[117.]130.     The District later denied that any further

communications related to [the]Jane Doe's complaint took place.

### The Life Of The Does Since This Litigation Began

131.     During the summer of 2004, the Does were presented with the

opportunity to place Jordan in a non-District school.  Because of the widespread

custom and practice of promoting religion in the District and their fear of teacher

retaliation against Jordan, the Does decided that Jordan could not remain in a District

31

school.

132.    Jordan had difficulty adjusting to the new school.  Jordan became depressed and her grades suffered.  After the Does filed the Original Complaint in this litigation, the Does had to seek medical treatment for Jordan's depression.

133.    After the Does filed the Original Complaint in this litigation, Jane Doe has also suffered anxiety and depression aggravated by the shock of discovering the extent of Jordan's condition.

134.    Because of Defendants' widespread custom and practice of promoting religion in the District and their fear of teacher retaliation against Jamie, the Does will not send Jamie to a District middle school.

**The District Has Refused to Distribute Its New Policies**

[118.]135.    After the District's legal counsel advised the School Board of the threat of litigation, the District proposed three new policies on "School Prayer at Commencement/Graduation and Baccalaureate Ceremonies," "Board Prayer at Regular Board Meetings" and "Religion" (together, the "Policies").

[119.]136.    The School Board gave [the proposed Policies ]token first and second readings to the proposed Policies, but refused to distribute copies of the Policies to interested parents and students and failed to provide a meaningful opportunity for public comment.

[120.]137.    The District [has] failed to post the Policies on its

32

website [despite the fact that it lists] even though other District policies were available on the site[there] – including policies on "Staff Conduct: Dating and Social Engagements with Students," "Staff Conduct: Sexual Harassment," "Staff Conduct: Sexual Harassment or Misconduct Toward Students," "Sexual Misconduct" and "Staff Ethics." The District finally posted copies of the Policies on its website after receiving a letter and a settlement proposal from Plaintiffs.

[121.]138.    When one interested parent called the Superintendent's office to request copies of the Policies, a District employee told the parent that she would have to submit a Freedom of Information Act request before she could obtain copies.

[122.]139.    In sum, the District [has ]deliberately kept the Policies beyond the reach of parents, employees and the general public in an effort to [prevent] reduce their effectiveness.

**The District Has Failed to Implement Its Policies**

[123.]140.    The District has [also ]failed to develop or implement procedures for investigating or resolving complaints alleging violations of the Policies.

[124.]141.    After the District ratified the Policies, a District official approached Defendant Hattier's wife, a member of the Dagsboro Church of God, about bringing the Church's Ministry into District middle and high schools.

[125.]142.    The School Board [has already] violated its policy on

33

"Board Prayer at Regular Meetings." The policy provides that "[o]n a rotating basis one individual adult Board member per meeting will be given the opportunity to offer a prayer or request a moment of silence." <u>On February 22, 2005, and on a rotating basis from August 23, 2005, through February 28, 2006,</u> Defendant [Evans]<u>Helms</u> [has] opened [three consecutive] School Board meetings with[a prayer in Jesus' name.[1] School children] <u>prayer. Students</u> attended [each]<u>many</u> of these School Board meetings at the [School Board's]<u>Defendants'</u> invitation.

[126.]<u>143.</u>    [At the February 23 School Board Meeting, f]<u>F</u>or example, approximately twenty high school students attended <u>the School Board meeting of February 22, 2005, to accept</u>[to receive] awards for their extra[ ]curricular activities. Three school[ ]children from District elementary schools <u>also</u> attended <u>the meeting</u> to [receive]<u>accept</u> awards for their achievements in a poster and essay contest.

[127.]<u>144.</u>    Defendant [Evans]<u>Helms</u> began <u>the School Board meeting of February 22, 2005,</u> with a prayer:

> Heavenly Father, Lord our God. Heavenly Father, please help the Board with the problems in the School District that we are going through right now. We ask these things in Jesus' Name.

[128.]<u>145.</u>    The District has [not ]taken <u>token</u> steps to instruct teachers, administrators and employees about the Policies and their obligations under the Policies. As a result, the Policies have done nothing to abate the ongoing constitutional violations in District schools.

---

1    [Defendant Evans led the audience in prayer at the December 21, 2004, January 26, 2005, and February 22, 2005 School Board meetings.]

**The District Has Failed to Respond to Good Faith**
**Efforts To Address Deficiencies in the Policies**

[129.]146.    On November 12, 2004, attorneys acting on behalf of the Dobriches sent a letter to the District requesting clarification of the new policies. The letter pointed out deficiencies and ambiguities in the Policies as well as the District's failure to publicize or implement [them]the Policies. The District did not respond.

