ONE RODNEY SQUARE
BOX 636
WILMINGTON, DELAWARE 19899-0636
(302) 651-3000

June 23, 2006

**VIA E-FILE AND HAND DELIVERY**

The Honorable Joseph J. Farnan, Jr.
844 North King Street
Lock Box 27
Wilmington, DE 19801

          RE:   *Dobrich, et al., v. Indian River School District, et al.*,
                  <u>D. Del. 05 - 120</u>

Dear Judge Farnan:

      Attached for this Court's review is a proposed protective order (the "Protective Order") (Exhibit A) governing disclosure of the Does' identities. The parties' principal point of disagreement goes to whether: (1) the Protective Order should prevent disclosure to Reginald Helms of some Identifying Information, as identified in paragraph 5 of the Protective Order; (2) the Protective Order, in paragraph 5, should prevent disclosure of all Identifying Information to Thomas Neuberger or other attorneys who are not litigating this case on behalf of the Indian River School District (the "District") and the Indian River School Board (the "School Board," and together with the District, "Defendants"); and (3) the Protective Order should omit Defendants' proposed paragraph 19 which would have the harsh penalty of automatically voiding the Protective Order for any disclosure of Identifying Information by the Does.

      Because of: (1) the violations of confidentiality orders that have already taken place in this matter; (2) the grave impact to the Does' lives and livelihoods that public disclosure of their identities could have; and (3) the potential for confusion that Defendants' proposed paragraph 19 would cause when other potential remedies are available to Defendants, the Does respectfully request that the Court grant the Protective Order in a form substantially similar to that attached to this letter.

The Honorable Joseph J. Farnan, Jr.
June 23, 2006
Page 2

**PARTIES CHALLENGING THE DISTRICT AND SCHOOL BOARD'S
UNCONSTITUTIONAL BEHAVIOR HAVE BEEN HARASSED**

Jamie and Jordan Doe are both minors. (*See* Jane Doe Affidavit) (Exhibit B) [REDACTED] [REDACTED] *Id.* Jane and John Doe are the parents of Jordan and Jamie. *Id.*

Jane and John both reside [REDACTED] in the District. Exhibit B.

[REDACTED]     [REDACTED]

Finally, the Does have been concerned about protecting their family's identity, and they have not made any disclosures that have resulted in any news media reporting their identities. *Id.*

There is also an extensive record of retaliation against those who have challenged Defendants' unconstitutional behavior. (*See* Mona Dobrich Affidavit) (Exhibit C) Mona Dobrich made the first public complaint against the District's practices at a June 15, 2004, School Board meeting. *Id.* By the August 24, 2004, School Board meeting at Frankford Elementary School, community tension over Mona's complaint had reached a fever pitch. *Id.* The crowd was so large it had to be divided into two rooms. *Id.* Harold Johnson, a former School Board member, suggested at the August 24 School Board meeting that, as a result of her complaints, Mona might just "disappear" like Madalyn Murray O'Hair, the named plaintiff in the Supreme Court case that ended mandatory recitation of Bible verses in the public schools. *Id.* Ms. O'Hair, her son and her granddaughter disappeared in 1995 and were presumed dead, and one of their killers led authorities to their dismembered bodies in 2001. *Id.*

The crowd at the August 24 School Board meeting did not limit its hostility to Mona Dobrich. When Mona's son, then-twelve year old Alexander Dobrich, stood up to speak at the August 24 School Board meeting, someone shouted at him, "take your yarmulke off." Exhibit C. When Drewry Fennel from the American Civil Liberties Union spoke at the same meeting, she was greeted with boos and catcalls. *Id.* Other called out "Go back to Wilmington," and "Go back up North." *Id.*

