Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
 2              FOR THE DISTRICT OF DELAWARE
 3
 4   MONA DOBRICH and MARCO DOBRICH, individually
     And as parents and next friend of ALEXANDER
 5   DOBRICH, SAMANTHA DOBRICH, JANE DOE and JOHN
     DOE, individually and as parents and next friend
 6   of JORDAN DOE and JAMIE DOE,
 7                               Plaintiffs
 8         vs.                            Civil Action
                                          Case No. 15-120
 9
10   INDIAN RIVER SCHOOL DISTRICT, ET AL.,
11                                Defendants
12
13            DEPOSITION OF NINA LOU BUNTING, taken
     pursuant t notice at the Indian River School
     District, 31 Hosier Street, Selbyville, Delaware,
14   beginning at 9:07 a.m. on October 13, 2006 before
     David A. Sroka, Registered Professional Reporter and
15   Notary Public.
16
     APPEARANCES:
17
             THOMAS ALLINGHAM, ESQ.
18           RICHARD HORVATH
             BRIAN LENHARD
19           P.O. Box 636
             Wilmington, Delaware  19899-0636
20           For the Plaintiffs
21           JARROD D. SHAW, ESQ.
             Drinker Biddle & Reath, LLP
22           One Logan Square
             Philadelphia, Pennsylvania  19103-6996
23           For the Defendants
24
```

Dobrich, et al.                          v.                    Indian River School District, et al.
Nina Lou Bunting                    Case No. 15-120                      October 13, 2006

Page 2

1          MS. DUPHILY:  This is the
2     videotape deposition of Ms. Nina Lou
3     Bunting taken by the Plaintiff in the
4     matter of Dobrich, et al. versus Indian
5     River School District, et al., case number
6     15-120.  We are going on the record at 31
7     Hosier Boulevard, Selbyville, Delaware
8     on October 12, 2006 at approximately 12:55
9     p.m..
10          The court reporter is Dave Sroka
11     from the firm of Wilcox & Fetzer,
12     Wilmington, Delaware.    My name is
13     Lindsay     duPhily and I'm the videotape
14     specialist     of Discovery Video Services.
15          Counsel will now introduce
16     themselves and then the court reporter
17     will swear in the witness.
18          MR. ALLINGHAM:  I'm Tom Allingham
19     I represent the Plaintiffs in this
20     case, and with me are Richard Horvath and
21     Brian Lenhard.
22          MR. SHAW:  I'm Jarrod Shaw and I
23     represent the defendants in this action.
24              NINA LOU BUNTING,

Page 3

1     The Witness herein, called for examination by
2     the Plaintiffs, having been duly sworn to tell the
3     truth, the whole truth, and nothing but the truth,
4     was examined and testified as follows:
5     EXAMINATION BY MR. ALLINGHAM:
6     Q.   Did you attend the August 24, 2004 Board
7     meeting?
8     A.   August 24, 2004 Board meeting, are you
9     referring to the one where the public, a lot of
10     people from the public came?
11     Q.   Hundreds of people?
12     A.   Okay, yes, I did.
13     Q.   Did anything occur at that meeting that was
14     disturbing to you personally?
15     A.   No.
16     Q.   I want to show you a clip of the vide from
17     that meeting?
18     A.   Okay.
19     Q.   This is a portion from the public comment
20     section of the meeting.
21     A.   Okay.
22     (AT THIS POINT IN TIME A TAPE WAS PLAYED)
23     Q.   Were you distracted when your telephone
24     rang during that clip?  Would you like me to play it

Page 4

1     again for you?
2     A.   No, I don't think I was distracted.  I may
3     have been momentarily.
4     Q.   Were you present when -- who was speaking
5     during that public comment section?
6     A.   Mr. Harold Short.
7     Q.   Harold Johnson?
8     A.   Harold Johnson, okay.  I don't know him
9     that well.  I knew it was Harold somebody.
10     Q.   Were you present when he made that
11     statement?
12     A.   Yes, I was.
13     Q.   Did you hear him say that the good Lord has
14     proven that there's a higher power above our Supreme
15     Court?
16     A.   I guess I heard him say it.  I didn't hang
17     on every word.
18     Q.   Did you hear him say that was proven when
19     the last I heard Madelyn Murray-O'Hare disappeared
20     never to be seen again?
21     A.   Well, I heard it just now, do I remember --
22     Q.   that's the first time that you heard it?
23     A.   I'm sure I heard it that night, but I
24     didn't remember hearing it until you showed me

Page 5

1     again.
2     Q.   Did you know at the time who Madelyn
3     Murray-O'Hare was?
4     A.   Oh, of course.
5     Q.   Did you know that she had disappeared never
6     to be seen again?
7     A.   I don't possibly knew it, I'm not sure.
8     Q.   Did you know that she was dismembered and
9     buried in a shallow grave?
10     A.   No, I did not know that.
11     Q.   Did you have any idea why Mr. Johnson
12     raised the issue of Ms. O'Hare's disappearance other
13     than to threaten Ms. Dobrich?
14     A.   I have no reason why he said it, I have no
15     idea.
16     Q.   Did you think that Mr. Johnston, Mr.
17     Johnson was trying to equate Ms. Dobrich's position
18     in challenging the Board's practices on prayer with
19     Ms. O'Hare's position as stated by Mr. Johnson as
20     the leader of the movement to take prayer out of the
21     schools?
22     A.   No, because I don't even remember him
23     having said it.
24     Q.   Well, let me ask you this, Ms. Bunting, is

2 (Pages 2 to 5)

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

Dobrich, et al.                                    v.                    Indian River School District, et al.
Nina Lou Bunting                          Case No. 15-120                        October 13, 2006

Page 6

1   it Miss. Bunting or Mrs. Bunting?
2      A.   Mrs.
3      Q.   Mrs. Bunting, did you listen to the
4   speakers during the public commentary section of the
5   August 24th meeting?
6      A.   I'm going to be honest with you, I did
7   listen, but we were all nervous wrecks, and for me
8   to hang on every word that everyone said, I did not.
9      Q.   Why were you a nervous wreck?
10     A.   So many people there.
11     Q.   Why were you all nervous wrecks, same
12  reason?
13     A.   No, just that I didn't want a confrontation
14  to occur.
15     Q.   Did you think that there was a danger that
16  a confrontation would occur?
17     A.   I didn't know when I drove up there were
18  cars everywhere.
19     Q.   Why were you a nervous wreck if you didn't
20  think a confrontation would occur?
21     A.   This is a little area, and we don't usually
22  have a lot of people come to our Board meetings, and
23  to see a lot of people at the Board meeting led me
24  to believe that there could be a problem.

Page 7

1      Q.   What kind of a problem?
2      A.   I don't know.  It was my understanding
3   there were even policemen outside.  I didn't see any
4   but --
5      Q.   Do you know who called the policemen?
6      A.   I have no idea.
7      Q.   Do you know if it was Mrs. Hobbs?
8      A.   I have no idea.
9      Q.   Would I be right in understanding that the
10  atmosphere at that meeting was charged?
11     A.   It was obviously charged.
12     Q.   Were the comments, some of the comments
13  given from the podium during the public comment
14  section of the meeting intended in your view to
15  intimidate Mr. Dobrich and her family?
16     A.   Not in my view.
17     Q.   You didn't think that the reference to
18  Madelyn Murray-O'Hare was intended to intimidate
19  Mrs. Dobrich and her family?
20     A.   No, sir I do not.
21     Q.   You thought that was just a temperate
22  comment on the disappearance of Mrs. O'Hare?
23     A.   As I said, I don't recall at the time even
24  getting involved with every word that everyone was

Page 8

1   speaking.
2      Q.   Would I be fair in understanding
3   Mrs. Bunting that you didn't really hear at the
4   August 24th meeting the comments Mr. Johnson made
5   about Madelyn Murray-O'Hare, her disappearance, and
6   her role in taking prayer out of the schools?
7      A.   I'm sure, sir, that I heard what he said,
8   but there's a difference between hearing and
9   listening and keeping that thought in your head.
10     Q.   Am I right in understanding that his
11  comments made, for whatever reason, his comments
12  made no particular impression on you?
13     A.   I feel that the people there had an agenda
14  and they were speaking to us as a Board, okay?  And
15  some of them were on a different wave length.  Not
16  all of them were totally understanding of what they
17  were there for.  Let me put it that way.
18         So, there were times that I was thinking
19  that people were talking about things that really
20  had nothing to do with why most of the people were
21  there, because they didn't have a full understanding
22  of the situation.
23     Q.   Is it your testimony Mrs. Bunting that you
24  did not view the tenor of the comments during the

Page 9

1   public comment session of that meeting as
2   intimidating?
3      A.   No, sir, I did not.
4      Q.   Did you view those comments as temperate,
5   respectful and courteous to Mrs. Dobrich and her
6   family?
7      A.   At times they were courteous.
8      Q.   And did you view them as intemperate,
9   discourteous and disrespectful at other times during
10  the public comment section of the meeting?
11     A.   I'm sure she saw it that way.
12     Q.   I want to know how you saw it?
13     A.   I did not see it that way.
14     Q.   Every comment made you thought was
15  respectful, courteous and temperate?
16     A.   I -- every comment made I felt was the
17  passion of the speaker.
18     Q.   That's an entirely different question from
19  the one I asked you.
20     A.   I don't know how she felt about it.
21     Q.   I didn't ask you how she felt about it.  I
22  asked you how you felt about it.  Did you believe
23  that each of the --
24     A.   Was I offended for her, no.

3 (Pages 6 to 9)

Dobrich, et al.                                v.                    Indian River School District, et al.
Nina Lou Bunting                        Case No. 15-120                           October 13, 2006

Page 10

1    Q.    That's not what I asked you either Mrs.
2    Bunting. We will go much more quickly —
3    A.    Okay.
4    Q.    I will try to ask clear questions. If you
5    understand my question you should try to answer the
6    question that I ask, and not a different question?
7    A.    Okay.
8    Q.    You have testified that you heard all of
9    the comments. Do you -- did you form the view that
10   all of the comments made at the public commentary
11   section of the August 24th meeting were courteous,
12   respectful and temperate in tone?
13   A.    Sir, not all of them, I'm sure, were
14   courteous, temperate or respectful.
15   Q.    Do you remember when Mr. Dobrich's son Alex
16   rose to speak?
17   A.    Her friend?
18   Q.    Her son?
19   A.    Her son. I think one of the children did
20   speak, was it the son?
21   Q.    Both of them rose to speak.
22   A.    Oh, okay, the daughter came to the podium
23   with the son?
24   Q.    Yes.

Page 11

1    A.    Okay.
2    Q.    Do you recall that?
3    A.    Yeah, uh-hum.
4    Q.    Do you recall that the response from the
5    crowd was something less than respectful, courteous
6    and temperate?
7    A.    Sir, people were saying things while people
8    were talking. I don't hear well, and that's no
9    excuse on my part, but I don't hear well. Most
10   things that people say in meetings, and I will refer
11   to last night, I don't hear everything that people
12   say. Was there mumbling, yes.
13   Q.    Disrespectful mumbling?
14   A.    I didn't hear what they said because I was
15   up front, so I don't know if it was disrespectful I
16   can't answer something I don't know, sir.
17   Q.    Did you hear someone shout, "Take your
18   yarmulke off?"
19   A.    No, I did not.
20   Q.    Did you hear someone shout to Mrs. Dobrich,
21   "If you would simply raise your children right in
22   the Christian faith there would be no problem?"
23   A.    No, sir, I did not.
24   Q.    If you had heard those comments would you

Page 12

1    have viewed them as inappropriate and disrespectful?
2    A.    I certainly would have, if I had heard
3    them.
4    Q.    You did hear Mr. Johnson's comments and you
5    did not view them as disrespectful or --
6    A.    I did hear Mr. Johnson's comments at the
7    time I'm sure while he was speaking. Did I hear
8    every word, I'm not sure.
9    Q.    Well, I hadn't finished my question, ma'am.
10   And I take it you viewed them as courteous and
11   respectful?
12   A.    He wasn't talking to Mrs. Dobrich.
13   Q.    Really?
14   A.    He was speaking at the podium in front of a
15   group of people.
16   Q.    Mrs. Bunting, I want to make sure that I
17   understand your testimony. Is it your view that
18   Mr. Johnson had no intention of speaking to Mrs.
19   Dobrich with those remarks?
20   A.    You mean threatening Mrs. Dobrich?
21   Q.    What gave you the idea I was talking about
22   threatening Mrs. Dobrich?
23   A.    Well, you said he was comparing it to
24   what's her name, Margaret.

Page 13

1    Q.    Madelyn Murray-O'Hare?
2    A.    Madelyn Murray-O'Hare.
3    Q.    Did you think that Mr. Johnson's comments
4    were in no way directed to Mrs. Dobrich?
5    A.    I didn't see the connection. He was
6    talking about a person who took prayer out of the
7    school.
8    Q.    And what did you understand the vast
9    majority of the people commenting during the public
10   commentary session of the August 24 meeting thought
11   Mrs. Dobrich was trying to do?
12   A.    They weren't -- that she wasn't trying to
13   take the prayer out of the schools, it was already
14   out of the schools.
15   Q.    And you thought that was what the people at
16   the meeting understood?
17   A.    I don't know what they understood.
18   Q.    Well, wait a minute. You said that you
19   thought a lot of people at the meeting misunderstood
20   what the meeting was about?
21   A.    Right, they did.
22   Q.    And isn't it correct, Mrs. Bunting, that
23   what they misunderstood was that they thought the
24   meeting was about taking prayer out of the schools?

4 (Pages 10 to 13)

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

Page 14

1   A.   They thought the meeting, my understanding
2   was, they thought it was about graduation, and some
3   may have thought it was about taking it out of
4   school. I don't know what they thought.
5   Q.   Oh February 27, 2005 there was a meeting to
6   address the issue of a proposed settlement of this
7   litigation, do you recall that meeting?
8   A.   Yes, I do.
9   Q.   The Board went into executive session, do
10  you recall that?
11  A.   Yes.
12  Q.   Physically speaking where did you go to go
13  into executive session?
14  A.   Oh --
15  Q.   Do you remember?
16  A.   Let's see, I think we were at Sussex
17  Central High School --
18  Q.   That's right.
19  A.   So, we would have gone to the library.
20  Q.   And is that --
21  A.   Either that or the first room next to where
22  we go to the cafeteria.
23  Q.   I just wanted to place it in context, Mrs.
24  Bunting. Were you able to hear through the door

Page 15

1   what was going on in the auditorium?
2   A.   No, sir.
3   Q.   At the close of the executive session did
4   Mr. Helms tell his fellow Board members that he
5   wanted to make a statement when the Board returned
6   to public session?
7   A.   I don't know, sir.
8   Q.   That is to say you can't remember whether
9   he told you that?
10  A.   I don't recall whether he told us all or
11  not.
12  Q.   You recall that Mr. Helms did in fact make
13  a statement when you returned to public session?
14  A.   Yes, he did.
15  Q.   Did he share that -- it was a prepared
16  statement, is that right?
17  A.   It was a prepared statement I understand.
18  Q.   Did he share that prepared statement with
19  you before he offered it?
20  A.   No, he did not.
21  Q.   Did you agree with the sentiments that the
22  prepared statement expressed?
23  A.   I thought it could have been a little
24  different.

Page 16

1   Q.   In what respect?
2   A.   Are you referring to the back of the bus?
3   Q.   I'm not referring to anything, I am just
4   asking you in what ways it should have been
5   different in your view?
6   A.   I just thought that it could have been a
7   little clearer about what the objective was.
8   Q.   And you mentioned the back of the bus
9   comment, was there something about that that you
10  thought was unclear?
11  A.   Well, I just remember me thinking I wonder
12  why he said back of the bus, that's all.
13  Q.   Did it occur to you that what he was
14  referring to was Mrs. Rosa Parks?
15  A.   I figured it had to be if that's what he
16  was referring to.
17  Q.   Did you personally think that it was
18  appropriate for Mr. Helms to compare himself to Rosa
19  Parks?
20  A.   I don't think Mr. Helms prepared the
21  statement, sir.
22  Q.   When did you find out that Mr. Helms did
23  not prepare the statement?
24  A.   He announced it when he was reading the

Page 17

1   statement in front of all the people.
2   Q.   I'm sorry?
3   A.   I thought he told the people that he had a
4   prepared statement to read, that he had been asked
5   to give.
6   Q.   I just finished deposing Mr. Helms and he
7   told me unequivocally that he did not attribute the
8   statement, but presented it as his own statement?
9   A.   Oh, okay, then maybe he told us later, I
10  don't recall. He might have told us later.
11  Q.   At the time when the Board returned from
12  its executive session to public session on February
13  27, 2005 do you think it would have been appropriate
14  for Mr. Bireley to call on a member of the public to
15  speak at that point?
16  A.   I don't see any reason why he should have
17  called on a member of the public to speak.
18  Q.   There was no public commentary section of
19  the meeting on the agenda at that point was there?
20  A.   I don't know, I don't recall, sir, whether
21  there was or not.
22  Q.   Do you think it would have been appropriate
23  for Mr. Bireley to call on Mr. Neuberger to speak at
24  that point?

5 (Pages 14 to 17)

Dobrich, et al.                                   v.                    Indian River School District, et al.
Nina Lou Bunting                           Case No. 15-120                          October 13, 2006

Page 18

1    A.   I don't see why he should have.
2    Q.   On the other hand, do you think it was
3  appropriate for Mr. Helms to read without
4  attribution a statement prepared by Mr. Neuberger at
5  that point?
6    A.   Was it appropriate? I think we all have
7  the right to read or say what we want to say.
8  Usually after you have the motion made and then
9  someone seconds it, then if anyone wants to say
10  anything about it before there is a vote, then
11  people say something if they want to.
12    Q.   If you, Mrs. Bunting, were to read a
13  statement that had been written by someone else into
14  the record at the Board meeting wouldn't you
15  attribute that statement to its author?
16    A.   I probably would.
17    Q.   And the reason you would do that is because
18  it is potentially deceptive to read a statement as
19  your own that was not written by you but rather by
20  someone else, wouldn't you agree?
21    A.   Well, I don't know that it's deceptive to
22  your audience, but you know when every word is
23  hanging, everything is hanging on what you say I
24  probably would want to be careful that I attribute

Page 19

1  it to who had said it.
2    Q.   I would like you to put yourself in the
3  shoes of an audience member at the December 27, 2005
4  meeting?
5    A.   Okay.
6    Q.   If Mr. Helms, did not, as he said he did
7  not, attribute the author of his prepared statement,
8  wouldn't you as an audience member have assumed that
9  the words that were being read were Mr. Helms'
10  words?
11    A.   Sure, if I heard it read.
12    Q.   This lawsuit is in part about the Board
13  Prayer Policy BDA.1. Actually let me put it in front
14  of you so that you have it.
15        I'm going to give you all the exhibits, but
16  I'm opening the stack to Exhibit 9.
17    A.   Okay.
18    Q.   Mrs. Bunting, you have before today read
19  Board Prayer at Regular Board Meetings, policy
20  BDA.1, is that correct?
21    A.   Yeah.
22    Q.   And it was adopted on October 19, 2004?
23    A.   I will take your word for it.
24    Q.   Well, you see down at the lower left where

Page 20

1  it says, "Adopted 10/19/04?"
2    A.   Okay.
3    Q.   I'm going ask you some questions about this
4  policy?
5    A.   All right.
6    Q.   The first section numbered one says: "In
7  order to solemnify its proceedings, the Board of
8  Education may choose to open its meetings with a
9  prayer or moment of silence, all in accord with the
10  freedom on conscience of the individual adult Board
11  member."
12    A.   Yes, sir.
13    Q.   That paragraph, which sets out the right of
14  the Board of Education to open its meetings with a
15  prayer, begins with the phrase, "In order to
16  solemnify its proceedings," do you see that?
17    A.   Uh-hum.
18    Q.   And is that in fact the reason for the
19  Board of Education's conferring on itself the choice
20  to open the meeting with a prayer, in order to
21  solemnify the proceedings?
22    A.   I did not write this, and I was not at the
23  meeting were this was written, so, am I to assume
24  that that's what the writers meant, is that what

Page 21

1  you're asking me?
2    Q.   Not at all. You are a Board member who
3  voted for this policy, correct?
4    A.   I voted for the policy, I'm sure I did.
5    Q.   When you voted for it did you understand
6  that the purpose of a prayer at the opening of the
7  meeting as embodied in this policy was to solemnify
8  the proceedings?
9    A.   I guess I will say yes.
10    Q.   Was there any other purpose for the
11  offering of the prayer or moment of silence at the
12  commencement of the Board meetings other than or in
13  addition to the desire to solemnify the Board's
14  proceedings?
15    A.   Any other reason?
16    Q.   Yes.
17    A.   Like in it was being done when I got on the
18  Board.
19    Q.   Okay fair enough, I will take that as a
20  second reason, we can call that reason inertia. Is
21  there any other reason for the offering of prayer at
22  the commencement of Board meetings?
23    A.   Not to my knowledge.
24    Q.   Okay, so as a Board member when you voted

6 (Pages 18 to 21)

Dobrich, et al.                                v.                    Indian River School District, et al.
Nina Lou Bunting                      Case No. 15-120                        October 13, 2006

Page 22

1   to approve policy BDA.1 you understood that the
2   purpose of prayer at the opening of Board meetings
3   was two fold, one, that's the way, a I understood
4   it, tat it had been done for a period of time, even
5   before you joined the Board, and two, prayer at the
6   beginning of a Board meeting operated to solemnify
7   the proceedings, is that correct?
8       A.   I guess that's correct.
9       Q.   Okay.  When did you join the board?
10      A.   2002, July 2002.
11      Q.   Do you believe that the Board has had a
12  long tradition of opening its meetings with a
13  prayer?
14      A.   Yes.
15      Q.   Do you believe the Board has a long history
16  of opening its meetings with sectarian prayer?
17      A.   Yes.
18      Q.   What's the basis for your belief?
19      A.   What's the basis for my belief?  Do you
20  want my history as long as I can remember, as long
21  as whatever?
22      Q.   I want to know what's the basis for your
23  belief that the Board of Education opened its
24  meetings with a sectarian prayer?

Page 23

1       A.   In the '50s I was in elementary school and
2   I remember being at a Board meeting one night, I
3   don't know for what reason, but I know they started
4   it with a prayer.
5       Q.   Was it a sectarian prayer?
6       A.   Can I be sure, I don't recall that it was,
7   but I can be pretty sure that it was.
8       Q.   How can you be so sure that it was?
9       A.   Because I know who the president of the
10  Board was and I knew my friend's father was also on
11  the Board, and another friend's father was also on
12  the Board.  These are people who were in my church
13  at the time.
14      Q.   People in your church would never offer a
15  nonsectarian prayer?
16      A.   I don't know, sir, they could probably.
17      Q.   Now I want to explore the basis on which
18  Board members had been invited to offer a prayer or
19  a moment of silence at each Board meeting?
