Dobrich, et al.                           v.            Indian River School District, et al.
Charles M. Bireley              C.A. # 15-120 (JJF)                October 11, 2006

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
 2            IN AND FOR THE DISTRICT OF DELAWARE
 3
 4    MONA DOBRICH and MARCO DOBRICH, individually and
      As parents and next friend of ALEXANDER DOBRICH,
 5    SAMANTHA DOBRICH, JANE DOE and JOHN DOE,
      individually and as parents and next friend of
 6    JORDAN DOE and JAMIE DOE,
 7                          Plaintiffs
            vs.                        CIVIL ACTION
 8                                     NO.  15-120
 9    INDIAN RIVER SCHOOL DISTRICT, ET AL.,
10
                        Defendants
11
      -------------------------------------------
12
13
              DEPOSITION OF CHARLES M. BIRELEY, taken
14    pursuant to notice at the Indian Ricer School
      District, 31 Hosier Street, Selbyville, Delaware,
15    beginning at 9:15 a.m. on October 11, 2006 before
      David A. Sroka, Registered Professional Reporter and
16    Notary Public.
17
      APPEARANCES:
18
                  THOMAS ALLINGHAM, ESQUIRE
19                RICHARD HORVATH, ESQUIRE
                  BRIAN LENHARD, ESQUIRE
20                P.O. Box 636
                  Wilmington, Delaware  19899-0636
21                For the Plaintiffs
22
                      WILCOX & FETZER
23        1330 King Street - Wilmington, DE   19801
                      (302) 655-0477
24                    www.wilfet.com
```

Dobrich, et al.                                                    Indian River School District, et al.
Charles M. Bireley                   v.                            October 11, 2006
                                     C.A. # 15-120 (JJF)

Page 2

4    JASON P. GOSSELIN, ESQUIRE
     Drinker Biddle & Reath LLP
5    Philadelphia, Pennsylvania 19103-6996
     For the Defendants

Page 3

1     MS. DUPHILY:  This is the
2   videotape deposition of Mr. Charles
3   Bireley, taken by the Plaintiffs in the
4   matter of Dobrich, et.al, versus Indian
5   River School District, et.al, case
6   number is 15-120.
7         The deposition is being held at 31
8   Hosier Boulevard, Selbyville, Delaware. We
9   are going on the record on October 11, 2006
10  at approximately 9:15 a.m.. The court
11  reporter is Dave Sroka from the firm of
12  Wilcox & Fetzer. I am Lindsay duPhily,
13  videotape specialist from Discovery Video
14  Services.
15        Now, the counsel will introduce
16  themselves and then the court reporter will
17  swear in the witness.
18        MR. ALLINGHAM: Tom Allingham
19  representing the Plaintiffs and with me is
20  Rick Horvath and Brian Lenhard.
21        MR. GOSSELIN: Jason Gosselin
22  representing the Indian River School
23  District, the school board and the other
24  defendants.

Page 4

1              CHARLES BIRELEY,
2       The Witness herein, called for examination by
3   the Plaintiffs, having been duly sworn to tell the
4   truth, the whole truth, and nothing but the truth,
5   was examined and testified as follows:
6   examination by him to.
7   EXAMINATION BY MR. ALLINGHAM:
8     Q.   Good morning, Mr. Bireley, my name is Tom
9   Allingham, I represent the Plaintiffs. I'm going to
10  ask you questions today that are relevant in our
11  view to the School Board prayer issue in this
12  litigation.
13        We have, as your lawyer has probably told
14  you separated, or the judge has asked us to separate
15  the School Board prior issue from the several other
16  issues in the case, and so the deposition today will
17  be focused on the School Board prayer issue.
18        A couple pieces of introduction. I'm going
19  to refer to the final board policy on School Board
20  prayer, a copy of which I'll give you later and we
21  will talk about it, as the School Board Prayer
22  Policy. Do you understand what I mean when I say
23  that?
24    A.   Yes.

Page 5

1     Q.   So, just some preliminaries. Ms. duPhily
2   told you that we are going a take a break every
3   hour. If you want at take a break at any other time
4   just speak up and we can do that. There is no
5   reason why we can't stop the tape and take a break
6   if you need to?
7     A.   Okay.
8     Q.   Have you ever been deposed before?
9     A.   Yes.
10    Q.   In what context?
11    A.   For the district.
12    Q.   When did that take place?
13    A.   Approximately four or five years ago.
14    Q.   And what was the subject matter of the
15  deposition?
16    A.   A person in the community brought a lawsuit
17  against one of our administrators.
18    Q.   Did the case go to trial?
19    A.   I don't think so.
20    Q.   You did not testify at trial?
21    A.   No.
22    Q.   The last preliminary and you've probably
23  been told this as well, if you don't understand the
24  question that I ask you don't answer it, tell me you

2 (Pages 2 to 5)

Dobrich, et al.                                        v.                    Indian River School District, et al.
Charles M. Bireley                          C.A. # 15-120 (JJF)                        October 11, 2006

Page 6

1    don't understand it and I will try to do better and
2    ask a question that you do understand. If you
3    answer the question without reservations I think
4    that the jury and the judge will believe that you
5    understood the question. So, let me know if you
6    think the question is unclear or ambiguous.
7         Mr. Bireley, you've been designated a
8    something called a 30(b)(6) designee for the
9    district on certain topics, and what I'd like to do
10   is designate the first portion of this deposition as
11   the Plaintiff's 30(b)(6) deposition on those topics.
12   Do we have the 30(b)(6) notice and the response?
13        I'll mark the topics themselves in a few
14   minutes, but for the time being let's just go
15   forward with that portion of the deposition, you are
16   currently a member of the Board of Education of the
17   Indian Driver School District?
18   **A.    Yes.**
19   Q.    How long have you served in that capacity
20   thigh?
21   **A.    There is my 30th year.**
22   Q.    When were you first elected?
23   **A.    1973.**
24   Q.    And as I understand it there was a short

Page 7

1    period in the middle when you were not a member of
2    the Board?
3    **A.    Yes.**
4    Q.    Was that because you didn't run?
5    **A.    I was defeated.**
6    Q.    That was a two years hiatus?
7    **A.    Three.**
8    Q.    You are currently president of the Board?
9    **A.    Yup.**
10   Q.    What are the duties of the president in
11   addition to a regular member of the Board?
12   **A.    To conduct the meetings, the monthly
13   meeting and any special meetings that we have.**
14   Q.    Do you have any day-to-day contact with the
15   individual schools within the district?
16   **A.    More from central office than any
17   individual school building. I rarely talk to a
18   school building.**
19   Q.    All right, and in your capacity as a Board
20   member do you speak to individual students other
21   than at Board meetings?
22   **A.    Yes.**
23   Q.    When do you have occasion to speak to
24   individual student in the district?

Page 8

1    **A.    Went I do?**
2    Q.    Yes?
3    **A.    Most of the time it's at athletic events.**
4    Q.    Talking about the athletic events?
5    **A.    Yes.**
6    Q.    Any other context in which you talk to
7    individual district students?
8    **A.    If there is something going on in an
9    individual building then I would. You know, some
10   type of get together. We have dinners, you know
11   academic achievement banquets, you know, things like
12   that then I would see students.**
13   Q.    How many students are there in the
14   district?
15   **A.    A little over 8000.**
16   Q.    You have been a Board member a long time,
17   can you summarize what I believe for me what you
18   believe are the principle areas of responsibility of
19   the School Board?
20   **A.    Principle responsibilities?**
21   Q.    Yes.
22   **A.    I guess to make sure that the district is
23   running certainly accordingly to law, make sure that
24   our bills are paid on time, that we have enough**

Page 9

1    **money to pay the bills and conduct the meetings.**
2    Q.    Do your duties also include enforcement of
3    the school attendance?
4    **A.    No.**
5    Q.    Do your duties include the grading and
6    standardization of all schools in the district?
7    **A.    I'm not sure I understand that. What do
8    you mean by the grading?**
9    Q.    Do you have an obligation to evaluate the
10   performance of the schools in the district?
11   **A.    No.**
12   Q.    Do you have an obligation to standardize
13   all schools in the district?
14   **A.    No.**
15   Q.    Is it within the Board's responsibility to
16   adopt courses of study or curriculum?
17   **A.    Yes.**
18   Q.    Is it within the Board's responsibility to
19   select, purchase and distribute text books and other
20   materials?
21   **A.    Yes.**
22   Q.    How about to provide forms for school
23   employees to make reports to the Board?
24   **A.    No.**

3 (Pages 6 to 9)

Dobrich, et al.                                    v.                    Indian River School District, et al.
Charles M. Bireley                          C.A. # 15-120 (JJF)                        October 11, 2006

Page 10

1   Q.   Is it the Board's responsibility to make
2   the reports required by the State Superintendent of
3   Public Instruction?
4   A.   Yes.
5   Q.   And is it the Board's responsibility to
6   appoint personnel for the district?
7   A.   Yes.
8   Q.   Including teachers?
9   A.   Yes.
10  Q.   I asked you a question about text books,
11  does the Board decide which text books to buy?
12  A.   Yes.
13  Q.   Does the Board approve the use of district
14  facilities?
15  A.   Yes.
16  Q.   For example for people in the community who
17  want to use a district building?
18  A.   Yes.
19  Q.   Does the School Board approve school use
20  applications?
21  A.   **Only if it's on a Sunday.**
22  Q.   Can you describe for me what you mean by
23  that?
24  A.   **If someone in the community wants to use**

Page 11

1   **one of our buildings that's handled by the building**
2   **principal unless it's on a Sunday, and then if it's**
3   **a Sunday it has to have Board approval.**
4   Q.   Why is that?
5   A.   **That's our rules.**
6   Q.   What was the reason for distinguishing
7   Saturdays from Sundays in the treatment of who has
8   to decide a school use application?
9   A.   **It's been that way ever since I've been a**
10  **Board member.**
11  Q.   So, you don't have any idea why there is a
12  distinction between Saturday and Sunday?
13  A.   **I have an opinion.**
14  Q.   What's your opinion?
15  A.   **Sunday's a day of rest.**
16  Q.   So that school use application on a Sunday
17  -- I'm stating it as a statement, so let me ask you
18  a question. Is it your opinion that the question of
19  school use applications on Sunday is reserved for
20  the Board because that's a more important question
21  than the school use applications on Saturday in
22  light of the fact that Sunday is a day of rest?
23  A.   **No, I'd say it's just that's the way it's**
24  **always been ever since I've been a Board member,**

Page 12

1   **that's how it goes, the process goes.**
2   Q.   And so that our record is clear, when you
3   refer to Sunday as being a day of rest you are
4   referring to the fact that Sunday is the Sabbath
5   Day --
6   A.   **Yes.**
7   Q.   -- under most Christian religions?
8        MR. GOSSELIN:  Objection.
9   Q.   I had this problem with Dr. Hattier
10  yesterday, it must be that I speak too slowly, but
11  you need to wait until my question is finished
12  before you answer it because he can't get both of
13  us.
14  A.   **Okay.**
15  Q.   Is the School Board involved in determining
16  the punishment for student who violate the
17  district's code of conduct?
18  A.   **Yes.**
19  Q.   And there are punishments, are there this
20  not, levels of punishment which can't be imposed
21  unless the School Board authorizes it?
22  A.   **Yes.**
23  Q.   Those would include expulsion and
24  suspension?

Page 13

1   A.   **Yeah.**
2   Q.   Do you know whether students are entitled
3   tight to speak to the Board directly in connection
4   with disciplinary actions against them?
5   A.   **Are they entitled to?**
6   Q.   Yes?
7   A.   **There's a process for that.**
8   Q.   Which permits them to speak directly to the
9   Board?
10  A.   **Yes.**
11  Q.   Are you aware of instances in which a
12  student has spoken directly to the Board?
13  A.   **Yes.**
14  Q.   Can you estimate for me over the course of
15  your 30 years how frequently that's occurred?
16  A.   **Very few.**
17  Q.   The Schools Board's responsibilities
18  include adopting the district's annual budget, is
19  that correct?
20  A.   **Yes.**
21  Q.   I asked you about hiring teachers, is the
22  School Board also responsible for firing teachers?
23  A.   **Yes.**
24  Q.   And also firing district employees?

4 (Pages 10 to 13)

Dobrich, et al.                                    v.                    Indian River School District, et al.
Charles M. Bireley                    C.A. # 15-120 (JJF)                            October 11, 2006

Page 14

1    A.    Yes.
2    Q.    Is the School Board involved in any way in
3    determining the punishment for teachers who violate
4    district policies?
5    A.    Yes.
6    Q.    Would you describe for me the process
7    involved in that determination?
8    A.    It usually comes through the superintendent
9    as a recommendation.
10   Q.    And the Board would then adopt the
11   recommendation or amend it?
12   A.    Based on the recommendation of the
13   superintendent we would listen to that and make a
14   decision.
15   Q.    The School Board in Indian River also
16   approves field trips at its meetings, is that right?
17   A.    Yes.
18   Q.    Why is that?
19   A.    That's our policy.
20   Q.    Do you have any idea what the reason is for
21   that policy?
22   A.    We would like to know whether or not what
23   trips people go on.
24   Q.    Does it involve determinations about the

Page 15

1    safety of the trips that are being proposed?
2    A.    Yes.
3    Q.    So, the welfare of the students is one
4    aspect of the responsibility of the School Board?
5    A.    Yes.
6    Q.    At its meetings is it correct that the
7    School Board gives students awards?
8    A.    Yes.
9    Q.    And in additional to direct awards it also
10   gives students recognition for awards that the
11   students have won in a wide variety of activities
12   relating to their status as students?
13   A.    Yes.
14   Q.    You've been a Board member for 30 years,
15   has the amount of time spent at individual Board
16   meetings that is devoted to student recognition and
17   student awards changed over time?
18   A.    Yes.
19   Q.    Can you tell me how it changed?
20   A.    When I first was a Board member we didn't
21   do it. It's something that's added maybe within
22   the last ten years.
23   Q.    So mid '90s?
24   A.    Yes.

Page 16

1    Q.    Is it the case that prior to that change in
2    the mid '90s it was rare for a student to be in
3    attendance at Board meetings?
4    A.    I would say yes.
5    Q.    And is it the case that since that change
6    in the mid '90s it is the case that students
7    regularly attend Board meetings?
8    A.    Pretty much.
9    Q.    Over the course of a given school year
10   could you estimate for me on average how many
11   student are in attendance at a Board meeting? A
12   couple of dozen?
13   A.    Not every meeting.
14   Q.    Well, there are meetings when there are 50
15   students, correct?
16   A.    Yes.
17   Q.    And but some meetings where there are very
18   few?
19   A.    Yes.
20   Q.    That's why I said on average maybe a couple
21   of dozen over the course of the school year?
22   A.    Okay.
23   Q.    The School Board approves construction
24   projects?

Page 17

1    A.    Yes.
2    Q.    The School Board also monitors the progress
3    of construction projects — is that right?
4    A.    Yes.
5    Q.    And does the School Board approve materials
6    used for improvements in school facilities?
7    A.    You mean during like renovations?
8    Q.    Yeah.
9    A.    No.
10   Q.    Has the School Board, for example,
11   considered and made a decision on what type of sod
12   or grass seed to use on athletic fields?
13   A.    Yes.
14   Q.    Has the School Board made decisions on what
15   type of carpet to use in a particular elementary
16   school?
17   A.    No.
18   Q.    And all of these determinations and areas
19   of responsibility that we have just discussed they
20   are addressed by the Board at its public meetings,
21   is that correct?
22   A.    Yes.
23   Q.    In your view is a decision on what textbook
24   to buy for the district a legislative function?

5 (Pages 14 to 17)

Dobrich, et al.
Charles M. Bireley

v.
C.A. # 15-120 (JJF)

Indian River School District, et al.
October 11, 2006

Page 18

1        MR. GOSSELIN: Objection.
2    Q.    You can answer it. The way this works is I
3    will probably ask lots of questions, that Mr.
4    Gosselin thinks are objectionable. If he doesn't
5    tell you not to answer, called instructing you not
6    to answer, you can go ahead and answer the question.
7        So, the question was, in your view is the
8    decision about what textbook to buy for a district
9    school or schools a legislative decision?
10   **A.    It's part of our process of what we are**
11   **responsible for.**
12   Q.    Yes that's -- my question was is it a
13   legislative decision?
14       MR. GOSSELIN: Objection.
15   **A.    I really don't know how to answer the**
16   **question.**
17   Q.    You have been quoted repeatedly in the
18   newspaper as having said the Board is a legislative
19   body, do you remember having given that quote to
20   reporters?
21   **A.    Yes.**
22   Q.    What did you mean when you said the Board
23   is a legislative body?
24   **A.    We've always been told that we are a**

Page 19

1    **legislative body.**
2    Q.    You don't have any independent opinion on
3    that apart from what you read and the opinion of the
4    judge?
5    **A.    No.**
6    Q.    No you don't have any independent opinion?
7    **A.    No, I do have an opinion.**
8    Q.    Oh, all right well then explain to me what
9    you meant by legislative body?
10   **A.    I meant that if you want to compare us to**
11   **what the legislature does in Dover, you know, they**
12   **make laws, set policies. We set policies and do**
13   **everything else that a Board is supposed to be, you**
14   **know, to do, that we are elected to do. There is a**
15   **similarity.**
16   Q.    There is a similarity in that you set
17   policies?
18   **A.    We set policies.**
19   Q.    So, now to come back to my earlier
20   question. I could ask it in a different way, does
21   the General Assembly make decisions about what
22   textbooks should be bought for district schools?
23   **A.    Not that I'm aware of.**
24   Q.    Or pick sods for athletic fields?

Page 20

1    **A.    Not that I'm aware of.**
2    Q.    Or carpet for elementary schools?
3    **A.    Not that I'm aware of.**
4    Q.    Or hiring or firing decisions for district
5    teachers?
6    **A.    No.**
7    Q.    Hiring and firing decisions for district
8    employees?
9    **A.    No.**
10       MR. GOSSELIN: Are these
11       questions, I think maybe I should have
12       asserted my form objection. Are you asking
13       him questions about what the legislature in
14       Delaware does or questions good what he
15       does as a member of the School Board and
16       School Board president?
17   Q.    I've already asked him what he does as a
18   member of the School Board.
19       MR. GOSSELIN: These are all
20       questions, I apologize maybe I missed the
21       beginning question there, but if are you
22       asking what he does or what the
23       legislature of Delaware, does I object to
24       the question. And all of the ones that

Page 21

1        followed.
2    Q.    You answered my question about your opinion
3    about the School Board being a legislative board by
4    comparing the School Board to the General Assembly,
5    correct?
6    **A.    Yes.**
7    Q.    Let me ask a couple of more questions. The
8    General Assembly doesn't approve field trips, does
9    it?
10       MR. GOSSELIN: Objection.
11   **A.    No.**
12   Q.    More generally in our -- in the structure
13   of our government, is the General Assembly
14   responsible for enforcing and administering the
15   policies that it sets, the laws that it passes?
16       MR. GOSSELIN: Objection.
17   **A.    Ask me the question again please, if you**
18   **would?**
19   Q.    Sure. In our government in the State of
20   Delaware is the General Assembly responsible for the
21   administration and enforcement of the statutes and
22   laws that it passes?
23       MR. GOSSELIN: Objection.
24   **A.    Not that I'm aware of.**

6 (Pages 18 to 21)

Dobrich, et al.                                 v.                    Indian River School District, et al.
Charles M. Bireley                   C.A. # 15-120 (JJF)                           October 11, 2006

| Page 22 | Page 24 |
|---|---|
| 1   Q.   You on the other hand as a School Board | 1   A.   Yes. |
| 2   mention are responsible for the enforcement and | 2   Q.   And the colors are presented by the student |
| 3   administration of the policies that you pass, isn't | 3   ROTC groups from the two high schools in the |
| 4   that right? | 4   district? |
| 5   A.   Yes. | 5   A.   Yes. |
| 6   Q.   Let me ask you this, on a percentage basis | 6   Q.   Who invites them to do that or do they just |
| 7   over the 30 years of your service as a Board member | 7   know that they are suppose to show up? |
| 8   what percentage of your time at public meetings has | 8   A.   I believe it's the building principal. |
| 9   been spent in the consideration of policies and what | 9   Q.   Building principal of the school in which |
| 10   percentage of time has been spent on other areas of | 10   you're meeting? |
| 11   responsibility? | 11   A.   Yes. |
| 12   A.   We have a committee that gives us a report | 12   Q.   So, if you were at during the construction |
| 13   each Board meeting on policy. If there are some to | 13   projects a couple of years ago, if you were at the |
| 14   adopt I'd say maybe just a range of 15 to 20, 25 | 14   elementary school the principal of the elementary |
| 15   minutes a meeting. | 15   school would invites the ROTC? |
| 16   Q.   On policy? | 16   A.   No. |
| 17   A.   Yes. | 17   Q.   I misunderstood you then, who would invite |
| 18   Q.   And the remainder on non-policy issues? | 18   them? |
| 19   A.   Yes. | 19   A.   Well, right how it's because we have two |
| 20   Q.   In the course of your tenure as a School | 20   high schools and that's where the ROTC and it would |
| 21   Board member are you aware of any instance in which | 21   be the principals of the two high schools. |
| 22   a School Board member has been accused of violating | 22   Q.   So, if you are meeting at Indian River High |
| 23   or failing to comply with a Board policy? | 23   School the Indian River principal remind the ROTC |
| 24   A.   Not that I'm aware of. | 24   group to show up for the Board meeting? |

| Page 23 | Page 25 |
|---|---|
| 1   Q.   Do you know what the process would be for | 1   A.   Yes. |
| 2   disciplining a School Board who violated a School | 2   Q.   And similarly at the other high school? |
| 3   Board policy? | 3   A.   Yes. |
| 4   A.   Never had the issue to do it, but I would | 4   Q.   Sussex Central, correct? |
| 5   assume that we would come before the rest of the | 5   A.   Yes. |
| 6   Board members and we would discuss it. | 6   Q.   And who instructs the principals to tell |
| 7   Q.   Fair enough. So, you are not aware of a | 7   the ROTC to show up at the meetings? How do the |
| 8   specific policy that sets that process but that as | 8   principals find out that they should remind the |
| 9   for example as Board president is what you | 9   ROTC? |
| 10   anticipate what would happen? | 10   A.   To the best of my knowledge ever since the |
| 11   A.   Yes. | 11   ROTC has been there that's been the process. |
| 12   Q.   I asked you some general questions about | 12   Q.   Do you know how long the ROTC has been in |
| 13   student attendance at school Board meetings and I | 13   place? |
| 14   want to ask some more specific questions. The | 14   A.   Probably around five years. |
| 15   minutes of the meetings reflect a presentation of | 15   Q.   2000 or thereabouts? |
| 16   the colors at virtually every meeting, is that | 16   A.   Yes. I'm not positive but it's somewhere |
| 17   consistent with your recollection? | 17   around there. |
| 18   A.   Yes, except during the summer months. | 18   Q.   We talked about students attending the |
| 19   Q.   Summer months being when the kids are out | 19   meetings for the receipt of awards or recognition, |
| 20   of school? | 20   who invites them to those meeting? |
| 21   A.   Yes. | 21   A.   The building principal. |
| 22   Q.   So during the academic school year | 22   Q.   The building principal in the school in |
| 23   September to June you would have presentation of | 23   which the meeting is being held? |
| 24   colors? | 24   A.   Well, normally they try to do that to keep |

7 (Pages 22 to 25)

Dobrich, et al.                                        v.                    Indian River School District, et al.
Charles M. Bireley                            C.A. # 15-120 (JJF)                          October 11, 2006

Page 26

1  down on the travel. But, for example if the meeting
2  was going to be held at Indian River, this next
3  meeting.
4  Q.  Yup.
5  A.  The principal would submit a letter to
6  central office of recent awards that has been
7  generated by his students and they would be invited
8  to come to the meeting.
9  Q.  So, it would be the building principal
10  sends a some kind of memo to the central office
11  saying would you please recognize my students who
12  have done something notable in the last period and
13  then the central office would invite the students?
14  A.  As I understand it.
15  Q.  And how does the central office invite the
16  student, by a letter?
17  A.  Well, can we go back a minute?
18  Q.  Yup.
19  A.  The principal does all of that. The
20  principal send a notice to central office was these
21  are the ones that, you know, deserve that.
22  Q.  Got you.
23  A.  But to the best of my knowledge the
24  principal is the one that also sends out the notices

Page 27

1  to invite the students to come to the meeting.
2  Q.  Understood. So, in effect the principal
3  tells the central office here are my kids who are
4  going to be at the meeting, I have invited them?
5  A.  Pretty much, yes.
6  Q.  And is that process a process that was set
7  up by the Board at some point in the mid '90s?
8  A.  It was done by the superintendent.
9  Q.  Who is the superintendent?
10  A.  Lois Hobbs, the previous superintendent.
11  Q.  Let me explore that a little bit. Did Miss
12  Hobbs present to the Board the idea that it would be
13  good for the Board to recognize achievement of
14  students in the schools?
15  A.  Yes.
16  Q.  Was there any dissent from that?
17  A.  Not that I'm aware of.
18  Q.  Everybody thought it was a good idea?
19  A.  Yes.
20  Q.  I understand that recently there has been
21  some rumblings that maybe it's gotten out of hand,
22  is that correct?
23  A.  That's it's gotten out of hand.
24  Q.  That it's taking too long, the awards

Page 28

1  portion of the meeting?
2  A.  There's been some discussion, yes.
3  Q.  Is there some sense that maybe that the
4  awards portion of the Board meeting will be
5  eliminated?
6  A.  I can't answer that, I don't know.
7  Q.  Has there been any discussion of that
8  possibility?
9  A.  Not on the Board level, no.
10  Q.  Has there been discussion of that among
11  Board members outside of the Board meeting?
12  A.  Yes.
13  Q.  Who has had such discussions according to
14  your knowledge?
15  A.  I've discussed it with a certain few.
16  Q.  Which ones?
17  A.  I know that I did with Dr. Hattier,
18  Mr. Helms, Mrs. Bunting, Mrs. Mitchell.
19  Q.  When did the first of those discussions
20  occur roughly speaking?
21  A.  Probably within the last six months.
22  Q.  And who initiated discussion you or the
23  other side of the conversation?
24  A.  I did.

Page 29

1  Q.  What prompted you to raise that issue?
2  A.  Because of the length of the Board
3  meetings.
4  Q.  Your sense as Board president is that they
5  are going awfully long?
6  A.  Yes.
7  Q.  And that seemed like a possible way to cut
8  the length of the meetings?
9  A.  One possible way.
10  Q.  And did you separately raise the issue with
11  Dr. Hattier, Mr. Helms, Ms. Bunting and Dr. Isaacs
12  -- Mitchell, sorry?
