Dobrich, et al.
Donald Hattier

v.

C.A. # 15-120 (JJF)

Indian River School District, et al.
October 10, 2006

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF DELAWARE

3

4    MONA DOBRICH and MARCO DOBRICH, individually and
     as parents and next friend of ALEXANDER DOBRICH,

5    SAMANTHA DOBRICH, JANE DOE and JOHN DOE,
     individually and as parents and next friend of

6    JORDAN DOE and JAMIE DOE,

7                          Plaintiffs

8         vs.                              Civil Action
                                           No. 15-120

9

10   INDIAN RIVER SCHOOL DISTRICT, ET AL.,

11                         Defendants

12

13        DEPOSITION OF DONALD HATTIER, taken at the
     Indian River School District, 31 Hosier Street,

14   Selbyville, Delaware beginning at 9:36 a.m. on
     October 10, 2006 before David A. Sroka, Registered

15   Professional Reporter and Notary Public.

16

     APPEARANCES:

17

18           THOMAS ALLINGHAM, ESQUIRE
             RICHARD HORVATH, ESQUIRE

19           BRIAN LENHARD, ESQUIRE
             P.O. Box 636

20           Wilmington, Delaware  19899-0636
             For the Plaintiffs

21

22

                   WILCOX & FETZER

23       1330 King Street - Wilmington, DE  19801
                   (302) 655-0477

24             www.wilfet.com

Dobrich, et al.                                                Indian River School District, et al.
Donald Hattier                    v.                           October 10, 2006
                          C.A. # 15-120 (JJF)

Page 2

```
 1
 2
 3      JASON P. GOSSELIN, ESQUIRE
        Drinker Biddle & Reath LLP
 4      One Logan Square
        Philadelphia, Pennsylvania 19103-6996
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 3

```
 1          MS. DUPHILY:  This is the
 2   videotape deposition of Dr. Donald G.
 3   Hattier taken by the Plaintiff in the
 4   matter of Dobrich, et al., versus Indian
 5   River School District, et al., case number
 6   15-120.  This deposition is taking place at
 7   31 Hosier Boulevard, Selbyville, Delaware.
 8   We are going on the record on October 10,
 9   2006 at approximately 9:37 a.m.
10          The court reporter is David Sroka
11   from the firm of Wilcox & Fetzer,
12   Wilmington, Delaware.  My name is Lindsay
13   duPhily I'm the videotape specialist of
14   Discovery Video Services in association
15   with Wilcox & Fetzer.
16          Counsel will now introduce
17   themselves and then the court reporter will
18   swear in the witness.
19          MR. ALLINGHAM:  Tom Allingham of
20   Skadden Arps.  With me is Rick Horvath and
21   Brian Lenhard also of Skadden Arps,
22   representing the Plaintiffs.
23          MR. GOSSELIN:  Jason Gosselin of
24   drinker Biddle & Reath representing the
```

Page 4

```
 1   defendants.
 2               DONALD HATTIER,
 3      The Witness herein, called for examination by
 4   the Plaintiffs, having been duly sworn to tell the
 5   truth, the whole truth, and nothing but the truth,
 6   was examined and testified as follows:
 7               MR. ALLINGHAM:  Jason, I just want
 8         to put a couple of things on the record.
 9         The first one is, it is my impression that
10         you are not going to be interrupting
11         this deposition very much, but I want you
12         to know that if you want to make relevance
13         objections feel free.  I'm not going to
14         accept invitations to explain the relevance
15         of my questions, I think that they are
16         relevant.
17   Q.     Mr. Hattier, I represent the Plaintiffs in
18   this action against the district and I'm going to be
19   asking you some questions.  If you don't understand
20   anything that I ask please tell me, don't answer the
21   question.  If you do answer it the judge and
22   ultimately even the jury will probably assume that
23   you did understand it, so if you do have a problem
24   with a question cut me off at the pass now, okay?
```

Page 5

```
 1   A.   Yes, sir.
 2               MR. GOSSELIN:  Can I respond?  I
 3         appreciate the instruction to me, I'm going
 4         to follow the rules and if I have an
 5         objection to the form I will say objection.
 6         If there is a reason that I think Dr.
 7         Hattier should not answer I will instruct
 8         him not to answer.  There is a Discovery
 9         order in the case the prescribes what the
10         subject matter of discovery is in this case
11         and obviously I think that a questioner
12         should get leeway, but if it goes far
13         afield my -- I won't ask you to explain the
14         relevance of your questioning, but there
15         might come a point where we think that we
16         are straying into territory that goes
17         beyond the court's order.
18         So --
19               MR. ALLINGHAM:  Understood.
20   Q.   Dr. Hattier, when we were off the record
21   you asked the videographer to identify you as Dr.
22   Hattier, that's the way you prefer to be addressed?
23   A.   Yes, sir, please for the purposes of a
24   professional situation.
```

2 (Pages 2 to 5)

Dobrich, et al.                                    v.                          Indian River School District, et al.
Donald Hattier                           C.A. # 15-120 (JJF)                              October 10, 2006

Page 6

1  Q.  Have you been deposed before?
2  A.  Yes, sir.
3  Q.  How many times?
4  A.  Somewhere between 18 and 22.
5  Q.  Well, we can cut that down to 19, 20 or 21
6  then, right?
7  A.  The last time I did an official deposition
8  was about five years ago went I decided I no longer
9  wanted to do personal injury or Workman's Comp work
10  in my practice.
11  Q.  Could you tell me do all the depositions
12  fall into the same basic category?
13  A.  In what sense, sir.
14  Q.  Subject matter?
15  A.  Yes, sir.
16  Q.  Was it that category?
17  A.  Chiropractic expert witness.
18  Q.  You and I both seems to have a tendency
19  that I can identify already of trampling on each
20  other. We need to wait, I will wait for you to
21  finish you need to wait for me to finish so that the
22  reporter can get everything that each of us says?
23  A.  Yes, sir.
24  Q.  And I'm sorry, would you just give me the

Page 7

1  answer again?
2  A.  Okay, I have been deposed several times as
3  an expert witness in chiropractic.
4  Q.  Were all of those deposition given in
5  Sussex County?
6  A.  No, sir I gave several of them in
7  Salisbury, one in Snow Hill and remainder of them
8  would have been in Sussex County to the best of my
9  recollection.
10  Q.  And in giving your testimony as an expert
11  witness in chiropractic did you offer that testimony
12  in support of plaintiffs or defendants or both?
13  A.  Both.
14  Q.  The contacts for serving as an expert
15  witness did those come from attorneys?
16  A.  Yes, sir.
17  Q.  And was it one attorney or more than one
18  attorney?
19  A.  It was more than one attorney, sir.
20  Q.  Have you ever testified at trial?
21  A.  I can specifically recall one time at
22  trial, there may have been two.
23  Q.  When did those one or two instances take
24  place?

Page 8

1  A.  Approximately 1991 or 1992.
2  Q.  Is that in the Superior Court of the State
3  of Delaware?
4  A.  The time that I testified in a court was in
5  Salisbury, whatever the designation of that court
6  happens to be.
7  Q.  Who was the lawyer with whom you were
8  working on that case?
9  A.  I do not recall at this time.
10  Q.  You said that you no longer do Workers'
11  Comp in your practice as a chiropractor, is that
12  right?
13  A.  I will take a Workers' Comp case if a
14  patient seeks me out. I do not actively recruit
15  them anymore. Frankly I just found it be a type of
16  a work that I didn't enjoy very much.
17  Q.  I take it from your previous answer that
18  you formerly sought out Workers' Comp cases?
19  A.  Yes, sir.
20  Q.  And why is it that you don't enjoy those
21  cases very much?
22  A.  Quite frankly I didn't like being deposed
23  and going to court.
24  Q.  That's a common complaint?

Page 9

1  A.  Yes, sir.
2  Q.  Has a judge or other judicial officer
3  arbitrator or whatever ever questioned the truth or
4  veracity of your testimony?
5  A.  No, sir.
6  Q.  I should have asked you this earlier, are
7  you taking any medications today that would prevent
8  you from giving full and comprehensive answers?
9  A.  No, sir.
10  Q.  Can you think of any reason why you
11  wouldn't be able to handle my questions truthfully?
12  A.  None that I think of, sir.
13  Q.  Have you spoken with anyone, and I want to
14  break this out, other than your attorneys in this
15  case about this litigation?
16  A.  I have spoken with my fellow Board members.
17  I have spoken in general terms with members of the
18  public who asked for information on it, and I have
19  spoken with my attorney. And my wife and I have
20  discussed it at various times. I do try to keep my
21  responses to the general public to those things that
22  we have been allowed to discuss by the judge.
23  Q.  Have you — I'm sorry, what do you mean by
24  you have been allowed to discuss by the judge?

3 (Pages 6 to 9)

Page 10

1　A.　If I recall correctly Judge Farnan has at
2　one time put a gag order on us in terms of what we
3　could discuss and what we couldn't and we did abide
4　by that gag order.
5　Q.　We being the Board members?
6　A.　Let me take that back, I'm speaking for
7　myself, me being me.
8　Q.　In a case like this where we have you know
9　multiple Board members, the frequent habit of
10　referring to ourselves as we is on that would be
11　helpful for clarity sake if you could avoid and just
12　refer to I or me?
13　A.　Yes, sir.
14　Q.　All right, so as you understood it there
15　was a gag order imposed by Judge Farnan?
16　A.　Yes, sir.
17　Q.　Who told you it was a gag order?
18　A.　I believe it was the original two Johns
19　that had sent our some material and then I heard
20　about it through some of the fellow Board members
21　when we discussed it.
22　Q.　And the Johns was Mr. Balliger and
23　Mr. Cafferty?
24　A.　Yes, sir.

Page 11

1　Q.　Did they describe that order to you as a
2　gag order?
3　A.　That's essentially how it came across, yes.
4　Q.　Well, my question was did the use the word
5　gag order?
6　　　　　MR. GOSSELIN:　Objection and don't
7　　　　answer that.　I think this is --
8　　　　　MR. ALLINGHAM:　I will withdraw
9　　　　the question.
10　　　　　MR. GOSSELIN:　Thank you.
11　Q.　All right, your discussions with other
12　Board members, did those take place only in Board
13　meetings or did you also speak with them outside of
14　Board meetings?
15　A.　We have also spoken outside of Board
16　meetings.
17　Q.　Is that a frequent occurrence?
18　A.　I wouldn't describe it as frequent.　We
19　don't get together as a rule and we don't call each
20　other that much.
21　Q.　Can you recall individual instances outside
22　of Board meetings where you have discussed this
23　litigation with other Board members?
24　A.　Specific details?

Page 12

1　Q.　Yes.
2　A.　No, sir.
3　Q.　Members of the public with whom you've
4　spoken about this litigation, can you identify any
5　of them?
6　A.　I've had a multiple series of phone calls
7　from people expressing support for our position.　We
8　have had a few who have expressed lack of support
9　for the position.　If I went back over my notes I
10　could probably come up with one or two specific
11　individuals.　I mean --
12　Q.　Were these limited to phone calls or did
13　you also get e-mails and/or personal encounters with
14　the public?
15　A.　Yes, sir.
16　Q.　That is to say it was limited to phone
17　calls?
18　A.　No, it's all of the above.
19　Q.　Okay, great.　You referred in your earlier
20　answer to if you went back over your notes you could
21　perhaps identify specific instances of contact with
22　the public?
23　A.　It's possible.
24　Q.　Do you keep notes of your contacts with the

Page 13

1　public regarding School Board matters?
2　A.　I keep a general series of notes as part of
3　a day timer system that I use to organize my office
4　and my private life, and there are sometimes where
5　I'm more specific in my entries than others.　And
6　it's not related to just School Board things, it's
7　if you get really busy you write them all down.　I'm
8　not an attorney in that sense, I don't log
9　everything.
10　Q.　Have you reviewed those notes to see
11　whether any of the notes in that system would be
12　responsive to the production request in this case?
13　A.　No.
14　Q.　Have you been used to review those notes?
15　A.　No.
16　　　　　MR. ALLINGHAM:　I call Jason for
17　　　　production of those notes.
18　　　　　MR. GOSSELIN:　Is that, what is
19　　　　that?
20　　　　　MR. ALLINGHAM:　It's a production
21　　　　request directed to documents that seam
22　　　　clearly to be responsive to certain
23　　　　requests made in the production request.
24　　　　　MR. GOSSELIN:　I mean, we can talk

4 (Pages 10 to 13)

Case 1:05-cv-00120-JJF    Document 250-7    Filed 04/10/2008    Page 5 of 86

Dobrich, et al.                                    Indian River School District, et al.
Donald Hattier          v.                         October 10, 2006
                        C.A. # 15-120 (JJF)

Page 14

1  afterward about which request you think it
2  would respond to, and we can also talk
3  about the objections that we asserted to
4  those requests.
5        MR. ALLINGHAM:  That's fine with
6  me and we don't need to do this on the
7  record, what I'm going to do during the
8  course of these depositions, if I identify
9  or the witness identifies documents that
10 I believe are responsive I will simply note
11 them for the record and I will be happy
12 to talk about them afterwards.
13 Q.   When you referred to those notes of
14 conversations with the public are you aware of any
15 specific notes that do, are reflected on your
16 daytimer system I think it was?
17 A.   Yes, sir.
18 Q.   Are you aware of any specific notes that
19 are reflected on the daytimer system reflecting
20 conversations with the public about this litigation?
21 A.   **The notes that I do take would be related**
22 **to who called. I generally do not take notes of**
23 **what it is we discussed.**
24 Q.   Okay.  You said that you discussed this

Page 15

1  litigation with your wife, is that a sort of an
2  ongoing practice of discussing it with your wife?
3  A.   **My wife can tell that there are times when**
4  **things weigh on me, and you know, we sit down and we**
5  **will discuss things.**
6  Q.   Your wife's name is Laura?
7  A.   **That is correct.**
8  Q.   Have you discussed this litigation or any
9  aspects of it with the rest of your family?
10 A.   **I believe my children have been privy to**
11 **some of the discussions at the dinner table.**
12 Q.   Do you know who the Doe family is?
13 A.   **I believe that I do, yes, sir.**
14 Q.   Have you made any efforts to confirm the
15 identity of the Doe family?
16 A.   **No, sir.**
17 Q.   Have you asked your wife to inquire about
18 the identity of the Doe family in any way directly
19 or indirectly?
20 A.   **No, sir.**
21 Q.   Have you asked your wife to inquire about
22 the identity of the Doe family in any way directly
23 or indirectly?
24 A.   **No, sir.**

Page 16

1  Q.   Have you asked your children to inquire
2  about the identity of the Doe family directly or
3  indirectly?
4  A.   **No, sir.**
5  Q.   Are you aware that your children have
6  inquired of members of the Doe family whether they
7  are the Doe family?
8  A.   **I am not aware of any such conversations.**
9  Q.   Would that surprise you?
10 A.   **Children are curious, maybe not.**
11 Q.   Have you had discussionis with among your
12 family about who the Doe family might be?
13 A.   **Early on we did have a discussion about it,**
14 **and that would have been with my wife.**
15 Q.   So you are not aware of any discussion in
16 your family with your children as to the Doe family
17 members are?
18 A.   **No, sir.**
19 Q.   Did you prepare for this deposition?
20 A.   **In what sense, sir.**
21 Q.   Did you meet with your attorneys before?
22 A.   **Yes, we did, or I did.**
23 Q.   Did you do anything other than meeting with
24 your attorneys to prepare for this deposition?

Page 17

1  A.   **No, sir.**
2  Q.   When did you meet with your attorneys?
3  A.   **I believe it was last Tuesday.**
4  Q.   For how long?
5  A.   **About three hours.**
6  Q.   Did you review any documents?
7  A.   **No, sir. I don't recall, we might have.**
8        MR. GOSSELIN:  We looked at the 30
9  (b)(6) deposition.
10 Q.   I'm sorry, your answer is I don't recall I
11 might have?
12 A.   **I might have, I mean if Mr. Gosselin**
13 **brought something in then we looked at it, but other**
14 **than that no I didn't bring anything in with me,**
15 **neither did I look at anything other than what he**
16 **brought, no.**
17 Q.   You are familiar with the Indian River
18 School District's Board Prayer at Regular Board
19 Meetings Policy?
20 A.   **Yes, sir.**
21 Q.   Did you review that policy at your meeting
22 with your attorney?
23 A.   **Yes, we did.**
24 Q.   Did you review any minutes of meetings at

5 (Pages 14 to 17)

Dobrich, et al.                                      v.                    Indian River School District, et al.
Donald Hattier                          C.A. # 15-120 (JJF)                          October 10, 2006

Page 18

1   which that policy or drafts of the were reviewed by
2   the Board?
3   **A.   I believe we did.**
4   Q.   Did those include both public meeting
5   minutes and executive committee meeting minutes?
6   **A.   I'm not sure we looked at the minutes. We**
7   **discussed the generalities of it, but I don't**
8   **believe we looked at specific minutes of the**
9   **meetings, no.**
10  Q.   When you say you discussed the generalities
11  of it, does that involve looking at a document, or
12  is that simply discussions back and forth with your
13  attorney?
14  **A.   Discussions back and forth between the**
15  **Board members who were present and discussion with**
16  **the attorney.**
17  Q.   The Board members who were present at the
18  preparation session?
19  **A.   Yes, sir.**
20  Q.   With this a preparation session at which
21  multiple Board members were present?
22  **A.   There were three other Board members there.**
23  Q.   Who were they?
24  **A.   It was Greg Hastings, Charlie Bireley,**

Page 19

1   **there was one other, John Evans, was Reggie there,**
2   **no. It was just the four of us, right. I believe**
3   **that's correct.**
4         MR. GOSSELIN:   Whatever you
5         remember.
6   Q.   It's a terrible temptation to ask someone
7   else who was there, but it has to be your
8   recollection?
9   **A.   There might have been five, but I can**
10  **specifically site four.**
11  Q.   And there was a discussion among the Board
12  members about the generalities of the adoption of
13  the School Board Prayer Policy, is that what you
14  were getting at?
15  **A.   Yes, sir.**
16  Q.   In the context of that discussion did you
17  have occasion to try to recall the history of the
18  Board's consideration adsorption of that policy?
19         MR. GOSSELIN: Objection and don't
20         answer that. This was a meeting with
21         lawyers and clients before a deposition. I
22         have no objection to your asking about the
23         fact that the meeting took place, but I
24         object to anything that goes to the

Page 20

1   substance of that. And I don't object to
2   asking what documents he recalls looking
3   at, but beyond that I object to questions
4   about that meeting.
5   Q.   Other than the Board prayer, I'm going to
6   call that policy which is titled Board Prayer at
7   Regular Board Meetings the School Board Prayer
8   Policy, if that's okay?
9   **A.   That's perfect, sir.**
10  Q.   Other than the actual School Board Prayer
11  Policy piece of paper, do you recall any other
12  document that you looked at during that prep
13  session?
14  **A.   No, I do not recall.**
15  Q.   Since the preparation session have you
16  reviewed any documents?
17  **A.   No, sir.**
18  Q.   Other than your attorney and the Board
19  members, whoever they were, who were present at the
20  prep session, was anyone else there?
21  **A.   I believe there were two other attorneys**
22  **present at the time.**
23  Q.   Were the attorneys with whom you met
24  Mr. Gosselin who is to your right today and other

Page 21

1   lawyers in his law firm, Drinker Biddle & Reath?
2   **A.   I believe that to be true.**
3   Q.   Okay. You full name is Donald G. Hattier,
4   is that correct?
5   **A.   Yes, sir.**
6   Q.   And you were born on October 1953?
7   **A.   That is correct.**
8   Q.   Were you born in Delaware?
9   **A.   No, sir.**
10  Q.   Where were you born?
11  **A.   I was born in Triesta, Italy in the 381st**
12  **infantry hospital.**
13  Q.   When did you come to the United States?
14  **A.   In 1962.**
15  Q.   How long have you lived in Delaware?
16  **A.   I was lived in Delaware since February no,**
17  **I have lived her Delaware since approximately March**
18  **of 1990.**
19  Q.   Do you consider yourself a long time
20  resident of Sussex County?
21  **A.   I do, yes, sir.**
22  Q.   Would you agree with me as a general
23  proposition that in Sussex County information and
24  news tends to travel by word of mouth as much as it

6 (Pages 18 to 21)

Case 1:05-cv-00120-JJF    Document 250-7    Filed 04/10/2008    Page 7 of 86

Dobrich, et al.                                          Indian River School District, et al.
Donald Hattier                    v.                              October 10, 2006
                          C.A. # 15-120 (JJF)

Page 22

1   does by newspaper or other formal media?
2   A.   In general terms I think that's probably
3   true.
4   Q.   I asked you earlier about your children,
5   you have two children, is that correct?
6   A.   I have four children, sir.
7   Q.   Four children.  Would you tell me their
8   names?
9   A.   Kristin, age 16, Georgette age 14, Hanna
10  age 11 and Donald age eight.
11  Q.   Do they attend district schools?
12  A.   Yes, sir.
13  Q.   Which schools do they attend?
14  A.   I have two, the oldest two are at Indian
15  River High School at the current time.  Hanna is at
16  Selbyville Middle School and Donald is currently at
17  the Lord Baltimore School.
18  Q.   My information may be a little stale so let
19  me just ask you, is your current address R.D. Box
20  114 Dagsboro?
21  A.   That was the old address before we went
22  911.
23  Q.   So, what's he address now?
24  A.   30682 Holts Landing Road.

Page 23

1   Q.   How long have you lived there?
2   A.   Since March of 1990.
3   Q.   So, you were 27 when you moved her, 26, 27,
4   mid 20s?
5   A.   No, 30, 1990, 1953, 37, 36, 37, somewhere
6   in there.
7   Q.   I'm sorry, right.  Where did you attend
8   college?
9   A.   I attended at the Virginia Polytechnic
10  Institute State University, currently known as
11  Virginia Tech.
12  Q.   And when did you graduate?
13  A.   1975.  That was for my Bachelor's in
14  Science.
15  Q.   I assume you have some kind of MD degree?
16  A.   I have a Chiropractic Degree, that's know
17  as a DC, Doctor of Chiropractic and that's from  the
18  National College of Chiropractic and I graduated
19  there in December of 1985.
20  Q.   I assume that you didn't go straight to
21  chiropractic school?
22  A.   No, sir.
23  Q.   What did you do in-between?
24  A.   In-between I ran a McDonald's for two and a

Page 24

1   half years, I went to work for the State of Virginia
2   in a power plant as a superintendent and a steam
3   fitter, I taught motorcycle safety at the Northern
4   Virginia Community College for a number of years,
5   and in the process injured my spine several times.
6   Then I was hired by IBM to work as what was called a
7   customer engineer on fixing typewriters, mag cards,
8   copiers and it was through that time period that I
9   was teaching motorcycle safety and my spine kept
10  acting up.  I was slated for surgery for a sciatica
11  case and basically discovered chiropractic.  I'm
12  single, I'm age 29, I sell my townhouse, my Cadillac
13  I go back do college.
14  Q.   And you are employed now as a chiropractor?
15  A.   Yes, sir.
16  Q.   Self-employed?
17  A.   Yes, sir.
18  Q.   Is there a name of the practice or is it
19  simply Dr. Donald G. Hattier?
20  A.   My sister and I recently formed loose
21  partnership, we call ourselves the Beach View Health
22  Associates.  Previous to that it was the Beach View
23  Chiropractic Center.
24  Q.   Where is your office located?

Page 25

1   A.   550 Atlantic Avenue in Millville, Delaware.
2   Q.   I'm speaking financially now, Dr. Hattier,
3   how much has this litigation cost you personally?
4   A.   I don't know.
5   Q.   Are you aware of any expenses that this
6   litigation has caused you to incur?
7   A.   A general answer would be at various times
8   off from work to attend meetings, but my schedule is
9   somewhat flexible so again I don't know what to say
10  to that.
11  Q.   How much has this lawsuit cost the
12  district?
13  A.   That's a good question, I don't know.
14  Q.   Is that a fact that you would consider
15  important in weighing the considerations that you
16  gave in adopting the School Board Prayer Policy.
17          MR. GOSSELIN:  Objection, don't
18      answer that.  That goes beyond the
19      discovery order that the judge entered.
20          MR. ALLINGHAM:  I disagree.
21  Q.   In considering the adoption of the School
22  Board Prayer Policy did you consider the costs of
23  litigation that would ensue if the policy were not
24  adopted?

7 (Pages 22 to 25)

Dobrich, et al.                              v.                    Indian River School District, et al.
Donald Hattier                    C.A. # 15-120 (JJF)                        October 10, 2006

Page 26

1          MR. GOSSELIN: Objection, don't
2     answer that.
3     Q.    In considering the School Board Prayer
4     Policy and its adoption, did you consider the costs
5     that would be avoided if it were not adopted?
6          MR. GOSSELIN: Object, same
7          instruction.
8     Q.    Was that a matter of irrelevancy to you?
9          MR. GOSSELIN: Objection, don't
10    answer it.
11    Q.    Have you discussed with anyone how the
12    School Board or the district will pay it's costs of
13    this litigation if the district's insurance carrier
14    does not have to pay the legal fees?
15         MR. GOSSELIN: Objection, don't
16         answer that. Tom, I've got patience, it's
17         early in the morning, but we have been here
18         for half an hour. I don't mind the
19         background, you are entitled to do that,
20         but all of these other -- if we are going
21         to spend six hours asking questions on
22         topics that the judge has already ruled as
23         not relevant in this phase of discovery and
24         perhaps not relevant at all, we might as

Page 27

1     well stop now.
2          MR. ALLINGHAM: My goal in
3     suggesting to you that I suspect that
4     you and I disagreed about the scope
5     of relevance was to urge you to be
6     precisely what you suggested you would do,
7     which is to lodge an objection without a
8     speech and then if you think that the
9     questions have become a pattern or practice
10    of harassment, which I don't think that
11    they will, to take what steps you need to
12    take. It's pointless for us to engage in
13    speechifying back and forth and I think we
14    will go faster if we don't.
15    Q.    Are you aware of any donations take the
16    district, the School Board, or the School Board
17    members have received to finance their defense of
18    this litigation.
19         MR. GOSSELIN: Objection, don't
20    answer that.
21    Q.    You mentioned earlier that you had had
22    comments from the public about the School Board's
23    position vis a vis this litigation, correct?
24    A.    Yes, sir.

Page 28

1     Q.    And you mentioned that some were in favor
2     and I think you said a lesser number were opposed to
3     the Board's position generally?
4     A.    Yes, sir.
5     Q.    And does it matter to you what your
6     constituents think in these areas?
7     A.    I would say yes it does.
8     Q.    And tell me what consideration you gave to
9     your constituencies' expressed views on the matters
10    addressed in this litigation?
11    A.    I listened to what they had to say on both
12    sides of the issue. And ultimately it boils down to
13    my own conscience which is what I tend to go with.
14    Q.    During the course of it consideration and
15    adoption of the School Board Prayer Policy, did you
16    or your fellow Board members have discussions of
17    that issue, that is what impact the views of your
18    constituencies should have on your consideration of
19    the Board Prayer Policy?
20    A.    There may have been some general
21    discussions regarding that. I believe that the
22    generally accepted viewpoint was that this is
23    something that folks in our area would strongly
24    support.

Page 29

1     Q.    And was there a discussion how -- strike
2     that.
3          How was that general consensus identified?
4     Was there polling, was there anecdotal evidence, how
5     did you arrive at that --
6     A.    I think probably anecdotal evidence based
7     on the familiarity we have with the people in the
8     community. This is still a fairly small community
9     compared to a lot of other places.
10         And I think virtually all of the Board
11    members know a lot of people in the public, you
12    know, it's not like being in Wilmington or where my
13    family is in Faifax County, Virginia. This is not
14    that kind of an environment.
15    Q.    So you sense is that the Board members
16    collectively know most of the people in the
17    district?
18    A.    A good chunk of them, yes, sir.
19    Q.    What's a good chunk?
20    A.    I'd say a good 15, 20, 30, 40 percent
21    depending on how long they've been here.
22    Q.    A good 15, 20, 30, 40 percent depending on
23    how long they've been here. Let me break that down
24    a little bit. Depending on how long they have been

8 (Pages 26 to 29)

Case 1:05-cv-00120-JJF    Document 250-7    Filed 04/10/2008    Page 9 of 86

Dobrich, et al.                              v.              Indian River School District, et al.
Donald Hattier                       C.A. # 15-120 (JJF)                  October 10, 2006

Page 30

1  here, refers to the residents of the district or the
2  Board members?
3  A.  The Board members.
4  Q.  Okay, my question earlier had to do with
5  collectively, not individually, but collectively is
6  it your view that the Board members are acquainted
7  with a majority of the residents of the district?
8           MR. GOSSELIN: Objection.
9  You can answer that one.
10  A.  I'm speculating, I'm speculating when you
11  use the word majority, I would have to say probably.
12  Certainly based on the votes that have happened in
13  the past.
14  Q.  Certainly based on the votes that happened
15  in the past, could you spin that out for me what you
16  mean?
17  A.  Sure, the people who have run for elections
18  on various platforms and how the numbers come out
19  with those, and a lot of times the margins are
20  fairly wide.
21  Q.  That's a different question from how many
22  residents of the district Board members are
23  acquainted with?
24  A.  Uh-hum.

Page 31

1  Q.  When I asked you how you formed the view
2  that your constituents, your constituents, the
3  general consensus was that they supported the Board
4  policy, you identified as the means by which that
5  consensus was identified, the Board members general
6  acquaintance with the residents of the district do
7  you recall that?
8  A.  Yes, sir.
9  Q.  And what I'm trying to get at now is, is
10  your view about how many of those residents the
11  Board members collectively are really acquainted
12  with. So, let me just ask some preliminary
13  questions. How many residents are there in the
14  Indian River School District?
15  A.  I don't know.
16  Q.  Well, let me ask you this question, how
17  many residents of the Indian River School District
18  do you believe you know well enough to be confident
19  that you know their views on the Board's positions
20  in this litigation?
21           MR. GOSSELIN: Objection.
22  Q.  Unless you are instructed not to answer you
23  can answer.
24  A.  Okay. Being a practicing chiropractor in

Page 32

1  the area, and knowing my patient base of about 6,000
2  people give or take, and having talked to a lot of
3  people over a lot of time periods, can I quantify
4  every single one of them, no, but having talked to a
5  multiplicity of people of people, reading the
6  editorials in the newspaper, what you hear on the
7  street, what you hear through church forums, I would
8  say several thousand.
9  Q.  You feel confident that you know the views
10  of several thousand residents of the district on the
11  positions that the Board has taken in this
12  litigation?
13  A.  Within those areas where my influence would
14  reach. The Indian River School District is broken up
15  into five different regions, I'm region four. And
16  that's the ones that I can comment on because that's
17  where my patient base and where most of the people
18  that I come into contact with would be.
19  Q.  You mentioned the vote of constituents on
20  particular Board members?
21  A.  Uh-hum.
22  Q.  Spin that out for me a little bit, how does
23  that help you know what the consensus is in the
24  district on the matters that are the subject of this

Page 33

1  litigation?
2  A.  I know that in the last election in
3  specific it had come up as an issue. It was also an
4  issue when I ran the last time, and the vote in
5  favor of me at that time was roughly two to one in
6  favor of my position. With Mr. Bireley when he
7  recently ran the vote was a little bit closer, I
8  think he had 1300 to roughly 1000, and it was highly
9  motivated and I believe this was part of the factor
10  in the last two elections.
11      I believe that if you look at the races
12  that were up in the Georgetown area that it was
13  probably a factor up there as well.
14  Q.  Is it your sense that the vote in the
15  recent election in which Mr. Bireley prevailed was
16  representative of the positions of the constituents
17  who voted on the School Board prayer issue?
18           MR. GOSSELIN: Objection.
19  A.  I believe it was one of the factors. There
20  were other issues with that particular election as
21  well.
22  Q.  All right, you identified that election as
23  one of the factors that led you to conclude that the
24  constituents' views are supportive of the Board's

9 (Pages 30 to 33)

Dobrich, et al.                           v.                Indian River School District, et al.
Donald Hattier                    C.A. # 15-120 (JJF)              October 10, 2006

Page 34

1  positions here, tell me how you evaluated that
2  election as one piece of evidence for that
3  consensus?
4              MR. GOSSELIN: Objection.
5      A.    By reading the editorials, by listening to
6  what the folks on the talk radio were talking about,
7  by what I heard in the community and then basically
8  by the vote itself. As I stated, there were other
9  issues at that time, too. I don't believe that any
10  of the elections here are single issue elections,
11  but I do believe that it played an important part in
12  what it was.
13     Q.    Well, by way of example, did Mr. Bireley
14  campaign on the School Board Prayer Policy issue?
15     A.    Not to my knowledge.
16     Q.    Are you aware that Mr. Bireley and persons
17  representing Mr. Bireley visited senior centers in
18  Sussex County and during those visits said that they
19  should be voted for because they are for prayer and
20  they are fighting the ACLU in court?
21              MR. GOSSELIN: Objection.
22     A.    I'm not aware of that, no.
23     Q.    You never heard that?
24     A.    No.

Page 35

1      Q.    Of course he is in a different district
2  than you are?
3      A.    No, he's in my district.
4      Q.    So, you didn't hear anything about that
5  despite the fact that you are in the same district?
6      A.    I didn't hear anything about that.
7      Q.    This is the district where you have your
8  finger on the pulse of the constituency?
9              MR. GOSSELIN: Objection.
10     A.    You know, you are using the word finger on
11  the pulse of the constituency but I will tell you
12  that I hear from different people than Mr. Bireley
13  does.
14     Q.    All right, in formulating your view that
15  the majority of your constituency supports the
16  Board's positions have you considered donations that
17  have come into the Board for the defense of this
18  litigation?
19              MR. GOSSELIN: Objection, don't
20       answer that.
21     Q.    Do you consider that the district as
22  fighting the ACLU in this litigation?
23              MR. GOSSELIN: Objection, don't
24       answer that.

Page 36

1      Q.    What is your understanding, if any, about
2  the connection between the ACLU and the Plaintiffs'
3  side of this litigation?
4      A.    My understanding is that the Plaintiffs
5  went to the ACLU for support, as well as pro bono
6  help.
7      Q.    Where did you get that understanding?
8      A.    Basically because that's what people do
9  when they are in this situation and they need
10  somebody else to turn to.
11     Q.    That's what people do, being they go to the
12  ACLU?
13     A.    Yes, sir.
14     Q.    And what is the situation that would lead
15  people to turn to the ACLU?
16     A.    If individuals feel they have a case in
17  certain areas the ACLU is known to defend and
18  litigate in this type of a situation. That's my
19  general understanding.
20     Q.    And what is this type of case you are
21  talking about?
22     A.    First Amendment freedoms.
23     Q.    And I'm sorry I may be summarizing
24  incorrectly, so forgive me if I am, sometimes I lose

Page 37

1  track of things?
2      A.    Me, too.
3      Q.    It is your understanding that the
4  Plaintiffs went to the ACLU for help and then
5  retained pro bono counsel, if any?
6      A.    That is my understanding.
7      Q.    Okay. Let me pose a more specific question
8  then. What is your understanding about the ACLU's
9  ongoing connection with the litigation post
10  retention of pro bono counsel, if any?
11     A.    My understanding is that the ACLU would be
12  guiding them, providing the counsel and basically
13  running the case. I'm not an attorney so I do not
14  understand the intricacies of running a case like
15  this.
16     Q.    And where did you get that understanding?
17     A.    Reading the newspapers, listening to what's
18  on the radio, just understanding how the ACLU
19  generally does these kind of cases based on what
20  I've read in the past.
21     Q.    You understand that the ACLU has been made
22  an important part of the dialogue on this litigation
23  and the positions that the Board has taken in
24  connection with this litigation, correct?

10 (Pages 34 to 37)

Dobrich, et al.                                                    v.                    Indian River School District, et al.
Donald Hattier                                         C.A. # 15-120 (JJF)                              October 10, 2006

Page 38

1    A.    Rephrase that please?
2                MR. GOSSELIN: Objection.
3    Q.    I'm trying to among all the people who have
4    spoken up in print, to you personally, a significant
5    portion of them have commented negatively or maybe
6    positively on the ACLU's connection to this
7    litigation, correct?
8    A.    I'd say that's a fair statement.
9    Q.    Are you concerned at all that the consensus
10   that you've identified among your constituencies is
11   affected by the ACLU's connection to this lawsuit?
12               MR. GOSSELIN: Objection.
13   A.    No.
14   Q.    And is that because you are confident that
15   the ACLU is in fact connected to this lawsuit?
16   A.    No, that's not why.
17   Q.    You just don't care whether people are
18   making their decision based on the ACLU's
19   connection?
20   A.    No.
21   Q.    Explain to me why you are not concerned?
22   A.    Because I think that the issue rises beyond
23   the ACLU. I mean they might be the attorneys in
24   this particular case and people can be turned on or

Page 39

1    off by the ACLU and I know the ACLU has a number of
2    supporters and I believe that they have done some
3    very good things in the past and they will probably
4    do some good things in the future, but I think this
5    issue stands or falls regardless of what the ACLU
6    does or doesn't do.
7    Q.    I understand Dr. Hattier that that is your
8    view and I assure you that I do respect it. My
9    question, though, had to do with your concern about
10   the reasons for the development of the consensus
11   among your constituents, that is to say are you
12   worried that they are making their decisions or
13   formulating their positions based in whole or in
14   part on the ACLU's alleged connection to this
15   lawsuit?
16   A.    No, sir.
17   Q.    Why is that it?
18   A.    Because I believe that the people of this
19   area generally, excuse me, genuinely believe that
20   the prayer before School Board meeting as we have
21   outlined it is something that is part and parcel of
22   the fabric of the community that has been going on
23   for many, many years. Congress does it,
24   legislatures do it, it's printed above the halls of

Page 40

1    the Supreme Court and I believe that they view this
2    as simply something that is either right or not, and
3    I don't think that it has much to do with what the
4    ACLU's feelings are.
5            You guys just happen to be the messenger,
6    well not the messenger, you guys just happen to be
7    the ones working with the other side.
8    Q.    You guys being?
9    A.    I'm assuming, sir that you are working with
10   or associated with the ACLU and if that's a false
11   assumption then I would stand corrected.
12   Q.    And you've given me the basis for that
13   assumption already, correct?
14   A.    Well, I'm assuming that I'm assuming that
15   since the ACLU has become involved in the case and
16   you are the attorney working with the Does and the
17   Dobriches that you would be associated with them.
18   And if that's not a valid assuming please correct
19   me.
20   Q.    When you gave your answer about Congress
21   opening its sessions and it being printed above the
22   doors of the Supreme Court what did you mean by the
23   it?
24   A.    Specifically Congress opens with a prayer

Page 41

1    of some sort, or a solemnization procedure and in
2    God we trust is printed in a lot of our public
3    buildings, and I know most legislatures, if not all,
4    have a moment where they solemnize their procedures.
5    So, in this case the use of it word it was perhaps a
6    bit general.
7    Q.    Because what's over the portals of the
8    Supreme Court is different in some way from what
9    Congress opens its sessions with, correct?
10   A.    Correct.
11   Q.    Indeed what Congress opens its sessions
12   with changes every time Congress opens its session,
13   right?
14   A.    The specific prayer solemnization I believe
15   changes each time. But I believe the general idea
16   behind the solemnization that they use is
17   essentially the same.
18   Q.    Fair enough. What you're getting at is
19   Congress regularly seeks somehow to solemnize the
20   opening of its session?
21   A.    That's correct.
22   Q.    And is it your sense that — you seem to be
23   somewhat of a student of this issue, is it your
24   sense that what Congress does is an appropriate way

11 (Pages 38 to 41)

Dobrich, et al.                         v.                 Indian River School District, et al.
Donald Hattier                   C.A. # 15-120 (JJF)              October 10, 2006

Page 42

1  to solemnize its session?
2      A.   I believe that it is something that has
3  been going on in American history since
4  approximately three days after the Constitution was
5  accepted, and I believe that that's something that
6  our founding fathers definitely stood for, and I
7  believe that it is wholly appropriate.
8      Q.   I think I didn't ask my question carefully
9  enough.
10     A.   Okay.
11     Q.   Are you familiar with the prayers with
12  which Congress has opened its sessions, and if so do
13  you believe that those are appropriate ways to
14  solemnize Congress' proceedings?
15             MR. GOSSELIN:  Objection.
16             MR. ALLINGHAM:  On the basis that
17          it's compound, I will be happy to break it
18          up?
19             MR. GOSSELIN:  Yes.
20     Q.   Have you had occasion to look at some of
21  the prayers with which Congress opens its sessions?
22     A.   Occasionally.
23     Q.   And have you seen any such prayer that you
24  thought was an inappropriate way to solemnize the

Page 43

1  proceedings?
2      A.   No, sir.
3      Q.   Did you think that the prayers, at least
4  the one that you looked at, were effective ways to
5  solemnize the proceeding?
6      A.   I believe so.
7      Q.   Where did you find the prayers?
8      A.   Internet.
9      Q.   I'm going to ask the reporter to mark as
10  how shall we do this, Hattier Exhibit 1, a document
11  which bears Bates numbers, it has two Bates numbers.
12  It's a Bates number, a Bates number is a number
13  that's stamped at the bottom of the page, I don't
14  know why they are called Bates numbers, probably
15  some guy names Bates is making lots of money off
16  this.
17     A.   Kind of like the Dewey decimal system.
18     Q.   But, you identify the document by the
19  number so that people can figure out what it was
20  that we were talking about later.
21     A.   That's fine.
22     Q.   A document bearing Bates number
23  IRSD00500581.
24             (WHEREUPON Hattier Exhibit 1 was

Page 44

1          marked for identification)
2      Q.   Would you take a look please at Hattier
3  Exhibit 1?
4      A.   Yes, sir.
5      Q.   Have you ever seen it before?
6      A.   I'm going to say maybe.  We get a lot of
7  things that are faxed in to us in the office which
8  where I receive them, I glance at them.  A lot of
9  cases we pitch them right away.  There is just so
10  much of it.
11     Q.   Okay.  You notice that this is a letter
12  from Mrs. Hobbs to Mr. & Mrs. Jay Widdoes of
13  Wilmington and that the Board of Education is
14  copied.
15     A.   Yes.
16     Q.   You would have been one would have been one
17  of the members of the Board of Education?
18     A.   Yes, sir.
19     Q.   But you just don't recall one way or
20  another whether you got this?
21     A.   No, sir.  Like I said, we get between one
22  and two faxes like this, sometimes I get three a
23  day, sometimes it's one every two or three days and
24  my staff puts the on my desk.  I read them.  If they

Page 45

1  require a response we address them, otherwise I
2  glance at them figuring I will remember it and then
3  pitch them.  We don't have an organized way to save
4  these, there is too many of them.
5      Q.   This letter refers to a donation to help
6  with the litigation of the prayer issue in the
7  Indian River School District and it's a thank you
8  note from Ms. Hobbs the superintendent.
9             Do you know whether Mr. & Mrs. Jay Widdoes
10  in fact made a donation to help with the litigation
11  of the prayer issue in the Indian River School
12  District?
13     A.   I'm going to assume based on the language
14  of the letter that they did.
15     Q.   Do you know whether any other such
16  donations were received and acknowledged in this
17  way?
18     A.   No, sir.
19     Q.   Is there a fund that's been established for
20  the defense of this litigation to which persons can
21  make a donation?
22     A.   My understanding was is that there had been
23  a donation of some type at same time, and that as a
24  result of that a fund had been established.  I do

12 (Pages 42 to 45)

Dobrich, et al.                                          Indian River School District, et al.
Donald Hattier                    v.                                      October 10, 2006
                              C.A. # 15-120 (JJF)

Page 46

1  not know the status of it.
2      Q.   Who is in charge of it, Miss Hobbs?
3      A.   I am going to assume the superintendent or
4  her secretary.
5      Q.   Who is Patrick Miller?
6      A.   Patrick Miller is our finance director.
7      Q.   I guess he could also be the person who is
8  in charge of this fund, right?
9      A.   Patrick Miller being the finance director
10  is the person we lean to in financial areas to make
11  sure that we in compliance with what the state would
12  want us to do.
13     Q.   I'm going to litter your room, but I'm
14  going to pick it up when I'm done.  Do you recall
15  any discussion at the Board level about donations
16  received to assist with the defense of the
17  litigation?
18     A.   It might have been mentioned once.  The
19  specific details, no, I do not.
20     Q.   Do you recall anyone saying well this shows
21  that we have the support of our constituents?
22     A.   More than likely.
23     Q.   Do you consider Mr. & Mrs. Widdoes one of
24  your constituents?

Page 47

1      A.   Not if they are from Wilmington, no, unless
2  they have a summer property down here.  I'm not
3  familiar with them individually, if that's what
4  you're asking.
5      Q.   All right, let me turn.  Let me start on a
6  different topic before we end the tape.  Do you have
7  any e-mail accounts?
8      A.   E-mail accounts, yes, sir.
9      Q.   Do you know how many?
10     A.   I use one main account for home, we use one
11  for the office, we have one on the front desk which
12  is used by the front desk for sending insurance
13  forms and purposes only, maybe three, four.
14     Q.   Have you ever sent or received any e-mails
15  about School Board meetings or the substance of the
16  discussions at School Board meetings?
17     A.   That's a pretty broad question.
18     Q.   It's intended to be.
19     A.   I understand that.  I'm going to say we
20  probably have received e-mails, discussing and
21  sending it back out.  I try to avoid that, you know,
22  sometimes when you write things down and send them
23  out you can put your foot in your mouth fairly
24  easily, and I have put my foot in my mouth on other

Page 48

1  issues and try to avoid that when possible.
2      Q.   Okay, your answer you said I guess we have
3  received, in that case you are talking about I have
4  received?
5      A.   I have received, that is correct, I
6  apologize.
7      Q.   The Internet service provider through which
8  you receive e-mails for each of the e-mails, can you
9  tell me the address and the service provider?
10     A.   For a long time we used a company called
11  splus.net.
12     Q.   And again that we is you?
13     A.   That is me, my apologies?  We in this case
14  would probably refer to the office.
15     Q.   Okay.
16     A.   Verizon.net and MCHSI.com.  I used
17  netzero.net or dot com briefly around the 2000 to
18  2002 time period and I had an account with MSN back
19  in the time period as well but we dropped those
20  many, many moons back.
21     Q.   Okay, so let me just restrict it to say
22  January 2003 forward.  Your e-mail addresses were on
23  either splus net, verizon net or --
24     A.   At that time period strictly splus.

Page 49

1      Q.   Okay and that's the service provider you
2  use today?
3      A.   No, sir.
4      Q.   What do you use today?
5      A.   Verizon and MCHSI.
6      Q.   Okay.  When did you switch over to Verizon
7  and MCHSI?
8      A.   Verizon we switched to for the office in
9  about 2004, give or take.  We had MCHSI briefly in
10  the office at the same time period, discontinued
11  them due to the expense and MCHSI.com at home for
12  probably since about let's say 2004 or 5, even
13  though we did not use their e-mail services until
14  recently.  Everything was filtered through the
15  splus.
16              MR. ALLINGHAM:  We are going to
17       break to change the tape, okay.
18              MS. DUPHILY:  We are going off the
19       record at 10:32 a.m..
20              (WHEREUPON a brief recess was
21       taken)
22              MS. DUPHILY:  we are back on the
23       record at approximately 10:42 a.m..
24     Q.   Just to return to something discussed in

13 (Pages 46 to 49)

Dobrich, et al.                                    v.          Indian River School District, et al.
Donald Hattier                          C.A. # 15-120 (JJF)                    October 10, 2006

Page 50

1  the first hour, the Bireley Wilson election in
2  whenever it was February or March is it your sense
3  that the vote in that election roughly represents
4  the position of the constituents in the fourth
5  district on the issue of School Board prayer?
6          MR. GOSSELIN: Objection.
7     A.   In the sense that the proportion of the
8  voters who voted for Mr. Bireley versus Mrs. Wilson,
9  excuse me, Dr. Wilson reflect the breakdown within
10  the community, no I do not. I believe you had some
11  very long term family friend and social
12  relationships that played a role in that vote. I
13  believe that the prayer position issue played part
14  of it, but I'm not sure that that was the entire
15  matter.
16     Q.   The long term friend issue, which way did
17  that cut, did that get Dr. Wilson more votes or did
18  that get Mr. Bireley more votes?
19          MR. GOSSELIN: Objection.
20     A.   My personal feeling, okay, and this is pure
21  speculation is that it probably got Dr. Wilson more
22  votes.
23     Q.   Mr. Bireley has been around here for a long
24  time, hasn't he?

Page 51

1     A.   Mr. Bireley has been here for many years.
2     Q.   Let's come back to e-mails and documents.
3  Have you ever, I asked you if you had ever sent or
4  received any e-mails about School Board meetings or
5  the substance of discussions at School Board
6  meetings, and you said I believe?
7     A.   That is correct.
8     Q.   Probably, but you are not sure?
9     A.   That's also correct.
10     Q.   Have you ever sent or received any e-mail
11  about School Board prayer in particular?
12     A.   If I have sent anything on that and again I
13  can't recall specifics, it would be limited to what
14  I would consider to be the historic discussion of
15  prayer within the United States itself.
16     Q.   And when I refer to e-mails I also mean to
17  include, and you can changes your answer if it
18  changes your answer, posting to bulletin boards, do
19  you understand that?
20     A.   Yes, sir.
21     Q.   Have you ever sent or received any e-mail
22  or postings about policies under consideration by
23  the School Board?
24     A.   I don't believe we sent policy via an

Page 52

1  e-mail. And I don't think, and I could be wrong on
2  this, but I don't think that that's something that
3  would happen electronically. We tend to do that in
4  person at meetings.
5     Q.   Okay.
6     A.   That's my recollection of that.
7     Q.   Have you sent any e-mails to persons other
8  than Board members about policies that were then
9  under consideration by the School Board?
10     A.   No, I wouldn't do that, I don't feel as if
11  that's something I would do.
12     Q.   Because it would be inappropriate to
13  discuss policies under consideration by the Board
14  with members of the public?
15     A.   That would be my feeling.
16     Q.   Do you think that consideration of policies
17  by the Board should be done as a matter of public
18  satchel?
19     A.   They are.
20     Q.   Why then would be it inappropriate to
21  discuss policy under consideration with an
22  individual member of the public?
23     A.   My feeling is that as a School Board member
24  I'm one of ten. I do not act individually. If we

Page 53

1  are going to adopt a policy it's something that
2  should be discussed as a group and then the public
3  has a right to see what we discussed as a group.
4     Q.   And is it your sense that the Board's
5  consideration and adoption of policies is always
6  done in public situation?
7     A.   To the best of my knowledge.
8     Q.   And that would include the School Board
9  Prayer Policy that's at issue here today?
10     A.   It was presented to the public at several
11  meetings, yes. At least at one.
12     Q.   One public meeting?
13     A.   When it came to the adoption of the School
14  Board Policy, the School Board Prayer Policy, we did
15  present it, we normally do it over a two month
16  period where it's presented to the public and then
17  brought out, but I think in this case we actually
18  had our first and second readings on the same date
19  to speed the policy up.
20     Q.   How frequently do you delete your e-mail?
21     A.   Not very.
22          MR. GOSSELIN: Can you do it more
23       than once?
24     Q.   That was a poorly phrased question as

14 (Pages 50 to 53)

Case 1:05-cv-00120-JJF    Document 250-7    Filed 04/10/2008    Page 15 of 86

Dobrich, et al.                                    v.                    Indian River School District, et al.
Donald Hattier                          C.A. # 15-120 (JJF)                      October 10, 2006

Page 54

1  Mr. Gosselin suggested with his non-objection. What
2  I meant by that is do you have a practice about how
3  often you empty your e-mail mailbox, delete all
4  e-mail?
5     A.  I do not have a policy. If the numbers get
6  high enough and it looks like it's choking the
7  system, you know, then we will dump them.
8     Q.  And when you dump them do you print out the
9  e-mails that are on --
10    A.  No, sir.
11    Q.  If there is an e-mail that relates to your
12 service as a School Board member, or consideration
13 of School Board issues do you print that e-mail and
14 keep it in your files?
15    A.  No, sir.
16    Q.  So, let me ask you a general question about
17 e-mails, is it the fact that you believe that there
18 are no e-mails on your various computers, whether in
19 the office or at home, that relate to the issues in
20 this lawsuit?
21    A.  I don't think so.
22    Q.  You haven't looked but you don't think
23 there are?
24    A.  No, sir. We've switched computers several

Page 55

1  times in the intervening time period. I live in an
2  electrically challenged area which means that where
3  we are the power can go down on a regular basis, and
4  even though we use uninterrupted power supplies,
5  there was a time period where we replaced hard
6  drives on a fairly regular basis, all right, and I
7  backup the things that I consider to be important
8  which is my financial information, my patient
9  records, some pictures but that's about the total of
10 what I back up.
11    Q.  And when you backup do you keep a copy of
12 the disk -- do you backup to floppies or to optical
13 disks or optical --
14    A.  Optical disks at this point. With the
15 financial information we now use and off line
16 storage.
17    Q.  And when you backup do you discard the
18 previous back up?
19    A.  I'm not that organized.
20    Q.  Do you use a fax machine either at home or
21 at work?
22    A.  At work.
23    Q.  Have you ever sent or received any faxes
24 about School Board meetings or matters discussed

Page 56

1  therein?
2     A.  Yes, sir.
3     Q.  Did you keep those faxes?
4     A.  No, sir.
5     Q.  Do you have a practice of discarding
6  matters relating to the School Board?
7     A.  As I stated earlier we get a lot of
8  material that comes in, we take a look at it,
9  basically if there is a date that I need to know
10 about I enter it either into the daytimer or the
11 electronic daytimer and pretty much pitch it.
12    Q.  Do you have a file either at home or at the
13 office relating to your service as a School Board
14 member?
15    A.  Yes, I do.
16    Q.  At the office or at home?
17    A.  Home.
18    Q.  Where did you keep it?
19    A.  In a pile next to my desk rather like you
20 did when you threw your papers behind the chair.
21    Q.  Well, it's good that everybody is as
22 disorganized as I am.
23    A.  There you go.
24    Q.  What do you put in that file?

Page 57

1     A.  I keep the minutes of the various
2  committees and meetings that I go to. I keep the
3  material that would relate to student improvement to
4  grades, to numbers breakdowns in the schools, what
5  units we are entitled to, what units we are not
6  entitled to, pay scales. Things that I would
7  consider have a direct wearing on my School Board
8  function. The rest of it we shred.
9     Q.  We shred, I shred?
10    A.  I shred, yes, sir.
11    Q.  And that's been your practice from the
12 start of your service as a Board member?
13    A.  Originally I started keeping the entire
14 Board packet which had everything in it, until the
15 pile reached about ye high, and at that particular
16 point I figured I had to do something different and
17 that was within the first two years, after which we
18 sat down on the floor one Christmas holiday, we in
19 this case being my wife and I, she had the trash
20 can, I basically sorted, I put it one pile she
21 pitched in the trash can.
22    Q.  Is it correct that everything that's in
23 your Board file comes from the Board package,
24 comes from the Board packages, it's a subset of the

15 (Pages 54 to 57)

Dobrich, et al.                          v.                    Indian River School District, et al.
Donald Hattier                  C.A. # 15-120 (JJF)                    October 10, 2006

Page 58

1  Board packages?
2  A.  The Board packages and committee meetings.
3  Q.  You said that earlier, I'm sorry.  Is there
4  anything else in your Board file other than a subset
5  of the Board package and the committee meeting
6  minutes?
7  A.  I do have some of the legal documents and
8  subpoenas that were served.  I'm going to assume
9  that I have all of them that were served to me, to
10 the best of my knowledge.
11 Q.  Do you have memos received from anyone
12 relating to your services as a School Board member?
13 A.  No, sir, other than what came in the Board
14 packages.  A lot of those things come across as
15 faxes and as I stated earlier I read them, note
16 them, and they go out.
17 Q.  Do you keep copies of media, newspaper
18 clippings, web postings, the like about the issues
19 in this case?
20 A.  I stopped that a long time ago.
21 Q.  How long ago?
22 A.  About two years.  I got tired of seeing my
23 name in print.
24 Q.  Well, about two years would be October of

Page 59

1  2004, can you be a little more accurate than that?
2  A.  That's roughly the time period.  Things
3  were showing up in print too much and while I like
4  advertising, and you know it's like P.T. Barnum
5  said, you know, any mention is a good mention.  But
6  personally I don't believe that I just simply.  As a
7  matter of fact to a large degree I have stopped
8  reading the editorials as well.  I just don't save
9  those things anymore.
10 Q.  And you stopped reading the editorials?
11 A.  Yup.
12 Q.  Is that because you are confident that what
13 they have to say is not going to be different from
14 what you have already formulated as to your view of
15 the consensus of your constituents?
16 A.  So far what I have seen appears to be
17 rehash of what has been rehashed for the last two
18 years.  Different name, in some cases same names.  I
19 just as a rule don't do it anymore.
20 Q.  Do you keep copies of correspondence
21 related to this case?
22 A.  In what sense?
23 Q.  If you get a letter from somebody that
24 relates to this case do you keep it, a copy of it?

Page 60

1  A.  No, sir.
2  Q.  Have you ever been instructed to retain all
3  documents relating to the issues in this litigation?
4  A.  Yes, sir.
5  Q.  When was that?
6  A.  Earlier this year.
7  Q.  That was from Mr. Gosselin?
8  A.  It was from somebody.
9  Q.  And since then have you retained everything
10 that you've received in connection with this case?
11 A.  Yes.
12 Q.  Where do you keep that in a separate file?
13 A.  No, it's still in the pile on the floor.
14 Q.  Do you take notes at School Board or
15 committee meetings?
16 A.  Yes, I do.
17 Q.  And do you keep those notes?
18 A.  What I do is I keep the notes and compare
19 them with the minutes and then I pitch them, my
20 originals, I keep the printed notes.
21 Q.  And since the instruction from Mr. Gosselin
22 or his firm to keep matters, keep documents related
23 to this litigation have you kept your notes?
24 A.  I haven't kept any notes on the litigation

Page 61

1  since then.
2  Q.  So, you've continued with your practice of
3  throwing away the notes after you review them in
4  connection with your review of the minutes?
5  A.  Again, I have not kept any notes regarding
6  the litigation.  Most of the notes that I do take
7  would relate to the heat is not working in this
8  building, we have a leak in this building, here is a
9  grant that came through properly.  Those things
10 would show back up in the printed notes and there
11 would be no reason to keep them in a separate note
12 area.
13 Q.  Well, whether there is a reason to or not,
14 Dr. Hattier, if you did take a note related to the
15 issues in this litigation?
16 A.  Right.
17 Q.  Since, the instruction to retain all
18 documents relating to this litigation?
19 A.  Right.
20 Q.  And I recognize that you are confident
21 there is no such note, I can from my point of view
22 say whatever notes you took, whatever they contain
23 you discarded them?
24 A.  I believe though, sir, you are making the

16 (Pages 58 to 61)

Case 1:05-cv-00120-JJF    Document 250-7    Filed 04/10/2008    Page 17 of 86

Dobrich, et al.                                    v.                    Indian River School District, et al.
Donald Hattier                          C.A. # 15-120 (JJF)                        October 10, 2006

Page 62

1  allegation that I have may have taken notes
2  regarding this and pitched them and I don't believe
3  that I've taken any notes in that regard.
4      Q.   No, sir, I wasn't trying to make any
5  allegation, I was simply trying to establish that
6  all notes that you've taken at Board and committee
7  meetings since the time that you received the
8  admonition to retain certain documents --
9      A.   Relating to this litigation, correct.
10     Q.   All notes that you've taken since that time
11 of Board or committee meetings you have tossed?
12     A.   Yes.
13     Q.   In accordance with your practice?
14     A.   Yes.
15     Q.   Okay, that's all I'm trying to get at?
16     A.   Okay.
17     Q.   Did the Board consider itself under the
18 threat of litigation in August of 2004, and I can
19 pinpoint that time for you if you like?
20     A.   That's all right. I believe that we
21 considered the possibility of it.
22     Q.   Why was that?
23     A.   Statements that were made by Mrs. Dobrich
24 at that time period. She had indicated that she

Page 63

1  would probably talk to the ADF at that particular
2  time is what I had heard and that being the
3  Anti-defamation League as opposed to the Alliance
4  Defense Fund, so we did consider that there was a
5  possibility.
6      Q.   What's the Alliance Defense Fund?
7      A.   The Alliance Defense Fund would be a
8  Christian group in favor of family values, First
9  Amendment issues, what I would classify as more
10 traditional American values.
11     Q.   It's in favor of more traditional American
12 values and First Amendment issues?
13     A.   Yes, sir. Religious freedom is
14 specifically the way they phrase it on their web
15 site.
16     Q.   And how did you become to be familiar with
17 the ADF?
18     A.   The same way I was familiar with the ACLU,
19 in what I read in news, what I read on the web
20 sites, and you would see a lot of times where the
21 ACLU was suing somebody where the ADF along with
22 Rutherford, Pacifica and others would come in.
23 Whatever side the ACLU was on the ADF, Pacifica,
24 Rutherford and some of the others would be on the

Page 64

1  other side.
2      Q.   Sounds like the ACLU is out numbered.
3      A.   I --
4      Q.   That's not a question, I'm sorry.
5      A.   Correct.
6      Q.   Did you ever have any conversations with
7  the ADF about this lawsuit or representatives of the
8  ADF?
9          MR. GOSSELIN:  Objection, don't
10 answer that.
11         MR. ALLINGHAM:  On what ground?
12         MR. GOSSELIN:  Your --
13 attorney/client privilege.
14     Q.   Did the Alliance Defense Fund ever
15 represent the district or your personally in this
16 litigation?
17     A.   Not to my knowledge.
18     Q.   Have you ever had a conversation with the
19 ADF relating to this litigation?
20     A.   I did e-mail them at one point, there might
21 have been a phone call.
22     Q.   When did that take place?
23     A.   On or about August of 2004.
24     Q.   And whom did you contact?

Page 65

1      A.   Whatever their 800 number happened to be.
2      Q.   And who did you speak to?
3      A.   Whoever happened to answer the telephone.
4      Q.   Did you thereafter correspond either
5  personally or as a member of the Board with
6  representatives of the ADF?
7      A.   No.
8      Q.   Were you aware that the ADF represented
9  that it represented the district in connection with
10 this litigation?
11     A.   I believe there was a time period where the
12 ADF was going to become involved with us, and then
13 for a variety of reasons was unable to do so.
14     Q.   When did you conclude that for a variety of
15 reasons the ADF would be unable to represent the
16 district in this litigation?
17     A.   Some time in late summer of 2004.
18     Q.   Late summer being August, September?
19     A.   October, possibly early fall.
20     Q.   And you let the ADF know that they would be
21 representing you or did they say to you we can't
22 represent you?
23     A.   At that particular point as an individual
24 Board member I had stepped out of it. It was

17 (Pages 62 to 65)

Dobrich, et al.                              v.                    Indian River School District, et al.
Donald Hattier                        C.A. # 15-120 (JJF)                     October 10, 2006

Page 66

1  whatever the district, I believe the district
2  handled it at that point. I had nothing to do with
3  that.
4      Q.   Okay, so let me just see if I can get the
5  sequence of events down. The Board perceives that
6  there is the possibility of litigation in August of
7  2004, correct?
8      A.   Correct.
9      Q.   In August of 204 you initiate a contact
10  with the Alliance Defense Fund?
11     A.   Yes.
12     Q.   Over the course of August, September maybe
13  October of 2004 there are discussions with
14  representatives of the Alliance Defense Fund having
15  to do with whether it would represent the district
16  in connection with --
17     A.   Correct.
18     Q.   With threatened litigation?
19     A.   I'm going assume yes.
20     Q.   And did you have any of those
21  conversations?
22     A.   No.
23     Q.   Who did?
24     A.   Somebody at the School Board, excuse me,

Page 67

1  somebody at the district level who coordinated this,
2  but it was not me.
3      Q.   Well, this is helpful to me because I guess
4  I misunderstood the chains of command. When you I
5  say someone at the district level, do you know who
6  at the district level?
7      A.   No.
8      Q.   Can you give me the possibilities of the
9  persons who could have been --
10     A.   Lois Hobbs. The materials that were sent
11  to me were fairly generic in nature and there were
12  things that I presented to my fellow Board members,
13  they were in turn passed to Mrs. Hobbs. And Mrs.
14  Hobbs would have reviewed them and in conjunction,
15  I'm assuming our attorney at the time, and with the
16  broader policy of defense would have looked at it
17  and I know there was some correspondence relating to
18  this but I can't give you the specific disposition
19  of it, no.
20     Q.   Correspondence relating to the question of
21  whether ADF would represent the district?
22     A.   The correspondence that I was looking at
23  was the correspondence of the materials pertaining
24  to the appropriateness of prayer --

Page 68

1              MR. GOSSELIN: Objection.
2      objection, stop answering the question. If
3      you ant to ask if they made inquires to the
4      ADF I have no objection to that, but you
5      are asking questions that are beginning to
6      elicit the substance of what those
7  communications were and I'm generally
8  instructing him, the witness, not to give
9  answers even if your question didn't
10  directly ask for the substance of the
11  communications.
12             MR. ALLINGHAM: On what basis?
13             MR. GOSSELIN: Attorney/client
14      privilege.
15             MR. ALLINGHAM: The witness has
16      just testified that the ADF did not
17      represent the district in connection with
18      this litigation.
19             MR. GOSSELIN: If the defendants
20      had communications with the ADF for the
21      purpose of possibly retaining the ADF to
22      represent them, those communications are
23      protected.
24             MR. ALLINGHAM: As Vince Vaughn

Page 69

1  said in Wedding Crashers, erroneous, but we
2  will just have to fight about that later.
3              MR. GOSSELIN: Okay.
4      Q.   So that we have the factual predicate
5  clear, the district never retained the ADF to
6  represent it, is that correct?
7              MR. GOSSELIN: Objection.
8              MR. ALLINGHAM: No, I'm entitled
9      to the factual predicate, Jason.
10             MR. GOSSELIN: I don't want to
11      have a speaking objection. If you want me
12      to talk to you outside of the presence of
13      the witness I'm happy to do that.
14             MR. ALLINGHAM: Nope, I want to
15      get an answer to my question.
16             MR. GOSSELIN: Can you
17      kindly read back the question.
18     Q.   Oh, I will move things along and I will
19  just pose the question again, sorry. Has the Board
20  ever retained the ADF as its counsel?
21     A.   Not do my knowledge.
22     Q.   You referred in an answer that was cut off
23  by Mr. Gosselin earlier to correspondence that you
24  reviewed that had to do with, and then you were cut

18 (Pages 66 to 69)

Dobrich, et al.                                                                        Indian River School District, et al.
Donald Hattier                              C.A. # 15-120 (JJF)                                      October 10, 2006

| Page 70 | Page 72 |
|---|---|
| 1 off, what is it that that correspondence had to do | 1  **A.  Okay.** |
| 2 with? | 2  Q.   Did you provide the ADF correspondence or |
| 3         MR. GOSSELIN: Objection, don't | 3  materials to your fellow Board members before or |
| 4 answer that. Next question. | 4  after that August 24th meeting? |
| 5         MR. ALLINGHAM: On the basis of? | 5  **A.   My recollection would be that it would be** |
| 6         MR. GOSSELIN: What we talked | 6  **at that meeting and latest the meeting following.** |
| 7 about before. | 7  Q.   And did you consider the ADF material, this |
| 8         MR. ALLINGHAM: Attorney/client | 8  is you personally, Dr. Hattier in connection with |
| 9 privilege? | 9  you decision whether to adopt the School Board |
| 10         MR. GOSSELIN: Yes. | 10  Prayer Policy? |
| 11         MR. ALLINGHAM: Not withstanding | 11  **A.   Nope.** |
| 12 the witness' recent answer? | 12  Q.   You gave no consideration to those |
| 13         MR. GOSSELIN: Do you want me to | 13  materials? |
| 14 say it again? If the Board or Board | 14  **A.   No.** |
| 15 members had communications with the ADF | 15  Q.   Is that because you thought that they were |
| 16 about the possibility of retaining them, | 16  not relevant? |
| 17 and for some reason they ultimately did not | 17  **A.   No.** |
| 18 end up retaining the Board, the protection | 18  Q.   Why did you give no consideration to them |
| 19 applies. If I'm wrong and you can, you've | 19  having solicited the materials from the ADF? |
| 20 got other than your say so, if you've got | 20  **A.   Because the issues at that time had started** |
| 21 something that tells me I'm wrong I will | 21  **to stray from some of the things that the ADF had** |
| 22 reconsider it and we can deal with this | 22  **sent us, and at the time we were looking at the** |
| 23 line of questions while Dr. Hattier is | 23  **Board Prayer Policy itself. There was a other** |
| 24 here. If you have got another Vince Vaughn | 24  **material that I had looked at that I felt was more** |

| Page 71 | Page 73 |
|---|---|
| 1 that supports your erroneous statement, | 1  **relevant.** |
| 2 I'm happy to listen to it. | 2  Q.   Oh, okay, what was that material? |
| 3         MR. ALLINGHAM: I'm not going to | 3  **A.   That material had been presented to us by a** |
| 4 argue the legal issue now. I don't think | 4  **Mr. Thomas Neuberger.** |
| 5 that you are correct. | 5  Q.   In your earlier answer you referred to |
| 6  Q.   Is it correct, Dr. Hattier that you did | 6  Mr. Neuberger's material as more relevant than the |
| 7 review correspondence from the ADF relating to | 7  ADF material? |
| 8 issues in this lawsuit, yes or no? | 8  **A.   That's correct.** |
| 9  **A.   Yes.** | 9  Q.   It might just be nuance of speech, but does |
| 10  Q.   And was that correspondence reviewed by the | 10  that mean that you considered the ADF materials |
| 11 Board as well? | 11  relevant? |
| 12  **A.   I'm going to say I passed it on. I made** | 12  **A.   No, I think the ADF material at that time** |
| 13 **photocopies of the materials and passed it on to the** | 13  **was substantively different. I watch my words** |
| 14 **other Board members.** | 14  **because I realize as an attorney you use words** |
| 15  Q.   How did you do that by fax or by hand? | 15  **slightly different than I would as a member of the** |
| 16  **A.   Hand.** | 16  **general public. As I stated, I believe that the** |
| 17  Q.   That was at a Board meeting? | 17  **issue had strayed somewhat from what the ADF had** |
| 18  **A.   Yes, sir.** | 18  **given us at that time. You know, a lot of the** |
| 19  Q.   Do you know which Board meeting? | 19  **things that they had were not dealing with the** |
| 20  **A.   Again on or about August of 2004.** | 20  **prayer issue itself before School Board meeting.** |
| 21  Q.   I can identify some meetings for you so | 21  Q.   Did you get one packet of materials from |
| 22 that we get some bench marks. On August 24th there | 22  the ADF? |
| 23 was a meeting at which many hundreds of people | 23  **A.   As I recall, yes, sir.** |
| 24 attended, that was August 24? | 24          MR. ALLINGHAM: Let's mark as |

19 (Pages 70 to 73)

Dobrich, et al.                                      v.                        Indian River School District, et al.
Donald Hattier                              C.A. # 15-120 (JJF)                                    October 10, 2006

Page 74

1    Hattier Exhibit 2 a document bearing Bates
2    numbers BPD640 through 642.
3         (WHEREUPON, Hattier Exhibit 2 was
4    marked for identification)
5    Q.   What we have now marked as Hattier Exhibit
6    2, is that the package of materials from the ADF
7    that you referred to in your earlier answers?
8    A.   No.
9    Q.   This one is dated April 1, 2004. Am I
10   correct that you got a subsequent package of
11   materials some time in the August time frame?
12   A.   All I can recall is it was a different
13   package of material. I have seen this document
14   before.
15   Q.   I'm going to ask you about that in a
16   minute. I'm just trying to get the sequence of
17   events.
18   A.   Understood.
19   Q.   I don't for purposes of this question want
20   you to tell me what was in that subsequent package
21   from the ADF, but can you tell me generically what
22   it was. Was it legal memoranda, was it copies of
23   cases, was it correspondence from representatives of
24   the ADF, or was it something else? Can you describe

Page 75

1    for me generically what was included in that ADF
2    package?
3    A.   What I recall of the, and you are using the
4    word subsequent, this to me would be the subsequent.
5    Okay, this would be the one that would follow what I
6    got from them. This was not the original
7    information that I got from them.
8    Q.   So, this came after the package that you
9    got from the ADF?
10   A.   Yes.
11   Q.   This is April 1, 2004?
12   A.   Correct.
13   Q.   The meeting with lots of people at it was
14   August 24, 2004?
15   A.   Correct.
16   Q.   So, you contacted the ADF some time before
17   April 1, 2004?
18   A.   Correct. No, no back up. No restate your
19   question please, I'm jumping to conclusions and I
20   apologize.
21   Q.   I may just have misunderstood.
22   A.   I may have as well, sir.
23   Q.   We have Hattier Exhibit 2 which is dated
24   April 1, 2004?

Page 76

1    A.   Correct.
2    Q.   And a couple of answers ago you told me
3    that you would consider this April 1, 2004 Alliance
4    Defense Fund memo subsequent to the package that you
5    were discussing earlier?
6    A.   Correct.
7    Q.   So, am I correct that the package from the
8    ADF that you were discussing earlier was dated and
9    sent to you earlier than April 1, 2004?
10   A.   No.
11   Q.   Did you get Hattier Exhibit 2 on or about
12   April 1,2004?
13   A.   No.
14   Q.   When did you receive Hattier Exhibit 2?
15   A.   My recollection is the November to
16   Christmas time frame of 2004.
17   Q.   If you look at the second page of Hattier
18   Exhibit 2, you will see that there is a fax line on
19   it August 23, 2004 1:08 p.m.?
20   A.   Okay.
21   Q.   Does that refresh your recollection about
22   when you received this memorandum?
23   A.   No.
24   Q.   You are confident that it was in the

Page 77

1    November December time frame?
2    A.   That is what I recall, yes, sir.
3    Q.   What enables you to place your receipt of
4    this memorandum in that time frame?
5    A.   Because what I recall is that we had
6    another issue come up of some type, and for some
7    reason this came across my fax line. That's as much
8    as I can tell you, I don't remember.
9    Q.   What was the issue that came up?
10   A.   I don't even remember that. I just
11   remember that this is one of the things that came
12   across around that time period.
13   Q.   You don't know who sent it to you?
14   A.   My guess is that it came from the ADF.
15   Q.   So, the ADF was still in contact were you
16   in the November December time frame?
17   A.   I'm assuming that's where it came from,
18   that is an assumption, however.
19   Q.   And that was after the final decision had
20   be made not to retain the ADF in September or
21   October, correct?
22   A.   I believe so. I can't answer that 100
23   percent, though.
24         MR. ALLINGHAM: One more time with

20 (Pages 74 to 77)

Case 1:05-cv-00120-JJF    Document 250-7    Filed 04/10/2008    Page 21 of 86

Dobrich, et al.                                    v.                      Indian River School District, et al.
Donald Hattier                          C.A. # 15-120 (JJF)                              October 10, 2006

Page 78

1    that predicate, Jason, will you permit the
2    witness to answer questions about the
3    substance of that package.
4            MR. GOSSELIN: Can you give me a
5    moment to talk --
6            MR. ALLINGHAM: Sure.
7            MR. GOSSELIN: To try to flesh
8    this out privately?
9            MR. ALLINGHAM: Sure, and so that
10   we are on the record about this,
11   Mr. Gosselin wants to talk to you I think
12   about some timing. You are under Delaware
13   rules prohibited from discussing the
14   substance of your testimony other than as
15   we've discussed to figure out timing here.
16   You can have that discussion but I'm
17   entitled to ask about it under the Delaware
18   rules. So, either discuss the timing and
19   that's all I will ask you about or --
20           MR. GOSSELIN: What Delaware rule
21   applies here that would prohibit me from
22   having an attorney/client protected
23   discussion about whether the question you
24   are about to ask is protected by the

Page 79

1    attorney/client privilege?
2            MR. ALLINGHAM: None, if that's
3    what you want to ask about you are entitled
4    to ask that.
5            MR. GOSSELIN: That's all I want
6    to do. I want to flesh this out privately
7    so I can decide whether to maintain the
8    objection.
9            MR. ALLINGHAM: Let's go off the
10   record for, whatever it takes.
11           MR. GOSSELIN: A minute.
12           MS. DUPHILY: We are going off the
13   record at 11:16 a.m..
14           (WHEREUPON an off-the-record
15   discussion was held)
16           MS. DUPHILY: We are back on the
17   record at approximately 11:26 a.m..
18   Q.   With some help from Mr. Gosselin on
19   clarifying his position, I have a few more questions
20   on this ADF issue. I'm going to, we have Hattier
21   Exhibit 2 which we've established you received in
22   November, December of 2004?
23   A.   Or thereabouts, yes sir.
24   Q.   You also received a package from the ADF in

Page 80

1    the August 2004 time frame, correct?
2    A.   Yes, sir.
3    Q.   Do you know what that package addressed?
4    A.   As I recall that was a general discussion
5    of the Supreme Court cases that would have had a
6    bearing on it.
7    Q.   On it being what?
8    A.   On it being the issue that had been
9    presented to the School Board and at that time the
10   major issue was prayer at graduations. And the
11   materials that I got back, there are three specific
12   things that I remember, Lee versus Weitzman, Santa
13   Fe and Marsh versus Chambers. And there were very
14   general discussions of that material which again I
15   made copies of and passed to the other School Board
16   members.
17   Q.   Okay, so here is the sequence, you perceive
18   there to be a danger of litigation on the issue
19   having to do with graduation prayer?
20   A.   Yes.
21   Q.   You call the ADF or e-mail them one or the
22   other, contact the ADF?
23   A.   Correct.
24   Q.   And speak to someone there who says well

Page 81

1    why don't we send you some materials?
2    A.   Yes.
3    Q.   And then they send you some materials?
4    A.   Yes.
5    Q.   Which constituted three cases and a
6    discussion of those cases?
7    A.   Essentially that is what I recall, yes.
8    Q.   Okay, and do you have a copy of that
9    package still in your file?
10   A.   No, sir.
11   Q.   What did you do with it?
12   A.   Pitched it same as I do most things.
13   Q.   Was that package considered -- distributed
14   to Board members?
15   A.   It was distributed to the Board members, I
16   made copies of it at my expense to that they would
17   have some better understanding of what, again I'm
18   not an attorney, let us be clear about that, but as
19   a lay person what I understand.
20   Q.   And did you simply distribute the ADF
21   package or did you provide a summary of it as you
22   understood it?
23   A.   No, sir I simply provided the package.
24   Q.   And did you thereafter hove any further

21 (Pages 78 to 81)

Dobrich, et al.                                    v.                    Indian River School District, et al.
Donald Hattier                          C.A. # 15-120 (JJF)                        October 10, 2006

Page 82

1  conversations with ADF representatives?
2  **A.  Not that I can recall.**
3  Q.  E-mail correspondence?
4  **A.  Not that I can recall.**
5  Q.  And I take it that you have no light to
6  shed on why an ADF representative would have said
7  that he represented the Indian River School District
8  in connection with this litigation?
9  **A.  As I understand it the ADF had expressed a**
10 **willingness to work with us, but that they were not**
11 **able to find a Delaware based attorney that could**
12 **work with us. That's as I understand it issue. I**
13 **think the closest they came was Kentucky, and don't**
14 **ask me why that sticks in my memory.**
15 Q.  I thought that's where they were, but I
16 might be wrong. Okay, I've asked you questions
17 about your communications with ADF representatives.
18 Do you know of your own knowledge whether there were
19 any communications following the receipt of the
20 August package, let's call it, between any
21 representative of the district and any
22 representative of the Alliance Defense Fund?
23 **A.  I believe that there were.**
24 Q.  Written communications or telephone

Page 83

1  conversations?
2  **A.  I'm making an assumption her but I believe**
3  **that there were both.**
4  Q.  And I think we have been over this already,
5  your best guess is that it would be Miss Hobbs who
6  had those conversations or those communications?
7  **A.  Yes, sir.**
8  Q.  Now, in describing the Alliance Defense
9  Fund you told me earlier that you view them as being
10 allied with more traditional American values, do you
11 recall that?
12 **A.  Yes, sir.**
13 Q.  What do you mean by that?
14 **A.  That's a good question. I see them as**
15 **supporting more of what, certainly what I grew up**
16 **with as a young person in the 1950s, and just**
17 **supporting more of a family unity, more traditional**
18 **marriage, more traditional child rearing, the First**
19 **Amendment I think there are probably more in favor**
20 **of things like prayer at legislative sessions, board**
21 **meetings opening with things like that.**
22 Q.  Do you view opening the School Board
23 meetings with a prayer as consistent with
24 traditional American values as you understand them?

Page 84

1  **A.  Yes, sir.**
2  Q.  Do you view prayer in school during the
3  schools, during the school day as consistent with
4  traditional American values?
5  **A.  If you are a student taking a test, yes**
6  **sir.**
7  Q.  Do you view district or teacher sponsored
8  or led prayer in school as consistent with
9  traditional American values.
10         MR. GOSSELIN:  Objection, don't
11     answer that.
12         MR. ALLINGHAM:  Attorney/client
13     privilege?
14         MR. GOSSELIN:  No. You can try to
15     bring in the rest of the issues in the case
16     every time we have one of these go off on a
17     tangent --
18         MR. ALLINGHAM:  Relevance or
19     privilege?
20         MR. GOSSELIN:  The court order.
21         MR. ALLINGHAM:  Relevance?
22         MR. GOSSELIN:  Well, no, the court
23     order, there is a court order describing
24     what the topics of discover can be in this

Page 85

1      phase of the litigation.
2  Q.  Did the district ever retain Mr. Neuberger
3  to be its attorney?
4  **A.  No, sir.**
5  Q.  Did the district ever retain the Rutherford
6  Institute to be it's attorney?
7  **A.  No, sir.**
8  Q.  Did the Board ever, Board of the district
9  ever consider retaining either Mr. Neuberger or the
10 Rutherford Institute as its attorney?
11 **A.  Yes, sir.**
12 Q.  When was that?
13 **A.  Again time frame on or about September,**
14 **October of 2004. Possibly as late as November.**
15 Q.  And I take it the decision was made not to
16 retain Mr. Neuberger and the Rutherford Institute?
17 **A.  No, sir.**
18 Q.  Tell me how it came to be that they did not
19 represent you?
20 **A.  Mr. Neuberger chose not to represent us.**
21 Q.  Did he tell you why?
22 **A.  Yes, sir.**
23 Q.  What did he say?
24 **A.  He felt that we were not a unified body --**

22 (Pages 82 to 85)

Case 1:05-cv-00120-JJF    Document 250-7    Filed 04/10/2008    Page 23 of 86

Dobrich, et al.                          v.                    Indian River School District, et al.
Donald Hattier                    C.A. # 15-120 (JJF)                      October 10, 2006

Page 86

1  well let me back up. Mr. Neuberger came and spoke
2  to us one evening about all of this. He came
3  extremely well prepared. He came prepared with what
4  I considered to be a lot of precedents and other
5  material. A lot of discussions on the issue, and he
6  gave us some good information. He essentially gave
7  us the choice of accepting him or rejecting him that
8  evenings.
9       Now, in my family my father and mother
10  always taught me that is somebody puts it to you
11  that way that basically you probably want to walk
12  away from it for at least 24 hours. I don't buy
13  anything on the spot. I walk away from it, I will
14  think about it for 24 hours, if it's a good deal we
15  will come back to it. That apparently in my opinion
16  offended Mr. Neuberger and by the following day he
17  had withdrawn his offer. This is as I understand
18  it.
19  Q.   Seems a little imperious.
20           MR. GOSSELIN: Objection.
21  A.   No comment.
22  Q.   You mentioned that Mr. Neuberger came very
23  well prepared, did he bring a package of materials?
24  A.   Yes, he did.

Page 87

1  Q.   Were the distributed to the Board?
2  A.   Yes, they were.
3  Q.   Do you still a copy of those materials that
4  he distributed?
5  A.   No, sir.
6  Q.   We talked about the Board's consideration
7  of retaining the Alliance Defense Fund or the
8  Rutherford Institute. The Board had an attorney at
9  that time for regular Board matters, is that
10  correct?
11  A.   Yes, sir.
12  Q.   Who was that?
13  A.   That was Mr. Jim Griffin.
14  Q.   And did the Board consult Mr. Griffin on
15  the issues presented by this lawsuit?
16  A.   Yes, the Board did.
17  Q.   But ultimately decided not to use
18  Mr. Griffin for this purpose?
19  A.   That is correct.
20  Q.   Why was that?
21  A.   I think the general feeling was that we are
22  dealing with First Amendment constitutional law and
23  Mr. Griffin is a general attorney and much like you
24  would not see me for low back surgery, the idea was

Page 88

1  to speak to somebody who was more qualified or
2  competent in that particular area of law.
3  Q.   So, I take it you didn't ask Mr. Griffin
4  for advise on this litigation?
5  A.   We asked his opinion.
6  Q.   What did he tell you?
7           MR. GOSSELIN: Objection, don't
8      answer that.
9  Q.   Did Mr. Griffin distribute any materials to
10  the Board on this issue?
11  A.   I believe that he did send a memorandum of
12  sorts to Mrs. Hobbs which was photocopied to us.
13  Q.   But I think you discarded your copy?
14  A.   Absolutely.
15  Q.   I don't want you to tell me what it was,
16  but do you recall the substance of the advise that
17  Mr. Griffin gave the Board?
18  A.   Yes.
19  Q.   I apologize, I'm just making a record, Mr.
20  Gosselin is going to object. What was the substance
21  of the advice that Mr. Griffin gave the Board on the
22  issues presented by this lawsuit?
23           MR. GOSSELIN: Objection,
24      don't answer that. Is there a good faith

Page 89

1      basis for asking a question, asking a
2      witness what the attorney told him in
3      connection with issues that are in the
4      lawsuit? I'm not aware of any case that
5      says you can ask --
6           MR. ALLINGHAM: Sure, sure --
7           MR. GOSSELIN: What?
8           MR. ALLINGHAM: If the lawyer did
9      not represent the district in connection
10      with the advice given I think that, you
11      know, if Dr. Hattier called me and said hey
12      what do you think about School Board prayer
13      and I said you know here is what I think, I
14      don't think that's a privileged
15      communication.
16           MR. GOSSELIN: But other than,
17      like I said before your say so, because I'm
18      not trying to be cute here, if I've got
19      this wrong I will reconsider my objection,
20      but if you've got it wrong I don't think
21      you should continue to be asking the same
22      questions that directly implicate
23      attorney/client privilege.
24           MR. ALLINGHAM: Well I don't think

23 (Pages 86 to 89)

Dobrich, et al.                                v.                    Indian River School District, et al.
Donald Hattier                         C.A. # 15-120 (JJF)                       October 10, 2006

Page 90

1   there is any danger here since you are
2   asserting the privilege and the issue will
3   be teed up with respect to each piece of
4   legal advice that we need to tee up. I
5   mean it's time consuming to the extent that
6   it takes five or ten minutes, but it
7   requires a record in order to bring a
8   motion to compel.
9       So, I don't think there is any
10  harm, the witness is not going to testify,
11  you are going to instruct. But the answer
12  is I do believe there is a good faith basis
13  for taking for advice given by a person who
14  has not been retained.
15      MR. GOSSELIN: Okay. One of the
16  things, as long as we are still talking
17  about this, I called one of my colleagues
18  on the break and asked him to get me a cite
19  and he just e-mailed me a cite, Bevel
20  Bressler & Schulman 3rd Circuit 805(f) 2nd
21  120 page 124, and the quoted language that
22  my colleague just e-mailed me is that the
23  attorney/client privilege protects
24  conversations between prospective clients

Page 91

1   and counsel as well as communications which
2   retain counsel.
3       Like I said before if I'm wrong
4   and I don't intend to have a oral argument
5   with you right here, but I think that every
6   single time that this comes up for to you
7   ask a series of six questions and for me
8   to instruct him not to answer is wasting a
9   lot of time. I would rather just get the
10  judge on the phone right now and get a
11  ruling so that we don't all have to come
12  back here if I am wrong and we don't have
13  to stay here all day if you are wrong.
14      MR. ALLINGHAM: With respect,
15  Jason I don't think that we are going to
16  stay here all day because of sequence of
17  questions that I'm going to ask. I believe
18  I've now exhausted all the lawyers.
19  Although I might be wrong, that the Board
20  consulted on these issues, so we have the
21  record that we are required to have, and we
22  can evaluate our respective positions. I'm
23  not going to have an oral argument either
24  and I'm not going to provide you or call

Page 92

1   someone to get cases on the other side.
2       MR. GOSSELIN: All of your people are
3   here, who could you call?
4       MR. ALLINGHAM: Oh.
5   Q.   Just to clarify the timing of the advice
6   from Mr. Griffin, there is an assertion of privilege
7   with respect to a document, that means that your
8   lawyers have declined to produce to us a document
9   having to do with advice from Mr. Griffin on a day
10  of prayer. Do you recall a discussion about a day
11  of prayer at the Board meeting?
12      MR. GOSSELIN: Objection, don't
13  answer that.
14      MR. ALLINGHAM: I just want to
15  establish Jason whether it's a different
16  document, that's all. It will take about
17  30 seconds. I'm not asking what the
18  discussion was.
19  Q.   I just want to know there is a document
20  that's been identified by your lawyers as having to
21  do as representing Mr. Griffin's advice on a day of
22  prayer in the Indian River Schools. Do you recall a
23  document different from that that Mr. Griffin
24  provided to the Board having to do with advice on

Page 93

1   the issues presented in this litigation?
2       MR. GOSSELIN: Objection. I don't
3   know whether, it's not an instruction not
4   to answer. Form, I'm a little unclear. I
5   don't know that he has established that he
6   recalls the document you are referring to.
7       MR. ALLINGHAM: That's fair. Let
8   me do it one step at a time.
9   Q.   On the privilege list provided by your
10  lawyers there is identified a document that relates
11  to advice from Mr. Griffin or his firm on the issue
12  of a day of prayer in the Indian River School
13  District. So, by way of background do you recall
14  any discussion at the Board level of a day of prayer
15  at the Indian River School District schools?
16  **A.   No, I do not.**
17      MR. ALLINGHAM: All right, well
18  then I agree I don't think I can establish
19  anymore.
20  Q.   This goes back to some questions I asked
21  earlier. You told me that you had looked up prayers
22  that Congress had used to solemnize its sessions on
23  the Internet?
24  **A.   Yes.**

24 (Pages 90 to 93)

Dobrich, et al.                                          v.                    Indian River School District, et al.
Donald Hattier                              C.A. # 15-120 (JJF)                                October 10, 2006

Page 94

1   Q.   Do you recall that?
2   A.   Yes.
3   Q.   Am I correct that those prayers are then
4   prayers from recent years, as I understand that they
5   maintain those prayers only for a period of four or
6   five years going backward?
7   A.   When you look up prayer on the Internet,
8   there are a wide variety of sources to print things
9   and recall them. So whether this came from the
10  Congressional Archives or the Congressional Record I
11  don't recall. They would have come from a wide
12  variety of areas. In general when I do look up
13  prayers I will look up everything from President
14  George Bush's National Prayer Day comments or
15  opening comments at other things. I will look up
16  what George Washington may have said, Thomas
17  Jefferson, James Madison, Martin Luther King. I
18  generally reach to a wide variety of sources,
19  Congress merely being one of them.
20  Q.   When you told me that the prayers that you
21  had reviewed that Congress had used to solemnize its
22  proceedings seemed to you to be effective ways to
23  solemnize the proceedings, do you recall whether the
24  prayers that you reviewed in forming that conclusion

Page 95

1   were sectarian or non-sectarian?
2   A.   In the sense that whether they mention
3   Jesus Christ or not, no I do not. But I think you
4   could get some arguments with folks of different
5   religions as to whether sectarian if you mention God
6   would suit an individual of the Muslim faith where
7   it's Allah is not God, I believe they are probably
8   all sectarian. So I don't know that that's a good
9   question.
10              MR. ALLINGHAM: Well, many of my
11      questions suffer from that weakness. I'm
12      going to mark as, or ask to have marked as
13      Hattier Exhibit 3 a document which is a
14      letter from me to Nathan Kellum with copies
15      to Mr. Griffin, Miss Hobbs, Assistant
16      Superintendent Savage and each of the
17      Indian River School Board members.
18          (WHEREUPON Hattier Exhibit 3 was
19      marked for identification)
20              MR. GOSSELIN: Can I get a copy?
21              MR. ALLINGHAM: Yeah, I'm sorry.
22              MS. DUPHILY: We are going off the
23      record at 11:44 a.m..
24          (WHEREUPON a brief recess was

Page 96

1       taken)
2               MS. DUPHILY: Back on the record
3       at 11:46 a.m..
4   Q.   Dr. Hattier, have you had a chance to look
5   at Hattier Exhibit 3?
6   A.   Yes I have, sir.
7   Q.   Did you receive a copy of that letter on or
8   about March 10, 2005?
9   A.   Not that I recall.
10  Q.   Did you alter your practice with respect to
11  document retention at any time between March 10,
12  2005 and the time earlier this year when you
13  testified earlier you received a letter?
14  A.   No, sir.
15  Q.   Having to do with document retention?
16  A.   No, sir. Let me back up. If you're asking
17  did I preserve things related to the lawsuit in
18  terms of subpoenas, et cetera, we always save those,
19  okay but other than that I didn't really feel that I
20  had much that was worth retaining.
21  Q.   Okay.
22              MR. GOSSELIN: Did you send this
23      to the – this is a letter to you to from
24      Nathan Kellum, I'm not even sure I know who

Page 97

1       Nathan Kellum is.
2               MR. ALLINGHAM: From me to Nathan
3       Kellum.
4               MR. GOSSELIN: Right, from you to
5       Nathan Kellum. Are you the one who
6       actually sent, it says cc James Griffin,
7       Superintendent Lois Hobbs, Assistant
8       Superintendent Earl Savage and Indian River
9       School Board members. Did you actually
10      copy those individuals?
11              MR. ALLINGHAM: I copied Griffin.
12      I believe that I copied the letter to the
13      School Board members but we would just have
14      to look at the receipts for that.
15              MR. GOSSELIN: Okay.
16  Q.   I'm not going to mark this as an exhibit,
17  Dr. Hattier, I'm just going to show you a pleading
18  in the case which is called Plaintiff's First
19  Request for the Production of Documents from
20  Defendants Indian River School District and Indian
21  River School Board?
22  A.   Okay.
23  Q.   You can take as much time as you want to to
24  look at it, but you probably don't need to?

25 (Pages 94 to 97)

Dobrich, et al.                                v.                    Indian River School District, et al.
Donald Hattier                          C.A. # 15-120 (JJF)                        October 10, 2006

Page 98

1    A.   What's the date on this?
2    Q.   April 20, 2006 on the last page?
3    A.   Okay, thank you. Okay.
4    Q.   Have you ever seen that document before?
5    A.   I believe I did and it came as a request
6    for any information that we may or may not have had.
7    Q.   We being you?
8    A.   We being the Board in this particular case,
9    and me specific, yes, sir.
10   Q.   And I'm correct that you individually
11   searched your files to see whether you had anything
12   in response to that?
13   A.   Yes, sir I did.
14   Q.   And did you also search the hard drives of
15   your computers?
16   A.   I pretty much know that's on the hard
17   drives of my computers and there wasn't anything
18   there.
19   Q.   The answer then is no, but you are
20   confident that you wouldn't find anything if you did
21   search?
22   A.   Yes, sir.
23   Q.   Are you familiar with the Board's policy
24   entitled Procedure for Audio Tapes?

Page 99

1    A.   No, sir.
2    Q.   This is policy BDDG, at least on the
3    district's web site at least that's how it's
4    designated and I will show it to you?
5    A.   Okay.
6          MR. ALLINGHAM: Let's mark this as
7          Hattier Exhibit 4.
8          (WHEREUPON Hattier Exhibit 4 was
9          marked for identification)
10   A.   Okay.
11   Q.   Does that refresh your recollection?
12   A.   Yes, sir.
13   Q.   Hattier Exhibit 4 reflects a policy of the
14   Board which reads, the purpose of audio tapes is to
15   assist the Board of Education secretary in creating
16   the minutes of the Board meetings, therefore, 60
17   calendar after the Board of Education has approved
18   such minutes the audio tapes may be destroyed. This
19   policy was adopted according to its, the lower left
20   hand adoption date on June 27, 2006?
21   A.   Uh-hum.
22   Q.   Is that accurate, is that when you adopted
23   the policy?
24   A.   If that's what it says, yes, sir.

Page 100

1    Q.   And what prompted the Board to consider and
2    adopt this policy?
3    A.   We started the process about a year to
4    approximately two years ago of putting all minutes
5    on the Internet, of putting all of our policies on
6    the Internet, that was actually ongoing even at the
7    time that all of this started in 2004 and we felt
8    that once it's on the Internet and once everything
9    is typed up, you know, that once it's all out there
10   already what's the purpose of saving the tapes.
11         Most of the thing that happen at School
12   Board meeting, if you have ever attended one, are
13   incredibly dry, incredibly lengthy and it's pretty
14   minutia. You know, if people want to sit around and
15   listen to it, I suppose they are welcome to. When I
16   ran for the Board the first in the year 2000 and it
17   was somewhat mind numbing and we felt that it was
18   probably okay to just put it out on the Internet.
19         We had had many requests from members of
20   the community in terms of full disclosure and
21   openness to put things on the net. I think you've
22   seen our policy manual, it's relatively thick, and a
23   piece at a time over a two year period we did put it
24   on the net, we put the minutes on the net so that

Page 101

1    folks could look at it without having to come down
2    to central office to get it. To me that was just a
3    continuation of that.
4    Q.   Well, first of all I have served on the
5    School Board?
6    A.   Good.
7    Q.   So I'm aware of the nature of the topics
8    discussed at School Board meetings. And secondly
9    that the minutes are available on the web in more
10   convenient form than for someone to have to come
11   down to the district offices and get the hard copy,
12   doesn't really address, does it, why you thought you
13   needed a policy permitting the destruction of the
14   tapes which are different from the minutes?
15   A.   I can't comment on that.
16   Q.   Did you have any other reason for
17   destroying the tapes?
18   A.   As I stated we have a ton of material and I
19   believe that it was simply to help reduce some of
20   the storage and get it all on electronic media.
21   That's my opinion.
22   Q.   the tapes of course are the most accurate
23   record of what occurred at a Board meeting, is that
24   correct?

26 (Pages 98 to 101)

Dobrich, et al.                    v.                Indian River School District, et al.
Donald Hattier                C.A. # 15-120 (JJF)              October 10, 2006

Page 102

1  A.  That would be my assumption as well.
2  Q.  Do you know when this policy was first read
3 to the Board?
4  A.  If it's according to standard policy
5 approximately either two to three months prior, so
6 March is when it would have first come up, more than
7 likely.
8  Q.  Was there any reason for this particular
9 policy to be adopted on a more expedited basis than
10 that?
11  A.  I'm not aware that it was on a more
12 expedited basis.
13      MR. ALLINGHAM: Let's mark as
14   Hattier Exhibit 5 a copy of the Board
15   minutes of June 20, 2006.
16      (WHEREUPON Hattier Exhibit 5 was
17   marked for identification.)
18  Q.  Hattier Exhibit 5 bears Ms. Hobbs signature
19 on page PR448, it's the tenth page of the minutes,
20 do you see that?
21  A.  Yes, I do in.
22  Q.  And does that mean that this version of the
23 minutes is the final version of the minutes?
24  A.  Yes, sir.

Page 103

1  Q.  Okay, if you look on page six of the Board
2 minutes you will see that about two thirds of the
3 way down the page Mr. Walls is recorded as having
4 presented policy BDDG audio tape retention for a
5 first reading?
6  A.  Yes.
7  Q.  At the June 20, 2006 --
8      MR. GOSSELIN:   What page are we
9   on?
10  A.  Page six.
11      MR. ALLINGHAM: Page six, two
12   thirds of the way down, Jason, are you with
13   me?
14      MR. GOSSELIN: Uh-hum.
15  Q.  Do you have any reason to doubt that in
16 fact that the first reading of policy BDDG was at
17 the June 20, 2006 Board meeting?
18  A.  No, I have no reason to doubt that at all,
19 sir.
20  Q.  Do you have any recollection as to why
21 policy BDDG was finally adopted seven days later as
22 opposed to the two to three month process that you
23 described for me a minute ago?
24  A.  I believe if you read the next sentence,

Page 104

1  Mr. Walls asked that these policies be placed on the
2  agenda for the special Board meeting on June 27
3  since that would be his last meeting.
4      Mr. Walls had been chairman of our policy
5  committee for many years and I believe he didn't
6  want to leave anything unfinished left over.  So he
7  did not single out BDDG, he basically went with all
8  of the rest of them.  It was a group item.  And if
9  you look down below that where it says first and
10  second reading, that was on student attendance and
11  the reason that one was accepted in the first and
12  second is that the changes changing to the policy
13  were minor, there was some small word changes. You
14  have that I'm sure.
15  Q.   I do and policies IN1, IND, KLA and BDDG
16  were not minor changes, correct, these were
17  significant changes to existing policies or new
18  polices?
19  A.  Yes, or new polices I believe that's
20  correct.
21  Q.   Did the Board give any consideration to
22  whether more substantive consideration should be
23  given than the seven day period that apparently
24  these policies were given?

Page 105

1  A.  No, I can't comment on that.
2  Q.   But as you recall it it was Mr. Walls'
3  request to accommodate the fact that the June 27
4  meeting would be his last meeting that led to the
5  expedited treatment of the policies?
6  A.  That is correct.
7  Q.   All right, I'm going to come back to that
8  in a minutes we have got to dig up another document.
9  But in the meantime let's turn to something else.
10  Let's turn to a different topic. You are -- well,
11  it's here.
12      MR. ALLINGHAM: Let's mark as
13   Hattier Exhibit 6 a document which is
14   a letter from Richard Horvath to Jason
15   Gosselin dated July 7, 2006.
16      (WHEREUPON Hattier Exhibit 6 was
17   marked for identification.)
18  Q.  Have you ever seen Hattier Exhibit 6
19 before?
20  A.  No, sir.
21  Q.  You referred earlier in the deposition to a
22 communication relating to the retention of
23 documents?
24  A.  Yes.

27 (Pages 102 to 105)

Dobrich, et al.                                    v.                      Indian River School District, et al.
Donald Hattier                        C.A. # 15-120 (JJF)                            October 10, 2006

Page 106

1    Q.    Did that communication, you don't have to
2    tell me what it was, but did it come from
3    Mr. Gosselin's firm?
4    A.    Probably.
5    Q.    And what did you do to retain evidence or
6    documents in response to that request?
7    A.    Anything that related to the ongoing
8    litigation was saved.
9    Q.    Did you review or did you take any steps
10   thereafter to preserve any e-mail communications or
11   posts that you may have relating to issues in this
12   litigation?
13   A.    In terms of what Mr. Gosselin has sent me
14   as far as know that's still existing, excuse me, I
15   apologize.
16   Q.    Fair enough, and I'm not asking, even I
17   will agree that's not --
18   A.    As far as I know it's still on my computer.
19   Q.    That's communications with Mr. Gosselin and
20   his colleagues?
21   A.    Correct.
22   Q.    To the extent that any other e-mail
23   communications or posts relate to the issues in this
24   lawsuit did you preserve them?

Page 107

1    A.    I don't think there have been any.
2    Q.    You have not posted to the WMGD forum
3    since --
4    A.    Whatever is on the WMGD forum is already
5    there, they maintain their own copy, and besides
6    when you post it on there you are not posting it on
7    your own computer, you are posting it on theirs.
8    So, no I don't retain copies of it, I just wrote it
9    on there.
10   Q.    Well, I guess I understand what you've
11   done, but you do understand that a communication to
12   a forum such as the WMGD forum is a communication
13   relating to the topics in this lawsuit?
14   A.    In the sense that that's a legal issue then
15   perhaps I have erred.
16   Q.    Okay.
17          MR. ALLINGHAM: And Jason,  you
18          said this off the record, you've retained
19          all the tapes?
20          MR. GOSSELIN: Yeah, all of the
21          tapes have been preserved.  I only had one
22          conversation with Janet Hearn about this
23          policy, everything has been preserved.
24          MR. ALLINGHAM: Great, okay.

Page 108

1    Q.    You have been a member of the Indian River
2    School Board since 2002?
3    A.    Yes, sir.
4    Q.    And that means that you've been re-elected
5    once, correct?
6    A.    Yes, sir.
7    Q.    In 2005?
8    A.    2005, thereabouts.
9    Q.    Am I correct that you hold no other
10   position in the district?
11   A.    That is correct.
12   Q.    Do you serve on any other school boards?
13   A.    No, sir.
14   Q.    Have you ever served on any other school
15   boards?
16   A.    No, sir.
17   Q.    This is what's called a predicate question,
18   are you an active member of any political party?
19   A.    The Republicans hold me on their rolls, if
20   you will, in terms of being active, no.
21   Q.    The 2005 election came up after the issues
22   in this litigation, right?
23   A.    Yes, sir.
24   Q.    Did you campaign for re-election to the

Page 109

1    School Board using any of your position on any of
2    the issues in this litigation as a --
3    A.    People would ask what my position was and I
4    would tell them.  In terms of making speeches going
5    out in public, what I call the rubber chicken
6    circuit, no we did none of that.  It was somewhat
7    unusual in that regard, that there were no public
8    appearances of any type that I remember.
9    Q.    Really not even I don't know, no Rotary?
10   A.    No Rotary.
11   Q.    No Lions Clubs?
12   A.    No Lions Clubs, nope.
13   Q.    Have you given active consideration to
14   running for any other office?
15   A.    Zero.
16   Q.    Mr. Gosselin told me before this deposition
17   began in response to an interrogatory question that
18   we asked that you would describe your religion as
19   Christian, is that correct?
20   A.    Yes, sir.
21   Q.    Any particular denomination?
22   A.    No, sir.
23   Q.    Do you attend church?
24   A.    No, sir.

28 (Pages 106 to 109)

Dobrich, et al.                                v.                Indian River School District, et al.
Donald Hattier                          C.A. # 15-120 (JJF)                    October 10, 2006

Page 110

1    Q.    Do you think that prayer is important?
2    A.    Absolutely.
3    Q.    Do you think that everyone has the right to
4    pray?
5    A.    Yes, sir.
6    Q.    Do you think that everyone has the right to
7    pray even if they will be interpreted as speaking
8    for others in the offering of their prayers?
9              MR. GOSSELIN: Objection.
10   A.    At what point does my right to free speech
11   start and stop? So, if I'm offering a prayer for
12   you, let's say, that I pray that you go home safely
13   and that you do not have an accident, all righty, I
14   personally don't see anything wrong with that. So,
15   I'm not quite sure the question that you are asking,
16   sir.
17   Q.    I understand your point. You have been
18   quoted as saying that the issues in this lawsuit
19   relate to the resolution of the potential tension
20   between an individual's right to pray as he pleases,
21   guaranteed by the Constitution and prohibition
22   against establishment of religion by the government,
23   also set forth in the Constitution?
24   A.    I'm not sure that I used those words.

Page 111

1    Q.    Okay, fair enough but do you understand
2    that there is a need to resolve those two
3    principles?
4    A.    Yes.
5    Q.    Okay. So that I take it you don't, you
6    clearly don't view it as an unconditional
7    prohibition against any government involvement in
8    religion in any way?
9              MR. GOSSELIN: Objection.
10   A.    Rephrase that, please?
11   Q.    The First Amendment prohibition against
12   establishment of religion is in your view not an
13   absolute prohibition on government involvement in
14   religion in any way?
15   A.    No, it's not.
16   Q.    And am I also correct that the First
17   Amendment right to pray as one sees fit is also not
18   unlimited?
19             MR. GOSSELIN: Objection.
20   A.    I'm not sure I understand what you're
21   asking, sir.
22   Q.    Let me give you a specific example. Where
23   a person's offering of a prayer will be perceived by
24   elementary school students as the offering of a

Page 112

1    prayer by the Board of Education in the district --
2    A.    Okay.
3    Q.    -- would you agree that that prayer would
4    fall under the prohibition of establishment of
5    religion?
6    A.    No.
7              MR. GOSSELIN: Objection.
8    Q.    And that's a view that you formed yourself
9    not in reliance on the advice of counsel?
10   A.    Correct.
11             MR. GOSSELIN: Objection.
12   Q.    In your view it would be, and I want to
13   ling this to the School Board Prayer Policy in
14   particular --
15   A.    Okay.
16   Q.    If every person at the School Board meeting
17   including students invited to attend would perceive
18   the prayer to be a prayer of the district and the
19   Board of Education, you would nevertheless believe
20   it to be appropriate and not prohibited by the
21   Constitution?
22             MR. GOSSELIN: Objection.
23   A.    If I am not mistaken, our Board Prayer
24   Policy deals with the fact that it is between the

Page 113

1    ten members of the Board and does not have to
2    involve the public and should not involve the
3    public. It is for us to solemnize the occasion.
4    Q.    Why is it -- well, first before I ask that
5    question, and that is the reason for the policy
6    permitting a prayer to be offered at the beginning
7    of sessions, is that right, to solemnize the
8    occasion?
9    A.    That is our primary reason for doing that.
10   That's the only reason, let me restate that, thank
11   you.
12   Q.    And what purpose is served by solemnizing
13   the occasion?
14   A.    The same purpose that has been served
15   historically throughout the history of the United
16   States, to put something beyond ourselves, the idea
17   that we are saying please you know let us subvert
18   our own egos, our own tensions, what we may want so
19   that we may do the best for the public. It's the
20   same things George Washington has asked for,
21   Franklin asked for in World War II, Bush has asked
22   for over the years. It's the same thing essentially
23   that Congress does when they open theirs. As I
24   understand it.

29 (Pages 110 to 113)

Dobrich, et al.                                    v.                    Indian River School District, et al.
Donald Hattier                          C.A. # 15-120 (JJF)                    October 10, 2006

Page 114

1    Q.   What do you mean by solemnifying the
2    proceedings?
3    A.   In other words, we are not simply a group
4    of guys and gals getting together to simply have
5    some fun and to sit around and decide things. It's
6    the idea that we are going to put, the idea that we
7    are going to think beyond ourselves, beyond what's
8    happening today and sit down and make absolutely the
9    best decisions that we can. And it's taking a
10   moment to where you can focus on what your reason is
11   for being there. Otherwise, I believe a lot of
12   people can be caught up in the intensity of the
13   moment and, you know, you can kind of get carried
14   away with yourself. We see politicians on TV all
15   the time and others.
16   Q.   So, it's way for the Board members to be
17   reminded that they should take their duties
18   seriously during the meetings?
19   A.   That would be my primary reason, yes. And
20   again it's in keeping with what I see as American
21   history.
22   Q.   Well, Dr. Hattier, portions of American
23   history, correct? I mean there must have been
24   meetings of legislative bodies that have occurred --

Page 115

1    A.   More than likely.
2    Q.   Where no prayer was offered?
3    A.   More than likely.
4    Q.   So, when you say it's in keeping with
5    American history, you mean it's not inconsistent
6    with all parts of American history?
7    A.   I think that the quote from Rhenquist comes
8    in quite nicely where he says, that it's
9    inconceivable that the founding fathers intended for
10   it not to take place. And I don't remember which of
11   the Supreme Court decisions he was dissenting on at
12   that particular point.
13   Q.   That was a dissenting opinion?
14   A.   I believe it was a dissenting opinion.
15   Q.   It had to do with prayer at what?
16   A.   Like I said, I don't have my paperwork at
17   this point. I don't know which one it was, but his
18   comment was that it was inconceivable. You know, if
19   people choose not to do it that is their freedom do
20   so, but if they choose to do it, I believe they have
21   the freedom to do that as well. You are defining it
22   in terms of prayer. I prefer to look at it as an
23   issue of free speech.
24   Q.   Yes, my question actually has to do --

Page 116

1         MR. GOSSELIN:  Is there a
2    question? This is actually a very
3    interesting philosophical discussion that I
4    have had many times, I'm sure you have,
5    too. There aren't any questions about what
6    the Board's policy is.
7         MR. ALLINGHAM:  Well, the Board's
8    reasons for adopting the policy are quite
9    clearly relevant under anyone's
10   understanding of the court's order. If the
11   witness says to me gratuitously and I think
12   it's in keeping with the history of our
13   country, I think that I'm obligated to
14   pursue that. And if we end up on a tangent
15   as a result of my pursuit that may be my
16   fault, but it's a function of trying to
17   follow up on what the witness has offered
18   me.
19   Q.   In an earlier answer, Dr. Hattier, you
20   said, and correct me if I am wrong, but I think I
21   have this right, that Board prayer should not
22   involve the public. Can you tell me first if that's
23   what you said and secondly what you meant by that?
24   A.   The policy as we currently have it involves

Page 117

1    the adult Board members of the Board itself, all
2    right and the public, we were specifically including
3    only ourselves.
4    Q.   As of the group of people who would be
5    offered the opportunity to offer a prayer?
6    A.   Yes. As well as among ourselves and to
7    whom the prayer would concern.
8    Q.   So, when you said the Board prayer should
9    not involve the public what you meant was the policy
10   does not contemplate that anyone other than Board
11   members should offer it?
12   A.   No that anyone other than Board members
13   should partake.
14   Q.   Oh, and that's because the goal is to
15   remind Board members that they must take their
16   duties seriously and do the best they can to
17   discharge their responsibilities?
18   A.   That's what we ought to do, yes sir.
19   Q.   Okay. And why then could the Board not
20   shortly before it steps onto the stage conduct its
21   own prayer outside of the public view?
22   A.   I don't have an answer to that.
23   Q.   We talked earlier about the issue of denomi
24   -- it's a word I have trouble with, denominational

30 (Pages 114 to 117)

Dobrich, et al. · · · · · · · · · · · · · · · · v. · · · · · · · · · Indian River School District, et al.
Donald Hattier · · · · · · · · · · · · C.A. # 15-120 (JJF) · · · · · · · · · · · · October 10, 2006

Page 118

1  or nondenominational prayers?
2  A.  Correct.
3  Q.  Is it your view that if Christians don't
4  mention Christ in their prayers they are denying
5  Christ?
6  A.  You are asking me --
7  · · · · · · · MR. GOSSELIN:  Objection.
8  A.  You are asking me to make a comment about
9  Christianity. I cannot comment on that since there
10  are many different denominations within
11  Christianity. I don't know if they are denying
12  Christ. I was raised in the United States Army and
13  I attended many functions that were conducted by a
14  military chaplain and I don't see a military
15  chaplain having problems with giving a prayer for a
16  larger group without mentioning Christ and yet it
17  still can be an effective prayer.
18  Q.  Effective for the purpose of whatever
19  purpose it's offered, correct?
20  A.  Correct.
21  · · · · · · · MR. ALLINGHAM:  I'm going to ask
22  · · · · · · · the reporter to mark as Hattier Exhibit 7 a
23  · · · · · · · document bearing Bates numbers 710 through
24  · · · · · · · 860.

Page 119

1  · · · · · · · (WHEREUPON Hattier Exhibit 7 was
2  · · · · · · · marked for identification.)
3  A.  Oh joy.
4  Q.  Why do you say oh joy?
5  A.  Because of the length of the document that
6  we have.
7  Q.  Hattier Exhibit 7 is a copy of postings on
8  the WGMD web site. Is this a web site that you log
9  onto from time to time?
10  A.  Very occasionally.
11  Q.  And have you posted to this web site from
12  time to time?
13  A.  At one very short time period.
14  Q.  When was that?
15  A.  I don't know, earlier possibly this summer,
16  spring.
17  Q.  Of this year?
18  A.  I don't remember.
19  Q.  Spring, summer of this year?
20  A.  It's dated were I can look try date
21  whatever its laps to be.
22  Q.  What prompted you to log onto the web site
23  and post on it?
24  A.  Somebody had made some comments that I

Page 120

1  should probably look on the web site and I did. I
2  responded one or two times, maybe three, I don't
3  remember, after which I decided that that's enough
4  of that.
5  Q.  Who suggested that you should visit the web
6  site?
7  A.  I don't recall. I knew that it was there,
8  and I knew that the public was writing in about it,
9  but that's about it.
10  Q.  There are what we call Bates numbers down
11  at the bottom of the page, can you turn to page 836?
12  A.  Okay. Yes.
13  Q.  If you looking up at the top of the page
14  you will see a reflection that the following posts
15  posted by someone identified as dghattierdc?
16  A.  Correct.
17  Q.  Is that you?
18  A.  Yes.
19  Q.  Dghattierdc?
20  A.  Yes, sir that's a standard notation that I
21  use everywhere.
22  Q.  If you will look at page 832?
23  A.  Okay.
24  Q.  And by the way I should ask you, the 836

Page 121

1  post, is that post that you wrote and posted to the
2  WMGD forum?
3  A.  Yes, it is.
4  Q.  And what's reflected in that post you
5  believed to be, and continue to believe that that is
6  reflective of your beliefs?
7  A.  Yes.
8  Q.  Now, on 832, same questions, is it correct
9  that this is a post that you wrote, dghattierdc?
10  A.  Yes.
11  Q.  And it reflected your views as of that
12  time?
13  A.  Yes.
14  Q.  And it reflects your views today?
15  A.  Yes.
16  Q.  At the end of that post you write,
17  unfortunately with historic research lots of things
18  can be taken out of context and argue in a number of
19  ways. It is best to look at the whole body of what
20  the founders said and did and not just parts of it.
21  A.  Yes.
22  Q.  You did not intend in this post to provide
23  to the reader the whole breadth of what the founders
24  said and did, did you?

31 (Pages 118 to 121)

Dobrich, et al.                                    v.                    Indian River School District, et al.
Donald Hattier                          C.A. # 15-120 (JJF)                        October 10, 2006

Page 122

1    A.   No.
2    Q.   As with all people you were picking and
3    choosing?
4            MR. GOSSELIN:  Objection.
5    A.   I believe that what I was doing was
6    countering some of the discussions in the previous
7    postings.
8    Q.   Which also offered only a partial view of
9    what the founds said?
10   A.   Correct.
11   Q.   Turn if you would to 829.  In this post you
12   will see it's dated March 17, 2006, dghattierdc and
13   this is a post that you wrote and which you believe
14   belief to be accurate?
15   A.   Yes.
16   Q.   And reflected your views at the time and
17   today?
18   A.   Yes, I believe so.
19   Q.   Down at the bottom of the page you write,
20   in my mind a prayer, be it it sectarian or
21   nonsectarian still steps on someone's toes.  For
22   those who don't like prayer of any kind it's
23   offensive, for a Muslim it's really bad, for a
24   Christian without mentioning Christ it's denying

Page 123

1    Christ.  And either way it appears to be telling
2    someone how to use their free speech.  Does that
3    accurately reflect your views?
4    A.   Yes.  You can read on, which violates the
5    First Amendment protections against free speech.  A
6    true catch 22.
7    Q.   In that post you write a Christian without
8    mentioning Christ is denying Christ?
9    A.   Yes.
10   Q.   Which is the question that I asked earlier?
11   A.   I was perhaps more specific in this post
12   than I'm in my own personal life, but as I indicated
13   earlier to lots of Christians without mentioning
14   Christ is denying Christ, if you don't mention
15   Christ for a lot of Christians.
16   Q.   So, for you personally to offer a prayer
17   that doesn't mention Christ is not denying Christ?
18   A.   Not at all.
19   Q.   But you believe that there are Christians
20   for whom offering up a prayer that doesn't mention
21   Christ would be denying Christ?
22   A.   Yes, sir.
23   Q.   And would offering up no prayer at all be
24   denying Christ for such Christians?

Page 124

1    A.   No, but it would be denying free speech.
2    Q.   Page 820.  Is this a post that you wrote?
3    A.   Yes.
4    Q.   And which you believe to be accurate
5    then --
6    A.   Yes.
7    Q.   Believe to be accurate then and now?
8    A.   Yes.
9    Q.   The last paragraph of this post refers to
10   your belief that support for the revolution was
11   never 100 percent.  My reading of history shows
12   maybe 35 to 40 percent.
13           MR. GOSSELIN:  What page are we on
14   here?
15   A.   Page 821.
16           MR. ALLINGHAM:  Page 821 at the
17   bottom.
18   Q.   A little bit earlier you say, as the
19   founders once said,  and for the support of this
20   declaration with a firm reliance on the protection
21   of the divine providence, we mutually pledge to each
22   other our lives, our fortunes and our sacred honor?
23   A.   Yes, sir.
24   Q.   And then you note that remember support for

Page 125

1    the revolution was never 100 percent?
2    A.   Correct.
3    Q.   My reading of history shows maybe 35 to 40
4    percent.  Should have given up.  Are we less
5    than that today.  What did you mean by that
6    discussion about support for the revolution?
7    A.   People like to make the comment that we
8    live in severely divided times, and it's never been
9    more divided, but what they forget is that during
10   the Revolutionary War we didn't have a fairly
11   sizable proportion of that they call Tories were
12   very loyal to the Crown that that percentage was a
13   high as 30 to 35 percent with a goodly number of
14   people who were fighting in the revolution against
15   the Crown as well as a whole lot of people in the
16   middle who really couldn't care less and just knew
17   that their lives were being interrupted.
18        So, my point in making this is even though
19   all the other people are saying we should do this,
20   we should do that, it's divisive, it's not divisive.
21   You know, I don't see in -- and I believe it was
22   referring to other things I had read in the past.
23
24   Q.   When you say my reading of history shows

32 (Pages 122 to 125)

Dobrich, et al.                                    Indian River School District, et al.
Donald Hattier                                              October 10, 2006
                                    v.
                        C.A. # 15-120 (JJF)

Page 126

1  maybe 35 to 40 percent, does that refer to support
2  for the revolution or opposition?
3    A.  Support.
4    Q.  And when you say should they have given up
5  you mean the revolutionary supports?
6    A.  Correct, the Founding Fathers, should they
7  have given up. I think it's an excellent rhetorical
8  question.
9    Q.  On 813. Is this a post that you wrote?
10   A.  Yes.
11   Q.  And it accurately reflected your views then
12  and now?
13   A.  Yes.
14   Q.  In this post you offer a number of
15  observations relating to the separation of church
16  and state, and whether the founders required total
17  freedom from religion everywhere you go.
18       Was this post based on your own knowledge
19  of history, were you referring to documents when you
20  wrote this post?
21   A.  This is based on any own knowledge of
22  American history.
23   Q.  When you posted under Delaware law the
24  Board is a legislative body, this is a matter of

Page 127

1  law, what --
2    A.  That's my understanding. I'm under --
3  excuse me, please. On that one doctor, Judge Farnan
4  had ruled that we are a legislative body and
5  therefore had legislative immunity. Now again, I'm
6  not an attorney but the way I understood it, based
7  on the functions that we perform as a Board in
8  terms of setting policies, taxes, et cetera, we
9  qualify as a legislative body and for some reason I
10  am under the impression that somewhere in Delaware
11  it says that we are. Or at least the judge decided
12  that we were. I will defer to judge's opinion on
13  this.
14   Q.  Is it your understanding that Judge Farnan
15  decided the Marsh v Chambers applies to the Indian
16  River School Board?
17   A.  Could you repeat that?
18   Q.  Is it your understanding that Judge Farnan
19  decided that Marsh v Chambers applies to the Indian
20  River School Board?
21   A.  Again I am not an attorney but no had Judge
22  Farnan applied that I don't think we'd be sitting
23  here today.
24   Q.  All right, so, when you say in your post

Page 128

1  under Delaware law the Board is a legislative body,
2  this is a matter of law, that means that Chambers
3  applies. What do you rely on for that?
4    A.  Common sense.
5    Q.  All right.
6    A.  That's it?
7    Q.  Those are the only five posts I found.
8    A.  Those are the only ones I made.
9        MR. GOSSELIN: Tom did you have a
10  plan for lunch?
11       MR. ALLINGHAM: No, I don't, what
12  do you want to do it's 12:30?
13       MR. GOSSELIN: Well, we've been
14  here three hours, it sounds like we are
15  going to be going the full six hours with
16  Dr. Hattier. I mean if you are, if I am
17  wrong on that if you think you are
18  somewhere reasonably close to finishing I
19  wouldn't mind pushing through.
20       MR. ALLINGHAM: I'm not.
21       MR. GOSSELIN: Okay, then I think
22  we probably ought to take a break for
23  lunch.
24       MR. ALLINGHAM: How close can you

Page 129

1  get food?
2        MR. HATTIER: McDonald's.
3        MR. ALLINGHAM: How close?
4        MR. HATTIER: About three or
5  four minutes. There is also a
6  Schaeffer's no Schaeffer's is closed,
7  there is Doyle's which is a family
8  restaurant.
9        MR. ALLINGHAM: We can get
10  something a few minute away.
11       MR. HATTIER: There is a local
12  pub, I can't tell you anything about their
13  food.
14       MS. DUPHILY: We are going off the
15  record at 12:35 p.m..
16       (WHEREUPON a lunch recess was
17  taken)
18       MS. DUPHILY: We are back on the
19  record at approximately 1:26 p.m.
20   Q.  Dr. Hattier, I asked you a few questions
21  before we -- in the morning session about the
22  identify of the Does and whether you had personally
23  made any efforts to confirm your views about who the
24  Does are. I have a follow-up questions. Do you

33 (Pages 126 to 129)

Dobrich, et al.
Donald Hattier

v.

C.A. # 15-120 (JJF)

Indian River School District, et al.
October 10, 2006

Page 130

1  believe that it would be inappropriate for Board
2  members to, or district employees to reveal the
3  identity of the Does?
4     A.  I believe that the courts have stated that
5  they have the right to anonymity.
6     Q.  Do you therefore think it would be
7  inappropriate for Board members to reveal their
8  identity?
9     A.  I think we are bound by what the court
10 says, yes.
11    Q.  I want to follow-up on a couple of
12 questions that we asked before the break. Before
13 the break I asked you whether the purpose of the
14 Board Prayer Policy was to solemnize the Board's
15 proceedings and we agreed that was the only purpose
16 for the Board Prayer Policy, correct?
17    A.  Yes, sir.
18    Q.  Am I then correct that the purpose of Board
19 prayer as set forth in the policy is not to
20 proselytize?
21    A.  That is correct.
22    Q.  And it is not to affect or influence the
23 members of the public who may be in attendance at
24 Board meetings?

Page 131

1     A.  That's the way I would see it, sir.
2     Q.  And similarly the purpose it not to affect
3  or influence district students who might be in
4  attendance at the meeting?
5     A.  That is correct, sir.
6     Q.  I asked you how many residents there were
7  in the district which you weren't sure about, do
8  you know how many student there are in the
9  district's schools?
10    A.  I believe at this point we are around 7900
11 give or take a few.
12    Q.  Do you believe that Christianity is the
13 only true religion?
14    A.  No.
15         MR. GOSSELIN: Objection.
16    Q.  Do you believe the Judaism is a valid a
17 religion as Christianity?
18    A.  Absolutely.
19    Q.  Do you believe that Islam is a valid a
20 religion as Christianity?
21         MR. GOSSELIN: Objection.
22    A.  Philosophically that one I could argue to
23 some degree.
24    Q.  What's the basis for your argument?

Page 132

1     A.  The way the book was written and the way
2  Muhammad presented himself halfway through. The
3  first part of the Koran seems to deal with issues of
4  taking care of widows and orphans and how you live
5  you life and then the last half of the book it
6  appears to me that he was more concerned with
7  passing on a dynasty of sorts and how that was to
8  take place.
9       Whereas Judaism and Christianity tend to be
10 peaceful religions to a large degree. The latter
11 half of the Koran they talk a lot about beheading
12 people and that the only true response to being
13 around a Muslim is either submit, convert or die, I
14 think that's called the Dhimmi, D-H-I-M-M-I.
15      I could be wrong but this is my
16 understanding of it. But if a person wished to
17 practice Islam in their way that did not involved
18 any injury or whatever to my family any threats to
19 my family I have no problem with that. Neither
20 Buddhism, Taoism, Shintoism, you know, pick one.
21    Q.  Do you have a belief as to what the
22 majority religion is among voters in the district?
23    A.  My believe would be that it's majority
24 Christian based.

Page 133

1     Q.  And the same would be true of the students
2  in the district's schools?
3     A.  That would be my general belief, yes sir.
4     Q.  How about teachers in the district, same?
5     A.  Well if they are based on the average
6  population then yes sir.
7          MR. ALLINGHAM: This is Hattier
8       Exhibit 8 a document bearing Bates number
9       BPD1034.
10      (WHEREUPON Hattier Exhibit 8 was
11      marked for identification.)
12    Q.  Hattier Exhibit 8 is a policy of the Indian
13 River Board of Education designated BBA entitled
14 School Board Powers and Duties. Take a minute to
15 review the powers and duties set forth there and
16 tell me if you agree that those powers and duties
17 are powers and duties of the Indian River School
18 Board?
19    A.  As I understand them as listed in the
20 Delaware Code, yes sir.
21    Q.  Okay. In addition, or maybe as a fleshing
22 out of the duties of the Board in Hattier Exhibit 8,
23 would you agree that among the Board's duties is to
24 approve curriculum in district schools?

34 (Pages 130 to 133)

Dobrich, et al.                                    v.                    Indian River School District, et al.
Donald Hattier                            C.A. # 15-120 (JJF)                        October 10, 2006

Page 134

1   A.   Yes.
2   Q.   And to determine which textbooks to buy for
3   district schools?
4   A.   Yes.
5   Q.   And to handle the district's finances?
6   A.   Yes.
7   Q.   And to approve the use of district
8   facilities?
9   A.   Yes.
10  Q.   And that would include the approval of
11  school use applications?
12  A.   Yes.
13  Q.   I may not have this one right, does the
14  School Board also approve school choice
15  applications?
16  A.   Yes.
17  Q.   And the School Board is involved in
18  determining the punishment for students who violated
19  the district's Code of Conduct, is that correct?
20  A.   Yes.
21  Q.   In fact there are some punishments for
22  students who violate the district's Code of Conduct
23  that can't be imposed without School Board approval,
24  isn't that correct?

Page 135

1   A.   Correct.
2   Q.   Expulsion is one of those?
3   A.   Yes.
4   Q.   Any others, suspension?
5   A.   Certain forms of suspension, carrying a
6   firearm, certain types of drugs. It's a fairly
7   broad list. I mean it's actually a multi-tiered
8   process. In other words, some things happen at a
9   local level, there are some in house suspensions and
10  there are some out of school suspensions that happen
11  strictly at the school level itself. Then there are
12  other offenses if it's happened three to four times
13  that it would rise to the School Board level and in
14  which case it's usually adjudicated by a hearing
15  over before we get to it, and that is in accordance
16  with Delaware law.
17  Q.   All right, so there is a spectrum of
18  punishments that can't be imposed —
19  A.   Correct --
20  Q.   You have to let me finish the question?
21  A.   I'm sorry, sir.
22  Q.   That can't be imposed without School Board
23  approval?
24  A.   Yes.

Page 136

1   Q.   Okay. This probably falls under the
2   finance obligation, but the School Board is
3   ultimately responsible for adopting the district's
4   annual budget, correct?
5   A.   Yes.
6   Q.   And for hiring teachers?
7   A.   Ultimately we are responsible for it, but
8   the selection process happens at a more local level.
9   Q.   That is to say you don't do the
10  interviewing and all that?
11  A.   No, sir, we do not.
12  Q.   But you must approve the hiring?
13  A.   Right.
14  Q.   Okay. Is the School Board responsible for
15  the firing of teachers?
16  A.   Same thing.
17  Q.   Okay. And is the School Board involved in
18  determining discipline for teachers who violate
19  district policies?
20  A.   I'm going to say yes.
21  Q.   The School Board is responsible for hiring
22  district employees including the superintendent?
23  A.   Correct.
24  Q.   And also for firing that same class of

Page 137

1   employees?
2   A.   Yes.
3   Q.   A little bit more specific or down to
4   earth, the School Board approves field trips for
5   district school students?
6   A.   Correct.
7   Q.   Is that something that's required by law or
8   is that just something that the Board feels it's
9   appropriate for it to do?
10  A.   I don't know.
11  Q.   Historically --
12  A.   Historically that's what we have done all
13  along.
14  Q.   The School Board has chosen to give
15  students awards at it's meetings, is that correct?
16  A.   Some awards at some meetings, yes.
17  Q.   And in addition do giving at some meetings
18  its own awards it also sometimes invites students to
19  recognize them for special achievements that they've
20  been made as students of the district's schools?
21  A.   I believe that to be true.
22  Q.   Now, I want to separate out public sessions
23  of the School Board, would you agree with me that at
24  the public sessions the Board, during your tenure,

35 (Pages 134 to 137)

Dobrich, et al.                                    v.              Indian River School District, et al.
Donald Hattier                          C.A. # 15-120 (JJF)                      October 10, 2006

Page 138

1    spends the majority of its time on supervising
2    construction projects, that is to say discussing and
3    supervising construction projects, or recognizing
4    students either by giving them awards directly or
5    recognizing them for awards or achievements?
6    A.    A majority of our time?
7    Q.    Yes.
8    A.    No, I would not agree.
9    Q.    A substantial part of your time?
10   A.    Yes.
11   Q.    The School Board, whether it's the majority
12   of the time or not, the School Board does approve
13   construction projects for the district?
14   A.    Yes we do, sir.
15   Q.    And the School Board monitors those
16   construction projects?
17   A.    Yes, we do.
18   Q.    Do you receive updates on the constructions
19   projects at public meetings?
20   A.    Yes we do.
21   Q.    Who do those come from?
22   A.    We have a management company EDIS who
23   handles most of the big details and they will come
24   both to the School Board meetings as well as to a

Page 139

1    separate buildings and grounds meeting, as well as a
2    separate finance committee meeting if indicated.
3    Q.    Okay, so in effect the construction
4    managing, sorry, the construction management company
5    provides reports on construction projects to the
6    Board?
7    A.    Yes they do, sir.
8    Q.    Does the School Board approve materials
9    used for district facilities?
10   A.    What do you mean by materials?
11   Q.    Well, it means to be a broad question, but
12   I can give you some examples. For example, does the
13   School Board approve sod or field materials for the
14   district's athletic facilities?
15   A.    We have, we have approved it, we have
16   discussed it mostly in the sense that we want to
17   make sure that all buildings are treated equally, in
18   the north south of the district, but some of those
19   things again will simply happen.
20        Recently we have tightened up the policy
21   because we have found that some of the schools are
22   moving out on their own a little bit in areas where
23   a joint policy for everything might be better. In
24   other words, choosing Kentucky 31 instead of Bermuda

Page 140

1    grass. Something like that.
2    Q.    So —
3    A.    The determ -- I'm sorry, go ahead.
4    Q.    I think I interrupted you, go ahead.
5    A.    We made the determination that Kentucky 31,
6    it may be more expensive, it may not, I don't know
7    much about grass seeds. But it seems to be that the
8    Kentucky 31 grows better, wears better than Bermuda
9    grass, which may be less expensive. Some of our
10   people in the past have wanted to see with Bermuda
11   grass and you know, rather than having them do it ad
12   hoc let's just take a look at a broader picture.
13   Q.    So, that's an example of something where
14   the Board took within it's handling responsibilities
15   the selection of a what I call the material?
16   A.    Based on a competent outside advice, yes
17   sir.
18   Q.    Would you agree with me that buying
19   textbooks, approving the use of district facilities,
20   approving school use applications and school choice
21   applications, punishing students or teachers who
22   violate the district's policy, hiring and firing
23   district employees, approving field trips, giving
24   student awards and approving and overseeing

Page 141

1    construction projects have nothing to do with the
2    setting of the Board policy?
3    A.    Would you read that again, please?
4    Q.    Sure. Just so that you have it in mind,
5    its going to be sequence of Board responsibilities
6    which we've just established in questions and then
7    I'm going to ask you whether you believe, I could
8    ask you individually but will ask you broadly
9    whether you believe that each of those
10   responsibilities does not fall within the Board
11   responsibilities of setting Board policy, okay?
12   Do you have it?
13   A.    I have got the big picture.
14   Q.    Would you agree with me that buying
15   textbooks, approving the use of district facilities,
16   approving school use applications, approving the
17   school choice applications, punishing students or
18   teachers who violate district policy, hiring or
19   firing districts employees, approving field trips,
20   giving students awards and overseeing or approving
21   construction projects have nothing to do with
22   setting Board policy?
23        MR. GOSSELIN: Objection.
24   A.    Yes and no both.

36 (Pages 138 to 141)

Case 1:05-cv-00120-JJF    Document 250-7    Filed 04/10/2008    Page 37 of 86

Dobrich, et al.                                    v.                    Indian River School District, et al.
Donald Hattier                            C.A. # 15-120 (JJF)                          October 10, 2006

Page 142

1    Q.    Tell me, elaborate so I can understand?
2    A.    That is an easy one for the most part.
3    Maybe not easy, but if you are setting a policy as
4    to what constitutes a student punishment and what
5    doesn't, those are things that get deliberated over
6    quite a bit. There was a time period where we were
7    discussing the types of athletic enhancement drugs
8    that could be allowed. Are we going to go with what
9    the NCAA wants as their list? Did we want to break
10   out from that. It would be set as a matter of
11   policy is what the students can take and what they
12   can't, so that is a matter of policy.
13         Then you have the policy in terms of how
14   would you punish a student for violating that. You
15   know, would you immediately expel a student or do we
16   have a policy where we say, you know what first time
17   anybody can do something, all right let's work with
18   you, let's educate you on what the right way to do
19   it is and then don't do it again.
20         Second time out, okay you have already been
21   instructed, now you've had the details in front of
22   you. Now, if you do it again, now you are subject
23   to some kind of a punishment, that is policy.
24   Q.    I think I understand the distinction that

Page 143

1    you are trying to draw. Let me ask you this
2    question. In areas, among the areas that I talked
3    to you about, there are instances in which the Board
4    has adopted a policy?
5    A.    Uh-hum.
6    Q.    Say on what punishments would be applied
7    for violation of performance enhancing drug policy?
8    A.    Okay.
9    Q.    Okay. Is that an example we can use?
10   A.    Again it works, yes sir.
11   Q.    And what you were saying when you said yes
12   and no, is that the setting of that policy does
13   involve the Board's policy responsibilities?
14   A.    I believe so.
15   Q.    Once that policy is in place then the
16   application of the policy and the decisions that
17   need to be made in order to determine where somebody
18   falls in the policy, that kind if determination us
19   not the setting of policy but the execution of the
20   policy?
21   A.    Yes, sir.
22   Q.    Or the administration of the policy?
23   A.    Yes, sir.
24   Q.    And so, that was an example along the list

Page 144

1    of things that I gave you. Can we agree that the
2    decisions on buying textbooks does not involve the
3    Board's policy responsibilities?
4          MR. GOSSELIN: Objection.
5    A.    I don't have an opinion on that at the
6    moment, sir. And the reason I say that is because
7    if we look at some textbooks from some of the
8    manufactures, some of them have more opinion in them
9    than others. You know, we would want something
10   that would line with what the district policies are
11   in terms of how we want the education to go. So, I
12   don't know that I could answer that yes or no.
13   Q.    Okay. In all events we can agree that the
14   School Board does administer and enforce whatever
15   policies it adopts?
16         MR. GOSSELIN: Objection.
17   A.    That is correct.
18         MR. ALLINGHAM: Hattier Exhibit 9,
19   please.
20         (WHEREUPON Hattier Exhibit 9 was
21   marked for identification)
22   Q.    Okay.
23   A.    Okay.
24   Q.    You've seen this paper before, correct?

Page 145

1    A.    Yes, sir, I have.
2    Q.    This is the Board Prayer at Regular Board
3    Meetings that I have referred you to earlier?
4    A.    Yes, sir.
5    Q.    When did the School Board first consider
6    adopting policy BDA.1, the School Board Prayer
7    Policy?
8    A.    On or about August, September 2004.
9    Q.    Was it in response to any particular event
10   or occasion?
11   A.    Yes, sir.
12   Q.    What was that?
13   A.    It was in response to the potential, it not
14   already overt lawsuit that we are discussing today.
15         MR. ALLINGHAM: Mark as Hattier
16   Exhibit 10 a document bearing Bates numbers
17   BPD510 and 511.
18         (WHEREUPON Hattier Exhibit 10 was
19   marked for identification)
20   Q.    Have you seen Hattier Exhibit 10 before?
21   A.    I do recall seeing this in the past, yes
22   sir.
23   Q.    And is this the triggering event for the
24   Board's consideration of a School Board Prayer

37 (Pages 142 to 145)

Dobrich, et al.                                    v.                    Indian River School District, et al.
Donald Hattier                              C.A. # 15-120 (JJF)                              October 10, 2006

Page 146

1  Policy?
2  A. This arrived on or about the same time
3  period.
4  Q. Correct.
5  A. Whether this was the exact trigger or not,
6  I don't know.
7  Q. Did you vote to adopt Board Policy BDA.1?
8  A. Yes, I did.
9  Q. And I take it you continue to support that
10 policy?
11 A. Yes, sir, I do.
12 Q. Did you understand that there was a history
13 of the Board opening its meetings with prayer at the
14 time that the School Board Prayer Policy was
15 adopted?
16 A. Yes, sir.
17 Q. If there was already a history of the Board
18 opening its meetings with prayer why did you need a
19 policy at all?
20 A. Because we did not have one at the time.
21 At least I don't think we did, I might be wrong on
22 this. My understanding was that with everything
23 else that was coming down having a policy on
24 something wouldn't be a bad idea.

Page 147

1  Q. How did you come to see Hattier Exhibit 10,
2  the letter from Miss Fennell?
3  A. It was either faxed to me or handed in a
4  package of some type. My guess is that it may have
5  been faxed.
6  Q. Do you know who faxed it to you?
7  A. It would have been central office, I
8  believe.
9  Q. And did you then take it with you to the
10 next Board meeting?
11 A. No.
12 Q. Was its contents discussed at the next
13 Board meeting?
14 A. More than likely, yes, sir.
15 Q. All right, I'm going to come back to my
16 earlier question, do you know who first suggested
17 that the Board adopt a policy on School Board
18 prayer, you answer that question yes or no?
19 A. No, I don't recall.
20 Q. Do you recall without knowing who it was,
21 do you recall whether it was an attorney or a Board
22 member?
23 A. I do not recall that either.
24 Q. Do you recall that the Board considered

Page 148

1  several versions of a Board policy on School Board
2  prayer?
3  A. I believe we might have, or at least I
4  might have seen several, maybe two.
5           MR. ALLINGHAM: Let's mark as
6  Hattier Exhibit 11 a copy of a document
7  bearing Bates number BPD 698.
8           (WHEREUPON Hattier Exhibit 11 was
9  marked for identification)
10 Q. Have you ever seen Hattier Exhibit 11
11 before?
12 A. I think so.
13 Q. Do you know when?
14 A. No.
15 Q. Or in what context?
16 A. I'm assuming it would in the context of
17 what we are discussing here today.
18 Q. Do you know who provided it?
19 A. No, sir.
20 Q. Do you know whether that was the first
21 draft of a Board Prayer Policy that the Board
22 considered?
23 A. That would be my assumption?
24 Q. And what's that assumption based on?

Page 149

1  A. The way it's bunched together in one
2  paragraph form.
3  Q. Do you know who drafted that document?
4  A. My assumption again would be that it would
5  be a person on the policy committee, possibly Harvey
6  Walls. Harvey was chairman of the policy committee
7  for a very long time period.
8  Q. Was it your understanding that Mr. Walls
9  was generally the drafter of policies proposed to
10 the Board for adoption?
11 A. Mr. Walls was the one who coordinated what
12 the various responses would have been at the policy
13 meetings. To my knowledge he did not act alone. To
14 any knowledge he would have discussed things with
15 other people and then whatever the consensus is he
16 probable would have written up the first copy. It's
17 possible that Mrs. Hearn typed some things together
18 and then Harvey reviewed it and then okayed it.
19 Q. But as a general proposition its your
20 understanding that the initial drafts person for
21 policies was Mr. Walls?
22 A. It would have come out of his committee,
23 that part I can say for sure.
24 Q. Do you recall any discussion of the rulings

38 (Pages 146 to 149)

Dobrich, et al.                         v.                    Indian River School District, et al.
Donald Hattier                  C.A. # 15-120 (JJF)                    October 10, 2006

Page 150

1 of it United States Court of Appeals Third Circuit,
2 that is referenced in the first line of Hattier
3 Exhibit 11. I'm sorry, sir, that's okay. It says
4 following the rulings of the United States Court of
5 Appeals Third Circuit?
6   A.   No, that I do not.
7   Q.   Do you recall whether there was a
8 discussion of those rulings?
9   A.   There may have been, we had a lot of
10 discussions at that particular time, but I don't
11 whether that one came up.
12  Q.   On way or another, you don't recall one way
13 or another?
14  A.   No, I do not.
15  Q.   Do you have any recollection as to why that
16 language and the language and past practices of
17 State of Delaware legislative bodies which continues
18 over to the second explain was not included in the
19 final version of the Board Prayer Policy?
20  A.   No, I don't.
21  Q.   In the summer of 2004 we established, I
22 think we established the time in point of view, the
23 Board had it's own attorney Mr. Griffin, correct?
24  A.   Yes.

Page 151

1   Q.   Am I correct based on your earlier answer
2 that you don't believe that Mr. Griffin drafted this
3 Hattier Exhibit 11 proposed policy?
4   A.   I don't think he did.
5   Q.   Do you know whether Mr. Griffin was
6 consulted at any point in the process of it
7 consideration and adoption of the Board Prayer
8 Policy?
9   A.   No, I do not.
10  Q.   Is it correct that you don't have any
11 present recollection that he was consulted?
12  A.   I don't have a present recollection that he
13 was. I don't know that he wasn't either.
14  Q.   Am I correct that you don't recall
15 Mr. Griffin's ever having provided any advice about
16 any draft of the School Board Prayer Policy?
17  A.   Not to my knowledge.
18       MR. ALLINGHAM: Would you mark as
19       Hattier Exhibit 12 a document bearing Bates
20       numbers BPD699 to 703.
21       (WHEREUPON Hattier Exhibit 12 was
22       marked for identification)
23  Q.   Take as much time as you want to to look at
24 it, but my first question to you, sir, is have you

Page 152

1 ever seen it before?
2   A.   I think so. There is something about this
3 that looks familiar. Let's put it that way.
4   Q.   Do you recall the context in which you
5 looked at it?
6   A.   It might have been in the meeting with
7 Mr. Neuberger. It probably was in a meeting with
8 Mr. Neuberger.
9   Q.   And What leads you to that conclusion?
10  A.   The it lengthiness of it.
11  Q.   Well, he is no different from any other
12 lawyer?
13  A.   No, sir he certainly isn't.
14  Q.   Anything else?
15  A.   That's it.
16  Q.   I'm going to operate on the premise that
17 you are right and that this was looked at in the
18 context of a meeting with Mr. Neuberger. Do you
19 know when such meeting took place?
20  A.   Again, on or about August, September,
21 October of 2004.
22  Q.   Look at the last page of exhibit 12?
23  A.   Okay.
24  Q.   You will see that there is what appears to

Page 153

1 be a file designation Indian River/public proposed
2 prayer resolution August 30, 2004?
3   A.   Okay.
4   Q.   Is that a district file designation?
5   A.   No, sir, not to my knowledge. If I
6 remember from the ones I've seen they usually have a
7 file and file extension afterwards, as opposed to
8 just a straight statement like this. Usually the
9 XLS or whatever the word document doc, something
10 like that. And it wouldn't be up that high either.
11 Generally speaking they'd be at the bottom of the
12 page. That's what I remember.
13  Q.   Then let me have you turn to the top of the
14 first page and you will see in brackets, it reads,
15 for release to the general public proposed School
16 Board Prayer Resolution dated 8/30/04 --
17  A.   Okay.
18  Q.   Prepared by the Rutherford Institute with a
19 telephone number and the Neuberger firm with a
20 telephone number?
21  A.   Correct.
22  Q.   Is it your belief that this document was
23 prepared by, and distributed to the Board prepared
24 by the Rutherford Institute and the Neuberger form,

39 (Pages 150 to 153)

Dobrich, et al.                          v.                Indian River School District, et al.
Donald Hattier                    C.A. # 15-120 (JJF)              October 10, 2006

Page 154

1  firm and distributed to the Board by Tom Neuberger?
2  A.   As I stated, I believe this is consistent
3  with something that he would have prepared.
4  Q.   Can we agree that it is likely that it was
5  distributed to the Board on or after August 30,
6  2004?
7  A.   I would agree to that. Again my assumption
8  is that it happened in that time frame somewhere.
9  Q.   And you do recall that it was distributed
10 to each Board member at that meeting?
11 A.   Yes, sir, I do.
12 Q.   Did anyone have any comments about this
13 document?
14 A.   I believe we discussed it at length.
15 Q.   Did you have any comments about this
16 document?
17 A.   Speaking for myself I would have to say
18 that I by and large agree with what's in it. I mean
19 I certainly feel that, you know I agree with what
20 George Washington wrote and Abraham Lincoln and I am
21 somewhat familiar with what Franklin Roosevelt would
22 have stated, as wells as president George Bush.
23 Q.   I'd like you to, before I go back to the
24 comments and opinions of Board members, I'd like you

Page 155

1  to compare page four at the bottom of Exhibit 12 to
2  the final Board policy which is Exhibit 9?
3  A.   All right, sir.
4  Q.   With the exception of some minor wording
5  changes in paragraph one, would you agree with me
6  that the five paragraphs at the bottom of pave five
7  are identical to the policy ultimately adopted?
8  A.   Substantively, yes.
9  Q.   On the other hand, the first four and a
10 half pages of the document were not adopted, was
11 there a reason for that?
12 A.   As stated earlier I believe it's
13 unnecessarily lengthy.
14 Q.   Was there any discussion of whether to
15 adopt, I'm going to call it the preamble to the five
16 paragraphs, was there any discussion at the Board
17 level of whether to adopt the preamble as well as
18 the five numbered paragraphs?
19 A.   I don't recall any real discussion.
20 Q.   Because the draft prepared by the
21 Rutherford Institute appears to have included the
22 preamble in the Policy on Prayer at Board Meetings
23 as you can see from the first page. You don't
24 recall any discussion about why it was taken out of

Page 156

1  the final policy?
2  A.   As a general rule, and I'm speaking for
3  myself, okay, the more that you have written down
4  the more it is for somebody to have an ability to
5  attack you at a later time period, and I think that
6  by keeping it short and concise it makes it a lot
7  easier to administer.
8       One of the problems in my believe is that
9  we have too many laws that are too wordy as it is
10 and it allow too much room for people to insert
11 their own interpretations. There is old statement,
12 kiss keep it simple stupid. And I think that
13 admonition applies in this particular case.
14 Q.   Did that principle also apply to just
15 continuing with the practice and having no policy at
16 all on School Board prayer?
17 A.   I believe that in the circumstances that we
18 were facing ourselves with, that having no policy at
19 all created an even bigger issue.
20 Q.   Let me ask you this, did the policy as
21 adopted in Hattier Exhibit 9 change the practice of
22 the Board in any way with respect to its offering of
23 prayers to open School Board meetings?
24 A.   Yes, sir, I believe it did.

Page 157

1  Q.   How did it change the practice?
2  A.   Previous time periods I seem to recall one
3  or two individuals opening with prayer on somewhat
4  regular basis, at least for the parts that I paid
5  attention to. I believe that as a result of this we
6  have included a lot more people and rotated it
7  around on a more regular basis than we certainly did
8  prior to that.
9  Q.   Was that a change that you agreed with?
10 A.   Yes, sir.
11 Q.   Did you do view that as beneficial?
12 A.   Yes, sir.
13 Q.   Why did you view it as beneficial?
14 A.   Because it included more people's opinion.
15 Q.   Any why is it useful to include more
16 people's opinions?
17 A.   If we are representing a broad
18 cross-section of the public from five different
19 areas with ten different individuals, it would be
20 nice if we all had an opportunity to be heard.
21 Q.   Why wouldn't that same policy as you
22 suggest that you should have prayers from a broader
23 spectrum than merely the ten Board members?
24 A.   Because if my reading of the law is

40 (Pages 154 to 157)

Dobrich, et al.
Donald Hattier

v.

C.A. # 15-120 (JJF)

Indian River School District, et al.
October 10, 2006

Page 158

1  correct, and again I'm not an attorney, but if my
2  reading of the law is correct, if we invite outside
3  people to come in you actually increase the
4  likelihood of there being a problem.  In some of the
5  cases that I read it seemed to me that it just
6  seemed to increase the potential for problems.
7      Q.   All right coming back to the issue of the
8  discussion of the Rutherford draft, Hattier Exhibit
9  12, I'm going to try to help you, to quote Jerry
10 McGuire have you help me, in figuring out when this
11 policy was first discussed.
12             MR. ALLINGHAM:  I want to mark as
13      Hattier Exhibit 13 a document bearing Bates
14      number BPD1291 and 1292.
15             (WHEREUPON Hattier Exhibit 13 was
16      marked for identification)
17     Q.   Dr. Hattier, you've been in litigation
18 before so you may know, but I always explain to
19 people, redacted is a lawyer's word meant to
20 indicate that some material has been taken out or
21 masked from the document.
22     A.   Correct.
23     Q.   But some portion of the minutes of a
24 special Board meeting on August 23 executive session

Page 159

1  is reflected here.  Do you recall that on the day
2  before the have large meeting on August 24th the
3  Board held a special meeting at the Sussex Central
4  Middle School Library?
5      A.   Yes.
6      Q.   Do you recall for what purpose that special
7  meeting was called?
8      A.   If I'm not mistaken it was called to
9  discuss, geez, I believe it was called to discuss
10 the entire issue of the prayer at the graduation as
11 well as potential prayers before School Board
12 meeting.  That's what I seem to remember.
13     Q.   Sort of the global prayer in school issue?
14     A.   Yes, sir, it was a global in my mind it was
15 a global conversation, that's a good word.
16             MR. ALLINGHAM:  Okay, off the
17      record for a minute.
18             MS. DUPHILY:  We are going off the
19      record at approximately 2:07 p.m..
20             (WHEREUPON a brief recess was
21      taken)
22             MS. DUPHILY:  Back on the
23      record at approximately 2:11 p.m..
24             MR. ALLINGHAM:  Let's mark as

Page 160

1  Hattier Exhibit 14 a document bearing Bates
2  numbers IRSD45360 through 5362.
3             (WHEREUPON Hattier Exhibit 14 was
4      marked for identification.)
5      Q.   I'm trying to just put together how this
6  worked, Dr. Hattier.  So, let me start with Hattier
7  Exhibit 14 which is, I believe the minutes of the
8  special meeting on Monday August 23, is that
9  correct?
10     A.   Yes, sir, that's what it appears to be.
11     Q.   And you are reflected as present both on
12 the roll call which is the last page and I think
13 also on the roll call reflection on the second page
14 of the minutes?
15     A.   Correct, sir.
16     Q.   The meeting was called to order at 7
17 o'clock and moved immediately on a motion by
18 Mr. Helms, seconded by you to go into executive
19 session to seek advice from our legal counsel
20 regarding potential litigation.  And right under
21 that are A and B, strategy session to discuss
22 collective bargaining, pending or potential
23 litigation and such other business as may properly
24 be discussed in an executive session.  Am I correct

Page 161

1  that that is the Board's record of the reasons why
2  it went into executive session?
3      A.   Yes, sir.
4      Q.   And in this case there was not a collective
5  bargaining it was pending potential litigation?
6      A.   That's what I'm going to recollect.  I a
7  lot of times we go into executive session, other
8  things like the pending, excuse me, the collective
9  bargaining will be thrown in.
10     Q.   Okay.  The other visitors and staff in
11 attendance is Lois Hobbs, Earl Savage, Janet Hearn,
12 Patrick Miller and James Griffin.  Is the legal
13 counsel from whom you -- that was going to be a very
14 bad question.  Is the legal counsel that you were
15 going to seek advice from in executive session,
16 Mr. Griffin?
17     A.   That's what it looks like yes, sir.
18     Q.   Now let's go to the executive session
19 minutes?
20     A.   Okay.
21     Q.   The Board went into executive session at
22 7:01 according to the regular minutes and came out
23 of executive session at 11:15.  So, a little over
24 four hours of executive session on this topic?

41 (Pages 158 to 161)

Dobrich, et al.                                              v.                    Indian River School District, et al.
Donald Hattier                                    C.A. # 15-120 (JJF)                        October 10, 2006

Page 162

1    A.   Uh-hum.
2    Q.   My question to you is, is this to your
3    recollection the first time that the Board prayer
4    issue was discussed at the Indian River School
5    District Board?
6    A.   No.
7    Q.   Okay.  Do you recall a previous time when
8    it was discussed?
9    A.   Yes, sir.
10   Q.   When was that?
11   A.   It was first discussed when Mrs. Dobrich
12   came before the Board, I believe it would have been
13   in the July meeting, and we did at that time, we had
14   received some material from our attorney and it had
15   arrived the day that she arrived there.  We tabled
16   the discussion for the executive session time
17   period.  You know we had a lot of other things to
18   discuss that night as well.
19   Q.   Let's see if can get that?
20   A.   Okay.
21           MR. ALLINGHAM:  Let's mark as
22   Hattier Exhibit 15 a document bearing Bates
23   numbers BPD10 through 18.
24           (WHEREUPON Hattier Exhibit 15 was

Page 163

1    marked for identification.)
2    Q.   First of all, can you identify Exhibit 15
3    as the minutes of the June 15, 2004 meeting?
4    A.   Yes, sir I believe I can.
5    Q.   On page two page you will see under the
6    public comments section?
7    A.   Yes, sir.
8    Q.   Mona Dobrich, Mrs. Dobrich a parent of the
9    Jewish faith expressed concern about prayers at
10   School District events.  She asked that the Board
11   consider using a nondenominational prayer that would
12   be appropriate for all faiths at events such as
13   graduations, et cetera?
14   A.   Yes, sir.
15   Q.   Did you have an opinion, either supporting
16   or opposing the request that Mrs. Dobrich made at
17   the June 15th meeting as set forth in the minutes?
18   A.   I had no disagreement with what her request
19   was.
20   Q.   And when you say that you had no
21   disagreement, does that mean that you would believe
22   it to be appropriate that the Board use a
23   nondenominational prayer that would be appropriate
24   for all faiths at events such as graduations, et

Page 164

1    cetera?
2    A.   At that time I had just heard about the
3    entire event because I was unable to attend the
4    Sussex Central High School graduation because of
5    other issues with my children, and I was not 100
6    percent certain what the other gentleman, what the
7    preacher or pastor had said at that particular time
8    period.  It had essentially just come to my
9    attention within anywhere between a week or the day
10   before, I don't remember that.
11       All right, so if the prayer was overly
12   preachy I would not have had a problem with toning
13   it down.  I don't know.  I would certainly want to
14   have been supportive of Mrs. Dobrich's request.
15   Q.   If you look you at the next page, under
16   knew business, you will see a reference to
17   graduation ceremonies which reads, Ms. Hobbs
18   provided the Board with information regarding school
19   prayer from Mr. Griffin?
20   A.   Yes.
21   Q.   She apologized for the lateness of
22   providing the material however Mr. Griffin was out
23   of town due to a death in his family.  It was moved
24   by Mr. Helms seconded by Mr. Cohee to table this

Page 165

1    item until the next regular Board meeting.  The
2    passed unanimously ten zero.
3    A.   Yes, sir.
4    Q.   And i assume that you were one of those ten
5    votes?
6    A.   Yes, sir.
7    Q.   So, am I correct that at the June 15
8    meeting the issue was raised by Mrs. Dobrich but
9    there was no substantive discussion by the Board?
10   A.   No. As I recall it -- let me take back the
11   word no because I think we are using the work
12   incorrectly.  I believe that Mrs. Dobrich had either
13   talked to or confronted, made a phone call to Mrs.
14   Hobbs in some manner and had asked about the, you
15   know, what the prayer issue had been.
16       Mrs. Hobbs in accordance with what we would
17   request her to do, placed it on the Board agenda for
18   us to discuss.  Mrs. Dobrich would have talked to
19   Mrs. Hobbs some time immediately after the ceremony
20   at some time, in there.  I don't know what the time
21   frame was and Mrs. Hobbs went ahead and requested
22   information from Mr. Griffin, and then placed it on
23   the Board agenda for us to discuss.
24       So, whether Mrs. Dobrich would have

42 (Pages 162 to 165)

Dobrich, et al.                                    v.                   Indian River School District, et al.
Donald Hattier                          C.A. # 15-120 (JJF)                      October 10, 2006

Page 166

1  attended or not it was already on the meeting's
2  agenda for that particular night.
3      Q.  Oh, yes, sorry.  I was probably unclear?
4      A.  okay, sorry.
5      Q.  Is it correct forget the Dobrich pat of the
6  question that was just a preliminary, is it correct
7  that the Board did not substantively discuss this
8  issue at the June 15 meeting but rather tabled it to
9  be at addressed at the July meeting?
10     A.  I'm think for the most part we did discuss
11  it at the July meeting, but I believe there was some
12  incidental discussion on it in terms of some of the
13  materials that were presented.  Mr. Griffin had, I
14  think it was from Mr. Griffin, he had given us many
15  pages worth of reading to do and the way the evening
16  goes you do not have, you stated yourself, sir you
17  were on a school board, things start moving and you
18  don't have five or ten minutes, people read at
19  different rates, for us to actually read it and then
20  to be able to discuss it.
21      This would have given us time to read the
22  material and to be able to comment on it in an
23  intelligent manner.
24     Q.  And was the materials that Mr. Griffin

Page 167

1  provided to the Board among the materials that you
2  as a Board member considered in your ultimate vote
3  to adopt the School Board Prayer BDA.1?
4      A.  Yes, sir.
5          MR. ALLINGHAM:  Okay, now let me
6      mark as Hattier Exhibit 16 a document
7      bearing Bates number BPD32 through 40.
8          (WHEREUPON Hattier Exhibit 16 was
9      marked for identification.)
10     Q.  And again can you confirm for me that these
11  are the minutes of the July 27, 2004 meeting?
12     A.  Yes, sir, I will do that.
13     Q.  And as the roll call section on the first
14  page reflects you were in attendance at this
15  meeting?
16     A.  Yes, sir, I was.
17     Q.  If you look in the public comments section
18  on page two?
19     A.  Uh-hum.
20     Q.  You will see that 12 people are reflected
21  as having spoken regarding the districts's practice
22  of holding prayers at school sponsored events
23  including graduation ceremonies?
24     A.  Yes, sir.

Page 168

1      Q.  I'm assuming that you believe that that's
2  accurate reflection of the number of people who
3  spoke?
4      A.  Yes, sir.
5      Q.  All right, and it also said that comments
6  were equally made in favor of continuing and
7  discontinuing the present practice, do you see that?
8      A.  Yes, sir.
9      Q.  Do you believe that that's an accurate
10  reflection of what occurred?
11     A.  If that's what it says I'm going to go with
12  that.
13     Q.  Under old business, under graduation
14  ceremonies it was moved by Mr. Helms seconded by
15  Mr. Code to table graduation ceremonies until after
16  executive session, and the motion passed unanimously
17  seven zero.  Why did you vote to table the
18  graduation ceremonies issue until after you had gone
19  into executive session, you Donald Hattier?
20     A.  I believe that we still had a lot of issues
21  that we needed to cover before there was much that
22  we could do in public.
23     Q.  What were those issues?
24     A.  In terms of the adoption, should we do it,

Page 169

1  should we not do it.  That's pretty general.
2      Q.  I notice that there is no reference to the
3  rational for going into executive session.  At the
4  executive session portion of the minutes which you
5  will find at BPD39, which is the eighth page of the
6  minutes?
7      A.  Okay.
8      Q.  Four rationals are offered.  One has to do
9  with personnel, one has to do with strategy session
10  to discuss collective bargaining pending a potential
11  litigation, one is to conduct a hearing regarding
12  employee or student discipline and then there is the
13  catch all, D.
14      What was it about graduation ceremonies or
15  discussion of graduation ceremonies that you felt
16  justified going into executive session?
17     A.  To the best of my knowledge it would have
18  to do with the contentious nature of the subject, if
19  we had discussed it in a open meeting.  Certainly
20  with a lot of the people present.  At that
21  particular time I don't recall that we had a clear
22  understanding of what it is that we wanted to do,
23  and I felt that as a Board, speaking for myself,
24  that we needed to discuss it further, and how are we

43 (Pages 166 to 169)

Dobrich, et al.                               Indian River School District, et al.
Donald Hattier                v.              October 10, 2006
                    C.A. # 15-120 (JJF)

Page 170

1  going to approach it.
2       In other words, what is the approach that
3  should be taken. And I believe that we rightly
4  referred it to the policy committee because that's
5  where it should have gone.
6  Q.   Okay, you mentioned two things, one that it
7  was a contentious subject and the other that you
8  didn't have a consensus yet on what to do?
9  A.   That's my recollection, yes sir.
10 Q.   During the discussion did you discuss
11 potential litigation having to do with the
12 graduation ceremony?
13 A.   More than likely.
14 Q.   Did you discuss only the potential
15 litigation having to do with the graduation
16 ceremonies.
17 A.   No. We had a lot of other issues to
18 discuss in executive sessions, this particular one
19 as we do in most.
20 Q.   Did you receive any presentations from any
21 lawyers during the executive session?
22 A.   I don't remember.
23 Q.   I'm looking at the lengthy list of other
24 visitors and staff in attendance?

Page 171

1  A.   Okay.
2  Q.   And I don't --
3  A.   What page are you on, sir?
4  Q.   It's the first and second page, carry over
5  to the second page. I clearly don't know everybody
6  but I don't see anyone that I can identify as a
7  lawyer there?
8  A.   Sorry, I can't either.
9  Q.   Okay. You went into executive session at
10 10:20 and reconvened at 12:10 a.m., do you know
11 whether there was any other matter discussed, other
12 than the graduation ceremony?
13 A.   Yes, sir.
14 Q.   What was that?
15 A.   I'm almost 100 percent positive that we had
16 disciplinary issues to discuss with the kids, or
17 about some of our children who needed the
18 disciplining referral, drug therapy, whatever and
19 then I believe there was something to do also with
20 several employees. I mean I'm doing this off the
21 top of my head. Student hearings, there was the
22 secretarial contract which was discussed we had a
23 discussion on the confidential secretaries, and then
24 we would have also have had a conversation about the

Page 172

1  personnel agenda and addendum.
2       And you had asked earlier what we do in
3  terms of the board, at each executive session we
4  have, we are given a list of individuals who are
5  hired, fired promoted, moved around, transferred,
6  whatever and we all take a look at who is being
7  moved, et cetera and then we vote on it.
8  Q.   Okay. After you came out of executive
9  session on page nine of the minutes at the top of
10 the page you'll see that it was moved by Mr. Helms,
11 seconded by you to refer the graduation ceremonies
12 matter to the policy committee?
13 A.   Correct.
14 Q.   During the executive session was there
15 substantive discussion of the issue, or did someone
16 propose look isn't this a policy question we ought
17 to refer it to the policy committee?
18 A.   It's probably both. I mean in terms of an
19 executive session we went at ten something and came
20 out at 12:10, that's actually a short meeting.
21      I mean there is sometimes we have been in
22 there three and half, four hours, so if we were in
23 there for an hour or so, all things considered
24 that's a short meeting.

Page 173

1  Q.   Well, my question is other than discussion
2  of referring the matter to the policy committee what
3  was said during the executive session?
4  A.   My guess would be, and that's what it is is
5  a guess, is that we had some of the materials from
6  Mr. Griffin that we would have discussed in terms of
7  what is some of the applicable case law, what is it
8  we want to do about it and how do we want to
9  approach it.
10 Q.   Let me ask you this question, we have a
11 June 20 fairly brief consideration but you have the
12 material from Mr. Griffin you have a July 27th
13 discussion, you have an August 23 discussion, you
14 have the big meeting on August 24; is it fair to say
15 that at least in casting your vote to approve the
16 School Board Prayer Policy you took into account all
17 of the matters and considerations that were brought
18 to your attention during the meetings that preceded
19 present --
20 A.   I would like to hope so.
21 Q.   When you say you would like to hope so --
22 A.   Yes, sir, it's a straight, yes, sir, I
23 apologize.
24 Q.   All right, so now to come back to Exhibit

44 (Pages 170 to 173)

Dobrich, et al.
Donald Hattier

v.

C.A. # 15-120 (JJF)

Indian River School District, et al.
October 10, 2006

Page 174

1    13. This is an executive session that lasted about
2    four hours and 15 minutes.  It doesn't appear from
3    the minutes that anything was discussed except the
4    global prayer issue?
5    A.    Uh-hum.
6    Q.    The only unredacted portion of that four
7    hour 15 minute discussion is reflected at the bottom
8    on the first page. It says during, the discussion
9    of this issue several Board members expressed that
10   their constituents do not want the Board to change
11   its practice of opening the meetings with a prayer.
12   It was not felt that a decision could be made this
13   evening regarding whether or not to change our past
14   practice.
15        So, first of all what I would like you to
16   tell me is which Board members expressed that their
17   constituents did not want the Board to change its
18   practice?
19   A.    To the best of my knowledge it was all of
20   us.
21   Q.    Well, the minutes say several the Board
22   members, which doesn't sound like all?
23   A.    Understood.
24   Q.    You believe every single Board member said

Page 175

1    that?
2    A.    To the best of my knowledge. I don't
3    believe we had any dissention at that time. I don't
4    believe that.
5    Q.    So, at the August 23 meeting as well as you
6    can recall every Board member who was present, which
7    includes I believe every Board member, yes --
8    A.    Ten zip.
9    Q.    Expressed the view that his or her
10   constituents did not want the Board to change its
11   existent practice?
12   A.    That would be my belief, yes sir.
13   Q.    And in expressing that view did the Board
14   members say my constituents unanimously don't want
15   the Boar to changes its practice, a majority of my
16   constituents don't want the Board to change its
17   practice, the ones that I happened to talk to don't
18   want the Board to change it's practice?
19   A.    I can comment on those that talked to me
20   and in which case it would have been a majority,
21   majority who wanted us to continue what we were
22   doing. I cannot comment on what the other gentlemen
23   and ladies were thinking or going through.
24   Q.    This is one of those things where it's hard

Page 176

1    sometimes to keep a close eye on what we are saying.
2    So, in expressions your view that your constituents
3    did not want the Board to change it's practice, what
4    you were basing that expression on was that a
5    majority of your constituents had said that?
6    A.    Yes, sir.
7    Q.    A majority of the constituents that you had
8    talked to?
9    A.    A majority of the constituents that I had
10   talked to, a majority of the e-mails, not so much
11   e-mails but the newspaper editorials, what we were
12   hearing from my wife's church, what we were hearing
13   from other people's churches.
14        I have a significant number of pastors in
15   my practice and a lot of people would you know just
16   in and state what their opinions were.
17   Q.    Would you read that answer back, please?
18        (WHEREUPON the preceding
19        answer was read back by the
20        reporter)
21   Q.    Okay, I want to explore those categories
22   for just a minute. The first one was the majority
23   of the people that you talked to?
24   A.    Correct.

Page 177

1    Q.    In advance of the August 23 meeting can you
2    give me an estimate of how many people you talked to
3    among your constituents on this issue?
4    A.    No, a raw number, no. I mean people --
5    Q.    Hundreds, dozens?
6    A.    Dozens at the minimum.
7    Q.    Dozens at the minimum?
8    A.    I'm an active --
9    Q.    As many as 100?
10   A.    More than likely.
11   Q.    And how is it that the issue came to those
12   people's, to those hundred people's attention?
13   A.    This was already in the newspapers at that
14   particular time and it was also on our local talk
15   show station and there were already starting to
16   appear a significant number of editorials in the
17   local Wave, the Coastal Point, I believe the Sussex
18   Countian and there is one other one, I the Sussex
19   Post we have in our area, too.
20   Q.    You talked about the majority of e-mails?
21   A.    I don't get a lot of e-mails on things like
22   this from my constituents because frankly I don't
23   publish my e-mail address. I have a spam problem or
24   did at the time like a lot of other people have had

45 (Pages 174 to 177)

Dobrich, et al.  
Donald Hattier

v.  
C.A. # 15-120 (JJF)

Indian River School District, et al.  
October 10, 2006

Page 178

1 and I see so many people in public life that for
2 them to e-mail me on these things is not a routine
3 thing.
4    Q.    All right, newspaper editorials, do you
5 mean editorials or letters to the editor?
6    A.    Letters to the editor, my mistake.
7    Q.    And information you got from your wife's
8 church, how did you get that information?
9    A.    My wife is very active in her church. I
10 talk to the pastor from time to time. I've
11 supported the youth league over there since that's
12 where my kids go and they've called and offered
13 their support in what we are doing. There are other
14 pastors as well that I know within the community who
15 called.
16    Q.    That's a separate category. So, on your
17 wife's church, you said they've called and offered
18 support for what you are doing?
19    A.    Yes.
20    Q.    Who is they?
21    A.    They would be whoever the people are that
22 attend the church, as well as the pastor, pastoral
23 staffs.
24    Q.    And this is up to the August 23 meeting.

Page 179

1 What was it that you were doing that they offered
2 support for?
3    A.    They basically wanted us to continue with
4 the practice of opening the Board meetings with
5 prayer.
6    Q.    Anybody say why?
7    A.    Most people for the same reason that I have
8 stated it, it's part of American historical movement
9 and it is part of the fabric and tradition of our
10 area for a very long time period. Some people were
11 just flat out offended that just one person could
12 change the law entirely. You know for the most part
13 people believe that it is the right thing to do.
14    Q.    Did you assure them that one person could
15 not change the law?
16    A.    No, sir, I can't do that. I don't believe
17 that, either.
18    Q.    Who was the one person who was threatening
19 to changes the law?
20    A.    Mrs. Dobrich.
21    Q.    Don't you think that if Mrs. Dobrich is
22 successful in this litigation she would have been
23 successful in enforcing the existing law?
24    A.    That's assuming that it is the existing

Page 180

1 law. That's what we are doing right now.
2    Q.    Well, if she is successful presumably it
3 will be the existing law?
4    A.    Then that's what it would be.
5    Q.    The pastors in your in your practice whom
6 you spoke to?
7    A.    Yes, sir.
8    Q.    How many pastors did you speak to, before
9 August 23rd?
10    A.    Six to ten.
11    Q.    How many people from your wife's church?
12    A.    A dozen perhaps.
13    Q.    How about people calling from other
14 people's churches?
15    A.    Perhaps another dozen.
16    Q.    And then people who just contacted you, how
17 many of those did you have, who don't fall into the
18 other categories?
19    A.    We can probably throw another dozen or so
20 into that. This was obviously a fairly hot issue in
21 the community.
22    Q.    All right, on this very hot issue, if add
23 them all up you had maybe 200 people who contacted
24 you?

Page 181

1    A.    That's a reasonable number.
2    Q.    And how many of those supported what you
3 were doing?
4    A.    The vast majority.
5    Q.    How many of those said we kind of agree
6 with Mrs. Dobrich?
7    A.    A few.
8    Q.    Did it occur to you that the categories of
9 constituents from whom you were hearing were perhaps
10 likely to be biased in favor of continuing what you
11 were doing?
12    A.    I believe that's probably true in any
13 political area, and yes that's a fair statement.
14    Q.    In expressing your view that your
15 constituents did not want the Board to change it's
16 practice what effort did you make to determine the
17 attitude of the people who hadn't gone out of their
18 way to contact you who had this, as you say built-in
19 bias?
20    A.    As I stated to you earlier, I also do what
21 I personally believe to be right, so I did not make
22 an extra effort to seek those out.
23    Q.    Well, did you try to be accurate in what
24 you tell your fellow Board members, don't you?

46 (Pages 178 to 181)

Page 182

1    A.   Yes.
2    Q.   So, did you tell your fellow Board members
3  that your constituents did not want the Board to
4  change its practice of opening the meetings with a
5  prayer?
6    A.   Yes.
7    Q.   Okay. You spoke to a maximum of 200 of
8  your constituents?
9    A.   We spoke to approximately 200 or
10  thereabouts.
11    Q.   200 of your constituents. It seems quite
12  clear to me, although you haven't been able to tell
13  me how many residents there are in your district,
14  there are more than 400, does that seem fair?
15    A.   That seems eminently fair.
16    Q.   So, to come back to my question is it
17  correct that you made no effort to find out the
18  views of the people who had not sought you out on
19  this issue?
20    A.   That's probably a fair statement.
21    Q.   Okay. Now when every other Board member
22  expressed his or her view that his or her
23  constituents did not want the Board to change its
24  practice, did they tell you whether they meant the

Page 183

1  majority of their constituents, all of their
2  constituents whom they spoke to or did they not
3  specify?
4    A.   I would say that it would be the majority
5  of the folks that they had talked to.
6    Q.   Okay, and is that what they told you at the
7  Board meeting?
8    A.   That is what I recall.
9    Q.   Okay, so it would be fair for me to
10  understand that what the Board members, what you
11  understood all of the Board members to be saying was
12  that a majority of their constituents who had
13  contacted them did not want their Board to change
14  its practice of opening its meetings with a prayer?
15    A.   That's a fair statement.
16    Q.   Did anybody ask what efforts had been made
17  to determine the views of the people who had not
18  contacted them?
19    A.   I don't recall any such question being
20  asked.
21    Q.   In addition to this expression that their
22  constituents did not want the Board to change its
23  practice of opening the meetings with a prayer, what
24  else was discussed during this four hour and 15

Page 184

1  minutes of executive session?
2    A.   I believe we also discussed some of the
3  issues regarding having prayer at a graduation and
4  prayer at things like school sponsored dinners and
5  athletic sponsored dinners, and that sort of thing.
6    Q.   And did the Board members also express
7  their views that their constituents wanted all of
8  those practices to continue as well?
9    A.   Yes.
10    Q.   Okay. Ultimately the Board adopted a
11  policy that prohibits prayers at many of those
12  functions, is that right?
13    A.   Yes, that is correct.
14    Q.   And so in those instances the Board chose
15  not to follow the wishes of its constituents?
16    A.   On those issues the Board chose to follow
17  what were the federal guidelines which were quite
18  specific regarding those types of instances. And
19  that's essentially what we incorporated into our
20  polices.
21    Q.   Well, in adopting, I'm only speaking about
22  the School Board Prayer Policy now?
23    A.   Okay.
24    Q.   Unless it comes to contrast that with other

Page 185

1  policies, but in adopting the School Board Prayer
2  Policy, first question, did you Donald Hattier
3  consider what your constituents wanted in terms of
4  continuing the Board practice of opening its meeting
5  with a prayer?
6    A.   No.
7    Q.   Then why did you bother do tell your Board
8  members what they wanted?
9    A.   Because that's what was asked.
10    Q.   Okay. Did any other Board member at any
11  time during consideration of the School Board Prayer
12  Policy express the view that that Board member was
13  taking into consideration what his or her
14  constituents wanted?
15    A.   I'm speculating from what I recall, I'd
16  have to say yes. I would have to state it as a
17  matter of fact, no I can't do that.
18    Q.   Which Board members do you believe said
19  such a thing, expressed the view that they were
20  taking into consideration what their constituents
21  wanted?
22    A.   Possibly Reggie Helms, who else was on at
23  that particular point. Reggie comes to mind the
24  most.

47 (Pages 182 to 185)

Dobrich, et al.                              v.                    Indian River School District, et al.
Donald Hattier                        C.A. # 15-120 (JJF)                       October 10, 2006

Page 186

1    Q.   What did Mr. Helms say in that respect?
2    A.   The fact that most of his constituents
3    requested that we leave things the way it has been
4    for a very long time period.
5    Q.   Did anybody respond we'd really love to
6    take into consideration what the law is?
7    A.   I believe the general consideration was
8    that since we are legislative body that we come
9    under March and therefor we are under the law. And
10   again I'm not an attorney, I'm a lay person, but
11   that is how I would read it.
12   Q.   Now, as of August 23 there had been no
13   opinion from Judge Farnan?
14   A.   That is correct.
15   Q.   Also as of October 19, 2004 when the policy
16   was adopted. So describe for me what consideration
17   was given or what basis was given for the conclusion
18   that the Board was a legislative body that fell
19   under Marsh?
20   A.   We are elected officials, we set policy, we
21   set tax rates, we set dates and from what we could
22   tell one of our Board members, and I do not recall
23   who, had pulled out the Delaware Code Book and had
24   looked this up and read it to us. I do not remember

Page 187

1    who it was, and if in my opinion that we came under
2    that as a legislative body and therefore we were
3    under Marsh.
4    Q.   The Delaware Code Book said you were a
5    legislative body that falls under Marsh?
6    A.   If we are a legislative body why would we
7    not come under Marsh.
8    Q.   Did you read the Marsh opinion?
9    A.   Yes.
10   Q.   You understand that there is a factually
11   intensive analysis of what the board did, what
12   the --
13   A.   As much as a lay person I can understand,
14   yes, okay, and that's again where some comments were
15   made that this has been a continuing part of the
16   fabric of the American way of for the last 200 plus
17   years.
18   Q.   You seem like a person with genuine
19   curiosity about these issues?
20   A.   Absolutely.
21   Q.   Have you read the opinions that have been
22   issued on the question of School Board prayer?
23   A.   Which opinions are you talking about
24   because I have read a lot of them at this particular

Page 188

1    point but again I'm not an attorney and I don't have
2    the kind of mind that stores that sort of
3    information. But I have read as many of them as I
4    could find.
5    Q.   I could give you names of cases, but since
6    I don't have that kind of mind either I can only
7    give you a few and they'd probably be the ones that
8    come down on my side of the issue.
9    A.   Probably.
10   Q.   But let me just ask you based on your
11   curiosity and investigation of this issue, would you
12   agree with me that the issue of whether a School
13   Board is treated as a legislative body is a
14   factually intensive issue?
15   A.   Yes, it is.
16        MR. GOSSELIN: Objection.
17   A.   I'm also aware that various school boards
18   are constituted in different ways in certain states.
19   Some of them are appointed, some of them are
20   non-elected, not all of them set tax rates, not all
21   of them set legislative issues, but I do believe
22   under the definition that is used here in Delaware
23   we did come under that, and I would have to say that
24   it might be Delaware specific.

Page 189

1    Q.   The decision of the Board let me start
2    again. Did the Board arrive at a consensus that it
3    was a legislative body?
4    A.   I believe we did.
5    Q.   Do you know when it arrived at that
6    consensus?
7    A.   No, sir, I do not. Somewhere through all
8    of this.
9    Q.   Well, there was this long four hour
10   meeting, did the Board arrive at it at that
11   executive session meeting or was it later than that?
12   A.   I'm going to make a guess that we had
13   arrived as a body by the time that that meeting was
14   over that that is where we were.
15   Q.   Okay, the conclusion at the, and the only
16   part of this executive session minutes that I have,
17   says it was not felt that a decision could be made
18   there evening regarding whether or not to change our
19   past practice.
20        My question to you is, if you had arrived
21   at a consensus that the Board was a legislative
22   body, and if it was a legislative body it fell under
23   Marsh, and if it fell under Marsh it could open its
24   meetings with a prayer, and all of your constituents

48 (Pages 186 to 189)

Dobrich, et al.
Donald Hattier

v.
C.A. # 15-120 (JJF)

Indian River School District, et al.
October 10, 2006

Page 190

1  wanted you to open your meetings with a prayer, why
2  was it that it was not felt by the Board presumably
3  that a decision could be made this evening regarding
4  whether or not to change our past practice?
5      A.   I believe that was because as lay people
6  we were looking at that as an opinion rather than a
7  statement of fact and that we probably still needed
8  more guidance on the issue in order to proceed.
9      Q.   Okay. So, as lay people you arrived at a
10 consensus but you wanted more information?
11     A.   Yes, sir.
12     Q.   Where did you think that you were going to
13 get that information?
14     A.   From an attorney.
15     Q.   Was there an attorney present during this
16 four hour 15 minute executive session?
17     A.   If I remember right this may have been the
18 time period where Mr. Neuberger talked to us. It
19 may have been, okay, I don't specifically recall.
20 It was tie either some time in August or possibly
21 some time in September when he talked to us. I do
22 remember one very long meeting that we had.
23     Q.   If you look at the minutes of August 23rd,
24 which is Exhibit 14?

Page 191

1      A.   Right.
2      Q.   You will see that under other visitors and
3  staff in attendance, Mr. Neuberger is not listed but
4  Mr. Griffin is?
5      A.   August which date, sir?
6      Q.   August 23, it's Exhibit 14. Not the
7  executive committee, the regular meeting. If you
8  look at the stickers you will see the exhibit
9  numbers?
10     A.   Well, then that wasn't the meeting he was
11 here. Okay then he wasn't here that meeting then it
12 means that we met some time in September.
13     Q.   The person who was present at that meeting
14 was Mr. Griffin, is that correct?
15     A.   Correct.
16     Q.   And the Board had an opportunity to discuss
17 with Mr. Griffin whether the Board was a legislative
18 body?
19     A.   Yes, sir.
20     Q.   Did the Board discuss with Mr. Griffin
21 whether the Board was a legislative body?
22     A.   I believe we probably did.
23     Q.   So, you had already gotten advice from a
24 lawyer about whether the Board was an executive body

Page 192

1  as of the time that you concluded that you couldn't
2  make a decision?
3      A.   You know, as a I stated to you earlier, sir
4  Mr. Griffin is a general attorney and for what we
5  were discussing and with the potential for
6  litigation we felt that it would be better to pick a
7  different attorney for another opinion.
8          In my opinion Mr. Griffin, and he is a find
9  attorney, Mr. Griffin has served our district
10 extremely well over the years, but he is a general
11 attorney and his issues do not run into the First
12 Amendment as a general rule. He would do contract
13 law he would do personal issues, but, you know,
14 First Amendment issues are not the sort of thing
15 that routinely come across his desk.
16     Q.   So, you wanted to consult a First Amendment
17 specialist?
18     A.   That was my general feeling, yes, sir.
19     Q.   Was that the consensus of the Board by the
20 end of the August 23 executive session?
21     A.   I would have to speculate that the answer
22 is yes.
23     Q.   And did somebody say in words or substance
24 we better get ourselves a First Amendment Specialist

Page 193

1  to test our consensus?
2      A.   It would be the appropriate thing to do.
3      Q.   And in words or substance was that kind of
4  what the Board said --
5      A.   Something along those -- yeah, that's
6  actually, yes sir.
7      Q.   Did anyone say I wonder who we can get?
8      A.   Yes, sir.
9      Q.   And Who said that?
10     A.   Virtually all of us.
11     Q.   Did anyone answer who you could get?
12     A.   Yes, we discussed the Alliance Defense
13 Fund, Liberty Counsel, Pacifica, we discussed
14 Rutherford. We discussed anybody who could
15 potentially do this pro bono.
16     Q.   Did you discuss the ACLU, they are big
17 First Amendment folks?
18     A.   The ACLU has a tendency to come down
19 against what we wanted to do so, no they were not
20 discussed other than as potential adversaries.
21     Q.   The roster of people that you discussed,
22 seems to me, and correct me if I am wrong, to be
23 identical to the roster of organizations that you
24 discussed and described as supportive of more

49 (Pages 190 to 193)

Case 1:05-cv-00120-JJF   Document 250-7   Filed 04/10/2008   Page 50 of 86

Dobrich, et al.                              v.                    Indian River School District, et al.
Donald Hattier                     C.A. # 15-120 (JJF)                              October 10, 2006

Page 194

1  traditional American values?
2  **A.  That is correct sir, that is a fair**
3  **statement.**
4  Q.  So that in looking for somebody to give you
5  advice on whether the Board was a legislative body
6  you identified legal organizations that were as you
7  understood it likely to be in line with more
8  traditional American values?
9         MR. GOSSELIN: Objection.
10  Q.  Correct?
11  **A.  As I understand it that is correct.**
12  Q.  That is what everybody wanted to do, right?
13  **A.  Yes, sir.**
14  Q.  Did you thank Mr. Griffin for his counsel
15  and tell him that you wouldn't be needing his advice
16  anymore in connection with these issues?
17  **A.  I'm quite certain that we thanked him.  In**
18  **terms of needing his advice, I don't know what to**
19  **say about that.**
20  Q.  And who was charged with contacting
21  Pacifica, Rutherford, ADF and so forth?
22  **A.  I believe Mr. Helms indicated that he had**
23  **talked to the Rutherford.  I may have contacted them**
24  **on about the same time period.  Reggie took the lead**

Page 195

1  **on that.  The folks that I had contacted as I stated**
2  **were ADF but I turned that over to the school system**
3  **rather than me pursuing it myself.  With my job**
4  **responsibilities and family responsibilities I**
5  **cannot handle that kind of a load.**
6  Q.  The load of contacting the ADF and finding
7  out whether they could advise you on this issue?
8  **A.  Yeah, and making all the necessary contacts**
9  **and setting up their meetings and sending the**
10  **materials, et cetera.**
11  Q.  All right, so you turned over to, you said
12  the school system, I assume you mean the district?
13  **A.  The district, yes, sir.**
14  Q.  You turned over to the district the task of
15  contacting ADF, Mr. Helms took the lead in
16  contacting the Rutherford?
17  **A.  Yes, sir.**
18  Q.  And you mentioned a couple of other legal
19  organizations, did anybody contact them as well?
20  **A.  I don't remember.**
21  Q.  So, at the end of the day, the Board
22  concluded not to hire anybody who was a specialist
23  in the First Amendment, who was a specialist in the
24  First Amendment to advise you on whether the Board

Page 196

1  was a legislative body, is that right?
2         MR. GOSSELIN: Objection.
3  **A.  If you recall we also had the issue of**
4  **insurance coverage and I don't remember at that time**
5  **whether our insurance company had gotten back to us**
6  **yet or not in terms of determining how they would**
7  **want to approach the issue because if we are being**
8  **sued we have an obligation to work with them as**
9  **well.  And I'm not quite sure whether they had**
10  **responded back to us at that point what their**
11  **position was or how they would approach it, I don't**
12  **remember that.**
13  Q.  That's helpful, but my question was at the
14  end of the day you never did retain an organization
15  that was a First Amendment specialist to provide you
16  with an opinion on whether the Board was a
17  legislative body?
18  **A.  You mean in terms of --**
19         MR. GOSSELIN: Objection.
20  **A.  -- of the overall suit itself?**
21  Q.  Correct?
22  **A.  No, we did not.**
23  Q.  And you personally didn't retain a First
24  Amendment specialist?

Page 197

1  **A.  No, I did not.**
2  Q.  At the special meeting on August 23 was
3  there any discussion of the fact that there was
4  going to be a regular meeting on August 24?
5  **A.  Yes, sir.**
6  Q.  And tell me what the substance of that
7  discussion was?
8  **A.  That we were going to discuss it on August**
9  **24th?**
10  Q.  Was there anything that you would be able
11  to discuss on August 24th that you couldn't have
12  discussed on August 23rd?
13  **A.  Yes.**
14  Q.  What was that?
15  **A.  Because if you figure that we blocked out**
16  **four hours to simply discuss all of this in one**
17  **meeting that would have put us home Wednesday tome**
18  **time at 3:30 or 4 o'clock in the morning and since**
19  **virtually all School Board members are volunteers**
20  **non-paid and we have other jobs we would not be able**
21  **to discuss the issue all in one shot.**
22      **This was a way for to us get together and**
23  **discuss the issue and then still be able to do the**
24  **School Board functions the next day.  That's how I**

50 (Pages 194 to 197)

Dobrich, et al.                                    v.                   Indian River School District, et al.
Donald Hattier                            C.A. # 15-120 (JJF)                      October 10, 2006

Page 198

1    looked at looked it.
2        Q.    Sure, but as you said the reason that you
3    couldn't make a decision on August 23rd was that you
4    wanted to get the advice of a First Amendment
5    specialist?
6        A.    Right.
7        Q.    Other than Mr. Griffin and different from
8    Mr. Griffin on the issue of whether the Board was a
9    legislative body or not.  You weren't going to have
10   that by August 24th were you?
11       A.    No, I don't believe we were.
12       Q.    Was there any discussion of, you know,
13   where you should have that August 24th meeting?
14       A.    In the normal rotation.
15       Q.    Was there any discussion of whether there
16   was a overflow expected?
17       A.    No, sir, I don't believe that came up.
18       Q.    Did you expect there to be an overflow at
19   that August 24 meeting?
20       A.    No, I did not.
21       Q.    Prior to the August 24 meeting you had had
22   occasion to discuss the issue of School Board prayer
23   on a talk show hosted by a Dan Gaffney, is that
24   right?

Page 199

1        A.    Yes, sir.
2        Q.    Were you invited to go on that talk show?
3        A.    No, I'm pretty sure I just called to answer
4    some of the public's questions about it.
5        Q.    was it your hope that the public's interest
6    would be engaged in this important issue by your
7    appearing on the WGMD talk show?
8        A.    No, sir.
9        Q.    What was your hope in appearing --
10       A.    That I would be able to clear up the
11   factual misconceptions which were out there.
12       Q.    So, you had identified some factual
13   misconceptions?
14       A.    Quite a few.
15       Q.    Can you tell me what they were?
16       A.    Yes, sir there were a lot of people who
17   were saying we were taking prayer out of school all
18   together.  When essentially that was something that
19   had already been done a long time ago.  There were
20   people who -- it essentially ran along those lines.
21   In other words, they did not understand what the
22   real issues in the case were and the way I
23   understood them at the time and still do, is that we
24   had the issue of any kind of a prayer or benediction

Page 200

1    at a graduation, Baccalaureate ceremony and prayer
2    before the School Board meetings.
3        I mean essentially that's what it was, it
4    had nothing to do with the way I saw it teachers
5    leading kids in prayer in schools or offering an
6    early morning prayer over the loud speaker.  For
7    some reason a good number of the general public
8    seemed to have felt that that was something that we
9    were still doing when in point of fact that's been
10   out of the program for many many, many years.
11   That's if it ever was in our program to begin with.
12   And I'm not aware of any of that since consolidation
13   around the 1970s.
14       Q.    How did the misconceptions come to your
15   attention?
16       A.    By the types of phone calls and comments
17   and by the types that we talked about earlier.  I
18   mean if you go back and look at some of the letters
19   to the editor that were written there, it was quite
20   clear that a lot of people did not understand all of
21   it.
22       Q.    I might have asked you this question and it
23   just got lost in my backs and forths.  Did you
24   suspect there to be an overflow at the August

Page 201

1    24th --
2        A.    No, sir, I did not.
3        Q.    Sorry I did ask that now that I've said it
4    again.  All right, at the August 24th meeting you
5    were in attendance correct?
6        A.    Yes, sir.
7        Q.    Were you surprised by the number of people
8    who were in attendance?
9        A.    Overwhelmed.
10       Q.    And were you gratified?
11       A.    Not particularly.
12       Q.    Arrangements had been made to deal with the
13   overflow of people beyond the auditorium do you
14   recall that?
15       A.    Yes, sir.
16       Q.    Do you know who made those arrangements?
17       A.    I'm going to the assumption that it was by
18   our staff personnel in the school itself.
19       Q.    Do you know how the staff personnel came to
20   learn that there was a likelihood that there would
21   be an overflow and that video cameras would be
22   necessary?
23       A.    No, I do not.
24       Q.    Did you ever have a discussion about that

51 (Pages 198 to 201)

Dobrich, et al.                          v.                    Indian River School District, et al.
Donald Hattier                    C.A. # 15-120 (JJF)                         October 10, 2006

Page 202

1    with anybody?
2    **A.   No, sir.**
3    Q.    It's your testimony, sir, I take it that
4    your appearance on the WGMD talk show was not
5    intended to increase the number of people in
6    attendance at the August 24 Board meeting?
7    **A.   No, sir it is not.  That had nothing to do**
8    **with why I appeared on the radio.**
9    Q.    Were you on the radio at the time that
10   Mr. Gaffney said you all ought to go out to the
11   Board meeting and express your views?
12   **A.   I don't remember.**
13   Q.    Dr. Hattier, you believe that a moment of
14   silence would be effective to solemnize the Board's
15   proceedings, isn't that right?
16   **A.   That is correct.**
17   Q.    And you believe that Board members are
18   capable of privately reminding themselves to take
19   their responsibility seriously, is that correct?
20   **A.   I would say.**
21   Q.    And you believe that Board members are
22   capable of privately reminding themselves to
23   discharge their duties as Board members to the very
24   best of their abilities?

Page 203

1    **A.   I would certainly hope so, sir.**
2    Q.    When you go into executive session do you
3    inquire of the district attorney whether the topics
4    for discussion at executive session are appropriate
5    for executive session.
6    **A.   I have never done that, no, sir.**
7    Q.    Actually that's good because I would want
8    to know what you did.  Have you ever seen another
9    Board member inquire of the district's attorney
10   whether the topics to be discussed are appropriate?
11   **A.   Not that I remember.**
12   Q.    Do you know -- are you familiar generally
13   with the appropriate topics for executive session?
14   **A.   Things that would be considered private**
15   **things that would relate to employment, anything**
16   **that mentions a specific name of anyone who is**
17   **either in trouble or is facing some kind of a**
18   **suspension, contract negotiations, things that**
19   **generally would probably be best not seen by the**
20   **public and in this case I'm talking contract**
21   **negotiations, items relating to strategies in a**
22   **lawsuit such as this one.  You know that's**
23   **essentially what I would feel.**
24               MR. ALLINGHAM: I'm getting the

Page 204

1    word that we have to stop for a minute.
2    let's go off the record.
3               MS. DUPHILY:  We are going off the
4    record at approximately 3:05 p.m..
5               (WHEREUPON a brief recess was
6    taken)
7               MS. DUPHILY:  We are back on the
8    record at approximately 3:20 p.m..
9    Q.    Dr. Hattier, in the August 23 executive
10   committee, sorry, executive session minutes which is
11   Exhibit 13, I hope you have in front of you.  I
12   asked you some questions about the Board members
13   expressing that their constituents did not want the
14   Board to change its practice of opening the meeting
15   with a prayer.  And we have identified that as a
16   very rough estimate maybe 200 people, you had
17   contact with 200 of your constituents on that issue?
18   **A.   Yes.**
19   Q.    Did any of them tell you that they wanted
20   to Board to continue their practice in order to
21   preserve Christian values?
22   **A.   I think some of them did.**
23   Q.    Did you inquire what that meant?
24   **A.   No.**

Page 205

1    Q.    Did you inform those constituents that it
2    was not the purpose of the School Board Prayer
3    Policy being considered to preserve Christian
4    values?
5    **A.   Yes, I did, as many of them as I could.**
6    Q.    What did they say?
7    **A.   She listened.**
8    Q.    Anybody respond that they didn't care that
9    what they wanted to do was preserve Christian
10   values?
11   **A.   uh-hum, yes.**
12   Q.    How many?
13   **A.   I can't tell you that, I don't know.**
14   Q.    Somewhere between zero and 200?
15   **A.   Probably less than that.  Well, certainly**
16   **no less than zero, but I don't think it was a**
17   **majority.**
18   Q.    I was I being facetious, and that's not
19   right because it won't come through properly.  But
20   it was not one or two, this was a significant number
21   of?
22   **A.   Yes, sir.**
23   Q.    Of you constituency that you talked to,
24   correct?

52 (Pages 202 to 205)

Dobrich, et al.                                                                    Indian River School District, et al.
Donald Hattier

v.

C.A. # 15-120 (JJF)

October 10, 2006

Page 206

1    A.   Yes, sir. As I stated earlier I think a
2    lot of people have a misunderstanding, or had a
3    misunderstanding as to what was really at issue, and
4    I'm somewhat convinced that there is still a lot of
5    people who still don't understand what's at issue.
6         You know as is true with almost any
7    situation the public sees the part that they want to
8    see. They don't see all of the details. That's my
9    opinion.
10   Q.   And your concern in that respect would be
11   that the public would perceive this School Board
12   Prayer Policy with the purpose that you have
13   articulated for it as serving a different purpose,
14   that is preserving Christian values?
15        MR. GOSSELIN:  Objection.
16   A.   Some of them might, and some of them
17   probably would.
18   Q.   On a different issue we talked about advice
19   from Mr. Griffin during the executive session
20   minutes and you were concerned that Mr. Griffin was
21   not a First Amendment lawyer.  Are you aware of any
22   instances in the past where the Board relied on
23   Mr. Griffin's advice on First Amendment issues?
24   A.   No, sir I'm not aware of that at all.

Page 207

1    Q.   At any time during the four hours or so of
2    this executive session on August 23, remember this
3    is the one with Mr. Griffin there, the discussion of
4    constituents and whatnot, did any Board member
5    express any concern about the fact that students
6    attend Indian River School District School Board
7    meetings?
8    A.   I believe that it came up with the general
9    discussion.
10   Q.   What was discussed in the respect?
11   A.   That students were there, and it was
12   bantered back and forth as to, you know, is this
13   part of what we should be doing, is it part of not
14   what we should be doing.  But again I think that's
15   why we are here with the litigation is because the
16   students can also go to Legislative Hall where they
17   would do the same thing, you know whereas with what
18   we do. It would be more of a general discussion,
19   sir.
20   Q.   Did, I mean what triggered the discussion?
21   Did someone say well you know we have students at
22   School Board meetings maybe we shouldn't have
23   prayers?
24   A.   I believe if it came from anybody it would

Page 208

1    have come from Mr. Griffin in terms of discussing
2    what is the First Amendment, how you deal with
3    prayer and students in general.
4    Q.   So, your best recollection is it wasn't a
5    concern expressed by a Board member?
6    A.   Not to my best recollection, no, sir.
7    Q.   And I take it the only specific that you
8    can recall that was discussed on that topic was
9    somebody in words or substance saying hey they can
10   go to Legislative Hall in Dover and hear a prayer
11   there, why can't --
12   A.   Something to that general effect.
13   Something to that general effect.
14        MR. ALLINGHAM:  Let's mark as
15        Hattier Exhibit 17 a copy of a document
16        bearing Bates numbers BPD76 through 86.
17        (WHEREUPON Hattier Exhibit 17 was
18        marked for identification)
19   Q.   Again, my first question is can you
20   identify Hattier Exhibit 17 as the official minutes
21   approved by the Board of it August 24, 2004 Board
22   meeting?
23   A.   Yes, sir.
24   Q.   In the call to order you will see that

Page 209

1    president Walls called the meeting to order and then
2    asked Dr. Hattier to give a prayer?
3    A.   Yes, sir.
4    Q.   Did you know in advance that a Mr. Walls
5    was going to ask you tp give the prayer at that
6    meeting?
7    A.   Yes, sir I did.
8    Q.   How did you know that?
9    A.   I volunteered.
10   Q.   When did you volunteer?
11   A.   It could have been the night before or at
12   some other time, I don't remember.
13   Q.   And when you volunteered did you have in
14   mind the prayer that you wanted to give?
15   A.   Yes, I did.
16   Q.   And where did you get that prayer?
17   A.   It might have been brought in partially by
18   Mr. Neuberger at some point, and again I wish I
19   could remember when he actually talked to us, I
20   don't, okay.  The other thing is I went on the
21   Internet and I looked at about a half a dozen
22   historical prayers of various time periods and
23   decided on which one I felt fit the occasion the
24   best and that's what I gave.

53 (Pages 206 to 209)

Dobrich, et al.                                    v.                    Indian River School District, et al.
Donald Hattier                          C.A. # 15-120 (JJF)                        October 10, 2006

Page 210

1   Q.   What made you choose that particular
2   prayer?
3   A.   I like to consider himself myself an
4   amateur historian. I spend enough hours at VPI so
5   that I could have a minor in history on paper. VPI
6   does not minors, however, and I have continued with
7   a love of history all of my life and I felt that
8   since this is a contentious issue that if you would
9   like to argue with somebody you can argue with
10  George Washington. If it was good enough for George
11  Washington to give then why is it not good enough
12  for me to give also.
13  Q.   A rhetorical question?
14  A.   A rhetorical question, yes, sir.
15          MR. GOSSELIN: You can answer it.
16  Q.   The text of the prayer that you gave is not
17  in the minutes?
18  A.   No.
19  Q.   We have the prayer or we know the prayer
20  that you gave?
21  A.   Uh-hum.
22  Q.   Is it correct that that's not a prayer that
23  invokes particular religions, sorry. Your prayer
24  does not invoke the name of Jesus Christ?

Page 211

1   A.   That is correct.
2   Q.   And was that by design?
3   A.   No, that's more in keeping with the way I
4   personally would pray.
5          And actually if I looked, I gave my only
6   copies of that to several reporters when they left,
7   so personally do not have a copy of it. I mean if
8   you have a copy of it I'd be happy to discuss it
9   with you. But the way George Washington and some of
10  the contemporaries of the founding fathers used
11  words like the creator of our divine providence, et
12  cetera. The way they used the words would have been
13  different that perhaps in the way we do, but it may
14  have meant exactly the same thing if you look used
15  the words Jesus Christ. So, I would have to look at
16  exactly what I said. If you guys have a copy I'd
17  love to see it.
18  Q.   You brought more than one copy of the
19  prayer to the meeting?
20  A.   Yes, I did.
21  Q.   Was that for the purpose of distributing it
22  to reporters afterwards?
23  A.   I figured somebody might want a copy of it.
24          I seem to remember bringing two. One of

Page 212

1   them I had some handwritten notes on. I go through
2   multiple drafts of things which means that I would
3   have probably brought two of them. You know, one
4   that a more rough and another one that I scribbled
5   something else on. I do recall giving them both
6   away.
7   Q.   Do you know who you gave them to?
8   A.   No, sir. There were quite a few people
9   there that night.
10  Q.   Yes, so I understand. The minutes reflect
11  that a president Walls recommended that the agenda
12  be amended to allow 45 minutes for public comments
13  due to the large number of persons who requested to
14  speak at the meeting. That was approved 10 to
15  nothing. You voted for that, I take it?
16  A.   Yes, sir.
17  Q.   Was there any consideration given to
18  permitting as much time as necessary to let everyone
19  speak?
20  A.   The general speaking time period is 15
21  minutes and given the large numbers of people that
22  were there, we increased it to 45 minutes which is
23  basically three time what we would normally do, and
24  then I believe we always allowed some time at the

Page 213

1   end because there was also a second public comments
2   period, but as I stated earlier there are other
3   things that happen besides at the School Board
4   meeting besides this, and we did have other things
5   that we needed to discuss.
6          So, we could spend the entire night on it
7   which I don't see would have been very productive
8   which would have simply left us with a lot of other
9   Board items to do at another time period.
10  Q.   I want to come to the comments at the
11  meeting in few minutes. If you look at page four of
12  the minutes, under the public comments section?
13  A.   Page four, okay.
14  Q.   At the bottom of the public comment section
15  which lists all of the people who spoke, there is a
16  note from president Walls in which he notes, "That
17  the Board would be reviewing additional information
18  regarding this issue and that a public forum may be
19  scheduled in the future?"
20  A.   I believe he said that, yes, sir.
21  Q.   And was that something that had been
22  discussed by the Board in advance, this public forum
23  idea?
24  A.   We might have. I don't have a clear

54 (Pages 210 to 213)

Dobrich, et al.
Donald Hattier

v.

C.A. # 15-120 (JJF)

Indian River School District, et al.
October 10, 2006

Page 214

1   recollection of it, however.
2       Q.   Did the Board ever have a public forum on
3   these issues?
4       A.   I don't think we did.
5       Q.   Why is that?
6       A.   I don't know what to tell you there.
7       Q.   If you look at page six of the minutes up
8   you will see that there is a reference down at the
9   bottom to first reading of policy on school
10  ceremonies and observances?
11      A.   Uh-hum.
12      Q.   Mr. Griffin noted that the draft policy is
13  based on guidelines from the Department of
14  Education?
15      A.   Yes, sir.
16      Q.   And is that what Mr. Griffin told the
17  Board. I mean that was true, isn't it?
18      A.   It is true, but I think we had pretty much
19  arrived at the conclusion independently of what he
20  said that that's what we ought to be doing.
21      Q.   And the triggering event for consideration
22  of those issues was Mrs. Dobrich's comment to the
23  Board, is that correct?
24      A.   Yes, sir, I believe that to be true, yes.

Page 215

1       Q.   On page nine of the minutes there are
2   reflected two additional public comments from Pam
3   Shockley and Collen Waters, do you see that?
4       A.   It should be Colleen, I think. Oh, no wait
5   a minute that is Collen, sorry.
6       Q.   Mr. Griffin is noted as having informed Ms.
7   Shockley that according to the regulations of the
8   State Department of Education prayer must be student
9   issued and student led. Is that advice that
10  Mr. Griffin gave to the Board as well?
11      A.   I believe it is.
12      Q.   And then there is a executive session at
13  10:55 with the Board reconvening in public session
14  at 12:55. Was there a discussion at the executive
15  session of the public comments on the School Board
16  prayer issue?
17      A.   I don't remember. We were having a lot of
18  issues at that time with irrigation at the Sussex
19  Central High School, and I do remember Dr. Isaacs is
20  a director with the University of Delaware in the
21  agricultural department and I believe he spent a lot
22  of time discussing some irrigation things and what
23  we should be doing. I don't recall, I think we were
24  all surprised at the amount of people who came by.

Page 216

1   Like you guys noted you videotaped it, there was
2   just a huge amount of people. I think it surprised
3   all of us.
4       Q.   You understand that we didn't videotape it?
5       A.   Somebody videotaped it. I assumed it was
6   you guys, because somebody from your office has been
7   videotaping an awful lot of our meetings the last
8   two years. There is always somebody in the back
9   room, I believe it's this gentleman here who comes
10  in and he sits in the back and he has his little
11  video camera. So, my assumption was that he
12  videotaped us. I didn't.
13      Q.   So, you don't know who videotaped the
14  August 24 meeting?
15      A.   No, I do not.
16      Q.   It certainly wasn't at your direction?
17      A.   No, I didn't even know a videotape exits
18  until you guys just told me about it now.
19      Q.   Was the meeting audio taped?
20      A.   The policy is for Mr. Hearn to turn the
21  video, sorry, the audiotape on and record what is
22  said. I believe she did.
23      Q.   That is the policy of the Board?
24      A.   That would be the policy, the consistent

Page 217

1   policy.
2       Q.   Do you recall, do you have a specific
3   recollection in your mind of the tenor of the public
4   comments at the August 24 meeting?
5       A.   Everything from very respectful to very
6   angry. I mean it swung a huge gamut.
7       Q.   Were there comments that you found
8   offensive?
9       A.   Yes.
10      Q.   Was anything done to curb the offensiveness
11  of those comments?
12      A.   As is noted under the public comments
13  section, it is our job to listen, not, it is a one
14  way conversation. It is not our policy to comment
15  as a rule on what people say unless they get out of
16  line in terms of mentioning names. That has
17  happened in which case we have shut it down. I
18  think in some cases here we probably could have told
19  people to tone it down and didn't.
20           I mean like I said there were some things
21  that in my opinion went a little bit out of hand.
22  But when you are dealing with a large group of
23  people like that and everybody does have a right to
24  speak, you do not she screen beforehand what they

55 (Pages 214 to 217)

Dobrich, et al.                                v.                    Indian River School District, et al.
Donald Hattier                      C.A. # 15-120 (JJF)                         October 10, 2006

Page 218

1 are going to say.
2    Q.    Did the comments at the public comment
3 portion of the August 24 meeting confirm your view
4 that many members of the public understood the
5 School Board Prayer Policy to be an issue of whether
6 or not the Board would be preserving Christian
7 values.
8    A.    No. As a matter of fact, if I came away
9 with any impression at all it's that a huge amount
10 of people did not understand what the real issue was
11 and if you have listened to it, I think you would
12 agree that a lot of people did not really understand
13 what this was about.
14         Most of them in my opinion felt that more
15 or what was happening in here was changing something
16 that had been in our community for again at least
17 the 30 some odd years that we can document for sure,
18 and probably prior to that.
19    Q.    Yes, and if that practice was preserved as
20 people were urging, you understood that they were
21 urging its preservation as a way to preserve
22 Christian values, isn't that correct?
23         MR. GOSSELIN: Objection.
24    A.    I would have seen it more as a way of

Page 219

1 preserving what has been in the community for the
2 last 30 or 35 years. Again, everybody looks at
3 religious in their own way. Some people understood
4 it for the splenification that it is and some people
5 simply felt that something was being stripped away
6 from us period. So, I don't think you can lump them
7 all into one category.
8    Q.    Well, fair enough, I didn't mean suggest
9 that there was unanimity of expression, but didn't
10 you understand a number of the comments to be urging
11 the Board to preserve the existing practice in order
12 to preserve Christian values?
13    A.    Some people --
14         MR. GOSSELIN: Objection.
15    A.    I'm sorry, sir.
16         MR. GOSSELIN: Wait until he is
17 done asking the question, give me a chance to object
18 which I am doing here. Now you can answer the
19 question.
20    A.    Okay, thank you. I apologize. I'm certain
21 there were people who felt that way and did that,
22 yes.
23    Q.    Look at Hattier Exhibit 9 which is the
24 policy itself. You told me that it changed the

Page 220

1 Board's practice on prayer at regular Board meetings
2 in one respect, which is that it expanded the number
3 of Board members offered the opportunity to·
4 solemnize the proceedings either with a prayer or a
5 moment of silent whatever?
6    A.    Right.
7    Q.    The policy itself, though, provides that if
8 a member chooses not to exercise the opportunity the
9 next member in rotation shall be given the
10 opportunity, correct?
11    A.    That is what I understand, yes.
12    Q.    So, unless all ten members decline the
13 opportunity there will be a prayer or a moment of
14 silence in accord with the freedom of conscience of
15 the individual adult Board members, is that right?
16    A.    That is the way it's written.
17    Q.    In practice, since you offered the prayer
18 at the August 24th meeting, since that time has
19 there been any meeting at which there has, a Board
20 member has not taken up the opportunity to solemnize
21 the proceedings?
22    A.    I believe that to be true. Some of them
23 have not chosen to, have chosen not to speak or not
24 to pray or whatever.

Page 221

1    Q.    And in that instance the opportunity goes
2 to the next Board member?
3    A.    Yes.
4    Q.    And is there some, how do you keep track of
5 who's next in the rotation?
6    A.    That's up to the president of the Board and
7 I'm not sure how he keeps track of it.
8    Q.    That's a question I got to ask him?
9    A.    Yeah answer that for you, sir.
10    Q.    Let me make sure that I understand. If an
11 individual Board member affirmatively wishes not to
12 have a prayer or a moment of the silence there is no
13 way for him to effectuate that desire under the
14 policy, is there?
15    A.    It doesn't look like it, does it.
16    Q.    We have now gone through the June, July and
17 August meetings and so far as I can tell from the
18 Board minutes there has still been no public
19 discussion of the School Board Prayer Policy, is
20 that correct?
21    A.    Probably correct.
22    Q.    Did the School Board read policy BDA.1
23 before it voted on it?
24    A.    Yes, sir.

56 (Pages 218 to 221)

Dobrich, et al.                          v.                Indian River School District, et al.
Donald Hattier                    C.A. # 15-120 (JJF)                      October 10, 2006

Page 222

1    MR. ALLINGHAM: This would be
2    Hattier Exhibit 18 bearing Bates number
3    BPD182 through 191.
4         (WHEREUPON Hattier Exhibit 18 was
5    marked for identification)
6    Q.    Here on September 28th you will see that
7    there is an executive session from 6:30 to 7:15 --
8    by the way, these are the official meeting minutes
9    of this meeting, is that correct?
10   A.    Yes, sir.
11   Q.    And there is an executive session from 6:30
12   to 7:15?
13   A.    Yes, sir.
14   Q.    The only topic is collective bargaining
15   pending a potential litigation. Am I correct that
16   that executive session was convened to discuss the
17   School Board Prayer Policy?
18   A.    I don't remember.
19   Q.    On page three of the minutes, you will see
20   under public comments that you are recorded as
21   thanking the administration for their work in
22   organizing a plan to successfully handle the large
23   number of persons in attendance at last month's
24   Board meeting, do you see that?

Page 223

1    A.    Yes, sir.
2    Q.    How did you come to learn that the
3    administration had organized a plan successfully to
4    handle those persons?
5    A.    I found out that they had contacted the
6    Delaware State Police to see to it that the traffic
7    was handled smoothly, that parking would be handled
8    smoothly, that there were chairs set up in virtually
9    two auditoriums, that they had gone to the extra
10   effort to see to it that there would be video
11   cameras and monitors in the school gymnasium itself
12   to handle, that way people weren't just standing
13   around.
14       You know, when you look at the numbers --
15   the average School Board attendance might be 50
16   people, you know, you said you were a School Board
17   member, it's generally under attended and all of a
18   sudden we have anywhere between, I'm going to make a
19   guess, six to 800 people. There was a large group
20   in any event.
21       I think it reflected well on the
22   administration to have planned ahead for that, and
23   to handle it so that there were no incidents of any
24   type. There weren't even parking accidents. I

Page 224

1    think they did really good.
2    Q.    So, it didn't come, there are people to
3    whom it didn't come as a shock that there were going
4    to be hundreds and hundreds of people?
5    A.    Apparently not, no, sir.
6    Q.    But it as a shock to you?
7    A.    Actually yes, it was.
8    Q.    On page six of the minutes you will see
9    that near the top Mr. Walls submitted Policy BDA.1
10   Board Prayer at Regular Board Meetings for a first
11   reading. Do you have any reason to doubt that it
12   was September 28th that the policy was first read?
13   A.    No.
14   Q.    So, am I correct that at some point between
15   August 24 and September 28 --
16   A.    Wait a minute, back up, I'm sorry. I was
17   reading the wrong thing, sir.
18   Q.    Okay, page six.
19   A.    Okay got it, top of the page first reading
20   all right, thank you.
21   Q.    Am I correct that at some point between
22   August 24th and September 28th the Board policy
23   committee arrived at a final determination about the
24   text of the proposed Board Prayer Policy?

Page 225

1    A.    Yes, sir.
2    Q.    Now, in the process of adopting polices
3    dust the Board approve the proposed text as well
4    before it goes to reading?
5    A.    That's the purpose of the first reading.
6    Q.    Okay. There is also a first reading for
7    Policy IN.1 on Religion and the policy on School
8    Prayer at Commencement and Baccalaureate, these are
9    all first readings, correct?
10   A.    Yes.
11   Q.    Okay?
12   A.    The baccalaureate one changes were made to
13   it so, even though technically it would have been a
14   second reading because of the changes that were made
15   it had to be resubmitted as a first reading.
16   Q.    Now, over on page nine in the second
17   heading there is a another public comment section.
18   Is it customary for there to be multiple public
19   comment sections in the Board meetings?
20   A.    There is also an opportunity for a second
21   public comments at the end of the meeting. As I
22   explained earlier, the standard allotted time is 15
23   minutes, five minutes if you are part of a group,
24   three minutes if you are an individual. But with

57 (Pages 222 to 225)

Dobrich, et al.                               v.                    Indian River School District, et al.
Donald Hattier                          C.A. # 15-120 (JJF)                    October 10, 2006

Page 226

1  the numbers of people who came forward the month
2  before we had increased it to 45 minutes initially,
3  however it is always our policy that there be two
4  would public comment sections.
5       In my opinion that gives the public a
6  chance to listen to have we have done and then give
7  us their take on it. People do not always, however,
8  take us up on the opportunity. If there is any
9  public comment period that gets skipped more often
10 than not, this is the one.
11 Q.   Now, here the Reverend Jerry Fike is
12 reported as having thanked the Board for continuing
13 to have a prayer at the beginning of the Board
14 meeting. I take it from the fact that you voted to
15 approve these minutes that you believe that
16 accurately reflects what Mr. Fike said?
17 A.   Yes, sir.
18 Q.   And then the minutes record that he also
19 expressed his apology to Mona Dobrich for any
20 comments he made during his prayer as Sussex Central
21 High School's graduation ceremonies that offended
22 her?
23 A.   Yes, sir.
24 Q.   And I take it from the fact that you

Page 227

1  approved the minutes that you also thought that
2  accurately reflected his comments?
3  A.   Yes, sir.
4  Q.   Did you think it appropriate for Reverend
5  Fike to express his apology to Mona Dobrich?
6  A.   Well, I think that since things rose up
7  under something he said I would certainly think it
8  was a reaching out if nothing else. And I
9  personally feel that yes it was appropriate.
10 Q.   On page ten under pending or potential
11 litigation, there is a reference to Mr. Helms'
12 motion seconded by Dr. Isaacs that the Board secure
13 legal counsel regarding potential litigation. I
14 take it from this that as of September 28th the
15 Board had not retained any counsel relating to the
16 issues in this litigation?
17 A.   I believe we talked to the counsel by that
18 particular point, but I don't think we had made any
19 decision to officially hire anybody.
20       MR. ALLINGHAM: This is Hattier
21 Exhibit 19 a document bearing Bates numbers
22 BPD208 to 217.
23       (WHEREUPON Hattier Exhibit 19 was
24 marked for identification)

Page 228

1  Q.   Now, if you could take Hattier 18 and
2  Hattier 19, and look at them together. You'll see
3  that on Hattier 18 the September 28th minutes the
4  call to order is reflected as president Harvey Walls
5  called the regular meeting of the Indian River
6  School District Board of Education to order at 6:30
7  p.m.. There is no notation about a prayer.
8       MR. GOSSELIN: You are looking at
9  BPD208?
10      MR. ALLINGHAM: No I'm looking at
11 182, the September minutes, Hattier 18.
12      MR. ALLINGHAM: I'm sorry, my
13 mistake.
14 A.   Okay.
15 Q.   Do you know whether a prayer was offered at
16 that meeting?
17 A.   On September 28th generally we would open
18 with a moment of prayer, either before the
19 presentation of colors or after the presentation of
20 colors. Which is the Pledge of Allegiance and the
21 units either the ROTC units, you know, bringing the
22 flag down. Okay, so on the 28th it looks like we
23 had a prayer or an invocation of some type at about
24 7:30 when we would normally start the reconvening

Page 229

1  versus the regular district meeting in which case we
2  started right at 7:30 and gave it at that time.
3  Q.   Fair enough. So what you are referring to
4  in Hattier 18, the September 28 minutes is that on
5  page two of the minutes after the presentation there
6  is a statement president Walls stated it's been the
7  history and custom of the Indian River School
8  District Board of Education to open its meetings
9  with a prayer. He noted that the prayer is
10 voluntary and among the members of the Board. He
11 then asked Dr. Hattier to give an invocation?
12 A.   Yes.
13 Q.   And this the second straight meeting at
14 which you gave an invocation?
15 A.   You know, I don't remember giving the
16 second one, but if it says I did, I must have.
17 Q.   You must have known in advance?
18 A.   I must have known in advance. I don't
19 remember the second one at all, but I must have.
20 Q.   Do you remember what prayer you gave?
21 A.   No, I do not. Knowing my past practice it
22 would have been another historical one.
23 Q.   This history and custom of the Indian River
24 School District Board of Education to open its

58 (Pages 226 to 229)

Dobrich, et al.                                    v.                    Indian River School District, et al.
Donald Hattier                          C.A. # 15-120 (JJF)                      October 10, 2006

Page 230

1  meetings with a prayer, is that a custom and
2  practice of opening its public meetings with a
3  prayer, its closed meetings with a prayer, its
4  public sessions, its closed session, is there any
5  consistent practice?
6  **A.   I'm going to belief that the consistent**
7  **practice was the public sessions. That's the way**
8  **it's been ever since I have been on the Board and**
9  **I'm pretty sure that's the way it was in the past.**
10  Q.   Is it correct that the Board does not open
11  its executive sessions with a prayer?
12  **A.   No. We've already opened at that particular**
13  **point, it's merely a continuation.**
14  Q.   Well, in this particular Board meeting you
15  had already met in executives session for 45
16  minutes?
17  **A.   To my knowledge the time being on the Board**
18  **we've never opened it early with prayer, we've**
19  **always opened it around either before or after the**
20  **presentation of colors. That's just been part of**
21  **the general opening up of the way the Board runs.**
22  Q.   I take it then that on September 28th at
23  least you didn't feel the need to solemnize the
24  proceeding until 7:30?

Page 231

1  **A.   The executive sessions or anything that we**
2  **do beforehand from what I can recall has never been**
3  **treated in that fashion. I believe that we viewed**
4  **it for the School Board meeting itself.**
5  Q.   Is there any difference in terms of
6  importance of taking your duties seriously --
7  **A.   In point of no, I agree.**
8  Q.   Discharging them to the best of your
9  ability?
10  **A.   Correct.**
11  Q.   Is it just a historical accident that you
12  opened the public meetings with a prayer but don't
13  open the closed meetings with a prayer?
14  **A.   As I said --**
15        MR. GOSSELIN: Objection.
16  **A.   My apologies. As I stated, it has been the**
17  **history and practice of the district for at least as**
18  **long as I can remember that it's around the time of**
19  **the presentation of the colors. I believe at this**
20  **point we have moved it before the colors. There are**
21  **times when we did it after the colors.**
22  Q.   In that very lengthy meeting on August 23rd
23  do you recall whether the closed session opened with
24  a prayer?

Page 232

1  **A.   No, it would not have.**
2  Q.   Do you recall whether the meeting itself
3  opened with a prayer?
4  **A.   On the very lengthy one you mean the August**
5  **23rd meeting --**
6  Q.   The August 23rd meeting --
7  **A.   No, I don't believe it would have opened**
8  **with a prayer.**
9  Q.   Is that because that was a special meeting?
10  **A.   I believe so, yes sir.**
11  Q.   There is no reason to distinguish between
12  the importance of Board members' performance of
13  their duties on August 23 and say August 24, is
14  there?
15  **A.   No, in point of fact no, I agree with that.**
16  **But that has not been the history or the practice of**
17  **the district for again as many years as I can**
18  **recall.**
19  Q.   Well, let me ask the question bluntly, do
20  think it's any less important to solemnize the
21  proceedings, it was any less important to solemnize
22  the proceeding on August 23rd than it was on August
23  24th? It was equally important on both dates,
24  wasn't it?

Page 233

1  **A.   Certainly. And based on your comments in**
2  **the future sir we may do that.**
3  Q.   All right, I gave you Hattier Exhibit 19
4  this the October 19, 2004 meeting, and here
5  immediately after the roll call president Walls asks
6  again for an invocation and noting the history and
7  that it's voluntary among the members of the Board
8  of Education and he asks Dr. Hattier to give the
9  invocation again --
10  **A.   Uh-hum.**
11  Q.   -- did you know that you were going to
12  asked to give the invocation on October 19th?
13  **A.   I must have. I don't remember but I must**
14  **have.**
15  Q.   Is this consistent with the practice of the
16  Board going backward from August 24 that you were
17  primarily asked to give the invocation?
18  **A.   Yes, that would be a deviation. I can't**
19  **tell you why, why I was elected to do it. I don't**
20  **know what to say about that. But I do know that we**
21  **were trying to start rotating it on or about that**
22  **time period.**
23  Q.   On or about October 19th?
24  **A.   Well, actually on or about even September**

59 (Pages 230 to 233)

Dobrich, et al.                          v.                    Indian River School District, et al.
Donald Hattier                    C.A. # 15-120 (JJF)                    October 10, 2006

| Page 234 | Page 236 |
|---|---|

Page 234

1  28th, I mean that's when the whole process would
2  have started. I'm not sure why Mr. Walls asked me
3  to do it.
4      Q.    Okay so, you had in your hands for the
5  first reading the actual policy which contemplated
6  rotation?
7      A.    Right.
8      Q.    And it was your understanding that the
9  rotation practice was going to begin right away?
10     A.    That's what I would have felt, yes, sir.
11     Q.    So, you can't recall why on October 19th
12 you were asked to give it again?
13     A.    No, I can't.
14     Q.    For the third time in a row?
15     A.    No, that would have been the second.
16     Q.    No, August 24 and September and then
17 October 19?
18     A.    You know what, I don't remember giving it
19 three times in a row. I do remember giving it
20 specifically, I do remember specifically giving it
21 at the big meeting, and I could have given it one
22 other time, but I really don't remember giving it
23 three times in a row.
24     Q.    Well, do you check the minutes to make sure

Page 235

1  that they are accurate before you vote to approve
2  them?
3      A.    Obviously I did not, not on this one. I'll
4  have to go back and take a look at what my daytimer
5  notes show that I did during that time period. I
6  mean it's possible I logged in a time block where I
7  looked something up on the Internet. Which is my
8  habit on most occasions, not all of them.
9      Q.    That is a your habit is to record on your
10 daytimer when you were looking stuff up on the
11 Internet?
12     A.    When I'm doing a block of activities. I
13 have four children, several rental properties, I'm
14 active in the Rotary, I'm on the School Board, my
15 wife is legally blind and doesn't drive at night, so
16 we've had some interesting times and my wife and I
17 spend a lot of time trying to coordinate when the
18 various activities are going to be. I mean it makes
19 for an exciting life sometimes.
20     Q.    One upshot of which is that you try to mark
21 down on your daytimer what you are doing?
22     A.    I try, yes, sir.
23         MR. ALLINGHAM: I'm going to ask
24     to have marked as Hattier Exhibit 20 a copy

Page 236

1  of the next Board minutes on November 16,
2  2004.
3         (WHEREUPON Hattier Exhibit 20 was
4         marked for identification)
5      Q.    Keep 19 in front of you as well as 20. I
6  just wanted to go to 20 for a minute because --
7      A.    Okay.
8      Q.    You'll see that --
9      A.    Nope didn't happen.
10     Q.    -- at the November 16, 2004 meeting the
11 minutes reflect that you were asked to give an
12 invocation with the usual drill about the history
13 and the voluntary nature. Did you give the
14 invocation at the November 16 Board meeting?
15     A.    You know, at this point I have to plead
16 ignorance. I can't tell you because I don't believe
17 that I did four in a row. I just don't think I did
18 four in a row.
19     Q.    Wouldn't it be your practice at least with
20 respect to points at which the minutes refer
21 specifically to you to make sure that they were
22 accurate?
23     A.    It certainly would.
24     Q.    You did vote to approve all these minutes,

Page 237

1  right?
2      A.    Yes, I did.
3      Q.    Let's go back to Hattier Exhibit 19. Oh,
4  by the way at the September 28th Board minutes, this
5  is Hattier 18, there is still no public discussion
6  of the Board Prayer Policy, is there?
7      A.    You said the 28th, correct?
8      Q.    Yeah, Hattier Exhibit 18?
9      A.    No, it looks like the only thing we did at
10 that time period was the policy committee the
11 committee first and second readings. Actually all
12 first readings.
13     Q.    And there were a couple of executive
14 sessions where again the rubric of pending and
15 potential litigation is --
16     A.    Correct.
17     Q.    Is it your belief that you may have
18 discussed the School Board prayer and other prayer
19 polices during those executive sessions?
20     A.    Probably.
21     Q.    Now, in the October 19 minutes, if you will
22 look at page five, you will see that under policy
23 committee --
24     A.    Uh-hum.

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

Case 1:05-cv-00120-JJF    Document 250-7    Filed 04/10/2008    Page 61 of 86

Dobrich, et al.                                    v.                    Indian River School District, et al.
Donald Hattier                            C.A. # 15-120 (JJF)                              October 10, 2006

Page 238

1    Q.    -- there is a second reading and
2    recommended approval and subsequent approval of four
3    new policies including Board prayer, religion and
4    school prayer at commencement, graduation and
5    baccalaureate, do you see that?
6    A.    Uh-hum.
7    Q.    And there was no public discussion of these
8    policies at any time prior to this approval either,
9    was there?
10   A.    Not unless Mr. Walls did it separately from
11   what I'm aware of.
12   Q.    Separately outside of the Board meetings
13   which these minutes record?
14   A.    In other words, at his policy committee
15   meetings.
16   Q.    Fair enough. You are not on the policy
17   committee?
18   A.    No, sir, I'm not.
19   Q.    At any rate the full Board never had a
20   public discussion of the School Board Prayer Policy,
21   is that right?
22   A.    That is correct.
23   Q.    And is that the custom and practice of the
24   Board to have no public discussion of a policy

Page 239

1    that's being adopted?
2    A.    Well, the idea is that you read it at the
3    meeting on a first reading and then if the public
4    has a comment, they would contact the schools or I
5    don't think they speak up at the meetings
6    themselves, but the idea is that if you have an
7    objection to it that you would contact the
8    administration and they would make whatever
9    appropriate changes would need to be made. That's
10   the way I understand it.
11   Q.    Yes, sir, my question was whether the Board
12   typically at some point prior to the adoption of a
13   policy engages in public discussion of the policy
14   and the reasons for it?
15   A.    No, not to my knowledge.
16   Q.    Why did you vote for the Board Prayer
17   Policy?
18   A.    I felt it was the right thing to do.
19   Q.    The Board Prayer Policy as we've
20   established is in substance identical to the and
21   mostly verbatim to the hanging of the proposed
22   policy that was given to you by the Rutherford
23   Institute back in looks like August 30th or
24   thereabouts?

Page 240

1    A.    Somewhere in there, yes, sir.
2    Q.    Did you ever have an opportunity to ask
3    anyone representing the Rutherford Institute where
4    it got the language in these policies?
5    A.    No, I did not.
6    Q.    Was there any discussion of the language in
7    these policies at any time at the Board level?
8    A.    This would have been discussed at an
9    executive committee meeting.
10   Q.    Executive session?
11   A.    Executive session, I'm sorry, yes, sir.
12   Q.    At any time did anyone offer any other
13   purpose for the Board Prayer Policy other than to
14   solemnify its proceedings?
15   A.    No they did not.
16   Q.    No Board member ever suggested that it was
17   an appropriate policy to preserve Christian values?
18   A.    Not that I'm aware of.
19   Q.    Paragraph three says such opportunity, that
20   is the opportunity to pray, have a moment of
21   silence, such opportunity shall not be used or
22   exploited to proselytize, advance or convert anyone
23   or to derogate or otherwise disparage any particular
24   faith or belief. Is it your view that that limits

Page 241

1    in any way the right, the constitutional right of
2    individual Board members to pray as they see fit?
3            MR. GOSSELIN: Objection. Go
4    ahead.
5    A.    I believe that if you are offering a prayer
6    for splenification that it is not the correct place
7    to derogate or put anybody else down because that
8    does not solemnify anything. All that does is at
9    that particular point become insulting. I mean, as
10   I said, I grew up in the military I sat through many
11   experiences with chaplains in mixed groups and what
12   I saw the chaplains do, the military chaplains was
13   nothing but uphold what I would consider to be the
14   highest ideals of God and country and make it as
15   inclusive as possible.
16          And I genuinely believe that that's where
17   my Board members, my fellow Board members were
18   coming from also.
19   Q.    That is to say they wanted to preserve the
20   freedom to pray, but they also had a desire to be as
21   inclusive as possible?
22   A.    Absolutely.
23   Q.    Okay. How will you know as a Board member
24   whether one of your fellow Board members uses an

61 (Pages 238 to 241)

Dobrich, et al.                                    v.                    Indian River School District, et al.
Donald Hattier                         C.A. # 15-120 (JJF)                      October 10, 2006

Page 242

1  opportunity established in paragraph one, to
2  proselytize, advance or convert anyone or to
3  derogate or otherwise disparage any particular faith
4  or belief?
5      A.   How do I answer this one.  I believe it was
6  a Supreme Court justice who said I can't define
7  pornography but I know it when I see it.  And I
8  think that in this particular case it's fairly easy
9  at least for me, where if someone is upholding the
10  ideal asking that we think about things, but if he
11  says on the other hand that the only way this can
12  happen is through Jesus or through a belief in Allah
13  or that you have to convert you entire life over to
14  something in order for this to happen that that
15  would be proselytizing.
16      But I have not seen that in my time on the
17  Board.
18      Q.   Well, let me give you an example --
19      A.   Okay.
20      Q.   -- and ask you to apply the way that you
21  would examine that issue.  Suppose that a Board
22  member said God please grant us the wisdom to take
23  the right actions on issues that are presented to us
24  this evening and know the right way which knowledge

Page 243

1  can only come through knowledge of our Lord and
2  Savior Jesus Christ.  Would you consider that that
3  is a prayer that proselytizes others in the audience
4  at that time?
5      MR. GOSSELIN:  Objection.
6      A.   No, I would believe that to be the freedom
7  of conscience of what he believes.  That would not
8  suit my freedom of conscience.  You know I would
9  listen to him and respect what he had to say and you
10  know incorporate those parts that I feel are
11  appropriate and I would drop the rest of it.
12      Q.   That's you, what you would do?
13      A.   That is correct.
14      Q.   But you would think it appropriate under
15  the Board's policy for him to offer that prayer?
16      A.   If that's what the freedom of his
17  conscience offers him.  I don't view that as
18  proselytizing.
19      Q.   I'm going to ask you another question.  Can
20  you put yourself in the shoes of say a elementary
21  school student who has been invited to a School
22  Board meeting who hears an adult speaking from the
23  dais, the panel, the stage being asked to give an
24  invocation by the president of that Board, and the

Page 244

1  student hears the wisdom and truth that can only be
2  known through knowledge of our Lord and Savior Jesus
3  Christ.  Do you think that that threatens, I don't
4  mean threaten in a physical sense, I mean offers the
5  possibility that the student could feel that it is
6  the view of the School Board, those people in
7  authority on the stage that the truth can only be
8  known through knowledge of our Lord and Savior Jesus
9  Christ?
10      MR. GOSSELIN:  Objection.  Go
11  ahead.
12      A.   If that same student were listening to a
13  speech by President Bush on TV when he talks about
14  asking God beneficence upon our country, I don't see
15  what the difference is, other than one seems to take
16  place in a school forum and the other one takes
17  place in a broader function.  You've got the
18  President of the United States asking us to do
19  things, you know, and he is speaking not just to
20  adults he is speaking to everybody.  You know,
21  what's the difference.
22      I understand what you are asking but I also
23  would question what the difference is.
24      Q.   So, your answer to my question is no you

Page 245

1  don't see any danger?
2      A.   No, I do not, because that same student at
3  some other point might be exposed to other
4  individuals who talk about the Indian Great Spirit,
5  or who may be exposed to a Jewish rabbi.  I mean
6  keep in mind, Lee versus Weitzman was about a rabbi
7  making a speech and that was not acceptable either.
8      But, you know, if they listen to it and
9  they have a chance to think about it on their own,
10  in any formative year people grow and they put
11  circumstances together.  So I don't see that as a
12  problem.
13      Q.   What do you figure the chances are that a
14  prayer would be offered by a person in any tradition
15  other then the Christian tradition from this
16  rotating the Board?
17      A.   Under the current policy with the people
18  being elected, unless an individual of the Jewish
19  faith or the Muslim faith or Bahia or whatever, you
20  know, runs for office, probably not good.  But on
21  the other hand in listening to somebody else you
22  know deliver a speech at another time period I would
23  think that at some point it would be good, unless of
24  course we strike religion from public life

62 (Pages 242 to 245)

Case 1:05-cv-00120-JJF    Document 250-7    Filed 04/10/2008    Page 63 of 86

Dobrich, et al.                                v.                Indian River School District, et al.
Donald Hattier                        C.A. # 15-120 (JJF)                     October 10, 2006

Page 246

1  altogether, in which case it's over with.
2      Q.   Well, you understand this lawsuit is only
3  about the issues in this lawsuit?
4      A.   I understand that.
5      Q.   Okay.  There has been a lot of talk about
6  I'm sure from your constituents and in the letters
7  to the editor which I read as well as you, about the
8  effort to strike religion from public life
9  altogether that this lawsuit represents, but you
10  don't actually believe that that's what this lawsuit
11  seeks to accomplish, do you?
12      A.   I believe that this lawsuit is a part of
13  that particular effort, yes I do.
14      Q.   In adopting the policy did you take into
15  account, that is the policy on School Board prayer,
16  did you take into account what you perceived to be
17  the role of the persons who raise these issues
18  before the Board in your decision whether to adopt
19  this there policy?
20      A.   I'm sorry I don't understand the question.
21      Q.   Did the role of this lawsuit as you
22  perceive it in a larger plan to eliminate religion
23  from public life altogether have any role in your
24  decision to vote to adopt the School Board Prayer

Page 247

1  Policy?
2      A.   No.
3            MR. ALLINGHAM:  Let's go off the
4       record.
5            MS. DUPHILY:  We are going off the
6       record at approximately 4:16 p.m..
7            (WHEREUPON a brief recess was
8       taken)
9            MS. DUPHILY:  We are back on the
10       record at 4:17 p.m..
11      Q.   You mentioned earlier that the Board
12  policies are posted on the web?
13      A.   Yes.
14      Q.   When did that practice begin?
15      A.   The practice began some time around 2004 in
16  the early portions of the year.  They were putting a
17  lot of student responsibilities and student items on
18  the web a piece at a time.  There has been an
19  ongoing effort since about the year 2000 and maybe 1
20  or maybe 2002 to upgrade and build our web site to
21  where it is today.
22      Q.   Do you know whether anyone asked to have a
23  copy of the School Board Prayer Policy and was told
24  to file a FOIA request if they wanted it?

Page 248

1      A.   Yes, I believe I was.
2      Q.   Who was that?
3      A.   I don't know who the person was, but in
4  defense of the district policy that is what they
5  were advised to do the way I understand it by an
6  attorney, that way we have a copy of whoever
7  requested it.  That's what I heard.  I mean, to me
8  it's ridiculous up want a copy, get a copy.  All
9  right, but my understanding was that was the legal
10  advice at the time.
11      Q.   Who gave had that legal advice?
12      A.   I have no clue.
13      Q.   Where did you get that understanding from?
14      A.   From talking to, I believe it was
15  Mrs. Hearn or Mrs. Hobbs.  Because Mrs. Hearn, the
16  way I understand it Mrs. Hearn would be the one that
17  would handle that.
18      Q.   If the policies either are or are going to
19  shortly to be made available on the web, what
20  possible purpose would be served by requiring
21  somebody to file a FOIA request --
22      A.   I have no clue and I'm sorry to step on top
23  of what you are talking about.  I have no clue.
24      Q.   It's not an action or a direction that you

Page 249

1  had anything to do with?
2      A.   Zero.
3      Q.   Are policy committee meetings open to the
4  general public?
5      A.   I believe that they are.
6      Q.   Are they, is notice given of policy
7  committee meetings?
8      A.   Policy committee meetings are published, if
9  I'm not mistaken all committee meetings are
10  published openly in the newsletter or in the
11  calendar that goes out.  Now we have had to change
12  them from time to time because somebody can't do it,
13  but I believe, thank you sir, that a notice is
14  published somewhere that the committee meetings have
15  changed.
16      Q.   Did ever attend any policy committee
17  meeting at which the School Board Prayer Policy was
18  discussed?
19      A.   No, policy committee meetings are on Friday
20  afternoons and in my practice that's one of our
21  busier time periods, I can't close for that.
22      Q.   Other than the executive sessions which we
23  have identified in the various minutes at which
24  either School Board Prayer Policy was discussed as

63 (Pages 246 to 249)

Dobrich, et al.
Donald Hattier

v.

C.A. # 15-120 (JJF)

Indian River School District, et al.
October 10, 2006

Page 250

1  we can tell from August 23 or may have been
2  discussed as we tried to infer from the reasons for
3  the executive committee sessions, the executive
4  session, have you ever had any discussions with
5  anybody — sorry, first of all with any other Board
6  member about the School Board Prayer Policy?
7    **A.  We have discussed it or I have discussed,**
8  **it,  yes.**
9    Q.    With other Board members?
10   **A.    Yes.**
11   Q.    Outside of a Board meeting?
12   **A.    Yes.**
13   Q.    And outside of the policy committee
14  meeting?
15   **A.    Yes.**
16   Q.    With whom?
17   **A.    I'm going to say probably Charlie Bireley,**
18  **Mr. Walls. I don't remember, I mean we talk on**
19  **other issues from time to time.**
20   Q.    And are these conversations that you
21  arrange for that purpose?
22   **A.    No.**
23   Q.    So these are incidental to other
24  conversations that you have?

Page 251

1    **A.    Yes.**
2    Q.    At any time during any executive session,
3  Board session, policy committee session to the
4  extent that you heard about it, or during your extra
5  Board meeting discussions with fellow Board members,
6  did anyone ever express any reservations about the
7  School Board Prayer Policy?
8    **A.    My feeling is that all of us knew that this**
9  **is something that was going to be litigated and**
10  **tested, and in that sense is there a reservation,**
11  **yes there is. On the other hand I believe certainly**
12  **in my own mind I believe that, you know, what we are**
13  **doing is fair and equitable for all the parties**
14  **concerned.**
15      **And in that sense, you know, it will stand**
16  **or fall on its own. Which again is why we are here.**
17   Q.    In consideration with your suggestion that
18  this was going to be litigated no matter what, did
19  anybody ever inform you that the lawyers for
20  Mrs. Dobrich had contacted everyone they could find
21  to request the opportunity to talk to the Board or
22  the Board's representatives —
23   **A.    Yes.**
24   Q.    About the existing policies so as to avoid

Page 252

1  litigation?
2    **A.    Yes.**
3    Q.    And did you learn that those requests were
4  rejected out of hand?
5    **A.    Yes.**
6    Q.    And if you were so sure that the litigation
7  — well, first of all, did the Board direct that
8  those requests be rejected?
9    **A.    It probably happened at the Board level,**
10  **yes.**
11   Q.    Was there a discussion of that?
12   **A.    Yes.**
13   Q.    And why don't you tell me what the
14  discussion consisted of?
15   **A.    The discussion generally consisted of**
16  **should we do it or not, and I believe it was on**
17  **advice of attorney that we decided not to talk to**
18  **them.**
19   Q.    Which attorney?
20   **A.    That's the harder question to answer. That**
21  **I don't recall who said that. I know Mr. Neuberger**
22  **was not in favor of discussing anything with the**
23  **ACLU. Mr. Griffin I believe was in favor of**
24  **discussing something with the ACLU. I'm not certain**

Page 253

1  **that the two Johns as we call them were or weren't.**
2  **So, I don't know what to say about that.**
3    Q.    Well, Mr. Neuberger wasn't representing the
4  Board, right?
5    **A.    Not after a certain point.**
6    Q.    Well never according to your testimony
7  earlier?
8    **A.    Correct.**
9    Q.    So, Mr. Griffin as I understand it wasn't
10  representing the Board on these issues, correct?
11   **A.    No, but he is still the legal counsel of**
12  **record for the district.**
13   Q.    Okay?
14   **A.    So pretty much no matter what he was being**
15  **included, I'm sure he courtesy copied a lot of**
16  **different things that happened.**
17   Q.    So, Mr. Griffin who remained involved
18  counseled the Board to meet with Plaintiffs lawyers?
19   **A.    I think he did.**
20   Q.    Okay. Mr. Cafferty and Mr. Balliger you
21  just don't remember?
22   **A.    I don't remember, no.**
23   Q.    So far you haven't identified any legal
24  advice that you should not meet were the Plaintiffs

64 (Pages 250 to 253)

Dobrich, et al.                                                        Indian River School District, et al.
Donald Hattier                      C.A. # 15-120 (JJF)                                October 10, 2006

Page 254

1 attorneys?
2 **A.    That's about right.**
3             MR. GOSSELIN:  Just to clarify,
4       are you talking about -- the premise of
5       your question is that Mr. Dobrich's
6       attorneys attempted to meet with the Board
7       to talk about the Board Prayer Policy or
8       the whole --
9             MR. ALLINGHAM:  The whole issues.
10            MR. GOSSELIN:  All of the issues
11      okay.
12 Q.    So, your best recollection Dr. Hattier is
13 that you concluded that you, the Board, concluded
14 that you would not accept the request of the, of
15 Mrs. Dobrich's attorneys on the basis of advice of
16 counsel.  That counsel was not Mr. Neuberger, it was
17 not Mr. Griffin who advised you to meet, and it was
18 not, and you can't remember when it was Balliger or
19 Cafferty?
20 **A.    No.**
21 Q.    No means yes that's an accurate summary of
22 the testimony?
23 **A.    That's probably, yeah.**
24 Q.    Were there any dissenting voices about

Page 255

1 meeting with the Plaintiffs?
2 **A.    I believe some of the Board members may**
3 **have dissented, I can't tell you who.**
4 Q.    Did that go to an actual Board vote?
5 **A.    That's a good question.  I don't remember.**
6            MR. ALLINGHAM:  Mark as Hattier
7       Exhibit 21 a document bearing Bates numbers
8       BPD 249 to 258.
9            (WHEREUPON, Hattier Exhibit 21 was
10      marked for identification)
11 Q.    Is this the official minutes of the
12 December meeting?
13 **A.    Yes, sir.**
14 Q.    When you voted to approve them did you
15 believe them to be accurate?
16 **A.    Yes, sir.**
17 Q.    Of you look at page three of the minutes,
18 there is a public comment from Mona Dobrich in which
19 it is noted that she had requested clarification
20 through her attorney on the recently adopted
21 policies regarding religion, however she had not yet
22 received a response.  She stated that she and her
23 son moved away from Georgetown to the city due to
24 the continued harassment of community members

Page 256

1 because of this issue.  Do you recall that
2 Mrs. Dobrich made those comments?
3 **A.    Yes, I do.**
4 Q.    What was your reaction to her disclosure
5 that she and her son had moved away from Georgetown
6 due to continued harassment from community members?
7 **A.    I don't think it's a good comment on**
8 **community members to harass people on things like**
9 **this.**
10 Q.    Were you distressed about that?
11 **A.    Yes.**
12 Q.    Is it fair to say that by December 21 you
13 as a Board member had notice that Mrs. Dobrich had
14 requested clarification in writing through her
15 attorney on the recently adopted religion policies?
16 **A.    Yes.**
17 Q.    Did anyone respond to Mrs. Dobrich about
18 why she hadn't gotten a response?
19 **A.    I'm not aware of any communication, no.**
20 Q.    Was there any discussion of that issue
21 during the Board meeting on December 21?
22 **A.    I don't think so, unless it would have**
23 **happened later on in executive session.**
24 Q.    Is the district's practice or policy to

Page 257

1 ignore letters from interested members of the
2 community?
3 **A.    No. That's something, however, that would**
4 **be handled by Mrs. Hobbs and by the administration**
5 **rather than by the Board.  I mean the Board would**
6 **direct them what to do but I was not president of**
7 **the Board so I didn't get involved in that**
8 **particular aspect.**
9 Q.    Well, you told me earlier that the decision
10 not to respond was made at the Board level?
11            MR. GOSSELIN:  Objection.
12 **A.    The decision not do respond to the ACLU,**
13 **regarding them coming by to visit but not to respond**
14 **to Mrs. Dobrich, that's a separate issue.**
15 Q.    You recall that the ACLU mad the request
16 for clarification of the Board policies?
17 **A.    Yes.**
18 Q.    And on what basis do you tell me that
19 today?
20 **A.    What I recall is the letters that came to**
21 **us or that I seem so remember them being on that**
22 **letterhead, that's what I recall.**
23 Q.    So, you did see the letters?
24 **A.    I saw a letter.**

65 (Pages 254 to 257)

Case 1:05-cv-00120-JJF    Document 250-7    Filed 04/10/2008    Page 66 of 86

Dobrich, et al.                              v.                    Indian River School District, et al.
Donald Hattier                        C.A. # 15-120 (JJF)                        October 10, 2006

Page 258

1   Q.   You did see a letter asking for
2   clarification of the Board policies?
3   A.   Yes.
4   Q.   And requesting to meet with the Board?
5   A.   Yes.
6   Q.   And it's your recollection that it came on
7   ACLU letterhead?
8   A.   That is a my recollection.
9   Q.   Apart from Mrs. Dobrich has the Board ever
10  received complaints or the district ever received
11  complaints about religious practices in district
12  schools?
13  A.   I believe that concurrent with this, or on
14  or about the same time period, that this is where
15  the Does would come in in terms of one of the
16  complaints that they made.
17  Q.   And apart from the Does and Dobriches you
18  don't recall any complaints about religious
19  practices?
20  A.   I don't recall any, not in my time on the
21  Board, no, sir.
22  Q.   And did the district also ignore the
23  complaints from the Does?
24  A.   No.

Page 259

1   Q.   Was a response given to the complaints from
2   the Does?
3   A.   Yes, and we corrected what they were
4   complaining about.
5   Q.   Did you ever notify the Does that a
6   correction had been made?
7   A.   You will have to ask the people who would
8   normally correspond with that, not me, but I do know
9   that went the Does made their comments about what
10  they felt was happening, this had to do with the
11  Bible Club that within a very short time period that
12  that was corrected.
13  Q.   Corrected to comply with constitutional
14  practice?
15  A.   To comply with what is the current law on
16  the issue, yes.
17  Q.   Fair enough?
18  A.   I don't remember that one lingering for any
19  great length of time at all.
20  Q.   To that the Board recognized that the prior
21  practice did not comply with constitutional law on
22  the issue?
23      MR. GOSSELIN:  Objection.
24  A.   Apparently not. I'm sorry.

Page 260

1   Q.   I know that you didn't go to policy
2   committee meetings on this topic, but I want to show
3   you and in fact I'm going to mark for identification
4   Hattier Exhibit 22 what I believe to be an agenda of
5   a policy committee meeting?
6   A.   Okay.
7          (WHEREUPON Hattier Exhibit 22 was
8          marked for identification)
9   Q.   This bears Bates number BPD467.  Can you
10  identify this as an agenda of a policy committee
11  meeting?
12  A.   No, I cannot.
13  Q.   Do you recognize the handwriting on this
14  document?
15  A.   No, I do not.
16  Q.   I'll bet you a nickel that it's a female?
17  A.   I basically would be another nickel along
18  with you.
19      MR. GOSSELIN:  Why because you can
20  read it?
21      MR. ALLINGHAM:  Yeah.  I know it's
22  not mine.
23  A.   And it's not mine either, sir.
24  Q.   About six lines under the typed item four

Page 261

1   which is discuss policy goals for the 2004 - 2005
2   school year, there is a notation, religion - follow
3   Board's direction?
4   A.   Okay.
5   Q.   You testified earlier that you thought that
6   the text of the policy on Board prayer was approved
7   by the policy committee?
8   A.   Yes.
9   Q.   This notation appears to be reflecting that
10  the policy committee was following the Board's
11  direction on religion issues.  Does this cause you
12  in any way to rethink your earlier testimony?
13  A.   No.  First off, it's dated July 19th, which
14  I believe would have been before the Board meeting
15  of the whatever the July meeting would have been.
16  That is consistent with it having been brought to
17  somebody's attention and at least they discussed it
18  at a policy meeting and that they were starting to
19  take a look at it and other than that they wanted
20  the Board's input first, that's the way I would read
21  it.
22      MR. ALLINGHAM:  I'm going to mark
23  now as Exhibit 23 a document bearing Bates
24  numbers BPD466 through 479.

66 (Pages 258 to 261)

Case 1:05-cv-00120-JJF    Document 250-7    Filed 04/10/2008    Page 67 of 86

Dobrich, et al.                                                    Indian River School District, et al.
Donald Hattier                          v.                         October 10, 2006
                              C.A. # 15-120 (JJF)

Page 262

1      (WHEREUPON Hattier Exhibit 23 was
2      marked for identification).
3  Q.    You'll see that this was a package of
4  materials which were numbered by your side
5  sequentially --
6  A.    Uh-hum.
7  Q.    -- and in the September 20, 2004 policy
8  committee meeting agenda there is an agenda item
9  number six which reads, discuss Dr. Hattier's
10  concern of appreciation and tolerance of the
11  religious views of others?
12  A.    Correct.
13  Q.    Do you recall having asked the policy
14  committee in connection with its consideration of --
15  A.    Yes, I did.
16  Q.    Let me finish my question, of the School
17  Board Prayer Policy to take into account your
18  concern as expressed?
19  A.    My concern at that time was not in relation
20  to the Prayer Policy at all. It had to do with the
21  comments that the young Dobrich gentleman had stated
22  that he had been called Jew boy in school and that
23  you know our teachers did nothing to correct that.
24  I got on the phone some time after the meeting and

Page 263

1  asked, I believe it was, Mr. Hudson up at the
2  school, I said did anybody ever come to you and tell
3  you that he been called Jew boy and the answer was
4  no.
5      Then I called our other people and asked
6  what is the policy regarding calling names of any
7  child whether it's four eyes, railroad mouth, you
8  know, buck tooth, rabbit breath, I mean pick one,
9  okay. And I was assured hat we had policies that
10  dealt with name calling. And I was disappointed
11  that if Mrs. Dobrich's son had been called a name
12  such as Jew boy, which I do not approved of name
13  calling whatsoever, not like that, and that had it
14  been reported to us and had we been given an
15  opportunity to address it that we would have done
16  so.
17      But in what I did in talking to the school
18  and the people involved, we had no knowledge
19  whatsoever that she had complained about it, that
20  one came out of it blue.
21      And if you have any other information other
22  than that please again let me know. My daughter let
23  me back up a little bit, in or around the same time
24  period my young daughter, Hannah, had written some

Page 264

1  notes back and forth to another girl in class where
2  they were accusing another girl of being fat and
3  ugly. Okay, and the other girl somehow intercepted
4  the note and it came home to our family that my
5  daughter was involved in calling another girl fat
6  and ugly.
7      Well, in our house we don't tolerate name
8  calling, we don't approve of it and it was the Lord
9  Baltimore School, I believe it was under Mrs. Smith
10  was still principal at that time, rightly called us
11  and said hey what is your daughter doing. And we
12  looked into it and Hanna was disciplined, punished
13  and talked to about it and had to write a letter of
14  apology and come forward and say I'm sorry I didn't
15  mean to call you fat and ugly. And that was
16  certainly the appropriate thing to do.
17      And I think had we been informed at the
18  district that somebody was running around calling
19  you know the young gentleman Jew boy that we would
20  have reacted similarly at that other building, there
21  would be no reason not to. The two things happened
22  basically contemporaneously.
23  Q.    Do you doubt Alex Dobrich's credibility --
24  A.    Not a bit.

Page 265

1  Q.    -- in reporting that he was called Jew boy?
2  A.    Not a bit, I believe he probably was, okay.
3  On the other hand I don't know when he was called
4  that, I don't know what the age of the kids was
5  involved, and you know apparently you have children,
6  I'm going to make a guess, okay, we have four kids
7  and some of the nastiest people on earth are
8  children, especially to one another. And it is up
9  to us as adults to discipline them and correct them
10  and teach them socially appropriate behaviors.
11      So, if some kid somewhere had a bad day and
12  decided to call some other child a name, certainly
13  it would not have been condoned by the school
14  district. And I'm not doubting what the young
15  gentleman said at all. I'm only wondering why Mrs.
16  Dobrich did not come forward if this was an issue
17  with her and say something to the school or the
18  appropriate school authorities about it.
19      Because again in my own case with what
20  happened to me at or about the same time period, we
21  had to deal with it immediately. It was sent home
22  to us the guidance counselor had talked to the kids,
23  we had to write a letter of apology regarding it and
24  at this particular point Hannah and that young lady

67 (Pages 262 to 265)

Dobrich, et al.
Donald Hattier

v.

C.A. # 15-120 (JJF)

Indian River School District, et al.
October 10, 2006

Page 266

1  do still get together as friends, and they associate
2  with one another. That's why I say I don't doubt
3  the young gentleman.
4      Q.   You seem to be a pragmatic person, do you
5  really think that someone who called Alex Dobrich a
6  Jew boy could come to the view that Alex and he
7  could be good friends?
8          MR. GOSSELIN: Objection.
9      A.   Yeah, absolutely. Look, my son is a bit
10 firery and I've heard him say things to the boy next
11 door and I've heard the boy next door say things
12 equally to my son and by the next morning they are
13 trying to figure out who can get the go-kart
14 started.
15         Okay, first off, do you have daughters?
16 It's a question, okay, I have found that girls in
17 general seem to be a bit more difficult in name
18 calling than boys are. Girls, young girls at least
19 seem to be a bit less forgiving about things than
20 young men are. This is a general statement, but I
21 believe in a general it's probably true.
22     Q.   You are not suggesting, are you Dr. Hattier
23 that calling a girl fat and ugly is the equivalent
24 of calling one of the few Jews in a school Jew boy,

Page 267

1  are you?
2      A.   I'm saying --
3          MR. GOSSELIN: Objection. Go
4  ahead.
5      A.   I'm saying that name calling is name
6  calling. Whether it's slant eyes, four eyes buffalo
7  breath, again, pick one.
8      Q.   You think they are all the same?
9      A.   I believe it's an insult.
10     Q.   But you think they are all of equal
11 seriousness?
12     A.   I believe they are insults.
13     Q.   You are not answering my question --
14     A.   Yes, I do believe.
15     Q.   Do you believe they are of equal
16 seriousness?
17         MR. GOSSELIN: Objection.
18     A.   Yes, I do, they are insults, and they
19 should be dealt with as such.
20     Q.   And you think that they, the discipline
21 that should be metered out should be the same for
22 someone who calls someone with braces tinsel teeth
23 as someone who called a boy wearing a yarmulke Jew
24 boy?

Page 268

1      A.   I think.
2          MR. GOSSELIN: Objection.
3      A.   Sorry. I think they are both derogatory
4  and I think they are both designed to hurt another
5  individual and they are both designed to make
6  another individual feel small, and as such neither
7  one of them is acceptable behavior. I mean if you
8  wish to put an emotional value of whatever type you
9  are certainly free to do so, but to me it's an
10 insult.
11         And my concerned at this particular time
12 period had been to see to it that we did have
13 something in our policies that would address those
14 issues, if we didn't already have them.
15     Q.   At the August 24 meeting do you recall a
16 comment in which someone suggested that Mrs. Dobrich
17 might disappear like Madelyn Murray-O'Hare?
18     A.   Yes.
19     Q.   How did you feel about that comment?
20     A.   As I told you earlier some things were said
21 that should not have been said and were clearly
22 inappropriate.
23     Q.   You understood that to be a threat to
24 Mrs. Dobrich did you not?

Page 269

1      A.   Yes, I did.
2      Q.   What was done to silence that person from
3  making that threat in the context of that highly
4  volatile meeting?
5      A.   Not so much.
6      Q.   How made that threat?
7      A.   I couldn't begin to tell you. We had a lot
8  of people talking that day.
9      Q.   Has it come to pass that someone in a
10 public comment session has been asked to sit down
11 because what they were saying was inappropriate?
12     A.   Yes.
13     Q.   And that's happened for example when
14 someone begins to discuss an individual school
15 district employee?
16     A.   Yes.
17     Q.   Because the Board has a policy to make sure
18 that concerns about individual school district
19 employees should be dealt with privately, not in
20 public?
21     A.   Yes.
22     Q.   But it's okay in your view, and in the
23 views of the Board to let members of the community
24 threaten Mrs. Dobrich with disappearance like a

68 (Pages 266 to 269)

Dobrich, et al.                          v.                    Indian River School District, et al.
Donald Hattier                    C.A. # 15-120 (JJF)                      October 10, 2006

Page 270

1  renowned atheist who was later found dismembered?
2        MR. GOSSELIN:  Objection.
3     A.  All right, I think the best way to express
4  my feelings at that time would be stunned that
5  somebody would be stupid enough to make comments
6  like that in an open meeting.
7     Q.  Dr. Hattier, this person spoke for lost two
8  minutes did someone think about saying to Mr. Walls
9  tell that person to sit down?
10    A.  Not to my knowledge.
11    Q.  In retrospect do you think that you should
12  have done that?
13    A.  Absolutely.
14    Q.  And every other Board member should have
15  done it, don't you think?
16    A.  I would think so.
17    Q.  Was that the only threatening comment made
18  about Mrs. Dobrich at the August 24 meeting?
19        MR. GOSSELIN:  Go ahead.
20    A.  That's the one that I remember the most.  I
21  don't remember all of the specifics.  Like you
22  noted, there were a lot of people who talked that
23  particular day.
24    Q.  Do you remember comments that Alex Dobrich

Page 271

1  should take his yarmulke off before he spoke before
2  that Board meeting?
3     A.  No.
4     Q.  Would you like me to show you the tape?
5     A.  I believe you.
6         MR. GOSSELIN:  Objection.  If you
7       have got a tape you can look at it.
8     Q.  Did you hear the comments that if Mrs.
9  Dobrich would merely raise her child right in the
10  Christian faith she wouldn't have any problems with
11  the district's practices?
12    A.  Comments like that might have been made.
13    Q.  Did you think those were appropriate?
14    A.  You know what --
15        MR. GOSSELIN:  Objection.
16       You can answer.
17    A.  Okay.  I'm not going to tell you how to
18  raise your child.  I'm not going to tell you how to
19  behave in public.  You know if you want to make a
20  fool out of yourself on the stand and go for it
21  that's your entire privilege.
22       Okay, and something like that as a
23  practicing chiropractor I'm used to people making
24  fun of what I do on a fairly regular basis.  And I'm

Page 272

1  also sued to considering what the sources are and I
2  end up flushing most of it, okay.  So, if somebody
3  wants to make a fool out of themselves and make
4  comments like that in an open meeting to my mind the
5  thing speaks for itself.
6     Q.  Let me ask you this question.  Did you view
7  the atmosphere that existed at that meeting as
8  highly intimidating to Mrs. Dobrich and her family?
9     A.  It could have been seen that way --
10        MR. GOSSELIN:  Objection.
11    Q.  By Mrs. Dobrich?
12    A.  It could have seen that way.
13    Q.  Don't you think that the comment, some of
14  the comments that I just reviewed with you were
15  intended to intimidate Mrs. Dobrich and her family?
16        MR. GOSSELIN:  Objection.  Let's
17       take a break everybody seems to be getting
18       a little excited right here.  Let's take a
19       break, five minutes.
20        MR. ALLINGHAM:  I'd like an answer
21       to my question.
22    Q.  Don't you think those comments were
23  intended to intimidate Mrs. Dobrich and her family?
24    A.  I can't --

Page 273

1        MR. GOSSELIN:  Objection.
2     A.  I can't speak for what somebody else had on
3  their mind.  It would appear that way on the
4  surface.
5     Q.  Didn't you think it was your duty as a
6  Board member to ensure that comments made during the
7  public comment section of Board meetings were not
8  used to intimidate other persons at the meeting?
9     A.  In retrospect I agree with that.
10        MR. GOSSELIN:  Objection.
11        MR. ALLINGHAM:  All right, we
12       can take a five minute break.
13        MS. DUPHILY:  We are going off the
14       record at approximately 4:48 p.m..
15        (WHEREUPON a brief recess was
16       taken)
17        MS. DUPHILY:  Back on the record
18       at approximately 4:55 p.m..
19    Q.  you told me that you did not call
20  Mr. Gaffney's show and offer to come on the show in
21  order to increase attendance at the August 24 Board
22  meeting, correct?
23    A.  Correct.
24    Q.  You were just on the show to correct public

69 (Pages 270 to 273)

Dobrich, et al.                          v.                  Indian River School District, et al.
Donald Hattier                    C.A. # 15-120 (JJF)                      October 10, 2006

Page 274

1  misconceptions?
2  A.  Correct.
3  Q.  Have you ever contacted any community group
4  prior to August 24 church group, whatever to urge
5  them to attend the August 24 meeting?
6  A.  No.
7  Q.  Do you know whether any Board member did?
8  A.  No.
9  Q.  Do you know what prompted the increased
10  attendance over normal at the August 24 meeting?
11  A.  If I recall correctly a lot of it had come
12  out on the radio, people had called Mr. Gaffney's
13  program and suggested that there was going to be a
14  big meeting of some type and that it was going to be
15  a fairly heavy issue where we are discussing it and
16  if they wanted input they should go to the meeting.
17  Q.  Would I be correct in understanding that
18  Mr. Gaffney's ideological perspective would also be
19  consistent with what you characterize as traditional
20  American values?
21  A.  I would say that he's leaning more in that
22  direction, yes.
23  Q.  Did you give an interview to Nella Banerjee
24  of the New York times?

Page 275

1  A.  Yes, I did.
2  Q.  In that interview did you tell Nella
3  Banerjee that Dr. Hattier had called WGMD to discuss
4  the issue of school board prayer?
5  A.  Yes, I did.
6  Q.  And did you tell Nella Banerjee that Mr.
7  Gaffney and others had encouraged people to go to
8  the August 24 meeting?
9  A.  I believe I did.
10  Q.  Who were the others that you were referring
11  to?
12  A.  Oh, other people on his radio program.  You
13  had Ron Letterman -- Mr. Gaffney's program is
14  divided into both national feed and local feed.
15  From nine, sorry from 5:30 to 9 is usually Dan he
16  has Dr. Laura on from 9 to 12, 12 to 3 is Rush
17  Limbaugh, 3 to 6 would have been local, 3 to 7 would
18  have been a local person Ron Letterman and after 7
19  o'clock it switches back to a national feed for the
20  rest of the evening all the way through to morning.
21  Q.  So, it pretty much cuts across the entire
22  political spectrum?
23  A.  My political spectrum, yes.
24  Q.  Do you know who Harold Johnson is?

Page 276

1  A.  No, I do not.
2  Q.  Mr. Johnson is said to be a former Indian
3  River School Board member, does that refresh your
4  recollection about who he is?
5  A.  That could be, yes.
6  Q.  Do you know when Mr. Johnson was the person
7  who made the Madelyn Murray-O'Hare comment?
8  A.  No, I do not.
9  Q.  Do you know whether Mr. Johnson wrote a
10  letter to the editor supporting Mr. Bireley's
11  re-election campaign?
12  A.  I believe he did.
13  Q.  How did that come to your attention?
14  A.  As I stated earlier I don't generally read
15  the letters to the editor anymore.  Occasionally I
16  will open it up during the election time period.
17  I've read one or two of them occasionally just to
18  see who was writing in because it seemed as if the
19  letter writing policy for The Wave had changed from
20  the year that I was running to the year that Mr.
21  Bireley was running.
22  Q.  What do you mean?
23  A.  The year that I was running they would not
24  print positive letters on either side.

Page 277

1  Q.  That's not very productive?
2  A.  No for me nor for Mr. Ellings, either,
3  Lloyd Ellings ran against me, a fine gentleman.
4  With Mr. Bireley's election however, a year later
5  they seemed to have reversed that policy and were
6  allow supportive letters.
7  Q.  I have some questions about the comments
8  that were made at the August 24 Board meeting, and I
9  will try not to be so heated about it, for which I
10  apologize.
11  A.  Okay.
12  Q.  A comment was made by a person named Gary
13  Knapps that the country was founded by Christians
14  with the intention of speaking the name of Jesus.
15  To you agree with that statement?
16  A.  I think the contract was founded by
17  individuals of Christian faith.  Some of did speak
18  the name of Jesus and some who didn't.  At least as
19  I understand history.
20  Q.  When you say the country was founded by
21  persons of Christian faith, you mean a majority of
22  persons of Christian faith?
23  A.  Yes.
24  Q.  A person named Dorinta Peacock commented

70 (Pages 274 to 277)

Dobrich, et al.                          v.                 Indian River School District, et al.
Donald Hattier                    C.A. # 15-120 (JJF)                    October 10, 2006

Page 278

1  that Christians need to take a stand. Do you agree
2  with the comment that respecting issues like School
3  Board prayer, prayer in schools and prayer at
4  graduation that Christian need to take a stand?
5      A.   I think that all people of faith should be
6  taking a stand at this particular point. It should
7  not be limited to Christians. As I stated earlier
8  when you take a look at the landscape that's out
9  everything from removing the Ten Commandments blocks
10  to trying to get in God we trust out of coins, to me
11  is all part of a broader effort to essentially
12  remove religion from our lives altogether, at least
13  in the public square.
14         So, I don't believe that it should be
15  limited to Christians, it should be all individuals
16  of faith.
17     Q.   To the extent that Miss Peacock's comment
18  was limited to Christians would you disagree with it
19  to that extent?
20     A.   Yeah, yes.
21     Q.   A woman named Judy Smith was recorded as
22  saying that, "Jesus is the best example that any
23  parent could have for their child." Do you agree
24  with that comment?

Page 279

1      A.   I believe that Jesus is one of the better
2  examples that people could look in their lives. I
3  think there is a lot of wonderful people, people
4  that we can look up to in the history of the world.
5      Q.   A woman named Stephanie Heywood commented,
6  sorry, "Christ will deny anyone who has denied him."
7  Do you agree with that comment?
8      A.   This is her belief, not mine.
9      Q.   The Reverend Worthy commenced that heaven
10  would be filled with Christians. Do you take the
11  same view as the Reverend Worthy?
12     A.   I believe that to be his belief.
13     Q.   It is your belief that heaven is not
14  limited to Christians?
15     A.   Quite frankly even though I believe in
16  Christ as the Son of God I'm not convinced as of yet
17  that there is a heaven or a hell.
18     Q.   Would the School Board Prayer Policy
19  prohibit a Board member from including each of these
20  comments as a portion of his invocation?
21     A.   I would believe that, yes they would
22  because that would be stepping over the line and has
23  nothing to do with splenification.
24     Q.   Is there a district policy that requires

Page 280

1  the School Board to hold public forums each year?
2      A.   I don't know.
3      Q.   I think I asked you this question, but
4  forgive me if I did, and it's correct that the
5  School Board has never held a public forum on
6  religion in schools?
7      A.   No. I don't believe that we have, no sir.
8      Q.   I'm going to try to short circuit some of
9  this. I have lot of minutes that I could go through
10  with specific examples, but I'm going to try general
11  questions --
12     A.   Okay.
13     Q.   -- And if we can accomplish it that will be
14  great. Is it correct that students of the district
15  routinely attend Board meetings?
16     A.   Yes.
17     Q.   And sometimes to receive awards?
18     A.   Yes.
19     Q.   Sometimes to recognized for their awards
20  achieved outside of the Board's --
21     A.   Yes.
22     Q.   Sometime to perform for the Board?
23     A.   Yes.
24     Q.   Sometimes for the purpose of presenting the

Page 281

1  colors?
2      A.   Yes.
3      Q.   And sometimes as student government
4  representatives to present their concerns to the
5  Board?
6      A.   Or their positive comments, yes.
7      Q.   In fact at some point the Board set aside a
8  specific portion of the agenda for that purpose?
9      A.   I believe so, yes.
10     Q.   Okay. Also students can appear for
11  purposes of defending or explaining themselves on
12  disciplinary action?
13     A.   I'm going to say no to that one because
14  that's more under the disciplinary areas where they
15  would do that either to the hearing or if there is
16  going to be something like that we usually do that
17  at a separate hearing, and to allow the matter to
18  either have an attorney be represented or to give
19  adequate weight to it, but it would not happen in a
20  public session, and I don't think we've done it in
21  an executive session. Not that I remember.
22     Q.   So, to the extent that students participate
23  in disciplinary proceeding that proceeding would not
24  be open with a prayer?

71 (Pages 278 to 281)

Dobrich, et al.                                                    Indian River School District, et al.
Donald Hattier                          v.                         October 10, 2006
                                C.A. # 15-120 (JJF)

Page 282

1    A.    No. That happens, disciplinary proceedings
2    happen usually at a hearing environment much like
3    what we have here. Generally there is an audio
4    recording which is later transcribed, we don't use
5    an official transcriber like this gentleman here,
6    but the notes are transcribed they are sent to
7    everybody, I believe that the State of Delaware has
8    a whole series of rules and regulations in terms of
9    law these things are suppose to be held.
10   Q.    Are you aware of any instance in which a
11   student has been invited to a School Board meeting
12   and the declined the invitation?
13   A.    Yes.
14   Q.    Are you aware of any such instance in which
15   the student declined the invitation for reasons
16   other than a conflict in scheduling?
17   A.    No.
18   Q.    Is it your belief, and I'm not asking about
19   the Board as a whole --
20   A.    Okay.
21   Q.    -- but just your belief that a student who
22   is invited to attend a School Board meeting would
23   feel that it is expected of him or her to attend
24   that meeting?

Page 283

1    A.    No.
2          MR. GOSSELIN: Objection.
3    A.    We have too many of them who don't.
4    Q.    I am going to ask you some questions about
5    the history of opening the Board meetings with
6    prayer?
7    A.    Okay, sir.
8    Q.    You can speak I take it from personal
9    knowledge going back least to 2002?
10   A.    2000 actually because that's when I started
11   attending School Board meetings.
12   Q.    So you went for a couple of years before
13   you were elected?
14   A.    I used to go about every other month.
15   When I ran in 2000, actually it was prior to that,
16   maybe it was early 2000 I felt that even though I
17   lost the election in the year 2000 that I did have
18   an interest in the schools so I stayed active with
19   the finance committee to try to understand the
20   intricacies of running the school finances which is
21   not like anything that anybody in their right mind
22   would ever do, again you have experience with that,
23   sir, and I felt that you know a couple of years I
24   might understand something. And how after seven I

Page 284

1    sort of do. And I would go to School Board meetings
2    periodically just to see what they were doing. It
3    was not on a regular basis however until the year
4    2002.
5    Q.    Okay, but you were there frequently enough
6    to observe that prayers were offered?
7    A.    Yes, sir.
8    Q.    Prior to 2000, am I correct that your
9    knowledge on the issue of the history of the Board's
10   practice is based on hearsay, someone told you?
11   A.    Someone told me, that's correct.
12   Q.    Who told you? I just want to pin down who
13   I should be asking these questions of?
14   A.    From what I understand there are records
15   going back to 1971 where I believe it was a
16   gentleman name Proudfoot who first suggested that we
17   should be doing this. I have queried and tried to
18   locate people prior to that time period, regrettably
19   many of them are now deceased and what I have done
20   is exactly what we find today that even though
21   almost everybody had somebody in a school setting
22   virtually nobody goes to a School Board meeting if
23   they don't have to.
24   Q.    So, who told you, what persons told you

Page 285

1    about what happened prior to 2000? For example, who
2    told you about Mr. Proudfoot?
3    A.    I believe it may have come up in a
4    discussion with Mr. Gosselin in terms of reviewing
5    some of the notes that he had available. And other
6    than I can ask Mr. Bireley because Mr. Bireley has
7    been on the Board since roughly 1974 or '73. He is
8    a true glutton for punishment and I know that he is
9    aware of if going all the way back to that time
10   period.
11   Q.    Well, it's a very profitable job?
12   A.    Very profitable.
13   Q.    Somebody has to do it?
14   A.    No, it's not.
15   Q.    I know. I was really trying to get at
16   people who told you or informed you or judgment
17   which you've talked about several times today, that
18   this Board has a history going back more than 30
19   years --
20   A.    Right.
21   Q.    -- of offering prayers at meetings. So,
22   you told me that Mr. Gosselin informed you that a
23   fellow named Mr. Proudfoot suggested it back in 1971
24   as a good thing for the Board to do?

72 (Pages 282 to 285)

Case 1:05-cv-00120-JJF    Document 250-7    Filed 04/10/2008    Page 73 of 86

Dobrich, et al.                                    v.                    Indian River School District, et al.
Donald Hattier                         C.A. # 15-120 (JJF)                         October 10, 2006

Page 286

1    A.   Which was right after the consolidation,
2   but other than independently Mr. Bireley has taken
3   it all the way back to like I said 1974. This just
4   pushed it a few year farther back than that. But I
5   believe it's common knowledge from those people that
6   I have talked to my neighbor across the street was
7   on the Board in the late 1980s through 1992 and he
8   confirmed that they were doing it. You know, it's
9   pretty much whoever I can talk to.
10   Q.   Have you undertaken, is it possible to
11   undertake a research into what sorts of prayers were
12   offered?
13   A.   From what I have been able to tell, nobody
14   has ever written down the type of a prayer, or
15   nobody has ever really said what type of prayers,
16   no, I don't think that that's going to be possible.
17   Q.   So, our knowledge of history in the
18   district is that prayers were offered but we don't
19   know what the prayers were?
20   A.   Correct.
21        MR. GOSSELIN: Who is our?
22        MR. ALLINGHAM: Dr. Hattier's
23        knowledge informed by whoever he's talked
24        to.

Page 287

1        MR. GOSSELIN: Okay.
2   Q.   Am I correct that you have made an effort
3   to find out as much as you can about the history?
4   A.   Absolutely.
5   Q.   And is that because you saw that as an
6   important issue or just because of your interest in
7   history?
8   A.   Both.
9   Q.   Apart from talking to people did you
10   delve into documents of any kind?
11   A.   I don't have the time to delve into
12   documents. It has recently come to my attention
13   that some of the early School Board meetings might
14   be in the Delaware State Archives but I'm not in a
15   position at this time to take off whatever it takes
16   to go through looking at the Delaware archives. I
17   know that there might be some there. I have not
18   been able to identify any people living at this time
19   period who go back that far. There is one gentleman
20   I believe who could push us back to the 1960s. And
21   I've met several teachers that go back to 1951, but
22   they too didn't go to School Board meetings if they
23   didn't have to.
24   Q.   Combining your sense that -- by the way,

Page 288

1   this notion that students routinely attend School
2   Board meetings, that also part of the district
3   that students have always been part of the meetings?
4   A.   There seems to have been some kind of a
5   change in the quantity and amounts of awards that
6   were given out under Mrs. Hobbs versus other people.
7   It used to be that the awards, again this is what I
8   understand, that some of those awards would be given
9   out more in student assemblies of various types in
10   earlier time periods.
11       And one of the reasons that think our
12   School Board meetings run so interminably long is
13   because of some of those things that happen. So,
14   there seems to have been a shift of some type, and
15   we have discussed at this particular point simply
16   due to time that's something we still want to do.
17       Again I state, we are all volunteers we all
18   work for a living. I'm generally up 5 o'clock or
19   5:30 in the morning. I start my paperwork at 7,
20   start seeing patients at 8. And you know if you get
21   home at 2 o'clock in the morning first off you are
22   not going to fall asleep real easy, you are awake at
23   that point, so by the time you get to sleep you are
24   ready to wake back up. Are you truly sharp enough

Page 289

1   the next morning to do things.
2       You know in my business because I used my
3   hands is an issue, and that's something that I'm
4   hoping we can resolve in a pleasant way.
5   Q.   So, there has been an increase in the
6   number of awards given at the district level. In
7   the other areas that I talked about, students
8   expressing their delight or concern on particular
9   aspects of school life, presentation of colors,
10   performances of students, is it correct that that
11   goes back a long time?
12   A.   As far as I know that goes back a long
13   time.
14   Q.   So, is it fair for me to infer that the
15   long time practice of opening School Board meetings
16   with prayers coincides with the attendance ot
17   students at those meetings?
18   A.   Probably.
19   Q.   Have you ever heard any Board member
20   express opposition to student involvement in Board
21   meetings or support for limiting student involvement
22   at Board meetings?
23   A.   Recently.
24   Q.   Who is that?

73 (Pages 286 to 289)

Dobrich, et al.                                    v.                    Indian River School District, et al.
Donald Hattier                          C.A. # 15-120 (JJF)                        October 10, 2006

Page 290

1    A.   A lot of us simply because if there was a
2    way me could eliminate that first half an hour, 45
3    minutes it might get us home by 11 o'clock or 11:30.
4    Q.   Oh, that's the issue --
5    A.   Yes and that there might be a more
6    appropriate way to handle that particular item.
7    Others than that I'm not aware of any.
8    Q.   On the issue of the prayers that would be
9    offered you expect to be on a rotational basis at
10   least offered the opportunity to give prayers --
11   A.   Yes, sir.
12   Q.   -- before the Board meetings?
13   A.   Yes, sir.
14   Q.   Is it your intent to continue to use
15   historical prayers of some kind?
16   A.   Yes, it is.
17   Q.   The policy, the School Board Prayer Policy
18   was adopted in October of 2004, since that time has
19   a Board member offered a prayer or moment of silence
20   at the beginning of every meeting?
21   A.   I believe so.
22   Q.   And of those meetings can you give me a
23   ballpark so as to how many have opened with a prayer
24   and how many have opened with a moment of silence?

Page 291

1    A.   Most I would say open with a prayer of some
2    type, or a statement of some type because I have
3    also used nonreligious individuals. I've made
4    statements from Albert Einstein to open mine. I
5    recall at least two occasions of moments of silence.
6    And I have not made every Board meeting, I make
7    about 11, between ten and 11 per year, so I'm not at
8    all have them.
9    Q.   The Albert Einstein statement, have you the
10   text of the statements or prayers that you've
11   offered?
12   A.   I might be able to find that one because it
13   was fairly recent.
14   Q.   Why did you pick the Albert Einstein
15   statement?
16   A.   Because Albert Einstein in that particular
17   one was referring to the existence of God and how
18   that that was something that should play a role in
19   folks' lives. And that was a good way to look
20   beyond yourself. I can't remember the exact quote.
21   I'm not very good at exact quotes.
22   Q.   And you obviously thought that was adequate
23   to solemnize the proceeding?
24   A.   Absolutely.

Page 292

1    Q.   You told me earlier there have been
2    instances in which a School Board member has
3    declined to offer a prayer or lead a moment of
4    silence?
5    A.   Yes.
6    Q.   Can you tell me which Board members did
7    that?
8    A.   I want to say that it was probably
9    Dr. Isaacs but I cannot say that with a sense of
10   assurety.
11   Q.   Is there only one that you recall?
12   A.   That's it. My believe is that Mr. Bireley
13   will set these things up in advance to give us all a
14   chance to be prepared, and especially they know if I
15   do it that they know that I'm going to need a good
16   couple of days.
17   Q.   So, if Mr. Bireley sets these things up in
18   advance how did you know that Dr. Isaacs or whoever
19   it was had declined the opportunity?
20   A.   Because there was one Board meeting where
21   somebody did and that was early on when we were
22   still working non the process itself. That would
23   have been maybe early 2005, I don't remember. It
24   was something in that time frame.

Page 293

1    Q.   Did the minutes reflect that decline of the
2    invitation?
3    A.   I have no idea.
4    Q.   Since October 19, 2004 do you recall any
5    prayer offered by any Board member that you believe
6    violated policy BDA.1?
7    A.   No.
8    Q.   Prior to October 19, 2004 do you remember
9    any policy offered by any Board member that violated
10   Policy BDA.1?
11   A.   I don't think so.
12   Q.   Do you have in mind some prayer that you
13   think is close but you think in balance it was okay?
14   A.   No, to be honest I wasn't paying that close
15   attention prior to that time period.
16   Q.   In connection with paragraph three of the
17   Board policy on School Board prayer, do you think
18   there is a difference between overtly sectarian
19   prayer and proselytizing prayer?
20   A.   I'm not sure I understand your question.
21   Q.   Do you think it is possible to offer a
22   prayer directed to a particular sect, Christianity,
23   Islam, that is not intended to persuade or influence
24   its listeners to consider the religion it expresses?

74 (Pages 290 to 293)

Dobrich, et al.                                    v.                Indian River School District, et al.
Donald Hattier                        C.A. # 15-120 (JJF)                        October 10, 2006

Page 294

1    A.   As I stated earlier, I think if you are
2  going to include the Muslims into the group that if
3  any mention of God and not Allah his name be
4  praised, could be seen as a sectarian effort and
5  that it would probably be seen in a way that they
6  might not appreciate.
7        Okay, so in terms of whether it's
8  proselytizing or not, I don't think that it would be
9  proselytizing if you offer it in what you personally
10 belief. You know, you are not asking, if you are
11 not asking to convert or do things your way then its
12 your prayer, okay?
13   Q.   The minutes reflect at least the ones that
14 we went over that in each case president Walls says
15 it is the history of the Board to have a prayer at
16 the beginning of the meeting which is voluntary
17 among the members of the Board of Education?
18   A.   Right.
19   Q.   Does president Walls actually say that each
20 time?
21   A.   Yes.
22   Q.   Does president Walls also say that no
23 school employee student in attendance or member of
24 the community in attendance shall be required to

Page 295

1  participate in any such prayer or moment of silence?
2    A.   That is part of the general statement.
3    Q.   He does say that?
4    A.   I believe he is supposed to.
5    Q.   Do you think that he is supposed to under
6  the new policy?
7    A.   Yes.
8    Q.   And it was the intention of the board that
9  those disclaimers be stated at each Board meeting,
10 not just once?
11   A.   No, it should be stated at each Board
12 meeting.
13   Q.   Okay.
14       MS. DUPHILY: We are going off the
15 record at approximately 5:25 p.m..
16       (WHEREUPON a brief recess was
17 taken)
18       MS. DUPHILY: Back on the record
19 at 5:25 p.m..
20   Q.   These questions directed to you, not to the
21 Board as a whole. To you think that not being
22 permitted to open a School Board meeting with a
23 sectarian would mean that you were treated as a
24 second class citizen?

Page 296

1    A.   I believe so.
2    Q.   Have you ever been treated as a second
3  class citizen?
4    A.   As I stated earlier as a practicing
5  chiropractor I'm used to getting a lot of barbs from
6  the medical community and even from attorneys in
7  situations like depositions where they basically one
8  side will make you out to be a very good individual
9  and the other side will make you out to be a dumb
10 cluck. So, in that sense, yes.
11   Q.   You don't seriously think of that as being
12 treated as a second class citizen, do you?
13   A.   I like to think -- you are being extremely
14 respectful in our conversations and I must that I
15 appreciate that very much. I don't think you have
16 crossed the line in any way. I have been parts of
17 depositions what I would have to say that attorneys
18 have been less than cordial, where they have been
19 more attacking and quite derogatory and demeaning.
20 And whether they mean that simply because of their
21 courtroom appearance or because they feel they have
22 to, or whether that's just the way they genuinely
23 are, I can't answer that. So, yes I do consider it
24 demeaning.

Page 297

1    Q.   Demeaning, but when I ask the question
2  about second class citizen I mean has someone
3  treated you as if your rights were not equal to
4  other person's rights?
5    A.   Not that I'm aware of.
6    Q.   You've never had to a ride in the back of
7  the bus because you are a Christian?
8    A.   No.
9    Q.   Or drink from a different water fountain
10 because you are a Christian?
11   A.   No.
12   Q.   Did you happen to read Mr. Helms'
13 commentary about how he was tired of having to ride
14 at the back of the bus because he is a Christian?
15   A.   No.
16   Q.   Do you think that it's appropriate for
17 Mr. Helms to compare himself to Rosa Parks?
18       MR. GOSSELIN: Objection.
19   A.   I think it's withing Mr. Helms' rights to
20 write and state whatever he who like to, as long as
21 it's not going to infringe on someone else's rights
22 or cause them to, you know, incite riots, et cetera.
23   Q.   Am I right that no one has ever threatened
24 you or your family because you are a Christian?

75 (Pages 294 to 297)

Dobrich, et al.                         v.              Indian River School District, et al.
Donald Hattier                  C.A. # 15-120 (JJF)              October 10, 2006

Page 298

1    A.   Correct.
2    Q.   Or threaten bodily harm to you because
3    you're a Christian?
4    A.   Correct.
5    Q.   And are you aware of any teacher trying to
6    convert your children to another religion?
7    A.   No.
8    Q.   Have you ever been harassed because you're
9    a Christian?
10   A.   No. Actually in terms of what my children
11   are going through, it depends on how you define
12   secular humanism and the way it's taught in schools,
13   but I believe that may be a separate philosophical
14   discussion.
15   Q.   I think you've addressed this, but I'm
16   going to ask the questions directly. As a Board
17   member do you or do you not believe that you are
18   obligated to take action in accordance with the
19   majority of what the majority of your constituents
20   want?
21            MR. GOSSELIN: Objection.
22   A.   I believe that I am elected by the people
23   who support me because they have faith in what I do,
24   and in the fact that I will do what my conscience

Page 299

1    dictates for me to do. And if they don't like it
2    come election time they are free to elect someone
3    else.
4         So, do I take the majority's viewpoint into
5    consideration, I probably do, but ultimately I am
6    going to act on what my own conscience tells me to
7    do.
8    Q.   Have you told any of your fellow Board
9    members who you believe the Does to be?
10   A.   I don't think so.
11   Q.   Have you heard any Board member tell
12   another Board member who that Board member believes
13   the Does to be?
14   A.   No.
15   Q.   Has there been any discussion either at
16   Board meeting or outside of Board meetings among
17   Board members that you are aware of in which the
18   identity of the Does has been discussed?
19   A.   Not between Board members. I've had
20   members of the public come up to me and tell me who
21   the Doe family is.
22   Q.   What's your response to that?
23   A.   My response to that is I can't confirm or
24   deny because I can't confirm or deny, I don't know.

Page 300

1    I'm assuming that what they tell me is correct.
2    I've had the same names pop up quite a few times so
3    that would be my assumption.
4    Q.   Who's told you that they know who the Does
5    are?
6    A.   Members of the community in a variety of
7    situations.
8    Q.   Who?
9    A.   I don't know that that's something that I
10   need to give out. They are members of the
11   community. Some patients of mine who brought it to
12   my attention, other family members, I'm sorry, not
13   my family members but people who have been family
14   friends with the Does in the past. Variety of
15   individuals.
16   Q.   Did you ask why they thought it was
17   necessary to try to figure out who the Does were?
18   A.   I don't know that they had to figure it
19   out.
20   Q.   Did you ask them why they were telling you
21   who the Does were?
22   A.   A lot of them wanted to know why we can't
23   release their name to the public.
24   Q.   Were they at the August 24th meeting in

Page 301

1    which the Madelyn Murray-O'Hare comment was made?
2    A.   Not that I'm aware of. I can't tell you
3    that.
4    Q.   Let me ask you personally, Dr. Hattier. Do
5    you have same sympathy with the Doe's desire to
6    remain anonymous given what happened at the August
7    24th meeting?
8            MR. GOSSELIN: Objection.
9         Go ahead.
10   A.   You know, I have a sympathy for them but
11   let me state that I actually have a high degree of
12   respect for the Dobrich family, all righty, I really
13   do. I have a high respect for them because they
14   believed in something and they were willing to step
15   forward, just as I am now to defend the beliefs that
16   I have him. All right, and I think that if somebody
17   wishes to hide behind anonymity on an issue, you
18   know they are doing it out of fear or whatever, but
19   if they are right they are right.
20        And my understanding is that the thing that
21   the Doe family was originally complaining about,
22   which had something to do with the Bible Club, which
23   I was not aware of at the time period, okay there
24   were right, we fixed it. We corrected it. Okay,

76 (Pages 298 to 301)

Dobrich, et al.                                              Indian River School District, et al.
Donald Hattier                        v.                              October 10, 2006
                            C.A. # 15-120 (JJF)

Page 302

1  and other than I personally don't see what the issue
2  is.
3      Q.    You were personally present and observed
4  the treatment of Alex and Samantha Dobrich at the
5  August 24th Board meeting, correct?
6      A.    Yes.
7      Q.    Do think that the treatment of those two
8  children at that meeting, by community members,
9  might legitimately cause parents to be concerned
10  about the treatment that their children would get if
11  they relinquished anonymity?
12     A.    Yes.
13     Q.    I asked you earlier whether you are that
14  any of your children had tried to confirm who the
15  Does were and you said you were not aware of that?
16     A.    No, I would prefer that my children not
17  have a clue as to who they.
18     Q.    Am I also correct that you are not aware
19  that your wife or any member of your family has
20  taken any action to try to confirm who the Does are.
21     A.    I would hope not.
22     Q.    This is closing the loop for the record, I
23  would hope not means no you not area?
24     A.    Take that as a no, yes, well, whatever, no.

Page 303

1      Q.    This can go quickly.  I have some
2  statements that you were quoted as having been to
3  the media.  I really don't want to, I don't think
4  debate these statements just want to confirm that
5  you were quoted accurately?
6      A.    Okay.
7      Q.    I may have a question or two but I think
8  it's going to be —
9            MR. ALLINGHAM:  This is Hattier
10           24.  The Bates number is P104 and 105.
11           (WHEREUPON Hattier Exhibit 24 was
12           marked for identification)
13     Q.    There is taken from Sussex County Online.
14  You are reported in the one, two, three four, fifth
15  paragraph as having been, as having said,
16  "Dr. Donald Hattier who opened last week's meeting
17  with a prayer penned by George Washington admitted
18  the School Board's current stance on prayer wouldn't
19  hold up in court?"
20     A.    Incomplete quote.
21     Q.    Can you complete it for me?
22     A.    Yes.  Graduation prayer.  Graduation prayer
23  and prayer at school luncheons, other things.  If
24  you compare what we were doing with the DOJ cite it

Page 304

1  would not hold up.  Incomplete quote.
2      Q.    Okay, so you did say this but you weren't
3  referring to the School Board prayer?
4      A.    No, I was not, I was referring to the other
5  issues.
6      Q.    And let me just ask you the question, and
7  are the current policies which have been adopted
8  since that time in your have view in compliance with
9  the Constitution?
10     A.    Lordy, I hope so.
11           MR. ALLINGHAM:  This is Hattier
12           25.  And I will tell you in advance, Dr.
13           Hattier I have only the second page of this
14           article from The Wave.  I don't know why.
15           It bears Bates number P122.  I will see if I
16           can find the first page.
17           (WHEREUPON, Hattier Exhibit 25 was
18           marked for identification)
19     A.    Yes, final paragraph.
20     Q.    Is your comment accurately reported there?
21     A.    Yes.
22     Q.    Okay?
23     A.    And again though that's based on my
24  findings afterwards.  Okay, in other words, you look

Page 305

1  back on what the law had been or had not been, start
2  looking at the aforementioned, you know citing, and
3  as you read the court cases, so that's where the
4  decades part came in.
5      Q.    Understood.
6      A.    Okay.
7            MR. ALLINGHAM:  This is
8            Hattier 26 bearing Bates numbers P290
9            through 293.
10           (WHEREUPON Hattier Exhibit 26 was
11           marked for identification)
12     Q.    This is an August 27 article from the
13  Coastal Point?
14     A.    Okay.
15     Q.    If you —
16     A.    I can't even see myself in there if you can
17  help me out, please.
18     Q.    If you will look at the third page, the
19  last column, the second full paragraph you will see
20  district four representative Dr. Donald Hattier, do
21  you see that?
22     A.    Uh-hum.
23     Q.    "Responded to further public comments on
24  the issue by stating his personal support for prayer

77 (Pages 302 to 305)

Case 1:05-cv-00120-JJF    Document 250-7    Filed 04/10/2008    Page 78 of 86

Dobrich, et al.                              v.                Indian River School District, et al.
Donald Hattier                    C.A. # 15-120 (JJF)                    October 10, 2006

Page 306

1  but acknowledging that the Board had no expectation
2  that it would be able to win any case taken to the
3  court with a pro prayer stand. He said the Board
4  was proceeding in forming the policy under the
5  guidelines of the State Education Department and
6  with the advice of the district's legal counsel?"
7  **A.  Same incomplete quote.  This has to be**
8  **again with the baccalaureate and the graduation**
9  **policies.**
10  Q.  And did individual Board members respond to
11  the public comment section with their own views?
12  **A.  I don't think so.**
13  Q.  Other than yourself?
14  **A.  You mean in terms of what I am saying here?**
15  Q.  Yeah.
16  **A.  You know, based on what it is and based on**
17  **what's out there, this is what it is.  Okay, we are**
18  **not going to be able to go to court and argue that**
19  **we should be able to have under our current policies**
20  **that a person should be allowed to invite a preacher**
21  **to come and talk to our graduation ceremonies.**
22  Q.  Yes, sir, my question is much more limited
23  and I want to see if I can get you out of here.  You
24  did make this comment?

Page 307

1  **A.  Yes, I did.**
2  Q.  With the clarification that you have given?
3  **A.  Again, incomplete quote.**
4  Q.  And my question was just did any other
5  Board member make a comment in response to the
6  public comment section of the meeting?
7  **A.  Unless it's printed in here I'm going to**
8  **say no. And this, whatever comment I made here, who**
9  **is the author here, Pat Titus, Patricia Titus, this**
10  **probably would have been an interview that happened**
11  **afterwards during the break of some type. This**
12  **would have been a comment that would have been made**
13  **during the Board meeting itself.**
14  Q.  I have two quick questions on the report of
15  the August 24 meeting. On page two of this exhibit
16  in the second column, look at the one, two, three,
17  fourth paragraph halfway down the paragraph here is
18  a sentence that begins, at times?
19  **A.  Uh-hum.**
20  Q.  And it reads, "At times the meeting
21  resembled a prayer meeting as much as a School Board
22  meeting with choruses of amen ringing in the
23  audience after speakers declared their believe and
24  their support for prayer in the schools."

Page 308

1  **A.  Right.**
2  Q.  "Few speakers drew any line between the
3  Board's policy on commencement ceremonies or other
4  school events and the policy of prayer said before
5  School Board meetings."
6  **A.  Right.**
7  Q.  I want to ask you, would you agree that at
8  times the meeting resembled prayer meeting?
9  **A.  I don't know that I'd call it a prayer**
10  **meeting but I would say as I stated to you earlier I**
11  **don't think a lot of people really understood what**
12  **the issues were.  Like the last sentence says few**
13  **speakers drew any lines.  I think most of the**
14  **speakers were not aware what we were discussing was**
15  **a more limited realm.**
16  Q.  There were choruses of amen --
17  **A.  Yes.**
18  Q.  -- and people?
19  **A.  Yes.**
20  Q.  -- cheering for people who expressed
21  support for prayer in schools?
22  **A.  Yes.  Yes I don't know if I would call it a**
23  **prayer meeting.**
24  Q.  Revival meeting?

Page 309

1  **A.  I wouldn't even call it -- definitely not a**
2  **revival meeting.  I don't know if you have ever been**
3  **to a revival meeting, but I would not call it that**
4  **okay.**
5  Q.  On the next page, second column right under
6  the big block quote from Mona Dobrich in the middle?
7  **A.  Yes.**
8  Q.  There is a statement from Representative
9  Hocker, do you know Representative Hocker?
10  **A.  Yes, I do.**
11  Q.  And Representative Hocker is quoted as
12  having said, "I'm a great believer in letting the
13  majority rule?"
14  **A.  Yes.**
15  Q.  Are you a great believer in letting the
16  majority rule on issues such as School Board prayer?
17  **A.  Well --**
18      MR. GOSSELIN: Objection. I think
19  he has covered that a couple times now?
20  **A.  I would think that as a general rule our**
21  **country is built on majority rule and that if a**
22  **majority would wish to vote for something we do have**
23  **to protect the interests of the minority, if you**
24  **will, but on the other hand if this is what the**

78 (Pages 306 to 309)

Dobrich, et al.                                  v.                    Indian River School District, et al.
Donald Hattier                         C.A. # 15-120 (JJF)                          October 10, 2006

Page 310

1   majority would care to do it should be put up to a
2   vote.
3          And in there particular case I believe that
4   it should not be put up to a vote in the sense that
5   the public gets to go out and cast a ballot, this is
6   something that should be corrected by a
7   constitutional amendment to clarify. It's a more
8   difficult process, but at that particular point you
9   would know that everybody had played by the rules
10  and that's what we believe in.
11         My own concern is that a lot of these
12  things are not being done by any kind of vote
13  whatsoever but rather by judicial fiat, and that is
14  not something that our nation stands for.
15         MR. ALLINGHAM: Mark as Exhibit 27
16         P554 through 555.
17         (WHEREUPON Hattier Exhibit 27 was
18         marked for identification).
19  Q.    Sorry, sir, I'm going as fast as I can.
20  A.    That's okay.
21  Q.    In a number of your web postings, Dr.
22  Hattier you referred to a gag order that had been
23  imposed by Judge Farnan?
24  A.    Yes.

Page 311

1   Q.    Prohibiting Board members from talking
2   about terms of the settlement?
3   A.    Yes.
4   Q.    In this article from the Coastal Point, you
5   are reported as having told Jonathan Starkey that
6   among other things, there was a provision of the
7   settlement that would have required the Board
8   members to bump one of the Plaintiffs' children to
9   the front of the line for admittance to the Southern
10  Delaware School of the Arts?
11  A.    Yes.
12  Q.    Did it occur to you that that was a
13  violation of the order imposed by the judge?
14  A.    Okay, somewhere in the early part of this
15  year around January, February there was a
16  great deal of confusion as to whether the gag order
17  had been lifted after the mediation collapsed.
18         I do remember seeing documents that said
19  that the mediation was over and some of these
20  things, especially regarding the children being
21  allowed into a school preferentially had already
22  been published in other newspapers as well. People
23  were asking me about it. I did not release that, it
24  was already out there.

Page 312

1          Then there was a time period where the gag
2   order was reinstated and then was lifted again. So,
3   There was a time period where I think there was a
4   great deal of uncertainty as to whether we had a gag
5   order or whether we didn't. And that had to do with
6   when the mediation efforts collapsed on or about
7   February of this year.
8          And at some point somebody released
9   everything and then they said they didn't and then
10  yes we did and no we didn't.
11  Q.    Who was the somebody that released
12  everything?
13  A.    Got me. I'm assuming it came from Judge
14  Farnan's office or, I don't know, who was the
15  mediation judge, it was the lady's name I believe
16  started with a T.
17  Q.    Judge Thine?
18  A.    Judge Thine, thank you sir. Okay, there
19  was some confusion over that.
20  Q.    Do you recall that Thomas Neuberger
21  disclosed to the press that the settlement offer
22  included a six figure money settlement?
23  A.    He might have, I don't remember
24  specifically.

Page 313

1   Q.    Did the Board authorize Mr. Neuberger to
2   make such a disclosure?
3   A.    Not to my knowledge.
4   Q.    Did Mr. Helms authorize Mr. Neuberger to
5   make such a disclosure?
6   A.    I'm not going to speak for Mr. Helms.
7   Q.    Were you a little dismayed when that
8   disclosure hit the press?
9   A.    Not really. Sooner or later all this is
10  going to come out anyway.
11         MR. ALLINGHAM: All right, mark as
12         Hattier Exhibit 28 a document bearing Bates
13         numbers 559 through 560.
14         (WHEREUPON Hattier Exhibit 28 was
15         marked for identification)
16  A.    Yes, I remember this one.
17  Q.    Well, I'm going to interest of completeness
18  did you say to the reporter from the Delaware Wave,
19  Laren Hughes, "Serving us on Easter was tacky. I
20  was at home with my family and now they are
21  intruding on my personal life?"
22  A.    Yes.
23  Q.    And so that the record remains clear that
24  was not this lawsuit?

79 (Pages 310 to 313)

Dobrich, et al.
Donald Hattier

v.

C.A. # 15-120 (JJF)

Indian River School District, et al.
October 10, 2006

Page 314

1  A.  No, correct, thank you.
2         MR. ALLINGHAM:  This is a one page
3     exhibit which would be Exhibit 29, from the
4     Wave it bears Bates number P582.
5         (WHEREUPON Hattier Exhibit 29 was
6     marked for identification)
7  Q.  This is an article in the Wave written by
8  Laren Hughes shortly after the School Board rejected
9  the settlement that had emerged from the mediation?
10  A.  Yes.
11  Q.  I have a couple of practical questions.
12  When the Board met in executive session at that
13  Board meeting, where did it meet?
14         MR. GOSSELIN:  I am just going to
15     object for a second.  You know most of this
16     stuff is fairly harmless.  If we are
17     going to be getting into the circumstances
18     surrounding the Board's rejection --
19         MR. ALLINGHAM:  Nope this has to
20     do with School Board prayer and the
21     public's perception of this policy.  I'm
22     not going to get into that.
23         MR. GOSSELIN:  Okay.
24         MR. ALLINGHAM:  I am trying hard

Page 315

1     to get him out of here.
2  A.  Where did we meet.
3  Q.  Could you hear what was going on in the
4  auditorium?
5  A.  No.
6  Q.  So, you were far enough away that you
7  didn't hear what was going on?
8  A.  If I remember correctly, we did this at
9  Sussex Central High School.
10  Q.  Correct.
11  A.  In which we are sitting way upstairs and
12  the auditorium is around the corner out in the back,
13  because when we are meeting there, when we meet at
14  Sussex Central High School we actually meet in the
15  cafeteria which is a goodly distance away down
16  several hallways and up, the way the building is
17  structured.
18  Q.  You couldn't hear what was going on in the
19  auditorium?
20  A.  No.
21  Q.  So, you can't confirm that the audience
22  members were singing hymns and Onward Christian
23  Soldier?
24  A.  No.

Page 316

1  Q.  Remind me to tell you my favorite ACLU
2  change in the ACLU initials I saw on a sign once.
3         You are quoted in this article, this is in
4  what is the second page of the newspaper article,
5  but on the first page of this.  On the first column
6  about halfway down, as saying, "This is an
7  opportunity for us to find out if we are legally
8  correct in what we believe Hattier said.  This is a
9  very tough issue but this is the right vote for me.
10  I know that I can look my kids in the face and know
11  I did the right thing?"
12  A.  Yes, I said that.
13  Q.  When up said this is an opportunity for us
14  to find out if we are legally correct in what we
15  believe, did you mean by rejecting the settlement
16  that provides an opportunity for us to find out if
17  we are legally correct in what we believe?
18  A.  No.  All right, keep in mind that with the
19  settlement that there were a lot of other issues
20  there also and the fact that this may or may not go
21  to trial in terms of whether it's legal for us to
22  have a prayer at a School Board meeting or not, it
23  seemed to me that's the direction that it was going
24  to head into.

Page 317

1  Q.  So, and let me just see if I understand, I
2  think I have it.  The settlement provided that the
3  Plaintiffs would agree not to challenge the existing
4  School Board Prayer Policy, correct?
5  A.  That was one of the less odious portions of
6  it, yes.
7  Q.  So that if that settlement had been
8  approved, on the one hand you would have dispensed
9  with the existing challenge to the School Board
10  Prayer Policy, but on the other hand you would not
11  have a final decision from a court as to whether
12  that policy was constitutional or not?
13  A.  Correct.
14  Q.  And so what you are saying here is the
15  rejection of the settlement provides an opportunity
16  for us to find out if we are legally correct in
17  believing that our existing School Board Prayer
18  Policy is constitutional?
19  A.  I believe that's what I intended, yes.  One
20  thing I have learned about dealing with the press of
21  any type, even though they tape record you and you
22  might be aware of this yourself, sometimes what
23  actually hits print is still not necessarily the way
24  you said it or what you said.

80 (Pages 314 to 317)

Dobrich, et al.                                    v.                    Indian River School District, et al.
Donald Hattier                              C.A. # 15-120 (JJF)                        October 10, 2006

Page 318

1        MR. ALLINGHAM: This is Exhibit 30
2    P2716 through 2720.
3        (WHEREUPON Hattier Exhibit 30 was
4    marked for identification.)
5    A. If I could offer a comment going back to
6    Exhibit Number 27.
7    Q. Let me just find it, sir.
8    A. Fourth paragraph first page, last sentence,
9    it says according to Thomas Neuberger and Hattier
10   that settlement offer included a six figure money
11   settlement. I would not have mentioned what the
12   settlement figures were, because I don't believe
13   that we were allowed to discuss the money involved.
14   Q. So, you think in that aspect Mr. Starkey
15   got —
16   A. I think in that respect he got that portion
17   of it if incorrect, all righty?
18   Q. I appreciate the clarification.
19       Exhibit 30 is an article from Delaware
20   Beach Life?
21   A. Uh-hum.
22   Q. It has a picture on the first page and I
23   think the person in sort of the upper right corner
24   is you, is that correct?

Page 319

1    A    Yes, it is.
2    Q. Do I correctly understand that when someone
3    offers a prayer you bow your head?
4    A. I do.
5    Q. All right, did you give an interview to the
6    author of this article?
7    A. Yes, I did.
8    Q. On the second, sorry, the third page of
9    Exhibit 30, on the right hand column, second
10   paragraph —
11   A. Okay, sorry black up?
12   Q. Third page of the exhibit, right hand
13   column?
14   A. Yes.
15   Q. Second paragraph. You are reported as
16   having told the reporter that in addition to
17   answering 10-4 when asked if you're a Christian, you
18   often volunteer to offer the prayer. Was that an
19   accurate description of what you told the reporter?
20   A. Yes.
21   Q. This was —
22   A. I don't know if volunteer is the right work
23   but if you tap me, I will do it.
24   Q. Well, that was my question. I mean

Page 320

1    volunteer typically means hey, I'd like to do it.
2    A. No, I don't typically say I'd like to do
3    it, but you tap me I will do it and I will try to do
4    the best job I can.
5    Q. July 2006, a policy had been in place for
6    almost two years that required rotation?
7    A. 2006, okay, right.
8    Q. What context would it be appropriate for
9    you to volunteer to give the prayer under the Board
10   Prayer Policy?
11   A. It wouldn't.
12   Q. So, why did you tell the reporter —
13   A. I'm not sure that's a correct quote. This
14   particular --
15       MR. GOSSELIN: I don't think that
16       part is a quote.
17   A. It's not. This particular individual was
18   have very difficult interviewer. Nella Banerjee,
19   and I've given a lot of interviews on this subject
20   in the past, but Nella Banerjee with the New York
21   Times would, rather like yourself, she was an
22   extremely fair individual. She worked her questions
23   very well, and she was, I believe, very responsible
24   in the way she reported things. This particular

Page 321

1    woman had an edge in her voice the entire time she
2    was giving the interview and I was very concerned
3    that she was not going to be quoting me correctly
4    and as it turns out I don't believe she did.
5    Q. Okay, so you don't think that volunteer
6    work is your word?
7    A. No.
8    Q. Okay, that's fine. I just wanted to know.
9    You are reported two paragraphs below that as saying
10   that, "prayer works, look at the test scores in
11   Indian River, look at the number of superior schools
12   we have and the number of blue ribbon schools. We
13   have done good and part of that is because of
14   prayer."
15   A. I believe that.
16   Q. Did you say that to her?
17   A. Something to this effect, yes, I did.
18   Q. Part of that is because of prayer is a
19   generic statement. Do you believe that the
20   district's superior performance is as you've layed
21   them out here are due in part to the opening of
22   School Board meetings with a prayer?
23   A. I think that's probably part of it, yes.
24   Q. And explain to me how the opening of School

81 (Pages 318 to 321)

Dobrich, et al.
Donald Hattier

v.

C.A. # 15-120 (JJF)

Indian River School District, et al.
October 10, 2006

Page 322

1 Board meetings with a prayer contributes to improved
2 academic performance of the students?
3    A.  In the same sense the George Washington and
4 a lot of our founding fathers made the statement
5 that you cannot have a good nation without studying
6 religion and morality and without putting the glory
7 of God ahead of what you do. It's in the same
8 thing.
9        I mean I don't have my direct quotes with
10 me as I stated I'm not very good with direct quotes
11 without my notepad handy, but if you look at what
12 the founding fathers stated and they way they
13 approached things it was always with the idea in
14 mind that they would give the credit and the glory
15 to God and that good things were found that way.
16    Q.  All right, so when you offer a payer at the
17 beginning of the School Board meeting you believe
18 that it will have an impact on the students of the
19 district?
20    A.  I believe so.
21    Q.  And is that an impact that is limited to
22 the students who are in attendance or does it apply
23 across the board in the district?
24    A.  I hope it applies across the board.

Page 323

1    Q.  And how will the students who are not
2 present find out the prayer that you've offered?
3    A.  Okay now you're asking some interesting
4 questions about theology, but if a prayer is offered
5 does the other person need to know that you are
6 praying for them, or is it simply the fact that, you
7 know, the Lord would understand.
8    Q.  I apologize. I misunderstood. I thought
9 that prayers were offered in order to invoke the
10 help of a higher power for the Board members to do
11 their best in discharging their responsibilities --
12    A.  Yes.
13    Q.  -- as Board members?
14    A.  They are.
15    Q.  I did not understand that you offer prayers
16 that a higher power assist the students of the
17 district in performing?
18    A.  We have asked in terms of our prayers to
19 solemnify that we ask again, if you read what I
20 wrote above it, maybe it's not this one, yeah, it is
21 in this one, you know, praying is about giving
22 yourself up saying I don't know everything give me
23 help. It's about going above and beyond mere ego
24 and about being willing to humble yourself.

Page 324

1        And in that sense at a lot of our prayers
2 we will ask for the proper guidance for our
3 custodial staff, or our teachers to do the right
4 things as well. I mean it's about solemnifying the
5 Board meeting and maybe in that sense we step over
6 the line and pray for too many people, but we
7 certainly want our students to succeed well and at
8 least speaking for myself I do believe that God will
9 intervene in those things. Without being overly
10 simplistic about it.
11    Q.  On the next page of the article, you are
12 quoted as saying and this is near the bottom of the
13 left hand most column. The reporter purports to
14 report the prayer that you gave at the August 24th
15 meeting which is the prayer from George Washington,
16 do you see that there?
17    A.  uh-hum.
18    Q.  And then quotes you as having said, "Our
19 founding fathers said that if this nation doesn't
20 have God it doesn't have squat?"
21    A.  Yes, and actually that is a verbatim quote
22 absolutely. And if need be I can, they would not
23 have used the word squat, let's face it. They would
24 have phrased it far more 17th century or 18th

Page 325

1 century language but if need be I can produce the
2 quotes.
3    Q.  I understand. Under the picture of you
4 which I don't know if was taken for this article,
5 but I want that photographer to take that picture if
6 it was because you look 20 years younger.
7    A.  You and I both look young, sir.
8    Q.  There is the question where does my right
9 to free speech stop and the prayer opponents rights
10 begin?
11    A.  Something to that effect, yes.
12    Q.  And that's a question that you asked?
13    A.  That is a question that I asked throughout
14 all of this process.
15    Q.  And have you formulated an answer?
16    A.  No. Because even when I read the Supreme
17 Court rulings on this thing and again I'm not an
18 attorney and this is some incredibly dry reading, I
19 admire you guys for being able to plow through all
20 of this on a regular basis. Okay, you can find
21 where they can tease more things out of one or two
22 words and then come back and then some of them you
23 have got two concurring opinions and three
24 dissentings and I mean it makes incredible

82 (Pages 322 to 325)

Dobrich, et al.                                    v.                    Indian River School District, et al.
Donald Hattier                          C.A. # 15-120 (JJF)                        October 10, 2006

Page 326

1  interesting reading that the Supreme Court itself
2  hasn't even answered this particular question.
3       So no, I do not have an answer for this.
4  There I wish I did.
5       Q.  Would you agree that the resolution of the
6  question yes does my right to free speech stop and
7  prayer opponents' rights begin, requires a balancing
8  of the two provisions in the First Amendment that
9  you and I talked about earlier in this deposition.
10  That is the prohibition against establishment of
11  religion and the free speech for the exercise of
12  one's religion?
13       MR. GOSSELIN:  Objection.
14       A.  Or prohibiting the free exercise thereof
15  and that apparently is what this is as all about.
16  Is there a balance in here, you know, that's what we
17  have to determine.  At what point do the prayer
18  opponents start censoring what I wish to say and
19  instituting censorship, which as Americans we do not
20  generally believe in, and where am I stepping on
21  their toes.
22       Because at no time, at no time do I feel
23  that you know the Dobriches or the Does would have
24  been proscribed or prevented from, you know, telling

Page 327

1  me their beliefs, and had they chosen to do so I
2  would have stood in respectful silence and
3  essentially supported their right to do it, because
4  I believe they have that right.
5       Q.  On the last page, second column from the
6  right, in the last paragraph you are reported as
7  having told the reporter that, "Rather than forcing
8  what you think on other people you see yourself as
9  defending the values of Sussex County.  You see
10  yourself as protecting what Hattier who moved here
11  in 1986, calls one of the last great communities
12  with rural attitudes in the country."
13       First question, is that an accurate
14  reflection of what you said?
15       A.  I think the general gist of it is correct.
16       Q.  Could tell me what you mean by rural
17  attitudes?
18       A.  People willing to be self sufficient, stand
19  up for themselves, not relying on government, people
20  being willing to make good decisions to help their
21  neighbors when they need it.
22       You know the attitude that the government
23  is not to be all to end all and basically you do
24  have a right to pray and to, how do I phrase this,

Page 328

1  that you don't, that you can just come and be and
2  live as a free American, and basically not
3  participate in high taxes and paying for things that
4  you don't believe in.  In terms of what our schools
5  offer they are still some of the best in the state
6  for being a rural area, and for being able to
7  publicly pray if you want to.  You want to put a
8  shotgun on the back of your truck if you want to
9  that's fine.  You know, you want to drive your
10  pickup, it's whatever.
11       It's what we would see in the Walt Disney
12  movies from the 1950s.
13       Q.  You didn't mean to suggest to the reporter
14  that the position you took on School Board prayer
15  you were defending all of those principles?
16       A.  Part of it.  I'm not quits sure --
17       Q.  Explain to me how those principles are
18  connected to the position of the Board on School
19  Board prayer.
20       MR. GOSSELIN:  Objection.  I think
21       the question is what did you mean by rural
22       attitudes.
23       MR. ALLINGHAM:  This is a
24       follow-up question when I said what did

Page 329

1  you mean by rural attitudes the answer
2  which we could have read back includes the
3  right to be free from high taxes, the right to
4  carry a shotgun on the back of your pickup
5  truck, the right to whatever.  None of
6  which, as I recall them have to do with
7  School Board prayer?
8       A.  They don't in specific, but they are part
9  of again what I believe the nation was founded on
10  and I believe that something that I don't think any
11  of our founding fathers would have argued with.
12  They would have argued with you taking a tax out of
13  my paycheck to pay for a religious teacher in the
14  schools, and I too, would argue with that.
15       But having the right to pray where you want
16  to pray that was one of the things that did drive
17  the founder and the colonists from England in the
18  first place, so why are we in a situation now where
19  I have to careful simply because I have been elected
20  to a School board, which by the way does not pay
21  very well, and eats up humongous amounts of time and
22  is strictly a volunteer position.  Why am I being
23  told at this particular point that because I have
24  chosen to do this that suddenly now I am an agent of

83 (Pages 326 to 329)

Case 1:05-cv-00120-JJF    Document 250-7    Filed 04/10/2008    Page 84 of 86

Dobrich, et al.                          v.                    Indian River School District, et al.
Donald Hattier                  C.A. # 15-120 (JJF)                        October 10, 2006

Page 330

1  the government.
2       I don't view myself in that light. I view
3  myself as a member of the general public who is
4  trying to do the best that they can for the schools
5  and why would my right to free speech in this
6  particular case be prevented. I don't understand
7  that.
8    Q.   Just so you I understand you, you don't
9  view yourself as a government official functioning,
10 during the period of time when you function as a
11 School Board member?
12   A.   I view myself as a School Board member, but
13 I don't necessarily view myself as a government
14 official, no I do not.
15   Q.   Do you think that the members of the public
16 who come to School Board meetings see you as a
17 government official?
18            MR. GOSSELIN: Objection.
19            MR. ALLINGHAM: Well, that's an
20       important and clearly relevant
21       consideration.
22            MR. GOSSELIN: I have an objection
23       to form, you are asking him to speculate on
24       what other people might think.

Page 331

1    A.   I would agree with that.
2    Q.   No, my question is do you have a view as to
3  whether the members of the public who come to the
4  Board meetings think of you as a government
5  official?
6            MR. GOSSELIN: Objection?
7    A.   Some might, some might not.
8    Q.   You have taxing authority, correct?
9    A.   Uh-hum which we exercise -- yes, we have
10 taxing authority.
11   Q.   You spend the money that local residents
12 contribute to the district for the running of the
13 schools, you dictate how that money gets spent,
14 don't you?
15   A.   Uh-hum.
16   Q.   So, in your capacity as a School Board
17 member you tax the residents and then spend that
18 money for the greater good, correct?
19   A.   Correct. I guess that makes me
20 government --
21   Q.   Isn't that the essence of a government
22 function?
23   A.   I guess so, then I'm wrong.
24            MR. ALLINGHAM: 31. P2593 to

Page 332

1  P2594.
2            (WHEREUPON Hattier Exhibit 31 was
3       marked for identification)
4            MR. GOSSELIN: Are we getting
5       close to the end cause we definitely way
6       beyond our six hours.
7            MR. ALLINGHAM: Yeah, this is the
8       last one.
9    A.   What is the date on this?
10   Q.   It's after April of 2006 because it reports
11 on the graphic arts lawsuit. This was taken off the
12 web and the web doesn't report the date?
13   A.   Okay.
14   Q.   So, I can only tell you that it's after
15 April 2006.
16            MR. GOSSELIN: I can tell you now
17       that I'm objecting to any questions
18       relating to the graphic arts lawsuit.
19            MR. ALLINGHAM: I'm not going to
20       ask any questions about the graphic arts
21       lawsuit. So it's yet another area on which
22       we are in complete agreement.
23   Q.   First of all the fourth paragraph reports
24 that you told Jonathan Starkey, "It was one of the

Page 333

1  bigger issues but not the whole thing, Hattier said
2  of the School Board Prayer Policy. If you were to
3  read the entire settlement there would be things you
4  wouldn't sign off on either."
5    A.   Correct.
6    Q.   Is that a fair quote?
7    A.   It is.
8    Q.   Did you discuss with Mr. Starkey the
9  aspects of the settlement package that he would not
10 have signed off on either?
11   A.   No.
12   Q.   Do you recall statements from colleagues of
13 yours on the Board shortly after the February
14 meeting at which the settlement was rejected and
15 which they were quoted as saying we rejected the
16 settlement in order to preserve our right to pray
17 before School Board meetings?
18   A.   I don't know what they said, but that's not
19 the only reason I rejected it.
20   Q.   Are you saying that you rejected the
21 settlement in part because it would have left you
22 free to pray before School Board meetings in
23 accordance with the at policy?
24   A.   I may not have understood your question

84 (Pages 330 to 333)

Dobrich, et al.                                    v.                  Indian River School District, et al.
Donald Hattier                            C.A. # 15-120 (JJF)                        October 10, 2006

Page 334

1  correctly if you could phrase it again please, sir.
2  Q.  I think probably I didn't ask the question
3  right?
4  A.  I apologize for my confusion.
5  Q.  Reggie Helms among others was quoted as
6  saying that the settlement was rejected in order to
7  ensure that Board members would remain free to offer
8  prayers before School Board meetings.  Did you see
9  any of those quotes?
10  A.  No, not that I recall.
11  Q.  Am I correct that that was not a
12  consideration in your vote to disapprove the
13  settlement?
14  A.  No.
15          MR. GOSSELIN: Objection.
16  Q.  Since the settlement would have left the
17  School Board Prayer Policy in tact?
18          MR. GOSSELIN: Objection, you
19  don't have to answer questions about why
20  you voted not to accept the settlement.
21          MR. ALLINGHAM: Well, I think that
22  this -- I haven't asked any other questions
23  about the other aspects of the settlement.
24  I'm just asking about whether its impact on

Page 335

1  the School Board Prayer Policy contributed
2  to your vote to reject the settlement?
3  A.  No.
4  Q.  Okay.
5          MR. GOSSELIN: Do you have another
6  last one?
7          MR. ALLINGHAM: No, it's the same
8  one. Don't tease me, I told you it was the
9  last one and it was the last one.
10          It is my normal practice to say
11  give me five minutes to review my notes
12  but because I have already impinged on your
13  patience enough I will say that I'm done,
14  thank you very much for your courtesy.
15  A.  You are welcome.
16          MS. DUPHILY: We are going off the
17  record at approximately 6:13 p.m..
18
19
20
21
22
23
24

Page 336

1                    INDEX
2
    DEPONENT:    DONALD HATTIER                    PAGE
3
    Examination by Mr. Allingham              4
4
5
6          EXHIBITS
7                           MARKED
8  No. 1    Letter dated 3/30/06          43
9  No. 2    Memo 4/1/04                    73
10  No. 3    Letter dated 3/10/05          95
11  No. 4    Policy 6/27/06                99
12  No. 5    Minutes 6/20/06               102
13  No. 6    Letter dated 7/7/06           105
14  No. 7    Copies of postings WGMD       119
15  No. 8    School Board powers and duties   133
16  No. 9    School Board Prayer Policy    144
17  No. 10   Letter dated 4/4/04           145
18  No. II   Board prayer                  148
19  No. 12   Prayer resolution 8/30/04     151
20  No. 13   Minutes executive session 8/23/04  158
21  No. 14   Minutes regular session 8/23/04   160
22  No. 15   Minutes 6/15/04               162
23  No. 16   Minutes 7/27/04               167
24  No. 17   Minutes 8/24/04               208

Page 337

1  No. 18   Minutes 9/28/04               222
2  No. 19   Minutes 10/19/04              227
3  No. 20   Minutes 11/16/04              236
4  No. 21   Minutes 12/21/04              255
5  No. 22   Policy committee agenda       260
6  No. 23   Policy meeting schedule       262
7  No. 24   Editorial Sussex County Online   303
8  No. 25   Article the Wave 9/1/04       304
9  No. 26   Article Coastal Point 8/27/04   305
10  No. 27   Article Coastal Point         310
11  No. 28   Article the Wave 4/19/06      313
12  No. 29   Article the Wave 3/3/06       314
13  No. 30   Article Delaware Beach Life   318
14  No. 31   Article Coastal Point 4/06    332
15
16
17
18
19  ERRATA SHEET/DEPONENT'S SIGNATURE    PAGE  338
20
    CERTIFICATE OF REPORTER              PAGE  339
21
22
23
24

| Dobrich, et al. | v. | Indian River School District, et al. |
|---|---|---|
| Donald Hattier | C.A. # 15-120 (JJF) | October 10, 2006 |

Page 338

1
2
3
4
5
6
7
8

REPLACE THIS SHEET WITH ERRATA SHEET

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 339

1    CERTIFICATE OF REPORTER
2        I, David A. Sroka, Registered Professional
     Reporter and Notary Public, do hereby certify that
3    there came before me on October 10, 2006, the
     deponent herein, DONALD HATTIER, who was duly sworn
4    by me and thereafter examined by counsel for the
     respective parties; that the questions asked of said
5    deponent and the answers given were taken down by me
     in Stenotype notes and thereafter transcribed by use
6    of computer-aided transcription and computer printer
     under my direction.
7
8        I further certify that the foregoing is a
     true and correct transcript of the testimony given
9    at said examination of said witness.
10
         I further certify that reading and signing
11   of the deposition were not waived by the deponent
     and counsel.
12
         I further certify that I am not counsel,
13   attorney, or relative of either party, or otherwise
     interested in the even of this suit.
14
15       _____
         David A. Sroka, RPR
16       Certification No. 259-RPR
         (Expires January 31, 2008)
17
18   DATED: _____
19
20
21
22
23
24

86 (Pages 338 to 339)