Dobrich, et al.
Donna Mitchell
v.
Case No. 15-120
Indian River School District, et al.
October 16, 2006

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2              IN AND FOR THE DISTRICT OF DELAWARE
 3    MONA DOBRICH and MARCO      :    Case No. 15-120
      DOBRICH, Individually and  :
 4    as parents and next friend :
      of ALEXANDER DOBRICH,      :
 5    SAMANTHA DOBRICH, JANE DOE :
      and JOHN DOE, Individually :
 6    and as parents and next    :
      friend of JORDAN DOE and   :
 7    JAMIE DOE,                  :
                                  :
 8              Plaintiffs,       :
                                  :
 9              v.                :
                                  :
10    INDIAN RIVER SCHOOL         :
      DISTRICT, et al.,           :
11                                :
                Defendants.       :
12              .. .. .. .. .. ..
13           Video Deposition of DONNA MITCHELL, taken
      pursuant to notice, on Monday, October 16, 2006
14    at 9:15 a.m. at 31 Hosier Street, Selbyville,
      Delaware, reported by Lorena J. Hartnett, a Registered
15    Professional Reporter and Notary Public.
16              .. .. .. .. .. ..
17    APPEARANCES:
18           THOMAS ALLINGHAM, ESQUIRE
             RICHARD HORVATH, ESQUIRE
19           Skadden, Arps, Slate, Meagher & Flom
             One Rodney Square
20           Wilmington, DE  19801
               Attorneys for the Plaintiff
21
22              WILCOX & FETZER
      1330 King Street - Wilmington, DE  19801
23              (302) 655-0477
             www.wilfet.com
24
```

Dobrich, et al.                                      v.              Indian River School District, et al.
Donna Mitchell                              Case No. 15-120                      October 16, 2006

Page 2

1
2    APPEARANCES (CONTINUED):
3        JASON P. GOSSELIN, ESQUIRE
         Drinker, Biddle & Reath, LLP
4        One Logan Square
         18th and Cherry Streets
5        Philadelphia, PA  19103-6996
         Attorney for the Defendants
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 3

1
2
3              TABLE OF CONTENTS
4    TESTIMONY OF DONNA MITCHELL:
5        Direct Examination by Mr. Allingham. . . . . . . 4
6    Certificate of Reporter . . . . . . . . . . . . . 171
7
8
9              INDEX TO EXHIBITS
10   Plaintiff's Exhibit 55 . . . . . . . . . . . . . . 67
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 4

1              (The videographer read the
2       introduction, and the attorneys introduced
3       themselves.)
4              DONNA MITCHELL,
5    HAVING FIRST BEEN DULY SWORN, TESTIFIED AS FOLLOWS:
6       DIRECT EXAMINATION ON BEHALF OF THE PLAINTIFFS
7    BY MR. ALLINGHAM:
8       Q.  Good morning, Mrs. Mitchell.  My name is Tom
9    Allingham.  I represent the plaintiffs.  Have you ever
10   been deposed before?
11      A.  No.
12      Q.  I am sure Mr. Gosselin or someone has
13   explained the process to you, but I will, just
14   briefly, I will ask you questions.
15             You are obligated to provide answers unless
16   your counsel instructs you not to answer a question.
17   If you don't understand the question that I ask you or
18   if you would like to have it clarified, it's really up
19   to you.  You can say, "Could you say that a different
20   way, I don't understand it," whatever is the problem.
21             If you answer the question, I, at least, will
22   understand that you understood what you were
23   answering, and I think it's likely that the judge and
24   the jury will understand that, as well, so be sure

Page 5

1    that you understand the question before you answer it.
2             The second thing that's important to keep in
3    mind is that you have to answer out loud and the court
4    reporter can't take the question down.  Our
5    videographer might get a nod or might not, but nods
6    tend to be ambiguous, so be sure to answer the
7    question out loud.
8             And, lastly, all of us have the tendency to
9    anticipate or think that they understand what's going
10   to be said before it's said, and so we have a tendency
11   to run on each other's sentences or questions.  Make
12   sure that I have finished before you answer, and that
13   will give your lawyer a chance to object if he needs
14   to object, as well.
15      A.  Okay.
16      Q.  I said earlier that it may be that your
17   counsel will give you instructions not to answer some
18   questions.  He may also object but not instruct you
19   not to answer.  That's an objection for the record,
20   and you can go ahead and answer the question unless he
21   instructs you not to answer.  All right?
22      A.  Okay.
23      Q.  Any questions?
24      A.  No.

2 (Pages 2 to 5)

Dobrich, et al.                                    Indian River School District, et al.
Donna Mitchell                    v.
                          Case No. 15-120                      October 16, 2006

Page 6

1    Q.   Your full name is Donna Mitchell?
2    A.   **Donna Marie Mitchell.**
3    Q.   And where do you live?
4    A.   **Selbyville, Delaware.  Actually it's a**
5    **Frankford mailing address.**
6    Q.   What's the address?
7    A.   **38083 Cypress Road -- Oh, 27824 -- I'm sorry,**
8    **I am getting confused.  I am thinking of my work**
9    **address.  27824 Cypress Road, Frankford, Delaware.**
10   Q.   You understand that we are here today to talk
11   about the school board prayer policy of the Indian
12   River School District?
13   A.   **Yes.**
14   Q.   Am I correct that you were not a member of
15   the board of the Indian River School District when
16   that policy was adopted?
17   A.   **That is correct.**
18   Q.   When were you elected to the board?
19   A.   **I have been on the board a year.  I am**
20   **starting my second year.**
21   Q.   Were you elected or appointed?
22   A.   **I ran unopposed.**
23   Q.   So you were elected?
24   A.   **Yes.**

Page 7

1    Q.   All right, and that was in what month was the
2    election?
3    A.   **I believe it was May.**
4    Q.   Of 2005?
5    A.   **Yes.**
6    Q.   Why did you run for the board?
7    A.   **Well, I am a civic-minded person.  I have six**
8    **children that have gone through the Indian River**
9    **School District, and my youngest son was a senior in**
10   **high school at the time.**
11        **I have grandchildren that will be going**
12   **through the Indian River School District, and I care**
13   **about the issues of education.**
14   Q.   Had you ever run for the school board before
15   the election in which you were elected?
16   A.   **No.**
17   Q.   Have you spoken with anyone who has already
18   been deposed in this matter?
19   A.   **Yes.**
20   Q.   Who was that?
21   A.   **Charlie Bireley, Nina Lou Bunting, we rode to**
22   **a state meeting together.**
23   Q.   What did they tell you --
24   A.   **They just --**

Page 8

1    Q.   -- about the deposition?
2    A.   **It was basically questions to each person**
3    **were completely different.**
4    Q.   Anything else?
5    A.   **Just discussed things in general.**
6    Q.   Do you recall any issues that were discussed?
7    A.   **Um, they were just generalizations, nothing**
8    **in particular.**
9    Q.   Did Ms. Bunting or Mr. Bireley tell you that
10   the questions that were asked of them were entirely
11   different, or did you discern that from their
12   description of some of the questions?
13   A.   **I discerned that.**
14   Q.   So tell me what the questions were that you
15   or the subject matter areas that you understood were
16   asked to each of them.
17   A.   **With Mr. Bireley, he seemed to indicate that**
18   **the questions were more about school board issues,**
19   **policies, things of that nature.**
20        **And with Nina Lou, I think I remember her**
21   **saying something about something that was written in**
22   **the paper that in her opinion was taken out of context**
23   **and that you had mentioned that.**
24   Q.   Did either Mr. Bireley or Ms. Bunting suggest

Page 9

1    that I had been abusive in any way in the deposition?
2    A.   **No, they did not.**
3    Q.   Or harassing?
4    A.   **No.**
5    Q.   Or belittling in tone?
6    A.   **No.**
7    Q.   What did you do to prepare for the
8    deposition?  Did you meet with your lawyers?
9    A.   **Yes.**
10   Q.   And when did that take place?
11   A.   **I don't remember the exact date.**
12   Q.   The exact date is not -- Within the last
13   couple of weeks?
14   A.   **Yes.**
15   Q.   Alright, and is that a meeting that took
16   place in this room?
17   A.   **Yes.**
18   Q.   And who was here?
19   A.   **Myself, Nina Lou, Janet, the secretary, Janet**
20   **Hearn, and Jason, and two of his associates.**
21   Q.   Over the course of that meeting, did you
22   review any documents?
23   A.   **I had no documents before me.**
24   Q.   Did any of the lawyers read to you from any

3 (Pages 6 to 9)

Dobrich, et al.                                          v.                          Indian River School District, et al.
Donna Mitchell                                  Case No. 15-120                              October 16, 2006

Page 10

1  documents?
2     A.  I don't remember documents being read. It
3  was more preparing us for kind of what to expect,
4  because we had never been to a deposition.
5     Q.  Did anything occur at that meeting that
6  refreshed your recollection about events relating to
7  the school board prayer issue, particularly the events
8  of the summer and fall of 2004?
9     A.  No, I don't believe we even discussed that.
10    Q.  Where were you born, Ms. Mitchell?
11    A.  Lewes, Delaware.
12    Q.  And did you attend public schools in the
13  Lewes area?
14    A.  No, I did not.  I attended this school that
15  we are sitting in for 12 years.
16    Q.  All right, so you moved to this area early on
17  in your life?
18    A.  I have always lived in this area.  It's just
19  that I was born at the hospital in Lewes.
20    Q.  When you ran for the school board, did you
21  prepare any campaign materials, posters, handouts,
22  anything like that?
23    A.  Nothing.
24    Q.  Who asked you to run for the school board?

Page 11

1     A.  Nobody asked me in particular.  My friends
2  encouraged me, because the person who held the seat
3  was moving out of the district.
4     Q.  Who was that?
5     A.  Elaine McCabe.
6     Q.  And whom did you notify that you intended to
7  run for the school board?  What's the official process
8  for putting your name on the ballot?
9     A.  You go to Georgetown and you put your name in
10  to get on the ballot.
11    Q.  What district do you represent?
12    A.  District 5.
13    Q.  During the campaign or during let's just call
14  it the period of time running up to the election, did
15  you make any special effort to connect with voters,
16  explain your positions, find out their concerns and so
17  forth?
18    A.  Actually, I didn't do anything formal.  I,
19  you know, worked with the people; I go to church with
20  the people; I have lived in this community my entire
21  life; so, of course, I have conversations, but nothing
22  formal.
23    Q.  Was that because you felt that people
24  understood where you stood on the issues?

Page 12

1     A.  Yes.
2     Q.  Before you were elected to the board, did you
3  have a position on the appropriateness of opening
4  school board meetings with a prayer?
5     A.  Yes.
6     Q.  What was that position?
7     A.  I believe that it's okay to do so.
8     Q.  And what was the basis for that belief?  And
9  this is before you joined the board; this is at the
10  time that you were running for the school board in
11  2005.
12    A.  It has been tradition to open school board
13  meetings with prayer.  My grandfather was on the
14  school board when I was a young child in school, and
15  they opened the meetings with prayer at that time, and
16  that's over 50 years ago.
17       It's always been done that way, and I believe
18  it solemnizes the proceedings and prepares people to
19  conduct the business of the district.
20    Q.  Anything else?  Any other reason for your
21  belief?
22    A.  No, I think that says it.
23    Q.  Okay.  You would agree with me that not
24  everything that has been a tradition is always

Page 13

1  correct?  We can think of bad examples?
2     A.  Yes.
3     Q.  Or, to say it a different way, some
4  traditions are good and some traditions are bad?  Fair
5  enough?
6     A.  Fair enough.
7     Q.  This one, though, seems to you to be a good
8  tradition?
9     A.  Yes.
10    Q.  Why does it seem to you to be a good
11  tradition?
12    A.  I see no harm in it, and I only see good in
13  it, because I think it prepares people to settle down
14  to be serious about what is going to take place.
15       And, as a Christian personally, it makes me
16  feel that I am more prepared because I am asking for
17  wisdom in making decisions that are important that are
18  going to affect the school district.  That's my
19  personal opinion.
20    Q.  And some of what we will talk about today is
21  your personal opinion and then the sort of broader
22  impact of the open prayer.
23       But in your earlier answer you said it
24  prepared — I may not have the words quite right, but

4 (Pages 10 to 13)

Dobrich, et al.                                    v.                    Indian River School District, et al.
Donna Mitchell                         Case No. 15-120                            October 16, 2006

Page 14

1  it prepares people to settle down for the business at
2  hand?
3      A.  It solemnizes it.  It makes us get more
4  serious and settles us.
5      Q.  Okay.  And in each of those sentences, the
6  object of the settling or the solemnization, you use
7  the pronoun "us," and what I would like to know is who
8  is it, precisely, that the prayer is directed to?
9      A.  The school board.
10     Q.  All right.  Is it intended that it has any
11 impact whatsoever on the members of the public who are
12 in attendance, or is it limited to the school board
13 members who have to make decisions at that meeting?
14     A.  In my opinion, it's limited to the school
15 board members.
16     Q.  And was that your view when you were running
17 for the school board in 2005?
18     A.  I never thought about it at that time.  It
19 was no issue.
20     Q.  And, by the way, that's a perfectly good
21 answer.  Don't feel like you have to have an answer to
22 every question.
23     A.  Right.
24     Q.  So what caused you to think about it and form

Page 15

1  the opinion that you have just expressed today, that
2  the impact of the prayer is limited to the ten board
3  members?
4      A.  I can't really say.  It's just the way I feel
5  about it.
6      Q.  You testified several times using the word
7  solemnizing.  You know that word is in the
8  policy, itself?
9      A.  Yes.
10     Q.  Would you tell me, and maybe you have already
11 answered this question in part, maybe entirely, but
12 would you tell me what you think it means when the
13 policy says "in order to solemnify its proceedings"?
14     A.  To me, it means to get serious, solemn, to
15 bring us together as a body, as a legislative body to
16 conduct business.
17     Q.  Do you think it's necessary for the, in order
18 for the board members to get serious and to bring the
19 board members together as a legislative body, for the
20 board to open its meetings with a prayer?
21     A.  Do I think it's necessary?
22     Q.  Correct.
23     A.  I think it's preferable.
24     Q.  Preferable but not necessary?

Page 16

1      A.  To me, it's extremely important.
2      Q.  I can ask -- I can keep asking the question,
3  but -- I could ask the question a different way, but I
4  am going to persist until I get an answer from you or
5  an answer that you can't answer.
6          Do you think it's necessary for the Board of
7  Education of the Indian River School District to open
8  its meetings with a prayer in order for those members
9  to get serious and to bring them together as a
10 legislative body?
11     A.  In my personal opinion, we would not be as
12 effective if we did not do so.
13     Q.  And why is that?
14     A.  Because I believe asking the Lord's direction
15 and guidance is extremely important when you come to
16 matters that are discussed of such importance.
17     Q.  Let me pursue that a moment.  So, in your
18 personal perspective -- Let me strike that.
19          It's your goal, I assume, always to make the
20 best possible decisions you can as a school board
21 member?
22     A.  Correct.
23     Q.  And it's your belief that the ten members of
24 the school board will make better decisions if they

Page 17

1  seek divine guidance before opening their meeting than
2  if they don't; correct?
3      A.  Yes.
4      Q.  And I infer, but I may be wrong,
5  Mrs. Mitchell, that it's your view that God hears your
6  prayer however you offer it?
7      A.  Yes.
8      Q.  So that I take it it would be equally --
9  Well, let me take one step back.  If it's important
10 from your point of view to offer a prayer in order to
11 invoke God's guidance before the meeting, and the
12 audience for the prayer is the ten members of the
13 school board, is there any reason, from your
14 perspective, why the board couldn't offer its prayer
15 to get serious and to come together as a legislative
16 body in the wings of the stage before you walk on
17 stage rather than out on the stage?
18     A.  You are asking me do we need to have the
19 people that are there that are not on the school board
20 present --
21     Q.  Yes.
22     A.  -- before we have the prayer?
23     Q.  Correct.
24     A.  It isn't necessary to do so.  It's tradition

5 (Pages 14 to 17)

Dobrich, et al.                                    v.                              Indian River School District, et al.
Donna Mitchell                          Case No. 15-120                                          October 16, 2006

Page 18

1  that we have always done so.
2      Q.  Your point is a good one. I want to set
3  aside the tradition reason for doing so and now
4  address any other possible reason for offering the
5  prayer in the presence of the public rather than say
6  backstage right before you walk on the stage. Is
7  there any other reason other than tradition?
8      A.  If there is, I am not aware of it. It's
9  something that has taken place for many, many years,
10  and I have only been on the board for one year.
11     Q.  Yes, ma'am. So that, from your perspective,
12  offering a prayer increases the chances that you will
13  make the best possible decisions; correct?
14     A.  Absolutely.
15     Q.  Offering the prayer in public doesn't
16  increase the chances that you will make the best
17  possible decisions; it's the offering of the prayer
18  that increases the chances?
19     A.  Would you ask that again?
20     Q.  Yes. The distinction I am trying to draw is
21  between -- And I have actually not seen what it looks
22  like backstage, but I assume there must be some wings
23  like there are in a usual stage of an auditorium, so I
24  would like you to think about the possibility of the

Page 19

1  ten board members getting together and offering up a
2  prayer for God's guidance right before you walk on the
3  stage for a board meeting.
4      A.  Actually, we are not up on the stage. We are
5  usually out in the cafeteria or a room that is just
6  one big open room, and people have come in and have
7  sat down.
8          There is a disclaimer that is said before the
9  prayer that they know it's coming. If they are going
10  to be offended, they can get up and leave. But no one
11  has ever questioned or been offended in the past. It
12  has never been an issue.
13     Q.  Never since when?
14     A.  That I can ever remember.
15     Q.  You mean other than Mrs. Dobrich and the Doe
16  family?
17     A.  Yes, yes.
18     Q.  So "never" is a little too broad?
19     A.  Well, from the time that I have been aware
20  that prayer has been said.
21     Q.  You mean aware as a board member?
22     A.  As a person, as a community member.
23     Q.  Well, then, "never" is a little too broad,
24  isn't it, because the Doe family and the Dobrich

Page 20

1  family have both expressed, first expressed concerns
2  and then ultimately filed a lawsuit about the
3  practice; correct?
4      A.  I am speaking before, before the lawsuit was
5  filed.
6      Q.  Alright, and so the tradition existed up
7  until the time that the Dobriches and the Does
8  expressed their complaints, and then the board had to
9  confront the issue of school board prayer in a way
10  that it had not confronted it before; correct?
11         MR. GOSSELIN:  Objection. You can
12     answer.
13     A.  Would you repeat that?
14     Q.  Well, often traditions exist until somebody
15  says, "Hey, there is a problem with that tradition."
16  Would you agree with me on that?
17     A.  Would you say it again?
18     Q.  Sure. And I am going to back up a little
19  bit. At the February 27, 2006 board meeting, were you
20  present at that meeting? That's the one at which the
21  settlement was proposed and rejected.
22     A.  Yes.
23     Q.  And do you recall Mr. Helms read a statement
24  after the board came back out of executive session?

Page 21

1      A.  Yes.
2      Q.  And do you recall that Mr. Helms said that he
3  did not want to be a second-class citizen or be
4  relegated to the back of the bus anymore?
5      A.  I don't remember his exact words. I remember
6  him reading a statement.
7      Q.  You remember that concept, though, about
8  being relegated to the back of the bus as a Christian?
9      A.  I can't say that I remember his exact
10  statement.
11     Q.  I didn't ask you the exact statement. I
12  asked you whether you remember the concept which was
13  at least, to me, striking of being relegated to the
14  back of the bus as a Christian. Do you recall that
15  concept?
16     A.  Yes.
17     Q.  Okay. There was an unfortunate period of
18  time in our country when blacks were relegated to the
19  back of the bus in public transportation. Do you
20  recall that?
21     A.  Yes.
22     Q.  And that was a tradition for a long time;
23  correct?
24     A.  (Nodding head)

6 (Pages 18 to 21)

Dobrich, et al.                                    v.                Indian River School District, et al.
Donna Mitchell                           Case No. 15-120                        October 16, 2006

Page 22

1        MR. GOSSELIN: Objection.
2        MR. ALLINGHAM: Sorry?
3        MR. GOSSELIN: I said objection.
4        MR. ALLINGHAM: Irrelevance, form?
5        MR. GOSSELIN: Do you want me to give
6    the basis for my objection or do you want me
7    to state my objection?
8        MR. ALLINGHAM: Just quickly -- I am
9    interested, because I might fix the question
10   if it's a long form.
11       MR. GOSSELIN: I am not sure that I
12   would refer to Jim Crow laws and things like
13   that as tradition, but go ahead and ask the
14   question.
15       MR. ALLINGHAM: Okay. Could I have
16   the last question read back?
