Dobrich, et al.                                    v.                  Indian River School District, et al.
Dr. Mark A. Isaacs                        C.A. # 15-120 (JJF)                    October 18, 2006

                                                                              Page 1

```
 1           IN THE UNITED STATES DISTRICT COURT
 2               FOR THE DISTRICT OF DELAWARE
 3   MONA DOBRICH and MARCO      :  C.A. No. 15-120 (JJF)
     DOBRICH, Individually and  :
 4   as parents and next friend :
     of ALEXANDER DOBRICH,      :
 5   SAMANTHA DOBRICH, JANE DOE  :
     and JOHN DOE, Individually  :
 6   and as parents and next    :
     friend of JORDAN DOE and   :
 7   JAMIE DOE,                  :
                                 :
 8            Plaintiffs,        :
                                 :
 9            v.                 :
                                 :
10   INDIAN RIVER SCHOOL         :
     DISTRICT, et al.,           :
11                               :
              Defendants.        :
12                  .. .. .. .. .. ..
13           Videotaped Deposition of DR. MARK A. ISAACS,
     taken pursuant to notice, on Wednesday, October 18,
14   2006 at 1:36 p.m. at 31 Hosier Street, Selbyville,
     Delaware, reported by Lorena J. Hartnett, a Registered
15   Professional Reporter and Notary Public.
16                  .. .. .. .. .. ..
17   APPEARANCES:
18           THOMAS ALLINGHAM, ESQUIRE
             RICHARD HORVATH, ESQUIRE
19           BRIAN LENHARD, ESQUIRE
             One Rodney Square
20           Wilmington, DE  19801
                Attorney for the Plaintiff
21
22
23              WILCOX & FETZER
        1330 King Street - Wilmington, DE  19801
24                 (302) 655-0477
```

Dobrich, et al.                                v.                  Indian River School District, et al.
Dr. Mark A. Isaacs              C.A. # 15-120 (JJF)                        October 18, 2006

Page 2

1
2
3
4    APPEARANCES: (CONTINUED)
5        JARROD SHAU, ESQUIRE
         Drinker, Biddle & Reath, LLP
6        One Logan Square
         18th and Cherry Streets
7        Philadelphia, PA  19103-6996
             Attorney for the Defendants
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 3

1
2
3
4            TABLE OF CONTENTS
5    TESTIMONY OF DR. MARK A. ISAACS:
6      Direct Examination by Mr. Allingham. . . . . . 3
7    Certificate of Reporter . . . . . . . . . . . . 73
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 4

1          VIDEOGRAPHER:  This is the videotaped
2    deposition of Dr. Mark A. Isaacs, taken by
3    the plaintiff in the matter of Dobrich et
4    al. versus Indian River School District, et
5    al.. Civil Action Number 15-120.  The
6    deposition is taking place at 31 Hosier
7    Boulevard in Selbyville, Delaware, on
8    October 18, 2006 at approximately 1:36 p.m.
9          The court reporter is Lorena Hartnett
10   from the firm of Wilcox & Fetzer.  My name
11   is Mark Buckmaster, a video specialist from
12   Discovery Video Services Incorporated in
13   association with Wilcox & Fetzer.  Counsel
14   will now introduce themselves and the
15   reporter will swear in the witness.
16         MR. ALLINGHAM:  Tom Allingham
17   representing the plaintiffs.  With me is
18   Brian Lenhard and Richard Horvath.
19         MR. SHAU:  Jarrod Shau representing
20   the defendants.
21          DR. MARK A. ISAACS,
22   HAVING FIRST BEEN DULY SWORN, TESTIFIED AS FOLLOWS:
23   DIRECT EXAMINATION ON BEHALF OF THE PLAINTIFFS
24   BY MR. ALLINGHAM:

Page 5

1    Q.  All the other witnesses so far have referred
2    to you as Dr. Isaacs.  Is that how you prefer to be
3    addressed?
4    A.  Mark.
5    Q.  Mark?  Well, I can't do that, so I will call
6    you Dr. Isaacs, unless Mr. is preferable?
7    A.  No, that's fine.
8    Q.  When were you elected to the Indian River
9    School Board?
10   A.  You would think that would be simple.  About
11   three and a half years ago I actually filled in for
12   Joe Booth, who was elected representative.
13   Q.  So --
14   A.  It's over three years.
15   Q.  So spring of 2003, roughly speaking?
16   A.  I think so.
17   Q.  Were you appointed or elected?
18   A.  I was appointed.
19   Q.  Did you interview for the position when you
20   were appointed?
21   A.  To be honest, I do not recall.  I think I
22   attended the board meeting and -- I honestly don't
23   remember.
24   Q.  Dr. Isaacs, where do you live?

2 (Pages 2 to 5)

Wilcox & Fetzer, Ltd.           Professional Court Reporters              (302)655-0477

Dobrich, et al.                                    v.                    Indian River School District, et al.
Dr. Mark A. Isaacs                      C.A. # 15-120 (JJF)                        October 18, 2006

Page 6

1    A.  Georgetown, Delaware.
2    Q.  What's the address?
3    A.  16043 Clemson Lane.
4    Q.  Have you been a lifelong resident of Sussex
5    County?
6    A.  Yes.
7    Q.  Did you attend the Indian River schools?
8    A.  Yes.
9    Q.  Which high school did you graduate from?
10   A.  Sussex Central.
11   Q.  Would you describe for me your education
12   after high school?
13   A.  I attended Clemson University where I
14   obtained a bachelor's and a master's degree, and then
15   got a Ph.D. from Virginia Tech.
16   Q.  What was your master's in?
17   A.  Master's in plant science physiology.
18   Q.  And your Ph.D.?
19   A.  Plant physiology.
20   Q.  Are you currently employed?
21   A.  Yes.
22   Q.  As what?
23   A.  Director of the University of Delaware
24   Research and Education Center.

Page 7

1    Q.  Where is that located?
2    A.  Georgetown.
3    Q.  Research and --
4    A.  Education Center.
5    Q.  -- education as to what?
6    A.  Cooperative extension, doing agricultural
7    research, teach.  I also teach.
8    Q.  How long have you had that position?
9    A.  Since '91.  I have been with the University
10   for 20 years, but I have been the director there since
11   '91.
12   Q.  And when did you get your Ph.D.?
13   A.  2000.
14   Q.  Have you spoken with anyone who has already
15   been deposed in this matter?
16   A.  No.
17   Q.  What did you do to prepare for the
18   deposition?
19   A.  Nothing other than have a meeting last night
20   with Jason.
21   Q.  Did that meeting take place down here?
22   A.  No.
23   Q.  Where did it take place?
24   A.  Sussex Central High School.

Page 8

1    Q.  Was anyone else present during the meeting?
2    A.  No.
3    Q.  Did Mr. Gosselin show you any documents?
4    A.  No, not really.
5    Q.  In connection with this litigation, the
6    plaintiff's side provided to the defendant's side
7    something called a production request, which is a
8    process by which litigants ask the other side for
9    documents described in the request.
10        Have you ever seen or been told about a
11   production request for documents from the plaintiff's
12   side?
13   A.  No.
14   Q.  Have you ever been asked by anyone to collect
15   documents that are relevant to the issues in this
16   case?
17   A.  I do remember if we had any e-mail
18   correspondence or anything like that regarding
19   anything, that we were supposed to forward that
20   information over, but I had none.
21   Q.  Do you maintain an e-mail account or
22   accounts?
23   A.  Yes, I have e-mail.
24   Q.  And have you done so since the spring of

Page 9

1    2004?
2    A.  Yes, the University of Delaware e-mail.
3    Q.  Does the district communicate with you from
4    time to time via e-mail?
5    A.  Occasionally, not very often.
6    Q.  How did you search your -- How did you search
7    for e-mail correspondence relating to the issues in
8    this case when you were asked to do so?
9    A.  I didn't have any.
10   Q.  How did you know?
11   A.  Because I know.  I read my e-mail.
12   Q.  So you had an affirmative recollection that
13   you had had no communications from anyone --
14   A.  Right.
15   Q.  -- relating to the issues in this case via
16   e-mail?
17   A.  Right.
18   Q.  On the rare occasions when you are
19   communicated with via e-mail from the district, what
20   are the topics?
21   A.  Mainly not from the school.  Mainly from say
22   booster club members, parent advisory groups.
23   Probably the most recent was one of the field hockey
24   boosters asking about conditions of the field.

