IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MONA DOBRICH and MARCO DOBRICH, Individually and as parents and next friend of ALEXANDER DOBRICH, SAMANTHA DOBRICH, JANE DOE and JOHN DOE, Individually and as parents and next friend of JORDAN DOE and JAMIE DOE,

Plaintiffs,

v.

INDIAN RIVER SCHOOL, DISTRICT, et al.,

Defendants.

Civil Action No. 05-120 (JJF)

Videotaped Deposition of HARVEY L. WALLS, taken pursuant to notice at 31 Hosier Street, Selbyville, Delaware, beginning at 1:30 p.m., on Wednesday, October 25, 2006, before Terry Barbano Burke, RMR-CRR and Notary Public.

APPEARANCES:

THOMAS ALLINGHAM, ESQUIRE
BRIAN LENHARD, ESQUIRE
One Rodney Square
Wilmington, Delaware 19801
For the Plaintiff

WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477
www.wilfet.com

APPEARANCES (cont'd):

JARROD SHAU, ESQUIRE
Drinker, Biddle & Reath, LLP
One Logan Square
18th and Cherry Streets
Philadelphia, Pennsylvania 19103-6996
For the Defendants

ALSO PRESENT:

TIMOTHY KEARNS
MARK BUCKMASTER, Video Specialist

\- - -

VIDEO SPECIALIST: This is the videotape deposition of Harvey L. Walls, taken by the plaintiff in the matter of Dobrich, et al., versus Indian River School District et al., Civil Action No. 05-120, held at 31 Hosier Street in Selbyville, Delaware, on October 25th, 2006, at approximately 1:32 p.m.

The court reporter is Terry Burke from the firm of Wilcox & Fetzer. My name is Mark Buckmaster, a video specialist with Discovery Video Services, Incorporated, in association with Wilcox & Fetzer.

Counsel will now introduce themselves and the reporter will swear in the witness.

MR. ALLINGHAM: I'm Tom Allingham. I represent the plaintiffs, and along with me are Tim Kearns and Brian Lenhard.

MR. SHAU: I'm Jarrod Shau and I represent the defendants in this action.

HARVEY L. WALLS,

the deponent herein, having first been duly sworn on oath, was examined and testified as follows:

BY MR. ALLINGHAM:

Q. Have you ever been deposed before, Mr. Walls?

**A. Yes.**

Q. When?

**A. I'm not sure of the date. Somewhere around the late 90's for a district staff employee that had sued the district.**

Q. I am going to ask you some questions. Please tell me if you don't understand the question or if you think it's ambiguous.

If you answer the question, I will assume, and I think the judge and the jury will assume, that you understood it. So let me know and I'll try to fix the question if you have a problem.

You have to answer out loud yes or no, not uh-huh or uh-uh.

And lastly, I freely confess that I tend to interrupt people. I'll try not to do that. You

should try not to interrupt me or assume that you know that what the answer to my question is, because the court reporter can't take down both of us at once; okay?

Do you know who the Doe family are?

**A. No.**

Q. Has anyone ever told you that they know who the Doe family are?

**A. Not to my knowledge.**

Q. Have you spoken with anyone who has already given their deposition in this matter?

**A. I have spoken to Dr. Hattier and Mrs. Bunting.**

Q. When did you speak to Dr. Hattier?

**A. Oh, probably a week or two ago.**

Q. And what was the substance of your conversation, what did he say?

**A. Just basically that it went quite a long time.**

Q. Anything else?

**A. We talked about, a little bit about the type of stuff you might be covering or asking or something, but exactly what I couldn't tell you.**

Q. Do you recall that Dr. Hattier told you any questions that he was asked?

**A. No. He told me that you and him got into some**

**philosophical discussion.**

Q. You can imagine that's difficult with Dr. Hattier?

**A. I have been sitting on the board with him for quite a few years, I could imagine.**

Q. And Mrs. Bunting, what did you talk about with Mrs. Bunting?

**A. She had mentioned some things that she didn't think made her sound very smart because she didn't know the answers to them. I think it kind of made her look as if she weren't very smart.**

**And specifically I couldn't tell you just what they were.**

Q. To prepare for the deposition today, you met with lawyers for the district?

**A. Yes.**

Q. That's Mr. Shau and Mr. Gosselin?

**A. Yes.**

Q. Was anyone else present?

**A. Yes.**

Q. Who was present?

**A. Other people that were to be disposed as well. Elaine McCabe and Robert Wilson, and I think that's it.**

Q. Were you shown any documents during the

Page 6

preparation session?
**A. No.**
Q. Do you have an e-mail address that ends with irsd.net?
**A. No.**
Q. Do you maintain any e-mail accounts?
**A. I have an e-mail account at work.**
Q. Do you have one at home as well?
**A. I got one, but I don't even know what it is.**
Q. All right. Do you ever receive e-mail communications from the district regarding your duties as a school board member?
**A. No, I never do.**
Q. When you get a board package, I take it it's hand delivered to you?
**A. Yes.**
Q. We had testimony this morning from Susan Bunting that periodically she receives updates via e-mail from the Drinker Biddle firm which represents the district in this case. She did not know who else was on the distribution list for those updates.
Are you on the distribution list?
**A. Yes.**
Q. And do you receive those updates via e-mail?

Page 7

**A. Yes.**
Q. All right. So you do get communications regarding school board issues via e-mail from time to time?
**A. Just regarding this particular case.**
Q. Yes, that's the one I'm worried about today.
In addition to the updates from Drinker Biddle lawyers, have you received any other e-mail communications relating to this case?
**A. No.**
Q. Have you received any e-mail communications regarding the school board prayer policy?
**A. Not that, to my knowledge, no.**
Q. Do you use a fax machine?
**A. Yes.**
Q. Have you received faxes concerning school board meetings?
**A. Concerning school board meetings?**
Q. Yes.
**A. I'm sure I have.**
Q. Have you received faxes concerning this case?
**A. Probably.**
Q. When you receive a fax concerning this case, what do you do with it? I assume you read it?

Page 8

**A. Yes.**
Q. And do you then file it somewhere?
**A. My filing system is whichever pile it goes into, or that's what it had been over the years.**
Q. You say that's what it had been over the years. Did you change it?
**A. I'm no longer on the board.**
Q. I understand.
When you went off the board, what did you do with your piles relating to the school board?
**A. Anything I found regarding the school prayer issue or regarding this case was turned over to the school secretary.**
Q. Okay. So at some point a request was made to you to look through your --
**A. Yes.**
Q. You have to let me finish my question.
-- look through your stacks of documents relating to the school board and you turned over to the school secretary anything you found that you thought related to this case?
**A. Yes.**
Q. Okay. And the school secretary is?
**A. Janet Hearn.**

Page 9

Q. Was it Mrs. Hearn or Miss Hearn?
**A. Mrs. Hearn.**
Q. Was it Mrs. Hearn who asked you to look through your files?
**A. Either Mrs. Hearn or one of her attorneys.**
Q. And was that request in writing or orally?
**A. I can't remember. It could very well have been both.**
Q. Prior to your search for documents, did you ever receive a communication from anyone urging you not to destroy any documents relating to this case?
**A. Yes, I think our original attorneys had sent us something.**
Q. All right. And did you try to preserve all --
**A. Yes.**
Q. -- documents relating to this case?
**A. Yes.**
Q. When you turned all those documents over to the school secretary, did you retain copies of them?
**A. No.**
Q. When were you elected to the school board?
**A. 1992 I believe was my first term.**
Q. And you went off the school board earlier this year?

Dobrich, et al. v. Indian River School District, et al.
Harvey L. Walls C.A. # 15-120 (JJF) October 25, 2006

Page 10

A. **Yes, July 1st.**
Q. So that's 14 years, roughly speaking --
A. **Yes.**
Q. -- of service.
During that period of time, is it correct that the board had a practice of opening its regular meetings with a prayer?
A. **Yes.**
Q. And were those prayers sectarian or non-sectarian?
A. **Probably most of them were -- honestly I'm not sure what sectarian and non-sectarian, the actual definitions are.**
Q. So you can't answer the question?
A. **Well, if I knew the definition of non-sectarian and sectarian, I could answer the question.**
Q. I may be able to help you out in a minute.
We have previously marked as -- we are running out of copies of this -- but we have previously marked as PX-9 what has been identified as the actual board prayer policy.
A. **Uh-huh.**
Q. This is policy BDA.1 and you'll see --

Page 11

MR. SHAU: They'll do anything to get rid of you down here, Tom.
MR. ALLINGHAM: Is that noise going to show up?
VIDEO SPECIALIST: I can hear you well over it, but it's just in the background. If you want to go off the record until it's done?
MR. ALLINGHAM: That's all right. We need to finish.
BY MR. ALLINGHAM:
Q. You'll see at the lower left that it was adopted on October 19th, 2004?
A. **Uh-huh.**
Q. All right. And this was a policy that emerged from the policy committee that you chaired; is that correct?
A. **That's correct.**
Q. And so you, I take it, were involved in leading the drafting process?
A. **Yes.**
Q. In Paragraph 5 of this policy, you'll see that it reads, "Any such prayers may be sectarian or non-sectarian.
A. **Uh-huh.**

Page 12

Q. And it continues on.
In the process of drafting this policy, what did you understand sectarian and non-sectarian to mean?
A. **Well, I never knew what they meant at all. I never even looked at the terms until all this started.**
Q. I'm sorry, you never looked at the terms of the policy you were considering --
A. **No --**
Q. Let me finish my question, sir.
You never looked at the terms of the policy you were considering and ultimately voting on until this litigation started?
A. **No. I said I never actually looked at non-sectarian or sectarian definitions at all until all this case started.**
Q. Well, when you --
A. **Or not the actual case. When the original complaint came to the board.**
Q. When you voted to adopt Board Policy BDA.1, what was your understanding of what sectarian and non-sectarian meant?
A. **Well, my understanding after reading this of non-sectarian means basically that you could name a**

Page 13

**supreme being, being Jehovah or Jesus or Buddha or Allah and whatever. And sectarian I take to mean as you can't, it would be basically a generality, only mentioning God and nothing else.**
Q. All right. So taking that as the definition of sectarian and non-sectarian, the prayers that were offered over the 14 years of your service on the board, were they sectarian or non-sectarian?
A. **I would say 90 percent were probably non-sectarian.**
Q. Non-sectarian?
A. **Yes.**
Q. So would I be correct in understanding that the board's practice over the 14 years of your tenure was to offer non-sectarian prayers to open its meetings?
A. **I don't know that that was a practice. I don't know that anyone in particular was told give non-sectarian or sectarian prayer, to my knowledge. Whoever gave the prayer gave the prayer however they wanted to give it.**
Q. All right.
Who drafted BDA.1?
A. **This was drafted by Tom Neuberger.**

4 (Pages 10 to 13)

Wilcox & Fetzer, Ltd. Professional Court Reporters (302)655-0477

Dobrich, et al. v. Indian River School District, et al.
Harvey L. Walls C.A. # 15-120 (JJF) October 25, 2006

Page 14

Q. How long did the policy committee consider the board prayer policy before it presented the proposed policy to the full board for first reading?

**A. Just long enough to get it into draft form. In other words, assigning the letters to it.**

**The actual wording in it was not left up to the policy committee. It was brought to the board by myself.**

Q. Was the actual language of the board prayer policy considered by the policy committee at any time?

**A. No.**

Q. How long did you serve on the policy committee?

**A. Out of 14 years, probably 11 or 12.**

Q. Okay. Was there an ordinary process for the drafting, consideration and adoption of board policies?

**A. The normal process would be it would come through the policy committee and then from the policy committee to me or the policy committee chairman would bring it to the board.**

Q. What was the normal process for drafting a policy?

**A. Various.**

Q. Tell me the ways that you went about drafting

Page 15

the policy?

**A. It all depends on the type of policy that it was. I mean sometimes the board would think that a policy would be needed in a certain area and they would make a recommendation to the policy committee and they would then consider it, come back with a draft.**

**Other times it could be that the state, department of education or federal education department would come down and say, you need to have a policy in this area. Then it would go through a policy committee and to the board.**

**Many times also it would go to the district's lawyer before it would come to the board.**

Q. Who was the district's lawyer in 2004?

**A. James Griffin.**

Q. Did this policy go to the district's lawyer?

**A. I believe it did, but I can't say for sure.**

Q. Well, in 2004, you were the president of the board; correct?

**A. I think so.**

Q. And you were the head of the policy committee?

**A. Yes.**

Q. Who would know better than you whether this policy went to the district's lawyer before it went to

Page 16

the full board?

**A. Probably a district administrator off the policy committee that sent it to Mr. Griffin.**

Q. Who would that be?

**A. I don't know. It could be Mr. Savage or Mrs. Bunting.**

Q. That would be Susan Bunting?

**A. Yes.**

Q. How did it come about that the policy committee undertook to consider a school board prayer policy?

**A. Because of the original complaint from Mrs. Dobrich.**

Q. And would you describe how that original complaint was transmitted to, either to the board or to the policy committee?

**A. The original complaint I think had to do with graduation services and baccalaureate services. During, there was also a complaint at a public meeting I think in August or so of that year about prayer at board meetings. I believe that complaint came from the ACLU representative who was there.**

**At that point, that's where the policy committee got looking at three different areas of the**

Page 17

**religion policy. We at that time had not in force.**

Q. Let me just see if I can establish a couple points out of that answer. First, in the summer of 2004, the board had no policies on graduation prayer, religion, or board prayer?

**A. Not to my knowledge.**

Q. Mrs. Dobrich made a complaint about prayer at graduation; correct?

**A. Yes.**

Q. And that was a complaint that was communicated orally to Miss Hobbs and subsequently to you; is that correct?

**A. That's correct.**

Q. Do you recall that Mrs. Dobrich later complained about, generally about religion in the schools?

**A. I think she may have said something along that line at public comments at a board meeting.**

Q. Do you recall that Mrs. Dobrich made a complaint about prayer at school board meetings?

**A. I don't recall that she did. I do recall that the ACLU representative did.**

Q. All right. And was it after the comment by the ACLU representative that the policy committee first

5 (Pages 14 to 17)

Wilcox & Fetzer, Ltd. Professional Court Reporters (302)655-0477

Page 18

began consideration of school board prayer?
**A. It was along that time.**
Q. Along that time is maybe different from after?
**A. My recollection is that three board policies concerning religion, board prayer, and there were two others concerning religion, were introduced to the board on the first reading about September of that year.**
Q. Correct.
**A. And I think the second reading was in October.**
Q. Correct.
**A. The initial complaint I believe came after the graduation in June.**
Q. Correct.
**A. So the policy committee in July and August would have looked at all of those and brought to the board in September.**
Q. All right.
Was it you who was in charge of the Policy Committee's development of the new policies?
**A. Yes.**
Q. I take it, then, that you contacted Mr. Neuberger to ask for a draft of a policy on school board prayer?

Page 19

**A. I had discussions with Mr. Neuberger.**
Q. How did you come to be in contact with Mr. Neuberger on that topic?
**A. We had, after the original complaint and a threat of lawsuit, we had contact with Mr. Neuberger.**
Q. Okay. Let me get some timing down. The original complaint was on June 3rd, that was the day of the graduation?
**A. Shortly thereafter --**
Q. I'll represent to you it was June 3rd.
**A. -- I would think.**
Q. When was the first threat of litigation communicated to you?
**A. I -- I'm not sure.**
Q. When did you first contact Mr. Neuberger?
**A. I don't know. I don't know when he was contacted.**
Q. Is it correct that your first contact with Mr. Neuberger came after a threat of litigation was made?
**A. I would say so.**
Q. And was that a threat of litigation that was explicit or did you just assume that litigation would ensue?

Page 20

**A. I would say it was an assumption.**
Q. Did you contact Mr. Neuberger or did Mr. Neuberger contact you?
**A. That I don't remember just who contacted Mr. Neuberger first. It could very well have been another board member.**
Q. Mr. Helms?
**A. I don't know if it was Mr. Helms or Dr. Hattier.**
Q. When you were president of the board, were individual board members authorized to contact lawyers to represent the board?
**A. On an instance like this, I may very well have authorized them to do so, to contact someone. But they certainly weren't authorized to sign a retainer with anybody.**
Q. And is it also true that without authorization from the board president or a full vote of the board, individual board members were not authorized to contact lawyers individually?
**A. That would depend on the case. I mean certainly when the district gets sued, especially lawyers have a tendency to name board members individually in their lawsuits, as was the case with**

Page 21

**this one.**
Q. When was this lawsuit filed, sir?
**A. I have no idea. I'd say --**
Q. February 28th, 2005.
**A. Okay.**
Q. The board policies were adopted in October of 2004; is that right?
**A. That's correct.**
Q. Did you receive any threat of litigation at any time, an explicit threat, up until the adoption of the policies in 2004?
**A. I'm not sure of an explicit threat.**
Q. Do you recall requests by representatives of Mrs. Dobrich for clarification of the policies after they were passed?
**A. Yes.**
Q. Do you recall that those requests explicitly said that Mrs. Dobrich's representatives hoped to act in a constructive way with the board?
**A. I remember it.**
Q. Do you know whether any response was made to Mrs. Dobrich's representatives?
**A. I think the response from the board was that, no, we would not meet with them.**

Dobrich, et al. v. Indian River School District, et al.
Harvey L. Walls C.A. # 15-120 (JJF) October 25, 2006

Page 22

Q. How about answering the questions that were posed?
**A. No, we were not going to answer the questions.**
Q. And why was it that you decided not to answer the questions or otherwise to respond to Mrs. Dobrich's representatives?
**A. Under the advice of an attorney.**
Q. Which attorney was that?
**A. Mr. Neuberger.**
Q. Was Mr. Neuberger representing the board?
**A. At that time, no.**
Q. So the board chose not to respond to Mrs. Dobrich on the basis of advice from a lawyer who was not representing the board; is that correct?
**A. He was advising the board.**
Q. What's the difference?
**A. We certainly weren't paying him and we had not signed a retainer with him.**
Q. How did you decide which lawyer that you had not retained -- strike that.
I asked you earlier whether Mr. Neuberger contacted you or you contacted Mr. Neuberger and you said the first contact with Mr. Neuberger may have been with another board member.

