Dobrich, et al.                          v.                    Indian River School District, et al.
Lois Hobbs                      C.A. # 15-120 (JJF)                      October 24, 2006

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MONA DOBRICH and MARCO          )
DOBRICH, Individually and       )
as parents and next friend      )
of ALEXANDER DOBRICH,           )
SAMANTHA DOBRICH, JANE DOE       ) Civil Action
and JOHN DOE, Individually      ) Number 15-120 (JJF)
and as parents and next         )
friend of JORDAN DOE and        )
JAMIE DOE,                      )
                                )
            Plaintiffs,         )
                                )
v.                              )
                                )
INDIAN RIVER SCHOOL             )
DISTRICT, et al.,               )
                                )
            Defendants.         )

            Videotape deposition of LOIS HOBBS, taken
pursuant to notice at 31 Hoosier Street, Selbyville,
Delaware, beginning at 9:12 a.m., on October 24, 2006,
before Julie H. Parrack, Registered Merit Reporter,
Certified Realtime Reporter and Notary Public.
APPEARANCES:
            THOMAS ALLINGHAM, ESQUIRE
            BRIAN G. LENHARD, ESQUIRE
              One Rodney Square
              Wilmington, Delaware  19801
              On behalf of Plaintiffs


            WILCOX & FETZER
    1330 King Street - Wilmington, Delaware 19801
              (302) 655-0477
              www.wilfet.com

Dobrich, et al.                                           v.                    Indian River School District, et al.
Lois Hobbs                                    C.A. # 15-120 (JJF)                              October 24, 2006

---

Page 2

1  APPEARANCES (CONT'D:)
2      JASON P. GOSSELIN, ESQUIRE
       DRINKER, BIDDLE & REATH, LLP
3      One Logan Square
       18th and Cherry Streets
4      Philadelphia, Pennsylvania  19103-6996
       On behalf of Defendants
5
   ALSO PRESENT: TIMOTHY KEARNS
6              LINDSAY DuPHILY, VIDEOGRAPHER
7              - - - - -
8          THE VIDEOGRAPHER:  This is the videotape
9  deposition of Ms. Lois Hobbs taken by the Plaintiff in
10 the matter of Dobrich, et al., versus Indian River
11 School District, et al., Civil Action No. 15-120.  The
12 deposition is being held at 31 Hoosier Street,
13 Selbyville, Delaware, on October 24th, 2006.  We are
14 going on the record at approximately 9:12 a.m.
15         The court reporter is Julie Parrack from
16 the firm of Wilcox & Fetzer, Wilmington, Delaware.  My
17 name is Lindsay DuPhily, and I am the videotape
18 specialist of Discovery Video Services.
19         Counsel will now introduce themselves, and
20 then the court reporter will swear in the witness.
21         MR. ALLINGHAM:  My name is Tom Allingham.
22 I represent the plaintiffs.  Along with me is Brian
23 Lenhard and Tim Kearns.
24         MR. GOSSELIN:  Jason Gosselin for the

---

Page 3

1  defendants.
2              LOIS HOBBS,
3      the deponent herein, having first been duly
4      sworn on oath, was examined and testified as
5      follows:
6  BY MR. ALLINGHAM:
7  Q.  Mrs. Hobbs, Ms. Hobbs, which do you prefer?
8  A.  Miss, Miss Hobbs.
9  Q.  Miss Hobbs, sorry.  Have you ever been deposed
10 before?
11 A.  Yes.
12 Q.  All right, so you know the process.  I'm going
13 to ask you some questions.  You are -- unless your
14 counsel instructs you not to answer, you're obligated
15 to answer those questions to the best of your ability.
16 I'm almost world renowned for asking questions that
17 are sometimes confusing.  Please tell me if you find a
18 question confusing or ambiguous, and I will do my best
19 to fix it.  Don't answer a question that you don't
20 feel like you understand.
21 A.  Okay.
22 Q.  You need to answer, although we have a
23 videographer here, you still need to answer out loud;
24 that is to say, so that the court reporter can take

---

Page 4

1  down your answer and there's no ambiguity in what your
2  answer is.  Nods and "um-hums" can be misinterpreted.
3  A.  All right.
4  Q.  I understand that you have a previous
5  commitment and that you need to stop at 1:00 this
6  afternoon, correct?
7  A.  At 1:30 at the latest.
8  Q.  Okay.  I think what we'll do then is stop for
9  lunch at 1:00.  You can take care of your obligations
10 and if we need to resume thereafter, we will.
11         Is there any -- are you suffering from any
12 condition that would prevent you from giving
13 comprehensive and truthful answers to my questions
14 today?
15 A.  No.
16 Q.  Or taking any medications that might prohibit
17 you from doing that?
18 A.  No, I took a Benadryl, but I don't think that
19 will prohibit.
20 Q.  All right, your full name is what?
21 A.  Lois Margaret Hobbs.
22 Q.  And what is your address?
23 A.  It is 3 Brighton Street, Ocean View, Delaware.
24 Q.  Are you currently employed?

---

Page 5

1  A.  No, I am not.  I'm self-employed.  I am working
2  as a consultant for an education foundation.
3  Q.  What's the foundation?
4  A.  Rodel.
5  Q.  And is your business, your consulting business
6  incorporated or otherwise legally organized?
7  A.  It is just on an hourly basis with them.  And I
8  will, you know, pay taxes on the one --
9  Q.  Yes, ma'am.
10 A.  I'm not incorporated, no.
11 Q.  Okay.  You previously served as the
12 superintendent of the Indian River School District; is
13 that right?
14 A.  Yes.
15 Q.  What dates did you serve in that capacity?
16 A.  I started in 1996 until 2006.
17 Q.  And why did you leave your position?
18 A.  I retired.
19 Q.  Did you meet -- are you represented by
20 Mr. Gosselin here today?
21 A.  Yes.
22 Q.  Did you meet with Mr. Gosselin before this
23 deposition --
24 A.  Yes.

---

2 (Pages 2 to 5)

Dobrich, et al.
Lois Hobbs

v.
C.A. # 15-120 (JJF)

Indian River School District, et al.
October 24, 2006

Page 6

1    Q.  -- for preparation purposes?
2    A.  Yes.
3    Q.  When did that take place?
4    A.  Last week, I believe on Tuesday.
5    Q.  And were there other people there?
6    A.  Yes.
7    Q.  Who was there?
8    A.  Susan Bunting and Rick Cohee.
9    Q.  Anyone other than Mr. Gosselin, Miss Bunting,
10   Mr. Cohee and yourself?
11   A.  No.
12   Q.  Did you review any documents at that meeting in
13   preparation for this deposition?
14   A.  No, I didn't review documents.
15   Q.  Have you done anything else, other than meeting
16   with your counsel and a couple of your colleagues, to
17   prepare for this deposition?
18   A.  I got a copy of the Board policy on prayer.
19   Q.  Okay.  That's the Board -- that's the policy on
20   School Board prayer?
21   A.  Yeah.
22   Q.  Okay.  We'll mark a copy -- or take a look at a
23   copy of that in a minute.
24   A.  Okay.

Page 7

1    Q.  Have you spoken to anyone who's been deposed in
2    this case?
3    A.  No.
4    Q.  Or reviewed any transcripts of depositions that
5    have been taken in this case?
6    A.  No.
7    Q.  All right.  At some point in this litigation
8    did you review your own personal files and collect
9    documents for production to the plaintiffs?
10   A.  No.
11   Q.  Is that because you have no personal files
12   relating to your --
13   A.  I didn't really take any files home.
14   Q.  I should have said earlier in the deposition,
15   the court reporter can only take one of us at a time
16   so --
17   A.  Oh, sorry.
18   Q.  -- despite the fact that I do it, and I bet you
19   do it, we need to try not to interrupt each other.
20        You testified that you did not review any
21   files for purposes of producing documents for the
22   plaintiffs in this case.  Is that because you didn't
23   have any files from your service as superintendent of
24   the Indian River District?

Page 8

1    A.  I had files, but not on this case.  And they're
2    all in boxes.  When I packed, I just packed things in
3    boxes, but nothing on this case.
4    Q.  And how do you know that there are no files on
5    this case?
6    A.  Most of them were personal things, you know,
7    books and files of work that I had done myself, memos
8    that I had written, letters that I had written for --
9    normally I keep copies of some of the letters I've
10   written and evaluations I've written on people, taking
11   their names off in case that I ever need to use them
12   in the future for my own work.
13   Q.  Where are those files located?
14   A.  In the garage of my house.
15   Q.  What's the volume?  One box, two box, one file,
16   20 boxes?
17   A.  One box, and then about, I would say, 15 boxes
18   of books, of my professional books that I thought I
19   might need.
20   Q.  But in terms of pieces of paper, maybe a box of
21   paper?
22   A.  A box, um-hum.
23   Q.  Did you have any notes or communications with
24   attorneys in connection with this case in your files?

Page 9

1    A.  No, not that I can recall.
2    Q.  When you left the Indian River School District
3    in 2006, what did you -- well, let me take one step
4    back.
5         During your tenure as superintendent, did
6    you maintain a file or files on this litigation?
7    A.  Only when our previous lawyers started asking
8    us for things, we gave whatever they wanted to them.
9    And I worked on a book of -- and you probably have
10   seen it -- a book of information about the different
11   questions on the case.  But I didn't keep a copy of
12   that.  It went to them and, I imagine, to you.
13   Q.  Yeah, I'm not talking about what you've
14   produced to the plaintiffs or to your own lawyers now,
15   I'm just talking about when this matter, which has
16   been characterized as 05-01 PL, was commenced, did you
17   or someone at your direction open a file on this
18   matter?
19   A.  I don't have a file on this matter.  If there's
20   a file, it would be in the, you know, in the office.
21   But we didn't keep...
22   Q.  My questions are intentionally specific.  Did
23   you or someone at your direction at some point open a
24   file on this litigation?

3 (Pages 6 to 9)

Dobrich, et al.                                    v.                Indian River School District, et al.
Lois Hobbs                                 C.A. # 15-120 (JJF)                        October 24, 2006

|  | Page 10 |  | Page 12 |
|---|---|---|---|
| 1 | A. No. | 1 | Q. Is the superintendent -- is it part of the |
| 2 | Q. Okay. How long have you lived in Delaware, | 2 | superintendent's duties to attend School Board |
| 3 | Miss Hobbs? | 3 | meetings? |
| 4 | A. Ten years. | 4 | A. Yes. |
| 5 | Q. So you came here to take this job? | 5 | Q. And what is the purpose of the superintendent's |
| 6 | A. Yes. | 6 | attendance at the School Board meetings? |
| 7 | Q. Where did you live prior to that? | 7 | A. We're called the Board secretary -- I mean |
| 8 | A. I lived in Arlington, Virginia, and also I had | 8 | we're called secretary to the Board, along with the |
| 9 | a home on the Bay near Annapolis in Edgewater. | 9 | Board secretary. But I do not run the meetings. The |
| 10 | Q. Before you became superintendent, did you hold | 10 | Board president runs the meetings. I, when asked, I |
| 11 | any other positions in the district? | 11 | give my opinion on some things. Usually I have, |
| 12 | A. In this district? No. | 12 | either make a presentation if it's a new program that |
| 13 | Q. Yes. Describe for me your duties as | 13 | I want to, you know, have the Board accept. We had |
| 14 | superintendent of the district. | 14 | several new programs developed since I've been |
| 15 | A. I'm responsible for the running of the | 15 | superintendent, so I would give a presentation or one |
| 16 | district, the safety in the schools, the curriculum, | 16 | of my staff members would give a presentation on that. |
| 17 | the instruction of children. Predominantly that. | 17 |     Predominantly I'm fairly quiet at the |
| 18 | Q. Were you interviewed for the position of Board | 18 | School Board meetings most of the time. I don't speak |
| 19 | superintendent? | 19 | up. It's their meeting, as I see it. |
| 20 | A. Yes. | 20 | Q. What are your duties as secretary to the Board? |
| 21 | Q. Do you know whether there were other | 21 | A. Actually, I read over the minutes, and |
| 22 | candidates? | 22 | generally most of the time I read over the minutes |
| 23 | A. Yes, I believe that there were three finalists. | 23 | that Janet Hearn prepares for the Board. And I sign |
| 24 | Q. When you were interviewed for the position -- | 24 | those minutes before they go to the Board members. |

|  | Page 11 |  | Page 13 |
|---|---|---|---|
| 1 | were you interviewed by Board members? | 1 | Q. Any other duties besides reading over the |
| 2 | A. Yes. | 2 | minutes and signing them? |
| 3 | Q. Did any Board member ask you about your | 3 | A. Preparing the materials. I work on -- we send |
| 4 | position on school prayer? | 4 | the Board a packet and before -- we send the Board a |
| 5 | A. No. | 5 | packet on Thursday, so usually Wednesday and Thursday |
| 6 | Q. Did anyone ask you about your position on | 6 | we gather all the materials that they would need to |
| 7 | religion in the schools? | 7 | read over before making decisions at the Board |
| 8 | A. No. | 8 | meetings. |
| 9 | Q. Did anyone ask you for your position on prayer | 9 | Q. And you provide those materials to the Board |
| 10 | by the School Board to open its meetings? | 10 | members how? |
| 11 | A. No. | 11 | A. We gather materials from the staff, if it's the |
| 12 | Q. What topics did the Board members ask you about | 12 | budget or whatever it has to do with, and we collate |
| 13 | in connection with your interview? | 13 | the materials and we send it to them in a packet. And |
| 14 | A. Let me see. Ten years ago, I believe -- it's | 14 | we send them, by our, one of our custodians, by |
| 15 | hard to remember exactly the topics. But one was | 15 | courier on Thursdays, usually on Thursdays. |
| 16 | based on the national school goals, I do remember | 16 | Q. Okay, so they're hand delivered? |
| 17 | that. Another was my opinion of instruction, you | 17 | A. Hand delivered, yes. |
| 18 | know, for children. But probably based on the things | 18 | Q. For the meeting the following Tuesday? |
| 19 | that were happening 10 years ago in education were | 19 | A. Tuesday. |
| 20 | predominantly what the questions were. | 20 | Q. And are you ultimately responsible for -- is |
| 21 | Q. Do you recall any discussion at all during the | 21 | that the Board, so-called Board package? |
| 22 | interviews of the broad topic of religion in the | 22 | A. That's the Board packet, um-hum. |
| 23 | schools? | 23 | Q. Okay. Are you responsible ultimately for |
| 24 | A. No. | 24 | what's included in the Board package? |

4 (Pages 10 to 13)

Dobrich, et al.                              v.                    Indian River School District, et al.
Lois Hobbs                          C.A. # 15-120 (JJF)                        October 24, 2006

Page 14

1    A.  I -- we usually, you know, when we form the
2    agenda, then we try to put the items in the packet
3    that go along with the agenda, so I --
4        Q.  Who forms the agenda?
5        A.  I form the agenda with the president of the
6    Board.
7        Q.  And what was the process for that?  Did you
8    actually meet with the president?
9        A.  What happens is -- no, we don't meet.  We talk
10   over the phone, and we talk over different items.  And
11   then probably, maybe on Tuesday before Thursday, it
12   could be Wednesday, depends on how rushed we are and
13   what we can do, we send him a draft copy of the
14   agenda, both the Board president and vice president.
15   And then if he has things that he would like to add,
16   then we add those to them.
17           Predominantly the agenda is pretty
18   similar.  It's a standard agenda and we fit the items
19   under those, under the standard agenda.
20       Q.  Yeah, let me explore that for just a minute.  I
21   have looked at some agendas.  It looks to me like
22   there are, there's a sort of standard agenda with line
23   items, and then you would put sub items on the line
24   items.

Page 15

1        A.  Right.
2        Q.  Is that a fair summary?
3        A.  That is a fair summary.
4        Q.  Okay.  And when you say, "We send a draft
5    agenda to the president and the vice president,"
6    sometimes witnesses modestly say "we" instead of "I,"
7    sometimes you mean we and it's you and someone else.
8        A.  I'm sorry, it's Janet Hearn.
9        Q.  And you?
10       A.  And me.
11       Q.  And was that true throughout your tenure?
12       A.  Yes.
13       Q.  Okay.  Let me explore the relationship between
14   you and Ms. Hearn for a minute.
15           You are secretary to the Board, but you
16   don't actually draft minutes; is that correct?
17       A.  Correct.
18       Q.  And that's something you delegate to Ms. Hearn?
19       A.  Yes.  She was doing that I guess almost 10
20   years before I even arrived.
21       Q.  No point in changing that point, right?
22       A.  No, uh-uh.
23       Q.  Okay.  On the other hand, you reviewed the
24   minutes once they were drafted; is that correct?

Page 16

1        A.  Yes.
2        Q.  Okay.  So that when you signed the minutes, you
3    had satisfied yourself with your own review of those
4    minutes that they accurately reflected what happened
5    at the meeting?
6        A.  That was generally my practice, to read over
7    the minutes before they went out in the packet.
8        Q.  Okay.
9        A.  And sign them.
10       Q.  And that was certainly your intention?
11       A.  Right.
12       Q.  You would not -- you would -- let's just say
13   you would prefer not to sign the minutes as accurate
14   if you hadn't reviewed them first?
15       A.  True.
16       Q.  Okay.
17       A.  There's sometimes I was more rushed than
18   others.
19       Q.  Can you recall any instance in which you signed
20   them without looking at them?
21       A.  No.  I would look at them.
22       Q.  All right.
23       A.  You know, unless I was ill or out of town, and
24   then perhaps the assistant superintendent would read

Page 17

1    over them or write the memo to the Board.
2        Q.  Before you signed the minutes, you also, the
3    Board members would also have been given an
4    opportunity to review them and make comments, correct?
5        A.  No.  Not usually.
6        Q.  So --
7        A.  They went out in their packet, and they
8    reviewed them at the next meeting.  And added, you
9    know, made an amendment to them if needed, if they
10   found something incorrect in them.
11       Q.  Let me just, I'm going to just pick an
12   arbitrary date.  It's not arbitrary, it's a date that
13   is at issue in this case.  On August 24th, 2004, there
14   was a board meeting, was a regular board meeting.
15       A.  If you say so.
16       Q.  It's been referred to in, throughout testimony
17   here as the big meeting at which many hundreds of
18   people showed up at Frankford Elementary School.  Do
19   you recall that?
20       A.  Yes, I do.
21       Q.  All right.  And am I correct that Ms. Hearn sat
22   through that board meeting and did whatever she does
23   to get ready to prepare the notes, the minutes and
24   then she drafted minutes, correct?

5 (Pages 14 to 17)

Dobrich, et al.
Lois Hobbs

v.

C.A. # 15-120 (JJF)

Indian River School District, et al.
October 24, 2006

Page 18

1     A.  Yes, I believe so.
2     Q.  Okay.  And then Ms. Hearn gave you the draft,
3  correct?
4     A.  Before it went out to the next meeting?
5     Q.  Yes.
6     A.  That's usually the procedure.
7     Q.  Okay.  Would she usually also give the minutes
8  to the assistant superintendent, Mr. Savage?
9     A.  Not normally.
10     Q.  Okay.  Your normal practice would then have
11  been to review Ms. Hearn's draft?
12     A.  Yes.
13     Q.  All right.  And then the draft would be
14  included in the Board package?
15     A.  For the next meeting.
16     Q.  Yes.
17     A.  Yes.  Unless she was behind minutes, and then,
18  you know, we might put two or three minutes in
19  together, so I'm not sure.
20     Q.  Let's just assume she was not behind.
21     A.  Okay.
22     Q.  Okay?  So Ms. Hearn prepares the draft, you
23  look at it, it would then be included in the Board
24  package for the next meeting.

Page 19

1     A.  Correct.
2     Q.  Okay.  Am I correct that you did not sign those
3  draft minutes before they were put in the Board
4  package?
5     A.  I normally, my usual practice is to sign them
6  before they're run off for the Board package.  That's
7  my normal practice.
8     Q.  Oh, really.  So you would affirm their accuracy
9  before the Board had an opportunity to make comments
10  or suggestions?
11     A.  Yes.
12     Q.  All right.  If a Board member had comments or
13  suggestions, what would you do, amend the minutes and
14  re-sign them?
15     A.  They're amended right in front of the entire
16  meeting.  They're -- they say, you know, I find an
17  error that they want it corrected and then they vote --
18  they vote on the minutes as amended at the meeting.
19     Q.  Okay.
20     A.  If they have no corrections, they just vote on
21  the minutes.
22     Q.  So they would — somebody would just
23  interlineate whatever corrections they wanted to make?
24     A.  Yes.

Page 20

1     Q.  And then they would vote to approve them?
2     A.  Right.
3     Q.  So you wouldn't even have to re-sign them?
4     A.  No.
5     Q.  All right.
6        MR. GOSSELIN:  Only lawyers say
7  "interlineate," by the way.  You will not hear that in
8  normal conversation.
9        MR. ALLINGHAM:  No, my six-year-old says
10  that too.
11        You know, that's actually true.  There's
12  probably a perfectly good English word for it, but I
13  don't know it anymore.
14        MR. GOSSELIN:  "Writing it in."
15  BY MR. ALLINGHAM:
16     Q.  The superintendent does not vote at School
17  Board meetings, correct?
18     A.  No.
19     Q.  All right.  And ties are not broken by vote of
20  the superintendent, they're broken by how?  How are
21  ties broken?
22     A.  Well, if they're voted down, or they take no
23  action, there's no objection.  They can reconsider
24  their motion and vote again, is what they normally do.

Page 21

1     Q.  So a 5/5 vote would be treated as a no vote?
2     A.  Yes, it wouldn't pass.
3     Q.  Okay.  Does the superintendent perform any
4  oversight roles for the Board?
5     A.  Could you explain, please?
6     Q.  Separate from your responsibilities in the
7  district, does the superintendent have any
8  responsibilities directly to the Board to assist it in
9  the performance of its duties?
10     A.  I don't assist the Board in the performance of
11  their duties.  My job would be more like if they pass
12  policies, then I'm to see that, you know, they're
13  distributed through the district and the district
14  understands them.
15     Q.  Okay.  I take it from your description of the
16  agenda preparation process that you as superintendent
17  have the power to place items on the agenda.
18     A.  Yes, I can.
19     Q.  Okay.  I take it also from your description
20  that the president has the power to place items on the
21  agenda.
22     A.  Yes.
23     Q.  Okay.  And in the course of your ten years or
24  so of superintendent, do you recall instances in which

6 (Pages 18 to 21)

Dobrich, et al.                                    v.                    Indian River School District, et al.
Lois Hobbs                              C.A. # 15-120 (JJF)                        October 24, 2006

| Page 22 | Page 24 |
|---|---|
| 1 the president placed items on the agenda? | 1 that, but I would also bring it back to the Board if |
| 2   A. I'm sure that in the ten years the different | 2 the Board needs a policy, and suggest that they take a |
| 3 presidents have placed items on the agenda. Specific | 3 look at creating a policy for that. |
| 4 ones, I wouldn't be able to say. | 4   Q. That was the point of my question. If, if you |
| 5   Q. That's helpful to me. So without knowing what | 5 found that there was an area that you were required to |
| 6 they are, you're confident that from time to time | 6 act in using your own discretion because there was no |
| 7 presidents have placed items on the agenda? | 7 Board policy, would you raise that issue with the |
| 8   A. Right, and people have called to be on the | 8 Board and suggest that the Board consider a policy? |
| 9 agenda; and you know, they put in writing they want to | 9   A. Yes, I would. |
| 10 be on the agenda, we put people on the agenda. | 10   Q. Okay. And I take it then that it's part of |
| 11   Q. How does that work? | 11 your, the superintendent's responsibilities, as you |
| 12   A. Normally they -- if they're speaking in public | 12 understood them, to suggest areas for consideration of |
| 13 comment, they don't need to be, get permission to be | 13 Board policies to the Board? |
| 14 on the agenda. But if they want a topic discussed, | 14   A. Actually, I don't recall that I had to ever do |
| 15 they usually write to be on the agenda. | 15 that, to recommend a policy or take an action. |
| 16   Q. So if a member of the public wanted to discuss, | 16 Normally my actions would be, you know, dealing with |
| 17 I don't know, new goalposts at the Sussex Central | 17 personnel or school safety or things like that. |
| 18 football field, and they wrote to the superintendent | 18   Q. Had you ever functioned as a superintendent at |
| 19 and said, "I'd like to have a discussion of this," it | 19 any other district before you joined the Indian River |
| 20 would be your job to figure out -- and I guess the | 20 District? |
| 21 Board president's job to figure out whether that issue | 21   A. No. |
| 22 should be put on the agenda? | 22   Q. What was your job position prior to your taking |
| 23   A. Yes. | 23 that job? |
| 24   Q. And was it your practice typically if somebody | 24   A. I was a regional director in Charles County, |

| Page 23 | Page 25 |
|---|---|
| 1 from the public asked to have an agenda item to put it | 1 Maryland. |
| 2 on the agenda? | 2   Q. And I'm sorry for my ignorance, what does a |
| 3   A. Yes. | 3 regional director do? |
| 4   Q. Okay. If a Board member neglects his or her | 4   A. The county was divided into three areas, and I |
| 5 duty or acts outside his or her authority, does the | 5 was responsible for one of the areas, predominantly in |
| 6 superintendent have any authority to take action | 6 instruction because I didn't, you know, I was one of |
| 7 against that Board member? | 7 the three directors. I wasn't sitting with the |
| 8   A. No. | 8 superintendent and the Board of Charles County; you |
| 9   Q. If you believed a Board member was acting | 9 know, sitting in the sidelines. |
| 10 against the best interests of the district, what would | 10   Q. Just so I understand the chain of command here, |
| 11 you do? What would you have done? | 11 there were three -- there was one director for each of |
| 12   A. I would share that with the president of the | 12 the three regions, and am I right that you reported in |
| 13 Board, and perhaps -- and the vice president. | 13 that position to the superintendent? |
| 14   Q. For matters that are not covered by Board | 14   A. Yes. |
| 15 policy, does the superintendent have discretion to act | 15   Q. All right. But in that position you did not |
| 16 in her best judgment for the interests of the | 16 attend School Board meetings, for example? |
| 17 district? | 17   A. I attended them, but I was more or less in the |
| 18   A. Could you give me an example? | 18 audience of the School Board. |
| 19   Q. Yes, where a decision is -- where the | 19   Q. And did that -- |
| 20 superintendent or the district is confronted with a | 20   A. And mainly to do presentations on new programs |
| 21 decision that is not covered by a Board policy, does | 21 and new instructional programs when I was asked to |
| 22 the superintendent have discretion to act in her best | 22 speak in front of that board. |
| 23 judgment for the district's interest? | 23   Q. How long did you work in that district? |
| 24   A. I could act in the case of emergency about | 24   A. Two years in Charles County. |

7 (Pages 22 to 25)

Dobrich, et al.                                          v.                    Indian River School District, et al.
Lois Hobbs                                      C.A. # 15-120 (JJF)                          October 24, 2006

Page 26

1    Q.  And before that?
2    A.  Prince Georges County.
3    Q.  How long in that position?
4    A.  Twenty-eight.
5    Q.  In the 30 years that you served in those two
6    districts in Maryland, did those district -- did those
7    boards open their meetings with a prayer?
8    A.  I don't recall.  I don't believe Prince Georges
9    did.  But I'm not sure about Charles, tell you the
10   truth.
11   Q.  And just refresh me, the most recent one was
12   Prince Charles?
13   A.  Yeah, it was Charles.  But the meetings were,
14   would go on so long, from 8:00 in the morning, and I
15   wasn't always there in the beginning, so I really
16   can't tell you that.
17   Q.  Okay.  In the earlier district where you served
18   28 years, you don't recall that they did open their
19   meetings with a prayer?
20   A.  No, I don't.
21   Q.  Did you think the meetings were conducted in a
22   solemn and appropriate manner?
23   A.  Yes.
24   Q.  Was it among your duties to make

Page 27

1    recommendations to the School Board with respect to
2    expenditures like field trips?
3    A.  No, I never made any recommendations about
4    field trips.
5    Q.  Did you bring requests for expenditure of funds
6    on field trips to the Board as superintendent?
7    A.  We don't bring requests for expenditures.  It
8    would be more -- we had the policy on where -- if
9    field trips were on Sundays, the Board needed to
10   approve them, or overnight on weekends or so many
11   miles outside of the Delmarva Peninsula.  And that
12   became more of a need when, you know, all the safety
13   issues and the terrorist issues, we got more concerned
14   about how far our children were traveling.
15   Q.  What was the reason for the Board's being
16   involved in approving a field trip on a Sunday?
17   A.  I don't recall.  That was here before I came
18   here.  It was just something we did.
19   Q.  You never discussed that at the Board meetings?
20   A.  No.
21   Q.  Do you recall field trips on Sundays being
22   proposed to the Board for approval?
23   A.  It was mostly overnight trips that would take
24   us into Sunday, I guess.

Page 28

1    Q.  Do you recall any discussion on any of those
2    field trips about the fact that the field trip would
3    have children away from home on Sunday morning because
4    of the overnight?
5    A.  Not on a field trip, no.
6    Q.  You said, "Not on a field trip, no."  Do you
7    recall such a discussion in some other context?
8    A.  I believe they wanted like sporting events to
9    start after, afternoon, so if children wanted to
10   attend church, they could, I guess.
11   Q.  They, the Board members?
12   A.  Um-hum.
13   Q.  And which of the Board members do you recall
14   saying that?
15   A.  I don't recall who would say that.
16   Q.  Did that come up in the context of a proposal
17   to schedule a sporting event before noon?
18   A.  I believe that there's a possibility that over
19   the 10 years that was a conversation at times.
20   Q.  And that -- and the response to it was that one
21   or more of the Board members said, "We don't want to
22   do that.  We want to make sure everyone can go to
23   church"?
24   A.  No one said that that I heard.

Page 29

1    Q.  Words or substance.
2    A.  No.
3        MR. GOSSELIN:  Register my belated
4    objection to the form of that question.  It took me a
5    minute to chuckle and then get it out.
6    Q.  Well, responding to that suggestion, some Board
7    member, your earlier answer was, suggested that they
8    would prefer not to have sporting events start before
9    noon on Sunday, correct?
10   A.  I believe that's the general belief, that...
11   Q.  Okay.  And how did you form that belief?  You
12   heard one or more Board members express that belief?
13   A.  I think it's in the, that was what, why those
14   things came before the Board.
15   Q.  And when you say that was why those things came
16   before the Board, what do you mean by that?
17   A.  You know, like a field trip or use of a
18   facility on Sunday, you know, or for a soccer game or
19   something like that.
20   Q.  And so what did the Board members say, as you
21   recall, as to their reasons for addressing that
22   request?
23   A.  I don't recall them specifically saying
24   anything about that.  I think that was sort of a

8 (Pages 26 to 29)

Dobrich, et al.
Lois Hobbs

v.
C.A. # 15-120 (JJF)

Indian River School District, et al.
October 24, 2006

Page 30

1  long-term thing that people just understood.
2     Q.  Well, and I, in this question I just want your
3  understanding, not what other people understood, which
4  is harder to divine.  As superintendent you understood
5  that the Board members did not want events to take
6  place before noon on Sundays --
7     A.  Yes.
8     Q.  -- so that students would have the opportunity
9  to go to church.  Correct?
10    A.  Yes.
11        MR. GOSSELIN:  Objection.
12    Q.  Did building management fall within your
13  responsibilities?
14    A.  Yes, I mean as far as the buildings being clean
15  and orderly, yes.
16    Q.  Um-hum.  How about decisions on materials or
17  contractors or any aspect of improvements to buildings
18  or facilities?
19    A.  Usually they came before a Buildings and
20  Grounds Committee and then to the Board for
21  contractors.
22    Q.  And if you know, how would a question like that
23  be presented to the Buildings and Grounds Committee?
24  How would it come to them?  Through you?

Page 31

1     A.  Normally it would be our renovation -- we have
2  a big renovation project, which was approved by the
3  public.  So when we hired a manager to manage that,
4  they, you know, came before the Board and were
5  interviewed by the Board and selected.
6     Q.  All right.  And then that building manager,
7  project manager would bring issues directly to the
8  Buildings and Grounds Committee?
9     A.  Normally they would bring them first to the
10  Buildings and Grounds Committee.  The Buildings and
11  Grounds Committee would suggest whether they needed to
12  come before the Board.
13    Q.  Okay.  I asked you whether you sat with the
14  Board during its meetings.  Do you also sit with the
15  Board during executive sessions?
16    A.  Yes.
17    Q.  And also during special meetings?
18    A.  Yes.
19    Q.  Do you attend policy -- sorry.  Do you attend
20  committee meetings?
21    A.  No.  Oh, I'm sorry.  I do attend the buildings
22  and grounds meeting and the finance meeting, committee
23  meetings.  They are the two I attended.
24    Q.  But not the Policy Committee meetings?

Page 32

1     A.  No.
2     Q.  Miss Hobbs, am I right that -- this goes back
3  to the minutes for a moment.  Am I right that if you
4  found an inaccuracy in the minutes, you would not
5  certify that they were accurate, but rather, would ask
6  Miss Hearn to make whatever correction needed to be
7  made?
8     A.  Yes.
9     Q.  What did you understand the purpose of the
10  minutes to be?
11    A.  The purpose of the minutes would be to make
12  sure we got down the motions that the Board and the,
13  and the business of the Board, that they wanted to
14  conduct.  That would be the purpose of the minutes, to
15  keep a record of, for the public of what business
16  occurred at the Board meeting.
17    Q.  And to, I take it to have an accurate record of
18  actions actually taken by the Board?
19    A.  Take -- yes.
20    Q.  Minutes are posted on the district's Web site.
21  Are you aware of that?
22    A.  Yes.
23    Q.  And are those minutes identical to the ones you
24  certify, except that they don't have your signature at

Page 33

1  the bottom?
2     A.  They're posted after the Board approves them.
3     Q.  So they should be identical?
4     A.  Yeah.
5     Q.  You have to answer orally.
6     A.  Yes.
7     Q.  Okay.  In your 10 years or so here in Indian
8  River, did you ever invite people to the Board
9  meetings?
10    A.  I invited children who won an award or teachers
11  who wrote a grant to be recognized if they wanted to
12  come.
13    Q.  And with respect to the children who won an
14  award, was it typical that you -- and I'm talking now
15  about the academic school year board meetings, was it
16  typical that children were invited to receive awards
17  or to get recognition?
18    A.  What would happen, because you can't keep track
19  of the whole district, the principal, if they felt
20  that a child had received an honor, somewhere else in
21  the district or outside of the district, and they
22  should be recognized at the Board meeting, they either
23  called my office and said they should be recognized,
24  or we then later had a form that they could fill out

9 (Pages 30 to 33)

Dobrich, et al.                                    v.                     Indian River School District, et al.
Lois Hobbs                              C.A. # 15-120 (JJF)                           October 24, 2006

Page 34

1  so we wouldn't miss children if they would be
2  recognized, or should be recognized. And they were
3  recognized for, you know, athletics, for academics,
4  for outside poster contests, anything usually at the
5  state or national level.
6     Q. And this was not intended to be restricted to
7  athletics, I take it?
8     A. No.
9     Q. Would it be fair to say that the hope was to
10 cast a net broad enough to encompass all areas of
11 achievement that the students might participate in?
12    A. Anything that was at the state or national
13 level that a student participated in, to recognize
14 them and say thank you for, you know, trying that or
15 doing that.
16    Q. There's been some testimony from other
17 witnesses that you might have been instrumental in
18 expanding this practice of trying to recognize
19 achievements by the students. Is that correct?
20    A. Yes.
21    Q. Okay. Tell me why you did that. Well, first
22 of all, tell me what changes you implemented in that
23 area.
24    A. I invited people who, children or adults who

Page 35

1  had made contributions to the district because I think
2  they should be recognized. I think that's a part of a
3  community, that we say great job and thank you. Some
4  of our teachers had written grants for 5 and $6,000,
5  and I thought they should be thanked publicly.
6     Q. How does that grant process work? Do teachers
7  have to get authorization from the district, from you
8  or from someone at the district before they submit the
9  grant application?
10    A. Actually, they can write the grant. MBNA, who
11 is no longer in business, or in business with us, I
12 should say, offered teachers grants. And they could
13 apply to MBNA for the grants. And that's where we got
14 most of our grant money. And so they could write it
15 directly and could ask for help from the district if
16 they needed it, to write the grant or ideas for the
17 grant.
18    Q. I take it from your earlier answer that you
19 thought that the district benefited directly or
20 indirectly from recognizing teachers who had
21 successfully applied for grants.
22    A. I just wanted to say thank you to people.
23    Q. And what I was trying to get at was, as a
24 manager, as superintendent, you believed that the

Page 36

1  district would benefit by a practice of thanking
2  people for achievements on behalf of the district,
3  correct?
4     A. Yes, I think that's fair.
5     Q. Okay. And then coming over to the, to the
6  recognition of the children, what benefit did you
7  think that the district would achieve by recognizing
8  achievements of children within the district?
9     A. The children are what we're all about. So I
10 wanted to say thank you and recognize the children.
11    Q. Did you think the children would benefit from
12 that recognition?
13    A. I did. I think the parents enjoyed the fact
14 that they were recognized, and normally, in the past
15 few years I sent them a congratulatory letter with a
16 picture of them standing in front of the Board.
17    Q. Oh, really?
18    A. Um-hum.
19    Q. And I guess that was to memorialize the
20 recognition?
21    A. Well, I don't know. I'm a first grade teacher
22 at heart.
23    Q. What does that mean?
24    A. That I like recognizing children. I think it's

Page 37

1  important. This is, this is what we do.
2     Q. From the children's perspective, did you
3  understand that they viewed it as an honor to be
4  recognized by the School Board?
5     A. They could come and be honored or they might
6  not, or their principal might accept the award and
7  they could stay home. There was no obligation for
8  them to come to a Board meeting.
9     Q. That wasn't my question. As a superintendent
10 who began as a first grade teacher, did you understand
11 that the children would view it as an honor to be
12 recognized by the School Board?
13    A. I would think they would.
14    Q. And it's to memorialize that honor that you
15 sent them the letter and the picture, correct?
16    A. I wouldn't go that far.
17    Q. Who was in the picture?
18    A. Usually it was the children, their parents when
19 they got their certificate, so it would be the Board
20 president and myself.
21    Q. So you had a process in place, at least for the
22 last few years, in which there was a photographer
23 available to take a picture of each of the children
24 who was being -- each of the children who were being

10 (Pages 34 to 37)

Dobrich, et al.
Lois Hobbs

v.

C.A. # 15-120 (JJF)

Indian River School District, et al.
October 24, 2006

Page 38

1  recognized?
2  **A. Right.**
3  Q. Correct?
4  **A. Yes.**
5  Q. Okay. And was that a district employee, the
6  photographer, or someone else?
7  **A. District employee.**
8  Q. I take it not a full-time photographer then?
9  **A. No.**
10  Q. Okay.
11  **A. We don't have that luxury.**
12  Q. Understood. I looked at the minutes that we
13  were given, or that we were able to get off the Web
14  site, to get a sense of what sorts of achievements the
15  Board chose to recognize. And I certainly saw a
16  number of state and national awards that children were
17  recognized for. I saw some recognition for, simply
18  for participation from time to time. Was that also
19  something that was done?
20  **A. I would imagine, if you saw it. We tried to**
21  **make it more of an award or national participation or**
22  **state participation. But they may have participated**
23  **in a, you know, a team that won, sports team that won.**
24  Q. And the process by which invitations were

Page 39

1  extended during -- that you established during your
2  tenure as superintendent was to ask the principals at
3  each of the schools to suggest children who could be
4  invited for recognition and then the district would
5  extend the invitation?
6  **A. Normally the principal extended it and said,**
7  **you know, we will -- we didn't send them a written**
8  **formal invitation to the Board, no.**
9  Q. Okay. What was the purpose then of having the
10  principals tell you?
11  **A. I had to put it on the agenda, so I had to know**
12  **what names were going on the agenda.**
13  Q. Okay. And the awards on the agenda, was that a
14  single line item or did you have subline items, if you
15  will, that identified the children who would be
16  getting recognition?
17  **A. For instance, if it was Odyssey of the Mind,**
18  **you know, if they won a national award, we would list**
19  **the children's name under that.**
20  Q. On the agenda?
21  **A. On the agenda.**
22  Q. And I'm sort of feeling my way here. But was
23  there a distinction between, you know, a national
24  award like the children recently got for Odyssey of

Page 40

1  the Mind and, I don't know, the Fifth Grade Yell Club,
2  for purposes of whether they'd be specifically listed
3  on the agenda?
4  **A. Not really.**
5  Q. Was it your practice to, if a child was going
6  to receive recognition, to put that child's name on
7  the agenda?
8  **A. Yes.**
9  Q. Okay. Now, the minutes reflect the recognition
10  of the child at the meeting; that is to say, the Board
11  then recognized John Smith for his participation in
12  the Odyssey of the Mind championship team. Did you
13  have a practice, one way or another, as to whether the
14  minutes reflected the child's being recognized,
15  whether they were actually there or not?
16  **A. No, I don't think the minutes ever reflected**
17  **that. Not that I recall.**
18  Q. I asked you some questions earlier about
19  your having had some influence on the expansion of the
20  practice of recognizing children for their
21  achievements. Do you know what the practice was prior
22  to your coming here to Indian River in 1996?
23  **A. No.**
24  Q. The practice of inviting students for

Page 41

1  recognition at Board meetings, was that something that
2  you, and your belief that that was beneficial for the
3  kids and for the district, did you have any occasion
4  to discuss that with Board members at your interview?
5  **A. I don't believe I did.**
6  Q. I asked you earlier a general question about
7  inviting people to the Board meetings. Do you recall
8  ever having invited children to the Board meetings for
9  any purpose other than to receive recognition for
10  their achievements?
11  **A. We sometimes invited them to entertain.**
12  Q. So a musical group might perform for the Board?
13  **A. Yes.**
14  Q. All right. And would that be part of a --
15  **A. I don't recall that we reflected that on the**
16  **agenda or the minutes. It would be normally just a**
17  **group performing and we would say who it was**
18  **performing.**
19  Q. Okay, so you might have, I don't know, I'm just
20  making this up, but you might have the sixth grade
21  chorus come in and do a song or set of songs for the
22  Board members, that might not be on the minutes?
23  **A. Right.**
24  Q. All right. And who would make that

11 (Pages 38 to 41)

Dobrich, et al.                                    v.                 Indian River School District, et al.
Lois Hobbs                                 C.A. # 15-120 (JJF)                      October 24, 2006

Page 42

1  introduction -- sorry, who would make that invitation
2  to the kids?
3      A.  I would.
4      Q.  All right.  How did you, how did you make the
5  decision whom to invite and how often?
6      A.  Normally it would be a group that I heard that
7  when I was going around the district, and I thought,
8  you know, these are great kids.  I think the public
9  should hear them.
10     Q.  It's a different kind of recognition for the
11 kids as well, right?
12     A.  Yeah.  I -- I, the steel band, because they
13 started with like two drums and they turned out to be
14 a steel band, and I thought that's growth, you know.
15 Let's take a look at them.  They were playing all over
16 the community.
17     Q.  How -- do you have any sense of how frequently
18 you would invite a group, group of kids to perform for
19 the Board at meetings?
20     A.  Once a year.  Sometimes I invited the Odyssey
21 of the Mind group to present their problem that they
22 won a national, so when they came, so once a year,
23 maybe twice if Odyssey of Mind won during that year.
24     Q.  So maybe once a year for some kind of

Page 43

1  performance of the arts, and then twice if the Odyssey
2  of the Mind team won?
3      A.  Yeah, could be.  Some years not, not at all.
4      Q.  All right.  As a superintendent, having been
5  grounded in first grade teaching, would you agree with
6  me that a member of such a group would feel an
7  obligation to the group to try to attend that Board
8  meeting and perform their part in the performance?
9          MR. GOSSELIN:  Objection.
10     A.  I wouldn't know that.  I didn't -- I wouldn't
11 know that.
12     Q.  All right.  So we have children attending the
13 meetings to receive recognition from the Board, we
14 have children attending meetings to provide
15 performances of one kind or another to the Board.  Did
16 you extend invitations to anybody else in any
17 context --
18     A.  Community members have, you know, if they
19 donated coats to poor children, we would invite them
20 to say thank you.
21     Q.  And that was to say thank you and to recognize
22 them for a contribution in the same way that you would
23 try to recognize a teacher who had a successful grant?
24     A.  Yes.

Page 44

1      Q.  Did you -- can you think of any other context
2  in which you invited children to attend Board
3  meetings?
4      A.  Not that I can recall.
5      Q.  I have seen an agenda item for student
6  government representatives.  Did you invite student
7  government representatives to address the Board?
8      A.  I didn't personally invite them.  That had been
9  going on, I believe, before I even came here for them
10 to give a report on the schools.
11     Q.  Do you know how the student government
12 representatives knew that they were supposed to show
13 up at the Board meeting and make a presentation?
14     A.  It was a rotating basis, from each high school.
15     Q.  Yes.
16     A.  Just the high school students.  So normally, in
17 September, they don't get invited because they haven't
18 gotten -- or they aren't on the agenda because they
19 haven't gotten formed, but their principal sees the
20 agenda and knows that they're on the agenda to share
21 activities.
22     Q.  Oh, okay.  So the -- just to go back to the
23 agenda process for a minute.  You draft an agenda, you
24 send it to the Board president and vice president,

Page 45

1  they either add things or don't and tell you to go
2  ahead and send it out in the Board package?
3      A.  Um-hum.
4      Q.  And then you, in addition to sending it to the
5  Board members in the Board package, you also send it
6  to the school principals?
7      A.  Yes.
8      Q.  And would that be all the school principals or
9  just the school principals whose kids were being
10 invited to do something at the meeting?
11     A.  No.  When we post the agenda, which is usually
12 a week before the meeting, we send it to the schools
13 so they can post it also.  So every school gets one.
14     Q.  Every school gets one, okay.  And your
15 assumption is that the principal will look at the
16 agenda and if they have a child being invited to do
17 something, they'll tell the child they've got to be
18 there?
19     A.  I would hope so.
20         MR. ALLINGHAM:  Okay, let's change the
21 tape.
22         THE VIDEOGRAPHER:  Going off the record at
23 approximately 10:05 a.m.
24         (A brief recess was taken.)

12 (Pages 42 to 45)

Dobrich, et al.                          v.              Indian River School District, et al.
Lois Hobbs                    C.A. # 15-120 (JJF)                    October 24, 2006

Page 46

1       THE VIDEOGRAPHER:  Back on the record at
2    approximately 10:12 a.m.
3    BY MR. ALLINGHAM:
4       Q.  I was asking you before the break about the
5    superintendent's duties.  Is it correct that you have
6    a role in carrying out the School Board's policies?
7       A.  Yes.
8       Q.  Could you describe it for me briefly?
9       A.  When they pass a policy, each of the schools
10   has a policy book.  And we make sure that the schools
11   receive the policy.  It's sent out to all the schools
12   with a little note at the bottom of it that says they
13   received it and put it in their policy book.  Any
14   policies that needed to be discussed for
15   implementation would be discussed at a principal's
16   meeting.
17      Q.   Ultimately is it the superintendent's
18   responsibility or the Board's responsibility to
19   enforce its policies?
20      A.  I would say it was the management's
21   responsibility, the superintendent and the staff.
22      Q.  In carrying out your role in enforcing the
23   Board's policies, do you act on your own, or do you
24   act at the direction of the Board, or both?

Page 47

1       A.  Or both, I mean actually when the policies are
2    written, I review them with the principals.  But it
3    would be me at my meeting.  So...
4       Q.  And the process of enforcing policies, does
5    that exclusively involve you or does it sometimes as
6    well involve the Board as a body?
7       A.  If someone would violate a policy?
8       Q.  Yes.
9       A.  I would probably most likely in most cases deal
10   with that person and then bring them in front of the
11   Board if it was a serious violation of policy.
12      Q.  In performing your duties as superintendent,
13   did you act on your own authority, or did you act at
14   the Board's direction, or both?
15      A.  Both.
16      Q.  All right.  And am I correct then that it would
17   depend on the subject matter, the area that you were
18   acting in, as to whether you acted on your own
19   authority or whether you acted at the Board's
20   direction?
21      A.  Yes.  But I always communicated with the Board
22   about, for instance, if a teacher violated a policy,
23   it would be investigated and then brought before the
24   Board.

Page 48

1       Q.  It sounds like there was a, there was a process
2    for investigating possible violations of policy.  Is
3    that, is that a fair understanding?
4       A.  Yes, particularly personnel issues.
5       Q.  And what was that, what was that process?
6       A.  If a person was not acting according to policy
7    in dealing with children in the classroom, usually the
8    personnel director or the principal would start the
9    investigation, the personnel director would go in to
10   more serious investigations about this.  Or we're
11   directed by certain state law that we would have to
12   call child abuse, you know, have the state trooper
13   investigate if a teacher was accused of doing anything
14   wrong with a child, they would be our more serious
15   things.
16      Q.  And whether it was done by the personnel
17   director or the principal, they would be operating
18   under your supervision, correct?
19      A.  Yes, I would know about it.
20      Q.  And once the investigation was completed, was
21   it your practice to report the results of the
22   investigation to the Board?
23      A.  Yes, and make a recommendation if it had -- if
24   it was dealing with personnel.

Page 49

1       Q.  Yes.  And then the Board would act on your
2    recommendation, correct?
3       A.  Yes.
4       Q.  All right.  How did, over the course of your 10
5    years, possible violations of policy come to your
6    attention?  And if it's more than one way, tell me all
7    the ways that they came to your attention.
8       A.  I would say it would come to my attention
9    through a principal sharing information with us, a
10   parent concern, another teacher concern.
11      Q.  So typically, you would learn of a possible
12   policy violation from someone bringing it to your
13   attention?
14      A.  Yes.
15      Q.  And that could be a parent, a teacher or a
16   principal?
17      A.  Um-hum.
18      Q.  All right.  Did you ever get complaints
19   directly from students?
20      A.  Not that I recall.
21      Q.  When you act at the Board's direction, how do
22   you get the Board's direction; that is, how is it
23   communicated to you?
24      A.  Usually it's through the president of the

13 (Pages 46 to 49)

Dobrich, et al.                          v.                 Indian River School District, et al.
Lois Hobbs                      C.A. # 15-120 (JJF)                      October 24, 2006

Page 50

1    Board.
2    Q.   Okay.  Did you understand that it was through
3    the president that you were supposed to get your
4    instructions from the Board?
5    A.   Yes.
6    Q.   Okay.  So that if an individual Board member
7    came to you and asked you to do something, what would
8    your response be?
9    A.   Well, usually if it was something that I was
10   really going to act on, we would need a vote of the
11   Board to, to say that I was acting on.  I didn't run
12   out and do what every 10 Board members wanted me to do
13   or else I'd be running in circles.
14   Q.   So the appropriate -- the proper procedure was
15   for the Board's directions to be funneled through the
16   president to you, correct?
17   A.   To me or at a Board meeting when they were all
18   sitting there, if they needed to tell me something
19   that I should look into.
20   Q.   Okay.
21   A.   They would do it that way.
22   Q.   So you would know that it was the Board's
23   direction, either because it came from the president,
24   or because you personally observed that they voted to

Page 51

1    do something?
2    A.   Right.
3    Q.   Okay.  Was it your, part of your
4    responsibilities as superintendent to retain law firms
5    or lawyers to assist the Board in its, in its duties?
6    A.   Actually, the Board had a Board lawyer who was
7    here when I was here, and once, I think one other time
8    we put out a request for a proposal for other Board
9    lawyers.  And the Board would interview the Board
10   lawyer.
11   Q.   Okay.
12   A.   And, and, you know, hire the Board lawyer.
13   Q.   Okay.  So there's a regular Board lawyer who is
14   in place to respond to routine requests for legal
15   advice; is that right?
16   A.   Right.
17   Q.   Okay.  And the retention of that lawyer was
18   done by the Board itself?
19   A.   Yes.
20   Q.   Okay.  And that lawyer, during most of your
21   tenure, was Mr. Griffin, correct?
22   A.   Yes.
23   Q.   Did -- was it Mr. Griffin throughout your
24   tenure?

Page 52

1    A.   Yes.
2    Q.   Okay.  The request for proposals, did that come
3    in 2006?
4    A.   I believe they were discussing that as I left.
5    Q.   Okay.  You were not involved in the process of
6    a request for proposal for a new Board lawyer?
7    A.   No.  One other time during my tenure there was
8    another time that I think they requested just to see
9    if lawyers were interested in the school district, but
10   I can't recall what year that was.
11   Q.   Before 2000, after 2000?
12   A.   I can't recall, I'm sorry.
13   Q.   Did someone express dissatisfaction with
14   Mr. Griffin's performance?
15   A.   Not in particular.  They just talk about, you
16   know, opportunities to see if other people are
17   interested in the position.
18   Q.   The Board lawyer's compensation, is that on a
19   retainer basis, hourly basis, some combination
20   thereof?
21   A.   He bills us for hours that he -- that we use
22   the lawyer for.  So...
23   Q.   There's no annual retainer or anything like
24   that?

Page 53

1    A.   Not that I recall.  There might have been one
2    in the beginning.  I don't...
3    Q.   All right.  What about a situation where the
4    Board determines to hire a lawyer other -- or to
5    consider hiring a lawyer other than the Board's
6    attorney, how does that process work?
7    A.   We've never done that.  That I know of, I
8    should say.
9    Q.   Well, let's take this litigation, for example.
10   A.   Oh.
11   Q.   And the lead-up to this litigation.  Is it your
12   testimony that the Board and the district never
13   retained any lawyer other than Mr. Griffin for that
14   purpose?
15   A.   No.  The insurance company gave us a lawyer,
16   and then the Board retained the lawyer that we have.
17   Q.   Okay.  That's a helpful clarification.  So from
18   the Board's perspective, it was Mr. Griffin whom you
19   were looking to for advice?
20   A.   On the daily routine running of the school
21   district?
22   Q.   No, I'm talking about this litigation now.
23   A.   I would imagine, until the insurance lawyers
24   entered the picture.

14 (Pages 50 to 53)

Dobrich, et al.
Lois Hobbs

v.
C.A. # 15-120 (JJF)

Indian River School District, et al.
October 24, 2006

Page 54

1    Q.  Okay.  And after the insurance lawyers entered
2  the picture, was Mr. Griffin out of the picture or did
3  they function in cooperation?
4    A.  I believe he was copied some things, but I'm
5  not sure that he actually, you know, I think he was
6  copied some things and that's as far as I know or
7  recall.
8    Q.  Were you the principal interface between the
9  Board and the, and the district's lawyers in
10  connection with this litigation?
11    A.  They would ask me things that they wanted.  We
12  would gather them for that law firm.
13    Q.  And did you communicate to various lawyers'
14  requests for legal analysis and advice?
15    A.  When the lawyers -- the insurance lawyers
16  started working on the case?
17    Q.  Any lawyers.
18    A.  Regarding this case or regarding the daily
19  operations of the school district?
20    Q.  Regarding this case.
21    A.  They would call often.  I would talk to them.
22  I often asked Mr. Bireley when they had a conference call
23  with things that they were requesting.  I would
24  imagine along that time I may have asked for advice.

Page 55

1    Q.  Did you ever make written requests for legal
2  analysis and advice to any, any lawyer in connection
3  with this litigation and, the Board prayer, school
4  prayer, graduation prayer issues that it encompasses?
5    A.  Written advice?
6    Q.  Yes.
7    A.  I don't recall written advice.
8    Q.  But you think it may be true that you asked for
9  oral advice?  Asked orally for advice?
10    A.  Well, when you're talking on the phone.  I mean
11  I don't recall a specific question that I asked.  I
12  was mostly responding to things they wanted.
13    Q.  Okay.  And in that answer, that is the "they,"
14  "they wanted," who is "they"?
15    A.  The first lawyers with the insurance company.
16    Q.  Mr. Balaguer and Mr. Cafferky?
17    A.  Yeah.  If I asked any advice before that, it
18  would most likely or have been Mr. Griffin.  If there
19  was any advice asked beforehand, it would have been to
20  Mr. Griffin.
21    Q.  And I asked you this question before, but I'm
22  not sure that I got a direct answer.  Is it correct
23  that you were the principal interface between the
24  Board and the lawyers representing the district in

Page 56

1  this case?
2    A.  I would say so, except for a few times when I
3  asked Mr. Bireley to either sit in or listen, you
4  know, have a conference call with those lawyers.
5    Q.  Okay.  And so now my question is, would you
6  identify for me all the lawyers that you had occasion
7  to communicate with on the issues presented in this
8  case?
9    A.  John Cafferky and --
10    Q.  You've already identified Cafferky and Balaguer
11  and Griffin.
12    A.  Griffin, yes.
13    Q.  Any others?
14    A.  Then when Jason came into the case, I --
15    Q.  Yes, ma'am.
16    A.  -- I met him briefly.
17    Q.  Yes, ma'am.  Anyone else?
18    A.  No.
19    Q.  So as you understand it, as you sit here today,
20  the only lawyers whom you consulted for advice on the
21  issues of this case were Balaguer, Cafferky, Griffin
22  and Mr. Gosselin?
23    A.  Yes.
24    Q.  Okay.

Page 57

1    A.  I did notify my associations when the suit was
2  first, you know, when we said we were all being sued
3  individually, I did call my associations and ask them
4  to, if I would need a lawyer, was I covered.
5    Q.  Because you were named individually?
6    A.  Yes.  I do that.  But I don't recall --
7  when I found out that that was dropped individually, I
8  didn't pursue that.
9    Q.  Yes.  Now, the Board's regular lawyer, are you
10  the person in charge of whether to invite the Board's
11  lawyer to a Board meeting?
12    A.  Yes, for the most part, I talk that over with
13  the president of the Board.
14    Q.  Okay.  In this instance do you recall whether
15  you contacted Mr. Griffin or whether someone else
16  directed you to contact Mr. Griffin for the first time
17  about the issues presented in this case?
18    A.  I believe most likely I contacted Mr. Griffin.
19  I may have mentioned to Mr. Bireley that I was
20  contacting him, whoever was the president at that
21  time.
22    Q.  And correct me if I'm wrong, but I take it you
23  became aware of a complaint, Mrs. Dobrich's original
24  complaint, and you wanted legal advice on that issue?

15 (Pages 54 to 57)

Dobrich, et al.                                              v.                    Indian River School District, et al.
Lois Hobbs                                    C.A. # 15-120 (JJF)                              October 24, 2006

Page 58

1    A.  I became aware of her complaint on the night of
2    graduation.
3    Q.  Yes, ma'am.  When did you contact Mr. Griffin
4    for the first time?
5    A.  Probably right after that, because I had, I had
6    told her to bring her complaint to the Board when I
7    talked to her on the phone after that.  Because she
8    was so angry that I asked her to call my office or let
9    my office know about her concern and to bring her
10   concern to the Board.  So I imagine -- I don't know
11   the exact time, but I imagine sometime during that
12   period.
13   Q.  The first Board meeting -- do you recall the
14   date of the graduation, by the way?
15   A.  It was 2004, June.  But I can't go any further
16   than that.  Sorry.
17   Q.  The first Board meeting following the
18   graduation was on June 15th.  So within the first two
19   weeks of June.  Am I right in understanding that you
20   contacted Mr. Griffin sometime between the graduation
21   ceremony itself and the June 15th Board meeting?
22   A.  I can't tell you for sure when I contact him --
23   contacted him.
24   Q.  And did you contact him by telephone?

Page 59

1    A.  Yes.  If I contacted him during that period,
2    I'm not sure.
3    Q.  In your capacity as superintendent, do you
4    handle complaints from district residents about events
5    within the district?
6    A.  Some, some of them I do.  Often they call their
7    principal.  If they don't get satisfaction from the
8    principal, then they call my office.
9    Q.  And whether it comes first to the principal or
10   first directly to you, you would follow the process
11   that you described for me earlier, correct?
12   A.  Right.  I would either ask someone to look into
13   it, or someone to meet with the parent, or I would
14   meet with the parent myself to hear their concern.
15   Q.  But it was your practice, either yourself or
16   someone at your direction, to meet with the person who
17   made the complaint?
18   A.  Or talk to them on the phone.  Most of the
19   concerns were handled over the phone.  Very few
20   meetings face-to-face in my office on parent concerns.
21   Q.  You testified earlier about Mrs. Does having --
22   sorry, Mrs. Dobrich having complained to you about the
23   graduation prayer at the 2004 graduation ceremony.
24   A.  Yes.

Page 60

1    Q.  Prior to that, had anyone ever offered a
2    complaint to you about prayer at graduations in the
3    Indian River School District?
4    A.  Yes.
5    Q.  When did that occur?
6    A.  I, I'm not sure which graduation, but it was an
7    employee who wanted to remain anonymous.  So I told
8    the Board of her concern, but she -- I asked her if
9    she wanted to come forward to talk about her concern,
10   and she didn't.
11   Q.  And who was that employee?
12   A.  I --
13        MR. GOSSELIN:  Objection.  I mean this is
14   phase 2.
15   BY MR. ALLINGHAM:
16   Q.  I think Mr. Gosselin's objection is well taken.
17        Did the employee's complaint -- was it
18   limited to graduation prayer or was it more broadly
19   directed to prayer in the school district?
20   A.  Graduation prayer, I believe.
21   Q.  Specific to graduation prayer?
22   A.  (Nodded affirmatively.)
23   Q.  Okay.  Before your having learned of the
24   objection of the Doe family and the Dobrich family to

Page 61

1    the School Board's practice of opening its meetings
2    with prayer, had you ever had complaints about that
3    practice before then?
4    A.  No, not that I recall.
5    Q.  And that would include staff complaints, parent
6    complaints, student complaints, any complaints?
7    A.  Not that I recall.
8    Q.  All right.  The School Board has a policy on
9    the use of audiotape for regular Board meetings.  Are
10   you aware of that?  It was adopted recently.
11   A.  I'm sorry, I don't recall.
12   Q.  All right.  In all events, it was the Board's
13   practice to tape its meetings, correct?
14   A.  Yes.
15   Q.  Via audiotape?
16   A.  Yes.
17   Q.  It was not the Board's practice to videotape
18   its meetings; is that correct?
19   A.  Yes.
20   Q.  Do you know if any School Board meetings were
21   ever video recorded?
22   A.  The one on, when the crowd showed up.
23   Q.  August 24th?
24   A.  August 24th.  The reason behind that is we

16 (Pages 58 to 61)

Dobrich, et al.
Lois Hobbs

v.
C.A. # 15-120 (JJF)

Indian River School District, et al.
October 24, 2006

Page 62

1  heard that there would be a large crowd, and I just
2  didn't want angry people. So I said well, if we can
3  video, we can show it in another place, in case we
4  have too many people for the cafeteria. That's the
5  only time I recall us videotaping a Board meeting,
6  unless there was another time that we thought there
7  might be a crowd about something.
8     Q. Let me just ask you a few questions about that.
9  At that August 24th meeting, the meeting itself was
10 held in the cafeteria, correct?
11    A. I believe at Frankford Elementary, if I recall.
12    Q. It was at Frankford Elementary, I was just
13 wondering about the room.
14    A. In the cafeteria.
15    Q. And provision was made ahead of time for there
16 to be an overflow room, correct?
17    A. Yes, in the gymnasium.
18    Q. Okay. And you or someone acting at your
19 direction arranged for there to be a video feed to the
20 gymnasium?
21    A. Yes, because I felt, you know, people get angry
22 if they can't get in to hear a public meeting.
23    Q. And so you arranged to set up television
24 monitors in the gymnasium?

Page 63

1     A. Yes.
2     Q. And you asked someone to arrange for wiring of
3  the video feed from the cafeteria to the gymnasium?
4     A. Yes.
5     Q. Okay. When did you first hear that it was
6  likely there would be an overflow?
7     A. I think sometime close to the meeting, three or
8  four days maybe ahead of the meeting. I -- as I
9  recall.
10    Q. How did you hear about it?
11    A. Well, by word of mouth, you know, people just
12 say, you know, people are going to show up and, we
13 didn't really expect it or know it, you know, or think
14 about it. And when we started hearing that, I just
15 don't -- didn't want an angry crowd outside. So I
16 would say we, maybe three or four days or a week
17 before at the most.
18    Q. We've had some testimony that the news travels
19 as effectively by word of mouth in this district as it
20 does by any other media. Would you agree with that?
21    A. Most likely. That's what's been said about
22 Sussex County.
23    Q. And you would agree with that? Yes?
24    A. That's, I mean that's more like -- no, I don't

Page 64

1  know if I would really agree with that.
2     Q. Word of mouth is an effective mode of
3  communication in this district. Is that fair?
4     A. I'd say that's fair.
5     Q. All right. Mr. Cohee testified that you called
6  him on the afternoon of August 24th and told him that
7  there was going to be a very large crowd. Do you
8  recall making that telephone call?
9     A. I don't recall making that call. But I'm sure
10 if he said I did, I did.
11    Q. Do you recall, do you recall -- sometimes it's
12 useful for me to -- you don't affirmatively recall
13 that you did not call him, correct?
14    A. No.
15    Q. You have no reason to doubt that you called
16 him?
17    A. No, I would -- no. No. I mean I called Board
18 members.
19    Q. Did you call all the Board members to tell them
20 that there was going to be a big crowd?
21    A. You know, I don't recall that I did. I may
22 have done that.
23    Q. And --
24    A. Because it's unusual that we have a big crowd.

Page 65

1     Q. And why would you have called the Board
2  members? Was there something that you thought maybe
3  they should do differently if there was going to be a
4  big crowd?
5     A. No, I wanted them to know we're trying to
6  prepare for a big crowd, and I think I asked people to
7  help with parking, you know, and so that the
8  videotapes, so we could, people could see the meeting
9  or the procedures or the public speaking, whatever.
10    Q. And the video feed to the gymnasium, so far as
11 you know, that was working throughout the meeting?
12    A. I don't know.
13    Q. All right. You didn't hear any angry people in
14 the gymnasium, I take it?
15    A. No. I didn't.
16    Q. There were police officers outside the building
17 at Frankford Elementary. Did you call or ask someone
18 to call and have police officers ready at the
19 building?
20    A. I believe I did. When we met, a small group
21 met and we talked about the logistics of the meeting
22 and safety of people.
23    Q. Who was in that small group?
24    A. I believe it was Mr. Savage, the assistant

17 (Pages 62 to 65)

Page 66

1  superintendent at the time, and Mr. Hudson, who does,
2  you know, he works with schools on being secure.
3      Q.  What's Mr. Hudson's position?
4      A.  Pupil services.
5      Q.  Oh, he's employed by the district?
6      A.  Yeah, employed by the district, yeah.
7      Q.  But security responsibilities would fall --
8  security and safety responsibilities would fall within
9  his jurisdiction?
10     A.  Yes.  He, he works with the schools on their
11  safety plans.
12     Q.  All right.  And correct me if I'm wrong, but a
13  few days before the meeting, you heard that there
14  would be a big crowd.  Is it correct that you then
15  called Mr. Hudson and probably walked down the hall to
16  Mr. Savage's office and said, "We ought to have a
17  meeting to think about how to deal with this, this
18  event"?
19     A.  Normally I would call them together and say,
20  "We probably need to videotape and secure this event,"
21  and then I let them go ahead with the plans.  I don't
22  sit there and tell them what plan to use.
23     Q.  Well, you must have told them something about
24  what you had heard was to be expected.  Is that a fair

Page 67

1  assumption?
2      A.  Yes.
3      Q.  All right.  And am I correct that you told him
4  that you had heard -- told them that you had heard
5  there would be several hundreds of people there?
6      A.  Well, and they told me.  I mean, you know, it's
7  a conversation.
8      Q.  Everybody knew?
9      A.  Seemed like that, that they knew more -- more
10  people knew more than we knew, I think.  So...
11     Q.  Does it seem to you, thinking back, that it
12  was, at least in the days coming up to that August
13  24th meeting, that it was common knowledge that there
14  would be a very big crowd at the meeting?
15     A.  I wouldn't say that.  I'd say it sort of seemed
16  to happen more in the later days, closer to the
17  meeting.
18     Q.  Yes, in the time period when you heard about
19  it --
20     A.  Yeah.
21     Q.  -- would you agree that it was common
22  knowledge?
23     A.  I guess.  I don't know, I mean I really don't
24  know.

Page 68

1      Q.  Did you receive any copies of the videotape of
2  the August 24th meeting?
3      A.  We have a copy, but I didn't look at it.  I
4  mean, no.
5      Q.  Okay.  Did you -- did any Board member request
6  a copy of that videotape?
7      A.  Not that I recall.
8      Q.  Did any Board members ask for the opportunity
9  to review the videotape?
10     A.  Not that I recall.
11     Q.  Now, this is on the preparation of the minutes,
12  Miss Hobbs.  I gather since Mrs. Hearn was preparing
13  those minutes before you arrived that you weren't
14  involved in giving her any instructions as to how to
15  prepare the minutes?
16     A.  No.  We continued to prepare them the way she
17  had been preparing them.
18     Q.  Do you recall ever having given Mrs. Hearn any
19  instructions, whether with respect to a particular
20  meeting or more generally as to all meetings, do you
21  ever -- do you recall ever having given Mrs. Hearn an
22  instruction or direction as to how to prepare a set of
23  minutes?
24     A.  No, not that I recall.  We just had a routine

Page 69

1  that we used.
2      Q.  Do you recall any instruction coming from any
3  Board member as to Mrs. Hearn as to how to prepare the
4  minutes?
5      A.  Not that I recall.
6      Q.  I asked you earlier about the audiotaping of
7  meetings.  Do you know what happens to the audiotapes
8  after the meetings?
9      A.  I believe she uses those to write her minutes.
10     Q.  Is the best person to ask about that
11  Mrs. Hearn?
12     A.  Well, I would imagine.
13     Q.  We have been informed that the August 24th
14  Board meeting was not audiotaped.  Do you know why?
15     A.  I don't, I don't know why.
16     Q.  That would be contrary to the Board's practice.
17  Is that correct?
18     A.  Normally we do.  I don't, I wouldn't know.
19     Q.  Do you know how -- in the absence of an
20  audiotape, do you know how the minutes of the August
21  24 meeting were prepared?
22     A.  She takes minutes while she's sitting there.
23     Q.  Mrs. Hearn takes notes?
24     A.  Um-hum.

18 (Pages 66 to 69)

Dobrich, et al.                                    v.                    Indian River School District, et al.
Lois Hobbs                                C.A. # 15-120 (JJF)                        October 24, 2006

Page 70

1    Q.  Do you know whether Mrs. Hearn prepared her
2    minutes from her notes or from the videotape or from
3    some other source for the August 24th meeting?
4    **A.  I wouldn't really want to -- I wouldn't know**
5    **how to answer that.**
6    Q.  Is Mrs. Hearn the best person to ask that
7    question?
8    **A.  I would say so.**
9    Q.  Do the audio recordings for the Board meetings
10   start when the Board meeting is called to order?
11   **A.  I believe so.**
12   Q.  You're not the person who starts the tape, am I
13   right about that?
14   **A.  Yes, you're right.**
15   Q.  Who does start the tape?
16   **A.  Mrs. Hearn.**
17   Q.  As executive secretary, your understanding was
18   that the intent was to start the tape at the opening
19   of the meeting, correct?
20   **A.  Yes.**
21   Q.  Did you ever instruct Mrs. Hearn to transcribe
22   any portion of any audiotape recording of a Board
23   meeting?
24   **A.  I may have over the years.  I'm not sure any**

Page 71

1    **particular thing I would have asked her to do, but I**
2    **may have.**
3    Q.  Do you know whether the audiotapes of meetings
4    are preserved?
5    **A.  She keeps, I believe, the audiotapes or she**
6    **used to.  I'm not sure if that's the current policy or**
7    **not.**
8    Q.  Is Mrs. Hearn the best person to ask that
9    question?
10   **A.  I would say so.**
11   Q.  I'm going to show you a set of minutes, Miss
12   Hobbs, and I'm showing you these minutes because --
13   I'm going to give you the minutes first.  I'm putting
14   in front of you a document we've previously marked as
15   Plaintiffs' Exhibit 54.
16        MR. ALLINGHAM:  Do you want one?
17        MR. GOSSELIN:  Yeah.
18        MR. ALLINGHAM:  Can I get it back when
19   we're done?
20        MR. GOSSELIN:  Sure.
21        MR. ALLINGHAM:  Thanks.
22   BY MR. ALLINGHAM:
23   Q.  I have a few questions generally about the
24   practice of keeping minutes and how that's done.  So I

Page 72

1    give you this as an example.
2        First of all, these are the final minutes,
3    we took them off a Web site --
4    **A.  Okay.**
5    Q.  -- the district Web site.  You'll see there's
6    no signature.  But am I correct, as we talked about
7    earlier, that although your signature is not on it,
8    the Web site minutes are intended to be the final
9    minutes?
10   **A.  My understanding is Web site minutes wouldn't**
11   **be put on Web site until they're approved by the**
12   **Board.**
13   Q.  Yes, ma'am, okay.
14        Now, the minutes record that the meeting
15   is called to order at 7:30, which is the typical time,
16   correct?
17   **A.  Yes.**
18   Q.  And there is then a roll call, which shows
19   who's present and who's not, correct?
20   **A.  Yes.**
21   Q.  And it's then, it's then the practice of the
22   Board to approve the agenda, correct?
23   **A.  Yes.**
24   Q.  All right.  Now, under the approval of agenda

Page 73

1    heading, there is a notation which reads, "President
2    Walls noted that it is the history of the Board to
3    have a prayer at the beginning of the meeting, which
4    is voluntary among the members of the Board of
5    Education and the audience is not required to
6    participate.  President Walls then read a prayer,
7    which was part of a speech given by Dr. Martin Luther
8    King."
9        Do you know whether it was typical in the
10   minutes for a statement from President Walls about the
11   history of the Board's prayer practices to be
12   reflected in the minutes?
13   **A.  I don't recall that that happened in previous**
14   **minutes.  I'm not sure, but --**
15   Q.  Do you know, did you tell Mrs. Hearn to
16   incorporate that comment in the minutes of March 22,
17   2005?
18   **A.  I don't recall that I did.**
19   Q.  Do you know whether anyone else instructed
20   Mrs. Hearn to incorporate that statement in the
21   minutes?
22   **A.  I don't, no.**
23   Q.  The next heading is "Presentation of Colors."
24   And it reflects that the presentation of colors was

19 (Pages 70 to 73)

Dobrich, et al.                                    v.              Indian River School District, et al.
Lois Hobbs                              C.A. # 15-120 (JJF)                      October 24, 2006

Page 74

1  performed by the Sussex Central High School Army
2  JROTC. During the academic school year Board
3  meetings, was it the custom and practice of the
4  district to have a presentation of colors?
5  A.  Yes.
6  Q.  And was that performed by the JROTC of either
7  Sussex Central or Indian River High Schools on a
8  rotating basis?
9  A.  Yes.
10 Q.  Okay. And how did the JROTC members know that
11 they needed to be at the Board meeting?
12 A.  Well, we didn't have JROTC all the years I was
13 there, so I, at one time I would imagine we invited
14 them to come before the Board. And then it's placed
15 on the agenda, and usually through the principal they
16 would find out.
17 Q.  Okay. Now, the presentation of the colors was
18 an agenda item for every meeting during the school
19 year. Was there a presentation of colors during the
20 summer meetings of the Board?
21 A.  No.
22 Q.  All right. Would you agree with me that the --
23 A.  That I know of, I mean.
24 Q.  Okay. Would you agree with me that the JROTC

Page 75

1  members who were to present the colors were not --
2  this was not a voluntary thing, it was an important
3  part of the meeting to have the colors presented?
4  A.  I would think that they have certain hours of
5  service that they should do, and this would probably
6  be considered some of their hours of service.
7  Q.  And the JROTC is a district organization,
8  correct? District-sponsored organization?
9  A.  Yes.
10 Q.  Miss Hobbs, is it correct that from time to
11 time during your tenure as superintendent there was a
12 system pursuant to which students would be awarded
13 points for attendance at Board meetings?
14 A.  Not under my direction that I can recall.
15 Q.  This would be in connection with fund-raising
16 activities.
17 A.  Not that I know of.
18 Q.  Do you know whether when athletic teams were
19 invited to appear before the Board for recognition,
20 coaches employed by the district told the athletes
21 that attendance was mandatory?
22 A.  Not that I know of.
23 Q.  Would it surprise you if a coach told the
24 members of the team that attendance was mandatory?

Page 76

1  A.  Often we gave out a lot of certificates to
2  coaches only, there were no children there. So I
3  would say yes.
4  Q.  Well, you also gave certificates to individual
5  team members from time to time, correct?
6  A.  Right.
7  Q.  And would it surprise you that in those
8  instances, a coach had told the team members that
9  attendance was mandatory?
10 A.  I haven't heard of such a thing.
11 Q.  We talked earlier about approval of minutes,
12 which comes, I take it, after presentation of colors?
13 A.  Yes.
14 Q.  Typically on the agenda. And then there is a
15 listing of visitors and staff in attendance, which
16 appears to include the, among other things, the awards
17 for the children in attendance at that Board meeting?
18 A.  Yes.
19 Q.  Okay. You mentioned earlier that you tried to
20 give awards for statewide or nationwide achievement,
21 or recognition for statewide or nationwide
22 achievement. I take it from these minutes that you
23 also gave recognition for conferencewide or countywide
24 achievement.

Page 77

1  A.  Yes, at times we did.
2  Q.  I just did a quick count, but there are about
3  45 students who appeared to -- the minutes reflect
4  received recognition from the Board at this March 22
5  meeting. Is that a representative number of students
6  to achieve recognition at academic year Board
7  meetings?
8  A.  I think this is a rather large number, because
9  of the number of athletes that are being recognized.
10 Normally the list isn't this long, only on certain
11 times of the year when you get all conference and
12 those kind of things.
13 Q.  So I'm just, I'm just trying to get a sense,
14 Miss Hobbs. For the three Board meetings that follow
15 each of the athletic seasons, would it be fair to say
16 that this is a representative number?
17 A.  That are invited.
18 Q.  Yes, ma'am.
19 A.  I don't know if it really follows every, every
20 athletic season, but at times there's more and times
21 there's less.
22 Q.  Okay. At times there's more than this number,
23 at times there would be less than this number?
24 A.  Yeah, I would say this is probably pretty

20 (Pages 74 to 77)

Dobrich, et al.                          v.                    Indian River School District, et al.
Lois Hobbs                          C.A. # 15-120 (JJF)                          October 24, 2006

Page 78

1  heavy, according to our regular agendas.
2      Q.   According to your regular agendas, were there
3  meetings that were specially designed to recognize
4  students?
5      A.   No. There is an academic assembly at the end
6  of the year that recognizes all academic students who
7  make a certain point score.
8      Q.   Okay. And that's not a Board meeting?
9      A.   No. That's a dinner.
10     Q.   All right. So to summarize what we have here,
11  this 45 or so students is somewhere in the middle, as
12  you recall it. There were times when it was, the
13  number was higher --
14     A.   I'd say it's about --
15     Q.   Let me finish my question. There were times
16  when the number was higher, there were times when the
17  number was lower; is that correct?
18          MR. GOSSELIN: Objection.
19     A.   I'm not sure if it was higher or not, but there
20  were times when it was lower.
21     Q.   Can you recall any meeting at which, during the
22  academic school year at which no students were present
23  during your entire tenure as superintendent?
24     A.   I can't recall that.

Page 79

1          MR. ALLINGHAM: Can I have that back,
2  please?
3          THE WITNESS: Want this one?
4          MR. GOSSELIN: You can keep that.
5          MR. ALLINGHAM: No, you can keep that.
6  BY MR. ALLINGHAM:
7      Q.   Are the -- I just want to follow up on an
8  answer you gave a minute ago.
9          Are the students who are, who are
10  recognized for their academic achievement at that
11  assembly that you just talked about a minute ago, are
12  they the same students who are recognized for academic
13  achievement at Board meetings?
14     A.   It would be different things for academic
15  achievement at the Board meetings, more like Odyssey
16  of the Mind or a science team they won or a math team
17  they won. The academic achievement banquet is to
18  recognize children with a certain point score or
19  above. And they're invited each year to an academic
20  achievement banquet. So we wouldn't recognize
21  everybody who had a point score of 4.0 at the Board.
22  It would -- this is mainly their point score.
23     Q.   When you say point, you mean grade point
24  average?

Page 80

1      A.   Grade point average, yeah.
2      Q.   The, I take it then that the people who were
3  invited for recognition at the Board level is a lower
4  enough -- fewer students are -- fewer children are
5  invited for academic achievement at the Board meetings
6  than --
7      A.   It's more like national competitions or state
8  competitions. I think that might be a better way of
9  saying it than academic achievement.
10     Q.   More special honors?
11     A.   Yes.
12     Q.   Okay. I want to ask the same questions about
13  athletes. Is there a comparable, you know, athletic
14  awards assembly to the academic award assembly?
15     A.   They have those in the individual schools.
16  Like the soccer team will honor their soccer players,
17  and they have a dinner usually and give out letters or
18  whatever they earn.
19     Q.   And so I'm gathering it's the same situation,
20  there are more special or unusual awards recognized at
21  the Board level than would be recognized at the
22  individual school level?
23     A.   Right.
24     Q.   Okay. On PX 54 you'll see that the minutes

Page 81

1  reflect that Mr. Walls gave the prayer. Do you see
2  that?
3      A.   Yes, I do.
4      Q.   And the minutes indicate that Mr. Walls' prayer
5  was from a speech given by Martin Luther King. Do you
6  know why the minutes in this particular instance
7  reflect the source of the prayer?
8      A.   I don't know why.
9      Q.   Do you know whether that was customary in the
10  minutes?
11     A.   I don't believe it was customary.
12     Q.   Do you recall anyone instructing Mrs. Hearn to
13  include the source of the prayer in these minutes?
14     A.   I don't recall that.
15     Q.   Those minutes reflect that Mr. Walls gave a
16  prayer. Did you become aware that the minutes began
17  to refer to an invocation instead of a prayer at some
18  point?
19     A.   I don't -- I'm not aware of that.
20     Q.   Was there an instruction given to Mrs. Hearn to
21  call the opening prayer an invocation instead of a
22  prayer?
23     A.   I don't recall giving her that instruction.
24     Q.   Do you recall anyone giving her that

21 (Pages 78 to 81)

Page 82

1 instruction?
2    A.   No.
3    Q.   Do you know why Mrs. Hearn changed her practice
4 from describing it as a prayer to describing it as an
5 invocation?
6    A.   I don't know at this point.
7    Q.   You've several times mentioned Odyssey of the
8 Mind.  What is that?
9    A.   It's a competition where students have a
10 problem to solve and have so many minutes to solve it,
11 and they can choose how they're going to solve the
12 problem, you know.  Sometimes it often happens that
13 they choose through a drama presentation to solve
14 their problem.  It's a state competition and then a
15 national competition.
16   Q.   And have district students won statewide
17 competitions?
18   A.   They've won statewide competitions, and I think
19 for the first time last year we had someone win a
20 national competition.
21   Q.   And were those statewide winners and nationwide
22 winners recognized by the Board?
23   A.   Yes.
24   Q.   Were you involved in any way in inviting

Page 83

1 Odyssey of the Mind students to receive awards for
2 their achievements?
3    A.   Usually we were so elated about it, I would say
4 to the sponsor, you know, "Please have the children
5 come and be recognized," you know.  Just, I
6 wouldn't -- you know, it got to be a habit that when
7 somebody started to, you know, do something well,
8 they'd get recognized.
9    Q.   And specifically with respect to Odyssey of the
10 Mind, your best recollection is that you would be
11 excited about the children's achievement and you would
12 ask the sponsor of that group to invite the children?
13   A.   And their coaches.
14   Q.   Okay.  Do you have any recollection about
15 speaking to any members of the Odyssey of the Mind
16 team about, or their families about attending a Board
17 meeting?
18   A.   Personally?
19   Q.   Yes.
20   A.   No, I don't recall that.  I may have, but I
21 don't recall it.
22   Q.   This is a document that we've previously marked
23 as Plaintiffs' Exhibit 9.  It's been identified by a
24 number of witnesses as the Board's Board prayer

Page 84

1 policy.
2        You've got this one memorized.
3        THE WITNESS:  Do you need a copy?
4 BY MR. ALLINGHAM:
5    Q.   What role, if any, did you have in the
6 consideration and adoption of Board Policy BDA.1?
7    A.   I didn't recall that I had any role at all in
8 it.  I don't usually take a role in developing their
9 policies.
10   Q.   Did you have any role in obtaining legal advice
11 for the Board in connection with its consideration and
12 adoption of this policy?
13   A.   I would imagine that -- they also can ask
14 Mr. Griffin for his opinion or, you know, normally on
15 policies, certain policies we ask his opinion.
16 Whether I -- I don't believe that I called and asked
17 for his opinion on this.  But somebody on the Policy
18 Committee may have.
19   Q.   On this one, you have -- I just want to make
20 sure I have your testimony right.  You have an
21 affirmative recollection that you did not request
22 legal advice on this policy from Mr. Griffin; is that
23 correct?
24   A.   I don't believe that I asked for any legal

Page 85

1 advice on this one.  But I, I don't really recall.
2    Q.   Do you recall any public discussion of this
3 policy by Board members?
4    A.   If it was brought for the Board, which it most
5 likely was, it was passed, they would have probably
6 discussed it at the public Board meeting.  That's what
7 we do.
8    Q.   Do you, do you --
9    A.   I don't recall what was said about it, no.
10   Q.   Okay.  Do you recall that there was public
11 discussion of this policy at the Board meeting?
12   A.   All first readings are brought before the
13 Board, so I would imagine there was some discussion.
14   Q.   The first reading procedure is simply a
15 notation for the record that a policy is being
16 presented for a first reading.  Is that right?
17   A.   Yes.
18   Q.   All right.  There can be discussion, but there
19 are instances in which there is not discussion.
20   A.   Yes.
21   Q.   And typically, a first reading does not involve
22 actually reading the policy out loud, correct?  It's a
23 term for the first presentation of the policy.
24   A.   Sometimes we have read the policies out loud,

22 (Pages 82 to 85)

Dobrich, et al.
Lois Hobbs

v.

C.A. # 15-120 (JJF)

Indian River School District, et al.
October 24, 2006

Page 86

1 you know. So I would say sometimes, but not on a
2 regular basis.
3 Q. And I take it you don't remember whether this
4 policy was read out loud or not?
5 A. This may have been read out loud. I am not
6 sure.
7 Q. At least for your, during your tenure as
8 superintendent, did you understand that the Board
9 Policy BDA.1, which as you'll see at the bottom left
10 was adopted on October 19th, 2004, was it your
11 understanding that this policy changed the Board's
12 practice in any way regarding opening its meetings
13 with a prayer or a moment of silence?
14 A. I believe that may have been more rotated
15 between the Board members. But --
16 Q. And in suggesting that, you're referring to
17 paragraph 2 of the policy?
18 A. Yes, um-hum.
19 Q. Describe for me what the practice was before
20 the policy was adopted with respect to which Board
21 member or Board members were invited to open the
22 meeting with a prayer.
23 A. Usually two or three opened the Board with a
24 prayer.

Page 87

1 Q. And when you say that, you mean one of a group
2 of two or three was invited at each meeting, correct?
3 A. I didn't have anything to do with the inviting
4 or how they got invited. But the Board president
5 would say, "Mr. Evans will give the prayer," or,
6 "Mr. Helms will give the prayer." So I don't know how
7 that came about.
8 Q. Am I correct that you had no involvement in the
9 decision whom to invite to give the prayer?
10 A. Yes, you're correct.
11 Q. All right.
12 MR. ALLINGHAM: Okay, we have to change
13 the tape.
14 THE VIDEOGRAPHER: Going off the record at
15 approximately 11:15 a.m.
16 (A brief recess was taken.)
17 THE VIDEOGRAPHER: Back on the record at
18 approximately 11:21 a.m.
19 BY MR. ALLINGHAM:
20 Q. Miss Hobbs, am I right that you worked in
21 education for pretty close to 40 years?
22 A. Yes.
23 Q. First as a teacher and then as an
24 administrator?

Page 88

1 A. Yes.
2 Q. Would you agree with me that adolescents are
3 often susceptible to pressure from their peers towards
4 conformity?
5 A. Yes.
6 Q. And would you agree with me that that influence
7 is strongest in matters that could be described as
8 social conventions in the school?
9 MR. GOSSELIN: Objection.
10 A. I would have to say that I agree with you, that
11 they could be influenced by their peers.
12 Q. We were talking before the break about the
13 academic assembly, awards assembly and the
14 interrelationship between that event and the Board
15 meetings at which some academic achievements are
16 recognized.
17 My question to you is, would it have been
18 possible, during your tenure as superintendent, to
19 recognize all academic achievements at an assembly,
20 such as the academic awards assembly?
21 A. I would imagine that every school has certain
22 assemblies more than we do as a district, and the
23 children are recognized at those assemblies. I, I
24 feel that if the Board is representing the people,

Page 89

1 they should see what the people have accomplished.
2 And I think that at the state or national level,
3 that's a great accomplishment for children, adults or
4 whoever, and they should be thanked for it.
5 Q. The achievements of students in achieving a
6 certain GPA are recognized and those students are
7 thanked for their achievements at a school assembly,
8 correct?
9 A. No, well at the high school we had in the past
10 one district assembly to recognize the higher GPAs,
11 the academic assembly. Both high schools came
12 together and we would rotate it from high school to
13 high school, or have it in this cafeteria because it's
14 the largest.
15 Just this past year, because there were so
16 many children to be recognized, we did separate it and
17 have one at the Sussex Senior and one at Indian River
18 High School. But at that time both, you know, I'm
19 invited -- I'm not invited to normally every assembly
20 that a school has, that would be impossible. But this
21 was a district academic achievement banquet. I
22 believe it was started, I don't -- that because, you
23 know, all the boosters clubs for athletics always make
24 sure their athletes are recognized, and we wanted to

23 (Pages 86 to 89)

Dobrich, et al.                                    v.              Indian River School District, et al.
Lois Hobbs                                C.A. # 15-120 (JJF)                      October 24, 2006

Page 90

1  say well, you know, academics are important, after
2  all.
3     Q.  All right.  Do you know someone named Tom
4  Neuberger?
5     A.  Yes, I know who he is.
6     Q.  Did the district ever retain Mr. Neuberger to
7  advise it in connection with the issues presented in
8  this litigation?
9     A.  I don't believe the district retained
10 Mr. Neuberger.  He came and talked to us, but the
11 district didn't retain him.
12    Q.  We've had testimony that Mr. Neuberger offered
13 his services but those services were declined by the
14 Board.  Do you recall, do you recall that that
15 occurred?
16    A.  Yes, I believe so.
17    Q.  Do you know when the Board declined
18 Mr. Neuberger's representation?
19    A.  He came and spoke to us one evening.  I'm not
20 sure of the date.  And --
21    Q.  I'm going to set some time parameters and see
22 if we can pinpoint it more exactly.  The Board policy
23 BDA.1 was adopted on October 19th, 1990 -- sorry,
24 2004.  The first reading was in September of 2004.  Is

Page 91

1  it your recollection that Mr. Neuberger appeared
2  before the Board to offer his services at some time
3  before the first reading?
4     A.  Before the first of the year?
5     Q.  First reading.
6     A.  Oh, okay.  I was going to say, yes, before the
7  first of the year I could definitely say.  But I -- I
8  just don't know the date of that meeting, I'm sorry.
9     Q.  Do you know if it was a regular Board meeting?
10    A.  I think it was probably a special Board
11 meeting.
12    Q.  And was it in executive session or in public?
13    A.  I believe it was executive session.
14    Q.  I'm putting before you what we have marked as
15 PX 14.  These have been identified as the official
16 minutes of a special Board meeting on August 23, 2004.
17 This is the day before the big meeting.
18    A.  Okay.
19         MR. ALLINGHAM:  I have them if you want
20 them.
21         MR. GOSSELIN:  Actually, yeah, if I can.
22 Thanks.
23 BY MR. ALLINGHAM:
24    Q.  Miss Hobbs, you'll see on the agenda that there

Page 92

1  really was only one agenda item, which was potential
2  or pending litigation number 05-01 PL.  Do you see
3  that?
4     A.  Yes, um-hum.
5     Q.  And if you look at the next page, you'll see
6  that the meeting was called to order at 7:00 and the
7  Board went into executive session at 7:01.  It emerged
8  from executive session at 11:15, about four hours and
9  15 minutes later, and then adjourned one minute later
10 at 11:16.
11         Now, with those things in mind, that is,
12 that this meeting occurred the night before the very
13 large Board meeting, and with the fact reflected here
14 that the entire meeting, except the call to order and
15 the adjournment, was held in executive session, and
16 with the fact that the subject of the executive
17 session meeting of four hours and some minutes was
18 potential or pending litigation 05-01 PL, do any of
19 those facts give rise to an independent recollection
20 in your mind that such a meeting occurred?
21    A.  Well, yes, it occurred.  I mean here are the
22 minutes.
23    Q.  Do you recall a meeting in 2004 at which you
24 showed up, went into executive session a minute later,

Page 93

1  stayed in executive session for more than four hours
2  to discuss litigation, and then came out and adjourned
3  the meeting?
4     A.  Any other meeting that we've ever discussed
5  potential litigation, is that what you're asking me,
6  of any kind?
7     Q.  No.  Is this, is this meeting reflected in
8  these minutes, is this unusual to have a meeting of
9  four hours and 16 minutes' duration, of which four
10 hours and 14 minutes is spent in executive session
11 discussing a single piece of litigation?
12    A.  I can't say that this -- I wouldn't say it's
13 unusual.  Many of our meetings go quite late in the
14 evening.  And for just one topic, sometimes we've
15 often, we do one topic in order to keep us from there
16 until 2 in the morning.  But, so we've had executive
17 sessions before on certain topics.  Whether it's one
18 or two, I really can't recall.
19    Q.  All right.  If you look at other visitors and
20 staff in attendance on this page, you'll see that you
21 were in attendance at this meeting.
22    A.  Yes.
23    Q.  Also, Mr. Savage, Ms. Hearn, Mr. Miller and
24 Mr. Griffin.

24 (Pages 90 to 93)

Dobrich, et al.
Lois Hobbs

v.
C.A. # 15-120 (JJF)

Indian River School District, et al.
October 24, 2006

Page 94

1   A.  Um-hum.
2   Q.  And is it your belief, based on these minutes,
3   that Mr. Griffin was present at this meeting?
4   A.  Yes.
5   Q.  And if Mr. Griffin was present, would he have
6   been there at your invitation?
7   A.  Most likely mine, with consent of the Board
8   president.
9   Q.  Yes. Am I correct from these minutes that
10  Mr. Neuberger was not in attendance at this meeting?
11  A.  I don't know. I believe that Mr. Neuberger was
12  in attendance at one meeting where Mr. Griffin was.
13  But I don't, I don't know that it's this meeting or
14  another meeting.
15  Q.  Wouldn't you expect that if Mr. Neuberger was
16  present at some of all of this meeting, that he would
17  be reflected as other visitors and staff in
18  attendance?
19  A.  I would -- that would be the normal practice.
20  Q.  All right. Now, I'm going to ask a couple of
21  questions, and you have to take special care to pause
22  before you answer, because Mr. Gosselin will probably
23  want to interpose an objection, okay? Don't answer
24  right away.

Page 95

1   A.  Thanks for the warning.
2   Q.  Did Mr. Griffin advise the Board on the issues
3   presented by this lawsuit during the executive session
4   on August 23, 2004?
5   A.  I would say he would be in the discussion and
6   would advise the Board on what he thought was correct.
7   Q.  Don't say what he said, just yes or no.
8   A.  No, I don't recall what he said.
9   Q.  Now, using this meeting as a guidepost, and
10  working on the assumption that Mr. Griffin was in
11  attendance at this meeting and Mr. Neuberger was not,
12  and again, this is a meeting the night before the big
13  Board meeting on August 24th, can you tell me whether
14  you recall that Mr. Neuberger's appearance before the
15  Board took place before or after this August 23rd
16  meeting?
17  A.  I'm sorry. I can't recall that.
18  Q.  Okay. I'm going to show you a second document
19  which we've marked as PX 13. These are the executive
20  session minutes from the same night's meeting.
21  A.  Okay.
22  Q.  And you'll see again that you've signed these
23  minutes, correct?
24  A.  Yes.

Page 96

1   Q.  Most of the minutes are redacted, which is a
2   lawyer's term for something having been removed, and
3   you then stamp it "redacted" so that people will be
4   able to see that something is missing.
5       MR. GOSSELIN:  It's the opposite of
6   interlineate. Sort of.
7       MR. ALLINGHAM:  So interlineate minus
8   redact equals zero.
9       MR. GOSSELIN:  That's right.
10  BY MR. ALLINGHAM:
11  Q.  You will see that there's one paragraph that is
12  not redacted from the minutes, which reads, "During
13  the discussion of this issue, several Board members
14  expressed that their constituents do not want the
15  Board to change its practice of opening the meetings
16  with a prayer."
17      Can I correctly infer then that the topic
18  of the issue discussed during this executive session
19  was the Board's practice of opening its meetings with
20  a prayer?
21  A.  I would say you could infer that.
22  Q.  Do you recall a meeting at which the Board's
23  prayer policy was discussed in executive session?
24  A.  I believe that we have discussed the Board's

Page 97

1   prayer and policy in executive session sometime.
2   Q.  Once or more than once?
3   A.  Once, I don't know if it's more than once.
4   Q.  Miss Hobbs, in a discussion such as that, do
5   you typically participate or do you sit quietly and
6   listen?
7   A.  I sometimes participate.
8   Q.  Do you recall that you participated in the
9   discussion of School Board prayer at the Board level?
10  A.  I most likely probably did participate.
11  Q.  All right. And can you tell me what you said?
12      MR. GOSSELIN:  Objection. And don't
13  answer that question.
14      The basis is attorney-client privilege.
15  Mr. Griffin -- I mean I think it's been established,
16  kind of in a roundabout way, that the discussion was
17  the executive session meeting in which Mr. Griffin was
18  present, and at least that much has been established
19  by Mrs. Hobbs' testimony.
20      MR. ALLINGHAM:  I think that's a fair
21  summary of what's, whether it's been established or
22  not, I think it's a fair inference and I accept your
23  point.
24      But, for example, if Miss Hobbs said,

25 (Pages 94 to 97)

Dobrich, et al.
Lois Hobbs

v.

C.A. # 15-120 (JJF)

Indian River School District, et al.
October 24, 2006

Page 98

1  "Well, you know, I think that we should have prayers
2  of at least an hour's duration to open each meeting,"
3  that's simply an expression of her opinion, not a
4  request for advice or a, or the receipt of legal
5  advice from Mr. Griffin.  And so I could see an
6  instruction that says please don't, you know, please
7  don't reveal legal advice or request for legal advice.
8  But I don't think it's an appropriate instruction
9  simply to say on a blanket basis because Mr. Griffin
10  is there, you can't testify about what was said.
11       MR. GOSSELIN:  I think I'd like to respond
12  to that.  I think there comes a point, though, where I
13  should ask the witness to just, you know, step outside
14  for a second because I don't want to, I don't want to
15  color anything she might be saying.
16       MR. ALLINGHAM:  Fair enough.  Let me ask a
17  different question, I might come back to this one.
18  I'll withdraw it for now, okay?
19  BY MR. ALLINGHAM:
20   Q.  During the Board's discussion of School Board
21  prayer, did you at any time offer any views of your
22  own?
23       MR. GOSSELIN:  Objection.  Again, the
24  same -- I mean I think if you want to say what's, you

Page 99

1  know, what is your opinion?  What do you think of it?
2  It's, you know, I'll object to that because it's
3  calling for her opinion on a matter that ultimately
4  probably is not something that she can offer an
5  opinion on.
6       But as a matter of discovery, I wouldn't
7  have an objection to it.  My objection is when you
8  place it in the context of a discussion involving an
9  attorney.
10  BY MR. ALLINGHAM:
11   Q.  Okay, well let's just make a record quickly on
12  this, Miss Hobbs.
13       First, please tell me everything you
14  recall that you said during the discussion of School
15  Board prayer at Board meetings.
16       MR. GOSSELIN:  At any Board meeting?
17       MR. ALLINGHAM:  Any Board meeting.
18       MR. GOSSELIN:  Okay, and my, my
19  instruction is to --
20       MR. ALLINGHAM:  Well, I understand, I'm
21  sorry.
22       MR. GOSSELIN:  -- to the extent that you
23  can do that without saying what you said at this
24  executive session meeting on August 23rd, 2004, you

Page 100

1  can answer.
2  BY MR. ALLINGHAM:
3   Q.  Okay, let me see if I can address
4  Mr. Gosselin's objection, and we'll make it a little
5  easier for you I hope, too.
6       First of all, can you separate whatever
7  you said between meetings at which Mr. Griffin was
8  present, or later on Mr. Balaguer or Mr. Cafferky were
9  present, or Mr. Gosselin was present, on the one hand,
10  and anything that you said at meetings where lawyers
11  were not present?
12   A.  I don't think I can.
13   Q.  Okay.  Now, let me ask you whether lawyers were
14  present or not, would you please tell me everything
15  you recall having said at a Board meeting about the
16  School Board's prayer practice?
17       MR. GOSSELIN:  At a public Board meeting?
18       MR. ALLINGHAM:  Yes, at any public Board
19  meeting.
20   A.  I don't believe I said anything at a public
21  Board meeting.
22   Q.  Okay, would you now tell me everything that you
23  recall having said at any executive session meeting?
24       MR. GOSSELIN:  Objection.  And that one

Page 101

1  you do not have to answer.
2   Q.  I'd like a yes or no answer to this question:
3  Did you at any time during an executive session
4  express a view about the School Board's practice of
5  opening its meetings with a prayer?
6       MR. GOSSELIN:  Objection.  That one you
7  don't have to answer either.
8       MR. ALLINGHAM:  Can't answer yes or no?
9       MR. GOSSELIN:  Well, I mean no.
10  Objection.  She doesn't have to answer that.  I mean
11  that's putting the rabbit in the hat, you know, when
12  you met with your lawyer, at any time did you --
13       MR. ALLINGHAM:  Jason, if the answer is
14  no, we can move on.
15       MR. GOSSELIN:  -- make a suggestion as to
16  when you committed the crime, you know.
17       MR. ALLINGHAM:  If the answer is no, we
18  can move on.  That's all I was trying to get at.
19  BY MR. ALLINGHAM:
20   Q.  I do not, in asking you this question, want you
21  to reveal in any way advice from any lawyer
22  representing the district, so please do not in your
23  answer reveal any communications from a lawyer to you
24  or from you to a lawyer that constituted a request for

Dobrich, et al.                                v.                      Indian River School District, et al.
Lois Hobbs                              C.A. # 15-120 (JJF)                        October 24, 2006

Page 102

1   legal advice. Okay? You have the ground rules? Do
2   you understand what I'm asking you to exclude?
3   **A. I'll wait for the question.**
4   Q. Okay. Excluding such communications, can you
5   tell me anything that you said at the Board meeting in
6   executive session regarding School Board prayer?
7           MR. GOSSELIN: Objection. Don't answer
8   that. I think now I might be confused about what the
9   question is.
10          That, to me, sounds like the question I
11  just instructed her not to answer two questions ago.
12  BY MR. ALLINGHAM:
13  Q. Do you recall at any time board members
14  expressing the view that their constituents did not
15  want the Board to change its practice of opening the
16  meetings with a prayer?
17  **A. I think that's reflected in the minutes.**
18  Q. Yes, it is. And my question to you is do you
19  recall, do you recall that one or more Board members
20  expressed that view?
21  **A. Yes.**
22  Q. Which Board members?
23  **A. I don't recall.**
24  Q. Do you recall any Board member expressing the

Page 103

1   opposite view; that is, that their constituents wanted
2   the Board to consider changing its practice?
3   **A. I don't recall.**
4   Q. Do you recall any Board members saying, in
5   words or substance, "I don't know what my constituents
6   think"?
7   **A. I don't recall.**
8   Q. All right. You'll see that it then records,
9   "It was not felt that a decision could be made this
10  evening regarding whether or not to change our past
11  practice." Do you see that?
12  **A. Which?**
13  Q. This is on the executive committee minutes.
14  **A. Oh, okay.**
15  Q. It's the last sentence of the only substantive
16  paragraph.
17  **A. Um-hum, um-hum.**
18  Q. "It was not felt that a decision could be made
19  this evening regarding whether or not to change our
20  past practice."
21  **A. Um-hum, I see that.**
22  Q. Were you asked to do anything or to collect any
23  information or to take any action to enable the Board
24  to make a decision as to whether to continue its past

Page 104

1   practice?
2   **A. I don't recall being asked to gather any**
3   **information for the Board.**
4   Q. Were you asked to get legal advice from a
5   source other than Mr. Griffin?
6   **A. I was not asked to get legal advice from**
7   **someone else, that I recall.**
8   Q. And to say it positively, you can testify today
9   that you were not asked to get legal advice on this
10  issue from anyone in addition to Mr. Griffin. Is that
11  correct?
12  **A. I don't believe I was at this time. I don't**
13  **believe I was.**
14  Q. Okay. Now, going forward until the first
15  reading of the policy in September of 2004, do you
16  recall that the Board asked you to get advice from
17  someone other than Mr. Griffin on the issue of School
18  Board prayer?
19  **A. For me to actually call and contact another**
20  **lawyer?**
21  Q. Yes.
22  **A. About School Board prayer? I don't recall**
23  **that.**
24  Q. Do you recall any discussion at the Board level

Page 105

1   of the possibility of getting advice from another
2   lawyer than Mr. Griffin on School Board prayer?
3   **A. I'm sure that they most likely have talked**
4   **about other lawyers on advice on school -- any kind of**
5   **prayer.**
6   Q. And why are you sure about that? What makes
7   you sure about that?
8   **A. I mean because they're discussions. The**
9   **discussions were about this, and, you know, most**
10  **likely people are going to be looking for advice when**
11  **they have an issue.**
12  Q. You said most likely people were looking to be
13  looking for advice, they have an issue?
14  **A. If they have an issue or when they have an**
15  **issue.**
16  Q. Okay.
17  **A. I mean that's what I would call a normal thing**
18  **to do.**
19  Q. Well, do you recall any instance other than
20  this one in which Board members expressed a desire to
21  get advice from someone other than the School Board's
22  attorney?
23  **A. I would say it would be hard to separate what**
24  **meeting, what time, when, you know. I can't do that.**

27 (Pages 102 to 105)

Dobrich, et al.                          v.                    Indian River School District, et al.
Lois Hobbs                        C.A. # 15-120 (JJF)                    October 24, 2006

Page 106

1    Q.  Other than this issue, that is the issue that
2    came up in the summer of 2004 regarding School Board
3    prayer and more generally, prayer in the schools,
4    that's an issue on which you recall there was
5    discussion of getting advice from somebody other than
6    Mr. Griffin, correct?
7    A.  Um-hum.
8    Q.  Yes, ma'am?
9    A.  Yes.
10   Q.  Okay.  Do you recall any issue rather than that
11   one on which the Board discussed wanting to get advice
12   from someone other than Mr. Griffin?
13   A.  I would say that, you know, it first started
14   with graduation prayer.
15   Q.  Yes.
16   A.  So, you know, that was the policy we started
17   working on.
18   Q.  Yes.
19   A.  So that would be Mr. Griffin's advice that they
20   would have asked for.  I'm not sure that they asked
21   anybody else, or they didn't ask me to ask anyone
22   else.
23   Q.  Okay, well that --
24   A.  No, it...

Page 107

1    Q.  And how about the policy on religion in
2    schools, did any Board member ask you to get advice
3    from any other lawyer on that policy?
4    A.  Not any other lawyer.  They -- the Policy
5    Committee, I believe, asked for Mr. Griffin's advice
6    on that.
7    Q.  What's the basis for your belief that the
8    Policy Committee asked for Mr. Griffin's advice?
9    A.  Because I believe they were in contact with
10   Mr. Griffin when they drafted that policy.
11   Q.  Okay.  Now let's come to the School Board
12   prayer policy and the issue of School Board prayer.
13   It's that issue where you recollect that Board members
14   discussed getting additional legal advice other than
15   Mr. Griffin, correct?
16   A.  I believe so.
17   Q.  Okay.  Which Board members suggested getting
18   additional legal advice?
19   A.  I would think maybe Mr. Helms.
20   Q.  Anybody else that you recall?
21   A.  Not -- others may have chimed in, but I don't
22   recall who they are.
23   Q.  Tell me what you recall Mr. Helms said in that
24   respect.

Page 108

1    A.  I think that the Board felt strong enough from
2    this to keep their Board policy and they would look
3    for more advice.
4    Q.  You pointed at PX 13, the executive committee
5    minutes.  Do you recall that that discussion of other
6    counsel took place during the executive session on
7    August 23?
8    A.  They most likely bounced some names around,
9    organizations around that would support prayer in
10   general.
11   Q.  Do you recall what names they bounced around?
12   A.  Not particularly.
13   Q.  All right.  When the, when the decision was
14   made to adjourn the executive session, was there an
15   agreed-upon path forward, if you will, to get that
16   additional advice?
17   A.  It's been a while.  I mean there's -- I really
18   can't say that there was a path forward.  They were
19   sort of going on their own in contacting people, I
20   think, some of them.
21   Q.  Was that normal practice for individual Board
22   members to contact lawyers on a particular topic?
23   A.  Well, with 10 Board members over the 10 years,
24   people have contacted different people on different

Page 109

1    topics.
2    Q.  Am I correct that individual Board members
3    don't have the authority to retain lawyers for the
4    district on their own?
5    A.  Yes.  That would have to be agreed through the
6    Board on that.  But --
7    Q.  Okay.
8    A.  -- contacting people of interest, I wouldn't
9    hesitate to say that in the past they haven't talked
10   to people about being interested in whatever position
11   it is.
12   Q.  And your understanding of the names being
13   discussed at this August 23 Board meeting was
14   organizations that generally would support prayer in
15   schools, correct?
16   A.  Yes.
17           MR. GOSSELIN:  Objection.
18   Q.  Did Mr. Helms or anyone else express their
19   reasons for wanting to get additional advice on this
20   topic, other than from Mr. Griffin?
21           MR. GOSSELIN:  Objection.  And you don't
22   have to answer that.
23   BY MR. ALLINGHAM:
24   Q.  Was anyone directed -- this would include you,

28 (Pages 106 to 109)

Dobrich, et al.                                    v.                    Indian River School District, et al.
Lois Hobbs                              C.A. # 15-120 (JJF)                         October 24, 2006

Page 110

1  but it wouldn't be limited to you -- was anyone
2  directed to contact some lawyer or lawyers other than
3  Mr. Griffin as a result of this August 23 meeting?
4      A. As I recall, different people who had heard of
5  an organization or somebody may have said they would
6  go ahead and contact those people.
7      Q. So one or more Board members, in effect,
8  volunteered to contact some organizations?
9      A. I believe that's how it went, yes.
10     Q. Okay. And was there a report back to the Board
11  at some point about the results of those contacts?
12         MR. GOSSELIN: Objection, and you can
13  answer just the question, if there was a report back
14  to the Board. That's a yes or a no, I think.
15         THE WITNESS: No, I wouldn't say a formal
16  report was ever given.
17  BY MR. ALLINGHAM:
18     Q. I didn't mean for, you know, a written thing
19  that said "Report" on the top. I meant did whoever
20  volunteered to go out and contact someone tell the
21  Board at a subsequent meeting what the results of that
22  contact had been? Don't say what the results -- don't
23  tell me the content of the results, just tell me yes
24  or no, did they do that?

Page 111

1      A. Yes.
2      Q. Okay. And do you recall which Board members
3  reported back to the Board on the results of their
4  contacts?
5      A. No.
6         MR. ALLINGHAM: Okay. Can I have 13 and
7  14 back, Jason? Thanks.
8  BY MR. ALLINGHAM:
9      Q. At the -- let me show you what we've previously
10  marked as Plaintiffs' Exhibit 34. We've had testimony
11  from Mr. Helms that he faxed this material to
12  Mr. Walls. The material, he testified, came to him
13  from Mr. Neuberger or the Rutherford Institute. Does
14  that refresh your recollection that Mr. Helms
15  volunteered to contact the Rutherford Institute or
16  Mr. Neuberger?
17     A. I believe I recall I said that Mr. Helms is the
18  person who volunteered to call.
19     Q. And was it Mr. Neuberger or the Rutherford
20  Institute that he volunteered to contact?
21     A. I'm not sure which ones. There were several
22  batted around institutes. I'm sure if he said he did,
23  he volunteered to do it.
24     Q. Do you know where the text of PX 9, the final

Page 112

1  Board policy, came from?
2      A. No, I do not.
3      Q. Look, please, at page, the second page of the
4  attachment. In the last whereas clause before the
5  bottom of the page, it reads, "The School Board has
6  obtained the legal advice of two competent and
7  experienced constitutional attorneys, John Whitehead,
8  Esquire, and Thomas Neuberger, Esquire, that prayer to
9  open Board meetings is constitutional in the United
10  States Court of Appeals for the Third Circuit which
11  includes Delaware, and legal counsel have identified
12  the following legal authority in support of their
13  legal opinion."
14         My question to you, Miss Hobbs, is do you
15  recall that the School Board obtained the legal advice
16  of John Whitehead and Tom Neuberger that prayer to
17  open Board meetings is constitutional?
18     A. I don't -- I don't recall they obtained --
19         MR. GOSSELIN: Objection, objection, wait
20  a minute. It takes me a second sometimes to process
21  your questions.
22         I think the first part of that is fine
23  when you include advice in the question itself, the
24  yes or no answer. As to whether the Board retained

Page 113

1  those two lawyers then seeks attorney-client
2  privileged material, potentially privileged material.
3         Does my objection make sense to you? I
4  stated I instruct her not to answer, but I don't have
5  a problem with the whole question.
6         MR. ALLINGHAM: Excepting for purposes of
7  argument your notion that the answer to my question
8  might reveal attorney-client privileged information,
9  it seems to me that by the design of the question it
10  has quite clearly been waived, since I asked about
11  advice from the two people who are said to have
12  authored this document in a piece of paper, described
13  in a piece of paper that's been produced to us and
14  which almost every witness has testified about without
15  objection as to the attorney-client privilege, so I
16  think there's a pretty clear waiver.
17         You can't use the privilege as a sword and
18  a shield for purposes of showing me advice that's
19  favorable to your side but concealing advice that's
20  not so favorable to your side on a particular topic.
21         MR. GOSSELIN: That was produced because
22  this was drafted with the intention of it being, you
23  know, widely distributed, and there's that reference
24  in there. That's why we produced it.

29 (Pages 110 to 113)

Dobrich, et al.                              v.              Indian River School District, et al.
Lois Hobbs                          C.A. # 15-120 (JJF)                      October 24, 2006

Page 114

1    But, and the document says what it says.
2        MR. ALLINGHAM: And I think I'm entitled
3   to test whether what it says is true or not.
4        I'll withdraw the question and pose it
5   what is arguably a different question, okay?
6   BY MR. ALLINGHAM:
7    Q.  Follow along with me.  In that last whereas
8   clause on page 2 of Exhibit 34, it says, "The School
9   Board has obtained the legal advice of two competent
10  and experienced constitutional attorneys," and then it
11  names them, "that prayer to open Board meetings is
12  constitutional."  Is that statement true?
13       MR. GOSSELIN: Objection, you can, you can
14  answer it, if you know.
15   A.  This is a fax to Mr. Walls. I don't -- advice
16  was coming from lots of people, I guess.  I'm not sure
17  that we obtained, you know, we paid these lawyers
18  anything for this advice.  And they gave us free
19  advice, perhaps, in this memo obviously to Mr. Walls
20  from Mr. Helms.  But I didn't construct the policy or
21  I don't recall this memo being copied to me.
22   Q.  All right.  Let me ask a preliminary question.
23  Have you ever seen this document before?
24   A.  No, I can't say that I have.

Page 115

1    Q.  Mr. Helms testified he sent it to Mr. Walls.
2    A.  Right.
3    Q.  I haven't taken Mr. Walls' deposition yet.  But
4   typically, if a Board member sent something to
5   Mr. Walls, would he give it to you for inclusion in
6   the Board package?
7    A.  Not typically.  I mean it happens, you know.  I
8   would prefer it that way, but it doesn't always happen
9   that way.  So I imagine Mr. Walls was ahead of the
10  Policy Committee and he was sending this to help him
11  write the policy.
12   Q.  Let me ask you a different question.  Does the
13  district maintain files of the Board packages that are
14  sent to Board members for each meeting?
15   A.  Yes.
16   Q.  Okay.  And how far back do those files go?
17   A.  They go quite far back.  I don't know, we sent
18  a lot of, of those Board packets, I believe, to your
19  office.  Or the first lawyers asked us for our
20  minutes, and usually in the minutes in those boxes the
21  documents are included, to back the minutes.
22   Q.  I see.  So that in your files of the minutes
23  you would also have probably right behind the minutes
24  the Board package?

Page 116

1    A.  Packet, yes, the information that's in the
2   Board packet.
3    Q.  You'll see that the fax from Mr. Helms to
4   Mr. Walls is dated September 2, 2004?
5    A.  Yes.
6    Q.  Does that in any way refresh your recollection
7   about when Mr. Neuberger appeared before the Board?
8    A.  No.  I'm sorry.
9    Q.  I'm going to show you what we've previously
10  marked as PX 11.  Have you ever seen that document
11  before?
12   A.  It's, seems like the same policy of the five
13  whatever bullets, except the one paragraph.
14   Q.  I will agree with you that that's what it is.
15  Do you recall ever having seen it before?
16   A.  I've, I've seen the one separated.  I'm not
17  sure that I saw this one unless this is the one that
18  they finally put in the policy book.
19   Q.  The PX 9, which I showed you earlier, the five
20  numbered paragraphs, that's the final policy.
21   A.  Final one, yeah.
22   Q.  Do you have any recollection of having seen PX
23  11, which is the text of that policy but not in
24  numbered paragraphs?

Page 117

1    A.  I, I could have seen it.  I don't know.
2    Q.  Previous witnesses have testified that when
3   Mr. Neuberger offered his services to the Board and
4   those services were declined, one reason for the
5   Board's declining his offer was that it came
6   accompanied by an ultimatum that the Board had to
7   retain him that night or else his offer was withdrawn.
8   Do you recall that?
9    A.  I do recall that.
10   Q.  All right.  Can you -- is that an accurate
11  description of how the, how events unfolded that
12  evening?
13   A.  Yes.
14   Q.  All right.  And am I correct that at least as
15  of that evening, it was quite clear that the Board
16  would not be seeking legal advice from Mr. Neuberger
17  on these issues?
18   A.  Yes.
19   Q.  Okay.  Let me show you what we've previously
20  marked as PX 36.  Miss Hobbs, if you look about
21  halfway down the page on the right, you'll see a
22  numeric, alphanumeric code, BPD 00053.  Do you see
23  that?
24   A.  Yes.

30 (Pages 114 to 117)

Dobrich, et al.                              v.                    Indian River School District, et al.
Lois Hobbs                          C.A. # 15-120 (JJF)                        October 24, 2006

Page 118

1    Q.  I will represent to you that that BPD
2   designation means that the document was produced from
3   the files of the district.
4    A.  Okay.
5    Q.  Okay? It has a fax line at the top showing
6   that it, appearing to show that it was faxed by the
7   Neuberger firm on August 19th, 2004, at 9:31 in the
8   morning. Do you recall ever seeing this document?
9    A.  Well, that isn't our number at the top it's
10  faxed to.
11   Q.  That is not your number?
12   A.  302-655-9329?
13   Q.  Yes.
14   A.  Not, none -- ours are all 436-1000 on down the
15  line.
16   Q.  I believe that number to be Mr. Neuberger's
17  number.
18   A.  Okay, could be Mr. Neuberger's, or if it was
19  through Mr. Helms, we -- I probably, we probably got a
20  copy of this document, a press release I believe it
21  is, from Mr. Neuberger.
22   Q.  And do you know whether this press release was
23  ever issued?
24   A.  I really can't say if it was or wasn't.

Page 119

1    Q.  Were you asked to review this document and
2   ensure that it was accurate?
3    A.  This document?
4    Q.  Yes.
5    A.  No.
6    Q.  Do you recall seeing this document at or about
7   the date that it bears, August 19th, 2004?
8    A.  I have seen this document. Whether it was on
9   that date or later than that date, I'm not sure.
10   Q.  And did you review the document?
11   A.  I read it. I wouldn't call it review.
12   Q.  Did you identify any portion of the document
13  that you thought was inaccurate?
14   A.  No.
15   Q.  If you look at the bottom of the page, the last
16  paragraph, after some pithy descriptions of
17  Mr. Neuberger's qualifications, there's a paragraph
18  that reads, "If the Indian River School Board wants to
19  fight for its rights, Stephen and I," Stephen
20  Neuberger is Mr. Neuberger's son; is that correct? Do
21  you know that?
22   A.  I would imagine. I don't know for sure.
23   Q.  "Stephen and I and the full resources of TRI,"
24  that's the Rutherford Institute, "are available to

Page 120

1   them to see that this issue is properly and fully
2   litigated and that their rights are not lost by
3   default."
4       Does that refresh your recollection about
5   the date on which Mr. Neuberger offered his services
6   to the Board?
7    A.  The exact date, no.
8    Q.  Yes. Does it refresh your recollection that it
9   was on, it was on or about August 19th, 2004?
10   A.  I don't know when Mr. -- I can't tell you the
11  exact date when Mr. Neuberger came to talk to the
12  Board.
13   Q.  Look at the first paragraph of text in this
14  exhibit. I apologize, the second paragraph of text.
15  It reads, "The Indian River School Board has
16  historically opened its meetings with a nonsectarian
17  prayer." Is that an accurate statement?
18   A.  Yes, I would say it is.
19   Q.  And that's based on your 10 years of attendance
20  at Board meetings?
21   A.  Yes.
22       MR. ALLINGHAM: All right. I'm going to
23  ask the court reporter to mark as PX 59 a letter dated
24  October 23, 2006 from Jeffrey Boerger of the Drinker

Page 121

1   Biddle firm to me, and attached to it is a privilege
2   log of 15 pages having a total of 122 entries.
3       (Plaintiffs' Exhibit No. 59 was marked for
4   identification.)
5   BY MR. ALLINGHAM:
6    Q.  Miss Hobbs, this is a, a description prepared
7   by your lawyers identifying documents as to which a
8   claim of privilege has been made. So these documents
9   have not been given to our side and the practice is to
10  identify them in what's called a privilege log, that's
11  this document. It can provide sometimes information
12  about -- information that can be helpful in
13  pinpointing the time of events, even though we don't
14  have the documents themselves.
15       I'm again going to try to establish
16  parameters for when the Neuberger firm, or
17  Mr. Neuberger, appeared before the Board. The first
18  parameter, which I'll just represent to you for the
19  time being, this is, it's reflected in PX 18, the
20  minutes of the September 28, so September 28, nearly
21  the end of September 2004 Board meeting, that is the
22  point at which the first reading of the Board prayer
23  policy was given. Okay? So September 28th is the
24  first reading.

31 (Pages 118 to 121)

Dobrich, et al.                                        v.                          Indian River School District, et al.
Lois Hobbs                                    C.A. # 15-120 (JJF)                            October 24, 2006

Page 122

1    I'm going to show you entries in this log
2  that relate to communications from or to
3  Mr. Neuberger. The first one is dated -- and it's
4  entry number 68, so if you'll turn to entry number 68.
5  There is an entry showing a fax from Reggie Helms to
6  Janet Hearn dated August 18, 2004 regarding legal
7  issues with handwritten notes. This document does not
8  specifically reflect any involvement of Mr. Neuberger
9  or the Rutherford Institute, but I point it out to you
10  in order to show you the next item, which is No. 71.
11    No. 71 is an August 19th, 2004 fax from
12  you to Mr. Griffin forwarding an August 18, 2004
13  letter from Mr. Neuberger regarding legal
14  representation. Do you see that?
15  **A. Yes.**
16  Q. Do you recall having gotten a letter from
17  Mr. Neuberger dated in the middle of August and
18  forwarding it to Mr. Griffin?
19  **A. Well, according to the notes I did.**
20  Q. Do you have any doubt that you got this
21  document dated August 19th forwarding August 18th?
22  **A. I would imagine that we did that. I don't**
23  **recall what it said but --**
24  Q. I'll represent to you -- and also, would you

Page 123

1  look at item 69, which is a fax forwarding an August
2  18, 2004 letter from Thomas Neuberger regarding legal
3  representation, and it's forwarded from you to
4  Mr. Walls and Mr. Helms. Do you see that?
5  **A. Yes, I see that.**
6  Q. All right. I earlier showed you Exhibit 36,
7  the press release from the Neuberger firm.
8  **A. Um-hum.**
9  Q. Which is dated August 19th, 2004.
10  **A. Right.**
11  Q. Looking at the privilege log, can you confirm
12  that Mr. Neuberger sent a letter regarding legal
13  representation to you on the 18th and then faxed to
14  the district or one of the Board members the press
15  release that we've looked at one day later?
16  **A. I can't recall that.**
17  Q. Do you know why Mr. Helms would have sent a fax
18  regarding legal issues with handwritten notes to
19  Mrs. Hearn on August 18th, 2004?
20  **A. I believe that he would have been in contact**
21  **with Mr. Neuberger.**
22  Q. Okay. Do you know what this fax regarding
23  legal issues with handwritten notes was?
24  **A. Not without seeing it.**

Page 124

1  Q. Do you know whether it was that it, that is the
2  content of the fax, the document that was being faxed,
3  was prepared by Mr. Helms, as the privilege log
4  reflects?
5  **A. If the log says that, but I don't --**
6  Q. You don't know, do you?
7  **A. I really don't know who wrote what here.**
8  Q. All right. And I take it --
9  **A. Without seeing it.**
10  Q. And I take it you don't know whose handwritten
11  notes are reflected on that document?
12  **A. No, I don't.**
13  Q. The next document reflecting communications
14  from Mr. Neuberger is item 72.
15  **A. Um-hum.**
16  Q. Which is an August 24, 2004 e-mail from
17  Mr. Neuberger to his son, Mr. Whitehead, and
18  Mr. Helms, and the description is, "E-mail providing
19  legal analysis and advice." Do you recall ever
20  getting an e-mail from Mr. Neuberger to Mr. Helms;
21  that is, getting a copy of that e-mail?
22  **A. No.**
23  Q. Do you know whether that e-mail was forwarded
24  by Mr. Helms to any members of the Board?

Page 125

1  **A. No, I can't say that I do.**
2  Q. If you look at item 109 on the privilege log --
3  **A. Unless we put it in the packet, I don't know.**
4  Q. Item 109 is an August 24, 2004 -- are you with
5  me?
6  **A. Um-hum.**
7  Q. August 24, 2004 fax forwarding an e-mail from
8  Thomas Neuberger providing legal analysis and advice.
9  It's from Mr. Helms to Mr. Walls.
10  **A. Right.**
11  Q. Do you know whether that document, that is, the
12  e-mail on August 24th, is the report from Mr. Helms on
13  what he learned from Mr. Neuberger having volunteered
14  to go find out from Mr. Neuberger at the August 23rd
15  meeting which we just discussed?
16    MR. GOSSELIN: Objection. Don't answer
17  that.
18    I mean we tried to give you what we're
19  obligated to give you on a privilege log as far as a
20  description of the document goes. I don't know that
21  it's appropriate to try to get a further description
22  of it in a deposition.
23    MR. ALLINGHAM: On some issues, Jason, we
24  clearly have a different point of view. I've tried to

32 (Pages 122 to 125)

Dobrich, et al.
Lois Hobbs

v.
C.A. # 15-120 (JJF)

Indian River School District, et al.
October 24, 2006

Page 126

1  be careful in letting you make your objections, and I
2  hear your objection and instruction.
3  BY MR. ALLINGHAM:
4    Q.  Do you know whether Mr. Neuberger's e-mail
5  was -- first of all, did you ever see Mr. Neuberger's
6  e-mail of August 24 providing legal analysis and
7  advice?
8    A.  I don't recall that I have seen that.
9         MR. ALLINGHAM:  Okay, we need to change
10  the tape.
11        THE VIDEOGRAPHER:  Going off the record at
12  approximately 12:20 p.m.
13        (A brief recess was taken.)
14        THE VIDEOGRAPHER:  We are back on the
15  record at approximately 12:26 p.m.
16  BY MR. ALLINGHAM:
17    Q.  When we left off, Miss Hobbs, we had looked at
18  an August 24 fax from Mr. Helms to Mr. Walls
19  forwarding Mr. Neuberger's legal advice.  The next
20  Neuberger document I have is the, is the fax we looked
21  at earlier, which is Exhibit 34.
22    A.  Um-hum.
23    Q.  That's a fax from Mr. Helms to Mr. Walls
24  forwarding a document which on its face is dated

Page 127

1  August 30, 2004, and is said to have been prepared by
2  the Rutherford Institute and the Neuberger firm.  If
3  you look at the top of the left second, second page of
4  the document, you'll see that.  Okay?
5    A.  Second page of the document?
6    Q.  It's the first page of, of the document,
7  second page of the exhibit.  At the top you'll see
8  it's dated 8-30-04 and it's prepared --
9    A.  Am I looking at the right document?
10    Q.  Yes.
11    A.  I see a date of 9, 2nd, '04.
12    Q.  Yes, and if you look at the material in
13  brackets on the top left, it says "Released to the
14  general public, proposed School Board prayer
15  resolution dated 8-30-04"?
16    A.  I'm sorry.  I can't see it.
17    Q.  The top left.  Under the fax line, the first --
18    A.  Oh, okay.  "General public," I'm sorry.  Yes, I
19  see it.
20    Q.  You see it?
21    A.  Um-hum.
22    Q.  Let me ask you a question.  Mr. Gosselin has
23  represented to me helpfully off the record that he
24  believes that at the August 23rd meeting, that's the

Page 128

1  very long executive session meeting that we looked
2  at --
3    A.  Right.
4    Q.  -- that Mr. Griffin was there in person and
5  Mr. Neuberger was there by telephone.  Do you recall
6  that?
7    A.  I hate to be this -- I, I don't recall that.  I
8  mean maybe he was.  But I'm sorry, but...
9    Q.  The next item is item 108.  This is described
10  as the author being Thomas Neuberger, the description
11  is packet of information provided to Board members in
12  connection with legal representation.  And the date is
13  September 15th, 2004.
14         Do you remember Mr. Neuberger providing a
15  packet of information to Board members in connection
16  with legal representation?
17    A.  I would imagine if this says he did, he did.
18  But I don't know if he did it through Board members
19  that gave it out or if we gave it out at our district
20  office.
21    Q.  All right.  If you gave it out through the
22  district office, am I correct that it would have been
23  included in the Board package?
24    A.  Yes, I believe it would be.

Page 129

1    Q.  Okay.  And am I correct that the district --
2  the files that the district maintains of Board
3  packages would extend back at least through September
4  of 2004?
5    A.  Yes.
6    Q.  Okay.  Item No. 110 is a, is described as a
7  memorandum regarding legal representation from
8  Mr. Hastings to Board members dated August 23,
9  2004.  Do you recall Mr. Hastings providing a memo to
10  his colleagues on the topic of legal representation?
11    A.  I don't -- I just know that several people were
12  talking about legal representation.  I don't know that
13  he provided, if he provided it on his own or gave it
14  through our district office in the packet.
15    Q.  You don't know?
16    A.  I don't remember.
17    Q.  Do you remember, however it was distributed, a
18  memo from Mr. Hastings on this topic?
19    A.  I don't know -- I don't recall seeing a memo
20  from Mr. Hastings on this topic.
21    Q.  That item 108 is the last item from
22  Mr. Neuberger until item 6, which is more than a year
23  later, in November of 2005.  If you look at item 6
24  it's on the first page of the log.  Item 6 is authored

33 (Pages 126 to 129)

Dobrich, et al.                          v.                  Indian River School District, et al.
Lois Hobbs                        C.A. # 15-120 (JJF)                    October 24, 2006

Page 130

1  by Tom Neuberger, it's sent to Mr. Helms, Mr. Stephen
2  Neuberger and Mr. Whitehead dated on the 42nd
3  anniversary of President Kennedy's assassination,
4  November 22, 2005. And it's a letter providing legal
5  advice, legal analysis and advice.
6        Miss Hobbs, am I correct that by November
7  22, 2005, Mr. Neuberger had been retained to represent
8  Mr. Helms individually?
9     A.  I don't know the exact date, but I do know he
10  was obtained by Mr. Helms.
11     Q.  And do you know whether Mr. Helms has submitted
12  to the Board any legal bills from Mr. Neuberger for
13  that representation?
14     A.  Not that I recall.
15     Q.  All right. So you've now seen every log entry
16  that relates to advice from Mr. Neuberger. They are
17  in a tightly bunched group from August 18th, 2004 to
18  September 15th, 2004, all in advance of the first
19  reading of the Board prayer policy, and then a single
20  item No. 6 more than a year later. Does that tight
21  bunching of materials from Mr. Neuberger from
22  mid-August to mid-September tell you anything about
23  when Mr. Neuberger appeared before the Board?
24     A.  I do not know the exact date that Mr. Neuberger

Page 131

1  appeared in front of the Board.
2     Q.  Without regard to whether you know the exact
3  date, does it tell you that Mr. Neuberger appeared
4  before the Board sometime between August 18th, the
5  date of his first communication, and September 15th,
6  the date of his last communication before the adoption
7  of the Board policy?
8     A.  I would be guessing.
9     Q.  What is the process that the district uses to
10  retain a lawyer?
11     A.  Normally the process is we put a request for
12  proposal out and lawyers apply.
13     Q.  Okay. In a situation like this where you're
14  looking for advice on a specialized topic, what's the
15  process for looking for a lawyer in that case?
16     A.  Actually, I believe this would be our only
17  experience with this, and I think people just went on
18  the fact that they knew such and such, so and so
19  organization and they would go see, contact them, or
20  somebody had contacted them. They may not have been
21  the first contact, which was an unusual.
22     Q.  And I think we touched on this earlier, but am
23  I correct that you have no recollection of being
24  involved yourself in seeking out legal advice from

Page 132

1  someone other than Mr. Griffin on this topic?
2     A.  I do not recall, unless they asked me to call
3  somebody, but I don't recall. I didn't make
4  suggestions of who to contact, I know that.
5     Q.  All right, I'm going to show you entries on the
6  log that relate to communications from you.
7     A.  Okay.
8     Q.  Item 7 is a fax from you to Mr. Griffin dated
9  September 24 requesting legal analysis and advice.
10     A.  Okay.
11     Q.  I'm assuming that you don't specifically recall
12  that document, that fax.
13     A.  No.
14     Q.  All right. Item 41 is a fax dated January 5,
15  2006 from you to Mr. Griffin requesting legal analysis
16  and advice. Do you know the topic of the legal
17  analysis and advice that you asked Mr. Griffin for in
18  that fax?
19     A.  I'd have to see it, really. I can't recall
20  these, in a thing of business, how many faxes or
21  whatever you send.
22     Q.  Item 74 is a request from you to Mr. Griffin
23  for legal analysis and advice dated August 10, 2004.
24  Do you know the topic of that request for advice?

Page 133

1     A.  Could have been on graduation exercises. It's
2  when the, right after the complaint happened in June,
3  so could have been on Board prayer. I don't know.
4     Q.  Was Mr. Griffin the first lawyer that you asked
5  for advice on those topics?
6     A.  Yes.
7     Q.  Okay. Item 61 is a fax from you to Beth at ADF
8  requesting legal analysis and advice dated October
9  5th, 2004. Do you know what ADF is?
10     A.  No.
11     Q.  Have you heard of the Alliance Defense Fund?
12     A.  Oh. I can't recall what the fax said.
13     Q.  Have you heard of the Alliance Defense Fund?
14     A.  Yes, I guess I've heard of it.
15     Q.  Did you request legal analysis and advice from
16  someone named Beth at the Alliance Defense Fund?
17     A.  I don't know that I did. I mean obviously I
18  did if this says I did, but I don't remember what kind
19  of advice or what I was asking for. Could have been
20  follow-up of somebody saying they heard they would
21  help us, so send them something. I don't know.
22     Q.  Well the log says --
23     A.  I mean it's hard to go back two years and say
24  what this is and what you said.

34 (Pages 130 to 133)

Dobrich, et al.                              v.                Indian River School District, et al.
Lois Hobbs                           C.A. # 15-120 (JJF)                     October 24, 2006

Page 134

1    Q.  Yes, ma'am.
2    A.  I mean I do more for the school district than
3    fax out things about religion.
4    Q.  Yes, ma'am.  And I understand that this is a --
5    this relates to events of a couple of years ago.  I,
6    on the other hand, have a privilege log which gives me
7    very little information about these documents.
8    A.  Right.
9    Q.  The log says precisely what it says.  My
10   question to you was, do you have a recollection of --
11   independent of the log, of having requested legal
12   analysis and advice from someone named Beth at the
13   ADF?
14   A.  No.
15   Q.  Did requests for legal advice ever get made
16   through Mrs. Hearns?
17   A.  That wouldn't be a normal course of event.
18   Q.  Item 64.  The author is Lois Hobbs, the
19   recipient is Nathan Kellum, the date is January 4,
20   2005.  And it's a fax requesting legal analysis and
21   advice.  Do you recall, as you sit here today, having
22   requested legal analysis and advice from Mr. Kellum of
23   the ADF?
24   A.  No, I don't recall.

Page 135

1    Q.  Am I correct that if you made a request to
2    Mr. Kellum, or to Beth, or to Mr. Cafferky or to
3    Mr. Griffin, you could not have done so without
4    authorization from the Board?
5    A.  Well, with Mr. Cafferky when we were starting
6    to work on the case, he would be asking me things, I
7    guess I would be asking him things.  I'm not sure that
8    I would ask permission for the Board every time I
9    talked to Mr. Cafferky.
10   Q.  Okay.  Let me set aside Mr. Cafferky.  Am I
11   correct that you would not have contacted Mr. Kellum
12   or Beth at the Alliance Defense Fund without
13   authorization from the Board?
14   A.  I would say rather than authorization, one of
15   the Board members may have given me that person's name
16   to contact, not necessarily a vote of all 10 Board
17   members.
18   Q.  Mr. Savage worked under your supervision; is
19   that right?
20   A.  Yes.
21   Q.  Would it be typical for Mr. Savage to request
22   legal advice from counsel for the district?
23   A.  Yes.
24   Q.  Item 1 on the privilege log is from Rebecca

Page 136

1    Trifillis.  Do you know who she is?
2    A.  I believe she's the assistant lawyer with
3    Mr. Griffin.
4    Q.  All right.
5    A.  References.
6    Q.  It reflects, item 1 reflects a June 15, 2004
7    legal memorandum or memorandum providing legal
8    analysis and advice to you and Mr. Griffin from
9    Ms. Trifillis.  I will represent to you that that is
10   the earliest legal advice that we have found reflected
11   on the log.  Does that -- as a general proposition,
12   does that comport with your recollection as to when
13   you first requested legal advice from Mr. Griffin on
14   this topic?
15   A.  I believe so.  I believe that was right after
16   our complaint about graduation and most likely, those
17   were about graduation policies that we worked on
18   immediately to change or to bring in, you know, to
19   have him look at for us.
20   Q.  Item 4 is another memo from Ms. Trifillis to
21   you and Mr. Griffin dated a little more than a month
22   later on July 20, 2004, again described as a
23   memorandum providing legal analysis and advice.  Did
24   you ask for another analysis from the Griffin firm?

Page 137

1    A.  I don't recall that I did.
2    Q.  Am I correct, Miss Hobbs, that you continued to
3    seek advice on these issues from Mr. Griffin
4    throughout the course of this litigation?
5    A.  I would talk to the Board lawyer about any
6    advice on any situation.  So until other lawyers, as
7    the insurance company lawyers came into the picture, I
8    mean he would be the one I would be seeking advice
9    from.
10   Q.  Did there come a time when Mr. Griffin was told
11   that he should not speak for the Board on issues
12   relating to the Dobrich and Doe family complaints?
13   A.  I believe when the insurance company's lawyers
14   took over the case, he wasn't speaking for the Board
15   for the case.
16   Q.  And was he told that he should not speak for
17   the Board?
18   A.  I don't recall him being told that, but I know
19   they copied him some things, I believe.
20   Q.  All right.  All right, look at items 34 and 35,
21   please.  34 is a November 16, 2004 fax to Nathan
22   Kellum at the ADF requesting legal analysis and
23   advice, and 35 is a November 16, 2004 fax to James
24   Griffin requesting legal analysis.  Is that the same

35 (Pages 134 to 137)

Dobrich, et al.                                                            v.                          Indian River School District, et al.
Lois Hobbs                                                    C.A. # 15-120 (JJF)                                         October 24, 2006

Page 138

1  document, just addressed to different lawyers?
2    A.  I don't know at this point. I mean I, I would
3  have to see the document.
4    Q.  Do you recall that you were asking multiple
5  lawyers for advice on the same topic during the course
6  of the consideration of the issues in this lawsuit?
7    A.  I believe that ADF may have been -- a Board
8  member made the initial contact with them and wanted
9  me to follow up with some things to them.
10   Q.  Did you ever feel like the Board was shopping
11  for legal advice on these issues?
12   A.  Shopping in what way?
13   Q.  Looking for an opinion that would suit its
14  desires.
15   A.  I don't believe that I can answer that. I
16  don't know what the Board's reason for looking for
17  lawyers.
18   Q.  No, no. I asked you did you ever feel like
19  that's what they were doing?
20   A.  They were looking for representation.
21   Q.  Did you ever feel like they were looking for a
22  lawyer that would give them the opinion that they
23  wanted?
24   A.  No, not really.

Page 139

1    Q.  Did you ever form an opinion as to why the
2  Board wanted opinions from other lawyers than
3  Mr. Griffin on these topics?
4    A.  I -- if there would be any opinion of mine, it
5  would be to find somebody that they wouldn't go broke
6  with, you know, somebody that would help them legally
7  without spending a lot of money. That's what I would
8  think they would have been doing.
9    Q.  Is that what they told you?
10   A.  No. That's -- you asked my opinion.
11   Q.  Look, please, at item No. 76. There's no date
12  on this document. It's a copy of a complaint with
13  handwritten notes by Lois Hobbs. Do you recall having
14  put handwritten notes on a copy of the complaint in
15  this case?
16   A.  Of a complaint in this case?
17   Q.  Yes.
18   A.  I could -- sometimes I write handwritten notes
19  on, you know, if, if there is a telephone call and I'm
20  doing the conversation, I would write handwritten
21  notes, or if I'm talking to somebody I sometimes jot
22  down handwritten notes. That could be it.
23   Q.  When you saw a copy of the complaint in this
24  case, did you make notes on it as to what you recalled

Page 140

1  about the events described in that complaint?
2    A.  If it would be a complaint, it would be talking
3  to the parent directly, and I would write notes down
4  on what they complained about me, not the complaint
5  as... I would read through the complaint, and I may
6  have made notes on thoughts because we had to answer
7  those. I don't know, there was quite a number of
8  questions that we provided the big book for which took
9  a lot of my time.
10   Q.  You referred earlier to this big book. What
11  was it?
12   A.  I don't know, it was the complaint with all the
13  80-some things or 70-some things, and we tried to
14  answer each one of those things or give an answer back
15  on what we were doing.
16   Q.  And when you say "we," you're talking about you
17  and the other defendants?
18   A.  Yeah. If they complained about a school doing
19  this or that, we tried to find out what the school was
20  doing and answer them. But that was more than Board
21  prayer.
22   Q.  All right. And when you refer to the complaint
23  in that answer, are you referring to a pleading in the
24  litigation that would look like that that would have a

Page 141

1  caption on it?
2    A.  Yeah, I mean it was the long complaint, yeah.
3    Q.  Okay. And you and your fellow defendants put
4  together some book that had all of what you all could
5  remember about the allegations in the complaint?
6    A.  Yes, and gave it to Mr. Cafferky.
7    Q.  When did Mrs. Dobrich first contact you about
8  the commencement exercises at Sussex Central?
9    A.  On the graduation stage, the night of
10  graduation.
11   Q.  And did her complaint that day ultimately
12  expand into a complaint about School Board prayer?
13   A.  Not on that day. She --
14   Q.  No, I didn't mean on that day.
15   A.  Her original complaint to me was the
16  graduation -- the prayer at graduation and the
17  reverend who gave the prayer.
18   Q.  Over the course of the next two months at
19  which, during which Mrs. Dobrich appeared three times
20  before the Board, do you recall that her, the subject
21  of her complaint expanded to include School Board
22  prayer?
23   A.  I believe I recall her saying one time to, I
24  think it was Mr. Evans, that if he had ended the

36 (Pages 138 to 141)

Wilcox & Fetzer, Ltd.                    Professional Court Reporters                    (302)655-0477

Dobrich, et al.                              v.                    Indian River School District, et al.
Lois Hobbs                          C.A. # 15-120 (JJF)                        October 24, 2006

Page 142

1  prayer without Jesus, that would have been an okay
2  prayer with her. That -- but as far as until I saw
3  the whole complaint, knowing that it was moved to
4  School Board prayer, I didn't know.
5     Q.  Well, you saw on August 23 in the executive
6  session that at least by that date the Board
7  understood that the complaint had to do with School
8  Board prayer, correct?
9     A.  Yes.
10    Q.  Okay. And was the Board discussing this in
11 response to complaints from anyone other than
12 Mrs. Dobrich?
13    A.  No.
14    Q.  When Mrs. Dobrich contacted you at the
15 graduation, what did you tell her?
16    A.  I told her to -- she was -- at first I thought
17 she was a happy parent that her child had graduated
18 because she kept saying, "Thank you, thank you." But
19 then she was screaming it in my face and getting very
20 close to my face. And I said, "Please contact my
21 office. We can't talk about this right now," or
22 something like that.
23    Q.  Did you understand what the nature of her
24 complaint was?

Page 143

1     A.  Finally, when she said, "Thank you," something,
2  I don't know the exact words, but "Thank you for
3  having my child subjected to Jesus her whole life," or
4  something like that. I don't -- she was angry. I was
5  shocked. I don't recall the exact words.
6     Q.  You were shocked because you thought the
7  invocation was perfectly fine?
8     A.  I was shocked that anybody would come up and
9  act like that on a graduation stage.
10    Q.  What did you do in response to Mrs. Dobrich's
11 complaint?
12    A.  I called her back and talked to her about her
13 complaint, and said, you know, I would take it to the
14 Board it the next meeting, that she was concerned
15 about the graduation prayer and that I would advise
16 the Board to take a look at their policy and to start
17 working on it. And if she wanted to speak to the
18 Board about her concern, that was her right.
19    Q.  I want to take this step by step. The first
20 step was Mrs. Dobrich complained to you at the day of
21 graduation, correct?
22    A.  Um-hum, um-hum.
23    Q.  Your response was to tell her, "Please call my
24 office"?

Page 144

1     A.  Um-hum.
2     Q.  Correct?
3     A.  (Nodded affirmatively.)
4     Q.  Yes?
5     A.  Yes.
6     Q.  Okay. Did Mrs. Dobrich call your office?
7     A.  I believe she e-mailed me.
8     Q.  Okay. Did you frequently communicate with
9  constituents or residents of the district or parents
10 via e-mail?
11    A.  I didn't normally e-mail people back. I
12 normally called them back. That's been my practice.
13 I'm not saying that I haven't done it in 10 years,
14 but --
15    Q.  Is your e-mail address published somewhere in
16 the district materials?
17    A.  Um-hum.
18    Q.  On the Web site?
19    A.  Yeah, I believe it is.
20    Q.  And did, at this time in 2004, did you
21 customarily check your e-mails?
22    A.  My secretary checks them, checked them for me.
23    Q.  And your secretary is who?
24    A.  Janet Hearn.

Page 145

1     Q.  So Ms. Hearn is in charge of bringing to your
2  attention any e-mail that arrives that seems to be
3  relevant to your duties?
4     A.  What she normally did is run them off and I'd
5  have time to read them when I was doing something
6  else, rather than sit there at the screen, which takes
7  hours. So she would just run them off.
8     Q.  All right. So Mrs. Dobrich sent you an e-mail
9  and you called her back in response, correct?
10    A.  Yeah.
11    Q.  Do you know the date of the e-mail?
12    A.  I can't recall the date. I don't think I
13 called her back that very day of the e-mail. I think
14 she -- may have called her back in a couple of days.
15 I usually try to get back to people in a couple of the
16 days.
17    Q.  Did you retain that e-mail?
18    A.  I think that that might be what this is, I'm
19 not sure.
20    Q.  That might be what what is?
21    A.  One of these documents. I'm not sure.
22    Q.  On the privilege log?
23    A.  I don't know. I don't know, because I don't
24 know what the documents are.

37 (Pages 142 to 145)

Dobrich, et al.
Lois Hobbs

v.

C.A. # 15-120 (JJF)

Indian River School District, et al.
October 24, 2006

Page 146

1  Q.  Well, let's go back to my question:  Did you
2  retain the e-mail?
3  A.  I asked Janet to keep the e-mail because I kept
4  my notes on it.
5  Q.  Okay.  So Mrs. Hearn printed a copy of
6  Ms. Dobrich's e-mail?
7  A.  Um-hum.
8  Q.  You asked Mrs. Hearn to keep that printed copy
9  of the e-mail because you had kept some notes on it,
10  correct?
11  A.  Right.
12  Q.  What were the notes of?
13  A.  Just little bullets of our conversation.
14  Q.  Okay, so they were your notes of your
15  conversation with Mrs. Dobrich?
16  A.  Right.
17  Q.  Do you know where Mrs. Hearn would have filed a
18  document like that, a printout of an e-mail with your
19  notes on it?
20  A.  Usually, sometimes I just gave her and she
21  would make a file, you know, just say so and so, put
22  the parent complaint down so we would make sure we
23  followed through on it.  So I would imagine it would
24  be in her office.

Page 147

1  Q.  Again, Mrs. Hearn would be the one who knows
2  where it is?
3  A.  Yeah, and it could be in my box of stuff.  I
4  don't know.
5  Q.  All right.
6  A.  Or it could be this.
7  Q.  I'm sorry, your box of stuff in your garage?
8  A.  Yeah, um-hum.
9  Q.  Okay.  All right.  So you made notes of your
10  conversation with Mrs. Dobrich, you're not sure when
11  that occurred.  But am I correct it occurred within a
12  few days of graduation?
13  A.  Yes.
14  Q.  Okay.  What did you do in response to that
15  conversation with Mrs. Dobrich?
16  A.  Took her complaint to the following Board
17  meeting.
18  Q.  Okay.  And during the conversation, did you
19  tell Mrs. Dobrich that you would take the complaint to
20  the Board meeting?
21  A.  I did tell her that.
22  Q.  Did you tell her that you would put her
23  complaint on the agenda?
24  A.  I did tell her that, that I would hut

Page 148

1  graduation exercises, I think I put it on the agenda
2  that way.
3  Q.  Did you later learn that Mrs. Dobrich had asked
4  Mr. Walls to put her complaint on the agenda and he
5  had declined to do so?
6  A.  I don't recall that.
7  Q.  Between that conversation on the telephone with
8  Mrs. Dobrich and the next Board meeting, did you have
9  any further communications with Mrs. Dobrich?
10  A.  I don't recall that I did.
11  Q.  Did you have any further communications with
12  anybody else on issues relating to religion in the
13  schools, including School Board prayer?
14  A.  I don't believe I had any conversation about
15  School Board prayer, because at that time it was
16  graduation exercises.  That's the problem.
17  Q.  You understood my question to be religion in
18  the schools including, but not limited to, School
19  Board prayer?
20  A.  I -- if I asked anybody, it would be
21  Mr. Griffin to look at our policies, that would have
22  been it.
23  Q.  Okay.  This is a document which has been marked
24  as PX 15.  I'm going to try to move quickly through

Page 149

1  this.  These are the final minutes of June 15th.  They
2  bear your signature and you are reflected as being in
3  attendance at the meeting, correct?
4  A.  Um-hum.
5  Q.  All right.  You will see under "Public
6  Comments" on page 2 that "Mrs. Dobrich, a parent of
7  the Jewish faith, expressed concern about prayers at
8  school district events.  She asked that the Board
9  consider using a nondenominational prayer that would
10  be appropriate for all faiths at events such as
11  graduations, et cetera."
12  Is that a fair summary of what you recall
13  Mrs. Dobrich saying?
14  A.  I believe at that time she was asking about
15  events in graduations, yes.
16  Q.  She was asking about events and graduations?
17  A.  I mean not -- events such as graduation she was
18  saying, yeah.
19  Q.  All right.  What was the response, if any, from
20  the Board to her comment?
21  A.  Normally we do not respond to public speakers.
22  I'm not saying that in 10 years that's never happened.
23  But normally we sit and we listen.  And I've advised
24  the Board that that should be what they're doing, is

38 (Pages 146 to 149)

Dobrich, et al.
Lois Hobbs

v.
C.A. # 15-120 (JJF)

Indian River School District, et al.
October 24, 2006

Page 150

1  just listening to the concerns, not having a
2  conversation with the people across the table.
3      Q.  Did the Board take any action in response to
4  Mrs. Dobrich's complaint at the June 15th meeting?
5      A.  I believe they were waiting to talk to
6  Mr. Griffin in person, and because he wasn't there,
7  that they would, they put that off until he could be
8  there to talk to them.
9      Q.  So am I right, there was no public discussion
10  by the Board of any, of this issue or any potential
11  policy at this time?
12     A.  No, not that I recall.
13     Q.  Did the Board have a policy on prayer at
14  graduation at this time, June 15th?
15     A.  I believe they had some policies on religion,
16  but I don't know specifically if it was graduation.
17  But it could be.
18     Q.  Before I leave the actual graduation day
19  itself, do you recall that Mrs. Dobrich told you that
20  the prayer had ruined Samantha Dobrich's graduation?
21     A.  She may have said something about that, yeah.
22     Q.  The amended complaint, which is the complaint
23  that's currently operative in this case, reflects that
24  late in the evening of June 3, 2004, which is the date

Page 151

1  of the graduation, Mrs. Dobrich followed up her
2  conversation with you with an e-mail protesting the
3  invocation of Jesus Christ at the official school
4  ceremony.  Do you have any reason to doubt that that's
5  the date of Mrs. Dobrich's e-mail?
6      A.  I have no reason to doubt that.
7      Q.  All right.  It also says that the following
8  Monday, which I believe is June 5th, although that can
9  be confirmed with a calendar, Mrs. Dobrich telephoned
10  your office and left a message regarding the prayer.
11  Do you recall that Mrs. Dobrich both sent you an
12  e-mail and telephoned you before you responded?
13     A.  She may have telephoned as well.
14     Q.  Did you tell Mrs. Dobrich that you had slipped
15  the school prayer issue onto the agenda for the June
16  2004 School Board meeting under the innocuous title
17  "Graduation Ceremonies"?
18     A.  I did not tell her -- I told her I put it under
19  "Graduation Exercises."  That's what she complained
20  about.  And that under that it would be a discussion
21  of the school prayer.  Or the prayer at graduation,
22  I'm sorry.
23     Q.  Do you recall Mr. Evans' response to Mrs.
24  Dobrich's statements at the June 15th Board meeting?

Page 152

1      A.  I believe he said something, because she had
2  said to him that, I remember her saying to him
3  something about, "Your prayer would have been fine if
4  it didn't end 'in Jesus's name.'"  And I think he did
5  answer her back.  I do not recall her -- the words.
6      Q.  But you recall that he responded out loud?
7      A.  I do recall that he did that.
8      Q.  So that would have been contrary to your
9  suggestion to the Board that they not respond to
10  public comments?
11     A.  I said, sometimes they do and sometimes they
12  don't.
13     Q.  Do you recall that Mr. Evans said, "No, never,"
14  when Mrs. Dobrich made that suggestion?
15     A.  I -- I'm not sure of his words.
16     Q.  Do you recall that Mr. Evans said in words or
17  substance, "No, never," in response to Mrs. Dobrich's
18  suggestion?
19     A.  I recall that he said something to her,
20  and possible --
21     Q.  Something to that effect?
22     A.  -- could be those words, yes.
23     Q.  The minutes reflect that Bradley Layfield, the
24  athletic director of Sussex Central, had been invited

Page 153

1  to speak about field conditions at the new Sussex
2  Central High School.
3      A.  Are we talking about June 15?
4      Q.  Yes, ma'am?
5          MR. GOSSELIN:  And are we getting back to
6  board prayer?  Because we're kind of drifting into
7  phase 2.
8          MR. ALLINGHAM:  Well, I take the June 15th
9  statement by Mrs. Dobrich about events such as
10  graduation to incorporate board prayer, and in fact at
11  least by August 23rd, the Board clearly understood
12  that as well.
13         MR. GOSSELIN:  Okay.
14  BY MR. ALLINGHAM:
15     Q.  Do you recall Mr. Layfield had been invited to
16  speak about field conditions at Sussex Central?
17     A.  I recall that Mr. Layfield was there, according
18  to the minutes of this.  I'd have to look.
19     Q.  If you look at page 7 of the minutes, June 15th
20  minutes.
21     A.  Um-hum.
22     Q.  You'll see that Mr. Layfield in the public
23  comment section expressed his preference for sod with
24  an irrigation system, and then mentioned that when he

39 (Pages 150 to 153)

Dobrich, et al.
Lois Hobbs

v.

C.A. # 15-120 (JJF)

Indian River School District, et al.
October 24, 2006

Page 154

1  delivers a prayer and uses the name Jesus Christ, he
2  intends it to be for all faiths?
3  **A.  He said something relative to -- something like**
4  **this.**
5  Q.  Did you think it was odd that the athletic
6  director had --
7  **A.  Yes.**
8  Q.  -- spoken out on the issue of school prayer?
9  **A.  Yes.**
10  Q.  Did anyone speak to Mr. Layfield about making
11  that statement in his official capacity as athletic
12  director?
13  **A.  I don't know.**
14  Q.  At the June 15th meeting, Mrs. Dobrich left the
15  meeting and Dr. Hattier followed her out of the
16  meeting.  Do you recall that?
17  **A.  I do recall him following her out of the**
18  **meeting one time.**
19  Q.  Do you -- did Dr. Hattier tell you at any point
20  thereafter what he had said to Mrs. Dobrich and what
21  Mrs. Dobrich had said to him?
22  **A.  I don't believe that we had a conversation**
23  **about that.**
24  Q.  How did you find out that Mr. -- Dr. Hattier

Page 155

1  had spoken to Mrs. Dobrich when he followed her out?
2  **A.  Well, I figured that's what he was doing.  He**
3  **followed her out of the meeting.  I mean... that's**
4  **it.  But I don't recall a conversation about what**
5  **their conversation was about.**
6  Q.  You never, you never heard that Dr. Hattier had
7  proposed a compromise to Mrs. Dobrich?
8  **A.  Would you know what the compromise was?**
9  Q.  Yes, a compromise in which the district would
10  keep "Jesus" out of graduation prayers, but would
11  allow the use of the word "God"?
12  **A.  He may have said that to her personally.  He**
13  **may have told other Board members.  I don't recall him**
14  **telling the whole Board at one time about the**
15  **conversation.**
16  Q.  When you say that Dr. Hattier may have told
17  other Board members that, do you mean he may have told
18  other Board members about his conversation --
19  **A.  Yeah, he may have.**
20  Q.  -- with Mrs. Dobrich?
21  **A.  He may have.**
22  Q.  But he didn't tell you about his conversation
23  with Mrs. Dobrich?
24  **A.  Not particularly that I recall.**

Page 156

1  Q.  Did you ever learn that Dr. Hattier had offered
2  to provide Mrs. Dobrich with a copy of the school
3  district lawyer's legal opinion on the issue?
4  **A.  I can't speak for what Dr. Hattier does or**
5  **doesn't do.**
6  Q.  I understand that, ma'am.  My question was
7  just, did you ever learn that he had made that
8  statement?
9  **A.  I don't recall that.**
10  MR. ALLINGHAM:  Too many papers.
11  Q.  Do you recall that a parent at the June 15th
12  Board meeting at the public comment session spoke
13  up and said that she had previously expressed a
14  complaint to you about graduation prayer?
15  MR. GOSSELIN:  Objection.  We're clearly
16  drifting into phase 2.
17  BY MR. ALLINGHAM:
18  Q.  Between the June 15th meeting and the next
19  Board meeting, which was on June 27th, did you have
20  any further contact with Mrs. Dobrich?
21  **A.  I can't say for sure.  I don't know.  I may or**
22  **I may not have.**
23  Q.  Let me show you what we've marked as PX 16.
24  This is the July 27 Board meeting minutes.  Again, you

Page 157

1  are listed as having been present.  If you look on the
2  second page of the minutes, you will see under public
3  comments that 12 people are reflected as having spoken
4  about the Indian River School District's practice of
5  holding prayers at school-sponsored events, including
6  graduation ceremonies.  Do you recall that at this
7  July 27 meeting a number of persons spoke on that
8  topic?
9  **A.  Yes.**
10  Q.  Did the Board respond to any of those comments?
11  **A.  I can't promise you that the Board didn't**
12  **respond, but our practice is not to respond.  Often**
13  **they do what they want to do.  I don't recall, I don't**
14  **recall it, though.**
15  Q.  Excuse me.  Do you know how it came to the
16  public's attention that the issue of graduation
17  ceremonies and prayer at school-sponsored events would
18  be the topic of discussion by the Board at this
19  meeting?
20  **A.  The agenda is public.**
21  Q.  But the agenda item is simply graduation
22  ceremonies, correct?
23  **A.  But the agenda is public, and there's a large**
24  **community of folks here who may be in tune to anything**

40 (Pages 154 to 157)

Dobrich, et al.
Lois Hobbs

v.
C.A. # 15-120 (JJF)

Indian River School District, et al.
October 24, 2006

Page 158

1  that is talked about at the Board.  They usually only
2  show up when there's something they're concerned
3  about.  They don't usually show up when they're happy
4  about things.
5  Q.  Yes.  The agenda item simply says "Graduation
6  Ceremonies," correct?
7  A.  Yeah, um-hum.
8  Q.  But the public comment description in the
9  minutes makes clear that these people were speaking
10  not merely about graduation ceremonies, but about
11  prayers at school-sponsored events, including
12  graduation ceremonies.
13  A.  Yeah.
14  Q.  Do you know how that topic came up?
15  A.  No.
16  Q.  Do you know whether any effort was made by any
17  Board members to publicize the fact that the Board was
18  beginning to consider the issue of prayer at
19  school-sponsored events?
20  A.  I don't know that for a fact.
21  Q.  Okay.  When you say you don't know that for a
22  fact, have you heard that any Board members were
23  trying to drum up interest in the community on that
24  topic?

Page 159

1  A.  I don't know that.
2      MR. ALLINGHAM:  Off the record.
3      THE VIDEOGRAPHER:  Going off the record at
4  approximately 1:15 p.m.
5      MR. ALLINGHAM:  We have 10 minutes left on
6  the tape.  This is a good place for me to stop.  Why
7  don't you do what you have to do and when you're done,
8  you can come back.
9      (A luncheon recess was taken.)
10      THE VIDEOGRAPHER:  Back on the record at
11  approximately 3:12 p.m.
12  BY MR. ALLINGHAM:
13  Q.  Before the lunch break, we had discussed to
14  some degree the August 24th Board meeting.  That's the
15  big meeting.
16  A.  The big meeting, yes.
17  Q.  We talked about your having arranged for the
18  preparations to be made for the big crowd, the
19  overflow, the policemen to manage the flow of traffic
20  outside.
21  A.  Yes.
22  Q.  Speakers in the parking lot?
23  A.  Speakers?  I don't know about speakers.  I just
24  had people try to arrange the parking.  I didn't

Page 160

1  arrange for any speakers.
2  Q.  You were in the cafeteria for that meeting; is
3  that correct?
4  A.  Yes.
5  Q.  Did you find the tone of that meeting
6  disturbing or troubling in any way?
7  A.  I thought many people were emotional about what
8  they had to say.
9  Q.  Did you think that the tone of their comments
10  were appropriate?
11  A.  There were so many comments, I don't -- I would
12  say that they were tied up in what they believed.  I
13  don't think it's appropriate for everybody.
14  Q.  Do you recall any comments that you viewed as
15  threatening to the Dobrich family?
16  A.  I don't recall threatening comments.
17  Q.  Other witnesses have described the crowd at
18  that meeting as unruly.  Would you agree with that?
19  A.  I wouldn't -- I guess their definition of
20  unruly and mine are not the same.  I thought that
21  everybody was seated, there were emotions, but didn't
22  seem to me that I would call that unruly.
23  Q.  Do you recall members of the crowd booing when
24  Mrs. Dobrich spoke?

Page 161

1  A.  I believe there was some booing.
2  Q.  Do you recall members of the crowd booing when
3  Mrs. Dobrich's son tried to speak?
4  A.  I'm not sure.  I mean there, there possibly
5  could be.
6  Q.  Do you recall a member of the crowd yelling,
7  "Take your yarmulke off," to Alex Dobrich before he
8  spoke?
9  A.  I don't recall that.
10  Q.  Do you recall that because of the crowd's
11  reaction, Alex Dobrich was unable to speak when he got
12  to the podium?
13  A.  I thought he did at least begin to speak.  I
14  don't --
15  Q.  Let me see if I can refresh your recollection.
16  Do you recall that his sister, when he was unable to
17  speak, came to the podium and read the statement that
18  he had written?
19  A.  No, I don't recall it.
20  Q.  Do you recall a public comment in which the
21  speaker -- do you know a Harold Johnson?
22  A.  I don't know Howard Johnson.
23  Q.  Do you recall a speaker referring to Madalyn
24  Murray O'Hair during the public comment session?

41 (Pages 158 to 161)

Dobrich, et al.                           v.                Indian River School District, et al.
Lois Hobbs                        C.A. # 15-120 (JJF)                      October 24, 2006

Page 162

1   A.  I think I may have heard that.  My reaction
2   was, you know, she was -- that was a different
3   prayer -- that was an issue of prayer in school.  I
4   don't -- I heard her name mentioned.
5   Q.  Did you hear the comment that the Lord had
6   proved that He was the highest power because Madalyn
7   Murray O'Hair had disappeared never to be seen again?
8   A.  I may have heard that, but I don't -- I
9   wouldn't have appreciated that.
10  Q.  You don't think that kind of comment is
11  appropriate in a meeting on School Board prayer, do
12  you?
13  A.  No.
14  Q.  Miss Hobbs, did you ever, after any of the
15  Board meetings at which Miss Dobrich -- Mrs. Dobrich
16  spoke, approach Mrs. Dobrich after the meeting and
17  tell her that she was acting in an ungrateful way?
18  A.  I, on the 24th, I don't think it was
19  afterwards, but it was an intermittent, you know, a
20  break or something.  I had said, I don't know that I
21  said inappropriate, but I had said, you know, you had
22  made a complaint -- what I felt was she wasn't
23  completely telling the truth in her speech.  She was
24  acting like we hadn't done anything about her concern.

Page 163

1       And I did say something to the effect
2   that, "You know, Mrs. Dobrich, that's not completely
3   true.  We did start working on your concern as soon as
4   you brought it to me."  And I guess my interpretation
5   of what she said sounded like that we weren't taking
6   her concern seriously at all.  And I did -- I didn't
7   appreciate the fact that she thought we weren't doing
8   anything about her concern, because her concern was
9   the graduation prayer when she talked to me.
10  Q.  Did you, did you tell Mrs. Dobrich that you
11  thought she was ungrateful?
12  A.  If I said those words, I don't recall exactly
13  what words I used that evening.
14  Q.  When you, when you watched Mrs. Dobrich and her
15  daughter speak and then watched the parade of 40-odd
16  people go to the podium, did you feel any sympathy for
17  Mrs. Dobrich's position?  Or did you just think she
18  was ungrateful?
19  A.  No, I felt sympathy for her position.
20  Q.  Did you think that some of the comments
21  represented attacks on Mrs. Dobrich?
22  A.  I, I would have felt that way had I been
23  Mrs. Dobrich.  In fact, I also spoke to her daughter
24  that day and asked her how she was doing in school in

Page 164

1   her college career, and her daughter said fine.  So I
2   didn't --
3   Q.  On August 24th?
4   A.  Um-hum.
5   Q.  In the process of developing the pleadings in a
6   case, a complaint is filed by the plaintiff that lays
7   out the plaintiffs' claims and an answer is filed by
8   the defendants that responds paragraph by paragraph to
9   the paragraphs in the complaint.  Do you generally
10  recall that process?
11  A.  I believe that's what I referred to as the book
12  that we tried to put together for that complaint.
13  Q.  The big book, yes.
14       In paragraph 113 of the amended complaint,
15  which is the operative complaint now, the plaintiffs
16  plead, quote -- and this has to do with the August
17  24th meeting -- "During a break, Defendant Hobbs
18  confronted Mona Dobrich about her statement and
19  accused Mona of being ungrateful."  And the answer to
20  that allegation is, "Defendants are without knowledge
21  or information sufficient to form a belief as to the
22  truth of the averments set forth in this paragraph."
23       Am I right in understanding from your
24  testimony today that you do have knowledge or

Page 165

1   information about your actions at August 24th, and
2   your recollection is that during a break you spoke to
3   Mrs. Dobrich about her statement and may have called
4   her ungrateful?
5   A.  I don't recall calling her ungrateful.  But I
6   was -- my thing was I didn't think she was truthful.
7   Whether I said ungrateful or not truthful, because we
8   started to work on her complaint as soon as she
9   complained to me.  So...
10  Q.  I'm going to show you paragraph 4, 104 of the
11  amended complaint, which reproduces verbatim what
12  Mrs. Dobrich said during the meeting.  And I'm going
13  to ask you to identify for me whatever portions of it
14  you think are inaccurate or unfair.  All right?
15  A.  I would imagine that it would be the first part
16  when she approached the superintendent of School Board
17  and shared her displeasure at Sussex Central High
18  School, and I had been accused of being an outside
19  troublemaker and instigator, none of which is true.
20       I think it's down here further, that if
21  the Board had acted in a responsible manner, I took
22  that as we had acted in a responsible manner.  We had
23  started to work on her complaint as soon as she said
24  it.  And they -- and instead of letting this ignite

42 (Pages 162 to 165)

Dobrich, et al.                                    v.                    Indian River School District, et al.
Lois Hobbs                                 C.A. # 15-120 (JJF)                          October 24, 2006

Page 166

1  the community. As soon as she brought her complaint,
2  I took it to the Board, it was on the agenda. Ask --
3  Mr. Griffin of course was not there at that meeting.
4  But it wasn't like we just shoved her complaint under
5  a rug, and that is what I felt wasn't true in her
6  testimony.
7     Q.   And how would Mrs. Dobrich have learned that
8  the Board had been acting on her complaint?
9     A.   Well, she was there, she waited till one
10  executive session, and I don't remember the date. And
11  I said that it was getting really late with an
12  executive session, and I believe I even offered to
13  call her and let her know if the Board took any action
14  that night, being it was too late to stay, you know,
15  when they came out of the general meeting. And I
16  believe I called her to say what had happened at that
17  meeting, either they didn't because Mr. Griffin was
18  ill, I'm not sure what meeting. But I made that offer
19  to her.
20     Q.   Well, I showed you the minutes of the June 15th
21  meeting, and rather than take action, the Board tabled
22  the matter for discussion at the next meeting. I
23  showed you the July 27th minutes, and if you'll
24  recall, the Board took no action publicly during the

Page 167

1  July 27th meeting either. I showed you that there was
2  an August 23rd meeting the day before the big meeting
3  at which Mrs. Dobrich was speaking. And the Board
4  went into executive session immediately and adjourned
5  immediately after coming out of executive session with
6  no public action being taken.
7        So explain to me how Mrs. Dobrich would
8  have understood that the Board was acting on her
9  complaint.
10     A.   It was my opinion. This is how I felt about
11  this statement.
12     Q.   Well, if you could, if you could articulate for
13  me the objective basis for your belief that
14  Mrs. Dobrich --
15     A.   Well, I believe the one time I offered to call
16  her and talk to her.
17     Q.   I have to finish my question, ma'am. I have to
18  finish my question.
19        Explain to me the objective basis for your
20  belief that Mrs. Dobrich should have understood that
21  the Board was acting on her complaint.
22     A.   I think the conversation I had had with her
23  that I would take it to the Board; conversation at
24  another time that I had had with her that I would call

Page 168

1  her after executive session and explain what happened,
2  if they took an action or not. So the fact that it
3  was on the agenda of meetings.
4     Q.   By August 24th it had been two and a half
5  months since her complaint was made. Is that right?
6     A.   Well, it takes a while to change a policy or
7  create a policy. We -- I would say two and a half
8  months is fairly normal, or even longer for a policy
9  if the second reading isn't accepted and they change
10  and talk about it.
11     Q.   At the August 24th meeting do you recall that
12  there were boos and catcalls when a representative of
13  the ACLU spoke?
14     A.   There were boos at times. I'm not sure if it
15  was a particular representative that spoke or not, but
16  there were boos at times.
17     Q.   Miss Hobbs, would you agree with me that the
18  boos were directed to people who advocated changing
19  the Board's practice, and there were no boos directed
20  to persons who spoke in favor of School Board prayer
21  or, more generally, school prayer?
22     A.   Well, I believe that that would be accurate.
23     Q.   The atmosphere of the cafeteria was hostile to
24  Mrs. Dobrich and the persons who supported her

Page 169

1  position; isn't that right?
2     A.   I believe that the atmosphere of the cafeteria,
3  many of them didn't understand what they were saying.
4  They were talking about school prayer. They weren't
5  even talking about the issue. And they were hostile,
6  yes.
7     Q.   Do you recall that there were state
8  representatives at the August 24th meeting who spoke?
9     A.   Yes, there were some state representatives.
10     Q.   Did you know in advance of the meeting that
11  those state representatives would be speaking?
12     A.   I'm not sure they told us in advance that they
13  would be speaking. Sometimes they come just to show
14  up to support an issue and don't say anything.
15     Q.   Did you think it was odd that elected officials
16  would come and speak in support of School Board
17  prayer?
18     A.   These elected officials are very involved in
19  their community, and if they believe that the Board is
20  a legislative body, I would imagine they felt they had
21  a right to say something, as they're legislators in,
22  and the community's feelings at the time.
23     Q.   Do you recall that the state representatives
24  had a letter that they read into the record?

43 (Pages 166 to 169)

Dobrich, et al.                                    v.                    Indian River School District, et al.
Lois Hobbs                                  C.A. # 15-120 (JJF)                         October 24, 2006

Page 170

1    A.    I do recall they had a letter.
2    Q.    Did you notice that in that letter they seemed
3    to have advance notice of the prayer that would be
4    offered at that meeting?
5    A.    I don't recall that.
6    Q.    I'm going to show you a document which has not
7    been marked for identification. It bears Bates Nos. P
8    1614, P 1615. It is -- it bears the name of a member
9    of the Doe family. And I have masked that name out
10   consistently when I've asked deponents about this
11   document.
12   A.    Okay.
13         MR. GOSSELIN:  Do you have an extra copy
14   of that?
15         MR. ALLINGHAM:  Yes.  I have an extra --
16   I'm not marking it.  I have an extra copy which I can
17   give you if you'll give it back to me.
18         MR. GOSSELIN:  Yeah.
19   BY MR. ALLINGHAM:
20   Q.    Take as much time as you need, Miss Hobbs, to
21   read the document. My first question to you, I can
22   tell you, is going to be whether you've seen it before
23   or not.
24         Have you finished reading it?

Page 171

1    A.    Yes, um-hum.
2    Q.    Have you seen that document before?
3    A.    I may have seen it. I really am not sure.
4    Q.    You're not sure?
5    A.    No.
6    Q.    Do you recall having received --
7    A.    A copy of this?
8    Q.    -- a complaint about the religious climate at
9    Selbyville Middle School and the School Board's
10   current position on matters of religion?
11   A.    I believe I, we received a complaint about the
12   Bible Club at Selbyville Middle School. And I'm not
13   sure whether it was tied up in the case or if it was
14   before the case, but...
15   Q.    Do you recall from whom you received that
16   complaint?
17   A.    I believe it was really from the case when the
18   Does started in the case, Selbyville was their thing.
19   Q.    Dr. Hattier testified that you brought this
20   letter to his attention.
21   A.    I may have. If he said so.
22   Q.    Would you agree with me that the complaints
23   expressed in this letter are heartfelt?
24   A.    Yes.

Page 172

1    Q.    And these are matters that as superintendent
2    you would take seriously. Am I right about that?
3    A.    I wouldn't want anyone to be discriminated
4    against. I would take them seriously.
5    Q.    Would you tell me, other than bringing it to
6    the attention of Dr. Hattier, what you did in response
7    to this complaint?
8    A.    Well, we found -- if we found out that there
9    was a Bible Club and it was led by a teacher, it
10   wasn't to be led by a teacher, if a student wanted to
11   lead the Bible Club. But there was some
12   misconception, I believe, that children were let out
13   early just for Bible Club to get in the lunch line
14   first. That's a complaint I had heard. And all of
15   the clubs were let out in Selbville if they had a
16   club to go to at lunchtime. So whether it was Bible
17   Club or Soccer Club or whatever club it was. So that
18   was one of the things.
19   Q.    It sounds to me, Miss Hobbs, as though, and I'm
20   reading between the lines here, that you did
21   investigate the complaints in this letter, or caused
22   to be investigated the complaints in this letter.
23   A.    Whether they were in this letter or not, when I
24   heard about the Bible Club, I looked into what the

Page 173

1    Bible Club was doing.
2    Q.    And what did you find out?
3         MR. GOSSELIN:  Objection. Is this, does
4    this make its way back around to Board prayer?
5         MR. ALLINGHAM:  Yes.  And if you'd like to
6    go off the record and walk out in the hall with me,
7    I'll explain my reasons for asking these questions.
8    But I would also note that Dr. Hattier answered these
9    questions without objection, and that I think that I'm
10   entitled to test the answers that were given by one
11   witness with questions to another witness.
12         But in addition to that, which I think is
13   a good reason for asking them, I think that they do
14   link back to School Board prayer as well.
15         MR. GOSSELIN:  We don't need to go back
16   out in the hall.  If you're bringing it back around to
17   Board prayer, that's fine with me.
18   BY MR. ALLINGHAM:
19   Q.    What did you do in response to the complaints
20   in this letter?
21   A.    The teachers were told that they were not to be
22   leaders of a Bible Club, that they could be there as
23   chaperones so people, you know, children wouldn't hurt
24   themselves or whatever else might happen. But they

44 (Pages 170 to 173)

Dobrich, et al.
Lois Hobbs

v.
C.A. # 15-120 (JJF)

Indian River School District, et al.
October 24, 2006

Page 174

1 shouldn't lead the Bible Club. And right after that,
2 we had no teacher leaders of the Bible Club at
3 Selbyville. So I don't know at what time frame that
4 happened. But --
5    Q.  Did you receive more than one complaint about
6 Bible clubs?
7    A.  Not that I recall. I didn't receive -- it
8 either came up with the case or this letter was part
9 of it. But...
10    Q.  Well, this is clearly, this letter is clearly a
11 complaint, among other things, about Bible clubs,
12 correct?
13    A.  Right, right.
14    Q.  And you only recall one complaint about Bible
15 clubs?
16    A.  Right, at Selbyville.
17    Q.  I'm going to ask you to assume that that
18 complaint came in around the 1st of October 2004,
19 which is the date of this letter. And I gathered from
20 your previous answer that you did cause to be
21 investigated some or all of the complaints in this
22 letter. Did you do that investigation or did you ask
23 someone else to do it?
24    A.  I asked the principal of the school to look

Page 175

1 into this.
2    Q.  And the principal of the school in this case is
3 Mr. Kline?
4    A.  Yes.
5    Q.  I asked you earlier questions about the general
6 approach to complaints from district residents or
7 parents. Did you follow that approach in this case?
8    A.  Usually I -- either the principal of the school
9 investigates it or someone from my office investigates
10 it.
11    Q.  And I presume that if you asked someone else to
12 do it, you asked for them to report back to you?
13    A.  To share their findings.
14    Q.  Okay. And tell me, I gather that Mr. Kline
15 reported to you that there was a Bible club being led
16 by a teacher, correct?
17    A.  That there were Bible clubs, I believe three of
18 them.
19    Q.  Three Bible clubs being led by teachers?
20    A.  Two teachers and a secretary, as I recall.
21    Q.  Okay. All at the Selbyville Middle School?
22    A.  Yes.
23    Q.  Okay. Did Mr. -- did you ask Mr. Kline also to
24 investigate the allegation that a counselor at the

Page 176

1 school pressured a child to attend the Bible Club?
2    A.  I can't say that I did, because I am not sure
3 that I had a copy of this letter. I don't recall it.
4    Q.  Do you know who the Doe family is?
5    A.  I believe I do.
6    Q.  Do you recall getting a complaint from the Doe
7 family on the matters set forth in this letter?
8    A.  No, I don't.
9    Q.  Do you have an affirmative memory that there
10 was no inquiry made into Ms. Redard's, the allegation
11 that Ms. Redard put pressure on a child to attend the
12 Bible Club?
13    A.  I don't recall that at all.
14    Q.  Do you recall affirmatively that you never saw
15 this letter?
16    A.  I'm sorry, I can't say either way at this
17 point.
18    Q.  When a complaint comes in from a parent, do you
19 open a file on that complaint?
20    A.  Sometimes. Most of the time, yes, we do. And
21 it seems like I would have had a file on this one.
22 It's a pretty serious letter.
23    Q.  Did you search your files in your garage to see
24 whether you have a copy of this letter?

Page 177

1    A.  No, I didn't.
2    Q.  The privilege log shows that from time to time
3 you receive e-mail communications, or you received
4 e-mail communications in your capacity as
5 superintendent. Do you continue to maintain an e-mail
6 account that you had when you were superintendent?
7    A.  No.
8    Q.  The e-mails that you received, were they
9 received on a computer in your office?
10    A.  Yes, and also connected to my secretary's
11 office.
12    Q.  And did you ask someone to search that computer
13 to see whether there were e-mails that were responsive
14 to the document requests in this case?
15    A.  This? This document?
16    Q.  No. The general request for documents that our
17 side asked your side for.
18    A.  Yes, I think we tried to look back to see if we
19 had any information and give whatever we had.
20    Q.  On the computers?
21    A.  Yeah.
22    Q.  Is it Mrs. Hearn who maintains the files on
23 complaints of the kind that we have before us?
24    A.  Yes.

45 (Pages 174 to 177)

Dobrich, et al.
Lois Hobbs

v.

C.A. # 15-120 (JJF)

Indian River School District, et al.
October 24, 2006

Page 178

1  Q.  Okay.  Do you know where she keeps those files?
2  A.  In her office.
3  Q.  And that's here in the building we're sitting
4  in today?
5  A.  Yes.
6  Q.  In the ordinary course, would you ask Mr. --
7  would you ask the principal involved in the
8  investigation to provide you with a written summary of
9  his findings?
10  A.  Not necessarily.
11  Q.  Sometimes oral?
12  A.  Oral that he's looked into it and things have
13  changed.
14  Q.  Is it sometimes oral and sometimes written?
15  A.  Most of the times it's oral.  I mean we don't
16  have a lot of formal complaints in this district,
17  amazingly enough.  My being 10 years of
18  superintendent, I haven't had a great many formal
19  complaints.
20  Q.  What do you attribute that to?
21  A.  Well, usually people complain when they're not
22  happy about something.  Sometimes people just aren't
23  the type to complain or would rather be quiet than say
24  anything.

Page 179

1  Q.  Was it your practice if you received a written
2  complaint to make it available to the members of the
3  Board?
4  A.  Yes, the times -- this isn't addressed to me,
5  so I don't know who this was addressed to.  If it was
6  addressed to a Board member, to me or the Board in
7  general, and has no heading.
8  Q.  I'll represent to you that it was delivered to
9  you.
10  A.  Okay.
11  Q.  Dr. Hattier testified that the substance of the
12  complaints in this letter were reported on to the
13  Board by you.
14  A.  I may have talked about the Bible Club.
15  Q.  Do you recall telling the Board that you had
16  discovered that the Bible clubs complained of in here
17  existed and that the matter had been corrected?
18  A.  I did find out they existed and said that we
19  were working on correcting them, because they
20  shouldn't be happening in the manner that they were
21  happening.  Not that they would be ended completely if
22  children wanted to run the Bible Club, they would
23  still have a Bible Club and I think they did that for
24  a while.  But then I think they dropped them

Page 180

1  altogether.
2  Q.  Without the teacher leadership?
3  A.  Yeah.  Because some of the children, I believe,
4  asked if they could still meet together.
5  Q.  There are teachers and counselors identified by
6  name in this complaint letter.
7  A.  Um-hum.
8  Q.  Is it your practice where personnel of the
9  district are identified by name in a complaint letter
10  to specifically identify the allegations against those
11  individuals?
12  A.  Most likely I would ask the principal to look
13  into it to see if he felt there were substance to the
14  allegations in any kind of letter like this.
15  Q.  And do you recall whether Mr. Kline reported to
16  you on whether --
17  A.  I don't believe that I had a discussion with
18  Mr. Kline about the counselor in this case.
19  Q.  Those are very serious allegations, wouldn't
20  you agree with me, against the counselor?
21  A.  Well, I would think they are, according to this
22  letter.
23  Q.  As superintendent, wouldn't you want to know
24  whether those allegations are true?

Page 181

1  A.  I don't recall this letter.
2  Q.  I'm asking -- I've represented to you that you
3  got this letter, Dr. Hattier's testified that you
4  reported on the complaints in this letter.  My
5  question to you is, I want you to assume that you got
6  this letter.  If you read the allegations against this
7  counselor, you would take them very, very seriously,
8  wouldn't you?
9  A.  I would take them seriously.
10  Q.  They're serious allegations.  Correct?
11  A.  Yes.
12  Q.  You would want to know whether they're true?
13  A.  I would want to know if they're true, but I
14  don't recall these particular allegations against this
15  counselor.
16  Q.  You, I think, told me, correct me if I'm wrong,
17  that in the normal course of investigating a
18  complaint, you would report back to the person who
19  made the complaint as to whatever resolution was made
20  of the complaint.
21  A.  See, that's why I don't recall having a
22  conversation with this parent about this complaint.  I
23  believe when I first heard about the complaint was in
24  the general complaint by the Does.  That is what I'm

46 (Pages 178 to 181)

Dobrich, et al.                                   v.                    Indian River School District, et al.
Lois Hobbs                                  C.A. # 15-120 (JJF)                        October 24, 2006

Page 182

1  saying. The parent didn't come in and sit down and
2  meet with me.
3     Q.  Am I correct that whatever your general
4  practice is, you do not recall responding to the
5  Does --
6     A.  No, I don't.
7     Q.  -- to this complaint?
8     A.  No, I don't.
9     Q.  Or any aspect of it?
10    A.  No.  I think it's through the complaint of the
11 case.
12    Q.  Would you agree with me, Miss Hobbs, that if
13 the allegations against the counselor are true, that
14 the counselor should have been reprimanded?
15        MR. GOSSELIN:  Objection.  Is this coming
16 back to Board prayer?  Because so far it hasn't.
17        MR. ALLINGHAM:  Are you instructing the
18 witness not to answer?
19        MR. GOSSELIN:  Yes, you don't have to
20 answer that.
21 BY MR. ALLINGHAM:
22    Q.  Miss Hobbs, you served as an administrator, I
23 gather, for more than 10 years, maybe more than 15
24 years.  Is that correct?

Page 183

1     A.  Yes.
2     Q.  From time to time in that capacity, did you
3  encounter discrimination in your districts?
4     A.  Yes, I would say there were people who accused
5  people of discrimination in that, in that time frame
6  of 40 years.
7     Q.  Would you agree with me that discrimination is
8  not always obvious?
9     A.  Yes.
10    Q.  I'm going to ask you a global question, which I
11 think will take care of whatever other specific
12 questions I have.
13        Is it correct, Miss Hobbs, that you do not
14 recall having received this letter?
15    A.  Yes.
16    Q.  And is it therefore correct that though you
17 recognize the complaints in this letter, you did not
18 respond to the family that complained because you
19 recall that those complaints were received in the
20 context of this litigation?
21    A.  Yes.
22        MR. ALLINGHAM:  Can I get the copies back,
23 please?  Thank you.
24    Q.  I'm going to give you a copy of the amended

Page 184

1  complaint, which is the operative complaint, and a
2  copy of your answer to that complaint.
3     A.  What did you want me to do?
4     Q.  I want to hear what Mr. Gosselin has to say
5  first.
6        MR. GOSSELIN:  I believe she may have been
7  gone after the amended complaint and answer was filed.
8  I don't know if that --
9        MR. ALLINGHAM:  That may shorten the
10 process.
11        MR. GOSSELIN:  Okay.  I mean if you're
12 trying to get specific factual information, I mean you
13 might want to reference your original complaint.
14        THE WITNESS:  Are there dates on it?
15        MR. GOSSELIN:  It was in July I think that
16 this was filed.
17 BY MR. ALLINGHAM:
18    Q.  When did you leave your position as
19 superintendent?
20    A.  June 30th.
21    Q.  Well, it may be that you can't answer my
22 question, but let me pose it at any rate.  If you'll
23 look at page 28 --
24    A.  Which one?

Page 185

1     Q.  Of the amended complaint.  In paragraph 128,
2  the complaint alleges, "When Jane Doe complained by
3  letter to the district and the Delaware Department of
4  Education, Defendant Hobbs called and promised an
5  investigation."  Do you recall a telephone
6  conversation with Mrs. Doe in which you promised an
7  investigation of a complaint made by letter by
8  Mrs. Doe to the district?
9     A.  I don't recall it, but my normal practice would
10 be to have called her back, which is something that
11 I'm --
12    Q.  If you look at the answer to the amended
13 complaint, the same paragraph, 128, you will see that
14 the answer is, "Defendants are without knowledge or
15 information sufficient to respond to the averments in
16 paragraph 128."
17    A.  Right.
18    Q.  Is there anybody who would be more
19 knowledgeable about whether you called and promised an
20 investigation --
21    A.  No.
22    Q.  -- than you?
23    A.  No.  There wouldn't be.
24    Q.  Am I right in thinking that the meaning of

47 (Pages 182 to 185)

Dobrich, et al.
Lois Hobbs

v.

C.A. # 15-120 (JJF)

Indian River School District, et al.
October 24, 2006

Page 186

1  these words, "Defendants are without knowledge or
2  information sufficient to respond to the averments in
3  paragraph 128," at least from your perspective, is you
4  don't recall one way or another whether you did this?
5  **A. I don't recall.**
6  Q. If Mrs. Doe were to testify that these events
7  occurred, you would have no way of disputing her
8  recollection, would you?
9  **A. No.**
10  Q. Paragraph 129 pleads, "Jane Doe immediately
11  called back to follow up, but she had to leave a
12  message with a secretary. Hobbs never returned the
13  call."
14     Do you recall getting a message from
15  Mrs. Hearn that Mrs. Doe had called you and had
16  additional information to share with you concerning
17  the substance of her complaint?
18  **A. I don't recall.**
19  Q. And if Mrs. Doe were to testify as to the facts
20  in paragraph 129, you would have no way to dispute
21  those facts?
22  **A. No.**
23  Q. I'm going to show you what we've previously
24  marked as PX 3.

Page 187

1     MR. GOSSELIN: Do you want these back,
2  Tom?
3     MR. ALLINGHAM: Thank you.
4     While Miss Hobbs is looking at that
5  document, do we have the response of Nathan Kellum to
6  my letter of January 5?
7  BY MR. ALLINGHAM:
8  Q. Take as much time again as you want, Miss
9  Hobbs, but my first question is have you seen the
10  letter which we've previously marked as Exhibit 3?
11  **A. There's a copy of the letter to me. So...**
12  Q. Well, you don't have to believe everything you
13  see in writing, Miss Hobbs.
14  **A. I know.**
15  Q. Do you recall having seen a document addressing
16  the subject matter of this exhibit?
17  **A. No, I feel really bad, but I -- lots of things**
18  **come across my desk. So I would say that I saw this**
19  **letter.**
20  Q. What did you do to -- what actions did you take
21  to respond to the request in this letter that evidence
22  related to the district's prayer policies must be
23  preserved?
24  **A. By that time we would have taken any lawyer**

Page 188

1  **advice that was involved in the case. So we were not**
2  **to destroy any documents or anything that we had.**
3  Q. Let me show you what we've previously marked as
4  Exhibit 58. I can tell you that I addressed my March
5  10, 2005 letter, Exhibit 3 that you just looked at, to
6  Mr. Kellum because of this January 7 letter in which
7  he informed me, "Please know that this office has been
8  retained by the Board of Education for Indian River
9  School District regarding any possible challenge to
10  policies on school prayer at commencements graduation
11  and baccalaureate ceremonies, Board prayer at regular
12  Board meetings and religion." Did the Indian River
13  School District ever retain the Alliance Defense Fund
14  or Mr. Kellum regarding any possible challenges as set
15  forth there?
16  **A. I don't know that the Alliance Defense Fund is**
17  **representing us, or giving us any money towards this**
18  **case.**
19  Q. Well, who would know, if not the superintendent
20  of the district?
21  **A. I mean we have hired our own attorneys now. So**
22  **I don't think --**
23  Q. Who would know better than the superintendent
24  of the district --

Page 189

1  **A. I don't know.**
2  Q. You have to let me finish the question, Miss
3  Hobbs. Who would know better than the superintendent
4  of the district whether a legal organization or a law
5  firm such as the Alliance Defense Fund had been
6  retained by the Board regarding any possible challenge
7  to Board policies?
8  **A. I don't recall any Board vote on retaining this**
9  **law firm.**
10  Q. And I take it you don't recall having retained
11  this law firm at the direction of the Board?
12  **A. No.**
13  Q. So at least based on your recollection, the
14  statement, "This office has been retained by the Board
15  of Education for Indian River School District" is
16  incorrect?
17  **A. I would believe so, because we went back and**
18  **forth with the insurance lawyer and -- I don't know.**
19  **I really don't know. I'd be dishonest to make up**
20  **something.**
21  Q. Is there anyone connected with the district who
22  would know better than you whether the Alliance
23  Defense Fund had been retained?
24  **A. This was December 2004.**

48 (Pages 186 to 189)

Dobrich, et al.                    v.                Indian River School District, et al.
Lois Hobbs                  C.A. # 15-120 (JJF)                    October 24, 2006

| Page 190 | Page 192 |
|---|---|

Page 190

1    Q.   The question was, is there anyone connected
2    with the district who would know better than you
3    whether the Alliance Defense Fund had been retained?
4    **A.  I would say the president of the Board.**
5    Q.   That, at the time, would have been Mr. Walls?
6    **A.  In '04, I believe it's Mr. Walls.**
7    Q.   I asked you about my letter of March 2005
8    requesting that the Board preserve all evidence
9    relating to the prayer policies, and I think you told
10   me that by that point, you had been told by your own
11   lawyers to preserve all evidence.  Is that correct?
12   **A.  Right.**
13          MR. ALLINGHAM:  We've got a couple of
14   minutes left.  Let's change the tape.
15          THE VIDEOGRAPHER:  Going off the record at
16   approximately 4:05 p.m.
17          (A brief recess was taken.)
18          THE VIDEOGRAPHER:  Back on the record at
19   approximately 4:14 p.m.
20   BY MR. ALLINGHAM:
21   Q.   You testified this morning that you left as
22   your job as superintendent because you were retiring.
23   Is that right?
24   **A.  Right.**

Page 192

1    **agreement.**
2    Q.   How about a nondisparagement agreement?
3    **A.  No, I don't believe I signed anything like**
4    **that.**
5    Q.   Did you have anything to do with — strike
6    that, let me ask a better question.
7          Did you talk to Mrs. Bunting, that is
8    Susan Bunting, about her becoming superintendent
9    following your tenure?
10   **A.  We had talks about things, different things**
11   **that were going on in the district, you know, we have**
12   **a big renovation project, instruction.  She was my**
13   **director of instruction, so we talked often while I**
14   **was here.**
15   Q.   Did you talk to her about the possibility that
16   she could succeed you before you actually retired?
17   **A.  No.**
18   Q.   So the only conversations you had with
19   Mrs. Bunting about her performance of her duties as
20   superintendent came after you had made the decision to
21   retire?
22   **A.  I made the decision to retire like a year and a**
23   **half, I gave the Board a year and a half notice just**
24   **so they could search for a superintendent.**

Page 191

1    Q.   Did you -- is there a mandatory retirement age?
2    **A.  No.**
3    Q.   So you had an option to stay if you wanted to?
4    **A.  I've been working in education for 40 years.  I**
5    **thought it was about time, do something for myself.**
6    Q.   That was my question.
7    **A.  Yes.**
8    Q.   You wanted to move on to something different,
9    correct?
10   **A.  Right.  Mainly nothing.**
11   Q.   Mainly nothing.  So your job as a consultant is
12   not a full-time job?
13   **A.  No.**
14   Q.   In your job as a consultant, have you had among
15   your clients the Indian River School District?
16   **A.  No.**
17   Q.   Since you left your job as superintendent, have
18   you received any compensation from the Indian River
19   School District?
20   **A.  No.**
21   Q.   When you left the job, did you sign a
22   confidentiality agreement with the Indian River School
23   District?
24   **A.  I don't remember signing a confidentiality**

Page 193

1    Q.   Were you involved at all in the search for a
2    possible replacement?
3    **A.  I was on the one committee meeting about, you**
4    **know, what the community was looking for in a**
5    **superintendent, and then after that, I did not**
6    **participate in a search.**
7    Q.   Am I correct that you didn't ask Mrs. Bunting
8    about her positions on issues that face a
9    superintendent?
10   **A.  No, I didn't ask her.**
11   Q.   What, in your understanding, was the community
12   looking for in a superintendent?
13   **A.  Well, we were facing some budget problems, so**
14   **they're looking for someone who could manage the**
15   **budget, someone who knew instruction, that was just**
16   **one meeting of brainstorming, and someone who cared**
17   **about children, I would hope.  But I didn't even see**
18   **the application once -- they were developing the**
19   **application together, and I didn't even see the**
20   **application.**
21   Q.   Let me ask a global question.
22   **A.  Yeah.**
23   Q.   Did the issue of School Board prayer or prayer
24   in schools come up at all in that meeting?

49 (Pages 190 to 193)

Dobrich, et al.
Lois Hobbs

v.

C.A. # 15-120 (JJF)

Indian River School District, et al.
October 24, 2006

Page 194

1   A.   No.  Not that I recall.
2   Q.   I have some general questions that have to do
3   with communications or conversations that you've had
4   with anyone in the district, okay?  Have you ever had
5   a conversation with anyone in the district in which
6   they expressed the opinion that the Board's defense of
7   this lawsuit was a defense of Christian values?
8   A.   No, I can't say that I have.
9   Q.   And these questions are not meant to be a
10  question about the precise words, but words or
11  substance.  Has anyone ever said to you or expressed
12  the view that the Board's defense of this lawsuit was
13  a defense of Christian values?
14  A.   No, I can't say that.
15  Q.   Have you ever had anyone express any views to
16  you about the, the Board's defense of this lawsuit?
17  A.   If people started talking about it, I usually
18  said, "I don't want to talk about it.  I don't -- I'm
19  not talking about it."
20  Q.   And your answer was expressed in "I usually
21  said that."  Is that what you always did?
22  A.   Yeah, I would say a majority of the time.  I
23  didn't have any reason to talk to anybody about it.
24  Q.   Well, but people, on the other hand, might

Page 195

1   think that they had a reason to talk to you, and
2   that's the reason for my question to you about whether
3   anyone expressed the view that the defense of the
4   lawsuit was a defense of Christian values.
5   A.   I don't -- I mean like at spin class somebody
6   might bring up the lawsuit, and I would just say, "I'm
7   not talking about it."
8   Q.   And when they brought up the lawsuit, did
9   anyone ever say, "Look, thanks for standing up for
10  Christian values"?
11  A.   There were people who would say something like
12  that, "Thanks for standing up for school prayer," or
13  whatever they thought the issue was.
14  Q.   And because you weren't commenting on the
15  lawsuit, you would not correct whatever misimpression
16  you thought there was?
17  A.   No.
18  Q.   Did you ever -- I think I know the answer to
19  this question.  But did you ever tell anyone this case
20  is not about Christian values?
21  A.   No.
22  Q.   If somebody said to you, "Thanks for standing
23  up for Christian values," did you say, "It's not about
24  Christian values"?

Page 196

1   A.   No.
2   Q.   On the occasions when someone said to you or
3   expressed the view that the defense of this lawsuit
4   was a defense of Christian values, is it correct that
5   you just didn't respond?
6   A.   I would say that I stayed out of responding to
7   anybody about this case.
8   Q.   Okay.  Now I want to ask some questions about
9   the Board's consideration of the Board prayer policy.
10  Okay?  And this incorporates discussions at public
11  meetings if they occurred, discussions at executive
12  session meetings if they occurred, any time.  Okay?
13       Do you recall any discussion --
14       MR. GOSSELIN:  Objection.  I think in the
15  previous testimony she said that the only executive
16  session discussion she can recall was that August 23rd
17  one which is covered by attorney-client privilege.  So
18  I would instruct her not to answer if the answer would
19  reveal something that took place during that meeting.
20       But otherwise, I don't have an objection
21  to the question.
22       MR. ALLINGHAM:  Okay.
23  BY MR. ALLINGHAM:
24  Q.   Do you understand your counsel's instruction?

Page 197

1        THE WITNESS:  I don't know how to do it.
2        MR. GOSSELIN:  I don't know what the
3   question is going to be.
4        THE WITNESS:  I don't know what the
5   question is going to be.
6        MR. GOSSELIN:  But if it involves
7   revealing what took place at that August 23rd meeting
8   that we talked about before, the instruction is to not
9   answer that question.
10       THE WITNESS:  Okay.
11  BY MR. ALLINGHAM:
12  Q.   And I may have to ask a couple of questions to
13  develop the record because of the nature of the
14  instruction.
15       So my first question is, at any time
16  during the Board's consideration of the School Board
17  prayer policy, do you recall any Board member saying
18  or expressing the view that perhaps the Board should
19  consider a moment of silence instead of a prayer?
20  A.   I think Mr. Isaacs may have said that once.
21  Q.   And what was the response?
22  A.   Just that the Board's feeling was they wanted
23  to continue the tradition.
24  Q.   Do you recall during the discussion of the

50 (Pages 194 to 197)

Dobrich, et al.                         v.            Indian River School District, et al.
Lois Hobbs                    C.A. # 15-120 (JJF)              October 24, 2006

Page 198

1  moment of silence idea one or more Board members
2  saying, "I don't want to be told how I can pray," in
3  words or substance?
4      A. I'm not sure what meeting that would be, but I
5  did hear something like that.
6      Q. Who said that?
7      A. I don't recall who said it.
8      Q. What did you understand, if you had an
9  understanding, the purpose of the Board policy on
10 School Board prayer to be?
11     A. That it would be shared, that we wouldn't be
12 preaching any one religion to anyone, that it would be
13 shared amongst the Board members to say a prayer. If
14 they chose a moment of silence, they could choose a
15 moment of silence. If they chose a prayer, they could
16 choose a prayer. But as a legislative body, it was up
17 to that individual who was ever giving the prayer to
18 say whatever prayer they wanted.
19         And oftentimes I would say to whoever,
20 when I heard who was giving the prayer that, you know,
21 you know, a teacher died of a brain tumor, a fire of
22 the children, so often they would bless that, you
23 know, they would say, you're in our thoughts, that
24 family, who's ever gone through this tragedy is in our

Page 199

1  thoughts.
2      Q. According to your understanding, Miss Hobbs, is
3  the prayer directed only to the individual Board
4  members, or is it directed to all of the people in the
5  cafeteria or auditorium in which the prayer is being
6  offered?
7      A. I believe it's the Board members' prayer.
8      Q. So it's directed only to the Board members?
9      A. I think they sort of clarify it with a
10 statement before that says if you don't want to
11 participate in the prayer, you may leave the room, or
12 whatever that little paragraph says.
13     Q. That's the so-called disclaimer?
14     A. Yeah, um-hum.
15         MR. GOSSELIN: Or "the disclaimer."
16 Objection.
17         MR. ALLINGHAM: I'm sorry?
18         MR. GOSSELIN: Objection to the form.
19         MR. ALLINGHAM: It wasn't meant to be
20 substantively charged. I thought you'd object if I
21 called it the disclaimer.
22 BY MR. ALLINGHAM:
23     Q. I showed you the actual Board policy, PX 9.
24 Would you see if you can get that out again?

Page 200

1      A. Yes.
2      Q. Paragraph 1 reads "In order to solemnify its
3  proceedings the Board of Education may choose to open
4  its meetings with a prayer or moment of silence, all
5  in accord with the freedom of conscience of the
6  individual adult Board member."
7          Would you agree with me that according to
8  the policy, the purpose of the offering of a prayer or
9  moment of silence is to solemnify the proceedings?
10     A. Yes.
11     Q. And what do you understand the solemnification
12 of the proceedings to mean? What does that phrase
13 mean?
14     A. I think they were just trying to bring some
15 dignity and, you know, ask for guidance in their
16 decision about children.
17     Q. Was there any discussion about that at any time
18 that you recall?
19     A. Not that I recall.
20     Q. Was there ever any discussion of the purpose of
21 having a prayer to open Board meetings during any of
22 the Board's consideration of this Board policy?
23     A. I think it's been a tradition they've been
24 opening the Board meetings with a prayer.

Page 201

1      Q. Is that answer that there was no discussion of
2  the purpose of the prayer, that the Board simply said,
3  "Look, this is what we've always done"?
4      A. And that they felt that as a legislative body,
5  they had a right to do. That would be all I would
6  understand about the reason to open with a prayer.
7      Q. At any time during the Board's consideration of
8  the School Board prayer policy, did anyone suggest
9  that the Board consider offering its prayer privately
10 before the Board enters the meeting?
11     A. I'm not sure -- that may have been a
12 suggestion. I'm not sure what meeting.
13     Q. Do you know who made that suggestion?
14     A. No, I really don't.
15     Q. Do you know what the response was?
16     A. No, I don't recall.
17     Q. You testified in an earlier answer that
18 sometimes you would bring to the attention of the
19 people at the meeting that someone had passed away and
20 ask for a prayer for that person. Do you recall that
21 testimony?
22     A. Yeah. I would always let them know if we had a
23 tragedy in the district, if I knew of it.
24     Q. Yes.

51 (Pages 198 to 201)

Dobrich, et al.                                    v.              Indian River School District, et al.
Lois Hobbs                              C.A. # 15-120 (JJF)                        October 24, 2006

Page 202

1  A. And then during that prayer, it was up to them,
2  I didn't tell them what to say, I just said, so and so
3  lost their son or daughter in a car accident, or so
4  and so died of a brain tumor or massive heart attack.
5  And if it was timely enough, they would mention, you
6  know, that family.
7     Q. And when you say "they," that would be the
8  Board member who was asked to open the meeting with a
9  prayer?
10    A. Right, um-hum.
11    Q. Okay. Do you recall having asked for a moment
12 of silence in memory of a principal of a district
13 school who passed away suddenly?
14    A. If that would most likely have been Lorraine
15 Wray --
16    Q. Yes, ma'am.
17    A. -- who was the principal of -- that was the
18 most shocking thing I've ever been through.
19    Q. And do you recall asking for a moment of
20 silence?
21    A. I may have done that. I'm not saying I didn't,
22 because I...
23    Q. Do you know whether in addition to the moment
24 of silence you requested for Dr. Lorraine Wray, there

Page 203

1  was a prayer to open the meeting as well?
2     A. No, not that I recall. There was a memorial
3  service, which I had to give her eulogy. But that was
4  done by her family and her church.
5     Q. Do you know who Jim Bunting is?
6     A. I believe he is athletic coach or coach of a
7  football team, one of the coaches.
8     Q. Is he related to Susan Bunting?
9     A. No, I don't -- well, I'm not -- you know, I
10 don't want to say that. A lot of people down here are
11 related to one another. That could surprise you.
12    Q. I was going to say, there seem to be a lot of
13 Buntings down here.
14    A. There are a lot of Buntings, a lot of Hudsons,
15 yeah. They're some Sussex County names. I wouldn't
16 want to state that.
17    Q. I just want to make sure that I got the
18 testimony right. Is it correct that as you sit here
19 today, you have no recollection of the Board having
20 discussed the purpose for opening its meetings with a
21 prayer or a moment of silence? That the discussion
22 centered on, "This is what we've always done"?
23    A. Unless it was in that meeting that, the closed
24 meeting, I don't --

Page 204

1     Q. Yeah, let's set that meeting aside for a
2  minute. Other than that, you do not recall any
3  discussion of the purpose of opening a meeting with a
4  prayer?
5     A. Not that I recall. That it was more or less
6  the --
7     Q. Now, without telling me what the discussion was
8  at that August 23 executive session, do you recall
9  that there was a discussion of the purpose of opening
10 the meeting with a prayer?
11    A. I think there were views expressed by
12 individuals on how they felt the importance of prayer
13 was at opening a meeting. And different individuals
14 felt stronger than others about it.
15    Q. Earlier in this deposition in response to one
16 of my many, one of many questions that I posed that
17 Mr. Gosselin thought was inappropriate, he offered me
18 a question that he thought would be appropriate, which
19 was to ask you what, whether you have a view as to the
20 Board Policy BDA.1. So let me ask that question.
21 When you were superintendent, did you form a view
22 about that policy?
23    A. A view as, as my opinion of the policy or --
24    Q. Yes.

Page 205

1     A. -- my feeling toward the policy?
2     Q. Yes.
3     A. Or what do you mean by view?
4     Q. What were your feelings toward the policy?
5     A. I normally, I mean I don't get into the Board's
6  policies. But I felt that the Board had offered
7  alternatives to the prayer by the choice of the
8  person. And I thought, you know, a moment of silence,
9  I mean if I would be a Board member, I would have
10 probably chose a moment of silence, but I'm not a
11 Board member.
12    Q. Why would you have chosen a moment of silence?
13    A. That's what I would have chosen.
14    Q. Paragraph 3 of the Board prayer policy reads,
15 "Such opportunity," and that's the opportunity to
16 offer a prayer, "Such opportunity shall not be used or
17 exploited to proselytize, advance or convert anyone or
18 to derogate or otherwise disparage any particular
19 faith or belief."
20       In the Board meetings beginning with the
21 Board meeting on October 19th, 2004, did you ever hear
22 a Board member offer a prayer that you believed
23 proselytized, advanced or converted anyone or
24 derogated or otherwise disparaged any particular faith

52 (Pages 202 to 205)

Page 206

1  or belief?
2  A. I don't believe so. I would imagine that would
3  be taken personally by an individual hearing a prayer.
4  But as far as I'm concerned, I don't think that way.
5  Q. I take your last answer to be an acknowledgment
6  that different people might view the same prayer in
7  different ways.
8  A. Yes.
9  Q. Correct? And that might depend on, for
10  example, the religious faith of the person hearing the
11  prayer?
12  A. I would assume so. Or if they had no religious
13  faith.
14  Q. Yes, ma'am.
15        Oh, with respect to the opportunity for
16  people to respond to the disclaimer that is read
17  before the Board prayer, the disclaimer, we've had
18  testimony from Mr. Bireley that the disclaimer is --
19  that he reads is paragraph 1 and paragraph 4 of the
20  Board prayer policy. If you'd take a minute to look
21  at those and tell me whether you can confirm that
22  that's what Mr. Bireley, when he was president, read.
23  A. Yes.
24  Q. And --

Page 207

1  A. I would agree.
2  Q. Is it correct that you understood that the
3  statement, "No school employee, student in attendance,
4  or member of the community in attendance shall be
5  required to participate in any such prayer or moment
6  of silence," you view that as a statement to the
7  people assembled in the cafeteria or the auditorium
8  that if they don't want to participate, they can get
9  up and leave, correct?
10  A. Yes, or just not participate.
11  Q. Just not participate by not bowing their hands?
12  A. Yeah, people don't pledge the flag, they don't
13  stand up.
14  Q. Do you think it would be difficult for a
15  student to, who didn't want to participate in the
16  prayer to get up and leave?
17        MR. GOSSELIN: Objection.
18  Q. Let me ask a preliminary question. We've
19  established that there are, at least during the
20  academic school year, typically children in attendance
21  at the School Board meetings. And I assume, correct
22  me if I'm wrong, that you don't assume that every one
23  of those children wants to participate in the prayer
24  that the Board member is offering, correct?

Page 208

1  A. No, I wouldn't assume that.
2  Q. And in fact, the disclaimer is intended to
3  provide the opportunity for everyone in attendance if
4  they want to get up and leave the room?
5  A. Or not come before the meeting starts, or
6  whenever we do the prayer.
7  Q. Yes.
8  A. They have that choice.
9  Q. Well, some students are told to be at the
10  meeting before the meeting opens; isn't that right?
11  A. I don't know what the students are told.
12  Q. You don't know whether students, for example --
13  A. The principals make those arrangements with the
14  students.
15  Q. Okay. At all events, to come back to my
16  question, do you think it would be difficult for a,
17  one of the children in attendance to get up and walk
18  out of a meeting in front of all the people assembled
19  in the School Board meeting in order to avoid
20  participating in the prayer?
21  A. I would imagine that would be difficult.
22  Q. Because as he we said earlier, children don't
23  like to be seen as doing something different from what
24  everybody else is doing, correct?

Page 209

1  A. Most of them have their parents with them at
2  those meetings, they bring them. So I would imagine
3  the parents would walk out with them.
4  Q. Do you think it would be easy for an adult
5  resident of Indian River to walk out, particularly
6  after the August 24th meeting?
7  A. I really don't know. I don't think I should
8  form an opinion on that.
9  Q. Well, let me ask a factual question. Is that
10  something that you just haven't thought about until I
11  asked you that question today?
12  A. I would say that's probably so.
13  Q. I asked you some questions about the August
14  24th meeting earlier, and about the atmosphere at that
15  meeting. Do you think that a person who was in
16  attendance at that meeting would feel comfortable
17  addressing the Board on matters of religion after that
18  meeting; that is, at a subsequent Board meeting?
19        MR. GOSSELIN: Objection.
20  A. I feel if they had a strong conviction or -- if
21  they felt strongly enough about an issue, they would
22  address the Board. There was no one -- I mean it was
23  an orderly, mannered Board meeting. People were
24  emotional, but there was no one hurt or anything at

Dobrich, et al.
Lois Hobbs

v.

C.A. # 15-120 (JJF)

Indian River School District, et al.
October 24, 2006

Page 210

1  that Board meeting physically, so I don't know.
2  Q.  You mean physically hurt?
3  A.  Yeah.
4  Q.  You don't think, for example, that Mrs. Dobrich
5  was emotionally hurt by the reaction from the crowd to
6  what she said?
7  A.  I would imagine she was.
8  Q.  Do you think that would make it harder for a
9  child or an adult to speak up before, before a
10  subsequent Board meeting on matters of religion,
11  having seen what happened on page 2?
12  A.  Possibly they might feel that way.
13      MR. ALLINGHAM:  Must be music to your
14  ears, huh?
15  Q.  Let me show you what we've previously marked as
16  PX 18.  And what I'd like you to do is turn to --
17  well, I guess I should identify it.  This is the final
18  minutes of the September 28, 2004 Board meeting.  Your
19  signature is on the last page.  You are reflected as
20  having been in attendance on page 2.
21      And what I'd like you to do is turn to
22  page 9 of the minutes.
23  A.  You have it marked, sorry.
24  Q.  Are you there?

Page 211

1  A.  Yes, I'm here.
2  Q.  Okay.  Now, to put this in context, this is the
3  first regular Board meeting after the August 24th
4  meeting.  And you'll see under "Public Comments" there
5  is a reference to Jerry Fike.  Do you know Mr. Fike?
6  A.  He was the person who spoke at the Sussex
7  senior graduation.  I don't know him personally.
8  Q.  Okay.  You were not the person who invited him
9  to that graduation?
10  A.  No.
11  Q.  Do you know who was?
12  A.  Normally, it's been the -- that the students
13  invite the people who speak, and normally I would say
14  it would be a parent.  Often it's a parent of one of
15  the students.
16  Q.  It doesn't matter, there is a policy on this
17  now.
18      The minutes reflect that Reverend Fike
19  thanked the Board for continuing to have a prayer at
20  the beginning of the Board meeting.  He also expressed
21  his apology to Mona Dobrich for any comments he made
22  during his prayer at Sussex Central High School's
23  graduation ceremonies that offended her.  Do you see
24  that?

Page 212

1  A.  Yes, I do.
2  Q.  Now, when you signed the minutes, did you
3  believe that that was an accurate reflection of what
4  the Reverend Fike said?
5  A.  Yes.
6  Q.  What did you do to make sure that it was
7  accurate, if anything?
8  A.  I just -- Janet takes the meetings, I read
9  them, to my recollection.  If it's -- you know, I sign
10  the minutes, so...
11  Q.  Is it fair to say, Miss Hobbs, that for matters
12  like this, you do rely on Mrs. Hearn to get the, to
13  get the summary of the statements correct?
14  A.  Yes.
15  Q.  Okay.  I'm going to play a portion of the tape
16  of the September 28th meeting, and this is the
17  comments of the Reverend Fike.  And I'll tell you in
18  advance what my question is.  My question is, do you
19  hear the Reverend Fike expressing his apology to Mona
20  Dobrich for any comments that he made?
21      (At this time Exhibit 52, an audio
22  recording, was played for the witness.)
23      MR. LENHARD:  For the record, that was PX
24  52, from 30 minutes and 24 seconds to 31 minutes and

Page 213

1  28 seconds.
2  BY MR. ALLINGHAM:
3  Q.  My first question to you is, did you hear the
4  Reverend Jerry Fike expressing his apology to Mona
5  Dobrich for any comments he made during his prayer at
6  Sussex Central's graduation ceremonies that offended
7  her?
8  A.  Actually, I didn't hear an apology, I just
9  heard what he said here.  We most likely was
10  summarized as an apology, that he wasn't her enemy or
11  whatever he just said here.
12  Q.  You didn't hear any apology, did you?
13  A.  No, uh-uh.
14  Q.  As superintendent, did you view the Board as
15  taking a courageous stand in the positions it has
16  taken on graduation prayer and religion in the schools
17  and School Board prayer?
18  A.  As superintendent, I thought they moved in the
19  right direction to work on the policies on graduation
20  to change those policies or what had happened in the
21  past to work on those.  I wouldn't call it courageous.
22  I thought they were moving in the right direction.
23      MR. ALLINGHAM:  All right, what I'd like
24  to do is go off the record for about five minutes.  I

54 (Pages 210 to 213)

Dobrich, et al.                          v.              Indian River School District, et al.
Lois Hobbs                       C.A. # 15-120 (JJF)              October 24, 2006

Page 214

1    think that I'm done, and if I'm not, I can try to
2    clean things up quickly, okay?
3            THE VIDEOGRAPHER:  Going off the record at
4    approximately 4:46 p.m.
5            (A brief recess was taken.)
6            THE VIDEOGRAPHER:  Back on the record at
7    4:50 p.m.
8            MR. ALLINGHAM:  Miss Hobbs, thank you very
9    much for your patience.  I have no further questions.
10           THE WITNESS:  Thank you.
11           THE VIDEOGRAPHER:  Deposition is ending at
12   approximately 4:50 p.m.
13               - - - - -
14             I N D E X
15   Deponent: LOIS HOBBS                    Page
16   By Mr. Allingham................................   3
17           E X H I B I T S
18   Plaintiffs':                         Page
19   59    Letter dated 10/23/06 from Drinker Biddle   121
20         Firm with attached Privilege Log
21               - - - - -
22
23
24

Page 216

1              CERTIFICATE
2    STATE OF DELAWARE)
                      )
3    NEW CASTLE COUNTY)
4            CERTIFICATE OF REPORTER
5        I, Julie H. Parrack, Registered Professional
     Reporter and Notary Public, do hereby certify that
6    there came before me on the 24th day of October, 2006,
     the deponent herein, LOIS HOBBS, who was duly sworn by
7    me and thereafter examined by counsel for the
     respective parties; that the questions asked of said
8    deponent and the answers given were taken down by me
     in Stenotype notes and thereafter transcribed by use
9    of computer-aided transcription and computer printer
     under my direction.
10
         I further certify that the foregoing is a true
11   and correct transcript of the testimony given at said
     examination of said witness.
12
         I further certify that I am not counsel,
13   attorney, or relative of either party, or otherwise
     interested in the event of this suit.
14
15       _____
         Julie H. Parrack, RMR, CRR
16       Certification No. 102-RPR
         (Expires January 31, 2008)
17
18   DATED:_____
19
20
21
22
23
24

Page 215

1
2
3
4
5
6            Replace this page
7          with the Errata Sheet
8            after it has been
9         completed and signed
10           by the Deponent
11
12
13
14
15
16
17
18
19
20
21
22
23
24

55 (Pages 214 to 216)