Case 1:05-cv-00120-JJF   Document 250-17   Filed 04/10/2008   Page 1 of 11

| Dobrich | v. | Indian River School District, et al. |
| Patricia S. Oliphant, Ph.D. | C.A. # 05-120-JJF | December 14, 2006 |

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MONA DOBRICH and MARCO            )
DOBRICH, Individually and         )
as parents and next friend        )
of ALEXANDER DOBRICH,             )
SAMANTHA DOBRICH, JANE DOE        )
and JOHN DOE, Individually        )
and as parents and next           )
friend of JORDAN DOE and          )
JAMIE DOE,                        )
                                  )
         Plaintiffs,              )
                                  )  Civil Action
v.                                )  No. 05-120
                                  )
INDIAN RIVER SCHOOL,              )
DISTRICT, et al.,                 )
                                  )
         Defendants.              )

       Videotaped Deposition of PATRICIA S. OLIPHANT, Ph.D., taken pursuant to notice at 31 Hosier Street, Selbyville, Delaware, beginning at 11:00 a.m., on Thursday, December 14, 2006, before Terry Barbano Burke, RMR-CRR and Notary Public.

APPEARANCES:
       BRIAN LENHARD, ESQUIRE
       RICHARD S. HORVATH, JR., ESQUIRE
          One Rodney Square
          Wilmington, Delaware  19801
          For the Plaintiff

WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477
www.wilfet.com

Case 1:05-cv-00120-JJF   Document 250-17   Filed 04/10/2008   Page 2 of 11

Dobrich v. Indian River School District, et al.
Patricia S. Oliphant, Ph.D.   C.A. # 05-120-JJF   December 14, 2006

Page 2

1  APPEARANCES (cont'd):
2      JARROD SHAU, ESQUIRE
       Drinker, Biddle & Reath, LLP
3      One Logan Square
       18th and Cherry Streets
4      Philadelphia, Pennsylvania  19103-6996
       For the Defendants
5
   ALSO PRESENT:
6
       Lindsay duPhily, Videographer
7
8              - - -
9       VIDEO SPECIALIST:  This is the videotape
10 deposition of Dr. Patricia S. Oliphant, taken by the
11 plaintiff in the matter of Dobrich, et al, plaintiffs,
12 versus the Indian River School District, et al, Civil
13 Action No. 05-120.
14      The deposition is being held in the
15 offices of the Indian River School District located at
16 31 Hosier Street, Selbyville, Delaware.  We are going
17 on the record on December 14, 2006, at approximately
18 11 a.m.
19      The court reporter is Terry Burke from
20 the firm of Wilcox & Fetzer, Wilmington, Delaware.  My
21 name is Lindsay duPhily, and I'm the video specialist
22 of Discovery Video Services, in association with Wilcox
23 & Fetzer.
24      Counsel will now introduce themselves and

Page 3

1  then the court reporter will swear in the witness.
2       MR. LENHARD:  My name is Brian Lenhard
3  and I represent the plaintiffs, and with me today is
4  Richard Horvath.
5       MR. SHAU:  My name is Jarrod Shau and I
6  represent the defendants in this matter.
7          PATRICIA S. OLIPHANT, Ph.D.,
8          the deponent herein, having first been
9          duly sworn on oath, was examined and
10         testified as follows:
11 BY MR. LENHARD:
12  Q.  Good morning, Dr. Oliphant.  My name is Brian
13 Lenhard and I represent the plaintiffs in this
14 litigation.
15      Have you ever been deposed before?
16  A.  No.
17  Q.  I would like to explain how it works.  I'm
18 going to be asking you questions today and you're here
19 to answer them as completely and accurately as you can.
20 If you don't understand a question, please ask me to
21 rephrase it.
22      Even though this deposition is being
23 videotaped, please answer the questions verbally and
24 please wait until I finish asking the question before

Page 4

1  answering it because the court reporter can only take
2  down one conversation at a time.
3       What is your full name?
4   A.  Patricia S. Oliphant.
5   Q.  And you're currently a member of the Indian
6  River School Board; correct?
7   A.  Correct.
8   Q.  And you were elected a member of the school
9  board this year; correct?
10  A.  Yes.
11  Q.  When did you decide to run for school board?
12  A.  Approximately January of 2006.  January or
13 February.
14  Q.  Why did you decide to run?
15  A.  Because I have a vast amount of experience in
16 schools and I have a keen interest in education.  I
17 have four grandchildren and I'm interested in what
18 happens in schools.
19  Q.  Who did you discuss your decision with before
20 deciding to run?
21  A.  First my husband, then my two children.  Then
22 some friends who sought -- well, who sought my -- maybe
23 they were first.  Some friends who asked me to run.
24 Then my husband.  Then my children.  Then I discussed

Page 5

1  it with the president of my school board.  I am the
2  executive director of Sussex Academy Arts and Sciences.
3       And I discussed it next with the
4  president of that school board.  Then with the school
5  board.  Then with my staff.
6   Q.  These friends who asked you to run, what did
7  you discuss with them?
8       MR. SHAU:  Objection.  Form.
9       You can answer.
10 BY MR. LENHARD:
11  Q.  When he says you can answer, you can answer
12 the question if you understand it.
13  A.  I can't answer specifically because I don't
14 remember specifically.  I could only answer generally
15 about what I believe in, okay, and what I believe in
16 about schools.  So to be specific, I can't be specific.
17  Q.  Did you discuss prayer in schools with them?
18  A.  Nominally.  Nominally, if at all.
19  Q.  Did you discuss this litigation with them?
20  A.  Nominally, if at all, because I didn't know
21 enough about the litigation to discuss anything.
22  Q.  When they asked you to run, did they bring up
23 this litigation?
24  A.  Not specifically.

2 (Pages 2 to 5)

Case 1:05-cv-00120-JJF   Document 250-17   Filed 04/10/2008   Page 3 of 11

Dobrich v. Indian River School District, et al.
Patricia S. Oliphant, Ph.D.   C.A. # 05-120-JJF   December 14, 2006

Page 6

1  Q. And did they bring up prayer in schools?
2     MR. SHAU: Objection. Form.
3     THE WITNESS: I honestly don't remember.
4  BY MR. LENHARD:
5  Q. Did you discuss running for the school board
6  with any current or previous school board members?
7  A. I have to think about that.
8     Yes.
9  Q. Who would that be?
10 A. I'm going to tell you in a second. I'm having
11 a memory lapse.
12    Okay, yes, I discussed it with Gregg
13 Hastings and with Rick Cohee.
14 Q. With either Mr. Hastings or Mr. Cohee, did you
15 discuss this litigation?
16 A. Only that it was going on.
17 Q. And with Mr. Hastings and with Mr. Cohee, did
18 you discuss prayer in schools?
19 A. I don't specifically remember.
20 Q. Did you discuss running for the school board
21 with Lois Hobbs?
22 A. I don't remember. I don't think so, but I
23 don't remember.
24 Q. Did you discuss running for the school board

Page 7

1  with Susan Bunting?
2  A. Prior to my running or after my running, after
3  I decided to run?
4  Q. Prior to?
5  A. No.
6  Q. Did you discuss --
7  A. And I'll go back. I never discussed prior to
8  with Lois Hobbs, to my recollection.
9  Q. Prior to your running, did you discuss running
10 for the school board with Jackie Wilson?
11 A. Yes.
12 Q. And did those conversations involve this
13 litigation?
14 A. Yes. This litigation.
15    Can you clarify for me what "this
16 litigation" means? What does this litigation mean, the
17 whole enchilada what I read in the newspaper, what does
18 this mean?
19 Q. I'll ask a different question.
20 A. Okay, thank you.
21 Q. Did you discuss, prior to running for the
22 school board, the school board prayer policy with
23 Jackie Wilson?
24 A. I don't remember discussing the prayer policy,

Page 8

1  okay.
2  Q. Prior to running for the school board, did you
3  discuss with Jackie Wilson the practice of giving
4  prayer at the school board meetings?
5     MR. SHAU: Objection. You can answer if
6  you know what the practice of school board prayer at
7  the meetings means.
8     THE WITNESS: I can't remember, to that
9  specificity, I cannot remember.
10 BY MR. LENHARD:
11 Q. Did you discuss prayer in general in schools
12 with Miss Wilson?
13 A. Probably.
14 Q. Shifting the time focus to after you decided
15 to run, during your campaign, did you discuss your
16 views on school board prayer with people?
17 A. No.
18 Q. And why is that?
19 A. Because on four different occasions I had
20 questions posed to me by representatives of the media
21 relative to the prayer issue (indicating), whatever
22 that means, and I was very clear that I would not
23 respond to the questions because -- for the following
24 reasons:

Page 9

1     I had never read the litigation. First
2  off, what I knew about the issue was only what I had
3  read in the newspapers, that's Point No. 1.
4     Point No. 2, I had never read the
5  litigation. I had never been privy to the counsel of
6  the district's legal representatives.
7     Three -- the district's legal
8  representatives.
9     Three, I was not privy to anything that
10 had gone on in executive session relative to the issue.
11    And No. 4, I was unaccustomed -- I do not
12 make statements -- I do not talk about things when I
13 don't know what I'm talking about. I don't prejudge
14 situations. I have to have the information before I
15 make a decision.
16 Q. You mentioned there were four different times
17 you were asked about these issues.
18 A. Uh-huh.
19 Q. Can you tell me what four entities?
20 A. There were three newspapers in the Indian
21 River Education Association. I don't remember what the
22 newspapers are, but I responded in writing to each of
23 the three newspapers.
24 Q. Can you explain what the Indian River

| Dobrich | v. | Indian River School District, et al. |
|---|---|---|
| Patricia S. Oliphant, Ph.D. | C.A. # 05-120-JJF | December 14, 2006 |

Page 10

1  Education Association is?
2  A.  Yes, they're the bargaining unit for the
3  teachers, the custodians, and the secretaries.
4  Q.  And why did they ask you?
5  A.  Because they were -- I was told that they were
6  trying to get together a forum to present for the
7  persons running for the school board to have a debate
8  or to have a forum.  And so they sent out -- that was
9  the first thing I heard.  So they sent out these
10  questions.
11       And then I think it was their intention
12  to provide the press with those responses.  So the
13  questions they asked me were questions they asked all
14  persons who were running for the school board.  Or at
15  least that's what I believe.
16  Q.  And those questions also went to the standing
17  school board members who were running?
18  A.  I'm assuming so, but I don't know that for
19  fact.
20  Q.  It's your understanding, then, that they were
21  trying to contact all candidates and not just you
22  specifically?
23  A.  Uh-huh, yes.
24       MR. LENHARD:  I'd like to mark as Exhibit

Page 11

1  72 a document that's a copy of the Delaware Wave from
2  May 3rd, 2006.
3       (PX-72 was marked for identification.)
4  BY MR. LENHARD:
5  Q.  Have you seen this article before?
6  A.  I honestly don't know.  Let me read it or let
7  me look at it.
8       I don't remember.  I could have.  Or
9  I -- I don't remember.
10  Q.  If you turn --
11  A.  Okay, wait a minute.  I'm just looking at this
12  page, okay, front page.
13  Q.  The front page of the article starts "School
14  Board Elections are on Tuesday."
15  A.  Okay, yes, I have seen this one before, yes.
16  Q.  And the second page there's a caption and
17  there's a picture of you and there's responses that you
18  gave.
19       If you've read this before, are you
20  aware of any inaccuracies in those responses?
21  A.  First off, I don't have my glasses on so I
22  can't read the thing.  Okay?  I mean honestly.  I can't
23  begin to even read it.
24       I don't know, because I can't read it.

Page 12

1  If you want to read it to me, then I'll respond if I
2  believe it's accurate or not.
3  Q.  Okay.
4       When you responded to the newspapers,
5  you responded in writing to them?
6  A.  Yes.
7  Q.  Reading from the middle column toward the
8  bottom of P 4239, the issue is, "On the board's refusal
9  to settle prayer suit," and then it appears to be your
10  response, "In this case I just don't know enough of the
11  particulars to offer an opinion," and that's the end of
12  it.
13       Does that sound accurate to you?
14  A.  Yes, it does.
15  Q.  And that was an accurate statement when you
16  made it; correct?
17  A.  That's correct.
18  Q.  And it's still an accurate statement today;
19  correct?  Excuse me.  I'll rephrase the question.
20       At the time you made it, it was
21  accurate?
22  A.  Yes, sir.
23       MR. LENHARD; all right, I'd like to mark
24  as Exhibit 73 an article from the Sussex Post dated May

Page 13

1  4th, 2006.
2       (PX-73 was marked for identification.)
3  BY MR. LENHARD:
4  Q.  Do you recall seeing this article before?
5  A.  Probably, yes.
6  Q.  On this one on Page 1, which is P-2445, I'll
7  read for you that the questions asked of each school
8  board candidate are as follows:
9       MR. SHAU:  2445?
10  BY MR. LENHARD:
11  Q.  Yes.  The top, the first part under, "Election
12  slated for Tuesday," on the one, two, fourth column
13  over there's going to be the start of a series of
14  numbers, and I was just going to read it for the
15  witness if she can't read it?
16  A.  I can't read it, let me assure you.
17  Q.  "The questions asked of each school board
18  candidate are as follows:
19       "One, experience.
20       "Two, town of residence.
21       "Three, any children who go to school in
22  the district?
23       "Four, current position.
24       Five, community organizations.

4 (Pages 10 to 13)

Case 1:05-cv-00120-JJF   Document 250-17   Filed 04/10/2008   Page 5 of 11

| Dobrich | v. | Indian River School District, et al. |
|---|---|---|
| Patricia S. Oliphant, Ph.D. | C.A. # 05-120-JJF | December 14, 2006 |

Page 14

1     "Six, why are you running for this
2 position?
3     "Seven, what issues do you feel are most
4 important to the school district at this time?
5     "Eight, what is your opinion on the issue
6 of prayer at monthly board of education meetings?
7     "Nine, complete this sentence: 'I feel I
8 can make a difference through my service on the board
9 of education because.'"
10     Did you respond to a survey like that?
11 A.   Yes.
12 Q.   Do you believe it is this survey?
13 A.   I think so.
14 Q.   And did you respond in writing to this survey?
15 A.   I'm pretty sure I did.
16 Q.   In response to the question about school board
17 prayer, on the next page, in the fourth column towards
18 the bottom, I'll read you your response or what the
19 newspaper printed as your response.
20     "I believe in prayer; I pray; I attend
21 church. When I look at the mission and the goals of
22 this district, I don't see the topic of prayer on the
23 list. I don't think it is the mission of public
24 schools to build a religious base. I do think it is

Page 15

1 the mission of public schools to build character and
2 demographic citizenship. Thus, is this an issue of
3 religion or an issue of democracy? Not having heard
4 the scope and depth of the original complaint, the
5 litigation particulars, the attorneys advice and
6 potential outcome, I won't offer an opinion. I think
7 more deeply about issues, and I want to be more
8 respectful of the district, the present board and the
9 complainants than to comment without having that
10 information."
11     Do you think that's accurate?
12 A.   I do.
13 Q.   Was that accurate when you made it?
14 A.   Yes.
15 Q.   Do you think this litigation is important to
16 the Indian River School District?
17 A.   I need you to clarify the question.
18 Q.   When you were running for school board and you
19 received a survey, a written survey from these
20 newspapers, and at least as far as the Post is
21 concerned, the only issue that it raised specifically
22 is school board prayer at the meetings, did that make
23 you think that it was important?
24 A.   It made me think that it's important relative

Page 16

1 to the press and relative in terms of high profile
2 stirring of things.
3     But in terms of do I think it's an
4 important issue relative to the operation of schools,
5 the answer to that question is no.
6 Q.   Would you agree that any school board member
7 should make sure that he or she is properly informed
8 about this litigation?
9 A.   Yes.
10 Q.   And have you in fact taken steps since being
11 elected to make yourself properly informed?
12 A.   I believe so.
13 Q.   And what steps were those?
14 A.   Steps included listening to the school
15 district's attorneys. Reading the complaint.
16     Can I ask him a question? Because I
17 don't know if it's something I can say.
18 Q.   If it has to do with attorney-client
19 privilege, you may ask Mr. Shau to clarify whether you
20 can answer the question as long as it has to do with
21 attorney-client privilege.
22     If we need to take a five-minute break,
23 we can take a five-minute break.
24     THE WITNESS: I need a one second.

Page 17

1     VIDEO SPECIALIST: You're off. Do you
2 want to go off the record?
3     MR. SHAU: I don't need to.
4     MR. LENHARD: Let's just go off, take
5 your microphone down.
6     (A discussion was held off the record.)
7     THE WITNESS: Okay.
8     So in terms of getting back to and in
9 terms of getting myself more educated about this
10 situation, I've listened to conversation or -- yes,
11 conversation in executive session when the attorneys
12 have been present to advise of current happenings
13 relative to the case, and I think those are the
14 essential ways I have educated myself about the case.
15 BY MR. LENHARD:
16 Q.   So after you educated yourself, what is your
17 response now to the Sussex Post question, "What is your
18 opinion on the issue of prayers at monthly board
19 meetings?"
20 A.   Be more specific in your question. I mean
21 it's a broad question.
22 Q.   If the school board prayer policy was up for
23 vote as to whether it should be adopted or not, would
24 you vote for it?

Case 1:05-cv-00120-JJF   Document 250-17   Filed 04/10/2008   Page 6 of 11

| Dobrich | v. | Indian River School District, et al. |
| Patricia S. Oliphant, Ph.D. | C.A. # 05-120-JJF | December 14, 2006 |

Page 18

1  A.  As it currently is?
2  Q.  Correct.
3  A.  Probably not.
4  Q.  Have you expressed your opinion to other
5  school board members?
6  A.  Yes.
7  Q.  Who did you tell that to?
8  A.  The board and the superintendent.
9  Q.  Was this in executive session?
10 A.  Yes.
11 Q.  What were their responses?
12      MR. SHAU: Objection. I'm going to
13 instruct the witness not to answer. Conversations were
14 held in executive session with attorneys.
15      MR. LENHARD: The witness can answer as
16 long as it doesn't reflect attorney-client privileged
17 information.
18      MR. SHAU: It reflects work product as
19 well as attorney-client privilege as the discussions
20 were held with the attorneys amongst other school board
21 members, and I'm going to instruct the witness not to
22 answer.
23 BY MR. LENHARD:
24 Q.  Why did you tell the school board members that

Page 19

1  you would not have voted for the school board prayer
2  policy?
3  A.  I didn't say that. You said that. I did not
4  say -- that's not what you asked me. That's not what
5  you asked me.
6  Q.  I asked you would you vote for the school
7  board prayer policy if it were to be adopted today?
8  A.  And I said no.
9  Q.  And I asked you did you discuss that with the
10 school board members?
11 A.  Well, then, I didn't understand your question.
12 Because I didn't understand your question because I did
13 not understand the second question to mean discussion
14 of adopting the policy, and I contend that was not your
15 question.
16 Q.  Okay, my question is, have you ever expressed
17 to other school board members that you would not have
18 voted to adopt the policy as it stands?
19 A.  No.
20 Q.  Have you ever discussed with other school
21 board members any disagreements you have with any part
22 of the policy?
23      MR. SHAU: I'm going to caution the
24 witness, if they were held in discussions with the

Page 20

1  executive session with the attorneys, then I'll
2  instruct you not to answer. If it's been outside of
3  those sessions and in the context of your activity as a
4  school board member, then you can feel free to answer.
5      THE WITNESS: Then I won't answer the
6  question.
7      MR. LENHARD: The witness expressing her
8  own view is somehow attorney-client privilege?
9      MR. SHAU: Yes.
10     MR. LENHARD: How does that work?
11     MR. SHAU: It's attorney-client
12 privilege. If, for instance, we had discussions about,
13 say, settlement, those would be privy to
14 attorney-client privilege.
15     If we had discussions about strategy,
16 attorney-client privilege. If she's expressed those
17 things to us in those sessions, it's attorney-client
18 privilege.
19     MR. LENHARD: Okay, we disagree, but if
20 you're instructing her not to answer, we can always
21 come back.
22 BY MR. LENHARD:
23 Q.  Dr. Oliphant, I'm going to give you a copy of
24 the school board prayer policy that has previously been

Page 21

1  marked as PX-9.
2     Do you recognize this as the policy?
3  A.  I think so. And when I say "I think so," I
4  got a policy manual, and I think it is. If it's
5  sitting in my policy manual and I open up to page
6  whatever page it is, then I know it is. Okay?
7  Q.  Okay. When you say that you would not vote
8  today to adopt this policy as the school board prayer
9  policy, what part of the policy do you have a problem
10 with?
11 A.  I'm thinking.
12     I think in general I have a problem with
13 the policy because, as strange as it may seem to some
14 people, it offers up the opportunity for anybody to
15 open a board meeting with anything they want to say as
16 a prayer.
17     If a board member chose to, he could or
18 she could begin the prayer with, begin this session
19 with a Mother Goose rhyme, okay. A person could pray
20 for the downfall of the United States. Okay? And I
21 believe that it simply opens a door for things that
22 aren't necessary or a part of the proceedings of a
23 board meeting.
24 Q.  Okay. I'd like to ask you about one sentence

Case 1:05-cv-00120-JJF   Document 250-17   Filed 04/10/2008   Page 7 of 11

| Dobrich | v. | Indian River School District, et al. |
|---|---|---|
| Patricia S. Oliphant, Ph.D. | C.A. # 05-120-JJF | December 14, 2006 |

Page 22

1  in particular in the top of Paragraph 4. If you can't
2  read it, I will read it. The first sentence in
3  Paragraph 4 says, "Such prayer is voluntary and it is
4  among only the adult members of the board."
5       Do you see that?
6  A.  Uh-huh.
7  Q.  If the prayer is only among the adult members
8  of the board, why do you think the teachers'
9  association wanted to get your views on prayer when you
10 were a candidate?
11 A.  I have no idea. No one ever expressed an
12 opinion to me. They just asked the question.
13 Q.  Do you think that makes sense?
14 A.  I'm not going to suppose what the teachers'
15 union had in mind. I won't do that. It's
16 uncharacteristic of me.
17 Q.  Given your views on that about not giving
18 opinions without being informed, do you think it was
19 appropriate for the newspapers to ask candidates, even
20 candidates who were not on the school board who could
21 not have read the information necessary like the
22 complaint or talking to the attorneys, to offer an
23 opinion about prayer that they would publish in the
24 newspaper?

Page 23

1       MR. SHAU: I'm going to object. This has
2  no relevance to the school board prayer
3  constitutionality. I just don't see the relevance of
4  this questioning in this phase of the discovery.
5       MR. LENHARD: I thought the purpose was
6  primarily to come talk here about Miss Oliphant and her
7  role in the campaign.
8       MR. SHAU: As it pertains to school board
9  prayer.
10      MR. LENHARD: And that question's not
11 directed to school board prayer?
12      MR. SHAU: Whether or not she thinks it's
13 appropriate for a newspaper to ask her a question
14 anyway, feel free to depose the newspaper. They could
15 have asked her what color socks do you wear. It's not
16 relevant to this phase of the discovery.
17      MR. LENHARD: Are you instructing her not
18 to answer?
19      MR. SHAU: I am.
20      MR. LENHARD: Are you aware that we have
21 asked these questions of other people, Jarrod?
22      MR. SHAU: I am.
23      MR. LENHARD: And you didn't object
24 before?

Page 24

1       MR. SHAU: Who did you ask those
2  questions to?
3       MR. LENHARD: We asked questions about
4  the newspaper to other candidates.
5       MR. SHAU: I can object now.
6       MR. LENHARD: And what does that do for
7  the other depositions?
8       MR. SHAU: We are here to depose
9  Dr. Oliphant. Those other questions -- and if you have
10 those dep transcripts here, I'll be happy to take a
11 look at them right now -- but pertain to individuals'
12 views as they were voting for or analyzing whether they
13 wanted school board prayer and their beliefs on it.
14      Dr. Oliphant can't say why she would
15 think that them asking those questions is important.
16      You can ask her questions. I'll instruct
17 the witness whether or not I think she should answer.
18 BY MR. LENHARD:
19 Q.  Dr. Oliphant, is it your understanding that
20 voters viewed prayer as important in the campaign?
21      MR. SHAU: Objection. You can answer if
22 you know what the voters' views were.
23      THE WITNESS: I don't know. Some voters
24 must have, some voters didn't.

Page 25

1  BY MR. LENHARD:
2  Q.  Did you talk to any voters during your
3  campaign?
4  A.  Yes.
5  Q.  What did you talk about?
6  A.  Talked about my views on schools.
7  Q.  Did anyone ever raise the issue of prayer in
8  schools to you?
9  A.  Maybe once or twice.
10 Q.  And do you recall specifically what those
11 people said?
12 A.  No. But my response, whatever the question
13 was, my response was the same response I gave the
14 newspaper, I wasn't going to comment about something I
15 didn't have information on.
16 Q.  So before you got elected to the school board,
17 you never gave an opinion to anybody about school board
18 prayer?
19 A.  I don't know. I don't remember if I ever gave
20 an opinion about school board prayer.
21 Q.  As you sit here --
22 A.  Because it's still school board prayer. What
23 does that mean? School board prayer. The Indian
24 River -- what the Indian River School District does,

Dobrich v. Indian River School District, et al.
Patricia S. Oliphant, Ph.D.    C.A. # 05-120-JJF    December 14, 2006

**Page 26**

1  what an individual board member does. I'm not sure of
2  the question and I'm not trying to be hard to get along
3  with. I'm saying you got this broad question out there
4  that is no simple easy answer to.
5  Q. During your campaign, did you ever express an
6  opinion about school board members offering a prayer at
7  an Indian River School meeting?
8  A. I'm not sure.
9  Q. But you don't remember specifically ever
10 discussing it with anyone as we sit here now?
11 A. Not any specifics, that is correct.
12 Q. You don't think a candidate who is against
13 school board prayer could have been elected, do you?
14 A. Excuse me?
15 Q. Do you think that a candidate who was against
16 school board prayer could have been elected?
17 A. Yes.
18 Q. Were any of the candidates who were elected
19 against school board prayer?
20 A. I don't know.
21 Q. You didn't read the other candidates'
22 positions?
23 A. No. Not -- I mean no. Or if I did, it didn't
24 make a whole lot of difference to me. I was interested

**Page 27**

1  in what my position -- I was interested in what I'm
2  going to do. Not where other people are. Because I
3  had to get elected first. So where other people were
4  wasn't going to influence me particularly until I
5  figured out where I was myself.
6  Q. You weren't concerned that your views might be
7  opposite the other people who were elected?
8  A. No.
9  Q. Do you think that a candidate who is
10 non-Christian could have been elected?
11 A. Yes.
12 Q. Were all the successful candidates Christian?
13 A. I don't know.
14 Q. You know Jackie Wilson; correct?
15 A. Yes.
16 Q. And she was a candidate for the school board
17 in this year's election; correct?
18 A. Yes.
19 Q. And Miss Wilson's position on school board
20 prayer was she was in favor of non-sectarian prayer;
21 correct?
22 A. That sounds close. I don't know that I ever
23 heard her say I'm in favor of non-sectarian prayer. I
24 don't know that I ever heard her say that. Maybe she

**Page 28**

1  did; maybe she didn't.
2  Q. How would you describe her position?
3  A. Based on kind of more generalized what I
4  recall, and it's very general, I don't think Jackie
5  Wilson is against prayer. Okay? I know that Jackie
6  Wilson has two grandchildren and I know they are
7  Jewish, and so I think any kind of conversation we
8  would have had would have been more revolved around not
9  being against prayer, but being inclusive in prayer.
10 Q. And Miss Wilson lost the election; correct?
11 A. That's correct.
12 Q. And she lost it to Charles Bireley; correct?
13 A. That's correct.
14 Q. And Mr. Bireley's a school board member?
15 A. That's correct.
16 Q. And Mr. Bireley campaigned for continuing the
17 practice of school board prayer with Christian prayers?
18 A. Yeah, probably. Did I read -- I guess so. I
19 mean, again, I wasn't tuned in to what Mr. Bireley was
20 doing.
21 Q. Are you aware of any instances during the
22 campaign when Mr. Bireley described Miss Wilson's
23 position on school board prayer as being against school
24 board prayer?

**Page 29**

1  A. I don't know. I don't remember. I think I
2  would have the general idea that prayer -- I can say
3  this: I think that prayer was an issue in that
4  campaign. I think it became -- well, I personally
5  believe it became an unnecessary issue, because schools
6  are about a whole lot more than prayer. Schools --
7  well, never mind.
8  Q. Have you expressed that view to Mr. Bireley?
9  A. I can't respond to that question.
10 Q. Do you have --
11 A. I can't respond to that question.
12 Q. Unless your attorney instructs you not to
13 respond.
14     MR. SHAU: If the answer is it was at
15 executive session, I'm going to instruct the witness
16 not to answer.
17     THE WITNESS: I can't answer the
18 question.
19 BY MR. LENHARD:
20 Q. Did any voter ever tell you that he or she
21 wants the school board to pray at its meetings?
22 A. Not specifically.
23 Q. When you say "not specifically," what does
24 that mean?

Case 1:05-cv-00120-JJF   Document 250-17   Filed 04/10/2008   Page 9 of 11

| Dobrich | v. | Indian River School District, et al. |
|---|---|---|
| Patricia S. Oliphant, Ph.D. | C.A. # 05-120-JJF | December 14, 2006 |

Page 30

1  I'll clarify it. Do you have a general
2  understanding that was the point of the person's
3  conversation, it's just not the same words that I used?
4  A.  No. I believe, I truly believe that there are
5  persons out there who do not believe it is appropriate
6  for the school board to pray at school board meetings.
7  I believe there are persons out there who believe it is
8  very appropriate for the board to pray at school board
9  meetings. I believe there are people out there who
10 believe it's very appropriate and it should be
11 non-sectarian. And I believe there are people out
12 there that believe that this is an issue of
13 constitutionality and whoever is sitting and praying
14 should have the right to say what is in his heart.
15 That's what I believe. And I believe that there is no
16 single answer to this question.
17    Q.  Do you believe that these issues came up
18 during your campaign?
19    A.  During?
20    Q.  Your campaign?
21    A.  The prayer issue did not surface in my
22 campaign.
23    Q.  Did the prayer issue surface in the election
24 in general?

Page 31

1    A.  Yes, in my opinion.
2    Q.  Did any voters in the district ever tell you
3  that they view the board's prayer policy as protecting
4  Christian prayer?
5    A.  No, I don't think so.
6    Q.  Did any voters ever tell you that they viewed
7  the school board's prayer policy as promoting
8  Christianity?
9    A.  No, I don't think so.
10   Q.  Have you ever discussed with anyone whether
11 the results of the 2006 election were an endorsement of
12 the stance the school board has taken in support of
13 school board prayer?
14   A.  What was the first part of the question?
15   Q.  Have you ever discussed with anyone whether
16 the results of the 2006 election were an endorsement of
17 the stance the school board has taken in support of
18 school board prayer?
19   A.  The election in general?
20   Q.  The results of the election?
21   A.  In general?
22   Q.  Yes.
23   A.  The answer is no, in general.
24   Q.  Well, more specifically, has someone discussed

Page 32

1  it with you?
2    A.  Ask me the question again.
3    Q.  I didn't understand what your "in general" --
4    A.  Well, I think you're generalizing -- those
5  questions are very general questions, they are general
6  questions and I think it's more complex than -- I don't
7  think there's just a yes and no answer to all of this
8  stuff, and I know that my role is to just respond to
9  what you're asking me with a yes or no.
10   Q.  Did you discuss the results of the election
11 with people in this district?
12   A.  Yes.
13   Q.  And did those discussions relate to school
14 board prayer?
15   A.  Some did and some didn't.
16   Q.  The ones that did, what did you discuss with
17 those people?
18   A.  That the school, for the few people that I may
19 have discussed it with, that the school prayer issue
20 did not seem to be a source of contention for people
21 where I lived, but I did believe that it was a source
22 of contention and furor and stirring in the area where
23 Jackie Wilson lived.
24   Q.  There's been testimony from Mrs. Bunting, Nina

Page 33

1  Lou Bunting, that you would feel uncomfortable offering
2  prayer at a school board meeting. Is that true?
3    A.  I have made the statement to the board -- no,
4  to the board president, to the board president. Nina
5  Lou is not the board president. But I told the board
6  president, because he offers the opportunity for
7  everybody to pray. And I made the statement that when
8  I offer prayer it's going to be for a moment of silence
9  because I do not wish to pray publicly. That I think a
10 moment of silence is fitting at a school board
11 assemblage.
12   Q.  When you say school board president, you mean
13 Mr. Bireley?
14   A.  Yes.
15   Q.  What was Mr. Bireley's reaction to your
16 statement?
17   A.  He was fine with it. Absolutely fine with it.
18   Q.  Did he say he'll put you in the rotation?
19   A.  He did put me in the rotation.
20   Q.  Have you offered a moment of silence?
21   A.  Yes.
22   Q.  When was that?
23   A.  I think it was -- what month are we in? -- I
24 think it was in November's meeting.

Dobrich v. Indian River School District, et al.
Patricia S. Oliphant, Ph.D.   C.A. # 05-120-JJF   December 14, 2006

Page 34

1   Q.  Do you --
2   A.  One of the nights you guys weren't
3   videotaping.
4   Q.  Do you believe that Mr. Bireley's rotation
5   process conforms to the school board prayer policy in
6   front of you?
7   A.  Yes.
8   Q.  Did this discussion with Mr. Bireley happen as
9   part of your orientation, to use a better word, as
10  becoming a new school board member?
11  A.  Fairly close.  I mean our first orientation
12  was with the superintendent, okay, so that was our
13  orientation.  But Mr. Bireley asked me fairly early
14  in -- I have been on the board since July.
15      He asked me fairly early -- he just said
16  to me, he said, Trish, I ask each board member if they
17  want to offer prayer.  If you want to, great; if you
18  don't, I'll move on, but I'll call you, I'll give you a
19  heads up.  And he did.
20  Q.  So in November, shortly before, a few days
21  before the meeting, you're saying Mr. Bireley called
22  you and asked you --
23  A.  Uh-huh.
24  Q.  -- and asked you if you wanted to offer a

Page 35

1   moment of silence?
2   A.  No.  He called me and asked me if I wanted to
3   offer the prayer.  And I said, Yeah, I'll be glad to,
4   but I want you to know it's going to be a moment of
5   silence, it's not going to be an open prayer.  And I
6   said fine.
7       MR. LENHARD:  I want to take a
8   five-minute break.
9       VIDEO SPECIALIST:  Going off the record
10  at approximately 11:49 a.m.
11      (Recess.)
12      VIDEO SPECIALIST:  We're back on the
13  record at approximately 11:57 a.m.
14      MR. LENHARD:  Dr. Oliphant, I have no
15  further questions.  Thank you very much for your time.
16      THE WITNESS:  Okay.
17      VIDEO SPECIALIST:  The deposition is
18  ending at approximately 11:57 a.m.
19      (Witness excused.)
20      (The deposition concluded at 11:57 a.m.)
21
22
23
24

Page 36

1
2           I N D E X
3   DEPONENT: Patricia S. Oliphant       PAGE
4     Examination by Mr. Lenhard           3
5           E X H I B I T S
6   PLAINTIFF'S DEPOSITION EXHIBITS      MARKED
7   P-72  Delaware Wave Article, P-2438    11
8   P-73  Sussex Post article, P-2445-P2448  13
9
    ERRATA SHEET/DEPONENT'S SIGNATURE    PAGE 37
10
    CERTIFICATE OF REPORTER              PAGE 38
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 37

REPLACE THIS PAGE

WITH THE ERRATA SHEET

AFTER IT HAS BEEN

COMPLETED AND SIGNED

BY THE DEPONENT

10 (Pages 34 to 37)

Wilcox & Fetzer, Ltd.   Professional Court Reporters   (302)655-0477

| Dobrich | v. | Indian River School District, et al. |
|---|---|---|
| Patricia S. Oliphant, Ph.D. | C.A. # 05-120-JJF | December 14, 2006 |

Page 38

```
 1   State of Delaware    )
                          )
 2   New Castle County    )
 3
             CERTIFICATE OF REPORTER
 4
            I, Terry B. Burke, RMR-CRR and Notary Public,
 5   do hereby certify that there came before me on
     Thursday, December 14, 2006, the deponent herein,
 6   Patricia S. Oliphant, Ph.D., who was duly sworn by me
     and thereafter examined by counsel for the respective
 7   parties; that the questions asked of said deponent and
     the answers given were taken down by me in Stenotype
 8   notes and thereafter transcribed by use of
     computer-aided transcription and computer printer under
 9   my direction.
10          I further certify that the foregoing is a true
     and correct transcript of the testimony given at said
11   examination of said witness.
12          I further certify that I am not counsel,
     attorney, or relative of either party, or otherwise
13   interested in the event of this suit.
14
15
16          Terry Barbano Burke, RMR-CRR
17             Certification No. 233-RPR
18             (Expires January 31, 2008)
19
20   DATED:
21
22
23
24
```