Case 1:05-cv-00120-JJF    Document 250-18    Filed 04/10/2008    Page 1 of 43

Dobrich, et al.                          v.                  Indian River School District, et al.
John M. Evans                    C.A. # 15-120 (JJF)                      October 18, 2006

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                  FOR THE DISTRICT OF DELAWARE
 3    MONA DOBRICH and MARCO     :   C.A. No. 15-120 (JJF)
      DOBRICH, Individually and  :
 4    as parents and next friend :
      of ALEXANDER DOBRICH,      :
 5    SAMANTHA DOBRICH, JANE DOE :
      and JOHN DOE, Individually :
 6    and as parents and next    :
      friend of JORDAN DOE and   :
 7    JAMIE DOE,                  :
                                  :
 8              Plaintiffs,       :
                                  :
 9              v.                :
                                  :
10    INDIAN RIVER SCHOOL         :
      DISTRICT, et al.,           :
11                                :
                Defendants.       :
12                    .. .. .. .. .. ..
13              Videotaped Deposition of JOHN M. EVANS,
      taken pursuant to notice, on Wednesday, October 18,
14    2006 at 9:13 a.m. at 31 Hosier Street, Selbyville,
      Delaware, reported by Lorena J. Hartnett, a Registered
15    Professional Reporter and Notary Public.
16                    .. .. .. .. .. ..
17    APPEARANCES:
18              THOMAS ALLINGHAM, ESQUIRE
                RICHARD HORVATH, ESQUIRE
19              BRIAN LENHARD, ESQUIRE
                One Rodney Square
20              Wilmington, DE  19801
                  Attorney for the Plaintiff
21
22
23                  WILCOX & FETZER
          1330 King Street - Wilmington, DE  19801
24                    (302) 655-0477
```

Dobrich, et al.                                                Indian River School District, et al.
John M. Evans                  C.A. # 15-120 (JJF)                        October 18, 2006

Page 2

```
 1
 2   APPEARANCES (CONTINUED):
 3      JARROD SHAU, ESQUIRE
         Drinker, Biddle & Reath, LLP
 4      One Logan Square
         18th and Cherry Streets
 5      Philadelphia, PA 19103-6996
         Attorney for the Defendants
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 4

```
 1        VIDEOGRAPHER: Okay. This is the
 2   videotaped deposition of John M. Evans taken
 3   by the plaintiffs in the matter of Dobrich
 4   et al. versus Indian River School District,
 5   et al., Civil Action Number 15-120.
 6        The deposition is taking place at 31
 7   Hosier Boulevard in Selbyville, Delaware, on
 8   October 18, 2006 at approximately 9:13 a.m..
 9   The court reporter is Lorena Hartnett from
10   the firm of Wilcox and Fetzer.
11        My name is Mark Buckmaster, a video
12   specialist from Discovery Video Services
13   Incorporated in association with Wilcox and
14   Fetzer. Counsel will now introduce
15   themselves and the reporter will swear in
16   the witness.
17        MR. ALLINGHAM: My name is Tom
18   Allingham. I represent the plaintiffs, and
19   with me are Richard Horvath and Brian
20   Lenhard.
21        MR. SHAU: My name is Jarrod Shaw, and
22   I represent the defendants.
23
24
```

Page 3

```
 1
 2
 3        TABLE OF CONTENTS
 4   TESTIMONY OF JOHN M. EVANS:
 5      Direct Examination by Mr. Allingham. . . . . . 3
 6   Certificate of Reporter . . . . . . . . . . . .168
 7
```

Page 5

```
 1
 2        JOHN M. EVANS,
 3   HAVING FIRST BEEN DULY SWORN, TESTIFIED AS FOLLOWS:
 4      DIRECT EXAMINATION ON BEHALF OF THE PLAINTIFFS
 5   BY MR. ALLINGHAM:
 6      Q. Mr. Evans, because we have to have a record
 7   of this, I am going to give you the short version of
 8   what I have already given you. I am going to ask you
 9   questions. Please tell me if you don't understand the
10   question. I will try to fix it for you.
11        If you answer a question without telling me
12   that you think it's problematic, it's likely that the
13   ultimate audience of this deposition may assume that
14   you did understand it, so be sure that we are on the
15   same wavelength.
16      A. I understand.
17      Q. Also answer out loud. Please don't nod or
18   say uh-huh or nuh-uh, because it's hard for the court
19   reporter to take those words down.
20        You were a member of the school board of
21   Indian River?
22      A. Yes, I was.
23      Q. How long were you a member of the school
24   board?
```

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

Dobrich, et al.
John M. Evans

v.
C.A. # 15-120 (JJF)

Indian River School District, et al.
October 18, 2006

Page 6

1    A.  Ten years.
2    Q.  You went off the school board in 2005?
3    A.  2006.
4    Q.  2006.  So, roughly speaking, from 1996 to
5    2006 you were on the board?
6    A.  That's correct.
7    Q.  Okay, why did you run for the school board?
8    A.  I had several reasons.  I had been involved
9    in the Sussex Central Middle School PTA for three
10   years, where both my children attended, and in 1996
11   when the district passed the expense referendum, one
12   of the commitments that the district made was to see
13   that the funds were allocated according to what they
14   had informed the public of.  There were certain monies
15   to be spent on certain, in certain areas.
16       And, having been involved in the PTA and my
17   children still in school, I felt the need to run for
18   the board to make sure that the district adhered to
19   the promise they made the voters in the 1996 expense
20   referendum.
21       And that was my main reason.  And also being
22   involved because my kids were both in the school
23   district in middle school at that time.
24   Q.  What was the promises, as you understood it,

Page 7

1    that the district had made to the voters in the '96
2    expense referendum?
3    A.  There was promises to spend certain amounts
4    of money on the science equipment, on textbooks,
5    supplies, also for teachers.  We were short on
6    teachers because of the funding.  Those were some of
7    the main areas that I can recall.
8    Q.  And these areas that you have identified are
9    ones that were particularly important to you?
10   A.  Yes, they were.  We didn't need the funding
11   for teachers.  We had the allotment from the state
12   that we could hire teachers.  The state funding was
13   there, but we didn't have the local funds to pay for
14   the teachers, so this referendum provided that funding
15   to pay for those teachers, and I thought that was
16   important.  We needed the teachers; we needed the
17   supplies; we needed the textbooks.  I think some of
18   the textbooks at that point were ten years old, so I
19   felt the need to get involved in that.
20   Q.  Were you concerned that, about the
21   possibility that the district might spend funds on, in
22   areas that were not the subject of the district's
23   promise during the referendum?
24   A.  Now, is that before I ran or while I was on

Page 8

1    the board?
2    Q.  I am still talking now about your desire to
3    make sure that the board kept its promise.  Were you
4    worried it would not keep its promise?
5    A.  No, sir, I was not.
6    Q.  All right, if you weren't worried about it,
7    why did you run for the board to make sure that it did
8    keep its promise?
9    A.  Well, I didn't know the board, but I just
10   felt if I was involved in it, I could see that it was
11   spent the way that it should be.  I don't have any
12   concern that the board would not have done so.
13   Q.  Just a generic desire to be involved in
14   making sure that the money was spent wisely?
15   A.  That's right.
16   Q.  When you ran for the board, were you aware
17   that the board opened its meetings with prayers?
18   A.  No, I did not.
19   Q.  Did that effect in any way your decision to
20   run for the board, the fact that the board opened its
21   meetings with prayers?
22   A.  As I stated, I didn't know that they opened
23   their meetings in prayer, so it had no bearing in my
24   running for the board.

Page 9

1    Q.  It then follows as the night to day that it
2    had no bearing?
3    A.  It had no bearing on my decision.  I was not
4    aware of that.
5    Q.  Had you attended any board meetings prior to
6    your decision to run for the board?
7    A.  One, one board meeting.
8    Q.  And was that a board meeting on the expense
9    referendum?
10   A.  No, that was later.  I don't think -- No, I
11   don't think it was.
12   Q.  Why did you attend that board meeting?
13   A.  Just to get a feel for what happened at a
14   board meeting.
15   Q.  Did you think that the meeting that you
16   attended before you joined the board was conducted in
17   a solemn and serious and appropriate manner?
18   A.  Yes, I do.
19   Q.  Did you form a view as to whether the opening
20   of that meeting with a prayer was responsible for that
21   meeting's being conducted in a solemn, serious and
22   appropriate manner?
23   A.  I don't remember whether that board meeting
24   was opened to prayer or not.  I don't remember that.

3 (Pages 6 to 9)

Dobrich, et al.
John M. Evans

v.
C.A. # 15-120 (JJF)

Indian River School District, et al.
October 18, 2006

Page 10

1    Q.   I take it it did not make a big impression on
2    you one way or another as a member of the public at
3    that meeting?
4    A.   It did not, no.  I just don't remember
5    whether they opened that meeting with prayer or not.
6    Q.   Am I right, Mr. Evans, that you don't have
7    any personal information prior to, for the period
8    prior to your joining the board, about whether the
9    board had a practice or policy of opening meetings
10   with a prayer?
11   A.   I had no knowledge whether they did or did
12   not.
13   Q.   Okay, now let's go to the ten years that you
14   did serve on the board.  Is it correct that the board
15   had a practice or policy of opening its meetings with
16   a prayer?
17   A.   Yes.
18   Q.   And that would be its regular meetings;
19   correct?
20   A.   That's correct.
21   Q.   It's also correct, is it not, that the board
22   did not have a practice of opening its special
23   meetings with a prayer?
24   A.   That's correct.

Page 11

1    Q.   And it is also correct, is it not, that the
2    board does not open its executive sessions with a
3    prayer?
4    A.   That's correct.
5    Q.   And that question having to do with executive
6    sessions, that's true even if the executive session
7    takes place before the prayer that's offered at the
8    regular meeting; correct?
9    A.   Sorry, repeat that question.
10   Q.   Let me make it into two questions.  First of
11   all, do you recall that there have been times when the
12   board goes into executive session before any prayer is
13   offered at the regular meeting?
14   A.   That's correct.
15   Q.   And even at those, if you will, pre-prayer
16   executive sessions, the board does not open those
17   sessions with a prayer; correct?
18   A.   That's correct.
19   Q.   Do you know why?
20   A.   No, I never really thought about it, to be
21   honest.
22   Q.   Do you know why the board does not open its
23   special meetings with a prayer?
24   A.   No, I don't.

Page 12

1    Q.   The matters treated in executive session and
2    at special meetings are just as important as the
3    matters treated at regular meetings, aren't they?
4    A.   Yes, they are.
5    Q.   The proceedings are conducted in just as
6    solemn a manner at special meetings as at regular
7    meetings, is that correct, in your experience?
8    A.   Yes, I would say yes.
9    Q.   And the executive sessions, similarly, are
10   just as serious and solemn as the regular sessions?
11   A.   Yes.
12   Q.   Have you ever heard anyone at anytime raise
13   the issue of why executive sessions and special
14   meetings are not opened with a prayer?
15   A.   No, I have never, never heard that issue.
16   Q.   Okay.  What did you do to prepare for the
17   deposition today?
18   A.   The only thing that I did was about a week
19   ago read the policy on religion.
20   Q.   Seems like a sensible thing to do.
21   A.   That's the only thing I have done to prepare.
22   Q.   Did you meet with your lawyers?
23   A.   Personally, you mean with the district
24   lawyers?

Page 13

1    Q.   Yes.
2    A.   Yes, I did.
3    Q.   All right, and that was to help prepare for
4    the deposition; correct?
5    A.   Yes.
6    Q.   Okay.  Who was at that meeting?
7    A.   Let's see, Jarrod was there.
8    Q.   Mr. Shau?
9    A.   Yes, and I don't know all the last names.
10   Q.   Jason Gosselin?
11   A.   Jason Gosselin was there.  Jeff.  I don't
12   know Jeff's last name.  Mr. Bireley was there,
13   Dr. Hattier, and Mr. Hastings, Mr. Helms, I believe,
14   and myself.  And I believe that's the list of people
15   who were there.
16   Q.   The board doesn't hire lawyers just based on
17   the fact that their first name begins with J, do they?
18   John, John, Jeff, Jason, and Jarrod.
19   A.   Well --
20   Q.   You don't have to answer that.  And that
21   meeting took place last week, is that right, or was it
22   the week before?
23   A.   A week ago last Thursday.
24   Q.   Okay.  There has been testimony from one of

4 (Pages 10 to 13)

Case 1:05-cv-00120-JJF    Document 250-18    Filed 04/10/2008    Page 5 of 43

Dobrich, et al.                                                    Indian River School District, et al.
John M. Evans                              v.                      October 18, 2006
                              C.A. # 15-120 (JJF)

Page 14

1 the participants at that meeting that Mr. Gosselin
2 read from one or more documents in that meeting. Do
3 you recall that?
4    A. Yes.
5    Q. And do you know what documents Mr., document
6 or documents Mr. Gosselin was reading from?
7    A. He read from the -- I don't know the exact
8 title, but the prayer policy.
9    Q. The one that you reviewed?
10   A. No, he read the one in reference to praying
11 at board meetings, and I don't remember the exact
12 title of that policy.
13   Q. I see.
14   A. Board meeting prayer policy. I don't
15 remember exact title.
16   Q. Do you recall Mr. Gosselin reading from any
17 other document?
18   A. No, I do not.
19   Q. The policy that you reviewed to prepare for
20 this deposition, was that also the board prayer policy
21 or the religion in schools policy?
22   A. That was the religion in schools policy.
23   Q. And why did you read that policy?
24   A. Just to become familiar with it. Again, it's

Page 15

1 been months since I read it.
2    Q. Did you understand that this deposition is
3 limited to the issues raised in connection with the
4 school board prayer?
5    A. Yes, I do.
6    Q. Have you had occasion to talk with anyone who
7 has already been deposed in this case about their
8 depositions?
9    A. No, sir, I have not.
10   Q. Good thinking. Were you shown any documents
11 at the meeting with your lawyers, the district's
12 lawyers?
13   A. No, sir, I was not.
14   Q. Do you know who the Does are?
15   A. No, sir, I do not.
16   Q. Has anyone ever told you who the Does are?
17   A. No, no one has told me.
18   Q. Has anyone ever told you that that person
19 knows who the Does are?
20   A. The person -- Say again.
21   Q. If I walked up to you and said, "I know who
22 the Does are," that's the question I am asking you,
23 has anyone ever walked up to you or come up to you and
24 said in words or substance, "I know who the Does

Page 16

1 are."?
2    A. Words of maybe similar to that nature that
3 they think they know who the Does are.
4    Q. And who told you that?
5    A. I believe that was Dr. Hattier.
6    Q. And how did that conversation come up?
7    A. That occurred in one executive session
8 meeting that I am aware of.
9    Q. Tell me as much as you can about when that
10 executive session occurred. Tell me the year first,
11 and then we can try to pin it down.
12   A. Well, that would have been 2006, probably
13 sometime during the summer months. I can't exactly
14 tell you which month it was.
15   Q. This past summer?
16   A. Yes.
17   Q. And how did the conversation come up? What
18 prompted Dr. Hattier to make that statement?
19   A. That would have been during discussion about
20 this lawsuit.
21   Q. Was there a discussion going on about who the
22 Doe family was?
23   A. In what respect?
24   Q. In any respect. It seems like an odd -- It

Page 17

1 seems like a non-sequitur for someone to just
2 announce, "I think I know who the Does are." What was
3 the context in which that statement came up?
4    A. Well, there was discussion in reference to
5 the settlement and the Does being part of that
6 settlement, and I believe the discussion, the
7 discussion did come up in reference to one or both of
8 the Doe children attending the schoolyards.
9    Q. Okay.
10   A. That's the part I remember.
11   Q. Okay, understood. Does the school board have
12 final say over school choice issues?
13   A. The school choice, yes, they do.
14   Q. And do you recall any discussion at the board
15 level, executive session, regular meeting, special
16 meeting, about school choice, school choices -- That's
17 an awkward question. Let me ask you again.
18       Do you recall any discussion at the board
19 level in executive session, regular session, or
20 special session, of school elections made by or on
21 behalf of the Doe children?
22   A. I don't understand when you say school
23 elections.
24   Q. Choice.

5 (Pages 14 to 17)

Dobrich, et al.                                    v.                Indian River School District, et al.
John M. Evans                         C.A. # 15-120 (JJF)                        October 18, 2006

Page 18

1    A.  Choice?
2    Q.  The school choice process is there is an
3    application by the family on behalf of the children;
4    correct?
5    A.  Yes.
6    Q.  Okay.
7    A.  Right.
8    Q.  And do you recall any discussion at the board
9    level -- I just want to know yes or no.  Okay?
10   A.  Yes.
11   Q.  Do you recall any discussion at the board
12   level of applications for school choice issues by the
13   Doe family on behalf of their children?
14   A.  No.
15   Q.  Is there a particular board member who is in
16   charge of school choice issues?
17   A.  No, not that I am aware of.
18   Q.  How does the board exercise its authority
19   over school choice issues?  What's the process?
20   A.  Well, the process, we would receive a list in
21   our board packet by the school giving us the number of
22   children, choice in cadet school, and what area they
23   lived in.  There were no names.
24   Q.  Let me stop you there, because this is more

Page 19

1    detailed than I was really looking for.
2    A.  Okay.
3    Q.  Is it correct that the board gets a
4    recommendation from the district and typically
5    approves that recommendation?
6    A.  Yes.
7    Q.  Okay, the board does not, correct me if I am
8    wrong, but, as I understand it, the board does not
9    address individual applications?
10   A.  That's correct.
11   Q.  Okay.  And then a final follow-up, do you
12   recall anytime at which the board did address
13   individual applications?
14   A.  No, I do not.
15   Q.  And that would be over your entire ten-year
16   tenure?
17   A.  That's right.
18   Q.  Mr. Evans, I apologize, your counsel has
19   given us informal information about each board
20   member's religious faith, and I don't have the
21   interrogatory answer here, so I am just going to ask
22   you what is your religious faith?
23   A.  I am a Christian.
24   Q.  And any particular church that you attend or

Page 20

1    denomination?
2    A.  Denomination Presbyterian Church in America.
3    Q.  I'm sorry, the last part of that answer?
4    A.  Presbyterian Church in America.  PCA, it's
5    called.
6    Q.  What, if any, church do you attend?
7    A.  East Gate Presbyterian Church.
8    Q.  Is that in Selbyville?
9    A.  No, that's on Long Neck Road, Millsboro
10   address.
11   Q.  Apart from being a member of the congregation
12   at Ease Gate Presbyterian, do you have any role in
13   that church?
14   A.  Currently I share an adult teaching position
15   with the pastor.  I am an inactive elder.
16   Q.  Inactive elder?
17   A.  Yes.
18   Q.  What's the difference between an inactive
19   elder and an active elder?
20   A.  In our denomination, once you become an
21   elder, you are always an elder.  Active means
22   that you are actively participating on the church
23   board.
24   Q.  I understand, sir.  Any other positions?

Page 21

1    A.  No, sir.
2    Q.  In the summer of 2004, did you have any roles
3    in addition to the ones that you have just identified
4    for me at the church?
5    A.  In the summer of 2004?
6    Q.  To put this in time, the summer of 2004 is
7    the period of time in which the board, so far as the
8    record reflects, began considering a school board
9    prayer policy.
10        The summer of 2004 is also, August 24, 2004
11   is when what has come to be known as the big meeting
12   took place with many hundreds of people at the school
13   board meeting, so that's the period of time I am
14   asking you about.
15        Did you have any roles at East Gate
16   Presbyterian in addition to the ones you have already
17   identified during the summer of 2004?
18   A.  No.
19   Q.  Okay.  Now, I identified for you this
20   August 24, 2004 meeting.  Do you recall that meeting?
21   A.  Yes, I do.
22   Q.  Okay.  In the days and weeks running up to
23   that meeting, did you urge or encourage anyone to
24   attend that meeting?

6 (Pages 18 to 21)

Dobrich, et al.                           v.              Indian River School District, et al.
John M. Evans                    C.A. # 15-120 (JJF)                    October 18, 2006

Page 22

1    A. No, sir, I did not.
2    Q. Were you aware of anyone from your church,
3    the East Gate Presbyterian Church, encouraging or
4    urging anyone to attend that meeting?
5    A. Yes, there was.
6    Q. And tell me what you recall about that.
7    A. Just members coming up to me indicating
8    they were planning on being there, but I never, no, I
9    never encouraged anyone to be there.
10   Q. Were you aware that members of your church
11   were encouraging other members of the congregation to
12   consider attending the August 24 meeting?
13   A. Yes.
14   Q. And was there any -- Did that include the
15   pastor?
16   A. No, as far as the pastor, he never really
17   spoke to me one way or the other. As far as I know,
18   he didn't talk to anybody else about attending, if I
19   am answering your question.
20   Q. I think the second part you did answer my
21   question. So, as I understand it, you are not aware
22   that the pastor of your church urged or encouraged
23   anyone to attend?
24   A. No, I am not.

Page 23

1    Q. Okay. In the course of preaching during any
2    service, do you recall the pastor saying that it was
3    important or encouraging people to attend the
4    August 24 meeting?
5    A. Repeat the first part of that question?
6    Q. During the course of a sermon or during the
7    course of an adult education class, or in any context?
8    A. No, he, as far as I know, he never made that
9    statement in a public session.
10   Q. And do you recall -- What is your pastor's
11   name or what was the pastor's name in 2004?
12   A. Pastor Nabb, Pastor Gary Nabb.
13   Q. Do you recall Pastor Nabb in any kind of a
14   private conversation in summer 2004 urging people to
15   attend the August 24 meeting?
16   A. No, I don't.
17   Q. Do you recall the August 24 meeting in part
18   because so many people were there? Does it stand out
19   in your mind?
20   A. Yes, it does.
21   Q. When you arrived at the meeting -- By the
22   way, did you arrive alone?
23   A. Yes.
24   Q. Were you surprised to find so much commotion

Page 24

1    at the meeting?
2    A. Yes, I was.
3    Q. There were police cars there; is that right?
4    A. I don't recall any when I arrived.
5    Q. The meeting was scheduled for 7:30. Did you
6    get there early?
7    A. Yes, I am usually there 15, 20 minutes early.
8    Q. Okay, do you recall that there were speakers
9    set up in the parking lot?
10   A. No, I don't.
11   Q. Were there a lot of people milling around?
12   A. Yes.
13   Q. Were they carrying signs, some of them?
14   A. I didn't see anyone with signs when I
15   arrived.
16   Q. Did you go straight into the meeting?
17   A. Yes.
18   Q. When the board goes into the meeting, and I
19   am using August 24 as an example, but the question is
20   more general, do you meet somewhere or congregate
21   somewhere out of the public's eye before you walk into
22   the room where the meeting is being held?
23   A. No.
24   Q. So you just walk into the room and take your

Page 25

1    seat; is that right?
2    A. That's correct.
3    Q. At each facility -- Well, let me ask a
4    preliminary question. Where does the board hold its
5    meetings?
6    A. At that particular time?
7    Q. No, generally speaking.
8    A. In one of the schools.
9    Q. And is it typically the case that the board
10   holds its meetings at the high school in the district?
11   A. It is now, but it wasn't then.
12   Q. All right. In 2004 the district was in the
13   process of completing construction of two new high
14   schools; is that right?
15   A. That's correct.
16   Q. All right. Where were high school classes
17   being held during the construction process?
18   A. Well, they were being held at the original
19   high school.
20   Q. Is it correct that up until the new high
21   schools were completed, the board meetings were
22   rotated among all the schools in the district or just
23   some of them?
24   A. Just some.

7 (Pages 22 to 25)

Dobrich, et al.                                     Indian River School District, et al.
John M. Evans                 C.A. # 15-120 (JJF)              October 18, 2006

Page 26

1    Q.   And was there a known or accepted group of
2    schools at which you held your meetings?
3    A.   Yes.
4    Q.   Was the idea to try to move the meetings
5    around geographically because the district is kind of
6    large?
7    A.   I believe that's so, yes.
8    Q.   Okay, this meeting, August 24, was held at
9    Frankford Elementary School?
10   A.   That's right.
11   Q.   All right, and was that one of the schools
12   that had been in the rotation, if you will?
13   A.   Yes.
14   Q.   At Frankford Elementary School, the meetings
15   were held in the cafeteria?
16   A.   That's right.
17   Q.   Were most -- Were the meetings held in a
18   cafeteria at all the schools that were in the rotation
19   at that time?
20   A.   Yes, yes.
21   Q.   When you went into executive session, was
22   there -- Were you aware that there was a separate room
23   where you could go and have your executive session
24   different from the cafeteria?

Page 27

1    A.   Yes.
2    Q.   Okay. And over the course of time I assume
3    you came to know what those rooms were at each school?
4    A.   Yes.
5    Q.   For example, at the Frankford Elementary
6    School, where did you go for executive session?
7    A.   Usually the library.
8    Q.   And is that usually at each of the schools
9    where you went, the library?
10   A.   No, the, on occasion -- Yes, I believe it
11   was.
12   Q.   At the high schools, the new high schools,
13   the meetings that have been held since the new high
14   schools were constructed, when you arrive at the
15   meeting, do you go directly -- Those meetings are held
16   in the auditorium; correct?
17   A.   Yes.
18   Q.   And do you go directly to your seat on the
19   stage, or do you congregate with your fellow board
20   members off stage?
21   A.   Let me rephrase what I just said. We didn't
22   meet in the auditorium at the high school. We met in
23   the cafeteria at the new high school.
24   Q.   And that's the routine; correct?

Page 28

1    A.   Yes.
2    Q.   Have you ever had meetings in the
3    auditoriums?
4    A.   Yes.
5    Q.   Do you know the reason for moving the
6    meetings from the cafeteria to the auditoriums when
7    that occurred?
8    A.   Yes.
9    Q.   What was the reason?
10   A.   When we were expecting public attendance.
11   Q.   Don't you expect public attendance at every
12   meeting?
13   A.   I don't expect it, but it has occurred.
14   Q.   Over time, if it occurs over and over again,
15   don't you come to expect it?
16   A.   Well, yes.
17   Q.   Okay, so that's not a reason to distinguish
18   one meeting from another. What was it that caused the
19   meeting to be held in the auditorium instead of the
20   cafeteria, as you recall?
21   A.   Are you referring to a specific time period,
22   meeting, or any meeting?
23   Q.   If the reason is meeting specific, we can try
24   to figure out which meetings occurred in the

Page 29

1    auditorium and why. I thought there was just a
2    general reason that you could articulate.
3    A.   The only one that I can recall is a meeting
4    at -- I forget which high school, but we met in the
5    auditorium and that was the vote, the board vote on
6    the school prayer, the board school prayer.
7    Q.   That is the vote to adopt the board policy?
8    A.   No.
9    Q.   Was that the vote to reject the proposed
10   settlement of this litigation?
11   A.   Yes, I believe it was.
12   Q.   Okay, and you understood that to be a vote on
13   school board prayer?
14   A.   No.
15   Q.   Okay. I am not making the connection, so let
16   me just walk through it with you. That meeting took
17   place in February of 2006, and it was held at the
18   auditorium of I think it was the Sussex Central High
19   School; correct? I will get to that. I will get the
20   minutes so we can see where it was at.
21        You identified that meeting as the meeting at
22   which the board prayer issue was addressed. Could you
23   tell me why that's how you identified that meeting?
24   A.   No, I really can't. I said board prayer

8 (Pages 26 to 29)

Case 1:05-cv-00120-JJF    Document 250-18    Filed 04/10/2008    Page 9 of 43

Dobrich, et al.                          v.                Indian River School District, et al.
John M. Evans                   C.A. # 15-120 (JJF)                      October 18, 2006

Page 30

1 issue meaning the entire issue.
2     Q.   The entire issue being what?
3     A.   Well, I -- That's just what I said.  I can't
4 explain why I said it, but it wasn't the board prayer
5 issue; it was the settlement issue.  I made a mistake
6 on what I said.
7     Q.   Was it your memory that that meeting was
8 convened in the auditorium because it had to do with
9 the board prayer issue?
10    A.   No.
11    Q.   And you can't explain why that's how you
12 described the meeting before I identified particularly
13 what the meeting was?
14    A.   No, I can't.
15    Q.   As a board member, did you think at that
16 February 27, 2006 board meeting that you were voting
17 on the issue of school board prayer?
18    A.   No, as I commented earlier, that was a
19 mistake to make that statement.  I was confused.
20    Q.   Did you understand that the school board's,
21 school board prayer policy would be affected in any
22 way by the votes that you cast at that February 2006
23 meeting?
24    A.   Repeat that.

Page 31

1     Q.   Yes.
2     A.   The first part of that.
3     Q.   Did you understand that the board's school
4 board prayer policy would be affected in any way by
5 the votes that you cast at that meeting?
6     A.   No.
7     Q.   And I take it, then, Mr. Evans, that you did
8 not view your -- Well, let me get a preliminary
9 question.  You voted to reject the settlement;
10 correct?
11    A.   Correct.
12    Q.   In doing so, is it correct that no part of
13 the consideration that you gave to that vote was the
14 protection of the school board's right to pray at its
15 meetings?
16    A.   Would you repeat that, please?
17    Q.   In casting any vote, you have to consider
18 factors that weigh for or against in your decision;
19 correct?
20    A.   Right.
21    Q.   Did the desire to protect the school board's
22 right to pray at its meetings form any part of your
23 consideration in determining how to vote on the
24 settlement?

Page 32

1     A.   No.
2     Q.   And that's because your understanding was
3 that the school board prayer policy was not going to
4 be affected by the settlement; correct?
5     A.   My understanding?  I had no idea at that
6 point that we would even be voting on the policy
7 later.
8     Q.   And when you say you had no idea that you
9 would be voting on the policy later, what do you mean
10 by that?
11    A.   Well, you referred several times in your
12 questions about the school board prayer policy.
13    Q.   Yes, sir.
14    A.   Whether my voting on the settlement had any
15 impact on the prayer school board policy, and I
16 answered no, because I wasn't even aware that we were
17 going to have a school board prayer policy to vote on
18 later in the summer.
19    Q.   Okay.  When you said in your earlier answer
20 you weren't aware that you were going to have a school
21 board prayer policy to vote on later, you are not
22 talking about later at the February meeting; you are
23 talking about later in the summer of 2006?
24    A.   That's correct.

Page 33

1     Q.   Thank you.  I misunderstood.  Mr. Evans,
2 during your entire tenure as a board member, would you
3 agree with me that your first and greatest concern as
4 a board member is to act in the best interests of each
5 and every one of the children and youth of the Indian
6 River School District without distinction as to who
7 they are or what their backgrounds may be?
8     A.   Yes, that's correct.
9     Q.   And did you understand as a board member that
10 it was your obligation to resist every temptation and
11 outside pressure to use your school board member
12 position to benefit either yourself or any other
13 individual or agency apart from the total interest of
14 the school district?
15    A.   Would you read that again, please?
16    Q.   Yes, and the thrust of this is that board
17 members are not supposed to act for their own
18 interests but, rather, are to act for the whole
19 district.  I read this language because it comes from
20 a board policy, and I want to make sure that you agree
21 with it.  Okay?
22    A.   Yes.
23    Q.   Did you understand, as a board member, that
24 you were required to resist every temptation and

9 (Pages 30 to 33)

Dobrich, et al.                                    v.              Indian River School District, et al.
John M. Evans                              C.A. # 15-120 (JJF)                    October 18, 2006

Page 34

1  outside pressure to use your position as a school
2  board member to benefit either yourself or any other
3  individual or agency apart from the total interest of
4  the school district?
5      A.  Yes, I understood that.
6      Q.  And shorthand for that is that policy
7  requires the board's actions to be for the benefit of
8  the students; is that correct?
9      A.  That's correct.
10     Q.  And not for the benefit of the individual
11 board members?
12     A.  That's correct.
13     Q.  Do you recall when Charles Bireley became
14 president of the board?
15     A.  I don't recall the exact. I don't --
16     Q.  2005?
17     A.  2005? Yes, yes.
18     Q.  When he became president, did he speak to you
19 privately about whether you wanted to be, wanted to
20 open meetings with a prayer?
21     A.  He would ask me before a meeting if I would
22 be willing to do so.
23     Q.  Mr. Bireley testified that what he did when
24 he became president was to ask each board member, not

Page 35

1  before an individual meeting but as a general
2  proposition, whether the board members wanted to be
3  included in the group that would be asked to open
4  board meetings with a prayer. Some board members said
5  "No, thank you." Some board members didn't respond.
6  Some board members said yes. Okay? That's a summary
7  of Mr. Bireley's testimony.
8          Do you recall Mr. Bireley asking you, not
9  right before a board meeting, but as a general
10 proposition, whether you would like to be among the
11 board members invited to offer a prayer?
12     A.  No, I don't recall ever being asked that
13 question by Mr. Bireley.
14     Q.  So your recollection is that Mr. Bireley
15 asked you before an individual board meeting whether
16 you would like to offer a prayer?
17     A.  That's correct.  .
18     Q.  And did he do that after the meeting was
19 called to order or privately beforehand?
20     A.  Usually beforehand.
21     Q.  And you say usually beforehand. Is that
22 because you are not sure or because you recall at
23 least one meeting where he asked you after the meeting
24 was called to order?

Page 36

1      A.  No, I am sure it was always before the board
2  meeting.
3      Q.  Okay, and was it, you know, shortly before
4  the meeting was called to order, or was it the day
5  before, you know, the morning of the meeting?
6      A.  No, it was shortly before the meeting when I
7  arrived, he would, when he saw me there, he would ask
8  me before, somewhere between 7:00, 7:30 when I
9  arrived.
10     Q.  And so if this was the meeting that was being
11 held in the cafeteria, for example, of one of the high
12 schools, you would arrive, walk to the table at which
13 the board member seats are arrayed, and Mr. Bireley
14 would come up to you and say, "Would you like to give
15 the prayer at this meeting, John?"
16     A.  Yes.
17     Q.  Okay, and what did you respond?
18     A.  Yes.
19     Q.  What was your reason or reasons for accepting
20 Mr. Bireley's invitation to open the meeting with a
21 prayer?
22     A.  Whenever I am asked to open in a prayer, I
23 do.
24     Q.  Why?

Page 37

1      A.  Because I, that's my nature. That's my
2  Christian background.
3      Q.  And is that your practice no matter where the
4  invitation is extended to you?
5      A.  That's right.
6      Q.  So if you were sitting at dinner and someone
7  asked you to offer a blessing, you would accept the
8  invitation?
9      A.  That's correct.
10     Q.  At a school board meeting, you would accept
11 the invitation?
12     A.  That's correct.
13     Q.  Whatever the context, at least the context in
14 which invitations have been extended to you, you
15 always accept the invitation?
16     A.  That's correct.
17     Q.  Okay, and what is -- You may not have a
18 purpose in mind, but, if you do, what is the purpose
19 that you have in mind for offering a prayer?
20     A.  A school board prayer or any prayer?
21     Q.  Um, are there different purposes depending on
22 the context in which you are invited, in your mind?
23     A.  No.
24     Q.  Okay, then let me just ask you generally,

10 (Pages 34 to 37)

Dobrich, et al.
John M. Evans

v.
C.A. # 15-120 (JJF)

Indian River School District, et al.
October 18, 2006

Page 38

1   what's your purpose in agreeing to offer the prayer?
2   **A.   Well, my purpose is when I pray it is to seek**
3   **God's will, to seek his guidance and protection, to**
4   **seek his grace, to acknowledge that in all things that**
5   **I do I need his guidance and will.**
6       Q.   Is that a good summary?
7   **A.   I think so.**
8       Q.   In offering the school board prayers that you
9   have offered, that is the prayers to open the school
10  board meetings, it was your intention to seek God's
11  guidance, will, protection and grace; is that correct?
12  **A.   That's correct.**
13      Q.   And were you seeking God's guidance, will,
14  protection and grace for yourself only?
15  **A.   No, for the school board.**
16      Q.   That was going to be my next question.
17  **A.   For the school board as a collective body.**
18      Q.   Yes, sir.  So that the audience or the
19  beneficiary, the intended beneficiary of your prayer,
20  were the ten or whatever number, but the ten board
21  members at the meeting; correct?
22  **A.   Correct.**
23      Q.   Did you intend for there to be a beneficiary
24  of the prayer or audience of the prayer other than the

Page 39

1   ten, other than or in addition to the ten board
2   members?
3   **A.   Repeat that, please.**
4       Q.   Yes.  In offering the prayers that you
5   offered to open the school board meeting, did you
6   intend for the prayers to have as beneficiaries or
7   audiences, if you will, persons other than the ten
8   school board members?
9   **A.   No, not -- I offered my prayer for guidance**
10  **for the body of the school board, that we might make**
11  **good decisions for our school district.**
12      Q.   And I have asked this question of several
13  board members, and I think it's fair to say that the
14  answers were unanimous that the idea is that with
15  God's guidance it is possible or likely that board
16  members will make better decisions than without God's
17  guidance; is that correct?
18  **A.   That's correct.**
19      Q.   And that's why you pray not only for yourself
20  but also for the other board members?
21  **A.   That's correct.**
22      Q.   Let me show you what we have marked as
23  Plaintiff's Exhibit 9, which has been several times
24  identified as the board's policy on school board

Page 40

1   prayer.
2   **A.   Did you want me to read this?**
3       Q.   You know, I have enough questions on it that
4   maybe it's sensible for you to read it before I begin.
5   Have you read it?
6   **A.   Yes.**
7       Q.   All right.  The purpose of the prayer that a
8   member of the board may choose to open its meeting
9   with is set forth in paragraph one; is that correct?
10  **A.   Yes.**
11      Q.   And that purpose is the words, "in order to
12  solemnify its proceedings."  Correct?
13  **A.   Correct.**
14      Q.   The board policy does not say, it doesn't
15  repeat your exact words and it doesn't say in
16  substance, "In order to seek God's guidance, will,
17  protection and grace for the decisions to be made if
18  needed," does it?
19  **A.   Are you asking me if it does or does not**
20  **state those specific words?**
21      Q.   Correct.
22  **A.   That you just stated?**
23      Q.   Correct.
24  **A.   I don't see it on there, no.**

Page 41

1       Q.   Is it your view, as a board member, that the
2   words "in order to solemnify its proceedings" are the
3   functional equivalent of the words "in order to seek
4   God's guidance for the decisions to be made at that
5   meeting."?
6   **A.   I believe that, yes.**
7       Q.   Okay.  And I forgot to say at the beginning
8   of the deposition, it's really important for the court
9   reporter, in particular, that we don't trample on each
10  other's questions and answers.  It's the way we all
11  have conversations, but we need to have a specialized
12  sequential conversation in the depositions.  Okay?
13  **A.   I understand.**
14          MR. ALLINGHAM:  So could I have the
15      last question and answer read back?
16          (The reporter read back the last
17      question and answer.)
18  BY MR. ALLINGHAM:
19      Q.   Okay.  So that at least at, for your
20  understanding as a board member of the Policy BDA.1
21  which we have in front of us, it doesn't matter
22  whether the policy says, "In order to solemnify its
23  proceedings" or whether the policy says, "in order to
24  seek God's guidance, will, protection and grace," the

11 (Pages 38 to 41)

Dobrich, et al.                                   v.                    Indian River School District, et al.
John M. Evans                          C.A. # 15-120 (JJF)                        October 18, 2006

Page 42

1   meaning would be the same?
2       A. Yes, to me it would.
3       Q. Okay. Did anyone suggest at anytime in the
4   consideration of this policy that the policy ought to
5   say, "in order to seek God's guidance, will,
6   protection and grace."?
7       A. I don't remember.
8       Q. Do you remember any discussion at all of the
9   purpose articulated in the board prayer policy, that
10  is, quote, "in order to solemnify its proceedings."?
11      A. Would you repeat that, please?
12      Q. Yes, do you remember anyone discussing the
13  purpose of the policy at anytime during the board
14  meetings?
15      A. I don't recall, no, I don't recall.
16      Q. Let's make my question a little more
17  specific. Do you recall anyone offering any comment
18  whatsoever on the language, "in order to solemnify its
19  proceedings"?
20      A. I don't recall.
21      Q. When did the board first, first begin to
22  consider the issue of school board prayer?
23      A. When it began to first consider it? It would
24  have been sometime in the summer of 2004.

Page 43

1       Q. And what prompted the board's consideration
2   of that issue was Mrs. Dobrich's expression of
3   concerns that began with the graduation prayer in
4   early summer of 2004; correct?
5       A. Yes.
6       Q. Okay. Let me show you what we have marked as
7   PX15. When I say PX, it's short for plaintiff's
8   exhibit.
9       A. Okay.
10      Q. When we do that, that enables someone looking
11  at the transcript to be able to reconstruct what
12  document we were looking at.
13          If you look at the last page of PX15, you
14  will see Mrs. Hobbs' signature. Actually, it's a
15  signature stamp, but it's meant to be Mrs. Hobbs'
16  signature; correct?
17      A. Yes.
18      Q. And does that tell you that these are the
19  final minutes of the June 15, 2004 board meeting?
20      A. Yes.
21      Q. All right. You are recorded as being present
22  under roll call on the first page?
23      A. Yes, I am.
24      Q. And do you recall that you were present at

Page 44

1   the June 15, 2004 school board meeting at North
2   Georgetown Elementary School in the cafeteria?
3       A. Yes.
4       Q. Now, this would have been the first board
5   meeting after the 2004 graduation; is that right?
6       A. That's correct.
7       Q. If you will turn to page two of the minutes,
8   you will see under the public comments section that
9   one person made a public comment, and that's
10  Mrs. Dobrich; is that right?
11      A. Yes, I see that.
12      Q. And what the minutes record is that
13  "Mrs. Dobrich, a parent of the Jewish faith, expressed
14  concern about prayers at the school district events.
15  She asked that the board consider using a
16  nondenominational prayer that would be appropriate for
17  all faiths at events such as graduations, etcetera."
18          Do you see that?
19      A. Yes, I do.
20      Q. Do you recall Mrs. Dobrich making that
21  comment?
22      A. I recall Mrs. Dobrich being there, but I
23  can't recall her specific statement, but I assume the
24  board minutes would record such.

Page 45

1       Q. Well, that gives rise to some general
2   questions. The board minutes are not intended to
3   provide an exact quotation of what someone says at the
4   board meeting, are they?
5       A. An exact quotation?
6       Q. Yes, sir.
7       A. No, it's not an exact quotation.
8       Q. They are intended to be an accurate summary;
9   is that fair?
10      A. Yes.
11      Q. Okay. Do you have any reason to think that
12  this is not an accurate summary of what Mrs. Dobrich
13  said?
14      A. No, I have no reason.
15      Q. When you vote to approve minutes that reflect
16  a statement such as Mrs. Dobrich's statement, what do
17  you do to ensure that the summary of what is said is
18  a fair summary?
19      A. What do I do?
20      Q. Yes.
21      A. I really don't do anything. I accept it. If
22  I see something that's blatantly wrong, I would point
23  it out.
24      Q. So that you make the assumption that the

12 (Pages 42 to 45)

Case 1:05-cv-00120-JJF    Document 250-18    Filed 04/10/2008    Page 13 of 43

Dobrich, et al.                                    v.              Indian River School District, et al.
John M. Evans                             C.A. # 15-120 (JJF)                    October 18, 2006

Page 46

1 secretary's summary of what is said during the public
2 comment session, for example, is a fair summary?
3    A. Yes.
4    Q. You don't take notes of such things, do you?
5    A. No, I do not.
6    Q. Am I right that you do not take notes at
7 board meetings or did not?
8    A. Did not, that's correct.
9    Q. Okay. While I am on that topic, do you have
10 any files relating to your service as an Indian River
11 School Board member?
12    A. I have some board packets still, yes.
13    Q. And are they -- This has to do with
14 production of document issues. Do they contain any
15 notations that you made, or are they clean copies of
16 the board packets?
17    A. They are clean copies.
18    Q. Why do you keep them?
19    A. Well, I keep them until I get a chance to go
20 through them and throw them away, to be honest. I
21 have done so with some, but I still have some I
22 haven't gone through.
23    Q. What prompts that sort of review of what's in
24 your files, just space issues? When you run out of

Page 47

1 space you just start --
2    A. Well, I have got things stacked in the closet
3 and I have got things stacked in boxes. Yes, just a
4 space issue and a time issue.
5    Q. Without reference to the specific words that
6 Mrs. Dobrich said, do you recall that Mrs. Dobrich
7 asked that the board consider using a
8 nondenominational prayer for its meetings and its
9 events?
10    A. Yes, I do recall that, yes.
11    Q. And did you have any understanding of why
12 Mrs. Dobrich, a parent of the Jewish faith, would ask
13 the board to consider that?
14    A. Ask that, I'm sorry, first part of the
15 question.
16    Q. Did you have any understand, being yourself,
17 personally, as to why Mrs. Dobrich, a parent of the
18 Jewish faith, would ask the board to consider using
19 nondenominational prayers that would be appropriate
20 for all faiths?
21    A. Yes, I -- Yes.
22    Q. What was your understanding?
23    A. What my understanding is the Jewish faith
24 does not believe that Jesus Christ, the Messiah, has

Page 48

1 come.
2    Q. And am I right, then, in understanding that
3 you thought that Mrs. Dobrich was asking the board to
4 offer a prayer that would not be inconsistent with her
5 faith?
6    A. Repeat that, please.
7    Q. Yes. Did you think Mrs. Dobrich was asking
8 the board to consider using a prayer that was not
9 inconsistent with her faith?
10    A. Yes.
11       MR. ALLINGHAM: Mr. Evans, each
12    hour -- The tapes are one hour long. Each
13    hour we have to stop and change the tape.
14    The time has come.
15       THE WITNESS: Okay.
16       VIDEOGRAPHER: Going off the record at
17    10:11 a.m..
18       (A recess was taken.)
19       VIDEOGRAPHER: Going back on the
20    record at 10:17 a.m..
21 BY MR. ALLINGHAM:
22    Q. Mr. Evans, did you know before Mrs. Dobrich
23 got up to speak during the public comment session on
24 June 15, 2004 that the issue of prayer at school

Page 49

1 district events would be addressed at that June 15
2 meeting?
3    A. I don't recall that, but I do recall that a
4 parent had concern about the graduation prayer.
5    Q. So that before June 15 you had spoken to
6 someone about this concern.
7    A. Yes.
8    Q. And was that someone Mrs. Hobbs?
9    A. No.
10    Q. Who was it?
11    A. Mr. Walls.
12    Q. What did he tell you?
13    A. His only words were there was a parent who
14 had a concern, a Jewish parent who had a concern about
15 the prayer that was given at graduation.
16    Q. Did you ask Mr. Walls what the concern was?
17    A. No.
18    Q. Were you at the graduation ceremony?
19    A. Yes.
20    Q. Did you find the prayer that was given at the
21 graduation ceremony objectionable?
22    A. No.
23    Q. Did you have an understanding of why a parent
24 might have a concern about the prayer that was given

13 (Pages 46 to 49)

Dobrich, et al.                                      v.                   Indian River School District, et al.
John M. Evans                              C.A. # 15-120 (JJF)                              October 18, 2006

Page 50

1  at the graduation ceremony in 2004?
2     A.  A parent?  A parent?
3     Q.  Yes.
4     A.  Yes, I could understand that.
5     Q.  What was your understanding of why a parent
6  might object to that prayer?
7     A.  Well, I can understand that any parent that
8  didn't believe a particular religion might be
9  concerned.
10    Q.  You testified that Mr. Walls identified the
11 parent as a Jewish parent?
12    A.  I believe so.  I believe that he did.
13    Q.  Did you ask him why he identified the parent
14 as a Jewish parent?
15    A.  No.
16    Q.  I will represent to you that Mrs. Dobrich,
17 during the June 15, 2004 public comment session, asked
18 the board that prayers not be offered in the name of
19 Jesus at school events.  Do you recall that?
20    A.  What date was that?
21    Q.  That's the June 15, 2004 meeting.
22    A.  Yes, I recall -- I don't recall that she said
23 Jesus, but she did make some comment.
24    Q.  Yes, sir, my question was specific to that.

Page 51

1  Do you recall that she said or requested that the
2  board consider using prayers that did not, were not
3  offered in the name of Jesus?
4     A.  I don't recall the specifics of her comment.
5     Q.  Whether it's at June 15 or some other
6  meeting, do you recall that Mrs. Dobrich asked the
7  board to consider using prayers that were not offered
8  in the name of Jesus?
9     A.  Repeat that, please.
10    Q.  I am just expanding the time period.
11 Mrs. Dobrich spoke more than once before the school
12 board; correct?
13    A.  Correct.
14    Q.  At anytime during Mrs. Dobrich's comments, do
15 you recall that she said or that she asked the board
16 to consider using prayers that were not offered in the
17 name of Jesus?
18    A.  I have to answer that I am not sure.  I don't
19 know whether she said in Jesus's name or
20 non-sectarian.  I don't remember specifically.
21    Q.  Whether it was a request not to use prayers
22 that were offered in Jesus's name or whether it was
23 more general nondenominational or non-sectarian or, as
24 the minutes reflect, "appropriate for all faiths," do

Page 52

1  you recall what your reaction was at the board
2  meeting?
3     A.  My reaction?  I don't recall having any
4  specific reaction.
5     Q.  I want to be sure I am clear.  So this is at
6  the June 15 board meeting.  You do not, as you sit
7  here today, recall what your reaction was; correct?
8     A.  That's correct.  If you could elaborate on
9  what you mean by my reaction.
10    Q.  Sure.
11    A.  You mean verbal or expression or?
12    Q.  Do you recall making a comment out loud at
13 the conclusion of Mrs. Dobrich's remarks?
14    A.  No, I don't.
15    Q.  Do you recall making any externally
16 discernible reaction, anything that could be observed
17 by someone else?
18    A.  Only looking directly at her.
19    Q.  Do you recall what your internal reaction was
20 to Mrs. Dobrich's remarks?
21    A.  Of course, my internal reaction would be that
22 I don't disagree with -- I mean I don't agree with
23 what she is asking.
24    Q.  Do you recall looking directly at

Page 53

1  Mrs. Dobrich and mouthing the words, "No, never."  Not
2  saying them out loud, but saying "No, never," with
3  your lips?
4     A.  No, I don't.
5     Q.  Do you recall not doing that?
6     A.  No, I don't.
7     Q.  That is, do you have an affirmative memory
8  that you did not do that?
9     A.  No, I don't have any memory of what I did or
10 didn't do.
11    Q.  Now, you said that you did not agree with
12 Mrs. Dobrich's suggestion that the board use a
13 nondenominational prayer that would be appropriate for
14 all faiths.  Would you tell me why you did not agree
15 with that?
16    A.  Well, I don't agree with it.  I can't
17 speak -- I am not speaking for the board.  I am
18 speaking for myself.
19    Q.  Well --
20    A.  I can't agree with anyone that tells me how I
21 should pray.
22    Q.  All right, and I want to separate your
23 reaction as an individual and a person of faith with
24 your reaction as a board member.  They may be the

14 (Pages 50 to 53)

Case 1:05-cv-00120-JJF    Document 250-18    Filed 04/10/2008    Page 15 of 43

Dobrich, et al.                                    v.                    Indian River School District, et al.
John M. Evans                              C.A. # 15-120 (JJF)                        October 18, 2006

Page 54

1 same, but I just want to make sure I understand. As a
2 board member, did you disagree with what Mrs. Dobrich
3 was suggesting?
4    **A. No, I did not disagree with her asking the**
5 **board to consider it.**
6    Q. As a board member, after consideration of
7 that issue, I take it that you disagreed with that
8 suggestion; correct?
9    **A. With Mrs. Dobrich's suggestion?**
10    Q. Yes, ma'am, yes, sir, it's Dobrich, but yes,
11 with Mrs. Dobrich's suggestion.
12    **A. Dobrich. Did I disagree with her suggestion?**
13    Q. Yes.
14    **A. Now, are you asking, is this -- It's hard**
15 **to -- Well, ask me the question again, please.**
16    Q. Sure. Mrs. Dobrich suggested that the board
17 offer prayers not in Jesus's name. Okay, as a board
18 member, did you disagree with Mrs. Dobrich on that
19 point?
20    **A. I can't answer that with a yes or no. If I**
21 **am asked, if the board chose to not use the name of**
22 **Jesus, then I would adhere to that, but I would**
23 **request that I not be asked to pray.**
24    Q. And is that -- I may have this wrong, but I

Page 55

1 have heard some testimony on this issue. Is that
2 because, Mr. Evans, according to your beliefs,
3 if you are asked to pray, you should offer the prayer
4 in the name of Jesus?
5    **A. That's correct.**
6    Q. Okay. And, to expand on that a little bit,
7 is it also your belief that if you pray without
8 offering the prayer in the name of Jesus, you would be
9 denying Jesus?
10    **A. I believe that, yes.**
11    Q. Yes, sir. But, as you said earlier, you
12 could accept a board policy that said no prayer should
13 be offered in the name of Jesus by simply declining
14 the invitation to pray?
15    **A. Repeat that, please.**
16    Q. You articulated a way that you could comply
17 with the board policy that says no prayers shall be
18 offered in the name of Jesus by simply declining the
19 invitation to pray?
20    **A. If there was such a policy, I could accept**
21 **it, but I would decline to pray.**
22    Q. And am I correct, sir, that in that
23 circumstance, in order to seek divine guidance for
24 yourself, according to your own faith, you would pray

Page 56

1 silently for divine guidance in Jesus's name; correct?
2    **A. I very possibly would.**
3    Q. It's certainly a way in which you could,
4 according to your faith, effectively seek divine
5 guidance?
6    **A. That's right, yes.**
7    Q. Because, according to your faith, God hears
8 our prayers whether they are offered out loud or
9 silently?
10    **A. That's correct.**
11    Q. And whether they are offered in public or in
12 private?
13    **A. That's correct.**
14    Q. In church or in a supermarket?
15    **A. That's correct.**
16    Q. Okay.
17    **A. That's what I believe.**
18    Q. In light of what you have just told me, is it
19 necessary for the board to pray in public at a board
20 meeting in order for it to accomplish its purpose of
21 solemnifing the proceedings, which you have told me
22 means to seek divine guidance?
23    **A. You asked is it necessary?**
24    Q. Correct.

Page 57

1    **A. No, no, it's not necessary.**
2    Q. On the other hand, is it, am I right in
3 understanding that you think it's a, it's desirable to
4 do so in public rather than in private, or doesn't it
5 matter?
6    **A. To me, it doesn't really matter.**
7    Q. Now, you said a few minutes ago that one
8 reason that you disagreed with Mrs. Dobrich was that
9 you don't agree with anyone telling you how you can
10 pray; is that correct?
11    **A. That's correct.**
12    Q. Would you agree with me that your right to
13 pray however you like -- Well, let me ask the question
14 differently. Do you understand your right to pray in
15 whatever way you choose to be an unlimited right?
16    **A. Yes, I believe it is an unlimited right.**
17    Q. And is it then correct that you think it is
18 improper or inappropriate for anyone to impose any
19 limitations on any other United States citizens' right
20 to pray however they like?
21    **A. Repeat that, please.**
22    Q. Would it then be true that you view it as
23 inappropriate for anyone to seek to impose any
24 limitation on the right of any U.S. citizen to pray

15 (Pages 54 to 57)

Dobrich, et al.                                    v.                    Indian River School District, et al.
John M. Evans                          C.A. # 15-120 (JJF)                          October 18, 2006

Page 58

1  however they like?
2    A.  Yes, I believe that.
3    Q.  All right.  In approving the board prayer
4  policy, did you understand that you were imposing
5  certain limits on how board members could offer
6  prayers at school board meetings?
7    A.  No, I did not believe that I was imposing
8  **limits on any school board member as to how they**
9  **should pray.**
10   Q.  If you look at Plaintiff's Exhibit 9, I know
11 that you have read it, but let me just read paragraph
12 three again.
13       Paragraph three reads, "Such opportunity,"
14 and that means the opportunity to offer up prayers; is
15 that right?
16   A.  Yes, I believe so.
17   Q.  "Such opportunity shall not be used or
18 exploited to proselytize, advance, or convert anyone
19 or to derogate or otherwise disparage any particular
20 faith or belief."
21       Do you see that?
22   A.  Yes, I do.
23   Q.  Would you agree with me that paragraph three
24 imposes certain limitations on the content of the

Page 59

1  prayers to be offered by board members at board
2  meetings?
3    A.  No, I don't see it that way.
4    Q.  Under the board policy, do you think board
5  members are free to offer a prayer that proselytizes
6  for a particular faith?
7    A.  Repeat that, please.
8    Q.  Yes, under the board policy do you think that
9  board members are free to offer a prayer that
10 proselytizes for a particular faith?
11   A.  Can you define what you mean, what you mean
12 by proselytize?
13   Q.  No, sir.  It's your policy.  In fact, let me
14 ask a backup question.  When you voted on October 19,
15 2004 to adopt this policy as a board member, —
16   A.  Right.
17   Q.  — what did you understand proselytize to
18 mean in that paragraph?
19   A.  Well, to me, that means that when I pray, or
20 anyone prays, but I am using myself as an example, --
21   Q.  Yes, sir?
22   A.  -- that I would not say, "You need to be born
23 again, I am praying for you that God will touch you
24 and give you eternal life."

Page 60

1        I don't believe that I have that right when I
2  pray, and I don't do that.  I have never done that.
3    Q.  That's what you understood proselytize to
4  mean?
5    A.  Yes.
6    Q.  All right.  Do you understand that paragraph
7  three of the policy prohibits board members from
8  offering prayers that proselytize, as you have just
9  defined it?
10   A.  I believe that, yes, I believe it does.
11   Q.  Okay, so the policy does impose certain
12 limitations on the content of the prayers that can be
13 offered by board members at board meetings; correct?
14   A.  Yes.
15   Q.  Okay.  And, similarly, the policy prohibits
16 prayers that seek to advance or convert anyone;
17 correct?
18   A.  Correct.
19   Q.  And the policy prohibits prayers that
20 derogate or otherwise disparage any particular faith
21 or belief; correct?
22   A.  Yes.
23   Q.  Okay.  So, according to your understanding as
24 a board member, if a board member offered a prayer in

Page 61

1  which the board member said, "Please, God, touch each
2  of the board members with your guidance during their
3  decision-making process at the meeting tonight," would
4  that prayer be permitted or prohibited by paragraph
5  three?
6    A.  Well, I think it would be permitted.
7    Q.  But if the board member, the same board
8  member offered a prayer that said, "Please, God, touch
9  each board member with your salvation during the board
10 meeting today," that would be prohibited?
11   A.  I believe so, yes.
12   Q.  All right.  So a prayer for guidance is
13 alright, but a prayer for salvation is prohibited?
14   A.  Yes, I agree with that.
15   Q.  How about this prayer?  "Oh, Lord, imbue us
16 with the faith to know and serve you during our
17 decisions at this meeting."
18   A.  "Dear Lord."?
19   Q.  "Imbue us with the faith to know and serve
20 you."
21   A.  "To know you and to serve you?"  I don't
22 think that's appropriate.
23   Q.  I am going to ask you later in the
24 deposition, Mr. Evans, about some other prayers,

16 (Pages 58 to 61)

Dobrich, et al.                                    v.                    Indian River School District, et al.
John M. Evans                              C.A. # 15-120 (JJF)                            October 18, 2006

Page 62

1  as well, but I would like to ask you right now, as a
2  board member, how did you understand that paragraph
3  three would be enforced, the limitations in paragraph
4  three would be enforced?
5      A.  How I understood it would be enforced?
6      Q.  Yes, sir.
7      A.  I don't know.  I don't know how they would be
8  enforced.
9      Q.  Is it correct that the board is ultimately
10  responsible for the enforcement of its policies?
11     A.  Yes.
12     Q.  In the course of your consideration of Board
13  Policy BDA.1, did you give any consideration to how
14  this policy would be enforced?
15     A.  I did not, no.
16     Q.  In the course of your consideration of Board
17  Policy BDA.1, did you hear anybody give consideration
18  as to the issue of how Board Policy BDA.1 would be
19  enforced?
20     A.  I don't recall hearing anyone say, no.
21     Q.  Mr. Evans, the perception of whether a prayer
22  is proselytizing or not, do you think that the
23  decision about that -- And you and I went through a
24  few prayers in which I kept changing the content of it

Page 63

1  a little bit to see whether you would view it as
2  violative or permitted by paragraph three.
3      A.  Uh-huh.
4      Q.  In the course of deciding whether a prayer is
5  proselytizing or not, do you think that decision could
6  be affected by the individual faith of the person
7  making the decision?
8      A.  Repeat that, please.
9      Q.  Yeah, let me give you an example, and then I
10  will come back to a general question.  Okay?  I asked
11  you about some prayers that were at least intended to
12  be, and I think you heard them to be, Christian
13  prayers; correct?
14     A.  Right.
15     Q.  Do you think that the judgment of whether
16  those prayers are proselytizing or not might be
17  affected by whether the person making that decision
18  was Christian or Jewish or Muslim?
19     A.  Yes, I believe it would be affected.  You
20  can't separate the two.
21     Q.  So that a Christian might be more tolerant of
22  a -- Strike that.  I am going to use the language of
23  the policy.
24         A Christian might view a prayer as

Page 64

1  non-proselytizing which a Jewish person might view as
2  proselytizing, same prayer; correct?
3      A.  That's very possible, yes.
4      Q.  And the difference might be grounded in the
5  faith of those two persons?
6      A.  Well, I will use your words, yes, it might.
7      Q.  It's certainly not unreasonable to think that
8  it might be affected by that faith; isn't that true?
9      A.  That's true.
10     Q.  The persons making the judgment whether a
11  prayer is proselytizing or not in the Indian River
12  School District, that is the individual board members,
13  have been at all times since the adoption of this
14  policy Christian in faith; is that correct?
15     A.  Repeat that, please.
16     Q.  First, the persons ultimately responsible for
17  enforcing paragraph three of the board policy are the
18  board members; is that correct?
19     A.  That's correct.
20     Q.  And is it correct that at all times since
21  October 19, 2004 when this policy was adopted, every
22  board member has been of the Christian faith?
23     A.  I don't know that.
24     Q.  Do you have any reason to doubt that?

Page 65

1      A.  I have no reason to doubt that, no, but I
2  don't know that.  I don't know what the faith of some
3  of the board members are.
4      Q.  Do you attend church with any of the board
5  members?
6      A.  No.
7      Q.  On the other hand, you do know the faith of
8  some of your fellow board members; correct?
9      A.  Yes.
10     Q.  And how do you know that?
11     A.  Well, because they have, I have talked to
12  them and they have told me.  I know that from speaking
13  to them.
14     Q.  Identify the board members whose faith you do
15  know?
16     A.  Well, I do know Reggie Helms claims to be a
17  Christian; Nina Lou Bunting claims to be a Christian;
18  Donald Hattier claims to be a Christian.  He is -- I
19  don't ever recall him ending a prayer in Jesus's name,
20  but he has prayed.  Mark Isaacs, I don't know his
21  belief, but he had silent prayer once.
22         So it's not just those of us who claim to be
23  Christians that have prayed since this policy took
24  effect.

17 (Pages 62 to 65)

Dobrich, et al.                                    v.                    Indian River School District, et al.
John M. Evans                           C.A. # 15-120 (JJF)                          October 18, 2006

Page 66

1    Q.   That wasn't my question, sir. I just asked
2    you if you could identify the board members whose
3    faith you know. And you have told me Mr. Helms,
4    Mrs. Bunting, Nina Lou Bunting, and I guess you said
5    you didn't know Mr., Dr. Isaacs' faith; correct?
6    A.   No, I don't.
7    Q.   So the two board members that you do know
8    their faith is Mr. Helms and Ms. Bunting?
9    A.   Yes.
10   Q.   Anybody else?
11   A.   The only other one would be Donna Mitchell.
12   Q.   Who is also a Christian?
13   A.   Claims to be a Christian, yes.
14   Q.   Now, you have used the term "claims to be a
15   Christian." Do you use that phrase just because
16   there is no way to know for sure what someone's faith
17   is?
18   A.   Well, I use that term because I don't know.
19   I only know what they tell me and what I see.
20   Q.   Okay, so when you say "claims to be a
21   Christian," you mean in effect professes to be a
22   Christian?
23   A.   Professes, that might be a better word, yes.
24   Q.   You are not doubting that their faith is

Page 67

1    genuine?
2    A.   No, no, I am not.
3    Q.   To turn the question around, you are not
4    aware of anyone on the school board since October 19,
5    2004 who is not a Christian; is that correct? No one
6    has ever professed a faith other than the Christian
7    faith?
8    A.   No.
9    Q.   No, they have not?
10   A.   Well, no, they have not.
11   Q.   Yes, that's -- Sometimes --
12   A.   Not that I am aware of. They have never
13   professed it to me.
14   Q.   And during your entire decade of service on
15   the school board, is it correct that no person on the
16   board has ever professed a faith to you other than
17   Christianity?
18   A.   That's correct.
19   Q.   Look at page three of PX15, which is the
20   June 15 minutes. There is a section about halfway
21   down the page that is headed "graduation ceremonies."
22   Do you see that?
23   A.   Yes, I do.
24   Q.   And it reads, "Ms. Hobbs provided the board

Page 68

1    with information regarding school prayer from
2    Mr. Griffin. She apologized for its lateness. It was
3    moved by Mr. Helms, seconded by Mr. Cohee, to table
4    this item until the next regular board meeting. The
5    motion passed unanimously."
6    Am I correct that there was no public
7    discussion of the school board prayer or school prayer
8    issue at the June 15 meeting among the board members?
9    A.   I believe that's correct.
10   Q.   Okay. Now, it then reads, "Dr. Hattier left
11   the meeting from 8:30 to 8:45 p.m." Do you see that?
12   A.   Yes.
13   Q.   Do you recall that Mrs. Dobrich left at that
14   point and Dr. Hattier left immediately following her?
15   A.   No.
16   Q.   You do not?
17   A.   I do not.
18   Q.   Did you ever learn that Dr. Hattier left the
19   meeting to speak to Mrs. Dobrich outside of the
20   meeting?
21   A.   Yes.
22   Q.   How did you learn that?
23   A.   Well, he told us.
24   Q.   What did he tell you?

Page 69

1    A.   He told us that he spoke to Mrs. Dobrich.
2    Q.   Dobrich.
3    A.   Dobrich, excuse me.
4    Q.   And what did he tell you he said?
5    A.   I really don't recall. I don't remember what
6    he said.
7    Q.   When did Dr. Hattier inform -- This was at
8    another board meeting that he informed the members
9    about his conversation with Mrs. Dobrich?
10   A.   I don't know. It may have been. It may have
11   been at this meeting. It may have been at another
12   meeting.
13   Q.   At any rate, it was at a board meeting?
14   A.   Yes.
15   Q.   Okay. Did Dr. Hattier tell the board members
16   that he had proposed to Mrs. Dobrich a compromise in
17   which the district would keep Jesus, the name of Jesus
18   out of graduation prayers but would allow the use of
19   God in graduation prayers?
20   A.   I don't know. He may have. I don't know.
21   Q.   You have no memory one way or another?
22   A.   No, I don't.
23   Q.   Did Dr. Hattier tell the board members that
24   he had offered Mrs. Dobrich, had offered to provide

18 (Pages 66 to 69)

Dobrich, et al.                                                    v.                    Indian River School District, et al.
John M. Evans                                   C.A. # 15-120 (JJF)                             October 18, 2006

<table>
<tr><td>

Page 70

1  Mrs. Dobrich a copy of the legal opinion provided to
2  the school board by the district's lawyer?
3      A.  Are you asking me if I was aware of that?
4      Q.  No, I am asking you did you recall he told
5  you that?
6      A.  No, I don't.
7      Q.  Were you aware that Dr. Hattier offered
8  Mrs. Dobrich the opportunity to review a legal opinion
9  provided to the school board by the district's
10 lawyers?
11     A.  No, I was not aware of that.
12     Q.  Among the materials provided to the board at
13 the June 15 meeting -- Well, let me be more general.
14 On page three again of the minutes, under graduation
15 ceremonies, it says, "Mrs. Hobbs provided the board
16 with information regarding school prayer from
17 Mr. Griffin."  Do you see that?
18     A.  Yes.
19     Q.  What was that information?  What was that
20 material?
21     A.  I am not sure, but I know it was a reference
22 to school prayer.  I haven't read it since then, so I
23 really don't know.
24     Q.  Did you read it at that time?

</td><td>

Page 72

1      Q.  Alright.  When did the board have the
2  opportunity to direct Mrs. Hobbs to ask Mr. Griffin
3  for information regarding school prayer?
4      A.  I don't know.  I can't answer that.
5      Q.  Does the board from time to time give
6  direction to the district or the superintendent
7  outside of its regular board meetings?
8      A.  Outside of its regular board meetings?
9      Q.  Yes.
10     A.  Well, the president has that authority.
11     Q.  Alright.  Is it your belief that the
12 president, Mr. Walls, directed Mrs. Hobbs to get that
13 information from Mr. Griffin?
14     A.  I don't know that he did.  I don't know.  He
15 may have.
16     Q.  Alright.  The reason for your testimony that
17 the board had directed Mrs. Hobbs to get that
18 information is simply that she wouldn't have done it
19 if you hadn't told her to do so?
20     A.  I don't believe she would have done it on her
21 own.  It may have been a direction of the board or
22 Mr. Walls.
23     Q.  Okay.  If you look at page seven of the
24 minutes, under the heading Bradley Layfield.  Do you

</td></tr>
<tr><td>

Page 71

1      A.  Yes.
2      Q.  And when you say it was a reference to school
3  prayer, did it have to do with school prayer or school
4  board prayer or both?
5      A.  It may have been both.  I don't recall.
6      Q.  Did you know that Mrs. Hobbs had asked
7  Mr. Griffin for information regarding school prayer?
8      A.  Yes.
9      Q.  How did you learn that?
10     A.  Well, the board directed her to do so.
11     Q.  When did the board do that?
12     A.  Well, I don't recall.  I am assuming it was
13 prior to this meeting.
14     Q.  How do you know that the board directed
15 Mrs. Hobbs to do that?
16     A.  Well, she wouldn't have done it without the
17 board's consent.
18     Q.  Alright.  The graduation in 2004 took place
19 in early June.  Do you recall that?
20     A.  Yes.
21     Q.  Alright.  This was the first meeting
22 following that graduation ceremony.  You understand
23 that; correct?
24     A.  Yes.

</td><td>

Page 73

1  see that heading?
2      A.  Yes.
3      Q.  Do you know Mr. Layfield?
4      A.  Yes, I do.
5      Q.  Who is Mr. Layfield?
6      A.  Mr. Layfield is a teacher and athletic
7  director of Sussex Central High School.
8      Q.  Mr. Layfield was asked to speak on the issue
9  of what sod and what irrigation system would be used
10 at the high schools; is that correct?
11     A.  Yes, I believe so.
12     Q.  And then Mr. Layfield volunteered on his own
13 the substance of the final sentence under his heading.
14 It says, quote, "He mentioned that when he delivers a
15 prayer and uses the name 'Jesus Christ,' he intends it
16 to be for all faiths."  Do you see that.
17     A.  Yes, I do.
18     Q.  Did that strike you as a non-sequitur in the
19 context of his discussion of sod?
20     A.  Did it -- Say that again.  Did it strike me
21 as?
22     Q.  As a non-sequitur in the context of his
23 discussion of sod and irrigation systems?
24     A.  Well, that definitely is not non-sequitur.

</td></tr>
</table>

19 (Pages 70 to 73)

Dobrich, et al.                                          v.                    Indian River School District, et al.
John M. Evans                                  C.A. # 15-120 (JJF)                            October 18, 2006

Page 74

1  Q.  Oh, I'm sorry, I used a -- Did it strike you
2  as odd that Mr. Layfield volunteered his opinion about
3  prayer?
4  **A.  Yes, it did, absolutely.**
5  Q.  That kind of a comment would be more
6  appropriate for the public comment session; isn't that
7  right?
8  **A.  I believe it would be, yes.**
9  Q.  Did you have any idea how Mr. Layfield
10 thought that the use of the name Jesus Christ in a
11 prayer would be appropriate for all faiths?
12 **A.  I have no idea how he thought that.**
13 Q.  We can agree, can't we, that the use of Jesus
14 Christ in a prayer is not appropriate for persons of
15 the Muslim or Jewish faith?
16 **A.  Yes, I, yes, I know that, yes.**
17 Q.  Farther down the page, the minutes reflect
18 that the board went into executive session at 9:40,
19 and one of the reasons for doing so is to discuss
20 collective bargaining, pending or potential
21 litigation.  Do you see that?
22 **A.  Yes.**
23 Q.  Is that the heading under which the board
24 addressed the school prayer issue in executive

Page 75

1  session?
2  **A.  That would be, yes.**
3  Q.  And did the board address the school prayer
4  session during the executive session on June 15?
5  **A.  I don't remember.**
6  Q.  I am going to show you what we have marked as
7  PX16.  These are the minutes of the board's regular
8  meeting on July 27, 2004.  And, again, if you look at
9  the last page, you will see Mrs. Hobbs' signature.  Is
10 that her actual signature this time?
11 **A.  It looks like hers, yes.**
12 Q.  And we can confirm, then, these are the final
13 minutes of this meeting; right?
14 **A.  I believe so.**
15 Q.  Alright.  And you will see on the first page
16 under roll call that you are present at this meeting?
17 **A.  Yes.**
18 Q.  If you look at the second page under public
19 comments, you will see that there is a listing of
20 persons who spoke regarding Indian River School
21 District's practice of holding prayers at
22 school-sponsored events, including graduation
23 ceremonies, and then there is a list of people who
24 spoke.  Do you see?

Page 76

1  **A.  Uh-huh, yes, I do.**
2  Q.  The last sentence of that public comment
3  session says, "Comments were equally made in favor of
4  continuing and discontinuing the present practice."
5     Do you see that?
6  **A.  Yes.**
7  Q.  What did you understand the present practice
8  to be?
9  **A.  I understand that to mean continuing prayer**
10 **at school board meetings and at graduation.**
11 Q.  And is your recollection that comments were
12 equally made in favor of continuing and discontinuing
13 that practice?
14 **A.  Yes, I believe it was.**
15 Q.  Now, at the June 15 meeting, was Mrs. Dobrich
16 the only person who spoke during the public comment
17 session on this issue?
18 **A.  I believe so.**
19 Q.  Now, this was the meeting to which the board
20 tabled -- At June 15 the board tabled discussion of
21 board prayer until the next board meeting.  Do you
22 recall that?
23 **A.  I don't recall it, no.**
24 Q.  Well, we went through that in the minutes on

Page 77

1  June 15.  I can go back to it.
2  **A.  Oh, I remember June 15.  You are referring to**
3  **June 15 and not July?**
4  Q.  Yes.
5  **A.  Yes.**
6  Q.  The June 15 meeting, the board tabled
7  discussion until its next meeting?
8  **A.  Yes, I remember reading that.**
9  Q.  This is its next meeting; correct?
10 **A.  Yes.**
11 Q.  Alright, if you look down at the bottom of
12 page two of the July 27 minutes, you will see under
13 graduation ceremonies, quote, "It was moved by
14 Mr. Helms, seconded by Mr. Cohee, to table graduation
15 ceremonies until after executive session.  The motion
16 passed unanimously."
17    Do you see that?
18 **A.  Yes, I do.**
19 Q.  Alright, why did the board decide to go into
20 executive session to talk about this school board
21 prayer issue?
22 **A.  Well, that was usually the norm whenever we,**
23 **whenever there was a possibility of mentioning any**
24 **individual's names or positions.**

20 (Pages 74 to 77)

Dobrich, et al.                               v.                    Indian River School District, et al.
John M. Evans                         C.A. # 15-120 (JJF)                    October 18, 2006

Page 78

1    Q.  So it was to protect privacy interests of
2    persons who might be named during the discussion?
3        A.  Yes.
4        Q.  And what persons did you think would be named
5    during the discussion?
6        A.  Oh, you never know.  You never know whose
7    name might be mentioned during an executive session.
8        Q.  Well, wouldn't that argue for having
9    executive session discussions of everything, since
10   somebody's name might get mentioned?
11       A.  No, not necessarily.
12       Q.  Alright.  It's certainly possible that
13   Mrs. Dobrich's name might get mentioned; right?
14       A.  Sure, that's possible, yeah.
15       Q.  But Mrs. Dobrich had already spoken publicly
16   twice about this issue.  Her privacy interests weren't
17   served by going into executive session, were they?
18       A.  Well, I don't know that.  I don't know what
19   the discussion was.
20       Q.  Isn't the executive session, isn't the notion
21   of privacy interests addressed to district personnel?
22   You go into executive session --
23       A.  Yes.
24       Q.  -- when you are talking about district

Page 79

1    personnel.
2        A.  Yes, we do.
3        Q.  Not an incidental mention about a member of
4    the public; correct?
5        A.  Yes, that's correct.
6        Q.  Did you think that district personnel would
7    be mentioned during your discussion of the board
8    prayer issue?
9        A.  Quite possibly.
10       Q.  In what way?
11       A.  Possibly, as we read -- I don't know what
12   minutes it was.  Bradley Layfield could have been one
13   of the individuals on the agenda to talk about.  I
14   don't know.  I don't remember.
15       Q.  Do you recall that there was some notion that
16   there would be discussion of Bradley Layfield during
17   the July meeting?
18       A.  No, I don't recall that.
19       Q.  Do you think that was the reason why you went
20   into executive session?
21       A.  No, we always go into -- There is always an
22   executive session during every meeting.
23       Q.  I understand that.  The reason to incorporate
24   the discussion of graduation ceremonies and school

Page 80

1    board prayer in the executive session, was that
2    because you were afraid you were going to be
3    discussing Bradley Layfield's views on that issue?
4        A.  Well, I don't know.
5        Q.  You don't think so, do you?
6        A.  I really -- I don't know.  I don't know why
7    we went into executive session for that particular
8    item.
9        Q.  We have had testimony that the reason you
10   went into executive session was that it was a highly
11   charged issue.  Is that why you went into executive
12   session?
13       A.  Well, that may have been.  It was a highly
14   charged issue, yes.
15       Q.  And so you were trying to avoid what by going
16   into executive session?
17       A.  I don't know.  I don't have any response to
18   that.
19       Q.  Do you think that the public has a right to
20   see the deliberations of the school board on its
21   policies?
22       A.  Yes.
23       Q.  Did you think that by going into executive
24   session you were shielding from the public's view your

Page 81

1    discussion of a policy on school board prayer?
2        A.  Did I think that?
3        Q.  Yes.
4        A.  No, no, I didn't.
5        Q.  In retrospect, do you understand that by
6    going into executive session you shielded from the
7    public's view the board's discussion of the school
8    board prayer policy?
9        A.  Repeat that, please.
10       Q.  Do you understand, with the benefit of
11   hindsight, that by going into executive session in
12   July 27 you shielded from the public view the board's
13   discussion of its school board prayer policy?
14       A.  Yes.
15       Q.  Fine.
16       A.  Yes.
17       Q.  In retrospect, do you wish, as a board
18   member, that your discussions of that policy had been
19   in the public view?
20       A.  In retrospect, it should have been, like
21   other policies are discussed.
22       Q.  This is on a different topic, but I am on
23   these minutes, so I am just going to ask it quickly.
24   On page seven of the minutes.  There is virtually a

21 (Pages 78 to 81)

Page 82

1  whole page of the minutes devoted to various field
2  trips by various groups, school groups. Do you see
3  that?
4      A. Yes.
5      Q. And is it among the board's responsibilities
6  to approve field trips by student groups?
7      A. Yes, it is.
8      Q. And the board frequently does that; isn't
9  that right?
10     A. Yes.
11     Q. On page eight, the minutes reflect that you
12 went into executive session at 10:20 and emerged from
13 executive session at 12:10 a.m.. I will say
14 parenthetically that 12:10 a.m. is late and that you
15 folks worked very hard in your duties as board
16 members.
17        That reflects an executive session of an hour
18 and 50 minutes. And, by definition, executive
19 sessions are out of the public eye; correct?
20     A. Correct.
21     Q. When you came back out of executive session,
22 you will see on page nine at the top that the only
23 discussion of graduation ceremonies was to refer the
24 graduation ceremonies matter, which, by the way,

Page 83

1  includes the school board prayer matter; correct?
2  Yes? You have to say yes.
3      A. You are asking me if it does?
4      Q. If the graduation ceremonies matter included
5  the school board prayer issue?
6      A. Well, I don't know that. It may have.
7      Q. Do you have any recollection one way or
8  another?
9      A. No, I can't say yes or no if I am not sure.
10 I don't know this says graduation ceremonies. I can't
11 tell you if it included school board prayer or not.
12     Q. Okay, so you don't know whether, even as late
13 as July 27, the board had considered school board
14 prayer at all?
15     A. I believe it did, but I can't, I can't say
16 that it's included in this session.
17     Q. Okay, whatever graduation ceremonies refers
18 to, the only discussion of it in public session after
19 you came out of executive session was a motion to
20 refer that issue to the Policy Committee?
21     A. I believe so, yes.
22     Q. Okay. Now, are you a member, were you a
23 member of the Policy Committee?
24     A. No.

Page 84

1      Q. I will show you what we have previously
2  marked as PX13. This is a version of the final
3  minutes of the August 23 special board meeting. When
4  I say a version, I mean to refer to the fact that some
5  portions of the minutes have been masked so that we
6  can't see them and the word redacted has been stamped
7  on it to indicate that there has been a portion taken
8  out.
9      A. Yes.
10     Q. Okay, and that redaction was done by your
11 counsel. I don't yet know why.
12        This is actually, PX13 is the minutes of the
13 executive session of that special meeting. I would
14 like to show you now PX14, which is the minutes of the
15 regular portion of that meeting.
16        You will see on the second page of the
17 exhibit that you are listed as present. Does that
18 indicate to you that you attended the August 23
19 special meeting?
20     A. Yes, that's correct.
21     Q. Alright. The meeting was called to order at
22 7:00 and went into executive session at 7:01. Do you
23 see that?
24     A. Yes, I do.

Page 85

1      Q. And, as the minutes reflect, and this would
2  be consistent with your memory, as a special meeting
3  this meeting was not opened with a prayer; is that
4  correct?
5      A. That's correct.
6      Q. And you then came out of executive session at
7  11:15 and adjourned at 11:16; correct?
8      A. Yes.
9      Q. Can we agree, sir, that the entirety of this
10 meeting, except calling it to order and adjourning it,
11 was held in executive session?
12     A. That's correct.
13     Q. Alright. And do you recall that the sole
14 subject of the executive session was the discussion of
15 the school prayer issue?
16     A. Do I recall? It may have been. It's very
17 possible with legal counsel being there.
18     Q. When you say legal counsel being there,
19 that's because Mr. Griffin is shown as being in
20 attendance on page two of PX14, page two of the
21 exhibit, Page 1 of the minutes? "Other visitors and
22 staff in attendance," it reflects James Griffin. Do
23 you see that?
24     A. Yes.

22 (Pages 82 to 85)

Dobrich, et al.                              v.                    Indian River School District, et al.
John M. Evans                          C.A. # 15-120 (JJF)                        October 18, 2006

Page 86

1    Q.   And that's the counsel you are referring to.
2    A.   Yes.
3    Q.   Alright, fine.  And if you look at the
4    agenda, which is page one of the exhibit, turn back to
5    page one, you will see that the only specifically
6    addressed issue on the agenda is potential or pending
7    litigation, Number 0501PL.  Do you see that?
8    A.   I see that, yes.
9    Q.   Do you know what Number 0501PL means?
10   A.   No.
11   Q.   Do you know if PL stands for pending
12   litigation?
13   A.   I do know that, yes.
14   Q.   And the 0501 designation refers to the 05,
15   sorry, the 04-05 school year, and the 01 refers to the
16   first pending litigation; correct?
17   A.   Right, I understand that, yes.
18   Q.   Fine.  I will represent to you that others of
19   your colleagues have identified Number 0501PL as the
20   possible litigation involving the school prayer issue.
21   Alright?
22   A.   Okay.
23   Q.   Do you have any reason to doubt that?
24   A.   No, I don't.

Page 87

1    Q.   Okay.  Now, in the executive session minutes,
2    the only substantive discussion which remains after
3    your counsel has redacted this document is down near
4    the bottom of the page on page one, and it reads,
5    "During the discussion of this issue, several board
6    members expressed that their constituents do not want
7    the board to change its practice of opening the
8    meetings with a prayer.  It was not felt that a
9    decision could be made this evening regarding whether
10   or not to change our past practice."
11        Do you see that?
12   A.   Yes, I do.
13   Q.   Alright, and do you have any reason to doubt
14   that that was discussed?
15   A.   I have no reason to doubt it at all.
16   Q.   Do you have a specific recollection that at
17   this meeting board members expressed the view that
18   their constituents did not want the board to change
19   its practice of opening the meetings with a prayer?
20   A.   I don't recollect any specifics of that
21   meeting.
22   Q.   Do you recall that board members expressed
23   that sentiment at some point?
24   A.   Oh, yes, yes.

Page 88

1    Q.   Okay, and which board members; do you know?
2    A.   No, I don't remember specifically.
3    Q.   Did you express that sentiment?
4    A.   I don't know that I did.  I may have.  I may
5    have.
6    Q.   Was it your view in the summer of 2004 that
7    your constituents did not want the board to change its
8    practice of opening the meetings with a prayer?
9    A.   Was that my view?
10   Q.   Yes.
11   A.   Yes, I believe that they did not want us to
12   change it.
13   Q.   And when you say they, do you mean a majority
14   of your constituents or all of your constituents?
15   A.   A majority or all?  You are --
16   Q.   You said, "I believe they did not want us to
17   change it."
18   A.   Well, when I say they, I am referring to the
19   public.
20   Q.   Okay, all of the public or a majority of the
21   public?
22   A.   A majority.
23   Q.   Okay.  Did you have a view as to whether
24   there was a minority that did want you to change the

Page 89

1    practice?
2    A.   Did I have a -- I knew there were, there was
3    a minority that did want us to change the practice.
4    Q.   And did it matter to you what the majority
5    view was, or were you -- In voting for this policy,
6    were you exercising your own independent judgment?
7    A.   Well, I think it would have to be a
8    combination of both.
9    Q.   So, in exercising your independent judgment
10   as a board member, you do take into account what you
11   believe a majority of the public want you to do?
12   A.   Yes.
13   Q.   How did you form the view that a majority of
14   the public wanted the board to continue its practice
15   of opening the meeting with a prayer?
16   A.   Well, for one, at the August meeting the
17   attendance there and, you know, people that I know at
18   my church.
19   Q.   Any other way?
20   A.   No.
21   Q.   So you are aware that a majority of the
22   people at your church wanted the board to continue its
23   practice?
24   A.   Yes.

23 (Pages 86 to 89)

Dobrich, et al.                                    v.              Indian River School District, et al.
John M. Evans                         C.A. # 15-120 (JJF)                     October 18, 2006

Page 90

1    Q.  How did you learn that a majority of the
2    congregants at your church wanted the board to
3    continue its practice?
4    **A.  Well, they would tell me.  They would walk up**
5    **to me and tell me.**
6    Q.  How many people told you at your church?
7    **A.  Oh, I -- Maybe 20, 25, 30, somewhere in that**
8    **range.**
9    Q.  Is that over the course of the entire period
10   that you were considering the prayer, I mean the
11   policy?
12   **A.  Yes, I believe so.**
13   Q.  You also mentioned the attendance at the
14   August 24 board meeting.
15   **A.  Yes.**
16   Q.  Do you know how many people spoke at the
17   board meeting?
18   **A.  Maybe 20.**
19   Q.  Was there anything else at the board meeting
20   that suggested to you that the public wanted you to
21   continue your practice, other than the people who
22   actually spoke?
23   **A.  Well, just, just the attendance and the**
24   **people who spoke.  That was pretty much it.**

Page 91

1    Q.  How about the reaction of the people in the
2    crowd who didn't speak, did that suggest to you that
3    the public supported your existing practice of --
4    **A.  The people that didn't speak?  I'm sorry.**
5    Q.  Yes, sir, and I know that you are trying to
6    get clarification, but it's better if we each try not
7    to interrupt each other.
8    The people who didn't speak formally at the
9    podium during the public comment session, did their
10   behavior or conduct or anything that those people said
11   while they were not at the podium indicate anything to
12   you about whether the public supported your existing
13   practice of opening meetings with a prayer?
14   **A.  Well, those who didn't speak, there was**
15   **cheering and signs, people carrying signs and those**
16   **cheering that didn't speak.**
17   Q.  And those folks cheered during the comments
18   that supported the board's practice?
19   **A.  Yes.**
20   Q.  Alright.
21   **A.  Yes.**
22   Q.  And did you hear people say amen during
23   the --
24   **A.  Yes.**

Page 92

1    Q.  -- statements?
2    **A.  Yes.**
3    Q.  And that was a widespread practice during the
4    meeting, wasn't it?
5    **A.  Yes.**
6    Q.  And the cheering was loud, wasn't it?
7    **A.  Yes, it was.**
8    Q.  And the signs were many?
9    **A.  Maybe less than a dozen.**
10   Q.  Did you see any signs that expressed the view
11   that the board should stand up to the ACLU?
12   **A.  I don't recall if there was a specific sign**
13   **of that nature.**
14   Q.  And the flip side of the cheering and the
15   amen that followed public comments supporting the
16   board's practice was that there was booing during the
17   comments that supported changing the board's practice;
18   isn't that right?
19   **A.  I believe there was, yes.**
20   Q.  And some catcalling and jeering?
21   **A.  Yes, there was booing.  I can't tell you**
22   **about catcalling, because I don't know.**
23   Q.  And the booing was as loud as the cheering,
24   wasn't it?

Page 93

1    **A.  Possibly.**
2    MR. ALLINGHAM:  We are going to change
3    the tape, Mr. Evans.
4    VIDEOGRAPHER:  Going off the record at
5    11:15 a.m..
6    (A recess was taken.)
7    VIDEOGRAPHER:  Going back on the
8    record at 11:25 a.m..
9    BY MR. ALLINGHAM:
10   Q.  Looking again at PX13, which is the executive
11   session minutes, the last sentence of the only
12   substantive portion of these minutes says, quote, "It
13   was not felt that a decision could be made this
14   evening regarding whether or not to change our past
15   practice."
16   And my question to you, sir, is do you have
17   any recollection of what it was that the board members
18   needed in order to be able to make a decision about
19   whether to change the past practice which you didn't
20   have as of August 23?
21   **A.  No, but the fact that it was 11:15, it may**
22   **have been felt it was a little late to get into that**
23   **discussion or further that discussion.**
24   Q.  This is a four-hour and 14 minute executive

24 (Pages 90 to 93)

Case 1:05-cv-00120-JJF    Document 250-18    Filed 04/10/2008    Page 25 of 43

Dobrich, et al.                                     v.                    Indian River School District, et al.
John M. Evans                              C.A. # 15-120 (JJF)                           October 18, 2006

Page 94

1    session which appears to have been directed entirely
2    to the issue of school prayer, and what I would like
3    you to do is tell me everything you recall that was
4    discussed in that four-hour and 14 minute session.
5              MR. SHAU: Object. It's
6    attorney/client privilege discussions held
7    at that meeting. I am going to instruct the
8    witness not to answer.
9              MR. ALLINGHAM: Is your position that
10   everything that was discussed at that
11   meeting is protected by the attorney/client
12   privilege?
13             MR. SHAU: Right, I will limit my
14   objection to everything that was discussed
15   regarding the school board prayer issues and
16   the potential litigation with counsel. If
17   there were other issues discussed at that
18   meeting not related to that, then the
19   witness can answer.
20             MR. ALLINGHAM: Fair enough. I just
21   wanted to make sure we were on the same
22   wavelength. If Mr. Griffin offered a legal
23   opinion to the board, you would take the
24   position that it's covered by the privilege?

Page 95

1              MR. SHAU: Yes.
2              MR. ALLINGHAM: If Mr. Evans discussed
3    with Dr. Hattier their individual views on
4    the issues, that would not be covered by the
5    privilege just because Mr. Griffin was
6    there; correct?
7              MR. SHAU: I would say if they
8    discussed it in the forum of a conversation
9    with their counsel, that, too, would be
10   privileged.
11             MR. ALLINGHAM: Well, I don't want to
12   ask an improper question. What do you mean
13   by "in the forum of a conversation with
14   their counsel"?
15             MR. SHAU: If Dr. Hattier raised his
16   view and counsel may have said -- I wasn't
17   at the meeting, I don't know what
18   occurred -- may have said, "Well, what's
19   someone else's view," and somebody else
20   raised their view, then I think that is
21   within the confines of the attorney/client
22   privilege.
23   BY MR. ALLINGHAM:
24        Q.  Mr. Evans, what counsel have been having a

Page 96

1    colloquy on is the extent of the protection of
2    discussions from discovery in this deposition as a
3    consequence of the fact that it may or may not be
4    covered by the privilege, so I am going to ask you
5    some questions. On these questions it's particularly
6    important to wait until I am done and to give Mr. Shau
7    a chance to interpose an objection if he wants to.
8    Okay?
9         A.  Yes.
10        Q.  Did Mr. Griffin provide the board with legal
11   advice on the issue of school board prayer during this
12   meeting? Don't tell me what it was. Just tell me
13   whether he did or not.
14        A.  I am going to have to qualify my statement.
15   I don't know if it was at this meeting. I can't
16   verify that, but yes, he gave us his opinion.
17        Q.  Whether it was at this meeting or another
18   meeting, did Mr. Griffin provide the board members
19   with a draft of a school board prayer policy?
20        A.  I believe he did.
21        Q.  And when Mr. Griffin gave his opinion
22   regarding the issue of school board prayer, was it in
23   the form of an opinion about the legality of the
24   policy that he was offering you?

Page 97

1         A.  Would you repeat that, please?
2         Q.  Yeah, let me see if I can make it a little
3    clearer.
4         A.  It was a little confusing.
5         Q.  Mr. Griffin gave you some advice. Did it
6    have to do with the legality of the draft policy that
7    he had provided to you, or was it more generally on
8    the issue of school prayer?
9         A.  I don't remember. I honestly don't. He gave
10   us his opinion. I don't remember if it was a draft.
11        Q.  Let me show you what's been marked as PX11.
12   Take as much time as you want to read that document.
13   Have you read it?
14        A.  Yes.
15        Q.  Having just recently read Board Policy BDA.1,
16   do you recognize that the language of the two are,
17   with some minor modifications, identical?
18        A.  Yes.
19        Q.  Alright. Now I would like to show you PX12.
20   I am not going to ask you to read the whole document,
21   but rather I am going to direct your attention to
22   certain portions of it. The first portion is the
23   material in brackets at the top left of the first
24   page, which reads, "For release to the general public,

Page 98

1  proposed school board prayer resolution dated 8/30/04
2  prepared by the Rutherford Institute and the Neuberger
3  firm." Do you see that?
4      A.  Yes.
5      Q.  Alright, and do you recall receiving from the
6  Rutherford Institute or Tom Neuberger a document
7  having to do with prayer at board meetings?
8      A.  I believe so.
9      Q.  Okay.
10     A.  Yes, I think we did.
11     Q.  Turn to the next to the last page and you
12  will see five numbered paragraphs.
13     A.  Yes.
14     Q.  And I would like you to read the five
15  numbered paragraphs.  Have you read it?
16     A.  Yes.
17     Q.  Can we agree that the text of those five
18  numbered paragraphs is substantively identical to
19  Board Policy BDA.1 and with some very minor
20  modifications to the text of PX11?
21     A.  Yes.
22     Q.  And am I correct, then, in inferring that the
23  text of the board policy as adopted, the text of PX11,
24  and the text of the numbered paragraphs of PX12,

Page 99

1  according to your best recollection, were drafted by
2  either the Rutherford Institute or the Neuberger firm?
3      A.  It appears that way, yes.
4      Q.  Did you have a different draft policy that
5  was, from PX11, PX12 and PX9, that was prepared by
6  Mr. Griffin?
7      A.  I don't recall.  There may have been.
8      Q.  I thought you testified earlier that you
9  thought that Mr. Griffin had provided you with a draft
10  policy.  Is that correct?
11     A.  He may have, yes.  I believe he did.
12     Q.  Am I correct that you do not believe that the
13  draft provided to you by Mr. Griffin is any of PX9,
14  PX11 or PX12?
15     A.  Repeat that, please.
16     Q.  The draft Mr. Griffin provided you is not in
17  front of you right now; isn't that correct?
18     A.  I don't -- If he did, I don't see it, no.
19     Q.  Okay.  PX11, it says that it's dated 8/30/04
20  and is prepared, you will see somewhat under that, for
21  a first reading in September of '04.  Do you see that?
22     A.  I'm sorry, which document are you looking at?
23     Q.  PX --
24     A.  Twelve.

Page 100

1      Q.  Yes, sorry, PX12.
2      A.  Would you repeat that, please?
3      Q.  Yes.  You will see that it's dated 8/30/04,
4  top left.
5      A.  Yes.
6      Q.  And that it appears to have been intended for
7  a first reading in September of 2004.
8      A.  I see that line.
9      Q.  Is it your belief that the board at its
10  executive session on August 23 did not yet have this
11  document?
12     A.  It would appear, based on the dates I see on
13  this form.
14     Q.  Do you have any independent recollection of
15  whether at the August 23 executive session the board
16  had this document, PX 12?
17     A.  I have no recollection, no.
18     Q.  So your best belief, based on the text of the
19  document, is that it did not, but you don't have an
20  independent recollection?
21     A.  That's correct.
22     Q.  Okay.  Whenever the board got it, do you
23  recall the board considering the substance of what has
24  been marked as PX12?

Page 101

1      A.  Would you repeat that, please?
2      Q.  Without regard to time, do you recall that as
3  a board member you reviewed PX12?
4      A.  I don't recall.  I may have.
5      Q.  Does the document look familiar, that is to
6  say without having gone through it paragraph by
7  paragraph, do you recall getting a lengthy document
8  from the Rutherford Institute and Mr. Neuberger on the
9  issue of school prayer?
10     A.  I believe we did.  I don't know that it's
11  this document, but I believe we got something from
12  them.
13     Q.  Look on page two, please.  There are some
14  whereas clauses on page two, and the second one reads,
15  "The school board has obtained the legal advice of two
16  competent and experienced constitutional attorneys,
17  John W. Whitehead, Esquire, and Thomas Neuberger,
18  Esquire."  Do you see that?
19     A.  Yes, I do.
20     Q.  And did, in fact, the school board obtain the
21  legal advice of Mr. Whitehead and Mr. Neuberger?
22     A.  Of Mr. Whitehead, I am not aware that we did,
23  and Mr. Neuberger, he did attend one meeting.
24     Q.  And did he give you legal advice during that

26 (Pages 98 to 101)

Dobrich, et al.                              v.                Indian River School District, et al.
John M. Evans                        C.A. # 15-120 (JJF)                      October 18, 2006

Page 102

1   meeting?
2       A.   I am not sure. I don't know. He may have.
3       Q.   Do you know when that meeting took place?
4       A.   No, I don't remember.
5       Q.   Am I correct that it was before the board
6   finally adopted Board Policy BDA.1?
7       A.   I can't -- I don't know. I can't remember.
8   I can't specifically say when.
9       Q.   You testified that Mr. Neuberger attended one
10  board meeting. Do you know who invited Mr. Neuberger
11  to attend?
12      A.   It may have been Mr. Helms.
13      Q.   Does every board member have the authority to
14  invite lawyers to make presentations to the board?
15      A.   No, but I don't believe Mr. Helms would have
16  done it without prior consent from the president.
17      Q.   So your understanding is that Mr. Helms may
18  have extended the invitation but he was authorized to
19  do so by the board or its president?
20      A.   That would be the norm, yes.
21      Q.   And you have no reason to think that the norm
22  was deviated from in this instance?
23      A.   No, I don't.
24      Q.   During the board meeting at which

Page 103

1   Mr. Neuberger was in attendance, was consideration
2   given by the board to retaining Mr. Neuberger as its
3   legal counsel?
4       A.   At the board meeting that he attended? No,
5   we did not.
6       Q.   Did not retain him or did not consider
7   retaining him?
8       A.   We considered, yes.
9       Q.   And then at that meeting chose not to retain
10  him?
11      A.   That's correct.
12      Q.   Why did the board choose not to retain
13  Mr. Neuberger?
14          MR. SHAU: I am going to object on
15      attorney/client privilege, but, upon your
16      representation that this testimony has
17      occurred before, I will allow the witness to
18      answer your questions. What I mean by that
19      is previously you told me Jason had allowed
20      this to go forward.
21          MR. ALLINGHAM: Yeah, I don't know
22      that I asked precisely this question, but
23      there has been some testimony about the
24      decision-making process on retaining or not

Page 104

1   retaining Mr. Neuberger.
2           THE WITNESS: Would you repeat the
3       question, please?
4   BY MR. ALLINGHAM:
5       Q.   Yes, why did the board choose not to retain
6   Mr. Neuberger?
7       A.   What I recall of Mr. Neuberger, he wanted to
8   take complete control, and the board would not allow
9   that.
10      Q.   And so the board made a judgment at that
11  meeting that it was not going to retain him?
12      A.   I believe it was at that meeting. It was at
13  a meeting. I believe it was that one.
14      Q.   At the meeting at which Mr. Neuberger was in
15  attendance, did he pass out a document that he had
16  prepared relating to school board prayer? Did he
17  distribute it to the board members?
18      A.   He may have, but I don't know what it was. I
19  believe he may have passed out a document. It may
20  have been that.
21      Q.   May have been PX12 and may not have been?
22      A.   That's correct. It may have been. I don't
23  recall.
24      Q.   Do you recall that the ACLU threatened the

Page 105

1   board and the school district with a lawsuit if it did
2   not abandon its custom of opening its meetings with a
3   prayer?
4       A.   I believe they threatened a lawsuit. I don't
5   recall whether it was over the graduation policy or
6   school board prayer, but I believe they did threaten
7   to pursue it.
8       Q.   I want you to take as much time as you need
9   to answer the questions that I am going to pose to you
10  now, and that includes, if you want to, reading the
11  entirety of PX12. But, without reading it in its
12  entirety, unless you feel the need to, can we agree
13  that it has lengthy discussions of legal cases?
14      A.   Yes, it does have a number of legal cases
15  stated.
16      Q.   Did Mr. Neuberger, during his presentation to
17  the board, discuss legal cases on school prayer?
18      A.   He may have. I don't remember if he did or
19  not. He may have.
20      Q.   Look at page three, please. In the third
21  full paragraph which begins, "It is the opinion." Are
22  you with me?
23      A.   Yes.
24      Q.   Quote, "It is the opinion of legal counsel

27 (Pages 102 to 105)

Dobrich, et al.                         v.                    Indian River School District, et al.
John M. Evans                   C.A. # 15-120 (JJF)                        October 18, 2006

Page 106

1  that since the Indian River Board of Education is a
2  public legislative and deliberative body, it has the
3  right to open its meetings with a prayer." Closed
4  quote.
5          Did the Indian River Board of Education
6  receive such an opinion?
7      A.  I don't recall if we did, but we believe that
8  we had -- We believe this paragraph. Now, whether it
9  was legal counsel, I don't remember.
10     Q.  So let me explore that for a minute. Is it
11  your belief, I am going to start with you, that the
12  Indian River Board of Education is a public
13  legislative and deliberative body; correct?
14     A.  Yes.
15     Q.  And it is your belief that the board,
16  therefore, has the right to open its meetings with a
17  prayer?
18     A.  Yes, I believe that.
19     Q.  Right. Do you think you would have linked
20  the two concepts without advice from counsel, that is
21  do you think without advice from counsel you would
22  have said, "Well, the reason we have the right to open
23  our meetings with a prayer is that we are a public
24  legislative and deliberative body."?

Page 107

1      A.  Without -- you are asking -- repeat the
2  question for me, please.
3      Q.  There is a linkage between the two concepts.
4  It's because or since the board is a public
5  legislative and deliberative body, it has the right to
6  open its meetings with a prayer.
7          In the absence of legal advice to that
8  effect, do you think that you, as an individual, would
9  have said, "Well, I think we have the right to open
10  our meetings with a prayer because we are a public
11  legislative and deliberative body." That's a legal
12  question, isn't it?
13     A.  Right, as an individual, I would not have
14  known that, no.
15     Q.  So in forming the view that the Indian River
16  Board of Education is a public legislative and
17  deliberative body, you relied on the advice of
18  counsel; is that correct?
19     A.  I don't know that. I don't know that counsel
20  ever told us this. Possibly they did, but I can't say
21  that they, that anybody did.
22     Q.  In making your decision to vote for Board
23  Policy BDA.1, was one of the factors that you took
24  into account in considering that decision the opinion

Page 108

1  of legal counsel that since the Indian River Board of
2  Education is a public legislative and deliberative
3  body, it has the right to open its meetings with a
4  prayer? Did you take that into account in voting for
5  the policy?
6      A.  You are referring to our policy?
7      Q.  Correct. Yes, I'm sorry, I call it BDA.1,
8  the board prayer policy.
9      A.  You will have to repeat that again, please.
10     Q.  In voting for that policy, did you take into
11  account an opinion of legal counsel that since the
12  Indian River Board of Education is a public
13  legislative and a deliberative body, it has the right
14  to open its meetings with a prayer?
15     A.  Yes.
16     Q.  Who gave you that opinion?
17     A.  Well, as I have stated, I don't know who did.
18  I don't know that anybody did. But I do believe what
19  that paragraph states. Now, whether --
20     Q.  You just told me that when you voted for the
21  policy you took into account the opinion of legal
22  counsel to that effect.
23     A.  Well, I answered your question based on what
24  you said, but I don't know that we had legal counsel,

Page 109

1  but I can only base it on that paragraph. If I have
2  to exclude legal counsel, that's fine. I don't know
3  that we had legal counsel. I am assuming that we did
4  because I, as an individual, would not have linked
5  those, as I mentioned before.
6      Q.  Okay. So let's take, as a given, your
7  assumption for purposes of the next few questions.
8  Okay?
9          On the assumption that you had advice that
10  since the Indian River Board of Education is a public
11  legislative and deliberative body it has the right to
12  open its meetings with a prayer, on that assumption
13  you would agree with me, wouldn't you, that you took
14  that legal advice into account in deciding whether to
15  vote for the board policy?
16     A.  Yes, I would have.
17     Q.  If I then pursue that farther and say, we
18  understand that you assume that you got such advice
19  and so I ask you who gave you the advice, your answer
20  is you don't know?
21     A.  That's correct.
22     Q.  And if I ask you whether you got advice from
23  more than one source on that subject, legal advice
24  from more than one source, you don't know?

28 (Pages 106 to 109)

Dobrich, et al.                                    v.                    Indian River School District, et al.
John M. Evans                            C.A. # 15-120 (JJF)                        October 18, 2006

Page 110

1    A.  I don't know, but it's very possible.
2    Q.  Why is it very possible?
3    A.  Well, we had Mr. Neuberger and Mr. Griffin,
4    there is two attorneys that both or neither may have
5    given us the advice.  I don't know.
6    Q.  Do you recall whether you got differing
7    opinions on that topic from legal counsel?
8    A.  On the topic of school prayer, of our policy,
9    or this paragraph?
10   Q.  This paragraph, that since the Indian River
11   Board of Education is a public legislative and
12   deliberative body, it has the right to open its
13   meetings with a prayer.
14   A.  I don't recall if we had different opinions.
15   I don't recall.
16   Q.  Did you get differing advice on the, more
17   generally, on the issue of school board prayer from
18   more than one counsel?
19   A.  Yes.
20   Q.  And were those counsel Mr. Griffin and
21   Mr. Neuberger?
22   A.  Well, they were two of the legal counsel, and
23   then the legal counsel that -- Well, no, I don't know
24   if legal counsel from the insurance company

Page 111

1    provided -- I don't think they provided anything on
2    the prayer issue.
3    Q.  So your best recollection is that the
4    differing advice came from Mr. Griffin and
5    Mr. Neuberger?
6    A.  Yes, yes.
7    Q.  And now I want to ask you about the sequence
8    in which you received that advice.  Is it correct that
9    you got the advice from Mr. Griffin first and then got
10   advice from Mr. Neuberger second?
11   A.  That -- That may have been.
12   Q.  Is that your best recollection?
13   A.  Yes, it is.
14   Q.  And you need to definitely pause before you
15   answer this question, okay, because Mr. Shau may --
16   You need to give Mr. Shau a chance to object.
17   A.  Okay.
18   Q.  Tell me, as well as you can recall, what the
19   differences were between the advice Mr. Griffin gave
20   you and the advice that Mr. Neuberger gave you?
21       MR. SHAU:  Object.  The advice given
22   by counsel is attorney/client privilege.
23   Don't answer that question.  I will instruct
24   the witness not to answer the question,

Page 112

1    please.
2    BY MR. ALLINGHAM:
3    Q.  Do you understand that this lawsuit is being
4    prosecuted by the ACLU?
5    A.  Yes, I do.
6    Q.  What is the basis for that understanding?
7    A.  Well, I understand that the ACLU represents
8    the Dobrich family.
9    Q.  Where did you get that understanding?
10   A.  I assume one of the attorneys.  I don't
11   remember which one.
12   Q.  You --
13   A.  Somebody.  I can't tell you who it was.
14   Q.  You talked in some earlier answers about
15   understanding what the public perceives in your
16   district.  Do you believe that the public perceives
17   that the ACLU is prosecuting this lawsuit?
18   A.  I believe so.
19   Q.  And do you believe that the public views the
20   board's defense of this lawsuit as, in some sense,
21   standing up to the ACLU?
22   A.  In some sense, yes.
23   Q.  And do you believe that the public views the
24   defense of this lawsuit as a defense of Christian

Page 113

1    values?
2    A.  Yes.
3    Q.  Do you believe that the public views the
4    defense of this lawsuit as a defense of Christian
5    prayer?
6    A.  No.
7    Q.  Do you believe -- What are the Christian
8    values that you believe the defense of this lawsuit is
9    perceived to be defending?
10   A.  The right to pray at a board meeting.
11   Q.  Why is that a Christian value, but -- Sorry.
12   Why is that a Christian value as opposed to simply --
13   Strike that.  I will withdraw the question.
14       Now, in the August 23 board meeting you will
15   see that no action was taken on Number 0501PL.  The
16   next board meeting was the next day, August 24.
17       Do you have any recollection of why a special
18   meeting for the purpose of discussing the school board
19   prayer issue was scheduled for the day before the
20   August 24 meeting?
21   A.  No, I don't.
22   Q.  It's your understanding of the board's
23   intention that its meetings be conducted in a
24   respectful and courteous manner; is that correct?

29 (Pages 110 to 113)

Dobrich, et al.                          v.                Indian River School District, et al.
John M. Evans                   C.A. # 15-120 (JJF)                    October 18, 2006

Page 114

1    A.  That's correct.
2    Q.  And the board member who is initially charged
3    with that is the board president who has the gavel;
4    correct?
5    A.  That's correct.
6    Q.  But would you agree with me that each
7    individual board member has the obligation to try to
8    ensure, to the best of his ability, that meetings are
9    conducted in a courteous and respectful manner?
10   A.  Yes, I do.
11   Q.  And if you felt that the board president was
12   not acting to stop disrespectful or discourteous
13   behavior, you would do something yourself to address
14   the issue, wouldn't you?
15   A.  Yes, I believe I would.
16   Q.  And would that be to pass a note or speak to
17   the board president in the first instance?
18   A.  That could be one of those methods.
19   Q.  And an alternative would be to stand up and
20   take action yourself; correct?
21   A.  If needed.
22   Q.  During the August 24 board meeting, the big
23   meeting, did you believe that the conduct of the board
24   and the members of the public was at all times

Page 115

1    respectful and courteous?
2    A.  I believe the conduct of the board was, but
3    not necessarily the public in some instances with the
4    booing. I don't approve of that.
5    Q.  Did you do anything to stop the booing?
6    A.  No, I did not.
7    Q.  Do you recall that the board president did
8    anything to stop the booing?
9    A.  I don't recall that he did.
10   Q.  Looking back on it, do you think that he
11   should have?
12   A.  Yes, and second thought, he may have slammed
13   his gavel a couple times. I don't recall, but yes,
14   yes, that should have been stopped.
15   Q.  Would you agree with me that the booing and
16   the cheering intensified the emotionally charged
17   atmosphere of that meeting?
18   A.  Yes, I do.
19   Q.  Would you agree with me that the atmosphere
20   of the meeting was intimidating to persons who spoke
21   out against school board prayer?
22   A.  I can't speak for those individuals, but I
23   would think that it would be.
24   Q.  You would agree, at least, that it would

Page 116

1    not be unreasonable for people who had spoken out
2    against school board prayer to find the atmosphere of
3    the public session intimidating?
4    A.  I would, yes, it could be.
5    Q.  Mr. Evans, do you recall a speaker who spoke
6    about Madalyn Murray O'Hair during the public comment
7    session of the meeting?
8    A.  I believe I do.
9    Q.  And that was Mr. Harold Johnson?
10   A.  I don't remember who.
11   Q.  Did you serve on the school board with
12   Mr. Harold Johnson?
13   A.  No, I did not.
14   Q.  So his term predated 1996?
15   A.  Yes, that's correct.
16   Q.  You do know that Mr. Johnson was a former
17   school board member?
18   A.  Yes, I do.
19   Q.  And do you recall that Mr. Johnson spoke at
20   the big meeting?
21   A.  Yes.
22   Q.  Does my saying his name remind you that it
23   was Mr. Johnson who spoke about Madalyn Murray O'Hair?
24   A.  No, it does not.

Page 117

1    Q.  What do you recall about the comments that
2    were made about Madalyn Murray O'Hair during the
3    public comment session of the August 24 meeting?
4    A.  Honestly, I didn't recall it until you
5    mentioned it, but I know that there was something
6    said, but I don't recall exactly what the words were.
7    Q.  Let me see if I can refresh your recollection
8    again. Do you recall that a speaker stood up and said
9    that God had proved that God was the highest power by
10   the disappearance of Madalyn Murray O'Hair?
11   A.  I don't remember that specific statement, no.
12   Q.  Do you recall that the statement was made
13   that Madalyn Murray O'Hair had disappeared never to be
14   seen again?
15   A.  I believe I do recall that part, yes.
16   Q.  And do you recall that the speaker, in case
17   that anyone missed the linkage, informed the public
18   that Madalyn Murray O'Hair was the person who started
19   the movement to take prayer out of our schools?
20   A.  I'm sorry, I missed --
21   Q.  Do you recall that the speaker in his remarks
22   reminded the public that Mrs. O'Hair was the person
23   who had led the movement to take prayer out of our
24   schools?

30 (Pages 114 to 117)

Dobrich, et al.                                 v.                    Indian River School District, et al.
John M. Evans                          C.A. # 15-120 (JJF)                      October 18, 2006

Page 118

1    A.  I don't recall that, no.
2    Q.  I am going to show you Mr. Johnson's
3  comments.  Then I am going to have some questions to
4  ask you about those comments.  If you can't get some
5  of the words or you would like to have anything
6  replayed in order to fully understand what Mr. Johnson
7  said, just speak up.  Okay.
8            (At this time the videotape of Mr.
9    Johnson's comments was played for the witness.)
10           MR. LENHARD:  Let the record reflect
11           that was Plaintiff's Exhibit 40, a DVD,
12           played from one hour and one minute to one
13           hour and four minutes and 17 seconds.
14  BY MR. ALLINGHAM:
15   Q.  As Mr. Lenhard's notation about the time of
16  that speech shows, Mr. Johnson spoke for about three
17  minutes and 15 seconds.  Do you recall whether the
18  board imposed a time limit on the persons speaking at
19  the public comment session of this meeting?
20   A.  I am not sure at this meeting, but there is a
21  time limit on individuals in groups.
22   Q.  Do you recall that the board shortened that
23  time for purposes of public comment at the August 24
24  meeting?

Page 119

1    A.  Shortened that time?
2    Q.  Yes.
3    A.  No, I don't recall that.
4    Q.  When Mr. Johnson said, "The U.S. Supreme
5  Court may be the highest deliberative body of this
6  nation but there is one higher authority above them,
7  The Good Lord has proven that," and then said, "The
8  last I knew, Madalyn Murray O'Hair just disappeared to
9  never be seen or heard from again," did you understand
10  that to be Mr. Johnson's attempt to link the fate of
11  Mrs. O'Hair to what might happen to Mrs. Dobrich if
12  she continued to oppose prayer at the school board
13  meeting?
14   A.  I can't comment on what Mr. Johnson may have
15  thought or said.  I don't know, to answer your
16  question.
17   Q.  That wasn't my question, and it may be a
18  subtle distinction, but it's a distinction, sir.  What
19  was your understanding, as you sat there during the
20  board meeting about why in Heaven's name Mr. Johnson
21  was raising the fate of Mrs. O'Hair in the context of
22  a public comment on school board prayer?  Did you have
23  any understanding?
24   A.  I never related or connected it to

Page 120

1  Mrs. Dobrich's family.
2    Q.  Well, did you have any understanding about
3  why Mr. Johnson was raising the -- By the way, did you
4  know what actually happened to Mrs. O'Hair?
5    A.  I don't know exactly, but I know that she
6  ended up missing and was found dead somewhere.
7    Q.  Found dead and dismembered.  Do you recall
8  that?
9    A.  I remember that now, yes.
10   Q.  Do you have any idea -- Did you have any idea
11  at the time as to why Mr. Johnson would talk about the
12  fate of Madalyn Murray O'Hair in his public comment on
13  school board prayer?
14   A.  No, I thought it was uncalled for.
15   Q.  At the time?
16   A.  Well, I don't know about the time, but
17  looking back now, it was definitely, it was uncalled
18  for.
19   Q.  Do you think it would be reasonable for the
20  Dobrich family -- Let me just give you a preface for
21  this.  The Dobrich family members had already spoken
22  by the time Mr. Johnson stood up to give his little
23  speech, and they were still sitting in the audience.
24  Do you think it would have been reasonable for

Page 121

1  Mrs. Dobrich and her family to understand
2  Mr. Johnson's remarks to have been an implicit threat?
3    A.  I don't know how they may have felt, and I
4  cannot say that they may have taken it as a threat,
5  but, as I commented, it was very inappropriate.  It
6  should not have been said.
7    Q.  As with Mr. Johnson, I wasn't asking you how
8  the Dobrich family members took Mr. Johnson's
9  comments.  They can speak for themselves when they
10  testify.
11           What I was asking you is do you think it
12  would be unreasonable for someone in the Dobrich
13  family's position sitting in that audience to have
14  felt threatened by Mr. Johnson's remarks?
15   A.  I am not going to answer that question.  I
16  have already answered.  I don't know.  They may have,
17  but I don't know, and I can't comment whether they
18  felt that way or not.
19   Q.  No, sir, and it's an important distinction.
20  I am not asking you how they felt.  I am asking you
21  whether, in your opinion, it would have been
22  unreasonable for them to have understood Mr. Johnson's
23  remarks to be threatening?
24   A.  They could have thought that.

31 (Pages 118 to 121)

Dobrich, et al.                                v.                 Indian River School District, et al.
John M. Evans                        C.A. # 15-120 (JJF)                    October 18, 2006

Page 122

1    Q.  And it would have been reasonable for them to
2    think that, in your view, don't you think?
3    A.  That's very possible they may have thought
4    that.
5    Q.  Did you notice during the clip that we played
6    that members of the audience started laughing when
7    Mr. Johnson started discussing Mrs. O'Hair? I can
8    play it again, if you want me to?
9    A.  No, I didn't notice that. I did notice the
10   amens and -- I was more attuned to what he was saying.
11   I didn't notice what the crowd was doing.
12   Q.  You noticed the amens and the cheering during
13   Mr. Johnson's discussion of Mrs. O'Hair?
14   A.  Yes.
15   Q.  Looking at it today, do you find that at all
16   disturbing that people would be laughing and cheering
17   and saying amen when Mr. Johnson discussed
18   Mrs. O'Hair's disappearance?
19   A.  Yes, I do.
20   Q.  In retrospect, do you wish that Mr. Walls or
21   some other member of the board had stopped
22   Mr. Johnson's comments?
23   A.  Yes, they should have been -- Yes, it should
24   have been stopped at some point.

Page 123

1    Q.  Did you know the August 24 meeting was
2    videotaped?
3    A.  I know there were numerous meetings
4    videotaped. The 24th, was that the 24th?
5    Q.  Yes, the big meeting.
6    A.  Yes, yes, I was aware of that.
7    Q.  And were you aware that it was the district
8    which was taping that meeting?
9    A.  No, I wasn't.
10   Q.  So I take it you don't have any idea why the
11   district decided to tape that meeting?
12   A.  No, I wasn't aware of it.
13   Q.  When I played that clip for you, is that the
14   first time you have ever seen any portion of the
15   videotape of the August 24 meeting?
16   A.  Yes.
17   Q.  You said you were aware that numerous
18   meetings had been videotaped. When did those meetings
19   take place?
20   A.  Well, sometime after that meeting. From
21   where I am sitting, from where I was sitting, you
22   could see someone videotaping in the audience, but I
23   can't tell you specific meetings. I know it was at
24   least two or three or more.

Page 124

1    Q.  Yes, sir. And, in fact, a representative,
2    Mr. Horvath, in fact, who is here in the room,
3    videotaped some meetings as an observer.
4    Are you aware of any other meetings besides
5    the August 24 meeting that the district videotaped?
6    A.  No, no.
7    Q.  Sir, I will represent to you that on
8    December 21, 2004 -- These are all meetings of the
9    board. Okay?
10   A.  Uh-huh.
11   Q.  December 21, 2004; January 26, 2005; July 26,
12   2005; January 24, 2006; and April 25, 2006 you were
13   invited to and accepted the invitation to open the
14   board meeting with a prayer, alright, five meetings.
15   Would I be correct in assuming, based on your
16   earlier testimony, that the prayer you offered in each
17   case was offered in the name of Jesus?
18   A.  That's correct.
19   Q.  Were there students present at each of those
20   meetings?
21   A.  I believe so, yes.
22   Q.  Do you know the religious faith of those
23   students?
24   A.  No, I do not.

Page 125

1    Q.  Is it correct that for -- Strike that. Is it
2    correct that your belief that your prayer was
3    appropriate is unaffected by the religious faith of
4    the students who were in the audience, it doesn't
5    matter what their faith was; correct?
6    A.  Repeat that, please.
7    Q.  Yes. Your view, I assume, was that the
8    prayer you offered at each of those five sessions was
9    constitutional and appropriate?
10   A.  Yes.
11   Q.  And, by that, I mean both constitutional and
12   appropriate.
13   A.  Yes.
14   Q.  Okay, and your view about that, that is that
15   the prayer was constitutional and appropriate, is
16   unaffected by what the religious faith of the students
17   who were present might be; correct?
18   A.  Correct.
19   Q.  And is that, sir, because your prayer was
20   directed only to the ten board members?
21   A.  That's correct.
22   Q.  Now, in forming that view, do you also rely
23   on the fact that the board, through its president,
24   reads a disclaimer before the prayer is offered?

32 (Pages 122 to 125)

Dobrich, et al.                              v.                Indian River School District, et al.
John M. Evans                          C.A. # 15-120 (JJF)                    October 18, 2006

Page 126

1    A.   I am aware of that, yes.
2    Q.   And do you think that provides anyone who
3    does not wish to hear or participate in the prayer
4    with an opportunity to get up and leave?
5    A.   Yes, I do.
6    Q.   With respect to students who are in
7    attendance, would you agree with me that it requires
8    considerable courage for a school child to get up and
9    walk out of the meeting when a prayer is being
10   offered?
11   A.   Yes, it would.
12   Q.   That's a tough chore to give to a student;
13   wouldn't you agree?
14   A.   Yes, it is.
15   Q.   Because students, just like you, know that
16   the overwhelming majority of the residents of the
17   Indian River School District are Christian; correct?
18   A.   I don't know that they do.  They may.
19   Q.   And it's your belief, isn't it, sir, that the
20   students, by and large, will not wish to be singled
21   out as not wanting to participate in a prayer; isn't
22   that right?  Do you want me to ask the question in a
23   different way?
24   A.   Yes, yes, a different way, please.

Page 127

1    Q.   You testified earlier that it would take
2    courage, it was a tough chore for a kid to get up and
3    walk out during the prayer.  The reason for that is
4    that kids don't want to be singled out as a person who
5    doesn't participate in prayers; correct?
6    A.   If you leave the last part of that statement
7    out, I might be able to agree with you.
8    Q.   Okay, I will.  One reason for kids requiring
9    courage and being a tough chore is kids don't like to
10   be singled out?
11   A.   I agree with that.
12   Q.   Period?
13   A.   Yes.
14   Q.   And that would include not wanting to be
15   singled out as a person who doesn't want to
16   participate in a prayer?
17   A.   It may.
18   Q.   Aside from the complaints of the Dobrich
19   family and the Doe family, are you aware of any other
20   complaints about the use of prayer during Indian River
21   School Board meetings?
22   A.   No, I am not.
23   Q.   During the course of the board's
24   consideration of the school board prayer policy during

Page 128

1    the public comment sessions, did you hear comments
2    from persons other than the Dobrich family which urged
3    the board to consider nondenominational prayer?
4    A.   Yes.
5    Q.   Several people?
6    A.   Yes.
7    Q.   Mr. Evans, would you agree with me that the
8    use of prayer before school board meetings has
9    attracted a lot of attention from the public and the
10   media in the Indian River School District?
11   A.   Yes.
12   Q.   Do you think that the degree of attention
13   that this issue has gotten -- Strike that.  Let me ask
14   it a different way.  Do you think that the issue of
15   prayer during the school board meeting should have
16   attracted as much attention by the public and the
17   media as it has?
18   A.   You are asking if it should, if I think it
19   should have?
20   Q.   Yes, sir.  Among all the issues that come
21   before the school board --
22   A.   No, I don't think it should have.
23   Q.   And why is that?
24   A.   There is more important issues for a school

Page 129

1    district.  I mean there are equally important issues
2    that people don't respond to.
3    Q.   And you are disappointed by the lack of
4    public response to those other issues, aren't you?
5    A.   Yes, yes.
6    Q.   Give me some examples of issues like that.
7    A.   Whoo, that's a hard one.
8    Q.   Well, Mr. Hastings, for example, said, you
9    know, academic issues that come before the board?
10   A.   Yes, I was thinking academic issues, yes.
11   Q.   Curriculum issues?
12   A.   Curriculum issues, yes, those are a couple.
13   Q.   Budget issues?
14   A.   Yes.
15   Q.   Mr. Evans, I'm sorry, I think I asked you
16   this question.  If I did and you have already answered
17   it, indulge me and just answer it again.  You are not
18   a member of the Policy Committee?
19   A.   That's correct.
20   Q.   Thank you.  You testified a minute ago that
21   there were issues which were at least equally
22   important to you as the school board prayer that don't
23   get as much attention.
24        Would you agree with me that all of the

33 (Pages 126 to 129)

Dobrich, et al.                                   v.                    Indian River School District, et al.
John M. Evans                          C.A. # 15-120 (JJF)                              October 18, 2006

Page 130

1  issues that we identified in the subsequent questions
2  are at least equally as important as the school board
3  prayer policy issue?
4      A.  I believe so, yes.
5      Q.  Would you agree with me that those issues are
6  more important than the school board prayer policy
7  issue?
8      A.  I would like to leave it as equally as
9  important.
10     Q.  Do you know who first proposed that the board
11 consider adopting a policy on school board prayer?
12     A.  Specifically an individual?
13     Q.  Yes.
14     A.  No, I don't.
15          MR. ALLINGHAM:  Alright, we are going
16     to change the tape.
17          VIDEOGRAPHER:  Going off the record at
18     12:24 p.m.
19          (A recess was taken.)
20          VIDEOGRAPHER:  Going back on the
21     record at 12:30 p.m.
22 BY MR. ALLINGHAM:
23     Q.  I asked you before we broke about who had
24 first proposed considering the policy on school board

Page 131

1  prayer, and you didn't know.  I want to ask you some
2  questions about whether some statements were made
3  during the board's consideration of the school board
4  prayer policy.
5          Did anybody ever say, in words or substance,
6  these are in the board deliberations, did anybody ever
7  say in words or substance, "Nobody should be permitted
8  to tell me how I should pray"?
9      A.  Probably, that probably occurred.
10     Q.  And, having established that it probably
11 occurred, can you remember in specific a board member
12 or board members who expressed that sentiment?
13     A.  No, not specifically I can't tell you.
14     Q.  Did you ever say during the board
15 deliberations in words or substance, "Nobody should be
16 able to dictate how or to whom I pray."?
17     A.  I may have.
18     Q.  That's certainly your view; correct?
19     A.  Yes.
20     Q.  In the statements made on behalf of the
21 district in this case, representations have been made
22 that the board has been praying for 30 years or more
23 to open its meetings.  Did you know that?
24     A.  Yes.

Page 132

1      Q.  Okay.  If the board had been praying for 30
2  years or more, why did it need to adopt a policy?
3      A.  I thought we had a previous policy.
4      Q.  I will represent to you that you did not.
5      A.  Okay.
6      Q.  Did anyone ever discuss why you needed a
7  policy in light of the fact that you had been doing
8  fine without one for 30 years?
9      A.  Say -- I'm sorry, say that again.
10     Q.  Did anybody discuss why you had to adopt a
11 policy in 2004, since it appears that you had been
12 doing fine for 30 years in opening your meetings with
13 prayer?
14     A.  Well, I don't recall, but it seemed the
15 logical, the logical thing to do since it was an
16 issue.
17     Q.  That is because it had been raised as an
18 issue?
19     A.  Yes.
20     Q.  In your view, did the policy change the
21 board's practice in any way about how it opened its
22 meetings with a prayer?
23     A.  Yes, it did.
24     Q.  Tell me how.

Page 133

1      A.  I don't recall prior to the policy, and it
2  may have been that we rotated, but it may have been.
3  The president may have asked others that chose not to
4  pray.  I don't know that.
5      Q.  And in pointing that out, you are referring
6  to paragraph two of the policy?
7      A.  I would have to see paragraph two.
8      Q.  It's in front of you somewhere, PX9.
9      A.  PX9.  There it is.  Yes, it's referred to in
10 that paragraph.
11     Q.  Do you believe that the board has complied
12 with the requirements of paragraph two of the policy
13 since it was passed in October of 2004?
14     A.  Yes, I believe so.
15     Q.  I represented to you earlier that you were
16 invited to and did offer the prayer, among others, on
17 December 21, 2004, and at the next meeting on
18 January 26, 2005.  Can you explain to me how, if the
19 opportunity was being rotated, you offered the prayer
20 at two meetings in a row?
21     A.  Well, I was asked to by the president, and
22 whether or not the president asked other board members
23 and they declined, that, I don't know.
24     Q.  Would you agree with me that, as you

34 (Pages 130 to 133)

Dobrich, et al.
John M. Evans

v.

C.A. # 15-120 (JJF)

Indian River School District, et al.
October 18, 2006

Page 134

1 understand paragraph two of the policy, the only way a
2 board member could be offered the opportunity to give
3 a prayer at two meetings in a row would be if the
4 other nine board members declined the invitation?
5 **A. Based on the policy, yes.**
6 Q. And I take it you don't have any information
7 that the other nine board members declined the
8 invitation to offer the prayer on January 26, 2005?
9 **A. No, I don't.**
10 Q. We discussed earlier in the deposition,
11 Mr. Evans, that paragraph three imposes certain
12 limitations on the content of the prayer that a board
13 member can offer. Do you remember that testimony?
14 **A. Yes, I do.**
15 Q. And paragraph two imposes certain procedures
16 on the board president in the way he invites or the
17 persons he invites to open the meetings with a prayer;
18 correct?
19 **A. That's correct.**
20 Q. Okay. Do you know why the board considered
21 it appropriate to impose those limitations and
22 procedures on the board's practice of opening its
23 meeting with a prayer?
24 **A. You are referring to paragraph two?**

Page 135

1 Q. Paragraph two and paragraph three.
2 **A. Why? You are asking why?**
3 Q. Yes.
4 **A. Paragraph two would give any board member an**
5 **opportunity to pray regardless of their faith or**
6 **religion, and paragraph three so that we don't try to**
7 **convert someone to our faith during prayer.**
8 Q. Or proselytize?
9 **A. Right.**
10 Q. At anytime during your tenure as a board
11 member, had anyone used the opportunity to pray as a
12 way to convert or proselytize someone?
13 **A. Not that I am aware of, no, not that I**
14 **recall.**
15 Q. So for ten years there had been no
16 proselytizing or efforts to convert during the prayer
17 opening the board meetings?
18 **A. That's correct, to the best of my memory,**
19 **yes.**
20 Q. So why did you have to impose such a
21 restriction if that was already what the board was
22 doing?
23 **A. Well, again, because the issue came up. It's**
24 **better to document it. It's better to have some**

Page 136

1 **policy.**
2 Q. Mr. Evans, if, as I think you testified, the
3 board members could solemnify their proceedings by
4 praying privately before the meeting is opened, do you
5 have any idea why this policy provides specifically
6 for public prayer by the board members?
7 **A. Well, public prayer had always been, always**
8 **been done.**
9 Q. Can you think of any other reason why the
10 policy contemplates public prayer?
11 **A. No.**
12 Q. Let me ask you this: You have already told
13 me that the prayer that's offered is not directed to
14 members of the audience; correct?
15 **A. That's correct.**
16 Q. Okay. Based on your understanding of the
17 views of your constituents, do you think that their
18 support for board prayer is based in part on their
19 desire to participate in a prayer at the beginning of
20 the board meeting?
21 **A. Would you rephrase that or --**
22 Q. If the prayer is intended to be only among
23 the board members, why should the public care about
24 whether the prayer is public or private?

Page 137

1 **A. I don't know why they should care.**
2 Q. They clearly do care, however; you would
3 agree with that?
4 **A. Oh, yes, I would, they do.**
5 Q. And do you believe the reason they care is
6 because they view themselves as being participants in
7 the prayer at the beginning of the board meeting?
8 **A. That might be.**
9 Q. Do you remember when Mr. Hastings went off
10 the board? I don't mean the particular date, just do
11 you recall that that happened?
12 **A. Yes, that was in December of 2005.**
13 Q. And, in order to fill the vacancy left by
14 Mr. Hastings, the board interviewed candidates;
15 correct?
16 **A. Correct.**
17 Q. And whom did the board interview? One was
18 Mr. Hughes?
19 **A. Yes, Mr. Hughes. I know there was one other**
20 **gentleman, and I don't -- I can't recall his name.**
21 **There was another, a lady who withdrew her name. We**
22 **never interviewed her. I believe it was just those**
23 **two individuals, I believe.**
24 Q. Were you involved in those interviews?

35 (Pages 134 to 137)

Case 1:05-cv-00120-JJF    Document 250-18    Filed 04/10/2008    Page 36 of 43

Dobrich, et al.                          v.              Indian River School District, et al.
John M. Evans                    C.A. # 15-120 (JJF)              October 18, 2006

Page 138

1   A. Yes.
2   Q. Did you ask any questions during those
3   interviews?
4   A. Yes.
5   Q. Do you recall the substance of your
6   questions?
7   A. No, they were just generally questions that a
8   human resource director would prepare, and we would
9   either choose one of those or we could choose one of
10  our own.
11  Q. Let me make sure I understand. So a human
12  resource director prepared some questions which were
13  disseminated to the board members?
14  A. Yes.
15  Q. And is that a human resource director for the
16  district?
17  A. Yes.
18  Q. And then you could, you, as a board member,
19  could ask one of those questions that was provided to
20  you or you could ask a question of your own; correct?
21  A. That's correct.
22  Q. Alright, and do you remember whether in those
23  two interviews you asked questions on the human
24  resource director's sheet or whether you posed your

Page 139

1   own questions or both?
2   A. I used the questions provided by the human
3   resource director.
4   Q. There has been testimony that, at least in
5   Mr. Hastings' interview, there was discussion of the
6   school board prayer issue. Do you recall that?
7   A. A discussion when?
8   Q. During the interview of Mr. Hastings.
9   A. I don't recall that.
10  Q. I apologize, not the interview with
11  Mr. Hastings, the interview with Mr. Hughes.
12  A. Right, understood. I don't recall there
13  being any discussion.
14  Q. How about at the other interview, do you
15  recall there being a discussion of the school board
16  prayer issue?
17  A. No, I don't.
18  Q. As a board member, would you think it
19  appropriate to ask a prospective board member what his
20  views were on school board prayer?
21  A. Would I -- I'm sorry, repeat that question.
22  Q. As a board member, would you think it
23  appropriate to ask prospective board members about
24  their views on school board prayer?

Page 140

1   A. No, it would not. No, it would not be
2   appropriate.
3   Q. I am going to ask you some questions about
4   prayers that have been offered by board members since
5   the passage of policy in October of 2004. You
6   testified earlier in the deposition that Dr. Isaacs
7   offered a silent prayer. Do you remember that?
8   A. Yes.
9   Q. How do you know that it was a prayer if it
10  was silent?
11  A. Well, he indicated that before, before it
12  began. He said something to the effect that let's
13  have a silent prayer. I don't remember the exact
14  words, but he made some comment that this will be,
15  let's have a silent prayer. I don't remember exactly,
16  but he announced it.
17  Q. Do you recall whether he invited the audience
18  to join the board members in a silent prayer?
19  A. I don't believe he did.
20  Q. Do you recall whether any board member since
21  the passage of this policy has invited the members of
22  the audience to join the board in a prayer?
23  A. No.
24  Q. If someone did so, you would agree that

Page 141

1   that's inappropriate; correct?
2   A. Yes, I would.
3   Q. Back to this issue of the interviews of
4   prospective board members, we have had testimony in
5   depositions that prior to those interviews there was a
6   discussion about whether to ask the candidates their
7   views on the school board prayer. Do you recall such
8   a discussion?
9   A. I don't, but that may have been.
10  Q. And I take it from your earlier answer that
11  if there had been such a discussion, you would have
12  expressed your view that it was not appropriate to
13  ask?
14  A. Oh, yes, definitely not appropriate.
15  Q. Alright. Why do you view it as not
16  appropriate to ask a prospective board member about
17  his position on school board prayer?
18  A. Well, I don't think that's one of the
19  qualifications of the school board member. His faith
20  and religion has no bearing on his or her serving on
21  the school board.
22  Q. Yes, sir, but I didn't ask you about
23  questions about a person's faith or religion. I asked
24  you questions whether it was appropriate to ask

36 (Pages 138 to 141)

Dobrich, et al.
John M. Evans

v.

C.A. # 15-120 (JJF)

Indian River School District, et al.
October 18, 2006

Page 142

1  questions about a prospective board member's position
2  on school board prayer, or do you view those as the
3  same thing?
4      A.  I just don't think it would be an appropriate
5  question to ask a potential school board member.
6      Q.  Do you recall that anyone was in favor of
7  asking the candidates their views on school board
8  prayer?
9      A.  No, I don't -- As I mentioned before, I don't
10  recall that that even came up.  It may have, but I
11  don't recall that it did.
12     Q.  Would it be appropriate to ask board members
13  about their views on curriculum issues?
14     A.  Yes.
15     Q.  Would it be appropriate to ask board members
16  about their views on budget issues?
17     A.  Yes.
18     Q.  Would it be appropriate to ask prospective
19  board members their views on non-curriculum related
20  educational issues?
21     A.  Yes.
22     Q.  You testified earlier that those issues were
23  equally important as school board prayer issues.  Do
24  you recall that?

Page 143

1      A.  Yes.
2      Q.  Why is it important to ask about curriculum,
3  education and budget issues but not about the school
4  board prayer issue?
5      A.  I just don't think it's appropriate.
6      Q.  Can you elaborate on why?
7      A.  I don't think it matters what their religion
8  or faith is to be a school board member.  It doesn't
9  play into my decision who I would vote for.
10     Q.  And do you believe that a candidate's
11  position on school board prayer is likely to be
12  affected by the candidate's faith or religion?
13     A.  Yes.
14     Q.  Explain to me how.
15     A.  Well, if I were a candidate, then I, you
16  know, as I have always done, if I am asked to pray, I
17  would pray in Jesus's name.  I mean if that's the --
18  You know, if that's the answer you are asking.  I am
19  not real clear on the question, but anybody's religion
20  is going to have an impact on their life.  If they
21  believe, you know, if they really believe in their
22  faith, it's going to impact their life.  You can't
23  separate the two.
24     Q.  I understand that.  In this instance you

Page 144

1  would not ask a prospective candidate about his
2  position on school board prayer because you would view
3  that as equivalent to asking their religious faith?
4      A.  Yes, that's right.
5      Q.  Did you ever come to learn that someone had
6  been told by a district employee to submit a FOIA
7  request.  Do you know what a FOIA request is, Freedom
8  of Information Act?
9      A.  I do now.
10     Q.  Okay, did you ever come to learn that a
11  district employee had told a district resident who
12  asked for a copy of the school board prayer policy
13  that if she wanted that policy she had to file a FOIA
14  request?
15     A.  I have heard that, yes.
16     Q.  Who did you hear that from?
17     A.  I don't remember who it was.
18     Q.  Did, to your knowledge, did anyone from the
19  board authorize or direct district employees to tell
20  anyone who wanted a copy of a board policy to file a
21  Freedom of Information Act request?
22     A.  Not that I am aware of, no.
23     Q.  Do you view it as inappropriate for a
24  district employee to direct someone to file a FOIA

Page 145

1  request if they want a policy?
2      A.  No, I wouldn't -- That might -- If that's our
3  policy, I don't know if it is or not, but if I were a
4  district employee and if I was asked, I would supply
5  that person with what they wanted.
6      Q.  Is there any reason not to give district
7  residents a copy of school board policy?
8      A.  Absolutely not, no.
9      Q.  Just a couple of quick questions again on the
10  August 23 minutes.  This would be PX14, which still
11  should be in front of you.  And, just to refresh your
12  recollection, this is the meeting at which, the
13  special meeting which was called to discuss the school
14  board prayer issue.  Okay?
15         If you look at other visitors and staff in
16  attendance, you will see that Lois Hobbs was there.
17  She is the superintendent at the time?
18     A.  Yes.
19     Q.  And does Mrs. Hobbs, did Mrs. Hobbs, when she
20  was the superintendent, attend every board meeting?
21     A.  Yes.  If she didn't, then Mr. Savage did.
22     Q.  Or sometimes, as reflected here, both of them
23  did; right?
24     A.  Yes.

37 (Pages 142 to 145)

Page 146

1  Q.  Did Janet Hearn typically attend every board
2  meeting?
3  A.  Yes.
4  Q.  She functioned as the secretary?
5  A.  Yes.
6  Q.  Mr. Griffin is here, and you have already
7  identified that he was there for the purpose of giving
8  legal advice on the issue?
9  A.  Yes, I believe so, yes.
10  Q.  Who is Patrick Miller?
11  A.  He is the director of I want to say
12  budgeting, but he is the director of finance, director
13  of finance.
14  Q.  And did Mr. Miller typically attend every
15  board meeting?
16  A.  Most, yes.
17  Q.  Do you know why Mr. Miller was in attendance
18  at this board meeting if the topic was school board
19  prayer?
20  A.  Well, if he were there, there may have been
21  some potential discussion of insurance, possibly,
22  insurance coverage.  It would have to do with some
23  finances if he were there.
24  Q.  Alright, these questions relate to

Page 147

1  conversations at anytime before the big meeting on
2  August 24, 2004.  Several state representatives spoke
3  at that meeting.  Do you recall that?
4  A.  At the August 23 meeting?
5  Q.  The 24th meeting, the big meeting.
6  A.  Yes, I believe they did.
7  Q.  Did you know in advance that state
8  representatives would be speaking at the public
9  comment session of that meeting?
10  A.  No, I did not.
11  Q.  Did you have any conversation with any of
12  those legislators prior to their speaking at that
13  board meeting?
14  A.  No, I did not.
15  Q.  Do you know whether any school board member
16  had any conversations with state legislators who were
17  present at that meeting?
18  A.  No, I don't.
19  Q.  The August 24 meeting was a regular meeting,
20  Mr. Evans.  Do you recall that it opened with a
21  prayer?
22  A.  Yes.
23  Q.  Do you recall that there was very loud
24  cheering when Mr. Walls invited the person who gave

Page 148

1  the prayer to give it?
2  A.  Yes, I do.
3  Q.  Do you recall whether that prayer was offered
4  in the name of Jesus?
5  A.  No, I don't.
6  Q.  I am going to play for you the --
7  A.  I believe it was, but I am not sure.
8  Q.  I will represent to you, then, because I
9  think you are right, that the prayer was offered in
10  the name of Jesus.
11       Do you know whether the state legislators who
12  spoke at the public comment session had seen the text
13  of that prayer before the meeting?
14  A.  Do I have knowledge of that?
15  Q.  Yes.
16  A.  I am not aware that they did, no.
17  Q.  At anytime during the board's consideration
18  of Policy BDA.1, the school board prayer policy, did
19  any school board member express an opinion that the
20  school board practice of opening the board's meeting
21  with prayer might violate the law?
22  A.  Would you repeat that beginning?
23  Q.  At anytime during the board's consideration
24  of the school board prayer policy, did anyone at a

Page 149

1  school board meeting express -- Strike that.  I am
2  going to start again.
3       At anytime during the consideration of the
4  school board's prayer policy, did any board member
5  express the view that the school board's practice of
6  opening its meetings with prayer might violate the
7  law?
8  A.  I believe so.
9  Q.  Do you know which board members expressed
10  that view?
11  A.  No, I don't.
12  Q.  Can you narrow it down, for example can you
13  say with certainty that Mr. Helms did not express that
14  view?
15  A.  No, I can't.
16  Q.  Alright, do you have the board policy in
17  front of you?
18  A.  Yes.
19  Q.  The next questions are addressed to paragraph
20  three.  I am going to give you some examples of
21  prayers and ask you whether, in your judgment as a
22  board member, they would violate paragraph three or
23  would be permitted by it.  Okay?
24  A.  Yes.

38 (Pages 146 to 149)

Dobrich, et al.                         v.              Indian River School District, et al.
John M. Evans                   C.A. # 15-120 (JJF)              October 18, 2006

Page 150

1    Q.  We did this before, but these are written,
2  some prayers that are written down.  Some of them are
3  a little bit long, and I am going to give you a
4  printed copy so you can follow along with me as I read
5  them.  The first one has been marked as PX35.
6        And again I am going to read the prayer and
7  then ask you whether you think it is permitted by or
8  prohibited by paragraph three, which prohibits
9  proselytizing or converting prayers.
10   A.  Okay.
11   Q.  Okay?  This is the first one.  "Do not put
12 your trust in princes, in mortal men who cannot even
13 save themselves.  When their spirit departs, they
14 return to the ground.  On that very day, their plans
15 come to nothing.  Blessed is he whose help is the God
16 of Jacob, whose hope is in the Lord, his God, the
17 maker of heaven and earth, the sea and everything in
18 them, the Lord who remains faithful forever.  He
19 upholds the cause of the oppressed and gives food to
20 the hungry.  The Lord sets prisoners free.  The Lord
21 gives sight to the blind.  The Lord lifts up those who
22 are bowed down.  The Lord loves the righteous.  The
23 Lord watches over the alien and sustains the
24 fatherless and the widow, but he frustrates the ways

Page 152

1    A.  Well, the last sentence when it says, "The
2  gift of God is eternal life through Jesus Christ,"
3  that would violate paragraph three.
4    Q.  And is that because it suggests that the only
5  way to eternal life is through Jesus Christ?
6    A.  Yes, it does suggest that.
7    Q.  And is that why it is prohibited?
8    A.  Under paragraph three, yes.
9    Q.  Yes.  And I want to make sure I understand
10 this, Mr. Evans.  So in your view as a board member,
11 it's alright under paragraph three to say, "I offer
12 this prayer in the name of Jesus Christ."  Correct?
13   A.  Yes, I do.
14   Q.  But it is not alright to say that salvation
15 comes through Jesus Christ?
16   A.  Saying that would violate paragraph three.
17   Q.  Let me show you what we have marked as PX45.
18 This prayer reads, "Heavenly Father, thank you for
19 this great occasion, for the work, the effort, the
20 joys and everything that led up to this point in time.
21 Thank you for your guidance in this event.  We pray
22 for your direction in the lives of each of these
23 school board members.  We pray that you direct them
24 into the truth and eventually the truth that comes by

Page 151

1  of the wicked.  For the wages of sin is death, but the
2  gift of God is eternal life through Jesus Christ our
3  Lord."
4        So, in your judgment as a board member, does
5  that prayer, is that prayer permitted by or prohibited
6  by paragraph three?
7    A.  It's prohibited by paragraph three.
8    Q.  And why is that?
9    A.  Well, because of the last sentence in
10 reference to Jesus Christ.
11   Q.  And what is it about the reference to Jesus
12 Christ that you believe causes it to be prohibited by
13 paragraph three?  Because it's not just the mention of
14 Jesus Christ; correct?  You have offered prayers that
15 mention Jesus Christ.
16   A.  Oh, yes I have.
17   Q.  Yes, and those prayers, I assume, were
18 appropriate under paragraph three.
19   A.  Yes.
20   Q.  Okay.
21   A.  Yes.
22   Q.  What is it about the mention of Jesus Christ
23 in this prayer that you think causes it to be
24 prohibited by paragraph three?

Page 153

1  knowing Jesus.  We also pray that you would be with
2  them at this time.  We ask these things in Jesus's
3  name.  Amen."  Is that prayer permitted by or
4  prohibited by paragraph three?
5    A.  Possibly the sentence, "We pray that you
6  direct them into the truth and eventually the truth
7  that comes by knowing Jesus," that might be, that
8  might violate paragraph three.
9    Q.  You would view that as proselytizing?
10   A.  Yes, I would.
11   Q.  The next prayer may — Your judgment about
12 the next prayer may seem obvious to you, but I am
13 going to ask it anyway.  Suppose that a board member
14 offered the prayer, "Oh, Lord, convert the heathen
15 among us."  That would violate it?
16   A.  That would definitely violate paragraph
17 three.
18   Q.  Yes, sir, or a prayer that said, "Oh, Lord,
19 bring the Jews in the audience to knowledge and love
20 of our savior, Jesus Christ."
21   A.  It would violate paragraph three.
22   Q.  And I have one last prayer for you.  It's
23 short, but if you need me to read it again, I will.
24 "Allah, we offer you our school bus drivers.  We offer

39 (Pages 150 to 153)

Page 154

1  you our superintendent, our administrators, and our
2  secretaries. We offer you our teachers and our
3  parents. Finally, we offer you our students. Peace
4  be unto your prophet, Muhammed." Would you view that
5  as permitted or prohibited by paragraph three?
6      A. Well, I don't know what the prayer means by
7  offer.
8      Q. So, without knowing, you can't make a
9  judgment?
10     A. That's correct. I don't know. Whomever
11 would read that prayer, offer might mean something
12 different to them than it does to me.
13     Q. Well, let's explore that a little bit. Do
14 you have a sense of what you would mean if you offered
15 a prayer like that where you used the word, "we offer
16 you our teachers and students," or would you just not
17 offer a prayer like that?
18     A. I wouldn't use the word offer. I might say,
19 you know, protect or help or something along that
20 line.
21         I mean it appears that that would not violate
22 paragraph three, but again it depends on what the word
23 offer means by that individual. I would not be able
24 to determine from that prayer if it violates paragraph

Page 155

1  three.
2      Q. Okay. Now, Mr. Evans, we talked earlier in
3  the deposition about the enforcement mechanism for
4  this paragraph, and I, I think we established that
5  it's the board members who are ultimately responsible
6  for enforcing all of the board prayer policy,
7  including paragraph three; correct?
8      A. Right.
9      Q. If a board member offered, I am going to take
10 the extreme example first or the most extreme example
11 first, if a board member who was invited by the
12 president to open a meeting with a prayer said, "Lord,
13 we pray that you convert the Jews in the audience to
14 knowledge and love of your son, our Lord, Jesus
15 Christ," which you and I have agreed, I think, is
16 violative of paragraph three, --
17     A. Yes.
18     Q. -- what would you do as a board member?
19     A. What would I do?
20     Q. If you heard that prayer, what would you do?
21     A. Well, at that point it would be a little too
22 late to stop it, but I would -- I would have to talk
23 to the president that that person should be
24 reprimanded. Maybe that's a harsh word, but that

Page 156

1  person should be informed that they are not to pray
2  like that. That violates paragraph three of our
3  policy.
4      Q. And all board members should comply with the
5  policy; correct?
6      A. Yes.
7      Q. Okay. But, as you pointed out, at that point
8  the horse would be out of the barn, so to speak?
9      A. That's right.
10     Q. There is no provision in the policy for a
11 reprimand or a punishment to a board member. Do you
12 believe that a board member who offered such a prayer
13 would be reprimanded or punished?
14     A. Do I believe they would? If I were the
15 president, yeah, I would.
16     Q. And when you say reprimand, do you mean --
17     A. Well, when I say reprimand, I just mean talk
18 to that person and tell them, "Look, you violated our
19 policy, you cannot pray like you just prayed, and, if
20 it happens again, you won't be asked to pray." That's
21 the way I would handle it.
22     Q. Okay, and so, as you understand, it's not a
23 mechanism that's set forth in the policy, but as you
24 understand the way the policy ought to work, if a

Page 157

1  board member offers a prayer that another board member
2  or the president believes violates the policy, that
3  board member would be informed that the prayer
4  violated the policy and then instructed that if he or
5  she offers such a prayer again he would be taken out
6  of the rotation?
7      A. Yes, I would, yes, that's the way I would
8  handle it.
9      Q. And so your understanding is that -- And, by
10 using a colloquialism, I don't mean to minimize the
11 importance of the issues, but you understand that with
12 respect to violations of paragraph three, every board
13 member would get one bite? That is, you could make a
14 mistake, you would be reprimanded, you would be given
15 another opportunity to pray, and, if you did it again,
16 you would be taken out of the rotation?
17     A. Yes, you have to give every board member that
18 first mistake because you don't know, when you ask
19 someone to pray, what they are going to say, so you
20 are sort of open to that possibility, but I wouldn't
21 let it happen, you know, after the second time.
22     Q. You wouldn't let it happen a third time?
23     A. A third time, that's right.
24     Q. At all of the meetings that you attended as a

40 (Pages 154 to 157)

Case 1:05-cv-00120-JJF    Document 250-18    Filed 04/10/2008    Page 41 of 43

Dobrich, et al.                             v.                        Indian River School District, et al.
John M. Evans                      C.A. # 15-120 (JJF)                         October 18, 2006

Page 158

1  board member after the adoption of the prayer policy
2  on October 19, 2004, did you ever see anyone after the
3  board president read the disclaimer get up and leave
4  the room?
5      A. I don't recall seeing anyone, no.
6      Q. In the ten years of your service on the
7  board, did you ever hear any board member offer a
8  prayer in the name of any supreme being other than the
9  Christian God or Jesus Christ?
10     A. No.
11     Q. Mr. Evans, do you believe that the board,
12 under its policy, could open its meetings with a
13 moment of silence?
14     A. Yes, I do.
15     Q. And, in fact, that did happen at least once
16 after the policy was adopted?
17     A. Yes.
18     Q. While you were a board member, if the meeting
19 was opened with a moment of silence, did you silently
20 ask for guidance from God through Jesus Christ?
21     A. I am not sure. It only occurred once. I
22 don't remember if I did or not.
23     Q. Nothing prevented you from doing so?
24     A. No, nothing.

Page 160

1      Q. So you didn't know what he was going to say?
2      A. No, I did not.
3      Q. Do you know whether the statement that
4  Mr. Helms read was a statement that he had written?
5      A. I believe it was.
6      Q. He certainly gave no indication at the
7  meeting that it was not his own words?
8      A. No, he did not.
9      Q. Did you ever come to learn that they were not
10 his words?
11     A. No.
12     Q. Among the statements that he made during his
13 reading of this statement was a statement that
14 "Christians should not be made to feel like
15 second-class citizens because of their religious
16 beliefs." Do you remember that?
17     A. I remember something in reference to
18 second-class citizens, but I don't remember the whole
19 part.
20     Q. And do you remember Mr. Helms saying that he
21 did not think it was appropriate for him to be made to
22 move to the back of the bus because of his religious
23 beliefs?
24     A. I don't remember that.

Page 159

1      Q. In your view, would a moment of silence be
2  effective to solemnize the board's proceedings?
3      A. Yes, it would.
4      Q. At the February 27, 2006 board meeting, this
5  is the one we referred to earlier where the settlement
6  vote took place, --
7      A. Uh-huh.
8      Q. -- the board was in executive session and
9  then returned to the auditorium to announce its
10 decision. Do you recall that?
11     A. Yes, I do.
12     Q. Do you recall that Mr. Helms gave a statement
13 at that meeting?
14     A. Yes, I do.
15     Q. Did he tell the board members that he had a
16 written statement to read before you returned to the
17 public session?
18     A. I don't recall if he said, but it was, I
19 think it was known by the board members. I don't
20 remember how it was known, but I knew that he was
21 going to read a statement.
22     Q. Okay. And did he show you the statement in
23 advance?
24     A. No.

Page 161

1      Q. Some of these questions, the answers may seem
2  obvious, but it's important for me to get a record.
3          Do you believe that as a school board member
4  you were obligated to represent the views of everyone
5  in the district?
6      A. Yes, yes.
7      Q. That doesn't mean that you would, you could
8  only take action that everyone in the district agreed
9  with?
10     A. Right.
11     Q. But you were obligated to represent everyone
12 in the district; correct?
13     A. Yes, right.
14     Q. Or, to say it differently, you did not think
15 that as a board member you were obligated to do what
16 the majority of your constituents thought you should
17 do; correct?
18     A. Repeat that, please.
19     Q. You were not obligated to do what a majority
20 of your constituents thought you should do?
21     A. I believe that's, yes, that's a true
22 statement.
23     Q. In representing the views of everyone in the
24 district, the way you did that was to exercise your

41 (Pages 158 to 161)

Dobrich, et al.                                    v.                Indian River School District, et al.
John M. Evans                           C.A. # 15-120 (JJF)                      October 18, 2006

Page 162

1   best judgment; correct?
2      A.  That's correct.
3      Q.  Even if your best judgment was against the
4   views of the majority; correct?
5      A.  That's correct.
6      Q.  Is the Indian River School District a
7   Christian area?
8      A.  I would say yes.
9      Q.  What does that mean?
10     A.  That a majority of the population state that
11  they are Christian.
12     Q.  Do you think that a Jewish resident of the
13  Indian River School District would agree with the
14  statement that this is a Christian area?
15     A.  I believe so, yes.
16     Q.  Was the board's willingness to go to court
17  over the school board prayer issue a campaign issue in
18  the 2006 school board election?
19     A.  I don't believe so, no, not that I am aware
20  of.
21     Q.  Did you run for the school board in the 2006
22  election?
23     A.  No.
24     Q.  Why not?

Page 163

1      A.  Well, I had given the district ten years.  I
2   accomplished all the things that I wanted to.  As I
3   mentioned earlier, I accomplished assisting with the
4   '96 referendum, that the money was spent as promised,
5   and finalized that with two new schools, so the ten
6   years -- And my children graduated and the time was
7   right.
8      Q.  I takes it that the decision not to run had
9   nothing to do with the school board's prayer issue?
10     A.  No.
11     Q.  I am going to show you a document which I am
12  not going to mark.  And the reason I am not going to
13  mark it is that it was written by a member of the Doe
14  family.  I am also, because you have told me you don't
15  know who the Doe family is, I am masking out the name
16  at the bottom of the letter.
17     A.  Uh-huh.
18     Q.  And my question, my first question to you is
19  going to be have you ever seen this document before.
20  Okay?
21     A.  Do you want me to read it?
22     Q.  Yes, please.
23     A.  (Reviewing document)
24     Q.  Have you finished reading it?

Page 164

1      A.  Yes.
2      Q.  My first question is have you ever seen that
3   document before?
4      A.  No, I haven't.
5      Q.  It's dated October 1, 2004.  At or about that
6   time did you learn that complaints of the type
7   expressed in this letter had been received by the
8   district?
9      A.  Yes.
10     Q.  How did you learn that?
11     A.  I believe that it may have been presented by
12  Mrs. Hobbs, I believe.
13     Q.  Did the board discuss the complaints that are
14  addressed in this letter?
15     A.  Well, I am sure we did.  I don't remember
16  when.
17     Q.  Was any action taken in response to this
18  letter?
19     A.  That's dated October '04?
20     Q.  Correct.
21     A.  2004?  I believe so.  I believe Mrs. Hobbs
22  was instructed by the board to take action on some of
23  those issues.
24     Q.  And did the board later learn that Mrs. Hobbs

Page 165

1   had taken action on some of these issues?
2      A.  I believe so.
3      Q.  Is it the policy of the district, when
4   complaints are received from district residents, to
5   investigate the complaints?
6      A.  Yes.
7      Q.  Is it the policy of the board, when the
8   complaints are found to have substance, to try to
9   correct the problem that was addressed?
10     A.  Yes.
11     Q.  And is it the policy of the board to inform
12  the district resident who lodged the complaint as to
13  the resolution of the complaint?
14     A.  I don't know, but it should be.
15     Q.  Did the board direct Mrs. Hobbs or any
16  district employee to respond to this letter?
17     A.  I don't recall that we did.
18     Q.  You would agree with me that the letter is
19  sincere in tone?
20     A.  Yes.
21     Q.  Do you think that this letter deserved a
22  response?
23     A.  Yes.
24     Q.  Would it surprise you that no response was

42 (Pages 162 to 165)

Dobrich, et al.
John M. Evans

v.

C.A. # 15-120 (JJF)

Indian River School District, et al.
October 18, 2006

Page 166

1  ever given to this letter?
2  **A. Yes, it would.**
3  Q. Is it correct that at least, as a matter of
4  practice, Mr. Evans, the board would not itself
5  investigate a complaint such as this; rather, it would
6  direct the superintendent to engage in such an
7  investigation?
8  **A. Yes.**
9  Q. And so that it's your best guess or best
10 belief that Mrs. Hobbs would have been in charge of
11 the investigation of these complaints?
12 **A. Yes.**
13 Q. Do you recall that Mrs. Hobbs reported to the
14 board the result of the investigation of these
15 complaints?
16 **A. No, I don't.**
17 Q. Do you know whether any of the matters
18 complained about were corrected?
19 **A. I believe some of the things, at least I**
20 **thought some of them were.**
21 Q. Would you identify those matters that you
22 think were addressed? I can give you the letter back
23 if you like.
24 **A. Yeah, if you would. One I thought was the**

Page 167

1  **reference of pressure of children to join the Bible**
2  **Club, I thought that had been addressed. That's the**
3  **only one I see offhand.**
4  Q. Okay, thank you.
5  **A. That's the only one I see right now.**
6      MR. ALLINGHAM: Mr. Evans, we are
7  going to change the tape. I am going to
8  look through my notes. I think we are
9  pretty much complete.
10     VIDEOGRAPHER: Going off the record at
11 1:28 p.m.
12     (A recess was taken.)
13     VIDEOGRAPHER: Going back on the
14 record at 1:31 p.m.
15     MR. ALLINGHAM: Mr. Evans, I have no
16 further questions. Thank you very much for
17 your patience and for your candor.
18     VIDEOGRAPHER: Going off the record at
19 1:31 p.m.
20
21
22
23
24

Page 168

1                CERTIFICATE
2      I, Lorena J. Hartnett, a Notary Public and
3  Registered Professional Reporter, do hereby certify
4  that the witness, JOHN M. EVANS, was by me first
5  duly sworn to testify the truth, the whole truth, and
6  nothing but the truth; that the foregoing deposition
7  was taken at the time and place stated herein; and
8  that the said deposition was recorded stenographically
9  by me and then reduced to typewriting under my
10 direction, and constitutes a true record of the
11 testimony given by said witness.
12      I further certify that the inspection,
13 reading and signing of said deposition was not waived
14 by counsel for the parties and by the witness.
15      I further certify that I am not a relative,
16 employee, or attorney of any of the parties or a
17 relative or employee of either counsel, and that I am
18 in no way interested directly or indirectly in this
19 action.
20      IN WITNESS WHEREOF, I have hereunto set my
21 hand and affixed my seal of office on this 24th day of
22 October 2006.
23
24      Cert. #134-RPR, Exp. 01-31-2008

43 (Pages 166 to 168)