# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| JANE DOE, *et al.*, | x | |
| | : | |
| | : | |
| | : | |
| Plaintiffs, | : | |
| v. | : | Civil Action No. 05-120-JJF |
| | : | |
| INDIAN RIVER SCHOOL DISTRICT, *et al.*, | : | **FILED UNDER SEAL** |
| | : | |
| | : | |
| Defendants. | x | |

## EXHIBITS TO
## OPENING BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON THE CONSTITUTIONALITY OF THE INDIAN RIVER SCHOOL BOARD'S PRAYER POLICY AS WRITTEN AND AS APPLIED

Richard S. Horvath, Jr. (I.D. No. 4558)
Four Embarcadero Center
Suite 3800
San Francisco, California  94111-5974
(415) 984-6400

Thomas J. Allingham II (I.D. No. 476)
tallingh@probonolaw.com
Robert S. Saunders (I.D. No. 3027)
Brian G. Lenhard (I.D. No. 4569)
Timothy S. Kearns (I.D. No. 4878)
One Rodney Square
P.O. Box 636
Wilmington, Delaware  19899-0636
(302) 651-3000

*Attorneys for Plaintiffs*

DATED:  April 10, 2008

# EXHIBIT 1

**Page 1**

```
 1        IN THE UNITED STATES DISTRICT COURT
 2        IN AND FOR THE DISTRICT OF DELAWARE
 3
 4   MONA DOBRICH and MARCO DOBRICH, individually and
     As parents and next friend of ALEXANDER DOBRICH,
 5   SAMANTHA DOBRICH, JANE DOE and JOHN DOE,
     individually and as parents and next friend of
 6   JORDAN DOE and JAMIE DOE,
 7            Plaintiffs
          vs.           CIVIL ACTION
 8                      NO.  15-120
 9   INDIAN RIVER SCHOOL DISTRICT, ET AL.,
10
             Defendants
11
     ------------------------------------------------
12
13
        DEPOSITION OF CHARLES M. BIRELEY, taken
14   pursuant to notice at the Indian Ricer School
     District, 31 Hosier Street, Selbyville, Delaware,
15   beginning at 9:15 a.m. on October 11, 2006 before
     David A. Sroka, Registered Professional Reporter and
16   Notary Public.
17
     APPEARANCES:
18
        THOMAS ALLINGHAM, ESQUIRE
19      RICHARD HORVATH, ESQUIRE
        BRIAN LENHARD, ESQUIRE
20      P.O. Box 636
        Wilmington, Delaware  19899-0636
21      For the Plaintiffs
22
        WILCOX & FETZER
23   1330 King Street - Wilmington, DE  19801
        (302) 655-0477
24      www.wilfet.com
```

**Page 2**

```
 1
 2
 3
 4      JASON P. GOSSELIN, ESQUIRE
        Drinker Biddle & Reath LLP
 5      Philadelphia, Pennsylvania 19103-6996
        For the Defendants
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**Page 3**

```
 1        MS. DUPHILY:  This is the
 2   videotape deposition of Mr. Charles
 3   Bireley, taken by the Plaintiffs in the
 4   matter of Dobrich, et.al, versus Indian
 5   River School District, et.al, case
 6   number is 15-120.
 7        The deposition is being held at 31
 8   Hosier Boulevard, Selbyville, Delaware.  We
 9   are going on the record on October 11, 2006
10   at approximately 9:15 a.m.  The court
11   reporter is Dave Sroka from the firm of
12   Wilcox & Fetzer.  I am Lindsay duPhily,
13   videotape specialist from Discovery Video
14   Services.
15        Now, the counsel will introduce
16   themselves and then the court reporter will
17   swear in the witness.
18        MR. ALLINGHAM:  Tom Allingham
19   representing the Plaintiffs and with me is
20   Rick Horvath and Brian Lenhard.
21        MR. GOSSELIN:  Jason Gosselin
22   representing the Indian River School
23   District, the school board and the other
24   defendants.
```

**Page 4**

```
 1        CHARLES BIRELEY,
 2        The Witness herein, called for examination by
 3   the Plaintiffs, having been duly sworn to tell the
 4   truth, the whole truth, and nothing but the truth,
 5   was examined and testified as follows:
 6   examination by him to.
 7   EXAMINATION BY MR. ALLINGHAM:
 8      Q.   Good morning, Mr. Bireley, my name is Tom
 9   Allingham, I represent the Plaintiffs.  I'm going to
10   ask you questions today that are relevant in our
11   view to the School Board prayer issue in this
12   litigation.
13        We have, as your lawyer has probably told
14   you separated, or the judge has asked us to separate
15   the School Board prior issue from the several other
16   issues in the case, and so the deposition today will
17   be focused on the School Board prayer issue.
18        A couple pieces of introduction.  I'm going
19   to refer to the final board policy on School Board
20   prayer, a copy of which I'll give you later and we
21   will talk about it, as the School Board Prayer
22   Policy.  Do you understand what I mean when I say
23   that?
24      A.   Yes.
```

13

1    A.    Yeah.

2    Q.    Do you know whether students are entitled

3    tight to speak to the Board directly in connection

4    with disciplinary actions against them?

5    A.    Are they entitled to?

6    Q.    Yes?

7    A.    There's a process for that.

8    Q.    Which permits them to speak directly to the

9    Board?

10    A.    Yes.

11    Q.    Are you aware of instances in which a

12    student has spoken directly to the Board?

13    A.    Yes.

14    Q.    Can you estimate for me over the course of

15    your 30 years how frequently that's occurred?

16    A.    Very few.

17    Q.    The Schools Board's responsibilities

18    include adopting the district's annual budget, is

19    that correct?

20    A.    Yes.

21    Q.    I asked you about hiring teachers, is the

22    School Board also responsible for firing teachers?

23    A.    Yes.

24    Q.    And also firing district employees?

14

1    A.    Yes.

2    Q.    Is the School Board involved in any way in

3    determining the punishment for teachers who violate

4    district policies?

5    A.    Yes.

6    Q.    Would you describe for me the process

7    involved in that determination?

8    A.    It usually comes through the superintendent

9    as a recommendation.

10    Q.    And the Board would then adopt the

11    recommendation or amend it?

12    A.    Based on the recommendation of the

13    superintendent we would listen to that and make a

14    decision.

15    Q.    The School Board in Indian River also

16    approves field trips at its meetings, is that right?

17    A.    Yes.

18    Q.    Why is that?

19    A.    That's our policy.

20    Q.    Do you have any idea what the reason is for

21    that policy?

22    A.    We would like to know whether or not what

23    trips people go on.

24    Q.    Does it involve determinations about the

15

1    safety of the trips that are being proposed?

2    A.    Yes.

3    Q.    So, the welfare of the students is one

4    aspect of the responsibility of the School Board?

5    A.    Yes.

6    Q.    At its meetings is it correct that the

7    School Board gives students awards?

8    A.    Yes.

9    Q.    And in additional to direct awards it also

10    gives students recognition for awards that the

11    students have won in a wide variety of activities

12    relating to their status as students?

13    A.    Yes.

14    Q.    You've been a Board member for 30 years,

15    has the amount of time spent at individual Board

16    meetings that is devoted to student recognition and

17    student awards changed over time?

18    A.    Yes.

19    Q.    Can you tell me how it changed?

20    A.    When I first was a Board member we didn't

21    do it. It's something that's added maybe within

22    the last ten years.

23    Q.    So mid '90s?

24    A.    Yes.

16

1    Q.    Is it the case that prior to that change in

2    the mid '90s it was rare for a student to be in

3    attendance at Board meetings?

4    A.    I would say yes.

5    Q.    And is it the case that since that change

6    in the mid '90s it is the case that students

7    regularly attend Board meetings?

8    A.    Pretty much.

9    Q.    Over the course of a given school year

10    could you estimate for me on average how many

11    student are in attendance at a Board meeting? A

12    couple of dozen?

13    A.    Not every meeting.

14    Q.    Well, there are meetings when there are 50

15    students, correct?

16    A.    Yes.

17    Q.    And but some meetings where there are very

18    few?

19    A.    Yes.

20    Q.    That's why I said on average maybe a couple

21    of dozen over the course of the school year?

22    A.    Okay.

23    Q.    The School Board approves construction

24    projects?

21

1    followed.

2    Q.  You answered my question about your opinion

3    about the School Board being a legislative board by

4    comparing the School Board to the General Assembly,

5    correct?

6    A.  Yes.

7    Q.  Let me ask a couple of more questions.  The

8    General Assembly doesn't approve field trips, does

9    it?

10        MR. GOSSELIN:  Objection.

11   A.  No.

12   Q.  More generally in our -- in the structure

13   of our government, is the General Assembly

14   responsible for enforcing and administering the

15   policies that it sets, the laws that it passes?

16        MR. GOSSELIN:  Objection.

17   A.  Ask me the question again please, if you

18   would?

19   Q.  Sure.  In our government in the State of

20   Delaware is the General Assembly responsible for the

21   administration and enforcement of the statutes and

22   laws that it passes?

23        MR. GOSSELIN:  Objection.

24   A.  Not that I'm aware of.

22

1    Q.  You on the other hand as a School Board

2    mention are responsible for the enforcement and

3    administration of the policies that you pass, isn't

4    that right?

5    A.  Yes.

6    Q.  Let me ask you this, on a percentage basis

7    over the 30 years of your service as a Board member

8    what percentage of your time at public meetings has

9    been spent in the consideration of policies and what

10   percentage of time has been spent on other areas of

11   responsibility?

12   A.  We have a committee that gives us a report

13   each Board meeting on policy.  If there are some to

14   adopt I'd say maybe just a range of 15 to 20, 25

15   minutes a meeting.

16   Q.  On policy?

17   A.  Yes.

18   Q.  And the remainder on non-policy issues?

19   A.  Yes.

20   Q.  In the course of your tenure as a School

21   Board member are you aware of any instance in which

22   a School Board member has been accused of violating

23   or failing to comply with a Board policy?

24   A.  Not that I'm aware of.

23

1    Q.  Do you know what the process would be for

2    disciplining a School Board who violated a School

3    Board policy?

4    A.  Never had the issue to do it, but I would

5    assume that we would come before the rest of the

6    Board members and we would discuss it.

7    Q.  Fair enough.  So, you are not aware of a

8    specific policy that sets that process but that as

9    for example as Board president is what you

10   anticipate what would happen?

11   A.  Yes.

12   Q.  I asked you some general questions about

13   student attendance at school Board meetings and I

14   want to ask some more specific questions.  The

15   minutes of the meetings reflect a presentation of

16   the colors at virtually every meeting, is that

17   consistent with your recollection?

18   A.  Yes, except during the summer months.

19   Q.  Summer months being when the kids are out

20   of school?

21   A.  Yes.

22   Q.  So during the academic school year

23   September to June you would have presentation of

24   colors?

24

1    A.  Yes.

2    Q.  And the colors are presented by the student

3    ROTC groups from the two high schools in the

4    district?

5    A.  Yes.

6    Q.  Who invites them to do that or do they just

7    know that they are suppose to show up?

8    A.  I believe it's the building principal.

9    Q.  Building principal of the school in which

10   you're meeting?

11   A.  Yes.

12   Q.  So, if you were at during the construction

13   projects a couple of years ago, if you were at the

14   elementary school the principal of the elementary

15   school would invites the ROTC?

16   A.  No.

17   Q.  I misunderstood you then, who would invite

18   them?

19   A.  Well, right how it's because we have two

20   high schools and that's where the ROTC and it would

21   be the principals of the two high schools.

22   Q.  So, if you are meeting at Indian River High

23   School the Indian River principal remind the ROTC

24   group to show up for the Board meeting?

25

1    A.   Yes.

2    Q.   And similarly at the other high school?

3    A.   Yes.

4    Q.   Sussex Central, correct?

5    A.   Yes.

6    Q.   And who instructs the principals to tell

7    the ROTC to show up at the meetings?  How do the

8    principals find out that they should remind the

9    ROTC?

10    A.   To the best of my knowledge ever since the

11    ROTC has been there that's been the process.

12    Q.   Do you know how long the ROTC has been in

13    place?

14    A.   Probably around five years.

15    Q.   2000 or thereabouts?

16    A.   Yes.  I'm not positive but it's somewhere

17    around there.

18    Q.   We talked about students attending the

19    meetings for the receipt of awards or recognition,

20    who invites them to those meeting?

21    A.   The building principal.

22    Q.   The building principal in the school in

23    which the meeting is being held?

24    A.   Well, normally they try to do that to keep

26

1    down on the travel.  But, for example if the meeting

2    was going to be held at Indian River, this next

3    meeting.

4    Q.   Yup.

5    A.   The principal would submit a letter to

6    central office of recent awards that has been

7    generated by his students and they would be invited

8    to come to the meeting.

9    Q.   So, it would be the building principal

10    sends a some kind of memo to the central office

11    saying would you please recognize my students who

12    have done something notable in the last period and

13    then the central office would invite the students?

14    A.   As I understand it.

15    Q.   And how does the central office invite the

16    student, by a letter?

17    A.   Well, can we go back a minute?

18    Q.   Yup.

19    A.   The principal does all of that.  The

20    principal send a notice to central office was these

21    are the ones that, you know, deserve that.

22    Q.   Got you.

23    A.   But to the best of my knowledge the

24    principal is the one that also sends out the notices

27

1    to invite the students to come to the meeting.

2    Q.   Understood.  So, in effect the principal

3    tells the central office here are my kids who are

4    going to be at the meeting, I have invited them?

5    A.   Pretty much, yes.

6    Q.   And is that process a process that was set

7    up by the Board at some point in the mid '90s?

8    A.   It was done by the superintendent.

9    Q.   Who is the superintendent?

10    A.   Lois Hobbs, the previous superintendent.

11    Q.   Let me explore that a little bit.  Did Miss

12    Hobbs present to the Board the idea that it would be

13    good for the Board to recognize achievement of

14    students in the schools?

15    A.   Yes.

16    Q.   Was there any dissent from that?

17    A.   Not that I'm aware of.

18    Q.   Everybody thought it was a good idea?

19    A.   Yes.

20    Q.   I understand that recently there has been

21    some rumblings that maybe it's gotten out of hand,

22    is that correct?

23    A.   That it's gotten out of hand.

24    Q.   That it's taking too long, the awards

28

1    portion of the meeting?

2    A.   There's been some discussion, yes.

3    Q.   Is there some sense that maybe that the

4    awards portion of the Board meeting will be

5    eliminated?

6    A.   I can't answer that, I don't know.

7    Q.   Has there been any discussion of that

8    possibility?

9    A.   Not on the Board level, no.

10    Q.   Has there been discussion of that among

11    Board members outside of the Board meeting?

12    A.   Yes.

13    Q.   Who has had such discussions according to

14    your knowledge?

15    A.   I've discussed it with a certain few.

16    Q.   Which ones?

17    A.   I know that I did with Dr. Hattier,

18    Mr. Helms, Mrs. Bunting, Mrs. Mitchell.

19    Q.   When did the first of those discussions

20    occur roughly speaking?

21    A.   Probably within the last six months.

22    Q.   And who initiated discussion you or the

23    other side of the conversation?

24    A.   I did.

33

1    A.   That's probably true.

2    Q.   I can now eliminate several pages of my

3    outline.  Are there instances in which students are

4    required to attend Board meetings?

5    A.   Not that I'm aware of.

6    Q.   Are you aware of any instance in which a

7    student who isn't confronted with a scheduling

8    conflict has declined an invitation to attend School

9    Board meetings?

10   A.   Can you repeat the question?

11   Q.   Yes.  Setting aside instances in which

12   student has a scheduling conflict and can't come,

13   are you aware of any instance in which a student has

14   declined an invitation to attend School Board

15   meetings?

16   A.   Not that I'm aware of.

17   Q.   Is it your expectation as a Board member

18   that students would view an invitation from the

19   School Board as an attractive invitation for

20   recognition of their achievements?

21        MR. GOSSELIN:  Objection.

22   Q.   You can answer.

23   A.   My opinion it would be, it's an honor for

24   them to come to receive an award.

34

1    Q.   Yes, sir, and in fact isn't that

2    essentially what Mrs. Hobbs said back in the mid

3    '90s when she said we ought to be honoring our

4    students?

5    A.   Yes.

6    Q.   Okay, we identified the ROTC, and we

7    identified student who come to the Board meetings to

8    receive awards or recognition, is it also the case

9    that student government representatives address the

10   Board regularly?

11   A.   During the time of the school year, yes.

12   Q.   Yes, sir, and in fact there is now a

13   section, regular section of the agenda called

14   student government which is intended to provide the

15   student government representatives with an

16   opportunity to address the Board, is that correct?

17   A.   Yes.

18   Q.   And that practice was established back in

19   it 1999s, is that correct?

20   A.   That was one of the things that was done by

21   a Board member who made the suggestion, it wasn't

22   done by Mrs. Hobbs.

23   Q.   No, sir, I didn't suggest that it was

24   separate from the award issue.

35

1    A.   Yes, it's probably been going on longer

2    than the awards issue that she recommended that we

3    do.

4    Q.   Do you have any recollection of when it

5    began?

6    A.   No, I'm not sure.

7    Q.   I'm going to mark as exhibit, Plaintiff's

8    Exhibit 32 a document bearing Bates number, I should

9    have told you, Bates numbers you will see on the

10   bottom of most of the documents I give you, there is

11   a little printed number.  Some guy named Bates

12   invented this system.  So, we identify them on the

13   record by Bates numbers so people reading the

14   transcript know what we are talking about.

15        So, this is a document titled Minutes of

16   the Board of Education Special Meeting on July 19,

17   1994, it's bearing Bates numbers PR206 through 210.

18        (WHEREUPON, Plaintiff's Exhibit 32

19        was marked for identification)

20        MR. ALLINGHAM:  I can't remember

21        if I told you Jason we decided last night

22        we are going to sequentially number and

23        call them Plaintiff's Exhibits so that we

24        don't -- I never know which is the better

36

1    way, but that's how we are going to do it.

2        MR. GOSSELIN:  I prefer -- well,

3        you don't care what I prefer.  This is

4        fine, this is what I prefer.

5        MR. ALLINGHAM:  I feel better

6        then.

7    Q.   None of this is a memory test, sir.  If you

8    look at page four of the document Plaintiff's

9    Exhibit 32, under student government which is the

10   third heading, you will see that Mr. Cohee reports

11   on a meeting he had at Sussex Central with some

12   students who talked about a lack of communication

13   and the inactive student government, and Mr. Cohee

14   then made a motion, according to the minutes that

15   you seconded, to include on the agenda a ten minute

16   segment for student government for both high schools

17   and the motion passed unanimously.

18        Does that refresh your recollection that it

19   was in 1994 that that agenda item was added?

20   A.   I wasn't sure of the date that it was done,

21   but I know Mr. Cohee is the one who brought it.

22   Q.   And looking at these minutes does that

23   refresh your recollection that it was 1994?

24   A.   This says July 19, 1994.

37

1    Q.    Right above that heading, there is a
2    heading in the minutes called public comments in
3    which it's reported you made a motion seconded by
4    Mr. Moore to add a 15 minutes segment for public
5    comments at the beginning of regular Board meetings,
6    do you recall having done that?
7    A.    Yes.
8    Q.    Why did you do that?
9    A.    I thought it was important for people in
10   the community to come and talk to us about things
11   that was on their minds, concerns or anything like
12   that or have input.
13   Q.    Is there any restriction on what people can
14   say during that public comment period?
15   A.    They cannot talk about anything to do with
16   personnel issues.
17   Q.    What's the reason for that?
18   A.    Because personnel issues are private.
19   Q.    Any other restrictions at all?
20   A.    Other than the fact that it's supposed to
21   be limited to 15 minutes and if you come to speak as
22   an individual it's three minutes and if you speak as
23   group I believe you are entitled to four minutes.
24   Q.    Have those time limits been in existence

38

1    ever since 1994 when the public comment period was
2    adopted?
3    A.    To the best of my knowledge.
4    Q.    You're now Board president, and so you sort
5    of run the meeting, is that right?
6    A.    Yes.
7    Q.    Isn't there also a restriction on people
8    are not -- you would be permit people to make
9    offensive comments?
10   A.    Yes.
11   Q.    Or derogatory comments?
12   A.    Yes.
13   Q.    And that's just part of your responsibility
14   to keep order at the meeting?
15   A.    Yes.
16   Q.    Is it your view that public comments should
17   be respectful?
18   A.    Should be respectful?
19   Q.    Yes.
20   A.    Yes.
21   Q.    Is it also your view as a Board member that
22   the establishment of the public comment portion of
23   the meeting was rather than being required by law it
24   was an effort by the Board to confer a privilege of

39

1    communication on the general public?
2    A.    Yes.
3    Q.    And it's your view as a Board member that
4    that privilege should not be abused?
5    A.    Yes.
6    Q.    Since 1994 when the student government
7    portion of the meeting was established has it been
8    the case that most meetings during the academic
9    school year student government representatives have
10   addressed the Board?
11   A.    During the school year?
12   Q.    Yes.
13   A.    Yes.
14   Q.    Is it your practice that when they speak,
15   the student representatives speak to the Board, that
16   the nature of their remarks is identified in the
17   minutes?
18   A.    I don't think it's verbatim.
19   Q.    Is the fact that a student representative
20   spoke reflected in the minutes?
21   A.    To the best of my knowledge.
22   Q.    That's your intent anyway?
23   A.    Yes.
24   Q.    When you come to the student government

40

1    portion of the agenda do you as the board president
2    invite the student government representatives to
3    come forward to speak?
4    A.    Yes.
5    Q.    Describe for me, if you can, the nature of
6    the topics that student government representatives
7    have discussed with the Board over the years?
8    A.    Any awards that the school might have won
9    since the previous time they spoke, scores of
10   athletic events, the placement of the, on the state
11   log of where we rank, if we are having a good year
12   and things like that they do that.  And they invite
13   us to certain things that's coming up like maybe a
14   concert or a ROTC dinner or things like.  We are
15   invited to come to things like that.  That's
16   basically what they do.
17   Q.    And does the School Board or individual
18   members of the School Board accept those invitations
19   and attend those events?
20   A.    I try to go to as many as I possibly can.
21   Q.    Do you see fellow Board members there?
22   A.    Yes.
23   Q.    This may sound like a funny question
24   Mr. Bireley, but do you view you take your

41

1  responsibilities as a Board member seriously, don't
2  you?
3     A.  Yes.
4     Q.  And is it your sense that your fellow Board
5  members also take their responsibilities seriously?
6     A.  Yes.
7     Q.  Have you ever had a sense that your
8  colleagues on the Board were not trying their best
9  to discharge their responsibilities as Board
10  members?
11     A.  No.
12     Q.  So, this will sound like a summary
13  question, and it is, in your 30 years or so of
14  service on the Board you have throughout those 30
15  years of service you have been confident that your
16  fellow Board members are using their best efforts to
17  discharge their Board responsibilities
18  appropriately?
19     A.  To the west of my knowledge?
20     Q.  Yeah.
21     A.  Yes.
22     Q.  Do student government representatives from
23  time to time express concerns to the Board about
24  issues in their schools?

42

1     A.  Yes.
2     Q.  Give me an example of some concerns that
3  they've expressed?
4     A.  The period of time that Sussex Central was
5  going through their construction and they actually
6  were placed in a building maybe a year ahead of time
7  they shouldn't have been there, and it was -- well
8  basically it was not a very good experiences for
9  them.  We heard some of that type of thing.
10     Q.  It's a legitimate concern?
11     A.  Yes.
12     Q.  Any other that you can think of?
13     A.  Not that I can remember.
14     Q.  Do student groups sometimes attend Board
15  meetings?
16     A.  Yes.
17     Q.  Can you give me some examples?
18     A.  Well, I consider it to be a group when the
19  come in to get their awards if that's what you mean.
20     Q.  No, I meant you know musical groups or I
21  guess the ROTC would qualify as a group, some group
22  that attends Board meetings as a group?
23     A.  Yes.
24     Q.  Can you give me some examples?

43

1     A.  Most of the time during the month of
2  December a group would come in to perform either
3  singing or a small acting type thing.  The Odyssey
4  of the Mind students have come in and did their
5  little skit that they did in national in front of
6  the Board.
7     Q.  It SDSA Steel Band, that's a musical group?
8     A.  Yes.
9     Q.  Is that one of the December performances?
10     A.  They came I'm not sure whether it was
11  December, but we have had them there, yes.
12     Q.  What is the Odyssey of the Mind?
13     A.  It's a group of student that are elevated
14  students, you know the better students that through
15  creativity they do skits or they do like a play or
16  something like that that they go to state and
17  national competition and be judged with other school
18  districts.
19     Q.  And so they came and sort of made their
20  presentation to the Board?
21     A.  Yes.
22     Q.  I noticed in some of the older minutes
23  there were band groups that had done national
24  competitions and then had performances for the

44

1  Board, do you recall that?
2     A.  At a Board meeting?
3     Q.  Yes.
4     A.  No, I really don't.
5     Q.  The student groups that attend the School
6  Board meetings who invites them?
7     A.  The students?
8     Q.  The student groups like the steel band or
9  the musical groups or ROTC, who invites them?
10     A.  The superintendent.
11     Q.  Is that done by a letter to the groups?
12     A.  I'm not sure.
13     Q.  Okay.  In one of the minutes, and I don't
14  have it here, so if you don't remember it's not a
15  big deal, but do you recall a student representative
16  addressing the Board with concerns about the quality
17  of the water and quality of the athletic fields at
18  Sussex Central?
19     A.  Yes.
20     Q.  Was it helpful to the Board to get student
21  input on issues like that?
22     A.  Yes.
23     Q.  How did the School Board respond to those
24  concerns?

45

1    A.    We tried to make them better.

2    Q.    The student government representative

3    portion of the agenda is limited to the two high

4    school, is that right?

5    A.    Yes.

6    Q.    Are there instances in which other

7    representatives of student bodies express concerns

8    about conditions at their schools, that is other

9    than the high schools?

10   A.    I can't remember.

11   Q.    Do you recall in August of 2004 a

12   Selbyville middle school student expressing a

13   concern about the loss of safety and school climate

14   positions?

15   A.    Oh, yes.

16   Q.    Do you recall students speaking to the

17   Board about concerns about the Southern Delaware

18   Schools of the Arts?

19   A.    Yes.

20   Q.    And in each of these cases where students

21   come to the Board to address their concerns, does

22   the Board benefit from the attendance of the

23   students and expression of their concerns?

24   A.    Do they benefit?

46

1    Q.    Yes. Is it helpful to the Board?

2    A.    Yes.

3    Q.    And in case does the Board try to address

4    the concerns of the students?

5    A.    Yes.

6    Q.    Is there any other forum for the students

7    to address the Board other than the public School

8    Board meeting?

9    A.    Yes.

10   Q.    What is that?

11   A.    They can come in executive session.

12   Q.    Would that be by invitation of the Board

13   itself?

14   A.    They apply, they write a letter and tell us

15   that they have something that they want to talk

16   about which is usual a personnel issue and we allow

17   them to come.

18   Q.    And that has happened in the past?

19   A.    Yes.

20   Q.    How frequently?

21   A.    Rarely, but we do allow it. The same way

22   that we allow a person in the community to do the

23   same thing if it's a personnel issue something that

24   we are not allowed to discuss during an open session

47

1    they come to that.

2    Q.    Oh, I see so there is that limitation in

3    the public comment session where you can't speak

4    about personnel issues, but there is a way for a

5    member of the public to speak to the Board about

6    personnel issues?

7    A.    Yes.

8    Q.    By making an application to speak at an

9    executive session?

10   A.    Yes.

11   Q.    How do members of the public -- how can

12   members of the public find out about that avenue for

13   expressing their concerns to the executive session?

14   A.    They can contact the superintendent.

15   Q.    It's not posted that you can do that

16   anywhere on the web site or in the policies?

17   A.    I'm not sure.

18   Q.    How would students find out about the

19   possibility of speaking to executive session?

20   A.    It's like a chain of command. If they have

21   an issue they can go to the building principal

22   first. Then they can go to the superintendent and

23   the superintendent would make them aware that no you

24   cannot stand up in front of the Board meeting and

48

1    talk about this particular issue, however, if you

2    want to do it in executive session then they would

3    be told that they can do it in executive session.

4    Q.    So, the superintendent would let them know

5    which way they could go?

6    A.    Yes.

7    Q.    Apart from speaking to the board at public

8    sessions, or speaking to the Board in executive

9    session, is there any other way that students have

10   the ability to speak directly to the School Board?

11   A.    Other than just maybe seeing us out

12   somewhere and they make a comment individually.

13   Q.    No other official way to speak to the

14   School Board?

15   A.    Not that I'm aware of.

16   A.    It always warms witness' hearts when I

17   start skipping through and I have a long red line on

18   the outline.

19        MS. ALLINGHAM:  Miss duPhily has

20   told me we have about four minutes of tape

21   left, we are going to change the tape now,

22   just take a minute.

23        MS. DUPHILY:  Going off the record

24   at approximately 10:10 a.m..

57

1    Q.   So, to the best of your recollection at
2    every Board meeting during your service as a Board
3    member the School Board opened the meeting with a
4    prayer?
5    A.   To the best of my knowledge.
6    Q.   Who decided, and this is all prior to the
7    more recent adoption of the School Board Prayer
8    Policy, who decided which Board member would lead
9    the group in prayer or offer a prayer?
10   A.   The Board president.
11   Q.   How was it decided which School Board
12   member would open the meeting with a prayer?
13   A.   The Board president just asked someone, I
14   don't know how.
15   Q.   Were there any restriction of any kind on
16   what sort of prayer a School Board member could
17   over?
18   A.   Not that I'm aware of.
19   Q.   Prior to the adoption of Policy BDA.1,
20   whish is the School Board Prayer Policy in October
21   of 2004, was there any policy that governed the
22   offering of prayer at School Board meetings?
23   A.   Not that I'm aware of.
24   Q.   Were you ever asked to lead the Board in

58

1    prayer or offer a prayer at the beginning of School
2    Board meetings prior to the adoption of the School
3    Board policy?
4    A.   No.
5    Q.   So, 1974 to 2004 is the period of time
6    during which you were a School Board member with a
7    three year hiatus, so if my arithmetic is right
8    that's 27 years of service prior to the adoption of
9    Board Policy BDA.1, and you were never asked to
10   offer a prayer at a School Board meeting?
11   A.   That's correct.
12   Q.   Do you know why?
13   A.   No.
14   Q.   Did you ever tell any Board president that
15   you were not interested in offering a prayer at the
16   School Board meeting?
17   A.   No.
18   Q.   Again, if my arithmetic is correct, that's
19   well over 300 School Board meetings at which
20   somebody offered a prayer, but you were not invited
21   to do so, did that strike you as off or unusual?
22   A.   No.
23   Q.   Did you perceive any pattern in the Board
24   president's practice in the selection of the person

59

1    who would be invited to offer the prayer?
2    A.   It was usually done by a small portion of
3    the group of ten.
4    Q.   And did they have any common
5    characteristics, the small portion?
6    A.   Not that I'm aware of.
7    Q.   Do you know how that small group, smaller
8    group was identified by the Board?
9    A.   To my knowledge the Board president would
10   call on someone at the Board meeting to say the
11   prayer, that's all I know.
12   Q.   But you told me that a small group of the
13   Board was asked to offer the prayer, a group that
14   you were not a member of, do you know how that group
15   was identified or picked or selected to be the ones
16   who would offer the prayer?
17   A.   No.
18   Q.   How small a group, two, three?
19   A.   Three, four, somewhere in that
20   neighborhood.
21   Q.   Was a Jewish Board member ever included in
22   that group?
23   A.   I don't recall us ever having a Jewish
24   Board member.

60

1    Q.   Was a Muslim Board member ever included in
2    that group?
3    A.   I don't call us having a Muslim Board
4    member.
5    Q.   Or a Buddhist?
6    A.   Same answer.
7    Q.   A non-Christian Board member ever included
8    in that group?
9    A.   I don't recall us ever having that type of
10   Board member.
11   Q.   Would you characterize the members of that
12   smaller group as being particularly religious
13   amongst their peers?
14        MR. GOSSELIN:  Objection.
15   A.   Do I answer?
16   Q.   Yes, sir.
17   A.   Can you please ask that question again?
18   Q.   Was it -- did you perceive that the
19   criteria for selection of this smaller group was
20   that these were folks who were particularly
21   religious?
22        MR. GOSSELIN:  Objection.
23   A.   No.
24   Q.   Let me just ask the broad question, is it

65

1    Q.   But you did have a conversation in words or
2    substance like that with everybody to whom you had
3    not offered the invitation previously?
4    A.   Previous to that, yes.
5    Q.   Dr. Hattier testified yesterday, that he
6    works very hard to prepare his prayer, that it
7    doesn't flow easily, and he is not good at direct
8    quotations, he tries to write down what he's going
9    to say, is that consistent with your notion that Dr.
10   Hattier would fall into the group that is better at
11   offering a School Board prayer?
12   A.   Yes.
13   Q.   Is that because the content of the prayers
14   that he offers after his hard work seems to you to
15   be inspirational?
16   A.   Yes.
17   Q.   Seems to you to serve the purpose of School
18   Board prayer?
19   A.   Yes.
20   Q.   So, in Dr. Hattier's case it's the content
21   of the prayer that leads you to select Dr. Hattier?
22   A.   Yes.
23   Q.   The group of people that you identified for
24   me on the current Board that are good at, I'm using

66

1    a generic term, but that would be in that smaller
2    subset of the Board, I want to, make sure because I
3    have some questions based on the membership of that
4    sub group, is Dr. Hattier, Mr. Helms, is it Ms.
5    Mitchell or Dr. Mitchell?
6    A.   Mrs. Mitchell.
7    Q.   And Mrs. Bunting, correct?
8    A.   Correct.
9    Q.   Have you ever heard Mr. Helms -- first of
10   all, since the adoption of the policy have you as
11   Board president invited each of those four people to
12   take up the opportunity established by the Board
13   policy to open the meeting with a prayer?
14   A.   The ones that we are talking about now?
15   Q.   Those four that I just identified?
16   A.   To the best of my knowledge, yes.
17   Q.   And has each of those persons accepted the
18   invitation when you extended it?
19   A.   Yes.
20   Q.   Have they ever turned it down?
21   A.   No.
22   Q.   In the case of Mr. Helms, Mrs. Mitchell and
23   Mrs. Bunting, do you recall any instance in which
24   they offered a prayer that did not invoke the name

67

1    of Jesus Christ?
2    A.   That they did not.
3    Q.   Yes.
4    A.   Not that I'm aware of.
5    Q.   And that would be your expectation,
6    wouldn't it, that each of those three persons would
7    offer a prayer that would invoke the name of Jesus
8    Christ?
9        MR. GOSSELIN:   Objection.
10   Q.   You can answer.
11   A.   Yes.
12   Q.   Now, I want to explore with you how you as
13   Board president have implemented the rotational
14   aspect of Board Policy BDA.1.  Have you since the
15   passage of the policy and during your tenure as
16   Board president rotated the invitation among all
17   Board members?
18   A.   For those who wanted to, yes.
19   Q.   How did you find out who wanted to and who
20   didn't?
21   A.   I did the same thing as I did before, I
22   asked them were they willing, did they want to
23   participate, did they want to issue a prayer, if
24   they did please let me know.

68

1    Q.   All right, so when did you become Board
2    president in 2005, July?
3    A.   July 1st.
4    Q.   So, some time before the July 2005 Board
5    meeting you contacted each of the Board members to
6    ask whether they wanted to be extended an invitation
7    to offer the prayer?
8    A.   The existing Board member and the new Board
9    members come on except the three that are on there
10   now.  The three that were recently elected and came
11   on I have not had that conversation with those
12   three.
13   Q.   The three that were elected in March 2006?
14   A.   Yes, and that came on July 1st, of this
15   year.
16   Q.   So, I gather that some Board members when
17   you contacted them on this issue said no I would
18   prefer not to be invited to offer the prayer at the
19   beginning of the meeting?
20   A.   That's true.
21   Q.   Which Board members told you that?
22   A.   I asked Mr. Walls was the one specifically
23   asked me, when I asked him he said he declined right
24   at the present time, but if he chose to do it later

73

1    A.   Yes.
2    Q.   One person in response to your request
3  affirmatively said I would like to not be included
4  in the rotation at this time?
5    A.   Yes.
6    Q.   And that was Mr. Walls?
7    A.   Yes.
8    Q.   So, tell me, which persons affirmatively
9  said yes I would like to be included in the
10 rotation?
11   A.   Dr. Hattier, Mrs. Mitchell, Mr. Helms,
12 Mrs. Bunting. Is that five?
13   Q.   That's four?
14   A.   I'm trying to think.
15   Q.   Do you need a list of the Board members?
16 It happens to me all the time?
17   A.   They normally sit at the same chairs, I'm
18 trying to go around. Maybe it's only four. I'm
19 trying to think who is sitting on the other side.
20   Q.   Mr. Evans?
21   A.   He is not a Board member anymore.
22   Q.   In July did he indicate an interest in --
23   A.   Yeah, he did. I mean he participated I was
24 thinking of right now.

74

1    Q.   So, is your best guess that those are the
2  four who indicated an interest in participating?
3    A.   Well, it would be five including Mr. Evans.
4    Q.   Five with Mr. Evans, but he is now off the
5  Board. So, on the current Board you have a group of
6  four who affirmatively said I'd like to
7  volunteer to be in the rotation and offer a prayer?
8    A.   Yes.
9    Q.   And you have not yet talked to any of the
10 three more recently elected Board members?
11   A.   That is true but their names are coming up,
12 their time, so I would talk to them probably within
13 the next maybe prior to the next Board meeting. I
14 am not sure. I have it written down at home.
15   Q.   I was just going to ask you that, so how do
16 you keep track of who's next in the rotation?
17   A.   Well, I try to make notes for myself.
18   Q.   And where do you keep those notes?
19   A.   At home.
20   Q.   Do you have a Board file of some kind?
21   A.   No.
22   Q.   Where did you keep them?
23   A.   I have a disclaimer, that I'm sure you are
24 aware of that I read before every Board meeting. I

75

1  make a note on that.
2    Q.   And this is going to sound tedious, but I'm
3  trying to identify precisely what objects there are
4  that have the words, so do you have a pad that has
5  the disclaimer?
6    A.   It's just a single piece of paper like this
7  that has the disclaimer that I read at each Board
8  meeting.
9    Q.   What do you do write down the name of the
10 person who gave the prayer?
11   A.   That who is suppose to do it, yes.
12   Q.   And then how do you know who the next
13 person is in the rotation?
14   A.   The one that -- I try to go by the one --
15 in other words, for the ones who are doing it right
16 now, there is four of them, then that other one will
17 not do it again for four months as it stands right
18 now.
19   Q.   And so how do you remember what has gone in
20 the preceding three months and who is next?
21   A.   I make notes of it.
22   Q.   And you make that note on the disclaimer
23 piece of paper?
24   A.   Yeah.

76

1    Q.   So, the four members who are currently on
2  your rotation list, my memory is really shot, Dr.
3  Hattier, Mr. Helms Mrs. Mitchell and Mrs. Bunting,
4  would you characterize those four as good at
5  offering school board prayer?
6    A.   Yes.
7    Q.   I don't know how else to say it, they are
8  skilled at it?
9    A.   Yes.
10   Q.   In your home where do you keep the
11 disclaimer page?
12   A.   In my office.
13   Q.   Do you keep any other materials related to
14 your service as a Board member or Board president
15 with that disclaimer page?
16   A.   No.
17   Q.   So you have a single page that relates to
18 the School Board and your service as a member in
19 your home?
20   A.   It's usually in the packet, the Board
21 packet.
22   Q.   Do you keep the Board packet?
23   A.   Do I keep them?
24   Q.   Yes.

85

1    Q.   Do you know precisely when that took place?

2    A.   No.

3    Q.   Did Mr. Helms subsequently report on the

4    substance of his conversation with Mr. Neuberger to

5    the Board?

6    A.   He got Mr. Neuberger to come and visit us.

7    Q.   Do you know when that took place?

8    A.   Not exactly.

9    Q.   Was it the summer of 2004?

10   A.   It was after the graduation ceremony, yes.

11   Q.   Was it before the commencement of the next

12   academic year?

13   A.   Yes, I'm pretty sure it was.

14   Q.   So, sometime during the summer of 2004?

15   A.   Yes.

16   Q.   Do you know whether Mr. Neuberger's visit

17   to the Board is reflected in the minutes of the

18   Board meeting?

19   A.   I believe, if I am not mistaken that this

20   was a special Board meeting, it wasn't a regular

21   Board meeting.

22   Q.   Okay.  Do you know whether the minutes of

23   that meeting reflect Mr. Neuberger's attendance?

24   A.   I thought it was.

86

1    Q.   Did had a special Board meeting open with a

2    prayer?

3    A.   I don't believe it did.

4    Q.   Why is that?

5    A.   I know it's probably sounds strange but the

6    prayer issue usually is on regular Board meeting.

7    If we have a special Board meeting we don't do it.

8    Q.   Why would your say that sounds strange?

9    A.   Because we just have a rule, or I guess

10   it's a past practice or whatever that we always have

11   the prayer at the regular Board meetings but no

12   other.

13   Q.   And when you say the regular Board meetings

14   those are the regular meetings at which the public

15   is present?

16   A.   Yes, once a month.

17   Q.   And is that regular practice it's not just

18   today's practice or 2004's regular practice, it's

19   the regular practice that goes back in time as far

20   as your tenure on the Board extends, correct?

21   A.   Yes.

22   Q.   And is that because -- is the distinction

23   between public meetings where prayers are offered

24   and private meetings where prayers are not offered,

87

1    is there any distinction other than that the public

2    is present at those regularly scheduled public

3    meetings?

4    A.   Sometimes there is public at special

5    meetings, too.

6    Q.   Oh, and even if there is public at the

7    special meetings you don't offer a pray?

8    A.   That's correct.

9    Q.   Is there any distinction from your point of

10   view, just as an individual Board member, between a

11   special meeting at which the public is present and a

12   regular meeting at which the public is present that

13   would lead to pray at the latter but not at the

14   former?

15   A.   Except it's always the way that it's been

16   done.

17   Q.   How often does the Board, just an estimate

18   over your 30 years of tenure, how often does the

19   Board call special Board meetings?

20   A.   Two to three a year maybe.

21   Q.   And how often does the public attend

22   special Board meetings?

23   A.   I'm not sure.

24   Q.   Not very frequently?

88

1    A.   I wouldn't say not all three of them.  Say

2    if we do two or three a year, say not all three.  It

3    depends on what the issue is.

4    Q.   In this litigation we have had the

5    opportunity to look at the minutes of Board

6    meetings, and I'll represent to you that since the

7    adoption of Policy BDA.1, the School Board Prayer

8    Policy on October 19, 2004, since that date there

9    have been at least 17 special Board meetings over

10   the course of that two year period.

11   So, that's eight to nine per year.  Has the

12   incidents of special Board meetings increased in

13   recent years?

14   A.   The difference between what I'm talking

15   about and what you're talking about is we have a

16   special Board meeting the we interview for

17   personnel, I'm not talking about that.  I'm talking

18   about issues other than hiring of personnel that we

19   have a special Board meeting for.

20   Q.   Okay, so I can think of it as two

21   categories of special meetings, one is a category

22   which is limited to hiring personnel for the

23   district?

24   A.   Okay.

101

```
 1      Q.   Correct?
 2      A.   Yes.
 3      Q.   And you don't have any information about
 4   where the policy committee, what formed the basis
 5   for the policy committee's drafting of the text of
 6   this policy?
 7      A.   That is true.
 8      Q.   When the policy was presented to the full
 9   Board did you ask the policy committee what had been
10   the basis for the text that was presented to you?
11      A.   No, I did not.
12      Q.   Why not?
13      A.   Because I read it and it appeared that wit
14   this policy or any other policy we always run it by
15   the attorneys before we are allowed to see it, and
16   it was like something that was out of my domain, I
17   don't have the legal background to ask questions
18   like that, so I assumed that this was the way that
19   we should go.
20      Q.   Did the full Board make the decision to
21   refer to the policy committee the issue of whether
22   to adopt the policy on School Board prayer?
23      A.   That's the procedure.
24      Q.   So, there was a point at which the full
```

102

```
 1   Board said should we adopt the School Board Prayer
 2   Policy or not?
 3      A.   I would say probably, yes.
 4      Q.   And do you know when that discussion or
 5   consideration occurred?
 6      A.   No.
 7      Q.   Some time after graduation?
 8      A.   Yes.
 9      Q.   Sometime before October 1th9?
10      A.   Yes.
11      Q.   Did that determination occur before or
12   after the big meeting on August 24th?
13      A.   Are we talking about August the 24th of
14   2004.
15      Q.   Yes, sir.
16      A.   I think it was after that, but I'm not
17   positive, but I think so.
18      Q.   Back to the text of paragraph three. Am I
19   correct that the Board intends that the prayer
20   opportunity should not be used to advance any
21   particular faith?
22      A.   Yes.
23      Q.   And when you say advance any particular
24   faith, what do you mean by that?
```

103

```
 1      A.   If a person is a Christian it should not
 2   appear that the Christian prayer is the only one
 3   there is. It's just from the individual.
 4      Q.   Fair enough. That could be accomplished I
 5   suppose by saying before whatever you say as a Board
 6   member I am not intending by offering this prayer to
 7   suggest that this is the only appropriate prayer or
 8   that the faith in which this prayer is offered is
 9   the only appropriate faith?
10      A.   I would agree with that.
11      Q.   That's kind of the thrust that you are
12   trying to get at in this policy?
13      A.   Uh-hum. If I can say something, you want
14   to know what I read before every Board meeting, it's
15   paragraph one and paragraph three.
16      Q.   Oh, good, we were going to come to that,
17   but we might as well address it now. So, the words
18   on that disclaimer page that you have --
19      A.   Yes.
20      Q.   -- are the words of paragraph one and
21   paragraph three?
22      A.   Yes, that's the disclaimer that I read at
23   every meeting.
24      Q.   So, at every meeting, you say, "In order to
```

104

```
 1   solemnify its proceedings, the Board of Education
 2   may choose to open its meetings with a prayer or
 3   moment of silence, all in accord with the freedom of
 4   conscience of the individual adult Board member.
 5   Such opportunity shall not be used or exploited to
 6   proselytize, advance or convert anyone or to
 7   derogate or otherwise disparage any particular faith
 8   or belief?"
 9      A.   I'm sorry, that is not the paragraph, I'm
10   sorry. It's one and four.
11      Q.   Got you.
12      A.   After I read paragraph one I then read
13   paragraph four. But when it came to me, Mr. Walls
14   passed it on down to me after he became.
15      Q.   Yes, sir?
16      A.   That's what this is, when I talk about the
17   disclaimer it's paragraph one and paragraph four.
18      Q.   And you are confident that you read the
19   text of paragraph one and paragraph four at every
20   Board meeting?
21      A.   At every Board meeting.
22      Q.   Every Board meeting at which prayer is
23   offered?
24      A.   I'm not going to say that I've never
```

Bireley, Charles (Video)  10/11/2006  9:15:00 AM

---

**121**

1    Q.  You told me earlier that you told her to

2    call Mr. Walls?

3    A.  Well, she wanted to talk to the Board

4    president.

5    Q.  Okay, so you are confident that you told

6    her to call Mr. Walls because he was the Board

7    president?

8    A.  Yes.

9    Q.  And you think you probably also said that

10   if you want to speak to the Board call central

11   office?

12   A.  Because that's our practice, yes.  I hope I

13   did that.

14   Q.  Did you ever hear that Mrs. Dobrich did in

15   fact contact central office?

16   A.  Yes.

17   Q.  Did you ever hear what they told her?

18   A.  No.

19   Q.  Did you ever hear that she had difficulty

20   getting her issue on the agenda?

21   A.  I heard about that later on, yes.

22   Q.  Who did you hear about that from?

23   A.  Like scuttlebutt, but it came to me much

24   later even after the meeting at Frankford

---

**122**

1    Elementary.

2    Q.  Tell me everything you recall about this

3    scuttlebutt?

4    A.  That she had tried to do what, you know

5    that I had suggested that she do, and she didn't

6    feel that she was successful in getting it done.

7    Q.  And who did you hear that from?

8    A.  I'm not sure, I'm really not.

9    Q.  Did you investigate whether that concern

10   was true, because you wouldn't like it if somebody

11   went to the central office and had difficulty

12   getting their issue on an agenda, would you?

13   A.  Yes.

14   Q.  You did investigate?

15   A.  Yes.

16   Q.  What did you find out?

17   A.  I asked Mrs. Hobbs about it.

18   Q.  What did she say?

19   A.  She had told me that she had called her.

20   Q.  Mrs. Dobrich had called her?

21   A.  She said that I have talked to

22   Mrs. Dobrich.

23   Q.  Yes, sir, and did she say that she had

24   agreed to put the issue on the agenda?

---

**123**

1    A.  I'm not sure that she told me that.  I know

2    that she told me specifically that she had talked to

3    Mrs. Dobrich.

4    Q.  And what did she say, did she tell you the

5    substantiate of the conversation?

6    A.  It was concerning how Mrs. Dobrich felt

7    about the issues of what went on during the

8    graduation.

9    Q.  What did Mrs. Hobbs tell you that she told

10   Mrs. Dobrich?

11   A.  Well, I don't know that she did tell me

12   what she told Mrs. Dobrich, she just had a

13   conversation with her.

14   Q.  Did Mrs. Hobbs tell you how the

15   conversation ended up?

16   A.  No.  If she did, I don't remember.

17   Q.  Did Mrs. Hobbs assure you that Mrs. Dobrich

18   was advised that she could speak to the Board about

19   this issue?

20   A.  Not specifically I don't think she did.

21   Q.  Did she tell you, that she Mrs. Hobbs

22   agreed to put the issue on the agenda for the Board

23   meeting?

24   A.  I thought she did.

---

**124**

1    Q.  The next sentence of PX13, which is the

2    executive session minutes says, "It was not felt

3    that a decision could be made this evening regarding

4    whether or not to change our past practice."  I take

5    it that it was not felt means it was not felt by the

6    Board members, correct?

7    A.  Yes.

8    Q.  And it was not felt that a decision could

9    be made this evening regarding whether or not to

10   change our past practice, what is that the Board

11   members needed before they could make a decision

12   about whether or not to change their past practice?

13   A.  Advice from an attorney.

14   Q.  The minutes PX14 say that the purpose of

15   going into executive session which then lasted four

16   hours and 15 minutes, was to seek advice from our

17   legal counsel on this issue, right?

18   A.  Yes.

19   Q.  Was there something wrong with the four

20   hours and 15 minutes you had already gotten on the

21   issue?

22   A.  I would say that it was like they wanted a

23   second opinion.

24   Q.  And you say it was like they wanted a

---

125

1　second opinion, is the they just generally the Board
2　members, or was there a group that was urging that
3　the Board get a second opinion?
4　　　A.　I would say it was the Board members.
5　　　Q.　All of them.
6　　　A.　I would say so.
7　　　Q.　Yes, sir.
8　　　A.　I don't have any first hand knowledge that
9　anyone did not want that.
10　　　Q.　Can you think of any instance which the
11　Board had in the past received advice from
12　Mr. Griffin and then decided to get a second
13　opinion?
14　　　A.　Yes.
15　　　Q.　Give me an example?
16　　　A.　I can't give you a specific example but it
17　happens.
18　　　Q.　And is that because the Board doesn't like
19　the advice that it gets from Mr. Griffin?
20　　　　　MR. GOSSELIN:  Objection.
21　　　Q.　You may answer.
22　　　A.　We may not agree with what he advised, yes
23　that's true.
24　　　Q.　Is that what happened in this instance?

126

1　　　A.　I think so.
2　　　　　MR. GOSSELIN:  I don't want to
3　interfere with your questioning here. I
4　think that at least I thought your intent
5　just to just sort of find out the process.
6　I think you are starting to tread into
7　territory where you are trying to get at
8　what the advice was that Mr. Griffin gave,
9　and obviously we object to that.  I'm
10　putting that out on the record because I
11　want to just remind both you and the
12　witness what we agreed were going to be the
13　ground rules for this line of questioning.
14　　　　　MR. ALLINGHAM:  Yeah, it's a
15　little bit delicate.  The ground rule was
16　that you and I would agree to disagree
17　about whether I am entitled to ask
18　questions about the substance of the
19　advice.  That you and I would agree that,
20　and you would make the representation
21　that if I asked the same questions I asked
22　of Dr. Hattier, you would make the same
23　instructions so I don't need to do it again
24　with Mr. Bireley.

127

1　　　　　MR. GOSSELIN:  I don't know what
2　kind of letter I'm going to get tomorrow
3　and what you are going to be requesting,
4　but I don't want there to be any argument
5　that we have to give you, you know, written
6　documents from Mr. Griffin or anybody else
7　because somehow the attorney/client
8　objection has been waived.
9　　　　　I mean Mr. Bireley just gave an
10　answer that I think it's -- I don't know if
11　it was responsive to your question, if your
12　question was intended to elicit that
13　response I would have objected to it and
14　instructed him not to answer, and I didn't,
15　and I don't want that to be deemed by you
16　as some sort of a waiver, because if so I
17　think we can cut off the whole line of
18　questioning generally.
19　　　　　The judge issued an order here
20　saying that we have to produce documents
21　from the executive committee meetings to
22　the extent that they don't implicate
23　attorney/client privilege, that's why we
24　gave that.  And you know, it's difficult to

128

1　find out exactly where the line is to be
2　drawn in a case like this, and I think we
3　have drawn it that you can get the general
4　information about when the discussions took
5　place, the overall subject matter of the
6　discussions, but anything that goes to the
7　specific substance of the discussions
8　obviously I object to.
9　　　　　MR. ALLINGHAM:  I don't think it's
10　necessary to take positions on a deposition
11　record which take times of Mr. Bireley.  I
12　thought that had an agreement.  I thought
13　that we put our agreement on the record in
14　this transcript, we will abide by that
15　agreement.  I'm going on keep asking
16　questions that I think were not posed to
17　Dr. Hattier.  If I think that they are
18　appropriate, and if they are questions that
19　were not posed to Dr. Hattier it is our
20　position that you are obligated to object,
21　but the chips will fall where they may.  We
22　have whatever agreement we have.
23　　　　　MR. GOSSELIN:  Okay.
24　　　　　MR. ALLINGHAM:  Anticipating

145

1  something that Christianity is the only religion,
2  you know or that's what I would consider to be a
3  violation of paragraph three.
4      Q.  And you would not view the prayer that I
5  just had marked as PX35 as an example of what you
6  just described?
7      A.  No.
8      Q.  I'm correct am I not that it was your
9  intent as a Board member to adopt School Board
10  Prayer Policy that complied with existing applicable
11  law?
12      A.  Yes.
13      Q.  And in your, in casting your vote to adopt
14  that policy your belief that the policy that you
15  approved complied with applicable law was based in
16  part on Mr. Helms' report to you about
17  Mr. Neuberger's second opinion.  I don't want to
18  know the substance of the opinion, I just want to
19  know if that was part of your consideration in
20  reaching a conclusion on that issue?
21      A.  Probably so.
22      Q.  All right, I have a third prayer for you to
23  consider.  Heavenly Father, thank you for this great
24  occasion, for the work, the effort, the joys and

146

1  everything that led up to this point in time.  Thank
2  you for your guidance in this event.  We pray for
3  your direction in the lives of each of those in
4  attendance.  We pray that you direct them into the
5  truth, and eventually the truth that comes by
6  knowing Jesus.  We pray that you would be with them
7  now.  We ask these things in Jesus's name.  Amen.
8          MR. GOSSELIN:  Objection.
9      Q.  As a Board member would view that prayer as
10  a proselytizing prayer?
11      A.  Yes.
12      Q.  And describe for me as well as you can the
13  difference between this third prayer that I read and
14  the first two that you as a Board member would
15  consider nonproselytizing?
16      A.  My personal opinion what you just read,
17  they are basically saying that the only way through
18  to heaven or to God is through Jesus Christ.  I
19  think that's the difference.
20          In other words, in that prayer you are
21  saying, they are saying that that's the only way, if
22  I am hearing it correctly.  And I didn't think that
23  I interpreted that from the first two that that's
24  what it said.

147

1      Q.  So, the critical distinction, Mr. Bireley
2  is whether the content of the prayer suggest that
3  the only true religion or the only way to heaven or
4  only way to truth is through a particular faith, or
5  a particular Deity or representation of an Deity, is
6  that correct?
7          MR. GOSSELIN:  Objection.
8      Q.  Is that the distinction that you are trying
9  to draw?
10      A.  That the only way is through Jesus Christ.
11      Q.  Or presumably the way through Muhammad
12  or --
13      A.  Okay, I'm sorry, yes, some other.
14      Q.  And so long as a prayer doesn't say that
15  the only true way is through a particular Deity or a
16  particular faith you would find the prayer
17  nonproselytizing and not violative of paragraph
18  three?
19          MR. GOSSELIN:  Objection.
20      A.  Yes, in my opinion.
21      Q.  We were informed in an interrogatory answer
22  that you a Methodist, is that correct?
23      A.  Yes.
24      Q.  And do you attend church?

148

1      A.  Once in a while.
2      Q.  What church do you attend?
3      A.  My wife's church if I go.
4      Q.  Which church is that?
5      A.  Bethel Methodist in Dagsboro.
6      Q.  Would you characterize yourself as a person
7  who attends on big religious holidays, but not every
8  Sunday?
9      A.  I'm not sure that the big religious
10  holidays.  Once in a while, I would say once in a
11  while I do.  Not just that church but I go to, I
12  have had occasions to go to other churches, too.
13  But I'm not a every Sunday attendee, if that's what
14  you are asking me, I'm not.
15      Q.  On the other hand you would consider
16  yourself a practicing Christian?
17      A.  I try to.  I try to do what's right and I
18  mean I am aware of what the teachings say is right
19  and I try to do that.
20      Q.  In order to be a practicing Christian do
21  you consider it necessary to attend church on
22  Easter, for example?
23      A.  No.
24      Q.  Or to attend church on Christmas?

173

1  with a moment of silence?
2      A.  Well --
3          MR. GOSSELIN:  To the extent that
4      this is not based on information obtained
5      from counsel.
6      A.  Okay, this would be from individual Board
7  members?
8      Q.  Yes, sir?
9      A.  It was suggested and was discussed and they
10  decided not to do it because they still thought that
11  each individual Board member had the right to say
12  whatever they wanted to say in their moment of the
13  time that they give a prayer.
14      Q.  Did somebody say look if we just open the
15  meeting with a moment of silence it is not going to
16  be seeking divine guidance for our decisions at the
17  Board meeting?
18      A.  I don't recall that being said.  I don't
19  recall anybody saying that.
20      Q.  The policy itself contemplates, if you look
21  at PX9, sir that the Board of Education may choose
22  to open its meeting with a moment of silence, right?
23      A.  Yes.
24      Q.  And so am I correct that the policy itself

174

1  contemplates that moment of silence would be
2  effective to solemnify the proceedings?
3      A.  In some people's mind, yes.
4      Q.  And the policy itself contemplate that it
5  would be effective to solemnify the proceedings by
6  opening with a moment of silence, is that correct?
7      A.  What the policy says?
8      Q.  Yes, sir.  Did anyone raise the question if
9  as the policy reflects being a moment of silence
10  would be effective to solemnify the proceedings why
11  it was necessary also to offer the option to
12  individual Board members to open the meetings with a
13  prayer?
14      A.  The discussion that I remember what that
15  it's an individual's choice.
16      Q.  Was the inclusion in the Board Prayer
17  Policy of the option to open its meeting with a
18  prayer intended to protect individual Board members'
19  rights to express their religion as they saw fit?
20          MR. GOSSELIN:  Objection to the
21      form.
22      A.  To prevent them from doing it?
23      Q.  To protect their rights to express their
24  religion as they saw fit?

175

1      A.  I guess that's a fair statement.
2      Q.  Was a reason for the adoption of this
3  policy to protect individual Board members' First
4  Amendment rights to express their religion as they
5  see fit?
6          MR. GOSSELIN:  Objection.
7      A.  I will agree.
8      Q.  Did anybody give any consideration to
9  calling this policy the policy to protect individual
10  Board members First Amendment rights?
11      A.  No, not that I recall.
12      Q.  Do you know why the title of the policy was
13  changed from Policy on Prayer at Board Meetings,
14  which is what the first Rutherford Institute
15  document that Mr. Helms passed to you to Board
16  Prayer at Regular Board Meetings?
17      A.  The only thing I can recall in particular I
18  remember someone asking the question that was the
19  only time that we did it, and it was stated in
20  regular Board meetings because we didn't do it at
21  any other type of meetings.
22      Q.  Got you.  That's not because Board members
23  didn't think they could equally use divine guidance
24  at special Board meetings that you never had done

176

1  it?
2      A.  I guess that's true.
3      Q.  So, as far as you were able to tell Board
4  members did think they needed divine guidance for
5  special Board and regular Board meetings?
6      A.  Yes.
7          MR. GOSSELIN:  And everywhere
8      else.
9      Q.  In the Board School Board Prayer Policy we
10  talked a little bit about how you as the president
11  set up the rotating basis, I have a few more
12  questions on that.
13          As things stand now in your service as the
14  Board president, is it correct that you don't on a
15  rotating basis offer each Board member the
16  opportunity to offer a prayer to open the meeting?
17      A.  I just offer it to the people who have
18  indicated to me that they are willing to do it.
19      Q.  Would it be fair for me to understand that
20  the selection process is done in advance with the
21  offer extended only to the the, the invitation extended
22  to Board members who have previously volunteered to
23  participate in this process?
24      A.  If the other Board members has not

181

1   Q.   When Mr. Walls was on the Board if you had
2   extended an invitation to Mr. Walls you know that he
3   would have declined that invitation, isn't that
4   correct?
5   A.   Based on the fact that I had asked him
6   previous he was willing to do it and he declined,
7   yes.
8   Q.   Don't you think that the public is entitled
9   to know that some School Board members think it's
10  great to open School Board meeting with a prayer and
11  some School Board members don't?
12  A.   I've had people ask me why I don't do it.
13  Q.   Don't you think that the public is entitled
14  to see publicly that some Board members take up the
15  invitation and some Board members decline the
16  invitation?
17         MR. GOSSELIN:  Objection.
18  A.   If they come to the Board meetings, you
19  know, if people come to the Board meetings they are
20  going to see that anyway, they are going to know.
21  Q.   How are they going to know, sir?
22  A.   By observance.  They are going to see that
23  there is only a select amount of people that choose
24  to do this.

182

1   Q.   Do you think people keep track of which
2   Board member gave the prayer?
3   A.   I don't know if the others struggle with
4   doing it as much as I do, I don't know the answer.
5   Q.   Well, it's your job and you keep a piece of
6   paper, people don't keep in their minds --
7   A.   I agree with that.
8   Q.   Okay, so there is no way for people to know
9   that on the current Board six of the ten Board
10  members have indicated an unwillingness to offer a
11  prayer?
12         MR. GOSSELIN:  Objection.
13  A.   I'd like to say it was a personal
14  preference.
15  Q.   Indicated a personal preference not to have
16  an invitation extended to them to offer a prayer?
17  A.   Yes.
18  Q.   There is no way for the public to know
19  that?
20  A.   I guess not.
21  Q.   If you followed the policy as written, the
22  public would know that, isn't that correct?
23         MR. GOSSELIN:  Objection.
24  A.   If I called on someone that I knew that did

183

1   not choose to do so and they said or they chose not
2   to do it, then yes, they, they would, anyone who was there
3   in attendance would know.
4   Q.   And the reason you chose to figure out in
5   advance who would accept your invitation is that you
6   didn't want to embarrass the folks whose didn't
7   want, as a personal preference, to participate in
8   that process, isn't that right?
9          MR. GOSSELIN:  Objection.
10  A.   Yeah, embarrass them or put them on the
11  spot, yeah, when I already knew the answer.
12  Q.   Because you didn't want them to have to say
13  in public I prefer not to lead the Board in prayer?
14         MR. GOSSELIN:  Objection.
15  A.   Well, I guess yes.
16  Q.   Why was the rotating basis incorporated in
17  this policy, do you know?
18  A.   Other than the fact that that was what came
19  to us to be approved.
20  Q.   From the Rutherford Institute?
21  A.   Well, from the committee.  I'm not sure who
22  put that in there, whether the Rutherford Institute
23  recommended it or whether our own people in this
24  district did it Mr. Walls I'm not sure who did it.

184

1   Q.   Did you ask where it came from?
2   A.   No, I do not.
3   Q.   Did you ask why it was included?
4   A.   No.
5   Q.   Did any Board member ask where it came
6   from?
7   A.   Not that I'm aware of.
8   Q.   Did any Board member ask why it was
9   included?
10  A.   Not that I'm aware of.
11  Q.   It was included for no reason, correct?
12  You don't put in surplusage, or put in things that
13  have no purpose?
14  A.   True.
15  Q.   So, it has a purpose but you don't know
16  what it is?
17         MR. GOSSELIN:  Objection.
18  A.   Yes.
19  Q.   And you don't comply with it?
20         MR. GOSSELIN:  Objection.
21  A.   I don't comply with it?
22  Q.   You don't do what the policy says you
23  should do?
24         MR. GOSSELIN:  Objection.

193

```
 1    Q.  Oh, that's not what I said.  I didn't say
 2  did you make it an issue, I said was it your view
 3  the prayer suit facing the district and the Board
 4  the major issue surrounding this year's election
 5  which probably swung this year's vote?
 6    A.  I don't think I said that, not in the
 7  context like that.
 8    Q.  Well, in what context did you say it?
 9    A.  I agreed with him when he asked me the
10  question, did I think it was an important thing
11  because people in the community made it an important
12  thing.  I never did it, when I was campaigning or
13  anything.  No, I did not make this the issue.
14    Q.  Okay, so whether or not you made it the
15  issue, it became the major issue in the campaign?
16    A.  I don't know that it became a major issue,
17  it became an issue in the campaign.
18    Q.  Whether or not you made it an issue was it
19  your view that it probably swung the vote?
20    A.  I have no way of knowing that.
21    Q.  Well, did you tell Mr. Bireley that you
22  thought it probably swung the vote?
23        MR. GOSSELIN:  You mean Mr.
24    Starkey.
```

194

```
 1    Q.  Mr. Starkey, sorry.
 2        MR. GOSSELIN:  Objection.
 3    A.  I don't think that I did.
 4    Q.  Three paragraphs below that Mr. Starkey
 5  quotes you directly, "That's the issue Bireley said
 6  of the District four campaign.  They approved of
 7  what we did back on February 28th.  It became a
 8  campaign issue." Is that an accurate quote of what
 9  you told Mr. Starkey?
10    A.  Pretty much it did become a campaign issue.
11    Q.  Just don't know whether it swung the vote?
12    A.  I have no way of knowing --
13    Q.  Did --
14        MR. GOSSELIN:  You interrupted
15    him are you done?
16    A.  I started to say that it didn't come from
17  me, in anything that I ever wrote to anyone I never
18  said that this was, you know, the major issue or
19  whatever, that I can recall doing.
20    Q.  Did you raise it as an issue in the
21  campaign?
22    A.  Did I raise it as an issue?
23    Q.  Yes.
24    A.  No, not me personally.
```

195

```
 1    Q.  If someone else raised the issue did you
 2  respond as to what your position was?
 3    A.  Yes.
 4    Q.  You did respond to questions from
 5  Mr. Gaffney during that campaign interview on the
 6  School Board prayer issue?
 7    A.  On the radio?
 8    Q.  Yes.
 9    A.  Yes.
10        MR. ALLINGHAM:  Let's mark as PX39
11    a document bearing Bates numbers P2640.
12        (WHEREUPON Plaintiff's Exhibit 39
13        was marked for identification.)
14    Q.  This is an article from the Sussex Post
15  from the Thursday July 6, 2006 issue written by
16  James Diehl.  Did you give an interview to Mr. Diehl
17  in connection with this article?
18    A.  I'm not sure.
19        MR. GOSSELIN:  I haven't read this
20    article, can you give me a minute to read
21    it myself because I may object to any
22    questions relating to the article.  I think
23    I'm going to object to your substantive
24    questions but I suppose I will wait until
```

196

```
 1    you ask them.
 2        MR. ALLINGHAM:  Good idea.
 3    Q.  In the fourth column of the first portion
 4  of the article, the top portion of the article the
 5  second full paragraph incorporates a quote from you
 6  and it has a lead in paragraph which I also want to
 7  read, "Most provisions were made in response to
 8  recent court decisions according to Mr. Bireley.  As
 9  long as a student is not coerced, then they're
10  allowed to speak" I don't know what he was changing
11  from.
12        MR. GOSSELIN:  Where are you
13    reading from?
14        MR. ALLINGHAM:  It's the fourth
15    column top of the page.
16        MR. GOSSELIN:  Okay.
17    Q.  "As long as a student is not coerced then
18  they are allowed to speak Mr. Bireley said.  We
19  adopted this on our own." My question to you is
20  what do you mean when you say we adopted this on our
21  own?
22        MR. GOSSELIN:  Objection, don't
23    answer that.
24    Q.  Is the antecedent, is what you are
```

201

```
 1    Fike in that quotation?
 2          MR. GOSSELIN:  Objection,
 3    don't answer that.
 4          MR. ALLINGHAM:  The personal
 5    religious beliefs of the individual Board
 6    members who adopted the policy are plainly
 7    relevant under case law.  Do you want to
 8    reconsider your instruction?
 9          MR. GOSSELIN:  The judge told
10    you -- I'm going to -- if you want me to
11    tell you why I'm objecting or you don't.
12          MR. ALLINGHAM:  I just asked
13    whether you would reconsider in light of
14    what I just said.
15          MR. GOSSELIN:  No.
16    Q.   In the next paragraph of the article
17    reports, "School Board members Bireley and Hattier
18    rather than forcing what they think on other people,
19    see themselves as defending the values of Sussex
20    County.  They see themselves as protecting what
21    Hattier, who moved here in 1986, calls one of the
22    last great communities with rural attitudes in the
23    country."
24          In adopting the School Board Prayer Polity
```

202

```
 1    did you consider yourself as defending the values of
 2    Sussex County?
 3          MR. GOSSELIN:  Objection.
 4    Q.   You may answer.
 5    A.   Not in this context, no.
 6    Q.   Did you see yourself as defending one of
 7    the last great communities with rural attitudes in
 8    this country?
 9          MR. GOSSELIN:  Objection.
10    A.   No.
11    Q.   Did you speak to Dr. Hattier last night?
12    A.   Yes.
13    Q.   Did you discuss with him what he was asked
14    during the deposition?
15    A.   He made some statements to me, that's not
16    the purpose of the call.
17    Q.   What did he tell you about the deposition?
18    A.   What did he tell me?
19    Q.   Yes.
20    A.   That, well, that I should be polite, that I
21    should respect the other side, that I should do
22    something that I made a boo boo already is wait for
23    you to ask the complete question before I answer,
24    things like that.
```

203

```
 1    Q.   Did you visit the Harrison Senior Living
 2    Center in Georgetown, Delaware and Green Valley
 3    Terrace in Millsboro, Delaware as part of your
 4    re-election campaign for the School Board in 2006?
 5    A.   Did I?
 6    Q.   Yes.
 7    A.   No.
 8    Q.   Did anyone visit those centers on your
 9    behalf?
10    A.   Not that I'm aware of.
11          MR. ALLINGHAM:  All right let's go
12    off the record for five minutes.  I think
13    I'm done but I want to check with my
14    colleagues.
15          MS. DUPHILY:  We are going off the
16    record at approximately 2:54 p.m..
17          (WHEREUPON a brief recess was
18    taken)
19          MS. DUPHILY:  Back on the record
20    at approximately 2:58 p.m..
21    Q.   Do you believe that students in the
22    district are impressionable because of their youth?
23    A.   My personal opinion?
24    Q.   Yes.
```

204

```
 1    A.   Yes.
 2    Q.   In PX30 which I put before you a few
 3    moments ago, Mr. Gosselin and I had an exchange
 4    about whether a question relating to your personal
 5    religious views was relevant.  I understand that for
 6    reasons expressed by Mr. Gosselin he is
 7    withdrawing his instruction to you not to answer
 8    that question, so let me repose it.
 9          In the Delaware Beach Life article marked
10    PX30, the Reverend Jerry Fike, who by the way is the
11    minister who offered the commencement prayers in
12    2004, is that correct?
13    A.   Yes.
14    Q.   At the Board's invitation?
15    A.   Yes, well, not at the Board's invitation.
16    Q.   Who invited the Reverend Fike to deliver
17    the commencement --
18          MR. GOSSELIN:  I object to that
19    and instruct him not to answer, because we
20    are getting off topic.  You wanted his
21    personal views.
22    Q.   Is it within the Board's responsibility to
23    invite speakers to district events such as
24    commencement exercises?
```

213

1  he reacting to something on the record that
2  isn't in the record.
3     MR. ALLINGHAM:  All right, I
4  will mark as an exhibit the CD that
5  contains, the DVD that contains this video
6  at the conclusion of this line of
7  questioning.  We will also identify the
8  time when this video is started playing
9  and is finished playing, and I will ask and
10  I can do this now, who it is that is the
11  public speaker at the time so we have a
12  cross check about what portion of the
13  meeting we are showing Mr. Bireley.
14     MR. GOSSELIN:  Okay.
15     MR. ALLINGHAM:  All right, I think
16  that will provide a record that can be
17  reproduced for anyone who wants to see it
18  of what it is that Mr. Bireley was watching
19  when, prior to the time that I asked him
20  questions.
21     MR. GOSSELIN:  That's fine, and
22  I'm not saying that we wouldn't been able
23  to do that otherwise, I just would like to
24  know if it's not being taken down.

214

1     MR. ALLINGHAM:  Now, having said
2  that, if the reporter wants the public
3  statement that is being made on this tape,
4  can take down what is being said, that
5  would be helpful as well, but if you can't
6  you can't.  I think it's pretty clear
7  actually, but we will see.
8  Q.  Before we start the video again, do you
9  recognize the person who is standing to make a
10  comment during the public comment session of the
11  August 24 meeting?
12  A.  Yes.
13  Q.  Who is it?
14  A.  Harold Johnson.
15  Q.  Do you know who Mr. Johnson is?
16  A.  He used to be a School Board member.
17  Q.  Did he serve with you on the School Board?
18  A.  Yes.
19  Q.  For many years?
20  A.  Five, six, seven, eight, somewhere in that
21  neighborhood.
22  Q.  Had you spoken to Mr. Johnson before the
23  August 24th meeting about his intention to speak at
24  the meeting?

215

1  A.  No.
2     (AT THIS POINT A DVD WAS PLAYED)
3  Q.  Do you know how long Mr. Johnson spoke
4  before someone mentioned to him that his time was
5  up?
6  A.  No.
7  Q.  Do you know how much longer Mr. Johnson
8  spoke after someone told him that his time was up?
9  A.  No.
10  Q.  Do you think how long Mr. Johnson spoke had
11  anything to do with the substance of his remarks?
12     MR. GOSSELIN:  Objection.
13  A.  I really can't answer that.
14  Q.  Well, let me ask you this question did you
15  understand the reference Madelyn Murray-O'Hare to be
16  a threat against Mrs. Dobrich?
17  A.  I don't know that I thought that that was a
18  threat.  I'm familiar with Madelyn Murray-O'Hare, I
19  mean I know the situation, who she was and all that,
20  but I don't know that he was using that as a threat
21  against her, I hope not.
22  Q.  What was the purpose of raising Madelyn
23  Murray-O'Hare and her disappearance after raising
24  School Board prayer issues if not to threaten Mrs.

216

1  Dobrich?
2     MR. GOSSELIN:  Objection.
3  Q.  Do you have any idea what the purpose might
4  have been?
5  A.  No.
6     MR. GOSSELIN:  Objection.
7  Q.  Did you think it was inappropriate for
8  Mr. Johnson to raise the issue of Madelyn
9  Murray-O'Hare in the charged atmosphere that you
10  heard at that Board meeting?
11     MR. GOSSELIN:  Objection.
12  A.  It wouldn't have been something that I
13  would have done.
14  Q.  If you had been the School Board president
15  and you had heard that would you have banged your
16  gavel and said I'm sorry, I'm sorry in order to
17  maintain order at this meeting I'm going to have to
18  ask you to leave the podium?
19     MR. GOSSELIN:  Objection.
20  A.  Would I?
21  Q.  Yes.
22  A.  Yes.
23  Q.  And that was the right thing to do, isn't
24  it?

# EXHIBIT 2

**Page 1**

```
 1        IN THE UNITED STATES DISTRICT COURT
 2           FOR THE DISTRICT OF DELAWARE
 3
 4   MONA DOBRICH and MARCO DOBRICH, individually
     And as parents and next friend of ALEXANDER
 5   DOBRICH, SAMANTHA DOBRICH, JANE DOE and JOHN
     DOE, individually and as parents and next friend
 6   of JORDAN DOE and JAMIE DOE,
 7              Plaintiffs
 8      vs.          Civil Action
                     Case No. 15-120
 9
     INDIAN RIVER SCHOOL DISTRICT, ET AL.,
10
                    Defendants
11
12        DEPOSITION OF NINA LOU BUNTING, taken
13   pursuant t notice at the Indian River School
     District, 31 Hosier Street, Selbyville, Delaware,
14   beginning at 9:07 a.m. on October 13, 2006 before
     David A. Sroka, Registered Professional Reporter and
15   Notary Public.
16
     APPEARANCES:
17
        THOMAS ALLINGHAM, ESQ.
18      RICHARD HORVATH
        BRIAN LENHARD
19      P.O. Box 636
        Wilmington, Delaware  19899-0636
20      For the Plaintiffs
21      JARROD D. SHAW, ESQ.
        Drinker Biddle & Reath, LLP
22      One Logan Square
        Philadelphia, Pennsylvania  19103-6996
23      For the Defendants
24
```

**Page 2**

```
 1           MS. DUPHILY:  This is the
 2   videotape deposition of Ms. Nina Lou
 3   Bunting taken by the Plaintiff in the
 4   matter of Dobrich, et al. versus Indian
 5   River School District, et al., case number
 6   15-120.  We are going on the record at 31
 7   Hosier Boulevard, Selbyville, Delaware
 8   on October 12, 2006 at approximately 12:55
 9   p.m..
10           The court reporter is Dave Sroka
11   from the firm of Wilcox & Fetzer,
12   Wilmington, Delaware.    My name is
13   Lindsay    duPhily and I'm the videotape
14   specialist    of Discovery Video Services.
15           Counsel will now introduce
16   themselves and then the court reporter
17   will swear in the witness.
18           MR. ALLINGHAM:  I'm Tom Allingham
19   I represent the Plaintiffs in this
20   case, and with me are Richard Horvath and
21   Brian Lenhard.
22           MR. SHAW:  I'm Jarrod Shaw and I
23   represent the defendants in this action.
24           NINA LOU BUNTING,
```

**Page 3**

```
 1        The Witness herein, called for examination by
 2   the Plaintiffs, having been duly sworn to tell the
 3   truth, the whole truth, and nothing but the truth,
 4   was examined and testified as follows:
 5   EXAMINATION BY MR. ALLINGHAM:
 6      Q.  Did you attend the August 24, 2004 Board
 7   meeting?
 8      A.  August 24, 2004 Board meeting, are you
 9   referring to the one where the public, a lot of
10   people from the public came?
11      Q.  Hundreds of people?
12      A.  Okay, yes, I did.
13      Q.  Did anything occur at that meeting that was
14   disturbing to you personally?
15      A.  No.
16      Q.  I want to show you a clip of the vide from
17   that meeting?
18      A.  Okay.
19      Q.  This is a portion from the public comment
20   section of the meeting.
21      A.  Okay.
22       (AT THIS POINT IN TIME A TAPE WAS PLAYED)
23      Q.  Were you distracted when your telephone
24   rang during that clip?  Would you like me to play it
```

**Page 4**

```
 1   again for you?
 2      A.  No, I don't think I was distracted.  I may
 3   have been momentarily.
 4      Q.  Were you present when -- who was speaking
 5   during that public comment section?
 6      A.  Mr. Harold Short.
 7      Q.  Harold Johnson?
 8      A.  Harold Johnson, okay.  I don't know him
 9   that well.  I knew it was Harold somebody.
10      Q.  Were you present when he made that
11   statement?
12      A.  Yes, I was.
13      Q.  Did you hear him say that the good Lord has
14   proven that there's a higher power above our Supreme
15   Court?
16      A.  I guess I heard him say it.  I didn't hang
17   on every word.
18      Q.  Did you hear him say that was proven when
19   the last I heard Madelyn Murray-O'Hare disappeared
20   never to be seen again?
21      A.  Well, I heard it just now, do I remember --
22      Q.  that's the first time that you heard it?
23      A.  I'm sure I heard it that night, but I
24   didn't remember hearing it until you showed me
```

49

1   Q.   How would you go about analyzing?
2   A.   Making sure that we didn't do that, you
3   mean?
4   Q.   Yes, ma'am?
5   A.   Well, I know when I give the prayer it is
6   just talking about our staff and students, and about
7   our own decision making.  It does not involve
8   anything or anybody else.
9   Q.   Maybe a better way to go about it would be
10  to give you some examples of prayers and ask you
11  whether you think those prayers would violate
12  paragraph three of the limitations --
13  A.   Okay.
14  Q.   -- that are in there.  So, I'm going to
15  show you, I'm going to show you two prayers and the
16  third one is short and I think I can just read it
17  into the record for you.  Your counsel is getting
18  PX35.  I
19       I'm going to read it, Mrs. Bunting, but it
20  might help you to follow along as I read?
21  A.   Okay.
22  Q.   "Do not put your trust in princes, in
23  mortal men who cannot even save themselves.  When
24  their spirit departs they return to the ground.  On

50

1   that very day their plans come to nothing.  Blessed
2   is he whose help is the God of Jacob, whose hope is
3   in the Lord his God the maker of heaven and earth,
4   the sea and everything in them.  The Lord who
5   remains faithful forever.
6       He upholds the cause of the oppressed and
7   gives food to the hungry.  The Lord sets prisoners
8   free.  The Lord gives sight to the blind.  The Lord
9   lifts up those who are bowed down.  The Lord loves
10  the righteous.  The Lord watches over the alien and
11  sustains the fatherless and the widow, but he
12  frustrates the ways of the wicked.  For the wages of
13  sin is death, but the gift of God is eternal life
14  through Jesus Christ our Lord."
15      If one of your colleagues gave that prayer
16  in response to Mr. Bireley's offer of the
17  opportunity to do so, would you believe that that
18  prayer is permitted by paragraph three or prohibited
19  by paragraph three?
20  A.   Let me look at paragraph three again.  I
21  think it would depend, sir, and I'm not trying to be
22  evasive.  I think it would depend on whether or not
23  our Board member actually wrote this prayer, or
24  whether they were giving one that had already been

51

1   written.
2       I know Dr. Hattier likes to give prayers by
3   famous people.  So, if one of our Board members were
4   quoting some famous prayer then I would feel that it
5   would be appropriate in that way.  Are you asking
6   me, you are not asking me would I give this?
7   Q.   No, I asked you whether if one of your
8   colleagues gave this would you say to yourself, gee
9   I don't think that's permissible under paragraph
10  three of our policy, or would your conclude that it
11  was okay under the policy?
12  A.   I would say that I would wish they didn't
13  give it, if they had written it.
14  Q.   And why is that?
15  A.   Because I think it's a bit sermonizing, but
16  if they were quoting something that historically had
17  been said publicly before, like one of our
18  presidents or something, somebody like that, then --
19  and it was not of their authorship, then I would be
20  okay with it.
21  Q.   That's helpful, that's a good explanation
22  of how you'd go about it.  If -- there may be a
23  third possibility which is that the Board member
24  didn't write it, it was not a historical prayer such

52

1   as Dr. Hattier sometimes gives.  Let me step back.
2   Dr. Hattier sometimes has given a prayer that George
3   Washington gave, for example?
4   A.   Yes.
5   Q.   You already testified that when you offer
6   your prayer you offer a prayer in your own words and
7   you just address the decisions that you have to make
8   that night and the personnel of the district and the
9   students, I guess, right?
10  A.   This one is not, in my question to you,
11  this one is not the words of the Board member, your
12  colleague, it is not a historical prayer of George
13  Washington or some other historical figure, it is
14  taken from scripture, it is specifically taken from
15  Psalms and Romans of the King James Bible.
16  A.   Okay.
17  Q.   So, my question to you is, with that
18  additional information would you view this as
19  sermonizing or would you view it as perfectly okay
20  under paragraph three?
21  A.   Under paragraph three, at a Board meeting,
22  among the ten of us I would not expect anyone to
23  give this type of prayer, okay?
24  Q.   Yes, ma'am?

53

1  A.  Now, are you asking me if I think it would
2  be okay for them to?
3  Q.  I am going to do it in two pieces, okay?
4  The first piece which you have just given me is that
5  you would not expect anyone to give this type of
6  prayer?
7  A.  No.
8  Q.  And is the reason why you would expect that
9  this prayer would not be given because you view it,
10  it's content as sermonizing?
11  A.  Well, it's not just that I view it as
12  sermonizing, I view it as not dealing with what we
13  have at had as a Board.
14  Q.  Yes, ma'am.
15  A.  Okay.
16  Q.  Not relevant?
17  A.  Not relevant to our decision making for the
18  evening's, you know, meeting.
19  Q.  And just to tie that loop, in your prayers
20  you try to link up the prayer to the decisions that
21  you are actually going to have to make?
22  A.  Yes.
23  Q.  Okay.  Now, let me go to the second
24  question which you started to think about.

54

1  Accepting that you would not expect any of your
2  colleagues to offer this prayer for the reasons that
3  you've given, if they did so, would you think that
4  it would violate paragraph three of your policy?
5  A.  I'm going to say possibly, without, you
6  know, getting into it, every sentence, every word
7  every -- possibly it could.
8  Q.  Can you describe for me how you arrived at
9  that conclusion, and I know it's a tentative
10  conclusion?
11  A.  Well, again it just talking generally about
12  what the Lord does for all of us, or for those who
13  believe.  Again the reason being it doesn't have
14  anything to do with what we're doing that night in
15  our decision making.  I think it's more that it's
16  not appropriate.
17  Q.  And is your view that paragraph three is
18  intended to capture that notion of what's
19  appropriate and what's not appropriate for your
20  decision making process?
21  A.  I think paragraph three is to make sure
22  that we are not being evangelists, that we are not
23  being like when you would go to a revival or
24  something, that we are not, we are not preaching.  I

55

1  think that's what paragraph three means, which is
2  not our intent.
3  Q.  Okay.  And in looking at the prayer I've
4  given which is marked as Plaintiff's Exhibit 35, do
5  you think that this prayer is preachy or evangelical
6  or sermonizing in a way that would be prohibited by
7  paragraph three?
8  A.  I think more so inappropriate.  I guess
9  technically, yes.
10  Q.  Okay.  I'm going to give you, I'm actually
11  going to ready you a second prayer?
12  A.  Okay.
13  Q.  Assuming I can find it.  While I'm looking
14  I will give you a second prayer, okay?
15  A.  Okay.
16  Q.  This is PX45.  I'm going to read, you
17  should follow along --
18  A.  Okay.
19  Q.  -- with it.  "Heavenly Father thank you for
20  this great occasion.  For the work, the effort, the
21  joys and everything that led up to this point in
22  time.  Thank you for your guidance in this event.
23  We pray for your direction in the lives of each of
24  these School Board members.  We pray that you direct

56

1  them into the truth, and eventually the truth that
2  comes by knowing Jesus.  We also pray that you would
3  be with them at this time.  We ask these things in
4  Jesus' name.  Amen."
5  As a School Board member would you view
6  this prayer as violative of paragraph three of your
7  policy?
8  A.  Let me say I would sit on the fence with
9  this one.  As far as a prayer among the ten of us I
10  think it's appropriate.  I'm speaking about the one
11  sentence, "We pray that you direct them into the
12  truth, and eventually the truth that comes by
13  knowing Jesus."  I'm sure some people might think
14  that that is a bit preachy.  Does it offend me, no
15  because we are ten people, and when we pray it's
16  among the ten of us, and there is no reason for it
17  to be viewed or seen or anything by anyone else
18  unless they choose to.
19  Q.  I see.  The way you look at the prayer that
20  is offered by the person, the Board member who is
21  invited by Mr. Bireley, is that it's prayer among
22  the ten of you?
23  A.  Yes.
24  Q.  Is there any reason why that prayer among

**61**

1  A.  Yes.

2  Q.  And when it occurred to you that maybe you

3  could solve this problem by praying privately, that

4  was a solution in your mind because that would be an

5  idea that came from you, and it wasn't dictated by

6  somebody else?

7  A.  I don't know that it was a solution in my

8  mind.  It was something that could be maybe talked

9  about and dealt with and maybe it was an answer or

10  part of an answer or, you know, something to think

11  about or whatever.

12  Q.  All right, let me give you the third

13  prayer.

14  A.  Okay.

15  Q.  "Allah, we offer you our school bus

16  drivers, we offer you our superintendent, our

17  administrators and our secretaries.  We offer you

18  our teachers and our parents.  Finally, we offer you

19  our students.  Peace be unto your prophet Muhammad.

20  A.  Okay, and your question is?

21  Q.  My question is do you believe that if one

22  of your colleagues gave that prayer that it would

23  violate paragraph three of the policy?

24  A.  No.

**62**

1  Q.  In the period from 2002 to October 2004,

2  that's the period when you were on the Board prior

3  to the adoption of the Board Policy BDA.1, okay?

4  A.  Okay.

5  Q.  You have the period in mind?

6  A.  Yes.

7  Q.  Did the president of the Board -- how did

8  the president of the Board cause a prayer to be

9  offered.  Did he just invite somebody to offer a

10  prayer?

11  A.  Normally it was understood that if we were

12  at the southern end of the district Mr. Helms gave

13  the prayer, and if we were at the northern end of

14  the district Mr. Evans gave the prayer because these

15  gentlemen were comfortable with praying out loud.

16  That's my understanding.

17  Q.  Okay.

18  A.  Like I said I didn't come on the Board

19  until 2002, and that's the way it was being done

20  when I came on.

21  Q.  And did you develop the understanding that

22  some of the other eight Board members were not

23  comfortable praying out loud?

24  A.  I really didn't pay any attention to why it

**63**

1  was that way.  I just assumed, you know, that's the

2  way it was.

3  Q.  Okay.  In the period 2002 to October 2004

4  did the Board president read or speak any disclaimer

5  before the prayer was offered?

6  A.  No.  No, I don't think so.

7  Q.  In the period after October 19, 2004 has

8  the Board president read or spoken a disclaimer

9  before the prayer is offered?

10  A.  Since this all came about?

11  Q.  Yes, ma'am.

12  A.  Then that's when we started having the

13  disclaimer.

14  Q.  Okay.  We don't have a copy of the

15  disclaimer that's read?

16  A.  Okay.

17  Q.  But we do have some testimony about it.

18  Mr. Bireley has said that he has a piece of paper

19  that he takes to the meetings?

20  A.  He does.

21  Q.  So, you have seen the piece of paper?

22  A.  Well, I've seen him reading something.

23  Q.  But he said, he was helpful, he said look I

24  think what's on my piece of paper is paragraph one

**64**

1  and paragraph four of the policy?

2  A.  Yes, I think he's right.

3  Q.  Okay.

4  A.  Because I thought that looked awfully

5  familiar.

6  Q.  All right.  Now, you said a little earlier

7  that everybody knows that they can leave the meeting

8  if they want to, if they don't want to hear the

9  prayer, okay?

10  A.  Uh-hum.

11  Q.  I'm going to read the disclaimer and tell

12  me if I read it about the way Mr. Bireley reads it.

13  I'm going to read paragraph one and paragraph four.

14  A.  Okay.

15  Q.  "In order to solemnify its proceedings the

16  Board of Education may choose to open its meetings

17  with a prayer or moment of silence, all in accord

18  with the freedom on conscience of the individual

19  adult Board member.  Such opportunity shall not be

20  used or exploited to proselytize, advance or convert

21  anyone, or to derogate or otherwise disparage any

22  particular faith or belief, " Mrs. Bunting?

23  A.  Uh-hum.

24  Q.  Is that basically the way Mr. Bireley reads

65

1    the disclaimer?

2    A.   He doesn't usually read number three.

3    Q.   I didn't read number three either. Oh, I'm

4    sorry, I did.  You were right, I was wrong.  I'm

5    going to try it again, okay?

6    "In order to solemnify its proceedings, the

7    Board of Education may choose to open its meetings

8    with a prayer or moment of silence, all in accord

9    with the freedom of conscience of the individual

10    adult Board member.  Such prayer is voluntary, and

11    it is among only the adult members of the Board.  No

12    school employee, student in attendance, or member of

13    the community in attendance shall be required to

14    participate in any such prayer or moment of

15    silence."  And then he would call on one of the

16    Board members, right?

17    A.   Yeah, that's pretty much it.

18    Q.   Okay.  I will represent to you, Mrs.

19    Bunting, that it took me 20 seconds to read that

20    disclaimer?

21    A.   Okay.

22    Q.   Do you think that a member of the audience

23    could get up and leave the auditorium in that 20

24    second period before a Board member begins his

66

1    prayer?

2    A.   Could they get up and leave?  They could

3    get up and leave and be on their way out, I don't know that

4    they'd be all the way out.

5    Q.   At what point in that disclaimer do you

6    think that a person in attendance would understand

7    that if they want to leave they had better leave, if

8    they want not to hear the prayer they had better

9    leave?

10    A.   Whey they say open its meetings with a

11    prayer.

12    Q.   Okay.  How do you think -- do you think it

13    would take some courage for someone in response to

14    the disclaimer to stand up and leave a Board meeting

15    of the Indian River School District?

16    A.   Courage is something that I don't know how

17    to explain courage.  Some of us older individuals

18    seem to be able to do things that younger people

19    wouldn't do, is that what you're saying?

20    Q.   No.

21    A.   I mean courage to stand up and leave, it

22    wouldn't take me -- it wouldn't take much courage

23    for me to stand up and leave if something were not

24    going my way.

67

1    Q.   Do you think that a person who indicates

2    his unwillingness to listen to a prayer to open the

3    meetings might be fearful that he would be subject

4    to intimidation or recriminations from the

5    community?

6    A.   I feel a person that felt that strongly

7    about it that wanted to leave when that occurred

8    would probably be the kind of person that no would

9    not be fearful in getting up and leaving, if they

10    had such conviction.

11    Q.   Do you think Mrs. Dobrich is a person with

12    such conviction?

13    A.   I think Mrs. Dobrich is the type of person,

14    from what I've seen, that she had the conviction to

15    come and state her case and all.  I think that she

16    would be the type that yes would be willing to get

17    up and leave and not listen to the prayer.

18    Q.   And what is your understanding of the

19    community's reaction to Mrs. Dobrich after she

20    exercised the courage of her convictions?

21    A.   What is my understanding of what the

22    community did?

23    Q.   Yes.

24    A.   I don't know that the community did

68

1    anything.

2    Q.   Do you know whether Mrs. Dobrich received

3    hundreds of anonymous phone calls?

4    A.   No, sir, I have no knowledge of any of

5    that.

6    Q.   We've already been through the August 24th

7    public comment?

8    A.   Uh-huh.

9    Q.   Do you know whether Mrs. Dobrich was

10    harassed in any way?

11    A.   The only time I saw Mrs. Dobrich was that

12    evening because I think I missed the first time she

13    came to the Board.  I can't recall why I missed it,

14    but I don't think I was there the first time she

15    came to the Board.  I was there the evening when all

16    the other people showed up, and I saw Mrs. Dobrich

17    one other time when I went to Wilmington when we

18    were asked to come up.

19    Q.   Yes, ma'am.

20    A.   So they're the only two times that I know

21    of that I saw Mrs. Dobrich.  And I have -- no one

22    told me that she had received phone calls or

23    letters, so I have no knowledge of that.

24    Q.   I'm going to represent to you that she did,

73

1  worry about anyway, you know?  I don't know,
2  personally if something bothered me I'd get up and
3  leave, that's me.  Whether someone else would feel
4  that way, I don't know.
5      Q.  Let me explore the number of people at the
6  meetings.  The reports have been that at that August
7  24th meeting there were 7 or 800 people?
8      A.  Uh-huh.
9      Q.  The crowd overflowed the room in which you
10  and your colleagues were sitting?
11      A.  Uh-hum.
12      Q.  And there was an entire other room set
13  up --
14      A.  Uh-hum.
15      Q.  -- with a video feed?
16      A.  Right.
17      Q.  And there were speakers set up in the
18  parking lot, do you remember that?
19      A.  I didn't know there were speakers in the
20  parking lot.
21      Q.  That's what we understand, I don't know.
22  And as you said, that was not a typical meeting,
23  correct?
24      A.  No.

74

1      Q.  On the other hand, particularly during the
2  school year, there are, there is a significant
3  number of people at School Board meetings, correct?
4      A.  Uh-hum.
5      Q.  Because you have members of the public who
6  are interested in various issues that would be on
7  the agenda, you have anywhere from a dozen to 50 or
8  so students getting awards or recognition for some
9  achievements during the school year, correct?
10      A.  On occasion.
11      Q.  Yes.  When you say on occasion, pretty much
12  every meeting during the school year you have
13  students getting recognition, don't you?
14      A.  Well, you have them like at the end of
15  football season or maybe at the end of baseball
16  season, you know, athletes coming in.  A lot of
17  times they are still in their athletic garb, you
18  know and they are just running in to grab it or
19  whatever.
20      I wouldn't say every meeting, but probably
21  more than half of them, maybe.
22      Q.  It's not just limited to athl --
23      A.  Guesstimate.
24      Q.  But it's not just limited to athletes,

75

1  right?
2      A.  Oh, no it's academic as well, but again the
3  academic wouldn't be as much because they would be
4  awarded maybe Odyssey of the Mind, that would be at
5  the end of the year.  We don't bring in kids just
6  because they got As on their report cards or stuff
7  like that.  It's usually something major.
8      Q.  I've read the minutes?
9      A.  Uh-huh.
10      Q.  And I've seen recognition being given to
11  kids for being in the Fifth Grade Yell Club, I've
12  seen recognition -- I can show you the minutes, if
13  you like?
14      A.  Fifth Grade Yell Club?
15      Q.  Yes, ma'am?
16      A.  Lately?
17      Q.  Within the last five years?
18      A.  Fifth Grade Yell Club, well did they win a
19  competition?
20      Q.  I don't know.
21      A.  Well, they would have had to have won a
22  competition.
23      Q.  Okay.  In addition to the awards that
24  students get the JROTC, the Junior ROTC presents the

76

1  colors at every meeting during the school year?
2      A.  Yes, they do.
3      Q.  Don't they?
4      A.  Uh-hum.
5      Q.  And you also get performing groups,
6  students who are bands of the steel band or chorus
7  groups who occasionally perform for the Board?
8      A.  I think the steel band performed because
9  they wanted permission to go on their trip down in
10  South America somewhere.  They did perform for us,
11  yes.
12      Q.  So, to come back to my original question,
13  clearly at a regular Board meeting has many fewer
14  people than you had on August 24th, but can we agree
15  that you routinely have ten, 20, 30, 40, 50 people
16  other than yourselves at the Board meetings?
17      A.  I would say more than half of the time we
18  probably have between 20 and 50 people.
19      Q.  Okay?
20      A.  More than half of the time.  Last meeting
21  there was just us pretty much.
22      Q.  And of those people that you just tried to
23  estimate, would more than half of them be students
24  on a typical basis?

109

1   prayers that would be offered by the board
2   members --
3       A.   Uh-hum.
4       Q.   -- "Any such prayers may be sectarian or
5   non-sectarian, denominational or non-denominational,
6   in the same of a Supreme Being, Jehovah, Jesus
7   Christ, Buddha, Allah, or any other person or
8   entity, all in accord with the freedom of
9   conscience, speech and religion of the individual
10  Board member and his or her particular religious
11  heritage." You approved that language?
12      A.   Yes.
13      Q.   Would you describe for me the difference
14  between a sectarian prayer and a non-sectarian
15  prayer?
16      A.   Again, my belief, I could not give what I
17  would call a non-sectarian prayer, because I would
18  have to mention Jesus Christ in my prayer, and I
19  would consider that a sectarian prayer. So, if I
20  gave a prayer it would have to be sectarian and not
21  non-sectarian.
22      Q.   The mention of Jesus Christ in a prayer,
23  and that making it sectarian, is that because the
24  prayer would refer to a particular Deity of the

110

1   particular sect?
2       A.   Yes.  In my religion you get to the Father
3   through the Son, and to deny the Son is not a
4   prayer.
5       Q.   Just so that I understand, and so
6   delivering any prayer that does not mention Jesus
7   Christ would be to deny Jesus Christ?
8       A.   For me to, for me to give that prayer.
9       Q.   Yes, ma'am.
10      A.   That's a personal, my religion.
11      Q.   Yes, ma'am.  And what is your religion?
12      A.   Methodist.
13      Q.   Are you a church goer?
14      A.   No, I'm not.
15      Q.   I take it at some point you were a church
16  goer?
17      A.   I was raised in the church as a child.
18      Q.   As a Methodist?
19      A.   As a Methodist.
20      Q.   And that's where you formed the belief that
21  you just articulated?
22      A.   I have a personal bond, and I do attend
23  certain things, like I'm in a group where we study
24  books on self-help and that type of thing, and we

111

1   relate them back to scripture and stuff like that.
2   And -- but I'm just -- I believe that when I pray I
3   have to give credit to Jesus.
4       Q.   You touched on this earlier, but it is also
5   your view, isn't it, that it does not matter to the
6   Lord how you seek his guidance.  It can be out loud
7   it can be silently, it can be using a traditional
8   prayer it could be using your own words, it could be
9   on your knees or standing up.  Any way God will hear
10  our prayers no matter how they are delivered?
11      A.   My God says pray without ceasing.
12      Q.   And what does that mean to you?
13      A.   That means to me to pray everywhere, any
14  time, all the time, whether privately or publicly,
15  to pray without ceasing.
16      Q.   And your understanding of that admonition
17  is that your life should be an example of the
18  principles of your faith.  It's not possible
19  obviously to pray without ceasing?
20      A.   It's not possible.
21      Q.   Literally?
22      A.   Literally, no, sir.
23      Q.   On the other hand, that admonition is an
24  example that God hears us no matter how we appeal to

112

1   him?
2       A.   True.
3       Q.   At two of the Board meetings since October
4   19, 2004 when the policy was adopted you have
5   offered a moment of silence rather than a prayer?
6       A.   I offered one moment of silence.
7       Q.   I'm sorry.  One moment of silence?
8       A.   Uh-hum.
9       Q.   Could you tell me how you made the decision
10  to offer a moment of silence at that meeting and
11  then at subsequent meetings to offer prayers?
12      A.   Very simple thing.  The moment of silence,
13  apparently the person who had been asked to give the
14  prayer that night, and I don't recall what the
15  reason was, either they were sick and weren't able
16  to get there or they were going to be late or
17  whatever, I didn't find out until I got there that
18  someone needed to give the prayer and could I do it,
19  and I said sure.  I cannot stand up and give a
20  prayer like Reggie or someone else can do, I need to
21  write mine down.  I didn't have time to write it
22  down, so I chose to do the moment of silence.
23      Q.   When you did that, did you feel that the
24  moment of silence was effective to solemnify that

125

1  the August 24th meeting, do you know whether
2  meetings of the Board are customarily videotaped?
3      A.   I -- we have understood, and I don't know
4  if we are wrong or not, it's not customary as far as
5  we're concerned.  It was my understanding that they
6  were trying to show the people in another room what
7  was going on.
8      Q.   And so the tape was just incidental?
9      A.   The tape was incidental.  It was to let the
10  people who were in another, in the big auditorium --
11  well, we were in the cafeteria and the other group
12  was in the gymnasium, and it was my understanding
13  that we were being videotaped so that those people
14  could see what's going on.
15     Q.   Thanks.  You are the first person who has
16  had an answer to that question.
17     A.   Well, that's just my understanding, I don't
18  know it that was true or not.
19     Q.   When you gave the prayers in the meetings
20  following the adoption of PX9, the Board Prayer
21  Policy, is it correct that there were students in
22  attendance at each of the meetings?
23     A.   You know, whether there were or whether
24  there were not, I can't honestly say.  I know for

126

1  sure there was a possibility that there were, but I
2  didn't go out and look and check the audience before
3  I gave it.
4      Q.   In the prayers as opposed to the moment of
5  silence that you led, in the prayers that you gave
6  you prayed in the name of Jesus, correct?
7      A.   Yes, I did.
8      Q.   If there were students there is it correct
9  that you did not know their religious faith?
10     A.   No, I did not know their religious faith.
11     Q.   Did you notice whether anyone whether
12  student or adult got up to leave the room when Mr.
13  Bireley.  Or I guess Mr. Bireley was the previous
14  president, correct, of the Board?
15     A.   Mr. Walls --
16     Q.   When Mr. Walls or Mr. Bireley read the
17  disclaimer?
18     A.   Did I notice anyone leaving?
19     Q.   Yes.
20     A.   No, I was too busy getting my notes out to
21  read.
22     Q.   Am I right that the religious faith of the
23  persons in attendance at the meeting would not have
24  affected in any way the prayer that you were going

127

1  to give?  That is to say, you decided what prayer
2  you were going to give based on your own personal
3  beliefs and you weren't going to alter it based on
4  what the beliefs were of other people?
5      A.   That's correct, it's our understanding of
6  the way we do it.
7      Q.   Were you involved in the process to hire a
8  new Board lawyer for the Indian River School
9  District?
10     A.   Yes, sir.
11     Q.   How many lawyers did you interview?
12     A.   We ended up not interviewing anyone to my
13  knowledge.
14     Q.   How was the new lawyer selected?
15     A.   We had, I think five people on the list,
16  and the first thing we did was go through and look
17  about how much they were going to charge to be quite
18  honest, and we sort of were able to eliminate a few
19  people.  You mean our regular Board lawyer, you
20  don't mean these guys?
21     Q.   Yes.
22     A.   And we sort of did that.  We were very
23  familiar with one lawyer on there that we had had
24  contact with before, and we were impressed with him.

128

1      Q.   That was Mr. Williams?
2      A.   That was Mr. Williams.  So, we didn't want
3  to put anyone to a whole lot of trouble to come be
4  interviewed if we had all pretty much felt we knew
5  enough about that gentleman to know that he was the
6  one we'd like to have.
7      Q.   How did you -- what contact had you had
8  with Mr. Williams prior to this process?
9      A.   The only contact -- I had had two contacts
10  with Mr. Williams.  I heard Mr. Williams speak at a
11  DSBA meeting, the group that I was with last night.
12     Q.   Yes.
13     A.   And he was down with us with our other
14  lawsuit I guess one evening.
15     Q.   Your other lawsuit?
16     A.   Yes, our high school in Georgetown, we have
17  been sued by the people who were the bonding agents
18  for the HVAC group that went belly-up.
19     Q.   And Mr. Williams had been involved in that
20  lawsuit --
21     A.   No, he has not been involved in it, but for
22  some reason someone asked him to come down and give
23  us some advice about that situation or something.
24     Q.   When Mr. Williams spoke at the DSBA what

# EXHIBIT 3

**1**

```
 1        IN THE UNITED STATES DISTRICT COURT
 2         FOR THE DISTRICT OF DELAWARE
 3   MONA DOBRICH and MARCO    :  C.A. No. 15-120 (JJF)
     DOBRICH, Individually and :
 4   as parents and next friend :
     of ALEXANDER DOBRICH,      :
 5   SAMANTHA DOBRICH, JANE DOE :
     and JOHN DOE, Individually :
 6   and as parents and next    :
     friend of JORDAN DOE and   :
 7   JAMIE DOE,                  :
                                 :
 8         Plaintiffs,  :
                                 :
 9         v.           :
                                 :
10   INDIAN RIVER SCHOOL    :
     DISTRICT, et al.,     :
11                        :
           Defendants.   :
12         ... ... ... ...
           Videotaped Deposition of RICHARD COHEE,
13   taken pursuant to notice, on Tuesday, October 17, 2006
14   at 1:17 p.m. at 31 Hosier Street, Selbyville, Delaware,
     reported by Lorena J. Hartnett, a Registered
15   Professional Reporter and Notary Public.
16         ... ... ... ...
17   APPEARANCES:
18       BRIAN G. LENHARD, ESQUIRE
         RICHARD HORVATH, ESQUIRE
19       One Rodney Square
         Wilmington, DE  19801
20       Attorney for the Plaintiff
21
22       WILCOX & FETZER
     1330 King Street - Wilmington, DE  19801
23       302-655-0477
         www.wilfet.com
24
```

**2**

```
 1
 2   APPEARANCES  (CONTINUED):
 3       JASON P. GOSSELIN, ESQUIRE
         Drinker, Biddle & Reath, LLP
 4       One Logan Square
         18th and Cherry Streets
 5       Philadelphia, PA  19103-6996
         Attorney for the Defendants
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**3**

```
 1
 2
 3        TABLE OF CONTENTS
 4   TESTIMONY OF RICHARD COHEE:
 5     Direct Examination by Mr. Lenhard  . . . . . . . 4
 6   Certificate of Reporter  . . . . . . . . . . . .116
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**4**

```
 1        VIDEOGRAPHER:  This is the videotaped
 2   deposition of Mr. Richard Cohee taken by the
 3   plaintiff in the matter of Dobrich et al
 4   versus Indian River School District, et al,
 5   Case Number 15-120.  This deposition is
 6   being held at 31 Hosier Boulevard.  We are
 7   going on the record on October 17, 2006 at
 8   approximately 1:17 p.m.
 9        The court reporter is Lorena Hartnett
10   from the firm of Wilcox and Fetzer,
11   Wilmington, Delaware.  My name is Lindsay
12   DuPhily.  I am the videotape specialist with
13   Discovery Video Services.
14        Counsel will now introduce themselves
15   and the court reporter will swear in the
16   witness.
17        MR. LENHARD:  My name is Brian
18   Lenhard, and I represent the plaintiffs in
19   this action.
20        MR. GOSSELIN:  Jason Gosselin for
21   defendants.
22        RICHARD COHEE,
23   HAVING FIRST BEEN DULY SWORN, TESTIFIED AS FOLLOWS:
24   DIRECT EXAMINATION ON BEHALF OF THE PLAINTIFF
```

37

1  A.  Not necessarily correct.

2  Q.  Well, without your motion she would have done

3  so?

4  A.  My motion brought in a representative from

5  student government from each of the two high schools,

6  and most of the time we had one, not two.  If we were

7  meeting at Indian River, it would be the Indian River,

8  and the next month we met at Sussex Central, it would

9  be Sussex Central.  My motion did not bring in other

10  students who were recognized for sports banquets,

11  odyssey of the mind, those kinds of things.

12  Q.  Okay, so for student government, the board,

13  through your motion, is responsible for bringing them

14  to the meetings?

15  A.  As I said earlier, they were coming to the

16  meetings informally prior to the motion.  My motion, I

17  felt, recognized them, gave them an opportunity on the

18  agenda, recognized their involvement, and basically

19  allowed them to continue what they had been doing but

20  with, "This is the time on the agenda when you will be

21  here."  Because some students would come late.  When

22  you said, you know, "Is everybody ready to begin the

23  meeting," sometimes people wander in and out.

24  They can look at the agenda and say, okay,

38

1  they got this much on the agenda, any idea what time

2  we are going to be up, and you get a better idea of

3  what the time line is going to be.

4  We have had school board meetings that went

5  till two in the morning or later, so.  It's not a

6  common practice anymore, but that has been the case.

7  Q.  Since your motion passed, can you identify

8  any meeting during the school year at which the

9  student government did not show up?

10  A.  I know that there have been meetings when we

11  did not hear from the representative.  I can't

12  identify which particular meeting, but I know that

13  there have been meetings when we did not hear from the

14  student government.

15  Q.  Did your motion incorporate the student's

16  attendance as part of the official board meeting?

17  A.  Can you explain that?

18  Q.  Did your motion state that the student

19  government would become part of the official board

20  meeting?

21  A.  My motion, as I recall it, and again I am

22  going back over ten years, was not to assure the

23  attendance but to assure their spot on the agenda,

24  recognize them for what they were doing, as I have

39

1  said before.

2  Q.  Is there a history of school board prayer in

3  Indian River, in your view?

4  A.  Is there a history of school board prayer in

5  Indian River?  Yes.

6  Q.  Do you know why the school board opened its

7  meetings with prayer before adoption of the school

8  board policy?

9  A.  It was a practice that was in place when I

10  first came to the board and I understand was there for

11  sometime before I came to the board, and that has

12  continued since I have been with the board.

13  Q.  What is your view of its purpose?

14  A.  I feel that it's one moment when we all kind

15  of recognize that we are getting down to business

16  here, recognize that we are having a great deal of

17  serious issues involving people's kids and people's

18  money.

19  When I was running for the school board I

20  would say you never get involved with anything that

21  involves people's kids or people's money, and that

22  involves both of them.

23  And I think it was a moment for the whole

24  board to come together and go about their business and

40

1  recognize that during that meeting we may have

2  differences and that when we walk away from the board

3  table we support the decisions and move forward,

4  whether we disagreed during the meeting or not.

5  Q.  To summarize, would you say that the purpose

6  is to solemnize the meetings, then?

7  A.  Yes.

8  Q.  Is there any other purpose besides what you

9  described?

10  A.  Not that I am aware of or not on my part.

11  Q.  Is there a disclaimer read at current board

12  meetings?

13  A.  Yes.

14  Q.  What affect do you think that has?

15  A.  What affect do I think it has?

16  Q.  Yes.

17  A.  Well, not being smart, but I have never sat

18  in the audience when it was read, so I don't know that

19  I know the affect that it has.  I think I know the

20  intended purpose, and that's to recognize that it is a

21  board prayer, it is our prayer, and that we are not

22  encouraging anyone else to participate.  That's how I

23  interpret it.

24  Q.  So the school board prayer is directed only

53

1  one-on-one discussions with -- And I can't sit here
2  and tell you what exact board member at this point,
3  but there were those kind of brief moments like this
4  is really causing us, you know, some attention here
5  and this meeting is an overflow crowd type thing.
6      I don't recall having any one-on-one
7  conversations as far as my beliefs other than I do
8  believe that whoever is around that table should be
9  able to pray as they see fit.
10     Q.  A minute ago when you referred to these
11  conversations in general, you said that you, there
12  were discussions about the school board prayer and the
13  school board prayer policy but yet you cannot recall
14  specific instances; correct?
15     A.  There were discussions about school board
16  prayer, school board policy, at various board
17  meetings.
18     Q.  Were any of those board meetings public board
19  meetings?
20     A.  Um, I think there was a special board
21  meeting, and I cannot remember if it was opened or
22  closed.  We heard a lot from the public.  It wasn't a
23  discussion, because our public comment session is one
24  way, we listen and they speak.  We heard a lot from

54

1  the various members of the public at a number of
2  meetings on that issue.
3      In the meetings, itself, I can't recall what
4  discussion -- Um, well, there had to be, because the
5  policy is adopted in a public meeting, so we would
6  have discussions surrounding our concerns for that
7  policy.  That would be a public session.
8      As I said before, the normal procedure is a
9  first and second reading.  Sometimes that's two
10  successive months, and sometimes if the first draft
11  just doesn't fly with anybody and they say go back to
12  the drawing board and come back with something else,
13  which might delay it a month or so.  I don't recall
14  the time line in this case.
15     Q.  Can you describe for me how the Policy
16  Committee is involved in the policy drafting process?
17     A.  I am not sure.  I haven't served on that
18  committee in sometime.  I chaired the committee in
19  early to mid nineties, as I recall.  Probably the
20  committee meets and -- Well, I can't speak for
21  Mr. Walls.  Mr. Walls set up a system where they were
22  routinely reviewing a number of policies.
23     When I was there, we were working on policies
24  where issues had been brought up or concerns brought

55

1  up where something had changed with the different
2  guidelines that we needed to look at the policies that
3  might have been old or outdated.
4      I can't speak to just how it works, because I
5  have not been to any policy meetings in a number of
6  years, how it currently works.
7      Q.  Do you know whether or not it's different
8  from how you ran the Policy Committee?
9      A.  I can't say, because I see the end product
10  and I comment on that in our discussions when I
11  receive the first and second readings like everyone
12  does.
13     But the actual meetings, we are all invited
14  to participate.  As I said, this year personal and
15  professional demands have put a real burden on my free
16  time.
17     Q.  Is it correct that there is no school board
18  prayer policy for special meetings?
19     A.  Um, I don't think there is for a special
20  meeting.  As you have pointed out, this one says
21  regular meeting.
22     Q.  And there is no school board prayer policy
23  for executive sessions?
24     A.  No, not unless that executive session is part

56

1  of a regular meeting, but for the executive session,
2  itself, no.
3      Q.  And did the board ever consider drafting
4  policy?
5      A.  Um, I don't recall any discussion on that.
6  There may have been.  I don't recall any.
7      Q.  Okay, I would like to play -- I would like to
8  play an audio recording for you.  It's an Exhibit PX52
9  we have introduced before.  It's a board meeting from
10  September 28, 2004, and it is the first reading of the
11  policy.
12         (Exhibit PX52, a videotape, was
13         played for the witness.)
14  BY MR. LENHARD:
15     Q.  Do you recall that from the September 28
16  meeting?
17     A.  I recall at some point there being a couple
18  readings of the meeting.  Do I specifically recall
19  that?  I don't know.  As I have said, in the last year
20  or so I have missed a number of meetings.  Some of
21  them involved this issue.
22     I don't know how many first readings we had
23  on this, if more than one, so to sit here and say I
24  was -- I can't say I was even present on that little

Cohee, Richard (Video)  10/17/2006  1:17:00 PM

65

1    A.  That's okay.  I take them on and off a
2    hundred times a day.
3    Q.  Okay, if you turn to page four, which is
4    BPD702, you will see where the numbered paragraphs
5    start.
6    A.  Okay, page four?
7    Q.  About halfway down there is, it starts, the
8    paragraph starts, "In order to solemnify."  Do you see
9    that?
10   A.  Okay, number one?
11   Q.  Number one.
12   A.  Uh-huh.
13   Q.  If you look at that and look at PX9 at the
14   same time, do you see that those paragraphs are
15   substantially the same?
16   A.  Yes.
17   Q.  Do you want to take the time to read it, or
18   have you read it before?
19   A.  I recall this.
20   Q.  Okay.
21   A.  And I know that there is a lot of
22   similarities, as I skim through here, with those five
23   sections.
24   Q.  Did anyone from the public ever ask you for a

66

1    copy of this policy, PX9?
2    A.  I don't know.  I don't recall it.
3    Q.  Did anyone submit -- Can you -- Strike that.
4    If I were to be asked, I would most likely
5    refer them to Central Office.
6    Q.  Okay.  All right, now I would like to give
7    you two documents which again you probably have over
8    there, PX13 and PX14.  Do you recall why the board met
9    on August 23, 2004?
10   A.  Well, it says here to discuss potential
11   pending litigation.  The number there would identify
12   the issue, and I don't recall what number that was
13   used to identify the issue.
14   Q.  You don't recall whether it meant --
15   A.  0501PL, I don't know if that's the number
16   that refers to the issue that we are here for today or
17   not.
18   Q.  Do you recall whether it had to do with
19   school board prayer in general?
20   A.  I would -- Well, I know we had a number of
21   meetings about that, these issues, and I know some I
22   attended and some I did not.  I would -- Well, I don't
23   want to guess, but my thoughts are this meeting could
24   have very well been in reference to these issues, but

67

1    I can't sit here and say that with certainty.
2    Q.  Can you turn to the second page of PX 14?  On
3    the second page of that you will see there is a roll
4    call.
5    A.  Okay.
6    Q.  And you are listed there as present?
7    A.  Yes.
8    Q.  And the next section lists other visitors and
9    staff in attendance?
10   A.  Yes.
11   Q.  Can you tell me why those people were there
12   to discuss litigation?
13   A.  No.  Specifically, no.  I will say that it
14   has been an occurrence that the superintendent and/or
15   the assistant superintendent has been present during,
16   over the years during discussion of potential
17   litigation or pending litigation, along with Janet
18   Hearn, who was our recording secretary.
19       Patrick Miller was finance.  I am not sure
20   what role he would have played in that discussion.
21   And Jim Griffin at the time was an attorney.
22   Q.  Okay, so in your discussion you mentioned the
23   superintendent and the assistant superintendent.
24   That's Ms. Hobbs is the superintendent?

68

1    A.  She was at that time.
2    Q.  And Mr. Savage is assistant superintendent?
3    A.  And he still is, yes.  I think he was at that
4    time, but he is now.  Can I clarify something, though?
5    Q.  Sure.
6    A.  That is the beginning of the meeting.  Okay?
7    And then that's the roll call and the recording of who
8    is present, and then we go into executive session.
9        So whether or not those people all stayed, I
10   don't know.  They could have been asked to leave, as
11   we have done on other occasions.
12       For example, it strikes me as a little odd
13   that the finance person was there.  I would almost
14   venture to say that on this particular issue he was
15   asked or knew to step out, but I don't know that with
16   certainty.
17   Q.  Well, let me ask you a question.  Does the
18   board invite people to special meetings?
19   A.  Depending on the issue, the board requires or
20   asks for certain information and it comes from various
21   sources.
22   Q.  Well, if you look through the minutes, --
23   A.  Okay.
24   Q.  -- which is simply that one page, do you see

---

105

1    at the end.
2        "Heavenly Father, thank you for this great
3    occasion, for the work, the effort, the joys and
4    everything that led up to this point in time.
5    Thank you for your guidance in this event.  We pray
6    for your direction in the lives of each of these
7    school board members.  We pray that you direct them
8    into the truth and eventually the truth that comes by
9    knowing Jesus.  We also pray that you will be with
10   them at this time.  We ask these things in Jesus's
11   name.  Amen."
12       Same question:  Does this prayer violate
13   anything in the school board prayer policy?
14       A.  Um, I don't know that I would have -- I don't
15   know that I would have a problem with this one.
16       Q.  Is there any reason for that?
17       A.  It's completely the opposite of what the
18   other one is.  There is only one comment in there that
19   I would, if I had a chance to review it and take it
20   out, might look at "eventually the truth that comes
21   by knowing Jesus," but, beyond that, I don't have a
22   problem with it.  And I don't have a problem with
23   that, but that would be the one comment that, if I was
24   revising it, that I would probably be concerned with

---

106

1    from someone else's perspective.
2        Q.  Do you think that that prayer proselytizes?
3        A.  Um, no, overall, no.
4        Q.  Is there any section that does?
5        A.  I mentioned a concern about one clause, but
6    overall I would say no.
7        Q.  What clause was that?
8        A.  That was the one about "eventually the truth
9    that comes by knowing Jesus, direct them into the
10   truth."
11       Q.  Okay.
12       A.  And I am answering these in the perspective
13   if I were the board president and I am allowing the
14   board or picking from the board or rotating in this
15   policy.
16           And I don't know that the board president
17   reviews these prayers in advance.  I am assuming he
18   does not review them.  Okay?  If I were given that
19   ahead of the meeting and said, "Hey, what do you think
20   of this," I would be fine with it overall.  I would
21   have a little concern about the one line.
22       Q.  Is the board president responsible on his own
23   to determine whether it violates the school prayer
24   policy?

---

107

1        A.  No, he does not.  I said if I were reviewing
2    it as a board president, and normally you wouldn't be.
3        Q.  But if there were a question as to whether a
4    prayer possibly violated the policy, do you think that
5    all board members would discuss?
6        A.  If an individual board member came to me and
7    said, "This is what I am going to say tonight; do you
8    have a problem with it," then that's the perspective I
9    am answering from.  I don't know that that happens.  I
10   haven't done that, and when I was board president it
11   didn't happen.  Okay?
12       Q.  What would you do if someone gave a prayer
13   that you thought violated this policy?
14       A.  That I didn't know in advance?
15       Q.  Correct.
16       A.  Um, at that particular time I would probably
17   do nothing, and I may address it with the individual
18   later or collectively as a board, "Here is the policy,
19   folks; let's follow it."
20       Q.  All right, I am going to read you two more
21   short prayers and ask you the same question whether
22   they violate the policy.
23           The prayer is, quote, "Allah, we offer you
24   our school bus drivers.  We offer you your

---

108

1    superintendent, our administrators, and our
2    secretaries.  We offer you our teachers and our
3    parents.  Finally, we offer you our students.  Peace
4    be under your prophet, Muhammed."  End quote.
5            Does that violate the school board prayer
6    policy?
7        A.  Can I read it?  I am better at reading it
8    than I am hearing it.
9        Q.  We might need to -- I will ask some questions
10   while we get it to you in writing.
11       A.  Or just go through it again a little slower.
12       Q.  Sure, I will go through it again and see if
13   we can do it that way.  Quote:  "Allah, we offer you
14   our school bus drivers.  We offer you our
15   superintendent, our administrators, and our
16   secretaries.  We offer you our teachers and our
17   parents.  Finally, we offer you our students.  Peace
18   be unto your prophet, Muhammed."  End quote.
19       A.  Um, I don't know a lot about that faith.  The
20   first thing that comes to mind is the offering and
21   what the vocation is there.  But as you read it and
22   take it as you have read it, I don't see it as
23   threatening.  I can read into it if I so chose, as
24   anyone else could, but I, as you have read it, I don't

---

109

1   see it as being threatening or disparaging and would
2   be acceptable.
3       Q.  Do you think that this prayer is
4   proselytizing?
5       A.  That's what I just said, as you have read it,
6   I don't see it as such.
7       Q.  Okay.  All right, one more.  It's even
8   shorter.  Here is the prayer.  "We pray, Lord,
9   enlighten the heathen in our midst, inspire them to
10  come to your wisdom and goodness.  We ask these things
11  in the name of Jesus Christ.  Amen."
12      A.  Read it one more time.
13      Q.  "We pray, Lord, enlighten the heathen in our
14  midst, inspire them to come to your wisdom and
15  goodness.  We ask these things in the name of Jesus
16  Christ.  Amen."
17      A.  "Inspire the heathen, we ask them to come to
18  you --"  What was that clause?
19      Q.  Wisdom and goodness.
20      A.  Yeah, I would think that would violate the
21  section, as well.
22      Q.  Okay.  Do you think that non-Christians can
23  get elected to the school board?
24      A.  Do I think they can?

110

1       Q.  Yes.
2       A.  Why couldn't they?
3       Q.  Do you think that the -- What do you think
4   the religious faith of most people in the Indian River
5   is?
6       A.  Religious faith would be mostly Christian.
7       Q.  Has that ever been an issue in the school
8   board election?
9       A.  I don't know that it's been an issue with
10  school board elections during my tenure, at least,
11  prior to this.  And I am not certain that it's been a
12  sole issue since this, but I do know that, from
13  reading comments by other opponents, and I can't even
14  recall who they were, there were some issues in the
15  board pursuing this by some, they were against it, so
16  as minor -- Well, as minimal as that may be, I
17  wouldn't say minor, then it is an issue, yes.  In
18  somebody's mind they don't agree with what the board
19  is doing here.
20      Q.  There were board meetings on April 26, 2005
21  and May 24, 2005, and I will represent to you those
22  board minutes began with a moment of silence.
23      A.  Okay.
24      Q.  Do you recall any disruptions at those

111

1   meetings?
2       A.  Any disruptions?
3       Q.  Yes.
4       A.  I don't recall any.
5       Q.  Do you recall whether there was a prayer
6   given at the August 24, 2004 meeting?  That was the
7   one we played for you on the videotape.
8       A.  Um, I think that there was, but I don't know
9   for certain.
10      Q.  If you look at the first, on the first page
11  in the first paragraph.
12      A.  Of the minutes?
13      Q.  Of the August 24, yes, 2004 minutes.
14      A.  Okay, Dr. Hattier gave a prayer.
15      Q.  Correct.  Now, you heard on videotape the
16  laughter while Mr. Johnson was giving his public
17  comment?
18      A.  I heard laughter and other sounds.
19      Q.  Would you call that solemn?
20      A.  Some of it I would, because some of it
21  sounded like they were in support of the statement as
22  far as I think I heard a couple amens and a couple
23  yes, and that's not laughter.
24          The laughter, I would say would probably not

112

1   be solemn.  However, it is the opportunity for the
2   public to speak, and we have a policy for that.  We
3   try to adhere to that policy, and it's difficult to
4   control what one says at the podium.  It's also
5   difficult to control what the audience participants
6   interject.
7       Q.  Do you think it matters to the audience
8   whether you give a prayer or a moment of silence
9   before the school board meeting?
10      A.  I don't know whether it matters to the
11  audience or not.  It matters to the board, and we do
12  it for the board.  We don't do it for the audience.
13          MR. LENHARD:  I think I am getting
14      close to the end, and I am going to suggest
15      we take a few minute break for me to review
16      the notes.
17          THE WITNESS:  Okay.
18          VIDEOGRAPHER:  Going off the record at
19      approximately 4:02 p.m.
20          (A recess was taken.)
21          VIDEOGRAPHER:  We are back on the
22      record at approximately 4:09 p.m.
23  BY MR. LENHARD:
24      Q.  Mr. Cohee, do you remember the audience

113

1   reaction to Dr. Hattier's prayer or the announcement
2   that Dr. Hattier would give a prayer on August 24,
3   2004?
4      A.  Um, I don't remember the reaction, but I
5   think there was a lot of concern as to whether we
6   would or not, and if there was any reaction at all, it
7   most likely would have -- i shouldn't say that most
8   likely, because I don't know.  It would probably have
9   been supportive.
10     Q.  When you said that the prayer was for the
11  board members, is that because of the disclaimer?
12     A.  No, because it was for the board members long
13  before we had the disclaimer or that policy.
14     Q.  Okay, have you ever seen someone get up and
15  leave the meeting or attempt to leave the meeting when
16  there is an announcement that a prayer is going to be
17  given?
18     A.  Um, well, I will say that different times
19  during the meeting people come and go for a lot of
20  reasons.  Okay?  I can't sit here and say that I have
21  seen anyone go for in response to the prayer preface,
22  and I can't say that I have ever really watched to see
23  if that occurred.
24     Q.  Are students in the audience when the prayer

114

1   is given?
2      A.  Most often.
3      Q.  Have all the prayers been Christian?
4      A.  I think you asked that earlier, and, to my
5   knowledge, I would have to say the majority have been.
6      Q.  Do you recall any prayer in the name of
7   Jehovah?
8      A.  No, I can't.
9      Q.  Any prayer in the name of Buddha?
10     A.  No.
11     Q.  Any prayer in the name of Allah?
12     A.  No.
13     Q.  So can you recall any prayer for any other
14  religious deity besides Jesus or the Christian God?
15     A.  Other than the moment of silence, which would
16  not address either faith.
17     Q.  Has anyone served on the school board who is
18  not Christian?
19     A.  I do not know that is true.  I don't make it
20  a point of asking people their religion or beliefs,
21  and it wouldn't have made any difference to me.
22     MR. LENHARD:  I think that's all the
23  questions I have.  Thank you very much.
24     THE WITNESS:  Thank you.

115

1      VIDEOGRAPHER:  This deposition is
2   ending at approximately 4:12 p.m.
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

116

1      CERTIFICATE
2      I, Lorena J. Hartnett, a Notary Public and
3   Registered Professional Reporter, do hereby certify
4   that the witness, RICHARD COHEE, was by me first
5   duly sworn to testify the truth, the whole truth, and
6   nothing but the truth; that the foregoing deposition
7   was taken at the time and place stated herein; and
8   that the said deposition was recorded stenographically
9   by me and then reduced to typewriting under my
10  direction, and constitutes a true record of the
11  testimony given by said witness.
12     I further certify that the inspection,
13  reading and signing of said deposition was not waived
14  by counsel for the parties and by the witness.
15     I further certify that I am not a relative,
16  employee, or attorney of any of the parties or a
17  relative or employee of either counsel, and that I am
18  in no way interested directly or indirectly in this
19  action.
20     IN WITNESS WHEREOF, I have hereunto set my
21  hand and affixed my seal of office on this 24th day of
22  October 2006.
23
24     Cert. #134-RPR, Exp. 01-31-2008

# EXHIBIT 4

Dobrich, Marco  11/1/2006  12:55:00 PM

```
                                                    1
 1        IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF DELAWARE
 2
 3   MONA DOBRICH, et al.,      : CIVIL ACTION
            Plaintiffs,    :
 4                             :
 5       -v-                   :
                               :
     INDIAN RIVER SCHOOL        :
 6   DISTRICT, et al.,        : NO. 05-120-JJF
            Defendants.        :
 7
             Deposition of MARCO DOBRICH, taken before
 8   Elaine Gallagher Parrish, Registered Professional
     Reporter, at 1100 North Market Street, Suite 1000,
 9   Wilmington, Delaware on November 10, 2006, commencing
     approximately at 12:55 p.m.
10
     APPEARANCES:
11
         THOMAS J. ALLINGHAM, II, ESQ.
12       BRIAN G. LENHARD, ESQ.
           One Rodney Square
13         P.O. Box 636
           Wilmington, Delaware 19899-0636
14         for the Plaintiffs,
15       JARROD D. SHAW, ESQ.
           Drinker Biddle & Reath, LLP
16         One Logan Square
           18th and Cherry Streets
17         Philadelphia, Pennsylvania 19103-6996
           for the Defendant.
18
19   ALSO PRESENT:
20       Timothy Kearns
         Kristhy Peguero
21       Mona Dobrich, Plaintiff
22
     WILCOX & FETZER
23   1330 King Street - Wilmington, Delaware 19801
             (302)655-0477
24           www.wilfet.com
```

```
                                                    2
 1        MARCO DOBRICH,
 2   having been first duly sworn according to law, was
 3   examined and testified as follows:
 4            - - -
 5   BY MR. SHAW:
 6       Q.  Mr. Dobrich, I know you heard this earlier, but
 7   I'll give it again pretty quickly.  My name is Jarrod
 8   Shaw and I represent the Defendants in this litigation.
 9   I am going to ask you a bunch of questions to which
10   you'll respond.  If you don't understand the question,
11   please ask me to either repeat it or rephrase it.
12   Because if you give your answer it will look on the
13   transcript as though you understood the question and
14   your answer was to that question.  So I just want to
15   make sure that you're clear.
16       A.  Yes.
17       Q.  So please feel free to ask me to rephrase or to
18   repeat my question.
19            Again, if you need to take a break at any
20   point, just let me know and we'll stop and you can take
21   a break.
22       A.  Okay.
23       Q.  Have you ever been deposed before?
24       A.  No.
```

```
                                                    3
 1       Q.  What did you do to prepare for today's
 2   deposition?
 3       A.  Met with the lawyers a couple weeks ago.
 4       Q.  I believe you said your answer was you met with
 5   your attorneys to prepare for the litigation or for the
 6   deposition?
 7       A.  Yes.
 8       Q.  Did you discuss the deposition with anyone else?
 9       A.  No.
10       Q.  Okay.  Did your attorney show you any documents
11   at that point?
12       A.  No.
13       Q.  Mr. Dobrich, where do you currently live?
14       A.  Georgetown, Delaware, 154 David Street.
15       Q.  That's my next question.
16       A.  Pine Grove Manor.
17       Q.  Do you live in a house there?
18       A.  Yes.
19       Q.  Do you rent the house?
20       A.  No, I live with my wife's sister.
21       Q.  Okay.  Just for the record, where did you live
22   before that?
23       A.  174 Georgetown -- Route 1, 174, Georgetown,
24   Delaware.
```

```
                                                    4
 1       Q.  And how long did you live there for?
 2       A.  19 years.
 3       Q.  Did you grow up in Georgetown?
 4       A.  No.
 5       Q.  Where did you grow up?
 6       A.  Seaford, Delaware.
 7       Q.  Seaford, Delaware?
 8       A.  1994? -- or 73.
 9       Q.  What county is that in?
10       A.  Sussex.
11       Q.  It's in Sussex County.  Is it the Indian River
12   School District?
13       A.  No.
14       Q.  No.  Okay.  Is your high school a rival with
15   their high school?
16       A.  No, we were with Laurel.
17       Q.  Oh, okay.  So you did not live in the Indian
18   River School District until you moved into the home at
19   174 Georgetown?
20       A.  Yes.
21       Q.  Are Samantha and Alex your only children?
22       A.  Yes.
23       Q.  So is this your first marriage?
24       A.  Yes.
```

Dobrich, Marco  11/1/2006  12:55:00 PM

9

1    A.  Before this?  '04 or altogether?

2    Q.  I'll rephrase.  Right now I'm speaking before

3    June 15th, 2004, do you know approximately how many

4    School Board meetings you attended?

5    A.  Six or seven.

6    Q.  Six or seven.  Was Mrs. Dobrich with you at all

7    those meetings?

8    A.  Not at all of -- not at all of them.

9    Q.  Okay.  Were Alex and Samantha or Samantha with

10   you at any of those meetings?

11   A.  Maybe one or two.

12   Q.  Let me break it down.  Was Alex at one or two?

13   A.  Yes.

14   Q.  And then Samantha was maybe at one or two?

15   A.  Yes.

16   Q.  Okay.  Did the School Board offer a prayer at

17   any of those meetings?

18   A.  Yes.

19   Q.  Okay.  Do you remember what that prayer was?

20   A.  What they said?

21   Q.  Yeah.  If you could remember, was it in Jesus's

22   name?

23   A.  Most of them were.  Probably all of them.

24   Q.  Is it your recollection that all of them were or

10

1    most of them were?

2    A.  I would say all.

3    Q.  Did they ask you -- did the School Board ask you

4    -- let me rephrase.

5        Did the School Board ask the audience

6    members to bow their head before the prayer was given?

7    A.  Yes.

8    Q.  At all of the meetings?

9    A.  Yes.

10   Q.  Did you bow your head?

11   A.  Yes.

12   Q.  Do you know if -- you testified that Alex was

13   with you at one or two of these meetings?

14   A.  Yes.

15   Q.  Did Alex also bow his head?

16   A.  He kept his head straight ahead.

17   Q.  We can't take the hand motions down on the

18   record.

19   A.  Straight.  I mean maybe at one he did straight

20   but he probably put his head down at one -- the other

21   one.

22   Q.  Okay.  Did Samantha bow her head, do you know?

23   A.  Yes.

24   Q.  Okay.  Did you ask Alex why he kept his head

11

1    straight at that meeting?

2    A.  No.

3    Q.  Why did you bow your head at the meeting?

4    A.  Feel like I was obligated because they said to,

5    and everybody around was doing it.

6    Q.  Okay.  Mr. Dobrich, would you have a problem

7    with nondenominational prayer at the school or prayer

8    meetings?

9        MR. ALLINGHAM:  Object to the form of the

10   question.  You may answer it.

11       THE WITNESS:  As long as they don't say

12   within, you know, Jesus's name.

13   BY MR. SHAW:

14   Q.  Would you be okay if they said in God's name?

15       MR. ALLINGHAM:  Object to the form of the

16   question.

17   BY MR. SHAW:

18   Q.  Let me rephrase.  Would you be okay if the

19   School Board members said in God's name?

20       MR. ALLINGHAM:  Object to the form of the

21   question.

22       THE WITNESS:  Yes, I would.

23   BY MR. SHAW:

24   Q.  Okay.  Why is it okay if the Board members said

12

1    it in God's name but not okay if they say in Jesus's

2    name?

3        MR. ALLINGHAM:  Object to the form of the

4    question.

5    BY MR. SHAW:

6    Q.  In your mind?

7    A.  In my mind I think they should do it before

8    anybody is in there.  They should do it, you know, in

9    the back room before they come in there to start the

10   Board meeting.

11   Q.  Okay.  Is it okay if they say in God's name at

12   the meeting?

13       MR. ALLINGHAM:  Object to the form.

14       MR. SHAW:  In your mind.

15       MR. ALLINGHAM:  I object to the form of the

16   question.

17       THE WITNESS:  I don't think they should say

18   anything really.

19   BY MR. SHAW:

20   Q.  Mr. Dobrich, I am going to show you what's been

21   previously marked as plaintiff's Exhibit 9.  I think you

22   have it in front of you.  I'll represent to you that

23   this is the Board prayer at regular Board meetings.

24   It's designated by BDA-1.  Have you ever seen this