# EXHIBIT 6

Case 1:05-cv-00120-JJF     Document 255-2     Filed 04/10/2008     Page 2 of 56

Evans. John (Video)  10/18/2006  9:13:00 AM

**Page 1**

```
 1          IN THE UNITED STATES DISTRICT COURT
 2            FOR THE DISTRICT OF DELAWARE
 3   MONA DOBRICH and MARCO   :  C.A. No. 15-120 (JJF)
     DOBRICH, Individually and  :
 4   as parents and next friend  :
     of ALEXANDER DOBRICH,    :
 5   SAMANTHA DOBRICH, JANE DOE :
     and JOHN DOE, Individually  :
 6   and as parents and next    :
     friend of JORDAN DOE and  :
 7   JAMIE DOE,               :
                              :
 8         Plaintiffs,   :
                         :
 9         v.        :
                     :
10   INDIAN RIVER SCHOOL     :
     DISTRICT, et al.,        :
11                           :
         Defendants.   :
12   .. ........ ..
13         Videotaped Deposition of JOHN M. EVANS,
     taken pursuant to notice, on Wednesday, October 18,
14   2006 at 9:13 a.m. at 31 Hosier Street, Selbyville,
     Delaware, reported by Lorena J. Hartnett, a Registered
15   Professional Reporter and Notary Public.
16   .. ........ ..
17   APPEARANCES:
18         THOMAS ALLINGHAM, ESQUIRE
           RICHARD HORVATH, ESQUIRE
19         BRIAN LENHARD, ESQUIRE
           One Rodney Square
20         Wilmington, DE  19801
             Attorney for the Plaintiff
21
22
23         WILCOX & FETZER
           1330 King Street - Wilmington, DE  19801
24         (302) 655-0477
           www.wilfet.com
```

**Page 2**

```
 1
 2   APPEARANCES (CONTINUED):
 3         JARROD SHAU, ESQUIRE
           Drinker, Biddle & Reath, LLP
 4         One Logan Square
           18th and Cherry Streets
 5         Philadelphia, PA  19103-6996
             Attorney for the Defendants
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**Page 3**

```
 1
 2
 3         TABLE OF CONTENTS
 4   TESTIMONY OF JOHN M. EVANS:
 5     Direct Examination by Mr. Allingham. . . . . . . 3
 6   Certificate of Reporter . . . . . . . . . . . . . 168
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**Page 4**

```
 1         VIDEOGRAPHER:  Okay.  This is the
 2   videotaped deposition of John M. Evans taken
 3   by the plaintiffs in the matter of Dobrich
 4   et al. versus Indian River School District,
 5   et al., Civil Action Number 15-120.
 6         The deposition is taking place at 31
 7   Hosier Boulevard in Selbyville, Delaware, on
 8   October 18, 2006 at approximately 9:13 a.m..
 9   The court reporter is Lorena Hartnett from
10   the firm of Wilcox and Fetzer.
11         My name is Mark Buckmaster, a video
12   specialist from Discovery Video Services
13   Incorporated in association with Wilcox and
14   Fetzer.  Counsel will now introduce
15   themselves and the reporter will swear in
16   the witness.
17         MR. ALLINGHAM:  My name is Tom
18   Allingham.  I represent the plaintiffs, and
19   with me are Richard Horvath and Brian
20   Lenhard.
21         MR. SHAU:  My name is Jarrod Shaw, and
22   I represent the defendants.
23
24
```

Case 1:05-cv-00120-JJF     Document 255-2     Filed 04/10/2008     Page 3 of 56

Evans. John (Video)  10/18/2006  9:13:00 AM

**9**

1    Q.  It then follows as the night to day that it

2    had no bearing?

3    A.  It had no bearing on my decision.  I was not

4    aware of that.

5    Q.  Had you attended any board meetings prior to

6    your decision to run for the board?

7    A.  One, one board meeting.

8    Q.  And was that a board meeting on the expense

9    referendum?

10   A.  No, that was later.  I don't think -- No, I

11   don't think it was.

12   Q.  Why did you attend that board meeting?

13   A.  Just to get a feel for what happened at a

14   board meeting.

15   Q.  Did you think that the meeting that you

16   attended before you joined the board was conducted in

17   a solemn and serious and appropriate manner?

18   A.  Yes, I do.

19   Q.  Did you form a view as to whether the opening

20   of that meeting with a prayer was responsible for that

21   meeting's being conducted in a solemn, serious and

22   appropriate manner?

23   A.  I don't remember whether that board meeting

24   was opened to prayer or not.  I don't remember that.

**10**

1    Q.  I take it it did not make a big impression on

2    you one way or another as a member of the public at

3    that meeting?

4    A.  It did not, no.  I just don't remember

5    whether they opened that meeting with prayer or not.

6    Q.  Am I right, Mr. Evans, that you don't have

7    any personal information prior to, for the period

8    prior to your joining the board, about whether the

9    board had a practice or policy of opening meetings

10   with a prayer?

11   A.  I had no knowledge whether they did or did

12   not.

13   Q.  Okay, now let's go to the ten years that you

14   did serve on the board.  Is it correct that the board

15   had a practice or policy of opening its meetings with

16   a prayer?

17   A.  Yes.

18   Q.  And that would be its regular meetings;

19   correct?

20   A.  That's correct.

21   Q.  It's also correct, is it not, that the board

22   did not have a practice of opening its special

23   meetings with a prayer?

24   A.  That's correct.

**11**

1    Q.  And it is also correct, is it not, that the

2    board does not open its executive sessions with a

3    prayer?

4    A.  That's correct.

5    Q.  And that question having to do with executive

6    sessions, that's true even if the executive session

7    takes place then the prayer that's offered at the

8    regular meeting; correct?

9    A.  Sorry, repeat that question.

10   Q.  Let me make it into two questions.  First of

11   all, do you recall that there have been times when the

12   board goes into executive session before any prayer is

13   offered at the regular meeting?

14   A.  That's correct.

15   Q.  And even at those, if you will, pre-prayer

16   executive sessions, the board does not open those

17   sessions with a prayer; correct?

18   A.  That's correct.

19   Q.  Do you know why?

20   A.  No, I never really thought about it, to be

21   honest.

22   Q.  Do you know why the board does not open its

23   special meetings with a prayer?

24   A.  No, I don't.

**12**

1    Q.  The matters treated in executive session and

2    at special meetings are just as important as the

3    matters treated at regular meetings, aren't they?

4    A.  Yes, they are.

5    Q.  The proceedings are conducted in just as

6    solemn a manner at special meetings as at regular

7    meetings, is that correct, in your experience?

8    A.  Yes, I would say yes.

9    Q.  And the executive sessions, similarly, are

10   just as serious and solemn as the regular sessions?

11   A.  Yes.

12   Q.  Have you ever heard anyone at anytime raise

13   the issue of why executive sessions and special

14   meetings are not opened with a prayer?

15   A.  No, I have never, never heard that issue.

16   Q.  Okay.  What did you do to prepare for the

17   deposition today?

18   A.  The only thing that I did was about a week

19   ago read the policy on religion.

20   Q.  Seems like a sensible thing to do.

21   A.  That's the only thing I have done to prepare.

22   Q.  Did you meet with your lawyers?

23   A.  Personally, you mean with the district

24   lawyers?

Case 1:05-cv-00120-JJF     Document 255-2     Filed 04/10/2008     Page 4 of 56

Evans. John (Video)  10/18/2006  9:13:00 AM

41

1    Q. Is it your view, as a board member, that the
2    words "in order to solemnify its proceedings" are the
3    functional equivalent of the words "in order to seek
4    God's guidance for the decisions to be made at that
5    meeting."?
6    A. I believe that, yes.
7    Q. Okay. And I forgot to say at the beginning
8    of the deposition, it's really important for the court
9    reporter, in particular, that we don't trample on each
10   other's questions and answers. It's the way we all
11   have conversations, but we need to have a specialized
12   sequential conversation in the depositions. Okay?
13   A. I understand.
14        MR. ALLINGHAM: So could I have the
15   last question and answer read back?
16        (The reporter read back the last
17   question and answer.)
18   BY MR. ALLINGHAM:
19   Q. Okay. So that at least at, for your
20   understanding as a board member of the Policy BDA.1
21   which we have in front of us, it doesn't matter
22   whether the policy says, "in order to solemnify its
23   proceedings" or whether the policy says, "in order to
24   seek God's guidance, will, protection and grace," the

42

1    meaning would be the same?
2    A. Yes, to me it would.
3    Q. Okay. Did anyone suggest at anytime in the
4    consideration of this policy that the policy ought to
5    say, "in order to seek God's guidance, will,
6    protection and grace."?
7    A. I don't remember.
8    Q. Do you remember any discussion at all of the
9    purpose articulated in the board prayer policy, that
10   is, quote, "in order to solemnify its proceedings."?
11   A. Would you repeat that, please?
12   Q. Yes, do you remember anyone discussing the
13   purpose of the policy at anytime during the board
14   meetings?
15   A. I don't recall, no, I don't recall.
16   Q. Let's make my question a little more
17   specific. Do you recall anyone offering any comment
18   whatsoever on the language, "in order to solemnify its
19   proceedings"?
20   A. I don't recall.
21   Q. When did the board first, first begin to
22   consider the issue of school board prayer?
23   A. When it began to first consider it? It would
24   have been sometime in the summer of 2004.

43

1    Q. And what prompted the board's consideration
2    of that issue was Mrs. Dobrich's expression of
3    concerns that began with the graduation prayer in
4    early summer of 2004; correct?
5    A. Yes.
6    Q. Okay. Let me show you what we have marked as
7    PX15. When I say PX, it's short for plaintiff's
8    exhibit.
9    A. Okay.
10   Q. When we do that, that enables someone looking
11   at the transcript to be able to reconstruct what
12   document we were looking at.
13       If you look at the last page of PX15, you
14   will see Mrs. Hobbs' signature. Actually, it's a
15   signature stamp, but it's meant to be Mrs. Hobbs'
16   signature; correct?
17   A. Yes.
18   Q. And does that tell you that these are the
19   final minutes of the June 15, 2004 board meeting?
20   A. Yes.
21   Q. All right. You are recorded as being present
22   under roll call on the first page?
23   A. Yes, I am.
24   Q. And do you recall that you were present at

44

1    the June 15, 2004 school board meeting at North
2    Georgetown Elementary School in the cafeteria?
3    A. Yes.
4    Q. Now, this would have been the first board
5    meeting after the 2004 graduation; is that right?
6    A. That's correct.
7    Q. If you will turn to page two of the minutes,
8    you will see under the public comments section that
9    one person made a public comment, and that's
10   Mrs. Dobrich; is that right?
11   A. Yes, I see that.
12   Q. And what the minutes record is that
13   "Mrs. Dobrich, a parent of the Jewish faith, expressed
14   concern about prayers at the school district events.
15   She asked that the board consider using a
16   nondenominational prayer that would be appropriate for
17   all faiths at events such as graduations, etcetera."
18       Do you see that?
19   A. Yes, I do.
20   Q. Do you recall Mrs. Dobrich making that
21   comment?
22   A. I recall Mrs. Dobrich being there, but I
23   can't recall her specific statement, but I assume the
24   board minutes would record such.

Case 1:05-cv-00120-JJF    Document 255-2    Filed 04/10/2008    Page 5 of 56

Evans. John (Video)  10/18/2006  9:13:00 AM

53

1  Mrs. Dobrich and mouthing the words, "No, never." Not
2  saying them out loud, but saying "No, never," with
3  your lips?
4    A.  No, I don't.
5    Q.  Do you recall not doing that?
6    A.  No, I don't.
7    Q.  That is, do you have an affirmative memory
8  that you did not do that?
9    A.  No, I don't have any memory of what I did or
10  didn't do.
11    Q.  Now, you said that you did not agree with
12  Mrs. Dobrich's suggestion that the board use a
13  nondenominational prayer that would be appropriate for
14  all faiths.  Would you tell me why you did not agree
15  with that?
16    A.  Well, I don't agree with it.  I can't
17  speak -- I am not speaking for the board.  I am
18  speaking for myself.
19    Q.  Well --
20    A.  I can't agree with anyone that tells me how I
21  should pray.
22    Q.  All right, and I want to separate your
23  reaction as an individual and a person of faith with
24  your reaction as a board member.  They may be the

54

1  same, but I just want to make sure I understand.  As a
2  board member, did you disagree with what Mrs. Dobrich
3  was suggesting?
4    A.  No, I did not disagree with her asking the
5  board to consider it.
6    Q.  As a board member, after consideration of
7  that issue, I take it that you disagreed with that
8  suggestion; correct?
9    A.  With Mrs. Dobrich's suggestion?
10    Q.  Yes, ma'am, yes, sir, it's Dobrich, but yes,
11  with Mrs. Dobrich's suggestion.
12    A.  Dobrich.  Did I disagree with her suggestion?
13    Q.  Yes.
14    A.  Now, are you asking, is this -- It's hard
15  to -- Well, ask me the question again, please.
16    Q.  Sure.  Mrs. Dobrich suggested that the board
17  offer prayers not in Jesus's name.  Okay, as a board
18  member, did you disagree with Mrs. Dobrich on that
19  point?
20    A.  I can't answer that with a yes or no.  If I
21  am asked, if the board chose to not use the name of
22  Jesus, then I would adhere to that, but I would
23  request that I not be asked to pray.
24    Q.  And is that -- I may have this wrong, but I

55

1  have heard some testimony on this issue.  Is that
2  because, Mr. Evans, according to your beliefs,
3  if you are asked to pray, you should offer the prayer
4  in the name of Jesus?
5    A.  That's correct.
6    Q.  Okay.  And, to expand on that a little bit,
7  is it also your belief that if you pray without
8  offering the prayer in the name of Jesus, you would be
9  denying Jesus?
10    A.  I believe that, yes.
11    Q.  Yes, sir.  But, as you said earlier, you
12  could accept a board policy that said no prayer should
13  be offered in the name of Jesus by simply declining
14  the invitation to pray.
15    A.  Repeat that, please.
16    Q.  You articulated a way that you could comply
17  with the board policy that says no prayers shall be
18  offered in the name of Jesus by simply declining the
19  invitation to pray.
20    A.  If there was such a policy, I could accept
21  it, but I would decline to pray.
22    Q.  And am I correct, sir, that in that
23  circumstance, in order to seek divine guidance for
24  yourself, according to your own faith, you would pray

56

1  silently for divine guidance in Jesus's name; correct?
2    A.  I very possibly would.
3    Q.  It's certainly a way in which you could,
4  according to your faith, effectively seek divine
5  guidance?
6    A.  That's right, yes.
7    Q.  Because, according to your faith, God hears
8  our prayers whether they are offered out loud or
9  silently?
10    A.  That's correct.
11    Q.  And whether they are offered in public or in
12  private?
13    A.  That's correct.
14    Q.  In church or in a supermarket?
15    A.  That's correct.
16    Q.  Okay.
17    A.  That's what I believe.
18    Q.  In light of what you have just told me, is it
19  necessary for the board to pray in public at a board
20  meeting in order for it to accomplish its purpose of
21  solemnifing the proceedings, which you have told me
22  means to seek divine guidance?
23    A.  You asked is it necessary?
24    Q.  Correct.

Case 1:05-cv-00120-JJF     Document 255-2     Filed 04/10/2008     Page 6 of 56

Evans. John (Video)  10/18/2006  9:13:00 AM

---

**61**

1   which the board member said, "Please, God, touch each
2   of the board members with your guidance during their
3   decision-making process at the meeting tonight," would
4   that prayer be permitted or prohibited by paragraph
5   three?
6      A.  Well, I think it would be permitted.
7      Q.  But if the board member, the same board
8   member offered a prayer that said, "Please, God, touch
9   each board member with your salvation during the board
10  meeting today," that would be prohibited?
11     A.  I believe so, yes.
12     Q.  All right.  So a prayer for guidance is
13  alright, but a prayer for salvation is prohibited?
14     A.  Yes, I agree with that.
15     Q.  How about this prayer?  "Oh, Lord, imbue us
16  with the faith to know and serve you during our
17  decisions at this meeting."
18     A.  "Dear Lord."?
19     Q.  "Imbue us with the faith to know and serve
20  you."
21     A.  "To know you and to serve you?"  I don't
22  think that's appropriate.
23     Q.  I am going to ask you later in the
24  deposition, Mr. Evans, about some other prayers,

---

**62**

1   as well, but I would like to ask you right now, as a
2   board member, how did you understand that paragraph
3   three would be enforced, the limitations in paragraph
4   three would be enforced?
5      A.  How I understood it would be enforced?
6      Q.  Yes, sir.
7      A.  I don't know.  I don't know how they would be
8   enforced.
9      Q.  Is it correct that the board is ultimately
10  responsible for the enforcement of its policies?
11     A.  Yes.
12     Q.  In the course of your consideration of Board
13  Policy BDA.1, did you give any consideration to how
14  this policy would be enforced?
15     A.  I did not, no.
16     Q.  In the course of your consideration of Board
17  Policy BDA.1, did you hear anybody give consideration
18  as to the issue of how Board Policy BDA.1 would be
19  enforced?
20     A.  I don't recall hearing anyone say, no.
21     Q.  Mr. Evans, the perception of whether a prayer
22  is proselytizing or not, do you think that the
23  decision about that — And you and I went through a
24  few prayers in which I kept changing the content of it

---

**63**

1   a little bit to see whether you would view it as
2   violative or permitted by paragraph three.
3      A.  Uh-huh.
4      Q.  In the course of deciding whether a prayer is
5   proselytizing or not, do you think that decision could
6   be affected by the individual faith of the person
7   making the decision?
8      A.  Repeat that, please.
9      Q.  Yeah, let me give you an example, and then I
10  will come back to a general question.  Okay?  I asked
11  you about some prayers that were at least intended to
12  be, and I think you heard them to be, Christian
13  prayers; correct?
14     A.  Right.
15     Q.  Do you think that the judgment of whether
16  those prayers are proselytizing or not might be
17  affected by whether the person making that decision
18  was Christian or Jewish or Muslim?
19     A.  Yes, I believe it would be affected.  You
20  can't separate the two.
21     Q.  So that a Christian might be more tolerant of
22  a -- Strike that.  I am going to use the language of
23  the policy.
24        A Christian might view a prayer as

---

**64**

1   non-proselytizing which a Jewish person might view as
2   proselytizing, same prayer; correct?
3      A.  That's very possible, yes.
4      Q.  And the difference might be grounded in the
5   faith of those two persons?
6      A.  Well, I will use your words, yes, it might.
7      Q.  It's certainly not unreasonable to think that
8   it might be affected by that faith; isn't that true?
9      A.  That's true.
10     Q.  The persons making the judgment whether a
11  prayer is proselytizing or not in the Indian River
12  School District, that is the individual board members,
13  have been at all times since the adoption of this
14  policy Christian in faith; is that correct?
15     A.  Repeat that, please.
16     Q.  First, the persons ultimately responsible for
17  enforcing paragraph three of the board policy are the
18  board members; is that correct?
19     A.  That's correct.
20     Q.  And is it correct that at all times since
21  October 19, 2004 when this policy was adopted, every
22  board member has been of the Christian faith?
23     A.  I don't know that.
24     Q.  Do you have any reason to doubt that?

---

Case 1:05-cv-00120-JJF     Document 255-2     Filed 04/10/2008     Page 7 of 56

Evans. John (Video)  10/18/2006  9:13:00 AM

109

1   but I can only base it on that paragraph.  If I have
2   to exclude legal counsel, that's fine.  I don't know
3   that we had legal counsel.  I am assuming that we did
4   because I, as an individual, would not have linked
5   those, as I mentioned before.
6       Q.   Okay.  So let's take, as a given, your
7   assumption for purposes of the next few questions.
8   Okay?
9       On the assumption that you had advice that
10  since the Indian River Board of Education is a public
11  legislative and deliberative body it has the right to
12  open its meetings with a prayer, on that assumption
13  you would agree with me, wouldn't you, that you took
14  that legal advice into account in deciding whether to
15  vote for the board policy?
16      A.   Yes, I would have.
17      Q.   If I then pursue that farther and say, we
18  understand that you assume that you got such advice
19  and so I ask you who gave you the advice, your answer
20  is you don't know?
21      A.   That's correct.
22      Q.   And if I ask you whether you got advice from
23  more than one source on that subject, legal advice
24  from more than one source, you don't know?

110

1       A.   I don't know, but it's very possible.
2       Q.   Why is it very possible?
3       A.   Well, we had Mr. Neuberger and Mr. Griffin,
4   there is two attorneys that both or neither may have
5   given us the advice.  I don't know.
6       Q.   Do you recall whether you got differing
7   opinions on that topic from legal counsel?
8       A.   On the topic of school prayer, of our policy,
9   or this paragraph?
10      Q.   This paragraph, that since the Indian River
11  Board of Education is a public legislative and
12  deliberative body, it has the right to open its
13  meetings with a prayer.
14      A.   I don't recall if we had different opinions.
15  I don't recall.
16      Q.   Did you get differing advice on the, more
17  generally, on the issue of school board prayer from
18  more than one counsel?
19      A.   Yes.
20      Q.   And were those counsel Mr. Griffin and
21  Mr. Neuberger?
22      A.   Well, they were two of the legal counsel, and
23  then the legal counsel that -- Well, no, I don't know
24  if legal counsel from the insurance company

111

1   provided -- I don't think they provided anything on
2   the prayer issue.
3       Q.   So your best recollection is that the
4   differing advice came from Mr. Griffin and
5   Mr. Neuberger?
6       A.   Yes, yes.
7       Q.   And now I want to ask you about the sequence
8   in which you received that advice.  Is it correct that
9   you got the advice from Mr. Griffin first and then got
10  advice from Mr. Neuberger second?
11      A.   That -- That may have been.
12      Q.   Is that your best recollection?
13      A.   Yes, it is.
14      Q.   And you need to definitely pause before you
15  answer this question, okay, because Mr. Shau may --
16  You need to give Mr. Shau a chance to object.
17      A.   Okay.
18      Q.   Tell me, as well as you can recall, what the
19  differences were between the advice Mr. Griffin gave
20  you and the advice that Mr. Neuberger gave you?
21      MR. SHAU:  Object.  The advice given
22      by counsel is attorney/client privilege.
23      Don't answer that question.  I will instruct
24      the witness not to answer the question,

112

1   please.
2   BY MR. ALLINGHAM:
3       Q.   Do you understand that this lawsuit is being
4   prosecuted by the ACLU?
5       A.   Yes, I do.
6       Q.   What is the basis for that understanding?
7       A.   Well, I understand that the ACLU represents
8   the Dobrich family.
9       Q.   Where did you get that understanding?
10      A.   I assume one of the attorneys.  I don't
11  remember which one.
12      Q.   You --
13      A.   Somebody.  I can't tell you who it was.
14      Q.   You talked in some earlier answers about
15  understanding what the public perceives in your
16  district.  Do you believe that the public perceives
17  that the ACLU is prosecuting this lawsuit?
18      A.   I believe so.
19      Q.   And do you believe that the public views the
20  board's defense of this lawsuit as, in some sense,
21  standing up to the ACLU?
22      A.   In some sense, yes.
23      Q.   And do you believe that the public views the
24  defense of this lawsuit as a defense of Christian

113

1  values?

2  A.  Yes.

3  Q.  Do you believe that the public views the

4  defense of this lawsuit as a defense of Christian

5  prayer?

6  A.  No.

7  Q.  Do you believe -- What are the Christian

8  values that you believe the defense of this lawsuit is

9  perceived to be defending?

10  A.  The right to pray at a board meeting.

11  Q.  Why is that a Christian value, but -- Sorry.

12  Why is that a Christian value as opposed to simply --

13  Strike that.  I will withdraw the question.

14  Now, in the August 23 board meeting you will

15  see that no action was taken on Number 0501PL.  The

16  next board meeting was the next day, August 24.

17  Do you have any recollection of why a special

18  meeting for the purpose of discussing the school board

19  prayer issue was scheduled for the day before the

20  August 24 meeting?

21  A.  No, I don't.

22  Q.  It's your understanding of the board's

23  intention that its meetings be conducted in a

24  respectful and courteous manner; is that correct?

114

1  A.  That's correct.

2  Q.  And the board member who is initially charged

3  with that is the board president who has the gavel;

4  correct?

5  A.  That's correct.

6  Q.  But would you agree with me that each

7  individual board member has the obligation to try to

8  ensure, to the best of his ability, that meetings are

9  conducted in a courteous and respectful manner?

10  A.  Yes, I do.

11  Q.  And if you felt that the board president was

12  not acting to stop disrespectful or discourteous

13  behavior, you would do something yourself to address

14  the issue, wouldn't you?

15  A.  Yes, I believe I would.

16  Q.  And would that be to pass a note or speak to

17  the board president in the first instance?

18  A.  That could be one of those methods.

19  Q.  And an alternative would be to stand up and

20  take action yourself; correct?

21  A.  If needed.

22  Q.  During the August 24 board meeting, the big

23  meeting, did you believe that the conduct of the board

24  and the members of the public was at all times

115

1  respectful and courteous?

2  A.  I believe the conduct of the board was, but

3  not necessarily the public in some instances with the

4  booing.  I don't approve of that.

5  Q.  Did you do anything to stop the booing?

6  A.  No, I did not.

7  Q.  Do you recall that the board president did

8  anything to stop the booing?

9  A.  I don't recall that he did.

10  Q.  Looking back on it, do you think that he

11  should have?

12  A.  Yes, and second thought, he may have slammed

13  his gavel a couple times.  I don't recall, but yes,

14  yes, that should have been stopped.

15  Q.  Would you agree with me that the booing and

16  the cheering intensified the emotionally charged

17  atmosphere of that meeting?

18  A.  Yes, I do.

19  Q.  Would you agree with me that the atmosphere

20  of the meeting was intimidating to persons who spoke

21  out against school board prayer?

22  A.  I can't speak for those individuals, but I

23  would think that it would be.

24  Q.  You would agree, at least, that it would

116

1  not be unreasonable for people who had spoken out

2  against school board prayer to find the atmosphere of

3  the public session intimidating?

4  A.  I would, yes, it could be.

5  Q.  Mr. Evans, do you recall a speaker who spoke

6  about Madalyn Murray O'Hair during the public comment

7  session of the meeting?

8  A.  I believe I do.

9  Q.  And that was Mr. Harold Johnson?

10  A.  I don't remember who.

11  Q.  Did you serve on the school board with

12  Mr. Harold Johnson?

13  A.  No, I did not.

14  Q.  So his term predated 1996?

15  A.  Yes, that's correct.

16  Q.  You do know that Mr. Johnson was a former

17  school board member?

18  A.  Yes, I do.

19  Q.  And do you recall that Mr. Johnson spoke at

20  the big meeting?

21  A.  Yes.

22  Q.  Does my saying his name remind you that it

23  was Mr. Johnson who spoke about Madalyn Murray O'Hair?

24  A.  No, it does not.

Case 1:05-cv-00120-JJF    Document 255-2    Filed 04/10/2008    Page 9 of 56

Evans. John (Video)  10/18/2006  9:13:00 AM

125

```
1     Q.  Is it correct that for -- Strike that.  Is it
2   correct that your belief that your prayer was
3   appropriate is unaffected by the religious faith of
4   the students who were in the audience, it doesn't
5   matter what their faith was; correct?
6     A.  Repeat that, please.
7     Q.  Yes.  Your view, I assume, was that the
8   prayer you offered at each of those five sessions was
9   constitutional and appropriate?
10    A.  Yes.
11    Q.  And, by that, I mean both constitutional and
12  appropriate.
13    A.  Yes.
14    Q.  Okay, and your view about that, that is that
15  the prayer was constitutional and appropriate, is
16  unaffected by what the religious faith of the students
17  who were present might be; correct?
18    A.  Correct.
19    Q.  And is that, sir, because your prayer was
20  directed only to the ten board members?
21    A.  That's correct.
22    Q.  Now, in forming that view, do you also rely
23  on the fact that the board, through its president,
24  reads a disclaimer before the prayer is offered?
```

126

```
1     A.  I am aware of that, yes.
2     Q.  And do you think that provides anyone who
3   does not wish to hear or participate in the prayer
4   with an opportunity to get up and leave?
5     A.  Yes, I do.
6     Q.  With respect to students who are in
7   attendance, would you agree with me that it requires
8   considerable courage for a school child to get up and
9   walk out of the meeting when a prayer is being
10  offered?
11    A.  Yes, it would.
12    Q.  That's a tough chore to give to a student;
13  wouldn't you agree?
14    A.  Yes, it is.
15    Q.  Because students, just like you, know that
16  the overwhelming majority of the residents of the
17  Indian River School District are Christian; correct?
18    A.  I don't know that they do.  They may.
19    Q.  And it's your belief, isn't it, sir, that the
20  students, by and large, will not wish to be singled
21  out as not wanting to participate in a prayer; isn't
22  that right?  Do you want me to ask the question in a
23  different way?
24    A.  Yes, yes, a different way, please.
```

127

```
1     Q.  You testified earlier that it would take
2   courage, it was a tough chore for a kid to get up and
3   walk out during the prayer.  The reason for that is
4   that kids don't want to be singled out as a person who
5   doesn't participate in prayers; correct?
6     A.  If you leave the last part of that statement
7   out, I might be able to agree with you.
8     Q.  Okay, I will.  One reason for kids requiring
9   courage and being a tough chore is kids don't like to
10  be singled out?
11    A.  I agree with that.
12    Q.  Period?
13    A.  Yes.
14    Q.  And that would include not wanting to be
15  singled out as a person who doesn't want to
16  participate in a prayer?
17    A.  It may.
18    Q.  Aside from the complaints of the Dobrich
19  family and the Doe family, are you aware of any other
20  complaints about the use of prayer during Indian River
21  School Board meetings?
22    A.  No, I am not.
23    Q.  During the course of the board's
24  consideration of the school board prayer policy during
```

128

```
1   the public comment sessions, did you hear comments
2   from persons other than the Dobrich family which urged
3   the board to consider nondenominational prayer?
4     A.  Yes.
5     Q.  Several people?
6     A.  Yes.
7     Q.  Mr. Evans, would you agree with me that the
8   use of prayer before school board meetings has
9   attracted a lot of attention from the public and the
10  media in the Indian River School District?
11    A.  Yes.
12    Q.  Do you think that the degree of attention
13  that this issue has gotten -- Strike that.  Let me ask
14  it a different way.  Do you think that the issue of
15  prayer during the school board meeting should have
16  attracted as much attention by the public and the
17  media as it has?
18    A.  You are asking if it should, if I think it
19  should have?
20    Q.  Yes, sir.  Among all the issues that come
21  before the school board --
22    A.  No, I don't think it should have.
23    Q.  And why is that?
24    A.  There is more important issues for a school
```

Case 1:05-cv-00120-JJF    Document 255-2    Filed 04/10/2008    Page 10 of 56

Evans. John (Video)  10/18/2006  9:13:00 AM

153

1  knowing Jesus.  We also pray that you would be with
2  them at this time.  We ask these things in Jesus's
3  name.  Amen."  Is that prayer permitted by or
4  prohibited by paragraph three?
5      A.  Possibly the sentence, "We pray that you
6  direct them into the truth and eventually the truth
7  that comes by knowing Jesus," that might be, that
8  might violate paragraph three.
9      Q.  You would view that as proselytizing?
10     A.  Yes, I would.
11     Q.  The next prayer may -- Your judgment about
12  the next prayer may seem obvious to you, but I am
13  going to ask it anyway.  Suppose that a board member
14  offered the prayer, "Oh, Lord, convert the heathen
15  among us."  That would violate it?
16     A.  That would definitely violate paragraph
17  three.
18     Q.  Yes, sir, or a prayer that said, "Oh, Lord,
19  bring the Jews in the audience to knowledge and love
20  of our savior, Jesus Christ."
21     A.  It would violate paragraph three.
22     Q.  And I have one last prayer for you.  It's
23  short, but if you need me to read it again, I will.
24  "Allah, we offer you our school bus drivers.  We offer

154

1  you our superintendent, our administrators, and our
2  secretaries.  We offer you our teachers and our
3  parents.  Finally, we offer you our students.  Peace
4  be unto your prophet, Muhammed."  Would you view that
5  as permitted or prohibited by paragraph three?
6      A.  Well, I don't know what the prayer means by
7  offer.
8      Q.  So, without knowing, you can't make a
9  judgment?
10     A.  That's correct.  I don't know.  Whomever
11  would read that prayer, offer might mean something
12  different to them than it does to me.
13     Q.  Well, let's explore that a little bit.  Do
14  you have a sense of what you would mean if you offered
15  a prayer like that where you used the word, "we offer
16  you our teachers and students," or would you just not
17  offer a prayer like that?
18     A.  I wouldn't use the word offer.  I might say,
19  you know, protect or help or something along that
20  line.
21         I mean it appears that that would not violate
22  paragraph three, but again it depends on what the word
23  offer means by that individual.  I would not be able
24  to determine from that prayer if it violates paragraph

155

1  three.
2      Q.  Okay.  Now, Mr. Evans, we talked earlier in
3  the deposition about the enforcement mechanism for
4  this paragraph, and I, I think we established that
5  it's the board members who are ultimately responsible
6  for enforcing all of the board prayer policy,
7  including paragraph three; correct?
8      A.  Right.
9      Q.  If a board member offered, I am going to take
10  the extreme example first or the most extreme example
11  first, if a board member who was invited by the
12  president to open a meeting with a prayer said, "Lord,
13  we pray that you convert the Jews in the audience to
14  knowledge and love of your son, our Lord, Jesus
15  Christ," which you and I have agreed, I think, is
16  violative of paragraph three, --
17     A.  Yes.
18     Q.  -- what would you do as a board member?
19     A.  What would I do?
20     Q.  If you heard that prayer, what would you do?
21     A.  Well, at that point it would be a little too
22  late to stop it, but I would -- I would have to talk
23  to the president that that person should be
24  reprimanded.  Maybe that's a harsh word, but that

156

1  person should be informed that they are not to pray
2  like that.  That violates paragraph three of our
3  policy.
4      Q.  And all board members should comply with the
5  policy; correct?
6      A.  Yes.
7      Q.  Okay.  But, as you pointed out, at that point
8  the horse would be out of the barn, so to speak?
9      A.  That's right.
10     Q.  There is no provision in the policy for a
11  reprimand or a punishment to a board member.  Do you
12  believe that a board member who offered such a prayer
13  would be reprimanded or punished?
14     A.  Do I believe they would?  If I were the
15  president, yeah, I would.
16     Q.  And when you say reprimand, do you mean --
17     A.  Well, when I say reprimand, I just mean talk
18  to that person and tell them, "Look, you violated our
19  policy, you cannot pray like you just prayed, and, if
20  it happens again, you won't be asked to pray."  That's
21  the way I would handle it.
22     Q.  Okay, and so, as you understand, it's not a
23  mechanism that's set forth in the policy, but as you
24  understand the way the policy ought to work, if a

# EXHIBIT 7

---

**1**

```
1           IN THE UNITED STATES DISTRICT COURT
2            FOR THE DISTRICT OF DELAWARE
3
4    MONA DOBRICH and MARCO DOBRICH, individually and
     as parents and next friend of ALEXANDER DOBRICH,
5    SAMANTHA DOBRICH, JANE DOE and JOHN DOE,
     individually and as parents and next friend of
6    JORDAN DOE and JAMIE DOE,
7            Plaintiffs
                             Civil Action
8        vs.                 NO. 15-120
9    INDIAN RIVER SCHOOL DISTRICT, ET AL.,
10           Defendants
11
12       Deposition of GREGORY HASTINGS, taken
     pursuant to notice at the Indian River School
13   District, 31 Hosier Street, Selbyville, Delaware,
     beginning at 9:07 a.m. on October 13, 2006 before
14   David A. Sroka, Registered Professional Reporter and
     Notary Public.
15
     APPEARANCES:
16
         THOMAS ALLINGHAM, ESQ.
17       RICHARD HORVATH
         BRIAN LENHARD
18       P.O. Box 636
         Wilmington, Delaware  19899-0636
19       For the Plaintiffs
20       JARROD D. SHAW, ESQ.
         Drinker Biddle & Reath, LLP
21       One Logan Square
         Philadelphia, Pennsylvania  19103-6996
22       For the Defendants
23
24
```

---

**2**

```
1           MS. DUPHILY:  This is the
2    videotape deposition of Mr. Greg Hastings,
3    taken by the Plaintiff, in the
4    matter of Dobrich, et al. versus Indian
5    River School District, at al., case
6    number 15-120.
7        The deposition is taking place at 31
8    Hosier Boulevard, Selbyville, Delaware.  We
9    are going on the record on October 13,
10   2006 at approximately 9:07 a.m..  The court
11   reporter is Dave Sroka from the firm of
12   Wilcox & Fetzer.  My name is Lindsay
13   duPhily and I am with Discovery Video
14   Services in association with Wilcox &
15   Fetzer.
16       I will now ask counsel to
17   identify themselves on the record, and then
18   the court reporter will swear in the
19   witness.
20       MR. ALLINGHAM:  I am Tom Allingham
21   representing .  )  Plaintiffs.  With me are
22   Rick Horvath and Brian Lenhard.
23       MR. SHAW:   Jarrod Shaw
24   representing the defendants.
```

---

**3**

```
1           GREGORY HASTINGS,
2       The Witness herein, called for examination by
3    the Plaintiffs, having been duly sworn to tell the
4    truth, the whole truth, and nothing but the truth,
5    was examined and testified as follows:
6    EXAMINATION BY MR. ALLINGHAM:
7        Q.   Good morning, Mr. Hastings.  I am going to
8    ask you to clear up something that has been bugging
9    me.  Is it H-O-S-I-E-R or H-O-O-S-I-E-R?  Is it
10   pronounced Hoosier or Hosier?
11       A.   In this area we pronounce it Hosier.
12       Q.   Do you know how it's spelled?
13       A.   I believe it's one O.
14       Q.   Thanks.  Have you ever been deposed before?
15       A.   Yes, I have, yes.
16       Q.   In what context?
17       A.   As a defendant.
18       Q.   What kind of a case?
19       A.   It was a teacher in our high school and
20   there was -- she brought on a suit, I have to
21   reflect, this has been 12 years, I guess.
22       Q.   All right, I don't need that much detail.
23   That was a suit by a teacher?
24       A.   Yes.
```

---

**4**

```
1        Q.   And it was against you in your capacity as
2    a School Board member?
3        A.   Capacity as a School Board member?
4        Q.   Yes, sir?
5        A.   Yes.
6        Q.   Have you ever testified at trial?
7        A.   I have been an expert witness in Small
8    Claims Court, that's the extent of it.
9        Q.   Did the court issue an opinion in that
10   case?
11       A.   Yes.
12       Q.   Were you mentioned in the opinion?
13       A.   I don't believe so.
14       Q.   What was your area of expertise in that
15   testimony?
16       A.   I had provided architectural design for the
17   product.  This has been a long time, too but --
18       Q.   Let me cut you off.  It has nothing to do
19   with issues of religion in the schools, right?
20       A.   No.  thank you, no.
21       Q.   What is your -- I am trying to keep this
22   limited to the issues here.  You are employed as an
23   architect?
24       A.   Yes, I own a small architectural design
```

---

41

1  a legislative body, has anyone expressed any
2  concerns or reservations or drawn any distinctions
3  between the General Assembly and its functions, for
4  example, and the School Board and its functions?
5  A.  Not to my knowledge.
6  Q.  Legislative bodies pass laws, is that
7  correct?
8  A.  Yes.
9  Q.  And those laws are then enforced by a
10  different branch of government, correct?
11  A.  Correct.
12  Q.  The School Board doesn't pass laws, but it
13  passes policies, correct?
14  A.  Correct.
15  Q.  Unlike the General Assembly the School
16  Board also enforces those polices, correct?
17  A.  Yes.
18  Q.  At any time during the discussion of
19  whether the Board was a legislative body did anyone
20  raise or discuss the fact that students are
21  consistently present at regular Board meetings?
22  A.  I don't recall.
23  Q.  It is a fact that at least since the mid
24  1990s students were consistently present at regular

42

1  Board meetings?
2  A.  Yes.
3  Q.  And so when you walk into the Board meeting
4  or walk out to take your seat on the stage or where
5  ever the meeting is being held, you expect that
6  students will be in the audience?
7  A.  Most generally, yes.
8  Q.  Sometimes it's only half a dozen students,
9  maybe it's just the ROTC color guard?
10  A.  Yes.
11  Q.  Sometimes, I've seen some minutes where it
12  looked like there were 50 or more students there, is
13  that right?
14  A.  Yes.
15  Q.  Can you think of any regular Board meeting
16  where there have been no students present?
17  A.  Probably in the summer months.
18  Q.  Oh, I should have been clear about my
19  question.  Can you think of any regular Board
20  meeting during the academic year when students were
21  not present?
22  A.  No.
23  Q.  All right, I am going to show you another
24  exhibit, this is PX12.

43

1      Mr. Hastings, this is a long document, you
2  take as long as you want to to read it, but my first
3  question to you is have you ever seen it before, and
4  you may be able to answer that question without
5  reading the whole document?
6  A.  I may have, but I can't recall.  It's been
7  two years.
8  Q.  If you look at the fourth page of the
9  exhibit?
10  A.  Uh-hum.
11  Q.  You will see there are five numbered
12  paragraphs at the bottom of the page, the fifth one
13  of which carries over to the next page.  With some
14  extremely minor language changes can you confirm
15  that the five numbered paragraphs on PX12 are
16  essentially identical to the numbered paragraphs of
17  the final Board policy?  The only change I can tell
18  you is I know that there is in paragraph four just
19  is changed to only, but apart from that do you see
20  any other changes?
21  A.  No.
22  Q.  Do you know who drafted PX12?
23  A.  I suspect the Neuberger firm.
24  Q.  It says up at the top left the Rutherford

44

1  Institute and the Neuberger firm, is that the basis
2  for your answer?
3  A.  Yes.
4  Q.  Did anyone ever tell you that the board
5  policy as it was presented to you for a first
6  reading on September 28th had been drafted by the
7  Neuberger firm?
8  A.  I can't recall.
9  Q.  In an earlier answer you told me that your
10  normal process is to have Board policies checked by
11  the Board attorney, correct?
12  A.  Yes.
13  Q.  In the summer and fall of 2004 who was the
14  Board's attorney?
15  A.  If memory serves me correctly it was Jim
16  Griffin.
17  Q.  Do you know whether anyone on the Board or
18  the policy committee asked Mr. Griffin to
19  participate in the drafting of the Board policy on
20  School Board prayer?
21  A.  I don't want to assume, I know what happens
22  when you assume, but knowing our procedure and the
23  policy committee I would -- sitting here today I
24  would to -- that was the normal procedure, that it's

77

1  understood that it was in a gym, gymnasium, I
2  believe.
3      Q.   And that gymnasium was set up not only with
4  speakers but also with a video feed from the actual
5  Board meeting room?
6      A.   I believe so, I was told that, yes.
7      Q.   Mrs. Bunting told me yesterday that she had
8  heard via hearsay a couple of days before the
9  meeting that there were going to be very large
10  crowds at the meeting, did you hear that as well?
11      A.   I would have to say I suspect if there were
12  alleged large crowds going to be in attendance I
13  would not have heard it until that meeting, that
14  special meeting the evening before, but I don't
15  recall anything specific.
16      Q.   Am I right that you weren't shocked that
17  there were very large crowds when you arrived for
18  that Board meeting?
19      A.   No, not really, that's correct, I was not
20  shocked.  That's usually what happens.
21      Q.   What's usually what happens?
22      A.   When there is an issue that's very
23  personal, or parents in our community have a
24  concern, very strong concern about an issue, there

78

1  would be a moderate to a large attendance to the
2  Board meeting.  So, that's why I was not surprised
3  to see a large turn out.
4      Q.   Can you recall any Board meeting during
5  your 12 year tenure that had a turnout that even
6  approved the turnout at this meeting?
7      A.   One, on one other occasion.  And that was a
8  negotiation issue between the district and teachers
9  union several years ago.
10      Q.   Do you know how many people attended that
11  meeting?
12      A.   I am going to guess maybe 300.
13      Q.   The published reports of the attendance at
14  the August 24th meeting were 6 to 800.  That's based
15  on your answer a minute ago, would I be right in
16  understanding that at least for your 12 and a half
17  year tenure the attendance at the August 24th
18  meeting was double, roughly speaking, double the
19  highest attendance at any other Board meeting during
20  your tenure?
21      A.   Yes.
22      Q.   I asked you this question specifically with
23  respect to you and your family, let me ask it
24  generally, do you know of any School Board member

79

1  who discussed with church groups their attendance at
2  the August 24 School Board meeting?
3      A.   I do not.
4      Q.   Are you aware of any effort by any School
5  Board member to encourage people to attend the
6  August 24 School Board meeting?
7      A.   No, I do not.
8      Q.   Did you happen to hear Dr. Hattier's
9  comments on WGND shortly before the School Board
10  meeting?
11      A.   The August 24th meeting?
12      Q.   Yes, sir?
13      A.   I don't recall.  He's always on the radio.
14      Q.   I'm sorry say again?
15      A.   He's always on the radio.
16      Q.   Did you ever come to hear what Dr. Hattier
17  said on the radio shortly before the August 24th
18  meeting?
19      A.   No.
20      Q.   Did anything occur at the meeting itself,
21  the August 24th meeting that you found disturbing?
22      A.   I guess I would have to comment as we have
23  established that's probably the largest numbers of
24  parental constituent turn out that we've ever had at

80

1  a Board meeting.
2          When you have large numbers such as that,
3  it does have tendency to have effect on the regular
4  Board meeting.  The regular Board meeting is to
5  conduct business, share concerns, discuss issues,
6  just conduct business of the slated agenda.  I am
7  going to have to say that just in general the
8  overall ambience of the crowd, and the meeting, was
9  a little disturbing, but nothing -- I can't recall
10  anything specific that was I'll say alarming, if
11  that's what you are asking or referring to.
12      Q.   What was it in your view about the overall
13  ambience of the crowd in the meeting that was a
14  little disturbing?
15      A.   Many of them had signs they were waving, on
16  occasion there might -- I believe there was an
17  outburst or some larger or someone would comment.
18  When you have a group of people together like that
19  it can get a little unruly.  I understand there was
20  some singing prior to the meeting in the gymnasium.
21  I don't recall hearing singing in the cafeteria
22  where we conducted our meeting, but it was -- it
23  proposed for an interesting meeting, let's put it
24  that way.

109

1    A.  Yes, that is tradition.
2    Q.  Why was that changed in the adoption of the
3  policy?
4    A.  To rotating?
5    Q.  Yes.
6    A.  I don't know specific, but I suspect that
7  was offered in the policy to ensure at that setting
8  regardless of the faith of any Board member that
9  they would have the opportunity to share their
10  prayer at the opening of a regular Board meeting.
11    Q.  And to give you an example, if the district
12  elected a Jewish Board member you wanted to make
13  sure that the president didn't just skip over the
14  Jewish Board member every time?
15    A.  Correct.
16    Q.  Or an atheist Board member, or whatever,
17  correct?
18    A.  Correct.
19    Q.  Because if an atheist Board member were
20  elected, that Board member might want to say look I
21  don't believe in a higher power, but I do believe in
22  solemnifying our proceedings, and I urge all of you
23  to join me in reminding myself to take seriously my,
24  you know, my oath as a Board member, whatever, yes?

110

1    A.  Yes.
2    Q.  Who is the intended audience of the prayer,
3  the ten Board members who are the ones who have to
4  make the decisions at that Board meeting?
5    A.  In my opinion, yes.
6    Q.  And so I take it that the intended audience
7  of the prayer is the ten Board members, it would be
8  just as effective for the ten Board members to stand
9  in the wings and have their prayer and then walk
10  onto the stage as it would be for them to walk onto
11  the stage and then have their prayer, correct?
12    A.  Correct.
13    Q.  Did anybody ever suggest that a policy or
14  practice that would have contemplated that the
15  prayer that would solemnify the proceedings take
16  place before the Board walked out on stage?
17    A.  Not to my knowledge.
18    Q.  I asked you a question about the State
19  Board of Education, and whether it was necessary for
20  the State Board of Education to have a prayer, to
21  open its meetings with a prayer in order to
22  solemnify its proceedings and you answer was, "Nice
23  but not necessary," do you remember that?
24    A.  Yes.

111

1    Q.  I am going to ask you the same question
2  with respect to the Indian River School Board.  In
3  order for the School Board to solemnify its
4  proceedings, is it necessary for it to open its
5  meetings with a prayer?  Would you give me the same
6  answer, nice but not necessary?
7    A.  Nice but not necessary.
8    Q.  And let me follow-up on that.  In your view
9  why would it be nice?
10    A.  Again for the comment I made just a moment
11  ago, with the charge that we have, the
12  responsibilities that we have, we need all the help
13  we can get.  So, if that's divine help to guide us
14  and make all the right decisions, because some of
15  the decisions are tough.  It's nice to seek that
16  extra help.
17    Q.  Fair enough.  And in that context, and in
18  the context of the reason why in your view it's nice
19  to do it, you could accomplish that result, that it
20  would be equally nice, if you will, to have the
21  prayer or moment of silence off stage?
22    A.  I suppose, yes.
23    Q.  Because the prayer is not directed to the
24  public who are sitting out in the audience in front

112

1  of the stage, correct?
2    A.  In my opinion, that's correct.
3    Q.  Look at PX9 which is the board prayer
4  again.  From October 19, 2004, which is when this
5  policy was adopted, until the last meeting that you
6  attended, which -- I'm sorry if I am getting this
7  wrong, which was in December of 2005, correct?
8    A.  Yes.
9    Q.  Was this rotating basis among each
10  individual Board member observed?  That is to say,
11  in practice was the opportunity rotated among each
12  individual Board member?
13    A.  The only comment I could make to that would
14  be I may have been asked on one other occasion
15  during that period of time to ask, to give a prayer,
16  but I can't speak to whether or not the president
17  had gone in rotation fashion or asked several of the
18  Board members in rotation to speak.
19        Again, in practice what the Board president
20  usually has done is prior to the meeting, once we
21  arrive is walk up to that individual and ask them,
22  see if they are willing to give the prayer before we
23  begin that evening session.
24    Q.  The third paragraph reads, "Such

113

1  opportunity shall not used or exploited to
2  proselytize, advance or convert anyone, or to
3  derogate or otherwise disparage any particular faith
4  or belief."  Would you please describe for me during
5  your tenure on the Board how you analyzed whether
6  prayers that were offered violated or complied with
7  this limitation?
8      A.  Again ask that, please.
9      Q.  I will ask a preliminary question.  Once
10  you all adopted this policy on October 19, 2004, did
11  you evaluate the prayers that were given thereafter
12  to make sure that they complied with paragraph
13  three?
14      A.  To my knowledge, no, we didn't do it at a
15  Board setting.  No, I don't recall specifically
16  analyzing that or discussing that to see if we were
17  abiding by item three in this Board or this Prayer
18  Policy, no.
19      Q.  What enforcement mechanism is there to make
20  sure that Board members do not use or exploit the
21  prayer opportunity to proselytize, advance or
22  convert anyone or to derogate or otherwise disparage
23  any particular faith or belief?
24      A.  In past practice, to assure us following

114

1  Board policy, it would be typically Board members
2  raising a question, if a question would arise.  So,
3  individual Board members being responsible, if you
4  will.  The superintendent bringing an issue to the
5  table if we were getting off kilter, or lastly if
6  the attorney would happen to be present that evening
7  or if something, a question would arise and we need
8  to refer it back to the attorney for review.
9      Q.  Paragraph three is here for a reason,
10  correct?
11      A.  Yes.
12      Q.  And if an opportunity was used to
13  proselytize, advance or convert anyone or to
14  derogate or otherwise disparage any particular faith
15  or belief, you would view that as unconstitutional,
16  wouldn't you?
17      A.  Yes.
18      Q.  So, compliance with paragraph three is
19  important?
20      A.  Yes.
21      Q.  I am going to ask you about three prayers
22  and I'd like to tell me whether in your view as a
23  Board member they would have been in compliance with
24  paragraph three or violative of paragraph three.  The

115

1  first one -- I have two of them written down, so you
2  can follow along with me when I read them, and the
3  one is short.
4      The first one is Exhibit 35, and it reads
5  as follows:  "Do not put your trust in princes in
6  mortal men who cannot even save themselves.  When
7  their spirit departs they return to the ground.  On
8  that very day their plans come to nothing.  Blessed
9  is he whose help is the God of Jacob, whose hope is
10  in the Lord his God the maker of heaven and earth,
11  the sea and everything in them.  The Lord who
12  remains faithful forever.
13      He upholds the cause of the oppressed and
14  gives food to the hungry.  The Lord sets prisoners
15  free, the Lord gives sight to the blind, the Lord
16  lifts up those who are bowed down, the Lord loves
17  the righteous.  The Lord watches over the alien and
18  sustains the fatherless and the widow, but he
19  frustrates the ways of the wicked.  For the wages of
20  sin is death, but the gift of God is eternal life.
21  Through Jesus Christ our Lord."
22      Would that prayer be permissible under
23  paragraph three or violative of paragraph three?
24      A.  Being read from a Board member in that

116

1  setting?
2      Q.  Yes.
3      A.  In our setting, I'd say permissible.
4      Q.  The second prayer is PX45, maybe you can
5  get the original.  This prayer reads as follows:
6  "Heavenly Father, thank you for this great occasion,
7  for the work, the effort, the joys and everything
8  that led up to this point in time.  Thank you for
9  your guidance in this event.  We pray for your
10  direction in the lives of each of these School Board
11  members.  We pray that you direct them into the
12  truth, and eventually the truth that comes by
13  knowing Jesus.  We also pray that you would be with
14  them at this time.  We ask these things in Jesus'
15  name.  Amen."
16      Would you view that as violative of
17  paragraph three or permissible?
18      A.  Permissible.
19      Q.  And the last prayer reads as follows, and
20  if you need me to read it twice so you are sure, let
21  me know:  "Allah, we offer you our school bus
22  drivers, we offer you our superintendent, our
23  administrators and our secretaries.  We offer you
24  our teachers and our parents.  Finally we offer you

117

1  our students. Peace be unto your prophet Muhammad."
2      Permissible or violative?
3  A.  Permissible.
4  Q.  Now, in reaching the judgment that you
5  reached on each of those prayers, can you describe
6  for me the way you analyze the problem? How did you
7  reach the judgment that you reached that all three
8  prayers were permissible?
9  A.  I commented a moment ago that in my opinion
10  sitting there at the Board we need or we'd like to
11  have all of the help we can get. If there happened
12  to be other Board members at that particular time, a
13  particular time, that were of different faith and
14  they in this rotating basis were asked or offered a
15  prayer, then their prayer of whatever choice would
16  be respected.
17  Q.  Can you give me an example or generically a
18  kind of prayer that you would view as violative of
19  paragraph three?
20  A.  The only thing that I could share with you,
21  that myself included would probably have difficulty
22  with is and we are speaking of prayer, you are
23  asking about our prayer, but if a prayer or offer
24  for divine guidance to the devil or evil would be

118

1  just a little difficult, I suspect.
2  Q.  Okay. I am going to give you another
3  example of a prayer and ask you whether you think it
4  would be violative. Suppose that a Board member
5  said, we pray Lord that you enlighten the heathen in
6  our midst and that you inspire them to come to
7  knowledge of your wisdom and goodness. Would that
8  prayer be violative of paragraph three?
9  A.  You need to repeat that one more time.
10  Q.  We pray Lord that you inspire the heathen
11  in our midst to come to know your goodness and
12  wisdom. That's not identical to what I said, but
13  the idea is we pray that the heathen come to know
14  your wisdom and goodness.
15      Would that prayer be violative of paragraph
16  three?
17  A.  I suspect it would be permissible.
18  Q.  So, you would not view such a prayer as a
19  prayer that was used to convert anyone?
20  A.  No.
21  Q.  This one is going to be extreme, but it's
22  to illustrate a point. Suppose that a Board member
23  offered a prayer, Lord, we hope that you will
24  convert to Christianity all the Jews in the

119

1  audience. Would you view that prayer as violative
2  of paragraph three?
3  A.  Yes.
4  Q.  Okay. On the issue of how paragraph three
5  is enforced, I think you mentioned three groups or
6  people who could bring to the attention of the Board
7  the possibility that paragraph three had been
8  violated. The first was the Board members
9  themselves, a sort of self policing mechanism. The
10  second was the superintendent who might have an
11  issue to the Board and the third was the Board
12  attorney, correct?
13  A.  Correct.
14  Q.  Just as a practical matter the Board
15  attorney does not attend every meeting, is that
16  right?
17  A.  That's correct.
18  Q.  In fact, the Board attorney doesn't come
19  unless specifically invited?
20  A.  That's correct.
21  Q.  To your knowledge has the Indian River
22  School District ever had a Board member who was not
23  a Christian?
24  A.  I have no idea. I can't respond to that.

120

1  Q.  Well, let me turn the question around a
2  little bit. Are you personally aware of any Board
3  member who was not a Christian?
4  A.  No, no, I am not.
5      MS. DUPHILY:  We are going off the
6  record at approximately 1:03 p.m..
7      (WHEREUPON a brief recess was
8  taken)
9      MS. DUPHILY:  Back on the record
10  at 1:05 p.m..
11  Q.  Are you personally aware of any
12  superintendent of the district who was not
13  Christian?
14  A.  No.
15  Q.  And to the extent that it matters, are you
16  aware of any school attorney who was not a
17  Christian?
18  A.  No.
19  Q.  Do you think there is any danger that
20  these, all of these I'll call them enforcement
21  mechanisms, the people who represent the enforcement
22  mechanisms as Christians would be less sensitive to
23  whether an opportunity is used to proselytize,
24  advance or convert anyone, than might a person of

129

1    Q.   A couple of questions again about the
2  August 24th Board meeting but you won't have to make
3  judgments, at least not as many judgments as I asked
4  you about before.  Do you recall that state
5  representatives Hocker and Atkins spoke at the
6  meeting?
7    A.   Yes.
8    Q.   And do you recall that they were joined at
9  the podium by representative Ewing?
10   A.   I believe so, yes.
11   Q.   And did -- do you recall that the
12 representatives provided or read a letter during
13 their public comment section of the meeting?
14   A.   Yes.
15   Q.   And do you recall that that letter said
16 that they as representatives could not recognize the
17 separation of God from state?
18   A.   Maybe.  I can't recall specifically.  I
19 just know that they did read from a letter, but the
20 content I can't recall.
21   Q.   Do you think it was appropriate that
22 representatives stood at the podium and expressed
23 their views as representatives on this issue?
24   A.   I'll say it struck me strange.

130

1    Q.   Why?
2    A.   In this climate, this day and time as we
3  are sitting here knowing the delicateness of this
4  issue at hand, I was surprised two public officials
5  came forward in that light and expressed their
6  opinions, being politicians.
7    Q.   Have you ever had anyone tell you that they
8  see this case as about protecting Christian prayer?
9    A.   No.
10   Q.   Have you ever had anyone tell you that they
11 see this case as about protecting Christian values?
12   A.   You are asking me if I had someone
13 specifically in my face tell me that's what they
14 believe or that's the statement made to such?
15   Q.   Yes, let me take that question first.  So,
16 let's take the specific question, have you ever had
17 anyone actually say to your face that they believe
18 that this case is about protecting Christian values?
19   A.   No.
20   Q.   Now, let's be a little more general, have
21 you heard that sentiment expressed, or have you
22 heard that sentiment -- I'll do it in pieces.  Have
23 you heard that sentiment expressed?
24   A.   Yes.

131

1    Q.   By whom?
2    A.   I can't specifically tell you.  I mean in
3  the course of these two years, whether it would be
4  meeting someone on the street or after a Board
5  meeting or whatever have you, I have to tell
6  you I've heard that sentiment but who, whom, I don't
7  know.
8    Q.   More than once?
9    A.   Probably.
10   Q.   Would it be fair for me to understand that
11 that is a common sentiment in the Indian River
12 School District?
13   A.   Yes.
14   Q.   I am going to go back to a specific
15 question, have you heard anyone say, again to you
16 use your phrase, to your face, that they understand
17 the School Board Prayer Policy as protecting
18 Christian values?
19   A.   Repeat it, please?
20   Q.   Have you heard anyone say to your face that
21 they view the School Board Prayer Policy as
22 protecting Christian values?
23   A.   No.
24   Q.   Have you heard that sentiment expressed?

132

1    A.   No, I don't believe so.
2    Q.   So, it's the defense of this case that is
3  viewed as defending Christian values?
4    A.   I believe.
5    Q.   Have you discussed with anyone whether the
6  2006, the results of the 2006 School Board election
7  was an endorsement of the stance the School Board
8  has taken in support of School Board prayer?
9    A.   What the result of the Board election in
10 2006?
11   Q.   An endorsement of the stance the School
12 Board has taken in support of School Board prayer?
13   A.   Most definitely.
14   Q.   Is that also your view?
15   A.   That the stance was taken as such?
16   Q.   That the result was an endorsement of the
17 stance that the School Board took?
18   A.   Yes.
19   Q.   Have you ever discussed with anyone whether
20 someone who opposes School Board prayer could get
21 elected to the School Board in Indian River?
22   A.   Interesting question.
23   Q.   Let me rephrase it.  Let me just ask the
24 question directly, do you believe that someone who

133

1    is upfront about it, who says look I don't support
2    School Board prayer, could be elected to the School
3    Board in Indian River?
4        A.  Would you be referencing just this past
5    election particularly or in general?  Like five
6    years from now or five years prior?
7        Q.  Let me first ask about the 2006 election.
8    Do you believe that anybody who explicitly
9    acknowledged that he was opposed to School Board
10   prayer could be elected School Board in 2006?
11       A.  Board election 2006, if a candidate
12   acknowledged that, more than likely in my opinion at
13   that particular time he would not have been elected.
14       Q.  Regardless of whatever other policies and
15   qualifications, correct?
16       A.  Correct.
17       Q.  In fact, one of the candidates in the 2006
18   election was in your view an extraordinarily well
19   qualified candidate, that was Jackie Wilson?
20       A.  That's correct.
21       Q.  And her position on School Board prayer was
22   widely understood to be opposition, is that correct?
23   I am not saying what her position was, it was widely
24   reported in the Indian River School District to be

134

1    opposition to School Board prayer?
2        A.  I'd call that propaganda.
3        Q.  You heard that propaganda, though, didn't
4    you?
5        A.  Yes.
6        Q.  Did you think it was false?
7        A.  Yes.
8        Q.  Mrs. Wilson actually offered a pretty
9    nuanced position on School Board prayer, did she
10   not?
11       A.  Yes.
12       Q.  Which people either understood or reported
13   to be something different than what it was?
14       A.  Yes.
15       Q.  Do you know whether any of the candidates
16   in the 2006 election campaigned on the issue of
17   School Board prayer?
18       A.  The candidate did not campaign on the issue
19   of School Board prayer.  None of the candidates did
20   to my knowledge.
21       Q.  Did persons seeking to support the campaign
22   of individual candidates make School Board prayer an
23   issue?
24       A.  Yes.

135

1        Q.  In your view was it a pivotal issue in the
2    election?
3        A.  In my opinion, yes.
4        Q.  Is it your understanding that the ACLU is
5    prosecuting this case?
6        A.  It's my understanding of that, yes.
7        Q.  And what is you -- what is the basis for
8    that understanding?
9        A.  Initially the representative at the Board
10   meeting with Mrs. Dobrich, and the subsequent
11   meetings, a few meetings thereafter, so I have no
12   reason to believe differently.
13       Q.  Have you ever heard anyone say, has anyone
14   ever told you in the context of discussions of this
15   issue, that the ACLU is antiChristian?
16       A.  I believe that that's very controversial in
17   the entire public setting.
18       Q.  What do you mean by that?
19       A.  I think there is many varied opinions of
20   that, whether or not the ACLU are antiChristian.
21       Q.  In the course of the -- well, since June of
22   2004, has anyone said to you, or in your presence,
23   that the ACLU is antiChristian?
24       A.  No.

136

1        Q.  Have you heard that sentiment expressed?
2        A.  On the street, yes.
3        Q.  Have you heard any of your colleagues
4    on the Board express that opinion?
5        A.  Possibly, but I can't recall specifics, no.
6        Q.  Do you believe that the Board is obligated
7    to represent the views of the majority of the
8    constituents in the district?
9        A.  Yes.
10       Q.  Do you agree with Mrs. Bunting that this
11   area is Christian?
12       A.  Not 100 percent.
13       Q.  That is you don't 100 percent agree or you
14   don't agree that it's 100 percent Christian?
15       A.  I don't agree that it's 100 percent
16   Christian.  I am not sure what she was really
17   implying, but I don't believe -- we have other
18   faiths in this district, this area.  They are, I
19   would agree, they are a minority but we have other
20   faiths here.
21       Q.  Do you believe that the fact that the --
22   well, let me explore your answer a little bit.  This
23   is not a close thing, the vast majority of the
24   constituents in Indian River are Christian, is that

# EXHIBIT 8

**Page 1**

1     IN THE UNITED STATES DISTRICT COURT
2         FOR THE DISTRICT OF DELAWARE
3
4   MONA DOBRICH and MARCO DOBRICH, individually and
    as parents and next friend of ALEXANDER DOBRICH,
5   SAMANTHA DOBRICH, JANE DOE and JOHN DOE,
    individually and as parents and next friend of
6   JORDAN DOE and JAMIE DOE,
7              Plaintiffs
8        vs.              Civil Action
                          No. 15-120
9
10  INDIAN RIVER SCHOOL DISTRICT, ET AL.,
11             Defendants
12
13     DEPOSITION OF DONALD HATTIER, taken at the
    Indian River School District, 31 Hosier Street,
14  Selbyville, Delaware beginning at 9:36 a.m. on
    October 10, 2006 before David A. Sroka, Registered
15  Professional Reporter and Notary Public.
16
    APPEARANCES:
17
18      THOMAS ALLINGHAM, ESQUIRE
        RICHARD HORVATH, ESQUIRE
19      BRIAN LENHARD, ESQUIRE
        P.O. Box 636
20      Wilmington, Delaware  19899-0636
        For the Plaintiffs
21
22
        WILCOX & FETZER
23  1330 King Street - Wilmington, DE  19801
        (302) 655-0477
24      www.wilfet.com

**Page 2**

1
2
3       JASON P. GOSSELIN, ESQUIRE
        Drinker Biddle & Reath LLP
4       One Logan Square
        Philadelphia, Pennsylvania 19103-6996
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

**Page 3**

1            MS. DUPHILY:  This is the
2   videotape deposition of Dr. Donald G.
3   Hattier taken by the Plaintiff in the
4   matter of Dobrich, et al., versus Indian
5   River School District, et al., case number
6   15-120.  This deposition is taking place at
7   31 Hosier Boulevard, Selbyville, Delaware.
8   We are going on the record on October 10,
9   2005 at approximately 9:37 a.m.
10           The court reporter is David Sroka
11  from the firm of Wilcox & Fetzer,
12  Wilmington, Delaware.  My name is Lindsay
13  duPhily I'm the videotape specialist of
14  Discovery Video Services in association
15  with Wilcox & Fetzer.
16           Counsel will now introduce
17  themselves and then the court reporter will
18  swear in the witness.
19           MR. ALLINGHAM:  Tom Allingham of
20  Skadden Arps.  With me is Rick Horvath and
21  Brian Lenhard also of Skadden Arps,
22  representing the Plaintiffs.
23           MR. GOSSELIN:  Jason Gosselin of
24  drinker Biddle & Reath representing the

**Page 4**

1   defendants.
2            DONALD HATTIER,
3     The Witness herein, called for examination by
4   the Plaintiffs, having been duly sworn to tell the
5   truth, the whole truth, and nothing but the truth,
6   was examined and testified as follows:
7            MR. ALLINGHAM:  Jason, I just want
8   to put a couple of things on the record.
9   The first one is, it is my impression that
10  you are not going to be interrupting
11  this deposition very much, but I want you
12  to know that if you want to make relevance
13  objections feel free.  I'm not going to
14  accept invitations to explain the relevance
15  of my questions, I think that they are
16  relevant.
17  Q.   Mr. Hattier, I represent the Plaintiffs in
18  this action against the district and I'm going to be
19  asking you some questions.  If you don't understand
20  anything that I ask please tell me, don't answer the
21  question.  If you do answer it the judge and
22  ultimately even the jury will probably assume that
23  you did understand it, so if you do have a problem
24  with a question cut me off at the pass now, okay?

37

1 track of things?
2    A.  Me, too.
3    Q.  It is your understanding that the
4 Plaintiffs went to the ACLU for help and then
5 retained pro bono counsel?
6    A.  That is my understanding.
7    Q.  Okay.  Let me pose a more specific question
8 then.  What is your understanding about the ACLU's
9 ongoing connection with the litigation post
10 retention of pro bono counsel, if any?
11    A.  My understanding is that the ACLU would be
12 guiding them, providing the counsel and basically
13 running the case.  I'm not an attorney so I do not
14 understand the intricacies of running a case like
15 this.
16    Q.  And where did you get that understanding?
17    A.  Reading the newspapers, listening to what's
18 on the radio, just understanding how the ACLU
19 generally does these kind of cases based on what
20 I've read in the past.
21    Q.  You understand that the ACLU has been made
22 an important part of the dialogue on this litigation
23 and the positions that the Board has taken in
24 connection with this litigation, correct?

38

1    A.  Rephrase that please?
2        MR. GOSSELIN:  Objection.
3    Q.  I'm trying to among all the people who have
4 spoken up in print, to you personally, a significant
5 portion of them have commented negatively or maybe
6 positively on the ACLU's connection to this
7 litigation, correct?
8    A.  I'd say that's a fair statement.
9    Q.  Are you concerned at all that the consensus
10 that you've identified among your constituencies is
11 affected by the ACLU's connection to this lawsuit?
12        MR. GOSSELIN:  Objection.
13    A.  No.
14    Q.  And is that because you are confident that
15 the ACLU is in fact connected to this lawsuit?
16    A.  No, that's not why.
17    Q.  You just don't care whether people are
18 making their decision based on the ACLU's
19 connection?
20    A.  No.
21    Q.  Explain to me why you are not concerned?
22    A.  Because I think that the issue rises beyond
23 the ACLU.  I mean they might be the attorneys in
24 this particular case and people can be turned on or

39

1 off by the ACLU and I know the ACLU has a number of
2 supporters and I believe that they have done some
3 very good things in the past and they will probably
4 do some good things in the future, but I think this
5 issue stands or falls regardless of what the ACLU
6 does or doesn't do.
7    Q.  I understand Dr. Hattier that that is your
8 view and I assure you that I do respect it.  My
9 question, though, had to do with your concern about
10 the reasons for the development of the consensus
11 among your constituents, that is to say are you
12 worried that they are making their decisions or
13 formulating their positions based in whole or in
14 part on the ACLU's alleged connection to this
15 lawsuit?
16    A.  No, sir.
17    Q.  Why is that it?
18    A.  Because I believe that the people of this
19 area generally, excuse me, genuinely believe that
20 the prayer before School Board meeting as we have
21 outlined it is something that is part and parcel of
22 the fabric of the community that has been going on
23 for many, many years.  Congress does it,
24 legislatures do it, it's printed above the halls of

40

1 the Supreme Court and I believe that they view this
2 as simply something that is either right or not, and
3 I don't think that it has much to do with what the
4 ACLU's feelings are.
5        You guys just happen to be the messenger,
6 well not the messenger, you guys just happen to be
7 the ones working with the other side.
8    Q.  You guys being?
9    A.  I'm assuming, sir that you are working
10 or associated with the ACLU and if that's a false
11 assumption then I would stand corrected.
12    Q.  And you've given me the basis for that
13 assumption already, correct?
14    A.  Well, I'm assuming that I'm assuming that
15 since the ACLU has become involved in the case and
16 you are the attorney working with the Does and the
17 Dobriches that you would be associated with them.
18 And if that's not a valid assuming please correct
19 me.
20    Q.  When you gave your answer about Congress
21 opening its sessions and it being printed above the
22 doors of the Supreme Court what did you mean by the
23 it?
24    A.  Specifically Congress opens with a prayer

81

1  why don't we send you some materials?

2  A.  Yes.

3  Q.  And then they send you some materials?

4  A.  Yes.

5  Q.  Which constituted three cases and a

6  discussion of those cases?

7  A.  Essentially that is what I recall, yes.

8  Q.  Okay, and do you have a copy of that

9  package still in your file?

10  A.  No, sir.

11  Q.  What did you do with it?

12  A.  Pitched it same as I do most things.

13  Q.  Was that package considered -- distributed

14  to Board members?

15  A.  It was distributed to the Board members, I

16  made copies of it at my expense to that they would

17  have some better understanding of what, again I'm

18  not an attorney, let us be clear about that, but as

19  a lay person what I understand.

20  Q.  And did you simply distribute the ADF

21  package or did you provide a summary of it as you

22  understood it?

23  A.  No, sir I simply provided the package.

24  Q.  And did you thereafter have any further

82

1  conversations with ADF representatives?

2  A.  Not that I can recall.

3  Q.  E-mail correspondence?

4  A.  Not that I can recall.

5  Q.  And I take it that you have no light to

6  shed on what an ADF representative would have said

7  that he represented the Indian River School District

8  in connection with this litigation?

9  A.  As I understand it the ADF had expressed a

10  willingness to work with us, but that they were not

11  able to find a Delaware based attorney that could

12  work with us.  That's as I understand it issue.  I

13  think the closest they came was Kentucky, and don't

14  ask me why that sticks in my memory.

15  Q.  I thought that's where they were, but I

16  might be wrong.  Okay, I've asked you questions

17  about your communications with ADF representatives.

18  Do you know of your own knowledge whether there were

19  any communications following the receipt of the

20  August package, let's call it, between any

21  representative of the district and any

22  representative of the Alliance Defense Fund?

23  A.  I believe that there were.

24  Q.  Written communications or telephone

83

1  conversations?

2  A.  I'm making an assumption her but I believe

3  that there were both.

4  Q.  And I think we have been over this already,

5  your best guess is that it would be Miss Hobbs who

6  had those conversations or those communications?

7  A.  Yes, sir.

8  Q.  Now, in describing the Alliance Defense

9  Fund you told me earlier that you view them as being

10  allied with more traditional American values, do you

11  recall that?

12  A.  Yes, sir.

13  Q.  What do you mean by that?

14  A.  That's a good question.  I see them as

15  supporting more of what, certainly what I grew up

16  with as a young person in the 1950s, and just

17  supporting more of a family unity, more traditional

18  marriage, more traditional child rearing, the First

19  Amendment I think there are probably more in favor

20  of things like prayer at legislative sessions, board

21  meetings opening with things like that.

22  Q.  Do you view opening the School Board

23  meetings with a prayer as consistent with

24  traditional American values as you understand them?

84

1  A.  Yes, sir.

2  Q.  Do you view prayer in school during the

3  schools, during the school day as consistent with

4  traditional American values?

5  A.  If you are a student taking a test, yes

6  sir.

7  Q.  Do you view district or teacher sponsored

8  or led prayer in school as consistent with

9  traditional American values.

10  MR. GOSSELIN:  Objection, don't

11  answer that.

12  MR. ALLINGHAM:  Attorney/client

13  privilege?

14  MR. GOSSELIN:  No.  You can try to

15  bring in the rest of the issues in the case

16  every time we have one of these go off on a

17  tangent --

18  MR. ALLINGHAM:  Relevance or

19  privilege?

20  MR. GOSSELIN:  The court order.

21  MR. ALLINGHAM:  Relevance?

22  MR. GOSSELIN:  Well, no, the court

23  order, there is a court order describing

24  what the topics of discover can be in this

85

1     phase of the litigation.
2     Q.   Did the district ever retain Mr. Neuberger
3   to be its attorney?
4     A.   No, sir.
5     Q.   Did the district ever retain the Rutherford
6   Institute to be it's attorney?
7     A.   No, sir.
8     Q.   Did the Board ever, Board of the district
9   ever consider retaining either Mr. Neuberger or the
10  Rutherford Institute as its attorney?
11    A.   Yes, sir.
12    Q.   When was that?
13    A.   Again time frame on or about September,
14  October of 2004.  Possibly as late as November.
15    Q.   And I take it the decision was made not to
16  retain Mr. Neuberger and the Rutherford Institute?
17    A.   No, sir.
18    Q.   Tell me how it came to be that they did not
19  represent you?
20    A.   Mr. Neuberger chose not to represent us.
21    Q.   Did he tell you why?
22    A.   Yes, sir.
23    Q.   What did he say?
24    A.   He felt that we were not a unified body --

86

1   well let me back up.  Mr. Neuberger came and spoke
2   to us one evening about all of this.  He came
3   extremely well prepared.  He came prepared with what
4   I considered to be a lot of precedents and other
5   material.  A lot of discussions on the issue, and he
6   gave us some good information.  He essentially gave
7   us the choice of accepting him or rejecting him that
8   evenings.
9         Now, in my family my father and mother
10  always taught me that is somebody puts it to you
11  that way that basically you probably want to walk
12  away from it for at least 24 hours.  I don't buy
13  anything on the spot.  I walk away from it, I will
14  think about it for 24 hours, if it's a good deal we
15  will come back to it.  That apparently in my opinion
16  offended Mr. Neuberger and by the following day he
17  had withdrawn his offer.  This is as I understand
18  it.
19    Q.   Seems a little imperious.
20         MR. GOSSELIN:  Objection.
21    A.   No comment.
22    Q.   You mentioned that Mr. Neuberger came very
23  well prepared, did he bring a package of materials?
24    A.   Yes, he did.

87

1     Q.   Were the distributed to the Board?
2     A.   Yes, they were.
3     Q.   Do you still a copy of those materials that
4   he distributed?
5     A.   No, sir.
6     Q.   We talked about the Board's consideration
7   of retaining the Alliance Defense Fund or the
8   Rutherford Institute.  The Board had an attorney  at
9   that time for regular Board matters, is that
10  correct?
11    A.   Yes, sir.
12    Q.   Who was that?
13    A.   That was Mr. Jim Griffin.
14    Q.   And did the Board consult Mr. Griffin on
15  the issues presented by this lawsuit?
16    A.   Yes, the Board did.
17    Q.   But ultimately decided not to use
18  Mr. Griffin for this purpose?
19    A.   That is correct.
20    Q.   Why was that?
21    A.   I think the general feeling was that we are
22  dealing with First Amendment constitutional law and
23  Mr. Griffin is a general attorney and much like you
24  would not see me for low back surgery, the idea was

88

1   to speak to somebody who was more qualified or
2   competent in that particular area of law.
3     Q.   So, I take it you didn't ask Mr. Griffin
4   for advise on this litigation?
5     A.   We asked his opinion.
6     Q.   What did he tell you?
7         MR. GOSSELIN:  Objection, don't
8     answer that.
9     Q.   Did Mr. Griffin distribute any materials to
10  the Board on this issue?
11    A.   I believe that he did send a memorandum of
12  sorts to Mrs. Hobbs which was photocopied to us.
13    Q.   But I think you discarded your copy?
14    A.   Absolutely.
15    Q.   I don't want you to tell me what it was,
16  but do you recall the substance of the advise that
17  Mr. Griffin gave the Board?
18    A.   Yes.
19    Q.   I apologize, I'm just making a record, Mr.
20  Gosselin is going to object.  What was the substance
21  of the advice that Mr. Griffin gave the Board on the
22  issues presented by this lawsuit?
23         MR. GOSSELIN:  Objection,
24    don't answer that.  Is there a good faith

121

1   post, is that post that you wrote and posted to the
2   WMGD forum?
3   A.  Yes, it is.
4   Q.  And what's reflected in that post you
5   believed to be, and continue to believe that that is
6   reflective of your beliefs?
7   A.  Yes.
8   Q.  Now, on 832, same questions, is it correct
9   that this is a post that you wrote, dghattierdc?
10  A.  Yes.
11  Q.  And it reflected your views as of that
12  time?
13  A.  Yes.
14  Q.  And it reflects your views today?
15  A.  Yes.
16  Q.  At the end of that post you write,
17  unfortunately with historic research lots of things
18  can be taken out of context and argue in a number of
19  ways.  It is best to look at the whole body of what
20  the founders said and did and not just parts of it.
21  A.  Yes.
22  Q.  You did not intend in this post to provide
23  to the reader the whole breadth of what the founders
24  said and did, did you?

123

1   Christ.  And either way it appears to be telling
2   someone how to use their free speech.  Does that
3   accurately reflect your views?
4   A.  Yes.  You can read on, which violates the
5   First Amendment protections against free speech.  A
6   true catch 22.
7   Q.  In that post you write a Christian without
8   mentioning Christ is denying Christ?
9   A.  Yes.
10  Q.  Which is the question that I asked earlier?
11  A.  I was perhaps more specific in this post
12  than I'm in my own personal life, but as I indicated
13  earlier to lots of Christians without mentioning
14  Christ is denying Christ, if you don't mention
15  Christ for a lot of Christians.
16  Q.  So, for you personally to offer a prayer
17  that doesn't mention Christ is not denying Christ?
18  A.  Not at all.
19  Q.  But you believe that there are Christians
20  for whom offering up a prayer that doesn't mention
21  Christ would be denying Christ?
22  A.  Yes, sir.
23  Q.  And would offering up no prayer at all be
24  denying Christ for such Christians?

122

1   A.  No.
2   Q.  As with all people you were picking and
3   choosing?
4         MR. GOSSELIN:  Objection.
5   A.  I believe that what I was doing was
6   countering some of the discussions in the previous
7   postings.
8   Q.  Which also offered only a partial view of
9   what the founds said?
10  A.  Correct.
11  Q.  Turn if you would to 829.  In this post you
12  will see it's dated March 17, 2006, dghattierdc and
13  this is a post that you wrote and which you believe
14  belief to be accurate?
15  A.  Yes.
16  Q.  And reflected your views at the time and
17  today?
18  A.  Yes, I believe so.
19  Q.  Down at the bottom of the page you write,
20  in my mind a prayer, be it sectarian or
21  nonsectarian still steps on someone's toes.  For
22  those who don't like prayer of any kind it's
23  offensive, for a Muslim it's really bad, for a
24  Christian without mentioning Christ it's denying

124

1   A.  No, but it would be denying free speech.
2   Q.  Page 820.  Is this a post that you wrote?
3   A.  Yes.
4   Q.  And which you believe to be accurate
5   then --
6   A.  Yes.
7   Q.  Believe to be accurate then and now?
8   A.  Yes.
9   Q.  The last paragraph of this post refers to
10  your belief that support for the revolution was
11  never 100 percent.  My reading of history shows
12  maybe 35 to 40 percent.
13        MR. GOSSELIN:  What page are we on
14  here?
15  A.  Page 821.
16        MR. ALLINGHAM:  Page 821 at the
17  bottom.
18  Q.  A little bit earlier you say, as the
19  founders once said,  and for the support of this
20  declaration with a firm reliance on the protection
21  of the divine providence, we mutually pledge to each
22  other our lives, our fortunes and our sacred honor?
23  A.  Yes, sir.
24  Q.  And then you note that remember support for

157

```
1    Q.   How did it change the practice?
2    A.   Previous time periods I seem to recall one
3  or two individuals opening with prayer on somewhat
4  regular basis, at least for the parts that I paid
5  attention to.  I believe that as a result of this we
6  have included a lot more people and rotated it
7  around on a more regular basis than we certainly did
8  prior to that.
9    Q.   Was that a change that you agreed with?
10   A.   Yes, sir.
11   Q.   Did you do view that as beneficial?
12   A.   Yes, sir.
13   Q.   Why did you view it as beneficial?
14   A.   Because it included more people's opinion.
15   Q.   Any why is it useful to include more
16 people's opinions?
17   A.   If we are representing a broad
18 cross-section of the public from five different
19 areas with ten different individuals, it would be
20 nice if we all had an opportunity to be heard.
21   Q.   Why wouldn't that same policy as you
22 suggest that you should have prayers from a broader
23 spectrum than merely the ten Board members?
24   A.   Because if my reading of the law is
```

158

```
1  correct, and again I'm not an attorney, but if my
2  reading of the law is correct, if we invite outside
3  people to come in you actually increase the
4  likelihood of there being a problem.  In some of the
5  cases that I read it seemed to me that it just
6  seemed to increase the potential for problems.
7    Q.   All right coming back to the issue of the
8  discussion of the Rutherford draft, Hattier Exhibit
9  12, I'm going to try to help you, to quote Jerry
10 McGuire have you help me, in figuring out when this
11 policy was first discussed.
12        MR. ALLINGHAM:  I want to mark as
13    Hattier Exhibit 13 a document bearing Bates
14    number BPD1291 and 1292.
15        (WHEREUPON Hattier Exhibit 13 was
16    marked for identification)
17   Q.   Dr. Hattier, you've been in litigation
18 before so you may know, but I always explain to
19 people, redacted is a lawyer's word meant to
20 indicate that some material has been taken out or
21 masked from the document.
22   A.   Correct.
23   Q.   But some portion of the minutes of a
24 special Board meeting on August 23 executive session
```

159

```
1  is reflected here.  Do you recall that on the day
2  before the have large meeting on August 24th the
3  Board held a special meeting at the Sussex Central
4  Middle School Library?
5    A.   Yes.
6    Q.   Do you recall for what purpose that special
7  meeting was called?
8    A.   If I'm not mistaken it was called to
9  discuss, geez, I believe it was called to discuss
10 the entire issue of the prayer at the graduation as
11 well as potential prayers before School Board
12 meeting.  That's what I seem to remember.
13   Q.   Sort of the global prayer in school issue?
14   A.   Yes, sir, it was a global in my mind it was
15 a global conversation, that's a good word.
16        MR. ALLINGHAM:  Okay, off the
17    record for a minute.
18        MS. DUPHILY:  We are going off the
19    record at approximately 2:07 p.m.
20        (WHEREUPON a brief recess was
21    taken)
22        MS. DUPHILY:  Back on the
23    record at approximately 2:11 p.m..
24        MR. ALLINGHAM:  Let's mark as
```

160

```
1  Hattier Exhibit 14 a document bearing Bates
2  numbers IRSD45360 through 5362.
3        (WHEREUPON Hattier Exhibit 14 was
4    marked for identification.)
5    Q.   I'm trying to just put together how this
6  worked, Dr. Hattier.  So, let me start with Hattier
7  Exhibit 14 which is, I believe the minutes of the
8  special meeting on Monday August 23, is that
9  correct?
10   A.   Yes, sir, that's what it appears to be.
11   Q.   And you are reflected as present both on
12 the roll call which is the last page and I think
13 also on the roll call reflection on the second page
14 of the minutes?
15   A.   Correct, sir.
16   Q.   The meeting was called to order at 7
17 o'clock and moved immediately on a motion by
18 Mr. Helms, seconded by you to go into executive
19 session to seek advice from our legal counsel
20 regarding potential litigation.  And right under
21 that are A and B, strategy session to discuss
22 collective bargaining, pending or potential
23 litigation and such other business as may properly
24 be discussed in an executive session.  Am I correct
```

189

1    Q.    The decision of the Board let me start
2    again.  Did the Board arrive at a consensus that it
3    was a legislative body?
4    A.    I believe we did.
5    Q.    Do you know when it arrived at that
6    consensus?
7    A.    No, sir, I do not.  Somewhere through all
8    of this.
9    Q.    Well, there was this long four hour
10   meeting, did the Board arrive at it at that
11   executive session meeting or was it later than that?
12   A.    I'm going to make a guess that we had
13   arrived as a body by the time that that meeting was
14   over that is where we were.
15   Q.    Okay, the conclusion at the, and the only
16   part of this executive session minutes that I have,
17   says it was not felt that a decision could be made
18   there evening regarding whether or not to change our
19   past practice.
20        My question to you is, if you had arrived
21   at a consensus that the Board was a legislative
22   body, and if it was a legislative body it fell under
23   Marsh, and if it fell under Marsh it could open its
24   meetings with a prayer, and all of your constituents

190

1    wanted you to open your meetings with a prayer, why
2    was it that it was not felt by the Board presumably
3    that a decision could be made this evening regarding
4    whether or not to change our past practice?
5    A.    I believe that was because as lay people
6    we were looking at that as an opinion rather than a
7    statement of fact and that we probably still needed
8    more guidance on the issue in order to proceed.
9    Q.    Okay.  So, as lay people you arrived at a
10   consensus but you wanted more information?
11   A.    Yes, sir.
12   Q.    Where did you think that you were going to
13   get that information?
14   A.    From an attorney.
15   Q.    Was there an attorney present during this
16   four hour 15 minute executive session?
17   A.    If I remember right this may have been the
18   time period where Mr. Neuberger talked to us.  It
19   may have been, okay, I don't specifically recall.
20   It was tie either some time in August or possibly
21   some time in September when he talked to us.  I do
22   remember one very long meeting that we had.
23   Q.    If you look at the minutes of August 23rd,
24   which is Exhibit 14?

191

1    A.    Right.
2    Q.    You will see that under other visitors and
3    staff in attendance, Mr. Neuberger is not listed but
4    Mr. Griffin is?
5    A.    August which date, sir?
6    Q.    August 23, it's Exhibit 14.  Not the
7    executive committee, the regular meeting.  If you
8    look at the stickers you will see the exhibit
9    numbers?
10   A.    Well, then that wasn't the meeting he was
11   here.  Okay then he wasn't here that meeting then it
12   means that we met some time in September.
13   Q.    The person who was present at that meeting
14   was Mr. Griffin, is that correct?
15   A.    Correct.
16   Q.    And the Board had an opportunity to discuss
17   with Mr. Griffin whether the Board was a legislative
18   body?
19   A.    Yes, sir.
20   Q.    Did the Board discuss with Mr. Griffin
21   whether the Board was a legislative body?
22   A.    I believe we probably did.
23   Q.    So, you had already gotten advice from a
24   lawyer about whether the Board was an executive body

192

1    as of the time that you concluded that you couldn't
2    make a decision?
3    A.    You know, as I stated to you earlier, sir
4    Mr. Griffin is a general attorney and for what we
5    were discussing and with the potential for
6    litigation we felt that it would be better to pick a
7    different attorney for another opinion.
8         In my opinion Mr. Griffin, and he is a find
9    attorney, Mr. Griffin has served our district
10   extremely well over the years, but he is a general
11   attorney and his issues do not run into the First
12   Amendment as a general rule.  He would do contract
13   law he would do personal issues, but, you know,
14   First Amendment issues are not the sort of thing
15   that routinely come across his desk.
16   Q.    So, you wanted to consult a First Amendment
17   specialist?
18   A.    That was my general feeling, yes, sir.
19   Q.    Was that the consensus of the Board by the
20   end of the August 23 executive session?
21   A.    I would have to speculate that the answer
22   is yes.
23   Q.    And did somebody say in words or substance
24   we better get ourselves a First Amendment Specialist

197

1    A.   No, I did not.

2    Q.   At the special meeting on August 23 was

3    there any discussion of the fact that there was

4    going to be a regular meeting on August 24?

5    A.   Yes, sir.

6    Q.   And tell me what the substance of that

7    discussion was?

8    A.   That we were going to discuss it on August

9    24th?

10    Q.   Was there anything that you would be able

11    to discuss on August 24th that you couldn't have

12    discussed on August 23rd?

13    A.   Yes.

14    Q.   What was that?

15    A.   Because if you figure that we blocked out

16    four hours to simply discuss all of this in one

17    meeting that would have put us home Wednesday tome

18    time at 3:30 or 4 o'clock in the morning and since

19    virtually all School Board members are volunteers

20    non-paid and we have other jobs we would not be able

21    to discuss the issue all in one shot.

22        This was a way for to us get together and

23    discuss the issue and then still be able to do the

24    School Board functions the next day.  That's how I

198

1    looked at looked it.

2    Q.   Sure, but as you said the reason that you

3    couldn't make a decision on August 23rd was that you

4    wanted to get the advice of a First Amendment

5    specialist?

6    A.   Right.

7    Q.   Other than Mr. Griffin and different from

8    Mr. Griffin on the issue of whether the Board was a

9    legislative body or not.  You weren't going to have

10    that by August 24th were you?

11    A.   No, I don't believe we were.

12    Q.   Was there any discussion of, you know,

13    where you should have that August 24th meeting?

14    A.   In the normal rotation.

15    Q.   Was there any discussion of whether there

16    was a overflow expected?

17    A.   No, sir, I don't believe that came up.

18    Q.   Did you expect there to be an overflow at

19    that August 24 meeting?

20    A.   No, I did not.

21    Q.   Prior to the August 24 meeting you had had

22    occasion to discuss the issue of School Board prayer

23    on a talk show hosted by a Dan Gaffney, is that

24    right?

199

1    A.   Yes, sir.

2    Q.   Were you invited to go on that talk show?

3    A.   No, I'm pretty sure I just called to answer

4    some of the public's questions about it.

5    Q.   was it your hope that the public's interest

6    would be engaged in this important issue by your

7    appearing on the WGMD talk show?

8    A.   No, sir.

9    Q.   What was your hope in appearing --

10    A.   That I would be able to clear up the

11    factual misconceptions which were out there.

12    Q.   So, you had identified some factual

13    misconceptions?

14    A.   Quite a few.

15    Q.   Can you tell me what they were?

16    A.   Yes, sir there were a lot of people who

17    were saying we were taking prayer out of school all

18    together.  When essentially that was something that

19    had already been done a long time ago.  There were

20    people who -- it essentially ran along those lines.

21    In other words, they did not understand what the

22    real issues in the case were and the way I

23    understood them at the time and still do, is that we

24    had the issue of any kind of a prayer or benediction

200

1    at a graduation, Baccalaureate ceremony and prayer

2    before the School Board meetings.

3        I mean essentially that's what it was, it

4    had nothing to do with the way I saw it teachers

5    leading kids in prayer in schools or offering an

6    early morning prayer over the loud speaker.  For

7    some reason a good number of the general public

8    seemed to have felt that that was something that we

9    were still doing when in point of fact that's been

10    out of the program for many many, many years.

11    That's if it ever was in our program to begin with.

12    And I'm not aware of any of that since consolidation

13    around the 1970s.

14    Q.   How did the misconceptions come to your

15    attention?

16    A.   By the types of phone calls and comments

17    and by the types that we talked about earlier.  I

18    mean if you go back and look at some of the letters

19    to the editor that were written there, it was quite

20    clear that a lot of people did not understand all of

21    it.

22    Q.   I might have asked you this question and it

23    just got lost in my backs and forths.  Did you

24    suspect there to be an overflow at the August

217

1   policy.
2   Q.   Do you recall, do you have a specific
3   recollection in your mind of the tenor of the public
4   comments at the August 24 meeting?
5   A.   Everything from very respectful to very
6   angry.  I mean it swung a huge gamut.
7   Q.   Were there comments that you found
8   offensive?
9   A.   Yes.
10  Q.   Was anything done to curb the offensiveness
11  of those comments?
12  A.   As is noted under the public comments
13  section, it is our job to listen, not, it is a one
14  way conversation.  It is not our policy to comment
15  as a rule on what people say unless they get out of
16  line in terms of mentioning names.  That has
17  happened in which case we have shut it down.  I
18  think in some cases here we probably could have told
19  people to tone it down and didn't.
20      I mean like I said there were some things
21  that in my opinion went a little bit out of hand.
22  But when you are dealing with a large group of
23  people like that and everybody does have a right to
24  speak, you do not she screen beforehand what they

218

1   are going to say.
2   Q.   Did the comments at the public comment
3   portion of the August 24 meeting confirm your view
4   that many members of the public understood the
5   School Board Prayer Policy to be an issue of whether
6   or not the Board would be preserving Christian
7   values.
8   A.   No.  As a matter of fact, if I came away
9   with any impression at all it's that a huge amount
10  of people did not understand what the real issue was
11  and if you have listened to it, I think you would
12  agree that a lot of people did not really understand
13  what this was about.
14      Most of them in my opinion felt that more
15  or what was happening in here was changing something
16  that had been in our community for again at least
17  the 30 some odd years that we can document for sure,
18  and probably prior to that.
19  Q.   Yes, and if that practice was preserved as
20  people were urging, you understood that they were
21  urging its preservation as a way to preserve
22  Christian values, isn't that correct?
23      MR. GOSSELIN:  Objection.
24  A.   I would have seen it more as a way of

219

1   preserving what has been in the community for the
2   last 30 or 35 years.  Again, everybody looks at
3   religious in their own way.  Some people understood
4   it for the splenification that it is and some people
5   simply felt that something was being stripped away
6   from us period.  So, I don't think you can lump them
7   all into one category.
8   Q.   Well, fair enough, I didn't mean suggest
9   that there was unanimity of expression, but didn't
10  you understand a number of the comments to be urging
11  the Board to preserve the existing practice in order
12  to preserve Christian values?
13  A.   Some people --
14      MR. GOSSELIN:  Objection.
15  A.   I'm sorry, sir.
16      MR. GOSSELIN:  Wait until he is
17  done asking the question, give me a chance to object
18  which I am doing here.  Now you can answer the
19  question.
20  A.   Okay, thank you.  I apologize.  I'm certain
21  there were people who felt that way and did that,
22  yes.
23  Q.   Look at Hattier Exhibit 9 which is the
24  policy itself.  You told me that it changed the

220

1   Board's practice on prayer at regular Board meetings
2   in one respect, which is that it expanded the number
3   of Board members offered the opportunity to
4   solemnize the proceedings either with a prayer or a
5   moment of silent whatever?
6   A.   Right.
7   Q.   The policy itself, though, provides that if
8   a member chooses not to exercise the opportunity the
9   next member in rotation shall be given the
10  opportunity, correct?
11  A.   That is what I understand, yes.
12  Q.   So, unless all ten members decline the
13  opportunity there will be a prayer or a moment of
14  silence in accord with the freedom of conscience of
15  the individual adult Board members, is that right?
16  A.   That is the way it's written.
17  Q.   In practice, since you offered the prayer
18  at the August 24th meeting, since that time has
19  there been any meeting at which there has, a Board
20  member has not taken up the opportunity to solemnize
21  the proceedings?
22  A.   I believe that to be true.  Some of them
23  have not chosen to, have chosen not to speak or not
24  to pray or whatever.

229

1    versus the regular district meeting in which case we
2    started right at 7:30 and gave it at that time.
3    Q.   Fair enough.  So what you are referring to
4    in Hattier 18, the September 28 minutes is that on
5    page two of the minutes after the presentation there
6    is a statement president Wells stated it's been the
7    history and custom of the Indian River School
8    District Board of Education to open its meetings
9    with a prayer.  He noted that the prayer is
10   voluntary and among the members of the Board.  He
11   then asked Dr. Hattier to give an invocation?
12   A.   Yes.
13   Q.   And this the second straight meeting at
14   which you gave an invocation?
15   A.   You know, I don't remember giving the
16   second one, but if it says I did, I must have.
17   Q.   You must have known in advance?
18   A.   I must have known in advance.  I don't
19   remember the second one at all, but I must have.
20   Q.   Do you remember what prayer you gave?
21   A.   No, I do not.  Knowing my past practice it
22   would have been another historical one.
23   Q.   This history and custom of the Indian River
24   School District Board of Education to open its

230

1    meetings with a prayer, is that a custom and
2    practice of opening its public meetings with a
3    prayer, its special meetings with a prayer, its
4    public sessions, its closed session, is there any
5    consistent practice?
6    A.   I'm going to belief that the consistent
7    practice was the public sessions.  That's the way
8    it's been ever since I have been on the Board and
9    I'm pretty sure that's the way it was in the past.
10   Q.   Is it correct that the Board does not open
11   its executive sessions with a prayer?
12   A.   No.  We've already opened at that particular
13   point, it's merely a continuation.
14   Q.   Well, in this particular Board meeting you
15   had already met in executives session for 45
16   minutes?
17   A.   To my knowledge the time being on the Board
18   we've never opened it early with prayer, we've
19   always opened it around either before or after the
20   presentation of colors.  That's just been part of
21   the general opening up of the way the Board runs.
22   Q.   I take it then that on September 28th at
23   least you didn't feel the need to solemnize the
24   proceeding until 7:30?

231

1    A.   The executive sessions or anything that we
2    do beforehand from what I can recall has never been
3    treated in that fashion.  I believe that we viewed
4    it for the School Board meeting itself.
5    Q.   Is there any difference in terms of the
6    importance of taking your duties seriously --
7    A.   In point of no, I agree.
8    Q.   Discharging them to the best of your
9    ability?
10   A.   Correct.
11   Q.   Is it just a historical accident that you
12   opened the public meetings with a prayer but don't
13   open the closed meetings with a prayer?
14   A.   As I said --
15        MR. GOSSELIN:  Objection.
16   A.   My apologies.  As I stated, it has been the
17   history and practice of the district for at least as
18   long as I can remember that it's around the time of
19   the presentation of the colors.  I believe at this
20   point we have moved it before the colors.  There are
21   times when we did it after the colors.
22   Q.   In that very lengthy meeting on August 23rd
23   do you recall whether the closed session opened with
24   a prayer?

232

1    A.   No, it would not have.
2    Q.   Do you recall whether the meeting itself
3    opened with a prayer?
4    A.   On the very lengthy one you mean the August
5    23rd meeting --
6    Q.   The August 23rd meeting --
7    A.   No, I don't believe it would have opened
8    with a prayer.
9    Q.   Is that because that was a special meeting?
10   A.   I believe so, yes sir.
11   Q.   There is no reason to distinguish between
12   the importance of Board members' performance of
13   their duties on August 23 and say August 24, is
14   there?
15   A.   No, in point of fact no, I agree with that.
16   But that has not been the history or the practice of
17   the district for again as many years as I can
18   recall.
19   Q.   Well, let me ask the question bluntly, do
20   think it's any less important to solemnize the
21   proceedings, it was any less important to solemnize
22   the proceeding on August 23rd than it was on August
23   24th?  It was equally important on both dates,
24   wasn't it?

237

1  right?

2  A.  Yes, I did.

3  Q.  Let's go back to Hattier Exhibit 19.  Oh,

4  by the way at the September 28th Board minutes, this

5  is Hattier 18, there is still no public discussion

6  of the Board Prayer Policy, is there?

7  A.  You said the 28th, correct?

8  Q.  Yeah, Hattier Exhibit 18?

9  A.  No, it looks like the only thing we did at

10  that time period was the committee first and second readings.  Actually all

11  committee first and second readings.  Actually all

12  first readings.

13  Q.  And there were a couple of executive

14  sessions where again the rubric of pending and

15  potential litigation is --

16  A.  Correct.

17  Q.  Is it your belief that you may have

18  discussed the School Board prayer and other prayer

19  polices during those executive sessions?

20  A.  Probably.

21  Q.  Now, in the October 19 minutes, if you will

22  look at page five, you will see that under policy

23  committee --

24  A.  Uh-hum.

238

1  Q.  -- there is a second reading and

2  recommended approval and subsequent approval of four

3  new policies including Board prayer, religion and

4  school prayer at commencement, graduation and

5  baccalaureate, do you see that?

6  A.  Uh-hum.

7  Q.  And there was no public discussion of these

8  policies at any time prior to this approval either,

9  was there?

10  A.  Not unless Mr. Walls did it separately from

11  what I'm aware of.

12  Q.  Separately outside of the Board meetings

13  which these minutes record?

14  A.  In other words, at his policy committee

15  meetings.

16  Q.  Fair enough.  You are not on the policy

17  committee?

18  A.  No, sir, I'm not.

19  Q.  At any rate the full Board never had a

20  public discussion of the School Board Prayer Policy,

21  is that right?

22  A.  That is correct.

23  Q.  And is that the custom and practice of the

24  Board to have no public discussion of a policy

239

1  that's being adopted?

2  A.  Well, the idea is that you read it at the

3  meeting on a first reading and then if the public

4  has a comment, they would contact the schools or I

5  don't think they speak up at the meetings

6  themselves, but the idea is that if you have an

7  objection to it that you would contact the

8  administration and they would make whatever

9  appropriate changes would need to be made.  That's

10  the way I understand it.

11  Q.  Yes, sir, my question was whether the Board

12  typically at some point prior to the adoption of a

13  policy engages in public discussion of the policy

14  and the reasons for it?

15  A.  No, not to my knowledge.

16  Q.  Why did you vote for the Board Prayer

17  Policy?

18  A.  I felt it was the right thing to do.

19  Q.  The Board Prayer Policy as we've

20  established is in substance identical to the and

21  mostly verbatim to the hanging of the proposed

22  policy that was given to you by the Rutherford

23  Institute back in looks like August 30th or

24  thereabouts?

240

1  A.  Somewhere in there, yes, sir.

2  Q.  Did you ever have an opportunity to ask

3  anyone representing the Rutherford Institute where

4  it got the language in these policies?

5  A.  No, I did not.

6  Q.  Was there any discussion of the language in

7  these policies at any time at the Board level?

8  A.  This would have been discussed at an

9  executive committee meeting.

10  Q.  Executive session?

11  A.  Executive session, I'm sorry, yes, sir.

12  Q.  At any time did anyone offer any other

13  purpose for the Board Prayer Policy other than to

14  solemnify its proceedings?

15  A.  No they did not.

16  Q.  No Board member ever suggested that it was

17  an appropriate policy to preserve Christian values?

18  A.  Not that I'm aware of.

19  Q.  Paragraph three says such opportunity, that

20  is the opportunity to pray, have a moment of

21  silence, such opportunity shall not be used or

22  exploited to proselytize, advance or convert anyone

23  or to derogate or otherwise disparage any particular

24  faith or belief.  Is it your view that that limits

265

1    Q.    -- in reporting that he was called Jew boy?

2    A.    Not a bit, I believe he probably was, okay.

3    On the other hand I don't know when he was called

4    that, I don't know what the age of the kids was

5    involved, and you know apparently you have children,

6    I'm going to make a guess, okay, we have four kids

7    and some of the nastiest people on earth are

8    children, especially to one another.  And it is up

9    to us as adults to discipline them and correct them

10   and teach them socially appropriate behaviors.

11       So, if some kid somewhere had a bad day and

12   decided to call some other child a name, certainly

13   it would not have been condoned by the school

14   district.  And I'm not doubting what the young

15   gentleman said at all.  I'm only wondering why Mrs.

16   Dobrich did not come forward if this was an issue

17   with her and say something to the school or the

18   appropriate school authorities about it.

19       Because again in my own case with what

20   happened to me at or about the same time period, we

21   had to deal with it immediately.  It was sent home

22   to us the guidance counselor had talked to the kids,

23   we had to write a letter of apology regarding it and

24   at this particular point Hannah and that young lady

266

1    do still get together as friends, and they associate

2    with one another.  That's why I say I don't doubt

3    the young gentleman.

4    Q.    You seem to be a pragmatic person, do you

5    really think that someone who called Alex Dobrich a

6    Jew boy come to the view that Alex and he

7    could be good friends?

8        MR. GOSSELIN:  Objection.

9    A.    Yeah, absolutely.  Look, my son is a bit

10   firery and I've heard him say things to the boy next

11   door and I've heard the boy next door say things

12   equally to my son and by the next morning they are

13   trying to figure out who can get the go-kart

14   started.

15       Okay, first off, do you have daughters?

16   It's a question, okay, I have found that girls in

17   general seem to be bit more difficult in name

18   calling than boys are.  Girls, young girls at least

19   seem to be a bit less forgiving about things than

20   young men are.  This is a general statement, but I

21   believe in a general it's probably true.

22   Q.    You are not suggesting, are you Dr. Hattier

23   that calling a girl fat and ugly is the equivalent

24   of calling one of the few Jews in a school Jew boy,

267

1    are you?

2    A.    I'm saying --

3        MR. GOSSELIN:  Objection.  Go

4    ahead.

5    A.    I'm saying that name calling is name

6    calling.  Whether it's slant eyes, four eyes buffalo

7    breath, again, pick one.

8    Q.    You think they are all the same?

9    A.    I believe it's an insult.

10   Q.    But you think they are all of equal

11   seriousness?

12   A.    I believe they are insults.

13   Q.    You are not answering my question --

14   A.    Yes, I do believe.

15   Q.    Do you believe they are of equal

16   seriousness?

17       MR. GOSSELIN:  Objection.

18   A.    Yes, I do, they are insults, and they

19   should be dealt with as such.

20   Q.    And you think that they, the discipline

21   that should be metered out should be the same for

22   someone who calls someone with braces tinsel teeth

23   as someone who called a boy wearing a yarmulke Jew

24   boy?

268

1    A.    I think.

2        MR. GOSSELIN:  Objection.

3    A.    Sorry.  I think they are both derogatory

4    and I think they are both designed to hurt another

5    individual and they are both designed to make

6    another individual feel small, and as such neither

7    one of them is acceptable behavior.  I mean if you

8    wish to put an emotional value of whatever type you

9    are certainly free to do so, but to me it's an

10   insult.

11       And my concerned at this particular time

12   period had been to see to it that we did have

13   something in our policies that would address those

14   issues, if we didn't already have them.

15   Q.    At the August 24 meeting do you recall a

16   comment in which someone suggested that Mrs. Dobrich

17   might disappear like Madelyn Murray-O'Hare?

18   A.    Yes.

19   Q.    How did you feel about that comment?

20   A.    As I told you earlier some things were said

21   that should not have been said and were clearly

22   inappropriate.

23   Q.    You understood that to be a threat to

24   Mrs. Dobrich did you not?

269

1   A.  Yes, I did.
2   Q.  What was done to silence that person from
3   making that threat in the context of that highly
4   volatile meeting?
5   A.  Not so much.
6   Q.  How made that threat?
7   A.  I couldn't begin to tell you.  We had a lot
8   of people talking that day.
9   Q.  Has it come to pass that someone in a
10  public comment session has been asked to sit down
11  because what they were saying was inappropriate?
12  A.  Yes.
13  Q.  And that's happened for example when
14  someone begins to discuss an individual school
15  district employee?
16  A.  Yes.
17  Q.  Because the Board has a policy to make sure
18  that concerns about individual school district
19  employees should be dealt with privately, not in
20  public?
21  A.  Yes.
22  Q.  But it's okay in your view, and in the
23  views of the Board to let members of the community
24  threaten Mrs. Dobrich with disappearance like a

270

1   renowned atheist who was later found dismembered?
2           MR. GOSSELIN:  Objection.
3   A.  All right, I think the best way to express
4   my feelings at that time would be stunned that
5   somebody would be stupid enough to make comments
6   like that in an open meeting.
7   Q.  Dr. Hattier, this person spoke for lost two
8   minutes did someone think about saying to Mr. Walls
9   tell that person to sit down?
10  A.  Not to my knowledge.
11  Q.  In retrospect do you think that you should
12  have done that?
13  A.  Absolutely.
14  Q.  And every other Board member should have
15  done it, don't you think?
16  A.  I would think so.
17  Q.  Was that the only threatening comment made
18  about Mrs. Dobrich at the August 24 meeting?
19          MR. GOSSELIN:  Go ahead.
20  A.  That's the one that I remember the most.  I
21  don't remember all of the specifics.  Like you
22  noted, there were a lot of people who talked that
23  particular day.
24  Q.  Do you remember comments that Alex Dobrich

271

1   should take his yarmulke off before he spoke before
2   that Board meeting?
3   A.  No.
4   Q.  Would you like me to show you the tape?
5   A.  I believe you.
6           MR. GOSSELIN:  Objection.  If you
7       have got a tape you can look at it.
8   Q.  Did you hear the comments that if Mrs.
9   Dobrich would merely raise her child right in the
10  Christian faith she wouldn't have any problems with
11  the district's practices?
12  A.  Comments like that might have been made.
13  Q.  Did you think those were appropriate?
14  A.  You know what --
15          MR. GOSSELIN:  Objection.
16      You can answer.
17  A.  Okay.  I'm not going to tell you how to
18  raise your child.  I'm not going to tell you how to
19  behave in public.  You know if you want to make a
20  fool out of yourself on the stand and go for it
21  that's your entire privilege.
22      Okay, and something like that as a
23  practicing chiropractor I'm used to people making
24  fun of what I do on a fairly regular basis.  And I'm

272

1   also sued to considering what the sources are and I
2   end up flushing most of it, okay.  So, if somebody
3   wants to make a fool out of themselves and make
4   comments like that in an open meeting to my mind the
5   thing speaks for itself.
6   Q.  Let me ask you this question.  Did you view
7   the atmosphere that existed at that meeting as
8   highly intimidating to Mrs. Dobrich and her family?
9   A.  It could have been seen that way --
10          MR. GOSSELIN:  Objection.
11  Q.  By Mrs. Dobrich?
12  A.  It could have seen that way.
13  Q.  Don't you think that the comment, some of
14  the comments that I just reviewed with you were
15  intended to intimidate Mrs. Dobrich and her family?
16          MR. GOSSELIN:  Objection.  Let's
17      take a break everybody seems to be getting
18      a little excited right here.  Let's take a
19      break, five minutes.
20          MR. ALLINGHAM:  I'd like an answer
21      to my question.
22  Q.  Don't you think those comments were
23  intended to intimidate Mrs. Dobrich and her family?
24  A.  I can't --

289

1    the next morning to do things.

2         You know in my business because I used my

3    hands is an issue, and that's something that I'm

4    hoping we can resolve in a pleasant way.

5    Q.   So, there has been an increase in the

6    number of awards given at the district level.  In

7    the other areas that I talked about, students

8    expressing their delight or concern on particular

9    aspects of school life, presentation of colors,

10   performances of students, is it correct that that

11   goes back a long time?

12   A.   As far as I know that goes back a long

13   time.

14   Q.   So, is it fair for me to infer that the

15   long time practice of opening School Board meetings

16   with prayers coincides with the attendance of

17   students at those meetings?

18   A.   Probably.

19   Q.   Have you ever heard any Board member

20   express opposition to student involvement in Board

21   meetings or support for limiting student involvement

22   at Board meetings?

23   A.   Recently.

24   Q.   Who is that?

290

1    A.   A lot of us simply because if there was a

2    way me could eliminate that first half an hour, 45

3    minutes it might get us home by 11 o'clock or 11:30.

4    Q.   Oh, that's the issue --

5    A.   Yes and that there might be a more

6    appropriate way to handle that particular item.

7    Others than that I'm not aware of any.

8    Q.   On the issue of the prayers that would be

9    offered you expect to be on a rotational basis at

10   least offered the opportunity to give prayers --

11   A.   Yes, sir.

12   Q.   -- before the Board meetings?

13   A.   Yes, sir.

14   Q.   Is it your intent to continue to use

15   historical prayers of some kind?

16   A.   Yes, it is.

17   Q.   The policy, the School Board Prayer Policy

18   was adopted in October of 2004, since that time has

19   a Board member offered a prayer or moment of silence

20   at the beginning of every meeting?

21   A.   I believe so.

22   Q.   And of those meetings can you give me a

23   ballpark so as to how many have opened with a prayer

24   and how many have opened with a moment of silence?

291

1    A.   Most I would say open with a prayer of some

2    type, or a statement of some type because I have

3    also used nonreligious individuals.  I've made

4    statements from Albert Einstein to open mine.  I

5    recall at least two occasions of moments of silence.

6    And I have not made every Board meeting, I make

7    about 11, between ten and 11 per year, so I'm not at

8    all have them.

9    Q.   The Albert Einstein statement, have you the

10   text of the statements or prayers that you've

11   offered?

12   A.   I might be able to find that one because it

13   was fairly recent.

14   Q.   Why did you pick the Albert Einstein

15   statement?

16   A.   Because Albert Einstein in that particular

17   one was referring to the existence of God and how

18   that that was something that should play a role in

19   folks' lives.  And that was a good way to look

20   beyond yourself.  I can't remember the exact quote.

21   I'm not very good at exact quotes.

22   Q.   And you obviously thought that that was adequate

23   to solemnize the proceeding?

24   A.   Absolutely.

292

1    Q.   You told me earlier there have been

2    instances in which a School Board member has

3    declined to offer a prayer or lead a moment of

4    silence?

5    A.   Yes.

6    Q.   Can you tell me which Board members did

7    that?

8    A.   I want to say that it was probably

9    Dr. Isaacs but I cannot say that with a sense of

10   assurety.

11   Q.   Is there only one that you recall?

12   A.   That's it.  My believe is that Mr. Bireley

13   will set these things up in advance to give us all a

14   chance to be prepared, and especially they know if I

15   do it that they know that I'm going to need a good

16   couple of days.

17   Q.   So, if Mr. Bireley sets these things up in

18   advance how did you know that Dr. Isaacs or whoever

19   it was had declined the opportunity?

20   A.   Because there was one Board meeting where

21   somebody did and that was early on when we were

22   still working non the process itself.  That would

23   have been maybe early 2005, I don't remember.  It

24   was something in that time frame.

301

1  which the Madelyn Murray-O'Hare comment was made?

2      A.   Not that I'm aware of.  I can't tell you

3  that.

4      Q.   Let me ask you personally, Dr. Hattier.  Do

5  you have same sympathy with the Doe's desire to

6  remain anonymous given what happened at the August

7  24th meeting?

8          MR. GOSSELIN:  Objection.

9      Go ahead.

10     A.   You know, I have a sympathy for them but

11 let me state that I actually have a high degree of

12 respect for the Dobrich family, all righty, I really

13 do.  I have a high respect for them because they

14 believed in something and they were willing to step

15 forward, just as I am now to defend the beliefs that

16 I have him.  All right, and I think that if somebody

17 wishes to hide behind anonymity on an issue, you

18 know they are doing it out of fear or whatever, but

19 if they are right they are right.

20     And my understanding is that the thing that

21 the Doe family was originally complaining about,

22 which had something to do with the Bible Club, which

23 I was not aware of at the time period, okay there

24 were right, we fixed it.  We corrected it.  Okay,

302

1  and other than I personally don't see what the issue

2  is.

3      Q.   You were personally present and observed

4  the treatment of Alex and Samantha Dobrich at the

5  August 24th Board meeting, correct?

6      A.   Yes.

7      Q.   Do think that the treatment of those two

8  children at that meeting, by community members,

9  might legitimately cause parents to be concerned

10 about the treatment that their children would get if

11 they relinquished anonymity?

12     A.   Yes.

13     Q.   I asked you earlier whether you are that

14 any of your children had tried to confirm who the

15 Does were and you said you were not aware of that?

16     A.   No, I would prefer that my children not

17 have a clue as to who they.

18     Q.   Am I also correct that you are not aware

19 that your wife or any member of your family has

20 taken any action to try to confirm who the Does are.

21     A.   I would hope not.

22     Q.   This is closing the loop for the record, I

23 would hope not means no you not area?

24     A.   Take that as a no, yes, well, whatever, no.

303

1      Q.   This can go quickly.  I have some

2  statements that you were quoted as having been to

3  the media.  I really don't want to, I don't think

4  debate these statements just want to confirm that

5  you were quoted accurately?

6      A.   Okay.

7      Q.   I may have a question or two but I think

8  it's going to be --

9          MR. ALLINGHAM:  This is Hattier

10 24.  The Bates number is P104 and 105.

11         (WHEREUPON Hattier Exhibit 24 was

12         marked for identification.)

13     Q.   There is taken from Sussex County Online.

14 You are reported in the one, two, three four, fifth

15 paragraph as having been, as having said,

16 "Dr. Donald Hattier who opened last week's meeting

17 with a prayer penned by George Washington admitted

18 the School Board's current stance on prayer wouldn't

19 hold up in court?"

20     A.   Incomplete quote.

21     Q.   Can you complete it for me?

22     A.   Yes.  Graduation prayer.  Graduation prayer

23 and prayer at school luncheons, other things.  If

24 you compare what we were doing with the DOJ cite it

304

1  would not hold up.  Incomplete quote.

2      Q.   Okay, so you did say this but you weren't

3  referring to the School Board prayer?

4      A.   No, I was not, I was referring to the other

5  issues.

6      Q.   And let me just ask you the question, and

7  are the current policies which have been adopted

8  since that time in your have view in compliance with

9  the Constitution?

10     A.   Lordy, I hope so.

11         MR. ALLINGHAM:  This is Hattier

12 25.  And I will tell you in advance, Dr.

13 Hattier I have only the second page of this

14 article from The Wave.  I don't know why.

15 It bears Bates number P122. I will see if I

16 can find the first page.

17         (WHEREUPON, Hattier Exhibit 25 was

18         marked for identification)

19     A.   Yes, final paragraph.

20     Q.   Is your comment accurately reported there?

21     A.   Yes.

22     Q.   Okay?

23     A.   And again though that's based on my

24 findings afterwards.  Okay, in other words, you look

321

1    woman had an edge in her voice the entire time she
2    was giving the interview and I was very concerned
3    that she was not going to be quoting me correctly
4    and as it turns out I don't believe she did.
5    Q.   Okay, so you don't think that volunteer
6    work is your word?
7    A.   No.
8    Q.   Okay, that's fine.  I just wanted to know.
9    You are reported two paragraphs below that as saying
10   that, "prayer works, look at the test scores in
11   Indian River, look at the number of superior schools
12   we have and the number of blue ribbon schools.  We
13   have done good and part of that is because of
14   prayer."
15   A.   I believe that.
16   Q.   Did you say that to her?
17   A.   Something to this effect, yes, I did.
18   Q.   Part of that is because of prayer is a
19   generic statement.  Do you believe that the
20   district's superior performance is as you've layed
21   them out here are due in part to the opening of
22   School Board meetings with a prayer?
23   A.   I think that's probably part of it, yes.
24   Q.   And explain to me how the opening of School

322

1    Board meetings with a prayer contributes to improved
2    academic performance of the students?
3    A.   In the same sense the George Washington and
4    a lot of our founding fathers made the statement
5    that you cannot have a good nation without studying
6    religion and morality and without putting the glory
7    of God ahead of what you do.  It's in the same
8    thing.
9        I mean I don't have my direct quotes with
10   me as I stated I'm not very good with direct quotes
11   without my notepad handy, but if you look at what
12   the founding fathers stated and they way they
13   approached things it was always with the idea in
14   mind that they would give the credit and the glory
15   to God and that good things were found that way.
16   Q.   All right, so when you offer a payer at the
17   beginning of the School Board meeting you believe
18   that it will have an impact on the students of the
19   district?
20   A.   I believe so.
21   Q.   And is that an impact that is limited to
22   the students who are in attendance or does it apply
23   across the board in the district?
24   A.   I hope it applies across the board.

323

1    Q.   And how will the students who are not
2    present find out the prayer that you've offered?
3    A.   Okay now I'm asking some interesting
4    questions about theology, but if a prayer is offered
5    does the other person need to know that you are
6    praying for them, or is it simply the fact that, you
7    know, the Lord would understand.
8    Q.   I apologize.  I misunderstood.  I thought
9    that prayers were offered in order to invoke the
10   help of a higher power for the Board members to do
11   their best in discharging their responsibilities --
12   A.   Yes.
13   Q.   -- as Board members?
14   A.   They are.
15   Q.   I did not understand that you offer prayers
16   that a higher power assist the students of the
17   district in performing?
18   A.   We have asked in terms of our prayers to
19   solemnify that we ask again, if you read what I
20   wrote above it, maybe it's not this one, yeah, it is
21   in this one, you know, praying is about giving
22   yourself up saying I don't know everything give me
23   help.  It's about going above and beyond mere ego
24   and about being willing to humble yourself.

324

1        And in that sense at a lot of our prayers
2    we will ask for the proper guidance for our
3    custodial staff, or our teachers to do the right
4    things as well.  I mean it's about solemnifying the
5    Board meeting and maybe in that sense we step over
6    the line and pray for too many people, but we
7    certainly want our students to succeed well and at
8    least speaking for myself I do believe that God will
9    intervene in those things.  Without being overly
10   simplistic about it.
11   Q.   On the next page of the article, you are
12   quoted as saying and this is near the bottom of the
13   left hand most column.  The reporter purports to
14   report the prayer that you gave at the August 24th
15   meeting which is the prayer from George Washington,
16   do you see that there?
17   A.   uh-hum.
18   Q.   And then quotes you as having said, "Our
19   founding fathers said that if this nation doesn't
20   have God it doesn't have squat?"
21   A.   Yes, and actually that is a verbatim quote
22   absolutely.  And if need be I can, they would not
23   have used the word squat, let's face it.  They would
24   have phrased it far more 17th century or 18th

# EXHIBIT 9

**1**

```
 1          IN THE UNITED STATES DISTRICT COURT
 2              FOR THE DISTRICT OF DELAWARE
 3
 4   MONA DOBRICH and MARCO DOBRICH, individually and
     As parents and next friend of ALEXANDER DOBRICH,
 5   SAMANTHA DOBRICH, JANE DOE and JOHN DOE,
     individually and as parents and next friend of
 6   JORDAN DOE and JAMIE DOE,
 7              Plaintiffs
              vs.          Civil Action
 8                         No. 15-120
     INDIAN RIVER SCHOOL DISTRICT, ET AL.,
 9
              Defendants
10
11   ---------------------------------
12
13      DEPOSITION OF REGINALD HELMS, taken
     pursuant to notice at the Indian River School
14   District, 31 Hosier Street, Selbyville, Delaware,
     beginning at 3:32 p.m. on October 11, 2006 before
15   David A. Sroka, Registered Professional Reporter and
     Notary Public.
16
17   APPEARANCES:
18      THOMAS ALLINGHAM, ESQUIRE
         RICHARD HORVATH, ESQUIRE
19      BRIAN LENHARD, ESQUIRE
         P.O. Box 636
20      Wilmington, Delaware  19899-0636
         For the Plaintiffs
21
22
         WILCOX & FETZER
23   1330 King Street - Wilmington, DE  19801
         (302) 655-0477
24       www.wilfet.com
```

**2**

```
 1
 2
         JASON P. GOSSELIN, ESQ.
 3       JARROD D. SHAW, ESQ.
         Drinker Biddle & Reath LLP
 4       One Logan Square
         Philadelphia, Pennsylvania 19103-6996
 5       For the Defendants
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**3**

```
 1          MS. DUPHILY:  This is the
 2   videotape deposition of Reggie Helms.  This
 3   deposition is being taken on behalf of the
 4   Plaintiff in the matter of Dobrich, et al.
 5   versus Indian River School Board, et al,
 6   case number 15-120.  The deposition is
 7   being held at 31 Hosier Boulevard,
 8   Selbyville, Delaware.  We are going on the
 9   record on October 11, 2006 at approximately
10   3:32 p.m.
11          The court reporter is David Sroka
12   with Wilcox & Fetzer, Wilmington, Delaware.
13   my name is Lindsay duPhily and I am the
14   videotape specialist with Discovery Video
15   Services.
16          Counsel will now introduce
17   themselves and then the court reporter will
18   swear in the witness.
19          MR. ALLINGHAM:  I'm Tom Allingham
20   for the Plaintiffs and with me are Richard
21   Horvath and Brian Lenhard.
22          MR. GOSSELIN:  Jason Gosselin for
23   Indian River School District and the Indian
24   River School Board and the individual board
```

**4**

```
 1   member in attendance.
 2          REGINALD HELMS,
 3      The Witness herein, called for examination by
 4   the Plaintiff, having been duly sworn to tell the
 5   truth, the whole truth, and nothing but the truth,
 6   was examined and testified as follows:
 7   EXAMINATION BY MR. ALLINGHAM:
 8      Q.  I've put before you the top document is
 9   Plaintiff's Exhibit 30.  Would you turn to the last
10   page of that exhibit, please?
11          In the second column from the right -- I
12   should give you some background.  This is an article
13   from Delaware Beach Life, have you ever read it
14   before?
15      A.  No.
16      Q.  There is a picture of you on the front
17   page, is that correct?
18      A.  That's me.
19      Q.  Not the best picture of all time?
20      A.  Well --
21      Q.  In the second column from the right there
22   is a quotation from the Reverend Jerry Fike, do you
23   know who Mr. Fike is?
24      A.  Yes.
```

13

1  religion, and that type of thing.  A lot of people
2  were talking about that issue at that time.
3      Q.   And did you understand that what people
4  were all -- what people considered important was
5  whether School Board members could pray before the
6  School Board meeting?
7      A.   I don't recall thinking of it specifically
8  that way about praying before a Board meeting, no.
9      Q.   Did it seem to you that the public comments
10 at the Board meeting had as much to do with prayer
11 in the schools as they did prayer before a School
12 Board meeting?
13     A.   Yes.
14     Q.   Did you think that represented a
15 misunderstanding on the part of the public as to
16 what was before the Board at that meeting?
17     A.   Yes.
18     Q.   And what efforts were made to correct that
19 misunderstanding?
20     A.   Well, on my part I didn't know it was a
21 misunderstanding until that night.  So, I don't know
22 of anything that was done to prevent it because
23 quite frankly I didn't know it was a
24 misunderstanding until people started getting up at

14

1  the podium talking.
2      Q.   That is to say until people started talking
3  you thought people understood that this was a School
4  Board prayer issue?
5      A.   No.  I didn't think it was a School Board
6  prayer issue, I thought it was more along the lines
7  of prayer before graduation, and that sort of thing.
8  More so than the Board prayer issue.
9      Q.   Have you ever had occasion to -- strike
10 that.
11      How did you form the view that you thought
12 what was being talked about at the August 24th
13 meeting was graduation prayer rather than School
14 Board prayer?
15     A.   Well, as I recall it was a matter of
16 prayer.  I didn't in my own mind I didn't separate
17 it between prayer before graduation or that sort of
18 thing as specifically to the School Board meeting.
19 I thought it was prayer in general, but not prayer
20 in school, but prayer before any graduation or that
21 sort of thing.  I didn't, I didn't separate the two
22 in my mind.
23     Q.   So, as you walked into the August 24the
24 meeting you thought what was being discussed was

15

1  prayer at school related functions outside of the
2  school day, is that a fair description?
3      A.   Well, in my words, in my thoughts I would
4  say it was prayer in general that had anything to do
5  with banquets, graduation, that type of thing, and
6  some of that could have been part of the school day
7  and some of it might not have been.  But I didn't
8  think it was an issue of whether the students could
9  open the day with prayer or that sort of thing.
10      I mean that issue in my mind had been
11 settled by the courts and I didn't think we were
12 there to discuss that.  So, when people started
13 coming up to the podium and talking about that I
14 thought well, they obviously misunderstood what's
15 going on.
16     Q.   Where do you think that misunderstanding
17 came from?
18     A.   I have no idea.
19     Q.   What efforts did the Board make to correct
20 that misunderstanding?
21     A.   I don't recall anything specifically being
22 done as far as the Board is concerned.  I'm not sure
23 whether Mrs. Hobbs took any action or not.  I think
24 there was some discussion, although I can't recall

16

1  any specifics about an executive session where we
2  thought some people had misunderstood.
3      I don't know what specific actions were
4  taken.
5      Q.   Did you think given the clear
6  misunderstanding that it was important for the Board
7  to correct that misunderstanding?
8      A.   I don't recall -- I don't recall myself
9  making a statement like we must clear up this
10 misunderstanding.  I do know it was brought up, but
11 I don't recall saying anything specifically where we
12 need to make sure we clear up this misunderstanding.
13     Q.   Now, when you say I know it was brought up,
14 does that mean the notion that people had
15 misunderstood what was before the Board was brought
16 up?
17     A.   In the executive session I think there was
18 some mention of there is some people here tonight
19 that I think misunderstood what was going on.  I
20 don't recall who said that, but I do recall it being
21 said.
22     Q.   Were you present throughout the public
23 comment session at the August 24 meeting?
24     A.   Yes.

45

1    I have reviewed the ones that are
2    pertaining to the Board of Education, and my
3    responsibilities. Can I quote them to you verbatim,
4    no, but I have reviewed them. But there are some
5    policies in there that I have not reviewed.
6    Q.   How were you able to identify the ones that
7    relate to your responsibilities if you haven't
8    reviewed them all?
9    A.   There is a tab in the policy manual that we
10   receive that has the different categories and one of
11   those is of the Board of Education.
12   Q.   And you have reviewed all the policies
13   under that tab?
14   A.   Yes. And since I have been on the Board I
15   have looked at those, although there are some that I
16   probably can't recall, but I know where I can find
17   them if there is a question.
18   Q.   All of the policies that are in the policy
19   manual are policies that were adopted by the Board,
20   is that correct?
21   A.   At some point in time, yes.
22   Q.   And the Board is charged with enforcing and
23   administering all of those policies, is that
24   correct?

46

1    A.   I'm not -- the Board is responsible to make
2    sure that those policies are enforced. I don't know
3    if the Board enforces them themselves, but the buck
4    stops here. Ultimately the Board is responsible as
5    being the Board of Education.
6    Q.   Fair enough. It's true that you may
7    delegate enforcement or administration in some
8    areas, but the ultimate responsibility for
9    enforcement and administration of the Board policies
10   is with the Board?
11        MR. GOSSELIN:  Objection.
12   Q.   Correct?
13   A.   We do not enforce the policies. We are
14   responsible to make sure that the policies are
15   adhered to. In other words, the superintendent is
16   responsible for the day-to-day operation of the
17   district. However, when there is a question then
18   that is brought to the Board, and then the Board has
19   to make a decision on whether the policy was
20   followed, whether it was not, but as far as
21   enforcing the day-to-day operations and the policies
22   I don't think that's our responsibility.
23        We are responsible for the policies but not
24   to enforce them ourselves, if that's what you're

47

1    asking.
2         MS. DUPHILY:  We are going off the
3    record at approximately 4:29 p.m..
4         (WHEREUPON a brief recess was
5    taken)
6         MS. DUPHILY:  Back on the record
7    at approximately 4:36 p.m..
8    Q.   I'm going to try to establish some
9    chronological guideposts for purposes of our
10   discussion. The graduation in 2004 that
11   precipitated, it was the first event precipitating
12   this lawsuit, took place in early June, do you
13   recall that?
14   A.   I recall when it happened, but I wasn't
15   there.
16   Q.   Am I correct in characterizing that as the
17   first event that precipitated the Board's
18   consideration of -- that culminated in the Board's
19   consideration and adoption of School Board Prayer
20   Policy?
21   A.   I would say so, yes.
22   Q.   The first Board meeting at which, and we
23   have already marked these as exhibits, so I'm going
24   to get out the documents. The first Board meeting

48

1    at which that issue was considered was June 15,
2    2004, Mr. Helms, so let me show you the minutes from
3    that meeting.
4    A.   Okay.
5    Q.   This set of minutes and I believe every set
6    of minutes that I show you has either the signature
7    or signature stamp from Mrs. Hobbs, does that
8    indicate that these are the final minutes?
9    A.   I would assume so, yes.
10   Q.   Approved by the Board?
11   A.   Yes.
12   Q.   As a preliminary matter you're recorded as
13   being present at this meeting, do you have any
14   reason to doubt that you were there?
15   A.   No.
16   Q.   There is no discussion in the minutes of
17   any member of the Board offering a prayer after the
18   meeting was called to order, do you recall whether a
19   prayer was offered?
20   A.   I don't recall specifically, no, but I
21   would sit here and say I'm sure there was, but I
22   don't recall any specific.
23   Q.   I wasn't asking you about the specifics of
24   the prayer, I was just asking you do you recall

73

```
1      A.  Yes.  There was more along the lines that
2   we agree that we think you should continue what you
3   are doing.  It wasn't really stick to your guns that
4   sort of thing, it was encouraging, yes.
5      Q.  How many constituents do you suppose there
6   are in the Indian River School District?
7      A.  I don't know.
8      Q.  You have on the order of 8,000 students,
9   right?
10     A.  Yes, 7,000 something, yeah.
11     Q.  There must be at least two or three times
12  that number of residents, correct?
13     A.  Yes, I would say at least two times.
14     Q.  So, you had an average of 50 calls from
15  people who wanted -- you would have been expected to
16  be calling you in support, among the many more
17  constituents in your district?
18     A.  Correct.
19     Q.  You weren't trying to suggest to the Board
20  members that all of your constituents supported, did
21  not want the Board to change its practice of opening
22  meetings with a prayer, were you?
23     A.  I can't recall exact words, but probably I
24  would have said something like the people who have
```

74

```
1   called me have suggested that we continue.  No, I
2   wouldn't have said all my constituents.
3      Q.  That wouldn't have been the truth right?
4      A.  No, I don't use words like all, never,
5   those sort of thing, because it always comes back to
6   haunt you.
7      Q.  And the Board members concluded that they
8   didn't want to make a decision on that issue
9   correct?
10     A.  I think that would be safe to say, yes.
11     Q.  Is it correct that the reason the Board did
12  not feel that a decision could be made that evening
13  is that the Board wanted to get an additional or a
14  second legal opinion on the School Board prayer
15  issue?
16          MR. GOSSELIN:  Objection.
17     A.  I don't remember, it could have been.  I
18  don't recall specifically somebody saying we want to
19  get a second opinion.  I mean I don't remember those
20  words.  I don't know why.  The only thing I can tell
21  you for sure is I didn't want to make a decision
22  that night because I didn't feel we had enough
23  information.
24     Q.  What information did you feel you needed
```

75

```
1   that you didn't yet have?
2      A.  I wanted somebody to tell me that we were
3   breaking the law, and we were going against -- if
4   someone had told us that we were breaking the law,
5   and that what we are doing is illegal, then I would
6   have said then we need to stop it.  But I needed
7   somebody, you know, like a judge or someone to tell
8   me, and at that point we had never been showed that.
9          So, I don't know if it was to get a legal
10  opinion or to get a second opinion, I can't tell you
11  that.  But I know my stance was I need somebody to
12  tell me that what I'm doing is wrong.
13          MR. GOSSELIN:  You should call Mr.
14          Allingham.
15     Q.  The minutes, the full meeting minutes,
16  reflect that Mr. Griffin was in attendance?
17     A.  Okay.
18     Q.  Do you recollect that in the four hours and
19  14 minute executive session Mr. Griffin was also in
20  attendance?
21     A.  I don't recall that specifically, no, but
22  if you say he was there then he was there.
23     Q.  You should never accept --
24     A.  I mean, if the minutes reflect that he was
```

76

```
1   there --
2      Q.  I understand.  Do you recall whether it was
3   at August 23 or another time do you recall receiving
4   advice from Mr. Griffin on the School Board prayer
5   issue?
6          MR. GOSSELIN:  Objection.
7          Actually no I don't object to that, but
8          since we are getting into this territory I
9          am cautioning Mr. Helms give me time to
10         object because I may be instructing you not
11         to answer, but you can answer that
12         question.
13     A.  Yes, Mr. Griffin gave us advice.
14     Q.  In light of the fact that Mr. Griffin is
15  recorded as being present under other visitors and
16  staff in attendance on the PX14 regular minutes of
17  the August 23 meeting, and the fact that it appeared
18  the only purpose of the executive session and the
19  meeting was to deal with this school prayer issue,
20  School Board prayer issue, do you believe that your
21  advice from Mr. Griffin came during this executive
22  session?
23     A.  Yes.
24     Q.  And you agreed, I take it, with the
```

93

1  that was this, I asked you whether as a general
2  proposition it was fair to say that your approach
3  was that you would prefer to continue the Board's
4  past practice unless someone could tell you in a
5  reasonably definitive way that what the Board had
6  done in the past was illegal or unconstitutional.
7      I want to ask you how you use that approach
8  when what is being considered is a new action or a
9  new policy.  Do you require that someone demonstrate
10  to you that the new action or new policy proposed is
11  definitively constitutional or legal?
12      Do you understand my question?
13  A.  I think so.
14  Q.  Okay?
15  A.  And I'll try to answer that with perhaps a
16  little bit of past practice procedure.  What
17  normally happens is if someone brings up an issue,
18  and the Board feels that they need a new policy or
19  they need to change a policy or whatever, it's
20  normally handed over to the policy committee.  As
21  part of that research our Board attorney is
22  contacted and through coordination between the
23  policy committee and our Board attorney where drafts
24  are made, research is done, it goes back and forth

94

1  and when we come -- when the policy finally comes to
2  the Board for a first reading, we as the Board
3  expect and assume that all the legalities have been
4  handled and that the Board policy as it is presented
5  for the first reading is final.
6  Q.  Final being?
7  A.  Legal.
8  Q.  You can be assured that someone has
9  definitively advised that it's legal and
10  constitutional?
11  A.  That is the expectation, yes.
12  Q.  Just to explore a couple of points in that,
13  you are not on the policy committee so you are one
14  of the people on the Board who when the policy
15  committee emerges from that process with a new
16  proposed policy you assume that that has been vetted
17  for legality?
18  A.  Yes.
19  Q.  Okay.  Have you ever served on the policy
20  committee?
21  A.  No.
22  Q.  I've just forgotten, which committees are
23  you on?
24  A.  I'm right now I'm on the building and

95

1  grounds committee, the athletic fields oversight
2  committee.  I have been negotiations past.  I believe
3  that's it, to the best of my knowledge.
4  Q.  I think you have in front of you PX12
5  somewhere?
6  A.  No, I don't think so.
7  Q.  Here you go.
8  A.  Okay, thanks.
9  Q.  Have you ever seen PX12 before?
10  A.  Yes, I have.
11  Q.  At the top left of the first page in
12  brackets it says, "For release to the general public
13  proposed School Board Prayer Resolution," dated
14  8/30/04.  This is prepared by the Rutherford
15  Institute and the Neuberger firm?
16  A.  Yes.
17  Q.  Do you believe that you saw this document
18  for the first time at some point earlier than August
19  30, 2004?
20  A.  I don't recall.  I mean I don't recall
21  specific date.  I know I received this but I don't
22  know what the date was.
23  Q.  On August 24, 2004 at the Board meeting,
24  the Board referred the matter of the School Board

96

1  prayer to the policy committee, do you recall that?
2  A.  I recall referring it to the policy
3  committee, yes.
4  Q.  At the August 23 executive session the
5  Board decided it couldn't make a decision on whether
6  to maintain or deviate its past practice.  In your
7  case because you wanted someone to tell you
8  definitively that the past practice was not legal or
9  not constitutional.  Dr. Hattier and Mr. Bireley
10  testified that they were looking for additional
11  legal advice on the issues presented by the School
12  Board prayer problem.
13  A.  Okay.
14  Q.  My first question to you is whether it was
15  you looking for definitive legal advice that the
16  practice was unconstitutional, or as Dr. Hattier and
17  Mr. Bireley said the Board was looking for
18  additional advice on the issue of First Amendment
19  prayer -- sorry, on the issue of in Dr. Hattier's
20  case First Amendment issues and in Mr. Bireley's
21  case on School Board prayer.  Was someone from the
22  Board designated to go get additional legal advice
23  on these issues?
24  A.  I don't recall anyone being specifically

97

1    designated because I remember that there were a
2    couple of us who were checking into different
3    organizations.  Mr. Hastings had been looking on the
4    Internet for some organizations and I think like I
5    said I contacted two organizations ACLJ, is that the
6    Pat Robertson?
7        Q.    I don't know.
8        A.    And the Rutherford Institute.  And the
9    Rutherford Institute was the first one who responded
10   with the pro bono, if you will, and so I proceeded
11   that way.  I also remember receiving some
12   information I think at some point in time from
13   Mr. Hastings and a group that he had contacted, but
14   I don't recall the specific group.  So, was anyone
15   designated as the point man, if you will, I don't
16   recall that to be that way.
17       Q.    So, am I correct that several Board members
18   were acting on their own initiative to try to get
19   information on the issues?
20       A.    Well, I know I was.
21       Q.    All right, and you have personal knowledge
22   that Mr. Hastings was acting on his own initiative
23   to get some information?
24       A.    The best of my knowledge he was acting on

98

1    his own.
2        Q.    Do you remember that Dr. Hattier was
3    contacting an organization, something called the
4    Alliance Defense Fund?
5        A.    I remember the Alliance Defense Fund was
6    mentioned.  I'm not sure whether it was Dr. Hattier
7    or not, but I remember that fund, well yes.
8        Q.    You said that Mr. Hastings obtained some
9    materials from an organization that you can't recall
10   the name of?
11       A.    Right.
12       Q.    Did he share those materials with the
13   Board?
14       A.    I believe he did.
15       Q.    Do you still have them?
16       A.    No, I don't.
17       Q.    Did the materials present legal advice on
18   the issue of School Board prayer?
19       A.    No, I think it was basically Mr. Hastings
20   had contacted them and they sent a letter back
21   saying that they might be willing to take the case
22   but they needed the particulars or whatever.  There
23   was no legal advice or anything like that.
24       Q.    Was that followed up on, did anyone send

99

1    them the particulars?
2        A.    I don't believe it was.  Not to my
3    knowledge.
4        Q.    And when you contacted the Rutherford
5    Institute you got a reply from them you said?
6        A.    Yes, I did.
7        Q.    Again to try to pinpoint in time, was that
8    before or after the August 23, August 24 meetings?
9        A.    I know I look like, I don't know, I don't
10   have a very good memory but --
11       Q.    Not at all?
12       A.    Dates are not my thing.  I can't recall
13   specifically.  My wife has trouble with me as far as
14   memory is concerned.
15       Q.    Well, let me show you, and I think you have
16   this one in front of you, it's PX34.  That would be
17   near the bottom of the stack?
18       A.    Okay, thank you.
19       Q.    The handwriting on the first page of PX34
20   is yours, is that correct?
21       A.    That's correct.
22       Q.    And this is a fax that you sent to
23   Mr. Walls, according to the fax line at least, on
24   September 2, 2004 at 3:28 in the afternoon, is that

100

1    right?
2        A.    Yes.
3        Q.    Is that your phone number 436-7576?
4        A.    That's my fax number, yes.
5        Q.    And do you recall sending this material to
6    Mr. Walls?
7        A.    Yes, I do.
8        Q.    Did you send it to each of the Board
9    members?
10       A.    As I recall I don't think so, I think I
11   just sent it to Mr. Walls, I'm not sure.
12       Q.    I hope that this will help you pinpoint the
13   point in time when you contacted the Rutherford
14   Institute?
15       A.    Right.
16       Q.    It had to have been before September 2nd?
17       A.    It had to have been before September 2nd.
18       Q.    Did you receive this material from the
19   Rutherford Institute or from the Neuberger Firm?
20       A.    As I recall I received this from Mr.
21   Neuberger.
22       Q.    And can you tell me how far in advance of
23   your transmitting it to Mr. Walls you got it from
24   Mr. Neuberger?

133

1  can seek divine guidance for your work as a Board
2  member is by saying a prayer out loud on the stage
3  in the name of Jesus Christ at the Board meeting?
4     A.   No, that is not the only way.
5     Q.   You could pray for divine guidance off
6  stage in what I guess would be the wings of the
7  stage right before you walk on?
8     A.   Well, as I said before you can pray
9  anywhere.
10     Q.   Or after you walk on you could offer a
11  silent prayer in your head for divine guidance?
12     A.   Sure.
13     Q.   You could invite those present with you to
14  join you in a moment of silence as a way of seeking
15  divine guidance, is that correct or not correct?
16     A.   Yes, you could do that.
17     Q.   And those methods of seeking divine
18  guidance are no more or less effective in your
19  understanding of one's relationship with God, no
20  more or less effective than a public prayer out loud
21  would be?
22     A.   As I stated before I think God hears your
23  prayers whether it's openly or privately.  And the
24  only thing I would say is that could you do it in

134

1  the wings, yes, could you do it silently, yes, but
2  as far as I know we're still allowed to do it
3  openly, so if I were to choose to do it openly I
4  hope I would continue to have the right to do so.
5        But God would hear my prayer whether it was
6  silent, whether it was openly, whether it was in my
7  vehicle, or whether I was on stage.  God would hear
8  my prayer.
9        Now, how effective the prayer is only He
10  can determine that, but I believe He hears my prayer
11  and answers according to His will, but I think
12  that's why we are here.  I'm certainly very hopeful
13  that there doesn't come a time where someone says to
14  me you cannot pray openly.  I hope that never
15  happens in this United States.
16     Q.   Everyone's memory is not perfect, but would
17  you think it's fair to say that for every single
18  Board meeting that you've attended as a Board member
19  you have asked for God's help in performing your
20  duties at that meeting?
21     A.   I would say almost every one, sure.  I
22  don't know if it would be -- like I told you
23  yesterday I don't use words like never and all, but
24  I would say that it's safe to say that yes for the

135

1  most part.
2     Q.   And that would include regular meetings and
3  special meetings?
4     A.   Yes.
5     Q.   And so would you describe for me how you
6  have, if you can recall, how you have asked for
7  divine guidance before special meetings of the
8  Board?
9     A.   Typically we receive an agenda, and on that
10  agenda will be certain items, and I just simply ask
11  the Lord to help me make good sound decisions that
12  will be for the good of the district and the staff
13  and the students, and ask his blessings on whatever
14  decisions are made.  That type of thing.
15     Q.   And that -- because we know that public
16  prayers are not offered at special meetings, that
17  would be a private prayer?
18     A.   That would be private, although I would say
19  there have been other meetings besides regular
20  meetings that prayer has been open, the meeting has
21  been started with an open prayer.  As a matter of
22  fact, there were several negotiation meetings where
23  I was asked by the association on the other side of
24  the table if I would open the meeting with prayer.

136

1        So, there have been other meetings besides
2  regular meetings that have been opened with prayer
3  that I have been sitting in on --
4     Q.   Yes --
5     A.   -- but not every one.
6     Q.   Yes, sir.  I was following up on your
7  testimony and also that of Mr. Bireley and Dr.
8  Hattier, that it is not the practice of the Board to
9  open special meetings with a prayer, and that's
10  correct, isn't it?
11     A.   That's correct, although over the years
12  that I've been on there some have, but it would be
13  out of the ordinary.
14     Q.   Yes, sir.  And so setting aside the out of
15  the ordinary special meetings where someone offered
16  a public prayer, when you asked for divine guidance
17  you did so privately?
18     A.   Yes.
19     Q.   Let me ask you this, before any special
20  meeting have you ever gotten together with, just
21  said to one or more of your fellow Board members,
22  you know, before we start let's offer up a prayer
23  for guidance?  Not as a formal matter, but inside of
24  purely private prayer have you invited someone to

137

```
1    join you in a prayer?
2        A.   I don't recall any specific instances where
3    I did, no.
4        Q.   We have, I don't know half a dozen examples
5    of meetings at which executive sessions have
6    occurred before the prayer to open the meeting has
7    been offered.  I don't know why that occurred, but
8    the minutes show that there is an executive session
9    and then the junior ROTC would offer the colors and
10   the prayer would be offered.
11       Am I correct that it would be your
12   expectation that where a prayer was not offered
13   publicly before you start the executive session, you
14   would ask, you yourself, would ask for divine
15   guidance for your decisions to be made in that
16   executive session?
17       A.   I think it would be safe to say usually
18   before any of the meetings take place that I would
19   ask for God to help me, and to bless whatever, and
20   that would be before any meeting, yes.
21       Q.   Okay, and so in those instances where an
22   executive session starts before the public offering
23   of a prayer, as with the special meetings, you would
24   privately ask for God's help?
```

138

```
1        A.   It would be private, yes.
2        Q.   And as with my questions on the public
3    meetings, your request, your prayer to God would be
4    no less effective just because it was given
5    privately and silently?
6        A.   To the best of my knowledge, like I said,
7    whether it's effective or not only God knows that.
8        Q.   Fair enough.  But as your understanding,
9    your personal religious understanding, is that its
10   effectiveness is not, is not affected -- its
11   effectiveness is not affected by how it's offered?
12   It may be affected by your state at the time it is
13   offered, it may be affected by many things, but it's
14   not affected by the way you offer the prayer?
15       A.   If you are speaking the way as whether it's
16   open or private, no I don't think that makes a
17   difference.
18       Q.   Who benefits from the Board Policy BDA.1,
19   the School Board Prayer Policy?
20       A.   Is that the prayer policy?
21       Q.   Yes, sir.
22       A.   Okay.  Who benefits?
23       Q.   Who is it intended to benefit?
24       A.   Well, specifically I think it is intended
```

139

```
1    that the Board itself, when dealing with all the
2    important issues would certainly benefit, but
3    ultimately if we make good sound decisions and God
4    blesses those decisions, then ultimately everyone
5    should benefit from it, but the policy itself was
6    written for the Board.
7        Q.   And it was written to serve and protect the
8    interests of the Board, is that correct?
9        A.   To serve and protect?  I don't know.  When
10   I voted to accept that policy I didn't have an
11   attitude of serve and protect in particular I think
12   it was more -- my opinion was that it was more to
13   serve and the more that -- it's just a policy that
14   we say a prayer before the Board meeting to ask
15   God's blessing and to help us.  So, to protect us I
16   don't know, that was not my attitude that it was
17   adopted to protect us.
18       Q.   Let me just explore this a little bit?
19       A.   Okay.
20       Q.   The benefit to all of the constituents of
21   the district that you see from Board prayer, is that
22   your, you will make, we hope that you will make good
23   decisions, correct?
24       A.   Yes.
```

140

```
1        Q.   That you will make decisions that are the
2    best you can make with the assistance of God, if
3    that's what the prayer is that's offered, correct?
4        A.   That's my opinion, yes.
5        Q.   And there was discussion at the Board
6    level, wasn't there, that everybody benefits from
7    good sound decisions that may be informed by God's
8    help?
9        A.   I don't recall specific discussions but
10   that would have been my thoughts, yes.  That would
11   be my hope and my prayer would be that everyone
12   would benefit.
13       Q.   Don't recall that there was actually
14   specific discussion that look everyone is going to
15   benefit from this policy because everyone will
16   benefit from the good decisions that will result
17   from our asking for divine guidance?
18       A.   That may have taken place, but to sit here
19   and say I recall that specifically, no, I can't.
20   Like I said, that would have been my opinion.  Now,
21   if I said that specifically I don't recall, but that
22   would certainly have been my thoughts.
23       Q.   This is something that sometimes lawyers
24   try to do, you certainly don't recall, you don't
```

153

1    be facetious. In the absence of the policy, if the
2    position as you understood it of Mrs. Dobrich and
3    the ACLU were accepted, you would remain free to
4    stand in church or kneel in church or stand on the
5    fairway at the golf course, or the aisle in the
6    supermarket and pray silently or out loud in the
7    name of a Deity or unnamed Deity or in the name of
8    Jesus Christ, correct? The only place that anyone
9    with suggesting that you, your right to pray as you
10   saw fit might be limited in some way was at the
11   School Board meeting, isn't that right?
12       A.  That is my, yes, that is my impression.
13       Q.  Okay. And it was that right that you
14   perceived that the ACLU and Mrs. Dobrich were trying
15   to take away?
16       A.  That's correct.
17       Q.  And it was to protect that right that you
18   voted to adopt Board Policy BDA.1?
19       A.  Well, there again my thoughts was not to
20   protect me or whatever, I just wanted to be allowed
21   to continue what we'd been doing for many, many
22   years, and that policy I felt was a good policy to
23   ensure that.
24           I guess it's a matter of whether you say

154

1    protect or ensure. I mean I don't know what you're
2    looking for, but in my mind when I adopted that
3    policy it was to let people know what we'd been
4    doing, what we would like to continue to do, and I
5    felt that this policy would certainly do that.
6           But if you are asking me did I pass that
7    policy to protect me, no, it was more like to ensure
8    that I could continue to do what I had been doing.
9        Q.  And the benefits to the constituents of the
10   Indian River School District that had flowed from
11   your practice going back 30 years, the benefit of
12   good decisions, that was going to continue whether
13   you passed this policy or not, right?
14           Because we know that whether you passed
15   this policy or not and no matter what the ACLU and
16   Mrs. Dobrich want, you were still free and your
17   fellow Board members were still free to seek divine
18   guidance so that the constituents of the Indian
19   River School District would receive the benefits of
20   your best decision?
21       A.  I would hope that would be the case.
22       Q.  Nobody has ever suggested that you weren't
23   allowed to seek divine guidance, have they?
24       A.  Nobody has told me that, no. The only

155

1    thing they told me is that -- the only thing that I
2    felt was coming is that they were going tell me how
3    I could do that or maybe not so much how I could do
4    it, but how I could not.
5           In other words, I felt I was being told you
6    can seek divine guidance but you can't do it openly
7    at a School Board meeting and I just felt -- I felt
8    that was wrong.
9        Q.  Now, you have passed, the School Board has
10   adopted some policies that you mentioned, for
11   example, you had to address the graduation prayer
12   issue?
13       A.  That's correct.
14       Q.  And that policy prohibits the School Board
15   from inviting -- well, let me just take your answer,
16   the previous practice was not constitutional,
17   correct?
18       A.  As I understand it when we asked our
19   attorney to investigate it he said that our policy
20   did not --
21           MR. SHAW:  Objection.
22       Q.  Just a second, sir. Both of us are going
23   to -- it's important that I get your understanding.
24   You should not tell me what your attorney told you,

156

1    because that's a privileged communication. But I'm
2    entitled to listen to what your understanding was,
3    and so my question was not intended to ask you what
4    your attorney said, my question was intended to
5    elicit what your understanding is.
6        A.  Okay.
7        Q.  And you said before your understanding was
8    that your previous practice on graduation, I'm just
9    going to focus on graduation, your previous practice
10   on graduation was not in accordance with the law?
11       A.  That's correct.
12       Q.  And so you fixed it?
13       A.  Yes.
14       Q.  And the way you fixed it would now prohibit
15   Pastor Fike from offering the same prayer that he
16   offered at the 2004 graduation publicly, correct?
17       A.  As I understand it, yes.
18       Q.  Do you feel that you as a Board somehow
19   infringed by the passage of that policy on Pastor
20   Fike's freedom to practice his faith as he wishes?
21           MR. SHAW:  I'm going to object to
22       that question. Because we are only
23       supposed to be discovering School Board
24       prayer issue here. I am going to allow the

157

1    witness to answer it.
2    A.   Me personal opinion was that I don't
3    personally agree with the policy.
4    Q.   That's helpful.
5    A.   However --
6    Q.   Yes, sir, go ahead.
7    A.   -- if the policy we had was
8    unconstitutional, then as a law abiding citizen I
9    want to do what the court says.  Personally I do not
10   agree with it.
11   Q.   That's helpful to me, but my question was
12   -- had to do with the impact of the policy.  In
13   passing the policy did you as a Board member believe
14   that you were somehow limiting Pastor Fike's First
15   Amendment right to practice his religion as he sees
16   fit?
17   A.   Personally I believe it infringed on his,
18   mine, and whoever else would want to come to the
19   podium or be invited to the podium to say a prayer.
20   Like I said, I'm a law abiding citizen, if that's
21   what the court says then that's what I will do, but
22   personally I do not agree with it.  As I understand
23   it the policy -- well the policy says it should be
24   student initiated and student led.

158

1    In other words, any student can come to the
2    podium and pray.  Then my personal question is
3    what's the difference between a student coming to
4    the podium and pray and I come to the podium and
5    pray?  The only thing is I guess the courts have
6    addressed this and that's their ruling, and that's
7    what I will abide by, but personally I don't agree
8    with it.
9    Q.   Okay, but so -- and part of your answer is
10   helpful to me in understanding your view.  Your view
11   is that the policy on prayer at graduation limits
12   your, Mr. Helms' First Amendment rights?
13   A.   Yes, I think it limits my right to pray
14   whatever way I want.  I mean in other words, no
15   longer can a principal or anyone say Mr. Helms would
16   you like to come to the podium and lead us in
17   prayer, I can't do that, according to this -- at
18   graduation I can't do that.
19   Q.   And your understanding is that that's what
20   the law provides?
21   A.   As I understand it has to be student led
22   and student initiated that's my understanding.  And
23   I certainly am not a student any longer.
24   Q.   So, am I correct that your understanding is

159

1    that our laws do contemplate certain limitations on
2    one's individual right to exercise his religion and
3    faith as he sees fit.  An example is the law that
4    prevents you, for example, from standing up at the
5    podium at graduation and offering a prayer?
6    A.   I think some of the decisions here again
7    it's my opinion, that some of the decisions,
8    although well intended, sometimes limits people's
9    rights, yes.
10   Q.   Now, you told me yesterday that you don't
11   approve of policies that change your historical
12   practices, or that limit people's rights unless you
13   are satisfied with, definitively satisfied, that the
14   law requires you to do that, correct?
15   A.   That's a little confusing, would you
16   rephrase that?
17   Q.   I will start again.  It's your view that
18   you are not going to change a practice of the
19   district that goes back in time, a historical
20   practice of the district, you are not going to vote
21   to change it unless somebody tells you definitively
22   that it's against the law, correct?
23   A.   No.  I wouldn't say I'm not going to change
24   it, I'm saying in this issue about the prayer, that

160

1    I wasn't going to change it unless someone told me,
2    but -- and if there is other policies in our manual
3    that are breaking the law and as we become aware of
4    it, then yes, I want to be in compliance.  Would I
5    never change a policy unless somebody told me it was
6    breaking the law, no.
7    Q.   Okay, you are right, my question was what
8    we say over broad.
9    A.   Okay.
10   Q.   In this area of prayer and the exercise of
11   religion, am I right in thinking that you would not
12   agree to change a practice or policy of the district
13   without being told definitively that it was against
14   the law?
15   A.   In this specific case I did not want to
16   stop doing what we had been doing for years simply
17   because someone said it wasn't, you can't do it.  I
18   said I need someone higher up, if you will.  In
19   other words, my statement was I want to take it to
20   court and let the court tell me that it's wrong.
21   And like I said even though I don't agree with the
22   graduation policy if that's the laws of our land
23   then even as I took oath as being a part of the
24   member of the Board I must abide by law and that's

161

1  what I want to do.

2      However, in this case nobody had definitely

3  told me that what we were doing was

4  unconstitutional, so I needed someone to tell me

5  that before I change what we had been doing for

6  years.

7      Q.   So, on the graduation prayer issue you were

8  satisfied, on the Board prayer issue you have not

9  been satisfied?

10     A.   No, not as of yet.

11     Q.   Okay.  And one reason to pass the policy

12  was so that you could get a judicial decision, get a

13  judge to say one way or another with finality is our

14  practice constitutional or not, isn't that correct?

15     A.   No.  Like I said before, my reasoning for

16  adopting and voting for that policy was to let

17  people know -- there was a lot of people in our

18  district who did not attend Board meetings and had

19  no idea what this Board had been doing for years.

20  So, one aspect was this was going to let people know

21  what this Board has been doing for years, what is

22  our history and past practice, and the other reason

23  was that I wanted to continue to do that.  That was

24  the reason for me adopting that policy.

162

1      Q.   You could have let people know what you

2  were doing by sending a letter, couldn't you?

3      A.   Well, you could, but then being on this

4  Board for a number of years, letters don't always

5  make it home.  You know, people are missed even by

6  trying to send them letters or sending it home with

7  little Jamie or little Johnny there are still those

8  people who are missed.

9      Q.   And you think that you are going to get a

10  broader reach by passing a policy than you are going

11  to get by sending a letter home?

12     A.   I think this makes it available to anyone

13  and everyone.  If somebody were to call the district

14  office today and said what's going on with the Board

15  they could say to them they have a policy and this

16  is our policy, and all they have to say is I want a

17  copy of that, and all they have to say is I want a --

18  folding that policy up and sending it to all of our

19  constituents, you could do that, but I just never

20  thought about doing it.

21     Q.   This is a little bit of a diversion, but

22  are you aware that a resident of the district asked

23  for a copy of the School Board Prayer Policy and was

24  told by district employees to file FOIA request?

163

1      A.   My first question would be what's a FOIA

2  request?

3      Q.   Freedom of Information Act.

4      A.   No, I was not aware of that.

5      Q.   If that were true, that would be

6  inconsistent with your understanding of this notion

7  of free access of the policies, correct?

8      A.   I'm not familiar with all the nuts and

9  bolts of how it's done, but what I'm saying is I

10  would hope if someone were to call the district

11  office and say that I would like to see a copy of

12  that policy that they could get it.  Whatever means,

13  if it means they have to file whatever --

14      MR. ALLINGHAM:  Let me interrupt

15  you Mr. Helms we are going to run out of

16  tape, I'm really sorry.

17     A.  Okay, sure.

18      MS. DUPHILY:  We are going off the

19  record at approximately 10:04 a.m..

20      (WHEREUPON a brief recess was

21  taken)

22      MS. DUPHILY:  We are back on the

23  record at 10:13 a.m..

24      MR. ALLINGHAM:  I am going to ask

164

1  the court reporter to mark as PX42 a

2  document that has no Bates, but it's titled

3  School Board Member Ethics.

4      (WHEREUPON Plaintiff's Exhibit 42

5  was marked for identification.)

6      Q.   Do you recognize what we have marked as

7  PX42, Mr. Helms?

8      A.   Yes, I do.

9      Q.   Have you read it?

10     A.   I have read it.  Like I said yesterday, I

11  couldn't answer to it without reading it, but I have

12  read it before, yes.  Or do you mean now?

13     Q.   No, I meant at some time in the past?

14     A.   Okay, yes, I have.

15     Q.   And you understand that the first

16  introductory paragraph says, when it says "Members

17  of the Board of Education will strive to attain the

18  following Code of Ethics."  This is a code of ethics

19  that you have undertaken to strive to attain?

20     A.   Yes.

21     Q.   In paragraph one, the third, or section

22  one, the third paragraph one of the admonitions of

23  the Code of Ethics is, "That the public expects my

24  first and greatest concern to be in the best

165

1    interest of each and every one of these young people
2    without distinction as to who they are or what their
3    backgrounds may be." And have you at all times made
4    your first and greatest concern to be the interest
5    of the young people, the students whose education
6    you have been entrusted with?
7       A.   I strive to do that, yes.
8       Q.   And on the second page, in the third
9    paragraph, there is an admonition that each Board
10   member should resist every temptation and outside
11   pressure to use my position as a School Board member
12   to benefit either myself or any other individual or
13   agency apart from the total interest of the School
14   District, do you see that?
15      A.   Yes, I do.
16      Q.   Have you at all times, do you understand
17   that to be your obligation?
18      A.   Yes.
19      Q.   And have you at all times strived to
20   satisfy that obligation?
21      A.   I strive to do so, yes.
22      Q.   Just to pick up on an answer that you gave
23   me before the break, I understood you to say, but
24   tell me if I am wrong, that one reason that you

166

1    passed the policy was so that the public would know
2    that the Board intended to pray at its meetings, was
3    that one of the purposes?
4       A.   I think the way I phrased it was that the
5    public know what we've been doing, what the Board
6    had been doing, and that by adopting this policy I
7    was hoping that we could continue to do that.
8       Q.   Fair enough. So, it was both forward
9    looking and backward looking? You wanted to tell
10   them what you had done and you wanted to tell the
11   public that you were going to continue to do that?
12      A.   And to clarify that, there was some
13   discussions that we had been doing this for years
14   but there was nothing in writing about what we had
15   been doing, so one of the purposes or one of the
16   things in my mind that I wanted to do was, number
17   one, let's get it down on a document that let's
18   people know what we've been doing and hopefully by
19   doing that we could continue to do that in the
20   future.
21           So, I think that's -- I don't know if that
22   clarifies it or not, but that was my thinking.
23      Q.   Now, PX34 that we looked at yesterday
24   toward the end of the day. In terms of having

167

1    nothing in writing on what you had been doing, was
2    the preamble, the material before the numbered
3    paragraphs that ultimately became the policy near
4    the end of this document, was the preamble intended
5    to be a description of what the Board had been doing
6    in the past?
7       A.   The preamble, you are talking I assume page
8    one?
9       Q.   Yeah, everything --
10      A.   All the whereases?
11      Q.   Whereas the school Board is an elected
12   body, whereas the school Board has a long
13   established custom, that was intended to set down in
14   writing what the Board had been doing?
15      A.   I'm not sure. And one of the reasons is
16   that I was not involved with preparing this
17   document. I don't know why, I don't know the
18   specific reason why the whereases are in there.
19      Q.   Okay.
20      A.   If you follow what I'm saying is, this was
21   drafted by someone else.
22      Q.   Yes, sir, I understand.
23      A.   And I don't know what their intent was when
24   they did that.

168

1       Q.   Do you know who drafted it?
2       A.   Yes.
3       Q.   Was it Mr. Neuberger or Mr. Whitehead?
4       A.   I don't know that. I know it came from the
5    Rutherford Institute, or it may have come by way of
6    Mr. Neuberger. I'm not sure which one.
7       Q.   So, would it be fair you know who you got
8    it from, you don't know who drafted it?
9       A.   Right. I know where it came from, yes.
10      Q.   You told me that in adopting the policy you
11   wanted to set down in writing what the Board had
12   been doing in the past?
13      A.   Exactly.
14      Q.   Look at PX9, which is the actual policy,
15   BDA.1. I'll give you a copy. Here is a copy.
16           Would you point to me where in that policy
17   it is set down in writing what the Board had done in
18   the past?
19      A.   I think the document as a whole reflects
20   what the Board had been doing in the past. In other
21   words, if you're asking me is there a numbered item
22   in there that says in the past the Board has been
23   doing thus and so, no, there isn't anything in
24   there. The policy as a whole is what we had been

185

1  A.  Not to my knowledge.
2  Q.  Mrs. Dobrich or the Doe family represented
3  by the ACLU in this case?
4  A.  That's my opinion.
5  Q.  And what's that opinion based on?
6  A.  Right now?
7  Q.  Yup.
8  A.  What I've been told.
9  Q.  By whom?
10  A.  Attorneys, friends.
11  Q.  Do you have any direct information that
12  Mr. Horvath, Mr. Lenhard or I are representing or
13  are affiliated with the ACLU?
14  A.  Do I have anything?
15  Q.  Yes, sir.
16  A.  No.
17  Q.  Has anybody told you that we are?
18  A.  I'm trying to recall if anybody actually
19  told me that, or whether that was my assumption.
20     I don't think, I don't recall anybody
21  telling me specifically that you are members of the
22  ACLU.  I think, I recall somebody mentioning that
23  you may be, how can I say this, I don't know what
24  the term is, but you may be employed by the ACLU to

186

1  take this case.
2     In other words, I have heard for instance
3  that certain attorneys make themselves available to
4  certain organizations, and I have heard that you had
5  made yourself available for the ACLU.  Do I have any
6  documentation, no, but I heard that.
7  Q.  Who did you hear that from?
8  A.  Attorneys.
9  Q.  Neuberger?
10  A.  Yes.
11  Q.  Did he give you a list of the cases --
12     MR. SHAW:  I'm going to object --
13  Q.  -- in which I have been affiliated with the
14  ACLU?
15     MR. SHAW:  Mr. Neuberger
16     represented Mr. Helms at the time and this
17     is privy attorney/client privilege.
18     MR. ALLINGHAM:  Fine, I will
19     withdraw the question.
20  Q.  Mr. Helms, you made a pretty big point of
21  standing up to the ACLU at the February 27 Board
22  meeting, in a number of articles that I can provide
23  to you if you want, you have routinely characterized
24  your passionate defense in this case as standing up

187

1  to the ACLU, which wants to take your rights away,
2  is that a fair statement?
3  A.  That is my opinion, yes.
4  Q.  Did you think it was import -- and you
5  understood that that would inflame people's views
6  about this case, didn't you?  People have extreme
7  views about this case, don't they?
8  A.  I don't know.
9  Q.  Oh, Mr. Helms, come on?
10  A.  No, I would assume that would be the case,
11  but I don't know that.  I haven't had anyone come up
12  to me, and I don't know what your word is, but what
13  would be my word, really upset with the ACLU to the
14  point where they say Mr. Helms we're so upset, I've
15  not had anybody do that.
16  Q.  Let me ask you this question, when you
17  walked into the auditorium on February 27 did you
18  notice that there were a lot of signs being held by
19  people in the auditorium?
20  A.  I noticed there were signs, yes.
21  Q.  Did you notice that many of them were
22  attacks on the ACLU?
23  A.  No.
24  Q.  Really?

188

1  A.  Really.
2  Q.  You didn't see, for example, signs that
3  said, Anti Christian Lawyers Union ACLU?
4  A.  If I did see it I don't recall it, it don't
5  stick out in my mind, no.
6  Q.  That's fine?
7  A.  What was it?
8  Q.  Anti Christian Lawyers Union?
9  A.  No.
10  Q.  That's not what ACLU stands for, is it?
11  A.  I'm pretty sure it doesn't.  But no, I
12  don't recall seeing a sign like that, and it may
13  have been there, but I don't recall.
14  Q.  Before you made repeated statements about
15  the ACLU's control of and representation of the
16  Plaintiffs in this case, did you make any effort to
17  actually check whether the ACLU was driving this
18  suit, representing the Plaintiffs or whether the
19  Plaintiffs were represented by lawyers who were
20  connected to the ACLU?
21  A.  If you are asking me did I call you or
22  anyone else to verify that, no, I did not.
23  Q.  Did look at the Complaint to see whether or
24  not the ACLU was on the Complaint?

193

1    I just want to clarify. You believe that
2  the efforts of the Does and Dobriches and of their
3  lawyers, Messers Lenhard, Horvath and myself are a
4  part of that ongoing campaign, am I correct?
5    A.  I believe this case is part of an ongoing
6  campaign. Whether you're personally involved in
7  that I don't know, but I think this case --
8    Q.  Fine, that's all I need to know.
9    A.  Okay.
10   Q.  After then two sentences down you say, "Our
11 court case where we have been standing up to the
12 ACLU provides the opportunity for a federal court to
13 permanently uphold my right not to be treated as a
14 second class citizen, or have to move to the back of
15 the bus."
16   A.  Uh-hum.
17   Q.  When you refer to having to move to the
18 back of the bus, did you have reference to Mrs. Rosa
19 Parks?
20   A.  Yes.
21   Q.  And do you equate your position here with
22 that of Mrs. Rosa Parks?
23   A.  I equate that with the position, that I
24 feel as though some of my rights may be taken away

194

1  or denied. And certainly I think that was her main
2  concern that some of her rights were being violated,
3  and so in that way, yes.
4    Q.  So your position is equivalent to that of
5  Rosa Parks?
6    A.  I don't know if it's equivalent.
7    Q.  Why did you use the phrase, "move to the
8  back of the bus," if you didn't think it was
9  equivalent?
10   A.  Well, when you say equivalent, equivalent
11 is the same weight. Some people may say that her
12 issue is more important to them than my issue.
13   Q.  Not to you, though?
14   A.  To me my issue is very important and I also
15 recognize that hers was important, but are they
16 equal, that's a matter of opinion, but I think they
17 are both having to be involved with rights being
18 taken away from individuals or whatever. It's not
19 whether it's equal, it's whether it's of the same
20 nature. In other words --
21   Q.  You think that you are in the same position
22 as Mrs. Parks was?
23   A.  I think I'm in the position that there's a
24 possibility that some of my rights may be taken

195

1  away, yes.
2    Q.  Do you think that you are being
3  discriminated against in the same way that
4  Mrs. Parks was being discriminated against?
5    A.  I think I'm being discriminated against
6  because I'm a Christian and I want to pray in Jesus'
7  name.
8    Q.  I don't think that was my question. Do you
9  think that you are being discriminated against in
10 the same way as, and to the same degree that
11 Mrs. Parks was discriminated against?
12   A.  Well, would you describe to me your opinion
13 of same way?
14   Q.  No, sir.
15   A.  Okay, then I don't know if I can answer
16 that question.
17   Q.  Do you believe that you are discriminated
18 against to the same degree as Mrs. Parks?
19   A.  I really don't know how to answer that
20 question.
21   Q.  Have you ever have been made to sit in the
22 back of the bus because you're a Christian?
23   A.  No.
24   Q.  Have you ever been made to drink from a

196

1  separate water fountain because you're a Christian?
2    A.  No.
3    Q.  Have you ever been made to leave a lunch
4  counter because you're a Christian?
5    A.  No.
6    Q.  Have you ever been denied the right to vote
7  because you're a Christian?
8    A.  No.
9    Q.  Have your children ever been -- has anyone
10 ever sought to convert your children to another
11 religion because you're a Christian?
12   A.  I don't know that answer.
13   Q.  Do you believe --
14   A.  Not to my knowledge, but kids don't also
15 confide, I don't know.
16   Q.  Has anyone ever tried to convert you to a
17 religion different than Christianity?
18   A.  Yes.
19   Q.  Has anyone ever asked you why you were a
20 Christian?
21   A.  Yes.
22   Q.  Have you answered?
23   A.  Yes.
24   Q.  And what was your answer?

197

1  A.  Why am I a Christian?
2  Q.  Yes.
3  A.  Because on March 27, 1973 I was at a
4  revival meeting and the evangelist that was
5  preaching that night his sermon touched my heart and
6  I went forward and gave my heart to Jesus, and
7  that's why I'm a Christian.
8  Q.  And before March 27 what religion were you?
9  A.  I had attended a Methodist church when I
10  was younger, but I don't know if I had any — I
11  wasn't a Christian before March 27, 1973.
12  Q.  Anybody ever turn a fire hose or police
13  dogs on you because you're a Christian?
14  A.  No.
15  Q.  Has anyone ever suggested that you could
16  disappear because you're a Christian?
17  A.  To me?
18  Q.  Yeah.
19  A.  No.
20  Q.  Now, I know these words were not written by
21  you, but do you think that for you to equate your
22  position with Rosa Parks was a little over the top?
23  A.  No.
24  Q.  You think it was an exactly apt comparison?

198

1  A.  No.
2  Q.  Well, do you think it was an apt
3  comparison?
4  A.  I think in my mind the comparison that she
5  had rights taken away from her, and there was a
6  potential that I was going to have rights taken away
7  from me.  That's how I equate myself to Miss Parks.
8  Q.  All right --
9  A.  To me it's a matter of rights being
10  withheld, taken away, and in my case it was the
11  potential of that happening.
12      At this moment as we are sitting here right
13  now, as far as I know I have the right to pray when,
14  where and however I wish.  However, I feel as though
15  that right may be in jeopardy.
16  Q.  Mrs. Parks rights weren't in jeopardy, they
17  had been taken away, hadn't they?
18  A.  I think she was denied some rights, yes.
19  Q.  Mrs. Parks was being discriminated against?
20  A.  Okay, yes.
21  Q.  You're not being discriminated against, are
22  you?
23  A.  I am not, but there are Christians
24  throughout this nation and world that are.

199

1  Q.  That's not what this lawsuit is about, is
2  it Mr. Helms?
3  A.  I know, I know, but I'm just saying, you
4  asked me several times about are these things
5  happening to me and no they're not, but the
6  potential is there because it is happening in other
7  places.
8  Q.  I am going to ask one more question then
9  I'm going to go to a new topic?
10  A.  Okay.
11  Q.  Do you think that the comparison of
12  Reginald Helms, a white man from Sussex County,
13  Delaware, to Rosa Parks, a black woman in the south
14  in the late '50s is an apt comparison?
15  A.  I don't know how to answer that question.
16  In my mind it's not equal, but it is the same.
17  That's the best I can come, because I think it's a
18  matter of rights and although I haven't been fire
19  hosed, beaten or whatever, it's to me, my opinion,
20  it's a matter of rights.
21  Q.  I gave you a list of six Board meetings
22  that since the adoption of the prayer policy, at
23  which you gave the prayer, in each of those cases
24  did you pray in the name of Jesus?

200

1  A.  Yes.
2  Q.  In each of those cases you knew that
3  students were there?
4  A.  Yes.
5  Q.  You had no idea whether those students were
6  all Christian or of other faiths, isn't that
7  correct?
8  A.  No.
9  Q.  You didn't know if they were Muslim or
10  Jewish or Agnostic or atheist or whatever?
11  A.  No.
12  Q.  And for the purposes of your position in
13  this case it doesn't matter, isn't that right?
14  A.  It doesn't matter?
15  Q.  Yes.
16  A.  I wouldn't say it doesn't matter.
17  Q.  Well, explain to me how it matters whether
18  the students in the audience are Christian or Muslim
19  or Agnostic or Jewish for purposes of the
20  infringement of your rights?
21  A.  I guess I just have a -- I'm having a hard
22  time to understand what your question is.  Could you
23  ask it again?
24  Q.  Sure.  It didn't matter whether all of the

201

1  students are Christian or all the students are
2  atheist, for purposes of determining whether or not
3  your rights to pray as you wish are being
4  compromised, or you are being discriminated against,
5  does it? The audience doesn't matter, it's you that
6  matters?
7       A.   I wouldn't say that, I have respect for all
8  people. I would hope they would have respect for
9  me. So when you say does it matter, everyone
10  matters. But I just simply want to be able to pray
11  the way that I have always prayed since I've been a
12  Christian.
13       And if they want to pray, if they are in a
14  position that they are all called to pray, or they
15  want to pray, then whatever way they want to pray is
16  fine. I may not necessarily agree with it, but it's
17  fine.
18       Q.   If you offered a prayer and a student
19  walked to the podium said I would like to offer a
20  prayer, too, what would you do?
21       A.   What would I do?
22       Q.   Yeah.
23       A.   I don't know. That's an honest answer --
24       Q.   All right let's say that -- I'm sorry,

202

1  excuse me, I interrupted, I don't like to do that.
2       A.   I don't know how I would act in that
3  situation until presented to that. I would hope, I
4  would hope that I would be respectful, but I don't
5  know what I would do.
6       Q.   Well, let me pose a different hypothetical.
7  Suppose there were 35 students in the audience and
8  each of them one after another walked to the podium
9  and said I'd like to offer a prayer, and the Board
10  members began to look at their watches and said
11  something's got to be done here, and at some point
12  it's true, is it not that maybe the first person you
13  wouldn't say sorry we have got to get on with our
14  business, but at some point, we can both agree,
15  can't we, Mr. Helms, that you'd say look I have
16  enormous respect for your religion and I think it's
17  wonderful that you're anxious to invoke divine
18  guidance but we have got to get to the business at
19  hand?
20       A.   Well, I'm sitting here thinking as
21  presented with this, one way it might possibly be
22  handled is to say we have a public comment section
23  coming up and if you wish to come to the podium and
24  present a prayer we set aside 15 minutes and each

203

1  individual has two minutes to express themselves in
2  whatever way, maybe that would be the appropriate
3  time. But you know, and handle it that kind of way.
4       Q.   Isn't the public comment section limited to
5  matters of Board business?
6       A.   As far as I know public comment is public
7  comment. It could be -- now you would hope someone
8  wouldn't come to the podium in a School Board
9  meeting and start talking about what happened at the
10  Food Lion. However, we don't tell them what they
11  can talk about and we don't limit them except the
12  policy like we talked about before as far as getting
13  into personalities, bargaining unit types of things.
14  There are limitations there, but we don't tell
15  anyone what to speak about and we don't say you can
16  only talk about School Board issues.
17       I've never heard anyone say, to the best of
18  my knowledge, I have never heard any president tell
19  someone you can only talk about this issue and you
20  can't talk about that. I've never heard that. I
21  would assume everybody knows we are there about
22  School Board business.
23       However, if a student came up and says I
24  want to offer a prayer, I would hope we would handle

204

1  it respectfully and say well, we have a public
2  comment section and as an individual you have two
3  minutes, and you say whatever you want to say,
4  within the guidelines of our policy.
5       In other words, they couldn't bad mouth a
6  teacher by name, that sort of thing.
7       Q.   Doesn't the Constitution guarantee the
8  right to say whatever you want?
9       A.   Well, I think I'm not that familiar with
10  the Constitution law --
11       MR. ALLINGHAM:  That's a legal
12  question, I will withdraw it.
13       MS.DUPHILY:  We are going off the
14  record at approximately 11:10 a.m..
15       (WHEREUPON a brief recess was
16  taken)
17       MS. DUPHILY:  We are back on the
18  record at approximately 11:11 a.m..
19       Q.   As a School Board member you want this
20  School Board prayer issue to be decided by the
21  courts don't you?
22       A.   My opinion, yes.
23       Q.   Do you know who the Does are?
24       A.   No, I don't.

205

1    Q.  Has anyone told you who they think the Does

2  are?

3    A.  I don't recall that, although I have had

4  some people say to me they think they know who they

5  are.  But I don't recall anybody telling me

6  specifically who they were.  But if they did, I

7  don't remember.

8    Q.  I take it you have done nothing to counter

9  what people conjecture about, have you?

10    A.  If you are asking me if it's important for

11  me to know who they are, it's not important to me

12  who they are.  If they want to remain anonymous

13  that's fine.  We had some discussion about should we

14  know who they are, and some people think we should

15  know, but to me I would like to know, but it's not

16  that big a deal to me.  So, I have not made any

17  conscious effort to find out who they are.

18    Q.  Do you recall who told you they thought

19  they knew who the Does were?

20    A.  I believe as I recall I think Mrs. Hobbs

21  may have said she thought she knew who they were, I

22  think Dr. Hattier said he knew who -- he thought, he

23  thought he knew who they were and maybe Mr. Darling,

24  but again I'm not 100 percent sure.  But no, do I

206

1  know Mrs. Hobbs knows, she could, and Dr. Hattier

2  said he thought he knew, whether Mr. Bireley said it

3  or not, I think he did, but I'm not 100 percent

4  sure.

5    Q.  Whoever said, though, that they knew who

6  the Does were, they didn't tell you who they thought

7  the Does were?

8    A.  I don't recall that, but if they did I

9  can't give you a name, I don't know who they are.

10    Q.  This is the Southern Delaware School of the

11  Arts, and you have to audition to be admitted into

12  the school?

13    A.  I believe that to be true.

14    Q.  Does the Board have anything to do with the

15  scheduling of those auditions?

16    A.  To the best of my knowledge, no.

17    Q.  Yesterday you told me that typically where

18  the Board concludes that a matter is appropriate for

19  treatment by a policy that it's appropriate to pass

20  a policy on an issue, what typically they do is

21  refer the matter to the policy committee and ask the

22  Board's attorney to draft a policy, do you remember

23  that testimony?

24    A.  Yes.

207

1    Q.  In this case am I correct that you did not

2  ask Mr. Griffin to draft a School Board Prayer

3  Policy?

4    A.  I'm not sure whether we asked him or not.

5  I don't recall.

6    Q.  Are you aware of any alternative draft

7  School Board Prayer Policy that was provided by

8  anyone to the Board members?

9    A.  I am aware of the policy that I sent to

10  Mr. Walls, I'm aware of that.

11    Q.  It's one that you have in front of you?

12    A.  Yes, that's correct.

13    Q.  And you understand that that one has the

14  policy that was ultimately adopted as part of it?

15    A.  Yes.

16    Q.  When you sent PX34 to Mr. Walls that's the

17  document that you have right there?

18    A.  Yes.

19    Q.  Did you send it to him thinking in your

20  mind that it was an example of a School Board Prayer

21  Policy?

22    A.  I sent him the fax to say here is what I

23  have received and to consider this.  And I guess I

24  can't, I could have thought that this is one example

208

1  of a possible policy, but I don't recall my exact

2  thoughts.  But I did send it to him with the intent

3  that it was pretty important to looking it over and

4  see what he thought.

5    Q.  Was there any discussion at any time that

6  you are aware of whether to adopt simply the

7  five numbered paragraphs at the end of PX34 or the

8  longer document that you had sent to Mr. Walls?

9    A.  I seem to recall a discussion about the

10  document as we see here being entirely too lengthy.

11  I do recall that discussion.

12    Q.  And who said that?

13    A.  I want say it was Mr. Walls as being chair

14  person of the policy committee.  I'm not 100 percent

15  sure, but as I recall I think it may have been

16  Mr. Walls saying that it was too lengthy.

17    Q.  Did he say that to you?

18    A.  I think he said it to the entire Board as I

19  recall, I think that's where it was.

20    Q.  Was that in response to someone asking what

21  happened to the longer version that we received from

22  Mr. Helms?

23    A.  I can't recall the specifics.  I don't

24  recall a question of that, but I don't know.  It

213

1  lawsuit was filed?
2          MR. SHAW:  Do you have an extra
3      copy of that?
4          MR. ALLINGHAM:  I have masked out
5      the name at the bottom and I ask that you
6      do not take the mask off.
7      A.  I don't recall receiving this letter.
8      Q.  Thank you.  Do you recall at or about the
9   time of its date, October 1, 2004, being informed
10  that a complaint -- being informed of the substance
11  of a complaint like that?
12     A.  No.  You mean by Mrs. Hobbs?
13     Q.  Mrs. Hobbs or anybody?
14     A.  I don't recall that.  She may have but I
15  don't recall that.
16     Q.  Thank you, may I have it back, please?
17     A.  Sure.
18     Q.  The next three or four questions have to do
19  with contacts with voters or residents of your
20  district.  Has any of your constituents told you
21  that they see this case as about protecting
22  Christian prayer?
23     A.  Yes.
24     Q.  How many, and again I'm looking for

214

1  ballparks here?
2      A.  25 to 50, somewhere in there.
3      Q.  Has anyone ever told you that they see this
4   case as about protecting Christian values?
5      A.  No.
6      Q.  Has anyone ever told you that they see
7   this, the School Board's Prayer Policy, as
8   protecting Christian values?
9      A.  No.
10     Q.  Has anyone ever told that they see the
11  School Board's prayer policy as promoting
12  Christianity?
13     A.  No.
14     Q.  Has anyone ever told you that they see the
15  School Board's prayer policy as protecting Christian
16  prayer?
17     A.  Yes.
18     Q.  Do you know if any School Board member has
19  campaigned for election or reelection on the ground
20  that they support School Board prayer?
21     A.  Only hearsay.
22     Q.  What was the hearsay?
23     A.  I didn't hear the WGND broadcast, but I
24  understand that Mr. Bireley and Miss Wilson was on a

215

1  program and I believe that that was one of the
2  topics that people were calling in and asking, and I
3  heard that was told to me was Miss Wilson's
4  comments were not very good.  Now, whether she
5  campaigned on that issue or not I'm not sure, but
6  that's the only one I'm aware of that even mentioned
7  it during the elections.
8      Q.  Have you ever told anyone that you view the
9   ACLU as anti-Christian?
10     A.  No.
11     Q.  All right, look at PX9, that's the Board
12  Prayer Policy?
13     A.  Okay.
14     Q.  And you will see that paragraph three
15  reads, "Such opportunity shall not be used or
16  exploited to proselytize, advance or convert anyone
17  or to derogate or otherwise disparage any particular
18  faith or belief."
19         Do you see that?
20     A.  Yes.
21     Q.  And that's something that you believe in as
22  a Board member?
23     A.  Right.  Our -- may I clarify that?
24     Q.  Yes.

216

1      A.  Our Board meetings are not supposed to be
2   evangelistic meetings or --
3      Q.  We can all agree on that?
4      A.  Right.  I don't know what the Muslims call
5   their, but this is for School Board business and
6   it's not intended to be a church meeting or anything
7   of that nature.
8      Q.  Okay, I'm going to give you three examples
9   of a prayer one by one, and I'm going to ask you
10  whether in your view interpreting paragraph three of
11  the Board Prayer Policy you would view them as
12  prohibited by paragraph three or permitted under
13  paragraph three, okay?
14     A.  Yes.
15     Q.  The first one has previously been marked as
16  Plaintiff's Exhibit 35.  Can you read over Mr. Helms'
17  shoulder or do you have a copy?
18         MR. SHAW:  I have a copy.
19     Q.  And so the record is clear the prayer is as
20  follows, Mr. Helms, but follow along with me.  Do
21  not put your trust in princes, in mortal men who
22  cannot even save themselves.  When their spirit
23  departs they return to the ground.  On that very day
24  their plans come to nothing.  Blessed is he whose

221

1  think you are stepping over the bounds.
2      To someone else it's a matter of opinion.
3  They may have been, for instance the prayer that you
4  led off with Allah, someone may have been feeling
5  that hey are they trying to impose the, whatever
6  that is Muslim belief on us, us, or whatever, I would
7  not.
8  Q.  Okay, I'm only looking for your
9  interpretation as a Board member?
10  A.  I think you step over the line when in your
11  prayer you may include something like and all the
12  heathens sitting out in the audience need to bow
13  down and accept whatever. I think you may be
14  stepping over the bound. I don't know that, but in
15  my mind I would say I don't know if I would say that
16  or not.
17  Q.  Well, let me just explore that a little
18  bit, if I may. If, I will make Dr. Hattier the
19  villain in this case, I don't mean villain, you know
20  what I mean by villain, the example. If Dr. Hattier
21  offered a prayer in which he said at the end of the
22  prayer, and I pray that the heathen in the audience
23  recognize the error of their ways and come to Jesus
24  so that they may join his children in heaven. My

222

1  question to you is, that's a prayer that you would
2  view as violative of paragraph three?
3  A.  I would view that as a prayer that is very
4  dangerously on the edge, and I would need someone --
5  see, to me there is a difference between what is
6  lawful -- in other words, someone would have to tell
7  me whether that lawfully broke the policy. However,
8  in my mind I would say I would not say that, and I
9  don't know that I would, but perhaps I may say
10  something to Dr. Hattier in the form of you know Dr.
11  Hattier that might be dangerously close. That's
12  something I wouldn't do.
13  Q.  Yes, sir. That raises a couple of more
14  questions. If you viewed a prayer in your judgment
15  as a Board member, because you are charged with
16  enforcing this policy, correct?
17  A.  Right.
18  Q.  If you viewed a prayer offered by one of
19  your colleagues as violating paragraph three what
20  would you do?
21  A.  I would wait till the appropriate time and
22  I see that as executive session or whatever, and I
23  would like to talk about it.
24  Q.  It is fair to say, is it not, that nothing

223

1  in this policy would provide a mechanism for a
2  determination to be made that a prayer -- that a
3  prayer which is offered would violate paragraph
4  three in advance?
5  A.  Could you explain that question?
6  Q.  Yeah. There is a mechanism in the policy
7  which if Dr. Hattier, poor Dr. Hattier, if Dr.
8  Hattier had a piece of paper with that evangelical
9  prayer that we have been talking about in his hand
10  and he sits down at the table on the stage and
11  Mr. Bireley says would you like to give a prayer, to
12  open the meeting with a prayer Dr. Hattier, there is
13  no mechanism for you, of any Board member, to have
14  determined whether the prayer on the piece of paper
15  Dr. Hattier holds is violative of paragraph three or
16  not, is there?
17  A.  I think I understand your question and I
18  would say no, there is no stipulation that says you
19  have to submit your prayer beforehand or someone
20  needs to review that and make corrections, no, there
21  is no stipulation.
22  Q.  And if Dr. Hattier or any other Board
23  member delivered a prayer that was sufficiently
24  evangelical that you and your colleagues would

224

1  believe it was prohibited by paragraph three, there
2  is no provision for punishment of that Board member
3  for violating the policy, is there?
4  A.  Yes and no.
5  Q.  Tell me what you mean by yes and no?
6  A.  Okay. I would say yes there is a provision
7  number one if the president felt that they were
8  stepping over the line they have the opportunity to
9  step in and ask Dr. Hattier to cease. And is there
10  no punishment, I would say I don't know. During the
11  discussions in executive session I don't know if
12  there would be any punishment. We are certainly not
13  going to sentence him to jail, or we couldn't
14  suspend him from the job because it's not a job, so
15  there may be some punishment if you will, to the
16  extent we would appreciate it if you didn't do that
17  again. Someone may consider that to be punishment,
18  I don't know.
19      But there are opportunities to step in if
20  someone is out of line. The president has that
21  responsibility, but also in executive session there
22  are discussions that can be had to try to, you know,
23  straighten that sort of thing out.
24  Q.  Yes, sir. Where ever the line is drawn,