# EXHIBIT 10

**1**

FOR THE DISTRICT OF DELAWARE

MONA DOBRICH and MARCO    )
DOBRICH, Individually and    )
as parents and next friend    )
of ALEXANDER DOBRICH,    )
SAMANTHA DOBRICH, JANE DOE    ) Civil Action
and JOHN DOE, Individually    ) Number 15-120 (JJF)
and as parents and next    )
friend of JORDAN DOE and    )
JAMIE DOE,    )
    )
        Plaintiffs,    )
    )
v.    )
    )
INDIAN RIVER SCHOOL    )
DISTRICT, et al.,    )
    )
        Defendants.    )

Videotape deposition of LOIS HOBBS, taken
pursuant to notice at 31 Hoosier Street, Selbyville,
Delaware, beginning at 9:12 a.m., on October 24, 2006,
before Julie H. Parrack, Registered Merit Reporter,
Certified Realtime Reporter and Notary Public.

APPEARANCES:
    THOMAS ALLINGHAM, ESQUIRE
    BRIAN G. LENHARD, ESQUIRE
    One Rodney Square
    Wilmington, Delaware  19801
    On behalf of Plaintiffs
        WILCOX & FETZER
    1330 King Street - Wilmington, Delaware 19801
        (302) 655-0477
        www.wilfet.com

**2**

1  APPEARANCES (CONT'D:)
2    JASON P. GOSSELIN, ESQUIRE
        DRINKER, BIDDLE & REATH, LLP
3        One Logan Square
        18th and Cherry Streets
4        Philadelphia, Pennsylvania  19103-6996
        On behalf of Defendants
5
    ALSO PRESENT:  TIMOTHY KEARNS
6        LINDSAY DuPHILY, VIDEOGRAPHER
7            - - - - -
8        THE VIDEOGRAPHER:  This is the videotape
9  deposition of Ms. Lois Hobbs taken by the Plaintiff in
10  the matter of Dobrich, et al., versus Indian River
11  School District, et al., Civil Action No. 15-120.  The
12  deposition is being held at 31 Hoosier Street,
13  Selbyville, Delaware, on October 24th, 2006.  We are
14  going on the record at approximately 9:12 a.m.
15        The court reporter is Julie Parrack from
16  the firm of Wilcox & Fetzer, Wilmington, Delaware.  My
17  name is Lindsay DuPhily, and I am the videotape
18  specialist of Discovery Video Services.
19        Counsel will now introduce themselves, and
20  then the court reporter will swear in the witness.
21        MR. ALLINGHAM:  My name is Tom Allingham.
22  I represent the plaintiffs.  Along with me is Brian
23  Lenhard and Tim Kearns.
24        MR. GOSSELIN:  Jason Gosselin for the

**3**

1  defendants.
2            LOIS HOBBS,
3        the deponent herein, having first been duly
4        sworn on oath, was examined and testified as
5        follows:
6  BY MR. ALLINGHAM:
7    Q.  Mrs. Hobbs, Ms. Hobbs, which do you prefer?
8    A.  Miss, Miss Hobbs.
9    Q.  Miss Hobbs, sorry.  Have you ever been deposed
10  before?
11    A.  Yes.
12    Q.  All right, so you know the process.  I'm going
13  to ask you some questions.  You are -- unless your
14  counsel instructs you not to answer, you're obligated
15  to answer those questions to the best of your ability.
16  I'm almost world renowned for asking questions that
17  are sometimes confusing.  Please tell me if you find a
18  question confusing or ambiguous, and I will do my best
19  to fix it.  Don't answer a question that you don't
20  feel like you understand.
21    A.  Okay.
22    Q.  You need to answer, although we have a
23  videographer here, you still need to answer out loud;
24  that is to say, so that the court reporter can take

**4**

1  down your answer and there's no ambiguity in what your
2  answer is.  Nods and "um-hums" can be misinterpreted.
3    A.  All right.
4    Q.  I understand that you have a previous
5  commitment and that you need to stop at 1:00 this
6  afternoon, correct?
7    A.  At 1:30 at the latest.
8    Q.  Okay.  I think what we'll do then is stop for
9  lunch at 1:00.  You can take care of your obligations
10  and if we need to resume thereafter, we will.
11        Is there any -- are you suffering from any
12  condition that would prevent you from giving
13  comprehensive and truthful answers to my questions
14  today?
15    A.  No.
16    Q.  Or taking any medications that might prohibit
17  you from doing that?
18    A.  No, I took a Benadryl, but I don't think that
19  will prohibit.
20    Q.  All right, your full name is what?
21    A.  Lois Margaret Hobbs.
22    Q.  And what is your address?
23    A.  It is 3 Brighton Street, Ocean View, Delaware.
24    Q.  Are you currently employed?

33

1 the bottom?
2   A. They're posted after the Board approves them.
3   Q. So they should be identical?
4   A. Yeah.
5   Q. You have to answer orally.
6   A. Yes.
7   Q. Okay. In your 10 years or so here in Indian
8 River, did you ever invite people to the Board
9 meetings?
10   A. I invited children who won an award or teachers
11 who wrote a grant to be recognized if they wanted to
12 come.
13   Q. And with respect to the children who won an
14 award, was it typical that you -- and I'm talking now
15 about the academic school year board meetings, was it
16 typical that children were invited to receive awards
17 or to get recognition?
18   A. What would happen, because you can't keep track
19 of the whole district, the principal, if they felt
20 that a child had received an honor, somewhere else in
21 the district or outside of the district, and they
22 should be recognized at the Board meeting, they either
23 called my office and said they should be recognized,
24 or we then later had a form that they could fill out

34

1 so we wouldn't miss children if they would be
2 recognized, or should be recognized. And they were
3 recognized for, you know, athletics, for academics,
4 for outside poster contests, anything usually at the
5 state or national level.
6   Q. And this was not intended to be restricted to
7 athletics, I take it?
8   A. No.
9   Q. Would it be fair to say that the hope was to
10 cast a net broad enough to encompass all areas of
11 achievement that the students might participate in?
12   A. Anything that was at the state or national
13 level that a student participated in, to recognize
14 them and say thank you for, you know, trying that or
15 doing that.
16   Q. There's been some testimony from other
17 witnesses that you might have been instrumental in
18 expanding this practice of trying to recognize
19 achievements by the students. Is that correct?
20   A. Yes.
21   Q. Okay. Tell me why you did that. Well, first
22 of all, tell me what changes you implemented in that
23 area.
24   A. I invited people who, children or adults who

35

1 had made contributions to the district because I think
2 they should be recognized. I think that's a part of a
3 community, that we say great job and thank you. Some
4 of our teachers had written grants for 5 and $6,000,
5 and I thought they should be thanked publicly.
6   Q. How does that grant process work? Do teachers
7 have to get authorization from the district, from you
8 or from someone at the district before they submit the
9 grant application?
10   A. Actually, they can write the grant. MBNA, who
11 is no longer in business, or in business with us, I
12 should say, offered teachers grants. And they could
13 apply to MBNA for the grants. And that's where we got
14 most of our grant money. And so they could do it
15 directly and could ask for help from the district if
16 they needed it, to write the grant or ideas for the
17 grant.
18   Q. I take it from your earlier answer that you
19 thought that the district benefited directly or
20 indirectly from recognizing teachers who had
21 successfully applied for grants.
22   A. I just wanted to say thank you to people.
23   Q. And what I was trying to get at was, as a
24 manager, as superintendent, you believed that the

36

1 district would benefit by a practice of thanking
2 people for achievements on behalf of the district,
3 correct?
4   A. Yes, I think that's fair.
5   Q. Okay. And then coming over to the, to the
6 recognition of the children, what benefit did you
7 think that the district would achieve by recognizing
8 achievements of children within the district?
9   A. The children are what we're all about. So I
10 wanted to say thank you and recognize the children.
11   Q. Did you think the children would benefit from
12 that recognition?
13   A. I did. I think the parents enjoyed the fact
14 that they were recognized, and normally, in the past
15 few years I sent them a congratulatory letter with a
16 picture of them standing in front of the Board.
17   Q. Oh, really?
18   A. Um-hum.
19   Q. And I guess that was to memorialize the
20 recognition?
21   A. Well, I don't know. I'm a first grade teacher
22 at heart.
23   Q. What does that mean?
24   A. That I like recognizing children. I think it's

Page 37

1  important. This is, this is what we do.

2  Q. From the children's perspective, did you

3  understand that they viewed it as an honor to be

4  recognized by the School Board?

5  A. They could come and be honored or they might

6  not, or their principal might accept the award and

7  they could stay home. There was no obligation for

8  them to come to a Board meeting.

9  Q. That wasn't my question. As a superintendent

10  who began as a first grade teacher, did you understand

11  that the children would view it as an honor to be

12  recognized by the School Board?

13  A. I would think they would.

14  Q. And it's to memorialize that honor that you

15  sent them the letter and the picture, correct?

16  A. I wouldn't go that far.

17  Q. Who was in the picture?

18  A. Usually it was the children, their parents when

19  they got their certificate, so it would be the Board

20  president and myself.

21  Q. So you had a process in place, at least for the

22  last few years, in which there was a photographer

23  available to take a picture of each of the children

24  who was being -- each of the children who were being

Page 38

1  recognized?

2  A. Right.

3  Q. Correct?

4  A. Yes.

5  Q. Okay. And was that a district employee, the

6  photographer, or someone else?

7  A. District employee.

8  Q. I take it not a full-time photographer then?

9  A. No.

10  Q. Okay.

11  A. We don't have that luxury.

12  Q. Understood. I looked at the minutes that we

13  were given, or that we were able to get off the Web

14  site, to get a sense of what sorts of achievements the

15  Board chose to recognize. And I certainly saw a

16  number of state and national awards that children were

17  recognized for. I saw some recognition for, simply

18  for participation from time to time. Was that also

19  something that was done?

20  A. I would imagine, if you saw it. We tried to

21  make it more of an award or national participation or

22  state participation. But they may have participated

23  in a, you know, a team that won, sports team that won.

24  Q. And the process by which invitations were

Page 39

1  extended during -- that you established during your

2  tenure as superintendent was to ask the principals at

3  each of the schools to suggest children who could be

4  invited for recognition and then the district would

5  extend the invitation?

6  A. Normally the principal extended it and said,

7  you know, we will -- we didn't send them a written

8  formal invitation to the Board, no.

9  Q. Okay. What was the purpose then of having the

10  principals tell you?

11  A. I had to put it on the agenda, so I had to know

12  what names were going on the agenda.

13  Q. Okay. And the awards on the agenda, was that a

14  single line item or did you have subline items, if you

15  will, that identified the children who would be

16  getting recognition?

17  A. For instance, if it was Odyssey of the Mind,

18  you know, if they won a national award, we would list

19  the children's name under that.

20  Q. On the agenda?

21  A. On the agenda.

22  Q. And I'm sort of feeling my way here. But was

23  there a distinction between, you know, a national

24  award like the children recently got for Odyssey of

Page 40

1  the Mind and, I don't know, the Fifth Grade Yell Club,

2  for purposes of whether they'd be specifically listed

3  on the agenda?

4  A. Not really.

5  Q. Was it your practice to, if a child was going

6  to receive recognition, to put that child's name on

7  the agenda?

8  A. Yes.

9  Q. Okay. Now, the minutes reflect the recognition

10  of the child at the meeting; that is to say, the Board

11  then recognized John Smith for his participation in

12  the Odyssey of the Mind championship team. Did you

13  have a practice, one way or another, as to whether the

14  minutes reflected the child's being recognized,

15  whether they were actually there or not?

16  A. No, I don't think the minutes ever reflected

17  that. Not that I recall.

18  Q. Okay. I asked you some questions earlier about

19  your having had some influence on the expansion of the

20  practice of recognizing children for their

21  achievements. Do you know what the practice was prior

22  to your coming here to Indian River in 1996?

23  A. No.

24  Q. The practice of inviting students for

73

1  heading, there is a notation which reads, "President
2  Walls noted that it is the history of the Board to
3  have a prayer at the beginning of the meeting, which
4  is voluntary among the members of the Board of
5  Education and the audience is not required to
6  participate.  President Walls then read a prayer,
7  which was part of a speech given by Dr. Martin Luther
8  King."
9       Do you know whether it was typical in the
10  minutes for a statement from President Walls about the
11  history of the Board's prayer practices to be
12  reflected in the minutes?
13  A.  I don't recall that that happened in previous
14  minutes.  I'm not sure, but --
15  Q.  Do you know, did you tell Mrs. Hearn to
16  incorporate that comment in the minutes of March 22,
17  2005?
18  A.  I don't recall that I did.
19  Q.  Do you know whether anyone else instructed
20  Mrs. Hearn to incorporate that statement in the
21  minutes?
22  A.  I don't, no.
23  Q.  The next heading is "Presentation of Colors."
24  And it reflects that the presentation of colors was

74

1  performed by the Sussex Central High School Army
2  JROTC.  During the academic school year Board
3  meetings, was it the custom and practice of the
4  district to have a presentation of colors?
5  A.  Yes.
6  Q.  And was that performed by the JROTC of either
7  Sussex Central or Indian River High Schools on a
8  rotating basis?
9  A.  Yes.
10  Q.  Okay.  And how did the JROTC members know that
11  they needed to be at the Board meeting?
12  A.  Well, we didn't have JROTC all the years I was
13  there, so I, at one time I would imagine we invited
14  them to come before the Board.  And then it's placed
15  on the agenda, and usually through the principal they
16  would find out.
17  Q.  Okay.  Now, the presentation of the colors was
18  an agenda item for every meeting during the school
19  year.  Was there a presentation of colors during the
20  summer meetings of the Board?
21  A.  No.
22  Q.  All right.  Would you agree with me that the --
23  A.  That I know of, I mean.
24  Q.  Okay.  Would you agree with me that the JROTC

75

1  members who were to present the colors were not --
2  this was not a voluntary thing, it was an important
3  part of the meeting to have the colors presented?
4  A.  I would think that they have certain hours of
5  service that they should do, and this would probably
6  be considered some of their hours of service.
7  Q.  And the JROTC is a district organization,
8  correct?  District-sponsored organization?
9  A.  Yes.
10  Q.  Miss Hobbs, is it correct that from time to
11  time during your tenure as superintendent there was a
12  system pursuant to which students would be awarded
13  points for attendance at Board meetings?
14  A.  Not under my direction that I can recall.
15  Q.  This would be in connection with fund-raising
16  activities.
17  A.  Not that I know of.
18  Q.  Do you know whether when athletic teams were
19  invited to appear before the Board for recognition,
20  coaches employed by the district told the athletes
21  that attendance was mandatory?
22  A.  Not that I know of.
23  Q.  Would it surprise you if a coach told the
24  members of the team that attendance was mandatory?

76

1  A.  Often we gave out a lot of certificates to
2  coaches only, there were no children there.  So I
3  would say yes.
4  Q.  Well, you also gave certificates to individual
5  team members from time to time, correct?
6  A.  Right.
7  Q.  And would it surprise you that in those
8  instances, a coach had told the team members that
9  attendance was mandatory?
10  A.  I haven't heard of such a thing.
11  Q.  We talked earlier about approval of minutes,
12  which comes, I take it, after presentation of colors?
13  A.  Yes.
14  Q.  Typically on the agenda.  And then there is a
15  listing of visitors and staff in attendance, which
16  appears to include the, among other things, the awards
17  for the children in attendance at that Board meeting?
18  A.  Yes.
19  Q.  Okay.  You mentioned earlier that you tried to
20  give awards for statewide or nationwide achievement,
21  or recognition for statewide or nationwide
22  achievement.  I take it from these minutes that you
23  also gave recognition for conferencewide or countywide
24  achievement.

77

1    A.  Yes, at times we did.
2    Q.  I just did a quick count, but there are about
3  45 students who appeared to -- the minutes reflect
4  received recognition from the Board at this March 22
5  meeting.  Is that a representative number of students
6  to achieve recognition at academic year Board
7  meetings?
8    A.  I think this is a rather large number, because
9  of the number of athletes that are being recognized.
10  Normally the list isn't this long, only on certain
11  times of the year when you get all conference and
12  those kind of things.
13    Q.  So I'm just, I'm just trying to get a sense,
14  Miss Hobbs.  For the three Board meetings that follow
15  each of the athletic seasons, would it be fair to say
16  that this is a representative number?
17    A.  That are invited.
18    Q.  Yes, ma'am.
19    A.  I don't know if it really follows every, every
20  athletic season, but at times there's more and times
21  there's less.
22    Q.  Okay.  At times there's more than this number,
23  at times there would be less than this number?
24    A.  Yeah, I would say this is probably pretty

78

1  heavy, according to our regular agendas.
2    Q.  According to your regular agendas, were there
3  meetings that were specially designed to recognize
4  students?
5    A.  No.  There is an academic assembly at the end
6  of the year that recognizes all academic students who
7  make a certain point score.
8    Q.  Okay.  And that's not a Board meeting?
9    A.  No.  That's a dinner.
10    Q.  All right.  So to summarize what we have here,
11  this 45 or so students is somewhere in the middle, as
12  you recall it.  There were times when it was, the
13  number was higher --
14    A.  I'd say it's about --
15    Q.  Let me finish my question.  There were times
16  when the number was higher, there were times when the
17  number was lower; is that correct?
18    MR. GOSSELIN:  Objection.
19    A.  I'm not sure if it was higher or not, but there
20  were times when it was lower.
21    Q.  Can you recall any meeting at which, during the
22  academic school year at which no students were present
23  during your entire tenure as superintendent?
24    A.  I can't recall that.

79

1    MR. ALLINGHAM:  Can I have that back,
2  please?
3    THE WITNESS:  Want this one?
4    MR. GOSSELIN:  You can keep that.
5    MR. ALLINGHAM:  No, you can keep that.
6  BY MR. ALLINGHAM:
7    Q.  Are the -- I just want to follow up on an
8  answer you gave a minute ago.
9    Are the students who are, who are
10  recognized for their academic achievement at that
11  assembly that you just talked about a minute ago, are
12  they the same students who are recognized for academic
13  achievement at Board meetings?
14    A.  It would be different things for academic
15  achievement at the Board meetings, more like Odyssey
16  of the Mind or a science team they won or a math team
17  they won.  The academic achievement banquet is to
18  recognize children with a certain point score or
19  above.  And they're invited each year to an academic
20  achievement banquet.  So we wouldn't recognize
21  everybody who had a point score of 4.0 at the Board.
22  It would -- this is mainly their point score.
23    Q.  When you say point, you mean grade point
24  average?

80

1    A.  Grade point average, yeah.
2    Q.  The, I take it then that the people who were
3  invited for recognition at the Board level is a lower
4  enough -- fewer students are -- fewer children are
5  invited for academic achievement at the Board meetings
6  than --
7    A.  It's more like national competitions or state
8  competitions.  I think that might be a better way of
9  saying it than academic achievement.
10    Q.  More special honors?
11    A.  Yes.
12    Q.  Okay.  I want to ask the same questions about
13  athletes.  Is there a comparable, you know, athletic
14  awards assembly to the academic award assembly?
15    A.  They have those in the individual schools.
16  Like the soccer team will honor their soccer players,
17  and they have a dinner usually and give out letters or
18  whatever they earn.
19    Q.  And so I'm gathering it's the same situation,
20  there are more special or unusual awards recognized at
21  the Board level than would be recognized at the
22  individual school level?
23    A.  Right.
24    Q.  Okay.  On PX 54 you'll see that the minutes

105

1   of the possibility of getting advice from another
2   lawyer than Mr. Griffin on School Board prayer?
3       A.  I'm sure that they most likely have talked
4   about other lawyers on advice on school -- any kind of
5   prayer.
6       Q.  And why are you sure about that?  What makes
7   you sure about that?
8       A.  I mean because they're discussions.  The
9   discussions were about this, and, you know, most
10  likely people are going to be looking for advice when
11  they have an issue.
12      Q.  You said most likely people were going to be
13  looking for advice, they have an issue?
14      A.  If they have an issue or when they have an
15  issue.
16      Q.  Okay.
17      A.  I mean that's what I would call a normal thing
18  to do.
19      Q.  Well, do you recall any instance other than
20  this one in which Board members expressed a desire to
21  get advice from someone other than the School Board's
22  attorney?
23      A.  I would say it would be hard to separate what
24  meeting, what time, when, you know.  I can't do that.

106

1       Q.  Other than this issue, that is the issue that
2   came up in the summer of 2004 regarding School Board
3   prayer, and, more generally, prayer in the schools,
4   that's an issue on which you recall there was
5   discussion of getting advice from somebody other than
6   Mr. Griffin, correct?
7       A.  Um-hum.
8       Q.  Yes, ma'am?
9       A.  Yes.
10      Q.  Okay.  Do you recall any issue rather than that
11  one on which the Board discussed wanting to get advice
12  from someone other than Mr. Griffin?
13      A.  I would say that, you know, it first started
14  with graduation prayer.
15      Q.  Yes.
16      A.  So, you know, that was the policy we started
17  working on.
18      Q.  Yes.
19      A.  So that would be Mr. Griffin's advice that they
20  would have asked for.  I'm not sure that they asked
21  anybody else, or they didn't ask me to ask anyone
22  else.
23      Q.  Okay, well that --
24      A.  No, it...

107

1       Q.  And how about the policy on religion in
2   schools, did any Board member ask you to get advice
3   from any other lawyer on that policy?
4       A.  Not any other lawyer.  They -- the Policy
5   Committee, I believe, asked for Mr. Griffin's advice
6   on that.
7       Q.  What's the basis for your belief that the
8   Policy Committee asked for Mr. Griffin's advice?
9       A.  Because I believe they were in contact with
10  Mr. Griffin when they drafted that policy.
11      Q.  Okay.  Now let's come to the School Board
12  prayer policy and the issue of School Board prayer.
13  It's that issue where you recollect that Board members
14  discussed getting additional legal advice other than
15  Mr. Griffin, correct?
16      A.  I believe so.
17      Q.  Okay.  Which Board members suggested getting
18  additional legal advice?
19      A.  I would think maybe Mr. Helms.
20      Q.  Anybody else that you recall?
21      A.  Not -- others may have chimed in, but I don't
22  recall who they are.
23      Q.  Tell me what you recall Mr. Helms said in that
24  respect.

108

1       A.  I think that the Board felt strong enough from
2   this to keep their Board policy and they would look
3   for other advice.
4       Q.  You pointed at PX 13, the executive committee
5   minutes.  Do you recall that that discussion of other
6   counsel took place during the executive session on
7   August 23?
8       A.  They most likely bounced some names around,
9   organizations around that would support prayer in
10  general.
11      Q.  Do you recall what names they bounced around?
12      A.  Not particularly.
13      Q.  All right.  When the, when the decision was
14  made to adjourn the executive session, was there an
15  agreed-upon path forward, if you will, to get that
16  additional advice?
17      A.  It's been a while.  I mean there's -- I really
18  can't say that there was a path forward.  They were
19  sort of going on their own in contacting people, I
20  think, some of them.
21      Q.  Was that normal practice for individual Board
22  members to contact lawyers on a particular topic?
23      A.  Well, with 10 Board members over the 10 years,
24  people have contacted different people on different

173

1  Bible Club was doing.

2  Q.  And what did you find out?

3  MR. GOSSELIN:  Objection.  Is this, does

4  this make its way back around to Board prayer?

5  MR. ALLINGHAM:  Yes.  And if you'd like to

6  go off the record and walk out in the hall with me,

7  I'll explain my reasons for asking these questions.

8  But I would also note that Dr. Hattier answered these

9  questions without objection, and that I think that I'm

10  entitled to test the answers that were given by one

11  witness with questions to another witness.

12  But in addition to that, which I think is

13  a good reason for asking them, I think that they do

14  link back to School Board prayer as well.

15  MR. GOSSELIN:  We don't need to go back

16  out in the hall.  If you're bringing it back around to

17  Board prayer, that's fine with me.

18  BY MR. ALLINGHAM:

19  Q.  What did you do in response to the complaints

20  in this letter?

21  A.  The teachers were told that they were not to be

22  leaders of a Bible Club, that they could be there as

23  chaperones so people, you know, children wouldn't hurt

24  themselves or whatever else might happen.  But they

174

1  shouldn't lead the Bible Club.  And right after that,

2  we had no teacher leaders of the Bible Club at

3  Selbyville.  So I don't know at what time frame that

4  happened.  But --

5  Q.  Did you receive more than one complaint about

6  Bible clubs?

7  A.  Not that I recall.  I didn't receive -- it

8  either came up with the case or this letter was part

9  of it.  But...

10  Q.  Well, this is clearly, this letter is clearly a

11  complaint, among other things, about Bible clubs,

12  correct?

13  A.  Right, right.

14  Q.  And you only recall one complaint about Bible

15  clubs?

16  A.  Right, at Selbyville.

17  Q.  I'm going to ask you to assume that that

18  complaint came in around the 1st of October 2004,

19  which is the date of this letter.  And I gathered from

20  your previous answer that you did cause to be

21  investigated some or all of the complaints in this

22  letter.  Did you do that investigation or did you ask

23  someone else to do it?

24  A.  I asked the principal of the school to look

175

1  into this.

2  Q.  And the principal of the school in this case is

3  Mr. Kline?

4  A.  Yes.

5  Q.  I asked you earlier questions about the general

6  approach to complaints from district residents or

7  parents.  Did you follow that approach in this case?

8  A.  Usually I -- either the principal of the school

9  investigates it or someone from my office investigates

10  it.

11  Q.  And I presume that if you asked someone else to

12  do it, you asked for them to report back to you?

13  A.  To share their findings.

14  Q.  Okay.  And tell me, I gather that Mr. Kline

15  reported to you that there was a Bible club being led

16  by a teacher, correct?

17  A.  That there were Bible clubs, I believe three of

18  them.

19  Q.  Three Bible clubs being led by teachers?

20  A.  Two teachers and a secretary, as I recall.

21  Q.  Okay.  All at the Selbyville Middle School?

22  A.  Yes.

23  Q.  Okay.  Did Mr. -- did you ask Mr. Kline also to

24  investigate the allegation that a counselor at the

176

1  school pressured a child to attend the Bible Club?

2  A.  I can't say that I did, because I am not sure

3  that I had a copy of this letter.  I don't recall it.

4  Q.  Do you know who the Doe family is?

5  A.  I believe I do.

6  Q.  Do you recall getting a complaint from the Doe

7  family on the matters set forth in this letter?

8  A.  No, I don't.

9  Q.  Do you have an affirmative memory that there

10  was no inquiry made into Ms. Redard's, the allegation

11  that Ms. Redard put pressure on a child to attend the

12  Bible Club?

13  A.  I don't recall that at all.

14  Q.  Do you recall affirmatively that you never saw

15  this letter?

16  A.  I'm sorry, I can't say either way at this

17  point.

18  Q.  When a complaint comes in from a parent, do you

19  open a file on that complaint?

20  A.  Sometimes.  Most of the time, yes, we do.  And

21  it seems like I would have had a file on this one.

22  It's a pretty serious letter.

23  Q.  Did you search your files in your garage to see

24  whether you have a copy of this letter?

EXHIBIT 11

**Page 1**

```
1         IN THE UNITED STATES DISTRICT COURT
2         IN AND FOR THE DISTRICT OF DELAWARE
3    MONA DOBRICH and MARCO   :   Case No. 15-120 (JJF)
     DOBRICH, Individually, and :
4    as parents and next friend :
     of ALEXANDER DOBRICH,    :
5    SAMANTHA DOBRICH, JANE DOE :
     and JOHN DOE, Individually :
6    and as parents and next   :
     friend of JORDAN DOE and  :
7    JAMIE DOE,              :
                            :
8         Plaintiffs,   :
                       :
9         v.              :
                          :
10   INDIAN RIVER SCHOOL     :
     DISTRICT, et al.,       :
11                         :
     Defendants.   :
12        . . . . . . . . . .
13        Video Deposition of RANDALL HUGHES, taken
     pursuant to notice, on Monday, October 16, 2006
14   at 2:40 p.m. at 31 Hosier Street, Selbyville,
     Delaware, reported by Lorena J. Hartnett, a Registered
15   Professional Reporter and Notary Public.
16        . . . . . . . . . .
17   APPEARANCES:
18        THOMAS ALLINGHAM, ESQUIRE
          RICHARD HORVATH, ESQUIRE
19        One Rodney Square
          Wilmington, DE  19801
20        Attorneys for the Plaintiff
21
22
23        WILCOX & FETZER
          1330 King Street - Wilmington, DE  19801
24        (302) 655-0477
```

**Page 2**

```
1    APPEARANCES (CONTINUED):
2
          JASON P. GOSSELIN, ESQUIRE
3         Drinker, Biddle & Reath, LLP
          One Logan Square
4         18th and Cherry Streets
          Philadelphia, PA  19103-6996
5         Attorney for the Defendants
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**Page 3**

```
1
2
3              TABLE OF CONTENTS
4    TESTIMONY OF RANDALL HUGHES:
5    Direct Examination by Mr. Horvath . . . . . . . 4
6    Certificate of Reporter . . . . . . . . . . . . 96
7
8
9              INDEX TO EXHIBITS
10   Plaintiff's Exhibit 56 . . . . . . . . . . . . . 15
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**Page 4**

```
1              (The videographer read the
2         introduction, and the attorneys introduced
3         themselves.)
4              RANDALL HUGHES,
5    HAVING FIRST BEEN DULY SWORN, TESTIFIED AS FOLLOWS:
6    DIRECT EXAMINATION ON BEHALF OF THE PLAINTIFF
7    BY MR. HORVATH:
8    Q.  Good afternoon.  Have you ever been deposed
9    before?
10   A.  Yes.
11   Q.  When?
12   A.  The last time was in December of 2005.
13   Q.  How many times have you been deposed?
14   A.  Ten or so, perhaps.
15   Q.  What were the natures of the actions?
16   A.  Mostly traffic-related accidents, civil
17   suits, in those regards.  Also, the latest was in a
18   lawsuit filed against the State Police I did for my
19   workplace.
20   Q.  Have you ever testified at trial?
21   A.  Yes.
22   Q.  How many times have you testified at trial?
23   A.  Many, many, many times.
24   Q.  And were these the same cases that you
```

29

1    Q.  When you joined the board, did you go through

2    an orientation process?

3    A.  Yes.

4    Q.  What was involved in that?

5    A.  I was coming here, meeting with Mrs. Hobbs

6    and her staff at the time, to include Dr. Owens,

7    personnel; Mr. Miller, the business manager;

8    Mr. Hudson with Student Services; Mr. Savage; and

9    several other -- I say several other.  A few other

10   department heads were here talking about their

11   functions and how they worked in this organization

12   and, you know, what they brought into the total

13   organization.

14   Q.  Did you meet with any board members during

15   the orientation?

16   A.  Outside of board meetings, no.

17   Q.  Did you speak with any board members outside

18   of board meetings if you didn't meet face to face with

19   them?

20   A.  I know that I talked to Mr. Bireley the night

21   that he told me that I was going to be sworn in.

22   Outside of that, having other conversations -- I may

23   have had a conversation with Mr. Bireley.  I am trying

24   to think if there would have been any others.

30

1    Dr. Isaacs and I talked, but not so much

2    about board.  We had some other, some State Police and

3    U of D business to take care of, but it really wasn't

4    about the board.

5    So maybe Mr. Bireley a bit about just the

6    next board meeting and the committee meetings, being

7    able to attend committee meetings if I chose to do

8    that.

9    Q.  During your orientation, did anyone discuss

10   with you your responsibilities as a board member?

11   A.  Oh, we talked about confidentiality with

12   personnel matters.  As the board, things come to the

13   board for recommendation for a vote, any money to be

14   expended.  Yeah, we did talk about some of those

15   responsibilities.  The biggest thing was

16   confidentiality.

17   Q.  Did anyone discuss with you the scope of your

18   authority as a board member?

19   A.  No, I don't recall anyone talking to me about

20   that, and I am pretty sure I didn't ask.

21   Q.  During your orientation, did you draw any

22   conclusions as to whether or not the board acts as a

23   legislative body?

24   A.  I am not so sure I drew that conclusion from

31

1    the orientation as to what my thoughts were on local

2    government and the school board prior to.

3    I see the school board as a legislative body

4    or a policy making body.  Now, when that happened

5    exactly, I don't know if it -- I don't think it was

6    just because of the orientation.  I think that was

7    prior to.

8    Q.  So you think it happened at least either at

9    or before the orientation that you went through when

10   you were joining the board?

11   A.  Like I say, I believe that's just a belief

12   that I have.  I believe that a school board is your

13   truest form of local government.

14   Q.  How did you come to that belief?  And in

15   terms, let me clarify, how did you come to the belief

16   that the school board acts as legislative body?

17   A.  Spending taxpayer money, or allocating that

18   money to be spent.  Also educating the children,

19   establishing policies for educating our children seems

20   to me to be kinds of things that a legislative body,

21   if you will, do.

22   Q.  Since you joined the board, have you seen the

23   board engage in any activities that makes you --

24   Strike that.

32

1    Since you joined the board, have you seen the

2    board engage in any activities outside of the setting

3    of policy or the spending of taxpayer funds?

4    A.  I am not so sure I understand the question.

5    Q.  Am I correct that you believe the board is a

6    legislative body because it sets policies and spends,

7    or allocates taxpayer money?

8    A.  Yes.

9    Q.  Since you joined the board, have you seen it

10   engage in any activities that fall outside of those

11   two categories?

12   A.  We make policy; we spend money; some

13   decisions are made as to some curriculum type things,

14   the type of curriculum.  Again, that comes down to as

15   a policy type thing for the district.  Sir, I believe

16   that that would hold.  I still believe that to be the

17   case.

18   Q.  Has the board held any disciplinary hearings

19   for students?

20   A.  Yes.

21   Q.  Has the board made any decisions about hiring

22   or firing district employees?

23   A.  Yes.

24   Q.  Are these decisions made on a case-by-case

33

1  basis?
2  A.  They are individual hearings --
3  Q.  Uh-huh.
4  A.  -- that could come before the board, so in
5  that case I guess it would be case by case.
6  Q.  Do you believe that in the case of
7  disciplinary hearings for students, does that involve
8  the setting of policy?
9  A.  It could be adhering to already established
10  policy, so it wouldn't necessarily be setting new
11  policy.  Hopefully, if you are meting out, if you
12  would, discipline, that there is some process for
13  which that takes place.
14  Q.  Would you -- You said meting out policy?
15  A.  Media?  I'm sorry?
16  Q.  You said meting out policy.
17     MR. GOSSELIN:  He said meting out
18  discipline.
19  BY MR. HORVATH:
20  Q.  Oh, meting out discipline, sorry.  What do
21  you mean by that?
22  A.  If a decision or a judgment, if you will, is
23  going to be made that could discipline in its negative
24  form, could impact, negatively impact someone, the

34

1  board, through that process of the disciplinary
2  hearing, if you will, that could be done.
3  Q.  Do you see that disciplinary process as being
4  legislative in nature?
5  A.  Again, I am not so sure how to exactly answer
6  your question.
7  Q.  Does it involve the actual setting of policy?
8  A.  It is following established policy.
9  Q.  So it's enforcing?
10  A.  Yes, sir.
11  Q.  But not making new policy?
12  A.  No, not making new policy on that particular
13  one incident at that case, no, sir.
14  Q.  Does it involve the allocation of taxpayer
15  money?
16  A.  It could involve the allocation of taxpayer
17  money if something has been inappropriately done and
18  if taxpayer money is not spent wisely.
19  Q.  In the case of student discipline?
20  A.  As to some of our practices for keeping
21  orderly schools, safe schools, there are some
22  expenditures made to ensure that we have those
23  organizations.
24  Q.  You said it could?

35

1  A.  (Nodding head)
2  Q.  Have you had a disciplinary hearing that did
3  not involve?
4  A.  That did not involve?
5  Q.  The expenditure of taxpayer money?
6  A.  Sir, I believe potentially they all could
7  have an impact on taxpayer money.
8  Q.  Have students attended school board meetings
9  who are subject to a disciplinary hearing since you
10  have joined the board?
11  A.  Sir, are you asking that at a student hearing
12  has the student been there?
13  Q.  Yes.
14  A.  Since I have been -- In that hearing, itself?
15  Q.  Uh-huh.
16  A.  Held in executive session?
17  Q.  Yes.
18  A.  No, sir, I don't believe so since I have been
19  on the school board.
20  Q.  Has a student ever requested to address the
21  board about a disciplinary hearing?
22  A.  Not that I can recall.
23  Q.  Am I correct that since you have joined the
24  school board you have seen students at school board

36

1  meetings?
2  A.  Yes, that is correct.
3  Q.  Have you seen a student at every school board
4  meeting during the school year?
5  A.  I believe that is correct, because normally
6  the high school that we are in, the student council
7  president will give an update on that school.  Now,
8  the minutes would reflect if that has been done, but
9  normally that is the practice.
10  Q.  Have you seen Junior ROTC students --
11  A.  Yes.
12  Q.  -- present colors at those meetings?
13  A.  I'm sorry, yes, I have.
14  Q.  Have students received awards at those
15  meetings?
16  A.  Yes, they have.
17  Q.  Have students addressed the board about any
18  concerns they might have with their schools at those
19  meetings?
20  A.  Students have addressed the board.  Sitting
21  here now, I can't tell you exactly what their concerns
22  were at the time.  I don't know if it was particularly
23  to a specific school or to some other issue, but
24  students have addressed the board.

49

1    also, could also be in attendance while the prayer is
2    being read?
3        A.  That's correct.
4        Q.  So for those individuals to not be a part of
5    the prayer, what do they have to do, or to not -- Let
6    me correct that.  What would a school employee,
7    student in attendance, or a member of the community
8    have to do to not be a recipient of the prayer?
9        A.  I am not sure exactly how I answer this
10   question other than to say don't participate, don't
11   think about, you know, the words that are being said,
12   don't listen.  There is a big difference between
13   hearing and listening.  I am not exactly sure how to
14   answer the question.
15       Q.  Do you feel they should sit silently and not
16   do anything while the prayer is being read?
17       A.  I am not necessarily saying that they have to
18   sit silently.  I would hope that they wouldn't be,
19   discourage or loud or obnoxious.  I am not saying they
20   have to sit silently.
21       Q.  Do you think they could leave the meeting?
22       A.  Yes.
23       Q.  When would they know they should leave the
24   meeting in order to avoid hearing the prayer?

50

1        A.  I think we established that this was read
2    prior to, so perhaps that would be a time that they
3    chose to leave.
4        Q.  And about where in that process do you think
5    they should know that they need to leave the meeting?
6        A.  Well, in the very first sentence, the second
7    clause, that's where it talks about opens its meetings
8    with prayer.  That would be a hint.
9        Q.  About how long does it take -- I'm sorry, you
10   were going to say something?
11       A.  No.  I can go further and answer you there is
12   more clues.
13       Q.  Well, at the very earliest you feel it would
14   be when the board president states, "The Board of
15   Education may choose to open its meetings with a
16   prayer."
17       A.  Yes, sir.
18       Q.  How long does it take to read paragraph one
19   and four?
20       A.  I have never timed it.
21       Q.  I will just try to read it at a normal pace.
22   "In order to solemnify its proceedings, the Board of
23   Education may choose to open its meetings with a
24   prayer or a moment of silence, all in accord with the

51

1    freedom of conscience of the individual adult board
2    member.  Such prayer is voluntary and is among only
3    the adult members of the board.  No school employee,
4    student in attendance, or member of the community in
5    attendance shall be required to participate in any
6    such prayer or moment of silence."
7        I think that took me about 20 seconds to
8    read.  Do you think 20 seconds is enough time for
9    someone to be able to gather their things, get up and
10   leave the meeting in order to avoid hearing the
11   prayer?
12       A.  Twenty seconds is a very relative term,
13   depending on what you were doing.  Do I think they
14   would have to sprint in order to leave?  No, not
15   necessarily.  A leisurely pace?  No, I don't think it
16   would be that, so it's going to fall somewhere in
17   there.  So 20 seconds could be a very long time, and
18   other times it can be a very short time.  Again, it's
19   all -- it's relevant.
20       Q.  And if they were to leave the meeting, would
21   they have to travel a little bit farther to avoid
22   being able to hear the prayer, or would they just be
23   stepping outside?
24       A.  I don't think that -- I know that there are

52

1    microphones on the table, but I don't believe that the
2    voice or that audio is fed outside of the room that we
3    are in, so I assume it would be just stepping outside
4    of the room.
5        Q.  Well, do the microphones feed the audio
6    through speakers?
7        A.  Yes, there are speakers there.
8        Q.  So the sound that the board members make or
9    what the board members say at the meeting is amplified
10   for the audience?
11       A.  Yes, sir.
12       Q.  So could that make the what they say project
13   farther than if they were to speak without the
14   microphones?
15       A.  Yes, that would be the intended purpose.
16       Q.  Okay.  So is it possible that to avoid
17   hearing a prayer someone might have to travel farther,
18   even if the sound isn't pumped outside of the
19   auditorium?
20       A.  Yes, it is possible.
21       Q.  How would someone know that the prayer has
22   ended?
23       A.  I don't know.  If they were not in --
24       Q.  If they were not in --

69

1     MR. GOSSELIN:  Do you have an extra

2     copy?

3     MR. HORVATH:  I do.

4  BY MR. HORVATH:

5     Q.  Have you ever seen this document before?

6     A.  I need to --

7     Q.  Okay.

8     A.  The answer is I am not sure if I have read

9  this before or not.  I have read a couple things on

10  ethics and integrity by the I think Ethics and

11  Integrity Commission after being elected.  So I am not

12  sure if it was this exact document, but it seems

13  familiar to me.

14     Q.  To be clear, in the upper right hand corner

15  there are three letters, BDF?

16     A.  Uh-huh.

17     Q.  Do you know what those letters might signify?

18     A.  No, sir, I do not.

19     Q.  Have you ever received any copies of board

20  policies or policies that pertain to board

21  governments?

22     A.  Yes, sir, I have.

23     Q.  And do those policies start with the letter

24  B?

70

1     A.  When I receive those, I read the verbiage,

2  and I have not looked for that, but I bet when I go

3  home I will look and see if they are on there or they

4  will be.

5     Q.  I am going to represent that this is a copy

6  of the school board's, school board member ethics

7  policy.  Under number one on the first page, the third

8  paragraph down, it states that, "The public expects my

9  first and greatest concern to be in the best interests

10  of each and every one of these young people without

11  distinction as to who they are or what their

12  background may be."

13     To be clear, does this paragraph state that

14  the board, a board member's primary concern should be

15  the students of the district?

16     A.  Yes, it does.

17     Q.  And on the second page, the third paragraph

18  down, it says, "To resist every temptation and outside

19  pressure to use my position as a school board member

20  to benefit either myself or any other individual or

21  agency apart from the total interest of the school

22  district."

23     Does that paragraph suggest to you that board

24  members should not operate out of their own individual

71

1  self interests?

2     A.  Yes, it does.

3     Q.  So, with the first paragraph that we read and

4  the last paragraph that we read, should the board, do

5  you feel that it's now appropriate for the board to

6  pass policies that are for the benefit of the board

7  member's individual constitutional rights?

8     A.  Yes, I do, and the reason why --

9     Q.  I was going to say --

10     A.  You want to ask me first?  Okay.  I read that

11  first paragraph on the second page as not to bring or

12  bear influence upon any educational decisions that may

13  be made by staff or superintendents to benefit me

14  personally or a friend or a family member.  That's how

15  I read that paragraph.

16     Q.  But I think you had stated before that it is

17  an appropriate exercise of a board member's authority

18  to pass a policy that protects their own individual

19  constitutional rights?

20     A.  As I said, because of future boards, as well.

21  Protecting constitutional rights is for all of us to

22  do.

23     Q.  And what the board perceives as their own

24  individual rights that don't apply to anyone else in

72

1  the district?

2     A.  To future boards, yes.

3     Q.  Outside of the board?

4     A.  Protecting a constitutional right is

5  everyone's responsibility.

6     Q.  I am going to read to you four prayers.  I am

7  going to want your opinion as to whether or not those

8  prayers violate the policy.

9     The first prayer, "Lord, I pray that you

10  correct the heathens before me now to the truth that

11  comes by knowing you."  Oh, I'm sorry, I misread it.

12  "Lord, I pray that you convert the heathens before me

13  now to the truth that comes by knowing you."

14     A.  Yes, I believe that that -- Again, I am

15  basing this on is that a part of or is that the sole?

16  That's it, period?  Based on those exact words you

17  just said, yes, that could be a conflict.

18     Q.  And why would it be in conflict with policy?

19     A.  I looked at paragraph number three.  It's

20  kind of mean.

21     Q.  It's kind of mean?

22     A.  Kind of mean when you are saying that.

23     Q.  What's mean about it?

24     A.  You are referring to someone as a heathen.

73

1    Q.  Is there -- Suppose it wasn't heathen, it was
2  just "the individuals in front of me."
3    A.  Again, read it without the heathen.
4    Q.  "Lord, I pray that you convert the people
5  before me to the truth that comes by knowing you."
6    A.  Certainly the word convert.
7    Q.  So it's a combination of both heathens and
8  convert that you find problematic?
9    A.  Uh-huh.
10    Q.  And each one individually would pose a
11  problem?
12    A.  Yes, sir, I believe so.
13    Q.  I am going to hand you what has been
14  previously marked as PX35, which reads, "Do not put
15  your trust in princes and mortal men who cannot even
16  save themselves.  When their spirit departs, they
17  return to the ground.  On that very day, their plans
18  come to nothing.  Blessed is he whose help is the God
19  of Jacob, whose hope is in the Lord his God, the maker
20  of heaven and earth, the sea and everything in them,
21  the Lord who remains faithful forever.  He upholds the
22  cause of the oppressed and gives food to the hungry.
23  The Lord sets prisoners free.  The Lord gives sight to
24  the blind.  The Lord lifts up those who are bowed

74

1  down.  The Lord loves the righteous.  The Lord watches
2  over the alien and sustains the fatherless and the
3  widow, but he frustrates the ways of the wicked.  For
4  the wages of sin is death, but the gift of God is
5  eternal life through Jesus Christ our Lord."
6    Do you believe that this prayer would be
7  permissible under the policy?
8    A.  Yes, sir.
9    Q.  How did you make that determination?
10    A.  I did not find it offensive.
11    Q.  Is that the touchstone you use for whether or
12  not a prayer violates the policy, whether or not you
13  find it offensive?
14    A.  I don't see -- Yes, that's the first thing I
15  am going to rely on, how do I perceive that.  I do not
16  find it offensive.  I don't see where it's violating
17  number three of the policy, paragraph number three.
18    Q.  I take it you do not view the prayer in PX35
19  as proselytizing?
20    A.  Which one is that?
21    Q.  The one I just handed you?
22    A.  No, sir, I don't.
23    Q.  What does proselytizing mean to you?
24    A.  Again, to me it's preaching or negative,

75

1  trying to espouse my views forcefully onto someone
2  else.
3    Q.  Do you believe that the last sentence of the
4  prayer is not proselytizing?
5    A.  No, I do not.
6    Q.  How do you think you would respond to this
7  prayer if you were not a Christian?
8    A.  Mr. Horvath, that's very difficult to answer.
9  I would probably rely back on the very first thing
10  that I said, did I find it offensive.  No, I did not.
11    Q.  If you were not a Christian and you heard,
12  "for the wages of sin is death but the gift of God is
13  eternal life through Jesus Christ our Lord," do you
14  think you would find that offensive?
15    A.  In the spirit or in the tone in which you
16  read this, I did not find it offensive, and I don't --
17  It's hard for me to answer that question other than to
18  say I did not find it offensive.
19    Q.  Do you think your personal faith as a
20  Christian might impact your views on whether this
21  particular prayer is proselytizing?
22    A.  Yes, sir, I am sure that it does.
23    Q.  To put a variation on this, suppose the last
24  sentence read, "For the wages of sin is death, but the

76

1  gift of Allah is eternal life through his prophet
2  Muhammed."
3    A.  Again, I do not find that offensive.  There
4  are more people in this world than I.
5    Q.  Uh-huh.
6    A.  And, as I said, my religion is very
7  individual, very personal, and other people may find
8  their religion that way, as well, and I don't find it
9  offensive.  I wouldn't find it offensive if you insert
10  any other deity that you like.
11    Q.  I have another prayer.  This has been
12  previously marked PX45.  "Heavenly Father, thank you
13  for this great occasion, for the work, the effort, the
14  joys and everything that led up to this point in time.
15  Thank you for your guidance in this event.  We pray
16  for your direction in the lives of each of these
17  school board members.  We pray that you direct them
18  into the truth and eventually the truth that comes by
19  knowing Jesus.  We also pray that you would be with
20  them at this time.  We ask these things in Jesus's
21  name.  Amen."
22    Do you believe that this prayer would violate
23  paragraph three of the policy?
24    A.  No.

85

1    A.  Yes, I received lots of questions from a lot
2  of different local newspapers.  One of the questions a
3  lot of times did deal with the prayer issue and my
4  feelings.  Since I had already been appointed to the
5  board and I was operating under the gag order, my
6  response was, "Pending litigation, I am just not at
7  liberty to discuss that."
8    Q.  Did anyone from the public ask you about
9  board prayer?
10    A.  If they did, my answer was, "There is a gag
11  order, pending litigation, we can't talk about that."
12  I don't have that many -- There was no campaign --
13  There was no stump speeches made or anything like
14  that.
15       Just you might see someone in the supermarket
16  and talk to them about some school board issues, but I
17  don't recall that being a very specific question asked
18  to me.
19    Q.  Do you think it's understood by the public
20  that you support board prayer?
21    A.  No, I wouldn't necessarily say that that's
22  understood.  And are you implying that I do support
23  school prayer?
24    Q.  Okay, maybe I will --

86

1         MR. GOSSELIN:  He said board prayer.
2         THE WITNESS:  Oh, board prayer?
3         MR. HORVATH:  Yeah.
4         THE WITNESS:  Oh, okay.
5         MR. GOSSELIN:  You mean the policy.
6         MR. HORVATH:  Yes.
7         MR. GOSSELIN:  This policy here.
8         THE WITNESS:  Okay.  Okay.
9  BY MR. HORVATH:
10    Q.  So, to be clear on this, do you think the
11  public understands you to support policy BDA.1 in the
12  board's prayer practice?
13    A.  Probably.
14    Q.  And do you think they understood that during
15  the election?
16    A.  I am not -- I don't know.  I didn't -- Like I
17  said, when it came to any talk about the litigation, I
18  didn't say a word about it.
19    Q.  Do you know what your opponent's view on
20  board prayer was?
21    A.  Yes, he was to stop board prayer, stop -- It
22  was kind of a bit skewed in that it was drawn out to
23  include school prayer, prayer in school, took on a
24  whole different light.  I think perhaps the gentleman

87

1  was a bit misinformed.
2    Q.  You refer to the gag order.  This gag order
3  didn't prevent you from telling your constituents
4  whether or not you supported board prayer?  Did you
5  tell constituents that the gag order prevented you
6  from --
7    A.  Yeah, my answers that I put out to the
8  newspapers were that I didn't want to discuss that
9  topic or I couldn't discuss that because of pending
10  litigation.
11    Q.  Let's go back to your opponent.  Am I
12  correct, at the very least, that the perception became
13  that he opposed board prayer?
14    A.  Yeah, I believe think that would be --
15    Q.  And that was an accurate representation --
16  I'm sorry, I guess I should have let you finish.
17    A.  Yes.
18    Q.  And was that an accurate representation of
19  what you understood his position to be?
20    A.  Yes.
21    Q.  Do you believe that affected the campaign?
22    A.  My opponent had some, quite a few different
23  ideas.  I am not so sure that one particular answer
24  that he gave led to his demise.  I am not so sure.

88

1    Q.  Did anyone from the community tell you that
2  they were not going to vote for him because he opposed
3  board prayer?
4    A.  I don't recall.  Well, people who supported
5  me said, "I am going to vote for you."  They didn't
6  say, "I am going to vote for you because of X, Y or
7  Z."
8    Q.  Did anyone say they were going to vote for
9  you because you supported board prayer?
10    A.  No, I don't recall having that conversation
11  with anyone.
12    Q.  Do you believe that someone could get, in the
13  2006 election, do you believe that anyone could have
14  been elected to the board who openly opposed board
15  prayer?
16    A.  If you articulate your point of view and some
17  of the reasons behind it, perhaps, yes.
18    Q.  Has anyone told you that they see this case
19  as about protecting Christian values?
20    A.  Yes, I have heard that.  Have they told me
21  that?  I don't -- I have not been told that, but I
22  have kind of heard.  Again, that's like supermarket or
23  Wawa coffee stand talk sometimes.  You kind of hear
24  these kinds of things.

89

1   Q.  Have these things been told to you, or did
2   you overhear it?
3       A.  Well, if I heard it, then it was told to me.
4   But, again, it wasn't someone grabbing me by the shirt
5   collar and saying, "This is about maintaining
6   Christian values and beliefs."
7       Q.  Did anyone say that the board's prayer
8   practice, itself, was about protecting Christian
9   values?
10      A.  I don't recall that, that terminology being
11  used.
12      Q.  Do you think people understand this case as
13  involving the board prayer policy?
14      A.  To be perfectly honest with you, I think
15  there is a lot of misinformation.  A lot of people are
16  out there and don't have all the information from
17  which to make a decision on this.  Shortsightedness, a
18  particular mind set, but the perception out there is
19  it comes down to a single issue or something that it
20  may or may not be, so I think -- I don't know if the
21  gag order was helpful or not with people not going out
22  and talking about it.
23      Q.  What's the single issue that you believe the
24  public perceives this case is about?

90

1       A.  I believe the public thinks this is about
2   prayer in schools.
3       Q.  Have you ever heard anyone say that this case
4   is about board prayer?
5       A.  Mr. Horvath, I can't sit here and tell you
6   that I have heard that.  I just -- I believe that the
7   perception out there in the public is that this case
8   is about prayer in schools.
9       Q.  Do you know if any school board member has
10  campaigned for election or re-election on the ground
11  that they support school board prayer?
12      A.  We had several elections last time.  I have a
13  lot of things going on.  I didn't have an opportunity
14  to follow everyone else's campaign, if you will call a
15  school board election a campaign.  How and what
16  exactly they said or didn't say at their different
17  functions, I don't know.
18      Q.  You mentioned before what you characterized
19  as a misrepresentation that this case is about prayer
20  in schools.  Have you done anything to correct that
21  mis-perception?
22      A.  Again, how I refer to anything that's brought
23  up about this case is there is a gag order.  My
24  responses are very limited, pretty much to zero, and

91

1   there are many sides to every story and there are many
2   facets to this particular case.
3       Q.  Do you believe that a gag order is still in
4   place?
5       A.  Yes, I am operating under that -- I am going
6   to operate under that until otherwise directed by
7   either Jason or a judge.
8       Q.  Has anyone told you that a gag order is no
9   longer in place, aside from your attorneys or a judge?
10      A.  No.  Has anyone ever -- I'm sorry, say that
11  again, please.
12      Q.  Has, aside from your attorneys or a judge,
13  has anyone told you that a gag order is no longer in
14  place?
15      A.  There was some discussion in an executive
16  session if there was or there wasn't, but the bottom
17  line it came down to, as I left there, my
18  understanding was that there was, do not discuss.
19      Q.  And you have continued to operate under that
20  assumption since then?
21      A.  That's the way I have been operating, yes,
22  sir.
23      Q.  Has anyone told you they believe the ACLU is
24  involved with this case?

92

1       A.  I believe at executive sessions there have
2   been some mention that the ACLU is behind this case,
3   yes.
4       Q.  Do you believe that the ACLU is behind this
5   case?
6       A.  I don't know that for a fact.
7       Q.  Have you ever discussed with someone in the
8   community as to whether or not the ACLU is involved in
9   this case?
10      A.  No, sir.
11      Q.  Has anyone told you that they see this case
12  as standing up to the ACLU?
13      A.  No, I don't recall having that conversation.
14      Q.  Which board members told you that the ACLU
15  was involved with this case?
16      A.  Again, I think that's a discussion in
17  executive session, and I cannot -- I feel like I am
18  pointing fingers, because I am not 100 percent sure,
19  but I believe that perhaps Nina Lou Bunting may have
20  mentioned that.
21      Q.  Have any of the board members described the
22  ACLU as anti Christian?
23      A.  No, I don't recall hearing that.
24      Q.  Has anyone in the public described the ACLU

# EXHIBIT 12

**1**

```
 1        IN THE UNITED STATES DISTRICT COURT
 2          FOR THE DISTRICT OF DELAWARE
 3   MONA DOBRICH and MARCO    : C.A. No. 15-120 (JJF)
     DOBRICH, Individually and :
 4   as parents and next friend :
     of ALEXANDER DOBRICH,      :
 5   SAMANTHA DOBRICH, JANE DOE :
     and JOHN DOE, Individually :
 6   and as parents and next    :
     friend of JORDAN DOE and   :
 7   JAMIE DOE,                 :
                                :
 8        Plaintiffs,   :
                                :
 9        v.                    :
                                :
10   INDIAN RIVER SCHOOL        :
     DISTRICT, et al.,          :
11                              :
          Defendants.    :
12        - - - - - - - - -
13        Videotaped Deposition of DR. MARK A. ISAACS,
     taken pursuant to notice, on Wednesday, October 18,
14   2006 at 1:36 p.m. at 31 Hosier Street, Selbyville,
     Delaware, reported by Lorena J. Hartnett, a Registered
15   Professional Reporter and Notary Public.
16        - - - - - - - - -
17   APPEARANCES:
18        THOMAS ALLINGHAM, ESQUIRE
          RICHARD HORVATH, ESQUIRE
19        BRIAN LENHARD, ESQUIRE
          One Rodney Square
20        Wilmington, DE  19801
             Attorney for the Plaintiff
21
22
23        WILCOX & FETZER
     1330 King Street - Wilmington, DE  19801
24        (302) 655-0477
          www.wilfet.com
```

**2**

```
 1
 2
 3
 4   APPEARANCES: (CONTINUED)
 5        JARROD SHAU, ESQUIRE
          Drinker, Biddle & Reath, LLP
 6        One Logan Square
          18th and Cherry Streets
 7        Philadelphia, PA  19103-6996
             Attorney for the Defendants
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**3**

```
 1
 2
 3
 4            TABLE OF CONTENTS
 5   TESTIMONY OF DR. MARK A. ISAACS:
 6     Direct Examination by Mr. Allingham. . . . . . 3
 7   Certificate of Reporter . . . . . . . . . . . . 73
 8
 9
10
```

**4**

```
 1        VIDEOGRAPHER:  This is the videotaped
 2   deposition of Dr. Mark A. Isaacs, taken by
 3   the plaintiff in the matter of Dobrich et
 4   al. versus Indian River School District, et
 5   al.. Civil Action Number 15-120.  The
 6   deposition is taking place at 31 Hosier
 7   Boulevard in Selbyville, Delaware, on
 8   October 18, 2006 at approximately 1:36 p.m.
 9        The court reporter is Lorena Hartnett
10   from the firm of Wilcox & Fetzer.  My name
11   is Mark Buckmaster, a video specialist from
12   Discovery Video Services Incorporated in
13   association with Wilcox & Fetzer.  Counsel
14   will now introduce themselves and the
15   reporter will swear in the witness.
16        MR. ALLINGHAM:  Tom Allingham
17   representing the plaintiffs.  With me is
18   Brian Lenhard and Richard Horvath.
19        MR. SHAU:  Jarrod Shau representing
20   the defendants.
21        DR. MARK A. ISAACS,
22   HAVING FIRST BEEN DULY SWORN, TESTIFIED AS FOLLOWS:
23     DIRECT EXAMINATION ON BEHALF OF THE PLAINTIFFS
24   BY MR. ALLINGHAM:
```

Page 21

1    normal, probably ten minutes prior to the start, I
2    mean.
3        Q.  Did you know in advance of your arrival that
4    there would be a huge crowd at the meeting?
5        A.  No, not really.
6        Q.  I take it, then, you were surprised when you
7    got there and there were speakers in the parking lot
8    and police cars and so forth?
9        A.  Yes, right.
10       Q.  Do you recall that the -- Do you recall that
11   the school board prayer issue was discussed at that
12   meeting?
13       A.  No, I don't recall.
14       Q.  I should have been more specific.  I don't
15   mean discussed by the board.  I mean the subject of
16   public comments during the meeting.
17       A.  Yes, yes.
18       Q.  Do you recall that the public comment session
19   was expanded to accommodate more speakers?
20       A.  No, I don't recall that, but, if it was, it's
21   not atypical if there is a large overflow.
22       Q.  Several witnesses have said that they
23   couldn't recall a meeting that was anywhere near this
24   size in terms of the attendance.  Would you agree with

Page 22

1    that?
2        A.  Couldn't recall a meeting?
3        Q.  There were more people in attendance at this
4    meeting than any other that you recall?
5        A.  Yes, yes, yes.
6        Q.  By a factor of two or three; correct?
7        A.  I would say probably a good estimate.
8        Q.  Was the tone of the public remarks during
9    this meeting respectful and courteous at all times?
10       A.  From what I can recall, yes.
11       Q.  Do you recall that some speakers were loudly
12   cheered?
13       A.  No, but again that's not atypical either if
14   it's a heated subject matter.
15       Q.  Do you recall that some speakers were loudly
16   booed?
17       A.  No.
18       Q.  Do you recall the public responding
19   frequently with shouts of amen during speakers'
20   comments?
21       A.  No, I don't.
22       Q.  Do you recall being troubled by any of the
23   remarks offered at the public session?
24       A.  No.

Page 23

1        Q.  Other than the fact that there were a lot of
2    people in attendance, do you remember anything about
3    that meeting?
4        A.  No.
5        Q.  If you will look at page nine of the minutes
6    I just gave you, there is a separate public comment
7    session.  The first public comment session is
8    reflected on page four.  There is a second one on page
9    nine during which Pam Shockley and Colin Waters spoke.
10   Do you know either Ms. Shockley or Mr. Waters?
11       A.  No, sir.
12       Q.  Do you recall their comments during this
13   session?
14       A.  No.
15       Q.  The minutes record that, "Mr. Griffin noted
16   that according to the regulations of the State
17   Department of Education prayer must be student-issued
18   and student-led, and then President Walls explained
19   our procedures for establishing policy."
20            Do you recall what President Walls said in
21   explaining your procedures for establishing policy?
22       A.  No.
23       Q.  Tell me what the procedure was for
24   establishing policy.  How were policies --

Page 24

1        A.  For a policy to be approved and implemented?
2        Q.  Yes.
3        A.  Um, normally it involved a Policy Committee
4    meeting.  It would begin there.  Actually, it would
5    begin by maybe an inquiry, if there was something that
6    needed to be looked at from the public's perspective.
7            It would be brought attention to the Policy
8    Committee.  The Policy Committee would then usually
9    put together a first and second reading.  It would
10   bring it to the board.
11           The board would discuss it, look at it, make
12   amendments to it, and then go back and there would be
13   a recommendation from the Policy Committee for
14   approval.
15       Q.  And was it typical for policies, for the
16   board to deliberate on the desirability of adopting a
17   policy in public session or in executive session or
18   both?
19       A.  I would say probably both.
20       Q.  As a board member, did you consider it
21   desirable for the public to have the opportunity to
22   see the board's deliberations on policies that were
23   proposed for adoption?
24       A.  I certainly didn't have a problem with it.

25

1    Q.  Did the Policy Committee meet in public or in
2    private?
3    A.  The times I was present, it was in private --
4    Well, in private.
5    Q.  In the period of time that you were a board
6    member from 2003 to 2006, did the board customarily
7    open its regular meetings with a prayer?
8    A.  Yes.
9    Q.  Did the board customarily open its special
10   meetings with a prayer?
11   A.  I don't think so.
12   Q.  Is there any reason in terms of the
13   differences between regular meetings and special
14   meetings why, that you can see in your mind, why
15   regular meetings would be opened with a prayer but
16   special meetings would not?
17   A.  Tradition.  For as long as I was a student,
18   even back when Sussex Central High School, board
19   meetings were always opened with a prayer, and I think
20   to bring -- Board meetings were at least more
21   formalized.
22   Q.  You mean regular ones as opposed to special
23   ones?
24   A.  Right, right, so the general board meetings

26

1    opened to the, you know, to the public.  The formal
2    monthly board meetings, the agendas were always
3    packed, so there was a lot to go through and to
4    preview and discuss, so I think it was just a part --
5    Kind of like the presenting of arms.  That doesn't
6    take place at say a Policy Committee meeting or a
7    Bills and Grants meeting.  It's kind of a formal part
8    of the board meeting, a tradition part, I guess.
9    Q.  When you became a board member, Mr. Walls was
10   the president; is that right?
11   A.  Yes.
12   Q.  Did Mr. Walls at anytime ask you whether you
13   wanted to be invited to open a meeting of the board
14   with a prayer?
15   A.  Yes.
16   Q.  And what did you tell him?
17   A.  I told him I chose not to.
18   Q.  Did he ask you that question as sort of a
19   general proposition when you first joined the board,
20   or did he offer you the opportunity from time to time
21   at board meetings to open the meeting with a prayer?
22   A.  I think the only discussion that we had that
23   I can recall is he asked me and I said I chose not to,
24   and I didn't get asked after that.

27

1    Q.  And was that before or after the adoption of
2    the formal board prayer policy?
3    A.  Oh, that was in the very beginning before any
4    of this.
5    Q.  And, if you recall, did Mr. Walls ask you
6    that question at a board meeting or sometime outside
7    of the board meeting?
8    A.  I don't recall.
9    Q.  And why did you choose not to take up his
10   invitation to open the board meeting with a prayer?
11   A.  Personal preference.
12   Q.  Personal preference based on what?
13   A.  Based on I didn't want to do it.
14   Q.  Did you have any problem with other board
15   members doing it?
16   A.  No.
17   Q.  This question may seem odd, but were you glad
18   that -- Strike that.  Did Mr. Walls ask you that
19   question publicly, or did he ask you privately before
20   the meeting began?
21   A.  I don't remember, honestly.
22   Q.  Do you remember being asked publicly at a
23   meeting, "Dr. Isaacs, would you like to offer a
24   prayer," and having to say, "No, thanks," in public?

28

1    A.  No, I don't recall.
2    Q.  Do you think that it would potentially be
3    embarrassing or put you on the spot if Mr. Walls had
4    asked you that question at the public meeting, itself?
5    A.  No.
6    Q.  Is it correct that you never gave a prayer to
7    opening a board meeting?
8    A.  Correct.
9    Q.  When the board policy was adopted, and the
10   opportunity was articulated specifically in the policy
11   that a meeting could be opened with a moment of
12   silence, did that change your view or your personal
13   preference as to whether you wanted to participate?
14   A.  (Shaking head)
15   Q.  You have to answer out loud.
16   A.  I'm sorry, no.
17   Q.  When Mr. Bireley became board president in
18   2005, did he ask you whether you wanted to be included
19   in the group that would be asked to offer a prayer?
20   A.  I don't recall.  I think so, but I don't
21   really recall.
22   Q.  And am I right that if he did so ask you, you
23   said no, thank you?
24   A.  Yes.

33

1    A. Yes.

2    Q. And you voted to adopt this policy; correct?

3    A. Yes.

4    Q. Did you have anything to do with the drafting

5 of this policy as a member of the Policy Committee?

6    A. No, because I, I did not attend the Policy

7 Committee meetings, I don't think.

8    Q. If you didn't attend, that means the only

9 board member who was in attendance at those Policy

10 Committee meetings was Mr. Walls; correct?

11    A. No, because, if I am not mistaken, I think as

12 new board members came on board they were asked

13 whether they wanted a committee they wanted to be on.

14 I think -- I don't remember if, when this was adopted,

15 if there was anyone else that had joined the Policy

16 Committee since then, because, honestly, I don't think

17 I had attended a meeting in almost two years.  It had

18 been a long, long time.

19    Q. We can shorten things up.  Are you confident

20 that you did not attend any Policy Committee meetings

21 at which this policy was considered?

22    A. Yes.

23    Q. Okay.

24    A. Yes.

34

1    Q. The first paragraph reads, "In order to

2 solemnify its proceedings, the Board of Education may

3 choose to open its meetings with a prayer or moment of

4 silence, all in accord with the freedom of conscience

5 of the adult board member."

6      Would you agree with me that the policy

7 identifies the purpose of the prayer or moment of

8 silence as to solemnify its proceedings?

9    A. Yes.

10    Q. What does "in order to solemnify its

11 proceedings" mean to you?

12    A. I guess interpretation wise would be this

13 being a formalized board meeting to recognize that it

14 is a unique meeting monthly where many important

15 decisions are brought to the attention of the board

16 and to the public, and it requires careful thought and

17 deliberation.

18    Q. To sort of remind the board members that they

19 have to take their responsibilities seriously?

20    A. Seriously, yes.

21    Q. And discharge those obligations to the best

22 of their ability?

23    A. Yes.

24    Q. As a board member, did you understand that

35

1 "in order to solemnify its proceedings" was the

2 functional equivalent of "in order to seek divine

3 guidance"?

4    A. No.

5    Q. Do you think that it is an appropriate

6 purpose of the prayer at the board meeting to seek

7 divine guidance?

8    A. If you have ever been a board member, I think

9 you will recognize that any help you can get would

10 graciously appreciated, so I think wherever you get it

11 from.

12    Q. But you didn't understand that to be the

13 meaning of "in order to solemnify its proceedings."?

14    A. No, no.

15    Q. Now, with respect to what you described for

16 me as your understanding of "solemnify its

17 proceedings," was it your view as a board member that

18 you and your colleagues needed a prayer in order to be

19 reminded to take your duties and obligations

20 seriously?

21    A. I didn't.

22    Q. You did?

23    A. I did not.

24    Q. Fair enough.  Did you understand -- Based on

36

1 your perception of your colleagues over the course of

2 your three years of service, did you think it was

3 necessary for the Board of Education to open its

4 meetings with a prayer in order for your colleagues to

5 take their duties and obligations seriously?

6    A. I wouldn't say to take it seriously.  I would

7 just say to extend every opportunity to provide

8 assistance in making decisions, so I wouldn't say that

9 they did not take their duties seriously.

10    Q. Would it be fair for me to infer from your

11 answer that there is another purpose besides

12 solemnification of the proceedings for the prayer that

13 this policy authorizes, and that purpose is to provide

14 the individual board members with the opportunity to

15 seek divine guidance if they wish?

16    A. I guess that's a matter of interpretation.

17    Q. And I am asking for your interpretation as a

18 board member when you voted to adopt this policy.

19    A. No, I mean I said no because it didn't for

20 me.

21    Q. At anytime during the consideration of Board

22 Policy BDA.1, this board prayer policy, did anyone

23 suggest that the policy safeguarded the right of the

24 individual board members to pray as they saw fit?

37

1     A.  Well, according to this, it gives any board
2  member the opportunity to express and pray to whoever
3  they want and however they want.  So, to answer that
4  question, I would say yes.
5     Q.  Your answer spoke to terms of reviewing text
6  of the policy and interpreting the policy.  My
7  question had to do with comments by board members
8  during the consideration of the policy.
9        Did any board member ever say, in words or
10  substance, "We should adopt this policy because it
11  safeguards the rights of individual board members to
12  pray as they see fit."?
13     A.  No.
14     Q.  And when you say no, do you mean, "No, I
15  remember that that was never said," or "No, I don't
16  recall that that was ever said."?
17     A.  No, I don't recall any board member
18  specifically saying, "Adopt this so we can pray."
19     Q.  Paragraph three of the policy reads, quote,
20  "Such opportunity."  And that opportunity is the
21  opportunity to open the meeting with a prayer;
22  correct, or a moment of silence?
23     A.  (Nodding head)
24     Q.  "Such opportunity shall not be used or

38

1  exploited to proselytize, advance or convert anyone or
2  to derogate or otherwise disparage any particular
3  faith or belief."
4        Would you agree with me that that paragraph
5  imposes some limitations on the right of board members
6  to pray as they see fit?
7     A.  Yes.
8     Q.  And that was a limitation that you, as a
9  board member, thought was appropriate to include in
10  the policy?
11     A.  Yes.
12     Q.  What did you understand in the context of
13  this paragraph the prohibition against proselytizing
14  to mean?
15     A.  I guess my interpretation of it would be that
16  you cannot use that opportunity to advance or promote
17  any one particular religion over another.
18     Q.  Who had the responsibility to ensure that
19  that limitation was complied with?
20     A.  I would assume that it would be left up to
21  the individual giving the prayer.  I mean there wasn't
22  a police officer there to enforce anything or anything
23  like that.
24     Q.  I know you weren't being facetious, and when

39

1  I say enforce, that may have caused you to think about
2  police officers.  I meant was it the board members
3  themselves who had the obligation to enforce this
4  limitation?
5     A.  Yes.
6     Q.  Now, do you recall any prayer that was
7  offered that you viewed as either violating paragraph
8  three or raising a question about whether it violated
9  paragraph three at anytime during your tenure after
10  the adoption of this policy?
11     A.  No, not really, because, you know, my
12  interpretation of it was that each board member had
13  the opportunity to express as they felt fit as long as
14  it wasn't used to promote any one particular religion,
15  so, no, I don't remember any specific board prayer
16  that was more offensive or less offensive or anything
17  like that.
18     Q.  I am going to offer -- I am going to give you
19  an example of a prayer that -- Well, I will let you
20  make the judgment, but I am going to give you a prayer
21  and ask you if it would have been given it would have
22  violated the policy.  Okay?
23        "Oh, Lord, please convert the Jews in the
24  audience and ensure that they come to know our Lord

40

1  Jesus Christ."
2     A.  Yes, it would.
3     Q.  That would violate paragraph three?
4     A.  Yes.
5     Q.  Now, suppose that a board member gave that
6  prayer which would violate, in your view, paragraph
7  three.  What would be done?  What would be the
8  response of the board?
9     A.  As far as repercussions, you mean, or?
10     Q.  Yes, if any?
11     A.  I would assume that there would be dialogue
12  that would take place, probably in executive session,
13  to ask one of the board members why did you do that or
14  why did you say those words or --
15     Q.  I purposely picked that extreme example so we
16  could explore what the board would do.  I could ask
17  you what you would have done.  That's an example that
18  seems to you to be a clear violation of paragraph
19  three.  Would you have brought that to the president
20  or the individual board member's attention yourself?
21     A.  Yes.
22     Q.  And I take it what you would have done is to
23  say, "I believe that prayer was in violation of our
24  policy."  Correct?

41

1    A.  Yes.

2    Q.  At that point the horse would be out of the

3  barn; right?

4    A.  Right.

5    Q.  On that prayer?

6    A.  Right.

7    Q.  Would you suggest that that person be taken

8  out of the rotation to offer prayers thereafter, or do

9  you think --

10    A.  No, I am not a one-strike man, so I would

11  give them the opportunity to redeem themself.

12    Q.  Okay.  And if the board member then offered a

13  prayer, you know, "Convert the heathens in the

14  audience, please, Lord," you would at that point two

15  strikes is enough?

16    A.  Yeah.

17    Q.  You wouldn't give them a third chance?

18    A.  Right.

19        MR. ALLINGHAM:  Okay.  We are going to

20  change the tape.

21        THE WITNESS:  Okay.

22        VIDEOGRAPHER:  Going off the record at

23  2:34 p.m.

24        (A recess was taken.)

42

1        VIDEOGRAPHER:  Going back on the

2  record at 2:39 p.m.

3  BY MR. ALLINGHAM:

4    Q.  Dr. Isaacs, I am going to show you a second

5  prayer, and this one is long, so I am going to give it

6  to you in writing.  We have previously marked this as

7  PX35.  I will read it into the record, but follow

8  along as we go.

9        "Do not put your trust in princes, in mortal

10  men who cannot even save themselves.  When their

11  spirit departs, they return to the ground.  On that

12  very day, their plans come to nothing.  Blessed is he

13  whose help is the God of Jacob, whose hope is in the

14  Lord, his God, the maker of heaven and earth, the sea,

15  and everything in them, the Lord who remains faithful

16  forever.  He upholds the cause of the oppressed and

17  gives food to the hungry.  The Lord sets prisoners

18  free.  The Lord gives sight to the blind.  The Lord

19  lifts up those who are bowed down.  The Lord loves the

20  righteous.  The Lord watches over the alien and

21  sustains the fatherless and the widow, but he

22  frustrates the ways of the wicked.  For the wages of

23  sin is death, but the gift of God is eternal life

24  through Jesus Christ our Lord."

43

1        In your judgment as a board member, would

2  that prayer be permitted or be prohibited by paragraph

3  three of the policy?

4    A.  It's not nondenominational.

5    Q.  But the policy doesn't require that a prayer

6  be nondenominational.  The policy simply requires that

7  the prayer not be used or exploited to proselytize,

8  advance or convert anyone or to derogate or otherwise

9  disparage any particular faith.  So, in light of that,

10  would you view this as --

11    A.  No, I would not view this as bad.

12    Q.  It would be permitted under paragraph three?

13    A.  Yes, yes.

14    Q.  And, to put it in the language of paragraph

15  three, you would not view that prayer as --

16    A.  Proselytizing.

17    Q.  -- proselytizing?

18    A.  No, sir.

19    Q.  This prayer has been marked as PX45.  It

20  reads, "Heavenly Father, thank you for this great

21  occasion, for the work, the effort, the joys and

22  everything that led up to this point in time.

23  Thank you for your guidance in this event.  We pray

24  for your direction in the lives of each of these

44

1  school board members.  We pray that you direct them

2  into the truth and eventually the truth that comes by

3  knowing Jesus.  We also pray that you would be with

4  them at this time.  We ask these things in Jesus's

5  name.  Amen."

6        Do you view that prayer as proselytizing?

7    A.  No.  It's not nondenominational, but no.

8    Q.  You have said that several times.  Do I

9  correctly infer from that that, as a board member, you

10  would have preferred that the prayers that are offered

11  to open a meeting be nondenominational?

12    A.  I think everybody should be free to express

13  how they choose to do so, so I would say it's a matter

14  of interpretation.  I mean this goes in accordance

15  with what would be number three, any such prayer may

16  be sectarian or non-sectarian, so it's following the

17  policy, I guess, is what I am saying, but.

18    Q.  Let me ask you this question:  Is it possible

19  for a prayer to be sectarian, that is directed to a

20  particular deity, and at the same time not be

21  proselytizing?

22    A.  I guess when I think of proselytizing, I am

23  thinking of someone standing up at the pulpit saying,

24  "You will do this or this is the way you should go or

53

1  your attention to those words?

2     A.  No.

3     Q.  Halfway through the second page there is a

4  whereas clause that talks about the American Civil

5  Liberties Union.  Do you have any recollection of a

6  discussion of the American Civil Liberties Union

7  during the discussion of this school board prayer?

8     A.  You mean by board?

9     Q.  Yes, by board members.

10    A.  No, but I know that the public felt American

11  Civil Liberties Union -- I mean there is a sentiment

12  there that the ACLU is taking away rights of people by

13  the general public.  But no, not that I recall.

14    Q.  So you don't recall any discussion at the

15  board level or at the Policy Committee -- I guess I am

16  just going to assume you weren't at Policy Committee

17  meetings.  Okay?

18    A.  Yes, that's a good assumption.

19    Q.  Do you recall a discussion of any kind at the

20  board level of the involvement of the ACLU in this

21  litigation?

22    A.  Well, yes, I remember, if I am not mistaken,

23  that one of the board minutes add that there was

24  someone there from the ACLU that actually spoke, if I

54

1  am not mistaken, but.

2     Q.  Your memory is accurate.  Do you recall the

3  name of Dru Fennel?

4     A.  No.

5     Q.  Was the person who spoke a woman?

6     A.  Yes.

7     Q.  And did she speak at a meeting at which

8  Mrs. Dobrich also spoke?

9     A.  Good question.

10    Q.  That was a statement by a representative of

11  the ACLU.  Do you recall discussions by board members

12  of the ACLU's involvement in this litigation?

13    A.  Um, maybe just questioning whether they were

14  involved in it, but no lengthy deliberation about

15  anything like that.

16    Q.  Let me come back to your statement about the

17  public.  Do you understand or did you understand when

18  you were on the board that the public viewed the

19  board's defense of this lawsuit as a defense of

20  Christian values?

21    A.  Some did.

22    Q.  How did you find that out?  Did they tell you

23  that?

24    A.  I am sure just in grocery stores and I mean

55

1  obviously by comments of the general public, but.

2     Q.  Did you understand, Dr. Isaacs, that that was

3  a widely held view of the public?  I am not talking of

4  the board members now, I am talking about the public.

5     A.  I wouldn't say -- I would not say it's a

6  widely held view.  I would just say it was a view.

7     Q.  Which you heard from more than one person?

8     A.  Right.

9     Q.  These are hard things to remember, but can

10  you estimate the number of people who said that to you

11  in words or substance?  Are we talking a dozen?

12    A.  No.

13    Q.  A hundred?

14    A.  No.

15    Q.  Two?

16    A.  No, no, no, not even five.  If it didn't have

17  something to do with athletics or why the budget was

18  overspent, they were the main substance of what I was

19  dealing with.

20    Q.  The next clause on page two reads, "Whereas

21  the board has obtained the legal advice of two

22  competent and experienced constitutional attorneys,

23  John W. Whitehead, Esquire, and Thomas S. Neuberger,

24  Esquire, that prayer to open board meetings is

56

1  constitutional in the United States Court of Appeals

2  for the Third Circuit, which includes Delaware, and

3  legal counsel have identified the following legal

4  authority in support of their legal opinion."

5        Do you recall having read something to that

6  effect at anytime during your consideration of the

7  board prayer policy?

8     A.  No, I don't.

9     Q.  Is it correct that the school board obtained

10  the legal advice of two confident and experienced

11  constitutional attorneys that prayer to open board

12  meetings is constitutional?

13    A.  I know a lot of questions were asked.

14  Whether you would say that you got their legal advice

15  from it, according to this, yes.

16    Q.  When you say "a lot of questions were asked,"

17  you mean questions were asked by board members of

18  Mr. Neuberger?

19    A.  Yes.

20    Q.  And did Mr. Neuberger respond?

21    A.  Yes.

22    Q.  And is the substance of his response

23  reflected in this memorandum prepared by

24  Mr. Neuberger?

61

1   there is no dialogue that takes place between the
2   board.
3       Q.   Fair enough, so that the public spoke about
4   this issue?
5       A.   Yes.
6       Q.   But the board members did not deliberate on
7   the issue in public; is that correct?
8       A.   Right, correct.
9       Q.   And the board members did not deliberate on
10  the actual board policy in public; correct?
11      A.   Not that I recall.
12      Q.   Do you recall that the board ever considered
13  the possibility of opening its meetings only with a
14  moment of silence, not a prayer?
15      A.   I know that that was my suggestion.
16      Q.   And was that a suggestion that you made in a
17  board meeting?
18      A.   Yes.  I think it was.
19      Q.   Do you know at which board meeting you made
20  that suggestion?
21      A.   No.
22      Q.   Why did you make that suggestion?
23      A.   That's my personal belief.
24      Q.   Did you believe that a moment of silence

62

1   would be effective to solemnify the proceedings?
2       A.   Yes, I do.
3       Q.   What was the response, if any, of the board
4   members to your suggestion?
5       A.   It was heard.
6       Q.   Did anybody say in words or substance, "That
7   suggestion is not acceptable to me"?
8       A.   No, no, no.  There wasn't a vote taken or
9   anything like that.
10      Q.   No, sir, this is in the discussion of ideas
11  at the board meeting.
12      A.   No.
13      Q.   You offered the idea of maybe we could open
14  the meeting with a moment of silence?
15      A.   Right.  The only thing I would say is the
16  others said, "Well, I should have the right to do it
17  however I would like to do it, however I would like to
18  pray, it's my freedom of speech."  I do recall that.
19      Q.   And so the incorporation of not only a moment
20  of silence but also a prayer in the policy was
21  intended to preserve those board members' individual
22  freedoms of speech?
23      A.   Yes.
24      Q.   Did you ever see anybody leave the room when

63

1   the -- Let me back up one second.  After the policy
2   was adopted, it became the practice of the board to
3   read a disclaimer before the prayer was given;
4   correct?
5       A.   Yes.
6       Q.   At anytime after the policy was adopted, did
7   you see anyone upon hearing the disclaimer get up and
8   leave the room during the prayer?
9       A.   Honestly, I never paid any attention.  I was
10  reading.
11      Q.   Working on board business?
12      A.   Yes.
13      Q.   Let me ask you a question about your
14  perception.  Do you think it would be a difficult
15  thing for a student to get up and leave the board
16  meeting during the reading of the prayer?
17      A.   I guess it depends on the student.
18      Q.   Can you imagine that it would be -- Can you
19  imagine that a student would fear that that would
20  identify the student as a person who doesn't practice
21  a religion?
22      A.   Not necessarily, because one could get up and
23  leave saying they had to use the restroom, so you
24  didn't always have to tack it to, unless you were

64

1   there on every single board meeting, so I would say
2   there are mechanisms to get up and leave a board
3   meeting that you don't have to tack a particular
4   clause to it.  There is plenty of opportunities to get
5   up.
6       Q.   So you would agree with me that the
7   perception, if no explanation were offered of someone
8   who hearsay the disclaimer and gets up and leaves,
9   would be that that person affirmatively did not want
10  to participate in the prayer; correct?
11      A.   Well, no, not necessarily.  They could get up
12  to go to the restroom or something like that.  You
13  know, I -- I mean if it was the same person over and
14  over again, then maybe yes, yes, but that particular
15  board meeting, no.  I mean we have people getting up
16  and going out all the time, so.
17      Q.   During the prayer?
18      A.   Coming in the during, people come in.
19      Q.   We talked earlier about the color guard
20  folks, the junior ROTC kids?
21      A.   Yes.
22      Q.   Realistically speaking, as a practical
23  matter, if they don't want to participate in the
24  prayer, they can't leave; correct?

**65**

1   A. Sure.

2   Q. Is it your belief that the Indian River

3 School District is a Christian area?

4   A. Yes, I would say it is.

5   Q. And the board policy on school board prayer

6 recognizes that the Indian River School District is a

7 Christian area; does it not?

8   A. Yes.

9   Q. Would it be fair for me to understand that

10 the discussion of the school board prayer policy, the

11 board discussion of the school board prayer policy,

12 reflected the board members' beliefs that the Indian

13 River School District is a Christian area?

14   A. Yes.

15   Q. Mr. Bireley was quoted in one of the many

16 newspaper articles around this issue saying that, "The

17 prayer suit facing the district and the board was one

18 of the major issues surrounding this year's

19 election" -- that's the 2006 election -- "and that it

20 probably swung this year's vote." Would you agree

21 with Mr. Bireley's statement?

22   A. No.

23   Q. You had served on the board for about a year

24 and a half at the point in time in October of 2004

**66**

1 when the policy was adopted; correct?

2   A. Yes.

3   Q. From your perception, did the policy change

4 in any way the board's practice of offering a prayer

5 at the beginning of its meetings?

6   A. No, the only thing was just making it clear

7 that no one has to participate, this is a voluntary

8 deal, I mean other than the verbiage that was put in,

9 if you want to call it the disclaimer statement.

10   That's the only thing that really maybe

11 changed, I guess, so to speak, just making sure that

12 people knew that this was not a requirement of the

13 formal setting of the board meeting; it was something

14 that was being practiced by the Board of Education.

15   Q. To the extent that a board member chooses to

16 open the meeting with a prayer, is it correct that

17 that prayer is directed only to the ten board members?

18   A. True.

19   Q. And so whatever purpose it's intended to

20 accomplish, that purpose could be accomplished if the

21 ten board members prayed privately immediately before

22 the board meeting; correct?

23   A. Yes. I brought that up, but I understand

24 that you can't do that because a board cannot meet

**67**

1 independently like that because of the Sunshine Law,

2 which I am not familiar with, but it says the Board of

3 Educations cannot meet in a room before they go out

4 into the public. You can't have ten board members or

5 a majority of the board members meet behind closed

6 doors without some -- So, yes, that's one of the

7 things that I suggested, was that.

8   Q. So you made a suggestion that, I am going

9 back to an earlier answer -- During the course of the

10 board's consideration of this school board prayer

11 issue, you made a suggestion that the board could

12 simply open its meetings with a moment of silence;

13 correct?

14   A. Yes.

15   Q. And the response to that from some of your

16 colleagues was, "You know, I have a First Amendment

17 right to pray however I want."

18   A. Yes, right.

19   Q. And the policy that was ultimately adopted

20 was intended to ensure that?

21   A. Right.

22   Q. You also made a suggestion that, "Okay, if

23 you want to pray however you want, maybe we could pray

24 in private right before we begin the meeting."

**68**

1 Correct?

2   A. Correct.

3   Q. And someone said, "We can't do that because

4 of the Sunshine Laws."

5   A. Right.

6   Q. Who said that to you? Do you recall?

7   A. I don't know.

8   Q. Was it a board member or a lawyer?

9   A. No, it wasn't a lawyer.

10   Q. It was a board member?

11   A. Yes.

12   Q. Did anybody suggest looking into more closely

13 whether the Sunshine Laws would actually prohibit the

14 board members from just getting together and having a

15 prayer before they began their meeting?

16   A. No, but there has been several other

17 instances where I know personally that I have said,

18 "Well, why don't we get together and talk about this,"

19 and was told, "You can't do that," so I just assumed,

20 you know, I would have to do the leg work to

21 investigate it myself.

22   I mean there were multiple issues other than

23 this where I mentioned about getting together, and we

24 were told the same thing, so.

69

1    Q.  Did anybody suggest, you included, but did
2  anybody suggest that each of the board members could
3  pray however they want but simply pray silently?
4    A.  Yes.
5    Q.  Who suggested that?
6    A.  Me.
7    Q.  And what was the response to that suggestion?
8    A.  What I just said earlier, that --
9    Q.  "I can pray however I want to."
10    A.  Exactly.
11    Q.  And, "If I want to pray out loud, I will pray
12  out loud."
13    A.  Exactly.
14    Q.  There are -- Let me make it more specific.
15  During your tenure as a board member, were you aware
16  of discussions of issues that would be addressed by
17  the board among board members outside of meetings?
18    A.  (Shaking head)
19    Q.  It's a small community.  People meet outside
20  of meetings from time to time, don't they?
21    A.  Yes.  You mean board members?
22    Q.  Yes, sir.
23    A.  No.
24    Q.  You don't recall meeting someone in a

70

1  restaurant and talking about some issue that was
2  presented to the board?
3    A.  No, because myself, personally, I didn't have
4  the time, so, you know, I don't know if the others did
5  it.  Quite frankly, I didn't care.
6    Q.  Did anyone ever suggest that the
7  consideration of the board's deliberations on the
8  board policy on prayer should be considered in public
9  because of the Sunshine Laws?
10    A.  No, not that I recall.
11    Q.  Other than the suggestion to open the meeting
12  with a moment of silence, the suggestion that the
13  board members could meet privately immediately before
14  the meeting to pray, or the suggestion that each
15  individual board member could offer his own prayer
16  silently, according to his own conscience, did you
17  make any other suggestions during the discussions of
18  the board prayer policy?
19    A.  No, because, quite frankly, I felt there were
20  many other issues that needed closer attention than
21  these, so.
22    Q.  What do you mean by that?
23    A.  Meaning that the time that I was spending was
24  not on issues like this.  It was on construction,

71

1  budget, personnel matters, things like that.
2    Q.  Matters that you considered more important?
3    A.  More what would be typical of day-to-day
4  board operations.
5    Q.  This issue got a lot of attention in the
6  public and in the media; correct?
7    A.  Yes.
8    Q.  Did you think that the amount of attention it
9  got was disproportionate, given its importance to the
10  district?
11    A.  Are you asking for my personal opinion?
12    Q.  Yes.
13    A.  I would say so.  That depends on who you talk
14  to.
15      MR. ALLINGHAM:  Let's go off the
16    record for five minutes.  The farther we get
17    into the roster of witnesses, the more
18    quickly I am going, and I may well be done.
19      VIDEOGRAPHER:  Going off the record at
20    3:27 p.m.
21      (A recess was taken.)
22      VIDEOGRAPHER:  Going back on the
23    record at 3:30 p.m.
24  BY MR. ALLINGHAM:

72

1    Q.  When you made the suggestion that the board
2  could simply choose to open its meeting with a moment
3  of silence, did you think that that would have been an
4  effective way for the board to solemnify its
5  proceedings?
6    A.  Yes.
7    Q.  When you made the suggestion that the board
8  members could meet privately right before the board
9  meeting opened to have whatever prayer they wished,
10  did you think that that would have been an effective
11  way to solemnify the proceedings?
12    A.  Yes.
13    Q.  Then, lastly, when you made the suggestion
14  that each board member could silently offer whatever
15  prayer or whatever they wished to offer at the
16  commencement of the board meeting, did you think that
17  that would have been an effective way to solemnify the
18  board's proceedings?
19    A.  Yes, in my opinion.
20      MR. ALLINGHAM:  I have nothing
21    further.  Thank you very much.
22      VIDEOGRAPHER:  Going off the record at
23    3:31 p.m.
24

# EXHIBIT 13

**Page 1**

```
 1        IN THE UNITED STATES DISTRICT COURT
 2        IN AND FOR THE DISTRICT OF DELAWARE
 3   MONA DOBRICH and MARCO   : Case No. 15-120
     DOBRICH, Individually and :
 4   as parents and next friend :
     of ALEXANDER DOBRICH,     :
 5   SAMANTHA DOBRICH, JANE DOE :
     and JOHN DOE, Individually :
 6   and as parents and next   :
     friend of JORDAN DOE and  :
 7   JAMIE DOE,                 :
 8        Plaintiffs,   :
 9        v.            :
                        :
10   INDIAN RIVER SCHOOL        :
     DISTRICT, et al.,          :
11                              :
          Defendants.   :
12        .. ...... ..
13        Video Deposition of ELAINE MCCABE, taken
14   pursuant to notice, on Tuesday, October 17, 2006
     at 9:02 a.m. at 31 Hosier Street, Selbyville,
15   Delaware, reported by Lorena J. Hartnett, a Registered
     Professional Reporter and Notary Public.
16        .. ...... ..
17   APPEARANCES:
18        RICHARD HORVATH, ESQUIRE
          BRIAN G. LENHARD, ESQUIRE
19        Skadden, Arps, Slate, Meagher & Flom
          One Rodney Square
20        Wilmington, DE  19801
          Attorneys for the Plaintiff
21
22        WILCOX & FETZER
          1330 King Street - Wilmington, DE  19801
23        (302) 655-0477
          www.wilfet.com
24
```

**Page 2**

```
 1
 2   APPEARANCES (CONTINUED):
 3        JASON P. GOSSELIN, ESQUIRE
          Drinker, Biddle & Reath, LLP
 4        One Logan Square
          18th and Cherry Streets
 5        Philadelphia, PA  19103-6996
          Attorney for the Defendants
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**Page 3**

```
 1
 2
 3        TABLE OF CONTENTS
 4   TESTIMONY OF ELAINE MCCABE:
 5     Direct Examination by Mr. Horvath  . . . . . . . 4
 6   Certificate of Reporter  . . . . . . . . . . . . .112
 7
 8
 9
10        INDEX TO EXHIBITS
11   Plaintiff's Exhibit 57 . . . . . . . . . . . . . 99
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**Page 4**

```
 1        (The videographer read the
 2   introduction, and the attorneys introduced
 3   themselves.)
 4        ELAINE MCCABE,
 5   HAVING FIRST BEEN DULY SWORN, TESTIFIED AS FOLLOWS:
 6   DIRECT EXAMINATION ON BEHALF OF THE PLAINTIFFS
 7   BY MR. HORVATH:
 8   Q.  Good morning, Ms. McCabe.
 9   A.  Good morning.
10   Q.  Just so I can be clear from the start, is it
11   Ms. or Mrs.?
12   A.  Mrs.
13   Q.  Mrs.  Have you ever been deposed before?
14   A.  Once, yes.
15   Q.  And what was that, what were you -- What case
16   was that?
17   A.  It was the Barkaski case associated with the
18   school district.
19   Q.  And what was the nature of that case?
20   A.  It was a case that involved missing monies
21   from a booster organization.
22   Q.  Okay, did that case proceed to trial?
23   A.  No.
24   Q.  Did that case involve in any way religion in
```

McCabe, Elaine (Video)  10/17/2006  9:02:00 AM

17

1  moved very soon after I left the board, and I did not
2  take them with me. They were destroyed.
3      Q. Was that move the reason why you had to leave
4  the board?
5      A. I actually came up at the end of the term and
6  did not run again because I knew that we would be
7  moving. Terms are three years in this district, and I
8  knew that we would be moving within the next six to
9  eight months, and to run again and then have to resign
10  when I moved would just put the district in a position
11  of running a special election, so I just opted not to
12  run, and also I had some personal issues with care
13  giving with my parents, so I could no longer serve on
14  the board.
15      Q. You said that the notes that you had taken up
16  to that point had been destroyed. Were they just like
17  left for the garbage man to pick up?
18      A. Oh, no, no, they were shredded.
19      Q. Okay, and you shredded them?
20      A. Yes.
21      Q. Does the school board enforce the policies it
22  adopts?
23      A. To my knowledge, we always tried to enforce
24  them. Now, board members certainly are not in

18

1  buildings every day, but I believe that the policies
2  were enforced, yes.
3      Q. And for the policies that dealt with board
4  governance and operations, would it be pretty much up
5  to only the school board to enforce those policies?
6      A. Yes.
7      Q. Because those policies apply only to the
8  school board?
9      A. Right, that's correct.
10      Q. And no one else could tell the school board
11  how to enforce those policies?
12      A. Well, I think most of the policies the
13  district adopted was always done with the advice of an
14  attorney, so I guess from that respect an attorney or
15  a state could also have policies that we needed to
16  follow, but I think we always tried to follow the
17  policies.
18      Q. I was talking more to the board governance
19  and operations policies.
20      A. How we operate?
21      Q. Yes, that the board adopted, the policies
22  that begin with the letter code, they have the letter
23  code that begins with a B.
24      A. Right.

19

1      Q. Those policies deal with how the board
2  operates?
3      A. How we run the meetings, etcetera.
4      Q. Exactly. And it would be only up to the
5  board to enforce those policies?
6      A. I believe so.
7      Q. When you were acting as a school board
8  member, did your actions have to be for the betterment
9  of the district students?
10      A. Did they have to be?
11      Q. Uh-huh.
12      A. I am not sure I understand that.
13      Q. Was there any policy in place that directed
14  the board members to place the interests of the
15  district students first in any actions they took as a
16  board member?
17      A. I don't know if there was any policy that
18  said that. I think when you decide to volunteer your
19  time and run for the board, you obviously want to do
20  it for the betterment of the students.
21      I am not aware if there is a specific policy.
22  I think when we are sworn in, we, I believe, say that
23  we want to do it for the betterment of the students.
24      Q. Do you think it would be appropriate for the

20

1  board to pass any policy that was beneficial to the
2  board members themselves without any benefit to the
3  students?
4      A. No.
5      Q. No, it wouldn't be appropriate?
6      A. I don't think anyone would do that. I don't
7  see any reason for that.
8      Q. Do you think it would be appropriate for the
9  board to adopt a policy that was primarily for the
10  board members' benefits?
11      A. No.
12      Q. No, it would not be?
13      A. It would not be appropriate.
14      Q. What typically happens at a regularly
15  scheduled board meeting, the regular board meetings?
16      A. The monthly board meetings?
17      Q. Yes.
18      A. We have an agenda. We receive a packet
19  several days before the meeting so that we can review
20  everything that will be discussed that night. When we
21  get to the meeting, we would -- I am trying to
22  remember the order. We would generally have a prayer.
23  Then we would have a pledge of allegiance. And then
24  we would have public comment. And then we would

29

1  prayers?

2    A.  No, not to me.

3    Q.  Did you have any -- At any point, did you

4  have any understanding as to why they wanted to give

5  the prayers?

6    A.  Not really.

7    Q.  Which board members would typically give the

8  prayers?

9    A.  Let's see, over my 11 years board members

10  changed, but I would say most recently it was

11  Mr. Evans and Mr. Helms, Dr. Hattier.  Those are the

12  ones that I remember most in the last few years.

13    Q.  Aside from our clients' complaints, are you

14  aware of any complaints about the use of prayer during

15  board meetings?

16    A.  I never had anyone complain to me personally.

17    Q.  Did anyone speak to you about board prayer?

18    A.  No.

19    Q.  And why did the board open its meetings with

20  a prayer before the policy was adopted?

21    A.  I believe because we always had, and the

22  board always had before I was a member of the board.

23  I attended many meetings before I was a board member,

24  and I believe it's always been done as long as I can

30

1  remember.

2    Q.  Was that the only reason, because it had

3  always been done?

4    A.  Probably, or it's at least the reason it kept

5  continuing, I would say.

6    Q.  Did the prayer serve any purpose?

7    A.  I guess -- I guess it serves a purpose in

8  that it establishes and continues a tradition that's

9  always been done, and it gives everyone -- I felt it

10  gave everyone a moment to reflect.

11    Q.  And, by everyone, do you mean everyone in

12  attendance?

13    A.  No, the board members.

14    Q.  Was there a disclaimer read with the prayer

15  before the policy was adopted?

16    A.  No.

17    Q.  So how -- strike that.  I am going to show

18  you what has been previously marked as PX9.  Is this

19  the policy that the board adopted, the board prayer

20  policy that the board adopted?

21    A.  Yes.

22    Q.  And when was the policy adopted?

23    A.  It says 10/19/04.

24    Q.  When did the board first consider adopting

31

1  this policy?

2    A.  I believe the first time it was discussed was

3  in either June or July of '04, and I am not sure

4  which.

5    Q.  Was it in response to Mona Dobrich's

6  complaints?

7    A.  Yes.

8    Q.  At that time did any board member express any

9  reservations about adopting this policy?

10    A.  Reservations about a policy or a specific

11  policy?

12    Q.  Did any board member express any reservations

13  about the need to adopt this policy?

14    A.  Not that I remember.

15    Q.  A policy on board prayer in general?

16    A.  No, I don't believe so.

17    Q.  Did you have any reservations?

18    A.  No.

19    Q.  At the time did any board member say why they

20  supported board prayer?  And, by at the time, I mean

21  in the summer of 2004?

22    A.  I am not sure I remember the exact details of

23  that meeting.  I think there were some board members

24  that felt they wanted to continue the prayer because

32

1  it had always been done and it was a tradition of the

2  district, but I don't -- I don't remember any real

3  reservations.

4    Q.  Do you remember which board members?

5    A.  Not really.

6    Q.  So the board members, the reason you remember

7  the board members for giving for writing that policy

8  is to protect the tradition for the district?

9    A.  I think that was part of it, and I think

10  board members that attend church and pray, I am sure

11  want to continue the tradition of praying at the

12  meetings they go to.

13    Q.  Because it's something they have always done?

14    A.  Yes.

15    Q.  These were the board members that you

16  mentioned before, Hattier, Evans and Helms?

17    A.  My impression of that meeting was that

18  everyone wanted to continue it.

19    Q.  But you had mentioned the board members who

20  attend church and prayed regularly and you had

21  identified Hattier, Evans and Helms as those board

22  members earlier, so --

23        MR. GOSSELIN:  I think she identified

24    those board members as the board members who

57

1    Q.  It states on this document that the board
2  approved special meeting minutes for September 15,
3  2004.
4    A.  Yes.
5    Q.  And the regular meeting minutes for
6  September 28, 2004.
7    A.  Okay.
8    Q.  Do you think that the board met with
9  Mr. Neuberger on September 15, 2004?
10    A.  It could have been.  I truly just don't
11  remember the date.
12    Q.  Going back to Policy BDA.1, so it's Exhibit
13  Number 9 in your list.
14    A.  Okay.
15    Q.  There it is.  Does this policy only apply to
16  regular board meetings?
17    A.  Yes.
18    Q.  At anytime did anyone suggest that the board
19  should adopt a policy that would also apply to special
20  meetings or executive sessions?
21    A.  Not that I can remember.
22    Q.  In fact, in your history as a board member,
23  do you recall the board opening its special meetings
24  with a prayer?

58

1    A.  No, usually not.
2    Q.  Do you remember the board opening its
3  executive sessions with a prayer?
4    A.  No.
5    Q.  To your knowledge, has any school board
6  member ever recited a prayer that was prohibited by
7  this policy?
8    A.  That was prohibited?  No.
9    Q.  And let's assume that this policy would have
10  been in effect when you first joined the board in
11  1994.
12    A.  Okay.
13    Q.  From that time to the present, and, to be
14  clear, do you remember any board member that recited a
15  prayer that would have violated this policy if it was
16  in effect?
17    A.  No.
18    Q.  When this policy was being considered, did
19  you have any discussions with any of the other board
20  members about what the terms of this policy meant?
21    A.  I think during the meeting many of us had
22  comments concerning the policy, but I don't really
23  remember any other conversation.
24    Q.  Do you remember your comments concerning this

59

1  policy?
2    A.  I don't know that I could quote any of my
3  comments word for word.  I can tell you generally how
4  I feel about it.  I really don't like change and I
5  like tradition and I like -- I like procedures that
6  are done.
7        I like for my kids, when they go to school,
8  to experience the same things that I experienced as
9  far as, you know, a prom, a class ring, things like
10  that, so I was in favor of having a policy and keeping
11  prayer at board meetings.
12    Q.  You mentioned you are in favor of tradition.
13    A.  Uh-huh.
14    Q.  What does -- What makes something a
15  tradition?
16    A.  Doing it over and over again for a long time.
17    Q.  How long?
18    A.  I think that can vary.
19    Q.  Does it vary based on how many times you are
20  doing it and how long it's been done?  So, in other
21  words, if you do something once a year, you need to do
22  it for many years?
23    A.  Yes.
24    Q.  Whereas if you do something maybe once a

60

1  month, you don't need to do it for as many years?
2    A.  Oh, I don't know that that's true.  I just
3  think a tradition -- If I -- I just think tradition is
4  something that you do over and over again over a long
5  period of time.
6    Q.  Is the fact that something is a tradition
7  sufficient reason to continue doing it?
8    A.  I think if the majority of the people want
9  it, there is nothing wrong with continuing it.
10    Q.  Have there been traditions in the past that
11  we no longer do?
12    A.  Sure, I think there always is.  That's life.
13    Q.  You said that some of the board -- I believe
14  you said that some of the other board members have
15  comments about this policy?
16    A.  I am sure most board members had comments.
17    Q.  Do you remember generally what those comments
18  were?
19    A.  I don't remember, again, specific statements
20  or quotes.  It's pitiful what your memory is now that
21  you have to think back two years ago, but I would just
22  say my general impression is that all board members
23  wanted to look at the situation, since there had been
24  a complaint, and our normal procedure if there was a

**69**

1  minutes and nineteen seconds. Did you hear anything
2  in that comment that bothers you?
3     A. No.
4     Q. Did you hear his comments that, "The last I
5  knew, Madalyn Murray O'Hair just disappeared to never
6  be seen or heard from again. I think we all know who
7  she was. She was the person who initiated the
8  movement to remove prayer from our schools."?
9     A. I did not know who she was until that night.
10  I frankly had never heard of her, and I didn't know
11  who she was, so that night I didn't even, frankly,
12  under the comment. I am not sure that I still know
13  who she is past what he said that night.
14     Q. Well, he does say that she was the person who
15  initiated the movement to remove prayer --
16     A. Yes.
17     Q. -- from our schools?
18     A. Yes.
19     Q. And --
20     A. I had never heard of her.
21     Q. And at the August 24, 2004 meeting was Mona
22  Dobrich there to remove prayer from the district?
23        MR. GOSSELIN: Objection.
24     A. Was that the August --

**70**

1     Q. Yes.
2     A. Are we talking about the same? She was
3  present.
4     Q. Did you understand at that August 24, 2004
5  meeting that her complaints were about prayer in the
6  district?
7     A. As I said before, I thought her original
8  complaint was about graduation. I am not sure that I
9  remember exactly when I became aware that it was also
10  a complaint against prayer at the board meeting.
11     Q. Do you think that Mr. Johnson's comments were
12  directed in any way towards Mona Dobrich?
13     A. No.
14     Q. Even though she was the person who had
15  initiated the steps to remove prayer from the district
16  schools?
17     A. I thought his comments were directed towards
18  us as the board to not allow that to happen.
19     Q. So do you think he was threatening the board
20  with disappearing if they allowed it to happen?
21     A. No, I don't think he was threatening anyone.
22  I think he was just asking us to not discontinue the
23  prayer at the beginning of the board meetings.
24     Q. So how do you take the statement, either then

**71**

1  or now, that, "The last I knew," and I am going to
2  replace here Madalyn Murray O'Hair with how he
3  describes her later on, "the person who initiated the
4  movement to remove prayer from our schools just
5  disappeared to never be seen or heard from again."?
6     A. I don't really have an opinion about it,
7  because, like I said, I don't know her, I don't know
8  the background, I don't know what happened. I
9  don't -- I don't know enough about the issues
10  surrounding her to frankly have an opinion on it.
11     Q. Did you hear the laughter in the crowd that
12  was on the recording after he said Madalyn Murray
13  O'Hair just disappeared to never be seen or heard from
14  again?
15     A. Yes.
16     Q. Did the laughter bother you in any way?
17     A. It only bothered me in the sense that, and
18  that went on pretty much the whole night, generally
19  when someone talks to the board at public session, I
20  would have preferred that everyone in the audience was
21  quiet, but that didn't happen at all that night during
22  most of the people.
23     Q. Are the prayers at board meetings meant to
24  help solemnify the meetings?

**72**

1     A. I believe so, yes.
2     Q. Do you think the August 24, 2004 meeting --
3  Well, first off, was the August 24, 2004 meeting
4  opened with a prayer?
5     A. I would assume it was, yes.
6     Q. Do you believe that that meeting was
7  conducted in a solemn manner?
8     A. I think most of the meeting was.
9     Q. Which part of the meeting wasn't?
10     A. Probably the public session.
11     Q. Do you think the prayer had any affect to
12  keep the public session, to make sure that the public
13  session was conducted in a solemn manner?
14     A. No.
15     Q. Do you know if the August 24, 2004 board
16  meeting was audio recorded?
17     A. Mrs. Hearn generally had a tape recorder in
18  front of where she sat, and she recorded the meetings,
19  to my knowledge, all of them.
20     Q. And she was the person who was responsible
21  for preserving the tapes after those meetings?
22     A. Yes. I don't know who videotaped it.
23     Q. Did you request a copy of the videotape of
24  the meeting, or didn't you know it was videotaped

73

1  until today?
2  A.  I frankly didn't know that -- if I knew that
3  night, I had forgotten, but I really wasn't aware that
4  we were on tape.
5  Q.  Can we go back to exhibit number nine, the
6  copy of the policy?
7  A.  Uh-huh.
8  Q.  Is there any -- Which paragraph of this
9  policy limits what a board member can say as a part of
10  their prayer?
11  A.  I would say number three.
12  Q.  Okay.  And number three reads, "Such
13  opportunity," which I presume means the prayer, "shall
14  not be used or exploited to proselytize, advance or
15  convert anyone, or to derogate or otherwise disparage
16  any particular faith or belief."  Is that correct?
17  A.  Yes.
18  Q.  What does it mean to proselytize?
19  A.  I take that to mean that the prayer said
20  before board meetings was not meant to try to
21  influence anyone to a particular faith.
22  Q.  And I presume that you would use the same
23  definition for the convert anyone?
24  A.  Right, right.

74

1  Q.  What does the advance, the word advance in
2  this policy mean?
3  A.  To put one faith before another.
4  Q.  Okay.  Have school board prayers identified
5  any religious figures, any deities, for example?
6  A.  God and Jesus.
7  Q.  Anyone else?
8  A.  I don't believe so, and not always Jesus.
9  Q.  But --
10  A.  Or I would say the Lord, which would be used
11  sometimes.
12  Q.  But you don't remember hearing any school
13  board prayer that was directed to Jehovah?
14  A.  No.
15  Q.  Or Buddha?
16  A.  No.
17  Q.  Or Allah?
18  A.  No.
19  Q.  Or I can keep going through all religious
20  beings aside from God in general, the Lord and Jesus.
21  A.  Right.
22  Q.  I am going to go through a series of prayers.
23  A.  Okay.
24  Q.  And I want to see whether or not you think

75

1  those prayers would be permitted under this policy.
2  A.  Okay.
3  Q.  Oh, before I show you these ones, I am going
4  to read one to you.
5  A.  Okay.
6  Q.  Suppose that a board member gave the
7  following prayer:  "We pray, Lord, that you enlighten
8  the heathen in our midst and that you inspire them to
9  come to the knowledge of your wisdom and goodness."
10  Would that prayer be appropriate under the
11  policy?
12  A.  I don't know.
13  Q.  Would it violate paragraph three?
14  A.  I am not an expert on prayer.  Read it again.
15  Q.  "We pray, Lord, that you enlighten the
16  heathen in our midst and that you inspire them to come
17  to knowledge of your wisdom and goodness."
18  A.  I guess I personally probably don't like the
19  word heathen, but I don't know whether it would be
20  allowed or not.
21  Q.  Does this prayer proselytize?
22  A.  I have no idea.
23  Q.  You voted for Policy BDA.1?
24  A.  I did.

76

1  Q.  And, as a board member, you are responsible
2  for the enforcement of this policy?
3  A.  Yes, yes.
4  Q.  So, speaking as someone who voted for the
5  policy and was responsible for the enforcement of the
6  policy, how would you make a determination as to
7  whether or not that prayer would violate paragraph
8  three?
9  A.  Well, I guess, frankly, I had never thought
10  of it in terms of a prayer like you just read, because
11  that's not generally what the type of prayer that was
12  said at our meetings.
13  Generally, it was just a prayer asking for
14  wisdom to make good decisions for the betterment of
15  our district and our children, so I am not sure that
16  it ever came up and I ever thought about it in a
17  specific term like that.
18  I mean I am assuming, the way you read it,
19  that the words could be interpreted to encourage
20  people who were not religious to become religious, but
21  I don't know that that's really the case.
22  Q.  So you do not feel that this prayer violates
23  paragraph three of the policy?
24  A.  I don't really have a problem with it, no.

77

1  Now, that's not, might not be the same answer as
2  whether it violates paragraph three.  That's
3  someone -- That's probably for someone more
4  knowledgeable about prayer than me to say, but.
5      Q.  Well, whose job on the board was it to make
6  sure that the prayers complied with paragraph three?
7      A.  Well, you know, I have to say it was probably
8  our job.  I mean I admit that.  I just never heard a
9  prayer that I felt was inappropriate, so I frankly
10  probably never thought about what was inappropriate.
11      Q.  Okay, well, I mean, to be clear with these
12  prayer examples, I am using these as a way to test how
13  you would interpret the policy.
14      A.  I realize that.
15      Q.  So, for this purpose, let's assume that this
16  prayer would be given, not whether or not it has been
17  given.  And what would you do upon hearing that prayer
18  to determine whether or not it violates paragraph
19  three?
20      A.  I would probably have done nothing.
21      Q.  For any prayer that you have heard?
22      A.  No, I am not saying that.
23      Q.  Okay.
24      A.  I am saying that prayer I just don't find

78

1  terribly objectionable.  As I said, I am not
2  truthfully fond of the word heathen, but I just --
3      Q.  So you don't believe this prayer
4  proselytizes?
5      A.  No, I don't believe it does.
6          MR. HORVATH:  Go off?
7          VIDEOGRAPHER:  Going off the record at
8  approximately 11:00 a.m..
9          (A recess was taken.)
10          VIDEOGRAPHER:  We are back on the
11  record at approximately 11:08 a.m..
12  BY MR. HORVATH:
13      Q.  I am going to now introduce exhibit, the text
14  which has been previously marked as PX35.  It's a long
15  text, so I am giving it to you so you can read along
16  with me.
17      A.  Okay.
18      Q.  "Do not put your trust in princes and mortal
19  men who cannot even save themselves.  When their
20  spirit departs, they return to the ground.  On that
21  very day their plans come to nothing.  Blessed is he
22  whose help is the God of Jacob, whose hope is in the
23  Lord his God, the maker of heaven and earth, the sea,
24  and everything in them, the Lord who remains faithful

79

1  forever.  He upholds the cause of the oppressed and
2  gives food to the hungry.  The Lord sets prisoners
3  free.  The Lord gives sight to the blind.  The Lord
4  lifts up those who are bowed down.  The Lord loves the
5  righteous.  The Lord watches over the alien and
6  sustains the fatherless and the widow, but he
7  frustrates the ways of the wicked.  For the wages of
8  sin is death, but the gift of God is eternal life
9  through Jesus Christ our Lord."
10          Would this prayer violate paragraph three of
11  the policy?
12      A.  I don't think so.
13      Q.  Does this prayer proselytize?
14      A.  I don't think so.
15      Q.  How did you come to that conclusion?
16      A.  I just don't see anything in it that forces
17  anyone to believe the same thing that this person is
18  believing, whoever reads it.
19      Q.  You said forces someone to believe?
20      A.  Or tries to force.
21      Q.  What do you mean by force?
22      A.  Influence, I guess.
23      Q.  Influence?  Do you have any opinion as to
24  whether or not the statement, "For the wages of sin is

80

1  death, but the gift of God is eternal life through
2  Jesus Christ our Lord" as to whether or not that's
3  meant to influence?
4      A.  No.
5      Q.  How do you read that statement?
6      A.  The last sentence?
7      Q.  The last sentence?
8      A.  The person giving this prayer feels that you
9  get, you receive eternal life through believing in
10  God.
11      Q.  Would your opinion of this prayer change if
12  immediately after that sentence the person said, "Have
13  you discovered Jesus Christ?"
14      A.  Yes, it would change then.
15      Q.  How?
16      A.  Well, because then they are not saying their
17  personal prayer, but then they are trying to bring
18  someone else into it or influence someone else.
19      Q.  So by referencing someone else, --
20      A.  Uh-huh.
21      Q.  -- this prayer is meant to influence that
22  other person?
23      A.  Yes.  I am not an expert on prayer.
24      Q.  You don't have to be an expert on prayer.  I

81

1  just want to understand how you view this prayer to
2  operate under the policy.
3     A.  Okay.
4     Q.  So I am going to show you what has previously
5  been marked PX45.
6     A.  Okay.
7     Q.  "Heavenly Father, thank you for this great
8  occasion, for the work, the effort, the joys, and
9  everything that led up to this point in time.
10  Thank you for your guidance in this event.  We pray
11  for your direction in the lives of each of these
12  school board members.  We pray that you direct them to
13  the truth and eventually the truth that comes by
14  knowing Jesus.  We also pray that you would be with
15  them at this time.  We ask these things in Jesus's
16  name.  Amen."
17       Do you believe that this prayer would violate
18  paragraph three of the policy?
19     A.  No.
20     Q.  Is this prayer asking that the board members
21  be directed into the truth and eventually the truth
22  that comes by knowing Jesus?
23     A.  Yes, I believe it is.
24     Q.  Do you think that's trying to influence the

82

1  board members?
2     A.  No.
3     Q.  Why not?
4     A.  Well, because if a board member sat at a
5  board meeting and gave this prayer at the beginning,
6  then I am sitting there as a board member either open
7  to his prayer because of what, because I have similar
8  beliefs, or I am sitting there respecting his right to
9  say, or her right to say the prayer, but, if it's not
10  my thing, I may be sitting there quietly
11  reflecting, but I am not influenced by him giving this
12  prayer.
13   .  Q.  Do you think your impression of this prayer
14  might be biased because you are a Christian?
15     A.  Oh, it could be.
16     Q.  And you find nothing in this prayer that
17  proselytizes?
18     A.  No.
19     Q.  Nothing that's trying to influence or force
20  someone to change their religious faith?
21     A.  Not me.  I mean I can't speak for other
22  people that hear this, but it would not me.
23     Q.  Okay.  I have another one which I am just
24  going to read.

83

1     A.  Okay.
2     Q.  "Allah, we offer you our school bus drivers,
3  we offer you our superintendent, our administrators
4  and our secretaries.  We offer you our teachers and
5  our parents.  Finally, we offer you our students.
6  Peace be unto your prophet, Muhammed."
7     A.  What do you mean by offer you?
8     Q.  How do you understand that?
9     A.  I don't.  I am not sure that I do understand
10  it, because it's not a prayer that I am used to
11  hearing.  If it's just -- If by saying "we offer you,"
12  meaning please take care of or please oversee or care
13  for, then I have no objections to it.
14     Q.  What if it said, in place of offer, "we lift
15  up to you"?
16     A.  That's fine.
17     Q.  How do you understand "lift up to you" to
18  mean?
19     A.  Um, again I guess I would see it as being
20  here to accept a higher being's guidance.
21     Q.  Suppose you are in the audience if such a
22  prayer were offered.
23     A.  Uh-huh, that prayer?
24     Q.  This prayer.

84

1     A.  Okay.
2     Q.  And I am going to assume as a parent or other
3  member of the community you wouldn't see yourself as
4  one of these individuals listed under the prayer.  How
5  would you feel as a Christian hearing a board member
6  offering or lifting you up to Allah?
7     A.  I would not object to it.  And let me just
8  add to that.  I don't mean to keep referring to it,
9  but as I have indicated to you, I have been through
10  some personal crisis lately.  I have actually had a
11  house that my brother, sister and I owned burn down
12  through a construction accident out on our property.
13       I lost my father December 12 of 2005.  I lost
14  my mother January 4 of 2005, 22 days after my father,
15  and I lost a 20 year old nephew February 25, and I
16  frankly have appreciated every prayer that everyone
17  has offered up in my parents' name and my name, and
18  from customers where I work and people that I know
19  that some of them are not Christians and of the same
20  faith, but I have been thankful and grateful for any
21  prayer that they have given me, because it just simply
22  means they care about me, and I would not object to
23  that prayer.
24       And if there was a board member elected that

85

1    was of another faith, I would respect their prayer any
2    night they gave it, the same way I respected the ones
3    that were given the 11 years I was on the board.
4        Now, I have chosen personally not to attend
5    church after my children were grown, but, and I am not
6    going to tell you that I ever prayed, that I always
7    prayed every time someone at a board meeting gave a
8    prayer, but what I can tell you is that I was quiet
9    and I respected the prayer that they gave.
10       Probably the only ones that I would have
11   objected to strongly would be ones that proposed some
12   of the crazy things going on in our world today where
13   prayer is associated and faith and religion is
14   associated with causing people harm and doing crazy,
15   wild things in the name of the faith.
16       Q.  So, you know, if a prayer -- The only prayer
17   that you would find objectionable is if someone stood
18   up and said, "We pray that the heathens in our midst
19   come to know you and, if they don't, we are going to
20   behead them."?
21       A.  Uh-huh, yeah, I would have objected to that
22   one.
23       Q.  Would, short of that threat of physical
24   violence --

86

1        A.  No, I am not saying short of that.  I am just
2    saying that, you know, if people prayed to someone
3    else besides God or Jesus, I would have respected that
4    right.
5        Q.  Has, to your knowledge, has anyone served on
6    the board that was not a Christian?
7        A.  I have no idea.  It's not an issue that I
8    have ever been aware of, and I have never questioned
9    what religious background any of the board members
10   have.
11       Q.  Do you believe that someone who openly
12   professes the Muslim faith could be elected to the
13   school board?
14       A.  Oh, probably not in this area, not right now.
15   I think that day will come, but I don't think.
16       Q.  In the foreseeable future could that day
17   come?
18       A.  Probably in my children's lifetime, I think.
19   I am not sure whether it will in my lifetime.  I think
20   it would be much more likely for someone of the Jewish
21   faith to be elected to the school board, but I don't
22   know that religion has ever been an issue in a school
23   board election as politics or parties or not, either.
24       Q.  Was the board prayer issue -- Was the board's

87

1    practice of opening its meetings with prayer an issue
2    in the 2006 election?
3        A.  2006?  Last May, I think there were three or
4    four elections, if I am not mistaken.  I am sure it
5    was an issue for some people.  There were other
6    issues, I think, just as important.
7        Q.  You stated that if a board member gave a
8    prayer that you may not agree with personally, that
9    you would remain quiet and respectful while they give
10   the prayer.  Am I correct in that?
11       A.  What do you mean not agree with?
12       Q.  If someone gave a prayer of a different
13   religious faith than yours, --
14       A.  Uh-huh.
15       Q.  -- you would allow them to make the prayer
16   and remain quiet and respectful of them while
17   they were giving the prayer?
18       A.  Yes.
19       Q.  Do you think everyone in attendance should do
20   the same?
21       A.  Well, we can't really control what the
22   audience does.  I think the board members should, and
23   I think the board members would, but even with the
24   prayers that are given, frankly most of the time there

88

1    are people in the audience talking while it's going
2    on, and we don't -- We don't and can't really control
3    that.
4        Q.  Can the board president call the meeting to
5    order?  Can he --
6        A.  Yes.
7        Q.  -- insist that the meeting be conducted
8    orderly?
9        A.  Yes.
10       Q.  If there was a disruption in the audience,
11   could the board president clear the room?
12       A.  Well, you know, I suppose by procedures of
13   how to operate a meeting, he could.  I have never
14   known it to happen, and I don't know how he would do
15   it, really, she.
16       Q.  But you could see the board maintaining some
17   degree of order if there was a disruption?
18       A.  I think the board president tries to, by
19   beating the gavel or whatever, tries to maintain
20   order, yes, as much as they can.
21       Q.  To go back to your statement about,
22   instructing me that you would have to see the prayer
23   being really strong before you would find it
24   objectionable, so let me just read you one last one?

89

1    A.  Okay.

2    Q.  Suppose a board member offered a prayer that

3  stated, "Lord, we hope that you will convert to

4  Christianity all the Jews in the office."

5    A.  I would object to that.

6    Q.  And you would view that as proselytizing?

7    A.  Yes.

8    Q.  Would you find that that prayer derogates

9  those of another faith or disparages them?

10    A.  Yes.

11    Q.  And is seeking to convert them?

12    A.  Yes.

13    Q.  You basically would see it as violating

14  everything under paragraph three?

15    A.  Yes.

16    Q.  Do you remember if the April 26 and May 24,

17  2005 school board meetings were conducted in a solemn

18  manner?

19    A.  I don't remember.

20    Q.  Let's put it this way:  Would you remember if

21  there were any major disruptions during those

22  meetings?

23    A.  Well, I would remember the disruption.  I

24  might not be able to tell you the date that it took

90

1  place.

2    Q.  Well, these meetings were right before you

3  left the board, so do you remember any meetings before

4  you left the board where there was a major disruption?

5    A.  No.

6    Q.  Do you remember if those meetings opened with

7  a moment of silence?

8    A.  They probably opened with a prayer.  I gave

9  the -- I actually gave the prayer in June.  But you

10  are talking April and May?

11    Q.  Yes, I could show you the minutes.

12    A.  I am sure they opened with a prayer.

13    Q.  Okay.

14    A.  Although board members have the option to do

15  a moment of silence instead, and I am not going to say

16  that didn't happen.

17    Q.  Okay.  I could show you the minutes and it

18  would reflect that they were opened with a moment of

19  silence.

20    A.  Oh, okay.

21    Q.  Do you want me to do so?

22    A.  No, I take your word for it.

23    Q.  Was a moment of silence sufficient to

24  solemnize those meetings?

91

1    A.  Yes.

2    Q.  So is a prayer necessary to solemnize a board

3  meeting?

4    A.  I don't know that it's necessary.  I think

5  it's -- I think it's always been desired that it

6  happen by the board.

7    Q.  Is a sectarian prayer necessary to solemnize

8  the board meeting?

9    A.  No.

10    Q.  Is sectarian prayer desirable for the

11  board -- Is a sectarian prayer being used to open the

12  meeting desirable for the board?

13    A.  I don't think you can tell someone how to

14  pray, so if you ask different board members to pray,

15  then I don't think you can take that step and then

16  tell them how they have to pray.

17    Q.  When the policy was being considered, did

18  anyone suggest that the policy apply only to, or only

19  permit non-sectarian prayers?

20    A.  I think there was some discussion of that.  I

21  don't know who suggested it or what the discussion

22  was, but there was discussion of the difference

23  between the two.

24    Q.  Do you remember why the policy -- Well, you

92

1  do recall discussion between the two?

2    A.  Yes.

3    Q.  You don't -- Do you recall any discussion

4  about whether the policy should be limited to

5  permitting only non-sectarian prayer?

6    A.  Well, I think what I just said, I think it

7  was felt that it couldn't, because you cannot tell

8  people how to pray or who to pray to.

9    Q.  Okay.  Is it possible that if over an

10  extended period of time, months, a year, that if the

11  prayers were consistently sectarian of one faith, that

12  those prayers could be seen as advancing one religion?

13    A.  I don't believe so.

14    Q.  Why not?

15    A.  Well, and again I have to speak for me

16  personally, I can't speak for other board members or

17  people out in the audience, but for me the short

18  prayer at the beginning of the meeting wasn't an

19  important enough part of the meeting that it would

20  influence.  It wasn't long enough and wasn't important

21  enough or ever said in a way to influence other

22  people.

23    Q.  But it was important that -- A prayer at the

24  beginning of the meeting was important in that the

101

1    Q.   Were you referring to this litigation with
2    that statement?
3    A.   Yes.
4    Q.   And by referring to Mr. Bireley as standing
5    up to the ACLU, --
6    A.   Uh-huh.
7    Q.   -- did you mean to, also mean, or did you
8    also refer to Mr. Bireley's support of board prayer?
9    A.   Well, no, I guess I more meant that we had
10   had a complaint and we were addressing the complaint.
11   We had been threatened with a lawsuit.  We were
12   answering that.
13       And then we were doing it through -- or I
14   believed -- I shouldn't say we, because I wasn't on
15   the board at that time, but I perceived the board as
16   handling this potential litigation as they did any
17   others, and I don't see handling potential litigation
18   as being turbulent.
19   Q.   Why did you use the phrase "standing up to
20   the ACLU"?
21   A.   I don't know.  I guess that's the way I talk
22   or the way, the phrase I used.
23   Q.   Do you believe that the ACLU represents the
24   families in this case?

102

1    A.   I don't know if they officially represent the
2    families, but since I know that I received a letter
3    from them and I know that they attended a couple of
4    board meetings while I was still on the board, so I
5    certainly perceive that they are interested in and
6    involved in this.
7    Q.   When did you receive a letter from the ACLU?
8    A.   Sometime before I left the board.
9    Q.   Was it after the August 2004 meeting?
10   A.   I don't remember.
11   Q.   Do you recall receiving any letters sent on
12   Mrs. Dobrich's behalf by your attorneys concerning
13   prayer in the district?
14   A.   I don't remember specifically.  I am sure we
15   received, before I left the board, I am sure we
16   received information when we were briefed on the
17   progress of the potential litigation.  And I am sure
18   there were letters in there.  I don't specifically
19   remember exact forms or what they exactly said.
20   Q.   Do you think that -- Do you believe that the
21   community's perception is that the ACLU is involved in
22   this case?
23   A.   Yes, I do.
24   Q.   Do you believe that someone reading this

103

1    statement would see this as support for Mr. Bireley in
2    this particular case?
3    A.   Say that again.
4    A.   That was a bad question.
5    A.   Or say it a different way.
6    Q.   That's what I am trying to think of, a better
7    way to say it.  Have you ever heard anyone refer to
8    the ACLU as anti-Christian?
9    A.   No.
10   Q.   Do you believe that the community's
11   perception of the ACLU is as anti-Christian?
12   A.   Yes.
13   Q.   Do you think someone reading this statement
14   would see Mr. Bireley standing up to the ACLU as
15   Mr. Bireley standing up to the organization that is
16   anti-Christian?
17   A.   I guess that would be true.
18   Q.   And do you see this statement as -- Do you
19   think someone reading this statement would understand
20   that it's in reference to the board's litigation and
21   its stance on board prayer?
22   A.   Yes.
23   Q.   And so do you think someone would see this as
24   Mr. Bireley standing up in favor of an issue that an

104

1    anti-Christian organization opposes?
2    A.   Sure.  I mean you can follow that through,
3    yes.
4    Q.   So do you think someone would see Mr. Bireley
5    as supporting a pro-Christian position?
6    A.   He had gone on record as supporting it, so I
7    don't think that was any leap to make for anyone.  The
8    votes had been taken, and he was obviously supporting
9    board prayer.
10   Q.   Do you think someone would perceive that as a
11   pro-Christian position?
12   A.   I think Christians would.
13   Q.   I want to go back a little bit.  You had
14   mentioned you had received a letter?
15   A.   I believe we did, yes.
16   Q.   I am going to show you what has been marked
17   previously as PX49.  Is this the letter you were
18   referring to?
19       MR. HORVATH:  I can give you another
20   copy, Jason?
21       MR. GOSSELIN:  No, I think the letter
22   is actually PX10.
23       MR. HORVATH:  You think it's that one?
24       MR. GOSSELIN:  Yes.

# EXHIBIT 14

Page 1

```
 1           IN THE UNITED STATES DISTRICT COURT
 2           IN AND FOR THE DISTRICT OF DELAWARE
 3   MONA DOBRICH and MARCO    :    Case No. 15-120 (JJF)
     DOBRICH, Individually and :
 4   as parents and next friend :
     of ALEXANDER DOBRICH,     :
 5   SAMANTHA DOBRICH, JANE DOE :
     and JOHN DOE, Individually :
 6   and as parents and next   :
     friend of JORDAN DOE and  :
 7   JAMIE DOE,                 :
                                :
 8           Plaintiffs,        :
                                :
 9              v.              :
                                :
10   INDIAN RIVER SCHOOL        :
     DISTRICT, et al.,          :
11                              :
             Defendants.        :
12                   .. .. .. .. .. ..
13           Video Deposition of DONNA MITCHELL, taken
     pursuant to notice, on Monday, October 16, 2006
14   at 9:15 a.m. at 31 Hosier Street, Selbyville,
     Delaware, reported by Lorena J. Hartnett, a Registered
15   Professional Reporter and Notary Public.
16                   .. .. .. .. .. ..
17   APPEARANCES:
18           THOMAS ALLINGHAM, ESQUIRE
             RICHARD HORVATH, ESQUIRE
19           One Rodney Square
             Wilmington, DE  19801
20              Attorneys for the Plaintiff
21
22              WILCOX & FETZER
         1330 King Street - Wilmington, DE   19801
23                 (302) 655-0477
                   www.wilfet.com
24
```

Dobrich, et al.                          v.              Indian River School District, et al.
Donna Mitchell                    Case No. 15-120                  October 16, 2006

Page 2

1
2  APPEARANCES (CONTINUED):
3       JASON P. GOSSELIN, ESQUIRE
         Drinker, Biddle & Reath, LLP
4        One Logan Square
         18th and Cherry Streets
5        Philadelphia, PA  19103-6996
           Attorney for the Defendants
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 4

1        (The videographer read the
2   introduction, and the attorneys introduced
3   themselves.)
4           DONNA MITCHELL,
5   HAVING FIRST BEEN DULY SWORN, TESTIFIED AS FOLLOWS:
6   DIRECT EXAMINATION ON BEHALF OF THE PLAINTIFFS
7   BY MR. ALLINGHAM:
8   Q.  Good morning, Mrs. Mitchell.  My name is Tom
9   Allingham.  I represent the plaintiffs.  Have you ever
10  been deposed before?
11  A.  No.
12  Q.  I am sure Mr. Gosselin or someone has
13  explained the process to you, but I will, just
14  briefly, I will ask you questions.
15          You are obligated to provide answers unless
16  your counsel instructs you not to answer a question.
17  If you don't understand the question that I ask you or
18  if you would like to have it clarified, it's really up
19  to you.  You can say, "Could you say that a different
20  way, I don't understand it," whatever is the problem.
21          If you answer the question, I, at least, will
22  understand that you understood what you were
23  answering, and I think it's likely that the judge and
24  the jury will understand that, as well, so be sure

Page 3

1
2
3           TABLE OF CONTENTS
4   TESTIMONY OF DONNA MITCHELL:
5      Direct Examination by Mr. Allingham. . . . . . 4
6   Certificate of Reporter . . . . . . . . . . . .171
7
8
9           INDEX TO EXHIBITS
10  Plaintiff's Exhibit 55 . . . . . . . . . . . . . 67
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 5

1   that you understand the question before you answer it.
2           The second thing that's important to keep in
3   mind is that you have to answer out loud or the court
4   reporter can't take the question down.  Our
5   videographer might get a nod or might not, but nods
6   tend to be ambiguous, so be sure to answer the
7   question out loud.
8           And, lastly, all of us have the tendency to
9   anticipate or think that they understand what's going
10  to be said before it's said, and so we have a tendency
11  to run on each other's sentences or questions.  Make
12  sure that I have finished before you answer, and that
13  will give your lawyer a chance to object if he needs
14  to object, as well.
15  A.  Okay.
16  Q.  I said earlier that it may be that your
17  counsel will give you instructions not to answer some
18  questions.  He may also object but not instruct you
19  not to answer.  That's an objection for the record,
20  and you can go ahead and answer the question unless he
21  instructs you not to answer.  All right?
22  A.  Okay.
23  Q.  Any questions?
24  A.  No.

2 (Pages 2 to 5)

Dobrich, et al.                           v.              Indian River School District, et al.
Donna Mitchell                    Case No. 15-120                      October 16, 2006

Page 14

1  it prepares people to settle down for the business at
2  hand?
3      A.  It solemnizes it.  It makes us get more
4  serious and settles us.
5      Q.  Okay.  And in each of those sentences, the
6  object of the settling or the solemnization, you use
7  the pronoun "us," and what I would like to know is who
8  is it, precisely, that the prayer is directed to?
9      A.  The school board.
10     Q.  All right.  Is it intended that it has any
11  impact whatsoever on the members of the public who are
12  in attendance, or is it limited to the school board
13  members who have to make decisions at that meeting?
14     A.  In my opinion, it's limited to the school
15  board members.
16     Q.  And was that your view when you were running
17  for the school board in 2005?
18     A.  I never thought about it at that time.  It
19  was not an issue.
20     Q.  And, by the way, that's a perfectly good
21  answer.  Don't feel like you have to have an answer to
22  every question.
23     A.  Right.
24     Q.  So what caused you to think about it and form

Page 15

1  the opinion that you have just expressed today, that
2  the impact of the prayer is limited to the ten board
3  members?
4      A.  I can't really say.  It's just the way I feel
5  about it.
6      Q.  You testified several times using the word
7  solemnizing.  You know that that word is in the
8  policy, itself?
9      A.  Yes.
10     Q.  Would you tell me, and maybe you have already
11  answered this question in part, maybe entirely, but
12  would you tell me what you think it means when the
13  policy says "in order to solemnify its proceedings"?
14     A.  To me, it means to get serious, solemn, to
15  bring us together as a body, as a legislative body to
16  conduct business.
17     Q.  Do you think it's necessary for the, in order
18  for the board members to get serious and to bring the
19  board members together as a legislative body, for the
20  board to open its meetings with a prayer?
21     A.  Do I think it's necessary?
22     Q.  Correct.
23     A.  I think it's preferable.
24     Q.  Preferable but not necessary?

Page 16

1      A.  To me, it's extremely important.
2      Q.  I can ask -- I can keep asking the question,
3  but -- I could ask the question a different way, but I
4  am going to persist until I get an answer from you or
5  an answer that you can't answer.
6          Do you think it's necessary for the Board of
7  Education of the Indian River School District to open
8  its meetings with a prayer in order for those members
9  to get serious and to bring them together as a
10  legislative body?
11     A.  In my personal opinion, we would not be as
12  effective if we did not do so.
13     Q.  And why is that?
14     A.  Because I believe asking the Lord's direction
15  and guidance is extremely important when you come to
16  matters that are discussed of such importance.
17     Q.  Let me pursue that a moment.  So, in your
18  personal perspective -- Let me strike that.
19          It's your goal, I assume, always to make the
20  best possible decisions you can as a school board
21  member?
22     A.  Correct.
23     Q.  And it's your belief that the ten members of
24  the school board will make better decisions if they

Page 17

1  seek divine guidance before opening their meeting than
2  if they don't; correct?
3      A.  Yes.
4      Q.  And I infer, but I may be wrong,
5  Mrs. Mitchell, that it's your view that God hears your
6  prayer however you offer it?
7      A.  Yes.
8      Q.  So that I take it it would be equally --
9  Well, let me take one step back.  If it's important
10  from your point of view to offer a prayer in order to
11  invoke God's guidance before the meeting, and the
12  audience for the prayer is the ten members of the
13  school board, is there any reason, from your
14  perspective, why the board couldn't offer its prayer
15  to get serious and to come together as a legislative
16  body in the wings of the stage before you walk on
17  stage rather than out on the stage?
18     A.  You are asking me do we need to have the
19  people that are there that are not on the school board
20  present --
21     Q.  Yes.
22     A.  -- before we have the prayer?
23     Q.  Correct.
24     A.  It isn't necessary to do so.  It's tradition

Dobrich, et al.                          v.                Indian River School District, et al.
Donna Mitchell                     Case No. 15-120                        October 16, 2006

Page 18

1   that we have always done so.
2       Q.  Your point is a good one. I want to set
3   aside the tradition reason for doing so and now
4   address any other possible reason for offering the
5   prayer in the presence of the public rather than say
6   backstage right before you walk on the stage.  Is
7   there any other reason other than tradition?
8       A.  If there is, I am not aware of it.  It's
9   something that has taken place for many, many years,
10  and I have only been on the board for one year.
11      Q.  Yes, ma'am. So that, from your perspective,
12  offering a prayer increases the chances that you will
13  make the best possible decisions; correct?
14      A.  Absolutely.
15      Q.  Offering the prayer in public doesn't
16  increase the chances that you will make the best
17  possible decisions; it's the offering of the prayer
18  that increases the chances?
19      A.  Would you ask that again?
20      Q.  Yes. The distinction I am trying to draw is
21  between -- And I have actually not seen what it looks
22  like backstage, but I assume there must be some wings
23  like there are in a usual stage of an auditorium, so I
24  would like you to think about the possibility of the

Page 19

1   ten board members getting together and offering up a
2   prayer for God's guidance right before you walk on the
3   stage for a board meeting.
4       A.  Actually, we are not up on the stage.  We are
5   usually out in the cafeteria or a room that is just
6   one big open room, and people have come in and have
7   sat down.
8           There is a disclaimer that is said before the
9   prayer that they know it's coming.  If they are going
10  to be offended, they can get up and leave.  But no one
11  has ever questioned or been offended in the past.  It
12  has never been an issue.
13      Q.  Never since when?
14      A.  That I can ever remember.
15      Q.  You mean other than Mrs. Dobrich and the Doe
16  family?
17      A.  Yes, yes.
18      Q.  So "never" is a little too broad?
19      A.  Well, from the time that I have been aware
20  that prayer has been said.
21      Q.  You mean aware as a board member?
22      A.  As a person, as a community member.
23      Q.  Well, then, "never" is a little too broad,
24  isn't it, because the Doe family and the Dobrich

Page 20

1   family have both expressed, first expressed concerns
2   and then ultimately filed a lawsuit about the
3   practice; correct?
4       A.  I am speaking before, before the lawsuit was
5   filed.
6       Q.  Alright, and so the tradition existed up
7   until the time that the Dobriches and the Does
8   expressed their complaints, and then the board had to
9   confront the issue of school board prayer in a way
10  that it had not confronted it before; correct?
11          MR. GOSSELIN:  Objection.  You can
12      answer.
13      A.  Would you repeat that?
14      Q.  Well, often traditions exist until somebody
15  says, "Hey, there is a problem with that tradition."
16  Would you agree with me on that?
17      A.  Would you say it again?
18      Q.  Sure. And I am going to back up a little
19  bit. At the February 27, 2006 board meeting, were you
20  present at that meeting? That's the one at which the
21  settlement was proposed and rejected.
22      A.  Yes.
23      Q.  And do you recall Mr. Helms read a statement
24  after the board came back out of executive session?

Page 21

1       A.  Yes.
2       Q.  And do you recall that Mr. Helms said that he
3   did not want to be a second-class citizen or be
4   relegated to the back of the bus anymore?
5       A.  I don't remember his exact words. I remember
6   him reading a statement.
7       Q.  You remember that concept, though, about
8   being relegated to the back of the bus as a Christian?
9       A.  I can't say that I remember his exact
10  statement.
11      Q.  I didn't ask you the exact statement. I
12  asked you whether you remember the concept which was
13  at least, to me, striking of being relegated to the
14  back of the bus as a Christian. Do you recall that
15  concept?
16      A.  Yes.
17      Q.  Okay. There was an unfortunate period of
18  time in our country when blacks were relegated to the
19  back of the bus in public transportation. Do you
20  recall that?
21      A.  Yes.
22      Q.  And that was a tradition for a long time;
23  correct?
24      A.  (Nodding head)

6 (Pages 18 to 21)

Dobrich, et al.                          v.                 Indian River School District, et al.
Donna Mitchell                   Case No. 15-120                      October 16, 2006

Page 50

1    A.  Yes, I think I was.
2    Q.  Were you pleasantly surprised?
3    A.  Yes.
4    Q.  I asked you earlier about the importance of
5    seeking divine guidance for the decisions that you
6    make as a board member.  Do you remember that?
7    A.  Yes.
8    Q.  Would it, from your perspective, be equally
9    effective in seeking divine guidance to offer a prayer
10   to Allah?
11   A.  Would you repeat that?
12   Q.  Yes.  For the ten board members who are the
13   point of the offering of the prayer and the recipients
14   of the divine guidance, would it be equally effective
15   to, an equally effective way to ask for a divine
16   guidance to offer a prayer to Allah?
17   A.  Not for me personally.
18   Q.  How about for the ten board members?
19   A.  I can't speak for them.
20   Q.  In the long tradition of offering prayers at
21   the Indian River School District, are you aware that
22   all such prayers have been Christian?
23   A.  No, I am not aware of how every prayer has
24   gone.

Page 51

1    Q.  So you are aware of a tradition of offering
2    prayers, but you don't know the content of those
3    prayers?
4    A.  Right.
5    Q.  Would you agree with me that the vast
6    majority of the content of the prayers have been
7    Christian?
8    A.  Yes.
9    Q.  Okay.  Do you know whether there has ever
10   been any Indian River School Board member who was not
11   of the Christian faith?
12   A.  I don't know that.
13   Q.  Would you agree with me that at least the
14   vast majority of the school board members have been of
15   Christian faith?
16   A.  I don't know that either.
17   Q.  Do you know the -- Do you know the -- Do you
18   know whether your colleagues on the board today are of
19   the Christian faith?
20   A.  I know some of them that are, but I don't
21   know all of their religious backgrounds.
22   Q.  Would it surprise you if any of your
23   colleagues on the board today was a member of any
24   religion other than Christianity?

Page 52

1    A.  Nothing surprises me.  No.
2    Q.  Well, it isn't true that nothing surprises
3    you, because you have already testified that --
4    A.  Oh, okay.
5    Q.  -- the number of people at the August 24th
6    board meeting was surprising.
7    A.  Alright.  Well, it was a pleasant.
8    Q.  Yes, ma'am.  Well, let me ask you this:  What
9    board members, which of your colleagues do you know
10   their religious faith?
11   A.  I know Reggie's religious faith, Mr. Helms,
12   because I know the church that he goes to and I know
13   he is very involved.
14   Q.  Uh-huh.
15   A.  I know Nina Lou's religious faith because her
16   mother attended our church and she grew up in our
17   church.
18        I know that Charlie's wife attends church,
19   and I know that he believes, but I don't believe he is
20   a person who goes consistently himself.
21        And, as far as the others, I really don't
22   know them personally enough to know what they think or
23   where they go or if they go.
24   Q.  Since you have been a board member, have any

Page 53

1    prayers been offered to open the board meetings?
2    A.  Excuse me?
3    Q.  Since you have been a board member, have
4    there been any prayers offered to open the board
5    meetings?
6    A.  Have there been any prayers?
7    Q.  Yes.
8    A.  At every board meeting.
9    Q.  And --
10   A.  Yes.
11   Q.  Have those prayers been Christian prayers?
12   A.  Some.
13   Q.  Have any of those prayers been -- Has the
14   content of any of those prayers been identifiable as
15   anything other than Christian prayers?
16   A.  There has been silent prayer, so.
17   Q.  From your perspective, was the moment of
18   silence an effective way to seek divine guidance
19   for the decisions that the board members were going to
20   make?
21   A.  It would not be as effective for me, but I
22   respect everyone's right to offer it the way they
23   choose.
24   Q.  When the moment of silence was offered, was

14 (Pages 50 to 53)

Dobrich, et al.                          v.              Indian River School District, et al.
Donna Mitchell                    Case No. 15-120                    October 16, 2006

Page 54

1  that Mrs. Bunting, Nina Lou Bunting, who offered the
2  moment of silence?
3      A.  I know she did at least once, and I know
4  there have been others in the past.
5      Q.  When the moment or moments of silence were
6  offered, did you, yourself, offer a silent prayer for
7  divine guidance?
8      A.  Yes.
9      Q.  And that would be your custom or your
10  practice; correct?
11      A.  Yes.
12      Q.  So that for yourself, although the meeting
13  opened with a moment of prayer, you were not
14  prohibited in any way from seeking divine guidance
15  from God?
16      A.  No.
17      Q.  And when you say you seek divine guidance,
18  from whom do you seek divine guidance?  This is you,
19  Mrs. Mitchell.
20      A.  I seek divine guidance through God, to God
21  through Jesus.
22      Q.  And so, just to close the loop, if someone
23  offers a nondenominational prayer or a moment of
24  silence, you, for yourself, also ask for divine

Page 55

1  guidance from God through Jesus?
2      A.  Yes.
3      Q.  When was your first meeting of the board,
4  July 2005?
5      A.  It could have been.  I don't remember the
6  exact date.
7      Q.  But it is your recollection that there has
8  been at least one moment of silence since you joined
9  the board?
10      A.  Yes.
11      Q.  Do you know who offered it?  I asked you this
12  earlier.
13      A.  It was Nina.
14      Q.  And do you know whether there were any
15  others?
16      A.  I don't remember.
17      Q.  Alright, I have a sequence of questions about
18  your religious belief and the religious belief -- your
19  view as to the religious belief of residents of the
20  district.  Okay, you have the concept in mind?
21      A.  Yes.
22      Q.  What do you believe is the majority religion
23  among voters in the district?
24      A.  Christian.

Page 56

1      Q.  And is that a vast majority of the voters, in
2  your view?
3      A.  Yes.
4      Q.  What do you believe is the majority religion
5  among teachers in the district?
6      A.  I have no idea.
7      Q.  What do you believe is the majority religion
8  among students in the district?
9      A.  I would assume Christian, because most of the
10  public is.
11      Q.  And would you assume that the religious
12  practices or faith of the students roughly
13  approximates that of the voters as a whole?
14      A.  I would assume.
15      Q.  Do you believe that the Christians among the
16  voters in the district believe that Christianity is
17  the only true religion?
18          MR. GOSSELIN:  Objection.  You can
19      answer.
20      A.  For them, I believe that it is, but I find
21  them to be people who are open and accepting of others
22  who choose to believe differently, the ones that I
23  know.
24      Q.  Yes, ma'am, and you strike me as a tolerant

Page 57

1  person and that people select their friends.  Would
2  you agree with me that there are voters in the
3  district who are not so tolerant?
4      A.  Yes.
5      Q.  And would I be right in thinking that that's
6  a view that the board would prefer to discourage, that
7  is that intolerance?
8      A.  Of course, yes.
9      Q.  Do you believe that Christianity is the only
10  true religion?
11      A.  I believe that.
12      Q.  At the same time, is it correct that you try
13  to be tolerant of other religions?
14      A.  Yes, I do.
15      Q.  Why is that, if you believe Christianity is
16  the only true religion?
17      A.  Because I believe everyone is given free will
18  to believe as they choose, and I respect everybody's
19  right to make that decision.
20      Q.  Do you believe that the government should
21  establish a religion?
22      A.  I believe we are a Christian nation, we were
23  found as a Christian nation.
24      Q.  Do you believe that the government should

15 (Pages 54 to 57)

Dobrich, et al.                          v.                    Indian River School District, et al.
Donna Mitchell                    Case No. 15-120                      October 16, 2006

Page 82

1    Q.  Have those telephone calls been largely in
2  support of the board's position?
3    A.  All of them.
4    Q.  One-hundred percent?
5    A.  One-hundred percent.
6    Q.  Unanimous support?
7    A.  Unanimous.
8    Q.  Do you think that you would be likely to get
9  a call from someone who opposed the board's position?
10   A.  I can't answer that. I don't know. It could
11  happen.
12   Q.  Are you widely known as a supporter of the
13  board's position?
14   A.  Yes.
15   Q.  On the issue of a member of the public
16  walking out of a board meeting when a disclaimer is
17  read, do you think that would take a certain amount of
18  courage?
19   A.  I can't speak for others. If I were offended
20  by something, I would walk out, and have done.
21   Q.  And have done?
22   A.  Yes.
23   Q.  Over what issue?
24   A.  I walked out of a movie once that was

Page 83

1  offensive.
2    Q.  The school board policies that you read when
3  you became a board member, those are adopted by the
4  school board; is that correct?
5    A.  Yes.
6    Q.  And you view the adoption of those policies
7  as a legislative function; right?
8    A.  Yes.
9    Q.  And does the school board enforce the
10  policies that it adopts?
11   A.  Do they enforce the policies?
12   Q.  Yes, ma'am.
13   A.  They are supposed to enforce the policies
14  that they adopt, yes.
15   Q.  Not only supposed to, but the board does
16  enforce the policies?
17   A.  Yes.
18   Q.  Yes. Are you aware, and I know you have only
19  been on the board for a year or so, but are you aware
20  of any instance where a school board member has been
21  accused of violating one of those district policies?
22   A.  I can't think of any big scandal.
23   Q.  Whether it was a scandal or not, can you
24  think of anybody suggesting to a board member, one of

Page 84

1  your colleagues, that he or she was violating board
2  policy?
3    A.  That he or she personally was?
4    Q.  Yes, ma'am.
5    A.  I don't remember any.
6    Q.  If it came to your attention that a board
7  member was violating a policy, what would you do?
8    A.  That's difficult to answer because I am not,
9  you don't know unless you are presented with the
10  situation.
11      I know that I would approach that person and
12  I would -- I would assume I -- I think maybe I --
13  Well, again, you don't know unless it happens, but if
14  it were something that I felt were serious, I would go
15  to the board president and report it after speaking
16  with the person directly and giving them the
17  opportunity to, to say what they did.
18   Q.  Are you a member of any committees of the
19  school board?
20   A.  Yes.
21   Q.  Which committees?
22   A.  The Policy Committee, and I attend all the
23  committee meetings, the Building and Grounds. I don't
24  have to, but I choose to do that so that I will become

Page 85

1  more familiar, because there are so many things to
2  learn, such a short amount of time to do it, I choose
3  to attend every, every committee I can.
4    Q.  But you are a member of the Policy Committee?
5    A.  Yes, I currently chair the Policy Committee.
6    Q.  Any other committees?
7    A.  I don't chair any other committees.
8    Q.  Are you a member of any other committees?
9    A.  Building and Grounds.
10   Q.  Under your chairmanship, does the Policy
11  Committee have a practice, a regular practice pursuant
12  to which it considers and proposes policy for an
13  adoption to the full board?
14   A.  Would you repeat that?
15   Q.  Does the Policy Committee have a regular
16  procedure or practice for developing policies to be
17  submitted for adoption by the full board?
18   A.  Yes.
19   Q.  And describe that process or practice for me.
20   A.  We have a varied group that meets to discuss
21  the various issues that come to the surface that need
22  to be dealt with, and then we have a first reading
23  before the school board, and most of the time there is
24  a second reading so that it gives the school board an

22 (Pages 82 to 85)

Dobrich, et al.                          v.                  Indian River School District, et al.
Donna Mitchell                    Case No. 15-120                    October 16, 2006

Page 102

1  attention to each person, you know, how often it has
2  gone around.
3       I mean we only do it, we only meet so many
4  months out of the year, and it only happens one time.
5  I haven't noticed that anyone in particular hasn't
6  done anything.
7       Q.  Has Mr. Bireley ever offered a prayer?
8       A.  You know, I can't honestly remember if he
9  has.  It might he has, but I can't say for sure.
10      Q.  Why do you think it might be embarrassing for
11 a board member to be offered the opportunity to lead
12 the board in a prayer at a meeting and decline that
13 invitation?
14      A.  I can't speak for anybody, but I think some
15 people just are uncomfortable praying in the open,
16 period, whether it's in church or wherever.  They are
17 just not comfortable.  I don't know why.
18      Q.  But why would it be embarrassing to not be
19 comfortable?
20      A.  Because some people are embarrassed reading.
21 Some people just are uncomfortable speaking in front
22 of people.
23      Q.  But why couldn't those people just say, "No,
24 thanks, Mr. Bireley, I am a little shy."?

Page 103

1       A.  Well, I can't answer for them.  I don't know
2  why.
3       Q.  Since you have joined the board in I think we
4  said July 2005, Mr. Helms -- There have been 15 board
5  meetings, regular board meetings.  Mr. Helms has given
6  the prayer at six of those board meetings.  Does that
7  seem like a disproportionate number, being that there
8  are ten board members?
9       A.  I never really kept count.  I know he is very
10 comfortable doing so and maybe others are not.
11      Q.  Have there been any special board meetings
12 since you have become a board member?
13      A.  Yes.
14      Q.  Have you attended those board meetings?
15      A.  Yes.
16      Q.  Have those board meetings opened with a
17 prayer?
18      A.  No.
19      Q.  Why is that?
20      A.  I don't know.
21      Q.  Have you ever asked whether it would be
22 appropriate to extend the board policy to special
23 board meetings?
24      A.  No, the subject never came up.

Page 104

1       Q.  What do you do to seek divine guidance before
2  those board meetings?
3       A.  I suppose we all in our own way take care of
4  the situation.
5       Q.  In your case, you do exactly the same thing
6  you do at regular board meetings; isn't that right?
7       A.  I pray before.  I, you know, I don't do
8  anything specifically.  I always seek guidance in
9  whatever decision I am making.
10      Q.  When you say you don't do anything
11 specifically, that's not altogether true.  You do
12 offer up a silent prayer for divine guidance before
13 the special board meetings, don't you?
14      A.  Yes.
15      Q.  Just the way you do at the regular board
16 meetings?
17      A.  Not the same way, not in a formal way, but I
18 speak to the Lord in my head often.
19      Q.  Yes, and my question about the special
20 meetings versus the regular meetings, let me set aside
21 the one meeting in which you have offered a prayer
22 since you have joined the board.
23      A.  Okay.
24      Q.  At all of the other regular meetings, you say

Page 105

1  a prayer in your head seeking divine guidance, just as
2  you do at the special board meetings; is that right?
3       A.  I am listening to the prayer that's being
4  said and I am also on my own, yes.
5       Q.  Fair enough.  Paragraph three provides, "Such
6  opportunity."  That's the opportunity to offer a
7  prayer, a moment of silence?  Yes?  That's what it
8  refers to?
9       A.  Okay, yes.
10      Q.  "Such opportunity shall not be used or
11 exploited to proselytize, advance or convert anyone or
12 to derogate or otherwise disparage any particular
13 faith or belief."
14      Is it your understanding that that limits,
15 imposes some limits on what people can say when they
16 offer a prayer or a moment of silence?
17      A.  I wouldn't think it would affect a moment of
18 silence.
19      Q.  That's a good point.
20      A.  But it would have an affect on perhaps what
21 would be said verbally.
22      Q.  I have some -- I have some examples, and I
23 want to, as a board member, I want to try to ask you
24 whether you think these examples would violate

27 (Pages 102 to 105)

Dobrich, et al.                    v.              Indian River School District, et al.
Donna Mitchell                Case No. 15-120          October 16, 2006

Page 106

1  paragraph three or would be permitted under paragraph
2  three.
3         And the first example I want to give you is
4  suppose that a prayer was offered in which the person
5  offering the prayer said, "Lord, we pray that you
6  convert the heathen in our audience that they will
7  come to know the goodness and wisdom of your heart."
8         Would you view that as a prayer that was
9  permissible under paragraph three or violated
10 paragraph three?
11    A.  I would think that would be inappropriate for
12 a school board to say that, because we are praying for
13 wisdom for our group, not for the audience. We are
14 not trying to convert anyone.
15    Q.  That's helpful, and that's -- but it's -- I
16 am looking for an answer to my specific question. You
17 have before you a policy of the board. The board are
18 the people charged with enforcing the board's
19 policies; correct?
20    A.  Right.
21    Q.  So you, as a board member, are charged with
22 ensuring that nobody offers a prayer that is used or
23 exploited to proselytize, advance or convert anyone
24 and so forth; correct?

Page 107

1     A.  Right.
2     Q.  So that prayer that I have just offered you,
3  whether it's appropriate or inappropriate, is it your
4  view that it violates paragraph three of the board
5  policy?
6     A.  Would you say it again?
7     Q.  Sure. And I am not going to promise I am
8  going to get exactly the same words. I should have it
9  written down somewhere. "Oh, Lord, we pray that you
10 will convert the heathen in our audience so that they
11 come to know the goodness and wisdom of your heart."
12 Would that violate or be permitted under paragraph --
13    A.  I would not say that. I would say it's
14 really pushing the limit. It's -- I would not say
15 that.
16    Q.  When you say "pushing the limit," you mean
17 pushing the limit of things that are permitted under
18 paragraph three; correct?
19    A.  Yes.
20    Q.  Okay, and what is it in that prayer that you
21 think would violate some provision of paragraph three?
22    A.  We are not out to convert anyone.
23    Q.  Are you sure that that prayer would violate
24 paragraph three, at least as you understand?

Page 108

1     A.  I can't speak for anyone else. It wouldn't
2  be right for me, because our purpose is not to convert
3  anyone. It's to seek wisdom in making business
4  decisions.
5     Q.  Understood, and I think you and I are in the
6  same wavelength in that. I am now trying to get at
7  something different. If anybody -- I know that you
8  would not offer that prayer for the reasons you have
9  just said, but if one of your colleagues offered that
10 prayer and, just to make life a little easier for you,
11 passed out the text ahead of time, would you form the
12 conclusion that that was a prayer that would violate
13 paragraph three of the policy?
14    A.  I would go to that person and say I don't
15 think this is appropriate.
16    Q.  Because it violates paragraph three?
17    A.  More than paragraph three, it just isn't
18 appropriate.
19         MR. ALLINGHAM: Okay. I am going to
20 show you what we have previously marked as
21 Plaintiff's Exhibit 35. You don't have the
22 stack in front of you. Do you want copies?
23         MR. GOSSELIN: I never did have this
24 one, because it was that little sheet that

Page 109

1  we kind of --
2         MR. ALLINGHAM: Here, I have got an
3  extra.
4         MR. GOSSELIN: This is 35?
5         MR. ALLINGHAM: Yes, this one has a
6  sticker on it.
7  BY MR. ALLINGHAM:
8     Q.  So I am going to read this, and if you will
9  read along with me, Mrs. Mitchell, you will be able to
10 follow.
11    A.  Okay.
12    Q.  It's a little longer than my first prayer.
13    A.  Alright.
14    Q.  "Do not put your trust in princes, in mortal
15 men who cannot even save themselves. When their
16 spirit departs, they return to the ground. On that
17 very day their plans come to nothing. Blessed is he
18 whose help is the God of Jacob, whose hope is in the
19 Lord his God, the maker of heaven and earth, the sea,
20 and everything in them, the Lord who remains faithful
21 forever. He upholds the cause of the oppressed and
22 gives food to the hungry. The Lord sets prisoners
23 free. The Lord gives sight to the blind. The Lord
24 lifts up those who are bowed down. The Lord loves the

28 (Pages 106 to 109)

Dobrich, et al.                          v.              Indian River School District, et al.
Donna Mitchell                    Case No. 15-120                     October 16, 2006

Page 134

1    Q.  But you would offer this prayer in church?
2    A.  Yes.
3    Q.  Okay, I am going to read you a second prayer.
4    If you have trouble with it or if you can't hold it in
5    your mind, I will read it to you again.
6    A.  Okay.
7    Q.  I don't have a printed version of this one.
8    A.  Alright.
9    Q.  "Allah, we offer you our school bus drivers.
10   We offer you our superintendent, our administrators
11   and our secretaries.  We offer you our teachers and
12   our parents.  Finally, we offer you our students.
13   Peace be unto your prophet, Muhammed."
14   A.  That wouldn't offend me.
15   Q.  And that's fine that it would not offend you.
16   Look at paragraph three of the policy and tell me
17   whether you think it would violate paragraph three of
18   the policy.
19   A.  No, I would say if a school board member
20   offered that and that was their belief, they were
21   asking for wisdom and guidance.
22   Q.  That would be fine?
23   A.  That would be fine with me.
24   Q.  And, as a Christian board member, it would

Page 135

1    not -- Or let's imagine that you are a member of the
2    audience who is a parent.  As a parent, would it
3    trouble you that you were being offered to Allah
4    through his prophet, Muhammed?
5    A.  I would understand where it was coming from
6    and why.  I wouldn't be offended.
7    Q.  Therefore, you found it troubling?
8    A.  Yes.
9    Q.  Okay.  And how would you know where it was
10   coming from and why?
11   A.  Because it's positive.  It was a positive
12   statement.  It wasn't a converting statement.  It was
13   a positive statement.  From that person of that belief
14   system who was lifting us for wisdom, guidance,
15   blessings, it wouldn't offend me.  I would understand
16   that was their belief.
17   Q.  I have one variation on that prayer to offer
18   you.  Suppose that a board member offered a prayer
19   that said, "Allah, we lift up -- I offer to you my
20   colleagues on this board that they may be converted to
21   your wisdom and thereby make the best decisions that
22   they could make."
23   A.  The word converted would bother me.  That's
24   inappropriate, but they could offer me up for wisdom

Page 136

1    and I wouldn't be offended.
2    Q.  You will take it?
3    A.  I will take it.  I have a friend who is
4    Catholic.  She prays to Mary for me and I pray to
5    Jesus for her, and we laugh and hug each other and
6    respect each other's right to believe and pray as we
7    choose.
8    Q.  Do you know any Muslim families in the
9    district?
10   A.  No, I don't.
11   Q.  Other than the Gordons, do you know any
12   Jewish families in the district?
13   A.  Not practicing that I would be aware.
14         MR. ALLINGHAM:  Alright, let's change
15   the tape.
16         VIDEOGRAPHER:  Going off the record at
17   approximately 12:12 p.m.
18         (A luncheon recess was taken.)
19         VIDEOGRAPHER:  Back on the record at
20   approximately 1:02 p.m.
21         MR. ALLINGHAM:  I would like to show
22   you what we have previously marked as PX45.
23   Do you need a copy?
24         MR. GOSSELIN:  Yes, if you wouldn't

Page 137

1    mind.
2    BY MR. ALLINGHAM:
3    Q.  I will read it into the record.  You can
4    follow along.  "Heavenly Father, thank you for this
5    great occasion for the work, the effort, the joys and
6    everything that led up to this point in time.
7    Thank you for your guidance in this event.  We pray
8    for your direction in the lives of each of these
9    school board members.  We pray that you direct them
10   into the truth and eventually the truth that comes by
11   knowing Jesus.  We also pray that you be with them at
12   this time, and we ask these things in Jesus's name.
13   Amen."
14         If one of your colleagues gave that prayer,
15   would you consider it to be in violation of or
16   permitted in paragraph three of the policy?
17   A.  No, I wouldn't consider it in violation of.
18   Q.  It would be permitted by the policy?
19   A.  Yes, I think so.  I can see that perhaps, if
20   it's coming from someone who believes strongly in
21   Jesus, that is not meant to proselytize.  It was
22   to seek guidance.
23   Q.  For the prayer, actually the prayers -- One
24   was the my kind of extreme example of the conversion

35 (Pages 134 to 137)

# EXHIBIT 15

```
                                                      1
 1        IN THE UNITED STATES DISTRICT COURT
 2          FOR THE DISTRICT OF DELAWARE
 3
 4   MONA DOBRICH and MARCO      )
        DOBRICH, Individually and    )
 5   as parents and next friend     )
        of ALEXANDER DOBRICH,       )
 6   SAMANTHA DOBRICH, JANE DOE    )
        and JOHN DOE, Individually    )
 7   and as parents and next        )
        friend of JORDAN DOE and     )
 8   JAMIE DOE,                )
                              )
 9        Plaintiffs,           )
                              ) Civil Action
10   v.                        ) No. 05-120 (JJF)
                              )
11   INDIAN RIVER SCHOOL,        )
        DISTRICT, et al.,          )
12                              )
        Defendants.            )
13
14        Videotaped Deposition of HARVEY L. WALLS,
15   taken pursuant to notice at 31 Hosier Street,
        Selbyville, Delaware, beginning at 1:30 p.m., on
16   Wednesday, October 25, 2006, before Terry Barbano
        Burke, RMR-CRR and Notary Public.
17   APPEARANCES:
18        THOMAS ALLINGHAM, ESQUIRE
           BRIAN LENHARD, ESQUIRE
19        One Rodney Square
           Wilmington, Delaware  19801
20        For the Plaintiff
21
                 WILCOX & FETZER
22     1330 King Street - Wilmington, Delaware 19801
                   (302) 655-0477
23               www.wilfet.com
24
```

```
                                                      2
 1   APPEARANCES (cont'd):
 2        JARROD SHAU, ESQUIRE
           Drinker, Biddle & Reath, LLP
 3        One Logan Square
           18th and Cherry Streets
 4        Philadelphia, Pennsylvania  19103-6996
           For the Defendants
 5
     ALSO PRESENT:
 6
        TIMOTHY KEARNS
 7      MARK BUCKMASTER, Video Specialist
 8            -   -   -
 9        VIDEO SPECIALIST:  This is the videotape
10   deposition of Harvey L. Walls, taken by the plaintiff
11   in the matter of Dobrich, et al., versus Indian River
12   School District et al., Civil Action No. 05-120, held
13   at 31 Hosier Street in Selbyville, Delaware, on
14   October 25th, 2006, at approximately 1:32 p.m.
15        The court reporter is Terry Burke from
16   the firm of Wilcox & Fetzer.  My name is Mark
17   Buckmaster, a video specialist with Discovery Video
18   Services, Incorporated, in association with Wilcox &
19   Fetzer.
20        Counsel will now introduce themselves and
21   the reporter will swear in the witness.
22        MR. ALLINGHAM:  I'm Tom Allingham.  I
23   represent the plaintiffs, and along with me are Tim
24   Kearns and Brian Lenhard.
```

```
                                                      3
 1        MR. SHAU:  I'm Jarrod Shau and I
 2   represent the defendants in this action.
 3        HARVEY L. WALLS,
 4        the deponent herein, having first been
 5        duly sworn on oath, was examined and
 6        testified as follows:
 7   BY MR. ALLINGHAM:
 8   Q.   Have you ever been deposed before, Mr. Walls?
 9   A.   Yes.
10   Q.   When?
11   A.   I'm not sure of the date.  Somewhere around
12   the late 90's for a district staff employee that had
13   sued the district.
14   Q.   I am going to ask you some questions.  Please
15   tell me if you don't understand the question or if you
16   think it's ambiguous.
17        If you answer the question, I will
18   assume, and I think the judge and the jury will assume,
19   that you understood it.  So let me know and I'll try to
20   fix the question if you have a problem.
21        You have to answer out loud yes or no,
22   not uh-huh or uh-uh.
23        And lastly, I freely confess that I tend
24   to interrupt people.  I'll try not to do that.  You
```

```
                                                      4
 1   should try not to interrupt me or assume that you know
 2   that what the answer to my question is, because the
 3   court reporter can't take down both of us at once;
 4   okay?
 5        Do you know who the Doe family are?
 6   A.   No.
 7   Q.   Has anyone ever told you that they know who
 8   the Doe family are?
 9   A.   Not to my knowledge.
10   Q.   Have you spoken with anyone who has already
11   given their deposition in this matter?
12   A.   I have spoken to Dr. Hattier and Mrs. Bunting.
13   Q.   When did you speak to Dr. Hattier?
14   A.   Oh, probably a week or two ago.
15   Q.   And what was the substance of your
16   conversation, what did he say?
17   A.   Just basically that it went quite a long time.
18   Q.   Anything else?
19   A.   We talked about, a little bit about the type
20   of stuff you might be covering or asking or something,
21   but exactly what I couldn't tell you.
22   Q.   Do you recall that Dr. Hattier told you any
23   questions that he was asked?
24   A.   No.  He told me that you and him got into some
```

17

1   religion policy.  We at that time had not in force.
2      Q.   Let me just see if I can establish a couple
3   points out of that answer.  First, in the summer of
4   2004, the board had no policies on graduation prayer,
5   religion, or board prayer?
6      A.   Not to my knowledge.
7      Q.   Mrs. Dobrich made a complaint about prayer at
8   graduation; correct?
9      A.   Yes.
10     Q.   And that was a complaint that was communicated
11  orally to Miss Hobbs and subsequently to you; is that
12  correct?
13     A.   That's correct.
14     Q.   Do you recall that Mrs. Dobrich later
15  complained about, generally about religion in the
16  schools?
17     A.   I think she may have said something along that
18  line at public comments at a board meeting.
19     Q.   Do you recall that Mrs. Dobrich made a
20  complaint about prayer at school board meetings?
21     A.   I don't recall that she did.  I do recall that
22  the ACLU representative did.
23     Q.   All right.  And was it after the comment by
24  the ACLU representative that the policy committee first

18

1   began consideration of school board prayer?
2      A.   It was along that time.
3      Q.   Along that time is maybe different from after?
4      A.   My recollection is that three board policies
5   concerning religion, board prayer, and there were two
6   others concerning religion, were introduced to the
7   board on the first reading about September of that
8   year.
9      Q.   Correct.
10     A.   And I think the second reading was in October.
11     Q.   Correct.
12     A.   The initial complaint I believe came after the
13  graduation in June.
14     Q.   Correct.
15     A.   So the policy committee in July and August
16  would have looked at all of those and brought to the
17  board in September.
18     Q.   All right.
19          Was it you who was in charge of the
20  Policy Committee's development of the new policies?
21     A.   Yes.
22     Q.   I take it, then, that you contacted
23  Mr. Neuberger to ask for a draft of a policy on school
24  board prayer?

19

1      A.   I had discussions with Mr. Neuberger.
2      Q.   How did you come to be in contact with
3   Mr. Neuberger on that topic?
4      A.   We had, after the original complaint and a
5   threat of lawsuit, had contact with Mr. Neuberger.
6      Q.   Okay.  Let me get some timing down.  The
7   original complaint was on June 3rd, that was the day of
8   the graduation?
9      A.   Shortly thereafter --
10     Q.   I'll represent to you it was June 3rd.
11     A.   -- I would think.
12     Q.   When was the first threat of litigation
13  communicated to you?
14     A.   I -- I'm not sure.
15     Q.   When did you first contact Mr. Neuberger?
16     A.   I don't know.  I don't know when he was
17  contacted.
18     Q.   Is it correct that your first contact with
19  Mr. Neuberger came after a threat of litigation was
20  made?
21     A.   I would say so.
22     Q.   And was that a threat of litigation that was
23  explicit or did you just assume that litigation would
24  ensue?

20

1      A.   I would say it was an assumption.
2      Q.   Did you contact Mr. Neuberger or did
3   Mr. Neuberger contact you?
4      A.   That I don't remember just who contacted
5   Mr. Neuberger first.  It could very well have been
6   another board member.
7      Q.   Mr. Helms?
8      A.   I don't know if it was Mr. Helms or
9   Dr. Hattier.
10     Q.   When you were president of the board, were
11  individual board members authorized to contact lawyers
12  to represent the board?
13     A.   On an instance like this, I may very well have
14  authorized them to do so, to contact someone.  But they
15  certainly weren't authorized to sign a retainer with
16  anybody.
17     Q.   And is it also true that without authorization
18  from the board president or a full vote of the board,
19  individual board members were not authorized to contact
20  lawyers individually?
21     A.   That would depend on the case.  I mean
22  certainly when the district gets sued, especially
23  lawyers have a tendency to name board members
24  individually in their lawsuits, as was the case with

21

1  this one.
2  Q.   When was this lawsuit filed, sir?
3  A.   I have no idea.  I'd say --
4  Q.   February 28th, 2005.
5  A.   Okay.
6  Q.   The board policies were adopted in October of
7  2004; is that right?
8  A.   That's correct.
9  Q.   Did you receive any threat of litigation at
10  any time, an explicit threat, up until the adoption of
11  the policies in 2004?
12  A.   I'm not sure of an explicit threat.
13  Q.   Do you recall requests by representatives of
14  Mrs. Dobrich for clarification of the policies after
15  they were passed?
16  A.   Yes.
17  Q.   Do you recall that those requests explicitly
18  said that Mrs. Dobrich's representatives hoped to act
19  in a constructive way with the board?
20  A.   I remember it.
21  Q.   Do you know whether any response was made to
22  Mrs. Dobrich's representatives?
23  A.   I think the response from the board was that,
24  no, we would not meet with them.

22

1  Q.   How about answering the questions that were
2  posed?
3  A.   No, we were not going to answer the questions.
4  Q.   And why is it that you decided not to answer
5  the questions or otherwise to respond to Mrs. Dobrich's
6  representatives?
7  A.   Under the advice of an attorney.
8  Q.   Which attorney was that?
9  A.   Mr. Neuberger.
10  Q.   Was Mr. Neuberger representing the board?
11  A.   At that time, no.
12  Q.   So the board chose not to respond to
13  Mrs. Dobrich on the basis of advice from a lawyer who
14  was not representing the board; is that correct?
15  A.   He was advising the board.
16  Q.   What's the difference?
17  A.   We certainly weren't paying him and we had not
18  signed a retainer with him.
19  Q.   How did you decide which lawyer that you had
20  not retained -- strike that.
21        I asked you earlier whether
22  Mr. Neuberger contacted you or you contacted
23  Mr. Neuberger and you said the first contact with
24  Mr. Neuberger may have been with another board member.

23

1  Do you recall that testimony?
2  A.   Yes.
3  Q.   Is it your belief that Mr. Neuberger spoke to
4  another board member before he spoke to you?
5  A.   Could have.
6  Q.   You don't know one way or another?
7  A.   No.
8  Q.   Do you have any memory of how -- of the first
9  contact between Mr. Neuberger and a board member?
10  A.   The first contact, no.
11  Q.   I am going to show you what we have previously
12  marked as PX-36.
13  A.   (Pause.)
14  Q.   Have you ever seen that document before?
15  A.   I don't believe I have because I don't know
16  what TRI is.
17  Q.   The testimony has been that that's The
18  Rutherford Institute.
19  A.   Okay.
20  Q.   Do you know what The Rutherford Institute is?
21  A.   Yes.
22  Q.   That's an institution with which Mr. Neuberger
23  is affiliated; is that right?
24  A.   Yes.

24

1  Q.   So whether you know what TRI is or not, have
2  you ever seen PX-34 before?
3  A.   I could have.  It looks to be some type of
4  press release.
5  Q.   There is a fax line at the top showing that it
6  was sent by the Neuberger firm to someone on
7  August 19th, 2004.  I will represent to you that this
8  document was produced from the district's files.  So
9  some way this document found its way into the
10  district's files.
11        If you look at the fax line at the top,
12  you'll also see that this is the fourth page of a
13  four-page transmission.
14        Do you know what the other three pages
15  were?
16  A.   I have not a clue.
17  Q.   About halfway down the page of PX-36, you will
18  see that there's a statement that begins, "So one
19  member of the Indian River School Board," do you see
20  that?
21  A.   Yes.
22  Q.   "So one member of the Indian River School
23  Board has asked The Rutherford Institute in Virginia
24  for help in standing up to the ACLU.  That was vice

37

1   A.   No.

2   Q.   Okay.

3        So to come back to my earlier question,

4   the change from "in order to solemnify its proceedings"

5   to "in order to solemnify school board proceedings,"

6   can we agree that's a non-substantive change?

7   A.   I think it's a substantive change.

8   Q.   Did you think that "its" -- sorry.  You

9   understood "its" in your draft to be different

10  from "school board"?

11  A.   I understand where it says "it is the

12  policy" --

13  Q.   No, sir.  I'm just looking at the first

14  clause.  Just the "in order to solemnify its

15  proceedings," "in order to solemnify school board

16  proceedings," that's not a substantive difference,

17  correct, that first clause?

18  A.   That's correct.

19  Q.   Okay.  We have spoken about the change from

20  "it is the policy of the board" to "the board of

21  education may choose," and you've described that in the

22  one you viewed as requiring a board to open its

23  meetings with a prayer, whereas in the draft that you

24  created it was the board of education may, but doesn't

38

1   have to; correct?

2   A.   Right.

3   Q.   The second paragraph, there is a, I think, a

4   minor change, but let's just confirm that it is a minor

5   change.  The Neuberger draft says, "On a rotating

6   basis, one individual adult board member per meeting

7   will be given the opportunity to offer a prayer or

8   moment of silence," and in your draft, there is a

9   change to, "to offer a prayer or request a moment of

10  silence."

11       Do you see the difference?

12  A.   Yes.

13  Q.   And am I right that that's not a substantive

14  change, you just thought that you were drafting it more

15  clearly by saying "request a moment of silence"?

16  A.   That's correct.

17  Q.   In the third paragraph, would you agree with

18  me there are no changes from the Neuberger draft to

19  your draft?

20  A.   Yes.

21  Q.   The fourth paragraph there is a very modest, I

22  think a very modest change in the first sentence.  The

23  Neuberger draft reads, "Such prayer is voluntary and it

24  is just among the adult members of the board."  Your

39

1   draft reads, "Such prayer is voluntary and it is among

2   only the adult members of the board."

3        That's not a substantive change, you

4   just thought your draft was clearer; correct?

5   A.   Correct.

6   Q.   And can we agree that the second sentence of

7   the fourth paragraph is unchanged from Mr. Neuberger's

8   draft?

9   A.   Yes.

10  Q.   And the fifth paragraph is unchanged from the

11  Neuberger draft; is that right?

12  A.   Correct.

13  Q.   Okay.

14       Now, I take from the fact that you made

15  changes in the draft, including ones what you viewed as

16  a substantive change in the draft, that you read and

17  carefully considered Mr. Neuberger's draft?

18  A.   Yes.

19  Q.   Paragraph 1 of the draft appears to specify

20  what the purpose of the prayer or a moment of silence

21  is in that it says, "In order to solemnify its

22  proceedings, the board of education may choose to open

23  its meetings with a prayer or moment of silence."

24       Would you agree with me that the policy

40

1   sets forth the purpose of the prayer or moment of

2   silence offered by the board member, which is to

3   solemnify its proceedings?

4   A.   Yes.

5   Q.   When you voted to adopt this policy, what did

6   you understand the phrase "to solemnify its

7   proceedings" meant?

8   A.   Just to impress upon the importance of a

9   regular meeting, just to ask for guidance in making the

10  proper decisions.

11  Q.   I understand that to be two separate goals,

12  one to impress on the board members that they needed to

13  take their responsibility seriously in the meeting that

14  was coming up; is that right?

15  A.   Uh-huh.

16  Q.   And the second one was to seek divine guidance

17  for the decisions that would be made; is that correct?

18  A.   Yes.

19  Q.   Do you know whether the board prayer policy

20  was ever discussed at a policy committee meeting?

21  A.   I don't believe it was.  Other than to ask for

22  its proper format from the other policy members.  Me as

23  a board member, I don't know just exactly what letter

24  to assign.  That's the format I'm saying.  I mean the

41

1    actual substance of the board policy, no, it was not
2    discussed at that meeting.
3        Q.   Are most board policies discussed at a policy
4    committee meeting?
5        A.   Yes.
6        Q.   Why was this one not discussed?
7        A.   Because I did not want to subject the
8    administrators on the policy committee to any portion
9    of that policy because I figured -- I thought this was
10   a policy completely affecting the board.
11       Q.   And only the board?
12       A.   Yes.
13       Q.   Okay.  And that's reflected in the first
14   sentence of Paragraph 4, "Such prayer is voluntary and
15   it is among only the adult members of the board"?
16       A.   Yes.
17       Q.   I take it that it was your view that to
18   accomplish its purpose, that is, to solemnify its
19   proceedings, the board could accomplish that purpose by
20   having a member open its meeting with a prayer;
21   correct?
22       A.   Yes.
23       Q.   That would be an effective way to solemnify
24   the proceedings?

42

1        A.   Yes.
2        Q.   The board of education could also solemnify
3    its proceedings by having a member request a moment of
4    silence; correct?
5        A.   That's correct.
6        Q.   And that would be an effective way to
7    solemnify the proceedings?
8        A.   Yes.
9        Q.   At the October 19th, 2004 board meeting when
10   the policy was adopted, you were president of the
11   board; correct?
12       A.   I'm sure I was.
13       Q.   And did you invite someone to open the meeting
14   with a prayer or moment of silence?
15       A.   I'm sure I did.
16       Q.   Do you know whether you read a disclaimer of
17   some kind before the member offered the moment of
18   silence or the prayer?
19       A.   I probably did.
20       Q.   Did you have it written down?
21       A.   Yes.
22       Q.   Do you know what the text of that disclaimer
23   consisted of?
24       A.   Not after having not read it for a year and a

43

1    half, no.
2        Q.   Did you have a piece of paper that you
3    brought, the piece of paper on which the disclaimer was
4    written, that you took with you to each meeting --
5        A.   Yes.
6        Q.   -- so that you'd know what to read?
7        A.   Yes.
8        Q.   Do you still have that piece of paper?
9        A.   No.
10       Q.   Did you give it to Mr. Bireley?
11       A.   I more than likely did.
12       Q.   Okay.
13            Mr. Bireley testified that that
14   disclaimer consists of Paragraphs 1 and 4 of the board
15   policy.  Is that your recollection?
16       A.   I never really put the two together, but now
17   that I read them, I would say that's probably it.
18       Q.   Am I right in understanding, Mr. Walls, that
19   it is the intention of the board prayer policy that no
20   one other than the adult members of the board would be
21   the object of the prayer?
22       A.   That is the object.
23       Q.   Am I then correct that in order to solemnify
24   its proceedings, the prayer among the adult members of

44

1    the board could take place outside of the regular
2    meeting immediately before the meeting?
3        A.   It could, but in my mind, that wouldn't
4    solemnify the meeting.
5        Q.   Could you explain to me why not?
6        A.   The actual board meeting is the board's
7    meeting that happens to be held in public.  I would say
8    that there are Sunshine Laws that would prohibit the
9    board from getting together before the meeting and then
10   going in and holding the meeting.
11       Q.   Have you completed your answer?
12       A.   To my knowledge, the board can't meet unless
13   it advertises the meeting and opens it to the public.
14   So if the board were to meet outside in the hallway
15   with no one around, that would be an illegal meeting.
16       Q.   Have you completed your answer?
17       A.   Yes.
18       Q.   Did you ever request advice from anyone on
19   that topic?
20       A.   No, not that I can remember.
21       Q.   Do you recall any discussion of that opinion,
22   that is, to that to meet immediately, immediately prior to
23   walking on stage and taking your seats at the board
24   meeting, to meet solely for the purpose of having a

45

1  prayer among only the adult members of the board would
2  violate the Sunshine Laws?
3      A.   There could have been discussion.  I can't
4  recall.
5      Q.   Did you ever express the view that to meet
6  solely for the purpose of a prayer immediately prior to
7  a regular board meeting would violate the Sunshine
8  Laws?
9      A.   I could have.
10     Q.   Well, with respect, Mr. Walls, "I could have"
11 is not a useful answer because you could have done
12 anything.
13     A.   Well, I'm of that opinion since you asked me
14 that why don't we meet before you go in, I'm of the
15 opinion now that that would be an illegal meeting.  I
16 can't see where I would have been under a different
17 opinion a year and a half ago or two years ago.
18          MR. ALLINGHAM:  We're going to change the
19 tape.
20          VIDEO SPECIALIST:  Going off the record
21 at 2:31 p.m.
22          (Recess.)
23          VIDEO SPECIALIST:  Going back on the
24 record at 2:37 p.m.

46

1  BY MR. ALLINGHAM:
2      Q.   Before we broke, Mr. Walls, I asked you some
3  questions about whether the board could effectively
4  solemnify its proceedings by meeting immediately prior
5  to the regular board meeting and having its prayer
6  among the adult board members then.
7      A.   Uh-huh.
8      Q.   And I think your testimony was, "I don't think
9  that would solemnify the proceedings because it would
10 be illegal," is that a fair summary of what you said?
11     A.   It may be what I said.  I don't know that
12 that's a reason because.
13     Q.   That was what I wanted to explore.  There's
14 two separate issues here, one is whether it would be
15 legal to do so.
16     A.   Uh-huh.
17     Q.   And one is setting aside the issues of
18 legality under the Sunshine Laws, would that be an
19 equally effective way to solemnify the proceedings
20 among the adult board members who are the target of the
21 prayer.  Okay?
22     A.   Okay.
23     Q.   Do you agree with me that there are two
24 separate concepts?

47

1      A.   I understand what you're saying, yes.
2      Q.   And I want to come back to the legally part
3  in a minute.  But first, would you agree with me that
4  it would be equally effective to solemnify the board's
5  proceedings if the board members met immediately prior
6  to the board meeting and had a prayer among themselves?
7      A.   I don't think it would be equally.
8      Q.   How would it be different in terms of the
9  effect of solemnifying the board's proceedings?
10     A.   To me it sets the whole atmosphere of the
11 board meeting.
12     Q.   Do you have a button under the table?
13     A.   I'm not a fire member either.
14     Q.   It sets the whole tone of the board meeting?
15     A.   Uh-huh.
16     Q.   For the ten board members who would have the
17 prayer immediately prior to walking into the room,
18 wouldn't it set the tone for them equally well?
19     A.   I don't think it would be equal.
20     Q.   Would you agree with me that it would
21 effectively solemnify the proceedings?
22     A.   It could.
23     Q.   Well, it could is not -- anything could
24 happen.  My question to you is what is your view, would

48

1  a prayer among the ten board members immediately prior
2  to the regular board meeting effectively operate to
3  solemnify the proceedings?
4      A.   I suppose it could.
5      Q.   Would you agree with me that the only
6  difference between a prayer -- for purposes of just
7  articulating the difference here, I'm going to assume
8  that you're meeting in one of the district school's
9  auditoriums.  All right?
10     A.   Uh-huh.
11     Q.   The only difference between meeting in the
12 wings off stage and having a prayer and sitting down at
13 your table on stage and having a prayer is that there's
14 an audience for the latter and not for the former,
15 isn't that right?
16     A.   There could be an audience.
17     Q.   Have you ever been to a board meeting where
18 there wasn't an audience?
19     A.   I have been to some pretty sparsely attended
20 ones.
21     Q.   But there's always an audience, isn't there?
22     A.   It depends on what you mean by audience.
23     Q.   Have you ever been to a board meeting at which
24 there was no one present except the ten adult members

---

49

1  of the board?

2  A.  No.

3  Q.  Okay.

4  A.  Not a regular scheduled.

5  Q.  Yes, and we're talking about regular board

6  meetings --

7  A.  Yes.

8  Q.  -- because that's what the board prayer policy

9  applies to; correct?

10  A.  Right.

11  Q.  All right.  One difference between standing in

12  the wings and having a prayer among the adult board

13  members and walking on stage and having a prayer once

14  you sit down at the table is that there's an audience

15  for the on stage prayer; correct?

16  A.  That's one difference.

17  Q.  Okay.  With respect to the solemnification of

18  the proceedings, can you think of any other difference

19  between the off stage prayer and the on stage prayer?

20  A.  I don't know the differences.  You have

21  mentioned one.

22  Q.  Is there any other difference that you can

23  think of, in terms of the impact on solemnifying the

24  proceedings, between a prayer off stage and a prayer on

---

50

1  stage?

2  A.  Not that I can think of.

3  Q.  Okay.  Now let's talk about the difference in

4  the impact on the solemnification of the board's

5  proceedings because there's an audience for the on

6  stage prayer.  Okay?

7       Is that because, in your judgment, is

8  that because the members of the audience also get the

9  benefit of setting the tone for the meeting in the on

10  stage prayer?

11  A.  I would say they would get the benefit.

12  Q.  And they get the benefit because they observe

13  and participate in the prayer; is that correct?

14  A.  No.

15  Q.  So they're not participating in the prayer?

16  A.  No.

17  Q.  Then how does it have an impact on them in

18  terms of setting the tone for the meeting?

19  A.  I would think anybody who asks for guidance

20  doesn't do it just asking for himself or herself.

21  Normally people, when a prayer is given, are respectful

22  even though they're not asked to participate.

23  Q.  When prayers are offered at board meetings, do

24  you participate?

---

51

1  A.  I have.

2  Q.  Were there board meetings where you didn't

3  participate?

4  A.  Where I didn't participate in the prayer?

5  Q.  Did not participate in the prayer?

6  A.  No.

7  Q.  What do you do to indicate -- when you're not

8  leading the prayer, what do you do to indicate that

9  you're participating?

10  A.  I don't know that I have to indicate anything.

11  Q.  I didn't say that you had to.  Do you do

12  anything to indicate that you're participating in the

13  prayer?

14  A.  Occasionally I may say "amen" at the end.

15  Q.  Do you bow your head?

16  A.  Yes.

17  Q.  Do you fold your hands in prayer?

18  A.  I don't fold my hands, no.

19  Q.  Do you close your eyes when the prayer is

20  offered?

21  A.  Yes.

22  Q.  Is that your consistent practice to close your

23  eyes and bow your head?

24  A.  Yes.

---

52

1  Q.  Would it be your expectation that members of

2  the audience would close their eyes and bow their heads

3  during the offering of the prayer?

4  A.  I have no expectation for the audience.  They

5  can do whatever they wish.

6  Q.  In your view, Mr. Walls, is it necessary for a

7  member of the board to open board meetings with a

8  prayer in order to solemnify the proceedings?

9  A.  Is it necessary?

10  Q.  Yes.

11  A.  No.

12  Q.  To state it from the other direction, the

13  board would -- it's your expectation that the board

14  would conduct its proceedings in a solemn and dignified

15  and disciplined way whether it opened the meeting with

16  a prayer or not, isn't that correct?

17  A.  Yes.

18  Q.  In special meetings of the board, it has been

19  the practice not to open those meetings with a prayer;

20  correct?

21  A.  Correct.

22  Q.  Those meetings have been conducted, I take it,

23  in a solemn, respectful and disciplined way?

24  A.  Hopefully.

---

## 53

1    Q.   Yes, sir.

2         For the members of the board -- let me

3    just speak specifically for you first.  Are you a

4    member of any particular religion?

5    A.   Yes.

6    Q.   What religion is that?

7    A.   Methodist.

8    Q.   And do you regularly attend church?

9    A.   Not regularly.

10   Q.   Are you a member of some church?

11   A.   Yes.

12   Q.   What church is that?

13   A.   Grace United Methodist in Georgetown.

14   Q.   You mentioned one aspect of the

15   solemnification of the proceedings might be to seek

16   divine guidance for decisions that board members would

17   be confronted with during the meeting, do you recall

18   that?

19   A.   Yes.

20   Q.   And do you, yourself, or did you yourself when

21   you were a board member, from time to time, seek divine

22   guidance for the decisions with which you'd be faced?

23   A.   Yes.

24   Q.   Did you do that during special meetings from

## 54

1    time to time?

2    A.   Personally?

3    Q.   Yes.

4    A.   Yes.

5    Q.   And I take it you did that by offering a

6    silent prayer for guidance?

7    A.   Yes.

8    Q.   Whether God hears your request for divine

9    guidance doesn't depend whether it's stated out loud or

10   said to yourself, according to your belief?

11   A.   That's true.

12   Q.   Would you agree with me, then, that it would

13   be equally effective to solemnify the proceedings for

14   each individual board member to ask for divine guidance

15   in his or her own way in accord with the freedom of

16   conscience of that individual adult board member?

17   A.   It could be.

18   Q.   Would you think that it would be?

19   A.   No.

20   Q.   And would you explain to me why not?

21   A.   Just simply because of tradition if nothing

22   else.

23   Q.   I am going to show you again -- actually, you

24   may still have it.

## 55

1         MR. SHAU:  PX-36.

2         MR. ALLINGHAM:  The press release, yes,

3    PX-36.

4    BY MR. ALLINGHAM:

5    Q.   The second paragraph of the text of the press

6    release reads, "The Indian River School Board has

7    historically opened its meetings with a non-sectarian

8    prayer.  Our own US Congress and many other public

9    bodies historically do so."

10   A.   Right.

11   Q.   Is it correct that the Indian River -- first

12   of all, do you know where Mr. Neuberger learned that

13   the Indian River School Board has historically opened

14   its meetings with a non-sectarian prayer?

15   A.   I don't know how Mr. Neuberger knew that.

16   Q.   Did you tell him that?

17   A.   I could have.

18   Q.   Is it your view that the Indian River School

19   Board has historically opened its meetings with a

20   non-sectarian prayer?

21   A.   Yes.

22   Q.   But as you sit here today, you don't recall

23   one way or another whether you told Tom Neuberger that?

24   A.   I could very well have told Tom Neuberger

## 56

1    that.

2    Q.   But you don't --

3    A.   To my knowledge, for at least 14 years, I know

4    they have.

5    Q.   My question is simply directed to whether you

6    recall having told Mr. Neuberger that?

7    A.   My recollection's not good enough to recall

8    what I told somebody a year and a half ago or two years

9    ago or whatever it was.

10   Q.   That's a perfectly good answer.  I'm just

11   trying to get at whether you do recall that you said

12   it, you affirmatively recall that you didn't say it, or

13   whether you just don't remember one way or another?

14   A.   No, I don't remember specifically --

15   Q.   Fair enough.

16   A.   -- that I told Tom Neuberger.

17   Q.   Fair enough.

18        As between the two methods of

19   solemnifying the proceedings which are set forth in the

20   policy, that is, a prayer or a moment of silence, do

21   you view them as equally effective in solemnifying the

22   proceedings.

23   A.   My personal view is yes.

24   Q.   Have you ever heard any discussion at a board

89

```
1          (Recess.)
2          VIDEO SPECIALIST:  Going back on the
3   record at 3:41 p.m.
4   BY MR. ALLINGHAM:
5       Q.   Right before we broke, Mr. Walls, I asked you
6   whether you had heard from anyone that the defense of
7   this lawsuit represented the defense of Christian
8   values, and you said yes.  I asked you who said it, and
9   you didn't remember.  I asked you from what group, and
10  you didn't remember that either.
11          Is it fair to say that you heard it more
12  than once, however?
13      A.   Yes, I'd say that's fair to say.
14      Q.   When I asked you questions about the
15  attendance, expected attendance --
16      A.   At the big meeting.
17      Q.   -- at the August 24th meeting, you told me you
18  knew it was going to be a big meeting, but you really
19  didn't know how, that you just hear things in Sussex
20  County; right, correct?
21      A.   Correct.
22      Q.   Is it fair to say that it is a widely held
23  view in the Indian River District that the defense of
24  this lawsuit represents a defense of Christian values?
```

90

```
1       A.   There's a lot of perceptions out there about
2   this lawsuit, I think, and not all of them are correct.
3       Q.   That may or may not be true, but it's not
4   100 percent responsive to my question.
5           Would you agree with me that it's a
6   widely held view in the district that the defense of
7   this lawsuit is a defense of Christian values?
8       A.   It's probably widely held in this district.
9       Q.   You mentioned some potential misperceptions
10  about this lawsuit.
11      A.   Uh-huh.
12      Q.   Could you tell me what you had in mind when
13  you said that?
14      A.   I hear things from time to time or see things,
15  and I wondered where the people are coming from because
16  they act like they know, but I know that they don't.
17      Q.   So when you said that, you didn't have any
18  particular misperception in mind?
19      A.   No.
20      Q.   Is it fair to say that a lot of the comments
21  at the August 24th board meeting reflected a
22  misperception about what the board was considering at
23  that time?
24      A.   Yes.
```

91

```
1       Q.   And is that, was that misperception or did the
2   comments reflect a misperception that the issue was
3   prayer in the schools rather than --
4       A.   Yes.
5       Q.   -- school board?
6       A.   I heard that from several of the speakers.
7       Q.   Am I correct that you and the other board
8   members did not try to correct that misperception
9   because the public comment section is meant to be an
10  opportunity for the board to hear from the public and
11  not vice versa?
12      A.   Correct.
13      Q.   And that's something that the superintendent
14  had urged the board to remember; correct?
15      A.   Yes.
16      Q.   Do you know whether at any time before or
17  after the adoption of the board prayer policy a member
18  of the public asked for a copy of the proposed policy
19  and was -- and that request was declined?
20      A.   I don't remember if somebody specifically
21  asked.
22      Q.   You never heard that a person asked for a copy
23  of the policy and was told that if they wanted it, they
24  should file a Freedom of Information Act request?
```

92

```
1       A.   I don't remember that.
2       Q.   That would be contrary to --
3       A.   I mean but if this was the draft policy you're
4   talking about?
5       Q.   Yes, yes.
6       A.   I can't see why someone would want a draft
7   policy.
8       Q.   Well --
9       A.   And I don't know that the board has ever given
10  out a draft policy before it's actually adopted.
11      Q.   What is the purpose of the readings of the
12  policies?
13      A.   In case the board has second thoughts or wants
14  to make changes on something, it gives a chance to do
15  that.
16      Q.   It is not intended to give the public an
17  opportunity to review and comment on the policies?
18      A.   After the first reading, yes, but I'm not
19  giving something out to the public before I give to the
20  board on a first reading.
21      Q.   I thought we might be misunderstanding one
22  another.
23          I'm talking about a request made for the
24  proposed policy after the first reading?
```

121

1    A.    It could very well have.

2    Q.    When you say "it could very well have," does

3    that mean that having reviewed this log and the letter

4    from me that it's your best recollection that that's

5    about the time it occurred?

6    A.    January of 2005?

7    Q.    Yes, sir.

8    A.    That could be accurate.

9    Q.    Why did the board decide to discharge

10   Mr. Griffin for that purpose?

11   A.    The board did not want Mr. Griffin

12   representing us on this case.

13   Q.    Why?

14   A.    Because we had philosophical differences with

15   Mr. Griffin.

16   Q.    What was the nature of the philosophical

17   differences?

18        MR. SHAU:  Objection.  The differences

19   between counsel and their client are attorney-client

20   privilege.

21        MR. ALLINGHAM:  Not if they're not in

22   connection with the attorney-client relationship.

23        MR. SHAU:  Did you discuss your

24   differences with Mr. Griffin?

122

1         THE WITNESS:  One of the differences

2    was --

3         MR. SHAU:  Before you answer, did you

4    discuss these differences with Mr. Griffin?

5         THE WITNESS:  Portions of them.

6         MR. SHAU:  I am going to instruct the

7    witness not to answer, not to disclose any

8    conversations he has had with Mr. Griffin relating to

9    the representation.

10        MR. ALLINGHAM:  I'm completely in

11   agreement with that instruction.  Okay?

12   BY MR. ALLINGHAM:

13   Q.    Don't tell me what you told Mr. Griffin on

14   this topic.  Don't tell me what Mr. Griffin told you on

15   this topic.  I just want to know what you understood

16   the philosophical differences between you and

17   Mr. Griffin to be that led you to not want him to

18   represent you in connection with this litigation?

19   A.    One was his actual recommendation to us that

20   we would make him a rich man if he were to be our

21   lawyer.  That was a specific recommendation from him.

22        MR. SHAU:  I am going to instruct the

23   witness not to say specific recommendations from

24   Mr. Griffin.

123

1    BY MR. ALLINGHAM:

2    Q.    Anything else?

3    A.    We don't know that we as a board did not

4    believe that Mr. Griffin believed in what the board

5    believed in.

6    Q.    What was it that the board believed in?

7    A.    In that the board prayer issue at meeting was

8    legal.

9    Q.    And --

10   A.    And worth fighting for.

11   Q.    What was the basis for your belief that

12   Mr. Griffin didn't believe that the board policy was

13   legal?

14   A.    Several comments he had made over time.

15   Q.    Okay, don't tell me.

16        We've established that on or about

17   September 15th, maybe a day, maybe two days later,

18   Mr. Neuberger withdrew his offer of representation to

19   you.

20        You mentioned much earlier in the

21   deposition that you also had consulted the Alliance

22   Defense Fund in connection with these issues; correct?

23   A.    Yes.

24   Q.    If you look at the privilege log again, you'll

124

1    see Item 106 is a fax from Beth Procheska to you dated

2    August 25, 2004, with the description being "fax

3    providing legal analysis and advice." Okay?

4    A.    Uh-huh.

5    Q.    I'm going to represent to you, sir, having

6    looked through the privilege log that that's the

7    earliest dated document that reflects communications

8    with the Alliance Defense Fund, which is what ADF

9    stands for.

10   A.    I find that surprising.

11   Q.    That's not to say that you hadn't talked to

12   them earlier.  This is only documents, and so this is

13   the first, the earliest dated document that we have

14   seen on the privilege log.  Okay?

15        And that actually was my next question.

16   Do you recall communications with representatives of

17   the Alliance Defense Fund earlier than August 25, 2004?

18   A.    No, I don't recall that.

19   Q.    A minute ago you said you find it surprising

20   that there's a document dated August 25, 2004.

21   A.    Yes, I do.

22   Q.    It surprises you that it was this early?

23   A.    Yes.

24   Q.    Okay, thank you.

149

1     A.   Not normally.

2     Q.   And is it correct that most, at least for the

3   policy committee that you chaired, most of those

4   meetings had no member of the public there?

5     A.   That's correct.

6     Q.   Do you recall any point in time, Mr. Walls, at

7   which the school board prayer policy or the language of

8   the school board prayer policy was discussed in public

9   session of the board, or were all the deliberations on

10   the school board prayer policy held in executive

11   session?

12     A.   It was presented in public session as a first

13   reading and presented again as a second reading.

14     Q.   The first reading was in late September of

15   2004?

16     A.   Right.

17     Q.   For first reading.

18         And it's simply presented, there's no

19   discussion of the policy at first reading; correct?

20     A.   There is sometime.  If a board member has a

21   big problem with any part of the policy or whatever, he

22   has it four days in advance, he's certainly welcome to

23   say, I don't think this is direction that we should go

24   or I have a specific problem with this or that.

150

1     Q.   And am I correct that no board member

2   expressed a concern about the school board prayer

3   policy?

4     A.   Not that I can remember.

5     Q.   And that would be true also at the second

6   reading and adoption on October 19th?

7     A.   That would be reflected in the minutes whether

8   there was discussion, I would think.

9     Q.   Okay.

10     A.   Or changes.  That's the whole purpose of a

11   first and second reading.

12     Q.   We talked earlier about the disclaimer you

13   used to read before offering the invitation for the

14   prayer.

15     A.   Right.

16     Q.   What was the purpose of the disclaimer?

17     A.   That was under the legal advice of

18   Mr. Neuberger as well.

19     Q.   And was that to offer people the opportunity

20   to get up and leave if they wanted to?

21     A.   Again, we were advised to do that.

22     Q.   Apart from the fact that you got legal advice

23   on the issue, did you have any independent

24   understanding of the purpose of the disclaimer?

- 151

1     A.   Well, an independent understanding, we never

2   did it for 30 years prior to that, but we were advised

3   at that time to do it, so we did it.

4     Q.   Do you remember anybody asking why you had to

5   do it?

6     A.   No.

7     Q.   As far as you know, there's no purpose for

8   that disclaimer?

9     A.   There's a lot of things lawyers do or advise

10   that to me have no purpose, or I don't understand the

11   purpose, I'll put it that way.

12     Q.   So let me change my question a little bit.

13         There may or may not be a purpose, but

14   whatever it is, you don't know of any purpose for the

15   disclaimer?

16     A.   No, I don't know the exact purpose.

17     Q.   This is one of those things that lawyers do,

18   as soon as somebody satisfies the exact purpose, then

19   you say, well, what about the general purpose.

20         Is it fair to say, Mr. Walls, that the

21   sum and substance of your knowledge about the

22   disclaimer is that you were advised to read it, but you

23   don't know what the purpose is for it, if any?

24     A.   The only purpose I can see would be for an

152

1   exclamation from the board that the board prayer and

2   the way that it's being conducted is legal.  And to

3   make people aware that it is amongst the adult board

4   members present.

5     Q.   Have you ever seen someone leave the room when

6   the disclaimer is read?

7     A.   No.

8     Q.   Do you think that it would, if the disclaimer

9   was read and someone got up and left the room, that it

10   would draw attention to that person?

11     A.   No.

12     Q.   In interviewing candidates for new school

13   board positions or to replace a school board member who

14   is leaving -- well, first of all, as board president,

15   did you ever participate in such interviews?

16     A.   As board president, I think so.

17     Q.   Do you remember asking candidates about their

18   position on religion in the schools?

19     A.   I don't know that I did.

20     Q.   Do you recall anyone asking board candidates

21   about --

22     A.   Not that I can recall.

23     Q.   I asked you earlier whether you thought it was

24   a widely held view in the district that the defense of

153

1   this case was a defense of Christian values.  Let me
2   ask you a couple of related questions.
3              Have you ever been told that the defense
4   of this case was a defense of Christian prayer?
5     A.   I don't know if I have been told that --
6     Q.   You don't --
7     A.   -- specifically.
8     Q.   Whether those exact words were used or not,
9   has anyone ever suggested to you or expressed the view
10  to you that the district's defense of this case was a
11  defense of Christian prayer?
12    A.   I suppose some people have.
13    Q.   Would you characterize that as a widely held
14  view in the district?
15    A.   Here in this area, yeah, I would say that's
16  probably a widely held view.
17    Q.   Have you ever heard anyone express the view
18  that the result of the 2006 school board election was
19  an endorsement of the stance that the school board took
20  on school board prayer?
21    A.   Results of which election?
22    Q.   The 2006 school board election?
23    A.   There were more than one.
24    Q.   Yes, sir.

154

1     A.   Actually, I had very few people even talk to
2   me about that election because I was done.
3     Q.   In February of 2006, earlier this year, there
4   was a board meeting at which an earlier proposed
5   settlement of this case was presented to the board.
6              Do you recall that?
7     A.   Yes.
8     Q.   And the board rejected that settlement, do you
9   recall that?
10    A.   That's correct.
11    Q.   Do you recall that when the board came out of
12  executive session Mr. Helms made a statement?
13    A.   Yes.
14    Q.   Did Mr. Helms -- you were board president at
15  the time; correct?
16    A.   No, I don't think so.  No.
17    Q.   I'm sorry.
18    A.   Hey, the years run together on me too, believe
19  me.
20    Q.   Did you know in advance that Mr. Helms was
21  going to read a statement?
22    A.   I don't know if that was discussed in
23  executive session before we came out or not.
24    Q.   Do you know whether Mr. Helms -- he was

155

1   reading from a written statement; correct?
2     A.   Yes.
3     Q.   Do you know if Mr. Helms wrote that statement
4   himself?
5     A.   I don't know who wrote the statement.
6     Q.   Did he present it as if it was his own
7   statement?
8     A.   To the board before we came out?
9     Q.   No.  I mean when he stated it publicly?
10    A.   Could you rephrase that, please?
11    Q.   He didn't attribute his words to someone else,
12  did he?
13    A.   No.  I thought that he was speaking for
14  himself.
15    Q.   Do you have a view as to whether continuing
16  this litigation benefits the students of the district?
17             MR. SHAU:  Objection.  It's outside the
18  scope of this discovery.  I'm going to instruct the
19  witness not to answer.
20             MR. ALLINGHAM:  Well, this litigation
21  involves school board prayer, which is the topic of
22  this deposition.
23             MR. SHAU:  Your question was as to
24  whether it benefits the students?

156

1             MR. ALLINGHAM:  Yes.
2             MR. SHAU:  How is that relevant to the
3   constitutionality of school board prayer?
4   BY MR. ALLINGHAM:
5     Q.   Do you believe that the school board prayer
6   policy benefits students?
7     A.   Do I believe that?  Yes.
8     Q.   And would you tell me how?
9     A.   I think this district has been very blessed
10  over the years, and for all I know it may be because we
11  have asked for divine guidance on our decision making.
12  But this is one of the top districts in the state.
13    Q.   Any other ways that the policy benefits
14  students?
15    A.   I think it could very well teach them civics
16  in the sense of what's legal and what's not and what's
17  right and what's worth fighting for.
18    Q.   What do you mean by that?
19    A.   Well, just because someone who disagrees with
20  the policy, the board prayer policy, that doesn't
21  necessarily mean that it's illegal or that it's not
22  proper.
23    Q.   I see.  So you think it's possible that the
24  defense of the lawsuit represents a lesson in civics

157

1  for the students?
2      A.   It could very well.
3      Q.   And do you think that continuing this
4  litigation benefits students?
5      A.   As far as I know, the board -- the district's
6  not the one continuing it.
7      Q.   We are going to have to agree to disagree
8  about that.
9           Whoever is making that decision -- maybe
10  it's a joint decision -- do you think that continuing
11  the litigation benefits students?
12      A.   I think it could.
13      Q.   And how would it do that, in the ways that you
14  described earlier?
15      A.   Right.
16      Q.   Mr. Walls, you testified earlier in the
17  deposition that you and maybe other board members had
18  expressed the sentiment that no one should tell you how
19  to pray.  Do you recall that?
20      A.   Right.
21      Q.   And is it your understanding that as an
22  American citizen you have an absolute right to pray
23  however you like?
24      A.   Yes.

158

1      Q.   Do you understand that by taking public office
2  that right may be limited in some ways?
3      A.   It depends on which office.  In my mind, this
4  is a legislative and deliberative body, no different
5  than a town council or the US Congress.
6      Q.   All right.  You understand, don't you, that
7  the board policy that you adopted imposes limitations
8  on your absolute right to prayer however you like?
9      A.   In what sense?
10      Q.   Well, take a look at the board policy, which
11  is PX-9.  I think it is right in front of your counsel.
12           Paragraph 3 of the policy imposes some
13  limitations on what you can say when you offer a
14  prayer; is that right?
15      A.   That's right.
16      Q.   So we can agree that as a private citizen you
17  can pray in a proselytizing way, you can try to convert
18  people, you can derogate or otherwise disparage any
19  particular faith or belief that you like; correct?
20      A.   Correct.
21      Q.   But you agreed to impose limitations or
22  prohibitions on that kind of behavior for prayers
23  offered by board members in their capacity as board
24  members; correct?

159

1      A.   Correct.
2      Q.   Why did you do that?
3      A.   Well, I don't think it needed to be the time
4  or place for proselytizing or trying to convert
5  anybody.
6      Q.   But you still had an absolute right, as you
7  understood it, to do that; is that correct?
8      A.   Yes.
9      Q.   You just agreed voluntarily to accept those
10  limitations?
11      A.   Yes.
12      Q.   I am going to ask you some questions about
13  that limitation.
14      A.   About what?
15      Q.   That limitation in Paragraph 3.
16           What do you understand the prohibition
17  against proselytizing prayer to mean?
18      A.   Honestly, I'm not certain.
19      Q.   When you adopted this policy -- I'm sorry,
20  voted to adopt this policy, did you have an
21  understanding?
22      A.   Of that particular word, no.
23      Q.   Okay.
24           Since October 19th, 2004, and through the

160

1  end of your tenure as a board member, did you hear
2  anyone offer a policy that you thought violated
3  Paragraph 3?
4      A.   Offered a policy?
5      Q.   Sorry.  I'm getting tired.
6           Since October 19th, 2004, and through
7  the end of your tenure as a board member, did you hear
8  any board member offer a prayer to open board meetings
9  that you thought violated Paragraph 3?
10      A.   No.
11      Q.   Do you know or did you have an understanding
12  as to what the enforcement mechanism was to ensure that
13  the opportunity to prayer would not be used or
14  exploited to proselytize --
15      A.   I would assume it would be the board president
16  just not asking that person, again, or having a word
17  with them and saying that's not the time or place for
18  that.
19      Q.   I do say this respectfully, sir, you were the
20  board president and you didn't know, you didn't have an
21  understanding of what proselytizing prayer was.  How
22  would you enforce this provision?
23      A.   Well, I would assume that it's anything that's
24  either pushing your religion or taking down somebody

161

1  else's religion or criticizing them for them -- for
2  theirs.
3      No one that I know of would have used
4  that particular few seconds to convert anybody or try
5  to disparage any other faith.
6  Q.  What about proselytizing?
7  A.  I told you before, I'm not absolutely positive
8  of the definition of that word.
9  Q.  I'm going to offer you a few, I'm going to
10  give you some examples of prayers and ask you whether
11  in your judgment as a board member in adopting this
12  policy the prayers would have violated Paragraph 3 or
13  been permitted by Paragraph 3, and some of these
14  prayers are intentionally meant to be extreme so don't
15  be afraid to say, yeah, that would violate the policy
16  or, yeah, that's clearly permitted.
17      The first prayer is, "Oh, Lord, please
18  convert the heathens in the audience"?
19  A.  I wouldn't consider that appropriate.
20  Q.  And that would be prohibited by Paragraph 3;
21  correct?
22  A.  I don't know if it would be prohibited or not.
23  I just wouldn't consider it appropriate.
24  Q.  Well, I'm trying to get a sense of how a board

162

1  member and a particular board president would interpret
2  the school board prayer policy? I picked that prayer
3  because it seemed to me to be an explicit attempt --
4  here. I will give you a more extreme one. "Oh, Lord,
5  please convert the Jews in the audience to the
6  knowledge and love of our Savior Jesus Christ"?
7  A.  That would be against the policy.
8  Q.  Okay.
9      So if somebody gave that prayer, as
10  board president, what would you have done? Would you
11  have spoken to them afterwards?
12  A.  Yes.
13  Q.  And would you have said, look, you can't do
14  that, it's clearly not right, so don't do it again, or
15  words to that effect?
16  A.  Yes.
17  Q.  Okay.
18      And having spoken to the board member,
19  would you then offer them another opportunity as their
20  name came up in rotation to offer another prayer?
21  A.  I would probably give them another chance.
22  Q.  Everybody gets a second bite at the apple.
23  And if they offered up another inappropriate prayer,
24  you'd take them out of the rotation?

163

1  A.  I would.
2  Q.  All right. I'm going to give you somewhat
3  less extreme examples. I hope less extreme. That was
4  pretty extreme. It was the most extreme one I could
5  think of.
6      A couple of them I have actually had
7  typed up because they are kind of long so I want you to
8  be able to read them. This is marked as Plaintiffs'
9  Exhibit 35.
10      And it reads, "Do not put your trust in
11  princes, in mortal men who cannot even save themselves.
12  When their spirit departs, they return to the ground.
13  On that very day their plans come to nothing. Blessed
14  is he whose help is the God of Jacob, whose hope is in
15  the Lord his God, the maker of heaven and earth, the
16  sea, and everything in them, the Lord who remains
17  faithful forever. He upholds the cause of the
18  oppressed and gives food to the hungry. The Lord sets
19  prisoners free. The Lord gives sight to the blind.
20  The Lord lifts up those who are bowed down. The Lord
21  loves the righteous. The Lord watches over the alien
22  and sustains the fatherless and the widow, but he
23  frustrates the ways of the wicked. For the wages of
24  sin is death, but the gift of God is eternal life

164

1  through Jesus Christ our Lord."
2      Would you consider that that prayer is
3  permitted or prohibited by Paragraph 3 of your policy?
4  A.  I would say permitted.
5  Q.  So this would not, in your view, be an effort
6  to proselytize, advance or convert anyone or to
7  derogate or to otherwise disparage any particular
8  faith? Yes?
9  A.  Yes.
10  Q.  This is Plaintiff's Exhibit 45. Quote,
11  Heavenly Father, thank you for this great occasion, for
12  the work, the effort, the joys and everything that led
13  up to this point in time. Thank you for your guidance
14  in this event. We pray for your direction in the lives
15  of each of these school board members. We pray that
16  you direct them into the truth and eventually the truth
17  that comes by knowing Jesus. We also pray that you be
18  with them at this time and we ask these things in
19  Jesus's name. Amen."
20      Is that permitted or prohibited by
21  Paragraph 3?
22  A.  I think it is permitted.
23  Q.  All right, one last one. And it is short so I
24  am going to read it. "Allah, we offer you our school