## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

JANE DOE, *et al.*,                          x
                                             :
                                             :
                    Plaintiffs,              :
                                             :
          v.                                 :     Civil Action No. 05-120-JJF
                                             :
INDIAN RIVER SCHOOL DISTRICT, *et al.*,  :
                                             :     **PUBLIC VERSION**
                                             :
                    Defendants.              x     **DATED: APRIL 17, 2008**


## OPENING BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON THE CONSTITUTIONALITY OF THE INDIAN RIVER SCHOOL BOARD'S PRAYER POLICY AS WRITTEN AND AS APPLIED

Thomas J. Allingham II (I.D. No. 476)
tallingh@probonolaw.com
Robert S. Saunders (I.D. No. 3027)
Brian G. Lenhard (I.D. No. 4569)
Timothy S. Kearns (I.D. No. 4878)
One Rodney Square
P.O. Box 636
Wilmington, Delaware  19899-0636
(302) 651-3000

and

Richard S. Horvath, Jr. (I.D. No. 4558)
Four Embarcadero Center
Suite 3800
San Francisco, California  94111-5974
(415) 984-6400

*Attorneys for Plaintiffs*

DATED:  April 10, 2008

# TABLE OF CONTENTS

**PAGE NO.**

TABLE OF CASES & AUTHORITIES ..................................................................... i

PRELIMINARY STATEMENT ............................................................................. 1

NATURE AND STAGE OF THE PROCEEDINGS ................................................. 2

SUMMARY OF THE ARGUMENT ....................................................................... 3

STATEMENT OF FACTS ..................................................................................... 5

I.    IN 2004, THE BOARD REVIEWED ITS PRACTICE OF PROMOTING
      SECTARIAN PRAYER AND ADOPTED AN UNCONSTITUTIONAL POLICY
      TO "DRESS UP" ITS UNCONSTITUTIONAL PRACTICE. ............................... 6

II.   THE BOARD PRAYS DESPITE A SUBSTANTIAL STUDENT PRESENCE ........... 9

      A.    Dozens Of Students Attend Board Meetings To Receive Awards From The
            District, Provide Updates On School Activities, Present Colors, Or Express
            Constituent-Related Concerns To The Board .................................................. 10

      B.    Board Members Know That Students Are Susceptible To Peer Pressure And
            Likely Feel Compelled To Attend Regular Meetings ...................................... 11

III.  POLICY BDA.1 DOES NOT CONFORM TO OR PLAUSIBLY FURTHER THE
      PURPORTED PURPOSES OF SCHOOL BOARD PRAYER ................................ 11

      A.    Prayer Is "Nice, But Not Necessary" To Solemnize Board Meetings ............. 12

      B.    Board Members Pray At Regular Meetings Because They Want The Public
            To Participate .............................................................................................. 13

      C.    The Board Has Summarily Rejected A Board Member's Suggested
            Alternatives To Public Prayer ....................................................................... 14

IV.   THE BOARD OPENS AN OVERWHELMING MAJORITY OF ITS PUBLIC
      MEETINGS WITH SECTARIAN PRAYERS, AND EVERY SINGLE
      SECTARIAN PRAYER HAS BEEN OVERTLY CHRISTIAN. ........................... 14

V.    POLICY BDA.1 DOES NOT CHANGE THE BOARD'S PRACTICE OF
      OPENING PUBLIC MEETINGS WITH SECTARIAN PRAYER. ......................... 16

A.    Policy BDA.1 Provides No Clear Guidance To The Board On What Prayers
Are Allowed At School Board Meetings......................................................... 16

B.    Policy BDA.1's Disclaimer Is Ineffective, And Presents Students Who Do
Not Wish To Join The Prayer With Two Unpalatable Options:  Remain
Silent Or Leave During The Prayer. ............................................................. 18

VI.    THE BOARD HAS MADE CHRISTIANITY AND CHRISTIAN PRAYER
POLITICAL ISSUES IN THE DISTRICT. ............................................................ 18

VII.    THE BOARD OVERSEES FUNCTIONS THAT ARE INCONSISTENT WITH
THE TASKS OF A LEGISLATIVE BODY. ........................................................... 19

ARGUMENT......................................................................................................... 19

I.    PLAINTIFFS HAVE SATISFIED THE REQUIREMENTS FOR SUMMARY
JUDGMENT.......................................................................................................... 19

II.    THE ESTABLISHMENT CLAUSE PROHIBITS SCHOOL-SPONSORED
RELIGIOUS ACTIVITIES IN PUBLIC SCHOOLS........................................... 20

III.    EVERY ESTABLISHMENT CLAUSE TEST PROHIBITS SCHOOL BOARD
PRAYER. .............................................................................................................. 23

A.    School Board Prayer Is Unconstitutional Under The *Lemon* Test................... 23

1.    School Board Prayer is unconstitutional because it lacks a clear
secular purpose. ............................................................................. 24

2.    School Board Prayer is also unconstitutional because it has the
primary effect of advancing religion. .............................................. 28

3.    Policy BDA.1 is unconstitutional because it requires the Board itself
to assess whether prayers are permissible or impermissible,
excessively entangling the School Board with religion......................... 29

B.    School Board Prayer Is Unconstitutional Under The Endorsement Test
Originally Proposed In *Lynch*..................................................................... 31

C.    School Board Prayer Is Unconstitutional Under The Coercion Test................. 33

IV.    THE PRACTICE OF SCHOOL BOARD PRAYER DOES NOT FALL WITHIN
THE NARROW EXCEPTION OF *MARSH*. .......................................................... 34

A.     Defendants Cannot Carry Their Burden To Establish *Marsh* As The Guiding Precedent In This Case. ......................................................................................... 35

B.     Unlike In *Marsh*, Children Are An Active And Requested Part Of School Board Meetings And Are Inextricably Involved In The School Board's Prayers. ............................................................................................................. 36

C.     The School Board Is Not A Legislative Body As That Phrase Was Used In *Marsh*. ................................................................................................................ 37

D.     School Board Meetings In Their Current Format Have No "Unique History" Of Prayer. ........................................................................................................... 38

E.     The Overwhelming Majority Of Regular Meetings Open With Prayers That Advance One Religious Viewpoint – Christianity. ........................................... 39

CONCLUSION ...................................................................................................................... 40

# TABLE OF CASES & AUTHORITIES

<u>CASES</u>                                                               <u>PAGE(S)</u>

*Abington Sch. Dist. v. Schempp,*
    374 U.S. 203 (1963) ................................................................. 20, 21, 22, 33

*ACLU v. Black Horse Pike Reg'l Bd. of Educ.,*
    84 F.3d 1471 (3d Cir. 1996) ........................................................ 23, 28, 37

*Bacus v. Palo Verde Unified Sch. Dist. Bd. of Educ.,*
    52 Fed. Appx. 355 (9th Cir. 2002) ............................................. 35, 39

*Blackwelder v. Safnauer,*
    689 F. Supp. 106 (N.D.N.Y. 1988) ............................................ 38

*Board of Educ. of Westside Cmty. v. Mergens,*
    496 U.S. 226 (1990) ................................................................. 21

*Coles v. Cleveland Bd. of Educ.,*
    171 F.3d 369 (6th Cir. 1999),
    *reh'g denied,* 183 F.3d 538 (6th Cir. 1999) ........................... passim

*County of Allegheny v. ACLU,*
    492 U.S. 573 (1989) ................................................................. 32, 39

*Doe v. Tangipahoa Parish Sch. Bd.,*
    473 F.3d 188 (5th Cir. 2006),
    *rev'd on other grounds,* 494 F.3d 494 (5th Cir. 2007) ........... 34, 39

*Edwards v. Aguillard,*
    482 U.S. 578 (1987) ................................................................. passim

*Engel v. Vitale,*
    370 U.S. 421 (1962) ................................................................. 20, 25, 27

*Epperson v. Arkansas,*
    393 U.S. 97 (1968) ................................................................... 20

*Forsyth County of Ga. v. Nationalist Movement,*
    505 U.S. 123 (1992) ................................................................. 23

*Gomez v. Toledo,*
    446 U.S. 635 (1980) ................................................................. 35

*Grand Rapids Sch. Dist. v. Ball,*
　　473 U.S. 373 (1985) ..................................................................................23

*Guy v. Judicial Nominating Comm'n,*
　　659 A.2d 777 (Del. Super. Ct. 1995) .........................................................25

*Hinrichs v. Bosma,*
　　440 F.3d 393 (7th Cir. 2006), *rev'd on other grounds sub nom. Hinrichs v.*
　　*Speaker of the House of Representatives,*
　　2007 WL 3146453 (7th Cir. Oct. 30, 2007) ..............................................39

*Illinois ex rel. McCollum v. Board of Educ.,*
　　333 U.S. 203 (1948) ..................................................................................20

*Ingebretsen v. Jackson Pub. Sch. Dist.,*
　　88 F.3d 274 (5th Cir. 1996)................................................................23, 29

*Jager v. Douglas County Sch. Dist.,*
　　862 F.2d 824 (11th Cir. 1989)...................................................................37

*Kennan v. Dow Chem. Co.,*
　　717 F. Supp. 799 (M.D. Fla. 1989) ...........................................................35

*Kitzmiller v. Dover Area Sch. Dist.,*
　　400 F. Supp. 2d 707 (M.D. Pa. 2005) ...........................................28, 31, 37

*Lamb's Chapel v. Center Moriches Union Free Sch. Dist.,*
　　508 U.S. 384 (1993) ..................................................................................21

*Lassonde v. Pleasanton Unified Sch. Dist.,*
　　320 F.3d 979 (9th Cir. 2003)......................................................................37

*Lee v. Weisman,*
　　505 U.S. 577 (1992) ...........................................................................passim

*Lemon v. Kurtzman,*
　　403 U.S. 602 (1971) ...........................................................................passim

*Lynch v. Donnelly,*
　　465 U.S. 668 (1984) ....................................................................20, 31, 33

*Marsh v. Chambers,*
　　463 U.S. 783 (1983) ...........................................................................passim

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
　　475 U.S. 574 (1986) ..................................................................................19

*McCreary County v. ACLU,*
    545 U.S. 844 (2005) ................................................................................24, 26, 27

*Mellen v. Bunting,*
    327 F.3d 355 (4th Cir. 2003) ........................................................... passim

*New York v. Cathedral Academy,*
    434 U.S. 125 (1977) .............................................................................30

*News-Journal Co. v. McLaughlin,*
    377 A.2d 358 (Del. Ch. 1977) ...............................................................25

*Santa Fe Indep. Sch. Dist. v. Doe,*
    530 U.S. 290 (2000) ........................................................................ passim

*Stone v. Graham,*
    449 U.S. 39 (1980) .............................................................................20

*Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly,*
    309 F.3d 144 (3d Cir. 2002) ...............................................................31

*Thomas v. Independence Twp.,*
    463 F.3d 285 (3d Cir. 2006) ...............................................................36

*Wallace v. Jaffree,*
    472 U.S. 38 (1985) ....................................................................... 20, 24

*West Virginia State Bd. of Educ. v. Barnette,*
    319 U.S. 624 (1943) .............................................................................21

*Wynne v. Town of Great Falls,*
    376 F.2d 292 (4th Cir. 2004) ................................................ 26, 34, 35, 39

## <u>AUTHORITIES</u>

*29 Del. C.* § 10001 *et seq.* ................................................................. 14, 25

Fed. R. Civ. P. 56(c) ................................................................................19

iii

## PRELIMINARY STATEMENT

Members of Indian River School District's Board of Education have violated and continue to violate the Establishment Clause of the First Amendment to the United States Constitution by engaging in a pattern and practice of opening public school board meetings with sectarian Christian prayer. In so doing, Board members exploit governmental power to impose their religious beliefs on the community and particularly on susceptible schoolchildren. Although they voluntarily assumed the cloak of governmental authority conferred by their public offices, Board members consistently defend their pattern and practice of Christian prayer as an exercise of their *personal* First Amendment rights. That defense finds no support in the law. Where exercise of personal rights conflicts with the obligations of governmental authority voluntarily assumed, the governmental obligation must prevail. In fact, Board members clearly know this – because if they had unfettered personal rights to pray at Board meetings, there would have been no need for the School Board Prayer Policy ("Policy BDA.1"), which they adopted in 2004 in response to complaints about prayer in the District.

But even after their adoption of Policy BDA.1, Board members have continued their unconstitutional practice of delivering sectarian Christian prayers at public Board meetings, and their adoption of the Policy has not made that pattern and practice of prayer constitutional. For example, nothing in the Policy prevents the Board from delivering a sectarian Christian prayer *at every meeting* – and, in fact, the way Board members are selected to open the meetings has ensured that is exactly what will happen.

*And, critically, the Board's prayers are offered at meetings which schoolchildren are invited – in fact, often required – to attend.* Historically, students rarely, if ever, attended Board meetings in the District. But, in 1994, the Board expanded the scope of its public meetings to include school functions, and students of all ages are now routinely invited to

attend Board meetings to present colors, represent student government, perform music or drama for the Board, or receive awards for academic, athletic or extracurricular activities. The Board's intentional efforts to incorporate obvious school functions into Board meetings have turned segments of the meetings into what amount to school assemblies. Even Board members acknowledge that this practice has strained the Board's function, pushing some meetings beyond midnight because so many students are involved. And the expansion of the scope of Board meetings has made it unavoidable that the audience for its prayers includes not only adults, but also impressionable schoolchildren.

These are not abstract concerns. The Does – a District student, a former student who may return to District schools, and their parents – have a concrete, continuing stake in the outcome of these proceedings.

REDACTED

.

For all these reasons, the Board's practice of opening its public meetings with Christian prayers violates the Establishment Clause of the First Amendment. Plaintiffs respectfully submit this brief asking the Court to grant summary judgment that the District's Policy is unconstitutional as written and as applied.

## NATURE AND STAGE OF THE PROCEEDINGS

On February 28, 2005, Plaintiffs filed their complaint (D.I. #1) for injunctive relief and damages. The Defendants answered and moved to dismiss the claims against the individual defendants (current and former Board members and District administrators) in their individual capacities. (D.I. #8, 9, 29, 32) On August 2, 2005, the Court granted that motion. (D.I. #58) On August 5, 2005, the Court bifurcated the litigation, with the first stage focused on the

constitutionality of the Policy, as written and as applied. (D.I. #87) On June 2, 2006,

Plaintiffs amended their complaint. (D.I. #134) On July 12, 2006, Defendants answered the

amended complaint (D.I. #150) On August 21, 2007, the parties agreed in principle to settle

all claims in the complaint except for the constitutionality of that Policy. The Court approved

the settlement on February 21, 2008. (D.I. #237) The Dobriches' remaining claims were

thereafter voluntarily dismissed. (D.I. #242) The parties have completed discovery for the

first stage of the litigation, and Plaintiffs now respectfully move for summary judgment on the

constitutionality of Policy BDA.1 as written and as applied.

## SUMMARY OF THE ARGUMENT

1.      Defendants' policy and practice of opening public Board meetings with a

prayer ("School Board Prayer") violates a long line of Supreme Court precedents holding that

religious intrusions that could influence students in the public school environment are

unconstitutional.

2.      Defendants' policy and practice of opening meetings with a sectarian Christian

prayer given by a Board member fails every relevant Establishment Clause test.

3.      Defendants' policy and practice of prayer is unconstitutional under the *Lemon*

test, the principal Establishment Clause test in the Third Circuit, for the following reasons:

    (i)    <u>The policy and practice of prayer lacks a clear secular purpose.</u> The Policy's
stated secular purpose, to "solemnify" the Board meeting, is a sham. At the
Board's non-public meetings, there is no prayer, but the meetings are still
conducted in a solemn manner. To the extent that the Board argues that its
tradition of prayer also provides a secular purpose, that argument fails because
the Board has altered its tradition by incorporating school functions into its
meetings.

    (ii)    <u>The policy and practice of prayer has the primary effect of promoting religion.</u>
Prayers are the only spoken words permitted by the Board's policy to
solemnize a meeting. This practice promotes religion because prayers are, by
definition, religious. In addition, in practice the prayers offered are
overwhelmingly sectarian, and those sectarian prayers are *always* Christian

3

prayers.

    (iii)   <u>The policy and practice of prayer excessively entangles government with religion.</u>  Board members offer prayers as government officials at school-related events.  The Policy also requires Board members to monitor the content of Board members' prayers and determine whether those prayers are permissible or impermissible under the Policy.

4.      Defendants' policy and practice of prayer is unconstitutional under the "endorsement" test.  A reasonable observer would conclude that the Board and the District have endorsed Christianity by drafting a policy that does nothing to alter the entrenched practice of opening public Board meetings with sectarian Christian prayers.  This endorsement of Christianity – which is powerfully demonstrated by the public's explosive positive reaction to the continuance of these prayers – informs non-Christians they are not a respected part of the political process.

5.      Defendants' policy and practice of prayer is unconstitutional under the "coercion" test.  Board members have conceded that students and adults may be pressured into participating in the Board's prayers.  During the prayer, attendees, including students who do not wish to join the Board members in prayer, must either sit silently through the Board's prayer in spite of their objections or get up and leave, drawing unnecessary (and potentially harmful) attention to themselves, and likely creating a disturbance.  Thus, the only reasonable option available to a person who objects to the prayer is to sit silently – signifying to a reasonable observer that the person is voluntarily participating.  In short, those who do not wish to participate – or to be *perceived* to be participating – in prayers inconsistent with their personal beliefs have no practical ability to do so.

6.      Finally, Defendants cannot establish that the Board's prayers are legislative prayer governed by *Marsh v. Chambers*.  *Marsh*, a narrow exception to mainstream Establishment Clause jurisprudence, does not apply to (i) sectarian prayers, (ii) prayers

4

offered at events connected to the public school system, (iii) prayers offered by a legislative body with no "unique history" of prayer, or (iv) prayers delivered to recipients who are potentially susceptible to religious indoctrination. While Defendants may have a longer tradition of prayer in general, their practice of prayer at Board meetings involving schoolchildren dates back only fourteen years, and Defendants' prayers are consistently sectarian and Christian in nature. Therefore, *Marsh* does not apply.

## STATEMENT OF FACTS[1]

The Board[2] opens its regular public meetings[3] – meetings that the Board expects students to attend, and which students routinely do attend – with prayer. These prayers are overwhelmingly sectarian, and all of the sectarian prayers are Christian. After receiving complaints about prayer at school events, the Board adopted a policy that was obviously intended to protect the constitutionality of Board prayer at public meetings. But, the Board's

---

[1]  Depositions are cited herein with the name of the deponent and relevant page number(s).

[2]  The Board consists of ten elected members. Although Board members may change over time, they have historically all been Christian. (Bireley at 60) (responding to a question about non-Christian Board members, the District's 30(b)(6) witness said he did not recall ever "having that type of Board member")

[3]  The Board has both "regular meetings" and "special meetings." Both types of meetings are always held on District property, with regular meetings currently alternating between the cafeterias of Indian River and Sussex Central High Schools. (*See, e.g.*, Ex. 20 at 1; Ex. 21 at 1; Ex. 22 at 1) The regular meetings take place each month and are open to the public, which is encouraged to attend, with the exception of time spent in executive session. The Board will sometimes invite individuals to attend special meetings, but they are often closed to the public. (Bireley at 87; Cohee at 53, 68; Isaacs at 25-26) Other than the absence of a prayer from special meetings and their closed status, special meetings are substantively similar to regular meetings. (Bireley at 87; Hattier at 232) The Board's minutes indicate that in the three years after the Policy was adopted (October 2004-October 2007), the Board had 35 special meetings (none of which were opened with a prayer) and opened eight regular meetings in executive session (in which case, the Board always delayed the prayer until the public session began). In that same span, the Board held 36 regular meetings. Of those meetings, 33 opened with prayer (*see, e.g.*, Ex. 23 at 1; Ex. 24 at 1; Ex. 25 at 1), and the remaining three opened with a moment of silence.

prayer practice was unchanged by the Policy – members still routinely open regular public meetings involving students with sectarian Christian prayers. <u>These facts are not in dispute</u>.

**I.      IN 2004, THE BOARD REVIEWED ITS PRACTICE OF PROMOTING SECTARIAN PRAYER AND ADOPTED AN UNCONSTITUTIONAL POLICY TO "DRESS UP" ITS UNCONSTITUTIONAL PRACTICE.**

At Sussex Central High School's graduation in 2004, Reverend Jerry Fike offered overtly sectarian invocation and benediction prayers to Jesus Christ. In the benediction, Fike prayed that the "Heavenly Father . . . direct [graduates] into the truth, and eventually the truth that comes by knowing Jesus." (D.I. # 134 ¶ 30; D.I. # 150 ¶ 30) The baldly sectarian prayers upset a graduate's parent, who first raised her complaints about the prayers at the June 15, 2004 regular Board meeting.[4] (Ex. 0061 at 2; D.I. # 134 ¶ 82; D.I. # 150 ¶ 82) After the June 2004 Board meeting, newspapers and talk radio extensively reported the complaints, as well as the reactions of Board member Donald Hattier and at least one other member – in fact, Hattier answered the public's questions about the issue on the local talk radio station. (*See, e.g.,* Ex. 26; Ex. 27; Ex. 28; Hattier at 198-99) The Board did not address the issue at the July 27, 2004 regular meeting though there was some public comment. (Ex. 29)

On August 23, 2004, the day before the next regular meeting, the Board convened a special meeting, at which it met in executive session for over four hours to discuss prayer in the District and at Board meetings. (Ex. 30; Hattier at 158-59) (Apparently, no prayer was offered at this non-public meeting.) The Board's then-regular attorney, James Griffin, advised

---

[4]     The Board would later agree that its practice of graduation prayer was unconstitutional and change that practice. (Hattier at 303-04; Helms at 160-61) These were not the first complaints about religious practices in District schools. Others had complained about sectarian graduation prayer in the past, and the Does had previously objected to teacher-led Bible clubs in the schools. The Board would eventually change these practices as well. (*See, e.g.,* Hobbs 173-74)

that Board prayer was unconstitutional. (Hattier at 190-92; Helms at 76) As then-Board President Harvey Walls admitted, the Board disregarded Griffin's advice because Griffin did not agree with the Board's belief that School Board Prayer was constitutional. (Walls at 123; *see also* Bireley at 125-26; Hobbs at 107-08) After the August 23 meeting, individual Board members shopped for legal advice that conformed to their pre-existing views. (Bireley at 124 (stating the Board "wanted a second opinion"); Hobbs at 108; Helms at 74-75, 96-97; Hattier at 87-88)

The efforts to stir up public opinion about religious practices in the Indian River schools on talk radio and in the newspapers had the desired effect. At least 600 people attended the Board's August 24, 2004 meeting, *more than twice the attendance of any other Board meeting.* (Ex. 36 at P 0095 (estimating "roughly 800" attendees); Hastings at 78; Isaacs at 22) Jane Doe was present at the meeting, which she described as a "terrible thing." (Doe at 38)[5] As the meeting began, then-Board President Walls asked Board member Hattier to open the Board meeting with a prayer. (Ex. 31) The crowd erupted in applause. (Ex. 32) After the prayer, the crowd continued to be raucous, with attendees shouting, applauding, and booing during the meeting. (Ex. 55)[6] The overwhelming majority of the speakers who spoke during the public comments spoke of the District's need to continue praying in the name of Jesus *and*

---

[5] Jane Doe has attended several other Board meetings as well, including another meeting in 2004 that was opened with a prayer in Jesus's name. (Doe at 15) John, Jamie and Jordan Doe were not present at the August 24, 2004 meeting. Each, however, has attended at least one meeting during the years 2004-2008. To protect their anonymity, those meetings are not identified.

[6] Ex. 55 is an audiovisual recording of the August 24, 2004 meeting. Plaintiffs also submit other excerpted segments of Ex. 55. These shorter segments are meant to facilitate the Court's review of the relevant parts of the August 24, 2004 meeting.

*praying in school.* (*Id.*; Ex. 34[7]; *cf.* Ex. 35 at P 0092; Ex. 36)  Several state legislators read a letter and spoke during public comments, implying that Board members would be voted out of office if they did not defer to the majority and support prayer. (Ex. 35 at P 0092; Ex. 37)

Board members knew the public believed the debate to be about prayer in school, a clearly unconstitutional practice, not prayer at Board meetings or District events, a perception they now say was misinformed. (Helms at 13, 15-16; Hughes at 89-90; Walls at 90-91; Hattier at 218)  The Board, however, made no effort to correct the public's misperception. (Helms at 13-14, 16; Walls at 91)  Bypassing Griffin, its regular attorney whose advice they did not like, the Board instead worked privately with attorney Thomas Neuberger (Walls at 18-19, 23) and John Whitehead of the Rutherford Institute (Helms at 166-168), a well-known conservative think tank that defends "the First Amendment rights of churches." (http://www.rutherford.org/Issues/ChurchRights.asp)  Neuberger and the Rutherford Institute prepared a draft policy (Ex. 38) that became Policy BDA.1.  (Helms at 207)

As adopted, Policy BDA.1 reads:

1.     In order to solemnify its proceedings, the Board of Education may choose to open its meetings with a prayer or moment of silence, all in accord with the freedom of conscience of the individual adult Board member.

2.     On a rotating basis one individual adult Board member per meeting will be given the opportunity to offer a prayer or request a moment of silence.  If the member chooses not to exercise this opportunity, the next member in rotation shall have the opportunity.

---

[7]     Ex. 34 appears to be handwritten notes of Board secretary Janet Hearn taken at the August 24, 2004 meeting. When compared with the video recording of the meeting (Ex. 55), it becomes clear that the notation of "F" means a person spoke in favor of Board prayer or prayer in school, "A" means that a person spoke against Board prayer.  32 of the 39 speakers (neither of the individuals listed on line #28 spoke at the meeting) spoke in favor of prayer in school or Board prayer, with the majority of those supporting the clearly unconstitutional practice of prayer in the schools. *Compare* Ex. 34 *with* Ex. 55.

3.  Such opportunity shall not be used or exploited to proselytize, advance or convert anyone, or to derogate or otherwise disparage any particular faith or belief.

4.  Such prayer is voluntary, and it is among only the adult members of the Board. No school employee, student in attendance, or member of the community in attendance shall be required to participate in any such prayer or moment of silence.

5.  Any such prayers may be sectarian or non-sectarian, denominational or non-denominational, in the name of a Supreme Being, Jehovah, Jesus Christ, Buddha, Allah, or any other person or entity, all in accord with the freedom of conscience, speech and religion of the individual Board member, and his or her particular religious heritage. (Ex. 39)

## II.    THE BOARD PRAYS DESPITE A SUBSTANTIAL STUDENT PRESENCE.

Schoolchildren have become an integral part of Board meetings. The District regularly invites students to attend, and the Board frequently acknowledges students in attendance with awards. Board members could not recall a single regular Board meeting during the academic year without students in attendance. (Hastings at 42; Hughes at 36; *see also* Hobbs at 78) Board minutes reflect as many as 58 students receiving recognition at a single Board meeting. (Ex. 40 at 2-4) Even at meetings where the Board met in executive session before the public session (just steps away from the auditorium where the public board meeting would be held), the Board delayed its prayer until the public meeting began, ensuring that students will be present for the prayer. (*See, e.g.,* Ex. 40 at 1 (invocation after executive session and presentation of colors); Ex. 41 at 1-2 (same)) Thus, Board members know that students are in the audience when they open meetings with prayer. (Cohee at 113-14; Hastings at 42; Helms at 199-200)

Regular student attendance at Board meetings is a recent phenomenon; students did not typically attend regular Board meetings until the mid-1990s. (Hobbs at 34; Bireley at 27, 39) Thereafter, the Board made it a regular practice to recognize "children who won an

award." (Hobbs at 33; Bireley at 27-28)  These presentations often add thirty to forty-five minutes to regular meetings.  (Hattier at 289-90)

### A.     Dozens Of Students Attend Board Meetings To Receive Awards From The District, Provide Updates On School Activities, Present Colors, Or Express Constituent-Related Concerns To The Board.

Students and student groups of many grade levels receive recognition at, or are requested to attend, Board meetings that open with prayers.  Students being honored often also receive a letter signed by the Superintendent and Board President commemorating the experience, and the students know that photos are then often sent to the local newspapers for publication.  (Hobbs at 36-37)  A wide variety of student groups and award winners have performed or been recognized at Board meetings, including                  REDACTED

REDACTED                           have competed in art competitions (*see, e.g.,* Ex. 45; Ex. 46; Ex. 47); and have received athletic awards (*see, e.g.,* Ex. 48 at 2; Ex. 49 at 2-3).

Other students *routinely* participate in Board meetings.  Since 1994, student government representatives have, at the Board's invitation, addressed the Board at most regular meetings during the academic year.  (Ex. 50 at 4 (adding student government to the agenda); Bireley at 39)  Since about 2001, JROTC students have presented the colors at the start of each Board meeting – immediately before or immediately after the prayer – held during the academic year.  (N.L. Bunting at 75-76; Hughes at 36)  Students also address the Board to raise concerns about their schools.  (Bireley at 41-42, 44-46, 48; Hughes at 36)  In addition, the student hearings in front of the Board involve such important matters as whether a student is expelled.  (Ex. 17 at 10)  Students also have their correspondence to the Board presented at Board meetings.  (Ex. 18 at 9 (describing letter from students to Board regarding school safety))

10

**B.    Board Members Know That Students Are Susceptible To Peer Pressure And Likely Feel Compelled To Attend Regular Meetings.**

Students receiving awards, speaking as student government representatives or presenting the colors as a member of the JROTC, likely feel obligated to attend the Board's regular meetings. (Hobbs at 74-75; Isaacs at 64-65) For award recipients, this feeling of obligation is increased because their invitations are often delivered by the students' own school principals. (Ex. 19, Int. Resp. No. 2; Bireley at 24-25) The District's 30(b)(6) witness conceded that he could not recall a student *ever* declining an invitation, unless there was a scheduling conflict. (Bireley at 33) Moreover, students in groups like                 REDACTED and ⸱ REDACTED       ⸱ are under special pressure to attend these meetings, because attending earns members credit toward their obligations to the group, and the groups' performances will be compromised if all members are not present. ⸱ REDACTED

Students are susceptible to peer pressure, and, as a result, they are unlikely to leave a meeting if a prayer that contravenes their own beliefs is offered. (Hobbs at 88; *see also* Bireley at 203-04 (students "are impressionable because of their youth"); Evans at 126-27; Hobbs at 208) For students presenting the colors, in fact, leaving is not an option, because "as a practical matter, if they don't want to participate in the prayer, they can't leave." (Isaacs at 64-65; *see also* Hobbs at 74-75)

**III.    POLICY BDA.1 DOES NOT CONFORM TO OR PLAUSIBLY FURTHER THE PURPORTED PURPOSES OF SCHOOL BOARD PRAYER.**

Policy BDA.1 specifies only one purpose for School Board Prayer – to "solemnify" public Board meetings. (Ex. 39) Predictably, several Board members emphasized this purpose (*see, e.g.*, Cohee at 39-40; Hattier at 240), but one Board member indicated that the Policy was intended to maintain "tradition" (McCabe at 31-32), and another forthrightly conceded that the Policy was designed to elicit public participation in prayer. (Wilson at 31)

11

Even the Board members who dutifully testified that solemnifying meetings was the Policy's purpose could not agree what the term "solemnify" meant. Some understood "solemnify" to mean seeking divine guidance (Walls at 40; Evans at 41); others thought it was simply meant to convey the message that the Board's business required careful thought and deliberation. (Isaacs at 34) But other Board members' testimony directly contradicted these claimed purposes. In fact, as explained below, the stated purpose for Policy BDA.1 is a sham – unnecessary and designed to mask the Policy's real purpose.

**A.     Prayer Is "Nice, But Not Necessary" To Solemnize Board Meetings.**

Board members admit that prayer is "nice, but not necessary" to solemnify Board meetings. (Hastings at 111; *see* Isaacs at 61-62; Mitchell at 15-16; Walls at 42; McCabe at 91) Prayer is not necessary because, as Board members candidly admitted, Board meetings that opened with a moment of silence instead of prayer were conducted solemnly. (Cohee at 110-11; McCabe at 90-91) Moreover, in both special meetings and executive sessions, which the Board does not open with prayer (and at which, not coincidentally, the public is not present),[8] the Board has managed to deliberate in a solemn and respectful manner. (Evans at 11-12; Walls at 52)

In contrast, the August 24, 2004 Board meeting was hardly conducted in a solemn manner, even though it opened with a prayer. (McCabe at 72; *see* Ex. 52; Ex. 53) For

---

[8]     One Board member conceded that it was "strange" that regular meetings, where the public is present, open with a prayer, but special meetings and meetings that are closed to the public do not. (Bireley at 86; *see also* Bireley at 175; McCabe at 57-58; Helms at 136) Some Board members said that they silently sought divine guidance at meetings that did not open with prayer (Helms at 135-36; Mitchell at 103-04; Walls at 53-54) – which, of course, they could do before or during regular Board meetings as well. As Board member Helms testified, his prayers would be heard whether offered silently or out loud. (Helms at 137-38; *see also* Walls at 54) But when that solution was proposed by one Board member, his suggestion was summarily rejected. *See* Section III, C below.

example, at that meeting, former Board member Harold Johnson gave a lengthy speech about the need for prayer in a "chain of command society." (Ex. 63) Johnson then continued with a thinly veiled threat to anyone who challenged the District's prayer practices:

> The United States Supreme Court may be the highest deliberative body of the nation, but there is one higher authority above them. The Good Lord has proven that. The last I knew Madalyn Murray O'Hair just disappeared never to be seen or heard from again. I think we all know who she was. She was the person who initiated the movement to remove prayer from our schools. (Ex. 64)

Several Board members admitted they should have stopped Johnson from continuing to address the Board -- but they did nothing. (Hattier at 268-70; Bireley at 216-17; Evans at 120-21) The "solemn" crowd cheered and applauded Johnson's unsubtle warning. (Ex. 65; Ex. 66)

### B.    Board Members Pray At Regular Meetings Because They Want The Public To Participate.

Board member Robert Wilson freely conceded that the Board's prayers are "for the benefit of everyone in attendance." (Wilson at 31) In fact, Wilson explained that the reason the Board prays only at regular meetings: "We want the public to take part in the prayer. That's the whole thing behind the public board meeting." (Wilson at 31) Other Board members insisted they had no recollection of the public's behavior during the prayers (Cohee at 113; Isaacs at 63), but one Board member acknowledged the obvious, admitting he had "been able to look around at several times and see people that have heads bowed," and he testified that "99 percent of the people do take part" in the prayer. (Wilson at 31)

In fact, the Board has explicitly invited the public to participate. For example, at the contentious August 24, 2004 meeting, Hattier prefaced his prayer by saying: "The following prayer was given by General George Washington on the occasion of concluding his service to the Continental Army. On June 14, 1783, General Washington wrote all of the governors of

the newly-freed states to join him in the Service Prayer. *Likewise, I am asking all of those here tonight to join me in thinking about and understanding his words.*" (Ex. 54)

### C. The Board Has Summarily Rejected A Board Member's Suggested Alternatives To Public Prayer.

Then-Board member Mark Isaacs offered two alternatives to public prayer, but both were rebuffed without meaningful discussion. When the Board was considering Policy BDA.1, Isaacs suggested that the Board should simply pray in private. (Isaacs at 67-68) Other Board members rejected that suggestion, telling Isaacs that a private prayer would violate Delaware's Sunshine Laws. (Isaacs at 67-68; *see also* Walls at 44-45 (confirming his view that private prayer by the Board would make a meeting illegal)) No one on the Board researched whether private prayer would actually violate Delaware law – as, of course, it would not. *See 29 Del. C.* § 10001 *et seq.* (Isaacs at 68) Isaacs also suggested silent prayer, but other Board members stated that if they wanted to pray out loud, they would do so. (Isaacs at 69)[9]

## IV. THE BOARD OPENS AN OVERWHELMING MAJORITY OF ITS PUBLIC MEETINGS WITH SECTARIAN PRAYERS, AND EVERY SINGLE SECTARIAN PRAYER HAS BEEN OVERTLY CHRISTIAN.

The Board's prayer practice overwhelmingly favors Christianity. Board members could not recall a single non-Christian prayer ever being given at a public Board meeting.

---

[9] These Board members appear to be referring to their personal First Amendment rights, notwithstanding the cloak of governmental authority they assume as Board members. At all events, no Board member disputed that silent prayers would be equally effective as the public prayers they insist on delivering at regular Board meetings. (Helms at 133-34; N.L. Bunting at 111-12) In fact, several engage in silent prayers for guidance at executive sessions or special meetings where public prayers are not offered. (Helms at 134-35; Walls at 53-54; Mitchell 53-54)

(Bireley at 59-60, 62-63; Cohee at 114; McCabe at 74)  Thus, even those prayers that do not explicitly evoke Jesus still are recognizably Christian.[10]

Before June 2004, two Board members, Helms and John Evans, typically alternated in offering prayers at meetings.  (N.L. Bunting at 62; *see also* Doe at 15)  Both testified they always pray to Jesus.  (Evans at 55 (if he "pray[ed] without offering the prayer in the name of Jesus, [he] would be denying Jesus"); Helms at 195, 201; *cf.* N.L. Bunting at 111 ("My God says . . . to pray everywhere, any time, all the time, whether privately or publicly, to pray *without ceasing*.") (emphasis added))

The Board adopted Policy BDA.1, entitled "Board Prayer at Regular Board Meetings," on October 19, 2004.  (Ex. 0039; Ex. 0023 at 5)  But nothing changed.  The Board continued to routinely deliver sectarian prayers – and sectarian prayers only in Jesus's name.  (Bireley at 66-67; Cohee at 114; Dobrich at 9-10)  Despite the Policy's rotation requirement, Board President Bireley admitted that he has called on only select Board members to offer prayers: current Board members Helms, Mitchell, Nina Lou Bunting, and Hattier, and former Board member Evans.  (Bireley at 73-74)[11]  Of these, Evans, Helms, Mitchell and Bunting testified that they always name Jesus in their prayers.  (Mitchell at 54; Evans at 55; Helms at 195, 201; N.L. Bunting at 126)  Hattier and Bunting testified that requiring a Christian to refrain from naming Christ in a public prayer is the same as "denying Christ."  (Hattier at 122-23; N.L. Bunting at 109-10)

---

[10]  For example, although Hattier excised the sectarian phrase "Jesus Christ" from his recitation of Washington's prayer, the prayer, as a matter of historical fact, does invoke Jesus's name and is a sectarian prayer.  (Ex. 68)

[11]  Unsurprisingly, Bireley did not call on Board members who would be embarrassed to show their personal preference to decline the opportunity to pray (Bireley at 182-83 (stating that he did not want to "embarrass them")), which would undermine the apparent unanimity of the Board's Christian prayer practice.

## V.    POLICY BDA.1 DOES NOT CHANGE THE BOARD'S PRACTICE OF OPENING PUBLIC MEETINGS WITH SECTARIAN PRAYER.

### A.    Policy BDA.1 Provides No Clear Guidance To The Board On What Prayers Are Allowed At School Board Meetings.

Board members are responsible for enforcing Policy BDA.1. (Bireley at 22; Evans at 64; Helms at 222; Isaacs at 38-39; McCabe at 18-19; Mitchell at 83; Walls at 160) The only enforcement mechanism against a Board member who offers a prayer that violates the Policy, however, is depriving that member of subsequent opportunities to open meetings with prayer, an empty discipline. (Walls at 162; Isaacs at 41) Despite this mechanism, Board members collectively had no consistent idea what prayers would violate Policy BDA.1's prohibition of prayers used to proselytize, advance or disparage a religious faith, or convert anyone – ensuring that even this empty discipline will never be imposed. Throughout their depositions, Board members who voted for Policy BDA.1 and new members responsible for enforcing the Policy were asked whether several prayers violated Policy BDA.1. Their inconsistent answers show that Policy BDA.1 provides little guidance to the Board.

For instance, nine Board members were asked whether a sample prayer characterizing certain people as "heathens" would violate the Policy. Five Board members who heard a prayer requesting God to "convert the heathen" determined that it violated the Policy, but another member, astonishingly, was unsure. (Cohee at 109; Evans at 153; Hughes at 72; Isaacs at 41; Mitchell at 107-08; *but see* Walls at 161) However, three Board members who heard a slightly different prayer, requesting that God "enlighten" and "inspire" the heathen, stated that such a prayer would not be prohibited. (Hastings at 118; Helms at 221-22; McCabe at 75-78 (stating that she did not find it "terribly objectionable"))

Similarly, Board members disagreed whether a prayer requesting that Board members be "direct[ed] . . . into the truth, and eventually the truth that comes by knowing Jesus" would

16

violate the Policy.[12]  Remarkably, eight Board members determined that this prayer did not

violate the Policy's prohibition on attempts to convert, to proselytize or to advance a religion.

(Hastings at 116; Helms at 219-20; Cohee at 105; Hughes at 76; McCabe at 81; Mitchell at

137; Isaacs at 43-44; Walls at 164)  Two Board members concluded that the prayer was

prohibited proselytizing (Evans at 153; Bireley at 146); one was unsure.[13]  (N.L. Bunting at

55-56)

    When asked whether a non-Christian had ever prayed at a Board meeting, the

District's 30(b)(6) witness said he did not recall ever "having that type of Board member."

(Bireley at 60)  This group of Christians ultimately determines the permissibility of prayers

under the Policy.  Their disagreement about these clearly proselytizing prayers shows that the

Policy provides no clear guidance, and that the subjective judgment consequently required

will inevitably be affected by Board members' unanimously Christian views.

---

[12]  This prayer, of course, uses the language of Pastor Fike's graduation prayer that the Board
acknowledged was objectionable in that context, and which prompted the Board to adopt a
graduation policy that would explicitly prohibit such a prayer.  (Helms at 156)

[13]  In this line of questioning, individual Board members also offered various factors that
could alter their perception of whether a prayer violated the Policy, for instance, that a
prayer was "historical" (N.L. Bunting at 50-52), what the intended meaning of the term
"offer" was in a particular prayer (Evans at 153-54; McCabe at 83), and whether the Board
member found a given prayer to be "offensive."  (Hughes at 74)  Thus, Board members
not only did not agree on whether the particular prayers would violate the Policy, they did
not even agree on how that determination would be made under the Policy.

**B.    Policy BDA.1's Disclaimer Is Ineffective, And Presents Students Who Do Not Wish To Join The Prayer With Two Unpalatable Options:  Remain Silent Or Leave During The Prayer.[14]**

Before each prayer, the Board President reads a disclaimer describing the prayer as "voluntary."[15]  (Bireley at 74-75)  People in the audience have two options once the disclaimer is read:  (i) remain silent and seated during the prayer, or (ii) leave once the disclaimer is read and return after the prayer (and perhaps after the next portion of the meeting commenced).  (Hughes at 49-50)  Some Board members expressed a startling lack of understanding of the problems associated with requiring students who object to the prayer to stand up in front of their authority figures and peers and leave, even though schoolchildren as young as kindergarteners receive awards.  (N.L. Bunting at 66-67; Mitchell at 18-19; Ex. 47)  In any event, some students have no choice: JROTC students who present colors immediately before or after the prayer cannot leave.  (Isaacs at 64-65)

**VI.    THE BOARD HAS MADE CHRISTIANITY AND CHRISTIAN PRAYER POLITICAL ISSUES IN THE DISTRICT.**

Numerous Board members conceded that District residents consider the defense of this suit to be a defense of "Christian values."  (Evans at 112-13; Hastings at 130-31; Hughes at 88; Isaacs at 54-55; Walls at 88-89)  Board members also admitted that it was probably a widely held view that defense of the litigation was a defense of Christian prayer.  (Walls at 152-53; McCabe at 104)

Board members have admitted that Board prayer has become a significant political issue in the area.  (McCabe at 86-87; Hastings at 135; Helms at 214-15)  In fact, Board prayer

---

[14]  Nor is this likely to change, at least according to Defendants, who testified that non-Christians are not likely to get elected.  (McCabe at 86)

[15]  The disclaimer combines the first and fourth paragraphs of Policy BDA.1.  (Bireley at 103-04)

may have swung the 2006 School Board elections and caused Board members to be reelected by wide margins. (Hastings at 133; Bireley at 193-94; Ex. 56) Board members have wrongly characterized this litigation as driven by the ACLU,[16] and the public has responded in kind. (Ex. 57; Ex. 58; Hattier at 39-40; Helms at 186-87; McCabe at 101-02; *cf.* Ex. 59)

## VII.   THE BOARD OVERSEES FUNCTIONS THAT ARE INCONSISTENT WITH THE TASKS OF A LEGISLATIVE BODY.

The Board's functions include administrative, executive and quasi-judicial functions, none of which is legislative. The Board manages District schools, enforces District policy, reviews recommended disciplinary actions toward students, and rewards students and teachers. (Bireley at 13, 22; Helms at 45-47; Hughes at 31-34) For example, the District approves field trips (Ex. 60 at 9), approves school choice applications (Ex. 61 at 2), approves the school calendar (Ex. 67 at 6), makes hiring decisions (Ex. 60 at 10), and even determines which grass to plant on athletic fields (Ex. 60 at 11, Ex. 61 at 7).

## ARGUMENT

## I.   PLAINTIFFS HAVE SATISFIED THE REQUIREMENTS FOR SUMMARY JUDGMENT.

There are no genuine disputes of material fact, and Plaintiffs are entitled to judgment as a matter of law that Policy BDA.1 and the Board's prayer practice are unconstitutional. FED. R. CIV. P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The undisputed facts show that the Policy and the Board's practice of prayer is prohibited under (i) *Lemon v. Kurtzman*, 403 U.S. 602 (1971); (ii) the endorsement test

---

[16]   Defendants acknowledged that the community's perception of the ACLU is "anti-Christian," and that "standing up to the ACLU" would be seen as standing up for Christianity. (McCabe at 103) Their purpose for persisting in ascribing this litigation to the ACLU – which has not entered an appearance in this litigation and has never been substantively involved – is obvious.

originally proposed in *Lynch v. Donnelly*, 465 U.S. 668, 688 (1984) (O'Connor, J.,

concurring); and (iii) the coercion test of *Lee v. Weisman*, 505 U.S. 577, 592 (1992). Finally,

summary judgment is appropriate because Defendants cannot show that *Marsh v. Chambers*,

463 U.S. 783 (1983), applies to the Board's policy and practice of opening its public meetings

with prayer.

## II.    THE ESTABLISHMENT CLAUSE PROHIBITS SCHOOL-SPONSORED RELIGIOUS ACTIVITIES IN PUBLIC SCHOOLS.

As the Supreme Court has consistently held, the Establishment Clause prohibits

religious actions taken or authorized by elementary and secondary public schools and their

personnel. *See Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290 (2000) (student-led prayer

over PA system at football games); *Lee*, 505 U.S. 577 (graduation prayer by clergy overseen

by school principal); *Edwards v. Aguillard*, 482 U.S. 578 (1987) (statute forbidding teaching

of evolution unless creationism also taught); *Wallace v. Jaffree*, 472 U.S. 38 (1985) (moment

of silence intended to "return voluntary prayer" to schools); *Stone v. Graham*, 449 U.S. 39

(1980) (posting of Ten Commandments on classroom walls); *Lemon*, 403 U.S. 602

(government funding of instructors in non-religious courses at sectarian religious schools);

*Epperson v. Arkansas*, 393 U.S. 97 (1968) (prohibition on teaching of evolution); *Abington

Sch. Dist. v. Schempp*, 374 U.S. 203 (1963) (Bible reading over PA system before classes);

*Engel v. Vitale*, 370 U.S. 421 (1962) (prohibiting required recitation of "denominationally

neutral" prayer in public schools); *Illinois ex rel. McCollum v. Board of Educ.*, 333 U.S. 203

(1948) (weekly religious instruction during school hours by clergy members). Despite

repeated attempts by school districts, school boards and school officials to bring religion into a

public school system, including through prayers at voluntary school events, the Supreme

Court has made clear that such attempts are unconstitutional under the Establishment Clause.[17]

Here, the attempt to inject religion into a public school comes from the District's

highest authority figures – the Board members. Each month, Board members include religion

as part of their official public meeting agenda. The Board's regular meetings routinely

involve public schoolchildren on school grounds. This practice plainly violates the

Establishment Clause where, as here, the Policy *mandates* the Board's involvement in drafting,

delivering, and reviewing the prayers delivered at those meetings. As the Supreme Court has

stated:

> The Fourteenth Amendment, as now applied to the states, protects the citizen against
> the State itself and all of its creatures – *Boards of Education not excepted. . . .* That
> they are educating the young for citizenship is reason for scrupulous protection of
> Constitutional freedoms of the individual, if we are not to strangle the free mind at its
> source and teach youth to discount important principles of our government as mere
> platitudes.

*West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 637 (1943) (emphasis added).

More recently, the Supreme Court reaffirmed that school boards must comport themselves

"with the transcendent imperatives of the First Amendment." *Edwards*, 482 U.S. at 583.

School boards' special responsibilities are reflected in the frequency with which a board (or

district) appears as the named defendant in Supreme Court cases striking down religious

practices in public schools. *See, e.g., Santa Fe*, 530 U.S. 290; *Abington*, 374 U.S. 203;

*Barnette*, 319 U.S. 624.

---

[17]  To the extent that Supreme Court jurisprudence has *ever* permitted religious activity on
public school grounds, those contexts are inapplicable here. *See, e.g., Board of Educ. of
Westside Cmty. v. Mergens*, 496 U.S. 226, 231 (1990) (analyzing the Equal Access Act);
*Lamb's Chapel v. Center Moriches Union Free Sch. Dist.*, 508 U.S. 384, 387 (1993)
(noting that the case concerned the Free Speech Clause).

Furthermore, the Supreme Court has repeatedly stated that "there are heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools."[18] *Lee*, 505 U.S. at 592 (citing *Abington*, 374 U.S. at 307 (Goldberg, J., concurring); *Edwards*, 482 U.S. at 584 (other citations omitted)). "What to most believers may seem nothing more than a reasonable request that the nonbeliever respect their religious practices, in a school context may appear to the nonbeliever or dissenter to be an attempt to employ the machinery of the State to enforce a religious orthodoxy." *Lee*, 505 U.S. at 592. For that reason, the Supreme Court "has been particularly vigilant in monitoring compliance with the Establishment Clause in elementary and secondary schools." *Edwards*, 482 U.S. at 583-84.

Under binding precedents of the Supreme Court, prayers given by school board members in the presence of public schoolchildren on school grounds are unconstitutional.[19] The Supreme Court has never allowed public school officials to sanction or permit prayers to be given in the presence of schoolchildren on school grounds, much less to compose and deliver those prayers themselves.[20] Therefore, this Court should hold that Policy BDA.1, as written and as applied, is unconstitutional.

---

[18]   As explained in Section IV below, "[i]nherent differences between the public school system and a session of a state legislature distinguish this case from *Marsh*." *Lee*, 505 U.S. at 597.

[19]   As the Supreme Court has held, a few dominant facts, such as state officials directing religious activity on public school property (even when the school district did not require student attendance), can control an Establishment Clause decision. *Lee*, 505 U.S. at 586.

[20]   There is little dispute that Board members are school officials, given that the Board sets the policies that govern the schools and oversee the application of those policies. *See, e.g., Santa Fe*, 530 U.S. at 306 (finding that the school is involved in the selection of the speaker, even though students elect the speaker); *Lee*, 505 U.S. at 587 ("A school official, the principal, decided that an invocation and a benediction should be given; this is a choice attributable to the State, and from a constitutional perspective it is as if a state

*(cont'd)*

## III.  EVERY ESTABLISHMENT CLAUSE TEST PROHIBITS SCHOOL BOARD PRAYER.[21]

### A.    School Board Prayer Is Unconstitutional Under The *Lemon* Test.

Under the *Lemon* test, the Court must strike down the Board's policy and practice of School Board Prayer as unconstitutional if it:  (i) lacks a clear secular purpose; (ii) has a primary effect that advances or inhibits religion; *or* (iii) creates excessive entanglement of the government with religion.  *See, e.g., Lemon*, 403 U.S. at 612-13; *ACLU v. Black Horse Pike Reg'l Bd. of Educ.*, 84 F.3d 1471, 1483 (3d Cir. 1996).  *Lemon* is the "law of the land" in the Third Circuit.  *Black Horse Pike*, 84 F.3d at 1484.  Moreover, the *Lemon* test is the Supreme Court's most frequently utilized test in Establishment Clause cases like this one.  *See, e.g., Grand Rapids Sch. Dist. v. Ball*, 473 U.S. 373, 383 (1985) ("We have particularly relied on *Lemon* in every case involving the sensitive relationship between government and religion in the education of our children.").

---

*(cont'd from previous page)*

statute decreed that the prayers must occur.").

[21]  Plaintiffs' "as applied" and "as written" challenges to School Board Prayer do not require separate analysis.  As shown above, there is no question that Policy BDA.1 grants broad discretion to the Board Members to determine both the content of their own prayers, and whether the other Members' prayers violate that policy.  This broad discretion requires this Court to consider the Board's "authoritative constructions of the ordinance, including its own implementation and interpretation of it" in any "as written" challenge.  *Forsyth County of Ga. v. Nationalist Movement*, 505 U.S. 123, 131 (1992).  In addition, the factually intensive nature of the *Lemon* test, combined with the lack of any clear distinction between "as written" and "as applied" challenges, would render any distinction between the two meaningless.  *Cf. Ingebretsen v. Jackson Pub. Sch. Dist.*, 88 F.3d 274, 279 n.2 (5th Cir. 1996).

1.    **School Board Prayer is unconstitutional because it lacks a clear secular purpose.**

School Board Prayer lacks a clear secular purpose.  Its stated secular purpose of "solemnify[ing] School Board proceedings" (Ex. 39) is a sham.  Because "it is the duty of the courts to 'distinguish a sham secular purpose from a sincere one,'" the Court is not to give heightened deference to any claimed purpose that the Board may assert.  *McCreary County v. ACLU*, 545 U.S. 844, 865 n.13 (2005).  The Court is to look at the preeminent or primary purpose of Policy BDA.1, *Edwards*, 482 U.S. at 586-87, and discount rationales that appear implausible in light of other, available inferences.  *See McCreary*, 545 U.S. at 864 (citing *Wallace*, 472 U.S. at 57 n.45).

That the stated purpose – to "solemnify School Board proceedings" – is a sham is clear from the undisputed fact that the Board does not pray in a manner consistent with that purpose.  In fact, the Board opens <u>only</u> its public proceedings with prayer.  The Board concededly does not pray at the beginning of special meetings or executive sessions, both of which equally require solemnity, *but are held out of the view of the public*.  Moreover, in evaluating the Policy's stated purpose, this Court should consider the effect of prayer on the crowd's unruly behavior at the August 24, 2004 public meeting, and the Board's failure to act to control that behavior.  (Ex. 55)

The Board's demonstrated willingness to latch on to any purported basis to continue its practice of opening its public meetings with prayer (and to ignore any sound advice to the contrary) also powerfully suggests that the Policy's stated purpose is an expedient pretext.  For example, Walls claimed that Delaware's Sunshine Laws required the Board to pray in public, even though that law requires only Board discussions of public business or legislative strategy

take place in public.[22]  *See* 29 *Del. C.* § 10001 *et seq.*; *see also News-Journal Co. v. McLaughlin,* 377 A.2d 358, 362 (Del. Ch. 1977); *Guy v. Judicial Nominating Comm'n,* 659 A.2d 777, 780-81 (Del. Super. Ct. 1995). A similarly powerful inference can be drawn from the Board's immediate decision to "get a second opinion" when its regular attorney advised that Board prayer was unconstitutional.

In any event, even if the Court were to find that the stated "solemnifying" purpose was not a sham, Board members' testimony shows that the solemnity sought to be promoted is religious, not secular. In their depositions, Board members offered four definitions of the term "solemnify": (i) to seek divine guidance; (ii) to pray in public so that the public could benefit from the prayer; (iii) to convey a message that the Board's business required careful thought and deliberation; and (iv) to maintain a tradition. None satisfies the "clear secular purpose" prong of the *Lemon* test.

*First,* seeking divine guidance is, by definition, not a secular purpose. Invoking God's blessings is a religious activity, "a solemn avowal of divine faith and supplication for the blessings of the Almighty," even if the prayer is denominationally neutral. *Engel,* 370 U.S. at 424 (1962). This is particularly true here, where Board members concede that divine guidance could with equal effectiveness be sought silently or outside of the public Board meeting.

*Second,* the intended "benefit" to the public is obviously religious, not secular – Policy BDA.1 applies only to public meetings. The Board wants "the public to take part in the prayer. That's the whole thing behind the public board meeting." (Wilson at 31) The public benefit

---

[22]  Walls's claim demonstrates that the prayers are given by Board members in their official, not personal, capacity.

is that participation – if it was otherwise, the Board would pray at all of its meetings. And that benefit is not in any way secular.

*Third*, the suggestion that prayer is necessary to convey a message that the Board's business requires careful thought and deliberation suffers from the same flaws. That message could obviously be delivered without prayer – but if prayer were required to convey it, why does the Board not pray at all of its meetings? In any case, as the Supreme Court has stated: "the use of an invocation to foster . . . solemnity is impermissible when, in actuality, it constitutes prayer sponsored by the school." *Santa Fe*, 530 U.S. at 309.

*Fourth*, merely maintaining a tradition of School Board Prayer in the District cannot satisfy the first prong of *Lemon*. As the Court recognized in *Marsh,* tradition alone is insufficient to support a practice that violates the Establishment Clause. *Marsh*, 463 U.S. at 790 ("Standing alone, historical patterns cannot justify contemporary violations of constitutional guarantees. . . ."); *see also Wynne v. Town of Great Falls*, 376 F.3d 292, 298 (4th Cir. 2004).

In any case, it is undisputed that opening Board meetings with a prayer when schoolchildren are present is *not* a historical tradition in the District. In 1994, the Board altered its practice and began inviting students to meetings, significantly altering the purpose and scope of Board meetings. Thus, Board prayer before schoolchildren is a recent practice.

The Board's true religious purpose can also be discovered from the Policy's "sectarian heritage." *McCreary*, 545 U.S. at 866 n.14. In *McCreary*, the Supreme Court held that a Ten Commandments display was unconstitutional because the history of that display showed the "sectarian spirit" behind it. *Id.* at 872. Similarly, before the Board adopted Policy BDA.1, the Board rotated its prayer between two members who consistently offered sectarian prayers in

Jesus's name. When challenged about the constitutionality of the Board prayers, the Board adopted Policy BDA.1, but continued to offer sectarian prayers in Jesus's name. As in *McCreary*, this history shows that Policy BDA.1 was the Board's attempt to "reach[] for any way to keep a religious" activity at regular meetings, *McCreary*, 545 U.S. at 848, notwithstanding the absence of a clear secular purpose. Thus, the Court must look past the Board's purported purpose for Policy BDA.1 and conclude that, as a policy with no "adequate secular object, as against a predominantly religious one," Policy BDA.1 is unconstitutional. *Id.* at 865; *see Santa Fe*, 530 U.S. at 308; *Edwards*, 482 U.S. at 585-86; *Mellen v. Bunting*, 327 F.3d 355, 373 (4th Cir. 2003).

The Policy's real religious purpose can also be inferred from the undisputed fact that the Board has rejected equally effective, non-religious means to achieve its purported secular purpose. *See Engel*, 370 U.S. at 425. Board members admitted that prayers at regular meetings are "nice, but not necessary" – silent prayer or private prayer offstage would work as well. Indeed, the Policy on its face reflects that a moment of silence would accomplish the same objective as a prayer. And, again, the fact that the Board refrains from praying during its executive sessions and special meetings also shows that prayers are not necessary to accomplish the Board's purported purpose of solemnifying the proceedings.[23]

Finally, the Board's prayers routinely contain sectarian content that is unnecessary to solemnify the Board's proceedings. As in *Coles v. Cleveland Bd. of Educ.*, 171 F.3d 369, 384 (6th Cir. 1999), *reh'g denied*, 183 F.3d 538 (6th Cir. 1999), the content of the Board's prayers "clearly [goes] beyond what was necessary to solemnize or bring a businesslike decorum to

---

[23]    The Policy ensures that Board members deliver their prayers in public sessions, even though decisions that require careful thought and deliberation are often made in executive sessions outside the presence of the public, and only announced publicly thereafter.

such meetings." For example, the Board frequently goes beyond asking for divine assistance in the Board's decision-making, affirmatively seeking divine protection for teachers and students. (Hattier 323-24) Also, as the August 24, 2004 meeting indicates, the entire prayer practice can be counterproductive, inflaming passions and undermining a businesslike decorum.

The undisputed facts show there is no clear secular purpose for the Policy or the Board's prayer practice; they are, therefore, unconstitutional.

### 2.    School Board Prayer is also unconstitutional because it has the primary effect of advancing religion.

The Board's policy and practice of prayer has the primary effect of advancing religion in the District and is, therefore, unconstitutional. *Lemon*, 403 U.S. at 612. The Board has consistently offered sectarian Christian prayers, usually by those few of its members who are comfortable offering a prayer. The prayers offered by these Board members far exceed mere "solemnity," but instead routinely refer to Jesus Christ as the Board's appropriate source of divine guidance. *See Coles*, 171 F.3d at 384 (noting that prayers seeking divine assistance, referring to the Bible, or mentioning Jesus "clearly went beyond what was necessary to solemnize" Board meetings). Thus, the Policy and the Board's prayer practice advances and endorses religion over non-religion, and Christianity over other religions, violating the constitutional mandate of neutrality. *See Black Horse Pike*, 84 F.3d at 1488.

Policy BDA.1's primary effect of advancing Christianity is clear from the public's perception, as expressed through comments at Board meetings, letters to the editor and media coverage. *See Kitzmiller v. Dover Area Sch. Dist.*, 400 F. Supp. 2d 707, 730-31 (M.D. Pa. 2005). Board members understand that the community associates the Board's prayer practice and Policy BDA.1 with promoting and defending sectarian Christian prayer and Christian

28

values, so a reasonable observer (or an impressionable student) at a Board meeting would certainly make the same association. The public's response shows that the Policy and the Board's prayer practice have the primary effect of advancing religion, and are therefore unconstitutional.

> **3. Policy BDA.1 is unconstitutional because it requires the Board itself to assess whether prayers are permissible or impermissible, excessively entangling the School Board with religion.**

Policy BDA.1 excessively entangles the Board and the District with religion. First, excessive entanglement occurs through Board members composing and offering prayers as part of the official business of the Board's regular meetings. *Santa Fe*, 530 U.S. at 302, 306 (school board's choice to permit invocations or student-led prayer entangled the state with the prayer); *Ingebretsen v. Jackson Pub. Sch. Dist.*, 88 F.3d 274, 279 (5th Cir. 1996) (determining "who gets to say a prayer" constituted excessive entanglement). Second, the Board has assigned itself the task of monitoring whether its own prayers are used to "proselytize, advance, or convert anyone," as well as determining whether prayers are used to "derogate or otherwise disparage any particular faith or belief." This self-enforcement also excessively entangles the Board with religion. *Ingebretsen*, 88 F.3d at 279; *see Lemon*, 403 U.S. at 619.

The Constitution forbids the *ad hoc* determinations that Policy BDA.1 requires the Board to make as to which prayers are permissible. The Board's self-imposed duty to draft and actively monitor prayers is a "hallmark of state involvement." *Mellen*, 327 F.3d at 375; *see Lemon*, 403 U.S. at 619. The Board, composed solely of Christians, is assigned the role of ensuring that the prayers are not used to convert or proselytize – but whether prayers would convert or proselytize is self-evidently in the eye of the beholder, and Board members' universally Christian beliefs will likely bias those members against finding Christian prayers proselytizing – as, in fact, their judgments on that topic during their depositions show.

Moreover, Board members also disagree wildly on what is permissible prayer under the Policy. For instance, Board members disagreed over whether a prayer referring to meeting attendees as "heathens" was proselytizing or disparaged another belief. Likewise, Board members could not reach a consensus on whether a prayer that directed its audience to the "truth that comes by knowing Jesus" was proselytizing, meant to convert its recipients or advance a religion. These disagreements demonstrate that Policy BDA.1 provides no meaningful guidance to Board members and that, as written and as applied by the Board, Policy BDA.1 permits sectarian, proselytizing prayer.

The Policy and the Board's prayer practice also create a monitoring dilemma for the Board that results in excessive entanglement regardless of the Board's judgments on potentially prohibited prayers. Board members admitted that the only response to a Board member who does use the prayer for a prohibited purpose is to refuse that person a future opportunity to pray, ensuring that the constitutional guarantee against establishment may be violated at least once by each Board member. *See New York v. Cathedral Academy*, 434 U.S. 125, 133 (1977) ("The prospect of church and state litigating in court about what does or does not have religious meaning . . . cannot be dismissed by saying it will happen only once."); (Walls at 162-63). This "one free bite" rule has a pernicious effect: it would permit nearly constant proselytizing, given the size of the Board and the three-year election cycle. On the other hand, if the Board were to review the prayers before they were given to ensure that the Policy was being followed, excessive entanglement would also result. Thus, even if a Board member engages in activity that the other nine members agree violates the Policy, the damage *cannot* and *will not* be undone. For all of these reasons, Policy BDA.1, as written and as applied, is unconstitutional because it excessively entangles the Board with religion.

30

**B.** **School Board Prayer Is Unconstitutional Under The Endorsement Test Originally Proposed In *Lynch.***

School Board Prayer is unconstitutional because a "reasonable observer" would conclude that the Policy endorses religion over non-religion and Christianity over other religions. *Lynch*, 465 U.S. at 688 (O'Connor, J., concurring). A reasonable observer is deemed to be aware of the context and history of the community and to possess a greater than average amount of information. *See Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 176 (3d Cir. 2002) (citations omitted).

A reasonable observer would conclude that School Board Prayer endorses religion over non-religion and Christianity over other religions. The Policy's title "Board Prayer at Regular Board Meetings" indicates that prayer is the preferred mechanism of solemnizing Board meetings, despite the Policy's clause permitting moments of silence. *See Santa Fe*, 530 U.S. at 297-99. Policy BDA.1 contemplates only prayers or moments of silence to solemnify meetings – it does not refer to ceremonial solemnifications like the national anthem. By determining that only religious offerings would be sufficient to solemnify a meeting, the Board has endorsed the superiority of religion over non-religion.

As demonstrated by the video of the August 24, 2004 Board meeting, news reports and letters to the editor, a reasonable observer would perceive the Policy and the Board's prayer practice as an endorsement of Christian prayer. *Kitzmiller*, 400 F. Supp. 2d at 730-31. Indeed, the public clearly has perceived it as such. Speaker after speaker at the August 24, 2004 Board meeting stressed the need for the District and Board to continue offering *Christian* prayers at District events. (Ex. 55) When speaking with local media, or in letters to the newspaper, members of the public revealed a clearly perceived link between the Board's prayer practice and the promotion of (clearly unconstitutional) Christian prayer in school. The

31

public's expressed perception demonstrates that a reasonable observer, aware of the history of Board prayer leading up to the adoption of Policy BDA.1, would perceive that policy as an endorsement of religion and Christianity. There is little doubt that the Policy was meant to preserve Christian prayer; it was created in response to complaints about Christian prayer at graduations and Board meetings, and its origins and the continual string of Christian prayers offered after it was adopted clearly illustrate that "religion or a particular religious belief is favored or preferred." *See County of Allegheny v. ACLU*, 492 U.S. 573, 593 (1989); *Santa Fe*, 530 U.S. at 309-10.

Board members now claim that the public's explicitly stated perception that the Policy and the Board's prayer practice were intended to support Christian prayer and Christian values was misinformed. But those after-the-fact statements do not change this analysis. The Board concededly made no contemporaneous effort to correct what is now claimed to have been the public's misperception. Moreover, as Board member Wilson's testimony that the Board "want[s] the public to take part in the prayer" shows, the public *correctly* perceived that the Board intended for Policy BDA.1 to endorse religion.

Policy BDA.1 promotes the political divisions based on religion that the First Amendment was drafted to prevent. *Lemon*, 403 U.S. at 622. The public's reaction to the adoption of Policy BDA.1 has shown a division on the basis of religion in the District that has grown since the Board adopted Policy BDA.1. Numerous Board members testified that Board prayer has been a significant political issue in Board elections. Board members have exacerbated this politically charged atmosphere by repeatedly (and falsely) characterizing this litigation as being driven by the ACLU.

By offering District-sponsored Christian prayers at Board meetings, the District sends a message to community members that non-Christians are "outsiders, not full members of the political community." *Lynch,* 465 U.S. at 688 (O'Connor, J., concurring); *Santa Fe,* 530 U.S. at 309-10. Conversely, the response by the Board and the District to complaints about prayer has communicated a "message to [supporters of School Board Prayer] that they are insiders, favored members of the political community." *Lynch,* 465 U.S. at 488 (O'Connor, J., concurring). Some community members have even characterized the defense of this litigation as a defense of "Christian values." By endorsing religion, the Board has essentially rendered religion a political issue. Therefore, Policy BDA.1 is unconstitutional.

**C.     School Board Prayer Is Unconstitutional Under The Coercion Test.**

"It is a tenet of the First Amendment that the State cannot require one of its citizens to forfeit his or her rights and benefits as the price of resisting conformance to state-sponsored religious practice." *Lee,* 505 U.S. at 596. In *Lee,* the Supreme Court struck down a school's policy of opening high school graduations with prayer, even though attendance at the graduation was voluntary. *Id.* at 599. The Court noted that although students attended graduation voluntarily, the intangible benefits that came from years of academic achievement and motivation were not readily dismissed. *Id.* at 595 (argument that the option of not attending a voluntary school event excuses coercion "lacks all persuasion"); *see also Abington,* 374 U.S. at 288 (Brennan, J., concurring) ("availability of excusal or exemption [of public school students] simply has no relevance to the establishment [clause] question"). Student attendance at the Board's meetings is analogous to the facts found in *Lee.*

Students and residents of the District have a right to attend Board meetings. Taxpayers may wish to attend as part of a civic obligation or to help them assess the Board's expenditures. Students face a real coercive pressure to attend regular meetings. As noted

above, the District's 30(b)(6) witness on student attendance at Board meetings did not know of *a single instance* where a student declined an invitation to attend a regular meeting that did not involve a scheduling conflict – an implausible result if attendance were truly voluntary. Pressure to attend may come from multiple sources. For some, like students in the JROTC color guard, attendance at the meeting and during the prayer is, in effect, compulsory. Students are invited to attend meetings by their principals, lending substantial gravity to an invitation to a Board meeting. Peer pressure from other award recipients – often fellow team members – may play a role, because individuals may not want to be singled out for their refusal to appear before the Board, or undermine their group's performance. Lastly, the desire to be acknowledged and honored by the Board and the community it is charged to represent is a powerful incentive for schoolchildren to attend. All of these forces would drive students to attend a Board meeting, requiring them to forfeit their right to be free from state-sponsored religious practice. *Lee*, 505 U.S. at 596. Therefore, Policy BDA.1, as written and as applied, is unconstitutional for coercing students to participate in School Board Prayer.

## IV.    THE PRACTICE OF SCHOOL BOARD PRAYER DOES NOT FALL WITHIN THE NARROW EXCEPTION OF *MARSH*.

The Supreme Court's decision in *Marsh* stands as a narrow exception to the mainstream of Establishment Clause jurisprudence. *See Marsh*, 463 U.S. at 796 (Brennan, J., dissenting); *Edwards*, 482 U.S. at 583 n.4; *Doe v. Tangipahoa Parish Sch. Bd.*, 473 F.3d 188, 199 (5th Cir. 2006), *rev'd on other grounds*, 494 F.3d 494 (5th Cir. 2007); *Wynne*, 376 F.3d at 302 (noting "that, in the more than twenty years since *Marsh*, the [Supreme] Court has never found its analysis applicable to any other circumstances"); *Mellen*, 327 F.3d at 369; *Coles*, 171 F.3d at 377. For its practice of prayer to survive under *Marsh*, the Board must show that School Board Prayer satisfies all of the following four factors:

34

(i)     The recipients of the prayer must be "adult[s] . . . not readily susceptible to 'religious indoctrination' or peer pressure." *Marsh*, 463 U.S. at 792; *see also Coles*, 171 F.3d at 382 (holding that school boards are not equivalent to legislatures where students are directly involved in the discussion and debate at school board meetings);

(ii)    The prayers must open "sessions of legislative and other deliberative public bodies." *Marsh*, 463 U.S. at 786; *see also Lee*, 505 U.S. at 597 ("Inherent differences between the public school system and a session of a state legislature distinguish this case from *Marsh*.");

(iii)   The deliberative public body must have a "unique history" of school board prayer. *Marsh*, 463 U.S. at 791; *see also Mellen*, 327 F.3d at 370 ("Put simply, the supper prayer does not share *Marsh*'s 'unique history.'"); and

(iv)    There must be "no indication that the prayer opportunity has been exploited to proselytize or advance any one, or to disparage any other, faith or belief." *Marsh*, 463 U.S. at 794-95; *see also Wynne v. Town of Great Falls*, 376 F.2d at 298 ("But *Marsh* and *Allegheny* also teach that a legislative body cannot, consistent with the Establishment Clause, 'exploit' this prayer opportunity to 'affiliate' the Government with one specific faith or belief in preference to others."); *Bacus v. Palo Verde Unified Sch. Dist. Bd. of Educ.*, 52 Fed. Appx. 355, 357 (9th Cir. Dec. 3, 2002) (holding that school board prayers violated *Marsh* where those prayers "advanced one faith, Christianity, providing it with a special endorsed and privileged status in the school board").

If any one of these factors is not satisfied, *Marsh*'s narrow exception does not apply. *Cf.*

*Mellen*, 327 F.3d at 370 (absence of "unique history" prevented application of *Marsh*). The

undisputed material facts show that Policy BDA.1 and the Board's prayer practice satisfy *none*

of the four factors.

**A.     Defendants Cannot Carry Their Burden To Establish *Marsh* As The Guiding Precedent In This Case.**

*Marsh*'s holding serves as an affirmative defense for Defendants because *Marsh* does

not controvert the elements of a valid Establishment Clause claim, but substitutes a new

framework of analysis. *See Kennan v. Dow Chem. Co.*, 717 F. Supp. 799, 808 (M.D. Fla.

1989). Consequently, Defendants must bear the burden of establishing that the Board's

prayers fall within *Marsh*'s narrow holding. *See Gomez v. Toledo*, 446 U.S. 635, 640 (1980);

*Thomas v. Independence Twp.*, 463 F.3d 285, 292 (3d Cir. 2006); *see also Edwards*, 482 U.S. at 583 n.4 (*Marsh*'s approach is "not useful" in the context of public education). Thus, the Court should reject the Board's attempt to invoke *Marsh* as the guiding precedent on school board prayer. *See Lee*, 505 U.S. at 596-97; *Mellen*, 327 F.3d at 369.

**B.     Unlike In *Marsh*, Children Are An Active And Requested Part Of School Board Meetings And Are Inextricably Involved In The School Board's Prayers.**

*Marsh* does not apply because schoolchildren are the recipients of the Board's prayers. In upholding the legislative prayer in *Marsh*, the Supreme Court stated that "the individual claiming injury by the practice [of legislative prayer] is an adult, presumably not readily susceptible to 'religious indoctrination' or peer pressure." *Marsh*, 463 U.S. at 792. The record here, where two of the Plaintiffs are children, who, like hundreds of their peers, attended Board meetings, creates a starkly different picture. Not only have children been regular participants at Board meetings, but they are, as the Sixth Circuit stated, the very constituency that justifies a school board's existence. *See Coles*, 171 F.3d at 381.

The Board's desire to have children participate in the prayer is evident from the scope of Policy BDA.1's application. Policy BDA.1 applies only to the Board's public meetings, to which children are invited by the superintendent or school principals, and which children routinely attend. Policy BDA.1 does not apply to the Board's special meetings or executive sessions, neither of which children regularly attend.

There is no question that District students are the recipients of Board prayer just as they would be in the context of other school events, such as football games or graduations. *See Santa Fe*, 530 U.S. 290; *Lee*, 505 U.S. 577. In both *Santa Fe* and *Lee*, the Supreme Court held that *Marsh* did not apply to the prayer practices at issue and held them unconstitutional. Indeed, one important difference between a legislative body and a school function is that

36

"[l]egislators may presumably absent themselves from such public and ceremonial exercises without incurring any penalty, direct or indirect." *Black Horse Pike*, 84 F.3d at 1480 (quotation omitted).

The Board's disclaimer does not change the above analysis; the government cannot sponsor or endorse a religious observance by disclaiming any responsibility for the religious content. *See Black Horse Pike*, 84 F.3d at 1482; *see also Lassonde v. Pleasanton Unified Sch. Dist.*, 320 F.3d 979, 984-85 (9th Cir. 2003). In *Black Horse Pike*, the defendant school district called for a student vote to determine whether a prayer would be offered at graduation, while also announcing its intent to disclaim any religious content in the graduation program. *Black Horse Pike*, 84 F.3d at 1475. The Third Circuit nonetheless struck down the policy. *Id.* at 1477-78. If anything, the Board's disclaimer is even less effective than the disclaimer in *Black Horse Pike*. In that case, the school district had no role in the composition of any prayer. Here, the Board members not only unanimously voted to continue having prayers at regular meetings, but have composed and delivered those prayers. If a disclaimer were sufficient, "government would be free and able to sponsor religious messages simply by declaring that those who share in the beliefs that it is espousing are the message's only intended recipients." *Kitzmiller*, 400 F. Supp. 2d at 729. Thus, the Board's attempt to separate the students in attendance from its prayers is futile.

### C. The School Board Is Not A Legislative Body As That Phrase Was Used In *Marsh*.

Courts have repeatedly held that the historical approach used in *Marsh* is inapplicable to public schools or public school boards because public education was "virtually nonexistent at the time the Constitution was adopted." *Edwards*, 482 U.S. at 583 n.4; *see also Lee*, 505 U.S. at 597; *Jager v. Douglas County Sch. Dist.*, 862 F.2d 824, 828-29 (11th Cir. 1989);

*Blackwelder v. Safnauer*, 689 F. Supp. 106, 142 n.38 (N.D.N.Y. 1988); *cf. Mellen*, 327 F.3d at

370; *Coles*, 171 F.3d at 382. In any case, the Board bears little resemblance to the state

legislature in *Marsh.* Large portions of its regular meetings are devoted to the presentation of

awards to students. These awards are within the scope of regular school activities and have

nothing to do with any purported legislative function. *Lee*, 505 U.S. at 597 ("Inherent

differences between the public school system and a session of a state legislature distinguish

this case from *Marsh*.") The Board also performs numerous other non-legislative duties:

managing schools, enforcing District policies, reviewing recommended disciplinary acts

toward students, and performing ceremonial functions like rewarding students and teachers.

The consistent presence and participation of students at Board meetings is

fundamentally different than the incidental presence of students at legislative sessions.

Regular meetings provide "students with an incentive to attend the meetings that is lacking in

other settings . . . [and meetings] are the arena in which all issues directly relevant to students

are discussed and decided." *Coles*, 171 F.3d at 382. The Board "meetings are conducted on

school property by school officials, and are attended by students who actively and regularly

participate in the discussions of school-related matters." *Id.* at 381. The Board, therefore, "is

an integral part of the public school system . . . [and] its practice of opening its meetings with

a prayer does not fit within the rubric of *Marsh*." *Id.* at 383.

### D.    School Board Meetings In Their Current Format Have No "Unique History" Of Prayer.

*Marsh* upheld the practice of non-sectarian prayer where that prayer was rooted in an

"unambiguous and unbroken history" of prayer in the Nebraska legislative sessions extending

back over a century. 463 U.S. at 790, 792; *Coles*, 171 F.3d at 381. The Board and the District

have no such history associated with their current prayer practice; the current format of

regular meetings, with students routinely involved, began at most fourteen years ago. The Board's prior history of prayer was associated with regular meetings that were originally attended only by adults. Since 1994, however, the Board has expanded meetings to include student awards, student government, and JROTC participation in Board meetings. Thus, to the extent the Board has any tradition of prayer before children at regular meetings, the Board's "tradition" is fourteen years old at most, far shorter than the two centuries of "unique history" cited in *Marsh*.

### E.     The Overwhelming Majority Of Regular Meetings Open With Prayers That Advance One Religious Viewpoint – Christianity.

The Board has overwhelmingly advanced Christianity through its practice of sectarian prayer. Courts have consistently rejected legislative or government-sponsored prayers that advance or consistently favor one particular faith or belief system. *See Tangipahoa*, 473 F.3d at 204; *Hinrichs v. Bosma*, 440 F.3d 393, 399-402 (7th Cir. 2006), *rev'd on other grounds sub nom. Hinrichs v. Speaker of the House of Representatives*, 506 F.3d 584 (7th Cir. 2007); *Wynne*, 376 F.3d at 298-99; *Bacus*, 52 Fed. Appx. at 356-57; *cf. Allegheny*, 492 U.S. at 603. In *Marsh*, sectarian prayer was not an issue before the Supreme Court because the legislature removed all references to Christ after receiving a complaint. *Marsh*, 463 U.S. at 783 n.14. In contrast, Board members in this case intend to keep praying to Christ. The undisputed record also reflects that the only religious figures mentioned in Board prayers are Jesus or God. Thus, even if the Board were a legislative body, *Marsh* would still not permit the Board's practice of Christian prayer. *Marsh*, 463 U.S. at 794-95; *see Lee*, 505 U.S. at 642; *Tangipahoa*, 473 F.3d at 204; *Bacus*, 52 Fed. Appx. at 357.

## CONCLUSION

Policy BDA.1 and the Board's practice of opening its meetings with prayer are unconstitutional under any First Amendment analysis. The Supreme Court has rightly required school boards to refrain from prescribing orthodoxy in religion through *any* means, and this case does not warrant a departure from that precedent. The Policy lacks a clear secular purpose, has the primary effect of advancing religion, and creates excessive entanglement by requiring Board members to make fundamentally religious decisions. The Board's public stance on Board prayer is interpreted by reasonable observers of the community as an endorsement of Christianity and "Christian values." The Board's prayers coerce attendees, including children, into participating in governmentally-endorsed religious activities. No Establishment Clause analysis – not even *Marsh*, which is inapplicable here – permits the promotion of Christianity in public schools by public school officials. Plaintiffs respectfully submit that this Court should find that the Board's policy and practice of prayer violates Plaintiffs' rights guaranteed by the First Amendment of the United States Constitution.

<table>
<tr>
<td>

Richard S. Horvath, Jr. (I.D. No. 4558)
Four Embarcadero Center
Suite 3800
San Francisco, California 94111-5974
(415) 984-6400

</td>
<td>

/s/ Thomas J. Allingham II
Thomas J. Allingham II (I.D. No. 476)
tallingh@probonolaw.com
Robert S. Saunders (I.D. No. 3027)
Brian G. Lenhard (I.D. No. 4569)
Timothy S. Kearns (I.D. No. 4878)
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899-0636
(302) 651-3000

*Attorneys for Plaintiffs*

</td>
</tr>
</table>

DATED: April 10, 2008