# TAB 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MONA DOBRICH, et al., | : |
| Plaintiffs, | : |
| v. | : CIVIL ACTION NO. 05-120-JJF |
| INDIAN RIVER SCHOOL DISTRICT, et al., | : |
| Defendants. | : |

### DECLARATION OF CHARLES H. MITCHELL

I, CHARLES H. MITCHELL, pursuant to 28 U.S.C.A. § 1746, declare under penalty of perjury that the foregoing is true and correct:

1.    I am over eighteen (18) years of age, suffer from no disability, and I am competent to testify to the matters set forth herein.

2.    I currently live in Millsboro, Delaware 19966.

3.    I was a member of the Millsboro School Board beginning in 1966 and continuing until 1969.

4.    In 1969, there was a consolidation of five school districts, including the Millsboro School District. These consolidated districts became known as the Indian River School District.

5.    In 1969, following the consolidation, I became a member of the Indian River School Board ("IRSB").

6.    I served on the IRSB from the consolidation in 1969 until 1986. During this period, my roles included serving as Second Vice President and President.

1

7.     In 1986, I became a member of the Sussex Technical School Board. I still serve on that board in the role of Vice President.

8.     In my experience on each of these school boards, for over the last forty years, it has always been customary to open board meetings with a prayer.

9.     In particular, while I served as a member of the IRSB, the Board began each meeting with the Pledge of Allegiance followed by a prayer.

10.     The President designated one person at each meeting to deliver the prayer.

11.     There were no specific restrictions relating to the prayer or what the speaker could say.

12.     In general, the prayers were short. For the most part, the prayer usually centered on one of the following topics: guidance in our decision-making, for the sick to be taken care of, or thanking the administration and staff for their hard work.

13.     I do not recall any time during the last forty years when the school board on which I served did not open the meeting with a prayer.

Executed: March _25_, 2008.


Charles H. Mitchell

2.

TAB  2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

MONA DOBRICH and MARCO DOBRICH,   )
individually and as parents and next friend of   )
ALEXANDER DOBRICH, JANE DOE and JOHN )
DOE, individually and as parents and next friend of )   C.A. No.  05-120 JJF
JORDAN DOE and JAMIE DOE,   )
   )
       Plaintiffs,   )   TRIAL BY JURY OF TWELVE
   )   DEMANDED
   v.   )
   )
HARVEY L. WALLS, MARK A. ISAACS, JOHN )
M. EVANS, RICHARD H. COHEE, GREGORY )
A. HASTINGS, NINA LOU BUNTING,   )
CHARLES M. BIRELEY, DONALD G.   )
HATTIER, REGINALD L. HELMS, M. ELAINE )
McCABE, individually and as members of the )
Indian River School Board, LOIS M. HOBBS, )
individually and as District Superintendent, EARL )
J. SAVAGE, individually and as Assistant District )
Superintendent, THE INDIAN RIVER SCHOOL )
BOARD and THE INDIAN RIVER SCHOOL )
DISTRICT,   )
   )
       Defendants.   )

### RULE 26(a)(1) DISCLOSURE OF DEFENDANTS HARVEY L. WALLS, MARK A. ISAACS, JOHN M. EVANS, RICHARD H. COHEE, GREGORY A. HASTINGS, NINA LOU BUNTING, CHARLES M. BIRELEY, DONALD G. HATTIER, M. ELAINE MCCABE, LOIS M. HOBBS, AND EARL J. SAVAGE,  AND THE INDIAN RIVER SCHOOL BOARD AND INDIAN RIVER SCHOOL DISTRICT

Defendants Indian River School Board, the Indian River School District and Harvey L.

Walls, Mark A. Isaacs, John M. Evans, Richard H. Cohee, Gregory A. Hastings, Nina Lou

Bunting, Charles M. Bireley, Donald G. Hattier, M. Elaine McCabe, Lois M. Hobbs, and Earl J.

Savage (collectively "IRSD"), by counsel, respectfully submit the following initial discovery

disclosure pursuant to Federal Rule of Civil Procedure 26(a)(1).

     A. **The name and, if known, the address and telephone number of each individual likely to have discoverable information that the disclosing party may use to**

support its claims or defenses, unless solely for impeachment, identifying the
subjects of the information.

Harvey L. Walls, School Board Member and President;
Mark A. Isaacs, School Board Member
John M. Evans, School Board Member
Richard H. Cohee, School Board Member
Gregory A. Hastings, School Board Member
Nina Lou Bunting, School Board Member
Charles M. Bireley, School Board Member
Donald G. Hattier, School Board Member
M. Elaine McCabe, School Board Member
Reginald Helms, School Board Member
Lois Hobbs, Superintendent
Earl Savage, Assistant Superintendent
Indian River Education Complex
31 Hoosier Street
RD2, Box 156
Selbyville, DE 19975
302-436-1000

Each of these individuals may have information concerning any of the issues or claims raised in
the Complaint, Answer, and/or Motions to Dismiss, including but not limited to prayer before
School Board meetings, graduations, or other school-related events, or baccalaureate ceremonies;
availability of Bibles after the end of the school day and not provided by the School District or
its employees, for students to take voluntarily if they so choose; Bible Clubs, which exist only at
two schools in the District; the school curriculum; discussion, adoption, terms, implementation
and/or distribution of School Board policies concerning Religion, School Board Prayer, and
Graduation, including training provided to administration and staff; the School District's
response to complaints concerning religion; and events occurring at School Board meetings.

Donna Hall, Principal,
Bradley Layfield, Athletic Director
Sussex Central High School
26026 Patriots Way
Georgetown, DE 19947
302-934-3166

Dr. Hall and Mr. Layfield may have information concerning graduations, speakers for which are
chosen and invited by the students, as well as baccalaureate ceremonies and sports or academic
awards programs or dinners at Sussex Central High School. They may also have information
concerning Samantha Dobrich's positive experience at Sussex Central High School, and the lack
of any issue or problem concerning religion expressed to them by Samantha or her family during
her tenure there. Dr. Hall may also have information concerning staff training on School Board
policies concerning Religion and Graduation, and the Bible Club, at Sussex Central High School.
Mr. Layfield may also have information concerning the allegations in paragraph 75 of the
Complaint.

2

Patricia Anderson
Former Cross-Country Coach, Sussex Central High School
318 South Bedford Street
Georgetown, DE  19947
302-854-9772

Ms. Anderson may have information concerning voluntary statements of thanks and gratitude
which were offered by students during pre-meet pasta dinners, including but not limited to the
allegations in paragraph 42 of the Complaint.


Jim Bunting, Football coach
Indian River High School
Clayton Avenue
Frankford, DE  19945
302-732-3800

Mr. Bunting may have information concerning the allegations in paragraphs 40-41 of the
Complaint.

Heather Rodriguez-Costa, Teacher
Nancy Chamberlin, Teacher
Joyce E. Green, Teacher
North Georgetown Elementary School
664 N. Bedford Street
Georgetown, DE  19947
302-855-2430

Jon Brittingham, Teacher
Frankford Elementary School
RR3, Box 86
Frankford, DE  19945
302-732-3808

Ms. Rodriguez-Costa, Mr. Brittingham, Ms. Chamberlin and/or Ms. Green may have information
concerning Alex Dobrich's educational and social experience at North Georgetown Elementary
School, planning for Alex's subsequent educational placement, and Mrs. Dobrich's involvement
with the school and their communications with her, including but not limited to the lack of any
factual basis for the claim, in paragraphs 96, 107 & 109 of the Complaint, that Alex was harassed
or mistreated on the basis of religion.

Jim Hudson, Principal
Belinda Waples, Assistant Principal
North Georgetown Elementary School
664 N. Bedford Street
Georgetown, DE  19947
302-855-2430

3

Mr. Hudson and/or Ms. Waples may have information concerning Alex Dobrich's educational or social experience at North Georgetown Elementary School, and Mrs. Dobrich's involvement with the school and their communications with her, including but not limited to the lack of any factual basis for the claim, in paragraphs 96, 107 & 109 of the Complaint, that Alex was harassed or mistreated on the basis of religion. They may also have information concerning the availability of Bibles after the end of the school day and not provided by the School District or its employees, for students to take voluntarily if they so choose. They may also have information concerning staff training at North Georgetown Elementary on School Board policies concerning Religion and Graduation.

Patricia Riffle, Counselor
Georgetown Elementary School
301-A West Market Street
Georgetown, DE 19947
302-856-1940

Cathy Showell, Counselor
North Georgetown Elementary School
664 N. Bedford Street
Georgetown, DE 19947
302-855-2430

Ms. Riffle and/or Ms. Showell may have information concerning Alex Dobrich's educational and social experience at North Georgetown Elementary School, including but not limited to the lack of any factual basis for the claim, in paragraphs 96, 107 & 109 of the Complaint, that Alex Dobrich was harassed or mistreated on the basis of religion.

Michael Kline, Principal
Cheryl Truitt, Teacher
Brett Buchler, Teacher
Dee Butler, Secretary
Selbyville Middle School
80 Bethany Road
Selbyville, DE 19975
302-436-1020

Ms. Truitt, Mr. Buchler, and/or Ms. Butler may have information concerning the operation of the respective Bible Clubs at Selbyville Middle School, including but not limited to the allegations in paragraphs 32-36 of the Complaint, as well as other extracurricular clubs at the school. Ms. Truitt and/or Mr. Buchler may also have information concerning the curriculum taught in their respective classes, including but not limited to the allegations in paragraphs 48-51 of the Complaint. Ms. Truitt may also have information concerning the allegations in paragraph 45 of the Complaint concerning family dinners at Selbyville Middle School. Mr. Kline may have information concerning any or all of the foregoing, as well as staff training on School Board policies concerning Religion and Graduation at Selbyville Middle School.

4

Sharyn Hall, Teacher
Selbyville Middle School
80 Bethany Road
Selbyville, DE  19975
302-436-1020

Ms. Hall may have information concerning the formation and operation of some other
extracurricular clubs at Selbyville Middle School, including the Debate Club.


Joelle Lingenfelter, Librarian
Selbyville Middle School
80 Bethany Road
Selbyville, DE  19975
302-436-1020

Ms. Lingenfelter may have information concerning the operation of the Book Club at Selbyville
Middle School, including but not limited to the allegations in paragraph 34 of the Complaint.

**B. A copy of, or a description by category and location of, all documents, daily
compilations, and tangible things that are in the possession, custody, or control
of the party and that the disclosing party may use to support its claims or
defenses, unless solely for impeachment.**

Defendants state that the following types of documents, daily compilations, and

tangible things may eventually be used to support its defenses:

1.  School Board Policies BDA.1, IN.1, and IND, numbered D0001- D0006.

2.  Videotape of August 24, 2004 School Board meeting.

3.  Other documents numbered D0007- D0092.

4.  Documents relevant to this case may be in the possession of Plaintiffs.

5.  Documents relevant to this case may be in the possession of third parties

including but not limited to private school(s) attended by one or more Plaintiffs.

6.  Defendants reserve the right to amend or supplement this disclosure of materials

pursuant to Federal Rule of Civil Procedure 26(a)(1) as discovery proceeds, and as its

investigation continues.

**C.** **A Computation of Any Category of Damages Claimed by the Disclosing Party, Making Available for Inspection and Copying as Under Rule 34 of the Documents or Other Evidentiary Material, Not Privileged or Protected From Disclosure, on Which Such Computation is Based, Including Materials Bearing or the Nature and Extent of Injuries Suffered.**

Defendants have not asserted a claim for damages in this action.

**D.** **Insurance or Indemnification Agreements.**

This will be provided.

Respectfully submitted,

WHITE and WILLIAMS LLP

By:

John D. Balaguer (Bar I.D. 2537)
824 North Market Street, Suite 902
P.O. Box 709
Wilmington, Delaware 19899-0709
(302) 467-4501

and

John F. Cafferky, Esq.
William A. Porter, Esq.
Andrea D. Gemignani, Esq.
BLANKINGSHIP & KEITH
4020 University Drive, Suite 300
Fairfax, VA 22030

*Counsel for Defendants Harvey L. Walls, Mark A. Isaacs, John M. Evans, Richard H. Cohee, Gregory A. Hastings, Nina Lou Bunting, Charles M. Bireley, Donald G. Hattier, M. Elaine McCabe, Lois M. Hobbs, Earl J. Savage, the Indian River School Board, and the Indian River School District*

Dated: July 8, 2005

6

# TAB 3

10/09/06   17:14 FAX              DB&R PHILA.                          002

# DrinkerBiddle&Reath
L L P

Jason P. Gosselin
215-988-3371
jason.gosselin@dbr.com

*Law Offices*

One Logan Square
18TH and Cherry Streets
Philadelphia, PA
19103-6996

215-988-2700
215-988-2757 fax
www.drinkerbiddle.com

NEW YORK
WASHINGTON
LOS ANGELES
SAN FRANCISCO
CHICAGO
PRINCETON
FLORHAM PARK
BERWYN
WILMINGTON

October 9, 2006

*VIA FACSIMILE*

Thomas J. Allingham II
Skadden Arps
One Rodney Square
Box 636
Wilmington, DE  19899-0636

    **RE:**  *Dobrich v. Walls, et al.*, No. 05-120 (D. Del.)

Dear Tom:

    We have the 30(b)(6) deposition notice dated October 4, 2006.  The Indian River School District and the Indian River School Board make the following designations and assert the following objections to the specific topic areas identified in Exhibit 1 to the deposition notice:

    1.    **The Adoption of Board Prayer Policy.**  Harvey Walls.[1]

    2.    **History and Tradition of Board Prayer Since 1969.**  Charles Bireley.[2]

    3.    **History and Tradition of Board Prayer at Other School Districts.**  We object to Plaintiffs' request for a designee on this topic.  Although the Defendants do not seek to preclude the Plaintiffs from discovering information relative to the history and tradition of prayers at school board meetings of predecessor school districts, the Board and the District cannot designate a person to speak on behalf of other school districts.

    4.    **Factors Relating to Exploitation of School Prayer Opportunity.**  Charles Bireley.

    5.    **Enforcement of Board Prayer Policy.**  Charles Bireley.

    6.    **Operation and Implementation of Board Prayer Policy.**  Charles Bireley.

---

[1] This designation is subject to confirmation from Mr. Walls, which I expect to have by Wednesday. If Mr. Walls, who is a former Board member, does not consent to testify on behalf of the District and the Board, we will make another designation.

[2] As I mentioned in our telephone conversation today, Mr. Bireley has been a board member since 1974 and has the greatest historical knowledge of the Board's tradition of beginning its meetings with prayer. To the extent that Mr. Bireley is unable to answer certain questions based on his personal knowledge, but the information is available in historical Board records, it may be necessary to designate another individual. We can address the need for a subsequent designee after the deposition of Mr. Bireley.

*Established*
*1849*

PHILIT\5756700\1

Drinker Biddle & Reath

Tom Allingham
October 9, 2006
Page 2

7.    **Steps to Avoid Compulsory Participation in Prayer/Moment of Silence.**  Charles Bireley.

8.    **The Affirmative Defense That Board Acted as Legislative Body.**  We object to Plaintiffs' request for a designee on this topic, inasmuch as it seeks the designation of an individual to address a legal argument.

9.    **Policy and Procedures for Preserving Documents.**  Janet Hearn.

10.   **Actions in Response to Your Correspondence.**  We object to this request because it essentially seeks to explore communications protected by the attorney-client privilege.  However, we do not object to questions regarding the preservation of documents and/or audio and visual recordings directed to Mrs. Hearn relative to topic no. 9.

11.   **Attendance of Students at School Board Meetings.**  Charles Bireley.

12.   **Process for Preparing, Drafting and Adopting School Board Minutes.**  Janet Hearn.

13.   **The Installation, Operation of Audio Visual Equipment.**  Janet Hearn.

Per our discussion of last week, there will not be a separate "designee" deposition. Instead, the topics addressed above will be covered at the time of the previously scheduled depositions of these individuals.  If you have any questions, please feel free to give me a call.

Sincerely yours,

Jason P. Gosselin

JPG

PHLIT/576700.1

# TAB  4

1

```
 1        IN THE UNITED STATES DISTRICT COURT
 2        IN AND FOR THE DISTRICT OF DELAWARE
 3
 4   MONA DOBRICH and MARCO DOBRICH, individually and
     As parents and next friend of ALEXANDER DOBRICH,
 5   SAMANTHA DOBRICH, JANE DOE and JOHN DOE,
     individually and as parents and next friend of
 6   JORDAN DOE and JAMIE DOE,
 7              Plaintiffs
          vs.        CIVIL ACTION
 8                   NO. 15-120
 9   INDIAN RIVER SCHOOL DISTRICT, ET AL.,
10
               Defendants
11
     ───────────────────────────────────
12
13
          DEPOSITION OF CHARLES M. BIRELEY, taken
14   pursuant to notice at the Indian River School
     District, 31 Hosier Street, Selbyville, Delaware,
15   beginning at 9:15 a.m. on October 11, 2006 before
     David A. Sroka, Registered Professional Reporter and
16   Notary Public.
17
     APPEARANCES:
18
          THOMAS ALLINGHAM, ESQUIRE
19        RICHARD HORVATH, ESQUIRE
          BRIAN LENHARD, ESQUIRE
20        P.O. Box 636
          Wilmington, Delaware  19899-0636
21        For the Plaintiffs
22
          WILCOX & FETZER
23        1330 King Street - Wilmington, DE  19801
               (302) 655-0477
24        www.wilfet.com
```

51

1    ones that won.  They weren't very old I'm not

2    exactly sure how old they were.

3    Q.   Middle school kids?

4    A.   No, younger than middle school.  Well, see

5    I am confused, the one that one it was mainly

6    students from this builder here the school of the

7    arts, and it does go to the eighth grade.  So, they

8    could be.

9    Q.   When a student receives an award is his or

10   her picture taken with you or whoever the Board

11   president is at the time?

12   A.   Yes.

13   Q.   And is that picture then sent home to the

14   student with a letter of congratulations from the

15   Board?

16   A.   I'm not sure about that.

17   Q.   One of the topics on which you have been

18   designated as the District's representative for

19   under this 30(b)(6) designation is the history of

20   the Board's practice of opening its meetings with a

21   prayer, so I want to ask some questions about that

22   now?

23   A.   Okay.

24   Q.   When did the School Board first begin to

# TAB  5

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

MONA DOBRICH and MARCO                    :
DOBRICH, individually and as parents      :
and next friend of ALEXANDER              :
DOBRICH, SAMANTHA DOBRICH,                :
JANE DOE and JOHN                         :
DOE, individually and as parents and      :
next friend of JORDAN DOE and            :
JAMIE DOE,                                :
                                          :
    Plaintiffs,                         :
                                          :
    v.                                  :    Civ. Action No. 05-cv-00120-JJF
                                          :
THE INDIAN RIVER SCHOOL BOARD, et al.,    :
                                          :
    Defendants.                         :

---

## DEFENDANTS' OPENING BRIEF IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

---

April 10, 2008

Warren Pratt (Del. Bar No. 4334)
DRINKER BIDDLE & REATH LLP
1100 N. Market Street
Suite 1000
Wilmington, DE 19801
Telephone:  (302) 467-4200
Facsimile:  (302) 467-4201

Jason P. Gosselin
Katherine L. Villanueva
Elizabeth L. McLachlan
DRINKER BIDDLE & REATH LLP
One Logan Square
18th & Cherry Streets
Philadelphia, PA 19103-6996
(215) 988-2700

## TABLE OF CONTENTS

                                                                                    **Page**

I.    INTRODUCTION ........................................................................................... 1

II.   STATEMENT OF THE PROCEEDINGS ..................................................... 3

III.  STATEMENT OF FACTS ............................................................................ 4

      A.    The Indian River School Board As Legislative Body ....................... 4

            1.    Indian River School District ..................................................... 4

            2.    Indian River School Board........................................................ 4

                  a.    Popular Election of Board Members............................... 4

                  b.    Structure and Operations of Board ............................... 5

                  c.    Setting Policy for District ............................................. 6

                  d.    Power to Levy Taxes and Authorize Expenditures......... 7

                  e.    Elected and Representative Body .................................. 8

      B.    Board Prayer Practice and Policy .................................................... 8

            1.    Practice Prior to Adoption of Current Policy............................ 8

            2.    Adoption of Board Prayer Policy............................................... 9

                  a.    Context of Board Prayer ............................................... 10

                  b.    Non-Compulsory Nature of Prayer ............................... 11

                  c.    Content of Prayers........................................................ 12

                  d.    Purpose of Prayers ....................................................... 13

IV.   LEGAL STANDARD.................................................................................... 14

V.    SUMMARY OF ARGUMENT ..................................................................... 15

VI.   ARGUMENT ................................................................................................. 16

      A.    Under *Marsh v. Chambers*, the Board Prayer Policy Is Constitutional ............... 16

            1.    *Marsh v. Chambers* Is Controlling............................................. 16

                  a.    This Court Has Already Held that the Board Prayer Here
                        Constitutes Legislative Prayer Under *Marsh*................................ 16

            2.    Under *Marsh v. Chambers*, the Board Prayer Policy Is
                  Constitutional Because the Board Constitutes a Legislative or
                  Other Deliberative Body ......................................................... 18

            3.    Plaintiffs' Challenges to the Board Prayer Policy ...................... 22

                  a.    Sectarian Prayer Is Not Prohibited........................................ 22

                        (1)    Content Alone Is Largely Immaterial to
                               Constitutionality of Legislative Prayer ........................... 23

### TABLE OF CONTENTS
#### (continued)

|  |  |  | Page |
|---|---|---|---|
| (2) | Relevant Inquiry Is Whether Prayer Opportunity Is Being Exploited To Proselytize | | 24 |
| b. | The Presence of Students at Board Meetings Is Immaterial | | 29 |
| B. | Even If the Board Prayer Policy Does Not Constitute Legislative Prayer, the Board Prayer Policy Is Constitutional Under *Lemon v. Kurtzman* | | 31 |
| 1. | The Board Prayer Policy Has a Secular Purpose | | 32 |
| 2. | The Primary Effect of the Board Prayer Policy Is Not To Advance Religion | | 34 |
| 3. | The Board Prayer Policy Does Not Create Excessive Entanglement Between Government and Religion | | 36 |
| VII. | CONCLUSION | | 38 |

# TABLE OF AUTHORITIES

## CASES

*Agostini v. Felton,*
    521 U.S. 203 (1997).................................................................34

*Am. Family Ass'n v. City & County of San Francisco,*
    277 F.3d 1114 (9th Cir. 2002) ................................................33

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986).........................................................14, 15

*Arizona v. California,*
    460 U.S. 605 (1983).................................................................18

*Bacus v. Polo Verde Unified Sch. Dist. Bd. of Educ.,*
    52 F. Appx. 335 (9th Cir. 2002) .......................................19, 23

*Bogen v. Doty,*
    598 F.2d 1110 (8th Cir. 1979) ................................................30

*Books v. Elkhart County,*
    401 F.3d 857 (7th Cir. 2005) ..................................................32

*Bowen v. Kendrick,*
    487 U.S. 589 (1988) (emphasis added)...................................33

*Casey v. Planned Parenthood,*
    14 F.3d 848 (3d Cir. 1994).....................................................18

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986).................................................................14

*Chadhuri v. Tennessee,*
    130 F.3d 232 (6th Cir. 1997) ............................................31, 32

*Coles v. Cleveland Bd. of Educ.,*
    171 F.3d 369 (6th Cir. 1999) ..................................................19

*County of Allegheny v. ACLU,*
    492 U.S. 573 (1989).................................................................32

*Dobrich v. Walls,*
    380 F. Supp. 2d 366 (D. Del. 2005)................................3, 18, 21

## TABLE OF AUTHORITIES
(continued)

                                                                                Page

*Doe v. Tangipahoa Parish Sch. Bd.,*
    473 F.3d 188 (5th Cir. 2006) ........................................................................19, 23

*Fagan v. City of Vineland,*
    22 F.3d 1283 (3d Cir. 1994).......................................................................17

*Ferrara & Hantman v. Alvarez (In re Engel),*
    124  F.3d 567 (3d Cir. 1997)................................................................. 17-18

*Fireman's Ins. Co. v. Du Fresne,*
    676 F.2d 965 (3d Cir. 1982)............................................................14

*Habecker v. Town of Estes Park,*
    No. 05-cv-00153, 2006 U.S. Dist. LEXIS 68811 (D. Colo. Sep. 25, 2006).................19

*Hinrichs v. Bosma,*
    440 F.3d 393 (7th Cir. 2006) .................................................................23

*Lemon v. Kurtzman,*
    403 U.S. 602 (1971)................................................................2, 30

*Lynch v. Donnelly,*
    465 U.S. 668 (1984)................................................................31, 32

*Marchi v. Bd. of Cooperative Educ. Serv. of Albany,*
    173 F.3d 469 (2d Cir. 1999)......................................................33

*Marsh v. Chambers,*
    463 U.S. 783 (1983)............................................1, 15, 16, 17, 22, 24

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
    475 U.S. 574 (1986)................................................................14

*McCreary County v. ACLU,*
    545 U.S. 844 (2005).....................................................................17

*McHugh v. Bd. of Educ.,*
    100 F. Supp. 2d 231 (D. Del. 2000)..........................................21

*Pelphrey v. Cobb County,*
    448 F. Supp. 2d 1357 (N.D. Ga. 2006) ...................................19, 24

*Rosenberger v. Rector & Visitors of the University of Va.,*

## TABLE OF AUTHORITIES
### (continued)

|  | Page |
|---|---|
| 515 U.S. 819 (1995) | 35 |
| *Simpson v. Chesterfield County Bd. of Supervisors,*<br>404 F.3d 276 (4th Cir.) | 19, 20, 23 |
| *Snyder v. Murray City Corp.,*<br>159 F.3d 1227 (10th Cir. 1998) | 19, 20, 24 |
| *Tenafly Eruv Ass'n v. Borough of Tenafly,*<br>309 F.3d 144 (3d Cir. 2002) | 32 |
| *Van Orden v. Perry,*<br>545 U.S. 677 (2005) | 17 |
| *Wynne v. Town of Great Falls, S.C.,*<br>376 F.3d 292 (4th Cir. 2004) | 23 |
| *Zorach v. Clauson,*<br>343 U.S. 306 (1952) | 1 |

### CONSTITUTIONAL PROVISIONS, STATUTES, AND RULES

| | Page |
|---|---|
| Del. Const. art. XIV, 31 | 5 |
| 42 U.S.C. § 1983 | 21 |
| Del. Code Ann. tit. 14, § 1043 | 6, 20 |
| Del. Code Ann. tit. 14, § 1048 | 5, 6, 20 |
| Del. Code Ann. tit. 14, § 1049 | 20 |
| Del. Code Ann. tit. 14, § 1053 | 5, 19 |
| Del. Code Ann. tit. 14, § 1055 | 7 |
| Del. Code Ann. tit. 14, § 1056 | 20 |
| Del. Code Ann. tit. 14, § 1068 | 4, 5, 19 |
| Del. Code Ann. tit. 14, § 1701 | 7 |
| Del. Code Ann. tit. 14, § 1702 | 7, 21 |

## TABLE OF AUTHORITIES
### (continued)

Page

Del. Code Ann. tit. 14, § 1902 ...............................................................7, 20

Del. Code Ann. tit. 14, § 1916 ...................................................................7

Fed. R. Civ. P. 56(c) .............................................................................14

## OTHER AUTHORITIES

108 Cong. Rec. H1328-29 (daily ed. Mar. 23, 2004) ........................................26

108 Cong. Rec. H4767 (daily ed. June 23, 2004) ...........................................26

109 Cong. Rec. H1899 (daily ed. Apr. 13, 2005) ...........................................27

Indian River School Board, http://www.irsd.net/board.cfm ..................................4

I.    **INTRODUCTION**

As Justice Douglas observed nearly six decades ago, Americans "are a religious people whose institutions pre-suppose a Supreme Being." *Zorach v. Clauson*, 343 U.S. 306, 313 (1952). In that vein, our courts recognize a distinction between government activity that constitutes an establishment of religion, which is prohibited by the Constitution, and government activity that simply reflects the religious character of Americans, which is constitutionally permissible. The practice of invoking Divine guidance by those entrusted with legislative duties is definitively and firmly in the latter category. Legislative prayer -- whether by the United States Congress, a state legislature, or a democratically elected school board -- does not promote the establishment of religion generally or otherwise run afoul of the Constitution. To the contrary, prayer in this context is deeply rooted in our traditions, having "coexisted with the principles of disestablishment and religious freedom" since the founding of our nation. *See Marsh v. Chambers*, 463 U.S. 783 (1983).

In this action, Plaintiffs challenge the practice of the Indian River School Board ("Board") of opening its regular monthly meetings with a prayer or a moment of silence. The purpose of the Board's practice, which was reduced to a written policy in 2004, is to solemnize its monthly sessions and to focus the Board members on the important tasks that lay before them. The challenged policy provides that each member, on a rotating basis, may open the meeting in accordance with his or her own conscience. The policy does not dictate the manner in which a Board member must participate. Indeed, some Board members pray "in the name of Jesus," while others simply invoke Divine guidance or offer a moment of silence. Still others choose to participate by offering inspirational words from the likes of George Washington or Martin

Luther King.  While the policy permits each Board member to participate (or not participate) according to his or her own conscience, the policy also prohibits any Board member from proselytizing or disparaging the religion of another.  The Board's prayer policy, both as written and as applied, is constitutional, and this Court should grant summary judgment in Defendants' favor.

The decision in *Marsh v. Chambers*, in which the Supreme Court rejected a similar challenge to legislative prayer, is controlling here.  Indeed, this Court has already concluded that the Board's practice of opening its regular sessions with a prayer constitutes legislative activity and is within the scope of *Marsh*.  Under the law of the case doctrine, this conclusion may not be disturbed at this juncture.  Even if the Court were to consider that question anew, however, the record is clear that the Board is a legislative or other deliberative body, and that its prayer practice is part of a long tradition that is fully consistent with the First Amendment.  Although Plaintiffs will argue otherwise, the Indian River School Board has all of the characteristics of a representative, legislative body.  This case is not distinguishable in any meaningful way from *Marsh*.

Plaintiffs will likely assert that school board meetings are not a legislative body as in *Marsh*, but instead are more akin to a school classroom.  For that reason, Plaintiffs will likely urge this Court to disregard *Marsh* in favor of the test for religious establishment set forth in *Lemon v. Kurtzman*, 403 U.S. 602 (1971).  However, even if Plaintiffs could establish as a factual matter that the Board is something other than a legislative body and thus outside the reach of *Marsh*, that would not change the outcome here.  The Board's practice of opening its regular meetings with a prayer has a legitimate secular purpose of solemnizing the Board meetings.  Further, the solemnizing purpose of the prayer, which immediately follows the Presentation of

the Colors and the Pledge of Allegiance, is also the prayer's primary effect. Finally, there is no risk of excessive entanglement by the prayer policy, which is wholly voluntary and involves no use of public monies.

Whether reviewed under *Marsh* or *Lemon*, the Board Prayer Policy is constitutionally sound, and the Court should grant summary judgment in favor of Defendants.

## II.     STATEMENT OF THE PROCEEDINGS

On February 28, 2005, Mona Dobrich, Marco Dobrich, Samantha Dobrich, and Alexander Dobrich (collectively, the "Dobriches"), and John Doe, Jane Doe, Jordan Doe and Jamie Doe (collectively, the "Does") filed a complaint against the Indian River School Board ("Board"), the Indian River School District ("District"), and various District employees. In the complaint, Plaintiffs alleged a pattern and practice of unconstitutional behavior and sought damages and declaratory and injunctive relief. On August 2, 2005, this Court granted Defendants' motion to dismiss Plaintiffs' claims against Defendants in their individual capacities. *See Dobrich v. Walls*, 380 F. Supp. 2d 366 (D. Del. 2005).[1] In January 2008, the parties entered into a Settlement Agreement with respect to certain of Plaintiffs' claims. The Settlement Agreement excluded claims relating to the Board's practice of opening its monthly meetings with a prayer, and that practice is the subject of the instant motion. On March 5, 2008, the Dobriches, who no longer live within the borders of the District, voluntarily dismissed their claims relating to the Board Prayer Policy. Defendants now move for summary judgment.

---

[1] On August 5, 2005, Defendant Reginald Helms moved for summary judgment relative to the constitutionality of the Board Prayer Policy. On March 24, 2006, the Court denied that motion without prejudice, stating that "a factual record is necessary for the full and fair adjudication of the issues raised by the parties."

III.   **STATEMENT OF FACTS**

A.   **The Indian River School Board As Legislative Body**

1.   **Indian River School District**

In 1969, the Indian River School District ("District") was formed through the consolidation of five different school districts. *See* Declaration of Charles H. Mitchell at ¶4, attached hereto as Exhibit A; *see also* Deposition of Nina Lou Bunting at 99, attached hereto as Exhibit B. Currently, the District is divided into five separate electoral districts serving the towns of Selbyville, Frankford, Dagsboro, Gumboro, Fenwick Island, Bethany Beach, Ocean View, Millville, Millsboro, and Georgetown. *See* Del. Code Ann. tit. 14, § 1068(b) (2008). The District is composed of fourteen schools. *See* Declaration of Susan Bunting at ¶12, attached hereto as Exhibit C. The District has approximately 8,388 students and approximately 646 full-time teachers. *See* Exhibit C (Declaration of Susan Bunting at ¶11). The District is governed by an elected ten-member school board. *See* Del. Code Ann. tit. 14, § 1068(a).

2.   **Indian River School Board**

a.   Popular Election of Board Members

Each of the five electoral districts within the District elects two Board members.[2] *See*

---

[2] The School Board members are:

  a.   District Number 1: Dustin D. Davis; Robert D. Wilson;
  b.   District Number 2: Kelly R. Willing; Patricia S. Oliphant;
  c.   District Number 3: Nina Lou Bunting; Randall Hughes II;
  d.   District Number 4: Charles M. Bireley, President; Donald G. Hattier;
  e.   District Number 5: Reginald L. Helms, Vice President; Donna M. Mitchell.

Indian River School Board, http://www.irsd.net/board.cfm (last visited Apr. 8, 2008).

Del. Code Ann. tit. 14, § 1068(a); Deposition of Charles Bireley at 182, attached hereto as

Exhibit D.  Board members are elected by qualified electors of the five districts.  *See* Del. Code

Ann. tit. 14, § 1068(g).  Board members swear the following oath before entering upon the duties

of their office:

> I do solemnly swear (or affirm) that I will support the Constitution
> of the United States of America and the Constitution of the State of
> Delaware, and that I will faithfully discharge the duties of the
> office of school board member according to the best of my ability;
> and I do further solemnly swear (or affirm) that I have not directly
> or indirectly paid, offered or promised to pay, contributed, or
> offered or promised to contribute, any money or other valuable
> thing as consideration or reward for the giving or withholding a
> vote at the election at which I was elected to said office, so help
> me God (or so I affirm).

*See* Del. Code Ann. tit. 14, § 1053(a).[3]  Each Board member serves a term of three years.  *See id.*

§ 1068(f).

        b.   <u>Structure and Operations of Board</u>

    The Board holds regular public meetings at least once per month.  *See* Del. Code Ann. tit.

14, § 1048(a) ("Regular meetings of the school board shall be held each month during the year at

the regular meeting place designated by the school board.").  The Board also holds special

---

[3] This oath is similar to the oath sworn by members of the Delaware General Assembly and all
executive and judicial officers before entering upon the duties of their respective offices, which
oath is set forth in the Delaware Constitution as follows:

> I, . . . do proudly swear (or affirm) to carry out the responsibilities of the office of
> . . . (name of office) . . . to the best of my ability, freely acknowledging that the
> powers of this office flow from the people I am privileged to represent.  I further
> swear (or affirm) always to place the public interests above any special or
> personal interests, and to respect the right of future generations to share the rich
> historic and natural heritage of Delaware.  In doing so I will always uphold and
> defend the Constitutions of my Country and my State, so help me God.

Del. Const. art. XIV, § 1.

meetings as needed. *Id.* § 1048(b) ("Special meetings of the school board may be held whenever the duties and business of the school board may require."). The Board performs numerous functions in governing the District, including, but not limited to, adopting the curriculum for each of the schools within the District; developing District-wide policies; selecting and purchasing textbooks; preparing reports required by the State Secretary of Education; appointing and dismissing personnel for the District; approving the use of District facilities; adjudicating significant student or employee disciplinary actions; levying taxes and adopting the District's annual budget; and monitoring the progress of construction projects. *See* Exhibit D (Bireley Dep. at 9-17); Deposition of Donald Hattier at 127, 133-37, 331, attached hereto as Exhibit E. In order for the Board to transact any business at its regular monthly meetings, there must be a quorum consisting of a majority of the members on the Board. *See* Del. Code Ann. tit. 14, § 1048(c).

c.  <u>Setting Policy for District</u>

The development and adoption of District policies is one function of the Board. Typically, policies emanate from the Policy committee, which is a subcommittee of the entire Board. *See* Del. Code Ann. tit. 14, § 1043 (school boards of the reorganized school districts "shall have the authority to determine policy and adopt rules and regulations for the general administration and supervision of the free public schools"); *see also* Exhibit C (S. Bunting Dec. at ¶5). In addition to the Board members, certain District personnel and community members serve on the Policy committee. *Id.* at ¶6. The Policy committee meets separately from the full Board approximately once per month. In these meetings, the Policy committee, among other things, studies proposed policies, analyzes the need for new policies, and prepares drafts of new policies. *Id.* at ¶7. In order for a new policy to be presented to the full Board for consideration,

it must first be endorsed by the Policy committee members. The Policy committee chair then

presents the recommendations of the committee to the full Board. After a new policy is

presented for adoption, the Board will conduct a public first reading of the proposed policy. *Id.*

at ¶9. At the next regularly scheduled Board meeting, the Board will conduct a second reading

of the proposed policy. *Id.* at ¶9. After the second reading, the Board may vote to adopt the

proposed policy. *Id.* at ¶10. Approved policies are included in the Policy Manual.

d.    Power to Levy Taxes and Authorize Expenditures

The District, which acts through its elected Board, is empowered to levy and collect taxes

for school purposes. *See* Del. Code Ann. tit. 14, § 1902 (stating that "[a]ny district may, in

addition to the amounts apportioned to it by the Department of Education or appropriated to it by

the General Assembly, levy and collect additional taxes for school purposes upon the assessed

value of all taxable real estate in such district" except certain exempt real estate). The District

fixes the rate of taxation based on the total value of all taxable property as shown on the county

assessment list. *See id.* § 1916.

In addition to the money received through taxation, the District also receives

appropriations from the General Assembly. *See* Del. Code Ann. tit. 14, §§ 1701, 1702. The

appropriations are for the support, maintenance and operation of the free public schools. *See id.*

§ 1702(a). The District uses the appropriations for various purposes, including employing

personnel, school costs such as library resources, energy, and educational advancement. *See id.*,

§ 1702. The Board also has other spending powers; for example, the Board is required to spend

money for the maintenance of school property. *See* Del. Code Ann. tit. 14, § 1055 ("school

board shall make all repairs to school property, purchase all necessary furniture and provide for

adequate heating and proper ventilation of the buildings"). It also has the duty to file a district

report with the Department of Education, in which the Board is encouraged to include

information on the expenditures, revenues, and business and financial transactions of the

previous fiscal year. *See* Del. Code Ann. tit. 14, § 1050.

e.    Elected and Representative Body

As members of an elected body, Board members attempt to be responsive to the needs of

their constituents. *See, e.g.*, Exhibit B (N. Bunting Dep. at 98) ("[Constituent feedback] is

important to me because I represent these people and they elected me to make decisions at the

Board level on their behalf, and I represent my people."). As with other elected, deliberative

bodies, constituent preferences play a role in the Board's decision-making. *See* Exhibit E

(Hattier Dep. at 299) (testifying that if his constituents do not agree with his decisions, then

"come election time[,] they are free to elect someone else"). In 1994, in order to ensure greater

constituent feedback, the Board added a public comments segment to the regularly scheduled

meetings. *See* Exhibit D (Bireley Dep. at 36-37) ("[I]t was important for people in the

community to come and talk to us about things that was on their minds, concerns or anything like

that or have input.").

B.    **Board Prayer Practice and Policy**

1.    **Practice Prior to Adoption of Current Policy**

Opening school board meetings with a prayer to solemnize the proceedings is a tradition

that predates the District itself. *See* Exhibit A (C. Mitchell Dec. at ¶¶3-4, 8) (stating, for

example, Millsboro School Board opened its meetings with a prayer prior to 1969 consolidation);

Deposition of Donna Mitchell at 12, attached hereto as Exhibit F ("My grandfather was on the

school board when I was a young child in school, and they opened the meetings with prayer at

that time, and that's over 50 years ago."). Since the formation of the District, the Board has

- 8 -

opened each regular meeting with a prayer. *See* Exhibit A (C. Mitchell Dec. at ¶8). This practice has continued uninterrupted from the creation of the current district in 1969 to the present. *See id.* at ¶¶8-9; Exhibit D (Bireley Dep. at 52); *see also* Deposition of Dr. Mark Isaacs at 25, attached hereto as Exhibit G ("For as long as I was a student, even back in Sussex Central High School, board meetings were always opened with a prayer"). The usual custom was for the board president to designate one person at each meeting to lead the group. *See* Exhibit D (Bireley Dep. at 57, 59); Exhibit A (C. Mitchell Dec. at ¶10). Historically, the Board did not place any restrictions relating to the content of the prayer. *See* Exhibit D (Bireley Dep. at 57); Exhibit A (C. Mitchell Dec. at ¶11).

### 2.  **Adoption of Board Prayer Policy**

In the summer of 2004, after receiving a complaint from Plaintiff Mona Dobrich (who has since dismissed her claims regarding Board prayer), the Board reviewed its policy of opening its regular Board meetings with a prayer. On October 19, 2004, the Board formally adopted a policy entitled Board Prayer At Regular Board Meetings ("Board Prayer Policy"). *See* Exhibit D (Bireley Dep. at 96). That policy provides as follows:

> 1.      In order to solemnify its proceedings, the Board of Education may choose to open its meetings with a prayer or moment of silence, all in accord with the freedom of conscience of the individual adult Board member.
>
> 2.      On a rotating basis one individual adult Board member per meeting will be given the opportunity to offer a prayer or request a moment of silence. If the member chooses not to exercise this opportunity, the next member in rotation shall have the opportunity.
>
> 3.      Such opportunity shall not be used or exploited to proselytize, advance or convert anyone, or to derogate or otherwise disparage any particular faith or belief.

> 4.    Such prayer is voluntary, and it is among only the adult members of the Board. No school employee, student in attendance, or member of the community in attendance shall be required to participate in any such prayer or moment of silence.
>
> 5.    Any such prayers may be sectarian or non-sectarian, denominational or non-denominational, in the name of a Supreme Being, Jehovah, Jesus Christ, Buddha, Allah, or any other person or entity, all in accord with the freedom of conscience, speech and religion of the individual board member, and his or her particular religious heritage.

*See* Board Prayer Policy, attached hereto as Exhibit H.

a.    <u>Context of Board Prayer</u>

Each Board meeting usually opens with a call to order and a roll call of the Board members. *See, e.g.*, November 16, 2004 Board meeting minutes, attached hereto as Exhibit I. Next, the meeting's agenda is approved. *See id.* Following the approval of the meeting agenda is the Presentation of Colors. *See id.* After the Presentation of Colors, one Board member will offer a prayer, moment of silence, or other solemnizing appeal in accordance with the policy. *See id.* This usually takes less than a minute or two. *See, e.g.*, Audio tape: June 20, 2006 Indian River School District Board Meeting (June 20, 2006) (produced to plaintiffs as BDP 1321-1322); Exhibit C (S. Bunting Dec. at ¶13). After the Board prayer, the Board moves forward with the business at hand, beginning with the approval of the minutes from the previous Board meeting. *See, e.g.*, Exhibit I (November 16, 2004 Board meeting minutes).

It has become customary since the adoption of the current Board Prayer Policy for the board president to offer a disclaimer between the Presentation of Colors and the prayer to ensure that any members of the public in attendance understand the purpose of the prayer policy. For example, on November 16, 2004, at the first Board meeting following the adoption of the policy, the Board president made the following statement:

> It is the history and custom of this Board that, in order to solemnify the School Board proceedings, that we begin with a moment of prayer, in accord with the freedom of conscience of the individual adult members of the Board. Further, such prayer is voluntary and just among the adult members of the School Board. No school employee, student in attendance or member of the community is required to participate in any such prayer or moment of silence.

*See* Transcribed minutes of November 16, 2004 Board meeting, attached hereto as Exhibit J.

Although this disclaimer is not required by the Board Prayer Policy itself, since November 16, 2004, a disclaimer has been read in conjunction with the opening prayer at each regular Board meeting. *See* Exhibit D (Bireley Dep. at 104-05) (stating that, as board president, he has offered disclaimer at every meeting).

    b.    Non-Compulsory Nature of Prayer

Although the Board Prayer Policy provides that the prayer will be offered by Board members on a rotating basis, no Board member is forced to pray or otherwise lead the Board. *See* Deposition of Harvey L. Walls at 69, attached hereto as Exhibit K (stating that he declined to offer prayer or lead group); *see also* Exhibit D (Bireley Dep. at 154) (stating that he has always declined to offer prayer or moment of silence based on personal preference). Moreover, the Board does not require members of the public to participate in the prayer. *See* Exhibit K (Walls Dep. at 52) ("I have no expectation for the audience. . . . They can do whatever they wish"); Deposition of Lois Hobbs at 207-08, attached hereto as Exhibit L (describing the disclaimer portion of the Board Prayer policy that states, "No school employee, student in attendance, or member of the community in attendance shall be required to participate in any such prayer or moment of silence," Ms. Hobbs views such statement as allowing them to get up and leave, "just not participate," not bow their heads, or arrive after the prayer has concluded). The length of time the Board spends in the opening prayer is relatively brief in comparison to the length of the

- 11 -

Board meetings. For example, the June 20, 2006 meeting lasted more than five and a half hours, while the prayer lasted only sixty-two seconds. *See* June 20, 2006 Board meeting minutes, attached hereto as Exhibit M; Audio tape: June 20, 2006 Indian River School District School Board Meeting (June 20, 2006) (produced to plaintiffs as BDP 1321-1322); Exhibit C (S. Bunting Dec. at ¶13).

        c.    <u>Content of Prayers</u>

    With the adoption of the current policy, the Board has continued its tradition of allowing Board members to participate as they choose without dictating the content of the prayers. *See* Exhibit H (Board Prayer Policy at ¶5) ("Any such prayers may be sectarian or non-sectarian, denominational or non-denominational, in the name of a Supreme Being, Jehovah, Jesus Christ, Buddha, Allah, or any other person or entity, all in accord with the freedom of conscience, speech and religion of the individual board member, and his or her particular religious heritage."). In some instances, the prayers have referenced historical figures. For example, on November 16, 2004, Board member Dr. Donald Hattier quoted from George Washington's 1789 inaugural address:

> "Such being the impression under which I have, in obedience to the public summons, repaired to the present station, it would be peculiarly improper to omit in this first official act, my fervent supplications to that Almighty Being who rules over the universe, who presides in the councils of nations, and whose providential aids can supply every human defect, that His benediction may consecrate to the liberties and happiness of the people of the United States a Government instituted by themselves for these essential purposes, and may enable every instrument employed in its administration to execute with success the functions allotted to his charge." As we sit here tonight, fellow Board members, I must ask for the same benedictions from the Almighty as President Washington has before. Let those primary principles guide our actions for the betterment of the students, teachers and administrators and society as a whole here in the Indian River School District and [elsewhere]. We ask this in the Lord's name.

*See* Exhibit J (Transcribed minutes of November 16, 2004 Board meeting) (addition in original).

Similarly, on March 22, 2005, former Board member Harvey Walls offered the following prayer

to open the regular Board meeting:

> At this time, I'd like to lead the Board in a moment of prayer
> basically on an excerpt taken from a speech given by Dr. Martin
> Luther King that he entitled "Not So Civil Dreams." "God does
> not judge us by the separate incidences or the separate mistakes
> that we make, but by the total bent of our lives. In the final
> analysis, God knows that his children are weak and they are frail.
> In the final analysis what God requires is that your heart is right."
> As we gather here this evening, let us take these words to heart and
> put the best interests of the students, teachers, employees and
> residents of the Indian River School District ahead of our own.
> Amen.

*See* Transcribed minutes of March 22, 2005 Board meeting, attached hereto as Exhibit N.

In other instances, Board members have invoked Jesus. For example, on February 22,

2005, Board member Reginald Helms gave the opening prayer and offered the following:

"Heavenly Father, Lord our God. Heavenly Father, please help the Board with the problems in

the School District that we are going through right now. We ask these things in Jesus' Name."

*See* Amended Compl. at ¶144. In other instances, rather than offering a prayer, the Board

member elected to offer a moment of silence. *See* Deposition of Patricia Oliphant at 33, attached

hereto as Exhibit O (stating preference for offering a moment of silence rather than a prayer).

d.    Purpose of Prayers

The purpose of opening regular Board meetings with a prayer or moment of silence, as

stated in the policy itself, is to solemnize the proceedings. *See* Exhibit K (Walls Dep. at 40)

(purpose of prayer is to "impress upon the importance of a regular meeting, just to ask for

guidance in making the proper decisions"); Deposition of John Evans at 39, attached hereto as

Exhibit P (purpose of prayer is for "guidance for the body of the school board, that [they] might

- 13 -

make good decisions for [the] school district"); Exhibit D (Bireley Dep. at 151) (the purpose is to "ask for Divine guidance for the Board to help them make correct decisions and get them through the meeting in the proper way . . . to make the best decisions for what's best for our students"); Exhibit E (Hattier Dep. at 114) (solemnizing the proceedings means "the idea that we are going to think beyond ourselves, beyond what's happening today and sit down and make absolutely the best decisions we can").

In addition to seeking guidance in their decision making, Board members have occasionally prayed for individual families within the District stricken by tragedy or for others in the community. *See* Exhibit L (Hobbs Dep. at 198) (noting that if there was a death or other tragedy, "often [the person giving the prayer] would bless that, you know, they would say, you're in our thoughts, that family, who's ever gone through this tragedy is in our thoughts"); *see also* Exhibit F (D. Mitchell Dep. at 145) ("The prayer may be lifted for the school bus drivers or the teachers or the students, you know, however the person feels led to pray."). However, the prayer policy has not been used to proselytize one's own religion or to disparage that of another. *See* Exhibit L (Hobbs Dep. 198) (stating that prayer is not for "preaching any one religion to anyone"); Exhibit K (Walls Dep. at 159) ("I don't think [the meeting or prayer] needed to be the time or place for proselytizing or trying to convert anybody."). Any reasonable observer would see the prayers offered in these circumstances for what they are and would not construe them as attempts to preach, convert, or proselytize.

## IV.    **LEGAL STANDARD**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

- 14 -

of law." Fed. R. Civ. P. 56(c). The party moving for summary judgment bears the initial burden of demonstrating that there are no facts supporting the non-moving party's legal position. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986). The burden then shifts to the nonmoving party, who "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "The nonmoving party . . . cannot rely merely upon bare assertions, conclusory allegations or suspicions to support its claim." *Fireman's Ins. Co. v. Du Fresne*, 676 F.2d 965, 969 (3d Cir. 1982). Rather, the party opposing summary judgment must go beyond the pleadings and present evidence through affidavits, depositions, or admissions on file to show that there is a genuine issue for trial. *See Celotex*, 477 U.S. at 324.

When deciding a motion for summary judgment, the court must construe the evidence and any reasonable inferences arising from the evidence in the non-movant's favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A genuine issue of material fact exists only when "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. When, as here, the material facts are not in disputed, summary adjudication of the constitutionality of the Board Prayer Policy is warranted.

## V.    SUMMARY OF ARGUMENT

Under *Marsh v. Chambers*, 463 U.S. 783 (1983), the Board Prayer Policy is constitutional. In *Marsh*, the Supreme Court held that opening sessions of legislative or other deliberative bodies with prayer is constitutional. In this case, the Board clearly constitutes a legislative body, and thus the Board Prayer Policy is constitutional. Furthermore, sectarian references in Board prayer and the presence of students do not render the Board prayer unconstitutional.

- 15 -

Even if the Board Prayer Policy does not constitute legislative prayer, however, the Board Prayer Policy is constitutional under *Lemon v. Kurtzman*, 403 U.S. 602 (1971). This is because (1) the Board Prayer Policy has a secular purpose; (2) the primary effect of the Board Prayer Policy is not to advance religion; and (3) the Board Prayer Policy does not create excessive entanglement between government and religion. Therefore, as set forth more fully below, Plaintiffs' remaining claims should be dismissed in their entirety.

## VI.    ARGUMENT

### A.    Under *Marsh v. Chambers*, the Board Prayer Policy Is Constitutional

Legislative prayer is more than a deep-rooted American tradition. It is a tradition the Supreme Court has previously addressed in *Marsh v. Chambers*, 463 U.S. 783, 786 (1983), and found unequivocally permissible. This Court is bound by that decision. To be sure, the features of the Board Prayer Policy here, both as written and as applied, are well within the realm of acceptable practice outlined in *Marsh*. This Court therefore should find the Board prayer practice constitutional and dismiss Plaintiffs' remaining claims.

#### 1.    *Marsh v. Chambers* Is Controlling

##### a.    This Court Has Already Held that the Board Prayer Here Constitutes Legislative Prayer Under *Marsh*

The law of the case doctrine precludes this Court from reconsidering the issue of whether the Board prayer practice constitutes legislative prayer. The law of the case doctrine limits the extent to which an issue will be reconsidered once the court has made a ruling on it. *Fagan v. City of Vineland*, 22 F.3d 1283, 1290 (3d Cir. 1994). "This applies with equal force to earlier rulings of the same judge in the same case." *Ferrara & Hantman v. Alvarez (In re Engel)*, 124 F.3d 567, 584 (3d Cir. 1997). The law of the case doctrine was developed "to maintain

consistency and avoid reconsideration of matters once decided during the course of a continuing

lawsuit." *Casey v. Planned Parenthood*, 14 F.3d 848, 856 (3d Cir. 1994).

When this lawsuit was originally filed, Plaintiffs purported to state claims against the

Board members in their individual capacities. The Board members moved to dismiss those

claims, asserting that they were entitled to absolute legislative immunity from claims against

them in their individual capacities. In response, Plaintiffs argued that Defendants' acts were not

legislative, but were more appropriately characterized as administrative or managerial. *Dobrich*,

380 F. Supp. 2d at 375. The Court rejected Plaintiffs' argument, finding that the Board members

were entitled to legislative immunity. Relying on *Marsh*, the Court found as follows:

> [E]ven if the Court were to adopt Plaintiffs' contention that prayer
> is a ministerial action such that it is not covered by the doctrine of
> absolute immunity, *the Court concludes that Plaintiffs cannot
> prevail on a claim based on a prayer being said before a school
> board meeting.* As the *Marsh* decision makes clear, the practice of
> opening legislative sessions with a prayer is acceptable under the
> Constitution.

*Id.* at 377 (emphasis added). Before reaching this conclusion, extensive briefing was submitted

to the Court on the issue of Defendants' individual immunity and the extent to which the Board

prayer constituted legislative prayer. Because the Court has already "found the School Board's

conduct constitutional under the United States Supreme Court's holding in [*Marsh*,]" *see* D.I. 64

at 3, the law of the case doctrine precludes the Court from reconsidering the issue, and its prior

decision "should continue to govern" the issue. *See Arizona v. California*, 460 U.S. 605, 618

(1983).[4]

---

[4] Importantly, Plaintiffs have acknowledged that, "[i]n its August 2 Opinion, this Court held that
Plaintiffs did not state an establishment clause claim against the School Board for its practice of
opening its public meetings with a prayer. The Court explained that it found the School Board's
(continued...)

2.    **Under *Marsh v. Chambers*, the Board Prayer Policy Is Constitutional Because the Board Constitutes a Legislative or Other Deliberative Body**

Although the Court need not reconsider whether *Marsh* applies, the facts nonetheless demonstrate that the Board is a "legislative or other deliberative body," and thus the challenged prayer policy is constitutional. *See Marsh v. Chambers*, 463 U.S. 783, 786 (1983). In *Marsh v. Chambers*, the plaintiff challenged the practice of the Nebraska Legislature of opening its legislative sessions with a prayer by a paid chaplain. The Supreme Court rejected this challenge, holding that this practice did not violate the Establishment Clause. In finding the legislative prayer to be constitutionally permissible, the Court relied in part on the unique history of prayer at legislative sessions.[5] *Id.* at 790-91. The Court explained that the opening of "legislative and other deliberative public bodies with prayer" is deeply embedded in the traditions of this country. *See id.* at 786. In particular, the Court noted that on September 25, 1789, only three days after the Congress authorized the appointment of paid chaplains, final agreement was reached on the language of the Bill of Rights. *Id.* at 788. "Clearly the men who wrote the First Amendment Religion Clauses did not view paid legislative chaplains and opening prayers as a violation of

---

(..continued)
conduct constitutional under the United States Supreme Court holding in *Marsh v. Chambers*, 463 U.S. 783 (1983)." *See* D.I. 64 at 3. Plaintiffs then explained that Defendant "Helms offer[ed] no reason why the Court should rule again on the same issue." *Id.*

[5] The Supreme Court has recently affirmed the viability and applicability of *Marsh* in the context of legislative prayer. *See, e.g., McCreary County v. ACLU*, 545 U.S. 844, 860 n. 10 (2005) (noting that *Marsh* upheld "legislative prayer despite its religious nature"); *Van Orden v. Perry*, 545 U.S. 677, 690 (2005) ("Simply having religious content or promoting a message consistent with a religious doctrine does not run afoul of the Establishment Clause.") (citing *Marsh*, 463 U.S. at 792).

that Amendment, for the practice of opening sessions with prayer has continued without interruption since that early session of Congress." *Id.*

The Supreme Court went on to note that historical patterns in these circumstances do not simply shed light on the Founding Fathers' intentions, but actually indicate the Founder Fathers' view of the practice challenged in *Marsh* and in the present matter. *Id.* at 790. Indeed, it can hardly be argued that the Founding Fathers intended for the First Amendment to forbid what they had declared acceptable only three days earlier. *Id.* Thus, the Court ultimately held: "In light of the unambiguous and unbroken history of more than 200 years, there can be no doubt that the practice of opening legislative sessions with prayer has become part of the fabric of our society. To invoke Divine guidance on a public body entrusted with making laws is not, in these circumstances, an 'establishment' of religion; it is simply a tolerable acknowledgement of beliefs widely held among people of this country." *Id.* at 792.

Moreover, the Supreme Court in *Marsh* rejected arguments that certain features of the Nebraska prayer practice rendered it unconstitutional. In particular, the Court noted that a clergyman of only one denomination had been selected to give the prayers. However, the Court concluded that, absent evidence of an impermissible motive, choosing a clergyman from a single denomination does not advance the beliefs of a particular church. *Id.* at 794. The Court also rejected the plaintiff's argument that Judeo-Christian references contained in the prayers rendered the practice unconstitutional. The Court found that the content of the prayer was of no concern where there was "no indication that the prayer opportunity has been exploited to proselytize or advance any one, or to disparage any other, faith or belief." *Id.*

In this case, the factual record and applicable statutes make clear that the Board is a legislative or other deliberative body and is subject to the analysis in *Marsh*.[6]  The Board is a statutory body that conducts the business of the District.  The Board's duties include setting policies; making the reports required by the State Superintendent of Public Instruction; appointing and dismissing personnel for the District; approving the use of District facilities; imposing and enforcing student and employee disciplinary actions; adopting the District's annual budget; monitoring the progress of construction projects; and levying taxes.  *See* Exhibit D (Bireley Dep. at 9-17); Exhibit E (Hattier Dep. at 127, 133-37, 331).  In other words, the Board is a political subdivision, like any county, municipality, or another unit of local government.

Like most political subdivisions, the Board consists of elected public officials.  *See* Del. Code Ann. tit. 14, § 1068(g) ("All members of the Board of Education of Indian River School District shall be elected from the several representative districts in which they reside by the qualified electors.").  Like other elected officials, the Board members swear an oath before assuming their duties.  *See* Del. Code Ann. tit. 14, § 1053(a).  The Board members have a defined

---

[6] Lower courts in other jurisdictions have characterized various public bodies, including school boards, as "legislative or other deliberative bodies."  *See Doe v. Tangipahoa Parish Sch. Bd.*, 473 F.3d 188, 197 (5th Cir. 2006) (assuming without deciding that "the [School] Board, as a stipulated public deliberative body, falls under *Marsh*"); *Bacus v. Palo Verde Unified Sch. Dist. Bd. of Educ.*, 52 F. App'x 355, 356 (9th Cir. 2002) (applying *Marsh* to a school board as a deliberative body); *Snyder v. Murray City Corp.*, 159 F.3d 1227 (10th Cir. 1998) (*en banc*) (applying *Marsh* to city council), *cert. denied*, 526 U.S. 1039 (1999); *Pelphrey v. Cobb County*, 448 F. Supp. 2d 1357, 1368 (N.D. Ga. 2006) (County Board of Commissioners and Planning Commission considered legislative or other deliberative bodies); *Habecker v. Town of Estes Park*, No. 05-cv-00153, 2006 U.S. Dist. LEXIS 68811, at *38 (D. Colo. Sept. 25, 2006) (stating in *dicta* that, under *Marsh*, "the [town board of trustees] could open its meetings with prayers led by publicly funded clergy"); *Simpson v. Chesterfield County Bd. of Supervisors*, 404 F.3d 276, 278 (4th Cir.) (applying *Marsh* to a county board of supervisors as a deliberative body), *cert. denied*, 126 S. Ct. 426 (2005).  *But see Coles v. Cleveland Bd. of Educ.*, 171 F.3d 369, 381 (6th Cir. 1999) ("Although the school board, like many other legislative bodies, is composed of publicly elected officials drawn from the local community, that is where the similarity ends.").

limit to their term in office. *See* Del. Code Ann. tit. 14, § 1068(f) (three years). They also gather

feedback from their constituents and convey those opinions to the other Board members for

deliberations. *See* Exhibit D (Bireley Dep. at 113-15) (testifying that he received feedback from

some of his constituents that the Board should not change its practice on Board prayer, and he

conveyed their opinions to the other members during an executive session). They also must hold

meetings once a month. *See* Del. Code Ann. tit. 14, § 1048(a) ("Regular meetings of the school

board shall be held each month during the year at the regular meeting place designated by the

school board."); Exhibit D (Bireley Dep. at 86-87) (testifying that the Board holds regular public

meetings once a month).

 In addition, like city councils, to which several courts have applied *Marsh*, *see, e.g.*,

*Simpson*, 404 F.3d 276; *Snyder*, 159 F.3d 1227, the Board derives its authority to pass laws and

set policy from the state legislature. *See* Del. Code Ann. tit. 14, § 1043. The Delaware

Legislature has defined the function of a school board as to "determine policy and adopt rules

and regulations for the general administration and supervision of the free public schools[.]" Del.

Code Ann. tit. 14, §§ 1043, 1049. Consistent with this statutorily-defined function, the Board

deliberates, makes rules, and sets policy. *See generally* Exhibit C (S. Bunting Dec.) (noting that

the creation of District policy follows a clear procedure, beginning with the Board's policy

committee, and then to a recommendation to the full Board, two public readings, and ultimately

adoption by the entire Board).

 The Board also exercises a significant degree of statutory control, management, and

custody of all property and money vested by law in the public school authorities. Del. Code

Ann. tit. 14, § 1056(b). Moreover, the District may "levy and collect additional taxes for school

purposes upon the assessed value of all taxable real estate in [the] District[.]" Del. Code Ann. tit.

14, § 1902(a). It also spends appropriations on such items as employing personnel, school costs

and energy, and educational advancement expenditures. *See* Del. Code Ann. tit. 14, § 1702.

Finally, consistent with legislative immunity that is typically granted to legislative bodies, courts

have frequently granted school boards legislative immunity under 42 U.S.C. § 1983. *See, e.g.,*

*McHugh v. Bd. of Educ.*, 100 F. Supp. 2d 231 (D. Del. 2000); *see also Dobrich v. Walls,* 380 F.

Supp. 2d 366, 377 (D. Del. 2005).

By any measure, the Board is a legislative or other deliberative body. Thus, the Board's

written policy and its long-standing practice of opening regular Board meetings with a prayer

does not violate the Establishment Clause.

### 3.     Plaintiffs' Challenges to the Board Prayer Policy

In the Amended Complaint, Plaintiffs highlight two features of the Board's prayer

practice. First, Plaintiffs note that the Board prayers often contain sectarian references. *See*

Amended Compl. at ¶¶64, 68, 70 (making reference to prayer "in Lord's name," prayer "in the

name of Christ," and prayer to "Our Heavenly Father"). Second, Plaintiffs note that District

students frequently attend portions of the Board meetings. *See* Amended Compl. at ¶59 (noting

that students attend meetings to receive awards, to speak about issues affecting their schools, to

appear before the Board as representatives of student government, and to attend disciplinary

hearings). It is true that some Board prayers contain sectarian references and that students are

often in attendance at Board meetings. Neither of these facts, however, renders the Board's

practice unconstitutional.

#### a.     Sectarian Prayer Is Not Prohibited

To suggest that a prayer is unconstitutional simply because it contains sectarian

references misapprehends *Marsh*, which made clear that content is not determinative. Instead,

the relevant inquiry is whether the prayer opportunity is being used or exploited to promote or advance one religion, or to disparage another.

> (1)     Content Alone Is Largely Immaterial to Constitutionality of Legislative Prayer

The prayers in *Marsh* were described as both "nonsectarian" and "Judeo-Christian;" the Court also noted that the chaplain had previously used explicitly Christian prayers. *Marsh*, 463 U.S. at 793 n.14. The Court held, however, that the content of prayer "is not of concern" to the constitutionality of legislative prayer. Instead, the determinative inquiry was whether the "the prayer opportunity has been exploited to proselytize or advance any one, or to disparage any other, faith or belief. That being so, *it is not for us to embark on a sensitive evaluation or to parse the content of a particular prayer*." *Id.* (emphasis added). In other words, in permitting legislative prayer, the Court did not distinguish between sectarian and non-sectarian prayer, or otherwise limit its holding to non-sectarian prayer.

In considering the constitutionality of the Board Prayer Policy, this Court should heed the Supreme Court's admonition to avoid a "sensitive evaluation" of the content of one's prayer. *See Marsh*, 463 U.S. at 793 n.14. A rule that would permit prayer only if it is sufficiently non-sectarian is unworkable and offensive to First Amendment principles. Although prayer comes in many varieties, in its essence prayer is a religious exercise. To suggest that prayer is permissible as long as the content of the prayer is not too religious is itself a contradiction. How is one to know when a permissible prayer has devolved into an impermissible one? Indeed, there are some who believe that non-sectarian prayer is as odious as sectarian prayer. For example, references to "God" or "Allah" do not appeal to the non-believer or followers of Eastern religions such as Buddhism. A rule that permits only non-sectarian prayer therefore betrays a narrow, Judeo-Christian perspective.

Even more significantly, such a rule flirts dangerously with dictating the manner in which one may pray – precisely the evil cautioned by the *Marsh* Court. For some, any appeal to a sense of spirituality is prayer. For others, the very same words might inspire, but, when detached from Scripture or not offered in the name of Jesus, do not constitute a prayer. The Supreme Court has already concluded that legislative prayer is permissible under the Establishment Clause. *See supra* at § IV.A. This Court should heed the admonition of *Marsh* and refrain from parsing the content of prayers and attempting to distinguish between "acceptable" and "unacceptable" prayers.[7]

(2)    Relevant Inquiry Is Whether Prayer Opportunity Is Being Exploited To Proselytize

Fashioning a rule based on whether prayer contains sectarian references not only reads a requirement into *Marsh* that does not exist, it overlooks the one that does. *Marsh* provides a clear guidepost as to when a legislative prayer has crossed the constitutional line: it is not the

---

[7] Unfortunately, some courts have disregarded the Supreme Court's admonition in *Marsh*. *See Doe v. Tangipahoa Parish Sch. Bd.*, 473 F.3d 188, 205 (5th Cir. 2006) (declaring school board prayer unconstitutional based on Christianity-based content); *Wynne v. Town of Great Falls, S.C.*, 376 F.3d 292, 301 (4th Cir. 2004) ("The invocations at issue here, which specifically call upon Jesus Christ, are simply not constitutionally acceptable legislative prayer like that approved in *Marsh*."); *cf. Hinrichs v. Bosma*, 440 F.3d 393, 395 (7th Cir. 2006) (split panel) (denying stay pending appeal of lower court order enjoining sectarian prayers as unconstitutional, with disclaimer: "We hope that, by proceeding in this manner, the tentative nature of our analysis at this very early point in the litigation will be plain to all."); *Simpson v. Chesterfield County Bd. of Supervisors*, 404 F.3d 276, 283 (4th Cir. 2005) (continuing to apply *Wynne*, but with emphasis on fact that, there, the invocations offered by council members were "pervasively and exclusively sectarian in nature"); *Bacus v. Palo Verde Unified Sch. Dist. Bd. of Educ.*, 52 Fed. App'x. 355, 356-57 (9th Cir. 2002) (holding that "the [challenged] prayers, almost always 'in the Name of Jesus,' did [impermissibly] advance one faith"; but issuing caveat, "we need not decide whether the prayers 'in the Name of Jesus" would be a permissible solemnization of a legislature-like body, provided that invocations were, as is traditional in Congress, rotated among leaders of different faiths, sects, and denominations"). These departing decisions are not binding on this Court, and exceed the necessary level of constitutional inquiry as set forth by the Supreme Court in *Marsh*.

content of the prayer that matters but whether the prayer opportunity "has been exploited to

proselytize or advance any one, or disparage any other, faith or belief." *Marsh*, 463 U.S. at 794-

95; *see also Snyder v. Murray City Corp.*, 159 F.3d 1227, 1234 (10th Cir. 1998) ("[T]he kind of

legislative prayer that will run afoul of the Constitution is one that proselytizes a particular

religious tenet or belief, or that *aggressively advocates* a specific religious creed, or that

derogates another religious faith or doctrine.  When a legislative invocation strays across this line

of proselytization or disparagement, the Establishment Clause condemns it."); *see also Pelphrey*

*v. Cobb County*, 448 F. Supp. 2d 1357, 1368 (N.D. Ga. 2006) ("[I]nclusion of sectarian

references in their invocations does not, in the view of this Court, compel a finding of

unconstitutionality.").

   In this matter, the prayers at issue, while sometimes containing sectarian references, do

not rise to the level of exploiting or proselytizing any one religion.  As an initial matter,

consistent with the intent of other public bodies and the United States Congress, the Board

prayers are intended to solemnize the Board meetings and to seek guidance in the execution of

the Board's duties.  *See* Exhibit D (Bireley Dep. at 151) (purpose of the prayer is to "ask for

divine guidance for the Board to help them make correct decisions and get them through the

meeting in the proper way . . . to make the best decisions for what's best for our students");

Exhibit E (Hattier Dep. at 324) ("[A]t a lot of our prayers we will ask for the proper guidance for

our custodial staff, or our teachers to do the right things as well.").  Indeed, the policy explicitly

requires that the opportunity to offer a prayer "shall not be used or exploited to proselytize,

advance or convert anyone, or to derogate or otherwise disparage any particular faith or belief."

*See* Exhibit H (Board Prayer Policy at ¶3).

Moreover, the Board's practice is consistent with Supreme Court's instruction in *Marsh*. Board members typically use the prayer opportunity for nothing more than an appeal for wisdom in their decision making. In some instances, prayers have been offered to console District families suffering a tragedy. *See* Exhibit L (Hobbs Dep. at 198) (testifying that if there was a death or other tragedy, "often [the person giving the prayer] would bless that, you know, they would say, you're in our thoughts, that family, who's ever gone through this tragedy is in our thoughts"). The prayer offered on February 22, 2005, is typical of those offered since the adoption of the prayer policy. That prayer, in its entirety, consisted of the following: "Heavenly Father, Lord our God. Heavenly Father, please help the Board with the problems in the School District that we are going through right now. We ask these things in Jesus' Name." *See* Amended Compl. at ¶144 (Prayer said by R. Helms on February 22, 2005). That this and other similar prayers are not offered for the purpose of proselytizing one religion or disparaging another is self-evident.

However, the constitutionality of Mr. Helms' prayer and other Board members' prayers, when evaluated in the context of other legislative prayers, should be beyond doubt. The following are examples of prayers offered at the opening of recent sessions of the United States House of Representatives:

> Lord God, we call upon Your holy name in prayer. To take time for prayer helps us focus on Your presence in our midst.

> Prayer does not make You present, for You are the Almighty, the ever-present, far beyond us and our imagining. You hold everyone and everything in Your covenant and of Your communion.

> By being mindful and presenting ourselves to You, we state our desire that You bless all in this assembly and in this Nation. We open our minds to the possibility of Your goodness manifested

throughout the activities of this day. We open our hearts to receive the love, loyalty, virtue, and collaboration of one another.

In this way You strengthen, with lasting effect, all our labor and You fortify this union, both now and hopefully forever. Amen.

108 Cong. Rec. H1328-29 (daily ed. Mar. 23, 2004) (prayer of Rev. Daniel Coughlin).

Almighty and Gracious God, as we begin this new day, we seek forgiveness and blessing. As creator and Governor of all, we pray that You will protect our country from all harm and attack. Restrain the plans of those who would do us evil. Change the hearts of our enemies that we may live with them in peace. Give to those who protect us the wisdom to defeat the plans of our enemies so that the people of this Nation will live in unity and peace.

Bless all those in service of our country. Endow our leaders with wisdom and knowledge, that by Your power, they will make God-pleasing decisions for the welfare of our citizens; through Jesus Christ Your Son Our Lord, who lives and reigns with You and the Holy Spirit, one God, world without end. Amen.

108 Cong. Rec. H4767 (daily ed. June 23, 2004) (prayer of Rev. Dr. Jack Davidson).

Dear Heavenly Father, I ask You this day to empower these representatives, wherever they may be, both in this House and in committee meetings, with true spiritual sensitivity. Give them wisdom to know the difference between loud, hollow requests and opportunities to positively impact an entire nation.

Protect them, O Father, from the temptation to be politically correct for the sake of a few while the audience of heaven watches and millions in posterity wait to weigh their influence.

Help them this day to engage with purpose, using this platform for Your glory and their personal growth. Protect their families, regardless of where they may be this day. Surround them with Your presence, giving confidence that You have met their every need. In turn, may they meet the needs of others through their actions this day.

Help them enjoy the privilege of representing millions of Americans this day. May their decisions this day change our

- 27 -

> country for the better tomorrow. Give them great joy in what they
> do in this place.
>
> Father, may they experience what it really means to be in peace
> because of a relationship with You through Your Son Jesus, for it
> is in Jesus' name we pray. Amen.

109 Cong. Rec. H1899 (daily ed. April 13, 2005) (prayer of Dr. Curt Dodd). As these

congressional prayers reveal, the prayers challenged in this lawsuit are consistent with other,

non-proselytizing legislative prayers.[8]

Finally, the record contains further evidence that the prayers here have not been used as

an attempt to proselytize, inasmuch as the Board has no expectation that members of the public

are to participate. *See* Exhibit K (Walls Dep. at 52) ("I have no expectation for the audience

[regarding whether they would close their eyes or bow their heads during the offering of the

prayer]. They can do whatever they wish."). Furthermore, since the adoption of the Board

Prayer Policy in October 2004, it has become customary for the Board president to read the

following disclaimer prior to the prayer:

> It is the history and custom of this Board that, in order to
> solemnize the School Board proceedings, that we begin with a
> moment of prayer, in accord with the freedom of conscience of the
> individual adult members of the Board. Further, such prayer is
> voluntary and just among the adult members of the School Board.
> No school employee, student in attendance or member of the
> community is required to participate in any such prayer or moment
> of silence.

*See* Exhibit J (Transcribed notes of November 16, 2004 meeting). While there is no

---

[8] It is also worth noting that these congressional prayers are generally more extensive than the
Board prayers, which are typically recited in a matter of seconds. *See, e.g.,* Audio tape: June 20,
2006 Indian River School District School Board Meeting (June 20, 2006) (produced to plaintiffs
as BDP 1321-1322) (prayer lasting 62 seconds, while meeting itself lasted 5 hours and 35
minutes); *see also* Exhibit C (S. Bunting Dec. at ¶13).

constitutional requirement that the Board president offer a disclaimer, this is further evidence that the prayer practice is not an attempt to proselytize. *See* Exhibit L (Hobbs Dep. at 207-08) (viewing the disclaimer read by Mr. Bireley as allowing the audience to get up and leave, "just not participate," not bow their hands, and/or not come before the meeting starts).

>        b.        The Presence of Students at Board Meetings Is Immaterial

Defendants do not dispute that students are frequently in attendance at Board meetings. Their presence, however, does not render the practice of Board prayer unconstitutional. It would be an odd rule, indeed, if a school board were permitted to pray for wisdom but only if those affected by their decisions are absent or unaware of the prayers. It is true that a school board meeting is a different kind of legislative session than a debate of the United States Congress, but a school board meeting cannot be likened to a classroom, as Plaintiffs' position requires.

The Board is an elected body, which consists of ten adults who conduct public business in a public place. The Board members develop the curriculum for the schools, develop District policy, levy taxes as necessary, make difficult decisions regarding how to spend scarce resources, hire administrative personnel, and generally try to foster an academic environment where teachers and administrators can be successful in educating children. *See supra* at 6-8. Board members do *not* develop lesson plans, give lectures, hand out homework assignments, correct term papers, look after children at recess, or take on the daily educational responsibilities of the children of the District. The suggestion that a Board meeting is akin to a classroom – or that the Supreme Court decisions affecting teacher conduct in a school setting provide guidance here – overlooks the purpose and functions of the Board.[9]

---

[9] In previous briefing, Plaintiffs suggested that there are three "Marsh factors," one of which is that the "recipients of the prayer are adults not readily susceptible to religious indoctrination or

>        (continued...)

Furthermore, unlike regular curricular activities, Board meetings are conducted after school hours, and students are not compelled to attend. To the contrary, student attendance is incidental and voluntary. *See* Exhibit D (Bireley Dep. at 16) (noting that only a couple dozen students are invited to attend the Board meetings over the course of an academic year). For example, one of the reasons a student might attend a Board meeting is to be recognized for an achievement. *See* Exhibit D (Bireley Dep. at 31). While recognition by the Board is a pleasant gesture and, perhaps, one that should be encouraged,[10] this practice is not in any measure

_____

(..continued)
peer pressure." *See* Plaintiffs' Br. in Support of Mot. to Deny or Continue Helms' Mot. for Summary Judgment at 10 (D.I. 64). Although the *Marsh* Court noted that the plaintiff in that case was an adult, the Court did not hold that the "recipient" of legislative prayer, to be constitutional, must be an adult. The full paragraph containing this reference is as follows:

> This interchange [between members of the First Congress regarding legislative prayer] emphasizes that the delegates did not consider opening prayers as proselytizing activity or symbolically placing the government's "official seal of approval on one religious view.' Rather, the Founding Fathers looked at invocations as 'conduct whose . . . effect . . . [harmonized] with the tenets of some or all religions." The Establishment Clause does not always bar a state from regulating conduct simply because it "harmonizes with religious canons." Here, the individual claiming injury by the practice is an adult, presumably not readily susceptible to "religious indoctrination, or peer pressure."

*Marsh*, 463 U.S. at 792 (citations omitted). Indeed, it seems the most relevant point of the paragraph above is that the Founding Fathers viewed legislative prayer as inherently non-proselytizing. In any event, simply acknowledging that the *Marsh* plaintiff was an adult does not mean the Court would have reached an opposite conclusion had the plaintiff been a non-adult. Contrary to what Plaintiffs would urge in this case, that is not a fair inference, much less is a "factor" that Defendants must overcome to survive Plaintiffs' challenge to the Board prayer practice.

[10] Former Superintendent Lois Hobbs began the practice of inviting students to Board meetings for special recognition. As Ms. Hobbs explained, "[t]he children are what [the Board] is all about. So [the Board] wanted to say thank you and recognize the children." Exhibit L (Hobbs
(continued...)

essential to the work of the Board. Nor is student attendance mandatory. *See* Exhibit L (Hobbs

Dep. at 37) (The students "could come and be honored or they might not, or their principal might

accept the award and they could stay home. There was no obligation for them to come to a

Board meeting.").

To suggest that Board prayer becomes unconstitutional simply because a handful of

students, in a school district of more than eight thousand students, attend a monthly meeting

where a sixty-second prayer is offered, is absurd. By this logic, it would be improper for a

student to observe a Board member take the oath of office, where the Board member promises to

carry out his duties to the best of his abilities, "so help me God." Indeed, a legislative prayer by

the Delaware Legislature, which is inarguably permissible under *Marsh*, would become

impermissible if students on a field trip were present in the legislative chamber. The

fundamental flaw in Plaintiffs' position is that the Board prayer practice is a reflection of religion

– not a compulsion toward religion. The presence of students does not change this. Nor does it

require the complete elimination of all traces of the religious character of our nation's

institutions.

**B.**    **Even If the Board Prayer Policy Does Not Constitute Legislative Prayer, the**
         **Board Prayer Policy Is Constitutional Under *Lemon v. Kurtzman***

Although the Supreme Court in *Marsh* has set forth clear guidance for determining the

constitutionality of legislative prayer, it is anticipated that Plaintiffs will urge this Court to apply

_____

(..continued)
Dep. at 36). The students benefited from the public recognition, and the parents enjoyed
observing the recognition. Exhibit L (Hobbs Dep. at 36-37).

the more malleable three-part test set forth in *Lemon v. Kurtzman*, 403 U.S. 602 (1971).[11] This

Court should decline to analyze the issues in this matter under *Lemon*, just as the Supreme Court

declined to apply *Lemon* in the context of legislative prayer in *Marsh*. Regardless, application of

*Lemon* would not change the outcome.

    1.    **The Board Prayer Policy Has a Secular Purpose**

       The Board Prayer Policy here has a legitimate secular purpose of solemnizing the Board

meetings. *See Bogen v. Doty*, 598 F.2d 1110, 1113-14 (8th Cir. 1979) (upholding county board

prayer under *Lemon* because purpose of "establishing a solemn atmosphere and serious tone"

was "clearly secular"). The policy itself states that the purpose of Board prayer is to solemnize

the proceedings. *See* Exhibit H (Board Prayer Policy at ¶1). Further, the evidence in the record

establishes this secular purpose, as the Board members uniformly testified that the purpose of

Board prayer is "to ask for divine guidance for the Board to help [the Board] make correct

decisions and get [the Board] through the meeting in a proper way." *See, e.g*, Exhibit D (Bireley

Dep. at 151: 7-9);[12] Exhibit K (Walls Dep. at 40) (noting that the phrase "to solemnify its

proceedings" means "to impress upon the importance of a regular meeting, just to ask for

guidance in making the proper decisions"); Exhibit L (Hobbs Dep. at 200) (commenting on the

phrase "In order to solemnify the proceedings[:]" "I think they were just trying to bring some

dignity and, you know, ask for guidance in their decision about children"); Exhibit E (Hattier

---

[11] The test established by the Supreme Court in *Lemon* requires that the challenged activity satisfy the three prongs: (1) that the challenged action has a secular purpose; (2) that the primary effect of the challenged action not be to advance or inhibit religion (or a particular religion); and (3) that the challenged action not create an excessive entanglement between government and religion. 403 U.S. 602.

[12] Mr. Bireley explained that "in the proper way" means "to make the best decisions for what's best for [the] students." *See, e.g.*, Exhibit D (Bireley Dep. at 151: 11-12).

Dep. at 114) (stating that the phrase "solemnifying the proceedings" means "the idea that we are going to think beyond ourselves, beyond what's happening today and sit down and make absolutely the best decisions we can. And it's taking a moment to where you can focus on what your reason is for being there"); Exhibit F (D. Mitchell Dep. at 12, 15) ("I believe it solemnizes the proceedings and prepares people to conduct the business of the district"; the phrase "in order to solemnify its proceedings" means "to get serious, solemn, to bring us together as a body, as a legislative body to conduct business"). This legitimate secular purpose satisfies the first prong of the *Lemon* test.

Moreover, religious references in the prayers do not defeat a finding that the prayer has a secular purpose. Rather than focusing on the content of the religious activity, courts consider the context in which the religious activity occurred. Focusing "exclusively on the religious content of any activity would inevitably lead to its invalidation." *Chaudhuri v. Tennessee*, 130 F.3d 232, 236 (6th Cir. 1997) (citing *Lynch v. Donnelly*, 465 U.S. 668, 680 (1984)). In *Chaudhuri*, the Sixth Circuit explained:

> Any prayer has a religious component, obviously, but a single-minded focus on the religious aspects of challenged activities— which activities, in an Establishment Clause case, are religiously-oriented by definition — would extirpate from public ceremonies all vestiges of the religious acknowledgments that have been customary at civic affairs in this country since well before the founding of the Republic. The Establishment Clause does not require — and our constitutional tradition does not permit — such hostility toward religion. *Lynch*, 465 U.S. at 673. The people of the United States did not adopt the Bill of Rights in order to strip the public square of every last shred of public piety.

130 F.3d at 236; *see also Lynch*, 465 U.S. at 673 ("[S]uch hostility would bring us into war with our national tradition as embodied in the First Amendment's guaranty of the free exercise of

- 33 -

religion.") (internal quotation marks and citations omitted).  Accordingly, religious content does not undermine a secular purpose as long as the context of the religious activity does not advocate a particular religious message.  *See County of Allegheny v. ACLU*, 492 U.S. 573, 624 (1989) (O'Connor, J., concurring) (citing *Lynch*, 465 U.S. at 680); *Books v. Elkhart County*, 401 F.3d 857, 865 (7th Cir. 2005) (considering overall context of the religious activity in determining purpose prong of *Lemon* analysis).

As discussed above, the purpose of the Board's invocation of prayer, which often contained Judeo-Christian references, was to solemnize the Board meetings.  Although some of the prayers mention "God" and "Jesus Christ," an invocation of Divine guidance, by definition, assumes the existence of a particular deity.  Therefore, the Judeo-Christian references, or other sectarian references, do not defeat the secular purpose of the Board prayers.

### 2. The Primary Effect of the Board Prayer Policy Is Not To Advance Religion

The Board Prayer Policy here also satisfies the second prong of *Lemon*, as the primary effect of the policy is not to endorse or advance religion.  The United States Court of Appeals for the Third Circuit has held that the question of endorsement must be analyzed from the viewpoint of "a reasonably informed observer, *i.e.*, one familiar with the history and context of [the issue]." *Tenafly Eruv Ass'n v. Borough of Tenafly*, 309 F.3d 144, 174 (3d Cir. 2002).  In this case, the reasonable observer would not perceive the primary effect of Board prayers as an endorsement of religion.

There is a temptation to presume – albeit incorrectly – that any government activity acknowledging the religious character of the American people must run counter to the Establishment Clause because it advances religion.  However, that is not the test under the second prong of *Lemon*.  Government activity that slightly advances religion over non-religion

(or something else, for that matter) may be constitutionally permissible. Importantly, "the focus of this prong is on the *primary* effect of the government's conduct," not the incidental or ancillary effect. *Am. Family Ass'n v. City & County of San Francisco*, 277 F.3d 1114, 1122 (9th Cir. 2002) (emphasis in original); *see also Marchi v. Bd. of Coop. Educ. Serv. of Albany*, 173 F.3d 469, 476 (2d Cir. 1999) ("When courts adjudicate claims that some governmental activity violates the Establishment Clause, they must be careful not to invalidate activity that has a primary secular purpose and effect and only incidental religious significance."); *Bowen v. Kendrick*, 487 U.S. 589, 607 (1988) (analyzing the plaintiff's Establishment Clause claims under *Lemon* and finding that, "[t]o the extent that this congressional recognition has any effect of advancing religion, the effect is at most *incidental and remote*") (internal quotation marks omitted) (emphasis added).

It would be disingenuous to suggest that the Board Prayer Policy – even with its allowance for a moment of silence or no prayer at all – does not, at least in practice, have the incidental effect of advancing religion. Regardless, there is no evidence from which a reasonable observer could conclude that advancing religion is the prayer policy's *primary* effect. As discussed at length above, the purpose of the prayer policy is to solemnize the Board's proceedings. All of the evidence further suggests that solemnization is also the primary effect of the policy. *See, e.g.*, Exhibit F (D. Mitchell Dep. at 12, 15) ("I believe [the Board prayer] solemnizes the proceedings and prepares people to conduct the business of the district."). A finding that the primary effect of Board prayer here primarily advances religion not only runs counter to the evidence in the record, but it ignores the conclusion of *Marsh* and other courts that legislative prayer is wholly consistent with disestablishment. Because Plaintiffs cannot establish

- 35 -

that advancing religion is not the primary effect of the Board's prayer policy, the Board's prayer

policy does not run afoul of the second prong of the *Lemon* test.

### 3.   The Board Prayer Policy Does Not Create Excessive Entanglement Between Government and Religion

Finally, the Board Prayer Policy does not create excessive entanglement between the

government and religion.  In *Agostini v. Felton*, 521 U.S. 203, 233 (1997), the Supreme Court

held that "[i]nteraction between church and state is inevitable, . . . and we have always tolerated

some level of involvement between the two.  Entanglement must be 'excessive' before it runs

afoul of the Establishment Clause."  The Board Prayer Policy does not create excessive

entanglement between government and religion because the Board does not exclude prayers

based on their religious content, nor does the Board allow only Christian prayers.  *See* Exhibit H

(Board Prayer Policy at ¶5) ("Any such prayers may be sectarian or non-sectarian,

denominational or non-denominational, in the name of a Supreme Being, Jehovah, Jesus Christ,

Buddha, Allah, or any other person or entity, all in accord with the freedom of conscience,

speech and religion of the individual board member, and his or her particular religious

heritage."); *see also* Exhibit D (Bireley Dep. at 57) (stating that before the adoption of the Board

Prayer Policy, there were no specific restrictions relating to the content of the prayer); Exhibit A

(C. Mitchell Dec. at ¶11) (same).

All Board members, without regard to their religious affiliation, are invited to lead the

opening of the session.  Each Board member, at his turn, is free to lead the group in accordance

with his own conscience.  Apart from a restriction on proselytizing or disparaging specific

religions, there are no governmental restrictions on how a Board member may open the session.

Similarly, Board members in attendance are not required to participate in the opening prayer.

Nor are members of the public who are in attendance.  They are free to listen, to stand in

respectful silence, or simply to think of something else for the few moments it takes to complete the prayer. Those who are truly bothered by the practice may temporarily leave to avoid hearing the prayer altogether.

It is also notable that the Board Prayer Policy at issue here, unlike the one at issue in *Marsh*, does not require any expenditure of public funds. The Board does not retain and pay a chaplain, and the Board members themselves are volunteers. Thus, the policy in this matter does not "entangle" the government with religion in any manner. It certainly does not foster "excessive" entanglement.

Moreover, the practice that Plaintiffs' complaint seems to suggest is more palatable (*i.e.*, prayer that is stripped of sectarian references) likely would create an entanglement problem. The forced exclusion of prayers because they are "too religious" or because they contain sectarian references would necessarily place the government in the position of scrutinizing prayer. This sort of governmental monitoring or regulation of prayer conjures a frightening regime wholly antithetical to First Amendment Free Exercise principles.[13] *See Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 844 (1995) ("Were the dissent's view to become law, it would require the University, in order to avoid a constitutional violation, to scrutinize the content of student speech, lest the expression in question — speech otherwise protected by the Constitution — contain too great a religious content.").

---

[13] In addition to the obvious Free Exercise problems that would result from a requirement that legislative prayer must be "non-sectarian," such a requirement would also raise the specter of viewpoint discrimination in violation of the First Amendment's free speech protections. (These issues were addressed more fully by Defendant Helms in his previous summary judgment brief (D.I. 61), and those arguments are incorporated herein by reference.)

## VII.  CONCLUSION

For the foregoing reasons, the Board respectfully requests that the Court enter summary judgment in favor of the Board.

Dated: April 10, 2008

Respectfully submitted,

 /s/  Warren Pratt
Warren Pratt (Del. Bar No. 4334)
DRINKER BIDDLE & REATH LLP
1100 N. Market Street
Suite 1000
Wilmington, DE 19801
Telephone:   (302) 467-4200
Facsimile:    (302) 467-4201

Jason P. Gosselin
Katherine L. Villanueva
Elizabeth L. McLachlan
DRINKER BIDDLE & REATH LLP
One Logan Square, 18th and Cherry Sts.
Philadelphia, PA 19103
(215) 988-2700
(215) 988-2757 (facsimile)

## CERTIFICATE OF SERVICE

I, Warren T. Pratt, hereby certify that on April 10, 2008, I electronically filed the foregoing Motion for Summary Judgment, Opening Brief, and Statement of Undisputed Facts using CM/ECF, which will send notification of such filing to the following:

> Thomas J. Allingham II
> One Rodney Square
> P.O. Box 636
> Wilmington, DE 19899
> (302) 651-3000
>
> *Attorney for Plaintiffs*

/s/ Warren Pratt
Warren Pratt (Del. Bar No. 4334)