## THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

JANE DOE, *et al.*,                                    x
                                                       :
                                                       :
                                        Plaintiffs,    :
                           v.                          :    Civil Action No. 05-120-JJF
                                                       :
INDIAN RIVER SCHOOL DISTRICT, *et al.*,    :
                                                       :
                                                       :
                                        Defendants.    x


## ANSWERING BRIEF IN OPPOSITION TO
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Thomas J. Allingham II (I.D. No. 476)
tallingh@probonolaw.com
Robert S. Saunders (I.D. No. 3027)
Brian G. Lenhard (I.D. No. 4569)
Timothy S. Kearns (I.D. No. 4878)
One Rodney Square
P.O. Box 636
Wilmington, Delaware  19899-0636
(302) 651-3000

and

Richard S. Horvath, Jr. (I.D. No. 4558)
Four Embarcadero Center
Suite 3800
San Francisco, California  94111-5974
(415) 984-6400

*Attorneys for Plaintiffs*

DATED:  May 8, 2008

## TABLE OF CONTENTS

**PAGE**

PRELIMINARY STATEMENT ............................................................................................. 1

NATURE AND STAGE OF THE PROCEEDINGS ...................................................... 4

SUMMARY OF THE ARGUMENT ........................................................................... 4

COUNTERSTATEMENT OF FACTS· ....................................................................... 7

I.     DEFENDANTS DISINGENUOUSLY OMIT CRITICAL TESTIMONY
REGARDING THE PURPOSE OF THE PRAYER AND THE PUBLIC'S
PARTICIPATION IN THE PRAYER. ............................................................. 7

II.    DEFENDANTS FAIL TO ACKNOWLEDGE THE BOARD'S INVOLVEMENT IN
DICTATING THE CONTENT OF THE PRAYERS. ...................................... 9

III.   DEFENDANTS MISCHARACTERIZE HOW THE BOARD ADOPTED THE
POLICY. .................................................................................................... 10

ARGUMENT ............................................................................................................ 11

I.     DEFENDANTS' BRIEF EXAGGERATES AND MISCHARACTERIZES
EXISTING CASE LAW AND DELAWARE STATUTORY LAW RELATING TO
THE BOARD'S AUTHORITY. ..................................................................... 11

     A.    Defendants Exaggerate The Legal Authority That The Board Possesses......... 11

     B.    Defendants Mischaracterize The Supreme Court's Opinion In *Marsh v.
Chambers*............................................................................................... 12

     C.    Defendants Exaggerate The Alternatives Available Under The School Board
Prayer Policy.......................................................................................... 16

II.    THE POLICY IS AN UNCONSTITUTIONAL ENDORSEMENT OF RELIGION. ................. 17

A.    The Supreme Court Has Held That Prayers – Even Legislative Prayers -
       Referencing Jesus Christ Violate The Endorsement Test....................................... 17

B.    The Board's History Of Prayer Coupled With Its Current Attempts To
       Preserve Board Prayer Are Unconstitutional Endorsements Of Religion. ...................... 18

C.    As *Borden* And Other Case Law Demonstrate, Prayers By School Officials
       On Public School Grounds Are Unconstitutional............................................................. 19

D.    Defendants' Disclaimer Does Not Prevent Or Remove The Endorsement
       Effect. ...................................................................................................................... 21

E.    The Duration Of The Board's Prayers Is Constitutionally Irrelevant. .............................. 21

III.    THE POLICY IS UNCONSTITUTIONAL UNDER THE *LEMON* TEST.................................. 22

A.    The Policy Requires Excessive Entanglement Of Government And Religion................. 22

B.    Defendants' Purported Secular Purpose Is A Sham. ........................................................ 23

       1.    The Board's purported secular purpose does not explain the
              divergent treatment of public and non-public meetings. ..................................... 24

       2.    Defendants define "solemnify" in religious terms. .............................................. 25

       3.    The content of Defendants' prayers goes well beyond what would be
              necessary to achieve the modest goal of solemnifying Board
              proceedings........................................................................................................ 25

C.    The Primary Effect Of The Policy Is An Endorsement Of Religion. ................................ 26

       1.    *Marsh v. Chambers* does not stand for the premise that legislative
              prayer cannot advance religion............................................................................ 27

       2.    Defendants have stated that the prayers do not make regular
              meetings any more solemn. ................................................................................. 27

       3.    Defendants' prayers are not analogous to the prayers upon which
              they rely that were delivered by a minister to the House of
              Representatives..................................................................................................... 28

IV.    EVEN APPLYING *MARSH* WOULD NOT PERMIT DEFENDANTS' POLICY
        AND PRACTICE OF PRAYER................................................................................................ 29

A.    Defendants Grossly Distort The *Marsh* Opinion, Ignoring Nearly All Of The Circumstances Of The Nebraska Legislature. ................................................................. 29

B.    Defendants' Reading Of *Marsh* Creates A Paradox:  The Board Claims It Will Look At The Content Of Prayers Only If The Content Is Inappropriate. ................ 30

C.    Evidence In The Record Reflects That The Prayer Opportunity Has Been Used To Advance Christianity. ......................................................................................... 31

V.    *MARSH* HAS NO APPLICATION IN THIS CASE. ................................................... 32

A.    *Marsh* Does Not Apply To Public Schools. ................................................... 32

B.    *Marsh's* Focuses On Two Centuries Of Tradition To The District. ................................. 34

1.    The Board's meetings have actively involved the public, and particularly schoolchildren, for less than 15 years. .............................................. 34

2.    In discovery, the Board provided testimony for a tradition dating to only 1974. ........................................................................................... 35

C.    *Marsh* Does Not Apply Here Because The Board Is Neither A Legislative Body, Nor Analogous To The State Legislature In *Marsh*. ............................................... 36

VI.   THE LAW OF THE CASE DOCTRINE DOES NOT DETERMINE THE OUTCOME OF DEFENDANTS' MOTION. ................................................................. 38

CONCLUSION. ............................................................................................................. 40

`

# TABLE OF CASES & AUTHORITIES

**CASES**                                                                    **PAGE(S)**

*ACLU v. Black Horse Pike Reg'l Bd. of Educ.*,
   84 F.3d 1471 (3d Cir. 1996).................................................................................. 17, 21, 22

*Bacus v. Palo Verde Unified Sch. Dist.*,
   11 F. Supp. 2d 1192 (C.D. Cal. 1998), *rev'd*,
   52 F. App'x 355 (9th Cir. 2002) ......................................................................................... 33

*Bacus v. Palo Verde Unified Sch. Dist. Bd. of Educ.*,
   52 F. App'x 355 (9th Cir. 2002) ................................................................... 14, 15,29, 34

*Borden v. Sch. Dist. of E. Brunswick*,
   C.A. No. 06-3890, 2008 U.S. App. LEXIS 8011
   (3d Cir. Apr. 15, 2008) ............................................................................... 17,18, 19

*Coles v. Cleveland Bd. of Educ.*,
   171 F.3d 369 (6th Cir. 1999)....................................................................... 14, 15,25, 34

*Coles v. Cleveland Bd. of Educ.*,
   950 F. Supp. 1337 (N.D. Oh. 1996), *rev'd*,
   171 F.3d 369 (6th Cir. 1999)............................................................................................ 33

*County of Allegheny v. ACLU*,
   492 U.S. 573 (1989) ......................................................................................... 15, 30, 37

*Doe v. Tangipahoa Parish Sch. Bd.*,
   473 F.3d 188 (5th Cir. 2006) *rev'd on other grounds*,
   494 F. 3d 494 (5th Cir. 2007).......................................................................... 14, 29, 34

*Edwards v. Aguillard*,
   482 U.S. 578 (1987) ......................................................................................... 32, 33, 34

*Elrod v. Burns*,
   427 U.S. 347 (1976) ................................................................................................. 21, 22

*Engel v. Vitale*,
   370 U.S. 421 (1962) ............................................................................................................ 33

*Epperson v. Arkansas*,
   393 U.S. 97 (1968) ............................................................................................................. 33

*Hahnemann Univ. Hosp. v. All Shore, Inc.*,
   514 F.3d 300 (3d Cir. 2008) ............................................................................................... 7

i

*Hinrichs v. Bosma,*
    440 F.3d 393 (7th Cir. 2006), *rev'd on other grounds sub nom.*
    *Hinrich v. Speaker of the House of Representatives,*
    506 F.3d 584 (7th Cir. 2007) ........................................................................ 14, 29

*Ingebretsen v. Jackson Pub. Sch. Dist.,*
    88 F.3d 274 (5th Cir. 1996),
    *reh'g denied,* 88 F.3d 274 (5th Cir. 1996) ................................................. 20, 21

*Jager v. Douglas County Sch. Dist.,*
    862 F.2d 824 (11th Cir. 1989) ..................................................................... 20, 22

*Lee v. Weisman,*
    505 U.S. 577 (1992) .............................................................................. 19, 20, 37

*Lemon v. Kurtzman,*
    411 U.S. 192 (1973) ........................................................................................... 6

*Lynch v. Donnelly,*
    465 U.S. 668 (1984) .......................................................................................... 17

*Marsh v. Chamber,*
    473 U.S. 783 (1983) .................................................................................. passim

*McCreary County v. ACLU,*
    545 U.S. 844 (2005) ..................................................................................... 18, 23

*Santa Fe Indep. Sch. Bd. v. Doe,*
    530 U.S. 290 (2000) ................................................................................ 18, 20, 33

*School Dist. of Abington Twp. v. Schempp,*
    374 U.S. 203 (1963) ................................................................................... 20, 33

*Simpson v. Chesterfield County Bd. of Supervisors*
    404 F.3d 276 (4th Cir. 2005) ........................................................................... 29

*Wallace v. Jaffree,*
    472 U.S. 38 (1985) ............................................................................................ 24

*Wynne v. Town of Great Falls, S.C.,*
    376 F.3d 292 (4th Cir. 2004) ................................................................ 1, 14, 29,

**AUTHORITIES**

14 *Del. C.* § 1043 ............................................................................. 5, 12, 36

14 *Del. C.* § 1703 ........................................................................................................... 12

14 *Del. C.* § 1902 ...................................................................................................... 11, 12, 38

14 *Del. C.* § 1903 ......................................................................................................... 11, 38

Local Rule for the District of Delaware 7.1.3 (a)(4) ........................................................... 30

## PRELIMINARY STATEMENT

Defendants struggle to assemble a coherent argument that would support their Motion for Summary Judgment. Because neither the law nor the facts support their position, Defendants resort to misstating, mischaracterizing and omitting critical information that goes to the heart of this matter.

The United States Supreme Court has made clear that government involvement in prayers given in all public school settings (not just in classrooms) is unconstitutional. Recognizing that they must find a way to avoid that Supreme Court authority invalidating prayer at public schools, Defendants characterize this case as essentially identical to *Marsh v. Chambers* and its extremely limited exception to the Supreme Court's general Establishment Clause jurisprudence.[1] Indeed, that effort is the core of their argument. In doing so, however, Defendants ignore the discussion of two centuries of history in *Marsh*. Defendants ignore the fact that the prayer at issue before the Supreme Court in *Marsh* was non-sectarian. Defendants ignore the absence of public schoolchildren in the audience in *Marsh*. Defendants ignore the location of the prayer given in *Marsh*, which was not in a public school setting. And Defendants ignore that, in *Marsh*, the legislators were neither composing the prayers nor monitoring their content. Defendants ignore all of these critical facts so that they can make the simple (and simply incorrect) argument that the Indian River School Board is a legislative body, and therefore the Board's prayers are constitutional.

---

[1]   Although Defendants' Brief ignores the fact, there should be no doubt as to the limits of *Marsh*, which one Court has noted was intended by the Supreme Court to be confined to "the specific 'circumstances' before it – a nonsectarian prayer preceding public business, directed only at the legislators themselves." *Wynne v. Town of Great Falls*, 376 F.3d 292, 302 (4th Cir. 2004).

In addition to effectively ignoring the public school aspect of this case and stretching *Marsh* beyond all recognition, Defendants also advance the remarkable argument that *de minimis* violations of the Constitution are acceptable. Thus, they submit a Declaration of Defendant Susan Bunting, the primary point of which appears to be that one of the Board's prayers lasted only 62 seconds – as if there were a minimum length for violations of the Establishment Clause, or that as long as one "keeps it short," otherwise unconstitutional prayers are perfectly okay.

The obvious and myriad flaws in Defendants' arguments compel denial of their Motion, and a grant of summary judgment to the Doe family. But equally compelling is the human side of this dispute. It should not be forgotten that the Indian River School Board's actions have had *and continue to have* real, concrete impact on real people in the real world of the District. Imagine being in Jane Doe's shoes at a School Board meeting like the June 20, 2006 meeting referenced in Ms. Bunting's Declaration. Imagine believing that some of the Board members on the stage know (as, indeed, some Board members admitted "suspecting") exactly who you are: a plaintiff in a lawsuit against those very Board members, challenging their relentlessly sectarian prayer practices. Imagine too that those Board members know that your child is in the audience, waiting to be recognized by the Board for academic achievement – and they know that you and your child are Jewish. And then imagine that a Board member looks out at the audience, including you and your child, and opens the meeting with a prayer that specifically references the "successes, awards and accomplishments" of the students being honored – including your child – and closes with these words: "We ask these things and all others in the name of Jesus Christ, our Lord." That prayer and its impact are a long way from *de minimis*.

And it need not be the Doe family or the June 2006 Board meeting that one imagines. The Indian River School Board's own statement of School Board Member Ethics (posted on its

2

website) identifies each Board member's "first and greatest concern" to be "the best interest of each and every one of [the District's] young people *without distinction as to who they are or what their background may be.*" The members of the Indian River School Board *know* that not all of the schoolchildren in the District are Christian. So it is not difficult for them to imagine – for *us* to imagine – non-Christian schoolchildren at every one of its Board meetings.

Knowledge is power. The Board members' certain knowledge that not all of the schoolchildren in the District are Christian has given and continues to give them the power to conduct their meetings so as to include those non-Christian children as full participants in the meeting, and in the opportunities for recognition that brought them to the meeting in the first place. Or the Board members can choose to exercise their power to isolate those children with Christian prayers that the Board members *know* will highlight and reinforce the children's feelings of exclusion and alienation from their community and their school. The Indian River School Board has consistently chosen the latter path. That they have done so, time and time and time again, illustrates that the Policy's facial pluralism is a facade. In fact, the Policy was enacted to erect a superficially plausible legal rationale for the Board's Christian prayers. It must be struck down.

No number of citations to *Marsh* by Defendants can change the facts of this case. This case is about public school prayer, public schoolchildren and the school board of a public school. The facts of this case are not analogous to *Marsh* and, as Defendants have effectively conceded in their brief, the Circuit Courts of Appeals are in consensus that *Marsh* should not be expanded beyond its facts. (Defs.' Br. 24 n.7) For all of these reasons, the Court should deny Defendants' Motion.

3

## NATURE AND STAGE OF THE PROCEEDINGS

On February 28, 2005, Plaintiffs filed their Complaint (D.I. 1) for injunctive relief and damages. Defendants answered and moved to dismiss the claims against the individual defendants (current and former Board members and District administrators) in their individual capacities. (D.I. 8, 9, 29, 32) On August 2, 2005, the Court granted that motion. (D.I. 58) On March 24, 2006, the Court bifurcated the issues in this litigation, with the first stage focused on the constitutionality of the Policy, as written and as applied. (D.I. 87) On June 2, 2006, Plaintiffs amended their complaint. (D.I. 134) On August 21, 2007, the parties agreed in principle to settle all claims in the Complaint except for the constitutionality of that Policy.[2] The Court approved the settlement on February 21, 2008. (D.I. 237) The Dobriches' remaining claims were thereafter voluntarily dismissed. (D.I. 242)

On April 10, 2008, the parties each moved for summary judgment on the constitutionality of Policy BDA.1, as written and as applied. (D.I. 249, 251) On April 18, 2008, Plaintiffs filed a Motion to Strike Exhibit A and Footnote 13 to Defendants' Opening Brief in Support of Motion for Summary Judgment (D.I. 261). On May 6, 2008, the Court ordered that Plaintiffs' Motion to Strike would be decided in the context of Defendants' Motion.

Plaintiffs now respectfully submit this Answering Brief in Opposition to Defendants' Motion for Summary Judgment.

## SUMMARY OF THE ARGUMENT

The Court should deny Defendants' Motion for the following reasons:

---

[2]  An earlier settlement, reached after Court-ordered mediation in which Board members participated, would have settled *all* claims, and left the School Board Prayer Policy intact. Despite Board members' involvement in the mediation that led to that settlement, the Board voted unanimously to reject it in February 2006.

4

1.    In an attempt to convince the Court to grant their Motion, Defendants misstate, mischaracterize and omit critical information.

  A.    First, Defendants exaggerate their statutory authority to perform functions they claim are legislative. They say they have the power to levy and collect taxes, but fail to inform the Court that they need approval of voters before they can exercise their purported "power." Defendants also claim they can pass laws, but rely upon a statute that does not grant them that authority. Instead, the statute states that the Board may "adopt rules and regulations" for the District's schools. 14 *Del. C.* § 1043.

  B.    Second, Defendants mischaracterize *Marsh v. Chambers*. In *Marsh*, the United States Supreme Court found constitutional the practice of non-sectarian prayer delivered by an outside minister before a legislative body that had a tradition of prayer that was analogous to the two centuries of prayer given before Congress. These facts are in stark contrast to the sectarian prayer given by the Board in front of public schoolchildren, reflecting a "tradition" that is at most fourteen years old. Despite these obvious differences, Defendants insist that "[t]his case is not distinguishable in any meaningful way from *Marsh*." (Defs.' Br. 2) (D.I. 250)

  C.    Third, Defendants wrongly argue that Plaintiffs' must prove that, as a forum for prayer, a school board meeting is the functional equivalent of a classroom setting. In fact, the United States Supreme Court has consistently held public school prayer unconstitutional in settings other than the classroom, including (i) prayers at athletic events; (ii) prayers at graduation and (iii) prayers over a school's PA system during non-instructional time in school.

2.    The Policy is unconstitutional because it is an endorsement of religion. A reasonable observer would conclude that the history of the Policy and its application only in

*public* Board meetings reflects an intent to be seen as public supporters of Christianity. Neither the Board's disclaimer nor the temporal duration of the prayers eliminates the endorsement effect.

   3. The Policy is unconstitutional under each of the three prongs of the test outlined by the Supreme Court in *Lemon v. Kurtzman*, 411 U.S. 192 (1973). The Board's role in composing and monitoring prayer content constitutes excessive entanglement with religion. The ostensible secular purpose of solemnizing meetings is a sham, because the Board routinely conducts non-public special Board meetings in a solemn fashion without prayers; in any case, Board members define "solemnify" to mean "seek divine guidance," illustrating that their true purpose is religious. And the Board has provided no evidence that the Policy has the primary effect of solemnizing meetings.

   4. Lastly, Defendants now contend that this Court decided the dispositive issue about School Board Prayer in its rulings more than two years ago. If Defendants were correct, the parties and the Court have spent a significant amount of time litigating a foregone conclusion. In addition, Defendants fail to explain why, if they are correct, they did not move for summary judgment before incurring substantial discovery costs. Defendants' contention is meritless and the Court should disregard it.

   For all of the above reasons, the Court should deny Defendants' Motion.

## COUNTERSTATEMENT OF FACTS[3, 4]

**I.    DEFENDANTS DISINGENUOUSLY OMIT CRITICAL TESTIMONY REGARDING THE PURPOSE OF THE PRAYER AND THE PUBLIC'S PARTICIPATION IN THE PRAYER.**

Defendants purposefully omit sitting Board member Robert Wilson's testimony in an attempt to avoid the obvious: the Board's stated "solemnization" purpose for Board prayer is a sham. As Wilson testified, "We [*i.e.*, the Board] want the public to take part in the prayer. That's the whole thing behind the public board meeting." (Wilson 31)  Wilson's testimony proves that the stated purpose of "solemnifying" the meeting is a pretext – the curtain behind which Defendants seek to hide their unconstitutional behavior.

---

[3]    Defined terms in this Brief have the same meaning as in Defendants' Opening Brief in Support of Motion for Summary Judgment.

[4]    Plaintiffs' Counterstatement of Facts points out various misstatements, mischaracterizations and omissions by Defendants. Nothing included herein, however, should be construed as raising a genuine dispute of a material fact that would preclude the Court from granting Plaintiffs' Motion for Summary Judgment ("Plaintiffs' Motion"). For example, Defendants do not dispute that Wilson testified that the public participates in the Board's prayer, nor have they disputed his statement that public participation was "the whole thing behind [prayer at] the public board meeting." Defendants cannot prevent the Court from ruling against them by omitting a discussion about Wilson's testimony (as they have attempted to do in this brief). In another example, Defendants claim that the Policy does not restrict a prayer's content, despite the Policy's express language doing precisely that – language that the Defendants of course do not and cannot dispute. As the Third Circuit has stated, "summary judgment is appropriate only where, drawing all *reasonable* inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." *Hahnemann Univ. Hosp. v. All Shore, Inc.*, 514 F.3d 300, 305 (3d Cir. 2008) (citation omitted) (emphasis added). "[C]onclusory allegations do not satisfy a nonmoving party's duty to show that a material issue of fact exists once the moving party points to evidence demonstrating that there is no issue of material fact." *Id.* at 308 (citation omitted) (affirming summary judgment). In this case, the misstatements, mischaracterizations and omissions that Defendants set forth in support of their Motion do not support reasonable inferences that the Court may rely on when deciding if there is a genuine dispute about the material facts that support Plaintiffs' Motion. In contrast, Plaintiffs' Opening Brief on their Motion points to undisputed evidence requiring the grant of that Motion as a matter of law. For that reason, this Counterstatement of Facts herein does not preclude the Court from granting Plaintiffs' Motion.

Furthermore, by omitting Wilson's testimony Defendants fail to inform the Court that Walls's testimony (on which they heavily rely) is directly contradicted by a fellow Board Member. In their factual recitation, Defendants state that "the Board does not require members of the public to participate in the prayer." (Defs.' Br. 11 (citing Walls 52)) This, of course, is not fact, but inference – and it is clear that compulsion can take many forms. Moreover, the inference is not reasonable, based on all the facts and circumstances surrounding the Board's prayers, as our Opening Brief made clear. Moreover, Defendants tellingly pull back from this "fact" in their legal argument, where they claim only that the Board "has no expectation" of public participation – a "fact" directly contradicted by Wilson's candid testimony.

In addition to testifying about the Board's desire to have the public participate, Wilson also testified that he affirmatively observed the public participating in Board prayer. (Wilson 31 ("Of the people present, they do take part. I have been able to look around at several times and there are people that have heads bowed."))

Defendants' complete omission of Wilson's deposition is telling. Wilson provided critical testimony on key facts that support Plaintiffs' position and directly contradict Defendants. Instead of acknowledging the testimony to the Court and offering some form of explanation, Defendants attempt to hide its existence. Indeed, Defendants cited *nine other depositions*, but not Wilson's. Wilson's testimony is not rebutted by any of the other Board members, who stated only that they were not aware one way or the other of whether people in the audience participate, or that the Board does not "expect" them to participate. Only Wilson testified as to actual knowledge of audience participation – and his direct observations, confirmed in Jane Doe's deposition testimony, that audience members do participate - is thus undisputed. (Doe 16-17)

## II.    DEFENDANTS FAIL TO ACKNOWLEDGE THE BOARD'S INVOLVEMENT IN DICTATING THE CONTENT OF THE PRAYERS.

Defendants state as a "fact" that the Board does not dictate the content of the prayers. (Defs.' Br. 12)  This statement is not true.[5]

According to the words of the Policy, no Board member may offer a prayer that proselytizes, advances or converts anyone, or which derogates or otherwise disparages any particular faith or belief.  (Defs.' Br. 9; Policy BDA.1 ¶ 3 (D.I. 250, Ex. H))  These restrictions go directly to the content of the prayer.  Board members admitted that it is their responsibility to enforce the Policy, *see, e.g.,* Hattier 144, Bireley 22, and they must necessarily analyze the content of the prayers to determine whether the prayers violate the Policy.  (*See, e.g.,* Mitchell 106-08 (stating that using the word "convert" in a prayer is "inappropriate"); Isaacs 39-41 (stating that the prayer "Oh, Lord, please convert the Jews in the audience and ensure that they come to know our Lord Jesus Christ" would violate the Policy); Cohee 109 (stating that the prayer "We pray, Lord, enlighten the heathen in our midst, inspire them to come to your wisdom and goodness.  We ask these things in the name of Jesus Christ.  Amen" would violate the Policy).

Moreover, the content-based judgments that will be required will likely provoke disagreement among individual Board members.  *Compare* Hastings 118 (stating that the prayer "we pray, Lord, that you enlighten the heathen in our midst and that you inspire them to come to knowledge of your wisdom and goodness" would likely be permissible under the policy) and

---

[5]    Alternatively, to the extent that this statement *is* true, it proves Plaintiffs' argument that the Policy was intended solely to protect the Board during litigation.  Reading the content restriction out of the Policy makes the Policy useless as an enforcement tool to prevent unconstitutional behavior.

Helms 217-18 ("We pray that you direct them into the truth that comes by knowing Jesus" *not* proselytizing) Evans 153 (stating that the prayer "Oh, Lord, convert the heathen among us" would violate the Policy); *and* Hughes 72 (stating that the prayer "Lord, I pray that you convert the heathens before me now to the truth that comes by knowing you" would violate the Policy)) Indeed, Board members conceded that their judgments would be influenced by their own religious beliefs – insuring that the Board's content-based review cannot be entirely objective. (Hughes 75; McCabe 82)

Because the Policy expressly restricts certain content, because Board members compose the prayers that are delivered at meetings, and because Board members are charged with enforcing the Policy (and thus with monitoring the content of the prayers), the Board is necessarily involved in dictating the content of the prayers.

## III.    DEFENDANTS MISCHARACTERIZE HOW THE BOARD ADOPTED THE POLICY.

In their statement of facts, Defendants describe an organized process through which they adopt policies for the District. (Defs.' Br. 6-7) While this process may be the goal, and may have been adhered for some other Board policies, it does not accurately present what happened during the adoption of Policy BDA.1.

For example, Defendants claim "the Policy committee . . . studies proposed policies, analyzes the need for new policies, and prepares drafts of new policies." (Defs.' Br. 6) And they claim that "[i]n order for a new policy to be presented to the full Board for consideration, it must first be endorsed by the Policy committee members." (*Id.* 6-7) With regard to Policy BDA.1, however, Defendants' description of the drafting and adoption process generally is simply not accurate. As Walls testified, Wilmington attorney Tom Neuberger, who was neither a Board member nor a member of the Policy Committee, drafted Policy BDA.1, working from a

Rutherford Institute template. (Walls 13, 26-28) Walls candidly admitted that "[t]he actual

wording in [Policy BDA.1] was not left up to the policy committee." (Walls 14) The only role

the Policy Committee had in "drafting" Policy BDA.1 was to assign the number "BDA.1" to it.

(Walls 14, 41)

Similarly, Defendants describe a process in which a prospective policy is read aloud at

two regularly scheduled Board meetings. (Defs.' Br. 7) Although this may be the Board's

general practice, it is undisputed that Policy BDA.1 was never read aloud at a public meeting.

(Hastings 32-33)

Thus, while Defendants' description of the general workings of the Board's policy

committee may be accurate in the abstract, they are not accurate with regard to Policy BDA.1,

not relevant to the Board's process in this case, and thus potentially misleading.

ARGUMENT

I.    **DEFENDANTS' BRIEF EXAGGERATES AND MISCHARACTERIZES
EXISTING CASE LAW AND DELAWARE STATUTORY LAW RELATING TO
THE BOARD'S AUTHORITY.**

A.    **Defendants Exaggerate The Legal Authority That The Board Possesses.**

Defendants unsurprisingly contend that the Board is a legislative body because it has

certain legislative powers. In fact, the statutory authority for those "legislative powers" is greatly

overstated.

First, Defendants make several references to the ability of the Board to levy taxes. (*See*

Defs.' Br. 7, 21 (citing 14 *Del. C.* § 1702)). The power of the Board to "levy and collect

additional taxes for school purposes" is, in most cases, not the Board's power, but the power of

the voters of the District. As 14 *Del. C.* § 1703 demonstrates, the Board's ability to levy taxes is

wholly contingent on voter ratification in a referendum. While the Board can set the amount of

11

the tax proposal to be presented to District voters, the voters, not the Board, finally determine whether the tax will be collected.

The only circumstance where the Board can levy a tax without securing voter approval is when it must do so in order "to support the local district contribution" that is compelled by a statute. 14 *Del. C.* § 1902. Thus, the Board does not have discretion to levy and collect taxes, but may do so only when it has secured voter approval or when it is required to collect the taxes by statute.

Second, Defendants state that the "Board derives its authority to *pass laws* and set policy from the state legislature." (Defs.' Br. 21 (citing 14 *Del. C.* § 1043) (emphasis added)) But section 1043 unambiguously does *not* confer on the Board the power to pass laws. Section 1043 states, in its entirety:

> In each reorganized school district there shall be a school board which shall have the authority to administer and to supervise the free public schools of the reorganized school district and which shall have the authority to determine policy and adopt rules and regulations for the general administration and supervision of the free public schools of the reorganized school district. Such administration, supervision and policy shall be conducted and formulated in accordance with Delaware law and the policies, rules and regulations of the State.

Thus section 1043 does not give the Board any authority to pass *laws*, but only the power to enact policies, rules and regulations for the public schools and the District. And the last sentence of section 1043 clearly indicates that "Delaware *laws*" are a different animal than the policies and regulations the Board is empowered to enact. Unlike the General Assembly or the Congress, public school boards have no reason to exist except the public schools they serve.

**B.    Defendants Mischaracterize The Supreme Court's Opinion In *Marsh v. Chambers.***

In their brief, Defendants declare "[t]his case is not distinguishable in any meaningful way from *Marsh*." (Defs.' Br. 2) Given the myriad obvious factual differences between *Marsh*

and this case,[6] that statement is not accurate even if the Court were to adopt Defendants' unprecedented broad legal reading of *Marsh*.

In *Marsh*, the Supreme Court determined that the Nebraska legislature's particular practice of prayer before legislative sessions did not violate the Establishment Clause. Defendants argue that "[in *Marsh*,] the Court also rejected the plaintiff's argument that Judeo-Christian references contained in the prayers rendered the practice unconstitutional." (Defs.' Br. 19) But the "Judeo-Christian" references in *Marsh* were generic references to God, not, as here, pervasive sectarian references to Christ. (Defs.' Br. 26 (describing the "typical" prayer as including a reference to Christ))

Defendants later state that the *Marsh* court "also noted that the chaplain had previously used explicitly Christian prayers." (Defs.' Br. 23) However, Defendants neglect to mention that in *Marsh* the Supreme Court did not address those sectarian prayers, because the minister who delivered the prayer "removed all references to Christ after a 1980 complaint from a Jewish legislator." *Marsh v. Chambers*, 463 U.S. 783, 793 n.14 (1983). Thus, in arguing, as Defendants do, that "in permitting legislative prayer, the [*Marsh*] Court did not distinguish between sectarian prayer and non-sectarian prayer, or otherwise limit its holding to non-sectarian prayer," Defendants apparently rely on the Supreme Court's reticence to issue an advisory opinion about

---

[6] Indeed, Defendants' Brief concedes many of these differences. For example, Defendants admit that (i) the "legislative sessions" at Board meetings are of "a different kind" than those of Congress (Defs.' Br. 29); (ii) students "are what [the Board, unlike the legislature] is all about" (Defs.' Br. 30, n.10); and (iii) the Board itself, as opposed to a minister (as in *Marsh*), composes and delivers the prayers. (Defs.' Br. 36-37) Defendants also state that "it is also notable that the Board Prayer Policy at issue here, unlike the one at issue in *Marsh*, does not require any expenditure of public funds. The Board does not retain and pay a chaplain, and the Board members themselves are volunteers." (Defs.' Br. 37) Thus, it is abundantly clear that even Defendants regard this case as different in "meaningful" ways from *Marsh*.

facts not before it. The absence of a holding in *Marsh* on sectarian prayer is not evidence that

the Board's sectarian prayer practice has been approved by the Supreme Court. (*See* Defs.' Br.

23) In fact, in its assessment of the history of legislative prayer, the majority opinion makes no

reference to sectarian prayers, except the aforementioned footnote indicating that they were not

at issue in *Marsh*. But sectarian prayers are, of course, squarely at issue in this case.

   Defendants proclaim "[t]he Supreme Court has already concluded that legislative prayer

is permissible under the Establishment Clause." (Defs.' Br. 24) This, too, misstates existing case

law. While the Supreme Court held that the Nebraska legislature's practice of prayer was

permissible, it is simply untrue to say that all legislative prayer was deemed permissible under

*Marsh v. Chambers*. As Defendants' footnote 7 reflects, courts have uniformly rejected such a

sweeping interpretation, with even those Courts of Appeals that have applied *Marsh* doing so in

a manner that would clearly forbid Defendants' practice of sectarian prayer. *See Doe v.*

*Tangipahoa Parish Sch. Bd.,* 473 F.3d 188, 205 (5th Cir. 2006), *rev'd on other grounds,* 494

F.3d 494 (5th Cir. 2007) (en banc); *Bacus v. Palo Verde Unified Sch. Dist. Bd. of Educ.,* 52 F.

App'x 355, 356-57 (9th Cir. 2002)*; Wynne v. Town of Great Falls, S.C.,* 376 F.3d 292, 301 (4th

Cir. 2004)*; Hinrichs v. Bosma,* 440 F.3d 393 (7th Cir. 2006), *rev'd on other grounds sub nom.*

*Hinrichs v. Speaker of the House of Representatives,* 506 F.3d 584 (7th Cir. 2007)*; cf. Coles v.*

*Cleveland Bd. of Educ.,* 171 F.3d 369, 376-77 (6th Cir. 1999) (holding that *Marsh* did not apply

to school board prayer). Although Defendants characterize these decisions as "departing" from

*Marsh*, in fact these courts depart only from Defendants' expansive reading of *Marsh*, not from

the opinion itself, and certainly not from the body of Supreme Court precedent finding prayer in

public school contexts unconstitutional. Defendants do not (and cannot) provide any cases

adopting their expansive reading of *Marsh,* because the Supreme Court has already rejected such

14

a reading: "[I]n *Marsh* itself, the Court recognized that not even the 'unique history' of legislative

prayer can justify contemporary legislative prayers that have the effect of affiliating the

government with any one specific faith or belief. The legislative prayers involved in *Marsh* did

not violate this principle because the particular chaplain had 'removed all references to Christ.'"

*County of Allegheny v. ACLU*, 492 U.S. 573, 603 (1989) (citations omitted).

Thus, Defendants argument that "[t]o suggest that a prayer is unconstitutional simply

because it contains sectarian references misapprehends *Marsh*, which made clear that content is

not determinative" (Defs.' Br. 22) is unsustainable. The Supreme Court did, in fact, conclude

that the content was not determinative in the circumstances of *Marsh*, where the prayers were

non-sectarian. The Supreme Court did not, however, create the nearly boundless precedent that

Defendants urge, but subsequently concluded *exactly the opposite*. *Allegheny*, 492 U.S. at 603

("The legislative prayers involved in *Marsh* did not violate [the endorsement test] because the

particular chaplain had 'removed all references to Christ.'").

Additionally, Defendants note that "[l]ower courts in other jurisdictions have

characterized various public bodies, including school boards, as 'legislative or other deliberative

bodies,'" but fail to note that the only Courts of Appeals that have employed a *Marsh* analysis

have *assumed* without deciding that *Marsh* applied, because even under *Marsh*, the prayer

practices were unconstitutional. (Defs.' Br. 20, n.6; *see also Bacus*, 52 F. App'x at 356 ("We

need not determine whether prayers at school board meetings are more like prayers in state

legislatures, as in *Marsh v. Chambers* . . . or more like prayers in schoolrooms, as *Coles v.

Cleveland Board of Education*."))

15

C.    **Defendants Exaggerate The Alternatives Available Under The School Board Prayer Policy.**

Defendants characterize the Policy as authorizing a broad menu of practices to open public Board meetings: "[O]ne Board member will offer a prayer, moment of silence, or other solemnizing appeal in accordance with the policy." (Defs.' Br. 10)  In fact, however, the Policy prescribes only two mechanisms for solemnifying meetings – prayers or moments of silence. Those limited alternatives reveal a preference for religious expression underlying the Policy. Indeed, the Policy's title ("Board *Prayer* at Regular Board Meetings") inadvertently reveals the Policy's true religious purpose.  If the Policy were truly meant only to solemnify Board meetings, the title would reflect such a neutral purpose – for example, "Solemnizing Regular Board Meetings" – rather than indicating a preference for a particular (religious) means of solemnification in the title.

Defendants argue that the Policy has an "allowance for . . . no prayer at all." (Defs.' Br. 35)  But the nominal possibility that no prayer would be offered is in fact entirely theoretical. The Board interprets paragraph 2 of its Policy to mean that if one Board member declines to offer a prayer or a moment of silence when his or her turn arises, then another Board member will be given the same opportunity *at the same meeting*.  Thus, unless all ten Board members say that they do not want to give a prayer or moment of silence, a prayer or moment of silence will be given at every meeting.  And, consistent with the Policy's title, history has shown that in virtually every case, the Board member will open the meeting with a Christian prayer.

## II.    THE POLICY IS AN UNCONSTITUTIONAL ENDORSEMENT OF RELIGION.[7]

Defendants urge that a reasonable observer familiar with the history and nature of the

community would not regard the Policy as an endorsement of religion. The "endorsement test"

highlights whether governmental action "sends a message to nonadherents that they are outsiders,

not full members of the political community, and an accompanying message to adherents that

they are insiders, favored members of the political community." *Lynch v. Donnelly*, 465 U.S.

668, 688 (1984) (O'Connor, J., concurring).

The analysis of endorsement is similar to the analysis of "primary effect" under the

*Lemon* test. In this case, the Policy endorses religion over non-religion and Christianity over

other religions. Defendants have adopted a prayer policy that applies only to meetings where the

public is present, belying the ostensible purpose of "solemnifying those meetings." But the

public's response to Board prayer and the Board's own conduct underscore an endorsement effect.

### A.    The Supreme Court Has Held That Prayers – Even Legislative Prayers - Referencing Jesus Christ Violate The Endorsement Test.

Contrary to Defendants' contention, the United States Supreme Court has stated that its

holding in *Marsh* was expressly conditioned on the non-sectarian content of the prayers there

presented: "[I]n *Marsh* itself, the Court recognized that not even the 'unique history' of

legislative prayer can justify contemporary legislative prayers that have the effect of affiliating

the government with any one specific faith or belief. The legislative prayers involved in *Marsh*

did not violate this principle because the particular chaplain had 'removed all references to

---

[7]    Although the *Lemon* test has been the historically controlling test in the Third Circuit, *see ACLU v. Black Horse Pike Regional Board of Education,* 84 F.3d 1471, 1484 (3d Cir. 1996), a recent opinion from April 2008 shows that the Court may find challenged prayers unconstitutional using only the endorsement test. *See Borden v. Sch. Dist. of Twp. of E. Brunswick,* C.A. No. 06-3890, 2008 U.S. App. LEXIS 8011 (3d Cir. Apr. 15, 2008).

Christ.'" *Allegheny*, 492 U.S. at 603 (citations omitted). In this case, Defendants admit that the "typical" prayer includes references to Christ, and that they enacted a Policy permitting sectarian prayers after receiving complaints about that very kind of prayer. (Defs.' Br. 13, 26) Thus, the Board's sectarian prayers invoking Christ have affiliated the Board with one "faith or belief" and, thus, are unconstitutional. *Allegheny*, 492 U.S. at 603.

### B.    The Board's History Of Prayer Coupled With Its Current Attempts To Preserve Board Prayer Are Unconstitutional Endorsements Of Religion.

Shortly after the parties filed opening briefs in support of summary judgment, the Third Circuit decided *Borden v. School District of the Township of East Brunswick*, C.A. 06-3890, 2008 U.S. App. LEXIS 8011. In *Borden*, the Third Circuit concluded that a football coach at a public school violated the Establishment Clause by bowing his head during the football team's pre-meal prayer in the school cafeteria and taking a knee during a student-led locker room prayer. *Id*. at *3. The Third Circuit held that these acts were unconstitutional when considered with the coach's past conduct of leading his team in prayer, choosing a player to lead the team in prayer, and responding to complaints about prayer by telling students that "if they were uncomfortable during the prayer, they could wait in the restroom until it was over." *Id*. at *4.

Here, the evidence is similarly abundant that the Board's conduct is an endorsement of religion. Like the football coach in *Borden*, the Board purported to change its prayer practices only after receiving complaints. In fact, however, rather than altering its practice, the Board simply drafted a new Policy intended to legitimize its existing practice. *See McCreary County v. ACLU*, 545 U.S. 844, 873 (2005); *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 309-10 (2000); *Borden*, 2008 U.S. App. LEXIS 8011, at *55.

Defendants also argue that the qualms of objectors can be accommodated, emphasizing that those who are uncomfortable "are free to listen, to stand in *respectful silence*, or simply to

18

think of something else . . . or temporarily leave." (Defs.' Br. 36-37) (emphasis added)
Defendants' suggestion is no less constitutionally offensive than the coach's suggestion in *Borden*
that players simply wait in the restroom until the prayer is completed.[8]  In reality, the Board
offers no realistic choice for any community member who objects to the prayers but to tacitly
participate. *See Lee v. Weisman*, 505 U.S. 577, 593 (1992).  Defendants' two alternatives – tacit
participation or absence - impose a cost to civic participation that the Board cannot
constitutionally exact. *See Lee*, 505 U.S. at 596.

The District's history of unconstitutionally promoting religion must be considered in this
context.  As Plaintiffs' initial Complaint reflected, the District has permitted unconstitutional
religious intrusions into public schools for years, including sectarian graduation invocations
forbidden by *Lee v. Weisman*, prayer at athletic and academic banquets (Helms 14-15, 150-51; P
0338-P 0341 Exh. Nos?; P 0342-P 0345; P 0346-P 0349), and Bible Clubs run by school
personnel.  (Hobbs 171-74)

### C.    As *Borden* And Other Case Law Demonstrate, Prayers By School Officials On Public School Grounds Are Unconstitutional.

Defendants maintain that for Plaintiffs to prevail, they must prove that a school board
meeting is effectively the same as a classroom setting. (Defs.' Br. 29)  This argument implicitly
acknowledges the black letter rule that prayers in school classrooms are unconstitutional.  What
Defendants fail to acknowledge is that prayers given or sanctioned by school officials in the
presence of students anywhere on public school grounds – not merely in the classroom – are also
unconstitutional.  The Third Circuit's recent *Borden* decision, striking down a football coach's

---

[8]    In fact, it is worse.  In contrast to the football players in *Borden*, who were in high school, the
students whom the Board members suggest can simply temporarily leave the Board meetings
are as young as five years old.

silent involvement in a pre-game prayer offered in a locker room, makes that clear.[9]  The United

States Supreme Court has agreed, holding the following non-classroom prayers unconstitutional

as well:  (i) prayers at athletic events, (ii) prayers at graduation and (iii) prayers over a school's

PA system during non-instructional time in school.[10]  *See Santa Fe*, 530 U.S. 290; *Lee*, 505 U.S.

577; *Sch. Dist. of Abington Twp. v. Schempp*, 374 U.S. 203 (1963).  Defendants seek to avoid

these seminal cases by insisting that Plaintiffs' must directly analogize school board meetings to

classrooms.  That is not the law.[11]

   The *Borden* case also underscores that prayers delivered to students, and even

participation by school officials in student prayers, also pose a constitutional danger.  The

Board's conceded intention to seek divine guidance in making decisions that affect students is

directly analogous to the coach's situation in *Borden*.  Both the Board and the football coach

---

[9]   For a more comprehensive list of non-classroom settings where school prayer would be
      found unconstitutional, the Court may look to the Fifth Circuit's decision that found the
      following broad-reaching statute unconstitutional:  "[O]n public school property, other public
      property or other property, invocations, benedictions or nonsectarian, nonproselytizing
      student-initiated voluntary prayer shall be permitted during compulsory or noncompulsory
      school-related student assemblies, student sporting events, graduation or commencement
      ceremonies and other school-related student events."  *Ingebretsen v. Jackson Pub. Sch. Dist.*,
      88 F.3d 274, 277 (5th Cir. 1996), *reh'g denied*, 88 F.3d 274, 281 (5th Cir. 1996).

[10]  Plaintiffs presume Defendants' reference to the classroom means instructional time in the
      classroom.

[11]  In an analogous case almost twenty years ago, the Eleventh Circuit made clear that
      Defendants' argument is without merit:

            The School District first argues that the school prayer cases are not implicated here
            because pregame invocations occur outside the instructional environment of the
            classroom.  This argument is meritless.  Even though not occurring in the classroom,
            the invocations take place at a school-owned stadium during a school-sponsored event.

      *Jager v. Douglas County Sch. Dist.*, 862 F.2d 824, 831 (11th Cir. 1989) (finding prayer
      before football games to be unconstitutional).

make decisions that affect the students' morale and even physical well-being while serving as representatives of the school and the District.  If anything, the Board's conduct is more problematic, because in a very real sense, the ten members of the Board *are* the District.  The mere fact of the Board members' election and rule-making authority should not permit them to do what all other representatives of the School District cannot.

### D.    Defendants' Disclaimer Does Not Prevent Or Remove The Endorsement Effect.

The Third Circuit has held that disclaimers do not permit the government to engage in otherwise unconstitutional religious conduct.  Although the Court in *Black Horse Pike* noted that a disclaimer helped to restore some separation between the church (in the form of a student-delivered graduation prayer) and the state (in the form of the defendant school board), it nevertheless held that "the Board cannot sanction coerced participation in a religious observance merely by disclaiming responsibility for the content of the ceremony." *Black Horse Pike,* 84 F.3d at 1482; *see also Ingebretsen*, 88 F.3d at 277 (holding statute unconstitutional despite preamble that specifically stated that the statute "shall not be construed to violate the constitution").

Here, the disclaimer similarly cannot sanitize unconstitutional conduct.  Indeed, by prefacing their prayers with a recitation of the disclaimer, the Board draws additional emphasis to the prayer and ensures the public's attention to it.

### E.    The Duration Of The Board's Prayers Is Constitutionally Irrelevant.

There are no *de minimis* violations of the Establishment Clause.  As the Supreme Court has held, "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 374 (1976); *see also Jager v. Douglas County Sch. Dist.*, 862 F.2d 824, 832 (11th Cir. 1989) ("The School

District's final attempt to distinguish the school prayer cases centers on the contention that the invocations constitute a *de minimis* violation of the Establishment Clause because they last 60 to 90 seconds.  This approach is flawed . . . The Establishment Clause does not focus on the amount of time an activity takes, but rather examines the religious character of the activity.") (citations omitted).  Defendants repeatedly emphasize that the prayers at issue in this case are generally of brief duration, noting that one such prayer lasted only 62 seconds.  (Defs.' Br. 12, 26)  Setting aside the question whether a prayer longer than a minute can fairly be characterized as "brief" – the Lord's Prayer can be recited in half that time – the alleged brevity does not alter Plaintiffs' constitutional right to be free from governmental establishment of religion.

## III.    THE POLICY IS UNCONSTITUTIONAL UNDER THE *LEMON* TEST.

Although the Third Circuit ruled the school official's actions in *Borden* unconstitutional without analyzing the *Lemon* factors, Supreme Court precedents establishing each of the parts of the test are still binding upon the Third Circuit.  Here, the Policy violates each of the three factors in the *Lemon* test, because it excessively entangles government and religion, lacks a clear secular purpose, and has a primary effect of advancing religion.  Thus, the Policy is unconstitutional.

### A.    The Policy Requires Excessive Entanglement Of Government And Religion.

The Policy requires the Board to either ignore the express language of the Policy, or act as a monitor for inappropriate use of the prayer opportunity.  (*See* Policy BDA.1 ¶ 3 (D.I. 250, Ex. H) (purporting to restrict any use of the prayer opportunity for proselytizing, advancing, converting, derogating or disparaging))  In Defendants' opening brief, they contend that no entanglement exists because there is no "expenditure of public funds," "the Board does not retain and pay a chaplain," and "the Board members themselves are volunteers."  (Defs.' Br. 37)  Even assuming these points to be true, the Board is excessively entangled because of its role in

22

creating and monitoring the content of the prayers.  Defendants apparently concede that monitoring *would* create entanglement concerns, but argue that monitoring is not required unless the Policy required non-sectarian prayers.

Their argument is nonsense.  It effectively ignores paragraph 3 of the Policy, which provides that "such [prayer] opportunity shall not be used or exploited to proselytize, advance or convert anyone, or to derogate or otherwise disparage any particular faith or belief."  Self-evidently, in order to ascertain whether a prayer opportunity is used for these prohibited purposes, an observer must consider the words of the prayer offered.

During their depositions, Board members acknowledged that the application of paragraph 3 requires consideration of the words in a given prayer.  In analyzing whether prayers were permissible, Board members uniformly considered the words of prayers.  (*See, e.g.,* Mitchell 113; N.L. Bunting 116-17)  Some Board members went so far as to say that they could not determine whether a prayer was improper without being given a definition of a word in a prayer.  (McCabe 83-85)

### B.    Defendants' Purported Secular Purpose Is A Sham.

Defendants seek simply to co-opt the implied secular purpose of "solemnifying its proceedings" from *Marsh*.  But the Board acts as if the secular purpose "enquiry were so naive that any transparent claim to secularity would satisfy it, and they would cut context out of the enquiry, to the point of ignoring history. . . ." *McCreary*, 545 U.S. at 863-64.  As in *McCreary*, the proffered secular purpose here is a *post hoc* rationalization for preserving pre-existing religious practices in public Board meetings.

1.    **The Board's purported secular purpose does not explain the divergent treatment of public and non-public meetings.**

The Policy states that the prayer's purpose is to "solemnify" Board proceedings. However, the Policy on its face applies only to regular meetings, which are attended by public schoolchildren, their parents, and other interested members of the public. In contrast, there is no policy or practice of prayer for special meetings, which are not public, and the Board concededly does not pray at those meetings. (D.I. 9 ¶ 52.) By having a practice of prayer only at meetings attended by the public, the Board demonstrates that the stated purpose of the Policy is a sham – because special meetings equally require solemnity, but the Board does not pray at those meetings. It is quite obviously the presence of the public that drives the Board's prayer practice. *See Wallace v. Jaffree*, 472 U.S. 38, 63 (1985) (Powell, J., concurring).

In discussions about adopting a Board Prayer Policy, Board members considered their constituents' desire to continue the prayer practice, even though the Board members (again, with the glaring exception of Robert Wilson) all testified that the public is not involved in the prayer. (Bireley 113-15; Aug. 23, 2004 minutes)[12] There is no indication that the constituents were concerned about the solemnity of the Board's proceedings; their desire was based on religious preferences and a desire to defend Christian values. (Isaacs 54; Walls 88-89). The Board's practice of deciding whether to offer a prayer to open its meetings based on whether the public is in attendance powerfully confirms Board member Robert Wilson's remarkably candid testimony regarding the true purpose of the prayer policy. "We want the public to take part in the prayer. That's the whole thing behind the public board meeting." (Wilson 31) The dovetailing of

---

[12]    Interestingly, although Donald Hattier insisted that the prayers were for Board members only, the transcript of one of the prayers, he offered includes an explicit invitation to the audience to join him in the prayer. (Ex. 54 to Pls.' Br.)

Wilson's words and the Board's conduct is the strongest possible evidence of the Policy's real purpose.

### 2.     Defendants define "solemnify" in religious terms.

The Policy indicates that the secular purpose is to "solemnify" meetings. However, Defendants' brief is instructive about the meaning of "solemnify" to Defendants, reflecting that the Board members' meaning of "solemnify" is to "seek divine guidance." Seeking divine guidance is, by definition, not a secular purpose.

While the Supreme Court held that the Nebraska legislature could invoke divine guidance, the seeking of divine guidance was not the legislature's purpose. To sanction "seeking divine guidance over legislators" as a secular purpose would be to define the purely religious as secular.

### 3.     The content of Defendants' prayers goes well beyond what would be necessary to achieve the modest goal of solemnifying Board proceedings.

The stated purpose of solemnifying Board proceedings does not justify the Board's use of sectarian prayers. As the Sixth Circuit held in *Coles*, "the content of the prayers delivered at the school board meetings clearly went beyond what was necessary to solemnize or bring a more businesslike decorum to such meetings. The prayers frequently called for divine assistance or affirmation, sometimes by using veiled references to the Bible. In addition, many prayers mentioned Jesus by name." *Coles,* 171 F.3d at 384.

Here, the "typical" prayer includes a reference to Christ and is used "for nothing more than an appeal for wisdom in [the Board's] decision making." (Defs.' Br. 26) The prayer that Defendants describe as "typical of those offered since the adoption of the prayer policy" does not ask for divine guidance in decision making, but actual divine intervention: "Heavenly Father, Lord our God. Heavenly Father, please help the Board with the problems in the School District that we are going through right now. We ask these things in Jesus' Name." (Defs.' Br. 26 (citing

25

Amended Compl. ¶ 144)) Any solemnizing effect of this "typical" prayer is negligible in the context of repeated invocations to Christian entities.

The prayers also clearly involve non-Board members, whether through direct invitations to join in the prayers,[13] or by explicit identification of District families as beneficiaries of the prayers – for example, prayers "offered to console District families suffering a tragedy." (Defs.' Br. 26) Such prayers on their face directly involve non-Board members, in direct contradiction to the Policy's disclaimer that no one but the Board is involved in the prayers. By directing their prayers toward people outside the Board, including children in the audience, the content of such prayers removes any possible separation between the Board and the public.

The intermittent presence of "historical" prayers like those cited by Defendants does not alter this conclusion. Both of the historical prayers were nonetheless recognizable and identifiable as Christian prayers. For example, although Hattier excised the sectarian reference to "Jesus Christ" from his recitation of Washington's prayer, the prayer, as a matter of historical fact, does invoke Jesus's name and is a sectarian prayer. (D.I. 255, Ex. 54)

## C.    The Primary Effect Of The Policy Is An Endorsement Of Religion.

Defendants state that solemnization is the primary effect of the Policy, citing only to a Board member's testimony that she "believe[s the Board prayer] solemnizes the proceedings and prepares people to conduct the business of the district." (Defs.' Br. 35 (citing Mitchell 12, 15)) But the overflow attendance at the August 24, 2004 Board meeting at which Board prayer was

---

[13]  For example, at the August 24, 2004 meeting, Hattier prefaced his prayer by saying: "The following prayer was given by General George Washington on the occasion of concluding his service to the Continental Army. On June 14, 1783, General Washington wrote all of the governors of the newly-freed states to join him in the Service Prayer. *Likewise, I am asking all of those here tonight to join me in thinking about and understanding his words.*" (Ex. 54 to Pls.' Br.) (emphasis added)

discussed, the large number of people who spoke openly at that meeting about the importance of

the Board standing up for Christianity, and the admitted perception of District residents that the

Board is standing up for "Christian values by defending its Policy," all demonstrate that the

reasonable observers of the community have perceived the Policy as an endorsement of religion,

and, more specifically, Christianity. (Walls 88)

1.    *Marsh v. Chambers* **does not stand for the premise that legislative prayer cannot advance religion.**

Defendants attempt to portray *Marsh* as a holding that no legislative prayer could ever be

unconstitutional, regardless of the effect it has. Defendants state: "A finding that the primary

effect of Board prayer here primarily advances religion not only runs counter to the evidence in

the record, but it ignores the conclusion of *Marsh* and other courts that legislative prayer is

wholly consistent with disestablishment [*sic*]." (Defs.' Br. 35)  Defendants do not, and

presumably cannot, cite to these "other courts" that agree with the premise that the evidence of

an endorsement effect is wholly irrelevant under *Marsh*.  While the Supreme Court concluded in

*Marsh* that the legislative prayer there did not establish religion, it did not conclude that it was

impossible for legislative prayer to establish religion. Defendants' own brief seems to concede

this by limiting legislative prayers to circumstances where "the prayer opportunity 'has been

exploited to proselytize or advance any one, or disparage any other, faith or belief.'" (Defs.' Br.

25 (citing *Marsh*, 463 U.S. at 794))

2.    **Defendants have stated that the prayers do not make regular meetings any more solemn.**

Defendants make the bold declaration that "[a]ll of the evidence further suggests that

solemnization is also the primary effect of the policy." But the only evidence cited is the

testimony of one Board member stating that she "believe[s the Board prayer policy] solemnizes

the proceedings." (Defs.' Br. 35, citing Mitchell 12, 15)

27

But several Defendants have admitted that the prayer has little or no solemnizing effect. Board member Hastings described the opening prayer as "nice, but not necessary" for their purpose (Hastings 111); former Board president Walls stated that he would expect the Board to conduct its proceedings in a solemn manner regardless of whether a prayer was given (Walls 52); and Hughes stated that prayer was not necessary for special meetings to be conducted in a solemn manner (Hughes 83).

Because the Board has conducted its special meetings in the same fashion in the absence of the prayer policy, it is impossible to conclude that solemnizing proceedings is the primary effect of the Policy.

### 3.    Defendants' prayers are not analogous to the prayers upon which they rely that were delivered by a minister to the House of Representatives.

Although Defendants cite to three different prayers delivered before Congressional sessions as proof that Defendants' prayers are permissible, they ignore several important differences between the Board and Congress. First, the Board has actively (and, by all accounts, successfully) encouraged the participation of susceptible schoolchildren at its regular meetings. Second, Congress is not intimately connected with the public school system, which is an inherent right of citizenship, and in many circumstances is the only available education for children. Third, the ministers at congressional sessions are not government speakers. Although the ministers are invited by the government, it is not the individual members of the House or Senate delivering prayers unto Congress as a whole. Fourth, unlike the Board, which has had only Christian sectarian prayers, Congress invites ministers of a wide variety of faiths to deliver invocations at legislative sessions, including Christians, Jews, Muslims, and Hindus. Thus, the danger of sectarian prayer advancing a particular religion is mitigated by the different sects that the prayers represent. Fifth, Congress performs no oversight of the content of those prayers,

differentiating it from the Board, which both composes the prayers (as individual Board members) and enforces the content restrictions of paragraph 3 of the Policy.

## IV.    EVEN APPLYING *MARSH* WOULD NOT PERMIT DEFENDANTS' POLICY AND PRACTICE OF PRAYER.

### A.    Defendants Grossly Distort The *Marsh* Opinion, Ignoring Nearly All Of The Circumstances Of The Nebraska Legislature.

Defendants' interpretation of *Marsh* effectively extends its reach to any elected body with *some* legislative authority. After stating that the only limitation was "whether the 'the [*sic*] prayer opportunity has been exploited to proselytize or advance any one, or to disparage any other, faith or belief,'" Defendants argue that the Founders regarded legislative prayer as *inherently non-proselytizing.* Thus, under Defendants' reading, the only requirement of *Marsh* is that the praying entity have some legislative authority, because if the prayer is legislative, it could not be used to proselytize or convert.[14]

It is unsurprising, then, that, as Defendants concede in footnote 7, federal courts have uniformly rejected Defendants' reading of *Marsh.* (Defs.' Br. 24 (citing *Tangipahoa,* 473 F.3d at 205; *Hinrichs,* 440 F.3d 393; *Simpson v. Chesterfield Bd. of Supervisors,* 404 F.3d 276 (4th Cir. 2005); *Wynne,* 376 F.3d 292 (4th Cir. 2004); *Bacus,* 52 F. App'x 355)) Although Defendants dismiss these as cases in which other courts "disregarded the Supreme Court's admonition," Defendants do not, and presumably cannot, point to a single case where *Marsh* was applied without regard to the content of the prayers.

---

[14]    The American Heritage Dictionary of the English Language, 4th Edition defines "proselytize" as: 1) to induce someone to convert to one's own religious faith; 2) to induce someone to join one's own political party or to espouse one's doctrine.

In fact, the extent to which *Marsh* itself "did not distinguish" between sectarian and non-sectarian prayers is highly questionable. The majority opinion in *Marsh* highlighted that the prayers at issue were, in fact, non-sectarian, because all references to Christ had been removed upon the complaint of a Jewish legislator. *Marsh*, 473 U.S. at 793 n.14; *see also Allegheny*, 492 U.S. at 603. Thus, *Marsh* did not distinguish between sectarian and non-sectarian prayers, because only non-sectarian prayers were present on the record. Thus, the Court did not determine whether *sectarian* prayers may be used by a legislative body to solemnify its meetings.[15]

Because the Supreme Court has not decided the question of whether sectarian prayers are permissible at legislative bodies, that question is still an open question of law – although the weight of Circuit Court opinions is (as Defendants concede in footnote 7), that sectarian prayer (even by legislative bodies) is unconstitutional. This question, of course, is not before the Court because the Board is not a legislative body as that term is used in *Marsh*.

**B.    Defendants' Reading Of *Marsh* Creates A Paradox: The Board Claims It Will Look At The Content Of Prayers Only If The Content Is Inappropriate.**

Defendants contend that the Court should ignore the sectarian content of prayers.[16] To support their contention, Defendants point to the Court's statement in *Marsh* that the "content of

---

15  Defendants note in their brief that "the Court did not distinguish between sectarian and non-sectarian prayer." (Defs.' Br. at 23)  The reason that the Supreme Court did not distinguish between sectarian prayer and non-sectarian prayer is that the issue was not presented. The facts on the record for the Supreme Court were that the prayers were non-sectarian.

16  Defendants impermissibly attempted to incorporate arguments about viewpoint discrimination from a previous brief into their summary judgment briefing. (See Defs.' Br. 37 n.13; Plaintiffs' Motion to Strike)  Local Rule for the District of Delaware 7.1.3(a)(4) states that no opening brief shall exceed 40 pages. Defendants' attempt to incorporate by reference arguments from another brief would make their opening brief considerably in

*(cont'd)*

the prayer is not of concern to judges where, as here, there is no indication that 'the prayer opportunity has been exploited to proselytize or advance any one, or to disparage any other, faith or belief.'" (Defs.' Br. 23, 25 (citing *Marsh*, 463 at 794-95)) Defendants maintain that this means the content of all prayers is irrelevant to the constitutional inquiry.

Here, unlike in *Marsh*, Plaintiffs have directly alleged that the prayer opportunity has been used to advance Christianity. Perhaps more important, however, is the contradiction between Defendants' reading of *Marsh* (where prayer content is irrelevant) and Defendants' understanding of their own Policy. Defendants concede that the Policy mandates that the prayer opportunity "shall not be used or exploited to proselytize, advance or convert anyone, or to otherwise derogate or disparage any particular faith or belief." When asked at deposition to determine whether certain prayers ran afoul of this prohibition, the Board members uniformly relied upon the specific wording – that is, the *content* – of the prayers offered to them. Defendants cannot have their cake and eat it too.

## C.    Evidence In The Record Reflects That The Prayer Opportunity Has Been Used To Advance Christianity.

Contrary to Defendants' assertion, there is nothing "self-evident" about claiming that the Board's "typical" prayer, which includes an invocation to Jesus and several references to the Heavenly Father, is not proselytizing, particularly to impressionable schoolchildren who are in attendance at the Board's regular meetings. (Defs.' Br. 26) Board members conceded during depositions that the Board's prayers have been uniformly Christian. Although Defendants

---

*(cont'd from previous page)*

excess of this page limit. On May 6, 2008, the Court ordered that Plaintiffs' Motion to Strike would be decided in the context of Defendants' Motion. To the extent that Plaintiffs' Motion to Strike is not granted, Plaintiffs reserve their rights to respond to Defendants' arguments about viewpoint discrimination.

emphasize that the prayer opportunity is available to each Board member regardless of his or her religion, the Board's 30(b)(6) witness could not recall a non-Christian *ever* having served on the Board. (Bireley 60 ("I don't recall us ever having *that* type of Board member.")) (Emphasis added).

At the time of the depositions in this case, the Board members (and their predecessors named as Defendants in this lawsuit) were all Protestant Christians, further narrowing the already obviously Christian slant of the Board's prayers. The Policy's token nod to religious pluralism is thus a red herring, and the highly visible litigation over the Policy – and the political uses to which that court fight has been put[17] – makes it extremely unlikely that any non-Protestant would ever be elected to the Board and given an opportunity to pray.

## V.    *MARSH* HAS NO APPLICATION IN THIS CASE.

*Marsh* should not apply to this case, because the School Board is an administrative body governing schoolchildren with, at most, a fleeting tradition of Board prayer.

### A.    *Marsh* Does Not Apply To Public Schools.

While the Supreme Court concluded that the Founding Fathers' interpretation of the First Amendment permitted prayer at Congressional sessions, that understanding cannot be (and, indeed, has not been) expanded to include public schools. As the Supreme Court noted in *Edwards v. Aguillard*, *Marsh*'s historical approach is not useful for assessing public schools, because public schools did not exist for much of our nation's history. *Edwards v. Aguillard*, 482 U.S. 578, 583 n.4 (1987).

---

[17]    For example, in an article in today's <u>Sussex Post</u> on the upcoming Indian River School Board elections, two of the three incumbent Board members list as a principal "plan if elected" to "see the prayer lawsuit through to the end" or "ensure board's right to prayer before meetings," and all three list "prayer" as a key issue in their campaign. [*See* Exhibit 21]

32

In addition, opinions enforcing Establishment Clause protections in the public school context has shown that previously acceptable religious practices in public school have been routinely struck down as unconstitutional in the last 50 years. *Santa Fe*, 530 U.S. 290; *Edwards*, 482 U.S. 578 (statute mandating balanced treatment of evolution and creationism/intelligent design); *Epperson v. Arkansas*, 393 U.S. 97 (1968) (statute forbidding teaching of evolution of man); *School Dist. of Abington Twp.*, 374 U.S. 203 (beginning school day with Bible readings); *Engel v. Vitale*, 370 U.S. 421 (1962) (statute requiring New York regents' prayer to be recited at beginning of school day). While each of these religious practices was once regarded as permissible, history did not stop the Supreme Court from finding them unconstitutional. In fact, the only federal courts that have ever applied the historical approach of *Marsh* in a circumstance where children were involved were subsequently reversed. *See Bacus v. Palo Verde Unified Sch. Dist Bd. of Educ.*, 11 F. Supp. 2d 1192, 1197-98 (C.D. Cal. 1998), *rev'd*, 52 F. App'x 335 (9th Cir. 2002); *Coles v. Cleveland Bd. of Educ.*, 950 F. Supp. 1337, 1347-48 (N.D. Oh. 1996), *rev'd*, 171 F.3d 369 (6th Cir. 1999).

Furthermore, although Defendants cite the intermittent presence of schoolchildren at sessions of Congress in modern times, this does not establish that children are irrelevant to the constitutional calculus. (Defs.' Br. 31) There is little doubt that the Founding Fathers did not envision Congress as a tourist attraction. Any argument that the passive act of touring Congress can be equated with the student government presentation to the Board, the JROTC's regular role at the beginning of Board meetings, or the students who receive awards or give presentations or performances as a part of the meeting, is nonsensical. As one Defendant testified, "[T]he children are what [the Board] is all about." (*See* Defs.' Br. 30 n.10 (citing Hobbs 36)) Legislative bodies like the General Assembly and Congress do not exist solely to serve students,

nor are they "the whole reason" for the legislative bodies' existence, so the intermittent observation of students at Congressional sessions is simply not comparable to the continual participation by schoolchildren at meetings of the Board.

Defendants argue in footnote 6 that lower courts outside the Third Circuit have concluded that *Marsh* applies to other bodies. To Plaintiffs' knowledge, the only cases that applied *Marsh* to school boards were *Tangipahoa*, 473 F.3d 188 (5th Cir. 2006), and *Bacus*, 52 Fed. App'x 355. First, both of those cases *assumed without deciding* that *Marsh* applied. *Tangipahoa*, 473 F.3d at 197; *Bacus*, 52 F. App'x at 356 ("[E]ven if the school board is like a state legislature for this purpose, the invocations are unconstitutional. . . . In the case at bar the references to Christ were not removed despite objection, and the prayers, almost always 'in the Name of Jesus' did advance one faith."). Thus, they offer this Court no authority on whether *Marsh* should apply. Second, both of those cases interpreted *Marsh* to forbid the practice at issue in this case. *Id.* In *Coles*, the Sixth Circuit considered the issue of whether *Marsh* applied to the school board in question and determined that it did not. *Coles*, 171 F.3d at 376-77. Thus, Defendants' are unable to provide this Court with any precedent where a school board prayer practice was held to be permissible under *Marsh*.

**B.    *Marsh's* Focuses On Two Centuries Of Tradition To The District.**

**1.    The Board's meetings have actively involved the public, and particularly schoolchildren, for less than 15 years.**

In 1994, the District consciously sought to have more public involvement in its meetings. (Defs.' Br. 8) In that year, the Board began inviting student government representatives to address the Board about issues at their schools, and included a period for public comments. (Cohee 35; Defs.' Br. 8) In the last few years, the Board has also incorporated the presentation of colors by JROTC members into the Board meetings. (Bireley 25)

34

Thus, the Indian River School District has nothing like the lengthy history of legislative prayer present in *Marsh*, because the only prayer traditions involving the public and public schoolchildren have evolved in the last 15 years. (Defs.' Br. 8)  The Board's tradition (if any) falls closer to the tradition in *Borden*, where the football coach had participated in pre-meal and pre-game prayers for 23 years.  The Third Circuit nonetheless struck down the coach's prayer practices because they were unconstitutional endorsements of religion.

The Charles Mitchell declaration upon which Defendants rely as proof of their "historic tradition" of prayer notes that "I do not recall any time during the last forty years when the school board on which I served did not open the meeting with a prayer." (Ex. A to Defs' Br. ¶ 13) Plaintiffs have not been given an opportunity to depose Charles Mitchell to ascertain the truth of this statement, or any of his statements, but assuming it to be true, it indicates that from 1969 until 1986, the Indian River School Board prayed at every meeting.  Defendants' 30(b)(6) witness on the "History and Tradition of Board Prayer Since 1969" testified that the Board typically chose one of a limited group of Board members to give the prayer before the Policy was enacted, prompting adoption of the current rotation system. (Bireley 59)  But there is no evidence of significant student involvement before 1994.

### 2.    In discovery, the Board provided testimony for a tradition dating to only 1974.

Defendants argue that the Board has a tradition of prayer that is comparable to that of *Marsh*, but provide no evidence of a prayer tradition beyond the declaration of Charles Mitchell, a former Board member who was not identified in Defendants' Rule 26(e) disclosures or as

35

Defendants' 30(b)(6) witness on the tradition of School Board Prayer.[18]   Thus, even including

the inappropriate declaration of Mr. Mitchell, Defendants have not provided evidence of any

prayer tradition in *any* form of Board meeting dating back earlier than 1966.  This is not

analogous to the traditions at issue in *Marsh*, which reached back to the Founding Fathers and

were present in most of the state legislatures in the United States since the 18th century.

### C.     *Marsh* Does Not Apply Here Because The Board Is Neither A Legislative Body, Nor Analogous To The State Legislature In *Marsh*.

Congress is purely legislative, as opposed to the Board, which lacks the power to pass

laws and has many clearly non-legislative functions, including serving as a judicial branch of the

District.  The Board is merely an administrative body with rule-making authority, but not law-

making authority.  *See* 14 *Del. C.* § 1043 (school boards "shall have the authority to determine

policy and adopt rules and regulations for the general *administration and supervision* of the free

public schools.") (emphasis added)  Although Defendants' brief heavily emphasizes the power to

levy taxes, citing 14 *Del. C.* § 1902, this is disingenuous.  In fact, the Board may only levy

property taxes by calling for a special election referendum and having the levy approved by a

majority of the voters.  *See* 14 *Del. C.* § 1903.

---

[18]   On April 18, 2008, Plaintiffs filed their Motion To Strike (D.I. 261).  In the Motion, Plaintiffs moved to strike the Declaration of Charles Mitchell because Defendants failed to comply with both Federal Rule of Civil Procedure Rule 26(e) and Rule 30(b)(6).  Not only did Defendants fail to supplement their Rule 26(e) disclosures, they designated Bireley as their 30(b)(6) witness for the specific topic of "History and Tradition of Board Prayer Since 1969."  The last-minute submission of a declaration by anyone else on that topic is inappropriate and prejudicial.  In their response to the Motion To Strike, Defendants acknowledge that Mr. Mitchell's declaration "essentially re-states the substance of Mr. Bireley's testimony."  (Defendants' Response 3)  If this statement is true, there is no need for the Court to look to Mr. Mitchell's declaration.  If this statement is false, then Defendants have unfairly prejudiced Plaintiffs by submitting a declaration at the last minute without notice.  Either way, the Court should not rely on Mr. Mitchell's declaration in deciding Defendants' Motion.

Although the Board is called upon to perform administrative tasks in the District, the Board does not have any authority over adults and taxpayers in the District. The Board's authority to generate policies and rules is limited solely to schoolchildren. It has no ability to bind parents or taxpayers to any course of conduct without the citizens themselves ratifying the Board's action. The Board's task of setting policy is also largely delegated to the members of the community who serve on the Policy Committee. (Defs.' Br. 6; S. Bunting 81-82) Finally School Board elections are held separately from those of Delaware's federal, state and local legislators, another indication of the distinction between public school boards and legislative bodies.

*Marsh* has never been extended by the Supreme Court beyond its particular facts, and, despite Defendants' statement that it has been reaffirmed in recent cases,[19] there is significant reason to doubt that the Court would use the same historical approach today, especially for a school board prayer case. *See, e.g., Lee*, 505 U.S. at 596 (noting "inherent differences between the public school system and a session of the state legislature"); *Allegheny*, 492 U.S. at 603. No court has held that *Marsh* permits any governmental body, let alone a school board, to offer prayers with sectarian content that consistently advance one religion or religious belief over others. This should not become the first such case.

---

[19] Defendants state that the "Supreme Court has reaffirmed the viability and applicability of *Marsh*" in two cases; however, this assertion is specious. Both of the cases cited by Defendants dealt with displays of monuments involving the Ten Commandments. Neither addressed the constitutionality of legislative prayer. The Court has never been presented the opportunity to overrule *Marsh*, but has had many opportunities to extend it, including into the public school context, and the Court has consistently declined to do so.

## VI.    THE LAW OF THE CASE DOCTRINE DOES NOT DETERMINE THE OUTCOME OF DEFENDANTS' MOTION.

It is preposterous for Defendants to contend that the law of the case doctrine applies to the issue of whether the Board's policy and practice of prayer is unconstitutional. In its March 24, 2006 Memorandum Order ("2006 Order"), the Court bifurcated the issues in this litigation into the School Board Prayer Issue and the Remaining Issues. (D.I. 87 1-2) The Court's bifurcation makes clear that the constitutionality of the Board's policy and practice of prayer is an ongoing issue in this litigation. Indeed, both the Court and the parties in this litigation have proceeded in a manner that demonstrates that the School Board Prayer Issue remains litigable.

Since March 24, 2006, the Court has approved multiple scheduling orders that governed discovery on the School Board Prayer Issue. (*See, e.g.*, D.I. 128 ("Scheduling Order for Discovery Pertaining to the Indian River School Board's Prayer Policy" dated May 31, 2006); D.I. 137 (June 8, 2006 order extending time "to complete discovery related to the constitutionality of the Indian River School Board's Prayer Policy, as written and as applied"); D.I. 204 (November 21, 2006 order extending the "deadline for completion of discovery on the School Board Prayer Issue")) In addition, the Court has ruled on various motions, including denying Defendants' motion to prevent Plaintiffs from taking two depositions. (D.I. 201) Obviously, these are not actions the Court would have taken if the discovery were irrelevant to the determination of the School Board Prayer Issue.

The parties have also continued to litigate the School Board Prayer Issue, which further demonstrates that the Court has not resolved the issue. For example, the parties took approximately 20 depositions on the narrow issue of School Board Prayer. (*See, e.g.*, Ex. B, Ex. D, Ex. E, Ex. F, Ex. G, Ex. K, Ex. L, Ex. O, and Ex. P to Defs.' Br. (D.I. 250)) During several of

those depositions, Defendants' counsel objected when he thought that Plaintiffs' counsel was questioning a deponent beyond the narrow School Board Prayer Issue. (Hattier 25-27; Helms 5-6) At one of those depositions, Defendants' counsel requested that the questioning be restricted to "issues that are properly in the case *right now.*" (Helms 5) (emphasis added)

Defendants now appear to take the position that the School Board Prayer Issue is not properly in the case because the Court already decided the issue. This argument is absurd. In October 2006 (well after the Court's 2006 Order), Defendants' counsel acknowledged at Helms's deposition that the School Board Prayer Issue was properly in the case. Additionally, the actions of the Court and the parties both demonstrate that the School Board Prayer Issue continues to be properly in this case.

Defendants' position (if correct, which it is not) would mean that the Court has ruled on issues, granted motions and approved scheduling orders that were pointless. Defendants' position would also mean that the parties wasted hundreds, if not thousands, of hours in discovery and in preparing motions relating to the School Board Prayer Issue. Defendants cannot seriously contend that these hours were all spent for no reason, much less that they voluntarily devoted this much of their time to litigating an already-resolved issue. If the School Board Prayer Issue had already been resolved in March 2006, presumably Defendants would have moved for summary judgment two years ago because, according to their understanding of the case, nothing that has happened in the last two years is relevant to this litigation.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' Motion for Summary

Judgment.


/s/ Thomas J. Allingham II
Thomas J. Allingham II (I.D. No. 476)
tallingh@probonolaw.com
Robert S. Saunders (I.D. No. 3027)
Brian G. Lenhard (I.D. No. 4569)
Timothy S. Kearns (I.D. No. 4878)
One Rodney Square
P.O. Box 636
Wilmington, Delaware  19899-0636
(302) 651-3000

   *and*

Richard S. Horvath, Jr. (I.D. No. 4558)
Four Embarcadero Center
Suite 3800
San Francisco, California  94111-5974
(415) 984-6400

DATED:  May 8, 2008          *Attorneys for Plaintiffs*

530024-Wilmington Server 1A - MSW