## EXHIBIT INDEX

**EXHIBIT DESCRIPTION**                                                                                              **EX. NO.**

Deposition of Charles M. Bireley ...........................................................................................1

Deposition of Nina Lou Bunting ...........................................................................................2

Deposition of Susan Bunting ...............................................................................................3

Deposition of Richard H. Cohee ..........................................................................................4

Deposition of Jane Doe.........................................................................................................5

Deposition of John M. Evans................................................................................................6

Deposition of Gregory A. Hastings ......................................................................................7

Deposition of Donald G. Hattier...........................................................................................8

Deposition of Reginald L. Helms .........................................................................................9

Deposition of Lois M. Hobbs...............................................................................................10

Deposition of Randall Hughes..............................................................................................11

Deposition of Mark A. Isaacs ..............................................................................................12

Deposition of M. Elaine McCabe .........................................................................................13

Deposition of Donna M. Mitchell.........................................................................................14

Deposition of Harvey L. Walls.............................................................................................15

Deposition of Robert D. Wilson ...........................................................................................16

Indian River School District 2004 Academic Achievement Banquet (05/13/04)..........................17

Indian River School District 2003 Academic Achievement Banquet (05/14/03)..........................18

Indian River School District 2002 Academic Achievement Banquet (05/15/02)..........................19

School Board Members Ethics..............................................................................................20

*IR School Election May 13*, Sussex Post (05/08/08).........................................................21

# EXHIBIT 1

**Page 1**

```
 1        IN THE UNITED STATES DISTRICT COURT
 2        IN AND FOR THE DISTRICT OF DELAWARE
 3
 4   MONA DOBRICH and MARCO DOBRICH, individually and
     As parents and next friend of ALEXANDER DOBRICH,
 5   SAMANTHA DOBRICH, JANE DOE and JOHN DOE,
     individually and as parents and next friend of
 6   JORDAN DOE and JAMIE DOE,
 7             Plaintiffs
          vs.        CIVIL ACTION
 8             NO. 15-120
 9   INDIAN RIVER SCHOOL DISTRICT, ET AL.,
10
               Defendants
11
     --------------------------------
12
13
          DEPOSITION OF CHARLES M. BIRELEY, taken
14   pursuant to notice at the Indian River School
     District, 31 Hosier Street, Selbyville, Delaware,
15   beginning at 9:15 a.m. on October 11, 2006 before
     David A. Sroka, Registered Professional Reporter and
16   Notary Public.
17
     APPEARANCES:
18
     THOMAS ALLINGHAM, ESQUIRE
19   RICHARD HORVATH, ESQUIRE
     BRIAN LENHARD, ESQUIRE
20   P.O. Box 636
     Wilmington, Delaware 19899-0636
21   For the Plaintiffs
22
     WILCOX & FETZER
23   1330 King Street - Wilmington, DE 19801
     (302) 655-0477
24   www.wilfet.com
```

**Page 2**

```
 1
 2
 3
 4   JASON P. GOSSELIN, ESQUIRE
     Drinker Biddle & Reath LLP
 5   Philadelphia, Pennsylvania 19103-6996
     For the Defendants
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**Page 3**

```
 1        MS. DUPHILY:  This is the
 2   videotape deposition of Mr. Charles
 3   Bireley, taken by the Plaintiffs in the
 4   matter of Dobrich, et.al, versus Indian
 5   River School District, et.al, case
 6   number is 15-120.
 7        The deposition is being held at 31
 8   Hosier Boulevard, Selbyville, Delaware.  We
 9   are going on the record on October 11, 2006
10   at approximately 9:15 a.m.  The court
11   reporter is Dave Sroka from the firm of
12   Wilcox & Fetzer.  I am Lindsay duPhily,
13   videotape specialist from Discovery Video
14   Services.
15        Now, the counsel will introduce
16   themselves and then the court reporter will
17   swear in the witness.
18        MR. ALLINGHAM:  Tom Allingham
19   representing the Plaintiffs and with me is
20   Rick Horvath and Brian Lenhard.
21        MR. GOSSELIN:  Jason Gosselin
22   representing the Indian River School
23   District, the school board and the other
24   defendants.
```

**Page 4**

```
 1        CHARLES BIRELEY,
 2        The Witness herein, called for examination by
 3   the Plaintiffs, having been duly sworn to tell the
 4   truth, the whole truth, and nothing but the truth,
 5   was examined and testified as follows:
 6   examination by him to.
 7   EXAMINATION BY MR. ALLINGHAM:
 8        Q.  Good morning, Mr. Bireley, my name is Tom
 9   Allingham, I represent the Plaintiffs.  I'm going to
10   ask you questions today that are relevant in our
11   view to the School Board prayer issue in this
12   litigation.
13        We have, as your lawyer has probably told
14   you separated, or the judge has asked us to separate
15   the School Board prior issue from the several other
16   issues in the case, and so the deposition today will
17   be focused on the School Board prayer issue.
18        A couple pieces of introduction.  I'm going
19   to refer to the final board policy on School Board
20   prayer, a copy of which I'll give you later and we
21   will talk about it, as the School Board Prayer
22   Policy.  Do you understand what I mean when I say
23   that?
24        A.  Yes.
```

1    followed.
2    Q.  You answered my question about your opinion
3  about the School Board being a legislative board by
4  comparing the School Board to the General Assembly,
5  correct?
6    A.  Yes.
7    Q.  Let me ask a couple of more questions.  The
8  General Assembly doesn't approve field trips, does
9  it?
10        MR. GOSSELIN:  Objection.
11    A.  No.
12    Q.  More generally in our -- in the structure
13  of our government, is the General Assembly
14  responsible for enforcing and administering the
15  policies that it sets, the laws that it passes?
16        MR. GOSSELIN:  Objection.
17    A.  Ask me the question again please, if you
18  would?
19    Q.  Sure.  In our government in the State of
20  Delaware is the General Assembly responsible for the
21  administration and enforcement of the statutes and
22  laws that it passes?
23        MR. GOSSELIN:  Objection.
24    A.  Not that I'm aware of.

21

1    Q.  Do you know what the process would be for
2  disciplining a School Board who violated a School
3  Board policy?
4    A.  Never had the issue to do it, but I would
5  assume that we would come before the rest of the
6  Board members and we would discuss it.
7    Q.  Fair enough.  So, you are not aware of a
8  specific policy that sets that process but that as
9  for example as Board president is what you
10  anticipate what would happen?
11    A.  Yes.
12    Q.  I asked you some general questions about
13  student attendance at school Board meetings and I
14  want to ask some more specific questions.  The
15  minutes of the meetings reflect a presentation of
16  the colors at virtually every meeting, is that
17  consistent with your recollection?
18    A.  Yes, except during the summer months.
19    Q.  Summer months being when the kids are out
20  of school?
21    A.  Yes.
22    Q.  So during the academic school year
23  September to June you would have presentation of
24  colors?

23

1    Q.  You on the other hand as a School Board
2  mention are responsible for the enforcement and
3  administration of the policies that you pass, isn't
4  that right?
5    A.  Yes.
6    Q.  Let me ask you this, on a percentage basis
7  over the 30 years of your service as a Board member
8  what percentage of your time at public meetings has
9  been spent in the consideration of policies and what
10  percentage of time has been spent on other areas of
11  responsibility?
12    A.  We have a committee that gives us a report
13  each Board meeting on policy.  If there are some to
14  adopt I'd say maybe just a range of 15 to 20, 25
15  minutes a meeting.
16    Q.  On policy?
17    A.  Yes.
18    Q.  And the remainder on non-policy issues?
19    A.  Yes.
20    Q.  In the course of your tenure as a School
21  Board member are you aware of any instance in which
22  a School Board member has been accused of violating
23  or failing to comply with a Board policy?
24    A.  Not that I'm aware of.

22

1    A.  Yes.
2    Q.  And the colors are presented by the student
3  ROTC groups from the two high schools in the
4  district?
5    A.  Yes.
6    Q.  Who invites them to do that or do they just
7  know that they are suppose to show up?
8    A.  I believe it's the building principal.
9    Q.  Building principal of the school in which
10  you're meeting?
11    A.  Yes.
12    Q.  So, if you were at during the construction
13  projects a couple of years ago, if you were at the
14  elementary school the principal of the elementary
15  school would invites the ROTC?
16    A.  No.
17    Q.  I misunderstood you then, who would invite
18  them?
19    A.  Well, right how it's because we have two
20  high schools and that's where the ROTC and it would
21  be the principals of the two high schools.
22    Q.  So, if you are meeting at Indian River High
23  School the Indian River principal remind the ROTC
24  group to show up for the Board meeting?

24

Bireley, Charles (Video)  10/11/2006  9:15:00 AM

1    A.   Yes.
2    Q.   And similarly at the other high school?
3    A.   Yes.
4    Q.   Sussex Central, correct?
5    A.   Yes.
6    Q.   And who instructs the principals to tell
7  the ROTC to show up at the meetings?  How do the
8  principals find out that they should remind the
9  ROTC?
10    A.   To the best of my knowledge ever since the
11  ROTC has been there that's been the process.
12    Q.   Do you know how long the ROTC has been in
13  place?
14    A.   Probably around five years.
15    Q.   2000 or thereabouts?
16    A.   Yes.  I'm not positive but it's somewhere
17  around there.
18    Q.   We talked about students attending the
19  meetings for the receipt of awards or recognition,
20  who invites them to those meeting?
21    A.   The building principal.
22    Q.   The building principal in the school in
23  which the meeting is being held?
24    A.   Well, normally they try to do that to keep

25

1  down on the travel.  But, for example if the meeting
2  was going to be held at Indian River, this next
3  meeting.
4    Q.   Yup.
5    A.   The principal would submit a letter to
6  central office of recent awards that has been
7  generated by his students and they would be invited
8  to come to the meeting.
9    Q.   So, it would be the building principal
10  sends a some kind of memo to the central office
11  saying would you please recognize my students who
12  have done something notable in the last period and
13  then the central office would invite the students?
14    A.   As I understand it.
15    Q.   And how does the central office invite the
16  student, by a letter?
17    A.   Well, can we go back a minute?
18    Q.   Yup.
19    A.   The principal does all of that.  The
20  principal send a notice to central office was these
21  are the ones that, you know, deserve that.
22    Q.   Got you.
23    A.   But to the best of my knowledge the
24  principal is the one that also sends out the notices

26

1  to invite the students to come to the meeting.
2    Q.   Understood.  So, in effect the principal
3  tells the central office here are my kids who are
4  going to be at the meeting, I have invited them?
5    A.   Pretty much, yes.
6    Q.   And is that process a process that was set
7  up by the Board at some point in the mid '90s?
8    A.   It was done by the superintendent.
9    Q.   Who is the superintendent?
10    A.   Lois Hobbs, the previous superintendent.
11    Q.   Let me explore that a little bit.  Did Miss
12  Hobbs present to the Board the idea that it would be
13  good for the Board to recognize achievement of
14  students in the schools?
15    A.   Yes.
16    Q.   Was there any dissent from that?
17    A.   Not that I'm aware of.
18    Q.   Everybody thought it was a good idea?
19    A.   Yes.
20    Q.   I understand that recently there has been
21  some rumblings that maybe it's gotten out of hand,
22  is that correct?
23    A.   That's it's gotten out of hand.
24    Q.   That it's taking too long, the awards

27

1  portion of the meeting?
2    A.   There's been some discussion, yes.
3    Q.   Is there some sense that maybe that the
4  awards portion of the Board meeting will be
5  eliminated?
6    A.   I can't answer that, I don't know.
7    Q.   Has there been any discussion of that
8  possibility?
9    A.   Not on the Board level, no.
10    Q.   Has there been discussion of that among
11  Board members outside of the Board meeting?
12    A.   Yes.
13    Q.   Who has had such discussions according to
14  your knowledge?
15    A.   I've discussed it with a certain few.
16    Q.   Which ones?
17    A.   I know that I did with Dr. Hattier,
18  Mr. Helms, Mrs. Bunting, Mrs. Mitchell.
19    Q.   When did the first of those discussions
20  occur roughly speaking?
21    A.   Probably within the last six months.
22    Q.   And who initiated discussion you or the
23  other side of the conversation?
24    A.   I did.

28

Bireley, Charles (Video)  10/11/2006  9:15:00 AM

1    Q.   So, to the best of your recollection at
2  every Board meeting during your service as a Board
3  member the School Board opened the meeting with a
4  prayer?
5    A.   To the best of my knowledge.
6    Q.   Who decided, and this is all prior to the
7  more recent adoption of the School Board Prayer
8  Policy, who decided which Board member would lead
9  the group in prayer or offer a prayer?
10   A.   The Board president.
11   Q.   How was it decided which School Board
12 member would open the meeting with a prayer?
13   A.   The Board president just asked someone, I
14 don't know how.
15   Q.   Were there any restriction of any kind on
16 what sort of prayer a School Board member could
17 over?
18   A.   Not that I'm aware of.
19   Q.   Prior to the adoption of Policy BDA.1,
20 whish is the School Board Prayer Policy in October
21 of 2004, was there any policy that governed the
22 offering of prayer at School Board meetings?
23   A.   Not that I'm aware of.
24   Q.   Were you ever asked to lead the Board in

57

1  prayer or offer a prayer at the beginning of School
2  Board meetings prior to the adoption of the School
3  Board policy?
4    A.   No.
5    Q.   So, 1974 to 2004 is the period of time
6  during which you were a School Board member with a
7  three year hiatus, so if my arithmetic is right
8  that's 27 years of service prior to the adoption of
9  Board Policy BDA.1, and you were never asked to
10 offer a prayer at a School Board meeting?
11   A.   That's correct.
12   Q.   Do you know why?
13   A.   No.
14   Q.   Did you ever tell any Board president that
15 you were not interested in offering a prayer at the
16 School Board meeting?
17   A.   No.
18   Q.   Again, if my arithmetic is correct, that's
19 well over 300 School Board meetings at which
20 somebody offered a prayer, but you were not invited
21 to do so, did that strike you as off or unusual?
22   A.   No.
23   Q.   Did you perceive any pattern in the Board
24 president's practice in the selection of the person

58

1  who would be invited to offer the prayer?
2    A.   It was usually done by a small portion of
3  the group of ten.
4    Q.   And did they have any common
5  characteristics, the small portion?
6    A.   Not that I'm aware of.
7    Q.   Do you know how that small group, smaller
8  group was identified by the Board?
9    A.   To my knowledge the Board president would
10 call on someone at the Board meeting to say the
11 prayer, that's all I know.
12   Q.   But you told me that a small group of the
13 Board was asked to offer the prayer, a group that
14 you were not a member of, do you know how that group
15 was identified or picked or selected to be the ones
16 who would offer the prayer?
17   A.   No.
18   Q.   How small a group, two, three?
19   A.   Three, four, somewhere in that
20 neighborhood.
21   Q.   Was a Jewish Board member ever included in
22 that group?
23   A.   I don't recall us ever having a Jewish
24 Board member.

59

1    Q.   Was a Muslim Board member ever included in
2  that group?
3    A.   I don't call us having a Muslim Board
4  member.
5    Q.   Or a Buddhist?
6    A.   Same answer.
7    Q.   A non-Christian Board member ever included
8  in that group?
9    A.   I don't recall us ever having that type of
10 Board member.
11   Q.   Would you characterize the members of that
12 smaller group as being particularly religious
13 amongst their peers?
14        MR. GOSSELIN:  Objection.
15   A.   Do I answer?
16   Q.   Yes, sir.
17   A.   Can you please ask that question again?
18   Q.   Was it -- did you perceive that the
19 criteria for selection of this smaller group was
20 that these were folks who were particularly
21 religious?
22        MR. GOSSELIN:  Objection.
23   A.   No.
24   Q.   Let me just ask the broad question, is it

60

1  given, it reflects, "During the discussion of this
2  issue several Board members expressed that their
3  constituents do not want the Board to change its
4  practice of opening the meeting with a prayer.  It
5  was not felt that the decision could be made this
6  evening regarding whether or not to change our past
7  practice."
8      Do you recall that during that lengthy
9  meeting about prayer issues with Mr. Griffin in
10  attendance several board members expressed the view
11  that their constituents did not want the Board to
12  change its practice of opening the meetings with a
13  prayer?
14  A.  Yes.
15  Q.  Can you identify for them those Board
16  members who expressed that view?
17  A.  Not really, but I know -- I mean I would be
18  afraid to tell you any particular names because I
19  would miss one or something like that, but I know
20  that it was discussed.
21  Q.  Did you express the view that your
22  constituents did not want the Board to change its
23  practice?
24  A.  Yes.

113

1      Q.  How did you form the view that your
2  constituents did not want the Board on change its
3  practice?
4  A.  Based on feedback that I had received from
5  the community members.
6  Q.  How did you get that feedback?
7  A.  Well, either by them calling me on the
8  telephone or, you know, seeing them in the public,
9  something like that.
10  Q.  When did you first start getting comments
11  from the public, your constituents about this issue?
12  A.  After the graduation ceremony there when it
13  first hit the newspaper.
14  Q.  And you began getting calls from your
15  constituents?
16  A.  Yes.
17  Q.  You also had people come up to you on the
18  street in effect and say we hope you will continue
19  the Board prayer?
20  A.  Yes.
21  Q.  How many constituents would you say you had
22  talked to by the time of the August 23 executive
23  session?
24  A.  Just, I guess ten or 15.

114

1      Q.  Okay.  When you spoke to your fellow Board
2  members in executive session did you say my
3  constituents are in favor of continuing the
4  practice, or did you say the constituents of mine
5  that I've spoken to are in favor of continuing the
6  practice?
7  A.  I don't remember how I said that.
8  Q.  You see the distinction that I'm drawing?
9  A.  Yes, I do.
10  Q.  How many constituents do you have in your
11  district would you suppose?
12  A.  Three, four, 5000.
13  Q.  So, you said I'm sorry, three to 5000?
14  A.  Three, four, 5000, somewhere in that
15  neighborhood, I guess.
16  Q.  At the time of this meeting you estimate
17  that you had spoke to ten or 15 of them?
18  A.  Probably no more than that.
19  Q.  Did you have any concerns that that was not
20  a representative sampling of your constituency?
21  A.  The Only I can say is I had no one that
22  called me and said that it should be anything other
23  than that.
24  Q.  And would you expect that people would have

115

1  any concern about expressing the view that the Board
2  should not open its meetings with a prayer?
3  A.  Please say that again.
4  Q.  Would there be any reason why one of your
5  constituencies might be afraid to call you and, you
6  know, you really ought to jettison this School Board
7  prayer?
8  A.  That's possible.
9  Q.  And an example of why they might be afraid
10  occurred the very next day at the big Board meeting,
11  is that right?
12  A.  Yes.
13      MR. GOSSELIN:  Objection, go
14  ahead.
15  Q.  Isn't that correct?
16  A.  Yes, that's possible, yes.
17  Q.  Because what happened at the big Board
18  meeting was that many comments were made that were
19  intended to be intimidating, isn't that right?
20      MR. GOSSELIN:  Objection.
21  Q.  During the public comment, not from the
22  Board members, but during the public commentary?
23      MR. GOSSELIN:  Objection.
24  A.  I'm confused.  He says that --

116

Unsigned                                Page  113 - 116

# EXHIBIT 2

Bunting, Nina Lou (Video)  10/13/2006  9:07:00 AM

**Page 1**

```
 1        IN THE UNITED STATES DISTRICT COURT
 2           FOR THE DISTRICT OF DELAWARE
 3
 4   MONA DOBRICH and MARCO DOBRICH, individually
     And as parents and next friend of ALEXANDER
 5   DOBRICH, SAMANTHA DOBRICH, JANE DOE and JOHN
     DOE, individually and as parents and next friend
 6   of JORDAN DOE and JAMIE DOE,
 7              Plaintiffs
 8        vs.           Civil Action
                        Case No. 15-120
 9
     INDIAN RIVER SCHOOL DISTRICT, ET AL.,
10
                Defendants
11
12        DEPOSITION OF NINA LOU BUNTING, taken
13   pursuant t notice at the Indian River School
     District, 31 Hosier Street, Selbyville, Delaware,
14   beginning at 9:07 a.m. on October 13, 2006 before
     David A. Sroka, Registered Professional Reporter and
15   Notary Public.
16
     APPEARANCES:
17
         THOMAS ALLINGHAM, ESQ.
18       RICHARD HORVATH
         BRIAN LENHARD
19       P.O. Box 636
         Wilmington, Delaware  19899-0636
20       For the Plaintiffs
21       JARROD D. SHAW, ESQ.
         Drinker Biddle & Reath, LLP
22       One Logan Square
         Philadelphia, Pennsylvania  19103-6996
23       For the Defendants
24
```

**Page 2**

```
 1         MS. DUPHILY:  This is the
 2   videotape deposition of Ms. Nina Lou
 3   Bunting taken by the Plaintiff in the
 4   matter of Dobrich, et al. versus Indian
 5   River School District, et al., case number
 6   15-120.  We are going on the record at 31
 7   Hosier Boulevard, Selbyville, Delaware
 8   on October 12, 2006 at approximately 12:55
 9   p.m..
10       The court reporter is Dave Sroka
11   from the firm of Wilcox & Fetzer,
12   Wilmington, Delaware.   My name is
13   Lindsay   duPhily and I'm the videotape
14   specialist   of Discovery Video Services.
15       Counsel will now introduce
16   themselves and then the court reporter
17   will swear in the witness.
18       MR. ALLINGHAM:  I'm Tom Allingham
19   I represent the Plaintiffs in this
20   case, and with me are Richard Horvath and
21   Brian Lenhard.
22       MR. SHAW:  I'm Jarrod Shaw and I
23   represent the defendants in this action.
24           NINA LOU BUNTING,
```

**Page 3**

```
 1       The Witness herein, called for examination by
 2   the Plaintiffs, having been duly sworn to tell the
 3   truth, the whole truth, and nothing but the truth,
 4   was examined and testified as follows:
 5   EXAMINATION BY MR. ALLINGHAM:
 6    Q.   Did you attend the August 24, 2004 Board
 7   meeting?
 8    A.   August 24, 2004 Board meeting, are you
 9   referring to the one where the public, a lot of
10   people from the public came?
11    Q.   Hundreds of people?
12    A.   Okay, yes, I did.
13    Q.   Did anything occur at that meeting that was
14   disturbing to you personally?
15    A.   No.
16    Q.   I want to show you a clip of the vide from
17   that meeting?
18    A.   Okay.
19    Q.   This is a portion from the public comment
20   section of the meeting.
21    A.   Okay.
22       (AT THIS POINT IN TIME A TAPE WAS PLAYED)
23    Q.   Were you distracted when your telephone
24   rang during that clip?  Would you like me to play it
```

**Page 4**

```
 1   again for you?
 2    A.   No, I don't think I was distracted.  I may
 3   have been momentarily.
 4    Q.   Were you present when -- who was speaking
 5   during that public comment section?
 6    A.   Mr. Harold Short.
 7    Q.   Harold Johnson?
 8    A.   Harold Johnson, okay.  I don't know him
 9   that well.  I knew it was Harold somebody.
10    Q.   Were you present when he made that
11   statement?
12    A.   Yes, I was.
13    Q.   Did you hear him say that the good Lord has
14   proven that there's a higher power above our Supreme
15   Court?
16    A.   I guess I heard him say it.  I didn't hang
17   on every word.
18    Q.   Did you hear him say that was proven when
19   the last I heard Madelyn Murray-O'Hare disappeared
20   never to be seen again?
21    A.   Well, I heard it just now, do I remember --
22    Q.   that's the first time that you heard it?
23    A.   I'm sure I heard it that night, but I
24   didn't remember hearing it until you showed me
```

1    Board meeting?
2        A.   No, sir, I did not.
3        Q.   When -- to broaden the question, if any
4    other Board member offered a moment of silence would
5    you believe that the moment of silence is not
6    effective to solemnify the proceedings?
7        A.   That would be their choice and I'm okay
8    with what other people give.  Whatever prayer
9    someone else gives or how they give it's their
10   personal -- it's a personal thing with each one of
11   us, and if that's the way they chose it then that's
12   fine with me.
13       Q.   But as I understand the policy, the purpose
14   of the prayer or moment of silence is to solemnify
15   the proceedings, correct?
16       A.   Right.
17       Q.   If you believe that a moment of silence is
18   not effective to solemnify --
19       A.   It's not to me.
20       Q.   You have to let me finish my question?
21       A.   Okay, sorry.
22       Q.   If you believe that a moment of silence is
23   not effective to solemnify the proceedings, why did
24   you vote to approve this policy?

113

1    pray aloud or silently as so I choose at a Board
2    meeting.
3        Q.   Okay.  You believe you have the right to
4    pray to convert someone --
5        A.   No, sir.
6        Q.   Just a minute, let me finish my question?
7        A.   Sorry.
8        Q.   As an individual citizen, isn't that
9    correct?
10       A.   As an individual citizen?
11       Q.   Yes, ma'am.
12       A.   Do I feel I have a right to pray to convert
13   someone?
14       Q.   Yes, ma'am.
15       A.   Personally, privately I would pray to
16   convert someone, but would I go to that person and
17   like pray over them to convert them, is that what
18   you mean?
19       Q.   No.  I'm just asking what you have the
20   right to do as you understand it?
21       A.   Okay.  Do I have the right to try to
22   convert someone else?
23       Q.   Yes.
24       A.   No, sir, that's not my right.

115

1        A.   Because as I said it's among the ten of us.
2    It's not just my policy, it's ten people's policy,
3    it's the community's policy.  Therefore, each person
4    has their own personal feelings about the whole
5    thing.  How do I feel about it personally, I feel it
6    should be done out loud.  Do I respect someone
7    else's feelings of how it should be done, yes.  I
8    respect their prayer whatever kind of prayer it is
9    because I respect other people and their right to
10   say and do what they think is right.
11       Q.   In their capacity as individuals or in
12   their capacity as Board members?
13       A.   Well, I guess as Board members that evening
14   at our regular meeting.
15       Q.   Do you draw any distinction at all in your
16   mind between your rights in your capacity as a Board
17   member and your rights in your capacity as an
18   individual citizen?
19       A.   Do I see any difference?
20       Q.   Yes.
21       A.   As far as Board prayer is concerned?
22       Q.   You can start there, yes.
23       A.   I think I have the right to pray aloud or
24   silently in my regular life, and I have a right to

114

1        Q.   I'm going to give you an example of a
2    prayer?
3        A.   Okay.
4        Q.   And the prayer would be, Lord, we ask that
5    you open the hearts of the heathen among us, that
6    they may join the community of your church?
7        A.   Would I give that prayer?
8        Q.   Nope, that's not my question.  My first
9    question is, as you understand the rights of U.S.
10   Citizens, do U.S. Citizens have the right to offer
11   that prayer?
12       A.   They have the right to offer that prayer.
13       Q.   As you understand the rights of school
14   teachers in class, do teachers have the right to
15   offer that prayer in class?
16       A.   No, they do not have the right to offer
17   that prayer.
18       Q.   As you understand the rights of School
19   Board members, as School Board members, do they ha
20   the right to offer that prayer at a School Board
21   meeting?
22       A.   The one with the heathens among us?
23       Q.   Yes.
24       A.   No, they do not have the right to offer

116

Bunting, Nina Lou (Video)  10/13/2006  9:07:00 AM

**117**

1  that prayer.
2      Q.   Is that because as School Board members,
3  the School Board members are government officials?
4      A.   I feel School Board members are government
5  officials.
6      Q.   And is that the distinction between their
7  right to offer such a prayer as individuals, and the
8  fact that they don't have such a right to offer such
9  a prayer as School Board members, that they're
10  government officials?
11      A.   The one with the heathens among us?
12      Q.   Yes, ma'am.
13      A.   I think that violates our number three.
14  That's why I wouldn't expect anyone to say something
15  like that. I don't think it would have anything to
16  do with whether we were an individual or a
17  government official.
18      Q.   All right, in the absence of your policy?
19      A.   Okay, in the absence of our policy --
20      Q.   Before you passed the policy on October 19,
21  2004, is it your understanding that Indian River
22  School Board members could have offered the prayer
23  that I gave you, please Lord, convert the heathen
24  among us?

**118**

1      A.   They wouldn't have.
2      Q.   Could they have?
3      A.   Well, I guess they possibly could have, but
4  again they wouldn't have.
5      Q.   Over the course of the -- over the course
6  of this litigation, have you ever had occasion to
7  read the First Amendment of the Constitution?
8      A.   No. Like I said, I can read something and
9  forget it tomorrow.
10      Q.   You understand that the right to free
11  exercise of religion is found in the First Amendment
12  of our Constitution?
13      A.   I think that we read the First Amendment
14  aloud to the children on the first day of school
15  every year, is that what we would have read?
16      Q.   Don't know.
17      A.   I think so.
18      Q.   In all events, you do understand that the
19  First Amendment is where freedom of religion is
20  found?
21      A.   Yes, I guess, you're reminding me of it.
22      Q.   Do you also understand that the First
23  Amendment has language prohibiting the establishment
24  of religion by the government?

**119**

1      A.   Yes, establishing of religion by the
2  government.
3      Q.   And do you understand that the laws which
4  prohibit teachers, for example, from opening their
5  classes with a prayer, are based on that so called
6  establishment clause?
7          MR. SHAW: I'm going to object to
8      your question. She is not an attorney and
9      doesn't have any knowledge of what the laws
10      are based upon.
11          MR. ALLINGHAM: I don't think that
12      Jarrod is instructing you not to answer.
13          MR. SHAW: If you have some sort
14      of knowledge outside of a legal analysis to
15      base you answer upon, that's fine.
16      A.   I have no knowledge of. I even forgot what
17  was in the First Amendment.
18      Q.   Do you recall who proposed that a moment of
19  silence be included in the options in the School
20  Board Prayer Policy?
21      A.   No, I don't.
22      Q.   We're coming to the end, Mrs. Bunting.
23  It's good when you don't even have to ask a question
24  and someone hands you what you need. Have you --

**120**

1  did you do anything to prepare for this deposition?
2      A.   Did I do anything?
3      Q.   Yes, ma'am.
4      A.   Obviously I should have, but no.
5      Q.   Did meet with your attorneys?
6      A.   Oh, they met with us, what last week one
7  day last week.
8          MR. SHAW: I can't answer
9      questions.
10      A.   Oh, you are not allowed to answer
11  questions. It was one day last week I met with two
12  other people just to, we had never done anything
13  like this before, to let us know a few things.
14      Q.   Did -- who were the other two people
15  present during that meeting?
16      A.   I was in with Janet Hern and Donna
17  Mitchell.
18      Q.   Did you look at any documents during that
19  meeting?
20          MR. SHAW: I'm going to object to
21      what actually occurred at that meeting as
22      protected by attorney/client privilege.
23          MR. ALLINGHAM: Incorrect.
24      Q.   Did you look at any documents during that

# EXHIBIT 3

Bunting, Susan  10/25/2006  4:41:00 PM

FOR THE DISTRICT OF DELAWARE

MONA DOBRICH and MARCO )
DOBRICH, Individually and )
as parents and next friend )
of ALEXANDER DOBRICH, )
SAMANTHA DOBRICH, JANE DOE )
and JOHN DOE, Individually )
and as parents and next )
friend of JORDAN DOE and )
JAMIE DOE, )
                                )
          Plaintiffs,     )
                                )  Civil Action
     v.                       )  No. 05-120 (JJF)
                                )
INDIAN RIVER SCHOOL,      )
DISTRICT, et al.,            )
                                )
          Defendants.    )

Videotaped Deposition of SUSAN S.
BUNTING, Ed.D., taken pursuant to notice at 31 Hosier
Street, Selbyville, Delaware, beginning at 9:00 a.m.,
on Wednesday, October 25, 2006, before Terry Barbara
Burke, RMR-CRR and Notary Public.
APPEARANCES:
     THOMAS ALLINGHAM, ESQUIRE
     BRIAN LENHARD, ESQUIRE
     One Rodney Square
     Wilmington, Delaware  19801
     For the Plaintiff
          WILCOX & FETZER
     1330 King Street - Wilmington, Delaware 19801
          (302) 655-0477
          www.wilfet.com

1

APPEARANCES (cont'd):
     JARROD SHAU, ESQUIRE
     Drinker, Biddle & Reath, LLP
     One Logan Square
     18th and Cherry Streets
     Philadelphia, Pennsylvania  19103-6996
     For the Defendants

ALSO PRESENT:

     TIMOTHY KEARNS
     MARK BUCKMASTER, Videographer
          -     -     -
     VIDEO SPECIALIST:  This is the videotape
deposition of Dr. Susan S. Bunting, taken by the
plaintiff in the matter of Dobrich, et al., versus
Indian River School District, et al, Civil Action No.
15-120, held at 31 Hosier Street, Selbyville, Delaware,
on October 25th, 2006, at approximately 9:02 a.m.
     The court reporter is Terry Burke from
the firm of Wilcox & Fetzer.  My name is Mark
Buckmaster, a video specialist from Discovery Video
Services, Incorporated, in association with Wilcox &
Fetzer.
     Counsel will now introduce themselves and
the reporter will swear in the witness.
     MR. LENHARD:  My name is Brian Lenhard
and I represent the plaintiffs in this litigation, and
I'm here with Tom Allingham and Tim Kearns.

2

1   MR. SHAU:  My name is Jarrod Shau, and I
2  represent the defendants in this litigation.
3   SUSAN S. BUNTING, Ed.D.,
4  the deponent herein, having first been
5  duly sworn on oath, was examined and
6  testified as follows:
7  BY MR. LENHARD:
8  Q.   Good morning, Dr. Bunting.
9  A.   Good morning.
10  Q.   Have you ever been deposed before?
11  A.   Once.
12  Q.   What action was that in?
13  A.   It had to do with a business that we formerly
14  had here many years ago.  The business closed maybe
15  20 years ago.
16  Q.   But it had nothing to do with Indian River
17  School District?
18  A.   Absolutely not, no.
19  Q.   Before we begin, I'd like to go over the
20  deposition and what's going to happen today.  I'm going
21  to ask you a series of questions.  The deposition is
22  being videotaped and it's also being transcribed.  When
23  I ask you a question if you could give an oral answer,
24  an out loud answer so the court reporter can transcribe

3

1  it, that would be very helpful, instead of uh-huh or
2  shaking your head.
3   Also, please wait until I ask the
4  question, and I'll try to do the same and wait until
5  you answer the question before asking the next
6  question.  The court reporter can only take down one
7  person's conversation at a time.
8   If you don't understand my question,
9  please ask me to clarify it or to rephrase it.  If you
10  don't ask me to clarify it, we'll presume that in the
11  future a judge or jury looking at the videotape or
12  reading the transcript will presume that you understood
13  the question.
14   If at any time you want to take a break,
15  please let me know.  If there's a question pending,
16  I'll ask you to answer the question first but then
17  we'll take a break.  The DVD tapes are one hour long so
18  we'll take a break every hour anyway.
19   Are you feeling well today?
20  A.   Yes.
21  Q.   Are you taking any medication that might make
22  it difficult for you to understand and answer my
23  questions?
24  A.   I don't believe so.

4

1    Q.  Do you agree with the first phrase in the
2  paragraph numbered one that says, "In order to
3  solemnify its proceedings," is that a fair summary of
4  the answer you just gave?
5    A.  Yes.
6    Q.  Were you involved in policy committee meetings
7  where this policy was discussed?
8    A.  Yes.  Usually it takes several meetings, so
9  I'm sure at some of those meetings I was involved.
10    Q.  Will you give me a number of how many meeting
11  you think you were involved at at which this was
12  discussed?
13    A.  No, I can't.  I'd have to --
14    Q.  More than two?
15    A.  Possibly.  Usually there's a process that's
16  involved in devising any policy where it's usually
17  worked on at the policy committee.  The policy, the
18  proposed policy, a draft is shared with administrators
19  throughout the district.  It goes to the board.  It has
20  a first reading.  During the process of the next month,
21  it is revisited.  The committee probably looks at it
22  again.  The board members receive comments at times
23  about proposed policies so that they are prepared when
24  it comes up at a second board meeting to make a

81

1  decision on whether or not this should be put into
2  policy.
3    Q.  That answer you just gave was a general
4  description of policy approval; correct?
5    A.  Yes.
6    Q.  Was that procedure followed with regard to
7  this policy?
8    A.  Without taking a look at minutes from -- this
9  goes back to October of 2004, I'd have to say that was
10  the procedure that was followed.
11    Q.  You have no affirmative recollection that the
12  procedure was not followed?
13    A.  Correct.
14    Q.  Do you have any recollection of specific
15  discussions about this policy in the policy committee
16  meetings?
17    A.  About --
18    Q.  About the components of this policy?
19    A.  I have no recollection of specific
20  discussions.
21    Q.  Mr. Walls never suggested any other drafts or
22  modifications to this policy during those meetings?
23    A.  Can you be specific?
24    Q.  Was there a general discussion about including

82

1  other paragraphs or deleting certain of these
2  paragraphs that are included?
3    A.  This may have come from some other source, an
4  what Mr. Walls would sometimes say to the policy
5  committee members would be, can we find an existing
6  sample that we then can take a look at and draft a
7  similar one, an identical one.  That's often the
8  process.  So I'm not sure where these words
9  originally -- where they came from originally.
10    Q.  Does he say those words in substance at the
11  beginning of the procedure?  Let me back up.  Is the
12  policy committee given direction from the board to
13  draft a policy on a certain area?
14    A.  At times.
15    Q.  For this policy, was it given any direction by
16  the board?
17    A.  Probably.  That we needed a board policy that
18  would deal with school prayer.
19    Q.  You don't have any recollection that the board
20  did not direct the policy committee to draft this
21  policy?
22    A.  I don't have any recollection that they did
23  not.
24    Q.  And my question is, assuming for the purposes

83

1  of this question the board did direct the policy
2  committee to draft a policy on board prayer regular
3  board meetings, did Mr. Walls begin the process by
4  saying, you know, the procedure around here is maybe
5  could look to some other policy from someone else and
6  either use it in its identical form or shape it to our
7  own needs as necessary?
8    A.  I can't remember exact words from any meeting
9  two years ago.
10    Q.  What I'm trying to get at is, did he start the
11  process by saying let's get a policy from someone else
12  or did it ever occur to him to draft his own policy or,
13  excuse me, the policy committee to draft its own
14  policy?
15    A.  It may have been a combination.  I really
16  don't remember the origin of how we got started on the
17  draft that eventually went to the board.
18    Q.  Do you remember any drafts that are
19  substantially different from this one?
20    A.  I think at one point there might have been a
21  paragraph version of this, but the difference would be
22  this has one, two, three, four, five as opposed to
23  being in a paragraph.
24        MR. LENHARD:  Dr. Bunting, we're close to

84

# EXHIBIT 4

**Page 1**

```
 1        IN THE UNITED STATES DISTRICT COURT
 2           FOR THE DISTRICT OF DELAWARE
 3   MONA DOBRICH and MARCO   :  C.A. No. 15-120 (JJF)
     DOBRICH, Individually and :
 4   as parents and next friend :
     of ALEXANDER DOBRICH,      :
 5   SAMANTHA DOBRICH, JANE DOE :
     and JOHN DOE, Individually  :
 6   and as parents and next     :
     friend of JORDAN DOE and   :
 7   JAMIE DOE,                  :
                                 :
 8        Plaintiffs,   :
                         :
 9        v.            :
                         :
10   INDIAN RIVER SCHOOL   :
     DISTRICT, et al.,     :
11                         :
          Defendants.   :
12        . . . . . . . .
13        Videotaped Deposition of RICHARD COHEE,
     taken pursuant to notice, on Tuesday, October 17, 2006
14   at 1:17 p.m. at 31 Hosier Street, Selbyville, Delaware,
     reported by Lorena J. Hartnett, a Registered
15   Professional Reporter and Notary Public.
16        . . . . . . . .
17   APPEARANCES:
18        BRIAN G. LENHARD, ESQUIRE
          RICHARD HORVATH, ESQUIRE
19        One Rodney Square
          Wilmington, DE  19801
20             Attorney for the Plaintiff
21
22        WILCOX & FETZER
          1330 King Street - Wilmington, DE  19801
23             302-655-0477
               www.wilfet.com
24
```

**Page 2**

```
 1
 2   APPEARANCES  (CONTINUED):
 3        JASON P. GOSSELIN, ESQUIRE
          Drinker, Biddle & Reath, LLP
 4        One Logan Square
          18th and Cherry Streets
 5        Philadelphia, PA  19103-6996
               Attorney for the Defendants
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**Page 3**

```
 1
 2
 3             TABLE OF CONTENTS
 4   TESTIMONY OF RICHARD COHEE:
 5   Direct Examination by Mr. Lenhard  . . . . . . . 4
 6   Certificate of Reporter . . . . . . . . . . . .116
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

TABLE OF CONTENTS
TESTIMONY OF RICHARD COHEE:
Direct Examination by Mr. Lenhard  . . . . . . . 4
Certificate of Reporter . . . . . . . . . . . .116

**Page 4**

```
 1        VIDEOGRAPHER:  This is the videotaped
 2   deposition of Mr. Richard Cohee taken by the
 3   plaintiff in the matter of Dobrich et al
 4   versus Indian River School District, et al,
 5   Case Number 15-120.  This deposition is
 6   being held at 31 Hosier Boulevard.  We are
 7   going on the record on October 17, 2006 at
 8   approximately 1:17 p.m.
 9        The court reporter is Lorena Hartnett
10   from the firm of Wilcox and Fetzer,
11   Wilmington, Delaware.  My name is Lindsay
12   DuPhily.  I am the videotape specialist with
13   Discovery Video Services.
14        Counsel will now introduce themselves
15   and the court reporter will swear in the
16   witness.
17        MR. LENHARD:  My name is Brian
18   Lenhard, and I represent the plaintiffs in
19   this action.
20        MR. GOSSELIN:  Jason Gosselin for
21   defendants.
22        RICHARD COHEE,
23   HAVING FIRST BEEN DULY SWORN, TESTIFIED AS FOLLOWS:
24   DIRECT EXAMINATION ON BEHALF OF THE PLAINTIFF
```

1    A. The regular board meetings are scheduled
2    monthly. They are posted in advance. The agenda for
3    that meeting is posted in advance. The locations for
4    the regular board meetings are alternated between, now
5    between Indian River High School, the new one, and
6    Sussex Central High School, the new one.
7        The meetings start at 7:30, most evenings,
8    the regular meeting starts at 7:30. There are times
9    when we may have a special meeting or start the
10    meeting early and have an executive session issue
11    prior to the regular meeting, but we have always --
12    not always, but we try it make it a policy that we do
13    not keep the public that's there for the public 7:30
14    meeting waiting.
15        So if we have a short executive session, we
16    come out at 7:30, have the public portion and, if need
17    be, go back to executive session later on. We learned
18    that a number of years ago on an issue, and that has
19    worked rather well for us.
20        The meeting, itself, is called to order by
21    the board president. Attendance is taken. You have
22    the introduction of the colors for the ROTC from either
23    high school, approval of the agenda, approval of
24    minutes. And my order may be off a little bit. And

33

1    then we go into new business, old business, personnel
2    issues, and down the list.
3        Q. When you ran through the agenda, did you
4    mention prayer in that list of things that you did?
5        A. I did not mention that, no.
6        Q. And where does that fit in?
7        A. That fits in prior to, I believe, the -- As
8    many times as we have done it, I am going blank
9    whether it's prior to the colors or after the colors.
10        Q. Is there a history of student attendance at
11    these school board meetings?
12        A. There are students in attendance at the
13    meeting, yes.
14        Q. And how far back does that go?
15        A. I would guess but for maybe a couple summer
16    meetings, most of the meetings probably have some
17    students in attendance and probably have since I have
18    been with the board.
19        Occasionally in the summertime the attendance
20    is very light when school is not in session. I can't
21    say that there weren't any students there, but that
22    would probably be the time when there would be the
23    biggest opportunity to not have students there.
24        Q. But during the school year there is students

34

1    there, for the most part?
2        A. Normally, for various reasons.
3        Q. Does the board invite them?
4        A. Um, I don't know that the board invites. I
5    am not sure how the current board president and the
6    superintendent prepare the agenda. A lot of the
7    students that come are there for different types of
8    recognition. I think that is put together by staff.
9        Q. Are they there when the meeting is called to
10    order?
11        A. They can be.
12        Q. Has student government always been at the
13    meetings?
14        A. Um, student government was added to the
15    meetings. When I first came on board it wasn't there.
16        Q. And did you move for student government to be
17    at the meeting?
18        A. Yes, I did, ninety -- I came on '93. I don't
19    know if it was '93 or '94, maybe even '95, but it was
20    early in my tenure there.
21        Q. And why did you do that?
22        A. We had a -- We had a -- Periodically we had
23    student reports of the various activities in the
24    school in an informal way at the meetings, and they

35

1    would come up and they would tell you what's going on,
2    how the football game was going and that kind of
3    thing, and I personally felt that it was good -- There
4    was some talk at one point when actually a couple
5    districts supported having a student board member, and
6    I just thought it would be beneficial to the children
7    or to the students to have their spot on our agenda,
8    to be recognized there. That was my feelings on that.
9        Q. So it was your motion that is the driving
10    force in getting the student government to the
11    meeting?
12        A. I had made the motion, yes.
13        Q. But the superintendent would have done it on
14    her own?
15        A. Done what?
16        Q. Well, I asked you a few minutes ago did the
17    board invite students to the meeting, and you said
18    depending what the superintendent does.
19        A. Uh-huh, uh-huh.
20        Q. Correct?
21        A. Uh-huh, yes. Sorry.
22        Q. But now my question now is it's because of
23    your motion that the superintendent asked those
24    students; correct?

36

Cohee, Richard (Video)  10/17/2006  1:17:00 PM

1    see it as being threatening or disparaging and would
2    be acceptable.
3        Q.  Do you think that this prayer is
4    proselytizing?
5        A.  That's what I just said, as you have read it,
6    I don't see it as such.
7        Q.  Okay.  All right, one more.  It's even
8    shorter.  Here is the prayer.  "We pray, Lord,
9    enlighten the heathen in our midst, inspire them to
10   come to your wisdom and goodness.  We ask these thir
11   in the name of Jesus Christ.  Amen."
12       A.  Read it one more time.
13       Q.  "We pray, Lord, enlighten the heathen in our
14   midst, inspire them to come to your wisdom and
15   goodness.  We ask these things in the name of Jesus
16   Christ.  Amen."
17       A.  "Inspire the heathen, we ask them to come to
18   you --" What was that clause?
19       Q.  Wisdom and goodness.
20       A.  Yeah, I would think that would violate the
21   section, as well.
22       Q.  Okay.  Do you think that non-Christians can
23   get elected to the school board?
24       A.  Do I think they can?

109

1        Q.  Yes.
2        A.  Why couldn't they?
3        Q.  Do you think that the -- What do you think
4    the religious faith of most people in the Indian River
5    is?
6        A.  Religious faith would be mostly Christian.
7        Q.  Has that ever been an issue in the school
8    board election?
9        A.  I don't know that it's been an issue with
10   school board elections during my tenure, at least,
11   prior to this.  And I am not certain that it's been a
12   sole issue since this, but I do know that, from
13   reading comments by other opponents, and I can't even
14   recall who they were, there were some issues with the
15   board pursuing this by some, they were against it, so
16   as minor -- Well, as minimal as that may be, I
17   wouldn't say minor, then it is an issue, yes.  In
18   somebody's mind they don't agree with what the board
19   is doing here.
20       Q.  There were board meetings on April 26, 2005
21   and May 24, 2005, and I will represent to you those
22   board minutes began with a moment of silence.
23       A.  Okay.
24       Q.  Do you recall any disruptions at those

110

1    meetings?
2        A.  Any disruptions?
3        Q.  Yes.
4        A.  I don't recall any.
5        Q.  Do you recall whether there was a prayer
6    given at the August 24, 2004 meeting?  That was the
7    one we played for you on the videotape.
8        A.  Um, I think that there was, but I don't know
9    for certain.
10       Q.  If you look at the first, on the first page
11   in the first paragraph.
12       A.  Of the minutes?
13       Q.  Of the August 24, yes, 2004 minutes.
14       A.  Okay, Dr. Hattier gave a prayer.
15       Q.  Correct.  Now, you heard on videotape the
16   laughter while Mr. Johnson was giving his public
17   comment?
18       A.  I heard laughter and other sounds.
19       Q.  Would you call that solemn?
20       A.  Some of it I would, because some of it
21   sounded like they were in support of the statement as
22   far as I think I heard a couple amens and a couple
23   yes, and that's not laughter.
24           The laughter, I would say would probably not

111

1    be solemn.  However, it is the opportunity for the
2    public to speak, and we have a policy for that.  We
3    try to adhere to that policy, and it's difficult to
4    control what one says at the podium.  It's also
5    difficult to control what the audience participants
6    interject.
7        Q.  Do you think it matters to the audience
8    whether you give a prayer or a moment of silence
9    before the school board meeting?
10       A.  I don't know whether it matters to the
11   audience or not.  It matters to the board, and we do
12   it for the board.  We don't do it for the audience.
13           MR. LENHARD:  I think I am getting
14   close to the end, and I am going to suggest
15   we take a few minute break for me to review
16   the notes.
17           THE WITNESS:  Okay.
18           VIDEOGRAPHER:  Going off the record at
19   approximately 4:02 p.m.
20           (A recess was taken.)
21           VIDEOGRAPHER:  We are back on the
22   record at approximately 4:09 p.m.
23   BY MR. LENHARD:
24       Q.  Mr. Cohee, do you remember the audience

112

# EXHIBIT 5

Doe, Jane  12/5/2006  1:30:00 PM

C O N F I D E N T I A L
IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE
MONA DOBRICH and MARCO    )  CONFIDENTI/
DOBRICH, Individually and       )
as parents and next friend     )
of ALEXANDER DOBRICH,          )
SAMANTHA DOBRICH, JANE DOE    )
and JOHN DOE, Individually      )
as parents and next            )
friend of JORDAN DOE and       )
JAMIE DOE,                     )
                               )
        Plaintiffs,            )
                               )  Civil Action
v.                             )  No. 05-120
                               )
INDIAN RIVER SCHOOL,           )
DISTRICT, et al.,              )
                               )
        Defendants.            )
        Deposition of JANE DOE, taken pursuant to
notice at Drinker, Biddle & Reath, 1100 North Market
Street, Suite 1000, Wilmington, Delaware, beginning at
1:30 p.m., on Tuesday, December 5, 2006, before Terry
Barbano Burke, RMR-CRR and Notary Public.
        APPEARANCES:
                THOMAS J. ALLINGHAM, II, ESQUIRE
                One Rodney Square
                Wilmington, Delaware  19801
                For the Plaintiff
                WILCOX & FETZER
        1330 King Street -  Wilmington, Delaware 19801
                (302) 655-0477

                          1

2   APPEARANCES (cont'd):
3        JARROD SHAU, ESQUIRE
         Drinker, Biddle & Reath, LLP
4          One Logan Square
           18th and Cherry Streets
5          Philadelphia, Pennsylvania  19103-6996
           For the Defendants
6
    ALSO PRESENT:
7
         TIMOTHY KEARNS
8
9              -   -   -
10       MR. ALLINGHAM:  While we were off the
11   record, Mr. Shau and I agreed that we would all try to
12   refer to the witness by her pseudonym of Jane Doe and
13   to members of her family by the pseudonyms given her
14   in the complaint.
15       We have also agreed, and I want to
16   express my appreciation to Mr. Shau for this
17   suggestion, that we will each, to the extent anyone
18   slips up, we can substitute the appropriate pseudonym
19   in the final transcript so the anonymity of the witness
20   and the members of her family will again be preserved,
21   and I again appreciate that.
22       JANE DOE,
23       the deponent herein, having first been
24       duly sworn on oath, was examined and

                          2

1        testified as follows:
2   BY MR. SHAU:
3      Q.   Let me just add, Mrs. Doe, I'm going to
4   attempt to try to ask questions that won't lead you
5   down the path of saying your name or your children's
6   names, but in the event that I do, don't worry about it
7   and we will be able to remedy it later.
8      A.   Okay.
9      Q.   My name is Jarrod Shau, and I represent the
10   defendants in this action.
11       I am going to ask you a bunch of
12   questions about various things that have occurred, and
13   I ask that if you don't understand the question, you
14   ask me to rephrase it, or if you don't hear it, you ask
15   me to ask it again.
16       If you answer the question as it's asked
17   on the record, it's going to look like you understood
18   the question.
19      A.   Uh-huh.
20      Q.   So if you need for me to repeat it or rephrase
21   it, please ask me to and I will be happy to.
22       One other thing is the court reporter
23   can't see uh-huh or when you shake your head, so if you
24   could answer affirmatively or negatively, however you

                          3

1   choose, that would be appreciated by the court
2   reporter.
3      A.   Okay.
4      Q.   If you need to take a break at any point, just
5   let me know, we can stop whenever you want.  If you
6   want water or to use the rest room, please let me know.
7       Mrs. Doe, have you ever been deposed
8   before?
9      A.   No.
10      Q.   What did you do to prepare for this
11   deposition?
12      A.   Spoke with my lawyer.
13      Q.   Your lawyer, Mr. Allingham?
14      A.   Yes.
15      Q.   When did you speak with Mr. Allingham?
16      A.   Thursday.
17      Q.   Did you review any documents during that
18   preparation?
19      A.   No.
20      Q.   Have you spoken with anyone else regarding
21   your deposition today?
22      A.   Just my husband.
23      Q.   Mrs. Doe, what town do you currently live in?
24      A.   Dagsboro, Delaware.

                          4

1  it didn't seem to us that board members were rotating.
2    Q.  So after reading the policy --
3    A.  And --
4    Q.  I'm sorry, please finish.
5    A.  And on No. 3, we did feel that the way the
6  board gave their prayer was proselytizing.
7    Q.  I would like to ask you a few questions about
8  that.
9        So when you discussed it, you felt that
10  some of the board prayers that you had heard in the
11  past were proselytizing?
12    A.  Yes.  If proselytizing is to advance one
13  particular religion, is that what we agree on?
14    Q.  If that's your definition, that's fine.
15    A.  Then, yes, that would be the case.
16    Q.  And it's accurate to say you had only attended
17  two board meetings at the time you reviewed this
18  policy?
19    A.  Right.
20    Q.  Did the board prayer at those --
21    A.  I'm sorry.  I forgot one of the board
22  meetings.  Can we go back?
23    Q.  Sure.
24    A.  The August 24th school board meeting.

13

1    Q.  August 24?
2    A.  Uh-huh.
3    Q.  Did you sign in at the August 24th, 2004 board
4  meeting?
5    A.  No, I did not.
6    Q.  But you did attend the August 24th, 2004 board
7  meeting?
8    A.  Yes.
9    Q.  Did Mr. Doe attend that meeting?
10    A.  No.
11    Q.  Did either Jamie or Jordan attend that
12  meeting?
13    A.  No.
14    Q.  So I'll rephrase.
15        At the time you thought the board was,
16  I'll use your word, advancing religion --
17    A.  Uh-huh.
18    Q.  -- through prayer, you had heard three prayers
19  at board meetings?
20    A.  Well, I can't recall in 1998.
21    Q.  So in 1998 you don't recall that there was a
22  prayer said?
23    A.  I don't recall.  I might have, you know,
24  gotten there afterwards.  I just can't recall.

14

1    Q.  And spring of 2004, do you recall if there was
2  a prayer?
3    A.  Yes.
4    Q.  Do you remember who gave that prayer?
5    A.  There was a gentleman, I believe it was
6  Reginald Helms, or it could have been John Evans.  I'm
7  not sure exactly.
8    Q.  Do you remember what that prayer was?
9    A.  Yes.
10    Q.  Do you remember the exact words of the prayer?
11    A.  I remember the exact words of the end of the
12  prayer, "and in Jesus' name we pray."
13    Q.  Before the prayer started, did Mr. Evans or
14  Mr. Helms, whomever gave the prayer, ask you to bow
15  your head?
16    A.  I believe so, but I can't be sure.
17    Q.  So you don't remember whether or not he did?
18    A.  I know that we had been asked to bow our head
19  before and I'm not sure if that was the meeting.
20    Q.  Were you asked to bow your head at the August
21  24th, 2004 meeting?
22    A.  I can't recall specifically.
23    Q.  Is it fair to say you don't remember any
24  specific instance of you being asked to bow your head,

15

1  you just generally remember that occurring at one of
2  the meetings you attended?
3    A.  My recollection is that the impression given
4  was to bow your head for the prayer, but I can't recall
5  exactly whether we were specifically asked to bow our
6  heads.  But I do remember bowing of heads.
7    Q.  So it may have been just everyone in the area
8  bowed their heads and it just felt like you should have
9  bowed your head?
10    A.  That may be.
11    Q.  Did you bow your head during the prayer?
12    A.  No.
13    Q.  Did you feel like you had to bow your head
14  during the prayer?
15    A.  Well, I'm not sure what you mean by "had to."
16  Can you rephrase that?
17    Q.  Sure.
18        Even though you didn't bow your head,
19  did you feel any pressure?
20    A.  Yes.
21    Q.  However, you decided that you weren't going to
22  bow your head?
23    A.  Correct.
24    Q.  Why did you feel pressured to bow your head

16

1  even though you didn't?
2      A.   Well, I think what you describe as pressure is
3  exactly right, it's peer pressure, you know, to bow
4  your head. Everyone's bowing their head, so you would
5  stand out if you didn't.
6      Q.   Did anybody say anything to you about you not
7  bowing your head?
8      A.   No.
9      Q.   Let's go back, in the spring of 2004, when
10  Mr. Helms or Mr. Evans gave the prayer and ended "in
11  Jesus' name," how did that make you feel?
12      A.   Well, we were there to make a presentation and
13  it made us feel uncomfortable and excluded. And that
14  perhaps the board -- well, that's it.
15      Q.   Do you remember the prayer that was given at
16  the August 24th, 2004 meeting?
17      A.   Yes.
18      Q.   Who gave that prayer?
19      A.   Donald Hattier.
20      Q.   Do you remember that prayer?
21      A.   Yes.
22      Q.   Were there any religious indications in that
23  prayer?
24          MR. ALLINGHAM: I object to the form of

17

1  the question. You can answer.
2          THE WITNESS: It mentioned God.
3  BY MR. SHAU:
4      Q.   Were you offended by Dr. Hattier's prayer?
5      A.   I'm not exactly sure what you mean by
6  offended.
7      Q.   How did Dr. Hattier's prayer make you feel?
8      A.   I would say the same as the other board
9  meeting prayer.
10      Q.   It made you feel --
11      A.   That it was promoting religion.
12      Q.   How did it make you feel like it was promoting
13  religion?
14      A.   Well, it was a school board meeting and
15  Dr. Hattier knew us and it promoted one religion.
16      Q.   What religion did it promote?
17      A.   Well, due to the numerous signs around the
18  room of people promoting Christianity and shouting ame
19  and hallelujah, I would say that it promoted
20  Christianity.
21      Q.   Let's try and take for a moment all of the
22  people in the crowd with their signs and shouting amen,
23  act as though it didn't happen, although it did.
24          If Dr. Hattier had given his prayer or

18

1  given whatever he said without any of that, would you
2  have found it to be advancing religion?
3      A.   Yes.
4      Q.   Would you have still found it to be a
5  Christian prayer?
6      A.   Well, I know Dr. Hattier's family to be
7  Christian, so.
8      Q.   He didn't reference Jesus, though, did he?
9      A.   Well, it was a long prayer and I do not think
10  it did reference Jesus.
11      Q.   You mentioned before that Paragraph 3 you felt
12  that the board did use the prayer to proselytize or
13  advance religion. When you were discussing the praye
14  with your husband, did you find anything objectionable
15  about the policy?
16      A.   About this?
17      Q.   Yes, about what's in front of you, PX-9?
18      A.   Not that I can recall.
19      Q.   I'd like to take a few moments to go through
20  the policy with you now paragraph by paragraph and
21  discuss different aspects about it.
22          Paragraph 1 reads, "In order to
23  solemnify its proceeding, the board of education may
24  choose to open its meetings with a prayer or moment of

19

1  silence, all in accord with the freedom and conscious
2  of the individual adult board member."
3          Would it be okay with you if the board
4  of education opened its meetings with a moment of
5  silence?
6          MR. ALLINGHAM: I object to the form of
7  the question.
8          You can answer.
9          THE WITNESS: It would be okay with me.
10  It wouldn't be my preference.
11  BY MR. SHAU:
12      Q.   But you would be able to tolerate that?
13      A.   Uh-huh.
14      Q.   Would it be acceptable to you if the board
15  opened with a prayer in God's name?
16          MR. ALLINGHAM: I object to the form of
17  the question.
18  BY MR. SHAU:
19      Q.   You can answer the question.
20      A.   I'm sorry, would it be objectionable if it
21  opened in God's name, is that the question?
22      Q.   Yes. To you?
23      A.   Yes.
24      Q.   Why?

20

# EXHIBIT 6

Evans. John (Video)  10/18/2006  9:13:00 AM

---

**1**

```
 1          IN THE UNITED STATES DISTRICT COURT
 2            FOR THE DISTRICT OF DELAWARE
 3   MONA DOBRICH and MARCO   :  C.A. No. 15-120 (JJF)
     DOBRICH, Individually and :
 4   as parents and next friend :
     of ALEXANDER DOBRICH,     :
 5   SAMANTHA DOBRICH, JANE DOE :
     and JOHN DOE, Individually :
 6   and as parents and next   :
     friend of JORDAN DOE and  :
 7   JAMIE DOE,                 :
 8        Plaintiffs,           :
 9        v.                    :
10   INDIAN RIVER SCHOOL        :
     DISTRICT, et al.,          :
11                              :
        Defendants.             :
12
13        Videotaped Deposition of JOHN M. EVANS,
     taken pursuant to notice, on Wednesday, October 18,
14   2006 at 9:13 a.m. at 31 Hosier Street, Selbyville,
     Delaware, reported by Lorena J. Hartnett, a Registered
15   Professional Reporter and Notary Public.
16        ...........
17   APPEARANCES:
18        THOMAS ALLINGHAM, ESQUIRE
          RICHARD HORVATH, ESQUIRE
19        BRIAN LENHARD, ESQUIRE
          One Rodney Square
20        Wilmington, DE  19801
          Attorney for the Plaintiff
21
22
23        WILCOX & FETZER
          1330 King Street - Wilmington, DE  19801
24        (302) 655-0477
          www.wilfet.com
```

**2**

```
 1
 2   APPEARANCES (CONTINUED):
 3        JARROD SHAU, ESQUIRE
          Drinker, Biddle & Reath, LLP
 4        One Logan Square
          18th and Cherry Streets
 5        Philadelphia, PA  19103-6996
          Attorney for the Defendants
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**3**

```
 1
 2
 3               TABLE OF CONTENTS
 4   TESTIMONY OF JOHN M. EVANS:
 5   Direct Examination by Mr. Allingham. . . . . . . 3
 6   Certificate of Reporter . . . . . . . . . . . .166
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

TABLE OF CONTENTS
TESTIMONY OF JOHN M. EVANS:
Direct Examination by Mr. Allingham . . . . . . . 3
Certificate of Reporter . . . . . . . . . . . . 166

**4**

```
 1        VIDEOGRAPHER:  Okay.  This is the
 2   videotaped deposition of John M. Evans taken
 3   by the plaintiffs in the matter of Dobrich
 4   et al. versus Indian River School District,
 5   et al., Civil Action Number 15-120.
 6        The deposition is taking place at 31
 7   Hosier Boulevard in Selbyville, Delaware, on
 8   October 18, 2006 at approximately 9:13 a.m..
 9   The court reporter is Lorena Hartnett from
10   the firm of Wilcox and Fetzer.
11        My name is Mark Buckmaster, a video
12   specialist from Discovery Video Services
13   incorporated in association with Wilcox and
14   Fetzer.  Counsel will now introduce
15   themselves and the reporter will swear in
16   the witness.
17        MR. ALLINGHAM:  My name is Tom
18   Allingham.  I represent the plaintiffs, and
19   with me are Richard Horvath and Brian
20   Lenhard.
21        MR. SHAU:  My name is Jarrod Shaw, and
22   I represent the defendants.
23
24
```

---

Unsigned

Page  1 - 4

1  knowing Jesus.  We also pray that you would be with
2  them at this time.  We ask these things in Jesus's
3  name.  Amen."  Is that prayer permitted by or
4  prohibited by paragraph three?
5     A.  Possibly the sentence, "We pray that you
6  direct them into the truth and eventually the truth
7  that comes by knowing Jesus," that might be, that
8  might violate paragraph three.
9     Q.  You would view that as proselytizing?
10    A.  Yes, I would.
11    Q.  The next prayer may -- Your judgment about
12 the next prayer may seem obvious to you, but I am
13 going to ask it anyway.  Suppose that a board member
14 offered the prayer, "Oh, Lord, convert the heathen
15 among us."  That would violate it?
16    A.  That would definitely violate paragraph
17 three.
18    Q.  Yes, sir, or a prayer that said, "Oh, Lord,
19 bring the Jews in the audience to knowledge and love
20 of our savior, Jesus Christ."
21    A.  It would violate paragraph three.
22    Q.  And I have one last prayer for you.  It's
23 short, but if you need me to read it again, I will.
24 "Allah, we offer you our school bus drivers.  We offer

153

1  you our superintendent, our administrators, and our
2  secretaries.  We offer you our teachers and our
3  parents.  Finally, we offer you our students.  Peace
4  be unto your prophet, Muhammed."  Would you view tha[t]
5  as permitted or prohibited by paragraph three?
6     A.  Well, I don't know what the prayer means by
7  offer.
8     Q.  So, without knowing, you can't make a
9  judgment?
10    A.  That's correct.  I don't know.  Whomever
11 would read that prayer, offer might mean something
12 different to them than it does to me.
13    Q.  Well, let's explore that a little bit.  Do
14 you have a sense of what you would mean if you offere[d]
15 a prayer like that where you used the word, "we offer
16 you our teachers and students," or would you just not
17 offer a prayer like that?
18    A.  I wouldn't use the word offer.  I might say,
19 you know, protect or help or something along that
20 line.
21    I mean it appears that that would not violate
22 paragraph three, but again it depends on what the word
23 offer means by that individual.  I would not be able
24 to determine from that prayer if it violates paragraph

154

1  three.
2     Q.  Okay.  Now, Mr. Evans, we talked earlier in
3  the deposition about the enforcement mechanism for
4  this paragraph, and I, I think we established that
5  it's the board members who are ultimately responsible
6  for enforcing all of the board prayer policy,
7  including paragraph three; correct?
8     A.  Right.
9     Q.  If a board member offered, I am going to take
10 the extreme example first or the most extreme example
11 first, if a board member who was invited by the
12 president to open a meeting with a prayer said, "Lord,
13 we pray that you convert the Jews in the audience to
14 knowledge and love of our son, our Lord, Jesus
15 Christ," which you and I have agreed, I think, is
16 violative of paragraph three, --
17    A.  Yes.
18    Q.  -- what would you do as a board member?
19    A.  What would I do?
20    Q.  If you heard that prayer, what would you do?
21    A.  Well, at that point it would be a little too
22 late to stop it, but I would -- I would have to talk
23 to the president that that person should be
24 reprimanded.  Maybe that's a harsh word, but that

155

1  person should be informed that they are not to pray
2  like that.  That violates paragraph three of our
3  policy.
4     Q.  And all board members should comply with the
5  policy; correct?
6     A.  Yes.
7     Q.  Okay.  But, as you pointed out, at that point
8  the horse would be out of the barn, so to speak?
9     A.  That's right.
10    Q.  There is no provision in the policy for a
11 reprimand or a punishment to a board member.  Do you
12 believe that a board member who offered such a prayer
13 would be reprimanded or punished?
14    A.  Do I believe they would?  If I were the
15 president, yeah, I would.
16    Q.  And when you say reprimand, do you mean --
17    A.  Well, when I say reprimand, I just mean talk
18 to that person and tell them, "Look, you violated our
19 policy, you cannot pray like you just prayed, and, if
20 it happens again, you won't be asked to pray."  That's
21 the way I would handle it.
22    Q.  Okay, and so, as you understand, it's not a
23 mechanism that's set forth in the policy, but as you
24 understand the way the policy ought to work, if a

156

# EXHIBIT 7

Hastings, Gregory (Video)  10/13/2006  9:07:00 AM

3

```
1         IN THE UNITED STATES DISTRICT COURT
2           FOR THE DISTRICT OF DELAWARE
3
4    MONA DOBRICH and MARCO DOBRICH, individually and
     as parents and next friend of ALEXANDER DOBRICH,
5    SAMANTHA DOBRICH, JANE DOE and JOHN DOE,
     individually and as parents and next friend of
6    JORDAN DOE and JAMIE DOE,
7           Plaintiff
               Civil Action
8      vs.        NO. 15-120
9    INDIAN RIVER SCHOOL DISTRICT, ET AL.,
10           Defendants
11
12       Deposition of GREGORY HASTINGS, taken
     pursuant to notice at the Indian River School
13   District, 31 Hosier Street, Selbyville, Delaware,
     beginning at 9:07 a.m. on October 13, 2006 before
14   David A. Sroka, Registered Professional Reporter and
     Notary Public.
15
16   APPEARANCES:
17      THOMAS ALLINGHAM, ESQ.
        RICHARD HORVATH
        BRIAN LENHARD
18      P.O. Box 636
        Wilmington, Delaware  19899-0636
19      For the Plaintiffs
20      JARROD D. SHAW, ESQ.
        Drinker Biddle & Reath, LLP
21      One Logan Square
        Philadelphia, Pennsylvania 19103-6996
22      For the Defendants
23
24
```

```
1                GREGORY HASTINGS,
2       The Witness herein, called for examination by
3    the Plaintiffs, having been duly sworn to tell the
4    truth, the whole truth, and nothing but the truth,
5    was examined and testified as follows:
6    EXAMINATION BY MR. ALLINGHAM:
7       Q.  Good morning, Mr. Hastings.  I am going to
8    ask you to clear up something that has been bugging
9    me.  Is it H-O-S-I-E-R or H-O-O-S-I-E-R?  Is it
10   pronounced Hoosier or Hosier?
11      A.  In this area we pronounce it Hosier.
12      Q.  Do you know how it's spelled?
13      A.  I believe it's one O.
14      Q.  Thanks.  Have you ever been deposed before?
15      A.  Yes, I have, yes.
16      Q.  In what context?
17      A.  As a defendant.
18      Q.  What kind of a case?
19      A.  It was a teacher in our high school and
20   there was -- she brought on a suit, I have to
21   reflect, this has been 12 years, I guess.
22      Q.  All right, I don't need that much detail.
23   That was a suit by a teacher?
24      A.  Yes.
```

2

```
1       MS. DUPHILY:  This is the
2    videotape deposition of Mr. Greg Hastings,
3    taken by the Plaintiff, in the
4    matter of Dobrich, et al. versus Indian
5    River School District, at al., case
6    number 15-120.
7       The deposition is taking place at 31
8    Hosier Boulevard, Selbyville, Delaware.  We
9    are going on the record on October 13,
10   2006 at approximately 9:07 a.m.  The court
11   reporter is Dave Sroka from the firm of
12   Wilcox & Fetzer.  My name is Lindsay
13   duPhily and I am with Discovery Video
14   Services in association with Wilcox &
15   Fetzer.
16      I will now ask counsel to
17   identify themselves on the record, and then
18   the court reporter will swear in the
19   witness.
20      MR. ALLINGHAM:  I am Tom Allingham
21   representing .  ) Plaintiffs.  With me are
22   Rick Horvath and Brian Lenhard.
23      MR. SHAW:   Jarrod Shaw
24   representing the defendants.
```

4

```
1       Q.  And it was against you in your capacity as
2    a School Board member?
3       A.  Capacity as a School Board member?
4       Q.  Yes, sir?
5       A.  Yes.
6       Q.  Have you ever testified at trial?
7       A.  I have been an expert witness in Small
8    Claims Court, that's the extent of it.
9       Q.  Did the court issue an opinion in that
10   case?
11      A.  Yes.
12      Q.  Were you mentioned in the opinion?
13      A.  I don't believe so.
14      Q.  What was your area of expertise in that
15   testimony?
16      A.  I had provided architectural design for the
17   product.  This has been a long time, too but --
18      Q.  Let me cut you off.  It has nothing to do
19   with issues of religion in the schools, right?
20      A.  No.  thank you, no.
21      Q.  What is your -- I am trying to keep this
22   limited to the issues here.  You are employed as an
23   architect?
24      A.  Yes, I own a small architectural design
```

Hastings, Gregory (Video)  10/13/2006  9:07:00 AM

| | |
|---|---|
| 1    A.  Yes. | 1      produced.  Better yet you produced the CD |
| 2    Q.  I was talking about the School Board Prayer | 2      from the tapes. |
| 3   Policy, BDA.1? | 3        MR. SHAW:  We try. |
| 4    A.  That's all that was discussed. | 4      (AT THIS POINT A TAPE WAS PLAYED) |
| 5    Q.  Okay, so we can eliminate the August 24 | 5    Q.  That is the extent of discussion of the |
| 6   meeting as the venue for public deliberation on the | 6   School Board Prayer Policy BDA.1 at the September 28 |
| 7   School Board Prayer Policy, is that right? | 7   Board meeting.  It runs from 11 minutes 45 seconds |
| 8    A.  Yes. | 8   to 12 minutes and 32 seconds and you just heard the |
| 9    Q.  Let me show you what we have previously | 9   entirety of it.  Would you characterize that as |
| 10   marked as PX18, which is the official minutes of the | 10   public consideration of or public deliberation on |
| 11   September 28, 2004 Board meeting.  And same questic | 11   the School Board Prayer Policy by the Board? |
| 12   here, take as much time as you want, Mr. Hastings, | 12    A.  Yes. |
| 13   but would you point me to that portion of the | 13    Q.  Would you tell me in what way you consider |
| 14   minutes where there was public deliberation on the | 14   that to be public consideration or public |
| 15   School Board Prayer Policy, and you may want to look | 15   deliberation? |
| 16   at page six of the minutes? | 16    A.  We acknowledged the prayer, or we |
| 17    A.  Just first reading of policy on page six. | 17   acknowledged the policy, or alleged policy, and then |
| 18    Q.  Okay.  Now, do you have a recollection that | 18   we were given the opportunity to either talk to |
| 19   there was a discussion or deliberation by the Board | 19   constituents, if need be, or constituents had the |
| 20   substantively on the policy at that time, or was the | 20   freedom liberty to conduct us, or we as Board |
| 21   policy simply identified and submitted for a first | 21   members can contact the policy committee with |
| 22   reading? | 22   concerns or any specifics. |
| 23    A.  I don't recall the extent. | 23    Q.  Would you agree with me that there was no |
| 24    Q.  We are fortunate in having a tape of this | 24   opportunity for the public to observe the Board's |
| 29 | 31 |

| | |
|---|---|
| 1   meeting.  I can play that portion of the tape for | 1   deliberations on the School Board Prayer Policy |
| 2   you and then I have a couple of questions about what | 2   during the clip that I just played you? |
| 3   occurred. | 3    A.  Would I agree?  Repeat that, please? |
| 4        MR. SHAW:  Has the tape been | 4    Q.  Would you agree that there was no |
| 5      entered into evidence as an exhibit? | 5   opportunity for the public to observe Board |
| 6        MR. ALLINGHAM:  It has not.  All | 6   deliberations on the School Board Prayer Policy |
| 7      right, why don't you take it out for a | 7   during the clip that I just played you? |
| 8      minute, Rick.  I want to please have marked | 8    A.  Yes. |
| 9      as PX52.  Let me have the case, we will | 9    Q.  In fact, the public did not have access to |
| 10      mark the case.  Actually, let's mark the | 10   the text of that policy during the September 28 |
| 11      disk itself and we are going to mark it as | 11   meeting, did they? |
| 12      PX52. | 12    A.  Not to my knowledge. |
| 13        (WHEREUPON, Exhibit PX52 was | 13    Q.  And there is this process of a first and |
| 14      marked for identification) | 14   second reading for Board policies, but they are not |
| 15    Q.  All right, we are now going to play for you | 15   actually read out loud, is that correct? |
| 16   a portion of the PX52 which runs from 11 minutes and | 16    A.  It depends on the individual Board member, |
| 17   45 seconds into the meeting.  So, we will play that | 17   it depends on the setting, it depends on -- it could |
| 18   portion of the tape. | 18   depend on many things, but it's a line item up for |
| 19        MR. SHAW:  Do you mind if I | 19   discussion, or debate, or to -- for a concern to be |
| 20      bring the speaker closer? | 20   carried or followed up with at a later date. |
| 21        MR. ALLINGHAM:  Oh, you won't have | 21    Q.  Let me just follow up on that a little bit. |
| 22      any trouble hearing it.  And so the record | 22   You said it is a line item that is up for discussion |
| 23      is clear, this is actually a CD which has | 23   or concern or to be followed up with at a later |
| 24      been made from the tapes that were | 24   date.  At the September 28 Board meeting there was |
| 30 | 32 |

Hastings, Gregory (Video)  10/13/2006  9:07:00 AM

1  no discussion of the Board policy on School Board
2  prayer, correct?
3     A.  Correct.
4     Q.  At the September 28, 2004 Board meeting
5  there were no concerns of any kind expressed about
6  the Board policy on School Board prayer, correct?
7     A.  Correct.
8     Q.  And do you know whether anyone followed up
9  with any discussion or concern of the Board policy
10 on School Board prayer in public at any later date?
11    A.  I do not.
12    Q.  In your earlier answer to my question about
13 reading, and what does a first reading or a second
14 reading mean, I take it that sometimes proposed
15 policies are in fact read aloud at a Board meeting?
16    A.  Yes.
17    Q.  Do you know why School Board Prayer Policy
18 was not read out loud?
19    A.  No, I don't.
20    Q.  Was there any discussion about whether to
21 read School Board Prayer Policy aloud at the
22 September 28 Board meeting?
23    A.  I don't recall.
24    Q.  We have been told that we have a couple of

33

1  minutes left, so let's change the tape.
2        MS. DUPHILY:  Going off the
3     record at approximately 10:00 a.m..
4        (WHEREUPON a brief recess was
5     taken)
6        MS. DUPHILY:  Back on the record
7     at approximately 10:07 a.m..
8     Q.  I am going to show you a copy of what's
9  been previously marked as PX9.  This is the --
10 several witnesses have identified this as the
11 official Board policy on School Board prayer.  It's
12 titled Board Prayer at Regular Board Meetings.  You
13 testified earlier that the Board does not pray to
14 open special Board meetings or separately executive
15 sessions.  Did anyone ever suggest that the policy
16 should be extended to all Board meetings rather than
17 merely regular Board meetings?
18    A.  Not that I recall.
19    Q.  Was that discussed or raised at any time
20 during deliberations, public or private on the
21 School Board Prayer Policy?
22    A.  Not that I recall.
23    Q.  I am going to show you a couple of what I
24 believe to be drafts of the PX9 policy that I just

34

1  put in front of you.  This is a copy of what we have
2  previously marked as PX11.
3        Do you recall having seen this document
4  before?
5     A.  Give me a minute.
6     Q.  Sure.  On all of these documents Mr.
7  Hastings, take as much time as you want to to read
8  them.
9     A.  Okay, again I'm sorry, what was your
10 question?
11    Q.  Have you ever seen it before?
12    A.  You are taxing my memory.
13    Q.  That's my job.
14    A.  Honestly, I have to testify I honestly
15 suppose I have, but I honestly can't remember.
16    Q.  Fair enough.  As you read through PX11 do
17 you recognize it as containing most of the language
18 of the final Board policy as adopted?
19    A.  Yes.
20    Q.  But there are some differences, correct?
21 Let me see if I can be specific.
22    A.  Yeah.
23    Q.  The Board policy PX9 begins after the title
24 with the words, "In order to solemnify its

35

1  proceedings," and you'll see that although the
2  concept of solemnifying Board proceedings is
3  reflected in line 3 of the proposed policy marked
4  PX11, the language is a little different, do you see
5  that?
6     A.  Yes.
7     Q.  In addition, before the concept of
8  solemnifying the proceedings appears in the proposed
9  policy, there is the language, "Following the
10 rulings of the United States Court of Appeals Third
11 Circuit and past practices of State of Delaware
12 legislative bodies, the Indian River Board of
13 Education may choose to solemnify," do you see that?
14    A.  Yes.
15    Q.  Do you recall any discussion at the Board
16 level of that language, that is following the
17 rulings of the U.S. Court of Appeals Third Circuit
18 and past practices of State of Delaware legislative
19 bodies?  Did you discuss that at any time at the
20 Board level?
21    A.  I don't recall.
22    Q.  Do you know what was referred to by past
23 practices of State of Delaware legislative bodies?
24    A.  I would have to answer that question by

36

Unsigned                                    Page  33 - 36

Hastings, Gregory (Video) 10/13/2006 9:07:00 AM

1    A.   Yes, that is tradition.
2    Q.   Why was that changed in the adoption of the
3    policy?
4    A.   To rotating?
5    Q.   Yes.
6    A.   I don't know specific, but I suspect that
7    was offered in the policy to ensure at that setting
8    regardless of the faith of any Board member that
9    they would have the opportunity to share their
10   prayer at the opening of a regular Board meeting.
11   Q.   And to give you an example, if the district
12   elected a Jewish Board member you wanted to make
13   sure that the president didn't just skip over the
14   Jewish Board member every time?
15   A.   Correct.
16   Q.   Or an atheist Board member, or whatever,
17   correct?
18   A.   Correct.
19   Q.   Because if an atheist Board member were
20   elected, that Board member might want to say look I
21   don't believe in a higher power, but I do believe in
22   solemnifying our proceedings, and I urge all of you
23   to join me in reminding myself to take seriously my,
24   you know, my oath as a Board member, whatever, yes?

                        109

1    A.   Yes.
2    Q.   Who is the intended audience of the prayer,
3    the ten Board members who are the ones who have to
4    make the decisions at that Board meeting?
5    A.   In my opinion, yes.
6    Q.   And so I take it that the intended audience
7    of the prayer is the ten Board members, it would be
8    just as effective for the ten Board members to stand
9    in the wings and have their prayer and then walk
10   onto the stage as it would be for them to walk onto
11   the stage and then have their prayer, correct?
12   A.   Correct.
13   Q.   Did anybody ever suggest that a policy or
14   practice that would have contemplated that the
15   prayer that would solemnify the proceedings take
16   place before the Board walked out on stage?
17   A.   Not to my knowledge.
18   Q.   I asked you a question about the State
19   Board of Education, and whether it was necessary for
20   the State Board of Education to have a prayer, to
21   open its meetings with a prayer in order to
22   solemnify its proceedings and you answer was, "Nice
23   but not necessary," do you remember that?
24   A.   Yes.

                        110

1    Q.   I am going to ask you the same question
2    with respect to the Indian River School Board. In
3    order for the School Board to solemnify its
4    proceedings, is it necessary for it to open its
5    meetings with a prayer? Would you give me the same
6    answer, nice but not necessary?
7    A.   Nice but not necessary.
8    Q.   And let me follow-up on that. In your view
9    why would it be nice?
10   A.   Again for the comment I made just a moment
11   ago, with the charge that we have, the
12   responsibilities that we have, we need all the help
13   we can get. So, if that's divine help to guide us
14   and make all the right decisions, because some of
15   the decisions are tough. It's nice to seek that
16   extra help.
17   Q.   Fair enough. And in that context, and in
18   the context of the reason why in your view it's nice
19   to do it, you could accomplish that result, that it
20   would be equally nice, if you will, to have the
21   prayer or moment of silence off stage?
22   A.   I suppose, yes.
23   Q.   Because the prayer is not directed to the
24   public who are sitting out in the audience in front

                        111

1    of the stage, correct?
2    A.   In my opinion, that's correct.
3    Q.   Look at PX9 which is the board prayer
4    again. From October 19, 2004, which is when this
5    policy was adopted, until the last meeting that you
6    attended, which -- I'm sorry if I am getting this
7    wrong, which was in December of 2005, correct?
8    A.   Yes.
9    Q.   Was this rotating basis among each
10   individual Board member observed? That is to say,
11   in practice was the opportunity rotated among each
12   individual Board member?
13   A.   The only comment I could make to that would
14   be I may have been asked on one other occasion
15   during that period of time to ask, to give a prayer,
16   but I can't speak to whether or not the president
17   had gone in rotation fashion or asked several of the
18   Board members in rotation to speak.
19        Again, in practice what the Board president
20   usually has done is prior to the meeting, once we
21   arrive is walk up to that individual and ask them,
22   see if they are willing to give the prayer before we
23   begin that evening session.
24   Q.   The third paragraph reads, "Such

                        112

1  our students.  Peace be unto your prophet Muhammad.'
2  Permissible or violative?
3  A.  Permissible.
4  Q.  Now, in reaching the judgment that you
5  reached on each of those prayers, can you describe
6  for me the way you analyze the problem?  How did you
7  reach the judgment that you reached that all three
8  prayers were permissible?
9  A.  I commented a moment ago that in my opinion
10  sitting there at the Board we need or we'd like to
11  have all of the help we can get.  If there happened
12  to be other Board members at that particular time, a
13  particular time, that were of different faith and
14  they in this rotating basis were asked or offered a
15  prayer, then their prayer of whatever choice would
16  be respected.
17  Q.  Can you give me an example or generically a
18  kind of prayer that you would view as violative of
19  paragraph three?
20  A.  The only thing that I could share with you,
21  that myself included would probably have difficulty
22  with is and we are speaking of prayer, you are
23  asking about our prayer, but if a prayer or offer
24  for divine guidance to the devil or evil would be

117

1  just a little difficult, I suspect.
2  Q.  Okay.  I am going to give you another
3  example of a prayer and ask you whether you think it
4  would be violative.  Suppose that a Board member
5  said, we pray Lord that you enlighten the heathen in
6  our midst and that you inspire them to come to
7  knowledge of your wisdom and goodness.  Would that
8  prayer be violative of paragraph three?
9  A.  You need to repeat that one more time.
10  Q.  We pray Lord that you inspire the heathen
11  in our midst to come to know your goodness and
12  wisdom.  That's not identical to what I said, but
13  the idea is we pray that the heathen come to know
14  your wisdom and goodness.
15  Would that prayer be violative of paragraph
16  three?
17  A.  I suspect it would be permissible.
18  Q.  So, you would not view such a prayer as a
19  prayer that was used to convert anyone?
20  A.  No.
21  Q.  This one is going to be extreme, but it's
22  to illustrate a point.  Suppose that a Board member
23  offered a prayer, Lord, we hope that you will
24  convert to Christianity all the Jews in the

118

1  audience.  Would you view that prayer as violative
2  of paragraph three?
3  A.  Yes.
4  Q.  Okay.  On the issue of how paragraph three
5  is enforced, I think you mentioned three groups or
6  people who could bring to the attention of the Board
7  the possibility that paragraph three had been
8  violated.  The first was the Board members
9  themselves, a sort of self policing mechanism.  The
10  second was the superintendent who might bring an
11  issue to the Board and the third was the Board
12  attorney, correct?
13  A.  Correct.
14  Q.  Just as a practical matter the Board
15  attorney does not attend every meeting, is that
16  right?
17  A.  That's correct.
18  Q.  In fact, the Board attorney doesn't come
19  unless specifically invited?
20  A.  That's correct.
21  Q.  To your knowledge has the Indian River
22  School District ever had a Board member who was not
23  a Christian?
24  A.  I have no idea.  I can't respond to that.

119

1  Q.  Well, let me turn the question around a
2  little bit.  Are you personally aware of any Board
3  member who was not a Christian?
4  A.  No, no, I am not.
5  MS. DUPHILY:  We are going off the
6  record at approximately 1:03 p.m..
7  (WHEREUPON a brief recess was
8  taken)
9  MS. DUPHILY:  Back on the record
10  at 1:05 p.m..
11  Q.  Are you personally aware of any
12  superintendent of the district who was not
13  Christian?
14  A.  No.
15  Q.  And to the extent that it matters, are you
16  aware of any school attorney who was not a
17  Christian?
18  A.  No.
19  Q.  Do you think there is any danger that
20  these, all of these I'll call them enforcement
21  mechanisms, the people who represent the enforcement
22  mechanisms as Christians would be less sensitive to
23  whether an opportunity is used to proselytize,
24  advance or convert anyone, than might a person of

120

# EXHIBIT 8

**Page 1**

```
1         IN THE UNITED STATES DISTRICT COURT
2           FOR THE DISTRICT OF DELAWARE
3
4   MONA DOBRICH and MARCO DOBRICH, Individually and
    as parents and next friend of ALEXANDER DOBRICH,
5   SAMANTHA DOBRICH, JANE DOE and JOHN DOE,
    individually and as parents and next friend of
6   JORDAN DOE and JAMIE DOE,
7              Plaintiffs
8        vs.          Civil Action
                      No. 15-120
9
10  INDIAN RIVER SCHOOL DISTRICT, ET AL.,
11             Defendants
12
13       DEPOSITION OF DONALD HATTIER, taken at the
    Indian River School District, 31 Hosier Street,
14  Selbyville, Delaware beginning at 9:36 a.m. on
    October 10, 2006 before David A. Sroka, Registered
15  Professional Reporter and Notary Public.
16
    APPEARANCES:
17
18       THOMAS ALLINGHAM, ESQUIRE
         RICHARD HORVATH, ESQUIRE
19       BRIAN LENHARD, ESQUIRE
         P.O. Box 636
20       Wilmington, Delaware  19899-0636
         For the Plaintiffs
21
22
         WILCOX & FETZER
23       1330 King Street - Wilmington, DE  19801
              (302) 655-0477
24            www.wilfet.com
```

**Page 2**

```
1
2
3        JASON P. GOSSELIN, ESQUIRE
         Drinker Biddle & Reath LLP
4        One Logan Square
         Philadelphia, Pennsylvania 19103-6996
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**Page 3**

```
1            MS. DUPHILY:  This is the
2    videotape deposition of Dr. Donald G.
3    Hattier taken by the Plaintiff in the
4    matter of Dobrich, et al., versus Indian
5    River School District, et al., case number
6    15-120.  This deposition is taking place at
7    31 Hosier Boulevard, Selbyville, Delaware.
8    We are going on the record on October 10,
9    2006 at approximately 9:37 a.m.
10           The court reporter is David Sroka
11   from the firm of Wilcox & Fetzer,
12   Wilmington, Delaware.  My name is Lindsay
13   duPhily I'm the videotape specialist of
14   Discovery Video Services in association
15   with Wilcox & Fetzer.
16           Counsel will now introduce
17   themselves and then the court reporter will
18   swear in the witness.
19           MR. ALLINGHAM:  Tom Allingham of
20   Skadden Arps.  With me is Rick Horvath and
21   Brian Lenhard also of Skadden Arps,
22   representing the Plaintiffs.
23           MR. GOSSELIN:  Jason Gosselin of
24   drinker Biddle & Reath representing the
```

**Page 4**

```
1    defendants.
2            DONALD HATTIER,
3        The Witness herein, called for examination by
4    the Plaintiffs, having been duly sworn to tell the
5    truth, the whole truth, and nothing but the truth,
6    was examined and testified as follows:
7            MR. ALLINGHAM:  Jason, I just want
8    to put a couple of things on the record.
9    The first one is, it is my impression that
10   you are not going to be interrupting
11   this deposition very much, but I want you
12   to know that if you want to make relevance
13   objections feel free.  I'm not going to
14   accept invitations to explain the relevance
15   of my questions, I think that they are
16   relevant.
17       Q.   Mr. Hattier, I represent the Plaintiffs in
18   this action against the district and I'm going to be
19   asking you some questions.  If you don't understand
20   anything that I ask please tell me, don't answer the
21   question.  If you do answer it the judge and
22   ultimately even the jury will probably assume that
23   you did understand it, so if you do have a problem
24   with a question cut me off at the pass now, okay?
```

Hattier, Donald (Video)  10/10/2006  9:36:00 AM

1    A.  550 Atlantic Avenue in Millville, Delaware.
2    Q.  I'm speaking financially now, Dr. Hattier,
3  how much has this litigation cost you personally?
4    A.  I don't know.
5    Q.  Are you aware of any expenses that this
6  litigation has caused you to incur?
7    A.  A general answer would be at various times
8  off from work to attend meetings, but my schedule is
9  somewhat flexible so again I don't know what to say
10  to that.
11    Q.  How much has this lawsuit cost the
12  district?
13    A.  That's a good question, I don't know.
14    Q.  Is that a fact that you would consider
15  important in weighing the considerations that you
16  gave in adopting the School Board Prayer Policy.
17        MR. GOSSELIN:  Objection, don't
18      answer that.  That goes beyond the
19      discovery order that the judge entered.
20        MR. ALLINGHAM:  I disagree.
21    Q.  In considering the adoption of the School
22  Board Prayer Policy did you consider the costs of
23  litigation that would ensue if the policy were not
24  adopted?

25

1        MR. GOSSELIN:  Objection, don't
2      answer that.
3    Q.  In considering the School Board Prayer
4  Policy and its adoption, did you consider the costs
5  that would be avoided if it were not adopted?
6        MR. GOSSELIN:  Object, same
7      instruction.
8    Q.  Was that a matter of irrelevancy to you?
9        MR. GOSSELIN:  Objection, don't
10      answer it.
11    Q.  Have you discussed with anyone how the
12  School Board or the district will pay it's costs of
13  this litigation if the district's insurance carrier
14  does not have to pay the legal fees?
15        MR. GOSSELIN:  Objection, don't
16      answer that.  Tom, I've got patience, it's
17      early in the morning, but we have been here
18      for half an hour.  I don't mind the
19      background, you are entitled to do that,
20      but all of these other -- if we are going
21      to spend six hours asking questions on
22      topics that the judge has already ruled are
23      not relevant in this phase of discovery and
24      perhaps not relevant at all, we might as

26

1  well stop now.
2        MR. ALLINGHAM:  My goal in
3      suggesting to you that I suspect that
4      you and I disagreed about the scope
5      of relevance was to urge you to do
6      precisely what you suggested you would do,
7      which is to lodge an objection without a
8      speech and then if you think that the
9      questions have become a pattern or practice
10      of harassment, which I don't think that
11      they will, to take what steps you need to
12      take.  It's pointless for us to engage in
13      speechifying back and forth and I think we
14      will go faster if we don't.
15    Q.  Are you aware of any donations take the
16  district, the School Board, or the School Board
17  members have received to finance their defense of
18  this litigation.
19        MR. GOSSELIN:  Objection, don't
20      answer that.
21    Q.  You mentioned earlier that you had had
22  comments from the public about the School Board's
23  position vis a vis this litigation, correct?
24    A.  Yes, sir.

27

1    Q.  And you mentioned that some were in favor
2  and I think you said a lesser number were opposed to
3  the Board's position generally?
4    A.  Yes, sir.
5    Q.  And does it matter to you what your
6  constituents think in these areas?
7    A.  I would say yes it does.
8    Q.  And tell me what consideration you gave to
9  your constituencies' expressed views on the matters
10  addressed in this litigation?
11    A.  I listened to what they had to say on both
12  sides of the issue.  And ultimately it boils down to
13  my own conscience which is what I tend to go with.
14    Q.  During the course of it consideration and
15  adoption of the School Board Prayer Policy, did you
16  or your fellow Board members have discussions of
17  that issue, that is what impact the views of your
18  constituencies should have on your consideration of
19  the Board Prayer Policy?
20    A.  There may have been some general
21  discussions regarding that.  I believe that the
22  generally accepted viewpoint was that this is
23  something that folks in our area would strongly
24  support.

28

1    construction projects have nothing to do with the
2    setting of the Board policy?
3      A.   Would you read that again, please?
4      Q.   Sure.  Just so that you have it in mind,
5    its going to be sequence of Board responsibilities
6    which we've just established in questions and then
7    I'm going to ask you whether you believe, I could
8    ask you individually but will ask you broadly
9    whether you believe that each of those
10   responsibilities does not fall within the Board
11   responsibilities of setting Board policy, okay?
12   Do you have it?
13     A.   I have got the big picture.
14     Q.   Would you agree with me that buying
15   textbooks, approving the use of district facilities,
16   approving school use applications, approving the
17   school choice applications, punishing students or
18   teachers who violate district policy, hiring or
19   firing districts employees, approving field trips,
20   giving students awards and overseeing or approving
21   construction projects have nothing to do with
22   setting Board policy?
23         MR. GOSSELIN:  Objection.
24     A.   Yes and no both.

141

1     Q.   Tell me, elaborate so I can understand?
2     A.   That is an easy one for the most part.
3    Maybe not easy, but if you are setting a policy as
4    to what constitutes a student punishment for that.  You
5    doesn't, those are things that get deliberated over
6    quite a bit.  There was a time period where we were
7    discussing the types of athletic enhancement drugs
8    that could be allowed.  Are we going to go with what
9    the NCAA wants as their list?  Did we want to break
10   out from that.  It would be set as a matter of
11   policy is what the students can take and what they
12   can't, so that is a matter of policy.
13        Then you have the policy in terms of how
14   would you punish a student for violating that.  You
15   know, would you immediately expel a student or do we
16   have a policy where we say, you know what first time
17   anybody can do something, all right let's work with
18   you, let's educate you on what the right way to do
19   it is and then don't do it again.
20        Second time out, okay you have already been
21   instructed, now you've had the details in front of
22   you.  Now, if you do it again, now you are subject
23   to some kind of a punishment, that is a policy.
24     Q.   I think I understand the distinction that

142

1    you are trying to draw.  Let me ask you this
2    question.  In areas, among the areas that I talked
3    to you about, there are instances in which the Board
4    has adopted a policy?
5     A.   Uh-hum.
6     Q.   Say on what punishments would be applied
7    for violation of performance enhancing drug policy?
8     A.   Okay.
9     Q.   Okay.  Is that an example we can use?
10     A.   Again it works, yes sir.
11     Q.   And what you were saying when you said yes
12   and no, is that the setting of that policy does
13   involve the Board's policy responsibilities?
14     A.   I believe so.
15     Q.   Once that policy is in place then the
16   application of the policy and the decisions that
17   need to be made in order to determine where somebody
18   falls in the policy, that kind if determination us
19   not the setting of policy but the execution of the
20   policy?
21     A.   Yes, sir.
22     Q.   Or the administration of the policy?
23     A.   Yes, sir.
24     Q.   And so, that was an example along the list

143

1    of things that I gave you.  Can we agree that the
2    decisions on buying textbooks does not involve the
3    Board's policy responsibilities?
4         MR. GOSSELIN:  Objection.
5     A.   I don't have an opinion on that at the
6    moment, sir.  And the reason I say that is because
7    if we look at some textbooks from some of the
8    manufactures, some of them have more opinion in them
9    than others.  You know, we would want something
10   that would line with what the district policies are
11   in terms of how we want the education to go.  So, I
12   don't know that I could answer that yes or no.
13     Q.   Okay.  In all events we can agree that the
14   School Board does administer and enforce whatever
15   policies it adopts?
16         MR. GOSSELIN:  Objection.
17     A.   That is correct.
18         MR. ALLINGHAM:  Hattier Exhibit 9,
19   please.
20         (WHEREUPON Hattier Exhibit 9 was
21   marked for identification)
22     Q.   Okay.
23     A.   Okay.
24     Q.   You've seen this paper before, correct?

144

# EXHIBIT 9

**1**

```
 1        IN THE UNITED STATES DISTRICT COURT
 2         FOR THE DISTRICT OF DELAWARE
 3
 4   MONA DOBRICH and MARCO DOBRICH, individually and
     As parents and next friend of ALEXANDER DOBRICH,
 5   SAMANTHA DOBRICH, JANE DOE and JOHN DOE,
     individually and as parents and next friend of
 6   JORDAN DOE and JAMIE DOE,
 7          Plaintiffs
            vs.          Civil Action
 8                       No. 15-120
     INDIAN RIVER SCHOOL DISTRICT, ET AL.,
 9
            Defendants
10
11   -----------------------------
12
13        DEPOSITION OF REGINALD HELMS, taken
     pursuant to notice at the Indian River School
14   District, 31 Hosier Street, Selbyville, Delaware,
     beginning at 3:32 p.m. on October 11, 2006 before
15   David A. Sroka, Registered Professional Reporter and
     Notary Public.
16
17   APPEARANCES:
18        THOMAS ALLINGHAM, ESQUIRE
          RICHARD HORVATH, ESQUIRE
19        BRIAN LENHARD, ESQUIRE
          P.O. Box 636
20        Wilmington, Delaware 19899-0636
          For the Plaintiffs
21
22
          WILCOX & FETZER
23   1330 King Street - Wilmington, DE 19801
          (302) 655-0477
24        www.wilfet.com
```

**2**

```
 1
 2
          JASON P. GOSSELIN, ESQ.
 3        JARROD D. SHAW, ESQ.
          Drinker Biddle & Reath LLP
 4        One Logan Square
          Philadelphia, Pennsylvania 19103-6996
 5        For the Defendants
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**3**

```
 1        MS. DUPHILY:  This is the
 2   videotape deposition of Reggie Helms.  This
 3   deposition is being taken on behalf of the
 4   Plaintiff in the matter of Dobrich, et al.
 5   versus Indian River School Board, et al,
 6   case number 15-120.  The deposition is
 7   being held at 31 Hosier Boulevard,
 8   Selbyville, Delaware.  We are going on the
 9   record on October 11, 2006 at approximately
10   3:32 p.m.
11        The court reporter is David Sroka
12   with Wilcox & Fetzer, Wilmington, Delaware.
13   my name is Lindsay duPhily and I am the
14   videotape specialist with Discovery Video
15   Services.
16        Counsel will now introduce
17   themselves and then the court reporter will
18   swear in the witness.
19        MR. ALLINGHAM:  I'm Tom Allingham
20   for the Plaintiffs and with me are Richard
21   Horvath and Brian Lenhard.
22        MR. GOSSELIN:  Jason Gosselin for
23   Indian River School District and the Indian
24   River School Board and the individual board
```

**4**

```
 1   member in attendance.
 2           REGINALD HELMS,
 3        The Witness herein, called for examination by
 4   the Plaintiff, having been duly sworn to tell the
 5   truth, the whole truth, and nothing but the truth,
 6   was examined and testified as follows:
 7   EXAMINATION BY MR. ALLINGHAM:
 8        Q.   I've put before you the top document is
 9   Plaintiff's Exhibit 30.  Would you turn to the last
10   page of that exhibit, please?
11        In the second column from the right -- I
12   should give you some background.  This is an article
13   from Delaware Beach Life, have you ever read it
14   before?
15        A.   No.
16        Q.   There is a picture of you on the front
17   page, is that correct?
18        A.   That's me.
19        Q.   Not the best picture of all time?
20        A.   Well --
21        Q.   In the second column from the right there
22   is a quotation from the Reverend Jerry Fike, do you
23   know who Mr. Fike is?
24        A.   Yes.
```

1    Q.   Is he a minister in Sussex County?
2    A.   To the best of my knowledge, yes.
3    Q.   He offered the commencement prayer in 2004
4    at Indian River High School?
5    A.   As I understand it, yes, but I wasn't
6    present but that's what I heard.
7    Q.   Did you have any involvement in inviting
8    Jerry Fike to give that prayer?
9    A.   No.
10        MR. GOSSELIN:  Objection,
11        don't answer that.  Same thing, we are
12        sticking to the issues that are properly in
13        the case right now.
14    Q.   Mr. Fike is quoted as saying in this
15    article, and I'm looking now about half way down
16    that second column from the right, "My loyalty is to
17    Jesus Christ, foremost, even if that takes me to
18    prison or to death.  He is the predicted Messiah.
19    He rose again and that's what he knew what he was
20    talking about.  And if he is the Messiah, then all
21    religions are not equal.  There are no alternatives
22    to Christianity."
23        Do you agree with that sentiment?
24        MR. GOSSELIN:  Objection.

5

1    Q.   Would you tell me what portions of it you
2    do not agree with?
3    A.   The things when he says there are no
4    alternatives, all religions are not equal.  I don't
5    know if these are things that I would say, but he's
6    entitled to his opinion, and if that's what he
7    believes then that's fine.
8    Q.   I agree with you that he is entitled to his
9    opinion.  I also think that you are entitled to your
10    opinion.  My question was directed to precisely what
11    your opinion is.  Do you believe that all religions
12    are equal?
13    A.   Well, it depends on like I said all
14    religions equal, probably not, but it depends on
15    what context, and I don't know what he was -- I
16    don't know what he was meaning there.
17    Q.   Do you believe that the only true religion
18    is Christianity?
19    A.   I believe that as I read the scriptures
20    that when it says no one comes to the Father except
21    by the Son, I believe that.  Am I saying that
22    Christianity is the only religion and that sort of
23    thing, I wouldn't go that far.  But I do believe
24    when I read the scriptures it says no one comes to

7

1    I'm not going to instruct him not to
2    answer, but I'm letting you know that I
3    think this is outside the topic of
4    discussion, and if we are going to spend
5    the afternoon asking Mr. Helms what his
6    beliefs are I would appreciate it if
7    you'd tell me now because I will call
8    Judge Farnan.
9        But I'm not going to instruct him
10    not to answer this.
11        MR. ALLINGHAM: I'm working hard to
12    get this deposition done in accordance with
13    your request.  If you make speeches it will
14    be harder.
15    Q.   Do want me to reread the question again,
16    Mr. Helms?
17    A.   Yes, please.
18    Q.   All right, I don't think I need to read the
19    quote, do I?
20    A.   No.
21    Q.   My question is do you agree with the
22    sentiments expressed by the Reverend Fike in that
23    quotation?
24    A.   Not in its entirety.

6

1    the Father except through the Son, that's what I
2    believe.
3    Q.   Do you have any problem or disagreement or
4    concern about the accuracy of the statement, "The
5    only true religion is Christianity?"
6    A.   It would not be a statement that I would
7    make, so it depends on where a person is coming from
8    when he makes that statement, and I can't put myself
9    into their mind.  It wouldn't be a statement that I
10    would make.
11    Q.   What efforts, if any -- let me give some
12    context.  There was a meeting of the Board of
13    Education of the Indian River School District on
14    August 24, 2004, do you recall that meeting?
15    A.   I know there was a meeting, I don't know if
16    I can recall specifics, but yeah.
17    Q.   Let me identify that meeting as the meeting
18    at which estimates range in attendance from 600 to
19    800 people?
20    A.   Yes, I do.
21    Q.   You recall that meeting?
22    A.   Yes, I do.
23    Q.   What effort, if any, did you make to ensure
24    there would be a large turnout for that meeting?

8

1   religion, and that type of thing.  A lot of people
2   were talking about that issue at that time.
3       Q.   And did you understand that what people
4   were all -- what people considered important was
5   whether School Board members could pray before the
6   School Board meeting?
7       A.   I don't recall thinking of it specifically
8   that way about praying before a Board meeting, no.
9       Q.   Did it seem to you that the public comments
10  at the Board meeting had as much to do with prayer
11  in the schools as they did prayer before a School
12  Board meeting?
13      A.   Yes.
14      Q.   Did you think that represented a
15  misunderstanding on the part of the public as to
16  what was before the Board at that meeting?
17      A.   Yes.
18      Q.   And what efforts were made to correct that
19  misunderstanding?
20      A.   Well, on my part I didn't know it was a
21  misunderstanding until that night.  So, I don't know
22  of anything that was done to prevent it because
23  quite frankly I didn't know it was a
24  misunderstanding until people started getting up at

13

1   prayer at school related functions outside of the
2   school day, is that a fair description?
3       A.   Well, in my words, in my thoughts I would
4   say it was prayer in general that had anything to do
5   with banquets, graduation, that type of thing, and
6   some of that could have been part of the school day
7   and some of it might not have been.  But I didn't
8   think it was an issue of whether the students could
9   open the day with prayer or that sort of thing.
10      I mean that issue in my mind had been
11  settled by the courts and I didn't think we were
12  there to discuss that.  So, when people started
13  coming up to the podium and talking about that I
14  thought well, they obviously misunderstood what's
15  going on.
16      Q.   Where do you think that misunderstanding
17  came from?
18      A.   I have no idea.
19      Q.   What efforts did the Board make to correct
20  that misunderstanding?
21      A.   I don't recall anything specifically being
22  done as far as the Board is concerned.  I'm not sure
23  whether Mrs. Hobbs took any action or not.  I think
24  there was some discussion, although I can't recall

15

1   the podium talking.
2       Q.   That is to say until people started talking
3   you thought people understood that this was a School
4   Board prayer issue?
5       A.   No.  I didn't think it was a School Board
6   prayer issue, I thought it was more along the lines
7   of prayer before graduation, and that sort of thing.
8   More so than the Board prayer issue.
9       Q.   Have you ever had occasion to -- strike
10  that.
11      How did you form the view that you thought
12  what was being talked about at the August 24th
13  meeting was graduation prayer rather than School
14  Board prayer?
15      A.   Well, as I recall it was a matter of
16  prayer.  I didn't in my own mind I didn't separate
17  it between prayer before graduation or that sort of
18  thing as specifically to the School Board meeting.
19  I thought it was prayer in general, but not prayer
20  in school, but prayer before any graduation or that
21  sort of thing.  I didn't, I didn't separate the two
22  in my mind.
23      Q.   So, as you walked into the August 24the
24  meeting you thought what was being discussed was

14

1   any specifics about an executive session where we
2   thought some people had misunderstood.
3       I don't know what specific actions were
4   taken.
5       Q.   Did you think given the clear
6   misunderstanding that it was important for the Board
7   to correct that misunderstanding?
8       A.   I don't recall -- I don't recall myself
9   making a statement like we must clear up this
10  misunderstanding.  I do know it was brought up, but
11  I don't recall saying anything specifically where we
12  need to make sure we clear up this misunderstanding.
13      Q.   Now, when you say I know it was brought up,
14  does that mean the notion that people had
15  misunderstood what was before the Board was brought
16  up?
17      A.   In the executive session I think there was
18  some mention of there is some people here tonight
19  that I think misunderstood what was going on.  I
20  don't recall who said that, but I do recall it being
21  said.
22      Q.   Were you present throughout the public
23  comment session at the August 24 meeting?
24      A.   Yes.

16

1    trying to take away your right publicly to pray,
2    correct?
3        A.  Yes, I think towards the end of October,
4    fist of September somewhere in there.  I thought it
5    was becoming very obvious that now we've sort of
6    gone prayer before graduation as the issue that now
7    it was like all encumbersome, if you will, it's
8    prayer by anything, and even to the point where they
9    didn't want, these parties didn't want the Board to
10   pray before a meeting.  I -- that was probably later
11   on in the discussion when that became apparent to
12   me.
13       Q.   And before I move to another question, when
14   you say there were some people that were trying to
15   take that privilege away from me, who were those
16   people, was that me, was it -- who was it?
17       A.  I see that as Mrs. Dobrich at that time I
18   believe -- well, I know at some point in time she
19   had contacted the ACLU, or ACLU had contacted her or
20   whatever, but the ACLU became involved and some
21   things started being said, and I had the -- in my
22   mind it was the ACLU coming on Board was now trying
23   to take away my privilege of praying before a Board
24   meeting, and whether that's what Mrs. Dobrich

149

1    wanted, I don't know, but when the ACLU became
2    involved I think to me it became apparent that
3    everything was going to be taken away.
4        That's the way I felt.  So, when I say the
5    parties I'm talking about Mrs. Dobrich and the ACLU.
6        Q.   Okay, so when you say there were some
7    people that were trying to take that privilege away
8    from me, some people in your mind was Mrs. Dobrich
9    and the ACLU?
10       A.  Yes.
11       Q.   And in your previous answer you said when
12   the ACLU became involved it became clear that they
13   were trying to take everything away, what did you
14   mean by everything away?
15       A.   Everything would be they didn't want us to
16   have prayer at athletic banquets, they didn't want
17   us to have prayer at School Board meetings.  I can't
18   recall exactly what was said, but I believe in my
19   mind, and my memory is not as good as some other
20   people, but in my mind I was thinking that someone
21   even made the statement, and I don't know who it
22   was, I don't know if it was somebody from the ACLU
23   or whether was Mrs. Dobrich, but in my mind I felt
24   that someone was saying we want prayer out

150

1    altogether.  We don't want any public prayer
2    anywhere in the Indian River School District.  That
3    was my thought.
4        So at that time I thought that I was going
5    to lose my right and my privilege to express prayer
6    at a Board meeting and I became concerned about
7    that.  I didn't have to clarify after we had
8    received word from our attorneys --
9        MR. SHAW:  Can I caution the
10       witness not to discuss what he
11       spoke about with his attorney.
12       A.   Okay.  It became apparent that our policy
13   in regards to graduation and the prayer was not in
14   accordance with what it should have been.
15       Q.   Yes, sir.
16       A.   At that point in time I said well let's
17   make it right, whatever the law says then that's
18   what I want to do.  We are Board members we are
19   supposed to be law abiding citizens, if that's the
20   law then that's what we need to do.
21       However, as time went on it became apparent
22   that that was no longer the subject, the prime
23   concern now it was going into all aspects of prayer
24   throughout all the district and I thought I was

151

1    going to lose my right to express my prayer in
2    whatever way I wanted.
3        As a matter of fact, I even heard, and once
4    again I can't recall who said it, but someone even
5    said that as long as we prayed to God that was fine,
6    but they didn't want us to use Jesus' name.
7    Well, okay I just felt I was going to lose my right
8    to pray the way I felt I wanted to pray.
9        And so all those things came to light as I
10   recall it the start of fall or maybe the end of
11   summer, but it wasn't in the beginning.  In the
12   beginning I thought it was just a prayer issue at
13   graduation.
14       Q.   Did you understand that anyone was trying
15   to take away your right to pray publicly in any way
16   you saw fit at any place except at the School Board
17   meetings where you were functioning as a School
18   Board member?
19       A.   As I recall the only discussions were about
20   the Indian River School District.  They didn't say
21   they wanted to take away my right to pray in church,
22   no they didn't say that.  The discussions were only
23   around the school district.
24       Q.   I wasn't being, at least I wasn't trying to

152

EXHIBIT 10

Hobbs, Lois  10/24/2006  4:43:00 PM

**Page 1**

```
             FOR THE DISTRICT OF DELAWARE
MONA DOBRICH and MARCO    )
DOBRICH, Individually and  )
as parents and next friend )
of ALEXANDER DOBRICH,      )
SAMANTHA DOBRICH, JANE DOE ) Civil Action
and JOHN DOE, Individually ) Number 15-120 (JJF)
and as parents and next    )
friend of JORDAN DOE and   )
JAMIE DOE,                 )
                           )
            Plaintiffs,    )
                           )
    v.                     )
                           )
INDIAN RIVER SCHOOL        )
DISTRICT, et al.,          )
                           )
            Defendants.    )
        Videotape deposition of LOIS HOBBS, taken
pursuant to notice at 31 Hoosier Street, Selbyville,
Delaware, beginning at 9:12 a.m., on October 24, 2006,
before Julie H. Parrack, Registered Merit Reporter,
Certified Realtime Reporter and Notary Public.
APPEARANCES:
        THOMAS ALLINGHAM, ESQUIRE
        BRIAN G. LENHARD, ESQUIRE
        One Rodney Square
        Wilmington, Delaware 19801
        On behalf of Plaintiffs
            WILCOX & FETZER
        1330 King Street - Wilmington, Delaware 19801
            (302) 655-0477
            www.wilfet.com
```

**Page 2**

```
 1  APPEARANCES (CONT'D.):
 2      JASON P. GOSSELIN, ESQUIRE
        DRINKER, BIDDLE & REATH, LLP
 3      One Logan Square
        18th and Cherry Streets
 4      Philadelphia, Pennsylvania 19103-6996
        On behalf of Defendants
 5
    ALSO PRESENT:  TIMOTHY KEARNS
 6          LINDSAY DuPHILY, VIDEOGRAPHER
 7          - - - - -
 8          THE VIDEOGRAPHER:  This is the videotape
 9  deposition of Ms. Lois Hobbs taken by the Plaintiff in
10  the matter of Dobrich, et al., versus Indian River
11  School District, et al., Civil Action No. 15-120.  The
12  deposition is being held at 31 Hoosier Street,
13  Selbyville, Delaware, on October 24th, 2006.  We are
14  going on the record at approximately 9:12 a.m.
15          The court reporter is Julie Parrack from
16  the firm of Wilcox & Fetzer, Wilmington, Delaware.  My
17  name is Lindsay DuPhily, and I am the videotape
18  specialist of Discovery Video Services.
19          Counsel will now introduce themselves, and
20  then the court reporter will swear in the witness.
21          MR. ALLINGHAM:  My name is Tom Allingham.
22  I represent the plaintiffs.  Along with me is Brian
23  Lenhard and Tim Kearns.
24          MR. GOSSELIN:  Jason Gosselin for the
```

**Page 3**

```
 1  defendants.
 2              LOIS HOBBS,
 3      the deponent herein, having first been duly
 4      sworn on oath, was examined and testified as
 5      follows:
 6  BY MR. ALLINGHAM:
 7      Q.  Mrs. Hobbs, Ms. Hobbs, which do you prefer?
 8      A.  Miss, Miss Hobbs.
 9      Q.  Miss Hobbs, sorry.  Have you ever been deposed
10  before?
11      A.  Yes.
12      Q.  All right, so you know the process.  I'm going
13  to ask you some questions.  You are -- unless your
14  counsel instructs you not to answer, you're obligated
15  to answer those questions to the best of your ability.
16  I'm almost world renowned for asking questions that
17  are sometimes confusing.  Please tell me if you find a
18  question confusing or ambiguous, and I will do my best
19  to fix it.  Don't answer a question that you don't
20  feel like you understand.
21      A.  Okay.
22      Q.  You need to answer, although we have a
23  videographer here, you still need to answer out loud;
24  that is to say, so that the court reporter can take
```

**Page 4**

```
 1  down your answer and there's no ambiguity in what your
 2  answer is.  Nods and "um-hums" can be misinterpreted.
 3      A.  All right.
 4      Q.  I understand that you have a previous
 5  commitment and that you need to stop at 1:00 this
 6  afternoon, correct?
 7      A.  At 1:30 at the latest.
 8      Q.  Okay.  I think what we'll do then is stop for
 9  lunch at 1:00.  You can take care of your obligations
10  and if we need to resume thereafter, we will.
11          Is there any -- are you suffering from any
12  condition that would prevent you from giving
13  comprehensive and truthful answers to my questions
14  today?
15      A.  No.
16      Q.  Or taking any medications that might prohibit
17  you from doing that?
18      A.  No, I took a Benadryl, but I don't think that
19  will prohibit.
20      Q.  All right, your full name is what?
21      A.  Lois Margaret Hobbs.
22      Q.  And what is your address?
23      A.  It is 3 Brighton Street, Ocean View, Delaware.
24      Q.  Are you currently employed?
```

1 the bottom?
2 A. They're posted after the Board approves them.
3 Q. So they should be identical?
4 A. Yeah.
5 Q. You have to answer orally.
6 A. Yes.
7 Q. Okay. In your 10 years or so here in Indian
8 River, did you ever invite people to the Board
9 meetings?
10 A. I invited children who won an award or teachers
11 who wrote a grant to be recognized if they wanted to
12 come.
13 Q. And with respect to the children who won an
14 award, was it typical that you -- and I'm talking now
15 about the academic school year board meetings, was it
16 typical that children were invited to receive awards
17 or to get recognition?
18 A. What would happen, because you can't keep track
19 of the whole district, the principal, if they felt
20 that a child had received an honor, somewhere else in
21 the district or outside of the district, and they
22 should be recognized at the Board meeting, they either
23 called my office and said they should be recognized,
24 or we then later had a form that they could fill out

33

1 so we wouldn't miss children if they would be
2 recognized, or should be recognized. And they were
3 recognized for, you know, athletics, for academics,
4 for outside poster contests, anything usually at the
5 state or national level.
6 Q. And this was not intended to be restricted to
7 athletics, I take it?
8 A. No.
9 Q. Would it be fair to say that the hope was to
10 cast a net broad enough to encompass all areas of
11 achievement that the students might participate in?
12 A. Anything that was at the state or national
13 level that a student participated in, to recognize
14 them and say thank you for, you know, trying that or
15 doing that.
16 Q. There's been some testimony from other
17 witnesses that you might have been instrumental in
18 expanding this practice of trying to recognize
19 achievements by the students. Is that correct?
20 A. Yes.
21 Q. Okay. Tell me why you did that. Well, first
22 of all, tell me what changes you implemented in that
23 area.
24 A. I invited people who, children or adults who

34

1 had made contributions to the district because I think
2 they should be recognized. I think that's a part of a
3 community, that we say great job and thank you. Some
4 of our teachers had written grants for 5 and $6,000,
5 and I thought they should be thanked publicly.
6 Q. How does that grant process work? Do teachers
7 have to get authorization from the district, from you
8 or from someone at the district before they submit the
9 grant application?
10 A. Actually, they can write the grant. MBNA, who
11 is no longer in business, or in business with us, I
12 should say, offered teachers grants. And they could
13 apply to MBNA for the grants. And that's where we got
14 most of our grant money. And so they could do it
15 directly and could ask for help from the district if
16 they needed it, to write the grant or ideas for the
17 grant.
18 Q. I take it from your earlier answer that you
19 thought that the district benefited directly or
20 indirectly from recognizing teachers who had
21 successfully applied for grants.
22 A. I just wanted to say thank you to people.
23 Q. And what I was trying to get at was, as a
24 manager, as superintendent, you believed that the

35

1 district would benefit by a practice of thanking
2 people for achievements on behalf of the district,
3 correct?
4 A. Yes, I think that's fair.
5 Q. Okay. And then coming over to the, to the
6 recognition of the children, what benefit did you
7 think that the district would achieve by recognizing
8 achievements of children within the district?
9 A. The children are what we're all about. So I
10 wanted to say thank you and recognize the children.
11 Q. Did you think the children would benefit from
12 that recognition?
13 A. I did. I think the parents enjoyed the fact
14 that they were recognized, and normally, in the past
15 few years I sent them a congratulatory letter with a
16 picture of them standing in front of the Board.
17 Q. Oh, really?
18 A. Um-hum.
19 Q. And I guess that was to memorialize the
20 recognition?
21 A. Well, I don't know. I'm a first grade teacher
22 at heart.
23 Q. What does that mean?
24 A. That I like recognizing children. I think it's

36

Hobbs, Lois  10/24/2006  4:43:00 PM

1  position; isn't that right?
2      A.  I believe that the atmosphere of the cafeteria,
3  many of them didn't understand what they were saying.
4  They were talking about school prayer.  They weren't
5  even talking about the issue.  And they were hostile,
6  yes.
7      Q.  Do you recall that there were state
8  representatives at the August 24th meeting who spoke?
9      A.  Yes, there were some state representatives.
10     Q.  Did you know in advance of the meeting that
11  those state representatives would be speaking?
12     A.  I'm not sure they told us in advance that they
13  would be speaking.  Sometimes they come just to show
14  up to support an issue and don't say anything.
15     Q.  Did you think it was odd that elected officials
16  would come and speak in support of School Board
17  prayer?
18     A.  These elected officials are very involved in
19  their community, and if they believe that the Board is
20  a legislative body, I would imagine they felt they had
21  a right to say something, as they're legislators in,
22  and the community's feelings at the time.
23     Q.  Do you recall that the state representatives
24  had a letter that they read into the record?

169

1      A.  I do recall they had a letter.
2      Q.  Did you notice that in that letter they seemed
3  to have advance notice of the prayer that would be
4  offered at that meeting?
5      A.  I don't recall that.
6      Q.  I'm going to show you a document which has not
7  been marked for identification.  It bears Bates Nos. P
8  1614, P 1615.  It is -- it bears the name of a member
9  of the Doe family.  And I have masked that name out
10  consistently when I've asked deponents about this
11  document.
12     A.  Okay.
13         MR. GOSSELIN:  Do you have an extra copy
14  of that?
15         MR. ALLINGHAM:  Yes.  I have an extra --
16  I'm not marking it.  I have an extra copy which I can
17  give you if you'll give it back to me.
18         MR. GOSSELIN:  Yeah.
19  BY MR. ALLINGHAM:
20     Q.  Take as much time as you need, Miss Hobbs, to
21  read the document.  My first question to you, I can
22  tell you, is going to be whether you've seen it before
23  or not.
24         Have you finished reading it?

170

1      A.  Yes, um-hum.
2      Q.  Have you seen that document before?
3      A.  I may have seen it.  I really am not sure.
4      Q.  You're not sure?
5      A.  No.
6      Q.  Do you recall having received --
7      A.  A copy of this?
8      Q.  -- a complaint about the religious climate at
9  Selbyville Middle School and the School Board's
10  current position on matters of religion?
11     A.  I believe I, we received a complaint about the
12  Bible Club at Selbyville Middle School.  And I'm not
13  sure whether it was tied up in the case or if it was
14  before the case, but...
15     Q.  Do you recall from whom you received that
16  complaint?
17     A.  I believe it was really from the case when the
18  Does started in the case, Selbyville was their thing.
19     Q.  Dr. Hattier testified that you brought this
20  letter to his attention.
21     A.  I may have.  If he said so.
22     Q.  Would you agree with me that the complaints
23  expressed in this letter are heartfelt?
24     A.  Yes.

171

1      Q.  And these are matters that as superintendent
2  you would take seriously.  Am I right about that?
3      A.  I wouldn't want anyone to be discriminated
4  against.  I would take them seriously.
5      Q.  Would you tell me, other than bringing it to
6  the attention of Dr. Hattier, what you did in response
7  to this complaint?
8      A.  Well, we found -- if we found out that there
9  was a Bible Club and it was led by a teacher, it
10  wasn't to be led by a teacher, if a student wanted to
11  lead the Bible Club.  But there was some
12  misconception, I believe, that children were let out
13  early just for Bible Club to get in the lunch line
14  first.  That's a complaint I had heard.  And all of
15  the clubs were let out in Selbyville if they had a
16  club to go to at lunchtime.  So whether it was Bible
17  Club or Soccer Club or whatever club it was.  So that
18  was one of the things.
19     Q.  It sounds to me, Miss Hobbs, as though, and I'm
20  reading between the lines here, that you did
21  investigate the complaints in this letter, or caused
22  to be investigated the complaints in this letter.
23     A.  Whether they were in this letter or not, when I
24  heard about the Bible Club, I looked into what the

172

Unsigned                                    Page 169 - 172

**173**

1    Bible Club was doing.
2      Q.  And what did you find out?
3          MR. GOSSELIN:  Objection.  Is this, does
4    this make its way back around to Board prayer?
5          MR. ALLINGHAM:  Yes.  And if you'd like to
6    go off the record and walk out in the hall with me,
7    I'll explain my reasons for asking these questions.
8    But I would also note that Dr. Hattier answered these
9    questions without objection, and that I think that I'm
10   entitled to test the answers that were given by one
11   witness with questions to another witness.
12         But in addition to that, which I think is
13   a good reason for asking them, I think that they do
14   link back to School Board prayer as well.
15         MR. GOSSELIN:  We don't need to go back
16   out in the hall.  If you're bringing it back around to
17   Board prayer, that's fine with me.
18   BY MR. ALLINGHAM:
19     Q.  What did you do in response to the complaints
20   in this letter?
21     A.  The teachers were told that they were not to be
22   leaders of a Bible Club, that they could be there as
23   chaperones so people, you know, children wouldn't hurt
24   themselves or whatever else might happen.  But they

**174**

1    shouldn't lead the Bible Club.  And right after that,
2    we had no teacher leaders of the Bible Club at
3    Selbyville.  So I don't know at what time frame that
4    happened.  But --
5      Q.  Did you receive more than one complaint about
6    Bible clubs?
7      A.  Not that I recall.  I didn't receive -- it
8    either came up with the case or this letter was part
9    of it.  But...
10     Q.  Well, this is clearly, this letter is clearly a
11   complaint, among other things, about Bible clubs,
12   correct?
13     A.  Right, right.
14     Q.  And you only recall one complaint about Bible
15   clubs?
16     A.  Right, at Selbyville.
17     Q.  I'm going to ask you to assume that that
18   complaint came in around the 1st of October 2004,
19   which is the date of this letter.  And I gathered from
20   your previous answer that you did cause to be
21   investigated some or all of the complaints in this
22   letter.  Did you do that investigation or did you ask
23   someone else to do it?
24     A.  I asked the principal of the school to look

**175**

1    into this.
2      Q.  And the principal of the school in this case is
3    Mr. Kline?
4      A.  Yes.
5      Q.  I asked you earlier questions about the general
6    approach to complaints from district residents or
7    parents.  Did you follow that approach in this case?
8      A.  Usually I -- either the principal of the school
9    investigates it or someone from my office investigates
10   it.
11     Q.  And I presume that if you asked someone else to
12   do it, you asked for them to report back to you?
13     A.  To share their findings.
14     Q.  Okay.  And tell me, I gather that Mr. Kline
15   reported to you that there was a Bible club being led
16   by a teacher, correct?
17     A.  That there were Bible clubs, I believe three of
18   them.
19     Q.  Three Bible clubs being led by teachers?
20     A.  Two teachers and a secretary, as I recall.
21     Q.  Okay.  All at the Selbyville Middle School?
22     A.  Yes.
23     Q.  Okay.  Did Mr. -- did you ask Mr. Kline also to
24   investigate the allegation that a counselor at the

**176**

1    school pressured a child to attend the Bible Club?
2      A.  I can't say that I did, because I am not sure
3    that I had a copy of this letter.  I don't recall it.
4      Q.  Do you know who the Doe family is?
5      A.  I believe I do.
6      Q.  Do you recall getting a complaint from the Doe
7    family on the matters set forth in this letter?
8      A.  No, I don't.
9      Q.  Do you have an affirmative memory that there
10   was no inquiry made into Ms. Redard's, the allegation
11   that Ms. Redard put pressure on a child to attend the
12   Bible Club?
13     A.  I don't recall that at all.
14     Q.  Do you recall affirmatively that you never saw
15   this letter?
16     A.  I'm sorry, I can't say either way at this
17   point.
18     Q.  When a complaint comes in from a parent, do you
19   open a file on that complaint?
20     A.  Sometimes.  Most of the time, yes, we do.  And
21   it seems like I would have had a file on this one.
22   It's a pretty serious letter.
23     Q.  Did you search your files in your garage to see
24   whether you have a copy of this letter?