# EXHIBIT 11

Hughes, Randall (Video)  10/16/2006  12:00:00 PM

**Page 1**

```
1        IN THE UNITED STATES DISTRICT COURT
2        IN AND FOR THE DISTRICT OF DELAWARE
3    MONA DOBRICH and MARCO   :  Case No. 15-120 (JJF)
     DOBRICH, individually and  :
4    as parents and next friend  :
     of ALEXANDER DOBRICH,      :
5    SAMANTHA DOBRICH, JANE DOE :
     and JOHN DOE, individually  :
6    and as parents and next    :
     friend of JORDAN DOE and   :
7    JAMIE DOE,                 :
                                :
8        Plaintiffs,   :
                        :
9        v.            :
                        :
10   INDIAN RIVER SCHOOL     :
     DISTRICT, et al.,       :
11                           :
         Defendants.   :
12   .............
13       Video Deposition of RANDALL HUGHES, taken
     pursuant to notice, on Monday, October 16, 2006
14   at 2:40 p.m. at 31 Hosier Street, Selbyville,
     Delaware, reported by Lorena J. Hartnett, a Registered
15   Professional Reporter and Notary Public.
16   .............
17   APPEARANCES:
18       THOMAS ALLINGHAM, ESQUIRE
         RICHARD HORVATH, ESQUIRE
19       One Rodney Square
         Wilmington, DE 19801
20           Attorneys for the Plaintiff
21
22
23       WILCOX & FETZER
         1330 King Street - Wilmington, DE 19801
24               (302) 655-0477
```

**Page 2**

```
1    APPEARANCES (CONTINUED):
2
         JASON P. GOSSELIN, ESQUIRE
3    Drinker, Biddle & Reath, LLP
     One Logan Square
4    18th and Cherry Streets
     Philadelphia, PA 19103-6996
5        Attorney for the Defendants
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**Page 3**

```
1
2
3            TABLE OF CONTENTS
4    TESTIMONY OF RANDALL HUGHES:
5      Direct Examination by Mr. Horvath . . . . . . . 4
6      Certificate of Reporter . . . . . . . . . . . . 98
7
8
9            INDEX TO EXHIBITS
10   Plaintiff's Exhibit 56 . . . . . . . . . . . . . 15
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

TABLE OF CONTENTS
TESTIMONY OF RANDALL HUGHES:
  Direct Examination by Mr. Horvath . . . . . . . 4
  Certificate of Reporter . . . . . . . . . . . . 98

INDEX TO EXHIBITS
Plaintiff's Exhibit 56 . . . . . . . . . . . . . 15

**Page 4**

```
1        (The videographer read the
2    introduction, and the attorneys introduced
3    themselves.)
4        RANDALL HUGHES,
5    HAVING FIRST BEEN DULY SWORN, TESTIFIED AS FOLLOWS:
6    DIRECT EXAMINATION ON BEHALF OF THE PLAINTIFF
7    BY MR. HORVATH:
8        Q.  Good afternoon.  Have you ever been deposed
9    before?
10       A.  Yes.
11       Q.  When?
12       A.  The last time was in December of 2005.
13       Q.  How many times have you been deposed?
14       A.  Ten or so, perhaps.
15       Q.  What were the natures of the actions?
16       A.  Mostly traffic-related accidents, civil
17   suits, in those regards.  Also, the latest was in a
18   lawsuit filed against the State Police I did for my
19   workplace.
20       Q.  Have you ever testified at trial?
21       A.  Yes.
22       Q.  How many times have you testified at trial?
23       A.  Many, many, many times.
24       Q.  And were these the same cases that you
```

1      MR. GOSSELIN:  Do you have an extra
2    copy?
3      MR. HORVATH:  I do.
4    BY MR. HORVATH:
5    Q.  Have you ever seen this document before?
6    A.  I need to --
7    Q.  Okay.
8    A.  The answer is I am not sure if I have read
9    this before or not.  I have read a couple things on
10   ethics and integrity by the I think Ethics and
11   Integrity Commission after being elected.  So I am not
12   sure if it was this exact document, but it seems
13   familiar to me.
14   Q.  To be clear, in the upper right hand corner
15   there are three letters, BDF?
16   A.  Uh-huh.
17   Q.  Do you know what those letters might signify?
18   A.  No, sir, I do not.
19   Q.  Have you ever received any copies of board
20   policies or policies that pertain to board
21   governments?
22   A.  Yes, sir, I have.
23   Q.  And do those policies start with the letter
24   B?

69

1    A.  When I receive those, I read the verbiage,
2   and I have not looked for that, but I bet when I go
3   home I will look and see if they are on there or they
4   will be.
5   Q.  I am going to represent that this is a copy
6   of the school board's, school board member ethics
7   policy.  Under number one on the first page, the third
8   paragraph down, it states that, "The public expects my
9   first and greatest concern to be in the best interests
10  of each and every one of these young people without
11  distinction as to who they are or what their
12  background may be."
13    To be clear, does this paragraph state that
14  the board, a board member's primary concern should be
15  the students of the district?
16  A.  Yes, it does.
17  Q.  And on the second page, the third paragraph
18  down, it says, "To resist every temptation and outside
19  pressure to use my position as a school board member
20  to benefit either myself or any other individual or
21  agency apart from the total interest of the school
22  district."
23    Does that paragraph suggest to you that board
24  members should not operate out of their own individual

70

1    self interests?
2    A.  Yes, it does.
3    Q.  So, with the first paragraph that we read and
4   the last paragraph that we read, should the board, do
5   you feel that it's now appropriate for the board to
6   pass policies for the benefit of the board
7   member's individual constitutional rights?
8    A.  Yes, I do, and the reason why --
9    Q.  I was going to say --
10   A.  You want to ask me first?  Okay.  I read that
11   first paragraph on the second page as not to bring or
12   bear influence upon any educational decisions that may
13   be made by staff or superintendents to benefit me
14   personally or a friend or a family member.  That's how
15   I read that paragraph.
16   Q.  But I think you had stated before that it is
17   an appropriate exercise of a board member's authority
18   to pass a policy that protects their own individual
19   constitutional rights?
20   A.  As I said, because of future boards, as well.
21   Protecting constitutional rights is for all of us to
22   do.
23   Q.  And what the board perceives as their own
24   individual rights that don't apply to anyone else in

71

1    the district?
2    A.  To future boards, yes.
3    Q.  Outside of the board?
4    A.  Protecting a constitutional right is
5   everyone's responsibility.
6    Q.  I am going to read to you four prayers.  I am
7   going to want your opinion as to whether or not those
8   prayers violate the policy.
9    The first prayer, "Lord, I pray that you
10   correct the heathens before me now to the truth that
11   comes by knowing you."  Oh, I'm sorry, I misread it.
12   "Lord, I pray that you convert the heathens before me
13   now to the truth that comes by knowing you."
14   A.  Yes, I believe that that -- Again, I am
15   basing this on is that a part of or is that the sole?
16   That's it, period?  Based on those exact words you
17   just said, yes, that could be a conflict.
18   Q.  And why would it be in conflict with policy?
19   A.  I looked at paragraph number three.  It's
20   kind of mean.
21   Q.  It's kind of mean?
22   A.  Kind of mean when you are saying that.
23   Q.  What's mean about it?
24   A.  You are referring to someone as a heathen.

72

1    Q.  Is there -- Suppose it wasn't heathen, it was
2  just "the individuals in front of me."
3    A.  Again, read it without the heathen.
4    Q.  "Lord, I pray that you convert the people
5  before me to the truth that comes by knowing you."
6    A.  Certainly the word convert.
7    Q.  So it's a combination of both heathens and
8  convert that you find problematic?
9    A.  Uh-huh.
10    Q.  And each one individually would pose a
11  problem?
12    A.  Yes, sir, I believe so.
13    Q.  I am going to hand you what has been
14  previously marked as PX35, which reads, "Do not put
15  your trust in princes and mortal men who cannot even
16  save themselves.  When their spirit departs, they
17  return to the ground.  On that very day, their plans
18  come to nothing.  Blessed is he whose help is the God
19  of Jacob, whose hope is in the Lord his God, the maker
20  of heaven and earth, the sea and everything in them,
21  the Lord who remains faithful forever.  He upholds the
22  cause of the oppressed and gives food to the hungry.
23  The Lord sets prisoners free.  The Lord gives sight to
24  the blind.  The Lord lifts up those who are bowed

73

1  down.  The Lord loves the righteous.  The Lord watches
2  over the alien and sustains the fatherless and the
3  widow, but he frustrates the ways of the wicked.  For
4  the wages of sin is death, but the gift of God is
5  eternal life through Jesus Christ our Lord."
6       Do you believe that this prayer would be
7  permissible under the policy?
8    A.  Yes, sir.
9    Q.  How did you make that determination?
10    A.  I did not find it offensive.
11    Q.  Is that the touchstone you use for whether or
12  not a prayer violates the policy, whether or not you
13  find it offensive?
14    A.  I don't see -- Yes, that's the first thing I
15  am going to rely on, how do I perceive that.  I do not
16  find it offensive.  I don't see where it's violating
17  number three of the policy, paragraph number three.
18    Q.  I take it you do not view the prayer in PX35
19  as proselytizing?
20    A.  Which one is that?
21    Q.  The one I just handed you?
22    A.  No, sir, I don't.
23    Q.  What does proselytizing mean to you?
24    A.  Again, to me it's preaching or negative,

74

1  trying to espouse my views forcefully onto someone
2  else.
3    Q.  Do you believe that the last sentence of the
4  prayer is not proselytizing?
5    A.  No, I do not.
6    Q.  How do you think you would respond to this
7  prayer if you were not a Christian?
8    A.  Mr. Horvath, that's very difficult to answer.
9  I would probably rely back on the very first thing
10  that I said, did I find it offensive.  No, I did not.
11    Q.  If you were not a Christian and you heard,
12  "for the wages of sin is death but the gift of God is
13  eternal life through Jesus Christ our Lord," do you
14  think you would find that offensive?
15    A.  In the spirit or in the tone in which you
16  read this, I did not find it offensive, and I don't --
17  It's hard for me to answer that question other than to
18  say I did not find it offensive.
19    Q.  Do you think your personal faith as a
20  Christian might impact your views on whether this
21  particular prayer is proselytizing?
22    A.  Yes, sir, I am sure that it does.
23    Q.  To put a variation on this, suppose the last
24  sentence read, "For the wages of sin is death, but the

75

1  gift of Allah is eternal life through his prophet
2  Muhammed."
3    A.  Again, I do not find that offensive.  There
4  are more people in this world than I.
5    Q.  Uh-huh.
6    A.  And, as I said, my religion is very
7  individual, very personal, and other people may find
8  their religion that way, as well, and I don't find it
9  offensive.  I wouldn't find it offensive if you insert
10  any other deity that you like.
11    Q.  I have another prayer.  This has been
12  previously marked PX45.  "Heavenly Father, thank you
13  for this great occasion, for the work, the effort, the
14  joys and everything that led up to this point in time.
15  Thank you for your guidance in this event.  We pray
16  for your direction in the lives of each of these
17  school board members.  We pray that you direct them
18  into the truth and eventually the truth that comes by
19  knowing Jesus.  We also pray that you would be with
20  them at this time.  We ask these things in Jesus's
21  name.  Amen."
22       Do you believe that this prayer would violate
23  paragraph three of the policy?
24    A.  No.

76

1    Q.  I take it that you do not view this prayer as
2  proselytizing?
3    A.  No.
4    Q.  And did you reach that conclusion again
5  because you did not find this prayer offensive?
6    A.  That and the fact that it specifically states
7  to the board members.  It refers specifically to board
8  members.
9    Q.  Is your primary concern whether or not a
10  prayer is directed to the board members or mentions
11  anyone outside the board?  Is that the first step in
12  your analysis?
13    A.  I am not so sure.  It's the first step.
14  There may be multiple, multiple steps that consciously
15  I am not able to verbalize to you, but I don't find it
16  offensive, I do not find it's in violation of the
17  policy.
18    Q.  And you do not view the phrase, "We pray that
19  you direct them into the truth and eventually the
20  truth that comes by knowing Jesus," as an attempt to
21  convert anyone who is hearing that or convert the
22  board members?
23    A.  No.
24    Q.  I have one last one.  This isn't written

77

1  down, so if you can't follow along, I will read it
2  again.
3    "Allah, we offer you our school bus drivers,
4  we offer you our superintendent, our administrators,
5  and our secretaries.  We offer you our teachers and
6  our parents.  Finally, we offer you our students.
7  Peace be unto your prophet, Muhammed."  How do you
8  view that prayer?
9    A.  I do not find it offensive, and I do not find
10  that it's in violation of this policy.
11    Q.  How would you feel if you were in the
12  audience hearing that prayer and hearing that you were
13  being offered to a deity of a different religion?
14    A.  I do not find it offensive at all.  I don't
15  find it offensive at all.
16    Q.  Do you think the school board could open its
17  meetings with a moment of silence instead of a prayer?
18    A.  Yes, that is an option.
19    Q.  Have you ever discussed with any board member
20  whether the board should open its meetings with a
21  moment of silence?
22    A.  No, I have not.
23    Q.  If given the opportunity, would you open a
24  board meeting with a moment of silence?

78

1    A.  Yes, yes.
2    Q.  And, I think we have established before, but
3  I wanted to be clear again, you have never been
4  offered an opportunity to open a meeting with a prayer
5  or a moment of silence?
6    A.  Not that I recall, no.
7    Q.  Do you know if the board ever considered,
8  didn't discuss with you, but at any point in the past
9  ever considered whether to open its meetings with a
10  moment of silence?
11    A.  No, I do not.
12    Q.  Can you look at paragraph number two of the
13  policy?  It states, "On a rotating basis one
14  individual adult board member per meeting will be
15  given the opportunity to offer up prayer or request a
16  moment of silence.  If the member chooses not to
17  exercise this opportunity, the next member in rotation
18  shall have the opportunity."
19    Am I correct that means that if an individual
20  passes, the prayer or moment of silence opportunity
21  will continue on until you get a board member who
22  takes up the opportunity?  So, in other words, suppose
23  you pass, and then the next individual in line,
24  suppose Hattier passes, would it continue to pass

79

1  between the board members until a board member chose
2  to open the meeting with a prayer or moment of
3  silence?
4    A.  That could be a way that it could happen, but
5  I am not so sure that's how it happens.  Like I said,
6  I don't recall ever being asked to do that.
7    Q.  Just as a matter of reading the policy,
8  itself.
9    A.  Yeah, I don't know if that's something that
10  could be worked out.  I don't know if somebody wanted
11  to say, "I would like to offer the prayer."  Perhaps
12  that's how they do it.  Like I say, I have not been
13  asked.  Oftentimes, I am running late, but I have not
14  been asked.
15    Q.  Based on reading paragraph number two of the
16  policy, would you say, would you agree that in order
17  for a board member to not open with a prayer or
18  moment of silence, each board member would have to
19  decline the opportunity?
20    A.  Yes.
21    Q.  Put another way, if at least one board member
22  wants to open the meeting with a prayer, the meeting
23  is going to open with a prayer?
24    A.  Yes.

80

1    A.  Yes, I received lots of questions from a lot
2  of different local newspapers.  One of the questions a
3  lot of times did deal with the prayer issue and my
4  feelings.  Since I had already been appointed to the
5  board and I was operating under the gag order, my
6  response was, "Pending litigation, I am just not at
7  liberty to discuss that."
8    Q.  Did anyone from the public ask you about
9  board prayer?
10    A.  If they did, my answer was, "There is a gag
11  order, pending litigation, we can't talk about that."
12  I don't have that many -- There was no campaign --
13  There was no stump speeches made or anything like
14  that.
15        Just you might see someone in the supermarket
16  and talk to them about some school board issues, but I
17  don't recall that being a very specific question asked
18  to me.
19    Q.  Do you think it's understood by the public
20  that you support board prayer?
21    A.  No, I wouldn't necessarily say that that's
22  understood.  And are you implying that I do support
23  school prayer?
24    Q.  Okay, maybe I will --

85

1  was a bit misinformed.
2    Q.  You refer to the gag order.  This gag order
3  didn't prevent you from telling your constituents
4  whether or not you supported board prayer?  Did you
5  tell constituents that the gag order prevented you
6  from --
7    A.  Yeah, my answers that I put out to the
8  newspapers were that I didn't want to discuss that
9  topic or I couldn't discuss that because of pending
10  litigation.
11    Q.  Let's go back to your opponent.  Am I
12  correct, at the very least, that the perception became
13  that he opposed board prayer?
14    A.  Yeah, I believe think that would be --
15    Q.  And that was an accurate representation --
16  I'm sorry, I guess I should have let you finish.
17    A.  Yes.
18    Q.  And was that an accurate representation of
19  what you understood his position to be?
20    A.  Yes.
21    Q.  Do you believe that affected the campaign?
22    A.  My opponent had some, quite a few different
23  ideas.  I am not so sure that one particular answer
24  that he gave led to his demise.  I am not so sure.

87

1        MR. GOSSELIN:  He said board prayer.
2        THE WITNESS:  Oh, board prayer?
3        MR. HORVATH:  Yeah.
4        THE WITNESS:  Oh, okay.
5        MR. GOSSELIN:  You mean the policy.
6        MR. HORVATH:  Yes.
7        MR. GOSSELIN:  This policy here.
8        THE WITNESS:  Okay.  Okay.
9  BY MR. HORVATH:
10    Q.  So, to be clear on this, do you think the
11  public understands you to support policy BDA.1 in the
12  board's prayer practice?
13    A.  Probably.
14    Q.  And do you think they understood that during
15  the election?
16    A.  I am not -- I don't know.  I didn't -- Like I
17  said, when it came to any talk about the litigation, I
18  didn't say a word about it.
19    Q.  Do you know what your opponent's view on
20  board prayer was?
21    A.  Yes, he was to stop board prayer, stop -- It
22  was kind of a bit skewed in that it was drawn out to
23  include school prayer, prayer in school, took on a
24  whole different light.  I think perhaps the gentleman

86

1    Q.  Did anyone from the community tell you that
2  they were not going to vote for him because he opposed
3  board prayer?
4    A.  I don't recall.  Well, people who supported
5  me said, "I am going to vote for you."  They didn't
6  say, "I am going to vote for you because of X, Y or
7  Z."
8    Q.  Did anyone say they were going to vote for
9  you because you supported board prayer?
10    A.  No, I don't recall having that conversation
11  with anyone.
12    Q.  Do you believe that someone could get, in the
13  2006 election, do you believe that anyone could have
14  been elected to the board who openly opposed board
15  prayer?
16    A.  If you articulate your point of view and some
17  of the reasons behind it, perhaps, yes.
18    Q.  Has anyone told you that they see this case
19  as about protecting Christian values?
20    A.  Yes, I have heard that.  Have they told me
21  that?  I don't -- I have not been told that, but I
22  have kind of heard.  Again, that's like supermarket or
23  Wawa coffee stand talk sometimes.  You kind of hear
24  these kinds of things.

88

1    Q.  Have these things been told to you, or did
2  you overhear it?
3    A.  Well, if I heard it, then it was told to me.
4  But, again, it wasn't someone grabbing me by the shirt
5  collar and saying, "This is about maintaining
6  Christian values and beliefs."
7    Q.  Did anyone say that the board's prayer
8  practice, itself, was about protecting Christian
9  values?
10    A.  I don't recall that, that terminology being
11  used.
12    Q.  Do you think people understand this case as
13  involving the board prayer policy?
14    A.  To be perfectly honest with you, I think
15  there is a lot of misinformation.  A lot of people are
16  out there and don't have all the information from
17  which to make a decision on this.  Shortsightedness, a
18  particular mind set, but the perception out there is
19  it comes down to a single issue or something that it
20  may or may not be, so I think -- I don't know if the
21  gag order was helpful or not with people not going out
22  and talking about it.
23    Q.  What's the single issue that you believe the
24  public perceives this case is about?

89

1    A.  I believe the public thinks this is about
2  prayer in schools.
3    Q.  Have you ever heard anyone say that this case
4  is about board prayer?
5    A.  Mr. Horvath, I can't sit here and tell you
6  that I have heard that.  I just -- I believe that the
7  perception out there in the public is that this case
8  is about prayer in schools.
9    Q.  Do you know if any school board member has
10  campaigned for election or re-election on the ground
11  that they support school board prayer?
12    A.  We had several elections last time.  I have a
13  lot of things going on.  I didn't have an opportunity
14  to follow everyone else's campaign, if you will call a
15  school board election a campaign.  How and what
16  exactly they said or didn't say at their different
17  functions, I don't know.
18    Q.  You mentioned before what you characterized
19  as a misrepresentation that this case is about prayer
20  in schools.  Have you done anything to correct that
21  mis-perception?
22    A.  Again, how I refer to anything that's brought
23  up about this case is there is a gag order.  My
24  responses are very limited, pretty much to zero, and

90

1  there are many sides to every story and there are many
2  facets to this particular case.
3    Q.  Do you believe that a gag order is still in
4  place?
5    A.  Yes, I am operating under that -- I am going
6  to operate under that until otherwise directed by
7  either Jason or a judge.
8    Q.  Has anyone told you that a gag order is no
9  longer in place, aside from your attorneys or a judge?
10    A.  No.  Has anyone ever -- I'm sorry, say that
11  again, please.
12    Q.  Has, aside from your attorneys or a judge,
13  has anyone told you that a gag order is no longer in
14  place?
15    A.  There was some discussion in an executive
16  session if there was or there wasn't, but the bottom
17  line it came down to, as I left there, my
18  understanding was that there was, do not discuss.
19    Q.  And you have continued to operate under that
20  assumption since then?
21    A.  That's the way I have been operating, yes,
22  sir.
23    Q.  Has anyone told you they believe the ACLU is
24  involved with this case?

91

1    A.  I believe at executive sessions there have
2  been some mention that the ACLU is behind this case,
3  yes.
4    Q.  Do you believe that the ACLU is behind this
5  case?
6    A.  I don't know that for a fact.
7    Q.  Have you ever discussed with someone in the
8  community as to whether or not the ACLU is involved in
9  this case?
10    A.  No, sir.
11    Q.  Has anyone told you that they see this case
12  as standing up to the ACLU?
13    A.  No, I don't recall having that conversation.
14    Q.  Which board members told you that the ACLU
15  was involved with this case?
16    A.  Again, I think that's a discussion in
17  executive session, and I cannot -- I feel like I am
18  pointing fingers, because I am not 100 percent sure,
19  but I believe that perhaps Nina Lou Bunting may have
20  mentioned that.
21    Q.  Have any of the board members described the
22  ACLU as anti Christian?
23    A.  No, I don't recall hearing that.
24    Q.  Has anyone in the public described the ACLU

92

1    as anti Christian that you are aware of?
2        A.  Not that I am aware of, but you have to
3    remember that not that long ago our community, the
4    Seaford, western Sussex community had a visit from
5    Westboro Baptist Church at a soldier's funeral which
6    did, if you will, muddy the waters with some ACLU
7    things were bantering around about that.  So I don't
8    remember the public ever telling me anything about
9    ACLU and the school district, but it has been used in
10    that context with Westboro Baptist Church.
11        Q.  Could you explain a little bit more what
12    happened in that context?
13        A.  The Westboro Baptist Church?
14        Q.  Yes, please.
15        A.  Pretty inflammatory comments being made,
16    viewed as derogatory by the public, towards the family
17    and to the soldier that had been killed.
18        Q.  And how did the ACLU become involved in that?
19        A.  The perception was either it was or it
20    wasn't -- I don't know if the perception was that
21    they were protecting the Westboro Baptist Church,
22    they were the legal arm of the Westboro Baptist
23    Church.  I don't know for a fact if that's factual or
24    not.

93

1        Q.  So people understood -- To understand your
2    testimony there, you understand the public perceptions
3    being the ACLU was protecting an organization that was
4    making disparaging comments about a dead soldier or
5    the soldier's family?
6        A.  That's the perception that I had heard, yes,
7    sir.
8        Q.  And at any point during that -- At any point
9    in that series of events did anyone make a reference
10    to the ACLU as anti-Christian?
11        A.  No, I have not heard ACLU anti-Christian, no.
12        Q.  Okay.  Have you discussed with anyone whether
13    the 2006 election was an enforcement of the stance the
14    school board has taken in support of school board
15    prayer?
16        A.  No.
17        Q.  Have you ever heard anyone say that?
18        A.  Not to me.  My stance, if I can go for a
19    little bit further, construction costs, the huge
20    amount of monies we spend as a school district in
21    construction and projects.  All right?  I am the
22    construction guy.
23        I think that we have to hold some folks
24    accountable with their tax dollars in building some

94

1    good schools and making some wise decisions.  A lot of
2    my -- A lot of my campaign was along those avenues.
3        Q.  You limited your answer on that to your
4    campaign and your interests on the school board.  Can
5    we expand that to the other school board members who
6    were either elected or reelected in 2006?  In other
7    words, have you discussed with anyone whether their
8    election or re-election was an endorsement of the
9    stance the school board has taken in support of school
10    board prayer?
11        A.  No, I have not.
12        Q.  And you have heard --
13        A.  I have not discussed that with them.
14        Q.  With anyone from the public?
15        A.  No.
16        Q.  Do you know if school board members
17    campaigned stating that they were, a vote for them
18    would be a vote for prayer in fighting the ACLU?
19        A.  I do not know that to be a fact.
20        MR. HORVATH:  Thank you very much.  I
21    don't think I have any more questions.
22        THE WITNESS:  Thank you.
23        VIDEOGRAPHER:  Deposition ending
24    approximately 5:06 p.m.

95

1        CERTIFICATE
2        I, Lorena J. Hartnett, a Notary Public and
3    Registered Professional Reporter, do hereby certify
4    that the witness, RANDALL HUGHES, was by me first
5    duly sworn to testify the truth, the whole truth, and
6    nothing but the truth; that the foregoing deposition
7    was taken at the time and place stated herein; and
8    that the said deposition was recorded stenographically
9    by me and then reduced to typewriting under my
10    direction, and constitutes a true record of the
11    testimony given by said witness.
12        I further certify that the inspection,
13    reading and signing of said deposition was not waived
14    by counsel for the parties and by the witness.
15        I further certify that I am not a relative,
16    employee, or attorney of any of the parties or a
17    relative or employee of either counsel, and that I am
18    in no way interested directly or indirectly in this
19    action.
20        IN WITNESS WHEREOF, I have hereunto set my
21    hand and affixed my seal of office on this 20th day of
22    October 2006.
23
24        Cert. #134-RPR, Exp. 01-31-2008

96

1    Q.  Under paragraph number five, it states that,
2  "The prayer or moment of silence should be in accord
3  with the freedom of conscience, speech and religion of
4  the individual board member."
5       Is it possible that a board member could
6  decide that he or she wouldn't want the meeting to
7  open with a prayer or moment of silence consistent
8  with their freedom of conscience?
9    A.  Yes, that is possible.
10   Q.  Would the policy deny them that opportunity,
11  provided that at least one board member wants the
12  meeting to open with a prayer or moment of silence?
13   A.  There could be some conflict there, yes.
14   Q.  Do you know, and not speaking of yourself, do
15  you know if any board member has declined an
16  opportunity to open a meeting with prayer?
17   A.  I do not know.
18   Q.  Has a board member ever said they wanted to
19  open a meeting with a prayer but wanted someone from
20  the audience to give the prayer?
21   A.  I don't recall that ever happening.
22   Q.  Do you think the policy permits someone other
23  than a board member to give the prayer?
24   A.  No, I don't think this policy would permit

81

1  that.
2    Q.  Does the board open its special meetings or
3  its executive sessions with a prayer?
4    A.  Executive session?  No, no, sir.
5    Q.  And why is that?
6    A.  I don't know.  I would assume that if you go
7  back to paragraph one, the proceedings have already
8  been solemnified, if you will, so -- You can say it
9  better, Jason.
10       MR. GOSSELIN:  I keep messing it up.
11  I don't know if it's solemnize or solemnify.
12   A.  Yeah, solemnify.  That's much better.  It's
13  done once.  How many times -- And I know you -- I
14  don't want to -- It's okay to pray more than once,
15  but, you know, how many times in the same course of
16  business would you do that and why would you do that?
17   Q.  Since you joined the board, has the board
18  ever met in executive session before the regular
19  meeting?
20   A.  Yes, it has.
21   Q.  Did that executive session open with a
22  prayer?
23   A.  No, it did not.
24   Q.  Why did the board wait until the public

82

1  session to open with a prayer?
2    A.  I don't know.
3    Q.  Did the board deliberate in the executive
4  session?
5    A.  Yes.
6    Q.  Would the prayer have been beneficial in the
7  executive session for those deliberations?
8    A.  That's an individual, each individual has to
9  answer that question.
10   Q.  Were those deliberations conducted in a
11  solemn manner?
12   A.  Some executive sessions are lively.  Yes, the
13  overall answer is yes.
14   Q.  So a prayer wasn't necessary for those
15  deliberations to be conducted in a solemn manner?
16   A.  That is correct.
17   Q.  I want to clarify.  Have any special meetings
18  been opened with a prayer?
19   A.  Special meetings?  Um, I don't think so.  I
20  don't think so.  Again, I cannot be 100 percent sure
21  on that, but I don't think so.
22   Q.  And, again, has the board or, similarly to
23  before, has the board deliberated during those special
24  meetings?

83

1    A.  Yes.
2    Q.  And was the board able to deliberate in a
3  solemn manner?
4    A.  Again, some of them were more lively than
5  others, but overall, yes.
6    Q.  And a prayer wasn't necessary for those
7  special meetings to be conducted in a solemn manner?
8    A.  That is correct.
9       VIDEOGRAPHER:  Going off the record at
10  approximately 4:46 p.m.
11       (A recess was taken.)
12       VIDEOGRAPHER:  Back on the record
13  approximately 4:51 p.m.
14  BY MR. HORVATH:
15   Q.  Is it correct that you had to run for
16  re-election this year?
17   A.  Yes.  I had to run to be elected since I was
18  appointed.
19   Q.  Okay.  Was your campaign contested?
20   A.  Yes.
21   Q.  During the campaign did anyone discuss with
22  you school board prayer?
23   A.  From media?  Are you referring to the media.
24   Q.  We will start with media.

84

# EXHIBIT 12

**1**

```
1         IN THE UNITED STATES DISTRICT COURT
2            FOR THE DISTRICT OF DELAWARE
3    MONA DOBRICH and MARCO    :  C.A. No. 15-120 (JJF)
     DOBRICH, Individually and  :
4    as parents and next friend  :
     of ALEXANDER DOBRICH,        :
5    SAMANTHA DOBRICH, JANE DOE  :
     and JOHN DOE, individually  :
6    and as parents and next      :
     friend of JORDAN DOE and    :
7    JAMIE DOE,                   :
8         Plaintiffs,    :
                          :
9    v.                   :
                          :
10   INDIAN RIVER SCHOOL    :
     DISTRICT, et al,       :
11                          :
         Defendants.    :
12   ...............
13       Videotaped Deposition of DR. MARK A. ISAACS,
     taken pursuant to notice, on Wednesday, October 18,
14   2006 at 1:36 p.m. at 31 Hosler Street, Selbyville,
     Delaware, reported by Lorena J. Hartnett, a Registered
15   Professional Reporter and Notary Public.
16   ...............
17   APPEARANCES:
18       THOMAS ALLINGHAM, ESQUIRE
         RICHARD HORVATH, ESQUIRE
19       BRIAN LENHARD, ESQUIRE
         One Rodney Square
20       Wilmington, DE 19801
           Attorney for the Plaintiff
21
22
23       WILCOX & FETZER
         1330 King Street - Wilmington, DE 19801
24       (302) 655-0477
         www.wilfet.com
```

**2**

```
1
2
3
4    APPEARANCES: (CONTINUED)
5        JARROD SHAU, ESQUIRE
         Drinker, Biddle & Reath, LLP
6        One Logan Square
         18th and Cherry Streets
7        Philadelphia, PA 19103-6996
           Attorney for the Defendants
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**3**

```
1
2
3
4           TABLE OF CONTENTS
5    TESTIMONY OF DR. MARK A. ISAACS:
6      Direct Examination by Mr. Allingham . . . . . . . 3
7      Certificate of Reporter . . . . . . . . . . . . 73
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**4**

```
1           VIDEOGRAPHER:  This is the videotaped
2    deposition of Dr. Mark A. Isaacs, taken by
3    the plaintiff in the matter of Dobrich et
4    al. versus Indian River School District, et
5    al..  Civil Action Number 15-120.  The
6    deposition is taking place at 31 Hosler
7    Boulevard in Selbyville, Delaware, on
8    October 18, 2006 at approximately 1:36 p.m.
9           The court reporter is Lorena Hartnett
10   from the firm of Wilcox & Fetzer.  My name
11   is Mark Buckmaster, a video specialist from
12   Discovery Video Services Incorporated in
13   association with Wilcox & Fetzer.  Counsel
14   will now introduce themselves and the
15   reporter will swear in the witness.
16           MR. ALLINGHAM:  Tom Allingham
17   representing the plaintiffs.  With me is
18   Brian Lenhard and Richard Horvath.
19           MR. SHAU:  Jarrod Shau representing
20   the defendants.
21           DR. MARK A. ISAACS,
22   HAVING FIRST BEEN DULY SWORN, TESTIFIED AS FOLLOWS:
23   DIRECT EXAMINATION ON BEHALF OF THE PLAINTIFFS
24   BY MR. ALLINGHAM:
```

1    A.  Well, according to this, it gives any board
2  member the opportunity to express and pray to whoever
3  they want and however they want.  So, to answer that
4  question, I would say yes.
5    Q.  Your answer spoke to terms of reviewing text
6  of the policy and interpreting the policy.  My
7  question had to do with comments by board members
8  during the consideration of the policy.
9        Did any board member ever say, in words or
10  substance, "We should adopt this policy because it
11  safeguards the rights of individual board members to
12  pray as they see fit."?
13    A.  No.
14    Q.  And when you say no, do you mean, "No, I
15  remember that that was never said," or "No, I don't
16  recall that that was ever said."?
17    A.  No, I don't recall any board member
18  specifically saying, "Adopt this so we can pray."
19    Q.  Paragraph three of the policy reads, quote,
20  "Such opportunity."  And that opportunity is the
21  opportunity to open the meeting with a prayer;
22  correct, or a moment of silence?
23    A.  (Nodding head)
24    Q.  "Such opportunity shall not be used or

37

1  exploited to proselytize, advance or convert anyone or
2  to derogate or otherwise disparage any particular
3  faith or belief."
4        Would you agree with me that that paragraph
5  imposes some limitations on the right of board members
6  which you would pray as they see fit?
7    A.  Yes.
8    Q.  And that was a limitation that you, as a
9  board member, thought was appropriate to include in
10  the policy?
11    A.  Yes.
12    Q.  What did you understand in the context of
13  this paragraph the prohibition against proselytizing
14  to mean?
15    A.  I guess my interpretation of it would be that
16  you cannot use that opportunity to advance or promote
17  any one particular religion over another.
18    Q.  Who had the responsibility to ensure that
19  that limitation was complied with?
20    A.  I would assume that it would be left up to
21  the individual giving the prayer.  I mean there wasn't
22  a police officer there to enforce anything or anything
23  like that.
24    Q.  I know you weren't being facetious, and when

38

1  I say enforce, that may have caused you to think about
2  police officers.  I meant was it the board members
3  themselves who had the obligation to enforce this
4  limitation?
5    A.  Yes.
6    Q.  Now, do you recall any prayer that was
7  offered that you viewed as either violating paragraph
8  three or raising a question about whether it violated
9  paragraph three at anytime during your tenure after
10  the adoption of this policy?
11    A.  No, not really, because, you know, my
12  interpretation of it was that each board member had
13  the opportunity to express as they felt fit as long as
14  it wasn't used to promote any one particular religion,
15  so, no, I don't remember any specific board prayer
16  that was more offensive or less offensive or anything
17  like that.
18    Q.  I am going to offer -- I am going to give you
19  an example of a prayer that -- Well, I will let you
20  make the judgment, but I am going to give you a prayer
21  and ask you if it would have been given it would have
22  violated the policy.  Okay?
23        "Oh, Lord, please convert the Jews in the
24  audience and ensure that they come to know our Lord

39

1  Jesus Christ."
2    A.  Yes, it would.
3    Q.  That would violate paragraph three?
4    A.  Yes.
5    Q.  Now, suppose that a board member gave that
6  prayer which would violate, in your view, paragraph
7  three.  What would be done?  What would be the
8  response of the board?
9    A.  As far as repercussions, you mean, or?
10    Q.  Yes, if any?
11    A.  I would assume that there would be dialogue
12  that would take place, probably in executive session,
13  to ask one of the board members why did you do that or
14  why did you say those words or --
15    Q.  I purposely picked that extreme example so we
16  could explore what the board would do.  I could ask
17  you what you would have done.  That's an example that
18  seems to you to be a clear violation of paragraph
19  three.  Would you have brought that to the president
20  or the individual board member's attention yourself?
21    A.  Yes.
22    Q.  And I take it what you would have done is to
23  say, "I believe that prayer was in violation of our
24  policy."  Correct?

40

Isaacs, Mark, Dr. (Video)  10/18/2006  1:36:00 PM

1    A.  Yes.
2    Q.  At that point the horse would be out of the
3  barn; right?
4    A.  Right.
5    Q.  On that prayer?
6    A.  Right.
7    Q.  Would you suggest that that person be taken
8  out of the rotation to offer prayers thereafter, or do
9  you think --
10    A.  No, I am not a one-strike man, so I would
11  give them the opportunity to redeem themself.
12    Q.  Okay.  And if the board member then offered a
13  prayer, you know, "Convert the heathens in the
14  audience, please, Lord," you would at that point two
15  strikes is enough?
16    A.  Yeah.
17    Q.  You wouldn't give them a third chance?
18    A.  Right.
19        MR. ALLINGHAM:  Okay.  We are going to
20  change the tape.
21        THE WITNESS:  Okay.
22        VIDEOGRAPHER:  Going off the record at
23  2:34 p.m.
24        (A recess was taken.)

41

1        VIDEOGRAPHER:  Going back on the
2  record at 2:39 p.m.
3  BY MR. ALLINGHAM:
4    Q.  Dr. Isaacs, I am going to show you a second
5  prayer, and this one is long, so I am going to give it
6  to you in writing.  We have previously marked this as
7  PX35.  I will read it into the record, but follow
8  along as we go.
9        "Do not put your trust in princes, in mortal
10  men who cannot even save themselves.  When their
11  spirit departs, they return to the ground.  On that
12  very day, their plans come to nothing.  Blessed is he
13  whose help is the God of Jacob, whose hope is in the
14  Lord, his God, the maker of heaven and earth, the sea,
15  and everything in them, the Lord who remains faithful
16  forever.  He upholds the cause of the oppressed and
17  gives food to the hungry.  The Lord sets prisoners
18  free.  The Lord gives sight to the blind.  The Lord
19  lifts up those who are bowed down.  The Lord loves the
20  righteous.  The Lord watches over the alien and
21  sustains the fatherless and the widow, but he
22  frustrates the ways of the wicked.  For the wages of
23  sin is death, but the gift of God is eternal life
24  through Jesus Christ our Lord."

42

1        In your judgment as a board member, would
2  that prayer be permitted or be prohibited by paragraph
3  three of the policy?
4    A.  It's not nondenominational.
5    Q.  But the policy doesn't require that a prayer
6  be nondenominational.  The policy simply requires that
7  the prayer not be used or exploited to proselytize,
8  advance or convert anyone or to derogate or otherwise
9  disparage any particular faith.  So, in light of that,
10  would you view this as --
11    A.  No, I would not view this as bad.
12    Q.  It would be permitted under paragraph three?
13    A.  Yes, yes.
14    Q.  And, to put it in the language of paragraph
15  three, you would not view that prayer as --
16    A.  Proselytizing.
17    Q.  -- proselytizing?
18    A.  No, sir.
19    Q.  This prayer has been marked as PX45.  It
20  reads, "Heavenly Father, thank you for this great
21  occasion, for the work, the effort, the joys and
22  everything that led up to this point in time.
23  Thank you for your guidance in this event.  We pray
24  for your direction in the lives of each of these

43

1  school board members.  We pray that you direct them
2  into the truth and eventually the truth that comes by
3  knowing Jesus.  We also pray that you would be with
4  them at this time.  We ask these things in Jesus's
5  name.  Amen."
6        Do you view that prayer as proselytizing?
7    A.  No.  It's not nondenominational, but no.
8    Q.  You have said that several times.  Do I
9  correctly infer from that, that as a board member, you
10  would have preferred that the prayers that are offered
11  to open a meeting be nondenominational?
12    A.  I think everybody should be free to express
13  how they choose to do so, so I would say it's a matter
14  of interpretation.  I mean this goes in accordance
15  with what would be number three, any such prayer may
16  be sectarian or non-sectarian, so it's following the
17  policy, I guess, is what I am saying, but.
18    Q.  Let me ask you this question:  Is it possible
19  for a prayer to be sectarian, that is directed to a
20  particular deity, and at the same time not be
21  proselytizing?
22    A.  I guess when I think of proselytizing, I am
23  thinking of someone standing up at the pulpit saying,
24  "You will do this or this is the way you should go or

44

1    your attention to those words?
2        A.  No.
3        Q.  Halfway through the second page there is a
4    whereas clause that talks about the American Civil
5    Liberties Union.  Do you have any recollection of a
6    discussion of the American Civil Liberties Union
7    during the discussion of this school board prayer?
8        A.  You mean by board?
9        Q.  Yes, by board members.
10       A.  No, but I know that the public felt American
11   Civil Liberties Union -- I mean there is a sentiment
12   there that the ACLU is taking away rights of people by
13   the general public.  But no, not that I recall.
14       Q.  So you don't recall any discussion at the
15   board level or at the Policy Committee -- I guess I am
16   just going to assume you weren't at Policy Committee
17   meetings.  Okay?
18       A.  Yes, that's a good assumption.
19       Q.  Do you recall a discussion of any kind at the
20   board level of the involvement of the ACLU in this
21   litigation?
22       A.  Well, yes, I remember, if I am not mistaken,
23   that one of the board minutes add that there was
24   someone there from the ACLU that actually spoke, if I

53

1    am not mistaken, but.
2        Q.  Your memory is accurate.  Do you recall the
3    name of Dru Fennel?
4        A.  No.
5        Q.  Was the person who spoke a woman?
6        A.  Yes.
7        Q.  And did she speak at a meeting at which
8    Mrs. Dobrich also spoke?
9        A.  Good question.
10       Q.  That was a statement by a representative of
11   the ACLU.  Do you recall discussions by board member
12   of the ACLU's involvement in this litigation?
13       A.  Um, maybe just questioning whether they were
14   involved in it, but no lengthy deliberation about
15   anything like that.
16       Q.  Let me come back to your statement about the
17   public.  Do you understand or did you understand when
18   you were on the board that the public viewed the
19   board's defense of this lawsuit as a defense of
20   Christian values?
21       A.  Some did.
22       Q.  How did you find that out?  Did they tell you
23   that?
24       A.  I am sure just in grocery stores and I mean

54

1    obviously by comments of the general public, but.
2        Q.  Did you understand, Dr. Isaacs, that that was
3    a widely held view of the public?  I am not talking of
4    the board members now, I am talking about the public.
5        A.  I wouldn't say -- I would not say it's a
6    widely held view.  I would just say it was a view.
7        Q.  Which you heard from more than one person?
8        A.  Right.
9        Q.  These are hard things to remember, but can
10   you estimate the number of people who said that to you
11   in words or substance?  Are we talking a dozen?
12       A.  No.
13       Q.  A hundred?
14       A.  No.
15       Q.  Two?
16       A.  No, no, no, not even five.  If it didn't have
17   something to do with athletics or why the budget was
18   overspent, they were the main substance of what I was
19   dealing with.
20       Q.  The next clause on page two reads, "Whereas
21   the board has obtained the legal advice of two
22   competent and experienced constitutional attorneys,
23   John W. Whitehead, Esquire, and Thomas S. Neuberge
24   Esquire, that prayer to open board meetings is

55

1    constitutional in the United States Court of Appeals
2    for the Third Circuit, which includes Delaware, and
3    legal counsel have identified the following legal
4    authority in support of their legal opinion."
5        Do you recall having read something to that
6    effect at anytime during your consideration of the
7    board prayer policy?
8        A.  No, I don't.
9        Q.  Is it correct that the school board obtained
10   the legal advice of two confident and experienced
11   constitutional attorneys that prayer to open board
12   meetings is constitutional?
13       A.  I know a lot of questions were asked.
14   Whether you would say that you got their legal advice
15   from it, according to this, yes.
16       Q.  When you say "a lot of questions were asked,"
17   you mean questions were asked by board members of
18   Mr. Neuberger?
19       A.  Yes.
20       Q.  And did Mr. Neuberger respond?
21       A.  Yes.
22       Q.  And is the substance of his response
23   reflected in this memorandum prepared by
24   Mr. Neuberger?

56

# EXHIBIT 13

McCabe, Elaine (Video)  10/17/2006  9:02:00 AM

**Page 1**

```
 1          IN THE UNITED STATES DISTRICT COURT
 2          IN AND FOR THE DISTRICT OF DELAWARE
 3   MONA DOBRICH and MARCO    : Case No. 15-120
     DOBRICH, Individually and :
 4   as parents and next friend :
     of ALEXANDER DOBRICH,     :
 5   SAMANTHA DOBRICH, JANE DOE :
     and JOHN DOE, Individually :
 6   and as parents and next   :
     friend of JORDAN DOE and  :
 7   JAMIE DOE,                 :
 8          Plaintiffs,   :
                               :
 9          v.            :
                               :
10   INDIAN RIVER SCHOOL       :
     DISTRICT, et al.,         :
11                             :
            Defendants.   :
12
13       Video Deposition of ELAINE MCCABE, taken
     pursuant to notice, on Tuesday, October 17, 2006
14   at 9:02 a.m. at 31 Hosier Street, Selbyville,
     Delaware, reported by Lorena J. Hartnett, a Registered
15   Professional Reporter and Notary Public.
16       . . . . . . . . .
17   APPEARANCES:
18       RICHARD HORVATH, ESQUIRE
         BRIAN G. LENHARD, ESQUIRE
19       Skadden, Arps, Slate, Meagher & Flom
         One Rodney Square
20       Wilmington, DE  19801
           Attorneys for the Plaintiff
21
22       WILCOX & FETZER
     1330 King Street - Wilmington, DE  19801
23         (302) 655-0477
           www.wilfet.com
24
```

**Page 2**

```
 1
 2   APPEARANCES (CONTINUED):
 3       JASON P. GOSSELIN, ESQUIRE
         Drinker, Biddle & Reath, LLP
 4       One Logan Square
         18th and Cherry Streets
 5       Philadelphia, PA  19103-6996
           Attorney for the Defendants
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**Page 3**

```
 1
 2
 3          TABLE OF CONTENTS
 4   TESTIMONY OF ELAINE MCCABE:
 5     Direct Examination by Mr. Horvath . . . . . . . 4
 6     Certificate of Reporter . . . . . . . . . . . . .112
 7
 8
 9
10          INDEX TO EXHIBITS
11   Plaintiff's Exhibit 57 . . . . . . . . . . . . . 99
12
13
14
15
16
17
18
19
20
21
22
23
24
```

TABLE OF CONTENTS
TESTIMONY OF ELAINE MCCABE:
  Direct Examination by Mr. Horvath . . . . . . . 4
  Certificate of Reporter . . . . . . . . . . . . .112

INDEX TO EXHIBITS
Plaintiff's Exhibit 57 . . . . . . . . . . . . . 99

**Page 4**

```
 1        (The videographer read the
 2   introduction, and the attorneys introduced
 3   themselves.)
 4        ELAINE MCCABE,
 5   HAVING FIRST BEEN DULY SWORN, TESTIFIED AS FOLLOWS:
 6   DIRECT EXAMINATION ON BEHALF OF THE PLAINTIFFS
 7   BY MR. HORVATH:
 8   Q.  Good morning, Ms. McCabe.
 9   A.  Good morning.
10   Q.  Just so I can be clear from the start, is it
11   Ms. or Mrs.?
12   A.  Mrs.
13   Q.  Mrs.  Have you ever been deposed before?
14   A.  Once, yes.
15   Q.  And what was that, what were you -- What case
16   was that?
17   A.  It was the Barkeski case associated with the
18   school district.
19   Q.  And what was the nature of that case?
20   A.  It was a case that involved missing monies
21   from a booster organization.
22   Q.  Okay, did that case proceed to trial?
23   A.  No.
24   Q.  Did that case involve in any way religion in
```

1  just want to understand how you view this prayer to
2  operate under the policy.
3      A.  Okay.
4      Q.  So I am going to show you what has previously
5  been marked PX45.
6      A.  Okay.
7      Q.  "Heavenly Father, thank you for this great
8  occasion, for the work, the effort, the joys, and
9  everything that led up to this point in time.
10  Thank you for your guidance in this event.  We pray
11  for your direction in the lives of each of these
12  school board members.  We pray that you direct them to
13  the truth and eventually the truth that comes by
14  knowing Jesus.  We also pray that you would be with
15  them at this time.  We ask these things in Jesus's
16  name.  Amen."
17      Do you believe that this prayer would violate
18  paragraph three of the policy?
19      A.  No.
20      Q.  Is this prayer asking that the board members
21  be directed into the truth and eventually the truth
22  that comes by knowing Jesus?
23      A.  Yes, I believe it is.
24      Q.  Do you think that's trying to influence the

81

1  board members?
2      A.  No.
3      Q.  Why not?
4      A.  Well, because if a board member sat at a
5  board meeting and gave this prayer at the beginning,
6  then I am sitting there as a board member either open
7  to his prayer because of what, because I have similar
8  beliefs, or I am sitting there respecting his right to
9  say, or her right to say the prayer, but, if it's not
10  my thing, I may be sitting there just quietly
11  reflecting, but I am not influenced by him giving this
12  prayer.
13      Q.  Do you think your impression of this prayer
14  might be biased because you are a Christian?
15      A.  Oh, it could be.
16      Q.  And you find nothing in this prayer that
17  proselytizes?
18      A.  No.
19      Q.  Nothing that's trying to influence or force
20  someone to change their religious faith?
21      A.  Not me.  I mean I can't speak for other
22  people that hear this, but it would not me.
23      Q.  Okay.  I have another one which I am just
24  going to read.

82

1      A.  Okay.
2      Q.  "Allah, we offer you our school bus drivers,
3  we offer you our superintendent, our administrators
4  and our secretaries.  We offer you our teachers and
5  our parents.  Finally, we offer you our students.
6  Peace be unto your prophet, Muhammed."
7      A.  What do you mean by offer you?
8      Q.  How do you understand that?
9      A.  I don't.  I can not sure that I do understand
10  it, because it's not a prayer that I am used to
11  hearing.  If it's just -- If by saying "we offer you,"
12  meaning please take care of or please oversee or care
13  for, then I have no objections to it.
14      Q.  What if it said, in place of offer, "we lift
15  up to you"?
16      A.  That's fine.
17      Q.  How do you understand "lift up to you" to
18  mean?
19      A.  Um, again I guess I would see it as being
20  here to accept a higher being's guidance.
21      Q.  Suppose you are in the audience if such a
22  prayer were offered.
23      A.  Uh-huh, that prayer?
24      Q.  This prayer.

83

1      A.  Okay.
2      Q.  And I am going to assume as a parent or other
3  member of the community you wouldn't see yourself as
4  one of these individuals listed under the prayer.  How
5  would you feel as a Christian hearing a board member
6  offering or lifting you up to Allah?
7      A.  I would not object to it.  And let me just
8  add to that.  I don't mean to keep referring to it,
9  but as I have indicated to you, I have been through
10  some personal crisis lately.  I have actually had a
11  house that my brother, sister and I owned burn down
12  through a construction accident out on our property.
13      I lost my father December 12 of 2005.  I lost
14  my mother January 4 of 2005, 22 days after my father,
15  and I lost a 20 year old nephew February 25, and I
16  frankly have appreciated every prayer that everyone
17  has offered up in my parents' name and my name, and
18  from customers where I work and people that I know
19  that some of them are not Christians and of the same
20  faith, but I have been thankful and grateful for any
21  prayer that they have given me, because it just simply
22  means that they care about me, and I would not object to
23  that prayer.
24      And if there was a board member elected that

84

1  was of another faith, I would respect their prayer any
2  night they gave it, the same way I respected the ones
3  that were given the 11 years I was on the board.
4      Now, I have chosen personally not to attend
5  church after my children were grown, but, and I am not
6  going to tell you that I ever prayed, that I always
7  prayed every time someone at a board meeting gave a
8  prayer, but what I can tell you is that I was quiet
9  and I respected the prayer that they gave.
10     Probably the only ones that I would have
11  objected to strongly would be ones that proposed some
12  of the crazy things going on in our world today where
13  prayer is associated with faith and religion is
14  associated with causing people harm and doing crazy,
15  wild things in the name of the faith.
16     Q.  So, you know, if a prayer -- The only prayer
17  that you would find objectionable is if someone stood
18  up and said, "We pray that the heathens in our midst
19  come to know you and, if they don't, we are going to
20  behead them."?
21     A.  Uh-huh, yeah, I would have objected to that
22  one.
23     Q.  Would, short of that threat of physical
24  violence --

85

1      A.  No, I am not saying short of that.  I am just
2  saying that, you know, if people prayed to someone
3  else besides God or Jesus, I would have respected that
4  right.
5      Q.  Has, to your knowledge, has anyone served on
6  the board that was not a Christian?
7      A.  I have no idea.  It's not an issue that I
8  have ever been aware of, and I have never questioned
9  what religious background any of the board members
10  have.
11     Q.  Do you believe that someone who openly
12  professes the Muslim faith could be elected to the
13  school board?
14     A.  Oh, probably not in this area, not right now.
15  I think that day will come, but I don't think.
16     Q.  In the foreseeable future could that day
17  come?
18     A.  Probably in my children's lifetime, I think.
19  I am not sure whether it will in my lifetime.  I think
20  it would be much more likely for someone of the Jewish
21  faith to be elected to the school board, but I don't
22  know that religion has ever been an issue in a school
23  board election as politics or parties or not, either.
24     Q.  Was the board prayer issue -- Was the board's

86

1  practice of opening its meetings with prayer an issue
2  in the 2006 election?
3      A.  2006?  Last May, I think there were three or
4  four elections, if I am not mistaken.  I am sure it
5  was an issue for some people.  There were other
6  issues, I think, just as important.
7      Q.  You stated that if a board member gave a
8  prayer that you may not agree with personally, that
9  you would remain quiet and respectful while they give
10  the prayer.  Am I correct in that?
11     A.  What do you mean not agree with?
12     Q.  If someone gave a prayer of a different
13  religious faith than yours, --
14     A.  Uh-huh.
15     Q.  -- you would allow them to make the prayer
16  and remain quiet and respectful of them while
17  they were giving the prayer?
18     A.  Yes.
19     Q.  Do you think everyone in attendance should do
20  the same?
21     A.  Well, we can't really control what the
22  audience does.  I think the board members should, and
23  I think the board members would, but even with the
24  prayers that are given, frankly most of the time there

87

1  are people in the audience talking while it's going
2  on, and we don't -- We don't and can't really control
3  that.
4      Q.  Can the board president call the meeting to
5  order?  Can he --
6      A.  Yes.
7      Q.  -- insist that the meeting be conducted
8  orderly?
9      A.  Yes.
10     Q.  If there was a disruption in the audience,
11  could the board president clear the room?
12     A.  Well, you know, I suppose by procedures of
13  how to operate a meeting, he could.  I have never
14  known it to happen, and I don't know how he would do
15  it, really, she.
16     Q.  But you could see the board maintaining some
17  degree of order if there was a disruption?
18     A.  I think the board president tries to, by
19  beating the gavel or whatever, tries to maintain
20  order, yes, as much as they can.
21     Q.  To go back to your statement about,
22  instructing me that you would have to see the prayer
23  being really strong before you would find it
24  objectionable, so let me just read you one last one?

88

# EXHIBIT 14

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2              IN AND FOR THE DISTRICT OF DELAWARE
 3    MONA DOBRICH and MARCO     :    Case No. 15-120 (JJF)
      DOBRICH, Individually and :
 4    as parents and next friend :
      of ALEXANDER DOBRICH,      :
 5    SAMANTHA DOBRICH, JANE DOE :
      and JOHN DOE, Individually :
 6    and as parents and next    :
      friend of JORDAN DOE and   :
 7    JAMIE DOE,                  :
                                  :
 8              Plaintiffs,       :
                                  :
 9              v.                :
                                  :
10    INDIAN RIVER SCHOOL         :
      DISTRICT, et al.,           :
11                                :
                Defendants.       :
12              .. .. .. .. .. ..
13         Video Deposition of DONNA MITCHELL, taken
      pursuant to notice, on Monday, October 16, 2006
14    at 9:15 a.m. at 31 Hosier Street, Selbyville,
      Delaware, reported by Lorena J. Hartnett, a Registered
15    Professional Reporter and Notary Public.
16              .. .. .. .. .. ..
17    APPEARANCES:
18         THOMAS ALLINGHAM, ESQUIRE
           RICHARD HORVATH, ESQUIRE
19         One Rodney Square
           Wilmington, DE  19801
20             Attorneys for the Plaintiff

21
22              WILCOX & FETZER
        1330 King Street - Wilmington, DE  19801
23              (302) 655-0477
                www.wilfet.com
24
```

Mitchell, Donna  10/16/2006  4:44:00 PM

1 that I had been abusive in any way in the deposition?
2   A. No, they did not.
3   Q. Or harassing?
4   A. No.
5   Q. Or belittling in tone?
6   A. No.
7   Q. What did you do to prepare for the
8 deposition? Did you meet with your lawyers?
9   A. Yes.
10   Q. And when did that take place?
11   A. I don't remember the exact date.
12   Q. The exact date is not -- Within the last
13 couple of weeks?
14   A. Yes.
15   Q. Alright, and is that a meeting that took
16 place in this room?
17   A. Yes.
18   Q. And who was here?
19   A. Myself, Nina Lou, Janet, the secretary, Janet
20 Hearn, and Jason, and two of his associates.
21   Q. Over the course of that meeting, did you
22 review any documents?
23   A. I had no documents before me.
24   Q. Did any of the lawyers read to you from any

9

1 documents?
2   A. I don't remember documents being read. It
3 was more preparing us for kind of what to expect,
4 because we had never been to a deposition.
5   Q. Did anything occur at that meeting that
6 refreshed your recollection about events relating to
7 the school board prayer issue, particularly the events
8 of the summer and fall of 2004?
9   A. No, I don't believe we even discussed that.
10   Q. Where were you born, Ms. Mitchell?
11   A. Lewes, Delaware.
12   Q. And did you attend public schools in the
13 Lewes area?
14   A. No, I did not. I attended this school that
15 we are sitting in for 12 years.
16   Q. All right, so you moved to this area early on
17 in your life?
18   A. I have always lived in this area. It's just
19 that I was born at the hospital in Lewes.
20   Q. When you ran for the school board, did you
21 prepare any campaign materials, posters, handouts,
22 anything like that?
23   A. Nothing.
24   Q. Who asked you to run for the school board?

10

1   A. Nobody asked me in particular. My friends
2 encouraged me, because the person who held the seat
3 was moving out of the district.
4   Q. Who was that?
5   A. Elaine McCabe.
6   Q. And whom did you notify that you intended to
7 run for the school board? What's the official process
8 for putting your name on the ballot?
9   A. You go to Georgetown and you put your name in
10 to get on the ballot.
11   Q. What district do you represent?
12   A. District 5.
13   Q. During the campaign or during let's just call
14 it the period of time running up to the election, did
15 you make any special effort to connect with voters,
16 explain your positions, find out their concerns and so
17 forth?
18   A. Actually, I didn't do anything formal. I,
19 you know, worked with the people; I go to church with
20 the people; I have lived in this community my entire
21 life; so, of course, I have conversations, but nothing
22 formal.
23   Q. Was that because you felt that people
24 understood where you stood on the issues?

11

1   A. Yes.
2   Q. Before you were elected to the board, did you
3 have a position on the appropriateness of opening
4 school board meetings with a prayer?
5   A. Yes.
6   Q. What was that position?
7   A. I believe that it's okay to do so.
8   Q. And what was the basis for that belief? And
9 this is before you joined the board; this is at the
10 time that you were running for the school board in
11 2005.
12   A. It has been tradition to open school board
13 meetings with prayer. My grandfather was on the
14 school board when I was a young child in school, and
15 they opened the meetings with prayer at that time, and
16 that's over 50 years ago.
17   It's always been done that way, and I believe
18 it solemnizes the proceedings and prepares people to
19 conduct the business of the district.
20   Q. Anything else? Any other reason for your
21 belief?
22   A. No, I think that says it.
23   Q. Okay. You would agree with me that not
24 everything that has been a tradition is always

12

Mitchell, Donna  10/16/2006  4:44:00 PM

1  correct?  We can think of bad examples?
2      A.  Yes.
3      Q.  Or, to say it a different way, some
4  traditions are good and some traditions are bad?  Fair
5  enough?
6      A.  Fair enough.
7      Q.  This one, though, seems to you to be a good
8  tradition?
9      A.  Yes.
10     Q.  Why does it seem to you to be a good
11  tradition?
12     A.  I see no harm in it, and I only see good in
13  it, because I think it prepares people to settle down
14  to be serious about what is going to take place.
15         And, as a Christian personally, it makes me
16  feel that I am more prepared because I am asking for
17  wisdom in making decisions that are important that are
18  going to affect the school district.  That's my
19  personal opinion.
20     Q.  And some of what we will talk about today is
21  your personal opinion and then the sort of broader
22  impact of the open prayer.
23         But in your earlier answer you said it
24  prepared -- I may not have the words quite right, but

                          13

1  it prepares people to settle down for the business at
2  hand?
3      A.  It solemnizes it.  It makes us get more
4  serious and settles us.
5      Q.  Okay.  And in each of those sentences, the
6  object of the settling or the solemnization, you use
7  the pronoun "us," and what I would like to know is who
8  is it, precisely, that the prayer is directed to?
9      A.  The school board.
10     Q.  All right.  Is it intended that it has any
11  impact whatsoever on the members of the public who are
12  in attendance, or is it limited to the school board
13  members who have to make decisions at that meeting?
14     A.  In my opinion, it's limited to the school
15  board members.
16     Q.  And was that your view when you were running
17  for the school board in 2005?
18     A.  I never thought about it at that time.  It
19  was not an issue.
20     Q.  And, by the way, that's a perfectly good
21  answer.  Don't feel like you have to have an answer to
22  every question.
23     A.  Right.
24     Q.  So what caused you to think about it and form

                          14

1  the opinion that you have just expressed today, that
2  the impact of the prayer is limited to the ten board
3  members?
4      A.  I can't really say.  It's just the way I feel
5  about it.
6      Q.  You testified several times using the word
7  solemnizing.  You know that that word is in the
8  policy, itself?
9      A.  Yes.
10     Q.  Would you tell me, and maybe you have already
11  answered this question in part, maybe entirely, but
12  would you tell me what you think it means when the
13  policy says "in order to solemnify its proceedings"?
14     A.  To me, it means to get serious, solemn, to
15  bring us together as a body, as a legislative body to
16  conduct business.
17     Q.  Do you think it's necessary for the, in order
18  for the board members to get serious and to bring the
19  board members together as a legislative body, for the
20  board to open its meetings with a prayer?
21     A.  Do I think it's necessary?
22     Q.  Correct.
23     A.  I think it's preferable.
24     Q.  Preferable but not necessary?

                          15

1      A.  To me, it's extremely important.
2      Q.  I can ask -- I can keep asking the question,
3  but -- I could ask the question a different way, but I
4  am going to persist until I get an answer from you or
5  an answer that you can't answer.
6         Do you think it's necessary for the Board of
7  Education for the Indian River School District to open
8  its meetings with a prayer in order for those members
9  to get serious and to bring them together as a
10  legislative body?
11     A.  In my personal opinion, we would not be as
12  effective if we did not do so.
13     Q.  And why is that?
14     A.  Because I believe asking the Lord's direction
15  and guidance is extremely important when you come to
16  matters that are discussed of such importance.
17     Q.  Let me pursue that a moment.  So, in your
18  personal perspective -- Let me strike that.
19         It's your goal, I assume, always to make the
20  best possible decisions you can as a school board
21  member?
22     A.  Correct.
23     Q.  And it's your belief that the ten members of
24  the school board will make better decisions if they

                          16

1    a prayer in your head seeking divine guidance, just as
2    you do at the special board meetings; is that right?
3        A.  I am listening to the prayer that's being
4    said and I am also on my own, yes.
5        Q.  Fair enough.  Paragraph three provides, "Such
6    opportunity."  That's the opportunity to offer a
7    prayer, a moment of silence?  Yes?  That's what it
8    refers to?
9        A.  Okay, yes.
10       Q.  "Such opportunity shall not be used or
11   exploited to proselytize, advance or convert anyone or
12   to derogate or otherwise disparage any particular
13   faith or belief."
14           Is it your understanding that that limits,
15   imposes some limits on what people can say when they
16   offer a prayer or a moment of silence?
17       A.  I wouldn't think it would affect a moment of
18   silence.
19       Q.  That's a good point.
20       A.  But it would have an affect on perhaps what
21   would be said verbally.
22       Q.  I have some -- I have some examples, and I
23   want to, as a board member, I want to try to ask you
24   whether you think these examples would violate

105

1    paragraph three or would be permitted under paragraph
2    three.
3           And the first example I want to give you is
4    suppose that a prayer was offered in which the person
5    offering the prayer said, "Lord, we pray that you
6    convert the heathen in our audience that they will
7    come to know the goodness and wisdom of your heart."
8           Would you view that as a prayer that was
9    permissible under paragraph three or violated
10   paragraph three?
11       A.  I would think that would be inappropriate for
12   a school board to say that, because we are praying for
13   wisdom for our group, not for the audience.  We are
14   not trying to convert anyone.
15       Q.  That's helpful, and that's -- but it's -- I
16   am looking for an answer to my specific question.  You
17   have before you a policy of the board.  The board are
18   the people charged with enforcing the board's
19   policies; correct?
20       A.  Right.
21       Q.  So you, as a board member, are charged with
22   ensuring that nobody offers a prayer that is used or
23   exploited to proselytize, advance or convert anyone
24   and so forth; correct?

106

1        A.  Right.
2        Q.  So that prayer that I have just offered you,
3    whether it's appropriate or inappropriate, is it your
4    view that it violates paragraph three of the board
5    policy?
6        A.  Would you say it again?
7        Q.  Sure.  And I am not going to promise I am
8    going to get exactly the same words.  I should have it
9    written down somewhere.  "Oh, Lord, we pray that you
10   will convert the heathen in our audience so that they
11   come to know the goodness and wisdom of your heart."
12   Would that violate or be permitted under paragraph --
13       A.  I would not say that.  I would say it's
14   really pushing the limit.  It's -- I would not say
15   that.
16       Q.  When you say "pushing the limit," you mean
17   pushing the limit of things that are permitted under
18   paragraph three; correct?
19       A.  Yes.
20       Q.  Okay, and what is it in that prayer that you
21   think would violate some provision of paragraph three?
22       A.  We are not out to convert anyone.
23       Q.  Are you sure that that prayer would violate
24   paragraph three, at least as you understand?

107

1        A.  I can't speak for anyone else.  It wouldn't
2    be right for me, because our purpose is not to convert
3    anyone.  It's to seek wisdom in making business
4    decisions.
5        Q.  Understood, and I think you and I are in the
6    same wavelength in that.  I am now trying to get at
7    something different.  If anybody -- I know that you
8    would not offer that prayer for the reasons you have
9    just said, but if one of your colleagues offered that
10   prayer and, just to make life a little easier for you,
11   passed out the text ahead of time, would you form the
12   conclusion that that was a prayer that would violate
13   paragraph three of the policy?
14       A.  I would go to that person and say I don't
15   think this is appropriate.
16       Q.  Because it violates paragraph three?
17       A.  More than paragraph three, it just isn't
18   appropriate.
19           MR. ALLINGHAM:  Okay.  I am going to
20   show you what we have previously marked as
21   Plaintiff's Exhibit 35.  You don't have the
22   stack in front of you.  Do you want copies?
23           MR. GOSSELIN:  I never did have this
24   one, because it was that little sheet that

108

1    individual board members to offer any prayer except
2    those that are used or exploited to proselytize,
3    advance or convert anyone or to derogate or otherwise
4    disparage any particular faith or belief; correct?
5       A.  Yes.
6       Q.  Okay.  Am I right, then, at least in
7    understanding that you did not view the text of any
8    prayer that's been given since you joined the board as
9    having used or exploited the opportunity to pray, to
10   proselytize, advance or convert anyone, or to derogate
11   or otherwise disparage any particular faith or belief?
12      A.  There haven't been any that have offended me
13   or struck me that way.
14      Q.  On the other hand, that prayer that I gave
15   you a minute ago about converting the heathen, that
16   one would have struck you as being the use or
17   exploitation of the opportunity to proselytize,
18   advance or convert anyone and so forth; correct?
19      A.  It certainly would push the limit.  I just --
20      Q.  You seem as though you are just not sure?
21      A.  Well, no, I just --
22      Q.  Let me give you another one.  Suppose that
23   the prayer were --
24         MR. GOSSELIN:  If you did it with the

113

1       inflection that might come with it, that
2       would tip her over the edge.
3   BY MR. ALLINGHAM:
4      Q.  Suppose that the prayer were, "We pray,
5   Allah, that you convert the infidels in the public
6   audience and on this board."
7      A.  That would certainly get my attention.
8      Q.  Wouldn't you think that was a prayer that was
9   being used to try to convert someone?
10      A.  Yes.
11      Q.  Okay.
12      A.  Or not, maybe not just convert, but to
13   slander or, or, I don't know what's the correct word
14   to use.  It would, for a Christian school district
15   overall, per say a majority, it would certainly catch
16   the attention of everyone, I am sure.
17      Q.  But aren't these prayers supposed to be all
18   in accord with the freedom of conscience of the
19   individual adult board members?
20      A.  Yes.
21      Q.  So --
22      A.  I wouldn't -- I mean I would bring my prayer.
23   You know, I would -- I would -- I would give them the
24   right to say what they felt led to say, but it

114

1    wouldn't be my personal prayer.
2      Q.  And that would be true even if the text of
3   that prayer, in your mind, would sound like an effort
4   to convert someone?
5      A.  If I felt like something sounded like an
6   effort to convert someone, I would speak up.
7      Q.  Okay.  And, similarly, the other words in
8   paragraph three, if it was an effort to proselytize,
9   --
10      A.  Yes.
11      Q.  -- you would speak up?
12      A.  That's not our place to do so.
13      Q.  And so you would speak up if a board member
14   offered prayer that you viewed as proselytizing?
15      A.  Yes, I would.
16      Q.  And describe for me -- I tried to give you an
17   example of a prayer that seemed clearly to try to
18   convert someone, because it said, "Help us, Lord, to
19   convert these people."
20      A.  Right.
21      Q.  But give me an example or tell me how you
22   would know that a prayer was seeking to proselytize?
23      A.  I guess I would have to hear it.  I don't
24   want to -- I can't think of an example right off the

115

1    top of my head, but I just don't think it's our place
2   to convert anyone to any religion.
3      Q.  And proselytize is clearly different.  It's a
4   different clause here.  You don't think it's your
5   place to proselytize for any particular religion?
6      A.  No.
7      Q.  Alright, now coming back to PX35, which is
8   the text of the prayer I gave you, --
9      A.  Right.
10      Q.  -- is it your view that this prayer
11   proselytizes?
12      A.  It looks like the person will be reciting
13   scripture, and I can't get into their heads to know
14   why they would choose to cite scripture instead of
15   offering a prayer for wisdom.  I don't know what their
16   intent would be.  I just feel that it would be
17   inappropriate.  I wouldn't do it, for me.
18      Q.  This is not a prayer, though, that seeks to
19   convert someone, is it?
20      A.  It doesn't sound like a prayer.  It sounds
21   like scripture.  It sounds like Romans.
22      Q.  Part of it is Romans.
23      A.  Okay, the end of it.
24      Q.  Is it your view that for someone to quote

116

# EXHIBIT 15

**Page 1**

```
 1        IN THE UNITED STATES DISTRICT COURT
 2           FOR THE DISTRICT OF DELAWARE
 3
 4   MONA DOBRICH and MARCO        )
     DOBRICH, Individually and     )
 5   as parents and next friend    )
     of ALEXANDER DOBRICH,         )
 6   SAMANTHA DOBRICH, JANE DOE    )
     and JOHN DOE, Individually    )
 7   and as parents and next       )
     friend of JORDAN DOE and      )
 8   JAMIE DOE,                    )
                                   )
 9       Plaintiffs,               )
                                   ) Civil Action
10   v.                           ) No. 05-120 (JJF)
                                   )
11   INDIAN RIVER SCHOOL,          )
     DISTRICT, et al.,             )
12                                 )
         Defendants.               )
13
14        Videotaped Deposition of HARVEY L. WALLS,
15   taken pursuant to notice at 31 Hosier Street,
     Selbyville, Delaware, beginning at 1:30 p.m., on
16   Wednesday, October 25, 2006, before Terry Barbano
     Burke, RMR-CRR and Notary Public.
17   APPEARANCES:
18        THOMAS ALLINGHAM, ESQUIRE
          BRIAN LENHARD, ESQUIRE
19        One Rodney Square
          Wilmington, Delaware 19801
20        For the Plaintiff
21
          WILCOX & FETZER
22   1330 King Street - Wilmington, Delaware 19801
          (302) 655-0477
23        www.wilfet.com
24
```

**Page 2**

```
 1   APPEARANCES (cont'd):
 2        JARROD SHAU, ESQUIRE
          Drinker, Biddle & Reath, LLP
 3        One Logan Square
          18th and Cherry Streets
 4        Philadelphia, Pennsylvania 19103-6996
          For the Defendants
 5
     ALSO PRESENT:
 6
          TIMOTHY KEARNS
 7        MARK BUCKMASTER, Video Specialist
 8
 9        VIDEO SPECIALIST:  This is the videotape
10   deposition of Harvey L. Walls, taken by the plaintiff
11   in the matter of Dobrich, et al., versus Indian River
12   School District et al., Civil Action No. 05-120, held
13   at 31 Hosier Street in Selbyville, Delaware, on
14   October 25th, 2006, at approximately 1:32 p.m.
15        The court reporter is Terry Burke from
16   the firm of Wilcox & Fetzer.  My name is Mark
17   Buckmaster, a video specialist with Discovery Video
18   Services, Incorporated, in association with Wilcox &
19   Fetzer.
20        Counsel will now introduce themselves and
21   the reporter will swear in the witness.
22        MR. ALLINGHAM:  I'm Tom Allingham.  I
23   represent the plaintiffs, and along with me are Tim
24   Kearns and Brian Lenhard.
```

**Page 3**

```
 1        MR. SHAU:  I'm Jarrod Shau and I
 2   represent the defendants in this action.
 3        HARVEY L. WALLS,
 4   the deponent herein, having first been
 5   duly sworn on oath, was examined and
 6   testified as follows:
 7   BY MR. ALLINGHAM:
 8   Q.   Have you ever been deposed before, Mr. Walls?
 9   A.   Yes.
10   Q.   When?
11   A.   I'm not sure of the date.  Somewhere around
12   the late 90's for a district staff employee that had
13   sued the district.
14   Q.   I am going to ask you some questions.  Please
15   tell me if you don't understand the question or if you
16   think it's ambiguous.
17        If you answer the question, I will
18   assume, and I think the judge and the jury will assume,
19   that you understood it.  So let me know and I'll try to
20   fix the question if you have a problem.
21        You have to answer out loud yes or no,
22   not uh-huh or uh-uh.
23        And lastly, I freely confess that I tend
24   to interrupt people.  I'll try not to do that.  You
```

**Page 4**

```
 1   should try not to interrupt me or assume that you know
 2   that what the answer to my question is, because the
 3   court reporter can't take down both of us at once;
 4   okay?
 5        Do you know who the Doe family are?
 6   A.   No.
 7   Q.   Has anyone ever told you that they know who
 8   the Doe family are?
 9   A.   Not to my knowledge.
10   Q.   Have you spoken with anyone who has already
11   given their deposition in this matter?
12   A.   I have spoken to Dr. Hattier and Mrs. Bunting.
13   Q.   When did you speak to Dr. Hattier?
14   A.   Oh, probably a week or two ago.
15   Q.   And what was the substance of your
16   conversation, what did he say?
17   A.   Just basically that it went quite a long time.
18   Q.   Anything else?
19   A.   We talked about, a little bit about the type
20   of stuff you might be covering or asking or something,
21   but exactly what I couldn't tell you.
22   Q.   Do you recall that Dr. Hattier told you any
23   questions that he was asked?
24   A.   No.  He told me that you and him got into some
```

1   supreme being, being Jehovah or Jesus or Buddha or
2   Allah and whatever. And sectarian I take to mean as
3   you can't, it would be basically a generality, only
4   mentioning God and nothing else.
5       Q.   All right. So taking that as the definition
6   of sectarian and non-sectarian, the prayers that were
7   offered over the 14 years of your service on the board,
8   were they sectarian or non-sectarian?
9       A.   I would say 90 percent were probably
10  non-sectarian.
11      Q.   Non-sectarian?
12      A.   Yes.
13      Q.   So would I be correct in understanding that
14  the board's practice over the 14 years of your tenure
15  was to offer non-sectarian prayers to open its
16  meetings?
17      A.   I don't know that that was a practice. I
18  don't know that anyone in particular was told give
19  non-sectarian or sectarian prayer, to my knowledge.
20  Whoever gave the prayer gave the prayer however they
21  wanted to give it.
22      Q.   All right.
23           Who drafted BDA.1?
24      A.   This was drafted by Tom Neuberger.

                        13

1   the policy?
2       A.   It all depends on the type of policy that it
3   was. I mean sometimes the board would think that a
4   policy would be needed in a certain area and they woul
5   make a recommendation to the policy committee and th
6   would then consider it, come back with a draft.
7           Other times it could be that the state,
8   department of education or federal education departmel
9   would come down and say, you need to have a policy in
10  this area. Then it would go through a policy committee
11  and to the board.
12          Many times also it would go to the
13  district's lawyer before it would come to the board.
14      Q.   Who was the district's lawyer in 2004?
15      A.   James Griffin.
16      Q.   Did this policy go to the district's lawyer?
17      A.   I believe it did, but I can't say for sure.
18      Q.   Well, in 2004, you were the president of the
19  board; correct?
20      A.   I think so.
21      Q.   And you were the head of the policy committee?
22      A.   Yes.
23      Q.   Who would know better than you whether this
24  policy went to the district's lawyer before it went to

                        15

1       Q.   How long did the policy committee consider the
2   board prayer policy before it presented the proposed
3   policy to the full board for first reading?
4       A.   Just long enough to get it into draft form.
5   In other words, assigning the letters to it.
6           The actual wording in it was not left up
7   to the policy committee. It was brought to the board
8   by myself.
9       Q.   Was the actual language of the board prayer
10  policy considered by the policy committee at any time?
11      A.   No.
12      Q.   How long did you serve on the policy
13  committee?
14      A.   Out of 14 years, probably 11 or 12.
15      Q.   Okay. Was there an ordinary process for the
16  drafting, consideration and adoption of board policies?
17      A.   The normal process would be it would come
18  through the policy committee and then from the policy
19  committee to me or the policy committee chairman woul
20  bring it to the board.
21      Q.   What was the normal process for drafting a
22  policy?
23      A.   Various.
24      Q.   Tell me the ways that you went about drafting

                        14

1   the full board?
2       A.   Probably a district administrator off the
3   policy committee that sent it to Mr. Griffin.
4       Q.   Who would that be?
5       A.   I don't know. It could be Mr. Savage or
6   Mrs. Bunting.
7       Q.   That would be Susan Bunting?
8       A.   Yes.
9       Q.   How did it come about that the policy
10  committee undertook to consider a school board prayer
11  policy?
12      A.   Because of the original complaint from
13  Mrs. Dobrich.
14      Q.   And would you describe how that original
15  complaint was transmitted to, either to the board or to
16  the policy committee?
17      A.   The original complaint I think had to do with
18  graduation services and baccalaureate services.
19  During, there was also a complaint at a public meeting
20  I think in August or so of that year about prayer at
21  board meetings. I believe that complaint came from the
22  ACLU representative who was there.
23          At that point, that's where the policy
24  committee got looking at three different areas of the

                        16

Walls, Harvey  10/25/2006  4:42:00 PM

1    president Reginald Helms."
2         Does that refresh your recollection that
3    it was Mr. Helms who first contacted Mr. Neuberger?
4    A.   It could have been.
5    Q.   You still don't recollect?
6    A.   I'm not sure.
7    Q.   Did the board ever retain Mr. Neuberger or The
8    Rutherford Institute to represent it in connection with
9    this lawsuit and the issues presented?
10   A.   Technically, no.
11   Q.   And did Mr. Helms ever retain Mr. Neuberger to
12   represent him individually in connection with this
13   lawsuit?
14   A.   I believe he did.
15   Q.   And how do you know that Mr. Helms retained
16   Mr. Neuberger?
17   A.   I believe he announced that to the board.
18   Q.   Do you know whether Mr. Helms signed a
19   retention agreement with Mr. Neuberger?
20   A.   I would not know.
21   Q.   Is it your practice as board president when
22   you retain a lawyer or a law firm on the district's
23   behalf to sign a retention agreement with that lawyer?
24   A.   The actual board president, no.  It may very

25

1    paragraphs continuing over to the last page.
2    A.   Uh-huh.
3         Right.
4    Q.   Are they substantively identical to the board
5    policy as adopted?
6    A.   They are.
7    Q.   Is this the document in which Mr. Neuberger
8    transmitted to you, apparently through Mr. Helms, the
9    text of the policy that you prepared to the board on
10   September 29th?
11   A.   Yes.
12   Q.   And is this the first time that this text was
13   transmitted to you from Mr. Neuberger?
14   A.   I don't know.
15   Q.   When you received this document, PX-34, did
16   you review it?
17   A.   Yes.
18   Q.   Did you see anything in it that you thought
19   was inaccurate?
20   A.   I don't know about inaccuracies, but I believe
21   I recollect, after seeing it, my recommendation to the
22   board was the numbered items as policies on the last
23   two pages as the actual policy.
24   Q.   Yes, sir.  You recommended to the full

27

1    well have been the superintendent.
2    Q.   It is the practice of the district when it
3    retains lawyers to execute a retention agreement; is
4    that right?
5    A.   I believe so.
6    Q.   Okay.
7         Let me show you what's been marked as
8    PX-34.
9         I gather that you have seen this
10   document?
11   A.   I am sure I have.
12   Q.   The first page reflects it was faxed from
13   Mr. Helms to you on September 2nd, 2004; is that
14   correct?
15   A.   That's what it says on the front.
16   Q.   You have no reason to doubt that, do you?
17   A.   No.
18   Q.   Looking at the content of the fax, do you
19   recall having seen this document?
20   A.   I am sure I have seen it.  I just don't
21   necessarily remember it.
22   Q.   Look at the next to the last page of the
23   package which we have marked.  Down at the bottom o
24   the page, you will see that there are five numbered

26

1    board --
2    A.   I did not recommend that all these other pages
3    be part of the policy.
4    Q.   In making that recommendation and ultimately
5    voting to adopt policy BDA.1 on school board prayer,
6    did you take into consideration as one factor in your
7    decision the material provided by Mr. Neuberger in
8    PX-34?
9    A.   Well, obviously I considered the last two
10   pages.
11   Q.   Yes, that seems clear.  Did you also take into
12   account the materials provided in the first four pages
13   of the fax?
14   A.   I certainly read them.
15   Q.   And did you take them into account?
16   A.   Yes.
17   Q.   The information provided was one of the
18   factors that you considered in voting to adopt the
19   policy; is that right?
20   A.   Yes.
21   Q.   On Page 2 of Mr. Neuberger's memo, about
22   two-thirds of the way down the page in the last whereas
23   clause on that page, PX-34 reflects, "The school board
24   has retained the legal advice" -- sorry.  I'll start

28

1    actual substance of the board policy, no, it was not
2    discussed at that meeting.
3      Q.  Are most board policies discussed at a policy
4    committee meeting?
5      A.  Yes.
6      Q.  Why was this one not discussed?
7      A.  Because I did not want to subject the
8    administrators on the policy committee to any portion
9    of that policy because I figured -- I thought this was
10   a policy completely affecting the board.
11     Q.  And only the board?
12     A.  Yes.
13     Q.  Okay.  And that's reflected in the first
14   sentence of Paragraph 4, "Such prayer is voluntary and
15   it is among only the adult members of the board"?
16     A.  Yes.
17     Q.  I take it that it was your view that to
18   accomplish its purpose, that is, to solemnify its
19   proceedings, the board could accomplish that purpose b
20   having a member open its meeting with a prayer;
21   correct?
22     A.  Yes.
23     Q.  That would be an effective way to solemnify
24   the proceedings?

41

1    half, no.
2      Q.  Did you have a piece of paper that you
3    brought, the piece of paper on which the disclaimer was
4    written, that you took with you to each meeting --
5      A.  Yes.
6      Q.  -- so that you'd know what to read?
7      A.  Yes.
8      Q.  Do you still have that piece of paper?
9      A.  No.
10     Q.  Did you give it to Mr. Bireley?
11     A.  I more than likely did.
12     Q.  Okay.
13         Mr. Bireley testified that that
14   disclaimer consists of Paragraphs 1 and 4 of the board
15   policy.  Is that your recollection?
16     A.  I never really put the two together, but now
17   that I read them, I would say that's probably it.
18     Q.  Am I right in understanding, Mr. Walls, that
19   it is the intention of the board prayer policy that no
20   one other than the adult members of the board would b
21   the object of the prayer?
22     A.  That is the object.
23     Q.  Am I then correct that in order to solemnify
24   its proceedings, the prayer among the adult members o

43

1      A.  Yes.
2      Q.  The board of education could also solemnify
3    its proceedings by having a member request a moment
4    silence; correct?
5      A.  That's correct.
6      Q.  And that would be an effective way to
7    solemnify the proceedings?
8      A.  Yes.
9      Q.  At the October 19th, 2004 board meeting when
10   the policy was adopted, you were president of the
11   board; correct?
12     A.  I'm sure I was.
13     Q.  And did you invite someone to open the meeting
14   with a prayer or moment of silence?
15     A.  I'm sure I did.
16     Q.  Do you know whether you read a disclaimer of
17   some kind before the member offered the moment of
18   silence or the prayer?
19     A.  I probably did.
20     Q.  Did you have it written down?
21     A.  Yes.
22     Q.  Do you know what the text of that disclaimer
23   consisted of?
24     A.  Not after having not read it for a year and a

42

1    the board could take place outside of the regular
2    meeting immediately before the meeting?
3      A.  It could, but in my mind, that wouldn't
4    solemnify the meeting.
5      Q.  Could you explain to me why not?
6      A.  The actual board meeting is the board's
7    meeting that happens to be held in public.  I would say
8    that there are Sunshine Laws that would prohibit the
9    board from getting together before the meeting and then
10   going in and holding the meeting.
11     Q.  Have you completed your answer?
12     A.  To my knowledge, the board can't meet unless
13   it advertises the meeting and opens it to the public.
14   So if the board were to meet outside in the hallway
15   with no one around, that would be an illegal meeting.
16     Q.  Have you completed your answer?
17     A.  Yes.
18     Q.  Did you ever request advice from anyone on
19   that topic?
20     A.  No, not that I can remember.
21     Q.  Do you recall any discussion of that opinion,
22   that is, that to meet immediately, immediately prior to
23   walking on stage and taking your seats at the board
24   meeting, to meet solely for the purpose of having a

44

Walls, Harvey  10/25/2006  4:42:00 PM

1  of the board?
2    A.  No.
3    Q.  Okay.
4    A.  Not a regular scheduled.
5    Q.  Yes, and we're talking about regular board
6  meetings --
7    A.  Yes.
8    Q.  -- because that's what the board prayer policy
9  applies to; correct?
10    A.  Right.
11    Q.  All right.  One difference between standing in
12  the wings and having a prayer among the adult board
13  members and walking on stage and having a prayer onc
14  you sit down at the table is that there's an audience
15  for the on stage prayer; correct?
16    A.  That's one difference.
17    Q.  Okay.  With respect to the solemnification of
18  the proceedings, can you think of any other difference
19  between the off stage prayer and the on stage prayer?
20    A.  I don't know the differences.  You have
21  mentioned one.
22    Q.  Is there any other difference that you can
23  think of, in terms of the impact on solemnifying the
24  proceedings, between a prayer off stage and a prayer o

49

1  stage?
2    A.  Not that I can think of.
3    Q.  Okay.  Now let's talk about the difference in
4  the impact on the solemnification of the board's
5  proceedings because there's an audience for the on
6  stage prayer.  Okay?
7        Is that because, in your judgment, is
8  that because the members of the audience also get the
9  benefit of setting the tone for the meeting in the on
10  stage prayer?
11    A.  I would say they would get the benefit.
12    Q.  And they get the benefit because they observe
13  and participate in the prayer; is that correct?
14    A.  No.
15    Q.  So they're not participating in the prayer?
16    A.  No.
17    Q.  Then how does it have an impact on them in
18  terms of setting the tone for the meeting?
19    A.  I would think anybody who asks for guidance
20  doesn't do it just asking for himself or herself.
21  Normally people, when a prayer is given, are respectful
22  even though they're not asked to participate.
23    Q.  When prayers are offered at board meetings, do
24  you participate?

50

1    A.  I have.
2    Q.  Were there board meetings where you didn't
3  participate?
4    A.  Where I didn't participate in the prayer?
5    Q.  Did not participate in the prayer?
6    A.  No.
7    Q.  What do you do to indicate -- when you're not
8  leading the prayer, what do you do to indicate that
9  you're participating?
10    A.  I don't know that I have to indicate anything.
11    Q.  I didn't say that you had to.  Do you do
12  anything to indicate that you're participating in the
13  prayer?
14    A.  Occasionally I may say "amen" at the end.
15    Q.  Do you bow your head?
16    A.  Yes.
17    Q.  Do you fold your hands in prayer?
18    A.  I don't fold my hands, no.
19    Q.  Do you close your eyes when the prayer is
20  offered?
21    A.  Yes.
22    Q.  Is that your consistent practice to close your
23  eyes and bow your head?
24    A.  Yes.

51

1    Q.  Would it be your expectation that members of
2  the audience would close their eyes and bow their head
3  during the offering of the prayer?
4    A.  I have no expectation for the audience.  They
5  can do whatever they wish.
6    Q.  In your view, Mr. Walls, is it necessary for a
7  member of the board to open board meetings with a
8  prayer in order to solemnify the proceedings?
9    A.  Is it necessary?
10    Q.  Yes.
11    A.  No.
12    Q.  To state it from the other direction, the
13  board would -- it's your expectation that the board
14  would conduct its proceedings in a solemn and dignifiec
15  and disciplined way whether it opened the meeting with
16  a prayer or not, isn't that correct?
17    A.  Yes.
18    Q.  In special meetings of the board, it has been
19  the practice not to open those meetings with a prayer;
20  correct?
21    A.  Correct.
22    Q.  Those meetings have been conducted, I take it,
23  in a solemn, respectful and disciplined way?
24    A.  Hopefully.

52

Unsigned                                    Page  49 - 52

1    A.  Yes, I heard it.
2    Q.  And did you find that disturbing as you
3  watched it, that people would be laughing at a
4  description of somebody disappearing?
5    A.  Yes.  But I don't believe you saw me laughing
6  on there.
7    Q.  I don't think I did.
8         Was it your voice at the beginning of
9  the segment that I played for you that said something
10  along the lines of, "Sorry, Harold, I was going to say
11  Earl"?
12    A.  It could have been.  And I don't know why I
13  would have said that.
14    Q.  Do you recall that the August 24th meeting was
15  opened with a prayer?
16    A.  Yes.
17    Q.  You invited Dr. Hattier to give that prayer --
18    A.  That's correct.
19    Q.  -- correct?
20    A.  Correct.
21    Q.  Did you know what prayer he was going to give?
22    A.  I did.
23    Q.  How did you find out what prayer he was going
24  to give?

85

1    A.  He told me ahead of time when I asked him to
2  give the prayer.  He told me it would be one by George
3  Washington.
4    Q.  Do you know whether Dr. Hattier told anyone
5  else what prayer he was going to give?
6    A.  I don't know that.
7    Q.  Did you tell anyone else what prayer
8  Dr. Hattier was going to give?
9    A.  I don't know if I did or not.
10    Q.  Do you recall that state representatives spoke
11  at the meeting?
12    A.  Yes, there were three.
13    Q.  Do you recall that they read a letter?
14    A.  Yes.
15    Q.  Do you recall that the letter indicated
16  knowledge of the prayer that Dr. Hattier was going to
17  give?
18    A.  I don't recall that.
19    Q.  Have you ever served as a member of any other
20  public body than the Indian River School Board?
21    A.  Yes.
22    Q.  What bodies?
23    A.  The Georgetown Jaycees, Sussex Central Pop
24  Warner Football.  I was president of that for two

86

1  years.  Something else too.
2         I have been a coach in Little League
3  baseball and Little League wrestling and football.
4         Oh, American Legion, I'm a member of
5  that too.
6    Q.  I should have asked you this at the beginning
7  of the deposition.  Are you employed?
8    A.  Yes.
9    Q.  And what is your position?
10    A.  I'm a crematory manager at Parsell Funeral
11  Homes.
12    Q.  And is that in Georgetown?
13    A.  That's one of them.  It has four branches.
14    Q.  And have you had -- did you have that job
15  throughout your tenure as a school board member?
16    A.  No.
17    Q.  What did you do?
18    A.  I worked at E.I. du Pont in Seaford until
19  2001.
20    Q.  And that's when you took the job --
21    A.  Yes.  I retired from DuPont and took the job
22  with the funeral home.
23    Q.  Thank you.
24         Were you surprised at the amount of

87

1  attention that the school board prayer issue got?
2    A.  Yes.
3    Q.  Do you think that it attracted more attention
4  than it deserved among all the issues presented to the
5  school board?
6    A.  Oh, definitely.
7    Q.  I am going to ask you some questions about why
8  it might have gotten as much attention as it got.
9         Did you ever hear any constituent say to
10  you -- and by constituent, I mean student, parent,
11  resident of the district, fellow board member,
12  whatever -- did you ever hear any constituent say to
13  you, in words or substance, that the defense of this
14  lawsuit was a defense of Christian values?
15    A.  I've heard that said.
16    Q.  And could you tell me who you heard that from?
17    A.  No, I couldn't.
18    Q.  Could you tell me the group of which the
19  person who said that was a member?
20    A.  No.
21         MR. ALLINGHAM:  All right.  We have to
22  change the tape.  Thank you.
23         VIDEO SPECIALIST:  Going off the record
24  at 3:35 p.m.

88

Unsigned                                    Page  85 - 88

Walls, Harvey  10/25/2006  4:42:00 PM

1     (Recess.)
2     VIDEO SPECIALIST:  Going back on the
3  record at 3:41 p.m.
4  BY MR. ALLINGHAM:
5     Q.  Right before we broke, Mr. Walls, I asked you
6  whether you had heard from anyone that the defense of
7  this lawsuit represented the defense of Christian
8  values, and you said yes.  I asked you who said it, and
9  you didn't remember.  I asked you from what group, and
10  you didn't remember that either.
11     Is it fair to say that you heard it more
12  than once, however?
13     A.  Yes, I'd say that's fair to say.
14     Q.  When I asked you questions about the
15  attendance, expected attendance --
16     A.  At the big meeting.
17     Q.  -- at the August 24th meeting, you told me you
18  knew it was going to be a big meeting, but you really
19  didn't know that, that you just hear things in Sussex
20  County; right, correct?
21     A.  Correct.
22     Q.  Is it fair to say that it is a widely held
23  view in the Indian River District that the defense of
24  this lawsuit represents a defense of Christian values?

89

1     A.  There's a lot of perceptions out there about
2  this lawsuit, I think, and not all of them are correct.
3     Q.  That may or may not be true, but it's not
4  100 percent responsive to my question.
5     Would you agree with me that it's a
6  widely held view in the district that the defense of
7  this lawsuit is a defense of Christian values?
8     A.  It's probably widely held in this district.
9     Q.  You mentioned some potential misperceptions
10  about this lawsuit.
11     A.  Uh-huh.
12     Q.  Could you tell me what you had in mind when
13  you said that?
14     A.  I hear things from time to time or see things,
15  and I wondered where the people are coming from beca
16  they act like they know, but I know that they don't.
17     Q.  So when you said that, you didn't have any
18  particular misperception in mind?
19     A.  No.
20     Q.  Is it fair to say that a lot of the comments
21  at the August 24th board meeting reflected a
22  misperception about what the board was considering at
23  that time?
24     A.  Yes.

90

1     Q.  And is that, was that misperception or did the
2  comments reflect a misperception that the issue was
3  prayer in the schools rather than --
4     A.  Yes.
5     Q.  -- school board?
6     A.  I heard that from several of the speakers.
7     Q.  Am I correct that you and the other board
8  members did not try to correct that misperception
9  because the public comment section is meant to be an
10  opportunity for the board to hear from the public and
11  not vice versa?
12     A.  Correct.
13     Q.  And that's something that the superintendent
14  had urged the board to remember; correct?
15     A.  Yes.
16     Q.  Do you know whether at any time before or
17  after the adoption of the board prayer policy a member
18  of the public asked for a copy of the proposed policy
19  and was -- and that request was declined?
20     A.  I don't remember if somebody specifically
21  asked.
22     Q.  You never heard that a person asked for a copy
23  of the policy and was told that if they wanted it, they
24  should file a Freedom of Information Act request?

91

1     A.  I don't remember that.
2     Q.  That would be contrary to --
3     A.  I mean but if this was the draft policy you're
4  talking about?
5     Q.  Yes, yes.
6     A.  I can't see why someone would want a draft
7  policy.
8     Q.  Well --
9     A.  And I don't know that the board has ever given
10  out a draft policy before it's actually adopted.
11     Q.  What is the purpose of the readings of the
12  policies?
13     A.  In case the board has second thoughts or wants
14  to make changes on something, it gives a chance to do
15  that.
16     Q.  It is not intended to give the public an
17  opportunity to review and comment on the policies?
18     A.  After the first reading, yes, but I'm not
19  giving something out to the public before I give to the
20  board on a first reading.
21     Q.  I thought we might be misunderstanding one
22  another.
23     I'm talking about a request made for the
24  proposed policy after the first reading?

92

Unsigned                               Page  89 - 92

# EXHIBIT 16

Wilson, Robert  12/14/2006  1:08:00 PM

**Page 1**

FOR THE DISTRICT OF DELAWARE

MONA DOBRICH and MARCO )
DOBRICH, Individually and )
as parents and next friend )
of ALEXANDER DOBRICH, )
SAMANTHA DOBRICH, JANE DOE )
and JOHN DOE, Individually )
and as parents and next )
friend of JORDAN DOE and )
JAMIE DOE, )
          )
    Plaintiffs, )
          ) Civil Action
v.         ) No. 05-120
          )
INDIAN RIVER SCHOOL, )
DISTRICT, et al., )
          )
    Defendants. )

Videotaped Deposition of ROBERT WILSON,
taken pursuant to notice at 31 Hosier Street,
Selbyville, Delaware, beginning at 1:08 p.m., on
Thursday, December 14, 2006, before Terry Barbano
Burke, RMR-CRR and Notary Public.

APPEARANCES:
   RICHARD S. HORVATH, JR., ESQUIRE
   BRIAN LENHARD, ESQUIRE
   One Rodney Square
   Wilmington, Delaware  19801
   For the Plaintiff
      WILCOX & FETZER
   1330 King Street - Wilmington, Delaware 19801
      (302) 655-0477
      www.wilfet.com

**Page 2**

1  APPEARANCES (cont'd):
2    JARROD SHAU, ESQUIRE
     Drinker, Biddle & Reath, LLP
3    One Logan Square
     18th and Cherry Streets
4    Philadelphia, Pennsylvania 19103-6996
     For the Defendants
5
  ALSO PRESENT:
6
     Lindsay duPhily, Videographer
7
8      - - -
9      VIDEO SPECIALIST:  This is a videotape
10  deposition of Mr. Robert Wilson taken by the plaintiff
11  in the matter of Dobrich, et al. versus Indian River
12  School District, et al., Civil Action No. 05-120.
13      This is being held in the Indian River
14  School District offices, 31 Hosier Boulevard,
15  Selbyville, Delaware.
16      We are going on the record on December
17  14th, 2006, at approximately 1:08 p.m.
18      The court reporter is Terry Burke from
19  the firm of Wilcox & Fetzer, Wilmington, Delaware. My
20  name is Lindsay duPhily and the videographer specialist of
21  Discovery Video Services.
22      Counsel will now introduce themselves and
23  then the court reporter will swear in the witness.
24      MR. HORVATH: My name is Richard Horvath.

**Page 3**

1  I am here on behalf of the plaintiffs, along with Brian
2  Lenhard.
3      MR. SHAU:  My name is Jarrod Shau.  I'm
4  here on behalf of the defendants.
5      THE WITNESS:  My name is Robert Wilson.
6      ROBERT WILSON,
7    the deponent herein, having first been
8    duly sworn on oath, was examined and
9    testified as follows:
10  BY MR. HORVATH:
11    Q.  Mr. Wilson, you are a member of the Indian
12  River School Board; correct?
13    A.  That's right.
14    Q.  You have been a member since July 2006?
15    A.  That's right.
16    Q.  And I am going to show you what has been
17  marked PX-9.  This is a copy of the school board prayer
18  policy.
19    Since you joined the school board, have
20  you reviewed this policy?
21    A.  Yes.
22    Q.  When did you review it?
23    A.  Pretty much when I first came on the board.
24    Q.  Was this policy given to you in a packet of

**Page 4**

1  other district policies?
2    A.  Pretty much.  Well, no.  This was actually by
3  itself.
4    Q.  By itself?
5    A.  By itself.
6    Q.  Who gave it to you?
7    A.  I do not recall.  I do not recall.
8    Q.  Was it given to you at a school board meeting?
9    A.  Yes, it was.
10    Q.  And it was given to you after you joined the
11  board as a part of your orientation?
12    A.  Yes -- no, not necessarily as an orientation,
13  but it was given to me after I joined the board.
14    Q.  And after you received the policy, did you
15  discuss with any board members how the board prayer
16  policy operates?
17    A.  No.
18    Q.  Have you discussed with any school board
19  members what prayers would be prohibited under the
20  policy?
21    A.  No.
22    Q.  Have you discussed with any school board
23  members why the board opens its public meetings with
24  prayer?

1   want. It's just like a Jehovah Witness coming to my
2   house. I listen to what they have to say. I don't
3   agree with it, I'm not rude and I'm not ignorant.
4        The same thing is with other types of
5   religions. I'm very tolerant of other religions. If
6   they want to share that with me. I'm not saying my
7   religion's the only religion. That's not exactly at
8   all what I'm trying to do.
9        That's just my way of being taught,
10  that's my teaching. That's what I believe.
11       An atheist believes there's not a God.
12  That's his belief. That's fine.
13  Q.   You said same opportunity. Do you understand
14  that the opportunity we're talking about here is
15  offering a prayer at the start of school board
16  meetings?
17  A.   Yes.
18  Q.   Are members of the community who are not
19  school board members offered an opportunity to give a
20  prayer at the start of school board meetings?
21  A.   No.
22  Q.   So they don't have the same opportunity that
23  you have when it comes to offering a prayer at school
24  board meetings?

29

1   you physically when you ask for the intervention?
2   A.   Yes, it does. I think when you do it in the
3   public like that, I think it shows that you can come
4   together, and that's one thing that a lot of people
5   have in common. And when we say a prayer at a board
6   meeting, 99 percent of the people do take part.
7   Q.   Of the people, you mean the people present?
8   A.   Of the people present, they do take part. I
9   have been able to look around at several times and
10  there are people that have heads bowed. We have not
11  had anybody run out in a rave, I guess you would say.
12  It's just a way to publicly come together as a board.
13  Q.   Thank you, sir.
14       The board prayer in some way is for the
15  benefit of everyone in attendance?
16  A.   That's exactly right.
17  Q.   And the public will not benefit from that if
18  the board prayer is outside of the public's presence?
19  A.   I don't think it shows the same kind of unity.
20  We want the public to take part in the prayer. That's
21  the whole thing behind the public board meeting. If a
22  person wants to come forward after a meeting and say
23  that there was an issue with that, I can see us
24  changing it, rewording it, working with them, maybe

31

1   A.   No.
2   Q.   Why is it of the utmost importance to ask and
3   pray for divine guidance from Our Heavenly Father?
4   A.   I would say, I have to look at our
5   Constitutional government, our House of Representative
6   opens up with a word of prayer. Why is it important
7   for them to do it? We feel -- I think people on the
8   board feel whether it -- when we pray to God, now
9   understand that a God, when I say God, I'm praying to
10  God, or you're praying to God, you could mean Allah or
11  any other God, but praying to God is praying to God.
12  Do you understand what I mean by that?
13  Q.   Unfortunately, sir, I don't feel like you're
14  answering my question. I asked you why is it
15  important?
16  A.   It's more of a -- it's just a way, I guess, we
17  communicate through God asking for his divine
18  intervention. Okay, to a God for divine intervention,
19  whether it be my God or another person's God.
20  Q.   Do you believe that divine intervention will
21  help you make better decisions?
22  A.   Yes, I do.
23  Q.   It doesn't matter where you ask for divine
24  intervention, does it? And by where, I mean where are

30

1   even offering them to say a prayer.
2   Q.   Do you think that's likely after what happened
3   to the Dobriches?
4   A.   Yes, I do.
5   Q.   I am going to show you a copy of what's been
6   previously marked as PX-72.
7        It's a copy of the May 3rd, 2006 issue
8   of the Delaware Wave.
9   A.   Okay.
10  Q.   If you will look on the second page, it's
11  marked P-2439 at the bottom. I think you're already on
12  it.
13  A.   Yeah.
14  Q.   Were you sent a series of questions for this
15  article?
16  A.   Yes, I was.
17  Q.   And did one of those questions involve the
18  prayer suit?
19  A.   I don't -- let me look here and I'll tell you.
20       It evidently was, yes.
21  Q.   You responded to, I guess it's a query, On
22  board's refusal to settle prayer suit, your response
23  was, "I am very proud of this school board and the
24  stand they took. It took a lot of courage to stand

32

# EXHIBIT 17

# Indian River
# School District

# 2004

# Academic
# Achievement
# Banquet

*May 13, 2004*
*6:30 PM*
*Southern Delaware*
*School of the Arts*

## Program

| | |
|---|---|
| *Welcome* | Denise C. Speicher<br>Supervisor Of Secondary Instruction |
| *Musical Selections* | Southern Delaware School of Arts "The Road Show"<br>Conducted by Frank Mahoney |
| *Invocation* | Reverend Marvin Morris |

### Dinner

| | |
|---|---|
| *Remarks* | Lois Hobbs, Superintendent<br>Indian River School District |
| *Guest Speaker* | Dr. Jackie O. Wilson |
| *Presentations* | Harvey Walls, President, Board of Education<br>Lois Hobbs, Superintendent<br>Mark Steele, Principal, Indian River High School<br>Donna Hall, Principal, Sussex Central High School<br>Ray Steele, Asst. Principal, Indian River High School<br>Duncan Smith, Asst. Principal, Sussex Central High School<br>Tim Slade, Asst. Principal, Sussex Central High School |
| *Benediction* | Reverend Marvin Morris |

Dinner Catered by Georgia House

## Guests of Honor

| | | |
|---|---|---|
| Ashley Adams | Cassandra M. Gibbs | Dana Peragallo |
| Mark D. Ahlfeldt | Benjamin T. Gichner | Bonnie Plum |
| Melissa Alesi | Richard J. Giorgilli | Jacquelyn M. Powers |
| Stephen C. Alesi | Jordan R. Hale | Brittany Proudfoot |
| Lauren Baker | Timothy S. Hale | Michelle Pusey |
| Laura Bamaca | Cynthia Harvey | Thomas J. Reichert |
| Lucas F. Beam | Garrett A. Hastings | Stephanie L. Richter |
| Kathleen M. Bernsten | Tyler R. Hastings | Brandon K. Rickwood |
| Timothy V. Berzins | Marie Haughey | Kathryn R. Riley |
| Matthew T. Binsted | Christina A. Hensler | Gretchen A. Ritter |
| Begona Blasco | Lance Hickman | Karalyn A. Roach |
| Katie N. Blatzheim | Beth Hitchens | Peter O. Roenki |
| Andrew J. Bokinsky | Jamie Hoffer | Erin L. Sagers |
| Elizabeth Booth | Lauren Hoffman | Sean M. Santiago |
| Chad E. Brasure | Ashley R. Hudson | Glen Saunders |
| Scott D. Bulkeley | Amanda Hunsberger | Kristen Schaeffer |
| Jamie Bunting | Samantha Hyler | Whitney Shanefelter |
| Julie E. Butters | Cory Jackson | Lauren E. Sheats |
| Nicholas Cain | Brandy Jester | Krista K. Showalter |
| Catherine C. Clark | Amanda L. Johnson | Jonathan Siletta |
| Kate Collins | Thomas C. Jurusik | Darell Singleterry |
| Gwendolyn Conaway | Hyun Kim | Chelsea Sizemore |
| Andrew Cordell | Ji Kim | Dannitra Snead |
| Blaney Cordoba | Dezaray King | Elizabeth Stacey |
| Amanda Cordrey | Nicole E. Kline | Lindsay Steele |
| Richard Cordrey | Sara Lawrence | Rachel Stevenson |
| Mallory E. Cropper | Shannon Lecates | Tshnina Street |
| Elizabeth M. Daniel | Robin M. Lee | Pamela E. Townsend |
| Arthur E. Davidson | James M. Lewis | Brittany A. Truitt |
| Renee A. Davidson | Chelsea Leyh | Melissa Turpin |
| Amanda Dean | Chad Lingenfelder | Caitlind Twyford |
| Angela C. Delario | Julie Macklin | Allison Vari |
| Daniel Desiderio | Adam Maloney | Ann C. Veith |
| Samantha Dobrich | Charles Marshall | Stephanie Walls |
| Mary Ellen M. DuPont | Andrew Martin | Laura B. Walter |
| Brandi Eckler | Keili A. Marvel | Stephanie N. Ware |
| Edwin J. Edwards III | Kenneth Matthias | Kayla D. Warrington |
| Samuel Ehrick | Kalonna Maull | Lindsay Watson |
| Allison Erskine | Sara McCabe | Kaitlynn M. Wells |
| Erica E. Evans | Kelly A. McCreary | John Wheeler |
| Jennifer L. Evans | Colin McIlvaine | Kyle White |
| Stephanie Ewell | Sara Milam | Shanette White |
| Joyce Ferido | Lauren Miller | Heather Wilkerson |
| Timothy Fike | Holly C. Miskin | Tori Williams |
| Nicholas B. Firlein | Susan Mitchell | Sharde' N. Wise |
| Insley Fowler | Cara A. Morris | Maegen Wren |
| Fletcher Garrison | Trey Mumford | Jennifer Zezenski |
| Julie Garvilla | Joshua Myers | |
| Stacey Garvilla | Megan A. Orhelein | |

*Students in bold are those who have been honored four consecutive years.*

## Board of Education

Harvey Walls, President
Charles Bireley
Nina Lou Bunting
Richard Cohee
John Evans

Reginald Helms, Vice President
Gregory Hastings
Donald Hattier
Mark Isaacs
Elaine McCabe

## Administration

Lois M. Hobbs
Superintendent

Earl Savage
Asst. Superintendent

Susan Bunting, Ed.D.
Director, Dept. of Instruction

Jay Headman
Administrative Assistant

Denise C. Speicher
Supervisor, Secondary Instruction

Mark Steele
Principal, Indian River High School

Donna Hall, Ed.D
Principal, Sussex Central High School

Ray Steele
Asst. Principal, Indian River High School

Tim Slade
Asst. Principal, Sussex Central High School

Duncan Smith
Asst. Principal, Sussex Central High School

Appreciation is extended to the Southern Delaware School of the Arts and Indian River Educational Complex custodial staff for their cooperation and work towards preparation of the 2004 Academic Achievement Banquet. Further acknowledgement is given to Denise Speicher, Frank Mahoney & The Road Show, and Lauren Grise & her Southern Delaware School of the Arts Honor Society students. A special thanks also goes to Hans Anderson of the Southern Delaware School of the Arts for operating the sound system.

## "The Road Show"
### Dance Coordinator – Elizabeth Whealton
### Musical Arranger & Director – Frank Mahoney

Ryan Cannon
Victoria Clark
Shelby Collins
Cristin Corbin
Kelsey Daisey
Michelle Giorgilli
Alex Gundermann

Maurice Hein
Lucas Kerns
Colleen Mahaffie
Wayde Marsh
Eli Mumford
Alyssa Murray
Nicole Nadig

J. T. Norton
Chris Pridgeon
Sarah Purdum
Zack Smith
Latoya Walters
Matt Wiltshire

# EXHIBIT 18

*Indian River*
*School District*

*2003*

*Academic*
*Achievement*
*Banquet*

*May 14, 2003*
*6:30 PM*
*Southern Delaware*
*School of the Arts*

P 0342

## Program

| | |
|---|---|
| Welcome | Denise C. Speicher<br>Supervisor Of Secondary Instruction |
| Musical Selections | Southern Delaware School of Arts "The Road Show"<br>Conducted by Frank Mahoney |
| Invocation | Reverend Marvin Morris |

*Dinner*

| | |
|---|---|
| Remarks | Lois Hobbs, Superintendent<br>Indian River School District |
| Guest Speaker | Ileana Smith, Ed.D. |
| Presentations | Charles Bireley, President of Board of Education<br>Lois Hobbs, Superintendent<br>Mark Steele, Principal, Indian River High School<br>Donna Hall, Principal, Sussex Central High School<br>Ray Steele, Asst. Principal, Indian River High School<br>Duncan Smith, Asst. Principal, Sussex Central High School<br>Tim Slade, Asst. Principal, Sussex Central High School |
| Benediction | Reverend Marvin Morris |

## Menu

**Entrée**
Roast Beef au jus
Breast of Chicken

**Vegetables**
Mashed Potatoes
Broccoli with Cheese Sauce
Green Peas & Pearl Onions

**Salad**
Tossed Salad
Ambrosia

**Dessert**
Strawberry Tart

Hot Rolls -- Butter
Coffee – Iced Tea
Mints & Nuts

P 0343

## Guests of Honor

Ashley Adams
Melissa Adkins
Justin Albright
Melissa Alesi
Alexandra Ambrose
**Jamie Baker**
Lauren Beam
James Bennett III
Nicole Berzins
Courtney Betton
Linley Betton
Danielle Blake
Andrew Bokinsky
Brittany Booth
**Amber Brasure**
Chad Brasure
Jamie Bunting
**Nelson Bunting**
Sarah Burton
Timothy Butters
Jennifer Byus
Stacey Campbell
**Sheena Carter**
**William Chandler IV**
Michelle Ciampo
Catherine Clark
**Justin Cohee**
Jason Collins
Julie Collins
Kate Collins
Gwendolyn Conaway
**Heather Conroe**
Jeffrey Cook Jr.
Carin Corbin
Andrew Cordell
Bianey Cordoba
Brett Cordrey
Richard Cordrey
Maria Counts
Mallory Cropper
Elizabeth Daniel

Angela Delario
Erin DeMoss
Samantha Dobrich
Paige Doeberl
Amy Donovan
Mary DuPont
Stacey Dykes
Brandi Eckler
Edwin Edwards III
Candace Esham
Samantha Feld
Joyce Ferido
Timothy Fike
**Jessica Fisher**
Chelsie Frey
Jessica Garcia
Fletcher Garrison
Stacey Garvilla
Benjamin Gichner
Richard Giorgilli
Kaylynn Gland
Ronchelle Godwin
John Gooss
Shannon Gotte
**Jacqueline Gray**
Jordan Hale
Timothy Hale
**Katlin Harker**
Amanda Hastings
Grant Hastings
Tyler Hastings
Marie Haughey
Kyle Helke
Eric Henderson
Christina Hensler
Beth Hitchens
Joshua Hitchens
Jamie Hoffer
Matthew Hoffman
Lauren Hoffman
Ashley Hudson

Amanda Hunsberger
Samantha Hyler
Dona Inthaxoum
William Ireland Jr.
Cory Jackson
Daryl Jackson
**Kimberly Jones**
Thomas Jurusik
Jee Hee Kim
Dezaray King
Laura Kleinstuber
Nathaniel Kortvelesy
Sara Lawrence
Matthew Lewis
**Alexis Leyh**
Chelsea Leyh
Krista Littleton
Laura Long
**Ashley Lynch**
Julie Macklin
Adam Maloney
Charles Marshall
Aleni Martin
Andrew Martin
Ashleigh Martz
**Julie Matthias**
Kenneth Matthias
Amanda McCracken
Becky McDowell
**Erin McDowell**
Colin McIlvaine
Haley Mitchell
Susan Mitchell
Beth Moore
**Lindsey Moore**
Kyle Murray
Lagina Nosavanh
Jessica Nowacki
Megan Orhelein
**Bina Patel**
Dana Peragallo

Brittany Proudfoot
Michelle Pusey
Kathryn Riley
Gretchen Ritter
**Emily Robinson**
Erin Sagers
Glen Saunders
**Amanda Schleifer**
Ashley Schutt
Bradley Schutt
Louis Schwartz
Lauren Sheats
**Genny Shinn**
**Amanda Short**
**Ashley Short**
Krista Showalter
Darell Singleterry
Chelsea Sizemore
Margaret Stasi
Rachel Stevenson
**Shaun Thompson**
**Tiffany Tribbitt**
Eric Tsavdar
Melissa Turpin
Caitlind Twyford
Taylor Vanderhook
Dana Vogel
Laura Walter
Stephanie Ware
**Ryan Warner**
Kayla Warrington
Brandy West
Christopher White
Kyle White
Shanette White
Tyler Wilkins
Heather Willey
Tori Williams
Jessica Willing
Maegen Wren
Haley Wyatt

*Students in bold are those who have been honored four consecutive years.*

## Board of Education

Charles Bireley, President
Nina Lou Bunting
Richard Cohee
John Evans
Gregory Hastings

Harvey Walls, Vice President
Donald Hattier
Reggie Helms
Mark A. Isaacs
Elaine McCabe

## Administration

Lois M. Hobbs
Superintendent

Earl Savage
Asst. Superintendent

Susan Bunting, Ed.D.
Director, Dept. of Instruction

Denise C. Speicher
Supervisor, Secondary Instruction

Mark Steele
Principal, Indian River High School

Donna Hall, Ed.D
Principal, Sussex Central High School

Ray Steele
Asst. Principal, Indian River High School

Duncan Smith
Asst. Principal, Sussex Central High School

Tim Slade
Asst. Principal, Sussex Central High School

Appreciation is extended to the Southern Delaware School of the Arts cafeteria staff, as well as the Southern Delaware School of the Arts and Indian River Educational Complex custodial staff, for their cooperation and work towards preparation of the 2003 Academic Achievement Banquet. Further acknowledgement is given to Denise Speicher, Carmen Deldeo, Frank Mahoney & The Road Show, Lauren Grise & her Southern Delaware School of the Arts Honor Society students.

### "The Road Show"
Dance Coordinator – Elizabeth Whealton
Musical Arranger & Director – Frank Mahoney

| | | |
|---|---|---|
| J. T. Norton | Eli Mumford | Amy Johnson |
| Cristin Corbin | Emily Southmayd | Erin Kortvelesy |
| Wayde Marsh | Matt Wiltshire | Cori McCowan |
| Maurice Hein | Jeremy Pedersen | Nicole Nadig |
| Victoria Clark | Alyssa Murray | Erika Parlett |
| Andrea Picazo | Colleen Mahaffie | Cassidy Seabolt |
| Danielle Dell | Lucas Kerns | Loree Vickio |
| Kasey Cordell | Sarah Purdum | Chris Pridgeon |
| Kelsey Daisey | Emily Barton | Zach Smith |
| | Michell Giorgilli | |

EXHIBIT 19

# Indian River
# School District

# 2002

# Academic
# Achievement
# Banquet

May 15, 2002
6:30 PM
Southern Delaware
School of the Arts

# Program

| | |
|---|---|
| Welcome | Denise C. Speicher<br>Supervisor Of Secondary Instruction |
| Invocation | Reverend Marvin Morris<br>Booker Street Church of God |
| Musical<br>Selections | SDSA's "The Road Show"<br>Conducted by Frank Mahoney |
| | Dinner |
| Remarks | Lois Hobbs, Superintendent<br>Indian River School District |
| Guest Speaker | Everett Toomey, Ed.D. |
| Presentations | Charles Bireley, President Board of Education<br>Lois Hobbs, Superintendent<br>Mark Steele, Principal, IRHS<br>Donna Hall, Principal, SCHS<br>Ray Steele, Asst. Principal, IRHS<br>Duncan Smith, Asst. Principal, SCHS<br>Tim Slade, Asst. Principal, SCHS |
| Benediction | Reverend Marvin Morris |

# Menu

*Entrée*
Roast Beef au jus
Breast of Chicken

*Vegetables*
Mashed Potatoes
Broccoli with Cheese Sauce
Green Peas & Pearl Onions

*Salad*
Tossed Salad
Ambrosia

*Dessert*
Strawberry Tart

Hot Rolls — Butter
Coffee — Iced Tea
Mints & Nuts

# Guests of Honor

Ashley M. Adams
Melissa M. Alesi
Laura Bader
Jamie Baker
Lauren Beam
Richard Bell
Nicole Berzins
Danielle M. Blake
*Amanda L. Bly*
Brittany M. Booth
Amber R. Brasure
Kelly J. Brittin
Michelle Brittingham
Steven L. Brumberg
Tyler J. Bryan
*Jennifer L. Bunting*
Nelson J. Bunting
Stacey L. Campbell
Ashley B. Cannon
Nathan L. Carr II
Sheena L. Carter
Nicole E. Chafin
William B. Chandler
Aisha Choudhri
Catherine Clark
Justin Cohee
*Holly Collins*
Julie R. Collins
Angela J. Colone
Heather Conroe
Blaney Cordoba
John Cordrey
Brett A. Cordrey
Candy L. Couch
*Brittany A. Croll*
Mallory O. Cropper
Elizabeth M. Daniel
Christine L. Deck
Angela C. Delario
Megan B. Disharoon
Samantha Dobrich
*Danielle L. Dorman*
Stacey R. Dykes
Edwin J. Edwards III
Dayna L. Elliott
Candace E. Esham
*Candice A. Evans*
Samantha E. Feld
Joyce A. Ferido
Jessica Fisher
Insley M. Fowler
Samantha E. Frazier
Kaylynn R. Gland
Charmion A. Gray

Jacqueline Gray
Michelle C. Gray
*Heather R. Hale*
Jordan R. Hale
Katlin E. Harker
Renee L. Harmon
Candice R. Harris
Grant Hastings
*Angela M. Hauck*
Samantha C. Hauck
Crystal L. Haymond
Jennifer M. Hazzard
Jessica L. Hazzard
Kyle Helke
Eric J. Henderson
Christina Hensler
Mark D. Hernandez
Beth R. Hitchens
Jamie C. Hoffer
Lauren R. Hoffman
Meghan B. Howlett
Jessica L. Hudson
*Frank E. Hudson III*
Amanda Hunsberger
William Hyler
Dona Inthaxoum
*Nicole M. Ireland*
Daryl Jackson
Ashley Jones
Kimberly Jones
Jee Kim
Dezaray King
Laura A. Kleinstuber
Sara Lawrence
Robin E. Lee
Matthew D. Lewis
Alexis Leyh
Hien Luu
Ashley Lynch
Julie Macklin
*Lesley Maloney*
Aleni Martin
Andrew Martin
Ashleigh Martz
*Douglas M. Marvel*
Julie Matthias
Kenneth Matthias
Erin McDowell
Shannah Messick
Anthony Milam
Daniel Milam
Christopher Mirelder
Haley B. Mitchell
Beth Moore

Lindsey Moore
Ronald O. Morgan, Jr.
Leslie M. Morin
Matthew Murray
Jason T. Nauman
Lagina Nosavanh
*Craig S. Oliver*
Megan A. Orhelein
*Stephanie Parker*
David Parsons
Bina Patel
Devon E. Pennell
Dana Peragallo
*Colleen S. Powell*
Jacquelyn M. Powers
Michelle Pusey
Kyle Ricker
Brandon K. Rickwood
Jenna Riddle
Gretchen A. Ritter
Emily Robinson
Ravin E. Robinson
Amanda Schleifer
Ashley Schutt
Bradley Schutt
Genny Shinn
Amanda Short
Ashley Short
*Darion Showell*
Darel Singleterry, Jr.
Chelsea Sizemore
Luke Sizemore
Tabitha Smith
Margaret Stasi
Rachel Stevenson
Casey Strohmeyer
Kristy Ten
Shaun Thompson
Justin M. Tomlinson
Tiffany A. Tribbitt
Eric J. Tsavdar
Christopher Uibel
Taylor Vanderhook
Stephanie N. Ware
Ryan Warner
Courtney West
Jennifer Westfall
Megan M. Wharton
Kyle White
Hillary Wright
Dong Yang
Brandy S. Yost

*Students in italics are those who have been honored four consecutive years.*

## Board of Education

Charles Bireley, President
Gregory Hastings
Richard Cohee
John Evans
Reginald Helms

Joseph Booth
Elaine McCabe
Lewis Patterson
Everett Toomey
Harvey Walls

## Administration

Lois M. Hobbs
Superintendent

Mark L. Steele
Principal, Indian River High School

Susan Bunting, Ed.D.
Director, Dept. of Instruction

Ray L. Steele
Asst. Principal, Indian River High School

Denise Speicher
Supervisor, Secondary Instruction

Duncan Smith
Asst. Principal, Sussex Central High School

Donna Hall, Ed.D.
Principal, Sussex Central High School

Tim Slade
Asst. Principal, Sussex Central High School

Appreciation is extended to the Southern Delaware School of the Arts cafeteria staff, as well as the Southern Delaware School of the Arts and IREC custodial staff, for their cooperation and work towards preparation of the 2002 Academic Achievement Banquet.  Further acknowledgement is given to Denise Speicher, Carmen Deldeo, Frank Mahoney & The Road Show, Lauren Grise & her Southern Delaware School of the Arts Honor Society students, and Becky Mott-Lynn, Mark Mott-Lynn, and Cathy Macklin & the Art students from Southern Delaware School of the Arts, Sussex Central High School, and Indian River High School.

## The Road Show

Ricker Adkins
Lee Bailey
Linley Betton
Victoria Clark
Cristin Corbin
Danielle Diaz
Michelle Giorgilli
Ricky Giorgilli
Patrizia Gugliotta
Marc Hayden

Maurice Hein
Lance Hickman
Lucas Kems
Nick Kleper
Erin Kortvelesy
Wayde Marsh
Cori McCowan
Eli Mumford
Cory Murray
J. T. Norton

Mary Pawlina
Jeremy Pedersen
Chris Pridgeon
Josh Ritter
Rachel Silkworth
Emily Southmayd
Robbie Syphard
Connor Vanderhook
Elizabeth Whealton
(Dance Coordinator)

P 0349

# EXHIBIT 20

BBF

## SCHOOL BOARD MEMBER ETHICS

Members of the Board of Education will strive to attain the following Code of
Ethics adopted by the Board of Directors of the National School Board Association, May
2, 1961:

1.     As a member of my local Board of Education, representing all the citizens
of my school district, I recognize

That my fellow citizens have entrusted me with the educational
development of the children and youth of this community.

That the public expects my first and greatest concern to be in the best
interest of each and every one of these young people without distinction as
to who they are or what their background may be.

That the future welfare of this community, of this State, and of the nation
depends in the largest measure upon the quality of education we provide in
the public schools to fit the needs of every learner.

That my fellow board members and I must take the initiative in helping all
the people of this community to have all the facts all the time about their
schools, to the end that they will readily provide the finest possible school
program, school staff, and school facilities.

That legally the authority of the Board is derived from the State which
ultimately controls the organization and operation of the school district
and which determines the degree of discretionary power left with the
Board and the people of this community for exercise of local autonomy.

That I must never neglect my personal obligation to the community and
my legal obligation to the State, nor surrender these responsibilities to any
other person, group or organization; but that beyond these, I have a moral
and civic obligation to the nation which can remain strong and free only so
long as public schools in the United States of America are kept free and
strong.

2.     In view of the foregoing consideration, it shall be my constant endeavor:

To devote time, thought and study to the duties and responsibilities of a
school board member so that I may render effective and creditable service.

To work with my fellow board members in a spirit of harmony and
cooperation in spite of difference of opinion that arise during vigorous
debate of points of issue.

BBF

To base my personal decision upon all available facts in each situation; to vote my honest conviction in every case, unswayed by partisan bias of any kind; thereafter, to abide by and uphold the final majority decision of the Board.

To remember at all times that as an individual I have no legal authority outside the meetings of the Board and to conduct my relationship with the school staff, and local citizenry, and all media of communication on the basis of this fact.

To resist every temptation and outside pressure to use my position as a school board member to benefit either myself or any other individual or agency apart from the total interest of the school district.

To recognize that it is as important for the Board to understand and evaluate the educational program of the schools as it is to plan for the business of school operation.

To bear in mind under all circumstances that the primary function of the Board is to establish the policies by which the schools are to be administered, but that the administration of the education program and the conduct of school business shall be left to the employed superintendent of schools and his professional and non-professional staff.

To welcome and encourage active cooperation by citizens, organizations, and the media of communication in the district with respect to establishing policy on current school operation with proposed future developments.

To support my State and National School Boards Associations.

Finally, to strive step by step toward ideal conditions for most effective school board service to my community, in a spirit of teamwork and devotion to public education as the greatest instrument for the preservation and perpetuation of our representative democracy.

Adopted  1/25/88

# EXHIBIT 21

# SUSSEX POST

*Serving the Heart of Sussex County*

**Thursday, May 8, 2008**

50 cents

## IR school election May 13

**By Michael Short**
Sussex Post

DAGSBORO — Six candidates will be seeking three contested seats on the Indian River School Board on Tuesday. Nine face a challenge from political newcomer Sharon Brittingham.

In District Five, three candidates will seek two seats on the school board. Longtime incumbent Reggie L. Helms and incumbent Donna M. Mitchell will face a challenge from political newcomer Sharon Brittingham.

Mr. Walters, 51, is running for office for the first time. He is the mer Indian River student all give
him valuable experience.

Mr. Walters said he supports school uniforms for students. "I think that when the kids dress better and look better, they act better."

"It is a good district. It has

Lou Bunting will the returned to office since she's running unopposed for another term in District Three.

In District Four, incumbent Dr. Donald G. Hattier will face challengers Harold T. Walters and student adviser in the Indian River School District. He called for better communication and more seat available.

Christopher A. White for the one er School District. He called for better communication and more seat available.

accountability.

"I just think we need a (better) working relationship between the district and the community," he said. He said his experience in the community, working in two school districts and being a former Indian River student all give him valuable experience.

Mr. Walters said he supports the supervisor of transportation for the Milford School District and spent seven years working as a

some great teachers and some great students. We just need to be on the same page to make it that much greater," he said.

He said a good school board member needs to be "somebody who is going to be honest with you - and somebody who has no agenda. My only agenda is what's best for the kids."

Mr. White is a former MBNA employee who now works in sales for Mountaire. He said the board needs people with more diverse backgrounds and more

real world experience and he believes his experience in the corporate world would be a plus.

Mr. White said the board needs to resist the urge to be too involved in day-to-day operations. "You need to get on the board to give clear direction," he said.

He called for more student and parental involvement and said he is very concerned about graduation rates, both in the district and at the state level. More

See Election — Page 6

## Rape arrest



## Students soar: Eagle Company teaches life skills

# Election

Continued From Page 1

involvement by parents and students could result in higher test scores and graduation rates, he said.

He also said the board needs to update its ethics policy which dates back to 1961. He called for fiscal responsibility and said the district needs to make sure it manages its finances in the best possible fashion.

He believes in a strict dress code policy, saying it creates a better learning environment.

He said he brings an open mind and real world experience to the position and he pledged to listen and gather all the facts before making a decision.

"You have to have an open mind ... and no personal agenda," he said.

Dr. Hatler is a chiropractor. He served on the district's financial committee for two years before, becoming a member of the school board and he has been in the forefront of the district's study of a possible school uniform.

He decided to run again because "I think there are a lot of things that are unfinished."

He is concerned about possible funding cuts to education and calls the May 22 referendum a "must pass" for the district. "Since



**Harold Walters**

2002, the state has eliminated a total of 6 million dollars from the school budget in our district alone. At the same time, salaries and other employment costs have risen dramatically. You can't keep cutting funding and expect the same good product."

He said the board's changes in its religion policy (following a lawsuit over school prayer) give the students more flexibility and many school districts are now looking at Indian River's policy as a possible model.

One part of that lawsuit is still pending and that portion deals with whether or not the school board should be able to open its meetings with a prayer. He said he supports the opening prayer and believes it is constitutional.

Dr. Hatler said he has worked to increase participation in music and arts programs and he supports district efforts to supplement reading programs. He is quick to note the high test scores, the major building rebuilding and modernization program and other ac-



**Donald Hatler**

complishments of the district.

"I feel passionately about public education and its benefits," he said. "I want the best for my children, and by extension, for everybody else's children as well."

Mr. Helms has served on the school board for 17 years and he said that a good school board member needs to have "a servant's heart." He explained that a position like school board is taken because people want to help and called it "an honor and a privilege" to be able to serve the public.

He said one of the biggest challenges will be how to deal with possible budget cuts, although final state cuts have yet to be determined.

"I don't want to touch anything in the classroom (with budget cuts)," he said. "It will be a challenge to maintain those test scores and cut $1 million (in possible state cuts) out of the budget."

He said his constituents have told him they support prayer be-

**Chris White**

**Reggie Helms**



## Donna Mitchell

...fore the school board meetings. "I don't see a thing wrong with prayer before the board meetings," he said.

Mr. Helms said a good school board member needs to be open minded, do their homework and have no personal agendas.

"I have a willingness to work with people," he said. "I consider myself a people person and a problem solver."

He said he understands both sides of the debate over whether the district should have school uniforms, but generally is supportive of the idea.

He said the district has had good academic success.

"We've done well. That takes a group of people. It also takes a hand that cares," he said. "I appreciate the people allowing me to serve for 17 years."

Donna Mitchell has served on the school board for three years and has been chair of the policy committee for the last two years. She is a mother of six. She supports having a prayer before

## Sharon Brittingham

school board meetings, saying "I think we all need guidance. More than ever, when we see all the negative things that happen."

She said dealing with possible budget cuts is a major concern for the district and said that the state's equalization formula makes it difficult for districts like Indian River to get ahead. She also said it's difficult trying to fund all-day kindergarten because that requirement is an unfunded mandate from the state.

"Overall, I would say Indian River is a wonderful school district. I am very proud of it ... I think the school district is just about as good as it gets, but there is always room for improvement," she said.

She said a good school board member must be willing to do their homework and commit a lot of time to the board. "You really have to have the pulse of what's happening," she said.

She considers herself a "watchdog" for children and said she has always been involved with Little League, booster clubs or other youth activities.

"My whole life has been about kids," she said. "Kids have been my life. That's my passion."

Sharon Brittingham has extensive experience in education, having served as a coach, teacher and principal. She now works at the Delaware Academy of School Leadership at the University of

Delaware and says her experience is a major plus.

"I think I understand a lot of different perspectives. I understand the diverse needs of this community ... and I can't be a voice for people who sometimes don't have a voice. I bring an understanding that one size does not fit all," she said.

She said she is passionate about early childhood education and wants to investigate ways to increase high school graduation rates. She prides herself on being able to think out of the box and explore different ideas.

Ms. Brittingham said the school district may need to look at more technical offerings that might not be available from Sussex Tech, such as perhaps culinary arts. She said it's just a matter of seeing what programs are available and trying to give students more options to help them better compete globally.

She thinks the district should explore internships and apprenticeships as part of that effort to provide more options. She supports the ESL (English as a second language) and the Village Programs offered by the district.

"There are ways of thinking out of the box," she said. "I'm all about kids and what's in the best interests of the kids."

# Indian River School Board candidates at a glance

**See story, page 4**

## DISTRICT FOUR

| | Experience | Employment | Issues | Plans if elected | Quote |
|---|---|---|---|---|---|
| **Donald Hattier** | Six years on board, eight years on the district's finance committee and has four children in the school district. | Chiropractor | ■ Financial stability<br>■ Music and the arts<br>■ Prayer | ■ See prayer lawsuit through to end improve Sussex Central High School's graduation rate and add music programs. | "A single board member can only do so much. If you don't do so much. If the other nine, nothing's going to happen." |
| **Harold Walters** | Brought up in the Indian River School District, worked as student advisor in Indian River and Milford school districts for several years. | Currently a truancy officer and superintendent of transportation for the Milford School District. | ■ Improving relations between the community and the district<br>■ Ensuring the continuing education of students | ■ Strive to increase public communication with the school board. | "I'm an Indian River kid of the past planning to give kids of the present and future a voice." |
| **Chris White** | Father of two district students, commissioner of South Bethany Planning & Zoning Board. | Sales manager for Mountaire Farms. | ■ Ethics<br>■ Graduation rates<br>■ Fiscal responsibility | ■ Take a look at district ethics policies and get more children involved in extra-curricular activities. | "Education is the best legacy that we can leave our kids that's free of charge." |

## DISTRICT FIVE

| | Experience | Employment | Issues | Plans if elected | Quote |
|---|---|---|---|---|---|
| **Sharon Brittingham** | Former principal of Frankford Elementary School and former member of Delaware Professional Standards Board. | Currently works for Delaware Academy of School Leadership. | ■ Finance<br>■ Drop-out rate<br>■ Early-childhood programs | ■ Work to examine policies of the school board, many of which haven't been changed in decades. Examine ways to help more students graduate. | "I put kids first in anything I do." |

| | | | | | |
|---|---|---|---|---|---|
| **Harold Walters** | brought up in the Indian River School District, worked as student advisor in Indian River and Milford school districts for several years. | officer and superintendent of transportation for the Milford School District. | ■ between the community and the district<br>■ Ensuring the continuing education of students | public communication with the school board. | of the past planning to give kids of the present and future a voice." |
| **Chris White** | Father of two district students; commissioner of South Bethany Planning & Zoning Board. | Sales manager for Mountaire Farms. | ■ Ethics<br>■ Graduation rates<br>■ Fiscal responsibility | ■ Take a look at district ethics policies and get more children involved in extra-curricular activities. | "Education is the best legacy that we can leave our kids that's free of charge." |

## DISTRICT FIVE

| | | | | | |
|---|---|---|---|---|---|
| **Sharon Brittingham** | Former principal of Frankford Elementary School and former member of Delaware Professional Standards Board. | Currently works for Delaware Academy of School Leadership. | ■ Finance<br>■ Drop-out rate<br>■ Early-childhood programs | ■ Work to examine policies of the school board, many of which haven't been changed in decades. Examine new ways to help more children graduate. | "I put kids first in anything I do." |
| **Reginald Helms** | Served on the Indian River School Board since 1991, holding the positions of president, vice president and various committees. | Retired power company employee. | ■ State budget cuts<br>■ Prayer<br>■ Improving education | ■ Continue to improve the quality of education in the district through curriculum updates, see that the is prepared in every way. | "I believe I have a servant's heart. It's a privilege and honor to me to serve residents and taxpayers of Indian River and I always try to do my part for giving back to the community." |
| **Donna Mitchell** | Three years on school board and had six children go through the district, with two sons now teaching at district schools. | On-site manager of Delaware State Housing Authority's Hickory Tree site in Selbyville. | ■ Prayer<br>■ School safety<br>■ Morals and values | ■ Ensure board's right to prayer before meetings, improve on district's academic standards and see prayer lawsuit to a conclusion. | "I think we're doing an excellent job on education, but there's always room for improvement." |