**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| MONA DOBRICH, et al., | : | |
| Plaintiffs, | : | |
| v. | : | CIVIL ACTION NO. 05-120-JJF |
| INDIAN RIVER SCHOOL DISTRICT, et al., | : | |
| Defendants. | : | |

**COUNTER-STATEMENT CONTESTING PLAINTIFFS'
STATEMENT RELATED TO PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT AND STATEMENT OF FACTS**

In connection with Plaintiffs' Motion for Summary Judgment, they filed a Statement Related to Plaintiffs' Motion for Summary Judgment, in which they certified that "no genuine issues of material fact exist with regard to the facts set forth in support of Plaintiffs' Motion for Summary Judgment." *See* D.I. 253. They did not file a separate statement of facts delineating which facts they believe are (a) undisputed and (b) support their motion. Instead, Plaintiffs simply included within their brief a fifteen-page "Statement of Facts." In reality, this is a statement of argument that includes occasional references to the record. In order to avoid the necessity of responding in detail to Plaintiffs' Statement of Facts in Plaintiff's brief, Defendants proposed that Plaintiffs file a separate document isolating the facts they believe are undisputed. Plaintiffs declined that invitation. Thus, Defendants now contest Plaintiffs' certification and respond to the statement of facts set forth in Plaintiffs' opening brief.

## PLAINTIFFS' "STATEMENT OF FACTS" AND DEFENDANTS' RESPONSES[1]

1.      *The Board [fn. 2] opens its regular public meetings[fn. 3] – meetings that the Board expects students to attend, and which students routinely do attend – with prayer.*

**RESPONSE: Partially contested.**  Defendants contest the use of the term "expects." In certain circumstances, students are invited to attend Board meetings by the school principal. *See* Bireley Dep. at 25.  Students "could come and be honored or they might not, or their principal might accept the award and they could stay home."  *See* Hobbs Dep. at 37.

2.      [from footnote 2:] *The Board consists of ten elected members.*

**RESPONSE: Uncontested.**

3.      [from footnote 2:] *Although Board members may change over time, they have historically all been Christian.  (Bireley at 60) (responding to a question about non-Christian Board members, the District's 30(b)(6) witness said he did not recall ever "having that type of Board member").*

**RESPONSE: Partially contested.**  Defendants contest Plaintiffs' statement that historically all Board members have been Christian because this is not a fact in the record.  In support of such statement, Plaintiffs have mischaracterized Mr. Bireley's testimony.  The question to which Mr. Bireley was responding did not concern all the Board members; it concerned the group of people who tended to offer the prayer during the period prior to the adoption of the Board Prayer Policy.  *See* Bireley Dep. at 58-60.

4.      [from footnote 3:] *The Board has both "regular meetings" and "special meetings."*

**RESPONSE: Uncontested.**

---

[1] The italicized text below is verbatim from Plaintiffs' Statement of Facts as set forth in their Opening Brief.

5.       [from footnote 3:] *Both types of meetings are always held on District property, with regular meetings currently alternating between the cafeterias of Indian River and Sussex Central High Schools. (*See, e.g.*, Ex. 20 at 1; Ex. 21 at 1; Ex. 22 at 1)*

**RESPONSE: Partially contested.** As Plaintiffs' own exhibits of meeting minutes indicate, regular meetings are conducted in a variety of locations. *See, e.g.,* Plaintiffs' Exhibits 40, 41, 61.

6.       [from footnote 3:] *The regular meetings take place each month and are open to the public, which is encouraged to attend, with the exception of time spent in executive session.*

**RESPONSE: Partially contested.** Defendants contest the term "encouraged." The regular meetings are open to the public, who can come if they choose. Moreover, Plaintiffs have not pointed to anything in the record to support their statement.

7.       [from footnote 3:] *The Board will sometimes invite individuals to attend special meetings, but they are often closed to the public. (Bireley at 87; Cohee at 53, 68; Isaacs at 25-26)*

**RESPONSE: Partially contested.** Plaintiffs have not provided a citation to the record for the proposition that the special meetings are often closed to the public. Mr. Bireley testified that sometimes there are people from the public at special meetings. *See* Bireley Dep. at 87-89 (estimating that if the Board conducted two or three special meetings a year, the public usually wouldn't be at all three, that "it depends on what the issue is"). Mr. Cohee noted that there are both open and closed meetings; that at one special meeting (the August 23, 2004 meeting), when the Board went into executive session, he was not sure whether all the people recorded as being present stayed or were asked to leave; that sometimes people other than Board members may be

present at special meetings because the Board requires or asks for certain information; and that even at special meetings, normally once the executive session has ended, they would say, "If there is anybody outside, let them come in." *See* Cohee Dep. at 53, 68, 71, attached hereto as Exhibit Q. Mr. Isaacs simply noted that the Policy Committee meets in private. *See* Isaacs Dep. at 25-26.

8.      [from footnote 3:] *Other than the absence of a prayer from special meetings and their closed status, special meetings are substantively similar to regular meetings. (Bireley at 87; Hattier at 232)*

**RESPONSE: Partially contested.** *See supra* at ¶ 7.

9.      [from footnote 3:] *The Board's minutes indicate that in the three years after the Policy was adopted (October 2004-October 2007), the Board had 35 special meetings (none of which were opened with a prayer) and opened eight regular meetings in executive session (in which case, the Board always delayed the prayer until the public session began).*

**RESPONSE: Contested.** Plaintiffs have not supported this purported statement of fact with a citation to the record. Moreover, while the testimony was not specific to the time period of October 2004 through October 2007, Mr. Helms testified that he could recall some special meetings that opened with a prayers. *See* Helms Dep. at 136, attached hereto as Exhibit R ("over the years that I've been on there[,] some [special meetings] have [opened with prayer], but it would be out of the ordinary").

10.      [from footnote 3:] *In that same span, the Board held 36 regular meetings.*

**RESPONSE: Uncontested.**

11.      [from footnote 3:] *Of those meetings, 33 opened with prayer (*see, e.g.*, Ex. 23 at 1; Ex. 24 at 1; Ex. 25 at 1), and the remaining three opened with a moment of silence.*

**RESPONSE: Contested.** Plaintiffs' citation to the record does not establish that 33 of the meetings at issue opened with prayer, nor have Plaintiffs supported the remainder of that sentence with a citation to the record. Despite the fact that Plaintiffs' videotaped some or all of those meetings, they have not provided transcripts of the prayers actually offered.

12. *These prayers are overwhelmingly sectarian, and all of the sectarian prayers are Christian.*

**RESPONSE: Contested.** Defendants contest Plaintiffs' use of the phrase "overwhelmingly sectarian." Moreover, Plaintiffs have not supported their statement with a citation to the record.

13. *After receiving complaints about prayer at school events, the Board adopted a policy that was obviously intended to protect the constitutionality of Board prayer at public meetings.*

**RESPONSE: Contested.** Defendants contest the phrase "obviously intended." Not only is the phrase vague and argumentative, it is also not supported by a citation to the record. Each of the Board members testified at length regarding the purpose of the Board Prayer Policy, which was to solemnize the proceedings.

14. *But, the Board's prayer practice was unchanged by the Policy – members still routinely open regular public meetings involving students with sectarian Christian prayers.*

**RESPONSE: Contested.** The statement that the Board's prayer practice was unchanged by the Board Prayer Policy is both argumentative and incorrect. For example, the Board Prayer Policy made it clear that a moment of silence was another option for solemnizing the proceeding, *see* Board Prayer Policy ¶ 1, and this option has been exercised by Board members. *See, e.g.,* Oliphant Dep. at 33 (testifying that President Bireley put her into the rotation and that she has

offered a moment of silence).

15.    _The facts are not in dispute_.  [emphasis in original]

**RESPONSE: Contested.**  This is not a statement of fact.  Each of the facts disputed by

Defendants are set forth herein.

**I    IN 2004, THE BOARD ADOPTED THE BOARD PRAYER POLICY.**

16.    _At Sussex Central High School's graduation in 2004, Reverend Jerry Fike offered_

_overtly sectarian invocation and benediction prayers to Jesus Christ._

**RESPONSE: Contested.**  This statement concerns subject matter that was never

explored through discovery and which became subject to a settlement agreement (the

"Settlement Agreement") between the parties.  The Settlement Agreement settled all pending

issues except the Board Prayer Issue, and was approved by the Court on February 21, 2008.  _See_

D.I. 237.  This statement is irrelevant to the constitutionality of the Board Prayer Policy, and

Plaintiffs have not supported their statement with a citation to the record.

17.    _In the benediction, Fike prayed that the "Heavenly Father . . . direct [graduates]_

_into the truth, and eventually the truth that comes by knowing Jesus."  (D.I. # 134 ¶ 30; D.I. #_

_150 ¶ 30)_ [omission in original]

**RESPONSE:  Contested.**  _See supra_ at ¶ 16.

18.    _The baldly sectarian prayers upset a graduate's parent, who first raised her_

_complaints about the prayers at the June 15, 2004 regular Board meeting.[fn 4] (Ex. 0061 at 2;_

_D.I. # 134 ¶ 82; D.I. # 150 ¶ 82)_

**RESPONSE:  Contested.**  _See supra_ at ¶ 16.  In addition, Defendants contest the phrase

"baldly sectarian prayers."  First, "baldly" is argumentative and not supported by the record.

Moreover, Plaintiffs refer to "prayers" in the plural, but they only reference one prayer.

Defendants also contest Plaintiffs' supporting citations. Plaintiffs' Exhibit 61, to which Plaintiffs cite, are Board meeting minutes indicating in the Public Comments section, "Mrs. Dobrich, a parent of the Jewish faith, expressed concerns about prayers at school district events. She asked that the Board consider using a non-denominational prayer that would be appropriate for all faiths at events such as graduations, etc." *See* Plaintiffs' Exhibit 61. Plaintiffs' citation to their Amended Complaint and Defendants' Answer is likewise misleading. Defendants admitted that "Mona Dobrich spoke out during the public comments period." *See* D.I. 150 at ¶ 82. But, Defendants denied "the remaining allegations set forth in this paragraph 82 because they are an incomplete and inaccurate recitation of Ms. Dobrich's remarks, and are therefore denied as phrased." *See id*.

19.    [from footnote 4:] *The Board would later agree that its practice of graduation prayer was unconstitutional and change that practice. (Hattier at 303-04; Helms at 160-61)*

**RESPONSE: Contested.** *See supra* at ¶ 16. Moreover, this statement is a violation of, and contrary to, the Settlement Agreement, which provides:

- Each Defendant has denied and continues to deny having committed or having attempted to commit any violation of law.

- Defendants are entering into the Settlement of disputed claims because the Settlement will eliminate the burden and expense of further litigation.

- Neither the existence of the Settlement nor the provision contained herein will be deemed a presumption, concession or admission by any Party of any breach of duty, liability, default or wrongdoing as to any facts, claims or defenses alleged or asserted in the Litigation.

*See* Settlement Agreement ¶¶ 12, 18, 19, 25.

20.    [from footnote 4:] *These were not the first complaints about religious practices in District schools.*

**RESPONSE: Contested.** *See supra* at ¶ 19. In addition, Plaintiffs have not supported their statement with a citation to the record.

21. [from footnote 4:] *Others had complained about sectarian graduation prayer in the past, and the Does had previously objected to teacher-led Bible clubs in the schools.*

**RESPONSE: Contested.** *See supra* at ¶ 19. In addition, Plaintiffs have not supported their statement with a citation to the record.

22. [from Footnote 4:] *The Board would eventually change these practices as well. (*See, e.g.*, Hobbs 173-74)*

**RESPONSE: Contested.** *See supra* at ¶ 19.

23. *After the June 2004 Board meeting, newspapers and talk radio extensively reported the complaints, as well as the reactions of Board member Donald Hattier and at least one other member – in fact, Hattier answered the public's questions about the issue on the local talk radio station. (*See, e.g.*, Ex. 26; Ex. 27; Ex. 28; Hattier at 198-99)*

**RESPONSE: Partially contested.** Defendants contest the term "issue" as vague. Dr. Hattier spoke on the local talk show about the issue of Board prayer and with the hope that he "would be able to clear up the factual misconceptions out there." *See* Hattier Dep. at 198-199. To the extent Plaintiffs mean "issue" to refer to the graduation policy, *see supra* at ¶ 19.

24. *The Board did not address the issue at the July 27, 2004 regular meeting though there was some public comment. (Ex. 29)*

**RESPONSE: Partially contested.** *See supra* at ¶ 19. In addition, during this meeting, the minutes reflect that the Board probably did at least address the Graduation Ceremonies issue, which was at first tabled until after the Executive Session, after which it was referred to the Policy Committee. *See* Plaintiffs' Exhibit 29.

25.     *On August 23, 2004, the day before the next regular meeting, the Board convened a special meeting, at which it met in executive session for over four hours to discuss prayer in the District and at Board meetings.  (Ex. 30; Hattier at 158-59)*

**RESPONSE: Uncontested.**

26.     *(Apparently, no prayer was offered at this non-public meeting.)*

**RESPONSE: Contested.**  Plaintiffs do not support this statement with a citation to the record.  In addition, there have been instances where special meetings have opened with prayer. *See* Helms Dep. at 136 (testifying that "over the years that I've been on there[,] some [special meetings] have [opened with prayer], but it would be out of the ordinary").

27.     *The Board's then-regular attorney, James Griffin, advised that Board prayer was unconstitutional.  (Hattier at 190-92; Helms at 76)*

**RESPONSE: Contested.**  During the depositions of several Board members, Plaintiffs' counsel asked questions that, upon information and belief, he knew were subject to attorney-client privilege in the hope of provoking an inadvertent revelation of Mr. Griffin's advice. Plaintiffs' counsel was warned about his tactics both during and after the deposition.  *See, e.g.*, Bireley Dep. at 126 (Defendants' counsel stating, "I think you are starting to tread into territory where you are trying to get at what the advice was that Mr. Griffin gave, and obviously we object to that.  I'm putting that out on the record because I want to just remind both you and the witness what we agreed were going to be the ground rules for this line of questioning"); October 12, 2006 Letter to T. Allingham, attached hereto as Exhibit S. Improperly elicited testimony should not be part of the record.

Regardless, while Plaintiffs think they know what advice Mr. Griffin gave, they do not. The testimony in the record shows only that the Board felt it needed advice from an attorney who

specialized in First Amendment law before it could determine whether or not to alter the Board Prayer Policy. *See* Hattier Dep. at 191 ("Mr. Griffin is a general attorney and for what we were discussing and what the potential for litigation we felt that it would be better to pick a different attorney for another opinion. In my opinion Mr. Griffin, is a find [sic] attorney, Mr. Griffin has served our district extremely well over the years, but he is a general attorney and his issues do not run into the First Amendment as a general rule. He would do contract law[,] he would do personal issues, but, you know, First Amendment issues are not the sort of thing that routinely come across his desk"); Helms Dep. at 74, 77 ("The only thing I can tell you for sure if I didn't want to make a decision that night because I didn't feel we had enough information…My opinion was that we had not received information that said that what we were doing was illegal and breaking the law"). Plaintiffs' citations do not support the proposition that Mr. Griffin advised the Board that Board prayer was unconstitutional.

28.     *As then-Board President Harvey Walls admitted, the Board disregarded Griffin's advice because Griffin did not agree with the Board's belief that School Board Prayer was constitutional. (Walls at 123;* see also *Bireley at 125-26; Hobbs at 107-08)*

**RESPONSE: Contested**. *See supra* at ¶ 27. In addition, Plaintiffs have also mischaracterized the testimony they improperly elicited. Mr. Walls did not state that they disregarded Mr. Griffin's advice. He testified, "We don't know that we as a board did not believe that Mr. Griffin believed in what the board believed in." *See* Walls Dep. at 123. Mr. Walls further testified that the Board believed Board prayer was legal and "worth fighting for." *Id*. Likewise, Mr. Bireley did not testify as to what advice Mr. Griffin gave the Board or what the Board's belief was as to the constitutionality of Board prayer, *see* Bireley Dep. at 124-125, and

therefore his testimony does not support Plaintiffs' statement.  Mr. Bireley's testimony was as follows:

> Q:      Can you think of any instances which the Board had in the past received advice from Mr. Griffin and then decided to get a second opinion?
>
> A:      Yes.
>
> Q:       Give me an example.
>
> A:      I can't give you a specific example but it happens.
>
> Q:      And is that because the Board doesn't like the advice it gets from Mr. Griffin?
>
> [Objection]…
>
> A:      We may not agree with what he advised, yes that's true.
>
> Q:      Is that what happened in this instance?
>
> A:      I think so.

*See* Bireley Dep. at 125-126.

Nor did Ms. Hobbs testify as to what advice Mr. Griffin gave the Board or what the Board's belief was as to the constitutionality of Board prayer.  *See* Hobbs Dep. at 107-108.

29.    *After the August 23 meeting, individual Board members shopped for legal advice that conformed to their pre-existing views. (Bireley at 124 (stating the Board "wanted a second opinion"); Hobbs at 108; Helms at 74-75, 96-97; Hattier at 87-88)*

**RESPONSE:  Contested.**  *See supra* at ¶¶ 27, 28.

30.    *The efforts to stir up public opinion about religious practices in the Indian River schools on talk radio and in the newspapers had the desired effect.*

**RESPONSE: Contested.**  There is nothing in the record indicating that there were any efforts made by Defendants to "stir up" public opinion.  The evidence in the record is to the

contrary. Dr. Hattier, who spoke on a talk show, specifically *denied* that he went on the talk show in the hope that the public's interest would be engaged on the issue, but instead thought he "would be able to clear up the factual misconceptions which were out there." *See* Hattier Dep. at 199.

31.     *At least 600 people attended the Board's August 24, 2004 meeting,* more than twice the attendance of any other Board meeting. *(Ex. 36 at P 0095 (estimating "roughly 800" attendees); Hastings at 78; Isaacs at 22)* [emphasis in original]

**RESPONSE: Partially contested.** Plaintiffs' citations do not support the proposition that 600 people attended the August 24, 2004 meeting. One Board member testified that he thought about 300 people attended. *See* Hastings Dep. at 78, attached hereto as Exhibit T.

32.     *Jane Doe was present at the meeting, which she described as a "terrible thing." (Doe at 38)[fn. 5]*

**RESPONSE: Contested.** Plaintiffs have mischaracterized Ms. Doe's testimony. She did not describe the August 24, 2004 meeting as "a terrible thing." The inaccuracy is self-evident upon a review of the testimony, but Defendants offer no further explanation because to do so would reveal identifying information. Furthermore, Defendants cannot address whether Jane Doe was present at the meeting, as Defendants do not know her identity.

33.     [from footnote 5:] *Jane Doe has attended several other Board meetings as well, including another meeting in 2004 that was opened with a prayer in Jesus's name. (Doe at 15)*

**RESPONSE: Contested.** Defendants cannot address whether Jane Doe has attended other Board meetings, as Defendants do not know her identity. Moreover, because Mrs. Doe did not identify what Board meeting she was at in 2004 where she states she heard a prayer referencing Jesus, Defendants cannot verify to which meeting she is referring.

34.     *John, Jamie and Jordan Doe were not present at the August 24, 2004 meeting.*

**RESPONSE: Contested.** Defendants have no way of knowing whether or not John, Jamie, and Jordan Doe were present at the August 24, 2004 meeting, as Defendants do not know the identity of the Does.

35.     [from footnote 5:] *Each, however, has attended at least one meeting during the years 2004-2008. To protect their anonymity, those meetings are not identified.*

**RESPONSE: Contested.** *See supra* at ¶ 34.

36.     *As the meeting began, then-Board President Walls asked Board member Hattier to open the Board meeting with a prayer. (Ex. 31)*

**RESPONSE: Uncontested.**

37.     *The crowd erupted in applause. (Ex. 32)*

**RESPONSE: Contested.** Defendants contest the phrase "erupted in applause." People applauded; some did not. *See* Planitiffs' Exhibit 55.

38.     *After the prayer, the crowd continued to be raucous, with attendees shouting, applauding, and booing during the meeting. (Ex. 55)[fn. 6]*

**RESPONSE: Contested.** Defendants contest the term "raucous." Some members of the public did express their feelings toward the various speakers. Some people in the audience clapped after both Mrs. Dobrich and Samantha Dobrich spoke. *See* Plaintiffs' Exhibit 55.

39.     [footnote 6:] *Ex. 55 is an audiovisual recording of the August 24, 2004 meeting. Plaintiffs also submit other excerpted segments of Ex. 55. These shorter segments are meant to facilitate the Court's review of the relevant parts of the August 24, 2004 meeting.*

**RESPONSE: Uncontested**.

40.    *The overwhelming majority of the speakers who spoke during the public comments spoke of the District's need to continue praying in the name of Jesus and praying in school.  (*Id*.; Ex. 34[fn.7]; cf. Ex. 35 at P 0092; Ex. 36)* [emphasis in original]

**RESPONSE: Contested.**  Some speakers did speak about praying the name of Jesus, but it was not necessarily in terms of the District's need to continue praying as such but instead about praying in general.  *See* Plaintiffs' Exhibit 55.  It also appears from the speakers that the issue of "praying in school" had various meanings.  *See* Plaintiffs' Exhibit 55.

41.    [from footnote 7:]  *Ex. 34 appears to be handwritten notes of Board secretary Janet Hearn taken at the August 24, 2004 meeting.*

**RESPONSE: Contested.**  Plaintiffs have not supported their conclusion as to the author of Exhibit 34 with a citation to the record.

42.    [from footnote 7:]  *When compared with the video recording of the meeting (Ex. 55), it becomes clear that the notation of "F" means a person spoke in favor of Board prayer or prayer in school, "A" means that a person spoke against Board prayer.*

**RESPONSE: Contested.**  *See supra* at ¶ 41.  Moreover, Ms. Hearn testified that it was not her practice to keep track of which way people are voting in their comments.  *See* Hearn Dep. at 104, attached hereto as Exhibit U (discussing a different meeting but denying that it would have been her practice to keep track of which way people were voting in their comments).

43.    [from footnote 7:]  *32 of the 39 speakers (neither of the individuals listed on line #28 spoke at the meeting) spoke in favor of prayer in school or Board prayer, with the majority of those supporting the <u>clearly</u> unconstitutional practice of prayer in the schools.  Compare Ex. 34 with Ex. 55.*  [emphasis in original]

**RESPONSE: Contested.**  *See supra* at ¶¶ 40-42

- 14 -

44.     *Several state legislators read a letter and spoke during public comments, implying that Board members would be voted out of office if they did not defer to the majority and support prayer.  (Ex. 35 at P 0092; Ex. 37)*

**RESPONSE: Contested.**  The implication of the legislators' letter and/or speeches is not on in the record.  Plaintiffs have also mischaracterized one of the legislators' speeches, in which he told the Board to "do the right thing," and that if it did not do the right thing, then the public should vote them out.  *See* Plaintiffs' Exhibit 37.

45.     *Board members knew the public believed the debate to be about prayer in school, a clearly unconstitutional practice, not prayer at Board meetings or District events, a perception they now say was misinformed.  (Helms at 13, 15-16; Hughes at 89-90; Walls at 90-91; Hattier at 218)*

**RESPONSE: Partially contested.**  Mr. Helms testified that he thought the public thought the issue was freedom of speech or freedom of religion.  *See* Helms Dep. 12-13.

Plaintiffs' citation to Mr. Hattier's deposition does not support their proposition.  Indeed, when asked, "Did the comments at the public comment portion of the August 24 meeting confirm your view that many members of the public understood the School Board Prayer Policy to be an issue of whether or not the Board would be preserving Christian values," Mr. Hattier responded, "No.  As a matter of fact, if I came away with any impression at all it's that a huge amount of people did not understand what the real issue was and if you have listened to it, I think you would agree that a lot of people did not really understand what this was about.  Most of them in my opinion felt more or what was happening in here was changing something that had been in our community for again at least the 30 some odd years that we can document for sure, and probably prior to that."  *See* Hattier Dep. at 218.

46.    *The Board, however, made no effort to correct the public's misperception.*
*(Helms at 13-14, 16; Walls at 91)*

**RESPONSE: Partially contested.**  The public comments section of Board meetings is meant to be an opportunity for the Board to hear from the public and not the public to hear from the Board.  *See* Walls Dep. at 91; Hattier Dep. at 217 ("As is noted under the public comments section, it is our job to listen, not, it is a one way conversation.  It is not our policy to comment as a rule on what people say unless they get out of line in terms of mentioning names"); Cohee Dep. at 53 ("It wasn't a discussion, because our public comment session is one way, we listen and they speak").

47.    *Bypassing Griffin, its regular attorney whose advice they did not like, the Board instead worked privately with attorney Thomas Neuberger (Walls at 18-19, 23) and John Whitehead of the Rutherford Institute (Helms at 166-168), a well-known conservative think tank that defends "the First Amendment rights of churches."*
*(http://www.rutherford.org/Issues/ChurchRights.asp)*

**RESPONSE: Partially contested.**  Defendants contest the phrase, "Bypassing Griffin." *See supra* at ¶ 27.

48.    *Neuberger and the Rutherford Institute prepared a draft policy (Ex. 38) that became Policy BDA.1.  (Helms at 207)*

**RESPONSE: Uncontested.**

49.    *As adopted, Policy BDA.1 reads:*

1.    *In order to solemnify its proceedings, the Board of Education may choose to open its meetings with a prayer or moment of silence, all in accord with the freedom of conscience of the individual adult Board member.*

2.    *On a rotating basis one individual adult Board member per meeting will be given the opportunity to offer a prayer or request a moment of silence.  If the member*

*chooses not to exercise this opportunity, the next member in rotation shall have the opportunity.*

3.      *Such opportunity shall not be used or exploited to proselytize, advance or convert anyone, or to derogate or otherwise disparage any particular faith or belief.*

4.      *Such prayer is voluntary, and it is among only the adult members of the Board.  No school employee, student in attendance, or member of the community in attendance shall be required to participate in any such prayer or moment of silence.*

5.      *Any such prayers may be sectarian or non-sectarian, denominational or non-denominational, in the name of a Supreme Being, Jehovah, Jesus Christ, Buddha, Allah, or any other person or entity, all in accord with the freedom of conscience, speech and religion of the individual Board member, and his or her particular religious heritage.  (Ex. 39)*

**RESPONSE: Uncontested.**

## II.      THE BOARD PRAYS WHETHER OR NOT STUDENTS ARE PRESENT.

50.      *Schoolchildren have become an integral part of Board meetings.*

**RESPONSE: Contested.**  Students are not an integral part of the Board meetings and often are not in attendance.  *See* Hastings Dep. at 42 (testifying that probably during the summer months, there are regular Board meetings where no students are present).  In fact, Board members have discussed the possibility of eliminating the portion of the meeting of giving awards to students because of its length.  *See* Birely Dep. at 28-30.

51.      *The District regularly invites students to attend, and the Board frequently acknowledges students in attendance with awards.*

**RESPONSE: Partially contested.**  The school principals invite students to Board meetings.  *See* Bireley Dep. at 25.

52.      *Board members could not recall a single regular Board meeting during the academic year without students in attendance.  (Hastings at 42; Hughes at 36; see also Hobbs at 78).*

**RESPONSE: Uncontested.**

53.    *Board minutes reflect as many as 58 students receiving recognition at a single Board meeting.  (Ex. 40 at 2-4)*

**RESPONSE: Partially contested.**  The meeting minutes cited by Plaintiffs reflect that President Walls and Ms. Hobbs recognized and presented certificates to students and then provides a list of names.  *See* Plaintiffs' Exhibit 40.  This does not indicate that all the students listed were actually physically present at the meeting.  *See* Hobbs Dep. at 37 (students have the option to attend the meeting: they "could come and be honored or they might not, or their principal might accept the award and they could stay home.  There was no obligation for them to come to a Board meeting"); Bunting Dep. at 77 (even if the student does not attend, "They get their honor anyway"); Hattier Dep. at 282-83 (testifying that there have been students who have declined the invitation to come the Board meeting); Mitchell Dep. at 152 (the students who are recognized "come to get their award and they leave, or some don't show up at all…It's not a real serious thing").

54.    *Even at meetings where the Board met in executive session before the public session (just steps away from the auditorium where the public board meeting would be held), the Board delayed its prayer until the public meeting began, ensuring that students will be present for the prayer.  (See, e.g., Ex. 40 at 1 (invocation after executive session and presentation of colors); Ex. 41 at 1-2 (same))*

**RESPONSE: Partially contested.**  Defendants contest the phrase "just steps away from the auditorium where the public board meeting would be held," as this is not supported by a citation to the record.  Defendants also contest the term "ensuring" to the extent that Plaintiffs mean for it to imply that the Board purposely waits to say the prayer so that students will hear it.

- 18 -

55.     *Thus, Board members know that students are in the audience when they open meetings with prayer.  (Cohee at 113-14; Hastings at 42; Helms at 199-200)*

**RESPONSE: Partially contested.**  Defendants contest the term "Thus."  *See supra* at ¶ 54.

56.     *Regular student attendance at Board meetings is a recent phenomenon; students did not typically attend regular Board meetings until the mid-1990s.  (Hobbs at 34; Bireley at 27, 39)*

**RESPONSE:  Uncontested.**

57.     *Thereafter, the Board made it a regular practice to recognize "children who won an award."  (Hobbs at 33; Bireley at 27-28)*

**RESPONSE: Uncontested.**

58.     *These presentations often add thirty to forty-five minutes to regular meetings. (Hattier at 289-90)*

**RESPONSE: Uncontested.**

**A.     Students Can Attend Board Meetings To Receive Awards From The District, Provide Updates On School Activities, Present Colors, Or Express Constituent-Related Concerns To The Board.**

59.     *Students and student groups of many grade levels receive recognition at, or are requested to attend, Board meetings that open with prayers.*

**RESPONSE: Partially contested.**  Some students are "invited" to attend Board meetings.  *See* Bireley Dep. at 25.

60.     *Students being honored often also receive a letter signed by the Superintendent and Board President commemorating the experience, and the students know that photos are then often sent to the local newspapers for publication.  (Hobbs at 36-37)*

**RESPONSE: Partially contested.**  The cited deposition testimony does not make reference to photos being sent to local newspapers for publication or students knowledge as to such.  *See* Hobbs Dep. at 36-37.

61.    *A wide variety of student groups and award winners have performed or been recognized at Board meetings, including    REDACTED  ;  have competed in art competitions (see, e.g., Ex. 45; Ex. 46; Ex. 47); and have received athletic awards (see, e.g., Ex. 48 at 2; Ex. 49 at 2-3).*

**RESPONSE: Uncontested.**

62.    *Other students* routinely *participate in Board meetings.* [emphasis in original]

**RESPONSE: Uncontested.**

63.    *Since 1994, student government representatives have, at the Board's invitation, addressed the Board at most regular meetings during the academic year.  (Ex. 50 at 4 (adding student government to the agenda); Bireley at 39)*

**RESPONSE: Uncontested.**

64.    *Since about 2001, JROTC students have presented the colors at the start of each Board meeting – immediately before or immediately after the prayer – held during the academic year.  (N.L. Bunting at 75-76; Hughes at 36)*

**RESPONSE:  Uncontested.**

65.    *Students also address the Board to raise concerns about their schools.  (Bireley at 41-42, 44-46, 48; Hughes at 36)*

**RESPONSE: Uncontested.**

66.    *In addition, the student hearings in front of the Board involve such important matters as whether a student is expelled.  (Ex. 17 at 10)*

**RESPONSE: Partially contested.** Exhibit 17 only indicates that there were student hearings and their outcomes, not that students were present at those meetings.

67.     *Students also have their correspondence to the Board presented at Board meetings.  (Ex. 18 at 9 (describing letter from students to Board regarding school safety))*

**RESPONSE: Partially contested.** Exhibit 18 only indicates that a letter from some middle school students was shared, but there is no indication that the students who wrote that letter were present, that reading student correspondence is a regular occurrence, or that students are ever present when their correspondence is read.

**B.     Students Are Invited to Board Meetings By School Principals, But They Are Not Obligated to Attend the Meeting or Participate in the Prayer.**

68.     *Students receiving awards, speaking as student government representatives or presenting the colors as a member of the JROTC, likely feel obligated to attend the Board's regular meetings.  (Hobbs at 74-75; Isaacs at 64-65)*

**RESPONSE: Contested.** Plaintiffs have not provided any evidence as to how students feel with respect to attending regular Board meetings, let alone that they feel "obligated" to attend.  Moreover, not only is there no evidence as to how students feel about attending regular Board meetings, but Board members have testified that students are not required to be at the meetings, even if they are invited.  *See* Bireley Dep. at 33 (testifying that he cannot recall any instances where students have been required to attend School Board meetings); N. Bunting Dep. at 77 (even if the student does not attend, "They get their honor anyway"); Hattier Dep. at 282-83 (testifying that because "We have too many [students] who don't [attend when invited]," it is not his belief that an invited student would feel expected to attend); Mitchell Dep. at 152 (the students who are recognized "come to get their award and they leave, or some don't show up at all…It's not a real serious thing"); *see also* Hobbs Dep. at 37 (students "could come and be

honored or they might not, or their principal might accept the award and they could stay home. There was no obligation for them to come to a Board meeting").

69.    *For award recipients, this feeling of obligation is increased because their invitations are often delivered by the students' own school principals.  (Ex. 19, Int. Resp. No. 2; Bireley at 24-25)*

**RESPONSE: Contested.**  *See supra* at ¶ 68.  Furthermore, for the younger students, the invitation may be made by the principal to the student's parents.  *See* Plaintiffs' Exhibit 19, Int. Resp. No. 2.

70.    *The District's 30(b)(6) witness conceded that he could not recall a student ever declining an invitation, unless there was a scheduling conflict.  (Bireley at 33)* (emphasis in original)

**RESPONSE: Uncontested.**  However, he also testified that he cannot recall any student being required to attend.  *See* Bireley Dep. at 33.

71.    *Moreover, students in groups like   REDACTED   and  REDACTED   are under special pressure to attend these meetings, because attending earns members credit toward their obligations to the group, and the groups' performances will be compromised if all members are not present.  REDACTED*

**RESPONSE: Contested.**  *See supra* at ¶¶ 68, 69.  Moreover, Plaintiffs' citation does not support Plaintitffs' proposition.

72.    *Students are susceptible to peer pressure, and, as a result, they are unlikely to leave a meeting if a prayer that contravenes their own beliefs is offered.  (Hobbs at 88; see also Bireley at 203-04 (students "are impressionable because of their youth"); Evans at 126-27; Hobbs at 208)*

**RESPONSE: Contested.** Plaintiffs' citations to the record do not establish (1) that students are, in fact, susceptible to peer pressure, or (2) that they are unlikely to leave a meeting if a prayer that contravenes their own belief is offered. The citations to the record simply show some Defendants' opinions. For example, Board member Isaacs pointed out, "one could get up and leave saying they had to use the restroom…there are mechanisms to get up and leave a board meeting that you don't have to tack a particular clause to it. There [are] plenty of opportunities to get up." *See* Isaacs Dep. at 63-64.

73.    *For students presenting the colors, in fact, leaving is not an option, because "as a practical matter, if they don't want to participate in the prayer, they can't leave." (Isaacs at 64-65; see also Hobbs at 74-75)*

**RESPONSE: Contested**. Plaintiffs' citations to the record do not establish that, in fact, for students presenting colors, leaving is not an option. There is no evidence in the record that a student presenting the colors was forced or pressured to participate in the prayer when he or she did not want to participate. Finally, as the Board Prayer Policy itself states, the prayer is voluntary, among only the adult members of the Board, and no student in attendance "shall be required to participate in any such prayer or moment of silence." *See* Board Prayer Policy at ¶ 4; *see also* Walls Dep. at 52 ("I have no expectation for the audience [regarding whether they would close their eyes or bow their heads during the offering of the prayer]. They can do whatever they wish"); Hobbs Dep. at 207-08 (regarding Board Prayer Policy ¶ 4, specifically the second sentence, allows the public to get up and leave, "just not participate," not bow their hands, and/or not come before the meeting starts).

## III.    THE BOARD PRAYER POLICY CONFORMS TO ITS STATED PURPOSE.

74.    *Policy BDA.1 specifies only one purpose for School Board Prayer – to "solemnify" public Board meetings. (Ex. 39)*

**RESPONSE: Uncontested.**

75.    *Predictably, several Board members emphasized this purpose (see, e.g., Cohee at 39-40; Hattier at 240), but one Board member indicated that the Policy was intended to maintain "tradition" (McCabe at 31-32), and another forthrightly conceded that the Policy was designed to elicit public participation in prayer.  (Wilson at 31)*

**RESPONSE: Contested.**  Mr. Cohee and Dr. Hattier did not "emphasize" the purpose. Plaintiffs' counsel did.  Defendants simply responded with what, in fact, the purpose is.[2]  Mr. Cohee's testimony was as follows:

> Q.    What is your view of [the Board prayer's] purpose?
>
> A.    I feel that it's one moment when we all kind of recognize that we are getting down to business here, recognize that we are having a great deal of serious issues involving people's kids and people's money.
>
> When I was running for the school board I would say you never get involved with anything that involves people's kids or people's money, and that involves both of them.
>
> And I think it was a moment for the whole board to come together and go about their business and recognize that during that meeting we may have differences that when we walk away from the board table we support the decision and move forward, whether we disagreed during the meeting or not.
>
> Q:    To summarize, would you say that the purpose is to solemnize the meetings, then?
>
> A.    Yes.

*See* Cohee Dep. at 39-40; *see also* Hattier Dep. at 113, 240 (where the question was, "the reason for the policy permitting a prayer to be offered at the beginning of sessions, is that right, to

---

[2] Mr. Cohee was actually discussing the purpose of Board prayer, not specifically the Board Prayer Policy.

solemnize the occasion?", he responded, "That is our primary reason for doing that. That's the only reason, let me restate that, thank you"; where the question was, "At any time did anyone offer any other purpose for the Board Prayer Policy other than to solemnify its proceedings?", he responded, "No they did not").

Plaintiffs have also mischaracterized the other testimony they cite to for support. Ms. McCabe was not saying that the *Board Prayer Policy* was intended (or that its *purpose* was) to maintain tradition, but that she thought some board members wanted to continue *prayer* because it was a tradition. *See* McCabe Dep. at 32, attached hereto as Exhibit V. In addition, Board member Wilson did not, as Plaintiffs claim, concede that the Board Prayer Policy was designed to elicit public participation in prayer. The cited testimony says nothing about the Board Prayer Policy being "designed." *See* Wilson Dep. at 31, attached hereto as Exhibit W. In fact, the discussion at that point is focused on the Board conducting the prayer during the public session, *see id*. at 30-31, in which a member of audience can take part if he or she chooses.

76.    *Even the Board members who dutifully testified that solemnifying meetings was the Policy's purpose could not agree what the term "solemnify" meant.*

**RESPONSE: Contested.** Defendants contest the term "dutifully." They responded to the questions in their deposition. *See supra* at ¶ 75. Plaintiffs have also failed to support this statement with a citation to the record. In addition, the Board members' testimony on the meaning of "solemnify" was, in fact, generally consistent:

> ***Charles Bireley***: to "ask for divine guidance for the Board to help them make correct decisions and get them through the meeting in the proper way…to make the best decisions for what's best for our students…help us make the right decisions." *See* Bireley Dep. at 151.

**Harvey Walls**: "to solemnify its proceedings" means "to impress upon the importance of a regular meeting, just to ask for guidance in making the proper decisions."  *See* Walls Dep. at 40.

**Lois Hobbs**: "just trying to bring some dignity and, you know, ask for guidance in their decision about children."  *See* Hobbs Dep. at 200.

**Donald Hattier**: the phrase "solemnifying the proceedings" means "the idea that we are going to think beyond ourselves, beyond what's happening today and sit down and make absolutely the best decisions we can.  And its taking a moment to where you can focus on what your reason is for being there" *See* Hattier Dep. at 114.

**Donna Mitchell**: the phrase "in order to solemnify its proceedings" means "to get serious, solemn, to bring us together as a body, as a legislative body to conduct business."  *See* Mitchell Dep. at 15.

**Gregory Hastings**: the phrase "in order to solemnify the proceedings" means, given the large size of school district, the sometimes controversial decisions the Board has to make, and the financial issues at stake, "one hopes, or I hope, that I make the very best decision I possibly can for the sake of the district and the children in the school district, and I want all the help I can get," *See* Hastings Dep. at 102-103.

**Reginald Helms**: the phrase "to solemnify the proceedings" means or "simply says that we are asking for wisdom and guidance to make good sound decisions."  *See* Helms Dep. at 110-111.

**Randall Hughes**: the prayers have solemnized or do solemnify the proceedings, which means "to bring folks in, bring people into focus that we are about to do some matters that are important…to focus at the task at hand, making decisions that affect other people. It just brings some order to the meeting.  *See* Hughes Dep. at 41-42, attached hereto as Exhibit X.

**Mark Isaacs:** the phrase "in order to solemnify its proceedings" means, given that the meetings are formalized board meetings, "to recognize that it is a unique meeting month where many important decisions are brought to the attention of the [B]oard and to the public, and it requires careful thought and deliberation.  *See* Isaacs Dep. at 34.

- 26 -

> *John Evans*: the phrase "in order to solemnify its proceedings"
> means "in order to seek God's guidance for the decisions to be
> made at that meeting." *See* Evans Dep. at 41.

77.  *Some understood "solemnify" to mean seeking divine guidance (Walls at 40; Evans at 41); others thought it was simply meant to convey the message that the Board's business required careful thought and deliberation.  (Isaacs at 34)*

**RESPONSE: Contested.**  *See supra* at ¶ 76.  In fact, Mr. Walls did not testify that he understood "solemnify" to mean seeking *divine* guidance.  *See id.*  Mr. Walls' definition also included "to impress upon the importance of a regular meeting."  S*ee* Walls Dep. at 40.  Mr. Isaacs' definition included to recognize that a Board meeting "is a unique meeting month where many important decisions are brought to the attention of the [B]oard."  *See* Isaacs Dep. at 34.

78.  *But other Board members' testimony directly contradicted these claimed purposes.*

**RESPONSE: Contested.**  *See supra* at ¶¶ 76, 77.  In addition, Plaintiffs have failed to support this statement with a citation to the record.

79.  *In fact, as explained below, the stated purpose for Policy BDA.1 is a sham – unnecessary and designed to mask the Policy's real purpose.*

**RESPONSE: Contested.**  *See supra* at ¶ 77.  This is an argument, not a statement of fact.

### A.    Prayer or a Moment of Silence in the Public Session Solemnizes Board Meetings.

80.  *Board members admit that prayer is "nice, but not necessary" to solemnify Board meetings.  (Hastings at 111; see Isaacs at 61-62; Mitchell at 15-16; Walls at 42; McCabe at 91)*

**RESPONSE: Uncontested.**

81.     *Prayer is not necessary because, as Board members candidly admitted, Board meetings that opened with a moment of silence instead of prayer were conducted solemnly. (Cohee at 110- 11; McCabe at 90-91)*

**RESPONSE: Uncontested.**

82.     *Moreover, in both special meetings and executive sessions, which the Board does not open with prayer (and at which, not coincidentally, the public is not present),[fn. 8] the Board has managed to deliberate in a solemn and respectful manner.  (Evans at 11-12; Walls at 52).*

**RESPONSE: Partially contested.**  *See* Helms Dep. at 136 (testifying that "over the years that I've been on there[,] some have [opened with prayer], but it would be out of the ordinary").  Contrary to Plaintiffs' assertion, the public may be present at special meetings.  *See* Bireley Dep. at 87 ("Sometimes there is public at special meetings, too"); *supra* at ¶ 7.

83.     *[from footnote 8:] One Board member conceded that it was "strange" that regular meetings, where the public is present, open with a prayer, but special meetings and meetings that are closed to the public do not.  (Bireley at 86; see also Bireley at 175; McCabe at 57-58; Helms at 136)*

**RESPONSE: Contested.**  Plaintiffs have misconstrued the cited testimony.  Specifically, he testified, "I know it's [sic] probably sounds strange but the prayer issue usually is on regular Board meeting[s]."  *See* Bireley Dep. at 86.  In addition, the public may be present at special meetings, *see* Bireley Dep. at 87 and *supra* at ¶ 7, and one Board member does recall some special meetings that opened with prayer.  *See* Helms Dep. at 136.

84.     *[from footnote 8:] Some Board members said that they silently sought divine guidance at meetings that did not open with prayer (Helms at 135-36; Mitchell at 103-04; Walls at 53-54) – which, of course, they could do before or during regular Board meetings as well.*

**RESPONSE: Uncontested.**

85.    [from footnote 8:] *As Board member Helms testified, his prayers would be heard whether offered silently or out loud.  (Helms at 137-38; see also Walls at 54)*

**RESPONSE: Uncontested.**

86.    [from footnote 8:] *But when that solution was proposed by one Board member, his suggestion was summarily rejected.  See Section III, C below.*

**RESPONSE: Contested.**  *See* Defendants' response to Section III, C below.

87.    *In contrast, the August 24, 2004 Board meeting was hardly conducted in a solemn manner, even though it opened with a prayer.  (McCabe at 72; see Ex. 52; Ex. 53).*

**RESPONSE: Contested.**  The Board conducted its business in a solemn manner.  *See* Plaintiffs' Exhibit 55.

88.    *For example, at that meeting, former Board member Harold Johnson gave a lengthy speech about the need for prayer in a "chain of command society."  (Ex. 63)*

**RESPONSE: Partially contested.**  In Mr. Johnson's reference to a "chain of command society", he was saying there needed to be prayer, but that people should not be told how to pray.  *See* Plaintiffs' Exhibit 55.

89.    *Johnson then continued with a thinly veiled threat to anyone who challenged the District's prayer practices:*

> *The United States Supreme Court may be the highest deliberative body of the nation, but there is one higher authority above them.  The Good Lord has proven that.  The last I knew Madalyn Murray O'Hair just disappeared never to be seen or heard from again.  I think we all know who she was.  She was the person who initiated the movement to remove prayer from our schools.  (Ex. 64)*

**RESPONSE: Partially contested.**  There is no evidence in the record of what Mr. Johnson intended.  Furthermore, as Mr. Bireley testified, "I don't know that I thought that that

was a threat. I'm familiar with Madelyn Murray-O'Hair, I mean I know the situation, who she was and all that, but I don't know that he was using that as a threat against her, I hope not." *See* Bireley Dep. at 215.

90.  *Several Board members admitted they should have stopped Johnson from continuing to address the Board -- but they did nothing.  (Hattier at 268-70; Bireley at 216-17; Evans at 120-21)*

**RESPONSE: Contested.**  *See supra* at ¶ 46.  Plaintiffs misconstrue the cited testimony. Mr. Bireley did not admit that he should have stopped Mr. Johnson from continuing to address the Board.  He stated that it did not occur to him to say anything to Mr. Johnson.  *See* Bireley Dep. at 216-218.  Likewise, in Mr. Evans' deposition, he testified that he did not know if at the time of the meeting he thought Mr. Johnson's comments were uncalled for, as he remembered then at his deposition what happened to Mrs. O'Hair.  *See* Evans Dep. at 120.  Finally, Dr. Hattier simply stated that "some things were said that should not have been said and were clearly inappropriate."  *See* Hattier Dep. at 268-269.

91.  *The "solemn" crowd cheered and applauded Johnson's unsubtle warning.  (Ex. 65; Ex. 66)*

**RESPONSE: Partially contested.**[3]  *See supra* at ¶ 89.

**B.    Board Members Pray At Regular Meetings, And The Public Has the Option of Participating.**

92.  *Board member Robert Wilson freely conceded that the Board's prayers are "for the benefit of everyone in attendance."  (Wilson at 31)*

**RESPONSE: Partially contested.**  Mr. Wilson agreed with the question that Board prayer "in some way is for the benefit of everyone in attendance."  *See* Wilson Dep. at 31.

---

[3] Plaintiffs' citation to Exhibit 66 appears to be an error, as Exhibit 66 is excerpted pages from a book entitled, <u>Song and Service Book for Ship and Field.</u>

93.     *In fact, Wilson explained that the reason the Board prays only at regular meetings: "We want the public to take part in the prayer. That's the whole thing behind the public board meeting." (Wilson at 31)*

**RESPONSE: Contested.** Plaintiffs have taken Mr. Wilson's testimony out of context. *See* Wilson Dep. at 30-31. Mr. Wilson stated further, "I think that when you do it in the public like that, I think it shows that you can come together, and that's one thing that a lot of people have in common." *See* Wilson Dep. at 31.

94.     *Other Board members insisted they had no recollection of the public's behavior during the prayers (Cohee at 113; Isaacs at 63), but one Board member acknowledged the obvious, admitting he had "been able to look around at several times and see people that have heads bowed," and he testified that "99 percent of the people do take part" in the prayer. (Wilson at 31)*

**RESPONSE: Partially contested.** The public may participate if they choose to. *See supra* at ¶ 92; Hobbs Dep. at 207-08 (regarding the disclaimer portion of the Board Prayer policy that states, "No school employee, student in attendance, or member of the community in attendance shall be required to participate in any such prayer or moment of silence"); *see also* N. Bunting Dep. at 56 (discussing board prayer generally: when the Board prays, it is meant for "the ten of [the School Board members], and there is no reason for it to be viewed or seen or anything by anyone else unless they choose to").

95.     *In fact, the Board has explicitly invited the public to participate.*

**RESPONSE: Contested.** Plaintiffs have not provided support for this statement with a citation to the record. S*ee also supra* at ¶ 94.

96.    *For example, at the contentious August 24, 2004 meeting, Hattier prefaced his prayer by saying: "The following prayer was given by General George Washington on the occasion of concluding his service to the Continental Army.  On June 14, 1783, General Washington wrote all of the governors of the newly-freed states to join him in the Service Prayer. Likewise, I am asking all of those here tonight to join me in thinking about and understanding his words."  (Ex. 54)* [emphasis added]

**RESPONSE: Contested.**  Dr. Hattier asked the public to "think about" and "understand" the words of George Washington.

### C.    The Board Has Chosen to Keep Its Tradition of Prayer at Board Meetings As An Option for The Board Member On Rotation.

97.    *Then-Board member Mark Isaacs offered two alternatives to public prayer, but both were rebuffed without meaningful discussion.*

**RESPONSE: Partially contested.**  Defendants contest and characterization that Mr. Isaacs' suggestions were "rebuffed without meaningful discussion."  As Mr. Isaacs testified, there were responses to his suggestions.  *See* Isaacs Dep. at 69-70; *see also* Walls Dep. at 57-59 (discussing Mr. Isaacs' suggestion that the policy provide for a moment of silence rather than prayer and the responses to the same).  In addition, Mr. Isaacs' suggestion that the Board open its meetings with a moment of silence was something that was ultimately incorporated into the Board Prayer Policy.  *See* Board Prayer Policy ¶ 1; Isaacs Dep. at 67.

98.    *When the Board was considering Policy BDA.1, Isaacs suggested that the Board should simply pray in private.  (Isaacs at 67-68)*

**RESPONSE:  Uncontested**.

99.     *Other Board members rejected that suggestion, telling Isaacs that a private prayer would violate Delaware's Sunshine Laws.  (Isaacs at 67-68;* see also *Walls at 44-45 (confirming his view that private prayer by the Board would make a meeting illegal))*

**RESPONSE: Uncontested.**

100.     *No one on the Board researched whether private prayer would actually violate Delaware law – as, of course, it would not.*  See 29 Del. C. § *10001* et seq. *(Isaacs at 68)*

**RESPONSE: Contested.**  Plaintiffs mischaracterize the cited testimony.  Specifically, Mr. Isaacs was asked, "Did anybody suggest *looking into more closely* whether the Sunshine Laws would actually prohibit the board members from just getting together and having a prayer before they began their meeting."  *See* Isaacs Dep. at 68.

101.     *Isaacs also suggested silent prayer, but other Board members stated that if they wanted to pray out loud, they would do so. (Isaacs at 69) [fn. 9]*

**RESPONSE: Partially contested.**  This mischaracterizes the Board members' testimony.  *See* D. Mitchell Dep. at 53 (the moment of silence as a way to seek divine guidance for the Board's decision "would not be as effective for me, but I respect everyone's right to offer it the way they choose"); N. Bunting Dep. at 113-114 (testifying that personally, she feels the prayer should be done aloud to be effective to solemnize the proceedings, but respecting other Board members' rights to do it differently).

102.     [from footnote 9:] *These Board members appear to be referring to their personal First Amendment rights, notwithstanding the cloak of governmental authority they assume as Board members.*

**RESPONSE: Contested.**  This is not a statement of fact and has no citation to the record.

103.     [from footnote 9:] *At all events, no Board member disputed that silent prayers would be equally effective as the public prayers they insist on delivering at regular Board meetings.  (Helms at 133-34; N.L. Bunting at 111-12)*

**RESPONSE: Contested.**  Board members have testified that certain types of prayers, in their view, would not sufficiently solemnize the proceedings.  *See, e.g.,* Walls Dep. at 43-44 (in response to the question, "Am I correct that in order to solemnify its proceedings, the prayer among the adult members of the board could take place outside of the regular meeting immediately before the meeting," testifying, "It could, but in my mind, that wouldn't solemnify the meeting"); D. Mitchell Dep. at 53 (the moment of silence as a way to seek divine guidance for the Board's decision "would not be as effective for me, but I respect everyone's right to offer it the way they choose"); N. Bunting Dep. at 113-114 (testifying that personally, she feels the prayer should be done aloud to be effective to solemnize the proceedings, but respecting other Board members' rights to do it differently).

104.     [from footnote 9:] *In fact, several engage in silent prayers for guidance at executive sessions or special meetings where public prayers are not offered.  (Helms at 134-35; Walls at 53-54; Mitchell 53-54)*

**RESPONSE: Uncontested.**

## IV.     THE BOARD OPENS ITS PUBLIC MEETINGS WITH PRAYERS, SOME OF WHICH MAY HAVE CHRISTIAN REFERENCES.

105.     *The Board's prayer practice overwhelmingly favors Christianity.*

**RESPONSE: Contested.**  Plaintiffs have not supported this statement with a citation to the record.  Plaintiffs have provided very few examples of the prayers they consistently reference. Moreover, Defendants have testified that the substance of the prayers is not focused on a particular denomination.  *See, e.g.,* McCabe Dep. at 76 ("Generally, it was just a prayer asking

for wisdom to make good decisions for the betterment of our district and our children"); Nina

Lou Bunting Dep. at 49 ("I know when I give the prayer it is just talking about our staff and

students, and about our own decision making.  It does not involve anything or anybody else");

Hobbs Dep. at 198 (if there was a death or other tragedy, "often [the person giving the prayer]

would bless that, you know, they would say, you're in our thoughts, that family, who's ever gone

through this tragedy is in our thoughts"); Hattier Dep. at 324 ("at a lot of our prayers we will ask

for the proper guidance for our custodial staff, or our teachers to do the right things as well").

106.    *Board members could not recall a single non-Christian prayer ever being given at*
*a public Board meeting.  (Bireley at 59-60, 62-63; Cohee at 114; McCabe at 74)*

**RESPONSE: Contested.**  Plaintiffs have mischaracterized the cited testimony.

Plaintiffs' citation to Mr. Bireley's deposition does not support their proposition.  Mr. Bireley

was testifying about whether previous Board members had been non-Christian, about those who

offer prayers, and about the rotation practice.  *See* Bireley Dep. at 59-60, 62-63.  He did not

testify regarding the type of prayers given.  *See id.*

Finally, Ms. McCabe did not testify that she could not recall any non-Christian prayers.

The questioning was limited to prayers in which religious figures were identified.  *See* McCabe

Dep. at 74 (questioning on "Have any school board prayers identified any religious figures").

107.    *Thus, even those prayers that do not explicitly evoke Jesus still are recognizably*
*Christian.[fn. 10]*

**RESPONSE: Contested.**  Plaintiffs have not supported this statement with a citation to

the record.

108.    [footnote 10:] *For example, although Hattier excised the sectarian phrase "Jesus Christ" from his recitation of Washington's prayer, the prayer, as a matter of historical fact, does invoke Jesus's name and is a sectarian prayer.  (Ex. 68)*

**RESPONSE: Partially contested.[4]**  The prayer offered by George Washington referenced Jesus Christ but the "prayer" offered by Dr. Hattier did not.

109.    *Before June 2004, two Board members, Helms and John Evans, typically alternated in offering prayers at meetings.  (N.L. Bunting at 62; see also Doe at 15)*

**RESPONSE: Partially contested.**  Mr. Bireley testified that someone out of a small group composed of three or four Board members was usually invited by the Board President to offer a prayer.  *See* Bireley Dep. at 58-59.  In addition to designating members to lead the group, School Board Presidents testified that they would invite other board members to let them know if they wished to give the opening prayer.  *See* Bireley Dep. at 63-64 (specifically discussing his first tenure as Board President); *see also* Isaacs Dep. at 26 (testifying that President Walls asked him if he would want to be invited to open a meeting with prayer).

Defendants contest Plaintiffs' citation to Jane Does's deposition as unsupportive of Plaintiffs' statement.  *See* Jane Doe Dep. at 15.  In addition, Nina Lou Bunting could only provide testimony with reference to the time period beginning in 2002 when she came on the Board.  *See* N. Bunting Dep. at 62.

110.    *Both testified they always pray to Jesus.  (Evans at 55 (if he "pray[ed] without offering the prayer in the name of Jesus, [he] would be denying Jesus"); Helms at 195, 201; cf. N.L. Bunting at 111 ("My God says . . . to pray everywhere, any time, all the time, whether privately or publicly, to pray without ceasing.") (emphasis added))*

---

[4] Defendants respond under the assumption that Plaintiffs actually meant to cite to Exhibit 66, which appears to provide a quote of President Washington's speech quoted, in parts, by Dr. Hattier at the August 24, 2004 meeting. No Exhibit 68 was filed or provided under seal to Defendants.

**RESPONSE: Uncontested.**

111.    *The Board adopted Policy BDA.1, entitled "Board Prayer at Regular Board Meetings," on October 19, 2004.  (Ex. 0039; Ex. 0023 at 5)*

**RESPONSE: Uncontested.**

112.    *But nothing changed.*

**RESPONSE: Contested.**  Plaintiffs have not provided support for their statement with a citation to the record.  Moreover, the Board Prayer Policy did usher in changes.  Both the rotation and the disclaimer were added. Also, the Board Prayer Policy made it clear that such opportunity shall not be used or exploited to proselytize, advance or convert anyone, or to derogate or other disparage any particular faith or belief.  *See* Board Prayer Policy ¶ 3.  The Board Prayer Policy also made it clear that a moment of silence was an acceptable method of solemnizing the proceedings.  *See id.* at ¶ 1.

113.    *The Board continued to routinely deliver sectarian prayers – and sectarian prayers only in Jesus's name.  (Bireley at 66-67; Cohee at 114; Dobrich at 9-10)*

**RESPONSE: Contested.**  *See supra* at ¶ 105.  In addition, prayers were not always only in Jesus's name.  *See* McCabe Dep. at 74 (stating that Jesus was not always identified in the Board prayers); Cohee Dep. at 114 (not testifying that the prayers were only in Jesus's name but that he thought the majority of the prayers were Christian).  Plaintiffs' citation to their own party's testimony likewise does not support their proposition, as his testimony relates to meetings before June 15, 2004.  *See* Dobrich Dep. at 9-10.  Mr. Bireley's testimony cited by Plaintiffs relates to before the Board Prayer Policy was adopted.  *See* Bireley Dep. at 64-67.

114.    *Despite the Policy's rotation requirement, Board President Bireley admitted that he has called on only select Board members to offer prayers: current Board members Helms,*

*Mitchell, Nina Lou Bunting, and Hattier, and former Board member Evans. (Bireley at 73-74) [fn. 11].*

**RESPONSE: Partially contested.** The rotational schedule is in accordance with the Board Prayer Policy. *See* Bireley Dep. at 73-75 (Bireley established rotational schedule among individuals expressing interest to offer the prayer); Mitchell Dep. at 97 (understanding the term "rotating basis" in paragraph 2 of the Board Prayer Policy to mean "[t]hat the same person would not do it every meeting, that others will be given the opportunity. If they chose not [to] do it, it would go to another person"). Moreover, Board member Oliphant has was put into rotation and has offered a moment of silence. *See* Oliphant Dep. at 33.

115.     [fotenote 11:] *Unsurprisingly, Bireley did not call on Board members who would be embarrassed to show their personal preference to decline the opportunity to pray (Bireley at 182-83 (stating that he did not want to "embarrass them")), which would undermine the apparent unanimity of the Board's Christian prayer practice.*

**RESPONSE: Contested.** Plaintiffs mischaracterize Mr. Bireley's testimony regarding the rotation schedule. Mr. Bireley calls on the Board members who have expressed an interest in saying a prayer or having a moment of silence. *See* Bireley Dep. at 176-77. He has decided not to publicly offer the individual Board members the opportunity because he "didn't want to put anyone on the spot by asking them to do it or for them to decline." *Id.* at 177. As a Board member who has previously declined to offer the prayer or moment of silence, he understands that the Board member may want advance notice so that he or she can prepare something. *See id.* at 178-180. He additionally testified that he did ask the Board members publicly because he did not to "embarrass them or put them on the spot, yeah, when I already knew the answer." *See id.* at 183.

116.    *Of these, Evans, Helms, Mitchell and Bunting testified that they always name Jesus in their prayers.  (Mitchell at 54; Evans at 55; Helms at 195, 201; N.L. Bunting at 126)*

**RESPONSE: Contested.**  *See supra* at ¶¶ 105, 113.  Moreover, Ms. Mitchell was not testifying that all the Board prayers that she offers are in the name of Jesus, but that when she prays, she seeks "divine guidance through God, to God through Jesus."  *See* Mitchell Dep. at 54-55.  In addition, Ms. Bunting has offered a moment of silence instead of a prayer in the name of Jesus.  *See* N. Bunting Dep. at 112.

117.    *Hattier and Bunting testified that requiring a Christian to refrain from naming Christ in a public prayer is the same as "denying Christ."  (Hattier at 122-23; N.L. Bunting at 109-10)*

**RESPONSE: Contested.**  Dr. Hattier, an self-identified Christian, testified that for him personally, to offer a prayer that does not reference Christ is *not* denying Christ.  *See* Hattier Dep. at 109, 122.

## V.     THE BOARD CONTINUES THE LONGSTANDING TRADITION OF OPENING REGULAR BOARD MEETINGS WITH PRAYER.

### A.    **The Board Would Discuss Potentially Inappropriate Prayers and Discipline If It Was Warranted.**

118.    *Board members are responsible for enforcing Policy BDA.1.  (Bireley at 22; Evans at 64; Helms at 222; Isaacs at 38-39; McCabe at 18-19; Mitchell at 83; Walls at 160)*

**RESPONSE: Uncontested.**

119.    *The only enforcement mechanism against a Board member who offers a prayer that violates the Policy, however, is depriving that member of subsequent opportunities to open meetings with prayer, an empty discipline.  (Walls at 162; Isaacs at 41)*

**RESPONSE:  Contested.**  The Board members did not testify that denial of future opportunities is the only mechanism for enforcing the Board Prayer Policy.  *See* Walls Dep. at 162-163 (discussing what he would have done if he were Board President and someone gave an inappropriate prayer, but not testifying that this was the "only" mechanism); Isaacs Dep. at 40-41 (discussing what he would do if someone gave an inappropriate prayer, but not testifying that was necessarily the "only" mechanism).  Mr. Bireley testified that, while he has never had the issue of a Board member violating a Board policy, "I would assume that we would come before the rest of the Board members and we would discuss it."  Bireley Dep. at 23; *see also* Helms Dep. at 222-224 (stating that if he viewed a prayer as violative of the Board Prayer Policy, "I would wait till the appropriate time and I see that as executive session or whatever, and I would like to talk about it…there are opportunities to step in if someone is out of line.  The president has that responsibility, but also in executive session there are discussions that can be had to try to, you know, straighten that sort of thing out").

120.    *Despite this mechanism, Board members collectively had no consistent idea what prayers would violate Policy BDA.1's prohibition of prayers used to proselytize, advance or disparage a religious faith, or convert anyone – ensuring that even this empty discipline will never be imposed.*

**RESPONSE: Contested.**  Plaintiffs have not provided support for this statement with a citation to the record.  *See supra* at ¶ 119.

121.    *Throughout their depositions, Board members who voted for Policy BDA.1 and new members responsible for enforcing the Policy were asked whether several prayers violated Policy BDA.1.*

**RESPONSE: Contested.**  Plaintiffs have not provided support for this statement with a citation to the record.  Furthermore, to the extent Board members were "asked whether several prayers violated" the Board Prayer Policy, the prayers recited were not prayers *actually given* at Board meetings.

122.    *Their inconsistent answers show that Policy BDA.1 provides little guidance to the Board.*

**RESPONSE: Contested.**  *See supra* at ¶ 121.

123.    *For instance, nine Board members were asked whether a sample prayer characterizing certain people as "heathens" would violate the Policy.*

**RESPONSE: Contested.**  *See supra* at ¶ 121. The record does not indicate any prayers where the word "heathen" was actually used at a Board meeting.

124.    *Five Board members who heard a prayer requesting God to "convert the heathen" determined that it violated the Policy, but another member, astonishingly, was unsure.  (Cohee at 109; Evans at 153; Hughes at 72; Isaacs at 41; Mitchell at 107-08;* but see *Walls at 161)*

**RESPONSE: Partially contested.**  *See supra* at ¶ ¶ 121, 124.  Furthermore, the "unsure" Board member actually testified as follows:  "I don't know if it would be prohibited or not.  I just wouldn't consider it appropriate."  *See* Walls Dep. at 161.

125.    *However, three Board members who heard a slightly different prayer, requesting that God "enlighten" and "inspire" the heathen, stated that such a prayer would not be prohibited.  (Hastings at 118; Helms at 221-22; McCabe at 75-78 (stating that she did not find it "terribly objectionable"))*

**RESPONSE: Partially contested.**  Plaintiffs mischaracterize the cited testimony.  Mr. Helms did not state that the hypothetical prayer would not be prohibited; he stated, "I would view that as a prayer that is very dangerously on the edge, and I would need someone—see, to me there is a difference between what is lawful—in other words, someone would have to tell me whether that lawfully broke the policy.  However, in my mind I would say I would not say that, and I don't know that I would, but perhaps I may say something to Dr. Hattier in the form of you know Dr. Hattier that might be dangerously close.  That's something I wouldn't do."  *See* Helms Dep. at 222.  Mr. Hastings "suspect[ed] it would be permissible", that it was not a prayer used to convert anyone.  *See* Hastings Dep. at 118.]

126.     *Similarly, Board members disagreed whether a prayer requesting that Board members be "direct[ed] . . . into the truth, and eventually the truth that comes by knowing Jesus" would violate the Policy. [fn. 12]* [omission in original]

**RESPONSE: Contested.**  *See supra* at ¶¶ 121, 124.

127.     [footnote 12:] *This prayer, of course, uses the language of Pastor Fike's graduation prayer that the Board acknowledged was objectionable in that context, and which prompted the Board to adopt a graduation policy that would explicitly prohibit such a prayer. (Helms at 156)*

**RESPONSE: Contested.**  *See supra* at ¶¶  16, 19.

128.     *Remarkably, eight Board members determined that this prayer did not violate the Policy's prohibition on attempts to convert, to proselytize or to advance a religion.  (Hastings at 116; Helms at 219-20; Cohee at 105; Hughes at 76; McCabe at 81; Mitchell at 137; Isaacs at 43-44; Walls at 164)*

**RESPONSE: Partially contested.**  *See supra* at ¶¶ 121, 122, 124.

129.    *Two Board members concluded that the prayer was prohibited proselytizing (Evans at 153; Bireley at 146); one was unsure.[fn. 13]  (N.L. Bunting at 55-56)*

**RESPONSE: Partially contested.**  *See supra* at ¶¶ 121, 122, 124.

130.    [from footnote 13:] *In this line of questioning, individual Board members also offered various factors that could alter their perception of whether a prayer violated the Policy, for instance, that a prayer was "historical" (N.L. Bunting at 50-52), what the intended meaning of the term "offer" was in a particular prayer (Evans at 153-54; McCabe at 83), and whether the Board member found a given prayer to be "offensive."  (Hughes at 74)*

**RESPONSE: Uncontested.**

131.    [from footnote 13:]  *Thus, Board members not only did not agree on whether the particular prayers would violate the Policy, they did not even agree on how that determination would be made under the Policy.*

**RESPONSE: Contested.**  *See supra* at ¶¶ 121, 122, 124.

132.    *When asked whether a non-Christian had ever prayed at a Board meeting, the District's 30(b)(6) witness said he did not recall ever "having that type of Board member." (Bireley at 60)*

**RESPONSE: Contested.**   The question Mr. Bireley responded to was not whether a non-Christian had ever prayed at a Board meeting, but whether, out of the group of people who tended to offer the prayer, that group included a non-Christian.  *See* Bireley Dep. at 58-60.

133.    *This group of Christians ultimately determines the permissibility of prayers under the Policy.*

**RESPONSE: Contested.** Plaintiffs have not provided support for this statement with a citation to the record. Defendants contest the implication that Board members who are Christian are incapable of enforcing the Board Prayer Policy.

134. *Their disagreement about these clearly proselytizing prayers shows that the Policy provides no clear guidance, and that the subjective judgment consequently required will inevitably be affected by Board members' unanimously Christian views.*

**RESPONSE: Contested.** *See supra* at ¶¶ 121, 122, 124.

**B.    While Plaintiffs' State That the Board Prayer Policy's "Disclaimer Is Ineffective, And Presents Students Who Do Not Wish To Join The Prayer With Two Unpalatable Options:  Remain Silent Or Leave During The Prayer [fn. 14]", Students Actually Have a Variety of Options.**

135. [from footnote 14:] *Nor is this likely to change, at least according to Defendants, who testified that non-Christians are not likely to get elected.  (McCabe at 86)*

**RESPONSE: Contested.** Defendants contest footnote 14. Plaintiffs mischaracterize the cited testimony. In fact, Ms. McCabe testified as follows:

> Q.    [By Mr. Horvath]    Do you believe that someone who openly professes the Muslin faith could be elected to the school board?
>
> A.    Oh, probably not in this area, not right now.  I think that day will come, but I don't think.
>
> Q.    In the foreseeable future could that day come?
>
> A.    Probably in my children's lifetime, I think.  I am not sure whether it will in my lifetime.  I think it would be much more likely for someone of the Jewish faith to be elected to the school board, but I don't know that religion has ever been an issue in a school board election as politics or parties or not, either.

*See* McCabe Dep. at 86.

136.     *Before each prayer, the Board President reads a disclaimer describing the prayer as "voluntary."[fn. 15]  (Bireley at 74-75)*

**RESPONSE: Uncontested.**

137.     *[footnote 15:] The disclaimer combines the first and fourth paragraphs of Policy BDA.1.  (Bireley at 103-104)*

**RESPONSE: Uncontested.**

138.     *People in the audience have two options once the disclaimer is read: (i) remain silent and seated during the prayer, or (ii) leave once the disclaimer is read and return after the prayer (and perhaps after the next portion of the meeting commenced).  (Hughes at 49-50)*

**RESPONSE: Contested.**  *See supra* at ¶¶ 92, 94.  In addition, Mr. Hughes was testifying in response to a question about what a person in the audience would have to do to not be a recipient of the prayer, stating, "I am not sure exactly how I answer this question other than to say don't participate, don't think about, you know, the words that are being said, don't listen. There is a big difference between hearing and listening."  *See* Hughes Dep. at 49.  He also specifically testified that he was not saying that they had to sit silently.  *See id.*  He thought they would also have the option of leaving.  *See id.* at 49-50.  He did not testify that these are the only two options.

139.     *Some Board members expressed a startling lack of understanding of the problems associated with requiring students who object to the prayer to stand up in front of their authority figures and peers and leave, even though schoolchildren as young as kindergarteners receive awards.  (N.L. Bunting at 66-67; Mitchell at 18-19; Ex. 47)*

**RESPONSE: Contested.** Defendants contest the phrase "startling lack of understanding" as unsupported by the record. Plaintiffs also misconstrue the cited testimony. Mrs. Bunting was not being specifically asked about school children. She testified, "it wouldn't take much courage for me to stand up and leave if something were not going my way…I feel a person that felt that strongly about that wanted to leave when that occurred would probably be the kind of person that[,] no[,] would not be fearful in getting up and leaving, if they had such conviction." *See* N. Bunting Dep. at 66-67. Moreover, Ms. Mitchell's testimony was in response to questioning about offering a prayer backstage before walking on stage for the meeting. *See* D. Mitchell Dep. at 18-19. Ms. Mitchell was responding, "Actually, we are not up on the stage. We are usually out in the cafeteria or a room that is just one big open room, and people have come in and have sat down. There is a disclaimer that is said before the prayer that they know it's coming. If they are going to be offended, they can get up and leave. But no one has ever questioned or been offended in the past." *See id.* at 19; *see also* Hobbs Dep. at 209 ("Most of [the children] have their parents with them at those meetings, they bring them. So I would imagine the parents would walk out with them").

140.    *In any event, some students have no choice: JROTC students who present colors immediately before or after the prayer cannot leave.  (Isaacs at 64-65)*

**RESPONSE: Contested.** *See supra* at ¶ 73.

## VI.    THE PUBLIC HAS MADE CHRISTIANITY AND CHRISTIAN PRAYER POLITICAL ISSUES IN THE DISTRICT.

141.    *Numerous Board members conceded that District residents consider the defense of this suit to be a defense of "Christian values."  (Evans at 112-13; Hastings at 130-31; Hughes at 88; Isaacs at 54-55; Walls at 88-89)*

**RESPONSE: Partially contested.** Hastings testified that while it was a common sentiment within the District that the case is about protecting Christian values, he had not had anyone tell him that specifically. *See* Hastings Dep. at 130-131. Moreover, Mr. Hastings had never heard the sentiment expressed that the Board Prayer Policy was about protecting Christian values. *See* Hastings Dep. at 131-132; *see also* Hughes Dep. at 88-89 (had heard that the case was about protecting Christian values, but does not recall ever hearing anyone say that the Board's prayer practice was about protecting Christian values); Helms Dep. at 214 (testifying both that no one ever told him that this case was about protecting Christian values and that no one had ever told him that they see the Board Prayer Policy as protecting Christian values or promoting Christianity). Mr. Isaacs thought it was simply a view held by some. *See* Isaacs Dep. at 55.

142.    *Board members also admitted that it was probably a widely held view that defense of the litigation was a defense of Christian prayer. (Walls at 152-53; McCabe at 104)*

**RESPONSE: Contested.** In fact, Mr. Evans testified that he did not believe that the public viewed the defense of lawsuit as a defense of Christian prayer. *See* Evans Dep. at 113; *see also* Hastings Dep. at 130 (never had anyone tell him that this case was about protecting Christian prayer). Even while Walls may have conceded this, he did not recall if he himself had specifically been told that the defense of this case was defense of Christian prayer, though he supposed that some people have suggested or expressed that view. *See* Walls Dep. at 153. Plaintiffs' citation to McCabe's deposition does not support their proposition. See McCabe Dep. at 104 (discussing a letter Ms. McCabe wrote).

143.    *Board members have admitted that Board prayer has become a significant political issue in the area. (McCabe at 86-87; Hastings at 135; Helms at 214-15)*

**RESPONSE: Partially contested.**  Plaintiffs have mischaracterized Ms. McCabe's testimony.  She stated, "I am sure [Board prayer] was an issue for some people.  There were other issues, I think, just as important."  *See* McCabe Dep. at 86-87; Bireley Dep. at 193 (testifying, "I don't know that it became a major issue, it became an issue in the campaign").  Mr. Helms also testified that he did not think it had become a significant political issue.  *See* Helms Dep. at 214-215 (testifying that he had heard about a radio broadcast in which school board prayer was mentioned in connection with a campaign, but he was not sure if the woman had campaigned on the issue "but that's the only one I'm aware of that even mentioned it during the elections").  In addition, to the extent it became an issue, it was done by the public, not the candidates.  *See* Hastings Dep. at 135 (testifying that the candidates did not campaign on the issue of Board prayer, but that persons seeking to support the campaign of individual candidates did make it Board prayer an issue").

144.     *In fact, Board prayer may have swung the 2006 School Board elections and caused Board members to be reelected by wide margins.  (Hastings at 133; Bireley at 193-94; Ex. 56)*

**RESPONSE: Contested.**  The testimony refers to news articles that were not accurate.  *See* Bireley Dep. at 192-194 (stating he was inaccurately quoted).  With respect to the specifically cited testimony, Mr. Bireley testified that he did not make the lawsuit an issue, and he had no way of knowing whether it swung the vote.  *See* Bireley Dep. at 193-194.  Mr. Hastings did not testify whether or not the lawsuit or Board prayer swung the vote.  *See* Hastings Dep. at 133.

145.    *Board members have wrongly characterized this litigation as driven by the ACLU,[fn. 16] and the public has responded in kind.  (Ex. 57; Ex. 58; Hattier at 39-40; Helms at 186-87; McCabe at 101-02; cf. Ex. 59)*

**RESPONSE: Contested.**  Defendants received a letter from the ACLU.  *See* McCabe Dep. at 102.

146.    [from footnote 16:] *Defendants acknowledged that the community's perception of the ACLU is "anti-Christian," and that "standing up to the ACLU" would be seen as standing up for Christianity.  (McCabe at 103)*

**RESPONSE: Uncontested.**  Defendants contest that they have any control over how the public perceives the ACLU.

147.    [from footnote 16:] *Their purpose for persisting in ascribing this litigation to the ACLU – which has not entered an appearance in this litigation and has never been substantively involved – is obvious.*

**RESPONSE: Contested.**  Plaintiffs have not provided support for this statement with a citation to the record.  This statement is also argumentative.

## VII.    THE BOARD OVERSEES FUNCTIONS THAT ARE CONSISTENT WITH THE TASKS OF A LEGISLATIVE BODY.

148.    *The Board's functions include administrative, executive and quasi-judicial functions, none of which is legislative.*

**RESPONSE: Partially contested.**  The Board's functions are statutorily defined.  *See* Defendants' Opening Brief in Support of Summary Judgment, Section IIIA.

149.    *The Board manages District schools, enforces District policy, reviews recommended disciplinary actions toward students, and rewards students and teachers.  (Bireley at 13, 22; Helms at 45-47; Hughes at 31-34)*

**RESPONSE: Partially contested.** *See supra* at ¶ 148.

150.    *For example, the District approves field trips (Ex. 60 at 9), approves school choice applications (Ex. 61 at 2), approves the school calendar (Ex. 67 at 6), makes hiring decisions (Ex. 60 at 10), and even determines which grass to plant on athletic fields (Ex. 60 at 11, Ex. 61 at 7).*

**RESPONSE: Partially contested.** *See supra* at ¶ 148.


　/s/  Warren T. Pratt_____
Warren T. Pratt (DE Bar No. 4334)
DRINKER BIDDLE & REATH LLP
1100 N. Market Street, Suite 1000
Wilmington, DE 19801
Telephone:    (302) 467-4200
Facsimile:    (302) 467-4201

Jason P. Gosselin
Katherine L. Villanueva
Elizabeth L. McLachlan
DRINKER BIDDLE & REATH LLP
One Logan Square, 18th and Cherry Sts.
Philadelphia, PA 19103
(215) 988-2700
(215) 988-2757 (facsimile)

Dated: May 8, 2008

<u>**CERTIFICATE OF SERVICE**</u>

I, Warren T. Pratt, hereby certify that on May 8, 2008, I electronically filed the foregoing Counter-Statement Contesting Plaintiffs' Statement Related to Plaintiffs' Motion for Summary Judgment and Statement of Facts using CM/ECF, which will send notification of such filing to the following:

Thomas J. Allingham II
One Rodney Square
P.O. Box 636
Wilmington, DE 19899
(302) 651-3000

*Attorney for Plaintiffs*

_/s/_ Warren Pratt_____
Warren Pratt (Del. Bar No. 4334)