| Dobrich, et al.<br>Richard Cohee | v.<br>C.A. # 15-120 (JJF) | Indian River School District, et al.<br>October 17, 2006 |
|---|---|---|

```
 1          IN THE UNITED STATES DISTRICT COURT
 2              FOR THE DISTRICT OF DELAWARE
 3   MONA DOBRICH and MARCO    :   C.A. No. 15-120 (JJF)
     DOBRICH, Individually and :
 4   as parents and next friend :
     of ALEXANDER DOBRICH,      :
 5   SAMANTHA DOBRICH, JANE DOE :
     and JOHN DOE, Individually :
 6   and as parents and next    :
     friend of JORDAN DOE and   :
 7   JAMIE DOE,                  :
                                 :
 8              Plaintiffs,      :
                                 :
 9              v.               :
                                 :
10   INDIAN RIVER SCHOOL         :
     DISTRICT, et al.,           :
11                               :
                Defendants.      :
12              .. .. .. .. .. ..
13          Videotaped Deposition of RICHARD COHEE,
     taken pursuant to notice, on Tuesday, October 17, 2006
14   at 1:17 p.m. at 31 Hosier Street, Selbyville, Delaware,
     reported by Lorena J. Hartnett, a Registered
15   Professional Reporter and Notary Public.
16              .. .. .. .. .. ..
17   APPEARANCES:
18              BRIAN G. LENHARD, ESQUIRE
                RICHARD HORVATH, ESQUIRE
19              One Rodney Square
                Wilmington, DE  19801
20                Attorney for the Plaintiff
21
22                  WILCOX & FETZER
            1330 King Street - Wilmington, DE  19801
23                  302-655-0477
                    www.wilfet.com
24
```

Dobrich, et al.                          Indian River School District, et al.
Richard Cohee                            October 17, 2006
v.
C.A. # 15-120 (JJF)

Page 2

1
2  APPEARANCES (CONTINUED):
3      JASON P. GOSSELIN, ESQUIRE
       Drinker, Biddle & Reath, LLP
4      One Logan Square
       18th and Cherry Streets
5      Philadelphia, PA 19103-6996
       Attorney for the Defendants
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 3

1
2
3          TABLE OF CONTENTS
4  TESTIMONY OF RICHARD COHEE:
5   Direct Examination by Mr. Lenhard . . . . . . . 4
6   Certificate of Reporter . . . . . . . . . . . . .116
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 4

1        VIDEOGRAPHER: This is the videotaped
2  deposition of Mr. Richard Cohee taken by the
3  plaintiff in the matter of Dobrich et al
4  versus Indian River School District, et al,
5  Case Number 15-120. This deposition is
6  being held at 31 Hosier Boulevard. We are
7  going on the record on October 17, 2006 at
8  approximately 1:17 p.m.
9        The court reporter is Lorena Hartnett
10  from the firm of Wilcox and Fetzer,
11  Wilmington, Delaware. My name is Lindsay
12  DuPhily. I am the videotape specialist with
13  Discovery Video Services.
14        Counsel will now introduce themselves
15  and the court reporter will swear in the
16  witness.
17        MR. LENHARD: My name is Brian
18  Lenhard, and I represent the plaintiffs in
19  this action.
20        MR. GOSSELIN: Jason Gosselin for
21  defendants.
22        RICHARD COHEE,
23  HAVING FIRST BEEN DULY SWORN, TESTIFIED AS FOLLOWS:
24  DIRECT EXAMINATION ON BEHALF OF THE PLAINTIFF

Page 5

1  BY MR. LENHARD:
2    Q.  Good afternoon, Mr. Cohee. Again, my name is
3  Brian Lenhard. Have you been deposed before?
4    A.  Yes.
5    Q.  In what matter was that? When were you
6  deposed?
7    A.  Um, several times, actually, over the years.
8    Q.  Okay, can you describe each of those times?
9    A.  The most recent would be in reference to
10  another school district issue, and that would have
11  been late eighties, mid to late eighties, or, I'm
12  sorry, mid to late nineties, and a couple of times
13  early on in my law enforcement career, and I can't
14  remember exactly when.
15    Q.  Were any of those with regard to religion in
16  the schools?
17    A.  No.
18    Q.  And did any of them go to trial?
19    A.  I don't believe so.
20    Q.  Have you ever testified at trial?
21    A.  Yes, criminal trials.
22    Q.  And has any judge or judicial officer ever
23  questioned the truth of your testimony?
24    A.  No.

2 (Pages 2 to 5)

Case 1:05-cv-00120-JJF    Document 266-2    Filed 05/08/2008    Page 3 of 30

Dobrich, et al.                                        v.                Indian River School District, et al.
Richard Cohee                              C.A. # 15-120 (JJF)                        October 17, 2006

Page 6

1    Q.   Okay, I would like to go over the deposition
2  guidelines with you for a minute, even though you have
3  been deposed before.
4        I am going to ask the questions.  You are to
5  answer the questions.  We have a court reporter here
6  to take down the transcript of the deposition, so
7  please answer verbally, which I am sure you are aware
8  of.
9        Secondly, try to wait until I ask the
10 question before you answer the question, and I will
11 try to wait before asking the next question.  If you
12 need any clarification of any question, please let me
13 know, and I will clarify it.  If you don't ask for
14 clarification and you just answer the question,
15 presumably a judge or jury watching this videotape or
16 reading the transcript will assume that you understood
17 the question that I asked.  Is that okay?
18    A.   Yes, sir.
19    Q.   And if at anytime you need to take a break,
20 please say so.  If there is a question pending, I will
21 ask you to answer the question but then we can break.
22 The video cassette is approximately one our long, so
23 we are going to take a break every hour.
24        Are you feeling well today?

Page 7

1    A.   Fine, thank you.
2    Q.   Are you taking any medication that might make
3  it difficult for you to understand and answer my
4  questions?
5    A.   Nothing that would influence my understanding
6  or answering.
7    Q.   Is there any other reason why you will not be
8  able to answer my questions fully and truthfully?
9    A.   No, sir.
10    Q.   Have you spoken with anyone else who has been
11 deposed in this matter since they were deposed?
12    A.   No, I am not sure who all has been deposed at
13 this point, but no, not in that regard.
14    Q.   Have you spoken to any other school board
15 members in the last week about this litigation?
16    A.   No.
17    Q.   Did you prepare for this deposition?
18    A.   Yes.
19    Q.   How did you prepare?
20    A.   Spoke with our attorney last evening.
21    Q.   Was that in person?
22    A.   Yes.
23    Q.   Where was that?
24    A.   In this building.

Page 8

1    Q.   Who else was there?
2    A.   Lois Hobbs and Dr. Bunting.
3    Q.   Did anyone have any documents at that
4  meeting?
5    A.   There were a number of documents there, yes.
6  I did not have any other than a notepad.
7    Q.   Did anyone read any documents at that
8  meeting?
9    A.   I think someone referred to them.
10    Q.   Did they read them out loud verbatim to you?
11    A.   I think portions of them were read.
12    Q.   Did any of that reading refresh your
13 recollection?
14    A.   Um, I am not sure I understand your question.
15 On what particular part?
16    Q.   When the person read the document at this
17 meeting, did it refresh your recollection about the
18 facts of this case?
19    A.   Um, I don't know that it did, no.
20    Q.   Okay.  Have you discussed this deposition
21 with any other attorney besides Mr. Gosselin?
22    A.   No.
23    Q.   And did you review any documents besides,
24 except for in that meeting?

Page 9

1    A.   No.
2    Q.   Did you communicate with anyone else about
3  your deposition?
4    A.   No.
5    Q.   Can you state your full name for the record?
6    A.   Richard, middle initial H., Cohee.
7    Q.   How long have you lived in Sussex County?
8    A.   All of my 52 years.
9    Q.   Are you currently employed?
10    A.   Yes.
11    Q.   And what do you do?
12    A.   I am a criminal lieutenant at Delaware State
13 Police Troop 7 in Lewes, Delaware.
14    Q.   How long have you been on the school board?
15    A.   Seems like it's too long.  1993.
16    Q.   What positions have you held on the school
17 board?
18    A.   I have been president of the board, I think
19 for two years, vice president of the board for I
20 believe two years.  I have served as various committee
21 chairperson.  And, beyond that, I have participated in
22 various meetings.
23    Q.   Can you give me the years for your presidency
24 and vice presidency?

3 (Pages 6 to 9)

Dobrich, et al.
Richard Cohee

v.

C.A. # 15-120 (JJF)

Indian River School District, et al.
October 17, 2006

Page 10

1    A.  I am not sure that I can. Well, I can too.
2    Mrs. Hobbs was here ten years, so six -- Somewhere
3    around '95, '96 would be president, and vice president
4    was prior to that.
5        Q.  And you mentioned you were a committee chair
6    and possibly other committee positions. Were you ever
7    on the Policy Committee?
8        A.  Yes.
9        Q.  What function did you have there?
10       A.  I chaired that at one time, and I think that
11   was prior to the board president, so like that would
12   have been like '94, '95, '96, somewhere in there.
13       Q.  Do you know who was on that Policy Committee
14   with you?
15       A.  Oh, um, the ones I recall would be Earl
16   Savage, I think at the time. Harvey Walls, I think he
17   chaired it before I took over the chairmanship, and I
18   think that he stayed on it like part time after that.
19   One of the teachers named Glenda Scott. Susan
20   Bunting, I think, at one time was on the committee
21   while I was there. I don't know if it was when I
22   chaired it or when I was part of the committee. I am
23   going blank on the rest.
24       Q.  I am not sure if I understood your comment

Page 11

1    about Mr. Walls. Did you say that he was a chair
2    before and after you?
3        A.  I know he chaired it before me, and I know
4    that after me he chaired it again at some point.
5        Q.  Do you know of any other chairs of the Policy
6    Committee?
7        A.  Um, no. Since he has left the board, I will
8    be quite honest with you, I can't tell you right at
9    this moment who the current chairman is.
10       Q.  Okay. Have you served on any other school
11   boards?
12       A.  No.
13       Q.  Why did you run for school board?
14       A.  Well, the opening came about and a number of
15   people approached me, and I guess at the time there
16   wasn't a lot of interest in it, and I looked at it as
17   another form of community service.
18       Q.  Do you know who the Does are?
19       A.  Not personally, no.
20       Q.  Do any of the other board members know who
21   the Does are?
22       A.  I don't know. I am not aware of who the Does
23   are.
24       Q.  Have you made any attempts to find out who

Page 12

1    they are?
2        A.  Not interested.
3        Q.  Have any other board members made any
4    attempts to find out who they are?
5        A.  Not that I know of.
6        Q.  I know Mr. Gosselin probably provided this
7    information last week, but for the record, can you
8    give me your faith and denomination?
9        A.  I am a member of St. John's Methodist Church
10   in Georgetown.
11       Q.  And is that the same church you were a member
12   of in 2004?
13       A.  Yes.
14       Q.  Do you have any role in the church beyond
15   being a member?
16       A.  No.
17       Q.  Did you discuss with anyone from that church
18   about this litigation or the August 24, 2004 meeting?
19       A.  The litigation, no. Actually, I have not
20   been at church in a long time. The 2004 meeting,
21   would you clarify which meeting you are referring to?
22       Q.  The meeting with the large group of people at
23   it.
24       A.  And your question regarding that was?

Page 13

1        Q.  Did you discuss that meeting with anyone from
2    your church?
3        A.  Not that I recall.
4        Q.  Did you discuss that meeting with anyone from
5    any other church that you know?
6        A.  I am not sure I understand your question.
7        Q.  Did you discuss that meeting before it
8    happened with anyone from any other church?
9        A.  Before the meeting?
10       Q.  Yes.
11       A.  From my church, no.
12       Q.  And from any other church?
13       A.  Um, not that I was specifically aware of. I
14   mean obviously we anticipated that being a big
15   meeting. That was the feedback that was being heard.
16   If I discussed it with someone, it wasn't along the
17   lines of what church they was; it was just we are
18   going to have a big crowd this week, like that.
19       Q.  And when would you have had that discussion?
20       A.  I am not sure that I did. I am saying if it
21   was discussed, that would have been the manner in
22   which it was discussed.
23       Q.  But you were aware before the meeting that
24   there was going to be a large crowd there.

4 (Pages 10 to 13)

Case 1:05-cv-00120-JJF    Document 266-2    Filed 05/08/2008    Page 5 of 30

Dobrich, et al.                                                    Indian River School District, et al.
Richard Cohee                          v.                          October 17, 2006
                               C.A. # 15-120 (JJF)

Page 14

1    A.  I think there was pretty common knowledge
2  that there was going to be a large crowd there.
3    Q.  Can you give me a time period as to when you
4  would have known this information?
5    A.  Probably a week or so preceding the meeting.
6  But, to give you the exact date, no.
7    Q.  Are you aware of any special arrangements the
8  board made for this large crowd?
9    A.  I don't know that the board made special
10  arrangements, but that night that meeting was held at
11  Frankford Elementary, if I recall correctly, because
12  we alternate between the two sites.  Well, we did at
13  that time.  It was Frankford Elementary and Sussex
14  Central High School.
15    And I think, in anticipation of the overflow,
16  I think they set up a big screen or some other type of
17  communication in another room or another area of the
18  building.  I am not sure exactly what area.  It had
19  also been advertised in some type of gathering outside
20  the school.  I think that was on the local radio
21  station.
22    Q.  Was it advertised in any other way besides
23  the radio station?
24    A.  It may have been, but I don't recall that.

Page 15

1    Q.  Who would be in charge of making these
2  arrangements, the big screen TV, etcetera?
3    A.  I don't -- I could anticipate the
4  superintendent might have arranged that in
5  anticipation, because she does serve as the board's
6  executive secretary, but I don't know that to be a
7  fact.
8    Q.  Has she made any other similar arrangements?
9  Has she ever before made an arrangement for a large
10  overflow crowd at the regular school board meeting?
11    A.  I don't recall.  I don't know.  I can't think
12  of one at this point, but I can't say with certainty
13  that she did not either.
14    Q.  Do you take notes at school board meetings?
15    A.  Some.
16    Q.  And what do you do with those notes after the
17  meetings?
18    A.  Most of the time they are kind of little
19  pointers on the minutes themselves, but very few, if
20  any, notes, do I normally take.
21    Q.  Do you save them?
22    A.  For a period of time.
23    Q.  Do you have a process over time how you get
24  rid of them?

Page 16

1    A.  No, just periodically would have gotten rid
2  of them.
3    Q.  Do you have notes now at home?
4    A.  Not of anything recent, or not of anything of
5  any age.
6    Q.  Can you clarify that statement?
7    A.  Sure.
8    Q.  Do you mean earlier or later?
9    A.  If I have anything at home now, it's probably
10  fairly recent.  And I will say that in this particular
11  school year and spring of last year I have been away
12  from the board quite a bit for a number of reasons.
13  Some of my board packets actually went unopened on a
14  couple of occasions, so what I have at this point
15  would be fairly recent meetings.
16    Q.  And is it all in one file at your house?
17    A.  No.
18    Q.  How is it organized at your house?
19    A.  I have got them in several places.
20    MR. LENHARD:  All right, Jason, I will
21  call for the production of whatever minutes
22  he has that we don't already have.
23    MR. GOSSELIN:  Send me a letter, and I
24  will respond to it.

Page 17

1    MR. LENHARD:  Okay.
2  BY MR. LENHARD:
3    Q.  When acting as a school board member in
4  adopting policies and attending meetings, must those
5  members' actions be for the betterment of the children
6  in the school district?
7    A.  Restate that, please.
8    Q.  When a school board member is acting as a
9  school board member in adopting policies for the
10  district and attending meetings for the district, must
11  those members' actions be for the betterment of the
12  children in the district?
13    A.  I would hope that that's everyone's belief.
14  That would be mine.
15    Q.  Can a school board member acting as a school
16  board member act in their own interest?
17    A.  I am not sure I understand your question.
18    Q.  Can you enact policies that are self serving
19  to you individually?
20    A.  Well, it takes six people on the board to
21  enact any policy, so, as an individual, the answer to
22  that question would be no.
23    Q.  Okay, can the group, the ten of you enact a
24  policy that benefits the ten of you?

5 (Pages 14 to 17)

Dobrich, et al.                               v.                    Indian River School District, et al.
Richard Cohee                        C.A. # 15-120 (JJF)                        October 17, 2006

Page 18

1    A.  Um, possibly, but I am not -- I am not -- To
2    answer your question as you state it, can a group of
3    ten enact a policy that benefits them, I guess that is
4    possible.
5        Q.  Would that be against any other board policy?
6            MR. GOSSELIN:  Objection.  Well --
7        A.  Can you be a little more specific, because
8    you are being -- Either I am misunderstanding
9    everything you are saying at this point along those
10   lines or it's very vague.
11       Q.  Does the board have an ethics policy that
12   requires you to not enact self-serving policies?
13       A.  The board does have a board ethics policy,
14   and I don't recall specifically what it says.  It's
15   been sometime since I read it.
16       Q.  Can the board take into consideration other
17   constituencies besides the children in the district?
18       A.  Could you repeat that again?
19       Q.  Can the board take into consideration other
20   interests besides the children's interests?
21       A.  Um, I am not sure I am going where you want
22   to be going.  You may have to be more specific, but I
23   think there are times when the board has to take in
24   other interests.  For example, when we discuss

Page 19

1    referendum for new construction for building
2    modification, you are taking in the interest not only
3    of the kids but the interests of the taxpayers.
4        Q.  Do you agree that the first and greatest
5    concern of the board, though, is the children?
6        A.  I think we have already stated that, and I
7    agreed to that, yes.
8        Q.  Has Mr. Bireley ever spoken to you about
9    giving a prayer at the meeting?
10       A.  Collectively or individually?
11       Q.  Has Mr. Bireley ever spoken to you personally
12   about giving a prayer at a school board meeting?
13       A.  I don't recall that he has ever spoken to me
14   personally.  I recall some conversation, and it may
15   have very well been when we did the prayer policy,
16   about those with interests in giving the prayer.
17   There was some talk about the rotation of the prayer.
18       Q.  Can you put a timeframe on what you meant by
19   "when we discussed the prayer policy"?
20       A.  The one that was enacted on whatever date it
21   has on there.
22       Q.  So prior to 2004 did you ever discuss with
23   Mr. Bireley giving a prayer at the school board
24   meeting?

Page 20

1        A.  Are you talking about in the board setting?
2        Q.  Yes.
3        A.  I think there were a number of discussions
4    during the time of, that this issue was raised and the
5    discussion of prayer, there were a number of
6    discussions about giving prayer at the board meeting.
7        Q.  Okay, before this -- By this issue, what do
8    you mean?
9        A.  The issue of the suit that we are here for.
10       Q.  Okay, before this suit, before this
11   litigation, did you ever discuss with Mr. Bireley
12   giving a prayer at the school board meeting?
13       A.  I don't know that I -- I don't recall that I
14   was ever specifically asked, "Do you want to give a
15   prayer?"  I am not sure that's what you are asking,
16   because your questions are, again, kind of vague, and
17   I am going to ask you to be a little more specific, if
18   you could.
19       Q.  Okay, were you ever asked to give a prayer at
20   the school board meeting before 2004?
21       A.  I don't recall that I was, but I can't say
22   that I wasn't.  I don't recall being asked
23   specifically.  I think there was at times
24   conversations about who would be saying prayer, and I

Page 21

1    don't know who the board president would have been at
2    that time -- it probably changed -- but, "Who might be
3    interested in doing the prayer tonight" was something
4    that probably was said prior to the meetings or as we
5    gathered around the meeting table.  But, to be
6    specific about was, did so and so ask me, I can't
7    recall who that would have been.
8        Q.  Have you ever given a prayer at the school
9    board meeting?
10       A.  Um, I have given them at several board
11   functions.  I don't remember giving one around a board
12   table.  I may have early on, but I don't -- I don't
13   remember anything as of late.  I don't remember
14   anything specifically.
15       Q.  Your answer, two answers ago to me, at least,
16   indicated that the school board president prior to
17   2004 was the driving force of who would be giving the
18   prayer; is that correct?
19       A.  Uh-huh.
20       Q.  So when you were --
21       A.  Now, the 2004 -- Can I ask what date the new
22   policy was implemented?
23       Q.  Well, we will just make the question before
24   the new policy.

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

Page 22

1    A.  Okay.

2    Q.  Because what I meant from before 2004.

3    A.  And that's what I am thinking.

4    Q.  Before the new policy was implemented, what

5  was the role of the school board president in

6  designating who would give prayer?

7    A.  Um, I think quite often they just called upon

8  the person, or the person could indicate if they had

9  an interest in giving the prayer, "I would like to do

10  the prayer tonight."  It was moved around some, but I

11  don't know that it went a complete rotation at that

12  time.

13    Q.  When you were president, did it follow the

14  same process?

15    A.  Uh-huh.

16    Q.  And you were in charge of that process at

17  that time?

18    A.  Uh-huh.  Yes.  Sorry.

19    Q.  How did you select who would give the prayer,

20  specifically, when you were president?

21    A.  How did I?

22    Q.  Select who would give the prayer?

23    A.  Um, I knew that there were people -- I think

24  anyone around the table would have been willing to

Page 23

1  give the prayer if called upon.  I don't know of

2  anyone who would not have, but there were a couple of

3  people over the years that seemed to be more anxious

4  than some of the others.

5    Q.  Did you discuss giving the prayer with the

6  person before the meeting when you were president?

7    A.  When you --

8    Q.  I'm sorry, I will rephrase it.

9    A.  Okay.

10    Q.  When you were president, did you discuss

11  giving a prayer before the school board meeting with

12  the person or people you would designate to give the

13  prayer?

14    A.  Sometimes I would just call upon a person;

15  sometimes the person would say, "I would like to do

16  the prayer."

17       As far as your word discuss, if they asked to

18  do the prayer or I asked them to do that, we didn't

19  discuss what the prayer would or would not be, but

20  there might be a brief "I would like to do the prayer"

21  or, if none of that, then call upon a person after we

22  open the meeting and the prayer would be given.

23    Q.  Did anyone ever turn down giving a prayer if

24  you just called upon them at the meeting?

Page 24

1    A.  Not that I recall.

2    Q.  After you stopped being president, did you

3  ask to be included in the rotation of offering prayer?

4    A.  I never asked specifically, but if I were

5  called upon, I would be like anyone else and have

6  given a prayer.  I don't recall ever going to someone

7  and saying specifically, "I want to do this."  I may

8  have said, "If called upon, I will do this."

9    Q.  Did you ever tell anyone, "If called upon, I

10  won't do it."?

11    A.  No, I don't think so.

12    Q.  Does the school board enforce its own

13  policies?

14    A.  Well, the role of the school board is to

15  primarily set the policy, and to initiate and

16  implement the policy is actually the district

17  employees' role.

18    Q.  But if any of the policies are violated, who

19  enforces them?

20    A.  It depends on what the policy you are

21  violating.

22    Q.  Can you clarify that?

23    A.  Sure, the expulsion policy.  Okay?  That goes

24  to a process before it gets to the board, and

Page 25

1  sometimes it doesn't get to the board.  The alcohol

2  and drug policy.  Again, that's handled by the

3  building administrators and the staff.  It may make it

4  to the board upon appeal.

5       As far as enforcing the policy, it's the

6  principal's job to enforce the discipline in the

7  building.  That would be my thoughts along the line of

8  enforcing.  I am not sure if you are --

9    Q.  In terms of your expulsion example, are you

10  telling me that a student cannot get expelled until

11  the board has voted on it?

12    A.  There is a policy for expulsions that starts

13  with the teacher who, whatever the expulsion offense

14  is, directs to the building staff, being the principal

15  and the assistant principal.

16       It then goes to, if need be, it goes to a

17  hearing officer where they can either waive the

18  hearing or waive the expulsion.

19       And then at some point that comes to the

20  board to either say, "Yes, we agree with this," or the

21  parent and the child have an appeal process to the

22  board.

23    Q.  What about policies that govern the board's

24  actions themselves, who enforces those policies?

7 (Pages 22 to 25)

Dobrich, et al.
Richard Cohee

v.

C.A. # 15-120 (JJF)

Indian River School District, et al.
October 17, 2006

Page 26

1   A. I don't know -- I am not sure I understand
2   your question. Could you give me an example?
3       Q. For example, if someone were to have violated
4   the school board prayer policy, —
5       A. Uh-huh.
6       Q. -- who would enforce that?
7       A. Um, I don't know that there is a formal
8   enforcement process for that, at least on the board
9   end. I know over the years when I was board president
10  there were times when people might say to you, "I felt
11  this board member was a little bit out of line," and
12  you might collectively address that issue at a board
13  meeting, or you might individually address that issue
14  at a board meeting.
15          I remember one particular instance where
16  someone was in saying that they wanted the bleachers
17  painted a certain color by Friday at football game
18  time, and that's not the role of that board member.
19  Okay? With one individual, that authority is just not
20  there.
21      Q. At that time were you board president?
22      A. Um, yes.
23      Q. And how did you handle that?
24      A. I had a number of concerns brought to me

Page 27

1   along similar lines with a couple board members, and I
2   collectively addressed the entire group, reminded them
3   of the ethics policy that was in existence at that
4   time, and reminded them that as a single board member
5   we have absolutely no authority, and that's how that
6   was addressed, and that's kind of informally. Like I
7   say, I don't know that we have a formal process.
8       Q. Do you give the same type of orientation, as
9   it were, to new board members?
10      A. The superintendent normally gives an
11  orientation. A period I recall when I was first
12  elected we spent a couple afternoons in the Central
13  Office with the then superintendent.
14          There is also a statewide orientation that
15  the Delaware School Board Association does in the fall
16  for new board members.
17          As board president, I think there are times
18  when we have been reminded and I have reminded people
19  that this is the way we will be operating, you know,
20  we as a board can do a lot of things, but we as
21  individuals, we can do a lot of things too, but we
22  don't have the authority to do things that we can
23  otherwise do collectively. And I think each board
24  president has handled that somewhat differently.

Page 28

1       Q. Do you agree that when the school board
2   members are acting school board members they are
3   agents of the government?
4       A. I believe that they are an elected board and
5   I know that they are an elected board. Do I believe
6   that they are agents of the government? I am not sure
7   I understand your question on that.
8       Q. Are school board members acting in their
9   individual capacity when they are acting as school
10  board members?
11      A. They should be acting collectively as a
12  board, not as an individual.
13      Q. Has the board ever asked a prospective school
14  board member about school board prayer?
15      A. A prospective board member?
16      Q. Yes.
17      A. Has the board, as a board, or a board member?
18  What was the question? Can you repeat the question,
19  please?
20      Q. Well, let's do the board first.
21      A. Okay.
22      Q. Has the board, as a whole, ever asked a
23  prospective board member about school board prayer?
24      A. We interviewed two prospective board members

Page 29

1   to fill a temporary vacancy, and I am not clear on
2   whether that question came up in the interview of that
3   person or in the discussion of what we were or were
4   not going to ask of the two people. Beyond that, I
5   don't know that that's ever been the case.
6       Q. Who were those two people?
7       A. The prospective board members --
8       Q. Yes.
9       A. -- were Randy Hughes was one, and he was the
10  successful candidate, and the other candidate I am --
11  His name escapes me at this point.
12      Q. He was unsuccessful?
13      A. Yes, we interviewed, I think, two candidates
14  the same evening.
15      Q. And what type of meeting was this?
16      A. It was a -- We had a vacancy on the board,
17  and when there is a vacancy on the board by someone
18  leaving early -- Actually, I think it was when
19  Mr. Hastings left to go to the state board. He had a
20  number of months left on his three-year term, and the
21  procedure is that you advertise that and the board has
22  the authority to interview and pick someone for the
23  remainder of that year, and that's what this interview
24  was for.

8 (Pages 26 to 29)

Dobrich, et al.                                                    Indian River School District, et al.
Richard Cohee                          v.                                       October 17, 2006
                              C.A. # 15-120 (JJF)

Page 30

1    Q.  Was this an executive session of the board or
2  was this a regular meeting?
3    A.  It was not at a regular meeting.  It was at a
4  special meeting, and, if I recall correctly, it was in
5  the library of either Indian River or Sussex Central
6  High School.  I believe it was Sussex Central.  I
7  recall it was in the library area.  I cannot remember
8  if it was open or closed session.  I would -- I don't
9  remember whether it was open or closed session.
10   Q.  Would the timeframe be the end of 2005, then?
11   A.  Yes, spring of 2005.
12   Q.  Did you have a separate meeting about you --
13  Strike that.  You referred to you weren't sure whether
14  the question was asked in the interview process or a
15  separate meeting whether you would or would not ask
16  the question.  When was that other meeting?
17   A.  I don't think it was a separate meeting.  It
18  was at that same meeting, same evening.  As I recall
19  it, we had a meeting with two candidates, and prior to
20  interviewing the candidates we had some discussion of
21  what we were going to ask, what we weren't going to
22  ask, who was going to ask what, just like we do with
23  building principals when we interview them.  We have a
24  list of questions, and people look at those.  They

Page 31

1  might ask from those questions, or they might come up
2  with something of their own.
3    Q.  So it was the same meeting, --
4    A.  Yes.
5    Q.  -- but just before the candidate came in you
6  might have discussed it?
7    A.  I can't remember when it was discussed.  I
8  remember that that evening the prayer issue was either
9  mentioned and "Are we going to ask this or not ask
10  this," or it could have been after the candidates.  I
11  can't remember which.  I remember the prayer issue
12  being an issue at that meeting.
13   Q.  Do you remember specifically who said whether
14  or not it should be asked?
15   A.  No.
16   Q.  Did you have an opinion about that?
17   A.  Um, my opinion would be that whatever you
18  want to ask, you ask the same of both candidates.
19   Q.  Did you have an opinion about whether it
20  should be asked in general?
21   A.  Not really.
22   Q.  But there was someone there with an opinion?
23   A.  I am sure there were probably ten opinions if
24  there were ten board members there.

Page 32

1    Q.  Well, you just testified that you didn't have
2  an opinion, so that leaves nine; right?
3    A.  Uh-huh.  Did anyone else voice their opinion?
4    Q.  Yes.
5    A.  I think some were in favor of it, and I think
6  some were -- I don't want to say dead-set opposed
7  against it but were not as strongly in favor of it.
8  Myself, I probably, I would have opted to leave it
9  out, had I been the one deciding.
10   Q.  And why is that?
11   A.  I just felt that that was -- There was other
12  issues beyond that.  Even though that was a hot issue
13  at the time, I felt that the person should be selected
14  on their expertise and qualifications beyond their
15  religious belief.
16   Q.  Was there a lawyer present at that meeting?
17   A.  I don't remember.
18   Q.  Did you get any advice about whether or not
19  it's legal to ask something about that?
20   A.  I don't remember.
21   Q.  Can you just describe how school board
22  meetings work in general, what happens at a school
23  board meeting, how do people find out about it, those
24  types of things?

Page 33

1    A.  The regular board meetings are scheduled
2  monthly.  They are posted in advance.  The agenda for
3  that meeting is posted in advance.  The locations for
4  the regular board meetings are alternated between, now
5  between Indian River High School, the new one, and
6  Sussex Central High School, the new one.
7        The meetings start at 7:30, most evenings,
8  the regular meeting starts at 7:30.  There are times
9  when we may have a special meeting or start the
10  meeting early and have an executive session issue
11  prior to the regular meeting, but we have always --
12  not always, but we try it make it a policy that we do
13  not keep the public that's there for the public 7:30
14  meeting waiting.
15       So if we have a short executive session, we
16  come out at 7:30, have the public portion and, if need
17  be, go back to executive session later on.  We learned
18  that a number of years ago on an issue, and that has
19  worked rather well for us.
20       The meeting, itself, is called to order by
21  the board president.  Attendance is taken.  You have
22  the introduction of the colors by the ROTC from either
23  high school, approval of the agenda, approval of
24  minutes.  And my order may be off a little bit.  And

9 (Pages 30 to 33)

Dobrich, et al.                              v.                    Indian River School District, et al.
Richard Cohee                      C.A. # 15-120 (JJF)                      October 17, 2006

Page 34

1  then we go into new business, old business, personnel
2  issues, and down the list.
3      Q.  When you ran through the agenda, did you
4  mention prayer in that list of things that you did?
5      A.  I did not mention that, no.
6      Q.  And where does that fit in?
7      A.  That fits in prior to, I believe, the -- As
8  many times as we have done it, I am going blank
9  whether it's prior to the colors or after the colors.
10     Q.  Is there a history of student attendance at
11  these school board meetings?
12     A.  There are students in attendance at the
13  meeting, yes.
14     Q.  And how far back does that go?
15     A.  I would guess but for maybe a couple summer
16  meetings, most of the meetings probably have some
17  students in attendance and probably have since I have
18  been with the board.
19         Occasionally in the summertime the attendance
20  is very light when school is not in session.  I can't
21  say that there weren't any students there, but that
22  would probably be the time when there would be the
23  biggest opportunity to not have students there.
24     Q.  But during the school year there is students

Page 35

1  there, for the most part?
2      A.  Normally, for various reasons.
3      Q.  Does the board invite them?
4      A.  Um, I don't know that the board invites.  I
5  am not sure how the current board president and the
6  superintendent prepare the agenda.  A lot of the
7  students that come are there for different types of
8  recognition.  I think that is put together by staff.
9      Q.  Are they there when the meeting is called to
10  order?
11     A.  They can be.
12     Q.  Has student government always been at the
13  meetings?
14     A.  Um, student government was added to the
15  meetings.  When I first came on board it wasn't there.
16     Q.  And did you move for student government to be
17  at the meeting?
18     A.  Yes, I did, ninety -- I came on '93.  I don't
19  know if it was '93 or '94, maybe even '95, but it was
20  early in my tenure there.
21     Q.  And why did you do that?
22     A.  We had a -- We had a -- Periodically we had
23  student reports of the various activities in the
24  school in an informal way at the meetings, and they

Page 36

1  would come up and they would tell you what's going on,
2  how the football game was going and that kind of
3  thing, and I personally felt that it was good -- There
4  was some talk at one point when actually a couple
5  districts supported having a student board member, and
6  I just thought it would be beneficial to the children
7  or to the students to have their spot on our agenda,
8  to be recognized there.  That was my feelings on that.
9      Q.  So it was your motion that is the driving
10  force in getting the student government to the
11  meeting?
12     A.  I had made the motion, yes.
13     Q.  But the superintendent would have done it on
14  her own?
15     A.  Done what?
16     Q.  Well, I asked you a few minutes ago did the
17  board invite students to the meeting, and you said
18  depending what the superintendent does.
19     A.  Uh-huh, uh-huh.
20     Q.  Correct?
21     A.  Uh-huh, yes.  Sorry.
22     Q.  But now my question now is it's because of
23  your motion that the superintendent asked those
24  students; correct?

Page 37

1      A.  Not necessarily correct.
2      Q.  Well, without your motion she would have done
3  so?
4      A.  My motion brought in a representative from
5  student government from each of the two high schools,
6  and most of the time we had one, not two.  If we were
7  meeting at Indian River, it would be the Indian River,
8  and the next month we met at Sussex Central, it would
9  be Sussex Central.  My motion did not bring in other
10  students who were recognized for sports banquets,
11  odyssey of the mind, those kinds of things.
12     Q.  Okay, so for student government, the board,
13  through your motion, is responsible for bringing them
14  to the meetings?
15     A.  As I said earlier, they were coming to the
16  meetings informally prior to the motion.  My motion, I
17  felt, recognized them, gave them an opportunity on the
18  agenda, recognized their involvement, and basically
19  allowed them to continue what they had been doing but
20  with, "This is the time on the agenda when you will be
21  here."  Because some students would come late.  When
22  you said, you know, "Is everybody ready to begin the
23  meeting," sometimes people wander in and out.
24         They can look at the agenda and say, okay,

10 (Pages 34 to 37)

Dobrich, et al.                                                                      Indian River School District, et al.
Richard Cohee                          v.                                            October 17, 2006
                              C.A. # 15-120 (JJF)

Page 38

1  they got this much on the agenda, any idea what time
2  we are going to be up, and you get a better idea of
3  what the time line is going to be.
4        We have had school board meetings that went
5  till two in the morning or later, so. It's not a
6  common practice anymore, but that has been the case.
7     Q.  Since your motion passed, can you identify
8  any meeting during the school year at which the
9  student government did not show up?
10    A.  I know that there have been meetings when we
11 did not hear from the representative. I can't
12 identify which particular meeting, but I know that
13 there have been meetings when we did not hear from the
14 student government.
15    Q.  Did your motion incorporate the student's
16 attendance as part of the official board meeting?
17    A.  Can you explain that?
18    Q.  Did your motion state that the student
19 government would become part of the official board
20 meeting?
21    A.  My motion, as I recall it, and again I am
22 going back over ten years, was not to assure the
23 attendance but to assure their spot on the agenda,
24 recognize them for what they were doing, as I have

Page 39

1  said before.
2     Q.  Is there a history of school board prayer in
3  Indian River, in your view?
4     A.  Is there a history of school board prayer in
5  Indian River? Yes.
6     Q.  Do you know why the school board opened its
7  meetings with prayer before adoption of the school
8  board policy?
9     A.  It was a practice that was in place when I
10 first came to the board and I understand was there for
11 sometime before I came to the board, and that has
12 continued since I have been with the board.
13    Q.  What is your view of its purpose?
14    A.  I feel that it's one moment when we all kind
15 of recognize that we are getting down to business
16 here, recognize that we are having a great deal of
17 serious issues involving people's kids and people's
18 money.
19        When I was running for the school board I
20 would say you never get involved with anything that
21 involves people's kids or people's money, and that
22 involves both of them.
23        And I think it was a moment for the whole
24 board to come together and go about their business and

Page 40

1  recognize that during that meeting we may have
2  differences and that when we walk away from the board
3  table we support the decisions and move forward,
4  whether we disagreed during the meeting or not.
5     Q.  To summarize, would you say that the purpose
6  is to solemnize the meetings, then?
7     A.  Yes.
8     Q.  Is there any other purpose besides what you
9  described?
10    A.  Not that I am aware of or not on my part.
11    Q.  Is there a disclaimer read at current board
12 meetings?
13    A.  Yes.
14    Q.  What affect do you think that has?
15    A.  What affect do I think it has?
16    Q.  Yes.
17    A.  Well, not being smart, but I have never sat
18 in the audience when it was read, so I don't know that
19 I know the affect that it has. I think I know the
20 intended purpose, and that's to recognize that it is a
21 board prayer, it is our prayer, and that we are not
22 encouraging anyone else to participate. That's how I
23 interpret it.
24    Q.  So the school board prayer is directed only

Page 41

1  at school board members?
2     A.  It is a prayer of the board members.
3     Q.  Who is it directed at?
4     A.  I would say it's directed at the board
5  members, themselves.
6     Q.  And only themselves?
7     A.  Obviously others that are there could hear
8  the prayer, if that's what you are asking, but it's
9  not directed at -- It is directed -- It is amongst the
10 ten board members, or nine or however many happen to
11 be there on a particular given evening.
12    Q.  Didn't you just say a minute ago, though,
13 that the disclaimer states that the others don't have
14 to participate, the audience members don't have to
15 participate?
16    A.  As I recall the disclaimer, and I don't have
17 the exact verbiage and I don't know it verbatim, but
18 it says that it is a prayer of the board. It does not
19 encourage or invite anyone else to participate.
20    Q.  Can people participate?
21    A.  Can they?
22    Q.  Yes.
23    A.  I am sure they could if they wished to.
24    Q.  Do you think that they can benefit from the

11 (Pages 38 to 41)

Page 42

1 prayer, then?
2    A. Do I think who can benefit from the prayer?
3    Q. The audience can benefit from the prayer
4 given by the school board member?
5    A. I don't know whether they can benefit by the
6 prayer or not. That's up to the individual.
7    Q. Why do you think they would participate?
8    A. I didn't say they did. I said that they
9 could if they wished to, but they are not encouraged
10 to. I don't know what someone is saying in their mind
11 while we are having the prayer, so they could
12 participate on their own silence.
13    Q. I am asking you what would you think if
14 someone did participate?
15    A. That would be up to them.
16    Q. But would they benefit from it?
17    A. Again, that depends on that person and their
18 beliefs.
19    Q. If the prayer is only among the school board
20 members, what would be the difference from the current
21 practice and from the ten of you conducting a prayer
22 off stage directly before coming out into the public?
23    A. What would be the difference?
24    Q. Yes.

Page 43

1    A. The prayer is something that is said around
2 the board table while the board is gathered together.
3 I think it's a more structured atmosphere.
4    I don't know the difference between having it
5 somewhere off that or not, but in my mind that's why
6 the prayer is done around the board table.
7    Q. Okay, remove the audience. Pretend the
8 audience hasn't come in yet.
9    A. Uh-huh.
10    Q. What's the difference between having the
11 audience there or not?
12    A. I don't know if there is one.
13    Q. Who has historically determined who would
14 open the school board meeting with a prayer?
15    A. I think we have already discussed that that
16 can be most often the board president.
17    Q. Has that changed under the new board policy?
18    A. I don't know that it's changed. I think that
19 the board president -- Well, I know that the board
20 president still calls upon someone. Whether he or she
21 has conversed with that person in advance, I don't
22 know, but at the time of the prayer that person is
23 called upon by the board president.
24    Q. Do you have any knowledge whatsoever about

Page 44

1 how the board president currently picks the person to
2 pray?
3    A. No. As I said, a number of meetings this
4 year I have missed. I couldn't tell you who said what
5 prayer in a number of meetings.
6    Q. Before the school board policy was enacted,
7 were there any restrictions on what prayer a school
8 board member could offer?
9    A. Not that I recall.
10    Q. A minute ago you said with regard to the
11 school board prayer that, you implied that it would be
12 different if it were done off stage versus around the
13 school board table.
14    A. I don't think I implied -- Well, I might have
15 implied it was different, because I explained that I
16 think the setting is part of the board coming
17 together. You said earlier why do we do this. To
18 solemnify the meeting. And the board, I think that is
19 more effective in that setting.
20    Q. Is that because when you are in that setting
21 the meeting has already started?
22    A. At that point we are acting as a board, we
23 are a board --
24    Q. Okay, let's take a break.

Page 45

1    A. -- and not individuals.
2      VIDEOGRAPHER: We are going off the
3    record at approximately 2:09 p.m.
4      (A recess was taken.)
5      VIDEOGRAPHER: Back on the record at
6    2:16 p.m.
7 BY MR. LENHARD:
8    Q. Mr. Cohee, aside from our clients'
9 complaints, are you aware of any other complaints
10 about the use of prayer during school board meetings?
11    A. When you say your clients?
12    Q. The Dobriches or the Does?
13    A. Okay, we are putting both?
14    Q. Yes.
15    A. Okay, then the answer would be no.
16    Q. Do you think the use of prayer during school
17 board meetings has attracted a lot of attention from
18 the public or the media?
19    A. At one time it did not, but it obviously took
20 a turn at some point.
21    Q. Would you agree, then, that at sometime --
22 That answer would be a yes?
23    A. Yes, sometimes.
24    Q. Do you think the use of prayer during school

12 (Pages 42 to 45)

Case 1:05-cv-00120-JJF   Document 266-2   Filed 05/08/2008   Page 13 of 30

Dobrich, et al.                                                                          Indian River School District, et al.
Richard Cohee                            v.          C.A. # 15-120 (JJF)                            October 17, 2006

Page 46

1  board meetings should attract as much attention during
2  those times?
3     A.  Do I think it should?
4     Q.  Yes.
5     A.  Personally, I think that it would be better
6  if it did not.
7     Q.  Who have you talked about how much media
8  attention has been garnered by this case?
9     A.  Well, I don't know that I have talked to
10 anyone in particular.  It's been on radio; it's
11 been on television; it's been on the news; local
12 newspapers; out of state newspapers.  I don't know if
13 it's a matter of having to talk to anyone to know that
14 it's been in the media.
15    Q.  All right, I would like to turn to the school
16 board prayer.  I believe it's in there.  Would you
17 like me to give you another copy?  We have already
18 introduced an Exhibit PX9, which is a school board
19 prayer policy that Mr. Gosselin is getting for you.
20    PX9 with the Bates label at the bottom, the
21 Bates number at the bottom BPD00491 is simply a
22 numbering system that lawyers use to keep track of
23 documents.  Is this the school board prayer policy?
24    A.  It appears to be, yes.

Page 47

1     Q.  And it is entitled, "Board Prayer at Regular
2  Board Meetings."  Correct?
3     A.  Yes.
4     Q.  When did the school board first consider
5  adopting this policy?
6     A.  I think it was brought to the board during
7  late spring or early summer of, or late summer of '04.
8  The normal policy procedure is to have a first and
9  second reading which involves two monthly meetings,
10 normally, and I see that this is adopted on October 19
11 of '04.
12    Q.  Was this brought to the board in response to
13 Mrs. Dobrich's complaints?
14    A.  I would think that Mrs. Dobrich's concerns,
15 and I don't recall at what point there was a formal
16 complaint, but I know that after the graduation
17 ceremony there were some concerns and there was some
18 discussion of a policy.
19    Probably almost immediately after the
20 graduation exercise.  And I don't know, I don't recall
21 a time line for when the complaint was officially
22 made, but so it was during that late summer to early
23 summer.
24    Q.  Do you have any reservations about this

Page 48

1  policy?
2     A.  Do you mind if I read it?
3     Q.  Go ahead.  Take as much time as you feel
4  necessary.
5     A.  I think it's a policy that allows one of any
6  faith to exercise their belief in the prayer, and,
7  since it does allow that to anyone of any faith, I
8  have no problems with the policy, and that was the
9  intent of the policy.
10    Q.  Why did the school board need to adopt this
11 policy if there was already a history of the board
12 opening its meetings with prayer?
13    A.  When you say "need to adopt it," can you
14 clarify that or rephrase it.
15    Q.  I will rephrase it.
16    A.  Please.
17    Q.  Why did the board adopt this policy if there
18 was already a history of the school board opening its
19 meetings with prayer?
20    A.  I am answering on my belief, not the other
21 nine members of the board.  I believe that the policy
22 was adopted to put into record basically what we
23 already had practiced, and that is if you were called
24 upon or wished to offer a prayer, you could offer a

Page 49

1  prayer of your choosing, regardless of what faith you
2  happen to be around the table, board table, and I
3  believe that was the purpose of this prayer, was to
4  put it in writing that whatever the makeup of the
5  board, we would allow for prayer of that person's
6  choosing.
7     Q.  Did this policy change the practice, then?
8     A.  Um, it clarified that it was a board prayer
9  and did not encourage or did not seek the involvement
10 of the audience.  I don't know that that was -- I
11 think that before that was understood, but, again, I
12 it's clarification.
13    Other than the rotation, the board -- It's
14 been informally rotated over the years anyway, so I
15 think it kind of just cleaned up and documented what
16 we were already doing and structured it.
17    Q.  So you can't identify -- excuse me -- you
18 cannot identify any specific change in your practice
19 due to the implementation of this policy?
20    A.  I don't think -- I didn't think that's what
21 you were asking me.  Is that what you are asking me
22 now?
23    Q.  Yes, I meant by the previous question that
24 did this policy, did enacting and adopting this policy

13 (Pages 46 to 49)

Page 50

1  change the board's practice?
2      A.  It changed the board's practice because I
3  think at that point is when we read the clarification
4  at the beginning prior to the prayer, which is not
5  here, but I think it's a portion of it, and it changed
6  the board practice because you are saying that it is a
7  board prayer, which wasn't said before, not regularly
8  said before.  It may or may not have been said over
9  the years in some informal manner, but I don't know
10  that it was ever routinely said as it is now, so it
11  changed the board's practice in those areas.
12      It did not change the practice of whoever was
13  called upon, whoever offered could say a prayer as
14  they saw fit.
15      Q.  At anytime did any board member say why they
16  supported this policy?
17      A.  I would say a number of board members stated
18  why they supported the policy or maybe any concerns
19  they might have had with it or any versions of it.
20  There were a number of discussions about board prayer.
21      And, again, normally there is a first and
22  second reading, so both of those readings would
23  involve some discussion, so, yes, there were probably
24  board members that voiced their opinions in favor of

Page 51

1  certain things and maybe against certain things.  You
2  know, I can't sit here and specifically tell you what
3  board member said what in what regard.
4      Q.  Okay, so you don't know a specific instance
5  where you can say one board member supported a section
6  or was against a section at any of those meetings?
7      A.  I can't recall specifically who did that.
8      Q.  Okay.
9      A.  I think the minutes would reflect that the
10  majority of the board supported the overall policy at
11  the end.
12      Q.  Okay, and now I would like to ask the same
13  question about the board prayer, not the policy.  The
14  same question.  Did any individual board members that
15  you recall express support for the school board
16  prayer, itself?
17      A.  Did they express support for it?
18      Q.  Yes.
19      A.  Yes.
20      Q.  Now, do you recall specific instances of
21  that?
22      A.  Well, again, the majority of the board would
23  have expressed support for the school prayer because
24  they approved the policy that said we are going to

Page 52

1  have one, and the minutes will reflect who those
2  people were.
3      Q.  But did you have discussions with people that
4  you can recall specifically about school board prayer?
5      A.  I was present at a number of discussions that
6  involved school board prayer.  Different people said
7  different things.  There were a number of those
8  discussions that I did not make.
9      I don't know at some point if someone's
10  thoughts changed or whatever, but there were a number
11  of discussions where different points were raised.
12      Q.  Were any of these discussions outside of the
13  school board setting?
14      A.  Not that I recall.  You mean as a board or?
15      Q.  You, individually, did you talk to any other
16  school board member about school board prayer outside
17  of the school board meeting?
18      A.  I don't recall any specific discussion about
19  my view of the prayer issue.  There was probably
20  discussion about the media attention that it had
21  generated, and there was discussion about the tone of
22  the meeting in the August '04 meeting in the
23  anticipation of that meeting, so there was
24  discussions, probably not formal discussions, but like

Page 53

1  one-on-one discussions with -- And I can't sit here
2  and tell you what exact board member at this point,
3  but there were those kind of brief moments like this
4  is really causing us, you know, some attention here
5  and this meeting is around that table should be
6      I don't recall having any one-on-one
7  conversations as far as my beliefs other than I do
8  believe that whoever is around that table should be
9  able to pray as they see fit.
10      Q.  A minute ago when you referred to these
11  conversations in general, you said that you, there
12  were discussions about the school board prayer and the
13  school board prayer policy but yet you cannot recall
14  specific instances; correct?
15      A.  There were discussions about school board
16  prayer, school board policy, at various board
17  meetings.
18      Q.  Were any of those board meetings public board
19  meetings?
20      A.  Um, I think there was a special board
21  meeting, and I cannot remember if it was opened or
22  closed.  We heard a lot from the public.  It wasn't a
23  discussion, because our public comment session is one
24  way, we listen and they speak.  We heard a lot from

14 (Pages 50 to 53)

Dobrich, et al.                                                          Indian River School District, et al.
Richard Cohee                          v.                                         October 17, 2006
                                C.A. # 15-120 (JJF)

Page 54

1 the various members of the public at a number of
2 meetings on that issue.
3     In the meetings, itself, I can't recall what
4 discussion -- Um, well, there had to be, because the
5 policy is adopted in a public meeting, so we would
6 have discussions surrounding our concerns for that
7 policy. That would be a public session.
8     As I said before, the normal procedure is a
9 first and second reading. Sometimes that's two
10 successive months, and sometimes if the first draft
11 just doesn't fly with anybody and they say go back to
12 the drawing board and come back with something else,
13 which might delay it a month or so. I don't recall
14 the time line in this case.
15     Q.  Can you describe for me how the Policy
16 Committee is involved in the policy drafting process?
17     A.  I am not sure. I haven't served on that
18 committee in sometime. I chaired the committee in
19 early to mid nineties, as I recall. Probably the
20 committee meets and -- Well, I can't speak for
21 Mr. Walls. Mr. Walls set up a system where they were
22 routinely reviewing a number of policies.
23     When I was there, we were working on policies
24 where issues had been brought up or concerns brought

Page 55

1 up where something had changed with the different
2 guidelines that we needed to look at the policies that
3 might have been old or outdated.
4     I can't speak to just how it works, because I
5 have not been to any policy meetings in a number of
6 years, how it currently works.
7     Q.  Do you know whether or not it's different
8 from how you ran the Policy Committee?
9     A.  I can't say, because I see the end product
10 and I comment on that in our discussions when I
11 receive the first and second readings like everyone
12 does.
13     But the actual meetings, we are all invited
14 to participate. As I said, this year personal and
15 professional demands have put a real burden on my free
16 time.
17     Q.  Is it correct that there is no school board
18 prayer policy for special meetings?
19     A.  Um, I don't think there is for a special
20 meeting. As you have pointed out, this one says
21 regular meeting.
22     Q.  And there is no school board prayer policy
23 for executive sessions?
24     A.  No, not unless that executive session is part

Page 56

1 of a regular meeting, but for the executive session,
2 itself, no.
3     Q.  And did the board ever consider drafting
4 policy?
5     A.  Um, I don't recall any discussion on that.
6 There may have been. I don't recall any.
7     Q.  Okay, I would like to play -- I would like to
8 play an audio recording for you. It's an Exhibit PX52
9 we have introduced before. It's a board meeting from
10 September 28, 2004, and it is the first reading of the
11 policy.
12         (Exhibit PX52, a videotape, was
13         played for the witness.)
14 BY MR. LENHARD:
15     Q.  Do you recall that from the September 28
16 meeting?
17     A.  I recall at some point there being a couple
18 readings of the meeting. Do I specifically recall
19 that? I don't know. As I have said, in the last year
20 or so I have missed a number of meetings. Some of
21 them involved this issue.
22     I don't know how many first readings we had
23 on this, if more than one, so to sit here and say I
24 was -- I can't say I was even present on that little

Page 57

1 bit of information.
2     Q.  But your testimony earlier was that there was
3 discussion about the policy. Would that qualify as
4 discussion of the policy?
5     A.  No, but that is one meeting.
6     Q.  That's one meeting, but that does not -- That
7 is not the discussion that you were just talking about
8 in your testimony?
9     A.  True. I would not call that discussion.
10 Okay?
11     Q.  Who first proposed at the school board
12 meeting the policy on school board prayer?
13     A.  I am not sure if that came from the board or
14 whether that came from staff or whether that came from
15 legal counsel. I don't know who the first person, or
16 who first proposed it.
17         MR. LENHARD:  All right, we would like
18     to introduce a new exhibit, PX 58.
19         MR. HORVATH:  The same disc has been
20     labeled already as PX57. It is just a
21     different file on that disc.
22         VIDEOGRAPHER:  Then I would just say
23     it's 57 and name the file.
24         MR. LENHARD:  Okay, so it would be

15 (Pages 54 to 57)

Dobrich, et al.
Richard Cohee

v.

C.A. # 15-120 (JJF)

Indian River School District, et al.
October 17, 2006

Page 58

1    PX57. PX57 we are going to play an audio
2    recording from the October 19, 2004 board
3    meeting. The name of the file is Board
4    Meeting 10-19-04 Side A.
5        (Exhibit PX57, a videotape, was
6        played for the witness.)
7        MR. LENHARD: That was from 25 minutes
8    and 57 seconds to 26 minutes and 38 seconds
9    in that file.
10   BY MR. LENHARD:
11   Q. Does that recording qualify as discussion of
12   the school board prayer policy, Mr. Cohee?
13   A. There was an opportunity for discussion, but
14   I didn't hear any.
15   Q. Do you recall another discussion that was not
16   in either of those audio recordings of the school
17   board prayer policy?
18   A. I think I stated earlier there was a number
19   of discussions. Some of those could have been in
20   special meetings. Some of those could have been with
21   legal, because there was quite a discussion over it
22   with various legal counsel.
23       And I thought that some of it came up in
24   public session. Now, obviously, that would tell me

Page 59

1    that there wasn't a discussion about that particular
2    policy. And, if I am wrong in that, I am wrong in
3    that, but I still thought that at some public
4    meeting -- And it could have been in the early stages
5    where concerns of a number of people were brought to
6    the board. Okay? That may be what I am referring to.
7        I agree with you that that doesn't sound like
8    much of a discussion, but we had had a number of
9    discussions, a lot of it with attorneys, over this
10   issue. To sit here and tell you how many we had, who
11   was present, I'm sorry, but I can't do that.
12   Q. Okay. I am going to show you a school board
13   prayer policy that, proposed policy that was
14   introduced earlier, PX11, which I believe you have in
15   that stack. It's a one-page sheet of paper Bates
16   labeled BPD698. Have you seen this document before?
17   A. Let me look over it.
18   Q. Take your time, again, to read it.
19   A. I think I have seen this. I don't recall
20   what the source was.
21   Q. Do you see how it is substantively very
22   similar to the PX9, the other document you have in
23   front of you?
24   A. It is similar, and the other one is much

Page 60

1    easier to read.
2    Q. Do you have any recollection as to when you
3    received this proposed policy?
4    A. No, other than it would be most likely during
5    the summer, early fall of 2004. I am quite sure it
6    preceded the one that was approved in October.
7    Q. You will see in the first line of PX11, it
8    says, "Following the ruling" -- It says, "Following
9    the rulings of the United States Court of Appeals
10   Third Circuit." Do you know what that refers to?
11   A. Um, there were a number of rulings, and what
12   one they are particularly referring to there, I don't
13   know. At this point I don't recall.
14   Q. Do you know why the title was changed from
15   "board prayer" to "board prayer at regular board
16   meetings"?
17   A. I don't know that either.
18   Q. Now I would like you to look at PX12, which I
19   think you also have that over there. Again, first I
20   am just going to ask if you can identify this
21   document. Take this document. Take your time to read
22   it.
23   A. Will I have time to read the whole thing?
24   Q. Sure.

Page 61

1    A. Or do you want me to read the whole thing?
2    Q. If you can identify it without reading it,
3    just tell me. Otherwise, you can just keep reading
4    until you read the whole thing.
5    A. Well, it's easy to see it was written by an
6    attorney. I recall this as one that we received from
7    legal counsel at some point.
8    Q. Can you identify which legal counsel that
9    was?
10   A. As I recall, it was Mr. Neuberger or through
11   him in conjunction with maybe the Rutherford
12   Institute. I am not sure exactly which of them
13   prepared it, but I think we received it from
14   Mr. Neuberger.
15   Q. Okay, and when you said legal counsel, did
16   the board ever hire Mr. Neuberger or the Rutherford
17   Institute?
18       MR. GOSSELIN: You can answer that.
19       MR. LENHARD: Unless Mr. Gosselin
20   instructs you not to answer, you can answer.
21       THE WITNESS: Okay.
22       MR. GOSSELIN: And, just to be clear,
23   questions about the existence of an
24   attorney/client relationship or the

16 (Pages 58 to 61)

Dobrich, et al.                                          Indian River School District, et al.
Richard Cohee                    C.A. # 15-120 (JJF)                    October 17, 2006

Page 62

1    existence of communications, those sorts of
2    things he can ask you and I won't instruct
3    you not to answer, but you should make sure
4    that your answers don't include anything
5    that you may have said to the attorney or
6    prospective attorney or anything that the
7    attorney, prospective attorney said to you
8    or other board members.
9         THE WITNESS: Can you restate your
10    question, please?
11         MR. LENHARD: Sure.
12    BY MR. LENHARD:
13    Q.  You said that this opinion came from legal
14    counsel, and then you explained that legal counsel was
15    most likely Mr. Neuberger or the Rutherford Institute.
16    Did the board ever hire Mr. Neuberger or the
17    Rutherford Institute?
18    A.  The board did not hire Mr. Neuberger or the
19    Rutherford Institute.
20    Q.  Was this document also sent to other board
21    members?
22    A.  I am assuming it was shared with everyone.
23    Q.  How did you receive it?
24    A.  I can't recall if it was sent, delivered to

Page 63

1    my home like most board packets, whether it was faxed
2    or provided by another board member. I can't recall
3    how I actually received it. I recall receiving it,
4    but I can't -- or maybe handed out at one of the
5    meetings. I just don't recall that.
6    Q.  Did you discuss this with other board members
7    outside the presence of attorneys?
8    A.  This particular policy?
9    Q.  Yes.
10    A.  No, other than maybe to say that it's pretty
11    wordy.
12    Q.  And if you have Exhibit PX9 still in front of
13    you, did you have any discussion with other board
14    members as to why the title was changed from "policy
15    on prayer at board meetings" to the "board prayer at
16    regular board meetings"?
17    A.  I don't recall having that discussion.
18    Q.  Did you have any discussion with other board
19    members about the italicizations of the words,
20    "Through Jesus Christ our Lord," which is in the third
21    paragraph up from the bottom, last line?
22    A.  I don't recall any specific discussion on my
23    part. There may have been. I don't recall anything.
24    I think with the examples we have been given and with

Page 64

1    the issue that had been raised about the use of the
2    word Jesus Christ, there might have been comments that
3    could have been on my part that we are trying to --
4    that that might have been a little strong.
5    Q.  Do you see on the next line where it says
6    "emphasis added"? No, on the next line.
7    A.  Okay, first page? Okay.
8    Q.  The first page, next line right under the
9    line where it has the "Jesus Christ." It says,
10    "Emphasis added" at the end of that paragraph.
11    A.  Okay.
12    Q.  Do you understand that that means whoever
13    drafted this added the italicization to those words?
14    A.  I would understand that, yes.
15    Q.  That they were not in the original prayer by
16    George Washington?
17    A.  I didn't understand that.
18    Q.  Well, the emphasis was not --
19    A.  I understand that the emphasis was
20    represented by the italics.
21    Q.  Okay.
22    A.  I don't know what old George said back then.
23    Q.  Okay, if you turn to page -- I am probably
24    going to have to ask you to put your glasses on.

Page 65

1    A.  That's okay. I take them on and off a
2    hundred times a day.
3    Q.  Okay, if you turn to page four, which is
4    BPD702, you will see where the numbered paragraphs
5    start.
6    A.  Okay, page four?
7    Q.  About halfway down there is, it starts, the
8    paragraph starts, "In order to solemnify." Do you see
9    that?
10    A.  Okay, number one?
11    Q.  Number one.
12    A.  Uh-huh.
13    Q.  If you look at that and look at PX9 at the
14    same time, do you see that those paragraphs are
15    substantially the same?
16    A.  Yes.
17    Q.  Do you want to take the time to read it, or
18    have you read it before?
19    A.  I recall this.
20    Q.  Okay.
21    A.  And I know that there is a lot of
22    similarities, as I skim through here, with those five
23    sections.
24    Q.  Did anyone from the public ever ask you for a

17 (Pages 62 to 65)

Page 66

1    copy of this policy, PX9?
2    A. I don't know. I don't recall it.
3    Q. Did anyone submit -- Can you -- Strike that.
4    A. If I were to be asked, I would most likely
5    refer them to Central Office.
6    Q. Okay. All right, now I would like to give
7    you two documents which again you probably have over
8    there, PX13 and PX14. Do you recall why the board met
9    on August 23, 2004?
10   A. Well, it says here to discuss potential
11   pending litigation. The number there would identify
12   the issue, and I don't recall what number that was
13   used to identify the issue.
14   Q. You don't recall whether it meant --
15   A. 0501PL, I don't know if that's the number
16   that refers to the issue that we are here for today or
17   not.
18   Q. Do you recall whether it had to do with
19   school board prayer in general?
20   A. I would -- Well, I know we had a number of
21   meetings about that, these issues, and I know some I
22   attended and some I did not. I would -- Well, I don't
23   want to guess, but my thoughts are this meeting could
24   have very well been in reference to these issues, but

Page 67

1    I can't sit here and say that with certainty.
2    Q. Can you turn to the second page of PX 14? On
3    the second page of that you will see there is a roll
4    call.
5    A. Okay.
6    Q. And you are listed there as present?
7    A. Yes.
8    Q. And the next section lists other visitors and
9    staff in attendance?
10   A. Yes.
11   Q. Can you tell me why those people were there
12   to discuss litigation?
13   A. No. Specifically, no. I will say that it
14   has been an occurrence that the superintendent and/or
15   the assistant superintendent has been present during,
16   over the years during discussion of potential
17   litigation or pending litigation, along with Janet
18   Hearn, who was our recording secretary.
19      Patrick Miller was finance. I am not sure
20   what role he would have played in that discussion.
21   And Jim Griffin at the time was an attorney.
22   Q. Okay, so in your discussion you mentioned the
23   superintendent and the assistant superintendent.
24   That's Ms. Hobbs is the superintendent?

Page 68

1    A. She was at that time.
2    Q. And Mr. Savage is assistant superintendent?
3    A. And he still is, yes. I think he was at that
4    time, but he is now. Can I clarify something, though?
5    Q. Sure.
6    A. That is the beginning of the meeting. Okay?
7    And then that's the roll call and the recording of who
8    is present, and then we go into executive session.
9       So whether or not those people all stayed, I
10   don't know. They could have been asked to leave, as
11   we have done on other occasions.
12      For example, it strikes me as a little odd
13   that the finance person was there. I would almost
14   venture to say that on this particular issue he was
15   asked or knew to step out, but I don't know that with
16   certainty.
17   Q. Well, let me ask you a question. Does the
18   board invite people to special meetings?
19   A. Depending on the issue, the board requires or
20   asks for certain information and it comes from various
21   sources.
22   Q. Well, if you look through the minutes, --
23   A. Okay.
24   Q. -- which is simply that one page, do you see

Page 69

1    any other issues there besides the litigation?
2    A. Let me look through the minutes. I don't see
3    any other issues. I do recall at some meeting there
4    was discussion of the potential cost of litigation and
5    what sources we would get our money from, if need be,
6    for funding.
7       And with Patrick Miller there I first said I
8    don't know why he is there, but that could have very
9    well been the reason why he was there, because he
10   would be the person that we would go to for what
11   available funds do we have. We budget a certain
12   portion for legal fees, obviously nothing of this
13   magnitude. And, again, that could very well be why he
14   is there at the same time Mr. Griffin is there.
15      But, no, I see no other issue, to answer your
16   question.
17   Q. Okay, the fact that the only action the board
18   took during the special meeting was the executive
19   session, if you turn to PX13 you will see the
20   executive session minutes of that same day. And the
21   first section, you are going to have to -- It's a bit
22   redacted by the lawyers on the first page. If you
23   could turn back to the first page, redacted is a word
24   that lawyers use to mask words that were there. Your

18 (Pages 66 to 69)

Case 1:05-cv-00120-JJF    Document 266-2    Filed 05/08/2008    Page 19 of 30

Dobrich, et al.                                    v.                    Indian River School District, et al.
Richard Cohee                            C.A. # 15-120 (JJF)                          October 17, 2006

Page 70

1 attorney most likely has removed the words that were
2 there, not shown them to us for reasons that they are
3 privileged or some other reason that they believe is
4 proper.
5        But the only section in these two pages of
6 these minutes are the potential or pending litigation;
7 correct?
8     A. That's all I see, yes, sir.
9     Q. Do you have any reason to believe that the
10 board would have invited Ms. Hobbs, Mr. Savage,
11 Ms. Hearn, Mr. Miller, Mr. Griffin to the special
12 meeting on August 23 if the only action on the agenda
13 was this litigation and then not have invited them to
14 stay one minute later?
15     A. I don't understand your question.
16     Q. Well, before you said you were unsure that
17 those five people stayed.
18     A. Okay.
19     Q. And I am asking you do you have any reason to
20 believe that they would have left when the only thing
21 on the special meeting agenda was the litigation?
22     A. Okay, if they were in the executive session
23 portion and, as I said, with Mr. Griffin there as a
24 legal advisor at that point, it could have been that

Page 71

1 Mr. Miller would be there because we were talking
2 about anticipated costs and funding sources. Janet
3 Hearn, Earl Savage, Lois Hobbs are routinely there,
4 so that's not a surprise to me. Okay? Once the board
5 goes out of executive session at 11:15, then it's open
6 to the public anyway, so they could have very well
7 been there.
8     Q. Okay.
9     A. Or, if they were outside, we would say, "If
10 there is anybody outside, let them come in." That's
11 the way we normally do that when they go back out,
12 even in a special meeting.
13        Once we go from executive session to public
14 session, if there is anyone out there, we announce
15 that they can come back in. Okay? So I don't know
16 that they were asked to leave, I don't know that they
17 left. And, were they in the executive session, they
18 would have been entitled to stay or allowed to stay
19 after we went back to open session.
20     Q. Do you know if anyone in the board before
21 this meeting had contacted the insurance company about
22 funding this litigation?
23        MR. GOSSELIN: Objection, you don't
24     have to answer that. It goes into the other

Page 72

1     case, way beyond this.
2        MR. LENHARD: Mr. Cohee has brought up
3     the reason why Mr. Miller might not have
4     been there. He is the finance person.
5        MR. GOSSELIN: Next question.
6        MR. LENHARD: Are you instructing him
7     not to answer?
8        MR. GOSSELIN: I just did.
9 BY MR. LENHARD:
10     Q. Mr. Cohee, on PX13 there is one paragraph of
11 minutes that remains unredacted on the first page.
12     A. Uh-huh.
13     Q. And it says, "During the discussion of this
14 issue several board members expressed that their
15 constituents did not want the board to change its
16 practice about opening the meetings with a prayer."
17        Can you identify who those several board
18 members were?
19     A. I cannot specifically identify those several
20 board members, but this August 23rd meeting followed
21 the August -- Was it the August 4 meeting, the large
22 one? I am thinking that this meeting followed the
23 large one, and I think a lot of people around the
24 board heard from their constituents that evening, and

Page 73

1 I am sure they heard from them many times.
2     Q. Okay, were you one of the board members who
3 expressed that their constituents did not want the
4 board to change their practice of opening the board
5 meetings with a prayer?
6     A. I don't know. I could have been, because I
7 had a number of people who came to me and said, "We
8 don't want you to change this." You would go in the
9 local supermarket and somebody would approach you.
10 You know, you'd run in town on a Saturday morning to
11 take a child to breakfast or something, and people
12 would approach you.
13        I could have made that comment. I know that
14 there were some there that were probably more vocal
15 about it than others.
16     Q. Were all of the people who you heard from
17 just sort of out in the street or out in the
18 community, in the supermarket, as you gave the
19 example? Did you hear it from anyone via e-mail, via
20 letter, via any other meetings?
21     A. I would hear it from people at meetings,
22 because I usually get to the meetings -- When I can
23 make it to the meeting, I usually get there early.
24 And I would hear it from people during, prior to the

Page 74

1  meeting and maybe at the break in the meeting. After
2  certain issues, people would comment on various
3  issues. That one was commented or has been commented
4  on a lot.
5      If I happened to be in the school building
6  for whatever function and run into somebody, you might
7  hear something from them also.
8      E-mails, I don't routinely use e-mail for
9  school board purposes. And letters, I think we were
10 presented some letters at the board level in support.
11 I can't recall how many.
12     Q. Any phone calls?
13     A. I am sure that I got some phone calls also on
14 this issue.
15     Q. And can you identify the more vocal people
16 who talked about this?
17     A. At the board meeting or amongst the board?
18     Q. Well, you said, in discussion about the
19 school board prayers, you said people came up to you
20 and some people were more vocal than others?
21     A. No, I said at the board meetings some of the
22 board members were more vocal than others. Okay?
23 Obviously, some of the people in the public were more
24 vocal too, and we had a whole schoolhouse full of them

Page 75

1  one night. Okay? To sit here and list who commented
2  about that issue, I can't. I know there was a number
3  of people. I can't sit here and list them.
4      Q. Okay, about the board members, then, can you
5  identify who was more vocal at the board meetings?
6      A. Mr. Helms was very vocal on it.
7      Q. And how was he more vocal?
8      A. He was very strong in his belief that he
9  should be able to say the prayer as he said it. He
10 was also very concerned, as he is on a lot of issues
11 about his, and voices his concerns for the
12 constituents that contact him. Okay?
13     Other board members have constituents contact
14 them but don't always -- You know, I am not going to
15 go to every board member and sit there and say, "This
16 is who has contacted me," although I am concerned
17 about their concerns.
18     Q. Did Mr. Helms give you an idea of how many
19 constituents contacted him?
20     A. If he did, I don't recall how many.
21     Q. Did he say "every one of my constituents"?
22     A. He had said in the past on various issues
23 "Everyone has contacted me in support of this." Now,
24 I can't sit here and say if he said that on this

Page 76

1  occasion for this issue, but he has said that on some
2  occasions.
3      Q. Has he ever given an indication about the
4  population that has contacted him? I understand what
5  you mean about the percentage of people who contacted
6  him and what side they were on, but how about the
7  number of people who contacted him versus the number
8  of constituents he actually has?
9      A. You mean the portion of his constituency?
10     Q. Correct.
11     A. I don't recall that. I don't recall that.
12     Q. Okay, how about for yourself, can you put a
13 number on it?
14     A. As far as?
15     Q. The number of people who contacted you about
16 this issue versus the number of people who are in your
17 district?
18     A. Um, in my district it would be a smaller
19 percentage, and I can't put percentage on it. It was
20 no -- Beyond the public meeting, most of the contacts
21 were in the public setting like in the grocery store,
22 "I think the board is doing right on this" type thing,
23 and it wasn't any lengthy discussion.
24     I do know that on other issues over the years

Page 77

1  that a lot of the people in Mr. Helm's district and
2  Mr. Bireley's district, and even at the meetings, are
3  more vocal and more involved than a lot of people from
4  district two, which is my district, and district one,
5  which is where Jason's and Andy's corporate town
6  limits live at.
7      And I don't know why that is, but at the
8  meeting the attendance quite often is more heavily
9  from the southern end of the district, even if the
10 meeting is at the board member district.
11     Q. When you refer to the district there, you
12 mean the entire district?
13     A. The Indian River School District has five
14 board districts. Okay? I am referring to district
15 two being the one that I represent. Reggie's is I
16 think district five, which is Selbyville area. Okay?
17     Q. So you are saying the southern half of Indian
18 River is more vocal?
19     A. On a number of issues over the years, it's
20 been very apparent that the southern half of the
21 district can be more vocal and more involved as far as
22 being present and participating than a number of the
23 board members, or a number of people from any other
24 district, more than any district.

20 (Pages 74 to 77)

Dobrich, et al.                                              Indian River School District, et al.
Richard Cohee                     v.                                    October 17, 2006
                          C.A. # 15-120 (JJF)

Page 78

1    Q.  Do you take that into account?
2    A.  Um, on certain, on certain issues.  And I
3   don't -- We have talked, you know, we have wondered
4   why certain people get involved in certain issues.
5   And we talked at one point about attendance at the
6   meetings.
7         In some meetings over the years you have had
8   very few people, and then you will have an issue that
9   surfaces and you can pretty much speculate this is
10  going to bring people out.  Okay?
11        Routinely, the people from the southern end
12  of the district are more, more involved than the
13  people from any other district.  I like to think they
14  are trusting our good judgment.  I don't know.
15   Q.  Could you reread, not aloud, just to
16  yourself, the first sentence of this paragraph on PX13
17  starting, "During the discussion of this issue."?
18   A.  You say read aloud?
19   Q.  No, not aloud.  You can just read it to
20  yourself.
21   A.  Okay.
22   Q.  Do you agree with me that in that sentence
23  the term "this issue" refers to school board prayer?
24   A.  This issue, okay, yes, uh-huh.

Page 79

1    Q.  And did the board come to a decision that
2   night about what to do?
3    A.  I don't recall that we made any final
4   decision.  I think if we had made any final decision
5   you would have seen a motion and a vote or possibly
6   legal representation or policy change, but I don't see
7   that.
8         I know we had a number of meetings about
9   counsel and, as I said, Mr. Griffin made some
10  appearances, Mr. Neuberger made some appearances, or
11  made an appearance.  I don't know that we -- I know
12  there were several meetings that we didn't finalize.
13  I don't want to say finalize anything.  We might have
14  reached consensus on a couple things.
15        I can't specifically recall that at this
16  point.  But this was quite a lengthy process in time
17  and meetings that was involved in it, so.
18   Q.  All right, the next sentence says, "It was
19  not felt that a decision could be made this evening
20  regarding whether or not to change our past practice."
21  So you agree with that statement?
22   A.  Do I agree with that statement?  The last
23  statement?
24   Q.  Yes.

Page 80

1    A.  In a sense, and probably why I would agree
2   with it is I see Mr. Griffin on here, no disrespect to
3   Mr. Griffin as an attorney, but if he is the only
4   attorney present at that meeting, this issue, to me,
5   would be beyond his, beyond the time that he would
6   have to allow for it with his other obligations.
7    Q.  And what do you mean by that?
8    A.  And by that I mean we most likely would
9   not be using Mr. Griffin to represent us in this
10  matter.  So, therefore, if we are going to be getting
11  another attorney before we make any final decision, we
12  need to hear from that attorney.
13   Q.  Did other board members share that same view?
14   A.  Um, I don't know that they voiced that.  I
15  don't know that I voiced that.  I am sitting here
16  telling you how I think on that issue and why that, on
17  my part, why -- You asked me if I agreed with that
18  last statement, and that would be why I agreed with
19  it.  I don't think that Mr. Griffin would be the
20  attorney we would want in this instance.
21   Q.  Did you take any notes at that meeting?
22   A.  I don't recall that I did.
23   Q.  Do you recall if anyone else did?
24   A.  I wasn't watching what everyone else was

Page 81

1   doing during the meeting.
2    Q.  Did Ms. Hearn record that meeting?
3    A.  If she were there, I would think she recorded
4   it, but I don't know for certain.
5    Q.  Can you just note for the record and tell me
6   how long the meeting was, based on what's in front of
7   you?
8    A.  Can I note?
9    Q.  Yes.
10   A.  Okay, the meeting was called to order at 7:00
11  and was adjourned I think at eleven, 11:16, so that
12  would be four hours and 16 minutes.
13        MR. LENHARD:  All right, we have just
14       got a few minutes left on the tape, so let's
15       just take a five-minute break now.
16        VIDEOGRAPHER:  Going off the record at
17       approximately 3:10 p.m.
18        (A recess was taken.)
19        VIDEOGRAPHER:  We are back on the
20       record at approximately 3:18 p.m.
21  BY MR. LENHARD:
22   Q.  Mr. Cohee, you stated that it was your view
23  that Mr. Griffin wouldn't have the time to dedicate to
24  this litigation; is that correct?

21 (Pages 78 to 81)

Dobrich, et al.                    v.                    Indian River School District, et al.
Richard Cohee                C.A. # 15-120 (JJF)                    October 17, 2006

Page 82

1    A.  That would be one of my concerns.  At that
2  point he had just recently been appointed as the
3  Sussex County Council attorney, which was quite
4  involved, and we had used him on other issues over the
5  years, or issue.
6      My other reasoning would be I was not always
7  comfortable with Mr. Griffin as an attorney nor his
8  opinions, and he would not be someone I would have
9  voted for to pursue this issue.
10    Q.  Is there any particular opinion specifically
11  that concerned you?
12    A.  Um --
13      MR. GOSSELIN:  Objection.  Just for
14      one second.  I am not instructing him to
15      answer.  What is -- I don't understand what
16      this has to do with anything.  I mean I
17      don't think this is necessarily covered by
18      The Court's prior order, but I don't think
19      it's appropriate to ask, you know, why or
20      why not a client hired or didn't hire an
21      attorney that it sought advice from.
22      Here, he was the attorney.  He did
23      provide advice, and that's been testified
24      to, and the board sought advice from other

Page 83

1      attorneys.  I just don't understand -- I
2      mean am I missing something here?
3  BY MR. LENHARD:
4    Q.  Did the board make a determination that night
5  on August 23 not to use Mr. Griffin?
6    A.  Um, I don't recall that we did or didn't.
7  There wasn't a vote but, as I have already stated, he
8  wouldn't be my attorney of choice.
9      On other issues over the years we have used
10  him and on particular issues have gone outside for
11  other counsel, depending on the nature of the issue,
12  and that would have been my choice in this matter
13  also.
14    Q.  When the board members were discussing school
15  board prayer policy among themselves, did anyone ever
16  voice an opinion that the prayer policy might violate
17  the law?
18    A.  I think there was concern as to whether the
19  policy did violate the law.  And we had, again, with
20  the number of attorneys that we had talked with on
21  this issue or communicated with, I think they --
22      MR. GOSSELIN:  I will just instruct
23      you --
24  BY MR. LENHARD:

Page 84

1    Q.  I am not seeking attorney/client advice, just
2  what the board members would have discussed
3  themselves.
4    A.  I think there was concern that we wanted
5  clarification as to whether it did violate the law or
6  it didn't.
7    Q.  Again, with respect to the board members, did
8  you discuss as a group the issue of whether you are a
9  legislative body?
10    A.  When you say discuss as a group, again,
11  during some of those discussions there was discussion
12  between various people around the board table
13  as well as various legal people.
14    Q.  No, I mean was there --
15    A.  I cannot separate the two.
16    Q.  Okay.
17    A.  I cannot tell you that in this meeting we
18  didn't have any lawyers there, okay, or in this
19  meeting we did.  I cannot.  I can't do that.
20    Q.  Okay.
21    A.  Now I lost my track.  What was the issue?
22    Q.  The question was whether the board members
23  alone, without attorneys, discussed their views about
24  whether they were a legislative body or not?

Page 85

1    A.  At some point there was discussion.  Again, I
2  don't know whether attorneys were included or excluded
3  as to whether we were a legislative body or not.
4      And it was the belief of some, and I can't
5  sit here and go around the table as to who, that,
6  being elected, we were in the sense a legislative
7  body.
8    Q.  Did the board, the official school board,
9  make the determination to hire other attorneys besides
10  Mr. Griffin?
11    A.  There were other attorneys hired, yes.
12    Q.  But did the board make that decision?
13    A.  Um, yes, at some point.
14    Q.  Can you list the law firms that the board
15  contacted?
16    A.  No, I can't.  I think any contact would have
17  probably been through Mr. Bireley, the board
18  president, or his designee.  I was not involved in
19  those contacts.  I am aware of some of the firms -- I
20  was aware of some of the firms.  To name now, I
21  probably couldn't name.  Beyond that, it would be
22  something I wouldn't know.
23    Q.  Wasn't Mr. Walls board president at that
24  time?

22 (Pages 82 to 85)

Dobrich, et al.
Richard Cohee

v.

C.A. # 15-120 (JJF)

Indian River School District, et al.
October 17, 2006

Page 86

1    A.  Are we talking about since or --
2    Q.  I was talking about the August 23rd
3  timeframe.
4    A.  2004?
5    Q.  Yes, 2004.
6    A.  The board reorganizes in July, and I can't
7  remember if it was 2004 or 2005.  Mr. Walls was the
8  president prior to Mr. Bireley, whenever that change
9  occurred, and Mr. Bireley has been the president
10  since.
11    Q.  Okay.
12    A.  And I am not sure whether it was that July or
13  July of '05.
14    Q.  Is it fair to say, in general, you are just
15  talking about the president would have been the one to
16  determine who to contact or he would have designated a
17  board member to contact?
18    A.  Most likely, yes.
19    Q.  Did Mr. Griffin ever offer an opinion about
20  prayer in school in public?
21        MR. GOSSELIN:  Objection.  Don't
22    answer that question.
23        MR. LENHARD:  What was the objection
24    about that?

Page 87

1        MR. GOSSELIN:  Attorney/client
2    privilege.  He has already said they
3    consulted him on this issue.  Beyond that,
4    he is not answering questions.  Next
5    question.
6        MR. LENHARD:  A public statement?
7        MR. GOSSELIN:  Are you asking him did
8    he --
9        MR. LENHARD:  Yes, I am asking him did
10    Mr. Griffin in public at a school board
11    meeting give opinion about prayer in school.
12        THE WITNESS:  Um, I don't recall,
13    because most of Mr. Griffin's opinions were
14    not public, and that would be -- It would be
15    rare that he would comment publicly.
16  BY MR. LENHARD:
17    Q.  If Mr. Griffin attended -- Well, strike that.
18  Why would Mr. Griffin attend a regular meeting of the
19  school board?
20    A.  At one time Mr. Griffin attended all the
21  regular meetings when I first came on the board and
22  for a number of years thereafter.
23        At some point that transitioned to where he
24  came to certain meetings where we had litigation or

Page 88

1  legal issues that we needed guidance on.
2    Q.  And in those cases did Mr. Griffin ever offer
3  his opinion to the public?
4    A.  I can't sit here and say that he ever offered
5  his opinion to the public, because, as I recall, most
6  of his opinions were to the board in public session.
7    Q.  What do you mean by giving his opinion to the
8  board in public session?
9    A.  I'm sorry, in closed session.
10    Q.  Oh.
11    A.  In private session, yeah.
12        MR. LENHARD:  Do you have PX17 over
13      there, Jason, August 24, 2004?
14  BY MR. LENHARD:
15    Q.  At least on my copy, the Bates numbers have
16  been cut off after so many copies, but it's on page
17  nine -- Well, first of all, do you recognize this as
18  the August 24, 2004 board minutes?
19    A.  That's what it appears to be.
20    Q.  And you will see on the last page there is a
21  signature from Ms. Hobbs --
22    A.  Okay.
23    Q.  -- indicating this is the official board
24  minutes.

Page 89

1    A.  Yes.
2    Q.  Do you have any reason to doubt that these
3  are the board minutes?
4    A.  To doubt that they are or?
5    Q.  Are.
6    A.  No, I would assume that they are.
7    Q.  Could you turn to page nine of the minutes?
8  The page number for the minutes is at the top of the
9  page.
10    A.  Okay.
11    Q.  Most of the way down under public comments,
12  it lists Pam Shockley.
13    A.  Okay.
14    Q.  Do you see the second sentence, it starts
15  with Mr. Griffin?
16    A.  Uh-huh.
17    Q.  Could you read that out loud to me?
18    A.  Sure.  "Mr. Griffin noted that, according to
19  the regulations of the State Department of Education,
20  prayer must be student issued and student led.
21  President Walls explained our procedures for
22  establishing policy."
23    Q.  Do you view Mr. Griffin's statement there as
24  recorded in these minutes as legal advice?

23 (Pages 86 to 89)

Page 90

1    MR. GOSSELIN: Objection, leading.
2    The minutes refer to prayer of graduation
3    and baccalaureate ceremonies, which is
4    beyond the scope of this phase of the
5    litigation, so I object and instruct him not
6    to answer on that basis. Does this relate
7    to the school board prayer?
8    MR. LENHARD: Well, correct me if I am
9    wrong. We don't have the tape of this
10   meeting; is that correct?
11   MR. GOSSELIN: I am not here to answer
12   your questions. I instructed him not to
13   answer.
14   MR. LENHARD: So I am not allowed to
15   ask just to the fact if these minutes are
16   correct?
17   MR. GOSSELIN: Your question was does
18   this constitute legal advice, and it
19   concerns something that is in the next phase
20   of the litigation, and it goes -- I have
21   already had this discussion on the record
22   with your colleague. I am not going to have
23   it again. I instruct him not to answer.
24   MR. LENHARD: Okay.

Page 91

1    MR. GOSSELIN: Next question.
2    BY MR. LENHARD:
3    Q.   Mr. Cohee, do you remember the August 24,
4    2004 board meeting?
5    A.   I remember a number of meetings.
6    Specifically, sometimes, they tend to run together.
7    Q.   This is the one with hundreds of people
8    attending it.
9    A.   Uh-huh.
10   Q.   You remember that specifically?
11   A.   Yes.
12   Q.   Do you remember anything disturbing about
13   that meeting?
14   A.   Anything disturbing?
15   Q.   Yes.
16   A.   Um, I don't know if I would term anything
17   there as disturbing. Unusual would be the attendance.
18   Q.   Anything besides the attendance that was
19   unusual?
20   A.   Not that I recall.
21   Q.   You mentioned earlier that you frequently get
22   to meetings early.
23   A.   Uh-huh.
24   Q.   Did you notice speakers set up in the parking

Page 92

1    lot when you got there early?
2    A.   I believe that was the night they were going
3    to have an outside gathering of someone, a gathering
4    organized by someone, not myself, and which I did not
5    attend.
6    I saw a gathering forming, and I entered the
7    building where we normally meet. There were people
8    there, and I think the people were told to be there
9    at -- The meeting would have normally been 7:30. I
10   think the people, it was advertised at a time prior to
11   that.
12   Q.   It was your understanding when you arrived
13   and there was a large group of people outside that it
14   was organized by somebody?
15   A.   Advertised by somebody. If I said organized,
16   I meant advertised.
17   Q.   Advertised.
18   A.   And if it was advertised, I would assume
19   someone organized it, but I don't know that.
20   Q.   So did you find anything disturbing about any
21   of the public comments that were made that night?
22   A.   There were a lot of public comments made that
23   night, some of which I can generally recall the
24   message that the people were trying to convey. I am

Page 93

1    not sure what I might find disturbing is different
2    than what someone else would find disturbing. Again,
3    I don't know that there was anything disturbing, at
4    least to me, that I can recall.
5    Q.   Do you recall that Mona Dobrich spoke at that
6    meeting?
7    A.   I do recall that.
8    MR. LENHARD: Okay, I would like to
9    play the videotape from that meeting. This
10   has previously been marked, previously been
11   marked as PX40. It's BPD1288 from one hour
12   and one minute to one hour and four minutes
13   and 19 seconds.
14   (Exhibit PX40, a video, was
15   played for the witness.)
16   BY MR. LENHARD:
17   Q.   Do you recall that?
18   A.   I recall Mr. Johnson speaking, yes.
19   Q.   How do you perceive the comment that, "The
20   U.S. Supreme Court may be the highest deliberative
21   body in the nation, but there is one higher authority
22   above them. The Good Lord has proven that. The last
23   I knew, Madalyn Murray O'Hair just disappeared to
24   never be seen or heard from again. I think we all

24 (Pages 90 to 93)

Dobrich, et al.                          v.                Indian River School District, et al.
Richard Cohee                    C.A. # 15-120 (JJF)                    October 17, 2006

Page 94

1   know who she was. She was the person who initiated
2   the movement to remove prayer from our schools."
3       A.  How do I?
4       Q.  Perceive that.
5       A.  How I do perceive it?
6       Q.  Yes.
7       A.  First of all, I did not know entirely what
8   Mr. Johnson said until sometime later. I have a high
9   decibel hearing loss. And, as you will notice, as he
10  begins speaking, it was quiet, and then when other
11  people start chiming in, I have a time sorting things
12  out.
13      I heard him talking about taking speech from
14  school, or prayer from school, and then sometime later
15  I learned about the Madalyn Murray comment. I don't
16  recall hearing it as he spoke.
17      Q.  What did you think when you heard it later?
18      A.  Um, obviously Mr. Johnson has a right to his
19  beliefs, but his beliefs aren't necessarily mine.
20      Q.  Do you think that comment was directed at
21  Ms. Dobrich, Mrs. Dobrich?
22      A.  I can't tell you how it was directed. I can
23  see where anyone might have, where she may have seen
24  it was directed at her, having heard it, and I am glad

Page 95

1   I got the opportunity to hear it today, because, as I
2   said, I had heard about it afterwards and you realize
3   what he said type thing, and at that point I didn't.
4   I heard about taking prayer from school and I, of
5   course, I knew where that originated from, but I
6   didn't hear the comment about her disappearing.
7       I could see where someone could find that to
8   be alarming. I didn't. I didn't hear it. It wasn't
9   directed at me.
10      Q.  Now that you have hopefully heard it clearly
11  here, --
12      A.  Uh-huh.
13      Q.  -- the magic of technology, do you think it's
14  disturbing?
15      A.  I could see where it could be disturbing to
16  an individual.
17      Q.  How would you categorize the atmosphere at
18  the meeting at that time?
19      A.  Um, people were strong in their beliefs and
20  in their opinions. Whether you agree with them or
21  not, their opinions that night, they felt very strong
22  about it.
23      Mr. Johnson felt very strongly about that. I
24  did not take his tone as threatening. Okay? I don't

Page 96

1   recall anyone's tone being threatening that night. I
2   will say that Mrs. Dobrich, when she spoke, as I
3   recall, seemed to be a little bit more charged, and
4   maybe that was just the aggravation of the situation
5   or maybe that was nervousness on her part, and I
6   forget one of the comments that she made or someone
7   made about the audience being hostile or something to
8   that effect.
9       People were strong in their beliefs, but I
10  think that they voiced them, not necessarily agreeing
11  with what they said, but even Mr. Johnson's tone, I
12  don't -- His message may have been disturbing to
13  someone, but I didn't see his tone as being that.
14      Q.  Do you think his quote implies that people
15  opposing prayer should disappear?
16      A.  Do I think he implies that? I don't know
17  what he is trying to imply. I mean obviously it was
18  something that happened, she did oppose prayer and she
19  did disappear, it's a fact, so I don't that that's
20  anything we have to sit here and decide whether I
21  agree with it or whether that's what he was trying to
22  imply.
23      Q.  Why do you think that he brought it up?
24      MR. GOSSELIN: Objection.

Page 97

1   BY MR. LENHARD:
2       Q.  You can still answer that unless he says
3   don't answer it.
4       A.  Why do I think he brought it up?
5       Q.  Yes.
6       A.  I think you would have to ask Mr. Johnson.
7   He could have brought it up for two reasons. He could
8   have brought it up to be threatening. His tone was
9   not. He could have brought it up to emphasize that
10  school prayer has been taken from school, which it
11  has. So I don't know what his intent was.
12      Q.  Did you talk to Harold Johnson before the
13  August 24, 2004 school board meeting?
14      A.  That evening?
15      Q.  No, in general, did you talk to him about his
16  speaking at that meeting before the meeting?
17      A.  Um, at some point that evening I said hello
18  to Harold in the hallway, and I don't recall whether
19  that was before or after.
20      Q.  Did he tell you what he was going to say?
21      A.  No, I didn't ask anybody what they were going
22  to say. When I saw him there, I kind of figured that
23  he would be one of the people that would take the
24  opportunity to speak, to get time allotted for that.

25 (Pages 94 to 97)

Dobrich, et al.                                    v.              Indian River School District, et al.
Richard Cohee                          C.A. # 15-120 (JJF)                     October 17, 2006

Page 98

1    Q.   On August 24, did you know that the meeting
2    was going to be videotaped?
3        A.   I know I didn't know it was going to be
4    videotaped before the 24th. I might have found out
5    that afternoon. And I say might, because at some
6    point I learned that they were going to add the video
7    screen or whatever in another part of the building,
8    and at some point we learned it was going to be
9    videotaped, and I can't say whether that was that
10   afternoon or when I walked in.
11       Q.   Do you know who told you that?
12       A.   No.
13       Q.   Well, when you say you found out in the
14   afternoon, did someone call you?
15       A.   I think, I think Superintendent Hobbs was the
16   one that told me that they were making the
17   arrangements for the overflow crowd, and it's not
18   uncommon before a big day for me to call her, have
19   called her.
20       When I was board president, her and I worked
21   very well together, and that contact carried through
22   after I left being board president.
23       Whether she told me about the video, I don't
24   recall. But I did know a little bit ahead of time

Page 99

1    that they were anticipating a big crowd and some
2    arrangements were being made for that. I don't know
3    all the details.
4        Q.   Did she tell you how she knew there would be
5    a big crowd there?
6        A.   Well, it was on the local radio station, and
7    the local radio station does a good job with
8    generating controversy in some cases and/or
9    publicizing something that they may solely agree with
10   or solely disagree with.
11       It was on the local radio a number of times.
12   That radio in Sussex County, that station carries a,
13   has a pretty good following, a pretty good audience.
14   It's a talk radio channel. I listen to it sometimes
15   in the morning on the way to work. It's amazing how
16   many people have time to sit and listen to it. I
17   can't.
18       Q.   And can you identify that radio station
19   specifically?
20       A.   That would be WGMB 92, something, 7.
21       Q.   And as part of that, the discussion on that
22   radio station, did that involve Dr. Hattier?
23       A.   Prior to the?
24       Q.   August 24 board meeting?

Page 100

1        A.   I don't know. I know Dr. Hattier has been on
2    that radio station a number of times, a number of
3    times since. I cannot say with certainty if he was
4    there prior to that meeting or not. I don't know.
5        Q.   Did you receive any copies of the videotape
6    from August 24, 2004?
7        A.   Videotape? No.
8        Q.   Do you know if any other board member did?
9        A.   I don't know.
10       Q.   Was the meeting on August 24, 2004 audio
11   taped?
12       A.   It sounds like it was.
13       Q.   Well, separate from the videotape, is there
14   an audio tape?
15       A.   It was a regular meeting, so I am assuming
16   that it would have been audio taped, but, again, that
17   would be normal practice.
18       Q.   But no one brought up to you the fact that
19   you don't have the audio tape of that meeting?
20       A.   No. Wait a minute. Was that a special
21   meeting? Let me look at the minutes.
22       Q.   The minutes are PX17.
23       A.   Regular meeting, the standard or normal
24   practice is that it would have been taped. At some

Page 101

1    point that wasn't the case, but I think that could
2    have happened beyond 2004.
3        Q.   Okay, I am going to ask you to pull out PX9,
4    which is something we have been discussing, which is
5    the policy, by itself, one sheet of paper.
6        A.   PX9, here we go.
7        Q.   To your knowledge, has any school board
8    member ever recited a prayer that was prohibited by
9    the new policy?
10       A.   To my knowledge, no.
11       Q.   Is there a limitation on what type of prayer
12   can be given at the regular school board meeting in
13   that policy?
14       A.   Um, I think paragraph five would deal mainly
15   with that, and I don't see where there is any
16   limitation on it, as I interpret it.
17       Q.   Do you think that paragraph three operates to
18   limit the type of prayer given?
19       A.   That would limit it, yes. I think prayer and
20   preaching are two different things.
21       Q.   I'm sorry, is the word preach in this policy?
22       A.   No, it's not.
23       Q.   So what did you mean by your comment that
24   prayer and preach are not the same thing?

26 (Pages 98 to 101)

Dobrich, et al.                                            Indian River School District, et al.
Richard Cohee                    v.                              October 17, 2006
                          C.A. # 15-120 (JJF)

Page 102

1    A. Well, you have proselytize and convert, and
2    obviously when we preach or when someone preaches,
3    that could very well be what part of their intent is.
4    Q. And since this, so since this policy has been
5    enacted, no one has preached, in your term?
6    A. Not when I have been present that I recall.
7    And, as I have said, I missed a number of meetings. I
8    obviously missed some prayers along with that, but I
9    don't recall any that I would consider to be such.
10   Q. Have any school board prayers identified any
11   religious figures?
12   A. Can you restate that one?
13   Q. Have any of the prayers given by school board
14   members identified any religious figures in the
15   prayer?
16   A. Such as?
17   Q. Such as God or Jesus?
18   A. Yes, they have.
19   Q. Have there been any other religious figures
20   identified?
21   A. God, Jesus, Jesus Christ. I don't recall any
22   beyond that.
23   Q. Do you recall any prayers given before the
24   policy was adopted, that is prior to October 19, 2004,

Page 103

1    that would have violated the policy?
2    A. We are talking about in the board setting
3    still?
4    Q. Yes.
5    A. I don't recall that.
6    Q. I am going to give you a series of prayers
7    and ask them to run through whatever analysis you
8    would do to determine whether they would be violating
9    paragraph three of PX9. I think you already have PX35
10   over there, one paragraph, one sheet of paper.
11   A. Start with this one?
12   Q. This is the long one, so I will read it out
13   loud, and if you can just follow along with me. And,
14   before we start, because at the end of this I am going
15   to ask you whether this prayer would violate paragraph
16   three or any paragraph of the school board prayer
17   policy.
18        The prayer starts, "Do not put your trust in
19   princes, in mortal men who cannot even save
20   themselves. When their spirit departs, they return to
21   the ground. On that very day their plans come to
22   nothing. Blessed is he whose help is the God of
23   Jacob, whose hope is in the Lord, his God, the maker
24   of heaven and earth, the sea, and everything in them,

Page 104

1    the Lord who remains faithful forever. He upholds the
2    cause of the oppressed and gives food to the hungry.
3    The Lord sets prisoners free. The Lord gives sight to
4    the blind. The Lord lifts up those who are bowed
5    down. The Lord loves the righteous. The Lord watches
6    over the alien and sustains the fatherless and the
7    widow, but he frustrates the ways of the wicked. For
8    the wages of sin is death, but the gift of God is
9    eternal life through Jesus Christ our Lord."
10        Would that violate the school board prayer
11   policy?
12   A. In my opinion, it would.
13   Q. Can you tell me why it would?
14   A. Um, it's disparaging in some ways. It talks
15   about the Lord loves the righteous, eternal life
16   through Jesus Christ our Lord, the assumption being if
17   you didn't believe in Jesus Christ you wouldn't have
18   eternal life. And it, to me, is more preaching.
19   Q. Okay, I am going to read you another one,
20   which again you should have over there. It's PX45.
21   It's right next to it. I think Jason has got it out
22   there.
23        Again, I will read it out loud, and if you
24   could follow along, and I will ask the same question

Page 105

1    at the end.
2        "Heavenly Father, thank you for this great
3    occasion, for the work, the effort, the joys and
4    everything that led up to this point in time.
5    Thank you for your guidance in this event. We pray
6    for your direction in the lives of each of these
7    school board members. We pray that you direct them
8    into the truth and eventually the truth that comes by
9    knowing Jesus. We also pray that you will be with
10   them at this time. We ask these things in Jesus's
11   name. Amen."
12        Same question: Does this prayer violate
13   anything in the school board prayer policy?
14   A. Um, I don't know that I would have -- I don't
15   know that I would have a problem with this one.
16   Q. Is there any reason for that?
17   A. It's completely the opposite of what the
18   other one is. There is only one comment in there that
19   I would, if I had a chance to review it and take it
20   out, I might look at "eventually the truth that comes
21   by knowing Jesus," but, beyond that, I don't have a
22   problem with it. And I don't have a problem with
23   that, but that would be the one comment that, if I was
24   revising it, that I would probably be concerned with

27 (Pages 102 to 105)

Dobrich, et al.                                    v.                    Indian River School District, et al.
Richard Cohee                           C.A. # 15-120 (JJF)                       October 17, 2006

Page 106

1 from someone else's perspective.
2    Q.   Do you think that that prayer proselytizes?
3    A.   Um, no, overall, no.
4    Q.   Is there any one section that does?
5    A.   I mentioned a concern about one clause, but
6 overall I would say no.
7    Q.   What clause was that?
8    A.   That was the one about "eventually the truth
9 that comes by knowing Jesus, direct them into the
10 truth."
11    Q.   Okay.
12    A.   And I am answering these in the perspective
13 if I were the board president and I am allowing the
14 board or picking from the board or rotating in this
15 policy.
16       And I don't know that the board president
17 reviews these prayers in advance. I am assuming he
18 does not review them. Okay? If I were given that
19 ahead of the meeting and said, "Hey, what do you think
20 of this," I would be fine with it overall. I would
21 have a little concern about the one line.
22    Q.   Is the board president responsible on his own
23 to determine whether it violates the school prayer
24 policy?

Page 107

1    A.   No, he does not. I said if I were reviewing
2 it as a board president, and normally you wouldn't be.
3    Q.   But if there were a question as to whether a
4 prayer possibly violated the policy, do you think that
5 all board members would discuss?
6    A.   If an individual board member came to me and
7 said, "This is what I am going to say tonight; do you
8 have a problem with it," then that's the perspective I
9 am answering from. I don't know that that happens. I
10 haven't done that, and when I was board president it
11 didn't happen. Okay?
12    Q.   What would you do if someone gave a prayer
13 that you thought violated this policy?
14    A.   That I didn't know in advance?
15    Q.   Correct.
16    A.   Um, at that particular time I would probably
17 do nothing, and I may address it with the individual
18 later or collectively as a board, "Here is the policy,
19 folks; let's follow it."
20    Q.   All right, I am going to read you two more
21 short prayers and ask you the same question whether
22 they violate the policy.
23       The prayer is, quote, "Allah, we offer you
24 our school bus drivers. We offer you our

Page 108

1 superintendent, our administrators, and our
2 secretaries. We offer you our teachers and our
3 parents. Finally, we offer you our students. Peace
4 be under our prophet, Muhammed." End quote.
5       Does that violate the school board prayer
6 policy?
7    A.   Can I read it? I am better at reading it
8 than I am hearing it.
9    Q.   We might need to -- I will ask some questions
10 while we get it to you in writing.
11    A.   Or just go through it again a little slower.
12    Q.   Sure, I will go through it again and see if
13 we can do it that way. Quote: "Allah, we offer you
14 our school bus drivers. We offer you our
15 superintendent, our administrators, and our
16 secretaries. We offer you our teachers and our
17 parents. Finally, we offer you our students. Peace
18 be unto your prophet, Muhammed." End quote.
19    A.   Um, I don't know a lot about that faith. The
20 first thing that comes to mind is the offering and
21 what the vocation is there. But as you read it and
22 take it as you have read it, I don't see it as
23 threatening. I can read into it if I so chose, as
24 anyone else could, but I, as you have read it, I don't

Page 109

1 see it as being threatening or disparaging and would
2 be acceptable.
3    Q.   Do you think that this prayer is
4 proselytizing?
5    A.   That's what I just said, as you have read it,
6 I don't see it as such.
7    Q.   Okay. All right, one more. It's even
8 shorter. Here is the prayer. "We pray, Lord,
9 enlighten the heathen in our midst, inspire them to
10 come to your wisdom and goodness. We ask these things
11 in the name of Jesus Christ. Amen."
12    A.   Read it one more time.
13    Q.   "We pray, Lord, enlighten the heathen in our
14 midst, inspire them to come to your wisdom and
15 goodness. We ask these things in the name of Jesus
16 Christ. Amen."
17    A.   "Inspire the heathen, we ask them to come to
18 you --" What was that clause?
19    Q.   Wisdom and goodness.
20    A.   Yeah, I would think that would violate the
21 section, as well.
22    Q.   Okay. Do you think that non-Christians can
23 get elected to the school board?
24    A.   Do I think they can?

28 (Pages 106 to 109)

Dobrich, et al.                                          Indian River School District, et al.
Richard Cohee                        v.                              October 17, 2006
                            C.A. # 15-120 (JJF)

Page 110

1   Q.  Yes.
2   A.  Why couldn't they?
3   Q.  Do you think that the -- What do you think
4   the religious faith of most people in the Indian River
5   is?
6   A.  Religious faith would be mostly Christian.
7   Q.  Has that ever been an issue in the school
8   board election?
9   A.  I don't know that it's been an issue with
10  school board elections during my tenure, at least,
11  prior to this.  And I am not certain that it's been a
12  sole issue since this, but I do know that, from
13  reading comments by other opponents, and I can't even
14  recall who they were, there were some issues with the
15  board pursuing this by some, they were against it, so
16  as minor -- Well, as minimal as that may be, I
17  wouldn't say minor, then it is an issue, yes.  In
18  somebody's mind they don't agree with what the board
19  is doing here.
20  Q.  There were board meetings on April 26, 2005
21  and May 24, 2005, and I will represent to you those
22  board minutes began with a moment of silence.
23  A.  Okay.
24  Q.  Do you recall any disruptions at those

Page 111

1   meetings?
2   A.  Any disruptions?
3   Q.  Yes.
4   A.  I don't recall any.
5   Q.  Do you recall whether there was a prayer
6   given at the August 24, 2004 meeting?  That was the
7   one we played for you on the videotape.
8   A.  Um, I think that there was, but I don't know
9   for certain.
10  Q.  If you look at the first, on the first page
11  in the first paragraph.
12  A.  Of the minutes?
13  Q.  Of the August 24, yes, 2004 minutes.
14  A.  Okay, Dr. Hattier gave a prayer.
15  Q.  Correct.  Now, you heard on videotape the
16  laughter while Mr. Johnson was giving his public
17  comment?
18  A.  I heard laughter and other sounds.
19  Q.  Would you call that solemn?
20  A.  Some of it I would, because some of it
21  sounded like they were in support of the statement as
22  far as I think I heard a couple amens and a couple
23  yes, and that's not laughter.
24      The laughter, I would say would probably not

Page 112

1   be solemn.  However, it is the opportunity for the
2   public to speak, and we have a policy for that.  We
3   try to adhere to that policy, and it's difficult to
4   control what one says at the podium.  It's also
5   difficult to control what the audience participants
6   interject.
7   Q.  Do you think it matters to the audience
8   whether you give a prayer or a moment of silence
9   before the school board meeting?
10  A.  I don't know whether it matters to the
11  audience or not.  It matters to the board, and we do
12  it for the board.  We don't do it for the audience.
13      MR. LENHARD:  I think I am getting
14  close to the end, and I am going to suggest
15  we take a few minute break for me to review
16  the notes.
17      THE WITNESS:  Okay.
18      VIDEOGRAPHER:  Going off the record at
19  approximately 4:02 p.m.
20      (A recess was taken.)
21      VIDEOGRAPHER:  We are back on the
22  record at approximately 4:09 p.m.
23  BY MR. LENHARD:
24  Q.  Mr. Cohee, do you remember the audience

Page 113

1   reaction to Dr. Hattier's prayer or the announcement
2   that Dr. Hattier would give a prayer on August 24,
3   2004?
4   A.  Um, I don't remember the reaction, but I
5   think there was a lot of concern as to whether we
6   would or not, and if there was any reaction at all, it
7   most likely would have -- I shouldn't say that most
8   likely, because I don't know.  It would probably have
9   been supportive.
10  Q.  When you said that the prayer was for the
11  board members, is that because of the disclaimer?
12  A.  No, because it was for the board members long
13  before we had the disclaimer or that policy.
14  Q.  Okay, have you ever seen someone get up and
15  leave the meeting or attempt to leave the meeting when
16  there is an announcement that a prayer is going to be
17  given?
18  A.  Um, well, I will say that different times
19  during the meeting people come and go for a lot of
20  reasons.  Okay?  I can't sit here and say that I have
21  seen anyone go for in response to the prayer preface,
22  and I can't say that I have ever really watched to see
23  if that occurred.
24  Q.  Are students in the audience when the prayer

29 (Pages 110 to 113)

Dobrich, et al.                              v.                    Indian River School District, et al.
Richard Cohee                      C.A. # 15-120 (JJF)                        October 17, 2006

Page 114

1  is given?
2      A.  Most often.
3      Q.  Have all the prayers been Christian?
4      A.  I think you asked that earlier, and, to my
5  knowledge, I would have to say the majority have been.
6      Q.  Do you recall any prayer in the name of
7  Jehovah?
8      A.  No, I can't.
9      Q.  Any prayer in the name of Buddha?
10     A.  No.
11     Q.  Any prayer in the name of Allah?
12     A.  No.
13     Q.  So can you recall any prayer for any other
14 religious deity besides Jesus or the Christian God?
15     A.  Other than the moment of silence, which would
16 not address either faith.
17     Q.  Has anyone served on the school board who is
18 not Christian?
19     A.  I do not know that is true. I don't make it
20 a point of asking people their religion or beliefs,
21 and it wouldn't have made any difference to me.
22          MR. LENHARD:  I think that's all the
23     questions I have.  Thank you very much.
24          THE WITNESS:  Thank you.

Page 115

1          VIDEOGRAPHER:  This deposition is
2      ending at approximately 4:12 p.m.
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 116

1              CERTIFICATE
2          I, Lorena J. Hartnett, a Notary Public and
3  Registered Professional Reporter, do hereby certify
4  that the witness, RICHARD COHEE, was by me first
5  duly sworn to testify the truth, the whole truth, and
6  nothing but the truth; that the foregoing deposition
7  was taken at the time and place stated herein; and
8  that the said deposition was recorded stenographically
9  by me and then reduced to typewriting under my
10 direction, and constitutes a true record of the
11 testimony given by said witness.
12         I further certify that the inspection,
13 reading and signing of said deposition was not waived
14 by counsel for the parties and by the witness.
15         I further certify that I am not a relative,
16 employee, or attorney of any of the parties or a
17 relative or employee of either counsel, and that I am
18 in no way interested directly or indirectly in this
19 action.
20         IN WITNESS WHEREOF, I have hereunto set my
21 hand and affixed my seal of office on this 24th day of
22 October 2006.
23
24         Cert. #134-RPR, Exp. 01-31-2008

30 (Pages 114 to 116)