```
 1              IN THE UNITED STATES DISTRICT COURT
 2              IN AND FOR THE DISTRICT OF DELAWARE
 3    MONA DOBRICH and MARCO    :  Case No. 15-120
      DOBRICH, Individually and :
 4    as parents and next friend :
      of ALEXANDER DOBRICH,      :
 5    SAMANTHA DOBRICH, JANE DOE :
      and JOHN DOE, Individually :
 6    and as parents and next    :
      friend of JORDAN DOE and   :
 7    JAMIE DOE,                  :
                                  :
 8              Plaintiffs,       :
                                  :
 9              v.                :
                                  :
10    INDIAN RIVER SCHOOL         :
      DISTRICT, et al.,           :
11                                :
                Defendants.       :
12              .. .. .. .. .. ..
13              Video Deposition of ELAINE MCCABE, taken
      pursuant to notice, on Tuesday, October 17, 2006
14    at 9:02 a.m. at 31 Hosier Street, Selbyville,
      Delaware, reported by Lorena J. Hartnett, a Registered
15    Professional Reporter and Notary Public.
16              .. .. .. .. .. ..
17    APPEARANCES:
18              RICHARD HORVATH, ESQUIRE
                BRIAN G. LENHARD, ESQUIRE
19              Skadden, Arps, Slate, Meagher & Flom
                One Rodney Square
20              Wilmington, DE  19801
                  Attorneys for the Plaintiff
21
22                  WILCOX & FETZER
          1330 King Street - Wilmington, DE  19801
23                  (302) 655-0477
                    www.wilfet.com
24
```

Dobrich, et al.                                    v.                    Indian River School District, et al.
Elaine McCabe                          Case No. 15-120                            October 17, 2006

Page 2

1
2    APPEARANCES (CONTINUED):
3        JASON P. GOSSELIN, ESQUIRE
         Drinker, Biddle & Reath, LLP
4        One Logan Square
         18th and Cherry Streets
5        Philadelphia, PA  19103-6996
         Attorney for the Defendants
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 3

1
2
3            TABLE OF CONTENTS
4    TESTIMONY OF ELAINE MCCABE:
5        Direct Examination by Mr. Horvath . . . . . . . 4
6        Certificate of Reporter . . . . . . . . . . . .112
7
8
9
10            INDEX TO EXHIBITS
11    Plaintiff's Exhibit 57 . . . . . . . . . . . . . . 99
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 4

1              (The videographer read the
2        introduction, and the attorneys introduced
3        themselves.)
4              ELAINE MCCABE,
5    HAVING FIRST BEEN DULY SWORN, TESTIFIED AS FOLLOWS:
6    DIRECT EXAMINATION ON BEHALF OF THE PLAINTIFFS
7    BY MR. HORVATH:
8        Q.  Good morning, Ms. McCabe.
9        A.  Good morning.
10       Q.  Just so I can be clear from the start, is it
11   Ms. or Mrs.?
12       A.  Mrs.
13       Q.  Mrs.  Have you ever been deposed before?
14       A.  Once, yes.
15       Q.  And what was that, what were you -- What case
16   was that?
17       A.  It was the Barkaski case associated with the
18   school district.
19       Q.  And what was the nature of that case?
20       A.  It was a case that involved missing monies
21   from a booster organization.
22       Q.  Okay, did that case proceed to trial?
23       A.  No.
24       Q.  Did that case involve in any way religion in

Page 5

1    the district?
2        A.  No.
3        Q.  Okay, throughout this deposition I am going
4    to ask you a series of questions.  If at any point you
5    don't understand any of my questions, can you please
6    let me know?
7        A.  Sure.
8        Q.  If you don't do so, I am going to assume that
9    you understood the question.
10       A.  Okay.
11       Q.  And it's also likely that a judge and jury
12   would understand that you, or assume that you
13   understood the question.
14       A.  Okay.
15       Q.  Also, because we have a court reporter
16   present, and so far you have been great with this,
17   answer each question with a yes -- a verbal answer, a
18   clear yes, no, as opposed to an uh-huh or a nuh-uh.
19   Even though we are videotaping, head gestures aren't
20   going to be picked up on the written record.
21             Also, if at anytime you need to take a break,
22   let me know.  We are videotaping this deposition and
23   the tapes last about an hour each, so they have to be
24   replaced every hour, so hopefully we will be able to

2 (Pages 2 to 5)

Case 1:05-cv-00120-JJF    Document 266-7    Filed 05/08/2008    Page 3 of 29

Dobrich, et al.                                  v.              Indian River School District, et al.
Elaine McCabe                          Case No. 15-120                        October 17, 2006

Page 6

1   get all the breaks in that way, but if you need any
2   break at any point, let me know.
3       Just to let you know, if I am in the middle
4   of a question, I think we would kind of like it better
5   if you answered the question first and then take the
6   break afterwards.
7   **A.  That's fine.**
8   Q.  Are you feeling well today?
9   **A.  Yes.**
10  Q.  Are you taking any medications or drugs that
11  might make it difficult for you to understand and
12  answer my questions?
13  **A.  No.**
14  Q.  Even though it's very early in the morning,
15  have you drank any alcohol today?
16  **A.  No.**
17  Q.  So can you think of any reason why you would
18  not be able to answer my questions today?
19  **A.  Not at all.**
20  Q.  Have you spoken with anyone who has been
21  deposed in this matter, since their deposition?
22  **A.  I talked to Mr. Bireley once, I believe, in**
23  **the last week.**
24  Q.  When did you talk to him?

Page 7

1   **A.  Night before last.**
2   Q.  So that would be Sunday night?
3   **A.  Sunday night, yes.**
4   Q.  And did you talk to him about his deposition?
5   **A.  Not really, no.**
6   Q.  Not really?
7   **A.  I asked him how long his deposition took, and**
8   **he told me that, and basically I had called him about**
9   **something else.**
10  Q.  Did he tell you anything else about his
11  deposition?
12  **A.  No.**
13  Q.  Did he make any comments about the lawyer
14  questioning him as belittling him?
15  **A.  No.**
16  Q.  But he had no substantive comments about his
17  deposition?
18  **A.  No.**
19  Q.  Did you prepare for this deposition?
20  **A.  I met with the attorney one time for I think**
21  **an hour.**
22  Q.  When did that take place?
23  **A.  Last Tuesday evening.**
24  Q.  Okay, Tuesday of last week?

Page 8

1   **A.  Yes.**
2   Q.  And who else was there when you met with --
3   **A.  Mr. Walls and one of the new board members,**
4   **and I don't remember his name right at the moment.**
5   **Mr. Wilson.**
6   Q.  Was Mr. Hastings present?
7   **A.  No.**
8   Q.  And before, when you said your attorney, you
9   pointed to Mr. Gosselin?
10  **A.  Yes.**
11  Q.  Was anyone else present during that
12  preparation?
13  **A.  No, no.**
14  Q.  And where did you meet?
15  **A.  We met in Dr. Bunting's office.**
16  Q.  Did you review any documents during that
17  preparation?
18  **A.  No, it was just a conversation.**
19  Q.  Were any documents read to you?
20  **A.  No.**
21  Q.  Have you reviewed any documents since that
22  preparation?
23  **A.  No.**
24  Q.  Other than with your attorney, have you

Page 9

1   talked with anyone else about your deposition?
2   **A.  No.  My husband knows that I am coming this**
3   **morning for a deposition.  That's all.**
4   Q.  Okay.  Aside from your husband, no one else?
5   **A.  No.**
6   Q.  And what is your full name, for the record?
7   **A.  Mary Elaine McCabe.**
8   Q.  And how long have you lived in Sussex County?
9   **A.  Fifty-three years.**
10  Q.  Were you born here?
11  **A.  Yes.**
12  Q.  I guess that was an inadvertent way to find
13  out your age for the record.
14  **A.  (Laughter)**
15  Q.  And how long were you a member of the Indian
16  River School Board?
17  **A.  Eleven years.**
18  Q.  When were you first elected to the board?
19  **A.  Oh, my goodness.**
20  Q.  First off, were you elected to the board?
21  **A.  I actually was not, because I ran unopposed.**
22  Q.  You joined the board through an election?
23  **A.  Yes, yes.**
24  Q.  So you were elected?

3 (Pages 6 to 9)

Dobrich, et al.
Elaine McCabe

v.

Case No. 15-120

Indian River School District, et al.
October 17, 2006

Page 10

1   A. Technically, I guess.
2   Q. Okay.
3   A. I left the board in June of 2005, and I was
4   on the board 11 years, so I guess that's '94 that I
5   went on the board.
6   Q. And you would have probably joined in July of
7   2001?
8   A. July 1, yes.
9   Q. Have you ever served on any other school
10  boards?
11  A. No.
12  Q. Why did you decide to run for election to the
13  Indian River School Board?
14  A. I had two children go through the system, and
15  I was very active in the parent organizations, in the
16  booster clubs, and at that time I was dissatisfied
17  with some of the things going on in the district, and
18  decided to run for the board.
19  Q. Were you otherwise employed by the district?
20  A. No.
21  Q. Are you currently employed?
22  A. Yes.
23  Q. What do you do?
24  A. A friend of mine and I own a retail store in

Page 11

1   Bethany Beach, Delaware.
2   Q. And have you owned that business for --
3   A. Eighteen years.
4   Q. Eighteen years?
5   A. Uh-huh.
6   Q. So you operated that business before you
7   joined the board?
8   A. Yes, yes, I have always been -- Well, I
9   worked for an accountant many years ago, but I have
10  basically been self employed.
11  Q. Are you otherwise involved with the district?
12  Are you a member of any boosters organization, for
13  example?
14  A. No, both of my children are out of school
15  now, so I am not involved in that. I, since leaving
16  the board, I have attended, I think, two meetings
17  occasionally when they needed a community member. I
18  have attended twice, I think.
19  Q. Which meetings have you attended since you
20  left the board?
21  A. It's the committee that deals with federal
22  funding. I don't remember the name right now, but
23  with the ag monies and tech monies.
24  Q. So is this a -- So did you attend committee

Page 12

1   meetings?
2   A. Yes.
3   Q. As opposed to regular board meetings?
4   A. Oh, no board meetings. It was just a
5   committee that the district has.
6   Q. Okay, is it the Finance Committee?
7   A. No, no.
8   Q. Okay.
9   A. No, it's a committee that's run out of the
10  Curriculum Department, and one of the requirements is
11  that you meet once a year with curriculum staff,
12  community members --
13  Q. Uh-huh.
14  A. -- to just discuss how tech monies are spent
15  within the district.
16  Q. Is this a committee that's made up more of --
17  Is this an actual committee of the board, itself?
18  A. No, it's mostly teachers.
19  Q. Are any board members on that committee?
20  A. I believe there may be one on the committee.
21  Q. And I take it you don't recall --
22  A. I am not sure who it is, no, I don't.
23  Q. At any point during those committee meetings,
24  did you have any discussions with that board member

Page 13

1   about board prayer or the issues in this case?
2   A. No.
3   Q. So, when you were a member of the board, were
4   you a member of any committees?
5   A. Curriculum Committee.
6   Q. Any others?
7   A. No.
8   Q. Did you serve as a chair of the Curriculum
9   Committee?
10  A. I did for a few years. Not the whole time.
11  Q. What does the Curriculum Committee do?
12  A. The Curriculum Committee really discusses
13  textbooks and the purchase of textbooks and issues
14  that parents have concerning -- It tends to be mostly,
15  mostly math and English language arts issues, but any
16  approved curriculum of the district.
17  Q. So you mentioned textbooks. Does the
18  Curriculum Committee review proposed textbooks and
19  determine which ones will be purchased?
20  A. No.
21  Q. Who does that?
22  A. The Curriculum Department. Now, if they have
23  meetings, they may sometimes ask board members to
24  serve on that, but the Curriculum Committee does

4 (Pages 10 to 13)

Case 1:05-cv-00120-JJF    Document 266-7    Filed 05/08/2008    Page 5 of 29
Dobrich, et al.                                   v.                    Indian River School District, et al.
Elaine McCabe                              Case No. 15-120                          October 17, 2006

Page 14

1  not -- Usually it's a group of teachers that select
2  textbooks.
3     Q.  Okay, so what connection does the Curriculum
4  Committee have with textbooks, because you had
5  mentioned textbooks, and I am --
6     A.  It just oversees what those committees have
7  done.  Usually the head of curriculum will report to
8  the Curriculum Committee what they have selected and
9  the Curriculum Committee will then report that to the
10  board at a meeting.
11     Q.  So could these other bodies, these other
12  entities that look at the textbooks, could they
13  purchase textbooks without the Curriculum Committee or
14  the board making any determination about whether to
15  purchase those type of textbooks?
16     A.  Yes, I believe they could.
17     Q.  Has the Curriculum Committee or the board
18  ever voted on whether to purchase textbooks?
19     A.  I don't really know.  I believe that's
20  usually done within the administration.  I don't think
21  it takes a board vote, to my knowledge.
22     Q.  To your knowledge, has there been a board
23  vote?
24     A.  On a specific textbook?

Page 15

1     Q.  Yes.
2     A.  No, I don't believe so.
3     Q.  Okay.  I think you might have received an
4  e-mail about it, but I don't remember right now.  What
5  is your religious faith and denomination?
6     A.  Protestant.  I was raised in a Methodist
7  church.
8     Q.  Do you attend church now?
9     A.  No.
10     Q.  Did you attend church during the summer of
11  2004?
12     A.  No.
13     Q.  What do you believe is the majority religious
14  faith of the voters in the district?
15     A.  I am probably not sure of the correct term,
16  but I would use the terms Protestant or Christian.
17     Q.  Is that an overwhelming majority?
18     A.  Probably.
19     Q.  Similarly, what do you believe is the
20  majority faith among the students in the district?
21     A.  The same.
22     Q.  Overwhelmingly Protestant or Christian?
23     A.  Yes.
24     Q.  And what about the teachers in the district?

Page 16

1     A.  Probably the same.
2     Q.  Overwhelmingly Protestant or Christian?
3     A.  Yes, yes.
4     Q.  Did you ever take notes at school board
5  meetings?
6     A.  Rarely.
7     Q.  What would cause you to take notes at a
8  meeting?
9     A.  I would sometimes take notes on the financial
10  parts if they were giving us numbers, particularly
11  numbers of what things cost or things like that.  I
12  would take notes occasionally then.
13     Q.  Did you take any notes about, from the time
14  when the board was considering adopting its board
15  prayer policy?
16     A.  Not to my knowledge, I don't believe I took
17  any notes on that.
18     Q.  Did you keep all the notes that you took --
19     A.  No.
20     Q.  -- from when you were a member of the school
21  board?
22     A.  No, I did not.
23     Q.  What happened to those notes?
24     A.  They were destroyed when I -- I actually

Page 17

1  moved very soon after I left the board, and I did not
2  take them with me.  They were destroyed.
3     Q.  Was that move the reason why you had to leave
4  the board?
5     A.  I actually came up at the end of the term and
6  did not run again because I knew that we would be
7  moving.  Terms are three years in this district, and I
8  knew that we would be moving within the next six to
9  eight months, and to run again and then have to resign
10  when I moved would just put the district in a position
11  of running a special election, so I just opted not to
12  run, and also I had some personal issues with care
13  giving with my parents, so I could no longer serve on
14  the board.
15     Q.  You said that the notes that you had taken up
16  to that point had been destroyed.  Were they just like
17  left for the garbage man to pick up?
18     A.  Oh, no, no, they were shredded.
19     Q.  Okay, and you shredded them?
20     A.  Yes.
21     Q.  Does the school board enforce the policies it
22  adopts?
23     A.  To my knowledge, we always tried to enforce
24  them.  Now, board members certainly are not in

5 (Pages 14 to 17)

Dobrich, et al.
Elaine McCabe

v.

Case No. 15-120

Indian River School District, et al.
October 17, 2006

Page 18

1   buildings every day, but I believe that the policies
2   were enforced, yes.
3       Q.   And for the policies that dealt with board
4   governance and operations, would it be pretty much up
5   to only the school board to enforce those policies?
6       A.   Yes.
7       Q.   Because those policies apply only to the
8   school board?
9       A.   Right, that's correct.
10      Q.   And no one else could tell the school board
11  how to enforce those policies?
12      A.   Well, I think most of the policies the
13  district adopted was always done with the advice of an
14  attorney, so I guess from that respect an attorney or
15  a state could also have policies that we needed to
16  follow, but I think we always tried to follow the
17  policies.
18      Q.   I was talking more to the board governance
19  and operations policies.
20      A.   How we operate?
21      Q.   Yes, that the board adopted, the policies
22  that begin with the letter code, they have the letter
23  code that begins with a B.
24      A.   Right.

Page 19

1       Q.   Those policies deal with how the board
2   operates?
3       A.   How we run the meetings, etcetera.
4       Q.   Exactly.   And it would be only up to the
5   board to enforce those policies?
6       A.   I believe so.
7       Q.   When you were acting as a school board
8   member, did your actions have to be for the betterment
9   of the district students?
10      A.   Did they have to be?
11      Q.   Uh-huh.
12      A.   I am not sure I understand that.
13      Q.   Was there any policy in place that directed
14  the board members to share the interests of the
15  district students first in any actions they took as a
16  board member?
17      A.   I don't know if there was any policy that
18  said that.  I think when you decide to volunteer your
19  time and run for the board, you obviously want to do
20  it for the betterment of the students.
21          I am not aware if there is a specific policy.
22  I think when we are sworn in, we, I believe, say that
23  we want to do it for the betterment of the students.
24      Q.   Do you think it would be appropriate for the

Page 20

1   board to pass any policy that was beneficial to the
2   board members themselves without any benefit to the
3   students?
4       A.   No.
5       Q.   No, it wouldn't be appropriate?
6       A.   I don't think anyone would do that.  I don't
7   see any reason for that.
8       Q.   Do you think it would be appropriate for the
9   board to adopt a policy that was primarily for the
10  board members' benefits?
11      A.   No.
12      Q.   No, it would not be?
13      A.   It would not be appropriate.
14      Q.   What typically happens at a regularly
15  scheduled board meeting, the regular board meetings?
16      A.   The monthly board meetings?
17      Q.   Yes.
18      A.   We have an agenda.  We receive a packet
19  several days before the meeting so that we can review
20  everything that will be discussed that night.  When we
21  get to the meeting, we would -- I am trying to
22  remember the order.  We would generally have a prayer.
23  Then we would have a pledge of allegiance.  And then
24  we would have public comment.  And then we would

Page 21

1   continue on with the rest of the agenda.
2       Q.   Now, you said generally.  Would it always
3   follow that order or --
4       A.   I am trying to remember if the pledge of
5   allegiance was first or the prayer was first, but
6   those, at least, were the first two things that we
7   would do at the meeting.
8       Q.   And before the pledge of allegiance takes
9   place, would there be a presentation of colors?
10      A.   Most of the time.  Sometimes the groups could
11  not be there to do that, but I would say generally we
12  had ROTC students there and there would be
13  presentations of colors.
14      Q.   Were the JROTC students not there during the
15  summer months, outside of the academic year?
16      A.   Usually not.
17      Q.   And would they be there during the school
18  year?
19      A.   Yes, yes.
20      Q.   You said you couldn't remember if the prayer
21  took place before or after the presentation of
22  the colors?
23      A.   I can't really, can't remember which one was
24  first.

6 (Pages 18 to 21)

Dobrich, et al.                                                    Indian River School District, et al.
Elaine McCabe                       v.                             October 17, 2006
                              Case No. 15-120

Page 22

1    Q.  Is it possible that they flip back and forth
2    every now and then?
3       A.  No, it was usually the same order, but I just
4    can't remember the order now.  I haven't looked at an
5    agenda in a long time.
6       Q.  Between the pledge and the public comments,
7    would the board present awards to students?
8       A.  Many times, yes.  Again, usually not in the
9    summer, but most months we would have -- But not only
10   students.  Sometimes it would be community members and
11   teachers.
12      Q.  And would those awards be identified on the
13   agenda?
14      A.  Yes.
15      Q.  And would you review the agenda before the
16   board meeting?
17      A.  Yes.
18      Q.  So you would know before the board meeting
19   that students would be present?
20      A.  Yes.
21      Q.  To be clear, you had mentioned the summer
22   months.  Do we mean by the summer months the July and
23   August months, or does that also include June?
24      A.  Most of the time it would include June also.

Page 23

1       Q.  Okay, so three months out of the year the
2    chances of seeing a student at a school board meeting
3    might be pretty low?
4       A.  Yes.
5       Q.  But for nine months out of the year you would
6    expect to see a student at a school board meeting?
7       A.  Yes.
8       Q.  After public comment would student government
9    have the opportunity to speak during the school year?
10      A.  Most of the time, yes.
11      Q.  And that would be put on the agenda ahead of
12   time?
13      A.  Yes.
14      Q.  The students that received awards at board
15   meetings, did the board invite them to receive the
16   awards at the meeting?
17      A.  I assume the administration did.
18      Q.  But the board knew that the administration
19   was inviting the students?
20      A.  Yes.
21      Q.  Similarly, for the JROTC students who
22   presented colors, did the board invite them to present
23   colors at the meeting?
24      A.  Yes.

Page 24

1       Q.  And with the student government
2    representatives, they were placed on the agenda, so
3    did the board invite them?
4       A.  Yes.
5       Q.  One of the other little things with the
6    deposition, I forgot to mention this earlier, I will
7    try and check myself on this, but you should also
8    check yourself on it.  You should wait until I have a
9    chance to finish the question before you answer.  That
10   will also give your attorney an opportunity to object
11   to anything I might ask.
12      A.  Okay.
13      Q.  Were these students at the meeting when --
14   Were the students typically at the meeting when it was
15   called to order?
16      A.  Yes, usually.
17      Q.  And would they stay in the meeting until it
18   was time for them to do whatever it was they had to do
19   at the meeting, receive an award, speak as to the
20   government, present the colors?
21      A.  Yes.
22      Q.  So the students would have been present when
23   the prayer was given?
24      A.  Most of the time, yes.

Page 25

1       Q.  Based on your personal experience, have most
2    of the board's votes during the regular meeting been
3    unanimous votes?
4       A.  Votes?
5       Q.  Yes.
6       A.  No, I would say not.
7       Q.  And by unanimous -- Well, let me clarify what
8    I mean by unanimous.  Would the votes be votes without
9    a dissenting vote?  In other words, even if someone
10   might abstain, there wouldn't be a no vote on the
11   record?
12      A.  Most nights I would say there were votes, of
13   all the votes taken in a meeting, there would always
14   be some that were split.  I don't remember nights when
15   every vote would be unanimous.
16         Now, I have no idea what the percentage would
17   be, by most if you mean 80 percent or if you mean
18   70 percent, but I don't remember all votes being
19   unanimous.
20      Q.  Would you say that over half of the votes
21   have been unanimous?
22      A.  Probably close to half would be, because many
23   of the votes are just, are routine general things.
24      Q.  Okay.  Did board members ever discuss

7 (Pages 22 to 25)

Dobrich, et al.
Elaine McCabe

v.

Case No. 15-120

Indian River School District, et al.
October 17, 2006

Page 26

1  policies outside of regular board meetings?
2  **A. I can only speak for myself, and I rarely**
3  **ever did. If I read a policy and didn't understand it**
4  **or had a question I wanted answered before a meeting,**
5  **I would call someone working on that policy or**
6  **associated with that policy and ask a question, but I**
7  **rarely ever discussed policies outside of the board**
8  **meetings.**
9      Q. Was it the board's practice to discuss
10  policies outside of, or to raise those questions about
11  a policy before the meeting?
12      **A. Well, I think the reason we got our packet**
13  **ahead of time was so that we could review it and if we**
14  **had any questions we had time to ask them of the**
15  **appropriate person.**
16      Q. Do you think it would have been beneficial
17  for the public to understanding a policy if those
18  questions had been asked at a regular board meeting?
19      **A. Say that again, please.**
20      Q. Do you think it would have been helpful for
21  the public's understanding of policies the board was
22  considering if those questions were asked at the
23  regular meeting?
24      **A. It could have been beneficial. Again, I can**

Page 27

1  **only speak for myself. If I had a question about a**
2  **policy, I would generally re-ask that question at the**
3  **meeting, but I don't know what other board members**
4  **did.**
5      Q. Now, you said you were a board member since
6  1994?
7      **A. I believe, if my math was correct.**
8      Q. It was 11 years?
9      **A. Yes.**
10      Q. Yeah, I think '94 would be it. Did the
11  school board open its meetings with prayer during that
12  time?
13      **A. Yes.**
14      Q. And were students present at those meetings?
15      **A. Yes.**
16      Q. Do you remember when the JROTC students first
17  started to attend the meetings?
18      **A. I don't remember when we had the first**
19  **program in the district start.**
20      Q. Was it around 2000?
21      **A. I am not sure.**
22      Q. Did student government first start to attend
23  meetings regularly after you joined the board?
24      **A. Yes.**

Page 28

1      Q. Were awards started -- Did the district start
2  to give awards at board meetings regularly after you
3  joined the board?
4      **A. I believe that was done before I was on the**
5  **board.**
6      Q. Okay. All right, how was it decided who
7  would give a prayer at the meetings before the board
8  adopted its prayer policy?
9      **A. I believe that the president of the board**
10  **would normally ask if people wanted to do that.**
11      Q. Were you ever asked?
12      **A. Yes.**
13      Q. And this was before the policy was adopted?
14      **A. Yes.**
15      Q. And did you give a prayer?
16      **A. I generally did not.**
17      Q. Why not?
18      **A. I would say most years when the board would**
19  **establish itself in July, there were generally members**
20  **that wanted to give the prayer and there were members**
21  **that did attend church regularly, and we would usually**
22  **fall into a habit of just, of those folks taking turns**
23  **giving the prayers.**
24      Q. Did they say why they wanted to give the

Page 29

1  prayers.
2      **A. No, not to me.**
3      Q. Did you have any -- At any point, did you
4  have any understanding as to why they wanted to give
5  the prayers?
6      **A. Not really.**
7      Q. Which board members would typically give the
8  prayers?
9      **A. Let's see, over my 11 years board members**
10  **changed, but I would say most recently it was**
11  **Mr. Evans and Mr. Helms, Dr. Hattier. Those are the**
12  **ones that I remember most in the last few years.**
13      Q. Aside from our clients' complaints, are you
14  aware of any complaints about the use of prayer during
15  board meetings?
16      **A. I never had anyone complain to me personally.**
17      Q. Did anyone speak to you about board prayer?
18      **A. No.**
19      Q. And why did the board open its meetings with
20  a prayer before the policy was adopted?
21      **A. I believe because we always had, and the**
22  **board always had before I was a member of the board.**
23  **I attended many meetings before I was a board member,**
24  **and I believe it's always been done as long as I can**

8 (Pages 26 to 29)

Case 1:05-cv-00120-JJF    Document 266-7    Filed 05/08/2008    Page 9 of 29

Dobrich, et al.                                    v.                    Indian River School District, et al.
Elaine McCabe                                Case No. 15-120                          October 17, 2006

Page 30

1  remember.
2     Q.  Was that the only reason, because it had
3  always been done?
4     A.  Probably, or it's at least the reason it kept
5  continuing, I would say.
6     Q.  Did the prayer serve any purpose?
7     A.  I guess -- I guess it serves a purpose in
8  that it establishes and continues a tradition that's
9  always been done, and it gives everyone -- I felt it
10 gave everyone a moment to reflect.
11    Q.  And, by everyone, do you mean everyone in
12 attendance?
13    A.  No, the board members.
14    Q.  Was there a disclaimer read with the prayer
15 before the policy was adopted?
16    A.  No.
17    Q.  So how -- strike that. I am going to show
18 you what has been previously marked as PX9. Is this
19 the policy that the board adopted, the board prayer
20 policy that the board adopted?
21    A.  Yes.
22    Q.  And when was the policy adopted?
23    A.  It says 10/19/04.
24    Q.  When did the board first consider adopting

Page 31

1  this policy?
2     A.  I believe the first time it was discussed was
3  in either June or July of '04, and I am not sure
4  which.
5     Q.  Was it in response to Mona Dobrich's
6  complaints?
7     A.  Yes.
8     Q.  At that time did any board member express any
9  reservations about adopting this policy?
10    A.  Reservations about a policy or a specific
11 policy?
12    Q.  Did any board member express any reservations
13 about the need to adopt this policy?
14    A.  Not that I remember.
15    Q.  A policy on board prayer in general?
16    A.  No, I don't believe so.
17    Q.  Did you have any reservations?
18    A.  No.
19    Q.  At the time did any board member say why they
20 supported board prayer? And, by at the time, I mean
21 in the summer of 2004?
22    A.  I am not sure I remember the exact details of
23 that meeting. I think there were some board members
24 that felt they wanted to continue the prayer because

Page 32

1  it had always been done and it was a tradition of the
2  district, but I don't -- I don't remember any real
3  reservations.
4     Q.  Do you remember which board members?
5     A.  Not really.
6     Q.  So the board members, the reason you remember
7  the board members for giving for writing that policy
8  is to protect the tradition for the district?
9     A.  I think that was part of it, and I think
10 board members that attend church and pray, I am sure
11 want to continue the tradition of praying at the
12 meetings they go to.
13    Q.  Because it's something they have always done?
14    A.  Yes.
15    Q.  These were the board members that you
16 mentioned before, Hattier, Evans and Helms?
17    A.  My impression of that meeting was that
18 everyone wanted to continue it.
19    Q.  But you had mentioned the board members who
20 attend church and prayed regularly and you had
21 identified Hattier, Evans and Helms as those board
22 members earlier, so --
23        MR. GOSSELIN: I think she identified
24        those board members as the board members who

Page 33

1        had given the prayer that she could recall
2        recently.
3            MR. HORVATH: We will go with that for
4        now.
5  BY MR. HORVATH:
6     Q.  Now, you had mentioned a meeting at which
7  this was discussed.
8     A.  I believe it was either June or July.
9     Q.  Did the board discuss this in executive
10 session meeting?
11    A.  I don't remember which part of the meeting it
12 was.
13    Q.  I am going to show you a copy of two
14 exhibits, Plaintiff's Exhibit 13 and 14.
15    A.  Okay, 13.
16    Q.  These documents have these numbers at the
17 bottom of them. They are called Bates numbers.
18    A.  Okay.
19    Q.  They are a way to keep track of documents
20 that are produced in litigation.
21    A.  Okay.
22    Q.  So I am going to refer to on the document
23 that's been marked PX14, the IRSD numbers.
24    A.  Okay.

9 (Pages 30 to 33)

Dobrich, et al.                                    v.                    Indian River School District, et al.
Elaine McCabe                              Case No. 15-120                        October 17, 2006

Page 34

1    Q.   And the exhibit that's been marked 13 has a
2    BPD number on it that I am going to refer to.
3    A.   Right, uh-huh.
4    Q.   For IRSD45360, that's the first page of PX14
5    --
6    A.   PX14?
7    Q.   Yes.
8    A.   Okay.
9    Q.   -- is this the agenda for a school board
10   meeting held on August 23, 2004?
11   A.   Yes.
12   Q.   And was this meeting held the day before the
13   really big meeting on August 24?
14   A.   I don't remember.
15   Q.   Were you at this meeting?
16   A.   Yes.
17   Q.   And you found that by checking on the second
18   page with the roll call?
19   A.   Yes.
20   Q.   On the first page, under executive session --
21   A.   Uh-huh.
22   Q.   -- it identifies two reasons for or two items
23   that the board needed to discuss in executive session.
24   A.   Okay.

Page 35

1    Q.   The first was, the first one was the strategy
2    session to discuss collective bargaining pending our
3    potential litigation, and the second was such other
4    business as may properly be discussed in executive
5    session.
6    A.   Yes.
7    Q.   What was meant by the first item on the
8    strategy section?
9    A.   I honestly don't remember.
10   Q.   And do you remember what the second item
11   meant?
12   A.   I believe that's on most agendas for
13   executive sessions.
14   Q.   Sort of boilerplate language that's put in?
15   A.   Exactly, yes.
16   Q.   At the, under item five on this list --
17   A.   Uh-huh.
18   Q.   -- it has pending our potential litigation,
19   Number 05-01PL.
20   A.   I see it.
21   Q.   What does the 05-01PL mean?
22   A.   I don't remember. I am sure it referred to a
23   case in each number, but now in 2006, without looking,
24   I don't remember what that exact number and letter

Page 36

1    meant.
2    Q.   Is it possible that that number referred to a
3    potential and eventual religion lawsuit against --
4    A.   That's very possible, yes.
5    Q.   Can you turn to the second page?
6    A.   Okay.
7    Q.   The meeting was called to order at 7:00?
8    A.   Usually, yes.
9    Q.   And then was the meeting immediately moved
10   into executive session?
11   A.   It appears so by the minutes, yes.
12   Q.   And how long was the meeting in executive
13   session?
14   A.   It looks like it was adjourned at 11:16.
15   Q.   So it was about four and a quarter hours?
16   A.   Yes.
17   Q.   Were you present during the entire executive
18   session?
19   A.   Yes.
20   Q.   Did you take any breaks during that period?
21   A.   We usually took breaks, at least a couple.
22   Q.   And the other visitors and staff in
23   attendance, there are five individuals listed, Lois
24   Hobbs, Earl Savage, Janet Hearn, Patrick Miller and

Page 37

1    James Griffin?
2    A.   Yes.
3    Q.   Hobbs was the superintendent at the time?
4    A.   That's correct.
5    Q.   And Savage was the assistant superintendent?
6    A.   Right.
7    Q.   Why was Janet Hearn there?
8    A.   She was the secretary. She took the minutes.
9    Q.   Did she record the meeting?
10   A.   Yes, usually she did. I assume she did that
11   night also.
12   Q.   Would she record every executive session
13   meeting?
14   A.   I believe so.
15   Q.   And would she then use the tapes to make the
16   minutes?
17   A.   Yes.
18   Q.   Who is Patrick Miller?
19   A.   He was or is the finance director.
20   Q.   Do you recall why he was present at this
21   meeting?
22   A.   I don't.
23   Q.   Was he usually present during executive
24   sessions?

10 (Pages 34 to 37)

Dobrich, et al.                         v.                    Indian River School District, et al.
Elaine McCabe                    Case No. 15-120                        October 17, 2006

Page 38

1    A. At many, yes.
2    Q. And James Griffin was the district's
3    attorney; correct?
4    A. Yes, that's correct.
5    Q. Okay, can you please now look at Plaintiff
6    Exhibit 13? These sections here that look blank and
7    have redacted on it, that was probably done by your
8    attorneys. It's to remove privileged communications
9    or other information that shouldn't be produced.
10   A. Okay.
11   Q. With that exception, did these appear to be
12   the minutes for the executive session held on
13   August 23?
14   A. Yes.
15   Q. And you can identify it as such because it
16   states executive session minutes at the top?
17   A. Yes.
18   Q. Can you look at the pretty much the only
19   paragraph written on the first page and can you read
20   that first sentence?
21   A. "During the discussion of this issue several
22   board members expressed that their constituents do not
23   want the board to change its practice of opening the
24   meetings with a prayer."

Page 39

1    Q. Do you remember that exchange?
2    A. Yes.
3    Q. Did you say that your constituents did not
4    want the board to change its practice of opening the
5    meetings with a prayer?
6    A. I would say I probably said that. I am not
7    sure at what meeting I said that, but I very well
8    could have said it at this meeting, because that is
9    the way I felt.
10   Q. How did you come to that conclusion? Did you
11   talk to your constituents?
12   A. I talked to some constituents, yes. I would
13   say I more came about that from just a perception of
14   living and growing up in the area my whole life.
15   Q. What perception did you have from living and
16   growing up in this area?
17   A. I guess a couple of perceptions, one being
18   that most people in this area had no objection to the
19   school board meetings opening with a short prayer,
20   probably 30 seconds or less, and -- Well, I guess that
21   pretty much covers it.
22   Q. How do you think those people understood the
23   content of the prayer? So do you think the people
24   that you referred to there understood the content of

Page 40

1    the prayer being Christian?
2        MR. GOSSELIN: Objection.
3    A. I am not sure it made a difference.
4    Q. Well, you said most people had no objection.
5    A. Correct.
6    Q. Do you think -- And you have testified
7    earlier that an overwhelming majority of the residents
8    of the district are Christian. Do you think there
9    would be objections to the board opening the meetings
10   with prayer if the prayers were consistently of a
11   Muslim faith?
12       MR. GOSSELIN: Objection.
13   A. I am just not sure most people really thought
14   about it. I think they just knew that it was opened
15   with a prayer, and I am sure they assumed it was
16   Christian because they probably pray a Christian
17   prayer, but I am not sure that it was ever a big issue
18   of what kind of prayer.
19   Q. Did any other school board members -- Do you
20   recall which other school board members stated that
21   their constituents did not want the board to change
22   its practice of opening the meetings with a prayer?
23   A. I don't remember what specific board members
24   said that night. I just have a perception that it was

Page 41

1    an overall feeling that we wanted to try to continue
2    the practice.
3    Q. To go back to your earlier statement where
4    you did say you spoke with some constituents, --
5    A. Uh-huh.
6    Q. -- do you have an idea of how many you spoke
7    with?
8    A. Not many. It's not really relevant to this
9    issue, but at the time this was going on, I was
10   frankly in a personal situation where I was, my mother
11   and I were the primary caregiver for my father and,
12   frankly, I was working every day and I was going to my
13   parents' every night, and I wasn't leaving until my
14   dad was in bed.
15       So, to be honest, I was a little withdrawn
16   from some of this, and I was hard to -- I know I was
17   very hard to reach, so I don't want to seem like I
18   wasn't interested in this issue, but I was just
19   somewhat unavailable at this time.
20   Q. So you didn't speak to many people during
21   this time?
22   A. I did not, no.
23   Q. Because you had a very present issue at home?
24   A. Yes.

11 (Pages 38 to 41)

Wilcox & Fetzer, Ltd.              Professional Court Reporters              (302)655-0477

Case 1:05-cv-00120-JJF   Document 266-7   Filed 05/08/2008   Page 12 of 29

Dobrich, et al.                          v.              Indian River School District, et al.
Elaine McCabe                    Case No. 15-120                      October 17, 2006

Page 42

1  Q. Was this the first time the board discussed
2  board prayer at a meeting?
3    A. This was in August? I believe, if my memory
4  serves me, that we discussed it immediately at, the
5  first meeting after the graduation, and that was
6  probably the first time.
7    Q. Okay. And was that meeting the --
8    A. The June, I believe.
9    Q. I am going to hand you a copy of what's been
10 previously marked as PX15. It's the minutes for the
11 June 15, 2004 school board meeting. This is numbered
12 BPD10 through, let's see, 18.
13   A. Okay.
14   Q. If you turn to Page BPD11, --
15   A. Uh-huh.
16   Q. -- it states under public comments,
17 "Mrs. Dobrich, a parent of the Jewish faith, expressed
18 concern about prayers at school district events."
19   A. Yes.
20   Q. "She asked that the board consider using a
21 nondenominational prayer that would be appropriate for
22 all faiths at events such as graduation, etcetera?"
23   A. Yes.
24   Q. Did that etcetera include board prayer?

Page 43

1    A. I have no idea.
2    Q. But do you think this was the first meeting
3  when the board would have discussed board prayer?
4    A. I believe so, yes.
5    Q. Can you look through the minutes quickly and
6  find where the board would have discussed board prayer
7  during this meeting, the public portion of the
8  meeting?
9    A. Under new business.
10   Q. On which page?
11   A. Twelve. It appears that Mrs. Hobbs gave a
12 report concerning graduation ceremonies.
13   Q. Uh-huh. Does it also say under this portion
14 that, "It was moved by Mr. Helms, seconded by
15 Mr. Cohee, to table this item until the next regular
16 board meeting."?
17   A. Yes.
18   Q. So did any discussion take place of this
19 during the public's portion of the meeting?
20   A. I don't remember.
21   Q. Do you think discussion would have taken
22 place during the executive session of this meeting?
23   A. Possibly, but I don't remember.
24   Q. And is this correct that the board's attorney

Page 44

1  was not present during the meeting?
2    A. I don't believe he was present.
3    Q. Well, it says under graduation ceremonies
4  that Mr. Griffin was out of town due to a death in his
5  family.
6    A. Okay, then he was not present.
7    Q. Would any attorney have been present during
8  the board's discussions during executive session?
9    A. No, not to my knowledge.
10   Q. Do you remember that Dr. Hattier left the
11 meeting at about 8:30 and returned at about quarter to
12 nine?
13   A. I don't remember. I see that it says that,
14 but I don't really remember that.
15   Q. Do you remember if Dr. Hattier told you what
16 he did when he left the meeting?
17   A. No, I don't know what he did.
18   Q. Do you remember him saying that he spoke with
19 Mrs. Dobrich?
20   A. I don't remember that.
21   Q. Would the board's discussions of board prayer
22 have been recorded during the executive session of
23 this meeting?
24   A. I would assume so.

Page 45

1    Q. Who first proposed that the school board
2  needed to adopt a policy on board prayer?
3    A. I don't remember the specific person that
4  proposed that.
5    Q. I am going to show you what's been marked as
6  PX11. Let me see if I can slide this one. Do you
7  ever recall seeing this document?
8    A. Well, it says it's a proposed policy, so I
9  must have seen it, but I have to say frankly I don't
10 have a specific memory of seeing it.
11   Q. Did you see this policy during the August 23
12 meeting?
13         MR. GOSSELIN: Objection. She just
14     said she doesn't remember seeing it.
15   A. I am not -- I don't know.
16   Q. Okay. I am going to show you what's -- Well,
17 let's change the tape.
18         VIDEOGRAPHER: Going off the record at
19     approximately 9:55 a.m..
20         (A recess was taken.)
21         VIDEOGRAPHER: We are back on the
22     record at approximately 10:04 a.m..
23 BY MR. HORVATH:
24   Q. I am going to introduce to you what has been

12 (Pages 42 to 45)

Dobrich, et al.                              v.              Indian River School District, et al.
Elaine McCabe                           Case No. 15-120                    October 17, 2006

Page 46

1  marked as PX16. It's a copy of the minutes from the
2  July 27, 2004 board meeting. You were at this
3  meeting; correct?
4      A. Yes, I was.
5      Q. And do you remember if the board discussed
6  board prayer at this meeting?
7      A. I frankly don't remember without looking.
8      Q. Well, to maybe start with, could you turn to
9  Page BPD33.
10     A. Okay, yes.
11     Q. If you will see under the public comments, it
12 states, "The following persons spoke regarding Indian
13 River School District's practice of holding prayer at
14 school-sponsored events, including graduation
15 ceremonies."
16     A. Yes.
17     Q. Do you recall if any discussion happened
18 during those public comments about board prayer?
19     A. Well, looking at the names, I would say a lot
20 of the people were there about the prayer issue, and
21 their public comments, I am sure, was about it.
22     Q. By the prayer issue, do you mean globally or
23 specifically --
24     A. District.

Page 47

1      Q. And in that would you have understood their
2  comments to have included discussion about the board's
3  prayer practice?
4      A. At this time I thought it was really about
5  the graduation ceremony.
6      Q. So at this meeting the focus was about the
7  graduation ceremony?
8      A. I believe so, yes.
9      Q. And you don't recall, or do you recall any
10 discussions about board prayer after looking at this?
11     A. No, I don't recall.
12     Q. If states at the bottom of the page on Page
13 33 --
14     A. Thirteen? Thirty-three, okay.
15     Q. It states under graduation ceremonies, "It
16 was moved by Mr. Helms, seconded by Mr. Cohee, to
17 table the graduation ceremonies until after executive
18 session." Did that discussion include the board
19 prayer issue?
20     A. I believe it was graduation.
21     Q. Do you think any discussion took place during
22 executive session about board prayer?
23     A. I don't remember any discussion about that.
24 I really felt that the issue was about prayer at

Page 48

1  graduation at this time.
2      Q. I am going to hand you a copy of what has
3  been marked as PX17. It's BPD76 through 86. It's a
4  copy of the August 24, 2004 minutes. I forgot to
5  write on that one.
6      A. Okay, do you want it back?
7             MR. HORVATH: I will give you this
8      one. Jason, do you want a copy?
9             MR. GOSSELIN: No.
10            MR. HORVATH: Okay.
11 BY MR. HORVATH:
12     Q. If you will look at the middle of the page
13 here under approval of minutes --
14     A. Okay.
15     Q. -- it approved the regular meeting minutes
16 for July 27, 2004?
17     A. Uh-huh.
18     Q. And we know the board had a meeting on
19 August 23.
20     A. Right.
21     Q. So I think we can understand why that wasn't
22 included under the approval of minutes; it was just
23 too soon?
24     A. Right.

Page 49

1      Q. Do you recall if any other meetings of the
2  board took place between the July 27 regular meeting
3  and the August 24, 2004 meeting?
4      A. I don't remember.
5      Q. Okay. So the only meeting of the board that
6  you remember -- Strike that. The only meeting between
7  the July 27 regular meeting and the August 24 regular
8  meeting at which the board would have discussed board
9  prayer that you can recall is the August 23 meeting?
10     A. Yes.
11     Q. Were any policies on board prayer presented
12 to the board at the August 23 meeting?
13     A. I don't remember. I would have to look at
14 the minutes.
15     Q. It doesn't -- Could you look at PX13?
16     A. It doesn't appear so.
17     Q. It does state that, "It was not felt that a
18 decision could be made this evening regarding whether
19 or not to change our past practice." It's at the
20 second sentence of that single paragraph.
21     A. Okay, I see it.
22     Q. Was that decision -- What was the decision
23 that the board -- Strike that. Was the decision that
24 the board could not make at that meeting whether to

13 (Pages 46 to 49)

Page 50

1    adopt a policy?
2       A.  I don't remember.  What we would normally
3    do -- We would never just adopt a policy without
4    turning it over to the Policy Committee.
5       Q.  Uh-huh.
6       A.  And then it would go through a normal process
7    that took usually anywhere from two to four months to
8    adopt a policy.  So I don't specifically remember what
9    we discussed that night, but we wouldn't have adopted
10   a policy.
11      Q.  How about whether to consider adopting a
12   policy?
13      A.  I remember at some meeting we referred the
14   issue to the Policy Committee.  I don't remember
15   specifically which meeting that was without looking
16   through all the minutes.
17      Q.  Okay.  Now, going back to your reference to
18   referring items to the Policy Committee.  At the end
19   of the July 27 meeting, I think it's marked on BPD40,
20   it states that the graduation ceremony is not always
21   referred to the Policy Committee.
22      A.  Okay, that's what we would normally do.
23      Q.  Okay.  And if the board had done so, it would
24   have been reflected in the minutes, if the board had

Page 51

1    referred the matter to the Policy Committee, it would
2    have been reflected in the August 23 minutes?
3       A.  Yes.
4       Q.  I am going to show you a copy of what has
5    been marked as PX12.  It has Bates Numbers 699 through
6    703.  Have you ever seen this document before?
7       A.  Well, it says it's a proposed policy, so yes,
8    I am sure I have seen it.
9       Q.  Who prepared this policy, or who prepared
10   this document?
11      A.  I can't say that I know for sure.  I would
12   assume the Policy Committee, if it's a proposed
13   policy.
14      Q.  If you will look at the top of the document
15   --
16      A.  Okay, it says.
17      Q.  It states --
18      A.  Go ahead.
19      Q.  What does it say?
20      A.  It says that it's a proposed school board
21   prayer resolution dated -- I am going to have to go
22   out to my car and get my glasses, 8/30/04 prepared by
23   the Rutherford Institute and the Neuberger firm.
24      Q.  Did the board ever retain the Rutherford

Page 52

1    Institute or the Neuberger firm?
2       A.  I don't believe we ever retained them.
3       Q.  Was -- Before I go there:  Why did the board
4    feel that it could not make a decision whether it
5    could, whether or not it would change its past
6    practice at the August 23 meeting?
7       A.  Because it had not gone to the Policy
8    Committee, I believe.
9       Q.  So at that time did the board, since it
10   couldn't make a decision because the policy hasn't
11   gone through the Policy Committee, did the board
12   decide it had to go to the Policy Committee at the
13   August 23rd meeting?
14      A.  I am not sure if it was at the August 23rd
15   meeting or not.
16      Q.  Okay.
17      A.  I just know at some point it was referred to
18   the Policy Committee.
19      Q.  Without going into the substance of the
20   advice, did the board receive any legal advice at the
21   August 23 meeting about board prayer?
22      A.  I don't remember which meeting it was at, but
23   I do know that the attorney, Mr. Griffin, was
24   contacted at some point in this process.

Page 53

1       Q.  Okay.
2       A.  I am not sure which meeting.
3       Q.  Were any other attorneys contacted by the
4    board for advice on board prayer, without going into
5    the substance of it?
6       A.  I think -- By the board?  I believe that
7    board members contacted other attorneys.  I am not
8    sure the board as a group officially contacted other
9    attorneys.
10      Q.  Did the board ever have a vote to designate
11   those board members to contact other attorneys for
12   advice on board prayer?
13      A.  I don't remember.
14      Q.  But you don't remember the -- You don't
15   remember either way?
16      A.  That's right, I don't remember.
17      Q.  Okay.  If you will look back to PX12, can you
18   turn to Page BPD702, it's the fourth page of the
19   document?
20      A.  Okay.
21      Q.  Can you read the five numbered paragraphs at
22   the bottom of the page?  And if you need us to take a
23   break so you can go get your glasses, I will gladly do
24   so.

14 (Pages 50 to 53)

Dobrich, et al.                                                              Indian River School District, et al.
Elaine McCabe                          v.                                    October 17, 2006
                              Case No. 15-120

Page 54

1    A.  If I can hold it far enough away, I might be
2    able to do so.  Number five?
3    Q.  Can you just read through those five numbered
4    paragraphs?
5    A.  Quiet, myself, or out loud?
6    Q.  You can read it to yourself.
7    A.  Okay.
8    Q.  Are those paragraphs substantially similar to
9    the paragraphs in the policy that was adopted by the
10   board?
11   A.  Yes.
12   Q.  Policy BDA.1?
13   A.  Yes.
14   Q.  And the document PX12 has a date on it on the
15   first page dated August 30, 2004.
16   A.  Okay, yes, I see that.
17   Q.  So -- Strike that.  Do you remember if PX12
18   predated or postdated, was it drafted before or after
19   the document marked PX11?
20   A.  I don't remember.
21   Q.  Do you recall any discussion about the board,
22   or at the board level about whether to adopt the
23   entire text of PX12?
24   A.  I don't remember the discussion.

Page 55

1    Q.  Looking at the entire text of PX12, would you
2    have voted for this entire document?
3         MR. GOSSELIN:  Give her some time
4         to --
5         MR. HORVATH:  Yes, definitely.
6         THE WITNESS:  I don't -- I don't know.
7         MR. GOSSELIN:  Objection, the question
8         is objectionable in multiple levels.  I mean
9         it's calling for her to read and evaluate
10        what essentially is a legal memorandum,
11        which I don't think she is qualified to do.
12        I am going to instruct her not to answer the
13        question.
14   BY MR. HORVATH:
15   Q.  Can you turn to Page BPD701?  It's the third
16   page of that document.
17   A.  Okay.
18   Q.  On the third full paragraph on the top it
19   states, "It is the opinion of legal counsel that since
20   the Indian River Board of Education is a public
21   legislative and deliberative body it has the right to
22   open its meeting with a prayer."
23        Do you recall receiving, not going into the
24   substance of it, any other document, written document,

Page 56

1    containing a legal opinion on the board prayer policy
2    during the summer of 2004?
3    A.  I don't remember.
4    Q.  Did the board have any additional meetings
5    about a board prayer policy or board prayer between
6    the August 24 regular meeting and the next regular
7    board meeting at the end of September?
8    A.  I don't remember.
9    Q.  Did the board meet with Thomas Neuberger?
10   A.  Yes.
11   Q.  And you don't remember when the board met
12   with him?
13   A.  I don't remember the date.
14   Q.  Do you know if the board met with him during
15   a regular, either during an executive session or
16   during a public session of a regular board meeting?
17   A.  I believe it was a special meeting.
18   Q.  Okay, I am going to show you what has been
19   marked as PX19.  This is a copy of the October 19,
20   2004 board minutes.
21   A.  Okay.
22   Q.  Can you turn to the second page of that
23   document, please?  It's marked BPD209.
24   A.  Okay.

Page 57

1    Q.  It states on this document that the board
2    approved special meeting minutes for September 15,
3    2004.
4    A.  Yes.
5    Q.  And the regular meeting minutes for
6    September 28, 2004.
7    A.  Okay.
8    Q.  Do you think that the board met with
9    Mr. Neuberger on September 15, 2004?
10   A.  It could have been.  I truly just don't
11   remember the date.
12   Q.  Going back to Policy BDA.1, so it's Exhibit
13   Number 9 in your list.
14   A.  Okay.
15   Q.  There it is.  Does this policy only apply to
16   regular board meetings?
17   A.  Yes.
18   Q.  At anytime did anyone suggest that the board
19   should adopt a policy that would also apply to special
20   meetings or executive sessions?
21   A.  Not that I can remember.
22   Q.  In fact, in your history as a board member,
23   do you recall the board opening its special meetings
24   with a prayer?

15 (Pages 54 to 57)

Dobrich, et al.                                    v.                    Indian River School District, et al.
Elaine McCabe                          Case No. 15-120                              October 17, 2006

Page 58

1    A.  No, usually not.
2    Q.  Do you remember the board opening its
3  executive sessions with a prayer?
4    A.  No.
5    Q.  To your knowledge, has any school board
6  member ever recited a prayer that was prohibited by
7  this policy?
8    A.  That was prohibited?  No.
9    Q.  And let's assume that this policy would have
10  been in effect when you first joined the board in
11  1994.
12    A.  Okay.
13    Q.  From that time to the present, and, to be
14  clear, do you remember any board member that recited a
15  prayer that would have violated this policy if it was
16  in effect?
17    A.  No.
18    Q.  When this policy was being considered, did
19  you have any discussions with any of the other board
20  members about what the terms of this policy meant?
21    A.  I think during the meeting many of us had
22  comments concerning the policy, but I don't really
23  remember any other conversation.
24    Q.  Do you remember your comments concerning this

Page 59

1  policy?
2    A.  I don't know that I could quote any of my
3  comments word for word.  I can tell you generally how
4  I feel about it.  I really don't like change and I
5  like tradition and I like -- I like procedures that
6  are done.
7      I like for my kids, when they go to school,
8  to experience the same things that I experienced as
9  far as, you know, a prom, a class ring, things like
10  that, so I was in favor of having a policy and keeping
11  prayer at board meetings.
12    Q.  You mentioned you are in favor of tradition.
13    A.  Uh-huh.
14    Q.  What does -- What makes something a
15  tradition?
16    A.  Doing it over and over again for a long time.
17    Q.  How long?
18    A.  I think that can vary.
19    Q.  Does it vary based on how many times you are
20  doing it and how long it's been done?  So, in other
21  words, if you do something once a year, you need to do
22  it for many years?
23    A.  Yes.
24    Q.  Whereas if you do something maybe once a

Page 60

1  month, you don't need to do it for as many years?
2    A.  Oh, I don't know that that's true.  I just
3  think a tradition -- If I -- I just think tradition is
4  something that you do over and over again over a long
5  period of time.
6    Q.  Is the fact that something is a tradition
7  sufficient reason to continue doing it?
8    A.  I think if the majority of the people want
9  it, there is nothing wrong with continuing it.
10    Q.  Have there been traditions in the past that
11  we no longer do?
12    A.  Sure, I think there always is.  That's life.
13    Q.  You said that some of the board -- I believe
14  you said that some of the other board members have
15  comments about this policy?
16    A.  I am sure most board members had comments.
17    Q.  Do you remember generally what those comments
18  were?
19    A.  I don't remember, again, specific statements
20  or quotes.  It's pitiful what your memory is now that
21  you have to think back two years ago, but I would just
22  say my general impression is that all board members
23  wanted to look at the situation, since there had been
24  a complaint, and our normal procedure if there was a

Page 61

1  complaint was to investigate it and turn it over to
2  whatever route.
3      If it was a curriculum issue, it might go to
4  the Curriculum Committee.  If this was a policy issue,
5  it went to the Policy Committee.
6      So I feel that the board was concerned about
7  the complaint and interested in the issue, but that
8  most and probably all board members wanted to continue
9  the tradition of opening the meeting with a short
10  prayer.
11    Q.  Going back to the June 15 minutes, PX15.
12    A.  Okay, this is a regular meeting?
13    Q.  Looking at the public comment section for
14  Mona Dobrich's comments on the second page.
15    A.  Okay.
16    Q.  It states that she asked the board to
17  consider using a nondenominational prayer.
18    A.  Uh-huh.
19    Q.  Is that what you understood the complaint to
20  have been, that --
21    A.  Well, I understood her original complaint to
22  be that she objected to the prayer at the graduation
23  ceremony.
24    Q.  Well, I think we had gone through before that

16 (Pages 58 to 61)

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

Dobrich, et al.                        v.                Indian River School District, et al.
Elaine McCabe                    Case No. 15-120                      October 17, 2006

Page 62

1  the etcetera at the end of that first page included
2  board prayer, or at the end of the second page, so it
3  said, "She asked that the board consider using a
4  nondenominational prayer that would be appropriate for
5  all faiths at events such as graduation, etcetera."
6      A. Well, my perception is that her complaint was
7  concerning the graduation ceremony.
8      Q. Okay.
9      A. And I could have misunderstood that, but I
10 really felt that she, that her complaint concerned
11 graduation.
12     Q. Okay. How did you understand the complaint
13 as applying to the board prayer?
14     A. Originally I didn't think it had anything to
15 do with it.
16     Q. What did you think the complaint was about
17 board prayer?
18     A. I didn't think at this time -- When was this,
19 in June? I did not think in June that there was any
20 complaint about board prayer. I thought it was about
21 the graduation ceremony.
22     Q. That was my fault there. I was trying to
23 move us ahead in time a little bit.
24     A. Okay.

Page 63

1      Q. When the board was considering Policy BDA.1,
2  --
3      A. Okay.
4      Q. -- what did you understand the complaint
5  about board prayer to be?
6      A. I felt it to be that when Mrs. Dobrich came
7  to the board meetings and saw the prayer there that at
8  a later date she also complained about that.
9      Q. Was the complaint that the board should use a
10 nondenominational prayer or that the board shouldn't
11 pray at all?
12     A. I was never really sure about that. At first
13 it seemed that it was nondenominational, but then it
14 seemed almost like there was a feeling on her part
15 that there should be none at all, so I am not really
16 sure.
17     Q. Do you think the community understood her
18 complaints to be that there should be no prayer at
19 all?
20     A. I have no idea.
21     Q. Did anyone discuss with you that they thought
22 Mona's complaint was that there should be no prayer at
23 all?
24     A. Not really, no.

Page 64

1      Q. Do you remember the comments made at the
2  August 24, 2004 board meeting?
3      A. Was that the one where we had the large
4  turnout and there were lots of people there?
5      Q. Yes.
6      A. Okay, I in general remember them, yes.
7      Q. Do you remember anyone making comments that
8  the prayer issue in this case was about preserving
9  Christian prayer?
10     A. I can't say that I remember specifically. I
11 feel like they usually refer to it just as prayer.
12     Q. Were any comments made at that meeting that
13 you felt were inappropriate?
14     A. No, not by the people that stood up and spoke
15 before the board.
16     Q. Do you think the comments were made in a
17 respectful manner?
18     A. Most of them were. I thought some people got
19 a little emotional about their comments, but, again,
20 they all had the right to say, to express their
21 opinion on the matter.
22     Q. Do you recall any threats being made?
23     A. No.
24     Q. Just give me a second here.

Page 65

1      A. Okay.
2      Q. Do you recall that the August 24, 2004
3  meeting was video recorded?
4      A. I don't recall if it was or not, honestly.
5      Q. Do you remember if speakers were set up in
6  the parking lot before the meeting?
7      A. I don't remember.
8      Q. Do you remember that an overflow room was set
9  up before?
10     A. Yes, I do know that we were told so many
11 people were there that they had set up another room?
12     Q. Let me go back a little bit here. I don't
13 remember if I asked this question and you answered it,
14 so I apologize if I am asking it again.
15        When do you remember first hearing that they
16 had to set up additional equipment to handle the crowd
17 at that meeting?
18     A. That night when we got there.
19     Q. Okay, and do you remember any discussions
20 before the August 24, 2004 meeting about the potential
21 crowd for that meeting?
22     A. I remember just general comments that there
23 was a big turnout expected. Let me just say here that
24 I feel really bad saying I don't know all the time or

17 (Pages 62 to 65)

Dobrich, et al.                              v.                    Indian River School District, et al.
Elaine McCabe                          Case No. 15-120                        October 17, 2006

Page 66

1   I don't remember. It's just hard to remember details
2   from two years ago. I remember general things that
3   happened and general comments, but I don't remember.
4            And, you know, it's not relevant to this
5   case, but, as I referred to earlier, I had some
6   personal family issues at the time that were just
7   overwhelming some of the other things that I was also
8   trying to do.
9   Q.   Well, you know, if you don't remember --
10   A.   I don't.
11   Q.   -- the facts of a question that I am asking,
12   that's the best answer, as opposed to making something
13   up.
14   A.   (Laughter) Sometimes I have a hard time
15   remembering last week.
16   Q.   Don't worry. I forgot what happened this
17   morning.
18   A.   (Laughter).
19   Q.   You had stated you remember some general
20   comments about potential --
21   A.   Yes.
22   Q.   Do you remember discussing with anyone about
23   their attending the August 24 meeting?
24   A.   No.

Page 67

1   Q.   Do you remember hearing any board members say
2   that they discussed with church groups about those
3   groups attending the meeting?
4   A.   Not really.
5   Q.   You don't remember?
6   A.   I don't remember.
7   Q.   Do you remember any board member discussing
8   with any other individual or community group about
9   their attending the August 24 meeting?
10   A.   No.
11   Q.   You don't remember?
12   A.   I don't remember.
13            MR. HORVATH: Can we go off the record
14       here?
15            VIDEOGRAPHER: Going off the record at
16       approximately 10:40 a.m..
17            (A recess was taken.)
18            VIDEOGRAPHER: Back on the record at
19       approximately 10:42 a.m..
20   BY MR. HORVATH:
21   Q.   Would you describe the August 24 meeting as
22   emotionally charged?
23   A.   Yes.
24   Q.   Do you remember whether or not Harold Johnson

Page 68

1   spoke at that meeting?
2   A.   Yes, he did.
3   Q.   I am going to play you his comments made at
4   that meeting.
5   A.   Okay.
6   Q.   And if you can't see it, we will bring it
7   closer to you. If you can't hear it, we will turn it
8   up.
9            MR. GOSSELIN: Make sure the record
10       refers to your exhibit.
11            MR. HORVATH: Sorry. We are playing
12       what has been previously marked as PX40. It
13       will be a recording from approximately one
14       hour, one minute, zero seconds to one hour,
15       four minutes and nineteen seconds. Can you
16       hear it?
17            THE WITNESS: Yes.
18            (The referenced video was played for
19       the witness.)
20            MR. HORVATH: How long did that go to,
21       Brian?
22            MR. LENHARD: 1:04:19.
23   BY MR. HORVATH:
24   Q.   Okay, so that did go to one hour, four

Page 69

1   minutes and nineteen seconds. Did you hear anything
2   in that comment that bothers you?
3   A.   No.
4   Q.   Did you hear his comments that, "The last I
5   knew, Madalyn Murray O'Hair just disappeared to never
6   be seen or heard from again. I think we all know who
7   she was. She was the person who initiated the
8   movement to remove prayer from our schools."?
9   A.   I did not know who she was until that night.
10   I frankly had never heard of her, and I didn't know
11   who she was, so that night I didn't even, frankly,
12   under the comment. I am not sure that I still know
13   who she is past what he said that night.
14   Q.   Well, he does say that she was the person who
15   initiated the movement to remove prayer --
16   A.   Yes.
17   Q.   -- from our schools?
18   A.   Yes.
19   Q.   And --
20   A.   I had never heard of her.
21   Q.   And at the August 24, 2004 meeting was Mona
22   Dobrich there to remove prayer from the district?
23            MR. GOSSELIN: Objection.
24   A.   Was that the August --

18 (Pages 66 to 69)

Dobrich, et al.
Elaine McCabe

v.

Case No. 15-120

Indian River School District, et al.
October 17, 2006

Page 70

1    Q.  Yes.
2        A.  Are we talking about the same?  She was
3    present.
4        Q.  Did you understand at that August 24, 2004
5    meeting that her complaints were about prayer in the
6    district?
7        A.  As I said before, I thought her original
8    complaint was about graduation.  I am not sure that I
9    remember exactly when I became aware that it was also
10   a complaint against prayer at the board meeting.
11       Q.  Do you think that Mr. Johnson's comments were
12   directed in any way towards Mona Dobrich?
13       A.  No.
14       Q.  Even though she was the person who had
15   initiated the steps to remove prayer from the district
16   schools?
17       A.  I thought his comments were directed towards
18   us as the board to not allow that to happen.
19       Q.  So do you think he was threatening the board
20   with disappearing if they allowed it to happen?
21       A.  No, I don't think he was threatening anyone.
22   I think he was just asking us to not discontinue the
23   prayer at the beginning of the board meetings.
24       Q.  So how do you take the statement, either then

Page 71

1    or now that, "The last I knew," and I am going to
2    replace here Madalyn Murray O'Hair with how he
3    describes her later on, "the person who initiated the
4    movement to remove prayer from our schools just
5    disappeared to never be seen or heard from again."?
6        A.  I don't really have an opinion about it,
7    because, like I said, I don't know her, I don't know
8    the background, I don't know what happened.  I
9    don't -- I don't know enough about the issues
10   surrounding her to frankly have an opinion on it.
11       Q.  Did you hear the laughter in the crowd that
12   was on the recording after he said Madalyn Murray
13   O'Hair just disappeared to never be seen or heard from
14   again?
15       A.  Yes.
16       Q.  Did the laughter bother you in any way?
17       A.  It only bothered me in the sense that, and
18   that went on pretty much the whole night, generally
19   when someone talks to the board at public session, I
20   would have preferred that everyone in the audience was
21   quiet, but that didn't happen at all that night during
22   most of the people.
23       Q.  Are the prayers at board meetings meant to
24   help solemnify the meetings?

Page 72

1        A.  I believe so, yes.
2        Q.  Do you think the August 24, 2004 meeting --
3    Well, first off, was the August 24, 2004 meeting
4    opened with a prayer?
5        A.  I would assume it was, yes.
6        Q.  Do you believe that that meeting was
7    conducted in a solemn manner?
8        A.  I think most of the meeting was.
9        Q.  Which part of the meeting wasn't?
10       A.  Probably the public session.
11       Q.  Do you think the prayer had any affect to
12   keep the public session, to make sure that the public
13   session was conducted in a solemn manner?
14       A.  No.
15       Q.  Do you know if the August 24, 2004 board
16   meeting was audio recorded?
17       A.  Mrs. Hearn generally had a tape recorder in
18   front of where she sat, and she recorded the meetings,
19   to my knowledge, all of them.
20       Q.  And she was the person who was responsible
21   for preserving the tapes after those meetings?
22       A.  Yes.  I don't know who videotaped it.
23       Q.  Did you request a copy of the videotape of
24   the meeting, or didn't you know it was videotaped

Page 73

1    until today?
2        A.  I frankly didn't know that -- If I knew that
3    night, I had forgotten, but I really wasn't aware that
4    we were on tape.
5        Q.  Can we go back to exhibit number nine, the
6    copy of the policy?
7        A.  Uh-huh.
8        Q.  Is there any -- Which paragraph of this
9    policy limits what a board member can say as a part of
10   their prayer?
11       A.  I would say number three.
12       Q.  Okay.  And number three reads, "Such
13   opportunity," which I presume means the prayer, "shall
14   not be used or exploited to proselytize, advance or
15   convert anyone, or to derogate or otherwise disparage
16   any particular faith or belief."  Is that correct?
17       A.  Yes.
18       Q.  What does it mean to proselytize?
19       A.  I take that to mean that the prayer said
20   before board meetings was not meant to try to
21   influence anyone to a particular faith.
22       Q.  And I presume that you would use the same
23   definition for the convert anyone?
24       A.  Right, right.

19 (Pages 70 to 73)

Dobrich, et al.
Elaine McCabe

v.

Case No. 15-120

Indian River School District, et al.
October 17, 2006

Page 74

1    Q.   What does the advance, the word advance in
2  this policy mean?
3    A.   To put one faith before another.
4    Q.   Okay.  Have school board prayers identified
5  any religious figures, any deities, for example?
6    A.   God and Jesus.
7    Q.   Anyone else?
8    A.   I don't believe so, and not always Jesus.
9    Q.   But --
10   A.   Or I would say the Lord, which would be used
11 sometimes.
12   Q.   But you don't remember hearing any school
13 board prayer that was directed to Jehovah?
14   A.   No.
15   Q.   Or Buddha?
16   A.   No.
17   Q.   Or Allah?
18   A.   No.
19   Q.   Or I can keep going through all religious
20 beings aside from God in general, the Lord and Jesus.
21   A.   Right.
22   Q.   I am going to go through a series of prayers.
23   A.   Okay.
24   Q.   And I want to see whether or not you think

Page 75

1  those prayers would be permitted under this policy.
2    A.   Okay.
3    Q.   Oh, before I show you these ones, I am going
4  to read one to you.
5    A.   Okay.
6    Q.   Suppose that a board member gave the
7  following prayer:  "We pray, Lord, that you enlighten
8  the heathen in our midst and that you inspire them to
9  come to the knowledge of your wisdom and goodness."
10       Would that prayer be appropriate under the
11 policy?
12   A.   I don't know.
13   Q.   Would it violate paragraph three?
14   A.   I am not an expert on prayer.  Read it again.
15   Q.   "We pray, Lord, that you enlighten the
16 heathen in our midst and that you inspire them to come
17 to knowledge of your wisdom and goodness."
18   A.   I guess I personally probably don't like the
19 word heathen, but I don't know whether it would be
20 allowed or not.
21   Q.   Does this prayer proselytize?
22   A.   I have no idea.
23   Q.   You voted for Policy BDA.1?
24   A.   I did.

Page 76

1    Q.   And, as a board member, you are responsible
2  for the enforcement of this policy?
3    A.   Yes, yes.
4    Q.   So, speaking as someone who voted for the
5  policy and was responsible for the enforcement of the
6  policy, how would you make a determination as to
7  whether or not that prayer would violate paragraph
8  three?
9    A.   Well, I guess, frankly, I had never thought
10 of it in terms of a prayer like you just read, because
11 that's not generally what the type of prayer that was
12 said at our meetings.
13       Generally, it was just a prayer asking for
14 wisdom to make good decisions for the betterment of
15 our district and our children, so I am not sure that
16 it ever came up and I ever thought about it in a
17 specific term like that.
18       I mean I am assuming, the way you read it,
19 that the words could be interpreted to encourage
20 people who were not religious to become religious, but
21 I don't know that that's really the case.
22   Q.   So you do not feel that this prayer violates
23 paragraph three of the policy?
24   A.   I don't really have a problem with it, no.

Page 77

1  Now, that's not, might not be the same answer as
2  whether it violates paragraph three.  That's
3  someone -- That's probably for someone more
4  knowledgeable about prayer than me to say, but.
5    Q.   Well, whose job on the board was it to make
6  sure that the prayers complied with paragraph three?
7    A.   Well, you know, I have to say it was probably
8  our job.  I mean I admit that.  I just never heard a
9  prayer that I felt was inappropriate, so I frankly
10 probably never thought about what was inappropriate.
11   Q.   Okay, well, I mean, to be clear with these
12 prayer examples, I am using these as a way to test how
13 you would interpret the policy.
14   A.   I realize that.
15   Q.   So, for this purpose, let's assume that this
16 prayer would be given, not whether or not it has been
17 given.  And what would you do upon hearing that prayer
18 to determine whether or not it violates paragraph
19 three?
20   A.   I would probably have done nothing.
21   Q.   For any prayer that you have heard?
22   A.   No, I am not saying that.
23   Q.   Okay.
24   A.   I am saying that prayer I just don't find

20 (Pages 74 to 77)

Dobrich, et al.                                    v.                    Indian River School District, et al.
Elaine McCabe                                Case No. 15-120                         October 17, 2006

Page 78

1    terribly objectionable. As I said, I am not
2    truthfully fond of the word heathen, but I just --
3        Q.  So you don't believe this prayer
4    proselytizes?
5        A.  No, I don't believe it does.
6            MR. HORVATH:  Go off?
7            VIDEOGRAPHER:  Going off the record at
8        approximately 11:00 a.m..
9            (A recess was taken.)
10           VIDEOGRAPHER:  We are back on the
11       record at approximately 11:08 a.m..
12   BY MR. HORVATH:
13       Q.  I am going to now introduce exhibit, the text
14   which has been previously marked as PX35. It's a long
15   text, so I am giving it to you so you can read along
16   with me.
17       A.  Okay.
18       Q.  "Do not put your trust in princes and mortal
19   men who cannot even save themselves. When their
20   spirit departs, they return to the ground. On that
21   very day their plans come to nothing. Blessed is he
22   whose help is the God of Jacob, whose hope is in the
23   Lord his God, the maker of heaven and earth, the sea,
24   and everything in them, the Lord who remains faithful

Page 79

1    forever. He upholds the cause of the oppressed and
2    gives food to the hungry. The Lord sets prisoners
3    free. The Lord gives sight to the blind. The Lord
4    lifts up those who are bowed down. The Lord loves the
5    righteous. The Lord watches over the alien and
6    sustains the fatherless and the widow, but he
7    frustrates the ways of the wicked. For the wages of
8    sin is death, but the gift of God is eternal life
9    through Jesus Christ our Lord."
10           Would this prayer violate paragraph three of
11   the policy?
12       A.  I don't think so.
13       Q.  Does this prayer proselytize?
14       A.  I don't think so.
15       Q.  How did you come to that conclusion?
16       A.  I just don't see anything in it that forces
17   anyone to believe the same thing that this person is
18   believing, whoever reads it.
19       Q.  You said forces someone to believe?
20       A.  Or tries to force.
21       Q.  What do you mean by force?
22       A.  Influence, I guess.
23       Q.  Influence?  Do you have any opinion as to
24   whether or not the statement, "For the wages of sin is

Page 80

1    death, but the gift of God is eternal life through
2    Jesus Christ our Lord" as to whether or not that's
3    meant to influence?
4        A.  No.
5        Q.  How do you read that statement?
6        A.  The last sentence?
7        Q.  The last sentence?
8        A.  The person giving this prayer feels that you
9    get, you receive eternal life through believing in
10   God.
11       Q.  Would your opinion of this prayer change if
12   immediately after that sentence the person said, "Have
13   you discovered Jesus Christ?"
14       A.  Yes, it would change then.
15       Q.  How?
16       A.  Well, because then they are not saying their
17   personal prayer, but then they are trying to bring
18   someone else into it or influence someone else.
19       Q.  So by referencing someone else, --
20       A.  Uh-huh.
21       Q.  -- this prayer is meant to influence that
22   other person?
23       A.  Yes.  I am not an expert on prayer.
24       Q.  You don't have to be an expert on prayer.  I

Page 81

1    just want to understand how you view this prayer to
2    operate under the policy.
3        A.  Okay.
4        Q.  So I am going to show you what has previously
5    been marked PX45.
6        A.  Okay.
7        Q.  "Heavenly Father, thank you for this great
8    occasion, for the work, the effort, the joys, and
9    everything that led up to this point in time.
10   Thank you for your guidance in this event. We pray
11   for your direction in the lives of each of these
12   school board members. We pray that you direct them to
13   the truth and eventually the truth that comes by
14   knowing Jesus. We also pray that you would be with
15   them at this time. We ask these things in Jesus's
16   name. Amen."
17           Do you believe that this prayer would violate
18   paragraph three of the policy?
19       A.  No.
20       Q.  Is this prayer asking that the board members
21   be directed into the truth and eventually the truth
22   that comes by knowing Jesus?
23       A.  Yes, I believe it is.
24       Q.  Do you think that's trying to influence the

21 (Pages 78 to 81)

Dobrich, et al.                              v.                    Indian River School District, et al.
Elaine McCabe                        Case No. 15-120                        October 17, 2006

Page 82

1  board members?
2     A.  No.
3     Q.  Why not?
4     A.  Well, because if a board member sat at a
5  board meeting and gave this prayer at the beginning,
6  then I am sitting there as a board member either open
7  to his prayer because of what, because I have similar
8  beliefs, or I am sitting there respecting his right to
9  say, or her right to say the prayer, but, if it's not
10  my thing, I may be sitting there just quietly
11  reflecting, but I am not influenced by him giving this
12  prayer.
13     Q.  Do you think your impression of this prayer
14  might be biased because you are a Christian?
15     A.  Oh, it could be.
16     Q.  And you find nothing in this prayer that
17  proselytizes?
18     A.  No.
19     Q.  Nothing that's trying to influence or force
20  someone to change their religious faith?
21     A.  Not me. I mean I can't speak for other
22  people that hear this, but it would not me.
23     Q.  Okay. I have another one which I am just
24  going to read.

Page 83

1     A.  Okay.
2     Q.  "Allah, we offer you our school bus drivers,
3  we offer you our superintendent, our administrators
4  and our secretaries. We offer you our teachers and
5  our parents. Finally, we offer you our students.
6  Peace be unto your prophet, Muhammed."
7     A.  What do you mean by offer you?
8     Q.  How do you understand that?
9     A.  I don't. I am not sure that I do understand
10  it, because it's not a prayer that I am used to
11  hearing. If it's just -- If by saying "we offer you,"
12  meaning please take care of or please oversee or care
13  for, then I have no objections to it.
14     Q.  What if it said, in place of offer, "we lift
15  up to you"?
16     A.  That's fine.
17     Q.  How do you understand "lift up to you" to
18  mean?
19     A.  Um, again I guess I would see it as being
20  here to accept a higher being's guidance.
21     Q.  Suppose you are in the audience if such a
22  prayer were offered.
23     A.  Uh-huh, that prayer?
24     Q.  This prayer.

Page 84

1     A.  Okay.
2     Q.  And I am going to assume as a parent or other
3  member of the community you wouldn't see yourself as
4  one of these individuals listed under the prayer. How
5  would you feel as a Christian hearing a board member
6  offering or lifting you up to Allah?
7     A.  I would not object to it. And let me just
8  add to that. I don't mean to keep referring to it,
9  but as I have indicated to you, I have been through
10  some personal crisis lately. I have actually had a
11  house that my brother, sister and I owned burn down
12  through a construction accident out on our property.
13         I lost my father December 12 of 2005. I lost
14  my mother January 4 of 2005, 22 days after my father,
15  and I lost a 20 year old nephew February 25, and I
16  frankly have appreciated every prayer that everyone
17  has offered up in my parents' name and my name, and
18  from customers where I work and people that I know
19  that some of them are not Christians and of the same
20  faith, but I have been thankful and grateful for any
21  prayer that they have given me, because it just simply
22  means they care about me, and I would not object to
23  that prayer.
24         And if there was a board member elected that

Page 85

1  was of another faith, I would respect their prayer any
2  night they gave it, the same way I respected the ones
3  that were given the 11 years I was on the board.
4         Now, I have chosen personally not to attend
5  church after my children were grown, but, and I am not
6  going to tell you that I ever prayed, that I always
7  prayed every time someone at a board meeting gave a
8  prayer, but what I can tell you is that I was quiet
9  and I respected the prayer that they gave.
10        Probably the only ones that I would have
11  objected to strongly would be ones that proposed some
12  of the crazy things going on in our world today where
13  prayer is associated and faith and religion is
14  associated with causing people harm and doing crazy,
15  wild things in the name of the faith.
16     Q.  So, you know, if a prayer -- The only prayer
17  that you would find objectionable is if someone stood
18  up and said, "We pray that the heathens in our midst
19  come to know you and, if they don't, we are going to
20  behead them."?
21     A.  Uh-huh, yeah, I would have objected to that
22  one.
23     Q.  Would, short of that threat of physical
24  violence --

22 (Pages 82 to 85)

Wilcox & Fetzer, Ltd.           Professional Court Reporters           (302)655-0477

Dobrich, et al.                                   v.                    Indian River School District, et al.
Elaine McCabe                              Case No. 15-120                          October 17, 2006

Page 86

1    A.  No, I am not saying short of that.  I am just
2    saying that, you know, if people prayed to someone
3    else besides God or Jesus, I would have respected that
4    right.
5        Q.  Has, to your knowledge, has anyone served on
6    the board that was not a Christian?
7        A.  I have no idea.  It's not an issue that I
8    have ever been aware of, and I have never questioned
9    what religious background any of the board members
10   have.
11       Q.  Do you believe that someone who openly
12   professes the Muslim faith could be elected to the
13   school board?
14       A.  Oh, probably not in this area, not right now.
15   I think that day will come, but I don't think.
16       Q.  In the foreseeable future could that day
17   come?
18       A.  Probably in my children's lifetime, I think.
19   I am not sure whether it will in my lifetime.  I think
20   it would be much more likely for someone of the Jewish
21   faith to be elected to the school board, but I don't
22   know that religion has ever been an issue in a school
23   board election as politics or parties or not, either.
24       Q.  Was the board prayer issue -- Was the board's

Page 87

1    practice of opening its meetings with prayer an issue
2    in the 2006 election?
3        A.  2006?  Last May, I think there were three or
4    four elections, if I am not mistaken.  I am sure it
5    was an issue for some people.  There were other
6    issues, I think, just as important.
7        Q.  You stated that if a board member gave a
8    prayer that you may not agree with personally, that
9    you would remain quiet and respectful while they give
10   the prayer.  Am I correct in that?
11       A.  What do you mean not agree with?
12       Q.  If someone gave a prayer of a different
13   religious faith than yours, --
14       A.  Uh-huh.
15       Q.  -- you would allow them to make the prayer
16   and remain quiet and respectful of them while
17   they were giving the prayer?
18       A.  Yes.
19       Q.  Do you think everyone in attendance should do
20   the same?
21       A.  Well, we can't really control what the
22   audience does.  I think the board members should, and
23   I think the board members would, but even with the
24   prayers that are given, frankly most of the time there

Page 88

1    are people in the audience talking while it's going
2    on, and we don't -- We don't and can't really control
3    that.
4        Q.  Can the board president call the meeting to
5    order?  Can he --
6        A.  Yes.
7        Q.  -- insist that the meeting be conducted
8    orderly?
9        A.  Yes.
10       Q.  If there was a disruption in the audience,
11   could the board president clear the room?
12       A.  Well, you know, I suppose by procedures of
13   how to operate a meeting, he could.  I have never
14   known it to happen, and I don't know how he would do
15   it, really, she.
16       Q.  But you could see the board maintaining some
17   degree of order if there was a disruption?
18       A.  I think the board president tries to, by
19   beating the gavel or whatever, tries to maintain
20   order, yes, as much as they can.
21       Q.  To go back to your statement about,
22   instructing me that you would have to see the prayer
23   being really strong before you would find it
24   objectionable, so let me just read you one last one?

Page 89

1        A.  Okay.
2        Q.  Suppose a board member offered a prayer that
3    stated, "Lord, we hope that you will convert to
4    Christianity all the Jews in the office."
5        A.  I would object to that.
6        Q.  And you would view that as proselytizing?
7        A.  Yes.
8        Q.  Would you find that that prayer derogates
9    those of another faith or disparages them?
10       A.  Yes.
11       Q.  And is seeking to convert them?
12       A.  Yes.
13       Q.  You basically would see it as violating
14   everything under paragraph three?
15       A.  Yes.
16       Q.  Do you remember if the April 26 and May 24,
17   2005 school board meetings were conducted in a solemn
18   manner?
19       A.  I don't remember.
20       Q.  Let's put it this way:  Would you remember if
21   there were any major disruptions during those
22   meetings?
23       A.  Well, I would remember the disruption.  I
24   might not be able to tell you the date that it took

23 (Pages 86 to 89)

Dobrich, et al.
Elaine McCabe

v.

Case No. 15-120

Indian River School District, et al.
October 17, 2006

Page 90

1  place.
2      Q.  Well, these meetings were right before you
3  left the board, so do you remember any meetings before
4  you left the board where there was a major disruption?
5      A.  No.
6      Q.  Do you remember if those meetings opened with
7  a moment of silence?
8      A.  They probably opened with a prayer.  I gave
9  the -- I actually gave the prayer in June.  But you
10  are talking April and May?
11      Q.  Yes, I could show you the minutes.
12      A.  I am sure they opened with a prayer.
13      Q.  Okay.
14      A.  Although board members have the option to do
15  a moment of silence instead, and I am not going to say
16  that didn't happen.
17      Q.  Okay.  I could show you the minutes and it
18  would reflect that they were opened with a moment of
19  silence.
20      A.  Oh, okay.
21      Q.  Do you want me to do so?
22      A.  No, I take your word for it.
23      Q.  Was a moment of silence sufficient to
24  solemnize those meetings?

Page 91

1      A.  Yes.
2      Q.  So is a prayer necessary to solemnize a board
3  meeting?
4      A.  I don't know that it's necessary.  I think
5  it's -- I think it's always been desired that it
6  happen by the board.
7      Q.  Is a sectarian prayer necessary to solemnize
8  the board meeting?
9      A.  No.
10      Q.  Is sectarian prayer desirable for the
11  board -- Is a sectarian prayer being used to open the
12  meeting desirable for the board?
13      A.  I don't think you can tell someone how to
14  pray, so if you ask different board members to pray,
15  then I don't think you can take that step and then
16  tell them how they have to pray.
17      Q.  When the policy was being considered, did
18  anyone suggest that the policy apply only to, or only
19  permit non-sectarian prayers?
20      A.  I think there was some discussion of that.  I
21  don't know who suggested it or what the discussion
22  was, but there was discussion of the difference
23  between the two.
24      Q.  Do you remember why the policy -- Well, you

Page 92

1  do recall discussion between the two?
2      A.  Yes.
3      Q.  You don't -- Do you recall any discussion
4  about whether the policy should be limited to
5  permitting only non-sectarian prayer?
6      A.  Well, I think what I just said, I think it
7  was felt that it couldn't, because you cannot tell
8  people how to pray or who to pray to.
9      Q.  Okay.  Is it possible that if over an
10  extended period of time, months, a year, that if the
11  prayers were consistently sectarian of one faith, that
12  those prayers could be seen as advancing one religion?
13      A.  I don't believe so.
14      Q.  Why not?
15      A.  Well, and again I have to speak for me
16  personally, I can't speak for other board members or
17  people out in the audience, but for me the short
18  prayer at the beginning of the meeting wasn't an
19  important enough part of the meeting that it would
20  influence.  It wasn't long enough and wasn't important
21  enough or ever said in a way to influence other
22  people.
23      Q.  But it was important that -- A prayer at the
24  beginning of the meeting was important in that the

Page 93

1  board decided to adopt a policy?
2      A.  Yes, yes.
3      Q.  And does the board adopt a policy for
4  everything that happens at board meetings?
5      A.  A lot of things, yes.  Not everything, but
6  certainly a lot of things.
7      Q.  Does the board have a policy -- Has the board
8  adopted a policy for the presentation of colors at the
9  meeting?
10      A.  I have no idea.
11      Q.  For giving awards at the meeting?
12      A.  Probably not for that, I wouldn't think.
13      Q.  Has the board formally adopted a policy on
14  the board governance and operations for student
15  government attending the board meetings?
16      A.  Probably not.
17      Q.  Are those -- Do those events take up more
18  time than the board prayer does at the board meetings?
19      A.  Yes.
20      Q.  Do you see those events as being more
21  important than the board prayer that opens the
22  meeting?
23      A.  No, I think they are, one is as important as
24  the other.

24 (Pages 90 to 93)

Dobrich, et al.                              v.                    Indian River School District, et al.
Elaine McCabe                        Case No. 15-120                           October 17, 2006

Page 94

1    Q. Okay. You said there was discussion by the
2  board members between what sectarian and non-sectarian
3  means?
4    A. Uh-huh.
5    Q. What does -- What was the conclusion that was
6  reached as to what sectarian means?
7    A. Well, I guess we discussed the difference
8  between I guess actually who you pray to as far as
9  whether it's nondenominational or not, and again it
10  always came back to the discussion of you can't tell
11  people how to pray or who to pray to.
12    Q. So, to clarify this, prayers to a supreme
13  being or Heavenly Father, would those be viewed as
14  sectarian or not sectarian?
15    A. I would say non-sectarian, I guess.
16    Q. And prayers to Jesus Christ, would they be
17  viewed as sectarian?
18    A. Yes.
19    Q. When does a sectarian prayer become one that
20  advances a particular religion over all others?
21    A. I am not sure, but I guess -- I guess
22  something that would play into it for me personally
23  would be if the prayer stated that one religion was, I
24  hate to use the word better than another, but one

Page 95

1  existed and others didn't or something along those
2  lines.
3    Q. Did you say batter or better?
4    A. Better.
5    Q. Okay. Looking back at Exhibit 45, --
6    A. Okay.
7    Q. -- it states, "we pray that you direct them
8  into the truth and generally the truth that comes by
9  knowing Jesus."
10    A. Uh-huh.
11    Q. Does that statement suggest that the truth
12  that you can find is the truth that you can only find
13  through Jesus?
14    A. Well, I don't think this prayer -- Obviously,
15  the person giving the prayer finds their truth through
16  Jesus, but I don't think this prayer says that
17  everyone else has to and that everyone else that
18  doesn't think that is wrong, and I guess that's what I
19  see as the difference.
20    Q. So you, for a sectarian prayer to advance a
21  religion, you need to have it say, identify one
22  particular religion and say the others are wrong?
23    A. That's probably how I feel.
24    Q. When you were still on the board, had

Page 96

1  Mr. Bireley become board president yet?
2    A. Um, I think Mr. Walls was president the last
3  year I was on the board.
4    Q. Do you know how Mr. Walls decided whose turn
5  it would be in the rotating base?
6    A. I don't know.
7    Q. Do you know if any board members passed on
8  the opportunity to offer prayer at the board meeting?
9    A. I don't know.
10    Q. How did Mr. Walls contact board members --
11  Well, first off, did Mr. Walls contact you about
12  opening a meeting with a prayer?
13    A. He didn't really until the last meeting I
14  attended in June, and then he called me at home and he
15  discussed that it was going to be my last meeting and
16  asked me if I had any interest in giving the prayer,
17  and I said that I would.
18    Q. And he called you before the meeting?
19    A. Yes.
20    Q. Do you remember if the prayer that you gave
21  at the June meeting was sectarian or non-sectarian?
22    A. I believe it was sectarian.
23    Q. So you believe you mentioned Jesus in your
24  prayer?

Page 97

1    A. No, actually, it was non-sectarian. I only
2  mentioned God. Actually, I think I used the words
3  "Our Father."
4    Q. And you believe that was sufficient to
5  solemnify the proceedings?
6    A. Yes.
7    Q. Does Policy BDA.1 require the board to read a
8  disclaimer before the board meeting, or before the
9  prayer?
10    A. I don't see it in the actual policy, but I
11  know after we accepted the policy there was a
12  disclaimer read.
13    Q. Is that disclaimer taken from the policy?
14    A. Not from this sheet, no.
15    Q. Why is the disclaimer read before the prayer?
16    A. Well, okay, yes, it's a combination.
17  Certainly, some of the things in this policy are
18  stated in the disclaimer, yes, I agree to that.
19    Q. Does Policy BDA.1 require the board to read a
20  stated in the disclaimer, yes, I agree to that.
21    Q. Why is the disclaimer read before the prayer?
22    A. I never served on the Policy Committee, but I
23  would assume that legal counsel suggested it.
24      MR. GOSSELIN: Just for the sake of

25 (Pages 94 to 97)

Case 1:05-cv-00120-JJF    Document 266-7    Filed 05/08/2008    Page 26 of 29

Dobrich, et al.                                    v.                Indian River School District, et al.
Elaine McCabe                          Case No. 15-120                        October 17, 2006

Page 98

1  the record, the answer was nonresponsive.
2      MR. HORVATH: Yeah, and I am not going
3  to press.
4      MR. GOSSELIN: Okay.
5      MR. HORVATH: She said assumed and all
6  that and --
7      THE WITNESS: Should I have said I
8  don't know?
9      MR. GOSSELIN: No, no. For the
10  future, if any question that calls for
11  attorney/client communications, you don't
12  have to answer. I don't think his question
13  called for an attorney/client communication,
14  but your answer just sort of --
15      MR. HORVATH: Yeah, that was the
16  closest you came for an answer to it, and I
17  stopped asking right there.
18      THE WITNESS: (Laughter) Okay.
19      MR. GOSSELIN: So I guess, for the
20  sake of the record, objection, move to
21  strike as nonresponsive.
22      MR. HORVATH: Yeah. I am going to
23  introduce as a new exhibit PX56.
24      VIDEOGRAPHER: Fifty-seven, actually.

Page 99

1      MR. HORVATH: Fifty-seven, you are
2  correct. PX57. It has Bates labels P565
3  through P566. And I will give you a copy of
4  this one. We took this from the Delaware
5  wave website.
6      THE WITNESS: Okay, the newspaper?
7      MR. HORVATH: Yes.
8      THE WITNESS: Okay.
9  BY MR. HORVATH:
10  Q. Do you recall writing a letter to the editor
11  in support of Charles Bireley?
12  A. Yes.
13  Q. Is that letter?
14  A. Yes.
15  Q. And you wrote this before the 2006 election?
16  A. Yes.
17  Q. And did you write this letter in support of
18  Mr. Bireley's re-election campaign?
19  A. Yes, I did.
20  Q. What prompted you to write this letter?
21  A. Oh, there seemed to be a lot of talk in the
22  paper about Mr. Bireley being a troublemaker and
23  being, oh, very vocal and talkative, and I just felt,
24  with my 11 years on the board, that that really wasn't

Page 100

1  correct, and I found him in the 11 years I was on the
2  board with him to, frankly, be one of the quietest
3  board members at meetings and not -- The word that
4  this person kept using was "turbulent," and I just
5  found that not to be true, and I wanted to state my
6  opinion as being at the meetings for 11 years as
7  opposed to someone that I don't believe was at that
8  many meetings over the 11 years to view what type of
9  personality he had and how he conducted himself at the
10  meetings.
11  Q. So you wrote this letter to sort of summarize
12  your statement to correct the accusation --
13  A. Yes.
14  Q. -- that he led a turbulent board?
15  A. Yes, I mean that's just not true.
16  Q. Can you go to the fifth paragraph down? It's
17  two sentences. It's probably the shortest paragraph
18  on the first page. It states, "Does turbulent mean
19  that Mr. Bireley is standing up to the ACLU? I don't
20  call this turbulent. I call this leadership at its
21  finest."
22  A. Uh-huh.
23  Q. Did you write that?
24  A. Yes.

Page 101

1  Q. Were you referring to this litigation with
2  that statement?
3  A. Yes.
4  Q. And by referring to Mr. Bireley as standing
5  up to the ACLU, --
6  A. Uh-huh.
7  Q. -- did you mean to, also mean, or did you
8  also refer to Mr. Bireley's support of board prayer?
9  A. Well, no, I guess I more meant that we had
10  had a complaint and we were addressing the complaint.
11  We had been threatened with a lawsuit. We were
12  answering that.
13      And then we were doing it through -- or I
14  believed -- I shouldn't say we, because I wasn't on
15  the board at that time, but I perceived the board as
16  handling this potential litigation as they did any
17  others, and I don't see handling potential litigation
18  as being turbulent.
19  Q. Why did you use the phrase "standing up to
20  the ACLU"?
21  A. I don't know. I guess that's the way I talk
22  or the way, the phrase I used.
23  Q. Do you believe that the ACLU represents the
24  families in this case?

26 (Pages 98 to 101)

Dobrich, et al.                                    v.                    Indian River School District, et al.
Elaine McCabe                                Case No. 15-120                              October 17, 2006

Page 102

1    A. I don't know if they officially represent the
2    families, but since I know that I received a letter
3    from them and I know that they attended a couple of
4    board meetings while I was still on the board, so I
5    certainly perceive that they are interested in and
6    involved in this.
7        Q. When did you receive a letter from the ACLU?
8        A. Sometime before I left the board.
9        Q. Was it after the August 2004 meeting?
10       A. I don't remember.
11       Q. Do you recall receiving any letters sent on
12   Mrs. Dobrich's behalf by your attorneys concerning
13   prayer in the district?
14       A. I don't remember specifically. I am sure we
15   received, before I left the board, I am sure we
16   received information when we were briefed on the
17   progress of the potential litigation. And I am sure
18   there were letters in there. I don't specifically
19   remember exact forms or what they exactly said.
20       Q. Do you think that -- Do you believe that the
21   community's perception is that the ACLU is involved in
22   this case?
23       A. Yes, I do.
24       Q. Do you believe that someone reading this

Page 103

1    statement would see this as support for Mr. Bireley in
2    this particular case?
3        A. Say that again.
4        Q. That was a bad question.
5        A. Or say it a different way.
6        Q. That's what I am trying to think of, a better
7    way to say it. Have you ever heard anyone refer to
8    the ACLU as anti-Christian?
9        A. No.
10       Q. Do you believe that the community's
11   perception of the ACLU is as anti-Christian?
12       A. Yes.
13       Q. Do you think someone reading this statement
14   would see Mr. Bireley standing up to the ACLU as
15   Mr. Bireley standing up to the organization that is
16   anti-Christian?
17       A. I guess that would be true.
18       Q. And do you see this statement as -- Do you
19   think someone reading this statement would understand
20   that it's in reference to the board's litigation and
21   its stance on board prayer?
22       A. Yes.
23       Q. And so do you think someone would see this as
24   Mr. Bireley standing up in favor of an issue that an

Page 104

1    anti-Christian organization opposes?
2        A. Sure. I mean you can follow that through,
3    yes.
4        Q. So do you think someone would see Mr. Bireley
5    as supporting a pro-Christian position?
6        A. He had gone on record as supporting it, so I
7    don't think that was any leap to make for anyone. The
8    votes had been taken, and he was obviously supporting
9    board prayer.
10       Q. Do you think someone would perceive that as a
11   pro-Christian position?
12       A. I think Christians would.
13       Q. I want to go back a little bit. You had
14   mentioned you had received a letter?
15       A. I believe we did, yes.
16       Q. I am going to show you what has been marked
17   previously as PX49. Is this the letter you were
18   referring to?
19           MR. HORVATH: I can give you another
20           copy, Jason?
21           MR. GOSSELIN: No, I think the letter
22           is actually PX10.
23           MR. HORVATH: You think it's that one?
24           MR. GOSSELIN: Yes.

Page 105

1            MR. HORVATH: I was actually going to
2            get to that one eventually too, so.
3            MR. GOSSELIN: Okay.
4        A. Yes, I have seen this one before.
5        Q. Okay, did you see it before the lawsuit was
6    filed in this case?
7        A. I don't -- I don't remember.
8        Q. Do you remember --
9        A. I mean I would assume I saw it soon after it
10   was written.
11       Q. Do you remember any discussion at the board
12   level as to whether or not to respond to this letter?
13       A. Whether or not to respond? I don't remember
14   any discussion of that. I am not saying there wasn't.
15   I am saying I don't remember.
16       Q. Do you know if the board ever responded to
17   this letter?
18       A. I don't know. I would assume we referred it
19   to our attorney.
20           MR. GOSSELIN: Do you have an extra
21           copy of that?
22           MR. HORVATH: Yes, I do.
23           MR. GOSSELIN: That's PX49?
24           MR. HORVATH: PX49.

27 (Pages 102 to 105)

Dobrich, et al.                                                                    Indian River School District, et al.
Elaine McCabe                                    v.                                                October 17, 2006
                                          Case No. 15-120

Page 106

1   BY MR. HORVATH:
2       Q.  Do you see at the end of the first paragraph
3   the last --
4       A.  Before the number one?
5       Q.  Before the number one, the last three
6   sentences, "We commend the board for recognizing its
7   obligation to adhere to federal and state
8   constitutional principles and provisions, statutes and
9   regulations pertaining to religious observances in
10  public schools and the matters addressed in the
11  policies."
12      And the policies are referred to earlier that
13  include the board prayer policy.
14      "Our questions are designed to help us and we
15  hope the board, as well, understand whether the
16  policies accomplish that goal.  We look forward to
17  your responses and working constructively and
18  cooperatively with you to ensure that the district's
19  policies are in accord with constitutional
20  principles."
21      Do you see that language as any way
22  confrontational?
23      A.  No.
24      Q.  Do you see it as an attempt to resolve any

Page 107

1   dispute amicably?
2       A.  Well, to be perfectly honest, I found not
3   only in my board life but in my personal life that
4   when something comes to me from an attorney's office,
5   I find it somewhat confrontational, and that's not to
6   be disrespectful to anyone in the room, but I think it
7   immediately should cause one to be careful.
8       Q.  And that's why you would have referred it to
9   your attorneys?
10      A.  Yes.
11      Q.  I am going to show you what has been
12  previously marked as PX50.  This is another letter
13  that's dated December 16, 2004.  It starts off, "On
14  November 12 we sent a letter on behalf of our clients,
15  Mona Dobrich and her family, to the Indian River Board
16  of Education and its members seeking clarifications on
17  the district's recent movement of policies on the
18  school prayer commencement, graduation and
19  baccalaureate ceremonies, board prayer at regular
20  board meetings, and religion."  Do you recall
21  receiving this letter?
22      A.  Yes.
23      Q.  Did you forward this letter again to your
24  attorneys?

Page 108

1       A.  I don't know that I personally did, but.
2       Q.  Did the board?
3       A.  I believe, yes.
4       Q.  Do you recall whether there was any
5   discussion at the board level whether or not to
6   respond to this letter?
7       A.  I don't remember.
8       Q.  I think I might just show you two more
9   letters, this one and one more.  I have just handed
10  you a document that has been previously marked as
11  PX51.  Do you recall receiving this letter?
12      A.  I actually don't remember this particular
13  one, but I am sure I received it.
14      Q.  Do you remember a request from Mrs. Dobrich
15  and her attorneys to meet with the board and the
16  board's attorneys?
17      A.  Yes, I do remember that.
18      Q.  Do you remember any discussion at the board
19  level as to whether or not to respond to that request?
20      A.  Yes, I believe we did discuss that.  I don't
21  remember which meeting, but yes.
22      Q.  Was an attorney present when the board had
23  that discussion?
24      A.  I don't remember.

Page 109

1       Q.  Do you recall the board deciding -- Do you
2   recall what the board's decision was as to whether or
3   not to meet with Mrs. Dobrich and her attorneys?
4       A.  I believe we asked for a legal opinion on
5   whether we should do it.
6       Q.  And at some point after that the board
7   decided not to?
8       A.  I believe, based on legal opinion.  I know I
9   never took part in the meeting.
10      Q.  Okay.  Were those the letters that you
11  referred to before as being the letter from the ACLU?
12      A.  I actually thought there was another letter.
13      Q.  Okay.  Sort of a roundabout way to get to it
14  is --
15      A.  From an attorney --
16      Q.  -- I am introducing what has been previously
17  marked as PX10.
18      A.  Yes.
19      Q.  This would be the letter you were referring
20  to?
21      A.  Yes, yes.
22      Q.  This has the ACLU letterhead on it; correct?
23      A.  Uh-huh, yes.
24      Q.  And the other three letters I gave you do not

28 (Pages 106 to 109)

Dobrich, et al.                                    v.            Indian River School District, et al.
Elaine McCabe                              Case No. 15-120                   October 17, 2006

Page 110

1  have that?
2     A.  No, they were from an attorney's firm.
3     Q.  Yeah.  Based on those other three letters I
4  gave you, did you have any reason to believe that the
5  ACLU was representing Mona Dobrich?
6     A.  I don't think I ever said the ACLU was
7  representing her.
8     Q.  But it's --
9     A.  I believe I certainly perceived that
10 they were very interested in the case.
11        MR. HORVATH:  Okay.  Take five
12     minutes.
13        VIDEOGRAPHER:  Going off the record at
14     approximately 11:55 a.m..
15        (A recess was taken.)
16        VIDEOGRAPHER:  We are back on the
17     record at approximately 12:05 p.m.
18 BY MR. HORVATH:
19     Q.  When you attended school board meetings as a
20 school board member, were you acting as a government
21 official?
22     A.  Yes.
23     Q.  And one last question, I think I might have
24 asked it before, but I just want to be clear.  Have

Page 111

1  you spoken with any board members about board prayer
2  since you left the board?
3     A.  Very little, if any.  I mean, as I said, I
4  have been really tied up and busy.  Obviously, it's a
5  small community.  If I run into a board member, I may
6  have said how are things going or whatever, but not
7  really in any detail.
8     Q.  Can you remember any specifics?
9     A.  No.
10    Q.  Can you --
11    A.  And I have been invited to a couple of the
12 meetings and, frankly, I was not able to attend.
13    Q.  Can you remember any generalities about the
14 conversations?
15    A.  Not really.
16    Q.  Okay, thank you.
17    A.  It was very general.
18        MR. HORVATH:  Thank you very much for
19     your time.
20        THE WITNESS:  You are welcome.
21        VIDEOGRAPHER:  Going off the record at
22     approximately 12:06 p.m.
23
24

Page 112

1              CERTIFICATE
2        I, Lorena J. Hartnett, a Notary Public and
3  Registered Professional Reporter, do hereby certify
4  that the witness, ELAINE MCCABE, was by me first
5  duly sworn to testify the truth, the whole truth, and
6  nothing but the truth; that the foregoing deposition
7  was taken at the time and place stated herein; and
8  that the said deposition was recorded stenographically
9  by me and then reduced to typewriting under my
10 direction, and constitutes a true record of the
11 testimony given by said witness.
12        I further certify that the inspection,
13 reading and signing of said deposition was not waived
14 by counsel for the parties and by the witness.
15        I further certify that I am not a relative,
16 employee, or attorney of any of the parties or a
17 relative or employee of either counsel, and that I am
18 in no way interested directly or indirectly in this
19 action.
20        IN WITNESS WHEREOF, I have hereunto set my
21 hand and affixed my seal of office on this 20th day of
22 October 2006.
23
24        Cert. #134-RPR, Exp. 01-31-2008

29 (Pages 110 to 112)