Dobrich, et al.
Randall Hughes

v.
Case No. 15-120

Indian River School District, et al.
October 16, 2006

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
 2            IN AND FOR THE DISTRICT OF DELAWARE
 3   MONA DOBRICH and MARCO      :    Case No. 15-120
     DOBRICH, Individually and  :
 4   as parents and next friend :
     of ALEXANDER DOBRICH,      :
 5   SAMANTHA DOBRICH, JANE DOE :
     and JOHN DOE, Individually :
 6   and as parents and next    :
     friend of JORDAN DOE and   :
 7   JAMIE DOE,                 :
                                :
 8            Plaintiffs,       :
                                :
 9            v.                :
                                :
10   INDIAN RIVER SCHOOL        :
     DISTRICT, et al.,          :
11                              :
              Defendants.       :
12               .. .. .. .. .. ..
13            Video Deposition of RANDALL HUGHES, taken
     pursuant to notice, on Monday, October 16, 2006
14   at 2:40 p.m. at 31 Hosier Street, Selbyville,
     Delaware, reported by Lorena J. Hartnett, a Registered
15   Professional Reporter and Notary Public.
16               .. .. .. .. .. ..
17   APPEARANCES:
18            THOMAS ALLINGHAM, ESQUIRE
              RICHARD HORVATH, ESQUIRE
19            Skadden, Arps, Slate, Meagher & Flom
              One Rodney Square
20            Wilmington, DE  19801
               Attorneys for the Plaintiff
21
22
23                 WILCOX & FETZER
         1330 King Street - Wilmington, DE  19801
24                  (302) 655-0477
```

Dobrich, et al.
Randall Hughes

v.

Case No. 15-120

Indian River School District, et al.
October 16, 2006

Page 2

1  APPEARANCES (CONTINUED):
2
3      JASON P. GOSSELIN, ESQUIRE
       Drinker, Biddle & Reath, LLP
       One Logan Square
4      18th and Cherry Streets
       Philadelphia, PA  19103-6996
5      Attorney for the Defendants
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 3

1
2
3          TABLE OF CONTENTS
4  TESTIMONY OF RANDALL HUGHES:
5    Direct Examination by Mr. Horvath . . . . . . .  4
6  Certificate of Reporter . . . . . . . . . . . .  96
7
8
9          INDEX TO EXHIBITS
10  Plaintiff's Exhibit 56 . . . . . . . . . . . . .  15
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 4

1          (The videographer read the
2      introduction, and the attorneys introduced
3      themselves.)
4          RANDALL HUGHES,
5  HAVING FIRST BEEN DULY SWORN, TESTIFIED AS FOLLOWS:
6    DIRECT EXAMINATION ON BEHALF OF THE PLAINTIFF
7  BY MR. HORVATH:
8    Q.  Good afternoon.  Have you ever been deposed
9  before?
10    A.  Yes.
11    Q.  When?
12    A.  The last time was in December of 2005.
13    Q.  How many times have you been deposed?
14    A.  Ten or so, perhaps.
15    Q.  What were the natures of the actions?
16    A.  Mostly traffic-related accidents, civil
17  suits, in those regards.  Also, the latest was in a
18  lawsuit filed against the State Police I did for my
19  workplace.
20    Q.  Have you ever testified at trial?
21    A.  Yes.
22    Q.  How many times have you testified at trial?
23    A.  Many, many, many times.
24    Q.  And were these the same cases that you

Page 5

1  testified at trial for, or were there other cases?
2    A.  Yes, there is many criminal trials, criminal
3  prosecution trials that I have testified in.
4    Q.  Has a judge or other judicial official ever
5  questioned the truth of your testimony?
6    A.  No.
7    Q.  I am going to ask you a series of questions
8  during the course of this deposition, and if you don't
9  understand any of my questions, can you please tell me
10  and I will reword the question?
11        I am going to assume that, if you don't do
12  so, that you have understood my question and that I
13  will take your answer as understanding the question.
14  And it's also possible that a jury or a judge would
15  believe that you understood my question that I asked
16  if you don't speak up.
17    A.  Yes, sir.
18    Q.  Also, can you please answer my questions
19  verbally with a yes or no or any other statement you
20  want to give as opposed to something more inaudible
21  like an uh-huh or a nuh-uh?
22    A.  Yes, sir.
23    Q.  Okay.  And, finally, just so we avoid any
24  confusion in the record and so the court reporter can

2 (Pages 2 to 5)

Case 1:05-cv-00120-JJF    Document 266-9    Filed 05/08/2008    Page 3 of 25

Dobrich, et al.                                              Indian River School District, et al.
Randall Hughes                          v.    Case No. 15-120                October 16, 2006

Page 6

1  take everything down, can you please wait until I
2  finish a question to answer, and I will wait until you
3  finish your answer before I ask the next question.
4      **A. Yes.**
5      Q.  Are you feeling well today?
6      **A. Yes.**
7      Q.  And have you taken any medications or drugs
8  that might affect your ability to understand and
9  answer my questions?
10     **A. No.**
11     Q.  Have you drunk any alcohol today?
12     **A. No, sir.**
13     Q.  Can you think of any reason why you will not
14 be able to answer my questions fully and accurately?
15     **A. At this particular time, no.**
16     Q.  Have you spoken with anyone who has been
17 deposed in this matter?
18     **A. Since they have been deposed?**
19     Q.  Since they have been deposed?
20     **A. No.**
21     Q.  How did you prepare for this deposition?
22     **A. I talked to Jason.**
23     Q.  Was anyone else there when you spoke with
24 him?

Page 7

1      **A. No.**
2      Q.  When did you speak with him?
3      **A. Today is Monday.  Friday.**
4      Q.  Friday?
5      **A. Last Friday.**
6      Q.  Where did it take place?
7      **A. Via a phone.**
8      Q.  Other than your attorney, have you spoken
9  with anyone else about your deposition today?
10     **A. No.**
11     Q.  Did you review any documents in preparation
12 for this deposition?
13     **A. Yes.**
14     Q.  What documents?
15     **A. The board, Indian River School Board's policy**
16 **on prayer.**
17     Q.  Any other documents?
18     **A. No.**
19     Q.  What is your full name?
20     **A. Randall Lee Hughes, II.**
21     Q.  And where are you currently employed?
22     **A. I work for the Delaware State Police.**
23     Q.  And when did you first join the Indian River
24 School Board?

Page 8

1      **A. I was appointed to the Indian River School**
2  **Board in January of 2006.**
3      Q.  Before you were appointed to the school
4  board, had you ever attended any other school board
5  meeting?
6      **A. Yes.**
7      Q.  Which meetings?
8      **A. I attended several meetings prior to being**
9  **appointed, but not immediately prior to being**
10 **appointed. And it would have been probably four years**
11 **ago, three years ago, in a time period about the**
12 **middle school issues that were going on, curriculum**
13 **issues. I was attending a few school board meetings.**
14 **I would say probably four or five altogether.**
15     Q.  Were these middle school issues, did they
16 involve your children?
17     **A. Yes.**
18     Q.  What were the issues?
19     **A. There was some issues on some of the**
20 **curriculum, some of the math, Trailblazers that were**
21 **being used, also some issues as to the team concept**
22 **versus a junior high and into the middle school**
23 **concept.**
24     Q.  So, if I understand the time period

Page 9

1  correctly, you went to these board meetings in 2003?
2      **A. I would think that would be a good reflection**
3  **on that, yes, because my, my oldest daughter is now in**
4  **tenth grade, so this would have been when she was in**
5  **sixth, seventh and eighth.**
6      Q.  Did you address the board during this time
7  period?
8      **A. Yes, I did address the board on one occasion.**
9      Q.  Okay, how did you address the board?
10     **A. In the public comment session.**
11     Q.  And what did you say to the board at that
12 time?
13     **A. I expressed the views of, my views on the**
14 **middle school concept versus the junior high concept**
15 **and also on the team concept.**
16     Q.  And did you view the public comment period of
17 the school board session the appropriate way to raise
18 these issues to the school board?
19     **A. Yes.**
20     Q.  Were you aware of any other method you could
21 raise these issues to the school board?
22     **A. Well, I assume a letter writing, writing**
23 **letters to the school board would be another avenue.**
24     Q.  Okay. Aside from these meetings that you

3 (Pages 6 to 9)

Dobrich, et al.                                    v.                    Indian River School District, et al.
Randall Hughes                          Case No. 15-120                      October 16, 2006

Page 10

1   attended because of the Trailblazer's Program, have
2   you attended any other school board meetings?
3       A.  Not, no, not that I can recall at this
4   particular time attending other school board meetings.
5   Prior to that I had attended a few Building and
6   Grounds Committee meetings.
7       Q.  Okay, why did you attend those meetings?
8       A.  I was asked at the time by Mr. Greg Hastings
9   if I would be interested as a citizen to participate
10  in some of those meetings.
11      Q.  What was happening at those meetings that --
12      A.  Well, Building and Grounds Is, they are
13  responsible for the construction that certainly was
14  going on, and at that time period, which that would
15  have been -- Time really goes. I would say six or
16  seven, possibly even eight years ago there was a
17  referendum, of course, on construction in the district
18  and on how to expend those monies.
19      Q.  And did you attend those meetings at that
20  time?
21      A.  Yes, I did attend a few meetings, probably
22  maybe a handful, six, seven.
23      Q.  So your best estimate for when you -- What is
24  the best estimate for when you attended those

Page 11

1   meetings?
2       A.  I am trying to recall what referendum that
3   was for, whether it was the 1996 referendum. I am
4   going to think it was in the pre 2000. It's going to
5   be before 2000, so at this particular time I can't
6   give you a better timeframe. It was the referendum
7   that led up to the ultimate construction of both the
8   Sussex Central High School and Indian River High
9   School, so I am going to think around 2000.
10      Q.  Was anyone else from the public invited to
11  this meeting or to these meetings, the Building and
12  Grounds Committee meetings?
13      A.  They are open to the public, yes.
14      Q.  Okay, do you know if notice is posted for
15  those meetings?
16      A.  I'm sorry, I don't know.
17      Q.  Did you attend the August 24, 2004 school
18  board meeting?
19      A.  Not to the best of my knowledge.
20      Q.  Are you aware that either State Police or
21  other police were there to provide security or direct
22  traffic at that meeting?
23      A.  August 2004?
24      Q.  Uh-huh.

Page 12

1       A.  Other than school resource officers, the
2   State Police had assets committed to it?
3       Q.  I believe so, but are you aware of that?
4       A.  No. Actually, sitting here now, no, I am
5   not, but during that timeframe I was the field
6   operations officer for Kent and Sussex, but I don't
7   recall having additional assets at that meeting.
8       Q.  Okay. How did you initially join the board?
9       A.  I was appointed in January of 2006.
10  Mr. Hastings was appointed to the State Board of
11  Education, which left an opening. There was a process
12  in which to apply and then an interview before the
13  rest of the board.
14      Q.  When did the interview take place?
15      A.  I believe the early part of January 2006,
16  with the appointment -- Perhaps the first meeting that
17  I attended may have been the February meeting when it
18  was official.
19      Q.  During the interview did anyone discuss
20  school board prayer with you?
21      A.  Yes, actually there was a question along the
22  lines of school board prayer during the interview
23  process, I believe, but I -- Exactly what it was, I
24  don't recall.

Page 13

1       Q.  Do you remember who asked you the question?
2       A.  No, not 100 percent. It's nine people asking
3   questions, and there was quite a few.
4       Q.  So how was the question transmitted to you?
5   Was it verbally?
6       A.  Yes, all the questions were verbal, verbal
7   exchange.
8       Q.  Did this questioning take place in an
9   executive session?
10      A.  Yes, it did.
11      Q.  Do you remember if the question wanted to get
12  your views on school board prayer?
13      A.  I don't recall -- I don't recall it being
14  such as a view or a, for me to actually answer the
15  question one way or another how I felt. It was --
16  There was, and I can't remember exactly the question,
17  but school prayer or school board prayer was
18  mentioned. And exactly, I'm sorry, I don't recall.
19      Q.  Who else was present during the interview?
20      A.  The board members and myself.
21      Q.  Was Janet Hearn present during the interview?
22      A.  I don't know. I don't think so.
23      Q.  Was Lois Hobbs present during the interview?
24      A.  I believe Mrs. Hobbs might have been present

4 (Pages 10 to 13)

Page 14

1  during the interview, yes.
2      Q.  Were any attorneys present during the
3  interview?
4      A.  Not that I recall.
5      Q.  Do you recall if anyone took notes during
6  this interview?
7      A.  No, I don't recall anyone taking any notes.
8      Q.  Do you recall if the interview was recorded?
9      A.  No, I do not.
10     Q.  And you believe the interview took place
11 sometime before January 24, 2006?
12     A.  I believe it was after Christmas, so early
13 January.
14     Q.  Were you asked if you were aware of the
15 lawsuit that had been filed against the Indian River
16 School District during the interview?
17     A.  Yes, yes, actually, I was asked if I was
18 aware of that, and that may be exactly how that came
19 about.
20     Q.  And this interview was during an executive
21 session of the meeting of the board?
22     A.  I believe so, yes.
23          (An off-the-record discussion was
24     held between Mr. Horvath and Mr. Allingham.)

Page 15

1          MR. HORVATH:  I am going to introduce
2  as PX56 a document that's been Bates labeled
3  BPD 356 through 368.
4          (Exhibit PX56 was marked.)
5          THE WITNESS:  The official one?
6          MR. HORVATH:  The Bates labels that I
7  have mentioned, it sounds like you have been
8  deposed before, but, just in case, there are
9  these numberings at the bottom of the page
10         that identify where they were in the
11         production.
12 BY MR. HORVATH:
13     Q.  Do these appear to be the official minutes of
14 the January 24, 2006 board meeting?
15     A.  Yes, they do.
16     Q.  Can you please turn to the second page, BPD
17 357?
18     A.  Yes.
19     Q.  There is an approval of minutes listed on
20 this page, and it lists also -- It's right in the
21 middle.
22     A.  Uh-huh.
23     Q.  And it lists three meetings, the Board of
24 Education Special Meeting Minutes, November 30, 2005;

Page 16

1  Board of Education Special Meeting Minutes, December
2  7, 2005; and Board of Education Regular Meeting
3  Minutes, December 13, 2005.  Does that refresh your
4  recollection as to when the interview might have taken
5  place?
6      A.  Actually, Mr. Horvath, it does not.
7      Q.  If you look on the first page, there is a
8  reference under executive session.  It's about
9  two-thirds of the way down.
10     A.  Uh-huh.
11     Q.  It says, "Personnel to discuss matters
12 pertaining to names, competencies and abilities of
13 individual employees or students," and states, "It was
14 moved by Mr. Helms, seconded by Mrs. Mitchell to go
15 into executive section at 6:05 p.m.  The motion passed
16 unanimously nine to zero."
17     A.  Yes.
18     Q.  Could the interview have taken place during
19 that period?
20     A.  Yes, it could.  Yes, it could have.
21     Q.  Do you remember if you were voted on to join
22 the school board after the interview?
23     A.  Yes.  Yes I was, because I received a phone
24 call later in the evening.

Page 17

1      Q.  So if you scroll, look down at the bottom of
2  the page, it says, "Board vacancy interviews, district
3  number three.  It was moved by Dr. Isaacs, seconded by
4  Mr. Helms to appoint Randall L. Hughes to fulfill the
5  board vacancy in District Number 3.  Motion passed
6  unanimously."
7      A.  Yes, sir, I see that.
8      Q.  So do you believe, then, does that refresh
9  your recollection that the interview did take place
10 this night?
11     A.  Yes, yes, late January, January 24, yes.
12     Q.  Okay.  Have you held any other positions in
13 the district besides being a school board member?
14     A.  In the Indian River School District?
15     Q.  Uh-huh.
16     A.  No, sir, I have not.
17     Q.  Have you served on any other school boards?
18     A.  No, sir, I have not.
19     Q.  Have you attended school board meetings for
20 any other school district?
21     A.  No.
22     Q.  And how long have you lived in Sussex County?
23 Or, first off, do you live in Sussex County?
24     A.  Yes.

5 (Pages 14 to 17)

Case 1:05-cv-00120-JJF    Document 266-9    Filed 05/08/2008    Page 6 of 25

Dobrich, et al.                                    v.                Indian River School District, et al.
Randall Hughes                              Case No. 15-120                        October 16, 2006

Page 18

1  Q.  And how long have you lived here?
2  A.  Forty-four years, subtract out four for going
3  to college.
4  Q.  Am I correct that you are a Methodist?
5  A.  Yes.
6  Q.  Do you attend church?
7  A.  Yes.
8  Q.  Which church?
9  A.  Hickory Hill United Methodist Church.
10 Q.  Do you have any role in that church beyond
11 being a member?
12 A.  Yes.
13 Q.  What is that role?
14 A.  I am on the administrative board.
15 Q.  Were you on that board during the summer of
16 2004?
17 A.  No.
18 Q.  When did you join the board?
19 A.  I was voted or appointed to that board on a
20 Sunday that I was not there in church, and that was
21 last year. (Laughter)
22 Q.  Am I correct that you were a member of that
23 church during the summer of 2004?
24 A.  Yes, yes, I am, yes, I was a member and I am

Page 19

1  a member.
2  Q.  Do you remember anyone during that summer
3  discussing the prayer issue in the Indian River School
4  District?
5  A.  At the church?
6  Q.  At the church?
7  A.  No, sir.
8  Q.  How about outside of the church?
9  A.  The topic of this prayer issue has been
10 talked about a lot, but I, specifically to that --
11 It's been talked about a lot. I have heard -- You
12 know, you hear different things and you read different
13 things in the media and media outlets. There has been
14 no -- I have had no personal conversations with anyone
15 about that.
16 Q.  Do you remember hearing anyone -- Did you
17 remember hearing anyone or discussing with anyone
18 about attending the August 24, 2004 board meeting?
19 A.  No.
20 Q.  Just to be clear for the record, do you know
21 what happened at the August 24, 2004 board meeting?
22 A.  Apparently something happened but, no, I am
23 not aware.
24 Q.  Have you discussed the August 24, 2004 board

Page 20

1  meeting with any of the board members?
2       MR. GOSSELIN:  Can you excuse me?
3  Someone is --
4       VIDEOGRAPHER:  Going off the record at
5       2:59 p.m.
6       (A short recess was taken.)
7       VIDEOGRAPHER:  Back on the record
8       approximately 3:00 p.m.
9  BY MR. HORVATH:
10 Q.  What do you believe is the majority religion
11 among voters in the district?
12 A.  As in -- Christianity.
13 Q.  Christianity?  Do you believe that
14 Christianity is the majority religion among teachers
15 in the district?
16 A.  I couldn't answer that. I don't know that
17 for a fact.
18      REPORTER:  Excuse me. We never got an
19      answer to, "Have you discussed the August
20      24, 2004 board meeting with any of the board
21      members?"
22      MR. HORVATH:  I'm sorry, I thought he
23      had answered that. Can you answer it for
24      the record?

Page 21

1       THE WITNESS:  No.
2       REPORTER:  Thank you.
3  BY MR. HORVATH:
4  Q.  What do you believe is the majority religion
5  among students in the district?
6  A.  I believe that the majority religion, based
7  on the demographics of the county, which alluded to
8  earlier in your first question about the county and
9  its religion, would be Christian.
10 Q.  Do you think it's an overwhelming majority?
11 And I will parse that out. First, for the voters in
12 the district?  Answer that one first, please.
13 A.  For the voters in the district?  To be honest
14 with you, Mr. Horvath, I have not looked at that
15 particular demographic.
16      I have looked at some demographics in the
17 work that I do and did prior to just a week ago with
18 field operations, I would look at some other
19 socioeconomic factors, but I really have not looked at
20 the religious breakdown, so I don't have a factual
21 basis from which to answer that question.
22 Q.  What basis did you have initially for
23 answering that Christianity is the majority religion
24 of the district?

6 (Pages 18 to 21)

Dobrich, et al.                                    v.                    Indian River School District, et al.
Randall Hughes                              Case No. 15-120                        October 16, 2006

Page 22

1    A.  Again, some of the demographics would
2    indicate that that would be, but again I don't -- And
3    those are assumptions on my part, quite honestly, but
4    I don't have those numbers engrained in my brain.  I
5    don't have that as fact.
6        Q.  Are these demographics prepared by the State
7    of Delaware?
8        A.  To the census bureau, yes.
9        Q.  And you have access to these through your job
10   as a --
11       A.  Some of the demographics I was looking at?
12       Q.  Yes.
13       A.  Yes, sir.
14       Q.  Have you seen any studies done by the Indian
15   River School District as to the demographics, the
16   religious demographics of its citizens?
17       A.  No, sir, not that I can recall looking at
18   that.
19       Q.  Do you take notes at school board meetings?
20       A.  Yes, I do take some notes at the school board
21   meetings.
22       Q.  Do you also take notes at committee meetings.
23       A.  Some committee meetings, yes, I do take notes
24   on certain issues.

Page 23

1        Q.  Where do you take those notes?
2        A.  In just a tablet that I have.
3        Q.  Do you keep copies of those notes?
4        A.  Once the -- If I am taking notes, for
5    example, one area that I try to stay very much abreast
6    on is construction and construction calls.
7            If a project is said to be on schedule, I
8    like to keep track of that schedule.  I like to also
9    know what our vendors are doing and if they are
10   keeping to the schedule.
11           And sometimes I will refer back to those
12   notes based on what a vendor might have said or a
13   contractor might have said.
14           And then, once we meet that time line and
15   that project is finished, there is no need for me to
16   keep those any longer.
17       Q.  Have you taken any notes about board prayer?
18       A.  No, I have not.
19       Q.  Since you joined the board, have any board
20   members discussed board prayer with you?
21       A.  As an individual, no.
22       Q.  Have you been a part of any meetings where
23   the board discussed board prayer?
24       A.  With our counsel, yes.

Page 24

1        Q.  Okay, have you -- Leaving that to the side,
2    have you been a part of any meetings where the board
3    discussed board prayer outside of counsel's presence?
4        A.  Not that I am aware of.  Not that I can
5    recall at this particular time.  There has been a
6    couple of sets of attorneys, but I believe it's been,
7    conversations have taken place with representation
8    there.
9        Q.  Without going into the substance of the
10   discussions, the meetings that the board discussed
11   board prayer with counsel present, who was present at
12   that time?  So was it just the board?
13       A.  Uh-huh.
14       Q.  Were the attorneys present?
15       A.  (Nodding head)
16       Q.  Who were the attorneys?
17       A.  Pardon me for this next answer, because I
18   don't know the names, but we refer to them as the two
19   Johns were present at the very first, very first
20   meeting that I went to, I believe that they were
21   present.
22           And then after that it would have been
23   Jason's group would have been there.  So those are the
24   two, those are the attorneys that have been involved.

Page 25

1        Q.  Just to be clear on the record, the two
2    Johns, do you mean John Balaguer and John Cafferkey?
3        A.  I believe that is them.  It was a very brief
4    relationship, if you will, with those two gentlemen,
5    as far as my involvement with them.
6        Q.  Was anyone else present during those
7    meetings?
8        A.  Well, the board members were present, and I
9    don't recall if Ms. Hearn had been there or Mrs. Hobbs
10   would have been there.  I would think that Mrs. Hobbs
11   and perhaps Mr. Savage would have also been there.
12       Q.  Do you remember any other district employee
13   being present at those meetings?
14       A.  No, I don't recall.  There may have been, but
15   I don't -- I don't -- I can't sit here now and picture
16   that person in my mind.
17       Q.  Do you remember when those meetings took
18   place?
19       A.  They would have been during executive
20   session.
21       Q.  At a regular board meeting or a special
22   meeting.
23       A.  Regular board meeting, I would think.
24       Q.  Now, you are a member of the Building and

7 (Pages 22 to 25)

Page 26

1  Grounds Committee; correct?
2      A.  I don't know if I have officially been
3  appointed as a member of the Building and Grounds, but
4  I have attended several Building and Grounds.  In
5  fact, I missed the last Building and Grounds meeting,
6  but I have attended several.
7      Q.  Have you been officially appointed to any
8  other committees?
9      A.  This year I am the chairman of the Finance
10  Committee.
11     Q.  Any other committees?
12     A.  No.
13     Q.  Do you attend any other committee meetings?
14     A.  No.  Building and Grounds when I can, and
15  then Finance.
16     Q.  And what, exactly, does the Building and
17  Grounds Committee do?
18     A.  Again, taking a look at the facilities,
19  facility management, if you will, and recommendations
20  as far as field maintenance, just keeping the 14
21  schools and the property up.
22     Q.  You said taking a look at recommendations?
23     A.  I'm sorry, it should be making
24  recommendations to the full board as to perhaps some

Page 27

1  expenditures for school repair through minor cap
2  funds.
3      There is also ongoing building projects that
4  are out there now, and they have worked, the Building
5  and Grounds works closely with those vendors and
6  contractors that are doing the work.
7      Q.  Am I correct that the Buildings and Grounds
8  Committee is a subcommittee of the board that oversees
9  construction projects?
10     A.  I am not so sure oversees is a good word.
11  But, yes, they are taking a look at what's going on
12  there.  We have a Building and Grounds or a facilities
13  person, Mr. Wier, does that and reports to that
14  committee, and maybe some oversight.  I don't know if
15  oversee — I am not so sure that's a good term.  But,
16  yes, it's kind of the big picture, taking a look at
17  the big picture and then reporting it back to the
18  board.
19     Q.  What do you think a better term would be used
20  to describe?
21     A.  I am not so sure.  I didn't really think
22  about that role, I suppose, as — It's just a group of
23  made up of some board members and others that can take
24  a look at some of these issues in a more specific

Page 28

1  nature and then report out in more general terms to
2  the board, make recommendations to the board as to
3  what the specific issue was, the recommendation to the
4  board, and then hopefully have other board members ask
5  questions and try to get it clarified, any questions
6  clarified.
7      Q.  Maybe going another way on this, what about
8  the word oversees makes you doubt its accuracy?
9      A.  I am not so sure.  I don't know, exactly.  At
10  first when you said that word, it just struck me as a
11  little bit, I don't know, odd or maybe too much in the
12  way of micro managing.  I don't see the Building and
13  Grounds micro managing so much.  Maybe guidance is a
14  better word.
15     Q.  Does it provide this guidance to specific
16  projects?
17     A.  Yes, yes, they can be broken down into
18  specific projects.
19     Q.  And the committee makes recommendations about
20  those projects to the board?
21     A.  That is correct.
22     Q.  Does the board vote on the Building and
23  Grounds Committee recommendations at board meetings?
24     A.  Yes.

Page 29

1      Q.  When you joined the board, did you go through
2  an orientation process?
3      A.  Yes.
4      Q.  What was involved in that?
5      A.  I was coming here, meeting with Mrs. Hobbs
6  and her staff at the time, to include Dr. Owens,
7  personnel; Mr. Miller, the business manager;
8  Mr. Hudson with Student Services; Mr. Savage; and
9  several other — I say several other.  A few other
10  department heads were here talking about their
11  functions and how they worked in this organization
12  and, you know, what they brought into the total
13  organization.
14     Q.  Did you meet with any board members during
15  the orientation?
16     A.  Outside of board meetings, no.
17     Q.  Did you speak with any board members outside
18  of board meetings if you didn't meet face to face with
19  them?
20     A.  I know that I talked to Mr. Bireley the night
21  that he told me that I was going to be sworn in.
22  Outside of that, having other conversations — I may
23  have had a conversation with Mr. Bireley.  I am trying
24  to think if there would have been any others.

8 (Pages 26 to 29)

Dobrich, et al.                          v.                  Indian River School District, et al.
Randall Hughes                    Case No. 15-120                        October 16, 2006

Page 30

1    Dr. Isaacs and I talked, but not so much
2    about board. We had some other, some State Police and
3    U of D business to take care of, but it really wasn't
4    about the board.
5        So maybe Mr. Bireley a bit about just the
6    next board meeting and the committee meetings, being
7    able to attend committee meetings if I chose to do
8    that.
9        Q. During your orientation, did anyone discuss
10    with you your responsibilities as a board member?
11       A. Oh, we talked about confidentiality with
12    personnel matters. As the board, things come to the
13    board for recommendation for a vote, any money to be
14    expended. Yeah, we did talk about some of those
15    responsibilities. The biggest thing was
16    confidentiality.
17       Q. Did anyone discuss with you the scope of your
18    authority as a board member?
19       A. No, I don't recall anyone talking to me about
20    that, and I am pretty sure I didn't ask.
21       Q. During your orientation, did you draw any
22    conclusions as to whether or not the board acts as a
23    legislative body?
24       A. I am not so sure I drew that conclusion from

Page 31

1    the orientation as to what my thoughts were on local
2    government and the school board prior to.
3        I see the school board as a legislative body
4    or a policy making body. Now, when that happened
5    exactly, I don't know if it -- I don't think it was
6    just because of the orientation. I think that was
7    prior to.
8        Q. So you think it happened at least either at
9    or before the orientation that you went through when
10    you were joining the board?
11       A. Like I say, I believe that's just a belief
12    that I have. I believe that a school board is your
13    truest form of local government.
14       Q. How did you come to that belief? And in
15    terms, let me clarify, how did you come to the belief
16    that the school board acts as a legislative body?
17       A. Spending taxpayer money, or allocating that
18    money to be spent. Also educating the children,
19    establishing policies for educating our children seems
20    to me to be kinds of things that a legislative body,
21    if you will, do.
22       Q. Since you joined the board, have you seen the
23    board engage in any activities that makes you —
24    Strike that.

Page 32

1        Since you joined the board, have you seen the
2    board engage in any activities outside of the setting
3    of policy or the spending of taxpayer funds?
4        A. I am not so sure I understand the question.
5        Q. Am I correct that you believe the board is a
6    legislative body because it sets policies and spends,
7    or allocates taxpayer money?
8        A. Yes.
9        Q. Since you joined the board, have you seen it
10    engage in any activities that fall outside of those
11    two categories?
12       A. We make policy; we spend money; some
13    decisions are made as to some curriculum type things,
14    the type of curriculum. Again, that comes down to as
15    a policy type thing for the district. Sir, I believe
16    that that would hold. I still believe that to be the
17    case.
18       Q. Has the board held any disciplinary hearings
19    for students?
20       A. Yes.
21       Q. Has the board made any decisions about hiring
22    or firing district employees?
23       A. Yes.
24       Q. Are these decisions made on a case-by-case

Page 33

1    basis?
2        A. They are individual hearings --
3        Q. Uh-huh.
4        A. -- that could come before the board, so in
5    that case I guess it would be case by case.
6        Q. Do you believe that in the case of
7    disciplinary hearings for students, does that involve
8    the setting of policy?
9        A. It could be adhering to already established
10    policy, so it wouldn't necessarily be setting new
11    policy. Hopefully, if you are meting out, if you
12    would, discipline, that there is some process for
13    which that takes place.
14       Q. Would you -- You said meting out policy?
15       A. Media? I'm sorry?
16       Q. You said meting out policy.
17           MR. GOSSELIN: He said meting out
18    discipline.
19    BY MR. HORVATH:
20       Q. Oh, meting out discipline, sorry. What do
21    you mean by that?
22       A. If a decision or a judgment, if you will, is
23    going to be made that could discipline in its negative
24    form, could impact, negatively impact someone, the

9 (Pages 30 to 33)

Page 34

1  board, through that process of the disciplinary
2  hearing, if you will, that could be done.
3     Q.  Do you see that disciplinary process as being
4  legislative in nature?
5     A.  Again, I am not so sure how to exactly answer
6  your question.
7     Q.  Does it involve the actual setting of policy?
8     A.  It is following established policy.
9     Q.  So it's enforcing?
10    A.  Yes, sir.
11    Q.  But not making new policy?
12    A.  No, not making new policy on that particular
13  one incident at that case, no, sir.
14    Q.  Does it involve the allocation of taxpayer
15  money?
16    A.  It could involve the allocation of taxpayer
17  money if something has been inappropriately done and
18  if taxpayer money is not spent wisely.
19    Q.  In the case of student discipline?
20    A.  As to some of our practices for keeping
21  orderly schools, safe schools, there are some
22  expenditures made to ensure that we have those
23  organizations.
24    Q.  You said it could?

Page 35

1     A.  (Nodding head)
2     Q.  Have you had a disciplinary hearing that did
3  not involve?
4     A.  That did not involve?
5     Q.  The expenditure of taxpayer money?
6     A.  Sir, I believe potentially they all could
7  have an impact on taxpayer money.
8     Q.  Have students attended school board meetings
9  who are subject to a disciplinary hearing since you
10  have joined the board?
11    A.  Sir, are you asking that at a student hearing
12  has the student been there?
13    Q.  Yes.
14    A.  Since I have been -- In that hearing, itself?
15    Q.  Uh-huh.
16    A.  Held in executive session?
17    Q.  Yes.
18    A.  No, sir, I don't believe so since I have been
19  on the school board.
20    Q.  Has a student ever requested to address the
21  board about a disciplinary hearing?
22    A.  Not that I can recall.
23    Q.  Am I correct that since you have joined the
24  school board you have seen students at school board

Page 36

1  meetings?
2     A.  Yes, that is correct.
3     Q.  Have you seen a student at every school board
4  meeting during the school year?
5     A.  I believe that is correct, because normally
6  the high school that we are in, the student council
7  president will give an update on that school.  Now,
8  the minutes would reflect if that has been done, but
9  normally that is the practice.
10    Q.  Have you seen Junior ROTC students --
11    A.  Yes.
12    Q.  -- present colors at those meetings?
13    A.  I'm sorry, yes, I have.
14    Q.  Have students received awards at those
15  meetings?
16    A.  Yes, they have.
17    Q.  Have students addressed the board about any
18  concerns they might have with their schools at those
19  meetings?
20    A.  Students have addressed the board.  Sitting
21  here now, I can't tell you exactly what their concerns
22  were at the time.  I don't know if it was particularly
23  to a specific school or to some other issue, but
24  students have addressed the board.

Page 37

1     Q.  Let's go back a little bit.  You first
2  mentioned student government addresses the board at
3  those meetings?
4     A.  Uh-huh.
5     Q.  And I think you said there was the student
6  government for the high school where the board meeting
7  was taking place?
8     A.  I believe so, yes.
9     Q.  Is there a time reserved in the agenda for
10  the student government to speak in front of the school
11  board?
12    A.  Without referring to an agenda, I can't
13  100 percent answer that question.  I believe that
14  there is, but I can't -- I can't, without looking at
15  a -- Without looking at an agenda, I can't 100 percent
16  tell you that.
17    Q.  How does student government know it can speak
18  at the school board meeting?  What happens?
19    A.  I am assuming an agenda is posted and then
20  they know to come in.
21    Q.  Let me clarify a little bit.  During the
22  meeting, itself, how did the student government
23  representatives know it's time for them to speak at
24  the school board meeting?

10 (Pages 34 to 37)

Dobrich, et al.                              v.                     Indian River School District, et al.
Randall Hughes                        Case No. 15-120                        October 16, 2006

Page 38

1    A.  Normally they are called forward by
2    Mr. Bireley.
3    Q.  And what does he say?
4    A.  Sir, he probably says it's time for our
5    student council or school representative.  I don't
6    know his exact words.
7    Q.  Since you joined the board, has each meeting
8    been opened with a prayer?
9    A.  Board meetings?
10   Q.  Regular board meetings.
11   A.  I believe that they have, sir.
12   Q.  For those meetings that student government
13   attended, do you remember if they were present when
14   the prayer was given?
15   A.  No, I don't know if they were there at that
16   time.
17   Q.  Do you remember seeing those representatives
18   come in after the meeting was called to order?
19   A.  There have been -- There are lots of people
20   that come in after a meeting is called to order.  In
21   fact, I have been guilty of that myself, coming in
22   after, after the meeting is called to order.
23   Q.  And what do the student government
24   representatives discuss at the school board meetings?

Page 39

1    A.  Normally things that are going on within
2    their respective school.
3    Q.  Good things and bad things?
4    A.  Well, mostly it's good.  They come in and
5    they brag about their school, which I am glad to see
6    them doing that, talking about some of the things,
7    maybe the sports team or the math team or the Odyssey
8    of Mind teams, how they have been doing.
9    Q.  And you said that you are glad that you see
10   them speaking in front of the board?
11   A.  No, I said they are bragging, I am glad to
12   see them bragging.
13   Q.  Okay.  Do you think it's helpful to have
14   student government address the board?
15   A.  For that individual student for some public
16   speaking, yes, it is probably helpful for them.
17   Q.  Does it help the school board keep aware of
18   what's going on in the high schools?
19   A.  I suppose that it could, yes.
20   Q.  You also referenced JROTC for students that
21   attend school board meetings?
22   A.  You asked me if --
23   Q.  And you agreed?
24   A.  Yes.

Page 40

1    Q.  Are those members present at the meetings
2    when -- Are the JROTC members present when the meeting
3    is called to order?
4    A.  Yes, they are normally presenting the colors.
5    Q.  Now, so we can be clear on the timeline for
6    what happens at a meeting, does the president, the
7    school board president call the meeting to order, and
8    then does he call on somebody to give an invocation,
9    and then is there a presentation of colors?
10   A.  Mr. Horvath, you would think this would be a
11   very easy question, but sir, I have to be honest with
12   you, I am not exactly sure how that works.  And I will
13   be perfectly honest.  A lot of times I am reviewing
14   agendas, getting some paperwork in order, and again I
15   am a bit embarrassed not to know the answer for you.
16   Q.  You said that you attended board meetings
17   about three years before you had joined the school
18   board?
19   A.  Yes, sir.
20   Q.  Did anyone offer a prayer during that
21   meeting?
22   A.  Sir, I don't recall.  I may not have been at
23   the beginning of the meeting.  I don't recall.
24   Q.  Do you know why -- Did you ever discuss with

Page 41

1    any school board members why the board used to open
2    its meetings with prayer before the adoption of the
3    policy?
4    A.  No.
5    Q.  Have you discussed with any board members why
6    the board currently opens its meetings with prayer?
7    A.  No, sir, never have.  I have not discussed
8    that.
9    Q.  Why do you believe the school board opens its
10   meetings with prayer?
11   A.  Well, going back to what the policy says now,
12   it solemnified the proceeding.  And, to me, that means
13   just to bring folks in, bring people into focus that
14   we are about to do some matters that are important.
15   Q.  I am going to introduce what has been marked
16   as PX9.  It's a copy of BPD 490.  Is that a copy of
17   the board's current policy?
18   A.  It does appear to be, yes, sir.
19   Q.  So when you answered before that you take the
20   reason from what the policy says for it to solemnify
21   its proceedings, where did you get that from that
22   policy?
23   A.  Paragraph one.
24   Q.  Paragraph one.  And how does the prayer

11 (Pages 38 to 41)

Dobrich, et al.                          v.              Indian River School District, et al.
Randall Hughes                    Case No. 15-120                      October 16, 2006

Page 42

1 solemnify the proceedings?
2     A.  For me personally to answer the question?
3     Q.  Yes.
4     A.  It gives an opportunity for, again, as I said
5 earlier, just to focus at the task at hand, focus on
6 the task at hand, making decisions that affect other
7 people.  It just brings some order to the meeting.
8     Q.  Who is the prayer -- Oh, strike that.  Is the
9 purpose of the prayer to invoke divine guidance?
10     A.  That may be an individual -- Each individual
11 has to answer that question.
12     Q.  Do you believe the purpose of the prayer is
13 to invoke divine guidance?
14     A.  Of that particular prayer or prayer in
15 general?
16     Q.  Prayer before board meetings.
17     A.  If that individual believes in such things,
18 yes.
19     Q.  You stated that the prayer is also, the
20 solemnification is necessary to help bring the meeting
21 to order; is that correct?
22     A.  Yes, I did say that.
23     Q.  Is that meant for just the board members
24 themselves?

Page 43

1     A.  The prayer is meant for the board, yes, and
2 we have other, the presentation of the colors, some
3 other traditions.  Those traditions and the pledge to
4 the flag, I think, helps the rest of the public, if
5 you will, or the other folks that are there to, you
6 know, that this is the beginning, that we are going to
7 be starting.
8     Q.  Do you think the presentation of colors helps
9 solemnify the meeting?
10     A.  Yes.
11     Q.  Do you think reciting the pledge of
12 allegiance helps solemnify the meeting?
13     A.  Yes.
14     Q.  In light of the presentation of colors and
15 the pledge of allegiance, do you believe it is
16 necessary to open the meeting with a prayer?
17     A.  The meeting doesn't have to start with a
18 prayer.
19     Q.  Have you been offered the opportunity to open
20 a meeting with a prayer?
21     A.  No.
22     Q.  Has the board president ever asked you to let
23 him know if you would like to open a meeting with a
24 prayer?

Page 44

1     A.  Not that I recall.  It wouldn't be something
2 that I would feel comfortable doing.  Not that I
3 recall.
4     Q.  Why wouldn't you feel comfortable opening a
5 meeting with a prayer?
6     A.  My religious beliefs, my beliefs are very
7 personal to me.  I am a very personal, private
8 individual.
9     Q.  If you will look at the first paragraph in
10 the policy, it states, "In order to solemnify its
11 proceedings, the Board of Education may choose to open
12 its meetings with a prayer or a moment of silence."
13     A.  Yes, sir.
14     Q.  Since you have joined the board, has anyone
15 chosen to open a meeting with a moment of silence?
16     A.  Not that I can recall.
17     Q.  Do you believe a moment of silence would let
18 those in attendance reflect privately -- Let me
19 correct that.
20         Do you believe that a moment of silence would
21 be sufficient to let each board member to pray in
22 whichever form they may choose to themselves?
23     A.  Yes, that could be done.
24     Q.  Do you believe it would also enable everyone

Page 45

1 in the audience to pray or not pray however they may
2 choose to themselves?
3     A.  We are dealing, though, with this particular
4 policy?
5     Q.  Yes.
6     A.  I don't know what that would do for them,
7 because this is geared towards the board.  If there
8 was a moment of silence, people can choose to do
9 whatever they would like to do.
10     Q.  Does the prayer take place after the meeting
11 is called to order?
12     A.  Again, Mr. Horvath, this is back to my
13 embarrassing moment.  I am not exactly sure the
14 sequence of events.
15     Q.  Is there an audience present when the prayer
16 takes place?
17     A.  Yes, there are people there.
18     Q.  Do you see students in the audience?
19     A.  Yes, sir, I have observed students in the
20 audience.
21     Q.  So there are people present listening to the
22 prayer when it takes place?
23     A.  Yes.
24     Q.  Would they presumably be present if there was

12 (Pages 42 to 45)

Case 1:05-cv-00120-JJF    Document 266-9    Filed 05/08/2008    Page 13 of 25

Dobrich, et al.
Randall Hughes

v.

Case No. 15-120

Indian River School District, et al.
October 16, 2006

Page 46

1  a moment of silence?
2      A.  Those same exact folks, yes, would be there.
3      Q.  You said that you would feel uncomfortable
4  giving a prayer at the meeting.  How do you feel about
5  the other board members opening the meeting with a
6  prayer?
7      A.  I don't -- I don't have a problem with them
8  having, if they feel comfortable verbalizing that
9  prayer, I don't have any problems with that.
10     Q.  Since you joined the board, which board
11 members have opened meetings with prayer?
12     A.  Ms. Bunting.
13     Q.  And, to be clear, that's Nina Lou Bunting?
14     A.  Yes.  You have got to remember she was a
15 teacher for a long time before I ever knew her as Nina
16 Lou Bunting, so Mrs. Bunting.
17     Q.  There is also another Bunting involved now,
18 so ...
19     A.  Oh, I'm sorry.  Donna Mitchell, Reggie Helms.
20 I was trying to go around the table.  Dr. Hattier.
21 Those come to mind now.  I am trying to think if any
22 of the other board members before they left.  Perhaps
23 Mr. Evans before he left.  Again, perhaps.  But that's
24 about -- I think that's about all that I can recall.

Page 47

1      Q.  Did Dr. Hattier lead the board in prayer for
2  the July 25, 2006 meeting?
3      A.  I don't -- I don't have that off the top of
4  my head, sir.
5          MR. HORVATH:  Okay, we have to go off
6      the record.
7          VIDEOGRAPHER:  We are going off the
8      record at approximately 3:36 p.m.
9          (A recess was taken.)
10         VIDEOGRAPHER:  Back on the record at
11     approximately 3:48 p.m.
12 BY MR. HORVATH:
13     Q.  The prayer, the invocation of divine
14 guidance, is it for guidance for the board members or
15 the public or both?
16     A.  Are you referring back to the question we
17 asked before the break, about three questions prior.
18     Q.  I believe so, yes.
19     A.  And I believe I said then it was for the
20 board members.
21     Q.  How is it for the board members?
22     A.  It's to focus on the task at hand.
23     Q.  And how is it limited to just the board
24 members?

Page 48

1      A.  This policy is read stating -- The policy is
2  read before the board meeting.
3      Q.  Not the entire policy?
4      A.  No, no, sir, I believe it's just paragraph
5  one.
6      Q.  I think we have had testimony before it would
7  be a combination of paragraph one and paragraph four?
8      A.  Okay.
9      Q.  Well, could you read those two paragraphs
10 right now and see if that seems familiar.
11     A.  That does sound familiar.
12     Q.  Now, who reads those paragraphs?
13     A.  Mr. Bireley.
14     Q.  And after those paragraphs are read, does the
15 prayer begin?
16     A.  Yes.
17     Q.  But, nonetheless, these paragraphs
18 acknowledge that students might be in attendance while
19 the prayer is being given; correct?
20     A.  Yes.
21     Q.  And that school employees could also be in
22 attendance?
23     A.  That is correct.
24     Q.  Likewise, that members of the community will

Page 49

1  also, could also be in attendance while the prayer is
2  being read?
3      A.  That's correct.
4      Q.  So for those individuals to not be a part of
5  the prayer, what do they have to do, or to not -- Let
6  me correct that.  What would a school employee,
7  student in attendance, or a member of the community
8  have to do to not be a recipient of the prayer?
9      A.  I am not sure exactly how I answer this
10 question other than to say don't participate, don't
11 think about, you know, the words that are being said,
12 don't listen.  There is a big difference between
13 hearing and listening.  I am not exactly sure how to
14 answer the question.
15     Q.  Do you feel they should sit silently and not
16 do anything while the prayer is being read?
17     A.  I am not necessarily saying that they have to
18 sit silently.  I would hope that they wouldn't be,
19 discourage or loud or obnoxious.  I am not saying they
20 have to sit silently.
21     Q.  Do you think they could leave the meeting?
22     A.  Yes.
23     Q.  When would they know they should leave the
24 meeting in order to avoid hearing the prayer?

13 (Pages 46 to 49)

Case 1:05-cv-00120-JJF    Document 266-9    Filed 05/08/2008    Page 14 of 25

Dobrich, et al.                                    v.                    Indian River School District, et al.
Randall Hughes                                Case No. 15-120                         October 16, 2006

Page 50

1   A.  I think we established that this was read
2   prior to, so perhaps that would be a time that they
3   chose to leave.
4       Q.  And about where in that process do you think
5   they should know that they need to leave the meeting?
6       A.  Well, in the very first sentence, the second
7   clause, that's where it talks about opens its meetings
8   with prayer.  That would be a hint.
9       Q.  About how long does it take -- I'm sorry, you
10  were going to say something?
11      A.  No.  I can go further and answer you there is
12  more clues.
13      Q.  Well, at the very earliest you feel it would
14  be when the board president states, "The Board of
15  Education may choose to open its meetings with a
16  prayer."
17      A.  Yes, sir.
18      Q.  How long does it take to read paragraph one
19  and four?
20      A.  I have never timed it.
21      Q.  I will just try to read it at a normal pace.
22  "In order to solemnify its proceedings, the Board of
23  Education may choose to open its meetings with a
24  prayer or a moment of silence, all in accord with the

Page 51

1   freedom of conscience of the individual adult board
2   member.  Such prayer is voluntary and is among only
3   the adult members of the board.  No school employee,
4   student in attendance, or member of the community in
5   attendance shall be required to participate in any
6   such prayer or moment of silence."
7           I think that took me about 20 seconds to
8   read.  Do you think 20 seconds is enough time for
9   someone to be able to gather their things, get up and
10  leave the meeting in order to avoid hearing the
11  prayer?
12      A.  Twenty seconds is a very relative term,
13  depending on what you were doing.  Do I think they
14  would have to sprint in order to leave?  No, not
15  necessarily.  A leisurely pace?  No, I don't think it
16  would be that, so it's going to fall somewhere in
17  there.  So 20 seconds could be a very long time, and
18  other times it can be a very short time.  Again, it's
19  all -- It's relevant.
20      Q.  And if they were to leave the meeting, would
21  they have to travel a little bit farther to avoid
22  being able to hear the prayer, or would they just be
23  stepping outside?
24      A.  I don't think that -- I know that there are

Page 52

1   microphones on the table, but I don't believe that the
2   voice or that audio is fed outside of the room that we
3   are in, so I assume it would be just stepping outside
4   of the room.
5       Q.  Well, do the microphones feed the audio
6   through speakers?
7       A.  Yes, there are speakers there.
8       Q.  So the sound that the board members make or
9   what the board members say at the meeting is amplified
10  for the audience?
11      A.  Yes, sir.
12      Q.  So could that make the what they say project
13  farther than if they were to speak without the
14  microphones?
15      A.  Yes, that would be the intended purpose.
16      Q.  Okay.  So is it possible that to avoid
17  hearing a prayer someone might have to travel farther,
18  even if the sound isn't pumped outside of the
19  auditorium?
20      A.  Yes, it is possible.
21      Q.  How would someone know that the prayer has
22  ended?
23      A.  I don't know.  If they were not in --
24      Q.  If they were not in --

Page 53

1       A.  If they could not see, I don't know.
2       Q.  So is it possible that if someone were to
3   leave the meeting to avoid hearing the prayer that
4   they may not know that the prayer has ended?
5       A.  Yes, that is possible.
6       Q.  And they could miss other portions of the
7   meeting?
8       A.  That would be a possibility, yes.
9       Q.  Do you feel that members of the audience
10  benefit from the divine guidance the board receives
11  when it gives a prayer at the beginning of its
12  meetings?
13      A.  That prayer at the beginning is intended for
14  the board members, those board members who choose to
15  partake and to participate in that.  I can't speak to
16  those other individuals.
17      Q.  Is there anything in the policy that
18  prohibits a board member from stating in the prayer
19  that they are giving that it is meant for the benefit
20  of the people in the audience?
21      A.  I'm sorry, you are going to have to try me
22  one more time on that.
23      Q.  Okay.  Is there anything in the policy that
24  prohibits a board member from offering a prayer that

14 (Pages 50 to 53)

Dobrich, et al.                                                    Indian River School District, et al.
Randall Hughes                          v.                         October 16, 2006
                              Case No. 15-120

Page 54

1   might say, "Heavenly Father, please help the board
2   members and I make decisions that are for the best,
3   that are in the best interests of the district and
4   that those in attendance are able to fully participate
5   in this meeting."
6       A.  If I understand the question correctly, I
7   believe that the first part of your question, the
8   answer is yes, they can, but the second question where
9   you are saying that the board member is, I don't know,
10  placing the prayer onto the public?  Is that, I think
11  is what you are --
12      Q.  Yes.
13      A.  I am not so sure that's a good idea.
14      Q.  Is it prohibited by the policy?
15      A.  Well, probably paragraph three would take a
16  look at some of that or would be addressing some of
17  that.  The example you gave, I believe, would be
18  leading that way that it might be a problem with
19  paragraph three.
20      Q.  What about paragraph three would -- What in
21  paragraph three makes you read it that way?
22      A.  Well, I only want it to be -- or, to me, the
23  prayer is for the board members and it's not to be
24  pushed off on anyone else.

Page 55

1       Q.  And so if a prayer were to mention members in
2   the audience, you might feel that that's pushing it
3   off onto them?
4       A.  If read in its context, the entire content of
5   the prayer and looking at the context, potentially,
6   yes, that could be.
7       Q.  Would that similarly apply if the prayer
8   mentions anyone besides the board members?  In other
9   words, if a prayer mentions anyone besides the board
10  members, would you see that as being pushed off on
11  that individual?
12      A.  As an individual?
13      Q.  Or like, for example, students.  If the
14  prayer mentions students, would you see it as pushing
15  it off onto the students and not limited to the board
16  members?
17      A.  Possibly.  The word students by itself, and
18  again I think it would go to a little bit to the
19  context and the intent, if you will.  Of course, I
20  know that's very difficult to understand sometimes,
21  the intent.  But, yes, possibly that could be
22  competent.
23      Q.  What would you do if a prayer was, in your
24  view, in violation of paragraph three?

Page 56

1       A.  Again, if I was paying attention during that
2   and I heard that, then I think it would inhibit me,
3   behoove me, or be incumbent upon me to address that.
4       I don't know if I would -- I don't know if I
5   would address it at that particular time or if I would
6   do that later.  I don't know.  I haven't necessarily
7   run across that yet or I haven't paid attention enough
8   or heard that comment.
9       Q.  But at that point the prayer would have
10  already been given?
11      A.  Yes, sir.
12      Q.  So even if you might feel that the prayer
13  violated paragraph three, it has already taken place?
14      A.  Yes, or I wouldn't have known it possibly
15  violated the paragraph.
16      Q.  So what could you do to correct that once the
17  prayer has already been given?
18      A.  Either talk to the appropriate board, or to
19  that board member, or perhaps I, as a member of the
20  board, should talk to Mr. Bireley, the president, or
21  whomever is the president, and say, "You know, maybe
22  that's not where we needed to go with that prayer or
23  potentially there is a conflict with paragraph three."
24      Q.  And would you do that in executive session or

Page 57

1   would you --
2       A.  Yes, sir, to be honest with you, yes, I
3   probably would do that in executive session.
4       Q.  What would someone -- What do you believe --
5   Suppose you were sitting in the audience when that
6   prayer took place and nothing else was done, how would
7   you take that prayer?  How would you perceive that
8   prayer?
9       A.  Personally?
10      Q.  Yes.
11      A.  I wouldn't have a concern with it.  I
12  think -- Is that -- If you are asking my personal
13  opinion, I wouldn't have had a concern or a problem.
14      Q.  But you might -- Let me clarify this a little
15  bit.  Or maybe I will be better to just ask why
16  wouldn't you have had a personal problem?
17      A.  Again, as I said, my personal beliefs would
18  be such that that may be a prayer that I may make.
19      Q.  Uh-huh.  What if it was a prayer that you
20  wouldn't personally make?  For example, what if it was
21  a prayer directed to a deity of a religion which you
22  don't believe in, Allah, Sheba, Jehovah, how would you
23  feel then?
24      A.  Then I hate to use the term or think of a

15 (Pages 54 to 57)

Dobrich, et al.                         v.                Indian River School District, et al.
Randall Hughes                   Case No. 15-120                      October 16, 2006

Page 58

1  prayer as this thing that floats around and lands on
2  people, but I am kind of, if you picture it, that's
3  what we are talking about.
4       Here is this prayer that's being said, and
5  it's going to go out and it's going to land on some
6  person. Some of the words that people speak have
7  special meaning, and if that prayer was to have a
8  special meaning to you, then I guess it has landed on
9  you and you can act accordingly.
10      Q. Going back to perceiving the prayer as a
11 violation of paragraph three, would your concern be
12 that the prayer is being used to proselytize or that
13 someone in the audience might feel proselytized?
14      A. My understanding of paragraph three, to be
15 clear, not to be preachy, to try to put my views on
16 someone else, and to maybe even make someone else feel
17 inferior because of their particular beliefs. I don't
18 think that we should do that.
19      Q. Would that include, you know, if you viewed
20 the prayer as speaking on someone else's -- And, just
21 to be clear, you would include in that using a prayer
22 to speak on someone else's behalf? So, in other
23 words, "I pray on behalf of the students of the
24 district."

Page 60

1  hold me to -- That is not a quote from Dr. Hattier
2  because he -- He probably had said something about his
3  constitutional right.
4       Q. Which constitutional rights are you referring
5  to?
6       A. His freedom of speech. And I don't want
7  to -- I am not trying to be negative in any way. Have
8  you had the opportunity to talk with Dr. Hattier?
9       Q. We have deposed him.
10      A. You may have some idea where I am heading
11 with that. It may have been Dr. Hattier talking about
12 if other legislative bodies do this, why can't we.
13      Q. Do you agree with the concept that it's the
14 constitutional rights for a board member to be able to
15 give a prayer at a board meeting?
16      A. Yes.
17      Q. Where do you believe that right comes --
18 Strike that. Do you believe it as a matter of free
19 speech?
20      A. Yes.
21      Q. Do you believe that any other rights are
22 involved?
23      A. Well, our rights to choose our religion
24 without persecution and the free speech.

Page 59

1       A. Potentially I could, but I, instead of just
2  looking at that short phrase, I would like to see
3  more, but potentially, I do see potentially that could
4  be a conflict.
5       Q. Would this potential, could this potential
6  conflict be avoided if the prayers took place outside
7  of the public's view?
8       A. Well, the conflict with the policy, yes, yes.
9       Q. You would avoid a situation of someone in the
10 audience, whether rightly or wrongly, perceiving the
11 prayer as being offered on their behalf?
12      A. Yes, you could avoid that perception.
13      Q. If the prayer is intended for the board
14 members, why can't the board members then solemnify
15 the proceedings before they enter the room where the
16 board meeting takes place?
17      A. I don't know.
18      Q. Have you ever discussed that option with
19 anyone?
20      A. No.
21      Q. Has any board member explained to you why
22 they believe the prayer should take place in public?
23      A. Yes, I believe Dr. Hattier may have alluded
24 to his constitutional rights. Again, please do not

Page 61

1       Q. Do you understand that the purpose of this
2  policy is to protect individual board member's
3  constitutional rights?
4       A. Do I understand that this?
5       Q. That a purpose of this policy is to protect
6  individual board members' constitutional rights?
7       A. If you are telling me that's the case, then I
8  will understand it. Did I understand that before you
9  asked me the question? No.
10      Q. Okay, take some time to think about it and,
11 after that reflection, do you think that a purpose of
12 this policy is to protect board member's
13 constitutional rights? Not what I may tell you.
14      A. Yes, I can see that.
15      Q. To the best of your recollection, have you
16 heard any prayer that has violated paragraph number
17 three of the policy?
18      A. To the best of my recollection -- However, my
19 experience tells me that I am getting ready to see a
20 piece of paper, because a lot of times you don't get
21 asked questions unless people already know the answer.
22      So, as I recall, I do not recall any prayers
23 that I have heard that at that moment, that I was
24 paying attention to, that at that moment caused me any

16 (Pages 58 to 61)

Dobrich, et al.                              v.                    Indian River School District, et al.
Randall Hughes                        Case No. 15-120                        October 16, 2006

Page 62

1 concern.
2    Q. Actually, you may be about to see a piece of
3 paper but not the one you might thinking.
4    A. Okay. All right.
5    Q. So, before I go there, you have said that you
6 don't pay attention to every prayer that's offered at
7 the board meetings.
8    A. That would be correct.
9    Q. How many prayers have you paid attention to?
10    A. Oh, Mr. Horvath. Do I reflect on the -- Not
11 trying to answer your question with a question. I am
12 just going to try to answer this as best I can.
13       I do not reflect on the actual words that are
14 being spoken by the board member who is giving the
15 prayer. I may reflect, as I said. For me, to me, my
16 religion is a very personal thing. I may reflect in
17 my head. I can reflect in my head and continue doing
18 other things.
19       So, as far as me, I couldn't repeat the
20 prayers that have been said back to you, so, no, I
21 have not paid very close attention to the actual words
22 that are being spoken. I do use the opportunity,
23 again, to do some reflection on my own.
24    Q. So, for you, it is not necessary to hear the

Page 63

1 prayers in order to approach the board meetings in a
2 solemn manner?
3    A. Yes.
4    Q. Are the board members the only individuals
5 charged with making sure that the prayers comply with
6 the Policy BDA.1?
7    A. I don't know the answer.
8    Q. Are the board members the individuals who
9 implement Policy BDA.1?
10    A. Yes.
11    Q. And they make decisions as to which prayers
12 are appropriate or not appropriate under Policy BDA.1?
13    A. Yes. There is nothing that I read in that
14 policy that we have been referring to that would give
15 that to any other person or group.
16    Q. So, coming back to that, then, aren't the
17 board members the only ones charged with the
18 responsibility to ensure that the prayers offered
19 aren't used or exploited to proselytize, advance, or
20 convert anyone or to derogate or otherwise disparage
21 any particular faith or belief?
22    A. The policy is actually silent on whose
23 responsibilities that is, so it could be someone
24 else's responsibility, as well.

Page 64

1    Q. Since it's silent, is it possible that the
2 only individuals who have to make that determination
3 as to whether or not a prayer violates paragraph
4 number three is the person offering the prayer?
5    A. That is a possibility.
6    Q. Now, look at paragraph five. It says, "Any
7 such prayers may be sectarian or non-sectarian,
8 denominational or non-denominational, in the name of a
9 supreme being, Jehovah, Jesus Christ, Buddah, Allah or
10 any other personal entity, all in accord with the
11 freedom of conscience, speech, and religion of the
12 individual board member."
13       Does paragraph five give the individual board
14 member who is offering the prayer broad discretion as
15 to the content of their prayer?
16    A. Yes, it does.
17    Q. And if that individual is the person who has
18 to make a determination as to whether or not a prayer
19 proselytizes, advances or converts anyone or derogates
20 or otherwise disparages any particular faith or
21 belief, what guidance does this policy give that
22 individual as to what prayers they can offer and can't
23 offer?
24    A. Well, it goes back to what number three says,

Page 65

1 "shall not."
2    Q. Is there any -- Strike that. Is it correct
3 under paragraph five that prayers may be sectarian and
4 denominational?
5    A. Yes, it is.
6    Q. Is it possible that an individual board
7 member could give consistently sectarian and
8 denominational prayers each time they are up in the
9 rotation?
10    A. Giving the same prayer? Is that what you are
11 asking me?
12    Q. It doesn't have to be the same prayer, but
13 could that individual's prayers consistently be
14 sectarian and denominational?
15    A. Yes.
16    Q. Now, you have identified, I believe, four
17 individuals who have opened meetings with prayers
18 since you have joined the board?
19    A. (Nodding head)
20    Q. Maybe five. Let me go through that with you.
21 Dr. Hattier, Mr. Helms, Mrs. Mitchell, Mrs. Bunting,
22 and Mr. Evans. So there is five?
23    A. (Nodding head)
24    Q. Have any of those individuals given prayers

17 (Pages 62 to 65)

Dobrich, et al.                              v.                    Indian River School District, et al.
Randall Hughes                        Case No. 15-120                        October 16, 2006

Page 66

1  that could be described as sectarian?
2      A.  Yes.
3      Q.  Which individuals?
4      A.  Possibly all five.
5      Q.  And what do you understand sectarian to mean?
6      A.  In the name of a particular entity, Jesus,
7  for one, and very specific to a -- Even to a portion
8  of the Christian religion, Christianity, it's very
9  specific to the different branches.
10     Q.  Have all of their prayers been sectarian?
11     A.  I would -- I would think that they have, but,
12  again, this is back to not paying attention sometimes.
13  I can't tell you 100 percent.  I would assume that
14  that was the case, but I cannot tell you 100 percent.
15     Q.  For now let's suppose that each prayer has
16  been sectarian.
17     A.  Uh-huh.
18     Q.  Or, if not each, you know, maybe all of them
19  except one have been sectarian.  And let's also
20  suppose that you are a member of the audience who has
21  gone to every board meeting since you joined the
22  board, so since January 2006, February 2006.
23         Do you think it's possible that that
24  individual who has attended each of these board

Page 67

1  meetings and heard a sectarian prayer mentioning Jesus
2  each time would understand the board to be advancing a
3  particular sect?
4      A.  One and four, as you pointed out to me, the
5  combination of both being read prior to, this is
6  probably a very poor choice of words, but almost act
7  as a disclaimer to that, and I think that that could
8  alleviate some of those fears, if you will, but at the
9  same time, anything is possible.
10     Q.  Is paragraph number three read as a part of
11  the disclaimer?
12     A.  No, it's not, not that I recall.
13     Q.  And does paragraph three go to whether or not
14  the prayers -- Is paragraph three the only paragraph
15  that goes to whether or not a prayer could be used to
16  advance a particular faith?
17     A.  Yes.
18     Q.  So, in the absence of hearing paragraph three
19  as part of the disclaimer, is it possible that someone
20  who consistently attends board meetings and hears
21  sectarian prayers would understand the board, even if
22  it's amongst themselves, to be advancing a particular
23  sect?
24     A.  As I said earlier, I would think that one or

Page 68

1  four would help alleviate that, but, yes, it is
2  possible, because many things are possible.
3      Q.  Do you think that it is an appropriate
4  exercise of a board member's authority to pass a
5  policy that protects their own interests in the
6  constitutional right?  Let me rephrase that.
7          Do you think it is an appropriate exercise of
8  board members --
9              (The town fire whistle activated.)
10             MR. HORVATH:  Shall we go off the
11         record while --
12             VIDEOGRAPHER:  Going off the record
13         approximately 4:18 p.m.
14             (A recess was taken.)
15             VIDEOGRAPHER:  Back on the record
16         approximately 4:20 p.m.
17  BY MR. HORVATH:
18     Q.  I will restate my question before we went off
19  the record.  Do you think it's an appropriate
20  exercise of a board member's authority to pass a
21  policy to protect their own individual constitutional
22  rights?
23     A.  Also -- Yes, because it's not just for that
24  sitting board; it could be for boards that followed.

Page 69

1              MR. GOSSELIN:  Do you have an extra
2          copy?
3              MR. HORVATH:  I do.
4  BY MR. HORVATH:
5      Q.  Have you ever seen this document before?
6      A.  I need to --
7      Q.  Okay.
8      A.  The answer is I am not sure if I have read
9  this before or not.  I have read a couple things on
10  ethics and integrity by the I think Ethics and
11  Integrity Commission after being elected.  So I am not
12  sure if it was this exact document, but it seems
13  familiar to me.
14     Q.  To be clear, in the upper right hand corner
15  there are three letters, BDF?
16     A.  Uh-huh.
17     Q.  Do you know what those letters might signify?
18     A.  No, sir, I do not.
19     Q.  Have you ever received any copies of board
20  policies or policies that pertain to board
21  governments?
22     A.  Yes, sir, I have.
23     Q.  And do those policies start with the letter
24  B?

18 (Pages 66 to 69)

Dobrich, et al.                                    Indian River School District, et al.
Randall Hughes                          v.
                              Case No. 15-120                        October 16, 2006

Page 70

1    A.  When I receive those, I read the verbiage,
2    and I have not looked for that, but I bet when I go
3    home I will look and see if they are on there or they
4    will be.
5       Q.  I am going to represent that this is a copy
6    of the school board's, school board member ethics
7    policy.  Under number one on the first page, the third
8    paragraph down, it states that, "The public expects my
9    first and greatest concern to be in the best interests
10   of each and every one of these young people without
11   distinction as to who they are or what their
12   background may be."
13      To be clear, does this paragraph state that
14   the board, a board member's primary concern should be
15   the students of the district?
16      A.  Yes, it does.
17      Q.  And on the second page, the third paragraph
18   down, it says, "To resist every temptation and outside
19   pressure to use my position as a school board member
20   to benefit either myself or any other individual or
21   agency apart from the total interest of the school
22   district."
23      Does that paragraph suggest to you that board
24   members should not operate out of their own individual

Page 71

1    self interests?
2       A.  Yes, it does.
3       Q.  So, with the first paragraph that we read and
4    the last paragraph that we read, should the board, do
5    you feel that it's now appropriate for the board to
6    pass policies that are for the benefit of the board
7    member's individual constitutional rights?
8       A.  Yes, I do, and the reason why --
9       Q.  I was going to say --
10      A.  You want to ask me first?  Okay.  I read that
11   first paragraph on the second page as not to bring or
12   bear influence upon any educational decisions that may
13   be made by staff or superintendents to benefit me
14   personally or a friend or a family member.  That's how
15   I read that paragraph.
16      Q.  But I think you had stated before that it is
17   an appropriate exercise of a board member's authority
18   to pass a policy that protects their own individual
19   constitutional rights?
20      A.  As I said, because of future boards, as well.
21   Protecting constitutional rights is for all of us to
22   do.
23      Q.  And what the board perceives as their own
24   individual rights that don't apply to anyone else in

Page 72

1    the district?
2       A.  To future boards, yes.
3       Q.  Outside of the board?
4       A.  Protecting a constitutional right is
5    everyone's responsibility.
6       Q.  I am going to read to you four prayers.  I am
7    going to want your opinion as to whether or not those
8    prayers violate the policy.
9       The first prayer, "Lord, I pray that you
10   correct the heathens before me now to the truth that
11   comes by knowing you."  Oh, I'm sorry, I misread it.
12   "Lord, I pray that you convert the heathens before me
13   now to the truth that comes by knowing you."
14      A.  Yes, I believe that that -- Again, I am
15   basing this on is that a part of or is that the sole?
16   That's it, period?  Based on those exact words you
17   just said, yes, that could be a conflict.
18      Q.  And why would it be in conflict with policy?
19      A.  I looked at paragraph number three.  It's
20   kind of mean.
21      Q.  It's kind of mean?
22      A.  Kind of mean when you are saying that.
23      Q.  What's mean about it?
24      A.  You are referring to someone as a heathen.

Page 73

1       Q.  Is there -- Suppose it wasn't heathen, it was
2    just "the individuals in front of me."
3       A.  Again, read it without the heathen.
4       Q.  "Lord, I pray that you convert the people
5    before me to the truth that comes by knowing you."
6       A.  Certainly the word convert.
7       Q.  So it's a combination of both heathens and
8    convert that you find problematic?
9       A.  Uh-huh.
10      Q.  And each one individually would pose a
11   problem?
12      A.  Yes, sir, I believe so.
13      Q.  I am going to hand you what has been
14   previously marked as PX35, which reads, "Do not put
15   your trust in princes and mortal men who cannot even
16   save themselves.  When their spirit departs, they
17   return to the ground.  On that very day, their plans
18   come to nothing.  Blessed is he whose help is the God
19   of Jacob, whose hope is in the Lord his God, the maker
20   of heaven and earth, the sea and everything in them,
21   the Lord who remains faithful forever.  He upholds the
22   cause of the oppressed and gives food to the hungry.
23   The Lord sets prisoners free.  The Lord gives sight to
24   the blind.  The Lord lifts up those who are bowed

19 (Pages 70 to 73)

Dobrich, et al.                                     v.                    Indian River School District, et al.
Randall Hughes                              Case No. 15-120                          October 16, 2006

Page 74

1  down. The Lord loves the righteous. The Lord watches
2  over the alien and sustains the fatherless and the
3  widow, but he frustrates the ways of the wicked. For
4  the wages of sin is death, but the gift of God is
5  eternal life through Jesus Christ our Lord."
6      Do you believe that this prayer would be
7  permissible under the policy?
8      A. Yes, sir.
9      Q. How did you make that determination?
10     A. I did not find it offensive.
11     Q. Is that the touchstone you use for whether or
12 not a prayer violates the policy, whether or not you
13 find it offensive?
14     A. I don't see -- Yes, that's the first thing I
15 am going to rely on, how do I perceive that. I do not
16 find it offensive. I don't see where it's violating
17 number three of the policy, paragraph number three.
18     Q. I take it you do not view the prayer in PX35
19 as proselytizing?
20     A. Which one is that?
21     Q. The one I just handed you?
22     A. No, sir, I don't.
23     Q. What does proselytizing mean to you?
24     A. Again, to me it's preaching or negative,

Page 75

1  trying to espouse my views forcefully onto someone
2  else.
3      Q. Do you believe that the last sentence of the
4  prayer is not proselytizing?
5      A. No, I do not.
6      Q. How do you think you would respond to this
7  prayer if you were not a Christian?
8      A. Mr. Horvath, that's very difficult to answer.
9  I would probably rely back on the very first thing
10 that I said, did I find it offensive. No, I did not.
11     Q. If you were not a Christian and you heard,
12 "for the wages of sin is death but the gift of God is
13 eternal life through Jesus Christ our Lord," do you
14 think you would find that offensive?
15     A. In the spirit or in the tone in which you
16 read this, I did not find it offensive, and I don't --
17 It's hard for me to answer that question other than to
18 say I did not find it offensive.
19     Q. Do you think your personal faith as a
20 Christian might impact your views on whether this
21 particular prayer is proselytizing?
22     A. Yes, sir, I am sure that it does.
23     Q. To put a variation on this, suppose the last
24 sentence read, "For the wages of sin is death, but the

Page 76

1  gift of Allah is eternal life through his prophet
2  Muhammed."
3      A. Again, I do not find that offensive. There
4  are more people in this world than I.
5      Q. Uh-huh.
6      A. And, as I said, my religion is very
7  individual, very personal, and other people may find
8  their religion that way, as well, and I don't find it
9  offensive. I wouldn't find it offensive if you insert
10 any other deity that you like.
11     Q. I have another prayer. This has been
12 previously marked PX45. "Heavenly Father, thank you
13 for this great occasion, for the work, the effort, the
14 joys and everything that led up to this point in time.
15 Thank you for your guidance in this event. We pray
16 for your direction in the lives of each of these
17 school board members. We pray that you direct them
18 into the truth and eventually the truth that comes by
19 knowing Jesus. We also pray that you would be with
20 them at this time. We ask these things in Jesus's
21 name. Amen."
22     Do you believe that this prayer would violate
23 paragraph three of the policy?
24     A. No.

Page 77

1      Q. I take it that you do not view this prayer as
2  proselytizing?
3      A. No.
4      Q. And did you reach that conclusion again
5  because you did not find this prayer offensive?
6      A. That and the fact that it specifically states
7  to the board members. It refers specifically to board
8  members.
9      Q. Is your primary concern whether or not a
10 prayer is directed to the board members or mentions
11 anyone outside the board? Is that the first step in
12 your analysis?
13     A. I am not so sure. It's the first step.
14 There may be multiple, multiple steps that consciously
15 I am not able to verbalize to you, but I don't find it
16 offensive, I do not find it's in violation of the
17 policy.
18     Q. And you do not view the phrase, "We pray that
19 you direct them into the truth and eventually the
20 truth that comes by knowing Jesus," as an attempt to
21 convert anyone who is hearing that or convert the
22 board members?
23     A. No.
24     Q. I have one last one. This isn't written

20 (Pages 74 to 77)

Dobrich, et al.                                   v.                    Indian River School District, et al.
Randall Hughes                                                                        October 16, 2006
                                          Case No. 15-120

Page 78

1  down, so if you can't follow along, I will read it
2  again.
3        "Allah, we offer you our school bus drivers,
4  we offer you our superintendent, our administrators,
5  and our secretaries. We offer you our teachers and
6  our parents. Finally, we offer you our students.
7  Peace be unto your prophet, Muhammed." How do you
8  view that prayer?
9        A. I do not find it offensive, and I do not find
10  that it's in violation of this policy.
11       Q. How would you feel if you were in the
12  audience hearing that prayer and hearing that you were
13  being offered to a deity of a different religion?
14       A. I do not find it offensive at all. I don't
15  find it offensive at all.
16       Q. Do you think the school board could open its
17  meetings with a moment of silence instead of a prayer?
18       A. Yes, that is an option.
19       Q. Have you ever discussed with any board member
20  whether the board should open its meetings with a
21  moment of silence?
22       A. No, I have not.
23       Q. If given the opportunity, would you open a
24  board meeting with a moment of silence?

Page 79

1        A. Yes, yes.
2        Q. And, I think we have established before, but
3  I wanted to be clear again, you have never been
4  offered an opportunity to open a meeting with a prayer
5  or a moment of silence?
6        A. Not that I recall, no.
7        Q. Do you know if the board ever considered,
8  didn't discuss with you, but at any point in the past
9  ever considered whether to open its meetings with a
10  moment of silence?
11       A. No, I do not.
12       Q. Can you look at paragraph number two of the
13  policy? It states, "On a rotating basis one
14  individual adult board member per meeting will be
15  given the opportunity to offer up prayer or request a
16  moment of silence. If the member chooses not to
17  exercise this opportunity, the next member in rotation
18  shall have the opportunity."
19       Am I correct that means that if an individual
20  passes, the prayer or moment of silence opportunity
21  will continue on until you get a board member who
22  takes up the opportunity? So, in other words, suppose
23  you pass, and then the next individual in line,
24  suppose Hattier passes, would it continue to pass

Page 80

1  between the board members until a board member chose
2  to open the meeting with a prayer or moment of
3  silence?
4        A. That could be a way that it could happen, but
5  I am not so sure that's how it happens. Like I said,
6  I don't ever being asked to do that.
7        Q. Just as a matter of reading the policy,
8  itself.
9        A. Yeah, I don't know if that's something that
10  could be worked out. I don't know if somebody wanted
11  to say, "I would like to offer the prayer." Perhaps
12  that's how they do it. Like I say, I have not been
13  asked. Oftentimes, I am running late, but I have not
14  been asked.
15       Q. Based on reading paragraph number two of the
16  policy, would you say, would you agree that in order
17  for a board meeting to not open with a prayer or
18  moment of silence, each board member would have to
19  decline the opportunity?
20       A. Yes.
21       Q. Put another way, if at least one board member
22  wants to open the meeting with a prayer, the meeting
23  is going to open with a prayer?
24       A. Yes.

Page 81

1        Q. Under paragraph number five, it states that,
2  "The prayer or moment of silence should be in accord
3  with the freedom of conscience, speech and religion of
4  the individual board member."
5        Is it possible that a board member could
6  decide that he or she wouldn't want the meeting to
7  open with a prayer or moment of silence consistent
8  with their freedom of conscience?
9        A. Yes, that is possible.
10       Q. Would the policy deny them that opportunity,
11  provided that at least one board member wants the
12  meeting to open with a prayer or moment of silence?
13       A. There could be some conflict there, yes.
14       Q. Do you know, and not speaking of yourself, do
15  you know if any board member has declined an
16  opportunity to open a meeting with prayer?
17       A. I do not know.
18       Q. Has a board member ever said they wanted to
19  open a meeting with a prayer but wanted someone from
20  the audience to give the prayer?
21       A. I don't recall that ever happening.
22       Q. Do you think the policy permits someone other
23  than a board member to give the prayer?
24       A. No, I don't think this policy would permit

21 (Pages 78 to 81)

Dobrich, et al.                              v.                    Indian River School District, et al.
Randall Hughes                        Case No. 15-120                        October 16, 2006

Page 82

1   that.
2      Q.   Does the board open its special meetings or
3   its executive sessions with a prayer?
4      A.   Executive session? No, no, sir.
5      Q.   And why is that?
6      A.   I don't know. I would assume that if you go
7   back to paragraph one, the proceedings have already
8   been solemnified, if you will, so -- You can say it
9   better, Jason.
10         MR. GOSSELIN: I keep messing it up.
11         I don't know if it's solemnize or solemnify.
12      A.   Yeah, solemnify. That's much better. It's
13   done once. How many times -- And I know you -- I
14   don't want to -- It's okay to pray more than once,
15   but, you know, how many times in the same course of
16   business would you do that and would you do that?
17      Q.   Since you joined the board, has the board
18   ever met in executive session before the regular
19   meeting?
20      A.   Yes, it has.
21      Q.   Did that executive session open with a
22   prayer?
23      A.   No, it did not.
24      Q.   Why did the board wait until the public

Page 83

1   session to open with a prayer?
2      A.   I don't know.
3      Q.   Did the board deliberate in the executive
4   session?
5      A.   Yes.
6      Q.   Would the prayer have been beneficial in the
7   executive session for those deliberations?
8      A.   That's an individual, each individual has to
9   answer that question.
10      Q.   Were those deliberations conducted in a
11   solemn manner?
12      A.   Some executive sessions are lively. Yes, the
13   overall answer is yes.
14      Q.   So a prayer wasn't necessary for those
15   deliberations to be conducted in a solemn manner?
16      A.   That is correct.
17      Q.   I want to clarify. Have any special meetings
18   been opened with a prayer?
19      A.   Special meetings? Um, I don't think so. I
20   don't think so. Again, I cannot be 100 percent sure
21   on that, but I don't think so.
22      Q.   And, again, has the board or, similarly to
23   before, has the board deliberated during those special
24   meetings?

Page 84

1      A.   Yes.
2      Q.   And was the board able to deliberate in a
3   solemn manner?
4      A.   Again, some of them were more lively than
5   others, but overall, yes.
6      Q.   And a prayer wasn't necessary for those
7   special meetings to be conducted in a solemn manner?
8      A.   That is correct.
9          VIDEOGRAPHER: Going off the record at
10   approximately 4:46 p.m.
11          (A recess is taken.)
12          VIDEOGRAPHER: Back on the record
13   approximately 4:51 p.m.
14   BY MR. HORVATH:
15      Q.   Is it correct that you had to run for
16   re-election this year?
17      A.   Yes. I had to run to be elected since I was
18   appointed.
19      Q.   Okay. Was your campaign contested?
20      A.   Yes.
21      Q.   During the campaign did anyone discuss with
22   you school board prayer?
23      A.   From media? Are you referring to the media.
24      Q.   We will start with media.

Page 85

1      A.   Yes, I received lots of questions from a lot
2   of different local newspapers. One of the questions a
3   lot of times did deal with the prayer issue and my
4   feelings. Since I had already been appointed to the
5   board and I was operating under the gag order, my
6   response was, "Pending litigation, I am just not at
7   liberty to discuss that."
8      Q.   Did anyone from the public ask you about
9   board prayer?
10      A.   If they did, my answer was, "There is a gag
11   order, pending litigation, we can't talk about that."
12   I don't have that many -- There was no campaign --
13   There was no stump speeches made or anything like
14   that.
15          Just you might see someone in the supermarket
16   and talk to them about some school board issues, but I
17   don't recall that being a very specific question asked
18   to me.
19      Q.   Do you think it's understood by the public
20   that you support board prayer?
21      A.   No, I wouldn't necessarily say that that's
22   understood. And are you implying that I do support
23   school prayer?
24      Q.   Okay, maybe I will --

22 (Pages 82 to 85)

Page 86

1    MR. GOSSELIN: He said board prayer.
2    THE WITNESS: Oh, board prayer?
3    MR. HORVATH: Yeah.
4    THE WITNESS: Oh, okay.
5    MR. GOSSELIN: You mean the policy.
6    MR. HORVATH: Yes.
7    MR. GOSSELIN: This policy here.
8    THE WITNESS: Okay. Okay.
9  BY MR. HORVATH:
10    Q. So, to be clear on this, do you think the
11  public understands you to support policy BDA.1 in the
12  board's prayer practice?
13    A. Probably.
14    Q. And do you think they understood that during
15  the election?
16    A. I am not -- I don't know. I didn't -- Like I
17  said, when it came to any talk about the litigation, I
18  didn't say a word about it.
19    Q. Do you know what your opponent's view on
20  board prayer was?
21    A. Yes, he was to stop board prayer, stop -- It
22  was kind of a bit skewed in that it was drawn out to
23  include school prayer, prayer in school, took on a
24  whole different light. I think perhaps the gentleman

Page 87

1  was a bit misinformed.
2    Q. You refer to the gag order. This gag order
3  didn't prevent you from telling your constituents
4  whether or not you supported board prayer? Did you
5  tell constituents that the gag order prevented you
6  from --
7    A. Yeah, my answers that I put out to the
8  newspapers were that I didn't want to discuss that
9  topic or I couldn't discuss that because of pending
10  litigation.
11    Q. Let's go back to your opponent. Am I
12  correct, at the very least, that the perception became
13  that he opposed board prayer?
14    A. Yeah, I believe think that would be --
15    Q. And that was an accurate representation --
16  I'm sorry, I guess I should have let you finish.
17    A. Yes.
18    Q. And was that an accurate representation of
19  what you understood his position to be?
20    A. Yes.
21    Q. Do you believe that affected the campaign?
22    A. My opponent had some, quite a few different
23  ideas. I am not so sure that one particular answer
24  that he gave led to his demise. I am not so sure.

Page 88

1    Q. Did anyone from the community tell you that
2  they were not going to vote for him because he opposed
3  board prayer?
4    A. I don't recall. Well, people who supported
5  me said, "I am going to vote for you." They didn't
6  say, "I am going to vote for you because of X, Y or
7  Z."
8    Q. Did anyone say they were going to vote for
9  you because you supported board prayer?
10    A. No, I don't recall having that conversation
11  with anyone.
12    Q. Do you believe that someone could get, in the
13  2006 election, do you believe that anyone could have
14  been elected to the board who openly opposed board
15  prayer?
16    A. If you articulate your point of view and some
17  of the reasons behind it, perhaps, yes.
18    Q. Has anyone told you that they see this case
19  as about protecting Christian values?
20    A. Yes, I have heard that. Have they told me
21  that? I don't -- I have not been told that, but I
22  have kind of heard. Again, that's like supermarket or
23  Wawa coffee stand talk sometimes. You kind of hear
24  these kinds of things.

Page 89

1    Q. Have these things been told to you, or did
2  you overhear it?
3    A. Well, if I heard it, then it was told to me.
4  But, again, it wasn't someone grabbing me by the shirt
5  collar and saying, "This is about maintaining
6  Christian values and beliefs."
7    Q. Did anyone say that the board's prayer
8  practice, itself, was about protecting Christian
9  values?
10    A. I don't recall that, that terminology being
11  used.
12    Q. Do you think people understand this case as
13  involving the board prayer policy?
14    A. To be perfectly honest with you, I think
15  there is a lot of misinformation. A lot of people are
16  out there and don't have all the information from
17  which to make a decision on this. Shortsightedness, a
18  particular mind set, but the perception out there is
19  it comes down to a single issue or something that it
20  may or may not be, so I think -- I don't know if the
21  gag order was helpful or not with people not going out
22  and talking about it.
23    Q. What's the single issue that you believe the
24  public perceives this case is about?

23 (Pages 86 to 89)

Dobrich, et al.                          v.              Indian River School District, et al.
Randall Hughes                    Case No. 15-120                      October 16, 2006

Page 90

1    A.  I believe the public thinks this is about
2    prayer in schools.
3        Q.  Have you ever heard anyone say that this case
4    is about prayer?
5        A.  Mr. Horvath, I can't sit here and tell you
6    that I have heard that.  I just -- I believe that the
7    perception out there in the public is that this case
8    is about prayer in schools.
9        Q.  Do you know if any school board member has
10   campaigned for election or re-election on the ground
11   that they support school board prayer?
12       A.  We had several elections last time.  I have a
13   lot of things going on.  I didn't have an opportunity
14   to follow everyone else's campaign, if you will call a
15   school board election a campaign.  How and what
16   exactly they said or didn't say at their different
17   functions, I don't know.
18       Q.  You mentioned before what you characterized
19   as a misrepresentation that this case is about prayer
20   in schools.  Have you done anything to correct that
21   mis-perception?
22       A.  Again, how I refer to anything that's brought
23   up about this case is there is a gag order.  My
24   responses are very limited, pretty much to zero, and

Page 91

1    there are many sides to every story and there are many
2    facets to this particular case.
3        Q.  Do you believe that a gag order is still in
4    place?
5        A.  Yes, I am operating under that -- I am going
6    to operate under that until otherwise directed by
7    either Jason or a judge.
8        Q.  Has anyone told you that a gag order is no
9    longer in place, aside from your attorneys or a judge?
10       A.  No.  Has anyone ever -- I'm sorry, say that
11   again, please.
12       Q.  Has, aside from your attorneys or a judge,
13   has anyone told you that a gag order is no longer in
14   place?
15       A.  There was some discussion in an executive
16   session if there was or there wasn't, but the bottom
17   line it came down to, as I left there, my
18   understanding was that there was, do not discuss.
19       Q.  And you have continued to operate under that
20   assumption since then?
21       A.  That's the way I have been operating, yes,
22   sir.
23       Q.  Has anyone told you they believe the ACLU is
24   involved with this case?

Page 92

1    A.  I believe at executive sessions there have
2    been some mention that the ACLU is behind this case,
3    yes.
4        Q.  Do you believe that the ACLU is behind this
5    case?
6        A.  I don't know that for a fact.
7        Q.  Have you ever discussed with someone in the
8    community as to whether or not the ACLU is involved in
9    this case?
10       A.  No, sir.
11       Q.  Has anyone told you that they see this case
12   as standing up to the ACLU?
13       A.  No, I don't recall having that conversation.
14       Q.  Which board members told you that the ACLU
15   was involved with this case?
16       A.  Again, I think that's a discussion in
17   executive session, and I cannot -- I feel like I am
18   pointing fingers, because I am not 100 percent sure,
19   but I believe that perhaps Nina Lou Bunting may have
20   mentioned that.
21       Q.  Have any of the board members described the
22   ACLU as anti Christian?
23       A.  No, I don't recall hearing that.
24       Q.  Has anyone in the public described the ACLU

Page 93

1    as anti Christian that you are aware of?
2        A.  Not that I am aware of, but you have to
3    remember that not that long ago our community, the
4    Seaford, western Sussex community had a visit from
5    Westboro Baptist Church at a soldier's funeral which
6    did, if you will, muddy the waters with some ACLU
7    things were bantering around about that.  So I don't
8    remember the public ever telling me anything about
9    ACLU and the school district, but it has been used in
10   that context with Westboro Baptist Church.
11       Q.  Could you explain a little bit more what
12   happened in that context?
13       A.  The Westboro Baptist Church?
14       Q.  Yes, please.
15       A.  Pretty inflammatory comments being made,
16   viewed as derogatory by the public, towards the family
17   and to the soldier that had been killed.
18       Q.  And how did the ACLU become involved in that?
19       A.  The perception was either it was or it
20   wasn't -- I don't know if the perception was that
21   they were protecting the Westboro Baptist Church,
22   they were the legal arm of the Westboro Baptist
23   Church.  I don't know for a fact if that's factual or
24   not.

24 (Pages 90 to 93)

Dobrich, et al.                                    Indian River School District, et al.
Randall Hughes                                                  October 16, 2006

v.
Case No. 15-120

Page 94

1    Q.  So people understood -- To understand your
2    testimony there, you understand the public perceptions
3    being the ACLU was protecting an organization that was
4    making disparaging comments about a dead soldier or
5    the soldier's family?
6        A.  That's the perception that I had heard, yes,
7    sir.
8        Q.  And at any point during that -- At any point
9    in that series of events did anyone make a reference
10   to the ACLU as anti-Christian?
11       A.  No, I have not heard ACLU anti-Christian, no.
12       Q.  Okay.  Have you discussed with anyone whether
13   the 2006 election was an enforcement of the stance the
14   school board has taken in support of school board
15   prayer?
16       A.  No.
17       Q.  Have you ever heard anyone say that?
18       A.  Not to me.  My stance, if I can go for a
19   little bit further, construction costs, the huge
20   amount of monies we spend as a school district in
21   construction and projects.  All right?  I am the
22   construction guy.
23           I think that we have to hold some folks
24   accountable with their tax dollars in building some

Page 95

1    good schools and making some wise decisions.  A lot of
2    my -- A lot of my campaign was along those avenues.
3        Q.  You limited your answer on that to your
4    campaign and your interests on the school board.  Can
5    we expand that to the other school board members who
6    were either elected or reelected in 2006?  In other
7    words, have you discussed with anyone whether their
8    election or re-election was an endorsement of the
9    stance the school board has taken in support of school
10   board prayer?
11       A.  No, I have not.
12       Q.  And you have heard --
13       A.  I have not discussed that with them.
14       Q.  With anyone from the public?
15       A.  No.
16       Q.  Do you know if school board members
17   campaigned stating that they were, a vote for them
18   would be a vote for prayer in fighting the ACLU?
19       A.  I do not know that to be a fact.
20           MR. HORVATH:  Thank you very much.  I
21   don't think I have any more questions.
22           THE WITNESS:  Thank you.
23           VIDEOGRAPHER:  Deposition ending
24   approximately 5:06 p.m.

Page 96

1                CERTIFICATE
2        I, Lorena J. Hartnett, a Notary Public and
3    Registered Professional Reporter, do hereby certify
4    that the witness, RANDALL HUGHES, was by me first
5    duly sworn to testify the truth, the whole truth, and
6    nothing but the truth; that the foregoing deposition
7    was taken at the time and place stated herein; and
8    that the said deposition was recorded stenographically
9    by me and then reduced to typewriting under my
10   direction, and constitutes a true record of the
11   testimony given by said witness.
12       I further certify that the inspection,
13   reading and signing of said deposition was not waived
14   by counsel for the parties and by the witness.
15       I further certify that I am not a relative,
16   employee, or attorney of any of the parties or a
17   relative or employee of either counsel, and that I am
18   in no way interested directly or indirectly in this
19   action.
20       IN WITNESS WHEREOF, I have hereunto set my
21   hand and affixed my seal of office on this 20th day of
22   October 2006.
23
24       Cert. #134-RPR, Exp. 01-31-2008

25 (Pages 94 to 96)