# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

MONA DOBRICH and MARCO　　　　　:
DOBRICH, individually and as parents　:
and next friend of ALEXANDER　　　　:
DOBRICH, SAMANTHA DOBRICH,　　:
JANE DOE and JOHN　　　　　　　　:
DOE, individually and as parents and　　:
next friend of JORDAN DOE and　　　　:
JAMIE DOE,　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　:
　　　Plaintiffs,　　　　　　　　　　:
　　　　　　　　　　　　　　　　　:
　　　　　　v.　　　　　　　　　　　:　　Civ. Action No. 05-cv-00120-JJF
　　　　　　　　　　　　　　　　　:
THE INDIAN RIVER SCHOOL BOARD, et al.,　:
　　　　　　　　　　　　　　　　　:
　　　Defendants.　　　　　　　　　:

---

## ANSWERING BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

---

May 8, 2008

Warren Pratt (Del. Bar No. 4334)
DRINKER BIDDLE & REATH LLP
1100 N. Market Street
Suite 1000
Wilmington, DE 19801
Telephone:　(302) 467-4200
Facsimile:　(302) 467-4201

Jason P. Gosselin
Katherine L. Villanueva
Elizabeth L. McLachlan
DRINKER BIDDLE & REATH LLP
One Logan Square
18th & Cherry Streets
Philadelphia, PA 19103-6996
(215) 988-2700

## TABLE OF CONTENTS

**Page**

Table of Contents ................................................................................................ i

Table of Authorities ............................................................................................ ii

I.     INTRODUCTION ...................................................................................1

II.    RESPONSE TO PLAINTIFF'S "STATEMENT OF FACTS" ............................2

       A.  The Indian River School Board As Legislative Body ...................................2

             1.     Indian River School District ...........................................................2

             2.     Indian River School Board ...............................................................3

                    a.     Popular Election of Board Members .............................3

                    b.     Structure and Operations of Board ..............................4

                    c.     Setting Policy for District ............................................5

                    d.     Power to Levy Taxes and Authorize Expenditures ..........6

                    e.     Elected and Representative Body .................................6

       B.  Board Prayer Practice and Policy ...................................................7

             1.     Practice Prior to Adoption of Current Policy ............................7

             2.     Adoption of Board Prayer Policy ..............................................8

                    a.     Context of Board Prayer .............................................9

                    b.     Non-Compulsory Nature of Prayer ..............................10

                    c.     Content of Prayers.....................................................11

                    d.     Purpose of Prayers ...................................................12

**TABLE OF CONTENTS**
(continued)

**Page**

III.    LEGAL STANDARD ................................................................................13

IV.    ARGUMENT ........................................................................................15

    A.  *Lemon v. Kurtzman* ....................................................................16

        1.    Secular Purpose ..........................................................16

        2.    Primary Effect ............................................................22

        3.    Enlargement ...............................................................25

    B.  Endorsement Test ......................................................................28

    C.  Coercion Test ...........................................................................31

    D.  *Marsh v. Chambers* ..................................................................34

V.    CONCLUSION ....................................................................................37

# TABLE OF AUTHORITIES

## CASES

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)................................................................................................14

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)...........................................................................................13, 14

*Chadhuri v. Tennessee*,
   130 F.3d 232 (6th Cir. 1997) ................................................................................22

*Child Evangelism Fellowship v. Stafford Twp.*,
   386 F.3d 514 (3d Cir. 2004)..................................................................................26

*County of Allegheny v. American Civil Liberties Union*,
   492 U.S. 573 (1989)................................................................................................37

*Doe v. Tangipahoa Parish Sch. Bd.*,
   473 F.3d 188 (5th Cir. 2006) ............................................................................ 16-17

*Fireman's Ins. Co. v. Du Fresne*,
   676 F.2d 965 (3d Cir. 1982)....................................................................................14

*Gillette v. United States*,
   401 U.S. 437 (1971)................................................................................................16

*Ind. Civ. Liberties Union v. O'Bannon*,
   259 F.3d 766 (7th Cir. 2001) ................................................................................28

*Lee v. Weisman*,
   505 U.S. 577 (1992)...........................................................................................31, 32

*Lynch v. Donnelly*,
   465 U.S. 668 (1984).................................................................................15, 22, 28, 31

*Marsh v. Chambers*,
   463 U.S. 783 (1983)........................................................................................ *passim*

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986)................................................................................................13

*McCreary County v. ACLU*,
   545 U.S. 844 (2005)................................................................................................16

*Modrovich v. Allegheny County,*
    385 F.3d 397 (3d Cir. 2004).............................................................28

*Peck v. Upshur County Bd. of Ed.,*
    155 F.3d 274 (4th Cir. 1998) ...........................................................26

*Snyder v. Murray City Corp.,*
    159 F.3d 1227 (10th Cir. 1998) ........................................................37

*Tenafly Eruv Ass'n v. Borough of Tenafly,*
    309 F.3d 144 (3d Cir. 2002)......................................................28, 29

*Van Orden v. Perry,*
    545 U.S. 677 (2005).........................................................................16

*Verbena United Methodist Church v. Chilton County Board of Ed.,*
    765 F. Supp. 704 (M.D. Ala. 1991) .................................................26

## RULES & CODES

Fed. R. Civ. P. 56(c) ..........................................................................13

Del. Const. art. XIV, § 1 ......................................................................4

Del. Code Ann. tit. 14, § 1043 .............................................................5

Del. Code Ann. tit. 14, § 1048(a)..........................................................4

Del. Code Ann. tit. 14, § 1048(b) ........................................................4

Del. Code Ann. tit. 14, § 1048(c).........................................................5

Del. Code Ann. tit. 14, § 1050 .............................................................6

Del. Code Ann. tit. 14, § 1053(a)..........................................................4

Del. Code Ann. tit. 14, § 1055 .............................................................6

Del. Code Ann. tit. 14, § 1068(a)..........................................................3

Del. Code Ann. tit. 14, § 1068(b) ........................................................3

Del. Code Ann. tit. 14, § 1068(g) ........................................................3

Del. Code Ann. tit. 14, § 1068(f) ...................................................................4

Del. Code Ann. tit. 14, § 1701 .......................................................................6

Del. Code Ann. tit. 14, § 1702 .......................................................................6

Del. Code Ann. tit. 14, § 1902 .......................................................................6

Del. Code Ann. tit. 14, § 1916 .......................................................................6

## OTHER AUTHORITIES

*Webster's New World Dictionary*, 1276 (College ed. 1988) ..............................................21

## I.    <u>INTRODUCTION</u>

The only issue in this case that has not yet been resolved is whether the Indian River School Board's ("Board") practice of opening its regular Board meetings with a prayer or moment of silence is constitutional.  Plaintiffs maintain that this practice is inherently religious and runs afoul of the Establishment Clause.  Defendants maintain that this is part of a tradition that is as old as our nation itself, and that the Supreme Court decision in *Marsh v. Chambers* applies.  The issue before the Court matters not just to parties in this case.  Other school districts and the public at large have a stake in the outcome.  This is the sort of issue where men and women of good faith can and often do disagree.  It is a disappointment that Plaintiffs' brief in support of their Motion for Summary Judgment is not worthy of this important debate.

As an initial matter, Plaintiffs filed with their motion a certification that all of the facts upon which the motion is based are not in dispute.  However, the Statement of Facts included in Plaintiffs' brief can hardly be called undisputed.  Quite to the contrary, it is a statement of argument with occasional, and often misleading, citations to portions of certain deposition transcripts.  Moreover, Plaintiffs' Statement of Facts and other portions of Plaintiffs' brief constitute an *ad hominem* attack on the Board members themselves.  The foundation of Plaintiffs' motion is that the Board members are perpetrating a "sham" – that they are lying about the purpose of the Board prayer policy to cover up the "true" purpose, which emanates from their own religious bigotry or that of the Sussex County community.

This is unfortunate.  Plaintiffs' attorneys have made great and often admirable efforts to protect their clients from disparagement resulting from the public nature of a lawsuit that Plaintiffs themselves filed.  Yet, Plaintiffs' attorneys have used their summary judgment motion to belittle the Board members – volunteers who donate their time and talent for the benefit of a

school district that educates more than 8,000 youth – and to accuse them of deceiving the Court as well as their own constituents.  Defendants deserve better.  And so do Plaintiffs.

Wholly apart from the negative and unprofessional tenor of Plaintiffs' papers, Plaintiffs' attorneys certainly understand the standard for a summary judgment motion.  Even if Plaintiffs feel they have reason to disbelieve the testimony of Board members and other school administrators, Plaintiffs' attorneys should know better than to premise a summary judgment motion not on testimony, but on an *argument* that the testimony is not credible.  For these and other reasons, Plaintiffs' Motion for Summary Judgment should be denied.

## II.    RESPONSE TO PLAINTIFFS' "STATEMENT OF FACTS"

In connection with the filing of this Answering Brief, Defendants have also filed an opposition to Plaintiffs' certification of uncontested facts.  As set forth in the opposition, Plaintiffs' "Statement of Facts" is argumentative and contains minimal references to the record. Defendants therefore oppose Plaintiffs' "Statement of Facts," and Defendants offer the following undisputed statement of facts:

### A.    The Indian River School Board As Legislative Body

#### 1.    Indian River School District

In 1969, the Indian River School District ("District") was formed through the consolidation of five different school districts.  *See* Declaration of Charles H. Mitchell at ¶4, attached hereto as Exhibit A; *see also* Deposition of Nina Lou Bunting at 99, attached hereto as Exhibit B.  Currently, the District is divided into five separate electoral districts serving the towns of Selbyville, Frankford, Dagsboro, Gumboro, Fenwick Island, Bethany Beach, Ocean View, Millville, Millsboro, and Georgetown.  *See* Del. Code Ann. tit. 14, § 1068(b) (2008).  The District is composed of fourteen schools.  *See* Declaration of Susan Bunting at ¶12, attached

hereto as Exhibit C.  The District has approximately 8,388 students and approximately 646 full-time teachers.  *See* Exhibit C (Declaration of Susan Bunting at ¶11).  The District is governed by an elected ten-member school board.  *See* Del. Code Ann. tit. 14, § 1068(a).

### 2. <u>Indian River School Board</u>

a. <u>Popular Election of Board Members</u>

Each of the five electoral districts within the District elects two Board members.[1]  *See* Del. Code Ann. tit. 14, § 1068(a); Deposition of Charles Bireley at 182, attached hereto as Exhibit D.  Board members are elected by qualified electors of the five districts.  *See* Del. Code Ann. tit. 14, § 1068(g).  Board members swear the following oath before entering upon the duties of their office:

> I do solemnly swear (or affirm) that I will support the Constitution of the United States of America and the Constitution of the State of Delaware, and that I will faithfully discharge the duties of the office of school board member according to the best of my ability; and I do further solemnly swear (or affirm) that I have not directly or indirectly paid, offered or promised to pay, contributed, or offered or promised to contribute, any money or other valuable thing as consideration or reward for the giving or withholding a vote at the election at which I was elected to said office, so help me God (or so I affirm).

---

[1] The School Board members are**:**

a.      District Number 1: Dustin D. Davis; Robert D. Wilson;
b.      District Number 2: Kelly R. Willing; Patricia S. Oliphant;
c.      District Number 3: Nina Lou Bunting; Randall Hughes II;
d.      District Number 4: Charles M. Bireley, President; Donald G. Hattier;
e.      District Number 5: Reginald L. Helms, Vice President; Donna M. Mitchell.

Indian River School Board, http://www.irsd.net/board.cfm (last visited Apr. 8, 2008).

*See* Del. Code Ann. tit. 14, § 1053(a).[2]  Each Board member serves a term of three years.  *See id*.

§ 1068(f).

b.    Structure and Operations of Board

The Board holds regular public meetings at least once per month.  *See* Del. Code Ann. tit.

14, § 1048(a) ("Regular meetings of the school board shall be held each month during the year at

the regular meeting place designated by the school board.").  The Board also holds special

meetings as needed.  *Id*. § 1048(b) ("Special meetings of the school board may be held whenever

the duties and business of the school board may require.").  The Board performs numerous

functions in governing the District, including, but not limited to, adopting the curriculum for

each of the schools within the District; developing District-wide policies; selecting and

purchasing textbooks; preparing reports required by the State Secretary of Education; appointing

and dismissing personnel for the District; approving the use of District facilities; adjudicating

significant student or employee disciplinary actions; levying taxes and adopting the District's

annual budget; and monitoring the progress of construction projects.  *See* Exhibit D[3] (Bireley

---

[2] This oath is similar to the oath sworn by members of the Delaware General Assembly and all executive and judicial officers before entering upon the duties of their respective offices, which oath is set forth in the Delaware Constitution as follows:

> I, . . . do proudly swear (or affirm) to carry out the responsibilities of the office of . . . (name of office) . . . to the best of my ability, freely acknowledging that the powers of this office flow from the people I am privileged to represent.  I further swear (or affirm) always to place the public interests above any special or personal interests, and to respect the right of future generations to share the rich historic and natural heritage of Delaware.  In doing so I will always uphold and defend the Constitutions of my Country and my State, so help me God.

Del. Const. art. XIV, § 1.

[3] Unless otherwise indicated, the exhibits referenced herein refer to the exhibits attached to Defendants' Opening Brief in support of their Motion for Summary Judgment.

Dep. at 9-17); Deposition of Donald Hattier at 127, 133-37, 331, attached hereto as Exhibit E.  In order for the Board to transact any business at its regular monthly meetings, there must be a quorum consisting of a majority of the members on the Board.  *See* Del. Code Ann. tit. 14, § 1048(c).

c.    <u>Setting Policy for District</u>

The development and adoption of District policies is one function of the Board. Typically, policies emanate from the Policy committee, which is a subcommittee of the entire Board.  *See* Del. Code Ann. tit. 14, § 1043 (school boards of the reorganized school districts "shall have the authority to determine policy and adopt rules and regulations for the general administration and supervision of the free public schools"); *see also* Exhibit C (S. Bunting Dec. at ¶5).  In addition to the Board members, certain District personnel and community members serve on the Policy committee.  *Id*. at ¶6.  The Policy committee meets separately from the full Board approximately once per month.  In these meetings, the Policy committee, among other things, studies proposed policies, analyzes the need for new policies, and prepares drafts of new policies.  *Id.* at ¶7.  In order for a new policy to be presented to the full Board for consideration, it must first be endorsed by the Policy committee members.  The Policy committee chair then presents the recommendations of the committee to the full Board.  After a new policy is presented for adoption, the Board will conduct a public first reading of the proposed policy.  *Id.* at ¶9.  At the next regularly scheduled Board meeting, the Board will conduct a second reading of the proposed policy.  *Id.* at ¶9.  After the second reading, the Board may vote to adopt the proposed policy.  *Id.* at ¶10.  Approved policies are included in the Policy Manual.

d.    <u>Power to Levy Taxes and Authorize Expenditures</u>

The District, which acts through its elected Board, is empowered to levy and collect taxes

- 5 -

for school purposes.  *See* Del. Code Ann. tit. 14, § 1902 (stating that "[a]ny district may, in addition to the amounts apportioned to it by the Department of Education or appropriated to it by the General Assembly, levy and collect additional taxes for school purposes upon the assessed value of all taxable real estate in such district" except certain exempt real estate).  The District fixes the rate of taxation based on the total value of all taxable property as shown on the county assessment list.  *See id.* § 1916.

In addition to the money received through taxation, the District also receives appropriations from the General Assembly.  *See* Del. Code Ann. tit. 14, §§ 1701, 1702.  The appropriations are for the support, maintenance and operation of the free public schools.  *See id.* § 1702(a).  The District uses the appropriations for various purposes, including employing personnel, school costs such as library resources, energy, and educational advancement.  *See id.*, § 1702.  The Board also has other spending powers; for example, the Board is required to spend money for the maintenance of school property.  *See* Del. Code Ann. tit. 14, § 1055 ("school board shall make all repairs to school property, purchase all necessary furniture and provide for adequate heating and proper ventilation of the buildings").  It also has the duty to file a district report with the Department of Education, in which the Board is encouraged to include information on the expenditures, revenues, and business and financial transactions of the previous fiscal year.  *See* Del. Code Ann. tit. 14, § 1050.

### e.    Elected and Representative Body

As members of an elected body, Board members attempt to be responsive to the needs of their constituents.  *See, e.g.,* Exhibit B (N. Bunting Dep. at 98) ("[Constituent feedback] is important to me because I represent these people and they elected me to make decisions at the Board level on their behalf, and I represent my people.").  As with other elected, deliberative

bodies, constituent preferences play a role in the Board's decision-making. *See* Exhibit E

(Hattier Dep. at 299) (testifying that if his constituents do not agree with his decisions, then

"come election time[,] they are free to elect someone else"). In 1994, in order to ensure greater

constituent feedback, the Board added a public comments segment to the regularly scheduled

meetings. *See* Exhibit D (Bireley Dep. at 36-37) ("[I]t was important for people in the

community to come and talk to us about things that was on their minds, concerns or anything like

that or have input.").

### B.    Board Prayer Practice and Policy

#### 1.    Practice Prior to Adoption of Current Policy

Opening school board meetings with a prayer to solemnize the proceedings is a tradition

that predates the District itself. *See* Exhibit A (C. Mitchell Dec. at ¶¶3-4, 8) (stating, for

example, Millsboro School Board opened its meetings with a prayer prior to 1969 consolidation);

Deposition of Donna Mitchell at 12, attached hereto as Exhibit F ("My grandfather was on the

school board when I was a young child in school, and they opened the meetings with prayer at

that time, and that's over 50 years ago."). Since the formation of the District, the Board has

opened each regular meeting with a prayer. *See* Exhibit A (C. Mitchell Dec. at ¶8). This

practice has continued uninterrupted from the creation of the current district in 1969 to the

present. *See id*. at ¶¶8-9; Exhibit D (Bireley Dep. at 52); *see also* Deposition of Dr. Mark Isaacs

at 25, attached hereto as Exhibit G ("For as long as I was a student, even back in Sussex Central

High School, board meetings were always opened with a prayer"). The usual custom was for the

board president to designate one person at each meeting to lead the group. *See* Exhibit D

(Bireley Dep. at 57, 59); Exhibit A (C. Mitchell Dec. at ¶10). Historically, the Board did not

place any restrictions relating to the content of the prayer. *See* Exhibit D (Bireley Dep. at 57);

Exhibit A (C. Mitchell Dec. at ¶11).

## 2.    Adoption of Board Prayer Policy

In the summer of 2004, after receiving a complaint from Plaintiff Mona Dobrich (who has since dismissed her claims regarding Board prayer), the Board reviewed its policy of opening its regular Board meetings with a prayer.  On October 19, 2004, the Board formally adopted a policy entitled Board Prayer At Regular Board Meetings ("Board Prayer Policy").  *See* Exhibit D (Bireley Dep. at 96).  That policy provides as follows:

> 1.    In order to solemnify its proceedings, the Board of Education may choose to open its meetings with a prayer or moment of silence, all in accord with the freedom of conscience of the individual adult Board member.
>
> 2.    On a rotating basis one individual adult Board member per meeting will be given the opportunity to offer a prayer or request a moment of silence.  If the member chooses not to exercise this opportunity, the next member in rotation shall have the opportunity.
>
> 3.    Such opportunity shall not be used or exploited to proselytize, advance or convert anyone, or to derogate or otherwise disparage any particular faith or belief.
>
> 4.    Such prayer is voluntary, and it is among only the adult members of the Board.  No school employee, student in attendance, or member of the community in attendance shall be required to participate in any such prayer or moment of silence.
>
> 5.    Any such prayers may be sectarian or non-sectarian, denominational or non-denominational, in the name of a Supreme Being, Jehovah, Jesus Christ, Buddha, Allah, or any other person or entity, all in accord with the freedom of conscience, speech and religion of the individual board member, and his or her particular religious heritage.

*See* Board Prayer Policy, attached hereto as Exhibit H.

a.    Context of Board Prayer

Each Board meeting usually opens with a call to order and a roll call of the Board

members.  *See, e.g.*, November 16, 2004 Board meeting minutes, attached hereto as Exhibit I.

Next, the meeting's agenda is approved.  *See id.*  Following the approval of the meeting agenda

is the Presentation of Colors.  *See id.*  After the Presentation of Colors, one Board member will

offer a prayer, moment of silence, or other solemnizing appeal in accordance with the policy.

*See  id.*  This usually takes less than a minute or two.  *See, e.g.*, Audio tape: June 20, 2006 Indian

River School District Board Meeting (June 20, 2006) (produced to plaintiffs as BDP 1321-1322);

Exhibit C (S. Bunting Dec. at ¶13).  After the Board prayer, the Board moves forward with the

business at hand, beginning with the approval of the minutes from the previous Board meeting.

*See, e.g.*, Exhibit I (November 16, 2004 Board meeting minutes).

It has become customary since the adoption of the current Board Prayer Policy for the

board president to offer a disclaimer between the Presentation of Colors and the prayer to ensure

that any members of the public in attendance understand the purpose of the prayer policy.  For

example, on November 16, 2004, at the first Board meeting following the adoption of the policy,

the Board president made the following statement:

> It is the history and custom of this Board that, in order to solemnify
> the School Board proceedings, that we begin with a moment of
> prayer, in accord with the freedom of conscience of the individual
> adult members of the Board.  Further, such prayer is voluntary and
> just among the adult members of the School Board.  No school
> employee, student in attendance or member of the community is
> required to participate in any such prayer or moment of silence.

*See* Transcribed minutes of November 16, 2004 Board meeting, attached hereto as Exhibit J.

Although this disclaimer is not required by the Board Prayer Policy itself, since November 16,

2004, a disclaimer has been read in conjunction with the opening prayer at each regular Board

meeting.  *See* Exhibit D (Bireley Dep. at 104-05) (stating that, as board president, he has offered

disclaimer at every meeting).

b.    <u>Non-Compulsory Nature of Prayer</u>

Although the Board Prayer Policy provides that the prayer will be offered by Board

members on a rotating basis, no Board member is forced to pray or otherwise lead the Board.

*See* Deposition of Harvey L. Walls at 69, attached hereto as Exhibit K (stating that he declined to

offer prayer or lead group); *see also* Exhibit D (Bireley Dep. at 154) (stating that he has always

declined to offer prayer or moment of silence based on personal preference).  Moreover, the

Board does not require members of the public to participate in the prayer.  *See* Exhibit K (Walls

Dep. at 52) ("I have no expectation for the audience. . . . They can do whatever they wish");

Deposition of Lois Hobbs at 207-08, attached hereto as Exhibit L (describing the disclaimer

portion of the Board Prayer policy that states, "No school employee, student in attendance, or

member of the community in attendance shall be required to participate in any such prayer or

moment of silence," Ms. Hobbs views such statement as allowing them to get up and leave, "just

not participate," not bow their heads, or arrive after the prayer has concluded).  The length of

time the Board spends in the opening prayer is relatively brief in comparison to the length of the

Board meetings.  For example, the June 20, 2006 meeting lasted more than five and a half hours,

while the prayer lasted only sixty-two seconds.  *See* June 20, 2006 Board meeting minutes,

attached hereto as Exhibit M; Audio tape: June 20, 2006 Indian River School District School

Board Meeting (June 20, 2006) (produced to plaintiffs as BDP 1321-1322); Exhibit C (S.

Bunting Dec. at ¶13).

c.     <u>Content of Prayers</u>

With the adoption of the current policy, the Board has continued its tradition of allowing

Board members to participate as they choose without dictating the content of the prayers.  *See*

Exhibit H (Board Prayer Policy at ¶5) ("Any such prayers may be sectarian or non-sectarian,

denominational or non-denominational, in the name of a Supreme Being, Jehovah, Jesus Christ,

Buddha, Allah, or any other person or entity, all in accord with the freedom of conscience,

speech and religion of the individual board member, and his or her particular religious

heritage.").  In some instances, the prayers have referenced historical figures.  For example, on

November 16, 2004, Board member Dr. Donald Hattier quoted from George Washington's 1789

inaugural address:

> "Such being the impression under which I have, in obedience to
> the public summons, repaired to the present station, it would be
> peculiarly improper to omit in this first official act, my fervent
> supplications to that Almighty Being who rules over the universe,
> who presides in the councils of nations, and whose providential
> aids can supply every human defect, that His benediction may
> consecrate to the liberties and happiness of the people of the
> United States a Government instituted by themselves for these
> essential purposes, and may enable every instrument employed in
> its administration to execute with success the functions allotted to
> his charge."  As we sit here tonight, fellow Board members, I must
> ask for the same benedictions from the Almighty as President
> Washington has before.  Let those primary principles guide our
> actions for the betterment of the students, teachers and
> administrators and society as a whole here in the Indian River
> School District and [elsewhere].  We ask this in the Lord's name.

*See* Exhibit J (Transcribed minutes of November 16, 2004 Board meeting) (addition in original).

Similarly, on March 22, 2005, former Board member Harvey Walls offered the following prayer

to open the regular Board meeting:

> At this time, I'd like to lead the Board in a moment of prayer
> basically on an excerpt taken from a speech given by Dr. Martin
> Luther King that he entitled "Not So Civil Dreams."  "God does

> not judge us by the separate incidences or the separate mistakes
> that we make, but by the total bent of our lives.  In the final
> analysis, God knows that his children are weak and they are frail.
> In the final analysis what God requires is that your heart is right."
> As we gather here this evening, let us take these words to heart and
> put the best interests of the students, teachers, employees and
> residents of the Indian River School District ahead of our own.
> Amen.

*See* Transcribed minutes of March 22, 2005 Board meeting, attached hereto as Exhibit N.

In other instances, Board members have invoked Jesus.  For example, on February 22, 2005, Board member Reginald Helms gave the opening prayer and offered the following: "Heavenly Father, Lord our God.  Heavenly Father, please help the Board with the problems in the School District that we are going through right now.  We ask these things in Jesus' Name." *See* Amended Compl. at ¶144.  In other instances, rather than offering a prayer, the Board member elected to offer a moment of silence.  *See* Deposition of Patricia Oliphant at 33, attached hereto as Exhibit O (stating preference for offering a moment of silence rather than a prayer).

d.    Purpose of Prayers

The purpose of opening regular Board meetings with a prayer or moment of silence, as stated in the policy itself, is to solemnize the proceedings.  *See* Exhibit K (Walls Dep. at 40) (purpose of prayer is to "impress upon the importance of a regular meeting, just to ask for guidance in making the proper decisions"); Deposition of John Evans at 39, attached hereto as Exhibit P (purpose of prayer is for "guidance for the body of the school board, that [they] might make good decisions for [the] school district"); Exhibit D (Bireley Dep. at 151) (the purpose is to "ask for Divine guidance for the Board to help them make correct decisions and get them through the meeting in the proper way . . . to make the best decisions for what's best for our students"); Exhibit E (Hattier Dep. at 114) (solemnizing the proceedings means "the idea that we are going to think beyond ourselves, beyond what's happening today and sit down and make

absolutely the best decisions we can").

In addition to seeking guidance in their decision making, Board members have occasionally prayed for individual families within the District stricken by tragedy or for others in the community. *See* Exhibit L (Hobbs Dep. at 198) (noting that if there was a death or other tragedy, "often [the person giving the prayer] would bless that, you know, they would say, you're in our thoughts, that family, who's ever gone through this tragedy is in our thoughts"); *see also* Exhibit F (D. Mitchell Dep. at 145) ("The prayer may be lifted for the school bus drivers or the teachers or the students, you know, however the person feels led to pray."). However, the prayer policy has not been used to proselytize one's own religion or to disparage that of another. *See* Exhibit L (Hobbs Dep. 198) (stating that prayer is not for "preaching any one religion to anyone"); Exhibit K (Walls Dep. at 159) ("I don't think [the meeting or prayer] needed to be the time or place for proselytizing or trying to convert anybody."). Any reasonable observer would see the prayers offered in these circumstances for what they are and would not construe them as attempts to preach, convert, or proselytize.

## III.    <u>LEGAL STANDARD</u>

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The party moving for summary judgment bears the initial burden of demonstrating that there are no facts supporting the non-moving party's legal position. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986). The burden then shifts to the nonmoving party, who "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"The nonmoving party . . . cannot rely merely upon bare assertions, conclusory allegations or suspicions to support its claim."  *Fireman's Ins. Co. v. Du Fresne*, 676 F.2d 965, 969 (3d Cir. 1982).  Rather, the party opposing summary judgment must go beyond the pleadings and present evidence through affidavits, depositions, or admissions on file to show that there is a genuine issue for trial.  *See Celotex*, 477 U.S. at 324.

When deciding a motion for summary judgment, the court must construe the evidence and any reasonable inferences arising from the evidence in the non-movant's favor.  *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986).  A genuine issue of material fact exists only when "the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Anderson,* 477 U.S. at 248.  When, as here, the material facts are not in disputed, summary adjudication of the constitutionality of the Board Prayer Policy is warranted.

IV.    **ARGUMENT**

Plaintiffs first argue as a general matter that the Board prayer policy should be found unconstitutional because a long line of Establishment Clause cases prohibits certain types of religious activity during required courses of instruction and extracurricular activities.  This argument, however, fails to appreciate the role of a board of education.  Like other states, Delaware regards the education of its youth to be among the most important functions of state government.  The Indian River School Board is an arm of government whose jurisdiction happens to be education.  In all meaningful ways, the Board is a legislature or other deliberative body, and the practice of Board prayer should be examined under *Marsh v. Chambers*, 463 U.S. 783, 786 (1983).  The job of a school board is to govern the school district, not to instruct students, whose incidental presence at Board meetings in this matter is unnecessary for the board to carry out its core functions.  Decisions addressing religious activity during instructional or extracurricular time are inapposite here.

Although the Supreme Court has already found that legislative prayer does not violate the Establishment Clause, Plaintiffs focus their arguments on the various "tests" (*i.e.*, the *Lemon* test, the endorsement test, and the coercion test) for Establishment Clause claims, and they assert that the prayer policy here fails each of them.  Notably, the *Lemon* test was available to the Supreme Court in *Marsh*, but the Court chose not to employ that test.  (It is odd to suggest that the practice of legislative prayer, which is as old as the First Amendment itself, should be subjected to a "test" created in 1971).  The endorsement and coercion tests were developed after *Marsh*, in *Lynch v. Donnelly* and *Lee v. Weisman*, respectively.  Unless these cases are to be seen as a *sub*

*silentio* overruling of *Marsh*,[4] they, too, are inapplicable.  Regardless of the test under which

Board prayer is analyzed, however, the result is the same: Plaintiffs are not entitled to summary

judgment.

      A.      **Lemon v. Kurtzman**

          1.      **Secular Purpose**

Plaintiffs first argue that the Board prayer policy violates *Lemon v. Kurtzman* because

there is no secular purpose for the prayer.  In making this argument, Plaintiffs seem to accept the

possibility that solemnizing proceedings could be a secular purpose under *Lemon*, but not in this

instance because the Board's stated purpose is a "sham."  Plaintiffs note that the Board members

"predictably" and "dutifully" testified that the purpose of Board prayer is to solemnize its

proceedings, but Plaintiffs urge the Court to disbelieve these Board members, stating that the

Court "is not to give heightened deference to any claimed purpose that the Board may assert."

*See* Plaintiffs' Br. at 24.

In making this argument, Plaintiffs seem to have forgotten that the factual and legal

questions before the Court have been raised by *them* on a motion for summary judgment.  The

standard for such a motion is that the evidence on a particular factual question, and all reasonable

inferences flowing from that evidence, must be construed in favor of the non-moving party.  It is

well-established that the plaintiff bringing an Establishment Clause claim bears the burden of

proof.  *See Gillette v. United States*, 401 U.S. 437, 450-51 (1971); *see also Doe v. Tangipahoa*

---

[4] This is unlikely, given recent decisions by the Supreme Court citing to *Marsh*.  *See, e.g.*, *McCreary County v. ACLU*, 545 U.S. 844, 860 n.10 (2005) (noting that *Marsh* upheld "legislative prayer despite its religious nature"); *Van Orden v. Perry*, 545 U.S. 677, 690 (2005) ("Simply having religious content or promoting a message consistent with a religious doctrine does not run afoul of the Establishment Clause") (citing *Marsh*, 463 U.S. at 792).

*Sch. Bd.*, 473 F.3d 188 (5th Cir. 2006) ("The stipulations do not contain evidence establishing viewpoint discrimination or hostility to non-Christian religions. In the absence of proof to the contrary, the Board's actions have not been shown to be impermissible under the Constitution.") (Clement, J., dissenting). If the Board members testified (as they did), that the purpose of the Board prayer policy is to solemnify its proceedings, for purposes of this motion, that testimony must be taken as true. Contrary to Plaintiffs' argument, the Court *is* required to give "heightened deference" to their testimony. The Court certainly may not disregard their testimony entirely and presume the Board members are lying. Even if Plaintiffs could put forward *evidence* to contradict the Board members' testimony regarding the purpose of the policy, this would not entitle Plaintiffs to summary judgment but would raise a factual question precluding summary judgment. Regardless, a careful review of Plaintiffs' Opening Brief makes it clear that they have not even come forward with evidence. Instead, they have offered argument based on little more than their own skepticism.

Plaintiffs first argue that the claimed purpose of solemnifying the proceedings is a sham because the Board does not pray before special meetings or the executive session portion of its meetings. This is a curious argument, for it suggests that if Board members only prayed more often, then Plaintiffs would accept the sincerity of the Board members' testimony that their purpose is to solemnify the proceedings. This argument is non-sensical and inaccurate. Regardless, there is no reason to conclude that the Board's occasional omission of prayer renders the purpose of the Board prayer policy something other than solemnification on the more frequent occasions when prayer is not omitted. The Court should reject Plaintiffs' invitation to draw an unfounded, nefarious conclusion about the Board's "true" purpose.

The fact that the Board solemnizes public meetings rather than special (or nonpublic) meetings with a prayer is hardly surprising. Special meetings are typically called to address a single purpose or topic, and they are often called an expedited or emergency basis. Special meetings also lack many of the formalities of regular monthly Board meetings, such as the Presentation of Colors and the Pledge of Allegiance. Indeed, many state legislatures open their legislative sessions with a prayer, but do not open every committee meeting or every special session in an identical manner.

Furthermore, contrary to Plaintiffs' presumption, special meetings are not closed to the public. *See* Bireley Dep. at 87-89 (testifying that public can be at the special meetings in addition to the regular meetings); Deposition of Richard Cohee at 68, 91, attached to Defendants' Counter-Statement as Exhibit Q (testifying that sometimes people other than Board members may be present at special meetings because the Board requires or asks for certain information; and that even at special meetings, normally once the executive session has ended, they would say, "If there is anybody outside, let them come in"). Thus, Plaintiffs cannot fairly draw the public-nonpublic dichotomy that they believe supports their argument that the Board's stated purpose is a sham.

Plaintiffs also misconstrue the nature of executive sessions, which generally are not independent meetings but are simply a continuation of the public meeting. Certain topics, by law, cannot (and should not) be discussed in a public forum. This includes such topics as whether to hire or terminate a particular teacher or administrator. *See* Bireley Dep. at 88-89 (no public is present at the personnel special meetings). At the conclusion of the public portions of regular Board meetings, the Board takes a brief recess and reconvenes privately to discuss the matters not appropriate for public discussion. Plaintiffs nonetheless urge the Court conclude that

the Board chooses not to pray when sessions are "held out of the public view" because the

Board's true purpose of religious indoctrination may not be fulfilled. Such an inference is not

warranted based on the record.

Plaintiffs next argue that a "similarly powerful inference can be drawn from the Board's

immediate decision to 'get a second opinion' when its regular attorney advised that Board prayer

was unconstitutional." Plaintiffs' Br. at 25. As discussed in response to Plaintiffs' "Statement

of Facts," the advice provided by Attorney James Griffin is not in the record, despite the

persistent and highly inappropriate efforts of Plaintiffs' attorneys to force an inadvertent

revelation of confidential information. Regardless, even if it were true that Mr. Griffin believed

Board prayer to be unconstitutional, there is nothing wrong with getting a second opinion. The

only "powerful inference," *see* Plaintiffs' Br. at 25, to be drawn from such this alleged "fact" is

that, perhaps, the Board was not confident that the first opinion was correct. Seeking to confer

with an attorney who is more familiar with issues of constitutional law does not make the long-

standing tradition of Board prayer, which the Board undeniably seeks to preserve, suddenly non-

secular.

Plaintiffs next argue that, even if the Court finds the Board's stated purpose of

solemnizing Board meetings not to be a sham, the Court should nevertheless find the practice

unconstitutional because the purpose is religious. Plaintiffs argue that "the solemnity sought to

be promoted is religious, not secular." Plaintiffs' Br. at 25. Plaintiffs further claim the Board's

religious motivation is evident because Board members offered four different definitions of the

term "solemnify" in their depositions. Plaintiffs characterize these four definitions as follows:

"(i) to seek divine guidance; (ii) to pray in public so that the public could benefit from the prayer;

(iii) to convey a message that the Board's business required careful thought and deliberation; and (iv) to maintain a tradition." Plaintiffs' Br. at 25.[5]

Despite the reiteration of these supposed varying definitions offered by certain Board members, Plaintiffs have not identified where in the record these varying definitions might be found. In fact, the Board members' testimony on the meaning of "solemnify" was generally consistent:

> **Charles Bireley**: to "ask for divine guidance for the Board to help them make correct decisions and get them through the meeting in the proper way . . . to make the best decisions for what's best for our students . . . help us make the right decisions." Bireley Dep. at 151.
>
> **Harvey Walls**: "to solemnify its proceedings" means "to impress upon the importance of a regular meeting, just to ask for guidance in making the proper decisions." Walls Dep. at 40.
>
> **Lois Hobbs**: "just trying to bring some dignity and, you know, ask for guidance in their decision about children." Hobbs Dep. at 200.
>
> **Donald Hattier**: the phrase "solemnifying the proceedings" means "the idea that we are going to think beyond ourselves, beyond what's happening today and sit down and make absolutely the best decisions we can. And its taking a moment to where you can focus on what your reason is for being there." Hattier Dep. at 114.
>
> **Donna Mitchell**: the phrase "in order to solemnify its proceedings" means "to get serious, solemn, to bring us together as a body, as a legislative body to conduct business." Mitchell Dep. at 15.
>
> **Gregory Hastings**: the phrase "in order to solemnify the proceedings" means, given the large size of school district, the sometimes controversial decisions the Board has to make, and the financial issues at stake, "one hopes, or I hope, that I make the very

---

[5] It is unclear how Plaintiffs could conclude that the latter two "definitions" (*i.e.*, conveying a message of the need for careful thought and maintaining a tradition) somehow betray a religious purpose. There is nothing inherently religious about conveying a message of seriousness or maintaining a tradition.

best decision I possibly can for the sake of the district and the children in the school district, and I want all the help I can get." Hastings Dep. at 102-103.

**Reginald Helms**: the phrase "to solemnify the proceedings" means or "simply says that we are asking for wisdom and guidance to make good sound decisions." Helms Dep. at 110-111.

**Randall Hughes**: the prayers have solemnized or do solemnify the proceedings, which means "to bring folks in, bring people into focus that we are about to do some matters that are important…to focus at the task at hand, making decisions that affect other people. It just brings some order to the meeting. Hughes Dep. at 41-42.

**Mark Isaacs:** the phrase "in order to solemnify its proceedings" means, given that the meetings are formalized board meetings, "to recognize that it is a unique meeting month where many important decisions are brought to the attention of the [B]oard and to the public, and it requires careful thought and deliberation. Isaacs Dep. at 34.

**John Evans**: the phrase "in order to solemnify its proceedings" means "in order to seek God's guidance for the decisions to be made at that meeting." Evans Dep. at 41.

These off-the-cuff definitions offered in the midst of Defendants' depositions are generally consistent with the dictionary definition of "solemnify." *See Webster's New World Dictionary*, 1276 (College ed. 1988) (defining "solemnify" as "to make solemn," which in turn is defined as "serious;" "grave;" "deeply earnest;" "arousing feelings of awe;" "very impressive"). Contrary to Plaintiffs' arguments, Defendants generally testified that "solemnify" as used in the Board prayer policy means what it means elsewhere, and need not have any religious connotation.

In arguing that the prayer policy violates *Lemon*'s secular purpose requirement, Plaintiffs also assert that invoking Divine guidance "is, by definition, not a secular purpose." Plaintiffs' Br. at 25. In making this argument, Plaintiffs have confused *purpose* with *method*. The purpose

of the Board prayer policy is to solemnify (*i.e.*, arouse feelings of awe or seriousness), but it achieves that purpose in a variety of ways, including prayer.  The fact that some or even most members choose to invoke Divine guidance does not mean that their purpose is religious.  Indeed, focusing "exclusively on the religious content of any activity would inevitably lead to its invalidation."  *Chadhuri v. Tennessee*, 130 F.3d 232, 236 (6th Cir. 1997) (citing *Lynch*, 465 U.S. 668, 680 (1984)).  Plaintiffs' corollary argument, that there are equally effective non-religious methods of achieving solemnity, suffers from the same flaw.  Just because it is possible to accomplish the solemnizing purpose without prayer does not mean that prayer, when used, is not for purposes of solemnization.

It seems that the argument Plaintiffs are really trying to make is that because prayer is the most frequently used method of solemnifying the proceedings, the Board prayer policy has the effect of promoting religion.  If that is their argument, it is more properly analyzed under the second prong of *Lemon* (*i.e.*, whether the primary effect of the policy advances one religion over another or religion over non-religion).  Plaintiffs' argument, however, fails under both prongs.  Indeed, the rule Plaintiffs seem to prefer – that Board members can solemnify their proceedings only to the extent they do it *without* prayer – actually runs afoul of *Lemon* because it would impermissively advance non-religion over religion in achieving the secular purpose of solemnity.  Rather than solving a *Lemon* problem, Plaintiffs' purported solution would create one instead.

### 2.    Primary Effect

Plaintiffs next argue that the Board's prayer policy and practice violates *Lemon* because it has the primary effect of advancing religion.  Yet Plaintiffs have asked the Court to make this finding without citing to a single fact in the record.  Instead of doing so, Plaintiffs simply assert

that the prayers "far exceed solemnity" and thus the policy and practice "advances and endorses religion over non-religion, and Christianity over other religions." Plaintiffs' Br. at 28.

Although Plaintiffs would prefer not to trifle with things like evidence, the plain terms of the Board prayer policy rebut Plaintiffs' conclusions. The first paragraph of the Board prayer policy states that Board members may solemnize the proceedings with a prayer *or* moment of silence "in accord with the freedom of conscience of the individual adult Board member." *See* Board Prayer Policy ¶ 1. By allowing a prayer or moment of silence, the Board makes it clear it is not choosing to advance religion over non-religion. Prayer is a choice, just as a moment of silence is a choice. Furthermore, it is worth noting that some Board members have solemnized the proceedings by reciting words of inspiration from the likes of George Washington and Martin Luther King. *See, e.g.*, Exhibit J (Transcribed Minutes of Nov. 16, 2004 Board meeting) (prayer quoting Ghandi, George Washington, and Mark Twain); Exhibit N (Transcribed Minutes of March 22, 2005 Board meeting) (prayer quoting Martin Luther King). However, Plaintiffs are not satisfied with a policy that is neutral toward religion, as this one is, but instead seek a policy hostile to religion.

For those who choose to solemnify the proceedings with a prayer, the Board prayer policy similarly makes it clear that there is no particular prayer or type of prayer that is preferred. The policy states: "Any such prayers may be sectarian or non-sectarian, denominational or non-denominational, in the name of a Supreme Being, Jehovah, Jesus Christ, Buddha, Allah, or any other person or entity, all in accord with the freedom of conscience, speech and religion of the individual board member, and his or her particular religious heritage." *See* Board Prayer Policy. The policy also prohibits any conduct intended to proselytize or to disparage a particular religion. Therefore, contrary to Plaintiffs' unsupported accusations, the policy does not advance

- 23 -

Christianity over other religions.  It is facially neutral, and Plaintiffs' refusal to acknowledge this obvious fact is puzzling.

Furthermore, as mentioned above, Plaintiffs have not cited to any evidence that the policy, despite its requirement of neutrality, has been implemented in a manner inconsistent with the policy.  Plaintiffs have not cited — because they cannot — to an instance in which a Board member sought to use a moment of silence but was forced to offer a prayer.  Nor can Plaintiffs point to an instance where a Board member preferred to use a non-sectarian prayer but was forced to pray in the name of Jesus or any other deity.  Plaintiffs argue that the Court can discern the primary effect of the policy based on the public's perception of it as a general defense of Christianity or prayer in schools.  See Plaintiffs' Br. at  28 ("primary effect of advancing Christianity is clear from the public's perception, as expressed through comments at Board meetings, letters to the editor and media coverage").  The purported evidence to support Plaintiffs' "public perception" argument is a video tape of the August 24, 2004 Board meeting, which, notably, took place two months *before* the adoption of the policy at issue.  Otherwise, it is not clear to which "editorials" and "media coverage" Plaintiffs are referring.  Regardless, even if the Court were to accept Plaintiffs' premise that the Board prayer policy was intended to placate a public that misunderstood the Board prayer policy, Plaintiffs' argument defies common sense.[6]

If the prayer policy were really intended to assuage the raucous crowd, one might expect that the Board would not have adopted a formal policy at all.  Indeed, the Board had an unwritten prayer policy since the creation of the Board in 1969.  Presumably, the Board could have

---

[6] Despite the label Plaintiffs have given this argument, it seems more in the realm of *Lemon*'s purpose prong than its primary effect prong.  Plaintiffs are not really addressing the actual effect of the policy but are attributing to the Board another sham purpose.  This time, however, according to Plaintiffs, the Board is attempting to dupe its constituents rather than the Court.

achieved its goal by simply announcing that the current policy would remain unchanged.  But, that is not what the Board did.  Instead, it reviewed the practice in consultation with attorneys who were familiar with constitutional law, which resulted in the drafting of a policy carefully circumscribed to remain within the bounds of the law.  If the Board were attempting to do what Plaintiffs believe, the written policy would not be facially neutral.  Nor would it state explicitly that prayers in the name of other Supreme Beings are as welcome as prayers in the name of Jesus Christ.

Another curiosity of Plaintiffs' "primary effect" argument is that it directly conflicts with their "secular purpose" argument.  On one hand, Plaintiffs claim the public is too ignorant to understand the policy for what it is, and will instead accept the policy as a general defense of Christianity or prayer in schools.  This very same public, however, will accept without question the Board's "solemnifying purpose" ruse, fully understanding that this is simply the lie the Board members need to tell to survive a constitutional challenge.

It is bad enough that Plaintiffs' arguments are not based on evidence.  It is worse that Plaintiffs' arguments suppose (a) the Board is deceitful, (b) the Indian River community is stupid, and (c) both are hopelessly infected with religious bigotry.  Plaintiffs and their attorneys should be above these arguments.

### 3.    Entanglement

Plaintiffs next argue that the Board prayer policy fosters an excessive entanglement between government and religion and thus fails the third prong of *Lemon*.  The premise of this argument is that the Board president will endeavor to make sure his fellow Board members do not violate the policy.  Given Plaintiffs' previous arguments, one might expect Plaintiffs to argue that the Board president, fearing the political wrath of the raucous crowd, actually has no

intention of enforcing the policy at all, and would rather sit silently while other Board members preach the Gospel and disparage other religions. Instead, Plaintiffs have concocted a "heads I win, tails you lose" argument, where it is more expedient to presume the good faith of the Board president. Plaintiffs now postulate that an effort to avoid violating the Establishment Clause is itself a violation of the Establishment Clause.

Plaintiffs' entanglement argument is non-sensical. The Board prayer policy was carefully drafted to ensure that it remains within the parameters of *Marsh*. Instead of commending the Board, Plaintiffs argue that this creates a "monitoring dilemma" that runs afoul of *Lemon*'s prohibition on religious entanglements. If this were the rule, it is hard to imagine a practice that could withstand a *Lemon* challenge. *See, e.g.*, *Verbena United Methodist Church v. Chilton County Board of Ed.*, 765 F. Supp. 704, 713 (M.D. Ala. 1991) (permitting baccalaureate services to be held on school property); *Peck v. Upshur County Bd. of Ed.*, 155 F.3d 274, 285-86 (4th Cir. 1998) (permitting the private distribution of religious materials at schools pursuant to a neutral, open access policy); *Child Evangelism Fellowship v. Stafford Twp.*, 386 F.3d 514, 525 (3d Cir. 2004) (same). The courts have found all of these activities constitutional, provided they remain within certain contours. They do not become unconstitutional due to *Lemon*'s entanglement prong simply because the limits of those contours must be enforced by a school.

Plaintiffs also delight in pointing out that there were differences of opinion among Board members as to whether a particular prayer violates the policy. *See* Plaintiffs' Br. at 30 (whether references to "heathens" in a prayer would constitute disparagement). During the depositions, Plaintiffs' attorneys recited several "prayers" without stating their origins, and then asked whether such a prayer would be consistent with the policy. *See* Exhibit G (Isaacs Dep. at 39-41) (Plaintiffs' counsel stating, "I am going to give you a prayer and ask you if it would have been

given it would have violated the policy.  Okay?  'Oh, Lord, please convert the Jews in the audience and ensure that they come to know our Lord Jesus Christ'"); Exhibit F (D. Mitchell Dep. at 106-110 (testifying that another "prayer" from Plaintiffs' counsel, stated in part, "'Do not put your trust in princes, in mortal men who cannot even save themselves.  When their spirit departs, they return to the ground.  On that very day their plans come to nothing.  Blessed is he whose help is the God of Jacob, whose hope is in the Lord his God, the maker of heaven and earth, the sea, and everything in them, the Lord who remains faithful forever.  He upholds the cause of the oppressed and gives food to the hungry'")).  While Plaintiffs' attorneys no doubt enjoyed this thought game, it is of no consequence here because it did not involve prayers actually given at Board meetings.  Indeed, a review of prayers actually given at Board meetings – *i.e.*, the evidence in the record – exposes Plaintiffs' enforcement canard.  These prayers, without exception, have been non-proselytizing and non-disparaging, and no reasonable person would contend otherwise:

> At this time, I'd like to lead the Board in a moment of prayer basically an excerpt taken from a speech given by Dr. Martin Luther King that he entitled "Not So Civil Dreams."  God does not judge us by the separate incidences or the separate mistakes that we make, but by the total bent of our lives.  In the final analysis, God knows that his children are weak and they are frail.  In the final analysis what God requires is that your hear is right. As we gather here this evening, let us take these words to heart and put the best interests of the students, teachers, employees and residents of the Indian River School District ahead of our own.  Amen.

*See* Exhibit N (Transcribed Minutes of March 22, 2005 Board meeting)

Moreover, despite the fact that Plaintiffs' "monitoring dilemma" exists solely in the realm of the hypothetical, Plaintiffs push this argument to the limits of absurdity.  Plaintiffs

argue that the only enforcement mechanism is a denial of future opportunities to pray.

Therefore, according to Plaintiffs, "[t]his 'one free bite' rule has a pernicious effect: it would

permit nearly constant proselytizing, given the size of the Board and the three year election

cycle." Plaintiffs' Br. at 30. If "constant proselytizing" were a genuine concern, one would

expect Plaintiffs to be able to cite at least one example of proselytizing in the three and a half

years since the adoption of the policy. Plaintiffs' failure to cite any evidence on this point

demonstrates sufficiently that this not a serious argument.

### B.    Endorsement Test

Plaintiffs allege that the Board prayer policy is unconstitutional in light of the

endorsement test set forth in *Lynch v. Donnelly*, 465 U.S. 668 (1984). They assert that a

reasonable observer would conclude that the Policy endorses religion over non-religion and

Christianity over other religions. Again, Plaintiffs' arguments are not based on evidence, such as

testimony from actual observers. Instead, it is essentially a reiteration of Plaintiffs' *Lemon*

arguments that a crafty Board used the prayer policy as a proxy for religion generally. Plaintiffs

evidently believe their hypothetical "reasonable observer" will be as dim-witted and gullible as

the raucous crowd of actual observers.

The United States Court of Appeals for the Third Circuit has held that the question of

endorsement must be analyzed from the viewpoint of "a reasonably informed observer, i.e., one

familiar with the history and context of [the issue]." *Tenafly Eruv Ass'n v. Borough of Tenafly*,

309 F.3d 144, 174 (3d Cir. 2002). "Again, to answer th[is] question [courts] examine the content

and context of the display." *Ind. Civ. Liberties Union v. O'Bannon*, 259 F.3d 766, 772 (7th Cir.

2001). Moreover, what a reasonable observer would perceive is a question for the finder of

fact. *See Modrovich v. Allegheny County*, 385 F.3d 397, 417 (3d Cir. 2004). Thus, on that basis

alone, Plaintiffs' arguments under the endorsement test should be rejected.  Even if the Court

were to entertain a discussion of how a reasonable person would perceive the Board's prayer

policy, Plaintiffs are not entitled to summary judgment.  Indeed, a reasonable observer would

come to the opposite conclusion from what Plaintiffs urge here.

As Plaintiffs note, a reasonable observer is deemed to be aware of context and history,

and to have a greater than average amount of information.  *See Tenafly*, 309 F.3d at 174.  The

reasonable observer would not attend a single Board meeting on August 24, 2004, and jump to

the conclusion that the policy to emerge several weeks later, despite being facially neutral, was

really just an attempt to placate a crowd bent on promoting Christianity.[7]  The "history and

context" of the reasonable observer Plaintiffs imagine is limited to the eight-week period around

---

[7] In making their argument, Plaintiffs criticize the Board members for making "no contemporaneous effort [at the August 24, 2004 Board meeting] to correct what is now claimed to have been the public's misperception."  Plaintiffs' Br. at 32.  Because Plaintiffs did not cite to the record, it is not clear whose failure in particular Plaintiffs are referring to.  However, several Board members did testify that the purpose of the public comment portion of the Board meetings is to allow community members to voice their concerns on matters of importance.  *See* Bireley Dep. at 37 (testifying that additional time was added on to the public comments section because "I thought it was important for people in the community to come and talk to us about things that was on their minds, concerns or anything like that or have input"); Helms Dep. at 18 (the board had been advised in the past that public comments section "would be that people are allowed to express their opinions and we listen").  It is not intended to be a discussion, and it is typical for the Board to let members of the public say their piece without a response form the Board.  *See* Walls Dep. at 91 (testifying it is correct that Mr. Walls and the Board members did not try to correct any misperception because the public comment section is meant to be an opportunity for the Board to hear from the public and not vice versa); Hattier Dep. at 217 ("As is noted under the public comments section, it is our job to listen, not, it is a one way conversation.  It is not our policy to comment as a rule on what people say unless they get out of line in terms of mentioning names."); Cohee Dep. at 53 ("It wasn't a discussion, because our public comment session is one way, we listen and they speak.").  Public comments are not attributable to the Board just because Board members sat silently while they were made – rather than scolding the comment-makers or cutting their microphone, as Plaintiffs perhaps would have preferred.

the time of their complaints, the public's response to those complaints, and the adoption of the policy. This view considers none of the history and only a fraction of context.

A truly knowledgeable observer would understand that legislative prayer is a tradition as old as the United States itself. *See Marsh*, 463 U.S. at 786. He would know that non-proselytizing and non-disparaging legislative prayer is unequivocally constitutional. *See generally id.* He would know the Board has had a tradition of using precisely these types prayers to solemnize its meetings since the creation of the Board in 1969. *See* Bunting Dep. at 99; *see also* Mitchell Affidavit ¶¶ 8-9 (there was a prayer at each IRSD meeting while he served as a board member from 1969-1986). A reasonable observer would also know that the tradition of this Board was a continuation of a tradition begun by other boards of education in Sussex County prior to consolidation. At a minimum, the reasonable observer would know that the practice of opening its meetings with a prayer, as opposed to the written policy, was not a response to anything that occurred on August 24, 2004. Nor was it a response to anything said or done by the Dobriches or the Does.

To the extent that the written policy was a response to Plaintiffs' complaints, the reasonable observer would know it was *not* an attempt to surrender to an angry crowd. To the contrary, the written policy makes it clear that the Board prayer policy is part of a long-standing tradition of solemnizing its proceedings, and that it may not be exploited for an improper purpose. While there is no evidence to suggest that the prayer opportunity was ever used to proselytize one religion or to disparage another prior to the adoption of the policy, the policy nevertheless puts the entire community on notice that any such conduct will not be tolerated. If the reasonable observer had the same negative views of the Sussex County community as do Plaintiffs and their attorneys, the reasonable observer would see the Board prayer policy as a

careful and measured effort by the Board to follow the law and to set straight the misinformed public.

### C.    <u>Coercion Test</u>

Plaintiffs further argue that the Board prayer policy fails under the coercion test.  This argument is similarly unavailing.  The coercion test provides that, "at a minimum, . . . government may not coerce anyone to support or participate in religion or its exercise, or otherwise act in a way which 'establishes a [state] religion or religious faith, or tends to do so.'" *Lee v. Weisman*, 505 U.S. 577, 587 (1992) (quoting *Lynch*, 465 U.S. at 678).  Despite Plaintiffs' assertion that the Board prayer policy "is unconstitutional for coercing students to participate in School Board Prayer," *see* Plaintiffs' Br. at 33, the coercion test has received significant criticism from members of the Supreme Court.  As Justice Scalia has suggested, "the [Supreme] Court has replaced *Lemon* with its psycho-coercion test, which suffers the double disability of having no roots whatever in our people's historic practice, and being as infinitely expandable as the reasons for psychotherapy itself."  *Lee v. Weisman*, 505 U.S. 577, 644 (1992) (Scalia, J., dissenting).

Regardless, the evidence in the record does not support a finding that Board prayer policy coerced members of the audience to engage in a religious exercise.  There is no evidence that the Board prayer policy as applied indoctrinates or coerces any students to join in the prayer.  In *Lee v. Weisman*, 505 U.S. 577 (1992), the Supreme Court found the threat of coercion to exist when a prayer was recited at a high school graduation ceremony.  The Court explained that high school graduation is one of the most significant events in the life of a young adult.  *Id.* at 595.  The Court further explained that the students who did not wish to pray had no way to dissent without embarrassment.  *Id.* at 594.

Unlike the threat of coercion at high school graduation ceremonies, the prelude to each

Board prayer explained:

> Such prayer is voluntary, and *it is among only the adult members of the Board*. No school employee, student in attendance, or member of the community in attendance shall be required to participate in any such prayer or moment of silence.

Board Prayer Policy  (emphasis added).[8]  This disclaimer was read at every Board meeting by

Charles Bireley to ensure that the purpose of the Board prayer was not misconstrued.  *See*

Bireley Dep. at 75; 103-05.  Such language clearly states that the prayer is intended for the Board

members only, and the Board specifically refutes the presumption that audience members are

required to participate.  Voluntary prayer at a Board meeting, at which parents, students, and

members of the community are present—can hardly be thought to raise the same concerns as

prayer occurring in a classroom as part of the mandatory curriculum.  *See Lee v. Weisman*, 505

U.S. 577, 645 (1992) (Scalia, J., dissenting).  Therefore, the invocation of the Board prayers does

not create any threat of coerciveness.

In addition, the circumstances surrounding the graduation prayer at issue in *Lee* stand in

sharp contrast to those surrounding the Board prayer.  At a high-school graduation, the presence

---

[8] Though the preludes slightly varied at each meeting, they uniformly informed the audience members that the prayer was intended for "only" the board members.  For example, when Mr. Walls was Board President, he would typically give the following prelude:

> It is the history and custom of this Board that, in order to solemnize the School Board proceedings, that we begin with a moment of prayer, in accord with the freedom of conscience of the individual adult members of the Board.  Further, such prayer is voluntary and just among the adult members of the School Board.  No school employee, student in attendance or member of the community is required to participate in any such prayer or moment of silence.

*See* Exhibit J (Transcribed Minutes of Nov. 16, 2004 Board meeting).

of students is pivotal to the event itself.  *See Lee*, 505 U.S. at 595 ("Graduation is a time for family and those closest to the student to celebrate success and express mutual wishes of gratitude and respect[.]").  The students are present to receive their diplomas, which is the fundamental purpose of the graduation ceremony.  Moreover, the participation of a student in the graduation prayer in *Lee* "was the very point of the religious exercise."  *Id.* at 593.

At Board meetings, on the other hand, the attendance of students at Board meetings is not mandatory and is only incidental to the focus of the Board meetings.  *See* Bireley Dep. at 33 (testifying that he cannot recall any instances where students have been required to attend School Board meetings**).**  The Board's focus is on setting policies; adopting curriculum; selecting, purchasing, and distributing textbooks; making the reports required by the State Superintendent of Public Instruction; appointing and dismissing personnel for the district; approving the use of district facilities; student and employee disciplinary actions; adopting the district's annual budget; monitoring the progress of construction projects; and taxing.  *See* Bireley Dep. at 9-17 (discussing the numerous duties of the Board); Hattier Dep. at 127, 133-37, 331 (same).  Although students are invited to attend to accept awards or to voice opinions on various issues, their presence is not required, nor is it part of the curriculum.  For example, the purpose of the brief awards and recognition segment has been so that the district could "say thank you and recognize the children."  Hobbs Dep. at 36.  The students "could come and be honored or they might not, or their principal might accept the award and they could stay home.  There was no obligation for them to come to a Board meeting."  *Id*. at 37.  The JROTC, who performed the Presentation of Colors, was not even present at Board meetings during the summer months.  *See* Bireley Dep. at 23 (testifying that Presentation of Colors not done during the summer months).

The student government representative who was often present sometimes had no report to give. *See, e.g.,* December 21, 2004 Minutes.

Finally, as the preludes make clear, the participation of audience members in the prayer is not "the very point of the religious exercise." *See Lee*, 505 U.S. at 593. Quite the contrary, the participation of the *adult Board members* is the point of the religious exercise and the agenda of the Board at Board meetings. *See* Hobbs Dep. at 199 (her understanding is that it is only the Board Members' prayer); *see also* Walls Dep. at 47 (agreeing that it is the intention of the board prayer policy that no one other than the adult members of the board would be the object of the prayer); Hattier Dep. at 112-113, 117 ("our Board Prayer Policy deals with the fact that it is between the ten members of the Board and does not have to involve the public and should not involve the public"; no one "other than Board members should partake"); Mitchell Dep. at 14 (responding to the question of whether the prayer is intended to have any impact whatsoever on the members of the public who are in attendance: "it's limited to the school board members"); Bunting Dep. 56 (discussing board prayer generally: it is meant for "the ten of [the board members], and there is no reason for it to be viewed or seen or anything by anyone else unless they choose to"). In sum, the Board prayer policy does not implicate the concerns that have previously led the Supreme Court to find that school-related religious activity was coercive.

### D.      *Marsh v. Chambers*

Plaintiffs leave until the end their discussion of *Marsh v. Chambers* – the Supreme Court case that actually discusses legislative prayer, and the decision that this Court has already found to be controlling here. In doing so, Plaintiffs refer to *Marsh* as "a narrow exception to the mainstream of Establishment Clause jurisprudence." Plaintiffs' Br. at 34. Plaintiffs further assert that it is Defendants' burden to establish "that the Board's prayers fall within *Marsh*'s

narrow holding." Plaintiffs' Br. at 35.  It is not entirely clear what Plaintiffs mean by "mainstream" jurisprudence, but *Marsh* is not an exception to anything.  It is a decision that stands for the relatively simple proposition that legislative prayer does not offend the Establishment Clause.  Rather than acknowledge the obvious, they assert a presumption of *un*constitutionality that Defendants, the non-moving parties here, must overcome.  Leaving aside Plaintiffs' incorrect statements about exceptions and burden shifting,[9] Plaintiffs' *Marsh* analysis is deeply flawed.[10]

       Plaintiffs first read into *Marsh* a requirement that does not exist by claiming that *Marsh* only applies if schoolchildren are the recipients of the prayers.  Plaintiffs extrapolate this rule from dicta in the *Marsh* decision where the Court acknowledged that Plaintiffs in that case were adults.  However, the *Marsh* Court did not hold that the "recipient" of legislative prayer, to be constitutional, must be an adult.  The full paragraph containing this reference is as follows:

> This interchange [between members of the First Congress regarding legislative prayer] emphasizes that the delegates did not consider opening prayers as proselytizing activity or symbolically placing the government's official seal of approval on one religious view.  Rather, the Founding Fathers looked at invocations as conduct whose . . . effect . . . [harmonized] with the tenets of some or all religions.  The Establishment Clause does not always bar a state from regulating conduct simply because it harmonizes with religious canons.  Here, the individual claiming injury by the practice is an adult, presumably not readily susceptible to religious indoctrination, or peer pressure.

---

[9] Ultimately, Plaintiffs' inability to set forth the proper standard for a motion for summary judgment is immaterial because Defendants have also moved for summary judgment on this issue.  In that motion, Defendants accept and meet the burdens of a summary judgment movant.

[10] Defendants address Plaintiffs' *Marsh* arguments as necessary here, but to avoid needless repetition, Defendants refer the Court to Section IV.A. of their Opening Brief in support of their Motion for Summary Judgment.  This section discusses the applicability of *Marsh* in more detail, and is incorporated herein by reference.

*Marsh*, 463 U.S. at 792 (internal quotation marks and citations omitted). The most relevant point

of the paragraph above is that the Founding Fathers viewed legislative prayer as inherently non-

proselytizing. Simply acknowledging that the *Marsh* plaintiff was an adult does not mean the

Court would have reached an opposite conclusion had the plaintiff been a non-adult.

Plaintiffs next argue that "the school Board is not a legislative body as that phrase is used

in *Marsh*." Plaintiffs' Br. at 37. This argument harks back to Plaintiffs' introductory remarks

about the *Marsh* decision, where they suggest it is the Board's obligation to explain why *Marsh*

is applicable rather than Plaintiffs' obligation to explain why *Marsh* is not applicable. In any

event, the Court in *Marsh* did not limit its definition of legislative body in any way. In fact, it

did the opposite. It explicitly referred to "legislative *or other deliberative bodies*." *Marsh*, 463

U.S. at 786. As such, the ruling of *Marsh* was not narrow, but was intended to apply to a broad

array of governmental units. As discussed in Defendants' Motion for Summary Judgment, the

Board bears all of the hallmarks of a legislative body, and should be treated as such for purposes

of Board prayer.

Plaintiffs also argue that there is no unique history of Board prayer because the Board

began inviting certain students to meetings for awards fourteen years ago. This, of course, is

false. The practice of Board prayer goes back to the earliest days of the Board and is a

continuation of a practice that existed prior to the creation of the District. Plaintiffs have

identified one feature of the meetings that is different today than it was fourteen years ago, but

the Board prayer practice is essentially the same. Furthermore, Plaintiffs' argument, carried to

its logical conclusions, leads to the absurd possibility that the prayer practice could be

constitutional for one school district but not another, depending on when the practice began.

Indeed, by this logic, a state legislature that previously elected not to open its sessions with a prayer would be precluded from beginning such a practice because of its lack of a tradition. In *Marsh*, the Court rejected the notion that historical patterns alone can justify contemporary violations of constitutional guarantees. *See Marsh*, 463 U.S. at 790. Plaintiffs now urge the equally flawed construct that the *lack* of an historical pattern creates a constitutional violation for an otherwise acceptable practice. The historical inquiry compelled by *Marsh* is instead whether the Founding Fathers contemplated other contemporaneous legislative and deliberative bodies, such as school boards, opening their sessions with prayer. *Cf. Snyder v. Murray City Corp.*, 159 F.3d 1227, 1232 (10th Cir. 1998) (acknowledging *Marsh*'s consideration of the history of the challenged prayer but noting that, "since [*Marsh,*] the Court has repeatedly avoided applying *Marsh*'s mode of historical analysis") (citing *County of Allegheny v. American Civil Liberties Union*, 492 U.S. 573, 603 (1989) (rejecting the dissenting argument that the *Marsh* historical analysis controlled the constitutionality of traditional creche displays at Christmas)).

## V.    CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court deny Plaintiffs' Motion for Summary Judgment.


Dated: May 8, 2008                                  Respectfully submitted,


                                                      /s/  Warren Pratt
                                                     Warren Pratt (Del. Bar No. 4334)
                                                     DRINKER BIDDLE & REATH LLP
                                                     1100 N. Market Street
                                                     Suite 1000
                                                     Wilmington, DE 19801
                                                     Telephone:   (302) 467-4200
                                                     Facsimile:   (302) 467-4201

Jason P. Gosselin
Katherine L. Villanueva
Elizabeth L. McLachlan
DRINKER BIDDLE & REATH LLP
One Logan Square, 18th and Cherry Sts.
Philadelphia, PA 19103
(215) 988-2700
(215) 988-2757 (facsimile)