## EXHIBIT INDEX

**EXHIBIT DESCRIPTION**                                                    **EX. NO.**

Deposition of Charles M. Bireley ...............................................................................1

Deposition of Nina Lou Bunting .................................................................................2

Deposition of Richard H. Cohee................................................................................3

Deposition of Marco Dobrich ....................................................................................4

Deposition of Mona Dobrich ....................................................................................5

Deposition of Jane Doe (REDACTED).........................................................................6

Deposition of John M. Evans.......................................................................................7

Deposition of Gregory A. Hastings ...........................................................................8

Deposition of Donald G. Hattier.................................................................................9

Deposition of Reginald L. Helms ...............................................................................10

Deposition of Lois M. Hobbs.......................................................................................11

Deposition of M. Elaine McCabe ...............................................................................12

Deposition of Donna M. Mitchell.................................................................................13

Deposition of Harvey L. Walls ...................................................................................14

Deposition of Robert D. Wilson ..................................................................................15

Indian River School District Board of Education Minutes (06/29/99) ...........................16

*To The Residents of the Indian River School District living in the 5th Voting District,*
Coastal Point (05/09/08) .............................................................................................17

*Voters to Elect School Board Members Tuesday,* Coastal Point (05/20/08) ................18

Indian River School District Board of Education Minutes (02/27/07)............................19

Deposition of Mark A. Isaacs ......................................................................................20

# TAB  1

Bireley, Charles (Video)  10/11/2006  9:15:00 AM

---

**Page 1**

1  IN THE UNITED STATES DISTRICT COURT
2  IN AND FOR THE DISTRICT OF DELAWARE
3
4  MONA DOBRICH and MARCO DOBRICH, individually a
   As parents and next friend of ALEXANDER DOBRICH,
5  SAMANTHA DOBRICH, JANE DOE and JOHN DOE,
   individually and as parents and next friend of
6  JORDAN DOE and JAMIE DOE,
7              Plaintiffs
       vs.              CIVIL ACTION
8                       NO. 15-120
9  INDIAN RIVER SCHOOL DISTRICT, ET AL.,
10
              Defendants
11
12  ----------------------------------------
13
      DEPOSITION OF CHARLES M. BIRELEY, taken
14  pursuant to notice at the Indian Ricer School
   District, 31 Hosier Street, Selbyville, Delaware,
15  beginning at 9:15 a.m. on October 11, 2006 before
   David A. Sroka, Registered Professional Reporter and
16  Notary Public.
17
   APPEARANCES:
18
      THOMAS ALLINGHAM, ESQUIRE
19    RICHARD HORVATH, ESQUIRE
      BRIAN LENHARD, ESQUIRE
20    P.O. Box 636
      Wilmington, Delaware  19899-0636
21    For the Plaintiffs
22
      WILCOX & FETZER
23    1330 King Street - Wilmington, DE  19801
      (302) 655-0477
24    www.wilfet.com

1

---

**Page 2**

1
2
3
4      JASON P. GOSSELIN, ESQUIRE
       Drinker Biddle & Reath LLP
5      Philadelphia, Pennsylvania 19103-6996
       For the Defendants
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

2

---

**Page 3**

1          MS. DUPHILY:  This is the
2  videotape deposition of Mr. Charles
3  Bireley, taken by the Plaintiffs in the
4  matter of Dobrich, et.al, versus Indian
5  River School District, et.al, case
6  number is 15-120.
7          The deposition is being held at 31
8  Hosier Boulevard, Selbyville, Delaware.  We
9  are going on the record on October 11, 2006
10 at approximately 9:15 a.m..  The court
11 reporter is Dave Sroka from the firm of
12 Wilcox & Fetzer.  I am Lindsay duPhily,
13 videotape specialist from Discovery Video
14 Services.
15         Now, the counsel will introduce
16 themselves and then the court reporter will
17 swear in the witness.
18     MR. ALLINGHAM:  Tom Allingham
19 representing the Plaintiffs and with me is
20 Rick Horvath and Brian Lenhard.
21     MR. GOSSELIN:  Jason Gosselin
22 representing the Indian River School
23 District, the school board and the other
24 defendants.

3

---

**Page 4**

1          CHARLES BIRELEY,
2     The Witness herein, called for examination by
3  the Plaintiffs, having been duly sworn to tell the
4  truth, the whole truth, and nothing but the truth,
5  was examined and testified as follows:
6     examination by him to.
7  EXAMINATION BY MR. ALLINGHAM:
8     Q.   Good morning, Mr. Bireley, my name is Tom
9  Allingham, I represent the Plaintiffs. I'm going to
10 ask you questions today that are relevant in our
11 view to the School Board prayer issue in this
12 litigation.
13         We have, as your lawyer has probably told
14 you separated, or the judge has asked us to separate
15 the School Board prior issue from the several other
16 issues in the case, and so the deposition today will
17 be focused on the School Board prayer issue.
18         A couple pieces of introduction.  I'm going
19 to refer to the final board policy on School Board
20 prayer, a copy of which I'll give you later and we
21 will talk about it, as the School Board Prayer
22 Policy.  Do you understand what I mean when I say
23 that?
24     A.   Yes.

4

---

Bireley, Charles (Video) 10/11/2006 9:15:00 AM

1   A.   That's probably true.
2   Q.   I can now eliminate several pages of my
3   outline.  Are there instances in which students are
4   required to attend Board meetings?
5   A.   Not that I'm aware of.
6   Q.   Are you aware of any instance in which a
7   student who isn't confronted with a scheduling
8   conflict has declined an invitation to attend School
9   Board meetings?
10  A.   Can you repeat the question?
11  Q.   Yes.  Setting aside instances in which
12  student has a scheduling conflict and can't come,
13  are you aware of any instance in which a student has
14  declined an invitation to attend School Board
15  meetings?
16  A.   Not that I'm aware of.
17  Q.   Is it your expectation as a Board member
18  that students would view an invitation from the
19  School Board as an attractive invitation for
20  recognition of their achievements?
21         MR. GOSSELIN:  Objection.
22  Q.   You can answer.
23  A.   My opinion it would be, it's an honor for
24  them to come to receive an award.

33

1   Q.   Yes, sir, and in fact isn't that
2   essentially what Mrs. Hobbs said back in the mid
3   '90s when she said we ought to be honoring our
4   students?
5   A.   Yes.
6   Q.   Okay, we identified the ROTC, and we
7   identified student who come to the Board meetings to
8   receive awards or recognition, is it also the case
9   that student government representatives address the
10  Board regularly?
11  A.   During the time of the school year, yes.
12  Q.   Yes, sir, and in fact there is now a
13  section, regular section of the agenda called
14  student government which is intended to provide the
15  student government representatives with an
16  opportunity to address the Board, is that correct?
17  A.   Yes.
18  Q.   And that practice was established back in
19  it 1999s, is that correct?
20  A.   That was one of the things that was done by
21  a Board member who made the suggestion, it wasn't
22  done by Mrs. Hobbs.
23  Q.   No, sir, I didn't suggest that it was
24  separate from the award issue.

34

1   A.   Yes, it's probably been going on longer
2   than the awards issue that she recommended that we
3   do.
4   Q.   Do you have any recollection of when it
5   began?
6   A.   No, I'm not sure.
7   Q.   I'm going to mark as exhibit, Plaintiff's
8   Exhibit 32 a document bearing Bates number, I should
9   have told you, Bates numbers you will see on the
10  bottom of most of the documents I give you, there is
11  a little printed number.  Some guy named Bates
12  invented this system.  So, we identify them on the
13  record by Bates numbers so people reading the
14  transcript know what we are talking about.
15         So, this is a document titled Minutes of
16  the Board of Education Special Meeting on July 19,
17  1994, it's bearing Bates numbers PR206 through 210.
18         (WHEREUPON, Plaintiff's Exhibit 32
19         was marked for identification)
20         MR. ALLINGHAM:  I can't remember
21         if I told you Jason we decided last night
22         we are going to sequentially number and
23         call them Plaintiff's Exhibits so that we
24         don't -- I never know which is the better

35

1   way, but that's how we are going to do it.
2         MR. GOSSELIN:  I prefer -- well,
3         you don't care what I prefer.  This is
4         fine, this is what I prefer.
5         MR. ALLINGHAM:  I feel better
6         then.
7   Q.   None of this is a memory test, sir.  If you
8   look at page four of the document Plaintiff's
9   Exhibit 32, under student government which is the
10  third heading, you will see that Mr. Cohee reports
11  on a meeting he had at Sussex Central with some
12  students who talked about a lack of communication
13  and the inactive student government, and Mr. Cohee
14  then made a motion, according to the minutes that
15  you seconded, to include on the agenda a ten minute
16  segment for student government for both high schools
17  and the motion passed unanimously.
18         Does that refresh your recollection that it
19  was in 1994 that that agenda item was added?
20  A.   I wasn't sure of the date that it was done,
21  but I know Mr. Cohee is the one who brought it.
22  Q.   And looking at these minutes does that
23  refresh your recollection that it was 1994?
24  A.   This says July 19, 1994.

36

1    Q.   So, to the best of your recollection at
2  every Board meeting during your service as a Board
3  member the School Board opened the meeting with a
4  prayer?
5    A.   To the best of my knowledge.
6    Q.   Who decided, and this is all prior to the
7  more recent adoption of the School Board Prayer
8  Policy, who decided which Board member would lead
9  the group in prayer or offer a prayer?
10    A.   The Board president.
11    Q.   How was it decided which School Board
12  member would open the meeting with a prayer?
13    A.   The Board president just asked someone, I
14  don't know how.
15    Q.   Were there any restriction of any kind on
16  what sort of prayer a School Board member could
17  over?
18    A.   Not that I'm aware of.
19    Q.   Prior to the adoption of Policy BDA.1,
20  whish is the School Board Prayer Policy in October
21  of 2004, was there any policy that governed the
22  offering of prayer at School Board meetings?
23    A.   Not that I'm aware of.
24    Q.   Were you ever asked to lead the Board in

57

1  who would be invited to offer the prayer?
2    A.   It was usually done by a small portion of
3  the group of ten.
4    Q.   And did they have any common
5  characteristics, the small portion?
6    A.   Not that I'm aware of.
7    Q.   Do you know how that small group, smaller
8  group was identified by the Board?
9    A.   To my knowledge the Board president would
10  call on someone at the Board meeting to say the
11  prayer, that's all I know.
12    Q.   But you told me that a small group of the
13  Board was asked to offer the prayer, a group that
14  you were not a member of, do you know how that group
15  was identified or picked or selected to be the ones
16  who would offer the prayer?
17    A.   No.
18    Q.   How small a group, two, three?
19    A.   Three, four, somewhere in that
20  neighborhood.
21    Q.   Was a Jewish Board member ever included in
22  that group?
23    A.   I don't recall us ever having a Jewish
24  Board member.

59

1  prayer or offer a prayer at the beginning of School
2  Board meetings prior to the adoption of the School
3  Board policy?
4    A.   No.
5    Q.   So, 1974 to 2004 is the period of time
6  during which you were a School Board member with a
7  three year hiatus, so if my arithmetic is right
8  that's 27 years of service prior to the adoption of
9  Board Policy BDA.1, and you were never asked to
10  offer a prayer at a School Board meeting?
11    A.   That's correct.
12    Q.   Do you know why?
13    A.   No.
14    Q.   Did you ever tell any Board president that
15  you were not interested in offering a prayer at the
16  School Board meeting?
17    A.   No.
18    Q.   Again, if my arithmetic is correct, that's
19  well over 300 School Board meetings at which
20  somebody offered a prayer, but you were not invited
21  to do so, did that strike you as off or unusual?
22    A.   No.
23    Q.   Did you perceive any pattern in the Board
24  president's practice in the selection of the person

58

1    Q.   Was a Muslim Board member ever included in
2  that group?
3    A.   I don't call us having a Muslim Board
4  member.
5    Q.   Or a Buddhist?
6    A.   Same answer.
7    Q.   A non-Christian Board member ever included
8  in that group?
9    A.   I don't recall us ever having that type of
10  Board member.
11    Q.   Would you characterize the members of that
12  smaller group as being particularly religious
13  amongst their peers?
14         MR. GOSSELIN:  Objection.
15    A.   Do I answer?
16    Q.   Yes, sir.
17    A.   Can you please ask that question again?
18    Q.   Was it -- did you perceive that the
19  criteria for selection of this smaller group was
20  that these were folks who were particularly
21  religious?
22         MR. GOSSELIN:  Objection.
23    A.   No.
24    Q.   Let me just ask the broad question, is it

60

| | |
|---|---|
| 1    Q.   Do you know precisely when that took place?<br>2    A.   No.<br>3    Q.   Did Mr. Helms subsequently report on the<br>4  substance of his conversation with Mr. Neuberger to<br>5  the Board?<br>6    A.   He got Mr. Neuberger to come and visit us.<br>7    Q.   Do you know when that took place?<br>8    A.   Not exactly.<br>9    Q.   Was it the summer of 2004?<br>10    A.   It was after the graduation ceremony, yes.<br>11    Q.   Was it before the commencement of the next<br>12  academic year?<br>13    A.   Yes, I'm pretty sure it was.<br>14    Q.   So, sometime during the summer of 2004?<br>15    A.   Yes.<br>16    Q.   Do you know whether Mr. Neuberger's visit<br>17  to the Board is reflected in the minutes of the<br>18  Board meeting?<br>19    A.   I believe, if I am not mistaken that this<br>20  was a special Board meeting, it wasn't a regular<br>21  Board meeting.<br>22    Q.   Okay. Do you know whether the minutes of<br>23  that meeting reflect Mr. Neuberger's attendance?<br>24    A.   I thought it was.<br><br>85 | 1  is there any distinction other than that the public<br>2  is present at those regularly scheduled public<br>3  meetings?<br>4    A.   Sometimes there is public at special<br>5  meetings, too.<br>6    Q.   Oh, and even if there is public at the<br>7  special meetings you don't offer a pray?<br>8    A.   That's correct.<br>9    Q.   Is there any distinction from your point of<br>10  view, just as an individual Board member, between a<br>11  special meeting at which the public is present and a<br>12  regular meeting at which the public is present that<br>13  would lead to pray at the latter but not at the<br>14  former?<br>15    A.   Except it's always the way that it's been<br>16  done.<br>17    Q.   How often does the Board, just an estimate<br>18  over your 30 years of tenure, how often does the<br>19  Board call special Board meetings?<br>20    A.   Two to three a year maybe.<br>21    Q.   And how often does the public attend<br>22  special Board meetings?<br>23    A.   I'm not sure.<br>24    Q.   Not very frequently?<br><br>87 |
| 1    Q.   Did had a special Board meeting open with a<br>2  prayer?<br>3    A.   I don't believe it did.<br>4    Q.   Why is that?<br>5    A.   I know it's probably sounds strange but the<br>6  prayer issue usually is on regular Board meetings.<br>7  If we have a special Board meeting we don't do it.<br>8    Q.   Why would your say that sounds strange?<br>9    A.   Because we just have a rule, or I guess<br>10  it's a past practice or whatever that we always have<br>11  the prayer at the regular Board meetings but no<br>12  other.<br>13    Q.   And when you say the regular Board meetings<br>14  those are the regular meetings at which the public<br>15  is present?<br>16    A.   Yes, once a month.<br>17    Q.   And is that regular practice it's not just<br>18  today's practice or 2004's regular practice, it's<br>19  the regular practice that goes back in time as far<br>20  as your tenure on the Board extends, correct?<br>21    A.   Yes.<br>22    Q.   And is that because -- is the distinction<br>23  between public meetings where prayers are offered<br>24  and private meetings where prayers are not offered,<br><br>86 | 1    A.   I wouldn't say not all three of them.  Say<br>2  if we do two or three a year, say not all three.  It<br>3  depends on what the issue is.<br>4    Q.   In this litigation we have had the<br>5  opportunity to look at the minutes of Board<br>6  meetings, and I'll represent to you that since the<br>7  adoption of Policy BDA.1, the School Board Prayer<br>8  Policy on October 19, 2004, since that date there<br>9  have been at least 17 special Board meetings over<br>10  the course of that two year period.<br>11       So, that's eight to nine per year.  Has the<br>12  incidents of special Board meetings increased in<br>13  recent years?<br>14    A.   The difference between what I'm talking<br>15  about and what you're talking about is we have a<br>16  special Board meeting the we interview for<br>17  personnel, I'm not talking about that.  I'm talking<br>18  about issues other than hiring of personnel that we<br>19  have a special Board meeting for.<br>20    Q.   Okay, so I can think of it as two<br>21  categories of special meetings, one is a category<br>22  which is limited to hiring personnel for the<br>23  district?<br>24    A.   Okay.<br><br>88 |

1    Q.   Then I should be thinking then there is
2    category of special meeting for everything else?
3    A.   Yes.
4    Q.   Even it's the everything else type meeting
5    that comes two or three times a year?
6    A.   Yes, I would say so.
7    Q.   I assume that the personnel special
8    meetings there are no public present?
9    A.   That is true.
10   Q.   At the other kinds of special meetings
11   sometimes the public is present and sometimes there
12   is nobody from the public there?
13   A.   Yes.
14   Q.   To come back to Mr. Neuberger, there is a
15   special Board meeting on August 23, 2004 that was
16   addressed in large part to the issue of prayer in
17   the schools. I'll show you the minutes, what
18   portion of the minutes that we have in a little
19   while. It that the meeting and to place this in
20   time, the next day, August 24, 2004, was the meeting
21   at which many hundreds of people showed up. Was it
22   the August 23 special meeting, the day before the
23   big meeting, at which Mr. Neuberger showed up at the
24   Board?

89

1    A.   I don't think so.
2    Q.   Was it before or after that August 24th big
3    meeting?
4    A.   If memory serves me correctly it was after.
5    Q.   So, that's helpful, thanks. Other than
6    Mr. Neuberger did the Board or the district contact
7    any other lawyer or law firm to investigate issues
8    relating to School Board prayer?
9    A.   I believe that Mr. Walls, I think it's the
10   Alliance Defense Fund, I think he had some
11   conversation with them, but the Board never met with
12   anyone from them.
13   Q.   How did you find out about Mr. Walls'
14   contacts with the Alliance Defense Fund?
15   A.   He told us that he had done it, that's when
16   he was president.
17   Q.   Did the Board authorize Mr. Walls to
18   contact the Alliance Defense Fund?
19   A.   Not that I'm aware of.
20   Q.   So, he did that on his own?
21   A.   Yes.
22   Q.   Other than Mr. Neuberger and the Alliance
23   Defense Fund, did the Board or the district contact
24   any lawyers for the purpose of investigating the

90

1    issue of School Board prayer?
2    A.   I don't think so.
3    Q.   Did the Board have a regular Board lawyer?
4    A.   Yes.
5    Q.   In the year of 2004?
6    A.   Yes, excuse me.
7    Q.   Who was that?
8    A.   Mr. Griffin, James Griffin.
9    Q.   Did the Board consult with Mr. Griffin on
10   the issue of School Board prayer?
11   A.   Yes.
12   Q.   And when did the first, when did the Board
13   first consult with Mr. Griffin on that issue?
14   A.   Some time after the graduation.
15   Q.   In terms of its consultation with
16   Mr. Griffin did that take place before or after the
17   big meeting on August 24th?
18   A.   If memory serves me correctly that was
19   afterwards, after too.
20   Q.   Okay. So we've identified Mr. Neuberger,
21   the Alliance Defense Fund and Mr. Griffin, any other
22   lawyers that were consulted by the district on the
23   issue of School Board prayer?
24   A.   Maybe David Williams.

91

1    Q.   He's with the Morse James firm?
2    A.   I'm not sure.
3    Q.   It's okay if you don't know?
4    A.   It's a Delaware attorney.
5    Q.   Got you. Mr. Williams was retained by the
6    Board in connection with its dispute with its
7    insurer, correct?
8    A.   Yes.
9    Q.   So that took place after February of 2006?
10   A.   Yes.
11   Q.   Quite a long time after the adoption of the
12   School Board Prayer Policy?
13   A.   Yes.
14   Q.   Did the Board ever consult with either John
15   Cafferty or John Balliger on the issue of School
16   Board prayer?
17   A.   You mean before they came to work for us or
18   work with us?
19   Q.   Before or after they came to work with you?
20   A.   I don't think so. I think they were
21   presented to us by the insurance company.
22   Q.   Did Mr. Balliger and Mr. Cafferty represent
23   the School District and the School Board?
24   A.   Yes.

92

Bireley, Charles (Video)  10/11/2006  9:15:00 AM

1    A.    No.
2    Q.    In order to be a practicing Christian do
3    you consider it necessary to attend church at all?
4    A.    No.
5    Q.    Again on the issue of practice paragraph
6    three of Board prayer, would you consider that a
7    student who attends every regular Board meeting and
8    who hears prayers that regularly mention Jesus
9    Christ could conclude over time that it is the
10    Board's view that Christianity is the appropriate
11    religion?
12        MR. GOSSELIN:  Objection.
13    A.    I guess that's possible.
14    Q.    What I'm trying to get at, Mr. Bireley, is
15    whether you would consider the cumulative affect of
16    repeated mention of only one faith or only one
17    representation of the Deity to have some impact,
18    cumulative impact over and above the text of a
19    prayer that's offered?
20        MR. GOSSELIN:  Objection.
21    Q.    Would you agree with that?
22    A.    It's possible.
23    Q.    From your perspective as a Board member do
24    you think it would be preferable to avoid that kind

                          149

1    of cumulative impact, that is to say to offer a
2    variety of kinds of prayers or moments of silence to
3    solemnize the occasion?
4        MR. GOSSELIN:  Objection.
5    A.    I think the policy, or the practice that we
6    have right now, where the individual person who is
7    saying the prayer has the right to say, you know,
8    whatever they want.
9    Q.    I'm not asking about individual person's
10    rights, I'm asking about what as a Board member
11    would consider preferable?  Would you consider it
12    preferable to in order to solemnize the proceedings
13    for a variety of kinds of prayers, moments of
14    silence to be offered?
15    A.    I believe in the person's individual right
16    to say what they want to say when they're in prayer.
17    I think that's the way it should be.
18    Q.    Was the purpose of the adoption of the
19    School Board Prayer Policy to solemnify the
20    proceedings of the Board meetings?
21    A.    By that you mean to ask for like divine
22    guidance or help us get through the meeting, to make
23    the right decisions.
24    Q.    I'm really trying to ask a very specific

                          150

1    question.  I'll be a little more general about it.
2    I won't sort of put the answer in the question.
3    What was the purpose of the adoption of the Board
4    Prayer at Regular Board Meetings Policy?
5    A.    What was the purpose?
6    Q.    Yes.
7    A.    To ask for divine guidance for the Board to
8    help us make correct decisions and get us through
9    the meeting in the proper way.
10    Q.    What does the proper way mean?
11    A.    To do, to make the best decisions for
12    what's best for our students.
13    Q.    And is the proper way the way that God
14    would prefer?
15    A.    In my opinion, yes.
16    Q.    And is the proper way the way that God
17    personified by Jesus Christ would prefer?
18    A.    In my personal opinion, yes.
19    Q.    And that was the purpose of the adoption of
20    the School Board Prayer Policy?
21    A.    The purpose of adopting the School Board
22    policy is to grant us the opportunity to pray for
23    divine guidance, you know and help us make the right
24    decisions.

                          151

1    Q.    As a Board member when you cast your vote
2    in favor of Board Policy BDA.1, you cast that vote
3    in public, correct?
4    A.    Yes.
5    Q.    And did you expect that members of the
6    public in attendance would understand that that was
7    your purpose in adopting the School Board Prayer
8    Policy?
9    A.    I really had no way of knowing what they
10    thought.
11    Q.    If a member of the public had raised their
12    hand, that's not the right way to say it.  If they
13    signed up to ask a question of the Board during the
14    public comment session at the October 19th meeting,
15    and had asked the question what was your purpose in
16    casting your vote for Board Policy BDA.1, is that s
17    what you would have responded?
18    A.    Not at that time.
19    Q.    What would you have responded at that time?
20    A.    I wouldn't have responded anything.
21    Q.    You would have declined to answer a
22    question what is your purpose in adopting this
23    policy?
24    A.    Yes.

                          152

Bireley, Charles (Video) 10/11/2006 9:15:00 AM

1   with a moment of silence?
2   A.   Well --
3          MR. GOSSELIN: To the extent that
4   this is not based on information obtained
5   from counsel.
6   A.   Okay, this would be from individual Board
7   members?
8   Q.   Yes, sir?
9   A.   It was suggested and was discussed and they
10  decided not to do it because they still thought that
11  each individual Board member had the right to say
12  whatever they wanted to say in their moment of the
13  time that they give a prayer.
14  Q.   Did somebody say look if we just open the
15  meeting with a moment of silence it is not going to
16  be seeking divine guidance for our decisions at the
17  Board meeting?
18  A.   I don't recall that being said. I don't
19  recall anybody saying that.
20  Q.   The policy itself contemplates, if you look
21  at PX9, sir that the Board of Education may choose
22  to open its meeting with a moment of silence, right?
23  A.   Yes.
24  Q.   And so am I correct that the policy itself

173

1   contemplates that moment of silence would be
2   effective to solemnify the proceedings?
3   A.   In some people's mind, yes.
4   Q.   And the policy itself contemplate that it
5   would be effective to solemnify the proceedings by
6   opening with a moment of silence, is that correct?
7   A.   What the policy says?
8   Q.   Yes, sir. Did anyone raise the question if
9   as the policy reflects being a moment of silence
10  would be effective to solemnify the proceedings why
11  it was necessary also to offer the option to
12  individual Board members to open the meetings with a
13  prayer?
14  A.   The discussion that I remember what that
15  it's an individual's choice.
16  Q.   Was the inclusion in the Board Prayer
17  Policy of the option to open its meeting with a
18  prayer intended to protect individual Board members'
19  rights to express their religion as they saw fit?
20         MR. GOSSELIN: Objection to the
21  form.
22  A.   To prevent them from doing it?
23  Q.   To protect their rights to express their
24  religion as they saw fit?

174

1   A.   I guess that's a fair statement.
2   Q.   Was a reason for the adoption of this
3   policy to protect individual Board members' First
4   Amendment rights to express their religion as they
5   see fit?
6          MR. GOSSELIN: Objection.
7   A.   I will agree.
8   Q.   Did anybody give any consideration to
9   calling this policy the policy to protect individual
10  Board members First Amendment rights?
11  A.   No, not that I recall.
12  Q.   Do you know why the title of the policy was
13  changed from Policy on Prayer at Board Meetings,
14  which is what the first Rutherford Institute
15  document that Mr. Helms passed to you to Board
16  Prayer at Regular Board Meetings?
17  A.   The only thing I can recall in particular I
18  remember someone asking the question that was the
19  only time that we did it, and it was stated at
20  regular Board meetings because we didn't do it at
21  any other type of meetings.
22  Q.   Got you. That's not because Board members
23  didn't think they could equally use divine guidance
24  at special Board meetings that you never had done

175

1   it?
2   A.   I guess that's true.
3   Q.   So, as far as you were able to tell Board
4   members did think they needed divine guidance for
5   special Board and regular Board meetings?
6   A.   Yes.
7          MR. GOSSELIN: And everywhere
8   else.
9   Q.   In the Board School Board Prayer Policy we
10  talked a little bit about how you as the president
11  set up the rotating basis, I have a few more
12  questions on that.
13         As things stand now in your service as the
14  Board president, is it correct that you don't on a
15  rotating basis offer each Board member the
16  opportunity to offer a prayer to open the meeting?
17  A.   I just offer it to the people who have
18  indicated to me that they are willing to do it.
19  Q.   Would it be fair for me to understand that
20  the selection process is done in advance with the
21  offer extended only to the, the invitation extended
22  to Board members who have previously volunteered to
23  participate in this process?
24  A.   If the other Board members has not

176

# TAB  2

Bunting, Nina Lou (Video)  10/13/2006  9:07:00 AM

```
1              IN THE UNITED STATES DISTRICT COURT
2                 FOR THE DISTRICT OF DELAWARE
3
4    MONA DOBRICH and MARCO DOBRICH, individually
     And as parents and next friend of ALEXANDER
5    DOBRICH, SAMANTHA DOBRICH, JANE DOE and JO
     DOE, individually and as parents and next friend
6    of JORDAN DOE and JAMIE DOE,
7                    Plaintiffs
8        vs.              Civil Action
                          Case No. 15-120
9
     INDIAN RIVER SCHOOL DISTRICT, ET AL.,
10
                    Defendants
11
12        DEPOSITION OF NINA LOU BUNTING, taken
13   pursuant t notice at the Indian River School
     District, 31 Hosier Street, Selbyville, Delaware,
14   beginning at 9:07 a.m. on October 13, 2006 before
     David A. Sroka, Registered Professional Reporter and
15   Notary Public.
16
     APPEARANCES:
17
         THOMAS ALLINGHAM, ESQ.
18       RICHARD HORVATH
         BRIAN LENHARD
19       P.O. Box 636
         Wilmington, Delaware  19899-0636
20       For the Plaintiffs
21       JARROD D. SHAW, ESQ.
         Drinker Biddle & Reath, LLP
22       One Logan Square
         Philadelphia, Pennsylvania  19103-6996
23       For the Defendants
24

                         1
```

```
1          MS. DUPHILY:  This is the
2    videotape deposition of Ms. Nina Lou
3    Bunting taken by the Plaintiff in the
4    matter of Dobrich, et al. versus Indian
5    River School District, et al., case number
6    15-120.  We are going on the record at 31
7    Hosier Boulevard, Selbyville, Delaware
8    on October 12, 2006 at approximately 12:55
9    p.m..
10         The court reporter is Dave Sroka
11   from the firm of Wilcox & Fetzer,
12   Wilmington, Delaware.   My name is
13   Lindsay   duPhily and I'm the videotape
14   specialist   of Discovery Video Services.
15         Counsel will now introduce
16   themselves and then the court reporter
17   will swear in the witness.
18         MR. ALLINGHAM:  I'm Tom Allingham
19   I represent the Plaintiffs in this
20   case, and with me are Richard Horvath and
21   Brian Lenhard.
22         MR. SHAW:  I'm Jarrod Shaw and I
23   represent the defendants in this action.
24         NINA LOU BUNTING,

                         2
```

```
1         The Witness herein, called for examination by
2    the Plaintiffs, having been duly sworn to tell the
3    truth, the whole truth, and nothing but the truth,
4    was examined and testified as follows:
5    EXAMINATION BY MR. ALLINGHAM:
6    Q.   Did you attend the August 24, 2004 Board
7    meeting?
8    A.   August 24, 2004 Board meeting, are you
9    referring to the one where the public, a lot of
10   people from the public came?
11   Q.   Hundreds of people?
12   A.   Okay, yes, I did.
13   Q.   Did anything occur at that meeting that was
14   disturbing to you personally?
15   A.   No.
16   Q.   I want to show you a clip of the vide from
17   that meeting?
18   A.   Okay.
19   Q.   This is a portion from the public comment
20   section of the meeting.
21   A.   Okay.
22        (AT THIS POINT IN TIME A TAPE WAS PLAYED)
23   Q.   Were you distracted when your telephone
24   rang during that clip?  Would you like me to play it

                         3
```

```
1    again for you?
2    A.   No, I don't think I was distracted.  I may
3    have been momentarily.
4    Q.   Were you present when -- who was speaking
5    during that public comment section?
6    A.   Mr. Harold Short.
7    Q.   Harold Johnson?
8    A.   Harold Johnson, okay.  I don't know him
9    that well.  I knew it was Harold somebody.
10   Q.   Were you present when he made that
11   statement?
12   A.   Yes, I was.
13   Q.   Did you hear him say that the good Lord has
14   proven that there's a higher power above our Supreme
15   Court?
16   A.   I guess I heard him say it.  I didn't hang
17   on every word.
18   Q.   Did you hear him say that was proven when
19   the last I heard Madelyn Murray-O'Hare disappeared
20   never to be seen again?
21   A.   Well, I heard it just now, do I remember --
22   Q.   that's the first time that you heard it?
23   A.   I'm sure I heard it that night, but I
24   didn't remember hearing it until you showed me

                         4
```

1  Mr. Griffin to draft a School Board Prayer Policy?
2           MR. SHAW: I'm going to
3       object to attorney/client privilege. If
4       the Board asked Mr. Griffin that's covered
5       by the privilege.
6    Q.  Do you remember whether the Board asked
7  Mr. Griffin what the weather was like?
8    A.  No, I don't remember what was asked of
9  Mr. Griffin that evening.
10   Q.  The Board Prayer Policy, the process of
11 generating Board policies, I'm going to ask, this is
12 the general process, is it typical that the Board
13 would decide to refer a matter to the policy
14 committee. The policy committee would consult with
15 the Board's attorney, and then the policy committee
16 and the Board's attorney typically would draft a
17 policy for presentation to the full Board?
18   A.  Never having attended a policy meeting I
19 can't say what their process is.
20   Q.  Fair enough. Do you know whether or not
21 Mr. Griffin ever drafted a draft School Board Prayer
22 Policy?
23   A.  I have no idea.
24   Q.  The policy that you adopted is a policy

93

1  that is described on its face as, sorry, ma'am, it's
2  titled Board Prayer at Regular Board Meetings. It's
3  quite specific that it's a policy having to do with
4  regular Board meetings. Did anyone give any
5  consideration at the Board level to having a policy
6  that extended to special Board meetings?
7    A.  Not to my knowledge because I don't think
8  we had ever had prayer at special Board meetings, so
9  that wasn't even a consideration at this time.
10   Q.  Did you understand the -- there was no
11 litigation at the time of the adoption,
12 consideration and adoption of this policy, the
13 litigation was not filed until 2005?
14   A.  Okay.
15   Q.  So, did you understand that the question
16 that had been raised about prayer at Board meetings
17 was limited to regular Board meetings or did you
18 understand that it extended to all Board meetings?
19   A.  I understood that it was about regular
20 Board meetings.
21   Q.  And from where did you get that
22 understanding?
23   A.  I got the understanding, I don't think I
24 was present, there was the graduation at which Mona

94

1  Dobrich first talked about her complaint. I don't
2  recall having been to the first Board meeting after
3  that, and when I found out what was going on it was
4  my understanding that Mona Dobrich came to the June
5  Board meeting to complain about prayer at
6  graduation, then found out that there was prayer
7  at the regular Board meeting.
8        So, it was my understanding that we would
9  draft policy to try to take care of the situation,
10 and I think most things that we tried to do were in
11 hopes of not being sued.
12   Q.  This is sort of, maybe an unusual question,
13 buy do you feel as a Board member that your rights
14 regarding the free exercise of your religion are
15 infringed by not having a policy on special meeting
16 Board prayer?
17   A.  No, I don't think my rights are violated by
18 not having a policy, is that what you mean?
19   Q.  Yes, exactly. The other sentence of the
20 limited portion of the executive session minutes,
21 which is Plaintiff's Exhibit 13 that I have reports
22 that, "Several Board members expressed that their
23 constituents do not want the Board to change its
24 practice of opening the meetings with a prayer." Do

95

1  you remember which Board members expressed that
2  view?
3    A.  I know I was one of them.
4    Q.  Do you remember the others?
5    A.  And I'm not saying that I expressed that
6  view that evening. I know that over this entire
7  thing I have been bombarded with constituents, and I
8  have expressed that numerous times --
9    Q.  Okay.
10   A.  -- not necessarily just at this one time.
11   Q.  And when say that you've been bombarded
12 with communications from constituents, give me a
13 ballpark number 50, 100, 1000?
14   A.  In the hundreds. I'm not saying phone
15 calls and emails and letters. I know everyone in
16 this -- well, I know a lot of the people in this
17 community, and we go to restaurants in this
18 community, we go grocery shopping, we're at ball
19 games with our grandchildren and people come up to
20 me all the time. I know for a fact that five people
21 this week have come up to me, one lady that I had
22 called on the phone about something, so these people
23 have expressed this to us.
24   Q.  What are they expressing?

96

Bunting, Nina Lou (Video)  10/13/2006  9:07:00 AM

1  A.  They want us to stand firm, they want us to
2  take a stand for what we feel is right and they are
3  behind us and they support us.
4  Q.  Does anybody articulate what it is that you
5  are suppose to be standing firm for?
6  A.  We are standing firm for being able to have
7  the right to say a prayer in the regular Board
8  meeting aloud.
9  Q.  And it's a fine distinction, but your
10  answer is couched in terms of what you are standing
11  firm for, and what I was trying to ask was, did
12  anybody who's called you or bumped into you on the
13  street or whatever, have they articulated to you
14  what they think you're suppose to be standing up
15  for?
16  A.  Yes.
17  Q.  And have some of them articulated that they
18  want you to stand firm for School Board prayer?
19  A.  Yes.
20  Q.  Are have some of them articulated to you
21  that they want you to stand firm for prayer in the
22  schools?
23  A.  No, sir because they understand that that's
24  already been -- there's already been a decision

97

1  about that.
2  Q.  It appeared that a number of the
3  constituents at the August 24th meeting didn't
4  understand that?
5  A.  True, but it's been two years now and
6  people by reading the paper and all I think most
7  people now are aware of what the situation truly is.
8  Q.  Okay.  Have you received any comments that
9  a constituent of yours thought that the policy
10  should be revised?
11  A.  No, sir.
12  Q.  So, the comments that you've received from
13  your constituents have been unanimous?
14  A.  Yes, sir.
15  Q.  And that's important to you, isn't it?
16  A.  Well, it's important to me because I
17  represent these people and they elected me to make
18  decisions at the Board level on their behalf, and I
19  represent my people.
20  Q.  Do you know how many residents there are in
21  your district?  Which is your district,
22  Mrs. Bunting?
23  A.  I'm district three.  I have part of
24  Dagsboro, all of Millsboro, down toward the Long

98

1  Neck area.  I feel like I have a foot, I don't know
2  if you are familiar with our district, but we are
3  sort of north and south, I have a foot in the north
4  and also in the south.
5  Q.  That's the second time you've sort of
6  talked about the north and the south of the
7  district, is there, or has been in the past a divide
8  between the north and the south?
9  A.  Very much so.
10  Q.  Tell me what mean by that?
11  A.  We were put together as a district in 1969
12  by the courts, and there are some people who are
13  still upset that it was such a large district put
14  together, and we have to have two high schools
15  because it's such a large district, and our high
16  schools play sports against each other, which isn't
17  real good, so we are our own arch enemies.
18  So, therefore as a Board when we have to
19  decide about which time gets new uniforms, which
20  team gets turf on their football, see what I mean?
21  So, being on this School Board I was warned could be
22  tough because of a north south split sometimes on
23  decisions.
24  Q.  And I guess particularly tough for you

99

1  because your district is sort of part north and part
2  south?
3  A.  Yes, but I taught in this district and I
4  don't see a north and south, I see one district.
5  Q.  In terms of the members, the current
6  members of the Board, which are from the northern
7  half and which are from the southern half?
8  A.  The present members?
9  Q.  Yes, ma'am.
10  A.  Okay, I'll start with the southern half.
11  That would be Charlie Bireley, Reggie Helms, Donna
12  Mitchell, Donald Hattier.
13  Q.  And the rest are from the north?
14  A.  There are the two of us straddle, and that
15  would be Randy Hughes and myself.  We are the
16  straddlers.  And then the rest are from the
17  northern.
18  Q.  In the course of those hundred or hundreds
19  of comments from your constituents has anyone said
20  to you that you should stand firm for Christian
21  values?
22  A.  No.
23  Q.  Not one?
24  A.  No.  Not Christian values.  That's never

100

1   been the terminology used.  I will say it's fight
2   the ACLU.  And it's been we've always had prayer,
3   why can't we have prayer, we should have prayer,
4   it's our right to have prayer, but stand firm for
5   Christian values I don't think that terminology has
6   ever been used, not with me.
7       Q.   You mentioned that your constituents
8   generally speaking have told you that you should
9   stand firm for prayer at regular Board meetings?
10      A.   Uh-hum.
11      Q.   And do they draw that distinction between
12  regular Board meetings and special Board meetings?
13      A.   No.
14      Q.   So, they said stand firm for Board prayer?
15      A.   For Board meetings, for praying at the
16  Board meetings.
17      Q.   And what do you say to your constituents
18  when they say that?
19      A.   When I say that I say that we are -- what
20  can we do, we are listening to our lawyers, we are
21  doing what we need to do, and if the case goes to
22  court, you know, the judge will decide.  See we
23  have, we can't talk about this as you well know, so
24  we have to be extremely careful what we say.

101

1       A.   (Nods head).
2       Q.   No one has told you that you should stand
3   firm for Christian values?
4       A.   I'm not going to say the words Christian
5   values have never been mentioned, but to my
6   knowledge no one has called it Christian values.
7   They know that the situation is prayer at Board
8   meetings and they usually are the words they use.
9   Prayer, Board meetings.
10      Q.   Well, the litigation is, of course about
11  more than just prayer at Board meetings, correct?
12      A.   Well, they don't know that.
13      Q.   Have you ever received hundreds of comments
14  about any other issue that has faced the Board from
15  your constituents?
16      A.   No, sir.
17      Q.   Have you ever received even a fraction of
18  that many comments on any other issue?
19      A.   Not even a fraction.  The closest I ever
20  came to was when we were going to, our calendar
21  situation, a calendar situation, where we wanted to
22  shorten the Easter break and make it just Friday and
23  Monday because we didn't have air conditioning in
24  all the schools yet and, you know, and the parents

103

1       Q.   I apologize, but I don't know what do you
2   mean when you say you can't talk about this?
3       A.   We've been told to be very careful what we
4   say in public, okay?
5       Q.   By your lawyer?
6       A.   By our lawyers.
7       Q.   Nevertheless, from time to time members of
8   the Board have given statements or interviews to the
9   press, is that correct?
10      A.   True.
11      Q.   And members of the Board have gone on the
12  local radio station?
13      A.   Yes, sir.
14      Q.   In your view are those actions consistent
15  with the admonition from your lawyers that you
16  should be very, very careful about what you say?
17      A.   They were happening before we got, before
18  we were told to be extremely careful.  We didn't
19  have good representation in the beginning.
20      Q.   And that situation's been corrected now?
21      A.   Yes, sir.
22      Q.   So, in the comments from your constituents
23  that have been unanimous that you should stand firm
24  for School Board prayer?

102

1   got really upset because they felt the children
2   needed a break after the state test.  And I did get
3   many phone calls about that, but nothing, nothing
4   compared to this.
5       Q.   Would it be fair to say that this is the
6   issue in which your constituents have been most
7   intensely interested over the entire tenure, over
8   your entire tenure on the Board?
9       A.   Well, certainly the last several years of
10  my tenure.  Not so at the very beginning between '02
11  and '04.
12      Q.   Yes, the interest has been very intense
13  since '04?
14      A.   Since '04.
15      Q.   And the intensity of that interest is the
16  greatest of any issue that's ever been presented to
17  the Board --
18      A.   Yes.
19      Q.   -- during your tenure?
20      A.   Yes, in my knowledge, as far as I'm
21  concerned.
22      Q.   Do you know who the Does are?
23      A.   No, sir.
24      Q.   Has anybody ever told you they think they

104

# TAB 3

Cohee, Richard (Video)  10/17/2006  1:17:00 PM

```
 1        IN THE UNITED STATES DISTRICT COURT
 2           FOR THE DISTRICT OF DELAWARE
 3  MONA DOBRICH and MARCO   :  C.A. No. 15-120 (J
    DOBRICH, Individually and  :
 4  as parents and next friend :
    of ALEXANDER DOBRICH,    :
 5  SAMANTHA DOBRICH, JANE DOE :
    and JOHN DOE, Individually :
 6  and as parents and next   :
    friend of JORDAN DOE and  :
 7  JAMIE DOE,               :
                            :
 8        Plaintiffs,        :  :
                            :
 9        v.                 :
                            :
10  INDIAN RIVER SCHOOL      :
    DISTRICT, et al.,        :
11                          :
          Defendants.        :
12                          :
13      Videotaped Deposition of RICHARD COHEE,
    taken pursuant to notice, on Tuesday, October 17, 2006
14  at 1:17 p.m. at 31 Hosier Street, Selbyville, Delaware,
    reported by Lorena J. Hartnett, a Registered
15  Professional Reporter and Notary Public.
16        . . . . . . .
17  APPEARANCES:
18      BRIAN G. LENHARD, ESQUIRE
        RICHARD HORVATH, ESQUIRE
19      One Rodney Square
        Wilmington, DE  19801
20        Attorney for the Plaintiff
21
22      WILCOX & FETZER
        1330 King Street - Wilmington, DE  19801
23        302-655-0477
          www.wilfet.com
24

                      1
```

```
 1
 2
 3            TABLE OF CONTENTS
 4  TESTIMONY OF RICHARD COHEE:
 5    Direct Examination by Mr. Lenhard . . . . . . . 4
 6  Certificate of Reporter . . . . . . . . . . . . 116
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

                      3
```

TABLE OF CONTENTS
TESTIMONY OF RICHARD COHEE:
  Direct Examination by Mr. Lenhard . . . . . . . 4
Certificate of Reporter . . . . . . . . . . . . 116

```
 1
 2  APPEARANCES  (CONTINUED):
 3    JASON P. GOSSELIN, ESQUIRE
      Drinker, Biddle & Reath, LLP
 4    One Logan Square
      18th and Cherry Streets
 5    Philadelphia, PA  19103-6996
        Attorney for the Defendants
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

                      2
```

```
 1        VIDEOGRAPHER:  This is the videotaped
 2  deposition of Mr. Richard Cohee taken by the
 3  plaintiff in the matter of Dobrich et al
 4  versus Indian River School District, et al,
 5  Case Number 15-120.  This deposition is
 6  being held at 31 Hosier Boulevard.  We are
 7  going on the record on October 17, 2006 at
 8  approximately 1:17 p.m.
 9        The court reporter is Lorena Hartnett
10  from the firm of Wilcox and Fetzer,
11  Wilmington, Delaware.  My name is Lindsay
12  DuPhily.  I am the videotape specialist with
13  Discovery Video Services.
14        Counsel will now introduce themselves
15  and the court reporter will swear in the
16  witness.
17        MR. LENHARD:  My name is Brian
18  Lenhard, and I represent the plaintiffs in
19  this action.
20        MR. GOSSELIN:  Jason Gosselin for
21  defendants.
22        RICHARD COHEE,
23  HAVING FIRST BEEN DULY SWORN, TESTIFIED AS
24    DIRECT EXAMINATION ON BEHALF OF THE PLAIN

                      4
```

Cohee, Richard (Video)  10/17/2006  1:17:00 PM

| | |
|---|---|
| 1   A. That's okay. I take them on and off a<br>2  hundred times a day.<br>3   Q. Okay, if you turn to page four, which is<br>4  BPD702, you will see where the numbered paragraphs<br>5  start.<br>6   A. Okay, page four?<br>7   Q. About halfway down there is, it starts, the<br>8  paragraph starts, "In order to solemnify." Do you see<br>9  that?<br>10   A. Okay, number one?<br>11   Q. Number one.<br>12   A. Uh-huh.<br>13   Q. If you look at that and look at PX9 at the<br>14  same time, do you see that those paragraphs are<br>15  substantially the same?<br>16   A. Yes.<br>17   Q. Do you want to take the time to read it, or<br>18  have you read it before?<br>19   A. I recall this.<br>20   Q. Okay.<br>21   A. And I know that there is a lot of<br>22  similarities, as I skim through here, with those five<br>23  sections.<br>24   Q. Did anyone from the public ever ask you for a | 1  I can't sit here and say that with certainty.<br>2   Q. Can you turn to the second page of PX 14? On<br>3  the second page of that you will see there is a roll<br>4  call.<br>5   A. Okay.<br>6   Q. And you are listed there as present?<br>7   A. Yes.<br>8   Q. And the next section lists other visitors and<br>9  staff in attendance?<br>10   A. Yes.<br>11   Q. Can you tell me why those people were there<br>12  to discuss litigation?<br>13   A. No. Specifically, no. I will say that it<br>14  has been an occurrence that the superintendent and/or<br>15  the assistant superintendent has been present during,<br>16  over the years during discussion of potential<br>17  litigation or pending litigation, along with Janet<br>18  Hearn, who was our recording secretary.<br>19    Patrick Miller is finance. I am not sure<br>20  what role he would have played in that discussion.<br>21  And Jim Griffin at the time was an attorney.<br>22   Q. Okay, so in your discussion you mentioned the<br>23  superintendent and the assistant superintendent.<br>24  That's Ms. Hobbs is the superintendent? |
| 65 | 67 |
| 1  copy of this policy, PX9?<br>2   A. I don't know. I don't recall it.<br>3   Q. Did anyone submit -- Can you -- Strike that.<br>4   A. If I were to be asked, I would most likely<br>5  refer them to Central Office.<br>6   Q. Okay. All right, now I would like to give<br>7  you two documents which again you probably have over<br>8  there, PX13 and PX14. Do you recall why the board met<br>9  on August 23, 2004?<br>10   A. Well, it says here to discuss potential<br>11  pending litigation. The number there would identify<br>12  the issue, and I don't recall what number that was<br>13  used to identify the issue.<br>14   Q. You don't recall whether it meant --<br>15   A. 0501PL, I don't know if that's the number<br>16  that refers to the issue that we are here for today or<br>17  not.<br>18   Q. Do you recall whether it had to do with<br>19  school board prayer in general?<br>20   A. I would -- Well, I know we had a number of<br>21  meetings about that, these issues, and I know some I<br>22  attended and some I did not. I would -- Well, I don't<br>23  want to guess, but my thoughts are this meeting could<br>24  have very well been in reference to these issues, but | 1   A. She was at that time.<br>2   Q. And Mr. Savage is assistant superintendent?<br>3   A. And he still is, yes. I think he was at that<br>4  time, but he is now. Can I clarify something, though?<br>5   Q. Sure.<br>6   A. That is the beginning of the meeting. Okay?<br>7  And then that's the roll call and the recording of who<br>8  is present, and then we go into executive session.<br>9    So whether or not those people all stayed, I<br>10  don't know. They could have been asked to leave, as<br>11  we have done on other occasions.<br>12    For example, it strikes me as a little odd<br>13  that the finance person was there. I would almost<br>14  venture to say that on this particular issue he was<br>15  asked or knew to step out, but I don't know that with<br>16  certainty.<br>17   Q. Well, let me ask you a question. Does the<br>18  board invite people to special meetings?<br>19   A. Depending on the issue, the board requires or<br>20  asks for certain information and it comes from various<br>21  sources.<br>22   Q. Well, if you look through the minutes, --<br>23   A. Okay.<br>24   Q. -- which is simply that one page, do you see |
| 66 | 68 |

Cohee, Richard (Video)  10/17/2006  1:17:00 PM

1   reaction to Dr. Hattier's prayer or the announcement
2   that Dr. Hattier would give a prayer on August 24,
3   2004?
4       A.  Um, I don't remember the reaction, but I
5   think there was a lot of concern as to whether we
6   would or not, and if there was a reaction at all, it
7   most likely would have -- I shouldn't say that most
8   likely, because I don't know.  It would probably have
9   been supportive.
10      Q.  When you said that the prayer was for the
11  board members, is that because of the disclaimer?
12      A.  No, because it was for the board members long
13  before we had the disclaimer or that policy.
14      Q.  Okay, have you ever seen someone get up and
15  leave the meeting or attempt to leave the meeting when
16  there is an announcement that a prayer is going to be
17  given?
18      A.  Um, well, I will say that different times
19  during the meeting people come and go for a lot of
20  reasons.  Okay?  I can't sit here and say that I have
21  seen anyone go for in response to the prayer preface,
22  and I can't say that I have ever really watched to see
23  if that occurred.
24      Q.  Are students in the audience when the prayer

113

1       VIDEOGRAPHER:  This deposition is
2   ending at approximately 4:12 p.m.
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

115

1   is given?
2       A.  Most often.
3       Q.  Have all the prayers been Christian?
4       A.  I think you asked that earlier, and, to my
5   knowledge, I would have to say the majority have been.
6       Q.  Do you recall any prayer in the name of
7   Jehovah?
8       A.  No, I can't.
9       Q.  Any prayer in the name of Buddha?
10      A.  No.
11      Q.  Any prayer in the name of Allah?
12      A.  No.
13      Q.  So can you recall any prayer for any other
14  religious deity besides Jesus or the Christian God?
15      A.  Other than the moment of silence, which would
16  not address either faith.
17      Q.  Has anyone served on the school board who is
18  not Christian?
19      A.  I do not know that is true.  I don't make it
20  a point of asking people their religion or beliefs,
21  and it wouldn't have made any difference to me.
22          MR. LENHARD:  I think that's all the
23  questions I have.  Thank you very much.
24          THE WITNESS:  Thank you.

114

1               CERTIFICATE
2       I, Lorena J. Hartnett, a Notary Public and
3   Registered Professional Reporter, do hereby certify
4   that the witness, RICHARD COHEE, was by me first
5   duly sworn to testify the truth, the whole truth, and
6   nothing but the truth; that the foregoing deposition
7   was taken at the time and place stated herein; and
8   that the said deposition was recorded stenographically
9   by me and then reduced to typewriting under my
10  direction, and constitutes a true record of the
11  testimony given by said witness.
12      I further certify that the inspection,
13  reading and signing of said deposition was not waived
14  by counsel for the parties and by the witness.
15      I further certify that I am not a relative,
16  employee, or attorney of any of the parties or a
17  relative or employee of either counsel, and that I am
18  in no way interested directly or indirectly in this
19  action.
20      IN WITNESS WHEREOF, I have hereunto set my
21  hand and affixed my seal of office on this 24th day of
22  October 2006.
23
24      Cert. #134-RPR, Exp. 01-31-2008

116

# TAB  4

Dobrich, Marco  11/1/2006  12:55:00 PM

```
 1        IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF DELAWARE
 2
 3   MONA DOBRICH, et al.,        : CIVIL ACTION
          Plaintiffs,    :
 4                        :
          -v-            :
 5                        :
     INDIAN RIVER SCHOOL    :
 6   DISTRICT, et al.,.      : NO. 05-120-JJF
          Defendants.   :
 7
          Deposition of MARCO DOBRICH, taken before
 8   Elaine Gallagher Parrish, Registered Professional
     Reporter, at 1100 North Market Street, Suite 1000,
 9   Wilmington, Delaware on November 10, 2006, commen
     approximately at 12:55 p.m.
10
     APPEARANCES:
11
          THOMAS J. ALLINGHAM, II, ESQ.
12        BRIAN G. LENHARD, ESQ.
              One Rodney Square
13            P.O. Box 636
              Wilmington, Delaware 19899-0636
14               for the Plaintiffs.
15        JARROD D. SHAW, ESQ.
          Drinker Biddle & Reath, LLP
16            One Logan Square
              18th and Cherry Streets
17            Philadelphia, Pennsylvania 19103-6996
                 for the Defendant.
18
19   ALSO PRESENT:
20        Timothy Kearns
          Kristhy Peguero
21        Mona Dobrich, Plaintiff
22
          WILCOX & FETZER
23   1330 King Street -  Wilmington, Delaware 19801
              (302)655-0477
24            www.wilfet.com

                            1
```

```
 1        MARCO DOBRICH,
 2   having been first duly sworn according to law, was
 3   examined and testified as follows:
 4            - - -
 5   BY MR. SHAW:
 6      Q.  Mr. Dobrich, I know you heard this earlier, but
 7   I'll give it again pretty quickly.  My name is Jarrod
 8   Shaw and I represent the Defendants in this litigation.
 9   I am going to ask you a bunch of questions to which
10   you'll respond.  If you don't understand the question,
11   please ask me to either repeat it or rephrase it.
12   Because if you give your answer it will look on the
13   transcript as though you understood the question and
14   your answer was to that question.  So I just want to
15   make sure that you're clear.
16      A.  Yes.
17      Q.  So please feel free to ask me to rephrase or to
18   repeat my question.
19          Again, if you need to take a break at any
20   point, just let me know and we'll stop and you can take
21   a break.
22      A.  Okay.
23      Q.  Have you ever been deposed before?
24      A.  No.

                            2
```

```
 1      Q.  What did you do to prepare for today's
 2   deposition?
 3      A.  Met with the lawyers a couple weeks ago.
 4      Q.  I believe you said your answer was you met with
 5   your attorneys to prepare for the litigation or for the
 6   deposition?
 7      A.  Yes.
 8      Q.  Did you discuss the deposition with anyone else?
 9      A.  No.
10      Q.  Okay.  Did your attorney show you any documents
11   at that point?
12      A.  No.
13      Q.  Mr. Dobrich, where do you currently live?
14      A.  Georgetown, Delaware, 154 David Street.
15      Q.  That's my next question.
16      A.  Pine Grove Manor.
17      Q.  Do you live in a house there?
18      A.  Yes.
19      Q.  Do you rent the house?
20      A.  No, I live with my wife's sister.
21      Q.  Okay.  Just for the record, where did you live
22   before that?
23      A.  174 Georgetown -- Route 1, 174, Georgetown,
24   Delaware.

                            3
```

```
 1      Q.  And how long did you live there for?
 2      A.  19 years.
 3      Q.  Did you grow up in Georgetown?
 4      A.  No.
 5      Q.  Where did you grow up?
 6      A.  Seaford, Delaware.
 7      Q.  Seaford, Delaware?
 8      A.  19947 -- or 73.
 9      Q.  What county is that in?
10      A.  Sussex.
11      Q.  It's in Sussex County.  Is it the Indian River
12   School District?
13      A.  No.
14      Q.  No.  Okay.  Is your high school a rival with
15   their high school?
16      A.  No, we were with Laurel.
17      Q.  Oh, okay.  So you did not live in the Indian
18   River School District until you moved into the home at
19   174 Georgetown?
20      A.  Yes.
21      Q.  Are Samantha and Alex your only children?
22      A.  Yes.
23      Q.  So is this your first marriage?
24      A.  Yes.

                            4
```

Dobrich, Marco  11/1/2006  12:55:00 PM

1     A.  Before this?  '04 or altogether?
2     Q.  I'll rephrase.  Right now I'm speaking before
3  June 15th, 2004, do you know approximately how many
4  School Board meetings you attended?
5     A.  Six or seven.
6     Q.  Six or seven.  Was Mrs. Dobrich with you at all
7  those meetings?
8     A.  Not at all of -- not at all of them.
9     Q.  Okay.  Were Alex and Samantha or Samantha wil
10  you at any of those meetings?
11     A.  Maybe one or two.
12     Q.  Let me break it down.  Was Alex at one or two?
13     A.  Yes.
14     Q.  And then Samantha was maybe at one or two?
15     A.  Yes.
16     Q.  Okay.  Did the School Board offer a prayer at
17  any of those meetings?
18     A.  Yes.
19     Q.  Okay.  Do you remember what that prayer was?
20     A.  What they said?
21     Q.  Yeah.  If you could remember, was it in Jesus's
22  name?
23     A.  Most of them were.  Probably all of them.
24     Q.  Is it your recollection that all of them were or

9

1  most of them were?
2     A.  I would say all.
3     Q.  Did they ask you -- did the School Board ask you
4  -- or let me rephrase.
5          Did the School Board ask the audience
6  members to bow their head before the prayer was given
7     A.  Yes.
8     Q.  At all of the meetings?
9     A.  Yes.
10     Q.  Did you bow your head?
11     A.  Yes.
12     Q.  Do you know if -- you testified that Alex was
13  with you at one or two of these meetings?
14     A.  Yes.
15     Q.  Did Alex also bow his head?
16     A.  He kept his head straight ahead.
17     Q.  We can't take the hand motions down on the
18  record.
19     A.  Straight.  I mean maybe at one he did straight
20  but he probably put his head down at one -- the other
21  one.
22     Q.  Okay.  Did Samantha bow her head, do you know
23     A.  Yes.
24     Q.  Okay.  Did you ask Alex why he kept his head

10

1  straight at that meeting?
2     A.  No.
3     Q.  Why did you bow your head at the meeting?
4     A.  Feel like I was obligated because they said to,
5  and everybody around was doing it.
6     Q.  Okay.  Mr. Dobrich, would you have a problem
7  with nondenominational prayer at the school or prayer
8  meetings?
9          MR. ALLINGHAM:  Object to the form of the
10  question.  You may answer it.
11          THE WITNESS:  As long as they don't say
12  within, you know, Jesus's name.
13  BY MR. SHAW:
14     Q.  Would you be okay if they said in God's name?
15          MR. ALLINGHAM:  Object to the form of the
16  question.
17  BY MR. SHAW:
18     Q.  Let me rephrase.  Would you be okay if the
19  School Board members said in God's name?
20          MR. ALLINGHAM:  Object to the form of the
21  question.
22          THE WITNESS:  Yes, I would.
23  BY MR. SHAW:
24     Q.  Okay.  Why is it okay if the Board members said

11

1  it in God's name but not okay if they say in Jesus's
2  name?
3          MR. ALLINGHAM:  Object to the form of the
4  question.
5  BY MR. SHAW:
6     Q.  In your mind?
7     A.  In my mind I think they should do it before
8  anybody is in there.  They should do it, you know, in
9  the back room before they come in there to start the
10  Board meeting.
11     Q.  Okay.  Is it okay if they say in God's name at
12  the meeting?
13          MR. ALLINGHAM:  Object to the form.
14          MR. SHAW:  In your mind.
15          MR. ALLINGHAM:  I object to the form of the
16  question.
17          THE WITNESS:  I don't think they should say
18  anything really.
19  BY MR. SHAW:
20     Q.  Mr. Dobrich, I am going to show you what's been
21  previously marked as plaintiff's Exhibit 9.  I think you
22  have it in front of you.  I'll represent to you that
23  this is the Board prayer at regular Board meetings.
24  It's designated by BDA-1.  Have you ever seen this

12

# TAB 5

```
 1        IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF DELAWARE
 2
 3   MONA DOBRICH, et al.,       : CIVIL ACTION
           Plaintiffs,   :
 4
            -v-          :
 5
     INDIAN RIVER SCHOOL        :
 6   DISTRICT, et al.,          : NO. 05-120-JJF
           Defendants.   :
 7
           Deposition of MONA DOBRICH, taken before
 8   Elaine Gallagher Parrish, Registered Professional
     Reporter, at 1100 North Market Street, Suite 1000,
 9   Wilmington, Delaware on November 10, 2006, commen
     approximately at 11:05 a.m.
10
     APPEARANCES:
11
        THOMAS J. ALLINGHAM, II, ESQ.
12      BRIAN G. LENHARD, ESQ.
           One Rodney Square
13         P.O. Box 636
           Wilmington, Delaware 19899-0636
14         for the Plaintiffs,
15      JARROD D. SHAW, ESQ.
        Drinker Biddle & Reath, LLP
16         One Logan Square
           18th and Cherry Streets
17         Philadelphia, Pennsylvania 19103-6996
           for the Defendant.
18
19   ALSO PRESENT:
20      Timothy Kearns
        Kristhy Peguero
21      Marco Dobrich, Plaintiff
22
        WILCOX & FETZER
23   1330 King Street - Wilmington, Delaware 19801
        (302)655-0477
24      www.wilfet.com

                    1
```

```
 1        MONA DOBRICH,
 2   having been first duly affirmed according to law, was
 3   examined and testified as follows:
 4            - - -
 5   BY MR. SHAW:
 6      Q.  Hi, Mrs. Dobrich.  Thank you for coming today.
 7   My name is Jarrod Shaw and I represent the Defendant
 8   this action.  We're going to go through a process today
 9   of asking you some questions or I'll go through the
10   process of asking you questions and you'll answer them
11   I ask if you can't hear me or you need me to repeat a
12   question, or you don't understand what I'm asking that
13   you ask me to repeat it or rephrase it.  If you answer
14   the question as I ask it, it's going to look on the
15   transcript as though you understood what I was asking.
16      A.  Okay.
17      Q.  So it's important that you take a moment and
18   think about the question before you answer it.  And if
19   you don't understand it, I'll be happy to rephrase for
20   you.
21      A.  Okay.
22      Q.  Have you ever been deposed before?
23      A.  No.
24      Q.  Okay.  What did you do to prepare for today's

                    2
```

```
 1   deposition?
 2      A.  I met with my lawyer last week.
 3      Q.  Okay.  Do you remember when last week?
 4      A.  I don't even know if it was last week.
 5      Q.  Okay.
 6      A.  It might be last week.  I'm not sure.
 7      Q.  One other thing before we get going, if you
 8   could wait until I finish and I'll do the same for you.
 9   The Court Reporter can't take down both at the same
10   time, so it will just get a bit confusing.
11           Okay.  When you met with your attorneys
12   were you shown any documents?
13      A.  No.
14      Q.  No?  Okay.  And have you spoken with anyone els
15   regarding your deposition today?
16      A.  No.
17      Q.  All right.  Mrs. Dobrich, where do you currently
18   live?
19      A.  1428 Emory Road, Wilmington, Delaware, 19803.
20      Q.  And how long have you lived there?
21      A.  One year and three months.
22      Q.  Do you live in a house?
23      A.  We rent a house.
24      Q.  You rent a house?  Okay.  And where did you live

                    3
```

```
 1   before the Wilmington address?
 2      A.  We rented an apartment in Wilmington at Top of
 3   the Hill.
 4      Q.  Is that the name of the apartment complex?
 5      A.  Yes.
 6      Q.  Okay.  And how long did you rent that apartment
 7   for?
 8      A.  One year.
 9      Q.  And you said we, who do you mean by we?
10      A.  Myself and my son, Alex.
11      Q.  Okay.  I assume by that Alex goes by Alex?
12      A.  Correct.
13      Q.  Okay.  And before you moved to the apartments a
14   Top of the Hill, where did you live?
15      A.  In Georgetown, Delaware.
16      Q.  Did you own a house in Georgetown?
17      A.  Yes.
18      Q.  Okay.  Do you still own the house in Georgetown?
19      A.  No.
20      Q.  Okay.  And how long did you live at the house in
21   Georgetown for?
22      A.  19 years.
23      Q.  19 years.  Just for the record, what was the
24   address, if you remember?

                    4
```

1  A.  I could not say for certain.
2  Q.  And I'm only asking because if it was somebody
3  who was on the Board then and not now it might help
4  place the time.  Were those meetings that you attended
5  while your children were in the school district?
6  A.  Yes.
7  Q.  Do you recall any of the prayers that were
8  offered while you were in attendance at those meetings'
9  A.  No.
10  Q.  Do you recall if any of them were in Jesus's
11  name?
12  A.  Yes.
13  Q.  Do you recall if all of them were in Jesus's
14  name?
15  A.  Yes.
16  Q.  Did you have any idea that -- I'll rephrase.
17  It's been testified to earlier that the Indian River
18  School District has a custom or practice of offering a
19  prayer at the beginning of its School Board members?
20      MR. ALLINGHAM:  School Board meetings.
21      MR. SHAW:  At the beginning, thank you, of
22  its School Board meetings, did you have any -- do you
23  have an understanding that it's a School Board custom
24  and practice of offering a prayer at the beginning of

37

1  its meetings?
2      MR. ALLINGHAM:  I object to the form of the
3  question.
4      THE WITNESS:  I don't understand your
5  question.
6  BY MR. SHAW:
7  Q.  Sure.  I'll rephrase.  You have been to several
8  of the School Board meetings?
9  A.  Yes.
10  Q.  And at every meeting a prayer has been offered?
11  A.  Yes.
12  Q.  That you have attended?
13  A.  Yes.
14  Q.  Would you consider it to be a custom or a
15  practice -- I'll rephrase.  Would you expect that every
16  School Board meeting you would have attended would I
17  offered a prayer at the beginning?
18      MR. ALLINGHAM:  I object to the form of the
19  question.
20      THE WITNESS:  I always hoped that there
21  wouldn't be.  It always seemed to open with one.
22  BY MR. SHAW:
23  Q.  Okay.  Did you ever complain about any of those
24  prayers before?

38

1  A.  At School Board meetings?  No.
2  Q.  Okay.  It was when you met with Dr. Hattier in
3  2004, was that the first time you complained about the
4  prayer at the School Board meeting?
5  A.  I did not complain at that time about the prayer
6  at the School Board meeting.
7  Q.  Okay.  When did you complain about the prayer a
8  the School Board meeting?
9  A.  I'm unsure.
10  Q.  This would be a good time for a break if you
11  need to use the ladies room.
12      (Recess taken.)
13  BY MR. SHAW:
14  Q.  We can go back on the record.  Okay.
15  Mrs. Dobrich, you testified that you had not complained
16  about the School Board prayer or prayer at School Boar
17  meetings prior to June 15th, 2004, is that correct?
18  A.  That's correct.
19  Q.  Okay.  You also testified in sum or substance
20  that you had heard prayers at School Board meetings
21  previously?
22  A.  Correct.
23  Q.  Okay.  What did you do during those prayers
24  while you were in the meeting?

39

1  A.  They request that you bow your head.
2  Q.  Okay.  Did you bow your head?
3  A.  Yes.
4  Q.  When you left the meeting did you speak with
5  anyone about the meeting?
6      MR. ALLINGHAM:  Which meeting?
7  BY MR. SHAW:
8  Q.  I'm sorry.  You don't remember any of the dates
9  of those previous meetings, do you?
10  A.  No.
11  Q.  Okay.  Let's take this meeting where you bowed
12  your head, do you remember discussing that with anybo
13  A.  Yes, I spoke to my daughter and my husband abo
14  it and said that it made me feel really bad to have to
15  do that and I felt like I was being forced to, and I
16  asked my daughter what she did in instances like that.
17  Q.  What do you mean by made you feel really bad?
18  A.  It made me feel that in my religion you are not
19  to bow to false Gods and it made me feel as if I was
20  being forced to bow down to what I believed to be a
21  false God.
22  Q.  Okay.  You felt like you had to bow your head at
23  the meeting?
24  A.  The people who were running the meeting said bc

40

1  your head.
2    Q.  Okay.  Did you feel like you had any choice not
3  to bow your head?
4    A.  No, I did not.
5    Q.  Okay.  Have you ever attended a wedding at a
6  church?
7    A.  No.
8    Q.  Have you ever attended anything at a church?
9    A.  No.
10   Q.  Okay.  When you spoke with Samantha, your
11  daughter, about this and asked her what do you do, wha
12  did you mean by that?  What does she do when?
13   A.  I asked her what she does when she's at events
14  such as dinners of her cross country team at the school
15  when they offer a prayer, and I asked her what she does
16  during those events when they ask you to do that, to
17  pray.
18   Q.  So then am I understand to that you knew that
19  they offered prayers at these other events?
20   A.  Samantha had begin to -- begun to come home ar
21  complain and question why they were doing it.  So I
22  became aware by that it was going on more often than wha
23  knew from my own experience of being a student in the
24  school district.

                                41

1    Q.  Had you ever gone to School Board meetings
2  before Samantha came home and complained about the
3  different things that you just talked about?
4    A.  Yes.
5        MR. ALLINGHAM:  Would you just read the
6  question back for me, please?
7  BY MR. SHAW:
8    Q.  I'll rephrase the question, Tom.
9        You just testified that Samantha began to
10  come home and complain about School Board meetings
11  that correct?
12   A.  No.
13   Q.  No, excuse me, complain about different events
14  at school where people prayed, is that correct?
15   A.  Yes.
16   Q.  Okay.  Let's do it this way.  When did Samantha
17  begin high school?
18   A.  She graduated in 2004.  You begin high school --
19   Q.  In '97?
20   A.  Ninth grade.
21   Q.  No, 2000 rather.  In that time -- when did she
22  -- was she in high school when she began to come home
23  and complain about prayer at different activities?
24   A.  Yes.

                                42

1    Q.  Okay.  So she hadn't complained while she was in
2  elementary school and middle school?
3    A.  I'm unsure.
4    Q.  Okay.  But you are sure that she complained
5  during the time period 2000 and 2004?
6    A.  That's correct.
7    Q.  Okay.  Do you recall whether you had ever gone
8  to a School Board meeting prior to 2000?
9    A.  I'm unsure.
10   Q.  Okay.  But the School Board meetings that you do
11  recall going to occurred at some time between 2000 and
12  2004?  Let me -- I'll rephrase that.
13       I know you attended School Board meetings
14  through Board meeting notes and things like that, at the
15  earliest June 15th of 2004?
16       MR. ALLINGHAM:  Do you mean your earliest
17  knowledge is as of June 15th, 2004?
18       MR. SHAW:  That's right, and I'm just
19  trying to figure out what other meetings you may have
20  attended and what happened at those meetings.  So I'm
21  trying to pare down the years a little bit considering
22  now we have a gap of 2000 to 2004, okay.
23       THE WITNESS:  Okay.
24  BY MR. SHAW:

                                43

1    Q.  So do you recall when you may have attended
2  School Board meetings between those timeframes while
3  Samantha was in high school?
4    A.  I know I attended a School Board meeting where
5  it had something to do with can donations where we had
6  donated cans for Alexander's classroom, and his
7  classroom had the most donations and our family had the
8  most donations so we went to a School Board meeting.  I
9  think he was in first grade.
10   Q.  Okay.
11   A.  It might have been third grade.  I'm not sure.
12  Or second grade.
13   Q.  Okay.  And how many years older is Samantha tha
14  Alex?
15   A.  Alex was born in '92 and Samantha was born in
16  '86.  Samantha was born September of '86.  Alex was b
17  in July of '92.  No.  Samantha was born in July of '86,
18  and Alex was born in September of '92.
19   Q.  Okay.  Alex was born in September of 1992?
20   A.  Correct.
21   Q.  Samantha, July of '86?
22   A.  Correct.
23   Q.  So we can agree that they're approximately six
24  years apart, depending on the month?

                                44

# TAB 6

Doe, Jane  12/5/2006  1:30:00 PM

C O N F I D E N T I A L
IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE
MONA DOBRICH and MARCO        )  CONFIDENTIA
DOBRICH, Individually and       )
as parents and next friend      )
of ALEXANDER DOBRICH,           )
SAMANTHA DOBRICH, JANE DOE      )
and JOHN DOE, Individually      )
and as parents and next         )
friend of JORDAN DOE and        )
JAMIE DOE,                      )
                                )
          Plaintiffs,           )
                                )  Civil Action
v.                              )  No. 05-120
                                )
INDIAN RIVER SCHOOL,            )
DISTRICT, et al.,               )
                                )
          Defendants.           )
          Deposition of JANE DOE, taken pursuant to
notice at Drinker, Biddle & Reath, 1100 North Market
Street, Suite 1000, Wilmington, Delaware, beginning at
1:30 p.m., on Tuesday, December 5, 2006, before Terry
Barbano Burke, RMR-CRR and Notary Public.
APPEARANCES:
          THOMAS J. ALLINGHAM, II, ESQUIRE
          One Rodney Square
          Wilmington, Delaware 19801
          For the Plaintiff
          WILCOX & FETZER
          1330 King Street -  Wilmington, Delaware 19801
          (302) 655-0477

                    1

2    APPEARANCES (cont'd):
3        JARROD SHAU, ESQUIRE
         Drinker, Biddle & Reath, LLP
4        One Logan Square
         18th and Cherry Streets
5        Philadelphia, Pennsylvania  19103-6996
         For the Defendants
6
     ALSO PRESENT:
7
         TIMOTHY KEARNS
8
9                    -  -  -
10        MR. ALLINGHAM:  While we were off the
11   record, Mr. Shau and I agreed that we would all try to
12   refer to the witness by her pseudonym of Jane Doe and
13   to members of her family by the pseudonyms given then
14   in the complaint.
15        We have also agreed, and I want to
16   express my appreciation to Mr. Shau for this
17   suggestion, that we will each, to the extent anyone
18   slips up, we can substitute the appropriate pseudonym
19   in the final transcript so the anonymity of the witness
20   and the members of her family will again be preserved,
21   and I again appreciate that.
22        JANE DOE,
23        the deponent herein, having first been
24        duly sworn on oath, was examined and

                    2

1        testified as follows:
2    BY MR. SHAU:
3    Q.   Let me just add, Mrs. Doe, I'm going to
4    attempt to try to ask questions that won't lead you
5    down the path of saying your name or your children's
6    names, but in the event that I do, don't worry about it
7    and we will be able to remedy it later.
8    A.   Okay.
9    Q.   My name is Jarrod Shau, and I represent the
10   defendants in this action.
11        I am going to ask you a bunch of
12   questions about various things that have occurred, and
13   I ask that if you don't understand the question, you
14   ask me to rephrase it, or if you don't hear it, you ask
15   me to ask it again.
16        If you answer the question as it's asked
17   on the record, it's going to look like you understood
18   the question.
19   A.   Uh-huh.
20   Q.   So if you need for me to repeat it or rephrase
21   it, please ask me to and I will be happy to.
22        One other thing is the court reporter
23   can't see uh-huh or when you shake your head, so if you
24   could answer affirmatively or negatively, however you

                    3

1    choose, that would be appreciated by the court
2    reporter.
3    A.   Okay.
4    Q.   If you need to take a break at any point, just
5    let me know, we can stop whenever you want.  If you
6    want water or to use the rest room, please let me know.
7        Mrs. Doe, have you ever been deposed
8    before?
9    A.   No.
10   Q.   What did you do to prepare for this
11   deposition?
12   A.   Spoke with my lawyer.
13   Q.   Your lawyer, Mr. Allingham?
14   A.   Yes.
15   Q.   When did you speak with Mr. Allingham?
16   A.   Thursday.
17   Q.   Did you review any documents during that
18   preparation?
19   A.   No.
20   Q.   Have you spoken with anyone else regarding
21   your deposition today?
22   A.   Just my husband.
23   Q.   Mrs. Doe, what town do you currently live in?
24   A.

                    4          **REDACTED**

Doe, Jane  12/5/2006  1:30:00 PM

REDACTED

1   it didn't seem to us that board members were rotating.
2   Q.   So after reading the policy --
3   A.   And --
4   Q.   I'm sorry, please finish.
5   A.   And on No. 3, we did feel that the way the
6   board gave their prayer was proselytizing.
7   Q.   I would like to ask you a few questions about
8   that.
9       So when you discussed it, you felt that
10  some of the board prayers that you had heard in the
11  past were proselytizing?
12  A.   Yes.  If proselytizing is to advance one
13  particular religion, is that what we agree on?
14  Q.   If that's your definition, that's fine.
15  A.   Then, yes, that would be the case.
16  Q.   And it's accurate to say you had only attended
17  two board meetings at the time you reviewed this
18  policy?
19  A.   Right.
20  Q.   Did the board prayer at those --
21  A.   I'm sorry.  I forgot one of the board
22  meetings.  Can we go back?
23  Q.   Sure.
24  A.   The August 24th school board meeting.

13

1   Q.   August 24?
2   A.   Uh-huh.
3   Q.   Did you sign in at the August 24th, 2004 board
4   meeting?
5   A.   No, I did not.
6   Q.   But you did attend the August 24th, 2004 board
7   meeting?
8   A.   Yes.
9   Q.   Did Mr. Doe attend that meeting?
10  A.   No.
11  Q.   Did either Jamie or Jordan attend that
12  meeting?
13  A.   No.
14  Q.   So I'll rephrase.
15      At the time you thought the board was,
16  I'll use your word, advancing religion --
17  A.   Uh-huh.
18  Q.   -- through prayer, you had heard three prayers
19  at board meetings?
20  A.   Well, I can't recall in 1998.
21  Q.   So in 1998 you don't recall that there was a
22  prayer said?
23  A.   I don't recall.  I might have, you know,
24  gotten there afterwards.  I just can't recall.

14

1   Q.
2   a prayer?
3   A.   Yes.
4   Q.   Do you remember who gave that prayer?
5   A.   There was a gentleman, I believe it was
6   Reginald Helms, or it could have been John Evans.  I'm
7   not sure exactly.
8   Q.   Do you remember what that prayer was?
9   A.   Yes.
10  Q.   Do you remember the exact words of the prayer?
11  A.   I remember the exact words of the end of the
12  prayer, "and in Jesus' name we pray."
13  Q.   Before the prayer started, did Mr. Evans or
14  Mr. Helms, whomever gave the prayer, ask you to bow
15  your head?
16  A.   I believe so, but I can't be sure.
17  Q.   So you don't remember whether or not he did?
18  A.   I know that we had been asked to bow our head
19  before and I'm not sure if that was the meeting.
20  Q.   Were you asked to bow your head at the August
21  24th, 2004 meeting?
22  A.   I can't recall specifically.
23  Q.   Is it fair to say you don't remember any
24  specific instance of you being asked to bow your head,

15

1   you just generally remember that occurring at one of
2   the meetings you attended?
3   A.   My recollection is that the impression given
4   was to bow your head for the prayer, but I can't recall
5   exactly whether we were specifically asked to bow our
6   heads.  But I do remember bowing of heads.
7   Q.   So it may have been just everyone in the area
8   bowed their heads and it just felt like you should have
9   bowed your head?
10  A.   That may be.
11  Q.   Did you bow your head during the prayer?
12  A.   No.
13  Q.   Did you feel like you had to bow your head
14  during the prayer?
15  A.   Well, I'm not sure what you mean by "had to."
16  Can you rephrase that?
17  Q.   Sure.
18      Even though you didn't bow your head,
19  did you feel any pressure?
20  A.   Yes.
21  Q.   However, you decided that you weren't going to
22  bow your head?
23  A.   Correct.
24  Q.   Why did you feel pressured to bow your head

16

Unsigned                                Page 13 - 16

Doe, Jane  12/5/2006  1:30:00 PM

1  even though you didn't?
2    A.  Well, I think what you describe as pressure is
3  exactly right, it's peer pressure, you know, to bow
4  your head. Everyone's bowing their head, so you would
5  stand out if you didn't.
6    Q.  Did anybody say anything to you about you not
7  bowing your head?
8    A.  No.                          REDACTED
9
10  Mr. Helms or Mr. Evans gave the prayer and ended "in
11  Jesus' name," how did that make you feel?
12                                REDACTED
13  it made us feel uncomfortable and excluded. And that
14  perhaps the board -- well, that's it.
15    Q.  Do you remember the prayer that was given at
16  the August 24th, 2004 meeting?
17    A.  Yes.
18    Q.  Who gave that prayer?
19    A.  Donald Hattier.
20    Q.  Do you remember that prayer?
21    A.  Yes.
22    Q.  Were there any religious indications in that
23  prayer?
24        MR. ALLINGHAM: I object to the form of

17

1  the question. You can answer.
2        THE WITNESS: It mentioned God.
3  BY MR. SHAU:
4    Q.  Were you offended by Dr. Hattier's prayer?
5    A.  I'm not exactly sure what you mean by
6  offended.
7    Q.  How did Dr. Hattier's prayer make you feel?
8    A.  I would say the same as the other board
9  meeting prayer.
10    Q.  It made you feel --
11    A.  That it was promoting religion.
12    Q.  How did it make you feel like it was promoting
13  religion?
14    A.  Well, it was a school board meeting and
15                                REDACTED
16    Q.  What religion did it promote?
17    A.  Well, due to the numerous signs around the
18  room of people promoting Christianity and shouting ame
19  and hallelujah, I would say that it promoted
20  Christianity.
21    Q.  Let's try and take for a moment all of the
22  people in the crowd with their signs and shouting amen,
23  act as though it didn't happen, although it did.
24        If Dr. Hattier had given his prayer or

18

1  given whatever he said without any of that, would you
2  have found it to be advancing religion?
3    A.  Yes.
4    Q.  Would you have still found it to be a
5  Christian prayer?
6                                REDACTED
7
8    Q.  He didn't reference Jesus, though, did he?
9    A.  Well, it was a long prayer and I do not think
10  it did reference Jesus.
11    Q.  You mentioned before that Paragraph 3 you felt
12  that the board did use the prayer to proselytize or
13  advance religion. When you were discussing the prayer
14  with your husband, did you find anything objectionable
15  about the policy?
16    A.  About this?
17    Q.  Yes, about what's in front of you, PX-9?
18    A.  Not that I can recall.
19    Q.  I'd like to take a few moments to go through
20  the policy with you now paragraph by paragraph and
21  discuss different aspects about it.
22        Paragraph 1 reads, "In order to
23  solemnify its proceeding, the board of education may
24  choose to open its meetings with a prayer or moment of

19

1  silence, all in accord with the freedom and conscious
2  of the individual adult board member."
3        Would it be okay with you if the board
4  of education opened its meetings with a moment of
5  silence?
6        MR. ALLINGHAM: I object to the form of
7  the question.
8        You can answer.
9        THE WITNESS: It would be okay with me.
10  It wouldn't be my preference.
11  BY MR. SHAU:
12    Q.  But you would be able to tolerate that?
13    A.  Uh-huh.
14    Q.  Would it be acceptable to you if the board
15  opened with a prayer in God's name?
16        MR. ALLINGHAM: I object to the form of
17  the question.
18  BY MR. SHAU:
19    Q.  You can answer the question.
20    A.  I'm sorry, would it be objectionable if it
21  opened in God's name, is that the question?
22    Q.  Yes. To you?
23    A.  Yes.
24    Q.  Why?

20

# TAB 7

Evans. John (Video)  10/18/2006  9:13:00 AM

```
 1        IN THE UNITED STATES DISTRICT COURT
 2          FOR THE DISTRICT OF DELAWARE
 3   MONA DOBRICH and MARCO    : C.A. No. 15-120 (J.
     DOBRICH, Individually and  :
 4   as parents and next friend :
     of ALEXANDER DOBRICH,      :
 5   SAMANTHA DOBRICH, JANE DOE :
     and JOHN DOE, Individually :
 6   and as parents and next    :
     friend of JORDAN DOE and   :
 7   JAMIE DOE,                 :
 8        Plaintiffs,   :
 9        v.            :
10   INDIAN RIVER SCHOOL        :
     DISTRICT, et al.,          :
11                              :
          Defendants.  :
12
13        Videotaped Deposition of JOHN M. EVANS,
     taken pursuant to notice, on Wednesday, October 18,
14   2006 at 9:13 a.m. at 31 Hosier Street, Selbyville,
     Delaware, reported by Lorena J. Hartnett, a Registered
15   Professional Reporter and Notary Public.
16
17   APPEARANCES:
18        THOMAS ALLINGHAM, ESQUIRE
          RICHARD HORVATH, ESQUIRE
19        BRIAN LENHARD, ESQUIRE
          One Rodney Square
20        Wilmington, DE  19801
            Attorney for the Plaintiff
21
22
23        WILCOX & FETZER
24   1330 King Street - Wilmington, DE  19801
                (302) 655-0477
                www.wilfet.com

                      1
```

```
 1
 2
 3          TABLE OF CONTENTS
 4   TESTIMONY OF JOHN M. EVANS:
 5     Direct Examination by Mr. Allingham. . . . . . . 3
 6   Certificate of Reporter . . . . . . . . . . . .168
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

                      3
```

```
 1
 2   APPEARANCES (CONTINUED):
 3        JARROD SHAU, ESQUIRE
          Drinker, Biddle & Reath, LLP
 4        One Logan Square
          18th and Cherry Streets
 5        Philadelphia, PA  19103-6996
            Attorney for the Defendants
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

                      2
```

```
 1        VIDEOGRAPHER:  Okay.  This is the
 2   videotaped deposition of John M. Evans taken
 3   by the plaintiffs in the matter of Dobrich
 4   et al. versus Indian River School District,
 5   et al., Civil Action Number 15-120.
 6        The deposition is taking place at 31
 7   Hosier Boulevard in Selbyville, Delaware, on
 8   October 18, 2006 at approximately 9:13 a.m..
 9   The court reporter is Lorena Hartnett from
10   the firm of Wilcox and Fetzer.
11        My name is Mark Buckmaster, a video
12   specialist from Discovery Video Services
13   Incorporated in association with Wilcox and
14   Fetzer.  Counsel will now introduce
15   themselves and the reporter will swear in
16   the witness.
17        MR. ALLINGHAM:  My name is Tom
18   Allingham.  I represent the plaintiffs, and
19   with me are Richard Horvath and Brian
20   Lenhard.
21        MR. SHAU:  My name is Jarrod Shaw, and
22   I represent the defendants.
23
24

                      4
```

1    Q.  Is it your view, as a board member, that the
2  words "in order to solemnify its proceedings" are the
3  functional equivalent of the words "in order to seek
4  God's guidance for the decisions to be made at that
5  meeting."?
6    A.  I believe that, yes.
7    Q.  Okay.  And I forgot to say at the beginning
8  of the deposition, it's really important for the court
9  reporter, in particular, that we don't trample on each
10  other's questions and answers.  It's the way we all
11  have conversations, but we need to have a specialized
12  sequential conversation in the depositions.  Okay?
13    A.  I understand.
14       MR. ALLINGHAM:  So could I have the
15  last question and answer read back?
16      (The reporter read back the last
17  question and answer.)
18  BY MR. ALLINGHAM:
19    Q.  Okay.  So that at least at, for your
20  understanding as a board member of the Policy BDA.1
21  which we have in front of us, it doesn't matter
22  whether the policy says, "In order to solemnify its
23  proceedings" or whether the policy says, "in order to
24  seek God's guidance, will, protection and grace," the

41

1  meaning would be the same?
2    A.  Yes, to me it would.
3    Q.  Okay.  Did anyone suggest at anytime in the
4  consideration of this policy that the policy ought to
5  say, "in order to seek God's guidance, will,
6  protection and grace."?
7    A.  I don't remember.
8    Q.  Do you remember any discussion at all of the
9  purpose articulated in the board prayer policy, that
10  is, quote, "in order to solemnify its proceedings."?
11    A.  Would you repeat that, please?
12    Q.  Yes, do you remember discussing the
13  purpose of the policy at anytime during the board
14  meetings?
15    A.  I don't recall, no, I don't recall.
16    Q.  Let's make my question a little more
17  specific.  Do you recall anyone offering any comment
18  whatsoever on the language, "in order to solemnify its
19  proceedings"?
20    A.  I don't recall.
21    Q.  When did the board first, first begin to
22  consider the issue of school board prayer?
23    A.  When it began to first consider it?  It would
24  have been sometime in the summer of 2004.

42

1    Q.  And what prompted the board's consideration
2  of that issue was Mrs. Dobrich's expression of
3  concerns that began with the graduation prayer in
4  early summer of 2004; correct?
5    A.  Yes.
6    Q.  Okay.  Let me show you what we have marked as
7  PX15.  When I say PX, it's short for plaintiff's
8  exhibit.
9    A.  Okay.
10    Q.  When we do that, that enables someone looking
11  at the transcript to be able to reconstruct what
12  document we were looking at.
13      If you look at the last page of PX15, you
14  will see Mrs. Hobbs' signature.  Actually, it's a
15  signature stamp, but it's meant to be Mrs. Hobbs'
16  signature; correct?
17    A.  Yes.
18    Q.  And does that tell you that these are the
19  final minutes of the June 15, 2004 board meeting?
20    A.  Yes.
21    Q.  All right.  You are recorded as being present
22  under roll call on the first page?
23    A.  Yes, I am.
24    Q.  And do you recall that you were present at

43

1  the June 15, 2004 school board meeting at North
2  Georgetown Elementary School in the cafeteria?
3    A.  Yes.
4    Q.  Now, this would have been the first board
5  meeting after the 2004 graduation; is that right?
6    A.  That's correct.
7    Q.  If you will turn to page two of the minutes,
8  you will see under the public comments section that
9  one person made a public comment, and that's
10  Mrs. Dobrich; is that right?
11    A.  Yes, I see that.
12    Q.  And what the minutes record is that
13  "Mrs. Dobrich, a parent of the Jewish faith, expressed
14  concern about prayers at the school district events.
15  She asked that the board consider using a
16  nondenominational prayer that would be appropriate for
17  all faiths at events such as graduations, etcetera."
18      Do you see that?
19    A.  Yes, I do.
20    Q.  Do you recall Mrs. Dobrich making that
21  comment?
22    A.  I recall Mrs. Dobrich being there, but I
23  can't recall her specific statement, but I assume the
24  board minutes would record such.

44

TAB  8

Hastings, Gregory (Video) 10/13/2006 9:07:00 AM

```
1           IN THE UNITED STATES DISTRICT COURT
2              FOR THE DISTRICT OF DELAWARE
3
4    MONA DOBRICH and MARCO DOBRICH, individually
     as parents and next friend of ALEXANDER DOBRICH,
5    SAMANTHA DOBRICH, JANE DOE and JOHN DOE,
     individually and as parents and next friend of
6    JORDAN DOE and JAMIE DOE,
7              Plaintiffs
                             Civil Action
8      vs.              NO. 15-120
9    INDIAN RIVER SCHOOL DISTRICT, ET AL.,
10             Defendants
11
12        Deposition of GREGORY HASTINGS, taken
     pursuant to notice at the Indian River School
13   District, 31 Hosier Street, Selbyville, Delaware,
     beginning at 9:07 a.m. on October 13, 2006 before
14   David A. Sroka, Registered Professional Reporter and
     Notary Public.
15
     APPEARANCES:
16
         THOMAS ALLINGHAM, ESQ.
17       RICHARD HORVATH
         BRIAN LENHARD
18       P.O. Box 636
         Wilmington, Delaware  19899-0636
19       For the Plaintiffs
20       JARROD D. SHAW, ESQ.
         Drinker Biddle & Reath, LLP
21       One Logan Square
         Philadelphia, Pennsylvania  19103-6996
22       For the Defendants
23
24
```

-

```
1           MS. DUPHILY:  This is the
2    videotape deposition of Mr. Greg Hastings,
3    taken by the Plaintiff, in the
4    matter of Dobrich, et al. versus Indian
5    River School District, at al., case
6    number 15-120.
7           The deposition is taking place at 31
8    Hosier Boulevard, Selbyville, Delaware.  We
9    are going on the record on October 13,
10   2006 at approximately 9:07 a.m..  The court
11   reporter is Dave Sroka from the firm of
12   Wilcox & Fetzer.  My name is Lindsay
13   duPhily and I am with Discovery Video
14   Services in association with Wilcox &
15   Fetzer.
16          I will now ask counsel to
17   identify themselves on the record, and then
18   the court reporter will swear in the
19   witness.
20          MR. ALLINGHAM:  I am Tom Allingham
21   representing the Plaintiffs.  With me are
22   Rick Horvath and Brian Lenhard.
23          MR. SHAW:   Jarrod Shaw
24   representing the defendants.
```

2

```
1           GREGORY HASTINGS,
2       The Witness herein, called for examination by
3    the Plaintiffs, having been duly sworn to tell the
4    truth, the whole truth, and nothing but the truth,
5    was examined and testified as follows:
6    EXAMINATION BY MR. ALLINGHAM:
7      Q.   Good morning, Mr. Hastings.  I am going to
8    ask you to clear up something that has been bugging
9    me.  Is it H-O-S-I-E-R or H-O-O-S-I-E-R?  Is it
10   pronounced Hoosier or Hosier?
11     A.   In this area we pronounce it Hosier.
12     Q.   Do you know how it's spelled?
13     A.   I believe it's one O.
14     Q.   Thanks.  Have you ever been deposed before?
15     A.   Yes, I have, yes.
16     Q.   In what context?
17     A.   As a defendant.
18     Q.   What kind of a case?
19     A.   It was a teacher in our high school and
20   there was -- she brought on a suit, I have to
21   reflect, this has been 12 years, I guess.
22     Q.   All right, I don't need that much detail.
23   That was a suit by a teacher?
24     A.   Yes.
```

3

```
1      Q.   And it was against you in your capacity as
2    a School Board member?
3      A.   Capacity as a School Board member?
4      Q.   Yes, sir?
5      A.   Yes.
6      Q.   Have you ever testified at trial?
7      A.   I have been an expert witness in Small
8    Claims Court, that's the extent of it.
9      Q.   Did the court issue an opinion in that
10   case?
11     A.   Yes.
12     Q.   Were you mentioned in the opinion?
13     A.   I don't believe so.
14     Q.   What was your area of expertise in that
15   testimony?
16     A.   I had provided architectural design for the
17   product.  This has been a long time, too but --
18     Q.   Let me cut you off.  It has nothing to do
19   with issues of religion in the schools, right?
20     A.   No.  thank you, no.
21     Q.   What is your -- I am trying to keep this
22   limited to the issues here.  You are employed as an
23   architect?
24     A.   Yes, I own a small architectural design
```

4

1  a legislative body, has anyone expressed any
2  concerns or reservations or drawn any distinctions
3  between the General Assembly and its functions, for
4  example, and the School Board and its functions?
5     A.  Not to my knowledge.
6     Q.  Legislative bodies pass laws, is that
7  correct?
8     A.  Yes.
9     Q.  And those laws are then enforced by a
10  different branch of government, correct?
11    A.  Correct.
12    Q.  The School Board doesn't pass laws, but it
13  passes policies, correct?
14    A.  Correct.
15    Q.  Unlike the General Assembly the School
16  Board also enforces those polices, correct?
17    A.  Yes.
18    Q.  At any time during the discussion of
19  whether the Board was a legislative body did anyone
20  raise or discuss the fact that students are
21  consistently present at regular Board meetings?
22    A.  I don't recall.
23    Q.  It is a fact that at least since the mid
24  1990s students were consistently present at regular

41

1  Board meetings?
2     A.  Yes.
3     Q.  And so when you walk into the Board meeting
4  or walk out to take your seat on the stage or where
5  ever the meeting is being held, you expect that
6  students will be in the audience?
7     A.  Most generally, yes.
8     Q.  Sometimes it's only half a dozen students,
9  maybe it's just the ROTC color guard?
10    A.  Yes.
11    Q.  Sometimes, I've seen some minutes where it
12  looked like there were 50 or more students there, is
13  that right?
14    A.  Yes.
15    Q.  Can you think of any regular Board meeting
16  where there have been no students present?
17    A.  Probably in the summer months.
18    Q.  Oh, I should have been clear about my
19  question.  Can you think of any regular Board
20  meeting during the academic year when students were
21  not present?
22    A.  No.
23    Q.  All right, I am going to show you another
24  exhibit, this is PX12.

42

1     Mr. Hastings, this is a long document, you
2  take as long as you want to to read it, but my first
3  question to you is have you ever seen it before, and
4  you may be able to answer that question without
5  reading the whole document?
6     A.  I may have, but I can't recall.  It's been
7  two years.
8     Q.  If you look at the fourth page of the
9  exhibit?
10    A.  Uh-hum.
11    Q.  You will see there are five numbered
12  paragraphs at the bottom of the page, the fifth one
13  of which carries over to the next page.  With some
14  extremely minor language changes can you confirm
15  that the five numbered paragraphs on PX12 are
16  essentially identical to the numbered paragraphs of
17  the final Board policy?  The only change I can tell
18  you is I know that there is in paragraph four just
19  is changed to only, but apart from that do you see
20  any other changes?
21    A.  No.
22    Q.  Do you know who drafted PX12?
23    A.  I suspect the Neuberger firm.
24    Q.  It says up at the top left the Rutherford

43

1  Institute and the Neuberger firm, is that the basis
2  for your answer?
3     A.  Yes.
4     Q.  Did anyone ever tell you that the board
5  policy as it was presented to you for a first
6  reading on September 28th had been drafted by the
7  Neuberger firm?
8     A.  I can't recall.
9     Q.  In an earlier answer you told me that your
10  normal process is to have Board policies checked by
11  the Board attorney, correct?
12    A.  Yes.
13    Q.  In the summer and fall of 2004 who was the
14  Board's attorney?
15    A.  If memory serves me correctly it was Jim
16  Griffin.
17    Q.  Do you know whether anyone on the Board or
18  the policy committee asked Mr. Griffin to
19  participate in the drafting of the Board policy on
20  School Board prayer?
21    A.  I don't want to assume, I know what happens
22  when you assume, but knowing our procedure and the
23  policy committee I would -- sitting here today I
24  would to -- that was the normal procedure, that it's

44

1   from the microphone, stop talking?
2     A.   Another member of the Board other than the
3   president?
4     Q.   Yup.
5     A.   It may have occurred, but I don't recall
6   any particular date or time.
7     Q.   The last 20 minutes or half an hour we've
8   talked about the atmosphere or the overall ambience
9   of the meeting, which you characterized as a little
10  disturbing, there were outbursts, the crowd
11  mentality, or mob mentality, the crowd got a little
12  unruly.  I showed you the Johnson comments and the
13  crowd's reaction both to that with cheers and with
14  laughter during his comments.  I showed the clip of
15  the announcement that the meeting would open with a
16  prayer and the raucous reaction to that.
17     Do you have a view as to whether the prayer
18  given on August 24th was effective to make the crowd
19  solemn, respectful and courteous?
20       MR. SHAW:  I am going to object,
21     I don't think you showed him the prayer
22     that day.
23       MR. ALLINGHAM:  I didn't and
24     that's not what I said.

101

1     A.   I don't recall what the prayer was that
2   particular Board meeting.
3     Q.   I am going to start the question again.  It
4   doesn't matter what the prayer was a prayer was
5   offered at the meeting, correct?
6     A.   Yes.
7     Q.   And based on the conduct at that meeting
8   which I summarized a minute ago, do you think
9   whatever the pryer was, do you think it was
10  effective to solemnize the proceedings?
11     A.   I believe it was for the individuals of the
12  Board and the purpose it's given, yes.
13     Q.   Okay, and that's very helpful because I
14  wanted to ask you, is the solemnization, which is
15  the purpose of the prayer, as the policy reflects,
16  is that solemnization directed to the Board members
17  and their discharge of their duties, or is it
18  intended to affect everybody in the audience?
19     A.   In my opinion it's for the immediate
20  members of the Board.
21     Q.   Okay.  And when the policy says in order to
22  solemnize the proceedings, and you've now told me
23  that's the intended recipient of the solemnization,
24  if you will, are the Board members, when the policy

102

1   says in order to solemnify the proceedings, what do
2   you understand that to mean?
3     A.   Well, given the responsibility of a Board
4   member, and particularly as I know it to be in this
5   particular school district, because geographically
6   we are the largest in the state, and we have many
7   buildings, so the whole facet of our charge
8   obviously there are a lot of decisions to be made
9   and sometimes they are very controversial, sometimes
10  very testy, and also looking at the bigger picture
11  there is a lot of financial issues at stake.
12     So, sitting there as a member of the Board
13  one hopes, or I hope, that I make the very best
14  decision I possibly can for the sake of the district
15  and the children in the school district, and I want
16  all the help that I can get.
17     Q.   When you say, "I want all the help that I
18  can get," that means that if you can invoke some
19  divine guidance to guide your judgment that would be
20  helpful?
21     A.   That's correct.
22     Q.   Is it necessary to offer a prayer publicly
23  in order to invoke divine guidance for those
24  judgments?

103

1     A.   I don't suppose it's necessary, no.
2     Q.   You mentioned the financial issues, does
3   the Board deliberate over financial issues in
4   regular session or in executive session?
5     A.   All financial issues are deliberated in
6   regular session.
7     Q.   I forgot to ask you a question about
8   Mr. Johnson, and the clip I showed you.  Would you
9   agree with me that members of the Board greeted
10  Mr. Johnson warmly when he came to the podium?
11     A.   None of us got up and shook his hand.
12     Q.   No, sir and that's -- fair enough.  You
13  recall somebody made a joke about calling him Earl
14  Johnson?
15     A.   Do I recall it, no, no.
16     Q.   In the stack there you have PX9 which is
17  the actual Board Policy which says, the policy
18  opens, it's first phrase is, "In order to solemnify
19  its proceedings the Board of Education may choose to
20  open its meetings with a prayer or moment of
21  silence."  Is there any other purpose for the prayer
22  or moment of silence other than to solemnify the
23  Board's proceedings, as you've defined that?
24     A.   No.

104

1  Q.  A couple of questions again about the
2  August 24th Board meeting but you won't have to make
3  judgments, at least not as many judgments as I asked
4  you about before.  Do you recall that state
5  representatives Hocker and Atkins spoke at the
6  meeting?
7  A.  Yes.
8  Q.  And do you recall that they were joined at
9  the podium by representative Ewing?
10  A.  I believe so, yes.
11  Q.  And did -- do you recall that the
12  representatives provided or read a letter during
13  their public comment section of the meeting?
14  A.  Yes.
15  Q.  And do you recall that that letter said
16  that they as representatives could not recognize the
17  separation of God from state?
18  A.  Maybe.  I can't recall specifically.  I
19  just know that they did read from a letter, but the
20  content I can't recall.
21  Q.  Do you think it was appropriate that
22  representatives stood at the podium and expressed
23  their views as representatives on this issue?
24  A.  I'll say it struck me strange.

129

1  Q.  Why?
2  A.  In this climate, this day and time as we
3  are sitting here knowing the delicateness of this
4  issue at hand, I was surprised that two public
5  officials came forward in that light and expressed
6  their opinions, being politicians.
7  Q.  Have you ever had anyone tell you that they
8  see this case as about protecting Christian prayer?
9  A.  No.
10  Q.  Have you ever had anyone tell you that they
11  see this case as about protecting Christian values?
12  A.  You are asking me if I had someone
13  specifically in my face tell me that's what they
14  believe or that's the statement made to such?
15  Q.  Yes, let me take that question first.  So,
16  let's take the specific question, have you ever had
17  anyone actually say to your face that they believe
18  that this case is about protecting Christian values?
19  A.  No.
20  Q.  Now, let's be a little more general, have
21  you heard that sentiment expressed, or have you
22  heard that sentiment -- I'll do it in pieces.  Have
23  you heard that sentiment expressed?
24  A.  Yes.

130

1  Q.  By whom?
2  A.  I can't specifically tell you.  I mean in
3  the course of these two years, whether it would be
4  meeting someone on the street or after a Board
5  meeting or whatever what have you, I have to tell
6  you I've heard that sentiment but who, whom, I don't
7  know.
8  Q.  More than once?
9  A.  Probably.
10  Q.  Would it be fair for me to understand that
11  that is a common sentiment in the Indian River
12  School District?
13  A.  Yes.
14  Q.  I am going to go back to a specific
15  question, have you heard anyone say, again to you
16  use your phrase, to your face, that they understand
17  the School Board Prayer Policy as protecting
18  Christian values?
19  A.  Repeat it, please?
20  Q.  Have you heard anyone say to your face that
21  they view the School Board Prayer Policy as
22  protecting Christian values?
23  A.  No.
24  Q.  Have you heard that sentiment expressed?

131

1  A.  No, I don't believe so.
2  Q.  So, it's the defense of this case that is
3  viewed as defending Christian values?
4  A.  I believe.
5  Q.  Have you discussed with anyone whether the
6  2006, the results of the 2006 School Board election
7  was an endorsement of the stance the School Board
8  has taken in support of School Board prayer?
9  A.  What the result of the Board election in
10  2006?
11  Q.  An endorsement of the stance the School
12  Board has taken in support of School Board prayer?
13  A.  Most definitely.
14  Q.  Is that also your view?
15  A.  That the stance was taken as such?
16  Q.  That the result was an endorsement of the
17  stance that the School Board took?
18  A.  Yes.
19  Q.  Have you ever discussed with anyone whether
20  someone who opposes School Board prayer could get
21  elected to the School Board in Indian River?
22  A.  Interesting question.
23  Q.  Let me rephrase it.  Let me just ask the
24  question directly, do you believe that someone who

132

TAB 9

Hattier, Donald (Video) 10/10/2006 9:36:00 AM

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MONA DOBRICH and MARCO DOBRICH, individually a
as parents and next friend of ALEXANDER DOBRICH,
SAMANTHA DOBRICH, JANE DOE and JOHN DOE,
individually and as parents and next friend of
JORDAN DOE and JAMIE DOE,
                    Plaintiffs
        vs.                Civil Action
                        No. 15-120

INDIAN RIVER SCHOOL DISTRICT, ET AL.,
                    Defendants

        DEPOSITION OF DONALD HATTIER, taken at th
Indian River School District, 31 Hosier Street,
Selbyville, Delaware beginning at 9:36 a.m. on
October 10, 2006 before David A. Sroka, Registered
Professional Reporter and Notary Public.

APPEARANCES:

        THOMAS ALLINGHAM, ESQUIRE
        RICHARD HORVATH, ESQUIRE
        BRIAN LENHARD, ESQUIRE
        P.O. Box 636
        Wilmington, Delaware  19899-0636
        For the Plaintiffs

        WILCOX & FETZER
        1330 King Street - Wilmington, DE  19801
        (302) 655-0477
        www.wilfet.com

1

---

        JASON P. GOSSELIN, ESQUIRE
        Drinker Biddle & Reath LLP
        One Logan Square
        Philadelphia, Pennsylvania 19103-6996

2

---

        MS. DUPHILY:  This is the
videotape deposition of Dr. Donald G.
Hattier taken by the Plaintiff in the
matter of Dobrich, et al., versus Indian
River School District, et al., case number
15-120.  This deposition is taking place at
31 Hosier Boulevard, Selbyville, Delaware.
We are going on the record on October 10,
2006 at approximately 9:37 a.m.
        The court reporter is David Sroka
from the firm of Wilcox & Fetzer,
Wilmington, Delaware.  My name is Lindsay
duPhily I'm the videotape specialist of
Discovery Video Services in association
with Wilcox & Fetzer.
        Counsel will now introduce
themselves and then the court reporter will
swear in the witness.
        MR. ALLINGHAM:  Tom Allingham of
Skadden Arps.  With me is Rick Horvath and
Brian Lenhard also of Skadden Arps,
representing the Plaintiffs.
        MR. GOSSELIN:  Jason Gosselin of
drinker Biddle & Reath representing the

3

---

defendants.
        DONALD HATTIER,
The Witness herein, called for examination by
the Plaintiffs, having been duly sworn to tell the
truth, the whole truth, and nothing but the truth,
was examined and testified as follows:
        MR. ALLINGHAM:  Jason, I just want
to put a couple of things on the record.
The first one is, it is my impression that
you are not going to be interrupting
this deposition very much, but I want you
to know that if you want to make relevance
objections feel free.  I'm not going to
accept invitations to explain the relevance
of my questions, I think that they are
relevant.
Q.    Mr. Hattier, I represent the Plaintiffs in
this action against the district and I'm going to be
asking you some questions.  If you don't understand
anything that I ask please tell me, don't answer the
question.  If you do answer it the judge and
ultimately even the jury will probably assume that
you did understand it, so if you do have a problem
with a question cut me off at the pass now, okay?

4

---

Unsigned                                Page  1 - 4

Hattier, Donald (Video)  10/10/2006  9:36:00 AM

1   lawyers in his law firm, Drinker Biddle & Reath?
2   A.   I believe that to be true.
3   Q.   Okay.  You full name is Donald G. Hattier,
4   is that correct?
5   A.   Yes, sir.
6   Q.   And you were born on October 1953?
7   A.   That is correct.
8   Q.   Were you born in Delaware?
9   A.   No, sir.
10  Q.   Where were you born?
11  A.   I was born in Triesta, Italy in the 381st
12  infantry hospital.
13  Q.   When did you come to the United States?
14  A.   In 1962.
15  Q.   How long have you lived in Delaware?
16  A.   I was lived in Delaware since February no,
17  I have lived her Delaware since approximately March
18  of 1990.
19  Q.   Do you consider yourself a long time
20  resident of Sussex County?
21  A.   I do, yes, sir.
22  Q.   Would you agree with me as a general
23  proposition that in Sussex County information and
24  news tends to travel by word of mouth as much as it

21

1   does by newspaper or other formal media?
2   A.   In general terms I think that's probably
3   true.
4   Q.   I asked you earlier about your children,
5   you have two children, is that correct?
6   A.   I have four children, sir.
7   Q.   Four children.  Would you tell me their
8   names?
9   A.   Kristin, age 16, Georgette age 14, Hanna
10  age 11 and Donald age eight.
11  Q.   Do they attend district schools?
12  A.   Yes, sir.
13  Q.   Which schools do they attend?
14  A.   I have two, the oldest two are at Indian
15  River High School at the current time.  Hanna is at
16  Selbyville Middle School and Donald is currently at
17  the Lord Baltimore School.
18  Q.   My information may be a little stale so let
19  me just ask you, is your current address R.D. Box
20  114 Dagsboro?
21  A.   That was the old address before we went
22  911.
23  Q.   So, what's he address now?
24  A.   30682 Holts Landing Road.

22

1   Q.   How long have you lived there?
2   A.   Since March of 1990.
3   Q.   So, you were 27 when you moved her, 26, 27,
4   mid 20s?
5   A.   No, 30, 1990, 1953, 37, 36, 37, somewhere
6   in there.
7   Q.   I'm sorry, right.  Where did you attend
8   college?
9   A.   I attended at the Virginia Polytechnic
10  Institute State University, currently known as
11  Virginia Tech.
12  Q.   And when did you graduate?
13  A.   1975. That was for my Bachelor's in
14  Science.
15  Q.   I assume you have some kind of MD degree?
16  A.   I have a Chiropractic Degree, that's know
17  as a DC, Doctor of Chiropractic and that's from  the
18  National College of Chiropractic and I graduated
19  there in December of 1985.
20  Q.   I assume that you didn't go straight to
21  chiropractic school?
22  A.   No, sir.
23  Q.   What did you do in-between?
24  A.   In-between I ran a McDonald's for two and a

23

1   half years, I went to work for the State of Virginia
2   in a power plant as a superintendent and a steam
3   fitter, I taught motorcycle safety at the Northern
4   Virginia Community College for a number of years,
5   and in the process injured my spine several times.
6   Then I was hired by IBM to work as what was called a
7   customer engineer on fixing typewriters, mag cards,
8   copiers and it was through that time period that I
9   was teaching motorcycle safety and my spine kept
10  acting up.  I was slated for surgery for a sciatica
11  case and basically discovered chiropractic.  I'm
12  single, I'm age 29, I sell my townhouse, my Cadillac
13  I go back do college.
14  Q.   And you are employed now as a chiropractor?
15  A.   Yes, sir.
16  Q.   Self-employed?
17  A.   Yes, sir.
18  Q.   Is there a name of the practice or is it
19  simply Dr. Donald G. Hattier?
20  A.   My sister and I recently formed loose
21  partnership, we call ourselves the Beach View Health
22  Associates.  Previous to that it was the Beach View
23  Chiropractic Center.
24  Q.   Where is your office located?

24

Hattier, Donald (Video)  10/10/2006  9:36:00 AM

1  president Walls called the meeting to order and then
2  asked Dr. Hattier to give a prayer?
3  A.  Yes, sir.
4  Q.  Did you know in advance that a Mr. Walls
5  was going to ask you tp give the prayer at that
6  meeting?
7  A.  Yes, sir I did.
8  Q.  How did you know that?
9  A.  I volunteered.
10  Q.  When did you volunteer?
11  A.  It could have been the night before or at
12  some other time, I don't remember.
13  Q.  And when you volunteered did you have in
14  mind the prayer that you wanted to give?
15  A.  Yes, I did.
16  Q.  And where did you get that prayer?
17  A.  It might have been brought in partially by
18  Mr. Neuberger at some point, and again I wish I
19  could remember when he actually talked to us, I
20  don't, okay.  The other thing is I went on the
21  Internet and I looked at about a half a dozen
22  historical prayers of various time periods and
23  decided on which one I felt fit the occasion the
24  best and that's what I gave.

209

1  A.  That is correct.
2  Q.  And was that by design?
3  A.  No, that's more in keeping with the way I
4  personally would pray.
5  And actually if I looked, I gave my only
6  copies of that to several reporters when they left,
7  so personally do not have a copy of it.  I mean if
8  you have a copy of it I'd be happy to discuss it
9  with you.  But the way George Washington and some of
10  the contemporaries of the founding fathers used
11  words like the creator of our divine providence, et
12  cetera.  The way they used the words would have been
13  different that perhaps in the way we do, but it may
14  have meant exactly the same thing if you had used
15  the words Jesus Christ.  So, I would have to look at
16  exactly what I said.  If you guys have a copy I'd
17  love to see it.
18  Q.  You brought more than one copy of the
19  prayer to the meeting?
20  A.  Yes, I did.
21  Q.  Was that for the purpose of distributing it
22  to reporters afterwards?
23  A.  I figured somebody might want a copy of it.
24  I seem to remember bringing two.  One of

211

1  Q.  What made you choose that particular
2  prayer?
3  A.  I like to consider himself myself an
4  amateur historian.  I spend enough hours at VPI so
5  that I could have a minor in history on paper.  VPI
6  does not minors, however, and I have continued with
7  a love of history all of my life and I felt that
8  since this is a contentious issue that if you would
9  like to argue with somebody you can argue with
10  George Washington.  If it was good enough for George
11  Washington to give then why is it not good enough
12  for me to give also.
13  Q.  A rhetorical question?
14  A.  A rhetorical question, yes, sir.
15  MR. GOSSELIN:  You can answer it.
16  Q.  The text of the prayer that you gave is not
17  in the minutes?
18  A.  No.
19  Q.  We have the prayer or we know the prayer
20  that you gave?
21  A.  Uh-hum.
22  Q.  Is it correct that that's not a prayer that
23  invokes particular religions, sorry.  Your prayer
24  does not invoke the name of Jesus Christ?

210

1  them I had some handwritten notes on.  I go through
2  multiple drafts of things which means that I would
3  have probably brought two of them.  You know, one
4  that a more rough and another one that I scribbled
5  something else on.  I do recall giving them both
6  away.
7  Q.  Do you know who you gave them to?
8  A.  No, sir.  There were quite a few people
9  there that night.
10  Q.  Yes, so I understand.  The minutes reflect
11  that a president Walls recommended that the agenda
12  be amended to allow 45 minutes for public comments
13  due to the large number of persons who requested to
14  speak at the meeting.  That was approved 10 to
15  nothing.  You voted for that, I take it?
16  A.  Yes, sir.
17  Q.  Was there any consideration given to
18  permitting as much time as necessary to let everyone
19  speak?
20  A.  The general speaking time period is 15
21  minutes and given the large numbers of people that
22  were there, we increased it to 45 minutes which is
23  basically three time what we would normally do, and
24  then I believe we always allowed some time at the

212

Hattier, Donald (Video)  10/10/2006  9:36:00 AM

1   which the Madelyn Murray-O'Hare comment was made?
2     A.  Not that I'm aware of.  I can't tell you
3   that.
4     Q.  Let me ask you personally, Dr. Hattier.  Do
5   you have same sympathy with the Doe's desire to
6   remain anonymous given what happened at the August
7   24th meeting?
8          MR. GOSSELIN:  Objection.
9     Go ahead.
10    A.  You know, I have a sympathy for them but
11  let me state that I actually have a high degree of
12  respect for the Dobrich family, all righty, I really
13  do.  I have a high respect for them because they
14  believed in something and they were willing to step
15  forward, just as I am now to defend the beliefs that
16  I have him.  All right, and I think that if somebody
17  wishes to hide behind anonymity on an issue, you
18  know they are doing it out of fear or whatever, but
19  if they are right they are right.
20        And my understanding is that the thing that
21  the Doe family was originally complaining about,
22  which had something to do with the Bible Club, which
23  I was not aware of at the time period, okay there
24  were right, we fixed it.  We corrected it.  Okay,

301

1   and other than I personally don't see what the issue
2   is.
3     Q.  You were personally present and observed
4   the treatment of Alex and Samantha Dobrich at the
5   August 24th Board meeting, correct?
6     A.  Yes.
7     Q.  Do think that the treatment of those two
8   children at that meeting, by community members,
9   might legitimately cause parents to be concerned
10  about the treatment that their children would get if
11  they relinquished anonymity?
12    A.  Yes.
13    Q.  I asked you earlier whether you are that
14  any of your children had tried to confirm who the
15  Does were and you said you were not aware of that?
16    A.  No, I would prefer that my children not
17  have a clue as to who they.
18    Q.  Am I also correct that you are not aware
19  that your wife or any member of your family has
20  taken any action to try to confirm who the Does are?
21    A.  I would hope not.
22    Q.  This is closing the loop for the record, I
23  would hope not means no you not area?
24    A.  Take that as a no, yes, well, whatever, no.

302

1     Q.  This can go quickly.  I have some
2   statements that you were quoted as having been to
3   the media.  I really don't want to, I don't think
4   debate these statements just want to confirm that
5   you were quoted accurately?
6     A.  Okay.
7     Q.  I may have a question or two but I think
8   it's going to be --
9          MR. ALLINGHAM:  This is Hattier
10    24.  The Bates number is P104 and 105.
11        (WHEREUPON Hattier Exhibit 24 was
12    marked for identification)
13    Q.  There is taken from Sussex County Online.
14  You are reported in the one, two, three four, fifth
15  paragraph as having been, as having said,
16  "Dr. Donald Hattier who opened last week's meeting
17  with a prayer penned by George Washington admitted
18  the School Board's current stance on prayer wouldn't
19  hold up in court?"
20    A.  Incomplete quote.
21    Q.  Can you complete it for me?
22    A.  Yes.  Graduation prayer.  Graduation prayer
23  and prayer at school luncheons, other things.  If
24  you compare what we were doing with the DOJ cite it

303

1   would not hold up.  Incomplete quote.
2     Q.  Okay, so you did say this but you weren't
3   referring to the School Board prayer?
4     A.  No, I was not, I was referring to the other
5   issues.
6     Q.  And let me just ask you the question, and
7   are the current policies which have been adopted
8   since that time in your have view in compliance with
9   the Constitution?
10    A.  Lordy, I hope so.
11         MR. ALLINGHAM:  This is Hattier
12    25.  And I will tell you in advance, Dr.
13    Hattier I have only the second page of this
14    article from The Wave.  I don't know why.
15    It bears Bates number P122.  I will see if I
16    can find the first page.
17        (WHEREUPON Hattier Exhibit 25 was
18    marked for identification)
19    A.  Yes, final paragraph.
20    Q.  Is your comment accurately reported there?
21    A.  Yes.
22    Q.  Okay?
23    A.  And again though that's based on my
24  findings afterwards.  Okay, in other words, you look

304

1  back on what the law had been or had not been, start
2  looking at the aforementioned, you know citing, and
3  as you read the court cases, so that's where the
4  decades part came in.
5  Q.  Understood.
6  A.  Okay.
7          MR. ALLINGHAM:  This is
8  Hattier 26 bearing Bates numbers P290
9  through 293.
10         (WHEREUPON Hattier Exhibit 26 was
11  marked for identification)
12  Q.  This is an August 27 article from the
13  Coastal Point?
14  A.  Okay.
15  Q.  If you --
16  A.  I can't even see myself in there if you can
17  help me out, please.
18  Q.  If you will look at the third page, the
19  last column, the second full paragraph you will see
20  district four representative Dr. Donald Hattier, do
21  you see that?
22  A.  Uh-hum.
23  Q.  "Responded to further public comments on
24  the issue by stating his personal support for prayer

305

1  but acknowledging that the Board had no expectation
2  that it would be able to win any case taken to the
3  court with a pro prayer stand.  He said the Board
4  was proceeding in forming the policy under the
5  guidelines of the State Education Department and
6  with the advice of the district's legal counsel?"
7  A.  Same incomplete quote.  This has to be
8  again with the baccalaureate and the and graduation
9  policies.
10  Q.  And did individual Board members respond to
11  the public comment section with their own views?
12  A.  I don't think so.
13  Q.  Other than yourself?
14  A.  You mean in terms of what I am saying here?
15  Q.  Yeah.
16  A.  You know, based on what it is and based on
17  what's out there, this is what it is.  Okay, we are
18  not going to be able to go to court and argue that
19  we should be able to have under our current policies
20  that a person should be allowed to invite a preacher
21  to come and talk to our graduation ceremonies.
22  Q.  Yes, sir, my question is much more limited
23  and I want to see if I can get you out of here.  You
24  did make this comment?

306

1  A.  Yes, I did.
2  Q.  With the clarification that you have given?
3  A.  Again, incomplete quote.
4  Q.  And my question was just did any other
5  Board member make a comment in response to the
6  public comment section of the meeting?
7  A.  Unless it's printed in here I'm going to
8  say no.  And this, whatever comment I made here, who
9  is the author here, Pat Titus, Patricia Titus, this
10  probably would have been an interview that happened
11  afterwards during the break of some type.  This
12  would have been a comment that would have been mad
13  during the Board meeting itself.
14  Q.  I have two quick questions on the report of
15  the August 24 meeting.  On page two of this exhibit
16  in the second column, look at the one, two, three,
17  fourth paragraph halfway down the paragraph here is
18  a sentence that begins, at times?
19  A.  Uh-hum.
20  Q.  And it reads, "At times the meeting
21  resembled a prayer meeting as much as a School Boarc
22  meeting with choruses of amen ringing in the
23  audience after speakers declared their believe and
24  their support for prayer in the schools."

307

1  A.  Right.
2  Q.  "Few speakers drew any line between the
3  Board's policy on commencement ceremonies or other
4  school events and the policy of prayer said before
5  School Board meetings."
6  A.  Right.
7  Q.  I want to ask you, would you agree that at
8  times the meeting resembled prayer meeting?
9  A.  I don't know that I'd call it a prayer
10  meeting but I would say as I stated to you earlier I
11  don't think a lot of people really understood what
12  the issues were.  Like the last sentence says few
13  speakers drew any lines.  I think most of the
14  speakers were not aware what we were discussing was
15  a more limited realm.
16  Q.  There were choruses of amen --
17  A.  Yes.
18  Q.  -- and people?
19  A.  Yes.
20  Q.  -- cheering for people who expressed
21  support for prayer in schools?
22  A.  Yes.  Yes I don't know if I would call it a
23  prayer meeting.
24  Q.  Revival meeting?

308

TAB  10

Helms, Reginald (Video) 10/11/2006 3:32:00 PM

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

1
2
3
4   MONA DOBRICH and MARCO DOBRICH, individually
    As parents and next friend of ALEXANDER DOBRICH,
5   SAMANTHA DOBRICH, JANE DOE and JOHN DOE,
    individually and as parents and next friend of
6   JORDAN DOE and JAMIE DOE,
7                    Plaintiffs
         vs.           Civil Action
8                     No. 15-120
    INDIAN RIVER SCHOOL DISTRICT, ET AL.,
9
                    Defendants
10
11  ------------------------------------
12
13       DEPOSITION OF REGINALD HELMS, taken
    pursuant to notice at the Indian River School
14  District, 31 Hosier Street, Selbyville, Delaware,
    beginning at 3:32 p.m. on October 11, 2006 before
15  David A. Sroka, Registered Professional Reporter and
    Notary Public.
16
    APPEARANCES:
17
18       THOMAS ALLINGHAM, ESQUIRE
         RICHARD HORVATH, ESQUIRE
19       BRIAN LENHARD, ESQUIRE
         P.O. Box 636
20       Wilmington, Delaware  19899-0636
         For the Plaintiffs
21
22                  WILCOX & FETZER
23       1330 King Street - Wilmington, DE  19801
                    (302) 655-0477
24                  www.wilfet.com

1

1
2
3        JASON P. GOSSELIN, ESQ.
         JARROD D. SHAW, ESQ.
3        Drinker Biddle & Reath LLP
4        One Logan Square
         Philadelphia, Pennsylvania  19103-6996
5        For the Defendants
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

2

1        MS. DUPHILY:  This is the
2   videotape deposition of Reggie Helms.  This
3   deposition is being taken on behalf of the
4   Plaintiff in the matter of Dobrich, et al.
5   versus Indian River School Board, et al,
6   case number 15-120.  The deposition is
7   being held at 31 Hosier Boulevard,
8   Selbyville, Delaware.  We are going on the
9   record on October 11, 2006 at approximately
10  3:32 p.m.
11       The court reporter is David Sroka
12  with Wilcox & Fetzer, Wilmington, Delaware.
13  my name is Lindsay duPhily and I am the
14  videotape specialist with Discovery Video
15  Services.
16       Counsel will now introduce
17  themselves and then the court reporter will
18  swear in the witness.
19       MR. ALLINGHAM:  I'm Tom Allingham
20  for the Plaintiffs and with me are Richard
21  Horvath and Brian Lenhard.
22       MR. GOSSELIN:  Jason Gosselin for
23  Indian River School District and the Indian
24  River School Board and the individual board

3

1   member in attendance.
2            REGINALD HELMS,
3   The Witness herein, called for examination by
4   the Plaintiff, having been duly sworn to tell the
5   truth, the whole truth, and nothing but the truth,
6   was examined and testified as follows:
7   EXAMINATION BY MR. ALLINGHAM:
8        Q.   I've put before you the top document is
9   Plaintiff's Exhibit 30.  Would you turn to the last
10  page of that exhibit, please?
11       In the second column from the right -- I
12  should give you some background.  This is an article
13  from Delaware Beach Life, have you ever read it
14  before?
15       A.   No.
16       Q.   There is a picture of you on the front
17  page, is that correct?
18       A.   That's me.
19       Q.   Not the best picture of all time?
20       A.   Well --
21       Q.   In the second column from the right there
22  is a quotation from the Reverend Jerry Fike, do you
23  know who Mr. Fike is?
24       A.   Yes.

4

1    Q.   Do you understand that the Rutherford
2    Institute contributed to that process?
3    A.   All I can testify is that I sent this to
4    Mr. Walls and as you can see it may have been, I
5    don't know specifically that he did.
6    Q.   Well, if you look at the page of the
7    Rutherford Institute and Neuberger memorandum that I
8    was looking at earlier, at the bottom it has one,
9    two and three and on the next page it has four and
10   five?
11   A.   Right.
12   Q.   You can recognize without comparing it word
13   by word that it's virtually verbatim to the final
14   policy as adopted?
15   A.   That's why I'm saying you can see, but do I
16   have knowledge that that's what they based it on,
17   nobody told me that but as you can see.
18   Q.   Did the memorandum of the Rutherford
19   Institute and the Neuberger Firm, which constitutes
20   PX34, form part of the consideration that you took
21   into account in voting to adopt Board Policy BDA.1
22   the School Board Prayer Policy?
23   A.   Yes.
24   Q.   Did any other Board member tell you that it

109

1    formed an important part of their consideration of
2    the consideration that they took into account in
3    voting for adoption of the Board Prayer Policy?
4    A.   No, they didn't, they didn't say that.
5    Q.   Look at Exhibit 9, please?
6    A.   Okay.
7    Q.   And I'm going to ask you Mr. Helms just to
8    take a minutes to read through the policy?
9    A.   Sure.
10   Q.   Ready?
11   A.   Yes.
12   Q.   What in your mind was the purpose of
13   offering -- is the purpose of opening the Board's
14   meetings with a prayer or a moment of silence?
15   A.   Exactly what it says.
16   Q.   To solemnify the proceedings?
17   A.   Yes.  To me the work that we do is very
18   important.  We have the best interests of our
19   students, our staff, and our district and I think
20   any time you enter into important work, if you will,
21   of this nature, that in my way of thinking you
22   should invoke the wisdom and guidance of a higher
23   power, if you will, whatever you see that to be.
24       But I think that this simply says that we

110

1    are asking for wisdom and guidance to make good
2    sound decisions.
3    Q.   And the means of solemnifying the
4    proceedings specified in the Board policy are two,
5    is that correct? One is to offer a prayer and the
6    other is to offer a moment of silence?
7    A.   As I see there are two mentioned, prayer
8    and moment of silence.
9    Q.   And am I correct that the Board policy
10   authorizes Board members to open the meeting at the
11   invitation of the Board president and on a rotating
12   basis that's specified here, with the limitations
13   that are specified, in one of two ways and only one
14   of two ways, a prayer or a moment of silence?
15   A.   Well, I'll speak to that issue like this.
16   Your definition of a prayer and my definition of a
17   prayer may be two separate things.  Therefore, I
18   know that there are some Board members who have
19   opened the meeting with something that they received
20   from the Internet which may be from George
21   Washington or Thomas Jefferson or whatever.  There
22   have been some Board members that pray simply as
23   they are led.
24       In other words, there is nothing written,

111

1    it's just something that they do.  We've had Board
2    members that have requested a moment of silence.
3    Although there are only two mentioned here I think
4    the leeway is that whatever you feel as an
5    individual that you want to do, then that's what
6    we've been doing.
7        So, although the policy mentions prayer and
8    a moment of silence, there have been other occasions
9    where people have read something from the Internet
10   and simply that is to just like it says here, it's a
11   very important job that we have, we have over 7000
12   students, and staff and whatever.  It's a
13   responsibility that I don't take lightly, and for
14   myself I would love to have someone giving me wisdom
15   and guidance and in my case it's my Heavenly Father.
16       Well, in your case it may be something
17   different and some other Board member it maybe a
18   different way.  However, that is the intent as I see
19   it.  My feeling.
20   Q.   Let me ask you a question about whether --
21   I'm going to give you a hypothetical practice and
22   ask you whether in your judgment it would accord
23   with the policy.  I'd like you to imagine a
24   hypothetical Board member who is an atheist.  A very

112

Helms, Reginald (Video)  10/11/2006  3:32:00 PM

1  can seek divine guidance for your work as a Board
2  member is by saying a prayer out loud on the stage
3  in the name of Jesus Christ at the Board meeting?
4      A.   No, that is not the only way.
5      Q.   You could pray for divine guidance off
6  stage in what I guess would be the wings of the
7  stage right before you walk on?
8      A.   Well, as I said before you can pray
9  anywhere.
10     Q.   Or after you walk on you could offer a
11 silent prayer in your head for divine guidance?
12     A.   Sure.
13     Q.   You could invite those present with you to
14 join you in a moment of silence as a way of seeking
15 divine guidance, is that correct or not correct?
16     A.   Yes, you could do that.
17     Q.   And those methods of seeking divine
18 guidance are no more or less effective in your
19 understanding of one's relationship with God, no
20 more or less effective than a public prayer out loud
21 would be?
22     A.   As I stated before I think God hears your
23 prayers whether it's openly or privately.  And the
24 only thing I would say is that could you do it in

133

1  the wings, yes, could you do it silently, yes, but
2  as far as I know we're still allowed to do it
3  openly, so if I were to choose to do it openly I
4  hope I would continue to have the right to do so.
5      But God would hear my prayer whether it was
6  silent, whether it was openly, whether it was in my
7  vehicle, or whether I was on stage.  God would hear
8  my prayer.
9      Now, how effective the prayer is only He
10 can determine that, but I believe He hears my prayer
11 and answers according to His will, but I think
12 that's why we are here.  I'm certainly very hopeful
13 that there doesn't come a time where someone says to
14 me you cannot pray openly.  I hope that never
15 happens in this United States.
16     Q.   Everyone's memory is not perfect, but would
17 you think it's fair to say that for every single
18 Board meeting that you've attended as a Board member
19 you have asked for God's help in performing your
20 duties at that meeting?
21     A.   I would say almost every one, sure.  I
22 don't know if it would be -- like I told you
23 yesterday I don't use words like never and all, but
24 I would say that it's safe to say that yes for the

134

1  most part.
2      Q.   And that would include regular meetings and
3  special meetings?
4      A.   Yes.
5      Q.   And so would you describe for me how you
6  have, if you can recall, how you have asked for
7  divine guidance before special meetings of the
8  Board?
9      A.   Typically we receive an agenda, and on that
10 agenda will be certain items, and I just simply ask
11 the Lord to help me make good sound decisions that
12 will be for the good of the district and the staff
13 and the students, and ask his blessings on whatever
14 decisions are made.  That type of thing.
15     Q.   And that -- because we know that public
16 prayers are not offered at special meetings, that
17 would be a private prayer?
18     A.   That would be private, although I would say
19 there have been other meetings besides regular
20 meetings that prayer has been open, the meeting has
21 been started with an open prayer.  As a matter of
22 fact, there were several negotiation meetings where
23 I was asked by the association on the other side of
24 the table if I would open the meeting with prayer.

135

1      So, there have been other meetings besides
2  regular meetings that have been opened with prayer
3  that I have been sitting in on --
4      Q.   Yes --
5      A.   -- but not every one.
6      Q.   Yes, sir.  I was following up on your
7  testimony and also that of Mr. Bireley and Dr.
8  Hattier, that it is not the practice of the Board to
9  open special meetings with a prayer, and that's
10 correct, isn't it?
11     A.   That's correct, although over the years
12 that I've been on there some have, but it would be
13 out of the ordinary.
14     Q.   Yes, sir.  And so setting aside the out of
15 the ordinary special meetings where someone offered
16 a public prayer, when you asked for divine guidance
17 you did so privately?
18     A.   Yes.
19     Q.   Let me ask you this, before any special
20 meeting have you ever gotten together with, just
21 said to one or more of your fellow Board members,
22 you know, before we start let's offer up a prayer
23 for guidance?  Not as a formal matter, but inside of
24 purely private prayer have you invited someone to

136

# TAB 11

Hobbs, Lois  10/24/2006  4:43:00 PM

FOR THE DISTRICT OF DELAWARE
MONA DOBRICH and MARCO        )
DOBRICH, Individually and      )
as parents and next friend     )
of ALEXANDER DOBRICH,          )
SAMANTHA DOBRICH, JANE DOE  ) Civil Action
and JOHN DOE, Individually  ) Number 15-120 (JJF)
and as parents and next     )
friend of JORDAN DOE and    )
JAMIE DOE,                  )
                            )
        Plaintiffs,         )
                            )
v.                          )
                            )
INDIAN RIVER SCHOOL         )
DISTRICT, et al.,           )
                            )
        Defendants.         )
        Videotape deposition of LOIS HOBBS, taken
pursuant to notice at 31 Hoosier Street, Selbyville,
Delaware, beginning at 9:12 a.m., on October 24, 2006,
before Julie H. Parrack, Registered Merit Reporter,
Certified Realtime Reporter and Notary Public.
APPEARANCES:
        THOMAS ALLINGHAM, ESQUIRE
        BRIAN G. LENHARD, ESQUIRE
        One Rodney Square
        Wilmington, Delaware  19801
        On behalf of Plaintiffs
        WILCOX & FETZER
        1330 King Street - Wilmington, Delaware 19801
        (302) 655-0477
        www.wilfet.com

1

APPEARANCES (CONT'D:)
        JASON P. GOSSELIN, ESQUIRE
        DRINKER, BIDDLE & REATH, LLP
        One Logan Square
        18th and Cherry Streets
        Philadelphia, Pennsylvania  19103-6996
        On behalf of Defendants

ALSO PRESENT:  TIMOTHY KEARNS
        LINDSAY DuPHILY, VIDEOGRAPHER
                - - - - -
        THE VIDEOGRAPHER:  This is the videotape
deposition of Ms. Lois Hobbs taken by the Plaintiff in
the matter of Dobrich, et al., versus Indian River
School District, et al., Civil Action No. 15-120. The
deposition is being held at 31 Hoosier Street,
Selbyville, Delaware, on October 24th, 2006.  We are
going on the record at approximately 9:12 a.m.
        The court reporter is Julie Parrack from
the firm of Wilcox & Fetzer, Wilmington, Delaware.  My
name is Lindsay DuPhily, and I am the videotape
specialist of Discovery Video Services.
        Counsel will now introduce themselves, and
then the court reporter will swear in the witness.
        MR. ALLINGHAM:  My name is Tom Allingham.
I represent the plaintiffs.  Along with me is Brian
Lenhard and Tim Kearns.
        MR. GOSSELIN:  Jason Gosselin for the

2

1  defendants.
2          LOIS HOBBS,
3      the deponent herein, having first been duly
4      sworn on oath, was examined and testified as
5      follows:
6  BY MR. ALLINGHAM:
7      Q.  Mrs. Hobbs, Ms. Hobbs, which do you prefer?
8      A.  Miss, Miss Hobbs.
9      Q.  Miss Hobbs, sorry.  Have you ever been deposed
10  before?
11     A.  Yes.
12     Q.  All right, so you know the process.  I'm going
13  to ask you some questions.  You are -- unless your
14  counsel instructs you not to answer, you're obligated
15  to answer those questions to the best of your ability.
16  I'm almost world renowned for asking questions that
17  are sometimes confusing.  Please tell me if you find a
18  question confusing or ambiguous, and I will do my best
19  to fix it.  Don't answer a question that you don't
20  feel like you understand.
21     A.  Okay.
22     Q.  You need to answer, although we have a
23  videographer here, you still need to answer out loud;
24  that is to say, so that the court reporter can take

3

1  down your answer and there's no ambiguity in what your
2  answer is.  Nods and "um-hums" can be misinterpreted.
3      A.  All right.
4      Q.  I understand that you have a previous
5  commitment and that you need to stop at 1:00 this
6  afternoon, correct?
7      A.  At 1:30 at the latest.
8      Q.  Okay.  I think what we'll do then is stop for
9  lunch at 1:00.  You can take care of your obligations
10  and if we need to resume thereafter, we will.
11         Is there any -- are you suffering from any
12  condition that would prevent you from giving
13  comprehensive and truthful answers to my questions
14  today?
15     A.  No.
16     Q.  Or taking any medications that might prohibit
17  you from doing that?
18     A.  No, I took a Benadryl, but I don't think that
19  will prohibit.
20     Q.  All right, your full name is what?
21     A.  Lois Margaret Hobbs.
22     Q.  And what is your address?
23     A.  It is 3 Brighton Street, Ocean View, Delaware.
24     Q.  Are you currently employed?

4

1       THE WITNESS: I don't know how to do it.
2       MR. GOSSELIN: I don't know what the
3   question is going to be.
4       THE WITNESS: I don't know what the
5   question is going to be.
6       MR. GOSSELIN: But if it involves
7   revealing what took place at that August 23rd meeting
8   that we talked about before, the instruction is to not
9   answer that question.
10      THE WITNESS: Okay.
11  BY MR. ALLINGHAM:
12   Q.  And I may have to ask a couple of questions to
13  develop the record because of the nature of the
14  instruction.
15      So my first question is, at any time
16  during the Board's consideration of the School Board
17  prayer policy, do you recall any Board member saying
18  or expressing the view that perhaps the Board should
19  consider a moment of silence instead of a prayer?
20   A.  I think Mr. Isaacs may have said that once.
21   Q.  And what was the response?
22   A.  Just that the Board's feeling was they wanted
23  to continue the tradition.
24   Q.  Do you recall during the discussion of the

197

1   moment of silence idea one or more Board members
2   saying, "I don't want to be told how I can pray," in
3   words or substance?
4    A.  I'm not sure what meeting that would be, but I
5   did hear something like that.
6    Q.  Who said that?
7    A.  I don't recall who said it.
8    Q.  What did you understand, if you had an
9   understanding, the purpose of the Board policy on
10  School Board prayer to be?
11   A.  That it would be shared, that we wouldn't be
12  preaching any one religion to anyone, that it would be
13  shared amongst the Board members to say a prayer.  If
14  they chose a moment of silence, they could choose a
15  moment of silence.  If they chose a prayer, they could
16  choose a prayer.  But as a legislative body, it was up
17  to that individual who was ever giving the prayer to
18  say whatever prayer they wanted.
19      And oftentimes I would say to whoever,
20  when I heard who was giving the prayer that, you know,
21  you know, a teacher died of a brain tumor, a fire of
22  the children, so often they would bless that, you
23  know, they would say, you're in our thoughts, that
24  family, who's ever gone through this tragedy is in our

198

1   thoughts.
2    Q.  According to your understanding, Miss Hobbs, is
3   the prayer directed only to the individual Board
4   members, or is it directed to all of the people in the
5   cafeteria or auditorium in which the prayer is being
6   offered?
7    A.  I believe it's the Board members' prayer.
8    Q.  So it's directed only to the Board members?
9    A.  I think she sort of clarify it with a
10  statement before that says if you don't want to
11  participate in the prayer, you may leave the room, or
12  whatever that little paragraph says.
13   Q.  That's the so-called disclaimer?
14   A.  Yeah, um-hum.
15      MR. GOSSELIN: Or "the disclaimer."
16  Objection.
17      MR. ALLINGHAM: I'm sorry?
18      MR. GOSSELIN: Objection to the form.
19      MR. ALLINGHAM: It wasn't meant to be
20  substantively charged.  I thought you'd object if I
21  called it the disclaimer.
22  BY MR. ALLINGHAM:
23   Q.  I showed you the actual Board policy, PX 9.
24  Would you see if you can get that out again?

199

1    A.  Yes.
2    Q.  Paragraph 1 reads "In order to solemnify its
3   proceedings the Board of Education may choose to ope
4   its meetings with a prayer or moment of silence, all
5   in accord with the freedom of conscience of the
6   individual adult Board member."
7       Would you agree with me that according to
8   the policy, the purpose of the offering of a prayer or
9   moment of silence is to solemnify the proceedings?
10   A.  Yes.
11   Q.  And what do you understand the solemnification
12  of the proceedings to mean?  What does that phrase
13  mean?
14   A.  I think they were just trying to bring some
15  dignity and, you know, ask for guidance in their
16  decision about children.
17   Q.  Was there any discussion about that at any time
18  that you recall?
19   A.  Not that I recall.
20   Q.  Was there ever any discussion of the purpose of
21  having a prayer to open Board meetings during any of
22  the Board's consideration of this Board policy?
23   A.  I think it's been a tradition they've been
24  opening the Board meetings with a prayer.

200

# TAB  12

McCabe, Elaine (Video)  10/17/2006  9:02:00 AM

```
 1        IN THE UNITED STATES DISTRICT COURT
 2        IN AND FOR THE DISTRICT OF DELAWARE
 3   MONA DOBRICH and MARCO   : Case No. 15-120
     DOBRICH, individually and :
 4   as parents and next friend :
     of ALEXANDER DOBRICH,
 5   SAMANTHA DOBRICH, JANE DOE :
     and JOHN DOE, individually :
 6   and as parents and next   :
     friend of JORDAN DOE and  :
 7   JAMIE DOE,
 8        Plaintiffs,  :
 9        v.           :
10   INDIAN RIVER SCHOOL    :
     DISTRICT, et al.,     :
11
         Defendants.   :
12
13        Video Deposition of ELAINE MCCABE, taken
     pursuant to notice, on Tuesday, October 17, 2006
14   at 9:02 a.m. at 31 Hosier Street, Selbyville,
     Delaware, reported by Lorena J. Hartnett, a Registered
15   Professional Reporter and Notary Public.
16
17   APPEARANCES:
18      RICHARD HORVATH, ESQUIRE
        BRIAN G. LENHARD, ESQUIRE
19      Skadden, Arps, Slate, Meagher & Flom
        One Rodney Square
20      Wilmington, DE  19801
        Attorneys for the Plaintiff
21
22      WILCOX & FETZER
        1330 King Street - Wilmington, DE  19801
23      (302) 655-0477
        www.wilfet.com
24
                        1
```

```
 1
 2
 3        TABLE OF CONTENTS
 4   TESTIMONY OF ELAINE MCCABE:
 5     Direct Examination by Mr. Horvath . . . . . . . 4
 6   Certificate of Reporter . . . . . . . . . . . . .112
 7
 8
 9
10        INDEX TO EXHIBITS
11   Plaintiff's Exhibit 57 . . . . . . . . . . . . . 99
12
13
14
15
16
17
18
19
20
21
22
23
24
                        3
```

```
 1
 2   APPEARANCES (CONTINUED):
 3      JASON P. GOSSELIN, ESQUIRE
        Drinker, Biddle & Reath, LLP
 4      One Logan Square
        18th and Cherry Streets
 5      Philadelphia, PA  19103-6996
        Attorney for the Defendants
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
                        2
```

```
 1        (The videographer read the
 2   introduction, and the attorneys introduced
 3   themselves.)
 4        ELAINE MCCABE,
 5   HAVING FIRST BEEN DULY SWORN, TESTIFIED AS
 6   DIRECT EXAMINATION ON BEHALF OF THE PLAIN
 7   BY MR. HORVATH:
 8   Q.  Good morning, Ms. McCabe.
 9   A.  Good morning.
10   Q.  Just so I can be clear from the start, is it
11   Ms. or Mrs.?
12   A.  Mrs.
13   Q.  Mrs.  Have you ever been deposed before?
14   A.  Once, yes.
15   Q.  And what was that, what were you -- What case
16   was that?
17   A.  It was the Barkaski case associated with the
18   school district.
19   Q.  And what was the nature of that case?
20   A.  It was a case that involved missing monies
21   from a booster organization.
22   Q.  Okay, did that case proceed to trial?
23   A.  No.
24   Q.  Did that case involve in any way religion in
                        4
```

McCabe, Elaine (Video)  10/17/2006  9:02:00 AM

**Page 73**

1  until today?
2     A.  I frankly didn't know that -- If I knew that
3  night, I had forgotten, but I really wasn't aware that
4  we were on tape.
5     Q.  Can we go back to exhibit number nine, the
6  copy of the policy?
7     A.  Uh-huh.
8     Q.  Is there any -- Which paragraph of this
9  policy limits what a board member can say as a part of
10  their prayer?
11     A.  I would say number three.
12     Q.  Okay.  And number three reads, "Such
13  opportunity," which I presume means the prayer, "shall
14  not be used or exploited to proselytize, advance or
15  convert anyone, or to derogate or otherwise disparage
16  any particular faith or belief."  Is that correct?
17     A.  Yes.
18     Q.  What does it mean to proselytize?
19     A.  I take that to mean that the prayer said
20  before board meetings was not meant to try to
21  influence anyone to a particular faith.
22     Q.  And I presume that you would use the same
23  definition for the convert anyone?
24     A.  Right, right.

**Page 74**

1     Q.  What does the advance, the word advance in
2  this policy mean?
3     A.  To put one faith before another.
4     Q.  Okay.  Have school board prayers identified
5  any religious figures, any deities, for example?
6     A.  God and Jesus.
7     Q.  Anyone else?
8     A.  I don't believe so, and not always Jesus.
9     Q.  But --
10     A.  Or I would say the Lord, which would be used
11  sometimes.
12     Q.  But you don't remember hearing any school
13  board prayer that was directed to Jehovah?
14     A.  No.
15     Q.  Or Buddha?
16     A.  No.
17     Q.  Or Allah?
18     A.  No.
19     Q.  Or I can keep going through all religious
20  beings aside from God in general, the Lord and Jesus.
21     A.  Right.
22     Q.  I am going to go through a series of prayers.
23     A.  Okay.
24     Q.  And I want to see whether or not you think

**Page 75**

1  those prayers would be permitted under this policy.
2     A.  Okay.
3     Q.  Oh, before I show you these ones, I am going
4  to read one to you.
5     A.  Okay.
6     Q.  Suppose that a board member gave the
7  following prayer:  "We pray, Lord, that you enlighten
8  the heathen in our midst and that you inspire them to
9  come to the knowledge of your wisdom and goodness."
10       Would that prayer be appropriate under the
11  policy?
12     A.  I don't know.
13     Q.  Would it violate paragraph three?
14     A.  I am not an expert on prayer.  Read it again.
15     Q.  "We pray, Lord, that you enlighten the
16  heathen in our midst and that you inspire them to come
17  to knowledge of your wisdom and goodness."
18     A.  I guess I personally probably don't like the
19  word heathen, but I don't know whether it would be
20  allowed or not.
21     Q.  Does this prayer proselytize?
22     A.  I have no idea.
23     Q.  You voted for Policy BDA.1?
24     A.  I did.

**Page 76**

1     Q.  And, as a board member, you are responsible
2  for the enforcement of this policy?
3     A.  Yes, yes.
4     Q.  So, speaking as someone who voted for the
5  policy and was responsible for the enforcement of the
6  policy, how would you make a determination as to
7  whether or not that prayer would violate paragraph
8  three?
9     A.  Well, I guess, frankly, I had never thought
10  of it in terms of a prayer like you just read, because
11  that's not generally what the type of prayer that was
12  said at our meetings.
13       Generally, it was just a prayer asking for
14  wisdom to make good decisions for the betterment of
15  our district and our children, so I am not sure that
16  it ever came up and I ever thought about it in a
17  specific term like that.
18       I mean I am assuming, the way you read it,
19  that the words could be interpreted to encourage
20  people who were not religious to become religious, but
21  I don't know that that's really the case.
22     Q.  So you do not feel that this prayer violates
23  paragraph three of the policy?
24     A.  I don't really have a problem with it, no.