## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MONA DOBRICH and MARCO | : | |
| DOBRICH, individually and as parents | : | |
| and next friend of ALEXANDER | : | |
| DOBRICH, SAMANTHA DOBRICH, | : | |
| JANE DOE and JOHN | : | |
| DOE, individually and as parents and | : | |
| next friend of JORDAN DOE and | : | |
| JAMIE DOE, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | Civ. Action No. 05-cv-00120-JJF |
| | : | |
| THE INDIAN RIVER SCHOOL BOARD, et al., | : | |
| | : | |
| Defendants. | : | |

## REVISED SUBSTITUTED ANSWERING BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

June 19, 2008

Warren Pratt (Del. Bar No. 4334)
DRINKER BIDDLE & REATH LLP
1100 N. Market Street
Suite 1000
Wilmington, DE 19801
Telephone:   (302) 467-4200
Facsimile:   (302) 467-4201

Jason P. Gosselin
Katherine L. Villanueva
Elizabeth L. McLachlan
DRINKER BIDDLE & REATH LLP
One Logan Square
18th & Cherry Streets
Philadelphia, PA 19103-6996
(215) 988-2700

# TABLE OF CONTENTS

Table of Contents ................................................................................................................ i

Table of Authorities ........................................................................................................... ii

I.     INTRODUCTION ................................................................................................ 1

II.    RESPONSE TO PLAINTIFFS' "STATEMENT OF FACTS" ............................ 2

       A.     Plaintiffs Misrepresent the Nature of Board Prayer ................................ 2

       B.     Plaintiffs Erroneously Maintain That Students Are Required To Attend
              Board Meetings ........................................................................................ 4

       C.     Plaintiffs Misrepresent the Process By Which the Board Prayer Policy Is
              Applied ..................................................................................................... 6

       D.     Plaintiffs Rely on Improper Statements and Evidence That Is Not At Issue
              in This Litigation ..................................................................................... 8

       E.     Plaintiffs Misrepresent the Purpose of Board Prayer ............................ 11

III.   LEGAL STANDARD ........................................................................................ 12

IV.    ARGUMENT ..................................................................................................... 13

       A.     *Lemon v. Kurtzman* ............................................................................... 14

              1.     Secular Purpose ........................................................................... 14

              2.     Primary Effect ............................................................................. 21

              3.     Entanglement ............................................................................... 24

       B.     Endorsement Test .................................................................................. 26

       C.     Coercion Test ......................................................................................... 29

       D.     *Marsh v. Chambers* .............................................................................. 33

V.     CONCLUSION .................................................................................................. 36

# TABLE OF AUTHORITIES

## CASES

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)................................................................................14

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)............................................................................13, 14

*Chadhuri v. Tennessee*,
   130 F.3d 232 (6th Cir. 1997) ...................................................................22

*Child Evangelism Fellowship v. Stafford Twp.*,
   386 F.3d 514 (3d Cir. 2004)......................................................................26

*County of Allegheny v. American Civil Liberties Union*,
   492 U.S. 573 (1989)..................................................................................37

*Doe v. Tangipahoa Parish Sch. Bd.*,
   473 F.3d 188 (5th Cir. 2006) ............................................................. 16-17

*Fireman's Ins. Co. v. Du Fresne*,
   676 F.2d 965 (3d Cir. 1982).......................................................................14

*Gillette v. United States*,
   401 U.S. 437 (1971)..................................................................................16

*Ind. Civ. Liberties Union v. O'Bannon*,
   259 F.3d 766 (7th Cir. 2001) ...................................................................28

*Lee v. Weisman*,
   505 U.S. 577 (1992)............................................................................31, 32

*Lynch v. Donnelly*,
   465 U.S. 668 (1984)....................................................................15, 22, 28, 31

*Marsh v. Chambers*,
   463 U.S. 783 (1983)............................................................... *passim*

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986)..................................................................................13

*McCreary County v. ACLU*,
   545 U.S. 844 (2005)..................................................................................16

*Modrovich v. Allegheny County,*
   385 F.3d 397 (3d Cir. 2004) ........................................................................28

*Peck v. Upshur County Bd. of Ed.,*
   155 F.3d 274 (4th Cir. 1998) .......................................................................26

*Snyder v. Murray City Corp.,*
   159 F.3d 1227 (10th Cir. 1998) ...................................................................37

*Tenafly Eruv Ass'n v. Borough of Tenafly,*
   309 F.3d 144 (3d Cir. 2002)....................................................................28, 29

*Van Orden v. Perry,*
   545 U.S. 677 (2005).....................................................................................16

*Verbena United Methodist Church v. Chilton County Board of Ed.,*
   765 F. Supp. 704 (M.D. Ala. 1991) .............................................................26

## RULES & CODES

Fed. R. Civ. P. 56(c) ............................................................................................13

Del. Const. art. XIV, § 1 .......................................................................................4

Del. Code Ann. tit. 14, § 1043 ..............................................................................5

Del. Code Ann. tit. 14, § 1048(a)..........................................................................4

Del. Code Ann. tit. 14, § 1048(b) .........................................................................4

Del. Code Ann. tit. 14, § 1048(c)..........................................................................5

Del. Code Ann. tit. 14, § 1050 ..............................................................................6

Del. Code Ann. tit. 14, § 1053(a)..........................................................................4

Del. Code Ann. tit. 14, § 1055 ..............................................................................6

Del. Code Ann. tit. 14, § 1068(a)..........................................................................3

Del. Code Ann. tit. 14, § 1068(b) .........................................................................3

Del. Code Ann. tit. 14, § 1068(g) .........................................................................3

Del. Code Ann. tit. 14, § 1068(f) ..................................................................4

Del. Code Ann. tit. 14, § 1701 ......................................................................6

Del. Code Ann. tit. 14, § 1702 ......................................................................6

Del. Code Ann. tit. 14, § 1902 ......................................................................6

Del. Code Ann. tit. 14, § 1916 ......................................................................6

## OTHER AUTHORITIES

*Webster's New World Dictionary*, 1276 (College ed. 1988)..............................................21

I.    **INTRODUCTION**

The only issue in this case that has not yet been resolved is whether the Indian River

School Board's ("Board") practice of opening its regular Board meetings with a prayer or

moment of silence is constitutional.  Plaintiffs maintain that this practice is inherently religious

and runs afoul of the Establishment Clause.  Defendants maintain that this is part of a tradition

that is as old as our nation itself, and that the Supreme Court decision in *Marsh v. Chambers*

applies.  The issue before the Court matters not just to parties in this case.  Other school districts

and the public at large have a stake in the outcome.  This is the sort of issue where men and

women of good faith can and often do disagree.  It is a disappointment that Plaintiffs' brief in

support of their Motion for Summary Judgment is not worthy of this important debate.

As an initial matter, Plaintiffs filed with their motion a certification that all of the facts

upon which the motion is based are not in dispute.  However, the Statement of Facts included in

Plaintiffs' brief can hardly be called undisputed.  Quite to the contrary, it is a statement of

argument with occasional, and often misleading, citations to portions of certain deposition

transcripts.  Moreover, Plaintiffs' Statement of Facts and other portions of Plaintiffs' brief

constitute an *ad hominem* attack on the Board members themselves.  The foundation of

Plaintiffs' motion is that the Board members are perpetrating a "sham" – that they are lying

about the purpose of the Board prayer policy to cover up the "true" purpose, which emanates

from their own religious bigotry or that of the Sussex County community.

This is unfortunate.  Plaintiffs' attorneys have made great and often admirable efforts to

protect their clients from disparagement resulting from the public nature of a lawsuit that

Plaintiffs themselves filed.  Yet, Plaintiffs' attorneys have used their summary judgment motion

to belittle the Board members – volunteers who donate their time and talent for the benefit of a

school district that educates more than 8,000 youth – and to accuse them of deceiving the Court as well as their own constituents.  Defendants deserve better.  And so do Plaintiffs.

Wholly apart from the negative and unprofessional tenor of Plaintiffs' papers, Plaintiffs' attorneys certainly understand the standard for a summary judgment motion.  Even if Plaintiffs feel they have reason to disbelieve the testimony of Board members and other school administrators, Plaintiffs' attorneys should know better than to premise a summary judgment motion not on testimony, but on an *argument* that the testimony is not credible.  For these and other reasons, Plaintiffs' Motion for Summary Judgment should be denied.

## II.     RESPONSE TO PLAINTIFFS' "STATEMENT OF FACTS"

Plaintiffs' "Statement of Facts" is argumentative and contains minimal references to the record.  Defendants therefore oppose Plaintiffs' "Statement of Facts" and offer the following response to the "Facts" asserted by Plaintiffs, which focuses on those facts that are central to Plaintiffs' motion.

### A.     Plaintiffs Misrepresent the Nature of Board Prayer

First, Plaintiffs erroneously state that "[t]he Board's prayer practice overwhelmingly favors Christianity."  Plaintiffs' Br. at 14.  As an initial matter, Plaintiffs have not supported this statement with a citation to the record.  Indeed, Plaintiffs have provided very few examples of the prayers they consistently reference as favoring Christianity.  Moreover, Defendants have testified that the substance of the prayers is not focused on a particular denomination.  *See, e.g.,* McCabe Dep. at 76 ("Generally, it was just a prayer asking for wisdom to make good decisions for the betterment of our district and our children"); Nina Lou Bunting Dep. at 49 ("I know when I give the prayer it is just talking about our staff and students, and about our own decision making.  It does not involve anything or anybody else"); Hobbs Dep. at 198 (if there was a death

or other tragedy, "often [the person giving the prayer] would bless that, you know, they would

say, you're in our thoughts, that family, who's ever gone through this tragedy is in our

thoughts"); Hattier Dep. at 324 ("at a lot of our prayers we will ask for the proper guidance for

our custodial staff, or our teachers to do the right things as well").

     Although Plaintiffs stated that the Board members could not recall a single non-Christian

prayer ever being given at a public Board meeting, *see* Plaintiffs' Br. at 14, Plaintiffs' citation to

Mr. Bireley's deposition does not support their proposition. Mr. Bireley was testifying about

whether previous Board members had been non-Christian, about those who offer prayers, and

about the rotation practice. *See* Bireley Dep. at 59-60, 62-63. He did not testify regarding the

type of prayers given. *See id.* Like Mr. Bireley, Ms. McCabe did not testify that she could not

recall any non-Christian prayers. The questioning was limited to prayers in which religious

figures were identified. *See* McCabe Dep. at 74 (questioning on "Have any school board prayers

identified any religious figures"). In sum, there is no support for Plaintiffs' statement that all of

the Board prayers are primarily Christian.

     Plaintiffs similarly misstate that "[n]umerous Board members conceded that District

residents consider the defense of this suit to be a defense of 'Christian values,'" Plaintiffs' Br. at

18, and that the defense in this suit is the defense of Christian prayer. Although one Board

member, Mr. Hastings, testified that it was a common sentiment within the District that the case is

about protecting Christian values, he had not had anyone tell him that specifically. *See* Hastings

Dep. at 130-31. Moreover, Mr. Hastings had never heard the sentiment expressed that the Board

Prayer Policy was about protecting Christian values. *See* Hastings Dep. at 131-32; *see also*

Hughes Dep. at 88-89 (had heard that the case was about protecting Christian values, but does not

recall ever hearing anyone say that the Board's prayer practice was about protecting Christian

values); Helms Dep. at 214 (testifying both that no one ever told him that this case was about

protecting Christian values and that no one had ever told him that they see the Board Prayer

Policy as protecting Christian values or promoting Christianity).  Mr. Isaacs thought it was

simply a view held by some.  *See* Isaacs Dep. at 55.  In this regard, Board members testified that

they did not believe that the public viewed the defense of lawsuit as a defense of Christian

prayer.  *See* Evans Dep. at 113; Hastings Dep. at 130 (never had anyone tell him that this case

was about protecting Christian prayer).

### B.    Plaintiffs Erroneously Maintain That Students Are Required To Attend Board Meetings

Plaintiffs base their Motion for Summary Judgment, in large part, on their belief that

students are expected and/or are required to attend Board meetings.  This is not an accurate

reflection of the record.  For example, Plaintiffs state that "[t]he Board opens its regular public

meetings – meetings that the Board expects students to attend, and which students routinely do

attend – with prayer."  Plaintiffs' Br. at 5.  Defendants contest the use of the term "expects."  In

certain circumstances, students are invited to attend Board meetings by the school principal, *see*

Bireley Dep. at 25, but students "could come and be honored or they might not, or their principal

might accept the award and they could stay home."  *See* Hobbs Dep. at 37.[1]

---

[1] Moreover, there is no evidence in the record of the amount of students that were in attendance
at any particular meetings.  The meeting minutes cited by Plaintiffs reflect that President Walls
and Ms. Hobbs recognized and presented certificates to students and then provides a list of
names.  *See* Plaintiffs' Exhibit 40.  This does not indicate that all the students listed were actually
physically present at the meeting.  *See* Hobbs Dep. at 37 (students have the option to attend the
meeting: they "could come and be honored or they might not, or their principal might accept the
award and they could stay home.  There was no obligation for them to come to a Board
meeting"); Bunting Dep. at 77 (even if the student does not attend, "They get their honor
anyway"); Hattier Dep. at 282-83 (testifying that there have been students who have declined the
invitation to come the Board meeting); Mitchell Dep. at 152 (the students who are recognized
"come to get their award and they leave, or some don't show up at all…It's not a real serious
(continued…)

- 4 -

In addition, contrary to Plaintiffs' statement that "[s]choolchildren have become an integral part of Board meetings," *see* Plaintiffs' Br. at 9, students are not an integral part of the Board meetings and often are not in attendance. *See* Hastings Dep. at 42 (testifying that probably during the summer months, there are regular Board meetings where no students are present). In fact, Board members have discussed the possibility of eliminating the portion of the meeting of giving awards to students because of its length. *See* Birely Dep. at 28-30.

Finally, there is no evidence in the record to support Plaintiffs' proposition that students "likely feel obligated to attend the Board's regular meetings." Plaintiffs' Br. at 11. Plaintiffs have not provided any evidence as to how students feel with respect to attending regular Board meetings, let alone that they feel "obligated" to attend. Indeed, multiple Board members have testified that students are not required to be at the meetings, even if they are invited. *See* Bireley Dep. at 33 (testifying that he cannot recall any instances where students have been required to attend School Board meetings); N. Bunting Dep. at 77 (even if the student does not attend, "They get their honor anyway"); Hattier Dep. at 282-83 (testifying that because "We have too many [students] who don't [attend when invited]," it is not his belief that an invited student would feel expected to attend); Mitchell Dep. at 152 (the students who are recognized "come to get their award and they leave, or some don't show up at all…It's not a real serious thing"). Nor do Plaintiffs' citations to the record establish (1) that students are, in fact, susceptible to peer pressure, or (2) that they are unlikely to leave a meeting if a prayer that contravenes their own

---

(..continued)
thing"). Although Plaintiffs rely on the District's 30(b)(6) witness "conced[ing] that he could not recall a student ever declining an invitation, unless there was a scheduling conflict," the District's 30(b)(6) witness also testified that he cannot recall any student being required to attend. *See* Bireley Dep. at 33.

belief is offered.  The citations to the record simply show some Defendants' opinions.  For example, Board member Isaacs pointed out, "one could get up and leave saying they had to use the restroom…there are mechanisms to get up and leave a board meeting that you don't have to tack a particular clause to it.  There [are] plenty of opportunities to get up."  *See* Isaacs Dep. at 63-64.

### C.     Plaintiffs Misrepresent the Process By Which the Board Prayer Policy Is Applied

Plaintiffs next rely on the "fact" that only Christian Board members have offered prayers at Board meetings, and that Mr. Bireley invites only those Board members that he believes would be comfortable offering a prayer.  Importantly, Plaintiffs have mischaracterized Mr. Bireley's testimony regarding the rotation schedule.  Mr. Bireley calls on the Board members who have expressed an interest in saying a prayer or having a moment of silence.  *See* Bireley Dep. at 176-77.  He has decided not to offer publicly the individual Board members the opportunity because he "didn't want to put anyone on the spot by asking them to do it or for them to decline."  *Id*. at 177.  As a Board member who has previously declined to offer the prayer or moment of silence, he understands that the Board member may want advance notice so that he or she can prepare something.  *See id.* at 178-80.  He additionally testified that he did ask the Board members publicly because he did not to "embarrass them or put them on the spot, yeah, when I already knew the answer."  *See id*. at 183.

Plaintiffs also misstate the method by which the Board ensures that the Board members comply with the Board Prayer Policy.  For example, Plaintiffs state that "[t]he only enforcement mechanism against a Board member who offers a prayer that violates the Policy, however, is depriving that member of subsequent opportunities to open meetings with prayer, an empty discipline."  Plaintiffs' Br. at 16.  Contrary to Plaintiffs' assertion, the Board members did not

testify that denial of future opportunities is the only mechanism for enforcing the Board Prayer Policy.  *See* Walls Dep. at 162-63 (discussing what he would have done if he were Board President and someone gave an inappropriate prayer, but not testifying that this was the "only" mechanism); Isaacs Dep. at 40-41 (discussing what he would do if someone gave an inappropriate prayer, but not testifying that was necessarily the "only" mechanism).  Mr. Bireley testified that, while he has never had the issue of a Board member violating a Board policy, "I would assume that we would come before the rest of the Board members and we would discuss it."  Bireley Dep. at 23; *see also* Helms Dep. at 222-24 (stating that if he viewed a prayer as violative of the Board Prayer Policy, "I would wait till the appropriate time and I see that as executive session or whatever, and I would like to talk about it…there are opportunities to step in if someone is out of line.  The president has that responsibility, but also in executive session there are discussions that can be had to try to, you know, straighten that sort of thing out").

Plaintiffs also cite various hypothetical prayers and language that Board members believe would violate the Board Prayer Policy.  In addition to the absence of any citation to the record, to the extent Board members were "asked whether several prayers violated" the Board Prayer Policy, the prayers recited were not prayers actually given at Board meetings.  For instance, nine Board members were asked whether a sample prayer characterizing certain people as "heathens" would violate the Policy, but the record does not indicate any prayers where the word "heathen" was actually used at a Board meeting.  Plaintiffs cite additional hypothetical prayers that were not actually given at Board meetings to support their position that the Board members were "unsure" of the parameters of the Board Prayer Policy.  The testimony cited by Plaintiffs, however, does not support this broad assertion.  Mr. Helms, for example, did not state that the hypothetical prayer would not be prohibited; he stated, "I would view that as a prayer that is very

- 7 -

dangerously on the edge, and I would need someone—see, to me there is a difference between what is lawful—in other words, someone would have to tell me whether that lawfully broke the policy.  However, in my mind I would say I would not say that, and I don't know that I would, but perhaps I may say something to Dr. Hattier in the form of you know Dr. Hattier that might be dangerously close.  That's something I wouldn't do."  *See* Helms Dep. at 222.  Mr. Hastings "suspect[ed] it would be permissible", that it was not a prayer used to convert anyone.  *See* Hastings Dep. at 118.  The Board members also did not "disagree[]" that "a prayer requesting that Board members be "direct[ed] . . . into the truth, and eventually the truth that comes by knowing Jesus" would violate the Policy."  Plaintiffs' Br. at 6.

### D.     Plaintiffs Rely on Improper Statements and Evidence That Is Not At Issue in This Litigation

Plaintiffs also cite to "evidence" that is not part of the record.  For example, Plaintiffs assert that the Board members conceded that its practice of graduation prayer was unconstitutional.  Plaintiffs' Br. at n.4.  Plaintiffs further assert that certain Board members acknowledged that the language of Pastor Fike's graduation prayer was objectionable, which prompted the Board to adopt a graduation policy that would explicitly prohibit such a prayer. Plaintiffs' Br. at 6.  Not only are these statements irrelevant to the issue of Board prayer, they are a violation of, and contrary to, the Settlement Agreement, which provides:

- Each Defendant has denied and continues to deny having committed or having attempted to commit any violation of law.

- Defendants are entering into the Settlement of disputed claims because the Settlement will eliminate the burden and expense of further litigation.

- Neither the existence of the Settlement nor the provision contained herein will be deemed a presumption, concession

> or admission by any Party of any breach of duty, liability,
> default or wrongdoing as to any facts, claims or defenses
> alleged or asserted in the Litigation.

*See* Settlement Agreement ¶¶ 12, 18, 19, 25.

In addition, Plaintiffs make various improper assertions regarding legal advice that the Board received from its attorney, James Griffin. For example, Plaintiffs state that Mr. Griffin advised the Board that the practice of Board prayer was unconstitutional. Plaintiffs' Br. at 6-7. During the depositions of several Board members, Plaintiffs' counsel asked questions that, upon information and belief, he knew were subject to attorney-client privilege in the hope of provoking an inadvertent revelation of Mr. Griffin's advice. Plaintiffs' counsel was warned about his tactics both during and after the deposition. *See, e.g.*, Bireley Dep. at 126 (Defendants' counsel stating, "I think you are starting to tread into territory where you are trying to get at what the advice was that Mr. Griffin gave, and obviously we object to that. I'm putting that out on the record because I want to just remind both you and the witness what we agreed were going to be the ground rules for this line of questioning"); October 12, 2006 Letter to T. Allingham, attached hereto as Exhibit S. Improperly elicited testimony should not be part of the record.

While Plaintiffs think they know what advice Mr. Griffin gave, they do not. The testimony in the record shows only that the Board felt it needed advice from an attorney who specialized in First Amendment law before it could determine whether or not to alter the Board Prayer Policy. *See* Hattier Dep. at 191 ("Mr. Griffin is a general attorney and for what we were discussing and what the potential for litigation we felt that it would be better to pick a different attorney for another opinion. In my opinion Mr. Griffin, is a find [sic] attorney, Mr. Griffin has served our district extremely well over the years, but he is a general attorney and his issues do not run into the First Amendment as a general rule. He would do contract law[,] he would do

personal issues, but, you know, First Amendment issues are not the sort of thing that routinely

come across his desk"); Helms Dep. at 74, 77 ("The only thing I can tell you for sure if I didn't

want to make a decision that night because I didn't feel we had enough information…My

opinion was that we had not received information that said that what we were doing was illegal

and breaking the law").  Plaintiffs' citations do not support the proposition that Mr. Griffin

advised the Board that Board prayer was unconstitutional.

Plaintiffs also erroneously state that the Board disregarded Mr. Griffin's advice and that

the Board members "shopped for legal advice" after receiving Mr. Griffin's advice.  Plaintiffs'

Br. at 7.  These statements are inaccurate.  Mr. Walls did not state that they disregarded Mr.

Griffin's advice.  Instead, he testified that the Board questioned whether Mr. Griffin believe that

Board prayer was legal and "worth fighting for."  *Id*.  Nor did Ms. Hobbs testify as to what

advice Mr. Griffin gave the Board or what the Board's belief was as to the constitutionality of

Board prayer.  *See* Hobbs Dep. at 107-08.

Finally, Plaintiffs assert that "Board members have admitted that Board prayer has

become a significant political issue in the area."  Plaintiffs' Br. at 18-19.  Not only is this

statement irrelevant to the constitutionality of Board prayer, Plaintiffs have mischaracterized Ms.

McCabe's testimony.  Ms. McCabe stated, "I am sure [Board prayer] was an issue for some

people.  There were other issues, I think, just as important."  *See* McCabe Dep. at 86-87; Bireley

Dep. at 193 (testifying, "I don't know that it became a major issue, it became an issue in the

campaign").  Mr. Helms also testified that he did not think it had become a significant political

issue.  *See* Helms Dep. at 214-15 (testifying that he had heard about a radio broadcast in which

school board prayer was mentioned in connection with a campaign, but he was not sure if the

woman had campaigned on the issue "but that's the only one I'm aware of that even mentioned it

during the elections"). In addition, to the extent it became an issue, it was done by the public, not the candidates. *See* Hastings Dep. at 135 (testifying that the candidates did not campaign on the issue of Board prayer, but that persons seeking to support the campaign of individual candidates did make it Board prayer an issue").

### E.     Plaintiffs Misrepresent the Purpose of Board Prayer

Plaintiffs assert that the Board's stated purpose of the Board Prayer Policy (i.e., to solemnify the proceedings) is a sham. They ask the Court to disregard the Board members' testimony and to find that the true purpose was to advance religion, particularly Christianity. Plaintiffs specifically state that the Board Prayer Policy was "designed to elicit public participation in prayer." Plaintiffs' Br. at 11. Contrary to Plaintiffs' assertions, the testimony that they cite does not support their statement regarding the purpose of the Board Prayer Policy. Board member Wilson did not, as Plaintiffs claim, concede that the Board Prayer Policy was designed to elicit public participation in prayer. Plaintiffs also erroneously state that "Board member Robert Wilson freely conceded that the Board's prayers are 'for the benefit of everyone in attendance.'" Plaintiffs' Br. at 13. This testimony has been taken out of context. Mr. Wilson simply agreed with the question that Board prayer "in some way is for the benefit of everyone in attendance." *See* Wilson Dep. at 31.

Plaintiffs also rely on the "fact" that the Board does not open its special meetings with prayer.[2] As an initial matter, Plaintiffs have not supported this purported statement of fact with a

---

[2] Plaintiffs state that "[t]he Board will sometimes invite individuals to attend special meetings, but they are often closed to the public." Plaintiffs' Br. at n.3. Plaintiffs have not provided a citation to the record for the proposition that the special meetings are often closed to the public. Mr. Bireley testified that sometimes there are people from the public at special meetings. *See* Bireley Dep. at 87-89 (estimating that if the Board conducted two or three special meetings a year, the public usually wouldn't be at all three, that "it depends on what the issue is"). Mr.

(continued...)

citation to the record.  Moreover, Mr. Helms testified that he could recall some special meetings that opened with a prayer.  *See* Helms Dep. at 136, attached hereto as Exhibit R ("over the years that I've been on there[,] some [special meetings] have [opened with prayer], but it would be out of the ordinary").

Plaintiffs assert that "the Board's prayer practice was unchanged by the [Board Prayer] Policy – members still routinely open regular public meetings involving students with sectarian Christian prayers."  Plaintiffs' Br. at 5-6.  The statement that the Board's prayer practice was unchanged by the Board Prayer Policy is both argumentative and incorrect.  For example, the Board Prayer Policy made it clear that a moment of silence was another option for solemnizing the proceeding, *see* Board Prayer Policy ¶ 1, and this option has been exercised by Board members.  *See, e.g.,* Oliphant Dep. at 33 (testifying that President Bireley put her into the rotation and that she has offered a moment of silence).

## III.    <u>LEGAL STANDARD</u>

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party moving for summary judgment bears the initial burden

---

(..continued)

Cohee noted that there are both open and closed meetings; that at one special meeting (the August 23, 2004 meeting), when the Board went into executive session, he was not sure whether all the people recorded as being present stayed or were asked to leave; that sometimes people other than Board members may be present at special meetings because the Board requires or asks for certain information; and that even at special meetings, normally once the executive session has ended, they would say, "If there is anybody outside, let them come in."  *See* Cohee Dep. at 53, 68, 71.  Mr. Isaacs simply noted that the Policy Committee meets in private.  *See* Isaacs Dep. at 25-26.  *See also infra* at 19.

of demonstrating that there are no facts supporting the non-moving party's legal position. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986). The burden then shifts to the nonmoving party, who "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "The nonmoving party . . . cannot rely merely upon bare assertions, conclusory allegations or suspicions to support its claim." *Fireman's Ins. Co. v. Du Fresne*, 676 F.2d 965, 969 (3d Cir. 1982). Rather, the party opposing summary judgment must go beyond the pleadings and present evidence through affidavits, depositions, or admissions on file to show that there is a genuine issue for trial. *See Celotex*, 477 U.S. at 324.

## IV.   **ARGUMENT**

Plaintiffs first argue as a general matter that the Board prayer policy should be found unconstitutional because a long line of Establishment Clause cases prohibits certain types of religious activity during required courses of instruction and extracurricular activities. This argument, however, fails to appreciate the role of a board of education. Like other states, Delaware regards the education of its youth to be among the most important functions of state government. The Indian River School Board is an arm of government whose jurisdiction happens to be education. In all meaningful ways, the Board is a legislature or other deliberative body, and the practice of Board prayer should be examined under *Marsh v. Chambers*, 463 U.S. 783, 786 (1983). The job of a school board is to govern the school district, not to instruct students, whose incidental presence at Board meetings in this matter is unnecessary for the board to carry out its core functions. Decisions addressing religious activity during instructional or extracurricular time are inapposite here.

Although the Supreme Court has already found that legislative prayer does not violate the Establishment Clause, Plaintiffs focus their arguments on the various "tests" (*i.e.*, the *Lemon* test, the endorsement test, and the coercion test) for Establishment Clause claims, and they assert that the prayer policy here fails each of them. Notably, the *Lemon* test was available to the Supreme Court in *Marsh*, but the Court chose not to employ that test. (It is odd to suggest that the practice of legislative prayer, which is as old as the First Amendment itself, should be subjected to a "test" created in 1971). The endorsement and coercion tests were developed after *Marsh*, in *Lynch v. Donnelly* and *Lee v. Weisman*, respectively. Unless these cases are to be seen as a *sub silentio* overruling of *Marsh*,[3] they, too, are inapplicable. Regardless of the test under which Board prayer is analyzed, however, the result is the same: Plaintiffs are not entitled to summary judgment.

A.     ***Lemon v. Kurtzman***

1.     **Secular Purpose**

Plaintiffs first argue that the Board prayer policy violates *Lemon v. Kurtzman* because there is no secular purpose for the prayer. In making this argument, Plaintiffs seem to accept the possibility that solemnizing proceedings could be a secular purpose under *Lemon*, but not in this instance because the Board's stated purpose is a "sham." Plaintiffs note that the Board members "predictably" and "dutifully" testified that the purpose of Board prayer is to solemnize its proceedings, but Plaintiffs urge the Court to disbelieve these Board members, stating that the

---

[3] This is unlikely, given recent decisions by the Supreme Court citing to *Marsh*. *See, e.g.*, *McCreary County v. ACLU*, 545 U.S. 844, 860 n.10 (2005) (noting that *Marsh* upheld "legislative prayer despite its religious nature"); *Van Orden v. Perry*, 545 U.S. 677, 690 (2005) ("Simply having religious content or promoting a message consistent with a religious doctrine does not run afoul of the Establishment Clause") (citing *Marsh*, 463 U.S. at 792).

Court "is not to give heightened deference to any claimed purpose that the Board may assert." *See* Plaintiffs' Br. at 24.

In making this argument, Plaintiffs seem to have forgotten that the factual and legal questions before the Court have been raised by *them* on a motion for summary judgment. The standard for such a motion is that the evidence on a particular factual question, and all reasonable inferences flowing from that evidence, must be construed in favor of the non-moving party. It is well-established that the plaintiff bringing an Establishment Clause claim bears the burden of proof. *See Gillette v. United States*, 401 U.S. 437, 450-51 (1971); *see also Doe v. Tangipahoa Sch. Bd.*, 473 F.3d 188 (5th Cir. 2006) ("The stipulations do not contain evidence establishing viewpoint discrimination or hostility to non-Christian religions. In the absence of proof to the contrary, the Board's actions have not been shown to be impermissible under the Constitution.") (Clement, J., dissenting). If the Board members testified (as they did), that the purpose of the Board prayer policy is to solemnify its proceedings, for purposes of this motion, that testimony must be taken as true. Contrary to Plaintiffs' argument, the Court *is* required to give "heightened deference" to their testimony. The Court certainly may not disregard their testimony entirely and presume the Board members are lying. Even if Plaintiffs could put forward *evidence* to contradict the Board members' testimony regarding the purpose of the policy, this would not entitle Plaintiffs to summary judgment but would raise a factual question precluding summary judgment. Regardless, a careful review of Plaintiffs' Opening Brief makes it clear that they have not even come forward with evidence. Instead, they have offered argument based on little more than their own skepticism.

Plaintiffs first argue that the claimed purpose of solemnifying the proceedings is a sham because the Board does not pray before special meetings or the executive session portion of its

meetings.  This is a curious argument, for it suggests that if Board members only prayed more often, then Plaintiffs would accept the sincerity of the Board members' testimony that their purpose is to solemnify the proceedings.  This argument is non-sensical and inaccurate.  Regardless, there is no reason to conclude that the Board's occasional omission of prayer renders the purpose of the Board prayer policy something other than solemnification on the more frequent occasions when prayer is not omitted.  The Court should reject Plaintiffs' invitation to draw an unfounded, nefarious conclusion about the Board's "true" purpose.

The fact that the Board solemnizes public meetings rather than special (or nonpublic) meetings with a prayer is hardly surprising.  Special meetings are typically called to address a single purpose or topic, and they are often called an expedited or emergency basis.  Special meetings also lack many of the formalities of regular monthly Board meetings, such as the Presentation of Colors and the Pledge of Allegiance.  Indeed, many state legislatures open their legislative sessions with a prayer, but do not open every committee meeting or every special session in an identical manner.

Furthermore, contrary to Plaintiffs' presumption, special meetings are not closed to the public.  *See* Bireley Dep. at 87-89 (testifying that public can be at the special meetings in addition to the regular meetings); Deposition of Richard Cohee at 68, 91, attached hereto as Exhibit Q (testifying that sometimes people other than Board members may be present at special meetings because the Board requires or asks for certain information; and that even at special meetings, normally once the executive session has ended, they would say, "If there is anybody outside, let them come in").  Thus, Plaintiffs cannot fairly draw the public-nonpublic dichotomy that they believe supports their argument that the Board's stated purpose is a sham.

Plaintiffs also misconstrue the nature of executive sessions, which generally are not independent meetings but are simply a continuation of the public meeting. Certain topics, by law, cannot (and should not) be discussed in a public forum. This includes such topics as whether to hire or terminate a particular teacher or administrator. *See* Bireley Dep. at 88-89 (no public is present at the personnel special meetings). At the conclusion of the public portions of regular Board meetings, the Board takes a brief recess and reconvenes privately to discuss the matters not appropriate for public discussion. Plaintiffs nonetheless urge the Court conclude that the Board chooses not to pray when sessions are "held out of the public view" because the Board's true purpose of religious indoctrination may not be fulfilled. Such an inference is not warranted based on the record.

Plaintiffs next argue that a "similarly powerful inference can be drawn from the Board's immediate decision to 'get a second opinion' when its regular attorney advised that Board prayer was unconstitutional." Plaintiffs' Br. at 25. As discussed in response to Plaintiffs' "Statement of Facts," the advice provided by Attorney James Griffin is not in the record, despite the persistent and highly inappropriate efforts of Plaintiffs' attorneys to force an inadvertent revelation of confidential information. Regardless, even if it were true that Mr. Griffin believed Board prayer to be unconstitutional, there is nothing wrong with getting a second opinion. The only "powerful inference," *see* Plaintiffs' Br. at 25, to be drawn from such this alleged "fact" is that, perhaps, the Board was not confident that the first opinion was correct. Seeking to confer with an attorney who is more familiar with issues of constitutional law does not make the long-standing tradition of Board prayer, which the Board undeniably seeks to preserve, suddenly non-secular.

Plaintiffs next argue that, even if the Court finds the Board's stated purpose of solemnizing Board meetings not to be a sham, the Court should nevertheless find the practice unconstitutional because the purpose is religious. Plaintiffs argue that "the solemnity sought to be promoted is religious, not secular." Plaintiffs' Br. at 25. Plaintiffs further claim the Board's religious motivation is evident because Board members offered four different definitions of the term "solemnify" in their depositions. Plaintiffs characterize these four definitions as follows: "(i) to seek divine guidance; (ii) to pray in public so that the public could benefit from the prayer; (iii) to convey a message that the Board's business required careful thought and deliberation; and (iv) to maintain a tradition." Plaintiffs' Br. at 25.[4]

Despite the reiteration of these supposed varying definitions offered by certain Board members, Plaintiffs have not identified where in the record these varying definitions might be found. In fact, the Board members' testimony on the meaning of "solemnify" was generally consistent:

> **Charles Bireley**: to "ask for divine guidance for the Board to help them make correct decisions and get them through the meeting in the proper way . . . to make the best decisions for what's best for our students . . . help us make the right decisions." Bireley Dep. at 151.

> **Harvey Walls**: "to solemnify its proceedings" means "to impress upon the importance of a regular meeting, just to ask for guidance in making the proper decisions." Walls Dep. at 40.

> **Lois Hobbs**: "just trying to bring some dignity and, you know, ask for guidance in their decision about children." Hobbs Dep. at 200.

---

[4] It is unclear how Plaintiffs could conclude that the latter two "definitions" (*i.e.*, conveying a message of the need for careful thought and maintaining a tradition) somehow betray a religious purpose. There is nothing inherently religious about conveying a message of seriousness or maintaining a tradition.

**Donald Hattier**: the phrase "solemnifying the proceedings" means "the idea that we are going to think beyond ourselves, beyond what's happening today and sit down and make absolutely the best decisions we can. And its taking a moment to where you can focus on what your reason is for being there." Hattier Dep. at 114.

**Donna Mitchell**: the phrase "in order to solemnify its proceedings" means "to get serious, solemn, to bring us together as a body, as a legislative body to conduct business." Mitchell Dep. at 15.

**Gregory Hastings**: the phrase "in order to solemnify the proceedings" means, given the large size of school district, the sometimes controversial decisions the Board has to make, and the financial issues at stake, "one hopes, or I hope, that I make the very best decision I possibly can for the sake of the district and the children in the school district, and I want all the help I can get." Hastings Dep. at 102-103.

**Reginald Helms**: the phrase "to solemnify the proceedings" means or "simply says that we are asking for wisdom and guidance to make good sound decisions." Helms Dep. at 110-111.

**Randall Hughes**: the prayers have solemnized or do solemnify the proceedings, which means "to bring folks in, bring people into focus that we are about to do some matters that are important…to focus at the task at hand, making decisions that affect other people. It just brings some order to the meeting. Hughes Dep. at 41-42.

**Mark Isaacs:** the phrase "in order to solemnify its proceedings" means, given that the meetings are formalized board meetings, "to recognize that it is a unique meeting month where many important decisions are brought to the attention of the [B]oard and to the public, and it requires careful thought and deliberation. Isaacs Dep. at 34.

**John Evans**: the phrase "in order to solemnify its proceedings" means "in order to seek God's guidance for the decisions to be made at that meeting." Evans Dep. at 41.

These off-the-cuff definitions offered in the midst of Defendants' depositions are generally consistent with the dictionary definition of "solemnify." *See Webster's New World Dictionary*,

- 19 -

1276 (College ed. 1988) (defining "solemnify" as "to make solemn," which in turn is defined as "serious;" "grave;" "deeply earnest;" "arousing feelings of awe;" "very impressive").  Contrary to Plaintiffs' arguments, Defendants generally testified that "solemnify" as used in the Board prayer policy means what it means elsewhere, and need not have any religious connotation.

In arguing that the prayer policy violates *Lemon*'s secular purpose requirement, Plaintiffs also assert that invoking Divine guidance "is, by definition, not a secular purpose."  Plaintiffs' Br. at  25.  In making this argument, Plaintiffs have confused *purpose* with *method*.  The purpose of the Board prayer policy is to solemnify (*i.e.*, arouse feelings of awe or seriousness), but it achieves that purpose in a variety of ways, including prayer.  The fact that some or even most members choose to invoke Divine guidance does not mean that their purpose is religious. Indeed, focusing "exclusively on the religious content of any activity would inevitably lead to its invalidation."  *Chadhuri v. Tennessee*, 130 F.3d 232, 236 (6th Cir. 1997) (citing *Lynch*, 465 U.S. 668, 680 (1984)).  Plaintiffs' corollary argument, that there are equally effective non-religious methods of achieving solemnity, suffers from the same flaw.  Just because it is possible to accomplish the solemnizing purpose without prayer does not mean that prayer, when used, is not for purposes of solemnization.

It seems that the argument Plaintiffs are really trying to make is that because prayer is the most frequently used method of solemnifying the proceedings, the Board prayer policy has the effect of promoting religion.  If that is their argument, it is more properly analyzed under the second prong of *Lemon* (*i.e.*, whether the primary effect of the policy advances one religion over another or religion over non-religion).  Plaintiffs' argument, however, fails under both prongs. Indeed, the rule Plaintiffs seem to prefer – that Board members can solemnify their proceedings only to the extent they do it *without* prayer – actually runs afoul of *Lemon* because it would

impermissively advance non-religion over religion in achieving the secular purpose of solemnity. Rather than solving a *Lemon* problem, Plaintiffs' purported solution would create one instead.

### 2. <u>Primary Effect</u>

Plaintiffs next argue that the Board's prayer policy and practice violates *Lemon* because it has the primary effect of advancing religion. Yet Plaintiffs have asked the Court to make this finding without citing to a single fact in the record. Instead of doing so, Plaintiffs simply assert that the prayers "far exceed solemnity" and thus the policy and practice "advances and endorses religion over non-religion, and Christianity over other religions." Plaintiffs' Br. at 28.

Although Plaintiffs would prefer not to trifle with things like evidence, the plain terms of the Board prayer policy rebut Plaintiffs' conclusions. The first paragraph of the Board prayer policy states that Board members may solemnize the proceedings with a prayer *or* moment of silence "in accord with the freedom of conscience of the individual adult Board member." *See* Board Prayer Policy ¶ 1. By allowing a prayer or moment of silence, the Board makes it clear it is not choosing to advance religion over non-religion. Prayer is a choice, just as a moment of silence is a choice. Furthermore, it is worth noting that some Board members have solemnized the proceedings by reciting words of inspiration from the likes of George Washington and Martin Luther King. *See, e.g.*, Exhibit J (Transcribed Minutes of Nov. 16, 2004 Board meeting) (prayer quoting Ghandi, George Washington, and Mark Twain); Exhibit N (Transcribed Minutes of March 22, 2005 Board meeting) (prayer quoting Martin Luther King). However, Plaintiffs are not satisfied with a policy that is neutral toward religion, as this one is, but instead seek a policy hostile to religion.

For those who choose to solemnify the proceedings with a prayer, the Board prayer policy similarly makes it clear that there is no particular prayer or type of prayer that is preferred.

The policy states: "Any such prayers may be sectarian or non-sectarian, denominational or non-denominational, in the name of a Supreme Being, Jehovah, Jesus Christ, Buddha, Allah, or any other person or entity, all in accord with the freedom of conscience, speech and religion of the individual board member, and his or her particular religious heritage." *See* Board Prayer Policy. The policy also prohibits any conduct intended to proselytize or to disparage a particular religion. Therefore, contrary to Plaintiffs' unsupported accusations, the policy does not advance Christianity over other religions. It is facially neutral, and Plaintiffs' refusal to acknowledge this obvious fact is puzzling.

Furthermore, as mentioned above, Plaintiffs have not cited to any evidence that the policy, despite its requirement of neutrality, has been implemented in a manner inconsistent with the policy. Plaintiffs have not cited — because they cannot — to an instance in which a Board member sought to use a moment of silence but was forced to offer a prayer. Nor can Plaintiffs point to an instance where a Board member preferred to use a non-sectarian prayer but was forced to pray in the name of Jesus or any other deity. Plaintiffs argue that the Court can discern the primary effect of the policy based on the public's perception of it as a general defense of Christianity or prayer in schools. See Plaintiffs' Br. at 28 ("primary effect of advancing Christianity is clear from the public's perception, as expressed through comments at Board meetings, letters to the editor and media coverage"). The purported evidence to support Plaintiffs' "public perception" argument is a video tape of the August 24, 2004 Board meeting, which, notably, took place two months *before* the adoption of the policy at issue. Otherwise, it is not clear to which "editorials" and "media coverage" Plaintiffs are referring. Regardless, even if the Court were to accept Plaintiffs' premise that the Board prayer policy was intended to placate

a public that misunderstood the Board prayer policy, Plaintiffs' argument defies common sense.[5]

If the prayer policy were really intended to assuage the raucous crowd, one might expect that the Board would not have adopted a formal policy at all. Indeed, the Board had an unwritten prayer policy since the creation of the Board in 1969. Presumably, the Board could have achieved its goal by simply announcing that the current policy would remain unchanged. But, that is not what the Board did. Instead, it reviewed the practice in consultation with attorneys who were familiar with constitutional law, which resulted in the drafting of a policy carefully circumscribed to remain within the bounds of the law. If the Board were attempting to do what Plaintiffs believe, the written policy would not be facially neutral. Nor would it state explicitly that prayers in the name of other Supreme Beings are as welcome as prayers in the name of Jesus Christ.

Another curiosity of Plaintiffs' "primary effect" argument is that it directly conflicts with their "secular purpose" argument. On one hand, Plaintiffs claim the public is too ignorant to understand the policy for what it is, and will instead accept the policy as a general defense of Christianity or prayer in schools. This very same public, however, will accept without question the Board's "solemnifying purpose" ruse, fully understanding that this is simply the lie the Board members need to tell to survive a constitutional challenge.

It is bad enough that Plaintiffs' arguments are not based on evidence. It is worse that Plaintiffs' arguments suppose (a) the Board is deceitful, (b) the Indian River community is stupid, and (c) both are hopelessly infected with religious bigotry. Plaintiffs and their attorneys

---

[5] Despite the label Plaintiffs have given this argument, it seems more in the realm of *Lemon*'s purpose prong than its primary effect prong. Plaintiffs are not really addressing the actual effect of the policy but are attributing to the Board another sham purpose. This time, however, according to Plaintiffs, the Board is attempting to dupe its constituents rather than the Court.

should be above these arguments.

### 3.     Entanglement

Plaintiffs next argue that the Board prayer policy fosters an excessive entanglement between government and religion and thus fails the third prong of *Lemon*.  The premise of this argument is that the Board president will endeavor to make sure his fellow Board members do not violate the policy.  Given Plaintiffs' previous arguments, one might expect Plaintiffs to argue that the Board president, fearing the political wrath of the raucous crowd, actually has no intention of  enforcing the policy at all, and would rather sit silently while other Board members preach the Gospel and disparage other religions.  Instead, Plaintiffs have concocted a "heads I win, tails you lose" argument, where it is more expedient to presume the good faith of the Board president.  Plaintiffs now postulate that an effort to avoid violating the Establishment Clause is itself a violation of the Establishment Clause.

Plaintiffs' entanglement argument is non-sensical.  The Board prayer policy was carefully drafted to ensure that it remains within the parameters of *Marsh*.  Instead of commending the Board, Plaintiffs argue that this creates a "monitoring dilemma" that runs afoul of *Lemon*'s prohibition on religious entanglements.  If this were the rule, it is hard to imagine a practice that could withstand a *Lemon* challenge.  *See, e.g.*, *Verbena United Methodist Church v. Chilton County Board of Ed.*, 765 F. Supp. 704, 713 (M.D. Ala. 1991) (permitting baccalaureate services to be held on school property); *Peck v. Upshur County Bd. of Ed.*, 155 F.3d 274, 285-86 (4th Cir. 1998) (permitting the private distribution of religious materials at schools pursuant to a neutral, open access policy); *Child Evangelism Fellowship v. Stafford Twp.,* 386 F.3d 514, 525 (3d Cir. 2004) (same).  The courts have found all of these activities constitutional, provided they

remain within certain contours. They do not become unconstitutional due to *Lemon*'s entanglement prong simply because the limits of those contours must be enforced by a school.

Plaintiffs also delight in pointing out that there were differences of opinion among Board members as to whether a particular prayer violates the policy. *See* Plaintiffs' Br. at 30 (whether references to "heathens" in a prayer would constitute disparagement). During the depositions, Plaintiffs' attorneys recited several "prayers" without stating their origins, and then asked whether such a prayer would be consistent with the policy. *See* Exhibit G (Isaacs Dep. at 39-41) (Plaintiffs' counsel stating, "I am going to give you a prayer and ask you if it would have been given it would have violated the policy. Okay? 'Oh, Lord, please convert the Jews in the audience and ensure that they come to know our Lord Jesus Christ'"); Exhibit F (D. Mitchell Dep. at 106-110 (testifying that another "prayer" from Plaintiffs' counsel, stated in part, "'Do not put your trust in princes, in mortal men who cannot even save themselves. When their spirit departs, they return to the ground. On that very day their plans come to nothing. Blessed is he whose help is the God of Jacob, whose hope is in the Lord his God, the maker of heaven and earth, the sea, and everything in them, the Lord who remains faithful forever. He upholds the cause of the oppressed and gives food to the hungry'"). While Plaintiffs' attorneys no doubt enjoyed this thought game, it is of no consequence here because it did not involve prayers actually given at Board meetings. Indeed, a review of prayers actually given at Board meetings – *i.e.*, the evidence in the record – exposes Plaintiffs' enforcement canard. These prayers, without exception, have been non-proselytizing and non-disparaging, and no reasonable person would contend otherwise:

> At this time, I'd like to lead the Board in a moment of prayer basically an excerpt taken from a speech given by Dr. Martin Luther King that he entitled "Not So Civil

Dreams."  God does not judge us by the separate incidences or the separate mistakes that we make, but by the total bent of our lives.  In the final analysis, God knows that his children are weak and they are frail.  In the final analysis what God requires is that your hear is right. As we gather here this evening, let us take these words to heart and put the best interests of the students, teachers, employees and residents of the Indian River School District ahead of our own.  Amen.

*See* Exhibit N (Transcribed Minutes of March 22, 2005 Board meeting)

Moreover, despite the fact that Plaintiffs' "monitoring dilemma" exists solely in the realm of the hypothetical, Plaintiffs push this argument to the limits of absurdity.  Plaintiffs argue that the only enforcement mechanism is a denial of future opportunities to pray.  Therefore, according to Plaintiffs, "[t]his 'one free bite' rule has a pernicious effect: it would permit nearly constant proselytizing, given the size of the Board and the three year election cycle."  Plaintiffs' Br. at  30.  If "constant proselytizing" were a genuine concern, one would expect Plaintiffs to be able to cite at least one example of proselytizing in the three and a half years since the adoption of the policy.  Plaintiffs' failure to cite any evidence on this point demonstrates sufficiently that this not a serious argument.

### B.    Endorsement Test

Plaintiffs allege that the Board prayer policy is unconstitutional in light of the endorsement test set forth in *Lynch v. Donnelly*, 465 U.S. 668 (1984).  They assert that a reasonable observer would conclude that the Policy endorses religion over non-religion and Christianity over other religions.  Again, Plaintiffs' arguments are not based on evidence, such as testimony from actual observers.  Instead, it is essentially a reiteration of Plaintiffs' *Lemon* arguments that a crafty Board used the prayer policy as a proxy for religion generally.  Plaintiffs

evidently believe their hypothetical "reasonable observer" will be as dim-witted and gullible as the raucous crowd of actual observers.

The United States Court of Appeals for the Third Circuit has held that the question of endorsement must be analyzed from the viewpoint of "a reasonably informed observer, i.e., one familiar with the history and context of [the issue]." *Tenafly Eruv Ass'n v. Borough of Tenafly*, 309 F.3d 144, 174 (3d Cir. 2002). "Again, to answer th[is] question [courts] examine the content and context of the display." *Ind. Civ. Liberties Union v. O'Bannon*, 259 F.3d 766, 772 (7th Cir. 2001). Moreover, what a reasonable observer would perceive is a question for the finder of fact. *See Modrovich v. Allegheny County*, 385 F.3d 397, 417 (3d Cir. 2004). Thus, on that basis alone, Plaintiffs' arguments under the endorsement test should be rejected. Even if the Court were to entertain a discussion of how a reasonable person would perceive the Board's prayer policy, Plaintiffs are not entitled to summary judgment. Indeed, a reasonable observer would come to the opposite conclusion from what Plaintiffs urge here.

As Plaintiffs note, a reasonable observer is deemed to be aware of context and history, and to have a greater than average amount of information. *See Tenafly*, 309 F.3d at 174. The reasonable observer would not attend a single Board meeting on August 24, 2004, and jump to the conclusion that the policy to emerge several weeks later, despite being facially neutral, was really just an attempt to placate a crowd bent on promoting Christianity.[6] The "history and

---

[6] In making their argument, Plaintiffs criticize the Board members for making "no contemporaneous effort [at the August 24, 2004 Board meeting] to correct what is now claimed to have been the public's misperception." Plaintiffs' Br. at 32. Because Plaintiffs did not cite to the record, it is not clear whose failure in particular Plaintiffs are referring to. However, several Board members did testify that the purpose of the public comment portion of the Board meetings is to allow community members to voice their concerns on matters of importance. *See* Bireley Dep. at 37 (testifying that additional time was added on to the public comments section because

(continued…)

context" of the reasonable observer Plaintiffs imagine is limited to the eight-week period around the time of their complaints, the public's response to those complaints, and the adoption of the policy. This view considers none of the history and only a fraction of context.

A truly knowledgeable observer would understand that legislative prayer is a tradition as old as the United States itself. *See Marsh*, 463 U.S. at 786. He would know that non-proselytizing and non-disparaging legislative prayer is unequivocally constitutional. *See generally id.* He would know the Board has had a tradition of using precisely these types prayers to solemnize its meetings since the creation of the Board in 1969. *See* Bunting Dep. at 99; *see also* Mitchell Affidavit ¶¶ 8-9 (there was a prayer at each IRSD meeting while he served as a board member from 1969-1986). A reasonable observer would also know that the tradition of this Board was a continuation of a tradition begun by other boards of education in Sussex County prior to consolidation. At a minimum, the reasonable observer would know that the practice of opening its meetings with a prayer, as opposed to the written policy, was not a response to

---

(..continued)

"I thought it was important for people in the community to come and talk to us about things that was on their minds, concerns or anything like that or have input"); Helms Dep. at 18 (the board had been advised in the past that public comments section "would be that people are allowed to express their opinions and we listen"). It is not intended to be a discussion, and it is typical for the Board to let members of the public say their piece without a response form the Board. *See* Walls Dep. at 91 (testifying it is correct that Mr. Walls and the Board members did not try to correct any misperception because the public comment section is meant to be an opportunity for the Board to hear from the public and not vice versa); Hattier Dep. at 217 ("As is noted under the public comments section, it is our job to listen, not, it is a one way conversation. It is not our policy to comment as a rule on what people say unless they get out of line in terms of mentioning names."); Cohee Dep. at 53 ("It wasn't a discussion, because our public comment session is one way, we listen and they speak."). Public comments are not attributable to the Board just because Board members sat silently while they were made – rather than scolding the comment-makers or cutting their microphone, as Plaintiffs perhaps would have preferred.

anything that occurred on August 24, 2004.  Nor was it a response to anything said or done by the Dobriches or the Does.

To the extent that the written policy was a response to Plaintiffs' complaints, the reasonable observer would know it was *not* an attempt to surrender to an angry crowd.  To the contrary, the written policy makes it clear that the Board prayer policy is part of a long-standing tradition of solemnizing its proceedings, and that it may not be exploited for an improper purpose.  While there is no evidence to suggest that the prayer opportunity was ever used to proselytize one religion or to disparage another prior to the adoption of the policy, the policy nevertheless puts the entire community on notice that any such conduct will not be tolerated.  If the reasonable observer had the same negative views of the Sussex County community as do Plaintiffs and their attorneys, the reasonable observer would see the Board prayer policy as a careful and measured effort by the Board to follow the law and to set straight the misinformed public.

### C.    Coercion Test

Plaintiffs further argue that the Board prayer policy fails under the coercion test.  This argument is similarly unavailing.  The coercion test provides that, "at a minimum, . . . government may not coerce anyone to support or participate in religion or its exercise, or otherwise act in a way which 'establishes a [state] religion or religious faith, or tends to do so.'" *Lee v. Weisman*, 505 U.S. 577, 587 (1992) (quoting *Lynch*, 465 U.S. at 678).  Despite Plaintiffs' assertion that the Board prayer policy "is unconstitutional for coercing students to participate in School Board Prayer," *see* Plaintiffs' Br. at 33, the coercion test has received significant criticism from members of the Supreme Court.  As Justice Scalia has suggested, "the [Supreme] Court has replaced *Lemon* with its psycho-coercion test, which suffers the double disability of

- 29 -

having no roots whatever in our people's historic practice, and being as infinitely expandable as the reasons for psychotherapy itself." *Lee v. Weisman*, 505 U.S. 577, 644 (1992) (Scalia, J., dissenting).

Regardless, the evidence in the record does not support a finding that Board prayer policy coerced members of the audience to engage in a religious exercise.  There is no evidence that the Board prayer policy as applied indoctrinates or coerces any students to join in the prayer.  In *Lee v. Weisman*, 505 U.S. 577 (1992), the Supreme Court found the threat of coercion to exist when a prayer was recited at a high school graduation ceremony.  The Court explained that high school graduation is one of the most significant events in the life of a young adult.  *Id.* at 595.  The Court further explained that the students who did not wish to pray had no way to dissent without embarrassment.  *Id.* at 594.

Unlike the threat of coercion at high school graduation ceremonies, the prelude to each Board prayer explained:

> Such prayer is voluntary, and *it is among only the adult members of the Board*.  No school employee, student in attendance, or member of the community in attendance shall be required to participate in any such prayer or moment of silence.

Board Prayer Policy  (emphasis added). [7]  This disclaimer was read at every Board meeting by Charles Bireley to ensure that the purpose of the Board prayer was not misconstrued.  *See* Bireley Dep. at 75; 103-05.  Such language clearly states that the prayer is intended for the Board members only, and the Board specifically refutes the presumption that audience members are required to participate.  Voluntary prayer at a Board meeting, at which parents, students, and members of the community are present—can hardly be thought to raise the same concerns as prayer occurring in a classroom as part of the mandatory curriculum.  *See Lee v. Weisman*, 505 U.S. 577, 645 (1992) (Scalia, J., dissenting).  Therefore, the invocation of the Board prayers does not create any threat of coerciveness.

In addition, the circumstances surrounding the graduation prayer at issue in *Lee* stand in sharp contrast to those surrounding the Board prayer.  At a high-school graduation, the presence of students is pivotal to the event itself.  *See Lee*, 505 U.S. at 595 ("Graduation is a time for family and those closest to the student to celebrate success and express mutual wishes of

---

[7] Though the preludes slightly varied at each meeting, they uniformly informed the audience members that the prayer was intended for "only" the board members.  For example, when Mr. Walls was Board President, he would typically give the following prelude:

> It is the history and custom of this Board that, in order to solemnize the School Board proceedings, that we begin with a moment of prayer, in accord with the freedom of conscience of the individual adult members of the Board.  Further, such prayer is voluntary and just among the adult members of the School Board.  No school employee, student in attendance or member of the community is required to participate in any such prayer or moment of silence.

*See* Exhibit J (Transcribed Minutes of Nov. 16, 2004 Board meeting).

- 31 -

gratitude and respect[.]").  The students are present to receive their diplomas, which is the

fundamental purpose of the graduation ceremony.  Moreover, the participation of a student in the

graduation prayer in *Lee* "was the very point of the religious exercise."  *Id.* at 593.

At Board meetings, on the other hand, the attendance of students at Board meetings is not

mandatory and is only incidental to the focus of the Board meetings.  *See* Bireley Dep. at 33

(testifying that he cannot recall any instances where students have been required to attend School

Board meetings**)**.  The Board's focus is on setting policies; adopting curriculum; selecting,

purchasing, and distributing textbooks; making the reports required by the State Superintendent

of Public Instruction; appointing and dismissing personnel for the district; approving the use of

district facilities; student and employee disciplinary actions; adopting the district's annual

budget; monitoring the progress of construction projects; and taxing.  *See* Bireley Dep. at 9-17

(discussing the numerous duties of the Board); Hattier Dep. at 127, 133-37, 331 (same).

Although students are invited to attend to accept awards or to voice opinions on various issues,

their presence is not required, nor is it part of the curriculum.  For example, the purpose of the

brief awards and recognition segment has been so that the district could "say thank you and

recognize the children."  Hobbs Dep. at 36.  The students "could come and be honored or they

might not, or their principal might accept the award and they could stay home.  There was no

obligation for them to come to a Board meeting."  *Id*. at 37.  The JROTC, who performed the

Presentation of Colors, was not even present at Board meetings during the summer months.  *See*

Bireley Dep. at 23 (testifying that Presentation of Colors not done during the summer months).

The student government representative who was often present sometimes had no report to give.

*See, e.g.,* December 21, 2004 Minutes.

Finally, as the preludes make clear, the participation of audience members in the prayer is not "the very point of the religious exercise." *See Lee*, 505 U.S. at 593. Quite the contrary, the participation of the *adult Board members* is the point of the religious exercise and the agenda of the Board at Board meetings. *See* Hobbs Dep. at 199 (her understanding is that it is only the Board Members' prayer); *see also* Walls Dep. at 47 (agreeing that it is the intention of the board prayer policy that no one other than the adult members of the board would be the object of the prayer); Hattier Dep. at 112-113, 117 ("our Board Prayer Policy deals with the fact that it is between the ten members of the Board and does not have to involve the public and should not involve the public"; no one "other than Board members should partake"); Mitchell Dep. at 14 (responding to the question of whether the prayer is intended to have any impact whatsoever on the members of the public who are in attendance: "it's limited to the school board members"); Bunting Dep. 56 (discussing board prayer generally: it is meant for "the ten of [the board members], and there is no reason for it to be viewed or seen or anything by anyone else unless they choose to"). In sum, the Board prayer policy does not implicate the concerns that have previously led the Supreme Court to find that school-related religious activity was coercive.

### D.     *Marsh v. Chambers*

Plaintiffs leave until the end their discussion of *Marsh v. Chambers* – the Supreme Court case that actually discusses legislative prayer, and the decision that this Court has already found to be controlling here. In doing so, Plaintiffs refer to *Marsh* as "a narrow exception to the mainstream of Establishment Clause jurisprudence." Plaintiffs' Br. at 34. Plaintiffs further assert that it is Defendants' burden to establish "that the Board's prayers fall within *Marsh*'s narrow holding." Plaintiffs' Br. at 35. It is not entirely clear what Plaintiffs mean by "mainstream" jurisprudence, but *Marsh* is not an exception to anything. It is a decision that

stands for the relatively simple proposition that legislative prayer does not offend the

Establishment Clause.  Rather than acknowledge the obvious, they assert a presumption of

*un*constitutionality that Defendants, the non-moving parties here, must overcome.  Leaving aside

Plaintiffs' incorrect statements about exceptions and burden shifting,[8] Plaintiffs' *Marsh* analysis

is deeply flawed.[9]

      Plaintiffs first read into *Marsh* a requirement that does not exist by claiming that *Marsh*

only applies if schoolchildren are the recipients of the prayers.  Plaintiffs extrapolate this rule

from dicta in the *Marsh* decision where the Court acknowledged that Plaintiffs in that case were

adults.  However, the *Marsh* Court did not hold that the "recipient" of legislative prayer, to be

constitutional, must be an adult.  The full paragraph containing this reference is as follows:

> This interchange [between members of the First Congress
> regarding legislative prayer] emphasizes that the delegates did not
> consider opening prayers as proselytizing activity or symbolically
> placing the government's official seal of approval on one religious
> view.  Rather, the Founding Fathers looked at invocations as
> conduct whose . . . effect . . . [harmonized] with the tenets of some
> or all religions.  The Establishment Clause does not always bar a
> state from regulating conduct simply because it harmonizes with
> religious canons.  Here, the individual claiming injury by the
> practice is an adult, presumably not readily susceptible to religious
> indoctrination, or peer pressure.

*Marsh*, 463 U.S. at 792 (internal quotation marks and citations omitted).  The most relevant point

of the paragraph above is that the Founding Fathers viewed legislative prayer as inherently non-

---

[8] Ultimately, Plaintiffs' inability to set forth the proper standard for a motion for summary judgment is immaterial because Defendants have also moved for summary judgment on this issue.  In that motion, Defendants accept and meet the burdens of a summary judgment movant.

[9] Defendants address Plaintiffs' *Marsh* arguments as necessary here, but to avoid needless repetition, Defendants refer the Court to Section IV.A. of their Opening Brief in support of their Motion for Summary Judgment.  This section discusses the applicability of *Marsh* in more detail, and is incorporated herein by reference.

proselytizing.  Simply acknowledging that the *Marsh* plaintiff was an adult does not mean the Court would have reached an opposite conclusion had the plaintiff been a non-adult.

Plaintiffs next argue that "the school Board is not a legislative body as that phrase is used in *Marsh*."  Plaintiffs' Br. at 37.  This argument harks back to Plaintiffs' introductory remarks about the *Marsh* decision, where they suggest it is the Board's obligation to explain why *Marsh* is applicable rather than Plaintiffs' obligation to explain why *Marsh* is not applicable.  In any event, the Court in *Marsh* did not limit its definition of legislative body in any way.  In fact, it did the opposite.  It explicitly referred to "legislative *or other deliberative bodies*."  *Marsh*, 463 U.S. at 786.  As such, the ruling of *Marsh* was not narrow, but was intended to apply to a broad array of governmental units.  As discussed in Defendants' Motion for Summary Judgment, the Board bears all of the hallmarks of a legislative body, and should be treated as such for purposes of Board prayer.

Plaintiffs also argue that there is no unique history of Board prayer because the Board began inviting certain students to meetings for awards fourteen years ago.  This, of course, is false.  The practice of Board prayer goes back to the earliest days of the Board and is a continuation of a practice that existed prior to the creation of the District.  Plaintiffs have identified one feature of the meetings that is different today than it was fourteen years ago, but the Board prayer practice is essentially the same.  Furthermore, Plaintiffs' argument, carried to its logical conclusions, leads to the absurd possibility that the prayer practice could be constitutional for one school district but not another, depending on when the practice began.  Indeed, by this logic, a state legislature that previously elected not to open its sessions with a prayer would be precluded from beginning such a practice because of its lack of a tradition.  In *Marsh*, the Court rejected the notion that historical patterns alone can justify contemporary

violations of constitutional guarantees. *See Marsh*, 463 U.S. at 790. Plaintiffs now urge the

equally flawed construct that the *lack* of an historical pattern creates a constitutional violation for

an otherwise acceptable practice. The historical inquiry compelled by *Marsh* is instead whether

the Founding Fathers contemplated other contemporaneous legislative and deliberative bodies,

such as school boards, opening their sessions with prayer. *Cf. Snyder v. Murray City Corp.*, 159

F.3d 1227, 1232 (10th Cir. 1998) (acknowledging *Marsh*'s consideration of the history of the

challenged prayer but noting that, "since [*Marsh,*] the Court has repeatedly avoided applying

*Marsh*'s mode of historical analysis") (citing *County of Allegheny v. American Civil Liberties

Union*, 492 U.S. 573, 603 (1989) (rejecting the dissenting argument that the *Marsh* historical

analysis controlled the constitutionality of traditional creche displays at Christmas)).

## V.    <u>CONCLUSION</u>

For the foregoing reasons, Defendants respectfully request that the Court deny Plaintiffs'

Motion for Summary Judgment.


Dated: June 19, 2008                                Respectfully submitted,


                                                     _/s/  Warren Pratt_____
                                                    Warren Pratt (Del. Bar No. 4334)
                                                    DRINKER BIDDLE & REATH LLP
                                                    1100 N. Market Street
                                                    Suite 1000
                                                    Wilmington, DE 19801
                                                    Telephone:   (302) 467-4200
                                                    Facsimile:   (302) 467-4201


                                                    Jason P. Gosselin
                                                    Katherine L. Villanueva
                                                    Elizabeth L. McLachlan
                                                    DRINKER BIDDLE & REATH LLP
                                                    One Logan Square, 18th and Cherry Sts.

- 36 -

Philadelphia, PA 19103
(215) 988-2700
(215) 988-2757 (facsimile)

## <u>CERTIFICATE OF SERVICE</u>

I, Warren T. Pratt, hereby certify that on June 19, 2008, I electronically filed the foregoing Revised Substituted Answering Brief using CM/ECF, which will send notification of such filing to the following:

> Thomas J. Allingham II
> One Rodney Square
> P.O. Box 636
> Wilmington, DE 19899
> (302) 651-3000
>
> *Attorney for Plaintiffs*

_/s/_Warren Pratt_____
Warren Pratt (Del. Bar No. 4334)