Dobrich, et al.  
Reginald Helms

v.  
C.A. # 15-120 (JJF)

Indian River School District, et al.  
October 11, 2006

```
 1            IN THE UNITED STATES DISTRICT COURT
 2               FOR THE DISTRICT OF DELAWARE
 3
 4    MONA DOBRICH and MARCO DOBRICH, individually and
      As parents and next friend of ALEXANDER DOBRICH,
 5    SAMANTHA DOBRICH, JANE DOE and JOHN DOE,
      individually and as parents and next friend of
 6    JORDAN DOE and JAMIE DOE,
 7                            Plaintiffs
            vs.                        Civil Action
 8                                     No. 15-120
      INDIAN RIVER SCHOOL DISTRICT, ET AL.,
 9
                            Defendants
10
11    ------------------------------------------
12
13            DEPOSITION OF REGINALD HELMS, taken
      pursuant to notice at the Indian River School
14    District, 31 Hosier Street, Selbyville, Delaware,
      beginning at 3:32 p.m. on October 11, 2006 before
15    David A. Sroka, Registered Professional Reporter and
      Notary Public.
16
17    APPEARANCES:
18              THOMAS ALLINGHAM, ESQUIRE
                RICHARD HORVATH, ESQUIRE
19              BRIAN LENHARD, ESQUIRE
                P.O. Box  636
20              Wilmington, Delaware  19899-0636
                For the Plaintiffs
21
22
                    WILCOX & FETZER
23        1330 King Street - Wilmington,  DE  19801
                    (302) 655-0477
24                  www.wilfet.com
```

Dobrich, et al.                              v.              Indian River School District, et al.
Reginald Helms                   C.A. # 15-120 (JJF)                    October 11, 2006

Page 2

1
2
3    JASON P. GOSSELIN, ESQ.
     JARROD D. SHAW, ESQ.
     Drinker Biddle & Reath LLP
4    One Logan Square
     Philadelphia, Pennsylvania 19103-6996
5       For the Defendants
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 3

1        MS. DUPHILY:  This is the
2    videotape deposition of Reggie Helms.  This
3    deposition is being taken on behalf of the
4    Plaintiff in the matter of Dobrich, et al.
5    versus Indian River School Board, et al,
6    case number 15-120.  The deposition is
7    being held at 31 Hosier Boulevard,
8    Selbyville, Delaware.  We are going on the
9    record on October 11, 2006 at approximately
10   3:32 p.m.
11       The court reporter is David Sroka
12   with Wilcox & Fetzer, Wilmington, Delaware.
13   my name is Lindsay duPhily and I am the
14   videotape specialist with Discovery Video
15   Services.
16       Counsel will now introduce
17   themselves and then the court reporter will
18   swear in the witness.
19       MR. ALLINGHAM:  I'm Tom Allingham
20   for the Plaintiffs and with me are Richard
21   Horvath and Brian Lenhard.
22       MR. GOSSELIN:  Jason Gosselin for
23   Indian River School District and the Indian
24   River School Board and the individual board

Page 4

1    member in attendance.
2        REGINALD HELMS,
3    The Witness herein, called for examination by
4    the Plaintiff, having been duly sworn to tell the
5    truth, the whole truth, and nothing but the truth,
6    was examined and testified as follows:
7    EXAMINATION BY MR. ALLINGHAM:
8    Q.   I've put before you the top document is
9    Plaintiff's Exhibit 30.  Would you turn to the last
10   page of that exhibit, please?
11       In the second column from the right -- I
12   should give you some background.  This is an article
13   from Delaware Beach Life, have you ever read it
14   before?
15   A.   No.
16   Q.   There is a picture of you on the front
17   page, is that correct?
18   A.   That's me.
19   Q.   Not the best picture of all time?
20   A.   Well --
21   Q.   In the second column from the right there
22   is a quotation from the Reverend Jerry Fike, do you
23   know who Mr. Fike is?
24   A.   Yes.

Page 5

1    Q.   Is he a minister in Sussex County?
2    A.   To the best of my knowledge, yes.
3    Q.   He offered the commencement prayer in 2004
4    at Indian River High School?
5    A.   As I understand it, yes, but I wasn't
6    present but that's what I heard.
7    Q.   Did you have any involvement in inviting
8    Jerry Fike to give that prayer?
9    A.   No.
10       MR. GOSSELIN:  Objection,
11       don't answer that.  Same thing, we are
12       sticking to the issues that are properly in
13       the case right now.
14   Q.   Mr. Fike is quoted as saying in this
15   article, and I'm looking now about half way down
16   that second column from the right, "My loyalty is to
17   Jesus Christ, foremost, even if that takes me to
18   prison or to death.  He is the predicted Messiah.
19   He rose again and I believe that he knew what he was
20   talking about.  And if he is the Messiah, then all
21   religions are not equal.  There are no alternatives
22   to Christianity."
23       Do you agree with that sentiment?
24       MR. GOSSELIN:  Objection.

2 (Pages 2 to 5)

Page 6

1       I'm not going to instruct him not to
2    answer, but I'm letting you know that I
3    think this is outside the topic of
4    discussion, and if we are going to spend
5    the afternoon asking Mr. Helms what his
6    beliefs are I would appreciate it if
7    you'd tell me now because I will call
8    Judge Farnan.
9        But I'm not going to instruct him
10    not to answer this.
11        MR. ALLINGHAM: I'm working hard to
12    get this deposition done in accordance with
13    your request. If you make speeches it will
14    be harder.
15    Q.    Do want me to reread the question again,
16    Mr. Helms?
17    A.    Yes, please.
18    Q.    All right, I don't think I need to read the
19    quote, do I?
20    A.    No.
21    Q.    My question is do you agree with the
22    sentiments expressed by the Reverend Fike in that
23    quotation?
24    A.    Not in its entirety.

Page 7

1    Q.    Would you tell me what portions of it you
2    do not agree with?
3    A.    The things when he says there are no
4    alternatives, all religions are not equal. I don't
5    know if these are things that I would say, but he's
6    entitled to his opinion, and if that's what he
7    believes then that's fine.
8    Q.    I agree with you that he is entitled to his
9    opinion. I also think that you are entitled to your
10    opinion. My question was directed to precisely what
11    your opinion is. Do you believe that all religions
12    are equal?
13    A.    Well, it depends on like I said all
14    religions equal, probably not, but it depends on
15    what context, and I don't know what he was -- I
16    don't know what he was meaning there.
17    Q.    Do you believe that the only true religion
18    is Christianity?
19    A.    I believe that as I read the scriptures
20    that when it says no one comes to the Father except
21    by the Son, I believe that. Am I saying that
22    Christianity is the only religion and that sort of
23    thing, I wouldn't go that far. But I do believe
24    when I read the scriptures it says no one comes to

Page 8

1    the Father except through the Son, that's what I
2    believe.
3    Q.    Do you have any problem or disagreement or
4    concern about the accuracy of the statement, "The
5    only true religion is Christianity?"
6    A.    It would not be a statement that I would
7    make, so it depends on where a person is coming from
8    when he makes that statement, and I can't put myself
9    into their mind. It wouldn't be a statement that I
10    would make.
11    Q.    What efforts, if any -- let me give some
12    context. There was a meeting of the Board of
13    Education of the Indian River School District on
14    August 24, 2004, do you recall that meeting?
15    A.    I know there was a meeting, I don't know if
16    I can recall specifics, but yeah.
17    Q.    Let me identify that meeting as the meeting
18    at which estimates range in attendance from 600 to
19    800 people?
20    A.    Yes, I do.
21    Q.    You recall that meeting?
22    A.    Yes, I do.
23    Q.    What effort, if any, did you make to ensure
24    there would be a large turnout for that meeting?

Page 9

1    A.    As I recall I made no effort to make sure
2    there was a large turn out.
3    Q.    Were you aware of efforts in the community
4    to ensure that there was a large turnout for that
5    meeting?
6    A.    Yes.
7    Q.    Would you describe for me what those
8    efforts were?
9    A.    I know of efforts by some people in the
10    community as far as speaking through their churches,
11    through their organizations, they went to -- I knew
12    some of those things.
13    Q.    Give me as many details as possible?
14    A.    I don't have any specifics, but I do know
15    that I heard of people who were contacting their
16    churches and asking them to show up. Specifics I
17    don't know.
18    Q.    So, people contacting their churches as you
19    heard this, was it parishioners contacting the
20    ministers or pastors and saying you know you really
21    out to get the congregation out to this meeting?
22    A.    I don't know of any specifics to that.
23    What I heard was that they were speaking to one
24    another. Or in other words, this person may be

3 (Pages 6 to 9)

Dobrich, et al.                    v.                    Indian River School District, et al.
Reginald Helms                C.A. # 15-120 (JJF)                    October 11, 2006

Page 10

1   talking to the people they went to church with. I
2   don't know if they spoke with their pastors
3   directly. I don't know that.
4       Q.   Are you aware of any pastors who spoke from
5   the pulpit, or in the connection -- in their role as
6   a pastor to urge parishioners to attend the August
7   24th Board meeting?
8       A.   No, I don't know that specifically, no.
9       Q.   Are you aware of anyone informing Dan
10  Gaffney of WGMD that the issue of School Board
11  prayer would be addressed at the August 24th Board
12  meeting?
13      A.   Only hearsay. I heard that was done, I
14  don't know. I don't have any specific knowledge of
15  that. I heard it was done.
16      Q.   Where did you hear that from?
17      A.   Just talk. I mean I couldn't tell you who
18  said it, but I do know I heard that.
19      Q.   Would you agree with me that word of mouth
20  travels fast is Sussex County?
21           MR. GOSSELIN:   Objection.
22      Q.   You may answer?
23      A.   Yes.
24      Q.   And if you want to get a piece of news

Page 11

1   around you can just start talking about it in the
2   local restaurants and it will get around?
3       A.   Yes, but I would assume that's probably not
4   only Sussex County, but probably nationwide.
5       Q.   I take it from your earlier answer that
6   you did not personally ask anyone to attend the
7   Board of Education meeting on August 24th?
8       A.   No.
9       Q.   Do you know whether anyone in your family
10  did so?
11      A.   Not to my knowledge.
12      Q.   Did anyone tell you in advance of the
13  meeting that an overflow was expected and that media
14  had been set up, speakers in the parking lot, video
15  feeds to separate rooms, in order to accommodate the
16  many hundreds of people who were anticipated?
17      A.   Before the meeting?
18      Q.   Yes.
19      A.   No.
20      Q.   So, when you arrived and saw all that
21  equipment set up that was a surprise to you?
22      A.   Yes.
23      Q.   All right. Do you know who set up all that
24  equipment?

Page 12

1       A.   Not specifically, no.
2       Q.   Do you know at whose direction it was done?
3       A.   I assume it was done on behalf of the
4   superintendent. I did not hear her say that, but
5   that's what I'm thinking.
6       Q.   Were you surprised by the number of people
7   who showed up at the meeting?
8       A.   Yes.
9       Q.   Were you shocked by the number of people
10  who showed up at the meeting?
11      A.   No.
12      Q.   Why were you not shocked?
13      A.   This was an important issue to a lot of
14  people, and I assumed there would be a large number.
15  So, I wasn't shocked, but I was surprised.
16      Q.   How did you find out that this was an
17  important issue to a lot of people?
18      A.   Just general talk in the community. Like I
19  said when people, I heard people were talking to
20  their congregations I knew that this was a hot topic.
21      Q.   And when you say this was an important
22  issue, what's the this, what's the issue that was
23  important?
24      A.   It was an issue of free speech, freedom of

Page 13

1   religion, and that type of thing. A lot of people
2   were talking about that issue at that time.
3       Q.   And did you understand that what people
4   were all -- what people considered important was
5   whether School Board members could pray before the
6   School Board meeting?
7       A.   I don't recall thinking of it specifically
8   that way about praying before a Board meeting, no.
9       Q.   Did it seem to you that the public comments
10  at the Board meeting had as much to do with prayer
11  in the schools as they did prayer before a School
12  Board meeting?
13      A.   Yes.
14      Q.   Did you think that represented a
15  misunderstanding on the part of the public as to
16  what was before the Board at that meeting?
17      A.   Yes.
18      Q.   And what efforts were made to correct that
19  misunderstanding?
20      A.   Well, on my part I didn't know it was a
21  misunderstanding until that night. So, I don't know
22  of anything that was done to prevent it because
23  quite frankly I didn't know it was a
24  misunderstanding until people started getting up at

4 (Pages 10 to 13)

Dobrich, et al.                          v.                 Indian River School District, et al.
Reginald Helms                  C.A. # 15-120 (JJF)                    October 11, 2006

Page 14

1   the podium talking.
2      Q.   That is to say until people started talking
3   you thought people understood that this was a School
4   Board prayer issue?
5      A.   No. I didn't think it was a School Board
6   prayer issue, I thought it was more along the lines
7   of prayer before graduation, and that sort of thing.
8   More so than the Board prayer issue.
9      Q.   Have you ever had occasion to -- strike
10  that.
11         How did you form the view that you thought
12  what was being talked about at the August 24th
13  meeting was graduation prayer rather than School
14  Board prayer?
15     A.   Well, as I recall it was a matter of
16  prayer. I didn't in my own mind I didn't separate
17  it between prayer before graduation or that sort of
18  thing as specifically to the School Board meeting.
19  I thought it was prayer in general, but not prayer
20  in school, but prayer before any graduation or that
21  sort of thing. I didn't, I didn't separate the two
22  in my mind.
23     Q.   So, as you walked into the August 24the
24  meeting you thought what was being discussed was

Page 15

1   prayer at school related functions outside of the
2   school day, is that a fair description?
3      A.   Well, in my words, in my thoughts I would
4   say it was prayer in general that had anything to do
5   with banquets, graduation, that type of thing, and
6   some of that could have been part of the school day
7   and some of it might not have been. But I didn't
8   think it was an issue of whether the students could
9   open the day with prayer or that sort of thing.
10         I mean that issue in my mind had been
11  settled by the courts and I didn't think we were
12  there to discuss that. So, when people started
13  coming up to the podium and talking about that I
14  thought well, they obviously misunderstood what's
15  going on.
16     Q.   Where do you think that misunderstanding
17  came from?
18     A.   I have no idea.
19     Q.   What efforts did the Board make to correct
20  that misunderstanding?
21     A.   I don't recall anything specifically being
22  done as far as the Board is concerned. I'm not sure
23  whether Mrs. Hobbs took any action or not. I think
24  there was some discussion, although I can't recall

Page 16

1   any specifics about an executive session where we
2   thought some people had misunderstood.
3         I don't know what specific actions were
4   taken.
5      Q.   Did you think given the clear
6   misunderstanding that it was important for the Board
7   to correct that misunderstanding?
8      A.   I don't recall -- I don't recall myself
9   making a statement like we must clear up this
10  misunderstanding. I do know it was brought up, but
11  I don't recall saying anything specifically where we
12  need to make sure we clear up this misunderstanding.
13     Q.   Now, when you say I know it was brought up,
14  does that mean the notion that people had
15  misunderstood what was before the Board was brought
16  up?
17     A.   In the executive session I think there was
18  some mention of there is some people here tonight
19  that I think misunderstood what was going on. I
20  don't recall who said that, but I do recall it being
21  said.
22     Q.   Were you present throughout the public
23  comment session at the August 24 meeting?
24     A.   Yes.

Page 17

1      Q.   As a Board member what was your reaction to
2   the tone of the comments at that public meeting?
3      A.   As far as what?
4      Q.   Did you have any reaction to the tenor or
5   tone of comments that were offered by the public
6   during the 45 minute public commentary session at
7   the August 24th meeting?
8      A.   In my own mind I would say to you that I
9   didn't agree with everything that was said.
10     Q.   My question -- that's helpful, and I thank
11  you for the answer, but my question had more to do
12  not so much with whether you agreed with the
13  content, but whether you were disturbed by the tone
14  and tenor of the comments? Did anything said
15  during that meeting disturb you as a human being?
16         MR. GOSSELIN:  Objection.
17     A.   As I would say, some people made some
18  comments at the podium that I myself would not have
19  made, but I guess it's a matter of your
20  interpretation of being upset and that sort of
21  thing. Did I agree with everything, no. Was I
22  upset to the point where I would jump up and object,
23  no. I didn't feel that way because we've always
24  been told that people are allowed to express their

5 (Pages 14 to 17)

Dobrich, et al.                              v.          Indian River School District, et al.
Reginald Helms                   C.A. # 15-120 (JJF)              October 11, 2006

Page 18

1 opinions, say what they need to say at the podium,
2 as long as certain guidelines are followed. And so
3 we're instructed more or less to just sit there and
4 listen. Did I agree with everything, no.
5    Q.   Who instructed you to sit there and listen?
6    A.   We had been advised by our Board attorney
7 in the past that public comment section would be
8 that people are allowed to express their opinions
9 and we listen.
10   Q.   And that's Mr. Griffin?
11   A.   Yes.
12   Q.   Did Mr. Griffin -- strike that, I don't
13 need to know what Mr. Griffin said. There are
14 limits on what people can say from the podium at the
15 microphone during the public comment session, aren't
16 there?
17   A.   That's correct.
18   Q.   And among others people are not permitted
19 to speak about the district personnel?
20        MR. GOSSELIN:  Objection. Go
21 ahead, you can answer.
22   A.   People are not permitted to, yes, use names
23 as far as that's what they consider to be executive
24 session material. It's when you get into specific

Page 19

1 names, like if you are having -- an example would be
2 if you are having trouble with a teacher and you
3 come to the podium and you say there is a teacher at
4 X school that we're having a problem with, that's
5 acceptable. But if you come up there and say I'm
6 having trouble with Mr. Smith, we would say that's
7 executive session material because you are dealing
8 with names.
9    Q.   Are there any other limitations of what
10 people can say from the microphone?
11   A.   Yes, there is several, I don't recall what
12 they are, but I know the main thing that has been
13 expressed to us is that personalities or specific
14 names are not supposed to be used. I do remember
15 that very well. And there are some others.
16   Q.   It's the responsibility of the Board and
17 particularly the Board president is to ensure that
18 the comments from the podium during the public
19 comment session are consistent with public order,
20 isn't it?
21   A.   I would say so, yes.
22   Q.   And also the Board makes an effort to
23 ensure that comments from the podium are respectful?
24   A.   Yes.

Page 20

1    Q.   And courteous?
2    A.   Yes.
3    Q.   Would you agree with me that a number of
4 the comments from the podium during that August 24th
5 meeting were not respectful or courteous or
6 consistent with public order?
7    A.   There again I think it's a matter of
8 opinion. I can only say there was some things that
9 were said that I would not personally say, but
10 whether they are not courteous or whatever, that's a
11 matter of someone's opinion. What is courteous to
12 someone may not be courteous to someone else.
13   Q.   Sure, and you are a member of the Board
14 that has been charged with ensuring that comments
15 from the podium comply with the Board's guidelines?
16   A.   Yes.
17   Q.   And so your opinion, personally, as a Board
18 member matters to me?
19   A.   Okay.
20   Q.   Do you recall any comments that you
21 considered inconsistent with the guidelines that the
22 Board had applied to the public comment session at
23 Board meetings?
24   A.   I don't recall anything specific, but maybe

Page 21

1 if I reheard 'em I may be able to comment on them,
2 but I can't recall anything specifically.
3    Q.   What did you do to prepare for this
4 deposition today?
5    A.   Just more or less said I'd tell the truth
6 as I recall.
7    Q.   Did you meet with your lawyers before the
8 deposition?
9        MR. GOSSELIN:  And just
10 objection, caution. You can answer that
11 question but don't say anything that you
12 and I talked about, or you and another
13 lawyer talked about in preparation for the
14 deposition.
15   Q.   Did you meet with lawyers in preparation
16 for this deposition?
17   A.   Yes.
18   Q.   Who did you meet with?
19   A.   Jason.
20   Q.   Jason Gosselin?
21   A.   Yes, and his associates.
22   Q.   When did you have that meeting?
23   A.   Well, I think it was earlier this week.
24   Q.   Okay. Earlier this week?

6 (Pages 18 to 21)

Dobrich, et al.                                    v.                    Indian River School District, et al.
Reginald Helms                          C.A. # 15-120 (JJF)                          October 11, 2006

Page 22

1   A.   **Well, I'm sorry, must be last week.**
2          MR. GOSSELIN:   Last week.
3   Q.   Last week, I was going to say --
4   A.   **This is only Wednesday, right?**
5   Q.   Have you had occasion to speak to Dr.
6   Hattier about his deposition yesterday?
7   A.   **No.**
8   Q.   Have you had occasion to speak on Mr.
9   Bireley about his deposition today?
10  A.   **No.**
11  Q.   Have you had occasion to speak to
12  Mr. Gosselin about Mr. Hattier or Mr. Bireley's
13  deposition?
14  A.   **No.**
15          MR. GOSSELIN:   Objection,
16  objection, you don't have to answer that.
17  Q.   Who is representing you at the deposition
18  today?
19  A.   **Mr. Gosselin.**
20  Q.   Are you separately represented in
21  connection with this litigation?
22  A.   **I'm not sure, to be honest with you.  I'm**
23  **not sure.**
24  Q.   What would you need to know in order to

Page 23

1   answer the question whether you are being
2   represented in this litigation?
3   A.   **Well, I know I have an agreement with**
4   **Mr. Neuberger.**
5   Q.   What is that the nature of that agreement?
6   A.   **I signed a paper that he would be my lawyer**
7   **in representing me on behalf of the suit about the**
8   **prayer issue.**
9   Q.   You filed an affidavit in court in which
10  you said that you did not wish to be represented by
11  John Balliger and John Cafferty.  I take it that you
12  have no such reservations about Mr. Gosselin and his
13  firm?
14  A.   **No.**
15  Q.   That is to say you don't have such
16  reservation?
17  A.   **I don't have such reservation.**
18  Q.   Sometimes I ask questions in an odd way.
19  A.   **As I understand it Mr. Gosselin and his**
20  **firm is representing the Board and I'm part of the**
21  **Board, so I don't have any objection to that.**
22          MS. DUPHILY:   We are going
23  off the record at approximately 3:55 p.m..
24          (WHEREUPON a brief recess was

Page 24

1   taken)
2          (WHEREUPON Deposition
3   Exhibit 40 was marked for identification.)
4          MS. DUPHILY:   We are back on
5   the record at 3:56 p.m.
6   Q.   While we were on the break I asked the
7   videographer to mark as Deposition Exhibit 40 the
8   case of the CD and the CD bearing the Bates number
9   BPD1288.  I will represent to you that this is a
10  copy made of a videotape recording of a portion of
11  the August 24, 2004 Board meeting.
12  A.   **Okay.**
13          MR. ALLINGHAM:   All right, and I'm
14  going to ask Mr. Horvath to put it into the
15  computer which we are using as a player.
16          For the record, this is the same
17  disk that we played during the Bireley
18  deposition, and I will put on the record
19  the starting and ending times of that tape
20  which we played during the Bireley
21  deposition and which we will be playing
22  during your deposition which is at one hour
23  one minutes and zero seconds to one hour
24  four minutes and 19 seconds.

Page 25

1   Q.   You mentioned that you don't have a
2   specific recollection of finding any particular
3   comment, I forget the word I used, troubling or
4   something, and you said maybe if I could look at it
5   I could have my recollection refreshed.  I want to
6   show you a clip from this meeting --
7   A.   **Okay.**
8   Q.   -- and ask you some questions.
9   (AT THIS POINT A PORTION OF THE CD OF THE AUGUST
10          24, 2004 MEETING WAS PLAYED)
11  Q.   As you think back on the August 24th
12  meeting was there anything that Mr. Johnson said
13  that disturbed you at the time?
14  A.   **No.**
15  Q.   So, it didn't disturb you that Mr. Johnson
16  offered up, as an example of the good Lord's power,
17  Madelyn Murray-O'Hare's fate?
18  A.   **I don't know that that was what he was**
19  **saying.  I mean I don't know what his intent was.  I**
20  **heard what he said.  When he said that Miss Madelyn**
21  **O'Hare disappeared, well she did.  I don't know if**
22  **he meant that God did that or the Lord did that.  I**
23  **mean I heard what he said but --**
24  Q.   Let me see if I can test that.  What he

7 (Pages 22 to 25)

Dobrich, et al.                          v.                    Indian River School District, et al.
Reginald Helms                    C.A. # 15-120 (JJF)                        October 11, 2006

Page 26

1  said was there is a higher power than the U.S.
2  Supreme Court, the good Lord has proven that,
3  Madelyn Murray-O'Hare disappeared and was never seen
4  again. We all know who she was, she is the one who
5  started the movement to take prayer out of our
6  schools. Now, did you not understand that to be a
7  suggestion that the Dobriches might meet a similar
8  fate?
9      A.   No.
10     Q.   Did you not understand that that was
11 intended to intimidate the Dobriches and people who
12 had a different point of view than Mr. Johnson's
13 point of view?
14          MR. GOSSELIN:   Objection.
15     A.   There again I don't know what his intent
16 was.
17     Q.   I didn't ask what his intent was, sir, I
18 asked what your understanding --
19          MR. GOSSELIN:   Objection.
20     Settle down, settle down, you are getting
21     excited again. Just ask him the questions.
22     Q.   I didn't ask what Mr. Johnson's intention
23 was, I asked what your understanding of his words
24 was?

Page 27

1      A.   If you're -- I don't really understand what
2  you're saying. If you're asking me did I understand
3  that to be a threat by Mr. Johnson to say that if
4  the Dobriches continued this that something like
5  that would happen to them, no, I did not understand
6  it that way.
7      Q.   Did you have any understanding of why he
8  raised the issue of Madelyn Murray-O'Hare and her
9  disappearance? By the way, she was seen again,
10 wasn't she?
11     A.   I don't know.
12     Q.   Found in a shallow grave dismembered?
13     A.   Oh, I did hear that, yes.
14     Q.   Yeah, that's true?
15     A.   Yes.
16     Q.   What was your understanding of why someone,
17 anyone, including Mr. Johnson, would raise the issue
18 of Madelyn Murray-O'Hare's disappearance in the
19 context of a School Board meeting on School Board
20 prayer?
21          MR. GOSSELIN:   Objection can you
22     read the question again?
23          (WHEREUPON the reporter read
24     back the preceding question)

Page 28

1          MR. GOSSELIN:   Objection,
2     that's asked and answered. You asked him
3     that a couple of times and he gave you an
4     answer a couple of times.
5      A.   I don't know why anybody would use that. I
6  don't know what his intent was. You asked me if I
7  thought -- if you are asking me if I thought that
8  was a threat on his behalf, I didn't take it that
9  way.
10     Q.   Did you think it was courteous?
11     A.   That's a matter of interpretation.
12     Q.   Did you think it was courteous?
13     A.   I didn't think it was uncourteous.
14     Q.   Okay, so you thought it was not
15 discourteous. Did you think it was respectful?
16     A.   All I can say is that would not be
17 something that I would say. Is it disrespectful to
18 someone, maybe, possibly. Is it disrespectful to
19 everyone, I don't know. Was it disrespectful to me,
20 no. The only thing --
21     Q.   Did you think it was -- excuse me, I
22 interrupted you I apologize. The only thing, you
23 started to say the only thing?
24     A.   The only thing I can tell us is that would

Page 29

1  not be something that I would say. I can't speak
2  for Mr. Johnson.
3      Q.   Would you describe for me why that would
4  not be something that you would say?
5      A.   I just don't think referring to someone who
6  has had some misfortune in their life and has met a
7  tragic death like that, why -- I just wouldn't say
8  anything like that. I have no reason to say
9  anything like that.
10     Q.   Did you think it was a coincidence that
11 Mr. Johnson referred to someone who met a tragic end
12 in their life, in conjunction with a reminder that
13 that person was the person who started the movement
14 to take prayer out of our schools?
15     A.   I can only assume that it was not a
16 coincidence on his behalf. I think he said it for
17 some reason, now exactly what that reason is, I
18 don't know.
19     Q.   And on August 24th you didn't make an
20 effort to think about what the reason might have
21 been for his mentioning the disappearance of the
22 person who had been responsible for the movement to
23 "take prayer out of our schools?"
24          MR. GOSSELIN:   Objection.

8 (Pages 26 to 29)

Page 30

1    A.    The only thing I can tell you is sometimes
2    when you listen there are things that you take to
3    heart, and there are some things that you disregard.
4    Q.    Which did you do with this?
5    A.    I recall that is something that I
6    disregarded and I probably said like I'm saying now
7    I said in my mind probably, I don't recall exact
8    words, that's something I would not have said.
9    Q.    Now, I would like to turn that statement
10   around, and I'd like to ask you whether it's
11   something that you believe that Mrs. Dobrich and her
12   family, who were present at the meeting, could
13   easily have disregarded?
14          MR. GOSSELIN:  Objection.
15   Q.    You may answer.
16   A.    I don't know.
17   Q.    Well, you are human being just like the
18   rest of us, what do you think?
19   A.    I'm sitting here trying to think.  Probably
20   at that particular time it might not have been
21   received very well by her because she just might --
22   she may have had a different interpretation, or it
23   may have -- I'll use my words, struck her a little
24   harder than me.

Page 31

1    I don't know that, but it could have.  It
2    possibly was not received very well by her and her
3    family.  But once again I'll say, it's something
4    that I would not say.
5    Q.    Which do you think is more, a more serious
6    breach, potential breach of the public order, for
7    Mr. Johnson to refer to Madelyn Murray-O'Hare in
8    context of public comment on School Board prayer, or
9    for someone to mention the name of a teacher with
10   whom they had a problem in public session?
11          MR. GOSSELIN:  Objection.
12   A.    Would you ask that question again?
13   Q.    Sure.  Do you have a sense of which is a
14   more -- which one should the Board president have
15   banged his gavel on, Mr. Johnson's saying we all
16   remember that God proves his higher power, remember
17   Madelyn Murray-O'Hare she disappeared and was never
18   seen again, she was the one who took prayer out of
19   our schools.  That's one possibility where you might
20   bang your gavel, or the other possibility where
21   someone mentions the name of the teacher during the
22   public comment?
23          MR. GOSSELIN:  Objection.
24   A.    I would say that everyone is entitled to

Page 32

1    free expression, and they are entitled to their own
2    opinion.  I don't know if we have specific
3    guidelines on that, but I do know we have specific
4    guidelines on using personal names.  And then I'll
5    go back again, it's a matter of interpretation, it's
6    a matter of opinion.
7          But I do know that we have freedom of
8    speech, so I don't know if the president could have
9    cut him off at that time or not, according to the
10   policy, I don't know.  We'd have to review the
11   policy.  But I do know we are not suppose to use
12   names, I do know that.
13   Q.    Did you hear the laughter from the crowd
14   when Mr. Johnson mentioned Madelyn Murray-O'Hare's
15   fate?
16   A.    I heard some -- let me just say I worked at
17   a power plant for 30 years, I don't hear everything
18   as good as I used to.  I did hear some amens, I
19   don't know if I heard laughter or not but I do know
20   I heard amens.
21   Q.    Did you think it disturbing that a number
22   of people said amen when he mentioned Madelyn
23   Murray-O'Hare and her disappearance?
24   A.    Disturbing?

Page 33

1    Q.    Yes.
2    A.    No.
3    Q.    Did you think it was consistent with
4    traditional Christian values?
5          MR. GOSSELIN:  Objection.
6          Don't answer that, okay, it's harassing.
7    Q.    Come on.  As a Board member are you an
8    agent of the government?
9    A.    To the best of my knowledge, yes.
10   Q.    Do you know Harold Johnson?
11   A.    Yes, I do.
12   Q.    How long have you known him?
13   A.    Since 1991.  I believe he was on the Board
14   when I was first elected, and that's where I first
15   met him.
16   Q.    Is he just an acquaintance or a close
17   friend?
18   A.    He's more than an acquaintance.  I'd say
19   he's a friend, not a close friend.
20   Q.    Did you speak to Mr. Johnson before the
21   August 24th meeting about the comments that he would
22   make?
23   A.    No.
24   Q.    Mr. Helms, do you maintain a file in

9 (Pages 30 to 33)

Dobrich, et al.                              v.              Indian River School District, et al.
Reginald Helms                      C.A. # 15-120 (JJF)                    October 11, 2006

Page 34

1  connection with your service on the Board?
2  **A. I have some files, yes.**
3  Q.   At some point during this litigation did
4  you review those files to determine whether you had
5  any documents that are responsive to a request for
6  documents that was filed in this case?
7  **A. Yes, we were asked if we had anything**
8  **specific to this case that they wanted it.**
9  Q.   And is that the way it was said, if you
10 have anything specific to this case it's been
11 requested and you should turn it over?
12 **A. I think it was if you have any notes or**
13 **that sort of thing that they wanted them, yes, we**
14 **were told that.**
15 Q.   Did you turn over anything that you had
16 that was responsive as you understood it?
17 **A. To the best of my recollection I turned**
18 **over everything that I had personally on that.**
19 Q.   Do you keep notes at Board meetings?
20 **A. Yes.**
21 Q.   Do you have a practice as to what you take
22 notes about --
23 **A. No.**
24 Q.   -- or is it random?

Page 35

1  **A. It's random. I look at it like this, my**
2  **memory is not as good as other people's so what I do**
3  **a lot of times I will just jot down a word or**
4  **something that might help me remember something.**
5  Q.   Did you provide any documents to
6  Mr. Neuberger at any time in your consideration of
7  whether to retain him?
8  **A. I think I did.**
9  Q.   What documents did you send to him?
10         MR. GOSSELIN:  Objection,
11     you don't have to answer that.
12 **A. Okay.**
13 Q.   Were they Board documents?
14 **A. Yes.**
15         MR. GOSSELIN:  Objection,
16     objection, you don't have to answer that.
17 **A. Okay.**
18 Q.   Did you include all of the documents that
19 you provided to Mr. Neuberger in the documents that
20 you produced to your attorneys in this action?
21         MR. GOSSELIN:  Objection,
22     you don't have to answer that.
23         Is there a good faith basis
24     for asking somebody what documents he gave

Page 36

1  his attorney?  Do you have any argument
2  that that is not protected by
3  attorney/client privilege?
4          MR. ALLINGHAM:  Sure, the
5  witness has testified that he hasn't
6  retained Mr. Neuberger or isn't sure.
7          MR. GOSSELIN:  No, he
8  testified that he didn't know whether
9  Mr. Neuberger is representing him today.
10 Q.   Have you ever retained Mr. Neuberger?
11 **A. Yes.**
12 Q.   Have you ever terminated that
13 representation?
14 **A. No.**
15 Q.   Have you ever paid Mr. Neuberger for his
16 services?
17 **A. No.**
18 Q.   Is he currently representing you today?
19 **A. I'm not sure.  To the best of my knowledge**
20 **he is, but you know.**
21         MR. GOSSELIN:  Did you give
22     him the documents when you believed that he
23     was representing you?
24 **A. Yes.**

Page 37

1          MR. GOSSELIN:  Okay, end of
2      questioning.
3  Q.   I'm going to ask a series of questions,
4  probably Mr. Gosselin will instruct you not to
5  answer, so take a second before you answer the
6  question.
7          Among the documents that you gave to
8  Mr. Neuberger were minutes of meetings included?
9          MR. GOSSELIN:  Objection,
10     don't answer.
11 Q.   Among the documents you gave to
12 Mr. Neuberger, were documents that are publicly
13 available included?
14         MR. GOSSELIN:  Objection,
15     don't answer.
16         MR. ALLINGHAM:  And am I correct
17     Jason that you will instruct the witness
18     not to answer any question concerning the
19     documents he gave to Mr. Neuberger?
20         MR. GOSSELIN:  Yes.  Unless
21     you can give me some good faith reason why
22     that's an inappropriate objection.
23         MR. ALLINGHAM:  I just want the
24     objection on the record. I don't want to

10 (Pages 34 to 37)

Dobrich, et al.                          v.                    Indian River School District, et al.
Reginald Helms                    C.A. # 15-120 (JJF)                    October 11, 2006

Page 38

1  have a debate about privilege here.
2      MR. GOSSELIN: I am trying to be
3  efficient here, I don't want to have to
4  come back. If I'm wrong and you can tell
5  me why, I don't want to have to come back
6  here, I might consider withdrawing it.
7  Q. Have you ever spoken with
8  Mr. Johnson, Harold Johnson about Board prayer?
9  A. Probably so.
10 Q. Tell me everything that you can recall that
11 you and he said to each other on that topic?
12 A. I don't recall any specifics, but I say
13 probably so because it may have came up, come up in
14 conversations that we had, but I don't have any
15 specific recollection of it.
16 Q. What is your religious affiliation?
17 A. I'm a Wesleyan.
18 Q. Do you attend church?
19 A. Yes.
20 Q. What church do you attend?
21 A. I attend the Roxanna Wesleyan Church.
22 Q. You mentioned that you were aware that
23 people were urging their congregations to attend the
24 August 24th meeting, are you aware of any person in

Page 40

1  A. This was the adult class.
2  Q. The adult Sunday School?
3  A. Yes.
4  Q. Did any member of your church speak during
5  the public commentary session of the August 24th
6  meeting?
7  A. No.
8  Q. I am going to ask you some alternative
9  questions about religion. Do you believe that
10 Judaism is as valid a religion as Christianity?
11 A. Yes.
12 Q. Do you believe that Islam is as valid a
13 religion as Christianity?
14 A. Well, I guess I should've asked you on the
15 first question, what do you mean as valid? I mean,
16 give me your definition of valid?
17 Q. Well, in answering the question without
18 asking me for clarification, what did you mean by
19 valid?
20 A. I meant is someone entitled to worship
21 Judaism, is someone entitled to worship as a Muslim,
22 sure they are entitled. Is it valid, I want to know
23 -- that was my interpretation of valid.
24 Q. Fair enough. And so you would say given

Page 39

1  your church who was urging the members to attend the
2  meeting?
3  A. Yes.
4  Q. Who was that?
5  A. Let me put it this way, I know it was
6  mentioned in Sunday School. I am not sure exactly
7  who said it, but I do know it was said because I
8  heard it was said.
9  Q. From whom did you hear it was said? That
10 is to say, I know that you can't recall who said it,
11 but who reported to you that it had been said?
12 A. I heard from a lady, miss Joan Ennis from
13 Roxanna. I think she mentioned it to me, maybe a
14 couple of more ladies. If I told you who they were
15 I'd just be speculating, but I know that I heard it
16 from, I know Miss Joan said, said that to me.
17 Q. And you know that she told you that it was
18 mentioned in Sunday School that people should try to
19 attend the August 24th meeting?
20 A. I think, yes, she said several people in
21 Sunday School had said that.
22 Q. And I don't want to sound ignorant, but in
23 my church Sunday School goes up to 15 or 16 year
24 olds, are we talking about --

Page 41

1  that definition that Islam is as valid a religion as
2  Christianity?
3  A. If we agree that valid means are they
4  entitled to worship whatever way they feel,
5  absolutely.
6  Q. Now, I am going to ask you to consider a
7  different definition of validity. Does a follower
8  of Judaism have any chance of going to heaven?
9      MR. GOSSELIN: Objection.
10     This is, we are straying, don't answer
11     that. We are straying way beyond what's
12     appropriate in this case.
13     MR. ALLINGHAM: I'm sorry, I
14     just didn't hear, did you instruct him not
15     to answer?
16     MR. GOSSELIN: I did.
17 Q. Do you have a belief as to the majority
18 religion among voters in the Indian River School
19 District?
20 A. Yeah.
21 Q. What is that?
22 A. I think it would be Protestant.
23 Q. What's the basis for your belief, just
24 counting up the number of churches?

11 (Pages 38 to 41)

Dobrich, et al.                                    v.                    Indian River School District, et al.
Reginald Helms                          C.A. # 15-120 (JJF)                          October 11, 2006

Page 42

1    A.   Counting up the number of churches.
2    Q.   And would your answer be the same among
3    teachers in the district?
4    A.   Probably so, although I wouldn't be as
5    assured of that answer as I would on the other one.
6    I'm not sure. I would assume that the majority
7    would be Protestant, yes.
8    Q.   And how about a belief as to the majority
9    religion among students in the district, same as the
10   families overall?
11   A.   Probably the same.
12   Q.   I'm sorry Mr. Helms, but this is the third
13   of these depositions that I have taken, and to a
14   little small degree they are starting to run
15   together, so, forgive me if I ask a question that I
16   asked you before. I showed you a clip of the
17   videotape of the August 24th School Board meeting,
18   do you know who directed that the meeting be
19   videotaped?
20   A.   No.
21   Q.   It was not you I take it?
22   A.   No.
23   Q.   And it was not discussed beforehand at a
24   Board meeting?

Page 43

1    A.   No.
2    Q.   Have you, until today, ever reviewed the
3    copy of the videotape of that meeting?
4    A.   No, I haven't.
5    Q.   Do you know whether any other Board member
6    asked for a copy?
7    A.   I don't know of any, no.
8    Q.   The Board's minutes of its meetings are
9    intended to accurately reflect what happened during
10   the Board meeting, is that correct?
11   A.   That's the intent.
12   Q.   And you have a process pursuant to which at
13   the next Board meeting you approve the minutes from
14   the last Board meeting?
15   A.   That's correct.
16   Q.   And you personally, Mr. Helms, review the
17   minute before you vote to approve them, correct?
18   A.   Not always.
19   Q.   That would be your intention?
20   A.   That's the intention, yes.
21   Q.   Are you aware that School Board meetings
22   are audio recorded, audio taped?
23   A.   Yes.
24   Q.   Do you know why that happens?

Page 44

1    A.   No. I mean I don't -- I assume it's so
2    that they will be able to write down some minutes or
3    something. I mean that's my assumption. I mean I
4    don't know if anybody ever said this is why we are
5    taking the audio, but that would be the intention I
6    would think.
7    Q.   Well, let me ask you a question. I
8    understand sometimes maybe you don't have time or
9    whatever it is to review the minutes before you vote
10   to approve them. Would I be right, however, in
11   assuming that you have reviewed as a Board member
12   all of the Board's policies?
13   A.   No, I have not reviewed all of the Board
14   policy.
15   Q.   How would you know what it is that you are
16   charged with doing if you have not reviewed all of
17   the Board's policies?
18   A.   Well, I have reviewed the ones that I think
19   pertain to my personal responsibility, but there are
20   a lot of policies in that policy book that I have
21   never looked at personally. I mean there are
22   policies that deal with students, there are policies
23   that deal with administrators, and there are
24   policies that deal with the Board of Education.

Page 45

1        I have reviewed the ones that are
2    pertaining to the Board of Education, and my
3    responsibilities. Can I quote them to you verbatim,
4    no, but I have reviewed them. But there are some
5    policies in there that I have not reviewed.
6    Q.   How were you able to identify the ones that
7    relate to your responsibilities if you haven't
8    reviewed them all?
9    A.   There is a tab in the policy manual that we
10   receive that has the different categories and one of
11   those is of the Board of Education.
12   Q.   And you have reviewed all the policies
13   under that tab?
14   A.   Yes. And since I have been on the Board I
15   have looked at those, although there are some that I
16   probably can't recall, but I know where I can find
17   them if there is a question.
18   Q.   All of the policies that are in the policy
19   manual are policies that were adopted by the Board,
20   is that correct?
21   A.   At some point in time, yes.
22   Q.   And the Board is charged with enforcing and
23   administering all of those policies, is that
24   correct?

12 (Pages 42 to 45)

Dobrich, et al.                          v.                    Indian River School District, et al.
Reginald Helms                    C.A. # 15-120 (JJF)                      October 11, 2006

Page 46

1    A.   I'm not -- the Board is responsible to make
2   sure that those policies are enforced.  I don't know
3   if the Board enforces them themselves, but the buck
4   stops here.  Ultimately the Board is responsible as
5   being the Board of Education.
6    Q.   Fair enough.  It's true that you may
7   delegate enforcement or administration in some
8   areas, but the ultimate responsibility for
9   enforcement and administration of the Board policies
10  is with the Board?
11           MR. GOSSELIN:  Objection.
12   Q.   Correct?
13   A.   We do not enforce the policies.  We are
14  responsible to make sure that the policies are
15  adhered to.  In other words, the superintendent is
16  responsible for the day-to-day operation of the
17  district.  However, when there is a question then
18  that is brought to the Board, and then the Board has
19  to make a decision on whether the policy was
20  followed, whether it was not, but as far as
21  enforcing the day-to-day operations and the policies
22  I don't think that's our responsibility.
23           We are responsible for the policies but not
24  to enforce them ourselves, if that's what you're

Page 47

1   asking.
2           MS. DUPHILY:  We are going off the
3   record at approximately 4:29 p.m..
4           (WHEREUPON a brief recess was
5   taken)
6           MS. DUPHILY:  Back on the record
7   at approximately 4:36 p.m..
8    Q.   I'm going to try to establish some
9   chronological guideposts for purposes of our
10  discussion.  The graduation in 2004 that
11  precipitated, it was the first event precipitating
12  this lawsuit, took place in early June, do you
13  recall that?
14   A.   I recall when it happened, but I wasn't
15  there.
16   Q.   Am I correct in characterizing that as the
17  first event that precipitated the Board's
18  consideration of -- that culminated in the Board's
19  consideration and adoption of School Board Prayer
20  Policy?
21   A.   I would say so, yes.
22   Q.   The first Board meeting at which, and we
23  have already marked these as exhibits, so I'm going
24  to get out the documents.  The first Board meeting

Page 48

1   at which that issue was considered was June 15,
2   2004, Mr. Helms, so let me show you the minutes from
3   that meeting.
4    A.   Okay.
5    Q.   This set of minutes and I believe every set
6   of minutes that I show you has either the signature
7   or signature stamp from Mrs. Hobbs, does that
8   indicate that these are the final minutes?
9    A.   I would assume so, yes.
10   Q.   Approved by the Board?
11   A.   Yes.
12   Q.   As a preliminary matter you're recorded as
13  being present at this meeting, do you have any
14  reason to doubt that you were there?
15   A.   No.
16   Q.   There is no discussion in the minutes of
17  any member of the Board offering a prayer after the
18  meeting was called to order, do you recall whether a
19  prayer was offered?
20   A.   I don't recall specifically, no, but I
21  would sit here and say I'm sure there was, but I
22  don't recall any specific.
23   Q.   I wasn't asking you about the specifics of
24  the prayer, I was just asking you do you recall

Page 49

1   whether a prayer was offered?
2    A.   No, I don't recall.
3    Q.   Are you sure that a prayer was offered
4   whether you recollect it or not?
5    A.   No.
6    Q.   Okay.  Is that because you have been at
7   Board meetings when no prayer was offered?
8    A.   Not that I can remember.  We always start
9   our regular Board meeting with prayer, that's why I
10  say I assume that we had prayer, but I don't recall
11  any specifics.
12   Q.   On page two of the Board minutes you'll see
13  under public comments that the minutes record,
14  "Mrs. Dobrich, a parent of the Jewish faith
15  expressed concern about prayers at school district
16  events.  She asked that the Board consider using a
17  non-denominational prayer that would be appropriate
18  for all faiths at events such as graduations, etc.,"
19  do you see that?
20   A.   Yes.
21   Q.   Is that a fair summary of what Mrs. Dobrich
22  said?
23   A.   As I recall it, yes.
24   Q.   Did ever have a separation conversation

13 (Pages 46 to 49)

Dobrich, et al.                              v.              Indian River School District, et al.
Reginald Helms                    C.A. # 15-120 (JJF)                    October 11, 2006

Page 50

1  with Mrs. Dobrich about her concerns?
2     **A.  Not to my recollection.**
3     Q.  Did any Board member tell you that that
4  Board member had had a separate conversation with
5  Mrs. Dobrich about her concerns?
6     **A.  Yes.**
7     Q.  Which Board member?
8     **A.  As I recall I believe it was Dr. Hattier.**
9     Q.  What did Dr. Hattier tell you about his
10 conversation with Mrs. Dobrich?
11    **A.  I don't recall specifics, but it was**
12 **something to the order of I tried to talk to Mrs.**
13 **Dobrich about this, her concerns. I don't recall**
14 **any specifics.**
15    Q.  Do you recall Dr. Hattier urging Mrs.
16 Dobrich not to contact the ACLU?
17    **A.  I don't recall him telling me that, no.**
18    Q.  Did you later come to learn that he had
19 urged Mrs. Dobrich not to contact the ACLU?
20    **A.  If he said that I don't recall.**
21    Q.  All right, if you turn to the next page,
22 page three of the minutes you'll see under
23 graduation ceremonies, that the minutes record Ms.
24 Hobbs provided the Board with information regarding

Page 51

1  school prayer from Mr. Griffin. Do you recall what
2  the materials were that were provided by
3  Mr. Griffin?
4     **A.  No, I don't.**
5     Q.  It says that you then moved to table this
6  item until the next regular Board meeting. Why did
7  you move to table it to the next regular Board
8  meeting?
9     **A.  As I recall we received a packet of**
10 **information that night and I didn't feel as though,**
11 **and I was only expressing my opinion, I didn't feel**
12 **as though I had enough time to read and digest and**
13 **do anything that night. So, I asked the Board, I**
14 **made a motion to table so that we could have time to**
15 **look at the information and see what was in the**
16 **packet.**
17    Q.  And the next month would give you that
18 time?
19    **A.  Whatever time, yeah. Whatever time it**
20 **took. I didn't have any specific length of time in**
21 **mind, I just knew I needed more time.**
22    Q.  The minutes then reflect that Dr. Hattier
23 left the meeting from 8:30 to 8:45, do you know why
24 Dr. Hattier left the meeting?

Page 52

1     **A.  I didn't know at the time.**
2     Q.  You do know now?
3     **A.  Yes.**
4     Q.  What was the reason?
5     **A.  I was told that he went to talk to Mrs.**
6  **Dobrich.**
7     Q.  Who told you that Dr. Hattier?
8     **A.  Dr. Hattier, yes.**
9     Q.  Did he report anything about what Mrs.
10 Dobrich said during that conversation?
11    **A.  Not that I recall.**
12    Q.  When Dr. Hattier returned to the meeting
13 did he report to the Board members on the substance
14 of his conversation with Mrs. Dobrich?
15    **A.  I don't recall him doing that because I**
16 **think he told me some time later that that's where**
17 **he'd been. I don't recall it as he came back and**
18 **said I've spoken to Mrs. -- I don't recall that.**
19 **And he may have but I don't recall it that way**
20 **because he told me some time later where he had**
21 **been.**
22    Q.  All right, I'll represent to you that
23 that's the first set of minutes at which this issue
24 is discussed in any way. Now, let me give a copy of

Page 53

1  what we previously marked as PX16. These are the
2  minutes of the July 27, 2004 meeting.
3     **A.  Okay.**
4     Q.  Before I turn to these minutes, Mr. Helms,
5  up until the June 15th meeting, the one we just
6  looked at, had you done anything personally on the
7  issue of School Board prayer, graduation prayer,
8  prayer in the schools, religious policies in the
9  schools, anything like that?
10    **A.  You mean when you say have done anything**
11 **personally, do you mean did I review them or --**
12    Q.  Did you review the policies, did you
13 consult with anyone, did you do anything, or was
14 your first substantive contact with these issues
15 that June 15th Board meeting and Mr. Griffin's
16 package that was given you that night?
17    **A.  As I recall that was the first time.**
18    Q.  Okay.
19    Now, in the period from June 15 to July 27
20 which is the next Board minutes we have here, did
21 you do anything during that period to investigate or
22 explore or examine the issues of School Board prayer
23 and the related religious policies?
24    **A.  As I recall I think I tried to go on the**

14 (Pages 50 to 53)

Dobrich, et al.                              v.                    Indian River School District, et al.
Reginald Helms                      C.A. # 15-120 (JJF)                      October 11, 2006

Page 54

1  **Internet and do some reading on the Internet, as far**
2  **as about prayer before graduation and that sort of**
3  **thing. As I recall I did do some of that.**
4      Q.   Did you do anything other than researching
5  the issue on the Internet?
6      **A.   Not that I recall. I think that I was**
7  **trying to do some reading.**
8      Q.   Do you have any recollection of how you
9  tried to locate materials on the Internet?
10     **A.   No, just type in something like school**
11  **prayer or prayer. I think I started with the word**
12  **prayer and then went from there.**
13     Q.   Probably got a lot of results?
14     **A.   Yes, I did.**
15     Q.   Okay, so, let's -- was this time period the
16  first time that you had as a Board been asked to
17  consider the issue of prayer in the schools?
18     **A.   I don't recall it being raised as an issue**
19  **before that.**
20     Q.   Do you recall your -- that's an oddly asked
21  question, let me strike it.
22          Did you yourself raise the possibility of
23  having a day of prayer in the Indian River School
24  District Schools?

Page 55

1      **A.   Yes. Yes, I did.**
2      Q.   Do you have any recollection of when that
3  occurred?
4      **A.   No.**
5      Q.   Was that at a public or an executive
6  session of the Board?
7      **A.   I don't recall.**
8      Q.   Let me show what's been --
9          MR. ALLINGHAM:  I'm going to
10         mark as Plaintiff's Exhibit 41 a document
11         bearing Bates numbers PR271 through 280.
12         (WHEREUPON Plaintiff's Exhibit
13         41 was marked for identification.)
14     Q.   You will see that this document is signed
15  by Mrs. Hobbs on page eight of the minutes. Can you
16  identify this as the official Board minutes of June
17  29, 1999, the Board's regular meeting?
18     **A.   Yes.**
19     Q.   Okay. On page four of the minutes, under
20  the heading "School Prayer," it's the second heading
21  on that page. The minutes reflect, "Mr. Helms asked
22  that the Board consider designating a, "day of
23  prayer" which would be led by students in our
24  schools. He suggested that the members of the Board

Page 56

1  think about this for discussion at a future Board
2  meeting. Mrs. Hobbs will research this idea and
3  report back to the Board."
4          Do you recall having made that suggestion?
5      A.   Yes.
6      Q.   Did the Board ultimately designate a day of
7  prayer at the schools?
8      A.   No.
9      Q.   In connection with that had you done any
10  independent research on the Internet?
11     A.   Not that I recall. I just thought it would
12  be a good idea. I don't recall doing any research
13  on it.
14     Q.   Do you remember what, if anything, that
15  prompted your thinking about the issue at that time?
16         MR. GOSSELIN:  Objection.
17         Again this is part of the religion at
18         school generally which the judge --
19         MR. ALLINGHAM:  I'll
20         withdraw the question, I'll withdraw the
21         question, I understand. Every once in a
22         while my idle curiosity gets the better of
23         me.
24         MR. GOSSELIN:  And if I can

Page 57

1          satisfy your curiosity by not objecting for
2          a question or two I generally, you know,
3          I'm not trying to stop you.
4      Q.   Okay, so in the July 27 minutes you will
5  see that in the public comment section on page two,
6  one, two, three, four, five, six, seven, eight,
7  nine, ten, eleven, 12 people made public comments
8  about the district's practice of holding prayers at
9  school sponsored events including graduation
10  ceremonies, do you see that?
11     A.   Yes, I see that, yes.
12     Q.   And it records that comments were equally
13  made in favor of continuing and discontinuing the
14  present practice I think that I asked you, but again
15  I may have confused you with Mr. Bireley or Dr.
16  Hattier, did you form a view as to the majority view
17  of your constituents on the issue of continuing or
18  discontinuing School Board prayer?
19     A.   Yes.
20     Q.   Did the comments expressed at the July 27
21  meeting on a somewhat different topic have any
22  impact on your views about your constituents'
23  opinion on School Board prayer?
24         That is to say, did you look at this sort

15 (Pages 54 to 57)

Dobrich, et al.                                    v.                    Indian River School District, et al.
Reginald Helms                          C.A. # 15-120 (JJF)                          October 11, 2006

Page 58

1  of equal breakdown in these public comments and take
2  that into account in forming your view about your
3  constituents' opinions on School Board prayer?
4      A.   Yes.
5      Q.   Were you surprised that the comments sort
6  of split down the middle on this issue?
7      A.   Yes.
8      Q.   Why were you surprised?
9      A.   Well, you asked me the question what was my
10  opinion about my constituents --
11      Q.   Uh-hum.
12      A.   Well, my opinion is that the majority of my
13  constituents wanted prayer. However, you must
14  understand that although I represent the entire
15  district, when you asked me about my constituents, I
16  represent district number five, so my interpretation
17  of my constituents was that they overwhelmingly
18  supported prayer.
19      But so that night when it came up, I think
20  the comment was made like it was split right down
21  the middle six and six. I remember thinking wow how
22  do you do that, did somebody plan that, or is that
23  the way it just happened to be. But that was,
24  that's why I said you asked me was I surprised,

Page 59

1  yeah.
2      But my constituents I feel were
3  overwhelmingly in favor of prayer.
4      Q.   The way the Board sets up speakers at the
5  public comment portion of the meeting, it's not, you
6  can't manipulate that, people just sign up, right?
7      A.   Right.
8      Q.   And then you pick them in order?
9      A.   The best of my knowledge it's first come
10  first serve.
11      Q.   Let me ask you a question. Given what you
12  understand to be the majority opinion in the Indian
13  River School District, do you think it takes some
14  courage for someone to speak up at a public meeting
15  and oppose prayer?
16      A.   Absolutely.
17      Q.   And I'm not going to get on my high horse
18  again, and I apologize for doing that, but is the
19  tenor of some of the comments at the August 24
20  meeting an example of why you believe it takes
21  coverage to speak up against prayer at school
22  functions in the Indian River School District?
23      A.   No, I think the reason why I -- I'll
24  clarify my answer by saying that I think any time

Page 60

1  that you go against the tide it takes strength and
2  courage. And in our district I think it's fairly
3  well known that the overwhelming majority is in
4  favor of prayer. So anyone who would stand up and
5  speak against that, it would take coverage. But I
6  don't think it had anything to do with the
7  atmosphere of what the people said that night.
8      I think it was pretty well known before
9  that meeting. That's why I say it takes courage to
10  do that.
11      Q.   Would you agree that it takes courage to
12  identify yourself as a person -- strike that I think
13  you've answered the question, never mind.
14      Mr. Helms, I'm going to again use the
15  August 24 meeting as an example because it had so
16  many public speakers. When people came to the
17  podium during the public comment session did you
18  know whether they were residents of your particular
19  district or not?
20      A.   Like district five you mean?
21      Q.   Yes.
22      A.   Yes.
23      Q.   So, you would be able to identify your
24  constituents?

Page 61

1      A.   Most people, yes.
2      Q.   This is Exhibit 17 which is the minutes of
3  the August 24th meeting. If you look at page four
4  under public comments, there is a list of all the
5  people who spoke. Could you identify for me those
6  persons whom you believe to be residents of district
7  five?
8      A.   I will try. I believe Danny Tice may be in
9  my district, I am not 100 percent sure. I think
10  Mr. Paris Mitchell may have been in my district at
11  that time, and that would be the ones that I
12  recognize.
13      Q.   Okay. While we are open to this page, the
14  last sentence says that a public forum may be
15  scheduled, has such a forum ever been scheduled?
16      A.   Not to my knowledge.
17      Q.   Back to the July 27 minutes, if you turn to
18  -- sorry the same page down at the bottom of page
19  two, graduation ceremonies. You moved to table this
20  issue until after executive session. And that was
21  passed unanimously, do you recall that?
22      A.   Yes.
23      Q.   And then if you turn to page eight of the
24  minutes you will see that at 10:20 the Board went

16 (Pages 58 to 61)

ography...

Dobrich, et al.
Reginald Helms

v.

C.A. # 15-120 (JJF)

Indian River School District, et al.
October 11, 2006

Page 62

1  into executive session and came back out of
2  executive session at 12:10 a.m., and I believe it
3  was Dr. Hattier who pointed out that you guys work
4  long hours?
5      A.  Yes, we do.
6      Q.  This is July 27, this is the second meeting
7  on this topic.  Do you recall anything of what the
8  Board discussed in executive session, if anything,
9  having to do with the broadly speaking, the school
10  prayer issue?
11      A.  I don't recall anything specific.
12      Q.  Do you recall anything that you said during
13  that meeting?
14      A.  Not specifically, although I know I made
15  several comments about this issue, and I think I am
16  not sure whether I made a comment that night.  I
17  think I can recall making a statement like I wanted
18  to make sure that whatever our policy, whatever
19  policy we adopt is according to the law.  And I want
20  to take time and I want to get it right.
21         But I can't tell you that I made that
22  statement that night, but I remember making
23  statements like that, but I don't know if it was
24  that particular night.

Page 63

1      Q.  Am I right in understanding that that was a
2  sentiment that was shared, as far as your
3  understanding, by the other Board members?
4      A.  Yes, it is.
5      Q.  This is not something you ought to rush
6  into?
7      A.  Exactly.
8      Q.  During the executive session did you hear
9  from any lawyers on the topic?
10      A.  I don't recall.  We may have.  I can't
11  recall specifically.
12      Q.  I notice that in the other visitors and
13  staff in attendance Mr. Griffin was not listed,
14  Mr. Neuberger was not listed.  No person that I can
15  identify from the Rutherford Institute or Alliance
16  Defense Fund is listed, nor is Mr. Cafferty or Mr.
17  Balliger listed.  Looking back, if there is no
18  lawyer, you can look take a lok at these see if you
19  see a lawyer there, but if there is no lawyer whose
20  name you can recollect, would it be safe to assume
21  that you didn't get legal advice during that
22  executive session?
23      A.  We may have received legal advice from a
24  document.  It's hard to say.  We may have had

Page 64

1  advice.  I can't say that.
2      Q.  But no lawyer was present?
3      A.  I don't recall.  If somebody showed me a
4  piece of paper that said somebody was there I would
5  say okay, but I can't recall specifics.
6      Q.  From this paper which at least shows that
7  no lawyer was present at the beginning of the
8  meeting?
9      A.  Okay.
10      Q.  Does that comport with your recollection?
11      A.  Yeah.
12      Q.  In the earlier minutes of the June 15
13  minutes there was a notation that there had been
14  materials prepared by Mr. Griffin and you had
15  proposed tabling the matter to have a chance to look
16  at those materials?
17      A.  Yes.
18      Q.  I don't want to know what they said, I
19  would like to know what they were.  Was it a
20  memorandum, was it copies of cases, was it -- tell
21  me what it was?
22      A.  I can't recall specifically, but I know
23  like the chain of events was we received something
24  like preliminary, and I got the impression that

Page 65

1  Mr. Griffin was contacted and that Mrs. Hobbs wanted
2  to have something for that meeting to present to the
3  Board.
4      Q.  Yes, sir.
5      A.  But I got the impression that it was like
6  had you read up and we got some preliminary things
7  in that packet and as time went on we got more
8  definitive things, like court cases and background
9  and that sort of thing.  To the best of my
10  recollection the first packet we got things was very
11  limited.
12      Q.  You got something subsequently from
13  Mr. Griffin?
14      A.  Yes, as I recall I think but it was very
15  preliminary.
16      Q.  Page nine at the top following the
17  executive session under graduation ceremonies, you
18  are active on this issue Mr. Helms, it was moved by
19  Mr. Helms, seconded by Dr. Hattier, to refer the
20  graduation ceremonies matter to the policy committee
21  and the Board passed this unanimously.  Do you
22  recall doing that?
23      A.  Yes.
24      Q.  So, on July 27 the Board referred the

17 (Pages 62 to 65)

Dobrich, et al.                          v.                Indian River School District, et al.
Reginald Helms                    C.A. # 15-120 (JJF)              October 11, 2006

Page 66

1   matter to the policy committee?
2       A.   That's correct.
3       Q.   At some point you contacted Mr. Neuberger
4   or the Rutherford Institute in connection with this
5   matter, is that right?
6       A.   Yes.
7       Q.   When did you do that, before or after this
8   July 27 meeting?
9       A.   I don't recall specifically when I
10  contacted the Rutherford Institute. We were
11  notified that there was going to be a lawsuit, and I
12  don't recall when that exact time was.
13      Q.   Do you recall how you learned that there
14  was going to be a lawsuit?
15      A.   I think -- well, it had been discussed at
16  some meeting. I don't recall any specifics. I
17  don't recall a specific date.
18      Q.   Do you remember who told you that there was
19  going to be a lawsuit?
20      A.   I believe it came, and most always comes
21  from the superintendent, that there was the
22  possibility of a lawsuit.
23      Q.   Okay, what you heard, Mrs. Hobbs said there
24  was a possibility that there would be a lawsuit?

Page 67

1       A.   Yes, yes.
2       Q.   And was that the summer of 2004?
3       A.   I think so. I'm pretty sure, but I don't
4   -- like I said I can't specifically recall.
5       Q.   Next I would like to show you the minutes
6   from the August 23 special Board meeting which I
7   think you have in front of you now, PX13 and 14.
8           So, PX13 is the executive session minutes.
9       A.   Okay.
10      Q.   Which represent the minutes of a chunk of
11  the special Board meeting, the rest of which has
12  been redacted. So, let's go to 14 first?
13      A.   Okay.
14      Q.   On the first page of the minutes, which are
15  signed by Mrs. Hobbs, the call to order was at 7
16  o'clock. You moved at 7:01 to go into executive
17  session?
18      A.   Okay.
19      Q.   Am I correct in understanding that there
20  was no prayer between the call to order and motion
21  to go into executive session? That's the special
22  meeting?
23      A.   I don't recall.
24      Q.   You made the motion, what was the purpose

Page 68

1   of the executive session, to discuss prayer issues
2   including School Board prayer?
3       A.   As I recall, yes.
4       Q.   As this meeting that was the only purpose
5   of the executive session?
6       A.   I think so.
7       Q.   And it says to discuss collective
8   bargaining and potential litigation, am I correct
9   from that notation that you had had some indication
10  from Mrs. Hobbs by that date that there might be
11  litigation?
12      A.   I don't recall, but that would be my
13  assumption, yes.
14      Q.   You came out of executive session at 11:14,
15  for a duration of four hours and 14 minutes?
16      A.   Right.
17      Q.   Was the prayer issue, including School
18  Board prayer the only topic of discussion during
19  those four hours and 14 minutes?
20      A.   I don't recall. It could very well have
21  been the discussions.
22      Q.   Okay, now if you turn back to the minutes
23  it says potential ligation number 05-01 PL, no
24  action was taken regarding number 05-01 PL, do you

Page 69

1   know what the number designates?
2       A.   Yes, I do, that's designating potential
3   litigation.
4       Q.   PL indicates potential litigation?
5       A.   Yes.
6       Q.   Does the Board keep a file on each
7   potential claim in a packet or does the
8   superintendent of schools keep files?
9       A.   To the best of my knowledge, yes.
10      Q.   Do you have any idea what the significance
11  of 05-01 is, does it have any significance?
12      A.   I think it means the year '05 and it's from
13  the school year, it's from, I am sure from the 2004
14  to 2005, so that would be the '05 school year, so
15  this would have been the '05 school year, and the 01
16  first potential litigation of that year.
17      Q.   Got you.
18      A.   Well, I believe that's the designation.
19      Q.   Thank you. Let's go to Plaintiff's Exhibit
20  13.
21          Now, the word redacted is a word that
22  lawyers use to let people know that something there
23  has been blocked out of the original, and has been
24  masked out on these documents?

18 (Pages 66 to 69)

Dobrich, et al.                    v.                    Indian River School District, et al.
Reginald Helms                C.A. # 15-120 (JJF)                    October 11, 2006

Page 70

1    A.    Okay.
2    Q.    I believe it to be masked out because it is
3    thought to represent attorney/client privilege
4    material?
5    A.    Okay.
6    Q.    But there is a small portion that remains
7    which has two sentences, and I would like to talk to
8    you about those. One reads, "During the discussion
9    of this issue," do you know what this issue refers
10   to? Is it the School Board prayer issue?
11   A.    That's what I am assuming, because at the
12   top it says potential or pending litigation 05-01.
13   Q.    At the end of that sentence there is a
14   discussion of, "Several Board members expressed that
15   their constituents do not want the Board to change
16   its practice of opening the meetings with a prayer."
17   Does that refresh your recollection that the issue
18   was School Board prayer?
19   A.    Yes.
20   Q.    Which Board members expressed the opinion
21   that their constituents did not want the Board to
22   change its practice of opening its meetings with
23   prayer?
24   A.    I don't recall specifically which ones, but

Page 71

1    I believe it was a overwhelming majority, if not
2    all.
3    Q.    Did you express that view?
4    A.    Yes.
5    Q.    How were you able to determine that your
6    constituents did not want the Board to change its
7    practice?
8    A.    I believe during that period of time we
9    received several phone calls expressing that we,
10   encouraging the Board to continue with that.
11   Q.    When you say we received several phone
12   calls, that's sort of a modest we in place of I
13   received some phone calls?
14   A.    Well, let's say I as a Board member.
15   Normally when one receives a call several do. I say
16   we, but more specific, I received a lot of phone
17   calls.
18   Q.    And when you expressed the view that your
19   constituents didn't want the Board to change its
20   practice, this was your district five constituents?
21   A.    Well, phone calls thad I received, although
22   they were not all from my district, they were from
23   all over the school district.
24   Q.    How many phone calls are you estimating you

Page 72

1    got?
2    A.    I'm going to say conservative figure would
3    be around maybe 25, but it could have been as high
4    as 50.
5    Q.    Did you know most of those people were
6    acquaintances or friends of yours?
7    A.    Actually most of them were not.
8    Q.    Were they unanimous in their support of the
9    Board's practice of opening its meetings with a
10   prayer?
11   A.    Yes.
12   Q.    Was that surprising to you?
13   A.    No.
14   Q.    Were you surprised the people who supported
15   the Board's practice of opening its meetings with a
16   prayer would call you?
17   A.    No.
18   Q.    Would you say that it's widely known that
19   you supported the Board's practice of opening the
20   meetings with a prayer?
21   A.    Yes.
22   Q.    Were most of the calls in words or
23   substance, keep up the good work Mr. Helms, stick to
24   your guns?

Page 73

1    A.    Yes. There was more along the lines that
2    we agree that we think you should continue what you
3    are doing. It wasn't really stick to your guns that
4    sort of thing, it was encouraging, yes.
5    Q.    How many constituents do you suppose there
6    are in the Indian River School District?
7    A.    I don't know.
8    Q.    You have on the order of 8,000 students,
9    right?
10   A.    Yes, 7,000 something, yeah.
11   Q.    There must be at least two or three times
12   that number of residents, correct?
13   A.    Yes, I would say at least two times.
14   Q.    So, you had an average of 50 calls from
15   people who wanted -- you would have been expected to
16   be calling you in support, among the many more
17   constituents in your district?
18   A.    Correct.
19   Q.    You weren't trying to suggest to the Board
20   members that all of your constituents supported, did
21   not want the Board to change its practice of opening
22   meetings with a prayer, were you?
23   A.    I can't recall exact words, but probably I
24   would have said something like the people who have

19 (Pages 70 to 73)

Dobrich, et al.                      v.              Indian River School District, et al.
Reginald Helms             C.A. # 15-120 (JJF)                  October 11, 2006

Page 74

1  called me have suggested that we continue.  No, I
2  wouldn't have said all my constituents.
3      Q.   That wouldn't have been the truth right?
4      A.   No, I don't use words like all, never,
5  those sort of thing, because it always comes back to
6  haunt you.
7      Q.   And the Board members concluded that they
8  didn't want to make a decision on that issue
9  correct?
10     A.   I think that would be safe to say, yes.
11     Q.   Is it correct that the reason the Board did
12  not feel that a decision could be made that evening
13  is that the Board wanted to get an additional or a
14  second legal opinion on the School Board prayer
15  issue?
16          MR. GOSSELIN:  Objection.
17     A.   I don't remember, it could have been.  I
18  don't recall specifically somebody saying we want to
19  get a second opinion.  I mean I don't remember those
20  words.  I don't know why.  The only thing I can tell
21  you for sure is I didn't want to make a decision
22  that night because I didn't feel we had enough
23  information.
24     Q.   What information did you feel you needed

Page 75

1  that you didn't yet have?
2      A.   I wanted somebody to tell me that we were
3  breaking the law, and we were going against -- if
4  someone had told us that we were breaking the law,
5  and that what we are doing was illegal, then I would
6  have said then we need to stop it.  But I needed
7  somebody, you know, like a judge or someone to tell
8  me, and at that point we had never been showed that.
9      So, I don't know if it was to get a legal
10  opinion or to get a second opinion, I can't tell you
11  that.  But I know my stance as I need somebody to
12  tell me that what I'm doing is wrong.
13          MR. GOSSELIN:  You should call Mr.
14      Allingham.
15     Q.   The minutes, the full meeting minutes,
16  reflect that Mr. Griffin was in attendance?
17     A.   Okay.
18     Q.   Do you recollect that in the four hours and
19  14 minute executive session Mr. Griffin was also in
20  attendance?
21     A.   I don't recall that specifically, no, but
22  if you say he was there then he was there.
23     Q.   You should never accept --
24     A.   I mean, if the minutes reflect that he was

Page 76

1  there --
2      Q.   I understand.  Do you recall whether it was
3  at August 23 or another time do you recall receiving
4  advice from Mr. Griffin on the School Board prayer
5  issue?
6          MR. GOSSELIN:  Objection.
7      Actually no I don't object to that, but
8      since we are getting into this territory I
9      am cautioning Mr. Helms give me time to
10     object because I may be instructing you not
11     to answer, but you can answer that
12     question.
13     A.   Yes, Mr. Griffin gave us advice.
14     Q.   In light of the fact that Mr. Griffin is
15  recorded as being present under other visitors and
16  staff in attendance on the PX14 regular minutes of
17  the August 23 meeting, and the fact that it appeared
18  the only purpose of the executive session and the
19  meeting was to deal with this school prayer issue,
20  School Board prayer issue, do you believe that your
21  advice from Mr. Griffin came during this executive
22  session?
23     A.   Yes.
24     Q.   And you agreed, I take it, with the

Page 77

1  sentiment of the Board that a decision could not be
2  made this evening regarding whether or not to change
3  our past practice?
4      A.   Yes.
5      Q.   And in your mind, I'm not talking about
6  everybody else's mind, but in your mind that was
7  because no one had told you definitively that what
8  you were doing was illegal or unconstitutional?
9          MR. GOSSELIN:  Objection and to
10     the extent you can answer that without
11     revealing what Mr. Griffin told you.
12     Q.   I want to know what your reason for
13  agreeing with that sentiment was?
14     A.   Okay.  My opinion was that we had not
15  received information that said that what we were
16  doing was illegal and breaking the law.
17     Q.   And what you were looking for was some kind
18  of definitive statement, is that correct?
19     A.   On my part I was looking for some court
20  ruling, or something that said that we couldn't do
21  it.
22     Q.   Was there a discussion at the Board level
23  of the need for a definitive statement that what you
24  were doing was unconstitutional or illegal before

20 (Pages 74 to 77)

Dobrich, et al.                          v.                    Indian River School District, et al.
Reginald Helms                    C.A. # 15-120 (JJF)                      October 11, 2006

Page 78

1  you would change your existing practice?
2      A.   I don't recall that, but I'm sure that was
3  probably brought up because I've heard it before
4  whether it was at that meeting or some other
5  meeting, but I've heard those statements before in
6  discussions.
7      Q.   Let me ask you a more general question Mr.
8  Helms, as a school Board member you are familiar
9  with the practices of the Board, correct?
10     A.   Yes.
11     Q.   Is it fair to say that from your
12  perspective you would prefer to continue the
13  existing practices of the Board unless someone
14  demonstrates to you that what you're doing is
15  definitively illegal or unconstitutional?
16     A.   I'd say for the most part that statement is
17  correct.  I am a law abiding citizen, I want to do
18  what the law says, however, if we are doing
19  something wrong then I want somebody to show me.
20  I'm just not going to take somebody's word for it.
21  I know it was maybe a little bit humerous but
22  because of Mr. Allingham tells me you can't do that,
23  I need something more than that, if you understand
24  what I'm saying.

Page 79

1      Q.   Yeah, I do.
2      A.   However, if some point in time somebody
3  proves to me and shows me that it's unconstitutional
4  and you can't do that, then that's what I want to
5  do.  I want to abide by the law and I want to do
6  what's right.  However, I want to be showed.
7      Q.   In your desire that led to your joining
8  this decision -- this feeling that a decision could
9  not be made on August 23rd, were you looking for a
10  statement from a judge about your particular
11  practice, were you looking for an opinion from legal
12  counsel, were you looking for an opinion from a
13  judge on a practice that was similar to yours.  What
14  precisely would give you, I know it's not an opinion
15  from Tom Allingham, but what would give you adequate
16  comfort that you should change your practice?
17         MR. GOSSELIN:  And my same
18         admonition, to the extent that you can
19         answer this without revealing directly or
20         indirectly the information you received
21         from Mr. Griffin, you can answer the
22         question.
23     Q.   I just want to know what you were looking
24  for?

Page 80

1      A.   My thought process would be this, I need to
2  know in our area, where we are a Board of Education,
3  that it's unconstitutional for us to open a meeting
4  with prayer.  And I didn't have a document or
5  anything that said that to me.  So was I looking for
6  someone's opinion or was I looking for someone's
7  thoughts, that's fine, but I need something more
8  definitive than that for me to change my mind.
9      Q.   Mr. Griffin's advice to the Board on August
10  23rd, by that point had you received the
11  supplemental materials that you -- remember we
12  talked about June 17th, you had some stuff that you
13  thought was maybe put together in a hurry, and you
14  subsequently got supplemental materials, by August
15  23rd had you gotten everything that you were going
16  to get from Mr. Griffin?
17     A.   I don't recall specifically, but I would
18  say probably we had received a lot of information
19  from Mr. Griffin at that time, yes.
20     Q.   I don't want to know what his advice was, I
21  just want to know whether Mr. Griffin had given you
22  advice as to whether your existing practice was
23  constitutional or unconstitutional, by the
24  conclusion of the August 23 executive session?

Page 81

1      A.   I recall Mr. Griffin gave us his opinion, I
2  am not sure whether he used the words
3  unconstitutional or constitutional.  I know we
4  received --
5         MR. GOSSELIN:  Just, I think he's
6         answered your question on this.
7         MR. ALLINGHAM:  I agree, I agree,
8         I appreciate the answer.
9      Q.   All right so you were looking for something
10  more, were the other Board members looking for
11  something more as well?
12     A.   As I recall some of those statements maybe
13  made, but I don't recall anything specifically.
14     Q.   Can you recall another instance in which
15  Mr. Griffin had given you a presentation or his
16  opinion or his advice and the Board had decided to
17  look elsewhere for more legal advice?
18     A.   I know we've done that but I don't know, I
19  was sitting here trying to think of something
20  specifically that I could tell you, but I'll just
21  say this, we have not always gone by what
22  Mr. Griffin has asked us without asking someone
23  else.  I know that's happened on a couple of
24  occasions, and I will say this, Mr. Griffin is a

21 (Pages 78 to 81)

Dobrich, et al.                    v.              Indian River School District, et al.
Reginald Helms              C.A. # 15-120 (JJF)              October 11, 2006

Page 82

1  very capable and good lawyer, but there have been
2  occasions when we decided to ask someone else's
3  opinion, yes.
4      Q.  But as you sit here today you can't
5  remember what they were?
6      A.  I can't think of anything specific. I'm
7  sort of recollecting something to do with a teacher,
8  but I don't know the specifics of it, but I think
9  there was -- we brought another lawyer in one time
10 to handle the case rather than Mr. Griffin, and I
11 don't remember the specifics, but I think it had
12 something to do with a teacher.
13     Q.  How long has Mr. -- Mr. Griffin is the
14 Board's attorney, is that right?
15     A.  Well, no. He was at the time, but we've
16 just changed attorneys.
17     Q.  Who is the Board's attorney now?
18     A.  Mr. Dave Williams.
19     Q.  What was the reason for the change?
20     A.  Periodically we re-advertise for lawyers
21 and there was a few members of the Board wanted it
22 opened up again, and we did so. We received their
23 whatever you want to call it their --
24     Q.  Proposals?

Page 83

1      A.  Resume, proposals, whatever you want to say
2  and based on that we -- the Board decided to change
3  attorneys. That's just been done recently.
4      Q.  Who were the Board members who wanted to
5  reopen it?
6      A.  I would rather not get into personalities.
7      Q.  I'd like to know?
8      A.  Well, some people in the past who have
9  expressed not being totally satisfied with
10 Mr. Griffin has been Dr. Hattier, Mr. Rick Cohee,
11 Mr. Mark Isaacs, Dr. Isaacs who is no longer on the
12 Board, Mr. Walls who is no longer on the Board. We
13 have some new Board members that don't know
14 Mr. Griffin that well and know his history, so they
15 really didn't care one way or the other.
16         There were a few of us who liked
17 Mr. Griffin and would of liked him to stay, but we
18 were sort of out voted.
19     Q.  Your earlier testimony was that there were
20 a few Board members who wanted to reopen it?
21     A.  Yes.
22     Q.  When was that -- when did that reopening
23 take place?
24     A.  As I recall the timeline would be within

Page 84

1  the last maybe four months, five months.
2      Q.  So, this year?
3      A.  Yes.
4      Q.  Okay. And would that be after the March
5  2006 election?
6      A.  Yes. Let me clarify it by saying that when
7  I mentioned Dr. Isaacs and Mr. Walls, it had been
8  mentioned before, but it was never reopened. It was
9  just this year it was reopened.
10     Q.  And so who were the moving Board members
11 behind the reopening of the issue this year?
12     A.  I think it was, I want to say like Dr.
13 Hattier, Mr. Hughes, and some of the new Board
14 members that come on board just felt that it was
15 time to maybe reopen it and look and see if we could
16 get someone maybe at a better rate, or someone who
17 had a better reputation. I can't speak for all of
18 the reasons, but they just felt that it was time to
19 reopen it.
20     Q.  A couple of sort of broader questions, how
21 long had Mr. Griffin been the Board's attorney just
22 up on to the summer of this year?
23     A.  Wow, this would just be a guess, I want to
24 say in the late 1990s there was -- might have been

Page 85

1  sooner. I'm not sure he has been our attorney for a
2  while. Six to ten years, something like that.
3      Q.  Did the replacement of Mr. Griffin -- was a
4  Board vote taken on that issue?
5      A.  Yes.
6      Q.  Was it unanimous?
7      A.  Yes. To the best of my knowledge I think
8  it was unanimous. I'd have to refer to the minutes
9  to make sure, but I think it was.
10     Q.  I think I actually have not seen that in
11 the minutes, so I can't help you. I take it at
12 least you did vote for the replacement?
13     A.  Yes.
14     Q.  I'd understood your testimony earlier to
15 have been that you liked Mr. Griffin and would have
16 liked him to stay?
17     A.  Yes.
18     Q.  Does your vote for the replacement of
19 Mr. Griffin indicate that you prefer Board decisions
20 to be unanimous where possible?
21     A.  Where possible, yes. Yes, I think my
22 opinion is if it's possible it should be unanimous,
23 yes.
24     Q.  And I'm just speaking of yourself now, but

22 (Pages 82 to 85)

Dobrich, et al.                         v.              Indian River School District, et al.
Reginald Helms                  C.A. # 15-120 (JJF)                    October 11, 2006

Page 86

1  is it a fair statement that unless you feel very
2  strongly about an issue you will go along with the
3  majority?
4    A.   In my case is that unless you can convince
5  me otherwise, that if I don't have any strong
6  opinions then I will listen to the majority of the
7  Board, and if that's what they want then I will vote
8  with them, unless there is something really strong
9  that they have to convince me otherwise.
10   Q.   The Board -- how long have you been a Board
11 member?
12   A.   Since 1991.
13   Q.   In that period, that's now 15 years, it's a
14 good long time, is it your sense that virtually all
15 of the decisions of the Board that go to a Board
16 vote are unanimous votes?
17   A.   No.
18           MR. ALLINGHAM:  All right, we need
19       to change the tape.
20           MS. DUPHILY:  We are going off
21       the record at approximately 5:35 p.m..
22           MS. DUPHILY:  Back on the record
23       at 5:40 p.m..
24   Q.   I understand, Mr. Helms, that on the break

Page 87

1  that you and Mr. Gosselin had a discussion and that
2  you would like to make a clarification of some kind
3  about the Board's replacement of Mr. Griffin with
4  Mr. Williams?
5    A.   Yes.
6    Q.   Why don't you go ahead and give me that?
7    A.   Thank you for your opportunity.  I just
8  want just wanted to say that I'm one of the reasons
9  why Mr. Griffin is our Board attorney.  I think he
10 is a very competent lawyer and very nice man.
11       The reasons why Mr. Griffin was replaced
12 was the previous superintendent, Miss Hobbs
13 expressed to the Board several times where she had
14 problems with Jim getting back to the Board on
15 different matters in a timely fashion.  One of the
16 reasons why recently, I think it's been in the last
17 year or so, Mr. Griffin is also the Board attorney
18 for the County Council, and that has taken up quite
19 a bit of his time, and so Miss Hobbs would always
20 express to the Board where she had contacted
21 Mr. Griffin and she didn't feel as though he got
22 back to her as quickly as she wanted.
23       Also some other Board attorneys --
24   Q.   Board members, not attorneys.

Page 88

1    A.   Excuse me, Board members hearing that sort
2  of sided with Mrs. Hobbs before she retired and said
3  if that's the case that maybe we should start
4  looking for another attorney.
5        Then when Dr. Bunting became superintendent
6  we started hearing the same things from Dr. Bunting,
7  where she would try to contact Mr. Griffin and she
8  would either get an associate or he wouldn't get
9  back in a timely manner.
10       At that point in time some of the other
11 Board members said well maybe it's time to open it
12 up and see if we can find someone better.  But it
13 had nothing to do with this case.  And as far as I
14 am concerned there were two or three of us who were
15 very supportive of Mr. Griffin for him to stay, and
16 it had nothing to do with the prayer case.
17       That's basically all I wanted to say.
18   Q.   You consider it important for the Board's
19 attorney to understand the constituencies of the
20 district?
21   A.   Would you mind explaining that?
22   Q.   I appreciate you saying that you are not
23 sure you understand.  Do you consider it a favorable
24 quality in the Board's attorney that the Board

Page 89

1  attorney understand Indian River and the attitudes
2  of the Indian River constituencies?
3    A.   That may be all well and good, but I think
4  it's more important that they understand the letter
5  of the law and do everything to protect this
6  district no matter what the Board may say, or no
7  matter what the community may say.  The most
8  important thing is we hire a Board attorney to
9  protect us, so that we don't have to go through
10 lawsuits and that sort of thing.
11       So, I think it would be more important that
12 we felt very confident with his knowledge of the law
13 and that sort of thing.
14   Q.   Well, in this case Mr. Griffin's knowledge
15 of the law was not the issue it was his
16 responsiveness, is that right?
17   A.   Not for me.
18           MR. GOSSELIN:  In this case you
19       mean getting rid of him?
20   Q.   In getting rid of Mr. Griffin and replacing
21 him with Mr. Williams?
22   A.   When you said this case I thought you
23 meant --
24   Q.   The people who have the problems with

                                    23 (Pages 86 to 89)

Dobrich, et al.
Reginald Helms

v.
C.A. # 15-120 (JJF)

Indian River School District, et al.
October 11, 2006

Page 90

1  Mr. Griffin didn't have problems with his knowledge
2  of the law, they had problems with his
3  responsiveness?
4    A.   That's correct.
5    Q.   Okay.
6    A.   Yes.
7    Q.   Did you share the views expressed at the
8  public commentary at the August 24th meeting that
9  people from New Castle County should not try to
10  impose their views on people in Sussex County?
11    A.   They are not my views, no.
12    Q.   You think the opinions of those folks up
13  north are just as valid as the people in Sussex
14  County?
15    A.   Everybody is entitled to their opinion.
16    Q.   And you evaluate each opinion according to
17  its source and its support?
18    A.   I try to evaluate everybody's opinion on
19  their opinions, not who they are, where they came
20  from.
21    Q.   Fair enough.  Now, the process of opening
22  it up, was that a process of opening the Board
23  position, the Board attorney position, up for
24  proposals from anybody who wanted to make a proposal

Page 91

1  to become, to fill that position?
2    A.   Yes, I think there was I'm not sure how
3  widespread we advertised it, when I say that I mean
4  I don't know if it went in The News Journal, I'm not
5  sure about that, but the intent was to open it up to
6  anyone who wanted to be the Board attorney.  We
7  didn't' go nationwide of course, but we opened it up
8  for anyone who wanted to put in a proposal.
9    Q.   Limited, I assume, to Delaware attorneys?
10    A.   Probably, but I'm not sure.
11    Q.   Did Dr. Bunting run that process, that
12  proposal process?
13    A.   She may have or was the overseer, but I'm
14  not sure that maybe our personnel department didn't
15  take care of that.
16    Q.   Ultimately though that was a Board
17  decision, correct, whom to hire?
18    A.   The final vote was the Board's vote, yes.
19    Q.   Do you know how many people applied for the
20  position?
21    A.   As I recall it was like five or six maybe.
22    Q.   And did Mr. Griffin apply for the position?
23    A.   Yes, he did.
24    Q.   Did each of the people who applied for the

Page 92

1  position provide a package of material describing
2  their qualifications and services?
3    A.   Yes.  Some were more detailed than others,
4  as I recall.
5    Q.   And how did the board vote on the issue,
6  was there a recommendation from the superintendent
7  which the Board voted up or down, or did the Board
8  look at the five or six or whatever the number was
9  proposals, from the applicants to express it's own
10  judgment as to which was the best candidate?
11    A.   I'd have to look at the minutes.  Typically
12  we ask for a recommendation and then the Board votes
13  on the recommendation.  I can't recall specifically
14  how that was done, but typically we ask for a
15  recommendation.
16    Q.   Did the rates quoted to you have any impact
17  on the decision?
18    A.   I believe there was some discussion about
19  that, yes, some were higher than others, yes.
20    Q.   Was Mr. Williams' rates the highest of the
21  proposals?
22    A.   I don't recall.  I don't recall.
23    Q.   All right, I want to go back to a topic of
24  discussion that we looked at before the break, and

Page 93

1  that was this, I asked you whether as a general
2  proposition it was fair to say that your approach
3  was that you would prefer to continue the Board's
4  past practice unless someone could tell you in a
5  reasonably definitive way that what the Board had
6  done in the past was illegal or unconstitutional.
7        I want to ask you how you use that approach
8  when what is being considered is a new action or a
9  new policy.  Do you require that someone demonstrate
10  to you that the new action or new policy proposed is
11  definitively constitutional or legal?
12        Do you understand my question?
13    A.   I think so.
14    Q.   Okay?
15    A.   And I'll try to answer that with perhaps a
16  little bit of past practice procedure.  What
17  normally happens is if someone brings up an issue,
18  and the Board feels that they need a new policy or
19  they need to change a policy or whatever, it's
20  normally handed over to the policy committee.  As
21  part of that research our Board attorney is
22  contacted and through coordination between the
23  policy committee and our Board attorney where drafts
24  are made, research is done, it goes back and forth

24 (Pages 90 to 93)

Dobrich, et al.                          v.                  Indian River School District, et al.
Reginald Helms                    C.A. # 15-120 (JJF)                        October 11, 2006

Page 94

1  and when we come -- when the policy finally comes to
2  the Board for a first reading, we as the Board
3  expect and assume that all the legalities have been
4  handled and that the Board policy as it is presented
5  for the first reading is final.
6    Q.   Final being?
7    A.   Legal.
8    Q.   You can be assured that someone has
9  definitively advised that it's legal and
10  constitutional?
11    A.   That is the expectation, yes.
12    Q.   Just to explore a couple of points in that,
13  you are not on the policy committee so you are one
14  of the people on the Board who when the policy
15  committee emerges from that process with a new
16  proposed policy you assume that that has been vetted
17  for legality?
18    A.   Yes.
19    Q.   Okay.  Have you ever served on the policy
20  committee?
21    A.   No.
22    Q.   I've just forgotten, which committees are
23  you on?
24    A.   I'm right now I'm on the building and

Page 95

1  grounds committee, the athletic fields oversight
2  committee.  I have been negotiations past.  I believe
3  that's it, to the best of my knowledge.
4    Q.   I think you have in front of you PX12
5  somewhere?
6    A.   No, I don't think so.
7    Q.   Here you go.
8    A.   Okay, thanks.
9    Q.   Have you ever seen PX12 before?
10    A.   Yes, I have.
11    Q.   At the top left of the first page in
12  brackets it says, "For release to the general public
13  proposed School Board Prayer Resolution," dated
14  8/30/04.  This is prepared by the Rutherford
15  Institute and the Neuberger firm?
16    A.   Yes.
17    Q.   Do you believe that you saw this document
18  for the first time at some point earlier than August
19  30, 2004?
20    A.   I don't recall.  I mean I don't recall
21  specific date.  I know I received this but I don't
22  know what the date was.
23    Q.   On August 24, 2004 at the Board meeting,
24  the Board referred the matter of the School Board

Page 96

1  prayer to the policy committee, do you recall that?
2    A.   I recall referring it to the policy
3  committee, yes.
4    Q.   At the August 23 executive session the
5  Board decided it couldn't make a decision on whether
6  to maintain or deviate its past practice.  In your
7  case because you wanted someone to tell you
8  definitively that the past practice was not legal or
9  not constitutional.  Dr. Hattier and Mr. Bireley
10  testified that they were looking for additional
11  legal advice on the issues presented by the School
12  Board prayer problem.
13    A.   Okay.
14    Q.   My first question to you is whether it was
15  you looking for definitive legal advice that the
16  practice was unconstitutional, or as Dr. Hattier and
17  Mr. Bireley said the Board was looking for
18  additional advice on the issue of First Amendment
19  prayer -- sorry, on the issue of in Dr. Hattier's
20  case First Amendment issues and in Mr. Bireley's
21  case on School Board prayer.  Was someone from the
22  Board designated to go get additional legal advice
23  on these issues?
24    A.   I don't recall anyone being specifically

Page 97

1  designated because I remember that there were a
2  couple of us who were checking into different
3  organizations.  Mr. Hastings had been looking on the
4  Internet for some organizations and I think like I
5  said I contacted two organizations ACLJ, is that the
6  Pat Robertson?
7    Q.   I don't know.
8    A.   And the Rutherford Institute.  And the
9  Rutherford Institute was the first one who responded
10  with the pro bono, if you will, and so I proceeded
11  that way.  I also remember receiving some
12  information I think at some point in time from
13  Mr. Hastings and a group that he had contacted, but
14  I don't recall the specific group.  So, was anyone
15  designated as the point man, if you will, I don't
16  recall that to be that way.
17    Q.   So, am I correct that several Board members
18  were acting on their own initiative to try to get
19  information on the issues?
20    A.   Well, I know I was.
21    Q.   All right, and you have personal knowledge
22  that Mr. Hastings was acting on his own initiative
23  to get some information?
24    A.   The best of my knowledge he was acting on

25 (Pages 94 to 97)

Dobrich, et al.                          v.            Indian River School District, et al.
Reginald Helms                  C.A. # 15-120 (JJF)              October 11, 2006

Page 98

1 his own.
2    Q.   Do you remember that Dr. Hattier was
3 contacting an organization, something called the
4 Alliance Defense Fund?
5    A.   I remember the Alliance Defense Fund was
6 mentioned. I'm not sure whether it was Dr. Hattier
7 or not, but I remember that fund, yes.
8    Q.   You said that Mr. Hastings obtained some
9 materials from an organization that you can't recall
10 the name of?
11   A.   Right.
12   Q.   Did he share those materials with the
13 Board?
14   A.   I believe he did.
15   Q.   Do you still have them?
16   A.   No, I don't.
17   Q.   Did the materials present legal advice on
18 the issue of School Board prayer?
19   A.   No, I think it was basically Mr. Hastings
20 had contacted them and they sent a letter back
21 saying that they might be willing to take the case
22 but they needed the particulars or whatever. There
23 was no legal advice or anything like that.
24   Q.   Was that followed up on, did anyone send

Page 99

1 them the particulars?
2    A.   I don't believe it was. Not to my
3 knowledge.
4    Q.   And when you contacted the Rutherford
5 Institute you got a reply from them you said?
6    A.   Yes, I did.
7    Q.   Again to try to pinpoint in time, was that
8 before or after the August 23, August 24 meetings?
9    A.   I know I look like, I don't know, I don't
10 have a very good memory but --
11   Q.   Not at all?
12   A.   Dates are not my thing. I can't recall
13 specifically. My wife has trouble with me as far as
14 memory is concerned.
15   Q.   Well, let me show you, and I think you have
16 this one in front of you, it's PX34. That would be
17 near the bottom of the stack?
18   A.   Okay, thank you.
19   Q.   The handwriting on the first page of PX34
20 is yours, is that correct?
21   A.   That's correct.
22   Q.   And this is a fax that you sent to
23 Mr. Walls, according to the fax line at least, on
24 September 2, 2004 at 3:28 in the afternoon, is that

Page 100

1 right?
2    A.   Yes.
3    Q.   Is that your phone number 436-7576?
4    A.   That's my fax number, yes.
5    Q.   And do you recall sending this material to
6 Mr. Walls?
7    A.   Yes, I do.
8    Q.   Did you send it to each of the Board
9 members?
10   A.   As I recall I don't think so, I think I
11 just sent it to Mr. Walls, I'm not sure.
12   Q.   I hope that this will help you pinpoint the
13 point in time when you contacted the Rutherford
14 Institute?
15   A.   Right.
16   Q.   It had to have been before September 2nd?
17   A.   It had to have been before September 2nd.
18   Q.   Did you receive this material from the
19 Rutherford Institute or from the Neuberger Firm?
20   A.   As I recall I received this from Mr.
21 Neuberger.
22   Q.   And can you tell me how far in advance of
23 your transmitting it to Mr. Walls you got it from
24 Mr. Neuberger?

Page 101

1    A.   No, not unless there is a date somewhere
2 that tells me. I don't recall how soon I received
3 this.
4    Q.   Did you send it to Mr. Walls because he was
5 head of the policy committee?
6    A.   I believe I sent to Mr. Walls because he
7 was president.
8    Q.   He was also the head of the policy
9 committee?
10   A.   Yes, he was.
11   Q.   As of April 24 the matter of School Board
12 prayer had been given to the policy committee, does
13 that suggest to you that you sent it to Mr. Walls in
14 his capacity as head of the policy committee?
15   A.   No. As I recall I sent it to Mr. Walls
16 because he was the president and my intent was here
17 look at this see what you think whether up want to
18 present this to the full Board.
19   Q.   Let me ask you a question?
20   A.   Okay.
21   Q.   Would it be your practice if you got
22 something from somebody like Mr. Neuberger to review
23 it promptly? I mean you wouldn't let it sit on your
24 desk for a week, would you?

26 (Pages 98 to 101)

Dobrich, et al.                                v.              Indian River School District, et al.
Reginald Helms                        C.A. # 15-120 (JJF)                      October 11, 2006

Page 102

1   A.  **Oh, definitely not a week no.**
2   Q.  24 hours you'd take a look at it?
3   A.  **Probably so.**
4   Q.  Once you had looked at it, is it your
5   expectation that you would have sent it promptly to
6   Mr. Walls?
7   A.  **Within a day or so I would say yes.**
8   Q.  So, is it reasonable to assume that you got
9   this material from Mr. Neuberger within three or
10  four days of the date you sent it to Mr. Walls?
11  A.  **Yes.**
12  Q.  So, with that in mind can we reconstruct
13  the sequence that on August 23 and August 24 you did
14  not have this material, that you received it at some
15  point between August 23 and August 24 and then
16  resent it to Mr. Walls on September 2nd?
17  A.  **I don't recall specifically but that would**
18  **be a reasonable assumption, but I don't recall.**
19  Q.  Let me take one other effort at this?
20  A.  **Okay.**
21  Q.  If you look at page, it's the one that has
22  717, at the lower right-hand corner BPD717?
23  A.  **Okay.**
24  Q.  It's the first substantive paragraph above

Page 103

1   the numbered paragraphs on that page. You'll see it
2   says, "Thus it is the opinion of legal counsel that
3   the Supreme Court's decision in Marsh v. Chambers,
4   which unlike the Coles decision, is binding
5   precedent in Delaware, compels the conclusion that
6   the Indian River School District's tradition of
7   opening its meetings with a brief invocation is
8   constitutionally permissible."
9   A.  **I see that paragraph.**
10  Q.  And do you remember getting advice like
11  that from Mr. Neuberger?
12      MR. GOSSELIN:  Objection,
13      don't answer that.
14  Q.  Well, you got this piece of paper from
15  Mr. Neuberger, right?
16  A.  **Did I receive this from Mr. Neuberger?**
17  Q.  Yes.
18  A.  **Yes.**
19  Q.  When you read that paragraph did you
20  understand that Mr. Neuberger and the Rutherford
21  Institute were giving you legal counsel's opinion
22  that the Indian River School District's tradition of
23  opening it's meetings with a brief invocation is
24  constitutionally permissible?

Page 104

1   A.  **From my conversations with Mr. Whitehead --**
2   Q.  Let me ask you to answer my question first.
3       MR. GOSSELIN:  I want him to
4       answer the question. I don't want you to
5       argue at some point in the future that
6       we've waived the attorney/client privilege
7       with respect to Mr. Neuberger. I don't
8       know if we can agree to that or not?
9       MR. ALLINGHAM:  I can't, I'm not
10      going to agree to permit you to have the
11      witness answer one question or not.
12      MR. GOSSELIN:  Then I instruct him
13      not to answer. I'm trying to let you get
14      through this.
15  Q.  The statement that is made, that I just
16  read to you, in your opinion would that be
17  sufficiently definitive to enable you to form a view
18  as to whether the Board's practice was
19  constitutional or unconstitutional?
20  A.  **It helped me arrive at my opinion that what**
21  **we were doing was okay, if that's what you're**
22  **asking. I mean, in other words, I made a statement**
23  **earlier that somebody would have to show me where**
24  **it's unconstitutional and listening to this, or**

Page 105

1   **reading this, I felt as though we were within our**
2   **rights to continue.**
3   Q.  Yeah, and my question was so far from
4   demonstrating to you that your existing practice was
5   unconstitutional this document tells you without
6   equivocation that your existing tradition was
7   constitutional, correct?
8   A.  **Well, I don't know how to explain it other**
9   **than what I just said. I'm not going to say to you**
10  **that -- in my opinion this told me that what we were**
11  **doing was permissible, so, why stop? Continue until**
12  **somebody comes in and tells the Indian River School**
13  **District and Reggie Helms you're illegal, what you**
14  **are doing is unconstitutional and you need to stop.**
15  **And at that point in time as a law abiding citizen**
16  **we will stop.**
17      Did you ever have a conversation with
18  Mr. Whitehead at the Rutherford Institute?
19  A.  **Yes.**
20  Q.  How many such conversations?
21  A.  **As I recall three to five, not many.**
22  Q.  Over the course of how long a period?
23  A.  **Maybe a month or so.**
24  Q.  And was that around the time of this

27 (Pages 102 to 105)

Dobrich, et al.                  v.                   Indian River School District, et al.
Reginald Helms          C.A. # 15-120 (JJF)               October 11, 2006

Page 106

1  memorandum?
2    **A.  As I recall I had a conversation with**
3  **Mr. Whitehead before this and then after this I had**
4  **a few more conversations with him.**
5    Q.  Tell me what you recall was the substance
6  of your conversation before this memorandum with
7  Mr. Whitehead?
8            MR. GOSSELIN:  Objection,
9    don't answer that.
10         MR. ALLINGHAM:  Attorney/client
11    privilege?
12         MR. GOSSELIN:  Yes.
13    Q.  Tell me the substance of your conversations
14  with Mr. Whitehead after you received this document?
15         MR. GOSSELIN:  Objection, don't
16    answer that. Again, is there a good faith
17    basis --
18         MR. ALLINGHAM:  I need to make a
19    record, Jason, come on, I am going
20    quickly.
21         MR. GOSSELIN:  You're
22    wasting time.
23         MR. ALLINGHAM:  I don't think
24    so.

Page 107

1    Q.  You testified earlier that you weren't sure
2  whether Mr. Neuberger represented you in connection
3  with this litigation. I think you also testified
4  that you weren't sure whether Mr. Neuberger
5  represented you generally. Let me ask the same
6  question with respect to the Rutherford Institute,
7  have you ever been represented by the Rutherford
8  Institute?
9         MR. GOSSELIN:  Objection.
10    Well, he can answer that question but -- I
11    will let him answer the question and I will
12    decide if I need to object to any follow-up
13    questions.
14    Q.  That seems fair. Have you ever been
15  represented by the Rutherford Institute?
16    **A.  I'd have to review the document that I**
17  **signed. I'm not sure whether the Rutherford**
18  **Institute and Tom Neuberger are one of the same or**
19  **not, I'm not sure.**
20    Q.  You referred to the document earlier. You
21  signed some document that in your mind established
22  some kind of relationship with Mr. Neuberger and
23  maybe with the Rutherford Institute, correct?
24    **A.  Yes.**

Page 108

1         MR. ALLINGHAM:  I call for its
2    production and I won't ask anymore
3    questions about this business.
4         MR.GOSSELIN:  You'll send me a
5    letter?
6         MR. ALLINGHAM:  I will.
7         MR. GOSSELIN:  I'll respond to
8    it.
9    Q.  Do you know who drafted the -- and if you
10  look at Exhibit 9, which is in the pile in front of
11  you, it's the Board Policy itself?
12    **A.  No, I don't have it.  Yes.**
13    Q.  Got it?
14    **A.  Yes.**
15    Q.  In order to cut things short I'm just going
16  to represent to you that is the School Board Prayer
17  Policy adopted on October 19th?
18    **A.  Yes.**
19    Q.  Who drafted that policy?
20    **A.  The best of my knowledge this was a product**
21  **of the policy committee.**
22    Q.  Do you know on what the policy committee
23  based its drafting process?
24    **A.  Not specifically, no.**

Page 109

1    Q.  Do you understand that the Rutherford
2  Institute contributed to that process?
3    **A.  All I can testify is that I sent this to**
4  **Mr. Walls and as you can see it may have been, I**
5  **don't know specifically that he did.**
6    Q.  Well, if you look at the page of the
7  Rutherford Institute and Neuberger memorandum that I
8  was looking at earlier, at the bottom it has one,
9  two and three and on the next page it has four and
10  five?
11    **A.  Right.**
12    Q.  You can recognize without comparing it word
13  by word that it's virtually verbatim to the final
14  policy as adopted?
15    **A.  That's why I'm saying you can see, but do I**
16  **have knowledge that that's what they based it on,**
17  **nobody told me that but as you can see.**
18    Q.  Did the memorandum of the Rutherford
19  Institute and the Neuberger Firm, which constitutes
20  PX34, form part of the consideration that you took
21  into account in voting to adopt Board Policy BDA.1
22  the School Board Prayer Policy?
23    **A.  Yes.**
24    Q.  Did any other Board member tell you that it

28 (Pages 106 to 109)

Dobrich, et al.                                   v.              Indian River School District, et al.
Reginald Helms                          C.A. # 15-120 (JJF)                       October 11, 2006

Page 110

1   formed an important part of their consideration of
2   the consideration that they took into account in
3   voting for adoption of the Board Prayer Policy?
4   A.   No, they didn't, they didn't say that.
5   Q.   Look at Exhibit 9, please?
6   A.   Okay.
7   Q.   And I'm going to ask you Mr. Helms just to
8   take a minutes to read through the policy?
9   A.   Sure.
10  Q.   Ready?
11  A.   Yes.
12  Q.   What in your mind was the purpose of
13  offering -- is the purpose of opening the Board's
14  meetings with a prayer or a moment of silence?
15  A.   Exactly what it says.
16  Q.   To solemnify the proceedings?
17  A.   Yes. To me the work that we do is very
18  important. We have the best interests of our
19  students, our staff, and our district and I think
20  any time you enter into important work, if you will,
21  of this nature, that in my way of thinking you
22  should invoke the wisdom and guidance of a higher
23  power, if you will, whatever you see that to be.
24       But I think that this simply says that we

Page 111

1   are asking for wisdom and guidance to make good
2   sound decisions.
3   Q.   And the means of solemnifying the
4   proceedings specified in the Board policy are two,
5   is that correct? One is to offer a prayer and the
6   other is to offer a moment of silence?
7   A.   As I see there are two mentioned, prayer
8   and moment of silence.
9   Q.   And am I correct that the Board policy
10  authorizes Board members to open the meeting at the
11  invitation of the Board president and on a rotating
12  basis that's specified here, with the limitations
13  that are specified, in one of two ways and only one
14  of two ways, a prayer or a moment of silence?
15  A.   Well, I'll speak to that issue like this.
16  Your definition of a prayer and my definition of a
17  prayer may be two separate things. Therefore, I
18  know that there are some Board members who have
19  opened the meeting with something that they received
20  from the Internet which may be from George
21  Washington or Thomas Jefferson or whatever. There
22  have been some Board members that pray simply as
23  they are led.
24       In other words, there is nothing written,

Page 112

1   it's just something that they do. We've had Board
2   members that have requested a moment of silence.
3   Although there are only two mentioned here I think
4   the leeway is that whatever you feel as an
5   individual that you want to do, then that's what
6   we've been doing.
7        So, although the policy mentions prayer and
8   a moment of silence, there have been other occasions
9   where people have read something from the Internet
10  and simply that is to just like it says here, it's a
11  very important job that we have, we have over 7000
12  students, and staff and whatever. It's a
13  responsibility that I don't take lightly, and for
14  myself I would love to have someone giving me wisdom
15  and guidance and in my case it's my Heavenly Father.
16       Well, in your case it may be something
17  different and some other Board member it maybe a
18  different way. However, that is the intent as I see
19  it. My feeling.
20  Q.   Let me ask you a question about whether --
21  I'm going to give you a hypothetical practice and
22  ask you whether in your judgment it would accord
23  with the policy. I'd like you to imagine a
24  hypothetical Board member who is an atheist. A very

Page 113

1   serious Board member, and a conscientious Board
2   member, and one who takes his duties extremely
3   seriously works very hard as I think most of your
4   board members do at their duties, and when the time
5   comes for rotationally for that member to solemnify
6   the proceedings, he looks into the audience and at
7   his fellow Board members and says I would like to
8   make it clear that I am not resorting to a higher
9   power in making the decisions that I seek to make
10  today, and that I do not believe in a higher power.
11       That in fact I think it is a waste of time
12  to appeal to a higher power, but I would like to say
13  that I think it is critically important for all of
14  us to undertake our responsibilities judiciously,
15  solemnly, seriously and to the absolute best of our
16  abilities. And that's the statement I'd like to make
17  to solemnize the proceedings. Would that be
18  consistent with the Board policy?
19  A.   I don't know why it would be inconsistent
20  and I would say in my opinion he is entitled to his
21  opinion, and if that's the way he wants to approach
22  it that's fine.
23  Q.   Okay, so that statement would not in your
24  view violate this Board policy?

29 (Pages 110 to 113)

Dobrich, et al.                                    v.              Indian River School District, et al.
Reginald Helms                        C.A. # 15-120 (JJF)                        October 11, 2006

Page 114

1    A.   In my opinion I don't see how it would, but
2    however I'm not a legal mind, I don't know.  To me
3    it means when it's your turn then it's your turn.
4        Q.   And you can say whatever you want?
5        A.   You can say whatever you want, but, you
6    know, there has to be some constraints, and that
7    goes back to whether you cause disruption or if you
8    want to threaten someone, you know, that type of
9    thing.  But I mean if somebody wanted to say you
10   know it's my turn to open up this meeting and I want
11   everybody here to realize that I don't believe in a
12   higher power, and I'm not going pray for wisdom and
13   guidance, that's fine.  That's fine.
14       I mean, am I going to say you can no longer
15   say anything in this opening of this meeting, I'm
16   not going to say that.  Personally, that's my
17   opinion.
18       Q.   Is there any reason why the only two means
19   of solemnifying the proceedings mentioned in this
20   policy are a prayer or a moment of silence?
21       A.   I don't know the answer to that question.
22       Q.   Is the policy – I take it from your
23   answers that your understanding of the policy is
24   that it is not meant to exclude any method of

Page 115

1    solemnizing the proceedings as long as that method
2    is respectful and courteous?
3        A.   That would be my opinion, yes.
4        Q.   Have you ever discussed that issue with
5    anyone?
6        A.   No.  Not -- well, let me say that not that
7    I can recall.
8            MR. GOSSELIN:   Excluding
9    attorneys.
10       A.   Yeah.  Well, I'm not sure whether we had
11   that discussion or not, I can't recall.
12       Q.   Would you agree with me that a moment of
13   silence is effective to secure the purpose of this
14   policy which is to solemnify the proceedings?
15       A.   I would agree that it could be a form of.
16   I mean it's your choice.  You want a moment of
17   silence you know to take a moment to reflect,
18   whatever then yeah.
19       Q.   Is PX36 in front of you?
20       A.   Yes, it is, this one?
21       Q.   Did you review this document before it was
22   released?
23       A.   I don't recall.  Before it was released,
24   you mean in the newspaper or to us --

Page 116

1        Q.   Well –
2        A.   To us or --
3        Q.   Well, it's structured at least as a press
4    release, you see it says August 19, 2004 for
5    immediate release?
6        A.   Okay, I see that.  I don't recall.  I
7    remember reading about this, but I can't remember
8    when I saw it.
9        Q.   So, this is dated August 19, 2004 and
10   you'll see a little less than half down the page a
11   sentence.  Actually two sentence paragraph that
12   says, "So one member of the Indian River School
13   Board has asked the Rutherford Institute in Virginia
14   for help in standing up to the ACLU. That was vice
15   president Reginald Helms?"
16       A.   Yes, I recognize that.
17       Q.   Can we now establish that you spoke to the
18   Rutherford Institute at some time before August 19,
19   2004?
20       A.   I would say that'd be safe to say, yes.
21       Q.   Did you in fact ask the Rutherford
22   Institute for help in standing up to the ACLU?
23       A.   I don't know if I put it in those specific
24   terms, but I said would you be willing to help us in

Page 117

1    our prayer case, I know I said that.  I don't know
2    if I said stand up to the ACLU or, but I did say we
3    needed some help, would you be willing to help us.
4        Q.   This document has a fax line reflecting
5    that it was sent by the Neuberger firm on August 19,
6    2004 at 9:31 in the morning --
7        A.   Okay.
8        Q.   -- the 655-9329 number I believe, I can't
9    represent for sure, is a Neuberger firm fax number.
10   It's not in any case a number that's connected to
11   you in any way, is it?
12       A.   I don't think.
13       Q.   Do you remember getting a copy of this
14   press release by fax?
15       A.   I remember getting a copy of this. I'm not
16   sure if it was in the mail or by fax, but I remember
17   getting a copy of this.
18       Q.   My question to you is the last piece of
19   information in the fax line is that it is page four
20   of four?
21       A.   Okay.
22       Q.   Do you see that?
23       A.   Yes.
24       Q.   Do you know what the first three pages

30 (Pages 114 to 117)

Dobrich, et al.                          v.                Indian River School District, et al.
Reginald Helms                  C.A. # 15-120 (JJF)                      October 11, 2006

Page 118

1  were?
2  **A.  No. I mean I don't recall. I may have**
3  **known it at some time but I don't recall.**
4  Q.   Whenever you received a copy of this press
5  release did you retain your copy?
6  **A.  I think so.**
7  Q.   So, if you received a copy of this press
8  release it would still be in your Board files?
9  **A.  I can't say for sure, but maybe.**
10  Q.   Is it the case that you have tried to keep
11  materials relating to this issue that you have
12  received in connection with your School Board
13  service?
14  **A.  I have tried to retain all the information**
15  **that I received from Mr. Neuberger.**
16  Q.   How about from Messers Balliger and
17  Cafferty?
18  **A.  I don't know if I kept that or not. I**
19  **don't know if I turned that in or I have not made a**
20  **specific -- I don't know whether I have or not.**
21  Q.   And did you keep the materials that you
22  received on these issues from Mr. Griffin?
23  **A.  I don't know, I have to look. It's been a**
24  **while ago I'm not sure whether I kept all that or**

Page 119

1  not.
2  Q.   I'm going to close this up now, but let me
3  just ask you a couple of final questions?
4  **A.  Sure.**
5  Q.   Do you -- to the extent that you have
6  retained materials relating to this issue, is there
7  a particular place in your house or office or garage
8  or attic or where ever that you know that you have
9  kept those materials?
10  **A.  Yes.**
11  Q.   Where would that be?
12  **A.  In my file cabinet.**
13  Q.   Is that at your house?
14  **A.  Yes.**
15  Q.   Do you have what amounts to a Board file?
16  **A.  It's a Neuberger file. Everything that I**
17  **testified from Mr. Neuberger I put in this one file.**
18  Q.   And do you know whether you have similar
19  files, a Griffin file and a --
20  **A.  No, I don't.**
21  Q.   Okay. If you had retained any materials
22  from Griffin or Balliger and Cafferty or any other
23  lawyer if you retained those would they be a Board
24  file?

Page 120

1  **A.  They would probably have been in a Board**
2  **packet, and I have some packets, but I can't say**
3  **that they would specifically be in that packet, I'm**
4  **not sure.**
5  Q.   And some of those packets have notes on
6  them and some of them don't, is that correct?
7  **A.  That's true.**
8  Q.   Did you turn over all those packets to
9  Mr. Gosselin or his associates?
10  **A.  I went through and tried to turn in all the**
11  **notes. As I recall I tried to turn in all the notes**
12  **that I had, but I can't recall what all that was. I**
13  **just put that in a folder and give it to Mrs. Herd.**
14        MR. ALLINGHAM:  I am going to
15     adjourn the deposition for the evening,
16     largely in deference to David. We can go
17     off the record.
18        MS. DUPHILY:  We are going off the
19     record at approximately 6:30 p.m..
20        (WHEREUPON the deposition was
21     adjourned for the evening)
22        MS. DUPHILY:  Continuation of the
23     videotape deposition of Mr. Reggie Helms,
24     we are going back on the record on October

Page 121

1  12, 2006 at approximate 9:06 a.m..
2  Q.   Good morning, Mr. Helms.
3  **A.  Good morning.**
4  Q.   We concluded last night at 6:30 or so.
5  Between then and now have you had occasion to speak
6  to anybody about your testimony yesterday?
7  **A.  Very brief with Jason on the phone last**
8  **evening.**
9  Q.   And what did you say to him?
10        MR. SHAW:  I'm going to object to
11     that question as attorney/client privilege.
12     You can establish as to whether or not he
13     spoke with Jason but not the context of
14     that conversation.
15  Q.   My question was did you discuss your
16  testimony with anyone. I'm not talking about a
17  conversation with Mr. Gosselin about the weather or
18  about scheduling the resumptions today or anything
19  like that. My question was did you discuss the
20  substance of your testimony with anyone? Did you
21  have such a conversation with Mr. Gosselin?
22  **A.  Are you talking about specifics?**
23  Q.   Sure.
24  **A.  No, it was just in general.**

31 (Pages 118 to 121)

Dobrich, et al.                          v.                Indian River School District, et al.
Reginald Helms              C.A. # 15-120 (JJF)                      October 11, 2006

Page 122

1  Q.   When you say that you discussed your
2  testimony in general, did you ask Mr. Gosselin or
3  did Mr. Gosselin ask you any questions about what
4  you said in response to my questions yesterday?
5  **A.   No.**
6  Q.   Did you discuss with Mr. Gosselin or did
7  Mr. Gosselin discuss with you questions that might
8  arise during the deposition today?
9         MR. SHAW: I'm going to continue to
10        object. You are asking him questions that
11        are privy to attorney/client privilege.
12        MR. ALLINGHAM:  The Delaware rule
13        is that once a witness is on
14        cross-examination in a deposition the
15        lawyers are prohibited from speaking to the
16        witness on any matter of substance relating
17        to the testimony or the deposition. I can
18        call the judge if you want me to, but
19        that's the rule and when that rule is
20        breached -- it may not have been
21        breached, I don't know what the substance
22        of these conversations was, it may be that
23        they talked about the weather, but if that
24        rule is breached then I am entitled to know

Page 123

1  precisely what was said.
2         So, I want to explore whether the
3  rule was breached. I haven't asked any
4  question about what question was
5  anticipated or what answer was suggested,
6  if in fact any answer was suggested. But
7  I'm entitled to probe whether the Delaware
8  rule was violated.
9         MR. SHAW: I'm entitled to raise
10        the attorney/client privilege in relation
11        to those conversations.
12        MR. ALLINGHAM:  Could you mark the
13        transcript, please. And when we take a
14        break we will call the judge.
15  Q.   Apart from Mr. Gosselin did you speak to
16  anyone else between 6:30 last night and this morning
17  about your testimony?
18  **A.   No.**
19  Q.   Mr. Helms, have you prayed for divine
20  guidance in connection with your testimony on this
21  deposition?
22  **A.   Yes.**
23  Q.   How did you do that?
24  **A.   It might help me if you kind of explain**

Page 124

1  **that. I just pray like I normally do. Just to help**
2  **me to recall the things I need to recall, just, you**
3  **know, that sort of thing.**
4  Q.   I wasn't meaning to trample on your
5  privacy, I was trying to get at not the substance of
6  the prayer but the way you did it, how you did it,
7  where you were, do you recall?  Was it yesterday
8  morning, for example?
9  **A.   Actually let me say this, the scriptures**
10 **that I read says that you should be in a constant**
11 **attitude of prayer. So, I pray many times a day, it**
12 **could be at work, driving down the road in my car,**
13 **coming here this morning. I mean there is -- it's**
14 **just not one time a day, although in the morning**
15 **when you know it would be the type of thing thank**
16 **you for another day and be with me and the family,**
17 **that sort of thing.**
18 Q.   Thank you, that's helpful.
19        Am I right in thinking that based on what
20 you just told me that there are times during the day
21 when you offer a private prayer for divine guidance?
22 **A.   Sure, yes.**
23 Q.   For example, during the deposition
24 yesterday on a break, or when I was fumbling around

Page 125

1  for my papers or something, did you from time to
2  time ask for divine guidance?
3  **A.   Not as I recall, no, I didn't.**
4  Q.   Just before the deposition, correct?
5  **A.   Right.**
6  Q.   In whatever form that the prayer took was
7  it offered privately or publicly?
8  **A.   I think you could say it was privately. I**
9  **don't think anyone was around.**
10 Q.   As you understand it, Mr. Helms, you don't
11 feel that the effectiveness of a prayer for divine
12 guidance is undermined in any way by the fact that
13 it's offered privately, do you?
14 **A.   I don't think prayer is undermined if**
15 **that's your word by anything, whether it's openly or**
16 **it's privately. I think as people pray in whatever**
17 **way they pray I don't think it's undermined by**
18 **anything except, I don't know if you want to hear**
19 **this or not, but I do as I read my scriptures it**
20 **says that I'm not sure that God hears the prayer of**
21 **a sinner.**
22        **There is a sinner's prayer that is referred**
23 **to, and so I would say to you I don't think anything**
24 **undermines that except that scriptures say God hears**

32 (Pages 122 to 125)

Dobrich, et al.                                    v.           Indian River School District, et al.
Reginald Helms                              C.A. # 15-120 (JJF)                      October 11, 2006

Page 126

1  the prayers of his children and that sort of thing.
2  So, but whether it's openly or whether it's
3  privately I don't think that undermines it.
4      Q.   Let me make sure that I understand what you
5  just told me?
6      A.   Okay.
7      Q.   If the person offering the prayer is in a
8  condition such that God will hear him, not a sinner?
9      A.   Okay.
10     Q.   Or sinner having been forgiven, if the
11  prayer is in an appropriate state, it's your belief,
12  Mr. Helms, that God would hear his prayers however
13  and in whatever form the prayer is offered?
14     A.   I believe that to be true, whether it's
15  openly or privately.
16     Q.   Silently or out loud?
17     A.   Yes.
18     Q.   Eloquently or haltingly?
19     A.   Exactly.
20     Q.   And one can use a traditional prayer that
21  we all might know, or one can use one's own words?
22     A.   Exactly.
23     Q.   And it doesn't matter whether we're in
24  church or in the supermarket when we offer our

Page 127

1  prayer?
2      A.   No, yes.
3      Q.   If we are in the right state, if we are in
4  a state of grace where ever and however we seek
5  God's help God will hear us?
6      A.   That is my belief.
7      Q.   But, would I be right in understanding that
8  that's one of the principle messages of faith in
9  your view?
10     A.   That God hears our prayer?
11     Q.   Yes.
12     A.   Yes.
13     Q.   And hears our prayers wherever and however
14  we offer them?
15     A.   Yes.
16     Q.   You are married, Mr. Helms?
17     A.   Yes, I am.
18     Q.   And you have -- I recall we had a
19  conversation, you have children but I don't remember
20  how many?
21     A.   I have three, two boys and a girl.
22     Q.   And you work at a job or have a business to
23  support your family?
24     A.   I'm retired from the power company in

Page 128

1  Delaware, used to be Conectiv however they asked me
2  to come back from time to time to help out on
3  different jobs. So, I'm retired but I go back as a
4  consultant from time to time.
5      Q.   I think I asked you yesterday you attend
6  church regularly?
7      A.   Yes.
8      Q.   For your spare time what do you do, what do
9  you like to do?
10     A.   Well, in my spare time --
11     Q.   Assuming you have some?
12     A.   Which I don't have too much of, I enjoy, we
13  travel a little. I used to play golf, I haven't
14  played this year. I don't have a lot of hobbies
15  cause I don't have that much spare time. That's
16  about it.
17     Q.   And in all those roles and activities
18  husband, father, consultant to Conectiv, golfer,
19  traveler, whatever, all of those activities as one
20  of the 250 or more million citizens of the United
21  States, you don't need a Board policy to ensure that
22  you're free to exercise your right to practice your
23  faith as you see fit, do you?
24     A.   I didn't think I did.

Page 129

1      Q.   You sought divine guidance for your efforts
2  in all those roles as father and husband and so
3  forth before October 19, 2004, and you sought divine
4  guidance for your roles in the same way after
5  October 19, 2004, isn't that correct?
6      A.   Yes.
7      Q.   And however you choose to practice your
8  faith in those roles as a private citizen you are
9  not acting as a governmental official when you pray
10  at home or pray in church or pray in the
11  supermarket, do you?
12     A.   No.
13     Q.   And no one observing you pray in those
14  roles, in church, at home, in the supermarket,
15  whatever on the golf course, would have any reason
16  to think that you were praying as a government
17  official, would they?
18     A.   I don't know. All I can say if I saw
19  someone praying in the supermarket I wouldn't
20  automatically assume that they are a government
21  official. I mean I don't know how people -- all I
22  can say is people in this area know me and know my
23  life and know what I do.
24          I don't know if they look at me I say

33 (Pages 126 to 129)

Dobrich, et al.                            v.                    Indian River School District, et al.
Reginald Helms                    C.A. # 15-120 (JJF)                        October 11, 2006

Page 130

1    whether well there is someone on the School Board
2    over there praying how about that. I don't know
3    what they are thinking. So, I don't know how to
4    answer that other than to say that if I observed
5    someone praying in a, on a golf course or whatever,
6    I would not automatically assume that they were or
7    were not a government official.
8        I don't know what the other people think.
9    Q.    Now, when you walk out on the stage in your
10   role as an elected School Board member, you are
11   acting as a government official, isn't that right?
12   A.    Yes.
13   Q.    And the people in the audience understand
14   that when you walk out there and take your seat you
15   are performing your function as a government
16   official?
17   A.    I don't know that to be true because there
18   is a lot of people that don't understand things of
19   this nature. I mean, in other words, when you say
20   do they understand, they know I'm on the School
21   Board, but I don't know if they understand all of
22   the legislative things, and the legalities of all
23   those things. They do understand that I am on the
24   local School Board and I am acting on behalf of the

Page 131

1    local School Board, yes.
2    Q.    And they know that when you walk out onto
3    the stage at 7:30 and take your seat you are there
4    because you are a School Board member?
5    A.    That's correct.
6    Q.    And it's your belief that the members of
7    the audience understand that?
8    A.    They understand that I'm a School Board
9    member, yes.
10   Q.    And the students understand that as well?
11   A.    I would assume so.
12   Q.    Now, I have either minutes or tapes of
13   meetings on February 22, 2005, October 18, 2005,
14   December 13, 2005, February 28, 2006, May 23, 2006
15   and a few weeks ago on September 26, 2006 of Board
16   meetings at which you have been invited to, and have
17   accepted the invitation to open the meeting with a
18   prayer. I'm not asking you to confirm the dates,
19   I'm just -- those are the meetings that I have. We
20   can show that, we don't have to fight about it?
21   A.    Right.
22   Q.    When you bow your head and pray for divine
23   guidance at those School Board meetings, you
24   understand that the public including the students at

Page 132

1    the meetings understand that you are praying for
2    guidance in the performance of your role as a
3    government official?
4    A.    There again, I don't know how they see it.
5    I can only speak for myself. If I were in the
6    meeting as part of an invited guest or whatever --
7    Q.    Sure.
8    A.    And someone on the School Board were to bow
9    their head and pray, then I would say that's a
10   School Board member praying. I don't know how the
11   public, I can't speak for them, I don't know.
12   Q.    Let me ask a little bit more generalized
13   question?
14   A.    Okay.
15   Q.    It certainly would not be unreasonable to
16   assume that members of the audience would understand
17   that you were praying as a School Board member for
18   divine guidance in the performance of your roles
19   that night as a School Board member?
20   A.    I think that would be a fair assumption,
21   that they would, yeah.
22   Q.    Now, this is a little bit different way of
23   looking at something I asked you a few minutes ago,
24   but it's not your view, is it, that the only way you

Page 133

1    can seek divine guidance for your work as a Board
2    member is by saying a prayer out loud on the stage
3    in the name of Jesus Christ at the Board meeting?
4    A.    No, that is not the only way.
5    Q.    You could pray for divine guidance off
6    stage in what I guess would be the wings of the
7    stage right before you walk on?
8    A.    Well, as I said before you can pray
9    anywhere.
10   Q.    Or after you walk on you could offer a
11   silent prayer in your head for divine guidance?
12   A.    Sure.
13   Q.    You could invite those present with you to
14   join you in a moment of silence as a way of seeking
15   divine guidance, is that correct or not correct?
16   A.    Yes, you could do that.
17   Q.    And those methods of seeking divine
18   guidance are no more or less effective in your
19   understanding of one's relationship with God, no
20   more or less effective than a public prayer out loud
21   would be?
22   A.    As I stated before I think God hears your
23   prayers whether it's openly or privately. And the
24   only thing I would say is that could you do it in

34 (Pages 130 to 133)

Dobrich, et al.                                    v.                    Indian River School District, et al.
Reginald Helms                           C.A. # 15-120 (JJF)                        October 11, 2006

Page 134

1 the wings, yes, could you do it silently, yes, but
2 as far as I know we're still allowed to do it
3 openly, so if I were to choose to do it openly I
4 hope I would continue to have the right to do so.
5      But God would hear my prayer whether it was
6 silent, whether it was openly, whether it was in my
7 vehicle, or whether I was on stage. God would hear
8 my prayer.
9      Now, how effective the prayer is only He
10 can determine that, but I believe He hears my prayer
11 and answers according to His will, but I think
12 that's why we are here. I'm certainly very hopeful
13 that there doesn't come a time where someone says to
14 me you cannot pray openly. I hope that never
15 happens in this United States.
16      Q.   Everyone's memory is not perfect, but would
17 you think it's fair to say that for every single
18 Board meeting that you've attended as a Board member
19 you have asked for God's help in performing your
20 duties at that meeting?
21      A.   I would say almost every one, sure. I
22 don't know if it would be -- like I told you
23 yesterday I don't use words like never and all, but
24 I would say that it's safe to say that yes for the

Page 135

1 most part.
2      Q.   And that would include regular meetings and
3 special meetings?
4      A.   Yes.
5      Q.   And so would you describe for me how you
6 have, if you can recall, how you have asked for
7 divine guidance before special meetings of the
8 Board?
9      A.   Typically we receive an agenda, and on that
10 agenda will be certain items, and I just simply ask
11 the Lord to help me make good sound decisions that
12 will be for the good of the district and the staff
13 and the students, and ask his blessings on whatever
14 decisions are made. That type of thing.
15      Q.   And that -- because we know that public
16 prayers are not offered at special meetings, that
17 would be a private prayer?
18      A.   That would be private, although I would say
19 there have been other meetings besides regular
20 meetings that prayer has been open, the meeting has
21 been started with an open prayer. As a matter of
22 fact, there were several negotiation meetings where
23 I was asked by the association on the other side of
24 the table if I would open the meeting with prayer.

Page 136

1      So, there have been other meetings besides
2 regular meetings that have been opened with prayer
3 that I have been sitting in on --
4      Q.   Yes --
5      A.   -- but not every one.
6      Q.   Yes, sir. I was following up on your
7 testimony and also that of Mr. Bireley and Dr.
8 Hattier, that it is not the practice of the Board to
9 open special meetings with a prayer, and that's
10 correct, isn't it?
11      A.   That's correct, although over the years
12 that I've been on there some have, but it would be
13 out of the ordinary.
14      Q.   Yes, sir. And so setting aside the out of
15 the ordinary special meetings where someone offered
16 a public prayer, when you asked for divine guidance
17 you did so privately?
18      A.   Yes.
19      Q.   Let me ask you this, before any special
20 meeting have you ever gotten together with, just
21 said to one or more of your fellow Board members,
22 you know, before we start let's offer up a prayer
23 for guidance? Not as a formal matter, but inside of
24 purely private prayer have you invited someone to

Page 137

1 join you in a prayer?
2      A.   I don't recall any specific instances where
3 I did, no.
4      Q.   We have, I don't know half a dozen examples
5 of meetings at which executive sessions have
6 occurred before the prayer to open the meeting has
7 been offered. I don't know why that occurred, but
8 the minutes show that there is an executive session
9 and then the junior ROTC would offer the colors and
10 the prayer would be offered.
11      Am I correct that it would be your
12 expectation that where a prayer was not offered
13 publicly before you start the executive session, you
14 would ask, you yourself, would ask for divine
15 guidance for your decisions to be made in that
16 executive session?
17      A.   I think it would be safe to say usually
18 before any of the meetings take place that I would
19 ask for God to help me, and to bless whatever, and
20 that would be before any meeting, yes.
21      Q.   Okay, and so in those instances where an
22 executive session starts before the public offering
23 of a prayer, as with the special meetings, you would
24 privately ask for God's help?

35 (Pages 134 to 137)

Dobrich, et al.                                v.                Indian River School District, et al.
Reginald Helms                        C.A. # 15-120 (JJF)                      October 11, 2006

Page 138

1      A.   It would be private, yes.
2      Q.   And as with my questions on the public
3   meetings, your request, your prayer to God would be
4   no less effective just because it was given
5   privately and silently?
6      A.   To the best of my knowledge, like I said,
7   whether it's effective or not only God knows that.
8      Q.   Fair enough.  But as your understanding,
9   your personal religious understanding, is that its
10  effectiveness is not, is not affected -- its
11  effectiveness is not affected by how it's offered?
12  It may be affected by your state at the time it is
13  offered, it may be affected by many things, but it's
14  not affected by the way you offer the prayer?
15     A.   If you are speaking the way as whether it's
16  open or private, no I don't think that makes a
17  difference.
18     Q.   Who benefits from the Board Policy BDA.1,
19  the School Board Prayer Policy?
20     A.   Is that the prayer policy?
21     Q.   Yes, sir.
22     A.   Okay.  Who benefits?
23     Q.   Who is it intended to benefit?
24     A.   Well, specifically I think it is intended

Page 139

1   that the Board itself, when dealing with all the
2   important issues would certainly benefit, but
3   ultimately if we make good sound decisions and God
4   blesses those decisions, then ultimately everyone
5   should benefit from it, but the policy itself was
6   written for the Board.
7      Q.   And it was written to serve and protect the
8   interests of the Board, is that correct?
9      A.   To serve and protect?  I don't know.  When
10  I voted to accept that policy I didn't have an
11  attitude of serve and protect in particular I think
12  it was more -- my opinion was that it was more to
13  serve and the more that -- it's just a policy that
14  we say a prayer before the Board meeting to ask
15  God's blessing and to help us.  So, to protect us I
16  don't know, that was not my attitude that it was
17  adopted to protect us.
18     Q.   Let me just explore this a little bit?
19     A.   Okay.
20     Q.   The benefit to all of the constituents of
21  the district that you see from Board prayer, is that
22  your, you will make, we hope that you will make good
23  decisions, correct?
24     A.   Yes.

Page 140

1      Q.   That you will make decisions that are the
2   best you can make with the assistance of God, if
3   that's what the prayer is that's offered, correct?
4      A.   That's my opinion, yes.
5      Q.   And there was discussion at the Board
6   level, wasn't there, that everybody benefits from
7   good sound decisions that may be informed by God's
8   help?
9      A.   I don't recall specific discussions but
10  that would have been my thoughts, yes.  That would
11  be my hope and my prayer would be that everyone
12  would benefit.
13     Q.   Don't recall that there was actually
14  specific discussion that look everyone is going to
15  benefit from this policy because everyone will
16  benefit from the good decisions that will result
17  from our asking for divine guidance?
18     A.   That may have taken place, but to sit here
19  and say I recall that specifically, no, I can't.
20  Like I said, that would have been my opinion.  Now,
21  if I said that specifically I don't recall, but that
22  would certainly have been my thoughts.
23     Q.   This is something that sometimes lawyers
24  try to do, you certainly don't recall, you don't

Page 141

1   affirmatively recall that such discussions did not
2   take place.  I mean, if I said to you Mr. Helms
3   isn't it true that discussions of that sort took
4   place, you wouldn't say no Mr. Allingham I recall
5   they didn't happen?
6      A.   No, I would not say that.
7      Q.   In fact, you don't really doubt that they
8   did happen, do you?
9      A.   I wouldn't doubt it, although I just can't
10  specifically recall it.  But like I said that would
11  have been my thoughts.
12     Q.   And it's in that way that the
13  constituencies of the district benefit from the
14  policy, correct?
15     A.   Is that we make good sound decisions and
16  God blesses those, yes, that's my opinion.
17     Q.   Now, I want to ask you a question, those
18  interests, the interests of the constituency in good
19  sound decisions informed by God's guidance, that
20  benefit can be achieved if each of the Board members
21  prays privately for divine guidance right before
22  they walk on stage couldn't they?
23     A.   I wouldn't think they'd be hampered, no, if
24  they did it silently I don't think that that would

36 (Pages 138 to 141)

Dobrich, et al.                          v.              Indian River School District, et al.
Reginald Helms                   C.A. # 15-120 (JJF)                      October 11, 2006

Page 142

1  be, you know, like we said a while ago, I think God
2  hears prayer from his people, from his children,
3  whether it's openly or silently.
4       So, to say that if we did it silent he
5  wouldn't hear, I can't say that, but I would just
6  once again say that I hope we would also have the
7  right, if you will, to do it openly if we so wished.
8  But I can't say that it would hamper it because I
9  don't know that.
10  Q.   Well, and I want to try to draw a
11  distinction in a minute between those two concepts,
12  that is the interests of the constituents in the
13  best decisions you can make, and the interests of
14  the Board members in being free to practice their
15  faith however they want to practice it, okay?
16  A.   Okay.
17  Q.   So, for the constituents, not only the ones
18  out in the audience, but all around the district,
19  the benefit from the policy is that they get, as you
20  understand it, is that they benefit from the best
21  decisions the Board can make and if those decisions
22  are informed by divine guidance you think they will
23  be as good as you can do, correct?
24  A.   Yes.

Page 143

1  Q.   And I think we've agreed, but let me make
2  sure, and we can agree that that benefit for the
3  constituents of the best decisions possible can be
4  achieved whether you ask for divine guidance in
5  public on the stage or in private back stage?
6  A.   Yes.
7  Q.   Okay. Now, let me turn to the other issue
8  that we identified. There is, in your view, a
9  separate somewhat different benefit of the policy
10  which is that it protects the Board members' rights,
11  but I'm just going to speak in terms of you, Mr.
12  Helms, okay?
13  A.   Okay.
14  Q.   It protects your right to pray privately if
15  you want to in the wings or publicly on stage if you
16  want to, isn't that right?
17  A.   That's the way I understand it.
18  Q.   And when you passed this policy, one of the
19  reasons that you voted to adopt it was precisely for
20  that reason, that it protected the Board members'
21  rights, individual Board members' rights to practice
22  their religion as they see fit?
23  A.   I wouldn't say it that way. I would say it
24  by passing that policy that it put on paper a policy

Page 144

1  what the Board had been doing for years and years
2  and years. Whether it was -- I did not accept that
3  policy and vote for that policy to protect my right
4  to practice religion, that wasn't my thoughts.
5       My thoughts were that the policy was
6  adopted because that's what we've been doing and we
7  just simply put that in a policy where everybody
8  could see it, what the Board had been doing, and
9  what we wished to continue to do, not that that
10  protects my rights. That document in my mind
11  doesn't protect my rights of practicing religion in
12  a School Board setting.
13       I can practice my religion as far as I know
14  unless they take it away, anywhere I want. That's
15  something separate. This policy in my mind I was
16  adopting just to let everybody know that this is
17  what we've been doing and this is what we want to
18  continue to do, and as far as I know that policy was
19  according to -- in other words, it didn't violate
20  the Constitution or anything else.
21       But you when you asked me did I adopt that
22  policy to protect my right of practicing religion,
23  no that's not why I accepted that policy.
24  Q.   Well, then let me just ask you the general

Page 145

1  question, why did you accept the policy?
2  A.   Like I said, I accepted that policy and
3  voted for it because I felt that's what we'd been
4  doing for years and years and I wished to continue that, and
5  by putting it down on a piece of paper and everybody
6  saw what our policy was then I was hoping that that
7  would allow us to continue to do it in the future.
8  Q.   Did you think that in the absence of the
9  policy you wouldn't be permitted to do it in the
10  future?
11  A.   I think in my mind I had a distinct
12  impression that there was some people who were
13  trying to take that away from us, and I wanted to do
14  something that would let people know what we'd been
15  doing and what we would like to continue to do. I
16  had a feeling that at that time that someone was
17  going to try to take that privilege away from me,
18  and I didn't feel that was right.
19  Q.   And that's why you passed the policy?
20  A.   Among other things, but like I said, I
21  think this policy is to benefit the Board and
22  ultimately if we make the right decision and we
23  receive God's messing it's going to affect everyone.
24  And just as clarification I think that all the

37 (Pages 142 to 145)

Page 146

1  accolades that Indian River School District has
2  received here lately, I think God is blessing this
3  district.
4      So, that's my thoughts on it.
5  Q.  You mentioned in an earlier answer that
6  it's your belief that God answers the prayers of
7  God's children?
8  A.  Yes.
9  Q.  Can you tell me what you mean by God's
10 children?
11 A.  Well, as I read the scriptures in the Bible
12 that I use, and I realize that everybody doesn't use
13 the same Bible, but however the scriptures that I
14 read it tells me that God's children, if you will,
15 we are all God's children, but when I talk about
16 prayer, hearing God's children, it's in relationship
17 to your relationship to God and I interpret that to
18 be that you have accepted God's plan for salvation.
19     But that's my opinion, that's the
20 scriptures that I read. And I know there is other
21 people who do not agree with that, and that's fine.
22 Q.  Just to clarify, could you identify what
23 Bible it is that you use?
24 A.  I read from NIV which -- when I say the

Page 147

1  Bible that I use, I use the old testament and the
2  new testament. When I first became a Christian I
3  had a King James version. Now I read the NIV, but
4  it contains the old testament and the new testament.
5  And I also know that there are some people that
6  don't recognize the new testament, there is some
7  people that don't recognize the King James Bible at
8  all. So, there is many different beliefs, and
9  that's fine.
10 Q.  It is your belief that God hears the
11 prayers of only those people who have accepted God's
12 plan for salvation?
13 A.  That is my belief, yes.
14 Q.  And that plan for salvation, an important
15 component of it is the acceptance of Jesus Christ as
16 our Redeemer and salvation?
17 A.  That is my belief, yes.
18 Q.  To go back to an earlier answer, you told
19 me that at the time that you were considering and
20 adopting the Policy BDA.1, the School Board Prayer
21 Policy, at that time it was your perception that
22 there were some people who were trying to take that
23 privilege away from me. I want to explore that a
24 little bit?

Page 148

1  A.  Okay.
2  Q.  That privilege that you're talking about is
3  the privilege to pray however you want, publicly or
4  privately, correct?
5  A.  As I understand it, yes.
6  Q.  And your perception in the summer of 2004
7  was that there were people who were trying to take
8  that right publicly to pray away from you?
9  A.  Not in the beginning. When Mrs. Dobrich
10 first came to the Board my understanding was that
11 she had an objection, prayer before graduation and
12 that sort of thing. And that was in the summer of
13 2004.
14     As things progressed, and other parties
15 became involved, it was apparent to me that not only
16 did they want to take away prayer before graduation,
17 but they wanted to take my right to pray at a Board
18 meeting. So, it wasn't really in the summer it was
19 sort of like later on, because there was a
20 progression of things.
21 Q.  By August 23, we looked yesterday at that
22 long special meeting, the four hour and 15 minute
23 special meeting, certainly by that point your fears
24 had crystalized and you perceived that someone was

Page 149

1  trying to take away your right publicly to pray,
2  correct?
3  A.  Yes, I think towards the end of October,
4  fist of September somewhere in there. I thought it
5  was becoming very obvious that now we've sort of
6  gone prayer before graduation as the issue that now
7  it was like all encumbersome, if you will, it's
8  prayer by anything, and even to the point where they
9  didn't want, these parties didn't want the Board to
10 pray before a meeting. I -- that was probably later
11 on in the discussion when that became apparent to
12 me.
13 Q.  And before I move to another question, when
14 you say there were some people that were trying to
15 take that privilege away from me, who were those
16 people, was that me, was it -- who was it?
17 A.  I see that as Mrs. Dobrich at that time I
18 believe -- well, I know at some point in time she
19 had contacted the ACLU, or ACLU had contacted her or
20 whatever, but the ACLU became involved and some
21 things started being said, and I had the -- in my
22 mind it was the ACLU coming on Board was now trying
23 to take away my privilege of praying before a Board
24 meeting, and whether that's what Mrs. Dobrich

38 (Pages 146 to 149)

Dobrich, et al.                                    v.                    Indian River School District, et al.
Reginald Helms                          C.A. # 15-120 (JJF)                         October 11, 2006

Page 150

1  wanted, I don't know, but when the ACLU became
2  involved I think to me it became apparent that
3  everything was going to be taken away.
4        That's the way I felt. So, when I say the
5  parties I'm talking about Mrs. Dobrich and the ACLU.
6     Q.   Okay, so when you say there were some
7  people that were trying to take that privilege away
8  from me, some people in your mind was Mrs. Dobrich
9  and the ACLU?
10    A.   Yes.
11    Q.   And in your previous answer you said when
12 the ACLU became involved it became clear that they
13 were trying to take everything away, what did you
14 mean by everything away?
15    A.   Everything would be they didn't want us to
16 have prayer at athletic banquets, they didn't want
17 us to have prayer at School Board meetings. I can't
18 recall exactly what was said, but I believe in my
19 mind, and my memory is not as good as some other
20 people, but in my mind I was thinking that someone
21 even made the statement, and I don't know who it
22 was, I don't know if it was somebody from the ACLU
23 or whether was Mrs. Dobrich, but in my mind I felt
24 that someone was saying we want prayer out

Page 151

1  altogether. We don't want any public prayer
2  anywhere in the Indian River School District. That
3  was my thought.
4        So at that time I thought that I was going
5  to lose my right and my privilege to express prayer
6  at a Board meeting and I became concerned about
7  that. I didn't have to clarify after we had
8  received word from our attorneys --
9            MR. SHAW: Can I caution the
10           witness not to discuss what he
11           spoke about with his attorney.
12    A.   Okay. It became apparent that our policy
13 in regards to graduation and the prayer was not in
14 accordance with what it should have been.
15    Q.   Yes, sir.
16    A.   At that point in time I said well let's
17 make it right, whatever the law says then that's
18 what I want to do. We are Board members we are
19 supposed to be law abiding citizens, if that's the
20 law then that's what we need to do.
21        However, as time went on it became apparent
22 that that was no longer the subject, the prime
23 concern now it was going into all aspects of prayer
24 throughout all the district and I thought I was

Page 152

1  going to lose my right to express my prayer in
2  whatever way I wanted.
3        As a matter of fact, I even heard, and once
4  again I can't recall who said it, but someone even
5  said that as long as we prayed to God that was fine,
6  but they didn't want us to use Jesus' name.
7  Well, okay I just felt I was going to lose my right
8  to pray the way I felt I wanted to pray.
9        And so all those things came to light as I
10 recall it the start of fall or maybe the end of
11 summer, but it wasn't in the beginning. In the
12 beginning I thought it was just a prayer issue at
13 graduation.
14    Q.   Did you understand that anyone was trying
15 to take away your right to pray publicly in any way
16 you saw fit at any place except at the School Board
17 meetings where you were functioning as a School
18 Board member?
19    A.   As I recall the only discussions were about
20 the Indian River School District. They didn't say
21 they wanted to take away my right to pray in church,
22 no they didn't say that. The discussions were only
23 around the school district.
24    Q.   I wasn't being, at least I wasn't trying to

Page 153

1  be facetious. In the absence of the policy, if the
2  position as you understood it of Mrs. Dobrich and
3  the ACLU were accepted, you would remain free to
4  stand in church or kneel in church or stand on the
5  fairway at the golf course, or the aisle in the
6  supermarket and pray silently or out loud in the
7  name of a Deity or unnamed Deity or in the name of
8  Jesus Christ, correct? The only place that anyone
9  with suggesting that you, your right to pray as you
10 saw fit might be limited in some way was at the
11 School Board meeting, isn't that right?
12    A.   That is my, yes, that is my impression.
13    Q.   Okay. And it was that right that you
14 perceived that the ACLU and Mrs. Dobrich were trying
15 to take away?
16    A.   That's correct.
17    Q.   And it was to protect that right that you
18 voted to adopt Board Policy BDA.1?
19    A.   Well, there again my thoughts was not to
20 protect me or whatever, I just wanted to be allowed
21 to continue what we'd been doing for many, many
22 years, and that policy I felt was a good policy to
23 ensure that.
24        I guess it's a matter of whether you say

39 (Pages 150 to 153)

Dobrich, et al.                    v.              Indian River School District, et al.
Reginald Helms                C.A. # 15-120 (JJF)              October 11, 2006

Page 154

1  protect or ensure. I mean I don't know what you're
2  looking for, but in my mind when I adopted that
3  policy it was to let people know what we'd been
4  doing, what we would like to continue to do, and I
5  felt that this policy would certainly do that.
6          But if you are asking me did I pass that
7  policy to protect me, no, it was more like to ensure
8  that I could continue to do what I had been doing.
9      Q.    And the benefits to the constituents of the
10  Indian River School District that had flowed from
11  your practice going back 30 years, the benefit of
12  good decisions, that was going to continue whether
13  you passed this policy or not, right?
14          Because we know that whether you passed
15  this policy or not and no matter what the ACLU and
16  Mrs. Dobrich want, you were still free and your
17  fellow Board members were still free to seek divine
18  guidance so that the constituents of the Indian
19  River School District would receive the benefits of
20  your best decision?
21      A.    I would hope that would be the case.
22      Q.    Nobody has ever suggested that you weren't
23  allowed to seek divine guidance, have they?
24      A.    Nobody has told me that, no. The only

Page 155

1  thing they told me is that -- the only thing that I
2  felt was coming is that they were going tell me how
3  I could do that or maybe not so much how I could do
4  it, but how I could not.
5          In other words, I felt I was being told you
6  can seek divine guidance but you can't do it openly
7  at a School Board meeting and I just felt -- I felt
8  that was wrong.
9      Q.    Now, you have passed, the School Board has
10  adopted some policies that you mentioned, for
11  example, you had to address the graduation prayer
12  issue?
13      A.    That's correct.
14      Q.    And that policy prohibits the School Board
15  from inviting -- well, let me just take your answer,
16  the previous practice was not constitutional,
17  correct?
18      A.    As I understand it when we asked our
19  attorney to investigate it he said that our policy
20  did not --
21          MR. SHAW: Objection.
22      Q.    Just a second, sir. Both of us are going
23  to -- it's important that I get your understanding.
24  You should not tell me what your attorney told you,

Page 156

1  because that's a privileged communication. But I'm
2  entitled to listen to what your understanding was,
3  and so my question was not intended to ask you what
4  your attorney said, my question was intended to
5  elicit what your understanding is.
6      A.    Okay.
7      Q.    And you said before your understanding was
8  that your previous practice on graduation, I'm just
9  going to focus on graduation, your previous practice
10  on graduation was not in accordance with the law?
11      A.    That's correct.
12      Q.    And so you fixed it?
13      A.    Yes.
14      Q.    And the way you fixed it would now prohibit
15  Pastor Fike from offering the same prayer that he
16  offered at the 2004 graduation publicly, correct?
17      A.    As I understand it, yes.
18      Q.    Do you feel that you as a Board somehow
19  infringed by the passage of that policy on Pastor
20  Fike's freedom to practice his faith as he wishes?
21          MR. SHAW: I'm going to object to
22      that question. Because we are only
23      supposed to be discovering School Board
24      prayer issue here. I am going to allow the

Page 157

1      witness to answer it.
2      A.    Me personal opinion was that I don't
3  personally agree with the policy.
4      Q.    That's helpful.
5      A.    However --
6      Q.    Yes, sir, go ahead.
7      A.    -- if the policy we had was
8  unconstitutional, then as a law abiding citizen I
9  want to do what the court says. Personally I do not
10  agree with it.
11      Q.    That's helpful to me, but my question was
12  -- had to do with the impact of the policy. In
13  passing the policy did you as a Board member believe
14  that you were somehow limiting Pastor Fike's First
15  Amendment right to practice his religion as he sees
16  fit?
17      A.    Personally I believe it infringed on his,
18  mine, and whoever else would want to come to the
19  podium or be invited to the podium to say a prayer.
20  Like I said, I'm a law abiding citizen, if that's
21  what the court says then that's what I will do, but
22  personally I do not agree with it. As I understand
23  it the policy -- well the policy says it should be
24  student initiated and student led.

40 (Pages 154 to 157)

Dobrich, et al.
Reginald Helms

v.

C.A. # 15-120 (JJF)

Indian River School District, et al.
October 11, 2006

Page 158

1    In other words, any student can come to the
2    podium and pray. Then my personal question is
3    what's the difference between a student coming to
4    the podium and pray and I come to the podium and
5    pray? The only thing is I guess the courts have
6    addressed this and that's their ruling, and that's
7    what I will abide by, but personally I don't agree
8    with it.
9    Q.   Okay, but so -- and part of your answer is
10   helpful to me in understanding your view. Your view
11   is that the policy on prayer at graduation limits
12   your, Mr. Helms' First Amendment rights?
13   A.   Yes, I think it limits my right to pray
14   whatever way I want. I mean in other words, no
15   longer can a principal or anyone say Mr. Helms would
16   you like to come to the podium and lead us in
17   prayer, I can't do that, according to this -- at
18   graduation I can't do that.
19   Q.   And your understanding is that that's what
20   the law provides?
21   A.   As I understand it has to be student led
22   and student initiated that's my understanding. And
23   I certainly am not a student any longer.
24   Q.   So, am I correct that your understanding is

Page 159

1    that our laws do contemplate certain limitations on
2    one's individual right to exercise his religion and
3    faith as he sees fit. An example is the law that
4    prevents you, for example, from standing up at the
5    podium at graduation and offering a prayer?
6    A.   I think some of the decisions here again
7    it's my opinion, that some of the decisions,
8    although well intended, sometimes limits people's
9    rights, yes.
10   Q.   Now, you told me yesterday that you don't
11   approve of policies that change your historical
12   practices, or that limit people's rights unless you
13   are satisfied with, definitively satisfied, that the
14   law requires you to do that, correct?
15   A.   That's a little confusing, would you
16   rephrase that?
17   Q.   I will start again. It's your view that
18   you are not going to change a practice of the
19   district that goes back in time, a historical
20   practice of the district, you are not going to vote
21   to change it unless somebody tells you definitively
22   that it's against the law, correct?
23   A.   No. I wouldn't say I'm not going to change
24   it, I'm saying in this issue about the prayer, that

Page 160

1    I wasn't going to change it unless someone told me,
2    but -- and if there is other policies in our manual
3    that are breaking the law and as we become aware of
4    it, then yes, I want to be in compliance. Would I
5    never change a policy unless somebody told me it was
6    breaking the law, no.
7    Q.   Okay, you are right, my question was what
8    we say over broad.
9    A.   Okay.
10   Q.   In this area of prayer and the exercise of
11   religion, am I right in thinking that you would not
12   agree to change a practice or policy of the district
13   without being told definitively that it was against
14   the law?
15   A.   In this specific case I did not want to
16   stop doing what we had been doing for years simply
17   because someone said it wasn't, you can't do it. I
18   said I need someone higher up, if you will. In
19   other words, my statement was I want to take it to
20   court and let the court tell me that it's wrong.
21   And like I said even though I don't agree with the
22   graduation policy if that's the laws of our land
23   then even as I took oath as being a part of the
24   member of the Board I must abide by law and that's

Page 161

1    what I want to do.
2       However, in this case nobody had definitely
3    told me that what we were doing was
4    unconstitutional, so I needed someone to tell me
5    that before I change what we had been doing for
6    years.
7    Q.   So, on the graduation prayer issue you were
8    satisfied, on the Board prayer issue you have not
9    been satisfied?
10   A.   No, not as of yet.
11   Q.   Okay. And one reason to pass the policy
12   was so that you could get a judicial decision, get a
13   judge to say one way or another with finality is our
14   practice constitutional or not, isn't that correct?
15   A.   No. Like I said before, my reasoning for
16   adopting and voting for that policy was to let
17   people know -- there was a lot of people in our
18   district who did not attend Board meetings and had
19   no idea what this Board had been doing for years.
20   So, one aspect was this was going to let people know
21   what this Board has been doing for years, what is
22   our history and past practice, and the other reason
23   was that I wanted to continue to do that. That was
24   the reason for me adopting that policy.

41 (Pages 158 to 161)

Dobrich, et al.                              v.                    Indian River School District, et al.
Reginald Helms                        C.A. # 15-120 (JJF)                        October 11, 2006

Page 162

1    Q.    You could have let people know what you
2    were doing by sending a letter, couldn't you?
3    A.    Well, you could, but then being on this
4    Board for a number of years, letters don't always
5    make it home. You know, people are missed even by
6    trying to send them letters or sending it home with
7    little Jamie or little Johnny there are still those
8    people who are missed.
9    Q.    And you think that you are going to get a
10   broader reach by passing a policy than you are going
11   to get by sending a letter home?
12   A.    I think this makes it available to anyone
13   and everyone. If somebody were to call the district
14   office today and said what's going on with the Board
15   they could say to them they have a policy and this
16   is our policy, and all they have to say is I want a
17   copy of that, absolutely. But my sending a --
18   folding that policy up and sending it to all of our
19   constituents, you could do that, but I just never
20   thought about doing it.
21   Q.    This is a little bit of a diversion, but
22   are you aware that a resident of the district asked
23   for a copy of the School Board Prayer Policy and was
24   told by district employees to file FOIA request?

Page 163

1    A.    My first question would be what's a FOIA
2    request?
3    Q.    Freedom of Information Act.
4    A.    No, I was not aware of that.
5    Q.    If that were true, that would be
6    inconsistent with your understanding of this notion
7    of free access of the policies, correct?
8    A.    I'm not familiar with all the nuts and
9    bolts of how it's done, but what I'm saying is I
10   would hope if someone were to call the district
11   office and say that I would like to see a copy of
12   that policy that they could get it. Whatever means,
13   if it means they have to file whatever --
14              MR. ALLINGHAM: Let me interrupt
15   you Mr. Helms we are going to run out of
16   tape, I'm really sorry.
17   A.    Okay, sure.
18              MS. DUPHILY: We are going off the
19   record at approximately 10:04 a.m..
20              (WHEREUPON a brief recess was
21   taken)
22              MS. DUPHILY: We are back on the
23   record at 10:13 a.m..
24              MR. ALLINGHAM: I am going to ask

Page 164

1    the court reporter to mark as PX42 a
2    document that has no Bates, but it's titled
3    School Board Member Ethics.
4              (WHEREUPON Plaintiff's Exhibit 42
5    was marked for identification.)
6    Q.    Do you recognize what we have marked as
7    PX42, Mr. Helms?
8    A.    Yes, I do.
9    Q.    Have you read it?
10   A.    I have read it. Like I said yesterday, I
11   couldn't answer to it without reading it, but I have
12   read it before, yes. Or do you mean now?
13   Q.    No, I meant at some time in the past?
14   A.    Okay, yes, I have.
15   Q.    And you understand that the first
16   introductory paragraph says, when it says "Members
17   of the Board of Education will strive to attain the
18   following Code of Ethics." This is a code of ethics
19   that you have undertaken to strive to attain?
20   A.    Yes.
21   Q.    In paragraph one, the third, or section
22   one, the third paragraph one of the admonitions of
23   the Code of Ethics is, "That the public expects my
24   first and greatest concern to be in the best

Page 165

1    interest of each and every one of these young people
2    without distinction as to who they are or what their
3    backgrounds may be." And have you at all times made
4    your first and greatest concern to be the interest
5    of the young people, the students whose education
6    you have been entrusted with?
7    A.    I strive to do that, yes.
8    Q.    And on the second page, in the third
9    paragraph, there is an admonition that each Board
10   member should resist every temptation and outside
11   pressure to use my position as a School Board member
12   to benefit either myself or any other individual or
13   agency apart from the total interest of the School
14   District, do you see that?
15   A.    Yes, I do.
16   Q.    Have you at all times, do you understand
17   that to be your obligation?
18   A.    Yes.
19   Q.    And have you at all times strived to
20   satisfy that obligation?
21   A.    I strive to do so, yes.
22   Q.    Just to pick up on an answer that you gave
23   me before the break, I understood you to say, but
24   tell me if I am wrong, that one reason that you

42 (Pages 162 to 165)

Dobrich, et al.                        v.                    Indian River School District, et al.
Reginald Helms                 C.A. # 15-120 (JJF)                      October 11, 2006

Page 166

1  passed the policy was so that the public would know
2  that the Board intended to pray at its meetings, was
3  that one of the purposes?
4      A.  I think the way I phrased it was that the
5  public know what we've been doing, what the Board
6  had been doing, and that by adopting this policy I
7  was hoping that we could continue to do that.
8      Q.  Fair enough.  So, it was both forward
9  looking and backward looking?  You wanted to tell
10  them what you have done and you wanted to tell the
11  public that you were going to continue to do that?
12     A.  And to clarify that, there was some
13  discussions that we had been doing this for years
14  but there was nothing in writing about what we had
15  been doing, so one of the purposes or one of the
16  things in my mind that I wanted to do was, number
17  one, let's get it down on a document that let's
18  people know what we've been doing and hopefully by
19  doing that we could continue to do that in the
20  future.
21         So, I think that's -- I don't know if that
22  clarifies it or not, but that was my thinking.
23     Q.  Now, PX34 that we looked at yesterday
24  toward the end of the day.  In terms of having

Page 167

1  nothing in writing on what you had been doing, was
2  the preamble, the material before the numbered
3  paragraphs that ultimately became the policy near
4  the end of this document, was the preamble intended
5  to be a description of what the Board had been doing
6  in the past?
7      A.  The preamble, you are talking I assume page
8  one?
9      Q.  Yeah, everything --
10     A.  All the whereases?
11     Q.  Whereas the school Board is an elected
12  body, whereas the school Board has a long
13  established custom, that was intended to set down in
14  writing what the Board had been doing?
15     A.  I'm not sure.  And one of the reasons is
16  that I was not involved with preparing this
17  document.  I don't know why, I don't know the
18  specific reason why the whereases are in there.
19     Q.  Okay.
20     A.  If you follow what I'm saying is, this was
21  drafted by someone else.
22     Q.  Yes, sir, I understand.
23     A.  And I don't know what their intent was when
24  they did that.

Page 168

1      Q.  Do you know who drafted it?
2      A.  Yes.
3      Q.  Was it Mr. Neuberger or Mr. Whitehead?
4      A.  I don't know that.  I know it came from the
5  Rutherford Institute, or it may have come by way of
6  Mr. Neuberger.  I'm not sure which one.
7      Q.  So, would it be fair you know who you got
8  it from, you don't know who drafted it?
9      A.  Right.  I know where it came from, yes.
10     Q.  You told me that in adopting the policy you
11  wanted to set down in writing what the Board had
12  been doing in the past?
13     A.  Exactly.
14     Q.  Look at PX9, which is the actual policy,
15  BDA.1.  I'll give you a copy.  Here is a copy.
16         Would you point to me where in that policy
17  it is set down in writing what the Board had done in
18  the past?
19     A.  I think the document as a whole reflects
20  what the Board had been doing in the past.  In other
21  words, if you're asking me is there a numbered item
22  in there that says in the past the Board has been
23  doing thus and so, no, there isn't anything in
24  there.  The policy as a whole is what we had been

Page 169

1  doing.
2      Q.  Looking at PX34 you see that there are
3  paragraphs that say essentially exactly what you
4  just said?
5      A.  You mean, yes.
6      Q.  For example --
7      A.  Do you have something specific?
8      Q.  Yeah, for example the second whereas clause
9  says, "This School Board has had a long established
10  custom of solemnifying its proceedings by opening
11  its meetings with a sectarian or non-sectarian
12  prayer by one individual Board member as his or her
13  conscience and religious tradition leads?"
14     A.  Yes, I see that.
15     Q.  Nothing like that was incorporated in the
16  policy as adopted?
17     A.  No.
18     Q.  Now, you said that your understanding was
19  that policy BDA.1 reflected what the Board had been
20  doing in the past, correct?
21     A.  That's correct.
22     Q.  Had the Board prior to the adoption of
23  BDA.1 read a disclaimer before the prayer at its
24  open meetings?

43 (Pages 166 to 169)

Dobrich, et al.                              v.                    Indian River School District, et al.
Reginald Helms                        C.A. # 15-120 (JJF)                          October 11, 2006

Page 170

1   A.   About prayer?
2   Q.   Yeah.
3   A.   Not to my knowledge.
4   Q.   So, that portion of the policy that has the
5   disclaimer language in it is not what the Board had
6   been doing in the past, as it says in paragraph
7   four?
8   A.   I'd have to see it, but to the best of my
9   knowledge the disclaimer that is read at the
10  beginning of the Board, regular Board meeting is
11  different than this. That's what I think. I mean
12  I'd have to see it, but I think. There may be some
13  words in the disclaimer that may also be in this
14  policy, but I think it's different. Do you have a
15  copy of that?
16  Q.   No. We asked for it and weren't given it
17  yet.
18  A.   Okay. I'm just trying to go from memory
19  but I think it's different.
20  Q.   Mr. Bireley testified that what he reads is
21  paragraph one and paragraph four of the policy?
22  A.   And that may be true. I was just looking
23  at paragraph one and I'm thinking it's different
24  than that.

Page 171

1   Q.   In any events, your memory is that no
2   disclaimer was read immediately preceding the prayer
3   before this policy was adopted?
4   A.   To the best of my recollection, no. And
5   I'll clarify that by saying we didn't think we had
6   to, but no I don't recall.
7   Q.   Well, that's, I mean that's a helpful
8   point. Do you feel now that you have to in order to
9   comply with the law?
10  A.   Am I allowed to say that we have been
11  advised --
12  Q.   I only want to know what your understanding
13  is. Is it your understanding that you must read the
14  disclaimer language in order to comply with the law?
15  A.   My understanding is that that is something
16  that we should do. Nobody has said to me you have
17  to do that to be in compliance with the law, but I
18  have heard that that is something that we should do,
19  so we started doing it.
20  Q.   Okay. Your understanding is that it's not
21  necessarily required by the law but it's a good
22  thing to do?
23  A.   It was a good thing to do.
24  Q.   It would serve the interests that are

Page 172

1   articulated in the Board Ethics Policy, the
2   interests of the children?
3   A.   To strive to do your best. In other words,
4   we were advised to do this as something that would
5   be a good thing to do, because we had never done it
6   before and that's -- you know, so we did it. We
7   were just advised that that would be something good
8   to do.
9   Q.   I'm going to ask you to pause for a minute
10  before you answer this question, who advised you
11  that it would be good to do?
12  A.   Our Board attorneys.
13  Q.   Identify them by name only, please?
14  A.   As I understand it Mr. Neuberger,
15  Mr. Griffin and that would probably be it.
16  Q.   I'm going to ask Mr. Horvath to play for
17  you a portion of the audiotape of the Board meeting
18  of February 27, 2006. This is a portion in which
19  you make a statement, and I'm going to have some
20  questions for you about your statement.
21         Okay, I will read from the transcript and
22  let me mark it as PX43.
23         (WHEREUPON Plaintiff's Exhibit 43
24         was marked for identification.)

Page 173

1   Q.   And I'm going to just say by way of
2   background, Mr. Helms --
3         MR. SHAW: I'm sorry, do you have
4         another copy?
5         MR. ALLINGHAM: I do I am going to
6         give it to you in a second.
7   Q.   Just by way of background. We have been
8   provided with the audiotapes that are kept of some
9   of the Board meetings.
10  A.   Okay.
11  Q.   What I have put before you, PX43, is the
12  effort of people better at listening to tapes and
13  trying to transcribe them than I am, to set down the
14  words that you said at that meeting, and the
15  question, the question is you'll see that Mr.
16  Bireley, about the middle of the page, after loud
17  and prolonged applause and cheers says, "Mr. Helms,"
18  he recognizes you, correct?
19  A.   I see that.
20  Q.   Of course, just as I begin my questioning
21  my technical problems are solved so I'm going to
22  play the tape for you. So, what I would like you to
23  do as you listen to it is to follow along on this
24  transcript and the first thing I am going to ask you

44 (Pages 170 to 173)

Dobrich, et al.                          v.                 Indian River School District, et al.
Reginald Helms                    C.A. # 15-120 (JJF)                      October 11, 2006

Page 174

1   is to confirm that the transcript is an accurate
2   transcription of what you said, okay?
3       A.   Okay.
4       (AT THIS POINT AN AUDIO RECORDING WAS PLAYED)
5       Q.   There is a portion of the transcript that
6   says, rest "Of sentence drowned out by applause,"
7   and then it picks up, "As a citizen." With the
8   exception of that portion of your statement which
9   our folks just couldn't pick up over the applause,
10  is the transcript marked PX43 accurately reflect
11  what you said?
12          MR. SHAW: Before he answers could
13      we qualify it further? I don't think they
14      played the portion from above loud and
15      prolonged applause and cheers.
16          MR. ALLINGHAM: Fine.
17          MR. SHAW: Can you just kind of
18      confirm that at this point?
19          MR. ALLINGHAM: I am only asking
20      you to confirm the words reflected next to
21      Helms colon.
22      A.   Yes.
23      Q.   Okay. Were you reading from a prepared
24  statement?

Page 175

1       A.   Yes.
2       Q.   And who prepared the statement?
3       A.   Mr. Neuberger.
4       Q.   When did you first see the statement?
5       A.   I don't know, I don't recall when I first
6   saw it. It was before the Board meeting but I don't
7   recall how much before.
8       Q.   Did you give any thought to saying before
9   you began reading your statement, I would like to
10  read a statement from, prepared for me by Thomas
11  Neuberger of the Rutherford Institute?
12      A.   No.
13      Q.   Did you think that people in the audience
14  would understand that these were your words?
15      A.   I never give it any thought.
16      Q.   You don't care whether people think they
17  are your words?
18      A.   That was not my prime concern at that time,
19  no.
20      Q.   Did you ask Mr. Neuberger to prepare a
21  statement for you to read?
22      A.   I don't recall asking him.
23          MR. SHAW: Just answer the
24      question as simply as you can to not tread

Page 176

1   on what else you may have talked about
2   with Mr. Neuberger or any of your counsel
3   at the time.
4       A.   I shared with Mr. Neuberger my concerns and
5   this is what he sent to me.
6       Q.   All right, so the answer to my question is
7   no you did not ask Mr. Neuberger to prepare a
8   statement for you?
9       A.   As I recall, no.
10      Q.   Is it then correct that Mr. Neuberger
11  prepared this statement on his own initiative and
12  sent it to you?
13      A.   I think that'd be safe to say, yes.
14      Q.   Did you read the statement prepared by
15  Mr. Neuberger verbatim or did you edit it?
16      A.   I'm not sure. I can't remember. I can't
17  remember what I received and I'm not sure whether I
18  might have ad-libbed or not. Without seeing the
19  piece of paper -- I don't know whether I put some of
20  my own words in there or not.
21      Q.   Did you give any consideration at all to
22  providing information to the people assembled in the
23  auditorium about the author of the words that you
24  were reading?

Page 177

1       A.   No.
2       Q.   Am I correct then that you, it was your
3   view that it didn't matter who had written the words
4   that you were reading?
5       A.   That it didn't matter?
6       Q.   Yes.
7       A.   Well, I would hope that I just wouldn't
8   read something that just anyone wrote. Did it
9   matter, yes -- I don't understand what you're -- it
10  doesn't matter, sure it matters.
11      Q.   Well --
12      A.   What are you asking me?
13      Q.   Do you think it would matter to a member of
14  the audience whether those words were Reggie Helms'
15  words, as opposed to Osama bin Laden's words? I'm
16  trying to think --
17          MR. SHAW: Objection, foundation.
18          MR. ALLINGHAM: There is no
19      foundation problem. I'm asking him what he
20      thinks.
21          MR. SHAW: You are asking what the
22      audience thought.
23          MR. ALLINGHAM: No, I am asking
24      him what he thinks the audience thought,

45 (Pages 174 to 177)

Dobrich, et al.                    v.              Indian River School District, et al.
Reginald Helms              C.A. # 15-120 (JJF)              October 11, 2006

Page 178

1    that's an entirely different question.
2          MR. SHAW: That's fine.
3    A.    I would say I don't know what they thought.
4    When I read this at the Board meeting that was not
5    on my mind whether they thought it was my words or
6    someone else's words.
7    Q.    Don't you think you ought to make public
8    statements in your own words?
9    A.    I think you can do it in your own words or
10   perhaps you share your thoughts and someone else can
11   write a speech for you. I mean President Bush does
12   it all the time. Does it have to be in my own
13   words, no it can be my thoughts and then as I review
14   it, if there is anything in there that I do not
15   agree with then maybe discuss about taking it out,
16   this sort of thing.
17         But public figures do it all time, people
18   write speeches for people all the time. So, do I
19   think it has to be in my own words, no not always.
20   I mean someone could prepare something for you. If
21   they are your thoughts and your concerns, maybe they
22   have a better way of expressing it. I mean,
23   everybody's vocabulary and the way of expressing
24   themselves is not the same. Does it have to be in

Page 179

1    my own words, no.
2    Q.    Everybody understands that President Bush's
3    speeches are written by speech writers, don't they?
4    A.    I think they do. Not all of them, but a
5    lot of them, sure.
6    Q.    Most people?
7    A.    Sure.
8    Q.    Everybody in this room understands that
9    President Bush's speeches are written by speech
10   writer?
11   A.    Okay.
12   Q.    Did you think everybody in the auditorium
13   understood that somebody else had written the words
14   that you were saying into the microphone?
15   A.    I don't know. I can only speak on behalf
16   of me, in my opinion. I have heard some people say
17   some things in meetings before and I thought to
18   myself somebody must've wrote that for them because
19   they don't speak that way normally. That's just my
20   opinion.
21         If there was someone sitting in the
22   audience saying, you know, that sounds good but
23   Reggie don't normally talk that way, somebody must
24   have wrote that for him. I don't know if there was

Page 180

1    anybody out there like that or not. Could have
2    been, it's very possible.
3    Q.    What did you do with the written statement
4    that you had before you that you read from?
5    A.    I don't know. I don't know if I still have
6    it or not, I don't know. I don't think I do. When
7    asked if we had anything, notes or whatever I don't
8    know if that was part of the notes or not. I don't
9    know what I did with it.
10         MR. ALLINGHAM: I'd ask the
11   reporter to mark as PX44 a document bearing
12   Bates number P2640, a copy of an article
13   from the Sussex Post dated Thursday July 6,
14   2006.
15         (WHEREUPON Plaintiff's Exhibit 44
16   was marked for identification.).
17   Q.    If you look at the -- it's actually a copy
18   from two different pages as you will see, the front
19   page and then page seven, and I'm looking at the
20   page seven portion, it says continued from page one
21   down at the bottom?
22   A.    Yes.
23   Q.    And the second paragraph there is a block
24   quote, "The ACLU has an ongoing nationwide campaign

Page 181

1    to take away the right of any citizen legislator to
2    speak and pray according to his conscience and
3    religious tradition, Board member Reggie Helms said
4    following that vote. My freedom of speech is too
5    important to compromise or risk its loss.
6          Our court case, where we have been standing
7    up to the ACLU provides the opportunity for the
8    federal court to permanently uphold my right not to
9    be treated as a second-class citizen or to have to
10   move to the back of the buss." And it continues,
11   "Accordingly, I have voted not to settle the pending
12   court case so the courts will have the opportunity
13   to finally decide whether I can be discriminated
14   against because of the viewpoint of my speech, or
15   because I come from a particular religious tradition
16   which the ACLU opposes."
17         Now, my first question is, if you look at
18   the transcript which we have marked as PX42, sorry,
19   PX43, can we confirm that up until the point where
20   my colleague was unable to read or hear the sentence
21   drowned out by applause, that the words are
22   essentially identical from the Sussex Post, and the
23   transcript?
24   A.    They are almost identical.

46 (Pages 178 to 181)

Dobrich, et al.                              v.                    Indian River School District, et al.
Reginald Helms                       C.A. # 15-120 (JJF)                          October 11, 2006

Page 182

1  Q.   And my next questions is, at the point
2  where the Sussex Post reproduces what we were unable
3  to get from the tape, does it accurately reflect
4  what you recall of what you said?
5      A.   Without the piece of paper in front of me I
6  don't recall what was on that document.
7      Q.   Or what you said?
8      A.   Or what I said.
9      Q.   Okay. Let me ask you a more general
10  question, is what is reported here in the rest of
11  the sentence drowned out by applause section of my
12  transcript, is that consistent with what you felt at
13  the Board meeting?
14     A.   Yes.
15     Q.   Have you given copies of your prepared
16  statement to any reporters at any time?
17     A.   When I read this I was trying to recall
18  whether someone came up to me after the meeting and
19  asked me for a copy of that, and that may have
20  happened, but I don't recall.
21     Q.   Do you know Mr. Diehl of the Sussex Post?
22     A.   I believe I do.
23     Q.   But you just can't recall whether you gave
24  him a copy of your statement?

Page 183

1      A.   Like I said, you know, I do recall people
2  coming up to me after the meeting, several people,
3  and there may have been reporters, and I don't know
4  if they asked me for a copy of that or not. I don't
5  recall giving that to someone, but I could have, but
6  I don't recall it.
7          MR. ALLINGHAM:  We will send you a
8      letter to confirm this, but we call for
9      production of the prepared statement and
10     any drafts or notes on that prepared
11     statement.
12     Q.   The statement that we have marked and which
13  you heard was your view on February 27, 2006,
14  correct?
15     A.   Yes.
16     Q.   And do you continue to hold the views that
17  are reflected in the statement?
18     A.   Yes.
19     Q.   Is it your view that in this court case
20  that you have been standing up to the ACLU?
21     A.   In my personal opinion?
22     Q.   Yes.
23     A.   Yes.
24     Q.   What is that based on? What is your

Page 184

1  understanding about the ACLU's role in this case?
2      A.   My opinion is that the ACLU is a
3  organization --
4      Q.   Before you describe the ACLU, could you
5  tell me what the ACLU's role is in this case, as you
6  understand it?
7      A.   The understanding that I have in this case,
8  the ACLU is taking the standpoint that in my view
9  that they're trying to limit my right to pray where
10  ever, whenever, and however I wish. And I have a
11  very limited background on the ACLU, but I will say
12  what I have read, that I am not in agreement with
13  what the ACLU is in my opinion trying to do.
14          And that is that as a Christian I feel as
15  though the ACLU is trying to take some of my rights
16  away, although however well intended, they say they
17  are an organization that wants to protect and
18  preserve people's rights, I'm sorry that's not my
19  opinion, because as a Christian I think that this
20  organization in a lot of ways tries to take some of
21  my rights and privileges away.
22     Q.   I am not making my question clear.
23     A.   Okay.
24     Q.   Is the ACLU a plaintiff in this case?

Page 185

1      A.   Not to my knowledge.
2      Q.   Mrs. Dobrich or the Doe family represented
3  by the ACLU in this case?
4      A.   That's my opinion.
5      Q.   And what's that opinion based on?
6      A.   Right now?
7      Q.   Yup.
8      A.   What I've been told.
9      Q.   By whom?
10     A.   Attorneys, friends.
11     Q.   Do you have any direct information that
12  Mr. Horvath, Mr. Lenhard or I are representing or
13  are affiliated with the ACLU?
14     A.   Do I have anything?
15     Q.   Yes, sir.
16     A.   No.
17     Q.   Has anybody told you that we are?
18     A.   I'm trying to recall if anybody actually
19  told me that, or whether that was my assumption.
20          I don't think, I don't recall anybody
21  telling me specifically that you are members of the
22  ACLU. I think, I recall somebody mentioning that
23  you may be, how can I say this, I don't know what
24  the term is, but you may be employed by the ACLU to

47 (Pages 182 to 185)

Dobrich, et al.                                    v.              Indian River School District, et al.
Reginald Helms                          C.A. # 15-120 (JJF)                    October 11, 2006

Page 186

1  take this case.
2      In other words, I have heard for instance
3  that certain attorneys make themselves available to
4  certain organizations, and I have heard that you had
5  made yourself available for the ACLU. Do I have any
6  documentation, no, but I heard that.
7  Q.  Who did you hear that from?
8  A.  Attorneys.
9  Q.  Neuberger?
10  A.  Yes.
11  Q.  Did he give you a list of the cases --
12      MR. SHAW: I'm going to object --
13  Q.  -- in which I have been affiliated with the
14  ACLU?
15      MR. SHAW: Mr. Neuberger
16      represented Mr. Helms at the time and this
17      is privy attorney/client privilege.
18      MR. ALLINGHAM: Fine, I will
19      withdraw the question.
20  Q.  Mr. Helms, you made a pretty big point of
21  standing up to the ACLU at the February 27 Board
22  meeting, in a number of articles that I can provide
23  to you if you want, you have routinely characterized
24  your passionate defense in this case as standing up

Page 187

1  to the ACLU, which wants to take your rights away,
2  is that a fair statement?
3  A.  That is my opinion, yes.
4  Q.  Did you think it was import -- and you
5  understood that that would inflame people's views
6  about this case, didn't you? People have extreme
7  views about the ACLU, don't they?
8  A.  I don't know.
9  Q.  Oh, Mr. Helms, come on?
10  A.  No, I would assume that would be the case,
11  but I don't know that. I haven't had anyone come up
12  to me, and I don't know what your word was, but what
13  would be my word, really upset with the ACLU to the
14  point where they say Mr. Helms we're so upset, I've
15  not had anybody do that.
16  Q.  Let me ask you this question, when you
17  walked into the auditorium on February 27 did you
18  notice that there were a lot of signs being held by
19  people in the auditorium?
20  A.  I noticed there were signs, yes.
21  Q.  Did you notice that many of them were
22  attacks on the ACLU?
23  A.  No.
24  Q.  Really?

Page 188

1  A.  Really.
2  Q.  You didn't see, for example, signs that
3  said, Anti Christian Lawyers Union ACLU?
4  A.  If I did see it I don't recall it, it don't
5  stick out in my mind, no.
6  Q.  That's fine?
7  A.  What was it?
8  Q.  Anti Christian Lawyers Union?
9  A.  No.
10  Q.  That's not what ACLU stands for, is it?
11  A.  I'm pretty sure it doesn't. But no, I
12  don't recall seeing a sign like that, and it may
13  have been there, but I don't recall.
14  Q.  Before you made repeated statements about
15  the ACLU's control of and representation of the
16  Plaintiffs in this case, did you make any effort to
17  actually check whether the ACLU was driving this
18  suit, representing the Plaintiffs or whether the
19  Plaintiffs were represented by lawyers who were
20  connected to the ACLU?
21  A.  If you are asking me did I call you or
22  anyone else to verify that, no, I did not.
23  Q.  Did look at the Complaint to see whether or
24  not the ACLU was on the Complaint?

Page 189

1  A.  No.
2  Q.  Did it matter to you whether what you said
3  was true about the ACLU?
4      MR. SHAW: I'm going to object.
5      You're harassing the witness.
6      MR. ALLINGHAM: No, I'm not, no
7      I'm not, be quiet. You can just object.
8      MR. SHAW: Pardon me, sir. You can
9      ask --
10  Q.  Did it matter to you whether it was true
11  that what -- I will strike that. Did it matter to
12  you whether what you said about the ACLU was true?
13  A.  I believe it to be true. One of the things
14  that the reason why I believe it to be true, was you
15  have to forgive me, I have trouble with names, is
16  that Mrs. Fennel, Fernell, something like that, was
17  at one of our meetings, am I getting the name right?
18  Anyhow, I understood her to be a lawyer who made
19  helpers available to the ACLU, and we were told
20  that. And --
21  Q.  Oh, Mrs. Fennell told you that, didn't she?
22  A.  No, no -- well --
23  Q.  Did she say at the August 24th meeting I am
24  here representing the ACLU?

48 (Pages 186 to 189)

Dobrich, et al.                          v.                    Indian River School District, et al.
Reginald Helms                    C.A. # 15-120 (JJF)                          October 11, 2006

Page 190

1   A.   She may have said that. I don't recall it,
2   but I do know we had discussions that she was there
3   on behalf, as a lawyer who had been made available
4   to the ACLU. She may have made that statement, I
5   don't recall it.
6        Q.   And have you gotten any information of any
7   kind that Ms. Fennell represents the Plaintiffs in
8   this case?
9        A.   Not to my knowledge.
10       Q.   Do you have any information of any kind
11  that the ACLU controls this case?
12       A.   Any documents?
13       Q.   Yup.
14       A.   No.
15       Q.   Have you seen any pleading in this case
16  that reflects that it was prepared by or in
17  consultation with the ACLU?
18       A.   The only thing I've seen on the official
19  documents has been the Plaintiff, Mrs. Dobrich
20  versus Indian River and all of our names it's been
21  signed by you and your law firm, that's all. Have I
22  seen any signature that says ACLU on there, no.
23       Q.   Did you think that it was important to find
24  out whether what you were going to say was true

Page 191

1   before you raised the big bad wolf of the ACLU in
2   public statements about this litigation?
3        A.   I believed it to be true.
4        Q.   Do you believe it to be true today?
5        A.   Yes.
6        Q.   What if I said to you, sir, that I
7   represent Mrs. Dobrich, that I am not in
8   consultation in any way with the ACLU on this case
9   and that my only concern is upholding the rights of
10  my clients in this case, that's it. Would you
11  change your views about that the ACLU was trying to
12  take your rights away in this litigation?
13       A.   I wouldn't change my views of the ACLU, but
14  that would be fine, if you are acting on behalf of
15  Mrs. Dobrich that's fine. But my views of the ACLU
16  are still the same.
17       Q.   Would you continue to say publicly the ACLU
18  is trying to take my rights away in this litigation?
19       A.   Probably so, because that's still the way I
20  feel. I think the ACLU is trying to take some of my
21  rights away as a Christian. And I think --
22       Q.   In this litigation?
23       A.   And I believe that they are a part of this
24  whether directly or in consultation or whatever, I

Page 192

1   think the ACLU, my view, my opinion is they are a
2   part of it. Now, if that's not true then okay.
3        Q.   You don't care?
4        A.   No, it's not that I don't care, I'm saying
5   that's fine if it's not true.
6        Q.   But you are going to keep saying it?
7        A.   Yes, because I still -- I think I told you
8   yesterday that when I have a belief, if you can show
9   me a piece of paper that says the ACLU has nothing
10  to do with this case as far as consultation or you
11  don't confide or they don't help in any way, then
12  okay. But up until this time nobody has shown me
13  that, and my belief is that the ACLU is still
14  involved in this case.
15       Q.   And that's why you keep talking about the
16  ACLU in public?
17       A.   Because I don't agree with what the ACLU is
18  doing.
19       Q.   All right, I want to talk to you about the
20  text of your statement at the February 27th meeting.
21  The second sentence reads, "The ACLU has an ongoing
22  nationwide campaign to take away the rights of any
23  citizen legislator who speak or pray according to
24  his conscience and religious tradition."

Page 193

1            I just want to clarify. You believe that
2   the efforts of the Does and Dobriches and of their
3   lawyers, Messers Lenhard, Horvath and myself are a
4   part of that ongoing campaign, am I correct?
5        A.   I believe this case is part of an ongoing
6   campaign. Whether you're personally involved in
7   that I don't know, but I think this case --
8        Q.   Fine, that's all I need to know.
9        A.   Okay.
10       Q.   After then two sentences down you say, "Our
11  court case where we have been standing up to the
12  ACLU provides the opportunity for a federal court to
13  permanently uphold my right not to be treated as a
14  second class citizen, or have to move to the back of
15  the bus."
16       A.   Uh-hum.
17       Q.   When you refer to having to move to the
18  back of the bus, did you have reference to Mrs. Rosa
19  Parks?
20       A.   Yes.
21       Q.   And do you equate your position here with
22  that of Mrs. Rosa Parks?
23       A.   I equate that with the position, that I
24  feel as though some of my rights may be taken away

49 (Pages 190 to 193)

Dobrich, et al.                    v.              Indian River School District, et al.
Reginald Helms          C.A. # 15-120 (JJF)                 October 11, 2006

Page 194

1  or denied. And certainly I think that was her main
2  concern that some of her rights were being violated,
3  and so in that way, yes.
4      Q.   So your position is equivalent to that of
5  Rosa Parks?
6      A.   I don't know if it's equivalent.
7      Q.   Why did you use the phrase, "move to the
8  back of the bus," if you didn't think it was
9  equivalent?
10     A.   Well, when you say equivalent, equivalent
11  is the same weight. Some people may say that her
12  issue is more important to them than my issue.
13     Q.   Not to you, though?
14     A.   To me my issue is very important and I also
15  recognize that hers was important, but are they
16  equal, that's a matter of opinion, but I think they
17  are both having to be involved with rights being
18  taken away from individuals or whatever. It's not
19  whether it's equal, it's whether it's of the same
20  nature. In other words --
21     Q.   You think that you are in the same position
22  as Mrs. Parks was?
23     A.   I think I'm in the position that there's a
24  possibility that some of my rights may be taken

Page 195

1  away, yes.
2      Q.   Do you think that you are being
3  discriminated against in the same way that
4  Mrs. Parks was discriminated against?
5      A.   I think I'm being discriminated against
6  because I'm a Christian and I want to pray in Jesus'
7  name.
8      Q.   I don't think that was my question. Do you
9  think that you are being discriminated against in
10  the same way as, and to the same degree that
11  Mrs. Parks was discriminated against?
12     A.   Well, would you describe to me your opinion
13  of same way?
14     Q.   No, sir.
15     A.   Okay, then I don't know if I can answer
16  that question.
17     Q.   Do you believe that you are discriminated
18  against to the same degree as Mrs. Parks?
19     A.   I really don't know how to answer that
20  question.
21     Q.   Have you ever have been made to sit in the
22  back of the bus because you're a Christian?
23     A.   No.
24     Q.   Have you ever been made to drink from a

Page 196

1  separate water fountain because you're a Christian?
2      A.   No.
3      Q.   Have you ever been made to leave a lunch
4  counter because you're a Christian?
5      A.   No.
6      Q.   Have you ever been denied the right to vote
7  because you're a Christian?
8      A.   No.
9      Q.   Have your children ever been -- has anyone
10  ever sought to convert your children to another
11  religion because you're a Christian?
12     A.   I don't know that answer.
13     Q.   Do you believe --
14     A.   Not to my knowledge, but kids don't also
15  confide, I don't know.
16     Q.   Has anyone ever tried to convert you to a
17  religion different than Christianity?
18     A.   Yes.
19     Q.   Has anyone ever asked you why you were a
20  Christian?
21     A.   Yes.
22     Q.   Have you answered?
23     A.   Yes.
24     Q.   And what was your answer?

Page 197

1      A.   Why am I a Christian?
2      Q.   Yes.
3      A.   Because on March 27, 1973 I was at a
4  revival meeting and the evangelist that was
5  preaching that night his sermon touched my heart and
6  I went forward and gave my heart to Jesus, and
7  that's why I'm a Christian.
8      Q.   And before March 27 what religion were you?
9      A.   I had attended a Methodist church when I
10  was younger, but I don't know if I had any -- I
11  wasn't a Christian before March 27, 1973.
12     Q.   Anybody ever turn a fire hose or police
13  dogs on you because you're a Christian?
14     A.   No.
15     Q.   Has anyone ever suggested that you could
16  disappear because you're a Christian?
17     A.   To me?
18     Q.   Yeah.
19     A.   No.
20     Q.   Now, I know these words were not written by
21  you, but do you think that for you to equate your
22  position with Rosa Parks was a little over the top?
23     A.   No.
24     Q.   You think it was an exactly apt comparison?

50 (Pages 194 to 197)

Dobrich, et al.                        v.               Indian River School District, et al.
Reginald Helms              C.A. # 15-120 (JJF)                      October 11, 2006

Page 198

1    A.   No.
2    Q.   Well, do you think it was an apt
3    comparison?
4    A.   I think in my mind the comparison that she
5    had rights taken away from her, and there was a
6    potential that I was going to have rights taken away
7    from me. That's how I equate myself to Miss Parks.
8    Q.   All right --
9    A.   To me it's a matter of rights being
10   withheld, taken away, and in my case it was the
11   potential of that happening.
12        At this moment as we are sitting here right
13   now, as far as I know I have the right to pray when,
14   where and however I wish. However, I feel as though
15   that right may be in jeopardy.
16   Q.   Mrs. Parks rights weren't in jeopardy, they
17   had been taken away, hadn't they?
18   A.   I think she was denied some rights, yes.
19   Q.   Mrs. Parks was being discriminated against?
20   A.   Okay, yes.
21   Q.   You're not being discriminated against, are
22   you?
23   A.   I am not, but there are Christians
24   throughout this nation and world that are.

Page 199

1    Q.   That's not what this lawsuit is about, is
2    it Mr. Helms?
3    A.   I know, I know, but I'm just saying, you
4    asked me several times about are these things
5    happening to me and no they're not, but the
6    potential is there because it is happening in other
7    places.
8    Q.   I am going to ask one more question then
9    I'm going to go to a new topic.
10   A.   Okay.
11   Q.   Do you think that the comparison of
12   Reginald Helms, a white man from Sussex County,
13   Delaware, to Rosa Parks, a black woman in the south
14   in the late '50s is an apt comparison?
15   A.   I don't know how to answer that question.
16   In my mind it's not equal, but it is the same.
17   That's the best I can come, because I think it's a
18   matter of rights and although I haven't been fire
19   hosed, beaten or whatever, it's to me, my opinion,
20   it's a matter of rights.
21   Q.   I gave you a list of six Board meetings
22   that since the adoption of the prayer policy, at
23   which you gave the prayer, in each of those cases
24   did you pray in the name of Jesus?

Page 200

1    A.   Yes.
2    Q.   In each of those cases you knew that
3    students were there?
4    A.   Yes.
5    Q.   You had no idea whether those students were
6    all Christian or of other faiths, isn't that
7    correct?
8    A.   No.
9    Q.   You didn't know if they were Muslim or
10   Jewish or Agnostic or atheist or whatever?
11   A.   No.
12   Q.   And for the purposes of your position in
13   this case it doesn't matter, isn't that right?
14   A.   It doesn't matter?
15   Q.   Yes.
16   A.   I wouldn't say it doesn't matter.
17   Q.   Well, explain to me how it matters whether
18   the students in the audience are Christian or Muslim
19   or Agnostic or Jewish for purposes of the
20   infringement of your rights?
21   A.   I guess I just have a -- I'm having a hard
22   time to understand what your question is. Could you
23   ask it again?
24   Q.   Sure. It didn't matter whether all of the

Page 201

1    students are Christian or all the students are
2    atheist, for purposes of determining whether or not
3    your rights to pray as you wish are being
4    compromised, or you are being discriminated against,
5    does it? The audience doesn't matter, it's you that
6    matters?
7    A.   I wouldn't say that, I have respect for all
8    people. I would hope they would have respect for
9    me. So when you say does it matter, everyone
10   matters. But I just simply wasnt to be able to pray
11   the way that I have always prayed since I've been a
12   Christian.
13        And if they want to pray, if they are in a
14   position that they are all called to pray, or they
15   want to pray, then whatever way they want to pray is
16   fine. I may not necessarily agree with it, but it's
17   fine.
18   Q.   If you offered a prayer and a student
19   walked to the podium said I would like to offer a
20   prayer, too, what would you do?
21   A.   What would I do?
22   Q.   Yeah.
23   A.   I don't know. That's an honest answer --
24   Q.   All right let's say that -- I'm sorry,

51 (Pages 198 to 201)

Dobrich, et al.
Reginald Helms

v.

C.A. # 15-120 (JJF)

Indian River School District, et al.
October 11, 2006

Page 202

1  excuse me, I interrupted, I don't like to do that.
2      A.  I don't know how I would act in that
3  situation until presented to that. I would hope, I
4  would hope that I would be respectful, but I don't
5  know what I would do.
6      Q.  Well, let me pose a different hypothetical.
7  Suppose there were 35 students in the audience and
8  each of them one after another walked to the podium
9  and said I'd like to offer a prayer, and the Board
10  members began to look at their watches and said
11  something's got to be done here, and at some point
12  it's true, is it not that maybe the first person you
13  wouldn't say sorry we have got to get on with our
14  business, but at some point, we can both agree,
15  can't we, Mr. Helms, that you'd say look I have
16  enormous respect for your religion and I think it's
17  wonderful that you're anxious to invoke divine
18  guidance but we have got to get to the business at
19  hand?
20      A.  Well, I'm sitting here thinking as
21  presented with this, one way it might possibly be
22  handled is to say we have a public comment section
23  coming up and if you wish to come to the podium and
24  present a prayer we set aside 15 minutes and each

Page 203

1  individual has two minutes to express themselves in
2  whatever way, maybe that would be the appropriate
3  time. But you know, and handle it that kind of way.
4      Q.  Isn't the public comment section limited to
5  matters of Board business?
6      A.  As far as I know public comment is public
7  comment. It could be -- now you would hope someone
8  wouldn't come to the podium in a School Board
9  meeting and start talking about what happened at the
10  Food Lion. However, we don't tell them what they
11  can talk about and we don't limit them except the
12  policy like we talked about before as far as getting
13  into personalities, bargaining unit types of things.
14  There are limitations there, but we don't tell
15  anyone what to speak about and we don't say you can
16  only talk about School Board issues.
17      I've never heard anyone say, to the best of
18  my knowledge, I have never heard any president tell
19  someone you can only talk about this issue and you
20  can't talk about that. I've never heard that. I
21  would assume everybody knows we are there about
22  School Board business.
23      However, if a student came up and says I
24  want to offer a prayer, I would hope we would handle

Page 204

1  it respectfully and say well, we have a public
2  comment section and as an individual you have two
3  minutes, and you say whatever you want to say,
4  within the guidelines of our policy.
5      In other words, they couldn't bad mouth a
6  teacher by name, that sort of thing.
7      Q.  Doesn't the Constitution guarantee the
8  right to say whatever you want?
9      A.  Well, I think I'm not that familiar with
10  the Constitution law --
11          MR. ALLINGHAM:  That's a legal
12      question, I will withdraw it.
13          MS.DUPHILY:  We are going off the
14      record at approximately 11:10 a.m..
15          (WHEREUPON a brief recess was
16      taken)
17          MS. DUPHILY:  We are back on the
18      record at approximately 11:11 a.m..
19      Q.  As a School Board member you want this
20  School Board prayer issue to be decided by the
21  courts don't you?
22      A.  My opinion, yes.
23      Q.  Do you know who the Does are?
24      A.  No, I don't.

Page 205

1      Q.  Has anyone told you who they think the Does
2  are?
3      A.  I don't recall that, although I have had
4  some people say to me they think they know who they
5  are. But I don't recall anybody telling me
6  specifically who they were. But if they did, I
7  don't remember.
8      Q.  I take it you have done nothing to counter
9  what people conjecture about, have you?
10      A.  If you are asking me if it's important for
11  me to know who they are, it's not important to me
12  who they are. If they want to remain anonymous
13  that's fine. We had some discussion about should we
14  know who they are, and some people think we should
15  know, but to me I would like to know, but it's not
16  that big a deal to me. So, I have not made any
17  conscious effort to find out who they are.
18      Q.  Do you recall who told you they thought
19  they knew who the Does were?
20      A.  I believe as I recall I think Mrs. Hobbs
21  may have said she thought she knew who they were, I
22  think Dr. Hattier said he knew who -- he thought, he
23  thought he knew who they were and maybe Mr. Darling,
24  but again I'm not 100 percent sure. But no, do I

52 (Pages 202 to 205)

Dobrich, et al.
Reginald Helms

v.

C.A. # 15-120 (JJF)

Indian River School District, et al.
October 11, 2006

Page 206

1  know Mrs. Hobbs knows, she could, and Dr. Hattier
2  said he thought he knew, whether Mr. Bireley said it
3  or not, I think he did, but I'm not 100 percent
4  sure.
5     Q.   Whoever said, though, that they knew who
6  the Does were, they didn't tell you who they thought
7  the Does were?
8     A.   I don't recall that, but if they did I
9  can't give you a name, I don't know who they are.
10    Q.   This is the Southern Delaware School of the
11 Arts, and you have to audition to be admitted into
12 the school?
13    A.   I believe that to be true.
14    Q.   Does the Board have anything to do with the
15 scheduling of those auditions?
16    A.   To the best of my knowledge, no.
17    Q.   Yesterday you told me that typically where
18 the Board concludes that a matter is appropriate for
19 treatment by a policy that it's appropriate to pass
20 a policy on an issue, what typically they do is
21 refer the matter to the policy committee and ask the
22 Board's attorney to draft a policy, do you remember
23 that testimony?
24    A.   Yes.

Page 207

1     Q.   In this case am I correct that you did not
2  ask Mr. Griffin to draft a School Board Prayer
3  Policy?
4     A.   I'm not sure whether we asked him or not.
5  I don't recall.
6     Q.   Are you aware of any alternative draft
7  School Board Prayer Policy that was provided by
8  anyone to the Board members?
9     A.   I am aware of the policy that I sent to
10 Mr. Walls, I'm aware of that.
11    Q.   It's one that you have in front of you?
12    A.   Yes, that's correct.
13    Q.   And you understand that that one has the
14 policy that was ultimately adopted as part of it?
15    A.   Yes.
16    Q.   When you sent PX34 to Mr. Walls that's the
17 document that you have right there?
18    A.   Yes.
19    Q.   Did you send it to him thinking in your
20 mind that it was an example of a School Board Prayer
21 Policy?
22    A.   I sent him the fax to say here is what I
23 have received and to consider this. And I guess I
24 can't, I could have thought that this is one example

Page 208

1  of a possible policy, but I don't recall my exact
2  thoughts. But I did send it to him with the intent
3  that it was pretty important to looking it over and
4  see what he thought.
5     Q.   Was there any discussion at any time that
6  you are aware of about whether to adopt simply the
7  five numbered paragraphs at the end of PX34 or the
8  longer document that you had sent to Mr. Walls?
9     A.   I seem to recall a discussion about the
10 document as we see here being entirely too lengthy.
11 I do recall that discussion.
12    Q.   And who said that?
13    A.   I want say it was Mr. Walls as being chair
14 person of the policy committee. I'm not 100 percent
15 sure, but as I recall I think it may have been
16 Mr. Walls saying that it was too lengthy.
17    Q.   Did he say that to you?
18    A.   I think he said it to the entire Board as I
19 recall, I think that's where it was.
20    Q.   Was that in response to someone asking what
21 happened to the longer version that we received from
22 Mr. Helms?
23    A.   I can't recall the specifics. I don't
24 recall a question of that, but I don't know. It

Page 209

1  could have been but I don't recall. It could be.
2     Q.   Aside from the length do you recall any
3  other concern of what you sent to Mr. Walls other
4  than the five numbered paragraphs?
5     A.   I don't recall any concern about the
6  wording itself, no. I don't recall any concerns.
7     Q.   If you have PX9 and PX34 in front of you, I
8  have a couple of questions about the two. If you
9  look at the second to last page of PX34 you will see
10 that there are cases cited, legal cases cited?
11    A.   Yes.
12    Q.   Did you read these cases or did you absorb
13 the summaries that were provided to you?
14    A.   You mean did I look at the cases
15 themselves?
16    Q.   Yes, sir.
17    A.   No, I did not.
18    Q.   Anyone argue that the cases included in
19 PX34, should be incorporated in the final Board
20 Prayer Policy?
21    A.   Not to my recollection.
22    Q.   You did agree with the sentiments expressed
23 in the contents of PX34 up to the numbered
24 paragraphs that begin on page four?

53 (Pages 206 to 209)

Dobrich, et al.                                    v.         Indian River School District, et al.
Reginald Helms                        C.A. # 15-120 (JJF)                    October 11, 2006

Page 210

1   A.   Are you saying did I agree with all the
2   whereas, that sort of thing?
3   Q.   Yeah.
4   A.   As I recall I thought it was okay. I
5   didn't read each and every case. So to say did I
6   agree with all of it, I am not sure about it. I had
7   cases but I agree that this was the point of what we
8   had been doing, what is the history, yes.
9   Q.   Is it your view that the Indian River
10  School Board has the responsibility for fighting the
11  war on terror?
12  A.   The Indian River School Board?
13  Q.   Yes, sir.
14  A.   Well, I think this again is my opinion, I
15  think that as individuals we are all responsible,
16  you know, it is our job to fight terror. Well, I
17  don't know if that's our job, but as individuals I
18  would hope that all of us are responsible for
19  fighting and protecting.
20  Q.   So, I take it you didn't read the legal
21  opinions, the actual cases that are cited in this
22  memorandum?
23  A.   No, I did not read all the cases.
24  Q.   Or any of them?

Page 211

1   A.   I was looking through this. The Marsh
2   versus Chambers looks very familiar, but I can't say
3   that I read the whole case. That's the only names
4   that jump out, but I don't recall reading that whole
5   case, but I do remember seeing those names.
6   Q.   Well, then I will ask you a question about
7   Marsh v Chambers. As you understand Marsh v
8   Chambers does it involve prayers, prayer by School
9   Board?
10          MR. SHAW:  You are asking him what
11      his understanding of the case would be?
12          MR. ALLINGHAM:  Of course.
13          MR. SHAW:  Have you read that
14      case?
15  A.   I am not familiar enough with that case to
16  make any comment on it.
17  Q.   Would your answer be the same if I asked
18  you questions about all the other cases?
19  A.   Yes.
20  Q.   Fair enough. This is not a law school
21  test?
22  A.   Right. I hope not.
23  Q.   The adoption of Board Policy BDA.1 on
24  October 19, 2004, that adoption did not change in

Page 212

1   any way how the Board opens its meeting with prayer,
2   did it?
3   A.   I don't believe so.
4   Q.   Okay. Is it correct that the contents of
5   Board policy BDA.1 was never discussed at a public
6   forum prior to its passage?
7   A.   I don't believe it was.
8   Q.   Have you as a Board member ever heard about
9   a complaint about religious practices at the
10  Selbyville Middle School?
11  A.   Before this case or -- the first time I
12  heard about any claim of Selbyville Middle School
13  was part of this case.
14  Q.   This is a when this lawsuit was filed?
15  A.   Yes.
16  Q.   I'm going to show you, but not mark, a
17  document that bears Bates numbers P1614 and P1615.
18  I am not marking it in part because of its nature.
19  It's marked highly confidential for attorney's eyes
20  only.
21      I am showing it to you in order to
22  determine simply whether you saw this document at or
23  about the time of the date, which is October 1,
24  2004, or approximately three months before this

Page 213

1   lawsuit was filed?
2          MR. SHAW:  Do you have an extra
3      copy of that?
4          MR. ALLINGHAM:  I have masked out
5      the name at the bottom and I ask that you
6      do not take the mask off.
7   A.   I don't recall receiving this letter.
8   Q.   Thank you. Do you recall at or about the
9   time of its date, October 1, 2004, being informed
10  that a complaint — being informed of the substance
11  of a complaint like that?
12  A.   No. You mean by Mrs. Hobbs?
13  Q.   Mrs. Hobbs or anybody?
14  A.   I don't recall that. She may have but I
15  don't recall that.
16  Q.   Thank you, may I have it back, please?
17  A.   Sure.
18  Q.   The next three or four questions have to do
19  with contacts with voters or residents of your
20  district. Has any of your constituents told you
21  that they see this case as about protecting
22  Christian prayer?
23  A.   Yes.
24  Q.   How many, and again I'm looking for

54 (Pages 210 to 213)

Dobrich, et al.                              v.                    Indian River School District, et al.
Reginald Helms                      C.A. # 15-120 (JJF)                      October 11, 2006

Page 214

1  ballparks here?
2      A.  25 to 50, somewhere in there.
3      Q.  Has anyone ever told you that they see this
4  case as about protecting Christian values?
5      A.  No.
6      Q.  Has anyone ever told you that they see
7  this, the School Board's Prayer Policy, as
8  protecting Christian values?
9      A.  No.
10     Q.  Has anyone ever told that they see the
11  School Board's prayer policy as promoting
12  Christianity?
13     A.  No.
14     Q.  Has anyone ever told you that they see the
15  School Board's prayer policy as protecting Christian
16  prayer?
17     A.  Yes.
18     Q.  Do you know if any School Board member has
19  campaigned for election or reelection on the ground
20  that they support School Board prayer?
21     A.  Only hearsay.
22     Q.  What was the hearsay?
23     A.  I didn't hear the WGND broadcast, but I
24  understand that Mr. Bireley and Miss Wilson was on a

Page 215

1  program and I believe that that was one of the
2  topics that people were calling in and asking, and I
3  heard that what was told to me was Miss Wilson's
4  comments were not very good. Now, whether she
5  campaigned on that issue or not I'm not sure, but
6  that's the only one I'm aware of that even mentioned
7  it during the elections.
8      Q.  Have you ever told anyone that you view the
9  ACLU as anti-Christian?
10     A.  No.
11     Q.  All right, look at PX9, that's the Board
12  Prayer Policy?
13     A.  Okay.
14     Q.  And you will see that paragraph three
15  reads, "Such opportunity shall not be used or
16  exploited to proselytize, advance or convert anyone
17  or to derogate or otherwise disparage any particular
18  faith or belief."
19         Do you see that?
20     A.  Yes.
21     Q.  And that's something that you believe in as
22  a Board member?
23     A.  Right. Our -- may I clarify that?
24     Q.  Yes.

Page 216

1      A.  Our Board meetings are not supposed to be
2  evangelistic meetings or --
3      Q.  We can all agree on that?
4      A.  Right. I don't know what the Muslims call
5  their, but this is for School Board business and
6  it's not intended to be a church meeting or anything
7  of that nature.
8      Q.  Okay, I'm going to give you three examples
9  of a prayer one by one, and I'm going to ask you
10  whether in your view interpreting paragraph three of
11  the Board Prayer Policy you would view them as
12  prohibited by paragraph three or permitted under
13  paragraph three, okay?
14     A.  Yes.
15     Q.  The first one has previously been marked as
16  Plaintiff's Exhibit 35. Can you read over Mr. Helms'
17  shoulder or do you have a copy?
18         MR. SHAW: I have a copy.
19     Q.  And so the record is clear the prayer is as
20  follows, Mr. Helms, but follow along with me. Do
21  not put your trust in princes, in mortal men who
22  cannot even save themselves. When their spirit
23  departs they return to the ground. On that very day
24  their plans come to nothing. Blessed is he whose

Page 217

1  help is the God of Jacob, whose hope is in the Lord
2  his God, the Maker of heaven and earth, the sea, and
3  everything in them. The Lord who remains faithful
4  forever.
5         He upholds the cause of the oppressed and
6  gives food to the hungry. The Lord sets prisoners
7  free, the Lord gives sight to the blind, the Lord
8  lifts up those who are bowed down, the Lord loves
9  the righteous. The Lord watches over the alien and
10  sustains the fatherless and the widow, but he
11  frustrates the ways of the wicked. For the wages of
12  sin is death; but the gift of God is eternal life
13  through Jesus Christ our Lord.
14        My question -- well, first of all sir, do
15  you recognize that scripture?
16     A.  For the wages of sin is death?
17     Q.  Yes, sir.
18     A.  Yes, I do.
19     Q.  Do you recognize the earlier part of the
20  prayer is taken from scripture?
21     A.  I recognize, you know, when they refer to
22  the God of Jacob and the maker of heaven and the
23  sea, that type, yes, I do.
24     Q.  And this is a christian prayer, correct?

55 (Pages 214 to 217)

Dobrich, et al.                          v.              Indian River School District, et al.
Reginald Helms                  C.A. # 15-120 (JJF)                    October 11, 2006

Page 218

1  A.  I would say that's a Christian prayer, yes.
2  Q.  Is it your view as a Board member that that
3  is permitted or prohibited by paragraph three and
4  its contents?
5  A.  In my mind I would say it'd be permitted
6  because I don't see this -- I don't see this as
7  evangelistic. I see this as just some people pray
8  scripture. Some people sing scripture. But I mean
9  I don't see this as an evangelistic type of a
10  meeting. However, I do recognize some of these
11  scriptures coming from the Bible, yes I do recognize
12  that.
13  Q.  The second prayer which I want to read for
14  you, and this is short so I don't have a document?
15  A.  Okay.
16  Q.  But I can cut it our and give it to you if
17  you need to read it. It's as follows: Allah, we
18  offer you our school bus drivers, we offer you our
19  superintendent, our administrators, and our
20  secretaries, we offer you our teachers and our
21  parents. Finally we offer you our students. Peace
22  be unto your prophet Muhammad.
23      Would you view that prayer as permitted or
24  not permitted by paragraph three of the prayer

Page 219

1  policy?
2  A.  I would say that would be permitted.
3  Q.  For the same reason that you said on the
4  first one, correct?
5  A.  Sure.
6      MR. ALLINGHAM:  Now, I am going to
7      ask the court reporter to mark as PX45 a
8      document that bears no Bates numbers but
9      this prayer is a little bit longer so I'm
10      going to give it to you so you can follow
11      along.
12      (WHEREUPON Plaintiff's Exhibit 45
13      was marked for identification.)
14  Q.  It reads: Heavenly Father, thank You for
15  this great occasion, for the work, the effort, the
16  joys and everything that led up to this point in
17  time. We thank You for Your guidance in this event.
18  We pray for Your direction in the lives of each of
19  these School Board members. We pray that You direct
20  them into the truth, and eventually the truth that
21  comes by knowing Jesus. We also pray that You would
22  be with them at this time. We ask these things in
23  Jesus's name. Amen.
24      Would you view that prayer as violative or

Page 220

1  permitted by paragraph three of the policy?
2  A.  Permitted.
3  Q.  Mr. Helms, you've described generically
4  what you think would be prohibited by the, by
5  paragraph three, and I take it that that would be
6  something that would be evangelical in spirit, is
7  that right?
8  A.  That's correct.
9  Q.  Seeking to convert someone to the religion
10  of the speaker?
11  A.  That's correct.
12  Q.  In your view does the text of such a
13  prayer, in order to be evangelical, does it have to
14  say explicitly come on over to our side, join our
15  religion, join our faith, become a Muslim, become a
16  Christian, does it have to say those words or can
17  the evangelical nature of the prayer be inferred
18  from the rest of its content?
19  A.  Well, my opinion it gets back to
20  interpretation and how you personally receive a
21  prayer like that. But for me, my opinion if someone
22  were to convince me that or try to convince me that
23  what I was doing was wrong, and I needed to repent
24  and change my ways, or come over to our side, then I

Page 221

1  think you are stepping over the bounds.
2      To someone else it's a matter of opinion.
3  They may have been, for instance the prayer that you
4  led off with Allah, someone may have been feeling
5  that hey are they trying to impose the, whatever
6  that is Muslim belief on us, or whatever, I would
7  not.
8  Q.  Okay, I'm only looking for your
9  interpretation as a Board member?
10  A.  I think you step over the line when in your
11  prayer you may include something like and all the
12  heathens sitting out in the audience need to bow
13  down and accept whatever. I think you may be
14  stepping over the bound. I don't know that, but in
15  my mind I would say I don't know if I would say that
16  or not.
17  Q.  Well, let me just explore that a little
18  bit, if I am may. If, I will make Dr. Hattier the
19  villain in this case, I don't mean villain, you know
20  what I mean by villain, the example. If Dr. Hattier
21  offered a prayer in which he said at the end of the
22  prayer, and I pray that the heathen in the audience
23  recognize the error of their ways and come to Jesus
24  so that they may join his children in heaven. My

56 (Pages 218 to 221)

Dobrich, et al.
Reginald Helms

v.
C.A. # 15-120 (JJF)

Indian River School District, et al.
October 11, 2006

Page 222

1  question to you is, that's a prayer that you would
2  view as violative of paragraph three?
3      A.  I would view that as a prayer that is very
4  dangerously on the edge, and I would need someone --
5  see, to me there is a difference between what is
6  lawful -- in other words, someone would have to tell
7  me whether that lawfully broke the policy.  However,
8  in my mind I would say I would not say that, and I
9  don't know that I would, but perhaps I may say
10  something to Dr. Hattier in the form of you know Dr.
11  Hattier that might be dangerously close.  That's
12  something I wouldn't do.
13      Q.  Yes, sir.  That raises a couple of more
14  questions.  If you viewed a prayer in your judgment
15  as a Board member, because you are charged with
16  enforcing this policy, correct?
17      A.  Right.
18      Q.  If you viewed a prayer offered by one of
19  your colleagues as violating paragraph three what
20  would you do?
21      A.  I would wait till the appropriate time and
22  I see that as executive session or whatever, and I
23  would like to talk about it.
24      Q.  It is fair to say, is it not, that nothing

Page 223

1  in this policy would provide a mechanism for a
2  determination to be made that a prayer — that a
3  prayer which is offered would violate paragraph
4  three in advance?
5      A.  Could you explain that question?
6      Q.  Yeah.  There is a mechanism in the policy
7  which if Dr. Hattier, poor Dr. Hattier, if Dr.
8  Hattier had a piece of paper with that evangelical
9  prayer that we have been talking about in his hand
10  and he sits down at the table on the stage and
11  Mr. Bireley says would you like to give a prayer, to
12  open the meeting with a prayer Dr. Hattier, there is
13  no mechanism for you, of any Board member, to have
14  determined whether the prayer on the piece of paper
15  Dr. Hattier holds is violative of paragraph three or
16  not, is there?
17      A.  I think I understand your question and I
18  would say no, there is no stipulation that says you
19  have to submit your prayer beforehand or someone
20  needs to review that and make corrections, no, there
21  is no stipulation.
22      Q.  And if Dr. Hattier or any other Board
23  member delivered a prayer that was sufficiently
24  evangelical that you and your colleagues would

Page 224

1  believe it was prohibited by paragraph three, there
2  is no provision for punishment of that Board member
3  for violating the policy, is there?
4      A.  Yes and no.
5      Q.  Tell me what you mean by yes and no?
6      A.  Okay.  I would say yes there is a provision
7  number one if the president felt that they were
8  stepping over the line they have the opportunity to
9  step in and ask Dr. Hattier to cease.  And is there
10  no punishment, I would say I don't know.  During the
11  discussions in executive session I don't know if
12  there would be any punishment.  We are certainly not
13  going to sentence him to jail, or we couldn't
14  suspend him from the job because it's not a job, so
15  there may be some punishment if you will, to the
16  extent we would appreciate it if you didn't do that
17  again.  Someone may consider that to be punishment,
18  I don't know.
19      But there are opportunities to step in if
20  someone is out of line.  The president has that
21  responsibility, but also in executive session there
22  are discussions that can be had to try to, you know,
23  straighten that sort of thing out.
24      Q.  Yes, sir.  Where ever the line is drawn,

Page 225

1  whether you use the evangelical rule that you've
2  articulated, or whatever it's drawn, and by whatever
3  standard, you would agree with me, would you not,
4  that the policy imposes limitations on each
5  individual Board member's right to pray as he sees
6  fit?  That is to say, it tells you that you may not
7  offer a prayer that proselytizes or seeks to advance
8  or convert anyone or to derogate or disparage any
9  particular faith?
10      A.  I would say that's in the language and
11  there again I would have to say it's a matter of
12  interpretation.  In other words, if I were president
13  I have something in my mind that I like I shared
14  with you, this might be stepping over the line.
15  However, someone else may be president that either
16  feels that I was too strict or maybe I wasn't strict
17  enough.
18      So, as each individual president sits in
19  that seat it's their responsibility to adhere to
20  these policies the best that him or her knows how.
21      Q.  Yes, sir.
22      A.  So, there may be so differences there.
23      Q.  But we can agree, can't we, that however we
24  interpret it, paragraph three is not just an empty

57 (Pages 222 to 225)

Dobrich, et al.                              v.              Indian River School District, et al.
Reginald Helms                      C.A. # 15-120 (JJF)                        October 11, 2006

Page 226

1  gesture, it has a meaning and it does impose some
2  limitation on the right of individual Board members
3  to pray as they see fit?
4      A.   Yes.
5      Q.   And in fact, Mr. Helms, I don't know if
6  this is your particular faith, but there are faiths
7  in the world in which, in which its adherents are
8  urged to show forth their faith at every
9  opportunity, is that correct?
10     A.   I would say that's correct.
11     Q.   And there are faiths in which we are urged
12  to try to convert people who do not believe in our
13  religion to our religion?
14     A.   Yes, there are religions that do that.
15     Q.   And I'm only inferring this from some of
16  your answers, but I am inferring that you have from
17  time to time been the subject of prayers or the
18  recipient of prayers that the persons who have not
19  yet been saved in the audience should come to God?
20     A.   Rephrase that question?
21     Q.   Have you ever heard an individual say I
22  urge those of you in the audience who have not yet
23  been saved to come to God?
24     A.   No, I have not heard that.  As I understand

Page 227

1  it, and I am trying to recall, that only happened
2  one time and that was at the graduation at Sussex
3  Central, and I wasn't there.
4      Q.   Yeah, I apologize, I didn't mean to limit
5  this to School Board meetings.  In your life you
6  have heard from time to time prayers in which the
7  speaker urged those in the audience who had not been
8  saved to come to God?
9      A.   Certainly, certainly.  I thought you just
10  meant in a School Board setting, I'm sorry.
11     Q.   I don't know whether this is true, but have
12  you ever urged someone who was not saved to come to
13  God?
14         MR. SHAW:  I'm going to instruct
15     Mr. Helms not to answer that.  It's delving
16     into his personal religious beliefs, and
17     it's not at issue in this.  Whether or
18     not he has asked people to come to God
19     isn't relevant in this context.
20         MR. ALLINGHAM:  Mr. Helms I'm
21     going to respect that instruction, but I'm
22     going to ask the general question.
23     Q.   Can we agree that paragraph three of the
24  policy imposes limitations on the free exercise of

Page 228

1  this religious faith by the individual Board
2  members?
3      A.   Yes, to the extent that in my opinion it
4  means that we are not to hold evangelistic meetings
5  or something like that.  But yes there are
6  limitations in this policy.
7      Q.   So, it's your understanding that the right,
8  the individual right of Board members to exercise
9  their faith as they see fit, is not an unlimited
10  one?
11     A.   I think that would be safe to say.
12     Q.   Okay.  Mr. Bireley testified yesterday that
13  his approach to the implementation of the rotating
14  basis that is set forth in paragraph two of the
15  policy was to ask each of the sitting Board members
16  whether they would like to be included in the
17  rotation.  Did Mr. Bireley ask you that question in
18  words or substance?
19     A.   In substance, yes.
20     Q.   And in response to that question did you
21  volunteer to be one of the Board members who would
22  be included in the rotation of people invited to
23  give a prayer at the beginning of the meeting?
24     A.   Yes, I told him that if he asked me to pray

Page 229

1  I would be glad to do that.
2      Q.   Does Mr. Bireley let you know in advance
3  when, at which meeting you will be invited to offer
4  the prayer?
5      A.   As I recall almost always, almost.  He asks
6  you before the meeting it could be five minutes
7  before the meeting, it could be a phone call in the
8  afternoon, he tries very hard to ask you before the
9  meeting if you would like to pray, yes.
10     Q.   And is it your understanding that he does
11  that in order to let you know that if you would
12  prefer not to at that meeting he won't invite you?
13     A.   I don't know.  I assume he doesn't want to
14  ask you if you want to pray if you don't want to.  I
15  know Mr. Bireley very well, but I don't know his
16  thoughts, but I'm thinking Mr. Bireley does not like
17  to embarrass anyone, so if you don't want to pray he
18  feels as though he doesn't want to ask you because
19  that might embarrass you.
20     Q.   Or put you on the spot?
21     A.   Or whatever, but I don't know what his
22  reason is, but I know in my case he always asks me
23  before the meeting, some time before the meeting.
24     Q.   Do you prepare a prayer or do you speak

58 (Pages 226 to 229)

Dobrich, et al.                                    v.                        Indian River School District, et al.
Reginald Helms                          C.A. # 15-120 (JJF)                              October 11, 2006

Page 230

1 extemporaneously?
2    A.   No, I don't prepare.
3    Q.   Whatever comes to your head?
4    A.   Yes.
5    Q.   I'm showing you what's been previously been
6 marked as PX37?
7    A.   Okay.
8    Q.   I think you have this one, but if you don't
9 let me know. The third paragraph of the article
10 from The Delaware Wave, which was written by Laren
11 Hughes, has a quote from you, actually there is a
12 few quotes in this article, have you from time to
13 time given interviews to Miss Hughes on the topics
14 of this case?
15   A.   This may have been the only one, I'm not
16 sure, but yes, I have talked to her, yes.
17   Q.   And it says, "If we pay them a six-figure
18 number and we settle all these issues and then they
19 drop the lawsuit about prayer, what happens if
20 someone else decides to file suit in three months,
21 he said. We need to take this through the court
22 system, let them make a ruling and take that through
23 the future." Is that an accurate quotation?
24   A.   Yes.

Page 231

1    Q.   And on the next page at the bottom there is
2 another quote from you, "I'm a Christian, so I
3 should be allowed to pray the way I want to pray,"
4 Helms said. I've had some people tell me that it
5 seems like this tolerance issue is a one way street.
6 They want us to be tolerant but they need to be
7 tolerant too." Is that an accurate quotation?
8    A.   Yes.
9    Q.   Is it the fact that you are a Christian --
10 withdrawn.
11          MR. ALLINGHAM: Would you mark
12       that as PX46, please.
13          (WHEREUPON Plaintiff's Exhibit 46
14       was marked for identification.)
15   Q.   This is an article by James Diehl of the
16 Sussex Post, dated December 22, 2005. In the fourth
17 column from the left, about halfway down the column
18 you're quoted as follows: "Even though we are
19 Christians we have rights also, and I just feel that
20 sometimes they want to take our rights away from us,
21 Mr. Helms said. When we had a meeting at the
22 beginning of this issue there was overwhelming
23 support for the Board and their stance on prayer
24 before Board meetings. Our public is in support of

Page 232

1 what we're doing, and I think it needs to be decided
2 by the courts." Is that an accurate quotation?
3    A.   Yes.
4    Q.   Do you feel that Christians have fewer
5 rights than non-Christians in Indian River?
6    A.   At times, yes, I do.
7    Q.   Describe for me why you feel that way?
8    A.   Well, just say for instance a non-Christian
9 within the law can do almost everything they want to
10 do. However, a Christian within the law is limited
11 to they can't -- for instance a teacher cannot open
12 their classroom with a prayer, if they are Christian
13 teacher. As a Christian Board member I'm being told
14 now that for instance if I were invited to speak to
15 the Teachers Association, or whatever, that I should
16 not open that proceeding, or that speech with
17 prayer.
18         So, I think in some ways the Christians
19 have been limited, if you will, in my opinion,
20 because of some of the laws that have been passed
21 down by the courts. However, as I said before I am
22 a law abiding citizen, and if they tell me not to do
23 it within school then I will abide by what the law
24 says. However, sometimes I do feel that we are

Page 233

1 limited, yes.
2    Q.   Just on the two examples that you have
3 given, I want to ask you a couple of questions. The
4 first one you pointed out that a teacher is not
5 permitted under your Board policy to open class with
6 a prayer, a Christian prayer?
7    A.   Right, well I'm not so sure, you say Board
8 policy, I would have to look at it, but I mean we
9 have been told that.
10   Q.   Okay.
11   A.   I think that's what it says.
12   Q.   You don't understand that the Board policy
13 would prohibit that?
14   A.   I think it does, but I would have to look
15 at the exact words.
16   Q.   Is it your understanding that a Jewish
17 teacher could open class with a Jewish prayer?
18   A.   No, as far as I know, I think it's no
19 prayer. In other words --
20   Q.   So, there is no distinction between a
21 Christian and non-Christians on this?
22   A.   Yes, you mean as far as opening with
23 prayer?
24   Q.   Yes.

59 (Pages 230 to 233)

Dobrich, et al.
Reginald Helms

v.

C.A. # 15-120 (JJF)

Indian River School District, et al.
October 11, 2006

Page 234

1    A.    Oh, no, I'm sorry.
2    Q.    Everybody has the same restriction?
3    A.    Same restriction as far as prayer is
4    concerned, yes.
5    Q.    Jews, Muslims, Buddhists, Christians,
6    everybody?
7    A.    Whomever, yes.
8    Q.    And that's the same case with the teacher's
9    meeting issue, correct? If you as a Christian can't
10   open your remarks with a prayer, it's also true that
11   a Jewish Board member or a Muslim Board member could
12   not open his or her remarks with a prayer.
13   A.    To the best of my knowledge that's correct.
14   Q.    Can you think of an instance in which
15   Christians are treated differently from Muslims, or
16   Jews or Buddhists?
17   A.    In a school setting?
18   Q.    Yes, sir.
19   A.    Yes, I can. I thought -- one of the things
20   I thought was very interesting was that in Salisbury
21   State University, which as I understand is a state
22   university, it was in the paper that they were
23   having I want to say, weeks, I don't know if it was
24   one, two, whatever, they were having instructions on

Page 235

1    the Muslim faith.
2          However, my belief is you cannot go in
3    there and say I want to have one week or two weeks
4    and instruct your student body on the Christian
5    faith.
6    Q.    Yes, sir.
7    A.    I don't think you would be allowed to do
8    that.
9    Q.    I don't know anything about Salisbury
10   State. I really, for my purposes I have no interest
11   in Salisbury State. My entire focus and the entire
12   focus of my clients is on the Indian River School
13   District.
14   A.    Right.
15   Q.    So, my question was are you aware of any
16   instance in which Christians in the Indian River
17   Schools or in matters relating to the Indian River
18   Schools have fewer rights than non-Christians?
19   A.    There again, it's your interpretation of
20   non-Christian. A non-Christian to me would be
21   someone who is an unbeliever, like I was before
22   1973. And I would be fee to do within the law
23   anything I want. But as a Christian if I want to
24   pray I can't do that. So, in that aspect, yes. I

Page 236

1    feel we are discriminated against.
2    Q.    In every instance in which you are
3    prohibited from praying, is it fair to say that a
4    Jewish person in precisely your position would also
5    be prohibited from praying?
6    A.    That's correct.
7    Q.    And a Buddhist person in your position
8    would also be prohibited from praying?
9    A.    To the best of my knowledge, yes.
10   Q.    And similarly a Muslim person would be
11   prohibited from praying to Allah?
12   A.    To the best of my knowledge, yes, however
13   that's why I mentioned the state university
14   because --
15   Q.    Yes, sir, I'm talking about the Indian
16   River School District?
17   A.    I know. I don't know -- I use that example
18   because I don't know what would happen if, for
19   instance, if someone wanted to teach a class on the
20   Muslim faith to "familiarize people with how they
21   think." I don't know what would happen.
22   Q.    Well, let me ask you --
23   A.    I would hope they would be treated the same
24   as anyone else. However, I'm not blind and I read.

Page 237

1    I know in the United States there is a movement, if
2    you will, to try to explain to the ones who don't
3    know about the Muslim faith who they are, how they
4    think and the kind of life they lead. Is that
5    teaching people about the Muslim faith, I think so.
6    But that's only my opinion.
7          I don't know what would happen if someone
8    wanted to do that in the Indian River School
9    District, and if we said no, would somebody want to
10   come in and sue us because we are being
11   discriminatory. I would hope they would be treated
12   as if someone wanted to come in and teach about the
13   Christian faith.
14          As I understand it we would not allow that.
15   So, I would hope we wouldn't allow the Muslims to do
16   that, however, I don't know for a fact that we
17   wouldn't do that.
18          MR. SHAW: Tom, before you ask
19   your follow-up question could we go off the
20   record for a second?
21          MR. ALLINGHAM: Yes.
22          MS. DUPHILY: We are going off the
23   record at approximately 12:05 p.m.
24          (WHEREUPON an off-the-record

60 (Pages 234 to 237)

Dobrich, et al.                          v.              Indian River School District, et al.
Reginald Helms                    C.A. # 15-120 (JJF)                     October 11, 2006

Page 238

1    discussion was held)
2         MS. DUPHILY:  Back on the record
3    at 12:05 p.m.
4    Q.   Finally, with respect to your last answer,
5    do you recall that the Board recently adopted
6    something called Real World Examples?
7         MR. SHAW:  I'm going to
8    object to any further questioning of my
9    witness.  The deposition has exceeded six
10   hours and we are now going to end the
11   deposition of Mr. Helms.
12        MR. ALLINGHAM:  How did you time
13   that?
14        MR. SHAW:  It was told to me that
15   the deposition started yesterday at or
16   before 3 o'clock, I would assume, depending
17   upon what time you guys finished yesterday
18   and going forward --
19        MR. ALLINGHAM:  So, you don't now
20   what time we finished yesterday?
21        MR. SHAW:  I don't have an exact
22   recollection.
23        MR. ALLINGHAM:  Well, I've got a
24   few more minutes.  If you don't know

Page 239

1    exactly that this is a six hour deposition,
2    which I think it is not, when you take into
3    account all the breaks, I urge you to let
4    me finish this deposition.  It would be a
5    terrible waste of time to bring Mr. Helms
6    back for something as trivial as this.
7         MR. SHAW:  We can stop running the
8    clock now and I would ask the court
9    reporter to tell me at what time
10   approximately or what time exactly the
11   deposition began yesterday.
12        MR. ALLINGHAM:  And are you going
13   to then count up all the breaks?
14        MR. SHAW:  Breaks are reasonable
15   within the confines of the deposition.
16        MR. ALLINGHAM:  That's not true,
17   it's testimony time.
18        MR. SHAW:  So, will you count up
19   all the breaks?
20        MR. ALLINGHAM:  No, it's not my
21   obligation.  I have probably three minutes
22   worth of questions left, which we could
23   have completed by now if you weren't,
24   without personal knowledge, asserting that

Page 240

1    the deposition had gone for six hours.
2         MR. SHAW:  I will grant you three
3    more minutes of questioning at this time.
4         MR. ALLINGHAM:  Of course I'm
5    delighted.
6         MR. SHAW:  Granted was the wrong
7    word to use, I will allow the witness to
8    undergo three more minutes of questioning.
9    Q.   Do you recall that the Board recently
10   adopted a multi-page document called Real World
11   Examples?
12   A.   I'm aware that they are in the process.  I
13   think the policy committee is trying to find a place
14   to put them, is that correct?  That's my
15   understanding, that -- those have not come to the
16   Board to the best of my knowledge to vote to put
17   them in a certain place.
18   Q.   Okay --
19   A.   But I do know we've been discussing it,
20   yes.
21   Q.   Have you seen the Real World Examples?
22   A.   I did at one time, yes.
23   Q.   Do you recall that there are specific real
24   world examples that address the very situation that

Page 241

1    you just articulated, that is the difference between
2    teaching a religion and teaching about a religion in
3    the context of, for example, a world religions class
4    or the like?
5    A.   I don't recall the specifics, but I do know
6    they were in there, yes.  Without seeing the
7    document I'm not sure what it says.
8         MR. ALLINGHAM:  Subject to the
9    document requests which I made during this
10   deposition, Mr. Helms, I've completed the
11   examination and I'm, as I've said to all
12   the witnesses, I'm grateful for your
13   patience.  I know that it takes time out of
14   your day.
15   A.   You are certainly welcome.
16        MS. DUPHILY:  The deposition
17   is ending at approximately 12:10 p.m..
18
19
20
21
22
23
24

61 (Pages 238 to 241)

Dobrich, et al.
Reginald Helms

v.

C.A. # 15-120 (JJF)

Indian River School District, et al.
October 11, 2006

Page 242

1         I N D E X
2
   DEPONENT:    REGINALD HELMS          PAGE
3
      Examination by  Mr. Allingham      3
4
5
          E X H I B I T S
6
   REGINALD HELMS EXHIBITS          MARKED
7
   40  CD of August 24, 2004 meeting     24
8
9  41  June 29, 1999 Board meeting minutes    55
10
   42  School Board Member Ethics       164
11
12 43  Transcript of Board meeting      172
13
   44  Copy of article Sussex Post      180
14
15 45  Copy of prayer           219
16
   46  Copy of article Sussex Post      231
17
18
19
20
21 ERRATA SHEET/DEPONENT'S SIGNATURE    PAGE 243
22
   CERTIFICATE OF REPORTER       PAGE 244
23
24

Page 244

1              CERTIFICATE OF REPORTER
2         I, David A. Sroka, Registered Professional
   Reporter and Notary Public, do hereby certify that
3  there came before me on October 11, 2006, the
   deponent herein, REGINALD HELMS, who was duly sworn
4  by me and thereafter examined by counsel for the
   respective parties; that the questions asked of said
5  deponent and the answers given were taken down by me
   in Stenotype notes and thereafter transcribed by use
6  of computer-aided transcription and computer printer
   under my direction.
7
8         I further certify that the foregoing is a
   true and correct transcript of the testimony given
9  at said examination of said witness.
10
11        I further certify that I am not counsel,
   attorney, or relative of either party, or otherwise
12 interested in the even of this suit.
13
14
15            _____
              David A. Sroka, RPR
              Certification No. 259-RPR
16            (Expires January 31, 2008)
17
18
19 DATED: _____
20
21
22
23
24

Page 243

1
2
3
4
          REPLACE THIS SHEET WITH ERRATA SHEET
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

62 (Pages 242 to 244)