Dobrich, et al.
Gregory Hastings
v.
C.A. # 15-120 (JJF)
Indian River School District, et al.
October 13, 2006

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                 FOR THE DISTRICT OF DELAWARE
 3
 4    MONA DOBRICH and MARCO DOBRICH, individually and
      as parents and next friend of ALEXANDER DOBRICH,
 5    SAMANTHA DOBRICH, JANE DOE and JOHN DOE,
      individually and as parents and next friend of
 6    JORDAN DOE and JAMIE DOE,
 7                         Plaintiffs
                                       Civil Action
 8              vs.                    NO. 15-120
 9    INDIAN RIVER SCHOOL DISTRICT, ET AL.,
10                         Defendants
11
12              Deposition of GREGORY HASTINGS, taken
      pursuant to notice at the Indian River School
13    District, 31 Hosier Street, Selbyville, Delaware,
      beginning at 9:07 a.m. on October 13, 2006 before
14    David A. Sroka, Registered Professional Reporter and
      Notary Public.
15
      APPEARANCES:
16
                THOMAS ALLINGHAM, ESQ.
17              RICHARD HORVATH
                BRIAN LENHARD
18              P.O. Box 636
                Wilmington, Delaware  19899-0636
19              For the Plaintiffs
20              JARROD D. SHAW, ESQ.
                Drinker Biddle & Reath, LLP
21              One Logan Square
                Philadelphia, Pennsylvania  19103-6996
22              For the Defendants
23
24
```

Case 1:05-cv-00120-JJF    Document 283-5    Filed 06/19/2008    Page 2 of 36

Dobrich, et al.                              v.                    Indian River School District, et al.
Gregory Hastings                    C.A. # 15-120 (JJF)                        October 13, 2006

Page 2

1      MS. DUPHILY: This is the
2  videotape deposition of Mr. Greg Hastings,
3  taken by the Plaintiff, in the
4  matter of Dobrich, et al. versus Indian
5  River School District, at al., case
6  number 15-120.
7      The deposition is taking place at 31
8  Hosier Boulevard, Selbyville, Delaware. We
9  are going on the record on October 13,
10  2006 at approximately 9:07 a.m.. The court
11  reporter is Dave Sroka from the firm of
12  Wilcox & Fetzer. My name is Lindsay
13  duPhily and I am with Discovery Video
14  Services in association with Wilcox &
15  Fetzer.
16      I will now ask counsel to
17  identify themselves on the record, and then
18  the court reporter will swear in the
19  witness.
20      MR. ALLINGHAM: I am Tom Allingham
21  representing the Plaintiffs. With me are
22  Rick Horvath and Brian Lenhard.
23      MR. SHAW:    Jarrod Shaw
24  representing the defendants.

Page 3

1          GREGORY HASTINGS,
2    The Witness herein, called for examination by
3  the Plaintiffs, having been duly sworn to tell the
4  truth, the whole truth, and nothing but the truth,
5  was examined and testified as follows:
6  EXAMINATION BY MR. ALLINGHAM:
7    Q.  Good morning, Mr. Hastings. I am going to
8  ask you to clear up something that has been bugging
9  me. Is it H-O-S-I-E-R or H-O-O-S-I-E-R? Is it
10  pronounced Hoosier or Hosier?
11    A.  **In this area we pronounce it Hosier.**
12    Q.  Do you know how it's spelled?
13    A.  **I believe it's one O.**
14    Q.  Thanks. Have you ever been deposed before?
15    A.  **Yes, I have, yes.**
16    Q.  In what context?
17    A.  **As a defendant.**
18    Q.  What kind of a case?
19    A.  **It was a teacher in our high school and**
20  **there was -- she brought on a suit, I have to**
21  **reflect, this has been 12 years, I guess.**
22    Q.  All right, I don't need that much detail.
23  That was a suit by a teacher?
24    A.  **Yes.**

Page 4

1    Q.  And it was against you in your capacity as
2  a School Board member?
3    A.  **Capacity as a School Board member?**
4    Q.  Yes, sir?
5    A.  **Yes.**
6    Q.  Have you ever testified at trial?
7    A.  **I have been an expert witness in Small**
8  **Claims Court, that's the extent of it.**
9    Q.  Did the court issue an opinion in that
10  case?
11    A.  **Yes.**
12    Q.  Were you mentioned in the opinion?
13    A.  **I don't believe so.**
14    Q.  What was your area of expertise in that
15  testimony?
16    A.  **I had provided architectural design for the**
17  **product. This has been a long time, too but --**
18    Q.  Let me cut you off. It has nothing to do
19  with issues of religion in the schools, right?
20    A.  **No. thank you, no.**
21    Q.  What is your -- I am trying to keep this
22  limited to the issues here. You are employed as an
23  architect?
24    A.  **Yes, I own a small architectural design**

Page 5

1  **firm, well, yes.**
2    Q.  Locally?
3    A.  **Locally.**
4    Q.  Down here somewhere?
5    A.  **Yes, Ocean View.**
6    Q.  Were you trained as an architect?
7    A.  **Yes. Well, I have a degree, architectural**
8  **degree from Del Tech. And again that was many years**
9  **ago, but I own this small residential design firm**
10  **which is CGH Developments, which is commercial**
11  **development properties for rental properties.**
12    Q.  Are you still engaged in architectural
13  design?
14    A.  **Yes.**
15    Q.  Mr. Hastings, what did you do to prepare
16  for this deposition?
17    A.  **Aside from being briefed from our attorneys**
18  **nothing. I am too busy.**
19    Q.  When did you meet with your attorneys?
20    A.  **Last week.**
21    Q.  Who was present at the time?
22    A.  **Jason, this young man and another young**
23  **man.**
24    Q.  Jason Gosselin and Jarrod Shaw. You would

2 (Pages 2 to 5)

Dobrich, et al.                                v.                    Indian River School District, et al.
Gregory Hastings                    C.A. # 15-120 (JJF)                      October 13, 2006

| Page 6 | Page 8 |
|---|---|

**Page 6**

1  be surprised at how frequently witnesses can't
2  remember the name, or the full name of their lawyer.
3  Was it just the two lawyers and you, or were there
4  other people as well?
5  **A.  There were other Board members. In my**
6  **position now I would have to say I am a former Board**
7  **member.**
8  Q.  Yes.
9  **A.  So, there were present and former Board**
10  **members present.**
11  Q.  Who were the members present?
12  **A.  Mr. Bireley, Dr. Hattier, Mr. Evans and Mr.**
13  **Helms.**
14  Q.  How long did you meet?
15  **A.  Approximately two and a half hours.**
16  Q.  Where did you meet?
17  **A.  This room.**
18  Q.  Sitting around the table basically?
19  **A.  Yes.**
20  Q.  Did anybody have any documents?
21       MR. SHAW:  I object to documents
22       that were shown to the client as privilege
23       work product. You can ask him if he used
24       any documentsto refresh his recollection

**Page 8**

1       MR. SHAW:  You can answer yes if
2       somebody read from documents, but I
3       instruct you not to answer specifically who
4       or what was said.
5  Q.  I am going to ask you a series of
6  preliminary questions, in which I am trying to
7  determine whether there were documents there or
8  whether documents were read from for the purpose of
9  refreshing anyone's recollection. I do not want to
10  know what the document was, and I do not want to
11  know the content of what was read for purposes of
12  these questions, okay?
13       If they were used to refresh I am just
14  going to ask you questions about what the documents
15  were. If they weren't, I am not entitled to those,
16  all right? I just need yes or no answers, okay?
17       So, my question is did anyone read from a
18  document at the meeting?
19  **A.  I believe so. I would have to say that I**
20  **am not really clear to the extent of the document or**
21  **form of the document that Jason might have read**
22  **from. He was just briefing us on points to expect**
23  **from this deposition. That's about it, as elaborate**
24  **as I can get.**

| Page 7 | Page 9 |
|---|---|

**Page 7**

1       for the deposition.
2            MR. ALLINGHAM:  Are you
3       instructing the witness not to answer?
4            MR. SHAW:  I am.
5            MR. ALLINGHAM:  You are
6       directing the witness not to answer a
7       question not directed to what documents,
8       but simply whether there were documents
9       present at the meeting?
10            MR. SHAW:  You can answer whether
11       there were documents present at the
12       meeting.
13  **A.  I did not review any documents.**
14  Q.  So, there was some documents here in the
15  room, but you didn't look at anything?
16  **A.  No.**
17  Q.  Did anybody read from any documents during
18  the meeting?
19            MR. SHAW:  I object, and I am
20       going to instruct the witness not to
21       answer.
22            MR. ALLINGHAM:  Precisely the
23       same as were there any documents present in
24       the room.

**Page 9**

1  Q.  Do you -- this is probably my last question
2  in this sequence of questions. Did any of the
3  material that Mr. Gosselin read to you refresh your
4  recollection about the events leading up to this
5  lawsuit beginning in June of 2004?
6  **A.  I recall he didn't verbatim read events,**
7  **with other Board members sitting here, in my**
8  **opinion, not being in attendance to the last ten**
9  **Board meetings.**
10            MR. SHAW:  I am going to instruct
11       the witness to limit his response to your
12       specific question. He is going beyond the
13       scope of your question into attorney/client
14       privilege as to what was discussed between
15       counsel and the defendants. I am going to
16       instruct him not to answer.
17            MR. ALLINGHAM:  Let me pose my
18       question again.
19  Q.  Did anything Mr. Gosselin read to you
20  refresh your recollection about factual events? I
21  think in order to help Mr. Shaw, can we just have a
22  yes or no answer to that question, if you can give a
23  yes or no answer?
24  **A.  Repeat your question?**

3 (Pages 6 to 9)

Page 10

1  Q.  Did any of the material Mr. Gosselin read
2  to you at the meeting last week refresh your
3  recollection about factual events?
4  A.  Yes.
5  Q.  What was it that refreshed your
6  recollection about factual events that he read to
7  you?
8  A.  The board meetings, two specific Board
9  meetings going back into '04, July and August of
10  '04, when the Plaintiff attended the Board meeting.
11  Q.  I am inferring from that what was read from
12  weren't minutes of the meeting?
13  A.  No.
14  Q.  What did he read from?
15  A.  I am not sure what he had in hand.
16  Q.  Tell me as best you can recall what the
17  words were that he read? If you have to summarize
18  it in your own words, do that.
19  A.  He asked questions --
20      MR. SHAW: I am instructing the
21  witness not to discuss questions that Jason
22  did, but restrict his answer to any
23  document that was produced by us to you
24  that you may have a copy of which Jason

Page 11

1  would have read at that meeting.
2      MR. ALLINGHAM: In light of the
3  testimony from you Mr. Shaw, the
4  instructions that you are giving us --
5      MR.SHAW: You are asking
6  questions about attorney/client privilege.
7      MR. ALLINGHAM: Mr. Shaw, I
8  waited until you were done, I would like
9  you to wait until I am done, okay? Are you
10  providing us testimony that all the
11  documents that were presented to the
12  witnesses at this meeting were
13  documents which you have produced to us?
14      MR. SHAW: Mr. Allingham, I am not
15  providing testimony in this case. What I
16  am saying is that you are infringing upon
17  the attorney/client privilege of a meeting
18  that we had in anticipation of this
19  deposition.
20      Now, I agree you can ask whether
21  or not he refreshed his recollection with
22  any specific documents. If Jason chose
23  to read that is attorney work product.
24      MR. ALLINGHAM: We can have a big

Page 12

1  argument about this. We agree on one
2  thing, that is if Mr. Hastings says those
3  documents refreshed his recollection I am
4  entitled to probe that, correct?
5      MR. SHAW: If he was shown a
6  document and it refreshed his recollection,
7  yes.
8      MR. ALLINGHAM: I don't think
9  there is a distinction between being shown
10  a document and being read to from a
11  document. And so -- and I think you agree
12  with me, because we were going down that
13  path. And so we have the testimony
14  that Mr. Gosselin read from a document to
15  Mr. Hastings and that the document that was
16  read from to Mr. Hastings, whether it was
17  one or more, refreshed his recollection
18  about factual events.
19      I am now asking Mr. Hastings what
20  it was that refreshed his recollection, and
21  my question had been what event did it
22  refresh your recollection about, and those
23  are perfectly appropriate questions.
24      MR. SHAW: Only if the documents

Page 13

1  which were read from are produced in this
2  litigation.
3      MR. ALLINGHAM: That's where we
4  disagree. I don't agree. I think if
5  Mr. Hastings is shown a phone book that
6  refreshed his recollection about something
7  I am entitled to see that phone book.
8      MR. SHAW: Do you think that if
9  Jason produced a document analyzing the
10  theory of the case that you are entitled to
11  that?
12      MR. ALLINGHAM: If that refreshed
13  Mr. Hastings' factual recollection, yes.
14      MR. SHAW: You do?
15      MR. ALLINGHAM: Yes.
16      MR. SHAW: I disagree.
17      MR. ALLINGHAM: You can direct
18  the witness not to answer, whatever if you
19  want to, but if you are instructing him not
20  to answer, then you can make an
21  objection, but let's proceed with my
22  questions, which you can see are at least
23  intended to elicit material that I think is
24  appropriate for me to elicit. If you have

4 (Pages 10 to 13)

Dobrich, et al.                          v.                  Indian River School District, et al.
Gregory Hastings                    C.A. # 15-120 (JJF)                    October 13, 2006

Page 14

1      a disagreement with that, about a
2      particular question, you can instruct the
3      witness not to answer.
4      Q.   It may be that colloquy will help you Mr.
5    Hastings, in understanding what we are trying to get
6    at. I don't want to know advice that Mr. Gosselin
7    and Mr. Shaw gave you. I do want to know the
8    substance of any document that was shown to you that
9    refreshed your recollection of factual events, or
10   the substance of any document that was read to you,
11   which in my view, is the same thing, that refreshed
12   your recollection of factual events.
13        Sometimes that's hard for the witness to
14   know, but that's the distinction that I am trying to
15   draw, okay? Now, let's just ask some questions, all
16   right?
17        So far we have established that
18   Mr. Gosselin read to you from one or more documents
19   and that what he read you refreshed your
20   recollection about the factual events of July and
21   August appearances by Mrs. Dobrich at the School
22   Board meetings, correct?
23   A.   Yes.
24   Q.   Tell me, in as much detail as you can, what

Page 15

1    Mr. Gosselin read you that refreshed your
2    recollection about those events?
3    **A.   Tell you in detail about those documents**
4    **that he read?**
5    Q.   Let me explain what I am trying to get at.
6    If you had the power to repeat verbatim what
7    Mr. Gosselin read from the documents, that's what I
8    would want. I don't believe that any of us, most of
9    us anyway, don't have that power, so what I'd like
10   you to tell me, in as much detail as you can, is
11   what you recollect Mr. Gosselin read to you that
12   refreshed your recollection?
13   **A.   I would have to say the gist of what he**
14   **read were statements that reflected back on the**
15   **public setting of July's Board meeting and August's**
16   **Board meeting in '04, where Mrs. Dobrich, Plaintiff,**
17   **came to the Board meeting and expressed her concern**
18   **about the prayer, excuse me, in July's Board meeting**
19   **in particular, about the prayer that was given at**
20   **the commencement program in June.**
21   Q.   Do you know what document Mr. Gosselin was
22   reading from or documents?
23   **A.   No, I do not.**
24   Q.   Were you able to see the document that

Page 16

1    Mr. Gosselin was reading from?
2    **A.   No, I did not.**
3    Q.   But you are able to tell me that he was not
4    reading from the minutes of the meetings?
5    **A.   I am not sure what he was reading from.**
6         MR. ALLINGHAM:  We'll send you a
7         letter on this, Mr. Shaw, but we believe we
8         are entitled to the production of documents
9         used to refresh the witness' recollection,
10        but we will make a formal request.
11   Q.   Okay, the next question in this fairly
12   conventional sequence is, about what factual events
13   did Mr. Gosselin's reading these documents refresh
14   you?  Was it what Mrs. Dobrich said at those
15   meetings, or was it something else?
16   **A.   It was the Plaintiff's comment at the**
17   **public portion of our agenda that we were refreshed,**
18   **and the content of her comment at the July Board**
19   **meeting.**
20   Q.   You should testify however you want, but
21   there is more than one Plaintiff in this case, and
22   so it may be ambiguous if you say the Plaintiff, and
23   I have tried in my questions to say Mrs. Dobrich or
24   Mrs. Doe of the Doe or the Dobrich family, and you

Page 17

1    might want to do the same because it will be clearer
2    on the transcript?
3    **A.   Okay.**
4    Q.   At the meeting last week did you ask to
5    have your recollection refreshed, that is, did you
6    say I can't remember what Mrs. Dobrich said or when
7    she said it, do you have anything that would help me
8    out on that?
9    **A.   Repeat your question, please?**
10   Q.   It's a question of who initiated the
11   refresh the recollection process.  Did you say I
12   just can't remember -- for example, I just can't
13   remember what Mrs. Dobrich said, do you have any
14   document that would reflect that, or was this a
15   process that was initiated by the lawyers?
16   **A.   I would say it was not initiated by the**
17   **lawyers.**
18   Q.   But it wasn't initiated by you either?
19   **A.   The recollection of events two years ago**
20   **was good for me because it was two years ago.**
21   Q.   Well, maybe I should ask a more general
22   question.  How did this process of refreshing the
23   witnesses' recollection at this meeting last week
24   begin, who initiated it?

5 (Pages 14 to 17)

Dobrich, et al.                          v.                Indian River School District, et al.
Gregory Hastings                    C.A. # 15-120 (JJF)              October 13, 2006

Page 18

1    A.   I was asked to be here because our
2  attorneys wanted to brief us on the events that were
3  about to take place with this deposition.
4    Q.   Other than your attorneys did you
5  communicate -- other than your attorneys and the
6  current Board members who were with you at the
7  meeting last week, have you talked to anyone else
8  about this deposition?
9    A.   I was in attendance to a DSBA Board meeting
10  evening before last, where Mr. Bireley and
11  Mrs. Bunting were in attendance, and they just
12  commented how lengthy these depositions were
13  occurring, and that was the extent.
14    Q.   They commented, both Mr. Bireley and Mrs.
15  Bunting?
16    A.   Yes.
17    Q.   Had Mrs. Bunting been deposed at that
18  point?
19    A.   No. She was conveying information that Mr.
20  Bireley had forwarded to her about how long his
21  depose was.
22    Q.   Anything else said about the depositions?
23    A.   No.
24    Q.   Did anyone say anything about the lawyers

Page 19

1  harassing the witnesses?
2    A.   No.
3    Q.   Or treating them in a disrespectful or
4  discourteous way?
5    A.   No.
6    Q.   Anything about belittling the witnesses?
7    A.   No.
8    Q.   That's good. What is your religious
9  affiliation, if any?
10    A.   Christian. I am a member of the Methodist
11  church here locally.
12    Q.   Which one?
13    A.   Grace United in Millsboro.
14    Q.   And apart from being a member do you have
15  any other role in that church?
16    A.   Currently I'm a member of our foundation
17  fund, that's one of our subcommittees.
18    Q.   Did you or anyone in your family discuss
19  with anyone from that church the possibility of that
20  person's attending the August 24, 2004 Board
21  meeting?
22    A.   Repeat that?
23    Q.   Yeah, it's a little complicated. The
24  August 24, 2000 Board meeting had, depending on

Page 20

1  who's estimating it, 6, 7, 800 people there. It was
2  a very well attended meeting. And we are frankly
3  trying to figure out how that happened. Some, at
4  least one of the witnesses has testified,
5  Mrs. Bunting testified that she heard scuttlebutt,
6  hearsay, whatever that church members in the
7  community were urging fellow church members to
8  attend that meeting.
9        So, I am -- that's what I am trying to get
10  at. So, my question to you is, did you or to your
11  knowledge any member of your family encourage or
12  urge or otherwise speak to members of your
13  congregation about attending the August 24th board
14  meeting at which the School Board prayer issue was
15  going to be discussed?
16    A.   No.
17    Q.   Do you know whether any other member of
18  your church urged members of your church to attend
19  that meeting?
20    A.   I do not.
21    Q.   Are you aware of anyone else urging anybody
22  to attend the August 24th Board meeting?
23    A.   No, I'm not.
24    Q.   So, to close the loop on the global

Page 21

1  question, you can she had no light on how the
2  attendance, the public attendance at the August 24th
3  Board meeting spiked a bit?
4    A.   I cannot.
5    Q.   How long did you serve as a member of the
6  Indian River School Board?
7    A.   Approximately 12 and a half years.
8    Q.   And you went off, let me see if I have this
9  right, the spring of 2005?
10    A.   No, I had to step down from that position
11  December 13, '05. I went through senate
12  confirmation November 8th of '05. I sat, attended
13  my first Board meeting December 15, '05 the state
14  level.
15    Q.   So, let's see, 12 and a half years, so you
16  were elected in 1993?
17    A.   That's correct.
18    Q.   Is it your understanding that as a member
19  of the Indian River School Board your primary
20  responsibility was to the children who are students
21  in the District schools?
22    A.   Yes.
23    Q.   And in making your decisions throughout
24  your 12 year tenure it was the students' interests

6 (Pages 18 to 21)

Case 1:05-cv-00120-JJF    Document 283-5    Filed 06/19/2008    Page 7 of 36

Dobrich, et al.                                              v.                    Indian River School District, et al.
Gregory Hastings                                  C.A. # 15-120 (JJF)                              October 13, 2006

Page 22

1  that you held paramount, correct?
2      A.   Correct.
3      Q.   Is it also correct that a Board member may
4  take into account the interests of other
5  constituencies, for example, teachers, tax payers,
6  district employees and administrators, but all in
7  the context of serving the educational interests of
8  the children?
9      A.   Can you expand on the question?
10     Q.   Let me try to rephrase it. Well, let me
11  ask the preliminary question first. In your view
12  may a board member take into account in making his
13  decisions the interests of constituencies other than
14  the children?
15     A.   I don't know how to respond. Can you ask
16  the question again?
17     Q.   Are the children the only people whose
18  interests a Board member may take into account in
19  making decisions as a School Board member?
20     A.   Sitting on the Board you have to look at
21  the entire picture, in my opinion.
22     Q.   That was what my earlier question was
23  trying, I guess not very effectively to get at. In
24  looking at the entire picture is it the children's

Page 23

1  interests that, educational interests, that are the
2  ultimate goal when you make your decisions?
3      A.   Oh, absolutely.
4      Q.   Okay. Is it also correct that while a
5  Board member should look at the, as you say the
6  whole picture, a Board member is not permitted to
7  use his position as a Board member to serve his own
8  interests?
9      A.   You are asking is it appropriate that Board
10  member not serve at his own interests.
11     Q.   Let me ask the question, I think it must
12  have been unclear. In your view, is it permitted
13  for a Board member to make a decision that serves
14  his own interests in a way that is apart from the
15  total interest of the School District, his own
16  individual interest, if you will?
17     A.   In my opinion it's not permitted.
18     Q.   And the Board has an ethics policy that
19  specifically prohibits Board members from doing so,
20  isn't that right?
21     A.   To a degree.
22     Q.   What do you mean by that?
23     A.   I think if I recollect the policy, a policy
24  has been revised more recent than when I initially

Page 24

1  got on the Board.
2      Q.   Oh, that's a good point, I'm sorry, my
3  question wasn't specific enough. During 2004 the
4  board had an ethics policy that prohibited Board
5  members from serving their own interests, their own
6  individual interests, correct?
7      A.   Yes.
8      Q.   Am I right that you served as president of
9  the Board for a period of time?
10     A.   That's correct.
11     Q.   When was that?
12     A.   '99 to 2001.
13     Q.   One of the issues that's been joined in
14  this case is the history of the district's practice
15  of opening its Board meetings with a prior. During
16  your entire 12 and a half year tenure did the board
17  open its regular Board meetings with a prior?
18     A.   Always.
19     Q.   Did it open its special meetings with a
20  prayer?
21     A.   I don't believe so.
22     Q.   Did it open its executive sessions with a
23  prayer?
24     A.   Executive session's part of the main

Page 25

1  agenda, no.
2      Q.   I always try to listen to what may not be
3  said in an answer. Are there executive sessions
4  that are not part of the main agenda?
5      A.   No.
6      Q.   In your earlier answer by describing
7  executive sessions that are part of the main agenda
8  did you have any purpose in describing the executive
9  sessions that particular way?
10     A.   My opinion we have a formal agenda.
11     Q.   Uh-hum?
12     A.   That's our usual protocol, and just like
13  public session, there is an item on the agenda
14  executive session is an item on our agenda. We have
15  to vote to go into executive session, but it's part
16  of our main structure format for the meeting.
17     Q.   Are you meaning to suggest that therefore
18  since the regular meeting opens with a prayer the
19  executive session falls under the rubric of that
20  original prayer?
21     A.   Yes.
22     Q.   Are you aware of executive sessions that
23  take place before the prayer is offered at the
24  regular Board meeting?

7 (Pages 22 to 25)

Dobrich, et al.                                                    Indian River School District, et al.
Gregory Hastings                    C.A. # 15-120 (JJF)                         October 13, 2006

Page 26

1   A.   On occasion.
2   Q.   And so there are some executive sessions
3   that take place before the regular prayer, do you
4   recall that any such executive session has itself
5   opened with a prayer?
6   A.   No.
7   Q.   The School Board Prayer Policy, was that
8   ever, during the entire Board consideration of that
9   policy, was that policy ever discussed at public
10  sessions of the Board meetings?
11  A.   Was that specific policy ever discussed at
12  a regular board meeting in public --
13  Q.   Public session, yes?
14  A.   Yes.
15  Q.   Do you know when that occurred?
16  A.   Specifically in the wake of Mrs. Dobrich
17  coming to the board meeting and expressing concern
18  and enlightening the Board on her concern about our
19  prayer issue, and so in the wake of that situation
20  we had discussion in public session regarding our
21  policy.
22  Q.   And was that public comment by members of
23  the audience or public consideration or deliberation
24  or discussion by Board members of the topic in

Page 27

1   public session or both?
2   A.   You will have to ask that again.
3   Q.   Too long, eh?  Did the Board ever
4   deliberate on or consider the Board policy on School
5   Board Prayer at public sessions?
6   A.   Did we?
7   Q.   Yes.
8   A.   In public setting?
9   Q.   Yes.
10  A.   Yes.
11  Q.   And that was as you recall following
12  Mrs. Dobrich's coming to the Board and expressing
13  her concerns?
14  A.   That's correct.
15  Q.   Was that at the August 24th meeting?
16  A.   I'm not sure if it was August or September.
17  Q.   Those are the two possibilities, though,
18  correct?
19  A.   Yes.
20  Q.   Okay.  Can I have the minutes of the two?
21  As a Board member do you believe that it is
22  beneficial for the Board to consider policies at
23  public session?
24  A.   Yes.

Page 28

1   Q.   And that's because the public is entitled
2   to observe the deliberative process of the Board in
3   adopting its policies, correct?
4   A.   That's correct.
5   Q.   Is there a term for that, public
6   deliberation on policies? I'm not suggesting there
7   is or isn't, I have some memory that there may be a
8   specific word that is applied to that process?
9   A.   Not that I recall.
10  Q.   Sir, I'm showing you what we have marked in
11  an earlier deposition as PX17.  This is the, as you
12  will see from looking at the last page and
13  Mrs. Hobbs' signature, this is the official minutes
14  for the August 24 Board meeting.
15       And what I'd like you to do is take as much
16  time as you want, to show me, or direct my attention
17  to that portion of the minutes that reflects public
18  consideration or public deliberation by the Board on
19  the school board prayer policy?
20  A.   It would be on page six Policy Committee
21  first reading, bottom of the page.
22  Q.   Okay, that's the graduation prayer --
23  A.   Yeah.
24  Q.   Policy.

Page 29

1   A.   Yes.
2   Q.   I was talking about the School Board Prayer
3   Policy, BDA.1?
4   A.   That's all that was discussed.
5   Q.   Okay, so we can eliminate the August 24
6   meeting as the venue for public deliberation on the
7   School Board Prayer Policy, is that right?
8   A.   Yes.
9   Q.   Let me show you what we have previously
10  marked as PX18, which is the official minutes of the
11  September 28, 2004 Board meeting.  And same question
12  here, take as much time as you want, Mr. Hastings,
13  but would you point me to that portion of the
14  minutes where there was public deliberation on the
15  School Board Prayer Policy, and you may want to look
16  at page six of the minutes?
17  A.   Just first reading of policy on page six.
18  Q.   Okay.  Now, do you have a recollection that
19  there was a discussion or deliberation by the Board
20  substantively on the policy at that time, or was the
21  policy simply identified and submitted for a first
22  reading?
23  A.   I don't recall the extent.
24  Q.   We are fortunate in having a tape of this

8 (Pages 26 to 29)

Case 1:05-cv-00120-JJF     Document 283-5     Filed 06/19/2008     Page 9 of 36

Dobrich, et al.                                    v.                    Indian River School District, et al.
Gregory Hastings                          C.A. # 15-120 (JJF)                        October 13, 2006

Page 30

1  meeting. I can play that portion of the tape for
2  you and then I have a couple of questions about what
3  occurred.
4          MR. SHAW:  Has the tape been
5      entered into evidence as an exhibit?
6          MR. ALLINGHAM:  It has not. All
7      right, why don't you take it out for a
8      minute, Rick. I want to please have marked
9      as PX52. Let me have the case, we will
10     mark the case. Actually, let's mark the
11     disk itself and we are going to mark it as
12     PX52.
13         (WHEREUPON, Exhibit PX52 was
14     marked for identification)
15 Q.   All right, we are now going to play for you
16 a portion of the PX52 which runs from 11 minutes and
17 45 seconds into the meeting. So, we will play that
18 portion of the tape.
19         MR. SHAW:  Do you mind if I
20     bring the speaker closer?
21         MR. ALLINGHAM:  Oh, you won't have
22     any trouble hearing it. And so the record
23     is clear, this is actually a CD which has
24     been made from the tapes that were

Page 31

1      produced. Better yet you produced the CD
2      from the tapes.
3          MR. SHAW:  We try.
4      (AT THIS POINT A TAPE WAS PLAYED)
5  Q.   That is the extent of discussion of the
6  School Board Prayer Policy BDA.1 at the September 28
7  Board meeting. It runs from 11 minutes 45 seconds
8  to 12 minutes and 32 seconds and you just heard the
9  entirety of it. Would you characterize that as
10 public consideration of or public deliberation on
11 the School Board Prayer Policy by the Board?
12 A.  Yes.
13 Q.   Would you tell me in what way you consider
14 that to be public consideration or public
15 deliberation?
16 **A.  We acknowledged the prayer, or we**
17 **acknowledged the policy, or alleged policy, and then**
18 **we were given the opportunity to either talk to**
19 **constituents, if need be, or constituents had the**
20 **freedom liberty to conduct us, or we as Board**
21 **members can contact the policy committee with**
22 **concerns or any specifics.**
23 Q.   Would you agree with me that there was no
24 opportunity for the public to observe the Board's

Page 32

1  deliberations on the School Board Prayer Policy
2  during the clip that I just played you?
3  A.  Would I agree? Repeat that, please?
4  Q.   Would you agree that there was no
5  opportunity for the public to observe Board
6  deliberations on the School Board Prayer Policy
7  during the clip that I just played you?
8  A.  Yes.
9  Q.   In fact, the public did not have access to
10 the text of that policy during the September 28
11 meeting, did they?
12 A.  Not to my knowledge.
13 Q.   And there is this process of a first and
14 second reading for Board policies, but they are not
15 actually read out loud, is that correct?
16 **A.  It depends on the individual Board member,**
17 **it depends on the setting, it depends on -- it could**
18 **depend on many things, but it's a line item up for**
19 **discussion, or debate, or to -- for a concern to be**
20 **carried or followed up with at a later date.**
21 Q.   Let me just follow up on that a little bit.
22 You said it is a line item that is up for discussion
23 or concern or to be followed up with at a later
24 date. At the September 28 Board meeting there was

Page 33

1  no discussion of the Board policy on School Board
2  prayer, correct?
3  A.  Correct.
4  Q.   At the September 28, 2004 Board meeting
5  there were no concerns of any kind expressed about
6  the Board policy on School Board prayer, correct?
7  A.  Correct.
8  Q.   And do you know whether anyone followed up
9  with any discussion or concern of the Board policy
10 on School Board prayer in public at any later date?
11 A.  I do not.
12 Q.   In your earlier answer to my question about
13 reading, and what does a first reading or a second
14 reading mean, I take it that sometimes proposed
15 policies are in fact read aloud at a Board meeting?
16 A.  Yes.
17 Q.   Do you know why School Board Prayer Policy
18 was not read out loud?
19 A.  No, I don't.
20 Q.   Was there any discussion about whether to
21 read School Board Prayer Policy aloud at the
22 September 28 Board meeting?
23 A.  I don't recall.
24 Q.   We have been told that we have a couple of

9 (Pages 30 to 33)

Dobrich, et al.                               v.              Indian River School District, et al.
Gregory Hastings                    C.A. # 15-120 (JJF)                October 13, 2006

Page 34

1  minutes left, so let's change the tape.
2          MS. DUPHILY:   Going off the
3      record at approximately 10:00 a.m..
4          (WHEREUPON a brief recess was
5      taken)
6          MS. DUPHILY:   Back on the record
7      at approximately 10:07 a.m..
8  Q.   I am going to show you a copy of what's
9  been previously marked as PX9.  This is the --
10 several witnesses have identified this as the
11 official Board policy on School Board prayer.  It's
12 titled Board Prayer at Regular Board Meetings.  You
13 testified earlier that the Board does not pray to
14 open special Board meetings or separately executive
15 sessions.  Did anyone ever suggest that the policy
16 should be extended to all Board meetings rather than
17 merely regular Board meetings?
18 A.   Not that I recall.
19 Q.   Was that discussed or raised at any time
20 during deliberations, public or private on the
21 School Board Prayer Policy?
22 A.   Not that I recall.
23 Q.   I am going to show you a couple of what I
24 believe to be drafts of the PX9 policy that I just

Page 35

1  put in front of you.  This is a copy of what we have
2  previously marked as PX11.
3      Do you recall having seen this document
4  before?
5  A.   Give me a minute.
6  Q.   Sure.  On all of these documents Mr.
7  Hastings, take as much time as you want to to read
8  them.
9  A.   Okay, again I'm sorry, what was your
10 question?
11 Q.   Have you ever seen it before?
12 A.   You are taxing my memory.
13 Q.   That's my job.
14 A.   Honestly, I have to testify I honestly
15 suppose I have, but I honestly can't remember.
16 Q.   Fair enough.  As you read through PX11 do
17 you recognize it as containing most of the language
18 of the final Board policy as adopted?
19 A.   Yes.
20 Q.   But there are some differences, correct?
21 Let me see if I can be specific.
22 A.   Yeah.
23 Q.   The Board policy PX9 begins after the title
24 with the words, "In order to solemnify its

Page 36

1  proceedings," and you'll see that although the
2  concept of solemnifying Board proceedings is
3  reflected in line 3 of the proposed policy marked
4  PX11, the language is a little different, do you see
5  that?
6  A.   Yes.
7  Q.   In addition, before the concept of
8  solemnifying the proceedings appears in the proposed
9  policy, there is the language, "Following the
10 rulings of the United States Court of Appeals Third
11 Circuit and past practices of State of Delaware
12 legislative bodies, the Indian River Board of
13 Education may choose to solemnify," do you see that?
14 A.   Yes.
15 Q.   Do you recall any discussion at the Board
16 level of that language, that is following the
17 rulings of the U.S. Court of Appeals Third Circuit
18 and past practices of State of Delaware legislative
19 bodies?  Did you discuss that at any time at the
20 Board level?
21 A.   I don't recall.
22 Q.   Do you know what was referred to by past
23 practices of State of Delaware legislative bodies?
24 A.   I would have to answer that question by

Page 37

1  saying, stating this, all of our policies are
2  reviewed by the Board attorney, so when a policy is
3  structured there is a process in place that we go
4  though.  So, I'm -- I don't recall the detail or the
5  extent of discussion, I just note sitting here today
6  knowing when we go though developing policy, that
7  we've always reviewed our structure of our policy
8  and the language of our policies though our Board
9  attorney, and the Board attorney advises.
10 Q.   Let me see if I can clarify that.  So, is
11 the answer to my question -- I will restate the
12 question and answer it.  My question was do you know
13 what is referred to by past practices of State of
14 Delaware legislative bodies, is the answer to my
15 question no, I don't?
16 A.   Yes, I do.
17 Q.   You do?  Okay.
18 A.   I think I do.
19 Q.   What is meant by past practices of State of
20 Delaware legislative bodies?
21 A.   Our legislative bodies here in Delaware do
22 open their sessions with prayer on the floor prior
23 to beginning.
24 Q.   So, that refers to the General Assembly?

10 (Pages 34 to 37)

Case 1:05-cv-00120-JJF     Document 283-5     Filed 06/19/2008     Page 11 of 36

Dobrich, et al.                              v.                    Indian River School District, et al.
Gregory Hastings                    C.A. # 15-120 (JJF)                          October 13, 2006

Page 38

1    A.  I believe so, yes.
2    Q.  Is there a reason why the, and you may not
3  know, but is there a reason why the proposed policy
4  refers to State of Delaware legislative bodies and
5  not State of Delaware school boards?
6    A.  My only opinion to that question would be
7  through the last two years the Board members we've
8  had discussion formally, informally, that being
9  elected officials as we are, that we are considered
10  or allegedly should be considered a legislative
11  body, therefore this legislative body in this text
12  that you used I believe just generically, but again
13  that's my opinion.
14    Q.  Oh, I thought you told me a minute ago you
15  thought it referred to the General Assembly?
16    A.  Well, it does.  In my opinion it does
17  because I know our General Assembly do open with a
18  prayer, but there also has been discussion, it's our
19  opinion that sitting as a board as we do that we are
20  also a legislative body.
21    Q.  Okay.
22    A.  Governing body, governance body.
23    Q.  Governance body or legislative body?  By
24  that I mean which term was discussed?

Page 39

1    A.  I would say legislative body.
2    Q.  And do you feel that as a Indian River
3  School District Board member you were sitting as a
4  legislative official or -- well let me just stop
5  there.  Did you feel that you were sitting as a
6  legislative official?
7    A.  To a degree.
8    Q.  Explain to me how?
9    A.  We are serving a limited area.  Our
10  legislative body for the state is serving an entire
11  constituency of the state.  We are serving the
12  students of our immediate school district area.  To
13  me that's the only difference.  We are just a
14  smaller scale of what our General Assembly serves.
15    Q.  The representatives in the General Assembly
16  are elected from legislative districts, is that
17  correct?
18    A.  Yes.
19    Q.  They are not elected from school districts,
20  correct?
21    A.  That's correct.
22    Q.  Now, a few questions ago you mentioned that
23  there has been discussion in the last two years both
24  formally and informally of the view that the Indian

Page 40

1  River School Board is a legislative body.  Do you
2  remember when that discussion first occurred at the
3  Board meeting, or outside the Board meeting?
4    A.  I can't say precisely.  Obviously it's in
5  the wake of this suit.
6    Q.  Well, not necessarily obviously.  Is it --
7  did it occur -- did it first occur before the
8  adoption of the Board policy on School Board prayer?
9    A.  I can't say for sure.
10    Q.  Do you recall anyone saying look it's okay
11  for us to have prayer before our meetings because we
12  are a legislative body?
13    A.  That exact statement?
14    Q.  In words or substance, you understand what
15  I mean.
16    A.  I would say in fairness, all of us have had
17  discussion regarding that statement, if we or if we
18  are not.  I would say we all have at one time or
19  another.
20    Q.  You all have said in words or substance I
21  think it's okay for us to have a prayer before our
22  meetings because we are a legislative body?
23    A.  Yes.
24    Q.  In the discussions of whether the Board is

Page 41

1  a legislative body, has anyone expressed any
2  concerns or reservations or drawn any distinctions
3  between the General Assembly and its functions, for
4  example, and the School Board and its functions?
5    A.  Not to my knowledge.
6    Q.  Legislative bodies pass laws, is that
7  correct?
8    A.  Yes.
9    Q.  And those laws are then enforced by a
10  different branch of government, correct?
11    A.  Correct.
12    Q.  The School Board doesn't pass laws, but it
13  passes policies, correct?
14    A.  Correct.
15    Q.  Unlike the General Assembly the School
16  Board also enforces those polices, correct?
17    A.  Yes.
18    Q.  At any time during the discussion of
19  whether the Board was a legislative body did anyone
20  raise or discuss the fact that students are
21  consistently present at regular Board meetings?
22    A.  I don't recall.
23    Q.  It is a fact that at least since the mid
24  1990s students were consistently present at regular

11 (Pages 38 to 41)

Dobrich, et al.                                        v.                    Indian River School District, et al.
Gregory Hastings                          C.A. # 15-120 (JJF)                            October 13, 2006

Page 42

1   Board meetings?
2       A.   Yes.
3       Q.   And so when you walk into the Board meeting
4   or walk out to take your seat on the stage or where
5   ever the meeting is being held, you expect that
6   students will be in the audience?
7       A.   Most generally, yes.
8       Q.   Sometimes it's only half a dozen students,
9   maybe it's just the ROTC color guard?
10      A.   Yes.
11      Q.   Sometimes, I've seen some minutes where it
12  looked like there were 50 or more students there, is
13  that right?
14      A.   Yes.
15      Q.   Can you think of any regular Board meeting
16  where there have been no students present?
17      A.   Probably in the summer months.
18      Q.   Oh, I should have been clear about my
19  question. Can you think of any regular Board
20  meeting during the academic year when students were
21  not present?
22      A.   No.
23      Q.   All right, I am going to show you another
24  exhibit, this is PX12.

Page 43

1        Mr. Hastings, this is a long document, you
2   take as long as you want to to read it, but my first
3   question to you is have you ever seen it before, and
4   you may be able to answer that question without
5   reading the whole document?
6       A.   I may have, but I can't recall. It's been
7   two years.
8       Q.   If you look at the fourth page of the
9   exhibit?
10      A.   Uh-hum.
11      Q.   You will see there are five numbered
12  paragraphs at the bottom of the page, the fifth one
13  of which carries over to the next page. With some
14  extremely minor language changes can you confirm
15  that the five numbered paragraphs on PX12 are
16  essentially identical to the numbered paragraphs of
17  the final Board policy? The only change I can tell
18  you is I know that there is in paragraph four just
19  is changed to only, but apart from that do you see
20  any other changes?
21      A.   No.
22      Q.   Do you know who drafted PX12?
23      A.   I suspect the Neuberger firm.
24      Q.   It says up at the top left the Rutherford

Page 44

1   Institute and the Neuberger firm, is that the basis
2   for your answer?
3       A.   Yes.
4       Q.   Did anyone ever tell you that the board
5   policy as it was presented to you for a first
6   reading on September 28th had been drafted by the
7   Neuberger firm?
8       A.   I can't recall.
9       Q.   In an earlier answer you told me that your
10  normal process is to have Board policies checked by
11  the Board attorney, correct?
12      A.   Yes.
13      Q.   In the summer and fall of 2004 who was the
14  Board's attorney?
15      A.   If memory serves me correctly it was Jim
16  Griffin.
17      Q.   Do you know whether anyone on the Board or
18  the policy committee asked Mr. Griffin to
19  participate in the drafting of the Board policy on
20  School Board prayer?
21      A.   I don't want to assume, I know what happens
22  when you assume, but knowing our procedure and the
23  policy committee I would -- sitting here today I
24  would to -- that was the normal procedure, that it's

Page 45

1   reviewed though our Board attorney. So, whether it
2   was or wasn't I can't recall if they stated it had
3   been. It's just been too long, but that's our
4   normal procedure.
5       Q.   Okay, and it's important to get that, what
6   your memory is and isn't correctly. You can confirm
7   that your normal procedure would be to do that, to
8   run it though your Board attorney?
9       A.   Yes.
10      Q.   With respect to Policy BDA.1 you can't
11  remember whether anyone told you that that normal
12  procedure had been followed or not?
13      A.   No, I can't.
14      Q.   I want to -- we've confirmed that the last
15  five paragraphs of PX12 in essence became the final
16  Board policy, but there are four, it's actually
17  three and a half pages of single spaced text that
18  precede that policy text, which are included in
19  PX12, and I want to ask you some questions about
20  that.
21        First of all, the entire document is titled
22  Policy on Prayer at Board Meetings. Was any
23  consideration given to your knowledge about
24  including the three and a half pages of text that

12 (Pages 42 to 45)

Case 1:05-cv-00120-JJF    Document 283-5    Filed 06/19/2008    Page 13 of 36

Dobrich, et al.                                    v.                    Indian River School District, et al.
Gregory Hastings                          C.A. # 15-120 (JJF)                        October 13, 2006

Page 46

1  appear in this policy before the five numbered
2  paragraphs at the end?
3  **A.   Was there any discussion about this**
4  **information?**
5  Q.   Yeah, did anybody say we have here a
6  something called a policy on prayer at Board
7  meetings which is four pages long, we should adopt
8  the whole thing?
9  **A.   I can't recall.**
10 Q.   Do you recall any discussion of the first
11 three and a half pages of this memo at a Board
12 meeting or any portion of it?
13 **A.   No.**
14 Q.   On the second page of PX12, in the middle
15 of the page, there is a paragraph that begins,
16 whereas, and it reads, "Whereas a member of the
17 American Civil Liberties Union attended one of our
18 school Board meetings was offended by a prayer which
19 was said, and which ended in the name of Jesus
20 Christ, as did the above mentioned prayer by
21 President George Washington, and the ACLU has
22 threatened the Board and School District with a
23 lawsuit if it does not abandon its custom."
24      Does that description of the statement by a

Page 47

1  representative of the American Civil Liberties Union
2  at one of your Board meetings, comport with your
3  recollection?
4  **A.   That there was a member of the American**
5  **Civil Liberties Union in attendance, is that what**
6  **you are asking?**
7  Q.   Well, let's work through it bit by bit. Do
8  you recall a Board meeting at which a member of the
9  ACLU was in attendance?
10 **A.   I recall that there was an alleged member**
11 **of the ACLU there, I was never introduced to anyone.**
12 Q.   Do you recall someone standing and speaking
13 and identifying herself as a member of the ACLU or a
14 representative of the ACLU?
15 **A.   Yes, now that you mention it. Yes.**
16 Q.   The next phrase is that that person was
17 offended by a prayer which was said and which ended
18 in the name of Jesus Christ. Do you remember the
19 representative of the ACLU indicating that she was
20 offended by the prayer?
21 **A.   I don't recall if she used those exact**
22 **words, no.**
23 Q.   I want to draw a distinction for purposes
24 of the next question, between someone who is

Page 48

1  personally offended and someone who expresses the
2  opinion that something is unconstitutional or
3  prohibited by law. Would you characterize the
4  remarks of the woman who identified herself as an
5  ACLU representative as a statement of what she
6  believed to be the law or a statement that she was
7  personally offended by the prayer?
8  **A.   You are going to have to ask that again.**
9  Q.   You understand the distinction I am trying
10 to draw?
11 **A.   Yes. Your precise question?**
12 Q.   Yes. Do you believe, as you recollect it,
13 were her remarks in the personally offended
14 camp, or the discussing her opinion of the law camp?
15 **A.   I don't recall any of the words, or even**
16 **the gist of what she was saying. Again, it's been**
17 **too long.**
18 Q.   Okay. Did anyone in the discussion of the
19 School Board Prayer Policy ever say I think it's
20 important that we have the ability to pray in the
21 name of Jesus Christ?
22 **A.   Can you repeat that again, please?**
23 Q.   Did anyone during the discussion of Board
24 Prayer Policy, School Board Prayer Policy, say in

Page 49

1  words or substance, I think it's important that we
2  have -- retain the ability to pray in the name of
3  Jesus Christ?
4  **A.   I can share with you to my best**
5  **recollection in discussions that we've had as**
6  **members of the Board, it's of my opinion and of our**
7  **opinion, my fellow Board members, that we have the**
8  **right to say a prayer asking guidance, divine**
9  **guidance over us to make the proper decisions,**
10 **guiding us in making policy, and those decisions**
11 **that we are charged to do. So, there has been**
12 **discussion about our rights as sitting Board members**
13 **in what we have the right to do.**
14      **Does that answer your question?**
15 Q.   In part. In the context of those
16 discussions, did one or more Board members say I
17 have the right to pray in the name of Jesus Christ
18 and I want a policy that preserves that right?
19 **A.   No, not to that content.**
20 Q.   Did anyone say I have the right to pray in
21 the name of Jesus Christ and we should pass a policy
22 that acknowledges that?
23 **A.   No.**
24 Q.   The discussion here in the Rutherford

13 (Pages 46 to 49)

Dobrich, et al.
Gregory Hastings

v.

C.A. # 15-120 (JJF)

Indian River School District, et al.
October 13, 2006

Page 50

1  Institute memorandum, or what's characterized as a
2  Board Prayer Policy, seems to be focused to some
3  degree on the right to pray in the name of Jesus
4  Christ, and I will tell you why I say that. If you
5  look at the fourth whereas clause on the first page,
6  are you with me?
7  **A.  Yes.**
8  Q.    There is a prayer attributed to George
9  Washington, and the whole prayer is set forth, but
10  in Italics at the end is -- are the words, "Through
11  Jesus Christ our Lord," do you see that?
12  **A.  Uh-hum.**
13  Q.    Was there ever any discussion at the Board
14  level, or from Mr. Neuberger if he presented this
15  document personally, as to why the words, through
16  "Jesus Christ our Lord," were Italicized in that
17  prayer?
18  **A.  Was there any discussion to why this is in**
19  **here Italicized?**
20  Q.    Yes.
21  **A.  Not that I recall, no.**
22  Q.    Do you have any understanding as to why
23  Mr. Neuberger, or whoever wrote this document,
24  Italicized the words, through "Jesus Christ our

Page 51

1  Lord?"
2  **A.  I have no idea.**
3  Q.    Do you think it, the Italicization -- that
4  can't possibly be a word. Do you think that the
5  fact that those words were put in Italics has any
6  connection to the whereas clause that I read you on
7  the second page referring to the member of the
8  American Civil Liberties Union being offended by a
9  prayer which was said, and which ended in the name
10  of Jesus Christ?
11  **A.  Honestly, I don't know. I can't speak for**
12  **Mr. Neuberger. I don't know where he was coming**
13  **from. I don't know.**
14  Q.    That's helpful, but it's a little bit
15  different than the question that I asked. Did
16  anybody say anything -- I am sorry you are right, I
17  withdraw the question.
18       Did anybody say anything that indicated
19  there was a linkage between the comments included in
20  the whereas clause in the middle of page two and the
21  fact that the words, "Through Jesus Christ our Lord"
22  are italicized on page one?
23  **A.  No, I can't recall.**
24  Q.    On page three of PX12, there is a

Page 52

1  paragraph, about a third of the way down the page
2  that begins, "It is the opinion," do you see that?
3  **A.  Yes.**
4  Q.    It reads, "It is the opinion of legal
5  counsel that since the Indian River Board of
6  Education is a public legislative and deliberative
7  body, it has the right to open its meetings with a
8  prayer." Did you receive the opinion of legal
9  counsel to that effect?
10  **A.  From specific counsel?**
11  Q.    That was going to be my next question, but
12  I thought I'd ask the preliminary question. In
13  fact, did you get advice to that effect from any
14  legal counsel?
15  **A.  I can't recall.**
16  Q.    Am I then correct that if you can't recall
17  getting the opinion I guess you can't identify the
18  counsel who gave you the opinion, is that right?
19  **A.  No.**
20  Q.    On the fourth page of the document, just
21  about in the middle of the page there's a paragraph
22  that reads, "Thus, it is the opinion of legal
23  counsel that the Supreme Court decision in Marsh v.
24  Chambers, which unlike the Coles decision, is

Page 53

1  binding precedent in Delaware, compels the
2  conclusion that the Indian River School District's
3  tradition of opening its meetings with a brief
4  invocation is constitutionally permissible."
5       Did the Board get an opinion as stated in
6  that paragraph?
7  **A.  I seem to recall somewhere in the timeline**
8  **being advised of such, yes.**
9  Q.    Who gave you that opinion, that legal
10  opinion?
11  **A.  I could not tell you, I have no idea, or I**
12  **can't recall.**
13  Q.    Well, I am going I give you a list of
14  possible suspects, if you will, all right? I am
15  going to give you a list of all the lawyers that
16  have been identified over the course of the last
17  three days and see if that refreshes your
18  recollection, all right?
19       Mr. Griffin was the Board attorney during
20  this period. And I'm going to just identify the
21  ones whose involvement predated August 30, 2004
22  which is as you will see is the date of this
23  document. So, if you got an opinion later than that
24  it couldn't qualify as the opinion of legal counsel

14 (Pages 50 to 53)

Dobrich, et al.                                    v.                    Indian River School District, et al.
Case 1:05-cv-00120-JJF   Document 282-6 -120 (JJF) Filed 06/19/2008   Page 1 of 36
Gregory Hastings                        C.A. # 15-120 (JJF)                    October 13, 2006

Page 54

1  that you got reflected here, okay.
2        So, Mr. Griffin was the Board's lawyer.
3  Mr. Neuberger and the Rutherford Institute appeared
4  to have been involved earlier than August 30, 2004.
5  I can also give some names but eliminate them.
6  Mr. Balliger and Mr. Cafferty were involved before
7  August 30, 2004. And of course the Board's current
8  counsel, Mr. Shaw's firm was not involved before
9  then.
10       Can you think of any other candidates to
11 have given you a legal opinion as set forth on page
12 four of this document, other than Mr. Griffin or
13 Mr. Neuberger and the Rutherford Institute?
14  **A.   Not to my knowledge.**
15  Q.   So, to the extent that you got such an
16 opinion it was -- it's your best recollection that
17 it was either Mr. Griffin or Mr. Neuberger who
18 provided it?
19  **A.   I guess through the process of elimination,**
20  **yes.**
21  Q.   Now, you testified earlier that you seemed
22 to recall having gotten an opinion to this effect
23 from somebody during this process. Do you know
24 whether you got your recollection that you got that

Page 56

1  **A.   No.**
2  Q.   Did the Rutherford Institute ever represent
3  the Board?
4  **A.   No.**
5  Q.   Now, do you recall the Board receiving any
6  other document constituting -- strike that.
7        The reason I asked you the question about
8  whether this document is the legal opinion referred
9  to in the document, and which you said you thought
10 maybe you had gotten as a Board, is that sometimes
11 legal opinions come in the form of a written
12 opinion, are you aware of that?
13  **A.   Yes.**
14  Q.   As an architect have you ever gotten a
15 written opinion from your lawyers?
16  **A.   Oh, yeah.**
17  Q.   Those pesky lawyers.
18  **A.   Uh-hum.**
19  Q.   So, you are familiar with the concept that
20 you could get a written legal opinion. With that
21 concept in mind would your answer change, that is to
22 say, does that refresh your recollection that this
23 document, PX12, is the legal opinion that you recall
24 having gotten on the issue of whether the Board

Page 55

1  opinion -- strike that.
2        Do you have an affirmative recollection of
3  when you got that opinion?
4  **A.   I don't know, I don't know the precise**
5  **time.  I would suspect that it would have to be**
6  **during that summer, early fall of '04.**
7  Q.   This question may sound a little funny, but
8  it's, as with all my questions, it's a serious
9  question, is this document, PX12, that opinion? I
10 mean it discusses lots of case law, and it reflects
11 thus it is the opinion of legal counsel.
12       Is this the opinion that you are referring
13 to that you got which suggested that the Supreme
14 Court's decision in Marsh v. Chambers which unlike
15 the Coles decision and so forth, compels the
16 conclusion that the Indian River School District's
17 tradition of opening its meetings with a brief
18 invocation is constitutionally permissible?
19  **A.   You're asking if this was what was**
20  **presented to us at that timeline, this exact**
21  **document?**
22  Q.   Yes.
23  **A.   I'm sorry I can't recall.**
24  Q.   Did Mr. Neuberger ever represent the Board?

Page 57

1  could open its meetings with a prayer?
2        You are looking at me like my question
3  might be unclear, is it?
4  **A.   I am not really sure what you are asking.**
5  **cause I mean --**
6  Q.   Let me repose it.
7  **A.   Yeah.**
8  Q.   I asked you is this document, PX12, the
9  legal opinion that you got that the Indian River
10 School District's tradition of opening its meetings
11 with a brief invocation is constitutionally
12 permissible, and you said you just didn't know,
13 correct?
14  **A.   Yes.**
15  Q.   Okay.  When you said I don't know, do you
16 mean it could be or it couldn't be? That is to say
17 this might be it, but it might have been that we got
18 something else?
19  **A.   True.**
20  Q.   Did you -- do you have an affirmative
21 recollection that you received some other written
22 legal opinion on that topic, some other than PX12?
23  **A.   You are asking did we?**
24  Q.   Yup.

15 (Pages 54 to 57)

Dobrich, et al.
Gregory Hastings

v.

C.A. # 15-120 (JJF)

Indian River School District, et al.
October 13, 2006

Page 58

1    A.   It's possible.
2    Q.   You don't recall one way or another?
3    A.   No.
4    Q.   The vote to approve School Board Policy
5    BDA.1 was unanimous, or at least the minutes so
6    reflect. At any time during the discussion in
7    executive session, because I think -- at any time
8    during the Board discussion of Board Policy BDA.1
9    did anyone express any reservations of any kind
10   about the policy?
11   A.   Not that I recall.
12   Q.   Did anyone ask any questions about the
13   policy?
14   A.   There may have been, but I don't recall.
15   Q.   Did you have any reservations about the
16   policy?
17   A.   No.
18   Q.   I asked Mrs. Bunting a few questions
19   yesterday, and at one point she volunteered that
20   there was a north south division in the district,
21   which she ascribed to the historical consolidation,
22   to the consolidation process some years ago. Do you
23   know what she means by the north south division?
24   A.   Yes, I do.

Page 59

1    Q.   Could you describe for me what you
2    understand it to be?
3    A.   You promised to be finished by 12.
4    Q.   Well, give me the short version.
5    A.   As you probably learned our consolidation
6    occurred in '69 and '70. The southern part of the
7    district being the resort area, Bethany -- well, in
8    that case it was Lord Baltimore, John M. Clayton and
9    this area, Selbyville Middle School. Selbyville had
10   been consolidated a year prior to the northern part
11   of the district, being Millsboro and Georgetown.
12       There was a lot of animosity for the
13   southern area, this area, joining with the northern
14   area of what's now become Indian River School
15   District, the Georgetown/Millsboro area. A lot of
16   it has to do with tax base. Also the territorial
17   division.
18       We have two high schools, and for a lot of
19   old seasoned tenured folks in this area there is
20   still some resentment to that consolidation.
21   Q.   What was the reason for the consolidation?
22   A.   To the best of my knowledge it was at that
23   time believed to be a political and economical
24   decision from the state by the state. It has to be

Page 60

1    done legislatively.
2    Q.   Did you perceive the north south division
3    to have any impact or play any role in the
4    considerations of or deliberations on the School
5    Board Prayer Policy?
6    A.   No.
7    Q.   You told me earlier in the deposition that
8    you were appointed to the Delaware State Board of
9    Education in December of 2005?
10   A.   I was appointed on November 8, I sat first
11   Board meeting December '05.
12   Q.   Sorry. And you shortly thereafter resigned
13   from the Indian School Board?
14   A.   No, I resigned December 13th.
15   Q.   Were you obligated to resign from the
16   district board because of the new state position?
17   A.   Yes.
18   Q.   Have you attended any Indian River School
19   Board meetings since you resigned as a Board member?
20   A.   Yes.
21   Q.   Could you identify that meeting or
22   meetings?
23   A.   It was April of this year, '06 and we were
24   in the midst of campaigning, we had several

Page 61

1    candidates vying for several seats open on the
2    Board, and it was during that period of campaign
3    that I attended that meeting.
4    Q.   What was it about the fact that it was a
5    period of campaign that caused you to attend the
6    Indian River Board meeting?
7    A.   One of our candidates was in attendance,
8    and it was just -- I'm sorry, it was in addition to
9    that, it was that period of time, we had, I was
10   informed of a meeting that was going to take place
11   in executive session, that particular Board meeting
12   with our attorneys regarding this case. So, I was
13   privy to that information in executive session. It
14   was a simultaneous -- actually and that's probably
15   confusing.
16   Q.   Yes, sir.
17   A.   The Board election that's how I recall the
18   time and date.
19   Q.   Okay.
20   A.   The Board election was taking place in May,
21   May the 8th or 9th, but it was April's Board meeting
22   that I sat with a candidate that's running for the
23   Board seat, and but I went for the purpose of
24   attending the executive session meeting to be

16 (Pages 58 to 61)

Case 1:05-cv-00120-JJF     Document 283-5     Filed 06/19/2008     Page 17 of 36

Dobrich, et al.                                                    Indian River School District, et al.
Gregory Hastings                      v.                           October 13, 2006
                            C.A. # 15-120 (JJF)

Page 62

1   briefed on the latest data pertaining to this case.
2   Q.   I understand. So, you are able to recall
3   the date because of sitting with the candidate?
4   A.   Yes, that's correct.
5   Q.   But you went to the meeting for the purpose
6   of being briefed on this case?
7   A.   That's correct, yes.
8   Q.   Who was the candidate that you sat with?
9   A.   Trish Oliver.
10      MS.DUPHILY:   We are going off the record
11  at approximately 11:03.
12      (WHEREUPON a brief recess was taken)
13      MS. DUPHILY:   We are back on the record
14  at approximately 11:11 a.m..
15  Q.   Before we broke you mentioned that you
16  attend the April 25, 2006 Board meeting.
17  A.   (Nods head).
18  Q.   I have the minutes of that meeting here, I
19  guess we should mark them.
20      (WHEREUPON Exhibit 53 was marked
21      for identification.)
22  Q.   I'm not suggesting to you, Mr. Hastings,
23  that you are wrong, but if you look at page four
24  you'll see the section on other visitors and staff

Page 63

1   in attendance.
2   A.   Uh-hum.
3   Q.   And it's possible that I missed it, but I
4   don't see your name listed, do you?
5   A.   I came in late.
6   Q.   Okay.
7   A.   And I sat in the back.
8   Q.   On the first page of April 25, 2006 you'll
9   see executive session agenda, and item 4B is number
10  06-05 PL. Is that the executive session that you
11  attended?
12  A.   I'm sorry you are looking at the executive
13  session agenda?
14  Q.   Look at the first page of PX53. You will
15  see down at the bottom there is a line item for
16  executive session agenda?
17  A.   Yes.
18  Q.   And you will see the second item is number
19  06-05 PL. We've had testimony that the PL stands
20  for potential litigation?
21  A.   Yes.
22  Q.   And is that the portion of the executive
23  session that you attended?
24  A.   I believe so, if that personnel -- if that

Page 64

1   number is appropriate for this case. I don't recall
2   the number.
3   Q.   There isn't any other litigation pending on
4   the executive session, is there?
5   A.   Correct.
6   Q.   If you look at pending or potential
7   litigation under the regular agenda, again on the
8   first page, see regular agenda about halfway down
9   the page?
10  A.   Right.
11  Q.   And under item 21 there's an item for
12  pending or potential litigation?
13  A.   Yeah.
14  Q.   There are two different issues, see that?
15  A.   Yes.
16  Q.   05-01 PL and 06-05 PL. Do you know what
17  those two numbers refer to?
18  A.   Not today I don't.
19  Q.   Is the State Board of Education a
20  legislative body?
21  A.   Well, in the text that we have commented in
22  my opinion I will say yes.
23  Q.   Do you know whether the law establishing
24  the State Board of Education identifies it as a

Page 65

1   legislative body?
2   A.   I do not.
3   Q.   Do you know what branch of government the
4   State Board of Education is identified with?
5   A.   What branch of government the State Board
6   of Education?
7   Q.   Yes, sir?
8   A.   Is affiliated with, it would be education.
9   Q.   Does it fall, do you know whether it falls
10  under the executive branch, the judicial branch or
11  the legislative branch of government?
12  A.   No.
13  Q.   Does the State Board of Education set state
14  wide testing standards?
15  A.   We have some say into that, yes.
16  Q.   Does it determine allocations of state
17  funds to individual districts in the State of
18  Delaware?
19  A.   No.
20  Q.   Who does that?
21  A.   The financial department. The structure
22  and bureaucracy, if you will.
23  Q.   As a member of the State Board of Education
24  do you represent a particular geographic region?

17 (Pages 62 to 65)

Page 66

1  **A.  Not precisely, but when this seat became**
2  **available the State Board is made up of three Board**
3  **members from the northern end of the state, two in**
4  **the middle and two in the southern, and then one at**
5  **large. So, there is kind of geographic area but not**
6  **a precise area. Or not a district, either.**
7  Q.   How is north and south delineated, above
8  and below the canal?
9  **A.  Well, we only have three counties.**
10  Q.   I wondered where Kent County falls?
11  **A.  Slightly below.**
12  Q.   Does the State Board of Education open
13  meetings with an invocation or prayer?
14  **A.  No, we can't.**
15  Q.   Does the State Board of Education open its
16  meetings with a moment of silence?
17  **A.  No.**
18  Q.   Since you joined the State Board has
19  anyone, including you, suggested that the State
20  Board of Education open its meetings with a prayer?
21  **A.  No.**
22  Q.   Or a moment of silence?
23  **A.  No.**
24  Q.   Since you joined the State Board of

Page 67

1  Education have you raised or discussed that issue
2  with anyone?
3  **A.  No.**
4  Q.   Has anyone raised it with you?
5  **A.  No.**
6  Q.   I am just looking for a ballpark number,
7  how many meetings of the State Board of Education
8  have you attended so far?
9  **A.  All inclusive or just regular?**
10  Q.   Well, let's start with the regular
11  meetings?
12  **A.  Regular there are just one a month, but we**
13  **have subcommittees and varied other events but --**
14  Q.   So, if the regular meetings are one month
15  we are talking about roughly speaking 20 regular
16  board meetings you've attended?
17  **A.  Regular and other?**
18  Q.   No, I made a mistake. Your first meeting
19  was in December of '05?
20  **A.  That's correct.**
21  Q.   So, you've attended nine or ten regular
22  Board meetings?
23  **A.  Yes.**
24  Q.   Okay. Is it your view that the State

Page 68

1  Board's meetings have been conducted in a respectful
2  and solemn manner?
3  **A.  In my opinion, yes.**
4  Q.   As solemnly and respectfully as the Indian
5  River School District meetings that you attended as
6  an Indian River School District Board member?
7  **A.  Yes.**
8  Q.   Do you think that the State Board members
9  take their duties seriously based on your
10  observation?
11  **A.  Yes.**
12  Q.   As seriously as again based on your
13  observations the Indian River School Board's members
14  took their duties?
15  **A.  Yes.**
16  Q.   Do you have any reason to believe that the
17  State Board needs to open its meetings with a prayer
18  in order to solemnize those proceedings?
19  **A.  Repeat that again, please?**
20  Q.   Do you have any reason to believe that the
21  State Board needs to open its meetings with a prayer
22  in order in order to solemnize those proceedings?
23  **A.  Do I believe there's a need?**
24  Q.   Yes.

Page 69

1  **A.  Nice yes, need no.**
2  Q.   Has anyone ever suggested to you that the
3  State Board needs to open it's -- I am going to
4  start again. Has anyone ever suggested to you that
5  the State Board needs to open its meetings with a
6  prayer in order to solemnize those meetings?
7  **A.  No.**
8  Q.   And if I asked you all of those same
9  questions but substituting moment of silence for
10  prayer, would your answers be the same?
11  **A.  Yes.**
12  Q.   To your knowledge has the State Board
13  historically opened its meetings with an invocation
14  or prayer?
15  **A.  Have they opened with a prayer?**
16  Q.   Have they had a historical practice of
17  opening their meetings with a prayer?
18  **A.  To my knowledge they have not.**
19  Q.   Does the State Board of Education have an
20  official policy with respect to opening its meetings
21  with a prayer or a moment of silence?
22  **A.  I don't know, but after this I am going to**
23  **find out.**
24  Q.   Does the State Board of Education, and this

18 (Pages 66 to 69)

Case 1:05-cv-00120-JJF    Document 283-5    Filed 06/19/2008    Page 19 of 36

Dobrich, et al.                                           v.                        Indian River School District, et al.
Gregory Hastings                              C.A. # 15-120 (JJF)                                October 13, 2006

Page 70

1  is a general question, does the State Board of
2  Education have any role or responsibility to guide
3  individual districts in conforming their conduct to
4  the law?
5      A.  Can you repeat that one more time, please?
6      Q.  Does the State Board of Education have any
7  role or responsibility in attempting to guide
8  individual districts in conforming their conduct to
9  the law?
10     A.  I would have to respond more so now than
11  just as recent as a few months ago.  We do again, to
12  a degree, surprisingly.  We have a school district
13  in the state that is in financial, in a major
14  financial state, and in light of this the State
15  Board really had no say or control or input,
16  involvement, but there has just been recently a
17  policy that addresses that, that we have the right
18  to step in and to assist, do what's necessary to
19  help maintain the integrity of that school district,
20  if that makes sense.
21     Q.  Yes, sir.  And is that a policy that is
22  restricted -- it's the Red Clay District, is that
23  right?
24     A.  No.

Page 72

1      A.  Additional independent audit, reviewing of
2  their administrative staff, expenditures of the
3  district, there are just a few.
4      Q.  Do you know whether the State Board of
5  Education has ever received an inquiry about the
6  Indian River School Board Prayer Policy, or the
7  School Board's practice of opening its meetings with
8  a prayer?
9      A.  If the -- repeat it, please?
10     Q.  Do you know whether the State Board of
11  Education has ever received an inquiry about the
12  Indian River School District's School Board Prayer
13  Policy?
14     A.  I do not.
15     Q.  Do you know whether the State Board of
16  Education has ever received an inquiry about the
17  Indian River School Board's practice of opening its
18  meetings with a prayer?
19     A.  I do not.
20     Q.  To your knowledge has the issue of School
21  Board prayer ever been addressed or discussed by the
22  State Board of Education?
23     A.  At a formal meeting?
24     Q.  Let's limit it first to at a formal

Page 71

1      Q.  Which district?
2      A.  Appaquinamic.
3      Q.  Is that policy restricted to --
4      A.  No Christina, I'm sorry, I beg your pardon
5  it's Christina.
6      Q.  Is that policy restricted to the Christina
7  District or is it, does it apply to all of the
8  districts state wide?
9      A.  All.
10     Q.  And am I correct that the State Board of
11  Education is currently involved in guiding or
12  advising the Appaquinamic School District -- sorry?
13     A.  Christina.
14     Q.  Are you currently involved in advising or
15  guiding the Christina District?
16     A.  Yes.
17     Q.  Is that the only district that you are
18  currently taking up your responsibilities in regard
19  to this particular policy, just the Christina
20  District?
21     A.  To date, yes.
22     Q.  What has the State Board done with respect
23  to the Christina District, you can just speak
24  generically?

Page 73

1  meeting?
2      A.  Not to my knowledge.
3      Q.  And now more broadly, in any context, has
4  the State Board of Education ever addressed the
5  issue of School Board prayer?
6      A.  No.
7      Q.  Mr. Hastings, on the day before the August
8  24 meeting, the really big meeting, there was a
9  special meeting of the Board of -- of the School
10  Board, do you recall that?
11     A.  A meeting the evening prior to our regular
12  board meeting?
13     Q.  Yes.
14     A.  It was identified as a special Board
15  meeting?
16     Q.  Yes.
17     A.  Honestly I don't recall.
18     Q.  Fortunately I have some documents?
19     A.  I am sure you do.
20     Q.  Mr. Sroka can give you a copy of PX14.
21  These have already been identified as the official
22  minutes and roll call for the meeting, special
23  meeting, of Monday August 23, 2004.  As you say in
24  the evening at Sussex Central Middle School library.

19 (Pages 70 to 73)

Case 1:05-cv-00120-JJF    Document 283-5    Filed 06/19/2008    Page 20 of 36

Dobrich, et al.                          v.                 Indian River School District, et al.
Gregory Hastings              C.A. # 15-120 (JJF)                      October 13, 2006

Page 74

1  If you look at the second page of the exhibit you
2  will see that you are listed as having been present?
3      A.   Yes.
4      Q.   The meeting is called to order at 7
5  o'clock, it's a special meeting, and it does not
6  reflect that there was a prayer. I take it you
7  think that there was not a prayer, correct?
8      A.   As tradition would have it, no that would
9  be correct.
10     Q.   And then Mr. Helms moved, and Dr. Hattier
11 seconded, to go into executive session one minute
12 later at 7:01 p.m., "To seek advice from our legal
13 counsel regarding potential litigation." The motion
14 passed unanimously 9-0. The minutes then reflect
15 that you came out of executive session at 11:15 p.m.
16 and adjourned at 11:16 p.m., do you see that?
17     A.   Yes.
18     Q.   All right, so we can agree I take it that
19 the entire purpose of this meetings was to seek
20 advice from your legal counsel regarding potential
21 litigation?
22     A.   Yes.
23     Q.   Now, I am going to turn to PX13, these are
24 the minutes of the executive session for the same

Page 75

1  meeting.
2      A.   Uh-hmm.
3      Q.   And as a preliminary matter you will see
4  that the word redacted appears twice on the first
5  page?
6      A.   Yes.
7      Q.   That's a lawyer's term when a portion of
8  the text is deleted probably for privilege purposes.
9  But there is some text remaining which I'd like to
10 ask you about. It says, "During discussion of this
11 issue several Board members expressed that their
12 constituents do not want the Board to change its
13 practice of opening the meetings with a prayer."
14 And my first question is, this issue in that
15 sentence, is that the School Board prayer issue?
16 And it may help to refresh your recollection if you
17 look at the rest of the sentence?
18     A.   Honestly, I would have to say I am
19 embarrassed to say this, but I do not recall this
20 meeting at all.
21     Q.   Okay.
22     A.   I suspect yes that's what it would refer
23 to, but I guess my memory is not as good as it used
24 to be.

Page 76

1      Q.   It's two years ago sir. You don't have any
2  recollection of a four hour executive session
3  meeting the night before the August 24th Board
4  meeting?
5      A.   No, I do not.
6      Q.   Okay, let's turn to the August 24th Board
7  meeting. Were speakers set up in the parking lot so
8  that people standing outside could hear what was
9  going on at the August 24 Board meeting?
10     A.   I believe I heard that that was the case.
11 I don't recall seeing the speakers, but I believe I
12 heard that they had been.
13     Q.   Do you know who arranged for the speakers
14 to be set up in the parking lot so that people
15 standing outside the building could hear what was
16 going on?
17     A.   No.
18     Q.   Did you ever hear who did that?
19     A.   No.
20     Q.   In addition do the speakers in the parking
21 lot, was there an overflow room also prepared in
22 anticipation for the large crowd at the August 24
23 meeting?
24     A.   Yes. Again I wasn't witness to it but I

Page 77

1  understood that it was in a gym, gymnasium, I
2  believe.
3      Q.   And that gymnasium was set up not only with
4  speakers but also with a video feed from the actual
5  Board meeting room?
6      A.   I believe so, I was told that, yes.
7      Q.   Mrs. Bunting told me yesterday that she had
8  heard via hearsay a couple of days before the
9  meeting that there were going to be very large
10 crowds at the meeting, did you hear that as well?
11     A.   I would have to say I suspect if there were
12 alleged large crowds going to be in attendance I
13 would not have heard it until that meeting, that
14 special meeting the evening before, but I don't
15 recall anything specific.
16     Q.   Am I right that you weren't shocked that
17 there were very large crowds when you arrived for
18 that Board meeting?
19     A.   No, not really, that's correct, I was not
20 shocked. That's usually what happens.
21     Q.   What's usually what happens?
22     A.   When there is an issue that's very
23 personal, or parents in our community have a
24 concern, very strong concern about an issue, there

20 (Pages 74 to 77)

Page 78

1  would be a moderate to a large attendance to the
2  Board meeting. So, that's why I was not surprised
3  to see a large turn out.
4      Q.  Can you recall any Board meeting during
5  your 12 year tenure that had a turnout that even
6  approved the turnout at this meeting?
7      A.  One, on one other occasion. And that was a
8  negotiation issue between the district and teachers
9  union several years ago.
10     Q.  Do you know how many people attended that
11  meeting?
12     A.  I am going to guess maybe 300.
13     Q.  The published reports of the attendance at
14  the August 24th meeting were 6 to 800. That's based
15  on your answer a minute ago, would I be right in
16  understanding that at least for your 12 and a half
17  year tenure the attendance at the August 24th
18  meeting was double, roughly speaking, double the
19  highest attendance at any other Board meeting during
20  your tenure?
21     A.  Yes.
22     Q.  I asked you this question specifically with
23  respect to you and your family, let me ask it
24  generally, do you know of any School Board member

Page 79

1  who discussed with church groups their attendance at
2  the August 24 School Board meeting?
3      A.  I do not.
4      Q.  Are you aware of any effort by any School
5  Board member to encourage people to attend the
6  August 24 School Board meeting?
7      A.  No, I do not.
8      Q.  Did you happen to hear Dr. Hattier's
9  comments on WGND shortly before the School Board
10  meeting?
11     A.  The August 24th meeting?
12     Q.  Yes, sir?
13     A.  I don't recall. He's always on the radio.
14     Q.  I'm sorry say again?
15     A.  He's always on the radio.
16     Q.  Did you ever come to hear what Dr. Hattier
17  said on the radio shortly before the August 24th
18  meeting?
19     A.  No.
20     Q.  Did anything occur at the meeting itself,
21  the August 24th meeting that you found disturbing?
22     A.  I guess I would have to comment as we have
23  established that's probably the largest numbers of
24  parental constituent turn out that we've ever had at

Page 80

1  a Board meeting.
2          When you have large numbers such as that,
3  it does have tendency to have effect on the regular
4  Board meeting. The regular Board meeting is to
5  conduct business, share concerns, discuss issues,
6  just conduct business of the slated agenda. I am
7  going to have to say that just in general the
8  overall ambience of the crowd, and the meeting, was
9  a little disturbing, but nothing -- I can't recall
10  anything specific that was I'll say alarming, if
11  that's what you are asking or referring to.
12     Q.  What was it in your view about the overall
13  ambience of the crowd in the meeting that was a
14  little disturbing?
15     A.  Many of them had signs they were waving, on
16  occasion there might -- I believe there was an
17  outburst or some larger or someone would comment.
18  When you have a group of people together like that
19  it can get a little unruly. I understand there was
20  some singing prior to the meeting in the gymnasium.
21  I don't recall hearing singing in the cafeteria
22  where we conducted our meeting, but it was -- it
23  proposed for an interesting meeting, let's put it
24  that way.

Page 81

1      Q.  Did you see the text of any of the signs?
2      A.  Yes.
3      Q.  Did you find the text of any of the signs
4  at least a little disturbing?
5      A.  You asked me if I saw the text, I did see
6  the text and I am trying to recall the text. Other
7  than the sign might have been save our prayer, God
8  bless you, something to that effect.
9      Q.  You mentioned that there were occasional
10  outbursts, what do you mean by that?
11     A.  Outburst may have been a little strong.
12  Again, when you have many numbers in a cafeteria
13  like that people would be talking in a larger volume
14  than what was probably appropriate, and sitting in
15  that atmosphere it was disturbing. It disturbed our
16  conduct of the meeting. You could hear them
17  discussing it or you could hear conversations which
18  is typical in a atmosphere of a crowd like that, I
19  suspect.
20     Q.  When you get a crowd like that is it your
21  experience that, and by a crowd like that I mean a
22  large crowd, is it your experience that people
23  behave differently than they do on an individual
24  basis?

21 (Pages 78 to 81)

Dobrich, et al.                              v.                    Indian River School District, et al.
Gregory Hastings                    C.A. # 15-120 (JJF)                    October 13, 2006

Page 82

1   A.   Yes.
2   Q.   What sometimes people call crowd mentality
3   or mob mentality, correct?
4   A.   Yes.
5   Q.   Did that occur on August 24th?
6   A.   I suspect it did.
7   Q.   During the meeting there were frequent
8   shouts of amen after a particular public comments,
9   is that correct?
10  A.   I suspect.  I don't recall to date exactly,
11  but I suspect.
12  Q.   You testified a little earlier that you
13  can't recall a specific instance that you would
14  characterize as alarming, and I have few questions.
15       I have -- I want to say first that I have
16  been accused in this case of feeling very strongly
17  about the issues in this case, and about protecting
18  my clients and their interests, and I admit that I
19  do.  But in asking the next series of questions I
20  want you to know that I don't mean to be
21  disrespectful.  I don't mean to belittle or harass
22  you, and that I am trying to develop evidence on
23  issues that I think are relevant to the issues
24  before us.

Page 83

1        So, please if I become emotional or try to
2   press you on an issue, I want you to understand that
3   I don't mean any disrespect, all right?
4   A.   Uh-hum.
5   Q.   What I want is your honest opinion about
6   the atmosphere during that meeting, and in
7   particular during the public comment portion of the
8   meeting.  And some of the comments made at that
9   meeting by the public.  And what I'm going to do is
10  play a portion of the videotape of that meeting and
11  ask you some questions about it.
12       While Mr. Horvath is getting the tape
13  ready, did you know that the meeting was going to be
14  videotaped?
15  A.   No.
16  Q.   That was not the normal practice of the
17  board, is that right?
18  A.   No, that's correct.
19  Q.   The meeting on August 24th opened with a
20  prayer, is that correct?
21  A.   Yes.
22  Q.   And did the crowd shout and yell amen and
23  cheer when the person offering the prayer began?
24  A.   I seem to recall a few comments.  I don't

Page 84

1   know to what degree well, yes.
2   Q.   Can you tee that up?  I'm going to show you
3   the portion of the meeting at which the prayer was
4   as offered.
5        (AT THIS POINT A TAPE WAS PLAYED)
6   Q.   Can we agree that there was enthusiastic
7   cheering when the president asked Dr. Hattier to
8   open the meeting with a prayer?
9   A.   Yes.
10  Q.   Now, I'd like to show you a portion of the
11  public comment that came I think midway though the
12  public comment, and while Mr. Horvath is finding
13  that section I have a few preliminary questions.
14       Do you recall that the public comment
15  section of the meeting was expanded with the Board's
16  approval in order to permit a larger number of the
17  public to comment at the meeting?
18  A.   Yes.
19  Q.   And do you recall that the time that was
20  given to each speaker from the public was reduced
21  from three minutes to two minutes in order to enable
22  even more people to speak at the meeting?
23  A.   I believe that's correct, yes.
24  Q.   All right let's play a portion of the

Page 85

1   meeting and then I want to ask you some questions
2   about it.
3   (AT THIS POINT THE TAPE OF THE MEETING WAS PLAYED)
4   Q.   Did you find Mr. Johnson's comments at the
5   meeting disturbing in any way?
6   A.   Not really.
7   Q.   Did you hear Mr. Johnson refer to the
8   disappearance of Madelyn Murray-O'Hare and his
9   linkage of her disappearance to the movement to
10  remove prayer from the schools?
11  A.   Yes.
12  Q.   And did you hear that Mr. Johnson
13  identified Madelyn Murray-O'Hare and her
14  disappearance immediately after his statement that,
15  "The good Lord has proven that there is one higher
16  authority above the Supreme Court?"
17  A.   I heard that.
18  Q.   Did you understand that the Board meeting
19  that Mr. Johnson intended Mrs. Dobrich and her
20  children who were in attendance, they were in
21  attendance, correct?
22  A.   Yes.
23  Q.   Did you understand that Mr. Johnson
24  intended Mrs. Dobrich and her children to hear those

22 (Pages 82 to 85)

Dobrich, et al.                                                      Indian River School District, et al.
Gregory Hastings                    v.                              October 13, 2006
                          C.A. # 15-120 (JJF)

Page 86

1  comments about Mrs. O'Hare?
2  **A.  I would suspect that he would. I am not**
3  **privy that he would know or knew that they were**
4  **going to be in attendance prior, but I suspect**
5  **knowing when he arrived that they were in**
6  **attendance, yes.**
7  Q.   Well, Mrs. Dobrich spoke first, didn't she?
8  **A.  I believe that's correct.**
9  Q.   And so Mr. Johnson knew that Mrs. Dobrich
10 was in attendance?
11 **A.  Yes.**
12 Q.   Along with her children?
13 **A.  Yes.**
14 Q.   Do you think it took a lot of coverage for
15 Mrs. Dobrich to stand up in front of that crowd and
16 speak her mind?
17 **A.  I'm sure it did.**
18 Q.   Did you think it took courage for her
19 children to stand up and try to say what they
20 thought about this issue?
21 **A.  Yes.**
22 Q.   Do you remember the conduct of the crowd
23 during Mrs. Dobrich's comments?
24 **A.  To a degree. I just recall that perhaps**

Page 87

1  **they weren't as appropriate or as kind as one would**
2  **like.**
3  Q.   Do you recall that there were boos?
4  **A.  Perhaps, I don't recall exactly, no.**
5  Q.   Do you remember that there were cat calls?
6  **A.  No, I don't recall.**
7  Q.   Did you believe the conduct of the crowd
8  during Mrs. Dobrich's public statement was
9  respectful and courteous?
10 **A.  I'm sorry, ask that again, please?**
11 Q.   Do you believe that the conduct of the
12 crown at the meeting during Mrs. Dobrich's
13 statements was respectful to Mrs. Dobrich and
14 courteous?
15 **A.  Was the conduct of the crowd?**
16 Q.   Yes.
17 **A.  Respectful, not completely no.**
18 Q.   How about when Alex Dobrich, her son, tried
19 to make a statement, was the conduct of the crowd
20 respectful and courteous?
21 **A.  I recall he tried to speak or he got to the**
22 **podium and wanted to speak but was unable to, and I**
23 **don't recall exactly how the crowd responded, but I**
24 **believe it was, I believe his sister spoke for him,**

Page 88

1  if I recall.
2  Q.   Yes, sir. Do you recall that Alex didn't
3  speak because people started booing or making
4  remarks about his appearance?
5  **A.  I don't recall. I recall as I said the**
6  **young man got up to the podium and not being able to**
7  **speak. I don't recall if things were said subtlely.**
8  **I wasn't privy to that, or did not hear if anything**
9  **was said just in a monotone, so I don't -- I could**
10 **not hear if there was anything just said as I said**
11 **in a monotone. But, I don't recall any loud remarks**
12 **or anything of that nature. I just recall him not**
13 **being able to go though with his comment.**
14 Q.   Do you know how old he was at the time?
15 **A.  I think someone said that he was 12, eleven**
16 **or 12.**
17 Q.   Did you notice that Alex Dobrich was
18 wearing a yarmulke when he made his way to the
19 podium?
20 **A.  I didn't notice that until he sat down.**
21 Q.   Did you notice that during Mr. Johnson's
22 comments that there was laughter from the crowd when
23 he got to the Madelyn Murray-O'Hare, with his
24 description of Madelyn Murray-O'Hare's disappearance

Page 89

1  after she had led the movement to remove prayer from
2  schools, did you notice that on the tape?
3  **A.  Yes.**
4  Q.   And did you recall that that occurred?
5  **A.  After seeing that, yes.**
6  Q.   And did you find that disturbing?
7  **A.  I would have to comment for me in all**
8  **fairness in light of what you are asking here, I**
9  **know Mr. Johnson, what comes -- what remarks that**
10 **gentleman says I am not surprised at the comments**
11 **that he would make. He is the type, I would have to**
12 **say in my opinion, as far as I am concerned he is**
13 **the type of individual when he makes a comment it**
14 **falls to deaf's ear.**
15     **I am not totally answering your question,**
16 **but I may not like what Mr. Johnson says and it**
17 **doesn't surprise me what Mr. Johnson says often. As**
18 **a matter of fact there is probably many occasions**
19 **through the years when he was on the Board, or off**
20 **the Board that Mr. Johnson would make.**
21     **Whether I would agree or disagree is a**
22 **different matter, but I -- in this case I don't have**
23 **control over the crowd, I don't have control of**

23 (Pages 86 to 89)

Dobrich, et al.
Gregory Hastings

v.

C.A. # 15-120 (JJF)

Indian River School District, et al.
October 13, 2006

Page 90

1  **Mr. Johnson. I would have to say that he's --**
2  **perhaps the crowd laughing at that comment is not a**
3  **funny remark, but I would say Mr. Johnson is**
4  **Mr. Johnson.**
5    Q.   I want to explore that for a moment. I
6  take it from your answer that you've known
7  Mr. Johnson for some time?
8    **A.   Yes, I have.**
9    Q.   And in fact, as you say you served on the
10  School Board with him?
11    **A.   For a short period of time.**
12    Q.   And because you know Mr. Johnson I take it
13  you were able, at least to some degree, to discount
14  the tenor of his comment as we just heard it. You
15  said you could sort of, you know Mr. Johnson, you
16  can take it as a Mr. Johnson comment in effect,
17  right?
18    **A.   I guess another way of putting it, rather**
19  **than beating around the bush, Mr. Johnson has a**
20  **reputation of being very crass, and lack of polish,**
21  **or with diplomacy when he speaks. And if he offends**
22  **someone in his comments in my opinion Mr. Johnson**
23  **doesn't care.**
24    Q.   Do you know Mr. Johnson carries a gun?

Page 91

1    **A.   No, I don't know that.**
2    Q.   It wouldn't surprise you, would it?
3          MR. SHAW: I am going to object to
4      the form. It's outside of the relevance of
5      this limited discovery issue, the School
6      Board prayer issue and I am going to
7      instruct you not to answer.
8          MR. ALLINGHAM: I think that
9      question is directly relevant to the
10      important issue of whether Mrs. Dobrich
11      felt threatened at the school Board
12      meeting, and if it was public knowledge
13      that Mr. Johnson carries a gun, that's
14      relevant.
15          So, I urge you to reconsider your
16      instruction.
17          MR. SHAW: The witness
18      answered your question as to whether or not
19      Mr. Johnson carries a gun, or whether or
20      not he knows, he said no he doesn't know.
21      If need further information after that I
22      would suggest you possibly could depose
23      Mr. Johnson, but as for this witness I am
24      going to continue to instruct him not to

Page 92

1      answer that question.
2          MR. ALLINGHAM:   Well, it's the
3      public reputation of whether Mr. Johnson
4      carries a gun that is relevant to whether
5      Mrs. Dobrich felt threatened, so deposing
6      Mr. Johnson actually be less effective,
7      than deposing members of the public who
8      were present at the meeting on August 24th.
9      secondly, I am fine with your
10      instructing the witness not to answer on
11      privilege grounds, but I think we have a
12      good faith disagreement about whether this
13      issue is relevant.
14          I think that you,
15      unless you tell me otherwise, I think
16      that you must acknowledge that whether
17      Mrs. Dobrich felt threatened at the
18      August 24th meeting is a relevant matter,
19      and I think that whether Mr. Johnson is
20      known to carry a gun is pertinent to that
21      relevant issue.
22          So, I urge you one more time to
23      reconsider your instruction.
24          MR. SHAW:  I agree that it could

Page 93

1      be relevant to the case as a whole. I
2      disagree that it's relevant to the limited
3      issue of whether or not the School Board
4      prayer is constitutional, and the discovery
5      related to that.
6          MR. ALLINGHAM:  Aren't the damages
7      that flow from the constitutional or
8      unconstitutional nature of the School
9      Board prayer affected by whether Mrs.
10      Dobrich felt threatened, and what actions
11      she took thereafter?
12          MR. SHAW:   Not as to the specific
13      issue of the prayer.
14          MR. ALLINGHAM: All right, I think
15      our positions are clear, and you have an
16      instruction, I am going to ask a couple
17      more questions.
18          MS. DUPHILY: Going off the record
19      at 12:08 p.m.
20          (WHEREUPON a brief recess was
21      taken)
22          MS. DUPHILY:   Back on the record
23      at approximately 12:17 p.m..
24    Q.   To sort of summarize the line that we were

24 (Pages 90 to 93)

Case 1:05-cv-00120-JJF    Document 283-5    Filed 06/19/2008    Page 25 of 36

Dobrich, et al.                                    Indian River School District, et al.
Gregory Hastings                C.A. # 15-120 (JJF)                    October 13, 2006

Page 94

1  talking about before the break, you, because you
2  know Mr. Johnson are able to discount to some degree
3  the seriousness of some of the things that he says,
4  is that correct?
5  **A.   Yes.**
6  Q.   So, that to the extent, and I'm going to
7  just make it an assumption of the question, to the
8  extent that an observer would see the text of
9  Mr. Johnson's comments as potentially threatening,
10  you would view them as less threatening because you
11  know Mr. Johnson, correct?
12  **A.   That's correct.**
13  Q.   That would not be true of someone who
14  doesn't know Mr. Johnson by definition, correct?
15  **A.   I would suspect, yes.**
16  Q.   Without taking into account what I'm going
17  to call the Mr. Johnson factor, that you might
18  discount what Mr. Johnson would say, without taking
19  into account the Mr. Johnson factor, would you view
20  the content of his remarks at the August 24th
21  meeting as potentially threatening?
22  **A.   I don't believe so.**
23  Q.   Did you feel that Mr. Johnson's remarks
24  were directed at Mrs. Dobrich and her family

Page 95

1  personally?
2  **A.   I didn't feel that, no.**
3  Q.   Well, no one else in the room that night or
4  in the overflow crowd room, or out in the parking
5  lot, to your knowledge no one else other than Mrs.
6  Dobrich was trying to limit prayer in the Indian
7  River School District, were they?
8  **A.   That's correct.**
9  Q.   She was the only one?
10  **A.   Yes.**
11  Q.   She was the only one comparable to the
12  comment that Mr. Johnson made about Mrs. O'Hare's
13  initiating the movement to remove prayer from our
14  schools, isn't that right?
15  **A.   Explain that again, please?**
16  Q.   Mr. Johnson helpfully for anyone who didn't
17  know who Madelyn Murray-O'Hare was, told the crowd
18  that Ms. O'Hare was the person who initiated the
19  movement to remove prayer from our schools. The
20  only person among the 7 or 800 people in attendance
21  who was in a similar position but with respect to
22  the Indian River School District was Mrs. Dobrich,
23  isn't that right?
24  **A.   Yes.**

Page 96

1          MR. SHAW:  I just want to make
2  sure I don't infringe upon you
3  attorney/client privilege, you guys, I
4  can kind of see the notes as they come  up.
5  I just want to be respectful of that.
6          MR. ALLINGHAM:  Our questions are
7  as an open book.
8          MR. SHAW:  I am sure you don't ask
9  some of them, so.
10  Q.   Did you understand the text of
11  Mr. Johnson's comment to be a inference that God
12  would ensure that those opposing prayer would
13  disappear?
14  **A.   I didn't take it as such, no.**
15  Q.   Is that because of the Mr. Johnson factor?
16  **A.   Yes, it is.**
17  Q.   In the absence of the Mr. Johnson factor
18  would you believe that it is a reasonable inference
19  from his remarks that those opposing prayer would
20  disappear?
21  **A.   Honestly, I don't know where Mr. Johnson**
22  **was coming from that evening.**
23  Q.   Now, I am only asking about your
24  understanding.  I know that you don't know what

Page 97

1  Mr. Johnson was thinking, but as you sat there did
2  you think that Mr. Johnson was intending an implied
3  threat to Mrs. Dobrich and her family?
4  **A.   No, I don't believe that.**
5  Q.   Did you think he was joking?
6  **A.   No, I don't think he was joking about the**
7  **matter at hand, no.**
8  Q.   You don't think his reference to the last I
9  knew Madelyn Murray-O'Hare just disappeared to never
10  be seen or heard from again.  I think we all know
11  who she was, she was the person who initiated the
12  movement to remove prayer from our schools.  He
13  wasn't joking when he said that, was he?
14  **A.   No.**
15  Q.   Let me ask a little bit different question.
16  If you don't think that he was intending to threaten
17  Mrs. Dobrich, did you think he was intending to fire
18  up the crowd?
19  **A.   Probably, that might have been his**
20  **objective.**
21  Q.   And based on the laughter and the applause
22  that came after he spoke, would you agree that he
23  was successful in firing up the crowd?
24  **A.   Yes.**

25 (Pages 94 to 97)

Dobrich, et al.                                    v.                    Indian River School District, et al.
Gregory Hastings                          C.A. # 15-120 (JJF)                              October 13, 2006

Page 98

1  Q.   Do you know what the time limit was on
2  speakers, public speakers that was imposed at the
3  beginning of the public comment session?
4     A.   Normally we have three minutes, but I
5  believe it was reduced to two because of the number
6  of folks.
7     Q.   Do you know how long Mr. Johnson was
8  permitted to speak?
9     A.   I didn't time it, but just reviewing that
10  video the gavel struck on a couple occasions.
11    Q.   There came a time when the chair told
12  Mr. Johnson that his time was up and he kept
13  talking, right?
14    A.   Yes.
15    Q.   And finally the gavel came down and I
16  gathered from the tape sort of walked back away from
17  the podium continuing to talk, right?
18    A.   Yes.
19    Q.   Do you know how long it was before anyone
20  even mentioned that Mr. Johnson had run out of time?
21    A.   From the time first mentioned till the time
22  he walked away from the podium?
23    Q.   That's a bad question and I will withdraw
24  it.  Let me ask a little more specific question.

Page 99

1  How does the Board enforce its time restrictions on
2  public speakers?
3     A.   That was a very good video of it.
4  Fortunately I would sit here and say most of time
5  folks are considerate of that time restraint,
6  timeline given.  On occasion that conduct is not new
7  in our board setting when a particular emotional or
8  controversial issue is at hand, whether it be this
9  or a removal of a athletic coach, or curriculum of
10  some nature.
11       So, I've seen that take place before in a
12  public setting, when folks are, have the privilege
13  of addressing the Board.  For the sake of our
14  timeline we structure, give them a set period of
15  time.  But on occasion when people are emotional or
16  if they are grandstanding or trying to be dramatic,
17  they do just as Mr. Johnson did, they will exceed
18  their time limit, and the gavel will strike and the
19  comments will be made until they walk away from the
20  podium.
21       So, we've seen it on occasion prior to this
22  particular time.
23       MR. ALLINGHAM:  Let's go off the
24  record for a minute.

Page 100

1       MS. DUPHILY:  We are going off
2  the record at approximately 12:25.
3       (WHEREUPON a brief recess was
4  taken)
5       MS. DUPHILY:  Back on the record
6  at 12:28 p.m..
7  Q.   My question is a little more basic, who
8  keeps the time?
9     A.   The Board president -- well, who keeps the
10  time?
11    Q.   Is that Mr. Savage?
12    A.   Yes.
13    Q.   And he lets Mr. Walls or whoever the Board
14  president is at the time know when the two minute
15  period or the three minutes period or the five
16  minute period has expired?
17    A.   That's correct.
18    Q.   Is the Board president the only one who is
19  empowered to tell someone at the podium that they
20  need to sit down?
21    A.   Yes.
22    Q.   Are you aware of instances in which other
23  Board members have spoken up and told the speaker
24  that they need to get away from the podium, or away

Page 101

1  from the microphone, stop talking?
2     A.   Another member of the Board other than the
3  president?
4     Q.   Yup.
5     A.   It may have occurred, but I don't recall
6  any particular date or time.
7     Q.   The last 20 minutes or half an hour we've
8  talked about the atmosphere or the overall ambience
9  of the meeting, which you characterized as a little
10  disturbing, there were outbursts, the crowd
11  mentality, or mob mentality, the crowd got a little
12  unruly.  I showed you the Johnson comments and the
13  crowd's reaction both to that with cheers and with
14  laughter during his comments.  I showed the clip of
15  the announcement that the meeting would open with a
16  prayer and the raucous reaction to that.
17       Do you have a view as to whether the prayer
18  given on August 24th was effective to make the crowd
19  solemn, respectful and courteous?
20       MR. SHAW:  I am going to object,
21  I don't think you showed him the prayer
22  that day.
23       MR. ALLINGHAM:  I didn't and
24  that's not what I said.

26 (Pages 98 to 101)

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

Case 1:05-cv-00120-JJF    Document 283-5    Filed 06/19/2008    Page 27 of 36

Dobrich, et al.                                    v.              Indian River School District, et al.
Gregory Hastings                          C.A. # 15-120 (JJF)                October 13, 2006

Page 102

1    A.   I don't recall what the prayer was that
2    particular Board meeting.
3    Q.   I am going to start the question again. It
4    doesn't matter what the payer was a prayer was
5    offered at the meeting, correct?
6    A.   Yes.
7    Q.   And based on the conduct at that meeting
8    which I summarized a minute ago, do you think
9    whatever the pryer was, do you think it was
10   effective to solemnize the proceedings?
11   A.   I believe it was for the individuals of the
12   Board and the purpose it's given, yes.
13   Q.   Okay, and that's very helpful because I
14   wanted to ask you, is the solemnization, which is
15   the purpose of the prayer, as the policy reflects,
16   is that solemnization directed to the Board members
17   and their discharge of their duties, or is it
18   intended to affect everybody in the audience?
19   A.   In my opinion it's for the immediate
20   members of the Board.
21   Q.   Okay. And when the policy says in order to
22   solemnize the proceedings, and you've now told me
23   that's the intended recipient of the solemnization,
24   if you will, are the Board members, when the policy

Page 103

1    says in order to solemnify the proceedings, what do
2    you understand that to mean?
3    A.   Well, given the responsibility of a Board
4    member, and particularly as I know it to be in this
5    particular school district, because geographically
6    we are the largest in the state, and we have many
7    buildings, so the whole facet of our charge
8    obviously there are a lot of decisions to be made
9    and sometimes they are very controversial, sometimes
10   very testy, and also looking at the bigger picture
11   there is a lot of financial issues at stake.
12       So, sitting there as a member of the Board
13   one hopes, or I hope, that I make the very best
14   decision I possibly can for the sake of the district
15   and the children in the school district, and I want
16   all the help that I can get.
17   Q.   When you say, "I want all the help that I
18   can get," that means that if you can invoke some
19   divine guidance to guide your judgment that would be
20   helpful?
21   A.   That's correct.
22   Q.   Is it necessary to offer a prayer publicly
23   in order to invoke divine guidance for those
24   judgments?

Page 104

1    A.   I don't suppose it's necessary, no.
2    Q.   You mentioned the financial issues, does
3    the Board deliberate over financial issues in
4    regular session or in executive session?
5    A.   All financial issues are deliberated in
6    regular session.
7    Q.   I forgot to ask you a question about
8    Mr. Johnson, and the clip I showed you. Would you
9    agree with me that members of the Board greeted
10   Mr. Johnson warmly when he came to the podium?
11   A.   None of us got up and shook his hand.
12   Q.   No, sir and that's -- fair enough. You
13   recall somebody made a joke about calling him Earl
14   Johnson?
15   A.   Do I recall it, no, no.
16   Q.   In the stack there you have PX9 which is
17   the actual Board Policy which says, the policy
18   opens, it's first phrase is, "In order to solemnify
19   its proceedings the Board of Education may choose to
20   open its meetings with a prayer or moment of
21   silence." Is there any other purpose for the prayer
22   or moment of silence other than to solemnify the
23   Board's proceedings, as you've defined that?
24   A.   No.

Page 105

1    Q.   Am I correct that your view is that the
2    Board can equally effectively solemnify its
3    proceedings with a prayer or with a moment of
4    silence?
5    A.   Ask that question again, please?
6    Q.   I'll ask a little bit different question,
7    then I will come back to this one. There is little
8    bit parsing of the language, so you can follow along
9    with me. The policy itself says, "In order to
10   solemnify its proceedings the Board of Education may
11   choose to open its prayers with a prayer or moment
12   of silence." And my question to you is do you
13   believe that a moment of silence is effective to
14   solemnify the Board's proceedings as the policy
15   appears to indicate?
16   A.   I suppose it can.
17   Q.   In fact, when given the opportunity to be
18   the Board member on a rotating basis to open the
19   meeting with a prayer or a moment of silence, you
20   chose a moment of silence, correct?
21   A.   Yes.
22   Q.   And did you believe that that choice,
23   leading a moment of silence, was effective to
24   solemnify the proceedings of the Board on that

27 (Pages 102 to 105)

Dobrich, et al.                                         Indian River School District, et al.
Gregory Hastings              v.                                October 13, 2006
                        C.A. # 15-120 (JJF)

Page 106

1  occasion?
2  **A.  Can be, yes.**
3  Q.    And on that date in fact you viewed it, you
4  thought that it was effective to solemnify the
5  proceedings, correct?
6  **A.  Yes.**
7  Q.    Why did you choose to open the meeting with
8  a moment of silence as opposed to a prayer?
9  **A.  Quite frankly, diversity.**
10  Q.   What do you mean by that?
11  **A.  If you recall the minutes we had one Dr.**
12  **Hattier gave a prayer, from a speech of George**
13  **Washington, yadda, yadda, yadda, we've had secular**
14  **prayers, we've had a nonsecular prayer. To my**
15  **knowledge at that point in time we had not had a**
16  **moment of silence, so I just chose at that given**
17  **time, to do a moment of silence.**
18  Q.   Is it your view that a moment of silence is
19  the most inclusive approach to solemnifying the
20  proceedings contemplated by the Board policy?
21  **A.  Repeat that again?**
22  Q.   Is it your view that the most inclusive
23  method to solemnify the proceedings, which is
24  contemplated by the policy, is a moment of silence?

Page 107

1  **A.  It could be, but I've also made the comment**
2  **that if we, in this particular case, in this**
3  **setting, if we had another Board member of another**
4  **faith sitting, as obviously you'd learned we have**
5  **all ten Board members of Christian faith, but if we**
6  **had any other Board member of any other faith**
7  **sitting there, and they offered a prayer, or the**
8  **Board president as we've typically practiced, asked**
9  **that particular Board member to offer a prayer, and**
10  **whatever faith he is, offers a prayer of his faith,**
11  **then we would be respectful of that.**
12  Q.   When you were president of the Board
13  prayers were offered to open virtually every
14  meeting, if not every meeting, correct?
15  **A.  Regular Board meetings, yes.**
16  Q.   You were the one who called on someone to
17  lead the Board in prayer?
18  **A.  Yes.**
19  Q.   How did you pick the person that you were
20  going to call on.
21  **A.  Generally I chose Mr. Evans. He was my**
22  **vice president at the time, but I mean that really**
23  **did not have relevance to my picking, choosing him**
24  **for asking to say the prayer, but prior, up to that**

Page 108

1  **point in time there were again as practice,**
2  **tradition, there were two that generally offered the**
3  **prayer, that was Mr. Evans and Mr. Helms, so it was**
4  **either one of the two.**
5  Q.    The policy's -- the policy prescribes a
6  particular method of picking the person who would be
7  offered the opportunity to solemnify the proceedings
8  in paragraph two, is that correct?
9  **A.  On a rotating basis?**
10  Q.   Yes.
11  **A.  Yes.**
12  Q.   And that's different from the way you
13  picked people to give the prayer during your tenure
14  as Board president, correct?
15  **A.  Yes.**
16  Q.   And it's different from the way as you
17  understood it, at least, the person had been picked
18  prior to the adoption of the Board Policy?
19  **A.  Yes.**
20  Q.   And that's because as you understood it
21  there were certain members of the Board who were
22  called on to give the prayer and certain members of
23  the Board who weren't prior to the adoption of the
24  policy?

Page 109

1  **A.  Yes, that is tradition.**
2  Q.   Why was that changed in the adoption of the
3  policy?
4  **A.  To rotating?**
5  Q.   Yes.
6  **A.  I don't know specific, but I suspect that**
7  **was offered in the policy to ensure at that setting**
8  **regardless of the faith of any Board member that**
9  **they would have the opportunity to share their**
10  **prayer at the opening of a regular Board meeting.**
11  Q.   And to give you an example, if the district
12  elected a Jewish Board member you wanted to make
13  sure that the president didn't just skip over the
14  Jewish Board member every time?
15  **A.  Correct.**
16  Q.   Or an atheist Board member, or whatever,
17  correct?
18  **A.  Correct.**
19  Q.   Because if an atheist Board member were
20  elected, that Board member might want to say look I
21  don't believe in a higher power, but I do believe in
22  solemnifying our proceedings, and I urge all of you
23  to join me in reminding myself to take seriously my,
24  you know, my oath as a Board member, whatever, yes?

28 (Pages 106 to 109)

Dobrich, et al.                                    v.                    Indian River School District, et al.
Gregory Hastings                          C.A. # 15-120 (JJF)                        October 13, 2006

Page 110

1    A.   Yes.
2    Q.   Who is the intended audience of the prayer,
3    the ten Board members who are the ones who have to
4    make the decisions at that Board meeting?
5    A.   In my opinion, yes.
6    Q.   And so I take it that the intended audience
7    of the prayer is the ten Board members, it would be
8    just as effective for the ten Board members to stand
9    in the wings and have their prayer and then walk
10   onto the stage as it would be for them to walk onto
11   the stage and then have their prayer, correct?
12   A.   Correct.
13   Q.   Did anybody ever suggest that a policy or
14   practice that would have contemplated that the
15   prayer that would solemnify the proceedings take
16   place before the Board walked out on stage?
17   A.   Not to my knowledge.
18   Q.   I asked you a question about the State
19   Board of Education, and whether it was necessary for
20   the State Board of Education to have a prayer, to
21   open its meetings with a prayer in order to
22   solemnify its proceedings and you answer was, "Nice
23   but not necessary," do you remember that?
24   A.   Yes.

Page 111

1    Q.   I am going to ask you the same question
2    with respect to the Indian River School Board. In
3    order for the School Board to solemnify its
4    proceedings, is it necessary for it to open its
5    meetings with a prayer? Would you give me the same
6    answer, nice but not necessary?
7    A.   Nice but not necessary.
8    Q.   And let me follow-up on that. In your view
9    why would it be nice?
10   A.   Again for the comment I made just a moment
11   ago, with the charge that we have, the
12   responsibilities that we have, we need all the help
13   we can get. So, if that's divine help to guide us
14   and make all the right decisions, because some of
15   the decisions are tough. It's nice to seek that
16   extra help.
17   Q.   Fair enough. And in that context, and in
18   the context of the reason why in your view it's nice
19   to do it, you could accomplish that result, that it
20   would be equally nice, if you will, to have the
21   prayer or moment of silence off stage?
22   A.   I suppose, yes.
23   Q.   Because the prayer is not directed to the
24   public who are sitting out in the audience in front

Page 112

1    of the stage, correct?
2    A.   In my opinion, that's correct.
3    Q.   Look at PX9 which is the board prayer
4    again. From October 19, 2004, which is when this
5    policy was adopted, until the last meeting that you
6    attended, which -- I'm sorry if I am getting this
7    wrong, which was in December of 2005, correct?
8    A.   Yes.
9    Q.   Was this rotating basis among each
10   individual Board member observed? That is to say,
11   in practice was the opportunity rotated among each
12   individual Board member?
13   A.   The only comment I could make to that would
14   be I may have been asked on one other occasion
15   during that period of time to ask, to give a prayer,
16   but I can't speak to whether or not the president
17   had gone in rotation fashion or asked several of the
18   Board members in rotation to speak.
19        Again, in practice what the Board president
20   usually has done is prior to the meeting, once we
21   arrive is walk up to that individual and ask them,
22   see if they are willing to give the prayer before we
23   begin that evening session.
24   Q.   The third paragraph reads, "Such

Page 113

1    opportunity shall not used or exploited to
2    proselytize, advance or convert anyone, or to
3    derogate or otherwise disparage any particular faith
4    or belief." Would you please describe for me during
5    your tenure on the Board how you analyzed whether
6    prayers that were offered violated or complied with
7    this limitation?
8    A.   Again ask that, please.
9    Q.   I will ask a preliminary question. Once
10   you all adopted this policy on October 19, 2004, did
11   you evaluate the prayers that were given thereafter
12   to make sure that they complied with paragraph
13   three?
14   A.   To my knowledge, no, we didn't do it at a
15   Board setting. No, I don't recall specifically
16   analyzing that or discussing that to see if we were
17   abiding by item three in this Board or this Prayer
18   Policy, no.
19   Q.   What enforcement mechanism is there to make
20   sure that Board members do not use or exploit the
21   prayer opportunity to proselytize, advance or
22   convert anyone or to derogate or otherwise disparage
23   any particular faith or belief?
24   A.   In past practice, to assure us following

29 (Pages 110 to 113)

Page 114

1  Board policy, it would be typically Board members
2  raising a question, if a question would arise. So,
3  individual Board members being responsible, if you
4  will. The superintendent bringing an issue to the
5  table if we were getting off kilter, or lastly if
6  the attorney would happen to be present that evening
7  or if something, a question would arise and we need
8  to refer it back to the attorney for review.
9      Q.   Paragraph three is here for a reason,
10  correct?
11     A.   Yes.
12     Q.   And if an opportunity was used to
13  proselytize, advance or convert anyone or to
14  derogate or otherwise disparage any particular faith
15  or belief, you would view that as unconstitutional,
16  wouldn't you?
17     A.   Yes.
18     Q.   So, compliance with paragraph three is
19  important?
20     A.   Yes.
21     Q.   I am going to ask you about three prayers
22  and I'd like to tell me whether in your view as a
23  Board member they would have been in compliance with
24  paragraph three or violative of paragraph three. The

Page 115

1  first one -- I have two of them written down, so you
2  can follow along with me when I read them, and the
3  one is short.
4          The first one is Exhibit 35, and it reads
5  as follows: "Do not put your trust in princes in
6  mortal men who cannot even save themselves. When
7  their spirit departs they return to the ground. On
8  that very day their plans come to nothing. Blessed
9  is he whose help is the God of Jacob, whose hope is
10  in the Lord his God the maker of heaven and earth,
11  the sea and everything in them. The Lord who
12  remains faithful forever.
13         He upholds the cause of the oppressed and
14  gives food to the hungry. The Lord sets prisoners
15  free, the Lord gives sight to the blind, the Lord
16  lifts up those who are bowed down, the Lord loves
17  the righteous. The Lord watches over the alien and
18  sustains the fatherless and the widow, but he
19  frustrates the ways of the wicked. For the wages of
20  sin is death, but the gift of God is eternal life.
21  Through Jesus Christ our Lord."
22         Would that prayer be permissible under
23  paragraph three or violative of paragraph three?
24     A.   Being read from a Board member in that

Page 116

1  setting?
2      Q.   Yes.
3      A.   In our setting. I'd say permissible.
4      Q.   The second prayer is PX45, maybe you can
5  get the original. This prayer reads as follows:
6  "Heavenly Father, thank you for this great occasion,
7  for the work, the effort, the joys and everything
8  that led up to this point in time. Thank you for
9  your guidance in this event. We pray for your
10  direction in the lives of each of these School Board
11  members. We pray that you direct them into the
12  truth, and eventually the truth that comes by
13  knowing Jesus. We also pray that you would be with
14  them at this time. We ask these things in Jesus'
15  name. Amen."
16         Would you view that as violative of
17  paragraph three or permissible?
18     A.   Permissible.
19     Q.   And the last prayer reads as follows, and
20  if you need me to read it twice so you are sure, let
21  me know: "Allah, we offer you our school bus
22  drivers, we offer you our superintendent, our
23  administrators and our secretaries. We offer you
24  our teachers and our parents. Finally we offer you

Page 117

1  our students. Peace be unto your prophet Muhammad."
2          Permissible or violative?
3      A.   Permissible.
4      Q.   Now, in reaching the judgment that you
5  reached on each of those prayers, can you describe
6  for me the way you analyze the problem? How did you
7  reach the judgment that you reached that all three
8  prayers were permissible?
9      A.   I commented a moment ago that in my opinion
10  sitting there at the Board we need or we'd like to
11  have all of the help we can get. If there happened
12  to be other Board members at that particular time, a
13  particular time, that were of different faith and
14  they in this rotating basis were asked or offered a
15  prayer, then their prayer of whatever choice would
16  be respected.
17     Q.   Can you give me an example or generically a
18  kind of prayer that you would view as violative of
19  paragraph three?
20     A.   The only thing that I could share with you,
21  that myself included would probably have difficulty
22  with is and we are speaking of prayer, you are
23  asking about our prayer, but if a prayer or offer
24  for divine guidance to the devil or evil would be

30 (Pages 114 to 117)

Case 1:05-cv-00120-JJF   Document 283-5   Filed 06/19/2008   Page 31 of 36

Dobrich, et al.                                    v.                    Indian River School District, et al.
Gregory Hastings                          C.A. # 15-120 (JJF)                        October 13, 2006

Page 118

1  **just a little difficult, I suspect.**
2      Q.   Okay. I am going to give you another
3   example of a prayer and ask you whether you think it
4   would be violative. Suppose that a Board member
5   said, we pray Lord that you enlighten the heathen in
6   our midst and that you inspire them to come to
7   knowledge of your wisdom and goodness. Would that
8   prayer be violative of paragraph three?
9      **A.   You need to repeat that one more time.**
10     Q.   We pray Lord that you inspire the heathen
11  in our midst to come to know your goodness and
12  wisdom. That's not identical to what I said, but
13  the idea is we pray that the heathen come to know
14  your wisdom and goodness.
15         Would that prayer be violative of paragraph
16  three?
17     **A.   I suspect it would be permissible.**
18     Q.   So, you would not view such a prayer as a
19  prayer that was used to convert anyone?
20     **A.   No.**
21     Q.   This one is going to be extreme, but it's
22  to illustrate a point. Suppose that a Board member
23  offered a prayer, Lord, we hope that you will
24  convert to Christianity all the Jews in the

Page 119

1   audience. Would you view that prayer as violative
2   of paragraph three?
3      **A.   Yes.**
4      Q.   Okay. On the issue of how paragraph three
5   is enforced, I think you mentioned three groups or
6   people who could bring to the attention of the Board
7   the possibility that paragraph three had been
8   violated. The first was the Board members
9   themselves, a sort of self policing mechanism. The
10  second was the superintendent who might bring an
11  issue to the Board and the third was the Board
12  attorney, correct?
13     **A.   Correct.**
14     Q.   Just as a practical matter the Board
15  attorney does not attend every meeting, is that
16  right?
17     **A.   That's correct.**
18     Q.   In fact, the Board attorney doesn't come
19  unless specifically invited?
20     **A.   That's correct.**
21     Q.   To your knowledge has the Indian River
22  School District ever had a Board member who was not
23  a Christian?
24     **A.   I have no idea. I can't respond to that.**

Page 120

1      Q.   Well, let me turn the question around a
2   little bit. Are you personally aware of any Board
3   member who was not a Christian?
4      **A.   No, no, I am not.**
5              MS. DUPHILY: We are going off the
6          record at approximately 1:03 p.m..
7              (WHEREUPON a brief recess was
8          taken)
9              MS. DUPHILY:  Back on the record
10         at 1:05 p.m..
11     Q.   Are you personally aware of any
12  superintendent of the district who was not
13  Christian?
14     **A.   No.**
15     Q.   And to the extent that it matters, are you
16  aware of any school attorney who was not a
17  Christian?
18     **A.   No.**
19     Q.   Do you think there is any danger that
20  these, all of these I'll call them enforcement
21  mechanisms, the people who represent the enforcement
22  mechanisms as Christians would be less sensitive to
23  whether an opportunity is used to proselytize,
24  advance or convert anyone, than might a person of

Page 121

1   another faith?
2      **A.   Your specific question would be are we at
3   risk?**
4      Q.   That's that -- yeah, I see why you would
5   think that, let me rephrase the question. Every
6   prayer that's been offered has been a Christian
7   prayer, correct?
8      **A.   Correct.**
9      Q.   The people who represent the enforcement
10  mechanisms are all Christian, correct?
11     **A.   Correct.**
12     Q.   Do you think it's possible that there is --
13  that the enforcement mechanisms are biased in favor
14  of a judgment that an opportunity is not being used
15  to convert anyone, since the prayers offered are
16  Christian and the people who are judging whether
17  they are proselytizing or converting are also
18  Christian, and hence would not be the object of the
19  conversion, if you will. Do think there is a
20  potential weakness in the enforcement mechanism as a
21  result of that?
22     **A.   I believe there could possibly be a
23  potential weakness, but I also don't believe there
24  would be any malice or bias in that setting**

31 (Pages 118 to 121)

Case 1:05-cv-00120-JJF    Document 283-5    Filed 06/19/2008    Page 32 of 36

Dobrich, et al.                              v.                    Indian River School District, et al.
Gregory Hastings                    C.A. # 15-120 (JJF)                      October 13, 2006

Page 122

1  conscious. It's the make up of the Board at that
2  particular time, and the administration at that
3  particular time.
4        MS. DUPHILY:  We are going off
5     the record at approximately 1:09 p.m..
6           (WHEREUPON a brief recess was
7     taken)
8        MS. DUPHILY:  Back on the record
9     at 1:15 p.m..
10       MR. ALLINGHAM:  Mark PX54 a
11    document bearing Bates numbers P873 though
12    883.
13          (WHEREUPON Exhibit 54 was
14    marked for identification)
15  Q.  Mr. Hastings, we printed these minutes off
16  the web site. Do you have any information as to
17  whether the minutes that are posted on the
18  district's web site are the same as the official
19  minutes except they don't have a signature at the
20  end?
21  A.  I am of the opinion they are always the
22  same. They are supposed to be the same.
23  Q.  You are reflected as having been present at
24  the March 22 meeting, and if you look about halfway

Page 123

1  down the first page you will see, "President Walls
2  noted that it is the history of the Board to have a
3  prayer at the beginning of the meeting which is
4  voluntary among the members of the Board of
5  Education, and the audience is not required to
6  participate." Do you know whether that's what
7  president Walls said at that meeting?  Does he have
8  a stock disclaimer that he reads?
9  A.  This paragraph here?
10  Q.  Yes, sir?
11  A.  Do I recall if this is exactly what he
12  said?
13  Q.  Yes.
14  A.  I can't recall if it was verbatim, but I
15  believe that was the gist of it.
16  Q.  And then it says, "President Walls then
17  read a prayer which was part of a speech given by
18  Dr. Martin Luther King." Do you recall that
19  Mr. Walls gave a speech that was taken -- sorry,
20  gave a prayer that was a speech taken -- I will
21  start again. Do you recall that Mr. Walls offered a
22  prayer that was taken from a speech by Dr. Martin
23  Luther King?
24  A.  I vaguely recall, yes.

Page 124

1  Q.  I'll represent to you that that's the only
2  post Board policy adoption prayer where the
3  substance of the prayer is described in any way. Do
4  you know why this particular prayer was described?
5  A.  No.
6  Q.  At any time during your tenure on the Board
7  did the Board discuss the importance of Dr. Martin
8  Luther King?
9  A.  Not to my knowledge, no.
10  Q.  Do you remember any discussion of wanting
11  to get rid of Martin Luther King Day as a holiday on
12  the Board's calendar?
13  A.  Not to get rid of the holiday. We had a
14  issue a couple of years ago where we opted, the
15  Board has to choose, select and develop a calendar
16  for each year.
17  Q.  Yes, sir.
18  A.  And we had slated Martin Luther Kind Day to
19  be a snow day, make up day, and as it so happened we
20  were looking at needing to make up a day, and it was
21  going to fall on Martin Luther King Day for the kids
22  to attend school, and that became an issue. But
23  then we were apprised by our attorney that it was a
24  federal holiday, but we had never been apprised

Page 125

1  prior to that or during discussion of that so
2  consequently --
3  Q.  So, it mooted the point?
4  A.  Yes.
5  Q.  Aside from our clients' complaints are you
6  aware of any complaints that came in during your
7  tenure as a School Board member about the use of
8  prayer during School Board meetings?
9  A.  No.
10  Q.  Do you think that the use of prayer during
11  School Board meetings has attracted substantial
12  attention from the public or the media in Indian
13  River?
14  A.  Do I believe it's attracted attention?
15  Q.  Substantial attention from the public or
16  the media?
17  A.  On occasion.
18  Q.  Do you think that the use of prayer during
19  School Board meetings should attract as much
20  attention from the public and the media as it has in
21  the Indian River School District?
22  A.  Let me say this, it probably should not,
23  I'm not surprised that it does. I wish our
24  curriculum and things, learning matters, would get

32 (Pages 122 to 125)

Dobrich, et al.                                                              Indian River School District, et al.
Gregory Hastings                          v.                                              October 13, 2006
                                   C.A. # 15-120 (JJF)

Page 126

1  folks as equally riled up in this district as much
2  as this particular issue has.
3      Q.   Do you have any idea why it has attracted
4  so much attention in the Indian River School
5  District given that the audience of the prayer is
6  intended to be simply the ten Board members?
7      A.   Initially I thought, I was of the opinion
8  that, you know, as general public often do, it was
9  misconstrued that people were commenting we don't
10  want prayer removed from our school.
11     Q.   Yes, sir.
12     A.   I think that was some sentiment again
13  initially. If it's a matter of folks being properly
14  informed, given the area, geographic area that we
15  are here and I don't know that Delaware has ever
16  been considered part of the bible belt, but it
17  doesn't surprise me that it has drawn the attention
18  of folks. You have a tendency to have very
19  conservative people here, traditional people. So,
20  am I surprised, no. As I commented a moment ago I
21  wish people would get equally as riled when we are
22  discussing curriculum.
23     Q.   You mentioned that people originally seemed
24  to perceive this issue as keeping prayer in the

Page 127

1  schools. Have you ever heard anyone say that this
2  issue represents the place where we need to draw the
3  line on the removal of religion from our schools?
4      A.   Ask it again, please?
5      Q.   Has anyone said to you in words or
6  substance, maybe we've lost the fight on prayer in
7  the schools, but we need to draw the line, and this
8  is where we should draw the line on the continuing
9  removal of religion from our schools. I'm not
10  saying exactly those words, but in words or
11  substance has someone expressed that concept to you?
12     A.   I can't say or recall if it's been to that
13  context, but I know there have been questions or
14  comments about the rights that we have as
15  individuals wanting to have prayer again for divine
16  guidance for the charge at hand. So, are we being
17  violated of our right, that is the question that has
18  been raised.
19     Q.   Who's raised that question?
20     A.   I know I have.
21     Q.   Is Board Policy BDA.1 intended to serve the
22  interests of the students of the district and the
23  other constituencies of the Board members, or is it
24  intended to serve the interests of the individual

Page 128

1  Board members themselves?
2      A.   This policy?
3      Q.   Yes, sir?
4      A.   Is it intended to have affect on the Board
5  members?
6      Q.   Is it intended to serve the interests of
7  the students and the Board's other constituencies,
8  or is it intended to serve or protect the interests
9  of the Board members themselves?
10     A.   I would have to say it's derived and its
11  content is to provide structure for the Board
12  members.
13     Q.   It's intended to preserve the Board members
14  individual rights to offer whatever prayer they
15  want, isn't that correct?
16     A.   Yes.
17     Q.   And more than one Board member has said
18  that during discussions of this Board policy,
19  correct?
20     A.   Yes.
21     Q.   Would you say that at one time or another
22  every Board member expressed that view?
23     A.   I suspect. I can't recall exactly, but I
24  suspect so, yes.

Page 129

1      Q.   A couple of questions again about the
2  August 24th Board meeting but you won't have to make
3  judgments, at least not as many judgments as I asked
4  you about before. Do you recall that state
5  representatives Hocker and Atkins spoke at the
6  meeting?
7      A.   Yes.
8      Q.   And do you recall that they were joined at
9  the podium by representative Ewing?
10     A.   I believe so, yes.
11     Q.   And did -- do you recall that the
12  representatives provided or read a letter during
13  their public comment section of the meeting?
14     A.   Yes.
15     Q.   And do you recall that that letter said
16  that they as representatives could not recognize the
17  separation of God from state?
18     A.   Maybe. I can't recall specifically. I
19  just know that they did read from a letter, but the
20  content I can't recall.
21     Q.   Do you think it was appropriate that
22  representatives stood at the podium and expressed
23  their views as representatives on this issue?
24     A.   I'll say it struck me strange.

33 (Pages 126 to 129)

Dobrich, et al.                                      v.                    Indian River School District, et al.
Gregory Hastings                          C.A. # 15-120 (JJF)                          October 13, 2006

Page 130

1   Q.   Why?
2   A.   In this climate, this day and time as we
3   are sitting here knowing the delicateness of this
4   issue at hand, I was surprised two public officials
5   came forward in that light and expressed their
6   opinions, being politicians.
7   Q.   Have you ever had anyone tell you that they
8   see this case as about protecting Christian prayer?
9   A.   No.
10  Q.   Have you ever had anyone tell you that they
11  see this case as about protecting Christian values?
12  A.   You are asking me if I had someone
13  specifically in my face tell me that's what they
14  believe or that's the statement made to such?
15  Q.   Yes, let me take that question first.  So,
16  let's take the specific question, have you ever had
17  anyone actually say to your face that they believe
18  that this case is about protecting Christian values?
19  A.   No.
20  Q.   Now, let's be a little more general, have
21  you heard that sentiment expressed, or have you
22  heard that sentiment -- I'll do it in pieces.  Have
23  you heard that sentiment expressed?
24  A.   Yes.

Page 131

1   Q.   By whom?
2   A.   I can't specifically tell you.  I mean in
3   the course of these two years, whether it would be
4   meeting someone on the street or after a Board
5   meeting or whatever what have you, I have to tell
6   you I've heard that sentiment but who, whom, I don't
7   know.
8   Q.   More than once?
9   A.   Probably.
10  Q.   Would it be fair for me to understand that
11  that is a common sentiment in the Indian River
12  School District?
13  A.   Yes.
14  Q.   I am going to go back to a specific
15  question, have you heard anyone say, again to you
16  use your phrase, to your face, that they understand
17  the School Board Prayer Policy as protecting
18  Christian values?
19  A.   Repeat it, please?
20  Q.   Have you heard anyone say to your face that
21  they view the School Board Prayer Policy as
22  protecting Christian values?
23  A.   No.
24  Q.   Have you heard that sentiment expressed?

Page 132

1   A.   No, I don't believe so.
2   Q.   So, it's the defense of this case that is
3   viewed as defending Christian values?
4   A.   I believe.
5   Q.   Have you discussed with anyone whether the
6   2006, the results of the 2006 School Board election
7   was an endorsement of the stance the School Board
8   has taken in support of School Board prayer?
9   A.   What the result of the Board election in
10  2006?
11  Q.   An endorsement of the stance the School
12  Board has taken in support of School Board prayer?
13  A.   Most definitely.
14  Q.   Is that also your view?
15  A.   That the stance was taken as such?
16  Q.   That the result was an endorsement of the
17  stance that the School Board took?
18  A.   Yes.
19  Q.   Have you ever discussed with anyone whether
20  someone who opposes School Board prayer could get
21  elected to the School Board in Indian River?
22  A.   Interesting question.
23  Q.   Let me rephrase it.  Let me just ask the
24  question directly, do you believe that someone who

Page 133

1   is upfront about it, who says look I don't support
2   School Board prayer, could be elected to the School
3   Board in Indian River?
4   A.   Would you be referencing just this past
5   election particularly or in general?  Like five
6   years from now or five years prior?
7   Q.   Let me first ask about the 2006 election.
8   Do you believe that anybody who explicitly
9   acknowledged that he was opposed to School Board
10  prayer could be elected School Board in 2006?
11  A.   Board election 2006, if a candidate
12  acknowledged that, more than likely in my opinion at
13  that particular time he would not have been elected.
14  Q.   Regardless of whatever other policies and
15  qualifications, correct?
16  A.   Correct.
17  Q.   In fact, one of the candidates in the 2006
18  election was in your view an extraordinarily well
19  qualified candidate, that was Jackie Wilson?
20  A.   That's correct.
21  Q.   And her position on School Board prayer was
22  widely understood to be opposition, is that correct?
23  I am not saying what her position was, it was widely
24  reported in the Indian River School District to be

34 (Pages 130 to 133)

Dobrich, et al.                                              Indian River School District, et al.
Gregory Hastings          v.      C.A. # 15-120 (JJF)                    October 13, 2006

Page 134

1 opposition to School Board prayer?
2   A.   I'd call that propaganda.
3   Q.   You heard that propaganda, though, didn't
4 you?
5   A.   Yes.
6   Q.   Did you think it was false?
7   A.   Yes.
8   Q.   Mrs. Wilson actually offered a pretty
9 nuanced position on School Board prayer, did she
10 not?
11   A.   Yes.
12   Q.   Which people either understood or reported
13 to be something different than what it was?
14   A.   Yes.
15   Q.   Do you know whether any of the candidates
16 in the 2006 election campaigned on the issue of
17 School Board prayer?
18   A.   The candidate did not campaign on the issue
19 of School Board prayer.  None of the candidates did
20 to my knowledge.
21   Q.   Did persons seeking to support the campaign
22 of individual candidates make School Board prayer an
23 issue?
24   A.   Yes.

Page 135

1   Q.   In your view was it a pivotal issue in the
2 election?
3   A.   In my opinion, yes.
4   Q.   Is it your understanding that the ACLU is
5 prosecuting this case?
6   A.   It's my understanding of that, yes.
7   Q.   And what is you -- what is the basis for
8 that understanding?
9   A.   Initially the representative at the Board
10 meeting with Mrs. Dobrich, and the subsequent
11 meetings, a few meetings thereafter, so I have no
12 reason to believe differently.
13   Q.   Have you ever heard anyone say, has anyone
14 ever told you in the context of discussions of this
15 issue, that the ACLU is antiChristian?
16   A.   I believe that that's very controversial in
17 the entire public setting.
18   Q.   What do you mean by that?
19   A.   I think there is many varied opinions of
20 that, whether or not the ACLU are antiChristian.
21   Q.   In the course of the -- well, since June of
22 2004, has anyone said to you, or in your presence,
23 that the ACLU is antiChristian?
24   A.   No.

Page 136

1   Q.   Have you heard that sentiment expressed?
2   A.   On the street, yes.
3   Q.   Have you ever heard any of your colleagues
4 on the Board express that opinion?
5   A.   Possibly, but I can't recall specifics, no.
6   Q.   Do you believe that the Board is obligated
7 to represent the views of the majority of the
8 constituents in the district?
9   A.   Yes.
10   Q.   Do you agree with Mrs. Bunting that this
11 area is Christian?
12   A.   Not 100 percent.
13   Q.   That is you don't 100 percent agree or you
14 don't agree that it's 100 percent Christian?
15   A.   I don't agree that it's 100 percent
16 Christian.  I am not sure what she was really
17 implying, but I don't believe -- we have other
18 faiths in this district, this area.  They are, I
19 would agree, they are a minority but we have other
20 faiths here.
21   Q.   Do you believe that the fact that the --
22 well, let me explore your answer a little bit.  This
23 is not a close thing, the vast majority of the
24 constituents in Indian River are Christian, is that

Page 137

1 correct?
2   A.   That's correct.
3   Q.   Do you believe that the fact that the vast
4 majority of the constituents in Indian River are
5 Christian should be considered in any way in the
6 consideration of whether the School Board should
7 open its meetings with a prayer?
8   A.   I would have to say it basically has to do
9 with numbers.  Since the majority of our
10 constituency are Christian, it's because of that we
11 have, in my recollection, in my opinion the members
12 of the Board are Christian.  And for the reason I
13 cited or mentioned earlier that out of respect to
14 anyone, whether of any faith any individual that
15 sits on the Board is of any other faith other than
16 Christian, and offered a prayer, then I believe in
17 my opinion that the Board would be respectful of
18 that.
19      It just happens to be the result of the
20 make up in the constituency here in this area.
21   Q.   My question probably wasn't clear.  In the
22 Board's consideration of Board Policy BDA.1, the
23 School Board Prayer Policy, do you believe that the
24 Board was obligated to consider, or that it was

35 (Pages 134 to 137)

Dobrich, et al.                                    v.              Indian River School District, et al.
Gregory Hastings                    C.A. # 15-120 (JJF)                    October 13, 2006

Page 138

1  appropriate for the Board to consider the fact that
2  the vast majority of its constituents were
3  Christians?
4     A.   I'm sorry, I don't understand your
5  question.
6     Q.   When you consider a Board policy you try to
7  weigh different factors, presumably, right?
8     A.   Uh-hum.
9     Q.   Do you think it was appropriate for one of
10 those factors to be weighed, to be the fact that the
11 vast majority of the constituents of Indian River
12 are Christians.  Is that an appropriate
13 consideration in deciding whether to adopt a policy
14 on School Board prayer?
15    A.   I suppose it's a consideration.
16    Q.   Was it a consideration as you in particular
17 considered the Board policy BDA.1?  Did you take it
18 into account?
19    A.   I believe I did.
20    Q.   And do you believe that your colleagues on
21 the Board did as well?
22    A.   I can't speak for them, but I believe they
23 tried.
24         MR. ALLINGHAM:   Thank you very

Page 139

1  much Mr. Hastings, I have no further
2  questions.
3         MS. DUPHILY:   This
4  deposition is ending at approximately 1:56
5  p.m..
6         (END OF DEPOSITION)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 140

1              I N D E X
2
3  DEPONENT:  GREGORY HASTINGS              PAGE
4
5     Examination by Mr. Allingham            2
6
7
8
9
10             E X H B I T S
11
12 GREGORY HASTINGS DEPOSITION EXHIBITS      MARKED
13
14 Plaintiff's  52  CD                    30
15 Plaintiff's  53  4/25/06 Board minutes    62
16 Plaintiff's  54  3/22/05 Board minutes    121
17
18
19
20
21
22
23
24

Page 141

1              CERTIFICATE OF NOTARY
2
3     I, David A. Sroka, a Notary Public, do hereby
   certify that the witness, GREGORY HASTINGS, was by
4  me first duly sworn to testify to the truth, the
   whole truth, and nothing but the truth; that the
5  foregoing deposition was taken at the time and place
   stated herein;  and that the said deposition was
6  recorded stenographically by me and then reduced to
   typewriting under my direction, and constitutes a
7  true record of the testimony given by said witness.
8
      I further certify that the inspection, reading
9  and signing of said deposition was not waived by
   counsel for the respective parties and by the
10 witness.
11    I further certify that I am not a relative,
   employee or attorney of any of the parties, or a
12 relative or employee of either counsel, and that I
   am in no way interested directly or indirectly in
13 this action.
14    IN WITNESS WHEREOF, I have hereunto set my hand
   and affixed my seal of office this 8th day of
15 November, 2006.
16
17
18    ------------------------
            NOTARY PUBLIC
19
20
21 DE RPR 259
22
23
24

36 (Pages 138 to 141)