Dobrich, et al.
Janet L. Hearn

v.
C.A. # 05-120-JJF

Indian River School District, et al.
November 14, 2006

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MONA DOBRICH and MARCO            )
DOBRICH, Individually and         )
as parents and next friend        )
of ALEXANDER DOBRICH,             )
SAMANTHA DOBRICH, JANE DOE        )
and JOHN DOE, Individually        )
and as parents and next           )
friend of JORDAN DOE and          )
JAMIE DOE,                        )
                                  )
          Plaintiffs,             )
                                  )  Civil Action
v.                                )  No. 05-120
                                  )
INDIAN RIVER SCHOOL,              )
DISTRICT, et al.,                 )
                                  )
          Defendants.             )

          Videotaped Deposition of JANET L. HEARN,
taken pursuant to notice at 31 Hosier Street,
Selbyville, Delaware, beginning at 11:10 a.m., on
Tuesday, November 14, 2006, before Terry Barbano Burke,
RMR-CRR and Notary Public.
APPEARANCES:
          THOMAS J. ALLINGHAM, II, ESQUIRE
          BRIAN G. LENHARD, ESQUIRE
            One Rodney Square
            Wilmington, Delaware   19801
            For the Plaintiff

                    WILCOX & FETZER
     1330 King Street -  Wilmington, Delaware 19801
                    (302) 655-0477
                    www.wilfet.com

Dobrich, et al.                                    v.                    Indian River School District, et al.
Janet L. Hearn                               C.A. # 05-120-JJF                         November 14, 2006

Page 2

1   APPEARANCES (cont'd):
2       JASON P. GOSSELIN, ESQUIRE
        Drinker, Biddle & Reath, LLP
3       One Logan Square
        18th and Cherry Streets
4       Philadelphia, Pennsylvania  19103-6996
        For the Defendants
5
    ALSO PRESENT:
6       TIMOTHY KEARNS
7       LINDSAY DuPHILY, Videographer
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 3

1           VIDEO SPECIALIST:  This is the videotape
2   deposition of Mrs. Janet Hearn taken by the plaintiff
3   in the matter of Dobrich, et al., versus Indian River
4   School District et al., Case No. 05-120.  The
5   deposition is taking place at 31 Hosier Boulevard,
6   Selbyville, Delaware.  We are going on the record on
7   November 14th, 2006, at approximately 11:10 a.m.
8           The court reporter is from Wilcox &
9   Fetzer, Wilmington, Delaware.  My name is Lindsay
10  duPhily, and I'm the videotape specialist at Discovery
11  Video Services, in association with Wilcox & Fetzer.
12          Counsel will now introduce themselves and
13  the court reporter will swear in the witness.
14          MR. ALLINGHAM:  My name is Tom Allingham.
15  I represent the plaintiffs.  With me is Brian Lenhard,
16  and helping us is Tim Kearns.
17          MR. GOSSELIN:  Jason Gosselin for the
18  defendants.
19              JANET L. HEARN,
20      the deponent herein, having first been
21      duly sworn on oath, was examined and
22      testified as follows:
23  BY MR. ALLINGHAM:
24  Q.   Good morning, Mrs. Hearn.  My name is Tom

Page 4

1   Allingham.  As I said, I represent the plaintiffs in
2   this case.
3           Have you been deposed before, have you
4   had your deposition taken before?
5   A.   No.
6   Q.   So this is an exciting new experience for you.
7   A.   Yes.
8   Q.   I'm sure that Mr. Gosselin has already told
9   you this, but so that the record's clear, I'm going to
10  ask you some questions.  He and I have a basic
11  agreement about what the subject matter of those
12  questions should relate to.  If you understand my
13  question, you should answer it, unless Mr. Gosselin
14  tells you that you should not.  He'll say "I instruct
15  you not to answer."
16          If you don't understand my question,
17  don't answer it.  Just tell me that you don't
18  understand it or ask me if I can clarify something,
19  because if you answer the question without telling me
20  that you don't understand it, everybody who sees this
21  tape and reads the transcript will assume that you did
22  understand it.
23          Okay, fair enough?
24  A.   Uh-huh, fair enough.

Page 5

1   Q.   I asked you if you have ever been deposed
2   before.  Have you ever actually testified in court
3   before?
4   A.   No.
5   Q.   Have you had a chance to speak to anyone who
6   has already been deposed in this case --
7   A.   Yes.
8   Q.   -- about their deposition?
9   A.   Yes.
10  Q.   And who was that?
11  A.   Dr. Bunting.  Mrs. Hobbs.
12  Q.   Anybody else?
13  A.   I've talked to -- not about the deposition
14  actually.
15  Q.   I know that sometimes you coordinate
16  scheduling issues.
17  A.   Right.
18  Q.   Other than scheduling issues?
19  A.   Okay, no.
20  Q.   All right.  So it would be Dr. Bunting and
21  Mrs. Hobbs?
22  A.   Uh-huh.
23  Q.   When did you first talk to Mrs. Bunting about
24  her deposition?

2 (Pages 2 to 5)

Dobrich, et al.                          v.                    Indian River School District, et al.
Janet L. Hearn                    C.A. # 05-120-JJF                    November 14, 2006

Page 6

1    A.  I think it was probably after her deposition,
2  and I don't remember which day that was.
3    Q.  And what did she say to you and what did you
4  say to her?
5    A.  She just said it was an experience, and I
6  think I said to her, I can't imagine what you could
7  talk about for the number of hours, you know, that she
8  was in the deposition.
9         And basically that was about it.  I mean
10  we didn't -- we didn't go into, they asked me this,
11  they asked me that, or any of that sort of thing.
12    Q.  I understand.  Did you have any discussion of
13  any particular issue that you recall?
14    A.  No.
15    Q.  How about with Mrs. Hobbs, when did you first
16  speak to her, on the day of her deposition?
17    A.  No.  I think it was a couple of days later I
18  spoke with her.
19    Q.  How did you have occasion to speak to her
20  about it?
21    A.  Actually it was on the telephone and we were
22  just -- called to talk to each other, not about the
23  deposition.  Anyway, I just said how did your
24  deposition go and she said, well, it was long.  And

Page 7

1  just talked about -- she didn't realize it would be
2  that lengthy either, and we didn't go into detail about
3  what was asked and what wasn't asked.  And I just
4  said -- I think I said to her, I dread if I have to go
5  through it.  And she said, well, you'll be fine, you'll
6  do fine, or whatever, but.
7    Q.  You mentioned one conversation with
8  Dr. Bunting and one with Mrs. Hobbs.  Were those the
9  only two you had with those two women about their
10  depositions?
11    A.  Uh-huh.
12    Q.  Did you meet with your attorney Mr. Gosselin
13  to prepare for this deposition?
14    A.  Yes.
15    Q.  And was that this morning?
16    A.  Yeah.  We met briefly this morning, but then I
17  was in another briefing with him two or three weeks
18  ago, before any deposition started.
19    Q.  And who else was in that meeting besides
20  Mr. Gosselin?
21    A.  I was in -- this morning, it was just he and
22  I.
23    Q.  Yes.
24    A.  But the other one it was Donna Mitchell and

Page 8

1  Nina Lou Bunting, with Jarrod I believe was there and
2  so was Jeff, I believe.
3    Q.  Were there any documents given to you at that
4  meeting?
5    A.  No.
6    Q.  Have you reviewed any transcripts of
7  depositions taken in this case?
8    A.  No.
9    Q.  Other than your attorneys, Mrs. Bunting and
10  Mrs. Hobbs, have you communicated with anyone else
11  about your deposition before this morning?
12    A.  No.
13         When you say communicate, I mean my
14  husband knew I was going through a deposition, I mean.
15    Q.  Yes, I understand.
16    A.  Okay.
17    Q.  About the substance of what you anticipated --
18    A.  No.
19    Q.  -- would be asked?
20         And did you yourself review any
21  documents before you came to the deposition today?
22    A.  I reviewed a document in the policy manual
23  regarding board minutes.
24    Q.  And what policy was that?

Page 9

1    A.  School board meeting, school board meetings.
2  I don't remember the number on it, but it's in the
3  policy manual and the title is school board meetings.
4    Q.  Why did you review that particular policy?
5    A.  In anticipation, in trying to prepare myself
6  for the deposition, you know, trying to anticipate what
7  questions might be asked and make sure I have the
8  answers.
9    Q.  I just want to make sure I understand.  The
10  policy was called school board meetings?
11    A.  Yes.
12    Q.  So this was not the policy on prayer at
13  regular school board meetings?
14    A.  No.
15    Q.  And this was not the policy on the retention
16  or of tapes of school board meetings?
17    A.  No.
18         MR. GOSSELIN:  Tom, we can give you a
19  copy of the policy.  It's the policy, I think it is
20  just mostly the Sunshine Law, the Freedom of
21  Information Act that deals with what has to be in
22  meeting minutes.
23         MR. ALLINGHAM:  Okay.
24  BY MR. ALLINGHAM:

3 (Pages 6 to 9)

Dobrich, et al.                          v.              Indian River School District, et al.
Janet L. Hearn                    C.A. # 05-120-JJF                  November 14, 2006

Page 10

1    Q.   I asked you whether you were given any
2  documents during the meeting among your attorneys, you,
3  Mrs. Mitchell and Miss Bunting, Mrs. Bunting.
4          Were you read any documents, did anyone
5  read something from a document to you?
6    A.   I don't recall.
7    Q.   Now, I understand that at board meetings it's
8  your practice to take shorthand notes; correct?
9    A.   Uh-huh.
10   Q.   And you retain those notes?
11   A.   Uh-huh.
12   Q.   And those notes are available in this
13 building; is that correct?
14   A.   Yes.
15   Q.   And how do you keep them, are they in a
16 notebook, are they in a file, are they loose, are they
17 in a binder?
18   A.   They're just in a file, a file drawer.
19   Q.   So at the meeting you have, I take it, a pad
20 on which you make your stenographic notes?
21   A.   That's correct.
22   Q.   And then you rip them out of your pad and use
23 them for whatever purpose you use them for, and then
24 file them?

Page 11

1    A.   Yes.
2    Q.   All right.  And is there a file folder for
3  each meeting in your files?
4    A.   No.  I have those by year.  They would all be
5  in one file per year.
6    Q.   Understood.
7    A.   For the year.
8    Q.   So, for example, there would be a file that
9  would say 2005 notes, or something like that?
10   A.   It would say board meeting notes probably
11 2005/2006 school year, something like that.
12   Q.   Okay.  And am I right that the only thing
13 that's in those files are your stenographic notes?
14   A.   Along with the board agenda.  For that
15 meeting.
16   Q.   Okay.  And is the agenda attached to your
17 stenographic notes?
18   A.   Yes, I think it's stapled to it.
19   Q.   Okay.  Sometimes my questions are going to
20 sound like somebody who's trying to imagine what's in
21 the file.  The way I keep my files may be very
22 different from the way you keep your files.
23          Okay, so there is a file probably set up
24 by academic year in which you keep your stenographic

Page 12

1  notes and the agenda of the related meeting; correct?
2    A.   Uh-huh.
3    Q.   And that would be the notes for the entire
4  academic year?
5    A.   Uh-huh.
6          MR. GOSSELIN:  You have to say yes or no.
7  BY MR. ALLINGHAM:
8    Q.   Oh, yeah, I should have said that.
9    A.   Okay.
10   Q.   It's little easier with a videotape, but it's
11 hard for the court reporter to know whether it is an
12 uh-uh or uh-huh.
13   A.   Okay.
14   Q.   So if you could say yes or no, that would be
15 better.
16          In addition to the files of your
17 stenographic notes, do you keep a file of some kind
18 that relates to individual board meetings?  For
19 example, do you keep a file in which you put the board
20 package for a particular board meeting?
21   A.   I have binders, and those are the -- they're
22 binders with the minutes and back-up information.
23 Board packet information goes in there with those.
24   Q.   So in the binder of the final board minutes,

Page 13

1  you also have included the package of materials,
2  whatever they were, that were sent to the board members
3  before that meeting?
4    A.   Yes.
5    Q.   Okay.
6          Do you regularly keep any other files
7  that relate to the board meetings?  We've identified
8  the files of your notes, we've identified the binders
9  of minutes and back-up materials or board packages.  Do
10 you retain anything else relating to board meetings?
11   A.   No.
12   Q.   How do you communicate with board members?
13 Let me ask you a preliminary question.
14          I understand from the depositions that
15 we've already taken that you function as, if you will,
16 the point person for communicating between the
17 superintendent and the board members; correct?
18   A.   Uh-huh.
19   Q.   You have to say yes or no.
20   A.   Yes.  Yes.  Sorry.
21   Q.   And how do you communicate with the board
22 members, telephone, e-mail, letters?
23   A.   Telephone or fax.
24          Sometimes e-mail, but not all of our

4 (Pages 10 to 13)

Dobrich, et al.
Janet L. Hearn

v.
C.A. # 05-120-JJF

Indian River School District, et al.
November 14, 2006

Page 14

1  board members have an e-mail address, so.
2      Q.  Are there any board members that prefer for
3  you to communicate via e-mail?
4      A.  Maybe Randy Hughes has mentioned that he would
5  rather just receive things by e-mail.
6          That's the only one.
7      Q.  Now, you testified that you sometimes
8  communicate via e-mail. In the instances in which you
9  do communicate via e-mail, what prompts you to use
10  e-mail rather than telephone or fax machines?
11      A.  I rarely use the e-mail. I just, most of the
12  time it's fax or telephone because most of the time I
13  need to know whether they're going to be able to attend
14  the special meeting or -- and I have found it, because
15  all of them do not have e-mails, if I fax it to
16  everybody, I know they all got it. Or if I call them,
17  then I know by talking to them.
18      Q.  Now, do you keep track, keep a record of fax
19  communications with the board members? Is there a
20  correspondence file, for example, or chronology file in
21  which you keep those contacts?
22      A.  Yeah. I keep a file for maybe a year, and
23  then once the particular year is over, then I throw
24  away that information.

Page 15

1      Q.  Okay. And, again, I'm trying to imagine what
2  it is you're keeping. In my office I keep, or more
3  probably my indispensable secretary keeps a record of
4  everything that I send out from my office which she
5  calls our chrono file.
6          Is that the sort of file you're talking
7  about here or is it a more specialized file?
8      A.  I guess it would be -- well, I'm not sure
9  because I don't know what your secretary keeps. Like
10  if I fax them a notice asking them whether they can
11  attend a meeting on a certain day --
12      Q.  Yes, ma'am.
13      A.  -- then I keep that particular piece of paper,
14  along with the fax proof that it went to everybody.
15      Q.  Uh-huh.
16      A.  Staple it together and put it on top of my
17  filing cabinet in the file, and I keep it there until,
18  like I said, when that school year's over, then I
19  usually shred those and start over with for the next
20  year.
21      Q.  Okay. Do you ever communicate with board
22  members on a topic other than to give them notice of a
23  board meeting? For example, do you communicate
24  substantive materials to the board members?

Page 16

1      A.  If the superintendent wants me -- you know, if
2  she writes something that she wants to know about, then
3  I fax it for her. But it comes from her. It's --
4      Q.  Okay.
5      A.  -- like a memo that comes from her.
6      Q.  And if a memo comes from the superintendent to
7  the board members --
8      A.  Uh-huh.
9      Q.  -- you would be the person who would send it
10  to them; correct?
11      A.  Yes.
12      Q.  And I'm assuming that you would send it to
13  them by fax; correct?
14      A.  Yes.
15      Q.  That would be something that you'd want to
16  make sure everybody got it?
17      A.  Yes.
18      Q.  Okay. And on those issues do you also keep a
19  record of what you sent to the board members?
20      A.  Yes, on a yearly basis.
21      Q.  Okay. And am I correct that at the end of the
22  school year you would throw away that file that had
23  those materials?
24      A.  Yes, uh-huh.

Page 17

1      Q.  Okay. All right, so let me see if I can
2  summarize the state of the files. What you keep, what
3  you do not discard is the academic year files of your
4  steno notes with agendas, you keep those, those don't
5  get thrown away; correct?
6      A.  Right, yes.
7      Q.  And then you have your board minutes and board
8  package binders, which obviously don't get thrown away?
9      A.  Yes.
10      Q.  Am I correct that everything else that you
11  keep on a temporary basis you throw away at the end of
12  the school year relating to board meetings?
13      A.  I'm not sure I understand.
14      Q.  Probably a bad question.
15          Are you aware of any other documents
16  relating to board meetings that you keep past the
17  academic year apart from your steno notes, the agendas
18  and the board meeting, the board meeting minutes and
19  board packages?
20      A.  I would say there probably are instances where
21  I keep things. If it relates to a certain subject, I
22  may have a file on that subject and possibly I could
23  keep them and not discard that.
24      Q.  I was actually going to go next to that.

5 (Pages 14 to 17)

Dobrich, et al.
Janet L. Hearn

v.
C.A. # 05-120-JJF

Indian River School District, et al.
November 14, 2006

Page 18

1    You might think of this as separate from
2  files relating to board meetings. We've had some
3  testimony in this case that when, if a litigation
4  matter comes to the case, like this comes to the board,
5  that you would open a file on that litigation; correct?
6    A.   Yes.
7    Q.   Okay.
8         And am I correct that even after that
9  litigation concludes you would keep the file?
10   A.   Yes.
11   Q.   You wouldn't throw it away?
12        And in that file -- am I correct that in
13 that file you would place correspondence with the
14 attorneys?
15   A.   Yes.
16   Q.   And to the extent that you communicated
17 memoranda or materials to board members relating to
18 that litigation, that would go into the litigation
19 file; correct?
20   A.   Yes.
21   Q.   So it would be retained?
22   A.   Yes.
23   Q.   Do you ever get -- apart from, yes, I'll be
24 there, do you ever get communications from board

Page 19

1  members either for yourself or communication to the
2  superintendent?
3    A.   By communication, do you mean them calling or
4  something written?
5    Q.   It could be either way. I'll give you an
6  example of one that I know about. At least one
7  instance I think a board member sent a copy of a
8  memorandum from his lawyer to the superintendent or to
9  the chairman of the board, and I wondered whether that
10 communication came through you?
11   A.   Possibly. I mean I opened all the
12 superintendent's mail, and then I take whatever comes
13 through the fax machine, so.
14   Q.   To the extent you got a communication from a
15 board member on litigation or relating to litigation,
16 am I correct that you would have put it in the
17 litigation file?
18   A.   I would, I would think that I would have.
19   Q.   Can you think of any other place you would
20 file it or are you saying that once you got it you
21 would discard it?
22   A.   Oh, I wouldn't discard it. No, I didn't
23 discard anything --
24   Q.   Okay.

Page 20

1    A.   -- for the litigation. I haven't discarded
2  anything.
3    Q.   Were you involved at all in the collection of
4  documents from the district and from the individual
5  board members that were intended to be produced, that
6  is, given to my side of this litigation in response to
7  a request for documents? Were you asked by the
8  attorneys to help collect those documents?
9    A.   Yes.
10   Q.   And would you tell me what you did in order to
11 collect the documents for the attorneys?
12   A.   What I did. You're talking about the
13 attorneys that first -- and I don't know, what
14 attorneys are you talking about? Are you talking
15 about --
16   Q.   That's a fair point.
17   A.   Okay.
18   Q.   There have been a few attorneys.
19        Whoever the attorneys were, and at
20 whatever time during the process, I'd like you to tell
21 me what you did to collect documents. If you did
22 something more than once, then break it down into the
23 first effort was this and the second effort was this.
24   A.   I remember when this, when the case first came

Page 21

1  about, the other two attorneys, John and John, John
2  Cafferkey and John Balaguer, they asked for certain
3  documents and we did a notebook of documents for them.
4    Q.   And that was a notebook that you put together?
5    A.   Yes. The superintendent, Mrs. Hobbs and I put
6  it together.
7    Q.   And what was in the notebook?
8         MR. GOSSELIN: Objection. That's, I
9  believe that's attorney work product.
10        MR. ALLINGHAM: If you want to ask
11 Mrs. Hearn, is that what you're saying?
12        MR. GOSSELIN: Yes.
13        MR. ALLINGHAM: Sure.
14        MR. GOSSELIN: Let's just break for a
15 second.
16        MR. ALLINGHAM: Don't forget to take off
17 your microphone.
18        MR. GOSSELIN: You don't want to have a
19 microphone on.
20        VIDEO SPECIALIST: We're going off the
21 record at approximately 11:35 a.m.
22        (PX-65 was marked for identification.)
23        MR. GOSSELIN: I do object to that based
24 on attorney work product.

6 (Pages 18 to 21)

Dobrich, et al.                                    v.                    Indian River School District, et al.
Janet L. Hearn                          C.A. # 05-120-JJF                            November 14, 2006

Page 22

1    MR. ALLINGHAM: We have to get back on
2 the record.
3    MR. GOSSELIN: I'm sorry.
4    VIDEO SPECIALIST: Back on the record at
5 approximately 11:36 a.m.
6    MR. GOSSELIN: I object to that question
7 based on attorney work product. There were documents
8 compiled in order to provide an answer to the
9 complaint. The selection of documents reflects
10 attorney work product.
11 BY MR. ALLINGHAM:
12    Q.    Separate from the preparation of the notebook
13 from Mr. Balaguer and Mr. Cafferkey, did you collect
14 other documents that you gave to the attorneys for
15 production my side of the case?
16    A.    I don't remember.
17    Q.    Did you subsequently, after Mr. Gosselin
18 joined the fray, collect any documents at his
19 instruction or at the instruction of other attorneys
20 for purposes of producing them to my side of the case?
21    A.    I don't recall.
22    Q.    Okay.
23        So the best you can recall is you know
24 that you collected some documents that were put in a

Page 23

1 notebook for Mr. Balaguer and Mr. Cafferkey, apart from
2 that you don't recall, I take it, one way or the other,
3 collecting any other documents; correct?
4    A.    Yes.
5    Q.    Okay.
6        I've asked the court reporter to mark as
7 PX-65 -- PX stands for Plaintiff's Exhibit, but we
8 always call it PX -- a document which is titled Notice
9 of Deposition pursuant to Rule 30(b)(6) of the Federal
10 Rules of Civil Procedure.
11        This is what's called a pleading or
12 filing in this case, and what it does is we filed it
13 and it's a request to the defendants to designate a
14 particular witness who is the most knowledgeable about
15 certain specific areas. And I'm going to ask the court
16 reporter to mark as Plaintiffs' 66 a letter from Jason
17 Gosselin to me dated October 9, 2006.
18        (PX-66 was marked for identification.)
19 BY MR. ALLINGHAM:
20    Q.    What you'll see, Mrs. Hearn, if you look at
21 the two documents together, is that for Items 9, 12,
22 and 13 you have the honor as being the person most
23 knowledgeable about those items, which are policy and
24 procedures for preserving documents, the process for

Page 24

1 preparing, drafting and adopting school board minutes
2 and the installation and operation of audiovisual
3 equipment.
4        Did you have any -- excuse me for a
5 moment.
6        And Mr. Gosselin's letter, also in
7 response to the Request No. 10, which has to do with
8 actions in response to some correspondence with
9 preservation of documents from me, Mr. Gosselin also
10 notes that he doesn't object to asking questions about
11 what you did to preserve those documents in response to
12 my correspondence.
13        My question to you is, were you told or
14 did you know that you were being designated as the
15 person most knowledgeable about those four topics?
16        MR. GOSSELIN: Objection. I'm going to
17 let her answer the question, but it's a form objection
18 that I think you can correct. The rule doesn't require
19 us to designate the person most knowledgeable. It
20 requires us to designate a person who can testify,
21 unless I'm misreading the rule, but go ahead.
22        MR. ALLINGHAM: I'm going to rephrase my
23 question to try to deal with the objection.
24 BY MR. ALLINGHAM:

Page 25

1    Q.    Were you told that you were going to be
2 designated as a person to testify about those four
3 topics?
4    A.    Yes.
5    Q.    Are you comfortable in testifying about those
6 four topics?
7    A.    Yes.
8        MR. GOSSELIN: For the sake of clarity, I
9 asked her if she would consent, but I did not tell her.
10 BY MR. ALLINGHAM:
11    Q.    Probably my question about whether you are
12 comfortable is a silly way to phrase it. Most people
13 are not comfortable in depositions.
14    A.    Well --
15    Q.    Your full name is Janet Hearn?
16    A.    Janet L. Hearn.
17    Q.    How long have you lived in Sussex County?
18    A.    All my life.
19    Q.    Did you go to school in the Indian River
20 School District?
21    A.    I did go to school, at that time it wasn't
22 Indian River School District. It was before
23 consolidation and I went to the John M. Clayton.
24    Q.    Would you agree that in the Indian River

7 (Pages 22 to 25)

Dobrich, et al.                          v.                Indian River School District, et al.
Janet L. Hearn                    C.A. # 05-120-JJF                November 14, 2006

Page 26

1 School District, or its predecessors, information and
2 news spreads by word of mouth as quickly as it does by
3 the newspaper or other media?
4   A.  I -- I really don't know.  You know, news does
5 travel quickly in Sussex County.
6   Q.   By word of mouth, among other ways?
7   A.   Yes.  It's my opinion that it does, I guess,
8 I'll put it that way.
9   Q.   Do you have any personal e-mail accounts?
10  A.   Yes.
11  Q.   Do you ever use your personal e-mail accounts
12 for communications on school district business?
13  A.   I don't think that I have.  I may e-mail my --
14 if I'm going to work on something at home, e-mail
15 something from my e-mail here to mine at home, just
16 those kinds of things.
17  Q.   Yes, I understand.
18  A.   But I don't recall using my personal e-mail
19 for --
20  Q.   I assume you have a school e-mail address as
21 well, a district e-mail address?
22  A.   I do.
23  Q.   And what is that address?
24  A.   jhearn@irsd.k12.de.us.

Page 27

1   Q.   Does everyone who is an employee of the
2 district have an e-mail address like yours?
3   A.   I believe they do.
4   Q.   So just as an example, Dr. Bunting's would be
5 sbunting@irsd.k12.de.us?
6   A.   Yes.
7   Q.   Do you use your district e-mail address to
8 communicate with other district employees?
9   A.   Yes.
10  Q.   And do you use your district e-mail address to
11 communicate with the superintendent or the assistant
12 superintendent?
13  A.   Yes.
14  Q.   Okay.
15      Have you ever searched or caused to be
16 searched any servers belonging to the district for
17 e-mails that are relevant to the issues in this case?
18  A.   I'm not sure I understand it when you say have
19 I -- I don't know.  I don't understand the question.
20  Q.   It would be possible to search the district
21 servers for e-mails relating to -- I don't know --
22 football, is that true?
23  A.   I'd have to ask the technical person.  I don't
24 know how the server can be searched.

Page 28

1   Q.   And who would be the technical person you
2 would ask?
3   A.   Ken Smith.
4   Q.   Have you ever had any communications with
5 Mr. Smith about searching the district servers for
6 e-mails that are relevant to the issues in this case?
7   A.   I think so.  I believe there was one time we
8 had to ask him at the very beginning.
9   Q.   And that, I guess, would have been at the
10 request of Mr. Balaguer or Mr. Cafferkey?
11  A.   I'm not sure at whose request.
12  Q.   Someone, though, asked you to ask Mr. Smith to
13 search the servers for e-mails?
14  A.   Yes.
15  Q.   And to the best of your recollection, you did
16 ask Mr. Smith to do that?
17  A.   Yes.
18  Q.   What did you ask Mr. Smith to search for?
19      MR. GOSSELIN:  Objection.  I'm going to
20 instruct her not to answer until we clarify whether
21 this was an instruction from an attorney.
22 BY MR. ALLINGHAM:
23  Q.   Do you know whether the instruction came from
24 an attorney?

Page 29

1   A.   I'm not sure.
2       MR. GOSSELIN:  If you want to table this
3 for a second, on the next break, I can talk to her to
4 see if I can try to clarify it.
5       MR. ALLINGHAM:  That makes sense, I
6 guess.
7       I think that I'm entitled to know what
8 the district searched for, whether it comes from an
9 attorney or not, I think I'm entitled to know that.
10      MR. GOSSELIN:  If it comes from an
11 attorney and it is a very specific request, it
12 probably -- it certainly could reveal attorney work
13 product.  It could be something more generic like
14 documents responding to discovery requests.  I think
15 you'd be entitled -- I have no objection to you asking
16 did we do searches once we got the discovery request
17 from you.
18      MR. ALLINGHAM:  Okay.
19      MR. GOSSELIN:  But if there was something
20 before that -- do you want to --
21      MR. ALLINGHAM:  No, we can keep going.
22 BY MR. ALLINGHAM:
23  Q.   The way a party to a litigation asks for
24 documents is to file something that looks a little bit

8 (Pages 26 to 29)

Dobrich, et al.
Janet L. Hearn

v.
C.A. # 05-120-JJF

Indian River School District, et al.
November 14, 2006

Page 30

1  like that pleading I showed you, but it would say
2  document request or request for production of documents
3  on the top, and what it does is describe categories of
4  documents which the other side is asking you to
5  produce.
6       Did you ever see a production request of
7  that kind?
8  A.  I think so.
9  MR. ALLINGHAM:  Let's mark as PX-66 a
10 document entitled Plaintiffs' First Request for the
11 Production of Documents.  Sorry, PX-67.
12      (PX-67 was marked for identification.)
13 BY MR. ALLINGHAM:
14 Q.  You said, Mrs. Hearn, that you thought you had
15 seen a request for the production of documents.  I have
16 given you a production request that we filed in this
17 case.  Does this look like the one that you saw?
18 A.  I think so.  I think I have seen this.  I have
19 seen many documents with this case.  I think I've seen
20 this one before.
21 Q.  Okay.  Based on your recollection that you
22 probably saw a production request and your recollection
23 of this probably is the one you saw, would you tell me
24 what you did to collect documents responsive to the

Page 31

1  production request?  And on this question I'm just
2  asking what you did to search for e-mail communication
3  relating to this production request.
4  MR. GOSSELIN:  Objection.  I think she
5  testified that she doesn't know whether the request for
6  the e-mail search related to this or if it was related
7  to something else.
8      I can't allow her to answer that question
9  until -- I mean I don't know the answer myself because
10 it happened when previous counsel was involved, but I
11 do want to make sure that it wasn't a request that
12 related to something that previous counsel was doing
13 rather than in response to this.  I think we can
14 probably get to the bottom of that on the next break,
15 but for now I'm going to have to instruct her not to
16 answer the question.
17 MR. ALLINGHAM:  Okay, I'm going to defer
18 this for a little while.
19 BY MR. ALLINGHAM:
20 Q.  One of the plaintiffs in this case, some of
21 the plaintiffs in this case are members of the Doe
22 family, they are proceeding anonymously.  Are you aware
23 of that?
24 A.  Uh-huh.

Page 32

1  Q.  Do you know who the Does are?
2  A.  No.
3  Q.  Have you ever heard anyone say in words or
4  substance, I know who the Does are?
5  A.  No.
6  Q.  Has anyone ever asked you in words or
7  substance, do you know who the Does are?
8  A.  No.
9  Q.  So, so far as you know, no one has evinced any
10 interest in the identity of the Doe family, within the
11 purview of your knowledge, your experience?
12 A.  What was the question again?
13 Q.  Has anyone ever expressed any interest in
14 finding out who the Does are around you?
15 A.  No.
16 Q.  What's your current job with the district?
17 A.  I'm secretary to the superintendent and to the
18 board of education.
19 Q.  How long have you held those jobs?
20 A.  I started in this position in 1991, so I'm
21 working on my 16th year.
22 Q.  And I know you probably have a lot of duties,
23 but touching the high points, what are your main duties
24 in that position?

Page 33

1  A.  The main duties would be the clerical duties
2  in association with the superintendent and the clerical
3  duties for the board of education.
4  Q.  Included in the clerical duties for the board
5  of education is the preparation of minutes of the board
6  meetings; is that right?
7  A.  That's correct, yes.
8  Q.  And so you've done that since 1991?
9  A.  Yes.
10 Q.  Okay.
11      Who trained you or explained to you how
12 to prepare board minutes?
13 A.  The secretary that was doing the board minutes
14 in the position before I took the position, along with
15 the superintendent at that time.
16 Q.  Who was the superintendent at that time?
17 A.  That was Dr. Charles Hudson.
18 Q.  Do you recall what they told you about what
19 was supposed to be in the minutes, what did they tell
20 you about how to prepare the minutes?
21 A.  Well, the votes must be recorded and how the
22 board members voted on whatever topics, and then if
23 there were no votes taken, it was just a summarization
24 of the particular topic that was on the agenda.

9 (Pages 30 to 33)

Dobrich, et al.
Janet L. Hearn

v.
C.A. # 05-120-JJF

Indian River School District, et al.
November 14, 2006

Page 34

1   Q.   Do you know whether the district has a policy
2   concerning how minutes should be drafted?
3   A.   Just the policy that I referred to earlier
4   that is like part -- or the Sunshine Law plays into
5   that, and the Roberts Rules of Order is the guideline,
6   actually.
7   Q.   Is that a policy that sets forth, in effect,
8   some legal requirements as to what has to be in the
9   minutes?
10  A.   I'm not sure I understand the question.
11  Q.   I'll withdraw it. Mr. Gosselin has told me
12  he'll give me a copy of it. I can ask better questions
13  then.
14       Have you ever changed your practice in
15  terms of the way you draft minutes, more detail, less
16  detail, new requirements of items that had to be
17  included in the minutes, or has your practice been
18  consistent throughout?
19  A.   I think it's been pretty consistent. I think
20  it's been pretty consistent.
21  Q.   You had, I take it, then, that even in 1991
22  you kept shorthand notes during the meetings?
23  A.   Yes.
24  Q.   And was it in 1991 where the shorthand notes

Page 35

1   were the basis for your drafting of the final draft
2   minutes?
3   A.   Yes.
4   Q.   At some point, and it may have been in the
5   practice that was in place in 1991, the board began
6   taping its meetings?
7   A.   Yes.
8   Q.   When did that start?
9   A.   It started prior to me taking the job.
10  Q.   Okay.
11  A.   Only shortly prior, I think, but maybe --
12  Q.   Okay.
13  A.   -- one or two years prior to that.
14  Q.   So throughout your tenure as board secretary,
15  there have been tapes, audiotapes of the meetings and
16  you also take steno notes?
17  A.   Yes.
18  Q.   And I take it from your earlier answer that
19  you -- it's your practice to rely on your steno notes
20  in the preparation of your draft minutes rather than
21  the audiotape?
22  A.   Yes.
23  Q.   Do you ever have reference to the audiotape?
24  A.   Yes.

Page 36

1   Q.   When do you go to the audiotape?
2   A.   If I have a question about, in my note,
3   sometimes I have questions about what I jotted down and
4   may go back to just listen to that portion of the tape
5   to clarify.
6   Q.   Okay. So as I understand the process, you
7   begin by looking at your steno notes, if there's
8   something that you think is unclear in the steno notes,
9   you may refer to the audiotape to clarify it?
10  A.   Yes.
11  Q.   And do your steno notes go back to 1991?
12  A.   I don't think so.
13  Q.   How far back?
14  A.   I am not sure.
15  Q.   Do you just purge your files every few years
16  to make space? Why is it that you don't have them
17  going all the way back to '91?
18  A.   I know I have them back to 2002, but prior to
19  that, I'm not sure how far back they go.
20  Q.   I'm just going to show you a document, since I
21  only have one copy right now, which bears Bates numbers
22  BPD 1047 through 1049.
23       Is this the policy that you reviewed in
24  connection with preparing for your deposition?

Page 37

1   A.   Yes.
2   Q.   May I have it back, please. Thank you.
3        By the way, is Mr. Hudson still employed
4   by the district?
5   A.   No.
6   Q.   Do your duties as secretary to the
7   superintendent include a responsibility to attend
8   school board meetings?
9   A.   Yes.
10  Q.   And that's for the purpose of preparing the
11  minutes?
12  A.   Yes.
13  Q.   Do you have any other job or responsibility
14  during those board meetings?
15  A.   No.
16  Q.   Do you attend special board meetings?
17  A.   Yes.
18  Q.   Do you attend executive sessions of board
19  meetings?
20  A.   Yes.
21  Q.   And for all those various kinds of meetings,
22  you do it in order to prepare the minutes; correct?
23  A.   Yes.
24  Q.   Are there any times that you're aware of when

10 (Pages 34 to 37)

Dobrich, et al.                                      v.                    Indian River School District, et al.
Janet L. Hearn                              C.A. # 05-120-JJF                          November 14, 2006

Page 38

1  a board meeting or a portion of a board meeting takes
2  place and you are not present?
3  A.  Yes.
4  Q.  What would those instances be?
5  A.  When interviews are held, I usually leave the
6  room when they're interviewing candidates for
7  positions.
8  Q.  What sort of positions, teacher positions?
9  A.  Administrative positions.
10  Q.  Administrative positions?
11  A.  Uh-huh.
12  Q.  Other than for interviews of administrators,
13  any other time when you're not present that you're
14  aware of?
15  A.  I have been asked to leave during some
16  executive sessions when they want to discuss -- and I
17  can't tell you what they discuss because I leave.
18  Q.  Sure.
19  A.  But at some times I have been asked to leave
20  for a few minutes or an hour or whatever.
21  Q.  Let me see if I can cut through this. This
22  deposition is addressed to the issue of school board
23  prayer. There were some meetings in 2004 and there may
24  have been meetings since then at which school board

Page 39

1  prayer issues were discussed.
2      Do you recall ever having been asked to
3  leave a meeting during a period when school board
4  prayer was being discussed?
5  A.  No.
6  Q.  Do you know how minutes of the sections of
7  meetings when you were asked to leave are prepared?
8  Are there just no minutes of those meetings?
9  A.  I'm not -- I'm not sure.
10  Q.  Do you have any idea?
11  A.  You know, like maybe you would say whatever
12  topic that I left for, a discussion was held regarding
13  blah blah topic, or whatever, might be part, might be
14  in the minutes.
15  Q.  I see.
16  A.  Okay.
17  Q.  So when you leave you might just make a note
18  of what the subject was?
19  A.  Uh-huh.
20  Q.  And then just say the board discussed blank?
21  A.  Uh-huh, yes.
22  Q.  Do your duties as secretary to the
23  superintendent include responding to communications
24  from parents of district students?

Page 40

1  A.  Typing a letter that they respond to, a
2  communication? Is that what you're asking?
3  Q.  Yes.
4  A.  Yes, okay.
5  Q.  But I take from that answer that you're not
6  responsible for drafting the letter?
7  A.  I am not responsible for drafting the letter.
8  Q.  You're responsible for -- you have the
9  clerical responsibility to get that letter done and to
10  get it sent out to the student's parents?
11  A.  (Witness nods.)
12  Q.  Okay.
13      And am I correct that you're also
14  responsible for -- well, let me ask it a different way.
15      If a parent complains to the district
16  and the complaint comes to you, I take it your
17  responsibility is to direct that complaint to the
18  appropriate administrator?
19  A.  Yes.
20  Q.  And typically you would direct the complaint
21  to your boss, the superintendent?
22  A.  Yes.
23  Q.  Am I correct that you don't have any authority
24  on your own independently to respond to parent

Page 41

1  complaints?
2  A.  No, I do not.
3  Q.  More broadly, do you have any authority to act
4  independently on behalf of the superintendent or the
5  school district?
6  A.  No.
7  Q.  Have your responsibilities changed in any way
8  since Dr. Bunting replaced Mrs. Hobbs as
9  superintendent?
10  A.  I'm not sure I understand the question.
11  Q.  Is your job description the same?
12  A.  Oh, the job description's the same, yes.
13  Q.  I understand that every boss is --
14  A.  I was going to say everybody has their own
15  style.
16  Q.  Every boss is different.
17      But your responsibilities --
18  A.  Is the same.
19  Q.  -- are the same?
20  A.  Yes.
21  Q.  I asked you earlier about the binder of board
22  minutes. Do you keep the executive session minutes in
23  a separate binder or in some way separate from the
24  regular session minutes?

11 (Pages 38 to 41)

Dobrich, et al.                                v.                    Indian River School District, et al.
Janet L. Hearn                        C.A. # 05-120-JJF                        November 14, 2006

Page 42

1    **A.   Yes.**
2    Q.   And how do you do that?  Is there a separate
3    binder?
4    **A.   There is a separate binder.**
5    Q.   Why do you keep them in a separate binder?
6    **A.   Because they're not for public -- they're not**
7    **a public document.**
8    Q.   All right.  And so if a citizen of the
9    district came in and said I'd like to look at the board
10   minutes, you would say, well, you can look at the
11   public minutes but you can't look at the executive
12   committee session, executive sessions?
13   **A.   That's --**
14         MR. GOSSELIN:  Objection.
15   BY MR. ALLINGHAM:
16   Q.   I think this is where Mr. Gosselin is
17   objecting for the record but not telling you not to
18   answer, so you can go ahead and answer the question.
19   **A.   And the question again was --**
20   Q.   I was going to say, usually that means I got
21   to repeat it.
22         So if a citizen of the district came to
23   you and said I'd like to look at the board minutes, you
24   would make available the regular board minutes but not

Page 43

1    the executive session minutes; is that right?
2    **A.   Usually if people come and ask -- I usually**
3    **ask them to fill out a Freedom of Information form.**
4    Q.   And do you do that for any request for
5    information from the district?
6    **A.   Like -- I'm not sure what you're asking me.**
7    Q.   In your last answer you said, usually if a
8    person wanted to look at the minutes they would say you
9    need to fill out a Freedom of Information Act request;
10   correct?
11   **A.   Uh-huh, yes.**
12   Q.   Okay.
13         First of all, is there any instance, in
14   which you can recall, in which you have not directed
15   that person to fill out a FOIA request?
16   **A.   I can't recall.  I'm not sure.**
17   Q.   Why do you -- has that happened in the past,
18   by the way, has someone come in and said I'd like to
19   look at the minutes?
20   **A.   Yes, yes, it has happened.**
21   Q.   And to the best of your recollection, you have
22   said you need to fill out a FOIA request?
23   **A.   Yes.**
24   Q.   And do you have the form to fill out a FOIA

Page 44

1    request?
2    **A.   Yes.**
3          MR. ALLINGHAM:  All right, we need to
4    change the tape so we will take a five-minute break.
5          VIDEO SPECIALIST:  Going off the record
6    at approximately 12:08 p.m.
7          (Recess.)
8          VIDEO SPECIALIST:  Back on the record at
9    approximately 12:19 p.m.
10   BY MR. ALLINGHAM:
11   Q.   Mr. Gosselin has told me off the record that
12   he had spoken to you and needs to maintain his
13   objection to some earlier questions I asked about
14   searches of the district servers for e-mails.  Let me
15   ask a couple of follow-up questions.
16         Whatever the search was, did it generate
17   any -- did Mr. Smith -- Ken Smith, is that right?
18   **A.   Uh-huh.**
19   Q.   Did Mr. Smith come back to you with some
20   e-mails that were responsive to your request?
21   **A.   I think he did.**
22   Q.   If he did, did you give them to your lawyers
23   for production to the other side?
24   **A.   I don't recall.**

Page 45

1          MR. GOSSELIN:  Maybe I should clarify.
2          If this search revealed what they were
3    searching for and I get a copy of it, I will give a
4    copy of it to you either in this phase or the next
5    phase.  And I don't know whether it's already been
6    produced.  It very well may have, given what it was.
7    BY MR. ALLINGHAM:
8    Q.   Because I don't have the results of the search
9    and because I don't know too much about the district's
10   e-mail practices, let me ask you a couple of questions
11   intended to shed some light on that issue.
12         I'm trying to get at how frequently
13   district employees use e-mail to communicate?  For
14   example, how many e-mails would you estimate you get
15   per day on your district e-mail address?
16   **A.   On my personal, on the one that I have?**
17   Q.   Yes, ma'am.
18   **A.   Some days it might be two or three.  Some days**
19   **it might be five or six.**
20   Q.   Oh, how fortunate you are.
21         Do you also, is it part of your
22   responsibilities to review the superintendent's e-mail
23   traffic?
24   **A.   Most of the time she does her own e-mails,**

12 (Pages 42 to 45)

Page 46

1   Dr. Bunting.
2   Q.   Yes.
3   A.   However, if she's going to be out of the
4   office for, you know, an extended time, she might ask
5   me to check on her e-mails.
6   Q.   In order of magnitude, how many e-mails does
7   Dr. Bunting get?
8   A.   She gets more than five or six a day, but I
9   really --
10   Q.   More than 100?
11   A.   No, I don't think it's more than 100, no.
12   Q.   Did you review Mrs. Hobbs' e-mails for her?
13   A.   I did.
14   Q.   Order of magnitude, how many did Mrs. Hobbs
15   get?
16   A.   Since I didn't count them, I would guess that
17   it might be 30, between 30 and 50, depending on, you
18   know, the day or whatever.
19   Q.   Do you recall any e-mail that Mrs. Hobbs,
20   Dr. Bunting, or you received that you recall that
21   related to the issue of school board prayer?
22   A.   I don't recall.
23   Q.   For example, do you recall e-mails from
24   district personnel to Mrs. Hobbs or Dr. Bunting saying

Page 47

1   in words or substance, I think it's great that you're
2   defending this lawsuit, keep up the good work, or that
3   sort of communication?
4   A.   I think there may have been some on Dr. -- or
5   Mrs. Hobbs' e-mails. I haven't seen any on
6   Dr. Bunting's. I don't recall seeing any, I'll put it
7   that way.
8   Q.   With respect to Mrs. Hobbs' e-mails, how did
9   you communicate the e-mails to Mrs. Hobbs?
10   A.   I --
11   Q.   Would you print those out and give her a hard
12   copy?
13   A.   I printed those out for her.
14   Q.   Just so I understand this process, you would
15   review the e-mails on the screen. Would you pick the
16   ones that you thought should be printed and
17   communicated to her, or would you just print them all
18   and give them to her?
19   A.   The only ones that I would not print would be
20   something of a sales nature.
21   Q.   I get a few of those.
22   A.   The marketing ones I did not print out for
23   her.
24   Q.   Okay. Anything relating to district business

Page 48

1   you would print out?
2   A.   Yes, yes.
3   Q.   And what was your practice with respect to
4   filing e-mails like that, would you also print a copy
5   for the file?
6   A.   No.
7   Q.   Did Mrs. Hobbs return e-mails to you for
8   filing from time to time?
9   A.   Yes.
10   Q.   Did you keep a file of communications relating
11   to the school board prayer and school prayer issues
12   generally?
13   A.   I had a file for the litigation.
14   Q.   Uh-huh.
15   A.   And basically put, you know, put everything in
16   that file.
17   Q.   Okay. And would that include the e-mails of
18   support that Mrs. Hobbs received? Did you put that in
19   the litigation file as well?
20   A.   I think so. I think anything relating to the
21   case I would put in there.
22   Q.   Okay, to come back to the, we were talking
23   about the FOIA requests before we broke, I first want
24   to establish what, I first want to establish when you

Page 49

1   began the practice of directing people to make FOIA
2   requests.
3       So when you joined the district in
4   1991 --
5   A.   Uh-huh.
6   Q.   -- did you instruct people who asked for
7   documents to make a FOIA request, or is that a more
8   recent practice?
9   A.   I don't remember if I did that in 1991 or not.
10   Q.   Who told you or instructed you to ask persons
11   requesting documents from the district to make a FOIA
12   request?
13   A.   I don't remember.
14   Q.   I'm assuming this is not something you would
15   have done on your own?
16   A.   No, no. I do recall when, when Mrs. Hobbs
17   took the position as superintendent in '96, there was a
18   time after that that our attorney did a Freedom of
19   Information seminar or something, workshop, and there
20   were forms in there, you know, like a sample form for a
21   Freedom of Information request. And probably after
22   that is when we may have started.
23   Q.   Okay.
24       And now I'd like to explore what you do,

13 (Pages 46 to 49)

Dobrich, et al.                                              Indian River School District, et al.
Janet L. Hearn                            v.                          November 14, 2006
                              C.A. # 05-120-JJF

Page 50

1  if I walked into your office and said I'd like to see
2  the minutes of a particular meeting --
3  A.  Uh-huh.
4  Q.  -- and you would say to me, Well, you need to
5  fill out a FOIA request, here's a form, I would then
6  fill it out and give it back to you, is that what --
7  A.  Uh-huh.
8  Q.  -- the process is?
9  A.  Uh-huh.
10  Q.  And then what would happen?
11  A.  Depending on what my schedule was like,
12  whether I would do it then or say, you know, I don't
13  have the time permitted to do this today, I will get it
14  to you and I can send it to you or you can come back
15  and pick it up and that sort of thing.
16  Q.  Yes, ma'am. So it's not a type situation
17  where you then exercise discretion about whether to
18  give the person the documents that they request, if
19  they fill out an appropriate FOIA request --
20  A.  If they fill out a FOIA request for board
21  minutes, public board minutes, there's not -- I mean
22  they can have those. I don't have to ask someone, no.
23  Q.  Okay. So let me see if I can make this clear.
24  There might be some categories of documents where you

Page 51

1  would have to ask someone, but you are aware yourself
2  of some categories of documents that if I made a proper
3  FOIA request you would just let me look at it; correct?
4  Yes?
5  A.  I would probably just tell the superintendent
6  that such and such has made -- here's a FOIA request --
7  Q.  Yes.
8  A.  -- and I am copying these. I wouldn't do it
9  just on my own. The superintendent would know I had
10  done it before I released the information to the
11  person.
12  Q.  But am I right that there are categories of
13  documents that you know the superintendent would say,
14  yeah, sure, fine, go ahead? Board minutes, for
15  instance?
16  A.  Board minutes, for instance.
17  Q.  Or board policies?
18  A.  Or policies, yes.
19  Q.  Now, when you say board minutes, actually
20  there are categories of board minutes. That would be
21  true of the public session board minutes. That would,
22  I take it, not be true of the executive session board
23  minutes?
24  A.  Yes, that's correct.

Page 52

1  Q.  And is that the reason why you keep the public
2  binder separate from the executive session binder?
3  A.  Yes.
4  Q.  So anything that's in the public binder you
5  would know that the superintendent would say, fine, go
6  ahead?
7       MR. GOSSELIN: Objection.
8  BY MR. ALLINGHAM:
9  Q.  Correct?
10       You can answer.
11  A.  I would still run it by her and say I've
12  gotten a request for this, is it okay. I would get the
13  superintendent's approval before I did it on my own.
14  Q.  And to get the superintendent's approval,
15  would you show her the documents or would you simply
16  say here's what the request is, I'm collecting the
17  documents, is this okay?
18  A.  She would see the documents. I may ask her,
19  do you want me to go ahead and collect them and then
20  show them to you after I get them? I would show them
21  to her before I sent them, before I released them.
22  Q.  Do you have an understanding as to whether the
23  superintendent would approve a FOIA request for any
24  materials in the public binder?

Page 53

1  A.  I believe she would.
2  Q.  In the past you said you had had at least some
3  requests for materials from the public binder. Can you
4  think of any instance in which the superintendent has
5  instructed you to decline such a request?
6  A.  No.
7  Q.  We talked about how you respond to requests
8  for documents from the public binder.
9       Am I correct that you would take that
10  approach no matter what documents were asked for, that
11  is, you would always tell someone --
12  A.  Oh, yes.
13  Q.  -- do me a favor, fill out the FOIA request,
14  and then we'll respond; correct?
15  A.  Uh-huh. Well, no, wait a minute.
16       If they ask for a policy --
17  Q.  Uh-huh.
18  A.  -- lots of times I say they're on the website.
19  Q.  Uh-huh.
20  A.  Or if another school district asks for a
21  policy, a copy of a policy, I don't require a Freedom
22  of Information request for that.
23  Q.  So why do you require a parent or a resident
24  to file a Freedom of Information Act request?

14 (Pages 50 to 53)

Dobrich, et al.                              v.                    Indian River School District, et al.
Janet L. Hearn                         C.A. # 05-120-JJF                          November 14, 2006

Page 54

1   A.   From the board minutes?  Is that what --
2   Q.   Sure, sure.
3   A.   That's just what I think I'm supposed to do.
4   Q.   Did anyone ever tell you that the reason for
5   requiring a FOIA request was so that the district would
6   have a record of who had asked for what documents?
7   A.   I don't recall anybody telling me that.
8   Q.   But it's your testimony, Mrs. Hearn, that it
9   is your practice when someone requests a copy of board
10  minutes or a copy of the board policy to instruct them
11  to file a FOIA request?
12  A.   Yes.
13  Q.   Do you keep copies of the FOIA requests?
14  A.   I keep them for that particular year.
15  Q.   So the FOIA request would fall into the
16  category of materials that you would discard at the end
17  of the academic year?
18  A.   Yes.
19  Q.   Has anyone ever requested copies of executive
20  session minutes?
21  A.   I don't recall.
22  Q.   In all of your years as secretary, can you
23  recall any request made by anyone for documents from
24  the district that you have declined, turned down?

Page 55

1   A.   I don't recall any.
2   Q.   Has anyone ever requested copies of the FOIA
3   requests themselves?
4   A.   Not that I recall.
5   Q.   Would it surprise --
6   A.   I --
7   Q.   Sorry.
8   A.   No, I'm not aware of any.
9   Q.   Would it surprise you if someone testified
10  that she asked for a copy of the district policy and
11  was directed to the principal of the school that her
12  children attended, is that something that you might
13  have done?
14  A.   You mean if somebody called me and asked me
15  for --
16  Q.   Yes.
17  A.   -- a policy?
18  Q.   Yes.
19  A.   I don't recall doing that.
20  Q.   So let me see if I can summarize what I've
21  learned so far.
22       You don't have any memory that anyone
23  has ever requested copies of executive session minutes;
24  correct?

Page 56

1   A.   I don't recall any, no.
2   Q.   If they did, however, you would expect that
3   that request would be declined; correct?
4   A.   I would expect that it would because, yeah,
5   because it would be executive session minutes.
6   Q.   You do recall that there have been requests
7   from time to time for materials in the public binders;
8   correct?
9   A.   Yes.
10  Q.   And you don't recall any instance in which
11  those requests have been declined once a FOIA request
12  was made?
13  A.   I don't recall any.  I don't recall any, no.
14  Q.   Okay.
15       I asked you a little earlier about
16  whether you were present during interviews of
17  administrators.
18  A.   Uh-huh.
19  Q.   And that was one of the instances where you
20  were excused; correct?
21  A.   Uh-huh.
22  Q.   Are you present for interviews of prospective
23  board members?
24  A.   We normally don't interview for board members,

Page 57

1   but there was an instance when a board member fulfilled
2   a term of a board member, and I believe I was there for
3   that interview.
4   Q.   And that was Mr. Hughes?
5   A.   Yes.
6   Q.   Do you recall any of the questions that were
7   asked of Mr. Hughes during that interview?
8   A.   No, I don't recall.
9   Q.   Do you recall whether Mr. Hughes was asked his
10  position on school board prayer?
11  A.   I don't remember.
12  Q.   Did you take minutes or take notes of the
13  portion of the meeting that represented the interview
14  of Mr. Hughes?
15  A.   I believe I did.
16  Q.   We're aware of one board meeting that was
17  videotaped, the August 24th, 2004 board meeting.
18       Do you recall any other board meeting
19  that has been videotaped by the district?
20  A.   I think there may have been one more since
21  that time.
22  Q.   When was that?
23  A.   I don't recall.
24  Q.   Do you know why it was videotaped?

15 (Pages 54 to 57)

Dobrich, et al.                           v.                    Indian River School District, et al.
Janet L. Hearn                       C.A. # 05-120-JJF                       November 14, 2006

Page 58

1    A.   I think it was when we anticipated a crowd,
2    but we didn't end up to have a crowd, but I don't
3    remember the date.
4    Q.   Do you know what the topic was that suggested
5    to you you might have a crowd?
6    A.   I think it was the lawsuit.
7    Q.   The issue of whether to accept the settlement
8    of the lawsuit?
9    A.   I'm not sure if that was the issue or not.
10   Q.   In any event, am I correct, then, that because
11   you anticipated a crowd, you set up video equipment?
12   A.   Our technical people did, yes.
13   Q.   I'm sorry, I didn't mean to suggest that you
14   did.
15   A.   I don't know anything about setting it up.
16   Q.   Your technical people set up video equipment?
17   A.   Yes.
18   Q.   And was that so that you could deliver a video
19   feed of the meeting into a separate room where overflow
20   people could be taken care of?
21   A.   Yes, yes.
22   Q.   And so the videotaping was -- well, let me
23   just ask you the question.  Was it intended that the
24   videotape provide a record of the meeting or was it

Page 59

1    simply incidental to the providing of the feed to the
2    overflow room?
3    A.   Just to provide the feed to the overflow room.
4    Q.   Okay.  So all of your other practices relating
5    to keeping records of the meeting would be the same,
6    you kept steno notes, you made audiotapes?
7    A.   (Witness nods.)
8    Q.   Yes?
9    A.   Yes.
10   Q.   You have to answer yes.
11   A.   Yes.
12   Q.   Now, to come over to that August 24th, 2004
13   meeting, which was the big meeting, seven, eight
14   hundred, lots of people, was it the same situation,
15   that is, you anticipated a crowd, asked the technical
16   people to set up a video screen in the overflow room,
17   and a videotape was created incidental to that
18   arrangement for the overflow room?
19   A.   Yes, for the overflow room, exactly.
20   Q.   And at that meeting as well, you used the same
21   practices as you did in other meetings for the
22   preparation of minutes, an audiotape and steno notes?
23   A.   Yes.
24   Q.   I asked you about what would happen with a

Page 60

1    FOIA request for a board policy.  I gather that you
2    would provide -- you might tell them you can get it on
3    the web, but if you'd like it --
4    A.   Uh-huh.
5    Q.   -- I can give it to you if you do a FOIA
6    request; correct?
7    A.   (Witness nods.)
8    Q.   What about a FOIA request for a board policy
9    that had not yet been adopted but had been presented
10   for a first reading, would you provide that to the
11   applicant, the FOIA applicant?
12   A.   Not without asking the superintendent.
13   Q.   Has that ever happened?
14   A.   I don't recall.
15   Q.   I'm correct that a number of policies have
16   been adopted since you have been board secretary?
17   A.   Yes.
18   Q.   What do you do with the policy after the first
19   reading but before it's adopted, do you keep it in a
20   file somewhere?
21   A.   Actually, I don't do anything with it.  I
22   don't do the policies.  That's not part of my
23   responsibility.
24   Q.   Who does that, the policy committee?

Page 61

1    A.   Yes.
2    Q.   Mrs. Hobbs testified that she asked you to
3    keep a printed copy of an e-mail from Mrs. Dobrich.  Do
4    you recall doing that?
5    A.   Yes.
6    Q.   And where is that printed copy kept, in the
7    litigation file?
8    A.   I believe it's in the litigation file.
9    Q.   And the printed copy of that e-mail that
10   Mrs. Hobbs asked you to file, did it have notes on it
11   of any kind or was it simply a printed copy of the
12   e-mail?
13   A.   I don't remember.
14   Q.   Did you communicate that e-mail to anyone
15   other than putting it into the file?  Did you send it
16   to attorneys?  Did you send it to anyone else?
17   A.   I'm not sure.
18   Q.   Other than the e-mail from Mrs. Dobrich, do
19   you recall filing any e-mails from anyone, district
20   employees, district residents, anybody, concerning the
21   issue of school board prayer?
22   A.   I can't remember.
23   Q.   When you say --
24   A.   I filed a lot of things for the litigation.  I

16 (Pages 58 to 61)

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

Page 62

1  can't remember exactly.
2      Q.    I'm gathering from your testimony about this
3  litigation file that some of the contents of that file
4  constituted communications with attorneys; is that
5  right?
6      A.    Yes.
7      Q.    And when I say communications with attorneys,
8  that would be communications from district folks to the
9  attorneys and also from the attorneys to folks in the
10  district; correct?
11      A.    Yes.
12      Q.    I'm also gathering that there are materials in
13  that file that do not constitute communications from
14  the district to attorneys or back; is that correct?
15      A.    I'm not sure what you mean.
16      Q.    Well, an example would be this e-mail from
17  Mrs. Dobrich to Mrs. Hobbs.
18      A.    Okay. Right, yes, that would probably be in
19  there, yes.
20      Q.    That's a document that is not a communication
21  from an attorney to the district or from the district
22  to an attorney; correct?
23      A.    Okay. Yes.
24      Q.    Are there other documents like that which are

Page 63

1  not communications from attorneys to the district or
2  the district to attorneys which were in the litigation
3  file?
4      A.    I don't remember.
5      Q.    Did anyone review the litigation file in
6  connection with the production of documents in this
7  case?
8      A.    I'm not sure.
9      Q.    Am I correct that you did not do so, you
10  personally?
11      A.    No. Okay, what are you -- I guess I'm not
12  sure what you're asking with that.
13      Q.    There's a file.
14      A.    Yes.
15      Q.    It's the litigation file. It may be big, it
16  may be small.
17      A.    It's really big.
18      Q.    Whatever it is, it's a big file.
19      A.    Right.
20      Q.    Did you go through that file to determine
21  whether there were documents in it that were responsive
22  to a production request?
23      A.    I did that --
24          MR. GOSSELIN: Objection. Again, that's

Page 64

1  work product. She's not going to know what's
2  responsive to that request. She's only going to do
3  what the attorneys ask when they review the request and
4  prepare the response.
5          MR. ALLINGHAM: I just don't believe I'm
6  not permitted to ask a witness what files she reviewed
7  for the purposes of pulling documents that were
8  responsive to a production request. It may be that the
9  identification of the documents she pulled would
10  reflect attorney-client work product, but the file that
11  she looked at or didn't look at is relevant and I can't
12  imagine how that impacts or implicates attorney-client
13  work product.
14          I just want to know the location of
15  places that were searched or not searched.
16          MR. GOSSELIN: Well, my objection is the
17  same as before. I don't have a problem with you asking
18  what document -- what files were searched. There was
19  in this case right after the lawsuit was filed, as we
20  mentioned earlier, a request by the attorneys, in the
21  absence of any document production, for certain things.
22  That clearly reflects attorney work product, but if you
23  want to ask questions about what files were searched
24  during this litigation, that's fine.

Page 65

1          MR. ALLINGHAM: I will try to simplify it
2  a little bit.
3  BY MR. ALLINGHAM:
4      Q.    During the course of this litigation, have you
5  ever gone back to search the litigation file to see
6  whether there are documents responsive to a production
7  request?
8          MR. GOSSELIN: Can we do it this way?
9  Can you ask her if she ever searched the litigation
10  file to give documents to her attorneys? I think I can
11  live with that one.
12          MR. ALLINGHAM: Okay.
13  BY MR. ALLINGHAM:
14      Q.    Did you ever search the litigation file to
15  give documents to your attorneys?
16      A.    Yes.
17      Q.    And did you do that in response to a request
18  from the attorneys?
19      A.    Yes.
20      Q.    And was that Mr. Balaguer and Mr. Cafferkey,
21  to the best of your recollection?
22      A.    Yes.
23      Q.    And have you ever searched that file since
24  that time?

17 (Pages 62 to 65)

Dobrich, et al.
Janet L. Hearn

v.
C.A. # 05-120-JJF

Indian River School District, et al.
November 14, 2006

Page 66

1    A.   I'm not sure. I may have. I'm not sure.
2    Q.   Am I correct that this was, this search of the
3    litigation file was conducted fairly early on in the
4    litigation?
5    A.   Yes.
6    Q.   Shortly after Mr. Balaguer and Mr. Cafferkey
7    joined the team?
8    A.   Yes.
9    Q.   When you receive parent complaints, do you
10   open a file relating to those complaints?
11   A.   We have a form that we use for parent
12   complaints when they call in, an expressed concern form
13   or something. Usually I document it on that.
14   Q.   So you would fill out a form that would sort
15   of reflect the substance of the complaint?
16   A.   Right.
17   Q.   And what would you do with that form, then,
18   give it to the superintendent?
19   A.   Give it to the superintendent.
20   Q.   And depending on the nature of the complaint,
21   the superintendent might take different courses to
22   investigate it; correct?
23   A.   Or, tell me to direct it to another person.
24   Q.   Sure.

Page 67

1         Do you open files beginning with that --
2    I have forgotten the name of it -- nature of complaint
3    file?
4    A.   No. I have a file that I keep for that year's
5    expressed concerns.
6    Q.   That's what it's called, expressed concerns?
7    A.   Expressed concerns, yes. And I just put them
8    all in the file for the 2005/2006 school year.
9    Q.   Okay. And do you keep those files or do you
10   throw them away at the end of the academic year?
11   A.   I throw them away at the end of the academic
12   year.
13   Q.   Have there been occasions when an
14   investigation of a parent complaint becomes
15   sufficiently involved that you open a separate file for
16   that particular complaint?
17   A.   Yes.
18   Q.   Is there any rule by which you decide whether
19   to open a file?
20   A.   Usually if it's resolved quickly I just file
21   the form, the expressed concern form in that file.
22        If it is an ongoing thing that doesn't
23   get resolved, I may start a separate file for that
24   particular parent complaint.

Page 68

1    Q.   And I know that this is not an exact science,
2    but when you say quickly, are you talking about with a
3    phone call or two or --
4    A.   Yes.
5    Q.   If something requires actually going out and
6    doing an investigation, it would be likely you would
7    open a separate file?
8    A.   Yes.
9    Q.   All right, I am going to go to a separate
10   topic just so you don't think I'm skipping around.
11        Do you have any role in preparing the
12   agenda for the school board meetings?
13   A.   Yeah, I do — yes.
14   Q.   What do you do?
15   A.   I do a draft agenda for the meeting.
16   Q.   How do you know what to put on it?
17   A.   I use the previous year's. Like when I get
18   ready to draft the November agenda, I go back to last
19   November's and take off things that are -- I just
20   review it and use the things that I think they will
21   need to go over again, you know, what needs to be on
22   there. And then the superintendent and her team add or
23   take off things from that. It's just a draft and they
24   take it to a meeting and they finalize it.

Page 69

1    Q.   So you --
2    A.   I start with a draft.
3    Q.   You put together an initial draft?
4    A.   Yes.
5    Q.   You give it to the superintendent?
6    A.   Uh-huh.
7    Q.   She and her team may add or delete items?
8    A.   Yes.
9    Q.   I have had testimony from Mr. Bireley that
10   sometimes the board president also adds items?
11   A.   Yes, that's correct.
12   Q.   Is there anybody else who is involved in the
13   preparation of the agenda?
14   A.   The vice president of the board. The day
15   before it's posted, an agenda is faxed to them for
16   their review.
17   Q.   Uh-huh.
18   A.   So it would be the vice president and the
19   president.
20   Q.   And am I correct that if any one of those
21   people wants an item on the agenda, you would simply
22   put it on, you don't exercise discretion about which
23   items to put on and which items not to put on?
24   A.   If they -- if any of the board members call

18 (Pages 66 to 69)

Dobrich, et al.
Janet L. Hearn

v.

C.A. # 05-120-JJF

Indian River School District, et al.
November 14, 2006

Page 70

1  and want to add something to the agenda, I share that
2  with the superintendent and she has the final say of
3  whether it will go on the agenda or whether it
4  wouldn't.
5      Q.   Is it typical that changes are made to the
6  draft agenda that you prepare?
7      A.   Yes.
8      Q.   Do you recall an agenda ever changing when the
9  added topic was school board prayer?
10     A.   I'm sorry, the question again?
11     Q.   Do you recall anyone asking you to add to an
12  agenda an item relating to school board prayer?
13     A.   I don't recall.
14     Q.   Do you recall anyone asking for an issue
15  relating to school board prayer to be deleted from the
16  agenda?
17     A.   I think there may have been an instance when
18  that happened, yes.
19     Q.   Do you remember when that occurred?
20     A.   No, I don't remember the date.
21     Q.   To give you some help on that, the board
22  meetings at which school board prayer was, it's
23  possible that school board prayer was discussed were
24  the June 2004, July 2004, and August 2004 board

Page 71

1  meetings.
2          At the September 2004 board meeting, the
3  policy on school board prayer got its first reading,
4  and then that policy was adopted in October of 2004.
5          So with that time frame, can you
6  identify more specifically for me when you recall a
7  school board prayer item was deleted from the agenda?
8      A.   No. But let me just go back. When you said
9  school board prayer, I guess I should say what I was
10  thinking about was not school board prayer, but the
11  lawsuit, the litigation. It doesn't necessarily -- I
12  mean it would be -- when it referred to the litigation
13  number of the Dobrich lawsuit. I think maybe there
14  was --
15     Q.   Okay, fair enough.
16     A.   Okay.
17     Q.   So you recall the deletion of discussion of
18  the lawsuit from agendas; you don't recall deletion of
19  simple discussion of school board prayer from the
20  agenda?
21     A.   I don't recall that, no.
22     Q.   Okay.
23          Am I right in thinking that the deletion
24  of the litigation from the agenda occurred some time

Page 72

1  after the litigation was actually filed?
2      A.   Yes.
3      Q.   And do you post the agenda on the board
4  website as well as posting it here in the district
5  building?
6      A.   Yes.
7      Q.   And when I say "do you," I mean you
8  personally, are you the one that does that?
9      A.   No.
10     Q.   Who does it?
11     A.   Dave Maull.
12     Q.   What's his position?
13     A.   He is actually our grant writer, but he takes
14  care of our website as well.
15     Q.   And is he also the person who posts the final
16  minutes on the website?
17     A.   Yes.
18     Q.   Am I correct that the minutes which are on the
19  website are identical to the minutes which are in your
20  public board minute book?
21     A.   Yes.
22     Q.   And am I correct that you are the person who
23  gives those final minutes to Mr. Maull for posting on
24  the web?

Page 73

1      A.   Yes.
2      Q.   I asked you if your duties changed when
3  Dr. Bunting replaced Mrs. Hobbs.
4          Did your duties change when Mrs. Hobbs
5  replaced Mr. Hudson?
6      A.   No.
7      Q.   Are agendas always prepared for board
8  meetings, that is, can you recall any instance in which
9  you convened a board meeting without having an agenda?
10     A.   No.
11     Q.   Are separate executive session agenda also
12  prepared for every meeting?
13     A.   Yes, there's a -- yes.
14     Q.   And who makes the decision what items go on
15  the regular agenda and what items go in the executive
16  session agenda?
17     A.   The superintendent.
18     Q.   Some of the minutes posted online have the
19  superintendent's signature and some do not. Do you
20  know why that is?
21     A.   Because I probably forgot to put the signature
22  on them.
23     Q.   And when you say forgot to put the signature
24  on them, do you mean you stamped the signature on the

19 (Pages 70 to 73)

Dobrich, et al.
Janet L. Hearn

v.
C.A. # 05-120-JJF

Indian River School District, et al.
November 14, 2006

Page 74

1  final minutes?
2  **A.   No. The superintendent signs the minutes.**
3  Q.   Yes.
4  **A.   And that's what's put in the binder.**
5  Q.   Yes.
6  **A.   When they're posted on the web, I don't have a**
7  **signature on the electronic copy.**
8  Q.   So how does the signature get on some of —
9  **A.   And I don't think with Dr. Bunting there are**
10  **any with a signature on it. There may be some with**
11  **Miss Hobbs because we had a stamp -- we had our**
12  **signature scanned, and I may have put those on --**
13  Q.   I see.
14  **A.   -- a couple of the minutes.**
15  Q.   Okay.
16  **A.   But I don't have Dr. Bunting's.**
17  Q.   I am going to show you a document which we
18  have previously marked as PX-9.
19       I am going to try to keep things short.
20  I will represent to you that this is the policy in the
21  board book on prayer at regular board meetings. And I
22  will also represent to you that in addition to the fact
23  that it was adopted at the October meeting, as you'll
24  see at the lower left-hand corner, that it got its

Page 75

1  first reading at a meeting in September.
2       Between that September meeting and its
3  adoption on October 19th, do you recall anyone asking
4  you for a copy of the proposed policy?
5  **A.   I don't recall.**
6  Q.   Am I correct that if someone had asked you for
7  a copy of the policy, you believe that you would have
8  directed them to submit a FOIA request?
9  **A.   I don't remember. I don't recall.**
10  Q.   So there's two sort of separate issues going
11  on here, one is do you actually recall someone asking
12  for a copy of the policy, and I gather that you do not
13  recall someone asking for a copy of it?
14  **A.   Right.**
15  Q.   But my second question was, if they had done
16  so, is it your expectation based on your practice that
17  you would have directed them to file a FOIA request?
18  **A.   I would have asked the superintendent.**
19  Q.   Before you directed them to file a FOIA
20  request?
21  **A.   Probably, because it was a draft policy and**
22  **not one of our policies.**
23  Q.   I see.
24       Can you recall any instance in which

Page 76

1  someone has asked for a copy of a draft or proposed
2  policy?
3  **A.   I don't remember.**
4  Q.   So if someone did ask for a draft policy, that
5  would be an unusual event, in your mind?
6  **A.   Yes.**
7  Q.   Do you know a woman named Susan Towers?
8  **A.   I've heard the name.**
9       MR. ALLINGHAM:   Let's mark as PX-68 a
10  document bearing Bates numbers BPD 282.
11       While the reporter's marking this, when I
12  say Bates number, I mean the number usually down in the
13  lower right-hand corner. It's the way we keep track of
14  what the documents are.
15       (PX-68 was marked for identification.)
16  BY MR. ALLINGHAM:
17  Q.   PX-68 is a letter on Indian River School
18  District letterhead from Miss Hobbs.
19       Do you recognize her signature on this
20  document?
21  **A.   Uh-huh, yes.**
22  Q.   And it appears that you were the person who
23  typed it, is that right, with a JLH down at the bottom?
24  **A.   Yes.**

Page 77

1  Q.   Are you the person who's responsible for
2  typing out letter responses to FOIA requests?
3  **A.   If it was from the superintendent, yes.**
4  Q.   Does reference to PX-68 refresh your
5  recollection that Susan Towers made a FOIA request to
6  the Indian River School District on January 27, 2005,
7  or thereabouts?
8  **A.   Yes, she must have, yes.**
9  Q.   And do you recall what documents Ms. Towers
10  asked for?
11  **A.   No, I don't.**
12  Q.   Ms. Hobbs' response in the second paragraph
13  suggests that the documents that were requested
14  pertained to pending or potential litigation and are
15  not records of any court.
16       Do you recall having any discussion with
17  anyone about a response to a FOIA request for documents
18  that relate to pending or potential litigation?
19  **A.   I don't remember.**
20  Q.   This is in late January/early February of
21  2005. Do you recall any discussions with Ms. Hobbs
22  about this issue?
23  **A.   No. I don't remember.**
24  Q.   You told me earlier that you keep a file of

20 (Pages 74 to 77)

Dobrich, et al.                                                v.                            Indian River School District, et al.
Janet L. Hearn                                    C.A. # 05-120-JJF                                   November 14, 2006

Page 78

1  all the FOIA requests for a given academic year and
2  then discard them at the end of the academic year.
3           How many FOIA requests do you get in a
4  given year?
5     A.  It's rare that I get a FOIA request.  One or
6  two --
7     Q.  Less than half a dozen?
8     A.  Oh, yes, less than half a dozen.  If I get a
9  couple a year, that would be a pretty good average.
10    Q.  So is it fair for me to assume that in the
11 academic school year 2004/2005 you probably only got
12 one or two or three FOIA requests?
13    A.  That's correct.
14    Q.  But nevertheless you have no memory that a
15 reporter from The Wave made a FOIA request in the
16 2004/2005 school year?
17    A.  I don't remember.
18    Q.  Now, when you say you don't remember, does
19 that mean you don't remember what Ms. Towers requested
20 or you just have no memory at all that a reporter from
21 The Delaware Wave made a FOIA request?
22    A.  Well, after you read this, of course she must
23 have made a request.
24    Q.  I understand, and actually --

Page 79

1     A.  But I don't remember.  I don't remember.  I
2  don't remember what she requested.
3     Q.  And I understand that people look at a
4  document like this and you say, well, she must have
5  made one.  What I'm trying to get at is, it might be
6  that this refreshes your recollection, but do you have
7  an independent memory that a reporter from The Delaware
8  Wave made a FOIA request to you or are you just saying
9  it must have happened because I see it in this
10 document?
11    A.  I don't remember -- you know, I don't recall.
12 Like I said, you see it in this document, obviously she
13 must have made a request.  But I don't remember it.
14    Q.  Okay.
15           Do you know what Susan Towers looks
16 like?
17    A.  No, I don't.
18    Q.  Okay.
19           So I take it you have no memory of having
20 had Miss Towers walk up to your office and say, I'd
21 like to get some documents, because you'd remember her
22 if she did?
23    A.  I don't remember.
24    Q.  Do you know a woman named Sharon Powell?

Page 80

1     A.  No.
2     Q.  If a former principal asked you for copies of
3  district policies, would you require that principal to
4  give, to make a FOIA request?
5     A.  A former principal?
6     Q.  Yes, ma'am.
7     A.  I don't know if I would require them or not.
8  Probably -- probably not.
9     Q.  Do you know Lewis Patterson?
10    A.  Yes.
11    Q.  Do you know whether Mr. Patterson ever asked
12 for copies of district policies after he left the
13 employ of the district?
14    A.  Oh, I don't recall whether he did or didn't.
15 I don't know.
16    Q.  Do you recall a parent ever submitting a FOIA
17 request for communications relating to any
18 investigation into prayer practices in the district
19 schools?
20    A.  I don't remember.
21    Q.  Are you the person who would -- let me ask it
22 a different way.
23           If the state department of education
24 contacted the district about a complaint received from

Page 81

1  a parent, would that mail come in to you?  Are you the
2  person who opens --
3     A.  If it was to the superintendent, yes.
4     Q.  Yes, okay.  And do you know who Valerie
5  Woodruff is?
6     A.  Yes.
7     Q.  Did Valerie Woodruff ever contact the district
8  about a complaint received from a district parent about
9  prayer in the district?
10    A.  I don't remember.
11           MR. ALLINGHAM:  Okay.  Well, we have
12 about three minutes left.  We can change the tape and
13 why don't we break for lunch.
14           VIDEO SPECIALIST:  Going off the record
15 at approximately 1:15 p.m.
16           (Lunch recess.)
17           VIDEO SPECIALIST:  We're back on the
18 record at approximately 2:15 p.m.
19 BY MR. ALLINGHAM:
20    Q.  Mrs. Hearn, you testified before the lunch
21 break that you keep the FOIA requests that you receive
22 in a file for the academic year in which they're
23 received; correct?
24    A.  Yes.

21 (Pages 78 to 81)

Dobrich, et al.                              v.                Indian River School District, et al.
Janet L. Hearn                        C.A. # 05-120-JJF                      November 14, 2006

Page 82

1    Q.   And you testified that at the end of the
2    academic year you discard or shred those documents?
3    A.   Sometimes I do. I'm not sure without going
4    back and look to see, you know, when the last time was
5    that I -- I don't always have time to go through and
6    get files cleaned up and that sort of thing from one
7    year to the next.
8    Q.   So that was my next question. Do you know as
9    you sit here today whether you have the 2005/2006
10   school year FOIA requests?
11   A.   I don't know for sure, but there's a
12   possibility that I might have it.
13   Q.   And do you know whether you have the 2004/2005
14   school year FOIA requests?
15   A.   I don't know for sure. I'd have to look to
16   see if they're still there.
17   Q.   If they're not there, is it correct that you
18   shredded those documents?
19   A.   Yes.
20   Q.   As I said it, those files would be pretty
21   skinny; correct?
22   A.   Yes.
23   Q.   It's a one-page request?
24   A.   It's a one-page request, yes.

Page 83

1    Q.   Is there a reason why you get rid of it? It
2    doesn't take up very much space.
3    A.   Just that I wouldn't think that I would need
4    them again.
5    Q.   You also testified before the break that the
6    policy committee keeps the draft policies after their
7    first reading; correct? You don't have them?
8    A.   I don't have them. Mary Anne Cordrey, who is
9    the secretary to the assistant superintendent, works on
10   the policy things.
11   Q.   I see.
12   A.   She does the policy committee work.
13   Q.   And so if you get a FOIA request for a policy
14   that's gone through first reading, but is not yet
15   adopted, do you pass that on to Miss Cordrey?
16   A.   No, I don't pass the FOIA request on.
17   Q.   Is it the case, then, if you got a FOIA
18   request for a adopted policy, you would ask the
19   superintendent whether you should provide it and then
20   go to Ms. Cordrey and get the document if the
21   superintendent said yes, you should provide it?
22   A.   If the superintendent said yes, I should
23   provide it, I would probably have a first draft copy
24   and I would probably just go to my board book and get

Page 84

1    it out of there.
2    Q.   Because you provide board members with a copy
3    in their board package of policies that are being
4    presented for first reading; correct?
5    A.   Yes.
6    Q.   In your decision whether to shred FOIA
7    requests or not, do you draw any distinction between
8    requests that are granted and requests that are denied,
9    or do you --
10   A.   No.
11   Q.   It would be the whole file?
12   A.   Uh-huh.
13   Q.   Whatever you did to the whole file, you would
14   do to the whole file?
15   A.   Yes.
16   Q.   Am I right that the matter of FOIA compliance
17   became more important to the district in 2000 or 2001
18   after an attorney general opinion on that issue?
19         MR. GOSSELIN: Objection.
20   BY MR. ALLINGHAM:
21   Q.   Well, let me lay the foundation first. Do you
22   recall that the attorney general of the State of
23   Delaware issued an opinion after the Indian River
24   School District denied a FOIA request instructing the

Page 85

1    district to comply with the request and telling it that
2    it's prior practice was incorrect?
3    A.   I don't remember.
4         MR. ALLINGHAM: Let's mark as Exhibit 69
5    a document which I got from the web off the State of
6    Delaware website.
7         (PX-69 was marked for identification.)
8    BY MR. ALLINGHAM:
9    Q.   I don't want to ask you about the substance of
10   the complaint, which is outside of the bounds of this
11   deposition. I simply want to ask you -- although if it
12   helps you to remember the issue, you can read the whole
13   letter -- my question to you is, do you recall
14   responding to a Freedom of Information Act complaint
15   against the Indian River School District in early 2001?
16   A.   I don't remember.
17   Q.   Are you the person who's responsible for
18   coordinating FOIA requests and responding to
19   complaints?
20   A.   The superintendent would be responsible for
21   that.
22   Q.   But the superintendent does all of her
23   clerical work through you; correct?
24   A.   Right. Yes.

22 (Pages 82 to 85)

Dobrich, et al.                              v.                    Indian River School District, et al.
Janet L. Hearn                      C.A. # 05-120-JJF                        November 14, 2006

Page 86

1    Q.   But you don't recall having prepared any
2    response to a Freedom of Information Act complaint in
3    early 2001?
4    A.   No, I don't remember it.
5    Q.   Do you recall any discussion, either at the
6    board meeting or with the superintendent, of the fact
7    that the attorney general of the State of Delaware had
8    issued an opinion finding the Indian River School Board
9    in violation of the Freedom of Information Act?
10   A.   I don't remember it.
11   Q.   Am I then correct that, since you don't recall
12   the opinion, you don't recall a heightened sense of
13   awareness about FOIA compliance at the Indian River
14   School District after this opinion issued?
15   A.   Would you restate the question?
16   Q.   I will withdraw it. That's what we call
17   argument.
18        Mrs. Hearn, as I said earlier, the
19   school board prayer issue came up at the board level in
20   2004. Do you recall at any time during 2004 the
21   district implementing a policy, whether formally as a
22   board policy or informally, of not responding to any
23   complaints regarding board prayer or prayers in the
24   schools?

Page 87

1    A.   No.
2    Q.   Do you know whether -- are you aware of an
3    instance in which a school principal received a
4    complaint from a parent about a teacher's behavior in
5    school and then sent that complaint on to the teacher?
6        MR. GOSSELIN:   Can you say that again?
7        MR. ALLINGHAM:   Yes.
8    BY MR. ALLINGHAM:
9    Q.   Do you understand my question?
10   A.   No.
11   Q.   I'm asking about a possible instance in which
12   a principal of a district school received a complaint
13   about a teacher from a parent and forwarded that
14   complaint on to the teacher?
15   A.   I don't remember.
16   Q.   Are you aware of any instance in which a
17   principal in the district received a complaint from a
18   parent about a teacher and forwarded that complaint on
19   to the district where you were involved in the
20   processing of that complaint?
21   A.   Could you restate that again?
22   Q.   Sure. And it may make it easier if I give you
23   sort of an introductory question.
24        From time to time you as the secretary

Page 88

1    to the superintendent received complaints directly from
2    parents; correct?
3    A.   Yes.
4    Q.   All right. Do you, from time to time, also
5    receive complaints that are forwarded to you from
6    principals who are the ones who initially receive the
7    complaint?
8    A.   Yes.
9    Q.   Okay. And do you record those in the same
10   way, that is, you would take out one of the -- I forgot
11   the name again --
12   A.   Expressed concerns.
13   Q.   Expressed concern forms and write down what
14   the principal told you passing on the parents'
15   complaint?
16   A.   I might use that form or I might just take a
17   note and write it down for the superintendent.
18   Q.   Is there any policy in the district pursuant
19   to which school principals are required to forward
20   parent complaints on to the superintendent?
21   A.   I don't recall any policy.
22   Q.   I asked you before the lunch break about the
23   audio recording of meetings, the audiotape recording.
24        Are you the person who tapes the

Page 89

1    meetings?
2    A.   Yes, with my tape recorder, yes.
3    Q.   And when you say your tape recorder, it's a
4    tape recorder that belongs to you?
5    A.   Well, no. It's a tape recorder that belongs
6    to the district, but it's the one that I operate.
7    Q.   Okay. Has it, since you started, always been
8    the same kind of tape recorder?
9    A.   No. It was, I think prior to 1996 it was a
10   cassette tape recorder that we used, and then around
11   1996 or '97, we bought a new recorder which uses the
12   micro cassettes.
13   Q.   All right. So your practice is that when you
14   see that the president of the board is ready to start
15   the meeting, you just push the record button on the
16   tape recorder?
17   A.   Yes.
18   Q.   Do you ever forget?
19   A.   Yes, I do.
20   Q.   And as soon as you remember --
21   A.   As soon as I remember, I push it.
22   Q.   Okay.
23        And then I take it that the machine keeps
24   taping until the meeting ends.

23 (Pages 86 to 89)

Dobrich, et al.                                    v.                Indian River School District, et al.
Janet L. Hearn                         C.A. # 05-120-JJF                         November 14, 2006

Page 90

1   A.  Yes.
2   Q.  All right.
3        Do you sometimes have to change the
4   tape?
5   A.  Yes.
6   Q.  I'm trying to imagine the situation. Is the
7   machine right in front of you so you can just reach
8   over and get it?
9   A.  Yes, yes.
10  Q.  Are you also in charge of changing the tape?
11  A.  Yes.
12  Q.  Or turning it over?
13  A.  Yes.
14  Q.  I always do what I'm told so I'm going to ask
15  you a question. Once you switched over to micro
16  cassettes, did you always use micro cassettes or did
17  you switch back and forth to the cassette machine?
18  A.  I think I've used micro cassettes since I
19  got -- since I switched over.
20  Q.  Do you continue tape recording the proceeding
21  even after the board goes into executive session?
22  A.  Previous to July of 2005, yes.
23  Q.  And what happened in July of 2005?
24  A.  Our attorney advised us not to tape executive

Page 91

1   session meetings.
2   Q.  And that was Mr. Griffin?
3   A.  Yes. And --
4        MR. GOSSELIN: I'm issuing a belated
5   objection. I didn't realize that was --
6        MR. ALLINGHAM: I'll affirmatively tell
7   you that I won't argue that that's a waiver.
8        MR. GOSSELIN: Okay.
9   BY MR. ALLINGHAM:
10  Q.  What Mr. Gosselin is talking about is you can
11  always testify about a fact like we stopped taping the
12  meetings, but your answer was a little different. It
13  was who told you to do it. So I'm going to try to
14  focus just on the facts, okay?
15  A.  Okay.
16  Q.  So beginning at the July of 2005 meeting, you
17  stopped taping all meetings or just the executive
18  sessions?
19  A.  Just the executive session.
20  Q.  Okay. So from July 2005 onward, there is no
21  audiotape of the executive sessions; correct?
22  A.  Yes.
23  Q.  But you continued to take your steno notes;
24  correct?

Page 92

1   A.  Yes.
2   Q.  And by the way, those notes, are they taken --
3   do you take Gregg shorthand, do you take a particular
4   system of shorthand or is it your own?
5   A.  Well, it's some of Gregg shorthand and then
6   some of my shorthand.
7   Q.  Is that the way most people do it, you start
8   out with Gregg?
9   A.  Probably, you start out with Gregg and then
10  make your own.
11  Q.  I take no shorthand at all.
12        Does that mean that only a person who
13  writes the notes could read the notes? Or let me make
14  it specific. In your case, could a person who knows
15  Gregg read your notes?
16  A.  They could make out some forms, yes. I don't
17  know that they would be able to read all of it.
18  Q.  What happens to the audiotapes at the end of a
19  board meeting?
20  A.  I pack them with my board materials and bring
21  them back here.
22  Q.  And is there a file of those tapes?
23  A.  Uh-huh.
24  Q.  You have to say yes or no.

Page 93

1   A.  Yes, yes. Sorry.
2   Q.  And I take it it's a separate file from the
3   binder --
4   A.  Yes.
5   Q.  -- since you can't put a tape in the binder?
6   Is it just a file that says audiotapes?
7   A.  It's just a manila folder that says the year,
8   fiscal year with the tapes in them.
9   Q.  And I take it you don't shred or discard the
10  tapes?
11  A.  No.
12  Q.  You keep those?
13  A.  Yes, keep them.
14  Q.  If a resident of the district wanted to hear
15  the tapes of a board meeting that they weren't able to
16  attend, would you -- and made a request to do so, would
17  you ask them to file a FOIA request?
18  A.  I would first ask the superintendent what she
19  wanted me to do, because I've never had anyone ask me
20  that.
21  Q.  Okay.
22        And so that was actually my next
23  question, what would you do? Your answer is you would
24  ask the superintendent?

24 (Pages 90 to 93)

Dobrich, et al.                          v.                Indian River School District, et al.
Janet L. Hearn                  C.A. # 05-120-JJF                      November 14, 2006

Page 94

1   A.  I would ask the superintendent.
2   Q.  Has any board member ever requested copies of
3   the audiotapes?
4   A.  I don't remember anybody ever asking for them,
5   no.
6   Q.  Or asked to listen to portions of the
7   audiotapes?
8   A.  No.
9   Q.  When you take your shorthand notes, is it your
10  goal to try to create a verbatim record of what's being
11  said?
12  A.  No.
13  Q.  How do you decide what to take notes of and
14  what not to take notes of?
15  A.  I just try to make notes of the important
16  things that I think will need to be addressed in the
17  minutes.
18  Q.  Do you gather notes from the board members at
19  the end of the meetings --
20  A.  No.
21  Q.  -- that they have prepared?
22  A.  No.
23  Q.  Do you know whether any board members have a
24  custom or practice of making notes at the board

Page 95

1   meetings?
2   A.  I think some of them make notes during the
3   meeting.
4   Q.  Do you know who?
5   A.  No. No. I'm busily sitting writing my own
6   notes. I don't usually --
7   Q.  So what leads you to think that some of the
8   board members make notes, have you seen them doing so?
9   A.  I have seen some of them doing, making some
10  notes at some times when I'm -- look up or --
11  Q.  Can you recall any particular board member
12  that you've seen making notes?
13  A.  I guess I would have to say it's usually the
14  vice president that I sit next to.
15  Q.  Uh-huh. Mr. Savage?
16  A.  No.
17  Q.  Sorry.
18  A.  The vice president of the board.
19  Q.  Who do you sit next to?
20  A.  Well, the vice president of the board of
21  education, which changes.
22  Q.  Sorry.
23  A.  It's not always the same person.
24  Q.  So who are those, who have those people been

Page 96

1   since 1991?
2   A.  Oh --
3   Q.  Who is it today?
4   A.  It's Mr. Helms now.
5   Q.  And before Mr. Helms?
6   A.  Before Mr. Helms, it was Mr. Evans.
7       I'd have to look back. I can't
8   remember.
9   Q.  I take it, at least, that you recall from time
10  to time Mr. Helms and/or Mr. Evans making notes at
11  board meetings?
12  A.  Or writing something on their agenda. I don't
13  know exactly what it was, but --
14  Q.  Okay.
15  A.  -- they had an agenda to go by and they might
16  write something by it.
17  Q.  Do you have a practice as to when you prepare
18  your draft minutes?
19  A.  No. It depends on my workload.
20  Q.  Is it your goal to have them prepared before
21  the next board meeting?
22  A.  Oh, yes, definitely.
23  Q.  Has there ever been an instance in which you
24  didn't have draft minutes prepared before the next

Page 97

1   board meeting?
2   A.  Yes, there has.
3   Q.  Do you specifically recall an instance in
4   which that happened?
5   A.  I can't remember the date. I can't remember
6   the date.
7   Q.  Do you remember anything about it? Can you
8   recall what prompted you to be -- not to meet your goal
9   of having minutes ready for the next board meeting?
10  A.  No, not really.
11  Q.  Since 1991, am I correct that the board has
12  always opened its regular meetings with a prayer or a
13  moment of silence?
14  A.  Yes.
15  Q.  And from 1991 until October 19th, 2004, when
16  the current board policy was adopted, am I correct that
17  the board always opened its meetings with a prayer?
18  A.  Yes, the regular meetings.
19  Q.  Yes, I meant regular meetings.
20      With very rare exceptions, the minutes
21  do not reflect the text of the prayer.
22      Is there a reason for that?
23  A.  Would you restate that question?
24  Q.  I'll say it differently.

25 (Pages 94 to 97)

Dobrich, et al.                                    v.                     Indian River School District, et al.
Janet L. Hearn                          C.A. # 05-120-JJF                          November 14, 2006

Page 98

1    There are a few instances in which the
2  minutes reflect what the actual prayer that was said.
3  In most cases that's not true, that is to say, the
4  minutes do not reflect the text of the prayer.
5        How do you decide whether to reflect the
6  text of the prayer or not?
7  **A.   Most of the time I usually just put the prayer**
8  **was given by whatever board member was giving the**
9  **prayer.**
10  Q.   Yes, that's correct, that is what you seem to
11  have done in the minutes.
12  **A.   Right.**
13  Q.   The question is, in the instances in which you
14  provide additional detail, why do you do that?  Is it
15  at the request of board members, is it just an
16  accident?
17  **A.   I don't remember.**
18  Q.   I am going to show you a set of minutes from
19  March 22, 2005, a year and a half ago, after the
20  board prayer policy was adopted.
21        These have been marked as PX-54.
22        I have an extra one, Jason.
23        MR. GOSSELIN:  Yes, can I have an extra
24  one?

Page 99

1        MR. ALLINGHAM:  Yes.
2  BY MR. ALLINGHAM:
3  Q.   If you look at the first -- these are the
4  official minutes, that have been identified as the
5  official minutes of March 22, 2005.  About halfway down
6  the page, you'll see that your minutes reflect that
7  President Walls noted that it is the history of the
8  board to have a prayer at the beginning of the meeting,
9  which is voluntary among the members of the board of
10  education and the audience is not required to
11  participate.
12        Now, my first question to you is, is the
13  text of what President Walls said, is that something
14  that you copy off a piece of paper that you have or do
15  you take down what he says?
16  **A.   It's not word for word what he says.**
17  **That's -- I believe this is part of the policy and**
18  **that's what that line refers to.**
19  Q.   And my question to you is, when you put this
20  into your minutes, this, what the president says --
21  **A.   Uh-huh.**
22  Q.   -- before the prayer, do you copy it from the
23  policy, do you copy it from something that the board
24  president is reading from, do you just paraphrase from

Page 100

1  your notes?
2  **A.   I paraphrase it.**
3  Q.   From your notes?
4  **A.   Yes.**
5  Q.   And then the minutes read, "President Walls
6  then read a prayer which was part of a speech given by
7  Dr. Martin Luther King."
8        Now, my question to you is why did you
9  include the description that this prayer was part of a
10  speech given by Dr. Martin Luther King?
11  **A.   I don't remember.**
12  Q.   Did President Walls ask you --
13  **A.   He may -- I don't remember.  I don't recall**
14  **whether he asked me to put that in there or not.**
15  Q.   Do you recall a board member ever saying to
16  you before you prepared your draft minutes, please make
17  sure that you put in something?
18  **A.   Would you restate the question?**
19  Q.   
20        Do you recall a board member ever having
21  said to you, before you prepared your draft minutes,
22  Mrs. Hearn, please be sure to include in your draft
23  minutes X, something that he wanted, he or she wanted
24  included in the minutes?

Page 101

1  **A.   I have had a board member maybe say,**
2  **Mrs. Hearn, please make sure the record shows blah,**
3  **blah, blah.**
4  Q.   Yes.
5  **A.   Yes, I have.**
6  Q.   But you don't recall whether Mr. Walls said to
7  you, please make sure the record reflects that my
8  prayer was from a speech from Dr. King?
9  **A.   I don't remember.**
10  Q.   And you don't have any other memory of why you
11  put that into these particular minutes?
12  **A.   No, I don't.**
13  Q.   Have you ever been given a copy of prayers
14  that board members have offered, a piece of paper that
15  has the text of the prayer?
16  **A.   I don't remember seeing anything.**
17  Q.   When you said a few questions earlier that you
18  can recall board members having said, Mrs. Hearn,
19  please make sure that the record reflects something,
20  can you recall specifically any of the subjects that
21  the board members were speaking about?
22  **A.   No.**
23  Q.   The draft minutes are included in the board
24  packet; is that correct?

26 (Pages 98 to 101)

Dobrich, et al.                                    v.                    Indian River School District, et al.
Janet L. Hearn                              C.A. # 05-120-JJF                        November 14, 2006

Page 102

1   A.   Yes.
2   Q.   Not separately sent to the board members?
3   A.   No.
4   Q.   All right, I'm going to ask you a question
5   that I just want a yes or no answer to, and I'm telling
6   you that because if you say more than yes or no it
7   might implicate the attorney-client privilege; okay?
8   A.   Okay.
9   Q.   I don't want to know the content of the
10  communication.
11        Have the board's attorneys ever spoken
12  to you about your practices in preparing minutes?
13  A.   No.
14  Q.   Has anyone ever told you to write the minutes
15  in a specific way? For example, Mrs. Hearn, you've got
16  to stop including so much detail, or, Mrs. Hearn, you
17  really need to put more detail into the minutes, or
18  anything like that?
19  A.   No, no.
20  Q.   In the public comment section of the minutes,
21  is it your practice to note each person who speaks and
22  then to summarize what they say?
23  A.   Yes. Or refer to the topic that they've
24  spoken on.

Page 103

1   Q.   This is a document we previously marked as
2   PX-16.
3        Again, it's been identified previously
4   as the official final version of the minutes of the
5   July 27th, 2004 board meeting. Again, to put this in
6   perspective, this is the second meeting at which the
7   topic of prayer was addressed.
8        If you look at the public comment
9   section on Page 2, you'll see that there are 12 people
10  listed as having spoken about the practice of holding
11  prayers at school sponsored events, including
12  graduation ceremonies, do you see that?
13  A.   Yes.
14  Q.   And then you recorded that comments were
15  equally made in favor of continuing and discontinuing
16  the present practice.
17        Did anyone tell you to put that into the
18  minutes?
19  A.   I don't remember. I may have discussed with
20  the superintendent how she wanted me to handle that.
21  Q.   And is it your best recollection that the
22  superintendent told you to put in something along the
23  lines of comments were being made in favor of
24  continuing and discontinuing the present practice?

Page 104

1   A.   I'm not sure if those were her words exactly.
2   Q.   I meant words or substance.
3   A.   Right. Well, obviously because she approved
4   the minutes after they were done, so she agreed — I
5   mean.
6   Q.   I think it's clear that she agreed with what
7   was said there, but the question was, who suggested
8   that this summary of the positions be included in the
9   public comment section, was that Mrs. Hobbs who
10  suggested that?
11  A.   I really don't remember.
12  Q.   Would it have been your practice to sort of
13  keep track of which way people were voting in their
14  comments?
15  A.   No.
16  Q.   Would you infer from that that somebody else
17  probably told you to put this in?
18  A.   I don't remember.
19  Q.   Mrs. Hearn, do you believe that the idea to
20  put in the concept of who voted for what position, do
21  you believe that that, it was your idea initially to
22  put that into these minutes?
23  A.   I don't, I don't remember.
24  Q.   Isn't it, hasn't it been your practice since

Page 105

1   you became board secretary to briefly summarize the
2   comments of each person who speaks at the public
3   comment session?
4   A.   Yes.
5   Q.   And did the superintendent tell you not to
6   summarize the comments of these 12 people in your
7   minutes for July 27?
8   A.   No, she did not tell me that.
9   Q.   Why did you depart from your normal practice
10  here?
11  A.   Because of the number of people who spoke and
12  were speaking to the same issue, topic, I just composed
13  the minutes this way.
14  Q.   I am going to show you a document we have
15  previously marked as PX-56. I'm sorry, can you reach
16  that?
17        It's a fine line. I'm afraid of
18  knocking over someone's coffee cup if I throw too hard.
19        MR. GOSSELIN: Did we mark this Susan
20  Towers letter? 68?
21        MR. ALLINGHAM: Yes.
22  BY MR. ALLINGHAM:
23  Q.   If you look at Page 5, there are 11 persons or
24  groups listed as having spoken in the public comment

27 (Pages 102 to 105)

Dobrich, et al.                                    v.                    Indian River School District, et al.
Janet L. Hearn                          C.A. # 05-120-JJF                          November 14, 2006

Page 106

1  section. And in the second public comment section,
2  which is over on Page 11, there are six more persons
3  listed as having spoken.
4        This is a larger number than spoke at
5  the July 24th meeting, but you have individually
6  summarized each person's comments. Was there a reason
7  for summarizing the individual person's comments here
8  but not summarizing the school board prayer comments on
9  July 24th?
10  **A.   I don't know of any, no.**
11  Q.    Did you have a practice of not recording the
12  individual comments of persons who spoke on topics that
13  you thought were controversial?
14  **A.   No.**
15  Q.    The treatment of the public comments here is
16  consistent with your practice of summarizing each
17  person's comments; is that right?
18  **A.   Yes.**
19        MR. ALLINGHAM: Let's mark as PX-70 a
20  document bearing Bates numbers BPD 289 to 301.
21        (PX-70 was marked for identification.)
22  BY MR. ALLINGHAM:
23  Q.    Over on Page 4 you'll see that the public
24  comment section begins. By the way, I guess I should

Page 107

1  ask a preliminary question. These minutes bear
2  Mrs. Hobbs' signature; is that right?
3  **A.   Uh-huh, yes.**
4  Q.    And is it your belief that these are the final
5  minutes of the April 26th, 2005 board meeting?
6  **A.   I think they are, yes.**
7  Q.    On Page 4, and continuing over to Page 5, in
8  the public comment section, you'll see, and confirm it
9  with me if you'd like, that there are nine persons who
10  spoke at the public comment section; correct?
11  **A.   Ten.**
12  Q.    Ten?
13  **A.   Ten.**
14  Q.    I guess ten if you count the Bethany-Fenwick
15  Chamber of Commerce?
16  **A.   Oh, well --**
17  Q.    Which probably makes sense since it is
18  specific comments.
19  **A.   Oh, I'm sorry, maybe I wasn't supposed to**
20  **count them.**
21  Q.    And then on Page 12 there's an 11th comment
22  from a member of the public.
23        In each case you've summarized the
24  comments of these speakers, which I gather is in

Page 108

1  accordance with your practice; correct?
2  **A.   Yes.**
3  Q.    And to sort of cut through this, you don't
4  recall why you summarized all these comments but didn't
5  summarize the comments at the July 24th meeting;
6  correct?
7  **A.   That's correct, I don't recall.**
8  Q.    This is a document that we have previously
9  marked as PX-17.
10        We have had testimony that these are the
11  official minutes of the August 24th, 2004 meeting.
12        On Page 4, you will find the public
13  comment section. Here you record the topic of the
14  comments at the public comment section but do not
15  summarize the positions of the people who spoke, as you
16  did in July. Do you know why that is?
17  **A.   No, I don't.**
18  Q.    Did you have any discussions with anyone about
19  whether you should summarize the positions of the
20  persons who spoke at the public comment section?
21  **A.   I don't remember whether I had a conversation**
22  **with anyone about it or not.**
23  Q.    When you do record the individual, summarize
24  the individual comments of the persons who speak at the

Page 109

1  public comment section, am I correct that you record
2  them in the order that those comments are given?
3  **A.   Yes, usually, yes.**
4  Q.    And would I also be correct that here where
5  you just give the people's names, that you put the
6  names in the order that they spoke in?
7  **A.   Yes.**
8  Q.    So that Mrs. Dobrich spoke first and someone
9  named either Collin or Colleen Waters spoke last?
10  **A.   Yes.**
11  Q.    In the, do your stenographic notes -- did you
12  take stenographic notes of what the public, or persons
13  who spoke at the public commentary section of the
14  August 24 meeting said?
15  **A.   I don't remember. I'd have to go back and**
16  **look. I don't know if I --**
17  Q.    It is your practice to at least make some
18  notes about what they say in order to be able to
19  summarize their comments; is that right?
20  **A.   Yes.**
21  Q.    I'm sorry, I may have asked you this and if I
22  did, I apologize. Did anyone tell you not to summarize
23  the individual comments of the speakers at the August
24  24th meeting?

28 (Pages 106 to 109)

Dobrich, et al.                          v.                    Indian River School District, et al.
Janet L. Hearn                    C.A. # 05-120-JJF                      November 14, 2006

Page 110

1    A.    I don't recall anyone telling me that.
2    Q.    Okay.
3          The minutes all have a section that says
4    visitors and others in attendance.
5    A.    Uh-huh.
6    Q.    How do you compile the list of people who are
7    in attendance?
8    A.    We have a sign-in sheet.
9    Q.    And so what you're doing in the minutes is
10   simply replicating the names of the people on the
11   sign-in sheet; correct?
12   A.    Yes.
13   Q.    If somebody doesn't sign in --
14   A.    They don't get their name in there.
15   Q.    And do you have any idea whether people who
16   attend the meeting usually sign in or don't sign in?
17   A.    Most of them usually sign in. We -- there's a
18   sheet provided and most of the time, you know, they
19   sign in as they come in.
20   Q.    I gather from that answer that you believe it
21   likely that there are times when people don't sign
22   in --
23   A.    Yes, there are times when they don't sign in,
24   that's correct.

Page 111

1    Q.    If a person is listed under the public comment
2    section in the minutes, does that indicate that the
3    person actually spoke at the meeting?
4    A.    If they're listed under the public comment
5    section?
6    Q.    Yes.
7    A.    Yes.
8    Q.    In the August 24th minutes, PX-17 that I put
9    before you a little earlier -- it's right in front on
10   top -- on Page 4, the second speaker listed is Alex
11   Dobrich.
12         Do you know whether your notes reflect
13   what Alex Dobrich said at the meeting?
14   A.    I don't recall.
15   Q.    Do you recall whether Alex Dobrich spoke at
16   the meeting?
17   A.    I don't remember.
18   Q.    Do you remember anything about this August
19   24th meeting?
20   A.    Yes.
21   Q.    What do you recall?
22   A.    I'm sorry, I don't understand the question. I
23   mean I was at the meeting so I don't know what you --
24   Q.    Well, were there a lot of people at the

Page 112

1    meeting?
2    A.    Yes, there were a lot of people at the
3    meeting.
4    Q.    We talked earlier about your having
5    anticipated that there would be a lot of people at the
6    meeting; correct?
7    A.    Right, yes.
8    Q.    How did you come to learn that there would be
9    a big crowd at the meeting?
10   A.    I learned it through the superintendent, that
11   she anticipated a big crowd. Now, I can't tell you
12   where exactly she got it. That's where I learned it
13   from, Mrs. Hobbs.
14   Q.    Yes, ma'am. So the first time you heard that
15   there would be a big crowd was from Mrs. Hobbs?
16   A.    Uh-huh, yes.
17   Q.    Okay.
18         At the meeting itself, did you -- did it
19   seem to you that it was -- strike that.
20         Are you familiar with the term "crowd
21   mentality"?
22   A.    No, I guess not.
23   Q.    Did it seem to you that people were behaving
24   at the August 24th meeting in a way different from the

Page 113

1    way they would behave if they were not in a large
2    crowd?
3          MR. GOSSELIN: Objection.
4          You can answer, if you can.
5          THE WITNESS: I don't know. I don't
6    understand what you're asking me.
7    BY MR. ALLINGHAM:
8    Q.    I'm reading from the board prayer policy. It
9    reads, the first words in the policy are, "in order to
10   solemnify its proceedings."
11         Did it seem to you that the August 24th
12   board meeting was conducted in a respectful and
13   courteous way toward the Dobriches?
14   A.    Yes.
15   Q.    And did you think that throughout the public
16   comment section of the meeting?
17   A.    In my opinion, yes.
18   Q.    Do you recall people booing during
19   Mrs. Dobrich's comments during the public comment
20   section?
21   A.    They may have. I'm not sure.
22   Q.    I assume we could agree that booing during a
23   person's comments during the public comment section
24   would not be respectful and courteous, in your opinion?

29 (Pages 110 to 113)

Case 1:05-cv-00120-JJF   Document 283-6   Filed 06/19/2008   Page 30 of 45

Dobrich, et al.                                    v.                    Indian River School District, et al.
Janet L. Hearn                          C.A. # 05-120-JJF                        November 14, 2006

Page 114

1   A.   That's correct.
2   Q.   Do you recall hearing any disrespectful
3   comments during Mrs. Dobrich's comments, the appearance
4   at the podium of her son Alex or daughter Samantha?
5   A.   I'm sorry, would you repeat that?
6   Q.   Do you recall hearing any disrespectful
7   comments during their comments during the public
8   comment section?
9   A.   I don't remember.
10  Q.   Do you recall being disturbed by the behavior
11  of the crowd during the August 24th meeting?
12  A.   I don't -- no, I wasn't disturbed.
13  Q.   Did it seem to you that the crowd at the
14  meeting was behaving the way that visitors to the
15  meetings usually behaved?
16       I'll withdraw the question.
17       When I asked you whether you were
18  disturbed you said no, you were not disturbed, but you
19  paused before you answered the question. Was there
20  something else that you wanted to say? Did I not quite
21  capture the right word?
22  A.   No, I wasn't disturbed.
23  Q.   I asked you about whether Alex Dobrich spoke
24  at the meeting. If I told you that he did not speak at

Page 115

1   the meeting, would you have any way of confirming or
2   denying that?
3   A.   I could look back at my notes to see if I had
4   him down as speaking, I guess.
5        I don't recall whether he spoke or
6   whether he didn't, to be honest with you.
7   Q.   Do you recall any dispute among board members
8   as to what the minutes should say about a particular
9   board meeting?
10  A.   No.
11  Q.   Am I correct that you could also refer to the
12  August 24th, 2004 audiotape to determine whether Alex
13  Dobrich spoke?
14  A.   Yes.
15       MR. ALLINGHAM: We are going to change
16  the tape.
17       VIDEO SPECIALIST: Going off the record
18  at approximately 3:09 p.m.
19       (Recess.)
20       VIDEO SPECIALIST: We're back on the
21  record at approximately 3:18 p.m.
22  BY MR. ALLINGHAM:
23  Q.   Somewhere in your stack is a document marked
24  PX-70. It's one of the minutes of the August 26th,

Page 116

1   2005 board meeting. It will have a blue sticker on it.
2   That's it, in your left hand.
3   A.   Okay.
4   Q.   On Page 5 of the minutes at the bottom,
5   there's some handwriting. Do you know whose
6   handwriting that is?
7   A.   Mine.
8   Q.   Do you know why you wrote on these
9   minutes, "remove from minutes inaccurate info"?
10  A.   Yes.
11  Q.   Why?
12  A.   Because Mr. Walls indicated that evening that
13  that first sentence was not -- that the first two
14  sentences were not correct.
15  Q.   Did you go back and check -- sorry.
16  A.   And he asked me to remove that from the
17  minutes.
18  Q.   Okay.
19       I believe these two have been produced
20  from the board minutes binder. Is the way you removed
21  them from the minutes simply to mark that they should
22  be removed as reflected on this exhibit, or did you
23  prepare amended minutes?
24  A.   I believe that in the May minutes, this

Page 117

1   correction will be reflected, but I'm not sure. But I
2   think.
3        MR. GOSSELIN: The number?
4        MR. ALLINGHAM: 70.
5        Let's mark as PX-71 a document bearing
6   Bates Nos. P 913 through 923.
7        (PX-71 was marked for identification.)
8   BY MR. ALLINGHAM:
9   Q.   Down at the bottom of the first page, is that
10  what you're referring to?
11  A.   Yes.
12  Q.   Okay.
13       Now, when Mr. Walls brought to your
14  attention the fact that he believed that the first two
15  sentences were inaccurate, did you go back and check
16  your notes to see whether they were inaccurate?
17  A.   If I'm not -- I'm trying to recall this. I
18  think that my notes were accurate; however, it didn't
19  happen so Mr. Walls did not want it reflected in the
20  minutes that it did happen.
21  Q.   So your notes reflected that in fact
22  Mr. Dwyer, that's Ted Dwyer, I assume; right?
23  A.   Yes.
24  Q.   Who is Ted Dwyer?

30 (Pages 114 to 117)

Dobrich, et al.                                     v.                    Indian River School District, et al.
Janet L. Hearn                                C.A. # 05-120-JJF                        November 14, 2006

Page 118

1    A.   Ted Dwyer is the -- he's with EDIS, a
2    consulting firm for our major capital improvement
3    programs.
4    Q.   And he reported that final surfacing of the
5    track at Sussex Central High School was complete and he
6    also said that the fields had been reseeded and
7    overseeded in the common areas has been done, and you
8    confirmed that by looking at your notes; correct?
9    A.   That's what I had written down, however, that
10   had not taken place and Mr. Walls wanted the minutes,
11   wanted it taken out of the minutes.
12   Q.   Don't you understand the minutes are supposed
13   to reflect what actually happened at the meeting?
14   A.   Yes, I do.
15   Q.   Did you tell Mr. Walls that you thought that
16   this was an accurate statement of what Mr. Dwyer had
17   said?
18   A.   Perhaps I got the wrong information -- perhaps
19   I wrote the wrong information down, it was a mistake on
20   my part. I'm not really sure. I'd have to go back and
21   look at my notes again. I'm just -- this is what I
22   think may have happened. I'm not real sure.
23   Q.   And you recall that you did go back to look at
24   your notes at the time; correct?

Page 119

1    A.   I really don't remember for sure.
2    Q.   When you saw that your notes -- well, let me
3    ask this question. Did you also check the audiotape of
4    this meeting to see what Mr. Dwyer had actually said?
5    A.   I don't recall whether I did or not.
6    Q.   Before you took this section out of the
7    minutes, did it seem important -- was it important to
8    you to determine whether in fact what you had written
9    was what occurred at the meeting?
10   A.   Would you state that question again?
11   Q.   Yes. Was it important to you before you took
12   this statement out of the minutes which you had drafted
13   to determine whether in fact what you had drafted was
14   what happened at the meeting?
15   A.   Yes.
16   Q.   And so I take it from that that you believe
17   that you went back and looked at your notes?
18   A.   I think that I did.
19   Q.   And you believe that what you saw when you
20   went back and looked at your notes is that your notes
21   reflected that Mr. Dwyer said what the original minutes
22   reflected he said; correct?
23   A.   I think so.
24   Q.   And when you discovered that, did you go back

Page 120

1    to check the audiotape to see whether the tape
2    confirmed what your notes said?
3    A.   I don't remember whether I went back and
4    listened to the audiotape or not.
5    Q.   Did you tell Mr. Walls when he asked you to
6    remove this from the minutes that your notes reflected
7    that this is what Mr. Dwyer said?
8    A.   I don't remember if I talked to him about that
9    or not.
10   Q.   I'm going to show you what we have marked as
11   PX-18. These have previously been identified as the
12   September 28, 2004 regular meeting board minutes.
13        Would you turn, please, to Page 9 of the
14   minutes.
15        Under public comments, here's what your
16   minutes record, "Jerry Fike. Reverend Fike thanked the
17   board for continuing to have a prayer at the beginning
18   of the board meeting. He also expressed his apology to
19   Mona Dobrich for any comments he made during his prayer
20   at Sussex Central High School's graduation ceremonies
21   that offended her."
22        Am I right, based on your earlier
23   answers, in thinking that you made an effort to
24   summarize accurately what Jerry Fike said at the

Page 121

1    September 28th meeting?
2    A.   That my summarization was accurate.
3    Q.   Yes.
4    A.   I believe it is.
5    Q.   And in making that summary, you relied on your
6    notes; correct?
7    A.   Yes.
8    Q.   Do you recall anyone -- was this comment one
9    of those times when a board member said to you,
10   Mrs. Hearn, please be sure that the record reflects
11   that Jerry Fike made these comments?
12   A.   No.
13   Q.   Did anybody speak to you at any time about the
14   Reverend Fike's comments at the September 28 meeting?
15   A.   Not that I recall.
16   Q.   I am going to show you or play for you a
17   portion of the audiotape of the September 28th meeting,
18   which I think reflects Jerry Fike's comments. And then
19   I'm going to ask you some questions about that portion
20   of the tape. All right?
21        (At this time, an audiotape recording,
22   Exhibit PX-52, was played for the witness.)
23        MR. LENHARD: That was Exhibit PX-52 from
24   30 minutes and 24 seconds to 31 minutes and 28 seconds.

31 (Pages 118 to 121)

Dobrich, et al.                                v.                    Indian River School District, et al.
Janet L. Hearn                          C.A. # 05-120-JJF                          November 14, 2006

Page 122

1  BY MR. ALLINGHAM:
2      Q.    I could play it again for you if you'd like,
3  but did you hear the Reverend Fike express his apology
4  to Mona Dobrich during those comments?
5      A.    I think in the last statement that he made he
6  was apologizing to her if he had offended her with
7  anything that he had said at the graduation. That's
8  the way I took it.
9      Q.    His comments were, "If Mrs. Dobrich is here, I
10 want her to know that I am not her enemy and never
11 was." You took that to be an apology for any comments
12 he made during his prayer that offended her?
13     A.    Uh-huh.
14     Q.    The sentence that you wrote is actually longer
15 than the sentence that the Reverend Fike said. Is
16 there any reason why you reworded what the Reverend
17 Fike said and characterized it as an apology to Mona
18 Dobrich?
19     A.    That's -- in my opinion, that's what he did,
20 and that's why I wrote it that way.
21     Q.    All right. Are the minutes intended to
22 reflect what you think someone intended to do or are
23 they intended to reflect what actually happened at the
24 meeting?

Page 123

1      A.    I guess they're intended to be what actually
2  happened at the meeting.
3      Q.    You did not record that the Reverend Fike also
4  offered his thanks to all those who supported him in
5  his freedom to pray in Jesus' name. Was there a reason
6  why you left that comment out?
7      A.    I just summarized his -- that was my
8  summarization of what he said.
9      Q.    And no one talked to you about how you should
10 summarize what Jerry Fike said?
11     A.    No, no.
12     Q.    Having listened to the Reverend Fike's
13 comments and having now read your summary of those
14 comments, do you believe that the summary is an
15 accurate summary of Mr. Fike's public comment?
16     A.    Yes.
17     Q.    I think you have in front of you PX-54 in that
18 stack of documents. Or maybe not.
19     A.    I think I do.
20     Q.    Maybe I have it here. It's always the last
21 one.
22            Mrs. Hearn, at some point in 2005, you
23 stopped referring to -- well, let me just as a
24 preliminary. You'll see that midway down the page in

Page 124

1  some language that I looked at with you earlier your
2  minutes record that President Walls then read a prayer
3  which was part of a speech given by Dr. Martin Luther
4  King. And I'll represent to you that in the minutes
5  leading up to March 22, you routinely referred to the
6  prayer as a prayer.
7            At some point you changed and began
8  referring to the prayer as an invocation. Was there
9  some reason why you did that? Did someone ask you do
10 that?
11     A.    No.
12     Q.    You just changed?
13     A.    No one asked me, no.
14     Q.    You just changed?
15     A.    Yes.
16     Q.    Was it not someone asking you but was there
17 any reason for why you changed from calling it a prayer
18 to calling it an invocation?
19     A.    No, there's no reason.
20     Q.    So when invocation is read in the minutes, it
21 means the same to you as prayer?
22     A.    Yes.
23     Q.    Some of the minutes don't record that the
24 meeting -- and these are regular meeting minutes --

Page 125

1  opened with a prayer. Your testimony earlier and the
2  testimony of other board members, of board members, has
3  been that, to their recollection and to yours, every
4  regular meeting was opened with a prayer.
5            Do you know why in some instances you
6  recorded that the meeting was opened with a prayer and
7  in some instances you didn't?
8      A.    Sometimes I may have forgotten to put it in
9  there, if it's not in there.
10           I believe when Miss Hobbs came on as
11 superintendent and she indicated it wasn't necessary
12 to put it in there and I stopped putting it in there
13 then.
14     Q.    Did she say why it wasn't necessary to put it
15 in there?
16     A.    I don't recall.
17     Q.    I take it since you didn't view the change to
18 the use of the word invocation to be a substantive
19 change, you didn't consult with anybody about that?
20     A.    I didn't consult with anybody about that, but
21 then again, these minutes are read by the
22 superintendent and the board members and approved by
23 them. I only draft them.
24     Q.    The board policy, PX-9, records in the second

32 (Pages 122 to 125)

Dobrich, et al.                          v.              Indian River School District, et al.
Janet L. Hearn                      C.A. # 05-120-JJF              November 14, 2006

Page 126

1   paragraph -- do you have it in front of you there?
2   It's in your stack. Sorry, it's getting to be a big
3   stack. That's it. Oh, sorry. All the way at the end.
4           It records in the second paragraph, "On
5   a rotating basis, one individual adult board member per
6   meeting will be given the opportunity to offer a prayer
7   or request a moment of silence. If the member chooses
8   not to exercise this opportunity, the next member in
9   rotation shall have the opportunity."
10          My question to you is, if a school board
11  member was given the opportunity to open the meeting
12  with a prayer and declined the opportunity, would that
13  be reflected in the minutes?
14      A.   I don't know. That hasn't happened.
15      Q.   The reality, Mrs. Hearn, is that you wouldn't
16  want to embarrass a board member by recording in the
17  minutes that he had declined to offer a prayer, would
18  you?
19          MR. GOSSELIN:  Objection.
20  BY MR. ALLINGHAM:
21      Q.   You can answer.
22      A.   It wouldn't -- that wouldn't be my call.
23      Q.   So who would you consult?
24      A.   I would ask the superintendent or the board

Page 127

1   president if they wanted that reflected in the minutes.
2       Q.   You have been board secretary for going on 16
3   years. Have you noticed over time that a few board
4   members have tended to be the ones who give the prayer
5   at the opening of meetings, not all of the board
6   members?
7       A.   Yes.
8       Q.   Since the adoption of the policy, BDA-1, have
9   you noticed that not all of the board members have been
10  offered the opportunity to open the meeting with a
11  prayer?
12          MR. GOSSELIN:  Objection. You can
13  answer.
14          THE WITNESS:  I know the same person
15  doesn't give the prayer all the time. I don't really
16  keep track of who's been asked and who's not been
17  asked.
18  BY MR. ALLINGHAM:
19      Q.   All right. So the answer to my question is,
20  no, you haven't noticed that not all of the board
21  members have been given an opportunity?
22      A.   No, I haven't, no.
23      Q.   I want to ask you a question about recent
24  board minutes, the June 2006, July 2006, and August

Page 128

1   2006 board meetings. Do the minutes state that there
2   was a prayer to open the meeting?
3       A.   Without going back and looking, I don't know.
4           At times -- I may have forgotten to put
5   it in there, but I usually put it in there.
6       Q.   Okay. No one said to you, stop putting in
7   there that --
8       A.   Oh, no.
9       Q.   -- that the meeting was opened with a prayer?
10      A.   No, no.
11      Q.   And I'm correct, am I not, that the audio
12  recordings for those meetings still exist?
13      A.   For what meetings?
14      Q.   June, July, and August of 2006?
15      A.   Yes.
16      Q.   Is it correct that those meetings did, in
17  fact, open with a prayer?
18      A.   I believe they did, yes.
19      Q.   Does the Indian River School Board have a
20  document retention policy?
21      A.   We have a state document retention policy.
22  There is a state document retention policy.
23      Q.   And is that kept in the policy book of the
24  Indian River School Board?

Page 129

1       A.   No. It's in a book by itself.
2       Q.   Okay. And do you know what that document
3   retention policy says?
4       A.   No. It's a book about this thick
5   (indicating).
6       Q.   To the extent that the district has someone
7   who's responsible for document retention, in compliance
8   with that document retention policy, are you that
9   person?
10      A.   I'm only responsible for the document
11  retention of the board meeting minutes.
12      Q.   Is the state document retention policy
13  publicly available?
14      A.   Yes.
15      Q.   On the state department of education website?
16      A.   I think it's on the website, yes.
17      Q.   Do you know how district employees are
18  informed of the document retention policy?
19      A.   No, I don't.
20      Q.   Has the board adopted any document retention
21  policy in addition to the state policy?
22      A.   We recently adopted a policy about audiotapes.
23      Q.   What prompted the consideration of the policy
24  on audiotapes?

33 (Pages 126 to 129)

Dobrich, et al.                          v.              Indian River School District, et al.
Janet L. Hearn                    C.A. # 05-120-JJF                    November 14, 2006

Page 130

1    MR. GOSSELIN: Objection. I want to
2  confirm whether or not that -- the answer may implicate
3  an attorney-client privilege.
4         MR. ALLINGHAM: Okay. Let me -- let's go
5  off the record for a minute. I don't want to waste
6  time. Why don't you just find out.
7         VIDEO SPECIALIST: Going off the record
8  at approximately 3:45 p.m.
9         (Pause.)
10        VIDEO SPECIALIST: Back on the record at
11  3:44 p.m.
12 BY MR. ALLINGHAM:
13  Q.  I'm going to repose the question but don't --
14 pause before you answer. Okay?
15  A.  Don't because pause before I answer?
16  Q.  No. Pause.
17        MR. GOSSELIN: Do pause so I can instruct
18 you not to answer.
19 BY MR. ALLINGHAM:
20  Q.  What prompted the board's consideration of a
21 policy on the retention of audiotapes?
22        MR. GOSSELIN: Objection. That's
23 attorney-client privilege.
24 BY MR. ALLINGHAM:

Page 131

1  Q.  I'm going to show you what's been marked as
2  Exhibit 4. This policy was adopted on June 27, 2006,
3  as you'll see in the lower left corner. Since the
4  adoption of the policy, have you destroyed any
5  audiotapes of meetings of the board of education of
6  Indian River School District?
7  A.  No.
8  Q.  Apart from the state document retention policy
9  and Exhibit 4, the audiotape policy, does the Indian
10 River School District have any other policies that
11 implicate document retention issues?
12  A.  I don't recall any.
13  Q.  And has that been true since you began working
14 in 1991?
15  A.  Yes.
16  Q.  All right, you told me that you were
17 responsible for document retention for the board's
18 documents. We've identified some files and I'm just
19 going to run through them. The public binder.
20  A.  Uh-huh.
21  Q.  The executive session binder. The FOIA
22 request file. There's a litigation file for this case,
23 and I presume there's a litigation file if you have
24 other cases as well; correct?

Page 132

1  A.  Yes.
2  Q.  There is the -- I just have to apologize, I'm
3  having a senior moment. But whatever those forms are
4  called that reflect parent complaints, there's a file
5  of those?
6  A.  Yes.
7  Q.  Is there anything else that, in terms of
8  files, that constitutes board documents that you think
9  of when you think of your obligation to retain board
10 documents?
11  A.  No.
12  Q.  All of those files that we just talked about,
13 are they in your office?
14  A.  Yes.
15  Q.  Which is in this building that we're in now?
16  A.  Yes. And not all -- okay, I should rephrase
17 it. Some of them are kept in the basement, because I
18 don't have room for them, all of them in my file. But,
19 yes, they're in this building.
20  Q.  So they're all in this building?
21  A.  Yes.
22  Q.  I assume it's the more recent iterations?
23  A.  The more recent ones are in my office and the
24 dated ones are stored downstairs.

Page 133

1  Q.  Who has access to those documents besides you
2  and the superintendent?
3  A.  Personnel sometimes goes through, not the
4  executive session minutes, but sometimes the board
5  public binders --
6  Q.  Uh-huh.
7  A.  -- looking for maybe verification for
8  employment for some people and that sort of thing. So
9  personnel has access to them.
10       Sometimes the assistant superintendents
11 or his secretary might have access to them because they
12 do the policy and if they need to research something on
13 policy. But that's probably the only people that go
14 back to the board.
15  Q.  So far as you know, the only people who have
16 access to those files are you and the superintendent,
17 occasionally the assistant superintendent and his
18 secretary, and for personnel matters sometimes
19 personnel people?
20  A.  Uh-huh.
21  Q.  Correct?
22  A.  Uh-huh, yes.
23  Q.  Is it also correct that the assistant
24 superintendent and his secretary and personnel people,

34 (Pages 130 to 133)

Dobrich, et al.                                    v.                    Indian River School District, et al.
Janet L. Hearn                              C.A. # 05-120-JJF                        November 14, 2006

Page 134

1  if they want to examine those board documents, they --
2  in effect you're the gate keeper?
3     A.  Yes.
4     Q.  They would say I want to see the documents?
5     A.  Yes, that's correct.
6     Q.  So if somebody wanted to see these board
7  documents, you would know about it; correct?
8     A.  Yes, yes.
9     Q.  So far as you recall, those are the only
10  people who look at board documents?
11    A.  Yes.
12    Q.  With respect to the public binder and the
13  executive session binder, how do you decide what goes
14  into which binder?
15    A.  The items or topics that are listed on the
16  executive session agenda, those items go in the
17  executive session binder.
18    Q.  Okay, so am I correct that you sort of split
19  up the board package into the materials that relate to
20  executive session agenda items --
21    A.  Yes.
22    Q.  -- and, on the other hand, the materials that
23  relate --
24    A.  I have an insert sheet that says executive

Page 135

1  session materials, and behind that is where I put the
2  executive session materials.
3     Q.  And am I correct, then, that that practice
4  would mean that the materials that go into the public
5  binder are materials that were considered at the public
6  session of the board?
7     A.  State that again?
8     Q.  Yes, I probably didn't do it very well. I'll
9  do it the other way. It may be easier.
10       The materials that go into the executive
11  session binder are only materials that relate to issues
12  that were considered in that private executive session;
13  correct?
14    A.  Yes.
15    Q.  So that whatever was considered at the public
16  session is what goes into the public binder?
17    A.  Yes.
18    Q.  Okay.
19       And now to come full circle back to the
20  FOIA issue, am I then correct that if someone requested
21  a document that was in the public binder, you would
22  assume that that would be an appropriate request and as
23  long as they made a FOIA request, you would provide
24  them with that document?

Page 136

1     A.  After getting the okay from the
2  superintendent, yes.
3     Q.  For purposes of complying with the document
4  retention policy, do you, as the person responsible for
5  document retention of board documents, consider
6  electronic communications to and from board members to
7  and from the district to be board documents that are
8  subject to the document retention policy?
9     A.  Would you restate that again?
10    Q.  Sure. You're the person who's in charge of
11  document retention for board documents.
12    A.  Right.
13    Q.  When you consider the universe of documents
14  that you have to think about retaining or which you
15  might be, it might be okay to throw away or dispose of,
16  do you include in the documents you're thinking about
17  electronic communications to or from board members?
18    A.  No.
19    Q.  All right, I'm going to show you a document
20  that we have previously marked as PX-3.
21       Have you ever seen this document before?
22    A.  I think that I have.
23    Q.  You'll see a copy is marked to Ms. Hobbs. Is
24  it in connection with its delivery to Miss Hobbs that

Page 137

1  you think that you saw this document?
2     A.  Yes.
3     Q.  Did you communicate this document to
4  individual board members?
5     A.  I don't recall if I provided them with a copy.
6  I would have assumed that you would have sent them a
7  copy.
8     Q.  What did you do after seeing a copy of this
9  letter to ensure that documents that you considered
10  board documents were preserved in accordance with the
11  contents of this letter?
12    A.  Would you state that question again?
13    Q.  I'll ask it a little differently.
14       Did you do anything to ensure that
15  documents were preserved in accordance with the
16  instructions in this letter?
17    A.  This would have been under the, Mrs. Hobbs,
18  she would have taken care of -- I mean -- I did
19  whatever she told me to do.
20    Q.  What did she tell you to do?
21    A.  And I knew you were going to ask me that next.
22  I don't remember exactly. I can tell you I haven't
23  discarded anything, I didn't destroy any evidence of
24  anything that we already have.

35 (Pages 134 to 137)

Dobrich, et al.                         v.                    Indian River School District, et al.
Janet L. Hearn                  C.A. # 05-120-JJF                       November 14, 2006

Page 138

1   Q.   Was it this letter that prompted you to speak
2   to Mr. Smith about -- well, strike that.
3           Did this letter prompt you to speak to
4   Mr. Smith or someone in his department about ensuring
5   that the district servers were not --
6   A.   I'm not sure if it was this letter that
7   prompted it or not.
8   Q.   I paused and I don't blame you for answering.
9           What I was trying to get at is have you
10  ever had a conversation with Mr. Smith or anybody
11  working in his department to ensure that e-mails were
12  not routinely erased?
13  A.   The only, the only item I remember talking to
14  him about was the very -- the early on e-mail before
15  the lawsuit became a lawsuit.
16  Q.   Uh-huh.
17  A.   And that was the e-mail from Mona Dobrich to
18  Mrs. Hobbs.
19  Q.   Okay.
20  A.   That's the only one that I remember talking to
21  Ken Smith about.
22  Q.   Okay.
23          Do you have any knowledge about whether
24  the district routinely erases e-mails after a certain

Page 139

1   period of time?
2   A.   I don't know.
3   Q.   Let me show you what we've marked as
4   Plaintiffs' Exhibit 6. More compelling correspondence
5   from me. Actually not from me but from Richard Horvath
6   of the plaintiffs' legal team.
7           The first question I have about PX-6 is
8   whether you have seen it before?
9   A.   I'm not sure.
10  Q.   At all events, as you said, the district has
11  not destroyed any audiotapes; is that correct?
12  A.   That's correct.
13  Q.   Your earlier answer prompts me to return to
14  something that we talked about this morning. Am I
15  right in understanding that the search that you asked
16  Mr. Smith to do was simply to search the district
17  servers for an e-mail from Mrs. Dobrich?
18  A.   That's correct.
19  Q.   Okay. And that's the only search that you've
20  asked Mr. Smith to do?
21  A.   Yes.
22  Q.   So that --
23  A.   That I'm aware of. I don't know --
24  Q.   That's what I was going to say. So far as you

Page 140

1   know?
2   A.   So far as I know.
3   Q.   Apart from that search, nothing has been done
4   to search the district servers for relevant e-mails, so
5   far as you know?
6   A.   So far as I know.
7   Q.   We talked about a videotaping of board
8   meetings, and you told me that so far as you're aware
9   the August 24th meeting and the February 2006
10  meeting -- that's the settlement meeting -- were the
11  two that you think there were videotapes that exist
12  for; correct?
13  A.   I know the first one was in August of 2004.
14  Q.   Yes, ma'am.
15  A.   I'm not sure when the other -- I don't
16  remember the date of the other one.
17  Q.   But it was the board meeting at which the
18  settlement was considered?
19  A.   I believe.
20  Q.   Okay. Who took possession of the videotapes
21  after those meetings, you?
22  A.   I'm trying to think if they actually did it
23  because we didn't have -- I'd have to go back and look
24  in my tapes.

Page 141

1           I don't remember how many people showed
2   up at that meeting, if everybody was able to sit in one
3   room. I can't remember.
4   Q.   Am I correct that if there was no need for an
5   overflow room you didn't videotape that meeting?
6   A.   Yes, I think that's correct.
7   Q.   Okay.
8           Who took possession of the August 24th
9   videotape?
10  A.   I have a copy of that.
11  Q.   And has any school board member asked for a
12  copy of it or asked to review that tape?
13  A.   Not to my knowledge.
14  Q.   You testified earlier that district personnel
15  set up that audiovisual equipment on August 24th?
16  A.   Yes.
17  Q.   And it was district equipment that you had
18  available to you?
19  A.   I believe it was, yes.
20  Q.   I think you also testified that Mrs. Hobbs,
21  Ms. Hobbs told you that a big crowd was expected. Did
22  she ask you to tell the district's AV people to set up
23  that --
24  A.   No.

36 (Pages 138 to 141)

Dobrich, et al.                                    v.                    Indian River School District, et al.
Janet L. Hearn                          C.A. # 05-120-JJF                          November 14, 2006

Page 142

1   Q.   -- video feed?
2   A.   No.
3   Q.   Did she herself --
4   A.   I think she did. She talked with Dave Maull.
5   Q.   I'm going to represent to you that your
6   lawyers have told us that the August 24th, 2004 meeting
7   was not audiotaped.
8         Do you know of your own knowledge
9   whether that's true or not?
10  A.   Not audiotaped?
11  Q.   Not audiotaped?
12  A.   With my tape recorder?
13  Q.   Not audiotaped in any way.
14  A.   The August meeting?
15  Q.   Yes, ma'am.
16  A.   I'd have to go back and look.
17  Q.   What you would do in order to check would be
18  to go back and look at your files of audiotapes;
19  correct?
20  A.   Yes.
21  Q.   Okay. I'm going to show you a portion of the
22  videotape of that meeting, which appears to me --
23  correct me if I'm wrong -- to show you pushing the
24  button on an audiotape machine, and I'm going to ask

Page 143

1   you whether you can confirm from that that you did
2   audiotape that meeting?
3         MR. GOSSELIN: Did we say it wasn't
4   audiotaped or did we say we don't have an audiotape?
5         MR. ALLINGHAM: I don't know.
6   BY MR. ALLINGHAM:
7   Q.   While we're setting up the videotape, let me
8   ask you this question: Am I correct that you do not
9   recall ever having destroyed an audiotape of a board
10  meeting?
11  A.   Of any board meeting?
12  Q.   Yes, ma'am.
13  A.   So would you ask me that again, I'm sorry?
14  Q.   Yes. My first question was, am I correct that
15  you do not recall having destroyed any audiotape of any
16  board meeting since you were board secretary?
17  A.   That's not correct.
18  Q.   Okay. Is it correct that you destroyed some
19  old audiotapes?
20  A.   Yes.
21  Q.   Okay. I just want to sort of set the point in
22  time when you're sure that you haven't destroyed them.
23  Is it correct that you have no recollection of having
24  destroyed any audiotape of a board meeting from January

Page 144

1   1st, 2004, to the present?
2   A.   Yes, that's correct.
3   Q.   And you're the only one with access to these
4   tapes once the meetings are concluded; correct?
5   A.   Yes.
6   Q.   Okay.
7         Can you see that, Mrs. Hearn?
8   A.   Yes.
9         (At this time, Exhibit PX-40 was played
10  for the witness.)
11  BY MR. ALLINGHAM:
12  Q.   Did you see yourself push the button on the
13  audiotape machine?
14  A.   Yes.
15  Q.   Does that confirm your belief that you made an
16  audiotape of the August 24th meeting?
17  A.   I believe I did.
18        MR. LENHARD: That was Exhibit PX-40 from
19  zero minutes and four seconds to zero minutes and 12
20  seconds.
21  BY MR. ALLINGHAM:
22  Q.   Let me show you a document which we have
23  previously marked as PX-59.
24        This is something called a privilege

Page 145

1   log. It is a document which is prepared by your
2   attorneys which have identified documents that have not
3   been given to us because of a claim of privilege.
4         If you'll turn to the page which is
5   marked 2 of 15 in the upper left-hand corner, it's
6   actually the third page of the exhibit.
7         MR. GOSSELIN: Tom, if you're going to
8   make reference to Entries 20 and 21, this is something
9   that we discussed the last time and there are certain
10  transcripts that are certainly relevant to the issues
11  in the case. They were put, the transcript of Mona
12  Dobrich's comments at the school board meeting are
13  relevant, admissible and we don't have any objection to
14  producing the transcript. I think this was put on the
15  privilege log because Mrs. Hearn made the transcript at
16  the direction of the previous attorney, so there was a
17  work product protection. But I think we probably ought
18  to agree or we can agree to produce those documents
19  because the important thing, as far as I'm concerned,
20  is to get a copy of the transcript into evidence, and
21  it doesn't matter much to me who prepared it, as long
22  as we can agree that it's accurate.
23        I don't know if that saves you any time
24  here today, but we are going to be amending the

37 (Pages 142 to 145)

Dobrich, et al.
Janet L. Hearn

v.
C.A. # 05-120-JJF

Indian River School District, et al.
November 14, 2006

Page 146

1  privilege log and making a supplemental production for
2  things like that.
3          MR. ALLINGHAM: Okay. So 17, 18, 20 and
4  21 will be removed from the log?
5          MR. GOSSELIN: 17, 18, 20, 21, yes.
6          MR. ALLINGHAM: Okay.
7          MR. GOSSELIN: Yes.
8          Yeah, it will be removed, and what I'm
9  hoping that we can do is agree that it's an accurate
10  transcript, because that's my point here, we have an
11  accurate recording of what happened on paper.
12  BY MR. ALLINGHAM:
13      Q.   On the next page, Page 3 of 15, Item 23 is
14  describe -- you're described as the author and the
15  description is, list of board meetings with prayer
16  after adoption of new policy.
17          Do you recall preparing a list of board
18  meetings that were opened with a prayer after the
19  adoption of the new policy?
20      A.   I'm not sure.
21          MR. ALLINGHAM: Mr. Gosselin, is this a
22  document that you will remove from the log?
23          MR. GOSSELIN: Let me think about this
24  one. I think that's different in character than the

Page 147

1  previous ones, and 24.
2          MR. ALLINGHAM: Well, 24 should be
3  exactly the same.
4          MR. GOSSELIN: That's what I mean. It's
5  different from 24 and the other previous four.
6          MR. ALLINGHAM: Okay, fine.
7  BY MR. ALLINGHAM:
8      Q.   Items 25 and 26, Mrs. Hearn, also list you as
9  the author. These are handwritten notes regarding
10  location of school board meeting minutes. That's Item
11  25.
12          The recipient is listed as John
13  Cafferkey.
14          Do you recall that Mr. Cafferkey asked
15  you to prepare a note regarding the location of the
16  school board minutes?
17      A.   He may have asked me where the school board
18  minutes were kept. Is that --
19      Q.   Yes.
20      A.   Okay.
21      Q.   And you sent a note back to him telling him?
22      A.   I'm not sure.
23      Q.   26 is the, the author is listed as you, the
24  recipient is Mr. Cafferkey, and it's described as a

Page 148

1  handwritten note regarding tapes checked for prayers.
2          Did you prepare a handwritten note
3  regarding tapes checked for prayers?
4      A.   I don't remember. I'd have to go back and
5  look. If he asked for it, I may have.
6      Q.   Independent of this privilege log, do you
7  remember checking some audiotapes of board meetings to
8  see whether there were prayers reflected?
9      A.   I don't remember.
10      Q.   On Page 6 of 15, Item No. 56 reflects you as
11  the author. And it's described as a copy of school
12  Board Policy BDA-1 with handwritten comments to
13  counsel.
14          Do you recall having made handwritten
15  comments on a copy of the board policy?
16      A.   No, I don't recall.
17      Q.   Do you recall ever having tried to communicate
18  to counsel via handwritten comments on a copy of the
19  board policy?
20      A.   I don't remember it, no.
21      Q.   Well, have you ever met with Mr. Gosselin or
22  representatives of his firm to try to identify whether
23  certain documents were prepared by you?
24      A.   No.

Page 149

1      Q.   Do you recall ever having identified examples
2  of your handwriting for any representative of
3  Mr. Gosselin's firm?
4      A.   No.
5      Q.   How about for Mr. Balaguer or Mr. Cafferkey?
6      A.   No.
7      Q.   Look at Page 8 of 15, please. Here the author
8  is Reggie Helms. The recipient is Janet Hearn. The
9  date is August 18th, 2004, which, to remind you, would
10  be a few days before the big board meeting of August
11  24th, and it's described as a fax regarding legal
12  issues with handwritten notes.
13          Do you remember receiving from Mr. Helms
14  a fax on or about August 18, 2004, regarding legal
15  issues with handwritten notes?
16      A.   I don't remember.
17      Q.   Do you recall getting a fax from Mr. Helms and
18  putting handwritten notes on it yourself?
19      A.   No, I don't remember.
20          MR. ALLINGHAM: Let's change the tape.
21          VIDEO SPECIALIST: Going off the record
22  at approximately 4:17 p.m.
23          (Recess.)
24          VIDEO SPECIALIST: We're back on the

38 (Pages 146 to 149)

Dobrich, et al.
Janet L. Hearn

v.

C.A. # 05-120-JJF

Indian River School District, et al.
November 14, 2006

Page 150

1   record at approximately 4:36 p.m.
2   BY MR. ALLINGHAM:
3      Q.   In front of you I hope still is the privilege
4   log. I was asking you about a fax from Mr. Helms to
5   you with handwritten notes, which is Item 68. I would
6   like now to turn to Item 70, which is another fax of
7   the same date, also regarding legal issues, also from
8   Mr. Helms to you.
9           Do you recall having received such a fax
10  from Mr. Helms shortly before the August 24th meeting?
11     A.   I don't recall.
12     Q.   Do you sometimes function as a conduit between
13  one board member and the other board members? For
14  example, if one board member wants to circulate
15  something to the other board members, does he sometimes
16  send it to you and ask that it be circulated out?
17     A.   Sometimes that has happened, yes.
18     Q.   Do you know whether you sent Mr. Helms' fax on
19  to the remaining board members?
20     A.   I don't recall.
21     Q.   Do you recall a fax from Mr. Helms regarding
22  legal issues ever being presented to the full board?
23     A.   I don't recall.
24     Q.   Okay, turn to Page 10 of 15, please.

Page 151

1           Item 90 is a memorandum regarding legal
2   issues from John Cafferkey to a distribution list
3   that's dated June 24, 2005.
4           Do you know whether you were on that
5   distribution list?
6      A.   No, I don't. I don't recall.
7      Q.   Do you know who is on the distribution list?
8      A.   I don't know for sure. I would guess that it
9   would probably be Mrs. Hobbs, the superintendent, and
10  the board members.
11     Q.   Was there a distribution list established for
12  communication between the attorneys and the district in
13  connection with this litigation?
14     A.   With John Cafferkey?
15     Q.   Yes.
16     A.   I'm not sure.
17     Q.   On Page 11 of 15, Item No. 100, is identified
18  as typed notes regarding legal issues that were
19  prepared by Lois Hobbs.
20          Did Ms. Hobbs do her own typing, or if
21  she wanted something typed up did she write it out or
22  dictate it and give it to you to be typed?
23     A.   She would either write it out or dictate it
24  for me to type.

Page 152

1      Q.   Okay. Is it your belief that you typed these
2   notes regarding legal issues?
3      A.   I'm not sure.
4      Q.   Look at Page 12 of 15.
5           Item 110 is a memorandum from Gregg
6   Hastings to fellow board members dated August 23, 2004,
7   and it's description is memorandum regarding legal
8   representation.
9           Do you recall ever seeing a memorandum
10  from Mr. Hastings to his fellow board members about
11  legal representation dated just around the time of
12  big board meeting?
13     A.   I don't remember.
14     Q.   Has any board member in your presence ever
15  suggested that children should not be invited to future
16  board meetings?
17     A.   No.
18     Q.   Has any board member in your presence made
19  statements indicating a desire to limit the number of
20  children invited to board meetings?
21     A.   No.
22     Q.   Has any board member in your presence
23  indicated a desire to begin executive sessions with a
24  prayer?

Page 153

1      A.   No.
2      Q.   Has any board member in your presence
3   indicated a desire to begin special board meetings with
4   a prayer?
5      A.   No.
6      Q.   Did you ever hear a board member say in words
7   or substance that the purpose of the board policy on
8   board prayer was to protect his or her right to pray as
9   he sees fit?
10     A.   I don't remember.
11     Q.   Well, do you recall any board member saying no
12  one is, in words or substance — I don't mean the exact
13  words -- no one has the right to tell me how to pray?
14     A.   I don't remember.
15     Q.   Do you recall anything that any board member
16  said at any time in your presence about the purpose of
17  the board prayer policy?
18     A.   No, I don't remember anything. They didn't
19  talk to me about the board.
20     Q.   I beg your pardon?
21     A.   They didn't talk to me about the prior policy.
22     Q.   Weren't you sitting there?
23     A.   You asked me if they had talked to me.
24     Q.   No, no, you misunderstood me.

39 (Pages 150 to 153)

Dobrich, et al.                                  v.                    Indian River School District, et al.
Janet L. Hearn                          C.A. # 05-120-JJF                        November 14, 2006

Page 154

1   A.   I'm sorry. Okay.
2   Q.   Let me go back to my original questions.
3   These are all do you recall a board member stating
4   while you were there in your presence that the purpose
5   of the board policy was to protect that board member's
6   right to pray as he sees fit, in words or substance?
7   A.   I don't remember.
8            MR. GOSSELIN:  Is this at any meeting at
9   any time?
10           MR. ALLINGHAM:  Yes.
11           MR. GOSSELIN:  Okay. And I'm going to
12  instruct that you can answer to the extent you're
13  referring to a public board meeting. So you can treat
14  the question as limited to public board meetings as
15  opposed to executive session.
16           THE WITNESS:  No, I don't think so. No.
17  Not at a public board meeting.
18           MR. ALLINGHAM:  I'm sorry to waste the
19  witness' time, but what is the basis for your
20  suggestion that I'm not entitled to board deliberations
21  in executive sessions on the adoption of the board
22  prayer policy. It's specifically the subject of the
23  judge's opinion.
24           MR. GOSSELIN:  But your question, it

Page 155

1   wasn't deliberations.  It said any statements in which
2   she was present, and if the statement occurred in the
3   context of seeking legal advice in one of the executive
4   session meetings, it's protected and that is what the
5   judge's decision delineated.
6            There's a difference between the adoption
7   of the policy --
8   BY MR. ALLINGHAM:
9   Q.   I don't agree with your position, but I'm
10  going to try to craft questions that will address
11  Mr. Gosselin's position, okay. This is going to
12  require a little bit of concentration on both of our
13  parts.
14           The board policy was adopted in October
15  of 2004. I can give you the minutes of each meeting if
16  you want, but I want you to sort of think with me as we
17  go through. There was a very brief discussion of the
18  issue in June of 2004. There was a discussion of the
19  issue which included public comments and an executive
20  session in July of 2004. Okay?
21  A.   Uh-huh.
22  Q.   There was an executive session exclusively
23  devoted to the issue on August 23, 2004, the day before
24  the big board meeting.

Page 156

1   A.   (Witness nods.)
2   Q.   There was the big board meeting at which there
3   was lots of public comment and executive sessions on
4   the issue. There was an executive session in
5   mid-September on the issue, and then the policy was
6   presented for its first reading on September 28th and
7   adopted on October 19. Okay?
8   A.   Uh-huh.
9   Q.   So my question to you is, during any of those
10  meetings at which the board prayer policy was being
11  discussed, did any school board member say in your
12  presence, in words or substance, that a purpose of the
13  policy was to protect his right to pray as he sees fit?
14  A.   I don't recall hearing that.
15           MR. GOSSELIN:  Again, I tried to -- your
16  question was more of a long statement when you were
17  talking about the meetings. My instruction remains.
18  To the extent you're seeking information concerning
19  what took place at executive session, I'm going to
20  instruct her not to answer.
21           MR. ALLINGHAM:  Look, we're entitled to
22  find out what happened at executive sessions prior to
23  the adoption of the policy if the board prayer policy
24  was discussed. That's the consideration by the board

Page 157

1   of the board prayer policy.
2            MR. GOSSELIN:  But, Tom, if there was a
3   discussion with Mr. Griffin present or an attorney
4   present and somebody were to say hypothetically I want
5   to have a board prayer because of X, is that okay,
6   that's protected by attorney-client privilege.
7            MR. ALLINGHAM:  Arguably if he says is
8   that okay, that's fine. But it is the "is that okay"
9   that's the request for advice.
10           MR. GOSSELIN:  But your questions are, I
11  know you're doing your best to ask questions that walks
12  the line appropriately, but they don't.
13           I think she answered the question anyway.
14  BY MR. ALLINGHAM:
15  Q.   At any of those meetings prior to the adoption
16  on October 19th on the board prayer policy, did you
17  hear anyone say in words or substance, no one has the
18  right to tell me who to pray?
19  A.   I don't recall.
20  Q.   I asked you some questions shortly before the
21  break about whether you had reviewed, you recalled
22  having reviewed audiotapes of board meetings for the
23  purpose of determining whether prayers had been given.
24  Do you recall that question?

40 (Pages 154 to 157)

Dobrich, et al.
Janet L. Hearn

v.

C.A. # 05-120-JJF

Indian River School District, et al.
November 14, 2006

Page 158

1    A.   Yes.
2    Q.   And you said I don't remember?
3    A.   Right.
4    Q.   Do you recall having reviewed a group of
5    audiotapes at any time for any purpose?
6    A.   No, I don't remember that.
7    Q.   And when you say "I don't remember that," that
8    is that you have an affirmative memory that you did not
9    do so?  Is it that you don't recall one way or another,
10   or is it that you are pretty sure you did not review
11   audiotapes for any purpose?
12   A.   I don't recall reviewing audiotapes for any
13   purpose.
14   Q.   Okay.
15        Tapes of the board meetings were
16   produced to us recently, and some of the tapes are not
17   complete, that is they start in the middle of the
18   meeting.
19        Did you edit any of the tapes or cause
20   any of the tapes to be edited before you gave them to
21   your lawyers?
22   A.   No.
23   Q.   Okay.  I know that you haven't reviewed the
24   tapes, but is it your belief that to the extent the

Page 159

1    beginning of a meeting is missing on a tape it's
2    because you forgot to push the button?
3    A.   I would -- yes.
4    Q.   Am I right that you arranged to have the tapes
5    copied before you gave them to your lawyers?
6    A.   No.
7    Q.   You gave them the originals?
8    A.   Yes.
9    Q.   Okay.
10        I am going to show you a document which
11   we have not marked as an exhibit but which we have
12   asked a number of other witnesses questions about it,
13   Bates Pages Nos. P 1614 and 1615.  This is a letter, as
14   you'll see in a minute, that's dated October 1st, 2004,
15   or a couple of weeks before the board prayer policy was
16   adopted.
17        You'll also see that I have placed a
18   Post-It across the bottom of the second page which
19   masks the name of the writer of the letter.  All right?
20        Do you want a copy, Jason?
21        MR. GOSSELIN:  No.
22   BY MR. ALLINGHAM:
23   Q.   What I'd like you to do, Mrs. Hearn, is read
24   this letter.

Page 160

1    A.   (Pause).
2        Okay.
3    Q.   This is not the first time you have seen that
4    letter, is it?
5    A.   No.
6    Q.   Did you receive it on or about the time that
7    it's dated, October 1st, 2004?
8    A.   I don't recall when I received, when it was
9    received, but --
10   Q.   Was it addressed to Mrs. Hobbs?
11   A.   I really don't recall if it had her name on it
12   or -- I'm not sure.
13   Q.   Okay.  Do you remember whether it was
14   delivered to you or to Mrs. Hobbs in an envelope?
15   A.   I think it did -- I think maybe it --
16   possibility that it came in an envelope.  Usually
17   parent complaints don't come in just -- without --
18   Q.   Yes, ma'am.
19   A.   They usually come in an envelope and I open
20   them, yes.
21   Q.   And I take it you gave it to Mrs. Hobbs?
22   A.   Yes.
23   Q.   And is this a complaint that was serious
24   enough for you to open a file on?

Page 161

1    A.   I -- yes, it would be, yes.
2    Q.   Were you involved at all in the followup to
3    this complaint either by communicating to people at
4    Mrs. Hobbs' request, with follow-up communications with
5    a parent, in any way at all?
6    A.   I don't remember being involved, no.
7    Q.   Do you know whether there was any followup at
8    all on this request?
9    A.   I'm not sure what was done.  I'm sure
10   Mrs. Hobbs did something with it.  I don't know if she
11   responded herself or I don't recall who responded, but
12   she, you know, she had the letter and she would have --
13   she would have followed up on it either --
14   Q.   This is not the kind of complaint that
15   Mrs. Hobbs would have ignored, is it?
16   A.   Exactly.
17   Q.   To the contrary, this is the kind of complaint
18   that you think Mrs. Hobbs would have taken very
19   seriously; correct?
20   A.   Yes, I do.
21   Q.   Do you know whether Mrs. Hobbs or anyone
22   working at the direction of Mrs. Hobbs investigated
23   whether there was a Bible Club being led by a teacher
24   which was meeting during school hours?

41 (Pages 158 to 161)

Dobrich, et al.                                v.                  Indian River School District, et al.
Janet L. Hearn                        C.A. # 05-120-JJF                       November 14, 2006

Page 162

1   A.   I think that was investigated, yes.
2   Q.   And do you know whether it was determined that
3   that complaint was factually well founded?
4   A.   I'm not sure.
5   Q.   Do you know whether it was determined whether
6   a sixth grade Bible Club was being led by Ms. Truitt, a
7   sixth grade science teacher?
8        MR. GOSSELIN: Objection. Tom, if these
9   questions relate to processing of documents and
10  procedures and those sorts of things, I don't object to
11  them, but it seems like this is the substance of the
12  next phase of the litigation that you're focusing on.
13        MR. ALLINGHAM: I do think that the issue
14  of how this complaint was processed is part and parcel
15  of what I'm asking, but I also think that all things
16  considered in light of the testimony that's been
17  received so far on this document, that no judge in the
18  world would tell me I can't ask these questions of a
19  witness who finally remembers having seen this letter.
20  So I think on both counts I'm entitled to ask these
21  questions, but I'll ask the questions and if you want
22  to instruct her.
23        MR. GOSSELIN: What I'm saying is if this
24  somehow relates to the process, things that conceivably

Page 163

1   have some application to the board prayer issue, then
2   okay. But substantively I don't think the letter
3   relates to the board prayer issue. I don't want to get
4   in the way of you using this as a tool to get to
5   something and it does relate to the board prayer issue,
6   but it seemed like you weren't moving in that
7   direction, you were actually moving into the substance
8   of the Phase II.
9        MR. ALLINGHAM: I don't remember whether
10  I had an answer to that question. Could you read it
11  back?
12        (The pending question was then read back
13  by the reporter.)
14        THE WITNESS: I don't recall.
15  BY MR. ALLINGHAM:
16  Q.   Do you know whether that issue was
17  investigated in response to this complaint?
18  A.   I don't, I don't really know.
19  Q.   Do you recall any investigation into behavior
20  by a counselor named Judy Redard having to do with
21  pressuring a student to engage in religious activities
22  in school?
23  A.   No, I don't.
24  Q.   On that question, you answered promptly no.

Page 164

1   Does that mean that you affirmatively recall that that
2   did not happen at least within your ambit of
3   experience, nobody did that that you know of; is that
4   correct?
5   A.   Would you restate the question?
6   Q.   Sure.
7        Is it that you recall affirmatively that
8   you do not, you are not aware that such an
9   investigation was initiated into Mrs. Redard's
10  behavior?
11  A.   I don't know if it was investigated.
12  Q.   Okay. You don't know one way or another?
13  A.   No.
14  Q.   Okay. Parent complaints of this kind, is it
15  the practice of the district to investigate and then to
16  respond to the parents?
17  A.   Yes.
18  Q.   And did you type a responsive letter to the
19  parent in this case?
20  A.   I don't remember.
21  Q.   If you had responded to the parent in this
22  case, would that be reflected in the file that you
23  opened on this complaint?
24  A.   I -- yes, I would say that there would be a

Page 165

1   response in there, if one had been done.
2   Q.   And would there be some reflection of what
3   investigation was done or what was done to investigate
4   the allegations in the complaint?
5   A.   If it was given me to put in the file, yes.
6   Q.   Do you recall personally getting a telephone
7   call from the writer of this letter telling you that
8   she had additional information to give to Mrs. Hobbs on
9   the subjects reflected in this letter?
10  A.   I don't remember.
11  Q.   Other than Mrs. Hobbs, did you show this
12  letter to anyone?
13  A.   I don't -- no, I just showed it to Mrs. Hobbs.
14  Q.   Do you know whether any report was given to
15  the board members on this complaint during a board
16  meeting at which you were present?
17  A.   I don't remember.
18  Q.   Dr. Hattier testified that he was familiar
19  with the allegations of this letter. Do you know how
20  he would have become familiar with those allegations?
21  A.   No, I don't.
22  Q.   So to summarize, you do recall seeing this
23  letter?
24  A.   Yes.

42 (Pages 162 to 165)

Page 166

1    Q.   You do recall making sure that it made its way
2  into Mrs. Hobbs' hands?
3    A.   Yes.
4    Q.   You do not have any recollection of what was
5  done to investigate the allegations in this letter?
6    A.   No.
7    Q.   And you don't know what was done in response
8  to these allegations?
9    A.   No.
10    Q.   Are you surprised that you don't know what was
11  done in response to allegations as serious as the ones
12  in this letter?
13        MR. GOSSELIN: Objection. It's time to
14  move on to something else. You don't have to answer
15  that.
16  BY MR. ALLINGHAM:
17    Q.   I asked you some questions earlier about
18  comments made by board members during the board's
19  consideration of the school board prayer policy.  I
20  have a couple more questions like that and then I'm
21  done.
22        The first one is, did you ever hear a
23  board member say that the practice of the board to open
24  its meetings with a prayer, in words or substance, had

Page 167

1  been a benefit to the students of the district?
2    A.   No.
3    Q.   Did you ever hear a board member say that the
4  prayer was intended to benefit the students of the
5  district?
6    A.   No.
7    Q.   Did you ever hear a board member say that the
8  board ought to consider the interests of the district
9  students in crafting its board prayer policy?  I
10    A.   I don't recall that, no.
11    Q.   And during the board's discussions of the
12  board prayer policy, were any concerns raised about the
13  presence of students at the board meetings?
14    A.   I don't recall that.
15        MR. ALLINGHAM: I have no further
16  questions. Thank you, Mrs. Hearn.
17        I should say I have no further questions
18  subject to my review of the notes which Mrs. Hearn
19  prepared of board meetings which Mr. Gosselin informed
20  me this morning would be produced to us. He and I
21  agreed that we would proceed today notwithstanding that
22  those documents have not previously been produced and
23  that I would review the documents as quickly as I could
24  and make a decision whether any further questions were

Page 168

1  necessary. So with that reservation of rights, I am
2  completed.
3        MR. GOSSELIN: I have a couple questions.
4  BY MR. GOSSELIN:
5    Q.   Mrs. Hearn, I want to go back to some of the
6  testimony from earlier in the day when you were
7  discussing the binders that are kept in the regular
8  course of your duties.
9        I believe you said there are essentially
10  two sets of binders, you have public binders and
11  executive session binders; is that correct?
12    A.   Yes.
13        MR. ALLINGHAM: I object to the form of
14  the question which is leading. On cross-examination of
15  the witness such as this, it is very important that you
16  not lead and I'll object each time that you do lead the
17  witness.
18        MR. GOSSELIN: Okay. And you can object
19  simply by saying objection.
20        MR. ALLINGHAM: I will do that from now
21  on.
22        MR. GOSSELIN: Okay. It's five after
23  five. I'm trying to get through some of the
24  preliminaries quickly, which I'm entitled to do.

Page 169

1  BY MR. GOSSELIN:
2    Q.   Again, I'm trying to get you to recall the
3  testimony that you were giving before, and I believe
4  you said that there were two types of binders, the
5  public binders and the executive session binders.
6    A.   Yes.
7    Q.   You remember that?
8    A.   That is correct, yes.
9    Q.   Okay. Roughly, can you describe what the
10  contents of each of those binders tend to be, the
11  executive session?
12    A.   The contents that, of the executive session
13  are items that are on the executive session agenda, any
14  information that would be relative to any of the topics
15  that are on that particular agenda.
16    Q.   And in generic terms, what are the contents of
17  the public session binders?
18    A.   Any items relating to the topics that are on
19  the regular public session agenda.
20    Q.   Have there ever been any occasion where
21  documents that were not intended to be for public
22  consumption have ended up in the public binders that
23  you know of?
24        MR. ALLINGHAM: I object to the form of

43 (Pages 166 to 169)

Dobrich, et al.                                v.                        Indian River School District, et al.
Janet L. Hearn                         C.A. # 05-120-JJF                      November 14, 2006

Page 170

1   the question.
2              THE WITNESS: Yes.
3   BY MR. GOSSELIN:
4   Q.    And do you recall any specific instances of
5   that?
6   A.    I believe there were some occasions when we
7   had an attorney opinion on something that was on the
8   public session or something that was mistakenly put in, in the
9   public comment or in the public book, because it
10  related to the topic on the public session agenda.
11  Q.    Do you know how it is that the non-public
12  documents would have ended up in the public session
13  binders?
14  A.    By mistake.
15  Q.    If somebody walked in off of the street and
16  said that they wanted to take a look at all of the
17  documents in the public session binders for a
18  particular meeting, would that person have the ability
19  to walk into a room and open up the binders and start
20  looking for what he or she wanted?
21  A.    I would, if the person came in and asked me to
22  look, they would have to fill out a Freedom of
23  Information request.
24  Q.    Okay. So it's not like there's a library —

Page 171

1   A.    It's not like somebody's going to come in and
2   I have a library and, yeah, you can go in there and
3   look at all of the books, no.
4   Q.    If there were a person who requested a
5   document that turned out to be one of those non- — one
6   of those documents that were not intended for public
7   consumption but mistakenly were put in the public
8   binders, would there have been a mechanism to prevent
9   the person coming in off the street requesting the
10  document from actually getting the document?
11             MR. ALLINGHAM: I object to the form of
12  the question.
13  BY MR. GOSSELIN:
14  Q.    You can answer.
15  A.    Yes, I would have reviewed what, what the
16  person requested, and if there was a question, if it
17  was a question -- if it was an attorney thing, I would
18  have asked the superintendent if that was public
19  information or not.
20  Q.    You would not have been the person to make the
21  decision as to whether -- or would you have been the
22  person to make the decision as to whether the
23  particular document should be given to the person from
24  the public who was asking for it?

Page 172

1              MR. ALLINGHAM: I object to the form of
2   the question.
3              THE WITNESS: No. I would have gotten --
4   I would seek approval from the superintendent.
5              MR. GOSSELIN: That's all I have.
6   BY MR. ALLINGHAM:
7   Q.    Did you discuss the questions that
8   Mr. Gosselin just asked you with Mr. Gosselin prior to
9   his asking them of you?
10             MR. GOSSELIN: Objection. You don't have
11  to answer that.
12             MR. ALLINGHAM: Why not?
13             MR. GOSSELIN: I'm instructing her not to
14  answer.
15             MR. ALLINGHAM: On what grounds?
16             MR. GOSSELIN: If she and I had a
17  discussion before this deposition began that is
18  protected by attorney-client privilege. If you have
19  some --
20             MR. ALLINGHAM: Yes, I'm sorry. I
21  withdraw the question. I think your objection is well
22  taken.
23  BY MR. ALLINGHAM:
24  Q.    At any time after this deposition began, did

Page 173

1   you have a discussion with Mr. Gosselin about the
2   substance of his questions to you just a minute ago?
3   A.    No.
4              MR. ALLINGHAM: Thank you. I have
5   nothing further.
6              VIDEO SPECIALIST: This deposition is
7   ending at approximately 5:15 p.m.
8              COURT REPORTER: Reading and signing?
9              MR. GOSSELIN: Yes.
10             (Witness excused.)
11             (The deposition concluded at 5:15 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24

44 (Pages 170 to 173)

Page 174

INDEX

DEPONENT: Janet L. Hearn PAGE
Examination by Mr. Allingham 3, 172
Examination by Mr. Gosselin 168

EXHIBITS

PLAINTIFF'S DEPOSITION EXHIBITS MARKED

PX-65 Notice of Deposition Pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure 21

PX-66 Two-page fax from Jason P. Gosselin to Thomas J. Allingham, II dated October 9, 2006 23

PX-67 Plaintiffs' First Request for the Production of Documents from defendants Indian River School District and Indian River School Board 30

PX-68 Letter dated February 9, 2005, from Lois M. Hobbs to Ms. Susan Towers, BPD 000282 76

PX-69 Two pages from website, re "Freedom of Information Act Complaint Against Indian River School District 85

PX-70 Board of Education Regular Meeting Minutes, Tuesday, April 26, 2005, BPD 000289 through BPD 000301 106

PX-71 Board of Education Regular Meeting Minutes, Tuesday, May 24, 2005, P0913 through P0923 117

ERRATA SHEET/DEPONENT'S SIGNATURE PAGE 175

CERTIFICATE OF REPORTER PAGE 176

Page 175

REPLACE THIS PAGE

WITH THE ERRATA SHEET

AFTER IT HAS BEEN

COMPLETED AND SIGNED

BY THE DEPONENT

Page 176

State of Delaware )
)
New Castle County )

CERTIFICATE OF REPORTER

I, Terry B. Burke, RMR-CRR and Notary Public, do hereby certify that there came before me on Tuesday, November 14, 2006, the deponent herein, JANET L. HEARN, who was duly sworn by me and thereafter examined by counsel for the respective parties; that the questions asked of said deponent and the answers given were taken down by me in Stenotype notes and thereafter transcribed by use of computer-aided transcription and computer printer under my direction.

I further certify that the foregoing is a true and correct transcript of the testimony given at said examination of said witness.

I further certify that I am not counsel, attorney, or relative of either party, or otherwise interested in the event of this suit.

Terry Barbano Burke, RMR-CRR
Certification No. 233-RPR
(Expires January 31, 2008)

DATED: