Case 1:05-cv-00120-JJF   Document 283-8   Filed 06/19/2008   Page 1 of 13

| Dobrich, et al. | v. | Indian River School District, et al. |
| Robert Wilson | C.A. # 05-120-JJF | December 14, 2006 |

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MONA DOBRICH and MARCO )
DOBRICH, Individually and )
as parents and next friend )
of ALEXANDER DOBRICH, )
SAMANTHA DOBRICH, JANE DOE )
and JOHN DOE, Individually )
and as parents and next )
friend of JORDAN DOE and )
JAMIE DOE, )
 )
      Plaintiffs, )
 ) Civil Action
v. ) No. 05-120
 )
INDIAN RIVER SCHOOL, )
DISTRICT, et al., )
 )
      Defendants. )

      Videotaped Deposition of ROBERT WILSON, taken pursuant to notice at 31 Hosier Street, Selbyville, Delaware, beginning at 1:08 p.m., on Thursday, December 14, 2006, before Terry Barbano Burke, RMR-CRR and Notary Public.
APPEARANCES:
    RICHARD S. HORVATH, JR., ESQUIRE
    BRIAN LENHARD, ESQUIRE
      One Rodney Square
      Wilmington, Delaware  19801
      For the Plaintiff

WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477
www.wilfet.com

| Dobrich, et al. | v. | Indian River School District, et al. |
|---|---|---|
| Robert Wilson | C.A. # 05-120-JJF | December 14, 2006 |

Page 2

1  APPEARANCES (cont'd):
2       JARROD SHAU, ESQUIRE
        Drinker, Biddle & Reath, LLP
3       One Logan Square
        18th and Cherry Streets
4       Philadelphia, Pennsylvania  19103-6996
        For the Defendants
5
    ALSO PRESENT:
6
        Lindsay duPhily, Videographer
7
8                - - -
9           VIDEO SPECIALIST:  This is a videotape
10 deposition of Mr. Robert Wilson taken by the plaintiff
11 in the matter of Dobrich, et al. versus Indian River
12 School District, et al., Civil Action No. 05-120.
13          This is being held in the Indian River
14 School District offices, 31 Hosier Boulevard,
15 Selbyville, Delaware.
16          We are going on the record on December
17 14th, 2006, at approximately 1:08 p.m.
18          The court reporter is Terry Burke from
19 the firm of Wilcox & Fetzer, Wilmington, Delaware.  My
20 name is Lindsay duPhily and the videotape specialist of
21 Discovery Video Services.
22          Counsel will now introduce themselves and
23 then the court reporter will swear in the witness.
24          MR. HORVATH:  My name is Richard Horvath.

Page 3

1  I am here on behalf of the plaintiffs, along with Brian
2  Lenhard.
3           MR. SHAU:  My name is Jarrod Shau.  I'm
4  here on behalf of the defendants.
5           THE WITNESS:  My name is Robert Wilson.
6              ROBERT WILSON,
7      the deponent herein, having first been
8      duly sworn on oath, was examined and
9      testified as follows:
10 BY MR. HORVATH:
11 Q.  Mr. Wilson, you are a member of the Indian
12 River School Board; correct?
13 A.  **That's right.**
14 Q.  You have been a member since July 2006?
15 A.  **That's right.**
16 Q.  And I am going to show you what has been
17 marked PX-9.  This is a copy of the school board prayer
18 policy.
19          Since you joined the school board, have
20 you reviewed this policy?
21 A.  **Yes.**
22 Q.  When did you review it?
23 A.  **Pretty much when I first came on the board.**
24 Q.  Was this policy given to you in a packet of

Page 4

1  other district policies?
2  A.  **Pretty much.  Well, no.  This was actually by**
3  **itself.**
4  Q.  By itself?
5  A.  **By itself.**
6  Q.  Who gave it to you?
7  A.  **I do not recall.  I do not recall.**
8  Q.  Was it given to you at a school board meeting?
9  A.  **Yes, it was.**
10 Q.  And it was given to you after you joined the
11 board as a part of your orientation?
12 A.  **Yes -- no, not necessarily as an orientation,**
13 **but it was given to me after I joined the board.**
14 Q.  And after you received the policy, did you
15 discuss with any board members how the board prayer
16 policy operates?
17 A.  **No.**
18 Q.  Have you discussed with any school board
19 members what prayers would be prohibited under the
20 policy?
21 A.  **No.**
22 Q.  Have you discussed with any school board
23 members why the board opens its public meetings with
24 prayer?

Page 5

1  A.  **No.**
2  Q.  Have you discussed with school board members
3  why the board opens only its public meetings with
4  prayer?
5  A.  **No.**
6           MR. HORVATH:  I am going to mark as PX, I
7  ask to have it marked PX-74, I believe.
8           (PX-74 was marked for identification.)
9  BY MR. HORVATH:
10 Q.  Before I go on to PX-74, were you present --
11 have you been present at executive sessions since you
12 joined the board?
13 A.  **Yes.**
14 Q.  Every executive session?
15 A.  **Yes.**
16 Q.  Has --
17 A.  **Every executive session at the regular board**
18 **meeting, yes.**
19 Q.  Okay.  Let's spin off of that, from that.  Has
20 the board had special meetings since you joined the
21 board?
22 A.  **Yes.**
23 Q.  Have you attended those special meetings?
24 A.  **Yes and no.  Yes, one.  No, the other.**

2 (Pages 2 to 5)

Wilcox & Fetzer, Ltd.        Professional Court Reporters        (302)655-0477

| Dobrich, et al.<br>Robert Wilson | v.<br>C.A. # 05-120-JJF | Indian River School District, et al.<br>December 14, 2006 |
|---|---|---|

Page 6

1  Q.   So there have been two special meetings
2  since --
3  A.   I think there has been. I recall knowing for
4  sure one with me being new to the board. Getting all
5  this into sequence, the way it needs to go, I can say
6  yes, there was one special board meeting.
7         The other, I'm not sure if it was a
8  special board meeting or not. I don't recall exactly.
9  Q.   So you can recall --
10 A.   I can recall one, yes.
11 Q.   And you recall attending one; you recall
12 missing one?
13 A.   I don't recall if it was a special meeting,
14 the one I missed. Yes, I did attend a special meeting,
15 but I do not recall if the meeting, the second meeting
16 that I guess you're referring to is a special meeting.
17 I don't think it was a special meeting. It may have
18 been. I get a packet at my house and that's --
19 Q.   Did you miss, have you missed any of the
20 regularly scheduled school board meetings?
21 A.   No. The regular board meetings, no.
22 Q.   Going back to PX-74 --
23 A.   Okay.
24 Q.   -- this document was printed from the

Page 7

1  district's website. It is a copy of the board's
2  October 17th, 2006 minutes; correct?
3  A.   It appears to be, yes.
4  Q.   If you'd like to flip through it, please feel
5  free to do so.
6  A.   (Pause.)
7         It appears to be correct.
8  Q.   You gave the prayer at this meeting; correct?
9  A.   Yes.
10 Q.   Did Mr. Bireley ask you to give the prayer
11 before the day of the meeting?
12 A.   Mr. Bireley gave me the option.
13 Q.   Uh-huh.
14 A.   Yes, I think it was the day before, maybe two
15 days before, but he gave me the option, yes.
16 Q.   Did Mr. Bireley first ask you if you would
17 like to give a prayer at a school board meeting after
18 October 17th, 2006 -- or I'm sorry, October 11th, 2006?
19 A.   The only thing Mr. Bireley -- the only time I
20 had talked to him about a prayer at the Indian River
21 School Board meeting, which it was my turn, it was two
22 days prior and it may have even been a day prior to the
23 meeting, but a couple of days before the meeting, yes,
24 he had called and asked, he says, it's totally up to

Page 8

1  you, it's totally voluntary. If you want to do it,
2  that's fine. If you don't, we'll go to the next
3  person.
4  Q.   Okay.
5         So based on the timing you gave there,
6  is it correct that the earliest that Mr. Bireley would
7  have approached you about giving a prayer at any school
8  board meeting was October 15th, 2006?
9  A.   That was, yes, two days prior to the regular
10 meeting.
11 Q.   Mr. Bireley, you said that Mr. Bireley told
12 you that it was your turn to give a prayer?
13 A.   That's right.
14 Q.   Did he say that everyone got a turn?
15 A.   Everybody has the opportunity. There's nine
16 of us. It pretty much goes in rotation.
17 Q.   Did he ask you if you'd like to be in the
18 rotation?
19 A.   How did he word it? I don't recall exactly
20 how he worded it. I was asked, but I don't -- I do not
21 want to say something that's not correct. I don't know
22 exactly how he worded it.
23 Q.   In form or substance, did he ask you would you
24 like to be in the rotation if he didn't specifically

Page 9

1  say rotation?
2  A.   No, I don't think it was like that. He
3  basically said you know that the board has the
4  opportunity for one of its members to say a prayer or
5  have a moment of silence. It is your turn. If you
6  decline, we will go on to the next person. It is in no
7  way mandatory that you do this. But I was offered the
8  opportunity, I guess you would say.
9  Q.   Do you know when your turn will come up again
10 to offer a prayer at a board meeting?
11 A.   To be honest with you, I haven't really kept
12 that close of a -- I assume nine meetings after the
13 last one. That's not being smart, but that's -- and if
14 he asks, I'm not really, haven't wrote down right to
15 the -- I'm assuming some time, well, roughly April, I'm
16 guessing, maybe.
17 Q.   You're basing that on the concept that every
18 other board member would give a prayer or moment of
19 silence?
20 A.   Yes. If every board member were to give a
21 prayer or a moment of silence, my turn would be nine
22 board meetings from that particular one.
23 Q.   Mr. Wilson, I'm going to ask you to do
24 something and I'm going to keep an eye on this myself.

3 (Pages 6 to 9)

Case 1:05-cv-00120-JJF    Document 283-8    Filed 06/19/2008    Page 4 of 13

| Dobrich, et al. | v. | Indian River School District, et al. |
| --- | --- | --- |
| Robert Wilson | C.A. # 05-120-JJF | December 14, 2006 |

Page 10

1  A.  Okay.
2  Q.  We have a court reporter taking down
3  everything that we say.
4  A.  Okay.
5  Q.  And even though we're videotaped, for the
6  clarity of the record --
7  A.  Okay.
8  Q.  -- I need to be sure that when you're speaking
9  I don't interrupt, and when I'm speaking you don't
10  interrupt.
11  A.  Okay.
12  Q.  That way she can get everything down that we
13  say.
14  A.  That's fine.
15  Q.  Do you remember what your prayer was?
16  A.  Can you be more specific?
17  Q.  Did your prayer mention Jesus?
18  A.  No, it didn't.
19  Q.  Do you recall the exact content of your
20  prayer?
21  A.  Basically, and I won't give you word for word
22  because I can't remember what word for word it was, it
23  was just basically asking for guidance through the
24  meeting, thanking Him for the progress the schools have

Page 11

1  made, thanking Him for the teachers we have, and at the
2  end saying amen.
3  Q.  And by "him," you meant God?
4  A.  Yeah.
5  Q.  And you would have directly addressed your
6  prayer to God?
7  A.  Exactly was -- and I remember how I ended
8  it --
9  Q.  Uh-huh.
10  A.  -- was in His name we pray.
11  Q.  Whose name?
12  A.  Well, basically Jesus' name, I guess, if
13  that's, I guess what you would consider prayer, who
14  else would you be praying to?
15  Q.  Okay.
16      You said who else would you be praying
17  to. What did you mean by that?
18  A.  Well, everybody has their religion. The
19  Dobriches have theirs. You have yours. I have mine.
20      I guess, I want to word this right, just
21  like when my kids would say grace, they would say, In
22  Jesus' name I pray, amen.
23  Q.  Uh-huh.
24  A.  I guess that's Jesus. I looked at Jesus, I

Page 12

1  guess, I'm just used to saying, In Jesus' name we pray,
2  amen. Although that particular night I said "His
3  name," which would be the same thing.
4  Q.  So really when you say who else would we pray
5  to, you mean who else would I pray to?
6  A.  Who else would I pray to, yes.
7  Q.  You wouldn't offer a prayer that was directed
8  to a different religious figure other than Jesus, for
9  example, you wouldn't offer a prayer to Allah?
10  A.  If I was asked to offer a prayer to Allah, I
11  probably would, yes. My belief -- it may be something
12  totally different -- but I have respect for other
13  beliefs.
14  Q.  So do you know if the other board members
15  share that view?
16      MR. SHAU:  Objection. You can answer if
17  you know what the views of the other board members are.
18      THE WITNESS:  No. I don't know all of
19  their denominations, to be perfectly honest with you.
20  I don't know.
21  BY MR. HORVATH:
22  Q.  Are you aware of any board member who is not a
23  Christian?
24  A.  Well, that could go two ways because I'm not

Page 13

1  aware of any of them that are Christians and I'm not
2  aware of any of them that aren't.
3  Q.  You just don't know?
4  A.  I don't know.
5  Q.  I want to go back to, if I understood your
6  testimony correctly, that you would offer, if asked,
7  offer a prayer directed to Allah?
8  A.  Yes, I would.
9  Q.  You would offer a prayer that asked Allah for
10  guidance on behalf of His only Prophet Mohammed?
11  A.  If I was asked to do that and my conviction
12  was there, yes.
13  Q.  Is your conviction there?
14  A.  There's a lot of things to put that in
15  context. You're asking me something -- that's like me
16  asking you if a meteor was falling, would you save your
17  mother before you saved yourself? I don't know, until
18  it happens, I'm not going to say I would not do it, no.
19      Do I believe -- there's different -- in
20  something that I have been taught all my life versus
21  something -- I mean I have a very, I'm very tolerant to
22  other beliefs. I'm very tolerant to the Dobriches. I
23  don't have -- there's not an issue with me and them as
24  far as I'm concerned.

| Dobrich, et al. | v. | Indian River School District, et al. |
|---|---|---|
| Robert Wilson | C.A. # 05-120-JJF | December 14, 2006 |

Page 14

1    If they would have said we want to pray
2    to our God, there would not have been an issue with
3    that. Back to your original question, would I pray to
4    Allah, I'm not going to say that I wouldn't.
5    Q.    You said if your conviction was there, and
6    this is what I want to clear up a little bit.
7    A.    Okay.
8    Q.    Am I correct that if your conviction was not
9    there -- first off, what do you mean by conviction?
10   A.    Well, I believe in Jesus Christ.
11   Q.    Yes.
12   A.    Saying a prayer for Allah and have it come
13   from the heart the way it would if I was praying to
14   Jesus Christ would be two totally different things. My
15   conviction would be for Jesus Christ, whereas if I was
16   praying for Allah, I would do it and go through the
17   motions of it. That don't mean it necessarily comes
18   from my heart.
19   Q.    Do you think, then, the board could adopt the
20   policy that required the board members to pray only to
21   Allah?
22         MR. SHAU: Objection. Form. You can
23   answer if you know what the question is.
24         THE WITNESS: Repeat the question again?

Page 15

1    BY MR. HORVATH:
2    Q.    Do you think the school board could adopt a
3    board prayer policy that would permit only prayers to
4    Allah?
5          MR. SHAU: I'm going to object as to
6    form. You can answer if you know what he's asking.
7          THE WITNESS: I think I understand what
8    you're asking.
9          If there's a person there that believes
10   in Allah, it's clearly demonstrated, I think, in PX-9,
11   that they have the right to do that. If there is
12   somebody on that board out of us nine members, ten
13   members, that believes in Allah, they have the same
14   right and we will show them the same respect.
15   BY MR. HORVATH:
16   Q.    Let me see if I can clarify this a little bit
17   more.
18         Is it your belief that this board, the
19   board prayer policy, PX-9, permits prayers to any
20   religious being?
21   A.    Absolutely.
22   Q.    Okay. Let's suppose that the only religious
23   being it would permit prayers to was Allah.
24   A.    That question's not even -- the board policy

Page 16

1    right there states that you can offer a prayer to any
2    other religion. It does not say you have to do a
3    secular or a Christian prayer. If I'm not mistaken and
4    I read it before, you can offer prayer -- if you
5    believe in -- if you believe in the Statue of Liberty,
6    you want to say a prayer about it, more power to you.
7    We do not segregate against any particular prayer. You
8    are wide open and Charlie, before the meeting, makes
9    that note. You have the right to do.
10   Q.    I understand that, sir. What I'm getting at,
11   and if you could, please put the policy in front of
12   you.
13         The language that you're referring to
14   that let's the board offer, board members offer any
15   prayer they want would be in Paragraph 5; correct?
16   A.    Uh-huh.
17   Q.    Let's suppose Paragraph 5 were not present,
18   and in place of Paragraph 5 it said board members may
19   only offer a prayer to Allah.
20   A.    That's speculating, though. Paragraph 5 is
21   there and this is our policy.
22   Q.    I know. I'm asking for a variation there, so
23   could you please answer the question.
24         If Paragraph 5 was not there and in its

Page 17

1    place it said board members may only offer a prayer to
2    Allah, would you support that policy?
3    A.    No, I wouldn't.
4    Q.    Thank you.
5          And you would not support that policy
6    because it's dictating the content of the prayers?
7    A.    The same reason that we have No. 5 on here, I
8    don't want to be denied my belief the same as the
9    people that believe in these other beliefs, Jehovah or
10   Jesus Christ or Allah. I think they have the right to
11   do what they want to do.
12         My by taking out No. 5 and wording it
13   the way you're saying to word it, you're saying that we
14   have to pray to one particular person and that's
15   exactly why No. 5 is in here for that reason.
16   Q.    Going back to the October 17th meeting --
17   A.    Okay.
18   Q.    -- JROTC students were present at the meeting;
19   correct?
20   A.    Uh-huh.
21   Q.    And did you see the JROTC students at the
22   meeting?
23   A.    Yes, I did.
24   Q.    Those students were there when you gave the

5 (Pages 14 to 17)

| Wilcox & Fetzer, Ltd. | Professional Court Reporters | (302)655-0477 |
|---|---|---|

Case 1:05-cv-00120-JJF   Document 283-8   Filed 06/19/2008   Page 6 of 13

Dobrich, et al.                                         v.                    Indian River School District, et al.
Robert Wilson                                   C.A. # 05-120-JJF                          December 14, 2006

Page 18

1   prayer; correct?
2   A.   I don't recall.
3   Q.   Could you turn to Page 2 of the minutes.
4   A.   Page 2.
5   Q.   At the top of the page it says Presentation of
6   Colors, "The presentation of colors was performed by
7   Sussex Central High School Army JROTC."
8   A.   Uh-huh.
9   Q.   Is it correct that on the minutes that
10  presentation of colors took place after the prayer?
11  A.   I am not sure -- hold on.  Let me look here
12  again.  It's actually on the front page.
13           I don't think so.
14  Q.   You don't think so --
15  A.   The junior ROTC, I do not think, to my
16  knowledge, were not in there.
17  Q.   Did you see them come in after you gave the
18  prayer?
19  A.   If the minutes are correct, as I see them, the
20  prayer is done and then the presentation of the colors,
21  if this is -- and this is the way I understand it.
22  Like I said, I have not been on the board long enough
23  to verbatim tell you.  It seems to me the prayer is
24  near the beginning of the board meeting.  The colors

Page 19

1   are presented farther down.  They actually are outside
2   of the gymnasium or the cafeteria.  Then they come in
3   and present the colors.  I don't think they are in
4   there for the prayer.  I don't think.
5   Q.   But you can't say for sure either way?
6   A.   I can't say for sure, but I don't think
7   they're in there for that.
8            I know the prayer's definitely done
9   before the presenting of colors.
10  Q.   Okay.  That's the only thing you're sure of?
11  A.   That's -- yeah.
12  Q.   If Mr. Bireley asked you at the school board
13  meeting instead of before the school board meeting to
14  offer a prayer, would that make you feel uncomfortable?
15  A.   No.
16  Q.   Do you know if it would make any other school
17  board member uncomfortable?
18           MR. SHAU:  Objection.  Form.
19           THE WITNESS:  I don't know how it would
20  make him feel.
21  BY MR. HORVATH:
22  Q.   Do you know who the Doe family is?
23  A.   No.
24  Q.   Has anyone told you who the -- that they know

Page 20

1   who the Doe family is?
2   A.   No.
3   Q.   Have you taken any steps to learn who the Doe
4   family is?
5   A.   No.
6   Q.   Do you know if anyone has taken any steps to
7   learn who the Doe family is?
8   A.   No.
9   Q.   Has anyone expressed any passing interest in
10  who the Doe family is, as far as you know?
11  A.   No, not really.
12  Q.   Wouldn't you agree that this case has
13  attracted a lot of attention in Sussex County?
14  A.   Yes.
15  Q.   And many people have expressed opinions about
16  the motivations of the families in this case?
17  A.   Yes.
18  Q.   In that time, not one person you spoke to
19  expressed any interest in who the Does are?
20           MR. SHAU:  Objection.  Form.
21           THE WITNESS:  No.
22  BY MR. HORVATH:
23  Q.   Before you joined the school board, did you
24  see the primary issue in this case as being whether the

Page 21

1   school board could open its meetings with Christian
2   prayer?
3   A.   No.
4   Q.   Did you sign any petitions in support of
5   prayer at any and all --
6   A.   No, no.
7   Q.   You were at the August 24th, 2004 school board
8   meeting; correct?
9   A.   August 24th?  2004, did you say?
10  Q.   Yes.
11  A.   No, I don't think I was.
12  Q.   I am going to mark as PX-75 a portion of the
13  sign-in sheet from that meeting.
14  A.   We're saying 2004, right?
15  Q.   Yes.
16           (PX-75 was marked for identification.)
17           THE WITNESS:  Okay.
18  BY MR. HORVATH:
19  Q.   In the left-hand column --
20  A.   I see it.
21  Q.   One, two, three, four, five, six, seven,
22  eight, nine, ten entries down, I believe.
23  A.   Uh-huh.
24  Q.   What name is in that column?

Case 1:05-cv-00120-JJF   Document 283-8   Filed 06/19/2008   Page 7 of 13

Dobrich, et al.                              v.                    Indian River School District, et al.
Robert Wilson                        C.A. # 05-120-JJF                         December 14, 2006

Page 22

1  A.  Robert Wilson.
2  Q.  Is that your handwriting?
3  A.  No.
4  Q.  Do you have any idea who that Robert Wilson
5  might be?
6  A.  Ideas, yep. It's not me, and I don't know
7  Joanne Wilson, but I'm not the only Robert Wilson in
8  Sussex County either. Especially that I know.
9  Q.  Are you married, Mr. Wilson?
10 A.  Yes, I am.
11 Q.  What is your wife's name?
12 A.  Bonita.
13 Q.  Just had to be clear.
14      What is your address?
15 A.  15621 Wilson Hill Road, Georgetown, Delaware.
16 Q.  How long have you lived there?
17 A.  Since 1994. June 4th, 1994.
18 Q.  Have you ever lived at 16595 Pine Road?
19 A.  Never.
20 Q.  Do you know who might live at 16595 Pine Road?
21 A.  No, but I'm assuming Robert Wilson.
22 Q.  Just not you?
23 A.  Not me, no.
24 Q.  Are you aware of the board or a board member

Page 23

1  ever giving a non-Christian prayer at a board meeting?
2  A.  Yes.
3  Q.  What meeting?
4  A.  I think it was the last one, Mrs. Oliphant
5  done a moment of silence.
6  Q.  Okay. And aside from the moment of silence,
7  are you aware of any board meeting that has opened with
8  a non-Christian prayer?
9  A.  No.
10 Q.  You ran for election this year; correct?
11 A.  Yes.
12 Q.  Was this the first time you have ever run for
13 elected office?
14 A.  Yes.
15 Q.  Did anyone ask you to run for the school board
16 in this past election?
17 A.  Yes.
18 Q.  Who asked you?
19 A.  My father.
20 Q.  And your father's name is?
21 A.  Sam.
22 Q.  Why did he ask you to run for election?
23 A.  Since I have two kids in this district, I seen
24 issues with referendums that I didn't like. Teachers'

Page 24

1  salaries I didn't like. No, it wasn't the prayer
2  issue. I have two kids in the district mainly is why I
3  ran for the position. There was a lot of things I
4  didn't like and I wanted to be involved in their
5  education more than what I was.
6  Q.  Is your father interested in the prayer issue?
7  A.  No more than me.
8  Q.  Did your father organize a group of Indian
9  River residents over the topic of prayer?
10      MR. SHAU: Objection. This isn't
11 relevant to the school board prayer issue.
12      MR. HORVATH: He said his father is no
13 more interested in school board prayer than he is. I
14 think this is relevant.
15      MR. SHAU: To the constitutionality of
16 the board prayer as written and in practice, you
17 believe that to be relevant to those issues?
18      MR. HORVATH: I am interested in what his
19 involvement is with the community in this issue, yes.
20      MR. SHAU: His father's involvement in
21 the community?
22      MR. HORVATH: He said his involvement is
23 the same. I am not going to argue with you.
24      MR. SHAU: I am going to instruct him not

Page 25

1  to answer. Ask your next question.
2       MR. HORVATH: I'm sorry, what?
3       MR. SHAU: I am going to instruct him not
4  to answer. Ask your next question.
5  BY MR. HORVATH:
6  Q.  Have you signed any petitions in support of
7  board prayer?
8  A.  I do not recall.
9  Q.  I am going to show you what has been
10 previously marked as PX-73.
11 A.  Thank you.
12      MR. HORVATH: I take it you do not need
13 one?
14 BY MR. HORVATH:
15 Q.  Have you seen this document before?
16 A.  I was sent a questionnaire. I never seen it
17 in the actual paper, no. I never seen what you're
18 showing me here, no, I never seen it.
19 Q.  Are you able to read the text on this paper?
20 A.  Yes.
21 Q.  So I want to go to the top article here on
22 this page, and this is from the May 4th, 2006 Sussex
23 Post. And if you see near the end of the first article
24 here it says, "The questions asked of each school board

Page 26

1  candidate are as follows:
2           "One, experience.
3           "Two, town of residence.
4           "Three, any children who go to school in
5  the district.
6           "Four, current position.
7           "Five, community organizations.
8           "Six, why are you running for this
9  position?
10          "Seven, what issues do you feel are most
11 important to the school district at this time?
12          "Eight, what is your opinion on the issue
13 of prayer at monthly board of education meetings.
14          "And nine, complete this sentence: I
15 feel I can make a difference through my service on the
16 board of education because.'"
17          Do you recall filling out a survey along
18 those lines?
19 A.  Yes, I do.
20 Q.  Can you please turn to the next page, and the
21 second column at the bottom starts near the bottom, it
22 has Robert Wilson.
23 A.  Uh-huh.
24 Q.  Going to Item No. 8, which if you flip back to

Page 27

1  the previous page would answer, "What is your opinion
2  on the issue of prayer at monthly board of education
3  meetings?"
4           Did you respond, "When dealing with
5  matters of such magnitude as the education of our
6  children and the spending of millions of dollars of
7  taxpayers' money, I feel it is of utmost importance to
8  ask and pray for divine guidance from our Heavenly
9  Father before any deliberation on these or any issues
10 of such importance are discusses."
11 A.  Yes.
12 Q.  You say "Our Heavenly Father," you
13 responded "Our Heavenly Father."
14          Whose Heavenly Father?
15 A.  Probably from a Christian standpoint, our
16 Heavenly Father I'm sure could be interpreted a lot of
17 different ways. My particular way, I'm looking at it
18 as our Heavenly Father is the same as in Jesus' name.
19 Our Heavenly Father I'm looking to as God, the Heavenly
20 Father.
21 Q.  Is this everybody's Heavenly Father?
22 A.  If you're Muslim, it's probably not.
23 Q.  And it's not the Heavenly Father of people of
24 the Jewish faith?

Page 28

1  A.  I don't know how the Jewish faith works, to be
2  totally honest with you.
3  Q.  How about Buddhist?
4  A.  I don't have a clue how it works either.
5  Q.  Maybe an easier one, atheist?
6  A.  It's definitely not with aetheist, no.
7  Q.  Do you know whether members of those faiths
8  would agree with you?
9           MR. SHAU: Objection. Form.
10          THE WITNESS: Repeat the question again.
11 BY MR. HORVATH:
12 Q.  Do you know whether members of those faiths,
13 the Jewish faith, the Muslim faith, aetheist being the
14 lack of faith, would you agree with your concept that
15 you would ask for divine guidance from Our Heavenly
16 Father?
17 A.  Probably not.
18 Q.  Does it matter to you whether members of those
19 faiths who are district residents would agree with you?
20 A.  Yes.
21 Q.  Why does it matter?
22 A.  I feel they have the same opportunity I do,
23 and when I say that, as I said earlier, I'll show
24 respect to their religion. They believe what they

Page 29

1  want. It's just like a Jehovah Witness coming to my
2  house. I listen to what they have to say. I don't
3  agree with it, I'm not rude and I'm not ignorant.
4           The same thing is with other types of
5  religions. I'm very tolerant of other religions. If
6  they want to share that with me. I'm not saying my
7  religion's the only religion. That's not exactly at
8  all what I'm trying to do.
9           That's just my way of being taught,
10 that's my teaching. That's what I believe.
11          An atheist believes there's not a God.
12 That's his belief. That's fine.
13 Q.  You said same opportunity. Do you understand
14 that the opportunity we're talking about here is
15 offering a prayer at the start of school board
16 meetings?
17 A.  Yes.
18 Q.  Are members of the community who are not
19 school board members offered an opportunity to give a
20 prayer at the start of school board meetings?
21 A.  No.
22 Q.  So they don't have the same opportunity that
23 you have when it comes to offering a prayer at school
24 board meetings?

Page 30

1  A. No.
2  Q. Why is it of the utmost importance to ask and
3  pray for divine guidance from Our Heavenly Father?
4  A. I would say, I have to look at our
5  Constitutional government, our House of Representatives
6  opens up with a word of prayer. Why is it important
7  for them to do it? We feel -- I think people on the
8  board feel whether it -- when we pray to God, now
9  understand that a God, when I say God, I'm praying to
10 God, or you're praying to God, you could mean Allah or
11 any other God, but praying to God is praying to God.
12 Do you understand what I mean by that?
13 Q. Unfortunately, sir, I don't feel like you're
14 answering my question. I asked you why is it
15 important?
16 A. It's more of a -- it's just a way, I guess, we
17 communicate through God asking for his divine
18 intervention. Okay, to a God for divine intervention,
19 whether it be my God or another person's God.
20 Q. Do you believe that divine intervention will
21 help you make better decisions?
22 A. Yes, I do.
23 Q. It doesn't matter where you ask for divine
24 intervention, does it? And by where, I mean where are

Page 31

1  you physically when you ask for the intervention?
2  A. Yes, it does. I think when you do it in the
3  public like that, I think it shows that you can come
4  together, and that's one thing that a lot of people
5  have in common. And when we say a prayer at a board
6  meeting, 99 percent of the people do take part.
7  Q. Of the people, you mean the people present?
8  A. Of the people present, they do take part. I
9  have been able to look around at several times and
10 there are people that have heads bowed. We have not
11 had anybody run out in a rave, I guess you would say.
12 It's just a way to publicly come together as a board.
13 Q. Thank you, sir.
14    The board prayer in some way is for the
15 benefit of everyone in attendance?
16 A. That's exactly right.
17 Q. And the public will not benefit from that if
18 the board prayer is outside of the public's presence?
19 A. I don't think it shows the same kind of unity.
20 We want the public to take part in the prayer. That's
21 the whole thing behind the public board meeting. If a
22 person wants to come forward after a meeting and say
23 that there was an issue with that, I can see us
24 changing it, rewording it, working with them, maybe

Page 32

1  even offering them to say a prayer.
2  Q. Do you think that's likely after what happened
3  to the Dobriches?
4  A. Yes, I do.
5  Q. I am going to show you a copy of what's been
6  previously marked as PX-72.
7     It's a copy of the May 3rd, 2006 issue
8  of the Delaware Wave.
9  A. Okay.
10 Q. If you will look on the second page, it's
11 marked P-2439 at the bottom. I think you're already on
12 it.
13 A. Yeah.
14 Q. Were you sent a series of questions for this
15 article?
16 A. Yes, I was.
17 Q. And did one of those questions involve the
18 prayer suit?
19 A. I don't -- let me look here and I'll tell you.
20    It evidently was, yes.
21 Q. You responded to, I guess it's a query, On
22 board's refusal to settle prayer suit, your response
23 was, "I am very proud of this school board and the
24 stand they took. It took a lot of courage to stand

Page 33

1  firm in what they believed in. I stand with them in
2  their decision"; is that correct?
3  A. Yes.
4  Q. When you made that statement, did you view the
5  board's decision not to settle as an indication that
6  the board was fighting for prayer at its meetings?
7  A. Say the question one more time.
8  Q. I'll try to clean it up for you.
9     You stated it took a lot of courage to
10 stand firm in what they believed in.
11 A. Okay.
12 Q. What did you view the "what they believed in"
13 to mean?
14 A. It goes back to what we was talking about
15 earlier in having the right to have a prayer at the
16 board meeting regardless of whether it's a Christian
17 prayer or any kind of prayer, we feel that we should
18 have a right to have a prayer and unify. Basically by
19 stating what I said there, I think it's good that they
20 want to keep the issue of being able to say a prayer
21 going forward.
22 Q. Was it your understanding that the settlement
23 would have prohibited the board from praying?
24 A. I'm unaware of, prior to me being on the

| Dobrich, et al.<br>Robert Wilson | v.<br>C.A. # 05-120-JJF | Indian River School District, et al.<br>December 14, 2006 |
|---|---|---|

Page 34

1  board, what the settlement would have contained.
2  Q. So when you made that statement, you didn't
3  know what was happening in terms of the litigation?
4  A. Mostly not. I say mostly. No more than what
5  I had heard throughout the public.
6  Q. What did you hear throughout the public?
7  A. Just that there was a lawsuit basically with a
8  school prayer. And I didn't really -- working a
9  full-time job, I didn't have a lot of opportunity to go
10 chasing it.
11 Q. I understand the feeling of not being able to
12 follow the news with a full-time job.
13 A. Yeah.
14 Q. At that time, or prior to when you made this
15 statement, had anyone told you what the terms of the
16 settlement were?
17 A. No. I don't even think there was a settlement
18 on the table or anything at all when all this school
19 board -- it was actually cooling down, I think, when I
20 was running. I don't think it was as hot as we'd be
21 led to believe.
22 Q. You were asked about the board's refusal to
23 settle prayer?
24 A. We were asked that. Every person running was

Page 35

1  asked that, yes.
2  Q. And you weren't aware at all of a proposed
3  settlement?
4  A. Of a settlement, no.
5  Q. You never had any discussions with anyone --
6  A. No.
7  Q. -- in the community?
8  A. No.
9  Q. Not even your father?
10 A. About a settlement? No.
11 Q. Has any voter told you that he or she wants
12 the school board to pray at its meetings?
13 A. Voter?
14 Q. Yes.
15     MR. SHAU: Objection. Voter for where?
16 BY MR. HORVATH:
17 Q. In the district.
18 A. Read the question one more time, please?
19 Q. Has any voter in the district told you that he
20 or she wants the school board to pray at its meetings?
21 A. Not as simple as cut and dry, no. I think a
22 lot of them would want us to have the opportunity and
23 be able to. As far as coming right out and saying,
24 probably not.

Page 36

1  Q. How did you form that opinion?
2  A. Be more specific, how did I form an opinion of
3  what?
4  Q. You said they haven't come out and said so
5  specifically, but that's what you think the voters
6  want.
7  A. Think of how you asked the question. You
8  asked me has any particular board -- or has any
9  particular person in the district came to me and asked
10 me or asked to pray -- you better read the question
11 again.
12 Q. I asked you has any voter in the district told
13 you that he or she wants the school board to pray at
14 its meetings? And I think your answer was they haven't
15 specifically said that, but I think that's what the
16 voters want.
17 A. I don't want to say yes or no. I don't think
18 it's a yes or no question. I think people, I think
19 people want us to be able to do that. I think they
20 want our constitutional right of being able to do it
21 regardless of whether they are in agreement or
22 disagreement. They think that should be our right as
23 it falls basically in the constitution of it's a
24 freedom of religion.

Page 37

1  Q. How did you form the view that that's what the
2  voters want?
3  A. There again, back to your last question.
4  Nobody told me specifically that they said about --
5  what they said about voting. I have had people tell me
6  and talk to me as far as saying we don't want to lose a
7  constitutional right, and a constitutional right of
8  being able to offer prayer, whether it's your prayer,
9  my prayer, or whoever's prayer, we don't want to lose a
10 right. And it's a right that we have as taxpaying
11 people.
12 Q. So the answer to my question, how did you
13 know, was voters told you they didn't want to give up a
14 right to offer a prayer at a board meeting?
15 A. That's basically, yes.
16 Q. Has anyone in the district told you that they
17 saw the board's prayer policy as about protecting the
18 right to offer a Christian prayer?
19 A. I hate to ask you to do that again, but repeat
20 the question again?
21 Q. Has anyone in the district told you that they
22 saw the board's prayer policy as about protecting the
23 right to offer Christian prayer?
24 A. No.

10 (Pages 34 to 37)

Wilcox & Fetzer, Ltd.     Professional Court Reporters     (302)655-0477

Case 1:05-cv-00120-JJF    Document 283-8    Filed 06/19/2008    Page 11 of 13

| Dobrich, et al. | v. | Indian River School District, et al. |
| --- | --- | --- |
| Robert Wilson | C.A. # 05-120-JJF | December 14, 2006 |

Page 38

1  Q. Have you discussed with anyone whether the
2  2006 election was an endorsement of the stance the
3  school board has taken in support of school board
4  prayer?
5  A. Have I discussed it? No.
6  Q. Do you think that the votes in the 2006
7  election showed that the voters supported the board's
8  stance?
9  A. Yes.
10 Q. Did you have any volunteers who helped you
11 with the board campaign?
12 A. Yes.
13 Q. Were these family members?
14 A. Yes.
15 Q. Which family members?
16 A. I had a niece, a couple of nieces that took
17 names at the polls. My mom called some people. And
18 there was one other person that wasn't family that took
19 names at the polls.
20 Q. Did you or any of your supporters distribute
21 absentee ballots for you?
22 A. I did probably most of them myself. I know I
23 did most of them myself.
24 Q. Where did you distribute absentee ballots?

Page 39

1  A. Not really any particular place. As close to
2  my house probably as a mile and as far away probably as
3  15 miles. Not one particular place.
4       MR. HORVATH: Let's take a quick break
5  right now.
6       VIDEO SPECIALIST: Going off the record
7  at approximately 2:01 p.m.
8       (Recess.)
9       VIDEO SPECIALIST: Back on the record at
10 approximately 2:05 p.m.
11 BY MR. HORVATH:
12 Q. Before we took the break, we were discussing
13 the fact that you distributed absentee ballots.
14 A. Uh-huh.
15 Q. Did you visit the Harrison Senior Living in
16 Georgetown, Delaware, in order to distribute absentee
17 ballots?
18 A. No.
19 Q. Did you visit the Green Valley Terrace in
20 Millsboro, Delaware?
21 A. No.
22 Q. Did you visit any nursing home?
23 A. Yes.
24 Q. Do you recall which nursing homes you visited?

Page 40

1  A. Visiting for the reason of --
2  Q. Distributing absentee ballots?
3  A. No, I did not disburse no absentee ballots at
4  the nursing homes. I had went there to talk to the
5  ladies, yes. I did not deliver them. I did not
6  collect them.
7  Q. So you went to the nursing home to campaign?
8  A. Not really.
9  Q. Did you discuss your election for the school
10 board?
11 A. I was asked questions, yes.
12 Q. Were you asked about board prayer?
13 A. Yes.
14 Q. Did you comment on board prayer?
15 A. Yes.
16 Q. Did you make any statements in words or
17 substance that a vote for you would be a vote for
18 prayer and against the ACLU?
19 A. No, I didn't.
20 Q. Did you mention the ACLU at all in your
21 comments?
22 A. I don't recall.
23 Q. Do you recall what you said about prayer,
24 board prayer?

Page 41

1  A. Word for word, no, but I do know I said I
2  support the board's prayer to move forward.
3       As I said, I did not know a heaping lot
4  about the situation.
5  Q. Did you think this was a legitimate campaign
6  issue?
7  A. Not really.
8  Q. Then why did you answer questions about it?
9  A. I answered many questions. I answered many
10 questions about referendums, what certain people in the
11 district made. About days off, days worked, teacher
12 salaries. I had numerous questions asked me.
13      Did one any more than the other rotate
14 around school board prayer? I don't think so. I would
15 say I was asked a lot of questions about many things.
16 School board prayer, yes. No more/no less than the
17 others.
18 Q. I appreciate that answer, but my question was,
19 if you did not think it was an appropriate campaign
20 issue, why did you answer questions about it?
21 A. They were voters; they asked. I didn't tell
22 them the questions to ask.
23 Q. Those voters were interested in the issue?
24 A. They asked me about it, yes.

Case 1:05-cv-00120-JJF    Document 283-8    Filed 06/19/2008    Page 12 of 13

Dobrich, et al.  
Robert Wilson  
v.  
C.A. # 05-120-JJF  
Indian River School District, et al.  
December 14, 2006

Page 42

1  In no way did I go up to somebody and
2  throw that in their lap. I was asked questions by a
3  voter, I tried to be as quite honest and frank as I
4  could.
5  Q. So you would answer any question a voter asked
6  you during the election?
7  A. If I had the information, I needed to answer
8  it, yes. I tried not to give an answer that I did not
9  know to be correct. I answered as plain, as simple as
10 I could without digging a hole. Therefore, there was
11 not a lot for me to talk about with the school board
12 prayer because I didn't know a lot to talk about.
13 Q. You just said I support it?
14 A. I do support it, yes.
15 Q. Do you think that someone who publicly
16 practiced the Muslim faith could have been elected to
17 the school board in the last election?
18 A. Yes.
19 Q. Are you aware of any Muslims in the district?
20 A. Not sure, so no.
21 Q. Do you think that someone who publicly
22 declared himself to be an aetheist could have been
23 elected to the school board in the last election?
24 A. Yes.

Page 43

1  Q. Now, I have been saying do you think could.
2  Could is sort of one of those vague possibility words.
3  A. Yes.
4  Q. Do you think if someone of the Muslim faith or
5  an atheist who was running for election had a better
6  than fifty-fifty odds of getting elected?
7        MR. SHAU: Objection. Form.
8        THE WITNESS: There's many issues in this
9  district that are big issues. I understand the board
10 prayer is a huge one. I'd have to say yes. There's
11 other things that -- we talk about way more things at
12 board meetings than this issue we're here dealing with
13 right now. There's a lot more that goes on at a board
14 meeting than talking about this school board prayer
15 issue.
16 BY MR. HORVATH:
17 Q. But aside from what goes on at a board
18 meeting, board prayer is a huge issue, as you said?
19 A. It is.
20 Q. Thank you.
21       Just a few more questions and then we
22 can wrap it up.
23 A. Okay.
24 Q. Since you joined the board, has any board

Page 44

1  member suggested that children should not be invited to
2  future board meetings?
3  A. No.
4        Now, let me change that. Say the
5  question again, please.
6  Q. Since you joined the board, have any board
7  members suggested that children should not be invited
8  to future board meetings?
9        MR. SHAU: I'm going to caution the
10 witness to think about if there was anything talked
11 about, when and where it was talked about.
12       THE WITNESS: That's what I'm -- I don't
13 recall. I don't want to be inaccurate.
14 BY MR. HORVATH:
15 Q. Since you joined the board, have any board
16 members made statements indicating a desire to limit
17 the number of children invited to board meetings?
18       MR. SHAU: I'm going to pose the same
19 instruction to my witness.
20       THE WITNESS: I don't remember. Like I
21 said, I slept since then.
22       MR. HORVATH: Thank you very much.
23       THE WITNESS: Okay.
24       VIDEO SPECIALIST: This deposition is

Page 45

1  ending at approximately 2:15 p.m.
2        (Witness excused.)
3        (The deposition concluded at 2:15 p.m.)
4              I N D E X
5  DEPONENT: Robert Wilson                    PAGE
6    Examination by Mr. Horvath                 3
7              E X H I B I T S
8  PLAINTIFF'S DEPOSITION EXHIBITS          MARKED
9  P-74   IRSD BOE Regular Meeting Minutes,     5
         Tuesday, 10/17/06

P-75   Sign-in Sheet, August 24, 2004 Board    21
       Meeting BPD 000100

ERRATA SHEET/DEPONENT'S SIGNATURE       PAGE 46

CERTIFICATE OF REPORTER                 PAGE 47

| Dobrich, et al. | v. | Indian River School District, et al. |
|---|---|---|
| Robert Wilson | C.A. # 05-120-JJF | December 14, 2006 |

Page 46

REPLACE THIS PAGE

WITH THE ERRATA SHEET

AFTER IT HAS BEEN

COMPLETED AND SIGNED

BY THE DEPONENT

Page 47

Page 48

1  State of Delaware   )
                      )
2  New Castle County   )
3
           CERTIFICATE OF REPORTER
4
           I, Terry B. Burke, RMR-CRR and Notary Public,
5  do hereby certify that there came before me on
   Thursday, December 14, 2006, the deponent herein,
6  ROBERT WILSON, who was duly sworn by me and thereafter
   examined by counsel for the respective parties;
7  that the questions asked of said deponent and the
   answers given were taken down by me in Stenotype notes
8  and thereafter transcribed by use of computer-aided
   transcription and computer printer under my direction.
9
           I further certify that the foregoing is a true
10 and correct transcript of the testimony given at said
   examination of said witness.
11
           I further certify that I am not counsel,
12 attorney, or relative of either party, or otherwise
   interested in the event of this suit.
13
14
15
16         Terry Barbano Burke, RMR-CRR
17         Certification No. 233-RPR
18         (Expires January 31, 2008)
19
20 DATED:
21
22
23
24

13 (Pages 46 to 48)

Wilcox & Fetzer, Ltd.   Professional Court Reporters   (302)655-0477