## THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

JANE DOE, *et al.*,                    x
                                       :
                                       :
                Plaintiffs,            :
        v.                             :    Civil Action No. 05-120-JJF
                                       :
INDIAN RIVER SCHOOL DISTRICT, *et al.*, :
                                       :
                                       :
                Defendants.            x

## REVISED SUBSTITUTED REPLY BRIEF IN SUPPORT OF
## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Thomas J. Allingham II (I.D. No. 476)
tallingh@probonolaw.com
Robert S. Saunders (I.D. No. 3027)
Brian G. Lenhard (I.D. No. 4569)
Timothy S. Kearns (I.D. No. 4878)
One Rodney Square
P.O. Box 636
Wilmington, Delaware  19899-0636
(302) 651-3000

        and

Richard S. Horvath, Jr. (I.D. No. 4558)
Four Embarcadero Center
Suite 3800
San Francisco, California  94111-5974
(415) 984-6400

*Attorneys for Plaintiffs*

DATED:  June 26, 2008

# TABLE OF CONTENTS

**PAGE**

TABLE OF CASES & AUTHORITIES ...................................................................... i

PRELIMINARY STATEMENT ............................................................................... 1

ARGUMENT ........................................................................................................... 2

I.      PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT. ..................... 2

II.     THE POLICY'S REAL PURPOSE IS NOT SECULAR. ............................... 7

        A.      Solemnifying Board Meetings Is Not A Secular Purpose Because
                Undisputed Facts Reflect That Board Members Themselves Define
                Solemnify To Mean "Seek Divine Guidance" ........................................ 8

        B.      The Board's Decision To Continue Sectarian Prayer In Public Meetings
                Despite Concededly Effective Secular Options Shows A Non-Secular
                Purpose ............................................................................................... 9

        C.      If The Purpose Of Solemnification Were Given Its Secular Dictionary
                Meaning, That Purpose Would Be A Sham ............................................. 9

        D.      The Policy Applies Only To Meetings That The Public – And Students –
                Routinely Attend ................................................................................ 11

III.    THE BOARD POLICY EITHER REQUIRES EXCESSIVE ENTANGLEMENT OR
        PERMITS ABSOLUTELY ANY PRAYER TO BE DELIVERED. .......................... 12

        A.      Compliance With Paragraph 3 Requires Monitoring The Content Of
                Prayers ............................................................................................... 12

        B.      The Board's Prayers Have Unquestionably Advanced One Faith –
                Christianity ........................................................................................ 13

IV.     REASONABLE OBSERVERS HAVE ALREADY RECOGNIZED THE POLICY AS A
        STRONG ENDORSEMENT OF RELIGION. .............................................. 14

V.      EVEN IF *MARSH* APPLIED, WHICH IT DOES NOT, THE SUPREME COURT AND
        THE COURTS OF APPEALS HAVE SHARPLY LIMITED ITS REACH. .............. 17

CONCLUSION ..................................................................................................... 20

## TABLE OF CASES & AUTHORITIES

**CASES**                                                                    **Page(s)**

*Abington Twp. v. Schempp,*
   374 U.S. 203 (1963) .................................................................................3, 4, 8

*ACLU v. Black Horse Pike Reg'l Bd. of Educ.,*
   84 F.3d 1471 (3d Cir. 1996) ...............................................................................3

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986) ........................................................................................2, 6

*Bacus v. Palo Verde Unified Sch. Dist. Bd. of Educ.,*
   52 F. App'x 355 (9th Cir. 2002) ...................................................................17, 18

*Borden v. Sch. Dist. of E. Brunswick,*
   C.A. No. 06-3890, 2008
   U.S. App. LEXIS 8011 (3d Cir. Apr. 15, 2008)...........................................11, 16

*Coles v. Cleveland Bd. of Educ.,*
   171 F.3d 369 (6th Cir. 1999)..........................................................................17, 18,

*County of Allegheny v. ACLU,*
   492 U.S. 573 (1989) .......................................................................................17, 19

*Diamond Triumph Auto Glass, Inc. v. Safelite Glass Corp.,*
   441 F. Supp. 2d 695 (M.D. Pa. 2006) .................................................................11

*Doe v. Tangipahoa Parish Sch. Bd.,*
   473 F.3d 188 (5th Cir. 2006),
   *rev'd on other grounds,* 494 F.3d 494 (5th Cir. 2007)................................17, 18

*Edwards v. Aguillard,*
   482 U.S. 578 (1987).............................................................................4, 8, 18, 19

*Hinrichs v. Bosma,*
   440 F.3d 393 (7th Cir. 2006),
   *rev'd on other grounds sub nom. Hinrichs v. Speaker of House of*
   *Representatives,* 506 F.3d 584 (7th Cir. 2007)............................................17, 18

*Hyde v. Stanley Tools,*
   107 F. Supp. 2d 992 (E.D. La. 2000)..................................................................12

*Jager v. Douglas County Sch. Dist.,*
   862 F.2d 824 (11th Cir. 1989) ..............................................................................9

*Lee v. Weisman,*
 505 U.S. 577 (1992) ............................................................4, 15, 19

*Marsh v. Chambers,*
 463 U.S. 783 (1983) ............................................................ passim

*McCreary County v. ACLU,*
 545 U.S. 844 (2005) ............................................................14, 15

*Mellen v. Bunting,*
 327 F.3d 355 (4th Cir. 2003)............................................................19

*Santa Fe Indep. Sch. Dist. v. Doe,*
 530 U.S. 290 (2000) ............................................................4, 8

*Snyder v. Murray City Corp.,*
 159 F.3d 1227 (10th Cir. 1998) ........................................................19

*Stein v. Plainwell Community Schools,*
 822 F.2d 1406 (6th Cir. 1987) ........................................................19

*Wynne v. Town of Great Falls, S.C.,*
 376 F.3d 292 (4th Cir. 2004) ........................................................18

## PRELIMINARY STATEMENT

The issues on these cross-motions are quite simple. Defendants claim that their School Board Prayer Policy has a stated secular purpose, that Board members are not "excessively entangled" in the prayers offered, and that the Board's prayers are for Board members alone. Plaintiffs respond that it is undisputed that Board members have themselves defined the Policy's stated purpose in clearly religious terms, that Board members' conceded selection, composition, presentation, and required content-based review of the Board's prayers is classic "entanglement," and that Board members' own credible testimony establishes that the Board wants the public (which includes schoolchildren) to participate in its prayers.

Unsurprisingly, Defendants argue that resolution of such issues on summary judgment is not appropriate, because (they say) there are disputed issues of material fact. But, as we show below, those disputed issues are manufactured, irrelevant and illusory. Perhaps there is no Perry Mason-style witness stand confession here, but the following questions, and their obvious answers, are quite enough to show that summary judgment for Plaintiffs is appropriate.

- If the real purpose of Board prayer is to "solemnify" Board meetings, why does the Policy on its face apply only to regular Board meetings, when the public is always present? And why doesn't the Board pray at special meetings, which Defendants concede equally need solemnity, but which the public typically does not attend?

- If the stated purpose to "solemnify" meetings has no intended religious connotation or purpose, why were concededly effective, undisputedly secular methods to solemnify the meetings summarily rejected by the Board?

- If the intended audience for the prayers is limited to the Board members alone, what possessed Board member Robert Wilson to testify under oath that "we want the public to take part in the prayer"? And why did Board member Donald Hattier explicitly invite the public to "think about" and "understand" the prayer he was about to give?

- If the Policy is not intended to endorse religion, why did the Board adopt a policy entitled "Board *Prayer* At Regular Board Meetings"? (emphasis added)

In our opening brief, Plaintiffs set forth with specificity the undisputed material facts and the relevant case law necessary to support our motion for summary judgment. In their answering brief,[1] Defendants fail to show that any of those material facts are in dispute and fail to provide contrary case law or to distinguish the cases that Plaintiffs cite. Instead, Defendants (i) manufacture illusory disputes by challenging immaterial facts, ignoring Wilson's uncontradicted testimony, or citing testimony that contradicts the controlling testimony of their 30(b)(6) witness; (ii) ignore controlling case law about prayer in the public school context, instead falling back on the limited exception in *Marsh v. Chambers* without explaining why every Circuit that has considered the matter, including two Circuits that assumed *Marsh* applied, has effectively ruled against Defendants – as they concede (DOB[2] 24 n.7); and (iii) refuse to acknowledge that *Marsh* did not approve any practice in which government officials (much less school board members) compose and deliver the prayers themselves. Each strategy fails.

For the reasons set forth below, the Court should find that the Board's policy and practice of prayer in public schools in front of public schoolchildren is unconstitutional.

## ARGUMENT

I.    **PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT.**

Plaintiffs' opening brief establishes that the Supreme Court has consistently held that the

---

[1]  "Answering brief" refers to Defendants' revised substituted answering brief unless otherwise noted. In their revision, Defendants appear to leave (for the most part) their legal argument intact. Tellingly, however, they omit a citation to *Anderson v. Liberty Lobby* that was in their original answering brief. (*Compare* DAB 14 *to* DRSAB 13) Presumably, after reading Plaintiffs' reply brief, Defendants realized that Plaintiffs' reading of *Anderson* is correct – the Court may grant summary judgment if the evidence is sufficiently one-sided. (PRB 5 n.4)

[2]  Citations to briefs are as follows: POB (Plaintiffs' Opening Brief, D.I. 254); PAB (Plaintiffs' Answering Brief, D.I. 265); DOB (Defendants' Opening Brief, D.I. 250); DAB (Defendants' Answering Brief, D.I. 267); PRB (Plaintiffs' Reply Brief, D.I. 269); DRSAB (Defendants' Revised Substituted Answering Brief, D.I. 283).

Establishment Clause prohibits religious actions taken or authorized by elementary and secondary public schools and their personnel, and cites ten separate Supreme Court cases striking down various examples of such religious intrusions into public schools. In response, Defendants do not distinguish these cases,[3] nor cite any other case that would undermine Plaintiffs' argument – and we are aware of none. Instead, Defendants offer the Court one sentence: "[Plaintiffs'] argument, however, fails to appreciate the role of a board of education." (DRSAB 13)

Having dismissed decades of Supreme Court Establishment Clause jurisprudence with this simple sentence, Defendants turn to their only serious argument: *Marsh v. Chambers* controls here. (DRSAB 13) Defendants apparently continue to insist that "this case is not distinguishable in any meaningful way from *Marsh*." (DOB 2) They are simply wrong. First, Defendants have conceded that, unlike in *Marsh*, the "typical" Board prayer is sectarian and invokes Jesus' name. (DOB 26) Second, it is undisputed that only the Board members themselves – not third parties, as in *Marsh* – compose and present the prayers. (DRSAB 6) Third, Defendants do not contest that students attend every regular Board meeting during the academic year. (DRSAB 5) Fourth, it is undisputed that school principals invite students to Board meetings. (DRSAB 4) Finally, Defendants do not contest the obvious fact that all Board

---

[3]    Indeed, Defendants concede that there is "a long line of Establishment Clause cases [that] prohibit[] certain types of religious activity during required courses of instruction and *extracurricular activities*." (DRSAB 13) (emphasis added) In contrast, in their opening brief, Defendants argued that Plaintiffs' position required that school board meetings be likened to a classroom (and, apparently, only a classroom). Defendants now apparently agree with Plaintiffs that the Supreme Court has also struck down religious intrusions in public schools outside of the instructional environment. Defendants also appear now to concede two legal points against which they argued in earlier briefing: (i) disclaimers cannot protect unconstitutional conduct as a matter of law, *ACLU v. Black Horse Pike Reg'l Bd. of Educ.*, 84 F.3d 1471, 1482 (3d Cir. 1996); and (ii) the duration of the prayers is legally irrelevant, *see Abington Twp. v. Schempp*, 374 U.S. 203, 225 (1963) (no defense "to urge that the religious practices here may be relatively minor encroachments on the First Amendment").

meetings are held, and thus all Board prayers are offered, on public school (*i.e.*, District) property. (*See, e.g.*, DOB Ex. M)

All of these undisputed facts make clear that this case is about prayer in front of children in a public school context, not prayer in front of a legislative body. Defendants' insistence that this case is "not distinguishable in any meaningful way from *Marsh*" willfully ignores these undisputed facts and their legal consequences. In fact, under the jurisprudence of the Supreme Court, including *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290 (2000); *Lee v. Weisman*, 505 U.S. 577 (1992); *Edwards v. Aguillard*, 482 U.S. 578 (1987); and *Abington Twp. v. Schempp*, 374 U.S. 203 (1963), prayer by school officials in elementary and secondary public schools in front of impressionable schoolchildren is unconstitutional. Those are precisely the facts of this case, and they require a grant of summary judgment for Plaintiffs.

Confronted with these undisputed dispositive facts, Defendants attempt to create factual disputes by several tactics.

(i) <u>Defendants manufacture fact disputes by referring to testimony that cannot be squared with uncontested facts.</u> For example, Defendants dispute that the Board wants the public to participate in the prayer, citing rote self-serving testimony from Board members that the prayers are only for themselves. But that testimony cannot be reconciled with the highly credible testimony – against Defendants' interests – of Board member Wilson, who candidly testified that "we want the public to take part in the prayer." (Wilson 31) Defendants claim this testimony was taken "out of context," but offer no explanation how or why Wilson's testimony does not mean exactly what it says. (DRSAB 11)

Defendants' attempt to dispute Wilson's testimony is absurd. Defendants claim this statement from Plaintiffs' brief is erroneous: "Board member Robert Wilson freely conceded

4

that the Board's prayers are for the benefit of everyone in attendance." (DRSAB 11) But Defendants admit that "Mr. Wilson simply agreed with the question that Board prayer in some way is for the benefit of everyone in attendance." (*Id.*) The legally relevant point is that the prayer is "for the benefit of everyone in attendance." (Wilson at 31) Defendants do not dispute Wilson's testimony on this point, as proven by their citation *to the same phrase*. Whether Wilson "freely conceded" or "simply agreed," the legal result is the same: Wilson admitted Defendants "want the public to take part in the prayer." (*Id.*) Defendants cannot dispute this fact, nor provide context that alters Wilson's testimony in any way.

Moreover, Defendant Hattier explicitly invited the audience to participate in the prayer he offered at the August 24, 2004 meeting: "The following prayer was given by General George Washington . . . I am asking all of those here tonight to join me in thinking about and understanding his words." (Ex. 55 to POB) As the quotation above shows, Hattier specifically invited the audience to participate in the prayer that immediately followed. Because Defendants do not offer the Court any other possible explanation for Hattier's words, they concede that Plaintiffs are correct.

(ii) <u>Defendants complain improperly about lack of record citation when attempting to</u> <u>dispute Plaintiffs' description of the Board Prayer.</u> (DRSAB 2) Defendants claim that "Plaintiffs erroneously state that the Board's prayer practice overwhelmingly favors Christianity." (*Id.*) Yet Defendants admit that the "typical" Board prayer is sectarian and invokes Jesus' name. (DOB 26) Ignoring their own admission, Defendants persist in claiming there is "no support" for the proposition that the Board prayers are "primarily Christian." (DRSAB 3) Defendants are incorrect. For example, Defendants' claim that McCabe's

testimony does not support the proposition that the prayers were Christian is simply wrong.  Her

testimony on the point speaks for itself:

> Q.    Okay.  Have school board prayers identified any religious figures,
> any deities, for example?
>
> A.    God and Jesus.
>
> Q.    Anyone else?
>
> A.    I don't believe so, and not always Jesus.
>
> Q.    But --
>
> A.    Or I would say the Lord, which would be used sometimes.
>
> Q.    But you don't remember hearing any school board prayer that was
> directed to Jehovah?
>
> A.    No.
>
> Q.    Or Buddha?
>
> A.    No.
>
> Q.    Or Allah?
>
> A.    No.  (McCabe 74)

(iii) <u>Defendants take an absurdly formalistic approach to the facts</u>.  For example, despite

the uncontested fact that students are in attendance at *every regular meeting in the academic year*

(Hastings 42; Hughes 36), Defendants argue that there is  "no evidence" that students likely feel

obligated to attend the Board's regular meetings.[4]  (DRSAB 5)  Rather than acknowledge the fact

that so many students (including Board members' own children) *do* attend Board meetings,

Defendants resort to the irrelevant assertion that students are "not required to be at the meetings."

(Ex. 19; Hattier 22)  Even if that were technically true (and, as a practical matter it is not, *see*

---

[4]    Bireley's self-serving testimony was simply that he cannot recall students being required to
attend meetings, not that students were not required.  (DRSAB 5 n.1)  Defendants argue this
testimony precludes granting Plaintiffs' motion because, they insist, if Board members'
testimony contradicts record evidence relied on by Plaintiffs, "that testimony must be taken
as true" – no matter how implausible it may be in light of the rest of the record.  That is not
the law, which plainly permits the Court to assess whether evidence is sufficiently one-sided
that one party must prevail.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

POB 10-11), it is legally irrelevant. Children are the reason that school boards exist. When Board members pray at meetings, it is undisputed that impressionable schoolchildren are present; that school officials invite them to attend; that they have incentives to attend (*e.g.*, receipt of awards, earning points for attendance, opportunity to address the Board); and that Defendants are unaware of any instance where a student declined an invitation for reasons other than a scheduling conflict. (Bireley 33) And whether or not they are technically required to attend, they have a right to raise concerns about their school with the Board (*id.* 41-48) and the Board's Prayer Policy imposes a price on the exercise of that right: the student must listen to, and be subjected to pressure to participate in, the School Board prayer.

Defendants even go so far as to dispute evidence about the "amount" of students in attendance at these meetings. (DRSAB 4 n.1) Students are not units of measure by which the Court should weigh the constitutionality of the Board's prayer practice. It is undisputed that students, as a *group*, are integral to the regular meetings (Hattier 289-90 (student involvement adds 30-45 minutes to meetings)) and that students, as a *group*, attend every regular meeting during the school year. To state that students "*often* are not in attendance" is wrong. (DRSAB 5) (emphasis added) Indeed, Defendants' parenthetical proves just how wrong they are – Hastings testified only that there "probably" were meetings during the summer months when students were not present. (Hastings 42) In contrast, Hastings was absolutely clear that there were no meetings during the school year in which students were not present. (*Id.*)

## II.    THE POLICY'S REAL PURPOSE IS NOT SECULAR.

Plaintiffs have identified undisputed facts that show the Policy lacks a clear secular purpose and is, therefore, unconstitutional. Plaintiffs do not dispute that the *stated* purpose of the Policy is to "solemnify" Board meetings for their decisions. (Ex. 39 to POB) Nor do we dispute that numerous Defendants candidly defined "solemnify" to mean to seek guidance. (*See* DOB

13-14; DRSAB 18-19; Bireley 150-51; Evans 41; Hastings 103; Helms 110-11; Hobbs 200;

Walls 40)  And it cannot seriously be disputed that the desired source of this "guidance" is a

Christian God; Defendants admit that the typical Board prayer seeking that guidance is sectarian

and Christian, and Defendant Evans and Defendants' 30(b)(6) witness (and Board President)

Bireley both concede the point explicitly (Bireley 150-151 (to "ask for divine guidance"); Evans

41 ("to seek God's guidance")).

> **A.    Solemnifying Board Meetings Is Not A Secular Purpose Because Undisputed Facts Reflect That Board Members Themselves Define Solemnify To Mean "Seek Divine Guidance."**

Defendants claim Plaintiffs are accusing the Board members of lying about the purpose

of the Policy.  (DRSAB 1)  We do nothing of the sort.  We simply use Board members' own

testimony to show that the facially secular purpose of "solemnifying" Board meetings is in fact

not secular, because, as noted above, Board members themselves define solemnify (implicitly

and often explicitly) to mean "seek divine guidance."[5]  Plaintiffs do not dispute that this is the

definition that Board members attribute to the term.  (PAB 25)  Thus "solemnifying" Board

meetings, *as defined by the Board*, remains a religious act.

One final point bears emphasis here.  Defendants offer a dictionary definition of

"solemnify" (DRSAB 19-20), but the Court will search that definition in vain for even a whiff of

---

[5]    Plaintiffs' argument that the stated purpose of the Policy is a sham is thus not an *ad hominem* attack, as Defendants claim.  (DRSAB 1)  By its nature, Establishment Clause litigation often involves allegations that the government's stated purpose is a sham.  As the Supreme Court stated in *Santa Fe*, it is "the *duty* of the courts to distinguish a sham secular purpose from a sincere one," *Santa Fe*, 530 U.S. at 308 (emphasis added), and courts have done so in the summary judgment context. *Edwards*, 482 U.S. at 597 (holding "The Act violates the Establishment Clause of the First Amendment because it seeks to employ the symbolic and financial support of government to achieve a religious purpose" despite "the Act's stated purpose . . . to protect academic freedom"); *see also Abington*, 374 U.S. at 223 (holding unconstitutional Bible reading and the Lord's Prayer in public schools, despite district's assertion of several purported secular purposes).

"seeking divine guidance." Defendants' insistence that solemnify "*need not* have any religious connotation" may be true, as far as it goes. But it willfully ignores the Board members' own testimony that *in this case* "solemnify" does in fact have precisely that connotation.

**B.      The Board's Decision To Continue Sectarian Prayer In Public Meetings Despite Concededly Effective Secular Options Shows A Non-Secular Purpose.**

It is undisputed that the Board rejected other equally effective means of solemnifying its meetings that would have had no Establishment Clause issues, including a Board member's suggestion of opening meetings with a moment of silence, and a Board member's suggestion of private prayer. (POB 14, uncontested in DRSAB)  Indeed, Defendants concede that public prayer is "nice but not necessary" and that "[p]rayer is not necessary" to solemnify Board meetings. (POB 12, uncontested in DRSAB)  Defendants' decision to adopt the non-secular, public approach to "solemnification" reflects that the Board's actual purpose is religious, not secular. *See Jager v. Douglas County Sch. Dist.,* 862 F.2d 824, 830 (11th Cir. 1989).

**C.      If The Purpose Of Solemnification Were Given Its Secular Dictionary Meaning, That Purpose Would Be A Sham.**

Even if the secular dictionary definition of "solemnifying" meetings were the Policy's stated purpose (and Defendants' "seeking divine guidance" definition of "solemnify" makes clear it is not), Wilson's testimony shows this secular purpose would be a sham.

Defendants attack Plaintiffs and their attorneys, claiming there is no evidence that the Policy's stated purpose is a sham. But Defendants conspicuously ignore Robert Wilson's unequivocal testimony that the Policy is intended to effectuate the Board's desire to involve the

public in the Board's prayer.[6]  Because Defendants claim that Plaintiffs cited Wilson's testimony

out of context (DRSAB 11), we reproduce the relevant testimony in full below:

> Q.   It doesn't matter where you ask for divine intervention, does it?  And by where, I mean where are you physically when you ask for the intervention?
>
> A.   Yes, it does.  I think when you do it in the public like that, I think it shows that you can come together, and that's one thing that a lot of people have in common.  And *when we say a prayer at a board meeting, 99 percent of the people do take part.*
>
> Q.   Of the people, you mean the people present?
>
> A.   Of the people present, they do take part.  *I have been able to look around at several times and there are people that have heads bowed.*  We have not had anybody run out in a rave, I guess you would say. It's just a way to publicly come together as a board.
>
> Q.   Thank you, sir.  *The board prayer in some way is for the benefit of everyone in attendance?*
>
> A.   *That's exactly right.*
>
> Q.   And the public will not benefit from that if the board prayer is outside of the public's presence?
>
> A.   I don't think it shows the same kind of unity.  *We want the public to take part in the prayer.  That's the whole thing behind the public board meeting.* If a person wants to come forward after a meeting and say that there was an issue with that, I can see us changing it, rewording it, working with them, maybe even offering them to say a prayer.  (Wilson 30-32) (emphases added)

Defendants did not mention Wilson either in their opening brief or in the legal argument

of their answering brief.  The reason is clear: his testimony proves the unconstitutionality of

Defendants' prayers, which are intended to elicit public participation.  And it illustrates the level

of *visible* public participation in Board prayers, which pressures those who don't want to

participate in two ways:  peer pressure from audience participants to join them in the prayer, and

pressure not to stand out as a non-participant, when influential community members like Board

---

[6]   Defendants also ignore the title of their own Policy:  "Board Prayer At Regular Board Meetings."  (DOB 9)  As the title shows, the Policy is about prayer, not about "solemnification" or generic Board procedures to open a meeting.

members (and respected teachers and administrators) are observing who does and does not

participate. Indeed, as Jane Doe stated in her deposition, "[I]t's peer pressure . . . to bow your

head. Everyone's bowing their head, so you would stand out if you didn't." (Doe 16-17)

Declining to bow her head made Jane and her family feel "uncomfortable and excluded."[7] (Doe

16-17; *see also* Marco Dobrich 11; Mona Dobrich 40-41)

### D.    The Policy Applies Only To Meetings That The Public – And Students – Routinely Attend.

Defendants argue that some special meetings are not entirely closed to the public.

Whether this is true or not, it is irrelevant. It is undisputed that the public attends all regular

meetings, and that the Board routinely prays at such meetings. It is also undisputed that the

public does not regularly attend special meetings (Bireley 87), and that the Board chooses not to

pray at those meetings. (*Id.* 86 ("we always have the prayer at regular meetings but no other");

N.L. Bunting 94 ("I don't think we had ever had prayer at special meetings."); *but see* Helms at

135-36 (prayer at some non-regular meetings, though it is "out of the ordinary"))[8] The

---

[7]    Remarkably, Defendants' advice for schoolchildren feeling such pressure is to hide their religion and lie about their reason for leaving the meeting: "[O]ne could get up and leave saying they had to use the restroom." (Isaacs 63) Telling students to use the restroom does not cure the Establishment Clause violation. *See Borden v. Sch. Dist. of E. Brunswick*, C.A. No. 06-3890, 2008 U.S. App. LEXIS 8011, at *5 (3d Cir. Apr. 15, 2008) (ruling against a coach who allegedly stated that "if [students] felt uncomfortable during the prayer, they could wait in the restroom until it was over").

[8]    Defendants designated Bireley as the District's 30(b)(6) witness on the "History and Tradition of Prayer Since 1969." (Ex. 3 to D.I. 261) Bireley stated unequivocally that the Board did not pray at special meetings. (Bireley at 86, 175-76) Defendants' use of Helms' statements to contradict the damaging testimony of the District's 30(b)(6) witness on this subject matter is another example of the lengths to which the District will go to manufacture factual disputes. Where, as here, Defendants rely on statements that disagree with their own 30(b)(6) witness without providing any explanation for the contradiction, the Court should disregard the contradictory testimony. *Diamond Triumph Auto Glass, Inc. v. Safelite Glass Corp.*, 441 F. Supp. 2d 695, 723 n.17 (M.D. Pa. 2006). Defendants should not "be allowed to defeat [Plaintiffs'] motion for summary judgment based upon [their] self-serving abuse of
                                                                                              *(cont'd)*

distinction is telling. The Policy ensures that the Board will pray in most, if not all, public meetings, but never in non-public meetings, which Defendants admit equally call for solemnity.

Defendants label as "curious" Plaintiffs' argument that the Board's different treatment of public and non-public meetings shows that the Board wants public participation in the prayers. But the Board offers no plausible explanation for its practice of not praying at meetings when the public is not in attendance.[9] Little wonder, then, that Bireley volunteered that the Board's differential treatment of public and non-public meetings "sounds strange." (Bireley 86)

## III. THE BOARD POLICY EITHER REQUIRES EXCESSIVE ENTANGLEMENT OR PERMITS ABSOLUTELY ANY PRAYER TO BE DELIVERED.

There is no dispute over essential facts that prove the Board is excessively entangled with religion. First, only Board members recite the prayers. Second, only Board members compose (or, for historical prayers, select and edit) the prayers they choose to deliver. Third, only Board members are charged with enforcing the Policy's content-based requirement that the prayer opportunity "shall not be used or exploited to proselytize, advance or convert anyone, or to derogate or disparage any particular faith or belief." Thus, Board members compose, monitor the content of, and deliver the prayers – the essence of unconstitutional entanglement in religious practices by government officials (including School Board members).

### A. Compliance With Paragraph 3 Requires Monitoring The Content Of Prayers.

Paragraph 3 of the Policy prohibits Board members from delivering prayers that are "used or exploited to proselytize, advance or convert anyone. . . . ." Defendants contend that

---

*(cont'd from previous page)*

a 30(b)(6) deposition." *Hyde v. Stanley Tools*, 107 F. Supp. 2d 992, 993 (E.D. La. 2000).
[9] Defendants suggest that the prayer is omitted at special meetings because such meetings are less formal, a strikingly circular rationale. (DRSAB 16) In any case, special meetings are no less in need of solemnity if that were the prayer's true purpose.

Paragraph 3 creates no entanglement concerns, even though the Policy places Board members in a dual role: first, as drafters and deliverers of prayers, and second, as enforcers of the Policy.[10] Unlike in *Marsh*, where the legislature was the audience for a minister's prayer, here, the Board is serving as the minister. *See Marsh v. Chambers*, 463 U.S. 783, 793 (1983).

Defendants say that if monitoring prayers for proselytizing content constituted impermissible entanglement, "it would be hard to imagine a practice that could withstand a *Lemon* challenge." (DRSAB 24) Defendants then point to cases where the board is monitoring *someone else* who seeks equal access to a public school. (*Id.*) In contrast, the Board here is responsible for ensuring that *its own prayers* do not proselytize, attempt to convert anyone or advance a faith. Entanglement must result.

### B. The Board's Prayers Have Unquestionably Advanced One Faith – Christianity.

The Policy requires the Board not to "advance" any one religious faith or belief. Because, as Defendants concede, the "typical" Board prayer is plainly Christian,[11] the Board has failed to comply with its own Policy.

Defendants ignore this aspect of their Policy and, instead, seek to focus the Court on whether their prayers are proselytizing. Defendants argue that no reasonable observer could possibly conclude the Board's prayers have been proselytizing by repeated reference to prayer

[10]  Defendants concede Board members are responsible for enforcing the Policy (Bireley at 22), but claim there is a dispute about *how* the Board might enforce the Policy. (DRSAB 6-7) This "dispute" is irrelevant. How the Board enforces the Policy does not matter; what matters is that they do. Defendants also complain that Board members were asked whether hypothetical prayers (not given at Board meetings) would violate the Policy. (DRSAB at 7) But the point was not to establish that prayers actually given did, in Defendants' view, violate the Policy. The point was to illustrate that Board members are unsure how to interpret their own Policy – as their conflicting views on identical sample prayers showed.

[11]  Indeed, no prayer based on any other faith has, to the knowledge of the Board members who were deposed, ever been offered at an Indian River School Board meeting. (POB 14-15)

from Martin Luther King, Jr.[12]  Their argument fails, however, because *Marsh* and the Policy are

more restrictive, requiring that prayers do not advance one religion.  *Marsh*, 463 U.S. at 794.

That non-proselytizing prayer is sometimes offered is not a defense to Plaintiffs' claims.  The

Board's unconstitutional behavior is not excused by one arguably non-proselytizing prayer.

## IV.    REASONABLE OBSERVERS HAVE ALREADY RECOGNIZED THE POLICY AS A STRONG ENDORSEMENT OF RELIGION.

Defendants urge that a hypothetical reasonable observer familiar with the history and

nature of the community would not regard the Policy as an endorsement of religion.  In doing so,

Defendants ignore the undisputed evidence that dozens of *actual* observers at the August 24,

2004 meeting perceived the Board's actions to be a defense of Christian values.  (POB at 7, 18)

Defendants find the observers' comments legally inconvenient, and thus dismiss those who spoke

at the meeting as a "raucous crowd" and "dim-witted and gullible."  (DRSAB 26-27)  That

opinion notwithstanding, the Board members continue to appeal to these same citizens by touting

their support for Board prayer in their re-election campaigns.[13]  (Ex. 17; Ex. 18)

The Policy is unconstitutional because a reasonable observer familiar with the "history

and context of the *community* and *forum in which the religious display occurs*" would perceive

that it endorses religion.  *McCreary County v. ACLU*, 545 U.S. 844, 866 (2005) (emphasis

---

[12]  The Martin Luther King, Jr. prayer is actually an aberration because it represents the only time Walls ever delivered a prayer at a Board meeting.  (Walls 73-74)  Moreover, the Board has already stated that the "typical" prayer, unlike the Martin Luther King, Jr. prayer, includes references to Jesus and the Christian God.  (DOB 26)

[13]  For example, the May 9, 2008 *Coastal Point* contained an ad paid for by Helms and Mitchell that stated, in part: "Another challenge is the issue of 'the Board Prayer.'  Mrs. Mitchell and I stand firm on the IRSD board of education's ability to have prayer before each regular board meeting . . . [W]e have and will continue to vote to fight for prayer before board meetings until such time as the law prohibits such action.  As of today, it is not unlawful to do so and we will fight to keep it this way. . . *Thank you and GOD bless the IRSD*."  (Ex. 17)  Similarly, Hattier's ad in that same newspaper states, "I have supported:  Traditional community values, Including:  Prayer before board meetings music & arts. [*sic*]" (Ex.18)

added). The actual responses of District residents to challenges to the District's prayer practices certainly better reflect the history and context of the community and the forum in which the Prayer Policy exists than abstract references to the history of *congressional* prayer.

Defendants contend that a reasonable observer would be aware of the history of legislative prayer. But the reasonable observer inquiry focuses on the history and context of the community and the forum for the religious display. *See McCreary*, 545 U.S. at 844. The history of prayer in Congress, or even the General Assembly, is of little or no significance to such inquiry. The context of the Indian River School District speaks volumes about the perception of endorsement in this case; the uproar over this litigation led that community to protest the "anti-Christian" lawsuit, speak in favor of prayer and praise the Board for defending Christian values. (Hastings 130-31 (describing sentiment that defending lawsuit was a representation of Christian values as a "common sentiment in the area"); N.L. Bunting 100-01 (heard public sentiment to "fight the ACLU. And it's been we've *always had* prayer, why can't we have prayer, we should have prayer, it's our right to have prayer. . . .") (emphasis added); D. Mitchell 160-61; Walls 88-89) These comments indicate that *actual* observers of the Policy in Indian River have been aware of the Board's past practice of prayer, but have also perceived the Board's defense as an endorsement of "Christian values" or "fighting the ACLU," which they have generally supported. Thus, "hundreds" of actual observers have urged the Board to stand firm for Board prayer (N.L. Bunting 95-97) – but there is *no* evidence that *anyone* has urged the Board to fight for solemnization of Board meetings.

Moreover, an observer familiar with the District's history of prayer and religious practice would also know that for more than a decade after *Lee v. Weisman*, the District continued to have sectarian prayers at high school graduations. Board member Hattier admitted to the *Delaware*

*Wave* that the graduation prayer was unconstitutional and had been for years.[14] (Hattier 303-05)

That practice was stopped only after complaints that ultimately led to this litigation. Similarly, it was only after receiving complaints about their unconstitutional Board prayers that the Board adopted the Policy. But *post hoc* Band-Aids cannot prop up previously unconstitutional practices. *See Borden*, 2008 U.S. App. LEXIS 8011, at *63.

A reasonable observer would also know that the Board had previously considered declaring a "day of prayer" to be led by students in schools in 1999. (Ex. 16) A reasonable observer might know of legislative prayer, but that same observer would also know of this Board's and this District's inclusion of prayer at events like athletic banquets. (Exs.17-19 to D.I. 265) A reasonable observer would, thus, regard the Policy as but one endorsement of religion among many in the District. This preservation of (and attempted installation of) prayer in the District's public schools form a substantial part of the context of the community and the forum that a reasonable observer would perceive. *Borden*, 2008 U.S. App. LEXIS 8011, at *63 (noting significance of history of coach praying with his team as a reason for finding endorsement).

This context of the community does not operate against endorsement, as Defendants may argue. Rather, as in *Borden*, those factors represent a history of prayer and a desire to keep prayer in place through any means necessary, regardless of constitutionality.

The efforts of several Board members to involve the public in a dispute over prayer leave little doubt that the dispute over prayer is a public endorsement of religion. (Exs. 17-18) School Board Prayer has become a cause célèbre for Board members, who repeatedly invoke the lawsuit and the fight to preserve Board prayer in their campaign ads, even while this dispute is playing

---

[14]    Defendants are incorrect that facts showing they understood the unconstitutionality of their actions are not properly before the Court. (DRSAB 8-11)

out in court.  (*Id.*)  Board members tout their support for prayer at meetings because they know

voters care – and it is absurd to suggest that voters care about a practice that is only for Board

members.  Indeed, the dispute over prayer has had the effect of making adherence to a religion

relevant to candidates' standing in the political community.  *See County of Allegheny v. ACLU*,

492 U.S. 573, 594 (1989).  Even if the Board claims they did not intend to convey such an effect,

there can be no doubt that the Board's actions have conveyed such an effect.

## V.    EVEN IF *MARSH* APPLIED, WHICH IT DOES NOT, THE SUPREME COURT AND THE COURTS OF APPEALS HAVE SHARPLY LIMITED ITS REACH.

It is Defendants' burden to establish that *Marsh* could apply to a school board, and thus is

the relevant constitutional framework.  *Marsh* has been consistently recognized as an aberration,

and no Court of Appeals has held that it applies to school boards.  Rather, the Fifth and Ninth

Circuits assumed without deciding that *Marsh* applied and struck down the prayer practices at

issue anyway – because they involved sectarian prayers.  *Doe v. Tangipahoa Parish Sch. Bd.*,

473 F.3d 188 (5th Cir. 2006), *rev'd on other grounds*, 494 F.3d 494 (5th Cir. 2007); *Bacus v.

Palo Verde Unified Sch. Dist. Bd. of Educ.*, 52 F. App'x 355 (9th Cir. 2002).  The Sixth Circuit,

the only Circuit Court to actually determine whether *Marsh* applied to a school board,

determined that it did not.  *Coles v. Cleveland Bd. of Educ.*, 171 F.3d 369, 381 (6th Cir. 1999).

Even if *Marsh* applies because the Board is a legislative body, which it is not (*see* PAB

36-37), the Policy is unconstitutional for a number of other reasons.  First, the Policy is

unconstitutional because the Board "typically" offers sectarian prayers.  (DOB 26)  *Tangipahoa*,

473 F.3d at 202-04; *Hinrichs v. Bosma*, 440 F.3d 393, 399 (7th Cir. 2006), *rev'd on other

grounds sub nom. Hinrichs v. Speaker of House of Representatives*, 506 F.3d 584 (7th Cir. 2007);

*Bacus*, 52 F. App'x at 356-57; *see also Coles*, 171 F.3d at 384.  Second, the Board itself, and not

an outside chaplain, composes and delivers sectarian prayers.  *Marsh*, 463 U.S. at 788 ("Clearly

17

the men who wrote the First Amendment Religion Clauses did not view paid *legislative chaplains* and opening prayers as a violation of that Amendment. . . .") (emphasis added). Moreover, although the Policy is nominally neutral, the neutrality is superficial, because the overwhelming majority of prayers are Christian in nature; no other faith has ever been represented in a prayer and no person of another faith has been permitted to deliver a prayer, because no non-Christian has *ever* served on the Board. *Tangipahoa*, 473 F.3d at 204; *Bacus*, 52 F. App'x at 357. The Policy is also unconstitutional because the recipients of the prayer include impressionable public schoolchildren. *Marsh*, 463 U.S. at 792; *Coles*, 171 F.3d at 382. Indeed, the Supreme Court has been "particularly vigilant in monitoring compliance with the Establishment Clause" in the "special context of the public elementary and secondary school system." *Edwards*, 482 U.S. at 583-84.

The Policy is unconstitutional because the Board demonstrates persistent affiliation with one religious faith, despite the "facial neutrality" of the Policy.[15] *See Wynne v. Town of Great Falls, S.C.*, 376 F.3d 292, 298 (4th Cir. 2004) ("*Marsh* and *Allegheny* also teach that a legislative body cannot, consistent with the Establishment Clause, 'exploit' this prayer opportunity to 'affiliate' the Government with one specific faith or belief in preference to others."); *Bacus*, 52 F. App'x at 357; *Hinrichs*, 440 F.3d at 400-01, *rev'd on other grounds*, 506 F.3d 584. The Policy is unconstitutional because the Board, like all school boards, lacks a "unique history" of prayer.

---

[15] Defendants decry that it is "puzzling" that Plaintiffs refuse to acknowledge the "facial neutrality" of the Policy. (DRSAB 22) Plaintiffs do not deny that the Policy is facially neutral, but have instead noted that because (i) the District's 30(b)(6) witness stated that a non-Christian has *never* served on the Board (Bireley 60), (ii) prayers are offered only by Board members and (iii) no prayer has ever been directed to any deity but Christ or God (McCabe 74; Cohee 114), the facially neutral Policy is in practice little different than a Policy requiring all prayers to be Christian. To conclude, as Defendants do, that the token mention of other faiths in a Policy legally inoculates persistent and constant advancement of Christianity would be "puzzling" indeed.

18

*See Mellen v. Bunting*, 327 F.3d 355, 370 (4th Cir. 2003) ("Put simply, the supper prayer does not share *Marsh*'s 'unique history.' In fact, public universities and military colleges, such as VMI, did not exist when the Bill of Rights was adopted.").[16] Moreover, Defendants' argument misses the larger point that school boards generally lack the "unique history" of state legislatures and Congress because public schooling (and, thus, public school boards) did not exist when the Bill of Rights was adopted. *See, e.g.*, *Edwards*, 482 U.S. at 583 n.4; *Mellen*, 327 F.3d at 370.

Lastly, the Supreme Court has not once, but twice, clearly stated that *Marsh* would not permit Defendants' practice. In *Allegheny*, the Court declared that the non-sectarian nature of the prayers in *Marsh* was absolutely necessary to the practice's constitutionality. *Allegheny*, 492 U.S. at 603. There is absolutely no dispute that the Board's typical prayer is sectarian. (DOB 13, 25-26) Thus, the Policy would be unconstitutional under *Marsh*. Further, *Edwards* clarified that *Marsh*'s historical approach was inapplicable to public schools. *Edwards*, 482 U.S. at 583 n.4. Nor was *Edwards* the only time when the Court has rejected the opportunity to expand *Marsh* into contexts that deal with schoolchildren. The Sixth Circuit applied *Marsh* to graduation prayer in *Stein v. Plainwell Community Schools*, 822 F.2d 1406 (6th Cir. 1987), but the Supreme Court declined to apply *Marsh* in *Lee v. Weisman*. *See Lee*, 505 U.S. at 596.

While Defendants portray themselves as more governmental than school-related, they are tasked with non-legislative school matters. They approve field trips and school choice applications, hire and fire teachers and review student expulsion recommendations. (DOB 6)

---

[16] As Defendants concede (albeit in the last sentence of their brief), "the [Supreme] Court has repeatedly avoided applying *Marsh*'s mode of historical analysis." (DRSAB 36) The case cited by Defendants also noted that *Marsh* employed only a historical analysis, "to the exclusion of [the Supreme Court's] traditional establishment tests." *Snyder v. Murray City Corp.*, 159 F.3d 1227, 1232 (10th Cir. 1998).

They are deeply involved in the operations and administration of the District, and the education of its students. *Id.*

Defendants continue to recite "the Founding Fathers viewed legislative prayer as inherently non-proselytizing" as a bizarre mantra. (DOB 30; DRSAB 34-35) They apparently hope that by mere repetition, it will transform *Marsh* into the sweeping opinion they need. Defendants have nominally drafted a Policy forbidding Board members to use the prayer opportunity to proselytize – in other words, the Policy forbids what Defendants claim is impossible. (DRSAB 34-35)

There is no Circuit split here. Three Circuit Courts have addressed school board prayer practices, and each has held sectarian prayer by school boards unconstitutional. This Court should not be the first to hold that *Marsh* applies to a school board. This Court should not be the first to hold that *Marsh* authorizes government officials to compose and deliver sectarian prayers. And this Court should not be the first to permit a school board to do what all other school officials unquestionably cannot: deliver prayers on school property in the presence of impressionable schoolchildren.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' Motion for Summary Judgment.

/s/ Thomas J. Allingham II

Richard S. Horvath, Jr. (I.D. No. 4558)
Four Embarcadero Center
Suite 3800
San Francisco, California  94111-5974
(415) 984-6400

Thomas J. Allingham II (I.D. No. 476)
tallingh@probonolaw.com
Robert S. Saunders (I.D. No. 3027)
Brian G. Lenhard (I.D. No. 4569)
Timothy S. Kearns (I.D. No. 4878)
One Rodney Square, P.O. Box 636
Wilmington, Delaware  19899-0636
(302) 651-3000
*Attorneys for Plaintiffs*