# EXHIBIT INDEX

**EXHIBIT DESCRIPTION**                                                                    **EX. NO.**

Deposition of Charles M. Bireley ................................................................................1

Deposition of Nina Lou Bunting ................................................................................2

Deposition of Richard H. Cohee................................................................................3

Deposition of Marco Dobrich ....................................................................................4

Deposition of Mona Dobrich ....................................................................................5

Deposition of Jane Doe (REDACTED)........................................................................6

Deposition of John M. Evans......................................................................................7

Deposition of Gregory A. Hastings ...........................................................................8

Deposition of Donald G. Hattier................................................................................9

Deposition of Reginald L. Helms .............................................................................10

Deposition of Lois M. Hobbs....................................................................................11

Deposition of M. Elaine McCabe .............................................................................12

Deposition of Donna M. Mitchell.............................................................................13

Deposition of Harvey L. Walls .................................................................................14

Deposition of Robert D. Wilson ...............................................................................15

Indian River School District Board of Education Minutes (06/29/99) .........................16

*To The Residents of the Indian River School District living in the 5th Voting District,* Coastal Point (05/09/08) ..........................................................................................17

*Voters to Elect School Board Members Tuesday,* Coastal Point (05/20/08) ................18

Indian River School District Board of Education Minutes (02/27/07).........................19

Deposition of Mark A. Isaacs ...................................................................................20

Deposition of Randall Hughes ..................................................................................21

# TAB  1

Bireley, Charles (Video) 10/11/2006 9:15:00 AM

**Page 1**

```
1          IN THE UNITED STATES DISTRICT COURT
2          IN AND FOR THE DISTRICT OF DELAWARE
3
4    MONA DOBRICH and MARCO DOBRICH, individually
     As parents and next friend of ALEXANDER DOBRICH,
5    SAMANTHA DOBRICH, JANE DOE and JOHN DOE,
     individually and as parents and next friend of
6    JORDAN DOE and JAMIE DOE,
7               Plaintiffs
                                  CIVIL ACTION
8         vs.              NO.  15-120
9    INDIAN RIVER SCHOOL DISTRICT, ET AL.,
10
11              Defendants
12   -------------------------------------------
13
           DEPOSITION OF CHARLES M. BIRELEY, taken
14   pursuant to notice at the Indian Ricer School
     District, 31 Hosier Street, Selbyville, Delaware,
15   beginning at 9:15 a.m. on October 11, 2006 before
     David A. Sroka, Registered Professional Reporter and
16   Notary Public.
17
     APPEARANCES:
18
           THOMAS ALLINGHAM, ESQUIRE
19         RICHARD HORVATH, ESQUIRE
           BRIAN LENHARD, ESQUIRE
20         P.O. Box 636
           Wilmington, Delaware  19899-0636
21         For the Plaintiffs
22
           WILCOX & FETZER
23         1330 King Street - Wilmington, DE  19801
           (302) 655-0477
24         www.wilfet.com
```

**Page 2**

```
1
2
3
4          JASON P. GOSSELIN, ESQUIRE
           Drinker Biddle & Reath LLP
5          Philadelphia, Pennsylvania 19103-6996
           For the Defendants
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**Page 3**

```
1          MS. DUPHILY:  This is the
2    videotape deposition of Mr. Charles
3    Bireley, taken by the Plaintiffs in the
4    matter of Dobrich, et.al, versus Indian
5    River School District, et.al, case
6    number is 15-120.
7          The deposition is being held at 31
8    Hosier Boulevard, Selbyville, Delaware.  We
9    are going on the record on October 11, 2006
10   at approximately 9:15 a.m..  The court
11   reporter is Dave Sroka from the firm of
12   Wilcox & Fetzer.  I am Lindsay duPhily,
13   videotape specialist from Discovery Video
14   Services.
15         Now, the counsel will introduce
16   themselves and then the court reporter will
17   swear in the witness.
18         MR. ALLINGHAM:  Tom Allingham
19   representing the Plaintiffs and with me is
20   Rick Horvath and Brian Lenhard.
21         MR. GOSSELIN:  Jason Gosselin
22   representing the Indian River School
23   District, the school board and the other
24   defendants.
```

**Page 4**

```
1                  CHARLES BIRELEY,
2        The Witness herein, called for examination by
3    the Plaintiffs, having been duly sworn to tell the
4    truth, the whole truth, and nothing but the truth,
5    was examined and testified as follows:
6    examination by him to.
7    EXAMINATION BY MR. ALLINGHAM:
8        Q.   Good morning, Mr. Bireley, my name is Tom
9    Allingham, I represent the Plaintiffs.  I'm going to
10   ask you questions today that are relevant in our
11   view to the School Board prayer issue in this
12   litigation.
13         We have, as your lawyer has probably told
14   you separated, or the judge has asked us to separate
15   the School Board prior issue from the several other
16   issues in the case, and so the deposition today will
17   be focused on the School Board prayer issue.
18         A couple pieces of introduction.  I'm going
19   to refer to the final board policy on School Board
20   prayer, a copy of which I'll give you later and we
21   will talk about it, as the School Board Prayer
22   Policy.  Do you understand what I mean when I say
23   that?
24       A.   Yes.
```

1    followed.
2    Q.   You answered my question about your opinion
3    about the School Board being a legislative board by
4    comparing the School Board to the General Assembly,
5    correct?
6    A.   Yes.
7    Q.   Let me ask a couple of more questions.  The
8    General Assembly doesn't approve field trips, does
9    it?
10        MR. GOSSELIN:  Objection.
11   A.   No.
12   Q.   More generally in our -- in the structure
13   of our government, is the General Assembly
14   responsible for enforcing and administering the
15   policies that it sets, the laws that it passes?
16        MR. GOSSELIN:  Objection.
17   A.   Ask me the question again please, if you
18   would?
19   Q.   Sure.  In our government in the State of
20   Delaware is the General Assembly responsible for the
21   administration and enforcement of the statutes and
22   laws that it passes?
23        MR. GOSSELIN:  Objection.
24   A.   Not that I'm aware of.

                                    21

1    Q.   You on the other hand as a School Board
2    mention are responsible for the enforcement and
3    administration of the policies that you pass, isn't
4    that right?
5    A.   Yes.
6    Q.   Let me ask you this, on a percentage basis
7    over the 30 years of your service as a Board member
8    what percentage of your time at public meetings has
9    been spent in the consideration of policies and what
10   percentage of time has been spent on other areas of
11   responsibility?
12   A.   We have a committee that gives us a report
13   each Board meeting on policy.  If there are some to
14   adopt I'd say maybe just a range of 15 to 20, 25
15   minutes a meeting.
16   Q.   On policy?
17   A.   Yes.
18   Q.   And the remainder on non-policy issues?
19   A.   Yes.
20   Q.   In the course of your tenure as a School
21   Board member are you aware of any instance in which
22   a School Board member has been accused of violating
23   or failing to comply with a Board policy?
24   A.   Not that I'm aware of.

                                    22

1    Q.   Do you know what the process would be for
2    disciplining a School Board who violated a School
3    Board policy?
4    A.   Never had the issue to do it, but I would
5    assume that we would come before the rest of the
6    Board members and we would discuss it.
7    Q.   Fair enough.  So, you are not aware of a
8    specific policy that sets that process but that as
9    for example as Board president is what you
10   anticipate what would happen?
11   A.   Yes.
12   Q.   I asked you some general questions about
13   student attendance at school Board meetings and I
14   want to ask some more specific questions.  The
15   minutes of the meetings reflect a presentation of
16   the colors at virtually every meeting, is that
17   consistent with your recollection?
18   A.   Yes, except during the summer months.
19   Q.   Summer months being when the kids are out
20   of school?
21   A.   Yes.
22   Q.   So during the academic school year
23   September to June you would have presentation of
24   colors?

                                    23

1    A.   Yes.
2    Q.   And the colors are presented by the student
3    ROTC groups from the two high schools in the
4    district?
5    A.   Yes.
6    Q.   Who invites them to do that or do they just
7    know that they are suppose to show up?
8    A.   I believe it's the building principal.
9    Q.   Building principal of the school in which
10   you're meeting?
11   A.   Yes.
12   Q.   So, if you were at during the construction
13   projects a couple of years ago, if you were at the
14   elementary school the principal of the elementary
15   school would invites the ROTC?
16   A.   No.
17   Q.   I misunderstood you then, who would invite
18   them?
19   A.   Well, right how it's because we have two
20   high schools and that's where the ROTC and it would
21   be the principals of the two high schools.
22   Q.   So, if you are meeting at Indian River High
23   School the Indian River principal remind the ROTC
24   group to show up for the Board meeting?

                                    24

Bireley, Charles (Video) 10/11/2006 9:15:00 AM

| | |
|---|---|
| 1    A. That's probably true. | 1    A. Yes, it's probably been going on longer |
| 2    Q. I can now eliminate several pages of my | 2 than the awards issue that she recommended that we |
| 3 outline. Are there instances in which students are | 3 do. |
| 4 required to attend Board meetings? | 4    Q. Do you have any recollection of when it |
| 5    A. Not that I'm aware of. | 5 began? |
| 6    Q. Are you aware of any instance in which a | 6    A. No, I'm not sure. |
| 7 student who isn't confronted with a scheduling | 7    Q. I'm going to mark as exhibit, Plaintiff's |
| 8 conflict has declined an invitation to attend School | 8 Exhibit 32 a document bearing Bates number, I should |
| 9 Board meetings? | 9 have told you, Bates numbers you will see on the |
| 10    A. Can you repeat the question? | 10 bottom of most of the documents I give you, there is |
| 11    Q. Yes. Setting aside instances in which | 11 a little printed number. Some guy named Bates |
| 12 student has a scheduling conflict and can't come, | 12 invented this system. So, we identify them on the |
| 13 are you aware of any instance in which a student has | 13 record by Bates numbers so people reading the |
| 14 declined an invitation to attend School Board | 14 transcript know what we are talking about. |
| 15 meetings? | 15    So, this is a document titled Minutes of |
| 16    A. Not that I'm aware of. | 16 the Board of Education Special Meeting on July 19, |
| 17    Q. Is it your expectation as a Board member | 17 1994, it's bearing Bates numbers PR206 through 210. |
| 18 that students would view an invitation from the | 18    (WHEREUPON, Plaintiff's Exhibit 32 |
| 19 School Board as an attractive invitation for | 19 was marked for identification) |
| 20 recognition of their achievements? | 20    MR. ALLINGHAM: I can't remember |
| 21    MR. GOSSELIN: Objection. | 21 if I told you Jason we decided last night |
| 22    Q. You can answer. | 22 we are going to sequentially number and |
| 23    A. My opinion it would be, it's an honor for | 23 call them Plaintiff's Exhibits so that we |
| 24 them to come to receive an award. | 24 don't -- I never know which is the better |
| 33 | 35 |

| | |
|---|---|
| 1    Q. Yes, sir, and in fact isn't that | 1 way, but that's how we are going to do it. |
| 2 essentially what Mrs. Hobbs said back in the mid | 2    MR. GOSSELIN: I prefer -- well, |
| 3 '90s when she said we ought to be honoring our | 3 you don't care what I prefer. This is |
| 4 students? | 4 fine, this is what I prefer. |
| 5    A. Yes. | 5    MR. ALLINGHAM: I feel better |
| 6    Q. Okay, we identified the ROTC, and we | 6 then. |
| 7 identified student who come to the Board meetings to | 7    Q. None of this is a memory test, sir. If you |
| 8 receive awards or recognition, is it also the case | 8 look at page four of the document Plaintiff's |
| 9 that student government representatives address the | 9 Exhibit 32, under student government which is the |
| 10 Board regularly? | 10 third heading, you will see that Mr. Cohee reports |
| 11    A. During the time of the school year, yes. | 11 on a meeting he had at Sussex Central with some |
| 12    Q. Yes, sir, and in fact there is now a | 12 students who talked about a lack of communication |
| 13 section, regular section of the agenda called | 13 and the inactive student government, and Mr. Cohee |
| 14 student government which is intended to provide the | 14 then made a motion, according to the minutes that |
| 15 student government representatives with an | 15 you seconded, to include on the agenda a ten minute |
| 16 opportunity to address the Board, is that correct? | 16 segment for student government for both high schools |
| 17    A. Yes. | 17 and the motion passed unanimously. |
| 18    Q. And that practice was established back in | 18    Does that refresh your recollection that it |
| 19 it 1999s, is that correct? | 19 was in 1994 that that agenda item was added? |
| 20    A. That was one of the things that was done by | 20    A. I wasn't sure of the date that it was done, |
| 21 a Board member who made the suggestion, it wasn't | 21 but I know Mr. Cohee is the one who brought it. |
| 22 done by Mrs. Hobbs. | 22    Q. And looking at these minutes does that |
| 23    Q. No, sir, I didn't suggest that it was | 23 refresh your recollection that it was 1994? |
| 24 separate from the award issue. | 24    A. This says July 19, 1994. |
| 34 | 36 |

1 responsibilities as a Board member seriously, don't
2 you?
3   A.   Yes.
4   Q.   And is it your sense that your fellow Board
5 members also take their responsibilities seriously?
6   A.   Yes.
7   Q.   Have you ever had a sense that your
8 colleagues on the Board were not trying their best
9 to discharge their responsibilities as Board
10 members?
11   A.   No.
12   Q.   So, this will sound like a summary
13 question, and it is, in your 30 years or so of
14 service on the Board you have throughout those 30
15 years of service you have been confident that your
16 fellow Board members are using their best efforts to
17 discharge their Board responsibilities
18 appropriately?
19   A.   To the west of my knowledge?
20   Q.   Yeah.
21   A.   Yes.
22   Q.   Do student government representatives from
23 time to time express concerns to the Board about
24 issues in their schools?

41

1   A.   Yes.
2   Q.   Give me an example of some concerns that
3 they've expressed?
4   A.   The period of time that Sussex Central was
5 going through their construction and they actually
6 were placed in a building maybe a year ahead of time
7 they shouldn't have been there, and it was -- well
8 basically it was not a very good experiences for
9 them.  We heard some of that type of thing.
10   Q.   It's a legitimate concern?
11   A.   Yes.
12   Q.   Any other that you can think of?
13   A.   Not that I can remember.
14   Q.   Do student groups sometimes attend Board
15 meetings?
16   A.   Yes.
17   Q.   Can you give me some examples?
18   A.   Well, I consider it to be a group when the
19 come in to get their awards if that's what you mean.
20   Q.   No, I meant you know musical groups or I
21 guess the ROTC would qualify as a group, some group
22 that attends Board meetings as a group?
23   A.   Yes.
24   Q.   Can you give me some examples?

42

1   A.   Most of the time during the month of
2 December a group would come in to perform either
3 singing or a small acting type thing.  The Odyssey
4 of the Mind students have come in and did their
5 little skit that they did in national in front of
6 the Board.
7   Q.   It SDSA Steel Band, that's a musical group?
8   A.   Yes.
9   Q.   Is that one of the December performances?
10   A.   They came I'm not sure whether it was
11 December, but we have had them there, yes.
12   Q.   What is the Odyssey of the Mind?
13   A.   It's a group of student that are elevated
14 students, you know the better students that through
15 creativity they do skits or they do like a play or
16 something like that that they go to state and
17 national competition and be judged with other school
18 districts.
19   Q.   And so they came and sort of made their
20 presentation to the Board?
21   A.   Yes.
22   Q.   I noticed in some of the older minutes
23 there were band groups that had done national
24 competitions and then had performances for the

43

1 Board, do you recall that?
2   A.   At a Board meeting?
3   Q.   Yes.
4   A.   No, I really don't.
5   Q.   The student groups that attend the School
6 Board meetings who invites them?
7   A.   The students?
8   Q.   The student groups like the steel band or
9 the musical groups or ROTC, who invites them?
10   A.   The superintendent.
11   Q.   Is that done by a letter to the groups?
12   A.   I'm not sure.
13   Q.   Okay.  In one of the minutes, and I don't
14 have it here, so if you don't remember it's not a
15 big deal, but do you recall a student representative
16 addressing the Board with concerns about the quality
17 of the water and quality of the athletic fields at
18 Sussex Central?
19   A.   Yes.
20   Q.   Was it helpful to the Board to get student
21 input on issues like that?
22   A.   Yes.
23   Q.   How did the School Board respond to those
24 concerns?

44

Bireley, Charles (Video) 10/11/2006 9:15:00 AM

1    A.  We tried to make them better.
2    Q.  The student government representative
3  portion of the agenda is limited to the two high
4  school, is that right?
5    A.  Yes.
6    Q.  Are there instances in which other
7  representatives of student bodies express concerns
8  about conditions at their schools, that is a other
9  than the high schools?
10   A.  I can't remember.
11   Q.  Do you recall in August of 2004 a
12  Selbyville middle school student expressing a
13  concern about the loss of safety and school climate
14  positions?
15   A.  Oh, yes.
16   Q.  Do you recall students speaking to the
17  Board about concerns about the Southern Delaware
18  Schools of the Arts?
19   A.  Yes.
20   Q.  And in each of these cases where students
21  come to the Board to address their concerns, does
22  the Board benefit from the attendance of the
23  students and expression of their concerns?
24   A.  Do they benefit?

45

1    Q.  Yes.  Is it helpful to the Board?
2    A.  Yes.
3    Q.  And in case does the Board try to address
4  the concerns of the students?
5    A.  Yes.
6    Q.  Is there any other forum for the students
7  to address the Board other than the public School
8  Board meeting?
9    A.  Yes.
10   Q.  What is that?
11   A.  They can come in executive session.
12   Q.  Would that be by invitation of the Board
13  itself?
14   A.  They apply, they write a letter and tell us
15  that they have something that they want to talk
16  about which is usual a personnel issue and we allow
17  them to come.
18   Q.  And that has happened in the past?
19   A.  Yes.
20   Q.  How frequently?
21   A.  Rarely, but we do allow it.  The same way
22  that we allow a person in the community to do the
23  same thing if it's a personnel issue something that
24  we are not allowed to discuss during an open session

46

1  they come to that.
2    Q.  Oh, I see so there is that limitation in
3  the public comment session where you can't speak
4  about personnel issues, but there is a way for a
5  member of the public to speak to the Board about
6  personnel issues?
7    A.  Yes.
8    Q.  By making an application to speak at an
9  executive session?
10   A.  Yes.
11   Q.  How do members of the public -- how can
12  members of the public find out about that avenue for
13  expressing their concerns to the executive session?
14   A.  They can contact the superintendent.
15   Q.  It's not posted that you can do that
16  anywhere on the web site or in the policies?
17   A.  I'm not sure.
18   Q.  How would students find out about the
19  possibility of speaking to executive session?
20   A.  It's like a chain of command.  If they have
21  an issue they can go to the building principal
22  first.  Then they can go to the superintendent and
23  the superintendent would make them aware that no you
24  cannot stand up in front of the Board meeting and

47

1  talk about this particular issue, however, if you
2  want to do it in executive session then they would
3  be told that they can do it in executive session.
4    Q.  So, the superintendent would let them know
5  which way they could go?
6    A.  Yes.
7    Q.  Apart from speaking to the board at public
8  sessions, or speaking to the Board in executive
9  session, is there any other way that students have
10  the ability to speak directly to the School Board?
11   A.  Other than just maybe seeing us out
12  somewhere and make a comment individually.
13   Q.  No other official way to speak to the
14  School Board?
15   A.  Not that I'm aware of.
16   Q.  It always warms witness' hearts when I
17  start skipping through and I have a long red line on
18  the outline.
19       MS. ALLINGHAM:  Miss duPhily has
20       told me we have about four minutes of tape
21       left, we are going to change the tape now,
22       just take a minute.
23       MS. DUPHILY:  Going off the record
24       at approximately 10:10 a.m..

48

Bireley, Charles (Video)  10/11/2006  9:15:00 AM

1    Q.   So, to the best of your recollection at
2  every Board meeting during your service as a Board
3  member the School Board opened the meeting with a
4  prayer?
5    A.   To the best of my knowledge.
6    Q.   Who decided, and this is all prior to the
7  more recent adoption of the School Board Prayer
8  Policy, who decided which Board member would lead
9  the group in prayer or offer a prayer?
10    A.   The Board president.
11    Q.   How was it decided which School Board
12  member would open the meeting with a prayer?
13    A.   The Board president just asked someone, I
14  don't know how.
15    Q.   Were there any restriction of any kind on
16  what sort of prayer a School Board member could
17  over?
18    A.   Not that I'm aware of.
19    Q.   Prior to the adoption of Policy BDA.1,
20  whish is the School Board Prayer Policy in October
21  of 2004, was there any policy that governed the
22  offering of prayer at School Board meetings?
23    A.   Not that I'm aware of.
24    Q.   Were you ever asked to lead the Board in

57

1  who would be invited to offer the prayer?
2    A.   It was usually done by a small portion of
3  the group of ten.
4    Q.   And did they have any common
5  characteristics, the small portion?
6    A.   Not that I'm aware of.
7    Q.   Do you know how that small group, smaller
8  group was identified by the Board?
9    A.   To my knowledge the Board president would
10  call on someone at the Board meeting to say the
11  prayer, that's all I know.
12    Q.   But you told me that a small group of the
13  Board was asked to offer the prayer, a group that
14  you were not a member of, do you know how that group
15  was identified or picked or selected to be the ones
16  who would offer the prayer?
17    A.   No.
18    Q.   How small a group, two, three?
19    A.   Three, four, somewhere in that
20  neighborhood.
21    Q.   Was a Jewish Board member ever included in
22  that group?
23    A.   I don't recall us ever having a Jewish
24  Board member.

59

1  prayer or offer a prayer at the beginning of School
2  Board meetings prior to the adoption of the School
3  Board policy?
4    A.   No.
5    Q.   So, 1974 to 2004 is the period of time
6  during which you were a School Board member with a
7  three year hiatus, so if my arithmetic is right
8  that's 27 years of service prior to the adoption of
9  Board Policy BDA.1, and you were never asked to
10  offer a prayer at a School Board meeting?
11    A.   That's correct.
12    Q.   Do you know why?
13    A.   No.
14    Q.   Did you ever tell any Board president that
15  you were not interested in offering a prayer at the
16  School Board meeting?
17    A.   No.
18    Q.   Again, if my arithmetic is correct, that's
19  well over 300 School Board meetings at which
20  somebody offered a prayer, but you were not invited
21  to do so, did that strike you as off or unusual?
22    A.   No.
23    Q.   Did you perceive any pattern in the Board
24  president's practice in the selection of the person

58

1    Q.   Was a Muslim Board member ever included in
2  that group?
3    A.   I don't call us having a Muslim Board
4  member.
5    Q.   Or a Buddhist?
6    A.   Same answer.
7    Q.   A non-Christian Board member ever included
8  in that group?
9    A.   I don't recall us ever having that type of
10  Board member.
11    Q.   Would you characterize the members of that
12  smaller group as being particularly religious
13  amongst their peers?
14      MR. GOSSELIN:  Objection.
15    A.   Do I answer?
16    Q.   Yes, sir.
17    A.   Can you please ask that question again?
18    Q.   Was it -- did you perceive that the
19  criteria for selection of this smaller group was
20  that these were folks who were particularly
21  religious?
22      MR. GOSSELIN:  Objection.
23    A.   No.
24    Q.   Let me just ask the broad question, is it

60

Bireley, Charles (Video)  10/11/2006  9:15:00 AM

1    Q.   Do you know precisely when that took place?
2    A.   No.
3    Q.   Did Mr. Helms subsequently report on the
4  substance of his conversation with Mr. Neuberger to
5  the Board?
6    A.   He got Mr. Neuberger to come and visit us.
7    Q.   Do you know when that took place?
8    A.   Not exactly.
9    Q.   Was it the summer of 2004?
10   A.   It was after the graduation ceremony, yes.
11   Q.   Was it before the commencement of the next
12  academic year?
13   A.   Yes, I'm pretty sure it was.
14   Q.   So, sometime during the summer of 2004?
15   A.   Yes.
16   Q.   Do you know whether Mr. Neuberger's visit
17  to the Board is reflected in the minutes of the
18  Board meeting?
19   A.   I believe, if I am not mistaken that this
20  was a special Board meeting, it wasn't a regular
21  Board meeting.
22   Q.   Okay.  Do you know whether the minutes of
23  that meeting reflect Mr. Neuberger's attendance?
24   A.   I thought it was.

85

1  is there any distinction other than that the public
2  is present at those regularly scheduled public
3  meetings?
4    A.   Sometimes there is public at special
5  meetings, too.
6    Q.   Oh, and even if there is public at the
7  special meetings you don't offer a pray?
8    A.   That's correct.
9    Q.   Is there any distinction from your point of
10  view, just as an individual Board member, between a
11  special meeting at which the public is present and a
12  regular meeting at which the public is present that
13  would lead to pray at the latter but not at the
14  former?
15   A.   Except it's always the way that it's been
16  done.
17   Q.   How often does the Board, just an estimate
18  over your 30 years of tenure, how often does the
19  Board call special Board meetings?
20   A.   Two to three a year maybe.
21   Q.   And how often does the public attend
22  special Board meetings?
23   A.   I'm not sure.
24   Q.   Not very frequently?

87

1    Q.   Did had a special Board meeting open with a
2  prayer?
3    A.   I don't believe it did.
4    Q.   Why is that?
5    A.   I know it's probably sounds strange but the
6  prayer issue usually is on regular Board meeting.
7  If we have a special Board meeting we don't do it.
8    Q.   Why would your say that sounds strange?
9    A.   Because we just have a rule, or I guess
10  it's a past practice or whatever that we always have
11  the prayer at the regular Board meetings but no
12  other.
13   Q.   And when you say the regular Board meetings
14  those are the regular meetings at which the public
15  is present?
16   A.   Yes, once a month.
17   Q.   And is that regular practice it's not just
18  today's practice or 2004's regular practice, it's
19  the regular practice that goes back in time as far
20  as your tenure on the Board extends, correct?
21   A.   Yes.
22   Q.   And is that because -- is the distinction
23  between public meetings where prayers are offered
24  and private meetings where prayers are not offered,

86

1    A.   I wouldn't say not all three of them.  Say
2  if we do two or three a year, say not all three.  It
3  depends on what the issue is.
4    Q.   In this litigation we have had the
5  opportunity to look at the minutes of Board
6  meetings, and I'll represent to you that since the
7  adoption of Policy BDA.1, the School Board Prayer
8  Policy on October 19, 2004, since that date there
9  have been at least 17 special Board meetings over
10  the course of that two year period.
11       So, that's eight to nine per year.  Has the
12  incidents of special Board meetings increased in
13  recent years?
14   A.   The difference between what I'm talking
15  about and what you're talking about is we have a
16  special Board meeting the we interview for
17  personnel, I'm not talking about that.  I'm talking
18  about issues other than hiring of personnel that we
19  have a special Board meeting for.
20   Q.   Okay, so I can think of it as two
21  categories of special meetings, one is a category
22  which is limited to hiring personnel for the
23  district?
24   A.   Okay.

88

Bireley, Charles (Video)  10/11/2006  9:15:00 AM

1    Q.   Then I should be thinking then there is
2    category of special meeting for everything else?
3    A.   Yes.
4    Q.   Even it's the everything else type meeting
5    that comes two or three times a year?
6    A.   Yes, I would say so.
7    Q.   I assume that the personnel special
8    meetings there are no public present?
9    A.   That is true.
10   Q.   At the other kinds of special meetings
11   sometimes the public is present and sometimes there
12   is nobody from the public there?
13   A.   Yes.
14   Q.   To come back to Mr. Neuberger, there is a
15   special Board meeting on August 23, 2004 that was
16   addressed in large part to the issue of prayer in
17   the school. I'll show you the minutes, what
18   portion of the minutes that we have in a little
19   while. It that the meeting and to place this in
20   time, the next day, August 24, 2004, was the meeting
21   at which many hundreds of people showed up. Was it
22   the August 23 special meeting, the day before the
23   big meeting, at which Mr. Neuberger showed up at the
24   Board?

89

1    A.   I don't think so.
2    Q.   Was it before or after that August 24th big
3    meeting?
4    A.   If memory serves me correctly it was after.
5    Q.   So, that's helpful, thanks. Other than
6    Mr. Neuberger did the Board or the district contact
7    any other lawyer or law firm to investigate issues
8    relating to School Board prayer?
9    A.   I believe that Mr. Walls, I think it's the
10   Alliance Defense Fund, I think he had some
11   conversation with them, but the Board never met with
12   anyone from them.
13   Q.   How did you find out about Mr. Walls'
14   contacts with the Alliance Defense Fund?
15   A.   He told us that he had done it, that's when
16   he was president.
17   Q.   Did the Board authorize Mr. Walls to
18   contact the Alliance Defense Fund?
19   A.   Not that I'm aware of.
20   Q.   So, he did that on his own?
21   A.   Yes.
22   Q.   Other than Mr. Neuberger and the Alliance
23   Defense Fund, did the Board or the district contact
24   any lawyers for the purpose of investigating the

90

1    issue of School Board prayer?
2    A.   I don't think so.
3    Q.   Did the Board have a regular Board lawyer?
4    A.   Yes.
5    Q.   In the year of 2004?
6    A.   Yes, excuse me.
7    Q.   Who was that?
8    A.   Mr. Griffin, James Griffin.
9    Q.   Did the Board consult with Mr. Griffin on
10   the issue of School Board prayer?
11   A.   Yes.
12   Q.   And when did the first, when did the Board
13   first consult with Mr. Griffin on that issue?
14   A.   Some time after the graduation.
15   Q.   In terms of its consultation with
16   Mr. Griffin did that take place before or after the
17   big meeting on August 24th?
18   A.   If memory serves me correctly that was
19   afterwards, after too.
20   Q.   Okay. So we've identified Mr. Neuberger,
21   the Alliance Defense Fund and Mr. Griffin, any other
22   lawyers that were consulted by the district on the
23   issue of School Board prayer?
24   A.   Maybe David Williams.

91

1    Q.   He's with the Morse James firm?
2    A.   I'm not sure.
3    Q.   It's okay if you don't know?
4    A.   It's a Delaware attorney.
5    Q.   Got you. Mr. Williams was retained by the
6    Board in connection with its dispute with its
7    insurer, correct?
8    A.   Yes.
9    Q.   So that took place after February of 2006?
10   A.   Yes.
11   Q.   Quite a long time after the adoption of the
12   School Board Prayer Policy?
13   A.   Yes.
14   Q.   Did the Board ever consult with either John
15   Cafferty or John Balliger on the issue of School
16   Board prayer?
17   A.   You mean before they came to work for us or
18   work with us?
19   Q.   Before or after they came to work with you?
20   A.   I don't think so. I think they were
21   presented to us by the insurance company.
22   Q.   Did Mr. Balliger and Mr. Cafferty represent
23   the School District and the School Board?
24   A.   Yes.

92

Bireley, Charles (Video)  10/11/2006  9:15:00 AM

1    A.  No.
2    Q.  In order to be a practicing Christian do
3  you consider it necessary to attend church at all?
4    A.  No.
5    Q.  Again on the issue of practice paragraph
6  three of Board prayer, would you consider that a
7  student who attends every regular Board meeting and
8  who hears prayers that regularly mention Jesus
9  Christ could conclude over time that it is the
10  Board's view that Christianity is the appropriate
11  religion?
12          MR. GOSSELIN: Objection.
13    A.  I guess that's possible.
14    Q.  What I'm trying to get at, Mr. Bireley, is
15  whether you would consider the cumulative affect of
16  repeated mention of only one faith or only one
17  representation of the Deity to have some impact,
18  cumulative impact over and above the text of a
19  prayer that's offered?
20          MR. GOSSELIN: Objection.
21    Q.  Would you agree with that?
22    A.  It's possible.
23    Q.  From your perspective as a Board member do
24  you think it would be preferable to avoid that kind

149

1  of cumulative impact, that is to say to offer a
2  variety of kinds of prayers or moments of silence to
3  solemnize the occasion?
4          MR. GOSSELIN: Objection.
5    A.  I think the policy, or the practice that we
6  have right now, where the individual person who is
7  saying the prayer has the right to say, you know,
8  whatever they want.
9    Q.  I'm not asking about individual person's
10  rights, I'm asking about what as a Board member
11  would consider preferable?  Would you consider it
12  preferable to in order to solemnize the proceedings
13  for a variety of kinds of prayers, moments of
14  silence to be offered?
15    A.  I believe in the person's individual right
16  to say what they want to say when they're in prayer.
17  I think that's the way it should be.
18    Q.  Was the purpose of the adoption of the
19  School Board Prayer Policy to solemnify the
20  proceedings of the Board meetings?
21    A.  By that you mean to ask for like divine
22  guidance or help us get through the meeting, to make
23  the right decisions.
24    Q.  I'm really trying to ask a very specific

150

1  question.  I'll be a little more general about it.
2  I won't sort of put the answer in the question.
3  What was the purpose of the adoption of the Board
4  Prayer at Regular Board Meetings Policy?
5    A.  What was the purpose?
6    Q.  Yes.
7    A.  To ask for divine guidance for the Board to
8  help us make correct decisions and get us through
9  the meeting in the proper way.
10    Q.  What does the proper way mean?
11    A.  To do, to make the best decisions for
12  what's best for our students.
13    Q.  And is the proper way the way that God
14  would prefer?
15    A.  In my opinion, yes.
16    Q.  And is the proper way the way that God
17  personified by Jesus Christ would prefer?
18    A.  In my personal opinion, yes.
19    Q.  And that was the purpose of the adoption of
20  the School Board Prayer Policy?
21    A.  The purpose of adopting the School Board
22  policy is to grant us the opportunity to pray for
23  divine guidance, you know and help us make the right
24  decisions.

151

1    Q.  As a Board member when you cast your vote
2  in favor of Board Policy BDA.1, you cast that vote
3  in public, correct?
4    A.  Yes.
5    Q.  And did you expect that members of the
6  public in attendance would understand that that was
7  your purpose in adopting the School Board Prayer
8  Policy?
9    A.  I really had no way of knowing what they
10  thought.
11    Q.  If a member of the public had raised their
12  hand, that's not the right way to say it.  If they
13  signed up to ask a question of the Board during the
14  public comment session at the October 19th meeting,
15  and had asked the question what was your purpose in
16  casting your vote for Board Policy BDA.1, is that s
17  what you would have responded?
18    A.  Not at that time.
19    Q.  What would you have responded at that time?
20    A.  I wouldn't have responded anything.
21    Q.  You would have declined to answer a
22  question what is your purpose in adopting this
23  policy?
24    A.  Yes.

152

Bireley, Charles (Video)  10/11/2006  9:15:00 AM

**173**

1  with a moment of silence?
2  A.  Well --
3  MR. GOSSELIN:  To the extent that
4  this is not based on information obtained
5  from counsel.
6  A.  Okay, this would be from individual Board
7  members?
8  Q.  Yes, sir?
9  A.  It was suggested and was discussed and they
10  decided not to do it because they still thought that
11  each individual Board member had the right to say
12  whatever they wanted to say in their moment of the
13  time that they give a prayer.
14  Q.  Did somebody say look if we just open the
15  meeting with a moment of silence it is not going to
16  be seeking divine guidance for our decisions at the
17  Board meeting?
18  A.  I don't recall that being said.  I don't
19  recall anybody saying that.
20  Q.  The policy itself contemplates, if you look
21  at PX9, sir that the Board of Education may choose
22  to open its meeting with a moment of silence, right?
23  A.  Yes.
24  Q.  And so am I correct that the policy itself

**174**

1  contemplates that moment of silence would be
2  effective to solemnify the proceedings?
3  A.  In some people's mind, yes.
4  Q.  And the policy itself contemplate that it
5  would be effective to solemnify the proceedings by
6  opening with a moment of silence, is that correct?
7  A.  What the policy says?
8  Q.  Yes, sir.  Did anyone raise the question if
9  as the policy reflects being a moment of silence
10  would be effective to solemnify the proceedings why
11  it was necessary also to offer the option to
12  individual Board members to open the meetings with a
13  prayer?
14  A.  The discussion that I remember what that
15  it's an individual's choice.
16  Q.  Was the inclusion in the Board Prayer
17  Policy of the option to open its meeting with a
18  prayer intended to protect individual Board members'
19  rights to express their religion as they saw fit?
20  MR. GOSSELIN:  Objection to the
21  form.
22  A.  To prevent them from doing it?
23  Q.  To protect their rights to express their
24  religion as they saw fit?

**175**

1  A.  I guess that's a fair statement.
2  Q.  Was a reason for the adoption of this
3  policy to protect individual Board members' First
4  Amendment rights to express their religion as they
5  see fit?
6  MR. GOSSELIN:  Objection.
7  A.  I will agree.
8  Q.  Did anybody give any consideration to
9  calling this policy the policy to protect individual
10  Board members First Amendment rights?
11  A.  No, not that I recall.
12  Q.  Do you know why the title of the policy was
13  changed from Policy on Prayer at Board Meetings,
14  which is what the first Rutherford Institute
15  document that Mr. Helms passed to you to Board
16  Prayer at Regular Board Meetings?
17  A.  The only thing I can recall in particular I
18  remember someone asking the question that was the
19  only time that we did it, and it was stated at
20  regular Board meetings because we didn't do it at
21  any other type of meetings.
22  Q.  Got you.  That's not because Board members
23  didn't think they could equally use divine guidance
24  at special Board meetings that you never had done

**176**

1  it?
2  A.  I guess that's true.
3  Q.  So, as far as you were able to tell Board
4  members did think they needed divine guidance for
5  special Board and regular Board meetings?
6  A.  Yes.
7  MR. GOSSELIN:  And everywhere
8  else.
9  Q.  In the Board School Board Prayer Policy we
10  talked a little bit about how you as the president
11  set up the rotating basis, I have a few more
12  questions on that.
13  As things stand now in your service as the
14  Board president, is it correct that you don't on a
15  rotating basis offer each Board member the
16  opportunity to offer a prayer to open the meeting?
17  A.  I just offer it to the people who have
18  indicated to me that they are willing to do it.
19  Q.  Would it be fair for me to understand that
20  the selection process is done in advance with the
21  offer extended only to the, the invitation extended
22  to Board members who have previously volunteered to
23  participate in this process?
24  A.  If the other Board members has not

# TAB 2

Bunting, Nina Lou (Video) 10/13/2006 9:07:00 AM

1  IN THE UNITED STATES DISTRICT COURT
2  FOR THE DISTRICT OF DELAWARE
3
4  MONA DOBRICH and MARCO DOBRICH, individually
   And as parents and next friend of ALEXANDER
5  DOBRICH, SAMANTHA DOBRICH, JANE DOE and JO
   DOE, individually and as parents and next friend
6  of JORDAN DOE and JAMIE DOE,
7                          Plaintiffs
8      vs.              Civil Action
                        Case No. 15-120
9
   INDIAN RIVER SCHOOL DISTRICT, ET AL.,
10
                        Defendants
11
12      DEPOSITION OF NINA LOU BUNTING, taken
13  pursuant t notice at the Indian River School
   District, 31 Hosier Street, Selbyville, Delaware,
14  beginning at 9:07 a.m. on October 13, 2006 before
   David A. Sroka, Registered Professional Reporter and
15  Notary Public.
16
   APPEARANCES:
17
   THOMAS ALLINGHAM, ESQ.
18  RICHARD HORVATH
   BRIAN LENHARD
19  P.O. Box 636
   Wilmington, Delaware  19899-0636
20  For the Plaintiffs
21  JARROD D. SHAW, ESQ.
   Drinker Biddle & Reath, LLP
22  One Logan Square
   Philadelphia, Pennsylvania 19103-6996
23  For the Defendants
24

1

1      MS. DUPHILY:  This is the
2  videotape deposition of Ms. Nina Lou
3  Bunting taken by the Plaintiff in the
4  matter of Dobrich, et al. versus Indian
5  River School District, et al., case number
6  15-120. We are going on the record at 31
7  Hosier Boulevard, Selbyville, Delaware
8  on October 12, 2006 at approximately 12:55
9  p.m..
10      The court reporter is Dave Sroka
11  from the firm of Wilcox & Fetzer,
12  Wilmington, Delaware.    My name is
13  Lindsay     duPhily and I'm the videotape
14  specialist    of Discovery Video Services.
15      Counsel will now introduce
16  themselves and then the court reporter
17  will swear in the witness.
18      MR. ALLINGHAM:  I'm Tom Allingham
19  I represent the Plaintiffs in this
20  case, and with me are Richard Horvath and
21  Brian Lenhard.
22      MR. SHAW:  I'm Jarrod Shaw and I
23  represent the defendants in this action.
24      NINA LOU BUNTING,

2

1      The Witness herein, called for examination by
2  the Plaintiffs, having been duly sworn to tell the
3  truth, the whole truth, and nothing but the truth,
4  was examined and testified as follows:
5  EXAMINATION BY MR. ALLINGHAM:
6      Q.   Did you attend the August 24, 2004 Board
7  meeting?
8      A.   August 24, 2004 Board meeting, are you
9  referring to the one where the public, a lot of
10  people from the public came?
11      Q.   Hundreds of people?
12      A.   Okay, yes, I did.
13      Q.   Did anything occur at that meeting that was
14  disturbing to you personally?
15      A.   No.
16      Q.   I want to show you a clip of the vide from
17  that meeting?
18      A.   Okay.
19      Q.   This is a portion from the public comment
20  section of the meeting.
21      A.   Okay.
22      (AT THIS POINT IN TIME A TAPE WAS PLAYED)
23      Q.   Were you distracted when your telephone
24  rang during that clip?  Would you like me to play it

3

1  again for you?
2      A.   No, I don't think I was distracted.  I may
3  have been momentarily.
4      Q.   Were you present when -- who was speaking
5  during that public comment section?
6      A.   Mr. Harold Short.
7      Q.   Harold Johnson?
8      A.   Harold Johnson, okay.  I don't know him
9  that well.  I knew it was Harold somebody.
10      Q.   Were you present when he made that
11  statement?
12      A.   Yes, I was.
13      Q.   Did you hear him say that the good Lord has
14  proven that there's a higher power above our Supreme
15  Court?
16      A.   I guess I heard him say it.  I didn't hang
17  on every word.
18      Q.   Did you hear him say that was proven when
19  the last I heard Madelyn Murray-O'Hare disappeared
20  never to be seen again?
21      A.   Well, I heard it just now, do I remember --
22      Q.   that's the first time that you heard it?
23      A.   I'm sure I heard it that night, but I
24  didn't remember hearing it until you showed me

4

Bunting, Nina Lou (Video)  10/13/2006  9:07:00 AM

| | |
|---|---|
| 1  Mr. Griffin to draft a School Board Prayer Policy? | 1  Dobrich first talked about her complaint. I don't |
| 2      MR. SHAW: I'm going to | 2  recall having been to the first Board meeting after |
| 3      object to attorney/client privilege. If | 3  that, and when I found out what was going on it was |
| 4      the Board asked Mr. Griffin that's covered | 4  my understanding that Mona Dobrich came to the June |
| 5      by the privilege. | 5  Board meeting to complain about prayer at |
| 6    Q.  Do you remember whether the Board asked | 6  graduation, and then found out that there was prayer |
| 7  Mr. Griffin what the weather was like? | 7  at the regular Board meeting. |
| 8    A.  No, I don't remember what was asked of | 8      So, it was my understanding that we would |
| 9  Mr. Griffin that evening. | 9  draft policy to try to take care of the situation, |
| 10    Q.  The Board Prayer Policy, the process of | 10  and I think most things that we tried to do were in |
| 11  generating Board policies, I'm going to ask, this is | 11  hopes of not being sued. |
| 12  the general process, is it typical that the Board | 12    Q.  This is sort of, maybe an unusual question, |
| 13  would decide to refer a matter to the policy | 13  buy do you feel as a Board member that your rights |
| 14  committee. The policy committee would consult with | 14  regarding the free exercise of your religion are |
| 15  the Board's attorney, and then the policy committee | 15  infringed by not having a policy on special meeting |
| 16  and the Board's attorney typically would draft a | 16  Board prayer? |
| 17  policy for presentation to the full Board? | 17    A.  No, I don't think my rights are violated by |
| 18    A.  Never having attended a policy meeting I | 18  not having a policy, is that what you mean? |
| 19  can't say what their process is. | 19    Q.  Yes, exactly. The other sentence of the |
| 20    Q.  Fair enough. Do you know whether or not | 20  limited portion of the executive session minutes, |
| 21  Mr. Griffin ever drafted a draft School Board Prayer | 21  which is Plaintiff's Exhibit 13 that I have reports |
| 22  Policy? | 22  that, "Several Board members expressed that their |
| 23    A.  I have no idea. | 23  constituents do not want the Board to change its |
| 24    Q.  The policy that you adopted is a policy | 24  practice of opening the meetings with a prayer." Do |
| 93 | 95 |
| 1  that is described on its face as, sorry, ma'am, it's | 1  you remember which Board members expressed that |
| 2  titled Board Prayer at Regular Board Meetings. It's | 2  view? |
| 3  quite specific that it's a policy having to do with | 3    A.  I know I was one of them. |
| 4  regular Board meetings. Did anyone give any | 4    Q.  Do you remember the others? |
| 5  consideration at the Board level to having a policy | 5    A.  And I'm not saying that I expressed that |
| 6  that extended to special Board meetings? | 6  view that evening. I know that over this entire |
| 7    A.  Not to my knowledge because I don't think | 7  thing I have been bombarded with constituents, and I |
| 8  we had ever had prayer at special Board meetings, so | 8  have expressed that numerous times -- |
| 9  that wasn't even a consideration at this time. | 9    Q.  Okay. |
| 10    Q.  Did you understand the -- there was no | 10    A.  -- not necessarily just at this one time. |
| 11  litigation at the time of the adoption, | 11    Q.  And when say that you've been bombarded |
| 12  consideration and adoption of this policy, the | 12  with communications from constituents, give me a |
| 13  litigation was not filed until 2005? | 13  ballpark number 50, 100, 1000? |
| 14    A.  Okay. | 14    A.  In the hundreds. I'm not saying phone |
| 15    Q.  So, did you understand that the question | 15  calls and emails and letters. I know everyone in |
| 16  that had been raised about prayer at Board meetings | 16  this -- well, I know a lot of the people in this |
| 17  was limited to regular Board meetings or did you | 17  community, and we go to restaurants in this |
| 18  understand that it extended to all Board meetings? | 18  community, we go grocery shopping, we're at ball |
| 19    A.  I understood that it was about regular | 19  games with our grandchildren and people come up to |
| 20  Board meetings. | 20  me all the time. I know for a fact that five people |
| 21    Q.  And from where did you get that | 21  this week have come up to me, one lady that I had |
| 22  understanding? | 22  called on the phone about something, so these people |
| 23    A.  I got the understanding, I don't think I | 23  have expressed this to us. |
| 24  was present, there was the graduation at which Mona | 24    Q.  What are they expressing? |
| 94 | 96 |

Bunting, Nina Lou (Video)  10/13/2006  9:07:00 AM

1    A.    They want us to stand firm, they want us to
2    take a stand for what we feel is right and they are
3    behind us and they support us.
4    Q.    Does anybody articulate what it is that you
5    are suppose to be standing firm for?
6    A.    We are standing firm for being able to have
7    the right to say a prayer at the regular Board
8    meeting aloud.
9    Q.    And it's a fine distinction, but your
10   answer is couched in terms of what you are standing
11   firm for, and what I was trying to ask was, did
12   anybody who's called you or bumped into you on the
13   street or whatever, have they articulated to you
14   what they think you're suppose to be standing up
15   for?
16   A.    Yes.
17   Q.    And have some of them articulated that they
18   want you to stand firm for School Board prayer?
19   A.    Yes.
20   Q.    Are have some of them articulated to you
21   that they want you to stand firm for prayer in the
22   schools?
23   A.    No, sir because they understand that that's
24   already been -- there's already been a decision

97

1    about that.
2    Q.    It appeared that a number of the
3    constituents at the August 24th meeting didn't
4    understand that?
5    A.    True, but it's been two years now and
6    people by reading the paper and all I think most
7    people now are aware of what the situation truly is.
8    Q.    Okay. Have you received any comments that
9    a constituent of yours thought that the policy
10   should be revised?
11   A.    No, sir.
12   Q.    So, the comments that you've received from
13   your constituents have been unanimous?
14   A.    Yes, sir.
15   Q.    And that's important to you, isn't it?
16   A.    Well, it's important to me because I
17   represent these people and they elected me to make
18   decisions at the Board level on their behalf, and I
19   represent my people.
20   Q.    Do you know how many residents there are in
21   your district? Which is your district,
22   Mrs. Bunting?
23   A.    I'm district three. I have part of
24   Dagsboro, all of Millsboro, down toward the Long

98

1    Neck area. I feel like I have a foot, I don't know
2    if you are familiar with our district, but we are
3    sort of north and south, I have a foot in the north
4    and also in the south.
5    Q.    That's the second time you've sort of
6    talked about the north and the south of the
7    district, is there, or has been in the past a divide
8    between the north and the south?
9    A.    Very much so.
10   Q.    Tell me what mean by that?
11   A.    We were put together as a district in 1969
12   by the courts, and there are some people who are
13   still upset that it was such a large district put
14   together, and we have to have two high schools
15   because it's such a large district, and our high
16   schools play sports against each other, which isn't
17   real good, so we are our own arch enemies.
18         So, therefore as a Board when we have to
19   decide about which time gets new uniforms, which
20   team gets turf on their football, see what I mean?
21   So, being on this School Board I was warned could be
22   tough because of a north south split sometimes on
23   decisions.
24   Q.    And I guess particularly tough for you

99

1    because your district is sort of part north and part
2    south?
3    A.    Yes, but I taught in this district and I
4    don't see a north and south, I see one district.
5    Q.    In terms of the members, the current
6    members of the Board, which are from the northern
7    half and which are from the southern half?
8    A.    The present members?
9    Q.    Yes, ma'am.
10   A.    Okay, I'll start with the southern half.
11   That would be Charlie Bireley, Reggie Helms, Donna
12   Mitchell, Donald Hattier.
13   Q.    And the rest are from the north?
14   A.    There are the two of us straddle, and that
15   would be Randy Hughes and myself. We are the
16   straddlers. And then the rest are from the
17   northern.
18   Q.    In the course of those hundred or hundreds
19   of comments from your constituents has anyone said
20   to you that you should stand firm for Christian
21   values?
22   A.    No.
23   Q.    Not one?
24   A.    No. Not Christian values. That's never

100

Bunting, Nina Lou (Video) 10/13/2006 9:07:00 AM

1   been the terminology used. I will say it's fight
2   the ACLU. And it's been we've always had prayer,
3   why can't we have prayer, we should have prayer,
4   it's our right to have prayer, but stand firm for
5   Christian values I don't think that terminology has
6   ever been used, not with me.
7       Q.  You mentioned that your constituents
8   generally speaking have told you that you should
9   stand firm for prayer at regular Board meetings?
10      A.  Uh-hum.
11      Q.  And do they draw that distinction between
12  regular Board meetings and special Board meetings?
13      A.  No.
14      Q.  So, they said stand firm for Board prayer?
15      A.  For Board meetings, for praying at the
16  Board meetings.
17      Q.  And what do you say to your constituents
18  when they say that?
19      A.  When I say that I say that we are -- what
20  can we do, we are listening to our lawyers, we are
21  doing what we need to do, and if the case goes to
22  court, you know, the judge will decide. See we
23  have, we can't talk about this as you well know, so
24  we have to be extremely careful what we say.

101

1       A.  (Nods head).
2       Q.  No one has told you that you should stand
3   firm for Christian values?
4       A.  I'm not going to say the words Christian
5   values have never been mentioned, but to my
6   knowledge no one has called it Christian values.
7   They know that the situation is prayer at Board
8   meetings and they usually are the words they use.
9   Prayer, Board meetings.
10      Q.  Well, the litigation is, of course about
11  more than just prayer at Board meetings, correct?
12      A.  Well, they don't know that.
13      Q.  Have you ever received hundreds of comments
14  about any other issue that has faced the Board from
15  your constituents?
16      A.  No, sir.
17      Q.  Have you ever received even a fraction of
18  that many comments on any other issue?
19      A.  Not even a fraction. The closest I ever
20  came to was when we were going to, our calendar
21  situation, a calendar situation, where we wanted to
22  shorten the Easter break and make it just Friday and
23  Monday because we didn't have air conditioning in
24  all the schools yet and, you know, and the parents

103

1       Q.  I apologize, but I don't know what do you
2   mean when you say you can't talk about this?
3       A.  We've been told to be very careful what we
4   say in public, okay?
5       Q.  By your lawyer?
6       A.  By our lawyers.
7       Q.  Nevertheless, from time to time members of
8   the Board have given statements or interviews to the
9   press, is that correct?
10      A.  True.
11      Q.  And members of the Board have gone on the
12  local radio station?
13      A.  Yes, sir.
14      Q.  In your view are those actions consistent
15  with the admonition from your lawyers that you
16  should be very, very careful about what you say?
17      A.  They were happening before we got, before
18  we were told to be extremely careful. We didn't
19  have good representation in the beginning.
20      Q.  And that situation's been corrected now?
21      A.  Yes, sir.
22      Q.  So, in the comments from your constituents
23  that have been unanimous that you should stand firm
24  for School Board prayer?

102

1   got really upset because they felt the children
2   needed a break after the state test. And I did get
3   many phone calls about that, but nothing, nothing
4   compared to this.
5       Q.  Would it be fair to say that this is the
6   issue in which your constituents have been most
7   intensely interested over the entire tenure, over
8   your entire tenure on the Board?
9       A.  Well, certainly the last several years of
10  my tenure. Not so at the very beginning between '02
11  and '04.
12      Q.  Yes, the interest has been very intense
13  since '04?
14      A.  Since '04.
15      Q.  And the intensity of that interest is the
16  greatest of any issue that's ever been presented to
17  the Board --
18      A.  Yes.
19      Q.  -- during your tenure?
20      A.  Yes, in my knowledge, as far as I'm
21  concerned.
22      Q.  Do you know who the Does are?
23      A.  No, sir.
24      Q.  Has anybody ever told you they think they

104

# TAB 3

Cohee, Richard (Video) 10/17/2006 1:17:00 PM

```
 1          IN THE UNITED STATES DISTRICT COURT
 2            FOR THE DISTRICT OF DELAWARE
 3   MONA DOBRICH and MARCO    :  C.A. No. 15-120 (J
     DOBRICH, Individually and  :
 4   as parents and next friend  :
     of ALEXANDER DOBRICH,    :
 5   SAMANTHA DOBRICH, JANE DOE :
     and JOHN DOE, Individually  :
 6   and as parents and next    :
     friend of JORDAN DOE and   :
 7   JAMIE DOE,               :
 8          Plaintiffs,   :
 9          v.            :
10   INDIAN RIVER SCHOOL    :
     DISTRICT, et al.,       :
11                         :
          Defendants.   :
12
13      Videotaped Deposition of RICHARD COHEE,
     taken pursuant to notice, on Tuesday, October 17, 2006
14   at 1:17 p.m. at 31 Hosier Street, Selbyville, Delaware,
     reported by Lorena J. Hartnett, a Registered
15   Professional Reporter and Notary Public.
16
17   APPEARANCES:
18      BRIAN G. LENHARD, ESQUIRE
        RICHARD HORVATH, ESQUIRE
19      One Rodney Square
        Wilmington, DE  19801
20      Attorney for the Plaintiff
21
22      WILCOX & FETZER
        1330 King Street - Wilmington, DE  19801
23      302-655-0477
        www.wilfet.com
24
                        1
```

```
 1
 2
 3          TABLE OF CONTENTS
 4   TESTIMONY OF RICHARD COHEE:
```
```
 5      Direct Examination by Mr. Lenhard . . . . . . . 4
 6   Certificate of Reporter . . . . . . . . . . . . 116
```
```
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
                        3
```

```
 1
 2
 3   APPEARANCES  (CONTINUED):
 4      JASON P. GOSSELIN, ESQUIRE
        Drinker, Biddle & Reath, LLP
 4      One Logan Square
        18th and Cherry Streets
 5      Philadelphia, PA  19103-6996
        Attorney for the Defendants
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
                        2
```

```
 1          VIDEOGRAPHER:  This is the videotaped
 2   deposition of Mr. Richard Cohee taken by the
 3   plaintiff in the matter of Dobrich et al
 4   versus Indian River School District, et al,
 5   Case Number 15-120.  This deposition is
 6   being held at 31 Hosier Boulevard.  We are
 7   going on the record on October 17, 2006 at
 8   approximately 1:17 p.m.
 9          The court reporter is Lorena Hartnett
10   from the firm of Wilcox and Fetzer,
11   Wilmington, Delaware.  My name is Lindsay
12   DuPhily.  I am the videotape specialist with
13   Discovery Video Services.
14          Counsel will now introduce themselves
15   and the court reporter will swear in the
16   witness.
17          MR. LENHARD:  My name is Brian
18   Lenhard, and I represent the plaintiffs in
19   this action.
20          MR. GOSSELIN:  Jason Gosselin for
21   defendants.
22          RICHARD COHEE,
23   HAVING FIRST BEEN DULY SWORN, TESTIFIED AS
24   DIRECT EXAMINATION ON BEHALF OF THE PLAIN
                        4
```

Cohee, Richard (Video)  10/17/2006  1:17:00 PM

1      A.  That's okay.  I take them on and off a
2  hundred times a day.
3      Q.  Okay, if you turn to page four, which is
4  BPD702, you will see where the numbered paragraphs
5  start.
6      A.  Okay, page four?
7      Q.  About halfway down there is, it starts, the
8  paragraph starts, "In order to solemnify."  Do you see
9  that?
10     A.  Okay, number one?
11     Q.  Number one.
12     A.  Uh-huh.
13     Q.  If you look at that and look at PX9 at the
14  same time, do you see that those paragraphs are
15  substantially the same?
16     A.  Yes.
17     Q.  Do you want to take the time to read it, or
18  have you read it before?
19     A.  I recall this.
20     Q.  Okay.
21     A.  And I know that there is a lot of
22  similarities, as I skim through here, with those five
23  sections.
24     Q.  Did anyone from the public ever ask you for a

65

1  copy of this policy, PX9?
2      A.  I don't know.  I don't recall it.
3      Q.  Did anyone submit -- Can you -- Strike that.
4      A.  If I were to be asked, I would most likely
5  refer them to Central Office.
6      Q.  Okay.  All right, now I would like to give
7  you two documents which again you probably have over
8  there, PX13 and PX14.  Do you recall why the board met
9  on August 23, 2004?
10     A.  Well, it says here to discuss potential
11  pending litigation.  The number there would identify
12  the issue, and I don't recall what number that was
13  used to identify the issue.
14     Q.  You don't recall whether it meant --
15     A.  0501PL, I don't know if that's the number
16  that refers to the issue that we are here for today or
17  not.
18     Q.  Do you recall whether it had to do with
19  school board prayer in general?
20     A.  I would -- Well, I know we had a number of
21  meetings about that, these issues, and I know some I
22  attended and some I did not.  I would -- Well, I don't
23  want to guess, but my thoughts are this meeting could
24  have very well been in reference to these issues, but

66

1  I can't sit here and say that with certainty.
2      Q.  Can you turn to the second page of PX 14?  On
3  the second page of that you will see there is a roll
4  call.
5      A.  Okay.
6      Q.  And you are listed there as present?
7      A.  Yes.
8      Q.  And the next section lists other visitors and
9  staff in attendance?
10     A.  Yes.
11     Q.  Can you tell me why those people were there
12  to discuss litigation?
13     A.  No.  Specifically, no.  I will say that it
14  has been an occurrence that the superintendent and/or
15  the assistant superintendent has been present during,
16  over the years during discussion of potential
17  litigation or pending litigation, along with Janet
18  Hearn, who was our recording secretary.
19         Patrick Miller was finance.  I am not sure
20  what role he would have played in that discussion.
21  And Jim Griffin at the time was an attorney.
22     Q.  Okay, so in your discussion you mentioned the
23  superintendent and the assistant superintendent.
24  That's Ms. Hobbs is the superintendent?

67

1      A.  She was at that time.
2      Q.  And Mr. Savage is assistant superintendent?
3      A.  And he still is, yes.  I think he was at that
4  time, but he is now.  Can I clarify something, though?
5      Q.  Sure.
6      A.  That is the beginning of the meeting.  Okay?
7  And then that's the roll call and the recording of who
8  is present, and then we go into executive session.
9         So whether or not those people all stayed, I
10  don't know.  They could have been asked to leave, as
11  we have done on other occasions.
12         For example, it strikes me as a little odd
13  that the finance person was there.  I would almost
14  venture to say that on this particular issue he was
15  asked or knew to step out, but I don't know that with
16  certainty.
17     Q.  Well, let me ask you a question.  Does the
18  board invite people to special meetings?
19     A.  Depending on the issue, the board requires or
20  asks for certain information and it comes from various
21  sources.
22     Q.  Well, if you look through the minutes, --
23     A.  Okay.
24     Q.  -- which is simply that one page, do you see

68

Cohee, Richard (Video) 10/17/2006 1:17:00 PM

1  reaction to Dr. Hattier's prayer or the announcement
2  that Dr. Hattier would give a prayer on August 24,
3  2004?
4      A.  Um, I don't remember the reaction, but I
5  think there was a lot of concern as to whether we
6  would or not, and if there was any reaction at all, it
7  most likely would have -- I shouldn't say that most
8  likely, because I don't know.  It would probably have
9  been supportive.
10     Q.  When you said that the prayer was for the
11 board members, is that because of the disclaimer?
12     A.  No, because it was for the board members long
13 before we had the disclaimer or that policy.
14     Q.  Okay, have you ever seen someone get up and
15 leave the meeting or attempt to leave the meeting when
16 there is an announcement that a prayer is going to be
17 given?
18     A.  Um, well, I will say that different times
19 during the meeting people come and go for a lot of
20 reasons.  Okay?  I can't sit here and say that I have
21 seen anyone go for in response to the prayer preface,
22 and I can't say that I have ever really watched to see
23 if that occurred.
24     Q.  Are students in the audience when the prayer

113

1  is given?
2      A.  Most often.
3      Q.  Have all the prayers been Christian?
4      A.  I think you asked that earlier, and, to my
5  knowledge, I would have to say the majority have been.
6      Q.  Do you recall any prayer in the name of
7  Jehovah?
8      A.  No, I can't.
9      Q.  Any prayer in the name of Buddha?
10     A.  No.
11     Q.  Any prayer in the name of Allah?
12     A.  No.
13     Q.  So can you recall any prayer for any other
14 religious deity besides Jesus or the Christian God?
15     A.  Other than the moment of silence, which would
16 not address either faith.
17     Q.  Has anyone served on the school board who is
18 not Christian?
19     A.  I do not know that is true.  I don't make it
20 a point of asking people their religion or beliefs,
21 and it wouldn't have made any difference to me.
22     MR. LENHARD:  I think that's all the
23 questions I have.  Thank you very much.
24     THE WITNESS:  Thank you.

114

1      VIDEOGRAPHER:  This deposition is
2  ending at approximately 4:12 p.m.

115

1           CERTIFICATE
2      I, Lorena J. Hartnett, a Notary Public and
3  Registered Professional Reporter, do hereby certify
4  that the witness, RICHARD COHEE, was by me first
5  duly sworn to testify the truth, the whole truth, and
6  nothing but the truth; that the foregoing deposition
7  was taken at the time and place stated herein; and
8  that the said deposition was recorded stenographically
9  by me and then reduced to typewriting under my
10 direction, and constitutes a true record of the
11 testimony given by said witness.
12     I further certify that the inspection,
13 reading and signing of said deposition was not waived
14 by counsel for the parties and by the witness.
15     I further certify that I am not a relative,
16 employee, or attorney of any of the parties or a
17 relative or employee of either counsel, and that I am
18 in no way interested directly or indirectly in this
19 action.
20     IN WITNESS WHEREOF, I have hereunto set my
21 hand and affixed my seal of office on this 24th day of
22 October 2006.
23
24     Cert. #134-RPR, Exp. 01-31-2008

116

Unsigned                          Page 113 - 116

# TAB 4

Dobrich, Marco  11/1/2006  12:55:00 PM

**Page 1**

```
 1          IN THE UNITED STATES DISTRICT COURT
 2             FOR THE DISTRICT OF DELAWARE
 3   MONA DOBRICH, et al.,      : CIVIL ACTION
         Plaintiffs,            :
 4                              :
         -v-                    :
 5                              :
     INDIAN RIVER SCHOOL        :
 6   DISTRICT, et al.,          : NO. 05-120-JJF
         Defendants.            :
 7
             Deposition of MARCO DOBRICH, taken before
 8   Elaine Gallagher Parrish, Registered Professional
     Reporter, at 1100 North Market Street, Suite 1000,
 9   Wilmington, Delaware on November 10, 2006, commen
     approximately at 12:55 p.m.
10
     APPEARANCES:
11
         THOMAS I. ALLINGHAM, II, ESQ.
12       BRIAN G. LENHARD, ESQ.
             One Rodney Square
13           P.O. Box 636
             Wilmington, Delaware 19899-0636
14           for the Plaintiffs.
15       JARROD D. SHAW, ESQ.
         Drinker Biddle & Reath, LLP
16           One Logan Square
             18th and Cherry Streets
17           Philadelphia, Pennsylvania 19103-6996
             for the Defendant.
18
     ALSO PRESENT:
19
20       Timothy Kearns
         Kristhy Peguero
21       Mona Dobrich, Plaintiff
22
         WILCOX & FETZER
23   1330 King Street - Wilmington, Delaware 19801
                  (302)655-0477
24                www.wilfet.com
```

1

**Page 2**

```
 1          MARCO DOBRICH,
 2   having been first duly sworn according to law, was
 3   examined and testified as follows:
 4              - - -
 5   BY MR. SHAW:
 6      Q.  Mr. Dobrich, I know you heard this earlier, but
 7   I'll give it again pretty quickly.  My name is Jarrod
 8   Shaw and I represent the Defendants in this litigation.
 9   I am going to ask you a bunch of questions to which
10   you'll respond.  If you don't understand the question,
11   please ask me to either repeat it or rephrase it.
12   Because if you give your answer it will look on the
13   transcript as though you understood the question and
14   your answer was to that question.  So I just want to
15   make sure that you're clear.
16      A.  Yes.
17      Q.  So please feel free to ask me to rephrase or to
18   repeat my question.
19          Again, if you need to take a break at any
20   point, just let me know and we'll stop and you can take
21   a break.
22      A.  Okay.
23      Q.  Have you ever been deposed before?
24      A.  No.
```

2

**Page 3**

```
 1      Q.  What did you do to prepare for today's
 2   deposition?
 3      A.  Met with the lawyers a couple weeks ago.
 4      Q.  I believe you said your answer was you met with
 5   your attorneys to prepare for the litigation or for the
 6   deposition?
 7      A.  Yes.
 8      Q.  Did you discuss the deposition with anyone else?
 9      A.  No.
10      Q.  Okay.  Did your attorney show you any documents
11   at that point?
12      A.  No.
13      Q.  Mr. Dobrich, where do you currently live?
14      A.  Georgetown, Delaware, 154 David Street.
15      Q.  That's my next question.
16      A.  Pine Grove Manor.
17      Q.  Do you live in a house there?
18      A.  Yes.
19      Q.  Do you rent the house?
20      A.  No, I live with my wife's sister.
21      Q.  Okay.  Just for the record, where did you live
22   before that?
23      A.  174 Georgetown -- Route 1, 174, Georgetown,
24   Delaware.
```

3

**Page 4**

```
 1      Q.  And how long did you live there for?
 2      A.  19 years.
 3      Q.  Did you grow up in Georgetown?
 4      A.  No.
 5      Q.  Where did you grow up?
 6      A.  Seaford, Delaware.
 7      Q.  Seaford, Delaware?
 8      A.  19947 -- or 73.
 9      Q.  What county is that in?
10      A.  Sussex.
11      Q.  It's in Sussex County.  Is it the Indian River
12   School District?
13      A.  No.
14      Q.  No.  Okay.  Is your high school a rival with
15   their high school?
16      A.  No, we were with Laurel.
17      Q.  Oh, okay.  So you did not live in the Indian
18   River School District until you moved into the home at
19   174 Georgetown?
20      A.  Yes.
21      Q.  Are Samantha and Alex your only children?
22      A.  Yes.
23      Q.  So is this your first marriage?
24      A.  Yes.
```

4

Dobrich, Marco  11/1/2006  12:55:00 PM

1    A.   Before this?  '04 or altogether?
2    Q.   I'll rephrase.  Right now I'm speaking before
3  June 15th, 2004, do you know approximately how many
4  School Board meetings you attended?
5    A.   Six or seven.
6    Q.   Six or seven.  Was Mrs. Dobrich with you at all
7  those meetings?
8    A.   Not at all -- not at all of them.
9    Q.   Okay.  Were Alex and Samantha or Samantha will
10  you at any of those meetings?
11    A.   Maybe one or two.
12    Q.   Let me break it down.  Was Alex at one or two?
13    A.   Yes.
14    Q.   And then Samantha was maybe at one or two?
15    A.   Yes.
16    Q.   Okay.  Did the School Board offer a prayer at
17  any of those meetings?
18    A.   Yes.
19    Q.   Okay.  Do you remember what that prayer was?
20    A.   What they said?
21    Q.   Yeah.  If you could remember, was it in Jesus's
22  name?
23    A.   Most of them were.  Probably all of them.
24    Q.   Is it your recollection that all of them were or

9

1  straight at that meeting?
2    A.   No.
3    Q.   Why did you bow your head at the meeting?
4    A.   Feel like I was obligated because they said to,
5  and everybody around was doing it.
6    Q.   Okay.  Mr. Dobrich, would you have a problem
7  with nondenominational prayer at the school or prayer
8  meetings?
9        MR. ALLINGHAM:  Object to the form of the
10  question.  You may answer it.
11        THE WITNESS:  As long as they don't say
12  within, you know, Jesus's name.
13  BY MR. SHAW:
14    Q.   Would you be okay if they said in God's name?
15        MR. ALLINGHAM:  Object to the form of the
16  question.
17  BY MR. SHAW:
18    Q.   Let me rephrase.  Would you be okay if the
19  School Board members said in God's name?
20        MR. ALLINGHAM:  Object to the form of the
21  question.
22        THE WITNESS:  Yes, I would.
23  BY MR. SHAW:
24    Q.   Okay.  Why is it okay if the Board members said

11

1  most of them were?
2    A.   I would say all.
3    Q.   Did they ask you -- did the School Board ask you
4  -- or let me rephrase.
5        Did the School Board ask the audience
6  members to bow their head before the prayer was given
7    A.   Yes.
8    Q.   At all of the meetings?
9    A.   Yes.
10    Q.   Did you bow your head?
11    A.   Yes.
12    Q.   Do you know if -- you testified that Alex was
13  with you at one or two of these meetings?
14    A.   Yes.
15    Q.   Did Alex also bow his head?
16    A.   He kept his head straight ahead.
17    Q.   We can't take the hand motions down on the
18  record.
19    A.   Straight.  I mean maybe at one he did straight
20  but he probably put his head down at one -- the other
21  one.
22    Q.   Okay.  Did Samantha bow her head, do you know
23    A.   Yes.
24    Q.   Okay.  Did you ask Alex why he kept his head

10

1  it in God's name but not okay if they say in Jesus's
2  name?
3        MR. ALLINGHAM:  Object to the form of the
4  question.
5  BY MR. SHAW:
6    Q.   In your mind?
7    A.   In my mind I think they should do it before
8  anybody is in there.  They should do it, you know, in
9  the back room before they come in there to start the
10  Board meeting.
11    Q.   Okay.  Is it okay if they say in God's name at
12  the meeting?
13        MR. ALLINGHAM:  Object to the form.
14        MR. SHAW:  In your mind.
15        MR. ALLINGHAM:  I object to the form of the
16  question.
17        THE WITNESS:  I don't think they should say
18  anything really.
19  BY MR. SHAW:
20    Q.   Mr. Dobrich, I am going to show you what's been
21  previously marked as plaintiff's Exhibit 9.  I think you
22  have it in front of you.  I'll represent to you that
23  this is the Board prayer at regular Board meetings.
24  It's designated by BDA-1.  Have you ever seen this

12

# TAB 5

Dobrich, Mona  11/10/2006  11:05:00 AM

1    IN THE UNITED STATES DISTRICT COURT
     FOR THE DISTRICT OF DELAWARE
2                                    :
3    MONA DOBRICH, et al.,           : CIVIL ACTION
         Plaintiffs,                 :
4                                    :
     -v-                             :
5                                    :
     INDIAN RIVER SCHOOL             :
6    DISTRICT, et al.,               : NO. 05-120-JJF
         Defendants.                 :
7
         Deposition of MONA DOBRICH, taken before
8    Elaine Gallagher Parrish, Registered Professional
     Reporter, at 1100 North Market Street, Suite 1000,
9    Wilmington, Delaware on November 10, 2006, commen
     approximately at 11:05 a.m.
10
     APPEARANCES:
11
         THOMAS J. ALLINGHAM, II, ESQ.
12       BRIAN G. LENHARD, ESQ.
             One Rodney Square
13           P.O. Box 636
             Wilmington, Delaware 19899-0636
14           for the Plaintiffs.
15       JARROD D. SHAW, ESQ.
         Drinker Biddle & Reath, LLP
16           One Logan Square
             18th and Cherry Streets
17           Philadelphia, Pennsylvania 19103-6996
             for the Defendant.
18
     ALSO PRESENT:
19
         Timothy Kearns
20       Kristhy Peguero
         Marco Dobrich, Plaintiff
21
22
         WILCOX & FETZER
23   1330 King Street - Wilmington, Delaware 19801
         (302)655-0477
24       www.wilfet.com

                        1

1           MONA DOBRICH,
2    having been first duly affirmed according to law, was
3    examined and testified as follows:
4               - - -
5    BY MR. SHAW:
6        Q.  Hi, Mrs. Dobrich. Thank you for coming today.
7    My name is Jarrod Shaw and I represent the Defendant
8    this action. We're going to go through a process today
9    of asking you some questions or I'll go through the
10   process of asking you questions and you'll answer them
11   I ask if you can't hear me or you need me to repeat a
12   question, or you don't understand what I'm asking that
13   you ask me to repeat it or rephrase it. If you answer
14   the question as I ask it, it's going to look on the
15   transcript as though you understood what I was asking.
16       A.  Okay.
17       Q.  So it's important that you take a moment and
18   think about the question before you answer it. And if
19   you don't understand it, I'll be happy to rephrase for
20   you.
21       A.  Okay.
22       Q.  Have you ever been deposed before?
23       A.  No.
24       Q.  Okay. What did you do to prepare for today's

                        2

1    deposition?
2        A.  I met with my lawyer last week.
3        Q.  Okay. Do you remember when last week?
4        A.  I don't even know if it was last week.
5        Q.  Okay.
6        A.  It might be last week. I'm not sure.
7        Q.  One other thing before we get going, If you
8    could wait until I finish and I'll do the same for you.
9    The Court Reporter can't take down both at the same
10   time, so it will just get a bit confusing.
11          Okay. When you met with your attorneys
12   were you shown any documents?
13       A.  No.
14       Q.  No? Okay. And have you spoken with anyone el
15   regarding your deposition today?
16       A.  No.
17       Q.  All right. Mrs. Dobrich, where do you currently
18   live?
19       A.  1428 Emory Road, Wilmington, Delaware, 19803.
20       Q.  And how long have you lived there?
21       A.  One year and three months.
22       Q.  Do you live in a house?
23       A.  We rent a house.
24       Q.  You rent a house? Okay. And where did you live

                        3

1    before the Wilmington address?
2        A.  We rented an apartment in Wilmington at Top of
3    the Hill.
4        Q.  Is that the name of the apartment complex?
5        A.  Yes.
6        Q.  Okay. And how long did you rent that apartment
7    for?
8        A.  One year.
9        Q.  And you said we, who do you mean by we?
10       A.  Myself and my son, Alex.
11       Q.  Okay. I assume by that Alex goes by Alex?
12       A.  Correct.
13       Q.  Okay. And before you moved to the apartments a
14   Top of the Hill, where did you live?
15       A.  In Georgetown, Delaware.
16       Q.  Did you own a house in Georgetown?
17       A.  Yes.
18       Q.  Okay. Do you still own the house in Georgetown?
19       A.  No.
20       Q.  Okay. And how long did you live at the house in
21   Georgetown for?
22       A.  19 years.
23       Q.  19 years. Just for the record, what was the
24   address, if you remember?

                        4

1  A.  I could not say for certain.
2  Q.  And I'm only asking because if it was somebody
3  who was on the Board then and not now it might help
4  place the time.  Were those meetings that you attended
5  while your children were in the school district?
6  A.  Yes.
7  Q.  Do you recall any of the prayers that were
8  offered while you were in attendance at those meetings'
9  A.  No.
10  Q.  Do you recall if any of them were in Jesus's
11  name?
12  A.  Yes.
13  Q.  Do you recall if all of them were in Jesus's
14  name?
15  A.  Yes.
16  Q.  Did you have any idea that -- I'll rephrase.
17  It's been testified to earlier that the Indian River
18  School District has a custom or practice of offering a
19  prayer at the beginning of its School Board members?
20      MR. ALLINGHAM:  School Board meetings.
21      MR. SHAW:  At the beginning, thank you, of
22  its School Board meetings, did you have any -- do you
23  have an understanding that it's a School Board custom
24  and practice of offering a prayer at the beginning of

37

1  A.  At School Board meetings?  No.
2  Q.  Okay.  It was when you met with Dr. Hattier in
3  2004, was that the first time you complained about the
4  prayer at the School Board meeting?
5  A.  I did not complain at that time about the prayer
6  at the School Board meeting.
7  Q.  Okay.  When did you complain about the prayer a
8  the School Board meeting?
9  A.  I'm unsure.
10  Q.  This would be a good time for a break if you
11  need to use the ladies room.
12      (Recess taken.)
13  BY MR. SHAW:
14  Q.  We can go back on the record.  Okay.
15  Mrs. Dobrich, you testified that you had not complained
16  about the School Board prayer or prayer at School Boar
17  meetings prior to June 15th, 2004, is that correct?
18  A.  That's correct.
19  Q.  Okay.  You also testified in sum or substance
20  that you had heard prayers at School Board meetings
21  previously?
22  A.  Correct.
23  Q.  Okay.  What did you do during those prayers
24  while you were in the meeting?

39

1  its meetings?
2      MR. ALLINGHAM:  I object to the form of the
3  question.
4      THE WITNESS:  I don't understand your
5  question.
6  BY MR. SHAW:
7  Q.  Sure.  I'll rephrase.  You have been to several
8  of the School Board meetings?
9  A.  Yes.
10  Q.  And at every meeting a prayer has been offered?
11  A.  Yes.
12  Q.  That you have attended?
13  A.  Yes.
14  Q.  Would you consider it to be a custom or a
15  practice -- I'll rephrase.  Would you expect that every
16  School Board meeting you would have attended would I
17  offered a prayer at the beginning?
18      MR. ALLINGHAM:  I object to the form of the
19  question.
20      THE WITNESS:  I always hoped that there
21  wouldn't be.  It always seemed to open with one.
22  BY MR. SHAW:
23  Q.  Okay.  Did you ever complain about any of those
24  prayers before?

38

1  A.  They request that you bow your head.
2  Q.  Okay.  Did you bow your head?
3  A.  Yes.
4  Q.  When you left the meeting did you speak with
5  anyone about the meeting?
6      MR. ALLINGHAM:  Which meeting?
7  BY MR. SHAW:
8  Q.  I'm sorry.  You don't remember any of the dates
9  of those previous meetings, do you?
10  A.  No.
11  Q.  Okay.  Let's take this meeting where you bowed
12  your head, do you remember discussing that with anybo
13  A.  Yes, I spoke to my daughter and my husband abo
14  it and said that it made me feel really bad to have to
15  do that and I felt like I was being forced to, and I
16  asked my daughter what she did in instances like that.
17  Q.  What do you mean by made you feel really bad?
18  A.  It made me feel that in my religion you are not
19  to bow to false Gods and it made me feel as if I was
20  being forced to bow down to what I believed to be a
21  false God.
22  Q.  Okay.  You felt like you had to bow your head at
23  the meeting?
24  A.  The people who were running the meeting said bc

40

Dobrich, Mona  11/10/2006  11:05:00 AM

1  your head.
2  Q.  Okay.  Did you feel like you had any choice not
3  to bow your head?
4  A.  No, I did not.
5  Q.  Okay.  Have you ever attended a wedding at a
6  church?
7  A.  No.
8  Q.  Have you ever attended anything at a church?
9  A.  No.
10  Q.  Okay.  When you spoke with Samantha, your
11  daughter, about this and asked her what do you do, wha
12  did you mean by that?  What does she do when?
13  A.  I asked her what she does when she's at events
14  such as dinners of her cross country team at the school
15  when they offer a prayer, and I asked her what she doe:
16  during those events when they ask you to do that, to
17  pray.
18  Q.  So then am I understand to that you knew that
19  they offered prayers at these other events?
20  A.  Samantha had begin to -- begun to come home ar
21  complain and question why they were doing it.  So I
22  became aware that it was going on more often than wha
23  knew from my own experience of being a student in the
24  school district.

41

1  Q.  Had you ever gone to School Board meetings
2  before Samantha came home and complained about the
3  different things that you just talked about?
4  A.  Yes.
5  MR. ALLINGHAM:  Would you just read the
6  question back for me, please?
7  BY MR. SHAW:
8  Q.  I'll rephrase the question, Tom.
9  You just testified that Samantha began to
10  come home and complain about School Board meeting:
11  that correct?
12  A.  No.
13  Q.  No, excuse me, complain about different events
14  at school where people prayed, is that correct?
15  A.  Yes.
16  Q.  Okay.  Let's do it this way.  When did Samantha
17  begin high school?
18  A.  She graduated in 2004.  You begin high school --
19  Q.  In '97?
20  A.  Ninth grade.
21  Q.  No, 2000 rather.  In that time -- when did she
22  -- was she in high school when she began to come hom
23  and complain about prayer at different activities?
24  A.  Yes.

42

1  Q.  Okay.  So she hadn't complained while she was in
2  elementary school and middle school?
3  A.  I'm unsure.
4  Q.  Okay.  But you are sure that she complained
5  during the time period 2000 and 2004?
6  A.  That's correct.
7  Q.  Okay.  Do you recall whether you had ever gone
8  to a School Board meeting prior to 2000?
9  A.  I'm unsure.
10  Q.  Okay.  But the School Board meetings that you dc
11  recall going to occurred at some time between 2000 and
12  2004?  Let me -- I'll rephrase that.
13  I know you attended School Board meetings
14  through Board meeting notes and things like that, at the
15  earliest June 15th of 2004?
16  MR. ALLINGHAM:  Do you mean your earliest
17  knowledge is as of June 15th, 2004?
18  MR. SHAW:  That's right, and I'm just
19  trying to figure out what other meetings you may have
20  attended and what happened at those meetings.  So I'm
21  trying to pare down the years a little bit considering
22  now we have a gap of 2000 to 2004, okay.
23  THE WITNESS:  Okay.
24  BY MR. SHAW:

43

1  Q.  So do you recall when you may have attended
2  School Board meetings between those timeframes while
3  Samantha was in high school?
4  A.  I know I attended a School Board meeting where
5  it had something to do with can donations where we hac
6  donated cans for Alexander's classroom, and his
7  classroom had the most donations and our family had th
8  most donations so we went to a School Board meeting.
9  think he was in first grade.
10  Q.  Okay.
11  A.  It might have been third grade.  I'm not sure.
12  Or second grade.
13  Q.  Okay.  And how many years older is Samantha th:
14  Alex?
15  A.  Alex was born in '92 and Samantha was born in
16  '86.  Samantha was born September of '86.  Alex was b:
17  in July of '92.  No.  Samantha was born in July of '86,
18  and Alex was born in September of '92.
19  Q.  Okay.  Alex was born in September of 1992?
20  A.  Correct.
21  Q.  Samantha, July of '86?
22  A.  Correct.
23  Q.  So we can agree that they're approximately six
24  years apart, depending on the month?

44

Unsigned                                    Page  41 - 44

TAB 6

Doe, Jane 12/5/2006 1:30:00 PM

C O N F I D E N T I A L
IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE
MONA DOBRICH and MARCO          )   CONFIDENTIAL
DOBRICH, individually and       )
as parents and next friend      )
of ALEXANDER DOBRICH,           )
SAMANTHA DOBRICH, JANE DOE      )
and JOHN DOE, individually      )
and as parents and next         )
friend of JORDAN DOE and        )
JAMIE DOE,                      )

    Plaintiffs,          )
                         )   Civil Action
v.                              )   No. 05-120

INDIAN RIVER SCHOOL,            )
DISTRICT, et al.,               )
                         )
    Defendants.          )

    Deposition of JANE DOE, taken pursuant to
notice at Drinker, Biddle & Reath, 1100 North Market
Street, Suite 1000, Wilmington, Delaware, beginning at
1:30 p.m., on Tuesday, December 5, 2006, before Terry
Barbano Burke, RMR-CRR and Notary Public.
APPEARANCES:
    THOMAS J. ALLINGHAM, II, ESQUIRE
    One Rodney Square
    Wilmington, Delaware 19801
    For the Plaintiff
    WILCOX & FETZER
    1330 King Street -  Wilmington, Delaware 19801
    (302) 655-0477

1

2  APPEARANCES (cont'd):
3      JARROD SHAU, ESQUIRE
    Drinker, Biddle & Reath, LLP
4      One Logan Square
    18th and Cherry Streets
5      Philadelphia, Pennsylvania  19103-6996
    For the Defendants
6
    ALSO PRESENT:
7
    TIMOTHY KEARNS
8
9
10      MR. ALLINGHAM:  While we were off the
11  record, Mr. Shau and I agreed that we would all try to
12  refer to the witness by her pseudonym of Jane Doe and
13  to members of her family by the pseudonyms given them
14  in the complaint.
15      We have also agreed, and I want to
16  express my appreciation to Mr. Shau for this
17  suggestion, that we will each, to the extent anyone
18  slips up, we can substitute the appropriate pseudonym
19  in the final transcript so the anonymity of the witness
20  and the members of her family will again be preserved,
21  and I again appreciate that.
22      JANE DOE,
23      the deponent herein, having first been
24      duly sworn on oath, was examined and

2

1      testified as follows:
2  BY MR. SHAU:
3      Q.  Let me just add, Mrs. Doe, I'm going to
4  attempt to try to ask questions that won't lead you
5  down the path of saying your name or your children's
6  names, but in the event that I do, don't worry about it
7  and we will be able to remedy it later.
8      A.  Okay.
9      Q.  My name is Jarrod Shau, and I represent the
10  defendants in this action.
11      I am going to ask you a bunch of
12  questions about various things that have occurred, and
13  I ask that if you don't understand the question, you
14  ask me to rephrase it, or if you don't hear it, you ask
15  me to ask it again.
16      If you answer the question as it's asked
17  on the record, it's going to look like you understood
18  the question.
19      A.  Uh-huh.
20      Q.  So if you need for me to repeat it or rephrase
21  it, please ask me to and I will be happy to.
22      One other thing is the court reporter
23  can't see uh-huh or when you shake your head, so if you
24  could answer affirmatively or negatively, however you

3

1  choose, that would be appreciated by the court
2  reporter.
3      A.  Okay.
4      Q.  If you need to take a break at any point, just
5  let me know, we can stop whenever you want.  If you
6  want water or to use the rest room, please let me know.
7      Mrs. Doe, have you ever been deposed
8  before?
9      A.  No.
10      Q.  What did you do to prepare for this
11  deposition?
12      A.  Spoke with my lawyer.
13      Q.  Your lawyer, Mr. Allingham?
14      A.  Yes.
15      Q.  When did you speak with Mr. Allingham?
16      A.  Thursday.
17      Q.  Did you review any documents during that
18  preparation?
19      A.  No.
20      Q.  Have you spoken with anyone else regarding
21  your deposition today?
22      A.  Just my husband.
23      Q.  Mrs. Doe, what town do you currently live in?
24      A.

REDACTED

4

Doe, Jane  12/5/2006  1:30:00 PM

REDACTED

1  It didn't seem to us that board members were rotating.
2  Q.  So after reading the policy --
3  A.  And --
4  Q.  I'm sorry, please finish.
5  A.  And on No. 3, we did feel that the way the
6  board gave their prayer was proselytizing.
7  Q.  I would like to ask you a few questions about
8  that.
9       So when you discussed it, you felt that
10  some of the board prayers that you had heard in the
11  past were proselytizing?
12  A.  Yes.  If proselytizing is to advance one
13  particular religion, is that what we agree on?
14  Q.  If that's your definition, that's fine.
15  A.  Then, yes, that would be the case.
16  Q.  And it's accurate to say you had only attended
17  two board meetings at the time you reviewed this
18  policy?
19  A.  Right.
20  Q.  Did the board prayer at those --
21  A.  I'm sorry.  I forgot one of the board
22  meetings.  Can we go back?
23  Q.  Sure.
24  A.  The August 24th school board meeting.

13

1  Q.
2  a prayer?
3  A.  Yes.
4  Q.  Do you remember who gave that prayer?
5  A.  There was a gentleman, I believe it was
6  Reginald Helms, or it could have been John Evans.  I'm
7  not sure exactly.
8  Q.  Do you remember what that prayer was?
9  A.  Yes.
10  Q.  Do you remember the exact words of the prayer?
11  A.  I remember the exact words of the end of the
12  prayer, "and in Jesus' name we pray."
13  Q.  Before the prayer started, did Mr. Evans or
14  Mr. Helms, whomever gave the prayer, ask you to bow
15  your head?
16  A.  I believe so, but I can't be sure.
17  Q.  So you don't remember whether or not he did?
18  A.  I know that we had been asked to bow our head
19  before and I'm not sure if that was the meeting.
20  Q.  Were you asked to bow your head at the August
21  24th, 2004 meeting?
22  A.  I can't recall specifically.
23  Q.  Is it fair to say you don't remember any
24  specific instance of you being asked to bow your head,

15

1  Q.  August 24?
2  A.  Uh-huh.
3  Q.  Did you sign in at the August 24th, 2004 board
4  meeting?
5  A.  No, I did not.
6  Q.  But you did attend the August 24th, 2004 board
7  meeting?
8  A.  Yes.
9  Q.  Did Mr. Doe attend that meeting?
10  A.  No.
11  Q.  Did either Jamie or Jordan attend that
12  meeting?
13  A.  No.
14  Q.  So I'll rephrase.
15       At the time you thought the board was,
16  I'll use your word, advancing religion --
17  A.  Uh-huh.
18  Q.  -- through prayer, you had heard three prayers
19  at board meetings?
20  A.  Well, I can't recall in 1998.
21  Q.  So in 1998 you don't recall that there was a
22  prayer said?
23  A.  I don't recall.  I might have, you know,
24  gotten there afterwards.  I just can't recall.

14

1  you just generally remember that occurring at one of
2  the meetings you attended?
3  A.  My recollection is that the impression given
4  was to bow your head for the prayer, but I can't recall
5  exactly whether we were specifically asked to bow our
6  heads.  But I do remember bowing of heads.
7  Q.  So it may have been just everyone in the area
8  bowed their heads and it just felt like you should have
9  bowed your head?
10  A.  That may be.
11  Q.  Did you bow your head during the prayer?
12  A.  No.
13  Q.  Did you feel like you had to bow your head
14  during the prayer?
15  A.  Well, I'm not sure what you mean by "had to."
16  Can you rephrase that?
17  Q.  Sure.
18       Even though you didn't bow your head,
19  did you feel any pressure?
20  A.  Yes.
21  Q.  However, you decided that you weren't going to
22  bow your head?
23  A.  Correct.
24  Q.  Why did you feel pressured to bow your head

16

Doe, Jane  12/5/2006  1:30:00 PM

1  even though you didn't?
2      A.   Well, I think what you describe as pressure is
3  exactly right, it's peer pressure, you know, to bow
4  your head.  Everyone's bowing their head, so you would
5  stand out if you didn't.
6      Q.   Did anybody say anything to you about you not
7  bowing your head?
8      A.   No.                    REDACTED
9
10  Mr. Helms or Mr. Evans gave the prayer and ended "in
11  Jesus' name," how did that make you feel?
12                                 REDACTED
13  it made us feel uncomfortable and excluded.  And that
14  perhaps the board -- well, that's it.
15      Q.   Do you remember the prayer that was given at
16  the August 24th, 2004 meeting?
17      A.   Yes.
18      Q.   Who gave that prayer?
19      A.   Donald Hattier.
20      Q.   Do you remember that prayer?
21      A.   Yes.
22      Q.   Were there any religious indications in that
23  prayer?
24          MR. ALLINGHAM:  I object to the form of

17

1  the question.  You can answer.
2          THE WITNESS:  It mentioned God.
3  BY MR. SHAU:
4      Q.   Were you offended by Dr. Hattier's prayer?
5      A.   I'm not exactly sure what you mean by
6  offended.
7      Q.   How did Dr. Hattier's prayer make you feel?
8      A.   I would say the same as the other board
9  meeting prayer.
10      Q.   It made you feel --
11      A.   That it was promoting religion.
12      Q.   How did it make you feel like it was promoting
13  religion?
14      A.   Well, it was a school board meeting and
15                                 REDACTED
16      Q.   What religion did it promote?
17      A.   Well, due to the numerous signs around the
18  room of people promoting Christianity and shouting amen
19  and hallelujah, I would say that it promoted
20  Christianity.
21      Q.   Let's try and take for a moment all of the
22  people in the crowd with their signs and shouting amen,
23  act as though it didn't happen, although it did.
24          If Dr. Hattier had given his prayer or

18

1  given whatever he said without any of that, would you
2  have found it to be advancing religion?
3      A.   Yes.
4      Q.   Would you have still found it to be a
5  Christian prayer?
6                                 REDACTED
7
8      Q.   He didn't reference Jesus, though, did he?
9      A.   Well, it was a long prayer and I do not think
10  it did reference Jesus.
11      Q.   You mentioned before that Paragraph 3 you felt
12  that the board did use the prayer to proselytize or
13  advance religion.  When you were discussing the prayer
14  with your husband, did you find anything objectionable
15  about the policy?
16      A.   About this?
17      Q.   Yes, about what's in front of you, PX-9?
18      A.   Not that I can recall.
19      Q.   I'd like to take a few moments to go through
20  the policy with you now paragraph by paragraph and
21  discuss different aspects about it.
22          Paragraph 1 reads, "In order to
23  solemnify its proceeding, the board of education may
24  choose to open its meetings with a prayer or moment of

19

1  silence, all in accord with the freedom and conscious
2  of the individual adult board member."
3          Would it be okay with you if the board
4  of education opened its meetings with a moment of
5  silence?
6          MR. ALLINGHAM:  I object to the form of
7  the question.
8          You can answer.
9          THE WITNESS:  It would be okay with me.
10  It wouldn't be my preference.
11  BY MR. SHAU:
12      Q.   But you would be able to tolerate that?
13      A.   Uh-huh.
14      Q.   Would it be acceptable to you if the board
15  opened with a prayer in God's name?
16          MR. ALLINGHAM:  I object to the form of
17  the question.
18  BY MR. SHAU:
19      Q.   You can answer the question.
20      A.   I'm sorry, would it be objectionable if it
21  opened in God's name, is that the question?
22      Q.   Yes.  To you?
23      A.   Yes.
24      Q.   Why?

20

Unsigned                                    Page  17 - 20

# TAB 7

Evans. John (Video)  10/18/2006  9:13:00 AM

---

**Page 1**

1
2          IN THE UNITED STATES DISTRICT COURT
3              FOR THE DISTRICT OF DELAWARE
   MONA DOBRICH and MARCO    :  C.A. No. 15-120 (J.
   DOBRICH, Individually and :
4  as parents and next friend :
   of ALEXANDER DOBRICH,
5  SAMANTHA DOBRICH, JANE DOE :
   and JOHN DOE, Individually  :
6  and as parents and next     :
   friend of JORDAN DOE and   :
7  JAMIE DOE,                   :
8          Plaintiffs,          :
9          v.                   :
10 INDIAN RIVER SCHOOL         :
   DISTRICT, et al.,           :
11                              :
         Defendants.   :
12
13        Videotaped Deposition of JOHN M. EVANS,
   taken pursuant to notice, on Wednesday, October 18,
14 2006 at 9:13 a.m. at 31 Hosier Street, Selbyville,
   Delaware, reported by Lorena J. Hartnett, a Registered
15 Professional Reporter and Notary Public.
16
17 APPEARANCES:
18        THOMAS ALLINGHAM, ESQUIRE
          RICHARD HORVATH, ESQUIRE
19        BRIAN LENHARD, ESQUIRE
          One Rodney Square
20        Wilmington, DE  19801
             Attorney for the Plaintiff
21
22
23        WILCOX & FETZER
24 1330 King Street - Wilmington, DE  19801
             (302) 655-0477
             www.wilfet.com

1

---

**Page 3**

1
2
3              TABLE OF CONTENTS
4  TESTIMONY OF JOHN M. EVANS:
5    Direct Examination by Mr. Allingham . . . . . . 3
6  Certificate of Reporter . . . . . . . . . . . .168
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

3

---

**Page 2**

1
2  APPEARANCES (CONTINUED):
3     JARROD SHAU, ESQUIRE
         Drinker, Biddle & Reath, LLP
4        One Logan Square
         18th and Cherry Streets
5        Philadelphia, PA  19103-6996
           Attorney for the Defendants
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

2

---

**Page 4**

1          VIDEOGRAPHER:  Okay.  This is the
2  videotaped deposition of John M. Evans taken
3  by the plaintiffs in the matter of Dobrich
4  et al. versus Indian River School District,
5  et al., Civil Action Number 15-120.
6          The deposition is taking place at 31
7  Hosier Boulevard in Selbyville, Delaware, on
8  October 18, 2006 at approximately 9:13 a.m..
9  The court reporter is Lorena Hartnett from
10 the firm of Wilcox and Fetzer.
11         My name is Mark Buckmaster, a video
12 specialist from Discovery Video Services
13 Incorporated in association with Wilcox and
14 Fetzer.  Counsel will now introduce
15 themselves and the reporter will swear in
16 the witness.
17         MR. ALLINGHAM:  My name is Tom
18 Allingham.  I represent the plaintiffs, and
19 with me are Richard Horvath and Brian
20 Lenhard.
21         MR. SHAU:  My name is Jarrod Shaw, and
22 I represent the defendants.
23
24

4

---

Evans. John (Video)  10/18/2006  9:13:00 AM

1    Q.  Is it your view, as a board member, that the
2  words "in order to solemnify its proceedings" are the
3  functional equivalent of the words "in order to seek
4  God's guidance for the decisions to be made at that
5  meeting."?
6    A.  I believe that, yes.
7    Q.  Okay.  And I forgot to say at the beginning
8  of the deposition, it's really important for the court
9  reporter, in particular, that we don't trample on each
10  other's questions and answers.  It's the way we all
11  have conversations, but we need to have a specialized
12  sequential conversation in the depositions.  Okay?
13    A.  I understand.
14        MR. ALLINGHAM:  So could I have the
15    last question and answer read back?
16        (The reporter read back the last
17    question and answer.)
18  BY MR. ALLINGHAM:
19    Q.  Okay.  So that at least at, for your
20  understanding as a board member of the Policy BDA.1
21  which we have in front of us, it doesn't matter
22  whether the policy says, "in order to solemnify its
23  proceedings" or whether the policy says, "in order to
24  seek God's guidance, will, protection and grace," the

41

1  meaning would be the same?
2    A.  Yes, to me it would.
3    Q.  Okay.  Did anyone suggest at anytime in the
4  consideration of this policy that the policy ought to
5  say, "in order to seek God's guidance, will,
6  protection and grace."?
7    A.  I don't remember.
8    Q.  Do you remember any discussion at all of the
9  purpose articulated in the board prayer policy, that
10  is, quote, "in order to solemnify its proceedings."?
11    A.  Would you repeat that, please?
12    Q.  Yes, do you remember anyone discussing the
13  purpose of the policy at anytime during the board
14  meetings?
15    A.  I don't recall, no, I don't recall.
16    Q.  Let's make my question a little more
17  specific.  Do you recall anyone offering any comment
18  whatsoever on the language, "in order to solemnify its
19  proceedings"?
20    A.  I don't recall.
21    Q.  When did the board first, first begin to
22  consider the issue of school board prayer?
23    A.  When it began to first consider it?  It would
24  have been sometime in the summer of 2004.

42

1    Q.  And what prompted the board's consideration
2  of that issue was Mrs. Dobrich's expression of
3  concerns that began with the graduation prayer in
4  early summer of 2004; correct?
5    A.  Yes.
6    Q.  Okay.  Let me show you what we have marked as
7  PX15.  When I say PX, it's short for plaintiff's
8  exhibit.
9    A.  Okay.
10    Q.  When we do that, that enables someone looking
11  at the transcript to be able to reconstruct what
12  document we were looking at.
13        If you look at the last page of PX15, you
14  will see Mrs. Hobbs' signature.  Actually, it's a
15  signature stamp, but it's meant to be Mrs. Hobbs'
16  signature; correct?
17    A.  Yes.
18    Q.  And does that tell you that these are the
19  final minutes of the June 15, 2004 board meeting?
20    A.  Yes.
21    Q.  All right.  You are recorded as being present
22  under roll call on the first page?
23    A.  Yes, I am.
24    Q.  And do you recall that you were present at

43

1  the June 15, 2004 school board meeting at North
2  Georgetown Elementary School in the cafeteria?
3    A.  Yes.
4    Q.  Now, this would have been the first board
5  meeting after the 2004 graduation; is that right?
6    A.  That's correct.
7    Q.  If you will turn to page two of the minutes,
8  you will see under the public comments section that
9  one person made a public comment, and that's
10  Mrs. Dobrich; is that right?
11    A.  Yes, I see that.
12    Q.  And what the minutes record is that
13  "Mrs. Dobrich, a parent of the Jewish faith, expressed
14  concern about prayers at the school district events.
15  She asked that the board consider using a
16  nondenominational prayer that would be appropriate for
17  all faiths at events such as graduations, etcetera."
18        Do you see that?
19    A.  Yes, I do.
20    Q.  Do you recall Mrs. Dobrich making that
21  comment?
22    A.  I recall Mrs. Dobrich being there, but I
23  can't recall her specific statement, but I assume the
24  board minutes would record such.

44

# TAB 8

Hastings, Gregory (Video)  10/13/2006  9:07:00 AM

```
1        IN THE UNITED STATES DISTRICT COURT
2           FOR THE DISTRICT OF DELAWARE
3
4   MONA DOBRICH and MARCO DOBRICH, individually
    as parents and next friend of ALEXANDER DOBRICH,
5   SAMANTHA DOBRICH, JANE DOE and JOHN DOE,
    individually and as parents and next friend of
6   JORDAN DOE and JAMIE DOE,
7           Plaintiffs
            Civil Action
8   vs.        NO. 15-120
9   INDIAN RIVER SCHOOL DISTRICT, ET AL.,
10          Defendants
11
12      Deposition of GREGORY HASTINGS, taken
    pursuant to notice at the Indian River School
13  District, 31 Hosler Street, Selbyville, Delaware,
    beginning at 9:07 a.m. on October 13, 2006 before
14  David A. Sroka, Registered Professional Reporter and
    Notary Public.
15
    APPEARANCES:
16
        THOMAS ALLINGHAM, ESQ.
17      RICHARD HORVATH
        BRIAN LENHARD
18      P.O. Box 636
        Wilmington, Delaware  19899-0636
19      For the Plaintiffs
20      JARROD D. SHAW, ESQ.
        Drinker Biddle & Reath, LLP
21      One Logan Square
        Philadelphia, Pennsylvania  19103-6996
22      For the Defendants
23
24
```

-

```
1        MS. DUPHILY:  This is the
2   videotape deposition of Mr. Greg Hastings,
3   taken by the Plaintiff, in the
4   matter of Dobrich, et al. versus Indian
5   River School District, at al., case
6   number 15-120.
7        The deposition is taking place at 31
8   Hosler Boulevard, Selbyville, Delaware.  We
9   are going on the record on October 13,
10  2006 at approximately 9:07 a.m..  The court
11  reporter is Dave Sroka from the firm of
12  Wilcox & Fetzer.  My name is Lindsay
13  duPhily and I am with Discovery Video
14  Services in association with Wilcox &
15  Fetzer.
16       I will now ask counsel to
17  identify themselves on the record, and then
18  the court reporter will swear in the
19  witness.
20       MR. ALLINGHAM:  I am Tom Allingham
21  representing the Plaintiffs.  With me are
22  Rick Horvath and Brian Lenhard.
23       MR. SHAW:   Jarrod Shaw
24  representing the defendants.
```

2

```
1            GREGORY HASTINGS,
2    The Witness herein, called for examination by
3   the Plaintiffs, having been duly sworn to tell the
4   truth, the whole truth, and nothing but the truth,
5   was examined and testified as follows:
6   EXAMINATION BY MR. ALLINGHAM:
7    Q.   Good morning, Mr. Hastings.  I am going to
8   ask you to clear up something that has been bugging
9   me.  Is it H-O-S-I-E-R or H-O-O-S-I-E-R?  Is it
10  pronounced Hoosier or Hosier?
11   A.   In this area we pronounce it Hosler.
12   Q.   Do you know how it's spelled?
13   A.   I believe it's one O.
14   Q.   Thanks.  Have you ever been deposed before?
15   A.   Yes, I have, yes.
16   Q.   In what context?
17   A.   As a defendant.
18   Q.   What kind of a case?
19   A.   It was a teacher in our high school and
20  there was -- she brought on a suit, I have to
21  reflect, this has been 12 years, I guess.
22   Q.   All right, I don't need that much detail.
23  That was a suit by a teacher?
24   A.   Yes.
```

3

```
1    Q.   And it was against you in your capacity as
2   a School Board member?
3    A.   Capacity as a School Board member?
4    Q.   Yes, sir?
5    A.   Yes.
6    Q.   Have you ever testified at trial?
7    A.   I have been an expert witness in Small
8   Claims Court, that's the extent of it.
9    Q.   Did the court issue an opinion in that
10  case?
11   A.   Yes.
12   Q.   Were you mentioned in the opinion?
13   A.   I don't believe so.
14   Q.   What was your area of expertise in that
15  testimony?
16   A.   I had provided architectural design for the
17  product.  This has been a long time, too but --
18   Q.   Let me cut you off.  It has nothing to do
19  with issues of religion in the schools, right?
20   A.   No. thank you, no.
21   Q.   What is your -- I am trying to keep this
22  limited to the issues here.  You are employed as an
23  architect?
24   A.   Yes, I own a small architectural design
```

4

Hastings, Gregory (Video)  10/13/2006  9:07:00 AM

**Page 41**

1  a legislative body, has anyone expressed any
2  concerns or reservations or drawn any distinctions
3  between the General Assembly and its functions, for
4  example, and the School Board and its functions?
5    A.  Not to my knowledge.
6    Q.  Legislative bodies pass laws, is that
7  correct?
8    A.  Yes.
9    Q.  And those laws are then enforced by a
10  different branch of government, correct?
11    A.  Correct.
12    Q.  The School Board doesn't pass laws, but it
13  passes policies, correct?
14    A.  Correct.
15    Q.  Unlike the General Assembly the School
16  Board also enforces those polices, correct?
17    A.  Yes.
18    Q.  At any time during the discussion of
19  whether the Board was a legislative body did anyone
20  raise or discuss the fact that students are
21  consistently present at regular Board meetings?
22    A.  I don't recall.
23    Q.  It is a fact that at least since the mid
24  1990s students were consistently present at regular

**Page 42**

1  Board meetings?
2    A.  Yes.
3    Q.  And so when you walk into the Board meeting
4  or walk out to take your seat on the stage or where
5  ever the meeting is being held, you expect that
6  students will be in the audience?
7    A.  Most generally, yes.
8    Q.  Sometimes it's only half a dozen students,
9  maybe it's just the ROTC color guard?
10    A.  Yes.
11    Q.  Sometimes, I've seen some minutes where it
12  looked like there were 50 or more students there, is
13  that right?
14    A.  Yes.
15    Q.  Can you think of any regular Board meeting
16  where there have been no students present?
17    A.  Probably in the summer months.
18    Q.  Oh, I should have been clear about my
19  question.  Can you think of any regular Board
20  meeting during the academic year when students were
21  not present?
22    A.  No.
23    Q.  All right, I am going to show you another
24  exhibit, this is PX12.

**Page 43**

1    Mr. Hastings, this is a long document, you
2  take as long as you want to to read it, but my first
3  question to you is have you ever seen it before, and
4  you may be able to answer that question without
5  reading the whole document?
6    A.  I may have, but I can't recall.  It's been
7  two years.
8    Q.  If you look at the fourth page of the
9  exhibit?
10    A.  Uh-hum.
11    Q.  You will see there are five numbered
12  paragraphs at the bottom of the page, the fifth one
13  of which carries over to the next page.  With some
14  extremely minor language changes can you confirm
15  that the five numbered paragraphs on PX12 are
16  essentially identical to the numbered paragraphs of
17  the final Board policy?  The only change I can tell
18  you is I know that there is in paragraph four just
19  is changed to only, but apart from that do you see
20  any other changes?
21    A.  No.
22    Q.  Do you know who drafted PX12?
23    A.  I suspect the Neuberger firm.
24    Q.  It says up at the top left the Rutherford

**Page 44**

1  Institute and the Neuberger firm, is that the basis
2  for your answer?
3    A.  Yes.
4    Q.  Did anyone ever tell you that the board
5  policy as it was presented to you for a first
6  reading on September 28th had been drafted by the
7  Neuberger firm?
8    A.  I can't recall.
9    Q.  In an earlier answer you told me that your
10  normal process is to have Board policies checked by
11  the Board attorney, correct?
12    A.  Yes.
13    Q.  In the summer and fall of 2004 who was the
14  Board's attorney?
15    A.  If memory serves me correctly it was Jim
16  Griffin.
17    Q.  Do you know whether anyone on the Board or
18  the policy committee asked Mr. Griffin to
19  participate in the drafting of the Board policy on
20  School Board prayer?
21    A.  I don't want to assume, I know what happens
22  when you assume, but knowing our procedure and the
23  policy committee I would -- sitting here today I
24  would to -- that was the normal procedure, that it's

Hastings, Gregory (Video)  10/13/2006  9:07:00 AM

1  from the microphone, stop talking?
2      A.   Another member of the Board other than the
3  president?
4      Q.   Yup.
5      A.   It may have occurred, but I don't recall
6  any particular date or time.
7      Q.   The last 20 minutes or half an hour we've
8  talked about the atmosphere or the overall ambience
9  of the meeting, which you characterized as a little
10  disturbing, there were outbursts, the crowd
11  mentality, or mob mentality, the crowd got a little
12  unruly. I showed you the Johnson comments and the
13  crowd's reaction both to that with cheers and with
14  laughter during his comments. I showed the clip of
15  the announcement that the meeting would open with a
16  prayer and the raucous reaction to that.
17      Do you have a view as to whether the prayer
18  given on August 24th was effective to make the crowd
19  solemn, respectful and courteous?
20      MR. SHAW:  I am going to object,
21      I don't think you showed him the prayer
22      that day.
23      MR. ALLINGHAM:  I didn't and
24      that's not what I said.

101

1  says in order to solemnify the proceedings, what do
2  you understand that to mean?
3      A.   Well, given the responsibility of a Board
4  member, and particularly as I know it to be in this
5  particular school district, because geographically
6  we are the largest in the state, and we have many
7  buildings, so the whole facet of our charge
8  obviously there are a lot of decisions to be made
9  and sometimes they are very controversial, sometimes
10  very testy, and also looking at the bigger picture
11  there is a lot of financial issues at stake.
12      So, sitting there as a member of the Board
13  one hopes, or I hope, that I make the very best
14  decision I possibly can for the sake of the district
15  and the children in the school district, and I want
16  all the help that I can get.
17      Q.   When you say, "I want all the help that I
18  can get," that means that if you can invoke some
19  divine guidance to guide your judgment that would be
20  helpful?
21      A.   That's correct.
22      Q.   Is it necessary to offer a prayer publicly
23  in order to invoke divine guidance for those
24  judgments?

103

1      A.   I don't recall what the prayer was that
2  particular Board meeting.
3      Q.   I am going to start the question again. It
4  doesn't matter what the payer was a prayer was
5  offered at the meeting, correct?
6      A.   Yes.
7      Q.   And based on the conduct at that meeting
8  which I summarized a minute ago, do you think
9  whatever the pryer was, do you think it was
10  effective to solemnize the proceedings?
11      A.   I believe it was for the individuals of the
12  Board and the purpose it's given, yes.
13      Q.   Okay, and that's very helpful because I
14  wanted to ask you, is the solemnization, which is
15  the purpose of the prayer, as the policy reflects,
16  is that solemnization directed to the Board members
17  and their discharge of their duties, or is it
18  intended to affect everybody in the audience?
19      A.   In my opinion it's for the immediate
20  members of the Board.
21      Q.   Okay. And when the policy says in order to
22  solemnize the proceedings, and you've now told me
23  that's the intended recipient of the solemnization,
24  if you will, are the Board members, when the policy

102

1      A.   I don't suppose it's necessary, no.
2      Q.   You mentioned the financial issues, does
3  the Board deliberate over financial issues in
4  regular session or in executive session?
5      A.   All financial issues are deliberated in
6  regular session.
7      Q.   I forgot to ask you a question about
8  Mr. Johnson, and the clip I showed you. Would you
9  agree with me that members of the Board greeted
10  Mr. Johnson warmly when he came to the podium?
11      A.   None of us got up and shook his hand.
12      Q.   No, sir and that's -- fair enough. You
13  recall somebody made a joke about calling him Earl
14  Johnson?
15      A.   Do I recall it, no, no.
16      Q.   In the stack here you have PX9 which is
17  the actual Board Policy which says, the policy
18  opens, it's first phrase is, "In order to solemnify
19  its proceedings the Board of Education may choose to
20  open its meetings with a prayer or moment of
21  silence." Is there any other purpose for the prayer
22  or moment of silence other than to solemnify the
23  Board's proceedings, as you've defined that?
24      A.   No.

104

Hastings, Gregory (Video)  10/13/2006  9:07:00 AM

1    Q.   A couple of questions again about the
2  August 24th Board meeting but you won't have to make
3  judgments, at least not as many judgments as I asked
4  you about before.  Do you recall that state
5  representatives Hocker and Atkins spoke at the
6  meeting?
7    A.   Yes.
8    Q.   And do you recall that they were joined at
9  the podium by representative Ewing?
10   A.   I believe so, yes.
11   Q.   And did -- do you recall that the
12  representatives provided or read a letter during
13  their public comment section of the meeting?
14   A.   Yes.
15   Q.   And do you recall that that letter said
16  that they as representatives could not recognize the
17  separation of God from state?
18   A.   Maybe.  I can't recall specifically.  I
19  just know that they did read from a letter, but the
20  content I can't recall.
21   Q.   Do you think it was appropriate that
22  representatives stood at the podium and expressed
23  their views as representatives on this issue?
24   A.   I'll say it struck me strange.

129

1    Q.   Why?
2    A.   In this climate, this day and time as we
3  are sitting here knowing the delicateness of this
4  issue at hand, I was surprised two public officials
5  came forward in that light and expressed their
6  opinions, being politicians.
7    Q.   Have you ever had anyone tell you that they
8  see this case as about protecting Christian prayer?
9    A.   No.
10   Q.   Have you ever had anyone tell you that they
11  see this case as about protecting Christian values?
12   A.   You are asking me if I had someone
13  specifically in my face tell me that's what they
14  believe or that's the statement made to such?
15   Q.   Yes, let me take that question first.  So,
16  let's take the specific question, have you ever had
17  anyone actually say to your face that they believe
18  that this case is about protecting Christian values?
19   A.   No.
20   Q.   Now, let's be a little more general, have
21  you heard that sentiment expressed, or have you
22  heard that sentiment -- I'll do it in pieces.  Have
23  you heard that sentiment expressed?
24   A.   Yes.

130

1    Q.   By whom?
2    A.   I can't specifically tell you.  I mean in
3  the course of these two years, whether it would be
4  meeting someone on the street or after a Board
5  meeting or whatever what have you, I have to tell
6  you I've heard that sentiment but who, whom, I don't
7  know.
8    Q.   More than once?
9    A.   Probably.
10   Q.   Would it be fair for me to understand that
11  that is a common sentiment in the Indian River
12  School District?
13   A.   Yes.
14   Q.   I am going to go back to a specific
15  question, have you heard anyone say, again to you
16  use your phrase, to your face, that they understand
17  the School Board Prayer Policy as protecting
18  Christian values?
19   A.   Repeat it, please?
20   Q.   Have you heard anyone say to your face that
21  they view the School Board Prayer Policy as
22  protecting Christian values?
23   A.   No.
24   Q.   Have you heard that sentiment expressed?

131

1    A.   No, I don't believe so.
2    Q.   So, it's the defense of this case that is
3  viewed as defending Christian values?
4    A.   I believe.
5    Q.   Have you discussed with anyone whether the
6  2006, the results of the 2006 School Board election
7  was an endorsement of the stance the School Board
8  has taken in support of School Board prayer?
9    A.   What the result of the Board election in
10  2006?
11   Q.   An endorsement of the stance the School
12  Board has taken in support of School Board prayer?
13   A.   Most definitely.
14   Q.   Is that also your view?
15   A.   That the stance was taken as such?
16   Q.   That the result was an endorsement of the
17  stance that the School Board took?
18   A.   Yes.
19   Q.   Have you ever discussed with anyone whether
20  someone who opposes School Board prayer could get
21  elected to the School Board in Indian River?
22   A.   Interesting question.
23   Q.   Let me rephrase it.  Let me just ask the
24  question directly, do you believe that someone who

132

Unsigned                              Page  129 - 132

# TAB 9

Hattier, Donald (Video) 10/10/2006 9:36:00 AM

1  IN THE UNITED STATES DISTRICT COURT
2  FOR THE DISTRICT OF DELAWARE
3
4  MONA DOBRICH and MARCO DOBRICH, Individually
   as parents and next friend of ALEXANDER DOBRICH,
5  SAMANTHA DOBRICH, JANE DOE and JOHN DOE,
   Individually and as parents and next friend of
6  JORDAN DOE and JAMIE DOE,
7              Plaintiffs
8  vs.           Civil Action
                 No. 15-120
9
10 INDIAN RIVER SCHOOL DISTRICT, ET AL.,
11           Defendants
12
13    DEPOSITION OF DONALD HATTIER, taken at th
   Indian River School District, 31 Hosier Street,
14 Selbyville, Delaware beginning at 9:36 a.m. on
   October 10, 2006 before David A. Sroka, Registered
15 Professional Reporter and Notary Public.
16
   APPEARANCES:
17
18    THOMAS ALLINGHAM, ESQUIRE
      RICHARD HORVATH, ESQUIRE
19    BRIAN LENHARD, ESQUIRE
      P.O. Box 636
20    Wilmington, Delaware 19899-0636
      For the Plaintiffs
21
22
      WILCOX & FETZER
23    1330 King Street - Wilmington, DE 19801
         (302) 655-0477
24       www.wilfet.com

                    1

1              MS. DUPHILY: This is the
2  videotape deposition of Dr. Donald G.
3  Hattier taken by the Plaintiff in the
4  matter of Dobrich, et al., versus Indian
5  River School District, et al., case number
6  15-120. This deposition is taking place at
7  31 Hosier Boulevard, Selbyville, Delaware.
8  We are going on the record on October 10,
9  2006 at approximately 9:37 a.m.
10             The court reporter is David Sroka
11 from the firm of Wilcox & Fetzer,
12 Wilmington, Delaware. My name is Lindsay
13 duPhily I'm the videotape specialist of
14 Discovery Video Services in association
15 with Wilcox & Fetzer.
16             Counsel will now introduce
17 themselves and then the court reporter will
18 swear in the witness.
19             MR. ALLINGHAM: Tom Allingham of
20 Skadden Arps. With me is Rick Horvath and
21 Brian Lenhard also of Skadden Arps,
22 representing the Plaintiffs.
23             MR. GOSSELIN: Jason Gosselin of
24 drinker Biddle & Reath representing the

                    3

1
2
3        JASON P. GOSSELIN, ESQUIRE
         Drinker Biddle & Reath LLP
4        One Logan Square
         Philadelphia, Pennsylvania 19103-6996
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

                    2

1  defendants.
2          DONALD HATTIER,
3  The Witness herein, called for examination by
4  the Plaintiffs, having been duly sworn to tell the
5  truth, the whole truth, and nothing but the truth,
6  was examined and testified as follows:
7          MR. ALLINGHAM: Jason, I just want
8  to put a couple of things on the record.
9  The first one is, it is my impression that
10 you are not going to be interrupting
11 this deposition very much, but I want you
12 to know that if you want to make relevance
13 objections feel free. I'm not going to
14 accept invitations to explain the relevance
15 of my questions, I think that they are
16 relevant.
17 Q.   Mr. Hattier, I represent the Plaintiffs in
18 this action against the district and I'm going to be
19 asking you some questions. If you don't understand
20 anything that I ask please tell me, don't answer the
21 question. If you do answer it the judge and
22 ultimately even the jury will probably assume that
23 you did understand it, so if you do have a problem
24 with a question cut me off at the pass now, okay?

                    4

Hattler, Donald (Video)  10/10/2006  9:36:00 AM

```
 1    lawyers in his law firm, Drinker Biddle & Reath?
 2    A.  I believe that to be true.
 3    Q.  Okay.  You full name is Donald G. Hattler,
 4  is that correct?
 5    A.  Yes, sir.
 6    Q.  And you were born on October 1953?
 7    A.  That is correct.
 8    Q.  Were you born in Delaware?
 9    A.  No, sir.
10    Q.  Where were you born?
11    A.  I was born in Triesta, Italy in the 381st
12  infantry hospital.
13    Q.  When did you come to the United States?
14    A.  In 1962.
15    Q.  How long have you lived in Delaware?
16    A.  I was lived in Delaware since February no,
17  I have lived her Delaware since approximately March
18  of 1990.
19    Q.  Do you consider yourself a long time
20  resident of Sussex County?
21    A.  I do, yes, sir.
22    Q.  Would you agree with me as a general
23  proposition that in Sussex County information and
24  news tends to travel by word of mouth as much as it
```

21

```
 1    Q.  How long have you lived there?
 2    A.  Since March of 1990.
 3    Q.  So, you were 27 when you moved her, 26, 27,
 4  mid 20s?
 5    A.  No, 30, 1990, 1953, 37, 36, 37, somewhere
 6  in there.
 7    Q.  I'm sorry, right.  Where did you attend
 8  college?
 9    A.  I attended at the Virginia Polytechnic
10  Institute State University, currently known as
11  Virginia Tech.
12    Q.  And when did you graduate?
13    A.  1975. That was for my Bachelor's in
14  Science.
15    Q.  I assume you have some kind of MD degree?
16    A.  I have a Chiropractic Degree, that's know
17  as a DC, Doctor of Chiropractic and that's from  the
18  National College of Chiropractic and I graduated
19  there in December of 1985.
20    Q.  I assume that you didn't go straight to
21  chiropractic school?
22    A.  No, sir.
23    Q.  What did you do in-between?
24    A.  In-between I ran a McDonald's for two and a
```

23

```
 1  does by newspaper or other formal media?
 2    A.  In general terms I think that's probably
 3  true.
 4    Q.  I asked you earlier about your children,
 5  you have two children, is that correct?
 6    A.  I have four children, sir.
 7    Q.  Four children.  Would you tell me their
 8  names?
 9    A.  Kristin age 16, Georgette age 14, Hanna
10  age 11 and Donald age eight.
11    Q.  Do they attend district schools?
12    A.  Yes, sir.
13    Q.  Which schools do they attend?
14    A.  I have two, the oldest two are at Indian
15  River High School at the current time.  Hanna is at
16  Selbyville Middle School and Donald is currently at
17  the Lord Baltimore School.
18    Q.  My information may be a little stale so let
19  me just ask you, is your current address R.D. Box
20  114 Dagsboro?
21    A.  That was the old address before we went
22  911.
23    Q.  So, what's he address now?
24    A.  30682 Holts Landing Road.
```

22

```
 1  half years, I went to work for the State of Virginia
 2  in a power plant as a superintendent and a steam
 3  fitter, I taught motorcycle safety at the Northern
 4  Virginia Community College for a number of years,
 5  and in the process injured my spine several times.
 6  Then I was hired by IBM to work as what was called a
 7  customer engineer on fixing typewriters, mag cards,
 8  copiers and it was through that time period that I
 9  was teaching motorcycle safety and my spine kept
10  acting up.  I was slated for surgery for a sciatica
11  case and basically discovered chiropractic.  I'm
12  single, I'm age 29, I sell my townhouse, my Cadillac
13  I go back do college.
14    Q.  And you are employed now as a chiropractor?
15    A.  Yes, sir.
16    Q.  Self-employed?
17    A.  Yes, sir.
18    Q.  Is there a name of the practice or is it
19  simply Dr. Donald G. Hattler?
20    A.  My sister and I recently formed loose
21  partnership, we call ourselves the Beach View Health
22  Associates.  Previous to that it was the Beach View
23  Chiropractic Center.
24    Q.  Where is your office located?
```

24

Hattier, Donald (Video) 10/10/2006 9:36:00 AM

1    president Walls called the meeting to order and then
2    asked Dr. Hattier to give a prayer?
3        A.    Yes, sir.
4        Q.    Did you know in advance that a Mr. Walls
5    was going to ask you tp give the prayer at that
6    meeting?
7        A.    Yes, sir I did.
8        Q.    How did you know that?
9        A.    I volunteered.
10       Q.    When did you volunteer?
11       A.    It could have been the night before or at
12   some other time, I don't remember.
13       Q.    And when you volunteered did you have in
14   mind the prayer that you wanted to give?
15       A.    Yes, I did.
16       Q.    And where did you get that prayer?
17       A.    It might have been brought in partially by
18   Mr. Neuberger at some point, and again I wish I
19   could remember when he actually talked to us, I
20   don't, okay. The other thing is I went on the
21   Internet and I looked at about a half a dozen
22   historical prayers of various time periods and
23   decided on which one I felt fit the occasion the
24   best and that's what I gave.

209

1        Q.    What made you choose that particular
2    prayer?
3        A.    I like to consider himself myself an
4    amateur historian. I spend enough hours at VPI so
5    that I could have a minor in history on paper. VPI
6    does not minors, however, and I have continued with
7    a love of history all of my life and I felt that
8    since this is a contentious issue that if you would
9    like to argue with somebody you can argue with
10   George Washington. If it was good enough for George
11   Washington to give then why is it not good enough
12   for me to give also.
13       Q.    A rhetorical question?
14       A.    A rhetorical question, yes, sir.
15             MR. GOSSELIN: You can answer it.
16       Q.    The text of the prayer that you gave is not
17   in the minutes?
18       A.    No.
19       Q.    We have the prayer or we know the prayer
20   that you gave?
21       A.    Uh-hum.
22       Q.    Is it correct that that's not a prayer that
23   invokes particular religions, sorry. Your prayer
24   does not invoke the name of Jesus Christ?

210

1        A.    That is correct.
2        Q.    And was that by design?
3        A.    No, that's more in keeping with the way I
4    personally would pray.
5             And actually if I looked, I gave my only
6    copies of that to several reporters when they left,
7    so personally do not have a copy of it. I mean if
8    you have a copy of it I'd be happy to discuss it
9    with you. But the way George Washington and some of
10   the contemporaries of the founding fathers used
11   words like the creator of our divine providence, et
12   cetera. The way they used the words would have been
13   different that perhaps in the way we do, but it may
14   have meant exactly the same thing if you had used
15   the words Jesus Christ. So, I would have to look at
16   exactly what I said. If you guys have a copy I'd
17   love to see it.
18       Q.    You brought more than one copy of the
19   prayer to the meeting?
20       A.    Yes, I did.
21       Q.    Was that for the purpose of distributing it
22   to reporters afterwards?
23       A.    I figured somebody might want a copy of it.
24             I seem to remember bringing two. One of

211

1    them I had some handwritten notes on. I go through
2    multiple drafts of things which means that I would
3    have probably brought two of them. You know, one
4    that a more rough and another one that I scribbled
5    something else on. I do recall giving them both
6    away.
7        Q.    Do you know who you gave them to?
8        A.    No, sir. There were quite a few people
9    there that night.
10       Q.    Yes, so I understand. The minutes reflect
11   that a president Walls recommended that the agenda
12   be amended to allow 45 minutes for public comments
13   due to the large number of persons who requested to
14   speak at the meeting. That was approved 10 to
15   nothing. You voted for that, I take it?
16       A.    Yes, sir.
17       Q.    Was there any consideration given to
18   permitting as much time as necessary to let everyone
19   speak?
20       A.    The general speaking time period is 15
21   minutes and given the large numbers of people that
22   were there, we increased it to 45 minutes which is
23   basically three time what we would normally do, and
24   then I believe we always allowed some time at the

212

1   the next morning to do things.
2       You know in my business because I used my
3   hands is an issue, and that's something that I'm
4   hoping we can resolve in a pleasant way.
5   Q.   So, there has been an increase in the
6   number of awards given at the district level.  In
7   the other areas that I talked about, students
8   expressing their delight or concern on particular
9   aspects of school life, presentation of colors,
10  performances of students, is it correct that that
11  goes back a long time?
12  A.   As far as I know that goes back a long
13  time.
14  Q.   So, is it fair for me to infer that the
15  long time practice of opening School Board meetings
16  with prayers coincides with the attendance ot
17  students at those meetings?
18  A.   Probably.
19  Q.   Have you ever heard any Board member
20  express opposition to student involvement in Board
21  meetings or support for limiting student involvement
22  at Board meetings?
23  A.   Recently.
24  Q.   Who is that?

289

1  A.   A lot of us simply because if there was a
2  way me could eliminate that first half an hour, 45
3  minutes it might get us home by 11 o'clock or 11:30.
4  Q.   Oh, that's the issue --
5  A.   Yes and that there might be a more
6  appropriate way to handle that particular item.
7  Others than that I'm not aware of any.
8  Q.   On the issue of the prayers that would be
9  offered you expect to be on a rotational basis at
10  least offered the opportunity to give prayers --
11  A.   Yes, sir.
12  Q.   -- before the Board meetings?
13  A.   Yes, sir.
14  Q.   Is it your intent to continue to use
15  historical prayers of some kind?
16  A.   Yes, it is.
17  Q.   The policy, the School Board Prayer Policy
18  was adopted in October of 2004, since that time has
19  a Board member offered a prayer or moment of silence
20  at the beginning of every meeting?
21  A.   I believe so.
22  Q.   And of those meetings can you give me a
23  ballpark so as to how many have opened with a prayer
24  and how many have opened with a moment of silence?

290

1  A.   Most I would say open with a prayer of some
2  type, or a statement of some type because I have
3  also used nonreligious individuals.  I've made
4  statements from Albert Einstein to open mine.  I
5  recall at least two occasions of moments of silence.
6  And I have not made every Board meeting, I make
7  about 11, between ten and 11 per year, so I'm not at
8  all have them.
9  Q.   The Albert Einstein statement, have you the
10  text of the statements or prayers that you've
11  offered?
12  A.   I might be able to find that one because it
13  was fairly recent.
14  Q.   Why did you pick the Albert Einstein
15  statement?
16  A.   Because Albert Einstein in that particular
17  one was referring to the existence of God and how
18  that that was something that should play a role in
19  folks' lives.  And that was a good way to look
20  beyond yourself.  I can't remember the exact quote.
21  I'm not very good at exact quotes.
22  Q.   And you obviously thought that was adequate
23  to solemnize the proceeding?
24  A.   Absolutely.

291

1  Q.   You told me earlier there have been
2  instances in which a School Board member has
3  declined to offer a prayer or lead a moment of
4  silence?
5  A.   Yes.
6  Q.   Can you tell me which Board members did
7  that?
8  A.   I want to say that it was probably
9  Dr. Isaacs but I cannot say that with a sense of
10  assurety.
11  Q.   Is there only one that you recall?
12  A.   That's it.  My believe is that Mr. Bireley
13  will set these things up in advance to give us all a
14  chance to be prepared, and especially they know if I
15  do it that they know that I'm going to need a good
16  couple of days.
17  Q.   So, if Mr. Bireley sets these things up in
18  advance how did you know that Dr. Isaacs or whoever
19  it was had declined the opportunity?
20  A.   Because there was one Board meeting where
21  somebody did and that was early on when we were
22  still working non the process itself.  That would
23  have been maybe early 2005, I don't remember.  It
24  was something in that time frame.

292

Hattier, Donald (Video)  10/10/2006  9:36:00 AM

1  which the Madelyn Murray-O'Hare comment was made?
2      A.  Not that I'm aware of.  I can't tell you
3  that.
4      Q.  Let me ask you personally, Dr. Hattier.  Do
5  you have same sympathy with the Doe's desire to
6  remain anonymous given what happened at the August
7  24th meeting?
8          MR. GOSSELIN:  Objection.
9          Go ahead.
10     A.  You know, I have a sympathy for them but
11  let me state that I actually have a high degree of
12  respect for the Dobrich family, all righty, I really
13  do.  I have a high respect for them because they
14  believed in something and they were willing to step
15  forward, just as I am now to defend the beliefs that
16  I have him.  All right, and I think that if somebody
17  wishes to hide behind anonymity on an issue, you
18  know they are doing it out of fear or whatever, but
19  if they are right they are right.
20          And my understanding is that the thing that
21  the Doe family was originally complaining about,
22  which had something to do with the Bible Club, which
23  I was not aware of at the time period, okay there
24  were right, we fixed it.  We corrected it.  Okay,

301

1      Q.  This can go quickly.  I have some
2  statements that you were quoted as having been to
3  the media.  I really don't want to, I don't think
4  debate these statements just want to confirm that
5  you were quoted accurately?
6      A.  Okay.
7      Q.  I may have a question or two but I think
8  it's going to be --
9          MR. ALLINGHAM:  This is Hattier
10  24.  The Bates number is P104 and 105.
11          (WHEREUPON Hattier Exhibit 24 was
12  marked for identification)
13     Q.  There is taken from Sussex County Online.
14  You are reported in the one, two, three four, fifth
15  paragraph as having been, as having said,
16  "Dr. Donald Hattier who opened last week's meeting
17  with a prayer penned by George Washington admitted
18  the School Board's current stance on prayer wouldn't
19  hold up in court?"
20     A.  Incomplete quote.
21     Q.  Can you complete it for me?
22     A.  Yes.  Graduation prayer.  Graduation prayer
23  and prayer at school luncheons, other things.  If
24  you compare what we were doing with the DOJ cite it

303

1  and other than I personally don't see what the issue
2  is.
3      Q.  You were personally present and observed
4  the treatment of Alex and Samantha Dobrich at the
5  August 24th Board meeting, correct?
6      A.  Yes.
7      Q.  Do think that the treatment of those two
8  children at that meeting, by community members,
9  might legitimately cause parents to be concerned
10  about the treatment that their children would get if
11  they relinquished anonymity?
12     A.  Yes.
13     Q.  I asked you earlier whether you are that
14  any of your children had tried to confirm who the
15  Does were and you said you were not aware of that?
16     A.  No, I would prefer that my children not
17  have a clue as to who they.
18     Q.  Am I also correct that you are not aware
19  that your wife or any member of your family has
20  taken any action to try to confirm who the Does are.
21     A.  I would hope not.
22     Q.  This is closing the loop for the record, I
23  would hope not means no you not area?
24     A.  Take that as a no, yes, well, whatever, no.

302

1  would not hold up.  Incomplete quote.
2      Q.  Okay so you did say this but you weren't
3  referring to the School Board prayer?
4      A.  No, I was not, I was referring to the other
5  issues.
6      Q.  And let me just ask you the question, and
7  are the current policies which have been adopted
8  since that time in your have view in compliance with
9  the Constitution?
10     A.  Lordy, I hope so.
11          MR. ALLINGHAM:  This is Hattier
12  25.  And I will tell you in advance, Dr.
13  Hattier I have only the second page of this
14  article from The Wave.  I don't know why.
15  It bears Bates number P122.  I will see if I
16  can find the first page.
17          (WHEREUPON, Hattier Exhibit 25 was
18  marked for identification)
19     A.  Yes, final paragraph.
20     Q.  Is your comment accurately reported there?
21     A.  Yes.
22     Q.  Okay?
23     A.  And again though that's based on my
24  findings afterwards.  Okay, in other words, you look

304

Hattier, Donald (Video) 10/10/2006 9:36:00 AM

1  back on what the law had been or had not been, start
2  looking at the aforementioned, you know citing, and
3  as you read the court cases, so that's where the
4  decades part came in.
5  Q.  Understood.
6  A.  Okay.
7       MR. ALLINGHAM:  This is
8  Hattier 26 bearing Bates numbers P290
9  through 293.
10      (WHEREUPON Hattier Exhibit 26 was
11  marked for identification)
12  Q.  This is an August 27 article from the
13  Coastal Point?
14  A.  Okay.
15  Q.  If you --
16  A.  I can't even see myself in there if you can
17  help me out, please.
18  Q.  If you will look at the third page, the
19  last column, the second full paragraph you will see
20  district four representative Dr. Donald Hattier, do
21  you see that?
22  A.  Uh-hum.
23  Q.  "Responded to further public comments on
24  the issue by stating his personal support for prayer

305

1  A.  Yes, I did.
2  Q.  With the clarification that you have given?
3  A.  Again, incomplete quote.
4  Q.  And my question was just did any other
5  Board member make a comment in response to the
6  public comment section of the meeting?
7  A.  Unless it's printed in here I'm going to
8  say no.  And this, whatever comment I made here, who
9  is the author here, Patricia Titus, this
10  probably would have been an interview that happened
11  afterwards during the break of some type.  This
12  would have been a comment that would have been mad
13  during the Board meeting itself.
14  Q.  I have two quick questions on the report of
15  the August 24 meeting.  On page two of this exhibit
16  in the second column, look at the one, two, three,
17  fourth paragraph halfway down the paragraph here is
18  a sentence that begins, at times?
19  A.  Uh-hum.
20  Q.  And it reads, "At times the meeting
21  resembled a prayer meeting as much as a School Board
22  meeting with choruses of amen ringing in the
23  audience after speakers declared their believe and
24  their support for prayer in the schools."

307

1  but acknowledging that the Board had no expectation
2  that it would be able to win any case taken to the
3  court with a pro prayer stand.  He said the Board
4  was proceeding in forming the policy under the
5  guidelines of the State Education Department and
6  with the advice of the district's legal counsel?"
7  A.  Same incomplete quote.  This has to be
8  again with the baccalaureate and the and graduation
9  policies.
10  Q.  And did individual Board members respond to
11  the public comment section with their own views?
12  A.  I don't think so.
13  Q.  Other than yourself?
14  A.  You mean in terms of what I am saying here?
15  Q.  Yeah.
16  A.  You know, based on what it is and based on
17  what's out there, this is what it is.  Okay, we are
18  not going to be able to go to court and argue that
19  we should be able to have under our current policies
20  that a person should be allowed to invite a preacher
21  to come and talk to our graduation ceremonies.
22  Q.  Yes, sir, my question is much more limited
23  and I want to see if I can get you out of here.  You
24  did make this comment?

306

1  A.  Right.
2  Q.  "Few speakers drew any line between the
3  Board's policy on commencement ceremonies or other
4  school events and the policy of prayer said before
5  School Board meetings."
6  A.  Right.
7  Q.  I want to ask you, would you agree that at
8  times the meeting resembled prayer meeting?
9  A.  I don't know that I'd call it a prayer
10  meeting but I would say as I stated to you earlier I
11  don't think a lot of people really understood what
12  the issues were.  Like the last sentence says few
13  speakers drew any lines.  I think most of the
14  speakers were not aware what we were discussing was
15  a more limited realm.
16  Q.  There were choruses of amen --
17  A.  Yes.
18  Q.  -- and people?
19  A.  Yes.
20  Q.  -- cheering for people who expressed
21  support for prayer in schools?
22  A.  Yes.  Yes I don't know if I would call it a
23  prayer meeting.
24  Q.  Revival meeting?

308

Unsigned                    Page  305 - 308

# TAB  10

Helms, Reginald (Video) 10/11/2006 3:32:00 PM

**Page 1**

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                   FOR THE DISTRICT OF DELAWARE
 3
 4   MONA DOBRICH and MARCO DOBRICH, Individually
     As parents and next friend of ALEXANDER DOBRICH,
 5   SAMANTHA DOBRICH, JANE DOE and JOHN DOE,
     individually and as parents and next friend of
 6   JORDAN DOE and JAMIE DOE,
 7                   Plaintiffs
 8        vs.                      Civil Action
                                   No. 15-120
 9   INDIAN RIVER SCHOOL DISTRICT, ET AL.,
10                   Defendants
11
12   -------------------------------------------------
13       DEPOSITION OF REGINALD HELMS, taken
     pursuant to notice at the Indian River School
14   District, 31 Hosler Street, Selbyville, Delaware,
     beginning at 3:32 p.m. on October 11, 2006 before
15   David A. Sroka, Registered Professional Reporter and
     Notary Public.
16
17   APPEARANCES:
         THOMAS ALLINGHAM, ESQUIRE
18       RICHARD HORVATH, ESQUIRE
         BRIAN LENHARD, ESQUIRE
19       P.O. Box 636
20       Wilmington, Delaware  19899-0636
         For the Plaintiffs
21
22               WILCOX & FETZER
23       1330 King Street - Wilmington, DE  19801
                 (302) 655-0477
24               www.wilfet.com
                       1
```

**Page 2**

```
 1
 2
 3       JASON P. GOSSELIN, ESQ.
         JARROD D. SHAW, ESQ.
 4       Drinker Biddle & Reath LLP
         One Logan Square
 5       Philadelphia, Pennsylvania 19103-6996
          For the Defendants
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
                       2
```

**Page 3**

```
 1          MS. DUPHILY:  This is the
 2   videotape deposition of Reggie Helms.  This
 3   deposition is being taken on behalf of the
 4   Plaintiff in the matter of Dobrich, et al.
 5   versus Indian River School Board, et al,
 6   case number 15-120.  The deposition is
 7   being held at 31 Hosler Boulevard,
 8   Selbyville, Delaware.  We are going on the
 9   record on October 11, 2006 at approximately
10   3:32 p.m.
11          The court reporter is David Sroka
12   with Wilcox & Fetzer, Wilmington, Delaware.
13   my name is Lindsay duPhily and I am the
14   videotape specialist with Discovery Video
15   Services.
16          Counsel will now introduce
17   themselves and then the court reporter will
18   swear in the witness.
19          MR. ALLINGHAM:  I'm Tom Allingham
20   for the Plaintiffs and with me are Richard
21   Horvath and Brian Lenhard.
22          MR. GOSSELIN:  Jason Gosselin for
23   Indian River School District and the Indian
24   River School Board and the individual board
                       3
```

**Page 4**

```
 1   member in attendance.
 2          REGINALD HELMS,
 3   The Witness herein, called for examination by
 4   the Plaintiff, having been duly sworn to tell the
 5   truth, the whole truth, and nothing but the truth,
 6   was examined and testified as follows:
 7   EXAMINATION BY MR. ALLINGHAM:
 8       Q.  I've put before you the top document is
 9   Plaintiff's Exhibit 30.  Would you turn to the last
10   page of that exhibit, please?
11          In the second column from the right -- I
12   should give you some background.  This is an article
13   from Delaware Beach Life, have you ever read it
14   before?
15       A.  No.
16       Q.  There is a picture of you on the front
17   page, is that correct?
18       A.  That's me.
19       Q.  Not the best picture of all time?
20       A.  Well --
21       Q.  In the second column from the right there
22   is a quotation from the Reverend Jerry Fike, do you
23   know who Mr. Fike is?
24       A.  Yes.
                       4
```

Helms, Reginald (Video)  10/11/2006  3:32:00 PM

**Page 109**

1    Q.    Do you understand that the Rutherford
2  Institute contributed to that process?
3    A.    All I can testify is that I sent this to
4  Mr. Walls and as you can see it may have been, I
5  don't know specifically that he did.
6    Q.    Well, if you look at the page of the
7  Rutherford Institute and Neuberger memorandum that I
8  was looking at earlier, at the bottom it has one,
9  two and three and on the next page it has four and
10  five?
11    A.    Right.
12    Q.    You can recognize without comparing it word
13  by word that it's virtually verbatim to the final
14  policy as adopted?
15    A.    That's why I'm saying you can see, but do I
16  have knowledge that that's what they based it on,
17  nobody told me that but as you can see.
18    Q.    Did the memorandum of the Rutherford
19  Institute and the Neuberger Firm, which constitutes
20  PX34, form part of the consideration that you took
21  into account in voting to adopt Board Policy BDA.1
22  the School Board Prayer Policy?
23    A.    Yes.
24    Q.    Did any other Board member tell you that it

**Page 110**

1  formed an important part of their consideration of
2  the consideration that they took into account in
3  voting for adoption of the Board Prayer Policy?
4    A.    No, they didn't, they didn't say that.
5    Q.    Look at Exhibit 9, please?
6    A.    Okay.
7    Q.    And I'm going to ask you Mr. Helms just to
8  take a minutes to read through the policy?
9    A.    Sure.
10    Q.    Ready?
11    A.    Yes.
12    Q.    What in your mind was the purpose of
13  offering -- is the purpose of opening the Board's
14  meetings with a prayer or a moment of silence?
15    A.    Exactly what it says.
16    Q.    To solemnify the proceedings?
17    A.    Yes.  To me the work that we do is very
18  important.  We have the best interests of our
19  students, our staff, and our district and I think
20  any time you enter into important work, if you will,
21  of this nature, that in my way of thinking you
22  should invoke the wisdom and guidance of a higher
23  power, if you will, whatever you see that to be.
24        But I think that this simply says that we

**Page 111**

1  are asking for wisdom and guidance to make good
2  sound decisions.
3    Q.    And the means of solemnifying the
4  proceedings specified in the Board policy are two,
5  is that correct? One is to offer a prayer and the
6  other is to offer a moment of silence?
7    A.    As I see there are two mentioned, prayer
8  and moment of silence.
9    Q.    And am I correct that the Board policy
10  authorizes Board members to open the meeting at the
11  invitation of the Board president and on a rotating
12  basis that's specified here, with the limitations
13  that are specified, in one of two ways and only one
14  of two ways, a prayer or a moment of silence?
15    A.    Well, I'll speak to that issue like this.
16  Your definition of a prayer and my definition of a
17  prayer may be two separate things.  Therefore, I
18  know that there are some Board members who have
19  opened the meeting with something that they received
20  from the Internet which may be from George
21  Washington or Thomas Jefferson or whatever.  There
22  have been some Board members that pray simply as
23  they are led.
24        In other words, there is nothing written,

**Page 112**

1  it's just something that they do.  We've had Board
2  members that have requested a moment of silence.
3  Although there are only two mentioned here I think
4  the leeway is that whatever you feel as an
5  individual that you want to do, then that's what
6  we've been doing.
7        So, although the policy mentions prayer and
8  a moment of silence, there have been other occasions
9  where people have read something from the Internet
10  and simply that is to just like it says here, it's a
11  very important job that we have, we have over 7000
12  students, and staff and whatever.  It's a
13  responsibility that I don't take lightly, and for
14  myself I would love to have someone giving me wisdom
15  and guidance and in my case it's my Heavenly Father.
16        Well, in your case it may be something
17  different and some other Board member it maybe a
18  different way.  However, that is the intent as I see
19  it.  My feeling.
20    Q.    Let me ask you a question about whether --
21  I'm going to give you a hypothetical practice and
22  ask you whether in your judgment it would accord
23  with the policy.  I'd like you to imagine a
24  hypothetical Board member who is an atheist.  A very

Helms, Reginald (Video) 10/11/2006 3:32:00 PM

1  can seek divine guidance for your work as a Board
2  member is by saying a prayer out loud on the stage
3  in the name of Jesus Christ at the Board meeting?
4      A.   No, that is not the only way.
5      Q.   You could pray for divine guidance off
6  stage in what I guess would be the wings of the
7  stage right before you walk on?
8      A.   Well, as I said before you can pray
9  anywhere.
10     Q.   Or after you walk on you could offer a
11  silent prayer in your head for divine guidance?
12     A.   Sure.
13     Q.   You could invite those present with you to
14  join you in a moment of silence as a way of seeking
15  divine guidance, is that correct or not correct?
16     A.   Yes, you could do that.
17     Q.   And those methods of seeking divine
18  guidance are no more or less effective in your
19  understanding of one's relationship with God, no
20  more or less effective than a public prayer out loud
21  would be?
22     A.   As I stated before I think God hears your
23  prayers whether it's openly or privately. And the
24  only thing I would say is that could you do it in

                        133

1  the wings, yes, could you do it silently, yes, but
2  as far as I know we're still allowed to do it
3  openly, so if I were to choose to do it openly I
4  hope I would continue to have the right to do so.
5      But God would hear my prayer whether it was
6  silent, whether it was openly, whether it was in my
7  vehicle, or whether I was on stage. God would hear
8  my prayer.
9      Now, how effective the prayer is only He
10  can determine that, but I believe He hears my prayer
11  and answers according to His will, but I think
12  that's why we are here. I'm certainly very hopeful
13  that there doesn't come a time where someone says to
14  me you cannot pray openly. I hope that never
15  happens in this United States.
16     Q.   Everyone's memory is not perfect, but would
17  you think it's fair to say that for every single
18  Board meeting that you've attended as a Board member
19  you have asked for God's help in performing your
20  duties at that meeting?
21     A.   I would say almost every one, sure. I
22  don't know if it would be -- like I told you
23  yesterday I don't use words like never and all, but
24  I would say that it's safe to say that yes for the

                        134

1  most part.
2      Q.   And that would include regular meetings and
3  special meetings?
4      A.   Yes.
5      Q.   And so would you describe for me how you
6  have, if you can recall, how you have asked for
7  divine guidance before special meetings of the
8  Board?
9      A.   Typically we receive an agenda, and on that
10  agenda will be certain items, and I just simply ask
11  the Lord to help me make good sound decisions that
12  will be for the good of the district and the staff
13  and the students, and ask his blessings on whatever
14  decisions are made. That type of thing.
15     Q.   And that -- because we know that public
16  prayers are not offered at special meetings, that
17  would be a private prayer?
18     A.   That would be private, although I would say
19  there have been other meetings besides regular
20  meetings that prayer has been open, the meeting has
21  been started with an open prayer. As a matter of
22  fact, there were several negotiation meetings where
23  I was asked by the association on the other side of
24  the table if I would open the meeting with prayer.

                        135

1      So, there have been other meetings besides
2  regular meetings that have been opened with prayer
3  that I have been sitting in on --
4      Q.   Yes --
5      A.   -- but not every one.
6      Q.   Yes, sir. I was following up on your
7  testimony and also that of Mr. Bireley and Dr.
8  Hattier, that it is not the practice of the Board to
9  open special meetings with a prayer, and that's
10  correct, isn't it?
11     A.   That's correct, although over the years
12  that I've been on there some have, but it would be
13  out of the ordinary.
14     Q.   Yes, sir. And so setting aside the out of
15  the ordinary special meetings where someone offered
16  a public prayer, when you asked for divine guidance
17  you did so privately?
18     A.   Yes.
19     Q.   Let me ask you this, before any special
20  meeting have you ever gotten together with, just
21  said to one or more of your fellow Board members,
22  you know, before we start let's offer up a prayer
23  for guidance? Not as a formal matter, but inside of
24  purely private prayer have you invited someone to

                        136

Unsigned                                Page  133 - 136

TAB 11

Hobbs, Lois  10/24/2006  4:43:00 PM

**Page 1**

FOR THE DISTRICT OF DELAWARE
MONA DOBRICH and MARCO        )
DOBRICH, individually and     )
as parents and next friend    )
of ALEXANDER DOBRICH,         )
SAMANTHA DOBRICH, JANE DOE    ) Civil Action
and JOHN DOE, individually    ) Number 15-120 (JJF)
and as parents and next       )
friend of JORDAN DOE and      )
JAMIE DOE,                    )
                              )
        Plaintiffs,    )
                       )
v.                     )
                       )
INDIAN RIVER SCHOOL    )
DISTRICT, et al.,      )
                       )
        Defendants.    )

        Videotape deposition of LOIS HOBBS, taken
pursuant to notice at 31 Hoosier Street, Selbyville,
Delaware, beginning at 9:12 a.m., on October 24, 2006,
before Julie H. Parrack, Registered Merit Reporter,
Certified Realtime Reporter and Notary Public.
APPEARANCES:
    THOMAS ALLINGHAM, ESQUIRE
    BRIAN G. LENHARD, ESQUIRE
    One Rodney Square
    Wilmington, Delaware  19801
    On behalf of Plaintiffs
        WILCOX & FETZER
    1330 King Street - Wilmington, Delaware 19801
        (302) 655-0477
        www.wilfet.com

**Page 2**

1   APPEARANCES (CONT'D:)
2       JASON P. GOSSELIN, ESQUIRE
            DRINKER, BIDDLE & REATH, LLP
3       One Logan Square
            18th and Cherry Streets
4       Philadelphia, Pennsylvania  19103-6996
            On behalf of Defendants
5
    ALSO PRESENT:  TIMOTHY KEARNS
6           LINDSAY DuPHILY, VIDEOGRAPHER
7       - - - - -
8       THE VIDEOGRAPHER:  This is the videotape
9   deposition of Ms. Lois Hobbs taken by the Plaintiff in
10  the matter of Dobrich, et al., versus Indian River
11  School District, et al., Civil Action No. 15-120.  The
12  deposition is being held at 31 Hoosier Street,
13  Selbyville, Delaware, on October 24th, 2006.  We are
14  going on the record at approximately 9:12 a.m.
15      The court reporter is Julie Parrack from
16  the firm of Wilcox & Fetzer, Wilmington, Delaware.  My
17  name is Lindsay DuPhily, and I am the videotape
18  specialist of Discovery Video Services.
19      Counsel will now introduce themselves, and
20  then the court reporter will swear in the witness.
21      MR. ALLINGHAM:  My name is Tom Allingham.
22  I represent the plaintiffs.  Along with me is Brian
23  Lenhard and Tim Kearns.
24      MR. GOSSELIN:  Jason Gosselin for the

**Page 3**

1   defendants.
2           LOIS HOBBS,
3       the deponent herein, having first been duly
4       sworn on oath, was examined and testified as
5       follows:
6   BY MR. ALLINGHAM:
7   Q.  Mrs. Hobbs, Ms. Hobbs, which do you prefer?
8   A.  Miss, Miss Hobbs.
9   Q.  Miss Hobbs, sorry.  Have you ever been deposed
10  before?
11  A.  Yes.
12  Q.  All right, so you know the process.  I'm going
13  to ask you some questions.  You are -- unless your
14  counsel instructs you not to answer, you're obligated
15  to answer those questions to the best of your ability.
16  I'm almost world renowned for asking questions that
17  are sometimes confusing.  Please tell me if you find a
18  question confusing or ambiguous, and I will do my best
19  to fix it.  Don't answer a question that you don't
20  feel like you understand.
21  A.  Okay.
22  Q.  You need to answer, although we have a
23  videographer here, you still need to answer out loud;
24  that is to say, so that the court reporter can take

**Page 4**

1   down your answer and there's no ambiguity in what your
2   answer is.  Nods and "um-hums" can be misinterpreted.
3   A.  All right.
4   Q.  I understand that you have a previous
5   commitment and that you need to stop at 1:00 this
6   afternoon, correct?
7   A.  At 1:30 at the latest.
8   Q.  Okay.  I think what we'll do then is stop for
9   lunch at 1:00.  You can take care of your obligations
10  and if we need to resume thereafter, we will.
11      Is there any -- are you suffering from any
12  condition that would prevent you from giving
13  comprehensive and truthful answers to my questions
14  today?
15  A.  No.
16  Q.  Or taking any medications that might prohibit
17  you from doing that?
18  A.  No, I took a Benadryl, but I don't think that
19  will prohibit.
20  Q.  All right, your full name is what?
21  A.  Lois Margaret Hobbs.
22  Q.  And what is your address?
23  A.  It is 3 Brighton Street, Ocean View, Delaware.
24  Q.  Are you currently employed?

Hobbs, Lois  10/24/2006  4:43:00 PM

1    THE WITNESS: I don't know how to do it.
2    MR. GOSSELIN: I don't know what the
3    question is going to be.
4    THE WITNESS: I don't know what the
5    question is going to be.
6    MR. GOSSELIN: But if it involves
7    revealing what took place at that August 23rd meeting
8    that we talked about before, the instruction is to not
9    answer that question.
10    THE WITNESS: Okay.
11    BY MR. ALLINGHAM:
12    Q.  And I may have to ask a couple of questions to
13    develop the record because of the nature of the
14    instruction.
15    So my first question is, at any time
16    during the Board's consideration of the School Board
17    prayer policy, do you recall any Board member saying
18    or expressing the view that perhaps the Board should
19    consider a moment of silence instead of a prayer?
20    A.  I think Mr. Isaacs may have said that once.
21    Q.  And what was the response?
22    A.  Just that the Board's feeling was they wanted
23    to continue the tradition.
24    Q.  Do you recall during the discussion of the

197

1    moment of silence idea one or more Board members
2    saying, "I don't want to be told how I can pray," in
3    words or substance?
4    A.  I'm not sure what meeting that would be, but I
5    did hear something like that.
6    Q.  Who said that?
7    A.  I don't recall who said it.
8    Q.  What did you understand, if you had an
9    understanding, the purpose of the Board policy on
10    School Board prayer to be?
11    A.  That it would be shared, that we wouldn't be
12    preaching any one religion to anyone, that it would be
13    shared amongst the Board members to say a prayer. If
14    they chose a moment of silence, they could choose a
15    moment of silence. If they chose a prayer, they could
16    choose a prayer. But as a legislative body, it was up
17    to that individual who was ever giving the prayer to
18    say whatever prayer they wanted.
19    And oftentimes I would say to whoever,
20    when I heard who was giving the prayer that, you know,
21    you know, a teacher died of a brain tumor, a fire of
22    the children, so often they would bless that, you
23    know, they would say, you're in our thoughts, that
24    family, who's ever gone through this tragedy is in our

198

1    thoughts.
2    Q.  According to your understanding, Miss Hobbs, is
3    the prayer directed only to the individual Board
4    members, or is it directed to all of the people in the
5    cafeteria or auditorium in which the prayer is being
6    offered?
7    A.  I believe it's the Board members' prayer.
8    Q.  So it's directed only to the Board members?
9    A.  I think they sort of clarify it with a
10    statement before that says if you don't want to
11    participate in the prayer, you may leave the room, or
12    whatever that little paragraph says.
13    Q.  That's the so-called disclaimer?
14    A.  Yeah, um-hum.
15    MR. GOSSELIN: Or "the disclaimer."
16    Objection.
17    MR. ALLINGHAM: I'm sorry?
18    MR. GOSSELIN: Objection to the form.
19    MR. ALLINGHAM: It wasn't meant to be
20    substantively charged. I thought you'd object if I
21    called it the disclaimer.
22    BY MR. ALLINGHAM:
23    Q.  I showed you the actual Board policy, PX 9.
24    Would you see if you can get that out again?

199

1    A.  Yes.
2    Q.  Paragraph 1 reads "In order to solemnify its
3    proceedings the Board of Education may choose to ope
4    its meetings with a prayer or moment of silence, all
5    in accord with the freedom of conscience of the
6    individual adult Board member."
7    Would you agree with me that according to
8    the policy, the purpose of the offering of a prayer or
9    moment of silence is to solemnify the proceedings?
10    A.  Yes.
11    Q.  And what do you understand the solemnification
12    of the proceedings to mean? What does that phrase
13    mean?
14    A.  I think they were just trying to bring some
15    dignity and, you know, ask for guidance in their
16    decision about children.
17    Q.  Was there any discussion about that at any time
18    that you recall?
19    A.  Not that I recall.
20    Q.  Was there ever any discussion of the purpose of
21    having a prayer to open Board meetings during any of
22    the Board's consideration of this Board policy?
23    A.  I think it's been a tradition they've been
24    opening the Board meetings with a prayer.

200

# TAB  12

McCabe, Elaine (Video)  10/17/2006  9:02:00 AM

```
 1          IN THE UNITED STATES DISTRICT COURT
 2          IN AND FOR THE DISTRICT OF DELAWARE
 3   MONA DOBRICH and MARCO   :  Case No. 15-120
     DOBRICH, individually and :
 4   as parents and next friend :
     of ALEXANDER DOBRICH,     :
 5   SAMANTHA DOBRICH, JANE DOE :
     and JOHN DOE, individually :
 6   and as parents and next   :
     friend of JORDAN DOE and  :
 7   JAMIE DOE,                 :
 8        Plaintiffs,    :  :
 9        v.             :
10   INDIAN RIVER SCHOOL        :
     DISTRICT, et al.,          :
11        Defendants.    :
12
13        Video Deposition of ELAINE MCCABE, taken
     pursuant to notice, on Tuesday, October 17, 2006
14   at 9:02 a.m. at 31 Hosier Street, Selbyville,
     Delaware, reported by Lorena J. Hartnett, a Registered
15   Professional Reporter and Notary Public.
16
17   APPEARANCES:
18        RICHARD HORVATH, ESQUIRE
          BRIAN G. LENHARD, ESQUIRE
19        Skadden, Arps, Slate, Meagher & Flom
          One Rodney Square
20        Wilmington, DE  19801
          Attorneys for the Plaintiff
21
22        WILCOX & FETZER
          1330 King Street - Wilmington, DE  19801
23        (302) 655-0477
          www.wilfet.com
24

                       1
```

```
 1   APPEARANCES (CONTINUED):
 2        JASON P. GOSSELIN, ESQUIRE
 3        Drinker, Biddle & Reath, LLP
          One Logan Square
 4        18th and Cherry Streets
          Philadelphia, PA  19103-6996
 5        Attorney for the Defendants
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

                       2
```

```
 1
 2
 3          TABLE OF CONTENTS
 4   TESTIMONY OF ELAINE MCCABE:
 5     Direct Examination by Mr. Horvath  . . . . . . . 4
 6   Certificate of Reporter  . . . . . . . . . . . .112
 7
 8
 9
10          INDEX TO EXHIBITS
11   Plaintiff's Exhibit 57 . . . . . . . . . . . . . 99
12
13
14
15
16
17
18
19
20
21
22
23
24

                       3
```

```
 1          (The videographer read the
 2   introduction, and the attorneys introduced
 3   themselves.)
 4          ELAINE MCCABE,
 5   HAVING FIRST BEEN DULY SWORN, TESTIFIED AS
 6   DIRECT EXAMINATION ON BEHALF OF THE PLAIN
 7   BY MR. HORVATH:
 8   Q.  Good morning, Ms. McCabe.
 9   A.  Good morning.
10   Q.  Just so I can be clear from the start, is it
11   Ms. or Mrs.?
12   A.  Mrs.
13   Q.  Mrs.  Have you ever been deposed before?
14   A.  Once, yes.
15   Q.  And what was that, what were you -- What case
16   was that?
17   A.  It was the Barkaski case associated with the
18   school district.
19   Q.  And what was the nature of that case?
20   A.  It was a case that involved missing monies
21   from a booster organization.
22   Q.  Okay, did that case proceed to trial?
23   A.  No.
24   Q.  Did that case involve in any way religion in

                       4
```

McCabe, Elaine (Video)  10/17/2006  9:02:00 AM

1  until today?
2      A.  I frankly didn't know that -- If I knew that
3  night, I had forgotten, but I really wasn't aware that
4  we were on tape.
5      Q.  Can we go back to exhibit number nine, the
6  copy of the policy?
7      A.  Uh-huh.
8      Q.  Is there any -- Which paragraph of this
9  policy limits what a board member can say as a part of
10  their prayer?
11     A.  I would say number three.
12     Q.  Okay.  And number three reads, "Such
13  opportunity," which I presume means the prayer, "shall
14  not be used or exploited to proselytize, advance or
15  convert anyone, or to derogate or otherwise disparage
16  any particular faith or belief."  Is that correct?
17     A.  Yes.
18     Q.  What does it mean to proselytize?
19     A.  I take that to mean that the prayer said
20  before board meetings was not meant to try to
21  influence anyone to a particular faith.
22     Q.  And I presume that you would use the same
23  definition for the convert anyone?
24     A.  Right, right.

73

1  those prayers would be permitted under this policy.
2      A.  Okay.
3      Q.  Oh, before I show you these ones, I am going
4  to read one to you.
5      A.  Okay.
6      Q.  Suppose that a board member gave the
7  following prayer:  "We pray, Lord, that you enlighten
8  the heathen in our midst and that you inspire them to
9  come to the knowledge of your wisdom and goodness."
10         Would that prayer be appropriate under the
11  policy?
12     A.  I don't know.
13     Q.  Would it violate paragraph three?
14     A.  I am not an expert on prayer.  Read it again.
15     Q.  "We pray, Lord, that you enlighten the
16  heathen in our midst and that you inspire them to come
17  to knowledge of your wisdom and goodness."
18     A.  I guess I personally probably don't like the
19  word heathen, but I don't know whether it would be
20  allowed or not.
21     Q.  Does this prayer proselytize?
22     A.  I have no idea.
23     Q.  You voted for Policy BDA.1?
24     A.  I did.

75

1      Q.  What does the advance, the word advance in
2  this policy mean?
3      A.  To put one faith before another.
4      Q.  Okay.  Have school board prayers identified
5  any religious figures, any deities, for example?
6      A.  God and Jesus.
7      Q.  Anyone else?
8      A.  I don't believe so, and not always Jesus.
9      Q.  But --
10     A.  Or I would say the Lord, which would be used
11  sometimes.
12     Q.  But you don't remember hearing any school
13  board prayer that was directed to Jehovah?
14     A.  No.
15     Q.  Or Buddha?
16     A.  No.
17     Q.  Or Allah?
18     A.  No.
19     Q.  Or I can keep going through all religious
20  beings aside from God in general, the Lord and Jesus.
21     A.  Right.
22     Q.  I am going to go through a series of prayers.
23     A.  Okay.
24     Q.  And I want to see whether or not you think

74

1      Q.  And, as a board member, you are responsible
2  for the enforcement of this policy?
3      A.  Yes, yes.
4      Q.  So, speaking as someone who voted for the
5  policy and was responsible for the enforcement of the
6  policy, how would you make a determination as to
7  whether or not that prayer would violate paragraph
8  three?
9      A.  Well, I guess, frankly, I had never thought
10  of it in terms of a prayer like you just read, because
11  that's not generally what the type of prayer that was
12  said at our meetings.
13         Generally, it was just a prayer asking for
14  wisdom to make good decisions for the betterment of
15  our district and our children, so I am not sure that
16  it ever came up and I ever thought about it in a
17  specific term like that.
18         I mean I am assuming, the way you read it,
19  that the words could be interpreted to encourage
20  people who were not religious to become religious, but
21  I don't know that that's really the case.
22     Q.  So you do not feel that this prayer violates
23  paragraph three of the policy?
24     A.  I don't really have a problem with it, no.

76

Unsigned                                      Page 73 - 76

# TAB 13

Mitchell, Donna  10/16/2006  4:44:00 PM

```
 1          IN THE UNITED STATES DISTRICT COURT
 2          IN AND FOR THE DISTRICT OF DELAWARE
 3  MONA DOBRICH and MARCO   :  Case No. 15-120
    DOBRICH, individually and :
 4  as parents and next friend :
    of ALEXANDER DOBRICH,      :
 5  SAMANTHA DOBRICH, JANE DOE :
    and JOHN DOE, individually :
 6  and as parents and next    :
    friend of JORDAN DOE and   :
 7  JAMIE DOE,                 :
                               :
 8          Plaintiffs,    :
                               :
 9       v.                    :
                               :
10  INDIAN RIVER SCHOOL        :
    DISTRICT, et al.,          :
11                             :
            Defendants.    :
12
13       Video Deposition of DONNA MITCHELL, taken
    pursuant to notice, on Monday, October 16, 2006
14  at 9:15 a.m. at 31 Hosier Street, Selbyville,
    Delaware, reported by Lorena J. Hartnett, a Registered
15  Professional Reporter and Notary Public.
16
17  APPEARANCES:
18       THOMAS ALLINGHAM, ESQUIRE
         RICHARD HORVATH, ESQUIRE
19       Skadden, Arps, Slate, Meagher & Flom
         One Rodney Square
20       Wilmington, DE  19801
            Attorneys for the Plaintiff
21
22          WILCOX & FETZER
    1330 King Street - Wilmington, DE  19801
23          (302) 655-0477
            www.wilfet.com
24
                        1
```

```
 1
 2
 3          TABLE OF CONTENTS
 4  TESTIMONY OF DONNA MITCHELL:
 5    Direct Examination by Mr. Allingham. . . . . . . 4
 6  Certificate of Reporter . . . . . . . . . . . .171
 7
 8
 9          INDEX TO EXHIBITS
10  Plaintiff's Exhibit 55 . . . . . . . . . . . . . 67
11
12
13
14
15
16
17
18
19
20
21
22
23
24
                        3
```

```
 1
 2  APPEARANCES (CONTINUED):
 3    JASON P. GOSSELIN, ESQUIRE
      Drinker, Biddle & Reath, LLP
 4    One Logan Square
      18th and Cherry Streets
 5    Philadelphia, PA  19103-6996
         Attorney for the Defendants
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
                        2
```

```
 1          (The videographer read the
 2  introduction, and the attorneys introduced
 3  themselves.)
 4          DONNA MITCHELL,
 5  HAVING FIRST BEEN DULY SWORN, TESTIFIED AS
 6  DIRECT EXAMINATION ON BEHALF OF THE PLAIN
 7  BY MR. ALLINGHAM:
 8    Q.  Good morning, Mrs. Mitchell.  My name is Tom
 9  Allingham.  I represent the plaintiffs.  Have you ever
10  been deposed before?
11    A.  No.
12    Q.  I am sure Mr. Gosselin or someone has
13  explained the process to you, but I will, just
14  briefly, I will ask you questions.
15          You are obligated to provide answers unless
16  your counsel instructs you not to answer a question.
17  If you don't understand the question that I ask you or
18  if you would like to have it clarified, it's really up
19  to you.  You can say, "Could you say that a different
20  way, I don't understand it," whatever is the problem.
21          If you answer the question, I, at least, will
22  understand that you understood what you were
23  answering, and I think it's likely that the judge and
24  the jury will understand that, as well, so be sure
                        4
```

1    Q.  Some might be intimidated?
2    A.  Some might.
3    Q.  Some might not?
4    A.  That's right.
5    Q.  A couple of practical questions on the
6  rotation in paragraph two. Is it correct that the way
7  this rotation is set up, that unless all ten board
8  members choose not to exercise the opportunity, every
9  board meeting will be opened with a prayer or a moment
10  of silence?
11    A.  Would you repeat that?
12    Q.  I am going do repeat it in a minute, but
13  let's just look at paragraph two first. You will see
14  that "if the member," and this is the second sentence
15  of the rotation, this is the mechanism of the
16  procedure. "If the member chooses not to exercise
17  this opportunity, the next member in rotation shall
18  have the opportunity."
19        And I presume that if that person declined
20  that it would go to the next member in the rotation;
21  right?
22    A.  Right.
23    Q.  So is it correct that the way this is set up,
24  that unless all ten members choose not to exercise the

157

1  opportunity, the board will open its meeting with a
2  prayer or a moment of silence?
3    A.  Yes.
4    Q.  Okay. This follows up on the testimony you
5  gave me that if the board members changed the policy
6  to provide for the offering of prayer for guidance
7  outside of the formal meeting, they would be voted out
8  of office.
9        Do you believe that anyone could be elected
10  to the Board of Education of the Indian River School
11  District who publicly opposed opening the school board
12  meetings with a prayer?
13    A.  I suppose it's possible. I don't know.
14    Q.  We all frequently say things like "All things
15  are possible." Do you think it's likely that anyone
16  could be elected to the board who publicly opposed
17  school board prayer?
18    A.  I can only speak for the people in my
19  district and the people in the community that I know.
20    Q.  Yes, ma'am.
21    A.  They would not be.
22    Q.  Have you ever heard any candidate for the
23  school board, whether successful or unsuccessful,
24  campaign on the proposition that a vote for them was a

158

1  vote for prayer and against the ACLU?
2    A.  Have I ever heard it or read it?
3    Q.  Yes.
4    A.  I don't know that I have read it. I know
5  that when school board members are interviewed, when
6  they are going through the process of running for an
7  election, they are asked questions about where they
8  stand on issues, and I have heard two that have been
9  supportive, since I have been on there, of the prayer.
10    Q.  Who are they?
11    A.  Charlie Bireley and Nina Lou Bunting.
12    Q.  And did you hear them say in a public setting
13  in words or substance, "A vote for me is a vote for
14  school board prayer."?
15    A.  In a what kind of setting?
16    Q.  In a public setting?
17    A.  No.
18    Q.  Have you heard either of them say that in a
19  private setting?
20    A.  No.
21    Q.  Have you heard any candidate for a seat on
22  the school board say, "A vote for me is a vote against
23  the ACLU."?
24    A.  I haven't heard that, no.

159

1    Q.  Or that, or any candidate campaign on the
2  notion that the candidate will stand up to the ACLU?
3    A.  I can't point to a specific time that I have
4  read or actually heard that. The ACLU is not popular
5  in this area. That's just a given.
6    Q.  Why is it a given?
7    A.  Well, I think many of the people in the
8  community feel that the ACLU oftentimes stands for
9  things that go against traditional values that they
10  hold dear, and that troubles them and worries them.
11    Q.  What do you mean by traditional values that
12  they hold dear?
13    A.  Like the prayer issue.
14    Q.  The prayer issue being school board prayer or
15  prayer in schools generally?
16    A.  Prayer issue in general, I believe, including
17  the school board prayer.
18    Q.  Do you understand that this lawsuit is being
19  prosecuted by the ACLU?
20    A.  Yes.
21    Q.  And do your constituents view the ACLU as
22  anti-Christian?
23    A.  I believe most of them do, yes.
24    Q.  Do you view the ACLU as anti-Christian?

160

Mitchell, Donna  10/16/2006  4:44:00 PM

1    A. I don't know enough about it to make that
2    determination. I do feel some concern.
3    Q. Do the constituents in your district share
4    your view that this lawsuit is being prosecuted by the
5    ACLU?
6    A. I believe they do.
7    Q. And I think this is the communicative
8    property word. Is it, therefore, the case that your
9    constituents view the defense of this lawsuit as
10   promoting Christian values against the ACLU?
11   A. Would you ask that again?
12   Q. Do your constituents view the defense of this
13   lawsuit by the board and the district, the defense of
14   this lawsuit has a defensive Christian values against
15   the ACLU?
16   A. I believe many of them do.
17   Q. Do you feel that way?
18   A. I am not sure.
19   Q. What's the cause of your uncertainty?
20   A. I am just not sure. I believe the ACLU has
21   good intentions and they believe in what they are
22   doing, but I don't happen to agree with them on this
23   point. I am not sure to what extent. They do go
24   against the values that I hold dear.

161

1    Q. In any case, in your defense of this lawsuit
2    do you believe that you are defending Christian
3    values, setting the ACLU aside?
4        MR. GOSSELIN: Objection.
5    A. I believe that in this lawsuit I am defending
6    our right to do something which is legal, and it just
7    happens to at this point be prayer before school board
8    meetings.
9    Q. Alright, so let me parse that. The subject
10   matter of your defense happens to be something that
11   represents Christian values, but you would defend your
12   practice, as long as it's legal, whether it
13   represented Christian values or not?
14   A. Yes.
15   Q. Is that what you are saying?
16   A. Yes, uh-huh.
17   Q. Okay. So that the answer to my earlier
18   question is yes, you do view the defense of this
19   lawsuit as a defense of Christian values, but that's
20   coincidental?
21   A. Yes.
22   Q. Is it your belief, Mrs. Mitchell, that a
23   school board member has a First Amendment freedom
24   speech right to say whatever he or she wants?

162

1        MR. GOSSELIN: Objection.
2    A. Would you repeat that?
3    Q. Is it your view that a school board member
4    has a First Amendment freedom of speech right to say
5    whatever he or she wants?
6    A. That depends on where it is and what it's
7    about. I believe we all have to have some restraints
8    in some of the areas that we are in.
9    Q. Okay. Can we agree that private citizens
10   have the right under our constitution to worship as
11   they see fit?
12   A. Yes.
13   Q. And do you think there is any difference or
14   limitation on that right that flows from an
15   individual's service as a school board member?
16   A. I feel more responsibility as a school board
17   member.
18   Q. And why is that?
19   A. Because I am representing other people.
20   Q. And --
21   A. And I have taken an oath to my office to
22   abide by the rules that I am given.
23   Q. And does that responsibility impose any
24   restrictions or limitations on how you can exercise

163

1    your religion while wearing your hat as a school board
2    member?
3    A. Well, I wouldn't proselytize.
4    Q. Whereas as a private citizen you could?
5    A. I may.
6    Q. Any other restrictions?
7    A. I would have to think about that. I really
8    can't think of anything in particular right now. I
9    just feel the responsibility of the office, where I
10   would not have that if I were just a private citizen
11   attending school board meetings. I am more sensitive
12   to others, how they may perceive things.
13   Q. And that sensitivity to perception, do you
14   feel that sensitivity because as a school board member
15   you are serving as a representative government
16   official?
17   A. Yes.
18   Q. The answer to this may be no, but do you have
19   a view, yourself, as to whether your colleagues on the
20   board share that view, that sensitivity that flows
21   from their service as government officials?
22   A. I can't answer for them.
23       MR. ALLINGHAM: Alright, let's go off
24       the record for a minute.

164

Unsigned                                    Page  161 - 164