TAB  14

Walls, Harvey 10/25/2006 4:42:00 PM

**Page 1**

```
 1          IN THE UNITED STATES DISTRICT COURT
 2              FOR THE DISTRICT OF DELAWARE
 3
 4   MONA DOBRICH and MARCO      )
     DOBRICH, individually and   )
 5   as parents and next friend  )
     of ALEXANDER DOBRICH,       )
 6   SAMANTHA DOBRICH, JANE DOE  )
     and JOHN DOE, individually  )
 7   and as parents and next     )
     friend of JORDAN DOE and    )
 8   JAMIE DOE,                   )
 9          Plaintiffs,          )
                                 ) Civil Action
10   v.                          ) No. 05-120 (JJF)
11   INDIAN RIVER SCHOOL,        )
     DISTRICT, et al.,           )
12                               )
            Defendants.          )
13
14          Videotaped Deposition of HARVEY L. WALLS,
     taken pursuant to notice at 31 Hosier Street,
15   Selbyville, Delaware, beginning at 1:30 p.m., on
     Wednesday, October 25, 2006, before Terry Barbano
16   Burke, RMR-CRR and Notary Public.
17   APPEARANCES:
18      THOMAS ALLINGHAM, ESQUIRE
        BRIAN LENHARD, ESQUIRE
19      One Rodney Square
        Wilmington, Delaware 19801
20      For the Plaintiff
21
        WILCOX & FETZER
22      1330 King Street - Wilmington, Delaware 19801
        (302) 655-0477
23      www.wilfet.com
24
```

**Page 2**

```
 1   APPEARANCES (cont'd):
 2      JARROD SHAU, ESQUIRE
        Drinker, Biddle & Reath, LLP
 3      One Logan Square
        18th and Cherry Streets
 4      Philadelphia, Pennsylvania 19103-6996
        For the Defendants
 5
     ALSO PRESENT:
 6
        TIMOTHY KEARNS
 7      MARK BUCKMASTER, Video Specialist
 8         - - -
 9          VIDEO SPECIALIST: This is the videotape
10   deposition of Harvey L. Walls, taken by the plaintiff
11   in the matter of Dobrich, et al., versus Indian River
12   School District et al., Civil Action No. 05-120, held
13   at 31 Hosier Street in Selbyville, Delaware, on
14   October 25th, 2006, at approximately 1:32 p.m.
15          The court reporter is Terry Burke from
16   the firm of Wilcox & Fetzer. My name is Mark
17   Buckmaster, a video specialist with Discovery Video
18   Services, Incorporated, in association with Wilcox &
19   Fetzer.
20          Counsel will now introduce themselves and
21   the reporter will swear in the witness.
22          MR. ALLINGHAM: I'm Tom Allingham. I
23   represent the plaintiffs, and along with me are Tim
24   Kearns and Brian Lenhard.
```

**Page 3**

```
 1          MR. SHAU: I'm Jarrod Shau and I
 2   represent the defendants in this action.
 3          HARVEY L. WALLS,
 4      the deponent herein, having first been
 5      duly sworn on oath, was examined and
 6      testified as follows:
 7   BY MR. ALLINGHAM:
 8      Q.  Have you ever been deposed before, Mr. Walls?
 9      A.  Yes.
10      Q.  When?
11      A.  I'm not sure of the date. Somewhere around
12   the late 90's for a district staff employee that had
13   sued the district.
14      Q.  I am going to ask you some questions. Please
15   tell me if you don't understand the question or if you
16   think it's ambiguous.
17          If you answer the question, I will
18   assume, and I think the judge and the jury will assume,
19   that you understood it. So let me know and I'll try to
20   fix the question if you have a problem.
21          You have to answer out loud yes or no,
22   not uh-huh or uh-uh.
23          And lastly, I freely confess that I tend
24   to interrupt people. I'll try not to do that. You
```

**Page 4**

```
 1   should try not to interrupt me or assume that you know
 2   that what the answer to my question is, because the
 3   court reporter can't take down both of us at once;
 4   okay?
 5          Do you know who the Doe family are?
 6      A.  No.
 7      Q.  Has anyone ever told you that they know who
 8   the Doe family are?
 9      A.  Not to my knowledge.
10      Q.  Have you spoken with anyone who has already
11   given their deposition in this matter?
12      A.  I have spoken to Dr. Hattier and Mrs. Bunting.
13      Q.  When did you speak to Dr. Hattier?
14      A.  Oh, probably a week or two ago.
15      Q.  And what was the substance of your
16   conversation, what did he say?
17      A.  Just basically that it went quite a long time.
18      Q.  Anything else?
19      A.  We talked about, a little bit about the type
20   of stuff you might be covering or asking or something,
21   but exactly what I couldn't tell you.
22      Q.  Do you recall that Dr. Hattier told you any
23   questions that he was asked?
24      A.  No. He told me that you and him got into some
```

1   A.   No.
2   Q.   Okay.
3        So to come back to my earlier question,
4   the change from "in order to solemnify its proceedings"
5   to "in order to solemnify school board proceedings,"
6   can we agree that's a non-substantive change?
7   A.   I think it's a substantive change.
8   Q.   Did you think that "its" -- sorry. You
9   understood "its" in your draft to be different
10  from "school board"?
11  A.   I understand where it says "it is the
12  policy" --
13  Q.   No, sir. I'm just looking at the first
14  clause. Just the "in order to solemnify its
15  proceedings," "in order to solemnify school board
16  proceedings," that's not a substantive difference,
17  correct, that first clause?
18  A.   That's correct.
19  Q.   Okay. We have spoken about the change from
20  "it is the policy of the board" to "the board of
21  education may choose," and you've described that in the
22  one you viewed as that as requiring a board to open its
23  meetings with a prayer, whereas in the draft that you
24  created it was the board of education may, but doesn't

37

1   have to; correct?
2   A.   Right.
3   Q.   The second paragraph, there is a, I think, a
4   minor change, but let's just confirm that it is a minor
5   change. The Neuberger draft says, "On a rotating
6   basis, one individual adult board member per meeting
7   will be given the opportunity to offer a prayer or
8   moment of silence," and in your draft, there is a
9   change to, "to offer a prayer or request a moment of
10  silence."
11       Do you see the difference?
12  A.   Yes.
13  Q.   And am I right that that's not a substantive
14  change, you just thought that you were drafting it more
15  clearly by saying "request a moment of silence"?
16  A.   That's correct.
17  Q.   In the third paragraph, would you agree with
18  me there are no changes from the Neuberger draft to
19  your draft?
20  A.   Yes.
21  Q.   The fourth paragraph there is a very modest, I
22  think a very modest change in the first sentence. The
23  Neuberger draft reads, "Such prayer is voluntary and it
24  is just among the adult members of the board." Your

38

1   draft reads, "Such prayer is voluntary and it is among
2   only the adult members of the board."
3        That's not a substantive change, you
4   just thought your draft was clearer; correct?
5   A.   Correct.
6   Q.   And can we agree that the second sentence of
7   the fourth paragraph is unchanged from Mr. Neuberger'
8   draft?
9   A.   Yes.
10  Q.   And the fifth paragraph is unchanged from the
11  Neuberger draft; is that right?
12  A.   Correct.
13  Q.   Okay.
14       Now, I take from the fact that you made
15  changes in the draft, including ones what you viewed as
16  a substantive change in the draft, that you read and
17  carefully considered Mr. Neuberger's draft?
18  A.   Yes.
19  Q.   Paragraph 1 of the draft appears to specify
20  what the purpose of the prayer or a moment of silence
21  is in that it says, "in order to solemnify its
22  proceedings, the board of education may choose to ope
23  its meetings with a prayer or moment of silence."
24       Would you agree with me that the policy

39

1   sets forth the purpose of the prayer or moment of
2   silence offered by the board member, which is to
3   solemnify its proceedings?
4   A.   Yes.
5   Q.   When you voted to adopt this policy, what did
6   you understand the phrase "to solemnify its
7   proceedings" meant?
8   A.   Just to impress upon the importance of a
9   regular meeting, just to ask for guidance in making the
10  proper decisions.
11  Q.   I understand that to be two separate goals,
12  one to impress on the board members that they needed
13  take their responsibility seriously in the meeting that
14  was coming up; is that right?
15  A.   Uh-huh.
16  Q.   And the second one was to seek divine guidance
17  for the decisions that would be made; is that correct?
18  A.   Yes.
19  Q.   Do you know whether the board prayer policy
20  was ever discussed at a policy committee meeting?
21  A.   I don't believe it was. Other than to ask for
22  its proper format from the other policy members. Me as
23  a board member, I don't know just exactly what letter
24  to assign. That's the format I'm saying. I mean the

40

Walls, Harvey 10/25/2006 4:42:00 PM

| | |
|---|---|
| 1      THE WITNESS: I don't know. | 1      A.   I had that feeling. |
| 2      MR. SHAU: You can answer as to whether | 2      Q.   How did you get that feeling? |
| 3   or not the attorneys reviewed it. I'm going to | 3      A.   Well, this is Sussex County. When things get |
| 4   instruct the witness not answer as to whether or not | 4   stirred up pretty much -- |
| 5   they approved the policy BDA.1. | 5      Q.   You hear about it? |
| 6   BY MR. ALLINGHAM: | 6      A.   You hear it. |
| 7      Q.   Let me break it into two questions. | 7      Q.   Would you agree that news can travel just as |
| 8      A.   I don't know if they reviewed it or not. | 8   effectively by word of mouth in Sussex County as by |
| 9      Q.   Was it your practice as chairman of the policy | 9   other media? |
| 10   committee to have the board's attorneys review policies | 10      A.   I would agree to that. |
| 11   before they were proposed for adoption? | 11      Q.   When you arrived -- before the meeting, did |
| 12      A.   Not all policies. | 12   you know that there would be overflow, an overflow room |
| 13      Q.   How did you decide which policies to have the | 13   set up with a video feed? |
| 14   board attorneys review? | 14      A.   I probably did know that. |
| 15      A.   A lot of times I left that decision to the | 15      Q.   Did Mrs. -- |
| 16   administrators. | 16      A.   I think Mrs. Hobbs may have briefed me that |
| 17      Q.   The administrators being the superintendent | 17   afternoon. |
| 18   and the assistant superintendent? | 18      Q.   Was it your practice to meet with the |
| 19      A.   Well, the superintendent wasn't on the policy | 19   superintendent in the afternoon before a board meeting |
| 20   committee, but the assistant superintendent was. | 20      A.   No. |
| 21      Q.   I have reviewed the minutes and audiotapes of | 21      Q.   When you walked into the board meeting at |
| 22   the meetings since October 19th, 2004, and it appears | 22   Frankford Elementary on August 24th, what do you reca |
| 23   to me that you did not offer a prayer during the period | 23   about the atmosphere? |
| 24   from October 2004 until you left the board; is that | 24      A.   Kind of tense. But it seemed to be, you know, |
| 73 | 75 |

| | |
|---|---|
| 1   correct? | 1   under control. |
| 2      A.   Me personally? | 2      Q.   One of your colleagues has testified that it |
| 3      Q.   Yes. | 3   seemed to be emotionally charged. Would you agree w |
| 4      A.   No, I think I did. | 4   that? |
| 5      Q.   You're absolutely right. And you offered a | 5      A.   I would agree with that. |
| 6   prayer that was taken from a speech or a sermon by | 6      Q.   Were people carrying signs in the audience? |
| 7   Martin Luther King? | 7      A.   They could have been. I don't remember. |
| 8      A.   That's correct. | 8      Q.   You don't remember. |
| 9      Q.   How did you find that? | 9      On occasion were there outbursts from |
| 10      A.   I don't know. It was a historical prayer. I | 10   the crowd in the audience? |
| 11   can't remember just exactly the context of it. | 11      A.   There were, I think, a couple people yelling |
| 12      Q.   Why did you choose a prayer by Martin Luther | 12   out or whatever. I can remember banging the gavel and |
| 13   King? | 13   asking people to be respectful of one another. |
| 14      A.   No reason. | 14      Q.   That's what I was going to ask you. You were |
| 15      Q.   There can't be no reason. | 15   in charge of keeping order at the meeting; correct? |
| 16      A.   I don't remember. | 16      A.   Yes. |
| 17      Q.   Do you recall if you said at the meeting | 17      Q.   And from time to time did you have to bang the |
| 18   before you gave the prayer that it was a prayer from | 18   gavel in order to get order? |
| 19   Martin Luther King? | 19      A.   Yes, I think I did. |
| 20      A.   I don't recall. I could have. | 20      Q.   During the public comment section of the |
| 21      Q.   Did you get the prayer from Dr. Hattier? | 21   meeting, did you consider the tone of the comments |
| 22      A.   I don't know where I got the prayer from. | 22   respectful and courteous? |
| 23      Q.   Did you know before the August 24th board | 23      A.   Most of them. |
| 24   meeting that it was going to be well attended? | 24      Q.   Did you find some of the comments |
| 74 | 76 |

Walls, Harvey  10/25/2006  4:42:00 PM

**Page 85**

1    A.   Yes, I heard it.
2    Q.   And did you find that disturbing as you
3  watched it, that people would be laughing at a
4  description of somebody disappearing?
5    A.   Yes. But I don't believe you saw me laughing
6  on there.
7    Q.   I don't think I did.
8         Was it your voice at the beginning of
9  the segment that I played for you that said something
10 along the lines of, "Sorry, Harold, I was going to say
11 Earl"?
12   A.   It could have been. And I don't know why I
13 would have said that.
14   Q.   Do you recall that the August 24th meeting was
15 opened with a prayer?
16   A.   Yes.
17   Q.   You invited Dr. Hattier to give that prayer --
18   A.   That's correct.
19   Q.   -- correct?
20   A.   Correct.
21   Q.   Did you know what prayer he was going to give?
22   A.   I did.
23   Q.   How did you find out what prayer he was going
24 to give?

**Page 86**

1    A.   He told me ahead of time when I asked him to
2  give the prayer. He told me it would be one by George
3  Washington.
4    Q.   Do you know whether Dr. Hattier told anyone
5  else what prayer he was going to give?
6    A.   I don't know that.
7    Q.   Did you tell anyone else what prayer
8  Dr. Hattier was going to give?
9    A.   I don't know if I did or not.
10   Q.   Do you recall that state representatives spoke
11 at the meeting?
12   A.   Yes, there were three.
13   Q.   Do you recall that they read a letter?
14   A.   Yes.
15   Q.   Do you recall that the letter indicated
16 knowledge of the prayer that Dr. Hattier was going to
17 give?
18   A.   I don't recall that.
19   Q.   Have you ever served as a member of any other
20 public body than the Indian River School Board?
21   A.   Yes.
22   Q.   What bodies?
23   A.   The Georgetown Jaycees, Sussex Central Pop
24 Warner Football. I was president of that for two

**Page 87**

1  years. Something else too.
2         I have been a coach in Little League
3  baseball and Little League wrestling and football.
4         Oh, American Legion, I'm a member of
5  that too.
6    Q.   I should have asked you this at the beginning
7  of the deposition. Are you employed?
8    A.   Yes.
9    Q.   And what is your position?
10   A.   I'm a crematory manager at Parsell Funeral
11 Homes.
12   Q.   And is that in Georgetown?
13   A.   That's one of them. It has four branches.
14   Q.   And have you had -- did you have that job
15 throughout your tenure as a school board member?
16   A.   No.
17   Q.   What did you do?
18   A.   I worked at E.I. du Pont in Seaford until
19 2001.
20   Q.   And that's when you took the job --
21   A.   Yes. I retired from DuPont and took the job
22 with the funeral home.
23   Q.   Thank you.
24         Were you surprised at the amount of

**Page 88**

1  attention that the school board prayer issue got?
2    A.   Yes.
3    Q.   Do you think that it attracted more attention
4  than it deserved among all the issues presented to the
5  school board?
6    A.   Oh, definitely.
7    Q.   I am going to ask you some questions about why
8  it might have gotten as much attention as it got.
9         Did you ever hear any constituent say to
10 you -- and by constituent, I mean student, parent,
11 resident of the district, fellow board member,
12 whatever -- did you ever hear any constituent say to
13 you, in words or substance, that the defense of this
14 lawsuit was a defense of Christian values?
15   A.   I've heard that said.
16   Q.   And could you tell me who you heard that from?
17   A.   No, I couldn't.
18   Q.   Could you tell me the group of which the
19 person who said that was a member?
20   A.   No.
21         MR. ALLINGHAM: All right. We have to
22 change the tape. Thank you.
23         VIDEO SPECIALIST: Going off the record
24 at 3:35 p.m.

Walls, Harvey 10/25/2006 4:42:00 PM

| | |
|---|---|
| 1     (Recess.)<br>2     VIDEO SPECIALIST: Going back on the<br>3 record at 3:41 p.m.<br>4 BY MR. ALLINGHAM:<br>5     Q.  Right before we broke, Mr. Walls, I asked you<br>6 whether you had heard from anyone that the defense of<br>7 this lawsuit represented the defense of Christian<br>8 values, and you said yes. I asked you who said it, and<br>9 you didn't remember. I asked you from what group, and<br>10 you didn't remember that either.<br>11     Is it fair to say that you heard it more<br>12 than once, however?<br>13     A.  Yes, I'd say that's fair to say.<br>14     Q.  When I asked you questions about the<br>15 attendance, expected attendance --<br>16     A.  At the big meeting.<br>17     Q.  -- at the August 24th meeting, you told me you<br>18 knew it was going to be a big meeting, but you really<br>19 didn't know how, that you just hear things in Sussex<br>20 County; right, correct?<br>21     A.  Correct.<br>22     Q.  Is it fair to say that it is a widely held<br>23 view in the Indian River District that the defense of<br>24 this lawsuit represents a defense of Christian values?<br><br>89 | 1     Q.  And is that, was that misperception or did the<br>2 comments reflect a misperception that the issue was<br>3 prayer in the schools rather than --<br>4     A.  Yes.<br>5     Q.  -- school board?<br>6     A.  I heard that from several of the speakers.<br>7     Q.  Am I correct that you and the other board<br>8 members did not try to correct that misperception<br>9 because the public comment section is meant to be an<br>10 opportunity for the board to hear from the public and<br>11 not vice versa?<br>12     A.  Correct.<br>13     Q.  And that's something that the superintendent<br>14 had urged the board to remember; correct?<br>15     A.  Yes.<br>16     Q.  Do you know whether at any time before or<br>17 after the adoption of the board prayer policy a member<br>18 of the public asked for a copy of the proposed policy<br>19 and was -- and that request was declined?<br>20     A.  I don't remember if somebody specifically<br>21 asked.<br>22     Q.  You never heard that a person asked for a copy<br>23 of the policy and was told that if they wanted it, they<br>24 should file a Freedom of Information Act request?<br><br>91 |
| 1     A.  There's a lot of perceptions out there about<br>2 this lawsuit, I think, and not all of them are correct.<br>3     Q.  That may or may not be true, but it's not<br>4 100 percent responsive to my question.<br>5     Would you agree with me that it's a<br>6 widely held view in the district that the defense of<br>7 this lawsuit is a defense of Christian values?<br>8     A.  It's probably widely held in this district.<br>9     Q.  You mentioned some potential misperceptions<br>10 about this lawsuit.<br>11     A.  Uh-huh.<br>12     Q.  Could you tell me what you had in mind when<br>13 you said that?<br>14     A.  I hear things from time to time or see things,<br>15 and I wondered where the people are coming from beca<br>16 they act like they know, but I know that they don't.<br>17     Q.  So when you said that, you didn't have any<br>18 particular misperception in mind?<br>19     A.  No.<br>20     Q.  Is it fair to say that a lot of the comments<br>21 at the August 24th board meeting reflected a<br>22 misperception about what the board was considering at<br>23 that time?<br>24     A.  Yes.<br><br>90 | 1     A.  I don't remember that.<br>2     Q.  That would be contrary to --<br>3     A.  I mean but if this was the draft policy you're<br>4 talking about?<br>5     Q.  Yes, yes.<br>6     A.  I can't see why someone would want a draft<br>7 policy.<br>8     Q.  Well --<br>9     A.  And I don't know that the board has ever given<br>10 out a draft policy before it's actually adopted.<br>11     Q.  What is the purpose of the readings of the<br>12 policies?<br>13     A.  In case the board has second thoughts or wants<br>14 to make changes on something, it gives a chance to do<br>15 that.<br>16     Q.  It is not intended to give the public an<br>17 opportunity to review and comment on the policies?<br>18     A.  After the first reading, yes, but I'm not<br>19 giving something out to the public before I give to the<br>20 board on a first reading.<br>21     Q.  I thought we might be misunderstanding one<br>22 another.<br>23     I'm talking about a request made for the<br>24 proposed policy after the first reading?<br><br>92 |

# TAB 15

**Page 1**

FOR THE DISTRICT OF DELAWARE
MONA DOBRICH and MARCO )
DOBRICH, Individually and )
as parents and next friend )
of ALEXANDER DOBRICH, )
SAMANTHA DOBRICH, JANE DOE )
and JOHN DOE, Individually )
and as parents and next )
friend of JORDAN DOE and )
JAMIE DOE, )
)
        Plaintiffs, )
                ) Civil Action
v.              ) No. 05-120
                )
INDIAN RIVER SCHOOL, )
DISTRICT, et al., )
                )
        Defendants. )

        Videotaped Deposition of ROBERT WILSON,
taken pursuant to notice at 31 Hosier Street,
Selbyville, Delaware, beginning at 1:08 p.m., on
Thursday, December 14, 2006, before Terry Barbano
Burke, RMR-CRR, and Notary Public.
APPEARANCES:
        RICHARD S. HORVATH, JR., ESQUIRE
        BRIAN LENHARD, ESQUIRE
        One Rodney Square
        Wilmington, Delaware 19801
        For the Plaintiff
        WILCOX & FETZER
        1330 King Street - Wilmington, Delaware 19801
        (302) 655-0477
        www.wilfet.com

**Page 2**

1  APPEARANCES (cont'd):
2      JARROD SHAU, ESQUIRE
       Drinker, Biddle & Reath, LLP
3      One Logan Square
       18th and Cherry Streets
4      Philadelphia, Pennsylvania 19103-6996
       For the Defendants
5
ALSO PRESENT:
6
       Lindsay duPhily, Videographer
7
8          -  -  -
9      VIDEO SPECIALIST:  This is a videotape
10  deposition of Mr. Robert Wilson taken by the plaintiff
11  in the matter of Dobrich, et al. versus Indian River
12  School District, et al., Civil Action No. 05-120.
13      This is being held in the Indian River
14  School District offices, 31 Hosier Boulevard,
15  Selbyville, Delaware.
16      We are going on the record on December
17  14th, 2006, at approximately 1:08 p.m.
18      The court reporter is Terry Burke from
19  the firm of Wilcox & Fetzer, Wilmington, Delaware.  My
20  name is Lindsay duPhily and the videotape specialist of
21  Discovery Video Services.
22      Counsel will now introduce themselves and
23  then the court reporter will swear in the witness.
24      MR. HORVATH:  My name is Richard Horvath.

**Page 3**

1  I am here on behalf of the plaintiffs, along with Brian
2  Lenhard.
3      MR. SHAU:  My name is Jarrod Shau.  I'm
4  here on behalf of the defendants.
5      THE WITNESS:  My name is Robert Wilson.
6          ROBERT WILSON,
7  the deponent herein, having first been
8  duly sworn on oath, was examined and
9  testified as follows:
10  BY MR. HORVATH:
11  Q.  Mr. Wilson, you are a member of the Indian
12  River School Board; correct?
13  A.  That's right.
14  Q.  You have been a member since July 2006?
15  A.  That's right.
16  Q.  And I am going to show you what has been
17  marked PX-9.  This is a copy of the school board prayer
18  policy.
19      Since you joined the school board, have
20  you reviewed this policy?
21  A.  Yes.
22  Q.  When did you review it?
23  A.  Pretty much when I first came on the board.
24  Q.  Was this policy given to you in a packet of

**Page 4**

1  other district policies?
2  A.  Pretty much.  Well, no.  This was actually by
3  itself.
4  Q.  By itself?
5  A.  By itself.
6  Q.  Who gave it to you?
7  A.  I do not recall.  I do not recall.
8  Q.  Was it given to you at a school board meeting?
9  A.  Yes, it was.
10  Q.  And it was given to you after you joined the
11  board as a part of your orientation?
12  A.  Yes -- no, not necessarily as an orientation,
13  but it was given to me after I joined the board.
14  Q.  And after you received the policy, did you
15  discuss with any board members how the board prayer
16  policy operates?
17  A.  No.
18  Q.  Have you discussed with any school board
19  members what prayers would be prohibited under the
20  policy?
21  A.  No.
22  Q.  Have you discussed with any school board
23  members why the board opens its public meetings with
24  prayer?

1  want. It's just like a Jehovah Witness coming to my
2  house. I listen to what they have to say. I don't
3  agree with it, I'm not rude and I'm not ignorant.
4          The same thing is with other types of
5  religions. I'm very tolerant of other religions. If
6  they want to share that with me. I'm not saying my
7  religion's the only religion. That's not exactly at
8  all what I'm trying to do.
9          That's just my way of being taught,
10  that's my teaching. That's what I believe.
11          An atheist believes there's not a God.
12  That's his belief. That's fine.
13  Q.  You said same opportunity. Do you understand
14  that the opportunity we're talking about here is
15  offering a prayer at the start of school board
16  meetings?
17  A.  Yes.
18  Q.  Are members of the community who are not
19  school board members offered an opportunity to give a
20  prayer at the start of school board meetings?
21  A.  No.
22  Q.  So they don't have the same opportunity that
23  you have when it comes to offering a prayer at school
24  board meetings?

29

1  A.  No.
2  Q.  Why is it of the utmost importance to ask and
3  pray for divine guidance from Our Heavenly Father?
4  A.  I would say, I have to look at our
5  Constitutional government, our House of Representative
6  opens up with a word of prayer. Why is it important
7  for them to do it? We feel -- I think people on the
8  board feel whether it -- when we pray to God, now
9  understand that a God, when I say God, I'm praying to
10  God, or you're praying to God, you could mean Allah or
11  any other God, but praying to God is praying to God.
12  Do you understand what I mean by that?
13  Q.  Unfortunately, sir, I don't feel like you're
14  answering my question. I asked you why is it
15  important?
16  A.  It's more of a -- it's just a way, I guess, we
17  communicate through God asking for his divine
18  intervention. Okay, to a God for divine intervention,
19  whether it be my God or another person's God.
20  Q.  Do you believe that divine intervention will
21  help you make better decisions?
22  A.  Yes, I do.
23  Q.  It doesn't matter where you ask for divine
24  intervention, does it? And by where, I mean where are

30

1  you physically when you ask for the intervention?
2  A.  Yes, it does. I think when you do it in the
3  public like that, I think it shows that you can come
4  together, and that's one thing that a lot of people
5  have in common. And when we say a prayer at a board
6  meeting, 99 percent of the people do take part.
7  Q.  Of the people, you mean the people present?
8  A.  Of the people present, they do take part. I
9  have been able to look around at several times and
10  there are people that have heads bowed. We have not
11  had anybody run out in a rave, I guess you would say.
12  It's just a way to publicly come together as a board.
13  Q.  Thank you, sir.
14          The board prayer in some way is for the
15  benefit of everyone in attendance?
16  A.  That's exactly right.
17  Q.  And the public will not benefit from that if
18  the board prayer is outside of the public's presence?
19  A.  I don't think it shows the same kind of unity.
20  We want the public to take part in the prayer. That's
21  the whole thing behind the public board meeting. If a
22  person wants to come forward after a meeting and say
23  that there was an issue with that, I can see us
24  changing it, rewording it, working with them, maybe

31

1  even offering them to say a prayer.
2  Q.  Do you think that's likely after what happened
3  to the Dobriches?
4  A.  Yes, I do.
5  Q.  I am going to show you a copy of what's been
6  previously marked as PX-72.
7          It's a copy of the May 3rd, 2006 issue
8  of the Delaware Wave.
9  A.  Okay.
10  Q.  If you will look on the second page, it's
11  marked P-2439 at the bottom. I think you're already on
12  it.
13  A.  Yeah.
14  Q.  Were you sent a series of questions for this
15  article?
16  A.  Yes, I was.
17  Q.  And did one of those questions involve the
18  prayer suit?
19  A.  I don't -- let me look here and I'll tell you.
20          It evidently was, yes.
21  Q.  You responded to, I guess it's a query, On
22  board's refusal to settle prayer suit, your response
23  was, "I am very proud of this school board and the
24  stand they took. It took a lot of courage to stand

32

# TAB 16

INDIAN RIVER SCHOOL DISTRICT
BOARD OF EDUCATION REGULAR MEETING
TUESDAY, JUNE 29, 1999 – 7:30 P.M.
NORTH GEORGETOWN ELEMENTARY SCHOOL MULTI-PURPOSE ROOM

MINUTES

CALL TO ORDER
The regular meeting of the Indian River School District Board of Education was called to order by President Richard H. Cohee at 7:30 p.m.

ROLL CALL
Board Members Present: Charles M. Bireley, Richard H. Cohee, John M. Evans, Gregory A. Hastings, Reginald L. Helms, William M. Howlett, (Mrs.) Christine C. Lecates,
Board Member Late: Harvey L. Walls (7:45 p.m.)
Board Members Absent: David W. Devine, (Mrs.) Elaine McCabe

APPROVAL OF AGENDA - Regular and Executive - June 29, 1999
The following items were added to the Regular Agenda:
    V. C. 1. Matt Cohee – High School Teacher Assistant at Ingram Pond
    VIII. C. School Prayer

It was moved by Mr. Helms, seconded by Mr. Hastings, to approve the Regular Agenda as amended and the Executive Session Agenda. The motion passed unanimously (7-0).

APPROVAL OF MINUTES
Board of Education Special Meeting Minutes – May 13, 1999
Board of Education Special Meeting Minutes – May 18, 1999
Board of Education Regular Meeting Minutes – May 24, 1999
Board of Education Special Meeting Minutes – June 10, 1999

It was moved by Mrs. Lecates, seconded by Mr. Howlett, to approve the minutes as recorded. The motion passed unanimously (7-0).

)

PR 00271

IRSD 0030052

BOARD OF EDUCATION REGULAR MEETING MINUTES
June 29, 1999
Page 2

VISITORS AND STAFF IN ATTENDANCE
Presentation from William Keene, University of Delaware
William Keene from the University of Delaware presented a certificate and gifts to Dr.
Susan Bunting as the recipient of the 1999 Outstanding Education Alumni Award.

President Cohee and Mrs. Hobbs recognized and presented certificates to the following
for their accomplishments:

Community/School Partnership
    Mr. & Mrs. Bruce Dolby – Donation to Phillip Showell
Odyssey of the Mind State Tournament Winners
    "Over the Mountain"

| | |
|---|---|
| Kaitlin Roach | Laura Ford |
| Kristin Roach | Nick Heim |
| Erin Harker | Colleen Powell |
| Katlin Harker | |

    "O, My Faire Shakespeare"

| | |
|---|---|
| Adrienne Showell | John Belkot |
| Josh Fox | Tim Fannin |
| Rachel Clark | Drew Parsons |
| Candice Evans | |

    High School Teacher Assistant at Ingram Pond – Matt Cohee
    1999 YELL Excellence Award - Cathy Showell – Advisor
        Weldon Bagwell (CM)
        Sarah Wolfe (CM)
    ASFSA/DSFSA Art Contest Winner
        Erica Evans (FE)
    Department of Education Mini Grants
        Bob Parsons (CM)
        Tracy Hudson (FE)
Interagency Program of the Year – Richard Allen Program
Sussex County Interagency Collaborator of the Year – Darlene St.Peter
Board of Education Service Awards
    Richard Cohee
    David Devine
    William Howlett

BOARD OF EDUCATION REGULAR MEETING MINUTES
June 29, 1999
Page 3

OTHER VISITORS AND STAFF IN ATTENDANCE
Lois Hobbs, Janet Hearn, Susan Bunting Earl Savage, Patrick Miller, Charles Hudson,
Greg Weer, Gregg Sutton, Carmen Deldeo, Ivan Neal, Charles Cole, Tim Fannin, Sharon
Brittingham, Woody Long, Mike McClure, Christine Wolfe, Cathy Showell, Glenn
Showell, Adrienne Showell, Gary Belkot, John Belkot, Raymond Moore, Sr., Kevin
Mumford, JoAnn Taylor, Tracy Hudson, Kathy Roach, Tom Evans, Erica Evans, Candice
Evans, Josh Fox, Robin Hall, Diane Baker, Maida Graves, Patricia Deptula, Brenda
Cohee, William Cohee, Matthew Cohee, Donna Tate, Connie Fannin, Darlene St. Peter

PUBLIC COMMENTS
Maida Graves
Mrs. Graves, SDSA parent, expressed her concerns regarding the new SDSA bussing
proposal for the 1999-2000 school year. She suggested that separate bus routes be
established for the students attending the Southern Delaware School of the Arts. She
asked that the Board help with the funding of these routes.

Patty Deptula
Mrs. Deptula, SDSA parent, also expressed her concerns regarding the new SDSA
bussing proposal for the 1999-2000 school year. Separate bus routes were suggested as a
solution to her concerns, which would create a safer environment for students.

Deon Baker
Mrs. Baker, SDSA parent, presented her opposition to the new SDSA bussing proposal
for the 1999-2000 school year. She also suggested separate bus routes for the SDSA
students.

President Cohee asked that Southern Delaware School of the Arts Bussing be placed on
next month's agenda for an update.

OLD BUSINESS
School Choice Applications
Mrs. Hobbs explained that there was no School Choice information available this evening.

NEW BUSINESS
Certify Election Results
President Cohee read into the record the results of the Board Elections held on May 8,
1999:

       Everett C. Toomey – District No. 3 – Three Year Term
       Lewis D. Patterson - District No. 4 – Three Year Term
       Reginald L. Helms – District No. 5 – Three Year Term
       Mary Elaine McCabe – District No. 5 – Three Year Term

PR 00273

IRSD 0030054

BOARD OF EDUCATION REGULAR MEETING MINUTES
June 29, 1999
Page 4

### School Closings/Delayed Openings
Mr. Hastings expressed concern about the notification of parents when we have delayed
openings and/or early dismissals. Mrs. Hobbs explained that extra steps were taken to
notify parents of the recent early dismissal due to heat. Mr. Weer is researching
procedures of other districts. Mrs. Hobbs noted we would work toward improving our
procedures to better notify parents of delayed openings and early dismissals.

### School Prayer
Mr. Helms asked that the Board consider designating a "Day of Prayer" which would be
led by students in our schools. He suggested that the members of the Board think about
this for discussion at a future board meeting. Mrs. Hobbs will research this idea and
report back to the Board.

### COMMITTEE REPORTS
#### Policy Committee
Mr. Walls reported that our policy regarding diplomas might have to be revised due to
proposed laws. He also noted that a sub-committee might need to be established for
school choice applications.

### Negotiations Committee
Mr. Bireley made a motion, seconded by Mrs. Lecates, to table Negotiations until after
Executive Session. The motion passed unanimously (8-0).

### IREA Representative
Mrs. Hobbs read a letter from Mr. Kichline since he could not be at this meeting. He
thanked board members for their hard work and dedication. He also thanked Mrs. Hobbs
for her support. Following are the new officers of the IREA:

| | |
|---|---|
| President | Lesia Jones |
| Vice-President | Darlene Johnson |
| Secretary | Sandra Stevens |
| Treasurer | Kay Moore |

### ADMINISTRATIVE REPORTS
#### Mrs. Hobbs, Board Update
#### School Visits
Mrs. Hobbs noted that students and staff were very busy at the end of the school year.
She attended graduations at Howard T. Ennis, Sussex Central High School and Indian
River High School. All were wonderful events. Mrs. Hobbs thanked everyone for their
extra efforts in bringing the 1998-99 school year to a safe closure.

### DSBA Annual Summer Conference – August 11
Mrs. Hobbs asked board members to notify Mrs. Hearn if they are interested in attending
the August 11 DSBA Summer Conference.

PR 00274

**IRSD 0030055**

BOARD OF EDUCATION REGULAR MEETING MINUTES
June 29, 1999
Page 5

Change Date of July 1 Organizational Meeting
It was decided to have the Organizational Meeting at 6:30 p.m. on July 26, 1999 at the
Frankford Elementary School.

FINANCIAL
Regular Invoices
It was moved by Mr. Helms, seconded by Mr. Howlett, to approve the payment of
Regular Invoices. The motion passed unanimously (8-0).

Financial Summaries
Mr. Miller noted that the Substitute Teachers Cost Center would be overspent. He
suggested reviewing this budgetary allocation for the future. He also noted that
adjustments have been made to some areas of the Howard T. Ennis budget. This will be
reflected in next month's report.

He informed the board that there would be a significant carryover in the maintenance
budget. The reason for the carryover is to afford Mr. Weer time to assess the needs in the
maintenance department.

Bid No. 36-99-13 Howard T. Ennis Bus
Mr. Miller recommended awarding Bid No. 36-99-13 Howard T. Ennis Bus to Wolfington
Body Co. It was moved by Mr. Walls, seconded by Mrs. Lecates, to approve the
recommendation to award Bid No. 36-99-13 Howard T. Ennis Bus to Wolfington Body
Co. The motion passed unanimously (8-0).

COMMUNICATIONS
Conference Requests (None)

Use of Facilities
Use of Selbyville Middle School Cafeteria by Zoar United Methodist Church - September
18, 1999

Mrs. Hobbs recommended approval of the use of facilities request. It was moved by Mr.
Helms, seconded by Mr. Evans, to approve the superintendent's recommendation. The
motion passed unanimously (8-0).

Correspondence
Letter from Sharon Bradford
Mrs. Hobbs shared a letter from Ms. Bradford regarding the extended day kindergarten
program and maintaining the teachers for that program.

PR 00275

IRSD 0030056

BOARD OF EDUCATION REGULAR MEETING MINUTES
June 29, 1999
Page 6

Letter from Charlotte Hurley
Mrs. Hobbs shared a letter from Charlotte Hurley, a substitute teacher at Indian River
High School. Ms. Hurley wrote a letter expressing her appreciation to the staff at Indian
River for their support during her tenure as substitute.

Field Trips (None)

STAFF
Personnel Agenda, Personnel Addendum
It was moved by Mr. Helms, seconded by Mr. Hastings, to table the Personnel Agenda
and Personnel Addendum until after Executive Session. The motion passed unanimously
(8-0).

District Office Task Assignments
It was moved by Mr. Helms, seconded by Mr. Walls, to table District Office Task
Assignments until Executive Session. The motion passed unanimously (8-0).

PUBLIC COMMENTS
There were no Public Comments.

EXECUTIVE SESSION
It was moved by Mrs. Lecates, seconded by Mr. Howlett, to go into Executive Session at
9:00 p.m. The motion passed unanimously (8-0).

1.    Personnel: To discuss matters pertaining to names, competencies and
      abilities of individual employees or students.
2.    Strategy Session: To discuss collective bargaining, pending or potential
      litigation.
3.    Hearing: To conduct a hearing regarding employee or student discipline or
      employee dismissal.
4.    Such other business as may properly be discussed in an executive session.

RECONVENE
It was moved by Mr. Howlett, seconded by Mr. Hastings, to reconvene in Regular Session
at 10:20 p.m. The motion passed unanimously (8-0).

CONSIDERATION OF AGENDA ITEMS DEFERRED
Personnel Agenda and Personnel Addendum
It was moved by Mr. Helms, seconded by Mrs. Lecates, to approve the Personnel Agenda
and Personnel Addendum. The motion passed unanimously (8-0).

PR 00276

IRSD 0030057

BOARD OF EDUCATION REGULAR MEETING MINUTES
June 29, 1999
Page 7

District Office Task Assignments
It was moved by Mr. Bireley, seconded by Mr. Walls, to approve the District Office Task Assignments as presented excluding salary changes. Discussions regarding salary can be held at a later date with adjustments being made if necessary. The motion passed unanimously (8-0).

Authorized Positions
It was moved by Mr. Helms, seconded by Mr. Evans, to approve the recommendation of the Personnel Director regarding the Authorized Positions Postings. The motion passed unanimously (8-0).

STUDENT HEARINGS
Student No. 99-70, Student No. 99-71, Student No. 99-72, Student No. 99-73, Student No. 99-75, Student No. 99-76, Student No. 99-77, Student No. 99-78, Student No. 99-79, Student No. 99-80, Student No. 99-81, Student No. 99-82

It was moved by Mr. Walls, seconded by Mrs. Lecates, to approve the recommendations of the Hearing Officers regarding Student Nos. 99-70, 99-71, 99-72, 99-73, 99-75, 99-76, 99-78, 99-79, 99-80, 99-81, and 99-82. The motion passed (7-0-1).
For the Motion: Mr. Bireley, Mr. Evans, Mr. Hastings, Mr. Helms, Mr. Howlett, Mrs. Lecates, Mr. Walls
Abstained: Mr. Cohee

Student No. 99-77
It was moved by Mr. Howlett, seconded by Mrs. Lecates, to modify the recommendation of the Hearing Officer to require that Student No. 99-77 attend the Richard Allen School for the 1999-2000 school year. Mrs. Hobbs explained that a meeting of the IEP team will be necessary to determine the student's placement. The motion and second were withdrawn.

It was moved by Mr. Howlett, seconded by Mrs. Lecates, to deny the recommendation of the Hearing Officer regarding Student No. 99-77. The motion passed (7-0-1).
For the Motion: Mr. Bireley, Mr. Evans, Mr. Hastings, Mr. Helms, Mr. Howlett, Mrs. Lecates, Mr. Walls
Abstained: Mr. Cohee

Negotiations
It was moved by Mrs. Lecates, seconded by Mr. Evans, to approve the increased salary of the Technology Resource Manager as determined by the Board. The motion passed unanimously (8-0).

PR 00277

IRSD 0030058

BOARD OF EDUCATION REGULAR MEETING MINUTES
June 29, 1999
Page 8

ADJOURNMENT
President Cohee adjourned the meeting at 10:30 p.m.

Respectfully submitted,

Richard H. Cohee
President
Board of Education
Indian River School District

(Mrs.) Lois M. Hobbs
Secretary and Superintendent
Board of Education
Indian River School District

RHC/LMH:jlh

PR 00278

IRSD 0030059

# BOARD OF EDUCATION
## INDIAN RIVER SCHOOL DISTRICT

### ROLL CALL

DATE: *June 29, 1999*

| BOARD MEMBER | PRESENT | ABSENT | TIME ARRIVED |
|---|---|---|---|
| Charles M. Bireley | ✓ | | |
| Richard H. Cohee | ✓ | | |
| David W. Devine | | ✓ | |
| John M. Evans | ✓ | | |
| Gregory A. Hastings | ✓ | | |
| Reginald L. Helms | ✓ | | |
| William Howlett | ✓ | | |
| Christine C. Lecates | ✓ | | |
| Elaine McCabe | | ✓ | |
| Harvey L. Walls | | ✓ | late 7:45 |

PR 00279

IRSD 0030060

**INDIAN RIVER SCHOOL DISTRICT**
**BOARD OF EDUCATION REGULAR MEETING**

**June 29, 1999**

**IN ATTENDANCE**
**PLEASE PRINT NAME**

| | |
|---|---|
| Mike McClure | Denise L Baker |
| Christine Wolfe | Mrida Evans |
| Cathy Showell | Patricia L. Deptula |
| Glenn Showell | Brenda Coley |
| Adrienne Showell | William E. Colins |
| | Matthew R. Cohen |
| GARY T. BELKOT | Doug Melrose |
| John BELKOT | Donna J Tota |
| RAYMOND MOORE, Sr. | Connie Farrin |
| Kevin B. Mumford | Tim Fannin |
| JoAnn Taylor | Dale F. Cole |
| Mary Hudson | Guy Moore |
| Sharon Bristic | Carmen J Cordon Jr |
| Earl J. Savage | Shawn Buttingham |
| Grey Geer | Gregg Sutton |
| Charles Hudson | Ivan Neal |
| Kathy Roach | Charles Cole |
| Toni Evans | Wesley Lange |
| Erica Evans | |
| Candice Evans | |
| John Fox | |
| Robin Hall | |
| Rachel Clark | |

PR 00280

IRSD 0030061

# TAB 17

May 9, 2008

118

## Sedona

Continued from page 16

Following his two-year stint at Fusion, Stowies was the head chef at Striper Bites in Lewes for seven years.

"My background is more of this type of cooking," he said of Sedona. "Striper Bites was a good job and we did a lot of great things there, but I want to get back into running a dinner-only menu and work with some kicked-up food."

With plenty of experience and a unique taste for perfection, Stowies hopes to bring some novel features to Sedona.

"The menu itself is still going to be American cuisine," he assured, "but we'll be working basically with the entire products.

"One of the first distinctive features will devoted to the addition of tapas, or miniature plates, to the menu. Derived from a Spanish custom, tapas are increasingly popular have its roots in the country, especially in the United States and United Kingdom. Rather than ordering a full-sized dinner, customers can try a variety of smaller courses," continued to satisfy the plate.

"They have a lot of these in the cities now, with these tapas items," said Parrot. "You can eat anything. Customers can go into places and have small portions of anything they want, from filet mignon to pork chops or seafood, and not fill up on any one thing. It really allows people to try a variety of food without having to pay the high-end price for an entire meal."

Prices for tapas plates can start from $6 to $8 and run up to about $14.

"I'm very excited about working with tapas," said Stowies. "I haven't before, but I've heard a lot of them. The opportunity for somebody to come in and get three different plates of different kinds of food, instead of one, it's great concept. I think people will enjoy coming in, sitting at the bar and sampling those different tapas with a glass or two of wine, rather than sitting down and...

---

# WARREN'S STATION

### Here We Go Again!

Opening for the Season! Friday, May 9th 4:30pm, Saturday, May 10th 8:00am

Serving Mother's Day 12:00pm – 9:00pm

### Great Service, Great Food For Over 45 Years!

The summer very from fresh seafood to roast beef dinner, all the trimmings, including fresh seafood and homemade desserts. Special children's and senior's menus. Visa &

302-539-7156

8 Dixon
Fenwick Island, Delaware

---

## To the residents of the Indian River School District living in the 5th voting district:

I am writing this letter on behalf of Mrs. Donna Mitchell and myself to ask for your vote in the upcoming IRSD school board elections, to be held on May 13, 2008.

Mrs. Mitchell and I have had the honor and privilege of serving on the IRSD Board of Education during a time of great success. Dr. Susan Bunting gave a summary of the district's 2007 accomplishments to a group of our legislators which included some of the following accolades;

a moving target in terms of not knowing how much the state is going to require the district to cut spending. We are faced with the possibility of cutting personnel and programs in order to give back to the state the required funds. We have not been given an exact figure as of yet.

But we think it will be a substantial amount.

Mrs. Mitchell and I are in agreement not to cut the buildings or any classroom personnel to absorb these cuts

# To the residents of the Indian River School District living in the 5th voting district:

I am writing this letter on behalf of Mrs. Donna Mitchell and myself to ask for your vote in the upcoming IRSD school board elections, to be held on May 13, 2008. Mrs. Mitchell and I have had the honor and privilege of serving on the IRSD Board of Education during a time of great success. Dr. Susan Bunting gave a summary of the district's 2007 accomplishments to a group of our legislators which included some of the following accolades:

- Ten Indian River schools have been rated as "superior" by the state of Delaware;
- Indian River's two high schools have been rated as "superior" by the state of Delaware;
- The district's third- and fifth-graders are rated first in the state in reading and mathematics;
- The district's eighth-graders placed third in math and fourth in reading in the state;
- Based on our outstanding DSTP performance, the IRSD has five National Blue Ribbon Schools;
- Frankford Elementary was recognized for the Intel Scholastic Technology award;
- North Georgetown and Long Neck Elementary Schools were awarded State Distinguished Title I awards;
- The counselor at Phillip Showell Elementary was selected as the Delaware Elementary Counselor of the Year;
- Indian River High School received a successful accreditation report from the Middle States Commission on Higher Education.

One legislator's remarks were, *"It takes several things to contribute to this type of success and one of those things is a good board making good decisions."*

The IRSD has shown great success; but we still have some challenges to address. One challenge is the financial situation the State of Delaware is in at the present time. The IRSD board of education has been asked to hit a moving target in terms of not knowing how much the state is going to require the district to cut spending. We are faced with the possibility of cutting personnel and programs in order to give back to the state the required funds. We have not been given an exact figure as of yet, but we think it will be a substantial amount. Mrs. Mitchell and I are in agreement not to cut the buildings or any classroom personnel to achieve these cuts. We feel there are other areas that can be cut in order to cover the required amount and we would be diligent in looking for these areas.

Another challenge is the issue of "the Board Prayer." Mrs. Mitchell and I stand firm on the IRSD board of education's ability to have prayer before each regular board meeting as has been the custom of our Board of Education for years. There are some candidates, if elected, who would vote to "just sit down and be quiet" and let such organizations as the ACLU intimidate the board into submission.

Mrs. Mitchell and I are law-abiding citizens; however, we have and will continue to vote to fight for prayer before board meetings until such time as the law prohibits such action. As of today, it is not unlawful to do so and we will fight to keep it that way.

Donna and I would like to thank the residents of the 5th voting district for the opportunity to serve these past years. We think our past records speak volumes of our ability to make good decisions for our students, staff and taxpayers in our district.

If you would like to have board members who are genuinely concerned with the education of our youth, as well as making sure we get the best bang for your hard-earned tax dollars, and members who will stand firm for our beliefs, then you need to re-elect Donna Mitchell and Reggie Helms to the IRSD Board of Education on Tuesday, May 13, 2008.

**Remember, a vote for Helms and Mitchell is a vote for continued success.**

*Thank you and GOD bless the IRSD.*

PAID FOR BY THE CANDIDATES

# TAB 18

42

Coastal Point

*May 9, 2008*

# Voters to elect school board members Tuesday

By Ryan Saxton
Staff Reporter

The Indian River School Board will be filling three seats next week in District 4 and 5, in elections on Tuesday, May 13.

Three candidates will contest for a term-seats for two candidates representing District 4; Harold L. Walters, Christopher A.

White, and incumbent board member Dr. Donald G. Hattier. Ballots can be cast by District 4 residents at Indian River High School, located at 29772 Armory Road in Dagsboro, or at Lord Baltimore Elementary School at 120 Atlantic Avenue in Ocean View.

Two seats are up for grabs in District 5, as Sharon L. Brittingham runs against incumbents Reginald L. Helms and Donna M. Mitchell. Voters residing in District 5 can vote for two candidates and should report to Selbyville Middle School at 80 Bethany Road in Selbyville to cast a ballot.

All three seats (one in District 4 and two in District 5) have three-year-terms on the board, starting July 1. Incumbent Nina Lou Bunting was unopposed in her district and will be seated for another three-year term.

Friday, May 9 will be the last day that eligible voters can mail out absentee ballots. Voters must be a bona fide resident of the Indian River School District in the district in which they are voting, a citizen of the United States of America and at least 18 years of age. Proof of identity will be required at the voting.

Affidavits must have been submitted

before absentee ballots can be mailed to voters, so those who have not already requested theirs will be unable to vote in this election.

The deadline to vote an absentee ballot in person in the Office of the Department of Elections is May 12 at noon.

In the Coastal Point's traditional question-and-answer series this week, each of the six candidates for the three available seats in District 4 and 5 weighed in on recent issues in the Indian River School District, including religion settlements and policies, funding and the upcoming current-expense referendum.

## Donald Hattier
### District 4

*Q.* In your opinion, what is the role and purpose of the school board on a day-to-day basis, in terms of the education of the district's children?

*A.* Reviewing and helping to decide on textbooks, curriculum, policies (such as drugs, dress, advising and guiding the financial decisions, guiding building needs for the rapid expansion that we have in numbers of students over the last several years (over 1,000 since the year 2000), helping to assure traditional values don't get lost in the myriad of new educational ideas, and acting

as a liaison between the public and the schools, the administration and government in general.

*Q.* What is your position regarding the changes in the district's religion policy in recent years and months? Should additional changes be implemented? If so, what and why? Specifically, does the board need to change its current policies regarding how the school calendar and policies deal with religious periods throughout the year (i.e. the Christmas break changed to Winter Break, Easter-associated items prohibited in schools)?

*A.* My fellow board members and I worked for many months to get these policies approved. I feel that they give our students more flexibility than they have ever had, and certainly more than many school districts. All adopted policies are in line with existing federal case law on student and teacher rights.

Many Delaware school districts are now looking at the IRSD policies as models for themselves. For instance, a student can write about Jesus in our schools without being called on it and can do artwork with a Christian theme without the teacher being able to yank the picture, as has happened in another state recently (as reported on WND.com). For that matter, if a student independently of the district wants to offer a prayer at graduation, he or she can. The student has a right to free speech that cannot be infringed upon.

I think that while the suit is still active that additional changes are not a wise idea. Besides, after two years of work, these are pretty good as they are.

As to changing the school calendar, we as a board fought to keep the right to call these holidays what they are, Christmas and Easter Break (when it coincides with Easter; otherwise, it is rightly called a Spring Break). Congress breaks for

Christmas, as does every major legislature, and the authorization for the Christmas break was one of the first of many federal holidays that have followed. It was mentioned in the 1876 legislation that gave the day off. Our community has celebrated this as Christmas Break since time immemorial. Why does it need to change now? There is no legislation or court case that mandates this.

As to Easter items: Boy, what a snafu. It was never intended that all Easter-related items be eliminated. The e-mail from the superintendent was interpreted by each school somewhat differently and in the public's eye played out poorly. I understand this. However, when it takes a court case to determine that a school-sponsored Easter egg hunt is not religious but secular (this did happen in another federal district, went to two levels of court) it is understandable that

See IRSD Page A6

---

The Perfect Marriage - 16" One Topping Pizza & Wings Only $14.99

Mondays · ~~Bubbas~~

Half-Price Nites

---

IT'S NATIONAL KARASTAN MONTH AT

Mary Apple Interiors

46    Coastal Point    May 9, 2008

# IRSD
## Continued from page A2

we as board were extremely gun-shy. In the future, Easter and the bunny will be back, as before – at least if I have anything to say about it. We have collected the data and cases needed to withstand scrutiny.

Q. How do you think the board handled the lawsuit and subsequent settlement with the Dobrich and "Doe" families? Should the district have made accommodations or settled the suit sooner or held out? Should the board's prayer continue to be pursued in the court system? Should it be eliminated or should the practice continue?

A. As you know, this case was separated into two parts, one policies, one prayer before the board. The Dobriches wanted us to sit down with their attorney and write policies, without us having an attorney as well. This was a non-starter. Second, the two main things that they asked for were to stop prayer at graduation, at least that type sponsored by the schools, and to stop pref-erential treatment for the SMS Bible Club students. Both of these were changed with in three months (which is the time it takes to get policies changed per the operating laws on schools districts) and the Bible Club treatment was stopped within 6 days of coming to the district's attention. They filed suit months after we made the changes.

As to accommodations, we did as they requested prior to the suit ever happening. Among other demands, the other side wanted was that our religion policies never be changeable. This would have tied the board's hands and was rejected. This whole issue would require a separate interview to go over completely.

The Indian River School District has opened their board meetings with a prayer to solemnize the proceedings since at least the early 1970s. More than likely, meetings before then did as well. It simply was not an issue in the earlier days, since the community as a whole supports the idea. I have a graduation booklet from 1936 and a Rev. Veith offered benedictions to the graduating class of Lord Baltimore High School. This was part of the fabric of the community and has been for many generations. Why stop now?

I believe that there is a segment of the population that is trying to eliminate any mention of religion or prayer in our lives in general, and not just the schools. We have all been tolerant of other ideas, but that tolerance is now stripping us in our lives of the very things that our forefathers held dear.

I believe that what the board is doing is constitutional and would be recognized as appropriate by those that actually wrote the document as opposed to those people from today trying to reinterpret or redefine what the Founders meant. Why otherwise would the Founders have hired not one but two chaplains with in days of passing the Constitution and why did they not modify the Northwest Territory act to exclude teaching religion in schools?

That act was originally passed under the Articles of Conservation and specifically called on the schools to teach morality and religion. The first Congress reauthorized the bill without changing the language regarding teaching and schools.

Should the practice continue, yes. Should

See IRSD Page A7

# Mom
## Continued from page A5

Ann Marie, who, like Colleen, has the unique perspective of being something other than in the middle somewhere (in her case, the youngest), agreed.

"You can always turn to our mom for anything," explained Ann Marie. "Whether it be help on an English paper, her famous ice tea, or just someone to talk to – I've been learning from my Mom all my life and continue to do so each day. She is an inspiration to me and to all my siblings. It's the little things she does to that make you feel special. One day, I remember, I received a postcard in the mail congratulating me on my A in Algebra.

"Being a new mom myself," continued Ann Marie, "I hope I can someday be something like her. I remember her saying something funny one Mother's Day about it being life any other day, that there shouldn't be one special day to honor your mom – it should be every day."

So, as life comes full circle, with the births of as many grandchildren as children, I remember the hand-me downs and homemade cakes, and smile. I remember the stories of protests and the pickets, and I'm proud.

The fact the she had a life outside of our family taught us the importance of education and where it can take you. The fact that she baked those cakes from scratch taught us we have all the ingredients within us to live the life we want to live. The fact that she bought those clothes that had been worn by someone else showed how to survive on little and what was really important in life – family.

Life's lessons are simple. Who needs t

BIG NEWS ★ BIG NEWS ★ BIG NEWS ★ BIG NEWS ★ BIG NEWS



NANTUCKET'S
Seafood, Spirits & Sandwiche

Open 7 Evenings
Fenwick Island, Delaware

1.800.362.DINE • 302.539.2607 • nantucketsrestaurant@comcast.com

# IRSD

## Continued from page A2

we defend this in court, yes.

**Q.** What are your opinions on the issues in the 2008 current-needs referendum set for May 22: operating initiatives, teacher salaries and full-day kindergarten? Should taxpayers have to pay for these items or should the state or school district come up with other ways to pay for them?

**A.** • Operating initiatives: This is a must-pass for us. Since 2002, the state has eliminated a total of $6 million from the school budget in our district alone. At the same time, salaries and other employment costs have risen dramatically. We have had to change and strip programs for years and with the new cuts ($2.1 million for FY'08-'09, on top of the current already made cuts, with at least that in '09-'10 coming), we are going to be hard pressed to have money for programs and even to retain teachers. You can't keep cutting funding and expect the same good product.

The feds have also cut funding, while at the same time increasing mandates (No Child Left Behind comes to mind). Federal programs have been held at the same levels or at our every year since 2002. Our Hispanic population has increased from 17 percent in 1990 to over 19 percent now. We are not being given adequate resources to educate and bring many of those children up to the levels needed. The reality is that the state will not come up with full funding.

• Teacher salaries: Our teachers are the heart of what makes education in the Indian River School District work. We are working hard at this time to be able to keep the teaching force as it is given in the above listed cuts. As you know the state is not giving any raises this year to anybody. We are trying to get a modest 2 percent increase to help with rising costs.

• Full-day kindergarten: All the research that I have seen indicates that full-day kindergarten will make a difference in the most vulnerable children that we have in the district. For those children this could make the difference between success and failure in life. Not all kids will need this, and for those children it ought to be a choice, and not mandatory.

Several of our local elementary schools have pilot programs which have done quite well as a choice, and if part one of this referendum passes, we ought to have the funds to continue those programs if and when the state discontinues their support. The state has tried to push this one off on the local districts financially since the idea first came up.

Having said that, the talk right now is that the state can't fund their side of the equation and this could be a moot point. We cannot afford it on our own. And even if the referendum question does pass, we would still be short several million dollars.

Should the residents pay for these: Good question. I feel that the state has a responsibility to fully fund their obligations. We are generally responsible for 35 to 40 percent. They really need to step up to the plate to fund us. However the reality is that they can't. In the meantime, we have children to educate. You have to have the funding from somewhere. This is the only method that we currently have available to ask for support.

Supposedly, the slots money goes to education; I think the promise was that it would supplement the money already given. In actuality it appears that they (the state) simply reduced the state portion by whatever reduced the slots brought in and took that money for other projects, like the Indian River Inlet Bridge or extra road repairs in the northern end of Delaware.

We could have a tax increase on income, which is not good for the economy in general, or we could reappraise every house in Delaware and thereby generate millions as well. That, in particular, is a backdoor method where the public has no choice but simply gets stuck with a higher tax bill. At least with referendums, there is a vote and it is public. That is why I support what we are trying to do with this referendum.

If you or anybody else can come up with other ideas I am willing to listen.

On another note: The IRSD told the public in the 2000 and 2002 referendums we would modernize and rebuild our buildings, essentially all of them. We started with two new high schools for a total of around $70 million, which included the sports field transfer of $2.1 million in surpluses we had accumulated through careful investment (another referendum by the way).

Cape is building one high school for $75 million just five years later. We built two for $70 (million). And, yes, the state shorted us so that project as well. We had enough money in those referendums to refurbish, air-condition, technology update, plumbing change, rewire and just generally fix up virtually every building.

We are now down to three, Philip Showell, John M. Clayton and Frankford Within three years, these will be finished as

well. This was something that was promised the public and the board has delivered. And, yes, the state shorted us there also. This is the largest total refurbishing project in IRSD history, totaling two new buildings, eight older buildings and new roofs on three buildings (which are under-budget at this time).

During that same time, we have some of the highest test scores in the state and have been recognized through out the United States as a good school district. The principal of Frankford, Duncan Smith, was selected several years ago to sit next to Mrs. Bush at the State of the Union address to represent the success in his building and the district in general, quite an honor for a small rural district. Our middle school, SMS is looked at as a model for other middle schools in the state. I could go on and on.

**Q.** What do you believe you offer as a potential member of the Indian River School Board at this time? What would be your goals and priorities as a board member, if you are elected?

**A.** I have been on the Finance Committee of the IRSD since 2000. I was on that committee for two years before becoming a board member. I have learned more about school financing than I ever cared to know but had to learn it to make proper decisions. As a board member you can just come up with ideas, you have to know how to pay for them and what realities there are.

When I first joined the board curriculums were not aligned through out the district which was true for most districts in the

See IRSD Page A15

# IRSD

## Continued from page A7

state. I participated in that alignment process to where we are now standardized. We still have three buildings to finish and I have been in on that since the beginning. In the case of Indian River High School I was part of the advisory committee for science in the main design of the building.

I have been working for many years to increase participation in the music and arts programs, since research tells us that those kids in music do better on average than other kids. We need a better program in the northern end to compliment the expanding band at SCHS. The program in the southern end is progressing better than it has in years.

Through the efforts of many people, supplementing the reading programs in our district has become a priority, one that is paying off in better scores and better educated students. I will continue to support and help find funding for them once the state pulls its support as it plans to.

We will be facing more growth in this district in the next three to five years. I have been part of the planning process for the last six years and, as part of a terrific board, have been able to guide and shape where we are now. No one board member can do much without the support of his/her fellow board members, but I have endeavored to work with, educate them and be educated by them in the needs of the district.

Lastly, I am about to graduate my first child from the IRSD. My daughter has decided to become a teacher as a result of her positive experience in this district. I still have three more to go. I feel passionately about public education and its benefits. I want the best for my children and by extension for everybody else's children as well.

## Harold Wallace

purpose of the school board on a day-to-day basis, in terms of the education of the district's children?

**A.** The role and purpose of the school board on a daily basis is to listen to the residents of the Indian River School District (IRSD) and address any of their concerns with members of the IRSD.

**Q.** What is your position regarding the changes in the district's religion policy in recent years and months? Should additional changes be implemented? If so, what and why? Specifically, does the board need to change its current policies regarding how the school calendar and policies deal with religious periods throughout the year (i.e. Christmas break changed to Winter Break, Easter-associated items prohibited in schools)?

**A.** It is my understanding the district has made the necessary changes regarding the religion policy. I think the names of the proposed breaks should be universal throughout the State of Delaware public school system.

**Q.** How do you think the board handled the lawsuit and subsequent settlement with the Dobrich and "Doe" families? Should the district have made accommodations or settled the suit sooner or held out? Should the board's prayer continue to be pursued in the court system? Should it be eliminated or should the practice continue?

**A.** I don't have all the pertinent information to answer this question. Not having firsthand knowledge of the particulars of the case it would not be fair for me to judge either side.

**Q.** What are your opinions on the issues in the 2008 current-needs referendum set for May 22: operating initiatives, teacher salaries and full-day kindergarten? Should taxpayers have to pay for these items or should the state or school district come up with other ways to pay for them?

in the state. I believe that everyone should help to pay for these initiatives. This is not limited to the taxpayer, the school district or the state. This should be a shared expense.

**Q.** What do you believe you offer as a potential member of the Indian River School Board at this time? What would be your goals and priorities as a board member, if you are elected?

**A.** As a lifelong IRSD resident, a former IRSD employee and an alumni of the IRSD educational system, I believe I have the general knowledge of the community and the school system and will serve District 4 to improve the IRSD. My goals and priorities are to listen to the residents of the IRSD and make their voices heard.

## Christopher White

### District 4

**Q.** In your opinion, what is the role and purpose of the school board on a day-to-day basis, in terms of the education of the district's children?

**A.** In my opinion, the role and purpose of the school board or any public office is to be a voice for the people and do the right thing for the students of our district. Specifically, to be successful the board must enact worthwhile educational policies, ensure we have the best personnel to lead the district into the future, provide an optimal learning environment that helps each student succeed in their desired goal, be accountable for the decisions and policies we set and be vigilant with the fiscal policies. In summary, we can do the right thing

See IRSD Page A22



*the* Parkway

*Come, join us*

*for a memorable*

*Mother's Day...*

**Wednesday**
Free logo t-shirt with purchase of 2 entrées. (Limited sizes & colors)

**Thursday**
Locals Night & Gourmet Burgers

**Sunday**
Complimentary all jumbo jump crab dip with purchase of 2 entrées.
(No other discounts apply to advertised specials)

*★★★ the Parkway Cafe*

Now Open 5 nights a week
Wednesday–Sunday
114 Garfield Parkway, Bethany Beach
302.537.7500 ♦ www.Parkway.com

---

**House of Welsh**

*Specializing in STEAK and SEAFOOD Since 1900*

PUB OPEN 4:00 PM
DINING ROOM 4:00 PM

rs, now mothers
; they can only now
appreciate all the
made and all that
who does not have
ig one of the older
lent itself to giving
ding and apprecia-
her.

n myself, but being
I feel as though I
of taking care of
felt like a chore or
d to do to help out.
ie little kids to the
t."

rls were born, my
in a row — some-
s saw as a blessing,
y four more girls.
e oldest boy and
n's brother, accord-
ier — but that's
ed that my mom
ch of us. And that
we are all adults,
ngs.

her day, when she
j are all here. Trust

funny one," gets serious when talking
about our mom. She said growing up in a
large family was like having "built-in
friends."

and I can only pray that I can be like her
when I 'grow up.' We love you, Mom!"

**See MOM Page A6**

## PLEASE RE-ELECT



Dr. Hattier has been on the Indian River School Board for the last 6 years and on
the Finance Committee for the last 8 years. During that time the Board has
renovated 8 buildings, built two new high schools, and is preparing to renovate two
more schools and potentially build a new elementary school. At the same time, the
Indian River school system has been held up as a model of success in academic
achievement through out the state of Delaware. Our middle school achievements are
being copied by other state middle schools. All of this while facing continuing
budget declines. The experience I have gained in being on the board will be needed
to face the upcoming budget challenges imposed on us by the state.

*I have supported:*
*Traditional community values, Including: Prayer before board meetings music & arts,*
*Adding extra teachers where needed, Teacher and leader development,*
*Continued ROTC presence in both high schools, Development of sports fields at the*
*new high schools, Development of practice fields for sports like soccer,*
*Ingram's Pond for environmental education, truly unique*
*Supported bus driver mileage increases at the state level,*
*Supported all day kindergarten as an option.*

I have four children in the district, by trying to get the best education for them,
I am also trying to get the best education for all other children as well.



## RE-ELECT DR. HATTIER ON
# MAY 13, 2008



RY CRAFTS
THE HOME

*Arts*

D'S FAIR

hine)

4rt Auction
rts PTO

nterior

19971

**Coastal Point**                                                                                    A5

people wouldn't dream of starting your own master's degree with three kids in college, but she did it."

Karen Adams, the third oldest, has tender thoughts of being the "favorite," as we all know she is. (Just kidding — sort of...)

"Mommy used to say every family should have a Karen — this is when I was about 2 or 3, and I remember saying, 'But you would have the real one!' I remember giving her a hard time every time she would tell us she was pregnant again — but I am so glad she didn't stop at five or six kids. I wouldn't trade coming from a big family, [there was] always someone to play with or fight with or hang out with. Now that I am a mom, I can appreciate her even more — her energy and ability to love us all equally. I remember her taking five or six of us to church alone! Imagine. I love her."

Many of my sisters, now mothers themselves, shared that they can only now truly understand and appreciate all the sacrifices our mother made and all that she did for us. Debbie, who does not have children, said that being one of the older kids in the family has lent itself to giving her a better understanding and appreciation of the role of mother.

"Not having children myself, but being one of the older kids, I feel as though I had that experience [of taking care of children] and it never felt like a chore or like something you had to do to help out. You wanted to take the little kids to the park or play with them."

After the three girls were born, my parents had two boys in a row — something my mother always saw as a blessing, as they were followed by four more girls.

Brian Fleming, the oldest boy and fourth child, (and Kevin's brother, according to my grandfather — but that's another story) explained that my mom can only handle so much of us. And that she still, even though we are all adults, worries about our feelings.

"How about the other day, when she said, 'I love it when you are all here. Trust me, I don't want it every day, but it is nice every now and again.' Now that is honesty; if not anything else! And, before, when she was talking about going on a trip with just Dad and she asked if that was selfish of them. For someone who has been so selfless all their life, she deserves a trip with just her husband!"

Kevin Fleming, "the middle child," put a new spin on what it was like growing up in such a large family.

"Having nine kids, Mom and Dad always made us feel important. It's nice to be in the spotlight as long as we weren't being held by the police or something," he said with a laugh. "The distraction of eight siblings certainly allowed you the freedom to be left pretty much alone. But they always seemed to be at important events or games even if there were seven other kids in tow."

Amy Hobbs, the sixth child, and "the funny one," gets serious when talking about our mom. She said growing up in a large family was like having "built-in friends."

"I always thought Mommy knew everything. I'm still amazed now when I talk to her how much she knows! And no matter how bad something seems, if I talk to her about it, I feel better. Now a mother myself, I am increasingly aware of how much I would like to be like her. She's a great role model and someone I want to be when I grow up."

You've heard of the second and third child getting the shaft with picture-taking? Well, nobody even knows what Elizabeth Williamson, the eighth child, looked like until she was 3 years old, because there are no pictures to document her life until then. But she has found it in her heart to be forgiving.

"My mom is indescribable," said Elizabeth. "There aren't enough words. She is a wonderful woman, mother and role model to people everywhere — not just her family. Her love is unconditional and I can only pray that I can be like her when I 'grow up.' We love you, Mom!"

**See MOM Page A6**

## PLEASE RE-ELECT

████ ████████ ████████

Dr. Harrier has been on the Indian River School Board for the last 6 years and on the Finance Committee for the last 8 years. During that time the Board has renovated 8 buildings, built two new high schools, and is preparing to renovate two more schools and potentially build a new elementary school. At the same time, the Indian River school system has been held up as a model of success in academic achievement through out the state of Delaware. Our middle school achievements are being copied by other state middle schools. All of this while facing continuing budget declines. The experience I have gained in being on the board will be needed to face the upcoming budget challenges imposed on us by the state.

*I have supported:*
*Traditional community values, Including: Prayer before board meetings music & arts,*
*Adding extra teachers where needed, Teacher and leader development,*
*Continued ROTC presence in both high schools, Development of sports fields at the*
*new high schools, Development of practice fields for sports like soccer,*
*Ingram's Pond for environmental education, truly unique*
*Supported bus driver mileage increases at the state level,*
*Supported all day kindergarten as an option.*

I have four children in the district, by trying to get the best education for them,
I am also trying to get the best education for all other children as well.



ACHE

E CONTEMPORARY CRAFTS

May 9, 2008

**Coastal Point**

*A65*

# IRSD

Continued from page A60

productive citizens.

The prayer issue, the renovation program and the continued improvement of our test scores are some of the issues I would like to see to fruition I would like to ask the residents of the 5th district of the IRSD to come out on the 13th of May to vote and if they think I would make a good candidate to continue on the IRSD board of education, I would appreciate their support.

## Donna Mitchell

### District 5

**Q.** In your opinion, what is the role and purpose of the school board on a day-to-day basis, in terms of the education of the district's children?

**A.** The role of the School Board is to set policies and act as a governing body to guide the district and establish a clear vision for the district's continuous improvement. The board acts as a liaison between the community that we represent and the administration that we are responsible to oversee. Our purpose is always to ensure that our children receive the best possible education.

**Q.** What is your position regarding the changes in the district's religion policy in recent years and months? Should additional changes be implemented? If so, what and why? Specifically,

was saddened that the Dobrich and Doe families felt they had to take such action against the district, especially since the board initially acted to address their concerns. I did vote to not accept the first settlement offer because there were so many demands that were unacceptable and would have hindered our ability to function as a school board. Eventually, a settlement concerning the first part of the lawsuit was agreed upon.

In retrospect, I am not so sure it was a good thing, because in my opinion this matter will never be resolved until it goes all the way to the Supreme Court. I say this because we still have teachers and staff who are fearful that anything they say or do could be misconstrued as insensitive to someone of another faith or culture. As for "The Board Prayer," I stand firm on our right to practice this time-honored tradition. We are an elected body and are afforded the same rights as our senate, congress and Supreme Court.

**Q.** What are your opinions on the issues in the 2008 current-needs referendum set for May 22: operating initiatives, teacher salaries and full-day kindergarten? Should taxpayers have to pay for these items or should the state or school district come up with other ways to pay for them?

**A.** The decision to conduct a referendum was forced upon the board, due to the state's unfunded mandate for all schools to implement full-day kindergarten beginning September of 2008. This would require additional

time? What would be your goals and priorities as a board member, if you are elected?

**A.** Having served on the board for three years has given me valuable experience. During the last two years, I chaired the Policy Committee and attended all subcommittee meetings chaired by other board members, despite the fact that I was not required to be there. I consider it important to hear all dialogue brought to these meetings because I believe it helps me make informed decisions when voting.

For three years, I have also attended the state meetings and workshops in Dover, where I learn about upcoming issues and new programs in our state. For the last two years, I went to the National School Board

Conventions in California and Florida where I compared notes and gained valuable insight from board members of other states. The classes and workshops conducted by successful districts enable me to see possibilities for new programs and direction for the future of the Indian River School District.

My goals would include a technical-trades school to replace the county vo-tech that once offered programs to students who were not college-bound. I would also like to see our own Scope Program in the Indian River District, which would allow room to house our discipline problems and get them out of the regular school setting.

Technology is necessary and we have to keep up if our students

are to compete in the 21st century. I am a firm believer that public schools should have a strong emphasis on the basic subjects, but offer other things as well, including sports, music, arts, science, history and geography. Physical education has been ignored, resulting in obesity, diabetes and health issues being at an all-time high for young people.

Finally, I hope to see the state testing go by the wayside so our teachers can stop teaching to the test and have more time to work these other subjects back in. Our children need a well-balanced education.

These are some of my visions for the future and I am willing to work hard to help make them happen.



sistration that we are responsible to oversee. Our purpose is always to ensure that our children receive the best possible education.

**Q.** What is your position regarding the changes in the district's religion policy in recent years and months? Should additional changes be implemented? If so, what and why? Specifically, does the board need to change its current policies and policies deal with religious periods throughout the year (i.e. Christmas break changed to Winter Break, Easter-associated items prohibited in schools)?

**A.** As chair of the Policy Committee, I can assure you that many long hours went into revising areas of our religion policy. Always taking into consideration the advice of our attorney, we worked to make sure that we were in compliance with the law and also that we preserved our rights under the First Amendment. As far as I am concerned, we do not need to make any further changes.

**Q.** How do you think the board handled the lawsuit and subsequent settlement with the Dobrich and 'Doe' families? Should the district have made accommodations or settled the suit sooner or held out? Should the board's prayers continue to be pursued in the court system? Should it be eliminated or should the practice continue?

**A.** I joined the board after the lawsuit had already been filed and

garten' should taxpayers have to pay for these items or should the state or school district come up with other ways to pay for them?

**A.** The decision to conduct a referendum was forced upon the board, due to the state's unfunded mandate for all schools to implement full-day kindergarten beginning September of 2008. This would require additional classroom teachers and instructional supplies. Our district did not have the money to implement this program, so we decided to allow the taxpayers to choose if they wanted to fund it. I personally disagree with non-funded mandates.

Teacher salaries have been an ongoing concern. Indian River ranks very low on the pay scale and we often lose good employees to bordering districts who can pay more.

"Operating Initiatives" is an ongoing expense with many needed items. It would be wonderful if the state would fund these things, but the reality is the state continues to take more each year from us and yet expects more in return. All these initiatives are good and have merit; however, the reality is our district does not have the funds to support them. The referendum will bring these issues directly to the taxpayer, giving them the opportunity to decide which, if any, of these initiatives they are willing to support.

**Q.** What do you believe you offer as a potential member of the Indian River School Board at this

## Lasting relationships are built on commitment.

Over a century's worth of economic cycles have come and gone since we first opened our doors. And throughout, a hallmark of our heritage has been our commitment to meet the credit needs of individuals and businesses in the communities we serve—a commitment that remains steadfast today.

Stability of commitment matters in a relationship, especially in times of uncertainty. It is what our clients have come to expect—and should always expect—from Wilmington Trust.

Give us a call. We're here for you and lending as we always have—to existing clients and those just beginning a relationship with us.



WILMINGTON TRUST

© 2008 Wilmington Trust Company. Member FDIC.

Carl Hostetter
Private Banking
302.651.8702

Joe Terranova
Real Estate Lending
302.651.8333

Katie Wilkinson
Commercial Banking
302.651.1460

Brian Bailey
Commercial Banking
302.651.1204

Rich Conway
Commercial Banking
302.651.1725

y 9, 2008

159

## Coastal Point

## District 5

# RSD

continued from page A58

; I would be doing the school trict and the community a serious injustice if I resorted to personal attacks on the board and w they handled a situation of ich I was not involved. I do not e access nor did I have access to of the particulars of the case.

As far as I am concerned, the e is settled and it is time to ve on. I can only thank "God" t the lawsuit has been settled I the district can focus its time I resources on educating our lents. I think it is very difficult ve a board member and devote r time to public service when xeone is second guessing your tives and actions. Again, I will second guess the current rd.

As far as the board's right to

Indian River's starting teacher salaries rank eighth out of the nine Sussex County school districts. The lack of a competitive salary scale makes it difficult for the district to recruit and retain qualified staff.

While principal of Frankford Elementary, I personally witnessed the benefits of full-day kindergarten. The demands of No Child Left Behind and Accountability legislation require our students to be better prepared than ever. Full-day kindergarten provides students with accessibility to programs that can close the achievement gap for our at-risk students while providing enrichment and stimulating programs for our average and gifted students, which will enable them to better compete globally.

I also believe that the state must develop a plan that fully funds the school system. Districts are bombarded with state and fed-

My goals and priorities;

• Support the learning and growth of our all of our students.

• Develop vocational education/apprenticeship programs in cooperation with local businesses.

• Develop internship programs in cooperation with various community agencies and local businesses.

• Support quality unique school programs (e.g. environmental, outdoor learning, vocational, creative arts, performing arts, agricultural, health care, early childhood).

• Anticipate growth and loss of student enrollment and plan accordingly.

• Support parent organizations at every school.

• Increase parent involvement.

and shared decision making.

• Build stronger parent-teacher relations.

• Ensure that money reaches the classroom.

• Explore creative methods of funding schools in light of recent budget cuts.

• Ensure equity for schools with the greatest needs.

• Develop policies and procedures which reduce lawsuits and litigation against the district.

• Recruit and retain quality educators.

• Ensure competitive salaries for all employee groups.

• Increase paraprofessionals and other learning support workers in the classrooms.

Q. In your opinion, what is the role and purpose of the school board on a day-to-day basis, in terms of the education of the district's children?

A. The school board is responsible for setting policy, approving the district budget and approving or not approving recommendations from the administrative staff in terms of staff, curriculum, and program adoption for the education of our students.

## Reginald Helms

See RSD Page A60

# REAL ESTATE AND CONTENTS

A60      Coastal Point      May 9, 2008

# IRSD

## Continued from page A59

*Q.* What is your position regarding the changes in the district's religion policy in recent years and months? Should additional changes be implemented? If so, what and why? Specifically, does the board need to change its current policies regarding how the school calendar and policies deal with religious periods throughout the year (i.e. Christmas break changed to Winter Break, Easter-associated items prohibited in schools)?

*A.* The Indian River School District Board of Ed is comprised of (10) law-abiding citizens, who take their responsibility

very seriously. When presented with the possibility our policies may not be "up-to-date" with current state and federal law, we investigated, formulated, and adopted new policies to bring our district into compliance.

We have been advised by our attorney(s) that we are in compliance with state and federal law. In the Dobrich settlement we stood firm on the issue of "Christmas break" and "Easter break" being placed on our calendars and on our school signs. As one member of the IRSD board of education, I will continue to stand firm on these issues.

*Q.* How do you think the board handled the lawsuit and subsequent settlement with the Dobrich and "Doe" families?

Should the district have made accommodations or settled the suit sooner or held out? Should the board's prayer continue to be pursued in the court system? Should it be eliminated or should the practice continue?

*A.* Contrary to the claims of alleged discrimination, when Mrs. Dobrich approached the board with her concerns and the board addressed her concerns and adopted new policies accordingly. In my opinion, the board acted responsibly and did exactly what a board should do. Perhaps the prompting by outside groups, the possibility of obtaining monetary gain, may have clouded the judgment on their part.

As one board member, my opinion is we should not have settled; but we should

have gone to court and let the courts decide the case. As it turns out, the district made a settlement with the Dobrich and Doe families, but we have not settled anything. There are people who are still unsure of what we should and should not do in the district.

[Should the board's prayer continue to be pursued in the court system?]

Absolutely! I believe in the freedom of religion; not freedom from religion. This is one issue I will stand up for and not waiver.

The practice of beginning our regular meetings with prayer should be continued for a very good reason. Whenever we enter into anything of great importance, we should invoke the wisdom and guidance of Deity. I am not trying to evangelize, or promote any religion; I am simply asking, in my case, for wisdom to make good and sound decisions for our district.

*Q.* What are your opinions on the issues in the 2008 current-needs referendum set for May 22: operating initiatives, teacher salaries and full-day kindergarten? Should taxpayers have to pay for these items or should the state or school district come up with other ways to pay for them?

*A.* We are planning to adopt new curriculum, which in turn would require new textbooks and supplies. At the present time, because of all the cutbacks the state requires, the increase in energy costs, we do not have the adequate funds for books and supplies.

In our district, we have some of the best teachers in the state, if not the nation. As well as anyone else, our teachers expect a yearly raise. The district, for the above reasons, does not have the adequate funds for staff raises. Each taxpayer will have to decide what they are willing to support and what they feel is excess.



teachers in the state, if not the nation. As well as anyone else, our teachers expect a yearly raise. The district, for the above reasons, does not have the adequate funds for staff raises. Each taxpayer will have to decide what they are willing to support and what they feel is excess.

I voted to allow the public to tell me what they will support. As far as full-day kindergarten is concerned, I am not convinced this is really needed. There are as many opinions as there are stars in the sky on this issue. Once again, the public will decide if this is something they are willing to support.

Since I have been on the board, the state has continually sent down mandates, however they have not always been funded by the state. They expect each district to raise taxes by way of referendum to secure these funds. I personally do not agree with this philosophy. If the state mandates the programs, they should fund it also.

*Q.* What do you believe you offer as a potential member of the Indian River School Board at this time? What would be your goals and priorities as a board member, if you are elected?

*A.* As a candidate for the IRSB, I bring to the table 17 years of experience. During my tenure, the IRSD has continued to improve in all areas of education. Our test scores and the many accolades that our students, teachers, and staff have received are indicative of the great things our district has accomplished. I have had the opportunity to serve the IRSD for these past 17 years and I continue to have "a servant's heart" and the willingness to help our students to be successful in their studies, and to eventually become positive and



At PNC, we understand your situation. That's why we work with you to show you the best options to fit your life. Right now, qualifying homeowners get a low fixed rate on select Home Equity Installment Loans, which lasts the life of your loan. To qualify, a portion of your loan must be used for Home Improvement, your requested amount must range from $1,000 to $35,000 and you must meet the income guidelines listed above. Offer only good April 1–May 31, so act now.

**PHONE 1-877-CALL-PNC · STOP BY ANY BRANCH · VISIT pnc.com**

◆ PNC
LEADING THE WAY

*Annual Percentage Rates (APR) shown are for loans up to 99% loan-to-value (LTV) and accurate as of 4/1/08. Minimum loan amount is $1,000 to a maximum of $15,000. Terms available are 36 to 84 months for loans ranging from $1,000 to $10,000 and up to 180 months for loans ranging from $10,001 to $15,000. Feature rate requires automatic payments from a PNC checking account. The APR range shown is from 4.99% APR to 6.74% APR with automatic payment from a PNC checking account; your actual rate will be based on review of your credit application. Other APRs available for loans with different repayment terms and conditions. Based on 36 days in first payment, the monthly payments for $1,000 borrowed at a range of 4.99% APR to 6.74% APR may range from $14.10 to $14.97 for 7 years and may range from $79 to $8.34 for 15 years. Property insurance required. Loans subject to credit approval. Offer cannot be combined with other offers, may be modified or discontinued at any time without prior notice, and may vary by market. Offer only good from 4/1/08 through 5/31/08. Portion of loan proceeds must be used for home improvement. Income guidelines subject to change. ©2008 The PNC Financial Services Group, Inc. All rights reserved. PNC Bank, Member FDIC.

⌂ EQUAL HOUSING LENDER

See IRSD Page A95

*May 9, 2008*

**Coastal Point**

# IRSD

**Continued from page A46**

productive citizens.

The prayer issue, the renovation program and the continued improvement of our test scores are some of the issues I would like to see to fruition. I would like to ask the residents of the 5th district of the IRSD to come out on the 13th of May to vote and if they think I would make a good candidate to continue on the IRSD board of education, I would appreciate their support.

## Donna Mitchell

*District 5*

Q. In your opinion, what is

was saddened that the Dobrich and Doe families felt they had to take such action against the district, especially since the board initially acted to address their concerns. I did vote to not accept the first settlement offer because there were so many demands that were unacceptable and would have hindered our ability to function as a school board. Eventually, a settlement concerning the first part of the lawsuit was agreed upon.

In retrospect, I am not so sure it was a good thing because in my opinion this matter will never be resolved until it goes all the way to the Supreme Court. I say this because we still have teachers and staff who are fearful that anything they say or do could be misconstrued as insensitive to someone of another faith or culture. As

time? What would be your goals and priorities as a board member, if you are elected?

A. Having served on the board for three years has given me valuable experience. During the last two years, I chaired the Policy Committee and attended all subcommittee meetings chaired by other board members, despite the fact that I was not required to be there. I consider it important to hear all dialogue brought to these meetings because I believe it helps me make informed decisions when voting.

For three years, I have also attended the state meetings and workshops in Dover, where I learn about upcoming issues and new programs in our state. For the last two years, I went to the National School Board

Conventions in California and Florida where I compared notes and gained valuable insight from board members of other states. The classes and workshops conducted by successful districts enable me to see possibilities for new programs and direction for the future of the Indian River School District.

My goals would include a technical-trades school to replace the county vo-tech that once offered programs to students who were not college-bound. I would also like to see our own Scope Program in the Indian River District, which would allow room to house our discipline problems and get them out of the regular school setting.

Technology is necessary and we have to keep up if our students

are to compete in the 21st century. I am a firm believer that schools should have a emphasis on the basic su but offer other things as including sports, music, an ence, history and geog Physical education has ignored, resulting in obesi betes and health issues be an all-time high for young ple.

Finally, I hope to see the testing go by the wayside teachers can stop teaching test and have more time to these other subjects back in children need a well-ba education.

These are some of my for the future and I am will work hard to help make happen.

# To the residents of the Indian River School District living in the 5th voting district:

I am writing this letter on behalf of Mrs. Donna Mitchell and myself to ask for your vote in the upcoming IRSD school board elections, to be held on May 13, 2008. Mrs. Mitchell and I have had the honor and privilege of serving on the IRSD Board of Education during a time of great success. Dr. Susan Bunting gave a summary of the district's 2007 accomplishments to a group of the following accolades:

- Ten Indian River schools have been rated as "superior" by the state of Delaware;
- Indian River's two high schools have been rated as "superior" by the state of Delaware;
- The district's third- and fifth-graders are rated first in the state in reading and mathematics;
- The district's eighth-graders placed third in math and fourth in reading in the state;
- Based on our outstanding DSTP performance, the IRSD has five National Blue Ribbon Schools;
- Frankford Elementary was recognized for the Intel Scholastic Technology award;
- North Georgetown and Long Neck Elementary Schools were awarded State Distinguished Title I awards;
- The counselor at Phillip Showell Elementary was selected as the Delaware Elementary Counselor of the Year;
- Indian River High School received a successful accreditation report from the Middle States Commission on Higher Education.

One legislator's remarks were, *"It takes several things to contribute to this type of success and one of those things is a good board making good decisions."*

The IRSD has shown great success, but we still have some challenges to address. One challenge is the financial situation that the State of Delaware is in at the present time. The IRSD board of education has been asked to hit a moving target in terms of not knowing how much the state is going to require the district to cut spending. We are faced with the possibility of cutting personnel and programs in order to give back to the state the required funds. We have not been given an exact figure as of yet, but we think it will be a substantial amount. Mrs. Mitchell and I are in agreement not to cut the buildings or any classroom personnel to achieve these cuts. We feel there are other areas that can be cut in order to cover the required amount and we would be diligent in looking for these areas.

Another challenge is the issue of "the Board Prayer." Mrs. Mitchell and I stand firm on the IRSD board of education's ability to have prayer before each regular board meeting as has been the custom of our Board of Education for years. There are some candidates, if elected, who would vote to "just sit down and be quiet" and let such organizations as the ACLU intimidate the board into submission.

Mrs. Mitchell and I are law-abiding citizens; however, we have and will continue to vote to fight for prayer before board meetings until such time as the law prohibits such action. As of today, it is not unlawful to do so and we will fight to keep it that way.

Donna and I would like to thank the residents of the 5th voting district for the opportunity to serve these past years. We think our past records speak volumes of our ability to make good decisions for our students, staff and taxpayers in our district.

If you would like to have board members who are genuinely concerned with the education of our youth, as well as making sure we get the best bang for your hard-earned tax dollars, and members who will stand firm for our beliefs, then you need to re-elect Donna Mitchell and Reggie Helms to the IRSD Board of Education on Tuesday, May 13, 2008.

**Remember, a vote for Helms and Mitchell is a vote for continued success.**

*Thank you and GOD bless the IRSD.*

thing they want, from filet mignon to i chops or seafood, and not fill up on any thing. It really allows people to try a va of food without having to pay the high price for an entire meal."

Prices for tapas plates can start from to $8 and run up to about $14.

"I'm very excited about working tapas," said Strowbe. "I haven't before, I've eaten a lot of them. The opportunity somebody to come in and get three diffe plates of different kinds of food, instead one, is a great concept. I think people enjoy coming in, sitting at the bar and s pling some different tapas with a glass two of wine, rather than sitting down having a heavy meal."

And if regular diners think they are have Sedona's wine selection down pat, t should think again. Parrott plans to bring some additions to the list.

"I'd like to eventually do some more s, cial featuring and pairing with the win too," she said.

Prior to Memorial Day, the restaura will be open on Thursdays, Fridays a Saturdays, beginning May 8, and "w another new concept on Sundays: bruns Doors will be open between 9 a.m. and no on Sundays to cater to a morning crowd.

Memorial Day will kick off Sedona's fu week schedule, and it will run through Lab Day, with restricted seasonal hours to follo

"We would like to stay open throu New Year's week, too," Parrott noted.

Employment in the restaurant's dini area will stay largely constant, with famili faces serving meals to customers. And those who like to stop in for traditional favorites, don't worry; those well-liked men items will be back.

"We will still have our popular dishe like the ahi tuna, great pork chops and crac cakes, as always," said Parrott. "We jus wanted to make sure we brought in som new things, too, which ought to be a goo touch."

Parrott and Strowbe plan to appeal everyone who comes to town, not just th high-end patrons.

"Basically," he stated, "the menu will be little more in the price range of a lot of th customers. We want to accommodate mo

# TAB  19

INDIAN RIVER SCHOOL DISTRICT
BOARD OF EDUCATION REGULAR MEETING
TUESDAY, FEBRUARY 27, 2007 – 7:30 P.M.
SUSSEX CENTRAL HIGH SCHOOL CAFETERIA

MINUTES

CALL TO ORDER
President Charles M. Bireley called the Regular Meeting of the Indian River School
District Board of Education to order at 7:30 p.m.

President Bireley noted that it is the history of the Board of Education at the beginning of
the meeting to have a prayer, which is voluntary among the adult members of the Board,
and that the audience is not required to participate. President Bireley then asked Mrs.
Mitchell to give an invocation.

ROLL CALL
Board Members Present: Charles M. Bireley, (Mrs.) Nina Lou Bunting, (Dr.) Dustin D.
Davis, (Dr.) Donald G. Hattier, Randall L. Hughes, (Mrs.) Donna M. Mitchell, (Dr.)
Patricia S. Oliphant, Robert D. Wilson
Board Member Late: Reginald L. Helms (7:40 p.m.)
Board Member Absent: Richard H. Cohee

APPROVAL OF AGENDA
Regular and Executive - February 27, 2007

The following item was added to the Regular Agenda:
XIV. 8. Use of North Georgetown Elementary School Classroom by Sussex County
Democratic Party – March 1 and 14, 2007 from 6:00 – 8:00 p.m.

It was moved by Mrs. Bunting, seconded by Mrs. Mitchell, to approve the Regular
Agenda as amended and the Executive Session Agenda. The motion passed unanimously
(8-0).

PRESENTATION OF COLORS
The Sussex Central High School Army JROTC performed the Presentation of Colors.

APPROVAL OF MINUTES
Board of Education Regular Meeting Minutes – January 23, 2007
Board of Education Special Meeting Minutes – February 15, 2007

It was moved by Dr. Oliphant, seconded by Mrs. Bunting, to approve the minutes as
submitted. The motion passed unanimously (8-0).

BOARD OF EDUCATION REGULAR MEETING MINUTES
February 27, 2007
Page 2

<u>VISITORS AND STAFF IN ATTENDANCE</u>
President Bireley and Dr. Bunting recognized and presented certificates to the following
visitors for their accomplishments:

Michael C. Ferguson Scholarship Recipients (Dr. Bunting noted that a reception was held
    prior to the Board Meeting this evening to honor the Ferguson Scholarship
    recipients:
        Maxinne Almine, Grace Belkot, Cameron Boucher, Abigail Buchler, Taryn Buck,
        Jarron Burton, Janeth Garza, Georgette Hattier, John Paul Jones, Ellen Joseph,
        Bryan Kaufman, Amin Lo, Ian Martin, Crystal Mihaylo, Stephanie Miller, Alyssa
        Murray, Leonardo Navarrete, Danielle Nobles, Amber Richards, Kurt Saunders,
        Brandon Shultie, Ryan Trager, Samantha West
State Football Coach of the Year - John Wells (SS)
Sussex County Elementary School Counselor of the Year - Cheryl Carey (PS)
Sussex County Middle School Counselor of the Year - Diane Twisselmann (SM)

<u>OTHER VISITORS AND STAFF IN ATTENDANCE</u>
Susan Bunting, Earl Savage, Janet Hearn, Sandy Smith, Patrick Miller, Celeste Tanner,
Jay Headman, Charlie Hudson, Tracy Hudson, Greg Weer, Cliff Toomey, Gary
Brittingham, Char Hopkins, Duncan Smith, Suzanne Tiemann, Loriann White, Mark
Steele, Dana Goodman, Karen Ware, Bev Marvel, Emily Pettyjohn, Pamela Shockley,
Jon Brittingham, Beth Booth, Julia Knopf, Cheryl Carey, Diane Twisselmann, Heather
Clark, Tyler Wright, Russell Bell, Karen Oliphant, Carol Buchler, Sarah Betlejewski,
Tina Lebron, Christine Clark, Donna Meade, Barbara Martin, Ian Martin, Dori Camper,
Stephanie Miller, Anna Miller, Ken Miller, Georgie Hattier, Laura Hattier, Alyssa
Murray, Anne Devine, Stephen Taylor, Tina Navarette, Amin Lo, Kathy Silar, Karen
Pusey, Brad Budesheim

<u>STUDENT GOVERNMENT</u>
Tyler Wright, Treasurer of the Sussex Central High School Student Government,
apprised the Board of events occurring at Sussex Central High School.

<u>PUBLIC COMMENTS</u>
<u>Dr. Patricia Oliphant</u>
Dr. Oliphant informed the Board that she attended the State Wrestling Tournament
recently held at Sussex Central High School. She noted that she received several
favorable comments regarding the professional manner in which the tournament was
held. She also thanked Mr. Layfield, Mr. Shultie, Mr. Dondarski, and the members of the
Wrestling Boosters Association for their efforts in making this tournament a success.

BOARD OF EDUCATION REGULAR MEETING MINUTES
February 27, 2007
Page 3

Randall Hughes
Mr. Hughes
Mr. Hughes congratulated the Ferguson Scholarship recipients for their
accomplishments. He also extended best of luck to the Odyssey of the Mind Teams in the
tournament to be held this weekend.

OLD BUSINESS
Major Capital Improvements
Progress Report
Mr. Weer gave the following progress reports:

Sussex Central High School
We are awaiting the report from EDiS on the roof leaks.

Indian River High School
We are also awaiting a report on the leaks at Indian River High School. The purchase
order has been sent to Joseph Zimmer for the work on the ice storage tank, and we are
awaiting a schedule for the work to begin.

Lord Baltimore Elementary School
The punch list work is essentially complete. The temporary boiler has been set up and is
working. The new vault for the geo-thermal unit has been ordered.

Georgetown Middle School
A meeting is scheduled on February 28th with our engineers, mechanical contractors, and
the Town of Georgetown to address the low water pressure in the building. There are
still balancing issues that will also be addressed at this meeting. There are some issues
with the electrical contractors and the cable TV system.

East Millsboro Elementary School
The counter tops are to be replaced during spring vacation. Minor punch list items are
being addressed. There are a couple of issues with Delcard, but most of the electrical and
mechanical punch list items are complete.

Millsboro Middle School
The mechanical, electrical, and plumbing rough-in work is moving forward. Boilers and
chillers have been installed. Pipe testing is being done. The sprinkler contractor is a little
behind schedule, and he has been put on notice to pick up the pace. Drywall and studs
ceiling grids are going up. Structural steel is done on the second floor. Door frames are
to be in next week. The elevator shaft is complete, awaiting the installation of power.

SDSA/IREC
The bid advertisements are out. There is a pre-bid meeting next week, and bids will be
opened on March 22, 2007 at 3:00 p.m.

BOARD OF EDUCATION REGULAR MEETING MINUTES
February 27, 2007
Page 4

Phillip Showell Elementary School
At the Buildings & Grounds meeting, presentations were given on heating systems.

Long Neck and Selbyville Middle School Roofing Projects
Specifications are complete and bids are going out on March 2, 2007. A pre-bid meeting
will be held on March 13, and bids will be received on April 5, 2007.

School Choice Applications
It was moved by Mr. Helms, seconded by Mrs. Mitchell, to approve the School Choice
Applications as recommended. The motion passed unanimously (9-0).

Legislative Dinner Packet Draft
A revised Legislative Dinner Packet was distributed for review. Dr. Bunting asked that
Board members contact her within the next week with any additions to the draft packet.

2007-08 District Calendar Draft
It was moved by Mrs. Bunting, seconded by Dr. Oliphant, to approve the 2007-08
District Calendar as submitted. The motion passed unanimously (9-0).

NEW BUSINESS
DSTP 2006 Science & Social Studies Scores
Sandy Smith reviewed the 2006 DSTP Science and Social Studies scores with the Board.
She noted that there are some discrepancies in the Grade 6 Social Studies scores and
revisions may be made.

Make-Up Day – February 7, 2007
President Bireley suggested that since there is a possibility for additional inclement
weather days, discussion on the Make-up Day for February 7th be postponed until next
month. It was moved by Mrs. Bunting, seconded by Dr. Hattier, to table discussion on
the February 7th Make Up Day until next month. The motion passed unanimously (9-0).

COMMITTEE REPORTS AND APPOINTMENTS
Administrative Compensation Committee
There was no report.

Athletic Fields Oversight Committee
There was no report.

BOARD OF EDUCATION REGULAR MEETING MINUTES
February 27, 2007
Page 5

Buildings & Grounds Committee
Mr. Helms reported that he was unable to attend the last Buildings & Grounds meeting.
However, at that meeting, the following items were discussed:

Girls' Soccer at GMS
A request for the Sussex Central High School Girls' Soccer team to utilize the
Georgetown Middle School field(s) was submitted to the Buildings & Grounds
Committee should the field at Sussex Central High School be deemed unsafe to play on.
It was noted that costs to maintain the Georgetown Middle School fields as well as the
cost to transport students to and from Georgetown Middle School are issues to consider
should this become necessary. However, at the present time, it appears as if the Sussex
Central High School Girls' Soccer team will be able to play its games on the Sussex
Central High School field.

GM Cafeteria Varnishing Change Order
Mr. Helms noted that the Buildings & Grounds Committee recommends approval of the
proposal in the amount of $10,206.25 to varnish the kitchen and cafeteria woodwork in
the Georgetown Middle School Cafeteria to match the existing woodwork . It was
moved by Mr. Helms, seconded by Mrs. Mitchell, to approve the recommendation of the
Buildings & Grounds Committee. The motion passed unanimously (9-0).

North Georgetown Blue Ribbon Plaque
The Buildings & Grounds Committee recommends approval of the request to mount a
plaque on the building recognizing North Georgetown Elementary School as a National
Blue Ribbon School. It was moved by Mr. Helms, seconded by Dr. Oliphant, to approve
the recommendation. The motion passed unanimously (9-0).

Security Instruments Proposal for MM and IREC
The Buildings & Grounds Committee recommended approval of the Security Instruments
Proposal for Millsboro Middle School and IREC/SDSA. Mr. Miller noted that funds to
cover the Security Instruments proposals would be taken from construction contingency
and local monies appropriated for renovations. Mr. Helms, made a motion, seconded by
Dr. Oliphant, to approve Security Instruments proposal for IREC/SDSA in the amount of
$62,895 and Security Instruments proposal for Millsboro Middle School in the amount of
$59,875. The motion passed unanimously (9-0).

Smartboard Electrical Change Order
The Buildings & Grounds Committee recommends approval of the H & A Electric Bid in
the amount of $9277 to install outlets in the classroom ceilings for the smartboards. It
was moved by Mr. Helms, seconded by Mrs. Bunting, to approve the recommendation.
The motion passed unanimously (9-0).

BOARD OF EDUCATION REGULAR MEETING MINUTES
February 27, 2007
Page 6

Curriculum Committee
Mrs. Bunting noted that the Curriculum Committee met on February 12, 2007. The
following topics were discussed:
- Literacy Leaps – Superstars in Education runner-up
- ELL students
- IRSD as a pilot for HHPD program
- Progress of the diploma bill (HB 18)
- March 2nd Inservice
- 2006 DSTP Science & Social Studies scores
- District calendar

The next meeting will be held on March 13 at 5:30 p.m.

DSBA Board of Directors Representative
Mrs. Bunting reported that the February meeting was canceled. The next meeting of the
DSBA Board of Directors will be held on March 14th prior to the DSBA clinic workshop.

DSBA Legislative Committee
Mr. Bireley reported that the February 28th DSBA Legislative Committee meeting has
been cancelled.

Finance Committee
Mr. Hughes reported that the Finance Committee recommended that $56,700 be allocated
from the Band Uniform Account for the purchase of band uniforms (125 uniforms, 3
drum major uniforms, and 30 band front uniforms) for the Indian River High School
Marching Band. It was moved by Mr. Hughes, seconded by Dr. Hattier, to approve the
recommendation. The motion passed unanimously (9-0).

Mary Bailey Scholarship Committee
There was no report.

Negotiations Committee
It was moved by Mr. Helms, seconded by Mrs. Mitchell, to table discussion on
Negotiations until Executive Session. The motion passed unanimously (9-0).

Policy Committee
Mrs. Mitchell reported that the Policy Committee met on February 23, 2007 at IREC.
The following topics were discussed:
- High school graduation and diplomas
- Honor Roll and weighted GPA's
- Make-up opportunities (deferred until later)
- Student supervision at athletic events
The next Policy Committee Meeting will be held on March 7, 2007 at 5:30 p.m.

BOARD OF EDUCATION REGULAR MEETING MINUTES
February 27, 2007
Page 7
<u>School Uniform Committee</u>
Dr. Hattier reported that the School Uniform Committee was formed in September, 2006
for the purpose of identifying the following:

1) benefits that uniforms would bring to the Indian River School District
2) issues that would need to be dealt with should a school uniform policy be
   implemented
3) type of uniform - dress code versus strong uniform
4) how a school uniform policy would be implemented
5) distribution issues and suppliers
6) level of public support that would be available
7) legal issues that may arise
8) other issues

The first meeting of the School Uniform Committee was held on November 2, 2006.
Advantages and disadvantages of implementing a school uniform policy were discussed.
In January 2007, Dr. Kevin Carson from the Woodbridge School District shared
information about Woodbridge's implementation of a school uniform policy. A
survey/questionnaire was developed and sent home with our students in January. Out of
8100 surveys sent out, approximately 4500 were returned, which represented 55%
participation. The survey revealed that 75% were in support of the implementation of
school uniform, while 25% were against. The committee will move forward with
developing a model uniform, as well as addressing timeline, supplier and legal issues.
The next meeting will be held on March 8, 2007 at 7:00 p.m. at IREC.

<u>IREA Representative</u>
There was no report.

<u>ADMINISTRATIVE REPORTS</u>
<u>Dr. Bunting, Board Update</u>
<u>School Visits</u>
Dr. Bunting reported that she has visited classrooms as well as participating in "I Love to
Read Month" at several schools. She also attended basketball games, wrestling
tournaments, the SDSA "Snow Biz" performance, and listened to original poetry at
Sussex Central Middle School's "coffee house."

<u>Curriculum Update</u>
The Curriculum Update for the month of February was included in the Board Packet.

<u>Support Services Update</u>
The Support Services Update for the month of February was included in the Board
Packet.

BOARD OF EDUCATION REGULAR MEETING MINUTES
February 27, 2007
Page 8

Academic Achievement Banquets
Dr. Bunting recommended that two Academic Achievement Banquets be held due to the
number of students involved. Sussex Central High School's banquet will be held on May
15 as noted on the calendar, and Indian River's banquet will be held on May 17, 2007. It
was moved by Mrs. Bunting, seconded by Mrs. Mitchell, to approve the
recommendation. The motion passed unanimously (9-0).

Sussex Central Middle School Dedication Date - May 3, 2007
Dr. Bunting recommended that Sussex Central Middle School's Dedication be held on
May 3, 2007. It was moved by Mrs. Bunting, seconded by Mrs. Mitchell, to approve the
recommendation. The motion passed unanimously (9-0).

Counselors Dinner
Dr. Bunting and Tracy Hudson attended the Kent/Sussex County School Counselors'
Dinner on February 7, 2007.

Technology Awards Dinner
Dr. Bunting reported that she attended a Technology Awards Dinner at which Judith
Loeber, Sussex Central High School art teacher, was honored for receiving an Art
through Technology award.

Mid-Year Principal Conferences
Dr. Bunting reported that she has been conducting mid-year conferences with principals
and central office staff.

FINANCIAL
Regular Invoices
It was moved by Mr. Helms, seconded by Dr. Hattier, to approve the payment of the
Regular Invoices. The motion passed unanimously (9-0).

Financial Summaries
Mr. Miller reviewed the Financial Summaries for the month ending January 31, 2007.

Major Cap Financial Summaries
Mr. Miller reviewed the Major Capital Improvement Financial Summaries for the month
ending January 31, 2007.

Major Cap Change Orders
Mr. Miller reviewed and recommended approval of the Major Cap Change Orders dated
February 8, 2007 in the amount of $228,707, and February 22, 2007 in the amount of
$68,664. It was moved by Dr. Hattier, seconded by Dr. Oliphant, to approve the Major
Cap Change Orders as recommended. The motion passed unanimously (9-0).

BOARD OF EDUCATION REGULAR MEETING MINUTES
February 27, 2007
Page 9

Major Cap Payment Voucher Authorizations
Mr. Miller reviewed and recommended approval of the Major Cap Payment Voucher
Authorizations dated February 8, 2007 in the amount of $177,292, and February 22, 2007
in the amount of $1,153,800. It was moved by Mr. Hughes, seconded by Dr. Hattier, to
approve the Major Cap Payment Authorizations as recommended. The motion passed
unanimously (9-0).

Major Cap Final Payment Voucher Authorizations
Mr. Miller recommended approval of the Major Cap Final Payment dated February 7,
2007 to John L. Briggs in the amount of $42,634.53. It was moved by Dr. Oliphant,
seconded by Mrs. Mitchell, to approve the Final Payment to John L. Briggs as
recommended. The motion passed unanimously (9-0).

Financial Position Report
Mr. Miller reviewed and recommended approval of the Financial Position Report, noting
that this report is a requirement under Section 1507, Title 14, Delaware Code. It was
moved by Mrs. Mitchell, seconded by Mr. Hughes to approve the Financial Position
Report. The motion passed unanimously (9-0).

Governor's Proposed FY '08 Budget
Mr. Miller shared highlights of the Governor's Proposed FY'08 Recommended Budget
with the Board.

COMMUNICATIONS
Use of Facilities
Use of Dr. Lorraine Wray Aquatic Center and Lobby by Adult Education Class No. 1 –
Sundays, February 4, 11, 18, 25, March 4, 11, 18, 25, and April 1, 2007 from 8:00 a.m. to
2:00 p.m.

Use of Dr. Lorraine Wray Aquatic Center and Lobby by Adult Education Class No. 2 –
Sundays, February 25, March 4, 11,18, 25, April 1, 2007 and week of April 9-14, 2007
from 8:00 a.m. to 2:00 p.m.

Use of Dr. Lorraine Wray Aquatic Center and Lobby by Adult Education Class No. 3 –
Sundays, April 29, May 6, 13, 20, 27, 2007 from 8:00 a.m. to 2:00 p.m.

Use of Southern Delaware School of the Arts Cafeteria by St. John A.M.E. Church
Women's Ministry - March 3, 2007 from 12:00 Noon to 4:00 p.m.

Use of Sussex Central High School Auditorium by Miss Delaware Organization –
Saturday and Sunday, March 10 and 11, 2007 from 8:00 a.m. to 7:00 p.m.

Use of Indian River High School Gymnasium by Ocean View Church of Christ – Friday
and Saturday, March 23 and 24, 2007 from 10:00 p.m. to 5:00 a.m.

BOARD OF EDUCATION REGULAR MEETING MINUTES
February 27, 2007
Page 10

Use of Sussex Central Middle School Football Field by COPA Service General Soccer
League – Sunday, February 18, 2007 from 10:00 a.m. to 5:00 p.m.

Use of North Georgetown Elementary School Classroom by Sussex County Democratic
Party – March 1 and 14, 2007 from 6:00 – 8:00 p.m.

It was moved by Dr. Hattier, seconded by Mrs. Mitchell, to approve the eight Use of
Facilities requests. The motion passed unanimously (9-0).

Field Trips
Overnight trip by Sussex Central High School JROTC – March 23-24, 2007 to Bethany
Beach, DE

Dr. Bunting recommended approval of the field trip request. It was moved by Dr.
Hattier, seconded by Mrs. Mitchell, to approve the field trip request. The motion passed
unanimously (9-0).

PERSONNEL
Personnel Agenda, Personnel Addendum, Personnel No. 07-08 PER, Personnel No. 07-
09 PER and Personnel No. 07-10 PER
It was moved by Mr. Helms, seconded by Mr. Hughes, to table Personnel Agenda,
Personnel Addendum, Personnel No. 07-08 PER, Personnel No. 07-09 PER, and
Personnel No. 07-10 PER until after Executive Session. The motion passed unanimously
(9-0).

PUBLIC COMMENTS
Christine Clark
Ms. Clark expressed her opposition to the Indian River School District implementing a
policy for school uniforms.

Donna Meade
Ms. Meade expressed her opposition to the Indian River School District implementing a
policy for school uniforms.

Stephen Taylor
Mr. Taylor indicated that he was trying to understand the purpose behind the Indian
River School District implementing a school uniform policy.

BOARD OF EDUCATION REGULAR MEETING MINUTES
February 27, 2007
Page 11

EXECUTIVE SESSION
It was moved by Mrs. Bunting, seconded by Mrs. Mitchell, to go into Executive Session
at 9:05 p.m. The motion passed unanimously (9-0).

A.    Personnel: To discuss matters pertaining to names, competencies and abilities of
individual employees or students.
B.    Strategy Session: To discuss collective bargaining, pending or potential
litigation.
C.    Hearing: To conduct a hearing regarding employee or student discipline or
employee dismissal.
D.    Such other business as may properly be discussed in an executive session.

RECONVENE
It was moved by Mr. Hughes, seconded by Dr. Davis, to reconvene in Regular Session at
10:10 p.m. The motion passed unanimously (9-0).

CONSIDERATION OF AGENDA ITEMS DEFERRED
Personnel Agenda and Personnel Addendum
It was moved by Mr. Helms, seconded by Dr. Hattier, to approve the Personnel Agenda
excluding the Assistant Boys' Baseball Coach at IRHS, the Head Girls' Tennis Coach at
IRHS, and the Volunteer Assistant JV Baseball Coach at IRHS, and the Personnel
Addendum including the Bus transfer from Harry Kitching to Glasco Transportation
Services. The motion passed unanimously (9-0).

It was moved by Dr. Hattier, seconded by Mr. Hughes, to approve the Head Girls Tennis
Coach at IRHS. The motion passed (8-0-1).
For the Motion: Mr. Bireley, Mrs. Bunting, Dr. Davis, Dr. Hattier, Mr. Helms, Mr.
Hughes, Mrs. Mitchell, Mr. Wilson
Abstained: Dr. Oliphant

It was moved by Mr. Helms, seconded by Mrs. Bunting, to approve the Assistant Boys'
Baseball Coach at IRHS and the Volunteer Assistant JV Baseball Coach at IRHS. The
motion passed (8-0-1).
For the Motion: Mr. Bireley, Mrs. Bunting, Dr. Davis, Dr. Hattier, Mr. Helms,
Mr. Hughes, Dr. Oliphant, Mr. Wilson
Abstained: Mrs. Mitchell

STUDENT HEARINGS
Student No. 07-25, Student No. 07-26, Student No. 07-27, Student No. 07-28,
Student No. 07-29
It was moved by Dr. Oliphant, seconded by Mrs. Bunting, to approve the Hearing
Officers' Recommendations on Student No. 07-25, Student No. 07-26, Student No. 07-
27, Student No. 07-28, and Student No. 07-29. The motion passed unanimously (9-0).

BOARD OF EDUCATION REGULAR MEETING MINUTES
February 27, 2007
Page 12

## ADJOURNMENT
It was moved by Dr. Oliphant, seconded by Mrs. Bunting, to adjourn the meeting at
10:20 p.m. The motion passed unanimously (9-0).

Respectfully Submitted,


Charles M. Bireley                                    Susan S. Bunting, Ed.D.
President                                             Secretary and Superintendent
Board of Education                                    Board of Education
Indian River School District                          Indian River School District

CMB/SSB:jlh

# TAB 20

Isaacs, Mark, Dr. (Video)  10/18/2006  1:36:00 PM

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE
MONA DOBRICH and MARCO    :  C.A. No. 15-120 (J.
DOBRICH, individually and  :
as parents and next friend  :
of ALEXANDER DOBRICH,
SAMANTHA DOBRICH, JANE DOE  :
and JOHN DOE, individually  :
and as parents and next   :
friend of JORDAN DOE and   :
JAMIE DOE,        :

         Plaintiffs,  :

     v.          :

INDIAN RIVER SCHOOL     :
DISTRICT, et al.,
              :
         Defendants.  :

     Videotaped Deposition of DR. MARK A. ISAACS
taken pursuant to notice, on Wednesday, October 18,
2006 at 1:36 p.m. at 31 Hosier Street, Selbyville,
Delaware, reported by Lorena J. Hartnett, a Registered
Professional Reporter and Notary Public.

APPEARANCES:
     THOMAS ALLINGHAM, ESQUIRE
     RICHARD HORVATH, ESQUIRE
     BRIAN LENHARD, ESQUIRE
     One Rodney Square
     Wilmington, DE  19801
         Attorney for the Plaintiff

     WILCOX & FETZER
     1330 King Street - Wilmington, DE  19801
         (302) 655-0477
         www.wilfet.com

**Page 2**

APPEARANCES: (CONTINUED)
     JARROD SHAU, ESQUIRE
     Drinker, Biddle & Reath, LLP
     One Logan Square
     18th and Cherry Streets
     Philadelphia, PA  19103-6996
         Attorney for the Defendants

**Page 3**

TABLE OF CONTENTS

TESTIMONY OF DR. MARK A. ISAACS:
  Direct Examination by Mr. Allingham. . . . . . . 3
  Certificate of Reporter . . . . . . . . . . . . 73

**Page 4**

     VIDEOGRAPHER:  This is the videotaped
deposition of Dr. Mark A. Isaacs, taken by
the plaintiff in the matter of Dobrich et
al. versus Indian River School District, et
al.. Civil Action Number 15-120. The
deposition is taking place at 31 Hosier
Boulevard in Selbyville, Delaware, on
October 18, 2006 at approximately 1:36 p.m.
     The court reporter is Lorena Hartnett
from the firm of Wilcox & Fetzer.  My name
is Mark Buckmaster, a video specialist from
Discovery Video Services Incorporated in
association with Wilcox & Fetzer.  Counsel
will now introduce themselves and the
reporter will swear in the witness.
     MR. ALLINGHAM:  Tom Allingham
representing the plaintiffs.  With me is
Brian Lenhard and Richard Horvath.
     MR. SHAU:  Jarrod Shau representing
the defendants.
     DR. MARK A. ISAACS,
HAVING FIRST BEEN DULY SWORN, TESTIFIED AS
DIRECT EXAMINATION ON BEHALF OF THE PLAIN
BY MR. ALLINGHAM:

1    there is no dialogue that takes place between the
2    board.
3        Q.  Fair enough, so that the public spoke about
4    this issue?
5        A.  Yes.
6        Q.  But the board members did not deliberate on
7    the issue in public; is that correct?
8        A.  Right, correct.
9        Q.  And the board members did not deliberate on
10   the actual board policy in public; correct?
11       A.  Not that I recall.
12       Q.  Do you recall that the board ever considered
13   the possibility of opening its meetings only with a
14   moment of silence, not a prayer?
15       A.  I know that that was my suggestion.
16       Q.  And was that a suggestion that you made in a
17   board meeting?
18       A.  Yes. I think it was.
19       Q.  Do you know at which board meeting you made
20   that suggestion?
21       A.  No.
22       Q.  Why did you make that suggestion?
23       A.  That's my personal belief.
24       Q.  Did you believe that a moment of silence

61

1    would be effective to solemnify the proceedings?
2        A.  Yes, I do.
3        Q.  What was the response, if any, of the board
4    members to your suggestion?
5        A.  It was heard.
6        Q.  Did anybody say in words or substance, "That
7    suggestion is not acceptable to me"?
8        A.  No, no, no. There wasn't a vote taken or
9    anything like that.
10       Q.  No, sir, this is in the discussion of ideas
11   at the board meeting.
12       A.  No.
13       Q.  You offered the idea of maybe we could open
14   the meeting with a moment of silence?
15       A.  Right. The only thing I would say is the
16   others said, "Well, I should have the right to do it
17   however I would like to do it, however I would like to
18   pray, it's my freedom of speech."  I do recall that.
19       Q.  And so the incorporation of not only a moment
20   of silence but also a prayer in the policy was
21   intended to preserve those board members' individual
22   freedoms of speech?
23       A.  Yes.
24       Q.  Did you ever see anybody leave the room when

62

1    the -- Let me back up one second. After the policy
2    was adopted, it became the practice of the board to
3    read a disclaimer before the prayer was given;
4    correct?
5        A.  Yes.
6        Q.  At anytime after the policy was adopted, did
7    you see anyone upon hearing the disclaimer get up and
8    leave the room during the prayer?
9        A.  Honestly, I never paid any attention. I was
10   reading.
11       Q.  Working on board business?
12       A.  Yes.
13       Q.  Let me ask you a question about your
14   perception. Do you think it would be a difficult
15   thing for a student to get up and leave the board
16   meeting during the reading of the prayer?
17       A.  I guess it depends on the student.
18       Q.  Can you imagine that it would be -- Can you
19   imagine that a student would fear that that would
20   identify the student as a person who doesn't practice
21   a religion?
22       A.  Not necessarily, because one could get up and
23   leave saying they had to use the restroom, so you
24   didn't always have to tack it to, unless you were

63

1    there on every single board meeting, so I would say
2    there are mechanisms to get up and leave a board
3    meeting that you don't have to tack a particular
4    clause to it. There is plenty of opportunities to get
5    up.
6        Q.  So you would agree with me that the
7    perception, if no explanation were offered of someone
8    who hearsay the disclaimer and gets up and leaves,
9    would be that that person affirmatively did not want
10   to participate in the prayer; correct?
11       A.  Well, no, not necessarily. They could get up
12   to go to the restroom or something like that. You
13   know, I -- I mean if it was the same person over and
14   over again, then maybe yes, yes, but that particular
15   board meeting, no. I mean we have people getting up
16   and going out all the time, so.
17       Q.  During the prayer?
18       A.  Coming in the during, people come in.
19       Q.  We talked earlier about the color guard
20   folks, the junior ROTC kids?
21       A.  Yes.
22       Q.  Realistically speaking, as a practical
23   matter, if they don't want to participate in the
24   prayer, they can't leave; correct?

64

TAB 21

**1**

```
1        IN THE UNITED STATES DISTRICT COURT
2        IN AND FOR THE DISTRICT OF DELAWARE
3  MONA DOBRICH and MARCO   :   Case No. 15-120 (JJF)
   DOBRICH, individually and :
4  as parents and next friend :
   of ALEXANDER DOBRICH,    :
5  SAMANTHA DOBRICH, JANE DOE :
   and JOHN DOE, individually :
6  and as parents and next   :
   friend of JORDAN DOE and  :
7  JAMIE DOE,                :
                            :
8       Plaintiffs,   :
                            :
9       v.            :
                            :
10 INDIAN RIVER SCHOOL       :
   DISTRICT, et al.,         :
11                          :
        Defendants.   :
12      ..............
13     Video Deposition of RANDALL HUGHES, taken
   pursuant to notice, on Monday, October 16, 2006
14 at 2:40 p.m. at 31 Hosier Street, Selbyville,
   Delaware, reported by Lorena J. Hartnett, a Registered
15 Professional Reporter and Notary Public.
16      ..............
17 APPEARANCES:
18     THOMAS ALLINGHAM, ESQUIRE
       RICHARD HORVATH, ESQUIRE
19     One Rodney Square
       Wilmington, DE  19801
20     Attorneys for the Plaintiff
21
22
23     WILCOX & FETZER
24 1330 King Street - Wilmington, DE  19801
       (302) 655-0477
```

**2**

```
1  APPEARANCES (CONTINUED):
2
3     JASON P. GOSSELIN, ESQUIRE
      Drinker, Biddle & Reath, LLP
      One Logan Square
4     18th and Cherry Streets
      Philadelphia, PA  19103-6996
5     Attorney for the Defendants
```

**3**

```
3            TABLE OF CONTENTS
4  TESTIMONY OF RANDALL HUGHES:
5     Direct Examination by Mr. Horvath . . . . . . . 4
6  Certificate of Reporter . . . . . . . . . . . . 96
9            INDEX TO EXHIBITS
10 Plaintiff's Exhibit 56 . . . . . . . . . . . . 15
```

**4**

```
1      (The videographer read the
2  introduction, and the attorneys introduced
3  themselves.)
4      RANDALL HUGHES,
5  HAVING FIRST BEEN DULY SWORN, TESTIFIED AS FOLLOWS:
6  DIRECT EXAMINATION ON BEHALF OF THE PLAINTIFF
7  BY MR. HORVATH:
8  Q.  Good afternoon.  Have you ever been deposed
9  before?
10 A.  Yes.
11 Q.  When?
12 A.  The last time was in December of 2005.
13 Q.  How many times have you been deposed?
14 A.  Ten or so, perhaps.
15 Q.  What were the natures of the actions?
16 A.  Mostly traffic-related accidents, civil
17 suits, in those regards.  Also, the latest was in a
18 lawsuit filed against the State Police I did for my
19 workplace.
20 Q.  Have you ever testified at trial?
21 A.  Yes.
22 Q.  How many times have you testified at trial?
23 A.  Many, many, many times.
24 Q.  And were these the same cases that you
```

29

1 Q. When you joined the board, did you go through
2 an orientation process?
3 A. Yes.
4 Q. What was involved in that?
5 A. I was coming here, meeting with Mrs. Hobbs
6 and her staff at the time, to include Dr. Owens,
7 personnel; Mr. Miller, the business manager;
8 Mr. Hudson with Student Services; Mr. Savage; and
9 several other -- I say several other. A few other
10 department heads were here talking about their
11 functions and how they worked in this organization
12 and, you know, what they brought into the total
13 organization.
14 Q. Did you meet with any board members during
15 the orientation?
16 A. Outside of board meetings, no.
17 Q. Did you speak with any board members outside
18 of board meetings if you didn't meet face to face with
19 them?
20 A. I know that I talked to Mr. Bireley the night
21 that he told me that I was going to be sworn in.
22 Outside of that, having other conversations -- I may
23 have had a conversation with Mr. Bireley. I am trying
24 to think if there would have been any others.

30

1 Dr. Isaacs and I talked, but not so much
2 about board. We had some other, some State Police and
3 U of D business to take care of, but it really wasn't
4 about the board.
5 So maybe Mr. Bireley a bit about just the
6 next board meeting and the committee meetings, being
7 able to attend committee meetings if I chose to do
8 that.
9 Q. During your orientation, did anyone discuss
10 with you your responsibilities as a board member?
11 A. Oh, we talked about confidentiality with
12 personnel matters. As the board, things come to the
13 board for recommendation for a vote, any money to be
14 expended. Yeah, we did talk about some of those
15 responsibilities. The biggest thing was
16 confidentiality.
17 Q. Did anyone discuss with you the scope of your
18 authority as a board member?
19 A. No, I don't recall anyone talking to me about
20 that, and I am pretty sure I didn't ask.
21 Q. During your orientation, did you draw any
22 conclusions as to whether or not the board acts as a
23 legislative body?
24 A. I am not so sure I drew that conclusion from

31

1 the orientation as to what my thoughts were on local
2 government and the school board prior to.
3 I see the school board as a legislative body
4 or a policy making body. Now, when that happened
5 exactly, I don't know if it -- I don't think it was
6 just because of the orientation. I think that was
7 prior to.
8 Q. So you think it happened at least either at
9 or before the orientation that you went through when
10 you were joining the board?
11 A. Like I say, I believe that's just a belief
12 that I have. I believe that a school board is your
13 truest form of local government.
14 Q. How did you come to that belief? And in
15 terms, let me clarify, how did you come to the belief
16 that the school board acts as a legislative body?
17 A. Spending taxpayer money, or allocating that
18 money to be spent. Also educating the children,
19 establishing policies for educating our children seems
20 to me to be kinds of things that a legislative body,
21 if you will, do.
22 Q. Since you joined the board, have you seen the
23 board engage in any activities that makes you --
24 Strike that.

32

1 Since you joined the board, have you seen the
2 board engage in any activities outside of the setting
3 of policy or the spending of taxpayer funds?
4 A. I am not so sure I understand the question.
5 Q. Am I correct that you believe the board is a
6 legislative body because it sets policies and spends,
7 or allocates taxpayer money?
8 A. Yes.
9 Q. Since you joined the board, have you seen it
10 engage in any activities that fall outside of those
11 two categories?
12 A. We make policy; we spend money; some
13 decisions are made as to some curriculum type things,
14 the type of curriculum. Again, that comes down to as
15 a policy type thing for the district. Sir, I believe
16 that would hold. I still believe that to be the
17 case.
18 Q. Has the board held any disciplinary hearings
19 for students?
20 A. Yes.
21 Q. Has the board made any decisions about hiring
22 or firing district employees?
23 A. Yes.
24 Q. Are these decisions made on a case-by-case

**33**

1 basis?
2 A. They are individual hearings --
3 Q. Uh-huh.
4 A. -- that could come before the board, so in
5 that case I guess it would be case by case.
6 Q. Do you believe that in the case of
7 disciplinary hearings for students, does that involve
8 the setting of policy?
9 A. It could be adhering to already established
10 policy, so it wouldn't necessarily be setting new
11 policy. Hopefully, if you are meting out, if you
12 would, discipline, that there is some process for
13 which that takes place.
14 Q. Would you -- You said meting out policy?
15 A. Media? I'm sorry?
16 Q. You said meting out policy.
17    MR. GOSSELIN: He said meting out
18    discipline.
19 BY MR. HORVATH:
20 Q. Oh, meting out discipline, sorry. What do
21 you mean by that?
22 A. If a decision or a judgment, if you will, is
23 going to be made that could discipline in its negative
24 form, could impact, negatively impact someone, the

**34**

1 board, through that process of the disciplinary
2 hearing, if you will, that could be done.
3 Q. Do you see that disciplinary process as being
4 legislative in nature?
5 A. Again, I am not so sure how to exactly answer
6 your question.
7 Q. Does it involve the actual setting of policy?
8 A. It is following established policy.
9 Q. So it's enforcing?
10 A. Yes, sir.
11 Q. But not making new policy?
12 A. No, not making new policy on that particular
13 one incident at that case, no, sir.
14 Q. Does it involve the allocation of taxpayer
15 money?
16 A. It could involve the allocation of taxpayer
17 money if something has been inappropriately done and
18 if taxpayer money is not spent wisely.
19 Q. In the case of student discipline?
20 A. As to some of our practices for keeping
21 orderly schools, safe schools, there are some
22 expenditures made to ensure that we have those
23 organizations.
24 Q. You said it could?

**35**

1 A. (Nodding head)
2 Q. Have you had a disciplinary hearing that did
3 not involve?
4 A. That did not involve?
5 Q. The expenditure of taxpayer money?
6 A. Sir, I believe potentially they all could
7 have an impact on taxpayer money.
8 Q. Have students attended school board meetings
9 who are subject to a disciplinary hearing since you
10 have joined the board?
11 A. Sir, are you asking that at a student hearing
12 has the student been there?
13 Q. Yes.
14 A. Since I have been -- in that hearing, itself?
15 Q. Uh-huh.
16 A. Held in executive session?
17 Q. Yes.
18 A. No, sir, I don't believe so since I have been
19 on the school board.
20 Q. Has a student ever requested to address the
21 board about a disciplinary hearing?
22 A. Not that I can recall.
23 Q. Am I correct that since you have joined the
24 school board you have seen students at school board

**36**

1 meetings?
2 A. Yes, that is correct.
3 Q. Have you seen a student at every school board
4 meeting during the school year?
5 A. I believe that is correct, because normally
6 the high school that we are in, the student council
7 president will give an update on that school. Now,
8 the minutes would reflect if that has been done, but
9 normally that is the practice.
10 Q. Have you seen Junior ROTC students --
11 A. Yes.
12 Q. -- present colors at those meetings?
13 A. I'm sorry, yes, I have.
14 Q. Have students received awards at those
15 meetings?
16 A. Yes, they have.
17 Q. Have students addressed the board about any
18 concerns they might have with their schools at those
19 meetings?
20 A. Students have addressed the board. Sitting
21 here now, I can't tell you exactly what their concerns
22 were at the time. I don't know if it was particularly
23 to a specific school or to some other issue, but
24 students have addressed the board.

49

1 also, could also be in attendance while the prayer is
2 being read?
3    A.  That's correct.
4    Q.  So for those individuals to not be a part of
5 the prayer, what do they have to do, or to not -- Let
6 me correct that.  What would a school employee,
7 student in attendance, or a member of the community
8 have to do to not be a recipient of the prayer?
9    A.  I am not sure exactly how I answer this
10 question other than to say don't participate, don't
11 think about, you know, the words that are being said,
12 don't listen.  There is a big difference between
13 hearing and listening.  I am not exactly sure how to
14 answer the question.
15    Q.  Do you feel they should sit silently and not
16 do anything while the prayer is being read?
17    A.  I am not necessarily saying that they have to
18 sit silently.  I would hope that they wouldn't be,
19 discourage or loud or obnoxious.  I am not saying they
20 have to sit silently.
21    Q.  Do you think they could leave the meeting?
22    A.  Yes.
23    Q.  When would they know they should leave the
24 meeting in order to avoid hearing the prayer?

50

1    A.  I think we established that this was read
2 prior to, so perhaps that would be a time that they
3 chose to leave.
4    Q.  And about where in that process do you think
5 they should know that they need to leave the meeting?
6    A.  Well, in the very first sentence, the second
7 clause, that's where it talks about opens its meetings
8 with prayer.  That would be a hint.
9    Q.  About how long does it take -- I'm sorry, you
10 were going to say something?
11    A.  No.  I can go further and answer you there is
12 more clues.
13    Q.  Well, at the very earliest you feel it would
14 be when the board president states, "The Board of
15 Education may choose to open its meetings with a
16 prayer."
17    A.  Yes, sir.
18    Q.  How long does it take to read paragraph one
19 and four?
20    A.  I have never timed it.
21    Q.  I will just try to read it at a normal pace.
22 "In order to solemnify its proceedings, the Board of
23 Education may choose to open its meetings with a
24 prayer or a moment of silence, all in accord with the

51

1 freedom of conscience of the individual adult board
2 member.  Such prayer is voluntary and is among only
3 the adult members of the board.  No school employee,
4 student in attendance, or member of the community in
5 attendance shall be required to participate in any
6 such prayer or moment of silence."
7      I think that took me about 20 seconds to
8 read.  Do you think 20 seconds is enough time for
9 someone to be able to gather their things, get up and
10 leave the meeting in order to avoid hearing the
11 prayer?
12    A.  Twenty seconds is a very relative term,
13 depending on what you were doing.  Do I think they
14 would have to sprint in order to leave?  No, not
15 necessarily.  A leisurely pace?  No, I don't think it
16 would be that, so it's going to fall somewhere in
17 there.  So 20 seconds could be a very long time, and
18 other times it can be a very short time.  Again, it's
19 all -- it's relevant:
20    Q.  And if they were to leave the meeting, would
21 they have to travel a little bit farther to avoid
22 being able to hear the prayer, or would they just be
23 stepping outside?
24    A.  I don't think that -- I know that there are

52

1 microphones on the table, but I don't believe that the
2 voice or that audio is fed outside of the room that we
3 are in, so I assume it would be just stepping outside
4 of the room.
5    Q.  Well, do the microphones feed the audio
6 through speakers?
7    A.  Yes, there are speakers there.
8    Q.  So the sound that the board members make or
9 what the board members say at the meeting is amplified
10 for the audience?
11    A.  Yes, sir.
12    Q.  So could that make the what they say project
13 farther than if they were to speak without the
14 microphones?
15    A.  Yes, that would be the intended purpose.
16    Q.  Okay.  So is it possible that to avoid
17 hearing a prayer someone might have to travel farther,
18 even if the sound isn't pumped outside of the
19 auditorium?
20    A.  Yes, it is possible.
21    Q.  How would someone know that the prayer has
22 ended?
23    A.  I don't know.  If they were not in --
24    Q.  If they were not in --

69

1    MR. GOSSELIN:  Do you have an extra
2    copy?
3    MR. HORVATH:  I do.
4    BY MR. HORVATH:
5    Q.  Have you ever seen this document before?
6    A.  I need to --
7    Q.  Okay.
8    A.  The answer is I am not sure if I have read
9    this before or not.  I have read a couple things on
10   ethics and integrity by the I think Ethics and
11   Integrity Commission after being elected.  So I am not
12   sure if it was this exact document, but it seems
13   familiar to me.
14   Q.  To be clear, in the upper right hand corner
15   there are three letters, BDF?
16   A.  Uh-huh.
17   Q.  Do you know what those letters might signify?
18   A.  No, sir, I do not.
19   Q.  Have you ever received any copies of board
20   policies or policies that pertain to board
21   governments?
22   A.  Yes, sir, I have.
23   Q.  And do those policies start with the letter
24   B?

70

1    A.  When I receive those, I read the verbiage,
2    and I have not looked for that, but I bet when I go
3    home I will look and see if they are on there or they
4    will be.
5    Q.  I am going to represent that this is a copy
6    of the school board's, school board member ethics
7    policy.  Under number one on the first page, the third
8    paragraph down, it states that, "The public expects my
9    first and greatest concern to be in the best interests
10   of each and every one of these young people without
11   distinction as to who they are or what their
12   background may be."
13   To be clear, does this paragraph state that
14   the board, a board member's primary concern should be
15   the students of the district?
16   A.  Yes, it does.
17   Q.  And on the second page, the third paragraph
18   down, it says, "To resist every temptation and outside
19   pressure to use my position as a school board member
20   to benefit either myself or any other individual or
21   agency apart from the total interest of the school
22   district."
23   Does that paragraph suggest to you that board
24   members should not operate out of their own individual

71

1    self interests?
2    A.  Yes, it does.
3    Q.  So, with the first paragraph that we read and
4    the last paragraph that we read, should the board, do
5    you feel that it's now appropriate for the board to
6    pass policies that are for the benefit of the board
7    member's individual constitutional rights?
8    A.  Yes, I do, and the reason why --
9    Q.  I was going to say --
10   A.  You want to ask me first?  Okay.  I read that
11   first paragraph on the second page are not to bring or
12   bear influence upon any educational decisions that may
13   be made by staff or superintendents to benefit me
14   personally or a friend or a family member.  That's how
15   I read that paragraph.
16   Q.  But I think you had stated before that it is
17   an appropriate exercise of a board member's authority
18   to pass a policy that protects their own individual
19   constitutional rights?
20   A.  As I said, because of future boards, as well.
21   Protecting constitutional rights is for all of us to
22   do.
23   Q.  And what the board perceives as their own
24   individual rights that don't apply to anyone else in

72

1    the district?
2    A.  To future boards, yes.
3    Q.  Outside of the board?
4    A.  Protecting a constitutional right is
5    everyone's responsibility.
6    Q.  I am going to read to you four prayers.  I am
7    going to want your opinion as to whether or not those
8    prayers violate the policy.
9    The first prayer, "Lord, I pray that you
10   correct the heathens before me now to the truth that
11   comes by knowing you."  Oh, I'm sorry, I misread it.
12   "Lord, I pray that you convert the heathens before me
13   now to the truth that comes by knowing you."
14   A.  Yes, I believe that that -- Again, I am
15   basing this on is that a part of or is that the sole?
16   That's it, period?  Based on those exact words you
17   just said, yes, that could be a conflict.
18   Q.  And why would it be in conflict with policy?
19   A.  I looked at paragraph number three.  It's
20   kind of mean.
21   Q.  It's kind of mean?
22   A.  Kind of mean when you are saying that.
23   Q.  What's mean about it?
24   A.  You are referring to someone as a heathen.

Hughes, Randall (Video)  10/16/2006  12:00:00 PM

73

1    Q. Is there -- Suppose it wasn't heathen, it was
2 just "the individuals in front of me."
3    A. Again, read it without the heathen.
4    Q. "Lord, I pray that you convert the people
5 before me to the truth that comes by knowing you."
6    A. Certainly the word convert.
7    Q. So it's a combination of both heathens and
8 convert that you find problematic?
9    A. Uh-huh.
10    Q. And each one individually would pose a
11 problem?
12    A. Yes, sir, I believe so.
13    Q. I am going to hand you what has been
14 previously marked as PX35, which reads, "Do not put
15 your trust in princes and mortal men who cannot even
16 save themselves. When their spirit departs, they
17 return to the ground. On that very day, their plans
18 come to nothing. Blessed is he whose help is the God
19 of Jacob, whose hope is in the Lord his God, the maker
20 of heaven and earth, the sea and everything in them,
21 the Lord who remains faithful forever. He upholds the
22 cause of the oppressed and gives food to the hungry.
23 The Lord sets prisoners free. The Lord gives sight to
24 the blind. The Lord lifts up those who are bowed

74

1 down. The Lord loves the righteous. The Lord watches
2 over the alien and sustains the fatherless and the
3 widow, but he frustrates the ways of the wicked. For
4 the wages of sin is death, but the gift of God is
5 eternal life through Jesus Christ our Lord."
6    Do you believe that this prayer would be
7 permissible under the policy?
8    A. Yes, sir.
9    Q. How did you make that determination?
10    A. I did not find it offensive.
11    Q. Is that the touchstone you use for whether or
12 not a prayer violates the policy, whether or not you
13 find it offensive?
14    A. I don't see -- Yes, that's the first thing I
15 am going to rely on, how do I perceive that. I do not
16 find it offensive. I don't see where it's violating
17 number three of the policy, paragraph number three.
18    Q. I take it you do not view the prayer in PX35
19 as proselytizing?
20    A. Which one is that?
21    Q. The one I just handed you?
22    A. No, sir, I don't.
23    Q. What does proselytizing mean to you?
24    A. Again, to me it's preaching or negative,

75

1 trying to espouse my views forcefully onto someone
2 else.
3    Q. Do you believe that the last sentence of the
4 prayer is not proselytizing?
5    A. No, I do not.
6    Q. How do you think you would respond to this
7 prayer if you were not a Christian?
8    A. Mr. Horvath, that's very difficult to answer.
9 I would probably rely back on the very first thing
10 that I said, did I find it offensive. No, I did not.
11    Q. If you were not a Christian and you heard,
12 "for the wages of sin is death but the gift of God is
13 eternal life through Jesus Christ our Lord," do you
14 think you would find that offensive?
15    A. In the spirit or in the tone in which you
16 read this, I did not find it offensive, and I don't --
17 It's hard for me to answer that question other than to
18 say I did not find it offensive.
19    Q. Do you think your personal faith as a
20 Christian might impact your views on whether this
21 particular prayer is proselytizing?
22    A. Yes, sir, I am sure that it does.
23    Q. To put a variation on this, suppose the last
24 sentence read, "For the wages of sin is death, but the

76

1 gift of Allah is eternal life through his prophet
2 Muhammed."
3    A. Again, I do not find that offensive. There
4 are more people in this world than I.
5    Q. Uh-huh.
6    A. And, as I said, my religion is very
7 individual, very personal, and other people may find
8 their religion that way, as well, and I don't find it
9 offensive. I wouldn't find it offensive if you insert
10 any other deity that you like.
11    Q. I have another prayer. This has been
12 previously marked PX45. "Heavenly Father, thank you
13 for this great occasion, for the work, the effort, the
14 joys and everything that led up to this point in time.
15 Thank you for your guidance in this event. We pray
16 for your direction in the lives of each of these
17 school board members. We pray that you direct them
18 into the truth and eventually the truth that comes by
19 knowing Jesus. We also pray that you would be with
20 them at this time. We ask these things in Jesus's
21 name. Amen."
22    Do you believe that this prayer would violate
23 paragraph three of the policy?
24    A. No.

Hughes, Randall (Video)  10/16/2006  12:00:00 PM

**85**

1    A.  Yes, I received lots of questions from a lot
2    of different local newspapers.  One of the questions a
3    lot of times did deal with the prayer issue and my
4    feelings.  Since I had already been appointed to the
5    board and I was operating under the gag order, my
6    response was, "Pending litigation, I am just not at
7    liberty to discuss that."
8    Q.  Did anyone from the public ask you about
9    board prayer?
10    A.  If they did, my answer was, "There is a gag
11    order, pending litigation, we can't talk about that."
12    I don't have that many -- There was no campaign --
13    There was no stump speeches made or anything like
14    that.
15       Just you might see someone in the supermarket
16    and talk to them about some school board issues, but I
17    don't recall that being a very specific question asked
18    to me.
19    Q.  Do you think it's understood by the public
20    that you support board prayer?
21    A.  No, I wouldn't necessarily say that that's
22    understood.  And are you implying that I do support
23    school prayer?
24    Q.  Okay, maybe I will --

**86**

1       MR. GOSSELIN:  He said board prayer.
2       THE WITNESS:  Oh, board prayer?
3       MR. HORVATH:  Yeah.
4       THE WITNESS:  Oh, okay.
5       MR. GOSSELIN:  You mean the policy.
6       MR. HORVATH:  Yes.
7       MR. GOSSELIN:  This policy here.
8       THE WITNESS:  Okay.  Okay.
9    BY MR. HORVATH:
10    Q.  So, to be clear on this, do you think the
11    public understands you to support policy BDA.1 in the
12    board's prayer practice?
13    A.  Probably.
14    Q.  And do you think they understood that during
15    the election?
16    A.  I am not -- I don't know.  I didn't -- Like I
17    said, when it came to any talk about the litigation, I
18    didn't say a word about it.
19    Q.  Do you know what your opponent's view on
20    board prayer was?
21    A.  Yes, he was to stop board prayer, stop -- It
22    was kind of a bit skewed in that it was drawn out to
23    include school prayer, prayer in school, took on a
24    whole different light.  I think perhaps the gentleman

**87**

1    was a bit misinformed.
2    Q.  You refer to the gag order.  This gag order
3    didn't prevent you from telling your constituents
4    whether or not you supported board prayer?  Did you
5    tell constituents that the gag order prevented you
6    from --
7    A.  Yeah, my answers that I put out to the
8    newspapers were that I didn't want to discuss that
9    topic or I couldn't discuss that because of pending
10    litigation.
11    Q.  Let's go back to your opponent.  Am I
12    correct, at the very least, that the perception became
13    that he opposed board prayer?
14    A.  Yeah, I believe think that would be --
15    Q.  And that was an accurate representation --
16    I'm sorry, I guess I should have let you finish.
17    A.  Yes.
18    Q.  And was that an accurate representation of
19    what you understood his position to be?
20    A.  Yes.
21    Q.  Do you believe that affected the campaign?
22    A.  My opponent had some, quite a few different
23    ideas.  I am not so sure that one particular answer
24    that he gave led to his demise.  I am not so sure.

**88**

1    Q.  Did anyone from the community tell you that
2    they were not going to vote for him because he opposed
3    board prayer?
4    A.  I don't recall.  Well, people who supported
5    me said, "I am going to vote for you."  They didn't
6    say, "I am going to vote for you because of X, Y or
7    Z."
8    Q.  Did anyone say they were going to vote for
9    you because you supported board prayer?
10    A.  No, I don't recall having that conversation
11    with anyone.
12    Q.  Do you believe that someone could get, in the
13    2006 election, do you believe that anyone could have
14    been elected to the board who openly opposed board
15    prayer?
16    A.  If you articulate your point of view and some
17    of the reasons behind it, perhaps, yes.
18    Q.  Has anyone told you that they see this case
19    as about protecting Christian values?
20    A.  Yes, I have heard that.  Have they told me
21    that?  I don't -- I have not been told that, but I
22    have kind of heard.  Again, that's like supermarket or
23    Wawa coffee stand talk sometimes.  You kind of hear
24    these kinds of things.

89

1  Q.  Have these things been told to you, or did
2  you overhear it?
3  A.  Well, if I heard it, then it was told to me.
4  But, again, it wasn't someone grabbing me by the shirt
5  collar and saying, "This is about maintaining
6  Christian values and beliefs."
7  Q.  Did anyone say that the board's prayer
8  practice, itself, was about protecting Christian
9  values?
10  A.  I don't recall that, that terminology being
11  used.
12  Q.  Do you think people understand this case as
13  involving the board prayer policy?
14  A.  To be perfectly honest with you, I think
15  there is a lot of misinformation.  A lot of people are
16  out there and don't have all the information from
17  which to make a decision on this.  Shortsightedness, a
18  particular mind set, but the perception out there is
19  it comes down to a single issue or something that it
20  may or may not be, so I think -- I don't know if the
21  gag order was helpful or not with people not going out
22  and talking about it.
23  Q.  What's the single issue that you believe the
24  public perceives this case is about?

90

1  A.  I believe the public thinks this is about
2  prayer in schools.
3  Q.  Have you ever heard anyone say that this case
4  is about board prayer?
5  A.  Mr. Horvath, I can't sit here and tell you
6  that I have heard that.  I just -- I believe that the
7  perception out there in the public is that this case
8  is about prayer in schools.
9  Q.  Do you know if any school board member has
10  campaigned for election or re-election on the ground
11  that they support school board prayer?
12  A.  We had several elections last time.  I have a
13  lot of things going on.  I didn't have an opportunity
14  to follow everyone else's campaign, if you will call a
15  school board election a campaign.  How and what
16  exactly they said or didn't say at their different
17  functions, I don't know.
18  Q.  You mentioned before what you characterized
19  as a misrepresentation that this case is about prayer
20  in schools.  Have you done anything to correct that
21  mis-perception?
22  A.  Again, how I refer to anything that's brought
23  up about this case is there is a gag order.  My
24  responses are very limited, pretty much to zero, and

91

1  there are many sides to every story and there are many
2  facets to this particular case.
3  Q.  Do you believe that a gag order is still in
4  place?
5  A.  Yes, I am operating under that -- I am going
6  to operate under that until otherwise directed by
7  either Jason or a judge.
8  Q.  Has anyone told you that a gag order is no
9  longer in place, aside from your attorneys or a judge?
10  A.  No.  Has anyone ever -- I'm sorry, say that
11  again, please.
12  Q.  Has, aside from your attorneys or a judge,
13  has anyone told you that a gag order is no longer in
14  place?
15  A.  There was some discussion in an executive
16  session if there was or there wasn't, but the bottom
17  line it came down to, as I left there, my
18  understanding was that there was, do not discuss.
19  Q.  And you have continued to operate under that
20  assumption since then?
21  A.  That's the way I have been operating, yes,
22  sir.
23  Q.  Has anyone told you they believe the ACLU is
24  involved with this case?

92

1  A.  I believe at executive sessions there have
2  been some mention that the ACLU is behind this case,
3  yes.
4  Q.  Do you believe that the ACLU is behind this
5  case?
6  A.  I don't know that for a fact.
7  Q.  Have you ever discussed with someone in the
8  community as to whether or not the ACLU is involved in
9  this case?
10  A.  No, sir.
11  Q.  Has anyone told you that they see this case
12  as standing up to the ACLU?
13  A.  No, I don't recall having that conversation.
14  Q.  Which board members told you that the ACLU
15  was involved with this case?
16  A.  Again, I think that's a discussion in
17  executive session, and I cannot -- I feel like I am
18  pointing fingers, because I am not 100 percent sure,
19  but I believe that perhaps Nina Lou Bunting may have
20  mentioned that.
21  Q.  Have any of the board members described the
22  ACLU as anti Christian?
23  A.  No, I don't recall hearing that.
24  Q.  Has anyone in the public described the ACLU