IN THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF DELAWARE

JANE DOE, et al.,                    :
                                     :
               Plaintiffs,           :
                                     :
     v.                              :  Civil Action No. 05-120-JJF
                                     :
INDIAN RIVER SCHOOL DISTRICT,  :
     et al.,                         :
                                     :
               Defendants.           :
_____

Thomas J. Allingham II, Esquire, Robert S. Saunders, Esquire,
Brian G. Lenhard, Esquire, and Timothy S. Kearns, Esquire of
SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP, Wilmington, Delaware,
and Richard S. Horvath, Jr., Esquire of SKADDEN, ARPS, SLATE,
MEAGHER & FLOM, LLP, San Francisco, California.
Attorneys for Plaintiffs.

Warren Pratt, Esquire of DRINKER BIDDLE & REATH LLP, Wimington,
Delaware, and Jason P. Gosselin, Esquire, Katherine L.
Villanueva, Esquire, and Elizabeth L. McLachlan, Esquire of
DRINKER BIDDLE & REATH LLP, Philadelphia, Pennsylvania.
Attorneys for Defendants.
_____

                        O  P  I  N  I  O  N

February 21, 2010
Wilmington, Delaware

Farnan, District Judge.

Presently before the Court are the parties' cross-Motions for Summary Judgment on the constitutionality of the Indian River School District's policy of opening public School Board meetings with a prayer or moment of silence. For the reasons set forth below, the Court will grant Defendants' Motion, deny Plaintiffs' Motion, and enter summary judgment in favor of Defendants.

## BACKGROUND

### I. Procedural Background

Plaintiffs Mona and Marco Dobrich, individually and as the parents of Alexander Dobrich, and Jane and John Doe, individually and as the parents of Jordan and Jamie Doe,[1] filed the instant action on February 28, 2005, pursuant to 42 U.S.C. § 1983, against (1) the Indian River School Board Members, the District Superintendent, and the Assistant Superintendent, in both their individual and official capacities; and (2) the School Board and the District themselves. Plaintiffs brought claims based on alleged violations of the First and Fourteenth Amendments of the United States Constitution arising out of the alleged school sponsored prayer at school functions and School Board meetings in the Indian River School District. As relief, Plaintiffs sought (1) compensatory and nominal damages for the alleged emotional distress and pecuniary loss suffered by Plaintiffs; (2) an injunction (i) banning Defendants from promoting, conducting, or permitting religious exercises or prayer at school functions,

including but not limited to graduation ceremonies, athletic activities, holiday festivals, awards presentations and School Board meetings, and (ii) requiring the District to distribute its school prayer policies publicly and to establish procedures for reviewing violations of the policy; and (3) a declaratory judgment that the customs, practices, and policies of the District with regard to prayer at School Board meetings and school functions are unconstitutional, both facially and as applied.

In August 2005, the Court granted Defendants' motion to dismiss Plaintiffs' claims against Defendants in their individual capacities.[2] Thereafter, the Court bifurcated the discovery process, with the first phase to focus on the issues surrounding the School Board's policy of opening its public meetings with a prayer or moment of silence, and the second phase to cover Plaintiffs' remaining constitutional claims.[3] In January 2008, the Parties agreed to settle all claims except those related to the Board's prayer policy. The Court approved that settlement in February 2008.[4] In March 2008, the Dobriches voluntarily dismissed their claims after they moved outside the District.

The Does and Defendants have each moved for summary judgment on the constitutionality of the Board's Prayer Policy. The matter has been fully briefed and is ripe for decision.

3

## II.   Factual Background

### A.   The Indian River School District and School Board

The Indian River School District (the "District" or the "School District") is located in Southeastern Sussex County and serves the towns of Selbyville, Frankford, Dagsboro, Gumboro, Fenwick Island, Bethany Beach, Ocean View, Millsboro, and Georgetown.[5]   The District was formed in 1969 through the consolidation of five different school districts.[6]   The District is composed of fourteen schools (including several elementary schools, two middle schools, two high schools, and an arts magnet school), with approximately 8,400 students and 650 full-time teachers.[7]

The District is governed by a School Board (the "Board") composed of ten unpaid members elected by qualified electors from the five districts into which the District is divided.[8]   Each Board Member serves a term of three years.[9]   Before assuming office, Board Members are required to take an oath, similar to that taken by members of the Delaware General Assembly,[10] affirming that they will "support the Constitution of the United States of America [and] the Constitution of the State of Delaware."[11]   As of this writing, the School Board Members are: Robert D. Wilson and Shelly R. Wilson (District 1); Patricia S. Oliphant and Vice President Kelly R. Willing (District 2); Randall L. Hughes II and Nina Lou Bunting (District 3); President

Charles M. Bireley and Dr. Donald G. Hattier (District 4); and Donna M. Mitchell and Reginald L. Helms (District 5).[12]

Delaware law grants the School Board broad powers to manage and establish policy for the District.[13]  By statute, the Board is vested with the authority to "administer and to supervise" public schools within the district and "determine policy and adopt rules and regulations for the general administration and supervision" of public schools.[14]  Pursuant to its policy making authority, the School Board is specifically charged with: (1) determining the hours of daily school sessions; (2) setting "education policies" for the District, and prescribing "rules and regulations for the conduct and management of the schools"; (3) enforcing school attendance; (4) "grad[ing] and standardiz[ing]" the public schools in the District; (5) adopting courses of study; (6) selecting and distributing textbooks and other educational materials; (7) appointing personnel; and (8) making "all reports required" by the Delaware Secretary of Education.[15]

In addition to these responsibilities, the Board exercises "control, management and custody" over "[a]ll property, estate, effects, money, funds, claims and state donations vested by law in the public school authorities of any public school."[16]  The School Board holds in trust any "real or personal estate granted, conveyed, devised or bequeathed" for the use of any public school.[17]  Through referendum, the School District may "levy and

5

collect additional taxes for school purposes," and the School Board may, "without the necessity of a referendum," levy any taxes necessary to support the School District's contribution where such a contribution is required by state law.[18]  Finally, the School Board controls the School District's budget, and manages "[a]ppropriations for the support, maintenance and operation" of schools, including appropriations for employee salaries, school costs and energy, and educational advancement.[19]

B.    The Board's Practice Of Opening Public Meetings With Prayer

The Board is required to hold public meetings at least once a month,[20] and may hold "[s]pecial meetings . . . whenever the duties and business of the school board [so] require."[21]  Before the Board may conduct business in any regular meeting, a quorum of a majority of active Board Members must be present.[22]  Public Board Meetings are held in the cafeterias or gyms of public schools within the School District.  In addition to conducting the business of the School District, the Board has added a public comments segment to the agenda for each of its regular public meetings.[23]

1.    Past Practice

The Board's practice of opening its regular public meetings with a moment of prayer dates back to the Board's formation in 1969.[24]  Until 2004, it was the Board's practice that the President would designate one person at each meeting to give a

6

prayer.[25] Before this time, only a few of the Board's ten
members alternated the responsibility of offering a prayer at
meetings.

2. Adoption Of The New Policy In 2004

During the 2004 graduation ceremony at Sussex Central High
School, Reverend Jerry Fike offered an invocation and benediction
that explicitly invoked Jesus Christ. For example, in the
benediction, Reverend Fike stated: "Heavenly Father . . . direct
[graduates] into the truth, and eventually the truth that comes
by knowing Jesus."[26] The prayer upset Plaintiff Mona Dobrich,
whose daughter was among those graduating. Accordingly, Ms.
Dobrich complained about the graduation prayers during a June 15,
2004 public Board meeting.[27]

On August 23, 2004, the Board convened a special meeting to
discuss prayer at the beginning of Board meetings.[28] According
to the minutes of that session, which lasted several hours,
"several board members expressed that their constituents d[id]
not want the Board to change its practice of opening the meetings
with a prayer."[29]

The Board held its next regularly-scheduled public meeting
on August 24, 2004, which attracted more than twice the
attendance of a typical public meeting.[30] At the beginning of
the meeting, then-Board President Walls asked Board Member
Hattier to "lead the Board in a moment of prayer."[31] Several

members of the crowd applauded. President Walls gaveled the room back to order.[32] Member Hattier then gave a prayer composed by George Washington and contained in a 1783 letter to the Governors of the newly-freed states.[33] During the portion of the meeting devoted to public comments, several attendees spoke in favor of continuing the practice of having an invocation at public school graduations and other school events.[34]

Following the August 2004 Board Meeting, the Board solicited legal advice regarding the constitutionality of the Board's practice of opening its regular meetings with a moment of prayer.[35] In October 2004, the Board adopted a new policy governing "Board Prayer at Regular Board Meetings."[36] This policy (the "Prayer Policy") provides as follows:

1. In order to solemnify its proceedings, the Board of Education may choose to open its meetings with a prayer or moment of silence, all in accord with the freedom of conscience of the individual adult Board member.

2. On a rotating basis one individual adult Board member per meeting will be given the opportunity to offer a prayer or request a moment of silence. If the member chooses not to exercise this opportunity, the next member in rotation shall have the opportunity.

3. Such opportunity shall not be used or exploited to proselytize, advance or convert anyone, or to derogate or otherwise disparage any particular faith or belief.

4. Such prayer is voluntary, and it is among only the adult members of the Board. No school employee, student in attendance, or member of the community in attendance shall be required to participate in

any such prayer or moment of silence.

5.     Any such prayers may be sectarian or non-sectarian,
       denominational or non-denominational, in the name
       of a Supreme Being, Jehovah, Jesus Christ, Buddha,
       Allah, or any other person or entity, all in accord
       with the freedom of conscience, speech and religion
       of the individual Board member, and his or her
       particular religious heritage.

Since the adoption of the policy in October 2004, the Board

President has offered at every public Board meeting a disclaimer,

consistent with the language of the Board Prayer Policy, similar

to the following:

It is the history and custom of this Board that, in order
to solemnify the School Board proceedings, that we begin
with a moment of prayer, in accord with the freedom of
conscience of the individual adult members of the Board.
Further, such prayer is voluntary and just among the
adult members of the School Board. No school employee,
student in attendance or member of the community is
required to participate in any such prayer or moment of
silence.[37]

This disclaimer is read after the Presentation of the Colors and

before the prayer or moment of silence. Following the prayer or

moment of silence, the Board moves forward to the business at

hand, beginning with the approval of the minutes from the

previous Board meeting.[38]

### 3.     Content of Board Prayers

Consistent with the adoption of the Board Prayer Policy in

October 2004, the Board has rotated the opportunity to open a

meeting with a prayer or moment of silence among its members. It

is undisputed that some Board members choose to invoke the name

"Jesus," "Jesus Christ," "Heavenly Father," or "Lord our God" during their prayers.  For example, on February 22, 2005, Board Member Helms gave the following prayer: "Heavenly Father, Lord our God.  Heavenly Father, please help the Board with the problems in the School District that we are going through right now.  We ask these things in Jesus' Name."[39]

In other instances, Board Members have quoted from prayers offered by historical figures, such as on November 16, 2004, when Board Member Dr. Donald Hattier read an excerpt from President George Washington's 1789 inaugural address, as well as quotations by Mahatma Ghandi and Mark Twain.[40]  Similarly, on March 22, 2005, former Board Member Harvey Walls, who typically chose not to give a prayer, opened a meeting by quoting from a speech given by Dr. Martin Luther King, Jr., entitled "Not So Civil Dreams." Although this speech includes a reference to Jesus Christ, Walls omitted that reference.[41]

Other Board Members prefer to open Board Meetings with a moment of silence.  For example, Board Member Oliphant chooses only to lead the Board in a moment of silence because she does not wish to pray publicly.[42]  Board Member Charles Bireley prefers to pray privately and does not participate in the rotation, as did former Board Member Walls.[43]  However, it is undisputed that a majority of Board Members choose to exercise their rotation opportunity by offering a prayer—from October 2004

to October 2007, 33 public meetings opened with a prayer, and 3 opened with a moment of silence.[44]

      4.   Student Attendance at Board Meetings

     Students did not begin attending public Board meetings until the mid-1990s.[45] Students attend Board meetings for a variety of reasons, including to receive a certificate commemorating an award they have won, or, in the case of student government representatives, to address the Board directly. In addition, since 2001, JROTC students have presented the colors at the start of each public Board meeting held during the academic year. Board Member Bireley testified that he cannot remember a student ever declining an invitation to accept an award during a Board meeting, other than due to a scheduling conflict.[46]

     However, the Board does not require students to attend any Board meeting.[47] In addition, students are not always in attendance at Board meetings—for example, during the summer months (when school is out of session), public Board meetings are usually not attended by students.[48]

**STANDARD OF REVIEW**

     A party is entitled to summary judgment only "if the pleadings, the discovery and disclosure materials on file, and any affidavits[,] show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[49] The standard for cross-motions for summary

11

judgments is the same as for individual motions for summary judgment.  The court handles cross-motions as if they were two distinct, independent motions.[50]  Thus, in evaluating each motion, the court must consider the facts and inferences in the light most favorable to the non-moving party.[51]  "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person would conclude that the position of the person with the burden of proof on the disputed issue is correct."[52]

The movant bears the burden of proving that no genuine issue of material fact exists.[53]  Once the movant offers such proof, the non-movant "must come forward with 'specific facts showing [a] genuine issue for trial.'"[54]  The mere existence of some evidence in support of the non-movant will not be sufficient to support a denial of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the non-movant on that issue.[55]  Thus, in ruling on a summary judgment motion, the court must perform the "threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."[56]

12

### DISCUSSION

Defendants argue that the School Board's Prayer Policy is constitutional under the Supreme Court's 1983 decision in Marsh v. Chambers.[57]  As explained below, the Court agrees, and concludes that the School Board's Prayer Policy passes constitutional muster under Marsh.

### I.    Law of the Case

As an initial matter, Defendants argue that the question whether Marsh applies to the School Board's Prayer Policy has already been decided—and thus may not be reconsidered—under the "law of the case doctrine."  In August 2005, the Court granted Defendants' motion to dismiss Plaintiffs' claims against Defendants in their individual capacities because, inter alia, the Board Members' actions were legislative acts, entitling them to absolute immunity.[58]  In the alternative, the Court also briefly discussed the Supreme Court's decision in Marsh, and concluded that "Plaintiffs cannot prevail on a claim based on a prayer being said before a School Board Meeting" because, "[a]s the Marsh decision makes clear, the practice of opening legislative sessions with a prayer is acceptable under the Constitution."[59]  Defendants first argue that the law of the case doctrine prohibits the Court from revisiting the issue of whether Marsh controls in this matter.

13

As the Supreme Court has explained,

> Unlike the more precise requirements of res judicata, law
> of the case is an amorphous concept. As most commonly
> defined, the doctrine posits that when a court decides
> upon a rule of law, that decision should continue to
> govern the same issues in subsequent stages in the same
> case.[60]

However, the law of the case doctrine does not "'restrict a
court's power[,] but rather governs its exercise of
discretion.'"[61] Thus, the law of the case doctrine does not
prevent courts from clarifying an earlier ruling.[62]

In adjudicating Defendants' motion to dismiss, it was not
the Court's intention to finally rule on the issue of the
constitutionality of the School Board's Prayer Policy under
Marsh. Although the Court concludes, consistent with its prior
decision, that Marsh applies, the question whether the School
Board's Prayer Policy is constitutional under that decision
requires a more in-depth inquiry, aided by the extensive
discovery the parties have taken on the issue.[63] Accordingly,
the Court concludes that the law of the case doctrine does not
preclude it from clarifying its conclusion that Marsh applies to
the School Board's Prayer Policy, and will address the merits of
the parties' Motions for Summary Judgment in light of the
evidence each party has produced during discovery.

## II. The Establishment Clause

The Establishment Clause of the First Amendment states:
"Congress shall make no law respecting an establishment of

14

religion."[64] The Establishment Clause applies to the states through the Fourteenth Amendment.[65]

As the Supreme Court has explained, "[t]he touchstone for [the Court's Establishment Clause] analysis is the principle that the 'First Amendment mandates governmental neutrality between religion and religion, and between religion and nonreligion."[66] At the same time, analysis under the Establishment Clause "lacks the comforts of doctrinal absolutes," and the Supreme Court has, in "special instances," found "good reason to hold governmental action legitimate even where its manifest purpose was presumably religious."[67] Indeed, "[w]e are a religious people whose institutions presuppose a Supreme Being,"[68] and there is "an unbroken history of official acknowledgment by all three branches of government of the role of religion in American life from at least 1789."[69]

## A. *Marsh v. Chambers*

The Supreme Court's decision in Marsh v. Chambers is the paradigm of a "special instance" where governmental action has been held not to run afoul of the Establishment Clause despite the fact that "its manifest purpose [is] presumably religious."[70] In Marsh, the Supreme Court considered an Establishment Clause challenge to the Nebraska Legislature's practice of beginning each session with a prayer offered by a chaplain that was (1) selected by the Executive Board of the Legislature's Legislative

15

Council, and (2) paid out of public funds.[71]  The Supreme Court

upheld the practice, but declined to apply the general three-part

test announced in Lemon v. Kurtzman.[72]  Rather, the Court focused

on the history of the practice at issue:

> [t]he opening of sessions of legislative and *other*
> *deliberative public bodies* with prayer is deeply embedded
> in the history and tradition of this country.  From
> colonial times through the founding of the Republic and
> ever since, the practice of legislative prayer has
> coexisted with the principles of disestablishment and
> religious freedom.[73]

Relying on the "unique history" of prayer at legislative

sessions, including the First Continental Congress, the Court

concluded that "[c]learly the men who wrote the First Amendment

Religion Clauses did not view paid legislative chaplains and

opening prayers as a violation of that Amendment."[74]

Accordingly, the Court held that the practice of opening

legislative sessions with a prayer "[t]o invoke Divine guidance

on a public body . . . is not, in these circumstances, an

'establishment' of religion or a step toward establishment."[75]

Against this backdrop, the Supreme Court determined that the

Nebraska Legislature's practice of employing a Protestant

chaplain, who consistently gave prayers in the "Judeo-Christian

tradition," did not violate the Establishment Clause.[76]  First,

the Court determined that "[a]bsent proof that the chaplain's

reappointment stemmed from an impermissible motive," the

chaplain's sixteen-year tenure did "not itself conflict with the

16

Establishment Clause."[77]

Second, the Court declined to evaluate the content of the prayers in determining whether there was an Establishment Clause violation. As the Court explained,

The content of the prayer is *not of concern* to judges where, as here, *there is no indication that the prayer opportunity has been exploited to proselytize or advance any one, or to disparage any other, faith or belief*. That being so, it is not for us to embark on a sensitive evaluation or to parse the content of a particular prayer.[78]

The Court concluded that the chaplain's faith, tenure, and the Judeo-Christian nature of his prayers did "not serve to invalidate" the Nebraska Legislature's practice when "[w]eighed against the historical background" of legislative prayer.[79]

The Marsh Court cautioned that, "[s]tanding alone, historical patterns cannot justify contemporary violations of constitutional guarantees."[80] The Court reasoned, however, that legislative prayer constituted more than "simply [a] historical pattern[]."[81] Rather, in the context of legislative prayer, "historical evidence sheds light not only on what the draftsmen intended the Establishment Clause to mean, but also on how they thought that Clause applied to the practice authorized by the First Congress—their actions reveal their intent."[82]

## B. Supreme Court Decisions After *Marsh*

Although the Supreme Court has never squarely applied Marsh in a subsequent case, certain of its decisions help to illuminate

its contours.

In County of Allegheny v. ACLU Greater Pittsburgh Chapter,[83] the Court applied the "endorsement" test to strike down the display of a Christian religious symbol in a public building. Under the "unique circumstances" of that case, the Court determined that displaying a creche had the effect of endorsing religion, while the display of a minorah did not.[84] In his dissent, Justice Kennedy argued that display of the creche was permissible in light of Marsh.[85] In response to Justice Kennedy, the Majority reasoned that Marsh recognized that historical practices such as legislative prayer may still run afoul of the Establishment Clause if they have "the effect of affiliating the government with any one specific faith or belief."[86] The Majority also rejected the proposition that "all accepted practices 200 years old and their equivalents are constitutional today."[87]

In Lee v. Weisman,[88] the Supreme Court held that asking a rabbi to give a "nonsectarian" invocation at a high school graduation ceremony violated the Establishment Clause. Lee rejected the applicability of Marsh in those circumstances, noting the "[i]nherent differences between the public school system and a session of a state legislature":

> The atmosphere at the opening of a session of a state
> legislature where adults are free to enter and leave with
> little comment and for any number of reasons cannot
> compare with the constraining potential of the one school

> event most important for the student to attend. The
> influence and force of a formal exercise in a school
> graduation are far greater than the prayer exercise we
> condoned in Marsh. . . . At a high school graduation,
> teachers and principals must and do retain a high degree
> of control over the precise contents of the program, the
> speeches, the timing, the movements, the dress, and the
> decorum of the students. In this atmosphere the
> state-imposed character of an invocation and benediction
> by clergy selected by the school combine to make the
> prayer a state-sanctioned religious exercise in which the
> student was left with no alternative but to submit.[89]

The Lee Court also found it objectionable that the school principal had "directed and controlled the content" of the rabbi's prayers.[90] The Court stated, "[i]t is a cornerstone principle of our Establishment Clause jurisprudence that 'it is no part of the business of government to compose official prayers for any group of the American people to recite as a part of a religious program carried on by government.'"[91]

The Supreme Court most recently recognized the ongoing validity of Marsh in Van Order v. Perry[92] and McCreary County v. Am. Civil Liberties Union of Kentucky.[93] In Van Orden, the Court held that the erection of a monument to the Ten Commandments on the grounds of the Texas State Capitol did not violate the Establishment Clause. The Court, as it had done in Marsh, declined to apply the Lemon test, finding it "not useful in dealing with the sort of passive monument that Texas has erected on its Capitol grounds."[94] Rather, the Court's analysis was "driven both by the nature of the monument and by our Nation's history."[95] The Court explained that "[r]ecognition of the role

of God in our Nation's heritage has . . . been reflected in our decisions," and that "[t]his recognition has led us to hold that the Establishment Clause permits a state legislature to open its daily sessions with a prayer by a chaplain paid by the states."[96] Citing Marsh, the Court reaffirmed that "[s]imply having religious content or promoting a message consistent with a religious doctrine does not run afoul of the Establishment Clause."[97]

By contrast, in McCreary, the Court applied the Lemon test and determined that the posting of the Ten Commandments in county courthouses in Kentucky violated the Establishment Clause.[98] The Majority rejected the dissent's argument that the displays were a "mere acknowledgment of religion 'on par with the inclusion of a creche or a menorah' in a holiday display, or an official's speech or prayer."[99] The Majority reasoned that "[c]reches placed with holiday symbols and prayers by legislators do not insistently call for religious action on the part of citizens," whereas posting of the Ten Commandments "express[es] a purpose to urge citizens to act in prescribed ways as a personal response to divine authority."[100] Citing Marsh, the Court noted that "[i]n special instances [it has] found good reason to hold governmental action legitimate even where its manifest purpose was presumably religious," but found no such "good reasons" in the context of the counties' display of the Ten Commandments.[101]

III. Application of Marsh

The parties vigorously dispute whether the framework of
Marsh, or the Supreme Court's other Establishment Clause
tests—i.e., the Lemon test, the "endorsement" test, or the
"coercion" test—applies to this case. In Plaintiffs' view, Marsh
is merely an "aberration" that should be limited to its unique
facts. However, as explained below, the Court concludes that
Marsh applies to the School Board's Prayer Policy, and that the
policy is constitutional under Marsh.[102]

### A. The School Board is a "Deliberative Body" to Which Marsh Applies

Marsh recognized that "[t]he opening of sessions of
legislative and *other deliberative public bodies* with prayer is
deeply embedded in the history and tradition of this country."[103]
The School Board is a statutorily-created, popularly-elected
deliberative body that conducts the business of the School
District. As noted above, its duties include setting educational
policies for the District, hiring and firing administrators and
teachers, creating and approving curriculum, administering the
District's budget, and the like. It holds public meetings at
which it discusses and votes on District affairs, and at which
parents and other members of the community may express their
views and concerns. In sum, the Court has little trouble
concluding that the School District qualifies as the type of
"deliberative body" contemplated by Marsh.[104]

Plaintiffs nonetheless contend that Marsh does not apply to the School Board because it is not similar to a state legislature, as the Board has no authority to pass laws or levy taxes without a public referendum. The Court is not persuaded by Plaintiffs' argument that Marsh applies differently depending on the level of government in which a legislative or deliberative body falls, or based on differences in the powers and responsibilities such bodies exercise.[105] Indeed, numerous other courts have held that Marsh applies to deliberative and legislative bodies other than state legislatures.[106]

Plaintiffs also argue that Marsh does not apply because, unlike state legislatures, public schools and public school boards were "virtually nonexistent at the time the Constitution was adopted."[107] However, there is nothing in Marsh that suggests that the Court intended to limit its approval of prayer in "legislative and other deliberative bodies" to those that were in existence when the First Amendment was adopted.[108] Plaintiffs have cited no authority for their argument, and the Court is aware of none. Notably, the Sixth Circuit—the only Court of Appeals to weigh in on the precise issue presented and hold that school board prayer policies should not be analyzed under Marsh—adopted no similar position.[109]

B.   The Fact That School Children Attend Board Meetings
     Does Not Render _Marsh_ Inapplicable

Plaintiffs further contend that Marsh does not apply because
a school board—unlike a city council, county board of
commissioners, or a state legislature—is "intimately connected
with the public school system."[110]   Accordingly, Plaintiffs argue
that the Court may not apply Marsh because "prayers given or
sanctioned by school officials in the presence of students
anywhere on public grounds—not merely in the classroom—are
unconstitutional."[111]   Plaintiffs emphasize that the Marsh Court
noted that "the individual claiming injury by the [Nebraska
Legislature's] practice [was] an adult, presumably not readily
susceptible to religious indoctrination or peer pressure."[112]

The Court is not persuaded by Plaintiffs' attempt to
characterize School Board meetings as more akin to a classroom
setting or a graduation ceremony.   A public meeting of a school
board, even those where students are present, is not similar to a
classroom setting, where attendance is involuntary and students
are under the exclusive control of school personnel.[113]   Nor is a
public school board meeting similar to a graduation ceremony—"the
one school event most important for the student to attend"—where
the "influence and force" exercised over students by school
personnel is "far greater."[114]

Similarly inapposite are the circumstances presented in
Borden v. School District of the Township of East Brunswick,[115]

where the Third Circuit applied the endorsement test and held
that a public school football coach had violated the
Establishment Clause by (1) bowing his head during the team's
pre-meal prayer in the school cafeteria, and (2) taking a knee
during a student-led locker room prayer. There, the Court found
it significant that the coach himself had led the team in pre-
meal prayers for twenty-three years, which would lead a
"reasonable observer [to] conclude that [he] is showing not
merely respect when he bows his head and takes a knee with his
teams and is instead endorsing religion."[116] The Court
nonetheless recognized that "[n]ot every religious display of a
school official will have the necessary 'history and context' to
be an Establishment Clause violation[.]"[117]

Just as a public school board meeting is not similar to a
graduation ceremony, it is not similar to extracurricular
activities such as sports team events.[118] Unlike extracurricular
activities, which are important "to many students . . . as part
of a complete educational experience,"[119] attending school board
meetings are, at best, incidental to a student's public school
experience. In sum, a school board meeting does not implicate
the same concerns as the coercive effect of classroom prayers,
graduation prayers, or prayers during extracurricular activities,
and the Court cannot agree that Marsh is rendered inapplicable
simply because a school board, and not a legislature or other

political unit of a state or municipality, is at issue in this case.[120]

The Court recognizes that School Board meetings are frequently attended by students, and that in some circumstances, those students may feel disinclined to leave during an opening prayer, even if they do not subscribe to the religious character of the prayer being offered.  For example, Plaintiff Doe testified in deposition that, during prayers before School Board meetings, "[e]veryone's bowing their head," that she felt "peer pressure" to bow her head, and that declining to bow her head made her feel "uncomfortable and excluded."[121]

While the Court is not insensitive to these concerns, it nonetheless concludes that they do not render the Board's Prayer Policy unconstitutional.  First, other than Plaintiff Doe's testimony, Plaintiffs have offered no evidence that any student has felt coerced or pressured to participate in a prayer given during a public Board meeting.  In any event, like school board meetings, students across this country attend legislative sessions, including sessions of the United States Senate and House of Representatives, for similar purposes, including field trips, presentation of the colors, and to be recognized for their accomplishments.  If the mere presence of school children were enough to invalidate prayers in legislative and other deliberate bodies, such practices would be unconstitutional in virtually

every setting.[122]

C.   The Sectarian References In Some Board Members' Prayers
     Do Not Render the Board's Prayer Policy
     Unconstitutional

Plaintiffs contend that the School Board's Prayer Policy is

unconstitutional under Marsh because the prayers given by members

of the Board have been "overwhelmingly sectarian."[123]  Although it

is undisputed that several Board Members usually reference Jesus

Christ in their prayers,[124] the Court takes issue with Plaintiff's

characterization.  Citing to the deposition testimony of Board

Members Bireley, Cohee, and McCabe, Plaintiffs assert that "Board

[M]embers could not recall a single non-Christian prayer ever

being given at a public Board meeting."[125]  However, Board Member

Bireley did not testify as to the types of prayer given—rather,

he testified that he could not recall a non-Christian having

served on the School Board.[126]  Similarly, Board Member McCabe

testified that some Board Members referenced "God," "Jesus," and

"the Lord" in their prayers, but did not testify as to the

frequency of these references.[127]  Finally, although Board Member

Cohee testified that the "majority" of Board prayers have been

"Christian," he did not explain how he defined that term (i.e.,

whether he considered non-denominational prayers to be

"Christian" prayers), and did not testify as to the frequency

with which Board Members specifically referenced Jesus Christ in

their prayers.[128]

In addition, the record confirms that some Board Members have chosen not to refer specifically to Jesus Christ in their prayers.  For example, in March 2005 former Board Member Harvey Walls quoted from a speech given by Dr. Martin Luther King, Jr., but excised the reference to Jesus Christ from that speech.[129] And at least one Board Member, Ms. Oliphant, chooses to lead the Board in a moment of silence because she does not wish to pray publicly.[130]

In any event, even viewing the evidence in the light most favorable to Plaintiffs, the Court concludes that the fact that Board Members often reference Jesus Christ in their prayers does not render the Board's Prayer Policy unconstitutional under Marsh.  Plaintiffs argue that Marsh does not authorize the School Board's Prayer Policy because, in Marsh, "sectarian prayer was not an issue . . . because the legislature removed all references to Christ after receiving a complaint."[131]  The Marsh Court did not premise its holding on the nonsectarian nature of the chaplain's prayers, however.  Rather, the Court described the nature of the chaplain's prayers only in a footnote, noting that the chaplain had "removed all references to Christ" after 1980, and had since offered "nonsectarian" prayers.[132]  The Court did not draw a distinction between sectarian and nonsectarian prayer in explaining why the Nebraska Legislature's practice was constitutional, and did not seek to define the terms "sectarian"

27

and "nonsectarian." Rather, the Court emphasized that the
content of the prayer was "not of concern" in determining whether
the practice was constitutional.[133]

Accordingly, the Court agrees with those courts that have
concluded that Marsh did not intend to authorize only
nonsectarian legislative prayer.[134] Indeed, considering the
content of Board Members' prayers would run afoul of the Marsh
Court's directive that courts not "embark on a sensitive
evaluation or . . . parse the content of a particular prayer."[135]
As the Sixth Circuit has explained:

> Any prayer has a religious component, obviously, but a
> single-minded focus on the religious aspects of
> challenged activities—which activities, in an
> Establishment Clause case, are religiously-oriented by
> definition—would extirpate from public ceremonies all
> vestiges of the religious acknowledgments that have been
> customary at civic affairs in this country since well
> before the founding of the Republic. The Establishment
> Clause does not require—and our constitutional tradition
> does not permit—such hostility toward religion. The
> people of the United States did not adopt the Bill of
> Rights in order to strip the public square of every last
> shred of public piety.[136]

In sum, the Court cannot agree that the brief sectarian
references in many of the Board Members' prayers renders Marsh
inapplicable. If the Court were to accept Plaintiffs' view, a
reference to a particular religious deity in any prayer offered
in a legislative or deliberative body would automatically render
the practice unconstitutional.[137] This conclusion cannot be
squared with the reasoning in Marsh.[138]

Moreover, the Court questions whether the mere reference to a deity or religious figure—whether it be "Jesus Christ," "God," "Allah," "Mohammed," or "Yahweh"—necessarily renders a prayer "sectarian." For example, the Fourth Circuit has approved of a county's practice of inviting clergy from diverse faiths to offer "a wide variety of prayers" at the meetings of its governing body.[139] Although the county had subsequently directed clergy to omit specific references to Jesus Christ, the Fourth Circuit determined that the prayers given at these meetings—which included references to "wide and embracive terms" such as "'Lord God, our creator,' 'giver and sustainer of life,' 'the God of Abraham, Isaac and Jacob,' 'the God of Abraham, of Moses, Jesus, and Mohammad,' 'Heavenly Father,' 'Lord our Governor,' 'mighty God,' [and] 'Lord of Lords, King of Kings, creator of planet Earth and the universe and our own creator'"—were constitutional under Marsh.[140] Notably, the Fourth Circuit expressed no disagreement with the lower court's finding that the prayers were "not controversial nor confrontational but for, at most, mention of specific Judeo-Christian references that are nevertheless clearly recognized as symbols of the universal values intended to be conveyed."[141] Similarly, the Eleventh Circuit has explained that the distinction between sectarian and nonsectarian prayers is anything but a bright line.[142]

The Court recognizes that other courts have reached different conclusions.[143]  However, these decisions are not binding, and as explained, the Court does not read Marsh as authorizing only non-sectarian prayer.[144]

## D.   The Board's Prayer Policy Has Not Been Used To Proselytize Or Adance Religion

Marsh nonetheless makes clear that courts may consider the content of prayers to determine whether the prayer opportunity "has been exploited to proselytize or advance any one, or to disparage any other, faith or belief."[145]  The Board's Prayer Policy, consistent with Marsh, facially prohibits such prayers, as it provides that the prayer opportunity "shall not be used or exploited to proselytize, advance or convert anyone, or to derogate or otherwise disparage any particular faith or belief." And in their depositions, Board Members could not recall any instance where the opportunity to give a prayer was used to proselytize or disparage any religion.[146]

Plaintiffs nonetheless argue that the Prayer Policy "advances" Christianity, and has been used to "proselytize," because the Board's "typical" prayer "includes an invocation to Jesus and several references to the Heavenly Father."[147]  As discussed, the record before the Court demonstrates that, at most, certain Board Members briefly refer to Jesus Christ by name in concluding their prayers.  The Court does not agree that these references, by themselves, constitute "proselytizing" or the

30

"advancement" of religion.[148]  As the Tenth Circuit has explained,
"all prayers 'advance' a particular faith or belief in one way or
another," but Marsh "underscores the conclusion that the mere
fact a prayer evokes a particular concept of God is not enough to
run afoul of the Establishment Clause.  Rather, what is
prohibited by the clause is a more aggressive form of
advancement, i.e., proselytization."[149]

      In sum, the Court concludes that the brief references to
Jesus Christ in certain Board Members' prayers does not transform
those prayers into an impermissible attempt to proselytize or
advance Christianity.  Although the Prayer Policy expressly
permits sectarian prayers, the type of sectarian prayers that
Board Members have given cannot be classified as proselytizing or
advancing Christianity, particularly in light of the fact that
(1) the prayer opportunity is rotated among Board Members, and
(2) some Board Members choose to give a moment of silence or
decline to include specific sectarian references in their
prayers.[150]

      Plaintiffs further contend that the Prayer Policy—which
prohibits Board Members from using the prayer opportunity to
"proselytize, advance or convert anyone, or to derogate or
otherwise disparage any particular faith or belief"—creates an
entanglement problem.  That is, by prohibiting prayers that
proselytize or disparage a particular faith, Board Members are

31

required to consider the content of prayers to determine whether a given prayer has violated the policy. As evidence of this potential problem, Plaintiffs note that, in their depositions, certain Board Members disagreed as to whether hypothetical prayers posed by Plaintiffs' counsel—prayers that have never been given at any Board meeting—would or would not violate the Prayer Policy. See, e.g., Isaacs Dep. at 39-41 (Plaintiffs' counsel: "I am going to give you a prayer and ask you if it would have been given it would have violated the policy. Okay? 'Oh, Lord, please convert the Jews in the audience and ensure that they come to know our Lord Jesus Christ.").

To the extent the Board's Prayer Policy requires Members to be cognizant of the content of prayers to enforce its terms, any resulting entanglement problem does not run afoul of Marsh. Indeed, accepting Plaintiffs' theory would require the Court to conclude that Marsh inherently contradicts itself—i.e., although Marsh holds that legislative prayer may not be exploited to proselytize, any effort by a legislative or deliberative body to enforce that requirement would necessarily render its prayer practice unconstitutional. Nothing in Marsh suggests that legislative prayer is rendered unconstitutional simply because the contours of what constitutes a permissible prayer must be enforced by the legislative or deliberative body itself, and the Court declines to accept a theory that would lead to such an

.

absurd result.  While Plaintiffs' entanglement argument would be
cognizable under the Lemon test, the Supreme Court has made clear
that a different analysis applies in the context of legislative
prayer.

> E.   There Is No Evidence That The School Board Had An
>      Impermissible Motive In Adopting The Prayer Policy

In Marsh, the Supreme Court determined that "[a]bsent proof
that the chaplain's reappointment stemmed from an impermissible
motive," the chaplain's sixteen-year tenure did "not itself
conflict with the Establishment Clause."[151]  Plaintiffs offer
several arguments for why the stated purpose of the Board's
Prayer Policy—i.e., to "solemnize" public Board meetings—is a
"sham," and contend that the Prayer Policy was adopted as a "post
hoc rationalization" to shield the Board's true motivation (i.e.,
advancing Christianity).[152]  The Court does not find any of
Plaintiffs' arguments persuasive, and concludes that there is no
genuine issue of material fact as to whether the School Board
adopted its Prayer Policy with an impermissible motive.

> 1.   The Fact That The Prayer Policy Only Applies to
>      Public Board Meetings Is Not Indicative Of An
>      Impermissible Motive

First, Plaintiffs find it significant that unlike general
Board meetings that are open to the public, Board Members do not
open their special meetings with a prayer or moment of silence.
According to Plaintiffs, "[b]y having a practice of prayer only
at meetings attended by the public, the Board demonstrates that

the stated purpose of the Policy is a sham—because special
meetings equally require solemnity, but the Board does not pray
at those meetings."[153]   In addition, Plaintiffs rely on the
deposition testimony of Board Member Hattier, who agreed that
prayer is "nice, but not necessary" to solemnize general Board
Meetings.[154]

Plaintiffs' argument strikes the Court as a non sequitur.
That Board Members do not open special meetings with prayer or a
moment of silence does not demonstrate that the stated purpose of
the Prayer Policy is a pretext for the advancement of religion.
Indeed, under Plaintiffs' theory, all legislative prayer would be
invalid unless legislatures (including Congress), in addition to
opening their regular, public sessions with a prayer, also opened
all committee meetings, subcommittee meetings, caucus meetings,
and informal meetings with a moment of prayer.

Moreover, Plaintiffs' theory finds no basis in Marsh, which
did not purport to apply the kind of strict scrutiny to
legislative prayer that Plaintiffs appear to advance.[155]   The
Marsh Court did not premise its holding on whether prayer was, as
a factual matter, "necessary" to solemnize public sessions of the
Nebraska Legislature, but on the ground that the practice of
opening sessions of legislatures and other deliberative bodies
with prayer was a historical practice that the Framers were aware
of, and did not intend to invalidate, when they passed the First

Amendment.

> 2.  Plaintiffs Have Produced No Evidence That The
> Purpose Of The Prayer Policy Is To Achieve Public
> Participation In Prayer Rather Than Solemnize
> Board Meetings

The Prayer Policy provides that the moment of silence or
moment of prayer "is among only the adult members of the Board,"
and that "[n]o school employee, student in attendance, or member
of the community in attendance shall be required to participate
in any such prayer or moment of silence." Consistent with the
terms of the Policy, Board Members consistently testified in
deposition that the purpose of the Prayer Policy is to solemnize
public Board meetings for the benefit of Board Members.[156] In
addition, Board Members testified that they have no expectation
for attendees to participate, and that members of the public are
free to leave during the prayer or otherwise not participate.[157]

Plaintiffs emphasize the deposition testimony of Board
Member Wilson, who testified that (1) the Board "want[s] the
public to take part in the prayer," and (2) the vast majority of
public attendees participate in the prayers.[158] According to
Plaintiffs, Wilson's testimony confirms that the "true purpose of
the prayer policy" is religious, not secular. The Court
disagrees.

Wilson was responding to questions regarding why the Board
does not hold its moment of prayer outside the presence of the
public.[159] Wilson explained as follows:

> I don't think it shows the same kind of unity. We want
> the public to take part in the prayer. That's the whole
> thing behind the public board meeting. If a person wants
> to come forward after a meeting and say that there was an
> issue with that, I can see us changing it, rewording it,
> working with them, maybe even offering them to say a
> prayer.[160]

In the Court's view, this testimony fairly read does not
establish that the School Board had an impermissible motive in
adopting the Prayer Policy. It is not surprising that
legislative and other deliberative bodies view their public
meetings as occasions of greater significance than their private
or informal meetings, or that they choose to solemnize those
meetings in the presence of the public. The Court discerns
little more from Board Member Wilson's deposition testimony than
a recognition of the fact that a moment of prayer does not have
the same solemnizing effect if done in private—i.e., it does not
"show[] the same kind of unity," and does not serve the purposes
"behind [having a] public board meeting."[161] However, even
viewing Wilson's testimony in the light most favorable to
Plaintiffs, Plaintiffs have not explained why the subjective
desire of a single Board Member—who was not a member of the Board
at the time the Prayer Policy was adopted—that public attendees
participate in prayers renders the Prayer Policy
unconstitutional.[162]

   As further evidence that the Prayer Policy is intended to
directly involve public attendees (rather than solemnize public

36

meetings to benefit the work of the Board Members), Plaintiffs
note that certain prayers given by Board Members have explicitly
identified non-Board Members as the intended beneficiaries of the
prayers.   It is undisputed that in some instances, Board Members
have offered prayers referring to District families that have
suffered a tragedy.[163]   For example, in June 2006 a Board Member
opened a public meeting with the following prayer:

> Dear Heavenly Father, among Your many blessings, we thank
> You for the beautiful summer weather and especially for
> the much needed rain.   We thank You also for the
> wonderful school year that has just ended with so many
> successes, awards, and accomplishments of our students
> and staff once again.  We ask Your continued blessings on
> those among us who have devoted so much time, energy, and
> expertise to the betterment of this district and who are
> now stepping down.   Given them peace, health, and
> happiness in the days to come.  Be with our people who
> have suffered illness or injury this year, and grant them
> a quick return to normal life.  Comfort the families of
> those who are lost to us and give them strength in their
> time of grief.  Protect all who are here and return them
> to us safely in the fall.  We ask that You continue to
> guide and direct us in . . . our decision-making, so that
> every child in this district receives the educational
> skills to be all he/she can be.  We ask these things and
> all others in the name of Jesus Christ, our Lord.
> Amen.[164]

In the Court's view, it would be a perverse result if the
fact that Board Members acknowledge their constituents in their
prayers rendered the Board's Prayer Policy unconstitutional.
Indeed, under Plaintiffs' theory, any prayer given to open a
session of a legislative or deliberative body that does anything
other than ask for guidance for the members of that body—*i.e.*, a
prayer that references an international, national, or local

37

tragedy or event effecting the body's constituents—would be
unconstitutional. The Court can find nothing in Marsh or any
other Supreme Court precedent that supports such a conclusion.

> 3. The Circumstances Surrounding The Board's Adoption
> Of The Prayer Policy Do Not Suggest An
> Impermissible Motive

Plaintiffs argue that the circumstances surrounding the
Board's adoption of the Prayer Policy demonstrate that it was
"enacted to erect a superficially plausible legal rationale for
the Board's Christian prayers,"[165] and that the Board
intentionally "made Christianity and Christian prayer political
issues in the District."[166] The Court recognizes, of course, that
this litigation has been contentious, and has aroused strong
feelings in members of the public. It does not follow, however,
that the Board's adoption of the Prayer Policy was motivated by a
desire to advance Christianity.

As originally filed, this lawsuit challenged the
constitutionality of prayer in the context of several different
types of events within the Indian River School District,
including graduation ceremonies, athletic activities, and holiday
festivals. As Plaintiffs themselves describe, members of the
public who attended the August 2004 public Board meeting
"believed the debate to be about prayer in school, . . . not
prayer at Board meetings or District events."[167] However, there
is no evidence that Board Members adopted the Prayer Policy with

an impermissible motive, even if members of the public were motivated to support the Board's prayer practice because of their religious beliefs.

For example, Plaintiffs assert that "[n]umerous Board members conceded that District residents consider the defense of this suit to be a defense of 'Christian values.'"[168] However, while Board Member Hastings testified in deposition that it was a common sentiment within the District that the case was about protecting "Christian values," he also testified that no one had told him that specifically.[169] More importantly, Hastings and other Board Members testified that they had never heard the sentiment expressed that the defense of the Board's Prayer Policy was meant to protect "Christian values."[170]

In sum, Plaintiffs' suggestion that the School District was solely interested in advancing Christianity in defending the issue of School Board prayer is belied by the record. Notably, the parties agreed to settle portions of this lawsuit with respect to other challenged practices, and Defendants adopted a new graduation policy prohibiting prayer at graduation ceremonies.[171] Plaintiffs are essentially asking the Court to presume that Board Members had an impermissible motive when they adopted the Prayer Policy because, if they had a *permissible* motive, they would have prohibited prayer at public Board meetings altogether. Plaintiffs' conclusion simply does not

follow from their premise, and the Court cannot presume an impermissible motive on the part of Defendants simply because they did not resolve the issue of prayer at public Board meetings to Plaintiffs' liking.

The Court also rejects Plaintiffs' argument that an impermissible motive can be inferred from the fact that Board Members sought outside legal advice that apparently conflicted with the opinion offered by the Board's regular attorney.  During its special meeting in August 2004, the Board's then-regular attorney—Mr. James Griffin, Esq.—discussed with the Board the constitutionality of the prayer practice, and whether the School Board could be considered a legislative body.[172]  After speaking with Griffin, the Board decided to seek a second opinion from an attorney with more experience dealing with First Amendment issues.  For example, Board Member Hattier testified that Griffin is "a general attorney" who typically focused on "contract law," but "First Amendment issues are not the sort of thing that routinely come across his desk."[173]  In these circumstances, the Board's decision to ask for legal advice from an attorney experienced in First Amendment law does not establish that it adopted the Prayer Policy with an impermissible motive.

F.    That Board Members Themselves Give The Prayers Does Not Render The Prayer Policy Unconstitutional

The most obvious difference between the legislative prayers the Marsh Court approved of and those at issue in the instant

40

case is that Board Members themselves give the prayers, rather than employing or inviting clergy members to do so. The Court determines that this difference does not serve to render <u>Marsh</u> inapplicable or the Board's Prayer Policy unconstitutional.

As the Tenth Circuit has explained, "as a consequence of the fact that [legislative prayer] cannot exist without the government actually selecting someone to offer such prayers, . . . <u>Marsh</u> also must be read as establishing the constitutional principle that a legislative body does not violate the Establishment Clause when it chooses a particular person to give its invocational prayers."[174] The Indian River School Board—composed of unpaid, popularly elected members—rotates the prayer opportunity among its members without regard to their religious beliefs or whether they prefer to open meetings with a prayer or a moment of silence. Thus, in one sense, the Board's Prayer Policy is more inclusive than the Nebraska Legislature's practice upheld in <u>Marsh</u>: instead of employing one clergyman of a particular faith to open Board meetings with a solemnizing prayer, that opportunity is rotated among Board Members who are elected by the public, rather than appointed by the State. Accordingly, the Court concludes that the fact that the School Board is not composed of Members of diverse faiths does not render its Prayer Policy unconstitutional.[175]

## CONCLUSION

As <u>Marsh</u> teaches, invocations at the beginning of sessions
of legislative and other deliberative bodies constitute "a
tolerable acknowledgment of beliefs widely held among the people
of this country," being as we are "'a religious people whose
institutions presuppose a Supreme Being.'"[176]   Legislative prayer
thus belongs among "[t]hose government acknowledgments of
religion [that] serve, in the only ways reasonably possible in
our culture, the legitimate secular purposes of solemnizing
public occasions, expressing confidence in the future, and
encouraging the recognition of what is worthy of appreciation in
society."[177]   Thus, the Court concludes that the Indian River
School Board's Prayer Policy appropriately serves these goals and
remains within the contours outlined in <u>Marsh</u> for
constitutionally permissible legislative prayer.

"Establishment Clause doctrine lacks the comfort of
categorical absolutes."[178]   This insight rings particularly true
in the context of legislative prayer, where what is determinative
is not the religious nature of legislative prayer, but the fact
that such practices have coexisted with the prohibition on
government-established religion since the founding of this
nation.   Although reasonable people can differ as to whether the
Board's policy is wise, could be more-inclusive, or is actually
necessary to solemnize board meetings, "too much judicial fine-

tuning of legislative prayer policies risks unwarranted
interference in the internal operations of a coordinate
branch."[179]  Because the School Board has not exploited its Prayer
Policy to proselytize or advance religion, the Court may not
demand anything further.

For the foregoing reasons, the Court concludes that the
Indian River School Board's Prayer Policy is constitutional, and
that Defendants are entitled to summary judgment.

An appropriate Order will be entered.

1.   In November 2006, the Court approved a protective order
limiting the disclosure of information that could be used to
identify the Does.   (D.I. 200.)

2.   See Dobrich v. Walls, 380 F. Supp. 2d 366, 375-78 (D. Del.
2005).   In May 2006, the Court denied Defendant Board Member
Reginald Helms' motion to be represented by a separately retained
lawyer and litigate this matter on behalf of himself and
independent of the School Board.   Dobrich v. Indian River Sch.
Dist., No. 05-120, 2006 WL 1173896, at *1 (D. Del. May 2, 2006).

3.   See D.I. 128, 129; Dobrich v. Walls, No. 05-120, 2006 WL
2642218, at *1 (D. Del. Sept. 14, 2006).

4.   (D. I. 237.)

5.   See Del. Code Ann. tit. 14, § 1068(b).

6.   Def.'s Mot. for Summ. J., Ex. A ¶ 4 (Declaration of former
Board Member Charles H. Mitchell).

7.   Id., Ex. C ¶¶ 11-12 (Declaration of Board Member Susan
Bunting).

8.   See Del. Code Ann. tit. 14, § 1068(g); id. § 1046 ("A school
board member shall receive no compensation for that member's
services.").

9.   Id. § 1068(f).

10.   See Del. Const. art. XIV, § 1.

11.   Del. Code Ann. tit. 14, § 1053(a).

12.   See Indian River School District, Indian River Board of
Education, http://www.irsd.net/discover-irsd/board-education.htm
(last visited February 18, 2010).

13.   See generally McHugh v. Bd. of Educ. of the Milford Sch.
Dist., 100 F. Supp. 2d 231, 238 (D. Del. 2000).

14.   Del. Code Ann. tit. 14, § 1043 ("Authority").

15.   Id. § 1049 ("Policy making").   The Board has constituted a
policy subcommittee, composed of Board Members, district
personnel, and members of the community.   See Bunting Dec. at
¶ 5.   This subcommittee meets separately at least once a month,
and typically recommends new policies before they are submitted
to the full Board for consideration.   See id. at ¶¶ 5-7.   Once a
policy is submitted to the full Board, it typically is publicly
announced at two consecutive regular Board meetings, after which

the Board may vote to adopt the policy. <u>Id.</u> at ¶ 10.

16. Del. Code Ann. tit. 14, § 1056(b).

17. <u>Id.</u>

18. <u>Id.</u> § 1902; <u>see also</u> <u>Steward v. Jefferson</u>, 3 Del. (3 Harr.)
335, 1841 WL 394, at *2 (1841) (holding that statute authorizing
school districts to levy taxes by referendum was not an
unconstitutional delegation of legislative power; "There is in
fact no instance in which the legislature does act directly in
the imposition of taxes, except in the single case of State taxes
. . . . In all other cases; county, road, poor, ditch, marsh,
military and all other taxes are laid through the intervention of
some other body, acting on principles fixed by law.").

19. Del. Code Ann. tit. 14, § 1702.

20. <u>Id.</u> § 1048(a).

21. <u>Id.</u> § 1048(b).

22. <u>Id.</u> § 1048(c).

23. <u>See</u> Bireley Dep. at 36-37.

24. <u>See</u> C. Mitchell Dec. at ¶¶ 3-4, 8; D. Mitchell Dep. at 12;
Bireley Dep. at 52; Isaacs Dep. at 25.

25. Bireley Dep. at 57-59; C. Mitchell Dec. at ¶ 10-11.

26. (D.I. 134 at ¶ 30; D.I. 150 at ¶ 30.)

27. Pls.' Mot. for Summ. J., Ex. 61 at 11 (minutes of June 15,
2004 Board meeting).

28. <u>See</u> <u>id.</u>, Ex. 30.

29. <u>Id.</u>

30. <u>See</u> Hastings Dep. at 78; Isaacs Dep. at 22.

31. Pls' Mot. for Summ. J., BPD 1288 (Video of August 24, 2004
Indian River School Board Meeting).

32. <u>Id.</u>

33. <u>Id.</u>

34. <u>Id.</u>

35. Hattier Dep. at 190-92; Helms Dep. at 76.  The Board chose not to adopt then-Board Member Mark Isaacs' suggestion that the Board could pray in private, or pray silently before the Board meeting began.  See Isaacs Dep. at 67-68.

36. Defs.' Mot. for Summ. J., Ex. H.

37. Id., Ex. J (transcribed minutes of Nov. 16, 2004 Board meeting); Bireley Dep. at 104-05.

38. See id., Ex. I (prepared minutes of Nov. 16, 2004 Board meeting).

39. Pls.' Am. Compl. ¶ 144.

40. Defs.' Mot. for Summ. J., Ex. J (transcribed minutes of Nov. 16, 2004 Board meeting).

41. Id., Ex. N (minutes of Mar. 22, 2005 Board meeting).

42. See Oliphant Dep. at 33-35.

43. Bireley Dep. at 154-55, 180-81.

44. See, e.g., Pls.' Mot. for Summ. J., Exs. 23-25.

45. Hobbs Dep. at 34; Bireley Dep. at 27, 39.

46. Bireley Dep. at 33.

47. See Bireley Dep. at 25 (explaining that students are typically invited to attend Board meetings by the school principal); Hobbs Dep. at 37 (explaining that students "could come and be honored or they might not, or their principal might accept the award and they could stay home"); Bunting Dep. at 77 (explaining that even if a student does not attend, "[t]hey get their honor anyway"); D. Mitchell Dep. at 152 (explaining that students who are recognized for awards "come to get their award and they leave, or some don't show up at all . . . It's not a real serious thing").

48. See Bireley Dep. at 28-30.

49. Fed. R. Civ. P. 56(c)(2).

50. Rains v. Cascade Indus. Inc., 402 F.2d 241, 245 (3d Cir. 1968).

51. Goodman v. Mead Johnson & Co., 534 F.2d 566, 573 (3d Cir. 1976).

52. <u>Horowitz v. Fed. Kemper Life Assurance Co.</u>, 57 F.3d 300, 302 n. 1 (3d Cir. 1995) (internal citations omitted).

53. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 n. 10 (1986).

54. <u>Id.</u> (quoting Fed. R. Civ .P. 56(e)).

55. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986).

56. <u>Id.</u> at 250.

57. 463 U.S. 783 (1983).

58. <u>Dobrich</u>, 380 F. Supp. 2d at 375-78.

59. <u>Id.</u> at 377.

60. <u>Arizona v. California</u>, 460 U.S. 605, 618 (1983).

61. <u>In re Pharmacy Benefit Managers Antitrust Litig.</u>, 582 F.3d 432, 439 (3d Cir. 2009) (quoting <u>Pub. Interest Research Group of N.J., Inc. v. Magnesium Elektron, Inc.</u>, 123 F.3d 111, 116 (3d Cir. 1997)); <u>see also</u> <u>Messinger v. Anderson</u>, 225 U.S. 436, 444 (1912) (Holmes, J.) (noting that the law of the case doctrine "merely expresses the practice of courts generally to refuse to reopen what has been decided, [and is] not a limit to their power").

62. <u>Pharmacy Benefit</u>, 582 F.3d at 439 (citing <u>Swietlowich v. County of Bucks</u>, 610 F.2d 1157, 1164 (3d Cir. 1979)).

63. <u>See</u> <u>Hamilton v. Leavy</u>, 322 F.3d 776, 787 (3d Cir. 2003) ("Reconsideration of a previously decided issue may . . . be appropriate in certain circumstances, including when the record contains new evidence.") (internal citation omitted).

64. U.S. Const. amend I.

65. <u>See</u> <u>Everson v. Bd. of Educ. of Ewing Twp.</u>, 330 U.S. 1, 8 (1947).

66. <u>McCreary County v. Am. Civil Liberties Union of Ky.</u>, 545 U.S. 844, 860 (2005) (quoting <u>Epperson v. Arkansas</u>, 393 U.S. 97, 104 (1968)); <u>see also</u> <u>County of Allegheny v. Am. Civil Liberties Union Greater Pittsburgh Chapter</u>, 492 U.S. 573, 605 (1989) ("Whatever else the Establishment Clause may mean[,] . . . it certainly means at the very least that government may not demonstrate a preference for one particular sect or creed (including a preference for Christianity over other religions.").

67.  <u>McCreary County</u>, 545 U.S. at 860 (2005).

68.  <u>Zorach v. Clauson</u>, 343 U.S. 306, 313 (1952).

69.  <u>Lynch v. Donnelly</u>, 465 U.S. 668, 674 (1984).

70.  <u>McCreary County</u>, 545 U.S. at 860.

71.  463 U.S. at 785-86.

72.  403 U.S. 602 (1971)

73.  <u>Marsh</u>, 463 U.S. at 786 (emphasis added).

74.  <u>Id.</u> at 788.

75.  <u>Id.</u> at 792.

76.  <u>Id.</u> at 793.

77.  <u>Id.</u> at 793-94.

78.  <u>Id.</u> at 794-95 (emphasis added).

79.  <u>Id.</u> at 793.

80.  <u>Id.</u> at 790.

81.  <u>Id.</u>

82.  <u>Id.</u>

83.  492 U.S. 573 (1989).

84.  <u>Id.</u> at 595-602.

85.  <u>See id.</u> at 665 (Kennedy, J., dissenting).

86.  <u>Id.</u> at 603.

87.  <u>Id.</u>

88.  505 U.S. 577 (1992).

89.  <u>Id.</u> at 596-97 (internal citations omitted).

90.  <u>Id.</u> at 588.

91.  <u>Id.</u> (quoting <u>Engel v. Vitale</u>, 370 U.S. 421, 425 (1962)).

92.  545 U.S. 677 (2005).

93.   545 U.S. 844 (2005).

94.   545 U.S. at 685.

95.   Id.

96.   Id. at 687-88 (citing Marsh, 463 U.S. at 792).

97.   Id. at 690 (citing Marsh, 463 U.S. at 792).

98.   545 U.S. at 850-51.

99.   Id. at 877 n.24.

100.  Id.

101.  Id. at 859 n.10 (citing Marsh, 463 U.S. 783); but see id. at 905 (Scalia, J., dissenting) (arguing that the displays were "no more of a step toward establishment of religion than was the practice of legislative prayer [the Court] approved in Marsh").

102.  See Simpson v. Chesterfield County Bd. of Supervisors, 404 F.3d 276, 281 (4th Cir. 2005) ("Marsh, in short, has made legislative prayer a field of Establishment Clause jurisprudence with its own set of boundaries and guidelines.").

103.  Marsh, 463 U.S. at 786 (emphasis added).

104.  See Doe v. Tangipahoa Parish Sch. Bd., 631 F. Supp. 2d 823, 838 (E.D. La. 2009) (holding that public school board was a "deliberative body" under Marsh, and noting that "it strains reason to conclude otherwise").

105.  See Pelphrey v. Cobb County, 547 F.3d 1263, 1276 (11th Cir. 2008) ("The decisions of the Supreme Court have not applied varying [Establishment Clause] standards based on the level of government, and we find no reason to adopt this artificial distinction now."); Van Zandt v. Thompson, 839 F.2d 1215, 1219 (7th Cir. 1988) ("We read Marsh to derive partly from the traditions of the nation and of the states and partly from a degree of deference to the internal spiritual practices of another branch of government or of a branch of the government of another sovereign.").

106.  See Pelphrey, 547 F.3d at 1271 (applying Marsh to two county commissions); Turner v. City Council of City of Fredericksburg, 534 F.3d 352, 356 (4th Cir. 2004) (applying Marsh to a city council); Doe v. Tangipahoa Parish Sch. Bd., 473 F.3d 188, 197 (5th Cir. 2006) (assuming that "the [School] Board, as a stipulated public deliberative body, falls under Marsh"); Simpson, 404 F.3d at 278 (applying Marsh to a county board of

supervisors); Bacus v. Palo Verde Unified Sch. Dist. Bd. of Educ., 52 F. App'x 355, 356 (9th Cir. 2002) (not precedential) (assuming, without deciding, that Marsh applies to a school board as a deliberative body); Snyder v. Murray City Corp., 159 F.3d 1227, 1228 (10th Cir. 1998) (applying Marsh to a city council).

107. Edwards v. Aguillard, 482 U.S. 578, 583 n.4 (1987).

108. See Pelphrey, 547 F.3d at 1276 ("Nothing in Marsh suggests that the tolerance of legislative prayer, under the Establishment Clause, applies unequally to legislative bodies based on the date the legislative body was formally established.").

Plaintiffs have moved to strike the declaration of former Board Member Charles H. Mitchell, which Defendants attached as Exhibit A to their Opening Brief in Support of their Motion for Summary Judgment. In that declaration, Mr. Mitchell averred that he could not recall any time since the formation of the Indian River School Board in 1969 that a public Board Meeting was not opened with a moment of prayer. Plaintiffs complain that (1) Mitchell was not identified by Defendants in their Rule 26(a) disclosures; and (2) that Defendants identified Board Member Charles M. Bireley, and not Mitchell, as the School District's Rule 30(b)(6) witness as to the topic of the "History and Tradition of Board Prayer Since 1969." Accordingly, Plaintiffs argue that the Court should strike the Mitchell Declaration because Defendants' reliance on this declaration "created genuine surprise," and was "willfully injected into the case well after the close of discovery on the School Board Prayer Issue." Pls.' Mot. to Strike ¶ 7.

The Court will deny Plaintiffs' Motion. During his deposition, Board Member Bireley (1) testified that the Board had opened its public meetings with a moment of prayer since 1974, when he first became a Board Member; and (2) specifically identified Mitchell as a Board Member who had told him that the Board had employed this practice since 1969, when the Board was created. Bireley Dep. at 51-53. Accordingly, Defendants were not required to supplement their disclosures with Mitchell's declaration. See Fed. R. Civ. P. 26(e)(1) ("A party who has made a disclosure under Rule 26(a) . . . must supplement or correct its disclosure or response . . . in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or inaccurate, *and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process* . . . .") (emphasis added). Moreover, even if Defendants had violated Rule 26, Plaintiffs will not be prejudiced by the Court considering this declaration. At most, the Mitchell Declaration confirms that the Board's prayer practice dates back to 1969 instead of 1974. This potential difference of six years is simply not determinative of the constitutionality of the Board's practice under Marsh.

109.  See Coles v. Cleveland Bd. of Educ., 171 F.3d 369 (6th Cir. 1999).

110.  Pls.' Ans. Br. at 28.

111.  Id. at 19.

112.  Marsh, 463 U.S. at 792 (internal quotation marks and citations omitted).

113.  See, e.g., Lee, 505 U.S. at 592; Edwards, 482 U.S. at 583-84 ("The Court has been particularly vigilant in monitoring compliance with the Establishment Clause in elementary and secondary schools. . . . Students in such institutions are impressionable and their attendance is involuntary.").

114.  Lee, 505 U.S. at 597; see also Am. Civil Liberties Union of N.J. v. Black Horse Pike Regional Bd. of Educ., 84 F.3d 1471, 1480 (3d Cir. 1996) ("A high school graduation is distinguishable from forums such as a legislative session where prayer has been upheld.").

115.  523 F.3d 153 (3d Cir. 2008).

116.  Id. at 178.

117.  Id. at 166.

118.  Compare Santa Fe Indep. Sch. Dist. v. Doe, 530 U.S. 290, 311 (2000) (holding that practice of beginning high school football games with a prayer led by a "Student Chaplain" violated the endorsement test, even though "attendance at an extracurricular event, unlike a graduation ceremony, is voluntary," because for some students, "such as cheerleaders, members of the band, and . . . the team members themselves, . . . seasonal commitments . . . mandate their attendance [at football games], sometimes for class credit").

119.  Id. at 311.

120.  Plaintiffs rely on a decision by the Court of Appeals for the Sixth Circuit that Marsh does not apply to school boards. See Coles, 171 F.3d 369.  This decision is not binding on the Court, and the Court does not find it persuasive.  Coles concluded that a school board is not similar to a state legislature because "the function of a school board is uniquely directed toward school related matters," id. at 381, and Marsh does not apply in a "public school setting."  Id. at 379 ("[W]e find that the policy of the . . . School Board is so inextricably intertwined with the public schools that it must be evaluated on the same basis as the schools themselves.").

In the Court's view, it strains credulity to equate a School Board meeting with a public school classroom, and the Court is aware of no Supreme Court precedent that supports the proposition that the same concerns that apply to prayer in school settings such as graduations also apply in every "public school setting." Indeed, this theory would presumably "include a teacher's conference in the evening or during a weekend, a training session for school administrators, a PTA supper in the school gym, or any other activity conducted on school property." Id. at 387 (Ryan, J., dissenting). It arguably would also serve to invalidate neutral school policies authorizing private religious speech on school grounds—a practice the Supreme Court has explicitly upheld. See Good News Club v. Milford Centr. Sch., 533 U.S. 98, 115 (2001) (noting that the Court has "never extended [its] Establishment Clause jurisprudence to foreclose private religious conduct during nonschool hours merely because it takes place on school premises where elementary school children may be present").

121. Doe Dep. at 16–17.

122. See Doe, 631 F. Supp. 2d at 839 n.22 ("[T]hat school children may participate in school board meetings cannot be dispositive of the constitutional analysis: students may well visit a state or federal legislative session, or some municipal body session as part of a field trip . . . but finding that school children are present would not render unconstitutional opening those sessions with prayer."); accord Coles, 171 F.3d at 386 (Ryan, J., dissenting).

123. Pl.'s Br. in Support of Mot. for S.J. at 5.

124. Board Members Helms, Donna Mitchell, Bunting, and former Board Member Evans each testified that they refer to Jesus Christ by name in their prayers. Helms Dep. at 195; Mitchell Dep. at 54; Bunting Dep. at 126; Evans Dep. at 54-55. However, it appears that at least one of these Members—Ms. Bunting—has chosen on occasion to offer a moment of silence instead of a prayer. See Mitchell Dep. at 54; Pls.' Mot. for Summ. J., Ex. 24 at 1 (minutes of April 26, 2005 Board meeting).

125. Pl.'s Br. in Support of Mot. for S.J. at 14.

126. Bireley Dep. at 60.

127. McCabe Dep. at 74.

128. Cohee Dep. at 114. In the context of Cohee's deposition, Plaintiffs' counsel defined "Christian" prayer not as a prayer specifically referring to Jesus Christ, but as one referring to

"any . . . religious deity besides Jesus or the Christian God."
Id.

129.  Defs.' Mot. for Summ. J., Ex. N (minutes of March 22, 2005
Board meeting).

130.  Oliphant Dep. at 33-34.

131.  Pl.'s Br. in Support of Mot. for S.J. at 39.

132.  Marsh, 463 U.S. at 793 n.14.

133.  Id. at 794.

134.  See Doe, 631 F. Supp. 2d at 839; Pelphrey, 547 F.3d at 1271
("[T]he Court never held that the prayers in Marsh were
constitutional because they were 'nonsectarian. . . .  The
'nonsectarian' nature of the chaplain's prayers was one factor in
[the Court's] fact-intensive analysis; it did not form the basis
for a bright-line rule."); see also Turner, 534 F.3d at 356
("[T]he Establishment Clause does not absolutely dictate the form
of legislative prayer.").

135.  Marsh, 463 U.S. at 794-95; accord Pelphrey, 547 F.3d at
1271.

136.  Chaudhuri v. State of Tennessee, 130 F.3d 232, 236 (6th
Cir. 1997) (internal citation omitted).

137.  Indeed, if Plaintiffs' theory were correct, similar prayers
recently given in the United States House of Representatives
would also violate the Establishment Clause.  See 108 Cong. Rec.
H4767 (daily ed. June 23, 2004) (prayer of Rev. Dr. Jack
Davidson) ("Endow our leaders with wisdom and knowledge, that by
Your power, they will make God-pleasing decisions for the welfare
of our citizens; through Jesus Christ Your Son Our Lord, who
lives and reigns with You and the Holy Spirit, one God, world
without end.  Amen."); 109 Cong. Rec. H1899 (daily ed. April 13,
2005) (prayer of Dr. Curt Dodd) ("Father, may they experience
what it really means to be in peace because of a relationship
with You through Your Son Jesus, for it is in Jesus' name we
pray.  Amen.").

138.  See Doe, 631 F. Supp. 2d at 839 ("Fidelity to Marsh
commands not a content-based approach, or an inquiry into whether
prayers are sectarian or nonsectarian at the outset, but, rather,
focuses on exploitation of the prayer opportunity and efforts . .
. to proselytize; to promote or sell a religion.").

139.  Simpson, 404 F.3d at 284.

140. Id.

141. Id. at 279.

142. Pelphrey, 547 F.3d at 1272 ("We would not know where to begin to demarcate the boundary between sectarian and nonsectarian expressions.").

143. See, e.g., Hinrichs v. Bosma, 440 F.3d 393, 399 (7th Cir. 2006) (reading Marsh as "hinging on the nonsectarian nature of the invocations at issue").

144. The Court recognizes that in Allegheny, the Supreme Court suggested that legislative prayers may still run afoul of the Establishment Clause if they have "the effect of affiliating the government with any one specific faith or belief," and that "the legislative prayers involved in Marsh did not violate this principle because the particular chaplain had 'removed all references to Christ.'" 492 U.S. at 603. However, the Court agrees with other courts that have declined to interpret this statement as limiting Marsh to permit only nonsectarian prayer. See Pelphrey, 547 F.3d at 1271-1272 (reasoning that reading Marsh to permit only nonsectarian prayers "is contrary to the command of Marsh that courts are not to evaluate the content of prayers absent evidence of exploitation"); Simpson, 404 F.3d at 281 n.3 ("Nothing in Allegheny suggests that it supplants Marsh in the area of legislative prayer.").

145. Marsh, 463 U.S. at 794-95; see also Pelphrey, 547 F.3d at 1281 ("The central concern of Marsh is whether the prayers have been exploited to create an affiliation between the government and a particular belief or faith.").

146. See, e.g., Hobbs Dep. at 198; Walls Dep. at 159.

147. Pls.' Ans. Br. at 31-32.

148. Compare Snyder, 159 F.3d at 1234 (upholding city's refusal to let a citizen give an invocation that derided Christianity, and noting that Marsh prohibits prayer that proselytizes or "aggressively advocates" one religion); see also N.C. Civil Liberties Union Legal Found. v. Constangy, 947 F.2d 1145, 1149 (4th Cir. 1991) (noting that "[l]egislative prayer does not urge citizens to engage in religious practices, and on that basis . . . [is] distinguishable from an exhortation from government to the people that they engage in religious conduct").

149. Snyder, 159 F.3d at 1234 n.10.

150. Compare Wynne v. Twp. of Great Falls, 376 F.3d 292 (4th Cir. 2004) (holding that town council's prayer practice was

unconstitutional under Marsh, where town leaders insisted on referring to Jesus Christ by name in all prayers).

151. Marsh, 463 U.S. at 793-94.

152. Pls.' Ans. Br. at 23-24.

153. Id. at 24.

154. Hattier Dep. at 111.

155. Cf. Nasir v. Morgan, 350 F.3d 366, 374 (3d Cir. 2003) (explaining, in the context of a First Amendment free speech claim, that to satisfy strict scrutiny, a governmental regulation must "further an important or substantial government interest," and "be no greater than necessary for the protection of that interest").

156. See, e.g., Walls Dep. at 40 (the purpose of the prayer opportunity is to "impress upon the importance of a regular meeting, just to ask for guidance in making the proper decisions"); Evans Dep. at 39 (the purpose of the prayer opportunity is to ask for "guidance for the body of the school board, that [it] might make good decisions for [the] school district"); Bireley Dep. at 151 (the purpose of the prayer opportunity is to "ask for Divine guidance for the Board to help them make correct decisions and get them through the meeting in the proper way . . . to make the best decisions for what's best for our students"); Hattier Dep. at 114 (solemnizing means "the idea that we are going to think beyond ourselves, beyond what's happening today and sit down and make absolutely the best decisions we can").

157. See, e.g., Walls Dep. at 52 ("I have no expectation for the audience . . . They can do whatever they wish"); Hobbs Dep. at 207-08 (explaining that he views the Prayer Policy as allowing audience members to get up and leave before the prayer begins, "just not participate," decline to bow their heads, or choose to arrive only after the prayer has concluded).

158. Wilson Dep. at 31.

159. Id.

160. Id. at 31-32.

161. Plaintiffs also argue that certain prayers have explicitly invited the public to participate. In support, Plaintiffs cite the prayer given by Board Member Hattier in August 2004—in which he quoted a letter written by General George Washington in 1783—which Hattier prefaced by "asking all of those here tonight

*to join me in thinking about and understanding his words.*"
Again, in the Court's view, to characterize Board Member
Hattier's request that the audience "join [him] in thinking about
and understanding [General Washington's] words" as proselytizing
or advancing religion, or as indicative of an impermissible
motive in offering prayer at Board meetings, is not plausible.

162. Cf. Bd. of Educ. of Westside Cmty. Schs. v. Mergens, 496
U.S. 226, 249 (1990) ("Even if some legislators were motivated by
a conviction that religious speech in particular was valuable and
worthy of protection, that alone would not invalidate the Act,
because what is relevant is the legislative *purpose* of the
statute, not the possibly religious *motives* of the legislators
who enacted the law.") (emphasis in original).

163. E.g., Hobbs Dep. at 198 (testifying that when a District
family has undergone a death or some other tragedy, "often [the
person giving the prayer] would bless that, you know, they would
say, you're in our thoughts, that family, who's ever gone through
this tragedy is in our thoughts").

164. Defs.' Reply to Pls.' Ans. Br. at 5, Ex. Y (recording of
prayer offered at June 26, 2006 Board meeting).

165. Pls.' Ans. Br. at 3.

166. Pls.' Br. in Support of Mot. for Summ. J. at 18.

167. Id. at 8.

168. Id. at 18.

169. Hastings Dep. at 130-31.

170. Id. at 131-32; accord Hughes Dep. at 88-89 (testifying that
he did not recall ever hearing anyone say that the Board's prayer
practice was about protecting Christian values); Helms Dep. at
214 (same).

171. See Hattier Dep. at 303-04; Helms Dep. at 160-61.

172. See Hattier Dep. at 190-92; Helms Dep. at 76.

173. Hattier Dep. at 191; see also Helms Dep. at 74, 77 ("My
opinion was that we had not received information that said that
what we were doing was illegal and breaking the law.").

174. Snyder, 159 F.3d at 1233; see also Simpson, 404 F.3d at 286
("The [Supreme Court], neither in Marsh nor in Allegheny, held
that the identity of the prayer-giver . . . was what would
'affiliat[e] the government with any one specific faith or

belief.'").

175. <u>Cf.</u> <u>Pelphrey</u>, 547 F.3d at 1281 ("The 'impermissible motive'
standard does not require that all faiths be allowed the
opportunity to pray. The standard instead prohibits purposeful
discrimination.").

176. <u>Marsh</u>, 463 U.S. at 792 (<u>quoting</u> <u>Zorach</u>, 343 U.S. at 313).

177. <u>Lynch</u>, 465 U.S. at 693 (O'Connor, J., concurring).

178. <u>McCreary County</u>, 545 U.S. at 860 n.10.

179. <u>Simpson</u>, 404 F.3d at 287.