[130.]147.    Marco Dobrich attended the [November 16, 2004 ]School Board meeting of November 16, 2004. Defendant Hattier began the meeting with a prayer.

[131.]148.    Attorneys acting on behalf of the Dobriches sent an additional letter on December 16, 2004, asking the District to answer the previous letter or [to] at least to state whether the District intended to respond.

[132.]149.    Mona Dobrich and her family attended the [December 21, 2004 ]School Board meeting of December 21, 2004. Defendant Evans began the [December 21 ]School Board meeting of December 21, 2004, with a prayer "in the name of Christ."

[133.]150.    During the public comment period, Mona Dobrich encouraged the School Board to respond to her attorneys' letters regarding the Policies. Mona told the School Board of the financial and emotional burden [their]its actions had placed on her family.

[134.]151.    The District rejected [Mona's attorneys' ]requests for

35

clarification [about ]of the Policies from Mona Dobrich's attorneys. In a letter dated January 7, 2005, the District claimed that the Policies were "sufficiently explicit" and refused to elaborate further.

[135.]152.     On the same day, Mona Dobrich sent a letter to the District in which she requested a face-to-face meeting with the School Board to discuss the failure to publicize or implement the Policies.

[136.]153.     The District ignored Mona's letter.

### COUNT I[:]
### The Customs and Practices of the District, School Board and Individual Defendants Have Violated the First Amendment and Created an Establishment of Religion

[137.]154.     Plaintiffs repeat, reallege and incorporate by reference the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

[138.]155.     [The District, School Board and individual defendants] Defendants have acted under the color of law of the State of Delaware.

[139.]156.     The pervasive customs and practices, both official and unofficial, of [the District, School Board and individual defendants]Defendants have established a policy of promoting, endorsing and establishing prayer and other religious activities at school events, ceremonies, meetings and assemblies, including but not limited to graduation ceremonies, academic awards banquets, School Board meetings, and athletic dinners and events.

157.     The Official Capacity Defendants have known about prayer

36

and other religious activities at school events, ceremonies, meeting and assemblies,
including but not limited to graduation ceremonies, academic awards banquets,
School Board meetings, and athletic dinners and events.

[140.]158.    There was no secular or educational purpose for this
prayer.

[141.]159.    The customs and practices of the [District, School
Board and individual] Defendants[' customs and practices] have [a]had the principal
and primary purpose of advancing a particular religious preference.

[142.]160.    The customs and practices of [the District, School
Board and individual defendants] Defendants have fostered an excessive
governmental entanglement with religion.

[143.]161.    The [pervasive] customs and practices of [the District,
School Board and individual defendants] Defendants have constituted an
establishment of religion in violation of the First and Fourteenth Amendments to the
United States Constitution, and Article One, Section One of the Constitution of the
State of Delaware.

[144.]162.    [Mona, Marco and Alexander Dobrich]The Dobriches
have been injured by [the]Defendants' conduct.  Mona and Marco Dobrich [have]had
to place Alexander Dobrich in private school.  [The District's]Defendants' actions have
forced Mona and Alexander to leave the District and to bear an emotional and
financial burden.  Defendants' actions have also forced Samantha to withdraw from

the Jewish Theological Seminary and Columbia University and to bear an emotional
and financial burden.

[145.]163.    The Does have been injured by [the]Defendants'
conduct.  The Does [have]had to take Jordan Doe out of a District school.  The Does
also have had to place Jamie Doe in a non-District middle school.  Defendants' actions
have forced the Does to bear a financial burden.  Defendants' actions have also forced
Jane and Jordan Doe to bear an additional emotional burden.

[146.]164.    The Does have suffered and will suffer irreparable
injury through the unconstitutional establishment of religion as complained of herein,
and they have no adequate remedy at law.

### COUNT II[:]
### The Customs and Practices of the District, School Board
### and Individual Defendants Have Violated the First Amendment
### and Violated Plaintiffs' Free Exercise Rights

[147.]165.    Plaintiffs repeat, reallege and incorporate by reference
the allegations in the foregoing paragraphs of this Complaint as if fully set forth
herein.

[148.]166.    The pervasive customs and practices of [the District,
School Board and individual defendants] Defendants establishing [that
establish ]religion infringed on the rights of Plaintiffs to freely exercise their religious
beliefs as follows:

(a)    By interfering with the rights of Jordan, Jamie, Samantha and
Alexander['s rights] to be instructed in religious doctrines and spiritual matters
according to their own preference and conscience;

38

(b)     By interfering with the rights of John, Jane, Mona and Marco's rights to instruct their children in religious doctrine and spiritual matters according to their own preferences and the persuasions of their consciences;

(c)     By introducing the authority of the State into the fundamentally private area of faith and doctrine;

all in violation of the First and Fourteenth Amendments of the United States Consti-

tution, and Article One, Section One of the Constitution of the State of Delaware.

[149.]167.     [Mona, Marco and Alexander Dobrich]The Dobriches

have been injured by [the ]Defendants' conduct.  Mona and Marco Dobrich [have]had

to place Alexander Dobrich in private school[outside of the District].  [The

District's,]Defendants' actions have forced Mona and Alexander to [flee the District

and]leave the District and to bear an emotional and financial burden.  Defendants'

actions have also forced Samantha to withdraw from the Jewish Theological Seminary

and Columbia University and to bear an emotional and financial burden.

[150.]168.     The Does have been injured by Defendants' conduct.

The Does [have]had to take Jordan Doe out of [the District's schools]a District school.

The Does also had to place Jamie Doe in a non-District middle school.  Defendants'

actions have forced the Does to bear a financial burden.  Defendants' actions have also

forced Jane and Jordan Doe to bear an additional emotional burden.

[151.]169.     The Does have suffered and will suffer irreparable

injury through the infringement of their right to freely exercise their religion, as

complained of herein, and they have no adequate remedy at law.

**COUNT III[:]**
**The District and School Board Have Failed to Train the District's Personnel to**
**Avoid Establishing Religion Within the District and Violating the Free Exercise**
**Rights of the Students, [Students' ]Parents and [the ]Employees of the District**

[152.]170.    Plaintiffs repeat, reallege and incorporate by reference

the allegations in the foregoing paragraphs of this Complaint as if fully set forth

herein.

[153.]171.    The District and School Board deliberately have failed

to train administrators, officers and employees to avoid promoting, endorsing and

establishing prayer and other religious activities at school events, ceremonies,

meetings and assemblies, including but not limited to graduation ceremonies,

academic awards banquets, School Board meetings, and athletic dinners and events,

when such religious activities would have a non-secular purpose.

[154.]172.    The District and School Board deliberately have failed

to train administrators, officers and employees to avoid promoting religious activities

at school events when such religious activities would have [a]the principal or primary

effect of advancing a particular religious preference.

[155.]173.    The District and School Board deliberately have failed

to train administrators, officers and employees to avoid promoting religious activities

at school events when such religious activities would foster an excessive

governmental entanglement with religion.

[156.]174.    The District and School Board's deliberate failure to

train administrators, officers and employees in the foregoing manner evidenced a

40

deliberate indifference to Plaintiffs' rights under the First and Fourteenth Amendments of the United States Constitution, and Article One, Section One of the Constitution of the State of Delaware.

[157.]175.    The District and School Board's failure to train its administrators, officers and employees [was]has been the moving force behind the deprivation of Plaintiffs' rights under the First and Fourteenth Amendments of the United States Constitution, and Article One, Section One of the Constitution of the State of Delaware.

[158.]176.    [Mona, Marco and Alexander Dobrich]The Dobriches have been injured by [the] Defendants' conduct.  Mona and Marco Dobrich [have]had to place Alexander in private school.  [The Districts']Defendants' actions have forced Mona and Alexander to [flee]leave the District and to bear an emotional and financial burden.  Defendants' actions have also forced Samantha to withdraw from the Jewish Theological Seminary and Columbia University and to bear an emotional and financial burden.

[159.]177.    The Does have been injured by [the] Defendants' conduct.  The Does [have]had to take Jordan Doe out of [the District's schools]a District school.  The Does also had to place Jamie Doe in a non-District middle school.  Defendants' actions have forced the Does to bear a financial burden.  Defendants' actions have also forced Jane and Jordan Doe to bear an additional emotional burden.

[160.]178.    [The Does have suffered and will suffer irreparable

41

injury through]Through the deliberate indifference of the District and School Board['s deliberate indifference] to train its employees to avoid the unconstitutional establishment of religion and infringement of the Does' rights to exercise their religion[ resulting from the District's deliberate indifference to train its employees, as complained of herein, and the Does], the Does have suffered and will continue to suffer irreparable injury and have no adequate remedy at law.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter an order:

A.    Awarding compensatory or nominal damages [to]in favor of the Dobriches, and against the [Districtand the individual defendants in their personal and official capacity]Defendants, for past unconstitutional practices and policies orchestrating and encouraging school-sponsored prayer in the District[, and]; for the Dobriches' resulting emotional distress; and for the pecuniary loss that the Dobriches have suffered[ for having to move, maintain two households and provide for the private education of Alexander Dobrich], including without limitation:  (i) the costs of Mona's and Alexander's move from Sussex County to Wilmington, Delaware; (ii) the costs of maintaining two households and ultimately selling the Dobriches' home of eighteen years; (iii) providing Alexander with a private education; (iv) providing Alexander and Samantha with needed medical treatment; and (v) Samantha's inability to remain in the universities of her choice;

B.    Awarding compensatory or nominal damages to the Does, and against [the District and the individual defendants in their personal and official capacity] Defendants, for past unconstitutional practices and policies orchestrating and encouraging school-sponsored prayer in the District; for the Does' resulting emotional distress, and the pecuniary loss that the Does have suffered, including without limitation:  (i) the costs of finding and providing for Jordan to attend a

43

non-District middle school; (ii) the costs of finding and providing for Jamie Doe to attend a non-District middle school; and (iii) Jane and Jordan have needed medical treatment;

        C.     [Granting an injunction enjoining the]Enjoining Defendants from promoting any school-sponsored religious exercises at public school functions within the District, including but not limited to graduation ceremonies, athletic activities, holiday festivals and awards presentations;

        D.     [Granting an injunction enjoining the]Enjoining Defendants, their agents, employees and successors in office from conducting or permitting any school-sponsored religious exercises or prayer as [a ]part of any School Board meetings;

        E.     Enjoining the District from continuing any customs or practices that promote, endorse or establish religion, including: (i) identifying scheduled breaks or vacation periods that coincide with or include particular religious holidays using language that identifies that religious holiday; (ii) school-sponsored and teacher-led religious clubs; and (iii) school-sponsored distribution of religious texts;

        [E.]F.  [Granting an injunction ordering]Ordering the District to [distribute publicly copies]establish policies for reviewing complaints for violations of its policies on "School Prayer at Commencement/Graduation and Baccalaureate Ceremonies," "Board Prayer at Regular Board Meetings" and "Religion["to students, parents,]," and to provide regular training for teachers, school officials and [any other

44

interested parties and to establish policies for reviewing complaints for violations of those]other District employees regarding these policies;

[F.]G. [Entering a declaratory judgment declaring]Declaring unconstitutional the customs and practices of the District which promote, endorse and establish religious activities, prayer and instruction in [schools in the ]District schools;

[G.]H. [Entering a declaratory judgment declaring]Declaring unconstitutional the District's policy on "Board Prayer at Regular Board Meetings";

[H.]I. Awarding Plaintiffs their attorneys' fees in this case under 42 U.S.C. § 1988;

[I.]J. Awarding Plaintiffs their costs herein; and

[J.]K. Awarding such other relief as the Court deems just and proper.

_____
Thomas J. Allingham II (I.D. No. 476)
Robert S. Saunders (I.D. No. 3027)
Richard S. Horvath, Jr. (I.D. No. 4558)
One Rodney Square
P.O. Box 636
Wilmington, Delaware  19899
(302) 651-3000
Attorneys for Plaintiffs

DATED: June ___, 2006

# EXHIBIT C

ONE RODNEY SQUARE

BOX 636

WILMINGTON, DELAWARE 19899-0636

(302) 651-3000

DIRECT DIAL
302-651-3070
DIRECT FAX
888-329-2997
EMAIL ADDRESS
TALLINGH@PROBONOLAW.COM

July 29, 2005

**BY FIRST CLASS MAIL**

John F. Cafferky, Esquire
Blankingship & Keith
4020 University Dr., Suite 300
Fairfax, Virginia 22030

Re:    <u>Mona Dobrich, et al., v. Harvey L. Walls, et al.</u>

Dear John:

I write on behalf of my clients regarding their damage claims. I hope this correspondence will lead to more productive negotiations this Thursday.

In Plaintiffs' Rule 26(a)(1) disclosures, the Dobriches computed their damages to be $48,971.96, subject to change due to current and future expenses. The Does computed their damages to be $17,844.49, also subject to change due to current and future expenses.

For the purposes of the mediation, we will project the damages of both families into the future and discount them to present value. The Dobriches' future damages include the costs of Alex Dobrich's education and the projected costs of maintaining two households more than eighty miles apart. The Does' future damages include the costs of providing for Jordan's education.

In addition to their claims for past and future out-of-pocket losses, both families have claims for emotional distress and punitive damages against the Indian River School District or the members of the school board. We are considering amending the complaint to include these claims.

John F. Cafferky, Esq.
July 29, 2005
Page 2


In discussing with your clients their settlement position, please keep these issues in mind.

Very truly yours,

Thomas J. Allingham II

cc:    The Honorable Mary Pat Thygne
       Thomas S. Neuberger, Esquire

422680.03-Wilmington S1A