The Honorable Joseph J. Farnan, Jr.
June 23, 2006
Page 3

After Mona Dobrich complained publicly, a man approached her daughter, Samantha Dobrich, while she was working at her summer job and gave her a tape praising Jesus Christ. Exhibit C. Alexander's schoolmates openly teased him, calling him "Jew Boy." *Id.* A community member called the Dobrich family residence to warn them that the Ku Klux Klan was meeting nearby, and the Dobriches received harassing phone calls daily. *Id.* Even when Mona and her son Alexander moved to Wilmington, the calls continued, both at their home in Sussex County and at their new apartment. *Id.* These events terrified the Dobriches and made their lives miserable. *Id.* Because of these events – many of which occurred in public forums – members of the community are afraid to speak out against the District. *Id.* Several would have joined this suit but decided not to do so for fear of retaliation. *Id.*

Since this litigation began, the Dobriches learned that a website called "Stop the ACLU Coaltion" attempted to make them the inaugural members of its "Expose the ACLU Plaintiff" project. Exhibit C; *see also* http://www.stoptheaclu.org/index.php?option=com_content&task=view&id=54&Itemid=2 (Exhibit D). The website urges sympathizes to make telephone calls to the Dobriches, and assures potential callers that they "can be firm and angry." *Id.* Characteristically, however, the website published information for Alexander's grandparents, not for Mrs. Dobrich or her husband, thereby further extending the harassment. Exhibit C. Unfortunately, Alexander Dobrich's ability to spend time with his grandparents has been impacted, because Mrs. Dobrich has grown concerned for his safety now that his grandparents' address has been published nationwide in connection with this lawsuit. *Id.* The Does are aware of the Stop the ACLU Coalition's attempt to publish the Dobriches' contact information, and the Does are concerned that if their identities are publicly disclosed, then their identities would be published on this or other websites, and that their safety could be jeopardized. Exhibit B.

### CONFIDENTIALITY ORDERS HAVE BEEN VIOLATED AND IDENTIFYING INFORMATION HAS BEEN DISCLOSED

Reginald Helms and Thomas Neuberger have demonstrated that they are willing to violate Court orders to further their own ends. On June 20, 2005, Magistrate Judge Thynge entered an order (D.I. 54) that stated, in part:

> The contents of the mediation conference statements and the conference discussion, including any resolution or settlement, shall remain confidential, shall not be used in the present litigation, nor any other litigation presently pending or filed in the future, and shall not

The Honorable Joseph J. Farnan, Jr.
June 23, 2006
Page 4

be construed as nor constitute an admission. (the "Confidentiality Order")

By an order dated August 5, 2005 (D.I. 59), Magistrate Judge Thynge confirmed that the Confidentiality Order would remain in full force and effect.

Following extensive efforts to mediate before Judge Thynge, the parties eventually negotiated a settlement agreement (the "Settlement Agreement") that could have ended this litigation. In the Settlement Agreement, Plaintiffs not only explicitly acknowledged that they would dismiss all claims in this action with prejudice, but also affirmatively represented that they would not in the future challenge the District's current policy on School Board prayer. There was nothing in the Settlement Agreement that would have prevented the School Board from opening its meeting with prayers.

Before the School Board voted on the Settlement Agreement, Reginald Helms and Thomas Neuberger, Helms's personal attorney, willfully violated the Confidentiality Order. *See, e.g.*, James Diehl, *Indian River Board to Ponder Settlement*, SUSSEX POST, Dec. 22, 2005 at 2 (Exhibit E) ("*A six-figure settlement offer is on the table* in the ongoing court battles over prayer in the Indian River School District – *but board member Reginald Helms wants no part of it.*") (emphasis added); *id.* (Neuberger stating that the settlement offer was "six figures"); Sean O'Sullivan, *School Prayer Lawsuit Tentatively Settled*, NEWS JOURNAL, Jan. 5, 2006 (Even though Helms had been cautioned not to comment further due to Magistrate Judge Thyne wanting to speak with him, "he said his previous statements are 'still my opinion.'") (Exhibit F); Transcript: Dan Gaffney and State Representative John Atkins, WGMD (Jan. 5, 2006) (State Representative John Atkins stated on the air that "I've talked to at least 3 or 4 of the school board members that I am closest with and those 4 are ready not to settle. Reggie Helms . . . thinks it's time that we draw a line in the sand.") (Exhibit G); Patrick Varine, *IRSD Settlement Decision Postponed*, SUSSEX COUNTIAN, Jan. 16, 2006 ("IRSD board member Reginald Helms, who has retained his own legal counsel, Wilmington attorney Thomas Neuberger, could not comment, *but referred to earlier news reports where he stressed his desire* not to settle and get a ruling one way or another.") (Exhibit H) (emphasis added); *cf.* James Diehl, *Community Rallies for Prayer*, SUSSEX POST, Jan. 26, 2006 ("However, before the gag order came down from the bench, board member Reginald Helms went on record opposing the proposed offer of a large settlement.") (Exhibit I).

The apparent reason for Helms and Neuberger's violations of the Confidentiality Order was to kill any chance of settlement that would "'prevent[] any legal precedent from being established which would protect the board from claims in

The Honorable Joseph J. Farnan, Jr.
June 23, 2006
Page 5

the future or benefit other public bodies elsewhere in the country.'" Exhibit E (quoting Neuberger). That Helms and Neuberger violated the Mediation Orders so that a newspaper could publish three days before Christmas a report about the Settlement in this case challenging Defendants' establishment of Christianity speaks volumes about the motivation of Helms and Neuberger – they wanted to provoke a public outcry that would kill the Settlement. Indeed, even the former counsel for the District and the Board appear to have concluded that the comments in the December 22 Sussex Post article constituted a violation of the Confidentiality Order. Letter from J. Balaguer to Magistrate Judge Thynge, Dec. 28, 2005 (Exhibit J).

Soon after these leaks to the press, Magistrate Judge Thynge held a conference with Neuberger and the District's former counsel.[1] The media also reported that a "verbal order has been issued by the mediating judge to prevent anyone involved from commenting, according to sources close to the case." Exhibit H. Nonetheless, that same article demonstrates that Helms, despite knowing about the verbal order issued by Magistrate Judge Thynge, continued to refer to his previous comments. *Id.*

Once some of the details of the Settlement Agreement were leaked intentionally by Helms and Neuberger to the press, the events of the summer of 2004 predictably replayed themselves. Members of the community expressed outrage at the Settlement Agreement – based, in part, on the false impression (intentionally and wrongfully conveyed in certain of the intentional leaks) that the Settlement Agreement would have prevented the School Board from opening its sessions with prayer. *See* Exhibit I (community member stating that "I support the school board and I think if they want to say a prayer, then they should say their prayer."); *see also* Exhibit H ("In terms of details, IRSD attorney John Balaguer said he was upset at what he called 'so much incorrect information being printed, it really borders on irresponsible.'").

The School Board held a special meeting on February 27, 2006 for the School Board to consider and vote on the Settlement Agreement. While the Board met in executive session, more than a hundred people gathered and sang hymns (including variations on certain hymns that denigrated the ACLU, of counsel to Plaintiffs' lawyers in this action), while waiting for the School Board to announce its decision. *See* Molly Murray, *Indian River Refuses Deal On Prayer*, NEWS JOURNAL, Feb. 28, 2006 (Exhibit K). When the School Board announced its rejection of the Settlement Agreement, the "crowd rose and gave the board a standing ovation and cheered." *See id.* Helms reiterated his sentiments after the School Board rejected the Settlement Agreement: "Our court case, where we have been standing up to the

---

[1] Plaintiffs were not present during that conference.

ACLU, provides the opportunity for the federal government to permanently uphold my right not to be treated as a second class citizen, or to have to move to the back of the bus." *Id.* Helms's equation of his position with that of Rosa Parks went uncommented upon in the press.



Therefore, before Identifying Information is made available to Defendants, the Does must be assured that Identifying Information is not disclosed to Helms and Neuberger where they have no need for that information, and already have demonstrated their willingness to ignore this Court's orders.

**THE PROTECTIVE ORDER SHOULD PREVENT DISCLOSURE OF IDENTIFYING INFORMATION TO HELMS AND "PERSONAL ATTORNEYS" SUCH AS NEUBERGER**

The Court has already recognized that a suit "naming a person as a defendant in his/her official capacity is an action against the entity of which the individual is an agent or member." *Dobrich v. Indian River Sch. Dist.*, C.A. No. 05-120, 2006 WL 1173896, at *1 (D. Del. May 2, 2006) (Exhibit M) (citing *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 544 (1986)). As such, Helms and the other School Board members have no personal stake in this litigation. *See id.* Therefore, the fact that Helms is an official capacity defendant is irrelevant for whether he is entitled to Identifying Information.

In another case involving anonymous plaintiffs suing a school district for monetary damages related to that District's establishment of religion, the court limited access to all trial proceedings to the defendant school district's superintendent and president of the school board of trustees. *Doe v. Santa Fe Indep. Sch. Dist.*, 933 F. Supp. 647, 652 (S.D. Tex. 1996). Under the plain terms of the *Santa Fe* court's

The Honorable Joseph J. Farnan, Jr.
June 23, 2006
Page 7

order, those two officials could not disclose the plaintiffs' identities to other members of the school board. *See id.* ("**THESE INDIVIDUALS ARE ORDERED NOT TO REVEAL PLAINTIFFS' IDENTITIES TO ANYONE FOR ANY REASON WHATSOEVER. . . .**"). Therefore, the Protective Order could prevent disclosure of *any* Identifying Information to Mr. Helms.

However, in recognition of Defendants' concern that Helms might have to leave the room for the disclosure of *any* Identifying Information, the Protective Order should prohibit Helms from having access only to the following Identifying Information: (1) the Does' names, (2) the Does' employers, and (3) the schools the Does have attended, currently attend or will attend. First, there is no reason that, when discussing the Does with the School Board, Defendants and their counsel cannot refer to the Does as "Does" in the presence of Helms. Second, for the claims even on the remaining issues, discussing the specifics of the Does' employers or the Does' schools should not be necessary on a regular basis. Because of the high likelihood that public disclosure of the above information would lead to the identification of the Does, restricting disclosure of the above information would: (1) enable Defendants to consult with their counsel with minimal interruption and (2) protect from the sort of disclosure of which Helms's past behavior has demonstrated he is capable.

By extension, Personal Attorneys (as defined in the Protective Order) who are not the Attorneys of Record (as defined in the Protective Order) have no need for Identifying Information. On May 25, 2006, the Court denied access of Identifying Information to anyone but the "counsel for the School Board and the School District." (D.I. 126 at 2) While the Court's decision was limited to who could receive Identifying Information during discovery on the School Board Prayer Issue, the reasoning underlying the Court's May 25 order also applies here. Because the School Board's attorneys represent Mr. Helms in his official capacity, and Helms's involvement in this litigation is limited to his official capacity, there is no reason to permit disclosure of Identifying Information to Neuberger or any of the other individuals identified in paragraph 5 of the Protective Order. Neuberger willfully violated the Court's order, and should not be entitled to Identifying Information going forward. What Helms's personal counsel knows or does not know should have no bearing on how counsel for the District and School Board conduct this case.[2]

---

[2] To the extent Helms may eventually challenge any injunction entered with respect to the School Board Prayer Issue, *see Dobrich*, 2006 WL 1173896, at *1 n.1, Identifying Information would not be relevant at that point since the Court would have already determined the Does' standing

The Honorable Joseph J. Farnan, Jr.
June 23, 2006
Page 8

Further, Helms and Neuberger campaigned against the Settlement Agreement *because they claimed to desire a final judgment on the merits of the School Board Prayer Issue – an argument that is fundamentally inconsistent with any effort to challenge Plaintiffs' standing.* Because Helms and Neuberger desire (or at least claim to desire) a final judgment on the merits on this issue, they must have some reason to learn the Does' identities other than to challenge the Does' standing. Sherlock Holmes' famous maxim on deductive reasoning should help guide this Court to the truth: "[W]hen you have eliminated the impossible, whatever remains, *however improbable*, must be the truth." SIR ARTHUR CONAN DOYLE, SIGN OF FOUR, ch. 6 (1890). Given the previous leaks that have been made and the events of the summer of 2004, there can be only one conclusion: Helms and Neuberger wish to learn Identifying Information so that they can eventually leak that information to the public in order to create another public outcry against an innocent family who has challenged Defendants' unconstitutional conduct – and to deter future families from challenging this conduct. Any rationale for wishing to learn the Does' identities *must* be pretextual, given the previous statements made by Helms and Neuberger – and this Court should not entertain any opposition by Defendants to paragraph 5 of the Protective Order until they provide a reason for why both Helms and Neuberger would need Identifying Information that is consistent with their previous, public statements.

For the foregoing reasons, the Does respectfully request that the Court restrict access of Identifying Information to Helms and Neuberger in a manner consistent with the Protective Order the Does have submitted.

### DEFENDANTS' PROPOSED PARAGRAPH 19 WOULD INVITE CONFUSION WHERE OTHER REMEDIES WOULD BE AVAILABLE TO DEFENDANTS

Defendants have proposed that the Protective Order contain paragraph 19, which would automatically void the Protective Order in the event that the Does "disclosed [Identifying Information] . . . to any person not entitled to know or possess Identifying Information under this Protective Order." First, such language was not contained in the protective orders entered in either *Santa Fe* or *Doe v. Provident Life and Accident Ins. Co.*, 176 F.R.d. 464 (E.D. Pa. 1997), the only two cases the Does are aware of with protective orders governing disclosure of anonymous parties' identities to defendants during discovery or during trial. More importantly, Defendants' proposed paragraph 19 invites confusion by enabling any potential violator to claim that the Does voided the Protective Order through even an

---

with regard to the School Board Prayer Issue. Therefore, Identifying Information would not be relevant to any collateral challenge by Helms to an injunction on the School Board Prayer Issue.

The Honorable Joseph J. Farnan, Jr.
June 23, 2006
Page 9

inadvertent disclosure of Identifying Information.[3] Should Defendants wish to challenge the Protective Order based on the Does' future conduct, they should move the Court under Rule 60 of the Federal Rules of Civil Procedure to reconsider the Protective Order. However, the Court should not include in the Protective Order Defendants' proposed language that would grant an obvious defense – even if it lacked any merit – for what would otherwise be a violator's willful disclosure of Identifying Information.

      For the foregoing reasons, the Does respectfully request that the Court enter the Protective Order in a form substantially similar to that attached as Exhibit A. The Does have "demonstrated that disclosure of [their] true identit[ies] would expose [them] to a defined and specific injury; therefore, [they have] demonstrated 'good cause.'" *Provident Life*, 176 F.R.D. at 470.

Respectfully,

*/s/ Richard S. Horvath, Jr.*

Thomas J. Allingham II (I.D. No. 476)
Robert S. Saunders (I.D. No. 3027)
Richard S. Horvath, Jr. (I.D. No. 4558)
P.O. Box 636
Wilmington, Delaware 19899
Tel: (302) 651-3000
Fax: (302) 651-3001

Attachments

cc:    Warren Thomas Pratt, Esquire (by e-file)
       Stephen J. Neuberger, Esquire (by e-file)
       Thomas S. Neuberger, Esquire (by e-file)

---

[3] REDACTED