20      A.   Right.
21      Q.   And did you understand that the policy that
22  you voted to adopt provides a rotating basis, each
23  Board member would be given the opportunity to offer
24  a prayer or request a moment of silence?

Page 24

1       A.   Uh-hum.
2       Q.   You have to answer yes or no?
3       A.   Yes.
4       Q.   The court reporter can't take down a nod?
5       A.   Okay, video camera it's good, though.
6       Q.   Has the Board on a rotating basis offered
7   each individual Board member the opportunity to
8   offer a prayer, or request a moment of silence since
9   this policy was adopted?
10      A.   I believe that's the case, sir, but I am
11  not the one who, you know, invites the people.  And
12  I know there are evenings when some people are
13  absent and that type of thing.  It's my
14  understanding that people are given the opportunity
15  on a rotating basis.  But can I count up when it's
16  my turn because there are ten of us, then no because
17  there are other circumstances.
18      Q.   Do you know whether it's the intent of the
19  president of the Board to have followed paragraph
20  two of this policy?
21      A.   Yes, sir it's his intent, that's as far as
22  I know.
23      Q.   Mr. Bireley testified that when he became
24  president of the Board he asked each Board member

Page 25

1   whether they would like to be in the rotation to be
2   invited to offer a prayer.  Were you asked that
3   question?
4       A.   Yes.
5       Q.   And did you volunteer to become part of the
6   rotation when he asked you that?
7       A.   Yes, I did, yes.
8       Q.   Did he tell you that some persons had
9   declined that invitation?
10      A.   No, sir.
11      Q.   Are you aware of anyone who has been
12  offered the opportunity to offer a prayer or a
13  moment of silence and has turned it down at a Board
14  meeting?
15      A.   I have no knowledge of that.
16      Q.   When you say you have no knowledge does
17  that mean you don't recall that ever having
18  happened?
19      A.   No, sir, he would not have discussed that
20  with rest of us.
21      Q.   No, I'm talking about at meetings where you
22  were in attendance?
23      A.   You weren't asked right at the meeting.
24  You're asked ahead of time.

7 (Pages 22 to 25)

Dobrich, et al.
Nina Lou Bunting

v.

Case No. 15-120

Indian River School District, et al.
October 13, 2006

Page 26

1  Q.  Oh, you're asked ahead of time?
2  A.  Oh, yes, sir.
3  Q.  And then aren't you at the meeting doesn't
4  president Bireley say, by way of example. Mrs.
5  Bunting would you like to lead the Board in a prayer
6  or in a moment of silence?
7  A.  Right.
8  Q.  All right, so an invitations is in fact
9  offered at the meeting?
10  A.  No, sir.  Well, he knows that you are going
11  to be the one that has said they will do it.  He
12  will -- he calls you and asks you ahead of time if
13  you will do it, and you say yes, and then or, you
14  know, if you are going to do it, I said yes, and
15  then the night of the meeting he turns to you and
16  calls your name.
17  Q.  All right, and so you get a heads up ahead
18  of time?
19  A.  Yes.
20  Q.  And then at the meeting he says
21  Mrs. Bunting would you like to lead us in a prayer?
22  A.  No, sir, he does not say Mrs. Bunting would
23  you like to lead us in a prayer.
24  Q.  What does he say?

Page 27

1  A.  He says Mrs. Bunting.  He reads number one
2  here, and then he says --
3  Q.  Mrs. Bunting?
4  A.  Mrs. Bunting.
5  Q.  That's it?
6  A.  Yes.
7  Q.  Okay.  Well, do you know whether anyone who
8  was called in advance declines the opportunity to be
9  the person to present the prayer?
10  A.  No, sir I have had no knowledge of that.  I
11  would not know that.
12  Q.  The process that Mr. Bireley uses by
13  calling people in advance -- well, let me ask you
14  this question, do you know whether if Mr. Bireley
15  called an individual Board member and he or she said
16  I would rather not give the prayer, whether
17  Mr. Bireley would then turn to that person at the
18  subsequent meeting and say, if it were you, for
19  example, Mrs. Bunting and you would say no?
20  A.  Oh, no sir, he would not turn to you if you
21  had already declined.
22  Q.  He wouldn't put you on the spot, would he?
23  A.  No.
24  Q.  Or embarrass you?

Page 28

1  A.  No.
2  Q.  So, the process that Mr. Bireley uses
3  ensures that the only people who will be given an
4  opportunity to lead the Board in prayer are people
5  who would want to do so, correct?
6  A.  Would you repeat that, please?
7  Q.  Sure.  The process that Mr. Bireley uses of
8  asking you in advance whether you want to do it,
9  that ensures that in every case the person offered
10  the opportunity to lead the Board in prayer will
11  take up that opportunity, correct?
12  A.  Yes.
13  Q.  In fact, it's designed so that no one will
14  be embarrassed by having to say no thank you Mr.
15  Bireley, I'd prefer not to, correct?
16  A.  It's designed not to embarrass, yes sir.
17  Q.  Now, I am going to represent to you that
18  Mr. Bireley told me under oath that one Board member
19  affirmatively told him that he did not want to be
20  involved in offering a prayer to open the Board
21  meeting?
22  A.  Okay.
23  Q.  And that five other Board members declined
24  to volunteer, that is they said -- they did not say

Page 29

1  as you did sure Mr. Bireley I'd be delighted if you
2  asked me to offer the prayer.  He said would you
3  like to be involved, if you would just give me a
4  call and let me know, and they all did not call him.
5  So, in the current composition of the
6  Board, of the ten members, six have declined to
7  volunteer, one of those six has affirmatively said
8  that he does not want to led the Board in prayer.
9  I'd like you to accept that for the moment, okay?
10  A.  Okay.  Six people have said that they do
11  not want to, is that what you just said?
12  Q.  No, six people have not taken up
13  Mr. Bireley's invitation to tell him that they want
14  to --
15  A.  With the present Board?
16  Q.  Correct.
17  A.  Six people have not, okay.
18  Q.  Okay?
19  A.  Okay.
20  Q.  Four people, or to say it a different way,
21  four people have volunteered to join the prayer
22  rotation?
23  A.  Four people have volunteered to join?
24  Q.  Yes, ma'am.

8 (Pages 26 to 29)

Dobrich, et al.                                    v.                  Indian River School District, et al.
Nina Lou Bunting                          Case No. 15-120                        October 13, 2006

Page 30

1  A.  I didn't know there was a volunteering,
2  sir.
3  Q.  I'm just telling you what Mr. Bireley told
4  me?
5  A.  Okay, I just thought he called you and said
6  yes or no, okay.
7  Q.  Now, I'd like you to imagine that you are a
8  person who attends each Board meeting as an audience
9  member, a resident of the district, and I'd like you
10  to imagine that as is the practice in each case when
11  Mr. Bireley turns to Mrs. Bunting or Dr. Hattier or
12  whoever, that person launches into a prayer, or
13  leads a moment of silence, whatever, and that that
14  occurs for 27 straight meetings, that no person ever
15  declines the opportunity, okay?
16  A.  Okay, no person on the Board ever declines?
17  Q.  At the meetings. Each person when
18  Mr. Bireley turns to them takes up the opportunity
19  to lead a prayer. Are you with me so far?
20  A.  I'm not sure that I'm with you, because I
21  thought we clarified the fact that people don't
22  decline at the meeting.
23  Q.  Yes, that's precisely what I said —?
24  A.  Now you are saying --

Page 31

1  Q.  In each instance, each meeting since
2  October 19, 2004 when the president of the Board has
3  turned to a member of the Board and said
4  Mrs. Bunting, that person has promptly launched into
5  a prayer or led a moment of silence, okay?
6  A.  Okay. For 27 --
7  Q.  I think it's 27 straight, maybe it's 24,
8  maybe it's 28, I forget, okay?
9  A.  All right.
10  Q.  And the person sitting in the audience in
11  each of those meetings would develop a picture of
12  the religious beliefs of the Board members based in
13  part on what they do in response to that invitation
14  to pray, would you agree with me about that?
15  A.  The people in the audience are getting a
16  picture of the person's religious beliefs?
17  Q.  Sure.
18  A.  Just by whether there are willing to give
19  the prayer or not?
20  Q.  Sure.
21  A.  Is that what you're asking me?
22  Q.  Sure.
23  A.  I wouldn't get a vision of what someone's
24  religious beliefs were, just whether they were

Page 32

1  willing to give a prayer or not, sir. So, why would
2  someone in the audience think that?
3  Q.  Fair enough, thank you for your answer. My
4  next scenario, which is not what has happened, but
5  which would comply with paragraph two of the policy
6  would be that at each meeting on a rotating basis
7  each Board member would be given the opportunity to
8  offer a prayer, and, for example, on the current
9  composition of the Board we could intuit that six of
10  them would say no thank you.
11  Would that give a different picture of the
12  religious beliefs of the School Board to an audience
13  member?
14  A.  No, sir. Could I clarify that?
15  Q.  Sure.
16  A.  Some people aren't comfortable doing it.
17  They'd like to.
18  Q.  Is that the clarification?
19  A.  Well, I know for a fact that some people
20  aren't comfortable doing it. I talked to a person
21  last night.
22  Q.  What person was that?
23  A.  That was Trish Oliphant.
24  Q.  What was the occasion for your conversation

Page 33

1  with Ms. --
2  A.  We were at that meeting that I couldn't be
3  here last night, Reggie had to take my place, I was
4  representing our Board in Dover. We had a big state
5  meeting and Charlie Bireley, Susan Bunting, Donna
6  Mitchell, Trish Oliphant and I.
7  Q.  That was a State Board of Education
8  meeting?
9  A.  Yes, sir.
10  Q.  Did it open with a prayer?
11  A.  No, it did not.
12  Q.  Did you feel like the proceedings were not
13  solemn?
14  A.  I did personally.
15  Q.  I'm sorry, my question was in the negative,
16  let me ask it properly.
17  A.  Okay.
18  Q.  Did you think that the proceedings were
19  conducted in a solemn manner?
20  A.  I was okay with the meeting, sir, but I was
21  not comfortable at dinner when there was not a
22  blessing of the food, okay? I will answer that for
23  you.
24  Q.  I didn't ask about the dinner, I was asking

9 (Pages 30 to 33)

Dobrich, et al.                                    v.                    Indian River School District, et al.
Nina Lou Bunting                        Case No. 15-120                        October 13, 2006

Page 34

1  about the meeting?
2      A.   That was part of the meeting, sir the
3  dinner was part of the meeting.
4      Q.   It was the lack of blessing of the food
5  that troubled you?
6      A.   Well, if you said not solemnized, that's
7  what I meant.
8      Q.   The proceedings of the meeting itself, the
9  discussions at the meetings, the actions taken and
10  so forth, the official proceedings of the meeting
11  were conducted in a solemn manner, is that correct?
12      A.   I don't know that you would call it a
13  solemn manner.  It was a state meeting where people
14  from every school district are represented, and we
15  are talking about state matters, and we are not
16  dealing with legislating or making any kind of
17  decisions for our own local district.  We just
18  discussing things throughout the state that we would
19  like to see happen or we would like to work on.
20      Q.   Did you think that the tenor of those
21  discussions was serious?
22      A.   It was serious I'm sure, I mean it all
23  dealt with education.
24      Q.   Did people conduct themselves appropriately

Page 35

1  and take the matter seriously?
2      A.   Oh, sure they always conduct themselves
3  appropriately.
4      Q.   And take the matters which they are
5  addressing seriously?
6      A.   It is a serious matter.
7      Q.   How long have you been attending State
8  Board of Education meetings?
9      A.   The whole time I've been on this School
10  Board.
11      Q.   Since 2002?
12      A.   Uh-hum.
13      Q.   And has there ever been a prayer offered at
14  the commencement of the meetings?
15      A.   No.
16      Q.   I take it then that it's your view that it
17  is not necessary to necessary to solemnify the State
18  Board of Education proceedings for those meetings to
19  open with a prayer?
20      A.   Sir, it's not under my control.
21      Q.   That's not my question.  I know it's not
22  under your control.  My question is, is it your
23  testimony that it is not necessary to solemnify the
24  State Board of Education proceedings for them to be

Page 36

1  opened with a prayer?
2      A.   I can't say something that you're trying to
3  get me to say.  Again I have no control over that.
4  There is not for me to say.
5      Q.   Mrs. Bunting, it's probably true that I
6  will give up eventually if you keep not answering my
7  questions, but the deposition will be much longer if
8  you don't.
9      A.   Sir, all I can say to you is when I am in
10  their territory it is not my territory, and it is
11  not my decision to be made.
12      Q.   Whose territory is it?
13      A.   It's the entire state.
14      Q.   Your previous answer was their territory?
15      A.   It's the entire state.
16      Q.   Well, then --
17      A.   I am only 1/19, they are 18/19 of the
18  state.  I am only representing one School Board.
19      Q.   Well, if it's not within your control whose
20  control is it within?
21      A.   It's a state organization made up all 19
22  school districts.
23      Q.   Who makes the decision how to solemnify the
24  proceedings of the State Board of Education?

Page 37

1      A.   Sir, again I am new man on the totem pole,
2  I arrived there in '02, and things were going along,
3  you know.  I joined the group because I was asked to
4  represent my School Board.
5      Q.   I don't know what new --
6      A.   We have an executive director, if that's
7  what you mean who, and a secretary, who are in
8  charge of the Delaware State School Boards
9  Association, I'm on the executive committee.
10      Q.   Of the State School Board Association?
11      A.   Of the State School Board's Association
12  because I represent Indian River School District at
13  those meetings.  This is not a State School Board
14  meeting, this is a -- there is the State School
15  Board and then our group is, represents all of the
16  individual boards.  They are two different things.
17  Like Greg Hastings is now on the State School Board,
18  but this is DSBA, Delaware State Boards Association.
19      Q.   And you are on the executive committee of
20  that organization?
21      A.   I am on the executive committee.
22      Q.   Are all 19 districts represented on the
23  executive committee?
24      A.   Yes, sir, all 19 are represented.

10 (Pages 34 to 37)

Dobrich, et al.                                          v.                    Indian River School District, et al.
Nina Lou Bunting                           Case No. 15-120                              October 13, 2006

Page 38

1    Q.   On the executive committee?
2    A.   On the executive committee.  They are not
3    always all in attendance, so I can't say that they
4    are represented at every meeting.
5    Q.   Is a purpose of Board Policy BDA.1 to
6    protect individual Board members against
7    discrimination?
8    A.   Sir, I don't know if it's protecting us
9    against discrimination or not.
10   Q.   When you voted to adopt Board Policy BDA.1
11   am I right that it was not your purpose to protect
12   individual Board members from discrimination?
13   A.   When I adopted this it was my understanding
14   that I had the right to adopt what this says.
15   Q.   I don't really -- I wasn't asking you for
16   you understanding of your rights, I was asking what
17   your purpose was in adopting the policy?
18   A.   My right to be able to pray at the Board
19   meeting.
20   Q.   Oh, okay, so your purpose in adopting the
21   policy was to preserve your right to pray at the
22   Board meeting?
23   A.   That's my understanding, that this was a
24   document that would give us our free speech and our

Page 39

1    freedom of religion.
2    Q.   And when you used the possessive pronoun
3    our, you mean the individual --
4    A.   Ten board members.
5    Q.   Yes, okay.  And that was the purpose of
6    adopting the policy?
7    A.   Well, that was my understanding, that we
8    had to have a policy, so the policy committee came
9    up with a policy.
10   Q.   Mrs. Bunting, I can only ask the questions
11   of the person in front of me, so I'm asking in each
12   case, I'm asking for what caused you to vote for the
13   policy.  Was your purpose in voting for this policy
14   to preserve the individual rights of the individual
15   School Board members to pray at School Board
16   meetings?
17   A.   Yes.
18   Q.   Okay, and so the purpose of the policy is
19   to prevent discrimination against the individual
20   Board members in the exercise of their religion?
21   A.   Sir, I guess so, but you're a lawyer and
22   I'm not so --
23        MR. SHAW:  Can we go off the
24        record for a moment please?

Page 40

1        MR. ALLINGHAM:   No thanks.
2        MR. SHAW:  Just answer the
3    questions that he is asking you.
4    A.   Okay.  I mean --
5    Q.   Would you like to have that question read
6    back?
7    A.   Yes.
8    Q.   Could you read it back, please?
9        (WHEREUPON the reporter read
10       back the preceding question)
11   A.   I'll say yes.
12   Q.   Okay.  I have a couple of questions that go
13   back to an earlier answer.  I asked you whether
14   inertia, let's use a different word.  I asked you
15   whether the School Board's history of offering a
16   prayer at the beginning of its meetings formed any
17   part of your thinking in terms of voting for the
18   Board Prayer Policy, and I think you said it did, is
19   that correct?
20   A.   Yes, because we had always done it.
21   Q.   I have a slightly different question.  If
22   the Board had not, prior to the summer of 2004 when
23   you began considering this policy, if the Board had
24   not up to that point been offering a prayer at the

Page 41

1    beginning of its meetings, would you still have
2    supported the adoption of a policy that would offer
3    Board members the choice to offer a prayer?
4    A.   If what you are saying is, if it had not --
5    if there had been no prayer all these years?
6    Q.   Yes, ma'am.
7    A.   And then all of a sudden when I got on the
8    Board someone suggested why don't we start having a
9    prayer before we start our meetings --
10   Q.   Yes, ma'am?
11   A.   Is that what you're saying?
12   Q.   Yes, ma'am?
13   A.   Would I have supported having a prayer at
14   the beginning of the meetings?
15   Q.   Yes, ma'am?
16   A.   I don't know.
17   Q.   If you were -- if it were within your
18   control to open DSBA meetings with a prayer, would
19   you do so?
20   A.   You don't want me to be long winded, I
21   know.
22   Q.   You should answer however you like, that
23   represents your best answer to the question.
24   A.   The word represent, sir, I represent the

11 (Pages 38 to 41)

Dobrich, et al.
Nina Lou Bunting

v.

Case No. 15-120

Indian River School District, et al.
October 13, 2006

Page 42

1 community, I'm elected official, I would have to
2 know -- I would have to find out what my
3 constituency wanted me to do.
4    Q.    I understand, I think understand. I'm
5 going to come back to that in a little while. All
6 right, the right of the individual Board members to
7 exercise their faith as they see fit, that is
8 protected by Board Policy BDA.1, am I correct that
9 it is not without limits? There is to say, there
10 are limitations in the policy itself on the right of
11 Board members to exercise their religion by praying?
12    A.    I'm not sure what you mean by that
13 question.
14    Q.    Well, let me try to be clearer. In
15 paragraph three?
16    A.    All right.
17    Q.    Referring to the opportunity to open the
18 meetings with a prayer or a moment of silence,
19 paragraph three says, "Such opportunity shall not be
20 used or exploited to proselytize, advance or convert
21 anyone, or to derogate or otherwise disparage any
22 particular faith or belief."
23    A.    Okay, and your question again?
24    Q.    My question is that paragraph represents a

Page 43

1 limitation on the otherwise absolute right to
2 exercise your religion as you see fit?
3    A.    In my view, yes, sir.
4    Q.    And that was a limitation that you were
5 willing to accept?
6    A.    Absolutely.
7    Q.    And a limitation that you thought was
8 appropriate for the Board to adopt as policy?
9    A.    Of course.
10    Q.    Okay. I would like to know how, and this
11 is just exploring what those words mean, I 'd like
12 to know how you would go about identifying a prayer
13 that was a proselytizing prayer. Walk me through
14 your analysis?
15    A.    Would you please clarify the meaning?
16 Clarify the meaning?
17    Q.    Of?
18    A.    Of proselytize for me, please, your
19 meaning?
20    Q.    It's actually your understanding that's
21 important, Mrs. Bunting. When you adopted the
22 policy, voted to adopt the policy, what did you
23 understand proselytize to mean?
24    A.    I didn't understand it, advance or convert

Page 44

1 I understand. Derogate or otherwise disparage any
2 particular faith or belief, I understand, but I'm
3 not sure what the word means.
4    Q.    Did you ask anybody before you voted on the
5 policy?
6    A.    No, sir I did not.
7    Q.    How come?
8    A.    I just didn't. We trust each other on the
9 Board. We take recommendations, I'm not on this
10 committee, the committee recommended that we adopt
11 this, and I voted to adopt it. Did I know every
12 single word there, I hadn't thought about it till
13 now.
14    Q.    Do you know who drafted Board Policy BDA.1?
15    A.    I understand it was Mr. Walls was I think
16 the chairperson of the committee. I am not sure who
17 else was on his committee. I assume Donna Mitchell
18 was on his committee, but I do not know who else was
19 involved. And I am not even sure that Donna was on
20 the committee. I think she was.
21    Q.    I'm just going to walk through the process
22 quickly and make sure I understand it?
23    A.    Okay.
24    Q.    When a matter is -- when the Board

Page 45

1 concludes that a matter should be addressed with a
2 Board policy, the Board refers that matter to the
3 policy committee of the Board is that right?
4    A.    Yes, sir.
5    Q.    And then the policy committee formulates a
6 recommended policy which it brings back to the full
7 Board, correct?
8    A.    Yes, sir.
9    Q.    And is that the process that was gone
10 through for Board policy BDA.1?
11    A.    I'm sure it was.
12    Q.    So, your understanding of the source or the
13 genesis of Board Policy BDA.1 is that it came from
14 the policy committee?
15    A.    Yes, that's where it says it came from, so
16 I assume it did. They number them at the top.
17    Q.    This BDA.1?
18    A.    Uh-hum.
19    Q.    Business. Isn't that the designation for
20 where it falls in the process?
21    A.    Yeah, but if it wasn't anything that had
22 been generated in the policy committee they wouldn't
23 have numbered it.
24    Q.    Okay. When this policy was presented for

12 (Pages 42 to 45)

Case 1:05-cv-00120-JJF   Document 250-4   Filed 04/10/2008   Page 13 of 48

Dobrich, et al.                          v.          Indian River School District, et al.
Nina Lou Bunting                  Case No. 15-120                    October 13, 2006

Page 46

1  first reading at the Board, it was presented by
2  Mr. Walls, correct?
3    A.  I'm sure.
4    Q.  So, and he is the head of the policy
5  committee?
6    A.  Uh-hum.
7    Q.  So, that's the basis of your understanding
8  that the policy committee was responsible for
9  putting together this policy?
10   A.  Right.
11   Q.  And it's those people whom you would be
12 trusting as to the meaning of proselytize or
13 whatever other --
14   A.  Yes, sir.
15   Q.  -- word you didn't know?
16   A.  Yes, sir.
17   Q.  Would it surprise you to learn that the
18 policy committee did not draft this policy?
19   A.  Would it surprise me?
20   Q.  Yes.
21   A.  No, because I think something was said
22 about they had lawyer input or something into the
23 policy or something, or they had gotten it from
24 another group, or I don't know.  I really don't

Page 47

1  know.
2    Q.  So, it's possible that someone else drafted
3  this policy than the members of the policy
4  committee, you just don't know?
5    A.  No. And I would say if someone else did
6  draft the policy, our policy committee would have
7  gone over it, they wouldn't have just automatically
8  brought it to us without them having discussed it.
9    Q.  Okay.  We need to change the tape.
10   A.  Okay.
11       MS. DUPHILY: Going off the record
12    at approximate;y 1:52 p.m..
13       (WHEREUPON a brief recess was
14    taken)
15       MS. DUPHILY: We are back on the
16    record at approximately 1:59 p.m..
17   Q.  Mrs. Bunting, before we broke you told me
18 that if the Board policy was written by someone
19 other than the Board Policy Committee you were quite
20 sure that the policy committee would have reviewed
21 it and gotten comfortable that it was an appropriate
22 policy to present to the full Board, is that right?
23   A.  Yes, sir.
24   Q.  In this particular case with respect to

Page 48

1  Board Policy BDA.1, do you know whether or not the
2  policy committee did that?
3    A.  No, I don't because I don't attend policy
4  committee meetings.
5    Q.  I'd have to ask Mr. Walls about that?
6    A.  Oh, okay.
7    Q.  He would know, right?
8    A.  He would know if I were there?
9    Q.  I am sorry.
10   A.  He would know --
11   Q.  If I want to know whether the policy
12 committee --
13   A.  Oh, yeah, right, please.
14   Q.  We were looking at paragraph three of the
15 Board Policy, and I am going to skip over the
16 proselytizing part, but I am going to ask you about
17 the advance or convert anyone or to derogate or
18 otherwise disparage any particular faith or belief.
19 Would describe for me how you as a Board member
20 would make the decision whether a particular prayer
21 advanced -- sought to advance or convert anyone or
22 to derogate or otherwise disparage any particular
23 faith or belief?
24   A.  How I would do it?

Page 49

1    Q.  How would you go about analyzing?
2    A.  Making sure that we didn't do that, you
3  mean?
4    Q.  Yes, ma'am?
5    A.  Well, I know when I give the prayer it is
6  just talking about our staff and students, and about
7  our own decision making.  It does not involve
8  anything or anybody else.
9    Q.  Maybe a better way to go about it would be
10 to give you some examples of prayers and ask you
11 whether you think those prayers would violate
12 paragraph three of the limitations --
13   A.  Okay.
14   Q.  -- that are in there.  So, I'm going to
15 show you, I'm going to show you two prayers and the
16 third one is short and I think I can just read it
17 into the record for you.  Your counsel is getting
18 PX35. I
19       I'm going to read it, Mrs. Bunting, but it
20 might help you to follow along as I read?
21   A.  Okay.
22   Q.  "Do not put your trust in princes, in
23 mortal men who cannot even save themselves.  When
24 their spirit departs they return to the ground.  On

13 (Pages 46 to 49)

Dobrich, et al.                               v.                    Indian River School District, et al.
Nina Lou Bunting                    Case No. 15-120                          October 13, 2006

Page 50

1   that very day their plans come to nothing. Blessed
2   is he whose help is the God of Jacob, whose hope is
3   in the Lord his God the maker of heaven and earth,
4   the sea and everything in them. The Lord who
5   remains faithful forever.
6        He upholds the cause of the oppressed and
7   gives food to the hungry. The Lord sets prisoners
8   free. The Lord gives sight to the blind. The Lord
9   lifts up those who are bowed down. The Lord loves
10  the righteous. The Lord watches over the alien and
11  sustains the fatherless and the widow, but he
12  frustrates the ways of the wicked. For the wages of
13  sin is death, but the gift of God is eternal life
14  through Jesus Christ our Lord."
15       If one of your colleagues gave that prayer
16  in response to Mr. Bireley's offer of the
17  opportunity to do so, would you believe that that
18  prayer is permitted by paragraph three or prohibited
19  by paragraph three?
20  **A.   Let me look at paragraph three again. I**
21  **think it would depend, sir, and I'm not trying to be**
22  **evasive. I think it would depend on whether or not**
23  **our Board member actually wrote this prayer, or**
24  **whether they were giving one that had already been**

Page 51

1   **written.**
2        **I know Dr. Hattier likes to give prayers by**
3   **famous people. So, if one of our Board members were**
4   **quoting some famous prayer then I would feel that it**
5   **would be appropriate in that way. Are you asking**
6   **me, you are not asking me would I give this?**
7   Q.   No, I asked you whether if one of your
8   colleagues gave this would you say to yourself, gee
9   I don't think that's permissible under paragraph
10  three of our policy, or would your conclude that it
11  was okay under the policy?
12  **A.   I would say that I would wish they didn't**
13  **give it, if they had written it.**
14  Q.   And why is that?
15  **A.   Because I think it's a bit sermonizing, but**
16  **if they were quoting something that historically had**
17  **been said publicly before, like one of our**
18  **presidents or something, somebody like that, then --**
19  **and it was not of their authorship, then I would be**
20  **okay with it.**
21  Q.   That's helpful, that's a good explanation
22  of how you'd go about it. If -- there may be a
23  third possibility which is that the Board member
24  didn't write it, it was not a historical prayer such

Page 52

1   as Dr. Hattier sometimes gives. Let me step back.
2   Dr. Hattier sometimes has given a prayer that George
3   Washington gave, for example?
4   **A.   Yes.**
5   Q.   You already testified that when you offer
6   your prayer you offer a prayer in your own words and
7   you just address the decisions that you have to make
8   that night and the personnel of the district and the
9   students, I guess, right?
10       This one is not, in my question to you,
11  this one is not the words of the Board member, your
12  colleague, it is not a historical prayer of George
13  Washington or some other historical figure, it is
14  taken from scripture, it is specifically taken from
15  Psalms and Romans of the King James Bible.
16  **A.   Okay.**
17  Q.   So, my question to you is, with that
18  additional information would you view this as
19  sermonizing or would you view it as perfectly okay
20  under paragraph three?
21  **A.   Under paragraph three, at a Board meeting,**
22  **among the ten of us I would not expect anyone to**
23  **give this type of prayer, okay?**
24  Q.   Yes, ma'am?

Page 53

1   **A.   Now, are you asking me if I think it would**
2   **be okay for them to?**
3   Q.   I am going to do it in two pieces, okay?
4   The first piece which you have just given me is that
5   you would not expect anyone to give this type of
6   prayer?
7   **A.   No.**
8   Q.   And is the reason why you would expect that
9   this prayer would not be given because you view it,
10  it's content as sermonizing?
11  **A.   Well, it's not just that I view it as**
12  **sermonizing, I view it as not dealing with what we**
13  **have at had as a Board.**
14  Q.   Yes, ma'am.
15  **A.   Okay.**
16  Q.   Not relevant?
17  **A.   Not relevant to our decision making for the**
18  **evening's, you know, meeting.**
19  Q.   And just to tie that loop, in your prayers
20  you try to link up the prayer to the decisions that
21  you are actually going to have to make?
22  **A.   Yes.**
23  Q.   Okay. Now, let me go to the second
24  question which you started to think about.

14 (Pages 50 to 53)

Dobrich, et al.                          v.                Indian River School District, et al.
Nina Lou Bunting                    Case No. 15-120                 October 13, 2006

Page 54

1  Accepting that you would not expect any of your
2  colleagues to offer this prayer for the reasons that
3  you've given, if they did so, would you think that
4  it would violate paragraph three of your policy?
5    A.   I'm going to say possibly, without, you
6  know, getting into it, every sentence, every word
7  every -- possibly it could.
8    Q.   Can you describe for me how you arrived at
9  that conclusion, and I know it's a tentative
10  conclusion?
11    A.   Well, again it just talking generally about
12  what the Lord does for all of us, or for those who
13  believe. Again the reason being it doesn't have
14  anything to do with what we're doing that night in
15  our decision making. I think it's more that it's
16  not appropriate.
17    Q.   And is your view that paragraph three is
18  intended to capture that notion of what's
19  appropriate and what's not appropriate for your
20  decision making process?
21    A.   I think paragraph three is to make sure
22  that we are not being evangelists, that we are not
23  being like when you would go to a revival or
24  something, that we are not, we are not preaching. I

Page 55

1  think that's what paragraph three means, which is
2  not our intent.
3    Q.   Okay. And in looking at the prayer I've
4  given which is marked as Plaintiff's Exhibit 35, do
5  you think that this prayer is preachy or evangelical
6  or sermonizing in a way that would be prohibited by
7  paragraph three?
8    A.   I think more so inappropriate. I guess
9  technically, yes.
10    Q.   Okay. I'm going to give you, I'm actually
11  going to ready you a second prayer?
12    A.   Okay.
13    Q.   Assuming I can find it. While I'm looking
14  I will give you a second prayer, okay?
15    A.   Okay.
16    Q.   This is PX45. I'm going to read, you
17  should follow along --
18    A.   Okay.
19    Q.   -- with it. "Heavenly Father thank you for
20  this great occasion. For the work, the effort, the
21  joys and everything that led up to this point in
22  time. Thank you for your guidance in this event.
23  We pray for your direction in the lives of each of
24  these School Board members. We pray that you direct

Page 56

1  them into the truth, and eventually the truth that
2  comes by knowing Jesus. We also pray that you would
3  be with them at this time. We ask these things in
4  Jesus' name. Amen."
5    As a School Board member would you view
6  this prayer as violative of paragraph three of your
7  policy?
8    A.   Let me say I would sit on the fence with
9  this one. As far as a prayer among the ten of us I
10  think it's appropriate. I'm speaking about the one
11  sentence, "We pray that you direct them into the
12  truth, and eventually the truth that comes by
13  knowing Jesus." I'm sure some people might think
14  that that is a bit preachy. Does it offend me, no
15  because we are ten people, and when we pray it's
16  among the ten of us, and there is no reason for it
17  to be viewed or seen or anything by anyone else
18  unless they choose to.
19    Q.   I see. The way you look at the prayer that
20  is offered by the person, the Board member who is
21  invited by Mr. Bireley, is that it's prayer among
22  the ten of you?
23    A.   Yes.
24    Q.   Is there any reason why that prayer among

Page 57

1  the ten of you couldn't be had in the wings of the
2  stage as opposed to on the stage in the public
3  meeting?
4    A.   Yes sir, I'm sure it could be.
5    Q.   You could solemnize the occasion just as
6  well by saying the prayer off stage as on stage?
7    A.   I personally feel we could, again we
8  represent the community.
9    Q.   Yes, ma'am and I promise you I will come to
10  that point. But I'm asking you now for your view as
11  a Board member?
12    A.   My view as a Board member this could be
13  done at the beginning of the meeting and we could
14  let people know that if they don't choose to come in
15  they don't -- well, they know that anyway, they
16  don't have to come in if they are offended by it.
17    Q.   You could solemnize the proceedings by
18  simply just before you walk onto the stage having
19  your prayer among the ten of you in the wings of the
20  stage, couldn't you?
21    A.   Yes, because you can pray at any time
22  anywhere.
23    Q.   Mr. Helms and I had a long philosophical
24  discussion about that today. Was there any

15 (Pages 54 to 57)

Dobrich, et al.                          v.              Indian River School District, et al.
Nina Lou Bunting                  Case No. 15-120                  October 13, 2006

Page 58

1  discussion at any time at the Board level, during
2  the consideration and then the adoption of Board
3  Policy BDA.1, was there any discussion by any Board
4  member of whether you could accomplish your goals in
5  this policy by simply praying off stage?
6    A.  I don't recall any formal discussion. I do
7  feel that there could have been discussion among
8  Board members you know, at other times.
9    Q.  Outside of Board meetings?
10   A.  Outside of Board meetings.
11   Q.  Were those discussion to which you were a
12 party?
13   A.  Well, you know it's casual things, it's
14 walking in or walking out, and people, you know,
15 talking to each other briefly about this or that. I
16 don't recall anything formal.
17   Q.  Okay, so on the formal side at the meetings
18 you don't recall any such discussion?
19   A.  No.
20   Q.  Do you recall any such discussion
21 informally?
22   A.  I think I at one point made the suggestion
23 and I don't recall to whom.
24   Q.  Do you remember --

Page 59

1    A.  That I'm wondering if we could consider
2  something like this, but this was way back in the
3  very beginning of the whole situation.
4    Q.  This situation, this issue was originally
5  triggered by Mrs. Dobrich's complaint about the
6  graduation prayer?
7    A.  Yes, sir.
8    Q.  So, am I right that that informal
9  discussion that you recall would have taken place
10 shortly after the complaint came from Mrs. Dobrich
11 about the graduation prayer?
12   A.  I'm sure because we were doing everything
13 that we knew to do to appease.
14   Q.  To appease Mrs. Dobrich?
15   A.  Yes, at that time.
16   Q.  And so you made a suggestion maybe we could
17 pray?
18   A.  I don't -- I'm not saying I made a
19 suggestion. I'm saying I may have said this to
20 someone, and to be quite honest with you I'm not
21 even sure if it was even a Board member, it could
22 have been a member of my family.
23   Q.  Okay. Without characterizing it as a
24 suggestion, it occurred to you --

Page 60

1    A.  It occurred to me in my mind.
2    Q.  That a solution to this problem might be --
3    A.  Might be possible.
4    Q.  And let me finish, and that solution might
5  be to have the Board members pray privately before
6  the commencement of the Board meeting?
7    A.  It did occur to me.
8    Q.  And now I just want to ask you personally,
9  for you personally would a prayer before the public
10 Board meeting commenced be sufficient to ask God for
11 guidance during that meeting?
12   A.  It would be as long as I did not have the
13 feeling that my rights have been diminished.
14   Q.  Let me see if I understand you. To pray
15 privately right before the Board meeting, would be
16 effective in your view to invoke God's guidance for
17 the decisions that you would be making during the
18 meeting, but if you were told that you had to pray
19 privately and that you could not pray during the
20 public meeting, that would be offensive to you?
21   A.  That would be.
22   Q.  Okay. So, the private prayer would be
23 effective to get God's guidance, but if you were
24 forced to do that that would be offensive?

Page 61

1    A.  Yes.
2    Q.  And when it occurred to you that maybe you
3  could solve this problem by praying privately, that
4  was a solution in your mind because that would be an
5  idea that came from you, and it wasn't dictated by
6  somebody else?
7    A.  I don't know that it was a solution in my
8  mind. It was something that could be maybe talked
9  about and dealt with and maybe it was an answer or
10 part of an answer or, you know, something to think
11 about or whatever.
12   Q.  All right, let me give you the third
13 prayer.
14   A.  Okay.
15   Q.  "Allah, we offer you our school bus
16 drivers, we offer you our superintendent, our
17 administrators and our secretaries. We offer you
18 our teachers and our parents. Finally, we offer you
19 our students. Peace be unto your prophet Muhammad.
20   A.  Okay, and your question is?
21   Q.  My question is do you believe that if one
22 of your colleagues gave that prayer that it would
23 violate paragraph three of the policy?
24   A.  No.

16 (Pages 58 to 61)

Dobrich, et al.                                    v.                Indian River School District, et al.
Nina Lou Bunting                          Case No. 15-120                        October 13, 2006

Page 62

1    Q.    In the period from 2002 to October 2004,
2    that's the period when you were on the Board prior
3    to the adoption of the Board Policy BDA.1, okay?
4    A.    Okay.
5    Q.    You have the period in mind?
6    A.    Yes.
7    Q.    Did the president of the Board -- how did
8    the president of the Board cause a prayer to be
9    offered. Did he just invite somebody to offer a
10   prayer?
11   A.    Normally it was understood that if we were
12   at the southern end of the district Mr. Helms gave
13   the prayer, and if we were at the northern end of
14   the district Mr. Evans gave the prayer because these
15   gentlemen were comfortable with praying out loud.
16   That's my understanding.
17   Q.    Okay.
18   A.    Like I said I didn't come on the Board
19   until 2002, and that's the way it was being done
20   when I came on.
21   Q.    And did you develop the understanding that
22   some of the other eight Board members were not
23   comfortable praying out loud?
24   A.    I really didn't pay any attention to why it

Page 63

1    was that way. I just assumed, you know, that's the
2    way it was.
3    Q.    Okay. In the period 2002 to October 2004
4    did the Board president read or speak any disclaimer
5    before the prayer was offered?
6    A.    No. No, I don't think so.
7    Q.    In the period after October 19, 2004 has
8    the Board president read or spoken a disclaimer
9    before the prayer is offered?
10   A.    Since this all came about?
11   Q.    Yes, ma'am.
12   A.    Then that's when we started having the
13   disclaimer.
14   Q.    Okay. We don't have a copy of the
15   disclaimer that's read?
16   A.    Okay.
17   Q.    But we do have some testimony about it.
18   Mr. Bireley has said that he has a piece of paper
19   that he takes to the meetings?
20   A.    He does.
21   Q.    So, you have seen the piece of paper?
22   A.    Well, I've seen him reading something.
23   Q.    But he said, he was helpful, he said look I
24   think what's on my piece of paper is paragraph one

Page 64

1    and paragraph four of the policy?
2    A.    Yes, I think he's right.
3    Q.    Okay.
4    A.    Because I thought that looked awfully
5    familiar.
6    Q.    All right. Now, you said a little earlier
7    that everybody knows that they can leave the meeting
8    if they want to, if they don't want to hear the
9    prayer, okay?
10   A.    Uh-hum.
11   Q.    I'm going to read the disclaimer and tell
12   me if I read it about the way Mr. Bireley reads it.
13   I'm going to read paragraph one and paragraph four.
14   A.    Okay.
15   Q.    "In order to solemnify its proceedings the
16   Board of Education may choose to open its meetings
17   with a prayer or moment of silence, all in accord
18   with the freedom on conscience of the individual
19   adult Board member. Such opportunity shall not be
20   used or exploited to proselytize, advance or convert
21   anyone, or to derogate or otherwise disparage any
22   particular faith or belief, " Mrs. Bunting?
23   A.    Uh-hum.
24   Q.    Is that basically the way Mr. Bireley reads

Page 65

1    the disclaimer?
2    A.    He doesn't usually read number three.
3    Q.    I didn't read number three either. Oh, I'm
4    sorry, I did. You were right, I was wrong. I'm
5    going to try it again, okay?
6          "In order to solemnify its proceedings, the
7    Board of Education may choose to open its meetings
8    with a prayer or moment of silence, all in accord
9    with the freedom of conscience of the individual
10   adult Board member. Such prayer is voluntary, and
11   it is among only the adult members of the Board. No
12   school employee, student in attendance, or member of
13   the community in attendance shall be required to
14   participate in any such prayer or moment of
15   silence." And then he would call on one of the
16   Board members, right?
17   A.    Yeah, that's pretty much it.
18   Q.    Okay. I will represent to you, Mrs.
19   Bunting, that it took me 20 seconds to read that
20   disclaimer?
21   A.    Okay.
22   Q.    Do you think that a member of the audience
23   could get up and leave the auditorium in that 20
24   second period before a Board member begins his

17 (Pages 62 to 65)

Dobrich, et al.
Nina Lou Bunting

v.
Case No. 15-120

Indian River School District, et al.
October 13, 2006

Page 66

1  prayer?
2     A.   Could they get up and leave? They could
3  get up and be on their way out, I don't know that
4  they'd be all the way out.
5     Q.   At what point in that disclaimer do you
6  think that a person in attendance would understand
7  that if they want to leave they had better leave, if
8  they want not to hear the prayer they had better
9  leave?
10    A.   Whey they say open its meetings with a
11  prayer.
12    Q.   Okay. How do you think -- do you think it
13  would take some courage for someone in response to
14  the disclaimer to stand up and leave a Board meeting
15  of the Indian River School District?
16    A.   Courage is something that I don't know how
17  to explain courage.  Some of us older individuals
18  seem to be able to do things that younger people
19  wouldn't do, is that what you're saying?
20    Q.   No.
21    A.   I mean courage to stand up and leave, it
22  wouldn't take me -- it wouldn't take much courage
23  for me to stand up and leave if something were not
24  going my way.

Page 67

1     Q.   Do you think that a person who indicates
2  his unwillingness to listen to a prayer to open the
3  meetings might be fearful that he would be subject
4  to intimidation or recriminations from the
5  community?
6     A.   I feel a person that felt that strongly
7  about it that wanted to leave when that occurred
8  would probably be the kind of person that no would
9  not be fearful in getting up and leaving, if they
10  had such conviction.
11    Q.   Do you think Mrs. Dobrich is a person with
12  such conviction?
13    A.   I think Mrs. Dobrich is the type of person,
14  from what I've seen, that she had the conviction to
15  come and state her case and all.  I think that she
16  would be the type that yes would be willing to get
17  up and leave and not listen to the prayer.
18    Q.   And what is your understanding of the
19  community's reaction to Mrs. Dobrich after she
20  exercised the courage of her convictions?
21    A.   What is my understanding of what the
22  community did?
23    Q.   Yes.
24    A.   I don't know that the community did

Page 68

1  anything.
2     Q.   Do you know whether Mrs. Dobrich received
3  hundreds of anonymous phone calls?
4     A.   No, sir, I have no knowledge of any of
5  that.
6     Q.   We've already been through the August 24th
7  public comment?
8     A.   Uh-huh.
9     Q.   Do you know whether Mrs. Dobrich was
10  harassed in any way?
11    A.   The only time I saw Mrs. Dobrich was that
12  evening because I think I missed the first time she
13  came to the Board.  I can't recall why I missed it,
14  but I don't think I was there the first time she
15  came to the Board.  I was there the evening when all
16  the other people showed up, and I saw Mrs. Dobrich
17  one other time when I went to Wilmington when we
18  were asked to come up.
19    Q.   Yes, ma'am.
20    A.   So they're the only two times that I know
21  of that I saw Mrs. Dobrich.  And I have -- no one
22  told me that she had received phone calls or
23  letters, so I have no knowledge of that.
24    Q.   I'm going to represent to you that she did,

Page 69

1  would that surprise you?
2     A.   No, it wouldn't surprise me.
3     Q.   Would you imagine that the community as a
4  whole in the Indian River School District would be
5  tolerant of someone, who exercising the courage of
6  her convictions, walked out of the meeting in
7  response to the disclaimer?
8     A.   What would be their response?
9     Q.   Yes.
10    A.   I don't think they would be anymore upset
11  at her walking out, than they would be at her
12  talking to the Board, is that what you mean?
13    Q.   That's helpful, but let me then ask the
14  predicate question.  Did you understand that there
15  were significant elements of the community who were
16  very upset at Mrs. Dobrich's comments to the Board?
17    A.   Well, it was obvious at the meeting that
18  there were -- that the people were there to -- our
19  understanding, and we didn't know anything until
20  maybe two or three days before our Board meeting,
21  when hearsay had it that people were coming to the
22  Board meeting.
23       Did we know how many, no.  I was on my way
24  to the Board meeting when I heard a radio announcer

18 (Pages 66 to 69)

Page 70

1  telling everyone where the meeting was. I had no
2  idea of the number of people involved until I drove
3  to the meeting. That was my first indication. I
4  was surprised when I got there as I said that there
5  were so many people, because we hardly ever have
6  that many people at Board meetings.
7      Q.  You never have that many people Board
8  meetings?
9      A.  I don't think we've ever had that many.
10 So, and was the community upset, I've lived in this
11 community was upset. I've lived in this community a
12 long time. This is not a group of vigilantes in
13 this community. People are very nice people here,
14 and -- well Mona had lived here her life, too --
15     Q.  Yes, ma'am?
16     A.  So, she knows that there were nice people
17 in this community.
18     Q.  Do you know where she lives now?
19     A.  Yes, I've heard she lives in Philadelphia.
20     Q.  No.
21     A.  No.
22     Q.  Does she live in Sussex County?
23     A.  Oh, I know she doesn't live in Sussex
24 County. I think her husband lives in Sussex County.

Page 71

1      Q.  Do you Know why Mrs. Dobrich no longer
2  lives in Sussex County?
3      A.  We heard that she moved, I heard
4  Philadelphia. We heard she moved to Philadelphia to
5  put her son in a private school or something up in
6  Philadelphia. That's what I heard.
7      Q.  Who did you hear that from?
8      A.  Hmm, I don't know, I don't know, hearsay.
9      Q.  If a person got up an walked out during the
10 disclaimer how would they know when to come back in?
11     A.  Well, I think we have a Board agenda, don't
12 we, that tells you what's next.
13     Q.  Sure. How would they know when the prayer
14 was over?
15     A.  Well, I guess they could look through the
16 door.
17     Q.  When you said in a response to an earlier
18 question that you thought that maybe older people
19 had a different view of courage than younger people,
20 did you mean that it might be harder for a student
21 to get up and walk out than it would be for an
22 adult?
23     A.  No, I think kids are very brazen anymore.
24 I don't think kids these days are afraid of too

Page 72

1  much. I'm thinking about like a young adult maybe,
2  you know when you're a young adult you're not sure
3  whether you're doing the right thing or whatever.
4      Q.  So, a person in that age category might be
5  reluctant --
6      A.  I just know personally when I was a younger
7  person, and especially as a school teacher, I was
8  very well aware of how I was acting in public and
9  what I was doing. That wouldn't make me, give a
10 negative opinion of me.
11         Now that I'm older, and I hope wiser, and I
12 really am not so concerned about what other people
13 think of me as I once did, that's what I mean.
14     Q.  So, when I asked the question earlier,
15 maybe I didn't really phrase it correctly. When I
16 said do you think it would take some courage to walk
17 out of the meeting, in response to the disclaimer,
18 let me ask a little bit different question. Do you
19 think that people in the audience, the public, might
20 be concerned about what the community would think of
21 them if they got up and walked out of the meeting in
22 response to the disclaimer?
23     A.  Again, that would be the person and like I
24 said there are usually not that many people there to

Page 73

1  worry about anyway, you know? I don't know,
2  personally if something bothered me I'd get up and
3  leave, that's me. Whether someone else would feel
4  that way, I don't know.
5      Q.  Let me explore the number of people at the
6  meetings. The reports have been that at that August
7  24th meeting there were 7 or 800 people?
8      A.  Uh-huh.
9      Q.  The crowd overflowed the room in which you
10 and your colleagues were sitting?
11     A.  Uh-hum.
12     Q.  And there was an entire other room set
13 up --
14     A.  Uh-hum.
15     Q.  -- with a video feed?
16     A.  Right.
17     Q.  And there were speakers set up in the
18 parking lot, do you remember that?
19     A.  I didn't know there were speakers in the
20 parking lot.
21     Q.  That's what we understand, I don't know.
22 And as you said, that was not a typical meeting,
23 correct?
24     A.  No.

19 (Pages 70 to 73)

Dobrich, et al.
Nina Lou Bunting

v.

Case No. 15-120

Indian River School District, et al.
October 13, 2006

Page 74

1  Q.  On the other hand, particularly during the
2  school year, there are, there is a significant
3  number of people at School Board meetings, correct?
4  **A.  Uh-hum.**
5  Q.  Because you have members of the public who
6  are interested in various issues that would be on
7  the agenda, you have anywhere from a dozen to 50 or
8  so students getting awards or recognition for some
9  achievements during the school year, correct?
10  **A.  On occasion.**
11  Q.  Yes.  When you say on occasion, pretty much
12  every meeting during the school year you have
13  students getting recognition, don't you?
14  **A.  Well, you have them like at the end of**
15  **football season or maybe at the end of baseball**
16  **season, you know, athletes coming in.  A lot of**
17  **times they are still in their athletic garb, you**
18  **know and they are just running in to grab it or**
19  **whatever.**
20  **I wouldn't say every meeting, but probably**
21  **more than half of them, maybe.**
22  Q.  It's not just limited to athl --
23  **A.  Guesstimate.**
24  Q.  But it's not just limited to athletes,

Page 75

1  right?
2  **A.  Oh, no it's academic as well, but again the**
3  **academic wouldn't be as much because they would be**
4  **awarded maybe Odyssey of the Mind, that would be at**
5  **the end of the year.  We don't bring in kids just**
6  **because they got As on their report cards or stuff**
7  **like that. It's usually something major.**
8  Q.  I've read the minutes?
9  **A.  Uh-huh.**
10  Q.  And I've seen recognition being given to
11  kids for being in the Fifth Grade Yell Club, I've
12  seen recognition -- I can show you the minutes, if
13  you like?
14  **A.  Fifth Grade Yell Club?**
15  Q.  Yes, ma'am?
16  **A.  Lately?**
17  Q.  Within the last five years?
18  **A.  Fifth Grade Yell Club, well did they win a**
19  **competition?**
20  Q.  I don't know.
21  **A.  Well, they would have had to have won a**
22  **competition.**
23  Q.  Okay.  In addition to the awards that
24  students get the JROTC, the Junior ROTC presents the

Page 76

1  colors at every meeting during the school year?
2  **A.  Yes, they do.**
3  Q.  Don't they?
4  **A.  Uh-hum.**
5  Q.  And you also get performing groups,
6  students who are bands of the steel band or chorus
7  groups who occasionally perform for the Board?
8  **A.  I think the steel band performed because**
9  **they wanted permission to go on their trip down in**
10  **South America somewhere.  They did perform for us,**
11  **yes.**
12  Q.  So, to come back to my original question,
13  clearly at a regular Board meeting has many fewer
14  people than you had on August 24th, but can we agree
15  that you routinely have ten, 20, 30, 40, 50 people
16  other than yourselves at the Board meetings?
17  **A.  I would say more than half of the time we**
18  **probably have between 20 and 50 people.**
19  Q.  Okay?
20  **A.  More than half of the time.  Last meeting**
21  **there was just us pretty much.**
22  Q.  And of those people that you just tried to
23  estimate, would more than half of them be students
24  on a typical basis?

Page 77

1  **A.  No, it would be like you say when the**
2  **students come it seems like they come, we have a lot**
3  **of them at one time.  It would be our supervisors,**
4  **some of our secretaries, our people who there was a**
5  **particular thing that they were interested in seeing**
6  **that it got done and they were there to get support**
7  **for whatever might be on the agenda for certain**
8  **things and then they leave when their thing is over.**
9  **They get up and out the door they go.  So, there are**
10  **people getting up and going out, coming back in all**
11  **the time.**
12  Q.  But the prayer is offered at the opening of
13  the meeting?
14  **A.  It's offered at the opening.  I don't think**
15  **it's right at very -- I'm not sure.**
16  Q.  Would you agree with me that students who
17  are invited to the Board meetings feel as though
18  they ought to attend if they can?
19  **A.  I think that if you consider it quite an**
20  **honor, and you want to be honored in front of**
21  **people, and you want people to see you receive your**
22  **honor, then you would probably want to attend, but**
23  **does it mean that they get it anyway, of course they**
24  **do.  They get their honor anyway.**

20 (Pages 74 to 77)

Dobrich, et al.                                    v.                    Indian River School District, et al.
Nina Lou Bunting                        Case No. 15-120                        October 13, 2006

Page 78

1      I think it works into their schedule. Like
2  I said some of our sports people can't make it, or
3  they just call out the names of people who are
4  there.
5      Q.   I'm sorry, but I think you told me off the
6  record that you taught for 37 years?
7      A.   39.
8      Q.   39 years. In your experience with students
9  most of them want to receive their awards in public,
10 don't they?
11     A.   I don't know. I would assume they do, but
12 you know, I don't -- kids these days it's hard to
13 get them to show up for much of anything, unless
14 it's playing ball.
15     Q.   That's kind of discouraging commentary.
16     A.   I know, and I don't mean to be like that,
17 but I was just talking about it last night, as a
18 school teacher when Easter vacation is over and they
19 come back and they started Little League and now
20 they start it in March, parents don't want them to
21 have homework, parents don't want anything because
22 everything is ball.
23         So, it gets a little discouraging as a
24 teacher when you try to award people for academics

Page 79

1  and that sort of thing. It seems like a lot of the
2  kids just want to be rewarded for whatever sport
3  they play, or whatever. That's just my personal
4  opinion.
5      Q.   Yes, ma'am. In the stack in front of you
6  is a document that has a sticker that says PX34.
7  First page of that exhibit Mrs. Bunting is
8  handwritten, it's Mr. Helms' handwriting?
9      A.   Okay.
10     Q.   And he testified that he faxed this package
11 to Mr. Walls on September 2nd --
12     A.   Of this.
13     Q.   Do you see the fax line at the top, of
14 2004?
15     A.   Okay.
16     Q.   And the next five pages is a document that
17 Mr. Helms received from the Rutherford Institute,
18 maybe through Mr. Neuberger as a representative of
19 the Rutherford Institute, which Mr. Helms wanted to
20 transmit to Mr. Walls as the president of the Board?
21     A.   Okay.
22     Q.   My first question to you is have you ever
23 seen that five page attachment?
24     A.   No, sir.

Page 80

1      Q.   So, it was never -- a copy of it was never
2  given to you as a Board member?
3      A.   I'm not going to say it was never given to
4  me, but if it was I don't recall it being given to
5  me. I do not have a very good memory, and I don't
6  say things, so I don't know. I'm going to say I
7  just don't, I don't know if I've seen it or not, I
8  could have.
9      Q.   Can we agree that you don't, as you sit
10 here today, recall ever having seen it?
11     A.   As we sit here today I don't recall having
12 seen it.
13     Q.   I told you earlier that Board Policy BDA.1
14 had been drafted by someone other than the policy
15 committee?
16     A.   Okay.
17     Q.   If you look at page four and five of the
18 attachments, PX34, you'll see down at the bottom
19 there is numbered paragraphs one, two, three, and at
20 the top of the next page is paragraphs four and
21 five?
22     A.   Yes, sir I see it.
23     Q.   I will represent to you that those
24 paragraphs are essentially verbatim to the

Page 81

1  paragraphs of the Board Policy BDA.1?
2      A.   Uh-hum.
3      Q.   And that is among other reasons, the reason
4  for my statement to you that the Board policy was
5  drafted by someone other than the policy committee?
6      A.   Okay.
7      Q.   Because that document before you was
8  prepared by the Rutherford Institute.
9      A.   Okay.
10     Q.   My question to you is, do you recall that
11 anyone told you that the policy that was presented
12 to you for approval had been drafted by the
13 Rutherford Institute and remained unchanged by the
14 policy committee?
15     A.   Again, when reports are brought to the full
16 Board --
17     Q.   Yes, ma'am?
18     A.   We don't get every -- see, we have to
19 report back at the regular Board meetings. Like
20 Tuesday night I'll go and report back about the one
21 I'm the chairperson of and what occurred. To my
22 knowledge I don't recall any in-depth conversation
23 about where the policy came from. But, somehow I
24 had the idea that there had been some lawyer input

21 (Pages 78 to 81)

Dobrich, et al.
Nina Lou Bunting

v.

Case No. 15-120

Indian River School District, et al.
October 13, 2006

Page 82

1  into the policy, so that we could be sure that we
2  were not violating anything, okay?
3  Q.    Yup.
4  A.    In our attempt to do right.
5  Q.    Yup. I'm going to ask you, or ask the
6  court reporter to hand you Plaintiff's Exhibit 14
7  and Plaintiff's Exhibit 13.
8        We're going to start with 14, Mrs. Bunting.
9  A.    Okay.
10  Q.    You'll see that this document is a copy of
11  the minutes, the agenda, and the roll call sheet of
12  the Board's special meeting of August 23, 2004?
13  A.    Okay.
14  Q.    Do you see that?
15  A.    Yup.
16  Q.    And you'll see Mrs. Hobbs' signature is at
17  the bottom of the second page indicating that those
18  are the official minutes --
19  A.    Uh-hum.
20  Q.    -- is that correct?
21  A.    Okay.
22  Q.    When you say okay, is that correct?
23  A.    That's correct.
24  Q.    Yes, ma'am.

Page 83

1  A.    I see her name.
2  Q.    This was a special meeting of the Board, do
3  you recall why it was called?
4  A.    Let me see what we say here. Okay, from
5  our minutes it says to get advice from our legal
6  counsel.
7  Q.    And am I correct in thinking that the
8  entire meeting was devoted to getting advice from
9  your legal counsel?
10  A.    I assume so, because it wasn't the entire
11  meeting because we have -- oh, I don't know, I
12  don't know what 05-01 PL is.
13  Q.    We've had testimony during this week that
14  that is this litigation?
15  A.    Oh, that's this?
16  Q.    Yes.
17  A.    Okay.
18  Q.    It's actually potential litigation is what
19  PL means?
20  A.    Okay, potential litigation. Well, see, we
21  have several in our district.
22  Q.    I don't know that.
23  A.    Okay, then that apparently is what it was
24  about.

Page 84

1  Q.    Okay. Now, you see that the meeting was
2  called to order at 7 o'clock and you went into
3  executive session at 7:01?
4  A.    Okay.
5  Q.    Called to order at 7 and then halfway down
6  you'll see 7:01 under executive session?
7  A.    Okay.
8  Q.    Am I correct in assuming that there was no
9  prayer offered at this meeting?
10  A.    If it's not on here, then no.
11  Q.    And that's in part because the Indian River
12  School District has a historical practice of not
13  offering a prayer to open special meetings, is that
14  correct?
15  A.    I guess. I've never known it to be at a
16  special meeting since I've been on.
17  Q.    Since 2002, anyway?
18  A.    Right.
19  Q.    From your perspective as a Board member is
20  there any distinction between a special meeting and
21  a regular meeting that would explain why you offer
22  prayers at the regular meeting but not offer prayers
23  at the special meeting?
24  A.    I can't say that the distinction is that

Page 85

1  it's not a regular meeting, number one that might be
2  the distinction. Normally, not always, but normally
3  at a special meeting we are not voting on things.
4  Now, sometimes we do. It depends on if it's like
5  were interviewing personnel. But normally at a
6  special meeting we are getting recommendations as a
7  committee, a lot of times, or whatever, to take to
8  the regular Board meeting.
9  Q.    That testimony is actually very helpful.
10  While it is normally true that you don't take action
11  at special meetings and will except --
12  A.    Normally true.
13  Q.    There are certainly special meetings where
14  you do that action, isn't that right?
15  A.    Well, there would be like hiring personnel.
16  Q.    Sure. And in fact on these minutes of
17  August 23 you'll see that no action was taken
18  regarding number 05-01 PL, but I presume that that
19  means that consideration was given to taking action
20  and you decided not to take action at that time,
21  correct?
22  A.    We do consider things and get an idea of
23  where we're going to go, but we don't actually vote.
24  Q.    Would I be right in understanding that at

22 (Pages 82 to 85)

Dobrich, et al.                              v.              Indian River School District, et al.
Nina Lou Bunting                    Case No. 15-120                   October 13, 2006

Page 86

1   special meetings, just as at regular meetings, it's
2   your view that it would be helpful to have divine
3   guidance to help you with the consideration of
4   matters that come up at those meetings?
5   A.   Would it be helpful to me?
6   Q.   Yes, ma'am.
7   A.   Personally?
8   Q.   Yes, ma'am?
9   A.   It possibly could.
10  Q.   And when you have offered prayers at the
11  regular Board meetings since the adoption of the
12  policy, it's been your hope that you could -- you're
13  asking for divine guidance for your deliberations
14  during that meeting, aren't you?
15  A.   I'm asking for divine guidance during that
16  meeting, yes, sir, yes.
17  Q.   For the matters that you're deliberating on
18  and considering at that meeting?
19  A.   Yes, sir.
20  Q.   Yes, ma'am.
21  A.   Uh-hum.
22  Q.   Now, so, one possible distinction between
23  special meetings and regular meetings that you've
24  articulated is just definitional, one is a special

Page 87

1   meeting and one's a regular meeting?
2   A.   Right.
3   Q.   A second one is that you, although you take
4   action at both kinds of meetings, you tend to make
5   more action at the regular meetings than at the
6   special meetings?
7   A.   Well, we do take action at the regular
8   meetings and most of the time we do not take action
9   at the other meetings, most of the time.
10  Q.   In both cases you get advice, deliberate
11  and consider matters, is that correct?
12  A.   Yes, we do in both, yes.
13  Q.   Okay --
14  A.   We deliberate and consider, yes, sir.
15       MR. ALLINGHAM: I'm going to
16  change the tape now, we're going to take a
17  break.
18  A.   Okay.
19       MS. DUPHILY: We're going off the
20  record at approximately 2:52 p.m..
21       (WHEREUPON a brief recess was
22  taken)
23       MS. DUPHILY: Back on the record
24  at approximately 2:59 p.m..

Page 88

1   Q.   We looked at PX14 before the break, now I'd
2   like to look at PX13. As we noted the special
3   meeting of the Board of Education on August 23 was
4   exclusively devoted to getting advice from your
5   legal counsel regarding potential litigation. And
6   you went into executive session one minute after you
7   started the meeting, you came out of executive
8   session four hours and 14 minutes later, and the
9   meeting was adjourned one minute after you came out
10  of executive session.
11  A.   Wow.
12  Q.   Which indicate at least some efficiency in
13  moving through agenda items. I want to turn now to
14  PX13 which is the minutes of the executive session,
15  constituting all but two minutes of the actual
16  meeting minutes, okay?
17  A.   Okay.
18  Q.   If you look at PX13 Mrs. Bunting you will
19  see that there are two areas that are blank, and
20  they have the word redacted on them?
21  A.   Yes.
22  Q.   That's a word that lawyers use to indicate
23  that something has been masked out of the minutes,
24  taken out of the minutes?

Page 89

1   A.   Okay.
2   Q.   And your counsel did that before they
3   produced these minutes to us. I don't know why for
4   sure, but I expect that it's because they think that
5   it represents attorney's advice. So, much of the
6   minutes is not here, but there is one paragraph.
7   Is there something that's of interest to you, ma'am?
8   A.   I'm just looking at the one you mean
9   regular session it was moved by Mr. Helms seconded
10  by Dr. Isaacs, is that what you mean?
11  Q.   No, ma'am at the bottom of the first page?
12  A.   Oh, the bottom of the first page.
13  Q.   Yes.
14  A.   Oh, okay.
15  Q.   There is a paragraph there that does
16  reflect some of what the Board members discussed
17  during the meeting, the executive session of the
18  meeting, do you see that?
19  A.   Yes.
20  Q.   And where it says during the discussion of
21  this issue --
22  A.   Okay.
23  Q.   -- do you recall that the issue that was
24  being discussed was School Board prayer?

23 (Pages 86 to 89)

Dobrich, et al.                                    v.                    Indian River School District, et al.
Nina Lou Bunting                          Case No. 15-120                              October 13, 2006

Page 90

1    A.   Sir, I don't. I tell you, I've got a
2    terrible memory. I assume it was, if that's what PL
3    05-01 means.
4    Q.   Let me see if I can help you out?
5    A.   All right.
6    Q.   If you keep looking in that sentence, it
7    says, "During the discussion of this issue several
8    Board members expressed that there constituents do
9    not want the Board to change its practice of opening
10   the meetings with a prayer?"
11   A.   So that must have been what we were
12   discussing, huh?
13   Q.   Yes.
14   A.   Can we agree about that, that at least
15   what's what the minutes appear to indicate?
16   A.   That's what it assumes, uh-um.
17   Q.   And then it says, "It was not felt that a
18   decision could be made this evening regarding
19   whether or not to change our past practice." Do you
20   have any recollection of why after four hours and 14
21   minutes of discussion the Board felt that it could
22   not make a decision regarding whether or not to
23   change its past practice?
24   A.   We are there late a lot of nights. There

Page 91

1    are ten people with a lot of differing ideas, okay.
2    I'm not sure which meeting this was. Was this the
3    meeting -- I don't know if this was the meeting --
4    it says James Griffin was there.
5    Q.   Yes, Mr. Griffin was at this meeting.
6    A.   Okay.
7         MR. SHAW: Mr. Griffin was at that
8    meeting, I just caution my client not to
9    discuss what was said at the meeting as
10   it's protected by the attorney/client
11   privilege?
12   A.   Oh, okay.
13        MR. ALLINGHAM: Well, I suggest
14   that we have questions and answers because
15   many questions about that meeting would not
16   infringe on the attorney/client privilege.
17   Q.   But, it would be worthwhile to establish,
18   do you recall a lengthy executive session meeting on
19   the issue of School Board prayer at which
20   Mr. Griffin was present?
21   A.   Do I recall it?
22   Q.   Yes.
23   A.   I see it's here in front of me, so it
24   occurred. Do I remember that specific night and

Page 92

1    could tell you --
2    Q.   Oh, no, I was just -- let me just start
3    with what you told me. You have no doubt I take it
4    from the minutes --
5    A.   No, I have no doubt that it occurred.
6    Q.   Okay. Now, my next question is do you have
7    a recollection that, whether it was on August 23 or
8    not, don't worry about that, do you have a
9    recollection of an executive session that went for
10   four hours on a single topic, that is School board
11   prayer with Mr. Griffin present?
12   A.   Well, I see that it did go for four hours.
13   Is it unusual for something to go for four hours
14   with us, no, sir.
15   Q.   Do you have an independent recollection
16   that you all had a four hour executive session with
17   Mr. Griffin on the School Board prayer issue?
18   A.   I wouldn't have known it if you hadn't
19   shown me these papers.
20   Q.   Okay. The regular minutes show that you
21   were going into executive session to get advice of
22   counsel on this issue?
23   A.   Okay.
24   Q.   Do you remember whether the Board asked

Page 93

1    Mr. Griffin to draft a School Board Prayer Policy?
2         MR. SHAW: I'm going to
3         object to attorney/client privilege. If
4         the Board asked Mr. Griffin that's covered
5         by the privilege.
6    Q.   Do you remember whether the Board asked
7    Mr. Griffin what the weather was like?
8    A.   No, I don't remember what was asked of
9    Mr. Griffin that evening.
10   Q.   The Board Prayer Policy, the process of
11   generating Board policies, I'm going to ask, this is
12   the general process, is it typical that the Board
13   would decide to refer a matter to the policy
14   committee. The policy committee would consult with
15   the Board's attorney, and then the policy committee
16   and the Board's attorney typically would draft a
17   policy for presentation to the full Board?
18   A.   Never having attended a policy meeting I
19   can't say what their process is.
20   Q.   Fair enough. Do you know whether or not
21   Mr. Griffin ever drafted a draft School Board Prayer
22   Policy?
23   A.   I have no idea.
24   Q.   The policy that you adopted is a policy

24 (Pages 90 to 93)

Dobrich, et al.                              v.                    Indian River School District, et al.
Nina Lou Bunting                     Case No. 15-120                        October 13, 2006

Page 94

1    that is described on its face as, sorry, ma'am, it's
2    titled Board Prayer at Regular Board Meetings. It's
3    quite specific that it's a policy having to do with
4    regular Board meetings. Did anyone give any
5    consideration at the Board level to having a policy
6    that extended to special Board meetings?
7        A.   Not to my knowledge because I don't think
8    we had ever had prayer at special Board meetings, so
9    that wasn't even a consideration at this time.
10       Q.   Did you understand the — there was no
11   litigation at the time of the adoption,
12   consideration and adoption of this policy, the
13   litigation was not filed until 2005?
14       A.   Okay.
15       Q.   So, did you understand that the question
16   that had been raised about prayer at Board meetings
17   was limited to regular Board meetings or did you
18   understand that it extended to all Board meetings?
19       A.   I understood that it was about regular
20   Board meetings.
21       Q.   And from where did you get that
22   understanding?
23       A.   I got the understanding, I don't think I
24   was present, there was the graduation at which Mona

Page 95

1    Dobrich first talked about her complaint. I don't
2    recall having been to the first Board meeting after
3    that, and when I found out what was going on it was
4    my understanding that Mona Dobrich came to the June
5    Board meeting to complain about prayer at
6    graduation, and then found out that there was prayer
7    at the regular Board meeting.
8        So, it was my understanding that we would
9    draft policy to try to take care of the situation,
10   and I think most things that we tried to do were in
11   hopes of not being sued.
12       Q.   This is sort of, maybe an unusual question,
13   buy do you feel as a Board member that your rights
14   regarding the free exercise of your religion are
15   infringed by not having a policy on special meeting
16   Board prayer?
17       A.   No, I don't think my rights are violated by
18   not having a policy, is that what you mean?
19       Q.   Yes, exactly. The other sentence of the
20   limited portion of the executive session minutes,
21   which is Plaintiff's Exhibit 13 that I have reports
22   that, "Several Board members expressed that their
23   constituents do not want the Board to change its
24   practice of opening the meetings with a prayer." Do

Page 96

1    you remember which Board members expressed that
2    view?
3        A.   I know I was one of them.
4        Q.   Do you remember the others?
5        A.   And I'm not saying that I expressed that
6    view that evening. I know that over this entire
7    thing I have been bombarded with constituents, and I
8    have expressed that numerous times --
9        Q.   Okay.
10       A.   -- not necessarily just at this one time.
11       Q.   And when say that you've been bombarded
12   with communications from constituents, give me a
13   ballpark number 50, 100, 1000?
14       A.   In the hundreds. I'm not saying phone
15   calls and emails and letters. I know everyone in
16   this -- well, I know a lot of the people in this
17   community, and we go to restaurants in this
18   community, we go grocery shopping, we're at ball
19   games with our grandchildren and people come up to
20   me all the time. I know for a fact that five people
21   this week have come up to me, one lady that I had
22   called on the phone about something, so these people
23   have expressed this to us.
24       Q.   What are they expressing?

Page 97

1        A.   They want us to stand firm, they want us to
2    take a stand for what we feel is right and they are
3    behind us and they support us.
4        Q.   Does anybody articulate what it is that you
5    are suppose to be standing firm for?
6        A.   We are standing firm for being able to have
7    the right to say a prayer at the regular Board
8    meeting aloud.
9        Q.   And it's a fine distinction, but your
10   answer is couched in terms of what you are standing
11   firm for, and what I was trying to ask was, did
12   anybody who's called you or bumped into you on the
13   street or whatever, have they articulated to you
14   what they think you're suppose to be standing up
15   for?
16       A.   Yes.
17       Q.   And have some of them articulated that they
18   want you to stand firm for School Board prayer?
19       A.   Yes.
20       Q.   Are have some of them articulated to you
21   that they want you to stand firm for prayer in the
22   schools?
23       A.   No, sir because they understand that that's
24   already been -- there's already been a decision

25 (Pages 94 to 97)

Case 1:05-cv-00120-JJF    Document 250-4    Filed 04/10/2008    Page 26 of 48

Dobrich, et al.                           v.           Indian River School District, et al.
Nina Lou Bunting                    Case No. 15-120                    October 13, 2006

Page 98

1  about that.
2    Q.   It appeared that a number of the
3  constituents at the August 24th meeting didn't
4  understand that?
5    A.   True, but it's been two years now and
6  people by reading the paper and all I think most
7  people now are aware of what the situation truly is.
8    Q.   Okay. Have you received any comments that
9  a constituent of yours thought that the policy
10  should be revised?
11    A.   No, sir.
12    Q.   So, the comments that you've received from
13  your constituents have been unanimous?
14    A.   Yes, sir.
15    Q.   And that's important to you, isn't it?
16    A.   Well, it's important to me because I
17  represent these people and they elected me to make
18  decisions at the Board level on their behalf, and I
19  represent my people.
20    Q.   Do you know how many residents there are in
21  your district? Which is your district,
22  Mrs. Bunting?
23    A.   I'm district three. I have part of
24  Dagsboro, all of Millsboro, down toward the Long

Page 99

1  Neck area. I feel like I have a foot, I don't know
2  if you are familiar with our district, but we are
3  sort of north and south, I have a foot in the north
4  and also in the south.
5    Q.   That's the second time you've sort of
6  talked about the north and the south of the
7  district, is there, or has been in the past a divide
8  between the north and the south?
9    A.   Very much so.
10    Q.   Tell me what mean by that?
11    A.   We were put together as a district in 1969
12  by the courts, and there are some people who are
13  still upset that it was such a large district put
14  together, and we have to have two high schools
15  because it's such a large district, and our high
16  schools play sports against each other, which isn't
17  real good, so we are our own arch enemies.
18       So, therefore as a Board when we have to
19  decide about which time gets new uniforms, which
20  team gets turf on their football, see what I mean?
21  So, being on this School Board I was warned could be
22  tough because of a north south split sometimes on
23  decisions.
24    Q.   And I guess particularly tough for you

Page 100

1  because your district is sort of part north and part
2  south?
3    A.   Yes, but I taught in this district and I
4  don't see a north and south, I see one district.
5    Q.   In terms of the members, the current
6  members of the Board, which are from the northern
7  half and which are from the southern half?
8    A.   The present members?
9    Q.   Yes, ma'am.
10    A.   Okay, I'll start with the southern half.
11  That would be Charlie Bireley, Reggie Helms, Donna
12  Mitchell, Donald Hattier.
13    Q.   And the rest are from the north?
14    A.   There are the two of us straddle, and that
15  would be Randy Hughes and myself. We are the
16  straddlers. And then the rest are from the
17  northern.
18    Q.   In the course of those hundred or hundreds
19  of comments from your constituents has anyone said
20  to you that you should stand firm for Christian
21  values?
22    A.   No.
23    Q.   Not one?
24    A.   No. Not Christian values. That's never

Page 101

1  been the terminology used. I will say it's fight
2  the ACLU. And it's been we've always had prayer,
3  why can't we have prayer, we should have prayer,
4  it's our right to have prayer, but stand firm for
5  Christian values I don't think that terminology has
6  ever been used, not with me.
7    Q.   You mentioned that your constituents
8  generally speaking have told you that you should
9  stand firm for prayer at regular Board meetings?
10    A.   Uh-hum.
11    Q.   And do they draw that distinction between
12  regular Board meetings and special Board meetings?
13    A.   No.
14    Q.   So, they said stand firm for Board prayer?
15    A.   For Board meetings, for praying at the
16  Board meetings.
17    Q.   And what do you say to your constituents
18  when they say that?
19    A.   When I say that I say that we are -- what
20  can we do, we are listening to our lawyers, we are
21  doing what we need to do, and if the case goes to
22  court, you know, the judge will decide. See we
23  have, we can't talk about this as you well know, so
24  we have to be extremely careful what we say.

26 (Pages 98 to 101)

Dobrich, et al.                                      Indian River School District, et al.
v.
Nina Lou Bunting                Case No. 15-120                October 13, 2006

Page 102

1    Q.   I apologize, but I don't know what do you
2    mean when you say you can't talk about this?
3    A.   We've been told to be very careful what we
4    say in public, okay?
5    Q.   By your lawyer?
6    A.   By our lawyers.
7    Q.   Nevertheless, from time to time members of
8    the Board have given statements or interviews to the
9    press, is that correct?
10   A.   True.
11   Q.   And members of the Board have gone on the
12   local radio station?
13   A.   Yes, sir.
14   Q.   In your view are those actions consistent
15   with the admonition from your lawyers that you
16   should be very, very careful about what you say?
17   A.   They were happening before we got, before
18   we were told to be extremely careful. We didn't
19   have good representation in the beginning.
20   Q.   And that situation's been corrected now?
21   A.   Yes, sir.
22   Q.   So, in the comments from your constituents
23   that have been unanimous that you should stand firm
24   for School Board prayer?

Page 103

1    A.   (Nods head).
2    Q.   No one has told you that you should stand
3    firm for Christian values?
4    A.   I'm not going to say the words Christian
5    values have never been mentioned, but to my
6    knowledge no one has called it Christian values.
7    They know that the situation is prayer at Board
8    meetings and they usually are the words they use.
9    Prayer, Board meetings.
10   Q.   Well, the litigation is, of course about
11   more than just prayer at Board meetings, correct?
12   A.   Well, they don't know that.
13   Q.   Have you ever received hundreds of comments
14   about any other issue that has faced the Board from
15   your constituents?
16   A.   No, sir.
17   Q.   Have you ever received even a fraction of
18   that many comments on any other issue?
19   A.   Not even a fraction. The closest I ever
20   came to was when we were going to, our calendar
21   situation, a calendar situation, where we wanted to
22   shorten the Easter break and make it just Friday and
23   Monday because we didn't have air conditioning in
24   all the schools yet and, you know, and the parents

Page 104

1    got really upset because they felt the children
2    needed a break after the state test. And I did get
3    many phone calls about that, but nothing, nothing
4    compared to this.
5    Q.   Would it be fair to say that this is the
6    issue in which your constituents have been most
7    intensely interested over the entire tenure, over
8    your entire tenure on the Board?
9    A.   Well, certainly the last several years of
10   my tenure. Not so at the very beginning between '02
11   and '04.
12   Q.   Yes, the interest has been very intense
13   since '04?
14   A.   Since '04.
15   Q.   And the intensity of that interest is the
16   greatest of any issue that's ever been presented to
17   the Board —
18   A.   Yes.
19   Q.   — during your tenure?
20   A.   Yes, in my knowledge, as far as I'm
21   concerned.
22   Q.   Do you know who the Does are?
23   A.   No, sir.
24   Q.   Has anybody ever told you they think they

Page 105

1    know who the Does are?
2    A.   Someone has told me they think they know
3    who the Does are.
4    Q.   Who was with a that person?
5    A.   He didn't tell me, I asked him, Don
6    Hattier, thought he knew who the Does were.
7    Q.   You asked Dr. Hattier if he knew who the
8    Does were?
9    A.   I didn't ask him if he knew who the Does
10   were, but we were at something and I said to him do
11   you know who they are, and he said he thought he
12   did.
13   Q.   Did he tell you who he thought they were?
14   A.   No, sir.
15   Q.   Did you ask him to tell you?
16   A.   No, sir.
17   Q.   Why did you ask him if he knew who they
18   were?
19   A.   Because that had been going on so long and
20   that really had stuck in my craw. I'm not a lawyer
21   and I don't know what my, what I have the right to
22   know, but it really upset me that someone was suing
23   me and I didn't know who it was. That bothered me
24   personally.

27 (Pages 102 to 105)

Dobrich, et al.
Nina Lou Bunting

v.

Case No. 15-120

Indian River School District, et al.
October 13, 2006

Page 106

1    Q.    Did you think in light of what you saw at
2    the August 24th meeting that it would be
3    unreasonable for a parent to fear recrimination
4    against his or her children for trying to stand up
5    to the Board and the community?
6       A.    Personally, no. I'm a teacher. I would
7    never hold it against the child for anything that
8    their parents did, and I don't say that in others.
9       Q.    Have you ever seen children behave in a
10   mean fashion based on --
11      A.    Have I ever seen children behave in a mean
12   fashion?
13      Q.    Yes, based on a perception that someone is
14   different from the rest of the community?
15      A.    From the rest of the community, well, you
16   know how kids are I have seen --
17      Q.    I do know how kids are.
18      A.    I have seen children tease other children
19   not about religion, if that's what you're asking,
20   because I taught little kids third and fifth. I've
21   seen kids tease other kids about their clothes or
22   their hairstyle, or something like that, sure. But
23   it stopped when I got in on it.
24      Q.    You never in your 37 years heard anyone

Page 107

1    insult or use an ethnic slur based on someone's
2    religion?
3       A.    Religion?
4       Q.    Yes.
5       A.    From a child?
6       Q.    Yes.
7       A.    To my knowledge no. To my knowledge.
8       Q.    You asked me whether I was limiting my
9    questions to insults based on religion, have you
10   heard ethnic slurs based on race?
11      A.    With children?
12      Q.    Yes.
13      A.    Yes, sir.
14      Q.    And you corrected those when you heard
15   them?
16      A.    Absolutely.
17      Q.    Are you aware of the allegations in the
18   Complaint that Alex Dobrich was repeatedly called
19   Jew boy by students in his class?
20      A.    I have heard that that did occur.
21      Q.    If that occurred in your class you would
22   have stopped it right away?
23      A.    Absolutely.
24      Q.    Because that's really inappropriate

Page 108

1    behavior?
2       A.    Of course.
3       Q.    Would knowledge of such behavior by
4    children in the district reasonably give a parent
5    concern that his or her children would be subjected
6    to the same treatment?
7       A.    Okay, you're referring to the Does now?
8       Q.    Yes, ma'am.
9       A.    That they would be afraid to come out for
10   the fear that their children would get the same
11   treatment that you're saying the Dobrich child got?
12      Q.    Yes, ma'am.
13      A.    Would I feel that the parents would feel
14   that there was the possibility?
15      Q.    Yes, ma'am.
16      A.    From other children?
17      Q.    Yes, ma'am.
18      A.    I'm sure they would from other children.
19   I'm saying from me as a teacher or a Board member
20   absolutely not.
21      Q.    Back to the Board policy for a minute.
22   Paragraph five of the Board policy?
23      A.    Okay.
24      Q.    It reads, "Any such prayers," these are the

Page 109

1    prayers that would be offered by the board
2    members --
3       A.    Uh-hum.
4       Q.    -- "Any such prayers may be sectarian or
5    non-sectarian, denominational or non-denominational,
6    in the same of a Supreme Being, Jehovah, Jesus
7    Christ, Buddha, Allah, or any other person or
8    entity, all in accord with the freedom of
9    conscience, speech and religion of the individual
10   Board member and his or her particular religious
11   heritage." You approved that language?
12      A.    Yes.
13      Q.    Would you describe for me the difference
14   between a sectarian prayer and a non-sectarian
15   prayer?
16      A.    Again, my belief, I could not give what I
17   would call a non-sectarian prayer, because I would
18   have to mention Jesus Christ in my prayer, and I
19   would consider that a sectarian prayer. So, if I
20   gave a prayer it would have to be sectarian and not
21   non-sectarian.
22      Q.    The mention of Jesus Christ in a prayer,
23   and that making it sectarian, is that because the
24   prayer would refer to a particular Deity of the

28 (Pages 106 to 109)

Dobrich, et al.                 v.               Indian River School District, et al.
Nina Lou Bunting          Case No. 15-120              October 13, 2006

Page 110

1 particular sect?
2    A.   Yes. In my religion you get to the Father
3 through the Son, and to deny the Son is not a
4 prayer.
5    Q.   Just so that I understand, and so
6 delivering any prayer that does not mention Jesus
7 Christ would be to deny Jesus Christ?
8    A.   For me to, for me to give that prayer.
9    Q.   Yes, ma'am.
10    A.   That's a personal, my religion.
11    Q.   Yes, ma'am. And what is your religion?
12    A.   Methodist.
13    Q.   Are you a church goer?
14    A.   No, I'm not.
15    Q.   I take it at some point you were a church
16 goer?
17    A.   I was raised in the church as a child.
18    Q.   As a Methodist?
19    A.   As a Methodist.
20    Q.   And that's where you formed the belief that
21 you just articulated?
22    A.   I have a personal bond, and I do attend
23 certain things, like I'm in a group where we study
24 books on self-help and that type of thing, and we

Page 111

1 relate them back to scripture and stuff like that.
2 And -- but I'm just -- I believe that when I pray I
3 have to give credit to Jesus.
4    Q.   You touched on this earlier, but it is also
5 your view, isn't it, that it does not matter to the
6 Lord how you seek his guidance. It can be out loud
7 it can be silently, it can be using a traditional
8 prayer it could be using your own words, it could be
9 on your knees or standing up. Any way God will hear
10 our prayers no matter how they are delivered?
11    A.   My God says pray without ceasing.
12    Q.   And what does that mean to you?
13    A.   That means to me to pray everywhere, any
14 time, all the time, whether privately or publicly,
15 to pray without ceasing.
16    Q.   And your understanding of that admonition
17 is that your life should be an example of the
18 principles of your faith. It's not possible
19 obviously to pray without ceasing?
20    A.   It's not possible.
21    Q.   Literally?
22    A.   Literally, no, sir.
23    Q.   On the other hand, that admonition is an
24 example that God hears us no matter how we appeal to

Page 112

1 him?
2    A.   True.
3    Q.   At two of the Board meetings since October
4 19, 2004 when the policy was adopted you have
5 offered a moment of silence rather than a prayer.
6    A.   I offered one moment of silence.
7    Q.   I'm sorry. One moment of silence?
8    A.   Uh-hum.
9    Q.   Could you tell me how you made the decision
10 to offer a moment of silence at that meeting and
11 then at subsequent meetings to offer prayers?
12    A.   Very simple thing. The moment of silence,
13 apparently the person who had been asked to give the
14 prayer that night, and I don't recall what the
15 reason was, either they were sick and weren't able
16 to get there or they were going to be late or
17 whatever, I didn't find out until I got there that
18 someone needed to give the prayer and could I do it,
19 and I said sure. I cannot stand up and give a
20 prayer like Reggie or someone else can do, I need to
21 write mine down. I didn't have time to write it
22 down, so I chose to do the moment of silence.
23    Q.   When you did that, did you feel that the
24 moment of silence was effective to solemnify that

Page 113

1 Board meeting?
2    A.   No, sir, I did not.
3    Q.   When -- to broaden the question, if any
4 other Board member offered a moment of silence would
5 you believe that the moment of silence is not
6 effective to solemnify the proceedings?
7    A.   That would be their choice and I'm okay
8 with what other people give. Whatever prayer
9 someone else gives or how they give it's their
10 personal -- it's a personal thing with each one of
11 us, and if that's the way they chose it then that's
12 fine with me.
13    Q.   But as I understand the policy, the purpose
14 of the prayer or moment of silence is to solemnify
15 the proceedings, correct?
16    A.   Right.
17    Q.   If you believe that a moment of silence is
18 not effective to solemnify --
19    A.   It's not to me.
20    Q.   You have to let me finish my question?
21    A.   Okay, sorry.
22    Q.   If you believe that a moment of silence is
23 not effective to solemnify the proceedings, why did
24 you vote to approve this policy?

29 (Pages 110 to 113)

Dobrich, et al.                              v.                    Indian River School District, et al.
Nina Lou Bunting                      Case No. 15-120                      October 13, 2006

Page 114

1    A.   Because as I said it's among the ten of us.
2    It's not just my policy, it's ten people's policy,
3    it's the community's policy. Therefore, each person
4    has their own personal feelings about the whole
5    thing. How do I feel about it personally, I feel it
6    should be done out loud. Do I respect someone
7    else's feelings of how it should be done, yes. I
8    respect their prayer whatever kind of prayer it is
9    because I respect other people and their right to
10   say and do what they think is right.
11   Q.   In their capacity as individuals or in
12   their capacity as Board members?
13   A.   Well, I guess as Board members that evening
14   at our regular meeting.
15   Q.   Do you draw any distinction at all in your
16   mind between your rights in your capacity as a Board
17   member and your rights in your capacity as an
18   individual citizen?
19   A.   Do I see any difference?
20   Q.   Yes.
21   A.   As far as Board prayer is concerned?
22   Q.   You can start there, yes.
23   A.   I think I have the right to pray aloud or
24   silently in my regular life, and I have a right to

Page 115

1    pray aloud or silently as so I choose at a Board
2    meeting.
3    Q.   Okay. You believe you have the right to
4    pray to convert someone --
5    A.   No, sir.
6    Q.   Just a minute, let me finish my question?
7    A.   Sorry.
8    Q.   As an individual citizen, isn't that
9    correct?
10   A.   As an individual citizen?
11   Q.   Yes, ma'am.
12   A.   Do I feel I have a right to pray to convert
13   someone?
14   Q.   Yes, ma'am.
15   A.   Personally, privately I would pray to
16   convert someone, but would I go to that person and
17   like pray over them to convert them, is that what
18   you mean?
19   Q.   No. I'm just asking what you have the
20   right to do as you understand it?
21   A.   Okay. Do I have the right to try to
22   convert someone else?
23   Q.   Yes.
24   A.   No, sir, that's not my right.

Page 116

1    Q.   I'm going to give you an example of a
2    prayer?
3    A.   Okay.
4    Q.   And the prayer would be, Lord, we ask that
5    you open the hearts of the heathen among us, that
6    they may join the community of your church?
7    A.   Would I give that prayer?
8    Q.   Nope, that's not my question. My first
9    question is, as you understand the rights of U.S.
10   Citizens, do U.S. Citizens have the right to offer
11   that prayer?
12   A.   They have the right to offer that prayer.
13   Q.   As you understand the rights of school
14   teachers in class, do teachers have the right to
15   offer that prayer in class?
16   A.   No, they do not have the right to offer
17   that prayer.
18   Q.   As you understand the rights of School
19   Board members, as School Board members, do they have
20   the right to offer that prayer at a School Board
21   meeting?
22   A.   The one with the heathens among us?
23   Q.   Yes.
24   A.   No, they do not have the right to offer

Page 117

1    that prayer.
2    Q.   Is that because as School Board members,
3    the School Board members are government officials?
4    A.   I feel School Board members are government
5    officials.
6    Q.   And is that the distinction between their
7    right to offer such a prayer as individuals, and the
8    fact that they don't have such a right to offer such
9    a prayer as School Board members, that they're
10   government officials?
11   A.   The one with the heathens among us?
12   Q.   Yes, ma'am.
13   A.   I think that violates our number three.
14   That's why I wouldn't expect anyone to say something
15   like that. I don't think it would have anything to
16   do with whether we were an individual or a
17   government official.
18   Q.   All right, in the absence of your policy?
19   A.   Okay, in the absence of our policy --
20   Q.   Before you passed the policy on October 19,
21   2004, is it your understanding that Indian River
22   School Board members could have offered the prayer
23   that I gave you, please Lord, convert the heathen
24   among us?

30 (Pages 114 to 117)

Dobrich, et al.
Nina Lou Bunting

v.

Case No. 15-120

Indian River School District, et al.
October 13, 2006

Page 118

1   **A.   They wouldn't have.**
2   Q.   Could they have?
3   **A.   Well, I guess they possibly could have, but**
4   **again they wouldn't have.**
5   Q.   Over the course of the -- over the course
6   of this litigation, have you ever had occasion to
7   read the First Amendment of the Constitution?
8   **A.   No. Like I said, I can read something and**
9   **forget it tomorrow.**
10   Q.   You understand that the right to free
11   exercise of religion is found in the First Amendment
12   of our Constitution?
13   **A.   I think that we read the First Amendment**
14   **aloud to the children on the first day of school**
15   **every year, is that what we would have read?**
16   Q.   Don't know.
17   **A.   I think so.**
18   Q.   In all events, you do understand that the
19   First Amendment is where freedom of religion is
20   found?
21   **A.   Yes, I guess, you're reminding me of it.**
22   Q.   Do you also understand that the First
23   Amendment has language prohibiting the establishment
24   of religion by the government?

Page 119

1   **A.   Yes, establishing of religion by the**
2   **government.**
3   Q.   And do you understand that the laws which
4   prohibit teachers, for example, from opening their
5   classes with a prayer, are based on that so called
6   establishment clause?
7         MR. SHAW: I'm going to object to
8       your question. She is not an attorney and
9       doesn't have any knowledge of what the laws
10       are based upon.
11         MR. ALLINGHAM: I don't think that
12       Jarrod is instructing you not to answer.
13         MR. SHAW: If you have some sort
14       of knowledge outside of a legal analysis to
15       base you answer upon, that's fine.
16   **A.   I have no knowledge of. I even forgot what**
17   **was the First Amendment.**
18   Q.   Do you recall who proposed that a moment of
19   silence be included in the options in the School
20   Board Prayer Policy?
21   **A.   No, I don't.**
22   Q.   We're coming to the end, Mrs. Bunting.
23   It's good when you don't even have to ask a question
24   and someone hands you what you need. Have you --

Page 120

1   did you do anything to prepare for this deposition?
2   **A.   Did I do anything?**
3   Q.   Yes, ma'am.
4   **A.   Obviously I should have, but no.**
5   Q.   Did meet with your attorneys?
6   **A.   Oh, they met with us, what last week one**
7   **day last week.**
8         MR. SHAW: I can't answer
9       questions.
10   **A.   Oh, you are not allowed to answer**
11   **questions. It was one day last week I met with two**
12   **other people just to, we had never done anything**
13   **like this before, to let us know a few things.**
14   Q.   Did -- who were the other two people
15   present during that meeting?
16   **A.   I was in with Janet Hern and Donna**
17   **Mitchell.**
18   Q.   Did you look at any documents during that
19   meeting?
20         MR. SHAW: I'm going to object to
21       what actually occurred at that meeting as
22       protected by attorney/client privilege.
23         MR. ALLINGHAM: Incorrect.
24   Q.   Did you look at any documents during that

Page 121

1   meeting?
2         MR. SHAW: I'm going to instruct
3       her not to answer that question?
4   **A.   Okay.**
5         MR. ALLINGHAM: Oh, Jarrod, come
6       on, you know perfectly well I can ask if
7       documents were looked at, I can ask if
8       those documents refreshed her recollection
9       and if they did I'm entitled to them. You
10       know that.
11         MR. SHAW: I will instruct the
12       witness to answer as to specifically what
13       documents she looked at and whether or not
14       they did refresh her recollection.
15         MR. ALLINGHAM: Why don't you let
16       me ask a new question and you can do what
17       you want to do.
18   Q.   Did you look at any documents during the
19   meeting?
20         MR. SHAW: You can answer that.
21   **A.   I can answer that? No, no documents.**
22   Q.   Okay, that's all I needed to know.
23   **A.   Okay.**
24   Q.   Other than your attorneys and the two

31 (Pages 118 to 121)

Page 122

1   persons that you identified, have you talked to
2   anybody else about the fact that you were going to
3   give a deposition?
4   **A.   My husband knows I was coming to give a**
5   **deposition, my daughter knows because I had to**
6   **cancel my dental appointment, she's my dentist.**
7   Q.   Oh, well then you've got an in to get it
8   rescheduled.
9   **A.   And last night on my way, I rode with**
10  **Charlie Birely and he knew that I had to come some**
11  **time today.**
12  Q.   Did you -- that was riding to the meeting?
13  **A.   Riding to the meeting.**
14  Q.   Is that in Dover?
15  **A.   Dover.**
16  Q.   Did you discuss with Mr. Birely what had
17  been asked in his deposition?
18  **A.   We just asked him what types of questions,**
19  **you know.**
20  Q.   What did he tell you?
21  **A.   Were they personal. He said people were**
22  **getting all kinds of different questions. That he**
23  **was asked mostly about his -- yeah, when he ran for**
24  **the School Board, that's what he was asked mostly**

Page 123

1   about. You know, it was hard for him to say what
2   you were going to ask us because people were getting
3   asked different things.
4   Q.   Did Mr. Birely tell you how he knew what
5   other people had been asked?
6   **A.   He had talked to Dr. Hattier and he had**
7   **been asked mostly questions about his family and**
8   **stuff like that.**
9   Q.   You didn't talk to Dr. Hattier?
10  **A.   No.**
11  Q.   That's what Mr. Birely told you Dr.
12  Hattier had said he was asked about?
13  **A.   Right, that you were asking individuals**
14  **different things, you know, and probably trying to**
15  **piece the puzzle together by, you know, asking**
16  **different things. He told me not to be scared**
17  **because you weren't that bad.**
18  Q.   That's what my mom says, too. Do you
19  maintain any e-mail accounts?
20  **A.   No, sir, I don't have a computer. That's**
21  **how old fashioned I am.**
22  Q.   Do you keep a file relating to your service
23  as a Board member?
24  **A.   No, sir.**

Page 124

1   Q.   I have one question I've a asked every
2   Board member is, which I asked you, is what is your
3   religious denomination, and do you attend church.
4   You are not the first person who's told me that you
5   don't attend church, but I have a follow-up
6   question. Is there a particular reason why you
7   don't attend church? You're obviously a religious
8   woman.
9   **A.   Yes, I'm a religious woman. To me religion**
10  **is personal. One of the reasons I don't attend**
11  **churn is I have severe asthma and allergies and I**
12  **can't be around the flowers and the perfumes and**
13  **things like that. So that's one of the reasons.**
14  **And I must admit I got extremely busy when**
15  **my children were all in high school and college and**
16  **stuff and me taking courses and stuff, and I just**
17  **got out, wasn't able to attend and it was not a top**
18  **priority for me at that time.**
19  Q.   And when you say that for you religion is
20  personal, what do you mean by that?
21  **A.   I mean that I don't feel you have to go to**
22  **church to believe in God and to live a religious**
23  **life and to try to do right.**
24  Q.   I showed you a portion of the videotape of

Page 125

1   the August 24th meeting, do you know whether
2   meetings of the Board are customarily videotaped?
3   **A.   I -- we have understood, and I don't know**
4   **if we are wrong or not, it's not customary as far as**
5   **we're concerned. It was my understanding that they**
6   **were trying to show the people in another room what**
7   **was going on.**
8   Q.   And so the tape was just incidental?
9   **A.   The tape was incidental. It was to let the**
10  **people who were in another, in the big auditorium --**
11  **well, we were in the cafeteria and the other group**
12  **was in the gymnasium, and it was my understanding**
13  **that we were being videotaped so that those people**
14  **could see what's going on.**
15  Q.   Thanks. You are the first person who has
16  had an answer to that question.
17  **A.   Well, that's just my understanding, I don't**
18  **know it that was true or not.**
19  Q.   When you gave the prayers in the meetings
20  following the adoption of PX9, the Board Prayer
21  Policy, is it correct that there were students in
22  attendance at each of the meetings?
23  **A.   You know, whether there were or whether**
24  **there were not, I can't honestly say. I know for**

32 (Pages 122 to 125)

Dobrich, et al.                                    v.                    Indian River School District, et al.
Nina Lou Bunting                          Case No. 15-120                        October 13, 2006

|  | Page 126 |
|---|---|

**Page 126**

1  sure there was a possibility that there were, but I
2  didn't go out and look and check the audience before
3  I gave it.
4      Q.   In the prayers as opposed to the moment of
5  silence that you led, in the prayers that you gave
6  you prayed in the name of Jesus, correct?
7      A.   Yes, I did.
8      Q.   If there were students there is it correct
9  that you did not know their religious faith?
10     A.   No, I did not know their religious faith.
11     Q.   Did you notice whether anyone whether
12  student or adult got up to leave the room when Mr.
13  Bireley.  Or I guess Mr. Walls was the previous
14  president, correct, of the Board?
15     A.   Mr. Walls --
16     Q.   When Mr. Walls or Mr. Bireley read the
17  disclaimer?
18     A.   Did I notice anyone leaving?
19     Q.   Yes.
20     A.   No, I was too busy getting my notes out to
21  read.
22     Q.   Am I right that the religious faith of the
23  persons in attendance at the meeting would not have
24  affected in any way the prayer that you were going

**Page 127**

1  to give?  That is to say, you decided what prayer
2  you were going to give based on your own personal
3  beliefs and you weren't going to alter it based on
4  what the beliefs were of other people?
5      A.   That's correct, it's our understanding of
6  the way we do it.
7      Q.   Were you involved in the process to hire a
8  new Board lawyer for the Indian River School
9  District?
10     A.   Yes, sir.
11     Q.   How many lawyers did you interview?
12     A.   We ended up not interviewing anyone to my
13  knowledge.
14     Q.   How was the new lawyer selected?
15     A.   We had, I think five people on the list,
16  and the first thing we did was go through and look
17  about how much they were going to charge to be quite
18  honest, and we sort of were able to eliminate a few
19  people.  You mean our regular Board lawyer, you
20  don't mean these guys?
21     Q.   Yes.
22     A.   And we sort of did that.  We were very
23  familiar with one lawyer on there that we had
24  contact with before, and we were impressed with him.

**Page 128**

1      Q.   That was Mr. Williams?
2      A.   That was Mr. Williams.  So, we didn't want
3  to put anyone to a whole lot of trouble to come be
4  interviewed if we had all pretty much felt we knew
5  enough about that gentleman to know that he was the
6  one we'd like to have.
7      Q.   How did you -- what contact had you had
8  with Mr. Williams prior to this process?
9      A.   The only contact -- I had had two contacts
10  with Mr. Williams.  I heard Mr. Williams speak at a
11  DSBA meeting, the group that I was with last night.
12     Q.   Yes.
13     A.   And he was down with us with our other
14  lawsuit I guess one evening.
15     Q.   Your other lawsuit?
16     A.   Yes, our high school in Georgetown, we have
17  been sued by the people who were the bonding agents
18  for the HVAC group that went belly-up.
19     Q.   And Mr. Williams had been involved in that
20  lawsuit --
21     A.   No, he has not been involved in it, but for
22  some reason someone asked him to come down and give
23  us some advice about that situation or something.
24     Q.   When Mr. Williams spoke at the DSBA what

**Page 129**

1  was the topic of his speech?
2      A.   He was talking about school Board, about
3  law in Delaware and school law and stuff like that.
4      Q.   Did he have anything to say about the
5  School Board prayer?
6      A.   Yes, he did.
7      Q.   What did he say?
8          MR. ALLINGHAM:  This was not
9          during attorney/client relationship, public
10         speech
11     A.   Is it okay?
12         MR. SHAW:  Who was in attendance
13         at that meeting?
14     A.   Who was in attendance?
15     Q.   This was at a Delaware School Boards
16  Association?
17     A.   This is at a Delaware School Boards
18  Association meeting where a representative from each
19  of the 19 --
20         MR. SHAW:  Then that's fine.
21     Q.   What did Mr. Williams have to say about
22  School Board prayer on that occasion?
23     A.   Mr. Williams used Indian River School
24  District as an example in his speech.

33 (Pages 126 to 129)

Dobrich, et al.                                          v.                          Indian River School District, et al.
Nina Lou Bunting                            Case No. 15-120                            October 13, 2006

Page 130

1   Q.   What did he say?
2   A.   He said that he felt that Indian River
3   School District was a legislative body, and he felt
4   that we had the right to pray at Board meetings.
5   Q.   And was that information helpful to you in
6   the process of selecting a new Board attorney?
7   A.   No, but it made me feel better because of
8   the situation that we had just become involved in.
9   Q.   The situation being this lawsuit?
10  A.   Yes.
11  Q.   Was there any discussion at the Board level
12  about Mr. Williams' statement at the DSBA meeting
13  that the Indian River School Board was a legislative
14  body and that therefore it had the right to pray at
15  its meetings?
16  A.   No.  After my meeting again we had a dinner
17  and then we have a workshop, like last evening we
18  had the dinner and then the workshop afterwards.  At
19  the dinner I relayed the information to Mr. Bireley
20  and Mrs. Mitchell about what had been said at the
21  end of the DSBA meeting, and that was I'm going to
22  say probably 18 months ago.
23  Q.   And did Mr. Bireley or Ms. Mitchell relay
24  that the information to the rest of the Board

Page 131

1   members?
2   A.   I don't know.
3   Q.   Those are the only two that you talked to
4   about it?
5   A.   That's the only two that I recall talking
6   to about it.
7   Q.   Okay.
8           MS. DUPHILY:  We are going
9       off the record at approximately 3:56 p.m..
10          (WHEREUPON a brief recess was
11          taken)
12          MS. DUPHILY:  Back on the
13      record at approximately 4:03 p.m..
14  Q.   Mrs. Bunting, if you look at PX34 which is
15  the document that has Mr. Walls' fax sheet on it?
16  A.   Oh, okay.
17  Q.   This is the document that we established
18  has the five paragraphs that were ultimately adopted
19  as the Board policy down at the back of the
20  document, do you remember that?
21  A.   Yes.
22  Q.   This document is called Policy on Prayer at
23  Board meetings?
24  A.   Okay.

Page 132

1   Q.   And the second whereas clause says,
2   "Whereas this school Board has had a long
3   established custom of solemnifying its proceedings
4   by opening its meetings with a sectarian or
5   non-sectarian prayer," do you know how or when or at
6   whose suggestion the change was made from adopting a
7   policy on prayer at all Board meetings to adopting a
8   policy on prayer that would apply only to regular
9   Board meetings?
10  A.   I have no idea.  I'm just going to suppose
11  that they meant regular Board meetings and didn't
12  say it.  I don't know.
13  Q.   In the stack of exhibits before you
14  somewhere there is a document with a sticker that
15  says PX36.  My first question to you, ma'am is have
16  you ever seen this document before?
17  A.   Oh, gosh here we go.  I don't think I have
18  but I can't say I haven't.  I don't think I have.
19  Q.   Have you ever meet Tom Neuberger?
20  A.   Yes.
21  Q.   In what context?
22  A.   He came down to one of our Board meetings.
23  He came down to be "interviewed" or whatever by us.
24  Q.   Who invited him, do you know?

Page 133

1   A.   I think it was Reggie, I think.
2   Q.   And would was this be to be interviewed to
3   be retained to represent the district in connection
4   with this pending litigation?
5   A.   Yes.
6   Q.   And do you recall that Mr. Neuberger
7   delivered an ultimatum to the Board in which he said
8   look, you are either going to retain me tonight or
9   you are not going to retain me?
10          MR. SHAW:  I am going to object
11      this is attorney/client privilege with
12      respect to representation.
13          MR. ALLINGHAM:  That might be
14      true, but Mr. Gosselin has already let two
15      witnesses answer this question, so whatever
16      privilege exists it's been waived.
17          MR. SHAW:  I will permit the
18      witness on your word that MR. Gosselin has
19      allowed the other witnesses to answer
20      this.
21  Q.   Did Mr. Neuberger deliver an ultimatum to
22  the Board that either you would retain him that
23  night or you would not retain him?
24  A.   I don't recall that he gave us an ultimatum

34 (Pages 130 to 133)

Dobrich, et al.                               v.              Indian River School District, et al.
Nina Lou Bunting                    Case No. 15-120                    October 13, 2006

Page 134

1    that night, but I think it was a situation like, you
2    know, like those people that are trying to sell you
3    something, you know, take advantage of it now or you
4    might not be able to get it later.
5        Q.   So you don't forget call before midnight?
6        A.   Right, yeah and I don't recall if it was
7    that night at that meeting, because I think when he
8    left it was his idea that we were going to
9    deliberate, we were going to talk about it, and I'm
10   not sure if he said if you don't tell me, I'm not
11   sure.
12       Q.   Okay.  The district ultimately decided not
13   to retain Mr. Neuberger, is that right?
14       A.   Yes.
15       Q.   What was the reason for that?
16       A.   In my opinion what was the reason?
17       Q.   Yes.
18       A.   I think several people thought he was too
19   aggressive.
20       Q.   Which people were they?
21       A.   Oh, gosh. I am thinking maybe Mark Isaacs
22   was one, Dr. Isaacs, I'm not sure about Dr. Hattier,
23   possibly, I'm not sure about Mr. Walls, and if
24   Mr. Cohee was there, because a lot of times he's not

Page 135

1    at meetings, I think Mr. Cohee might have a concern
2    because he is a Delaware State Trooper and
3    Mr. Neuberger has been doing some state trooper work
4    and he didn't' know if there would be a conflict,
5    from what I recall.  There were people had different
6    reasons.
7        Q.   And the decision not to retain
8    Mr. Neuberger, do you remember when that took place?
9        A.   I think that evening to the best of my
10   knowledge was that we needed to go slow on this, we
11   needed to talk about it because I don't think at
12   that time we had been sued yet, had we?
13       Q.   That's correct?
14       A.   So, I think it was a situation where why do
15   we need to put the cart before the horse, you know,
16   why don't we sort of a wait and see attitude, or
17   maybe we should talk to someone else about what we
18   should do, we shouldn't just put all of our apples
19   in one basket.  I don't know,  it was people who
20   weren't sure yet what we needed to do.
21       Q.   Were you in that group?
22       A.   No.
23       Q.   You were in favor?
24       A.   I liked Mr. Neuberger.

Page 136

1        Q.   You were in favor of retaining him?
2        A.   Yes, I was.
3             MR. ALLINGHAM:  I am going to
4        mark as PX47, a document bearing Bates
5        numbers P551 to 552.
6             (WHEREUPON Plaintiff's Exhibit 47
7        was marked for identification.)
8        Q.   This is a copy of a, of an article from the
9    Delaware Wave?
10       A.   Right.
11       Q.   This is actually printed off the Internet
12   but it's the same text?
13       A.   Okay.
14       Q.   In August of 2005?
15       A.   Uh-hum.
16       Q.   And to put it in context, you will see that
17   this is shortly following Judge Farnan's decision
18   dismissing the claims against the individual Board
19   members, do you recall that?
20       A.   I know Judge Farnan dismissed it against
21   individual Board members.
22       Q.   This was, this was an article that you gave
23   an interview to Miss Hughes for, is that correct?
24       A.   Yes.

Page 137

1        Q.   And I assume you said things other than, in
2    addition to the things that were quoted here?
3        A.   I didn't say much other than what was
4    quoted.  She had a — she was talking to me on a
5    cell phone while she was driving her car.  I should
6    have known better, and bless her heart she had it
7    all messed up.
8        Q.   Until you gave this interview had you ever
9    met Miss Hughes?
10       A.   I had not met her personally.  I had talked
11   to her on the phone I think one other time, because
12   she was a little thing trying to get information all
13   the time.
14       Q.   This I take it was before your attorneys
15   told you to be very careful about what you say?
16       A.   Yes, it was.
17       Q.   In the third paragraph from the bottom of
18   the exhibit I have given you, PX47, you are quoted,
19   first you are reported as having said you attended
20   Selbyville Middle School and that prayer is not a
21   policy but a tradition?
22       A.   Right.
23       Q.   There is an inaccuracy in that sentence, is
24   that correct?

35 (Pages 134 to 137)

Dobrich, et al.                                v.                    Indian River School District, et al.
Nina Lou Bunting                         Case No. 15-120                          October 13, 2006

Page 138

1    A.   Let me see.
2    Q.   You went to Selbyville High School?
3    A.   I went to Selbyville High School, not
4  Selbyville Middle School, even though the building
5  is the same or was the same. This used to be, it
6  was Selbyville High School and then it became
7  Selbyville Middle School and then a new middle
8  school was built and that's now Selbyville Middle
9  School and this school became Southern Delaware
10  School of the Arts and IRAC.
11       So, when I attended here it was Selbyville
12  High School.
13       Q.   I guess to be technically accurate
14  you must have also attended it when it was
15  Selbyville Elementary School since you --
16    A.   Right.
17    Q.   Since you went to kindergarten here as
18  well?
19    A.   Right. Except it was just called
20  Selbyville High School.
21    Q.   Even when you were in kindergarten?
22    A.   Yeah. It was always Selbyville High School
23  and we went here -- it's a small town Selbyville.
24  We went to school from kindergarten to grade 12

Page 139

1  right in this one building. 36 in our class, if
2  that tells you anything.
3    Q.   So, did you go to school from kindergarten
4  right up through 12th grade in this building?
5    A.   Uh-hum.
6    Q.   So, it's true that you went to middle
7  school here but it wasn't called Selbyville Middle
8  School?
9    A.   It was called Jr. High School in those
10  days. We had elementary, Jr. high and high school
11  and they were all in this building.
12    Q.   I feel sorry for Laren Hughes it sounds
13  like it was a little confusing?
14    A.   I am sure, but she shouldn't write things
15  if she was still confused about them.
16    Q.   Then you are quoted as saying "We represent
17  the people and that's what we're trying to do" she
18  said, Nina Lou Bunting --
19    A.   Where is that?
20    Q.   Right after the, it's the third paragraph
21  from the bottom?
22    A.   Okay.
23    Q.   I read you the sentence that starts Nina
24  Lou Bunting?

Page 140

1    A.   Okay.
2    Q.   And then the next sentence in quotes says,
3  "We represent the people and that's what we're
4  trying to do," she said, referring to Mrs. Bunting,
5  "This is a traditional thing for this area and this
6  area is Christian."
7    A.   Okay we are you now?
8    Q.   I'm sorry, it's the first page of the
9  article?
10    A.   First page of the article.
11    Q.   I don't think you're looking at the same
12  thing I am looking at. That may be what the problem
13  is?
14    A.   That may be.
15       MR. SHAW:  We are on 57?
16       MR. ALLINGHAM:  47.
17       MR. SHAW:  We marked the wrong
18       exhibit.
19    Q.   Okay, may I have it back? No wonder you
20  were having trouble following it.
21    A.   Well.
22       MR. ALLINGHAM:  Okay, I'm going to
23       leave that marked as Exhibit 47 and I'm
24       going to ask to have marked as Exhibit 48 a

Page 141

1       document bearing Bates numbers 549 to 550.
2       And just to correct the record what we had
3       marked as 47 bears Bates numbers P551 to
4       552. That should help.
5           (WHEREUPON Exhibit 48 was
6       marked for identification.)
7    A.   That should help. Okay.
8    Q.   If you will hang on for a minute while I
9       fix my numbers.
10       Okay, let's try it again. I'd like you to
11  look at PX48?
12    A.   Okay.
13    Q.   The headline for which is "Federal Judge:
14  School Board Not Liable."
15    A.   Okay.
16    Q.   Are we on the same page now?
17    A.   Yes.
18    Q.   This is an article from the Wave dated
19  August 10, 2005 written by Laren Hughes.
20    A.   Okay.
21    Q.   I'd like you to look at the third paragraph
22  from the bottom which starts "Nina Lou Bunting?"
23    A.   Right.
24    Q.   And that first sentence says, "Nina Lou

36 (Pages 138 to 141)

Dobrich, et al.                              v.                    Indian River School District, et al.
Nina Lou Bunting                        Case No. 15-120                        October 13, 2006

Page 142

1  Bunting, a Board member said she attended Selbyville
2  Middle School and prayer is not a written policy but
3  a tradition." And then she quotes you, "We
4  represent the people and that's what we're trying to
5  do," she said. "This is a traditional thing for
6  this area, and this area is Christian."
7        Miss Hughes then goes on to report that you
8  said, the Board did not intend to push religion on
9  anyone, and would have gladly allowed others to give
10 their own prayer. "In no way are we trying to
11 offend anyone and if someone wanted to give a prayer
12 at the beginning of school meetings that would have
13 been fine," Bunting said. "We would be happy to her
14 that opportunity."
15       Now, I gather that you read this article
16 from The Wave on or about the time that it issued?
17 A.   Yes.
18 Q.   And if you will now look at Exhibits 47?
19 A.   Is that the other one that I was looking
20 at?
21 Q.   That's the other one?
22 A.   Okay.
23 Q.   And the headline on this one is, "Board
24 Member Disputes Editorial Accuracy."

Page 143

1  A.   Uh-hum.
2  Q.   And this document is a letter to the editor
3  from you, to the editor of The Wave, correct?
4  A.   Uh-hum.
5  Q.   And it's dated August 24, 2005, or exactly
6  two weeks after Miss Hughes' article issued?
7  A.   Uh-hum.
8  Q.   Okay. Now, it was our intent in writing
9  this article, I mean in writing this letter to
10 correct whatever inaccuracies you saw in Ms. Hughes'
11 article which we marked as PX48?
12 A.   Well, attempting to.
13 Q.   Yes, ma'am?
14 A.   Clarify it, if possible.
15       MR. SHAW: Do you have another
16       copy of that?
17       MR. ALLINGHAM: Yeah, I'm sorry,
18       didn't I give it to you?
19       MR. SHAW: You gave me the other
20       one.
21 Q.   And in fact that's what you say in the
22 third paragraph of your letter, you write, "After
23 appealing to the Wave's president and publisher I am
24 writing this to clarify my statements which were

Page 144

1  reported in that article?"
2  A.   Uh-hum.
3  Q.   "As she advised," correct?
4  A.   Right. I spoke with the publisher of The
5  Wave, a gentleman who was not a gentleman. He
6  wasn't very nice and I could not get anywhere with
7  him. He let me know that what she wrote was what I
8  said, and I knew that she had been on a cell phone
9  driving a car, and that she did not have things
10 correct, and I wanted them clarified.
11       So, I called the president of the
12 publishing company, The Wave is one of their papers
13 and over in Salisbury, Maryland, I talked to her and
14 her suggestion was to just send a letter to the
15 editor attempting to clarify my position because he
16 obviously wasn't going to do anything about it.
17 Q.   So, to clarify your position if Ms. Hughes
18 reported things in a way that made your position
19 ambiguous or misleading or —
20 A.   Well, it was just things that weren't true.
21 You know, people around here know I'm too old to
22 have gone to Selbyville Middle School and all that
23 kind of stuff, you know.
24 Q.   And also to correct whatever factual

Page 145

1  inaccuracies —
2  A.   Yes.
3  Q.   — or misquotes you saw in the article?
4  A.   Yes, misquotes, inaccuracies,
5  misunderstandings. You know, I don't think Laren
6  deliberately put something in there, I think she was
7  just trying to write down notes and when she went
8  back to put it together she just — it didn't come
9  out right, put it that way.
10 Q.   Okay, and to sort of sum this up, in the
11 call to the publisher, the call to the president and
12 then ultimately in this letter, what you were trying
13 to do was to correct whatever mistakes you saw in
14 Ms. Hughes' article?
15 A.   Trying to correct the mistakes and try to
16 make it clear about what was truly the right answer
17 the best I could, you know, without going on and on,
18 and on. I'm a teacher, you know, I could clarify
19 for weeks, but trying to make it as simple as
20 possible, let's put it that way.
21 Q.   So, let me go down the corrections?
22 A.   Okay.
23 Q.   The fourth paragraph, you say, "To begin
24 the front page caption misleads the readers because

37 (Pages 142 to 145)

Dobrich, et al.                        v.                    Indian River School District, et al.
Nina Lou Bunting                  Case No. 15-120                        October 13, 2006

Page 146
1   the Indian River School Board is still liable as a
2   group. It is the Board members as individuals who
3   the judge has determined to be not liable."
4      A.   Right.
5      Q.   And looking back at PX48, the front page
6   caption that you are talking about is the caption or
7   headline that says "Federal Judge: School Board Not
8   Liable?"
9      A.   So, I thought the public would get the idea
10  that the Board was not liable and it was all over.
11     Q.   And wanted the public to know that the
12  litigation was still going on?
13     A.   Well, I just wanted it clarified. You are
14  not supposed to put inaccuracies out there in the
15  public.
16     Q.   When you corrected that what you said is,
17  "It is the Board members as individuals who the
18  judge has determined to be not liable, but the
19  Indian River School Board is still liable as a
20  group?"
21     A.   Yes.
22     Q.   Do you see that?
23     A.   Yes.
24     Q.   What did you mean liable?

Page 147
1      A.   I guess I was using their word.
2      Q.   The Wave's word?
3      A.   Yeah. That if that was the word that they
4   wanted to use. What I meant was we have still been
5   sued as a group.
6      Q.   And is it your understanding that as a
7   group you could sill be required to pay damages?
8      A.   Well, as a group we were still responsible
9   for whatever came along, as a group. It's just it
10  was no longer an individual thing.
11     Q.   Okay.
12     A.   I mean I didn't know what was going to come
13  along.
14     Q.   But that was the distinction or correction
15  that you were trying to make, it was only as
16  individuals?
17     A.   It was only as individuals that any type of
18  decision at all on anything had been made at this
19  point.
20     Q.   Okay. In the next paragraph you say, "The
21  continuation of that article on page three
22  incorrectly states that I attended Selbville Middle
23  School (it was Selbyville High School)," and that's
24  the statement that we just read a minute ago where

Page 148
1   it says, "Nina Lou Bunting a Board member said she
2   attended Selbville Middle School?"
3      A.   Yes, uh-hum.
4      Q.   And then you go to say, back to your
5   letter, "And the reference to prayer being a
6   tradition without being a written policy was what I
7   said about prayer at the Board level, not at
8   Selbville Middle School as the copy states."
9      A.   Right.
10     Q.   And so, I just want to make sure I
11  understand it, when you told Laren Hughes that
12  prayer is not a written policy but a tradition, you
13  meant prayer at the Board meetings?
14     A.   I meant prayer at the Board meetings. and
15  what she had written in the paper was that Nina Lou
16  Bunting said that when she attended Selbville
17  Middle School they had prayer. So it sounded like
18  that we had prayer in the classroom at Selbville
19  Middle School.
20     Q.   I don't see that it says Nina Lou Bunting
21  said when she attended Selbyville Middle School --
22     A.   No, but.
23     Q.   -- but I can see that you would be worried?
24     A.   That's what I was afraid that people would

Page 149
1   think.
2      Q.   And that's what you wanted to correct?
3      A.   Yeah.
4      Q.   Okay. And when you attended Selbville
5   Middle School was there prayer in the classroom?
6      A.   When I attended Selbyville High School?
7      Q.   Sorry, yes?
8      A.   Yes.
9      Q.   I apologize.
10     A.   Yes, there was in elementary school.
11     Q.   But your point was that's not the case
12  anymore?
13     A.   No.
14     Q.   All right, and then in the next paragraph
15  you have another correction in which you say, "The
16  Indian River District has policies in place
17  regarding school functions such as banquets,
18  sporting events, graduations, etc. which comply with
19  state law as to religion. This article was speaking
20  to the lawsuit about prayer at Board meetings and
21  should not have confused the reader about schools
22  and prayer in general."
23          My first question is, is that kind of the
24  same issue you were talking about, this blurring of

38 (Pages 146 to 149)

Dobrich, et al.                                    v.                      Indian River School District, et al.
Nina Lou Bunting                           Case No. 15-120                        October 13, 2006

Page 150

1    the distinction between School Board prayer and
2    school prayer generally?
3        A.   Yes, and Laren kept jumping around with her
4    questions, you know, and she kept taking me from
5    what it used to be like when I was in school to what
6    it's like now, and back and forth and that's how she
7    got it confused. So, I wanted it clear that this
8    whole thing was about prayer at Board meetings, not
9    anywhere else.
10       Q.   Now, your letter goes on then to address an
11   editorial that was in The Wave --
12       A.   Yes.
13       Q.   Which we haven't looked at and I don't
14   actually have, to tell you the truth, and so I'm not
15   going to concern ourselves with this editorial and
16   the changes.
17       A.   Well, the man I talked to who is the editor
18   of the paper that's -- he got his information from
19   Laren, so then when he wrote the editorial he had
20   everything screwed up in the editorial.
21       Q.   And actually I spoke too soon, I see that
22   the editorial apparently reproduced something that
23   was in Laren's article, so let's talk about that as
24   well.

Page 151

1        At the bottom of PX47 you say in your
2    letter, the sixth paragraph misquotes that I, "Would
3    be glad to give anyone the opportunity to offer a
4    prayer of their choosing at school meetings," and
5    you correct that, "School meetings? Again an
6    interview where words were taken out of context, as
7    I referred to compromises which could have been made
8    at school functions in lieu of filing the lawsuit a
9    year ago."
10       I'm having a little trouble understanding
11   this. Is what you are saying that --
12       A.   What I'm saying is in that situation if
13   Mona Dobrich had come to us earlier --
14       Q.   Yup.
15       A.   Knowing that she had been in our district,
16   grew up in our district, and then her daughter and
17   son were growing up in our district, her daughter
18   had gone all the way through, if she had come to us
19   sooner, then there could have been situations where
20   we could have intervened. Like at banquets and
21   things, and you know, have a rabbi one month and
22   somebody else the next month.
23       That's what I was saying, there could have
24   been compromises done, had we had talked earlier,

Page 152

1    then bing bang here we are, you know.
2        That's what I was referring to.
3        Q.   Did it occur to you that Mrs. Dobrich was
4    trying to be tolerant of other people's religions?
5        A.   Well, what occurred to me, quite honestly
6    what has occurred to me is that Mrs. Dobrich lived
7    here all these years and was well meshed in with the
8    community and had friends in this community,
9    celebrated with friends in this community, I might
10   add Christmas celebrations as well, and if she was
11   offended ever at anything, she never said anything
12   ever. I mean, not even to friends or people that
13   have told me things.
14       So, this is a nice place to be around here.
15   People are tolerant, and nobody wants to hurt
16   anybody's feelings that I know of or offend anyone.
17   So, I just wish she had said something sooner, so we
18   could have started working something out.
19       Q.   And the kinds of things that you might've
20   thought of to work things out would be, for example,
21   to have a rabbi and a minister offer blessings at
22   academic banquets?
23       A.   Why not?
24       Q.   I don't know.

Page 153

1        A.   Why not? Why not have one or the other,
2    why not have both. I mean why not? And to be quite
3    honest, you know when, you don't think about it this
4    community is like I said it is Christian community,
5    and we don't usually see people of other religious
6    backgrounds and all in our day do day goings on, and
7    maybe we don't think about it.
8        But you know I really honestly feel if she
9    had brought it to our attention sooner and in a
10   different way, she knew graduation was coming up and
11   instead of waiting until a prayer was given, which I
12   might add the School Board has no control over, then
13   maybe this could all have been averted.
14       Q.   Do you know when this lawsuit was filed?
15       A.   I've forgotten.
16       Q.   I will get it for you, hang on. It was
17   filed on the last day of February of 2005, February
18   28, 2005
19       A.   Well, we were certainly -- we had been
20   expecting it for months, and months and months.
21       Q.   Do you know whether Mrs. Dobrich and her
22   attorneys made any effort to avoid litigation?
23       A.   I wouldn't know, sir, I have no idea.
24           MR. ALLINGHAM: I'm going to ask

39 (Pages 150 to 153)

Dobrich, et al.                                v.                Indian River School District, et al.
Nina Lou Bunting                    Case No. 15-120                        October 13, 2006

Page 154

1    the court reporter to mark as PX49 a
2    document bearing Bates numbers D19 through
3    D23.
4              (WHEREUPON Plaintiff's Exhibit 49
5          was marked for identification.)
6    Q.    Now, I'm going to tell you what this letter
7    is.
8    A.    Okay.
9    Q.    It's a letter with my illegible signature
10   at the end, fortunately we also type the name so you
11   can tell who it is. It's dated November 12, 2004
12   and it's directed to the Board members of the Board
13   of Education. Do you know whether you got a copy of
14   this letter?
15   A.    You know, here we go again. It says dear
16   Board members, and I'm sure I probably did.
17   Q.    Let me just ask you a couple of questions
18   about that Mrs. Bunting?
19   A.    Uh-hum.
20   Q.    It's probably uncommon for you to get a
21   five page single spaced letter from some law firm,
22   do you have any independent recollection that you
23   got this, or can you recall that you didn't get it?
24   A.    I could not recall that I did or did not.

Page 155

1    I assume that I did because I know our district is
2    pretty good about making sure that we get things
3    that we are supposed to get.
4    Q.    I'm going to read the first paragraph.
5    A.    Okay.
6    Q.    "Dear Board Members, we represent Mona
7    Dobrich and her family. We have reviewed the Indian
8    River School District's policies on School Prayer at
9    Commencement/Graduation and Baccalaureate
10   Ceremonies, Board Prayer at Regular Board Meetings,
11   and Religion," which we then define as the policies,
12   "and have the following questions regarding the
13   policies. We commend the Board for recognizing its
14   obligation to adhere to Federal and State
15   Constitutional principles and provisions, statutes
16   and regulations pertaining to religious observances
17   in public schools and the matter addressed in the
18   policies. Our questions are designed to help us
19   (and, we hope, the Board as well) understand whether
20   the policies accomplish that goal. We look forward
21   to your responses and to working constructively and
22   cooperatively with you to ensure that the district's
23   policies are in accord with constitutional
24   principles."

Page 156

1    And there follow several pages of questions
2    about the policies that the Board had adopted?
3    A.    These are the new policies that the Board
4    had adopted?
5    Q.    Yes, ma'am.
6    A.    In 2004 or whatever?
7    Q.    Yes, ma'am.
8    A.    After Mona complained?
9    Q.    Yes. So the sequence of events, just so
10   you have the timing in place?
11   A.    Okay.
12   Q.    Graduation occurred in 2004, I believe in
13   the first week of June of 2004?
14   A.    Yes, it would have been.
15   Q.    Mrs. Dobrich complained to Mrs. Hobbs after
16   graduation, and that set into process without who's
17   responsible for what, set into process the Board's
18   consideration of the policies. Do you recall that
19   generally?
20   A.    I know she complained after the --
21   Q.    Graduation?
22   A.    Graduation.
23   Q.    And that was what set into process the
24   Board working on the policies?

Page 157

1    A.    Right. And I don't recall, as I said,
2    being at the June meeting.
3    Q.    Right?
4    A.    So by the time it was coming along, okay,
5    it was near the end of the summer for me.
6    Q.    The School Board prayer Policy was adopted
7    on October 19th?
8    A.    Okay.
9    Q.    So that was sort of at the end of the Board
10   process and before this letter?
11   A.    Okay.
12   Q.    Okay? And the other policies were adopted
13   also on October 19th?
14   A.    Okay.
15   Q.    Okay. So, this letter follows it by three,
16   three and a half weeks?
17   A.    So, this was looking at our policies that
18   you say we adopted in what October?
19   Q.    October 19, 2004.
20   A.    And this was questioning those policies?
21   Q.    This was asking questions --
22   A.    About those policies.
23   Q.    -- about the policies and about how the
24   Board understood the policies.

40 (Pages 154 to 157)

Dobrich, et al.                                           v.                    Indian River School District, et al.
Nina Lou Bunting                          Case No. 15-120                              October 13, 2006

Page 158

1     A.   Okay.
2     Q.   Okay.  And as we wrote in the letter, "Our
3   questions are designed to help us and we hope the
4   Board as well understand whether the policies
5   accomplish that goal.  We look forward to your
6   responses and to working constructively and
7   cooperatively with you to ensure that the district's
8   policies are in accord with constitutional
9   principles."
10        Now, my question to you is, when you read
11   this letter, and I'm going to assume for the moment
12   that you did read it, since as you pointed out the
13   district is good at getting letters out to you?
14    A.   Uh-hum.
15    Q.   Did that sound like a letter of somebody
16   who was rattling sabers, or did it sound like the
17   letter of somebody who was trying to work with the
18   Board?
19    A.   From looking at it now, it looks like
20   someone who's trying to work with the Board, but
21   there are an awful lot of questions, so I don't know
22   I haven't read them all yet.  I'm sure I did at the
23   time.
24    Q.   Do you know how the Board responded to the

Page 159

1   request from Mrs. Dobrich's lawyers for
2   clarification, and for an opportunity to work
3   constructively and cooperatively with the district?
4    A.   I would say that I know that all of us
5   would not have sat down and gone through each of
6   these and tried to hammer it out.  Because, as I
7   said there are ten of us that are long winded and we
8   would have been all night, you know what I mean?
9        So, I'm sure that we turned this over
10   either to the policy committee or someone to
11   probably go through and answer the questions.  Are
12   you saying they did not get answered?
13    Q.   Well, my first question is do you know
14   whether any response was delivered?
15    A.   I have no idea, and I can say that it would
16   not have come from the full Board, I can assure you
17   of that, because it would have been labor intensive
18   if we had all tried to hammer through this.
19    Q.   If, and I'm just asking about you as an
20   individual Board member, reading the opening of this
21   letter, would it have been your desire that some
22   response have been provided to Mrs. Dobrich's
23   lawyers?
24    A.   Some response should have been provided?

Page 160

1     Q.   Yes.
2     A.   Yes, some response should have been
3   provided.
4         MR. ALLINGHAM:  I'm going to ask
5        the court reporter to make as PX50, a
6        document which has no Bates number on it on
7        One Rodney Square letterhead bearing my
8        signature dated December 16, 2004.
9             (WHEREUPON Exhibit 50 was
10        marked for identification.)
11    Q.   This letter is addressed to the individual
12   Indian River School Board members, but a copy is
13   marked to Mr. Griffin and to superintendent Lois
14   Hobbs, do you see that?
15    A.   Yes.
16    Q.   And you see that all of the copies are to
17   be delivered by U.S. Mail?
18    A.   Yup.
19    Q.   I will represent to you Mrs. Bunting that
20   we did the best we could to find everybody's address
21   and to mail them with a stamp to you at your homes.
22   My first question to you is do you know whether you
23   received this December 16, 2004 letter?
24    A.   Again I would not remember, but again I

Page 161

1   would hope that I received it.
2    Q.   The first paragraph of this letter which is
3   addressed to you as well as your colleagues on the
4   Board reads, "On November 12, 2004 we sent a letter
5   on behalf of our clients Mona Dobrich and her family
6   to the Indian River Board of Education and its
7   members, seeking clarification on the district's
8   recently implemented policies on School Prayer at
9   Commencement/Graduation and Baccalaureate
10   Ceremonies, Board Prayer at Regular Board Meetings,
11   and Religion.  To date, we have not received answers
12   to our questions, or a statement from the Board
13   showing its intent to reply."
14        Now, looking at the two letters, as a
15   Board member are you disappointed that no response
16   whatsoever of any kind had been given to Mrs.
17   Dobrich's lawyers in the more than a month since the
18   November 12th letter?
19    A.   I would say that you should have received
20   some response.
21    Q.   The next paragraph reads, "Considering the
22   importance of the constitutional principles
23   involved, and the time that has elapsed, we would
24   appreciate it if the Board would extend to us the

41 (Pages 158 to 161)

Dobrich, et al.                              v.                    Indian River School District, et al.
Nina Lou Bunting                    Case No. 15-120                        October 13, 2006

Page 162
1 courtesy of a reply either answering our questions
2 or indicating your intention not to answer those
3 questions by January 7, 2005. If we do not receive
4 a response by that date, we shall assume,
5 reluctantly, that the Board does not intend to
6 respond.
7     We still look forward to receiving your
8 answers to these questions, and working with you to
9 insure that the district's policies are in accord
10 with constitutional principles. If you have any
11 questions, please feel free to contact us."
12     And then the last paragraph says, "If we
13 are unable to meet, we will regretfully have to
14 consider other options to insure that the district's
15 policies comply with the Constitution. If you have
16 any questions, pleases feel free to contact us."
17     As a School Board member, would it have
18 been your desire to, for the district to issue some
19 kind of response to the letter PX50?
20   A.  My answer is in a question form back to
21 you, where were our lawyers?
22   Q.  They weren't my lawyers,ma'am.
23   A.  And I'm afraid, I shouldn't say this, but I
24 wish they hadn't been ours. We thought that we had

Page 163
1 legal representation, and to me things like this
2 should have been something that our lawyers should
3 have been handling.
4   Q.  The Board's attorney at the time was James
5 Griffin, is that right?
6   A.  The Board's attorney was James Griffin.
7   Q.  We copied this letter to James Griffin, do
8 you see that?
9   A.  Yes, sir.
10   Q.  Did the Board ask Mr. Griffin what to do?
11   A.  Did he we ask him what to do?
12   Q.  Sure?
13   A.  I wouldn't have had no idea if we asked
14 him. Maybe someone, maybe the president or maybe
15 Mrs. Hobbs asked him, I don't know.
16   Q.  Is it correct Mrs. Bunting --
17   A.  He doesn't attend our meetings.
18   Q.  I understand. Is it correct that for the
19 purposes of this question I'm going to assume that
20 the mail worked and that you got the November letter
21 and the December letter?
22   A.  Uh-hum.
23   Q.  Did you yourself ask at a Board meeting
24 either in November or December has anybody done

Page 164
1 anything to respond to these letters from this
2 fellow Allingham?
3   A.  I probably would not have since I am not,
4 you know, this type of thing reading things like
5 this or how to work the VCR, or whatever throws me
6 into total old age overload. So, this is something
7 that I would want referred to someone who knew what
8 they were doing, and I know what assuming does, but
9 I think I would have assumed that someone in the
10 know would have taken care of this.
11   Q.  Would you agree with me that the tone of
12 these letters is not confrontational but rather
13 cooperative?
14   A.  It looks cooperative.
15   Q.  Do you recall that at the December 21, 2004
16 Board meeting, five days after the date of my second
17 letter, Mrs. Dobrich came to the Board and said, why
18 won't you answer our questions?
19   A.  I've no recollection of that. I don't
20 recall that.
21   Q.  If you have the audio let's play the audio.
22   A.  The only meeting I recall her being at is
23 the one where all the people were there.
24   Q.  This would be P51 if I mark the exhibit.

Page 165
1 I'm going to give you a copy of a document that we
2 have previously marked as PX21, Mrs. Bunting?
3   A.  Okay.
4   Q.  Oh, sorry I either throw it too short or
5 throw it too long.
6     This is a copy of the final minutes of the
7 Board's meeting on December 21, 2004 and you are
8 listed as being in attendance on the first page, do
9 you see that?
10   A.  Yes.
11   Q.  If you look on the third page of the
12 minutes under public comments?
13   A.  Uh-hum.
14   Q.  You see Mona Dobrich?
15   A.  Yes.
16   Q.  Do you see that the minutes record, "Mrs.
17 Dobrich noted that she had requested clarification
18 through her attorney on the recently adopted
19 policies regarding religion, however she had not yet
20 received a response."
21     Does that refresh your recollection that
22 after the two letters were sent and Mrs. Dobrich
23 still nod no response she appeared personally before
24 the Board and asked if she could get a response to

42 (Pages 162 to 165)

Dobrich, et al.                                    v.                    Indian River School District, et al.
Nina Lou Bunting                          Case No. 15-120                           October 13, 2006

Page 166

1  her questions?
2     A.   I can't say I don't remember and I can't
3  say I do remember.  I mean obviously she was there
4  and obviously she said it cause it's in the minutes.
5     Q.   You don't doubt that it happened you just
6  can't remember?
7     A.   I don't doubt that it happened, but I
8  couldn't say, you know, if you had a gun up here yes
9  or no.
10    Q.   I asked you earlier in your deposition
11 about the harassment of the Dobriches and whether
12 you had ever heard that she and her family had been
13 harassed by the community, or community members.
14 The minutes record that Mrs. Dobrich stated, "That
15 she and her son had moved away from Georgetown to
16 the city due to the continued harassment of
17 community members because of this issue?"
18    A.   Okay.
19    Q.   Does that refresh your recollection that
20 you did learn that Mrs. Dobrich and her family moved
21 because of harassment from community members?
22    A.   No, it does not refresh my memory.  I
23 mean --
24    Q.   Do you doubt that you were told that?

Page 167

1     A.   No I don't doubt that I was told that.  I
2  just don't recall it.
3     Q.   I have a tape of the meeting if you'd like
4  to hear it?
5     A.   Yeah, well it's down here and I assume it
6  happened.
7     Q.   Do you know whether the Board responded to
8  either of my letters before January 7?
9     A.   I have no idea.
10    Q.   As an individual Board member do you think
11 that the district should have responded to my
12 letters and Mrs. Dobrich's personal request?
13    A.   It looks like something should have been
14 done, even if it was just letting you know that they
15 were working on it, and they would be coming along
16 with it when they could.
17         MR. ALLINGHAM:  Would you mark
18      please as PX51 a letter on One Rodney
19      Square letterhead to the Board of Education
20      of Indian River School District from Thomas
21      J. Allingham dated January 7, 2005.
22         (WHEREUPON Plaintiffs's Exhibit
23      51 was marked for identification.)
24    Q.   This is a letter that I sent to the Board

Page 168

1  members, you'll see that copies are marked to each
2  individual Board member on the second page.  And
3  here I record, "We appreciated the recent phone call
4  from the Indian River School District's attorney,
5  James Griffin, and the materials that he provided
6  for our review.  We hope that communication between
7  the Indian River Board of Education and our client
8  Mona Dobrich will continue and remain constructive.
9  We propose a private meeting with members of the
10 Board and Mr. Griffin to discuss our concerns with
11 the policies."  And we proposed dates thereafter.
12    A.   Okay.
13    Q.   Do you know whether any response was given
14 to that request?
15    A.   No, I wouldn't be in position to know.  I'm
16 just -- I'm not a president or a vice president, you
17 know.
18    Q.   I gather this was not something that was
19 ever discussed at a Board meetings?
20    A    Again that assuming, and I know some people
21 take a while getting around to doing things.
22    Q.   Having now had the opportunity to review
23 this correspondence which took place over a period
24 of almost two months, do you have a different view

Page 169

1  about whether Mrs. Dobrich tried to avoid litigation
2  with the district?
3     A.   Yes and no.
4     Q.   Explain what you mean?
5     A.   I don't feel this was the district avoiding
6  Mrs. Dobrich, because I know as a Board member that
7  I was not aware that these things were not being
8  taken care of, okay?  So, I feel in the chain of
9  responsibilities that somehow someone or some people
10 on our end maybe weren't doing what they were
11 suppose to do, but I wasn't aware that this was not
12 occurring.
13    Q.   Yes, ma'am.
14    A.   Okay?
15    Q.   That's from your end, and then my question
16 was really directed more to Mrs. Dobrich's end, do
17 you have a different view as to whether Mrs. Dobrich
18 from her perspective was trying her best to avoid
19 litigation with the district?
20    A.   The main thing that I'm concerned about
21 with Mrs. Dobrich from her point of view is about
22 just the prayer, not these other policies.  And I
23 feel that all of these other things involved made it
24 too cumbersome and I don't think she tried hard

43 (Pages 166 to 169)

Page 170

1  enough to dismiss the prayer at Board meetings.
2      I think she had too many other things that
3  she was concerned about as well with all of this,
4  with all of these questions and everything.
5      Q.   Mrs. Bunting, nobody ever gave Mrs. Dobrich
6  an opportunity to discuss any of those things
7  because we never got a reply.  Do you think that's
8  Mrs. Dobrich's fault?
9      A.   That we didn't -- that she didn't get a
10 reply?
11     Q.   Yes.
12     A.   Well, I think this is a situation from
13 lawyer to lawyer situation.  I don't see it as being
14 Mrs. Dobrich and us.  You know, if maybe we could
15 have gotten rid of the middlemen and sat down
16 together type of thing.
17     Q.   Well, that's precisely what we were asking
18 for in our letter.  I've heard from you today that
19 it would have been great if Mrs. Dobrich had --
20     A.   Right.
21     Q.   -- sat down with you and tried to work out
22 a compromise.
23     A.   I'd like to talk -- I would like to have
24 talked to Mrs. Dobrich one on one type of thing.  I

Page 171

1  think when all of this was letters back and forth to
2  each other and one person writes this and somebody
3  else writes that and you assume this one did this
4  you assume that one did that and all of it comes up
5  it came to the point that it came to.
6      Q.   Well, let me ask you this --
7      A.   It could have been a lot more simple than
8  this.
9      Q.   Did the Board ever say as a Board I think
10 we should just stiff arm Mrs. Dobrich?
11     A.   I think we should just do what, sir?
12     Q.   Stiff arm, do you know that term?  Should
13 we just not respond to Mrs. Dobrich?
14     A.   Not to my knowledge, no, we knew that we
15 needed to respond.
16     Q.   Has -- this is a different topic, has David
17 Williams represented the district in this
18 litigation?
19     A.   In this litigation?
20     Q.   Yes, ma'am.
21     A.   David Williams?
22     Q.   Yes, ma'am.
23     A.   I don't know, I don't think so in this
24 litigation?

Page 172

1      Q.   Yes.
2      A.   David Williams?
3      Q.   Yes.
4      A.   Oh, no but now wait a minute, when we were
5  not pleased with our former lawyers, David Williams
6  came to a meeting, I think I told you that was the
7  second time I ever saw him.
8      Q.   Uh-hum, yes.
9      A.   Now, was he there about that or was he
10 there about our other lawsuit.  I'm not sure.
11     Q.   Okay, now I'd like to come back briefly to
12 Laren Hughes' article and your correcting letter?
13     A.   Okay.
14         MR. ALLINGHAM:  Actually, Mrs.
15     Bunting let's go this, I am going to ask
16     Ms. duPhily to change the tape.  I have a
17     couple of more questions on these two
18     letters and while we are changing the tape
19     I will talk to my colleagues and make sure
20     I have nothing else, okay.
21         MS. DUPHILY:  We are going off
22     the record at approximately 4:57 p.m..
23         (WHEREUPON a brief recess
24     was taken)

Page 173

1         MS. DUPHILY:  Back on the
2     record at approximately 5:10 p.m
3      Q.   In PX47, your letter of clarification, down
4  at the bottom of the first page we looked earlier at
5  this paragraph, the sixth paragraph misquotes that
6  I, "Would be glad to give anyone the opportunity to
7  offer a prayer of their choosing at school
8  meetings."  Are you saying here that Laren Hughes
9  misquoted you, that is, that the words are incorrect
10 in the quote when she reported that you said, "In no
11 way are we trying to offend anyone, and if someone
12 wanted to give a prayer at the beginning of the
13 school meetings that would have been fine," Bunting
14 said, "We would be happy to give her that
15 opportunity."
16     A.   Where is this one now?
17     Q.   You are going to look at PX48, second
18 paragraph from the bottom, do you see that?
19     A.   Number one, yes I'm saying I was misquoted
20 because I wouldn't have the power to give anyone the
21 ability to pray at the beginning of a meeting.
22 I'm not the Board president.
23     Q.   That you don't have the power to do that,
24 doesn't mean you wouldn't, couldn't have said that

44 (Pages 170 to 173)

Dobrich, et al.
Nina Lou Bunting

v.

Case No. 15-120

Indian River School District, et al.
October 13, 2006

Page 174

1 ma'am?
2    A.   No, it doesn't mean that I couldn't have
3 said it, but she's misquoted it. I did say that we
4 as Board members didn't want to offend anyone, and I
5 think she got all that screwed up with someone
6 having the opportunity at what she called a school
7 meeting, that someone would have the opportunity
8 like at a dinner that we would have for the athletes
9 or the academic banquets, or something someone would
10 the opportunity to offer it at that time.
11    Q.   I understand, okay. And that completes the
12 corrections and clarifications that you set forth in
13 your letter, am I right?
14    A.   Well, I'm not so sure that it completed
15 anything, but I was attempting to get a little bit
16 more clarification if someone had actually read this
17 in the paper, you know, and saw all the crazy
18 things. I was just attempting to make some
19 clarification to try to clean it up a little.
20    Q.   It gets late in the day and we have to be
21 careful about the questions. My question was that
22 completes the corrections and clarifications that
23 you set forth in your letter to The Wave?
24    A.   That completes what I set forth in my

Page 175

1 letter at that time, yes. Whether they were
2 completely clarified, I don't know.
3    Q.   You did not offer any correction or
4 clarification of the quote in the third paragraph
5 from the bottom of the article, which says, "We
6 represent the people and that's what we're trying to
7 do." Is it your sense that that was an accurate
8 quotation?
9    A.   It might not have been the exact words, but
10 that is accurate that we do represent the people.
11    Q.   And the next sentence is, "This is a
12 traditional thing for this area and this area is
13 Christian."
14    A.   Again, it might not have been the exact
15 words but yes --
16    Q.   That's accurate?
17    A.   We represent the people and this is a
18 Christian area, yes, I did say that.
19    Q.   Would you describe for me how you see your
20 responsibility to represent your constituents? Is
21 it that you have to try to understand what a
22 majority of your constituents want and then try to
23 effectuate that?
24    A.   It is my opinion that I pretty well know

Page 176

1 what my constituents want having lived here 64
2 years, and knowing so many people. Believe me, they
3 let you know what they want. Where ever you are
4 people knowing you come up to you and tell you. I
5 mean I get calls all the time about all kinds of
6 different things, whether the bathrooms are clean at
7 the pool up at, you know, Howard T. Ennis or we hear
8 it all.
9            MR. SHAW:  Tom, I just want to
10       make sure the door is closed it's kind of
11       open.
12            MR. ALLINGHAM:  Sure, go ahead.
13    Q.   So, that's the first step in that
14 representational process, you have to try to
15 understand what it is that your constituents want,
16 and you feel confident based on your 64 years of
17 experience living here that you do have a good sense
18 of what your constituents want?
19    A.   I feel I do.
20    Q.   Do you feel that what your constituents
21 want on the School Board prayer is for you to
22 continue the historical practice of the School
23 Board?
24    A.   Yes, sir.

Page 177

1    Q.   Do you believe that among all the residents
2 in your district that is a unanimous feeling?
3    A.   All of the residents?
4    Q.   Yes, ma'am.
5    A.   Would I say every single person?
6    Q.   Yes, ma'am.
7    A.   Well, you can never say all.
8    Q.   So, the answer --
9    A.   How would you know without counting
10 everyone?
11    Q.   So the answer to my question is no you
12 don't feel like you know what all of your
13 constituents want?
14    A.   No, I don't.
15    Q.   Do you feel it is your obligation as a
16 representative from your district to try to
17 effectuate what a majority of your constituents want
18 as you understand that?
19    A.   I feel in a democracy the majority rules.
20    Q.   Okay. Now, I'm going to ask you a couple
21 of hypothetical situations. Suppose that you
22 learned that your constituents wanted to do
23 something, I can give you a specific example if you
24 want, but let's speak generically first, wanted to

45 (Pages 174 to 177)

Page 178

1  do something that you believed based on the advice
2  of your attorneys was categorically
3  unconstitutional. I'll give you a specific example.
4  Suppose that a majority of your constituents wanted
5  to require that all elementary school children open
6  the school day with a Christian prayer, okay?
7      A.   Okay.
8      Q.   Am I right that you would nevertheless not
9  try to effectuate that desire even though it was
10  held by a majority of your constituents?
11     A.   I couldn't, sir. I would explain to them
12  it's law.
13     Q.   Yes. Now I'm going to give you a second
14  hypothetical. Suppose that a majority of your --
15  you came to the understanding, and you were quite
16  confident about it, that a majority of your
17  constituents wanted to do something that you thought
18  was a terrible, terrible idea, just not good for the
19  students of your district and their education, but
20  not unconstitutional. Would you try to effectuate
21  the desires of the majority of your constituents or
22  would you exercise your own judgment?
23     A.   Again it would have to depend on what it
24  was, and I'll give you an example.

Page 179

1      Q.   Okay.
2      A.   They are thinking about putting in a dress
3  code.
4      Q.   Yes.
5      A.   And it sounds like the majority of the
6  people probably will agree with it.
7      Q.   When you say the people you mean your
8  constituents?
9      A.   My constituents. And I will vote for it if
10  that's what the people want me to vote for, but
11  personally I think it's a hardship on low income
12  people who can depend on clothes from relatives or
13  from yard sales and things like that. I'm also
14  concerned about children who are heavy, who when
15  required to put your shirt in, that type of thing,
16  especially young girls and their self-esteem. So, I
17  would be -- I would not want to vote for it myself
18  under certain situations, but if my constituents
19  wanted me to then I would vote for it.
20          Now, if it has to do with an educational
21  thing, having had 39 years of experience as a
22  teacher, again I would have to weigh it and hope
23  that my constituents would understand that with my
24  background and experience maybe my decision, if it

Page 180

1  differed from theirs, you know, I have a reason, and
2  I would try to explain that and why I felt
3  differently.
4      Q.   Now, in those issues such as the dress code
5  example that you gave me, where you would subjugate
6  your judgment to the judgment of the majority, in
7  that circumstance would you agree with me that you
8  would be subjugating your judgment to the judgment
9  of the majority, and sacrificing your judgment which
10  is consistent with the judgment of the minority?
11     A.   I would be sacrificing my judgment?
12     Q.   Let me rephrase the question. Would you
13  agree with me that by voting in accord with what the
14  majority of your constituents want, but contrary to
15  your own view, your own personally held view, which
16  personally held view is consistent with what a
17  minority of your constituents want, you would not be
18  serving the interests of your constituents who are
19  in the minority, for example, on the dress code
20  issue lower income people?
21     A.   Well, again I feel that the majority should
22  rule, that's how I got elected. And I feel that in
23  a democracy, you know, an election, whatever, the
24  person with the most votes wins, don't they, and the

Page 181

1  rest of us go on and live with it. Would I feel
2  like I was giving up something?
3      Q.   Yes, ma'am?
4      A.   No.
5      Q.   Would you feel like --
6      A.   Cause I would feel that most of the people
7  got what they wanted.
8      Q.   Would you feel like you were trying to
9  represent the interests of all of your constituents?
10     A.   You can't represent the interests of all of
11  your constituents.
12     Q.   Isn't it the case that you could represent
13  the interests of all of your constituents by
14  exercising your best judgment, your best judgment,
15  and not submitting issues to in effect a referendum?
16     A.   Hit me with that one again, please?
17     Q.   I'll withdraw it.
18          There are many models of representational
19  government. One possibility is that a
20  representative would be elected and then take it as
21  her responsibility to exercise her independent
22  judgment relying on her constituents to vote her out
23  of office if they don't like her judgments.
24          A different model for representational

46 (Pages 178 to 181)

Dobrich, et al.                                        v.                          Indian River School District, et al.
Nina Lou Bunting                           Case No. 15-120                                    October 13, 2006

Page 182

1    governmental, we could call it the referendum model,
2    would have that representative simply trying to
3    determine what the majority thinks in every respect
4    and just voting as the majority would vote, in
5    effect the pass-through.
6         I take it that you view your role more as a
7    pass-through than as a person who regardless of what
8    the majority thinks should exercise her own
9    independent judgment?
10   A.   Is that what I say when I answer?
11   Q.   That's what I asked you?
12   A.   I just see myself as someone who tries to
13   make the best decisions she knows how to make with
14   the support of the people who put her in office.
15        Q.   The quote in this article is, "We represent
16   the people and that's what we are trying to do."
17   This, which is School Board prayer, "This is a
18   traditional thing for this area and this area is
19   Christian." What is the significance in your
20   thinking on School Board prayer of the fact that
21   this area is Christian?
22   A.   What is my thinking that this area is
23   Christian?
24   Q.   No, what is the significance of that fact

Page 183

1    in your thinking on School Board prayer?
2    A.   That the people in this area believe in
3    prayer, it's been a tradition to have it at the
4    School Board level at the regular meetings, and they
5    don't want to give it up.
6    Q.   And that's important to you, correct?
7    A.   That's my thinking.
8    Q.   That's important to you, correct?
9    A.   That's important to me that the people who
10   support me want this.
11   Q.   When you were going to school, elementary
12   school at Selbyville High School --
13   A.   Uh-hum.
14   Q.   -- it was a tradition to have prayer in the
15   it the classroom, correct?
16   A.   Yes.
17   Q.   And would it be your best guess that the
18   constituents strongly supported prayer in the
19   classroom at that time?
20   A.   I'm sure they must have.
21   Q.   If you had been serving as a Board member
22   at that time and received advice that despite the
23   fact that the constituents in that district strongly
24   supported prayer in the classrooms, prayer in the

Page 184

1    classroom was unconstitutional, would you have voted
2    to get rid of it or would you have fought to keep
3    it?
4    A.   I do not, could not vote for something that
5    was against the law, and my constituents would
6    understand that you can't support something that's
7    against the law.
8    Q.   What I hope will be one last question.
9    It's your understanding that there is no definitive
10   decision on whether School Board prayer is against
11   the law or not, correct?
12   A.   That is correct.
13   Q.   And as long as you don't have a definitive
14   indication of whether it's against the law or not
15   your view is that as a School Board member you're
16   going to do what your Christian constituents want
17   you to do?
18   A.   That's correct.
19        MR. ALLINGHAM: I am concluded,
20        thank you very much for your patience.
21        MS. DUPHILY:  We are going off the
22        record at approximately 5:17 p.m..
23
24

Page 185

                    I N D E X

DEPONENT:    NINA LOU BUNTING                PAGE

     Examination by  Mr. Allingham            2


                  E X H I B I T S

NINA LOU BUNTING                         MARKED

47   Letter to the editor            136

48   News article                    141

49   Letter dated November 12, 2004      154

50   Letter dated December 16, 2004      160

51   Letter dated January 7, 2005        167


ERRATA SHEET/DEPONENT'S SIGNATURE      PAGE  186

CERTIFICATE OF REPORTER           PAGE   187

47 (Pages 182 to 185)

Dobrich, et al.
Nina Lou Bunting

v.
Case No. 15-120

Indian River School District, et al.
October 13, 2006

Page 186

```
 1
 2              ERRATA - BUNTING
 3
       PAGE    LINE #     CORRECTION
 4     ----    -----    --------------
 5     ----    -----    --------------
 6     ----    -----    --------------
 7     ----    -----    --------------
 8     ----    -----    --------------
 9     ----    -----    --------------
10     ----    -----    --------------
11     ----    -----    --------------
12     ----    -----    --------------
13     ----    -----    --------------
14     ----    -----    --------------
15     ----    -----    --------------
16     ----    -----    --------------
17     ----    -----    --------------
18     ----    -----    --------------
19     ----    -----    --------------
20     ----    -----    --------------
21     ----    -----    --------------
22     ----    -----    --------------
23     ----    -----    --------------
24
```

Page 187

```
 1
 2
 3            CERTIFICATE OF REPORTER
 
        I, David A. Sroka, Registered Professional
 4  Reporter and Notary Public, do hereby certify that
    there came before me on October 12, 2006, the
 5  deponent herein, NINA LOU BUNTING, was duly sworn by
    me and thereafter examined by counsel for the
 6  respective parties; that the questions asked of said
    deponent and the answers given were taken down by me
 7  in Stenotype notes and thereafter transcribed by use
    of computer-aided transcription and computer printer
 8  under my direction.
 9
        I further certify that the foregoing is a
10  true and correct transcript of the testimony given
    at said examination of said witness.
11
12        I further certify that reading and signing
    of the deposition were not waived by the deponent
13  and counsel.
14        I further certify that I am not counsel,
    attorney, or relative of either party, or otherwise
15  interested in the even of this suit.
16
17  _____
           David A. Sroka, RPR
           Certification No. 259-RPR
18         (Expires January 31, 2008)
19
20  DATED: _____
21
22
23
24
```

48 (Pages 186 to 187)

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477