13  A.  Mrs. Mitchell? Did I raise the issue?
14  Q.  Yes.
15  A.  Yes.
16  Q.  What was the response from each of those
17  persons?
18  A.  I don't know that I had a direct response
19  from them.
20  Q.  Did you raise it orally in a conversation
21  or did you send them a note?
22  A.  Just by talking to them.
23  Q.  And this is when you bumped into each of
24  them some time during the day?

8 (Pages 26 to 29)

Dobrich, et al.                                          v.                    Indian River School District, et al.
Charles M. Bireley                          C.A. # 15-120 (JJF)                              October 11, 2006

Page 30

1    A.    Or we go to meetings you know on the state
2    level together, we ride together.
3        Q.    Okay. I think you told me you didn't know
4    that you had a response from them, you raised the
5    issue did they say anything to you back responding?
6        A.    We discussed it but we haven't made any
7    decision on it.
8        Q.    No, no, I didn't mean what's the decision,
9    I mean what did they say when you raised the issue?
10       A.    I think everyone agrees that our meetings
11   are going too long.
12       Q.    In the course of all of those conversations
13   did anyone discuss the utility of eliminating
14   student attendance at Board meetings?
15       A.    No.
16       Q.    Only, so far as it related to elimination
17   of shortening of the Board meetings, correct?
18       A.    Yes.
19       Q.    Have you discussed the idea of eliminating
20   the student award portion of the meetings with the
21   current superintendent or the former superintendent?
22       A.    Current superintendent, yes.
23       Q.    What was her reaction?
24       A.    We just discussed it.

Page 31

1        Q.    What did she say to you?
2        A.    She didn't agree that we should or
3    whatever, she agrees with me the same at the others,
4    our meetings are going too long we need to try to
5    find a way to shorten the Board meeting.
6        Q.    Well, you made a proposal to shorten it by
7    eliminating the student award section of the
8    meetings?
9        A.    Well, I need to clarify something.
10       Q.    Yes, sir.
11       A.    When we first started with doing this, if a
12   student won a national, like a big award, a national
13   award, we just had a group of students that went
14   away and won a national title. We would never
15   eliminate them. It's for people who might have
16   gotten like a third place finish in something, you
17   know, or a second place finish.
18           The original idea of having this was
19   whoever wins would get the awards and they would get
20   them in front of the Board. Not for everybody that
21   got anything at all to come before the Board.
22       Q.    I have some sympathy with what you are
23   telling me. I've waded through the minutes and read
24   all the awards that have been given, and I don't

Page 32

1    mean to single out any particular group, but I
2    noticed that a group of students were recognized for
3    participation in the Fifth Grade Yell Group?
4        A.    Yes.
5        Q.    Maybe that type of thing would be
6    eliminated, is that what you're saying?
7        A.    Yes.
8        Q.    The current status of these, of the awards
9    is that a fairly wide swath of students comes before
10   the Board over the course of a given academic year
11   as a consequence of how deeply you reach into the
12   awards and recognition?
13       A.    Fair assumption, yes.
14       Q.    Okay. I'm going to try to ask some general
15   questions that could eliminate more specific ones,
16   longer more specific ones. Am I correct in my
17   understanding from the minutes that forever Board
18   meeting in the academic school year, not the July
19   and August meetings, but for every Board meeting in
20   the academic school year since at least June of 2004
21   there have been students in attendance?
22       A.    Not every month, no. Do you mean to get
23   awards?
24       Q.    No, for any purpose.

Page 33

1        A.    That's probably true.
2        Q.    I can now eliminate several pages of my
3    outline. Are there instances in which students are
4    required to attend Board meetings?
5        A.    Not that I'm aware of.
6        Q.    Are you aware of any instance in which a
7    student who isn't confronted with a scheduling
8    conflict has declined an invitation to attend School
9    Board meetings?
10       A.    Can you repeat the question?
11       Q.    Yes. Setting aside instances in which
12   student has a scheduling conflict and can't come,
13   are you aware of any instance in which a student has
14   declined an invitation to attend School Board
15   meetings?
16       A.    Not that I'm aware of.
17       Q.    Is it your expectation as a Board member
18   that students would view an invitation from the
19   School Board as an attractive invitation for
20   recognition of their achievements?
21           MR. GOSSELIN: Objection.
22       Q.    You can answer.
23       A.    My opinion it would be, it's an honor for
24   them to come to receive an award.

9 (Pages 30 to 33)

Dobrich, et al.
Charles M. Bireley

v.

C.A. # 15-120 (JJF)

Indian River School District, et al.
October 11, 2006

Page 34

1    Q.   Yes, sir, and in fact isn't that
2    essentially what Mrs. Hobbs said back in the mid
3    '90s when she said we ought to be honoring our
4    students?
5    A.   Yes.
6    Q.   Okay, we identified the ROTC, and we
7    identified student who come to the Board meetings to
8    receive awards or recognition, is it also the case
9    that student government representatives address the
10   Board regularly?
11   A.   During the time of the school year, yes.
12   Q.   Yes, sir, and in fact there is now a
13   section, regular section of the agenda called
14   student government which is intended to provide the
15   student government representatives with an
16   opportunity to address the Board, is that correct?
17   A.   Yes.
18   Q.   And that practice was established back in
19   it 1999s, is that correct?
20   A.   That was one of the things that was done by
21   a Board member who made the suggestion, it wasn't
22   done by Mrs. Hobbs.
23   Q.   No, sir, I didn't suggest that it was
24   separate from the award issue.

Page 35

1    A.   Yes, it's probably been going on longer
2    than the awards issue that she recommended that we
3    do.
4    Q.   Do you have any recollection of when it
5    began?
6    A.   No, I'm not sure.
7    Q.   I'm going to mark as exhibit, Plaintiff's
8    Exhibit 32 a document bearing Bates number, I should
9    have told you, Bates numbers you will see on the
10   bottom of most of the documents I give you, there is
11   a little printed number. Some guy named Bates
12   invented this system. So, we identify them on the
13   record by Bates numbers so people reading the
14   transcript know what we are talking about.
15        So, this is a document titled Minutes of
16   the Board of Education Special Meeting on July 19,
17   1994, it's bearing Bates numbers PR206 through 210.
18        (WHEREUPON, Plaintiff's Exhibit 32
19        was marked for identification)
20        MR. ALLINGHAM:  I can't remember
21   if I told you Jason we decided last night
22   we are going to sequentially number and
23   call them Plaintiff's Exhibits so that we
24   don't -- I never know which is the better

Page 36

1    way, but that's how we are going to do it.
2         MR. GOSSELIN:  I prefer -- well,
3    you don't care what I prefer. This is
4    fine, this is what I prefer.
5         MR. ALLINGHAM:  I feel better
6    then.
7    Q.   None of this is a memory test, sir. If you
8    look at page four of the document Plaintiff's
9    Exhibit 32, under student government which is the
10   third heading, you will see that Mr. Cohee reports
11   on a meeting he had at Sussex Central with some
12   students who talked about a lack of communication
13   and the inactive student government, and Mr. Cohee
14   then made a motion, according to the minutes that
15   you seconded, to include on the agenda a ten minute
16   segment for student government for both high schools
17   and the motion passed unanimously.
18        Does that refresh your recollection that it
19   was in 1994 that that agenda item was added?
20   A.   I wasn't sure of the date that it was done,
21   but I know Mr. Cohee is the one who brought it.
22   Q.   And looking at these minutes does that
23   refresh your recollection that it was 1994?
24   A.   This says July 19, 1994.

Page 37

1    Q.   Right above that heading, there is a
2    heading in the minutes called public comments in
3    which it's reported you made a motion seconded by
4    Mr. Moore to add a 15 minutes segment for public
5    comments at the beginning of regular Board meetings,
6    do you recall having done that?
7    A.   Yes.
8    Q.   Why did you do that?
9    A.   I thought it was important for people in
10   the community to come and talk to us about things
11   that was on their minds, concerns or anything like
12   that or have input.
13   Q.   Is there any restriction on what people can
14   say during that public comment period?
15   A.   They cannot talk about anything to do with
16   personnel issues.
17   Q.   What's the reason for that?
18   A.   Because personnel issues are private.
19   Q.   Any other restrictions at all?
20   A.   Other than the fact that it's supposed to
21   be limited to 15 minutes and if you come to speak as
22   an individual it's three minutes and if you speak as
23   group I believe you are entitled to four minutes.
24   Q.   Have those time limits been in existence

10 (Pages 34 to 37)

Dobrich, et al.
Charles M. Bireley

v.

C.A. # 15-120 (JJF)

Indian River School District, et al.
October 11, 2006

Page 38

1  ever since 1994 when the public comment period was
2  adopted?
3  **A. To the best of my knowledge.**
4  Q.   You're now Board president, and so you sort
5  of run the meeting, is that right?
6  **A. Yes.**
7  Q.   Isn't there also a restriction on people
8  are not -- you would be permit people to make
9  offensive comments?
10 **A. Yes.**
11 Q.   Or derogatory comments?
12 **A. Yes.**
13 Q.   And that's just part of your responsibility
14 to keep order at the meeting?
15 **A. Yes.**
16 Q.   Is it your view that public comments should
17 be respectful?
18 **A. Should be respectful?**
19 Q.   Yes.
20 **A. Yes.**
21 Q.   Is it also your view as a Board member that
22 the establishment of the public comment portion of
23 the meeting was rather than being required by law it
24 was an effort by the Board to confer a privilege of

Page 39

1  communication on the general public?
2  **A. Yes.**
3  Q.   And it's your view as a Board member that
4  that privilege should not be abused?
5  **A. Yes.**
6  Q.   Since 1994 when the student government
7  portion of the meeting was established has it been
8  the case that most meetings during the academic
9  school year student government representatives have
10 addressed the Board?
11 **A. During the school year?**
12 Q.   Yes.
13 **A. Yes.**
14 Q.   Is it your practice that when they speak,
15 the student representatives speak to the Board, that
16 the nature of their remarks is identified in the
17 minutes?
18 **A. I don't think it's verbatim.**
19 Q.   Is the fact that a student representative
20 spoke reflected in the minutes?
21 **A. To the best of my knowledge.**
22 Q.   That's your intent anyway?
23 **A. Yes.**
24 Q.   When you come to the student government

Page 40

1  portion of the agenda do you as the board president
2  invite the student government representatives to
3  come forward to speak?
4  **A. Yes.**
5  Q.   Describe for me, if you can, the nature of
6  the topics that student government representatives
7  have discussed with the Board over the years?
8  **A. Any awards that the school might have won**
9  **since the previous time they spoke, scores of**
10 **athletic events, the placement of the, on the state**
11 **log of where we rank, if we are having a good year**
12 **and things like that they do that. And they invite**
13 **us to certain things that's coming up like maybe a**
14 **concert or a ROTC dinner or things like. We are**
15 **invited to come to things like that. That's**
16 **basically what they do.**
17 Q.   And does the School Board or individual
18 members of the School Board accept those invitations
19 and attend those events?
20 **A. I try to go to as many as I possibly can.**
21 Q.   Do you see fellow Board members there?
22 **A. Yes.**
23 Q.   This may sound like a funny question
24 Mr. Bireley, but do you view you take your

Page 41

1  responsibilities as a Board member seriously, don't
2  you?
3  **A. Yes.**
4  Q.   And is it your sense that your fellow Board
5  members also take their responsibilities seriously?
6  **A. Yes.**
7  Q.   Have you ever had a sense that your
8  colleagues on the Board were not trying their best
9  to discharge their responsibilities as Board
10 members?
11 **A. No.**
12 Q.   So, this will sound like a summary
13 question, and it is, in your 30 years or so of
14 service on the Board you have throughout those 30
15 years of service you have been confident that your
16 fellow Board members are using their best efforts to
17 discharge their Board responsibilities
18 appropriately?
19 **A. To the west of my knowledge?**
20 Q.   Yeah.
21 **A. Yes.**
22 Q.   Do student government representatives from
23 time to time express concerns to the Board about
24 issues in their schools?

11 (Pages 38 to 41)

Dobrich, et al.                                    v.                     Indian River School District, et al.
Charles M. Bireley                        C.A. # 15-120 (JJF)                        October 11, 2006

Page 42

1    A.   Yes.
2    Q.   Give me an example of some concerns that
3    they've expressed?
4    A.   The period of time that Sussex Central was
5    going through their construction and they actually
6    were placed in a building maybe a year ahead of time
7    they shouldn't have been there, and it was -- well
8    basically it was not a very good experiences for
9    them. We heard some of that type of thing.
10   Q.   It's a legitimate concern?
11   A.   Yes.
12   Q.   Any other that you can think of?
13   A.   Not that I can remember.
14   Q.   Do student groups sometimes attend Board
15   meetings?
16   A.   Yes.
17   Q.   Can you give me some examples?
18   A.   Well, I consider it to be a group when the
19   come in to get their awards if that's what you mean.
20   Q.   No, I meant you know musical groups or I
21   guess the ROTC would qualify as a group, some group
22   that attends Board meetings as a group?
23   A.   Yes.
24   Q.   Can you give me some examples?

Page 43

1    A.   Most of the time during the month of
2    December a group would come in to perform either
3    singing or a small acting type thing. The Odyssey
4    of the Mind students have come in and did their
5    little skit that they did in national in front of
6    the Board.
7    Q.   It SDSA Steel Band, that's a musical group?
8    A.   Yes.
9    Q.   Is that one of the December performances?
10   A.   They came I'm not sure whether it was
11   December, but we have had them there, yes.
12   Q.   What is the Odyssey of the Mind?
13   A.   It's a group of student that are elevated
14   students, you know the better students that through
15   creativity they do skits or they do like a play or
16   something like that that they go to state and
17   national competition and be judged with other school
18   districts.
19   Q.   And so they came and sort of made their
20   presentation to the Board?
21   A.   Yes.
22   Q.   I noticed in some of the older minutes
23   there were band groups that had done national
24   competitions and then had performances for the

Page 44

1    Board, do you recall that?
2    A.   At a Board meeting?
3    Q.   Yes.
4    A.   No, I really don't.
5    Q.   The student groups that attend the School
6    Board meetings who invites them?
7    A.   The students?
8    Q.   The student groups like the steel band or
9    the musical groups or ROTC, who invites them?
10   A.   The superintendent.
11   Q.   Is that done by a letter to the groups?
12   A.   I'm not sure.
13   Q.   Okay. In one of the minutes, and I don't
14   have it here, so if you don't remember it's not a
15   big deal, but do you recall a student representative
16   addressing the Board with concerns about the quality
17   of the water and quality of the athletic fields at
18   Sussex Central?
19   A.   Yes.
20   Q.   Was it helpful to the Board to get student
21   input on issues like that?
22   A.   Yes.
23   Q.   How did the School Board respond to those
24   concerns?

Page 45

1    A.   We tried to make them better.
2    Q.   The student government representative
3    portion of the agenda is limited to the two high
4    school, is that right?
5    A.   Yes.
6    Q.   Are there instances in which other
7    representatives of student bodies express concerns
8    about conditions at their schools, that is a other
9    than the high schools?
10   A.   I can't remember.
11   Q.   Do you recall in August of 2004 a
12   Selbyville middle school student expressing a
13   concern about the loss of safety and school climate
14   positions?
15   A.   Oh, yes.
16   Q.   Do you recall students speaking to the
17   Board about concerns about the Southern Delaware
18   Schools of the Arts?
19   A.   Yes.
20   Q.   And in each of these cases where students
21   come to the Board to address their concerns, does
22   the Board benefit from the attendance of the
23   students and expression of their concerns?
24   A.   Do they benefit?

12 (Pages 42 to 45)

Dobrich, et al.                                    v.                   Indian River School District, et al.
Charles M. Bireley                          C.A. # 15-120 (JJF)                          October 11, 2006

Page 46

1    Q.   Yes.  Is it helpful to the Board?
2    A.   Yes.
3    Q.   And in case does the Board try to address
4    the concerns of the students?
5    A.   Yes.
6    Q.   Is there any other forum for the students
7    to address the Board other than the public School
8    Board meeting?
9    A.   Yes.
10   Q.   What is that?
11   A.   They can come in executive session.
12   Q.   Would that be by invitation of the Board
13   itself?
14   A.   They apply, they write a letter and tell us
15   that they have something that they want to talk
16   about which is usual a personnel issue and we allow
17   them to come.
18   Q.   And that has happened in the past?
19   A.   Yes.
20   Q.   How frequently?
21   A.   Rarely, but we do allow it.  The same way
22   that we allow a person in the community to do the
23   same thing if it's a personnel issue something that
24   we are not allowed to discuss during an open session

Page 47

1    they come to that.
2    Q.   Oh, I see so there is that limitation in
3    the public comment session where you can't speak
4    about personnel issues, but there is a way for a
5    member of the public to speak to the Board about
6    personnel issues?
7    A.   Yes.
8    Q.   By making an application to speak at an
9    executive session?
10   A.   Yes.
11   Q.   How do members of the public — how can
12   members of the public find out about that avenue for
13   expressing their concerns to the executive session?
14   A.   They can contact the superintendent.
15   Q.   It's not posted that you can do that
16   anywhere on the web site or in the policies?
17   A.   I'm not sure.
18   Q.   How would students find out about the
19   possibility of speaking to executive session?
20   A.   It's like a chain of command.  If they have
21   an issue they can go to the building principal
22   first.  Then they can go to the superintendent and
23   the superintendent would make them aware that no you
24   cannot stand up in front of the Board meeting and

Page 48

1    talk about this particular issue, however, if you
2    want to do it in executive session then they would
3    be told that they can do it in executive session.
4    Q.   So, the superintendent would let them know
5    which way they could go?
6    A.   Yes.
7    Q.   Apart from speaking to the board at public
8    sessions, or speaking to the Board in executive
9    session, is there any other way that students have
10   the ability to speak directly to the School Board?
11   A.   Other than just maybe seeing us out
12   somewhere and they make a comment individually.
13   Q.   No other official way to speak to the
14   School Board?
15   A.   Not that I'm aware of.
16   Q.   It always warms witness' hearts when I
17   start skipping through and I have a long red line on
18   the outline.
19        MS. ALLINGHAM:  Miss duPhily has
20        told me we have about four minutes of tape
21        left, we are going to change the tape now,
22        just take a minute.
23        MS. DUPHILY:  Going off the record
24        at approximately 10:10 a.m..

Page 49

1        (WHEREUPON a brief recess was
2        taken)
3        MS. DUPHILY:  We are back on the
4        record at 10:15 a.m..
5    Q.   Mr. Bireley, among all of the people that,
6    this goes back to a question earlier this morning,
7    among all the people that you spoke to about the
8    possibility of eliminating the awards section or a
9    portion of the awards section at the Board meetings,
10   did anyone say to you look I really oppose that, I
11   think we need to continue this practice?
12   A.   No.
13   Q.   Did some or all of those persons express
14   agreement that the level of award that was getting
15   recognition at the Board had become pretty
16   expansive?
17   A.   Mostly, yes.
18   Q.   Those awards do include recognition for
19   awards that district students or groups achieve on a
20   state or national level, correct?
21   A.   Yes.
22   Q.   Can you think of recent state or national
23   awards that you gave recognition for groups to?
24   A.   The Odyssey of the Mind, I think that was

13 (Pages 46 to 49)

Dobrich, et al.                                    v.                    Indian River School District, et al.
Charles M. Bireley                          C.A. # 15-120 (JJF)                    October 11, 2006

Page 50

1   the most recent.
2      Q.   What was that?
3      A.   They won a national award, they are
4   considered the best in the world.
5      Q.   For their performance of this?
6      A.   Yes.
7      Q.   Is it like a persuasive performance or
8   something?
9      A.   It's something I don't know exactly how to
10  describe it, I mean I've seen their plays or their
11  skits. They do it themselves. If they dress, you
12  know if they have a costume or something they make
13  their own costume, if they have to have like
14  background like in the theater, they make their own.
15  It's truly a work of art that they do for a younger
16  student.
17     Q.   What level of student is this?
18     A.   I believe they were under eight, under the
19  eighth grade.
20     Q.   Under the eighth grade?
21     A.   Yes.
22     Q.   Okay?
23     A.   There is different levels of Odyssey of the
24  Mind and I'm trying to think of the age limit of the

Page 51

1   ones that won. They weren't very old I'm not
2   exactly sure how old they were.
3      Q.   Middle school kids?
4      A.   No, younger than middle school. Well, see
5   I am confused, the one that one it was mainly
6   students from this builder here the school of the
7   arts, and it does go to the eighth grade. So, they
8   could be.
9      Q.   When a student receives an award is his or
10  her picture taken with you or whoever the Board
11  president is at the time?
12     A.   Yes.
13     Q.   And is that picture then sent home to the
14  student with a letter of congratulations from the
15  Board?
16     A.   I'm not sure about that.
17     Q.   One of the topics on which you have been
18  designated as the District's representative for
19  under this 30(b)(6) designation is the history of
20  the Board's practice of opening its meetings with a
21  prayer, so I want to ask some questions about that
22  now?
23     A.   Okay.
24     Q.   When did the School Board first begin to

Page 52

1   open its meetings with a prayer?
2      A.   To it best of my knowledge we've been doing
3   it ever since I first became a Board member, 1974.
4      Q.   So, from your own personal knowledge you
5   can testify that the Board has had a regular
6   practice of opening meetings with a prayer since
7   1974?
8      A.   Yes.
9      Q.   You've been quoted in the media as having
10  said this has been a practice of the Board since
11  1969, do you recall that?
12     A.   Yes.
13     Q.   How did you link up the five years between
14  '69 and 1974?
15     A.   I had previous Board members tell me that's
16  what they did.
17     Q.   Who were those board members?
18     A.   That were there before me?
19     Q.   the people who told you that's what
20  the School Board did before 1974?
21     A.   Harold Short, Charles Mitchell. those are
22  the two that come to mind right now.
23     Q.   And the timing of their having told you,
24  that is did they tell you that in 2006 or 2005 or

Page 53

1   2004, or did they tell you that back in '74 when you
2   said you know we've been doing this for a long time?
3      A.   When I first came to the Board.
4      Q.   And so how did that issue come up in 1974,
5   did you say hey why do we open meetings with a
6   prayer or did they volunteer to you that it had
7   always been the School Board's practice to open
8   meetings with a prayer?
9      A.   It was like a orientation, to tell me, you
10  know, what had gone on in the past what's sort of
11  expected of me as a Board member.
12     Q.   So, part of your orientation was to let you
13  know that School Board meetings are opened with a
14  prayer?
15     A.   Yes.
16     Q.   And did the orientation include this
17  business of letting you know what you needed to do
18  as a Board member, did they tell you that you'd be
19  expected, you personally, would be expected to on a
20  rotating basis open the Board meeting with a prayer?
21     A.   No.
22     Q.   So, it was simply a matter of they said to
23  you Board meetings open with a prayer?
24     A.   They just explained, you know, the

14 (Pages 50 to 53)

Dobrich, et al.                              v.                        Indian River School District, et al.
Charles M. Bireley                  C.A. # 15-120 (JJF)                           October 11, 2006

Page 54

1   procedure.
2   Q.   Did they say why?
3   A.   No.
4   Q.   Did they say we open the meetings with a
5   prayer, by the way we've been doing that since 1969?
6   A.   Not that I can remember.
7   Q.   In didn't seem sensible, does it?
8   A.   No.
9   Q.   Is there any other way that you have been
10  able to trace that practice back to 1969?
11  A.   No.
12  Q.   You haven't looked at documents to see
13  whether the meetings opened with prayers?
14  A.   Prior to '74?
15  Q.   Yes.
16  A.   No.
17        MR. ALLINGHAM:  I'm going to mark
18        as Plaintiff's Exhibit 33 a document
19        bearing bates numbers PR00030 through 34.
20        (WHEREUPON Plaintiff's Exhibit 33
21        was marked for identification.)
22  Q.   PX33 which I've just had handed to you Mr.
23  Bireley, is a documents titled Board of Education
24  regular meeting Tuesday March 28, 1972. and if you

Page 55

1   look at the last page you will see it's signed by
2   James Proudfoot as secretary.  Is it the practice of
3   the Indian River School Board to maintain the final
4   versions of the minutes in its minute books?
5   A.   To the best of my knowledge.
6   Q.   And the indication that the minutes have
7   been approved by the Board as accurate is when the
8   secretary signs those minutes, is that correct?
9   A.   To the best of my knowledge.
10  Q.   Do you have any reason to doubt that these
11  are it official minutes of March 28, 1972?
12  A.   No.
13  Q.   Okay.  If you look at the first paragraph
14  of PX33 you will see that after the meeting is
15  called to order by president Reese, president Reese
16  asked Mr. Jefferson to lead the group in prayer.
17        I'm going to represent to you Mr. Bireley
18  that I have reviewed the minutes of the meetings
19  from July 1968 through February 1972, that is all
20  the minutes we have prior to this March 28, 1972
21  minutes, and that none of them reflects an
22  invitation to lead the group in prayer or the giving
23  of a prayer at the opening of the meeting.  Do you
24  know whether of your own personal knowledge, or from

Page 56

1   someone else, whether the Board opened its meetings
2   with a prayer prior to March 1972?
3   A.   Other than what I just told you a few
4   minutes ago during my orientation.
5   Q.   Yes, sir.  Do you still believe in light
6   of, accepting the representation that I have just
7   given you, which is that the minutes do not reflect
8   that the Board opened its meetings with a prayer at
9   any meeting that we have before March 1972, do you
10  have any reason to believe that the Board did open
11  its meetings with a prayer prior to March 1972?
12  A.   Other than my conversation with Mr. Short
13  when I got my orientation.
14  Q.   Now, and I'm just going to ask you given
15  your service on the Board, because I assume you have
16  no personal knowledge about the practice, personal
17  direct knowledge about the practice of the Board
18  before you joined it, is that correct?
19  A.   That's correct.
20  Q.   Beginning when you joined the Board, who
21  would decide which school -- one preliminary
22  question.  Were there meetings at which the School
23  Board did not open its meeting with a prayer?
24  A.   Not that I'm aware of.

Page 57

1   Q.   So, to the best of your recollection at
2   every Board meeting during your service as a Board
3   member the School Board opened the meeting with a
4   prayer?
5   A.   To the best of my knowledge.
6   Q.   Who decided, and this is all prior to the
7   more recent adoption of the School Board Prayer
8   Policy, who decided which Board member would lead
9   the group in prayer or offer a prayer?
10  A.   The Board president.
11  Q.   How was it decided which School Board
12  member would open the meeting with a prayer?
13  A.   The Board president just asked someone, I
14  don't know how.
15  Q.   Were there any restriction of any kind on
16  what sort of prayer a School Board member could
17  over?
18  A.   Not that I'm aware of.
19  Q.   Prior to the adoption of Policy BDA.1,
20  whish is the School Board Prayer Policy in October
21  of 2004, was there any policy that governed the
22  offering of prayer at School Board meetings?
23  A.   Not that I'm aware of.
24  Q.   Were you ever asked to lead the Board in

15 (Pages 54 to 57)

Page 58

1  prayer or offer a prayer at the beginning of School
2  Board meetings prior to the adoption of the School
3  Board policy?
4  A.  No.
5  Q.  So, 1974 to 2004 is the period of time
6  during which you were a School Board member with a
7  three year hiatus, so if my arithmetic is right
8  that's 27 years of service prior to the adoption of
9  Board Policy BDA.1, and you were never asked to
10  offer a prayer at a School Board meeting?
11  A.  That's correct.
12  Q.  Do you know why?
13  A.  No.
14  Q.  Did you ever tell any Board president that
15  you were not interested in offering a prayer at the
16  School Board meeting?
17  A.  No.
18  Q.  Again, if my arithmetic is correct, that's
19  well over 300 School Board meetings at which
20  somebody offered a prayer, but you were not invited
21  to do so, did that strike you as off or unusual?
22  A.  No.
23  Q.  Did you perceive any pattern in the Board
24  president's practice in the selection of the person

Page 59

1  who would be invited to offer the prayer?
2  A.  It was usually done by a small portion of
3  the group of ten.
4  Q.  And did they have any common
5  characteristics, the small portion?
6  A.  Not that I'm aware of.
7  Q.  Do you know how that small group, smaller
8  group was identified by the Board?
9  A.  To my knowledge the Board president would
10  call on someone at the Board meeting to say the
11  prayer, that's all I know.
12  Q.  But you told me that a small group of the
13  Board was asked to offer the prayer, a group that
14  you were not a member of, do you know how that group
15  was identified or picked or selected to be the ones
16  who would offer the prayer?
17  A.  No.
18  Q.  How small a group, two, three?
19  A.  Three, four, somewhere in that
20  neighborhood.
21  Q.  Was a Jewish Board member ever included in
22  that group?
23  A.  I don't recall us ever having a Jewish
24  Board member.

Page 60

1  Q.  Was a Muslim Board member ever included in
2  that group?
3  A.  I don't call us having a Muslim Board
4  member.
5  Q.  Or a Buddhist?
6  A.  Same answer.
7  Q.  A non-Christian Board member ever included
8  in that group?
9  A.  I don't recall us ever having that type of
10  Board member.
11  Q.  Would you characterize the members of that
12  smaller group as being particularly religious
13  amongst their peers?
14      MR. GOSSELIN:  Objection.
15  A.  Do I answer?
16  Q.  Yes, sir.
17  A.  Can you please ask that question again?
18  Q.  Was it -- did you perceive that the
19  criteria for selection of this smaller group was
20  that these were folks who were particularly
21  religious?
22      MR. GOSSELIN:  Objection.
23  A.  No.
24  Q.  Let me just ask the broad question, is it

Page 61

1  your testimony that you have no idea how this, how
2  the members of this smaller group were selected by
3  the School Board president on which you served?
4  A.  That's true.
5  Q.  And you wasn't interested in finding out
6  how they were picked?
7  A.  It wasn't -- I guess the answer is yes I
8  wasn't, that I wasn't interested.
9  Q.  Just wasn't a topic that you were
10  interested in?
11  A.  No, that's not.  I just think that there
12  was a certain group, just like there is a certain
13  group now who does a better job of saying the
14  prayer.
15  Q.  Actually that's very helpful to me.  Is
16  that -- doing a better job at saying a prayer is
17  that that they are just better at offering, you
18  know, inspirational prayers?
19  A.  In my opinion, yes.
20  Q.  And is that because they are better at --
21  tell me what you mean by better, what constitutes a
22  better prayer?
23  A.  Some people it just naturally flows, you
24  know, it's very commonplace with them they can do

16 (Pages 58 to 61)

Dobrich, et al.                              v.              Indian River School District, et al.
Charles M. Bireley                  C.A. # 15-120 (JJF)                  October 11, 2006

Page 62

1  it. They can do it at a heart beat.
2      Q.   Is that the way it is even today on the
3  Board?
4      A.   With some, yes.
5      Q.   Who are the people that you would identify
6  as the people on the Board today who are better at
7  offering a prayer?
8      A.   Right now, Mr. Helms, Dr. Hattier, Mrs.
9  Bunting, Mrs. Mitchell.
10     Q.   Let me ask you this question, having
11  observed for 27 years the practice of conferring the
12  invitations to a smaller subset of the Board, did
13  you think that that worked well?
14     A.   Yes.
15     Q.   The School Board Prayer Policy BDA.1
16  provides for something different from that practice,
17  do you know that?
18     A.   Yes.
19     Q.   And did you believe that it was appropriate
20  to make that change?
21     A.   To make what change?
22     Q.   The change from extending the invitations
23  to his pray to a small subset of the Board, a change
24  from that practice, to the practice of rotating the

Page 63

1  invitation among all of the Board members?
2      A.   Since I've been Board president I've asked
3  for anyone who wishes to do that to let me know, and
4  if they don't tell me that they want to do it then
5  I'll call on that rotating group that I normally do.
6      Q.   Okay. You have been Board president the
7  entire tenure, you entire tenure as Board president
8  has occurred after passage of School Board Prayer
9  Policy BDA.1, correct?
10     A.   Me entire tenure?
11     Q.   Yes.
12     A.   No.
13          MR. GOSSELIN: As president.
14     A.   I have been president before that, is that
15  what you mean?
16     Q.   Oh, oh, I'm sorry, I thought this was your
17  first tenure as Board president?
18     A.   No.
19     Q.   When were you Board president before this?
20     A.   I can't tell you exact years, but it's like
21  eight or nine years.
22     Q.   Okay and during your tenure as Board
23  president prior to 2004 when the Board policy has
24  adopted, you selected the people to whom you would

Page 64

1  extend an invitation to lead the group in prayer on
2  the basis that you have just told me, which is they
3  were the people who were good at it?
4      A.   But I also asked the other members of the
5  Board if they wished to do that, to let me know and
6  if they didn't let me know then I just called on
7  that group, yes.
8      Q.   And I want to separate now pre October 19,
9  2004 to post October 19, 2004 in the pre-policy,
10  pre-October 2004 period, you selected the people
11  that you were going to extend an invitation to on
12  the basis of whether they were good at it, correct?
13     A.   Whether they wanted to. In other words,
14  whether they wanted to say a prayer.
15     Q.   Yes, sir. And then you also tried to let
16  the remaining Board members know that if they wanted
17  to be included in that group you would include them?
18     A.   Yes.
19     Q.   Did anybody during your tenure, pre policy
20  tenure as a Board member, did anybody to whom you
21  said hey I haven't been inviting you to offer the
22  prayer, but if you want me to invite you I will.
23  Anybody say actually I would like to be invited?
24     A.   No.

Page 65

1      Q.   But you did have a conversation in words or
2  substance like that with everybody to whom you had
3  not offered the invitation previously?
4      A.   Previous to that, yes.
5      Q.   Dr. Hattier testified yesterday, that he
6  works very hard to prepare his prayer, that it
7  doesn't flow easily, and he is not good at direct
8  quotations, he tries to write down what he's going
9  to say, is that consistent with your notion that Dr.
10  Hattier would fall into the group that is better at
11  offering a School Board prayer?
12     A.   Yes.
13     Q.   Is that because the content of the prayers
14  that he offers after his hard work seems to you to
15  be inspirational?
16     A.   Yes.
17     Q.   Seems to you to serve the purpose of School
18  Board prayer?
19     A.   Yes.
20     Q.   So, in Dr. Hattier's case it's the content
21  of the prayer that leads you to select Dr. Hattier?
22     A.   Yes.
23     Q.   The group of people that you identified for
24  me on the current Board that are good at, I'm using

17 (Pages 62 to 65)

Dobrich, et al.                                        v.                    Indian River School District, et al.
Charles M. Bireley              C.A. # 15-120 (JJF)                                    October 11, 2006

Page 66

1 a generic term, but that would be in that smaller
2 subset of the Board, I want to, make sure because I
3 have some questions based on the membership of that
4 sub group, is Dr. Hattier, Mr. Helms, is it Ms.
5 Mitchell or Dr. Mitchell?
6   A.   Mrs. Mitchell.
7   Q.   And Mrs. Bunting, correct?
8   A.   Correct.
9   Q.   Have you ever heard Mr. Helms -- first of
10 all, since the adoption of the policy have you as
11 Board president invited each of those four people to
12 take up the opportunity established by the Board
13 policy to open the meeting with a prayer?
14   A.   The ones that we are talking about now?
15   Q.   Those four that I just identified?
16   A.   To the best of my knowledge, yes.
17   Q.   And has each of those persons accepted the
18 invitation when you extended it?
19   A.   Yes.
20   Q.   Have they ever turned it down?
21   A.   No.
22   Q.   In the case of Mr. Helms, Mrs. Mitchell and
23 Mrs. Bunting, do you recall any instance in which
24 they offered a prayer that did not invoke the name

Page 67

1 of Jesus Christ?
2   A.   That they did not.
3   Q.   Yes.
4   A.   Not that I'm aware of.
5   Q.   And that would be your expectation,
6 wouldn't it, that each of those three persons would
7 offer a prayer that would invoke the name of Jesus
8 Christ?
9        MR. GOSSELIN:   Objection.
10   Q.   You can answer.
11   A.   Yes.
12   Q.   Now, I want to explore with you how you as
13 Board president have implemented the rotational
14 aspect of Board Policy BDA.1. Have you since the
15 passage of the policy and during your tenure as
16 Board president rotated the invitation among all
17 Board members?
18   A.   For those who wanted to, yes.
19   Q.   How did you find out who wanted to and who
20 didn't?
21   A.   I did the same thing as I did before, I
22 asked them were they willing, did they want to
23 participate, did they want to issue a prayer, if
24 they did please let me know.

Page 68

1   Q.   All right, so when did you become Board
2 president in 2005, July?
3   A.   July 1st.
4   Q.   So, some time before the July 2005 Board
5 meeting you contacted each of the Board members to
6 ask whether they wanted to be extended an invitation
7 to offer the prayer?
8   A.   The existing Board member and the new Board
9 members come on except the three that are on there
10 now. The three that were recently elected and came
11 on I have not had that conversation with those
12 three.
13   Q.   The three that were elected in March 2006?
14   A.   Yes, and that came on July 1st, of this
15 year.
16   Q.   So, I gather that some Board members when
17 you contacted them on this issue said no I would
18 prefer not to be invited to offer the prayer at the
19 beginning of the meeting?
20   A.   That's true.
21   Q.   Which Board members told you that?
22   A.   I asked Mr. Walls was the one specifically
23 asked me, when I asked him he said he declined right
24 at the present time, but if he chose to do it later

Page 69

1 he would let me know.
2   Q.   What other member declined?
3   A.   None. They just didn't tell me that they
4 wanted to do it.
5   Q.   I thought you contacted each one to ask
6 whether they wanted to do it?
7   A.   I said to them if you want to say a prayer
8 at the Board meeting please let me know.
9   Q.   And you said that in words or substance to
10 each of the sitting Board members?
11   A.   Except the three new ones.
12   Q.   Yes, sir.
13   A.   Yes, sir. I'm talking about in July of
14 2005?
15   A.   Yes.
16   Q.   So, Mr. Walls said no thank you, although
17 he could changes his mind, and each of the other
18 nine including yourself, I guess you'd have to say
19 it to yourself, but each of the other nine said yes
20 thank you I would like to be invited, I would like
21 to be included in the rotation?
22   A.   No.
23   Q.   Did anyone say I'd like to be excluded from
24 the rotation?

18 (Pages 66 to 69)

Dobrich, et al.                           v.                    Indian River School District, et al.
Charles M. Bireley              C.A. # 15-120 (JJF)                          October 11, 2006

Page 70

1    A.   No.
2    Q.   Did anyone in some other way indicate that
3    they would prefer not to be invited?
4    A.   No.
5    Q.   Well, in the absence of an indication that
6    a Board member would prefer not to be included in
7    the rotation, am I correct that as Board president
8    you included them in the rotation of persons to whom
9    the invitation would be extended?
10   A.   What I did since they chose not to do it,
11   then basically when their name up in order to do it,
12   they chose close not to do it because they didn't
13   tell me that they would I went on to the next one.
14   Q.   Okay, so I apologize this id just the way
15   this process goes. Sometimes I am thick, sometimes
16   I have to get through by questions and answers that
17   I misunderstand. So, let me, with that apology try
18   to summarize. You came on as board president in
19   July. You contacted each Board member to find out
20   whether they would like to be included in the
21   rotation of invitations. The only person who
22   affirmatively said I would like not to be included
23   at the present time was Mr. Walls?
24   A.   Yes.

Page 71

1    Q.   Subsequent do this, and therefore you at
2    that time in July established whether you did it,
3    and I'm going to talk to you about this in a minute,
4    whether you made a list or you just put it in your
5    head, you established a rotation of nine Board
6    members, is that correct?
7    A.   Pretty much, yes.
8    Q.   And then you began at each Board meeting
9    going through your list on a rotational basis,
10   correct?
11   A.   I also asked the person prior to that night
12   if they want to do the prayer.
13   Q.   Okay, and so over the course of the next 14
14   or 15 months in each case at sometime before the
15   Board meeting convened you'd ask the next person on
16   your rotation would you like to offer the prayer
17   specifically, correct?
18   A.   No.
19   Q.   Explain to me what you would do?
20   A.   I asked the people in a group, not in a
21   group, individually, if you would like to
22   participate in saying a prayer on the Board level,
23   please let me know. If they did not let me know
24   that they wanted to then I never ever asked them

Page 72

1    again.
2    Q.   I see.
3    A.   I went to the next one.
4    Q.   I apologize. Okay, and that's the
5    conversation that took place in July?
6    A.   Well, I'm not sure that it took place in
7    July.
8    Q.   Or August some time. Some time at the
9    beginning of your tenure as Board president?
10   A.   Well, you know I had this same conversation
11   with some of those people prior to that, you know,
12   when I was president before that.
13   Q.   All right, so the implementation of the
14   rotation in the School Board Prayer Policy, the way
15   you have implemented it is to say to the sitting
16   Board members either at the time either in 2005 or
17   maybe during a prior time when you served as board
18   president with those same Board members, the way you
19   implemented it was to say, if you would like to be
20   included in the rotation, let me know?
21   A.   Yes.
22   Q.   And unless they said yes I'd like to be
23   included in the rotation you did not include them in
24   the rotation?

Page 73

1    A.   Yes.
2    Q.   One person in response to your request
3    affirmatively said I would like to not be included
4    in the rotation at this time?
5    A.   Yes.
6    Q.   And that was Mr. Walls?
7    A.   Yes.
8    Q.   So, tell me, which persons affirmatively
9    said yes I would like to be included in the
10   rotation?
11   A.   Dr. Hattier, Mrs. Mitchell, Mr. Helms,
12   Mrs. Bunting. Is that five?
13   Q.   That's four?
14   A.   I'm trying to think.
15   Q.   Do you need a list of the Board members?
16   It happens to me all the time?
17   A.   They normally sit at the same chairs, I'm
18   trying to go around. Maybe it's only four. I'm
19   trying to think who is sitting on the other side.
20   Q.   Mr. Evans?
21   A.   He is not a Board member anymore.
22   Q.   In July did he indicate an interest in --
23   A.   Yeah, he did. I mean he participated I was
24   thinking of right now.

19 (Pages 70 to 73)

Dobrich, et al.                                    v.                      Indian River School District, et al.
Charles M. Bireley                      C.A. # 15-120 (JJF)                              October 11, 2006

Page 74

1  Q.  So, is your best guess that those are the
2  four who indicated an interest in participating?
3  A.  Well, it would be five including Mr. Evans.
4  Q.  Five with Mr. Evans, but he is now off the
5  Board.  So, on the current Board you have a group of
6  four who have affirmatively said I'd like to
7  volunteer to be in the rotation and offer a prayer?
8  A.  Yes.
9  Q.  And you have not yet talked to any of the
10 three more recently elected Board members?
11 A.  That is true but their names are coming up,
12 their time, so I would talk to them probably within
13 the next maybe prior to the next Board meeting.  I
14 am not sure.  I have it written down at home.
15 Q.  I was just going to ask you that, so how do
16 you keep track of who's next in the rotation?
17 A.  Well, I try to make notes for myself.
18 Q.  And where do you keep those notes?
19 A.  At home.
20 Q.  Do you have a Board file of some kind?
21 A.  No.
22 Q.  Where did you keep them?
23 A.  I have a disclaimer, that I'm sure you are
24 aware of that I read before every Board meeting.  I

Page 75

1  make a note on that.
2  Q.  And this is going to sound tedious, but I'm
3  trying to identify precisely what objects there are
4  that have the words, so do you have a pad that has
5  the disclaimer?
6  A.  It's just a single piece of paper like this
7  that has the disclaimer that I read at each Board
8  meeting.
9  Q.  What do you do write down the name of the
10 person who gave the prayer?
11 A.  That who is suppose to do it, yes.
12 Q.  And then how do you know who the next
13 person is in the rotation?
14 A.  The one that -- I try to go by the one --
15 in other words, for the ones who are doing it right
16 now, there is four of them, then that other one will
17 not do it again for four months as it stands right
18 now.
19 Q.  And so how do you remember what has gone in
20 the preceding three months and who is next?
21 A.  I make notes of it.
22 Q.  And you make that note on the disclaimer
23 piece of paper?
24 A.  Yeah.

Page 76

1  Q.  So, the four members who are currently on
2  your rotation list, my memory is really shot, Dr.
3  Hattier, Mr. Helms Mrs. Mitchell and Mrs. Bunting,
4  would you characterize those four as good at
5  offering school board prayer?
6  A.  Yes.
7  Q.  I don't know how else to say it, they are
8  skilled at it?
9  A.  Yes.
10 Q.  In your home where do you keep the
11 disclaimer page?
12 A.  In my office.
13 Q.  Do you keep any other materials related to
14 your service as a Board member or Board president
15 with that disclaimer page?
16 A.  No.
17 Q.  So you have a single page that relates to
18 the School Board and your service as a member in
19 your home?
20 A.  It's usually in the packet, the Board
21 packet.
22 Q.  Do you keep the Board packet?
23 A.  Do I keep them?
24 Q.  Yes.

Page 77

1  A.  For probably two months.
2  Q.  And then you throw them away?
3  A.  Yes.
4  Q.  Do you make a notes on the Board packets
5  during the meeting?
6  A.  Just like dates of the next committee
7  meeting or something like that.  Then when I get
8  home I have a great pig piece of calendar paper on
9  my desk and I write it on that.
10 Q.  So, apart from noting dates you don't write
11 anything else on your Board packet?
12 A.  No, believe me I have all I can do to run
13 the meeting.
14 Q.  Well, that's an interesting question, did
15 you keep notes before you became Board president on
16 your Board packet or in any other form?
17 A.  No.
18     MR. GOSSELIN:  He has all he
19     can do listening to the meeting, too.
20     MR. ALLINGHAM:  Well,
21     Mr. Gosselin, I will call for production of
22     the disclaimer page with whatever notes
23     exist on it.  I think that's called for by
24     the production request.

20 (Pages 74 to 77)

Dobrich, et al.                                    v.                     Indian River School District, et al.
Charles M. Bireley                      C.A. # 15-120 (JJF)                              October 11, 2006

Page 78

1          MR. GOSSELIN: That one you
2     don't even need to send a letter to me.
3     If you can grab that we will produce it.
4     Do you remember the disclaimer, do you know
5     what it says?
6     A.   Uh-hum.
7          MR. GOSSELIN: I'll produce the
8     paper, don't worry about.
9     Q.   Do you live a long way from Selbyville,
10    from the Selbyville School, what used to be called
11    the Selbyville School, where were are sitting today?
12    A.   Ten to 15 miles.
13         MR. GOSSELIN: Just off the
14    record.
15    Q.   Is it possible to have it delivered down
16    here tomorrow or something like that?
17    A.   I can bring it to you tomorrow.
18         MR. GOSSELIN: I don't want to
19    have to bring him back.
20         MR. ALLINGHAM: I don't either,
21    and I don't think I have to ask Mr.
22    Bireley questions about it if it's not
23    too hard to get it here in some form that
24    would obviate any possible need to ask any

Page 79

1     questions about it. I suspect what it is
2     -- let me just ask you a couple of
3     questions.
4     Q.   This piece of paper has the disclaimer
5     printed on it, correct?
6     A.   Yes.
7     Q.   And it has some notes relating to who gave
8     the prayer at some meetings, correct?
9     A.   Yes.
10    Q.   Other than that is there anything else on
11    this piece of paper?
12    A.   No.
13    Q.   Is this piece of paper from time to time
14    replaced by a new piece of paper?
15    A.   Yes.
16    Q.   That has the disclaimer on it?
17    A.   Yes.
18    Q.   I feel like I'm playing 20 questions now.
19    And someone from the central office includes that
20    disclaimer language in every package that you get,
21    is that correct?
22    A.   No. It's my responsibility to keep the
23    disclaimer letter.
24    Q.   And then if you don't have it you ask for

Page 80

1     it again? Why would someone from the central office
2     send you a new copy of the disclaimer?
3     A.   They don't, I make it.
4     Q.   Oh, you make a new copy?
5     A.   Yes.
6     Q.   Okay, and throw away the old copy?
7     A.   Yes.
8     Q.   If you have an old copy why make a new
9     copy?
10    A.   Because I change the name on there of who
11    was the person who said the prayer.
12    Q.   So, you can use that disclaimer piece of
13    paper to look back and see, to the extent you
14    couldn't recall it independently, you can look back
15    and see oh, yeah, I remember Dr. Hattier gave the
16    prayer or Mrs. Mitchell gave the prayer last
17    meeting, I should go to the next person?
18    A.   Yes.
19    Q.   Do you have in your head the order of those
20    four people?
21    A.   No.
22    Q.   So, how do you know which one comes next?
23    A.   I have the paper, you know with the names
24    on it, if I've collected enough of them say for the

Page 81

1     last, I'm only looking at four months, four times.
2     Q.   Yup.
3          MR. ALLINGHAM: All right well
4     request, Jason, I would like to have that
5     piece of paper cause I'm not certain that
6     I understand even now exactly what it says.
7          MR. GOSSELIN: Right now do you
8     have multiple pieces of paper going back a
9     couple of months?
10    A.   Probably one or two.
11         MR. GOSSELIN: Okay, but every
12    month you print out a new disclaimer with a
13    new name.
14    A.   Either every month or every two months.
15         MR. ALLINGHAM: Whatever there is
16    I'd like to see it.
17    A.   Okay.
18         MR. GOSSELIN: You have got
19    the disclaimer as a word file on your
20    computer or something like that?
21    A.   No, it's printed on a piece of paper and I
22    just make a copy of it.
23    Q.   Apart from the complaints that have been
24    raised in this litigation, have there been any

21 (Pages 78 to 81)

Dobrich, et al.                                    v.                     Indian River School District, et al.
Charles M. Bireley                          C.A. # 15-120 (JJF)                        October 11, 2006

Page 82

1  complaints during your tenure as a School Board
2  member about the use of prayer during School Board
3  meeting?
4    A.  To me?
5    Q.  To anyone that you are aware of?
6    A.  No.
7    Q.  During your entire as a school Board member
8  including any meeting of the School Board, has any
9  School Board member ever expressed an opinion that
10  the practice of opening School Board meetings with
11  prayer might violate the law?
12   A.  Not that I'm aware of.
13   Q.  Has the School Board consulted any law
14  firms to research legal issues relating to School
15  Board prayer?
16        MR. GOSSELIN:  Objection, don't
17  answer that.
18        MR. ALLINGHAM:  On what ground?
19        MR. GOSSELIN:  Well, it calls for
20  the I mean, I think that's sort of a, maybe
21  that's a close call.  Yes, he can answer
22  questions about whether they've consulted
23  law firms.
24        MR. ALLINGHAM:  I'm not going to

Page 83

1  go back through all the substantive
2  questions that I had yesterday.  I'm
3  assuming and if you can confirm this on the
4  record that you would make the same
5  instructions to Mr. Bireley that you made
6  to Dr. Hattier yesterday?
7        MR. GOSSELIN:  Yes, my instruction
8  is that you can answer questions about
9  whether a lawyer was hired, the fact that
10  consultations might have taken place, but
11  not anything regarding the substance of
12  what you said to a lawyer or lawyer that
13  you were considering hiring.  That's the
14  instruction.
15        MR. ALLINGHAM:  So, we are going
16  to go question by question, but we sort of
17  have the ground rules, and I'm going to try
18  to observe those ground rules, on the
19  assumption that I'm not going to re-ask all
20  the questions that you would object to
21  again, if you will represent that you would
22  make the same instructions.
23        MR. GOSSELIN:  I make that
24   representation.

Page 84

1    Q.  Has the School Board contacted any law
2  firms, or individual lawyers, I guess, for the
3  purpose of obtaining information about School board
4  prayer?
5    A.  Yes.
6    Q.  When was the first instance in which the
7  School Board made such a contact?
8    A.  After the graduation ceremony at Sussex
9  Central.
10   Q.  In 2004?
11   A.  Yes.
12   Q.  And do you know the names of the firms or
13  individual lawyers whom the School Board contacted?
14   A.  Mr. Neuberger.
15   Q.  Any others?
16   A.  No.
17   Q.  Who contacted Mr. Neuberger?
18   A.  Mr. Helms.
19   Q.  Did the Board authorize Mr. Helms to
20  contact Mr. Neuberger?
21   A.  Not that I'm aware of.
22   Q.  So, Mr. Helms contacted Mr. Neuberger on
23  his own?
24   A.  Yes.

Page 85

1    Q.  Do you know precisely when that took place?
2    A.  No.
3    Q.  Did Mr. Helms subsequently report on the
4  substance of his conversation with Mr. Neuberger to
5  the Board?
6    A.  He got Mr. Neuberger to come and visit us.
7    Q.  Do you know when that took place?
8    A.  Not exactly.
9    Q.  Was it the summer of 2004?
10   A.  It was after the graduation ceremony, yes.
11   Q.  Was it before the commencement of the next
12  academic year?
13   A.  Yes, I'm pretty sure it was.
14   Q.  So, sometime during the summer of 2004?
15   A.  Yes.
16   Q.  Do you know whether Mr. Neuberger's visit
17  to the Board is reflected in the minutes of the
18  Board meeting?
19   A.  I believe, if I am not mistaken that this
20  was a special Board meeting, it wasn't a regular
21  Board meeting.
22   Q.  Okay.  Do you know whether the minutes of
23  that meeting reflect Mr. Neuberger's attendance?
24   A.  I thought it was.

22 (Pages 82 to 85)

Dobrich, et al.                         v.              Indian River School District, et al.
Charles M. Bireley              C.A. # 15-120 (JJF)              October 11, 2006

Page 86

1    Q.   Did had a special Board meeting open with a
2    prayer?
3    A.   I don't believe it did.
4    Q.   Why is that?
5    A.   I know it's probably sounds strange but the
6    prayer issue usually is on regular Board meeting.
7    If we have a special Board meeting we don't do it.
8    Q.   Why would your say that sounds strange?
9    A.   Because we just have a rule, or I guess
10   it's a past practice or whatever that we always have
11   the prayer at the regular Board meetings but no
12   other.
13   Q.   And when you say the regular Board meetings
14   those are the regular meetings at which the public
15   is present?
16   A.   Yes, once a month.
17   Q.   And is that regular practice it's not just
18   today's practice or 2004's regular practice, it's
19   the regular practice that goes back in time as far
20   as your tenure on the Board extends, correct?
21   A.   Yes.
22   Q.   And is that because -- is the distinction
23   between public meetings where prayers are offered
24   and private meetings where prayers are not offered,

Page 87

1    is there any distinction other than that the public
2    is present at those regularly scheduled public
3    meetings?
4    A.   Sometimes there is public at special
5    meetings, too.
6    Q.   Oh, and even if there is public at the
7    special meetings you don't offer a pray?
8    A.   That's correct.
9    Q.   Is there any distinction from your point of
10   view, just as an individual Board member, between a
11   special meeting at which the public is present and a
12   regular meeting at which the public is present that
13   would lead to pray at the latter but not at the
14   former?
15   A.   Except it's always the way that it's been
16   done.
17   Q.   How often does the Board, just an estimate
18   over your 30 years of tenure, how often does the
19   Board call special Board meetings?
20   A.   Two to three a year maybe.
21   Q.   And how often does the public attend
22   special Board meetings?
23   A.   I'm not sure.
24   Q.   Not very frequently?

Page 88

1    A.   I wouldn't say not all three of them. Say
2    if we do two or three a year, say not all three. It
3    depends on what the issue is.
4    Q.   In this litigation we have had the
5    opportunity to look at the minutes of Board
6    meetings, and I'll represent to you that since the
7    adoption of Policy BDA.1, the School Board Prayer
8    Policy on October 19, 2004, since that date there
9    have been at least 17 special Board meetings over
10   the course of that two year period.
11       So, that's eight to nine per year. Has the
12   incidents of special Board meetings increased in
13   recent years?
14   A.   The difference between what I'm talking
15   about and what you're talking about is we have a
16   special Board meeting the we interview for
17   personnel, I'm not talking about that. I'm talking
18   about issues other than hiring of personnel that we
19   have a special Board meeting for.
20   Q.   Okay, so I can think of it as two
21   categories of special meetings, one is a category
22   which is limited to hiring personnel for the
23   district?
24   A.   Okay.

Page 89

1    Q.   Then I should be thinking then there is
2    category of special meeting for everything else?
3    A.   Yes.
4    Q.   Even it's the everything else type meeting
5    that comes two or three times a year?
6    A.   Yes, I would say so.
7    Q.   I assume that the personnel special
8    meetings there are no public present?
9    A.   That is true.
10   Q.   At the other kinds of special meetings
11   sometimes the public is present and sometimes there
12   is nobody from the public there?
13   A.   Yes.
14   Q.   To come back to Mr. Neuberger, there is a
15   special Board meeting on August 23, 2004 that was
16   addressed in large part to the issue of prayer in
17   the schools. I'll show you the minutes, what
18   portion of the minutes that we have in a little
19   while. It that the meeting and to place this in
20   time, the next day, August 24, 2004, was the meeting
21   at which many hundreds of people showed up. Was it
22   the August 23 special meeting, the day before the
23   big meeting, at which Mr. Neuberger showed up at the
24   Board?

23 (Pages 86 to 89)

Dobrich, et al.                          v.              Indian River School District, et al.
Charles M. Bireley            C.A. # 15-120 (JJF)                    October 11, 2006

Page 90

1   A.   I don't think so.
2   Q.   Was it before or after that August 24th big
3   meeting?
4   A.   If memory serves me correctly it was after.
5   Q.   So, that's helpful, thanks. Other than
6   Mr. Neuberger did the Board or the district contact
7   any other lawyer or law firm to investigate issues
8   relating to School Board prayer?
9   A.   I believe that Mr. Walls, I think it's the
10  Alliance Defense Fund, I think he had some
11  conversation with them, but the Board never met with
12  anyone from them.
13  Q.   How did you find out about Mr. Walls'
14  contacts with the Alliance Defense Fund?
15  A.   He told us that he had done it, that's when
16  he was president.
17  Q.   Did the Board authorize Mr. Walls to
18  contact the Alliance Defense Fund?
19  A.   Not that I'm aware of.
20  Q.   So, he did that on his own?
21  A.   Yes.
22  Q.   Other than Mr. Neuberger and the Alliance
23  Defense Fund, did the Board or the district contact
24  any lawyers for the purpose of investigating the

Page 91

1   issue of School Board prayer?
2   A.   I don't think so.
3   Q.   Did the Board have a regular Board lawyer?
4   A.   Yes.
5   Q.   In the year of 2004?
6   A.   Yes, excuse me.
7   Q.   Who was that?
8   A.   Mr. Griffin, James Griffin.
9   Q.   Did the Board consult with Mr. Griffin on
10  the issue of School Board prayer?
11  A.   Yes.
12  Q.   And when did the first, when did the Board
13  first consult with Mr. Griffin on that issue?
14  A.   Some time after the graduation.
15  Q.   In terms of its consultation with
16  Mr. Griffin did that take place before or after the
17  big meeting on August 24th?
18  A.   If memory serves me correctly that was
19  afterwards, after too.
20  Q.   Okay. So we've identified Mr. Neuberger,
21  the Alliance Defense Fund and Mr. Griffin, any other
22  lawyers that were consulted by the district on the
23  issue of School Board prayer?
24  A.   Maybe David Williams.

Page 92

1   Q.   He's with the Morse James firm?
2   A.   I'm not sure.
3   Q.   It's okay if you don't know?
4   A.   It's a Delaware attorney.
5   Q.   Got you. Mr. Williams was retained by the
6   Board in connection with its dispute with its
7   insurer, correct?
8   A.   Yes.
9   Q.   So that took place after February of 2006?
10  A.   Yes.
11  Q.   Quite a long time after the adoption of the
12  School Board Prayer Policy?
13  A.   Yes.
14  Q.   Did the Board ever consult with either John
15  Cafferty or John Balliger on the issue of School
16  Board prayer?
17  A.   You mean before they came to work for us or
18  work with us?
19  Q.   Before or after they came to work with you?
20  A.   I don't think so. I think they were
21  presented to us by the insurance company.
22  Q.   Did Mr. Balliger and Mr. Cafferty represent
23  the School District and the School Board?
24  A.   Yes.

Page 93

1   Q.   Did the School Board consult with
2   Mr. Balliger and Mr. Cafferty on the issue of School
3   Board prayer?
4   A.   Yes.
5   Q.   And did that consultation take place before
6   or after the big August 24th meeting?
7   A.   That was after.
8   Q.   Was that before or after adoption of the
9   School Board Prayer Policy on October 19, 2004?
10  A.   If I'm not mistaken I think they had input
11  into that.
12          MR. ALLINGHAM:  Okay, we are going
13  to change the tape so we will take a break.
14          MS. DUPHILY:  We are going off
15  the record at approximately 11:09 a.m..
16          (WHEREUPON a brief recess was
17  taken)
18          MS. DUPHILY:  We are back on the
19  record at approximately 11:17 a.m..
20  Q.   Mr. Bireley, I think the last answer was
21  clear, but I take it from that that Messers cafferty
22  and Balliger provided advice to the Board on the
23  School Board prayer policy prior to its adoption on
24  October 19, is that correct?

24 (Pages 90 to 93)

Dobrich, et al.                                    v.                 Indian River School District, et al.
Charles M. Bireley                    C.A. # 15-120 (JJF)                            October 11, 2006

Page 94

1   A.   I think so.
2   Q.   Of Mr. Neuberger -- are you familiar with
3   the Rutherford Institute?
4   A.   I know who they are.
5   Q.   Did you understand that the Rutherford
6   Institute and Mr. Neuberger were affiliated in some
7   way?
8   A.   Yes.
9   Q.   Of Mr. Neuberger, the Rutherford Institute,
10  the Alliance Defense Fund, Mr. Griffin and Messers
11  cafferty and Balliger, would you identify the
12  individuals or organizations which the Board
13  actually retained for purposes of providing advice
14  in connection with the School Board prayer?
15  A.   Cafferty and Balliger.
16  Q.   Am I correct that the Board did not retain
17  Mr. Neuberger?
18  A.   That's correct.
19  Q.   And the Board did not retain the Rutherford
20  Institute?
21  A.   That's correct.
22  Q.   The Board did not retain the Alliance
23  Defense Fund?
24  A.   Correct.

Page 95

1   Q.   Now, we come to Mr. Griffin did the Board
2   retain Mr. Griffin for purposes of providing advice
3   on School Board prayer issues?
4   A.   Mr. Griffin was our regular attorney.
5   Q.   When Mr. Griffin provided the advice that
6   he did to the Board on School Board prayer issues,
7   it was your expectation that he would be compensated
8   for that time, correct?
9   A.   Through his regular way.
10  Q.   Does he have, does Mr. Griffin charge by
11  the hour on an annual retainer basis?
12  A.   I believe he charges by the hour. I'm not
13  positive.
14  Q.   Okay. At all events it was your
15  expectation as a Board member that Mr. Griffin would
16  be compensated somehow for the advice he was giving
17  on the School Board prayer issue?
18  A.   I would think so.
19  Q.   All right, at any time, this is a little
20  bit complicated question, at any time since you have
21  been a Board member has a school Board member ever
22  offered a prayer that would have violated the School
23  Board Prayer policy that was adopted in October, on
24  October 19, 2004? Do you understand the question?

Page 96

1   A.   I understand what you said, but I don't
2   know how they would have violated it.
3   Q.   Let me ask it a different way which maybe
4   would help. If the School Board Prayer Policy had
5   been in place beginning before you were elected to
6   the School Board for the first time, do you recall
7   any prayer offered by a Board member that would have
8   violated that policy?
9   A.   Not that I'm aware of.
10  Q.   Okay. So, you're not aware of any prayer
11  that has ever been offered by a School Board member
12  that did not comply -- I'm going to withdraw the
13  question, and start again, I want to give you the
14  policy so you have it in front of you.
15      I have handed you a copy of what previously
16  was marked as Plaintiff's Exhibit 9, which is the
17  School Board Prayer Policy. First of all, is this
18  the School Board Prayer Policy?
19  A.   Yes.
20  Q.   It was adopted as it says down in the lower
21  left-hand corner on October 19, 2004?
22  A.   Yes.
23  Q.   Paragraph three says, "That the opportunity
24  to open Board meetings with a prayer shall not be

Page 97

1   used or exploited to proselytize, advance or convert
2   anyone or to derogate or otherwise disparage any
3   particular faith or belief." Am I correct in
4   understanding from your previous answer that it's
5   your belief that on no occasion has any prayer ever
6   been offered by a Board member at a Board meeting
7   that would be a proselytizing prayer?
8   A.   Not that I'm aware of.
9   Q.   Or that would have sought to advance any
10  particular faith or belief?
11  A.   Not that I'm aware of.
12  Q.   The language of paragraph three reads,
13  "Such opportunity," we can agree that would be the
14  opportunity to open meetings with a prayer?
15  A.   Yes.
16  Q.   Or a moment of silence?
17  A.   Yes.
18  Q.   "Such opportunity shall not be used or
19  exploited to proselytize," what do you understand
20  proselytize to mean?
21  A.   Like to convert or say that a particular
22  issue that they believed in is what everybody should
23  believe in.
24  Q.   The next clause reads, and I'm going to

25 (Pages 94 to 97)

Dobrich, et al.                                    v.                    Indian River School District, et al.
Charles M. Bireley                        C.A. # 15-120 (JJF)                              October 11, 2006

Page 98

1    just pick up the earlier language, "Such opportunity
2    shall not be used or exploited to advance or convert
3    anyone." Do you see that?
4       A.   Yes.
5       Q.   It's easy to understand what such
6    opportunity shall not be used or exploited to
7    convert anyone means. What do you understand the
8    meaning to be of the use of the word advance in that
9    clause? I read it to be such opportunity shall not
10   be used or exploited, advance anyone, anyone being
11   the object of the word advance, is that how you read
12   it?
13      A.   Yes.
14      Q.   What does that mean?
15      A.   That because one person is saying a prayer
16   that that's not suppose to mean that that particular
17   person's issues are put upon anyone else, it's just
18   his own words.
19      Q.   So, I am going to give an example, because
20   it's the typical practice, if a Christian prayer is
21   offered by a person who is a Christian that should
22   not be taken to advance that person ahead of other
23   people, is that what you're saying?
24      A.   That because one person is giving a

Page 99

1    Christian prayer doesn't mean that anyone else in
2    the audience might not or would have a right to
3    think differently than what he does, he or she.
4       Q.   Well, whether this policy exists or not
5    every person in the audience has the right to think
6    whatever they want to think under our laws, don't
7    they?
8       A.   Yes.
9       Q.   And they have the right to think whatever
10   they want to think, even if someone offers a
11   proselytizing prayer, isn't that correct?
12      A.   Yes.
13      Q.   So, why is paragraph three necessary?
14      A.   To be very honest with you the answer that
15   I can give you is because it was recommended to be
16   in there by the attorneys who helped us put this
17   policy together.
18      Q.   What attorneys helped you put this policy
19   together?
20      A.   The only two that I am aware of that did it
21   was Mr. Cafferty and Balliger, and I think that at
22   one time that Mr. Neuberger had some, he had some
23   insight into this. Whether or not that he actually
24   gave something that he wanted in there or whatever

Page 100

1    I'm not sure.
2       Q.   Who drafted this policy?
3       A.   It was done by the committee which
4    Mr. Walls was the chairman.
5       Q.   Do you know what Mr. Walls used at the
6    basis — do you know who actually put pen to paper
7    or fingers to keyboard and drafted this?
8       A.   No, I don't know who did that.
9       Q.   Were Mr. Cafferty and Mr. Balliger retained
10   by the Board after the Board was sued?
11      A.   I don't think that the Board ever retained
12   those two. I think they were retained by the
13   insurance company. I don't know that we even had
14   any choice in the matter.
15      Q.   Well, there is a lot imbedded in that
16   answer, but let me just focus on the timing part,
17   whoever retained Messers Balliger and Cafferty, did
18   that retention come before or after the Board was
19   sued?
20      A.   I'm not sure.
21      Q.   Okay. Am I correct that your best
22   recollection is that the text of this policy came
23   from the policy committee?
24      A.   Yes.

Page 101

1       Q.   Correct?
2       A.   Yes.
3       Q.   And you don't have any information about
4    where the policy committee, what formed the basis
5    for the policy committee's drafting of the text of
6    this policy?
7       A.   That is true.
8       Q.   When the policy was presented to the full
9    Board did you ask the policy committee what had been
10   the basis for the text that was presented to you?
11      A.   No, I did not.
12      Q.   Why not?
13      A.   Because I read it and it appeared that wit
14   this policy or any other policy we always run it by
15   the attorneys before we are allowed to see it, and
16   it was like something that was out of my domain, I
17   don't have the legal background to ask questions
18   like that, so I assumed that this was the way that
19   we should go.
20      Q.   Did the full the Board make the decision to
21   refer to the policy committee the issue of whether
22   to adopt the policy on School Board prayer?
23      A.   That's the procedure.
24      Q.   So, there was a point at which the full

26 (Pages 98 to 101)

Dobrich, et al.                        v.                Indian River School District, et al.
Charles M. Bireley              C.A. # 15-120 (JJF)              October 11, 2006

Page 102

1 Board said should we adopt the School Board Prayer
2 Policy or not?
3    **A.   I would say probably, yes.**
4    Q.   And do you know when that discussion or
5 consideration occurred?
6    **A.   No.**
7    Q.   Some time after graduation?
8    **A.   Yes.**
9    Q.   Sometime before October 1th9?
10    **A.   Yes.**
11    Q.   Did that determination occur before or
12 after the big meeting on August 24th?
13    **A.   Are we talking about August the 24th of**
14 **2004.**
15    Q.   Yes, sir.
16    **A.   I think it was after that, but I'm not**
17 **positive, but I think so.**
18    Q.   Back to the text of paragraph three. Am I
19 correct that the Board intends that the prayer
20 opportunity should not be used to advance any
21 particular faith?
22    **A.   Yes.**
23    Q.   And when you say advance any particular
24 faith, what do you mean by that?

Page 103

1    **A.   If a person is a Christian it should not**
2 **appear that the Christian prayer is the only one**
3 **there is. It's just from the individual.**
4    Q.   Fair enough. That could be accomplished I
5 suppose by saying before whatever you say as a Board
6 member I am not intending by offering this prayer to
7 suggest that this is the only appropriate prayer or
8 that the faith in which this prayer is offered is
9 the only appropriate faith?
10    **A.   I would agree with that.**
11    Q.   That's kind of the thrust that you are
12 trying to get at in this policy?
13    **A.   Uh-hum. If I can say something, you want**
14 **to know what I read before every Board meeting, is**
15 **paragraph one and paragraph three.**
16    Q.   Oh, good, we were going to come to that,
17 but we might as well address it now. So, the words
18 on that disclaimer page that you have --
19    **A.   Yes.**
20    Q.   -- are the words of paragraph one and
21 paragraph three?
22    **A.   Yes, that's the disclaimer that I read at**
23 **every meeting.**
24    Q.   So, at every meeting, you say, "In order to

Page 104

1 solemnify its proceedings, the Board of Education
2 may choose to open its meetings with a prayer or
3 moment of silence, all in accord with the freedom of
4 conscience of the individual adult Board member.
5 Such opportunity shall not be used or exploited to
6 proselytize, advance or convert anyone or to
7 derogate or otherwise disparage any particular faith
8 or belief?"
9    **A.   I'm sorry, that is not the paragraph, I'm**
10 **sorry. It's one and four.**
11    Q.   Got you.
12    **A.   After I read paragraph one I then read**
13 **paragraph four. But when it came to me, Mr. Walls**
14 **passed it on down to me after he became.**
15    Q.   Yes, sir?
16    **A.   That's what this is, when I talk about the**
17 **disclaimer it's paragraph one and paragraph four.**
18    Q.   And you are confident that you read the
19 text of paragraph one and paragraph four at every
20 Board meeting?
21    **A.   At every Board meeting.**
22    Q.   Every Board meeting at which prayer is
23 offered?
24    **A.   I'm not going to say that I've never**

Page 105

1 **forgotten to do it or something like that but for**
2 **the most part the answer is yes.**
3    Q.   Your intention anyway is to ready paragraph
4 one and paragraph four prior to the offering of any
5 prayer at a Board meeting?
6    **A.   Yes.**
7    Q.   Now, the legality of the School Board
8 Prayer Policy, I can easily understand why you would
9 not it's my bailiwick and I'm going to rely on the
10 lawyers, but the decision whether to have a policy
11 on School Board prayer and the decision whether to
12 offer an opportunity to Board members to pray before
13 meetings is certainly within your bailiwick, isn't
14 it?
15    **A.   Yes.**
16    Q.   And when Mr. Walls presented the text of
17 the School Prayer Policy to the Board, to the full
18 Board, did you ask him where the text of the policy
19 that relates to those generalized issues came from?
20    **A.   I did ask him?**
21    Q.   Yes.
22    **A.   No.**
23    Q.   Is that because you didn't care what the
24 source was as long as it seemed okay to you?

27 (Pages 102 to 105)

Dobrich, et al.                                    v.              Indian River School District, et al.
Charles M. Bireley                    C.A. # 15-120 (JJF)                        October 11, 2006

Page 106

1    A.   After reading this and listening to him
2    saying that this was recommended by the attorneys
3    who we asked to do this, then I accepted it.
4        Q.   Okay. When Mr. Walls said, and by the way
5    is the first time you saw the text of this School
6    Board Prayer Policy at the first reading of this
7    School Board Prayer Policy?
8        A.   Yes.
9        Q.   I'll represent to you that was at the
10   September Board meeting of 2004, okay?
11       A.   Okay.
12       Q.   When Mr. Walls presented the text of this
13   policy to you and told the Board that it had been
14   recommended by the attorneys, did he identify the
15   attorneys involved?
16       A.   No.
17       Q.   Did it matter to you which attorneys had
18   recommended that this was appropriate?
19       A.   Again it was my assumption that it was from
20   Mr. Cafferty and Mr. Balliger because they were they
21   who were representing us at the time.
22       Q.   So, your best guess is that Mr. Cafferty
23   and Mr. Balliger were representing the Board prior
24   to the first reading of this policy?

Page 107

1        A.   I certainly thought so.
2              MR. GOSSELIN: We can go back and
3        try to find out exactly the day that
4        Balliger and Cafferty got involved and if
5        it's inconsistent with what Mr. Bireley
6        remembers we can clarify that afterward if
7        you want us to so you don't have to spend
8        -- I mean you can do whatever you want
9        but I don't see that as a controversial
10       issue, and we want to get the right
11       information out there.
12             MR. ALLINGHAM: I'm going to mark
13       as Plaintiff's Exhibit 34 a document
14       bearing Bates numbers BPD713 through 718.
15          (WHEREUPON Plaintiff's Exhibit 34
16       was marked for identification.)
17       Q.   Now, the cover page of PX43 is what looks
18   like a fax cover page, handwritten from Reggie Helms
19   to Harvey Walls, subject proposed policy, sheets six
20   including cover, which conforms to the number of
21   pages in this exhibit. There's a fax line at the
22   top of the page that reflects that it was sent on
23   September 2, 2004 at 3:28 in the afternoon.
24       My first question to you, sir, is did you

Page 108

1    also get a copy of the attachment from Mr. Helms via
2    fax or any other means at any time?
3        A.   If I did I don't remember when it was, but
4    I am familiar with this, I have seen this.
5        Q.   Fair enough, that's my next question, have
6    you seen the attachment?
7        A.   Yes.
8        Q.   In what context did you see the attachment?
9        A.   If I am not mistaken I believe that this
10   was given to us either in a Board packet or at a
11   Board meeting.
12       Q.   Who gave it to you?
13       A.   Well, if it was in the Board packet it came
14   through central office. If it was at a Board
15   meeting it could have been given to us by either Mr.
16   Helms or Mr. Walls, either one, I guess.
17       Q.   Okay. Did the Board review and consider
18   the content of PX34?
19       A.   I know I read it. Whether or not that any
20   formal, anything formal at all was involved in it, I
21   don't know.
22       Q.   Did anybody make a presentation on this
23   document?
24       A.   I don't remember that they did.

Page 109

1        Q.   So, your best recollection is that either
2    in a the Board package or as a handout from
3    Mr. Helms or Mr. Walls individual Board members,
4    individual Board members got a copy of PX34?
5        A.   I believe that's true.
6        Q.   Did anybody say why you were being given
7    this material?
8        A.   Other than the fact that they wanted us to
9    review it.
10       Q.   At the point at which this material was
11   distributed to the full Board, had the matter of the
12   School Board Prayer Policy be referred to the policy
13   committee by the full Board?
14       A.   I'm not sure.
15       Q.   Let me show you what's previously been
16   marked as Hattier Exhibit 13, Plaintiff's Exhibit
17   13, I apologize.
18             MR. ALLINGHAM: I'm assuming Jason
19       that you have ones --
20             MR. GOSSELIN: I have everything
21       that you marked yesterday.
22       Q.   Okay, good. Just for a couple of
23   preliminaries, Mr. Bireley. These purport to be the
24   minutes of a special meeting of the Board of

28 (Pages 106 to 109)

Case 1:05-cv-00120-JJF    Document 250-6    Filed 04/10/2008    Page 29 of 57

Dobrich, et al.                                    v.                Indian River School District, et al.
Charles M. Bireley                         C.A. # 15-120 (JJF)                      October 11, 2006

Page 110

1  Education on August 23, 2004 and they are signed by
2  Ms. Hobbs as secretary and superintendent. I'm
3  going to talk about the portion that says redacted
4  on the first page in a minute, but apart from that
5  do you believe that these are the official minutes
6  of the August 23 meeting?
7      A.  They appear to be.
8      Q.  I don't know if someone's hold you this,
9  but redacted is a word lawyers use for taking out or
10 masking certain portions of a document?
11     A.  Edited or something doesn't it.
12     Q.  It just means that it's intended to
13 indicate take something has been removed. And your
14 lawyers were the ones who removed it for reasons
15 that we don't have to get into. Do you recall that
16 there was a meeting on August 23, 2004 at the Sussex
17 Central Middle School library, on the day preceding
18 the big the Board meeting on August 24th?
19     A.  No, I don't remember but it's very
20 possible.
21     Q.  Do you have any reason to doubt that such a
22 meeting took place?
23     A.  No.
24     Q.  The participants in the meeting are not

Page 111

1  listed, but I'll represent to you in a document
2  which we have also marked which is the of the
3  non-executive portion of that meeting you were
4  listed as an attendee at that meeting?
5      A.  I probably was.
6      Q.  Do you recall why you went into executive
7  session?
8      A.  It has to be for certain reasons that by
9  law that we're allowed to.
10     Q.  Let me now show you what we have marked as
11 PX14. These are the minutes of the non-executive
12 portion of that meeting, and you will see on the
13 second page of PX14 that you were in attendance at
14 the meeting?
15     A.  Okay.
16     Q.  The fourth heading on the first page of the
17 minutes shows that you went into executive session
18 immediately being after called to order to seek
19 advice from legal counsel regarding potential
20 litigation, do you see that?
21     A.  Yes.
22     Q.  Who was the legal counsel that you went
23 into special session to talk to?
24     A.  Well, I'm going to say that it must have

Page 112

1  been Mr. Griffin because he is listed as a visitor
2  in attendance.
3      Q.  Okay. You went into executive session at
4  7:01 and you came out at 11:15 so, it was about a
5  four and a quarter hour session. Do you recall a
6  lengthy session in executive session at the Sussex
7  Central Middle School to get advice from your legal
8  counsel regarding potential litigation?
9      A.  Again, I can't remember everything, but I
10 have no reason to doubt that this says.
11     Q.  And I'm not trying to get at whether when
12 it was exactly August 23, I'm trying to get at do
13 you recall a very lengthy executive session in which
14 you got advice from legal counsel about the School
15 Board prayer and prayer issues?
16     A.  Yes.
17     Q.  And is it your belief based on the minutes
18 that I put in front of you that that lengthy session
19 involved advice from Mr. Griffin?
20     A.  Yes.
21     Q.  Now, if you look at PX13, which is the
22 executive session minutes, you'll see down near the
23 bottom of the first page, and this is the only
24 substantive portion of the minute that we've been

Page 113

1  given, it reflects, "During the discussion of this
2  issue several Board members expressed that their
3  constituents do not want the Board to change its
4  practice of opening the meeting with a prayer. It
5  was not felt that the decision could be made this
6  evening regarding whether or not to change our past
7  practice."
8      Do you recall that during that lengthy
9  meeting about prayer issues with Mr. Griffin in
10 attendance several board members expressed the view
11 that their constituents did not want the Board to
12 change its practice of opening the meetings with a
13 prayer?
14     A.  Yes.
15     Q.  Can you identify for them those Board
16 members who expressed that view?
17     A.  Not really, but I know -- I mean I would be
18 afraid to tell you any particular names because I
19 would miss one or something like that, but I know
20 that it was discussed.
21     Q.  Did you express the view that your
22 constituents did not want the Board to change its
23 practice?
24     A.  Yes.

29 (Pages 110 to 113)

Dobrich, et al.                                    v.                      Indian River School District, et al.
Charles M. Bireley                         C.A. # 15-120 (JJF)                         October 11, 2006

Page 114

1  Q.  How did you form the view that your
2  constituents did not want the Board on change its
3  practice?
4  **A.  Based on feedback that I had received from**
5  **the community members.**
6  Q.  How did you get that feedback?
7  **A.  Well, either by them calling me on the**
8  **telephone or, you know, seeing them in the public,**
9  **something like that.**
10  Q.  When did you first start getting comments
11  from the public, your constituents about this issue?
12  **A.  After the graduation ceremony there when it**
13  **first hit the newspaper.**
14  Q.  And you began getting calls from your
15  constituents?
16  **A.  Yes.**
17  Q.  You also had people come up to you on the
18  street in effect and say we hope you will continue
19  the Board prayer?
20  **A.  Yes.**
21  Q.  How many constituents would you say you had
22  talked to by the time of the August 23 executive
23  session?
24  **A.  Just, I guess ten or 15.**

Page 115

1  Q.  Okay.  When you spoke to your fellow Board
2  members in executive session did you say my
3  constituents are in favor of continuing the
4  practice, or did you say the constituents of mine
5  that I've spoken to are in favor of continuing the
6  practice?
7  **A.  I don't remember how I said that.**
8  Q.  You see the distinction that I'm drawing?
9  **A.  Yes, I do.**
10  Q.  How many constituents do you have in your
11  district would you suppose?
12  **A.  Three, four, 5000.**
13  Q.  So, you said I'm sorry, three to 5000?
14  **A.  Three, four, 5000, somewhere in that**
15  **neighborhood, I guess.**
16  Q.  At the time of this meeting you estimate
17  that you had spoke to ten or 15 of them?
18  **A.  Probably no more than that.**
19  Q.  Did you have any concerns that that was not
20  a representative sampling of your constituency?
21  **A.  The Only I can say is I had no one that**
22  **called me and said that it should be anything other**
23  **than that.**
24  Q.  And would you expect that people would have

Page 116

1  any concern about expressing the view that the Board
2  should not open its meetings with a prayer?
3  **A.  Please say that again.**
4  Q.  Would there be any reason why one of your
5  constituencies might be afraid to call you and, you
6  know, you really ought to jettison this School Board
7  prayer?
8  **A.  That's possible.**
9  Q.  And an example of why they might be afraid
10  occurred the very next day at the big Board meeting,
11  is that right?
12  **A.  Yes.**
13                MR. GOSSELIN: Objection, go
14       ahead.
15  Q.  Isn't that correct?
16  **A.  Yes, that's possible, yes.**
17  Q.  Because what happened at the big Board
18  meeting was that many comments were made that were
19  intended to be intimidating, isn't that right?
20                MR. GOSSELIN: Objection.
21  Q.  During the public comment, not from the
22  Board members, but during the public commentary?
23                MR. GOSSELIN: Objection.
24  **A.  I'm confused.  He says that --**

Page 117

1                MR. GOSSELIN: Unless I tell you
2       don't answer you can answer it even though
3       I have asserted an objection.
4  **A.  Okay, I'm sorry.**
5  Q.  Do you want me to repeat the question
6  again?
7  **A.  Please.**
8  Q.  And the reason that you understand that a
9  member of the public might be fearful about
10  expressing a view in opposition to School Board
11  prayer is the tenor of the comments during the
12  public session at the August 24 Board meeting, is
13  that correct?
14  **A.  Yes.**
15  Q.  Some of which were intended to be
16  intimidating to opponents of School Board prayer?
17                MR. GOSSELIN: Objection.
18  **A.  Yes.**
19  Q.  In fact the vast majority of the comments
20  were intended to be intimidating to opponents of School
21  Board prayer, isn't that right?
22                MR. GOSSELIN: Objection.
23  **A.  Probably so.**
24  Q.  Now, whoever the Board members were who

30 (Pages 114 to 117)

Dobrich, et al.
Charles M. Bireley

v.
C.A. # 15-120 (JJF)

Indian River School District, et al.
October 11, 2006

Page 118

1  expressed the view that their constituents did not
2  want the Board to change their practice, did they
3  draw the distinction that I raised with you, about
4  did they say my constituents don't want a change, or
5  the constituents that I talked said they don't want
6  to change?
7     A.  I would say that I heard that from other
8  people, but I cannot tell you exactly who they were,
9  because I wouldn't want to do that cause I don't
10 know for sure, but yes, I did hear that from other
11 Board members.
12    Q.  And was it your understanding what they
13 were telling you is that the constituents that I
14 talked to don't want us to change our practice?
15    A.  I could assume that, yes, I would.
16    Q.  You didn't think that people had taken a
17 poll of their constituency?
18    A.  No.
19    Q.  Did anybody say some of my constituents
20 even contacted me to oppose School Board prayer?
21    A.  I don't remember that.
22    Q.  Up to this point you had no constituents
23 speak to you in opposition to School Board prayer?
24    A.  I'd have to clarify that.

Page 119

1     Q.  Sure.
2     A.  I had a call from Mrs. Dobrich after the
3  graduation at that time.
4     Q.  Yes.
5     A.  She was under the opinion that I was the
6  Board president.
7     Q.  Yes.
8     A.  And I told her that I wasn't, and that
9  Mr. Walls was.  Yes, she did call me and tell me how
10 she felt about what happened the night of the
11 graduation.
12    Q.  And Mrs. Dobrich is one of your
13 constituents?
14    A.  No.
15    Q.  So this was --
16    A.  But you said has anybody.  Basically in our
17 district we are divided into five districts, but if
18 you are a Board member you are really responsible
19 for all five districts in one way or another, but
20 when she called me I listened to her and I talked to
21 her.
22    Q.  But you understood what was being expressed
23 in these minutes as individual Board members saying
24 in my district of the district?

Page 120

1     A.  I would say that's correct.
2     Q.  My constituents want us to keep going?
3     A.  Yes.
4     Q.  Did Mrs. Dobrich raise the issue of School
5  Board prayer during the call to you?
6     A.  No.
7     Q.  And you said, I assume you were respectful
8  to Mrs. Dobrich?
9     A.  I hope so.
10    Q.  You said I'm not the president you should
11 speak to Mr. Walls?
12    A.  Yes.
13    Q.  Did Mrs. Dobrich ask how she could have an
14 opportunity to speak to the Board on the issue?
15    A.  I believe she did.
16    Q.  What did she say?
17    A.  I believe like I should have told her just
18 like I would tell anyone else, they should call
19 central office and talk to the superintendent and
20 request permission to be on our agenda.
21    Q.  When you say you should have told her that,
22 that what you expect that you would have told her
23 but you don't have an independent recollection?
24    A.  Yes.

Page 121

1     Q.  You told me earlier that you told her to
2  call Mr. Walls?
3     A.  Well, she wanted to talk to the Board
4  president.
5     Q.  Okay, so you are confident that you told
6  her to call Mr. Walls because he was the Board
7  president?
8     A.  Yes.
9     Q.  And you think you probably also said that
10 if you want to speak to the Board call central
11 office?
12    A.  Because that's our practice, yes.  I hope I
13 did that.
14    Q.  Did you ever hear that Mrs. Dobrich did in
15 fact contact central office?
16    A.  Yes.
17    Q.  Did you ever hear what they told her?
18    A.  No.
19    Q.  Did you ever hear that she had difficulty
20 getting her issue on the agenda?
21    A.  I heard about that later on, yes.
22    Q.  Who did you hear about that from?
23    A.  Like scuttlebutt, but it came to me much
24 later even after the meeting at Frankford

31 (Pages 118 to 121)

Page 122

1  Elementary.
2      Q.   Tell me everything you recall about this
3  scuttlebutt?
4      A.   That she had tried to do what, you know
5  that I had suggested that she do, and she didn't
6  feel that she was successful in getting it done.
7      Q.   And who did you hear that from?
8      A.   I'm not sure, I'm really not.
9      Q.   Did you investigate whether that concern
10  was true, because you wouldn't like it if somebody
11  went to the central office and had difficulty
12  getting their issue on an agenda, would you?
13      A.   Yes.
14      Q.   You did investigate?
15      A.   Yes.
16      Q.   What did you find out?
17      A.   I asked Mrs. Hobbs about it.
18      Q.   What did she say?
19      A.   She had told me that she had called her.
20      Q.   Mrs. Dobrich had called her?
21      A.   She said that I have talked to
22  Mrs. Dobrich.
23      Q.   Yes, sir, and did she say that she had
24  agreed to put the issue on the agenda?

Page 123

1      A.   I'm not sure that she told me that. I know
2  that she told me specifically that she had talked to
3  Mrs. Dobrich.
4      Q.   And what did she say, did she tell you the
5  substantiate of the conversation?
6      A.   It was concerning how Mrs. Dobrich felt
7  about the issues of what went on during the
8  graduation.
9      Q.   What did Mrs. Hobbs tell you that she told
10  Mrs. Dobrich?
11      A.   Well, I don't know that she did tell me
12  what she told Mrs. Dobrich, she just had a
13  conversation with her.
14      Q.   Did Mrs. Hobbs tell you how the
15  conversation ended up?
16      A.   No. If she did, I don't remember.
17      Q.   Did Mrs. Hobbs assure you that Mrs. Dobrich
18  was advised that she could speak to the Board about
19  this issue?
20      A.   Not specifically I don't think she did.
21      Q.   Did she tell you, that she Mrs. Hobbs
22  agreed to put the issue on the agenda for the Board
23  meeting?
24      A.   I thought she did.

Page 124

1      Q.   The next sentence of PX13, which is the
2  executive session minutes says, "It was not felt
3  that a decision could be made this evening regarding
4  whether or not to change our past practice." I take
5  it that it was not felt means it was not felt by the
6  Board members, correct?
7      A.   Yes.
8      Q.   And it was not felt that a decision could
9  be made this evening regarding whether or not to
10  change our past practice, what was it that the Board
11  members needed before they could make a decision
12  about whether or not to change their past practice?
13      A.   Advice from an attorney.
14      Q.   The minutes PX14 say that the purpose of
15  going into executive session which then lasted four
16  hours and 15 minutes, was to seek advice from our
17  legal counsel on this issue, right?
18      A.   Yes.
19      Q.   Was there something wrong with the four
20  hours and 15 minutes you had already gotten on the
21  issue?
22      A.   I would say that it was like they wanted a
23  second opinion.
24      Q.   And you say it was like they wanted a

Page 125

1  second opinion, is the they just generally the Board
2  members, or was there a group that was urging that
3  the Board get a second opinion?
4      A.   I would say it was the Board members.
5      Q.   All of them.
6      A.   I would say so.
7      Q.   Yes, sir.
8      A.   I don't have any first hand knowledge that
9  anyone did not want that.
10      Q.   Can you think of any instance which the
11  Board had in the past received advice from
12  Mr. Griffin and then decided to get a second
13  opinion?
14      A.   Yes.
15      Q.   Give me an example?
16      A.   I can't give you a specific example but it
17  happens.
18      Q.   And is that because the Board doesn't like
19  the advice that it gets from Mr. Griffin?
20           MR. GOSSELIN: Objection.
21      Q.   You may answer.
22      A.   We may not agree with what he advised, yes
23  that's true.
24      Q.   Is that what happened in this instance?

32 (Pages 122 to 125)

Dobrich, et al.                          v.                 Indian River School District, et al.
Charles M. Bireley              C.A. # 15-120 (JJF)                    October 11, 2006

Page 126

1    A.    **I think so.**
2              MR. GOSSELIN:  I don't want to
3     interfere with your questioning here.  I
4     think that at least I thought your intent
5     just to just sort of find out the process.
6     I think you are starting to tread into
7     territory where you are trying to get at
8     what the advice was that Mr. Griffin gave,
9     and obviously we object to that.  I'm
10    putting that out on the record because I
11    want to just remind both you and the
12    witness what we agreed were going to be the
13    ground rules for this line of questioning.
14             MR. ALLINGHAM:  Yeah, it's a
15    little bit delicate.  The ground rule was
16    that you and I would agree to disagree
17    about whether I am entitled to ask
18    questions about the substance of the
19    advice.  That you and I would agree that,
20    and you would make the representation
21    that if I asked the same questions I asked
22    of Dr. Hattier, you would make the same
23    instructions so I don't need to do it again
24    with Mr. Bireley.

Page 127

1              MR. GOSSELIN:  I don't know what
2     kind of letter I'm going to get tomorrow
3     and what you are going to be requesting,
4     but I don't want there to be any argument
5     that we have to give you, you know, written
6     documents from Mr. Griffin or anybody else
7     because somehow the attorney/client
8     objection has been waived.
9              I mean Mr. Bireley just gave an
10    answer that I think it's -- I don't know if
11    it was responsive to your question, if your
12    question was intended to elicit that
13    response I would have objected to it and
14    instructed him not to answer, and I didn't,
15    and I don't want that to be deemed by you
16    as some sort of a waiver, because if so I
17    think we can cut off the whole line of
18    questioning generally.
19             The judge issued an order here
20    saying that we have to produce documents
21    from the executive committee meetings to
22    the extent they don't implicate
23    attorney/client privilege, that's why we
24    gave that.  And you know, it's difficult to

Page 128

1     find out exactly where the line is to be
2     drawn in a case like this, and I think we
3     have drawn it that you can get the general
4     information about when the discussions took
5     place, the overall subject matter of the
6     discussions, but anything that goes to the
7     specific substance of the discussions
8     obviously I object to.
9              MR. ALLINGHAM:  I don't think it's
10    necessary to take positions on a deposition
11    record which take times of Mr. Bireley.  I
12    thought that had an agreement.  I thought
13    that we put our agreement on the record in
14    this transcript, we will abide by that
15    agreement.  I'm going on keep asking
16    questions that I think were not posed to
17    Dr. Hattier.  If I think that they are
18    appropriate, and if they are questions that
19    were not posed to Dr. Hattier it is our
20    position that you are obligated to object,
21    but the chips will fall where they may.  We
22    have whatever agreement we have.
23             MR. GOSSELIN:  Okay.
24             MR. ALLINGHAM:  Anticipating

Page 129

1     argument that haven't yet been made and
2     making responsive arguments on the record
3     is not an effective use of our time.
4              MR. GOSSELIN:  I am cautioning the
5     witness, wait before you answer the
6     question because I may be objecting and I
7     may be instructing you not to answer.
8    Q.    Mr. Bireley, I would second that.  I think
9     it's important that you hear my full question before
10    you answer, and I would give you the same advice,
11    it's important for our record to give your attorney
12    a chance to speak just a second before you respond,
13    okay?
14   A.    **Okay.**
15   Q.    I was asking you about the second sentence
16    portion of the executive session minutes.  Was there
17    anything else besides a second opinion that you
18    needed in order to make a decision regarding whether
19    or not to change your past practice?
20   A.    **Not that I am aware of.**
21   Q.    Was there an agreement at that meeting as
22    to how the Board would go an about getting a second
23    opinion?  Was somebody assigned to get it, find a
24    lawyer, what was the process to get that second

33 (Pages 126 to 129)

Dobrich, et al.                                    v.                    Indian River School District, et al.
Charles M. Bireley                        C.A. # 15-120 (JJF)                          October 11, 2006

Page 130

1   opinion?
2   A.   Usually it's through the administration the
3   superintendent.
4   Q.   As it your best recollection that the board
5   members agreed to tell Mrs. Hobbs to find a lawyer
6   to give the Board a second opinion on this issue?
7   A.   To the best of my knowledge.
8   Q.   And do you know whether the Board in fact
9   received any further legal advice on this issue?
10  A.   I believe we did.
11  Q.   And now I want to restrict my questions now
12  to the period preceding adoption of the policy, so
13  we are going to go up to October 19th when you
14  actually adopted the policy, okay?  From whom did
15  you receive additional legal advice between the
16  period August 23, 2004 and October 19, 2004?
17  A.   Mr. Neuberger.
18  Q.   And when did the Board receive that advice?
19  A.   I'm not sure of the time frame.
20  Q.   Was it at a regular Board meeting?
21  A.   I don't think so.
22  Q.   Was it a the Board meeting?
23  A.   Yes.
24  Q.   So, it was your best recollection is that

Page 131

1   it was at a special Board meeting?
2   A.   I think so.
3   Q.   Am I right that it was sometime between
4   August 23rd and October 19th?
5   A.   I think so.
6   Q.   Am I right that we can refine it further
7   that it was between August 23rd and the first
8   reading of the policy?
9   A.   I think so.
10  Q.   Before I get to this, pause before you
11  answer this question please, okay?  At the August 23
12  Board meeting did the Board reject Mr. Griffin's
13  advice on the issue?
14          MR. GOSSELIN:  Okay, don't answer
15      that.
16          MR. ALLINGHAM:  based on
17      attorney/client privilege?
18          MR. GOSSELIN:  Yes.
19  Q.   Let me show you what has previously been
20  marked as Plaintiff's Exhibit 18 which has been
21  identified as the minutes of the Board meeting on
22  September 28, 2004.  These are minutes signed by
23  Mrs. Hobbs as you will see on the last page.  If you
24  will look at page six of these minutes, Mr. Bireley.

Page 132

1   You will see under the policy committee that there
2   was a first reading of policy BDA.1 Board Prayer at
3   Regular Board Meeting for a first reading, do you
4   see that?
5   A.   Yes.
6   Q.   And do you have any reason to doubt from
7   that if Mr. Walls submitted the policy on September
8   28?
9   A.   No.
10  Q.   Does the Board actually read the policies
11  when it submits them for a reading?
12  A.   I do.
13  Q.   I didn't say that correctly.  Does the
14  Board or some representative of the Board read the
15  policies out loud so the public understands what's
16  being considered?
17  A.   Mr. Walls, when he presents it, usually
18  gives an overview of the existing policy and the
19  recommended changes by highlighting the changes
20  that's coming.
21  Q.   And it it's a new policy what does he do?
22  A.   Just describes it as a new policy.
23  Q.   And to come back to my earlier question,
24  when the policy is submitted for first reading, that

Page 133

1   is a first reading by the Board members, or a first
2   reading for the push public to comment upon?
3   A.   It's a first time that it's being mentioned
4   in a public setting.
5   Q.   And again I am just trying to clarify
6   because I am not sure what the practice is, is it
7   typical that the policy that is submitted to first
8   reading is read out loud during the meeting?
9   A.   No.
10  Q.   And am I correct that this School Board
11  Prayer Policy at Regular Board Meetings was not read
12  aloud?
13  A.   I don't recall.
14  Q.   If it was read aloud that would be a
15  deviation from your normal practice?
16  A.   Yes.
17  Q.   Is it the practice of the Board when a
18  policy is submitted for first reading to make copies
19  of it available to the public if they want to review
20  it?
21  A.   After the policy comes to the Board?
22  Q.   At or about the time of the first reading?
23  A.   I don't believe so.
24  Q.   Is it the policy of the Board to make

34 (Pages 130 to 133)

Page 134

1   available to the public copies of policies that are
2   being considered at any time prior to their adoption
3   by the Board?
4   **A.   I don't believe so.**
5   Q.   Is there any way that the public can take a
6   look at the policy under consideration and make a
7   comment to their representative on the Board?
8   **A.   Other than if they had first hand**
9   **knowledge.**
10  Q.   How would they get first hand knowledge?
11  **A.   If they heard about it or something like**
12  **that.**
13  Q.   If one of your constituents said I heard
14  that you are considering a school prayer policy I
15  would like to see a copy of it, could I have one
16  would you give it to the person?
17  **A.   Yes.**
18  Q.   Is that as you understand it is that the
19  practice of all the other Board members?
20  **A.   I hope so. I think so, it's public**
21  **information.**
22  Q.   Have you ever become aware that a district
23  resident asked for a copy of the School Board Prayer
24  Policy after it was adopted and was told that she

Page 135

1   couldn't have it and would have to file a FOIA
2   request?
3   **A.   No, I am not aware.**
4   Q.   Never heard that?
5   **A.   No. No, I am not aware.**
6   Q.   All right. So, looking at Exhibit 18 can
7   we agree that your consultation with Mr. Neuberger
8   on the issue of School Board prayer occurred at some
9   point between August 23rd and September 28th?
10  **A.   I guess so.**
11  Q.   Makes sense, right?
12  **A.   Yes.**
13  Q.   Because by September 28 the Board had
14  decided that it was going to do what it was -- what
15  was reflected in the policy?
16  **A.   Yes.**
17          MS. DUPHILY: Going off the record
18       at approximately 12:10 p.m..
19          (WHEREUPON a brief recess was
20       taken)
21          MS. DUPHILY: Back on the record
22       at 12:16 p.m..
23  Q.   Did you as a Board member get a second
24  opinion from Mr. Neuberger prior to the first

Page 136

1   reading of the Board policy on School Board prayer?
2   **A.   As an individual?**
3   Q.   Yes.
4   **A.   No.**
5   Q.   So, you never heard any advice from
6   Mr. Neuberger on that topic?
7   **A.   Not that I'm aware of.**
8   Q.   You testified earlier that it's your
9   understanding that Mr. Neuberger did offer a second
10  opinion on the issue, correct?
11  **A.   To the best of my knowledge.**
12  Q.   How was it delivered to the Board?
13  **A.   It had to be either through the**
14  **administration like the superintendent or through**
15  **other Board members.**
16  Q.   Let me see if I can pin that down. You,
17  Mr. Bireley, received no further legal advice on the
18  School Board prayer issue after August 23, is that
19  correct?
20  **A.   From Mr. Neuberger.**
21  Q.   Fair enough. Is that correct?
22  **A.   That's correct.**
23  Q.   Did you receive any advice between August
24  23 and October 19th on that issue from any other

Page 137

1   lawyer?
2   **A.   Not that I'm aware of.**
3   Q.   You told me that Mr. Neuberger offered a
4   second opinion on the School Board prayer issue, how
5   do you know that that occurred?
6   **A.   Mr. Helms talked to Mr. Neuberger.**
7   Q.   And Mr. Helms then report the substance of
8   his conversation with Mr. Neuberger to the Board?
9   **A.   I believe he did.**
10  Q.   And am I correct that that report from Mr.
11  Helms came at some point between August 23 and
12  September 28th?
13  **A.   Again I'm not sure of the time frame, but I**
14  **would think so.**
15  Q.   And did that report from Mr. Helms come at
16  a regular Board meeting? Sorry, I misspoke. Did
17  that report from Mr. Helms come at a meeting of the
18  full Board?
19  **A.   I believe so.**
20  Q.   I'm going to show you, I'm leaving aside
21  the big meeting because I assume that report from
22  Mr. Helms did not come at the big meeting, correct?
23  **A.   I think so, yes.**
24  Q.   I'm leaving aside the big meeting, we have

35 (Pages 134 to 137)

Dobrich, et al.                                      v.                  Indian River School District, et al.
Charles M. Bireley                       C.A. # 15-120 (JJF)                          October 11, 2006

Page 138

1   no minutes of any full Board meeting between August
2   24th and the first reading at September 28th.
3   However, in the, it is the practice of the Board to
4   approve at regular meeting to approve the minutes of
5   any meeting that has taken place since at the
6   preceding Board meetings, correct?
7       A.   Yes.
8       Q.   I'm going to show you PX19 which has been
9   identified as the minutes of the October 19, 2004
10  regular meeting of the Board. You are reflected on
11  the first page as having been in attendance?
12      A.   Yes.
13      Q.   And if you look at page two at the top you
14  will see that there is an approval of Board minutes
15  from a regular meeting on September 28th and a
16  special meeting on September 15th, do you see that?
17      A.   Yes.
18      Q.   Is it your belief based on this document
19  that the report from Mr. Helms came at the September
20  15th special meeting of the Board?
21      A.   It's possible, but I have no first hand
22  knowledge. I mean I can't remember exactly when it
23  was.
24      Q.   Based on the Board's practice of approving

Page 139

1   meeting minutes for the meetings in the intervening
2   period between the last meeting and this meeting,
3   and the fact that the only meeting referenced here,
4   between the period that we are focusing on, that is
5   a August 23 to September 28th, is September 15th,
6   would you agree with me that it's a fair inference
7   that Mr. Helms' report came at the September 15th
8   special meeting?
9       A.   Yes.
10      Q.   Is it the Board's practice to keep minutes
11  of every meeting that it holds whether regular or
12  special?
13      A.   Yes.
14      Q.   Do you know whether the September 15th
15  meeting was in executive session?
16      A.   I can't remember.
17      Q.   Do you know whether Mr. Helms' report,
18  whenever it occurred took place during a public
19  session or an executive session?
20      A.   I would say that it took place in executive
21  session.
22      Q.   And the Board's practice is to tape its
23  meetings, is that correct, audiotape?
24      A.   Yes.

Page 140

1       Q.   And do you know whether the September 15th
2   meeting was audiotaped?
3       A.   I don't have first hand knowledge of it but
4   I assume that it was.
5       Q.   Tell me everything that you can recall
6   about what Mr. Helms reported to the Board?
7           MR. GOSSELIN: Object, don't
8           answer that.
9       Q.   Did Mr. Helms' report to the Board
10  concerning Mr. Neuberger's second opinion enter into
11  your consideration of whether to approve the School
12  Board Prayer Policy? Was it a factor that you
13  considered in determining whether to vote to adopt
14  the School Board Prayer Policy?
15      A.   Yes.
16      Q.   Do you have any understanding as to whether
17  that second opinion was a factor in your colleagues'
18  consideration of whether to adopt the School Board
19  Prayer Policy?
20          MR. GOSSELIN: Objection.
21      A.   I can't speak to what they thought.
22      Q.   You'll recall that at the August 23 meeting
23  the Board concluded it couldn't make a decision at
24  that time and you told me that what it needed to

Page 141

1   make a decision was a second opinion on the issue, a
2   second legal opinion on the issue, do you recall
3   that?
4       A.   Yes.
5       Q.   Apart from the second legal opinion on the
6   issue that you received indirectly from Mr. Helms,
7   did the Board get any further information about the
8   School Board Prayer Policy between August 23 and the
9   first reading on September 28th?
10      A.   Not that I'm aware of.
11      Q.   Mr. Bireley, you've been individual as the
12  district's 30(b)(6) witness on the topic of how the
13  Board would determine whether a prayer offered by a
14  Board member would violate paragraph three of the
15  policy. So, I'd like you to put the policy in front
16  of you again. It has PX9 written on it somewhere.
17      A.   Okay.
18      Q.   And I'm going give you a couple of examples
19  and ask you to tell me how would you analyze these
20  prayers, as to whether they are proselytizing,
21  whether they would violate paragraph three, okay?
22      A.   Okay.
23      Q.   The first once is this prayer, Allah, we
24  offer you our school bus drivers, we offer you our

36 (Pages 138 to 141)

Dobrich, et al.                                    v.                    Indian River School District, et al.
Charles M. Bireley                    C.A. # 15-120 (JJF)                              October 11, 2006

Page 142

1  superintendent, our administrators, and our
2  secretaries, we offer you our teachers and our
3  parents. Finally we offer you our students. Peace
4  be unto your prophet Muhammad.
5          MR. GOSSELIN: Objection. Go
6      ahead.
7  Q.    Describe for me how you would analyze
8  whether that prayer would violate paragraph three of
9  the policy?
10  **A.    I don't know whether that it would violate**
11  **that paragraph.**
12  Q.    Okay, that's a good maybe way to get into
13  this. Do you believe that that prayer would violate
14  the policy?
15  **A.    No.**
16  Q.    And would you explain to me how you would
17  reach that conclusion?
18  **A.    I don't see where that someone reciting**
19  **that prayer is trying to push their beliefs off**
20  **towards anyone else that's in attendance.**
21  Q.    And is that the basic way you would look at
22  that problem, that issue of whether it violates
23  paragraph three?
24  **A.    I think so.**

Page 143

1  Q.    Now, I'm going to read another prayer for
2  you which may be familiar to you. If it's not
3  familiar to you or if you can't hold it in your head
4  I can give it to you on a piece of paper, but let me
5  read it first, all right? Do not put your trust in
6  princes, in mortal men who cannot even save
7  Themselves. When their spirit departs, they return
8  to the ground. On that very day their plans come to
9  nothing. Blessed is he whose help is the God of
10  Jacob, whose hope is in the Lord his God, the Maker
11  of heaven and earth, the sea, and everything in
12  them. The Lord, who remains faithful forever. He
13  upholds the cause of the oppressed and gives food to
14  the hungry. The Lord sets prisoners free, the Lord
15  gives sight to the blind, the Lord lifts up those
16  who are bowed down, the Lord loves the righteous.
17  The Lord watches over the alien and sustains the
18  fatherless and the widow, but he frustrates the ways
19  of the wicked. For the wages of sin is death; but
20  the gift of God is eternal life through Jesus Christ
21  our Lord.
22          MR. GOSSELIN: Objection.
23  Q.    Does --
24          MR. GOSSELIN: Is that something

Page 144

1  that can be marked cause I may want to ask
2  some questions at the end of this based on
3  not rather than making our court reporter
4  go all the way back.
5          MS. DUPHILY: We are going off the
6      record at approximately 12:27 p.m..
7          (WHEREUPON a brief recess was
8      taken)
9          MS. DUPHILY: Back on the record
10      12:29 p.m..
11  Q.    Mr. Gosselin has suggested and I'm amenable
12  to marking what I just read as an exhibit. So, I'm
13  going to mark as PX35 the text that I just read to
14  you. Would that prayer violate paragraph three of
15  the Board Prayer Policy?
16  **A.    In my opinion?**
17  Q.    Yes.
18  **A.    No.**
19  Q.    Would you tell me how you would analyze
20  that question as a Board member?
21  **A.    Analyze this one?**
22  Q.    Yes.
23  **A.    If someone used that as an opportunity to**
24  **basically preach a sermon, or try to convert, saying**

Page 145

1  **something that Christianity is the only religion,**
2  **you know or that's what I would consider to be a**
3  **violation of paragraph three.**
4  Q.    So, you would not view the prayer that I
5  just had marked as PX35 as an example of what you
6  just described?
7  **A.    No.**
8  Q.    I'm correct am I not that it was your
9  intent as a Board member to adopt School Board
10  Prayer Policy that complied with existing applicable
11  law?
12  **A.    Yes.**
13  Q.    And in your, in casting your vote to adopt
14  that policy your belief that the policy that you
15  approved complied with applicable law was based in
16  part on Mr. Helms' report to you about
17  Mr. Neuberger's second opinion. I don't want to
18  know the substance of the opinion, I just want to
19  know if that was part of your consideration in
20  reaching a conclusion on that issue?
21  **A.    Probably so.**
22  Q.    All right, I have a third prayer for you to
23  consider. Heavenly Father, thank you for this great
24  occasion, for the work, the effort, the joys and

37 (Pages 142 to 145)

Dobrich, et al.                          v.              Indian River School District, et al.
Charles M. Bireley           C.A. # 15-120 (JJF)                    October 11, 2006

Page 146

1   everything that led up to this point in time. Thank
2   you for your guidance in this event. We pray for
3   your direction in the lives of each of those in
4   attendance. We pray that you direct them into the
5   truth, and eventually the truth that comes by
6   knowing Jesus. We pray that you would be with them
7   now. We ask these things in Jesus's name. Amen.
8               MR. GOSSELIN: Objection.
9   Q.    As a Board member would view that prayer as
10  a proselytizing prayer?
11  A.    Yes.
12  Q.    And describe for me as well as you can the
13  difference between this third prayer that I read and
14  the first two that you as a Board member would
15  consider nonproselytizing?
16  A.    My personal opinion what you just read,
17  they are basically saying that the only way through
18  to heaven or to God is through Jesus Christ. I
19  think that's the difference.
20       In other words, in that prayer you are
21  saying, they are saying that that's the only way, if
22  I am hearing it correctly. And I didn't think that
23  I interpreted that from the first two that that's
24  what it said.

Page 147

1   Q.    So, the critical distinction, Mr. Bireley
2   is whether the content of the prayer suggest that
3   the only true religion or the only way to heaven or
4   only way to truth is through a particular faith, or
5   a particular Deity or representation of an Deity, is
6   that correct?
7               MR. GOSSELIN: Objection.
8   Q.    Is that the distinction that you are trying
9   to draw?
10  A.    That the only way is through Jesus Christ.
11  Q.    Or presumably the way through Muhammad
12  or --
13  A.    Okay, I'm sorry, yes, some other.
14  Q.    And so long as a prayer doesn't say that
15  the only true way is through a particular Deity or a
16  particular faith you would find the prayer
17  nonproselytizing and not violative of paragraph
18  three?
19              MR. GOSSELIN: Objection.
20  A.    Yes, in my opinion.
21  Q.    We were informed in an interrogatory answer
22  that you a Methodist, is that correct?
23  A.    Yes.
24  Q.    And do you attend church?

Page 148

1   A.    Once in a while.
2   Q.    What church do you attend?
3   A.    My wife's church if I go.
4   Q.    Which church is that?
5   A.    Bethel Methodist in Dagsboro.
6   Q.    Would you characterize yourself as a person
7   who attends on big religious holidays, but not every
8   Sunday?
9   A.    I'm not sure that the big religious
10  holidays. Once in a while, I would say once in a
11  while I do. Not just that church but I go to, I
12  have had occasions to go to other churches, too.
13  But I'm not a every Sunday attendee, if that's what
14  you are asking me, I'm not.
15  Q.    On the other hand you would consider
16  yourself a practicing Christian?
17  A.    I try to. I try to do what's right and I
18  mean I am aware of what the teachings say is right
19  and I try to do that.
20  Q.    In order to be a practicing Christian do
21  you consider it necessary to attend church on
22  Easter, for example?
23  A.    No.
24  Q.    Or to attend church on Christmas?

Page 149

1   A.    No.
2   Q.    In order to be a practicing Christian do
3   you consider it necessary to attend church at all?
4   A.    No.
5   Q.    Again on the issue of practice paragraph
6   three of Board prayer, would you consider that a
7   student who attends every regular Board meeting and
8   who hears prayers that regularly mention Jesus
9   Christ could conclude over time that it is the
10  Board's view that Christianity is the appropriate
11  religion?
12              MR. GOSSELIN: Objection.
13  A.    I guess that's possible.
14  Q.    What I'm trying to get at, Mr. Bireley, is
15  whether you would consider the cumulative affect of
16  repeated mention of only one faith or only one
17  representation of the Deity to have some impact,
18  cumulative impact over and above the text of a
19  prayer that's offered?
20              MR. GOSSELIN: Objection.
21  Q.    Would you agree with that?
22  A.    It's possible.
23  Q.    From your perspective as a Board member do
24  you think it would be preferable to avoid that kind

38 (Pages 146 to 149)

Dobrich, et al.                          v.                    Indian River School District, et al.
Charles M. Bireley                 C.A. # 15-120 (JJF)                      October 11, 2006

Page 150

1  of cumulative impact, that is to say to offer a
2  variety of kinds of prayers or moments of silence to
3  solemnize the occasion?
4          MR. GOSSELIN:  Objection.
5      A.   I think the policy, or the practice that we
6  have right now, where the individual person who is
7  saying the prayer has the right to say, you know,
8  whatever they want.
9      Q.   I'm not asking about individual person's
10 rights, I'm asking about what as a Board member
11 would consider preferable?  Would you consider it
12 preferable to in order to solemnize the proceedings
13 for a variety of kinds of prayers, moments of
14 silence to be offered?
15     A.   I believe in the person's individual right
16 to say what they want to say when they're in prayer.
17 I think that's the way it should be.
18     Q.   Was the purpose of the adoption of the
19 School Board Prayer Policy to solemnify the
20 proceedings of the Board meetings?
21     A.   By that you mean to ask for like divine
22 guidance or help us get through the meeting, to make
23 the right decisions?
24     Q.   I'm really trying to ask a very specific

Page 151

1  question.  I'll be a little more general about it.
2  I won't sort of put the answer in the question.
3  What was the purpose of the adoption of the Board
4  Prayer at Regular Board Meetings Policy?
5      A.   What was the purpose?
6      Q.   Yes.
7      A.   To ask for divine guidance for the Board to
8  help us make correct decisions and get us through
9  the meeting in the proper way.
10     Q.   What does the proper way mean?
11     A.   To do, to make the best decisions for
12 what's best for our students.
13     Q.   And is the proper way the way that God
14 would prefer?
15     A.   In my opinion, yes.
16     Q.   And is the proper way the way that God
17 personified by Jesus Christ would prefer?
18     A.   In my personal opinion, yes.
19     Q.   And that was the purpose of the adoption of
20 the School Board Prayer Policy?
21     A.   The purpose of adopting the School Board
22 policy is to grant us the opportunity to pray for
23 divine guidance, you know and help us make the right
24 decisions.

Page 152

1      Q.   As a Board member when you cast your vote
2  in favor of Board Policy BDA.1, you cast that vote
3  in public, correct?
4      A.   Yes.
5      Q.   And did you expect that members of the
6  public in attendance would understand that that was
7  your purpose in adopting the School Board Prayer
8  Policy?
9      A.   I really had no way of knowing what they
10 thought.
11     Q.   If a member of the public had raised their
12 hand, that's not the right way to say it.  If they
13 signed up to ask a question of the Board during the
14 public comment session at the October 19th meeting,
15 and had asked the question what was your purpose in
16 casting your vote for Board Policy BDA.1, is that s
17 what you would have responded?
18     A.   Not at that time.
19     Q.   What would you have responded at that time?
20     A.   I wouldn't have responded anything.
21     Q.   You would have declined to answer a
22 question what is your purpose in adopting this
23 policy?
24     A.   Yes.

Page 153

1      Q.   What would be the reason for declining to
2  answer?
3      A.   That's the way we do it.  We have been
4  given advice from attorneys for years and years and
5  years not to respond.  You write the question down
6  and then you seek that person after the meeting's
7  over and then you have a discussion with them and
8  tell them why that you voted the way that you did or
9  ask them if there is anything else that they want to
10 know.
11     Q.   So, the Board has a policy based on legal
12 advice not to respond to questions about why the
13 Board members cast votes to adopt a particular
14 policy?
15     A.   Let's say that it's a practice, it's not a
16 policy.
17     Q.   Yes, I didn't mean it was written down, I
18 apologize?
19     A.   Okay.
20     Q.   So, I will use your word, so the Board has
21 a practice based on legal advice not to respond to
22 questions from the public about the Board's purpose
23 in adopting a particular policy?
24     A.   During the time of the Board meeting.

39 (Pages 150 to 153)

Dobrich, et al.
Charles M. Bireley

v.

C.A. # 15-120 (JJF)

Indian River School District, et al.
October 11, 2006

Page 154

1    Q.    Yes. But the Board also had a practice
2    understood by board members that those questions can
3    and should be responded to after the Board meeting?
4    A.    Yes.
5    Q.    All right, so let me just amend my
6    question, suppose that a member of the public had
7    come up to you after the October 19th Board meeting
8    and said Mr. Bireley what was your purpose in
9    casting your vote to adopt Board Policy BDA.1, your
10   response would have been in words or substance the
11   same answer you gave me?
12   A.    Yeah.
13   Q.    Why is it that in the 30 years that you
14   have served as a Board member you have never taken
15   up the invitation or volunteered to offer a prayer
16   or moment of silence to open the Board meeting?
17   A.    For personal preference, my choice.
18   Q.    Based on what?
19   A.    Base on the fact that that's not the way
20   that I, you know, proclaim my way to God.
21   Q.    That being offering public prayer?
22   A.    In a public, you know, what I do is in
23   private.
24   Q.    Can you see any reason why the Board could

Page 155

1    not ask for divine guidance in private rather than
2    on the stage in front of the public meeting?
3    A.    That they -- please you ask it again?
4    Q.    Yes. Do you see any reason why the Board
5    could not effectively ask for divine guidance for
6    its decisions at Board meetings off stage rather
7    than on stage in front of the public meeting?
8    A.    That's possible, yes.
9    Q.    And can you think of any reason why the
10   Board's private request for divine guidance for its
11   members would not be equally effective as a public
12   request for divine guidance?
13   A.    In the eyes of the Almighty?
14   Q.    Yes.
15   A.    No.
16   Q.    In the eyes of the individual Board
17   members?
18   A.    Yes.
19   Q.    And what is that reason?
20   A.    I don't know, personal preferences. That's
21   the way they choose to do it.
22   Q.    Let me now ask that question of you.
23   Do you seek divine guidance before you embark on the
24   process of making decisions at Board meetings?

Page 156

1    A.    At that particular instance.
2    Q.    At every Board meeting?
3    A.    Not at the Board meeting, no.
4    Q.    Do you seek divine guidance generally with
5    the hope that it would extend to your decisions at
6    Board meetings?
7    A.    Yes.
8    Q.    So, that your practice in terms of your
9    relationship with God and the request for divine
10   guidance is to do it privately?
11   A.    Yes.
12   Q.    And for you it is equally effective whether
13   you do it privately for publicly?
14   A.    As a personal thing, yes.
15   Q.    Yes, sir. In fact from your personal
16   preference you prefer to do it privately rather than
17   publicly?
18   A.    Yes, I do.
19              MR. GOSSELIN:    It's ten of
20       1 --
21              MR. ALLINGHAM:    I'm happy to
22       break whenever you want.
23              MR. GOSSELIN:    Why don't we break
24       now.

Page 157

1              MS. DUPHILY:    We are going off the
2    record at approximately 12:50 p.m..
3              (WHEREUPON a lunch recess was
4    taken)
5              MS. DUPHILY:    We are back on the
6    record at 1:48 p.m.
7    Q.    Mr. Bireley, I ask you to take up PX34
8    which is the attachment that was provided by
9    Mr. Helms to individual members the Board at a
10   meeting which we've identified tentatively as
11   September 15, 2004, do you recall that?
12   A.    Yes.
13   Q.    And is this a handout that Mr. Helms
14   provided to the Board in connection with his report
15   on Mr. Neuberger's advice?
16   A.    I believe so.
17   Q.    So, I'm correct, am I not, that this
18   document PX34 was not the entirety of Mr. Helms'
19   report on Mr. Neuberger's second opinion but it was
20   a part of it?
21   A.    Part of it, yes.
22   Q.    And did you as a Board member read this
23   document at the September 15th Board meeting when
24   Mr. Helms passed it out?

40 (Pages 154 to 157)

Dobrich, et al.                                v.                    Indian River School District, et al.
Charles M. Bireley                    C.A. # 15-120 (JJF)                        October 11, 2006

Page 158

1  A.  I read it whenever I received it, and I'm
2  not sure, you know.
3  Q.  Right, it might have come as part of the
4  Board package?
5  A.  Right, but I did read it, yes I did.
6  Q.  Now, you testified earlier that you didn't
7  know where Mr. Walls got the text of the Board
8  policy BDA.1, the School Board Prayer Policy, do you
9  recall that?
10  A.  Yes.
11  Q.  I'd like you to look at the second to last
12  and last pages of this handout, and read the
13  paragraphs numbered one through five on those pages?
14  A.  Okay.
15  Q.  You can compare it to the Board policy if
16  you like, but can we agree that the text of the
17  paragraphs one through five in the Helms Neuberger
18  handout are substantively identical to the Board
19  policy as ultimately adopted?
20  A.  Yes.
21  Q.  And can we conclude, therefore, that the
22  text of the Board policy was prepared by the
23  Rutherford Institute as reflected at the top of the
24  second page of PX34?

Page 159

1           MR. GOSSELIN: Objection. You can
2  answer.
3  A.  I can answer it?
4           MR. GOSSELIN: Yes.
5  A.  It appears so, yes.
6  Q.  okay. On the next to last page sorry, the
7  beginning one, two, three, first three and a half
8  pages of the Rutherford Institute Neuberger
9  presentation is in the form of somewhere whereas
10  clauses, do you see that?
11  A.  I'm not sure. Are you talking about these
12  right here? Are you talking about on page five?
13  Q.  No, I'm looking at the, just start at the
14  second page, the first page of the actual handout?
15  A.  Oh, okay I'm sorry.
16  Q.  You see these paragraphs start with
17  whereas, whereas, whereas?
18  A.  Yes.
19  Q.  And they continue on periodically with some
20  other whereases, and on the middle of the second
21  page of the handout you'll see the second whereas
22  clause says, "whereas the School Board has obtained
23  the legal vice of two competent and experienced
24  constitutional attorneys, John Whitehead and Thomas

Page 160

1  Neuberger, that prayer to open Board meetings is
2  constitutional in the United States Court of Appeals
3  for the Third Circuit which includes Delaware, and
4  legal counsel have identified the following legal
5  authority in support of their legal opinion," do you
6  see that?
7  A.  Yes.
8  Q.  And did you obtain the legal advice of two
9  competent and experienced constitutional attorneys
10  Messers whitehead and Neuberger?
11  A.  As that again, please.
12  Q.  In fact, did you obtain the legal advice of
13  two competent and experienced constitutional
14  attorneys John Whitehead and Tom Neuberger?
15  A.  We did, Mr. Neuberger through Mr. Helms.
16  Q.  Okay, but you are not aware that he got the
17  advice of John Whitehead?
18  A.  No.
19  Q.  And in fact does the introductory section
20  before those numbered paragraphs I had you look at,
21  just a few questions earlier does that constitute
22  the legal advice that you got from Mr. Neuberger?
23  A.  I believe so.
24  Q.  Yes, and that was the legal advice that you

Page 161

1  reviewed?
2  A.  Yes.
3  Q.  Passed through to you by Mr. Helms?
4  A.  Yes.
5  Q.  Okay, now did Mr. Neuberger at any time up
6  to October 19, 2004 when you adopted School Board
7  Prayer Policy appear personally before the Board?
8  A.  To the best of my knowledge we talked to
9  Mr. Neuberger one time face to face as to
10  consideration whether or not he was going to
11  represent us or something.
12  Q.  When was that?
13  A.  I don't know exactly, but it was somewhere
14  in this frame, time frame.
15  Q.  Do you recall that Mr. Neuberger said to
16  the members of the Board look you got to decide
17  today whether you are going to retain me?
18  A.  Yes, I do.
19  Q.  And he did say that and the Board concluded
20  that it would not make that decision that day and
21  therefore decided not to retain him?
22  A.  That's a fair statement, yes.
23  Q.  And did that decision not to retain him on
24  Mr. Neuberger's terms occur before the September

41 (Pages 158 to 161)

Case 1:05-cv-00120-JJF    Document 250-6    Filed 04/10/2008    Page 42 of 57

Dobrich, et al.                          v.        Indian River School District, et al.
Charles M. Bireley           C.A. # 15-120 (JJF)        October 11, 2006

Page 162

1  15th meeting at which Mr. Helms relayed
2  Mr. Neuberger's advice?
3  A.  I'm not positive, but I believe that it
4  did.
5  Q.  Okay. I'm going to ask you to assume for
6  purposes of the next couple of questions that that
7  decision not to retain Mr. Neuberger occurred before
8  -- excuse me, I'll just withdraw the question.
9      We talked before lunch about the decision
10  on August 23rd at that long executive session
11  meeting to get a second legal opinion. How did you
12  decide or how was it decided whom to go to to seek
13  that second legal opinion?
14  A.  I believe again, if I recall this
15  correctly, the administration, the superintendent's
16  or her designee was suppose to talk to some people.
17  Q.  Did the Board itself say here is who you
18  should talk to?
19  A.  Not to my knowledge.
20  Q.  Did you think Mr. Hobbs knew where to go to
21  get First Amendment advice?
22  A.  I'm not sure about the First Amendment
23  advice, but that's the way that we do things.
24  Q.  I didn't mean to be so technical. Did you

Page 163

1  think that Mrs. Hobbs knew where to go to get a
2  second opinion on School Board prayer issues?
3  A.  Yes.
4  Q.  How would she have known that?
5  A.  She could call any attorney and ask them
6  their opinion of where we should go.
7  Q.  And is it your understanding that Mrs.
8  Hobbs called Tom Neuberger?
9  A.  No.
10  Q.  How was the connection made between Mrs.
11  Hobbs and Mr. Neuberger?
12  A.  I don't think that it was.
13  Q.  How did the Board come to seek a second
14  legal opinion from Mr. Neuberger, who made that
15  decision?
16  A.  It was through Mr. Helms, he suggested
17  that.
18  Q.  At the August 23rd meeting?
19  A.  I'm not sure about the time frame, you
20  know, but it was Mr. Helms who originally called
21  him.
22  Q.  And it was Mr. Helms who followed-up an
23  asked for the opinion?
24  A.  Yes.

Page 164

1  Q.  Okay. Did anybody on the Board question
2  why you were relying on a second legal opinion from
3  an attorney whom the Board had already decided not
4  to retain?
5  A.  I guess not.
6  Q.  In retrospect does that seem like a good
7  question for somebody to have asked?
8  A.  The thing with Mr. Neuberger was a
9  complicated issue.
10  Q.  Explain why?
11  A.  It's not a black and white issue.
12  Q.  Explain why?
13  A.  When Mr. Neuberger came in and I'm not sure
14  but I think there was either nine or ten Board
15  members there, and he had said his statement that
16  you previously said, you know keep us there all
17  night long, whatever, and he wanted to know, we
18  needed to make a decision. And there was some Board
19  members at the time who wanted to basically get,
20  they wanted to ask some questions from another
21  source, maybe their own personal sources or
22  something like that, therefore that's the reason we
23  ended up not having Mr. Neuberger to represent the
24  entire Board.

Page 165

1  Q.  Because Mr. Neuberger delivered this
2  scheduling ultimatum and the Board was not willing
3  to accept it?
4  A.  Pretty much so, yes.
5  Q.  All right. Who were the members of the
6  Board who wanted to ask questions of other sources
7  on the issue?
8  A.  I would say pretty much everyone except
9  maybe Mr. Helms.
10  Q.  Okay on PX34 look at page, it's the one
11  that has 717 down at the bottom, it's the next to
12  last page. And I'm looking at the paragraph right
13  above the numbered paragraphs, the one that starts
14  thus it is the opinion, do you say where I am?
15  A.  Yes.
16  Q.  And it says, thus "It is the opinion of
17  legal counsel that the Supreme Court's decision in
18  Marsh v. Chambers, which unlike the Coles decision
19  is binding precedent in Delaware, compels the
20  conclusion that the Indian River School District's
21  tradition of opening its meetings with a brief
22  invocation is constitutionally permissible."
23      In summary, is that the opinion on which
24  you relied in adopting Board policy BDA.1?

42 (Pages 162 to 165)

Dobrich, et al.                                    v.              Indian River School District, et al.
Charles M. Bireley                       C.A. # 15-120 (JJF)                    October 11, 2006

Page 166

1    A.    I would say it had a great impact on it,
2    yes.
3    Q.    Now, apart from this document what else did
4    Mr. Helms tell you about Mr. Neuberger's second
5    legal opinion?
6    A.    I really don't know that I can recall
7    anything other than just chitchat that he had talked
8    to him and that he was --
9              MR. GOSSELIN: Objection, I
10   apologize for interrupting you in the
11   middle of your answer, but I object and I'm
12   instructing you not to complete your
13   answer, because I think it runs afoul of
14   what we talked about before.
15             MR. ALLINGHAM: Well, I know that
16   I'm not going to convince you but let put
17   my position on the record. I agree that it
18   runs afoul of a proposed guideline that you
19   suggested should apply, but we have here
20   testimony that this document is the legal
21   opinion on which Board members relied in
22   adopting the policy. You produced it. You
23   can't tell me now that I can read something
24   that the Rutherford Institute prepared, but

Page 167

1    I can't hear what one of the Board members
2    reported the Rutherford Institute or
3    Mr. Neuberger said on the same topic. That
4    is, you can't selectively waive a
5    privilege.
6              MR. GOSSELIN: This obviously this
7    was intended to be, and actually I'd rather
8    than clutter up the record, I'm not trying
9    to be --
10             MR. ALLINGHAM: You are not going
11   to change your mind?
12             MR. GOSSELIN: No, I'm not but I
13   would be happy to tell you why, because I'm
14   really not trying to be extreporous here,
15   this document evidently was prepared with
16   the intention that it would be adopted as a
17   policy.
18             MR. ALLINGHAM: You are
19   testifying. I'm done, if you won't change
20   your mind that's fine.
21             MR. GOSSELIN: All right.
22   Q.    Other than this document PX34 did Mr. Helms
23   pass out any or was there included in the Board
24   package any other documents reflecting referring or

Page 168

1    relating to Mr. Neuberger's second legal opinion?
2    A.    Not that I'm aware of.
3    Q.    Would you pick up PX9 the actual Board
4    policy again. Paragraph one is reads, "In order to
5    solemnify its proceedings, the Board of Education
6    may choose to open its meetings with a prayer or a
7    moment of silence, all in accord with the freedom of
8    conscience of the individual adult Board member."
9              Your understanding of, "In order to
10   solemnify its proceedings," is in words or substance
11   as I understand your testimony from before lunch in
12   order to permit Board members publicly to seek
13   divine guidance for their decisions at that Board
14   meeting, is that a fair summary?
15   A.    I would say so.
16   Q.    Okay, so from your perspective as a Board
17   member it would not change the meaning of this
18   policy if I simply substituted the words in order to
19   permit Board members publicly to seek divine
20   guidance for their decisions at that the Board
21   meeting, in exchange for the words, "In order to
22   solemnify its proceedings?"
23             MR. GOSSELIN: Objection.
24   Q.    The meaning would remain unchanged?

Page 169

1    A.    Would you mind reading that, the second one
2    again?
3    Q.    Yeah slower, I'm sorry. If I were to
4    delete the words, "In order to solemnify its
5    proceedings," and substitute for them the following
6    words, which I'll try to read a little more
7    carefully, in order to permit Board members publicly
8    to seek divine guidance for their decisions at that
9    Board meeting, okay, that substitution would not
10   change the meaning of this policy in any way?
11             MR. GOSSELIN: Objection.
12   Q.    In your opinion as a Board member?
13   A.    In my opinion it wouldn't.
14             MR. ALLINGHAM: Okay. Could you
15   mark please as PX36 a document bearing
16   Bates number BPD503.
17             (WHEREUPON Plaintiff's Exhibit 36
18   was marked for identification.)
19   Q.    Have you ever seen PX36 before?
20   A.    Yes.
21   Q.    When did you see it?
22   A.    I'm not sure of the date, but I know that
23   I've seen it.
24   Q.    It's dated August 19th, was it on or about

43 (Pages 166 to 169)

Dobrich, et al.                                    v.                    Indian River School District, et al.
Charles M. Bireley                       C.A. # 15-120 (JJF)                          October 11, 2006

Page 170

1   that date that you saw it?
2   A.   Yes.
3   Q.   Who provided it to you?
4   A.   I'm not sure whether it came from Mr. Helms
5   or whether it came from the district office. I
6   would say one of the two.
7   Q.   And did you read it when you were provided
8   a copy of the?
9   A.   Yes.
10  Q.   Did you see anything in it that was
11  inaccurate?
12  A.   It's been some time.
13  Q.   Read it again if you like, see if you can
14  refresh your recollection?
15  A.   Okay.
16  Q.   Have you now read PX36?
17  A.   Yes.
18  Q.   Do you recall when you first read it noting
19  anything in it that was inaccurate in your view?
20       MR. GOSSELIN: Objection.
21  A.   Not at the time.
22  Q.   Now that you have read it, now you see it's
23  inaccurate?
24       MR. GOSSELIN: Objection.

Page 171

1   A.   No.
2   Q.   At any time in your dealings with
3   Mr. Neuberger did it occur to you Mr. Bireley that
4   Mr. Neuberger seemed to have a strong interest in
5   publicizing Mr. Neuberger?
6   A.   You mean like blowing his own horn
7   something like that?
8   Q.   Yeah.
9   A.   Okay.
10  Q.   The answer is yes?
11       MR. GOSSELIN: Do you agree with
12  that?
13  A.   Yes, I do, I agree.
14  Q.   And did that form any part of your
15  consideration in choosing not to retain
16  Mr. Neuberger on behalf of the Board?
17  A.   Me personally?
18  Q.   Yes.
19  A.   No.
20  Q.   Do you know where Mr. Neuberger -- did you
21  ever speak to Mr. Neuberger? Did you ever provide
22  Mr. Neuberger with any information about the Indian
23  River School Board's historical practices regarding
24  opening its meetings with a prayer?

Page 172

1   A.   It's a possibility.
2        MR. GOSSELIN: Objection, don't
3   answer that.
4   Q.   Did the School Board ever consider a policy
5   that would simply have provided for opening its
6   meetings with a moment of silence?
7   A.   Consider a policy stating that?
8   Q.   Yes.
9   A.   Not that I remember.
10  Q.   When the policy was being discussed, did
11  the School Board ever consider the possibility of
12  opening its meetings with a moment of silence?
13  A.   It was certainly discussed.
14  Q.   Do you remember who raised that issue?
15  A.   No, I don't.
16  Q.   Do you remember at what time that issue was
17  raised?
18  A.   During the same time frame that we were
19  considering this.
20  Q.   So, that period of time up to September
21  28th first reading?
22  A.   I guess so, yeah.
23  Q.   And tell me what the discussion was of the
24  possibility that the Board should open its meetings

Page 173

1   with a moment of silence?
2   A.   Well --
3        MR. GOSSELIN: To the extent that
4        this is not based on information obtained
5        from counsel.
6   A.   Okay, this would be from individual Board
7   members?
8   Q.   Yes, sir?
9   A.   It was suggested and was discussed and they
10  decided not to do it because they still thought that
11  each individual Board member had the right to say
12  whatever they wanted to say in their moment of the
13  time that they give a prayer.
14  Q.   Did somebody say look if we just open the
15  meeting with a moment of silence it is not going to
16  be seeking divine guidance for our decisions at the
17  Board meeting?
18  A.   I don't recall that being said. I don't
19  recall anybody saying that.
20  Q.   The policy itself contemplates, if you look
21  at PX9, sir that the Board of Education may choose
22  to open its meeting with a moment of silence, right?
23  A.   Yes.
24  Q.   And so am I correct that the policy itself

44 (Pages 170 to 173)

Dobrich, et al.                              v.                    Indian River School District, et al.
Charles M. Bireley                   C.A. # 15-120 (JJF)                        October 11, 2006

Page 174

1  contemplates that moment of silence would be
2  effective to solemnify the proceedings?
3      A.   In some people's mind, yes.
4      Q.   And the policy itself contemplate that it
5  would be effective to solemnify the proceedings by
6  opening with a moment of silence, is that correct?
7      A.   What the policy says?
8      Q.   Yes, sir. Did anyone raise the question if
9  as the policy reflects being a moment of silence
10 would be effective to solemnify the proceedings why
11 it was necessary also to offer the option to
12 individual Board members to open the meetings with a
13 prayer?
14     A.   The discussion that I remember what that
15 it's an individual's choice.
16     Q.   Was the inclusion in the Board Prayer
17 Policy of the option to open its meeting with a
18 prayer intended to protect individual Board members'
19 rights to express their religion as they saw fit?
20         MR. GOSSELIN: Objection to the
21     form.
22     A.   To prevent them from doing it?
23     Q.   To protect their rights to express their
24 religion as they saw fit?

Page 175

1      A.   I guess that's a fair statement.
2      Q.   Was a reason for the adoption of this
3  policy to protect individual Board members' First
4  Amendment rights to express their religion as they
5  see fit?
6          MR. GOSSELIN: Objection.
7      A.   I will agree.
8      Q.   Did anybody give any consideration to
9  calling this policy the policy to protect individual
10 Board members First Amendment rights?
11     A.   No, not that I recall.
12     Q.   Do you know why the title of the policy was
13 changed from Policy on Prayer at Board Meetings,
14 which is what the first Rutherford Institute
15 document that Mr. Helms passed to you to Board
16 Prayer at Regular Board meetings?
17     A.   The only thing I can recall in particular I
18 remember someone asking the question that was the
19 only time that we did it, and it was stated at
20 regular Board meetings because we didn't do it at
21 any other type of meetings.
22     Q.   Got you. That's not because Board members
23 didn't think they could equally use divine guidance
24 at special Board meetings that you never had done

Page 176

1  it?
2      A.   I guess that's true.
3      Q.   So, as far as you were able to tell Board
4  members did think they needed divine guidance for
5  special Board and regular Board meetings?
6      A.   Yes.
7          MR. GOSSELIN: And everywhere
8      else.
9      Q.   In the Board School Board Prayer Policy we
10 talked a little bit about how you as the president
11 set up the rotating basis, I have a few more
12 questions on that.
13         As things stand now in your service as the
14 Board president, is it correct that you don't on a
15 rotating basis offer each Board member the
16 opportunity to offer a prayer to open the meeting?
17     A.   I just offer it to the people who have
18 indicated to me that they are willing to do it.
19     Q.   Would it be fair for me to understand that
20 the selection process is done in advance with the
21 offer extended only to the, the invitation extended
22 to Board members who have previously volunteered to
23 participate in this process?
24     A.   If the other Board members has not

Page 177

1  indicated to me that they are willing to do it then
2  that would be true.
3      Q.   And so as the facts stand now so far you
4  extend the invitation only to the four Board members
5  who have indicated their interest?
6      A.   Yes.
7      Q.   Do you think the full range of the Board
8  views on this issue, that is the solemnization of
9  the Board's meetings, the full range of those views
10 could be more comprehensively presented by sticking
11 with paragraph two of the policy and publicly
12 offering on a rotating basis each individual Board
13 member the opportunity to open the meeting with a
14 prayer?
15     A.   I thought about something like that, but I
16 thought that I didn't want to put anyone on the spot
17 by asking them to do it or for them to decline.
18     Q.   Why do you think that it would put them on
19 the spot to decline the opportunity?
20     A.   I don't know that's just my personal
21 reason, that's the reason that I don't ask them.
22     Q.   All right I am asking you this question
23 because I take it if someone had offered you the
24 opportunity you would have decline it, correct?

45 (Pages 174 to 177)

Dobrich, et al.                                  v.                    Indian River School District, et al.
Charles M. Bireley                        C.A. # 15-120 (JJF)                    October 11, 2006

Page 178

1    A.   I did originally.
2    Q.   No, I mean if at the public Board meeting
3  when you were not the president?
4    A.   Oh, okay.
5    Q.   If somebody had turned to you, someone who
6  is not as considerate as you to ask you in advance,
7  if they just turned to you and said Charlie, it's
8  your turn, would you like to open the meeting with a
9  prayer, would you have declined the invitation?
10   A.   I don't know how what I would have done at
11  the time, you know, if that occurred but I probably
12  would have.
13   Q.   Probably would have declined?
14   A.   Yes.
15   Q.   To the extent that you would have declined,
16  would you have felt to some degree on the spot to
17  use your words?
18   A.   In all honesty I would.
19   Q.   And it would have made you feel
20  uncomfortable to decline the opportunity?
21   A.   Yes.
22   Q.   And the reason that it would have made you
23  feel uncomfortable would be that you would have
24  declined that invitation in public?

Page 179

1    A.   It would not be that I am declining,
2  because I would be concerned about what came out of
3  my mouth when I said it, because I am the type of
4  person that when I do this in public that I mean I
5  have not done the Board meetings but in life given a
6  prayer at other things that I write it before, you
7  know, what I want to say.
8    Q.   Sir, I may have misunderstand you. If the
9  Board president said Charlie it's your turn would
10  you like to open the Board meeting with prayer would
11  you have accepted the invitation or declined the
12  invitation?
13   A.   I probably would have declined.
14        MR. ALLINGHAM:  We have got to
15     change the tape.
16        MS. DUPHILY:  Off the record at
17     2:18 p.m..
18        (WHEREUPON a brief recess was
19     taken)
20        MS. DUPHILY:  back on the record
21     at 2:19 p.m..
22   Q.   Would you have considered offering a prayer
23  because you were in a public forum?
24   A.   I could say that I would consider it.

Page 180

1    Q.   And the reason -- in a private forum you
2  would not consider stepping up and leading a group
3  in prayer correct, it's not your way?
4    A.   I just like to have the prayer prepared
5  before I do it.
6    Q.   I asked you some questions earlier about
7  the cumulative impact of meeting after meeting
8  prayers being offered in the name of Jesus Christ.
9  Now I am to ask you about the cumulative impact of
10  every person extended an invitation at the Board
11  meetings offering a prayer or moment of silence.
12  That cumulative impact is assured by your practice
13  of extending the invitation only to people that you
14  know will accept it, isn't that correct?
15        MR. GOSSELIN:  Objection.
16   A.   I don't really look at it that way.  I look
17  at it that I gave them the opportunity to say one if
18  they wanted to.
19   Q.   Let me ask you this question, you do in
20  fact extend the invitation only to those people that
21  you know will accept it, isn't that correct?
22   A.   At the present time, yes.
23   Q.   And that's the way you have always done it?
24   A.   Yes.

Page 181

1    Q.   When Mr. Walls was on the Board if you had
2  extended an invitation to Mr. Walls you know that he
3  would have declined that invitation, isn't that
4  correct?
5    A.   Based on the fact that I had asked him
6  previous was he willing to do it and he declined,
7  yes.
8    Q.   Don't you think that the public is entitled
9  to know that some School Board members think it's
10  great to open School Board meeting with a prayer and
11  some School Board members don't?
12   A.   I've had people ask me why I don't do it.
13   Q.   Don't you think that the public is entitled
14  to see publicly that some Board members take up the
15  invitation and some Board members decline the
16  invitation?
17        MR. GOSSELIN:  Objection.
18   A.   If they come to the Board meetings, you
19  know, if people come to the Board meetings they are
20  going to see that anyway, they are going to know.
21   Q.   How are they going to know, sir?
22   A.   By observance.  They are going to see that
23  there is only a select amount of people that choose
24  to do this.

46 (Pages 178 to 181)

Dobrich, et al.                                v.                    Indian River School District, et al.
Charles M. Bireley                    C.A. # 15-120 (JJF)                        October 11, 2006

Page 182

1    Q.   Do you think people keep track of which
2  Board member gave the prayer?
3    A.   I don't know if the others struggle with
4  doing it as much as I do, I don't know the answer.
5    Q.   Well, it's your job and you keep a piece of
6  paper, people don't keep in their minds --
7    A.   I agree with that.
8    Q.   Okay, so there is no way for people to know
9  that on the current Board six of the ten Board
10  members have indicated an unwillingness to offer a
11  prayer?
12          MR. GOSSELIN:  Objection.
13    A.   I'd like to say it was a personal
14  preference.
15    Q.   Indicated a personal preference not to have
16  an invitation extended to them to offer a prayer?
17    A.   Yes.
18    Q.   There is no way for the public to know
19  that?
20    A.   I guess not.
21    Q.   If you followed the policy as written, the
22  public would know that, isn't that correct?
23          MR. GOSSELIN:  Objection.
24    A.   If I called on someone that I knew that did

Page 183

1  not choose to do so and they said or they chose not
2  to do it, then yes, they would, anyone who was there
3  in attendance would know.
4    Q.   And the reason you chose to figure out in
5  advance who would accept your invitation is that you
6  didn't want to embarrass the folks whose didn't
7  want, as a personal preference, to participate in
8  that process, isn't that right?
9          MR. GOSSELIN:  Objection.
10    A.   Yeah, embarrass them or put them on the
11  spot, yeah, when I already knew the answer.
12    Q.   Because you didn't want them to have to say
13  in public I prefer not to lead the Board in prayer?
14          MR. GOSSELIN:  Objection.
15    A.   Well, I guess yes.
16    Q.   Why was the rotating basis incorporated in
17  this policy, do you know?
18    A.   Other than the fact that that was what came
19  to us to be approved.
20    Q.   From the Rutherford Institute?
21    A.   Well, from the committee. I'm not sure who
22  put that in there, whether the Rutherford Institute
23  recommended it or whether our own people in this
24  district did it Mr. Walls I'm not sure who did it.

Page 184

1    Q.   Did you ask where it came from?
2    A.   No, I do not.
3    Q.   Did you ask why it was included?
4    A.   No.
5    Q.   Did any Board member ask where it came
6  from?
7    A.   Not that I'm aware of.
8    Q.   Did any Board member ask why it was
9  included?
10    A.   Not that I'm aware of.
11    Q.   It was included for no reason, correct?
12  You don't put in surplusage, or put in things that
13  have no purpose?
14    A.   True.
15    Q.   So, it has a purpose but you don't know
16  what it is?
17          MR. GOSSELIN:  Objection.
18    A.   Yes.
19    Q.   And you don't comply with it?
20          MR. GOSSELIN:  Objection.
21    A.   I don't comply with it?
22    Q.   You don't do what the policy says you
23  should do?
24          MR. GOSSELIN:  Objection.

Page 185

1    A.   I guess in that respect probably not.
2    Q.   Okay, I said at the outset that I would let
3  you know when I am now on to matters that are
4  Charlie Bireley specific and not 30(b)(6)
5  designations, and we've now reached that point, and
6  I have very little left to ask you as a matter of
7  fact.
8    A.   Okay.
9    Q.   Do you recall giving an interview to Dan
10  Gaffney on WGND in connection with the campaign for
11  the School Board this spring?
12    A.   Yes.
13          MR. ALLINGHAM:  I'm going to mark
14  as PX37 I hope I will. I'm not going to mark as PX37
15  lacking copies a transcript.
16    Q.   I'm just going to ask you about what you
17  said. Do you recall responding to question from Mr.
18  Gaffney that an important reason why you rejected
19  the settlement in February was that you wanted to
20  fight the issue of School Board prayer?
21          MR. GOSSELIN: Objection, don't
22  answer that.
23    Q.   Instead of the transcript I'll mark as PX37
24  a document bearing Bates numbers P559 through 560.

47 (Pages 182 to 185)

Dobrich, et al.                          v.              Indian River School District, et al.
Charles M. Bireley                C.A. # 15-120 (JJF)                October 11, 2006

Page 186

1    I won't mark it, it's Exhibit 28. This is an
2    article from The Wave, is that a paper that you read
3    from time to time? Do you read The Wave from time
4    to time?
5       A.   Yeah.
6       Q.   This is an article from Wednesday April 19,
7    2006, and you're quoted as having made some
8    statements to the reporter Laren Hughes. Have you
9    given an interview, one or more interviews to Laren
10   Hughes?
11      A.   Well, I've talked to her probably many
12   times.
13      Q.   Near the bottom of the second page the
14   article reports, "School Board members said they
15   would have made the same decision three months ago
16   even if they knew another lawsuit would follow."
17   And then you are quoted, "It was the right thing to
18   do," Bireley said. Until everyone in the community
19   knows what we had to consider, nobody will
20   understand it." Mr. Bireley, is that an accurate
21   quote of what you said Miss Hughes?
22           MR. GOSSELIN: Objection, don't
23           answer that. I'm instructing him not to
24           answer any questions that relate to why the

Page 187

1            Board made the decision it did to reject
2            the settlement proposal that was presented
3            to it back in February.
4            MR. ALLINGHAM: Quickly so you
5            understand my position, the public's
6            perception of the impact of the School
7            Board Prayer Policy is I think a relevant
8            consideration and the questions that I'm
9            asking are meant to be leading questions
10           for questions intended to elicit the
11           witness' perception of what the public
12           perceives to be the impact of the School
13           Board Prayer Policy.
14           MR. GOSSELIN: I object to
15           questions that elicit information
16           concerning why Mr. Bireley or anybody else
17           chose to accept or reject any previous
18           settlement proposals that they have
19           extended or have been extended to them.
20           MR. ALLINGHAM: Okay, are you
21           going to instruct on that question, the one
22           about is this an accurate quotation?
23           MR. GOSSELIN: Yeah, yeah.
24      Q.   Okay. My next question is, do you have a

Page 188

1    perception that the public has misperceived the
2    impact or interplay of the School Board Prayer
3    Policy and the settlement that was proposed and
4    rejected by the Board back in February?
5            MR. GOSSELIN: Objection, the same
6            instruction.
7       Q.   I'm handing you what was previously marked
8    as Plaintiff's Exhibit 29. This is an article which
9    includes a quote from you near the bottom of the
10   page. The full paragraph reads, "In the meantime,
11   Board members will continue to pray at the opening
12   of their meetings and prayer will be permitted at
13   commencement exercises if led by a student
14   volunteer, said School Board President Charlie
15   Bireley. This won't be easy but I'm pleased with
16   the decision we have made, he said. We need
17   finality." What did you mean when you told Miss
18   Hughes, "We need to have finality?"
19           MR. GOSSELIN: Objection, don't
20           answer that.
21           MR. ALLINGHAM: You can see who
22           has the hard job here. Let's mark as PX37
23           a document bearing Bates numbers P599 and
24           600.

Page 189

1            (WHEREUPON Plaintiff's Exhibit 37
2            was marked for identification.)
3       Q.   This is the text of an article from The
4    Wave from January 4, 2006. On the second page
5    you're quoted as saying in the fourth paragraph, "I
6    would hope we wouldn't have to pay any money because
7    we don't think we did anything that was wrong,
8    Bireley said." Was that an accurate quote?
9            MR. GOSSELIN: Objection, don't
10           answer that.
11           MR. ALLINGHAM: Damages are
12           certainly relevant in the School Board
13           prayer section of this litigation.
14           MR. GOSSELIN: Damages are
15           relevant but this concerns the decision not
16           to settle back in February, and that's what
17           this is article —
18           MR. ALLINGHAM: I think
19           without getting too detailed about that,
20           that that's a statement that's impossible
21           to be correct, because as everybody in the
22           room knows the settlement contemplated the
23           payment of money, and if Mr. Bireley was
24           talking about the possibility that we don't

48 (Pages 186 to 189)

Dobrich, et al.                                    v.                        Indian River School District, et al.
Charles M. Bireley                    C.A. # 15-120 (JJF)                              October 11, 2006

Page 190

1    have to pay any money then he is talking
2    about something other than the settlement.
3    I think I'm entitled to explore that.
4              MR. GOSSELIN:  I disagree.  The
5    issues here are the constitutionality of
6    the Board prayer policy as written and as
7    applied.  This has nothing to do with that.
8    This has to do with the process that led up
9    to the Board meeting in February at which
10   the Board voted not to accept the
11   settlement proposal that was put forward.
12             MR. ALLINGHAM:  Don't you think
13   that I'm entitled to test that with
14   Mr. Bireley rather than from Mr. Gosselin.
15             MR. GOSSELIN:  Test what?
16             MR. ALLINGHAM:  What you just
17   said.
18             MR. GOSSELIN:  This article, the
19   first paragraph of the article is the
20   Indian River School -- an article dated
21   January 4, 2006 the Indian River School
22   Board will consider paying a six figure
23   settlement to end recent litigation over
24   prayer at school functions.  Regardless of

Page 191

1    whether that statement is correct
2    concerning whether it's the Board's money,
3    the district's money or the insurance
4    company's money, the article concerns the
5    settlement which Judge Farnan said is not
6    within the realm of discoverable
7    information in this phase of the litigation
8    and presumably I think you will find that
9    in the next phase as well.  So, I'm
10   instructing him not to answer.
11   Q.   Was the school Board Prayer Policy a
12   critical issue in the election in the spring?
13   A.   Was it a critical issue?
14   Q.   Yes.
15   A.   I never made it if it was.
16             MR. ALLINGHAM:  Let me have 689.
17   Let's mark as PX38 a document bearing Bates
18   numbers P689 through 690.
19             (WHEREUPON, Plaintiffs's Exhibit
20   38        was marked for identification).
21   Q.   This is an article from the Coastal Point
22   written by Jonathan Starkey shortly after the
23   election.  Have you seen this article before?
24   A.   Yes.

Page 192

1    Q.   Is it correct that the turnout for the
2    election for the district four seat in which you
3    prevailed was a record turnout?
4    A.   Yes.
5    Q.   And was a major issue surrounding that
6    election the prayer suit facing the district and the
7    Board?
8    A.   In my personal opinion I don't think so, I
9    ran on my record.
10   Q.   In the seventh paragraph Mr. Starkey
11   reports that you said, "That the prayer suit facing
12   the district and the Board was the major issue
13   surrounding this year's election, and that it
14   probably swung this year's vote."  Did you tell
15   Mr. Starkey that?
16   A.   I don't think so.
17   Q.   So, this is a inaccurate quote, inaccurate
18   reporting of what you told him?
19   A.   I don't think that I said that in that
20   particular -- on my point of view from where I came
21   from, I did not make that this way.  There might
22   have been people in the community who did it,
23   because Lord only knows what was going, but I did
24   not make this an issue.

Page 193

1    Q.   Oh, that's not what I said.  I didn't say
2    did you make it an issue, I said was it your view
3    the prayer suit facing the district and the Board
4    the major issue surrounding this year's election
5    which probably swung this year's vote?
6    A.   I don't think I said that, not in the
7    context like that.
8    Q.   Well, in what context did you say it?
9    A.   I agreed with him when he asked me the
10   question, did I think it was an important thing
11   because people in the community made it an important
12   thing.  I never did it, when I was campaigning or
13   anything.  No, I did not make this the issue.
14   Q.   Okay, so whether or not you made it the
15   issue, it became the major issue in the campaign?
16   A.   I don't know that it became a major issue,
17   it became an issue in the campaign.
18   Q.   Whether or not you made an issue was it
19   your view that it probably swung the vote?
20   A.   I have no way of knowing that.
21   Q.   Well, did you tell Mr. Bireley that you
22   thought it probably swung the vote?
23             MR. GOSSELIN:  You mean Mr.
24        Starkey.

49 (Pages 190 to 193)

Dobrich, et al.                          v.              Indian River School District, et al.
Charles M. Bireley              C.A. # 15-120 (JJF)              October 11, 2006

Page 194

1    Q.   Mr. Starkey, sorry.
2         MR. GOSSELIN:  Objection.
3    A.   I don't think that I did.
4    Q.   Three paragraphs below that Mr. Starkey
5    quotes you directly, "That's the issue Bireley said
6    of the District four campaign.  They approved of
7    what we did back on February 28th.  It became a
8    campaign issue." Is that an accurate quote of what
9    you told Mr. Starkey?
10   A.   Pretty much it did become a campaign issue.
11   Q.   Just don't know whether it swung the vote?
12   A.   I have no way of knowing --
13   Q.   Did --
14        MR. GOSSELIN:  You interrupted
15   him are you done?
16   A.   I started to say that it didn't come from
17   me, in anything that I ever wrote to anyone I never
18   said that this was, you know, the major issue or
19   whatever, that I can recall doing.
20   Q.   Did you raise it as an issue in the
21   campaign?
22   A.   Did I raise it as an issue?
23   Q.   Yes.
24   A.   No, not me personally.

Page 195

1    Q.   If someone else raised the issue did you
2    respond as to what your position was?
3    A.   Yes.
4    Q.   You did respond to questions from
5    Mr. Gaffney during that campaign interview on the
6    School Board prayer issue?
7    A.   On the radio?
8    Q.   Yes.
9    A.   Yes.
10        MR. ALLINGHAM:  Let's mark as PX39
11   a document bearing Bates numbers P2640.
12        (WHEREUPON Plaintiff's Exhibit 39
13        was marked for identification.)
14   Q.   This is an article from the Sussex Post
15   from the Thursday July 6, 2006 issue written by
16   James Diehl.  Did you give an interview to Mr. Diehl
17   in connection with this article?
18   A.   I'm not sure.
19        MR. GOSSELIN:  I haven't read this
20   article, can you give me a minute to read
21   it myself because I may object to any
22   questions relating to the article.  I think
23   I'm going to object to your substantive
24   questions but I suppose I will wait until

Page 196

1    you ask them.
2         MR. ALLINGHAM:  Good idea.
3    Q.   In the fourth column of the first portion
4    of the article, the top portion of the article the
5    second full paragraph incorporates a quote from you
6    and it has a lead in paragraph which I also want to
7    read. "Most provisions were made in response to
8    recent court decisions according to Mr. Bireley.  As
9    long as a student is not coerced, then they're
10   allowed to speak" I don't know what he was changing
11   from.
12        MR. GOSSELIN:  Where are you
13   reading from?
14        MR. ALLINGHAM:  It's the fourth
15   column top of the page.
16        MR. GOSSELIN:  Okay.
17   Q.   "As long as a student is not coerced then
18   they are allowed to speak Mr. Bireley said.  We
19   adopted this on our own." My question to you is
20   what do you mean when you say we adopted this on our
21   own?
22        MR. GOSSELIN:  Objection, don't
23   answer that.
24   Q.   Is the antecedent, is what you are

Page 197

1    referring to with the words this, the policies on
2    religion in the Indian River School District?
3         MR. GOSSELIN:  Objection, don't
4    answer that.
5    Q.   Does this include the policy on School
6    Board prayer in the Indian River District?
7         MR. GOSSELIN:  Objection, don't
8    answer it.
9         MR. ALLINGHAM:  Wait a minute
10   Jason, if this incorporates the School
11   Board Prayer Policy then it's relevant and
12   it's --
13        MR. GOSSELIN:  You know as
14   well as I do what this refers to, it refers
15   to the settlement proposal made by the
16   Board to the Plaintiff, and you know what's
17   in that.
18        MR. ALLINGHAM:  I don't
19   believe that's true, but if it is true then
20   the witness can tell me that.
21   Q.   The question is the this in that sentence
22   are you intending to include the School Board Prayer
23   Policy?
24        MR. GOSSELIN:  Objection, don't

50 (Pages 194 to 197)

Dobrich, et al.                          v.              Indian River School District, et al.
Charles M. Bireley              C.A. # 15-120 (JJF)                    October 11, 2006

Page 198

1    answer that.
2    Q.    Was the Board's consideration of the School
3    Board Prayer Policy precipitated by Mrs. Dobrich's
4    complaints which first came to the Board's attention
5    in the spring or early summer of 2004?
6         MR. GOSSELIN: Objection, don't
7    answer it. Well, if you are asking him
8    whether the changes to the policy that
9    we've been talking, that this deposition is
10   supposedly about, the Board Prayer Policy
11   that was adopted back on October 19th, and
12   whether that was related to precipitated by
13   Mrs. Dobrich, I don't object to that
14   question.
15        MR. ALLINGHAM: Good position,
16   that was my question, but whatever my
17   question --
18        MR. GOSSELIN: Well it didn't seem
19   like --
20        MR. ALLINGHAM: From now on I
21   think what we should do is I will ask the
22   question you can pose an objection. You
23   can pose no speaking objection, but simply
24   identify whether it's a privilege objection

Page 199

1    or a form objection and we can move on. I
2    have been getting a lot of pressure about
3    the timing of depositions, you've now
4    switched witnesses in the order that you
5    told me last night they would be given.
6    That was after we had completed the
7    deposition last night and I'm not going to
8    waste my time listening to speaking
9    objections. I'm going to pose my question,
10   you can object, I will accept the objection
11   or not and we will move forward.
12   Q.    My question to you Mr. Bireley --
13        MR. GOSSELIN: If I don't
14   understand your question and I try --
15        MR. ALLINGHAM: I'm going to ask
16   you not to use any more time, Mr. Gosselin,
17   you know perfectly that your right in the
18   deposition is simply to object if you
19   have a form objection or to instruct the
20   witness if you have a privilege problem.
21   Other than your role as to sit there.
22   Q.    My question to you Mr. Bireley is this, the
23   School Board Prayer Policy adopted on October 19,
24   2004, was the board's consideration of that policy

Page 200

1    precipitated by Mrs. Dobrich's complaints to the
2    Board which were received in late spring or early
3    summer of 2004?
4    A.    Yes.
5    Q.    Would you characterize a policy adopted in
6    response to complaints from a member of the district
7    -- a resident of the district a policy that you
8    adopted on your own?
9         MR. GOSSELIN: Objection.
10   A.    No.
11   Q.    Did you give an interview to Lynn Parks for
12   inclusion in an article in Delaware Beach Life?
13   A.    Yes.
14   Q.    If you will look at the last page of PX30,
15   the second column from the right I have a question
16   for you as a personal Board member. The Reverend
17   Jerry Fike, is quoted as saying as follows: "My
18   loyalty is to Jesus Christ foremost, even if that
19   takes me to prison or to death. He is the predicted
20   Messiah. He rose again and I believe that he knew
21   what he was talking about, and if he is the Messiah
22   then all religions are not equal, there are no
23   alternatives to Christianity." Do you personally
24   agree with the sentiments expressed by the Reverend

Page 201

1    Fike in that quotation?
2         MR. GOSSELIN: Objection,
3    don't answer that.
4         MR. ALLINGHAM: The personal
5    religious beliefs of the individual Board
6    members who adopted the policy are plainly
7    relevant under case law. Do you want to
8    reconsider your instruction?
9         MR. GOSSELIN: The judge told
10   you -- I'm going to -- if you want me to
11   tell you why I'm objecting or you don't.
12        MR. ALLINGHAM: I just asked
13   whether you would reconsider in light of
14   what I just said.
15        MR. GOSSELIN: No.
16   Q.    In the next paragraph of the article
17   reports, "School Board members Bireley and Hattier
18   rather than forcing what they think on other people,
19   see themselves as defending the values of Sussex
20   County. They see themselves as protecting what
21   Hattier, who moved here in 1986, calls one of the
22   last great communities with rural attitudes in the
23   country."
24        In adopting the School Board Prayer Polity

51 (Pages 198 to 201)

Dobrich, et al.                                    v.                  Indian River School District, et al.
Charles M. Bireley                      C.A. # 15-120 (JJF)                       October 11, 2006

Page 202

1   did you consider yourself as defending the values of
2   Sussex County?
3                MR. GOSSELIN: Objection.
4   Q.   You may answer.
5   A.   Not in this context, no.
6   Q.   Did you see yourself as defending one of
7   the last great communities with rural attitudes in
8   this country?
9                MR. GOSSELIN: Objection.
10  A.   No.
11  Q.   Did you speak to Dr. Hattier last night?
12  A.   Yes.
13  Q.   Did you discuss with him what he was asked
14  during the deposition?
15  A.   He made some statements to me, that's not
16  the purpose of the call.
17  Q.   What did he tell you about the deposition?
18  A.   What did he tell me?
19  Q.   Yes.
20  A.   That, well, that I should be polite, that I
21  should respect the other side, that I should do
22  something that I made a boo boo already is wait for
23  you to ask the complete question before I answer,
24  things like that.

Page 203

1   Q.   Did you visit the Harrison Senior Living
2   Center in Georgetown, Delaware and Green Valley
3   Terrace in Millsboro, Delaware as part of your
4   re-election campaign for the School Board in 2006?
5   A.   Did I?
6   Q.   Yes.
7   A.   No.
8   Q.   Did anyone visit those centers on your
9   behalf?
10  A.   Not that I'm aware of.
11               MR. ALLINGHAM: All right let's go
12       off the record for five minutes. I think
13       I'm done but I want to check with my
14       colleagues.
15               MS. DUPHILY: We are going off the
16       record at approximately 2:54 p.m..
17               (WHEREUPON a brief recess was
18       taken)
19               MS. DUPHILY: Back on the record
20       at approximately 2:58 p.m..
21  Q.   Do you believe that students in the
22  district are impressionable because of their youth?
23  A.   My personal opinion?
24  Q.   Yes.

Page 204

1   A.   Yes.
2   Q.   In PX30 which I put before you a few
3   moments ago, Mr. Gosselin and I had an exchange
4   about whether a question relating to your personal
5   religious views was relevant. I understand that for
6   reasons expressed by Mr. Gosselin that he is
7   withdrawing his instruction to you not to answer
8   that question, so let me repose it.
9                In the Delaware Beach Life article marked
10  PX30, the Reverend Jerry Fike, who by the way is the
11  minister who offered the commencement prayers in
12  2004, is that correct?
13  A.   Yes.
14  Q.   At the Board's invitation?
15  A.   Yes, well, not at the Board's invitation.
16  Q.   Who invited the Reverend Fike to deliver
17  the commencement --
18               MR. GOSSELIN: I object to that
19       and instruct him not to answer, because we
20       are getting off topic. You wanted his
21       personal views.
22  Q.   Is it within the Board's responsibility to
23  invite speakers to district events such as
24  commencement exercises?

Page 205

1   A.   No.
2   Q.   The Reverend Fike is quoted as saying as
3   follows: "My loyalty is to Jesus Christ, foremost,
4   even if that takes me to prison or to death. He is
5   the predicted messiah. He rose again and I believe
6   that he knew what he was talking about. And if he
7   is the Messiah then all religions are not equal.
8   There are no alternatives to Christianity." Do you
9   agree with the sentiments expressed by the Reverend
10  Fike in that quotation?
11  A.   No.
12  Q.   One follow-up question, do you believe that
13  all religions are equal?
14  A.   That all religions are equal?
15  Q.   Yes.
16  A.   I believe that each individual group has a
17  much right to have their own religion, as I have to
18  have mine. Does that answer the question?
19  Q.   Fair enough. And I take it then that you
20  would say that there are alternative religions to
21  Christianity?
22  A.   Yes.
23  Q.   And that those religions are of equal
24  validity?

52 (Pages 202 to 205)

Dobrich, et al.                                    v.                    Indian River School District, et al.
Charles M. Bireley                        C.A. # 15-120 (JJF)                          October 11, 2006

Page 206

1    A.   To the best of my knowledge because I don't
2  know that I fully understand all of the religions.
3    Q.   Okay. I asked you some questions before
4  lunch about the responsibility of the Board to
5  maintain order during, among other portions, the
6  public comment section of the Board meetings, do you
7  recall those questions?
8    A.   Yes.
9    Q.   During your tenure as Board president have
10  you had occasion to turn off the mike or direct the
11  speaker to leave the microphone during a public
12  comment session?
13    A.   Yes.
14    Q.   Can you remember any specific examples?
15    A.   Yes.
16    Q.   What example can you recall?
17    A.   It didn't have anything to do with the
18  religious issue, it had something to do with an
19  issue that you occurred during my campaign.
20    Q.   I'm going to play a transcription -- I'm
21  going to play a tape of that meeting, what I believe
22  to be that meeting, and ask you to confirm whether
23  this is a recording of you exercising your
24  prerogative as the president to terminate a speaker

Page 207

1  during the public commentary portion of the meeting.
2    (AT THIS POINT AN AUDIO RECORDING WAS PLAYED)
3    Q.   The voice saying Mr. Alling, Mr. Alling,
4  that's your voice is that correct?
5    A.   I think so, yes.
6      MR. ALLINGHAM: Pick it up again.
7    (AT THIS POINT THE RECORDING WAS CONTINUED)
8    Q.   The voice that just said I suggest sir that
9  if you preach yourself to be a Christian then I
10  suggest that you act like a Christian. Do you know
11  whose voice that was?
12    A.   I think I do.
13    Q.   Whose voice is it?
14    A.   I think it's Mark Isaacs. I'm not
15  positive, but I think that's who it was.
16    Q.   Do you recall that portion of the public
17  commentary at a School Board meeting on March 28,
18  2006?
19    A.   Oh, I recall it.
20    Q.   And did you instruct Mr. Alling to leave
21  the podium and cease speaking during the public
22  commentary session?
23    A.   Pretty much.
24    Q.   Was that because he was speaking about what

Page 208

1  you considered to be personnel issues?
2    A.   He was allowed to say whatever he wanted to
3  say until he mentioned John Mitchell's name.
4    Q.   And who is Mr. Mitchell?
5    A.   He is the supervisor in charge of
6  transportation for the school district.
7    Q.   And did you think that up until the point
8  that he mentioned Mr. Mitchell's name the commentary
9  that Mr. Alling made was appropriate for public
10  commentary during the meeting?
11    A.   Probably so.
12    Q.   Did someone suggest to Mr. Alling that when
13  he mentioned Mr. Mitchell's name that that became a
14  matter for executive session?
15    A.   I tried to, yes, I did.
16    Q.   During the portion of the tape we just
17  heard?
18    A.   Yes.
19    Q.   All right, and when Mr. Alling left the
20  podium did you thereafter tell him that you would be
21  going into executive session and he could address
22  the Board at that time?
23    A.   No, not specifically. I don't know.
24    Q.   Did you, do think having listened to that

Page 209

1  portion of the tape that it was appropriate to in
2  effect cause Mr. Alling to cease speaking during the
3  public comment session at that time?
4    A.   Do I?
5    Q.   Yes.
6    A.   Yes.
7    Q.   Okay. Now, at the, what I've characterized
8  as the large meeting, the big meeting on August
9  24th, we spoke generally about the commentary during
10  the public comment period. I have a couple of
11  preliminary questions. Is it correct that the time
12  for each individual speaker was cut from three
13  minutes to two minutes during that meeting?
14    A.   I'm not sure. If I remember correctly the
15  15 minute period was extended.
16    Q.   Yes, the entire period was extended to 45
17  minutes, do you recall that?
18    A.   Yes.
19    Q.   And do you also recall that because of the
20  number of speakers the time was cut from three
21  minutes to two minutes for individual speakers?
22    A.   That's a possibility, yes.
23    Q.   And did you understand that as a Board
24  member because of the problems of the number of

53 (Pages 206 to 209)

Dobrich, et al.                          v.              Indian River School District, et al.
Charles M. Bireley            C.A. # 15-120 (JJF)                      October 11, 2006

Page 210

1  people who wanted to speak it was important to
2  maintain those time limits?
3      A.  You mean the difference between the two and
4  the three minutes?
5      Q.  Yeah.
6      A.  I understand why it was cut because there
7  were so many people who wanted to talk and we would
8  have been there all night.
9      Q.  You heard when you were speaking to
10  Mr. Alling that, maybe it was you maybe it was
11  someone else, spoke right up and said Mr. Alling
12  your time is up?
13      A.  That was someone else.
14      Q.  Do you know who that was?
15      A.  Mr. Savage.
16      Q.  Is it Mr. Savage's responsibility to keep
17  the time on the public comments?
18      A.  Yes.
19      Q.  All right, I want to show you a portion of
20  the August 24th meeting, a portion of the videotape of the
21  August 24th meeting.  But because of the exigencies
22  of technology it will take me a minute to do that.
23  In the meantime were you aware that the August 24th
24  the Board meeting was videotaped?

Page 211

1      A.  Was I aware?
2      Q.  Yeah.
3      A.  Yes.
4      Q.  At whose direction was it videotaped?
5      A.  Lois Hobbs as far as I know.
6  Superintendent Lois Hobbs.
7      Q.  It was not the practice of the
8  superintendent or the Board to videotape its
9  meetings?
10      A.  That is correct.
11      Q.  Do you know why Mrs. Hobbs decided to
12  videotape the August 24th meeting?
13      A.  I can't answer that.
14      Q.  Did you ever ask her?
15      A.  No.
16      Q.  It is the practice of the Board to
17  audiotape all of its meetings, correct?
18      A.  Yes.
19      Q.  And the reason for that among other reasons
20  is that it enables the secretary to be clear about
21  what happened when she goes to write the minutes?
22      A.  Yes, who says what, who does what, yes.
23      Q.  Do you know whether the August 24th meeting
24  was audiotaped?

Page 212

1      A.  To the best of my knowledge it was.
2      Q.  Have you ever heard anyone tell you that it
3  was not audiotaped?
4      A.  Not that I recall.
5      Q.  Let me play a portion of the public
6  commentary and then I have some questions for you.
7          MR. ALLINGHAM:  Before I do that,
8      do you have some --
9          MR. GOSSELIN:  Question, is this
10      being, I just want to ask the court
11      reporter, are you taking down what is being
12      said on this?
13          Well, I am going to ask the court
14      reporter, if you are unable to write down
15      what is being said on this videotape that
16      you just let us know.
17          MR. ALLINGHAM:  Well, before we do
18      that, do you have some application if the
19      court reporter is unable to write down
20      what's said on the videotape?
21          MR. GOSSELIN:  Well, if he can't
22      write down what's being said and you are
23      asking Mr. Bireley to react to it we are
24      not going to have a complete record because

Page 213

1      he reacting to something on the record that
2      isn't in the record.
3          MR. ALLINGHAM:  All right, I
4      will mark as an exhibit the CD that
5      contains, the DVD that contains this video
6      at the conclusion of this line of
7      questioning.  We will also identify the
8      time when this video is started playing
9      and is finished playing, and I will ask and
10      I can do this now, who it is that is the
11      public speaker at the time so we have a
12      cross check about what portion of the
13      meeting we are showing Mr. Bireley.
14          MR. GOSSELIN:  Okay.
15          MR. ALLINGHAM:  All right, I think
16      that will provide a record that can be
17      reproduced for anyone who wants to see it
18      of what it is that Mr. Bireley was watching
19      when, prior to the time that I asked him
20      questions.
21          MR. GOSSELIN:  That's fine, and
22      I'm not saying that we wouldn't been able
23      to do that otherwise, I just would like to
24      know if it's not being taken down.

54 (Pages 210 to 213)

Dobrich, et al.                                    v.                        Indian River School District, et al.
Charles M. Bireley                        C.A. # 15-120 (JJF)                             October 11, 2006

Page 214

1      MR. ALLINGHAM:  Now, having said
2   that, if the reporter wants the public
3   statement that is being made on this tape,
4   can take down what is being said, that
5   would be helpful as well, but if you can't
6   you can't.  I think it's pretty clear
7   actually, but we will see.
8   Q.   Before we start the video again, do you
9   recognize the person who is standing to make a
10  comment during the public comment session of the
11  August 24 meeting?
12  A.   Yes.
13  Q.   Who is it?
14  A.   Harold Johnson.
15  Q.   Do you know who Mr. Johnson is?
16  A.   He used to be a School Board member.
17  Q.   Did he serve with you on the School Board?
18  A.   Yes.
19  Q.   For many years?
20  A.   Five, six, seven, eight, somewhere in that
21  neighborhood.
22  Q.   Had you spoken to Mr. Johnson before the
23  August 24th meeting about his intention to speak at
24  the meeting?

Page 215

1   A.   No.
2       (AT THIS POINT A DVD WAS PLAYED)
3   Q.   Do you know how long Mr. Johnson spoke
4   before someone mentioned to him that his time was
5   up?
6   A.   No.
7   Q.   Do you know how much longer Mr. Johnson
8   spoke after someone told him that his time was up?
9   A.   No.
10  Q.   Do you think how long Mr. Johnson spoke had
11  anything to do with the substance of his remarks?
12      MR. GOSSELIN:  Objection.
13  A.   I really can't answer that.
14  Q.   Well, let me ask you this question did you
15  understand the reference Madelyn Murray-O'Hare to be
16  a threat against Mrs. Dobrich?
17  A.   I don't know that I thought that that was a
18  threat.  I'm familiar with Madelyn Murray-O'Hare, I
19  mean I know the situation, who she was and all that,
20  but I don't know that he was using that as a threat
21  against her, I hope not.
22  Q.   What was the purpose of raising Madelyn
23  Murray-O'Hare and her disappearance after raising
24  School Board prayer issues if not to threaten Mrs.

Page 216

1   Dobrich?
2       MR. GOSSELIN:  Objection.
3   Q.   Do you have any idea what the purpose might
4   have been?
5   A.   No.
6       MR. GOSSELIN:  Objection.
7   Q.   Did you think it was inappropriate for
8   Mr. Johnson to raise the issue of Madelyn
9   Murray-O'Hare in the charged atmosphere that you
10  heard at that Board meeting?
11      MR. GOSSELIN:  Objection.
12  A.   It wouldn't have been something that I
13  would have done.
14  Q.   If you had been the School Board president
15  and you had heard that would you have banged your
16  gavel and said I'm sorry, I'm sorry in order to
17  maintain order at this meeting I'm going to have to
18  ask you to leave the podium?
19      MR. GOSSELIN:  Objection.
20  A.   Would I?
21  Q.   Yes.
22  A.   Yes.
23  Q.   And that was the right thing to do, isn't
24  it?

Page 217

1       MR. GOSSELIN:  Objection.
2   A.   In my opinion it was.
3   Q.   Mr. Walls did not do that, did he?
4   A.   No, he did not.
5   Q.   Did any of the Board members stand up and
6   say I'm not going to listen to this kind of
7   commentary during our public comment session, it is
8   not orderly, it is not courteous, it is not
9   respectful and it is not the purpose of our public
10  comment section of this meeting?
11      MR. GOSSELIN:  Objection, and I'm
12      not instructing him not to answer, but I
13      think you are getting close to harassing
14      the witness.  We just listened to what
15      happened, now you are asking rhetorical
16      questions about what was on the videotape
17      and you are giving a speech.  I mean, come
18      on.
19      MR. ALLINGHAM:  Can he answer my
20      question?
21      MR. GOSSELIN:  Can you state
22      question again.
23  Q.   Every Board member has a right if they
24  believe that public comment is not being conducted

55 (Pages 214 to 217)

Dobrich, et al.                          v.              Indian River School District, et al.
Charles M. Bireley          C.A. # 15-120 (JJF)                    October 11, 2006

Page 218
1  in an orderly, respectful and appropriate fashion to
2  raise the issue with the chair of the meeting, do
3  they not?
4      A.  They probably do but it's done in a
5  different way.
6      Q.  Did it occur to you as a Board member to
7  say to Mr. Johnson, look this is not what we have
8  our public commentary for?
9      A.  No.
10     Q.  In retrospect do you think it should have
11  occurred to you?
12             MR. GOSSELIN:  Objection.
13     A.  I think that the president should have done
14  that.
15     Q.  Did you hear the laughs of the crowd during
16  the discussion of Madelyn Murray-O'Hare?
17     A.  Yes.
18     Q.  Does that sort of send a chill down your
19  spine as you listen to it now?
20             MR. GOSSELIN:  Objection.
21     A.  Well --
22             MR. GOSSELIN:  Go ahead.
23     A.  I really didn't agree with it the night
24  that it happened, let alone after what I heard

Page 219
1  today.
2      Q.  But my question is a little different.  Did
3  the laughter that accompanied that statement send
4  chills down your spine, either on August 24th or as
5  you listened to it today on the videotape?
6      A.  I can't say it ran chills down my spine.
7  It's something that I didn't approve of, didn't like
8  that it happened, and to re-answer the same question
9  you asked me before, if it had been me sitting there
10  with the gavel I wouldn't have allowed it.
11     Q.  Would you agree with me that that laughter
12  accompanying the Madelyn Murray-O'Hare statement is
13  really disturbing?
14             MR. GOSSELIN:  Objection.
15     A.  It's probably very disturbing to Mrs.
16  Dobrich and her family who was there, I would say
17  yes.
18     Q.  Is it disturbing to you?
19     A.  Yes.
20             MR. ALLINGHAM:  I have
21  nothing further, thank you very much.
22     A.  You are welcome.
23             MS. DUPHILY:  The deposition
24  is ending at approximately 3:20 p.m..

Page 220
1
2                    I N D E X
3
     DEPONENT:    CHARLES BIRELEY        PAGE
4
     Examination by Mr. Allingham        4
5
6
7
                   E X H I B I T S
8
                       MARKED
9
10  No. 32     July 19, 1994 minutes      35
11  No. 33     March 28, 1972 minutes     54
12  No. 34     Six sheet fax 9/2/04      107
13  No. 35     Prayer            144
14  No. 36     News release 8/19/04      169
15  No. 37     News article 1/4/2006     188
16  No. 38     News article Coastal Point  191
17  No. 39     News article 7/6/2006     195
18
19
20
21
22
    ERRATA SHEET/DEPONENT'S SIGNATURE    PAGE 221
23
24  CERTIFICATE OF REPORTER        PAGE 222

Page 221

REPLACE THIS PAGE WITH ERRATA SHEET

56 (Pages 218 to 221)

Dobrich, et al.                          v.              Indian River School District, et al.
Charles M. Bireley              C.A. # 15-120 (JJF)                   October 11, 2006

Page 222

1
2
                    CERTIFICATE OF REPORTER
3
            I, David A. Sroka, Registered Professional
4    Reporter and Notary Public, do hereby certify that
     there came before me on October 11, 2006, the
5    deponent herein, CHARLES BIRELEY, who was duly sworn
     by me and thereafter examined by counsel for the
6    respective parties; that the questions asked of said
     deponent and the answers given were taken down by me
7    in Stenotype notes and thereafter transcribed by use
     of computer-aided transcription and computer printer
8    under my direction.
9
            I further certify that the foregoing is a
10   true and correct transcript of the testimony given
     at said examination of said witness.
11
12          I further certify that reading and signing
     of the deposition were not waived by the deponent
13   and counsel.
14          I further certify that I am not counsel,
     attorney, or relative of either party, or otherwise
15   interested in the even of this suit.
16

17          _____
            David A. Sroka, RPR
            Certification No. 259-RPR
18          (Expires January 31, 2008)
19
20
21
     DATED: _____
22
23
24

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477