17       (The reporter read back the
18   question.)
19       MR. GOSSELIN: And I said objection.
20       MR. ALLINGHAM: Yes.
21   BY MR. ALLINGHAM:
22   Q.   There is an objection but --
23   **A.   I have to answer anyway?**
24   Q.   Yes.

Page 23

1    **A.   I don't know if there was a tradition. It**
2    **happened.**
3    Q.   Happened for a long time?
4    **A.   Yes, depending on what long is.**
5    Q.   Well, many decades; fair enough?
6    **A.   Fair enough.**
7    Q.   Now, you said "I don't know whether it's a
8    tradition, it happened for a long time." What makes
9    something that happens over a long period of time a
10   tradition or not a tradition in your mind?
11   **A.   I don't really know how to answer that**
12   **question.**
13   Q.   Well, you referred to the school board's
14   practice of opening its meeting with a prayer as a
15   tradition?
16   **A.   Correct.**
17   Q.   You said you didn't know whether to describe
18   the Jim Crow laws relegating African Americans to the
19   back of the bus as a tradition or not. What's the
20   distinction in --
21   **A.   I don't know enough about laws to understand**
22   **if I would consider that a tradition or just an**
23   **unfortunate thing that happened.**
24   Q.   Well, let me turn it around --

Page 24

1    **A.   I just, in my minds, don't put it in the**
2    **category of -- I suppose it could be perceived as a**
3    **tradition.**
4    Q.   Well, you are able to identify the school
5    board prayer practice as a tradition. What is it
6    about the practice of opening the board meetings with
7    a prayer that qualifies it as a tradition, in your
8    mind?
9    **A.   It's happened for as long as I can remember,**
10   **which is a very, very long time.**
11   Q.   And, as we, I think agreed, the Jim Crow law
12   relegating African Americans to the back of the bus
13   happened for a very long time; correct?
14   **A.   I just don't know how long it was.**
15   Q.   Well, it isn't the length of time that the
16   school board prayer practice has been in place that
17   distinguishes it from Jim Crow laws, is it? They both
18   took place over a very long period of time?
19   **A.   Okay.**
20   Q.   Yes? Would you agree?
21   **A.   Yes.**
22   Q.   And what I am trying to get at is what is the
23   distinction, in your mind, between the school board
24   prayer practice on the one hand, which you clearly

Page 25

1    view as a tradition, and Jim Crow laws which you are
2    not sure whether they were a tradition or not? What
3    is it that distinguishes the two, because they both
4    took place over a long period of time?
5        MR. GOSSELIN: Objection. It might be
6        helpful if you tell us what you mean when
7        you say tradition. I just don't consider
8        invidious discrimination something that's a
9        tradition. It may go back a long, long time
10       and, as the witness testified, it's
11       unfortunate, but I think that might be the
12       breakdown here in understanding what you
13       mean by tradition.
14       MR. ALLINGHAM: I don't think we are
15       necessarily in disagreement here. I mean I
16       think there are many things to distinguish
17       Jim Crow laws from the school board prayer
18       policy, but I am trying to find out what the
19       witness's view is. That's -- And the
20       witness's word was tradition, which is why I
21       have used the word tradition.
22   BY MR. ALLINGHAM:
23   Q.   So tell me anything you can that you think
24   distinguishes the school board prayer policy which

7 (Pages 22 to 25)

Dobrich, et al.                              v.                    Indian River School District, et al.
Donna Mitchell                      Case No. 15-120                        October 16, 2006

Page 26

1  took place over a very long time from the Jim Crow
2  laws which also took place over a very long time in
3  terms of whether each is a tradition.
4      **A. I am not sure if I know how to answer that**
5  **question. I think of the discrimination with the**
6  **blacks sitting in the back of the bus as just a**
7  **horrible thing that was discrimination.**
8      **I do not think of opening a legislative body**
9  **with prayer as a discrimination, and so in my mind I**
10 **have a hard time linking the two when I think of**
11 **tradition.**
12     **I think of the school board prayer as a good**
13 **thing, as a positive tradition. I think of the other**
14 **as discrimination and a bad thing.**
15     Q. So one distinguishing factor in figuring out
16 whether something that has happened over a long period
17 of time might be is it a good thing or a bad thing?
18     **A. Not necessarily, but in that situation it**
19 **applies.**
20     Q. And another distinguishing factor might be
21 whether the long-standing practice discriminates
22 against a body of people or whether it does not;
23 correct?
24     **A. I am not sure.**

Page 27

1      Q. You have spoken several times about, several
2  times about the school board opening its meetings as a
3  legislative body.
4      **A. Uh-huh.**
5      Q. When was the first time that you formed the
6  conclusion that the school board was a legislative
7  body?
8          MR. GOSSELIN: And I am not objecting,
9      but I am just cautioning the witness to the
10     extent if you can answer without revealing a
11     conversation with an attorney, you can
12     answer that.
13         THE WITNESS: Would you ask the
14     question again?
15 BY MR. ALLINGHAM:
16     Q. When was the first time that you formed the
17 opinion that the school board was a legislative body?
18     **A. I have always felt that it was.**
19     Q. What was it that caused you to think about
20 whether the school board was a legislative body, a
21 judicial body, an executive body, or some other kind
22 of body? It seems like a specialized conclusion to
23 have reached.
24         MR. GOSSELIN: Objection. You can

Page 28

1      answer.
2      **A. To me, it is a group of people that come**
3  **together to conduct business, and you are representing**
4  **districts. These are voted people that are voted into**
5  **office to represent, just as your House of**
6  **Representatives or your senators. That's what makes**
7  **me think of it as a legislative body.**
8      **We are representing districts to come**
9  **together to conduct business for the school district.**
10 **I just don't see it any other way.**
11     Q. Before you were elected to the school board,
12 did you ever attend school board meetings?
13     **A. Yes.**
14     Q. Just as an interested citizen?
15     **A. Yes.**
16     Q. And at anytime during those meetings did it
17 actually occur to you that you were watching a
18 legislative body in session?
19     **A. It always occurred to me that they were a**
20 **legislative body.**
21     Q. Have you ever sat in court?
22     **A. Yes.**
23     Q. As an interested citizen?
24     **A. No.**

Page 29

1      Q. In what context?
2      **A. I have had to go for an eviction. I am a**
3  **housing manager.**
4      Q. In Delaware?
5      **A. Yes.**
6      Q. And as you sat in court, did you think "Well,
7  here is a judicial body."?
8      **A. Did I?**
9      Q. Did you think, "Well, here is a judicial
10 body."?
11     **A. Who are you referring to as the judicial**
12 **body?**
13     Q. The court.
14     **A. It was just a judge.**
15     Q. Did you think, "Well, here is a judicial
16 officer."?
17     **A. Yes.**
18     Q. When you view the governor in action, do you
19 think of her as an executive officer?
20     **A. Yes.**
21     Q. And those terms come right to mind?
22     **A. Uh-huh.**
23         MR. GOSSELIN: Yes, just to, yes, no,
24     just for the sake of the record.

8 (Pages 26 to 29)

Case 1:05-cv-00120-JJF     Document 250-8     Filed 04/10/2008     Page 9 of 44

Dobrich, et al.                          v.              Indian River School District, et al.
Donna Mitchell                    Case No. 15-120                    October 16, 2006

Page 30

1  BY MR. ALLINGHAM:
2      Q. You characterized -- I noticed two qualities
3  that you describe that lead to your conclusion that
4  the school board is a legislative body. The first was
5  that it's a group of people who come together to
6  conduct business, and the second was that you are
7  elected.
8          Is there anything else about the school board
9  that contributes to your view that it is a legislative
10 body?
11     A. They are the two main ones. Nothing comes to
12 mind.
13     Q. Does the school board perform other functions
14 than legislative functions?
15     A. I guess that depends on what you consider a
16 legislative function. We make decisions concerning
17 many things within the school district.
18     Q. Well --
19     A. Policies, hiring people, having to sometimes
20 release people, dealing with issues of varying natures
21 when problems arise.
22     Q. Have you had any discussions with your
23 colleagues on the board about whether the board is a
24 legislative body?

Page 31

1      A. Yes.
2      Q. Have you had any discussions with your
3  colleagues on the board about how important it is that
4  the school board be considered a legislative body for
5  purposes of this lawsuit?
6      A. I don't -- I don't think that was -- I think
7  we are just all in agreement that we are a legislative
8  body. We have tried to clarify in our minds what this
9  is all about and how we see ourselves, and we are all
10 in agreement that we are a legislative body.
11     Q. And tell me everything that you can recall
12 that people have said in that context.
13     A. Who are you speaking of as, I mean?
14     Q. Your colleagues on the board.
15     A. We are all, all ten of us, are in agreement
16 that we are a legislative body.
17     Q. I have that. Have you ever had discussions
18 of that topic?
19     A. Just when we have read over the lawsuit. I
20 don't remember specifics. We have read over the
21 lawsuit and the accusations.
22     Q. And the substance of the discussions,
23 everyone looks around the table and says, "Good thing
24 we are a legislative body," or something to that

Page 32

1  effect?
2      A. No, no.
3      Q. Well, have you talked about, in this context
4  of whether the school board is a legislative body,
5  have you talked about the functions of the school
6  board?
7      A. When I was, when I first got on the school
8  board and they speak with you about the obligations of
9  school board, it's made clear to us at that point that
10 that is what we are, in orientation.
11     Q. When they speak to you about the obligations
12 of school board members, who is the they?
13     A. I met with a panel of people who were --
14 There was a school board member. There were officials
15 from the school district, from Central Office, to try
16 to help me prepare for what was ahead and to
17 understand my responsibilities as a board member.
18 They gave me a job description of sorts.
19     Q. Anybody else?
20     A. No.
21     Q. Who was the school board member?
22     A. I believe Nina Lou Bunting sat with me.
23     Q. And who were the officials of the district?
24     A. Lois Hobbs. I believe Susan Bunting was

Page 33

1  there. I believe Jay Hedman was there, Earl Savage,
2  and there may have been more people. I can't remember
3  exactly. It's been over a year ago.
4      Q. Lois Hobbs, Susan Bunting. You gave me a
5  third name, and I didn't get it.
6      A. Jay Hedman. Earl Savage.
7      Q. And who told you that the school board was a
8  legislative body during that orientation session?
9      A. No one came out and said it was a legislative
10 body. They just gave me a job description and tried
11 to help me understand the things that I would be
12 dealing with. I view it as a legislative body.
13     Q. Okay, so, just to clarify, during the
14 orientation, no one said to you --
15     A. No one came out directly and said, "You are a
16 legislative body." We have discussed -- I don't know,
17 you know, different board members that have tried to
18 help me in the beginning or speak with me have helped
19 me to -- Well, I don't really know how to answer that.
20 It's just that I know it's a legislative body.
21         We have -- I suppose when we look at our
22 policies that the subject has come up. I can't
23 remember exactly a person who said to me, "We are a
24 legislative body." It is an understood thing.

9 (Pages 30 to 33)

Dobrich, et al.                          v.                    Indian River School District, et al.
Donna Mitchell                    Case No. 15-120                        October 16, 2006

Page 34

1   Q.   Well, it's understood by you; correct?
2   A.   It's understood by the entire board.
3   Q.   How do you know that?
4   A.   Because we are all in agreement that we are.
5   Q.   How do you know that?
6   A.   Through discussing our policies, through
7   discussing the lawsuit, through discussing our
8   responsibilities.
9   Q.   Mrs. Mitchell, what I am trying to get at,
10  it's quite clear that you have to discuss your
11  responsibilities during the course of the performance
12  of your duties, but how do you know that everyone
13  thinks that you are a legislative body unless they
14  said so?
15  A.   Well, I can't remember exactly who would have
16  said it to me, but it was made clear to me in my
17  orientation before I got on the board that we are a
18  legislative body.
19  Q.   Okay, how was it made clear to you?
20  A.   By discussing the responsibilities of the
21  board member.
22  Q.   Okay, and so it was made clear to you by
23  discussing the responsibilities, and you drew the
24  conclusion from that that it was a legislative body?

Page 35

1   A.   I believe it was also said to me that we are,
2   but I can't remember exactly who would have said it or
3   how it was said.
4   Q.   Okay, you anticipated my next question.  You
5   have no memory, as you sit here today, which of the
6   people, Mrs. Bunting, Mrs. Hobbs, Mrs. Bunting again,
7   which must be confusing from time to time, Jay Hedmun
8   and Mr. Savage, who actually said to you, "By the way,
9   the school board is a legislative body."?
10  A.   I don't remember who, in particular, said it,
11  but it was made clear to me.
12  Q.   But you are confident -- What I was going to
13  say, you are confident that somebody during your
14  orientation actually said to you, "The school board is
15  a legislative body."
16  A.   Yes.
17  Q.   Do you have any recollection of what prompted
18  that person to say that?
19  A.   Probably because I asked a lot of questions
20  and wanted to understand exactly what my
21  responsibilities were and the scope of the position.
22  Q.   Is it your recollection that this statement
23  was made in response to a question from you such as,
24  "Hey, are we a legislative body?"

Page 36

1   A.   No.
2   Q.   Was it, you know, "What branch of government
3   are we most like?"  What was it that prompted this
4   person to say, "By the way, we are a legislative
5   body."?
6   A.   I can't remember that.  I spoke with a lot of
7   people.  I asked a lot of questions.  I wanted to
8   understand, even before I got on the school board,
9   what the scope of the responsibilities were.  And it
10  is -- I can't tell you which person or how many or
11  who, but it was explained to me that we are, which I
12  had always thought anyway.
13  Q.   If you had always thought, why were you
14  asking the question again?
15  A.   Just to clarify.
16  Q.   During the orientation process, did anyone
17  explain to you the board's policy on school board
18  prayer?
19  A.   I don't believe that ever came up.
20  Q.   Did anyone tell you that it was the board's
21  policy to open the meetings with school board prayer?
22  A.   Did anyone ever tell me?
23  Q.   Yeah, did they say, "Well, here is the way
24  the meetings work; we call the meeting to order and

Page 37

1   then we open it with a prayer?"
2   A.   Yes.
3   Q.   Okay, who told you that?
4   A.   I believe it was either Harvey Walls or
5   Charlie Bireley.  I can't remember which one, when
6   they explained to me how the meetings are conducted,
7   the formal meetings, so that I would understand.
8   Q.   Okay, they weren't people who you identified
9   having in your orientation earlier.  Was this during
10  the orientation or at a different time?
11  A.   At a different time.  When I had my first
12  orientation, it was to explain the scope of the
13  responsibilities and the issues that we deal with,
14  because they are so varied.
15  Q.   Yes, ma'am.
16  A.   And then the school board members also sat
17  with me, or the president of the school board and some
18  of the school board members, to explain to me how the
19  meetings are formally conducted so I would know what
20  to expect.
21  Q.   And this was outside of the school board
22  meeting; this was sort of a second type of orientation
23  discussion?
24  A.   Well, in our meetings to prepare me before I

10 (Pages 34 to 37)

Dobrich, et al.                                   v.                Indian River School District, et al.
Donna Mitchell                            Case No. 15-120                      October 16, 2006

Page 38

1  actually sat on board.
2      Q.  Yes, so this was a --
3      A.  So I would know what to expect.
4      Q.  Yes, this was before an actual board meeting?
5      A.  Yes.
6      Q.  This was a session outside of an actual board
7  meeting in which some of the board members gave you a
8  kind of preview of what to expect at the board
9  meetings?
10     A.  Yes.
11     Q.  Okay.  And you can recall at least that
12  Mr. Walls, as board president, was present at that
13  meeting?
14     A.  Well, it wasn't a meeting.
15     Q.  Session?
16     A.  It could have been Harvey or it could have
17  been Charlie.  They allowed me to come and sit with
18  them before I formally was sworn in, just to kind of
19  welcome me, and they at that time said, "This is what
20  we do so you will know what to expect."
21         It wasn't a formal session.  It was an
22  informal briefing.  They let me know I could not vote
23  or participate, but I was there to be with them.
24     Q.  I see.  So this actually was a meeting of the

Page 39

1  school board, but you weren't there as a school board
2  member?
3      A.  No.
4      Q.  No, you were not there as a school board
5  member?
6      A.  I was not there -- I was there as a person
7  who was going to be a school board member.  I had no
8  one running against me, and they introduced me to the
9  audience as a new school board member to be and
10  allowed me to sit with them at that meeting.
11     Q.  I am sorry for being so thick.  I just wasn't
12  getting it.  Alright, so --
13     A.  Sorry.
14     Q.  -- I think I now do understand.  So as a
15  person who was going to be on the school board, you
16  attended at least one school board meeting before you
17  were actually elected?
18     A.  Yes.
19     Q.  Okay.  And at that -- Did you meet with board
20  members before that meeting, or did you just sit in at
21  the meeting, itself?
22     A.  I just sat in at the meeting.  I was not
23  allowed to go to the executive session or really
24  participate.  It's just they were welcoming me,

Page 40

1  introducing me.
2      Q.  Alright.  So now going way back to the
3  question I first asked, --
4      A.  Okay.
5      Q.  -- I think the original question was did
6  anybody tell you that the board opened its meetings
7  with a prayer.
8      A.  Yes.
9      Q.  Okay.  And you identified, I just didn't get
10  it, that you learned that or someone told you that
11  when you attended this board meeting before you were
12  elected; correct?
13     A.  Now you have confused me.  I have always
14  known it.  It wasn't a subject that came up in the
15  sessions.  It was just when I came up to sit with the
16  board, "Now, this is how we do it, just so you will
17  know what to expect."  Kind of a quick briefing of
18  what to expect.  I already knew because I have
19  attended board meetings as a spectator.
20     Q.  I guess my question is when you got this
21  heads-up on what to expect, which included that the
22  board would open its meetings with a prayer, did
23  anybody say to you, in words or substance, "And we do
24  that because we are a legislative body."?

Page 41

1      A.  No, nobody said that.
2      Q.  In all of the various whatever they were, the
3  orientations that you went through for your position
4  as a school board member, were you given any written
5  materials?
6      A.  Yes.
7      Q.  What were you given?
8      A.  The policy manual.
9      Q.  And physically what does that look like?  Is
10  it a looseleaf binder?
11     A.  Yes, a large looseleaf binder.
12     Q.  Did anyone go through the policy manual with
13  you during your orientation?
14     A.  Briefly.
15     Q.  Who was that?
16     A.  The people that were sitting in the
17  orientation meeting with me that I just mentioned.
18     Q.  Okay.  And was that process paging through
19  the policy manual --
20     A.  Well, it wasn't --
21     Q.  Let me finish.  Just let me finish -- paging
22  through the policy manual with various of the people
23  who were there giving you comments as you went
24  through?

11 (Pages 38 to 41)

Dobrich, et al.                                    v.                    Indian River School District, et al.
Donna Mitchell                              Case No. 15-120                              October 16, 2006

Page 42

1    A.  No.
2    Q.  What was the process?
3    A.  The policy manual was not given to me at the
4    initial orientation meeting.  We discussed a lot of
5    the things that were in the manual or briefly touched
6    on those, and after the orientation I was given the
7    manual to go over and to read and to study and to be
8    able to come back and ask questions if I needed to.
9    Q.  And did you ask any questions about the
10   policy manual?
11   A.  Not to that group.
12   Q.  To anyone?
13   A.  Oh, yes.
14   Q.  Did you ever ask any questions about the
15   school board prayer policy?
16   A.  No.
17   Q.  Have you held any other positions in the
18   district besides serving on the school board?
19   A.  I guess I am not sure what kinds of positions
20   you are asking about.
21   Q.  Teacher, administrator?
22   A.  Well, I have been a camp director.  I am
23   manager of a public housing site.  I teach Sunday
24   school.  I am on the administrative board at my

Page 43

1    church.  I am on a board for 4H.  I am on a board for
2    Boy Scouts.
3    Q.  I asked a bad question again.
4    A.  Yes.
5    Q.  Have you ever held a position, not
6    geographically within the district, but as an employee
7    or -- as an employee of the district?
8    A.  No.
9    Q.  Have you ever served on any other school
10   boards?
11   A.  No.
12   Q.  4H, Boy Scouts -- My memory is probably not
13   as good as it should be.  You were a camp director.
14   These are positions geographically within the
15   district; correct?
16   A.  Yes.
17   Q.  Okay.  4H, Boy Scouts, camp director, you
18   gave me at least a couple other positions as well.
19   What were they?
20   A.  On the board of my church.
21   Q.  Any others?
22   A.  I sat on a lot of boards for boosters, sports
23   --
24   Q.  Uh-huh.

Page 44

1    A.  -- groups.
2    Q.  Anything else?
3    A.  Pop warner.  Things that have to do with
4    children.
5    Q.  Many of the same things that I have done.
6    You mentioned that you are on the board at your
7    church.  What is your church?
8    A.  Salem United Methodist Church.
9    Q.  Where is that located?
10   A.  In Selbyville.
11   Q.  How long have you served on the board?
12   A.  I have been on and off the board for many
13   years.  I have gone there all my life.  I am currently
14   on the board again.
15   Q.  A longtime but intermittent member?
16   A.  Yes, you change positions.  I mean people
17   serve on the board for awhile, and then other
18   people --
19   Q.  Goes off.
20   A.  -- come on, and then you go to other areas
21   and you come back.
22   Q.  Yes, I understand.  There was a board meeting
23   on October 24, 2004.  It was a meeting at which there
24   were many hundreds of people in attendance.

Page 45

1         MR. GOSSELIN:  August 24.
2         MR. ALLINGHAM:  What did I say?
3         MR. HORVATH:  October.
4         MR. ALLINGHAM:  Sorry.  That was a --
5    Strike that.
6    BY MR. ALLINGHAM:
7    Q.  There was a meeting on August 24, 2004, a
8    meeting at which many hundreds of people were in
9    attendance.  Were you in attendance at that meeting?
10   A.  Yes.
11   Q.  Just as a citizen?
12   A.  Yes.
13   Q.  How did you find out about the meeting?
14   A.  It was on the radio.  It was in the
15   newspaper, I believe.  It was just word of mouth,
16   common knowledge.
17   Q.  That answer is helpful, and it's probably the
18   most you can do, but my question is do you remember
19   how you found out about the meeting?
20   A.  Not any one --
21   Q.  One of those ways?
22   A.  One of those ways.
23   Q.  You said it was common knowledge.  How do you
24   know it was common knowledge?

12 (Pages 42 to 45)

Page 46

1    A.  We have a very small community, and everybody
2    talks about the things that happen within the school
3    district, the churches, the community. It's -- We are
4    very small.
5    Q.  Was the meeting talked about in your church?
6    A.  I can't remember if it was specifically. I
7    am sure people within the church were talking about
8    it.
9    Q.  When you found out about the meeting, did you
10   urge other persons to attend the meeting?
11   A.  Not in particular, no.
12   Q.  Were you aware of anyone within your church
13   urging others to attend the meeting?
14   A.  Not in my church in particular. All my
15   friends were already attending, so it wasn't an issue
16   of trying to urge anybody to go.
17   Q.  There has been some testimony that there
18   were, within Sunday schools, adult Sunday schools,
19   that in some of the churches in the area parishioners
20   were urged to attend the August 24th meeting. Am I
21   correct in understanding that did not occur in your
22   church?
23   A.  Not with me. I teach Sunday school kids, so
24   I am not in an adult class to know what was done or

Page 47

1    said.
2    Q.  Now, in answer to an earlier question, you
3    said you didn't do anything in particular to urge
4    people to attend. Were you aware that there was, that
5    there were people in the community making efforts to
6    increase the attendance at the August 24 meeting?
7    A.  Yes.
8    Q.  And who were you aware of?
9    A.  I just -- I am aware that some of my friends
10   who go to other churches had spoken about taking, you
11   know, that a bus was going to go so that a lot of
12   people could come and hear what was being said to
13   support the school board.
14   Q.  And who were those friends?
15   A.  I am trying to think specifically. The only
16   one that really comes to mind is Leek Warner, a
17   friend, Leek Warner, who goes to another church in the
18   Ocean View area.
19   Q.  What church is that?
20   A.  I believe she attends two. She is married to
21   a gentleman who is Catholic, so they go to St. Anne's,
22   and they also were going to one of the Methodist
23   churches in that area.
24   Q.  And you mentioned that you were aware that

Page 48

1    there were buses or you had heard about buses to
2    enable people to go and support the school board?
3    A.  Uh-huh.
4    Q.  How did you learn about the buses?
5    A.  I can't remember if I was told or if I heard
6    it on the radio. I just, I knew that it was going to
7    happen.
8    Q.  And you testified a minute ago that it was
9    the buses were, were intended to enable people to go
10   and support the school board; correct?
11   A.  Yes.
12   Q.  Did you know, when you heard about these
13   buses, what the school board's position on a board
14   prayer policy was going to be?
15   A.  Yes.
16   Q.  How did you know that?
17   A.  Because I was following the issue in the
18   paper and talking to people that were connected in the
19   district.
20   Q.  Did you know -- And I am speaking now about
21   the days leading up to August 24, 2004, so just keep
22   in mind the timeframe. Did you know that the board
23   was considering whether to adopt a school board prayer
24   policy at that time?

Page 49

1    A.  No.
2    Q.  So am I right that when you said that the
3    buses were put in place to help people be able to
4    attend the meeting to support the school board, your
5    understanding was that they were being put in place to
6    support the school board in its practice of opening
7    meetings with a prayer; correct?
8    A.  Yes.
9    Q.  Okay. Because you are aware now that
10   subsequently the board did adopt a policy on school
11   board prayer?
12   A.  Yes.
13   Q.  Okay. But you weren't aware of that at the
14   time?
15   A.  No.
16       MR. ALLINGHAM:  Okay.
17       VIDEOGRAPHER:  Going off the record at
18   approximately 10:07 a.m.
19       (A recess was taken.)
20       VIDEOGRAPHER:  Back on the record at
21   approximately 10:15 a.m..
22   BY MR. ALLINGHAM:
23   Q.  Were you surprised at how many people were in
24   attendance at the August 24 meeting?

13 (Pages 46 to 49)

Dobrich, et al.                          v.                Indian River School District, et al.
Donna Mitchell                    Case No. 15-120                        October 16, 2006

Page 50

1    A.  Yes, I think I was.
2    Q.  Were you pleasantly surprised?
3    A.  Yes.
4    Q.  I asked you earlier about the importance of
5    seeking divine guidance for the decisions that you
6    make as a board member.  Do you remember that?
7    A.  Yes.
8    Q.  Would it, from your perspective, be equally
9    effective in seeking divine guidance to offer a prayer
10   to Allah?
11   A.  Would you repeat that?
12   Q.  Yes.  For the ten board members who are the
13   point of the offering of the prayer and the recipients
14   of the divine guidance, would it be equally effective
15   to, an equally effective way to ask for a divine
16   guidance to offer a prayer to Allah?
17   A.  Not for me personally.
18   Q.  How about for the ten board members?
19   A.  I can't speak for them.
20   Q.  In the long tradition of offering prayers at
21   the Indian River School District, are you aware that
22   all such prayers have been Christian?
23   A.  No, I am not aware of how every prayer has
24   gone.

Page 51

1    Q.  So you are aware of a tradition of offering
2    prayers, but you don't know the content of those
3    prayers?
4    A.  Right.
5    Q.  Would you agree with me that the vast
6    majority of the content of the prayers have been
7    Christian?
8    A.  Yes.
9    Q.  Okay.  Do you know whether there has ever
10   been any Indian River School Board member who was not
11   of the Christian faith?
12   A.  I don't know that.
13   Q.  Would you agree with me that at least the
14   vast majority of the school board members have been of
15   Christian faith?
16   A.  I don't know that either.
17   Q.  Do you know the -- Do you know the -- Do you
18   know whether your colleagues on the board today are of
19   the Christian faith?
20   A.  I know some of them that are, but I don't
21   know all of their religious backgrounds.
22   Q.  Would it surprise you if any of your
23   colleagues on the board today was a member of any
24   religion other than Christianity?

Page 52

1    A.  Nothing surprises me.  No.
2    Q.  Well, it isn't true that nothing surprises
3    you, because you have already testified that --
4    A.  Oh, okay.
5    Q.  -- the number of people at the August 24th
6    board meeting was surprising.
7    A.  Alright.  Well, it was a pleasant.
8    Q.  Yes, ma'am.  Well, let me ask you this:  What
9    board members, which of your colleagues do you know
10   their religious faith?
11   A.  I know Reggie's religious faith, Mr. Helms,
12   because I know the church that he goes to and I know
13   he is very involved.
14   Q.  Uh-huh.
15   A.  I know Nina Lou's religious faith because her
16   mother attended our church and she grew up in our
17   church.
18        I know that Charlie's wife attends church,
19   and I know that he believes, but I don't believe he is
20   a person who goes consistently himself.
21        And, as far as the others, I really don't
22   know them personally enough to know what they think or
23   where they go or if they go.
24   Q.  Since you have been a board member, have any

Page 53

1    prayers been offered to open the board meetings?
2    A.  Excuse me?
3    Q.  Since you have been a board member, have
4    there been any prayers offered to open the board
5    meetings?
6    A.  Have there been any prayers?
7    Q.  Yes.
8    A.  At every board meeting.
9    Q.  And --
10   A.  Yes.
11   Q.  Have those prayers been Christian prayers?
12   A.  Some.
13   Q.  Have any of those prayers been -- Has the
14   content of any of those prayers been identifiable as
15   anything other than Christian prayers?
16   A.  There has been silent prayer, so.
17   Q.  From your perspective, was the moment of
18   silence an effective way to seek divine guidance
19   for the decisions that the board members were going to
20   make?
21   A.  It would not be as effective for me, but I
22   respect everyone's right to offer it the way they
23   choose.
24   Q.  When the moment of silence was offered, was

14 (Pages 50 to 53)

Dobrich, et al.                                    v.                    Indian River School District, et al.
Donna Mitchell                              Case No. 15-120                          October 16, 2006

Page 54

1  that Mrs. Bunting, Nina Lou Bunting, who offered the
2  moment of silence?
3      A.  I know she did at least once, and I know
4  there have been others in the past.
5      Q.  When the moment or moments of silence were
6  offered, did you, yourself, offer a silent prayer for
7  divine guidance?
8      A.  Yes.
9      Q.  And that would be your custom or your
10 practice; correct?
11     A.  Yes.
12     Q.  So that for yourself, although the meeting
13 opened with a moment of prayer, you were not
14 prohibited in any way from seeking divine guidance
15 from God?
16     A.  No.
17     Q.  And when you say you seek divine guidance,
18 from whom do you seek divine guidance?  This is you,
19 Mrs. Mitchell.
20     A.  I seek divine guidance through God, to God
21 through Jesus.
22     Q.  And so, just to close the loop, if someone
23 offers a nondenominational prayer or a moment of
24 silence, you, for yourself, also ask for divine

Page 55

1  guidance from God through Jesus?
2      A.  Yes.
3      Q.  When was your first meeting of the board,
4  July 2005?
5      A.  It could have been.  I don't remember the
6  exact date.
7      Q.  But it is your recollection that there has
8  been at least one moment of silence since you joined
9  the board?
10     A.  Yes.
11     Q.  Do you know who offered it?  I asked you this
12 earlier.
13     A.  It was Nina.
14     Q.  And do you know whether there were any
15 others?
16     A.  I don't remember.
17     Q.  Alright, I have a sequence of questions about
18 your religious belief and the religious belief -- your
19 view as to the religious belief of residents of the
20 district.  Okay, you have the concept in mind?
21     A.  Yes.
22     Q.  What do you believe is the majority religion
23 among voters in the district?
24     A.  Christian.

Page 56

1      Q.  And is that a vast majority of the voters, in
2  your view?
3      A.  Yes.
4      Q.  What do you believe is the majority religion
5  among teachers in the district?
6      A.  I have no idea.
7      Q.  What do you believe is the majority religion
8  among students in the district?
9      A.  I would assume Christian, because most of the
10 public is.
11     Q.  And would you assume that the religious
12 practices or faith of the students roughly
13 approximates that of the voters as a whole?
14     A.  I would assume.
15     Q.  Do you believe that the Christians among the
16 voters in the district believe that Christianity is
17 the only true religion?
18         MR. GOSSELIN:  Objection.  You can
19     answer.
20     A.  For them, I believe that it is, but I find
21 them to be people who are open and accepting of others
22 who choose to believe differently, the ones that I
23 know.
24     Q.  Yes, ma'am, and you strike me as a tolerant

Page 57

1  person and that people select their friends.  Would
2  you agree with me that there are voters in the
3  district who are not so tolerant?
4      A.  Yes.
5      Q.  And would I be right in thinking that that's
6  a view that the board would prefer to discourage, that
7  is that intolerance?
8      A.  Of course, yes.
9      Q.  Do you believe that Christianity is the only
10 true religion?
11     A.  I believe that.
12     Q.  At the same time, is it correct that you try
13 to be tolerant of other religions?
14     A.  Yes, I do.
15     Q.  Why is that, if you believe Christianity is
16 the only true religion?
17     A.  Because I believe everyone is given free will
18 to believe as they choose, and I respect everybody's
19 right to make that decision.
20     Q.  Do you believe that the government should
21 establish a religion?
22     A.  I believe we are a Christian nation, we were
23 found as a Christian nation.
24     Q.  Do you believe that the government should

15 (Pages 54 to 57)

Dobrich, et al.
Donna Mitchell

v.

Case No. 15-120

Indian River School District, et al.
October 16, 2006

Page 58

1  establish religion?
2          MR. GOSSELIN: Objection.
3      **A. I guess I am not sure how to answer that. I**
4  **don't believe we should establish. I believe we are a**
5  **Christian nation, we were founded a Christian nation.**
6  **That is our heritage.**
7      Q. And maybe this is an incorrect inference, but
8  I infer from your answer that you think there is no
9  need for the government to establish a religion
10  because the nation is, in fact, Christian; is that
11  correct?
12          MR. GOSSELIN: Objection.
13      **A. I don't know how to answer your question. I**
14  **am not sure what you are asking.**
15      Q. Well, I don't think that I got an answer to
16  my question, and so I am trying to explore whether I
17  can understand what you were meaning to imply, so I
18  asked do you believe that the government should be
19  permitted to establish religion, and your response
20  was, "I think that we are a Christian nation." Yes?
21      **A. I believe us to be a Christian nation.**
22      Q. Yes. Did you give me that answer because you
23  think it, the fact that we are a Christian nation
24  makes it a moot point whether the government can

Page 59

1  establish religion or not?
2      **A. Yes, I believe we have freedom to choose how**
3  **we want to worship or believe, but we are a Christian**
4  **nation, we were founded a Christian nation, it is our**
5  **heritage.**
6      Q. Now, I would like to engage in a couple of
7  hypotheticals with you. Suppose that, as has happened
8  in nations around the world, whether by immigration or
9  different birth rights or whatever, the balance of
10  citizens in the district shifted from being a vast
11  majority of Christians to a vast majority of Jews.
12          Do you think at that point it would be
13  alright for the school board to adopt a policy that
14  would permit the school board to open every school
15  board meeting with a prayer to Jehovah?
16      **A. That's difficult to answer hypothetically. I**
17  **believe that if we had Jewish members on the school**
18  **board, they could offer their prayer however they**
19  **chose right now.**
20      Q. Yes, ma'am, and that comes back now to my
21  question about the establishment of religions. So do
22  you believe that the district would be prohibited from
23  adopting a policy that required that all prayers
24  offered be Jewish prayers?

Page 60

1      **A. Would you ask that again?**
2      Q. Yes. Do you believe that -- Well, let me ask
3  one foundational quick question. Do you understand
4  that our constitution includes a prohibition against
5  state establishment of religion?
6      **A. Yes.**
7      Q. Okay. And that's a prohibition that you
8  agree with; correct?
9      **A. Yes.**
10      Q. And that's regardless of what the religion is
11  of a majority of a governmental unit's residences or
12  voters or property owners or whatever, it doesn't
13  matter what the majority's views are; correct?
14      **A. Correct.**
15      Q. And, because God hears our prayers however
16  they are offered, each individual board member in the
17  Indian River School Board can offer at anytime a
18  silent prayer seeking divine guidance from whatever
19  source that board member wants to seek divine guidance
20  from; correct?
21      **A. Correct.**
22      Q. Alright. So, in order to seek divine
23  guidance, in order for each individual board member to
24  have the right to seek divine guidance from whatever

Page 61

1  source, it is not necessary to have a policy providing
2  for public prayer at the beginning of meetings;
3  correct?
4      **A. I don't consider what we do public prayer.**
5  **It is not for the public.**
6      Q. It is offered in front of the public,
7  however; correct?
8      **A. They can get up and leave if they don't want**
9  **to be subjected to it. It is not for them. It is for**
10  **the board.**
11      Q. Let me explore the possibility that the
12  members of the public can get up and leave. They
13  would -- They are sort of warned that they may be
14  subjected to a prayer by the disclaimer that's read at
15  the beginning of the prayer; correct?
16      **A. Yes.**
17      Q. Alright. And that's a disclaimer that's read
18  by the president of the board?
19      **A. Yes.**
20      Q. And do you know how long it takes to read
21  that disclaimer?
22      **A. A minute or less.**
23      Q. And at what point in the disclaimer does it
24  become clear that a prayer is about to be offered?

16 (Pages 58 to 61)

Dobrich, et al.                                    v.                    Indian River School District, et al.
Donna Mitchell                          Case No. 15-120                              October 16, 2006

Page 62

1    A. Would you ask me that again?
2    Q. It's not important. I know the text of the
3 disclaimer now. I don't need to ask you that
4 question. Have you ever seen anyone get up and leave
5 when the disclaimer is read?
6    A. I don't really watch the audience.
7    Q. What do you do?
8    A. A lot of times I am looking over my material
9 that's been put in front of me, I am preparing to get
10 ready for what's ahead in the evening. Sometimes I am
11 glancing out at the audience. I don't just sit and
12 watch to see if somebody is leaving.
13    Q. Oh, I didn't mean to suggest that you did.
14 My question was simply have you ever had the occasion
15 to see someone leave during the disclaimer?
16    A. I wouldn't know if they were leaving for the
17 disclaimer or if they had to use the restroom. People
18 are moving in and out all the time.
19    Q. When the disclaimer is read, do you listen to
20 the disclaimer or are you looking at the materials in
21 front of you?
22    A. Would you ask me that?
23    Q. When the disclaimer is read at meetings, are
24 you listening to the disclaimer or do you look at

Page 63

1 materials in front of you?
2    A. Sometimes I am looking at the president who
3 is reading it, and sometimes I am looking at materials
4 in front of me. I have no set practice.
5    Q. When the prayer is offered, what do you do?
6    A. My head is bowed and I am listening and
7 praying.
8    Q. When you say you are listening and praying,
9 are you praying by listening to whatever it is
10 that your fellow board member says, or are you
11 offering your own prayer?
12    A. I am doing both.
13    Q. At the same time?
14    A. Yes.
15    Q. And you do both, Mrs. Mitchell, because in
16 your view you are the best person to decide how best
17 to seek divine guidance for yourself; correct?
18       You offer your own prayer at the beginning of
19 every board meeting because no one knows better than
20 you how to seek divine guidance for you. Correct?
21    A. Correct.
22    Q. And would you expect that to be true of each
23 of the other members of the board?
24    A. I can't speak for them, because I don't know

Page 64

1 how they feel about these issues.
2    Q. Have you ever had a discussion with any of
3 your colleagues on the board about the school board
4 prayer issue?
5    A. You mean in a formal sense?
6    Q. No, in any sense.
7    A. Yes.
8    Q. With whom?
9    A. With Mr. Helms.
10    Q. Anyone else?
11    A. Ms. Bunting.
12    Q. Anyone else?
13    A. Mr. Bireley, because we ride to meetings
14 together, so sometimes, and different events.
15 Sometimes we will discuss things.
16    Q. Anyone else?
17    A. No, not that I can recall.
18    Q. Those three?
19    A. I may have mentioned something to
20 Dr. Hattier.
21    Q. The first three people you mentioned were you
22 have a memory of having such a discussion on rides to
23 meetings; is that right?
24    A. Uh-huh.

Page 65

1    Q. And does Dr. Hattier fall into a different
2 category?
3    A. Yes, he doesn't ride with us.
4    Q. That's what I thought.
5    A. We live in a close area that we kind of car
6 pool.
7    Q. Yes, ma'am. The conversations with
8 Mr. Helms, Ms. Bunting and Mr. Bireley, are those
9 individual conversations -- Have there been individual
10 conversations with those people, or are they all among
11 the four of you?
12    A. Among the four of us, if we know it's going
13 to be an issue we are going to be discussing. I don't
14 go to church with any of them or sit one-on-one
15 individually just to have a deep conversation about
16 it.
17    Q. Actually, that's very helpful. I had in mind
18 whether you, you know, sit down over a cup of coffee
19 and have a deep discussion on the issue.
20    A. No.
21    Q. This would be in rides to and from meetings
22 of the board, meetings of the school district?
23    A. Yes.
24    Q. Okay, and the conversation with Dr. Hattier,

17 (Pages 62 to 65)

Dobrich, et al.
Donna Mitchell

v.

Case No. 15-120

Indian River School District, et al.
October 16, 2006

Page 66

1  conversation or conversations with Dr. Hattier, how
2  did those come up?
3      A.  They would usually be a sidebar conversation
4  after a board meeting, something of that nature, if we
5  had discussed issues that, you know, we are just
6  elaborating on, or generally we sit on the same side
7  of the table, so.
8      Q.  Have you ever signed a petition expressing
9  your views about religion in the schools?
10     A.  I don't recall ever signing one.
11     Q.  Have you ever signed a petition relating to
12  your views specifically on school board prayer?
13     A.  I don't remember ever signing one.
14     Q.  Let me ask you a more general question. Is
15  it correct, Mrs. Mitchell, that you would not sign a
16  petition that you did not believe in?
17     A.  No, I would not sign a petition I didn't
18  believe in.
19     Q.  Do you believe that students should have the
20  right to request local clergy to come and pray at the
21  school programs?
22          MR. GOSSELIN: Objection. You don't
23      have to answer that.
24          MR. ALLINGHAM: Let's mark as PX55 a

Page 67

1          document bearing Bates Number BPD-130.
2          (Plaintiff's Exhibit 55 was marked.)
3  BY MR. ALLINGHAM:
4      Q.  Have you ever seen PX55 before?
5      A.  I didn't remember it until I just saw it now.
6  I believe that was when we were going into that
7  meeting at Frankford and they were having people sign
8  as they went in. I had forgotten it.
9      Q.  That meeting in Frankford being the August 24
10  meeting?
11     A.  Yes.
12     Q.  The big meeting?
13     A.  The big meeting.
14     Q.  Yes. And, PX55 is a petition that you signed
15  at sometime -- Strike that. PX55 is a petition that
16  you signed at that big meeting; correct?
17     A.  Yes.
18          MR. GOSSELIN: I have an objection to
19      this. I think this is clearly the issues in
20      the next phase of the litigation.
21  BY MR. ALLINGHAM:
22     Q.  Did you understand that the principal topic
23  of the August 24 meeting was to consider whether the
24  school board would continue its practice of opening

Page 68

1  its meetings with a prayer?
2      A.  I am not sure exactly -- I didn't pin it down
3  to one particular issue. I went to the meeting
4  because I was concerned about our traditions and
5  practices being done away with and to support the
6  school board on their right to have prayer. It wasn't
7  one particular aspect of it.
8      Q.  That's a fair point. So it was more
9  generally the issue of the religious traditions of the
10  Indian River School District?
11     A.  Yes, yes.
12     Q.  Included in the religious traditions of the
13  Indian River School District was the school board's
14  tradition of opening its meetings with a prayer;
15  correct?
16     A.  Yes.
17     Q.  And in signing this petition you meant to
18  indicate your support for the school board's tradition
19  of opening its meetings with a prayer; correct?
20     A.  Among other things.
21     Q.  Yes. And do you know who wrote the text of
22  the petition?
23     A.  No.
24     Q.  Do you know who placed or made the petition

Page 69

1  available for signature at the meeting?
2      A.  No, there was a huge crowd of people, and as
3  we went in they were just having a sign-in, as I
4  recall, to support the school board on this issue.
5      Q.  Did you recognize -- Were there more than one
6  petition?
7      A.  I can't remember. As I said, there was a
8  huge crowd of people and we were all filing into the
9  building to try to get seating, and there were people
10  outside trying to get us, you know, asking us if we
11  would be willing to sign in support of the school
12  board.
13     Q.  Did anybody that was asking you to sign
14  identify themselves in any way?
15     A.  No. And I apologize I didn't even remember
16  signing it.
17     Q.  No, no, that's okay. First of all, it's more
18  than two years ago and, secondly, I don't believe I
19  have ever taken a deposition where I didn't try to
20  refresh a witness's recollection with something.
21     A.  Okay.
22     Q.  So don't -- Now, when you signed this
23  petition on August 24, 2004, the text of this
24  petition, excuse me, the text of this petition was

18 (Pages 66 to 69)

Dobrich, et al.                          v.              Indian River School District, et al.
Donna Mitchell                   Case No. 15-120                     October 16, 2006

Page 70

1 something that you believed in; correct?
2   **A.  Yes.**
3          MR. GOSSELIN:  Objection.  It looks
4   that the petition is related solely to the
5   graduation.  It says, "Graduation, other
6   programs at schools."
7          MR. ALLINGHAM:  Understood.  I —
8          MR. GOSSELIN:  I'm sorry, maybe you
9   did establish it as -- If you established it
10  as a foundation that she believed it related
11  to school board prayer, I don't object.
12         MR. ALLINGHAM:  Okay, that's what I
13  was trying to do with the other question,
14  but, if I didn't do it, then you can
15  continue to object.
16 BY MR. ALLINGHAM:
17  Q.  Have your views, have the views that you
18 expressed by signing this petition changed in any way?
19  **A.  Well, I never read the petition when I signed**
20 **it.  I was signing as, you know, briefly they**
21 **explained to everybody what it was, that we were in**
22 **support of the school board, supporting the school**
23 **board.**
24      **I was not on the school board.  Now that I am**

Page 71

1 **on the school board, I still support the school board**
2 **in their views.**
3   Q.  So if somebody walked up to you today and
4 said, "Would you please sign this petition," you would
5 sign again?
6   **A.  I would read what I was going to sign, but --**
7 **I have to go back and read it again.**
8   Q.  I was going to say why don't you take a
9 minute to read the text and then tell me whether you
10 would sign it again.
11  **A.  Well, we modified our policy already**
12 **concerning the graduation practices.  We have modified**
13 **quite a few things that we did in the past that were**
14 **tradition and to be inclusive and not offensive to**
15 **other children.**
16      **A modified version, I would sign still.  But**
17 **I probably wouldn't sign any petitions anymore.  But I**
18 **think we, we went back and looked at some of the**
19 **practices and really worked hard to try to not offend**
20 **anyone and yet maintain our traditions.**
21  Q.  When you say "worked hard not to offend
22 anyone," what you worked hard to do was to make sure
23 that your policies complied with the law; isn't that
24 right?

Page 72

1   **A.  Yes.**
2   Q.  Did you take notes at school board meetings?
3   **A.  Sometimes.**
4   Q.  Do you keep the notes that you take?
5   **A.  Not usually, not unless it's something that I**
6 **think I am going to need again.**
7   Q.  Do you keep a file in connection with your
8 school board service?
9   **A.  No.**
10  Q.  I'm sorry, you addressed this tangentially
11 before.  Are you currently employed?
12  **A.  Yes.**
13  Q.  Where are you employed?
14  **A.  I work for the Delaware State Housing**
15 **Authority as a site manager.  It's public housing.**
16  Q.  And briefly what are your responsibilities?
17  **A.  I am the site manager.  I do, I am kind of**
18 **like a landlord, but I do recertifications, I bring in**
19 **programs, I supervise the maintenance, the facility,**
20 **the community.**
21  Q.  And what's the site that you manage?
22  **A.  It's called Hickory Tree.**
23  Q.  Where is it located?
24  **A.  Selbyville.**

Page 73

1   Q.  So, to come back to this file issue, am I
2 correct that you don't keep any files about the school
3 board at your -- Do you have an office at Hickory
4 Tree?
5   **A.  Yes.**
6   Q.  Am I correct you keep no school board files
7 at Hickory Tree?
8   **A.  No, separate.**
9   Q.  Do you have an office at home?
10  **A.  No.**
11  Q.  Or do you have an area where you keep
12 business materials?
13  **A.  In my bedroom.  I had six kids, so there is**
14 **not a lot of space.**
15  Q.  Yes, ma'am.  And in your bedroom do you keep
16 a file on school board matters?
17  **A.  No, I have a box with a few things in it.**
18  Q.  Okay.  What's in the box?
19  **A.  Well, I have my, some of the literature that**
20 **I have gotten concerning the prayer issue, of course,**
21 **and I have kept those things, things that are current**
22 **and ongoing.**
23  Q.  What else?
24  **A.  Basically I will keep a couple of months of**

19 (Pages 70 to 73)

Page 74

1  materials from the board packets and then shred them.
2  There wouldn't be room to keep everything if you kept
3  it all.
4      And Central Office keeps copies of
5  everything, so we have no need to keep something
6  unless it's something that we want to refer back to on
7  our own.
8      Q.  You testified earlier that you don't
9  typically take notes but sometimes you take notes on
10 matters that are of importance to you.  Do you
11 remember that?
12     A.  Yes.
13     Q.  Alright, do you keep any portions of the
14 board packages on which you take notes?
15     A.  Not consistently.  Maybe I want to ask a
16 question about an issue or something in executive
17 session and, once that question is answered, then I
18 don't have a need to keep it any longer.
19     Q.  Okay.  Do you take whatever notes you take on
20 the board package materials, or do you have a separate
21 pad that you keep notes on?
22     A.  I just write it, write on the material.
23     Q.  Alright, you also testified that you keep
24 information concerning current issues, ongoing issues,

Page 75

1  including, I take it, the school board prayer issue;
2  correct?
3      A.  Yes.
4      Q.  Okay.  Describe for me, as specifically as
5  you can, what materials you currently have in your
6  box, your file, on school board prayer?
7      A.  Well, I have a copy of the lawsuit.
8      Q.  Yes.
9      A.  I have a copy of some of the materials we
10 have gotten in executive session concerning the
11 lawsuit.
12     Q.  Yes.  Anything else?
13     A.  That's it.
14     Q.  Did you review those materials before the
15 deposition?
16     A.  I glanced at the lawsuit and I read over our
17 policy again.
18     Q.  The materials that you have been given in
19 executive session, did you look at those materials
20 before the deposition today?
21     A.  No.
22     Q.  I don't know what they say.  I am going to
23 try to understand what they are.  Okay?  So try to be
24 careful about that.  And on these questions, in

Page 76

1  particular, make sure that you pause before you answer
2  so that Mr. Gosselin has time to interpose an
3  objection if he wishes.
4      Are those -- Are there any communications
5  from attorneys included in those materials that were
6  handed out at executive session?
7      A.  Yes.
8      Q.  Are there any materials that were not
9  communications from attorneys that were handed out
10 during those executive sessions?
11     A.  Yes.
12     Q.  Okay, I want to start with the attorney part.
13 Do you remember who prepared those materials?  And, if
14 it's more than one attorney, please identify each of
15 them.
16     A.  Well, I have some from Jason, updates,
17 keeping us informed.
18     Q.  Right.
19     A.  He is a very good attorney.  And former
20 attorneys, I have some which I did not consider to be
21 very good attorneys.
22     Q.  The former attorneys being Messrs. Cafferkey
23 and Balaguer?
24     A.  Yes.  Usually they did not come directly from

Page 77

1  them but were given to us in executive session
2  concerning the situations.
3          MR. ALLINGHAM:  Mr. Gosselin
4          appreciates the testimony.
5          MR. GOSSELIN:  Yes.
6  BY MR. ALLINGHAM:
7      Q.  Any other attorneys?
8      A.  That's all I can remember.
9      Q.  Okay, I am going to ask you a couple of
10 specific questions.
11     A.  Okay.
12     Q.  Do you have any materials prepared by Thomas
13 Neuberger?
14     A.  If I do, I don't recall.
15     Q.  Do you have any materials prepared by the
16 Rutherford Institute?
17     A.  I don't think so.
18     Q.  Do you have any materials prepared by the
19 Alliance Defense Client?
20     A.  I don't think so.
21     Q.  Do you have any materials prepared by James
22 Griffin?
23     A.  There could be, but I am not sure.  I know he
24 was the former attorney when it all started.

20 (Pages 74 to 77)

Dobrich, et al.                                    v.                    Indian River School District, et al.
Donna Mitchell                          Case No. 15-120                           October 16, 2006

Page 78

1    Q.  Do you have any materials prepared by David
2   Williams.
3       A.  If I do, I don't recall.
4       Q.  But all of these attorney materials, you did
5   not review them in preparation for this deposition;
6   right?
7       A.  No.
8       Q.  Okay, now, the non-attorney materials, could
9   you describe them for me?
10      A.  It could have been just something in
11  executive session where we were discussing among
12  ourselves where we stood, you know, maybe it was
13  something from Central Office concerning an update on
14  how things were going or where they, you know,
15  information that they had received from attorneys, but
16  not directly to me from the attorney, but through
17  them.
18      Q.  And I am going to do a little bit of
19  Mr. Gosselin's job for him.  Is it correct that those
20  communications, that is the non-attorney
21  communications, all reflected communications from
22  attorneys, that is to say they passed on to you
23  indirectly attorney communication?
24      A.  Most of them.

Page 79

1    ·Q.  Okay, now, let me take that subset.  There is
2   a -- There is some subset of that non-attorney
3   communication that did not indirectly reflect attorney
4   communication; is that correct?
5       A.  Some.
6       Q.  Okay.  Could you describe that subset for me?
7   What is it?
8       A.  It could have to do -- Some of the things
9   could have had to do with our past policies, current
10  policies, changes, things that we were looking at.
11      Q.  Drafts, draft policies?
12      A.  Yes.
13      Q.  Communications among board members on the
14  history or tradition of practice in the district?
15      A.  No, as I recall -- I don't think I have ever
16  received anything that was directly from a board
17  member.
18      Q.  Uh-huh.
19      A.  Everything kind of goes through Central
20  Office --
21      Q.  Uh-huh.
22      A.  -- to us.
23      Q.  Alright, but there is, in your box, there is
24  some group of documents that are neither

Page 80

1   communications directly to you from attorneys or
2   communications from the Central Office in effect
3   forwarding communication from attorneys?
4       A.  Would you repeat that?
5       Q.  Yeah, it was a bad question.  You have -- You
6   have, in your box file in your bedroom today some
7   documents that are not communications from attorneys,
8   whether direct or indirect, addressing the issue of
9   school board prayer?
10      A.  I can't -- I can't say specifically I do or I
11  don't.  I could have.
12      Q.  Okay.
13      A.  I didn't look through it.  This has been
14  ongoing for quite awhile.
15      Q.  You may already have answered this question,
16  but have you ever gone through that file to determine
17  whether there were any documents in a responsive to a
18  request for documents from our side in this
19  litigation?
20      A.  I don't know if I have anything in my file
21  currently, but I know there was a request and
22  everything I had I brought to Central Office.  There
23  was a request for anything that had come to us from
24  the community or anyone and, if I kept it, we were to

Page 81

1   bring it to Central Office, and I did.  So that took
2   those things out of the box.
3       Q.  And, roughly speaking, do you recall when
4   that request came to you?
5       A.  It's been quite awhile ago.
6       Q.  So I take it that since then you have
7   accumulated some more materials?
8       A.  No, I mean just the things that are relevant
9   to the case from the lawyers and from executive
10  session where we have discussed the situation.
11      Q.  Do you get communications from constituents
12  on this issue?
13      A.  Yes.
14      Q.  And do you keep those if they relate to
15  school board prayer?
16      A.  They were phone calls or conversations.  I
17  haven't had anything in writing.
18      Q.  Okay.  To whom in the Central Office did you
19  give the materials that you recalled from your file?
20      A.  I brought them to Dr. Hobbs, or Mrs. Hobbs,
21  excuse me.
22      Q.  Do you keep any record of the telephone calls
23  that you get on this issue?
24      A.  No.

21 (Pages 78 to 81)

Dobrich, et al.                                    v.                Indian River School District, et al.
Donna Mitchell                        Case No. 15-120                        October 16, 2006

Page 82

1   Q.  Have those telephone calls been largely in
2   support of the board's position?
3       A.  All of them.
4       Q.  One-hundred percent?
5       A.  One-hundred percent.
6       Q.  Unanimous support?
7       A.  Unanimous.
8       Q.  Do you think that you would be likely to get
9   a call from someone who opposed the board's position?
10      A.  I can't answer that.  I don't know.  It could
11  happen.
12      Q.  Are you widely known as a supporter of the
13  board's position?
14      A.  Yes.
15      Q.  On the issue of a member of the public
16  walking out of a board meeting when a disclaimer is
17  read, do you think that would take a certain amount of
18  courage?
19      A.  I can't speak for others.  If I were offended
20  by something, I would walk out, and have done.
21      Q.  And have done?
22      A.  Yes.
23      Q.  Over what issue?
24      A.  I walked out of a movie once that was

Page 83

1   offensive.
2       Q.  The school board policies that you read when
3   you became a board member, those are adopted by the
4   school board; is that correct?
5       A.  Yes.
6       Q.  And you view the adoption of those policies
7   as a legislative function; right?
8       A.  Yes.
9       Q.  And does the school board enforce the
10  policies that it adopts?
11      A.  Do they enforce the policies?
12      Q.  Yes, ma'am.
13      A.  They are supposed to enforce the policies
14  that they adopt, yes.
15      Q.  Not only supposed to, but the board does
16  enforce the policies?
17      A.  Yes.
18      Q.  Yes.  Are you aware, and I know you have only
19  been on the board for a year or so, but are you aware
20  of any instance where a school board member has been
21  accused of violating one of those district policies?
22      A.  I can't think of any big scandal.
23      Q.  Whether it was a scandal or not, can you
24  think of anybody suggesting to a board member, one of

Page 84

1   your colleagues, that he or she was violating board
2   policy?
3       A.  That he or she personally was?
4       Q.  Yes, ma'am.
5       A.  I don't remember any.
6       Q.  If it came to your attention that a board
7   member was violating a policy, what would you do?
8       A.  That's difficult to answer because I am not,
9   you don't know unless you are presented with the
10  situation.
11          I know that I would approach that person and
12  I would -- I would assume I -- I think maybe I --
13  Well, again, you don't know unless it happens, but if
14  it were something that I felt were serious, I would go
15  to the board president and report it after speaking
16  with the person directly and giving them the
17  opportunity to, to say what they did.
18      Q.  Are you a member of any committees of the
19  school board?
20      A.  Yes.
21      Q.  Which committees?
22      A.  The Policy Committee, and I attend all the
23  committee meetings, the Building and Grounds.  I don't
24  have to, but I choose to do that so that I will become

Page 85

1   more familiar, because there are so many things to
2   learn, such a short amount of time to do it, I choose
3   to attend every, every committee I can.
4       Q.  But you are a member of the Policy Committee?
5       A.  Yes, I currently chair the Policy Committee.
6       Q.  Any other committees?
7       A.  I don't chair any other committees.
8       Q.  Are you a member of any other committees?
9       A.  Building and Grounds.
10      Q.  Under your chairmanship, does the Policy
11  Committee have a practice, a regular practice pursuant
12  to which it considers and proposes policy for an
13  adoption to the full board?
14      A.  Would you repeat that?
15      Q.  Does the Policy Committee have a regular
16  procedure or practice for developing policies to be
17  submitted for adoption by the full board?
18      A.  Yes.
19      Q.  And describe that process or practice for me.
20      A.  We have a varied group that meets to discuss
21  the various issues that come to the surface that need
22  to be dealt with, and then we have a first reading
23  before the school board, and most of the time there is
24  a second reading so that it gives the school board an

22 (Pages 82 to 85)

Page 86

1  opportunity to hear what the Policy Committee is
2  recommending, to think about it, and then to follow,
3  and to make any recommendations or corrections that
4  they see fit, and then, when a second reading comes
5  forward, the following month it is usually voted on
6  and passed or rejected.
7      Q. Okay. So you testified you have a varied
8  group that considers matters that come before it?
9      A. Yes.
10     Q. And that varied group is the members of the
11 Policy Committee or --
12     A. Yes.
13     Q. -- some other group? Okay, who is on the
14 Policy Committee currently?
15     A. Currently on the Policy Committee besides
16 myself, Earl Savage. Let me think. We have two
17 principals. We have a high school principal, Mark
18 Steele. We have an elementary school principal, Gary
19 Brittingham. Celeste, we just invited Celeste Tanner,
20 who is our new director of personnel, to be a part of
21 the board.
22     We have another board member, and I am
23 drawing a blank, one of our board members, the new
24 one -- I don't know him very well.

Page 87

1          MR. GOSSELIN: Justin Davis --
2          THE WITNESS: No.
3          MR. GOSSELIN: Or Robert Wilson?
4          THE WITNESS: Robert Wilson is on the
5  board.
6  BY MR. ALLINGHAM:
7      Q. On the Policy Committee?
8      A. Yes, on the Policy Committee. I am trying to
9  think -- Oh, Charlie Hudson, who is in charge of the
10 pupils, the supervision over discipline and that sort
11 of thing.
12     And we invite different people in from time
13 to time, depending on what subject we are dealing
14 with. Also Sandy Smith, who is the director of
15 education.
16     Q. And since -- When did you become chairman of
17 the Policy Committee?
18     A. This year.
19     Q. Do you know what month?
20     A. I believe Charlie asked me at the beginning
21 of the school year.
22     Q. So it was just a month or two ago?
23     A. Yes.
24     Q. Okay, have you had occasion to consider any

Page 88

1  policies yet?
2      A. Yes.
3      Q. What policies?
4      A. We are currently working on the drug and
5  alcohol policy. We have -- We are looking at, just
6  thinking in particular, discrimination policy.
7      Uniform policies have been big on our list,
8  but there is a subcommittee that's dealing with that
9  in particular. That's what's currently.
10     What happens is when we come, whatever issues
11 have arisen -- We also are working on a policy for
12 terminating non-certified employees, because we
13 currently do not have one in place.
14     Q. Have you, in any of those areas or for any of
15 those policies, have you had occasion to begin the
16 drafting process, that is to begin actually drafting a
17 policy to be presented to the full board.
18     A. We are looking at several. We have not.
19 It's all in the planning discussion stages. We took
20 the current policy manual and we have decided to go
21 through it to try to simplify it, so we don't have
22 anything on the table to present to the board at this
23 time. We are working in all those areas that I
24 mentioned.

Page 89

1      Q. So, just so I understand you, is it correct
2  that you have not begun drafting any policy in any of
3  those areas.
4      A. I have assigned people to work on some of
5  those areas.
6      Q. Who have you assigned?
7      A. Celeste Tanner, who is our head of personnel,
8  is working with our lawyer on drafting a policy to
9  terminate non-certified employees.
10     Charlie Hudson is working with a subcommittee
11 on dealing with the drug and alcohol policy that we
12 currently have in place.
13     Q. And is Mr. Hudson working with the board
14 attorney, as well?
15     A. I am sure that he is.
16     Q. Would it be your expectation that whoever
17 gets assigned to begin drafting a policy would be
18 working with the board attorney in that effort?
19     A. Yes, yes.
20     Q. Okay. Since you have been chairman, does the
21 Policy Committee meet in public?
22     A. No.
23     Q. Why not?
24     A. They just never have. The public is always

23 (Pages 86 to 89)

Page 90

1  welcome to attend any meetings, but no one has come in
2  thus far.
3      Q.  Oh, okay.
4      A.  It's open if they choose to come.
5      Q.  That's what I was getting at.
6      A.  They are allowed.  It isn't a closed, secret,
7  little back-room meeting.
8      Q.  Correct, you don't bar the public from
9  coming?
10      A.  No.
11      Q.  Do you give public notice of the meeting?
12      A.  No.
13      Q.  Is there any reason why you don't give public
14  notice of the meetings?
15      A.  No.
16      Q.  Is that a tradition of the board?
17      A.  I suppose.  I can't speak for the board
18  before I was on there.
19      Q.  Okay, we have a --
20      A.  All of the -- The committees do give a report
21  at the big board meetings, the open board meetings,
22  and it is stated then when the next, so I suppose in a
23  way we do, when the next meetings will be.  It is
24  stated at that time before the public.

Page 91

1          MR. ALLINGHAM:  Okay, we can take a
2      break.  There is a couple of minutes of tape
3      left.  We need to change the tape.
4          VIDEOGRAPHER:  Going off of the record
5      at approximately 11:10 a.m..
6          (A recess was taken.)
7          VIDEOGRAPHER:  Back on the record
8      approximately 11:14 a.m..
9  BY MR. ALLINGHAM:
10      Q.  You testified before we broke a little
11  earlier that you read the board policy on school board
12  prayer to prepare for this deposition?
13      A.  Well, I just briefly looked over it.
14      Q.  Have you ever had a conversation with anyone
15  about who drafted that policy?
16      A.  You mean the original policy?
17      Q.  Yes.
18      A.  No.
19      Q.  When you say the original policy, do you
20  understand that there has been more than one policy on
21  school board prayer?
22      A.  I don't know what there was before I got on
23  the board.  I know we tweaked it since I have been on
24  the board.  We have made some modifications, but I

Page 92

1  don't know how many policies there were before that.
2      Q.  This is a document that we have previously
3  marked as Plaintiff's Exhibit 9.  That's the policy;
4  right?
5      A.  (Nodding head)
6      Q.  Is that correct?
7      A.  I mean I don't have the other one in front of
8  me to compare.  It appears to be.
9      Q.  When you say the other one, you mean the one
10  you have in your files?
11      A.  Well, I mean the whole prayer policy, the
12  whole religion policy.
13      Q.  Yes, ma'am.  This deposition is, as
14  Mr. Gosselin likes to remind me, limited to issues
15  surrounding one particular policy of the Indian River
16  School Board, and that is Board Prayer Policy BDA.1.
17      A.  Okay.
18      Q.  Which is titled "Board's Prayer at Regular
19  Board Meetings."
20      A.  Okay.
21      Q.  Do you see that?
22      A.  Yes.
23      Q.  Okay, is it your understanding that there is
24  a separate and distinct policy on board prayer,

Page 93

1  distinct from the policy on religion and the policy on
2  graduation prayer and so forth?
3      A.  Yes.
4      Q.  And is this that policy?
5      A.  Yes.
6      Q.  Okay.
7      A.  It appears to be.
8      Q.  I'm sorry, I didn't hear what you said.
9      A.  It appears to be.
10      Q.  Now, you testified a few minutes ago that you
11  know we have tweaked it and made some changes.  When
12  you said we have tweaked it, were you referring to
13  this policy --
14      A.  No.
15      Q.  -- or some other policy?
16      A.  It was the religion policy.
17      Q.  Okay, so now, is it your understanding that
18  this policy is the only policy on board prayer that
19  the board has ever adopted?
20      A.  To my knowledge, since I have been on the
21  board.
22      Q.  Now, if you look at the paragraph numbered
23  one, you will see that it begins, "In order to
24  solemnify its proceedings."  Do you see that?

24 (Pages 90 to 93)

Dobrich, et al.                          v.              Indian River School District, et al.
Donna Mitchell                  Case No. 15-120                    October 16, 2006

Page 94

1    A. Yes.
2    Q. And that language reflects what you testified
3  earlier in this deposition, that the purpose of this,
4  of the board prayer is to solemnify the board's
5  proceedings; correct?
6    A. Yes.
7    Q. Okay. And when you -- And your understanding
8  of "in order to solemnify its proceedings" is, correct
9  me if I am wrong, to enable board members to seek
10  divine guidance for the decisions that they are about
11  to make; correct?
12    A. That, and to become serious and to come
13  together as a united group. I mean that's how I
14  perceive it.
15    Q. Okay, so there is the divine guidance aspect
16  and then there is just the let's get down to business
17  and remind ourselves that we have serious matters to
18  discuss; correct?
19    A. And to ask for guidance in doing so.
20    Q. Yes, I said there is the divine guidance
21  aspect.
22    A. Right, right.
23    Q. And there is the let's get down to serious
24  business aspect?

Page 95

1    A. Right.
2    Q. Would, in your view, the prayer be the same
3  in meaning if I substituted for the phrase "in order
4  to solemnify its proceedings," the phrase "in order to
5  seek divine guidance for its business at that
6  meeting," would it mean the same thing?
7    A. I suppose it would change it.
8    Q. How would it change it?
9    A. Because the words are different. It can be
10  used in different ways. It's not exactly the correct
11  synonym.
12    Q. I asked that question because my lay
13  understanding of "in order to solemnify the
14  proceedings" would have included the let's get down to
15  serious business and, you know, be solemn and serious
16  about what we are going to do aspect of what you have
17  told me, but it would not have incorporated "in order
18  to seek divine guidance," that is to say the
19  solemnification of the proceedings would not
20  automatically, in my mind, raise the issue of divine
21  guidance.
22    Am I correct, though, that this phrase, "in
23  order to solemnify its proceedings," is, in your mind,
24  intended to include both concepts?

Page 96

1    A. In my mind, but each board member may think
2  differently.
3    Q. Alright. Now, in order for you to take your
4  responsibilities seriously, solemnly and responsibly,
5  do you need to offer a prayer?
6    A. I personally do, yes.
7    Q. That is, in the absence of a prayer, you
8  don't believe you would take your responsibilities
9  seriously?
10    A. I believe I would still take them seriously,
11  but I believe I would make wiser decisions.
12    Q. Yes, I understand. I understand. So that --
13  And the wiser decisions come from the seeking of
14  divine guidance?
15    A. Yes.
16    Q. Okay, so you are capable of taking your
17  responsibilities seriously; you would just make better
18  decisions after taking your responsibility seriously
19  if you seek divine guidance?
20    A. Yes.
21    Q. Paragraph two provides for the practical way
22  that this invitation to open the meeting will be
23  extended to individual board members; correct?
24    A. It's my understanding.

Page 97

1    Q. Okay. And it provides that, "On a rotating
2  basis, one individual adult board member per meeting
3  will be given the opportunity to offer prayer or
4  request a moment of silence." What do you understand
5  on a rotating basis to mean?
6    A. That the same person would not do it every
7  meeting, that others will be given the opportunity.
8  If they chose not do it, it would go to another
9  person.
10    Q. Is it your understanding that what paragraph
11  two is intended to provide for is that the opportunity
12  would be rotated around among all the members of the
13  board one by one until you come back around to the
14  beginning of the wheel or the beginning of the
15  rotation?
16    A. If they so choose.
17    Q. What do you mean if they so choose?
18    A. Well, yes, that everyone would be given an
19  opportunity, if they choose to do it. No one is
20  forced to do it. Some are not comfortable doing it.
21    Q. But everyone would be given the opportunity?
22    A. Yes.
23    Q. And do you have any understanding as to how
24  each of the individual adult board members is given

25 (Pages 94 to 97)

| Page 98 | Page 100 |
|---|---|
| 1 the opportunity? | 1    A. Absolutely. |
| 2    A. Well, when I was given the opportunity, I was | 2    Q. Okay, and I actually asked Mr. Bireley this |
| 3 asked by the president of the board if I would like to | 3 question, so I said to him, "You don't want to |
| 4 do it. | 4 embarrass anybody at the meeting." Correct? |
| 5    Q. When was that? | 5    A. Yes, because some people could be deeply |
| 6    A. I think I had prayer several months ago. I | 6 religious but not comfortable with praying openly. |
| 7 don't remember the month. I have only done it once | 7    Q. And then some people could be not deeply |
| 8 since I have been on the board. | 8 religious — |
| 9    Q. When you came on the board, did Mr. Bireley | 9    A. That's exactly right. |
| 10 say to you, in words or substance, "Mrs. Mitchell, | 10    Q. Let me finish my question. |
| 11 would you like to be included in the group of board | 11    A. I'm sorry. |
| 12 members who will be in the rotation?" | 12    Q. Some people could be not deeply religious |
| 13    A. I don't remember a conversation to that | 13 and just not be comfortable with offering a prayer; |
| 14 effect, no. | 14 correct? |
| 15    Q. Have you had any conversation with | 15    A. Correct. |
| 16 Mr. Bireley in which he asks you whether you would | 16    Q. And you don't know, since you don't know the |
| 17 like to be in the rotation of people who will be | 17 religious belief of most of your colleagues, whether |
| 18 invited to give a prayer or a moment of silence? | 18 if someone declined the invitation it would be because |
| 19    A. I just remember when it was, when he asked | 19 they are religious but not comfortable with offering a |
| 20 me, he said, "It is your turn, if you would like to | 20 prayer, on the one hand, or not religious and, for |
| 21 give it," you know, in that context. | 21 that reason not wanting to offer a prayer? |
| 22    Q. Did he say that to you at the meeting or | 22    A. I would not know. |
| 23 before the meeting? | 23    Q. Or whether they were atheists or agnostic and |
| 24    A. Before. | 24 chose not to offer a prayer? |

| Page 99 | Page 101 |
|---|---|
| 1    Q. On the same day or on an earlier day? | 1    A. I would not know. |
| 2    A. I believe it was several days before. | 2    Q. Or were Jewish or Muslim and were afraid to |
| 3    Q. And, as specifically as you can recall, what | 3 offer a prayer? |
| 4 did — This was Mr. Bireley or Mr. Walls? | 4    A. I would not know. |
| 5    A. Mr. Bireley. | 5    Q. In all events, paragraph two is intended to |
| 6    Q. What did Mr. Bireley say to you? | 6 give each individual board member the opportunity at a |
| 7    A. I can't remember exactly. Something like, | 7 meeting to accept or reject the invitation to offer a |
| 8 "Donna, I wanted to ask you if you would like to take | 8 prayer? |
| 9 your turn at the board meeting, you know, to offer | 9    A. Yes. |
| 10 prayer at the next board meeting, and are you okay | 10    Q. Okay. Since you have been a board member, |
| 11 with it or, you know, how do you feel about it?" | 11 has each individual adult board member been given the |
| 12       I don't remember the exact questioning. He | 12 opportunity at a meeting to offer a prayer? |
| 13 was just checking to see if I was wanting to take my | 13    A. I don't know that either. |
| 14 turn, if I would feel comfortable. | 14    Q. Have you ever had a conversation with |
| 15    Q. Now, did he actually ask you whether you | 15 Mr. Bireley in which he has told you that several |
| 16 would feel comfortable? | 16 board members have declined to be in the rotation? |
| 17    A. No, but I knew that's what he was doing. | 17    A. No. |
| 18    Q. How did you — | 18    Q. So you don't know whether that's true or not? |
| 19    A. I know him. | 19    A. No. |
| 20    Q. How did you know that? | 20    Q. Have you noticed that some individual adult |
| 21    A. I know him. We have all grown up together, a | 21 board members have given more than one prayer over |
| 22 lot of us. | 22 a period in which some others have given zero? |
| 23    Q. Is it fair to say that Mr. Bireley wouldn't | 23    A. I know that we have had two that I have heard |
| 24 want to put somebody on the spot? | 24 give prayer a couple of times, but I haven't paid |

26 (Pages 98 to 101)

Dobrich, et al.
Donna Mitchell

v.

Case No. 15-120

Indian River School District, et al.
October 16, 2006

Page 102

1 attention to each person, you know, how often it has
2 gone around.
3     I mean we only do it, we only meet so many
4 months out of the year, and it only happens one time.
5 I haven't noticed that anyone in particular hasn't
6 done anything.
7   Q.  Has Mr. Bireley ever offered a prayer?
8   A.  You know, I can't honestly remember if he
9 has.  I think he has, but I can't say for sure.
10   Q.  Why do you think it might be embarrassing for
11 a board member to be offered the opportunity to lead
12 the board in a prayer at a meeting and decline that
13 invitation?
14   A.  I can't speak for anybody, but I think some
15 people just are uncomfortable praying in the open,
16 period, whether it's in church or wherever.  They are
17 just not comfortable.  I don't know why.
18   Q.  But why would it be embarrassing to not be
19 comfortable?
20   A.  Because some people are embarrassed reading.
21 Some people just are uncomfortable speaking in front
22 of people.
23   Q.  But why couldn't those people just say, "No,
24 thanks, Mr. Bireley, I am a little shy."?

Page 103

1   A.  Well, I can't answer for them.  I don't know
2 why.
3   Q.  Since you have joined the board in I think we
4 said July 2005, Mr. Helms -- There have been 15 board
5 meetings, regular board meetings.  Mr. Helms has given
6 the prayer at six of those board meetings.  Does that
7 seem like a disproportionate number, being that there
8 are ten board members?
9   A.  I never really kept count.  I know he is very
10 comfortable doing so and maybe others are not.
11   Q.  Have there been any special board meetings
12 since you have become a board member?
13   A.  Yes.
14   Q.  Have you attended those board meetings?
15   A.  Yes.
16   Q.  Have those board meetings opened with a
17 prayer?
18   A.  No.
19   Q.  Why is that?
20   A.  I don't know.
21   Q.  Have you ever asked whether it would be
22 appropriate to extend the board policy to special
23 board meetings?
24   A.  No, the subject never came up.

Page 104

1   Q.  What do you do to seek divine guidance before
2 those board meetings?
3   A.  I suppose we all in our own way take care of
4 the situation.
5   Q.  In your case, you do exactly the same thing
6 you do at regular board meetings; isn't that right?
7   A.  I pray before.  I, you know, I don't do
8 anything specifically.  I always seek guidance in
9 whatever decision I am making.
10   Q.  When you say you don't do anything
11 specifically, that's not altogether true.  You do
12 offer up a silent prayer for divine guidance before
13 the special board meetings, don't you?
14   A.  Yes.
15   Q.  Just the way you do at the regular board
16 meetings?
17   A.  Not the same way, not in a formal way, but I
18 speak to the Lord in my head often.
19   Q.  Yes, and my question about the special
20 meetings versus the regular meetings, let me set aside
21 the one meeting in which you have offered a prayer
22 since you have joined the board.
23   A.  Okay.
24   Q.  At all of the other regular meetings, you say

Page 105

1 a prayer in your head seeking divine guidance, just as
2 you do at the special board meetings; is that right?
3   A.  I am listening to the prayer that's being
4 said and I am also on my own, yes.
5   Q.  Fair enough.  Paragraph three provides, "Such
6 opportunity."  That's the opportunity to offer a
7 prayer, a moment of silence?  Yes?  That's what it
8 refers to?
9   A.  Okay, yes.
10   Q.  "Such opportunity shall not be used or
11 exploited to proselytize, advance or convert anyone or
12 to derogate or otherwise disparage any particular
13 faith or belief."
14     Is it your understanding that that limits,
15 imposes some limits on what people can say when they
16 offer a prayer or a moment of silence?
17   A.  I wouldn't think it would affect a moment of
18 silence.
19   Q.  That's a good point.
20   A.  But it would have an affect on perhaps what
21 would be said verbally.
22   Q.  I have some — I have some examples, and I
23 want to, as a board member, I want to try to ask you
24 whether you think these examples would violate

27 (Pages 102 to 105)

Dobrich, et al.                                    v.                    Indian River School District, et al.
Donna Mitchell                          Case No. 15-120                              October 16, 2006

Page 106

1    paragraph three or would be permitted under paragraph
2    three.
3         And the first example I want to give you is
4    suppose that a prayer was offered in which the person
5    offering the prayer said, "Lord, we pray that you
6    convert the heathen in our audience that they will
7    come to know the goodness and wisdom of your heart."
8         Would you view that as a prayer that was
9    permissible under paragraph three or violated
10   paragraph three?
11       A.  I would think that would be inappropriate for
12   a school board to say that, because we are praying for
13   wisdom for our group, not for the audience.  We are
14   not trying to convert anyone.
15       Q.  That's helpful, and that's -- but it's -- I
16   am looking for an answer to my specific question.  You
17   have before you a policy of the board.  The board are
18   the people charged with enforcing the board's
19   policies; correct?
20       A.  Right.
21       Q.  So you, as a board member, are charged with
22   ensuring that nobody offers a prayer that is used or
23   exploited to proselytize, advance or convert anyone
24   and so forth; correct?

Page 107

1        A.  Right.
2        Q.  So that prayer that I have just offered you,
3    whether it's appropriate or inappropriate, is it your
4    view that it violates paragraph three of the board
5    policy?
6        A.  Would you say it again?
7        Q.  Sure.  And I am not going to promise I am
8    going to get exactly the same words.  I should have it
9    written down somewhere.  "Oh, Lord, we pray that you
10   will convert the heathen in our audience so that they
11   come to know the goodness and wisdom of your heart."
12   Would that violate or be permitted under paragraph --
13       A.  I would not say that.  I would say it's
14   really pushing the limit.  It's -- I would not say
15   that.
16       Q.  When you say "pushing the limit," you mean
17   pushing the limit of things that are permitted under
18   paragraph three; correct?
19       A.  Yes.
20       Q.  Okay, and what is it in that prayer that you
21   think would violate paragraph three?
22       A.  We are not out to convert anyone.
23       Q.  Are you sure that that prayer would violate
24   paragraph three, at least as you understand?

Page 108

1        A.  I can't speak for anyone else.  It wouldn't
2    be right for me, because our purpose is not to convert
3    anyone.  It's to seek wisdom in making business
4    decisions.
5        Q.  Understood, and I think you and I are in the
6    same wavelength in that.  I am now trying to get at
7    something different.  If anybody -- I know that you
8    would not offer that prayer for the reasons you have
9    just said, but if one of your colleagues offered that
10   prayer and, just to make life a little easier for you,
11   passed out the text ahead of time, would you form the
12   conclusion that that was a prayer that would violate
13   paragraph three of the policy?
14       A.  I would go to that person and say I don't
15   think this is appropriate.
16       Q.  Because it violates paragraph three?
17       A.  More than paragraph three, it just isn't
18   appropriate.
19           MR. ALLINGHAM:  Okay.  I am going to
20       show you what we have previously marked as
21       Plaintiff's Exhibit 35.  You don't have the
22       stack in front of you.  Do you want copies?
23           MR. GOSSELIN:  I never did have this
24       one, because it was that little sheet that

Page 109

1    we kind of --
2            MR. ALLINGHAM:  Here, I have got an
3        extra.
4            MR. GOSSELIN:  This is 35?
5            MR. ALLINGHAM:  Yes, this one has a
6        sticker on it.
7    BY MR. ALLINGHAM:
8        Q.  So I am going to read this, and if you will
9    read along with me, Mrs. Mitchell, you will be able to
10   follow.
11       A.  Okay.
12       Q.  It's a little longer than my first prayer.
13       A.  Alright.
14       Q.  "Do not put your trust in princes, in mortal
15   men who cannot even save themselves.  When their
16   spirit departs, they return to the ground.  On that
17   very day their plans come to nothing.  Blessed is he
18   whose help is the God of Jacob, whose hope is in the
19   Lord his God, the maker of heaven and earth, the sea,
20   and everything in them, the Lord who remains faithful
21   forever.  He upholds the cause of the oppressed and
22   gives food to the hungry.  The Lord sets prisoners
23   free.  The Lord gives sight to the blind.  The Lord
24   lifts up those who are bowed down.  The Lord loves the

28 (Pages 106 to 109)

| | |
|---|---|
| Dobrich, et al. | v. |
| Donna Mitchell | Case No. 15-120 |

Indian River School District, et al.
October 16, 2006

Page 110

1  righteous. The Lord watches over the alien and
2  sustains the fatherless and the widow, but he
3  frustrates the ways of the wicked. For the wages of
4  sin is death. But the gift of God is eternal life
5  through Jesus Christ our Lord."
6      First, would you give that prayer?
7      A. Not in a board meeting. In church, maybe,
8  not in a board meeting.
9      Q. And why not in a board meeting?
10     A. Because, again, at a board meeting I see us
11 as coming together at a solemn occasion in a serious
12 manner to ask for wisdom and guidance, and --
13     Q. This prayer doesn't do that?
14     A. For me, for me, it doesn't. I wouldn't give
15 it. I can't speak for anyone else.
16     Q. Okay. We can agree that the text of this
17 prayer does not seek guidance for the decisions
18 that you are about to make at the board meeting?
19     A. I suppose that depends on who is saying this
20 and what is in their mind as they read it or recite
21 it. I can't speak for others, you know.
22     You could have a Jewish person offer a
23 different prayer or, like you said, a Muslim or a
24 Hindu or someone else. I would not personally be

Page 111

1  offended by any prayer that was offered, if it came
2  from a sincere heart and I knew they were meaning to
3  do, in their mind, what was right to solemnize the
4  circumstances.
5      I wouldn't do it. I can't speak for anyone
6  else, and I don't know if anyone would give this, why
7  they would give it.
8      Q. You understand that the limitation of
9  paragraph three of the policy, the enforcement of that
10 is left to the individual board members; correct? I
11 mean is there anyone else who can enforce that?
12     A. And their understanding of it.
13     Q. Sure, but is there anyone else who has any
14 power to enforce paragraph three? It's each of you
15 ten; correct?
16     A. Yes.
17     Q. Okay.
18     A. And we check each other.
19     Q. So is it that you would not offer this prayer
20 because for you it doesn't accomplish the purpose that
21 the policy is intended to address?
22     A. For me personally, yes.
23     Q. Okay. But you would not -- If a board member
24 offered this prayer, you would not go to that board

Page 112

1  member and say, "Hey, look, I think this is, you
2  shouldn't give this because this doesn't do what our
3  policy is intended to accomplish."?
4      A. I can't say that I wouldn't. I might. I
5  would have to hear it said, and I would be surprised
6  if something like this were given.
7      Q. Okay. Since you have joined the board in
8  July of 2005, in fact, have you gone to any board
9  member and said, "Gee, I think that prayer you gave
10 really isn't appropriate under our policy."
11     A. No, I haven't.
12     Q. Okay. Would I be fair in assuming, then,
13 that you viewed the text of all the prayers that have
14 been given as appropriate under the policy?
15     A. I guess I view it as when they are giving
16 their prayer that it's coming from their heart and
17 they view it appropriate.
18     You know, we are all ten different people,
19 and I know some like to recite maybe a prayer that was
20 given by a president or a historical person, you know,
21 and I accept that. I know, you know, I understand
22 where it's coming from. I am not personally offended
23 by it.
24     Q. Well, Mrs. Mitchell, the policy authorizes

Page 113

1  individual board members to offer any prayer except
2  those that are used or exploited to proselytize,
3  advance or convert anyone or to derogate or otherwise
4  disparage any particular faith or belief; correct?
5      A. Yes.
6      Q. Okay. Am I right, then, at least in
7  understanding that you did not view the text of any
8  prayer that's been given since you joined the board as
9  having used or exploited the opportunity to pray, to
10 proselytize, advance or convert anyone, or to derogate
11 or otherwise disparage any particular faith or belief?
12     A. There haven't been any that have offended me
13 or struck me that way.
14     Q. On the other hand, that prayer that I gave
15 you a minute ago about converting the heathen, that
16 one would have struck you as being the use or
17 exploitation of the opportunity to proselytize,
18 advance or convert anyone and so forth; correct?
19     A. It certainly would push the limit. I just --
20     Q. You seem as though you are just not sure?
21     A. Well, no, I just --
22     Q. Let me give you another one. Suppose that
23 the prayer were --
24     MR. GOSSELIN: If you did it with the

29 (Pages 110 to 113)

Dobrich, et al.                              v.              Indian River School District, et al.
Donna Mitchell                        Case No. 15-120                    October 16, 2006

Page 114

1    inflection that might come with it, that
2    would tip her over the edge.
3    BY MR. ALLINGHAM:
4        Q.  Suppose that the prayer were, "We pray,
5    Allah, that you convert the infidels in the public
6    audience and on this board."
7        A.  That would certainly get my attention.
8        Q.  Wouldn't you think that was a prayer that was
9    being used to try to convert someone?
10       A.  Yes.
11       Q.  Okay.
12       A.  Or not, maybe not just convert, but to
13   slander or, or, I don't know what's the correct word
14   to use.  It would, for a Christian school district
15   overall, per say a majority, it would certainly catch
16   the attention of everyone, I am sure.
17       Q.  But aren't these prayers supposed to be all
18   in accord with the freedom of conscience of the
19   individual adult board members?
20       A.  Yes.
21       Q.  So --
22       A.  I wouldn't -- I mean I would bring my prayer.
23   You know, I would -- I would -- I would give them the
24   right to say what they felt led to say, but it

Page 115

1    wouldn't be my personal prayer.
2        Q.  And that would be true even if the text of
3    that prayer, in your mind, would sound like an effort
4    to convert someone?
5        A.  If I felt like something sounded like an
6    effort to convert someone, I would speak up.
7        Q.  Okay.  And, similarly, the other words in
8    paragraph three, if it was an effort to proselytize,
9    --
10       A.  Yes.
11       Q.  -- you would speak up?
12       A.  That's not our place to do so.
13       Q.  And so you would speak up if a board member
14   offered prayer that you viewed as proselytizing?
15       A.  Yes, I would.
16       Q.  And describe for me -- I tried to give you an
17   example of a prayer that seemed clearly to try to
18   convert someone, because it said, "Help us, Lord, to
19   convert these people."
20       A.  Right.
21       Q.  But give me an example or tell me how you
22   would know that a prayer was seeking to proselytize?
23       A.  I guess I would have to hear it.  I don't
24   want to -- I can't think of an example right off the

Page 116

1    top of my head, but I just don't think it's our place
2    to convert anyone to any religion.
3        Q.  And proselytize is clearly different.  It's a
4    different clause here.  You don't think it's your
5    place to proselytize for any particular religion?
6        A.  No.
7        Q.  Alright, now coming back to PX35, which is
8    the text of the prayer I gave you, --
9        A.  Right.
10       Q.  -- is it your view that this prayer
11   proselytizes?
12       A.  It looks like the person will be reciting
13   scripture, and I can't get into their heads to know
14   why they would choose to cite scripture instead of
15   offering a prayer for wisdom.  I don't know what their
16   intent would be.  I just feel that it would be
17   inappropriate.  I wouldn't do it, for me.
18       Q.  This is not a prayer, though, that seeks to
19   convert someone, is it?
20       A.  It doesn't sound like a prayer.  It sounds
21   like scripture.  It sounds like Romans.
22       Q.  Part of it is Romans.
23       A.  Okay, the end of it.
24       Q.  Is it your view that for someone to quote

Page 117

1    scripture would violate the prohibition in paragraph
2    three against proselytizing in the prayer that's being
3    offered?
4        A.  Not necessarily.  I think, you know, it
5    depends on that person and what their intent is.
6        Q.  That's an important point for me.  Let me
7    explore that for a minute.
8        A.  Okay.
9        Q.  Can whether a prayer violates paragraph three
10   be discerned just from the text of the prayer, or do
11   you need to know what the intent of the person was?
12       A.  I think the intent of the person is always
13   important.
14       Q.  Okay.  And so just, you may think these
15   examples are silly, but they are intended to make sure
16   I understand.  If the person offering the prayer could
17   be hooked up to a lie detector and then read PX35, the
18   scripture that I have just read to you, and then
19   asked, "Well, in reading that did you intend to
20   proselytize," and the answer was yes, you would view
21   that as an inappropriate prayer under your board laws;
22   correct?
23       A.  Yes, I would.
24       Q.  And, now, a second example, same prayer, same

30 (Pages 114 to 117)

Dobrich, et al.                                          Indian River School District, et al.
Donna Mitchell                      v.                              October 16, 2006
                              Case No. 15-120

Page 118

1  lie detector, same board member is asked the same
2  question, and the board member says, "Absolutely not,
3  I just wanted to express my individual conscience,"
4  you would say that prayer would be perfectly okay
5  under the policy, the Board Policy BDA.1; correct?
6      A.  It wouldn't be something I would do, but I
7  would respect their right to do that.
8      Q.  Okay.  Now I want to take the "convert the
9  infidels" prayer.  Same board member offers the
10  "convert the infidels" prayer to Allah, and then
11  hooked up to the same lie detector and the board
12  member is asked, "Did you intend to convert all the
13  infidel Christians and Jews," and the board member
14  says yes.  You would say that that's a prayer that
15  violates the policy; correct?
16      A.  Yes.
17      Q.  Okay, same prayer, same lie detector, same
18  board member.  The board member is asked, "Did you
19  intend by that prayer to convert all the infidel
20  Christians and Jews," and the board member says,
21  "Absolutely not, I am just expressing my individual
22  conscience."  You would say that that board member was
23  entitled to give that prayer; correct?
24      A.  I would think that prayer, that was a little

Page 119

1  different than reciting scripture that is something
2  that is written.
3      Q.  Something that is written?
4      A.  In the Bible.
5      Q.  And tell me how you see -- What's the
6  distinction?
7      A.  Say the infidel prayer again.
8      Q.  "Allah, convert the infidels among us."
9      A.  It sounds like the person that's giving the
10  prayer is making a request.
11      Q.  To the deity?
12      A.  To change people from who they are.  It would
13  be inappropriate, in my opinion.
14      Q.  No matter what their intent was?
15      A.  I can't see any other intent, personally.
16      Q.  Fair enough.  So am I right in thinking from
17  your perspective you would first look at the content
18  of the prayer and see whether you could see two ways
19  of reading it?
20      A.  Yes.
21      Q.  And if you could see no way to read it except
22  a way as in my "convert the infidels" prayer that
23  seems inappropriate to you, you could make a judgment,
24  without knowing the intent of the person giving the

Page 120

1  prayer, whether it violated the policy?
2      A.  I think so, but I would confront the person.
3      Q.  Yes.  On the other hand, if you could see
4  alternative interpretations, one that seems
5  proselytizing or intending to convert and one that
6  seemed neutral and simply asking for guidance, then
7  you would think about the intention of the person
8  giving the prayer?
9      A.  I think so.
10      Q.  And you would evaluate that intention based
11  on your knowledge of that person, your own perspective
12  on the prayer, a variety of factors?
13      A.  Yes.
14      Q.  And would you agree with me that as a
15  lifelong Christian, you might view the content of the
16  prayer or the intention of the giver of the prayer
17  differently from a person of the Muslim faith in the
18  audience or a person of the Jewish faith in the
19  audience?
20      A.  I don't know how they would perceive things.
21  I can't speak for other people.
22      Q.  In events, the decision at each meeting as to
23  whether the prayer that's offered is being used or
24  exploited to proselytize, advance or convert anyone or

Page 121

1  to derogate or otherwise disparage any particular
2  faith or belief is a decision that's made by the ten
3  board members?
4      A.  Yes.
5      Q.  Okay.  The judgment of those ten boards
6  members as to whether a prayer does or does not
7  proselytize, advance or convert anyone or derogate or
8  otherwise disparage any particular faith or belief is
9  a judgment, I think you would agree with me, that
10  could be made differently by different people
11  depending on the prayer?
12      A.  Yes.
13      Q.  Okay.  So my question to you is wouldn't the
14  safest way to ensure that the prayer that is offered
15  not be understood to proselytize, advance or convert
16  anyone or derogate or otherwise disparage any
17  particular faith or belief, wouldn't the safest way to
18  ensure that that was true be to have the prayer just
19  among the people to whom it's directed, the board
20  members, and not risk the possibility of having people
21  perceive it to be proselytizing or converting?
22      A.  Are you asking me if the people should be
23  present when it's being done.
24      Q.  Wouldn't the safest way to avoid any danger

31 (Pages 118 to 121)

Dobrich, et al.                              v.                    Indian River School District, et al.
Donna Mitchell                        Case No. 15-120                        October 16, 2006

Page 122

1  of proselytizing and so forth be for the board members
2  simply to pray among themselves?
3      A.  Don't audiences sit in when state governments
4  and our federal government has legislative openings
5  with prayer?  Is that considered proselytizing that
6  they are exposed to such prayer?
7          Aren't we just following, in my opinion, the
8  way other legislative bodies are allowed to proceed?
9  We are not doing anything wrong, in my opinion.  It
10 wasn't done for the purpose or intent of infringing on
11 anyone's rights or proselytizing anyone.  It's
12 something that happens from the Supreme Court right on
13 down.  That's how I view it.
14         MR. ALLINGHAM:  Could you read the
15     question back, please?
16         (The reporter read back the question,
17     "Wouldn't the safest way to avoid any danger of
18     proselytizing and so forth be for the board
19     members simply to pray among themselves?")
20 BY MR. ALLINGHAM:
21     Q.  Can you give me an answer to that question?
22     A.  I do not feel we are doing anything wrong.
23     Q.  That's not the question that I asked you.  I
24 am quite confident, Mrs. Mitchell, that you don't

Page 123

1  believe you are doing anything wrong.  And lawsuits
2  are made on disagreements about that point.
3          My question to you is the purpose -- And let
4  me give you some background.  The purpose of paragraph
5  three, as you understand it, is to try to avoid
6  leaving anyone with the impression from the prayer
7  offered that they are seeking to proselytize, advance
8  or convert anyone or derogate or otherwise disparage
9  any particular faith.  That's the purpose of paragraph
10 three; correct?
11     A.  Yes.
12     Q.  Yes.  And isn't the safest way to avoid that
13 simply having the board members pray in private,
14 because then there is nobody who can form an
15 impression, proper or improper, right or wrong, that
16 they are being proselytized or that someone is seeking
17 to convert them or that their faith is being derogated
18 or otherwise disparaged?  Isn't that the safest way?
19     A.  I don't feel that there is ever a safe way to
20 make everybody happy.  Then other people would be
21 upset that it wasn't being done.  It is a tradition, a
22 time-honored tradition that goes on throughout our
23 land, and I don't believe that it's my responsibility
24 to sit and worry about if one person is going to be

Page 124

1  offended because something is being done.
2          We would never get anything done if --
3  Because everything you do is making somebody happy and
4  somebody upset.  No one is doing it with that intent.
5  The disclaimer states that.  And I see -- I just feel
6  like it would be wrong to not open our meetings with
7  prayer the way we have always done.
8          I don't see anything wrong with it.  I'm
9  sorry if people, some people are upset by it, but I
10 think that's an extremely, extremely small minority of
11 people.
12         And I can tell you that if we chose to do
13 that, every one of us, the ten of us, would probably
14 be voted out of office.
15     Q.  Why is that?
16     A.  We represent our districts, and the people
17 within our districts want prayer before the school
18 meeting.
19     Q.  Why?
20     A.  Because it's important to them.
21     Q.  Why?
22     A.  I can't answer -- I can't answer for them
23 individually, but I do know that we represent the
24 people and we vote accordingly.  And the people want

Page 125

1  prayer before school board meetings.  It's important
2  to them.
3      Q.  Do the people want prayer at graduation?
4      A.  I can't answer for the people.  I think --
5      Q.  You just did.
6      A.  The majority of the people, I think, do, yes.
7      Q.  And so do you think that you should have
8  prayer at graduation?
9      A.  Do I personally think it?
10     Q.  As a board member?
11     A.  As a board member, that's already been
12 settled.  As a person, personally, I am not offended
13 by it.
14         It wouldn't matter to me if you had a Jewish
15 rabbi, a Buddhist priest, a Christian minister.  I
16 think that it's a good thing, personally, but I have
17 to abide by the laws and the rules that are given to
18 me, and we are not breaking the laws or the rules
19 right now by having prayer before a board meeting, so,
20 in my opinion, it should not stop.
21     Q.  Do you think that your constituents would
22 want prayer at board meetings if the prayers were
23 Muslim prayers?
24     A.  I can't answer for the constituent.  I only

32 (Pages 122 to 125)

Dobrich, et al.                                    Indian River School District, et al.
Donna Mitchell                    v.                        October 16, 2006

Case No. 15-120

Page 126

1   know how they feel about this issue.
2       Q.  You mean Christian prayer?
3       A.  Yes. Well, they haven't said specifically.
4   They have said prayer.
5       Q.  Yes. And you have several times today told
6   me what you think your constituents want.
7       A.  Yes.
8       Q.  My question to you is do you think your
9   constituents would want prayer before board meetings
10  to solemnize the proceedings if they were told that
11  the prayers would be Muslim prayers?
12      A.  I can't answer for other people.
13      Q.  You can't answer that question?
14      A.  No, I can't answer for other people. I think
15  if it went around and a person was of another faith
16  and offered their prayer at their turn, I don't think
17  people -- You would always have a few that are
18  offended, but I think that it would be accepted.
19      Q.  Wouldn't you have the vast majority of people
20  offended by a Muslim prayer?
21      A.  I don't know.
22      Q.  Well, you certainly know that you would not
23  offend the vast majority if you had a Christian
24  prayer; correct?

Page 127

1       A.  That's true.
2       Q.  Okay. You told me earlier that you knew what
3   your constituents want, at least to this extent, that
4   if you chose to solemnify your proceedings by praying
5   in private immediately before the board meeting, that
6   all of you would be voted out of office?
7       A.  I think so.
8       Q.  Do you think that's because your constituents
9   would think that praying in private is not effective
10  to solemnify the proceedings?
11      A.  I can't speak for why people think the way
12  they do. I know that this is a very conservative
13  little community. Many of us have lived here all of
14  our lives. It's an important part of their tradition
15  and their way of life, and they resent -- They resent
16  being told you can't do it, because they feel like it
17  is a good thing. They feel that it helps in making
18  good decisions, that it blesses the children in the
19  district.
20          They are not negative toward children of
21  other faith or people of other religions. And if
22  there were enough people in the district that wanted
23  to get someone from another faith or belief system on
24  the board, that would happen, and they would accept

Page 128

1   that.
2           But I, I just think that this is the way it's
3   been, this is the way they want it, and they resent
4   being told you can't do it if it's legal. And, in our
5   opinion, it is legal.
6       Q.  That's a fair point. What is the basis for
7   your opinion that the board prayer policy is legal?
8           MR. GOSSELIN: And I just caution that
9       if you can answer that without revealing
10      things that were told to you by either me or
11      some other attorney or conversations with,
12      conversations that initially came as a
13      result of attorney advice. In other words,
14      if you have some independent reason for
15      believing in the legality of the policy
16      apart from your counsel from lawyers, you
17      can answer it.
18          THE WITNESS: Why do I believe it's
19      legal? Because we are a legislative body
20      and we -- I don't know if I can say it.
21          MR. GOSSELIN: If you heard it from an
22      attorney.
23          THE WITNESS: Legal advice that we
24      have been given.

Page 129

1   BY MR. ALLINGHAM:
2       Q.  You need to -- Mr. Gosselin and I agree on
3   one thing, and that is that you are not supposed to
4   tell me what your lawyers have told you.
5       A.  No, I wasn't going to say specifically.
6       Q.  Okay.
7       A.  I do not believe we are breaking the law.
8       Q.  You said in a earlier response that your
9   constituents believe that it is important to bless the
10  children in the district. Do you remember that?
11      A.  I think that's the intent of some of the
12  people that I have spoken with.
13      Q.  And who would be blessing the children in the
14  district?
15      A.  Who would be blessing the children in the
16  district?
17      Q.  Yes, ma'am.
18      A.  They believe that prayer will add to the
19  wisdom and decisions that are made, which will
20  indirectly bless the school district and the children
21  in the district.
22      Q.  So they don't -- Your constituents don't care
23  who blesses the children, whether it's Jehovah or
24  Allah or Sheba or God or Jesus; it's the important

33 (Pages 126 to 129)

Dobrich, et al.                                  v.                    Indian River School District, et al.
Donna Mitchell                          Case No. 15-120                          October 16, 2006

Page 130

1  thing is that the children be blessed?
2       A.  I can't speak for people individually. The
3  Christian parents believe that Jesus blesses the
4  children.
5       Q.  And the Christian parents, as you understand
6  it, want you to have prayer opening the school board
7  meeting?
8       A.  Yes, along with other people who are not of
9  faith. I have friends that are agnostic. I have some
10  friends that are atheists, and they don't have a
11  problem with prayer. I have Jewish friends that don't
12  have a problem with the prayer.
13       Q.  In the district?
14       A.  Yes.
15       Q.  Who are they?
16       A.  The Gordon family. We went to their son's
17  Bar Mitzvah. He graduated several years ago with one
18  of my boys, and it was a beautiful occasion and we
19  respected their religion and their way of looking at
20  things. But they never had a problem with it.
21       Q.  They never had a problem with it, --
22       A.  I mean they never, ever voiced a concern.
23       Q.  Let me finish. Let me finish my question.
24       A.  I'm sorry.

Page 131

1       Q.  They never had a problem with it, it being
2  the school board's practice of opening its meetings
3  with a prayer?
4       A.  To my knowledge, they never had a problem
5  with the school board opening its meetings with
6  prayer.
7       Q.  Did you ever have a discussion with them
8  about that?
9       A.  Not one-on-one, no.
10       Q.  Did you ever have a discussion with them on
11  that topic in some way other than one-on-one that I am
12  having a hard time imagining.
13       A.  Well, we respect each other's religions.
14  That's why we attended their son's Bar Mitzvah. You
15  know, they are very open to all religions, but they --
16  The mother was a teacher, not in our particular
17  district, but she -- They celebrated Christmas. They
18  never had a problem with Christian issues. They were
19  not offended. If they were, they never spoke it.
20       Q.  Is it your understanding, Mrs. Mitchell, that
21  the plaintiffs in this case do not respect the
22  Christian faith and its practitioners?
23       A.  I don't know what they think and feel. I
24  don't know them at all.

Page 132

1       Q.  Well, you have intimated that by challenging
2  the practice of opening school board meetings with a
3  prayer the plaintiffs in this case somehow have
4  evidenced their lack of respect for the Christian
5  faith. Am I wrong in inferring that?
6       A.  I don't know what they feel.
7       Q.  Okay. Do you -- It may be that this would
8  sound like an odd question to you, but for purposes of
9  the appropriateness of opening with a prayer, do you
10  recognize any difference between the opening of a
11  school board meeting and the opening of a Bar Mitzvah
12  ceremony?
13       A.  I have only attended one, so I don't know how
14  to compare.
15       Q.  Let me ask you this question.
16       A.  I can't compare the two at all.
17       Q.  Let me ask you this question: Can we agree
18  that the Bar Mitzvah is a private ceremony and the
19  board meeting is a governmental meeting?
20       A.  Yes.
21       Q.  Okay. Before I leave Plaintiff's Exhibit 35,
22  which you still have in front of you, you testified
23  somewhat earlier that you would think this would be an
24  appropriate prayer for -- And this is from your

Page 133

1  perspective, Mrs. Mitchell, personally. You would
2  think this would be an appropriate prayer for church
3  but not something that you would give to open a board
4  meeting?
5       A.  Not something that I would give.
6       Q.  And would you describe for me why you draw
7  that distinction, that is that it would be appropriate
8  for church but not appropriate for a board meeting?
9       A.  I think, in my opinion, part of it could be,
10  but the last statement, which I know comes from
11  Romans, in my opinion I would not have given at a
12  school board meeting.
13       Q.  Because it comes from scripture?
14       A.  No, the rest of it does too, but the -- I
15  wouldn't be talking about the wages of sin is death.
16  I, personally, wouldn't. I wouldn't feel that, in my
17  opinion, wouldn't be offering that at the opening of a
18  school board meeting. For me. I can't speak for
19  anyone else.
20          I can see throughout here how somebody might,
21  in their belief system, believe that they are asking
22  for wisdom and commenting on what they believe is
23  wisdom. I can only speak for myself. For me it's not
24  something I would offer.

34 (Pages 130 to 133)

Dobrich, et al.                          v.                    Indian River School District, et al.
Donna Mitchell                    Case No. 15-120                          October 16, 2006

Page 134

1    Q.  But you would offer this prayer in church?
2    A.  Yes.
3    Q.  Okay, I am going to read you a second prayer.
4    If you have trouble with it or if you can't hold it in
5    your mind, I will read it to you again.
6    A.  Okay.
7    Q.  I don't have a printed version of this one.
8    A.  Alright.
9    Q.  "Allah, we offer you our school bus drivers.
10   We offer you our superintendent, our administrators
11   and our secretaries. We offer you our teachers and
12   our parents. Finally, we offer you our students.
13   Peace be unto your prophet, Muhammed."
14   A.  That wouldn't offend me.
15   Q.  And that's fine that it would not offend you.
16   Look at paragraph three of the policy and tell me
17   whether you think it would violate paragraph three of
18   the policy.
19   A.  No, I would say if a school board member
20   offered that and that was their belief, they were
21   asking for wisdom and guidance.
22   Q.  That would be fine?
23   A.  That would be fine with me.
24   Q.  And, as a Christian board member, it would

Page 135

1    not -- Or let's imagine that you are a member of the
2    audience who is a parent. As a parent, it would not
3    trouble you that you were being offered to Allah
4    through his prophet, Muhammed?
5    A.  I would understand where it was coming from
6    and why. I wouldn't be offended.
7    Q.  Therefore, you found it troubling?
8    A.  Yes.
9    Q.  Okay. And how would you know where it was
10   coming from and why?
11   A.  Because it's positive. It was a positive
12   statement. It wasn't a converting statement. It was
13   a positive statement. From that person of that belief
14   system who was lifting us for wisdom, guidance,
15   blessings, it wouldn't offend me. I would understand
16   that was their belief.
17   Q.  I have one variation on that prayer to offer
18   you. Suppose that a board member offered a prayer
19   that said, "Allah, we lift up -- I offer to you my
20   colleagues on this board that they may be converted to
21   your wisdom and thereby make the best decisions that
22   they could make."
23   A.  The word converted would bother me. That's
24   inappropriate, but they could offer me up for wisdom

Page 136

1    and I wouldn't be offended.
2    Q.  You will take it?
3    A.  I will take it. I have a friend who is
4    Catholic. She prays to Mary for me and I pray to
5    Jesus for her, and we laugh and hug each other and
6    respect each other's right to believe and pray as we
7    choose.
8    Q.  Do you know any Muslim families in the
9    district?
10   A.  No, I don't.
11   Q.  Other than the Gordons, do you know any
12   Jewish families in the district?
13   A.  Not practicing that I would be aware.
14        MR. ALLINGHAM: Alright, let's change
15   the tape.
16        VIDEOGRAPHER: Going off the record at
17   approximately 12:12 p.m.
18        (A luncheon recess was taken.)
19        VIDEOGRAPHER: Back on the record at
20   approximately 1:02 p.m.
21        MR. ALLINGHAM: I would like to show
22   you what we have previously marked as PX45.
23   Do you need a copy?
24        MR. GOSSELIN: Yes, if you wouldn't

Page 137

1    mind.
2    BY MR. ALLINGHAM:
3    Q.  I will read it into the record. You can
4    follow along. "Heavenly Father, thank you for this
5    great occasion for the work, the effort, the joys and
6    everything that led up to this point in time.
7    Thank you for your guidance in this event. We pray
8    for your direction in the lives of each of these
9    school board members. We pray that you direct them
10   into the truth and eventually the truth that comes by
11   knowing Jesus. We also pray that you be with them at
12   this time, and we ask these things in Jesus's name.
13   Amen."
14        If one of your colleagues gave that prayer,
15   would you consider it to be in violation of or
16   permitted in paragraph three of the policy?
17   A.  No, I wouldn't consider it in violation of.
18   Q.  It would be permitted by the policy?
19   A.  Yes, I think so. I can see that perhaps, if
20   it's coming from someone who believes strongly in
21   Jesus, that it was not meant to proselytize. It was
22   to seek guidance.
23   Q.  For the prayer, actually the prayers -- One
24   was the my kind of extreme example of the conversion

35 (Pages 134 to 137)

Dobrich, et al.                                      v.                    Indian River School District, et al.
Donna Mitchell                              Case No. 15-120                          October 16, 2006

Page 138

1 prayer, and one was the prayer from scriptures that
2 you said you wouldn't give.
3    **A. Uh-huh.**
4    Q. For the prayers that you would have thought
5 to be inappropriate, would those be inappropriate
6 whether the board president gave the disclaimer or
7 not, or does the disclaimer cure any problem?
8    **A. I think the disclaimer is not to cure the**
9 **particular prayers that are being said by each**
10 **individual member but to say that no one has to**
11 **participate or agree with, and each board member is**
12 **independently praying according to their belief. This**
13 **isn't a prayer that I would particularly pray myself.**
14 **Again, there is a couple things in it that I wouldn't**
15 **say, but I can understand why some would.**
16    Q. What parts of it would you not say?
17    **A. Is that important?**
18    Q. Yes.
19    **A. Probably -- I probably -- I personally**
20 **probably would not say we pray that you direct**
21 **them from -- "eventually the truth that comes from**
22 **knowing Jesus." I would not feel the need personally**
23 **to put that in there, but I wouldn't be offended if**
24 **someone else did, because I would assume that that's**

Page 139

1 **how they felt led to pray.**
2    Q. In performing your work as a board member,
3 are you functioning as a government individual or a
4 private citizen? Sorry, let me ask the question
5 again.
6       In performing your work as a school board
7 member, are you functioning as a government official
8 or as a private citizen?
9    **A. I feel that I am performing as a government**
10 **official and a private -- Well, not a private citizen,**
11 **but as a citizen representing that district.**
12    Q. Again, a government official representing the
13 district?
14    **A. Yes.**
15    Q. And, as I understood your earlier answer
16 about the disclaimer, I take it that you view the
17 disclaimer as having a different and independent
18 function from paragraph three of your policy?
19    **A. (Nodding head)**
20    Q. The disclaimer is intended to tell people in
21 the public that they don't have to participate if they
22 don't want to and that the prayer is only among the
23 board members?
24    **A. That's how I view it, yes.**

Page 140

1    Q. Paragraph three is intended to impose some
2 limitations on what the board members should say, even
3 though it's just among the board members?
4    **A. Yes.**
5    Q. Okay. And I asked you some questions before
6 lunch of the opportunity not to participate that the
7 disclaimer puts people in the public on notice of.
8 Are you with me on that?
9    **A. (Nodding head)**
10    Q. And what I want to get at is how can people
11 not participate? Is your thought that most people who
12 didn't want to participate just would not participate
13 simply by remaining silent and sitting in the meeting?
14    **A. Well, I wouldn't expect them to be**
15 **disruptive, but they could get up and leave; they**
16 **could quietly whisper to a friend; they could do**
17 **whatever they wanted to. They don't have to sit there**
18 **and listen intently to what's being said.**
19    Q. So one way not to participate would be simply
20 not pay attention?
21    **A. Yes.**
22    Q. A second way would be affirmatively to get up
23 and walk out of the room?
24    **A. Yes.**

Page 141

1    Q. And I asked you the question about whether
2 you thought walking out of an Indian River School
3 Board meeting in order to show that you are not
4 participating in the prayer would require some
5 courage. And you said, I think, "Not necessarily. I
6 personally have walked out of things" that you didn't
7 approve of?
8    **A. Right.**
9    Q. And you gave me the example of a movie?
10    **A. Yes.**
11    Q. And that was when you are, I assume, an
12 adult?
13    **A. Yes.**
14    Q. Do you think that walking out of a movie
15 requires the same kind of courage as walking out of an
16 Indian River School Board meeting when a prayer is
17 offered?
18    **A. I think probably walking out of a movie might**
19 **even be harder, because at a school board meeting**
20 **people are constantly coming and going in and out of**
21 **the room. It isn't something that would stand out, as**
22 **people are always moving around using the restroom,**
23 **whatever, but you are in the middle of a movie that's**
24 **intense and something bad happens and someone gets up**

36 (Pages 138 to 141)

Dobrich, et al.                                v.                Indian River School District, et al.
Donna Mitchell                          Case No. 15-120                        October 16, 2006

Page 142

1    and walks out.
2        Q.  People are moving in and out during the
3    invocation?
4        A.  Sometimes in the back of the room you have
5    people moving around.
6        Q.  Do you think that if someone, if Mr. Bireley
7    gave the disclaimer and someone stood up at the
8    conclusion of the disclaimer and walked out of the
9    room, that most people in the room would understand
10   that that person was declining to participate in the
11   prayer?
12       A.  I don't know what most people would think. I
13   can't speak for other people. If they got up and said
14   something and walked out, you would know, but, if they
15   didn't, you wouldn't know.
16       Q.  School board meetings are open to the public;
17   is that right?
18       A.  Yes.
19       Q.  And students attend those meetings; correct?
20       A.  Yes.
21       Q.  I understand from some of the others'
22   testimony that there may be meetings, particularly
23   during the summertime, when there are not students
24   present?

Page 143

1        A.  Yes.
2        Q.  But is it correct that at most of your
3    meetings students are present?
4        A.  A few, to receive awards.
5        Q.  Students are also present to participate in
6    the presentation of the colors?
7        A.  Yes, sometimes they are there, sometimes they
8    walk in late, but they could be, yes.
9        Q.  Well, the presentation of colors takes place
10   at the beginning of a meeting, doesn't it?
11       A.  Right.
12       Q.  And so those JROTC students are present at
13   meetings?
14       A.  Oh, yes, they are, yes.
15       Q.  And that's by invitation of the board;
16   correct, the JROTC?
17       A.  I assume it is.
18       Q.  The students who are invited to receive
19   awards from the board, those are invited to do so by
20   the board?
21       A.  By the district office.
22       Q.  At the board's instruction?
23       A.  Yes, uh-huh.
24       Q.  Do the awards that are given cut across all

Page 144

1    of the school levels, that is are there high school
2    students, middle school students, and elementary
3    school students?
4        A.  There can be. I don't think there is any,
5    anything that says any particular age isn't invited.
6    Usually it's the older kids, usually, from what I have
7    observed.
8        Q.  Can you recollect instances in which
9    elementary school kids have gotten awards?
10       A.  Nothing in particular. The ones that stand
11   out more in my mind are middle school, high school. A
12   lot of times teachers are receiving awards for
13   specific things that have happened in the schools.
14   But usually when students come it has usually been
15   middle school or high school kids.
16       Q.  And middle school is what, fourth grade or
17   fifth grade kids?
18       A.  No, they are sixth, seventh and eighth, and
19   they are in and out.
20       Q.  The awards are given early in the board
21   meeting; correct?
22       A.  Yes.
23       Q.  So the students who want to get there for the
24   awards get there for the first part of the meeting?

Page 145

1        A.  Mostly.
2        Q.  At the meeting at which you gave the prayer
3    that you gave, were there students present?
4        A.  I don't remember.
5        Q.  From your perspective as a board member and
6    your assessment of the legality of what you, as board
7    members, are doing in offering the prayer, it doesn't
8    matter whether there are students present at the
9    meeting, does it?
10       A.  It doesn't have anything to do with the
11   students.
12       Q.  And I guess, to expand that, it not only
13   don't have anything to do with the students, it
14   doesn't have anything to do with anybody in the
15   public. It has only to do with the ten board members.
16   Correct?
17       A.  Directly, yes.
18       Q.  Is it supposed to have some indirect impact
19   on the people in the public?
20       A.  Well, you know, the prayer may be lifted for
21   the school bus drivers or the teachers or the
22   students, you know, however the person feels led to
23   pray. If they are praying for the school district in
24   the meeting, they may choose to include them in their

37 (Pages 142 to 145)

Dobrich, et al.                                    v.                    Indian River School District, et al.
Donna Mitchell                          Case No. 15-120                              October 16, 2006

Page 146

1   prayer.
2       Q.   And then it would be directed to those
3   students?
4       A.   Not to them, on behalf, for them.
5       Q.   Well, is the prayer intended to be directed
6   to the public or not?
7       A.   No.
8       Q.   Okay. And from the perspective of the board
9   members, it doesn't matter whether there is anyone
10  there or not; correct?
11      A.   Yes.
12      Q.   Yes, it doesn't matter?
13      A.   Yes, it doesn't matter. I'm sorry. We would
14  have the prayer if no one was in the audience.
15      Q.   I assume so, because you would still have the
16  people that the prayer was being offered for; correct?
17      A.   The board members.
18      Q.   Correct.
19      A.   (Nodding head)
20      Q.   I asked you earlier about the August 24
21  meeting, the big meeting. When you got there, were
22  you able to find a seat in the room in which the board
23  members were seated?
24      A.   Yes.

Page 147

1       Q.   Did you get there early on purpose?
2       A.   No, it wasn't early, and I had a hard time
3   getting a seat.
4       Q.   Do you recall whom you sat with?
5       A.   It was a whole group of people.
6       Q.   From?
7       A.   The whole community.
8       Q.   You weren't sitting with any particular group
9   of people?
10      A.   No.
11      Q.   And when I say you sat in the room with the
12  board members, you did not sit in the overflow room;
13  correct?
14      A.   No.
15      Q.   So you were able to watch the speakers at the
16  podium?
17      A.   Yes.
18      Q.   In person?
19      A.   Uh-huh.
20      Q.   Did you have the sense that the atmosphere in
21  the meeting was charged emotionally?
22      A.   It was tense.
23      Q.   We had testimony last week that there were,
24  that the conduct at times was unruly. Would you agree

Page 148

1   with that?
2       A.   I didn't see it unruly.
3       Q.   Raucous? I am using words that came out of
4   the transcripts last week.
5       A.   I wouldn't say raucous. I didn't see
6   raucous. I saw concern, a great deal of concern.
7       Q.   Concern from the people who were concerned
8   that the board would abandon its policy?
9       A.   Concern over the issues.
10      Q.   During the public comment section of the
11  meeting, did you observe the individual speakers as
12  they made their way to the podium?
13      A.   I saw the back of them as they were up there,
14  because I was toward the back of the room.
15      Q.   Could you hear what they had to say?
16      A.   Most of what they had to say.
17      Q.   Was it your view that the public comments
18  were respectful to the Dobrich family?
19      A.   I felt they were.
20      Q.   And I take it, then, that you thought that
21  the speakers were courteous to the Dobrich family?
22      A.   Yes, I think overall they were.
23      Q.   When you say overall, were some of the
24  comments less than courteous and respectful?

Page 149

1       A.   Not towards the Dobrich family. I was quite
2   impressed that quite a few of the speakers, before
3   they began speaking after people representing the
4   Dobriches had said some negative things about how they
5   had been treated, I was impressed that people would
6   get up and turn to the Dobrich family before they
7   spoke and said, "If some of these things happened to
8   you, I am so sorry that was," you know, but they went
9   on to speak how they felt about the issue. They were
10  being courteous to the Dobrich family. I did not
11  personally see anyone being mean spirited to the
12  Dobrich family.
13      Q.   So, from your perspective in the audience,
14  you saw nothing that you viewed as threatening either
15  implicitly or explicitly to the Dobrich family?
16      A.   No.
17      Q.   Do you recall a discussion of the
18  disappearance of Madalyn Murray O'Hair?
19      A.   I don't remember that ever being addressed.
20      Q.   Do you know who Harold Johnson is?
21      A.   I think he was a school board member at one
22  time.
23      Q.   He was?
24      A.   I don't know him. I just recognize the name.

38 (Pages 146 to 149)

Dobrich, et al.                                v.                    Indian River School District, et al.
Donna Mitchell                          Case No. 15-120                          October 16, 2006

Page 150

1    Q.   Okay.  You said you were sitting in the back?
2    A.   Towards the back.
3    Q.   Toward the back?
4    A.   The place was packed.  I mean it was just
5    packed, and I was kind of sitting in the middle of a
6    group close to the back, so you couldn't hear
7    everything that was being said, and there is lots of
8    talking going on around you, so you are trying to
9    listen.  I am sure I didn't hear everything that was
10   said, but I heard much of what was said.
11   Q.   Well, so let me just cut through this,
12   because I can save a lot of time.
13   A.   Okay.
14   Q.   You don't recall any discussion of Madalyn
15   Murray O'Hair or her disappearance during the board
16   meeting?
17   A.   No, I don't remember hearing anything like
18   that.
19   Q.   Okay, did you hear at anytime cat calls from
20   the audience directed to the Dobrich family?
21   A.   Not that I remember no.
22   Q.   Or jeers?
23   A.   No.
24   Q.   Or boos?

Page 151

1    A.   I might have heard some people in there that
2    were upset over what they were, of the subject, but I
3    never heard cat calls or, you know, things like that
4    being loudly directed at the Dobrich family.  I don't
5    remember it.  It was a lot of talking.  It was loud.
6    It was a lot of, lot of people that were packed into a
7    very small space.
8    Q.   Did you hear a lot of people saying amen
9    throughout the public commentary portion of the
10   meeting?
11   A.   I heard some.  There were church groups that
12   were there, and I did hear some.
13   Q.   Oh, I forgot to ask you when I asked about
14   students at the meeting.  There is a regular agenda
15   item for student government representatives to address
16   the board, isn't there?
17   A.   Yes.
18   Q.   In at least most of the meetings during the
19   academic school year someone from the student
20   government does address the board; correct?
21   A.   Yes.
22   Q.   And that's, it's on the agenda, it's by
23   invitation of the board; correct?
24   A.   Right.

Page 152

1    Q.   As I understand it, that's something that one
2    of the board members — Well, you don't know that.
3    Never mind.  Do you find the student government
4    representatives' comments to the board useful?
5    A.   I like it.  They share all the positive
6    things that are going on in the schools.
7    Q.   Is it your understanding that students who
8    are invited to attend the board meetings take those
9    invitations seriously?
10   A.   To be quite honest with you, I don't think
11   they do.  They come to get their award and they leave,
12   or some don't show up at all.  Some do take it
13   serious, but I don't think — You know, if they can't
14   come, a lot of them are at sporting events or various
15   reasons.
16        I don't think it's something that, when they
17   get it, it's like an invitation to go see the
18   president or something.  It's not a real serious
19   thing, you know.
20        That's my honest opinion of how they view it.
21   They are sitting their laughing and chatting, the ones
22   that come, most of them, and then they come up and get
23   their award and their picture taken and out they go.
24   Q.   The color guards from JROTC, they take it

Page 153

1    seriously, don't they?
2    A.   Yes, very respectful.
3    Q.   And the student government people the same;
4    correct?
5    A.   Some do and some don't.  Some are very witty
6    and fun, and I don't think they are super serious.
7    Q.   I think I discerned the answer to this
8    question from an earlier answer, but is it correct
9    that you do not know who the Does are?
10   A.   No, I do not know them.
11   Q.   Okay, turn back to the policy, itself, and I
12   am now looking at paragraph five of the policy.  This
13   section reads, "Any such prayers may be sectarian or
14   non-sectarian, denominational or nondenominational, in
15   the name of the supreme being, Jehovah, Jesus Christ,
16   Buddha, Allah, or any other person or entity, all in
17   accord with the freedom of conscience, speech, and
18   religion of the individual board member and his or her
19   particular heritage."
20        As a board member who implements this policy,
21   what does sectarian mean to you?
22   A.   I am not sure what the definition would be.
23   I assume that it is a formal or associated with a
24   denomination, or I can't honestly tell you exactly

39 (Pages 150 to 153)

Dobrich, et al.                                        v.                    Indian River School District, et al.
Donna Mitchell                              Case No. 15-120                              October 16, 2006

Page 154

1   what it means.
2       Q.  Has there ever been any discussion at the
3   board level about what sectarian or non-sectarian
4   means?
5       A.  No, not since I have been there.
6       Q.  As a board member responsible for
7   implementing this policy, what is your understanding
8   of what denominational means?
9       A.  Well, within each religion there can be
10  different denominations.  Just like within
11  Christianity there are many denominations, Methodist,
12  Baptist, Presbyterian.
13      Q.  And so a prayer cannot reference the
14  particular denomination of the give of the prayer or
15  reference it?
16      A.  I think number five is saying that you can
17  offer the prayer in whatever way you feel led
18  according to how you believe.
19      Q.  Okay, so five is essentially saying
20  affirmatively that you can offer any prayer you want,
21  any prayer that you are led to give, subject to the
22  constraints of paragraph three?
23      A.  Yes.  That's how I view it.
24      Q.  Okay.  Is there any difference between a

Page 155

1   sectarian prayer and a prayer that proselytizes, as
2   you understand it?
3       A.  Proselytizing is a whole different area, in
4   my opinion.  Proselytizing would be to try to go out
5   and convert somebody to your way of thinking, your
6   religion.
7       Q.  Sectarian merely states what your religion
8   is?
9       A.  Right.
10      Q.  A couple of practical questions in the
11  leaving-the-room issue.  If a person felt the need to
12  leave the room in order not to participate in the
13  prayer, how would that person know when he should
14  return to the meeting room in order to participate in
15  the rest of the meeting?
16      A.  I would assume an if they stepped out because
17  of the prayer issue, they would just stand outside the
18  door because they know it's over very quickly.
19      Q.  And just kind of cock one ear to what's being
20  said?
21      A.  I don't know how they would know when to
22  return.  They would know that it would only be for a
23  couple minutes.  It's a big room and a large hall
24  outside of the room.

Page 156

1       Q.  And so --
2       A.  If they stepped out in the hall, they could
3   watch into the meeting, if they chose, and would see
4   when it was over.
5       Q.  Do you think it would be difficult for a
6   middle school student who didn't want to participate
7   in the prayer to get up and leave the room?
8       A.  I can't speak for those students.  For my
9   kids it wouldn't have been if they felt offended.  I
10  suppose that depends on the personality of the child.
11      Q.  And I don't mean to suggest that one is
12  necessarily offended by the prayer.  It might simply
13  be that one affirmatively does not want to participate
14  in the prayer, it's not what the individual believes,
15  and so the individual is not offended by it but simply
16  doesn't want to participate.
17          Do you think it would be hard for a middle
18  school student to stand up in the middle of a meeting
19  and walk out of the room at the point in time when the
20  prayer is given?
21      A.  I can't speak for other people.  I think
22  young people today are quite bold, and I think they
23  are not as inhibited as you may think.  I don't know.
24  I can't speak for them.  It all depends on the person.

Page 157

1       Q.  Some might be intimidated?
2       A.  Some might.
3       Q.  Some might not?
4       A.  That's right.
5       Q.  A couple of practical questions on the
6   rotation in paragraph two.  Is it correct that the way
7   this rotation is set up, that unless all ten board
8   members choose not to exercise the opportunity, every
9   board meeting will be opened with a prayer or a moment
10  of silence?
11      A.  Would you repeat that?
12      Q.  I am going do repeat it in a minute, but
13  let's just look at paragraph two first.  You will see
14  that "if the member," and this is the second sentence
15  of the rotation, this is the mechanism of the
16  procedure.  "If the member chooses not to exercise
17  this opportunity, the next member in rotation shall
18  have the opportunity."
19          And I presume that if that person declined
20  that it would go to the next member in the rotation;
21  right?
22      A.  Right.
23      Q.  So is it correct that the way this is set up,
24  that unless all ten members choose not to exercise the

40 (Pages 154 to 157)

Dobrich, et al.
Donna Mitchell

v.

Case No. 15-120

Indian River School District, et al.
October 16, 2006

Page 158

1  opportunity, the board will open its meeting with a
2  prayer or a moment of silence?
3      A.  Yes.
4      Q.  Okay.  This follows up on the testimony you
5  gave me that if the board members changed the policy
6  to provide for the offering of prayer for guidance
7  outside of the formal meeting, they would be voted out
8  of office.
9          Do you believe that anyone could be elected
10  to the Board of Education of the Indian River School
11  District who publicly opposed opening the school board
12  meetings with a prayer?
13      A.  I suppose it's possible.  I don't know.
14      Q.  We all frequently say things like "All things
15  are possible."  Do you think it's likely that anyone
16  could be elected to the board who publicly opposed
17  school board prayer?
18      A.  I can only speak for the people in my
19  district and the people in the community that I know.
20      Q.  Yes, ma'am.
21      A.  They would not be.
22      Q.  Have you ever heard any candidate for the
23  school board, whether successful or unsuccessful,
24  campaign on the proposition that a vote for them was a

Page 160

1      Q.  Or that, or any candidate campaign on the
2  notion that the candidate will stand up to the ACLU?
3      A.  I can't point to a specific time that I have
4  read or actually heard that.  The ACLU is not popular
5  in this area.  That's just a given.
6      Q.  Why is it a given?
7      A.  Well, I think many of the people in the
8  community feel that the ACLU oftentimes stands for
9  things that go against traditional values that they
10  hold dear, and that troubles them and worries them.
11      Q.  What do you mean by traditional values that
12  they hold dear?
13      A.  Like the prayer issue.
14      Q.  The prayer issue being school board prayer or
15  prayer in schools generally?
16      A.  Prayer issue in general, I believe, including
17  the school board prayer.
18      Q.  Do you understand that this lawsuit is being
19  prosecuted by the ACLU?
20      A.  Yes.
21      Q.  And do your constituents view the ACLU as
22  anti-Christian?
23      A.  I believe most of them do, yes.
24      Q.  Do you view the ACLU as anti-Christian?

Page 159

1  vote for prayer and against the ACLU?
2      A.  Have I ever heard it or read it?
3      Q.  Yes.
4      A.  I don't know that I have read it.  I know
5  that when school board members are interviewed, when
6  they are going through the process of running for an
7  election, they are asked questions about where they
8  stand on issues, and I have heard two that have been
9  supportive, since I have been on there, of the prayer.
10      Q.  Who are they?
11      A.  Charlie Bireley and Nina Lou Bunting.
12      Q.  And did you hear them say in a public setting
13  in words or substance, "A vote for me is a vote for
14  school board prayer."?
15      A.  In a what kind of setting?
16      Q.  In a public setting?
17      A.  No.
18      Q.  Have you heard either of them say that in a
19  private setting?
20      A.  No.
21      Q.  Have you heard any candidate for a seat on
22  the school board say, "A vote for me is a vote against
23  the ACLU."?
24      A.  I haven't heard that, no.

Page 161

1      A.  I don't know enough about it to make that
2  determination.  I do feel some concern.
3      Q.  Do the constituents in your district share
4  your view that this lawsuit is being prosecuted by the
5  ACLU?
6      A.  I believe they do.
7      Q.  And I think this is the communicative
8  property word.  Is it, therefore, the case that your
9  constituents view the defense of this lawsuit as
10  promoting Christian values against the ACLU?
11      A.  Would you ask that again?
12      Q.  Do your constituents view the defense of this
13  lawsuit by the board and the district, the defense of
14  this lawsuit has a defensive Christian values against
15  the ACLU?
16      A.  I believe many of them do.
17      Q.  Do you feel that way?
18      A.  I am not sure.
19      Q.  What's the cause of your uncertainty?
20      A.  I am just not sure.  I believe the ACLU has
21  good intentions and they believe in what they are
22  doing, but I don't happen to agree with them on this
23  point.  I am not sure to what extent.  They do go
24  against the values that I hold dear.

41 (Pages 158 to 161)

Dobrich, et al.                          v.                    Indian River School District, et al.
Donna Mitchell                      Case No. 15-120                    October 16, 2006

Page 162

1    Q.  In any case, in your defense of this lawsuit
2   do you believe that you are defending Christian
3   values, setting the ACLU aside?
4           MR. GOSSELIN:  Objection.
5    A.  I believe that in this lawsuit I am defending
6   our right to do something which is legal, and it just
7   happens to at this point be prayer before school board
8   meetings.
9    Q.  Alright, so let me parse that.  The subject
10  matter of your defense happens to be something that
11  represents Christian values, but you would defend your
12  practice, as long as it's legal, whether it
13  represented Christian values or not?
14   A.  Yes.
15   Q.  Is that what you are saying?
16   A.  Yes, uh-huh.
17   Q.  Okay.  So that the answer to my earlier
18  question is yes, you do view the defense of this
19  lawsuit as a defense of Christian values, but that's
20  coincidental?
21   A.  Yes.
22   Q.  Is it your belief, Mrs. Mitchell, that a
23  school board member has a First Amendment freedom of
24  speech right to say whatever he or she wants?

Page 163

1           MR. GOSSELIN:  Objection.
2    A.  Would you repeat that?
3    Q.  Is it your view that a school board member
4   has a First Amendment freedom of speech right to say
5   whatever he or she wants?
6    A.  That depends on where it is and what it's
7   about.  I believe we all have to have some restraints
8   in some of the areas that we are in.
9    Q.  Okay.  Can we agree that private citizens
10  have the right under our constitution to worship as
11  they see fit?
12   A.  Yes.
13   Q.  And do you think there is any difference or
14  limitation on that right that flows from an
15  individual's service as a school board member?
16   A.  I feel more responsibility as a school board
17  member.
18   Q.  And why is that?
19   A.  Because I am representing other people.
20   Q.  And --
21   A.  And I have taken an oath to my office to
22  abide by the rules that I am given.
23   Q.  And does that responsibility impose any
24  restrictions or limitations on how you can exercise

Page 164

1   your religion while wearing your hat as a school board
2   member?
3    A.  Well, I wouldn't proselytize.
4    Q.  Whereas as a private citizen you could?
5    A.  I may.
6    Q.  Any other restrictions?
7    A.  I would have to think about that.  I really
8   can't think of anything in particular right now.  I
9   just feel the responsibility of the office, where I
10  would not have that if I were just a private citizen
11  attending school board meetings.  I am more sensitive
12  to others, how they may perceive things.
13   Q.  And that sensitivity to perception, do you
14  feel that sensitivity because as a school board member
15  you are serving as a representative government
16  official?
17   A.  Yes.
18   Q.  The answer to this may be no, but do you have
19  a view, yourself, as to whether your colleagues on the
20  board share that view, that sensitivity that flows
21  from their service as government officials?
22   A.  I can't answer for them.
23           MR. ALLINGHAM:  Alright, let's go off
24       the record for a minute.

Page 165

1           VIDEOGRAPHER:  Going off the record at
2       approximately 1:42 p.m.
3           (A recess was taken.)
4           VIDEOGRAPHER:  Back on the record at
5       1:46 p.m.
6   BY MR. ALLINGHAM:
7    Q.  A few more questions, and then I am done.
8   When you came into the big meeting, the August 24
9   meeting, was the atmosphere outside the meeting
10  emotionally charged, as well?
11   A.  When I came in, everybody was just pouring
12  into the meeting.  It was like a bottleneck.  I don't
13  remember a lot of talking and stuff.  Everybody was in
14  a hurry to get in because they knew the seating was
15  limited.  That's what I remember, the rush to get in.
16   Q.  Were people carrying signs?
17   A.  There might have been a few signs out there.
18  I don't really remember that.
19   Q.  Do you remember signs in the meeting, itself?
20   A.  If there were, I didn't pay attention to it.
21   Q.  Would you tell me what the basis is for your
22  belief that the ACLU is prosecuting this lawsuit?
23   A.  Because the ACLU is linked with the Dobrich
24  family and the lawsuit.

42 (Pages 162 to 165)

Dobrich, et al.
Donna Mitchell

v.
Case No. 15-120

Indian River School District, et al.
October 16, 2006

Page 166

1    Q. How?
2    A. I have seen it in the paperwork.
3    Q. What paperwork?
4    A. That has been given to me.
5    Q. What paperwork?
6    A. Forms. It's been discussed at meetings,
7    executive meetings. I have read it in the paper.
8    Q. Before you go to the next point, can you tell
9    me what forms or paperwork you mean that links the
10   ACLU to the Dobrich family?
11   A. Well, maybe there aren't formal forms. I
12   don't know. I just --
13   Q. I understand that it has been your
14   assumption, and I am just --
15   A. Right.
16   Q. -- trying to test where that assumption came
17   from, because assumptions don't --
18   A. Well, I have certainly seen it in writing in
19   the paper. It has been spoken of in the executive
20   meetings.
21   Q. Okay, before you go to the executive
22   meetings, in the newspaper what do you recall has been
23   said that led you to the believe that the ACLU was
24   prosecuting this lawsuit?

Page 167

1    A. Various statements about the Dobrich family,
2    the Doe family, who are represented by the ACLU,
3    statements like that.
4    Q. Have you ever asked any of your lawyers,
5    Mr. Balaguer, Mr. Cafferkey, Mr. Gosselin, anybody,
6    whether that fact, not advice about that, but whether
7    that fact is true, that the Dobriches and the Does are
8    represented by the ACLU?
9    A. No.
10   Q. Let me ask you this question: Does your
11   attitude toward this lawsuit, and I am now speaking
12   just to Mrs. Mitchell --
13   A. Okay.
14   Q. -- does your attitude toward this lawsuit, is
15   it affected in any way by whether the ACLU is
16   prosecuting this lawsuit?
17   A. Yes.
18   Q. Tell me how it would -- Tell me how it's
19   affected by that knowledge.
20   A. I feel concern that their funding is
21   limitless and they are using my tax dollars to
22   represent someone who is fighting against what I
23   believe in. That concerns me.
24   Q. Anything else?

Page 168

1    A. I know that there is a limitless amount of
2    lawyers and money there, which a small school district
3    does not have access to, so it's kind of like a David
4    and Goliath type of thing, could be perceived that
5    way. We have very limited funds. And, if that is
6    true, as I believe it is, we are going up against
7    someone with limitless funds. That's a concern.
8    Q. So it's not a matter of the ideological band
9    of the ACLU; it's simply a matter of resources?
10   A. Yes.
11   Q. Okay, so you would have a different view of
12   this lawsuit if it was your perception that the
13   Dobriches and Does were paying for their lawyers?
14   A. It would change my way of thinking about it,
15   yes.
16   Q. How would it change your way of thinking
17   about it?
18   A. Well, there wouldn't be that concern about
19   the limitless funds and the responsibility to the
20   school district and, you know, what could happen.
21   Q. How do you understand that the ACLU would be,
22   uses your tax dollars?
23   A. Well, I believe our taxes go into funding the
24   American Civil Liberties Union.

Page 169

1    Q. How do you understand that to be the case?
2    A. Aren't funds indirectly funded into those
3    organizations from our taxes?
4    Q. Those organizations being the ACLU?
5    A. Yeah.
6    Q. Well, I am not here to answer questions, but
7    I don't -- I wouldn't have thought so.
8    A. It's my understanding that it is, and I could
9    be wrong. They are certainly well funded, regardless.
10   Q. Have you ever had occasion to tell your
11   constituents that the ACLU is prosecuting this
12   lawsuit?
13   A. No.
14   Q. Have your constituents ever complained about
15   the ACLU prosecuting this lawsuit?
16   A. No.
17   Q. Or sticking their nose where they don't
18   belong?
19   A. There might have been a comment here or
20   there, but nothing in a formal meeting or --
21   Q. Oh, no, I wasn't suggesting a formal meeting.
22   I was talking about just comments from constituents.
23   A. Yes, I have had some comments.
24   Q. And how did you respond to those comments?

43 (Pages 166 to 169)

Dobrich, et al.
Donna Mitchell

v.
Case No. 15-120

Indian River School District, et al.
October 16, 2006

Page 170

1     A.  I try not to discuss the whole, anything to
2   do with the case with the constituents.  We have been
3   told to be quiet.
4           MR. ALLINGHAM:  I have no further
5     questions.  Thank you very much,
6     Mrs. Mitchell.
7           THE WITNESS:  Thank you.
8           VIDEOGRAPHER:  This deposition is
9     ending at approximately 1:55 p.m.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 171

1              CERTIFICATE
2          I, Lorena J. Hartnett, a Notary Public and
3   Registered Professional Reporter, do hereby certify
4   that the witness, DONNA MITCHELL, was by me first
5   duly sworn to testify the truth, the whole truth, and
6   nothing but the truth; that the foregoing deposition
7   was taken at the time and place stated herein; and
8   that the said deposition was recorded stenographically
9   by me and then reduced to typewriting under my
10  direction, and constitutes a true record of the
11  testimony given by said witness.
12          I further certify that the inspection,
13  reading and signing of said deposition was not waived
14  by counsel for the parties and by the witness.
15          I further certify that I am not a relative,
16  employee, or attorney of any of the parties or a
17  relative or employee of either counsel, and that I am
18  in no way interested directly or indirectly in this
19  action.
20          IN WITNESS WHEREOF, I have hereunto set my
21  hand and affixed my seal of office on this 20th day of
22  October 2006.
23
24          Cert. #134-RPR, Exp. 01-31-2008

44 (Pages 170 to 171)