3 (Pages 6 to 9)

Dobrich, et al.                                v.                    Indian River School District, et al.
Dr. Mark A. Isaacs                    C.A. # 15-120 (JJF)                        October 18, 2006

Page 10

1    Q.  Do you know how those folks get your e-mail
2  addresses, or are they communications that are routed
3  through the district to you?
4    A.  No, no, not that I am aware of.
5    Q.  They are direct communications?
6    A.  Yes.
7    Q.  How do those folks get your e-mail address?
8    A.  Probably Google, I would speculate.
9    Q.  Did you get any e-mail communications from
10 anyone about the issue of school board prayer?
11   A.  No.
12   Q.  Did you get any faxes from anyone about
13 school board prayer?
14   A.  No.
15   Q.  Did you get any written communications of any
16 kind from anyone other than the district about school
17 board prayer?
18   A.  Would you repeat that?
19   Q.  Yes.  Did you get any written communications
20 of any kind from anyone other than the district?
21   A.  Just what we have gotten from lawyers.
22   Q.  All right.  So over the entire course of the
23 consideration and adoption of the school board prayer
24 policy, you received no written communications from

Page 11

1  any constituents on the issue?
2    A.  (Shaking head)
3    Q.  And no written communications of any kind
4  from a fellow board member?
5    A.  No.
6    Q.  Dr. Isaacs, what lawyers, and identify them
7  by name, if you can, did the board receive advice from
8  on the issue of school board prayer?
9    A.  The two gentlemen, and I'm sorry I cannot
10 tell you their names, but the two gentlemen that were
11 with the insurance company.
12   Q.  John Cafferkey and John Balaguer?
13   A.  Yes.
14   Q.  Who else?
15   A.  Thomas Neuberger was at one meeting.
16   Q.  And did you receive advice from Mr. Neuberger
17 at that meeting?
18   A.  No, not really.  He just sat there and took
19 everything in, the one that I was at.
20   Q.  Okay.  Do you have a recollection as to
21 whether that was a regular or a special meeting?
22   A.  No, I do not recall.
23   Q.  Do you have a recollection as to whether it
24 was an open session or executive session?

Page 12

1    A.  I would -- I don't recall.  I would probably
2  say executive.
3    Q.  Wherever it took place, your recollection is
4  that Mr. Neuberger was largely silent during that
5  meeting?
6    A.  Yes.
7    Q.  Did Mr. Neuberger during that meeting
8  distribute any materials to the board members?
9    A.  No.
10   Q.  Did Mr. Helms distribute any materials from
11 Mr. Neuberger?
12   A.  Not that I recall, no.
13   Q.  Did the board receive any advice from
14 Mr. Griffin on issues relating to school board prayer,
15 James Griffin?
16   A.  Yes, yes, we had.
17   Q.  And Mr. Griffin was, at the time in the
18 summer of 2004, the board's attorney; correct?
19   A.  Yes.
20   Q.  Mr. Griffin is no longer the board's
21 attorney; is that right?
22   A.  I don't know.  I am not on the board now.
23   Q.  Up until the time you left the board,
24 Mr. Griffin had remained the board's attorney?

Page 13

1    A.  Yes, but there were times where we seeked
2  additional information.
3    Q.  And when did you leave the board?
4    A.  July.
5    Q.  Am I correct that you were on the Policy
6  Committee while you were on the board?
7    A.  Yes.
8    Q.  Why did you decide to serve on the school
9  board?
10   A.  Well, I had two young children, one five and
11 one ten, and one that is in the Indian River School
12 District.  At that time the middle school son was
13 not -- He went to the elementary school.  Primarily to
14 be able to help shape the district, if my kids so
15 chose to go, I guess.
16   Q.  And why did you choose not to run for a seat
17 again in 2006?
18   A.  Very, very demanding time wise.  If you look,
19 when you asked the question about the Policy
20 Committee, I was on there, but I bet if you go back
21 and look at the minutes, I don't think I might have
22 attended four or five policy meetings my entire term
23 there.
24       Not only do I work for the University of

4 (Pages 10 to 13)

Dobrich, et al.                                          v.                    Indian River School District, et al.
Dr. Mark A. Isaacs                              C.A. # 15-120 (JJF)                              October 18, 2006

Page 14

1  **Delaware, but I also farm; I have graduate students;**
2  **and, quite honestly, I didn't feel like I was**
3  **fulfilling the time commitment that I needed to devote**
4  **to the board, so I just elected to not -- I had too**
5  **many pots on too many stoves.**
6      Q.  Which district within Indian River District
7  did you represent?
8      **A.  One.**
9      Q.  Is that a northern district or a southern
10  district?
11      **A.  I guess it depends on -- I don't really**
12  **divide the district, you know, but.**
13      Q.  I don't ask that question with any particular
14  agenda in mind.  We have had testimony from several of
15  your former colleagues that the district is widely
16  perceived as having a southern half and a northern
17  half?
18      **A.  Correct.**
19      Q.  In which half does the first district fall?
20      **A.  Northern.**
21      Q.  During your time on the Policy Committee, who
22  else served on that committee?  And let's start with
23  board members, and then if you can recall non-board
24  members.

Page 15

1      **A.  Mr. Harvey -- I think it was just Mr. Harvey**
2  **Walls and myself as far as board members.  And then**
3  **Dr. Bunting was there.  Usually Dr. Owens.**
4      Q.  First name?
5      **A.  Michael, Dr. Michael Owens.  The IREA rep,**
6  **which --**
7      Q.  IREA stands for Education Association?
8      **A.  Yes.**
9      Q.  Anyone else?
10      **A.  Assistant superintendent.**
11      Q.  That's Mr. Savage?
12      **A.  Yes.  I think that was it.**
13      Q.  Did the Policy Committee meet monthly?
14      **A.  Yes.**
15      Q.  I know that it was an estimate, but you
16  estimated you attended maybe only five or six Policy
17  Committee meetings during your tenure?
18      **A.  That's probably generous.**
19      Q.  Fine.  When you missed a meeting, how did you
20  keep informed about what had been addressed or
21  accomplished?
22      **A.  At the board meetings.**
23      Q.  By talking to Mr. Walls at the board meeting?
24      **A.  Yes, and then usually at each board meeting**

Page 16

1  **there is an opportunity where each subcommittee of the**
2  **board presents to the board an update on what's taken**
3  **place, so in Harvey's case he would say, you know, the**
4  **Policy Committee meeting, blah, blah, blah, so forth.**
5      Q.  Did you have separate conversations from time
6  to time with Mr. Walls on that topic?
7      **A.  If I did, it was very minute, I would say**
8  **most of my information came from the board meeting.**
9      Q.  When you were a board member, did you keep a
10  file of documents that related to your service as a
11  board member?
12      **A.  Yes, and no.  We would get a board packet,**
13  **and I would keep it for maybe two or three months, and**
14  **then dispose of it just because, quite frankly, you**
15  **didn't have the space to store it.**
16      Q.  Did you take notes at board meetings?
17      **A.  No.**
18      Q.  Did the board ever receive advice from the
19  Alliance Defense Fund?
20      **A.  I do not remember any advice.  I do remember**
21  **there was discussions regarding talking to them, but I**
22  **don't remember any advice coming.**
23      Q.  Did the board ever retain the Alliance
24  Defense Fund or any of its affiliated attorneys?

Page 17

1      **A.  Not that I am -- Not that I am aware of.**
2      Q.  Let me show you a document we have marked as
3  Plaintiff's Exhibit 3.  I don't know if you have been
4  deposed before, but we mark the documents so that you
5  can then retrace the steps.
6      **A.  Right, right, sure.**
7      Q.  My first question to you is have you ever
8  seen this document before?
9      **A.  Yes.  This was what I was referencing, any**
10  **information that was needed.  Right.**
11      Q.  And what did you do to ensure that you
12  preserved any documents that were relative to the
13  issues in this case?
14      **A.  Really, nothing, because I did not have any**
15  **communications with anybody regarding it.**
16      Q.  I will have that back, please.
17      **A.  (Handing back)**
18      Q.  This is, and actually let's mark -- Let's
19  mark as PX58, BPD497.
20          (Exhibit PX58 was marked.)
21  BY MR. ALLINGHAM:
22      Q.  Mr. Isaacs, the court reporter has handed you
23  what we have marked as PX58.  This is a letter from
24  Nathan Kellam on Alliance Defense Fund letterhead,

5 (Pages 14 to 17)

Dobrich, et al.                          v.                    Indian River School District, et al.
Dr. Mark A. Isaacs              C.A. # 15-120 (JJF)                        October 18, 2006

Page 18

1    which has a copy marked to the Board of Education of
2    the Indian River School District. My first question
3    is have you ever seen this document before?
4        **A. I don't remember seeing this, no.**
5        Q.   The first sentence of the letter, which is
6    addressed to me, reads, "Please know that this office
7    has been retained by the Board of Education for Indian
8    River School District regarding any possible challenge
9    to policies on," among other things, "board prayer at
10   regular board meetings." Do you see that?
11       **A. Yes, sir.**
12       Q.   Was the Alliance Defense Fund retained by the
13   Board of Education for the Indian River School
14   District for that purpose?
15       **A. I would assume so with this, yes.**
16       Q.   Apart from having seen that document, did you
17   have any recollection that the board had retained the
18   Alliance Defense Fund or Mr. Kellam for this purpose?
19       **A. No.**
20       Q.   Did Mr. Kellam or any representative of the
21   Alliance Defense Fund ever appear at a board meeting
22   while you were serving as a board member?
23       **A. I don't recall any, but I also missed a**
24   **number of board meetings, as well.**

Page 19

1        Q.   Thank you. Are you a churchgoer, Dr. Isaacs?
2        **A. No, sir.**
3        Q.   Are you a member of any particular religious
4    faith?
5        **A. If you go back to childhood, yes.**
6        Q.   And what would that be?
7        **A. Methodist.**
8        Q.   Would you characterize yourself as a
9    Christian?
10       **A. Yes, I would hope, hope so.**
11       Q.   There was a board meeting on October 24, 2004
12   which we have characterized as the big board meeting.
13   It's the one where hundreds of people showed up to
14   talk about the school board prayer issue. Do you
15   remember that meeting, August 24, 2004?
16       **A. Oh, August?**
17       Q.   Yes, sir.
18       **A. No, honestly I can't say I do remember it.**
19       Q.   I am going to show you what we have
20   previously marked as PX17. This is a copy, as you
21   will see from the signature of Mrs. Hobbs on the last
22   page, of the official minutes of the August 24, 2004
23   meeting of the board. This took place at the
24   Frankford Elementary School cafeteria.

Page 20

1        You will see that these are the official
2    minutes and this is obviously the signature. On the
3    first page of the minutes is the roll call section of
4    the minutes, and it records that you were present at
5    the meeting.
6        **A. Yes.**
7        Q.   Do you have any reason to doubt that you were
8    there?
9        **A. No.**
10       Q.   Whether it was on August 24 or some other
11   date, do you recall being present at a board meeting
12   at which hundreds and hundreds and hundreds of people
13   showed up?
14       **A. Yes.**
15       Q.   And do you recall that it took place at the
16   Frankford Elementary School?
17       **A. No.**
18       Q.   Okay. This is a meeting where an overflow
19   room had been set up and also speakers out in the
20   parking lot. Do you remember that?
21       **A. Yes.**
22       Q.   All right. When did you arrive at that
23   meeting, if you recall?
24       **A. I would say if it were normally, if it were**

Page 21

1    **normal, probably ten minutes prior to the start, I**
2    **mean.**
3        Q.   Did you know in advance of your arrival that
4    there would be a huge crowd at the meeting?
5        **A. No, not really.**
6        Q.   I take it, then, you were surprised when you
7    got there and there were speakers in the parking lot
8    and police cars and so forth?
9        **A. Yes, right.**
10       Q.   Do you recall that the -- Do you recall that
11   the school board prayer issue was discussed at that
12   meeting?
13       **A. No, I don't recall.**
14       Q.   I should have been more specific. I don't
15   mean discussed by the board. I mean the subject of
16   public comments during the meeting.
17       **A. Yes, yes.**
18       Q.   Do you recall that the public comment session
19   was expanded to accommodate more speakers?
20       **A. No, I don't recall that, but, if it was, it's**
21   **not atypical if there is a large overflow.**
22       Q.   Several witnesses have said that they
23   couldn't recall a meeting that was anywhere near this
24   size in terms of the attendance. Would you agree with

6 (Pages 18 to 21)

Dobrich, et al.                                    v.                   Indian River School District, et al.
Dr. Mark A. Isaacs                        C.A. # 15-120 (JJF)                      October 18, 2006

Page 22

1    that?
2       A.  Couldn't recall a meeting?
3       Q.  There were more people in attendance at this
4    meeting than any other that you recall?
5       A.  Yes, yes, yes.
6       Q.  By a factor of two or three; correct?
7       A.  I would say probably a good estimate.
8       Q.  Was the tone of the public remarks during
9    this meeting respectful and courteous at all times?
10      A.  From what I can recall, yes.
11      Q.  Do you recall that some speakers were loudly
12   cheered?
13      A.  No, but again that's not atypical either if
14   it's a heated subject matter.
15      Q.  Do you recall that some speakers were loudly
16   booed?
17      A.  No.
18      Q.  Do you recall the public responding
19   frequently with shouts of amen during speakers'
20   comments?
21      A.  No, I don't.
22      Q.  Do you recall being troubled by any of the
23   remarks offered at the public session?
24      A.  No.

Page 23

1       Q.  Other than the fact that there were a lot of
2    people in attendance, do you remember anything about
3    that meeting?
4       A.  No.
5       Q.  If you will look at page nine of the minutes
6    I just gave you, there is a separate public comment
7    session. The first public comment session is
8    reflected on page four. There is a second one on page
9    nine during which Pam Shockley and Colin Waters spoke.
10   Do you know either Ms. Shockley or Mr. Waters?
11      A.  No, sir.
12      Q.  Do you recall their comments during this
13   session?
14      A.  No.
15      Q.  The minutes record that, "Mr. Griffin noted
16   that according to the regulations of the State
17   Department of Education prayer must be student-issued
18   and student-led, and then President Walls explained
19   our procedures for establishing policy."
20          Do you recall what President Walls said in
21   explaining your procedures for establishing policy?
22      A.  No.
23      Q.  Tell me what the procedure was for
24   establishing policy. How were policies --

Page 24

1       A.  For a policy to be approved and implemented?
2       Q.  Yes.
3       A.  Um, normally it involved a Policy Committee
4    meeting. It would begin there. Actually, it would
5    begin by maybe an inquiry, if there was something that
6    needed to be looked at from the public's perspective.
7          It would be brought attention to the Policy
8    Committee. The Policy Committee would then usually
9    put together a first and second reading. It would
10   bring it to the board.
11         The board would discuss it, look at it, make
12   amendments to it, and then go back and there would be
13   a recommendation from the Policy Committee for
14   approval.
15      Q.  And was it typical for policies, for the
16   board to deliberate on the desirability of adopting a
17   policy in public session or in executive session or
18   both?
19      A.  I would say probably both.
20      Q.  As a board member, did you consider it
21   desirable for the public to have the opportunity to
22   see the board's deliberations on policies that were
23   proposed for adoption?
24      A.  I certainly didn't have a problem with it.

Page 25

1       Q.  Did the Policy Committee meet in public or in
2    private?
3       A.  The times I was present, it was in private --
4    Well, in private.
5       Q.  In the period of time that you were a board
6    member from 2003 to 2006, did the board customarily
7    open its regular meetings with a prayer?
8       A.  Yes.
9       Q.  Did the board customarily open its special
10   meetings with a prayer?
11      A.  I don't think so.
12      Q.  Is there any reason in terms of the
13   differences between regular meetings and special
14   meetings why, that you can see in your mind, why
15   regular meetings would be opened with a prayer but
16   special meetings would not?
17      A.  Tradition. For as long as I was a student,
18   even back when Sussex Central High School, board
19   meetings were always opened with a prayer, and I think
20   to bring -- Board meetings were at least more
21   formalized.
22      Q.  You mean regular ones as opposed to special
23   ones?
24      A.  Right, right, so the general board meetings

7 (Pages 22 to 25)

Dobrich, et al.                                          v.                    Indian River School District, et al.
Dr. Mark A. Isaacs                          C.A. # 15-120 (JJF)                          October 18, 2006

Page 26

1  opened to the, you know, to the public. The formal
2  monthly board meetings, the agendas were always
3  packed, so there was a lot to go through and to
4  preview and discuss, so I think it was just a part --
5  Kind of like the presenting of arms. That doesn't
6  take place at say a Policy Committee meeting or a
7  Bills and Grants meeting. It's kind of a formal part
8  of the board meeting, a tradition part, I guess.
9      Q.   When you became a board member, Mr. Walls was
10  the president; is that right?
11     A.   Yes.
12     Q.   Did Mr. Walls at anytime ask you whether you
13  wanted to be invited to open a meeting of the board
14  with a prayer?
15     A.   Yes.
16     Q.   And what did you tell him?
17     A.   I told him I chose not to.
18     Q.   Did he ask you that question as sort of a
19  general proposition when you first joined the board,
20  or did he offer you the opportunity from time to time
21  at board meetings to open the meeting with a prayer?
22     A.   I think the only discussion that we had that
23  I can recall is he asked me and I said I chose not to,
24  and I didn't get asked after that.

Page 27

1      Q.   And was that before or after the adoption of
2  the formal board prayer policy?
3      A.   Oh, that was in the very beginning before any
4  of this.
5      Q.   And, if you recall, did Mr. Walls ask you
6  that question at a board meeting or sometime outside
7  of the board meeting?
8      A.   I don't recall.
9      Q.   And why did you choose not to take up his
10  invitation to open the board meeting with a prayer?
11     A.   Personal preference.
12     Q.   Personal preference based on what?
13     A.   Based on I didn't want to do it.
14     Q.   Did you have any problem with other board
15  members doing it?
16     A.   No.
17     Q.   This question may seem odd, but were you glad
18  that -- Strike that. Did Mr. Walls ask you that
19  question publicly, or did he ask you privately before
20  the meeting began?
21     A.   I don't remember, honestly.
22     Q.   Do you remember being asked publicly at a
23  meeting, "Dr. Isaacs, would you like to offer a
24  prayer," and having to say, "No, thanks," in public?

Page 28

1      A.   No, I don't recall.
2      Q.   Do you think that it would potentially be
3  embarrassing or put you on the spot if Mr. Walls had
4  asked you that question at the public meeting, itself?
5      A.   No.
6      Q.   Is it correct that you never gave a prayer to
7  opening a board meeting?
8      A.   Correct.
9      Q.   When the board policy was adopted, and the
10  opportunity was articulated specifically in the policy
11  that a meeting could be opened with a moment of
12  silence, did that change your view or your personal
13  preference as to whether you wanted to participate?
14     A.   (Shaking head)
15     Q.   You have to answer out loud.
16     A.   I'm sorry, no.
17     Q.   When Mr. Bireley became board president in
18  2005, did he ask you whether you wanted to be included
19  in the group that would be asked to offer a prayer?
20     A.   I don't recall. I think so, but I don't
21  really recall.
22     Q.   And am I right that if he did so ask you, you
23  said no, thank you?
24     A.   Yes.

Page 29

1      Q.   Do you remember a comment -- This is the big
2  board meeting again at which there was a lengthy
3  public comment --
4      A.   (Yawning) Excuse me.
5      Q.   I sympathize. Do you recall a comment being
6  offered from the podium during the public comment
7  session about Madalyn Murray O'Hair?
8      A.   No.
9      Q.   Do you know who Madalyn Murray O'Hair is?
10     A.   No.
11     Q.   A man named Harold Johnson, during his public
12  comments, suggested that Madalyn Murray O'Hair's
13  disappearance was evidence that God was the highest
14  power. Does that refresh your recollection about that
15  comment?
16     A.   No, not really.
17     Q.   Mr. Johnson then went on to inform the public
18  present at the meeting that Madalyn Murray O'Hair was
19  the person who had started the movement to take prayer
20  out of our schools. Does that refresh your
21  recollection?
22     A.   No.
23     Q.   Did you pay attention throughout the public
24  comment session of the meeting?

8 (Pages 26 to 29)

Dobrich, et al.                                    v.                    Indian River School District, et al.
Dr. Mark A. Isaacs                    C.A. # 15-120 (JJF)                          October 18, 2006

Page 30

1    A.  No, no, and, you know, I may be answering a
2    lot I don't recall now, but let me just tell you so
3    you understand. Oftentimes I would spend time during
4    the public comments in previewing board-related
5    information, so I might have been there but I might
6    have not been listening, so.
7        Q.  That is to say you might have been focusing
8    on the business of the board?
9        A.  Right, exactly.
10       Q.  Did you hear Mrs. Dobrich speak at the public
11   comment session?
12       A.  Yes, yes.
13       Q.  And what was your reaction to her comments?
14       A.  I think she did it in a professional manner.
15       Q.  Did you have a personal view as to whether
16   you agreed or disagreed with her suggestion that the
17   board consider prayers that were not in the name of
18   Jesus?
19       A.  I respected what she said.
20       Q.  Did you agree with it?
21       A.  I would say a non-sectarian prayer would,
22   would be appropriate.
23       Q.  And when you say non-sectarian prayer, you
24   are talking about what Mrs. Dobrich was talking about,

Page 31

1    that is a prayer simply to God or a higher power;
2    correct?
3        A.  Correct.
4        Q.  I may have asked you this, but how did you
5    get on the Policy Committee? Were you appointed? Did
6    you ask to be put on it?
7        A.  No, I didn't ask. Just -- If I recall, I
8    think Harvey had me on the Policy Committee and the
9    Scholarship Committee.
10       Q.  You testified earlier that even as a student
11   at Sussex Central you observed the board opening its
12   meetings with a prayer. I gather from that that from
13   time to time you attended board meetings as a student?
14       A.  Yes, sir.
15       Q.  For what purpose?
16       A.  Academic honors, athletic honors.
17       Q.  To get recognition from the board?
18       A.  Yes.
19       Q.  For achievement as a student?
20       A.  Yes.
21       Q.  Or an athlete?
22       A.  Yes.
23       Q.  And that practice continued throughout your
24   tenure as a board member, as well; correct?

Page 32

1        A.  Yes.
2        Q.  Would you agree with me that at least for
3    board meetings during the academic year there were
4    always students in attendance at the board meetings?
5        A.  Yes.
6        Q.  And, depending on the number of awards, it
7    might simply be the five or six folks who were there
8    for student government and the presentation of the
9    colors, or it could be dozens and dozens?
10       A.  Yes.
11       Q.  Depending on the awards, but always some of
12   them?
13       A.  Yes. There might have been a board meeting
14   or two that there weren't any awards presented to a
15   student.
16       Q.  But you would still have the color guard?
17       A.  Right.
18       Q.  And the student government representative?
19       A.  Yes.
20       Q.  In the stack of documents that Mr. Shau has,
21   you will find PX9, which is, has been identified as a
22   copy of the board policy. Can we agree this is the
23   policy relating to school board prayer that was
24   adopted in October of 2004?

Page 33

1        A.  Yes.
2        Q.  And you voted to adopt this policy; correct?
3        A.  Yes.
4        Q.  Did you have anything to do with the drafting
5    of this policy as a member of the Policy Committee?
6        A.  No, because I, I did not attend the Policy
7    Committee meetings, I don't think.
8        Q.  If you didn't attend, that means the only
9    board member who was in attendance at those Policy
10   Committee meetings was Mr. Walls; correct?
11       A.  No, because, if I am not mistaken, I think as
12   new board members came on board they were asked
13   whether they wanted a committee they wanted to be on.
14   I think -- I don't remember if, when this was adopted,
15   if there was anyone else that had joined the Policy
16   Committee since then, because, honestly, I don't think
17   I had attended a meeting in almost two years. It had
18   been a long, long time.
19       Q.  We can shorten things up. Are you confident
20   that you did not attend any Policy Committee meetings
21   at which this policy was considered?
22       A.  Yes.
23       Q.  Okay.
24       A.  Yes.

9 (Pages 30 to 33)

Dobrich, et al.                                    v.                    Indian River School District, et al.
Dr. Mark A. Isaacs                        C.A. # 15-120 (JJF)                              October 18, 2006

Page 34

1    Q.  The first paragraph reads, "In order to
2   solemnify its proceedings, the Board of Education may
3   choose to open its meetings with a prayer or moment of
4   silence, all in accord with the freedom of conscience
5   of the adult board member."
6         Would you agree with me that the policy
7   identifies the purpose of the prayer or moment of
8   silence as to solemnify its proceedings?
9    **A.  Yes.**
10   Q.  What does "in order to solemnify its
11  proceedings" mean to you?
12   **A.  I guess interpretation wise would be this**
13  **being a formalized board meeting to recognize that it**
14  **is a unique meeting monthly where many important**
15  **decisions are brought to the attention of the board**
16  **and to the public, and it requires careful thought and**
17  **deliberation.**
18   Q.  To sort of remind the board members that they
19  have to take their responsibilities seriously?
20   **A.  Seriously, yes.**
21   Q.  And discharge those obligations to the best
22  of their ability?
23   **A.  Yes.**
24   Q.  As a board member, did you understand that

Page 35

1   "in order to solemnify its proceedings" was the
2   functional equivalent of "in order to seek divine
3   guidance"?
4    **A.  No.**
5    Q.  Do you think that it is an appropriate
6   purpose of the prayer at the board meeting to seek
7   divine guidance?
8    **A.  If you have ever been a board member, I think**
9   **you will recognize that any help you can get would**
10  **graciously appreciated, so I think wherever you get it**
11  **from.**
12   Q.  But you didn't understand that to be the
13  meaning of "in order to solemnify its proceedings."?
14   **A.  No, no.**
15   Q.  Now, with respect to what you described for
16  me as your understanding of "solemnify its
17  proceedings," was it your view as a board member that
18  you and your colleagues needed a prayer in order to be
19  reminded to take your duties and obligations
20  seriously?
21   **A.  I didn't.**
22   Q.  You did?
23   **A.  I did not.**
24   Q.  Fair enough. Did you understand -- Based on

Page 36

1   your perception of your colleagues over the course of
2   your three years of service, did you think it was
3   necessary for the Board of Education to open its
4   meetings with a prayer in order for your colleagues to
5   take their duties and obligations seriously?
6    **A.  I wouldn't say to take it seriously. I would**
7   **just say to extend every opportunity to provide**
8   **assistance in making decisions, so I wouldn't say that**
9   **they did not take their duties seriously.**
10   Q.  Would it be fair for me to infer from your
11  answer that there is another purpose besides
12  solemnification of the proceedings for the prayer that
13  this policy authorizes, and that purpose is to provide
14  the individual board members with the opportunity to
15  seek divine guidance if they wish?
16   **A.  I guess that's a matter of interpretation.**
17   Q.  And I am asking for your interpretation as a
18  board member when you voted to adopt this policy.
19   **A.  No, I mean I said no because it didn't for**
20  **me.**
21   Q.  At anytime during the consideration of Board
22  Policy BDA.1, this board prayer policy, did anyone
23  suggest that the policy safeguarded the right of the
24  individual board members to pray as they saw fit?

Page 37

1    **A.  Well, according to this, it gives any board**
2   **member the opportunity to express and pray to whoever**
3   **they want and however they want. So, to answer that**
4   **question, I would say yes.**
5    Q.  Your answer spoke to terms of reviewing text
6   of the policy and interpreting the policy. My
7   question had to do with comments by board members
8   during the consideration of the policy.
9         Did any board member ever say, in words or
10  substance, "We should adopt this policy because it
11  safeguards the rights of individual board members to
12  pray as they see fit."?
13   **A.  No.**
14   Q.  And when you say no, do you mean, "No, I
15  remember that that was never said," or "No, I don't
16  recall that that was ever said."?
17   **A.  No, I don't recall any board member**
18  **specifically saying, "Adopt this so we can pray."**
19   Q.  Paragraph three of the policy reads, quote,
20  "Such opportunity." And that opportunity is the
21  opportunity to open the meeting with a prayer;
22  correct, or a moment of silence?
23   **A.  (Nodding head)**
24   Q.  "Such opportunity shall not be used or

10 (Pages 34 to 37)

Dobrich, et al.                                              v.                    Indian River School District, et al.
Dr. Mark A. Isaacs                          C.A. # 15-120 (JJF)                              October 18, 2006

Page 38

1    exploited to proselytize, advance or convert anyone or
2    to derogate or otherwise disparage any particular
3    faith or belief."
4           Would you agree with me that that paragraph
5    imposes some limitations on the right of board members
6    to pray as they see fit?
7       A.  Yes.
8       Q.  And that was a limitation that you, as a
9    board member, thought was appropriate to include in
10   the policy?
11      A.  Yes.
12      Q.  What did you understand in the context of
13   this paragraph the prohibition against proselytizing
14   to mean?
15      A.  I guess my interpretation of it would be that
16   you cannot use that opportunity to advance or promote
17   any one particular religion over another.
18      Q.  Who had the responsibility to ensure that
19   that limitation was complied with?
20      A.  I would assume that it would be left up to
21   the individual giving the prayer.  I mean there wasn't
22   a police officer there to enforce anything or anything
23   like that.
24      Q.  I know you weren't being facetious, and when

Page 39

1    I say enforce, that may have caused you to think about
2    police officers.  I meant was it the board members
3    themselves who had the obligation to enforce this
4    limitation?
5       A.  Yes.
6       Q.  Now, do you recall any prayer that was
7    offered that you viewed as either violating paragraph
8    three or raising a question about whether it violated
9    paragraph three at anytime during your tenure after
10   the adoption of this policy?
11      A.  No, not really, because, you know, my
12   interpretation of it was that each board member had
13   the opportunity to express as they felt fit as long as
14   it wasn't used to promote any one particular religion,
15   so, no, I don't remember any specific board prayer
16   that was more offensive or less offensive or anything
17   like that.
18      Q.  I am going to offer -- I am going to give you
19   an example of a prayer that -- Well, I will let you
20   make the judgment, but I am going to give you a prayer
21   and ask you if it would have been given it would have
22   violated the policy.  Okay?
23          "Oh, Lord, please convert the Jews in the
24   audience and ensure that they come to know our Lord

Page 40

1    Jesus Christ."
2       A.  Yes, it would.
3       Q.  That would violate paragraph three?
4       A.  Yes.
5       Q.  Now, suppose that a board member gave that
6    prayer which would violate, in your view, paragraph
7    three.  What would be done?  What would be the
8    response of the board?
9       A.  As far as repercussions, you mean, or?
10      Q.  Yes, if any?
11      A.  I would assume that there would be dialogue
12   that would take place, probably in executive session,
13   to ask one of the board members why did you do that or
14   why did you say those words or --
15      Q.  I purposely picked that extreme example so we
16   could explore what the board would do.  I could ask
17   you what you would have done.  That's an example that
18   seems to you to be a clear violation of paragraph
19   three.  Would you have brought that to the president
20   or the individual board member's attention yourself?
21      A.  Yes.
22      Q.  And I take it what you would have done is to
23   say, "I believe that prayer was in violation of our
24   policy."  Correct?

Page 41

1       A.  Yes.
2       Q.  At that point the horse would be out of the
3    barn; right?
4       A.  Right.
5       Q.  On that prayer?
6       A.  Right.
7       Q.  Would you suggest that that person be taken
8    out of the rotation to offer prayers thereafter, or do
9    you think --
10      A.  No, I am not a one-strike man, so I would
11   give them the opportunity to redeem themself.
12      Q.  Okay.  And if the board member then offered a
13   prayer, you know, "Convert the heathens in the
14   audience, please, Lord," you would at that point two
15   strikes is enough?
16      A.  Yeah.
17      Q.  You wouldn't give them a third chance?
18      A.  Right.
19          MR. ALLINGHAM:  Okay.  We are going to
20      change the tape.
21          THE WITNESS:  Okay.
22          VIDEOGRAPHER:  Going off the record at
23      2:34 p.m.
24          (A recess was taken.)

11 (Pages 38 to 41)

Dobrich, et al.                                  v.                    Indian River School District, et al.
Dr. Mark A. Isaacs                     C.A. # 15-120 (JJF)                         October 18, 2006

Page 42

1          VIDEOGRAPHER: Going back on the
2      record at 2:39 p.m.
3    BY MR. ALLINGHAM:
4      Q.  Dr. Isaacs, I am going to show you a second
5    prayer, and this one is long, so I am going to give it
6    to you in writing. We have previously marked this as
7    PX35. I will read it into the record, but follow
8    along as we go.
9          "Do not put your trust in princes, in mortal
10    men who cannot even save themselves. When their
11    spirit departs, they return to the ground. On that
12    very day, their plans come to nothing. Blessed is he
13    whose help is the God of Jacob, whose hope is in the
14    Lord, his God, the maker of heaven and earth, the sea,
15    and everything in them, the Lord who remains faithful
16    forever. He upholds the cause of the oppressed and
17    gives food to the hungry. The Lord sets prisoners
18    free. The Lord gives sight to the blind. The Lord
19    lifts up those who are bowed down. The Lord loves the
20    righteous. The Lord watches over the alien and
21    sustains the fatherless and the widow, but he
22    frustrates the ways of the wicked. For the wages of
23    sin is death, but the gift of God is eternal life
24    through Jesus Christ our Lord."

Page 43

1          In your judgment as a board member, would
2    that prayer be permitted or be prohibited by paragraph
3    three of the policy?
4      A.  It's not nondenominational.
5      Q.  But the policy doesn't require that a prayer
6    be nondenominational. The policy simply requires that
7    the prayer not be used or exploited to proselytize,
8    advance or convert anyone or to derogate or otherwise
9    disparage any particular faith. So, in light of that,
10    would you view this as --
11      A.  No, I would not view this as bad.
12      Q.  It would be permitted under paragraph three?
13      A.  Yes, yes.
14      Q.  And, to put it in the language of paragraph
15    three, you would not view that prayer as --
16      A.  Proselytizing.
17      Q.  -- proselytizing?
18      A.  No, sir.
19      Q.  This prayer has been marked as PX45. It
20    reads, "Heavenly Father, thank you for this great
21    occasion, for the work, the effort, the joys and
22    everything that led up to this point in time.
23    Thank you for your guidance in this event. We pray
24    for your direction in the lives of each of these

Page 44

1    school board members. We pray that you direct them
2    into the truth and eventually the truth that comes by
3    knowing Jesus. We also pray that you would be with
4    them at this time. We ask these things in Jesus's
5    name. Amen."
6          Do you view that prayer as proselytizing?
7      A.  No. It's not nondenominational, but no.
8      Q.  You have said that several times. Do I
9    correctly infer from that that, as a board member, you
10    would have preferred that the prayers that are offered
11    to open a meeting be nondenominational?
12      A.  I think everybody should be free to express
13    how they choose to do so, so I would say it's a matter
14    of interpretation. I mean this goes in accordance
15    with what would be number three, any such prayer may
16    be sectarian or non-sectarian, so it's following the
17    policy, I guess, is what I am saying, but.
18      Q.  Let me ask you this question: Is it possible
19    for a prayer to be sectarian, that is directed to a
20    particular deity, and at the same time not be
21    proselytizing?
22      A.  I guess when I think of proselytizing, I am
23    thinking of someone standing up at the pulpit saying,
24    "You will do this or this is the way you should go or

Page 45

1    this is the only way," in other words selling one
2    particular religion over another. So, in my eyes,
3    that's proselytizing.
4          Just giving a prayer at the personal
5    preference of whoever is giving it, everybody ought to
6    have a right, whether it's whoever.
7      Q.  And everybody ought to have that right,
8    that's in fact a right that, as you understand it, is
9    guaranteed by The Constitution?
10      A.  Absolutely.
11      Q.  Do you understand that there are any limits
12    on that right in The Constitution?
13      A.  There are many things in The Constitution
14    that are subject to a matter of interpretation.
15      Q.  In functioning as board members, do you
16    believe that the boards members are governmental
17    officials?
18      A.  Yes, I agree, yes.
19      Q.  And do you think that imposes any limitations
20    or changes in any way the rights to say whatever they
21    want with respect to the practice of religion?
22      A.  I think there is precedent to do things. I
23    mean that's freedom of speech, so I would say again
24    it's a matter of interpretation. I mean, honestly,

12 (Pages 42 to 45)

Dobrich, et al.                          v.              Indian River School District, et al.
Dr. Mark A. Isaacs              C.A. # 15-120 (JJF)                  October 18, 2006

Page 46

1  you know, you may say something that I find offensive;
2  however, he may not.
3      Q.  On that issue, would you agree with me that
4  different people could reach a different conclusion as
5  to whether a particular prayer is proselytizing or
6  not?
7      A.  Absolutely.
8      Q.  And would you agree with me that it is likely
9  that the faith of the person making the judgment would
10  have an impact on that issue?
11      A.  Absolutely.
12      Q.  So that a Christian might find a Christian
13  prayer non-proselytizing, whereas a Jew or a Muslim
14  might find it proselytizing?
15      A.  Yes.
16      Q.  In that circumstance, for example, a
17  Christian might not be as sensitive to the issue
18  because the Christian was already a member of the
19  faith that the prayer might implicitly be seeking to
20  proselytize one to?
21      A.  Well, see, but I guess it goes back to what
22  you consider proselytizing, you know.  To me, that's
23  not -- Jimmy Swaggart would be, you know, the one that
24  gets on TV and says, "You need to be saved," blah,

Page 47

1  blah, blah, blah, to me, that, when I think of
2  proselytizing, that's what I see, and that's not what
3  happens at board meetings.  Nobody is sitting there
4  selling one religion over another, at least in my
5  interpretation.
6      Q.  Now, if you will look at PX45, which was the
7  second printed prayer that I asked you about --
8      A.  Uh-huh.
9      Q.  -- you will see that there is a statement in
10  the middle of the prayer, "We pray that you direct
11  them into the truth and eventually the truth that
12  comes by knowing Jesus."
13          Thinking about it again in light of the
14  discussion we have just had about proselytizing, do
15  you think that that statement might reasonably be
16  interpreted as the only way to the truth is through
17  Jesus?
18      A.  Could be.
19      Q.  And if that were how it was interpreted,
20  would you agree that that's a proselytizing prayer?
21      A.  No, I wouldn't agree that it's proselytizing.
22  I would say that it, the context of the words maybe
23  could be chosen better, but again I don't consider
24  that -- My definition of proselytizing is a little bit

Page 48

1  different, and maybe it's just because that's --
2      Q.  And I am going to just offer one more change
3  to this prayer and ask you whether it changes your
4  view.  Suppose that the prayer said, following that
5  same sentence again, "We pray that you direct them
6  into salvation and eventually the salvation that comes
7  by knowing Jesus."?
8      A.  Yes.
9      Q.  That would be proselytizing?
10      A.  Yes.
11      Q.  I am going to show you two documents that
12  appear to be drafts of the board policy and ask if you
13  have ever seen them before.  The first one is a
14  document that we have marked as PX11.  Actually, I
15  think it's in the stack in front of your counsel.  No?
16  I have got it.  (Handing)  It's not too long.  I am
17  going to ask you to read it, and I will have some
18  questions.
19      A.  Okay.  Okay.
20      Q.  We have been going over PX9, the final board
21  policy.  Would you agree with me that, with some minor
22  modifications, the text of PX11 is the same as the
23  final policy?
24      A.  Yes.

Page 49

1      Q.  Now, my question is have you ever seen,
2  before I just showed it to you, --
3      A.  Yes.
4      Q.  -- that text?
5      A.  Yes.
6      Q.  In what context?  When did you see it?
7      A.  I do not recall, but I have seen it.
8      Q.  This draft of the policy has a short sort of
9  preliminary statement that says, "Following the
10  rulings of the United States Court of Appeals Third
11  Circuit and past practices of State of Delaware
12  legislative bodies," and then it picks up with what
13  the text of the policy is.
14          Do you specifically recall a draft that has
15  that preliminary language?
16      A.  No, I do not.
17      Q.  Do you recall any discussion at the board or
18  Policy Committee level of rules of the United States
19  Court of Appeals Third Circuit?
20      A.  No.
21      Q.  Am I right that, so far as you recall, the
22  board did not discuss particular opinions or rules of
23  the Third Circuit Court of Appeals?
24      A.  Not that I recall.

13 (Pages 46 to 49)

Dobrich, et al.                                    v.                    Indian River School District, et al.
Dr. Mark A. Isaacs                         C.A. # 15-120 (JJF)                              October 18, 2006

Page 50

1    Q.  Other than your belief that you have seen
2    this before, do you have any other memory about how
3    you saw it, when you saw it, who gave it to you, how
4    it came into your possession, or anything?
5    **A.  No, I don't.  I would just assume that it**
6    **came in a board packet with, you know, other policies**
7    **or other information.**
8    Q.  Now I am going to show you -- Do you know who
9    drafted that draft?
10   **A.  No.**
11   Q.  I am going to show you a document we have
12   previously marked as PX12.  You can read as much of it
13   as you like, but my questions are directed to
14   particular portions of the document.
15       If you would look first at the next to last
16   and last page of PX12, you will see there are numbered
17   paragraphs that begin towards the bottom of the page?
18   **A.  Yes.**
19   Q.  I would like you to take the time to read
20   those numbered paragraphs one through five.  Would you
21   agree with me that those paragraphs are substantively
22   identical to the final policy?
23   **A.  Yes.**
24   Q.  At the top of the first page of PX12, it

Page 51

1    reads, "For release to the general public, Proposed
2    School Board Prayer Resolution dated 8/30/04 prepared
3    by the Rutherford Institute and the Neuberger firm."
4    Do you see that?
5    **A.  Yes.**
6    Q.  Does that refresh your recollection as to who
7    drafted the text of the Board Policy BDA.1?
8    **A.  No, but according to this it appears that**
9    **they were involved with it.**
10   Q.  They being the Rutherford Institute and the
11   Neuberger firm?
12   **A.  Yes.**
13   Q.  But you don't have any independent memory of
14   that?
15   **A.  No.**
16   Q.  Have you ever seen PX12 before?
17   **A.  Not that I recall.**
18   Q.  There is a lengthy discussion that goes
19   something like three and a half pages single-spaced
20   before this document gets to the text of the what
21   ultimately became the board policy on school board
22   prayer.
23       Do you recall any discussion of any of the
24   topics in those three and a half pages at the board

Page 52

1    level?
2    **A.  No, not really.**
3    Q.  For example, do you have a memory that there
4    was a discussion of whether, in the context of the
5    board prayer policy, of the fact that the country was
6    in a war with terrorism?
7    **A.  No.**
8    Q.  You would not view that as relevant to the
9    consideration of school board prayer; correct?
10   **A.  Yes.**
11   Q.  Do you recall a discussion of whether in
12   times of war the country's leaders have led the
13   country in prayer?
14   **A.  No, I don't recall.**
15   Q.  Do you have any recollection of a discussion
16   of a prayer offered by George Washington which
17   included the words "through Jesus Christ our Lord"?
18   **A.  No.**
19   Q.  Do you see it near the bottom of the page,
20   the words at the end of the prayer attributed to
21   George Washington "through Jesus Christ our Lord" is
22   italicized?
23   **A.  Yes.**
24   Q.  Do you have any recollection of them drawing

Page 53

1    your attention to those words?
2    **A.  No.**
3    Q.  Halfway through the second page there is a
4    whereas clause that talks about the American Civil
5    Liberties Union.  Do you have any recollection of a
6    discussion of the American Civil Liberties Union
7    during the discussion of this school board prayer?
8    **A.  You mean by board?**
9    Q.  Yes, by board members.
10   **A.  No, but I know that the public felt American**
11   **Civil Liberties Union -- I mean there is a sentiment**
12   **there that the ACLU is taking away rights of people by**
13   **the general public.  But no, not that I recall.**
14   Q.  So you don't recall any discussion at the
15   board level or at the Policy Committee -- I guess I am
16   just going to assume you weren't at Policy Committee
17   meetings.  Okay?
18   **A.  Yes, that's a good assumption.**
19   Q.  Do you recall a discussion of any kind at the
20   board level of the involvement of the ACLU in this
21   litigation?
22   **A.  Well, yes, I remember, if I am not mistaken,**
23   **that one of the board minutes add that there was**
24   **someone there from the ACLU that actually spoke, if I**

14 (Pages 50 to 53)

Dobrich, et al.                                    v.              Indian River School District, et al.
Dr. Mark A. Isaacs                        C.A. # 15-120 (JJF)                    October 18, 2006

Page 54

1  am not mistaken, but.
2      Q.  Your memory is accurate.  Do you recall the
3  name of Dru Fennel?
4      A.  No.
5      Q.  Was the person who spoke a woman?
6      A.  Yes.
7      Q.  And did she speak at a meeting at which
8  Mrs. Dobrich also spoke?
9      A.  Good question.
10      Q.  That was a statement by a representative of
11  the ACLU.  Do you recall discussions by board members
12  of the ACLU's involvement in this litigation?
13      A.  Um, maybe just questioning whether they were
14  involved in it, but no lengthy deliberation about
15  anything like that.
16      Q.  Let me come back to your statement about the
17  public.  Do you understand or did you understand when
18  you were on the board that the public viewed the
19  board's defense of this lawsuit as a defense of
20  Christian values?
21      A.  Some did.
22      Q.  How did you find that out?  Did they tell you
23  that?
24      A.  I am sure just in grocery stores and I mean

Page 55

1  obviously by comments of the general public, but.
2      Q.  Did you understand, Dr. Isaacs, that that was
3  a widely held view of the public?  I am not talking of
4  the board members now, I am talking about the public.
5      A.  I wouldn't say -- I would not say it's a
6  widely held view.  I would just say it was a view.
7      Q.  Which you heard from more than one person?
8      A.  Right.
9      Q.  These are hard things to remember, but can
10  you estimate the number of people who said that to you
11  in words or substance?  Are we talking a dozen?
12      A.  No.
13      Q.  A hundred?
14      A.  No.
15      Q.  Two?
16      A.  No, no, no, not even five.  If it didn't have
17  something to do with athletics or why the budget was
18  overspent, they were the main substance of what I was
19  dealing with.
20      Q.  The next clause on page two reads, "Whereas
21  the board has obtained the legal advice of two
22  competent and experienced constitutional attorneys,
23  John W. Whitehead, Esquire, and Thomas S. Neuberger,
24  Esquire, that prayer to open board meetings is

Page 56

1  constitutional in the United States Court of Appeals
2  for the Third Circuit, which includes Delaware, and
3  legal counsel have identified the following legal
4  authority in support of their legal opinion."
5      Do you recall having read something to that
6  effect at anytime during your consideration of the
7  board prayer policy?
8      A.  No, I don't.
9      Q.  Is it correct that the school board obtained
10  the legal advice of two confident and experienced
11  constitutional attorneys that prayer to open board
12  meetings is constitutional?
13      A.  I know a lot of questions were asked.
14  Whether you would say that you got their legal advice
15  from it, according to this, yes.
16      Q.  When you say "a lot of questions were asked,"
17  you mean questions were asked by board members of
18  Mr. Neuberger?
19      A.  Yes.
20      Q.  And did Mr. Neuberger respond?
21      A.  Yes.
22      Q.  And is the substance of his response
23  reflected in this memorandum prepared by
24  Mr. Neuberger?

Page 57

1      A.  Yes, yes.
2      Q.  Is it fair to say that this document
3  represents Mr. Neuberger's legal advice as reflected
4  in it?
5      A.  Again, I would say it's a matter of
6  interpretation.
7      Q.  With respect, I don't think this one is.
8  It's a question whether you recall that the substance
9  of the answers to the questions that were directed to
10  Mr. Neuberger is reflected in this memorandum.
11      A.  There was definitely input from him on it, so
12  yes.
13      Q.  On the third page in the third full
14  paragraph, this reads, "It is the opinion of legal
15  counsel that since the Indian River Board of Education
16  is a public legislative and deliberative body, it has
17  the right to open its meetings with a prayer."  Do you
18  see that?
19      A.  Yes.
20      Q.  And is that reflective of the answers
21  Mr. Neuberger gave at the meeting you described?
22      A.  There were lots of people offering -- I don't
23  know if it would be Neuberger's own interpretation of
24  it, but I mean there were many people that have said

15 (Pages 54 to 57)

Dobrich, et al.                                    v.                    Indian River School District, et al.
Dr. Mark A. Isaacs                        C.A. # 15-120 (JJF)                          October 18, 2006

Page 58

1  that, that the Board of Education is considered a
2  legislative body, so I would not say that it was just
3  Thomas Neuberger.
4      Q.  I didn't ask whether it was just Thomas
5  Neuberger.  I asked whether this reflects advice that
6  Mr. Neuberger gave in connection with his answers to
7  your questions at that meeting?
8      A.  Yes.
9      Q.  Okay.  On page four, shortly before the
10  numbered paragraphs, there is a paragraph that starts,
11  "Thus."
12      "Thus is the opinion of legal counsel that
13  the Supreme Court's decision in March v. Chambers
14  which, unlike the Cole's decision, is a binding
15  precedent in Delaware, compels the conclusion that the
16  Indian River School District's tradition of opening
17  its meetings with a brief invocation is
18  constitutionally permissible."
19      Does that paragraph reflect the advice given
20  in the answers Mr. Neuberger gave to the board?
21      A.  Yes.
22      Q.  And would it be fair to say, Dr. Isaacs, that
23  in your consideration of how to vote on the board
24  prayer policy, one of the factors you took into

Page 60

1  we got this whether we voted on it.
2      Q.  This being PX9?
3      A.  Yes, sir, yes.
4      Q.  I want to ask you a few questions about the
5  process of the board's consideration of the school
6  board prayer policy.  Do you recall any public
7  discussion at anytime of the substance of the board
8  prayer policy, or was it all done either in Policy
9  Committee meetings or in executive session?
10      A.  You mean a board member and/or public or?
11      Q.  The board members.  I will ask a different
12  question.  Were the board members' deliberations on
13  Board Policy BDA.1 conducted in executive sessions or
14  in Policy Committee meetings rather than in open
15  session?
16      A.  When you say open session, you mean public
17  board meetings?
18      Q.  Yes, sir?
19      A.  Open to -- I don't recall much discussion
20  other than if the public stood up and gave their
21  opinion.  There wasn't any dialogue.  When the public
22  comment session comes in, the board members did not
23  respond.  It's just an opportunity for them to stand
24  up, the public, and say whatever is on their minds, so

Page 59

1  consideration was the advice that Mr. Neuberger gave
2  as reflected in this memorandum?
3      A.  Yes.
4      Q.  Did you take into account, because you have
5  mentioned that other people were giving advice,
6  as well, did you take into account the advice of other
7  lawyers on the issue?
8      A.  Yes.
9      Q.  And would that include Mr. Griffin's advice?
10      A.  Yes.
11      Q.  Now, I have shown you PX9, which is the final
12  policy, PX11 which is that first draft that you were
13  confident you had seen probably in a board package,
14  and then PX 12 which we just discussed.
15      Do you know how, what process was used to
16  arrive at the final text of the board policy?  Were
17  you involved in that process in any way?
18      A.  No.  You mean like Policy Committee putting
19  things together?
20      Q.  Or the board in executive session --
21      A.  No.
22      Q.  -- saying, "I think we should take out the
23  opening line of PX11," for example?
24      A.  No.  The only thing that I remember is when

Page 61

1  there is no dialogue that takes place between the
2  board.
3      Q.  Fair enough, so that the public spoke about
4  this issue?
5      A.  Yes.
6      Q.  But the board members did not deliberate on
7  the issue in public; is that correct?
8      A.  Right, correct.
9      Q.  And the board members did not deliberate on
10  the actual board policy in public; correct?
11      A.  Not that I recall.
12      Q.  Do you recall that the board ever considered
13  the possibility of opening its meetings only with a
14  moment of silence, not a prayer?
15      A.  I know that that was my suggestion.
16      Q.  And was that a suggestion that you made in a
17  board meeting?
18      A.  Yes.  I think it was.
19      Q.  Do you know at which board meeting you made
20  that suggestion?
21      A.  No.
22      Q.  Why did you make that suggestion?
23      A.  That's my personal belief.
24      Q.  Did you believe that a moment of silence

16 (Pages 58 to 61)

Dobrich, et al.                                          v.                    Indian River School District, et al.
Dr. Mark A. Isaacs                                C.A. # 15-120 (JJF)                        October 18, 2006

Page 62

1   would be effective to solemnify the proceedings?
2      A.  Yes, I do.
3      Q.  What was the response, if any, of the board
4   members to your suggestion?
5      A.  It was heard.
6      Q.  Did anybody say in words or substance, "That
7   suggestion is not acceptable to me"?
8      A.  No, no, no.  There wasn't a vote taken or
9   anything like that.
10     Q.  No, sir, this is in the discussion of ideas
11  at the board meeting.
12     A.  No.
13     Q.  You offered the idea of maybe we could open
14  the meeting with a moment of silence?
15     A.  Right.  The only thing I would say is the
16  others said, "Well, I should have the right to do it
17  however I would like to do it, however I would like to
18  pray, it's my freedom of speech."  I do recall that.
19     Q.  And so the incorporation of not only a moment
20  of silence but also a prayer in the policy was
21  intended to preserve those board members' individual
22  freedoms of speech?
23     A.  Yes.
24     Q.  Did you ever see anybody leave the room when

Page 63

1   the -- Let me back up one second.  After the policy
2   was adopted, it became the practice of the board to
3   read a disclaimer before the prayer was given;
4   correct?
5      A.  Yes.
6      Q.  At anytime after the policy was adopted, did
7   you see anyone upon hearing the disclaimer get up and
8   leave the room during the prayer?
9      A.  Honestly, I never paid any attention.  I was
10  reading.
11     Q.  Working on board business?
12     A.  Yes.
13     Q.  Let me ask you a question about your
14  perception.  Do you think it would be a difficult
15  thing for a student to get up and leave the board
16  meeting during the reading of the prayer?
17     A.  I guess it depends on the student.
18     Q.  Can you imagine that it would be -- Can you
19  imagine that a student would fear that that would
20  identify the student as a person who doesn't practice
21  a religion?
22     A.  Not necessarily, because one could get up and
23  leave saying they had to use the restroom, so you
24  didn't always have to tack it to, unless you were

Page 64

1   there on every single board meeting, so I would say
2   there are mechanisms to get up and leave a board
3   meeting that you don't have to tack a particular
4   clause to it.  There is plenty of opportunities to get
5   up.
6      Q.  So you would agree with me that the
7   perception, if no explanation were offered of someone
8   who hearsay the disclaimer and gets up and leaves,
9   would be that that person affirmatively did not want
10  to participate in the prayer; correct?
11     A.  Well, no, not necessarily.  They could get up
12  to go to the restroom or something like that.  You
13  know, I -- I mean if it was the same person over and
14  over again, then maybe yes, yes, but that particular
15  board meeting, no.  I mean we have people getting up
16  and going out all the time, so.
17     Q.  During the prayer?
18     A.  Coming in the during, people come in.
19     Q.  We talked earlier about the color guard
20  folks, the junior ROTC kids?
21     A.  Yes.
22     Q.  Realistically speaking, as a practical
23  matter, if they don't want to participate in the
24  prayer, they can't leave; correct?

Page 65

1      A.  Sure.
2      Q.  Is it your belief that the Indian River
3   School District is a Christian area?
4      A.  Yes, I would say it is.
5      Q.  And the board policy on school board prayer
6   recognizes that the Indian River School District is a
7   Christian area; does it not?
8      A.  Yes.
9      Q.  Would it be fair for me to understand that
10  the discussion of the school board prayer policy, the
11  board discussion of the school board prayer policy,
12  reflected the board members' beliefs that the Indian
13  River School District is a Christian area?
14     A.  Yes.
15     Q.  Mr. Bireley was quoted in one of the many
16  newspaper articles around this issue saying that, "The
17  prayer suit facing the district and the board was one
18  of the major issues surrounding this year's
19  election" -- that's the 2006 election -- "and that it
20  probably swung this year's vote."  Would you agree
21  with Mr. Bireley's statement?
22     A.  No.
23     Q.  You had served on the board for about a year
24  and a half at the point in time in October of 2004

17 (Pages 62 to 65)

Dobrich, et al.                               v.                 Indian River School District, et al.
Dr. Mark A. Isaacs                    C.A. # 15-120 (JJF)                       October 18, 2006

Page 66

1  when the policy was adopted; correct?

2  **A. Yes.**

3  Q.  From your perception, did the policy change

4  in any way the board's practice of offering a prayer

5  at the beginning of its meetings?

6  **A.  No, the only thing was just making it clear**

7  **that no one has to participate, this is a voluntary**

8  **deal, I mean other than the verbiage that was put in,**

9  **if you want to call it the disclaimer statement.**

10  **That's the only thing that really maybe**

11  **changed, I guess, so to speak, just making sure that**

12  **people knew that this was not a requirement of the**

13  **formal setting of the board meeting; it was something**

14  **that was being practiced by the Board of Education.**

15  Q.  To the extent that a board member chooses to

16  open the meeting with a prayer, is it correct that

17  that prayer is directed only to the ten board members?

18  **A.  True.**

19  Q.  And so whatever purpose it's intended to

20  accomplish, that purpose could be accomplished if the

21  ten board members prayed privately immediately before

22  the board meeting; correct?

23  **A.  Yes.  I brought that up, but I understand**

24  **that you can't do that because a board cannot meet**

Page 67

1  **independently like that because of the Sunshine Law,**

2  **which I am not familiar with, but it says the Board of**

3  **Educations cannot meet in a room before they go out**

4  **into the public.  You can't have ten board members or**

5  **a majority of the board members meet behind closed**

6  **doors without some -- So, yes, that's one of the**

7  **things that I suggested, was that.**

8  Q.  So you made a suggestion that, I am going

9  back to an earlier answer -- During the course of the

10  board's consideration of this school board prayer

11  issue, you made a suggestion that the board could

12  simply open its meetings with a moment of silence;

13  correct?

14  **A.  Yes.**

15  Q.  And the response to that from some of your

16  colleagues was, "You know, I have a First Amendment

17  right to pray however I want."

18  **A.  Yes, right.**

19  Q.  And the policy that was ultimately adopted

20  was intended to ensure that?

21  **A.  Right.**

22  Q.  You also made a suggestion that, "Okay, if

23  you want to pray however you want, maybe we could pray

24  in private right before we begin the meeting."

Page 68

1  Correct?

2  **A.  Correct.**

3  Q.  And someone said, "We can't do that because

4  of the Sunshine Laws."

5  **A.  Right.**

6  Q.  Who said that to you?  Do you recall?

7  **A.  I don't know.**

8  Q.  Was it a board member or a lawyer?

9  **A.  No, it wasn't a lawyer.**

10  Q.  It was a board member?

11  **A.  Yes.**

12  Q.  Did anybody suggest looking into more closely

13  whether the Sunshine Laws would actually prohibit the

14  board members from just getting together and having a

15  prayer before they began their meeting?

16  **A.  No, but there has been several other**

17  **instances where I know personally that I have said,**

18  **"Well, why don't we get together and talk about this,"**

19  **and was told, "You can't do that," so I just assumed,**

20  **you know, I would have to do the leg work to**

21  **investigate it myself.**

22  **I mean there were multiple issues other than**

23  **this where I mentioned about getting together, and we**

24  **were told the same thing, so.**

Page 69

1  Q.  Did anybody suggest, you included, but did

2  anybody suggest that each of the board members could

3  pray however they want but simply pray silently?

4  **A.  Yes.**

5  Q.  Who suggested that?

6  **A.  Me.**

7  Q.  And what was the response to that suggestion?

8  **A.  What I just said earlier, that --**

9  Q.  "I can pray however I want to."

10  **A.  Exactly.**

11  Q.  And, "If I want to pray out loud, I will pray

12  out loud."

13  **A.  Exactly.**

14  Q.  There are -- Let me make it more specific.

15  During your tenure as a board member, were you aware

16  of discussions of issues that would be addressed by

17  the board among board members outside of meetings?

18  **A.  (Shaking head)**

19  Q.  It's a small community.  People meet outside

20  of meetings from time to time, don't they?

21  **A.  Yes.  You mean board members?**

22  Q.  Yes, sir.

23  **A.  No.**

24  Q.  You don't recall meeting someone in a

18 (Pages 66 to 69)

Dobrich, et al.                                    v.                    Indian River School District, et al.
Dr. Mark A. Isaacs                      C.A. # 15-120 (JJF)                        October 18, 2006

Page 70

1    restaurant and talking about some issue that was
2    presented to the board?
3        A.  No, because myself, personally, I didn't have
4    the time, so, you know, I don't know if the others did
5    it. Quite frankly, I didn't care.
6        Q.  Did anyone ever suggest that the
7    consideration of the board's deliberations on the
8    board policy on prayer should be considered in public
9    because of the Sunshine Laws?
10       A.  No, not that I recall.
11       Q.  Other than the suggestion to open the meeting
12   with a moment of silence, the suggestion that the
13   board members could meet privately immediately before
14   the meeting to pray, or the suggestion that each
15   individual board member could offer his own prayer
16   silently, according to his own conscience, did you
17   make any other suggestions during the discussions of
18   the board prayer policy?
19       A.  No, because, quite frankly, I felt there were
20   many other issues that needed closer attention than
21   these, so.
22       Q.  What do you mean by that?
23       A.  Meaning that the time that I was spending was
24   not on issues like this. It was on construction,

Page 71

1    budget, personnel matters, things like that.
2        Q.  Matters that you considered more important?
3        A.  More what would be typical of day-to-day
4    board operations.
5        Q.  This issue got a lot of attention in the
6    public and in the media; correct?
7        A.  Yes.
8        Q.  Did you think that the amount of attention it
9    got was disproportionate, given its importance to the
10   district?
11       A.  Are you asking for my personal opinion?
12       Q.  Yes.
13       A.  I would say so. That depends on who you talk
14   to.
15          MR. ALLINGHAM:  Let's go off the
16       record for five minutes. The farther we get
17       into the roster of witnesses, the more
18       quickly I am going, and I may well be done.
19          VIDEOGRAPHER:  Going off the record at
20       3:27 p.m.
21          (A recess was taken.)
22          VIDEOGRAPHER:  Going back on the
23       record at 3:30 p.m.
24   BY MR. ALLINGHAM:

Page 72

1        Q.  When you made the suggestion that the board
2    could simply choose to open its meeting with a moment
3    of silence, did you think that that would have been an
4    effective way for the board to solemnify its
5    proceedings?
6        A.  Yes.
7        Q.  When you made the suggestion that the board
8    members could meet privately right before the board
9    meeting opened to have whatever prayer they wished,
10   did you think that that would have been an effective
11   way to solemnify the proceedings?
12       A.  Yes.
13       Q.  Then, lastly, when you made the suggestion
14   that each board member could silently offer whatever
15   prayer or whatever they wished to offer at the
16   commencement of the board meeting, did you think that
17   would have been an effective way to solemnify the
18   board's proceedings?
19       A.  Yes, in my opinion.
20          MR. ALLINGHAM:  I have nothing
21       further. Thank you very much.
22          VIDEOGRAPHER:  Going off the record at
23       3:31 p.m.
24

Page 73

1               CERTIFICATE
2        I, Lorena J. Hartnett, a Notary Public and
3    Registered Professional Reporter, do hereby certify
4    that the witness, DR. MARK ISAACS, was by me first
5    duly sworn to testify the truth, the whole truth, and
6    nothing but the truth; that the foregoing deposition
7    was taken at the time and place stated herein; and
8    that the said deposition was recorded stenographically
9    by me and then reduced to typewriting under my
10   direction, and constitutes a true record of the
11   testimony given by said witness.
12       I further certify that the inspection,
13   reading and signing of said deposition was not waived
14   by counsel for the parties and by the witness.
15       I further certify that I am not a relative,
16   employee, or attorney of any of the parties or a
17   relative or employee of either counsel, and that I am
18   in no way interested directly or indirectly in this
19   action.
20       IN WITNESS WHEREOF, I have hereunto set my
21   hand and affixed my seal of office on this 24th day of
22   October 2006.
23
24       Cert. #134-RPR, Exp. 01-31-2008

19 (Pages 70 to 73)