Page 23

Do you recall that testimony?
**A. Yes.**
Q. Is it your belief that Mr. Neuberger spoke to another board member before he spoke to you?
**A. Could have.**
Q. You don't know one way or another?
**A. No.**
Q. Do you have any memory of how -- of the first contact between Mr. Neuberger and a board member?
**A. The first contact, no.**
Q. I am going to show you what we have previously marked as PX-36.
**A. (Pause.)**
Q. Have you ever seen that document before?
**A. I don't believe I have because I don't know what TRI is.**
Q. The testimony has been that that's The Rutherford Institute.
**A. Okay.**
Q. Do you know what The Rutherford Institute is?
**A. Yes.**
Q. That's an institution with which Mr. Neuberger is affiliated; is that right?
**A. Yes.**

Page 24

Q. So whether you know what TRI is or not, have you ever seen PX-34 before?
**A. I could have. It looks to be some type of press release.**
Q. There is a fax line at the top showing that it was sent by the Neuberger firm to someone on August 19th, 2004. I will represent to you that this document was produced from the district's files. So some way this document found its way into the district's files.
If you look at the fax line at the top, you'll also see that this is the fourth page of a four-page transmission.
Do you know what the other three pages were?
**A. I have not a clue.**
Q. About halfway down the page of PX-36, you will see that there's a statement that begins, "So one member of the Indian River School Board," do you see that?
**A. Yes.**
Q. "So one member of the Indian River School Board has asked The Rutherford Institute in Virginia for help in standing up to the ACLU. That was vice president Reginald Helms."

Page 25

Does that refresh your recollection that it was Mr. Helms who first contacted Mr. Neuberger?
**A. It could have been.**
Q. You still don't recollect?
**A. I'm not sure.**
Q. Did the board ever retain Mr. Neuberger or The Rutherford Institute to represent it in connection with this lawsuit and the issues presented?
**A. Technically, no.**
Q. And did Mr. Helms ever retain Mr. Neuberger to represent him individually in connection with this lawsuit?
**A. I believe he did.**
Q. And how do you know that Mr. Helms retained Mr. Neuberger?
**A. I believe he announced that to the board.**
Q. Do you know whether Mr. Helms signed a retention agreement with Mr. Neuberger?
**A. I would not know.**
Q. Is it your practice as board president when you retain a lawyer or a law firm on the district's behalf to sign a retention agreement with that lawyer?
**A. The actual board president, no. It may very**

7 (Pages 22 to 25)

Wilcox & Fetzer, Ltd. Professional Court Reporters (302)655-0477

Page 26

**well have been the superintendent.**

Q. It is the practice of the district when it retains lawyers to execute a retention agreement; is that right?

**A. I believe so.**

Q. Okay.

Let me show you what's been marked as PX-34.

I gather that you have seen this document?

**A. I am sure I have.**

Q. The first page reflects it was faxed from Mr. Helms to you on September 2nd, 2004; is that correct?

**A. That's what it says on the front.**

Q. You have no reason to doubt that, do you?

**A. No.**

Q. Looking at the content of the fax, do you recall having seen this document?

**A. I am sure I have seen it. I just don't necessarily remember it.**

Q. Look at the next to the last page of the package which we have marked. Down at the bottom of the page, you will see that there are five numbered

Page 27

paragraphs continuing over to the last page.

**A. Uh-huh.**

**Right.**

Q. Are they substantively identical to the board policy as adopted?

**A. They are.**

Q. Is this the document in which Mr. Neuberger transmitted to you, apparently through Mr. Helms, the text of the policy that you prepared to the board on September 29th?

**A. Yes.**

Q. And is this the first time that this text was transmitted to you from Mr. Neuberger?

**A. I don't know.**

Q. When you received this document, PX-34, did you review it?

**A. Yes.**

Q. Did you see anything in it that you thought was inaccurate?

**A. I don't know about inaccuracies, but I believe I recollect, after seeing it, my recommendation to the board was the numbered items as policies on the last two pages as the actual policy.**

Q. Yes, sir. You recommended to the full

Page 28

board --

**A. I did not recommend that all these other pages be part of the policy.**

Q. In making that recommendation and ultimately voting to adopt policy BDA.1 on school board prayer, did you take into consideration as one factor in your decision the material provided by Mr. Neuberger in PX-34?

**A. Well, obviously I considered the last two pages.**

Q. Yes, that seems clear. Did you also take into account the materials provided in the first four pages of the fax?

**A. I certainly read them.**

Q. And did you take them into account?

**A. Yes.**

Q. The information provided was one of the factors that you considered in voting to adopt the policy; is that right?

**A. Yes.**

Q. On Page 2 of Mr. Neuberger's memo, about two-thirds of the way down the page in the last whereas clause on that page, PX-34 reflects, "The school board has retained the legal advice" -- sorry. I'll start

Page 29

again.

"The school board has obtained the legal advice of two competent and experienced constitutional attorneys, John W. Whitehead, Esquire, and Thomas S. Neuberger, Esquire, that prayer to open board meetings is constitutional in the United States Court of Appeals for the Third Circuit, which includes Delaware, and legal counsel have identified the following legal authority in support of their legal opinion."

**A. Yes, sir.**

Q. That legal authority and legal opinion is the material in this fax up to the five numbered paragraphs at the end; is that correct?

**A. Right.**

Q. And that's what you, one of the factors that you relied on in voting to adopt the policy?

**A. Yes.**

Q. So I take it that the whereas clause that I just read to you is, in your view, accurate?

**A. Yes.**

Q. On the next page in the fourth full paragraph -- it's a short paragraph -- Mr. Neuberger's materials read, "It is the opinion of legal counsel that since the Indian River School Board of Education

Page 30

is a public legislative and deliberative body, it has its rights to open its meetings with a prayer." Do you see that?

**A. Yes.**

Q. And the opinion of legal counsel is, the legal counsel involved is Mr. Neuberger; correct?

**A. Yes.**

Q. And the opinion that he gave you in that respect is reflected in this document?

**A. Yes.**

Q. On the next to the last page of PX-34, about two-thirds of the way down the page, right before the numbered paragraphs, you'll see that Mr. Neuberger's materials report, "Thus it is the opinion of legal counsel that the Supreme Court's decision in Marsh versus Chambers, which, unlike the Coles' decision, is binding precedent in Delaware, compels the conclusion that the Indian River School District's tradition of opening its meetings with a brief invocation is constitutionally permissible."

The legal counsel involved there is Mr. Neuberger?

**A. Yes.**

Q. And the opinion that was rendered is this

Page 31

document that we have before us; correct?

**A. I would say so.**

Q. That's what you understood it to be?

**A. Yes.**

Q. Did any other lawyer give you advice on the topics of the legal opinions that I just read to you from PX-34?

**A. I think Mr. Griffin gave us some advice, written advice.**

Q. Anybody else?

**A. I believe there was a lawyer from Tennessee with the ADF, the Alliance Defense Fund.**

Q. That's Mr. Kellum?

**A. Yes.**

Q. Anybody else?

**A. Legal advice?**

Q. Yes, sir.

**A. From a lawyer?**

Q. Yes, sir.

**A. Of course we had our insurance attorneys, John and John.**

Q. Okay. Anyone else besides --

**A. And since then, Jason, Drinker -- the current firm that we're --**

Page 32

Q. So the list that I have so far is Mr. Griffin --

**A. Uh-huh.**

Q. -- Mr. Neuberger, Messrs. Balaguer and Cafferkey, the John and John?

**A. Right.**

Q. The Drinker firm, Jason and Jarrod's firm, and Mr. Kellum of the Alliance Defense Fund?

**A. Yes.**

Q. Did the board receive advice from anyone else on the topic of school board prayer?

**A. Not any other attorneys that I'm aware of.**

Q. And now I want to clarify the timing. Up to the point of adoption of the policy on October 19th, 2004, am I correct that you had received advice from three lawyers, Mr. Griffin, Mr. Kellum, and Mr. Neuberger?

**A. I'm not sure of the timing of Mr. Kellum, whether that was before or after the adoption of the policies.**

Q. Okay. Neuberger and Griffin offered advice before the adoption of the policy?

**A. Yes.**

Q. And is it fair to say that you took into

Page 33

account in voting to adopt the policy the advice of Mr. Neuberger and Mr. Griffin?

**A. Yes.**

Q. And with Mr. Kellum you don't know whether it was before or after?

**A. I can't recollect the exact timing of talking to him.**

Q. Do you know who requested Mr. Neuberger to draft the board policy on school board prayer?

**A. Not specifically.**

Q. Was it you?

**A. It could have been.**

Q. But you don't recall?

**A. I can't remember.**

Q. It would have been out of the ordinary for someone else to have done it since you were the chairman of the policy committee; is that right?

**A. Probably. If it was another board member, it could have come from me asking the other board member to ask him.**

Q. Did Mr. Helms serve on the policy committee?

**A. No.**

Q. Was there some reason why Mr. Neuberger's draft policy came through Mr. Helms rather than to you

Page 34

directly?

A. **It could have been I could have asked him for his recommendation.**

Q. You asked Mr. Helms for his recommendation?

A. **No. It could have been I asked Mr. Helms to ask Mr. Neuberger for the recommendation.**

Q. Why wouldn't you just ask Mr. Neuberger directly?

A. **I'm just saying it could have been that way. I can't remember that I didn't ask Mr. Neuberger.**

Q. Yes. And I'm saying that if you did ask Mr. Helms to ask Mr. Neuberger, I'm asking, why would you have done it that way? Why wouldn't you just call Mr. Neuberger yourself?

A. **I don't know. I don't know the timing of it. It could have been that Mr. Helms was the only one who had a retainer with Mr. Neuberger.**

Q. Am I correct that you recommended the policy drafted by Mr. Neuberger to the full board without any change?

A. **There was a change.**

Q. What was the change?

A. **I believe from this PX-34, this was a recommendation -- recommended policy from**

Page 35

**Mr. Neuberger. The policy that I recommended, I put in draft form to go to the board consisted of only the last five items.**

Q. Apart from that, that is to say, in the text -- let me start again.

The text of the five numbered paragraphs, that was unchanged from what Mr. Neuberger sent you; correct?

A. **You have them here. I don't know word for word if they're identical. They could very well be.**

Q. They are not perfectly identical, Mr. Helm -- -- I'm sorry, Mr. Walls, but there's no change in the meaning. I want to talk to you about how -- well, here, let's do it.

If you look at the five numbered paragraphs of PX-34 and compare them to PX-9, you will see that in Paragraph 1 the final policy reads, "In order to solemnify its proceedings," and in Mr. Neuberger's draft it says, "In order to solemnify school board proceedings." No substantive change; correct?

A. **There is a substantive change in Item No. 1. If you look at the first sentence, it says, "The board of education on the actual policy may choose to open**

Page 36

**this meeting." Whereas you look at Mr. Neuberger's recommendation it says, "It is the policy of the board to open its meetings with a moment of silence in accordance with the freedom of conscious of individual board members," so I did change that somewhat.**

Q. And do you know why you changed it?

A. **Whenever making a policy, the first objective of the policy committee is to make a policy workable within a school district.**

**Mr. Neuberger doesn't work for a school district. One of the things I changed there by "may choose to open this meeting," basically in my meeting -- or my impression is that means the board doesn't have to open a meeting with a board prayer by putting the word "may choose to" in there.**

Q. Yes, sir.

A. **And I would say that's why I did that.**

Q. Okay. And was it you who made that change?

A. **Yes.**

Q. In the process of taking Mr. Neuberger's draft and converting it into the final proposal that you delivered to the board --

A. **Uh-huh.**

Q. -- was there anyone involved other than you?

Page 37

A. **No.**

Q. Okay.

So to come back to my earlier question, the change from "in order to solemnify its proceedings" to "in order to solemnify school board proceedings," can we agree that's a non-substantive change?

A. **I think it's a substantive change.**

Q. Did you think that "its" -- sorry. You understood "its" in your draft to be different from "school board"?

A. **I understand where it says "it is the policy" --**

Q. No, sir. I'm just looking at the first clause. Just the "in order to solemnify its proceedings," "in order to solemnify school board proceedings," that's not a substantive difference, correct, that first clause?

A. **That's correct.**

Q. Okay. We have spoken about the change from "it is the policy of the board" to "the board of education may choose," and you've described that in the one you viewed that as requiring a board to open its meetings with a prayer, whereas in the draft that you created it was the board of education may, but doesn't

Dobrich, et al. v. Indian River School District, et al.
Harvey L. Walls C.A. # 15-120 (JJF) October 25, 2006

Page 38

have to; correct?
**A. Right.**
Q. The second paragraph, there is a, I think, a minor change, but let's just confirm that it is a minor change. The Neuberger draft says, "On a rotating basis, one individual adult board member per meeting will be given the opportunity to offer a prayer or moment of silence," and in your draft, there is a change to, "to offer a prayer or request a moment of silence."
Do you see the difference?
**A. Yes.**
Q. And am I right that that's not a substantive change, you just thought that you were drafting it more clearly by saying "request a moment of silence"?
**A. That's correct.**
Q. In the third paragraph, would you agree with me there are no changes from the Neuberger draft to your draft?
**A. Yes.**
Q. The fourth paragraph there is a very modest, I think a very modest change in the first sentence. The Neuberger draft reads, "Such prayer is voluntary and it is just among the adult members of the board." Your

Page 39

draft reads, "Such prayer is voluntary and it is among only the adult members of the board."
That's not a substantive change, you just thought your draft was clearer; correct?
**A. Correct.**
Q. And can we agree that the second sentence of the fourth paragraph is unchanged from Mr. Neuberger's draft?
**A. Yes.**
Q. And the fifth paragraph is unchanged from the Neuberger draft; is that right?
**A. Correct.**
Q. Okay.
Now, I take from the fact that you made changes in the draft, including ones what you viewed as a substantive change in the draft, that you read and carefully considered Mr. Neuberger's draft?
**A. Yes.**
Q. Paragraph 1 of the draft appears to specify what the purpose of the prayer or a moment of silence is in that it says, "In order to solemnify its proceedings, the board of education may choose to open its meetings with a prayer or moment of silence."
Would you agree with me that the policy

Page 40

sets forth the purpose of the prayer or moment of silence offered by the board member, which is to solemnify its proceedings?
**A. Yes.**
Q. When you voted to adopt this policy, what did you understand the phrase "to solemnify its proceedings" meant?
**A. Just to impress upon the importance of a regular meeting, just to ask for guidance in making the proper decisions.**
Q. I understand that to be two separate goals, one to impress on the board members that they needed to take their responsibility seriously in the meeting that was coming up; is that right?
**A. Uh-huh.**
Q. And the second one was to seek divine guidance for the decisions that would be made; is that correct?
**A. Yes.**
Q. Do you know whether the board prayer policy was ever discussed at a policy committee meeting?
**A. I don't believe it was. Other than to ask for its proper format from the other policy members. Me as a board member, I don't know just exactly what letter to assign. That's the format I'm saying. I mean the**

Page 41

**actual substance of the board policy, no, it was not discussed at that meeting.**
Q. Are most board policies discussed at a policy committee meeting?
**A. Yes.**
Q. Why was this one not discussed?
**A. Because I did not want to subject the administrators on the policy committee to any portion of that policy because I figured -- I thought this was a policy completely affecting the board.**
Q. And only the board?
**A. Yes.**
Q. Okay. And that's reflected in the first sentence of Paragraph 4, "Such prayer is voluntary and it is among only the adult members of the board"?
**A. Yes.**
Q. I take it that it was your view that to accomplish its purpose, that is, to solemnify its proceedings, the board could accomplish that purpose by having a member open its meeting with a prayer; correct?
**A. Yes.**
Q. That would be an effective way to solemnify the proceedings?

11 (Pages 38 to 41)

Wilcox & Fetzer, Ltd. Professional Court Reporters (302)655-0477

Page 42

**A. Yes.**

Q. The board of education could also solemnify its proceedings by having a member request a moment of silence; correct?

**A. That's correct.**

Q. And that would be an effective way to solemnify the proceedings?

**A. Yes.**

Q. At the October 19th, 2004 board meeting when the policy was adopted, you were president of the board; correct?

**A. I'm sure I was.**

Q. And did you invite someone to open the meeting with a prayer or moment of silence?

**A. I'm sure I did.**

Q. Do you know whether you read a disclaimer of some kind before the member offered the moment of silence or the prayer?

**A. I probably did.**

Q. Did you have it written down?

**A. Yes.**

Q. Do you know what the text of that disclaimer consisted of?

**A. Not after having not read it for a year and a half, no.**

Page 43

Q. Did you have a piece of paper that you brought, the piece of paper on which the disclaimer was written, that you took with you to each meeting --

**A. Yes.**

Q. -- so that you'd know what to read?

**A. Yes.**

Q. Do you still have that piece of paper?

**A. No.**

Q. Did you give it to Mr. Bireley?

**A. I more than likely did.**

Q. Okay.

Mr. Bireley testified that that disclaimer consists of Paragraphs 1 and 4 of the board policy. Is that your recollection?

**A. I never really put the two together, but now that I read them, I would say that's probably it.**

Q. Am I right in understanding, Mr. Walls, that it is the intention of the board prayer policy that no one other than the adult members of the board would be the object of the prayer?

**A. That is the object.**

Q. Am I then correct that in order to solemnify its proceedings, the prayer among the adult members of

Page 44

the board could take place outside of the regular meeting immediately before the meeting?

**A. It could, but in my mind, that wouldn't solemnify the meeting.**

Q. Could you explain to me why not?

**A. The actual board meeting is the board's meeting that happens to be held in public. I would say that there are Sunshine Laws that would prohibit the board from getting together before the meeting and then going in and holding the meeting.**

Q. Have you completed your answer?

**A. To my knowledge, the board can't meet unless it advertises the meeting and opens it to the public. So if the board were to meet outside in the hallway with no one around, that would be an illegal meeting.**

Q. Have you completed your answer?

**A. Yes.**

Q. Did you ever request advice from anyone on that topic?

**A. No, not that I can remember.**

Q. Do you recall any discussion of that opinion, that is, that to meet immediately, immediately prior to walking on stage and taking your seats at the board meeting, to meet solely for the purpose of having a

Page 45

prayer among only the adult members of the board would violate the Sunshine Laws?

**A. There could have been discussion. I can't recall.**

Q. Did you ever express the view that to meet solely for the purpose of a prayer immediately prior to a regular board meeting would violate the Sunshine Laws?

**A. I could have.**

Q. Well, with respect, Mr. Walls, "I could have" is not a useful answer because you could have done anything.

**A. Well, I'm of that opinion since you asked me that why don't we meet before going in, I'm of the opinion now that that would be an illegal meeting. I can't see where I would have been under a different opinion a year and a half ago or two years ago.**

MR. ALLINGHAM: We're going to change the tape.

VIDEO SPECIALIST: Going off the record at 2:31 p.m.

(Recess.)

VIDEO SPECIALIST: Going back on the record at 2:37 p.m.

Page 46

BY MR. ALLINGHAM:

Q. Before we broke, Mr. Walls, I asked you some questions about whether the board could effectively solemnify its proceedings by meeting immediately prior to the regular board meeting and having its prayer among the adult board members then.

**A. Uh-huh.**

Q. And I think your testimony was, "I don't think that would solemnify the proceedings because it would be illegal," is that a fair summary of what you said?

**A. It may be what I said. I don't know that that's a reason because.**

Q. That was what I wanted to explore. There's two separate issues here, one is whether it would be legal to do so.

**A. Uh-huh.**

Q. And one is setting aside the issues of legality under the Sunshine Laws, would that be an equally effective way to solemnify the proceedings among the adult board members who are the target of the prayer. Okay?

**A. Okay.**

Q. Do you agree with me that there are two separate concepts?

Page 47

**A. I understand what you're saying, yes.**

Q. And I want to come back to the legality part in a minute. But first, would you agree with me that it would be equally effective to solemnify the board's proceedings if the board members met immediately prior to the board meeting and had a prayer among themselves?

**A. I don't think it would be equally.**

Q. How would it be different in terms of the effect of solemnifying the board's proceedings?

**A. To me it sets the whole atmosphere of the board meeting.**

Q. Do you have a button under the table?

**A. I'm not a fire member either.**

Q. It sets the whole tone of the board meeting?

**A. Uh-huh.**

Q. For the ten board members who would have the prayer immediately prior to walking into the room, wouldn't it set the tone for them equally well?

**A. I don't think it would be equal.**

Q. Would you agree with me that it would effectively solemnify the proceedings?

**A. It could.**

Q. Well, it could is not -- anything could happen. My question to you is what is your view, would

Page 48

a prayer among the ten board members immediately prior to the regular board meeting effectively operate to solemnify the proceedings?

**A. I suppose it could.**

Q. Would you agree with me that the only difference between a prayer -- for purposes of just articulating the difference here, I'm going to assume that you're meeting in one of the district school's auditoriums. All right?

**A. Uh-huh.**

Q. The only difference between meeting in the wings off stage and having a prayer and sitting down at your table on stage and having a prayer is that there's an audience for the latter and not for the former, isn't that right?

**A. There could be an audience.**

Q. Have you ever been to a board meeting where there wasn't an audience?

**A. I have been to some pretty sparsely attended ones.**

Q. But there's always an audience, isn't there?

**A. It depends on what you mean by audience.**

Q. Have you ever been to a board meeting at which there was no one present except the ten adult members

Page 49

of the board?

**A. No.**

Q. Okay.

**A. Not a regular scheduled.**

Q. Yes, and we're talking about regular board meetings --

**A. Yes.**

Q. -- because that's what the board prayer policy applies to; correct?

**A. Right.**

Q. All right. One difference between standing in the wings and having a prayer among the adult board members and walking on stage and having a prayer once you sit down at the table is that there's an audience for the on stage prayer; correct?

**A. That's one difference.**

Q. Okay. With respect to the solemnification of the proceedings, can you think of any other difference between the off stage prayer and the on stage prayer?

**A. I don't know the differences. You have mentioned one.**

Q. Is there any other difference that you can think of, in terms of the impact on solemnifying the proceedings, between a prayer off stage and a prayer on

Page 50

stage?
**A. Not that I can think of.**
Q. Okay. Now let's talk about the difference in the impact on the solemnification of the board's proceedings because there's an audience for the on stage prayer. Okay?
Is that because, in your judgment, is that because the members of the audience also get the benefit of setting the tone for the meeting in the on stage prayer?
**A. I would say they would get the benefit.**
Q. And they get the benefit because they observe and participate in the prayer; is that correct?
**A. No.**
Q. So they're not participating in the prayer?
**A. No.**
Q. Then how does it have an impact on them in terms of setting the tone for the meeting?
**A. I would think anybody who asks for guidance doesn't do it just asking for himself or herself. Normally people, when a prayer is given, are respectful even though they're not asked to participate.**
Q. When prayers are offered at board meetings, do you participate?

Page 51

**A. I have.**
Q. Were there board meetings where you didn't participate?
**A. Where I didn't participate in the prayer?**
Q. Did not participate in the prayer?
**A. No.**
Q. What do you do to indicate -- when you're not leading the prayer, what do you do to indicate that you're participating?
**A. I don't know that I have to indicate anything.**
Q. I didn't say that you had to. Do you do anything to indicate that you're participating in the prayer?
**A. Occasionally I may say "amen" at the end.**
Q. Do you bow your head?
**A. Yes.**
Q. Do you fold your hands in prayer?
**A. I don't fold my hands, no.**
Q. Do you close your eyes when the prayer is offered?
**A. Yes.**
Q. Is that your consistent practice to close your eyes and bow your head?
**A. Yes.**

Page 52

Q. Would it be your expectation that members of the audience would close their eyes and bow their heads during the offering of the prayer?
**A. I have no expectation for the audience. They can do whatever they wish.**
Q. In your view, Mr. Walls, is it necessary for a member of the board to open board meetings with a prayer in order to solemnify the proceedings?
**A. Is it necessary?**
Q. Yes.
**A. No.**
Q. To state it from the other direction, the board would -- it's your expectation that the board would conduct its proceedings in a solemn and dignified and disciplined way whether it opened the meeting with a prayer or not, isn't that correct?
**A. Yes.**
Q. In special meetings of the board, it has been the practice not to open those meetings with a prayer; correct?
**A. Correct.**
Q. Those meetings have been conducted, I take it, in a solemn, respectful and disciplined way?
**A. Hopefully.**

Page 53

Q. Yes, sir.
For the members of the board -- let me just speak specifically for you first. Are you a member of any particular religion?
**A. Yes.**
Q. What religion is that?
**A. Methodist.**
Q. And do you regularly attend church?
**A. Not regularly.**
Q. Are you a member of some church?
**A. Yes.**
Q. What church is that?
**A. Grace United Methodist in Georgetown.**
Q. You mentioned one aspect of the solemnification of the proceedings might be to seek divine guidance for decisions that board members would be confronted with during the meeting, do you recall that?
**A. Yes.**
Q. And do you, yourself, or did you yourself when you were a board member, from time to time, seek divine guidance for the decisions with which you'd be faced?
**A. Yes.**
Q. Did you do that during special meetings from

Dobrich, et al. v. Indian River School District, et al.
Harvey L. Walls C.A. # 15-120 (JJF) October 25, 2006

Page 54

time to time?
**A. Personally?**
Q. Yes.
**A. Yes.**
Q. And I take it you did that by offering a silent prayer for guidance?
**A. Yes.**
Q. Whether God hears your request for divine guidance doesn't depend whether it's stated out loud or said to yourself, according to your belief?
**A. That's true.**
Q. Would you agree with me, then, that it would be equally effective to solemnify the proceedings for each individual board member to ask for divine guidance in his or her own way in accord with the freedom of conscience of that individual adult board member?
**A. It could be.**
Q. Would you think that it would be?
**A. No.**
Q. And would you explain to me why not?
**A. Just simply because of tradition if nothing else.**
Q. I am going to show you again -- actually, you may still have it.

Page 55

MR. SHAU: PX-36.
MR. ALLINGHAM: The press release, yes, PX-36.
BY MR. ALLINGHAM:
Q. The second paragraph of the text of the press release reads, "The Indian River School Board has historically opened its meetings with a non-sectarian prayer. Our own US Congress and many other public bodies historically do so."
**A. Right.**
Q. Is it correct that the Indian River -- first of all, do you know where Mr. Neuberger learned that the Indian River School Board has historically opened its meetings with a non-sectarian prayer?
**A. I don't know how Mr. Neuberger knew that.**
Q. Did you tell him that?
**A. I could have.**
Q. Is it your view that the Indian River School Board has historically opened its meetings with a non-sectarian prayer?
**A. Yes.**
Q. But as you sit here today, you don't recall one way or another whether you told Tom Neuberger that?
**A. I could very well have told Tom Neuberger that.**
Q. But you don't --
**A. To my knowledge, for at least 14 years, I know they have.**
Q. My question is simply directed to whether you recall having told Mr. Neuberger that?
**A. My recollection's not good enough to recall what I told somebody a year and a half ago or two years ago or whatever it was.**
Q. That's a perfectly good answer. I'm just trying to get at whether you do recall that you said it, you affirmatively recall that you didn't say it, or whether you just don't remember one way or another?
**A. No, I don't remember specifically --**
Q. Fair enough.
**A. -- that I told Tom Neuberger.**
Q. Fair enough.
As between the two methods of solemnifying the proceedings which are set forth in the policy, that is, a prayer or a moment of silence, do you view them as equally effective in solemnifying the proceedings.
**A. My personal view is yes.**
Q. Have you ever heard any discussion at a board meeting in which a board member expressed the view that a moment of silence was not as effective as a prayer to solemnify the proceedings?
**A. I don't remember such discussion.**
Q. Do you remember any discussion at the board level of the possibility of having a policy that would simply provide for a moment of silence rather than a prayer?
**A. I believe there was one board member who expressed that possibility.**
Q. Who was that?
**A. I believe that was Dr. Isaacs.**
Q. Did he express that possibility at a board meeting?
**A. I think he did.**
Q. Do you know when that board meeting took place?
**A. Oh, I would have no idea.**
Q. This would be before the policy was adopted; correct?
**A. Yes.**
Q. What was the response, if any, from other board members?
**A. The biggest response I heard was, no.**

15 (Pages 54 to 57)

Wilcox & Fetzer, Ltd. Professional Court Reporters (302)655-0477

Page 58

Q. And did anyone express their reasons for saying no?
**A. Tradition. I think I heard that more than anything else.**
Q. Tradition meaning the board's history of opening its meetings with a prayer?
**A. Yes.**
Q. Of course the policy, I take it, breaks from that tradition in the sense that it permits a moment of silence as well?
**A. It breaks from that tradition, yes.**
Q. Did anyone express any views, any reasons for saying no to Dr. Isaacs's suggestion other than tradition?
**A. I can't remember.**
Q. Do you recall anyone saying, I am not going to be told how I pray?
**A. I have heard board members say that, yes.**
Q. Was that at a board meeting?
**A. Yes.**
Q. More than one board meeting?
**A. We had more than one discussion over it, I'm sure.**
Q. What board members do you recall having said

Page 59

that?
**A. I have said that.**
Q. Anybody else?
**A. I'm sure there is, but exactly who, I couldn't tell you.**
Q. Did this board policy change the board's practice in any way of opening its meetings with a prayer? Did it effect any change in the board's practice or did it simply memorialize what had gone on before?
**A. I think there was more participation or in a rotation basis.**
Q. By that you mean that after the adoption of the policy more board members participated in the --
**A. Yes.**
Q. -- in the opportunity to open the meetings with a prayer?
**A. Correct.**
Q. Was that something that was, that you intended as the person who recommended this policy to occur as a result of the adoption of the policy?
**A. I think it was just a matter of fairness, because before that it had basically been up to the president, would ask someone, you know, ahead of time**

Page 60

**to give a prayer, so they wouldn't put anybody on the spot. And usually that would turn out to be one or two people throughout that year historically.**
**After that I think more people were asked to give a prayer, if they would like to. But I know even when I was board president, I didn't want to ask somebody at the board meeting right then and there and put them on the spot.**
Q. How would that put a board member on the spot?
**A. Well, I certainly wouldn't -- I'm not the type of person that I give public prayers often. I don't have that opportunity often.**
**If I were going to do one at a board meeting, I'd want to know it in advance.**
Q. Well, couldn't a board member simply decline the opportunity?
**A. Oh, certainly, certainly.**
Q. So why would it be putting the board member on the spot?
**A. I just believe that it would.**
Q. Well, and I'm trying to explore why you believe it would?
**A. Well, if you were to ask somebody and they would publicly decline, they may very well be**

Page 61

**embarrassed.**
Q. Why would they be embarrassed by publicly declining an opportunity to open the meeting with a prayer?
**A. Again, they would be put on the spot and asked about something they didn't know about ahead of time.**
Q. Was it your perception there was something wrong with simply declining the opportunity?
**A. It may be someone else's perception.**
Q. The perception of someone else in the audience?
**A. Yes.**
Q. And so by offering people the opportunity in advance, you would avoid --
**A. Well, some people, I know, wouldn't have time to research one board member in particular like historical-type prayers.**
Q. Dr. Hattier?
**A. Yes, sir.**
Q. Other than that, did the policy effect any change in the practice of the board regarding opening its meetings with a prayer?
**A. I don't think so.**
Q. The policy provides in paragraph -- this

Dobrich, et al. v. Indian River School District, et al.
Harvey L. Walls C.A. # 15-120 (JJF) October 25, 2006

Page 62

rotational idea is set forth in Paragraph 2 of the policy; correct?
**A. Right.**
Q. And since the adoption of the policy and up to the point where you left the board, was the mechanism or procedure set forth in Paragraph 2 followed?
**A. I don't think it was followed to the letter, no.**
Q. Tell me what you did as board president to rotate the opportunity to offer a prayer or moment of silence among the board members?
**A. Well, honestly, honestly, if -- again, if I didn't ask someone ahead of time, I felt very bad about asking somebody at all.**
Q. Okay.
**A. And many times I had forgotten about it when I got to the board meeting.**
Q. Yes.
**A. So at which time I knew there was only one or two board members who had no problem feeling comfortable doing it.**
Q. Right.
**A. So they probably got asked more than other people.**

Page 63

Q. Okay. Did you -- well, let me ask you a question.
Am I correct, then, that your practice as board president did not change from before adoption of the policy to after the adoption of the policy in terms of how you offered the opportunity to prayer?
**A. There was no set practice as far as I know as far as alphabetical or anything like that on how you would rotate.**
Q. When I took Mr. Bireley's deposition, who succeeded you as board president --
**A. Uh-huh.**
Q. -- he told me that what he did was to ask the board members who were then sitting on the board whether they would like to be included in the rotation.
**A. Uh-huh.**
Q. And he then offered the opportunity to prayer at the board meetings only to the people who had responded affirmatively that they'd like to be in the rotation.
Is that effectively what you did?
**A. Yes.**
Q. That practice ensures that no one will ever decline the opportunity to open the meeting with a

Page 64

prayer; correct?
**A. No, because I think we have one who specifically did a moment of silence.**
Q. Yes, I'm sorry, my question wasn't clear.
The practice that you and Mr. Bireley followed ensured that no one would decline the opportunity to offer a prayer or a moment of silence; correct?
**A. In our personal practices, yeah, it probably assured that.**
Q. Yes.
Would you agree with me that the rotational mechanism set forth in Paragraph 2 -- well, let me back up.
If a member chooses not to exercise the opportunity, the next member in the rotation is offered the opportunity, would you agree with me that the net effect of that mechanism is that unless all ten adult board members decline the opportunity, that is, unless all ten don't want to open the meeting with a prayer or moment of silence, the board's meetings will be open with a prayer or a moment of silence?
**A. That's probably correct.**
Q. Did you give any consideration to just not

Page 65

adopting a policy since it was not going to change the board's practice and tradition of opening its meetings with a prayer?
**A. I don't know if I did or not.**
Q. How did Mr. Neuberger know what you wanted in terms of the substance of the board prayer policy that you asked him, or someone asked him on your behalf to draft?
**A. I don't know how he knew it.**
Q. Did you give Mr. Neuberger any instructions at all as to what you wanted the board prayer policy to say?
**A. Did I?**
Q. Yes.
**A. No.**
Q. Did you ask someone else to give Mr. Neuberger instructions on what the board policy should say?
**A. Not that I can remember.**
Q. Does it strike you as odd that you sent someone off to draft a policy without giving him any instructions at all about the content of the policy that you wanted?
**A. To me, on something like this, I think we were after trying to get something that was legal.**

17 (Pages 62 to 65)

Wilcox & Fetzer, Ltd. Professional Court Reporters (302)655-0477

Dobrich, et al. v. Indian River School District, et al.
Harvey L. Walls C.A. # 15-120 (JJF) October 25, 2006

Page 66

Q. Okay. Would I be right in understanding that at the very least you said, in words or substance, what we're looking for, Mr. Neuberger, is a board prayer policy that's legal?

**A. We certainly wanted something that was legal.**

Q. And I assume you told Mr. Neuberger that or somehow conveyed that to Mr. Neuberger?

**A. It may have been conveyed to him, I'm sure.**

Q. There are lots of board prayer policies that would be legal? For example, you could have a board prayer policy that says, or a policy on solemnization that says, In order to solemnify its proceedings, the board of education may choose to open its meetings with a moment of silence.

Do you know how Mr. Neuberger knew that you wanted a policy that contemplated a prayer or a moment of silence?

**A. Not that specifically, no.**

Q. Okay.

The board's practice up to 2004 had been to open its meetings with a prayer, not with a moment of silence; correct?

**A. Yes.**

Q. Do you know why Mr. Neuberger put a moment of

Page 67

silence in the draft?

**A. No, I don't know why.**

Q. Do you know why Mr. Neuberger put the rotation in Paragraph 2 of the draft?

**A. Only that that would give everybody the opportunity to give a prayer.**

Q. Did you ever have any discussions with Mr. Neuberger about this draft?

**A. I probably did.**

Q. Do you recall the substance of those discussions?

**A. No, I don't.**

Q. At the time this policy was adopted, the only members of the board were adults; is that correct?

**A. Yes.**

Q. And there has never been a non-adult member of the board; correct?

**A. Not to my knowledge.**

Q. Do you know why Mr. Neuberger put in Paragraph 4, "it is among only the adult members of the board"?

**A. Well, it could be because some school boards do have student members of the board.**

Q. Did you have a discussion with Mr. Neuberger about that?

Page 68

**A. No. Or not that I can remember.**

Q. I am sorry, sir, I didn't write it down, the name of the church that you're a member of is the Grace United Church?

**A. Grace United --**

Q. United Methodist?

**A. -- United Methodist Church.**

Q. There's been testimony in the depositions in this case that have been taken in the last couple of weeks that at the August 24th, 2004 board meeting there were many hundreds of people in attendance. Do you recall that board meeting?

**A. Yes.**

Q. Do you know whether any effort was made at Grace United Methodist Church to encourage members of the congregation to attend that board meeting?

**A. I don't know that.**

Q. Have you ever heard anything about that?

**A. What, that Grace Church asked people to come?**

Q. Or encouraged people to come.

**A. No, I haven't.**

Q. Have you heard of any church at which parishioners were encouraged to attend the August 24th board meeting?

Page 69

**A. No.**

Q. When you arrived at the board meeting, did you notice that there were buses parked in the parking lot?

**A. I got there early, and we came in through the back. It was quite crowded.**

Q. Quite crowded even when you arrived early?

**A. Yes.**

Q. You said you came in through the back. Does that mean that you don't go through the main parking lot at Frankford Elementary?

**A. We didn't that night.**

Q. So you didn't see buses in the parking lot?

**A. No.**

Q. Did you personally encourage anyone to attend the August 24th board meeting?

**A. Yes. My wife.**

Q. Anyone else?

**A. No.**

Q. Why did you encourage your wife to attend?

**A. Because I occasionally encourage her to come.**

Q. I have been on a school board and it's hard for me to imagine encouraging my wife --

**A. I also encouraged her to come to my last one.**

Q. The last one I could see because you were

18 (Pages 66 to 69)

Wilcox & Fetzer, Ltd. Professional Court Reporters (302)655-0477

Dobrich, et al. v. Indian River School District, et al.
Harvey L. Walls C.A. # 15-120 (JJF) October 25, 2006

Page 70

leaving the board; right? Was there a particular reason why you --
A. **She came over the years, over the 14 years or so, she came in support of me.**
Q. In support of you for a particular issue?
A. **No.**
Q. Just --
A. **Just being in support of me as her husband.**
Q. Was there anything that distinguished the meetings at which she came to support you as her husband from the meetings where she didn't attend? Were they particularly thorny issues that were going to be presented at those meetings?
A. **I couldn't tell you. There could have been.**
Q. You said that you encouraged your wife to attend the August 24th meeting. Was there a particular reason why you encouraged her to attend that meeting?
A. **I knew that that would be a well attended meeting.**
Q. But apart from your wife, you didn't encourage anyone else?
A. **I don't see anything wrong with encouraging my wife to do anything I'm doing.**
Q. I didn't suggest that there was.

Page 71

A. **But other than my wife?**
Q. Yes, sir.
A. **No.**
**Actually as board president I like it a lot better when there's a lot less people there.**
Q. Why is that?
A. **The meeting tends to go a little easier.**
Q. If there's heavy attendance, you have more difficulty in running the meeting?
A. **As board president, yes.**
Q. Why is that?
A. **More people, more people want to talk, tends to take things a long time.**
Q. We will talk about that in a minute. We will talk about that in a minute.
You testified a little earlier that you, and perhaps other board members, had expressed the view with respect to the school board prayer policy that no one should, no one should tell you how to pray. Do you recall that?
A. **I remember saying that.**
Q. Was a purpose of adopting the board prayer policy to safeguard or otherwise protect the individual board members' right to pray as they see fit?

Page 72

A. **I think the purpose of the board prayer policy was to put something in place that had no coverage at all in the policy manual.**
Q. Well, there are many things that aren't covered in the policy manual, isn't that right?
A. **There is, there is.**
Q. So what I'm trying to get at is the purpose for adopting this particular policy?
A. **Well, the accusation had been made that prayer before a board policy -- or board meeting was illegal. And I think that our asking an attorney to come up with a policy that was legal was totally in line.**
Q. And was the purpose of doing that to protect the individual board member's right to pray as they see fit?
A. **That was one of the purposes.**
Q. When you presented Board Policy BDA.1 to the full board, did you tell the board that the board's attorneys had approved it?
A. **I don't remember what I told the board when I presented it.**
Q. Did the board's attorneys review and approve the policy before it was presented to the full board?
MR. SHAU: Objection.

Page 73

THE WITNESS: I don't know.
MR. SHAU: You can answer as to whether or not the attorneys reviewed it. I'm going to instruct the witness not answer as to whether or not they approved the policy BDA.1.
BY MR. ALLINGHAM:
Q. Let me break it into two questions.
A. **I don't know if they reviewed it or not.**
Q. Was it your practice as chairman of the policy committee to have the board's attorneys review policies before they were proposed for adoption?
A. **Not all policies.**
Q. How did you decide which policies to have the board attorneys review?
A. **A lot of times I left that decision to the administrators.**
Q. The administrators being the superintendent and the assistant superintendent?
A. **Well, the superintendent wasn't on the policy committee, but the assistant superintendent was.**
Q. I have reviewed the minutes and audiotapes of the meetings since October 19th, 2004, and it appears to me that you did not offer a prayer during the period from October 2004 until you left the board; is that

19 (Pages 70 to 73)

Wilcox & Fetzer, Ltd. Professional Court Reporters (302)655-0477

Page 74

correct?
A. **Me personally?**
Q. Yes.
A. **No, I think I did.**
Q. You're absolutely right. And you offered a prayer that was taken from a speech or a sermon by Martin Luther King?
A. **That's correct.**
Q. How did you find that?
A. **I don't know. It was a historical prayer. I can't remember just exactly the context of it.**
Q. Why did you choose a prayer by Martin Luther King?
A. **No reason.**
Q. There can't be no reason.
A. **I don't remember.**
Q. Do you recall if you said at the meeting before you gave the prayer that it was a prayer from Martin Luther King?
A. **I don't recall. I could have.**
Q. Did you get the prayer from Dr. Hattier?
A. **I don't know where I got the prayer from.**
Q. Did you know before the August 24th board meeting that it was going to be well attended?

Page 75

A. **I had that feeling.**
Q. How did you get that feeling?
A. **Well, this is Sussex County. When things get stirred up pretty much --**
Q. You hear about it?
A. **You hear it.**
Q. Would you agree that news can travel just as effectively by word of mouth in Sussex County as by other media?
A. **I would agree to that.**
Q. When you arrived -- before the meeting, did you know that there would be overflow, an overflow room set up with a video feed?
A. **I probably did know that.**
Q. Did Mrs. --
A. **I think Mrs. Hobbs may have briefed me that afternoon.**
Q. Was it your practice to meet with the superintendent in the afternoon before a board meeting?
A. **No.**
Q. When you walked into the board meeting at Frankford Elementary on August 24th, what do you recall about the atmosphere?
A. **Kind of tense. But it seemed to be, you know,**

Page 76

**under control.**
Q. One of your colleagues has testified that it seemed to be emotionally charged. Would you agree with that?
A. **I would agree with that.**
Q. Were people carrying signs in the audience?
A. **They could have been. I don't remember.**
Q. You don't remember.
On occasion were there outbursts from the crowd in the audience?
A. **There were, I think, a couple people yelling out or whatever. I can remember banging the gavel and asking people to be respectful of one another.**
Q. That's what I was going to ask you. You were in charge of keeping order at the meeting; correct?
A. **Yes.**
Q. And from time to time did you have to bang the gavel in order to get order?
A. **Yes, I think I did.**
Q. During the public comment section of the meeting, did you consider the tone of the comments respectful and courteous?
A. **Most of them.**
Q. Did you find some of the comments

Page 77

disrespectful and discourteous?
A. **I didn't find any to be out of line that I can remember. There were 30 some people I think that talked.**
Q. In order to -- the process for asking to speak at the public comment session of your board meetings is that there's a sign-up sheet; correct?
A. **Yes.**
Q. And in advance of the -- I'm sorry, the August 24th board meeting, you saw that there were a lot of people who had signed up to speak; correct?
A. **Yes.**
Q. And in response, did you expand the length --
A. **Yes.**
Q. -- of the public comment session?
A. **Yes.**
Q. And in response did you reduce the length of time that each individual speaker could speak?
A. **Yes, I think I did.**
Q. And did you enforce those time limitations?
A. **I think I only had to bang the gavel on one person to cut them off who I think went past the time limit.**
Q. Who was that?

Page 78

**A. Harold Johnson.**
Q. That's the only one you recall having to bang the gavel?
**A. That's the only one I recall having to bang the gavel on to tell him that was enough.**
Q. Who kept the time?
**A. Mr. Savage.**
Q. The way it would work was Mr. Savage would keep the time and let you know when the time --
**A. Yes, he would say time when the two minutes were up.**
Q. I forgot to ask you, Mr. Walls. Did you ask Mr. Neuberger whether the policy, the board prayer policy that he drafted, that he gave you, had been used elsewhere?
**A. I don't know if I asked that or not.**
Q. Did you ever learn whether it had been used elsewhere?
**A. No. I still don't know if it has or it hasn't.**
Q. Another policy that you adopted in the same time frame, the policy on religion --
**A. Right.**
Q. -- was largely taken from the Capital School

Page 79

District. Do you recall that?
**A. I don't know that it was Capital.**
Q. Did you from time to time use policies from other districts --
**A. Yes.**
Q. -- as precedents?
**A. Yes.**
Q. Is there a reason why you didn't use a precedent from another district to draft this school board prayer policy?
**A. I don't know if there's another board policy, prayer policy out there in Delaware on another district.**
Q. Did you look into whether there was another board prayer policy?
**A. Did I, no.**
Q. Did you ask anyone to look into that?
**A. I don't think so.**
Q. As a member of the policy committee, were you interested in whether any other district in the state had seen fit to adopt a policy on school board prayer?
**A. Was I interested?**
Q. Yes.
**A. I'm still interested.**

Page 80

Q. All right. If you were interested, did you do anything to investigate that issue?
**A. I may have asked an administrator to look into that, but I don't remember anything ever coming back.**
Q. As you sit here today, do you know whether any other district has --
**A. No, I don't.**
Q. You have to let me finish.
**A. Oh, I'm sorry.**
Q. On the one hand, we'd go faster if we each infringed on the other. On the other hand, we'd have a bad transcript.
**A. All right.**
Q. But I did lose my train of thought.
Have you ever learned whether any other district in the State of Delaware has a school board prayer policy?
**A. No, I haven't.**
Q. Do you know whether any other school district opens its board meetings with a prayer?
**A. No, I don't.**
Q. Are you interested in those questions?
**A. Yeah, I'm interested.**
Q. I'm going to show you a portion -- did you

Page 81

know that the August 24th meeting was videotaped?
**A. No, I didn't know that.**
Q. Have you ever seen or viewed any portion of the videotape of that meeting?
**A. I saw something on the WBOC News, like a ten-second clip or something the next day, but that's all.**
Q. Apart from that, that's all you know?
**A. That's all I know.**
Q. I want to show you a portion of the video -- so there's the siren, then there's the audio from the videotape. Its conspiracy to shut me up.
I am going to show you a portion of the videotape of the meeting. This is the comments of Harold Johnson.
And I think you will hear your voice toward the end of the portion of this tape.
And I am going to ask you some questions about it after I play it. If you need to see it again in order to get the substance of the comments, just let me know.
For the record, this is from PX-40, and what's the time?
MR. KEARNS: One hour one minute and zero

Page 82

seconds to one hour four minutes and 19 seconds.

MR. ALLINGHAM: Don't worry, I have absolute faith in my crew here.

Do you want me to go to something else and come back?

MR. KEARNS: That's okay.

(At this time Exhibit PX-40, a video recording, was played for the witness.)

BY MR. ALLINGHAM:

Q. First of all, I take it from some earlier testimony that you gave that you do recall Mr. Johnson spoke at the public comment session of the meeting?

**A. Yes.**

Q. And do you recall that Mr. Johnson spoke after Mrs. Dobrich spoke?

**A. Oh, I couldn't tell you when he spoke.**

Q. I'll represent to you that he did.

**A. Okay.**

Q. Did you hear Mr. Johnson speak about the disappearance of Madalyn Murray O'Hair at the meeting?

**A. I heard that.**

Q. And you heard it today?

**A. Yes.**

Q. Did you hear it at the meeting as well?

Page 83

**A. I think I -- yes, I had heard it.**

Q. And at the time did you know who Madalyn Murray O'Hair was?

**A. No, I didn't. It didn't sink into me who she was.**

Q. Well, Mr. Johnson helpfully described for those in the audience who Madalyn Murray O'Hair was; correct?

**A. Right.**

Q. And my question to you, Mr. Walls, is, do you think that it would have been reasonable for Mrs. Dobrich to feel threatened by the comments that Mr. Johnson made about the disappearance of a person who initiated the movement to remove prayer from the schools?

**A. I have known Mr. Johnson a long time. He was on the board when I first got on the board, and I can't believe that Mr. Johnson would make, you know, a personal threat of somebody's health.**

Q. Can you think of any reason why Mr. Johnson would have included in his remarks a description of Mrs. O'Hair's disappearance after she initiated the movement to remove prayer from our schools?

**A. I don't know why he put whatever context he**

Page 84

**had.**

Q. Okay. To come back to my original question. Do you think it would have been reasonable for Mrs. Dobrich to view that as a threat after she had spoken out in favor of changing the board's policy on prayer?

**A. Again, knowing Mr. Johnson, no, I just can't imagine him threatening.**

Q. I didn't ask whether he threatened her. I asked whether you thought it would be reasonable for Mrs. Dobrich to understand what he said to be a threat?

**A. Again, I wouldn't take what Mr. Johnson said as a threat because I know the guy.**

Q. Do you know whether Mrs. Dobrich knows the guy?

**A. I have no clue.**

Q. Did you notice the laughter from the crowd when he started talking about Mrs. O'Hair's disappearance?

**A. No, I didn't. Trying to run that meeting and get through that many speakers, believe me, I wanted everybody to get done as quickly as possible.**

Q. I can understand that. I meant during the tape, did you hear the laughter when he, Mr. Johnson --

Page 85

**A. Yes, I heard it.**

Q. And did you find that disturbing as you watched it, that people would be laughing at a description of somebody disappearing?

**A. Yes. But I don't believe you saw me laughing on there.**

Q. I don't think I did.

Was it your voice at the beginning of the segment that I played for you that said something along the lines of, "Sorry, Harold, I was going to say Earl"?

**A. It could have been. And I don't know why I would have said that.**

Q. Do you recall that the August 24th meeting was opened with a prayer?

**A. Yes.**

Q. You invited Dr. Hattier to give that prayer --

**A. That's correct.**

Q. -- correct?

**A. Correct.**

Q. Did you know what prayer he was going to give?

**A. I did.**

Q. How did you find out what prayer he was going to give?

Page 86

**A. He told me ahead of time when I asked him to give the prayer. He told me it would be one by George Washington.**
Q. Do you know whether Dr. Hattier told anyone else what prayer he was going to give?
**A. I don't know that.**
Q. Did you tell anyone else what prayer Dr. Hattier was going to give?
**A. I don't know if I did or not.**
Q. Do you recall that state representatives spoke at the meeting?
**A. Yes, there were three.**
Q. Do you recall that they read a letter?
**A. Yes.**
Q. Do you recall that the letter indicated knowledge of the prayer that Dr. Hattier was going to give?
**A. I don't recall that.**
Q. Have you ever served as a member of any other public body than the Indian River School Board?
**A. Yes.**
Q. What bodies?
**A. The Georgetown Jaycees, Sussex Central Pop Warner Football. I was president of that for two**

Page 87

**years. Something else too.**
**I have been a coach in Little League baseball and Little League wrestling and football.**
**Oh, American Legion, I'm a member of that too.**
Q. I should have asked you this at the beginning of the deposition. Are you employed?
**A. Yes.**
Q. And what is your position?
**A. I'm a crematory manager at Parsell Funeral Homes.**
Q. And is that in Georgetown?
**A. That's one of them. It has four branches.**
Q. And have you had -- did you have that job throughout your tenure as a school board member?
**A. No.**
Q. What did you do?
**A. I worked at E.I. du Pont in Seaford until 2001.**
Q. And that's when you took the job --
**A. Yes. I retired from DuPont and took the job with the funeral home.**
Q. Thank you.
Were you surprised at the amount of

Page 88

attention that the school board prayer issue got?
**A. Yes.**
Q. Do you think that it attracted more attention than it deserved among all the issues presented to the school board?
**A. Oh, definitely.**
Q. I am going to ask you some questions about why it might have gotten as much attention as it got.
Did you ever hear any constituent say to you -- and by constituent, I mean student, parent, resident of the district, fellow board member, whatever -- did you ever hear any constituent say to you, in words or substance, that the defense of this lawsuit was a defense of Christian values?
**A. I've heard that said.**
Q. And could you tell me who you heard that from?
**A. No, I couldn't.**
Q. Could you tell me the group of which the person who said that was a member?
**A. No.**
MR. ALLINGHAM: All right. We have to change the tape. Thank you.
VIDEO SPECIALIST: Going off the record at 3:35 p.m.

Page 89

(Recess.)
VIDEO SPECIALIST: Going back on the record at 3:41 p.m.
BY MR. ALLINGHAM:
Q. Right before we broke, Mr. Walls, I asked you whether you had heard from anyone that the defense of this lawsuit represented the defense of Christian values, and you said yes. I asked you who said it, and you didn't remember. I asked you from what group, and you didn't remember that either.
Is it fair to say that you heard it more than once, however?
**A. Yes, I'd say that's fair to say.**
Q. When I asked you questions about the attendance, expected attendance --
**A. At the big meeting.**
Q. -- at the August 24th meeting, you told me you knew it was going to be a big meeting, but you really didn't know how, that you just hear things in Sussex County; right, correct?
**A. Correct.**
Q. Is it fair to say that it is a widely held view in the Indian River District that the defense of this lawsuit represents a defense of Christian values?

Page 90

A. **There's a lot of perceptions out there about this lawsuit, I think, and not all of them are correct.**
Q. That may or may not be true, but it's not 100 percent responsive to my question.
Would you agree with me that it's a widely held view in the district that the defense of this lawsuit is a defense of Christian values?
A. **It's probably widely held in this district.**
Q. You mentioned some potential misperceptions about this lawsuit.
A. **Uh-huh.**
Q. Could you tell me what you had in mind when you said that?
A. **I hear things from time to time or see things, and I wondered where the people are coming from because they act like they know, but I know that they don't.**
Q. So when you said that, you didn't have any particular misperception in mind?
A. **No.**
Q. Is it fair to say that a lot of the comments at the August 24th board meeting reflected a misperception about what the board was considering at that time?
A. **Yes.**

Page 91

Q. And is that, was that misperception or did the comments reflect a misperception that the issue was prayer in the schools rather than --
A. **Yes.**
Q. -- school board?
A. **I heard that from several of the speakers.**
Q. Am I correct that you and the other board members did not try to correct that misperception because the public comment section is meant to be an opportunity for the board to hear from the public and not vice versa?
A. **Correct.**
Q. And that's something that the superintendent had urged the board to remember; correct?
A. **Yes.**
Q. Do you know whether at any time before or after the adoption of the board prayer policy a member of the public asked for a copy of the proposed policy and was -- and that request was declined?
A. **I don't remember if somebody specifically asked.**
Q. You never heard that a person asked for a copy of the policy and was told that if they wanted it, they should file a Freedom of Information Act request?

Page 92

A. **I don't remember that.**
Q. That would be contrary to --
A. **I mean but if this was the draft policy you're talking about?**
Q. Yes, yes.
A. **I can't see why someone would want a draft policy.**
Q. Well --
A. **And I don't know that the board has ever given out a draft policy before it's actually adopted.**
Q. What is the purpose of the readings of the policies?
A. **In case the board has second thoughts or wants to make changes on something, it gives a chance to do that.**
Q. It is not intended to give the public an opportunity to review and comment on the policies?
A. **After the first reading, yes, but I'm not giving something out to the public before I give to the board on a first reading.**
Q. I thought we might be misunderstanding one another.
I'm talking about a request made for the proposed policy after the first reading?

Page 93

A. **I don't remember. I mean but to me that's public information.**
Q. Should have been given to the person who requested it?
A. **Yes.**
Q. After the religion policies were adopted -- by religion policies, I mean the --
A. **There's three of them.**
Q. -- graduation, religion and board prayer --
A. **Yes.**
Q. I want to show you a copy of a document that we've marked as PX-49. This is a letter from me to the board of education dated, Indian River Board of Education, dated November 12th, 2004.
It's a lengthy letter. I recall spending time on it.
A. **Yes, I recall it.**
Q. Did you see it?
A. **Yes.**
Q. Did you read it?
A. **Yes.**
Q. Did you actually receive a copy in the mail?
A. **I don't know. I may have.**
Q. Whether you got it from the district or you

Page 94

got it in the mail, you have read a copy of it; correct?

A. **Right.**

Q. In the first paragraph, PX-49, the letter records, "We represent Mona Dobrich and her family. We have reviewed the Indian River School District's policies on 'School Prayer at Commencement/Graduation and Baccalaureate Ceremonies,' 'Board Prayer at Regular Board Meetings,' and 'Religion,'" which are then referred to as "the policies," "and have the following questions regarding the policies. We commend the board for recognizing its obligation to adhere to Federal and State constitutional principles and provisions, statutes and regulations pertaining to religious observances in public schools and the matters addressed in the policies. Our requests are designed to help us, and we hope the board as well, understand whether the policies accomplish that goal. We look forward to your responses and to working constructively and cooperatively with you to ensure that the district's policies are in accord with constitutional principles."

As a board member, when you read this letter, did you understand it to be a threat of litigation?

Page 95

**A. I thought it was.**

Q. What was it about this letter that you thought represented a threat of litigation?

**A. Well, one would have been we represent Mona Dobrich and her family.**

Q. You think every communication from a lawyer represents a threat of litigation?

**A. It sure does.**

Q. Really?

**A. To me.**

Q. That's actually what you think?

**A. Yes.**

Q. Apart from the fact that it was written by a lawyer representing someone, was there anything else about the letter that you viewed as threatening in tone?

**A. Yes. We were advised by Mr. Neuberger not to answer these complaints, that the policies should stand on their own and speak for themselves. And anything we did to answer all of these would just be giving you ammunition to use in a future lawsuit, which is true.**

Q. My question, though, is a little different. Was there anything in the letter other than the fact that it was written by a lawyer representing someone

Page 96

that you thought was threatening in tone?

**A. Well, I have certainly never had a lawyer write to me as policy committee chairman or board president with 21 questions being asked by a lawyer to explain policies.**

Q. I don't doubt that, but is just the asking of questions, in your view, threatening?

**A. From a lawyer, then I'm going to have a lawyer answer those questions.**

Q. Did you instruct a lawyer to answer the questions posed in the November 12th letter, which we've marked as PX-49?

**A. I did not.**

Q. What did you do with this letter when you received it?

**A. Basically, like I said, it was presented to Mr. Neuberger and he made the recommendation that it not be answered.**

Q. And who made the decision to present this letter to Mr. Neuberger?

**A. That could have been me or it could have been the entire board.**

Q. Do you remember whether it was you or the board?

Page 97

**A. I don't remember specifically who gave it to Mr. Neuberger.**

Q. Did you think that if you weren't going to respond that you should respond that you weren't going to respond?

**A. I thought we did. I thought we were -- a letter was sent saying that the policies speak for themselves.**

Q. Do you know when that letter was sent?

**A. No, I have not a clue.**

Q. This has been marked as PX-50.

This is a letter of December 16, 2004, directed to the board of education, Mr. Griffin, Miss Hobbs.

**A. Okay.**

Q. From me.

It references the November 12th letter that we just looked at and points out that to date we have not received answers to our questions or a statement from the board showing its intent to reply.

**A. Uh-huh.**

Q. Did you get a copy of this letter?

**A. Yes, I think I did.**

Q. And did you instruct someone to respond?

Page 98

**A. Did I instruct someone to respond? No. Again, we were under advice not to.**

Q. Let me show you a copy of what we've marked as PX-51.

This is a letter dated January 7, 2005, from me to the Board of Education of the Indian River School District. The first paragraph reads, "We appreciated the recent phone call from the Indian River School District's attorney James Griffin and the materials that he provided for our review. We hope that communication between the Indian River Board of Education and our client Mona Dobrich will continue and remain constructive."

Were you aware that a phone call was made from Mr. Griffin to the lawyers for Mrs. Dobrich?

**A. I can't remember that.**

Q. Were you aware that Mr. Griffin provided materials for Mrs. Dobrich's attorneys' review?

**A. I think he did. I can't remember everything that occurred back in 2004.**

Q. I had understood from your earlier testimony that Mr. Neuberger had advised the board not to respond to the November and December letters from me; correct?

**A. That's correct.**

Page 99

Q. This letter reflects, and your testimony a minute ago reflects that Mr. Griffin provided materials for the review, for review by Mrs. Dobrich's attorneys.

Was that with or without authorization from the board?

**A. Provided materials to who?**

Q. The materials were provided for in the letter "our review," "our" referring to the lawyers for Mrs. Dobrich?

**A. Oh, the materials that you were given by Mr. Griffin?**

Q. Yes.

**A. I don't know what materials they were.**

Q. Was Mr. Griffin subsequently instructed not to act for the board in connection with this lawsuit?

**A. I think at one point he may have been.**

Q. Who gave him that instruction?

**A. That would have been the entire board.**

Q. And was that at a board meeting?

**A. I don't know.**

Q. What do you recall about the instruction given to Mr. Griffin not to act for the board in connection with this lawsuit?

MR. SHAU: Objection. Instruction given by the board to the attorney one way or the other is attorney-client privilege. I am going to instruct the witness not to answer.

Page 100

BY MR. ALLINGHAM:

Q. Why did the board make the decision to tell Mr. Griffin not to act for the board in connection with this lawsuit?

**A. Because I think we were going under the advice of Mr. Neuberger.**

Q. Mr. Griffin was the board's attorney at that time; correct?

**A. That's correct.**

Q. Mr. Neuberger had not been retained by the board; correct?

**A. Not the board, no.**

Q. He had been retained by Mr. Helms?

**A. That's correct.**

Q. Okay.

But the board took Mr. Neuberger's advice as to whom should speak for the board and the district in connection with this lawsuit?

**A. At that particular time, yes.**

Q. Let me ask you a question. Didn't there come a time when Mr. Neuberger offered to represent the full

Page 101

board and the district and the full board declined, affirmatively declined Mr. Neuberger's offer?

**A. I don't think the board ever did formally decline the offer.**

Q. Several of your colleagues have testified that the board did decline the offer?

**A. I think Mr. Neuberger declined the board.**

Q. That is to say, Mr. Neuberger -- well, let me see if we are on the same page.

The testimony so far has been that Mr. Neuberger appeared at a board meeting and offered to represent the board.

**A. Uh-huh.**

Q. And made a presentation to the board. So far are we on the same page?

**A. Right.**

Q. And at the conclusion of that presentation, Mr. Neuberger, according to some of your colleagues, said -- delivered an ultimatum to the board and said, you can either retain me today or I'm out of here. Do you recall that? I don't mean he said I'm out of here, but words --

**A. I understand the reasoning of where you're going. That was not quite the specifics of it, but**

Page 102

**it's close.**

Q. Okay. Could you tell me what you recollect about that meeting?

**A. Yes. Mr. Neuberger did make a proposal to the board; however, the board did not want to make a hasty decision, and by waiting until the next day and wanting to do something that Mr. Neuberger had advised us not to do, Mr. Neuberger pulled his offer to the board.**

Q. Let me see if I can pinpoint that meeting in time; okay? It was before the adoption of the board policy on school board prayer; correct?

**A. I don't know.**

Q. I am going to show you a document that is called a privilege log. It's a document prepared by your attorneys, and its purpose is to identify by, if possible, the date, the author, the recipient, and a brief summary of the subject matter documents which are privileged or which -- as to which there's been a claim of privilege so they haven't been given to us. Okay?

We have marked this as Plaintiffs' Exhibit 59.

**A. Well, if these are privileged, how come you have them?**

Q. I probably didn't explain it well enough.

Page 103

It's not always easy.

I don't have them. What I have is, if you look at the document, look at the next page, for example.

**A. Okay.**

Q. What I have is sort of a very short description so that I know what it is that Mr. Shau and Mr. Gosselin haven't given us.

**A. Oh, okay.**

Q. Privilege logs are sometimes helpful in, you look at the date of a document and it might remind you when something occurred, and so what I'd like to do -- bear with me for just a minute.

**A. So this is a list of all the information Mrs. Hearn gave you or didn't give you? Or gave them but they didn't give you at all?**

Q. Yes. We didn't prepare it. Your lawyers prepared it.

**A. Okay.**

Q. It's intended to give us just a quick description of what it is that's been withheld.

**A. All right.**

Q. On privilege grounds.

The testimony from your colleagues has

Page 104

been that Mr. Neuberger appeared before the board once by, at a long board meeting, once on the telephone and once in person. Does that comport with your recollection?

**A. That seems reasonable.**

Q. We have been told by Mr. Gosselin that the telephone appearance, if you will, was at an August 23rd, 2004 board meeting the day before the big meeting. And I'll show you the minutes of that meeting in a minute. It doesn't show Mr. Neuberger there, but as Mr. Gosselin explained, because I was too thick to figure it out, he wasn't there but he was there on the telephone.

**A. Okay.**

Q. So I'll show you those minutes and we'll see if we can confirm that.

The only other meeting at which there's any indication that Mr. Neuberger was present is a September 15th meeting, so let me mark and then show you the minutes of that meeting.

I'm going to have marked as PX-63 a document bearing Bates number IRSD 45715 through 718.

(PX-63 was marked for identification.)

BY MR. ALLINGHAM:

Page 105

Q. You will see, Mr. Walls, on the last page that the minutes bear Miss Hobbs' signature.

**A. Uh-huh.**

Q. And that indicates that they are the final minutes of the meeting; is that correct?

**A. I assume they're the final minutes. I don't know what constitutes final and what constitutes amended minutes.**

Q. Well, it wasn't meant to be a tricky question. The minutes are not inserted into the district's minute book until they're signed --

**A. Oh, is that right?**

Q. -- they are signed by Miss Hobbs; is that correct?

**A. I don't see the district minute book.**

Q. When you vote as a board member on the minutes of previous meetings, do you understand that when those minutes are adopted --

**A. That's when they're posted.**

Q. Yes.

**A. Okay.**

Q. Okay.

These minutes were actually produced to us today -- maybe they were produced before too -- but

Page 106

produced to us today as an accommodation by your counsel from, as I understand it, the minute book of the board minutes here at the district.

**A. Okay.**

Q. And they are the minutes of the September 15, 2004 special meeting of the board of education.

You are reflected as having been present under roll call. Do you see that?

**A. Yes.**

Q. And farther down, a little bit farther down the page, under other visitors and staff in attendance, you'll see that both Mr. Griffin and Mr. Neuberger were present at this meeting.

**A. Yes.**

Q. All right. Am I correct that at this point the board had not retained Mr. Neuberger to represent him?

**A. The board never did retain Mr. Neuberger.**

Q. Do you know who invited Mr. Neuberger to appear before the board on September 15th?

**A. Not specifically. It could have been me.**

Q. Do you know why Mr. Neuberger was invited to appear before the board?

**A. Do I know exactly why? No.**

Page 107

Q. Had there been discussion going on for a period of weeks or months about whether Mr. Neuberger would be retained to represent the board?

**A. Yes.**

Q. And was that discussion among individual board members or at board meetings?

**A. At board meetings.**

Q. And since the discussion went on for quite some time, would I be right in assuming that some board members were in favor of retaining Mr. Neuberger and some were against?

**A. I don't think we ever got to that point.**

Q. Well, then, tell me the nature of the discussion of whether to retain Mr. Neuberger?

**A. I don't see why I should have to tell you what discussions between the board and an attorney.**

MR. SHAU: You can answer as to the discussions.

BY MR. ALLINGHAM:

Q. These are not discussions with Mr. Neuberger. These are discussions among board members about whether to retain Mr. Neuberger.

**A. What is it you want me to tell you, why we wanted to --**

Page 108

Q. I want you to tell me what you recall of the discussions about whether to retain Mr. Neuberger?

**A. There was hopes that the board would be able to retain Mr. Neuberger.**

Q. And who expressed those hopes?

**A. I expressed them.**

Q. Anybody else?

**A. Other board members did as well.**

Q. Who else?

**A. I think just about every one of them.**

Q. And what prevented the board from retaining Mr. Neuberger?

**A. Mr. Neuberger.**

Q. So the board expressed the hope that Mr. Neuberger would agree to represent the board; correct?

**A. Yes.**

Q. Did anyone express opposition to the retention of Mr. Neuberger?

**A. Some people had reservations.**

Q. Who were they?

**A. I remember Mr. Cohee having reservations, I remember Dr. Isaacs having reservations.**

Q. What was the nature of their reservations?

Page 109

**A. They weren't sure that Mr. Neuberger was the right person for this case.**

Q. Did they express why they felt that way?

**A. No, not that I can remember.**

Q. Did anybody say, well, we have a board attorney, why do we need to retain someone else?

**A. Somebody may have said that.**

Q. You don't recall one way or another whether they said that?

**A. I don't remember whether somebody said that, no.**

Q. On the minutes of the September 15th meeting, you'll see about halfway down the page that it was moved by Dr. Hattier, seconded by Mr. Hastings, to go into executive session at 7:02 p.m., or two minutes after the meeting was called to order.

Do you see that?

**A. Yes.**

Q. And was that executive session to discuss the potential litigation?

**A. Correct.**

MR. SHAU: Objection. The discussions in the executive meeting were held in the presence of Mr. Griffin, the board attorney, and are therefore

Dobrich, et al. v. Indian River School District, et al.
Harvey L. Walls C.A. # 15-120 (JJF) October 25, 2006

Page 110

attorney-client privilege.

MR. ALLINGHAM: The purpose of going into executive session is attorney-client privilege?

MR. SHAU: Ask your question again.

BY MR. ALLINGHAM:

Q. Why did the board go into executive session?

**A. To discuss potential litigation.**

Q. Thanks.

And was that potential litigation this litigation or this, the complaints that had been asserted by Mrs. Dobrich?

**A. I have to tell you the reasons or what was discussed in executive session?**

Q. No. I just want to know what litigation you were talking about.

MR. SHAU: You can answer that question.

THE WITNESS: 5-01.

BY MR. ALLINGHAM:

Q. And is that the complaint -- was that a file that was opened in response to Mrs. Dobrich's complaints?

**A. It could have been.**

Q. Do you know?

**A. Specifically do I know what number applies to who? No. But it would be my guess.**

Page 111

Q. All right. Mr. Neuberger was there and Mr. Griffin was there. You understood that, Mrs. Dobrich's complaints; correct?

**A. I would think.**

Q. Okay.

On the log, the privilege log, which I gave you earlier, if you look at Item 112, there is the number column on the far left.

That item reflects the author being Thomas Neuberger, the date being September 15, 2004, which is the date of the meeting we were just looking at.

**A. Uh-huh.**

Q. And the description being "packet of information provided to board members in connection with legal representation."

At this September 15th board meeting at which Mr. Neuberger was present, did he provide you with a packet of information regarding legal representation?

**A. He may have.**

Q. You don't recall one way or another?

**A. I don't see why I would have to tell you that.**

Page 112

Q. The way this process works, Mr. Walls, is that I ask you a question, your counsel has the right to interpose an objection, and if he thinks it's appropriate, an instruction to you not to answer. But in the absence of an instruction, the reason you're obligated to answer is because you swore to tell the truth to the questions you're asked. So I'm going to pose my question again and then we'll go through that process; all right?

**A. Uh-huh. Okay.**

Q. Okay.

My question to you is, during the meeting on September 15th, 2004, which we have the minutes of in front of you --

**A. Uh-huh.**

Q. -- did Mr. Neuberger provide you with a packet of information in connection with legal representation?

**A. He could have. I don't recall what he gave us.**

Q. Okay.

Is September 15th, according to your best recollection, the meeting at which Mr. Neuberger delivered the ultimatum that we talked about earlier?

**A. Yes. I don't know that I ever took it as an ultimatum.**

Page 113

Q. Sorry. You said that earlier. That's my fault.

Is this the meeting at which Mr. Neuberger made the presentation and the board decided -- I'm sorry, and Mr. Neuberger decided ultimately to withdraw his office with representation?

**A. No, he did not decide at that point.**

Q. When did he decide?

**A. I think it was the next day or the two days later.**

Q. Okay.

And you told me earlier that it was because the board acted contrary to Mr. Neuberger's recommendation that he withdrew his offer, do you recall that?

**A. That's correct.**

Q. What is it that the board did that was contrary to his recommendation?

**A. We had initially agreed to listen to you.**

Q. To listen to me, I assume as a representative of Mrs. Dobrich?

**A. Correct.**

Q. Listen to me in connection with the questions

29 (Pages 110 to 113)

Wilcox & Fetzer, Ltd. Professional Court Reporters (302)655-0477

Page 114

that we posed to you?
**A. Yes.**
Q. Okay.
I'm sure it's my fault -- I've done this before because I'm not getting things correctly -- but this meeting is on September 15th.
**A. Right.**
Q. My first letter to the board was dated November 14th, I think, or mid-November.
**A. You must have asked something before the 15th.**
Q. Okay.
**A. Or somebody must have, and I can't imagine it being anybody other than you.**
Q. Initially the board decided to engage in some kind of discussion with representatives of Mrs. Dobrich?
**A. Initially.**
Q. Okay.
And that was contrary to Mr. Neuberger's advice?
**A. That's correct.**
Q. And Mr. Neuberger withdrew his offer of representation because the board --
**A. That's correct.**

Page 115

Q. -- wanted to engage in discussions?
**A. That's correct.**
Q. Ultimately the board did not engage in discussions with representatives of Mrs. Dobrich; correct?
**A. That's correct. Correct.**
Q. What caused the board to change its mind?
**A. The removal of the offer.**
Q. Okay. Let me see if I can get the sequence right, okay?
At the September 15th meeting, Mr. Neuberger offered to represent the board; correct?
**A. Yes, I think so, if that's the meeting I'm thinking of.**
Q. At that meeting, Mr. Neuberger advised the board not to engage in discussions with Mrs. Dobrich's representatives; correct?
**A. Yes.**
Q. The board determined that it wished to engage in discussions with Mrs. Dobrich's representatives; correct?
**A. Yes.**
Q. When Mr. Neuberger found out about that a day or two later, he withdrew his offer of representation;

Page 116

correct?
**A. Correct.**
Q. Would I be right in assuming that it was Mr. Helms who communicated the board's wish to Mr. --
**A. That's been my suspicion.**
Q. And then because Mr. Neuberger had withdrawn his offer of representation, the board changed its mind and decided not to engage in discussions with Mrs. Dobrich's representatives; correct?
**A. Correct.**
Q. And did that, did the change in the board's decision take place at a board meeting?
**A. No. I made that decision as board president.**
Q. Did you consult with your fellow board members?
**A. No. If so, it was by phone, but we had no meeting, special meeting to discuss it.**
Q. After the board -- well, I guess you as board president changed its position on engaging in discussions with Mrs. Dobrich's representatives, did Mr. Neuberger renew his offer to represent the board?
**A. No.**
Q. Did you make the decision not to engage in discussions with Mrs. Dobrich's representatives with

Page 117

the hope that Mr. Neuberger would renew his offer of representation?
**A. Yes.**
Q. So I take it you were disappointed that he did not do so?
**A. Yes.**
Q. When he did not renew his offer, did you consider again the possibility of engaging in discussions with Mrs. Dobrich's representatives?
**A. No.**
Q. Why not?
**A. I didn't see the purpose without legal representation. At that particular time we had none.**
Q. You had the board's attorney; correct?
**A. We had the board's attorney, but he was not involved with this case.**
Q. As early as September of 2004?
**A. I would -- I can't remember the exact dates.**
Q. The reason I ask is that there are documents on the privilege log that appear to reflect a continuing request for advice to Mr. Griffin?
**A. He was our board attorney, but as far as him actually doing the representation to us for this particular case, we knew we needed, we needed**

Page 118

**additional legal advice.**
Q. If you look at Item 7 of the privilege log, you'll see that there is a fax from Lois Hobbs to Mr. Griffin dated September 24, 2004, or essentially --
**A. Correct.**
Q. -- the same time as this board meeting on September 15th, which is described as requesting legal analysis and advice.
Does that refresh your recollection that Mr. Griffin was being asked for advice on the issues presented in this case at least as of September 24, 2004?
**A. Yes. And probably later than that as well.**
Q. So the board did have representation at the time when it made its original decision to engage Mrs. Dobrich's representatives in discussions?
**A. Yes, I think we did.**
Q. Do you know, roughly speaking, when Mr. Griffin was told not to speak for the board in connection with this litigation?
**A. No, I can't remember just when.**
Q. Is it correct that it was after the adoption of the board policies?
**A. Yes.**

Page 119

Q. Let me show you a couple of items on the privilege log.
I'm sorry, Mr. Walls, it's not organized by any --
**A. I was going to say.**
Q. It is sometimes hard to find things. If you'll look at Items 42 and 43.
**A. Okay.**
Q. Item 43 is a letter from Mr. Griffin to you dated January 3, 2005, regarding legal representation, and I want to draw a distinction between that description, and just by way of example the description of the item two items above it, which is a fax from Ms. Hobbs to Mr. Griffin requesting legal analysis and advice. And I will tell you that the counsel who prepared this log used that phrase, "requesting legal analysis and advice" quite frequently and used the phrase "regarding legal representation" quite frequently. They seem to mean different things.
Do you recall having a discussion or communication with Mr. Griffin regarding legal representation in early January of 2005?
**A. We may have.**
Q. The letter from me that I showed you on

Page 120

January 7th, 2005 --
**A. Yes.**
Q. -- said, in effect, thank you for the call from Mr. Griffin and the materials that he provided. Okay.
So we have a letter regarding legal representation from Griffin to you on January 3rd. We have a call from Mr. Griffin to me some time before January 7th, and then on January 18th, and I'd now like you to look at Item 42, there is a letter from Mr. Griffin to Mr. Kellum, you and Ms. Hobbs again regarding legal representation.
**A. Right.**
Q. Is that a letter in which Mr. Griffin resigned his representation of the board in connection with this litigation?
MR. SHAU: Objection. The contents of that letter are attorney-client privilege. I am going to instruct the witness not to answer.
BY MR. ALLINGHAM:
Q. Do you recall that the board's statement to Mr. Griffin that he should not represent the board in this litigation occurred on or about the first couple of weeks of January of 2005?

Page 121

**A. It could very well have.**
Q. When you say "it could very well have," does that mean that having reviewed this log and the letter from me that it's your best recollection that that's about the time it occurred?
**A. January of 2005?**
Q. Yes, sir.
**A. That could be accurate.**
Q. Why did the board decide to discharge Mr. Griffin for that purpose?
**A. The board did not want Mr. Griffin representing us on this case.**
Q. Why?
**A. Because we had philosophical differences with Mr. Griffin.**
Q. What was the nature of the philosophical differences?
MR. SHAU: Objection. The differences between counsel and their client are attorney-client privilege.
MR. ALLINGHAM: Not if they're not in connection with the attorney-client relationship.
MR. SHAU: Did you discuss your differences with Mr. Griffin?

Dobrich, et al. v. Indian River School District, et al.
Harvey L. Walls C.A. # 15-120 (JJF) October 25, 2006

Page 122

THE WITNESS: One of the differences was --

MR. SHAU: Before you answer, did you discuss these differences with Mr. Griffin?

THE WITNESS: Portions of them.

MR. SHAU: I am going to instruct the witness not to answer, not to disclose any conversations he has had with Mr. Griffin relating to the representation.

MR. ALLINGHAM: I'm completely in agreement with that instruction. Okay?

BY MR. ALLINGHAM:

Q. Don't tell me what you told Mr. Griffin on this topic. Don't tell me what Mr. Griffin told you on this topic. I just want to know what you understood the philosophical differences between you and Mr. Griffin to be that led you to not want him to represent you in connection with this litigation?

**A. One was his actual recommendation to us that we would make him a rich man if he were to be our lawyer. That was a specific recommendation from him.**

MR. SHAU: I am going to instruct the witness not to say specific recommendations from Mr. Griffin.

Page 123

BY MR. ALLINGHAM:

Q. Anything else?

**A. We don't know that we as a board did not believe that Mr. Griffin believed in what the board believed in.**

Q. What was it that the board believed in?

**A. In that the board prayer issue at meeting was legal.**

Q. And --

**A. And worth fighting for.**

Q. What was the basis for your belief that Mr. Griffin didn't believe that the board policy was legal?

**A. Several comments he had made over time.**

Q. Okay, don't tell me.

We've established that on or about September 15th, maybe a day, maybe two days later, Mr. Neuberger withdrew his offer of representation to you.

You mentioned much earlier in the deposition that you also had consulted the Alliance Defense Fund in connection with these issues; correct?

**A. Yes.**

Q. If you look at the privilege log again, you'll

Page 124

see Item 106 is a fax from Beth Procheska to you dated August 25, 2004, with the description being "fax providing legal analysis and advice." Okay?

**A. Uh-huh.**

Q. I'm going to represent to you, sir, having looked through the privilege log that that's the earliest dated document that reflects communications with the Alliance Defense Fund, which is what ADF stands for.

**A. I find that surprising.**

Q. That's not to say that you hadn't talked to them earlier. This is only documents, and so this is the first, the earliest dated document that we have seen on the privilege log. Okay?

And that actually was my next question. Do you recall communications with representatives of the Alliance Defense Fund earlier than August 25, 2004?

**A. No, I don't recall that.**

Q. A minute ago you said you find it surprising that there's a document dated August 25, 2004.

**A. Yes, I do.**

Q. It surprises you that it was this early?

**A. Yes.**

Q. Okay, thank you.

Page 125

Do you remember ever getting a memo — I'm sorry, a fax providing legal analysis and advice from a woman named Beth Procheska at the Alliance Defense Fund?

**A. Do you know what state she was located in?**

Q. I don't. I think Tennessee, but I don't know that.

**A. I could have. I got several memos from the ADF.**

Q. Is the name familiar to you, Beth Procheska?

**A. Not right off.**

Q. You were surprised that you had a memo from the ADF as early as August 25th?

**A. Yes.**

Q. Why were you surprised about that?

**A. Because I don't remember talking to them until after Mr. Neuberger withdrew his offer to the board.**

Q. Which would have been mid-September?

**A. Yeah.**

Q. Let me explore that for a minute. Whenever it occurred, what is your recollection about who from the district first contacted the ADF?

**A. I think I did.**

Q. How did you find or how did you identify the

32 (Pages 122 to 125)

Wilcox & Fetzer, Ltd. Professional Court Reporters (302)655-0477

Page 126

Alliance Defense Fund as an organization that you wanted to contact in connection with this dispute?

**A. I think another board member may have mentioned it to me.**

Q. Who was that?

**A. It was a place to look for some type of legal representation.**

Q. Who was that?

**A. I can't remember just who. It may have been Dr. Hattier.**

Q. Whoever it was, is it your recollection, your best recollection that you were the one who initially contacted the ADF?

**A. I believe I did with ADF.**

Q. Okay. And tell me what you told the ADF?

MR. SHAU: Objection. Attorney-client privilege. Even if they were not yet retained, if he's seeking advice from potential counsel, that's protected. I'm going to instruct him not to answer.

MR. ALLINGHAM: Well, I disagree, but that's okay, we'll work that out.

BY MR. ALLINGHAM:

Q. Did you request advice on a particular topic? Don't tell me anything about what the advice was. Just

Page 127

did you request advice on a particular topic from --

**A. I requested representation.**

Q. Okay. So you called the ADF, you got someone on the phone and you said, we've got a dispute involving school prayer, school board prayer, something, and we'd like representation; correct?

**A. Yes.**

Q. All right. And did you ask for representation for free?

**A. Yes.**

Q. Was that the purpose of your call?

**A. Yes.**

Q. What is the response?

MR. SHAU: Objection. The response is attorney-client privilege. I'm going to instruct the witness not to answer.

BY MR. ALLINGHAM:

Q. Did you ever retain the Alliance Defense Fund?

**A. I signed a retainer to the Alliance Defense Fund at some point.**

Q. Can you in any way specify when you signed the retainer?

**A. No.**

Q. Is it correct that the Alliance Defense Fund

Page 128

does not represent the district currently?

**A. Yes.**

Q. How did it come about that the Alliance Defense Fund ceased to represent the district?

**A. Because the insurance company provided Cafferkey and John and John, and they wanted to be lead counsel, and being they were being paid for it by the insurance company, the ADF was asked to basically just take an advice on it.**

Q. And did they withdraw?

**A. Yes, as far as I know they did.**

Q. So in terms of setting the timing of that, would I be right in understanding that when Messrs. Balaguer and Cafferkey were retained by the board, the ADF withdrew its representation?

**A. Yes.**

Q. Okay, Mr. Walls, I am going to ask you a few questions, and it's particularly important in these questions for you not to start to answer before I finish my question and for Jarrod to have an opportunity to object. Okay?

When you called the ADF, what facts, if any, did you give to the ADF representative?

MR. SHAU: Objection. Attorney-client

Page 129

privilege. I'm going to instruct the witness not to answer.

BY MR. ALLINGHAM:

Q. When you called the ADF, did you offer to provide any documents to the ADF representative?

MR. SHAU: I'm going to instruct the witness that, yes, he can say whether he offered to provide documents, but not talk about the substance of any documents.

MR. ALLINGHAM: Okay.

BY MR. ALLINGHAM:

Q. Did you offer to provide documents to the ADF?

**A. Yes.**

Q. Again, pause, please.

What documents did you offer to provide the ADF representative?

MR. SHAU: Objection. Attorney-client privilege.

BY MR. ALLINGHAM:

Q. I'm going to show you two documents. The first one has been marked PX-14 and the second one has been marked PX-13. The first has been identified as the official minutes of a special meeting of the board on August 23, 2004. This would be the day before the

Dobrich, et al. v. Indian River School District, et al.
Harvey L. Walls C.A. # 15-120 (JJF) October 25, 2006

Page 130

big board meeting. Okay?

**A. Okay.**

Q. If you look at the second page of that Exhibit 14, you'll see that you called the meeting to order at 7 p.m. and you immediately went into executive session at 7:01 p.m., where you remained until 11:15 p.m. The meeting was adjourned at 11:16 p.m.

This meeting has been identified as a meeting at which the issues relating to religion in the schools was discussed with Mr. Griffin and by telephone with Mr. Neuberger.

Does that comport with your recollection?

**A. I remember Mr. Neuberger being on the telephone, but I can't remember if Mr. Griffin was there.**

Q. If you look at the other visitors and staff in attendance on the minutes, you'll see that Mr. Griffin is listed as being in attendance.

**A. Okay.**

Q. Does that refresh your recollection he was there?

**A. No, but I believe if his name's on here, he was there.**

Page 131

Q. I am going to show you another document which we have marked as PX-13.

**A. What's that mean, redacted?**

Q. This is a word that lawyers use and I think nobody else.

**A. I have never seen it.**

Q. What it's meant to indicate is that a portion of the document has been masked out or removed, and in order so that it's not misleading, you put the word "redacted" so that somebody would know that something was taken out.

**A. Okay.**

Q. I believe that the reason that the redactions were made is because what the minutes reflected was privileged or there's a claim of privilege.

**A. Okay.**

Q. So there isn't much left, actually, after you take out all the legal stuff, but there is one paragraph which I want to discuss with you.

It says, "During the discussion of this issue, several board members expressed that their constituents do not want the board to change its practice of opening the meetings with a prayer."

Do you recall that the issue being

Page 132

discussed at this August 23rd meeting was the practice, the board's practice of opening its meetings with a prayer?

**A. I don't remember.**

Q. That sentence certainly indicates that that was an issue being discussed, doesn't it?

**A. It could have been.**

Q. Do you recall whether it was at this meeting or another meeting that several board members expressed the view that their constituents did not want the board to change its practice of opening the meetings with a prayer?

**A. I think I've heard that.**

Q. Did you express that view?

**A. I don't know if I expressed it or not, but I hold it.**

MR. ALLINGHAM: The videographer tells me we have almost no time left.

THE WITNESS: What, an hour?

MR. ALLINGHAM: Yes. So we are going to change the tape.

VIDEO SPECIALIST: Going off the record at 4:39 p.m.

(Recess.)

Page 133

VIDEO SPECIALIST: Going back on the record at 4:52 p.m.

BY MR. ALLINGHAM:

Q. Mr. Walls, we had a discussion before the last break, a little bit before the last break, in which you said that you made the decision as board president to, in response to Mr. Neuberger's withdraw of his offer, not to engage in discussions with Mrs. Dobrich's representatives. Do you recall that?

**A. Yes.**

Q. When your decision did not have the desired effect, that is, to get Mr. Neuberger to renew his offer, did you give any consideration to going back to what the board had earlier decided, that is, to engage in discussions with Mrs. Dobrich's representatives?

**A. No.**

Q. Did you tell the board members that you had made the decision to override the board decision in order to try to get Mr. Neuberger to renew his offer?

**A. Yes.**

Q. And what was the reaction of the board members?

**A. They agreed with me.**

Q. When did you tell the board members that?

34 (Pages 130 to 133)

Wilcox & Fetzer, Ltd. Professional Court Reporters (302)655-0477

Page 134

**A. I'm sure by phone.**
Q. So it wasn't at a formal meeting?
**A. No.**
Q. Just as an example, that series of communications with the board members represents an example of communications in which a decision gets made outside of a regular board meeting; is that correct?
**A. That's correct.**
Q. Okay. Are there Sunshine Law implications from that?
**A. I have made a decision as a board president at that point. All I did was notify the board of what decision I had made and why.**
Q. Okay. So you didn't reconsult with the board; you just made the decision as board president?
**A. I made the decision. We certainly met at a later date and discussed it.**
Q. All right. I showed you the August 25th memorandum from Beth Procheska -- well, I didn't show you the memorandum -- I showed you the entry in the log -- from Beth Procheska at ADF to you. If you want to look at it again, it's 106 on the log. Because its date was two days after the August 23rd executive session minutes that I showed you a minute ago and one

Page 135

day after the big board meeting, okay, just to put it in time. If you look at the minutes of the executive session that we were looking at before, just that one paragraph of text on Exhibit 13, you'll see that the minutes reflect, quote, it was not felt that a decision could be made this evening regarding whether or not to change our past practice.
Do you see that?
MR. SHAU: Are you looking at PX-13? Or are you looking at --
MR. ALLINGHAM: PX-13.
THE WITNESS: Yes, I see it.
BY MR. ALLINGHAM:
Q. Okay.
Mr. Bireley testified that what was missing, what the board wanted to get in order to be able to make a decision regarding whether or not to change your past practice at this meeting, what was missing and what the board wanted to get was a second legal opinion.
Do you recall that that occurred?
**A. I don't recall that, but it sounds like something we would have done.**
Q. Okay. Which leads me to my next question, did

Page 136

you, following the August 23rd meeting, at which, as Mr. Bireley has testified you all wanted a second legal opinion, did you call the Alliance Defense Fund to get that second legal opinion?
**A. I don't remember why I called them at that point. Again, I can't --**
Q. You're surprised why --
**A. -- recall why I called that early.**
Q. The next contact with the ADF on the privilege log is Item No. 103. And this item is described as a fax requesting legal analysis and advice from you to Mr. Kellum of the ADF on October 14th, 2004.
To place this in time, this is after the September 15th sequence in which we've established that Mr. Neuberger made and then withdrew his offer, but five days before the board policy on school board prayer, religion, and graduation ceremonies was adopted; okay?
My question to you is, why did you make a request to Mr. Kellum for legal advice on October 14th?
**A. To me this would have been more in line of my timing of talking to the ADF. It would have been after Mr. Neuberger withdrew his offer.**

Page 137

Q. Yes.
This fax is not described, however, as, regarding legal representation, which remember we saw in the Griffin.
**A. Uh-huh.**
Q. This appears to be a request for actual legal analysis and advice, and my question to you is, you've testified a little earlier that you called the ADF and were looking for representation in connection with the lawsuit.
**A. Uh-huh.**
Q. Do you recall that you actually sent them a fax request for legal analysis and advice some time after you spoke to them by telephone?
**A. Yes.**
Q. And I don't want to know what their advice was, but was the topic on which you were seeking advice the issues in this lawsuit?
**A. Yes.**
Q. Now, you'll see two items down that six days later on October 20th, Mr. Kellum wrote to you a letter regarding legal representation. Do you see that?
**A. Yes.**
Q. And that's a day after the policies were

Dobrich, et al. v. Indian River School District, et al.
Harvey L. Walls C.A. # 15-120 (JJF) October 25, 2006

Page 138

adopted.

Is that the retention letter that you described earlier?

**A. Probably.**

Q. Is that about the right time frame?

**A. It sounds like it could be.**

Q. The next contact with the ADF on the privilege log is Item No. 62. This is a letter from Mr. Kellum to you dated December 21, 2004, again regarding legal representation.

Did you have ongoing discussions with Mr. Kellum about legal representation?

**A. Yes. I assume you have on here what time John and John came on board.**

Q. We don't.

**A. Well --**

Q. I asked you a question earlier about the October 20th letter and whether that was an engagement letter that you signed.

**A. I don't know for certain.**

Q. We now have a letter about two months later still regarding legal representation. Does that suggest to you that the October letter probably was not an engagement letter?

Page 139

**A. It may not have been.**

Q. The next communication from you to -- sorry, from Mr. Kellum to you is Item No. 5 on the log, which is a February 4, 2005 letter regarding legal representation, again, from Mr. Kellum to you.

Does that suggest to you that the December 21st letter was not an engagement letter since you're still corresponding with Mr. Kellum about representation?

**A. I don't know. If I knew when John and John came on board, then it would give me a better idea of just the actual correspondence.**

Q. Well, let me ask you a couple of questions about that. This lawsuit was filed on February 28th.

**A. Okay.**

Q. Am I right that you did not retain Mr. Balaguer and Mr. Cafferkey until some time after the filing of the lawsuit?

**A. Right. The insurance company wouldn't have provided us with a lawyer before an actual lawsuit had been filed.**

Q. Okay.

On the privilege log I'll represent to you that there is no response from Mr. Kellum or the

Page 140

Alliance Defense Fund after October 14th, 2004, which is the fax from you requesting legal advice, there is no response from the Alliance Defense Fund giving legal advice.

Do you recollect that you ever got back from the Alliance Defense Fund any communication of legal advice on the topics that you requested?

**A. Yes, I think we did.**

Q. Okay. And would I be correct that you don't recall exactly when that occurred?

**A. No.**

Q. Did you keep whatever you got from --

**A. Yes.**

Q. -- the Alliance Defense Fund?

**A. Yes.**

Q. And did you provide it to Mrs. Hearn --

**A. Yes.**

Q. -- when she asked?

**A. And that's probably why the list is here.**

Q. We try so hard to be organized.

**A. Hey, you should see my desk.**

Q. Let me show you what we have previously marked as Plaintiffs' Exhibit 58. Sorry.

**A. That's all right.**

Page 141

Q. This is a letter from Mr. Kellum to me, which references one of my earlier letters asking for clarification of the board policies, letter of December 16th.

In this letter, Mr. Kellum informs me that, quote, this office has been retained by the Board of Education for Indian River School District regarding any possible challenge to policies on school prayer at commencement/graduation and baccalaureate ceremonies, board prayer at regular board meetings, and religion."

First of all, is that a correct statement, was Mr. Kellum's office retained for that purpose?

**A. Yes.**

Q. And his retention for that purpose was memorialized in an engagement letter that you signed; correct?

**A. Yes.**

Q. And would I be right in assuming that that engagement letter was signed some time shortly before this letter was sent?

**A. I would assume that.**

Q. Did you make the decision to retain the Alliance Defense Fund on your own as board president or

36 (Pages 138 to 141)

Wilcox & Fetzer, Ltd. Professional Court Reporters (302)655-0477

Page 142

was that the subject of a board decision?
**A. That was a board decision.**
Q. And was that a decision taken at a regular meeting?
**A. That would have been in executive session.**
Q. Executive session of either a regular meeting or a special meeting?
**A. Yes. One or the other.**
Q. So it's something on which the board actually votes?
**A. Yes. I don't know if it was an actual vote for it or not, but if there was, it would be reflected in the minutes.**
Q. And if it was not, then the board action was taken by consensus?
**A. Yes.**
Q. So that when you signed the engagement letter, you were authorized by the board --
**A. Yes.**
Q. -- to sign it?
Let me show you a document we've previously marked as PX-23.
First of all, have you ever seen the first page of PX-23 before?

Page 143

**A. I don't remember.**
Q. Okay.
The second page is an agenda of a policy committee meeting.
Is this agenda in the format as you recall that policy committee agendas were prepared in?
**A. Yes.**
Q. Do you recognize the handwriting?
**A. No.**
Q. Mrs. Bunting has -- Dr. Bunting has, Susan Bunting has identified this handwriting as hers.
Did she typically attend the policy committee meetings?
**A. Yes.**
Q. The first page of PX-23 identifies three policy committee meetings that took place before the presentation of the school board prayer policy for its first reading on September 29th. Okay?
**A. Okay.**
Q. Your testimony earlier, if I got it right, was that you did not present the board prayer policy to the policy committee; is that correct?
**A. I did not ask for their input other than the format on board prayer.**

Page 144

Q. Yes, sir. And am I then correct that there was no discussion of the board prayer policy or drafts thereof at the policy committee?
**A. Concerning board prayer?**
Q. Yes.
**A. No, I don't believe so.**
Q. That is, you don't believe there was discussion?
**A. If there was, it wasn't me asking for discussion as policy committee chairman on it, because I specifically remember telling them that I'm not going to put them in that position.**
Q. The position of having to deal with the policy that --
**A. That was controversial.**
Q. That by its terms -- oh, sorry. That was controversial?
**A. Yes.**
Q. And why did you not want to put them in that position?
**A. Because this was a policy that I thought was the board's and the board thought it was their policy as well.**
Q. Okay. So one reason that you didn't want to

Page 145

present the school board prayer policy to the policy committee was that you thought it might be controversial?
**A. That's one reason.**
Q. A second reason was that by its terms it applied only to the board members themselves?
**A. Correct.**
Q. Okay.
On the second page of this exhibit you'll see in Dr. Bunting's handwriting just above the picture on this page, a notation "religion - follow board's direction."
Do you recall any discussion at the policy committee about following the board's direction on religion policies?
**A. I would say that was me directing about the board prayer.**
Q. So this is where you told them you weren't going to bring that board prayer policy to them?
**A. To them, other than formatting, yes.**
Q. Got it. Thank you.
**A. And I'm not sure if that happened in July or August or September.**
Q. All right. If you look at two pages back on

Dobrich, et al. v. Indian River School District, et al.
Harvey L. Walls C.A. # 15-120 (JJF) October 25, 2006

Page 146

the fourth page of the exhibit, you'll see there's an agenda for a policy committee meeting on September 20th, 2004.

First of all, do you recognize the handwriting?

**A. No.**

Q. Dr. Bunting thought that it was Mr. Savage's. Does that help you?

**A. It could have been. It's still too pretty for mine.**

Q. The third item of the agenda reads, "Discuss proposed policy - board prayer."

Does that alter your recollection in any way about whether the board prayer policy was discussed at policy committee meetings?

**A. No. These agendas were not prepared by me. They were prepared by either -- most of the time by Dr. Bunting or Mr. Savage. And most of the time they would go by what we discussed at the previous meeting and just add things that I specifically requested to be added to.**

Q. The sixth item is, "Discussed Dr. Hattier's concern of appreciation and tolerance of the religious views of others."

Page 147

Do you recall a policy committee meeting at which that topic was discussed?

**A. I can remember, I can remember doing something along those lines, but I don't remember the specifics of what was discussed. And I don't even remember what we were asking for there.**

Q. The handwriting appears to read, "Charlie, include in bullying. Be more specific re jew boy."

**A. Okay, that's a reference to the bullying policy that was put out by the State of Delaware that we had just adopted a couple years before that. And I think the concern or the discussion there was does the bullying policy cover a lot of Dr. Hattier's concerns as far as somebody bullying somebody on religion.**

Q. Okay. And I take it there was a discussion at the policy committee about whether that bullying policy does --

**A. Cover.**

Q. -- cover certain areas?

**A. Yes, I'm sure there were.**

Q. Was there a change made in the bullying policy?

**A. No, not that I remember.**

Q. Were minutes kept of policy committee

Page 148

meetings?

**A. Occasionally they were. Sometimes they were and sometimes they weren't.**

Q. Do you know who prepared them if they were kept?

**A. Usually it was Dr. Bunting.**

Q. Mr. Walls, the draft school board prayer policy that Mr. Neuberger provided, was that the only draft that you received of a school board prayer policy?

**A. That's the only one I remember.**

Q. So you didn't ask Mr. Griffin to draft a policy?

**A. I don't believe so.**

Q. The board prayer policy relates to prayer at regular board meetings and you, I think, confirmed for me that special board meetings are not opened with a prayer; right?

**A. Correct.**

Q. Is it also correct that committee meetings are not opened with a prayer?

**A. That's correct.**

Q. Are members of the public invited to attend committee meetings?

Page 149

**A. Not normally.**

Q. And is it correct that most, at least for the policy committee that you chaired, most of those meetings had no member of the public there?

**A. That's correct.**

Q. Do you recall any point in time, Mr. Walls, at which the school board prayer policy or the language of the school board prayer policy was discussed in public session of the board, or were all the deliberations on the school board prayer policy held in executive session?

**A. It was presented in public session as a first reading and presented again as a second reading.**

Q. The first reading was in late September of 2004?

**A. Right.**

Q. For first reading.

And it's simply presented, there's no discussion of the policy at first reading; correct?

**A. There is sometime. If a board member has a big problem with any part of the policy or whatever, he has it four days in advance, he's certainly welcome to say, I don't think this is direction that we should go or I have a specific problem with this or that.**

38 (Pages 146 to 149)

Wilcox & Fetzer, Ltd. Professional Court Reporters (302)655-0477

Dobrich, et al. v. Indian River School District, et al.
Harvey L. Walls C.A. # 15-120 (JJF) October 25, 2006

Page 150

Q. And am I correct that no board member expressed a concern about the school board prayer policy?
**A. Not that I can remember.**
Q. And that would be true also at the second reading and adoption on October 19th?
**A. That would be reflected in the minutes whether there was discussion, I would think.**
Q. Okay.
**A. Or changes. That's the whole purpose of a first and second reading.**
Q. We talked earlier about the disclaimer you used to read before offering the invitation for the prayer.
**A. Right.**
Q. What was the purpose of the disclaimer?
**A. That was under the legal advice of Mr. Neuberger as well.**
Q. And was that to offer people the opportunity to get up and leave if they wanted to?
**A. Again, we were advised to do that.**
Q. Apart from the fact that you got legal advice on the issue, did you have any independent understanding of the purpose of the disclaimer?

Page 151

**A. Well, an independent understanding, we never did it for 30 years prior to that, but we were advised at that time to do it, so we did it.**
Q. Do you remember anybody asking why you had to do it?
**A. No.**
Q. As far as you know, there's no purpose for that disclaimer?
**A. There's a lot of things lawyers do or advise that to me have no purpose, or I don't understand the purpose, I'll put it that way.**
Q. So let me change my question a little bit.
There may or may not be a purpose, but whatever it is, you don't know of any purpose for the disclaimer?
**A. No, I don't know the exact purpose.**
Q. This is one of those things that lawyers do, as soon as somebody satisfies the exact purpose, then you say, well, what about the general purpose.
Is it fair to say, Mr. Walls, that the sum and substance of your knowledge about the disclaimer is that you were advised to read it, but you don't know what the purpose is for it, if any?
**A. The only purpose I can see would be for an**

Page 152

**exclamation from the board that the board prayer and the way that it's being conducted is legal. And to make people aware that it is amongst the adult board members present.**
Q. Have you ever seen someone leave the room when the disclaimer is read?
**A. No.**
Q. Do you think that it would, if the disclaimer was read and someone got up and left the room, that it would draw attention to that person?
**A. No.**
Q. In interviewing candidates for new school board positions or to replace a school board member who is leaving -- well, first of all, as board president, did you ever participate in such interviews?
**A. As board president, I think so.**
Q. Do you remember asking candidates about their position on religion in the schools?
**A. I don't know that I did.**
Q. Do you recall anyone asking board candidates about --
**A. Not that I can recall.**
Q. I asked you earlier whether you thought it was a widely held view in the district that the defense of

Page 153

this case was a defense of Christian values. Let me ask you a couple of related questions.
Have you ever been told that the defense of this case was a defense of Christian prayer?
**A. I don't know if I have been told that --**
Q. You don't --
**A. -- specifically.**
Q. Whether those exact words were used or not, has anyone ever suggested to you or expressed the view to you that the district's defense of this case was a defense of Christian prayer?
**A. I suppose some people have.**
Q. Would you characterize that as a widely held view in the district?
**A. Here in this area, yeah, I would say that's probably a widely held view.**
Q. Have you ever heard anyone express the view that the result of the 2006 school board election was an endorsement of the stance that the school board took on school board prayer?
**A. Results of which election?**
Q. The 2006 school board election?
**A. There were more than one.**
Q. Yes, sir.

39 (Pages 150 to 153)

Wilcox & Fetzer, Ltd. Professional Court Reporters (302)655-0477

Page 154

**A. Actually, I had very few people even talk to me about that election because I was done.**
Q. In February of 2006, earlier this year, there was a board meeting at which an earlier proposed settlement of this case was presented to the board.
Do you recall that?
**A. Yes.**
Q. And the board rejected that settlement, do you recall that?
**A. That's correct.**
Q. Do you recall that when the board came out of executive session Mr. Helms made a statement?
**A. Yes.**
Q. Did Mr. Helms -- you were board president at the time; correct?
**A. No, I don't think so. No.**
Q. I'm sorry.
**A. Hey, the years run together on me too, believe me.**
Q. Did you know in advance that Mr. Helms was going to read a statement?
**A. I don't know if that was discussed in executive session before we came out or not.**
Q. Do you know whether Mr. Helms -- he was

Page 155

reading from a written statement; correct?
**A. Yes.**
Q. Do you know if Mr. Helms wrote that statement himself?
**A. I don't know who wrote the statement.**
Q. Did he present it as if it was his own statement?
**A. To the board before we came out?**
Q. No. I mean when he stated it publicly?
**A. Could you rephrase that, please?**
Q. He didn't attribute his words to someone else, did he?
**A. No. I thought that he was speaking for himself.**
Q. Do you have a view as to whether continuing this litigation benefits the students of the district?
MR. SHAU: Objection. It's outside the scope of this discovery. I'm going to instruct the witness not to answer.
MR. ALLINGHAM: Well, this litigation involves school board prayer, which is the topic of this deposition.
MR. SHAU: Your question was as to whether it benefits the students?

Page 156

MR. ALLINGHAM: Yes.
MR. SHAU: How is that relevant to the constitutionality of school board prayer?
BY MR. ALLINGHAM:
Q. Do you believe that the school board prayer policy benefits students?
**A. Do I believe that? Yes.**
Q. And would you tell me how?
**A. I think this district has been very blessed over the years, and for all I know it may be because we have asked for divine guidance on our decision making. But this is one of the top districts in the state.**
Q. Any other ways that the policy benefits students?
**A. I think it could very well teach them civics in the sense of what's legal and what's not and what's right and what's worth fighting for.**
Q. What do you mean by that?
**A. Well, just because someone who disagrees with the policy, the board prayer policy, that doesn't necessarily mean that it's illegal or that it's not proper.**
Q. I see. So you think it's possible that the defense of the lawsuit represents a lesson in civics

Page 157

for the students?
**A. It could very well.**
Q. And do you think that continuing this litigation benefits students?
**A. As far as I know, the board -- the district's not the one continuing it.**
Q. We are going to have to agree to disagree about that.
Whoever is making that decision -- maybe it's a joint decision -- do you think that continuing the litigation benefits students?
**A. I think it could.**
Q. And how would it do that, in the ways that you described earlier?
**A. Right.**
Q. Mr. Walls, you testified earlier in the deposition that you and maybe other board members had expressed the sentiment that no one should tell you how to pray. Do you recall that?
**A. Right.**
Q. And is it your understanding that as an American citizen you have an absolute right to pray however you like?
**A. Yes.**

Dobrich, et al. v. Indian River School District, et al.
Harvey L. Walls C.A. # 15-120 (JJF) October 25, 2006

Page 158

Q. Do you understand that by taking public office that right may be limited in some ways?

**A. It depends on which office. In my mind, this is a legislative and deliberative body, no different than a town council or the US Congress.**

Q. All right. You understand, don't you, that the board policy that you adopted imposes limitations on your absolute right to prayer however you like?

**A. In what sense?**

Q. Well, take a look at the board policy, which is PX-9. I think it is right in front of your counsel.

Paragraph 3 of the policy imposes some limitations on what you can say when you offer a prayer; is that right?

**A. That's right.**

Q. So we can agree that as a private citizen you can pray in a proselytizing way, you can try to convert people, you can derogate or otherwise disparage any particular faith or belief that you like; correct?

**A. Correct.**

Q. But you agreed to impose limitations or prohibitions on that kind of behavior for prayers offered by board members in their capacity as board members; correct?

Page 159

**A. Correct.**

Q. Why did you do that?

**A. Well, I don't think it needed to be the time or place for proselytizing or trying to convert anybody.**

Q. But you still had an absolute right, as you understood it, to do that; is that correct?

**A. Yes.**

Q. You just agreed voluntarily to accept those limitations?

**A. Yes.**

Q. I am going to ask you some questions about that limitation.

**A. About what?**

Q. That limitation in Paragraph 3.

What do you understand the prohibition against proselytizing prayer to mean?

**A. Honestly, I'm not certain.**

Q. When you adopted this policy -- I'm sorry, voted to adopt this policy, did you have an understanding?

**A. Of that particular word, no.**

Q. Okay.

Since October 19th, 2004, and through the

Page 160

end of your tenure as a board member, did you hear anyone offer a policy that you thought violated Paragraph 3?

**A. Offered a policy?**

Q. Sorry. I'm getting tired.

Since October 19th, 2004, and through the end of your tenure as a board member, did you hear any board member offer a prayer to open board meetings that you thought violated Paragraph 3?

**A. No.**

Q. Do you know or did you have an understanding as to what the enforcement mechanism was to ensure that the opportunity to prayer would not be used or exploited to proselytize --

**A. I would assume it would be the board president just not asking that person, again, or having a word with them and saying that's not the time or place for that.**

Q. I do say this respectfully, sir, you were the board president and you didn't know, you didn't have an understanding of what proselytizing prayer was. How would you enforce this provision?

**A. Well, I would assume that it's anything that's either pushing your religion or taking down somebody**

Page 161

**else's religion or criticizing them for them -- for theirs.**

**No one that I know of would have used that particular few seconds to convert anybody or try to disparage any other faith.**

Q. What about proselytizing?

**A. I told you before, I'm not absolutely positive of the definition of that word.**

Q. I'm going to offer you a few, I'm going to give you some examples of prayers and ask you whether in your judgment as a board member in adopting this policy the prayers would have violated Paragraph 3 or been permitted by Paragraph 3, and some of these prayers are intentionally meant to be extreme so don't be afraid to say, yeah, that would violate the policy or, yeah, that's clearly permitted.

The first prayer is, "Oh, Lord, please convert the heathens in the audience"?

**A. I wouldn't consider that appropriate.**

Q. And that would be prohibited by Paragraph 3; correct?

**A. I don't know if it would be prohibited or not. I just wouldn't consider it appropriate.**

Q. Well, I'm trying to get a sense of how a board

41 (Pages 158 to 161)

Wilcox & Fetzer, Ltd. Professional Court Reporters (302)655-0477

Dobrich, et al. v. Indian River School District, et al.
Harvey L. Walls C.A. # 15-120 (JJF) October 25, 2006

Page 162

member and a particular board president would interpret the school board prayer policy? I picked that prayer because it seemed to me to be an explicit attempt -- here. I will give you a more extreme one. "Oh, Lord, please convert the Jews in the audience to the knowledge and love of our Savior Jesus Christ"?

**A. That would be against the policy.**

Q. Okay.

So if somebody gave that prayer, as board president, what would you have done? Would you have spoken to them afterwards?

**A. Yes.**

Q. And would you have said, look, you can't do that, it's clearly not right, so don't do it again, or words to that effect?

**A. Yes.**

Q. Okay.

And having spoken to the board member, would you then offer them another opportunity as their name came up in rotation to offer another prayer?

**A. I would probably give them another chance.**

Q. Everybody gets a second bite at the apple. And if they offered up another inappropriate prayer, you'd take them out of the rotation?

Page 163

**A. I would.**

Q. All right. I'm going to give you somewhat less extreme examples. I hope less extreme. That was pretty extreme. It was the most extreme one I could think of.

A couple of them I have actually had typed up because they are kind of long so I want you to be able to read them. This is marked as Plaintiffs' Exhibit 35.

And it reads, "Do not put your trust in princes, in mortal men who cannot even save themselves. When their spirit departs, they return to the ground. On that very day their plans come to nothing. Blessed is he whose help is the God of Jacob, whose hope is in the Lord his God, the maker of heaven and earth, the sea, and everything in them, the Lord who remains faithful forever. He upholds the cause of the oppressed and gives food to the hungry. The Lord sets prisoners free. The Lord gives sight to the blind. The Lord lifts up those who are bowed down. The Lord loves the righteous. The Lord watches over the alien and sustains the fatherless and the widow, but he frustrates the ways of the wicked. For the wages of sin is death, but the gift of God is eternal life

Page 164

through Jesus Christ our Lord."

Would you consider that that prayer is permitted or prohibited by Paragraph 3 of your policy?

**A. I would say permitted.**

Q. So this would not, in your view, be an effort to proselytize, advance or convert anyone or to derogate or to otherwise disparage any particular faith? Yes?

**A. Yes.**

Q. This is Plaintiff's Exhibit 45. Quote, Heavenly Father, thank you for this great occasion, for the work, the effort, the joys and everything that led up to this point in time. Thank you for your guidance in this event. We pray for your direction in the lives of each of these school board members. We pray that you direct them into the truth and eventually the truth that comes by knowing Jesus. We also pray that you be with them at this time and we ask these things in Jesus's name. Amen."

Is that permitted or prohibited by Paragraph 3?

**A. I think it is permitted.**

Q. All right, one last one. And it is short so I am going to read it. "Allah, we offer you our school

Page 165

bus drivers. We offer you our superintendent, our administrators and our secretaries. We offer you our teachers and our parents. Finally, we offer you our students. Peace be unto your prophet, Muhammed."

**A. I think that would be permitted.**

Q. I asked you some questions earlier about Mr. Helms' statement in February of this year at the board meeting?

**A. I don't remember. What was that?**

Q. It is during the settlement.

**A. Oh, okay.**

Q. Mr. Helms expressed the view that he was not going to be a second class citizen because of his religious views. Do you feel that you have ever been treated as a second class citizen because of your religious views?

**A. Probably not until all this started.**

**Mr. Helms, I think, had some personal statements that he made.**

Q. Do you recall that Mr. Helms equated his situation with that of Mrs. Rosa Parks sitting at the back of the bus?

**A. I remember that.**

Q. Did you think that was an appropriate analogy?

42 (Pages 162 to 165)

Wilcox & Fetzer, Ltd. Professional Court Reporters (302)655-0477

Page 166

**A. It's not something I would have said.**
Q. I take it that you don't agree with it?
**A. There's many times Mr. Helms and I haven't agreed over the last 14 years.**
Q. Is this one of those instances?
**A. Yes.**
Q. I think, I have some things just to make sure we have completed, but I think I'm done. If you'll give us five minutes, maybe a little more, we'll make sure everything is covered and then we will come back on the record. Okay?
VIDEO SPECIALIST: Going off the record at 5:54 p.m.
(Recess.)
VIDEO SPECIALIST: Going back on the record at 5:52 p.m.
MR. ALLINGHAM: I am going to ask the reporter to mark as PX-64 a document bearing Bates numbers P-129 and 130.
(PX-64 was marked for identification.)
BY MR. ALLINGHAM:
Q. This is an article written by --
MR. SHAU: May I have a copy of this?
MR. ALLINGHAM: Yes, sir.

Page 167

BY MR. ALLINGHAM:
Q. This is an article written by J.L Miller of the Wilmington News Journal, which we took off their website.
You can read the whole article if you'd like, but my question has to do with the last two which quote you.
**A. (Pause.)**
**The last two paragraphs?**
Q. Yes. You're quoted as saying to Mr. Miller -- not quoted, but reported as saying that the prayer controversy has sparked strong reactions in his largely rural Sussex County district and he predicted what policy emerges will leave someone disappointed.
And then there's a quote, Unfortunately, I think both sides will be the losers of it, closed quote, he said.
Did you give that quote to Mr. Miller?
**A. Yes.**
Q. And did you believe it when you said it?
**A. Yes.**
Q. And do you still believe it?
**A. Yes.**
Q. You were quoted in numerous news articles as

Page 168

having suggested that it might be useful to have a public forum on the issues of prayer that were being considered by the board in the summer of 2004.
Do you recall having made that suggestion?
**A. I may have.**
Q. The board never did have a public forum on those issues, did it?
**A. No.**
Q. Was there a reason for that?
**A. Legal advice.**
Q. From?
**A. Mr. Neuberger.**
Q. Mrs. Dobrich complained about the graduation prayer at the graduation to Miss Hobbs. Do you recall that?
**A. Yes.**
Q. She also telephoned you to complain about it.
**A. Yes.**
Q. Was that on or about the day of graduation?
**A. Shortly thereafter.**
Q. And did you tell Mrs. Dobrich that the issue of prayer at commencement ceremonies was a matter that should be addressed by the whole board, not by you as

Page 169

an individual member?
**A. I may have.**
Q. You don't have any reason to doubt that's true, do you?
**A. No.**
Q. Do you recall Mrs. Dobrich asking you then how she could bring the issue to the full school board's attention?
**A. She may have.**
Q. You don't have any reason to doubt her statement to that effect?
**A. No.**
Q. Did you tell her that the way to do that was to put the topic on the agenda for the next board meeting?
**A. I told her I think that a board member would have to put that topic on the agenda.**
Q. And did Mrs. Dobrich ask you to put the item on the agenda?
**A. I think she did.**
Q. And did you decline?
**A. I think so.**
Q. Why?
**A. Because at the time I needed more information.**

Page 170

Q. Did you tell Mrs. Dobrich that you did not want to put it on the agenda for the next meeting but you would consider putting it on for a subsequent meeting?

**A. I don't remember just what I told her. I remember when she called she woke me up. Because I remember talking to her while I was laying in bed.**

Q. Well, when you told Mrs. Dobrich that you would not put the item on the agenda for the next board meeting, did you give her any indication that it might be possible to put it on the agenda for a subsequent meeting?

**A. I don't know what inclination I gave her. I may have given her the inclination she needed to talk to a different board member to see if they would agree to put it on, on the agenda. I don't remember just what I told her.**

Q. I'm going to show you -- while I'm finding the document, we are going to change the tape. I am almost done, by the way.

VIDEO SPECIALIST: Going off the record at 5:58 p.m.

(Pause.)

VIDEO SPECIALIST: Going back on the

Page 171

record at 5:59 p.m.

BY MR. ALLINGHAM:

Q. What I have put in front of you is something called an amended complaint, which is a statement of the claims of the plaintiffs in this case.

And I'd like you to turn to Page 18 of the document, please.

Look at Paragraph 84. This is in the context of the first board meeting at which Mrs. Dobrich spoke, which took place on June 15th.

Paragraph 84, "There is an allegation that Defendant Hobbs announced that the district's lawyer was absent from the meeting because of a death in the family. And then, "Defendant Walls previously had mentioned that no one had complained about graduation prayer before the Dobriches."

I have two questions on that statement. The first one was, is it true that as of June 15th, 2004, no one had complained about graduation prayer in Indian River?

**A. Not to my knowledge.**

Q. Okay. And secondly, do you recall having said at the June 15th meeting that no one had complained about graduation prayer before the Dobriches?

Page 172

**A. I don't remember saying that.**

Q. Do you ever listen to WGMD?

**A. Yes.**

Q. That's a local talk radio station. Do you know Dan Gaffney?

**A. I know of him. I don't know him personally.**

Q. Did you at any time leading up to the August 24th board meeting call Mr. Gaffney?

**A. No.**

Q. At the August 24th board meeting, when you asked Dr. Hattier to open the meeting with a prayer, do you recall that the crowd in the room where you were erupted into applause?

**A. Yes.**

Q. And there was also cheering, was there not?

**A. I guess so.**

Q. Do you recall when, after Mrs. Dobrich spoke, her son, Alex, walked to the podium?

**A. Yes.**

Q. Do you recall that there were boos from the crowd?

**A. No.**

Q. Do you recall that Alex was unable to speak because of the reaction of the crowd?

Page 173

**A. I don't know why he was unable to speak. I assumed he was emotional.**

Q. Do you recall someone yelling from the crowd, take your yarmulke off?

**A. No.**

Q. Do you recall that Alex was wearing a yarmulke?

**A. Could have been.**

MR. ALLINGHAM: Thank you, Mr. Walls. I'm finished.

THE WITNESS: Good.

MR. SHAU: No questions.

VIDEO SPECIALIST: Going off the record at 6:03 p.m.

(Witness excused.)

\- - -

(The deposition concluded at 6:03 p.m.)

Page 174

INDEX

DEPONENT: HARVEY L. WALLS PAGE
Examination by Mr. Allingham 4

EXHIBITS

PLAINTIFF'S DEPOSITION EXHIBITS MARKED
PX-63 September 15, 2004, Board of Education Special Meeting Agenda, Roll call, Minutes, IRSD 0045715 through 0045718 104
PX-64 Article in Wilmington News Journal, P0129 and P0130 166

ERRATA SHEET/DEPONENT'S SIGNATURE PAGE 175

CERTIFICATE OF REPORTER PAGE 176

Page 175

REPLACE THIS PAGE
WITH THE ERRATA SHEET
AFTER IT HAS BEEN
COMPLETED AND SIGNED
BY THE DEPONENT

Page 176

State of Delaware )
)
New Castle County )

CERTIFICATE OF REPORTER

I, Terry B. Burke, RMR-CRR and Notary Public, do hereby certify that there came before me on Wednesday, October 25, 2006, the deponent herein, HARVEY L. WALLS, who was duly sworn by me and thereafter examined by counsel for the respective parties; that the questions asked of said deponent and the answers given were taken down by me in Stenotype notes and thereafter transcribed by use of computer-aided transcription and computer printer under my direction.

I further certify that the foregoing is a true and correct transcript of the testimony given at said examination of said witness.

I further certify that I am not counsel, attorney, or relative of either party, or otherwise interested in the event of this suit.

Terry Barbano Burke, RMR-CRR
Certification No. 233-RPR
(Expires January 31, 2008)

DATED: